UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
───────────────────────────────────X

UNITED STATES OF AMERICA

                                                 23 CR 146 (DG)

- against -


RACHEL CHERWITZ and
NICOLE DAEDONE
                          Defendants.
───────────────────────────────────X

### DEFENDANTS' JOINT MOTIONS *IN LIMINE*

BONJEAN LAW GROUP, PLLC

Jennifer Bonjean, Esq.
Ashley Cohen, Esq.
303 Van Brunt Street, 1st Fl
Brooklyn, NY 11231
(718) 875-1850
jennifer@bonjeanlaw.com

AIDALA, BERTUNA & KAMINS, PC
Imran Ansari
Aidala, Bertuna & Kamins PC
546 Fifth Avenue, 6th Floor
New York, NY 10036
(212) 486-0011
iansari@aidalalaw.com

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………………….    iii

INTRODUCTION……………………………………………………………………    1

BACKGROUND……………………………………………………………………..    1

   A.  Motion *In Limine* to Exclude References to OneTaste as a "Cult" or to Individuals Associated with OneTaste as "Members" or "Leaders."………………    4

   B.  Motion *In Limine* to Exclude Evidence of Spiritual and Religious Beliefs and Practices………..…………………………………………………………………..    8

   C.  Motion *In Limine* to Preclude Reference or Introduction of Irrelevant and/or Highly Prejudicial Evidence with Minimal Probative Value………………………    11

     1.  Evidence or Argument suggesting that Defendants specifically encouraged, persuaded, and/or pressured individuals to have sex with wealthy, influential, or otherwise powerful customers…………………………………………………    12

     2.  Evidence related to the private sexual activity of Defendants, including consensual sex acts of Defendants…………………………………………………..    13

     3.  Evidence or Argument that Defendants marketed OneTaste to people who were vulnerable due to past trauma…………………………………………………    15

     4.  Evidence related to OneTaste's sales tactics as "predatory."…………………..    16

     5.  Evidence of Defendant Daedone's financial condition and/or the sale of OneTaste…………………………..………………………………………………    17

     6.  Evidence of Defendant Daedone's childhood trauma and/or relationship with her father……………………………………………………………………………    18

     7.  All Evidence Regarding Defendant Daedone's Personal Views about Rape and Sexual Assault…………………………………………………………………    19

     8.  Evidence Regarding the Communal Living arrangements of OM Practitioners that Defendants Had No Control Over In Any Event………………………………..    20

     9.  Evidence Related to a Settlement Agreement with a Former OneTaste Employee. …………………………………………………………………………...    22

   D.  Motion *In Limine* to Admit Evidence …………………………………………...    25

i

E.   Motion *In Limine* to Admit Evidence to Rebut Allegations Orgasmic Meditation is Harmful…………………………………………………………………………….   26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ............................................................. 10

*Old Chief v. United States*, 519 U.S. 172 (1997) ............................................. 6, 11, 19

**Statutes**

18 U.S.C. § 1589 ........................................................................................... 3, 12, 25

18 U.S.C. § 3500 ................................................................................................ 3, 17

**Rules**

Fed. R. Crim. P. 16 .................................................................................................. 8

Fed. R. Evid. 401 ........................................................................................... passim

Fed. R. Evid. 403 ........................................................................................... passim

Fed. R. Evid. 408 ................................................................................................. 24

Fed. R. Evid. 701 .................................................................................................. 7

## INTRODUCTION

Defendants, Rachel Cherwitz and Nicole Daedone**,** by and through their attorneys, move *in limine* to bar and admit certain anticipated evidence pursuant to Rules 401 and 403 of the Federal Rules of Evidence, the Due Process and Effective Assistance of Counsel Clauses of the Fifth and Sixth Amendments to the Constitution of the United States, the First Amendment to the Constitution, as well as other authority cited herein.

As of the filing of this motion, the government has provided no bill of particulars, no witness statements, or other § 3500 material. Even the government's so-called *Brady* Disclosures are piece meal, lacking context, and have failed to put the Defendants on sufficient notice of the import of any *Brady* material to the defense of this case. In short, Defendants have not received sufficient notice of the government's evidence or the case against them. Accordingly, Defendants' motion *in limine* is based largely on evidence they anticipate or speculate *could* be introduced at trial. Defendants do not waive their right to move to bar any other evidence that may be revealed when the government makes its § 3500 disclosure nor do they waive their right to bar evidence that takes on new or unexpected meaning with the disclosure of § 3500 material. Similarly, Defendants do not waive their right to admit evidence that may become relevant upon review of the government's disclosure of § 3500 material.

## BACKGROUND

In 2004, Ms. Daedone and her co-founder, Robert Kandell, started Caravan Retreats Inc., a wellness training and education company that was known as OneTaste commencing in 2005. OneTaste was dedicated to women's empowerment, by furthering the practice of OM, and supporting the emerging community of OM practitioners. OneTaste grew rapidly during the period 2010-2018, delivering classes, seminars, workshops, events, and media. Operations

spanned North America and Europe, with a mix of company and independently-owned centers working from the same curriculum. OneTaste hosted over thirty-five thousand in-person event attendees and served more than sixteen thousand course and seminar customers.

In 2017, Ms. Daedone sold OneTaste, in order to focus on writing and content creation. That year, she completed the sale of the entirety of OneTaste to an ownership group whose lives had been completely transformed by the practice of OM. Ms. Daedone then transitioned to book authoring while remaining engaged with OneTaste as an advisor. The new ownership team guided a strategic shift away from in-person events and training to online content and community, book publishing, scientific research, and philanthropic activities. Each of these projects and ventures is informed and inspired by the practice of OM.

Orgasmic Meditation (OM) is a structured, attention-training practice that is performed with another person. This practice follows a predefined set of detailed instructions, which were codified by Nicole Daedone in 2003, and which are set out in the OM Training Manual. The main purpose of OM is to enable practitioners to become completely rooted in the present moment. There are many non-negotiable elements relating to the context and the environment in which OM is carried out, but the fundamental tenet of the practice is, and has always been, the unequivocal consent of both parties. OM is a self-contained practice that is distinct from sexual activity and sexual relationships between practitioners. In fact, this concept is emphasized strongly in OM training materials. There are estimated to be more than two hundred thousand individuals worldwide who have learned the practice of OM.

OM Science: Six peer-reviewed scientific journal papers, and two additional published papers in review, make up a growing body of scientific evidence that substantiates reports by thousands of OM practitioners of marked improvements in health, relationships, and sense of

well being accruing to the practice. To date, studies by scientists from universities such as Thomas Jefferson University and the University of Pittsburgh have found that practicing OM reduces anxiety, decreases negative emotions (while increasing positive emotions), and facilitates greater interpersonal closeness.

On April 3, 2023, a federal grand jury sitting in the Eastern District of New York returned a one-count indictment charging defendants Nicole Daedone and Rachel Cherwitz with a forced labor conspiracy in violation of Title 18, United States Code, Sections 1589(a)-(b), 1594(b), and 3551 *et seq.* [Dkt. No 1] Trial in this matter is currently scheduled to commence on January 13, 2025.

18 U.S.C. § 1589(a), in relevant part as charged, proscribes knowingly and intentionally conspiring to provide and obtain the labor and services of one or more persons by means of, and by a combination of means of: (i) force, threats of force, physical restraint and threats of physical restraint to a person; (ii) serious harm and threats of serious harm to a person; (iii) the abuse and threatened abuse of law and legal process; and (iv) one or more schemes, plans, and patterns intended to cause a person to believe that, if he or she did not perform such labor and services, a person would suffer serious harm and physical restraint.

18 U.S.C. § 1589(b), likewise, proscribes the same with respect to benefitting, financially and by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any such means, knowing, and in reckless disregard of the fact, that said venture has engaged in the providing and obtaining of labor and services by any such means.

A.      **Motion *In Limine* to Exclude References to OneTaste as a "Cult" or to Individuals Associated with OneTaste as "Members" or "Leaders."**

Defendants, jointly and respectfully request that this Court enter an order, *in limine*, precluding any reference to OneTaste as a "cult," individuals associated with OneTaste as "members" or "leaders," or similar prejudicial and inflammatory characterization from the government or any of its witnesses in the presentation of evidence and argument at the upcoming trial. Generally speaking, Section 1589(b) of the forced labor statute requires the government to prove that a defendant knowingly benefitted from his participation in a venture which obtained labor or services through force/ threats of force or through threats of serious harm. According to the government's indictment, the Defendants here conspired to "obtain the labor and services of a group of OneTaste members by subjecting them to economic, sexual, emotional and psychological abuse; surveillance; indoctrination and intimidation." [Indictment ¶ 6] In its indictment and throughout its pleadings, the government has repeatedly referred to OneTaste in a manner that signals its view that OneTaste is a cult. The government refers to people who worked at OneTaste who took classes with OneTaste as "members" and has referred to the executive staff of OneTaste as "leaders."

Any evidence or argument stating, suggesting, alluding to, directly or indirectly, an allegation that OneTaste is a "cult" or similar characterization should be precluded *in limine* on the grounds that it is irrelevant. Similarly, referring to individuals associated with OneTaste as "members" – as the government has done throughout its indictment and continues to do in briefs, filings and argument before the Court is factually inaccurate (since the company had employees and customers, but never "members") but also feeds into the "cult" narrative that is extremely prejudicial.

4

Rule 401 of the Federal Rules of Evidence states that "relevant evidence" is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." At no point in the course of this trial will the government be required to prove that OneTaste was a "cult," or any of the defendants participated in a "cult." It is not an element of the charged forced labor conspiracy the government is required to prove, and nor does it otherwise advance the government's proof as to the elements of the charged offense. Indeed, 18 U.S.C. § 1589 uses the term "venture," and attaches to it only a requirement that the venture "has engaged in the providing or obtaining of labor or services" in the manner proscribed therein, such as through force, threats, and harm. Even if the government could persuade that there is some probative value to referencing OneTaste or any of its employees/customers in a manner indicative of a "cult," the probative value is substantially outweighed by its prejudicial effect. Fed. R. Evid. 403. Referencing "cults," "members," or "leaders" and similar terminology during trial would inject overwhelming prejudice to the Defendants and interfere with their ability to obtain a fair trial.

The term 'cult' encompasses a vast spectrum of meanings in popular culture and academic discourse, ranging from benign enthusiast communities (such as devoted fans of technology brands, fitness regimens, or even political parties) to new religious movements, to—in its most extreme and rare manifestations—destructive groups that have ended in tragedy. In sociological literature, the term is often used neutrally to describe novel religious or social movements, without inherent negative connotation.

While generally avoiding direct use of the term 'cult', the government has persistently employed a constellation of over fifty terms, concepts, and allusions that evoke the most negative associations of pernicious cults. This strategy, unsupported by factual foundation, serves to

create a prejudicial narrative by exploiting culturally loaded language and concepts. The government's approach sidesteps the term's broad and often neutral applications in social science and popular usage, instead weaving a tapestry of insinuation that primes the jury to draw unfounded and damaging conclusions about the defendants."

At bottom, the government must be precluded from expressly using the word cult *and* from using words meant to insinuate that OneTaste is a cult rather than a corporation. These labels have nothing to do with the charged offense and the trier of fact will not be asked to decide whether OneTaste is or is not a "cult." Indeed, the jury which will surely contain individuals with divergent sociocultural understandings and knowledge about the history of cults which should play no role in their decision making in connection with the charged offense.

In addition to the possibility of unfair prejudice along these lines, such evidence and testimony would risk juror confusion over the triable issues in this case or otherwise mislead them, and further, prove a source of undue delay.  Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  Planting the idea in the minds of jurors that OneTaste was a "cult" in which employees and/or customers became "members" would no doubt inflame the emotions of the jury and lead to determinations of the Defendant's guilt on an improper basis. Under U.S. law there is no specific definition of a "cult," and cults are not inherently illegal. In fact, they are arguably protected under the First Amendment. The First Amendment freedom of assembly protects the right to gather and organize with people who share the same views, ideas, or beliefs. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449 (1958). Similarly, the government must be barred from suggesting any correlation between communal living and cult involvement. Just as cults are not inherently

illegal, neither is communal living. And most importantly, there is no connection between communal living and cults.

Simply put, any terminology suggesting that OneTaste is a "cult" is wholly unnecessary and would deeply undermine Defendants' Due Process guarantees. The government can easily differentiate between OneTaste employees and customers, neither of whom were "members" (as OneTaste never was a membership-based organization). Attempts to conflate the two categories would only confuse the jury and inject unfair prejudice into the trial. Referring to employees as employees, customers as customers and executives as executives is factually accurate. More importantly, such neutral language will keep the categories clear to the jury without risking prejudice to the Defendants.

Finally, evidence or testimony describing and/or comparing OneTaste to a "cult" would also constitute improper opinion testimony. Whether a religious, wellness, spiritual, or other group or community constitutes a "cult"—and what dynamics and features of that group that qualify it as a "cult" is a complex, academic area of inquiry and requires scientific, technical, or other specialized knowledge to form a supportable opinion. Lay witnesses could therefore not offer any such opinions without violating Fed. R. Evid. 701(c). Any given witness's opinion as to whether OneTaste is a "cult," or whether individuals associated with OneTaste are customers, "members," or something else, are not questions the jury is going to be asked to resolve, and nor would such opinions aid in that task. Such testimony would therefore prove irrelevant. Instead, and again, it would risk juror confusion and unfair prejudice, and thus should be precluded under Rule 403. Jurors cannot be permitted to go back to jury room and debate what is and what is not a cult which would invariably occur if the government utilizes language that signals to the jury that OneTaste is a cult.

The government has filed an expert witness disclosure pursuant to Fed. R. Crim. P. 16(a)(1)(G) providing notice of its intent to call a psychologist, Dr. Chitra Raghavan, to testify regarding methods of "coercive control." [Dkt. 148] Defendants are simultaneously moving to preclude this testimony, but to the extent that the government intends to elicit such testimony from Dr. Raghavan, these objections would apply with equal force:  referring to OneTaste as a "cult," individuals associated with OneTaste as "members" or "leaders," or similar prejudicial and inflammatory characterizations are irrelevant within the meaning of Rule 401, and any conceivable relevance such testimony would have is substantially outweighed by the risk of unfair prejudice, juror confusion, misapprehension, and undue delay pursuant to Fed. R. Evid. 403.

Based on the foregoing, it is respectfully requested Court enter an order, *in limine*, precluding any reference to OneTaste as a "cult" or similar prejudicial and inflammatory characterization from the government or any of its witnesses in the presentation of evidence and argument at trial.

If the government is permitted to use the 'cult' language, Defendants must be afforded the opportunity to rebut that evidence through testimony regarding experiences of the thousands of students and customers who had no "cult like" experiences.

**B.     Motion *In Limine* to Exclude Evidence of Spiritual and Religious Beliefs and Practices.**

Since the outset of this case, the government has used underhanded rhetoric to suggest that OneTaste is a cult and has characterized the sincerely held spiritual and religious beliefs and practices the company promoted as an insincere "guise" to obtain control over its employees'

and customers' lives.[1] In reality, OneTaste consistently taught the importance of female empowerment and encouraged students to explore teachings from a number of the world's leading religions. (Even the name "OneTaste" comes from a Buddhist saying about the unity of all things.) Several of OneTaste's courses drew from Buddhist traditions, including an emphasis on traditional practices such as breathing and meditation, while other courses drew on core tenets from Judaism, Christianity, and Hinduism. None of these teachings, as the government contends, constitute "indoctrination" or an effort to obtain "complete control over their employees' lives." *Id.* The Court should preclude the Government from making improper arguments that attack OneTaste's religious and spiritual beliefs and practices or offering evidence to suggest that such beliefs and practices were used to exercise coercion over OneTaste students or employees.

Evidence regarding spiritual and religious beliefs and practices is also irrelevant to the single-count forced labor conspiracy that the government has charged in this case. In order to be relevant, evidence must have a tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401.

The government should be precluded from attacking OneTaste's religious and spiritual beliefs and practices in any form, including by characterizing OneTaste's course material as Daedone's "teachings" or "ideology." Indictment, ¶ 7(d) (OneTaste "demanded absolute commitment to DAEDONE, including by exalting DAEDONE's teachings and ideology"). Evidence about the contents and nature of Daedone's "teachings and ideology"—presumably including evidence attacking beliefs she holds, which are shared by millions around the word—is entirely irrelevant to whether specific former employees of OneTaste were forced to labor.

---

[1] USDOJ Press Release: OneTaste Founder and Former Head of Sales Indicted for Forced Labor Conspiracy, June 6, 2023 (https://www.justice.gov/usao-edny/pr/onetaste-founder-and-former-head-sales-indicted-forced-labor-conspiracy).

Such attacks on Ms. Daedone's spiritual and religious beliefs and practices are highly prejudicial and risk an unnecessary detour that will require the defense to present evidence regarding the validity of these religious beliefs and spiritual practices. Fed. R. Evid. 403. For example, should the Government offer evidence attacking OneTaste's teaching regarding traditional Buddhist meditation and breathing exercises as an "effort to control" its employees, the defense will be required to offer contrary evidence regarding the many benefits of these practices, including scientific studies regarding health benefits of such practices. Such a detour is unnecessary.

In addition to violating Rules 401 and 403, the Government's plan to offer evidence attacking the Defendants' spiritual and religious beliefs and practices also runs afoul of the First Amendment's protections of speech and religion. U.S. Const. Amend. I. The Constitution expressly prohibits the Government from "prohibiting the free exercise" of religion. *Id.* The Supreme Court has held that the Free Exercise Clause embraces two concepts: "freedom to believe and freedom to act." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The First Amendment also protects an individual's right to express his or her religious beliefs to others. Permitting the Government to argue in a criminal case that the Defendants' spiritual and religious beliefs and practices constitute evidence of a conspiracy to obtain labor by force interferes with the free exercise of religion and the freedom of speech.

If the government is not precluded from presenting evidence of the Defendants' spiritual and religious beliefs, the Defendants must be permitted to present evidence in support of these beliefs. For the foregoing reasons, Defendants move this Court for an order precluding the government from offering evidence regarding spiritual and religious beliefs and practices.

**C.    Motion *In Limine* to Preclude Reference or Introduction of Irrelevant and/or Highly Prejudicial Evidence with Minimal Probative Value.**

Discovery tendered to date has provided some indication that the government may seek to call witnesses to testify about evidence that is irrelevant to the charged offense. This evidence will not assist the jury in determining whether the Defendants knowingly and intentionally conspired to obtain labor by means of force, nor will it be probative of whether they received anything of value from the alleged conspiracy. Plainly, the evidence discussed below is not relevant to the charged conduct and must be excluded pursuant to Rule 401 of the Federal Rules of Evidence.

Rule 401 of the Federal Rules of Evidence states that "relevant evidence" is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

Even if the proffered evidence had such a tendency to make a consequential fact more or less probable (it does not), the evidence is impermissibly prejudicial to Defendants and must be excluded under Rule 403 of the Federal Rules of Evidence. Rule 403 permits exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). All Rule 403 concerns are present here.

The government should be precluded from presenting the following evidence or testimony, *in limine*, because it would prove irrelevant and, moreover, because any tangentially potential relevance is eclipsed by its prejudicial impact on the Defendants:

11

**1.    Evidence or Argument suggesting that Defendants specifically encouraged, persuaded, and/or pressured individuals to have sex with wealthy, influential, or otherwise powerful customers.**

As the Indictment suggests, the government seeks to present evidence that Defendants used pressure or persuasion to urge employees to have sex with wealthy or influential customers. The allegation is patently false, but assuming its truth for the purpose of these motions, such evidence is irrelevant where the charged forced labor conspiracy only contemplates labor obtained through the means set forth in Subsection (a) of 18 U.S.C. § 1589. Evidence of ostensibly forced acts of labor obtained through means such as invitations, persuasion, or even pressure falls outside the charged conduct and would thus prove irrelevant.  Moreover, such conduct, which is clearly reminiscent of prostitution, is not a separately charged offense in this case. The government should not be permitted to insinuate that Defendants were engaged in facilitating prostitution, when no such crime is alleged.

Furthermore, evidence suggesting that Defendants specifically encouraged, persuaded, and/or pressured individuals to have sex with wealthy, influential, or otherwise powerful customers does not on its face rise to the means described in § 1589(a). Such evidence would also require the defense to present evidence to clarify for the jury that any such sexual activity was consensual, consuming valuable trial time on issues that have little relevance to the charged forced labor conspiracy. The presentation of such evidence at trial would also create a risk that the jury might misunderstand the nature and elements of the offense they are considering and allow for the possibility of conviction based upon lesser conduct. For similar reasons, such evidence would prove distracting, misleading, and carry a risk of unnecessarily prolonging the trial and distracting from the presentation of otherwise relevant evidence and arguments.

If the government is permitted to introduce evidence and claims that employees were forced to have sex with people based on favorable economic status, Defendants must be allowed

to present evidence that OneTaste customers and students came from all socio-economic backgrounds and that irrespective of socio-economic background, OneTaste preached a fundamental tenet of consent. OneTaste was an environment of inclusivity and people were not segregated or encouraged to have sex, let alone based on socio-economic status.

      **2.**      **Evidence related to the private sexual activity of Defendants, including consensual sex acts of Defendants.**

The same holds true for evidence regarding Defendants' personal, consensual sexual activities, their attitudes about sex, and their religious beliefs.  Whether Defendants engaged in consensual sex acts and how they felt about sex and sexuality are of no consequence for the jury in determining if they engaged in a forced labor scheme. It should go without saying that that someone who has sex, or believes sex is a positive activity, has any correlation to engaging in a forced labor conspiracy. Instead, any such testimony would be offered simply to paint the defendants in a negative light and would amount to improper character evidence.  Moreover, evidence regarding Defendants' personal, consensual sexual activities, their attitudes about sex, and their religious beliefs would serve only to prejudice Defendants and confuse jurors with issues immaterial to the trial. This testimony has no place in this trial.

The government appears intent to introduce this evidence at trial, as evidenced by their Rule 16 disclosures.  Within that discovery, the government has produced evidence of consensual activity between Defendant Daedone and a close friend (A.P) that is wholly irrelevant to the charged conduct. A.P. has already filed a declaration in this case (ECF 113, Exh. O) stating that the activity was entirely consensual, so there is no reason for the Government to offer the evidence other than to portray Ms. Daedone as a deviant and prejudice the jury against her. In another example, the government has produced evidence related to Ms. Daedone's *personal* experience with "unconditional sex," a project Ms. Daedone labeled for herself in which she

13

endeavored to explore *her own sexuality* by having multiple sexual partners over the course of a year. Ms. Daedone's personal exploration of her own sexuality through consensual encounters with other adults are entirely irrelevant to alleged forced labor conspiracy. Allowing the government to introduce this evidence would not aid the jury in determining whether the Defendants engaged in a forced labor conspiracy but would, instead, inflame the emotions of the jury and unfairly prejudice the Defendants.

Accordingly, the government should be precluded from using the following evidence at trial:

- Evidence related to a private, consensual sexual encounter between Ms. Daedone and other consenting adults, such as A.P.

- Evidence related to Ms. Daedone's writings about period of explorations that she entitled a year of "unconditional sex" or her views on the practice itself

- Evidence related to either Defendants' views on sex, sexuality, or their spirituality or religious beliefs

- Evidence related to either Defendants' views on rape and/or trauma

- Evidence related to past sexual partners of either Defendant

- Any Evidence that is disclosed in the government's § 3500 material that is irrelevant or unduly prejudicial

### 3. Evidence or Argument that Defendants marketed OneTaste to people who were vulnerable due to past trauma.

Defendants were executives at a fast-growing, wellness company dedicated to helping people access greater consciousness and connection with their own bodies and with their partners through the practice of orgasmic meditation. OneTaste began in 2004 and started growing rapidly in 2011 after Ms. Daedone gave a TedX talk that was seen by millions, published a book

14

and was the feature of a NYT article. Despite its best efforts, OneTaste never employed traditional marketing teams and instead grew based on word-of-mouth referral and grassroots marketing efforts.

OneTaste, got its message out to potential customers by hosting local and national events, workshops and classes that were open to the public through signing up in advance either on-line or through a company salesperson. At times, OneTaste employees would stand on the sidewalk in matching t-shirts, handing out flyers and information to anyone who walked by. Other times, OneTaste employees would post about events on sites like Meetup.com. The practice and company were profiled in various lifestyle magazines. OneTaste's strategy was and always has been to get the message of the benefits of orgasmic meditation to as wide of an audience as possible. Indeed, OneTaste customers came from all backgrounds, ages, genders, races, professions and regions of the country and internationally. At no time did OneTaste market itself to any specific population, let alone to individuals who were vulnerable due to past trauma. Tellingly, the government's discovery to date is bereft of evidence that would suggest otherwise.

While it is not yet clear to Defendants what evidence the government may introduce to show that they targeted vulnerable people, the indictment alleges that Defendants, "intentionally recruited individuals who had suffered prior trauma to participate in OneTaste." It appears from the indictment and the discovery to date, that the government intends to prove this outrageous allegation in a backhanded way – by showcasing OneTaste's stated belief, backed up by scientific evidence, that the practice of orgasmic meditation could address past trauma. The government cannot and has not provided any universally understood definition of "trauma" or "vulnerability." Of course, trauma can range from childhood bullying to parental divorce to child

sexual abuse. It is also person specific. What is traumatic to one is not necessarily traumatic to another. Vulnerability also eludes definition. Even if the government could define these concepts in a universally-accepted way, it does not follow that Defendants did, or could, target such individuals.

### 4. Evidence related to OneTaste's sales tactics as "predatory."

Defendants believe that the government may seek to introduce evidence that OneTaste's sales practices were somehow "predatory." Indeed, the Indictment alleges that Defendants "induced the OneTaste members, including OneTaste employees, to incur debt, and at times facilitated the OneTaste members in opening lines of credit, to finance expensive OneTaste courses that the defendants knew the OneTaste members could not afford." To suggest that this practice – whereby an organization selling courses and other educational programs facilitates its customers to incur debt to finance their studies – is predatory would make every college, university, amusement park, mega-store, and trade school in the country guilty of "predatory" sales practices. As the government and this Court are aware, people purchase things they cannot afford every day; indeed, the entirety of the credit card industry is premised on this very idea. And profit-making corporations regularly take advantage of that practice by offering financing, credit, payment plans and loans to customers who want to buy their products but can't afford them. Additionally, permitting the Government to argue that OneTaste's sales practices were "predatory" would require Defendants to offer contrary evidence regarding the value that customers obtained from the company's classes, a detour that is not necessary should this argument be precluded.

Moreover, it is wholly irrelevant to the charged conduct whether Defendants encouraged individuals to take on debt to buy classes or courses – unless the government's theory is that "taking courses" amounts to labor.

16

Unless the government can put forth compelling reasons that "taking courses" amounts to labor, and that Defendants' sales practices were atypical, the government should not be permitted to introduce evidence characterizing this practice as outside the ordinary or "predatory" when such evidence would be misleading, confusing and prejudicial to the Defendants.

     5.      **Evidence of Defendant Daedone's financial condition and/or the sale of OneTaste**;

Defendants expect that the government will seek to introduce evidence related to Defendant Daedone's financial status and the amount of money she received upon the sale of OneTaste because Rule 16 discovery is replete with subpoenaed bank records and other documents purporting to relate to the financial condition of Defendant Daedone.  However, these records do not reflect transactions related to the acts alleged in the conspiracy. The documents do not purport to reflect the sources of funds in the accounts, nor do they reflect any nexus between the charged conduct and any funds that made their way to Defendant Daedone.   Notably, during the period of the alleged conspiracy, OneTaste was the employer of any alleged victim-employee.  Defendant Daedone was herself an employee, serving as OneTaste's CEO, and an owner of the company.  During her time as CEO, Defendant Daedone drew a salary averaging less than $50,000 per year.

Furthermore, even if the Court were to find that some of the documents reflecting Defendant Daedone's financial condition are relevant to the charged indictment, the introduction of her financial condition may unduly prejudice a jury and bears the substantial risk of confusing the jury and misleading them to draw conclusions based on the financial status of the Defendants rather than evidence related to the charged offenses. Introducing evidence that Ms. Daedone sold OneTaste for millions of dollars is only useful to portray Daedone as a wealthy person and to prejudice the jury against her for that reason. It should not be permitted.

This is not a situation involving unexplained wealth; there is no dispute that Ms. Daedone, as owner and co-founder, received proceeds from the sale of OneTaste. Under the circumstances, the only reason to introduce evidence of Ms. Daedone's wealth or to allow the jury to hear how much Defendant Daedone received from the sale is to suggest improperly that the source of Defendant Daedone's wealth, or the valuation of OneTaste prior to the sale,  is related to the acts alleged in the indictment.

Absent evidence showing a clear nexus between the charged conduct and specific funds or financial transactions, evidence related to Defendant Daedone's financial condition and/or the terms of the sale of OneTaste are irrelevant to the charged conduct and should be excluded from trial.  Any attempt by the government to insinuate that Defendant Daedone's wealth is a product of her allegedly criminal conduct would be mere conjecture and serve only to prejudice her standing in the eyes of the jury.

**6.    Evidence of Defendant Daedone's childhood trauma and/or relationship with her father;**

The government should not be permitted to introduce evidence related to Daedone's own alleged childhood or her prior statements regarding her father.  Defendant Daedone has spoken publicly and extensively about her experiences growing up as the daughter of a convicted child molester.  These statements were made in the context of describing her personal story and journey and, while true, are of no consequence in this trial.  Such evidence would not aid the jury in determining whether the Defendants engaged in a conspiracy to benefit from the forced labor of individuals who Daedone met well into her adult life and is plainly irrelevant.  Moreover, this evidence would undoubtedly shock the jury and stir up emotions that could lead jurors to make decisions on an improper basis. *See, Old Chief v. United States*, 519 U.S. 172, 180 (1997).

18

Based on the foregoing, Defendants, through counsel, respectfully request that the Court enter an order precluding the government from presenting the above evidence because it is irrelevant or more prejudicial than it is probative.

**7.      All Evidence Regarding Ms. Daedone's Alleged Views about Rape and Sexual Assault.**

Defendant Daedone has publicly acknowledged that her father died in prison awaiting sentencing for crimes of child sexual abuse. She has spoken extensively about her own experiences of sexual abuse by her father. Like many survivors of sexual abuse, Daedone has sought to reclaim her identity by rejecting the "victim" label that society applies to people who experienced sexual abuse. Daedone has spoken several times about her personal story, including at OneTaste courses, where she has discussed how her personal experience informed her views about how society treats survivors of sexual abuse and the need for women to reject the "victim" label and own their stories. She has never forced her views on others and has merely shared her own experiences so that others might benefit from them.

Ms. Daedone's personal experience as a victim of sexual abuse—as well as her personal views that were shaped by those experiences—is entirely irrelevant to the charged criminal conduct in this case. Nevertheless, the Government has indicated it may seek to introduce evidence of Daedone's personal views about the topics of rape and sexual assault. Such evidence is entirely improper, and the only possible rationale is for the Government to paint Ms. Daedone in a negative light in order to prejudice the jury against her.

This Court should bar the government from presenting any evidence concerning Daedone's personal views of rape and sexual assault. Rule 402 provides that irrelevant evidence is not admissible. Rule 401 provides that evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Neither Ms.

19

Daedone's personal experience as a victim of sexual assault, nor her resulting personal views on the subject of sexual assault and rape, have any relevance whatsoever in this case.

The only plausible rationale for the government to offer evidence of Ms. Daedone's personal experiences—or her resulting personal views on the topics of rape and sexual assault— is the hope that hearing about Ms. Daedone's views may prejudice the jury against her. Such evidence is not probative of any fact of consequence in this case, and its value is far outweighed by the risk of unfair prejudice. It should therefore be excluded.

### 8.    Evidence Regarding the Communal Living arrangements of OM Practitioners that Defendants Had No Control Over In Any Event.

Over its 14-year history, more than 35,000 people took OneTaste courses in one form or another. The vast majority of these people took one or two courses and moved on. However, as with other practices such as yoga and meditation, some individuals decided to dive deep and make Orgasmic Meditation ("OM") a major part of their lives.

A small subset of these individuals, about 400 people in total over the company's 14-year history, decided to move in with other OM practitioners in residences known as "OM houses." Living in an OM house was never required by OneTaste, and individuals who decided to live together with other OM practitioners managed their own living arrangements, including selecting roommates and determining how their communal living arrangements operated. While OneTaste signed the lease on two of the 33 known OM houses (to provide a convenient place for staff to live when the company expanded to a new city), the company was not involved in managing any of the properties.

Some OM houses included mainly OneTaste employees, while others were open to anyone, and often included friends who were entirely unaffiliated with the company or the practice of OM. OM houses were far from monolithic. Many, such as the "Brooklyn OM house"

at the center of this case, were organized without any involvement by the company at all—a group of friends who shared an interest in OM simply decided to live together and called their apartment an "OM house."[2]

Despite there being no evidence that anyone was ever forced to live in an OM house, the government has persisted in alleging that OM houses were central to the forced labor conspiracy charged. Indictment, ¶ 7(c) (Defendants "subjected the OneTaste members to constant surveillance in communal homes that OneTaste oversaw."). The Court should preclude the government from arguing without evidence that OneTaste "oversaw" the OM houses or implying without evidence that Defendants or OneTaste had anything to do with individuals who elected to live together with their friends.

The voluntary living arrangements by OM Practitioners are entirely irrelevant to the criminal charge in this case. The fact that groups of people who shared an interest in OM decided to live together in apartments is entirely irrelevant to the charged forced labor conspiracy. There is no evidence that Ms. Daedone or Ms. Cherwitz were involved in organizing or managing these communal living arrangements. The Government should be precluded from arguing that, just because the residents shared an interest in OM, that Defendants must have exercised some kind of control over these voluntary living arrangements.

Rule 401 provides that evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. The fact that people

---

[2] The Government appears to conflate the "OM houses" (including the Brooklyn OM house) where individuals elected to live together and independently managed their apartments, with the "Warehouse," an experimental living space in San Francisco where Daedone and other founders of the company themselves lived from 2006 to 2009.

interested in OM decided to live together in shared apartments without the involvement of Ms. Daedone or Ms. Cherwitz has no bearing on any fact of consequence in this case. Furthermore, the Government's attempt to argue that Daedone and Cherwitz "controlled" OM houses simply because residents of OM houses shared an interest in OM is also unduly prejudicial and should be excluded under Rule 403.[3] In addition to being prejudicial, this argument also has the potential to confuse the issues and mislead the jury, because the voluntary living arrangements that individuals elected to join have nothing to do with whether the Defendants conspired to obtain labor by force. Accordingly, this Court should preclude all evidence related to the communal living arrangements of OM Practitioners and bar the government from suggesting in any fashion that Defendants had any role in overseeing these OM houses.

### 9. Evidence Related to a Settlement Agreement with a Former OneTaste Employee.

In August 2015, a former employee of OneTaste sent a demand letter to the company threatening to bring a sexual harassment claim under California law and requesting millions of dollars in damages. Notably, the former employee's claims did not include any of the most serious allegations she now makes as a Government witness in this case or in the media, even though the demand letter was sent shortly after her employment ended and she was financially incentivized at the time to include all relevant claims. Recognizing the cost of litigation, OneTaste reached a settlement with the former employee in December 2015 for $325,000, a

---

[3] While OneTaste was involved in setting up and organizing the "Warehouse" experimental living facility that operated from 2006 to 2009, which participants also voluntarily joined, this was entirely unrelated to the voluntary community OM houses that proliferated in later years.

small fraction of the millions she originally sought. The agreement specified that OneTaste denied all the former employee's allegations and did not admit liability.

Evidence of this settlement agreement should be excluded for several reasons—because it is irrelevant under Rule 401, unfairly prejudicial under Rule 403, and because Rule 408 prohibits using settlement offers to prove the validity of the underlying claim. The settlement agreement with the former OneTaste employee should be excluded because it is plainly irrelevant under Fed. R. Evid. 401. Neither defendant in this case was involved in the settlement discussions, and OneTaste entered into the settlement purely to avoid the cost of litigation, and the negative publicity associated with such a claim being made. The weakness of the former employee's claims is made clear by the fact that she settled for a small percentage of what she originally sought. Were evidence of the settlement agreement to be admitted at trial, Defendants would be required to offer evidence from the OneTaste executives who made the decision to settle, to explain that it was made for business purposes to avoid the cost of litigating the claims, which was expected to exceed the "nuisance" value for which the company settled the claim.

Given the risk that the jury may misunderstand a $325,000 settlement—when millions were originally sought—as an admission of liability, Defendants would be required to offer witness testimony, perhaps from an expert familiar with employment disputes, to contextualize the amount and make clear that the value is consistent with the company determining the former employee's claims were false but wishing to avoid the significant cost of litigating even false claims. Defendants would also be required to relitigate the former employee's 2015 claims by calling witnesses to rebut the false allegations she made.

The Settlement Agreement must also be excluded under Rule 403. Admitting evidence of the settlement agreement between OneTaste and the former employee would also be unfairly

prejudicial, because doing so would suggest it an admission of liability, even though the true reason the company settled the claim was to avoid the cost of litigation. Clarifying this point would require a time-consuming detour into the company's decision making in 2015 about how it handled an employment dispute, an issue that has nothing to do with the underlying criminal charge in this matter.

This detour would also require Defendants to offer additional fact evidence regarding the former employee and the claims she made at the time in order to contextualize the company's decision to settle. Were the Court to admit this evidence, there is significant risk the jury would confuse the issues and mistakenly conclude that the Defendants must be guilty of the charged crime because the company settled an unrelated civil dispute years earlier. Evidence of the settlement will create a sideshow around the amount of the payout and its justifications, as the jury may incorrectly assume that OneTaste did something wrong merely from the size of the payout.

Lastly, the settlement agreement should be excluded under Rule 408, which prohibits the use of evidence of a party's "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim" in order "to prove the validity or amount of a disputed claim[.]" Fed. R. Evid. 408(a). Admitting this evidence to suggest that Defendants admitted wrongdoing via OneTaste's decision to settle would plainly violate Rule 408. It would also ignore the myriad reasons that can inform a settlement agreement, such as an effort to mitigate damages in response to potential litigation risk. For the foregoing reasons, Defendant Daedone requests that the Court enter an order excluding evidence of the settlement agreement reached between OneTaste and the former employee.

D.      **Motion *In Limine* to Admit Evidence Regarding the Disputed Question of "Serious Harm."**

The Government's case is premised on testimony from a few disgruntled former OneTaste employees who are expected to testify they thought they would suffer "serious harm" if they take certain actions associated with their jobs or engaged in conduct that was never expected of them. (Indictment, ¶ 12(a).) These few employees represent just a tiny fraction of the hundreds of employees who worked at OneTaste for more than a decade, and for each one, their unhappiness is clearly traceable to another source—from anger over a failed romantic relationship to resentment that Daedone, not they, received the public credit for founding OneTaste and spreading the practice of Orgasmic Meditation.

Fortunately, this case doesn't turn on the jealousies or lingering resentments of a few disgruntled former employees. The statute defines "serious harm" objectively, not subjectively. 18 U.S.C. § 1589(c)(2). Specifically, "serious harm" is defined as harm that is "sufficiently serious, under all the surrounding circumstances, to compel a **<u>reasonable person of the same background and in the same circumstances</u>** to perform or to continue performing labor of services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2) (emphasis added). To understand what a reasonable person would have experienced, the Court must admit not only the testimony of the government's intended "victims," but also the testimony of the many former OneTaste employees who worked and lived alongside them, who will testify that nobody was ever forced to do anything at OneTaste, and that employees were free to leave OneTaste—and, in fact, did leave is highly relevant to the charged crime and is critical to Daedone's defense.

E.      **Motion *In Limine* to Admit Evidence to Rebut Allegations Orgasmic Meditation is Harmful.**

This case is not about Orgasmic Meditation ("OM"). It is about whether the Defendants conspired to obtain forced labor, which they certainly did not. However, the Government has repeatedly indicated that it intends to impugn the OM practice, those who taught it and those who engaged in it. The government's communications and filings suggest it believes that no one would engage in the OM practice were there not a financial motive or coercive relationship dynamic at work that would lead them to do so. The Defendants anticipate the government will offer misleading evidence that the practice of OM is purely a sexual activity, that it is harmful, and is somehow used to "control" and exploit "vulnerable" individuals. To the extent the Government seeks to introduce such evidence, Defendants must be permitted to offer contrary evidence demonstrating the beneficial nature of the OM meditative practice.

OM is a structured attention-training practice that involves involving two consenting adults at least 18 years of age or older, that is strictly based on safety protocols established with regard to time, position, communication, sequence, and sanitation. It is not practiced for sexual gratification but rather to develop an individual's personal wellbeing by improving connections between mind and body. Multiple independent studies by leading researchers have shown that the OM practice confers positive effects on emotional health, interpersonal closeness, and other areas of physical and mental wellbeing. Notably,  a 2016-2018 study conducted by the University of Pittsburgh and Liberos involving 250 OM practitioners found that OM decreases negative emotions, such as anger and anxiety, and increases happiness.[4] A 2019-2021 study, conducted at Thomas Jefferson University using state of the art brain imaging (fMRI) found that the OM practice creates neural connections between regions of the brain responsible for self-

---

[4] Prause N, Siegle GJ, & Coan J (2021) Partner intimate touch is associated with increased interpersonal closeness, especially in non-romantic partners. *PLoS ONE, 16*(3): e0246065. https://doi.org/10.1371/journal.pone.0246065

judgment and cognition.[5] Additionally, a 2021 study demonstrated that OM significantly effectuates 'mystical experiences' as measured by the Johns Hopkins developed MEQ protocol.[6] Higher MEQ scores have been associated with greater symptom reduction and improved quality of life across various conditions including Post-Traumatic Stress Disorder ("PTSD"), cancer-related distress, substance use disorders, and depressive disorders (including treatment-resistant depression).

An important finding from the published studies is that the OM meditative practice significantly differs from sexual activity and is closely related to other forms of meditation.[7] Brain imaging studies show that OM practitioners exhibit neural activity more similar to meditation than to sexual arousal. Survey studies of 414 OM practitioners reveal that they view OM "as significantly more similar to meditation than to sex." [8] Should the Government seek to offer evidence that OM is not a beneficial meditative practice, or that the Defendants made false or fraudulent claims about the practice, the Defense should be

---

[5] Newberg, A. B., Wintering, N. A., Hriso, C., Vedaei, F., Stoner, M., & Ross, R. (2021). Alterations in functional connectivity measured by functional magnetic resonance imaging and the relationship with heart rate variability in subjects after performing orgasmic meditation: An exploratory study. *Frontiers in Psychology, 12*, 708973. https://doi.org/10.3389/fpsyg.2021.708973

[6] Siegel, V., & Emmert-Aronson, B. (2021). Both partners practicing orgasmic meditation report having a mystical-type experience: Results using the Mystical Experience Questionnaire [version 1; peer review: awaiting peer review]. *F1000Research, 10*, 638. https://doi.org/10.12688/f1000research.53496.1

[7] Newberg, A. B., Wintering, N. A., Hriso, C., Vedaei, F., Stoner, M., & Ross, R. (2021). Alterations in functional connectivity measured by functional magnetic resonance imaging and the relationship with heart rate variability in subjects after performing orgasmic meditation: An exploratory study. *Frontiers in Psychology, 12*, 708973. https://doi.org/10.3389/fpsyg.2021.708973

[8] Siegel, V., Roth, C., Bolaza, E., et al. (2022). Is orgasmic meditation a form of sex? Practitioners of orgasmic meditation view the practice as significantly more similar to meditation than to sex or fondling [version 1; peer review: awaiting peer review]. *F1000Research, 11*, 263. https://doi.org/10.12688/f1000research.109522.1

permitted to rebut these accusations by offering evidence that OM has been scientifically studied and found to confer significant health benefits.

The Government also falsely asserts that OneTaste sought to obtain the labor of employees by targeting people who "had suffered prior trauma." (Indictment, ¶ 7(a).) Not only is this factually inaccurate, because OneTaste never intentionally recruited people with trauma, but it also is logically incoherent, because the existing scientific data shows that, rather than making making people with past trauma more vulnerable, OM may, in fact, speed recovery for people who have experienced trauma, making them less vulnerable and susceptible to exploitation.[9] Should the Government seek to argue, without evidence, that OneTaste used OM to take advantage of vulnerable individuals, OneTaste should be permitted to offer contrary evidence.

For the foregoing reasons, the Defendants request that the Court enter an order permitting the Defendants to offer evidence to rebut the Government's assertions that Orgasmic Meditation

Respectfully Submitted,


 /s/JENNIFER BONJEAN

*One of the attorneys for Nicole Daedone*

Bonjean Law Group, PLLC
Jennifer Bonjean
Ashley Cohen
Gabriella Orozco
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
718-875-1850
Jennifer@bonjeanlaw.com

---

[9] N. Prause, H. Cohen & G.J. Siegle (2021): Effects of adverse childhood experiences on partnered sexual arousal appear context dependent, Sexual and Relationship Therapy. Https://doi.org/10/1080/1 4681994.2021.1991907.

/s/ IMRANA ANSARI
*One of the attorneys for Rachel Cherwitz*
Aidala, Bertuna & Kamins PC
546 Fifth Avenue, 6th Floor
New York, NY 10036
(212) 486-0011