JRS:GK/KCB/DEL/SF
F. #2018R01401

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Docket No. 23-CR-146 (DG)

RACHEL CHERWITZ and
NICOLE DAEDONE,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# MOTION TO EXCLUDE THE DEFENDANTS' PROFFERED EXPERT TESTIMONY

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Gillian Kassner
Kayla Bensing
Devon Lash
Sean Fern
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

APPLICABLE LAW ..... 4

ARGUMENT ..... 8

I. THE COURT SHOULD PRECLUDE THE PROPOSED TESTIMONY OF DR. LEONARD ..... 8

II. THE COURT SHOULD PRECLUDE MOST OF THE PROPOSED TESTIMONY OF DR. KRIEGMAN ..... 11

A. THE COURT SHOULD PRECLUDE TESTIMONY REGARDING WHETHER OTHER BUSINESSES, ENTITIES, AND SOCIAL AND SCIENTIFIC MOVEMENTS QUALIFY AS CULTS ..... 11

B. THE COURT SHOULD PRECLUDE TESTIMONY REGARDING THE IMPORTANCE OF EVIDENCE-BASED ASSESSMENT OF CULTS ..... 13

C. THE COURT SHOULD PRECLUDE TESTIMONY REGARDING WHETHER ONETASTE IS A CULT ..... 14

III. THE COURT SHOULD PRECLUDE THE PROPOSED TESTIMONY OF DR. KLEIN ..... 16

A. THE COURT SHOULD PRECLUDE DR. KLEIN'S TESTIMONY ON MEMORY ..... 16

B. THE COURT SHOULD PRECLUDE DR. KLEIN'S TESTIMONY ON CHANGING SOCIETAL EXPECTATIONS ..... 23

IV. THE COURT SHOULD PRECLUDE THE PROPOSED TESTIMONY OF DR. LEY ..... 24

A. THE COURT SHOULD PRECLUDE TESTIMONY ON THE SCIENCE OF ORGASMIC MEDIATION ..... 24

B. THE COURT SHOULD PRECLUDE DR. LEY'S TESTIMONY ON COERCIVE CONTROL/GROOMING ..... 26

C. THE COURT SHOULD PRECLUDE DR. LEY'S TESTIMONY AS TO WHETHER THE DEFENDANTS OR THE COMPANY TARGETED VULNERABLE INDIVIDUALS ........ 28

V. IN THE ALTERNATIVE, THE COURT SHOULD CONDUCT A *DAUBERT* HEARING ........ 30

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

Page(s)

## Cases

California v. Niblett,
No. B205293, 2009 WL 1759532 (Cal. Ct. App. June 23, 2009) ... 18
Colorado v. Battigalli-Ansell,
492 P.3d 376 (Colo. April 22, 2021) ... 17
Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) ... *passim*
Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) ... 4, 7, 12, 19
Nimely v. City of New York,
414 F.3d 381 (2d Cir. 2005) ... 25
R.D. v. Shohola, Inc.,
No. 16-CV-01056, 2019 WL 6053223 (M.D. Pa. Nov. 15, 2019) ... 22
Riegel v. Medtronic, Inc.,
451 F.3d 104 (2d Cir. 2006) ... 12, 19
United States v. Ahmed,
No. 12-CR-661 (SLT), 2015 WL 1611947 (E.D.N.Y. 2015) ... 6, 11
United States v. Amuso,
21 F.3d 1251 (2d Cir. 1994) ... 24
United States v. Brooks,
No. 08-CR-35 (PKL), 2008 WL 2332371 (S.D.N.Y. June 4, 2008) ... 7
United States v. Carter,
410 F.3d 942 (7th Cir. 2005) ... 21
United States v. Curry,
977 F.2d 1042 (7th Cir. 1992) ... 21
United States v. Daskal,
No. 21-CR-110, 2023 WL 9424080 ... 10
United States v. Dukagjini,
326 F.3d 45 (2d Cir. 2003) ... 15, 16, 29
United States v. Dupre,
462 F.3d 131 (2d Cir. 2006) ... 8, 9
United States v. Dzionara-Norsen,
No. 21-454-CR, 2024 WL 191803 (2d Cir. Jan. 18, 2024) ... 6
United States v. Ferguson,
No. 06-CR-137 (CFD), 2007 WL 4539646 (D. Conn. Dec.14, 2007) ... 6
United States v. Heine,
No. 15-CR-238 (SI), 2017 WL 5260784 (D. Or. Nov. 13, 2017) ... 21, 22
United States v. Jakobetz,
955 F.2d 786 (2d Cir. 1992) ... 4
United States v. Labansat,
94 F.3d 527 (9th Cir. 1996) ... 21

United States v. Libby,
461 F. Supp. 2d 3 (D.D.C. 2006) .......... 21, 22, 23
United States v. Mahaffy,
No. 05-CR-613 (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) .......... 6, 10, 20
United States v. Mejia,
545 F.3d 179 (2d Cir. 2008) .......... 15, 29
United States v. Powers,
59 F.3d 1460 (4th Cir. 1995) .......... 25
United States v. Ray,
583 F. Supp. 3d 518 (S.D.N.Y. 2022) .......... 15, 26, 29
United States v. Redwood,
216 F. Supp. 3d 890 (N.D. Ill. 2016) .......... 21
United States v. Scop,
846 F.2d 135 (2d Cir. 1988) .......... 9
United States v. Shiraishi,
No. 17-CR-582, 2019 WL 1386365 n.7 (D. Haw. Mar. 27, 2019) .......... 21
United States v. Smith,
148 F. App'x 867 (11th Cir. 2005) .......... 21
United States v. Stagliano, et al., No. 08-093 (RJL), 2010 WL 3536840 (D.D.C. 2010) .......... 18
United States v. Stewart,
433 F.3d 273 (2d Cir. 2006) .......... 7, 13
United States v. Tuzman,
No. 15-CR-536 (PGG), 2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017) .......... 12, 19
United States v. Ulbricht,
No. 14-CR-68 (KBF), 2015 WL 413318 (S.D.N.Y. Feb. 1, 2015) .......... 5, 10, 20
United States v. Ulbricht,
858 F.3d 71 (2d Cir. 2017) .......... 5, 6, 10
United States v. Vaccarelli,
No. 20-3768-CR, 2021 WL 4805218 (2d Cir. Oct. 15, 2021) .......... 6
United States v. Welch,
368 F.3d 970 (7th Cir. 2004) .......... 22
United States v. Wilson,
493 F. Supp. 2d 484 (E.D.N.Y. 2006) .......... 5, 6, 10
United States v. Zhong,
26 F.4th 536 (2d Cir. 2022) .......... *passim*

Statutes

18 U.S.C. § 1589 .......... 24, 25

Rules

Fed. R. Crim. P. 16 .......... *passim*
Fed. R. Evid. 402 .......... 1, 7, 13
Fed. R. Evid. 403 .......... *passim*

Fed. R. Evid. 702 ........................................ *passim*
Fed. R. Evid. 704 ........................................ *passim*
Fed. R. Evid. 801 ........................................ 15

Other Authorities

United States v. Kirkpatrick,
No. 15-41201, 2016 WL 944655 (5th Cir. 2016)........................................ 17
United States v. Levinson,
No. 11-13268-EE, 2011 WL 5036857 (S.D. Fl. 2011) ........................................ 17
California v. Severt,
No. A143499, 2016 WL 4367204 (Cal. Ct. App. Aug. 16, 2016) ........................................ 17

PRELIMINARY STATEMENT

The government respectfully moves to preclude the proposed opinion testimony of the noticed expert witnesses of the defendants Nicole Daedone and Rachel Cherwitz: (1) Dr. Robert A. Leonard, a linguistics professor, who would offer expert testimony regarding the authorship of a collection of unidentified "disputed documents" "purported" to have been written by Jane Doe 1; (2) Dr. Daniel Kriegman, a licensed psychologist, who would offer testimony regarding the nature and characteristics of pernicious cults, including an unspecified opinion regarding whether OneTaste meets the criteria for a pernicious cult; (3) Dr. Marty Klein, a marriage, family and sex therapist, who would offer testimony concerning the fallibility of individuals' memory and narrative related to past sexual experiences, and issues regarding consent, among other topics; and (4) Dr. David Ley, a clinical psychologist and sex therapist, who would offer testimony concerning scientific research on Orgasmic Meditation, coercive control and grooming, among other things.

With the exception of general testimony by Dr. Kriegman regarding the qualities of cults and pernicious cults, to which the government has no objection, the Court should preclude the proposed testimony of each of these proffered experts. First, the expert notices are inadequate under the revised Federal Rule of Criminal Procedure 16(b)(1)(C), which requires proponents of the testimony to provide a complete statement of all opinions that the party will elicit from the witness and the bases and reasons for them. Second, even had the defendants complied with Rule 16, which they did not, the proposed testimony is largely irrelevant, unreliable, and unhelpful to any question to be decided by the jury; therefore, it is improper under Federal Rules of Evidence 402 and 702. Third, pursuant to Federal Rule of Evidence 403, any marginal value of this opinion testimony is substantially outweighed by the high likelihood

of unfair prejudice to the government, confusion of the issues, misleading the jury, undue delay and wasting the time of the Court, jury and government, should the testimony be permitted.

## BACKGROUND

In advance of trial, the Court set a deadline for the defense to provide notices of its proposed expert witnesses by October 21, 2024. ECF Dkt. No. 176; Order dated October 17, 2024. On October 21, 2024, the defense provided notices for four proposed expert witnesses. ECF Dkt. No. 178 (the "Defense Disclosure" or "Def. Disclosure").

With respect to Dr. Robert A. Leonard (the "Leonard Disclosure"), the notice provides that Dr. Leonard:

> will testify that he was asked to analyze the language patterns of a set of documents known to have been written by [Jane Doe 1], referred to as known or K [Jane Doe 1]. Dr. Leonard will testify that he was also asked to analyze the language patterns of a set of disputed documents purported to have been written by [Jane Doe 1], referred to as the questioned or Q Journal or Q Data (two sets of type-written documents alleged to be journal writings of [Jane Doe 1]). Operating under the assumption of potential co-authorship [. . .] Dr. Leonard will testify that he considered the following: Hypothesis 1 - the Q data—the Journal—demonstrates NO indicia of co-authorship (there are no features that do not match or are inconsistent with K [Jane Doe 1])[;] Hypothesis 2 - the Q data—the Journal—demonstrates indicia of co-authorship (i.e., there are features that do NOT match or are inconsistent with K [Jane Doe 1])[;] Hypothesis 3 – Inconclusive[.] Based on the degree and type of differences, Dr. Leonard will testify to his opinion that Hypothesis 2 is the superior hypothesis: there are data that demonstrate indicia of coauthorship.

Def. Disclosure 46-47.

With respect to Dr. Daniel Kriegman (the "Kriegman Disclosure"), the notice provides that the notice provides that:

> Dr. Kriegman will identify four key characteristics typical of cults:
> (a) Adoption of unorthodox beliefs that diverge significantly from the larger culture; (b) Beliefs not based on direct experience or testable ideas, but on faith in authoritative declarations; (c) Significant investment of life energy by participants in supporting and spreading the belief system; and (d) Considerable group participation required. [. . .] Dr. Kriegman will testify

> that [. . .] [h]e distinguishes pernicious cults by the following additional feature: (e) Exploitation of participants, where the organization operates to the detriment of participants and/or larger society, often benefiting leaders to a degree that is abusive to the participants. [. . .]
>
> Dr Kriegman will testify that the characteristics of a cult as defined by this four-part test are also all characteristics of the early versions of all modern, successful religions as well as many successful businesses, many scientific revolutions, and many positive social movements (e.g., women's suffrage and abolitionism). Today, half the population of the world are believers in two religions that started out as unmistakable cults (Christianity and Islam) [. . .]
>
> Dr. Kriegman will emphasize the necessity of thorough, evidence-based evaluation of an organization's practices, impact on participants, and leadership dynamics before classifying it as a pernicious cult. [. . .]
>
> Dr. Kriegman will present his expert opinion on whether OneTaste meets the criteria for a pernicious cult, emphasizing the importance of distinguishing between unconventional practices and exploitative behaviors.

Def. Disclosure 38-40 (emphasis in original).

With respect to Dr. Marty Klein (the "Klein Disclosure"), the notice provides that:

> Dr. Klein is expected to offer his opinion that people commonly change their narrative (or "memory") of their experiences retrospectively, particularly experiences pertaining to sexuality and sexual experiences. […]
>
> He will testify about how societal expectations about sexuality have changed over the past 10 years and how those shifts in attitude can impact perspectives on issues related to consent.
>
> Dr. Klein will also discuss the "Misinformation Effect," which describes how recall of personal memories can become less accurate upon the receipt of post-event information. [. . .]
>
> Dr. Klein will focus on factors an individual may experience that may affect memory, perceptions and recollections, such as challenges to sexual identity over time, confusion about the nature and definitions of consent (both their own and their partners'), conflicts between their personal sexual experiences, and social, religious, ethnic, or family norms and expectations, changes in their narratives of experiences ("memories"), such as infidelity, and other sexual experiences.

Def. Disclosure 32-33.

With respect to Dr. David Ley, a clinical psychologist and sex therapist (the "Ley Disclosure"), the notice provides that:

> Dr. Ley is expected to offer his expert opinions on the scientific effects of Orgasmic Meditation, the potential benefits of Orgasmic Meditation, and the relationship of Orgasmic Meditation to existing sexual therapeutic techniques as well as to historical spiritual practices . . . .
>
> Dr. Ley will offer opinions concerning the subject matters of coercive behaviors and grooming in response to the government's expert Dr. Rhagavan [sic]. Dr. Ley will testify that there remain no well-validated, normed assessments to objectively or consistently measure "coercive control" or grooming.
>
> Dr. Ley will also refute the contention that that OneTaste, Cherwitz and Daedone targeted vulnerable individuals by engaging in grooming or coercive behaviors consistent with that of sexual predators.

Def. Disclosure 1.

On October 24, 2024, the government requested that the defendants disclose the scholarship, analyses, and materials underlying the experts' proffered testimony and identify the materials upon which the experts would rely in rendering their opinions. To date, the defendants have not provided any materials in response to the government's request.

## APPLICABLE LAW

### I. *Daubert* and Rule 16

In Daubert and its progeny, the Supreme Court focused on a district court's gatekeeping obligation when considering the admissibility of expert testimony based on specialized knowledge under Rule 702 of the Federal Rules of Evidence. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999). Although the Second Circuit applies a liberal approach with respect to the admission of expert evidence, see, e.g., United States v. Jakobetz, 955 F.2d 786,

794 (2d Cir. 1992), the Supreme Court has explained that a district court, in executing its gatekeeping function, must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The proponent of the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 592 n.10.

As the Second Circuit has stated, "[t]he district court cannot perform [the] complex evaluation of an expert's proposed methodology without a clear articulation of what the expert's opinions are and, even more importantly, of the bases for those opinions." United States v. Ulbricht, 858 F.3d 71, 115 (2d Cir. 2017). Thus, for a court to evaluate an expert's methodology, the proponent of the expert's testimony must comply with Federal Rule of Criminal Procedure 16(b)(1)(C)(iii), which requires defendants to disclose, for each expert witness, (1) "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief"; (2) "the bases and reasons for them"; (3) "the witness's qualifications, including a list of all publications authored in the previous 10 years"; and (4) "a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Such disclosures must be made "sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence." Fed. R. Crim. P. 16(b)(1)(C)(ii). The purpose of the rule is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." United States v. Wilson, 493 F. Supp. 2d 484, 486-87 (E.D.N.Y. 2006) (quoting Fed. R. Crim. P. 16, Advisory Committee Notes, 1993 Amendment); see also United States v. Ulbricht, No. 14-CR-68 (KBF), 2015 WL 413318, *5 (S.D.N.Y. Feb. 1, 2015), aff'd 858 F.3d 71 (2d Cir. 2017).

The rule charges the Court with setting a deadline for such disclosures. Fed. R. Crim. P. 16(b)(1)(C)(ii). In this case, the district court's deadline was October 21, 2024.

It is well-established that "[w]here a defendant fails to comply with such disclosure requirements, a court may prohibit the party from introducing the evidence at trial." United States v. Dzionara-Norsen, No. 21-454-CR, 2024 WL 191803, at *3-4 (2d Cir. Jan. 18, 2024) (affirming preclusion of defense expert where notice provided "a brief summary of the proposed testimony, but failed to provide a full statement of [the expert's] opinions and reasons for them"); United States v. Vaccarelli, No. 20-3768-CR, 2021 WL 4805218, at *1 (2d Cir. Oct. 15, 2021) (affirming preclusion of defense expert where notice "failed to specify the basis for his opinion"); Ulbricht, 858 F.3d at 115 (affirming preclusion of defense experts where disclosures "were plainly inadequate" in that they "merely listed general and in some cases extremely broad topics on which the experts might opine" and did not "describe the bases for the experts' opinions"). A court may preclude the testimony as a whole, or any part that it determines was not properly disclosed to the government. See United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007). Moreover, even if the disclosure provides a sufficient summary of any opinions to be offered by the witness, the testimony may be excluded if the defendant "has made no attempt at all to describe the bases and reasons for those opinions as required by [Rule 16(b)(1)(C)]." Wilson, 493 F. Supp. 2d at 487. "'[P]roviding the government with a list of sources from which the experts drew their opinions' but not 'specify[ing] which sources the expert used to reach the different opinions identified' is insufficient." United States v. Ahmed, No. 12-CR-661 (SLT), 2015 WL 1611947, at * 1 (E.D.N.Y. 2015) (quoting United States v. Ferguson, No. 06-CR-137 (CFD), 2007 WL 4539646, at *2 (D. Conn. Dec.14, 2007)).

II. Admissibility under Rules 702, 402 and 403

With respect to the admission of expert testimony, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has explained that Rule 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 590. Expert opinions are inadmissible if based on speculative assumptions. See id. at 589-590 ("knowledge" within the meaning of Rule 702 means more than subjective belief and unsupported speculation); see also Kumho Tire, 526 U.S. at 157 (1999) ("[o]pinion evidence that is connected to existing data only by the ipse dixit of the expert" should not be admitted).

In addition, under Fed. R. Evid. 402, "[i]rrelevant evidence is not admissible." Thus, a district court may preclude a proposed expert's testimony if the testimony is not relevant to the issues at trial. See, e.g., United States v. Stewart, 433 F.3d 273, 311-12 & n.10 (2d Cir. 2006) (affirming preclusion of expert testimony; "expert testimony regarding an issue not relevant to the charges under consideration has the potential to confuse the jury"); United States v. Brooks, No. 08-CR-35 (PKL), 2008 WL 2332371, at *2 (S.D.N.Y. June 4, 2008) (precluding expert testimony as "irrelevant to this trial," noting "substantial risk that such testimony would confuse the jury").

Even if the proposed testimony has some relevance, a district court may preclude testimony if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence." See Fed. R. Evid. 403; see also United States v. Dupre, 462 F.3d 131, 138 (2d Cir. 2006) (district court properly precluded expert testimony under Rule 403).

ARGUMENT

I. The Court Should Preclude the Proposed Testimony of Dr. Leonard

The Court should preclude the testimony of Dr. Leonard for numerous reasons.

First, the Leonard Disclosure fails to adequately state Dr. Leonard's opinion, as required by Rule 16. In particular, the Leonard Disclosure states that Dr. Leonard was asked to analyze "the language patterns" of a set of documents referred to as "K [Jane Doe 1]" as compared to the language patterns in a set of type-written documents "purported to have been written by Jane Doe 1," referred to as the "Q Journal" or "Q Data." Def. Disclosure 47. However, the Leonard Disclosure fails to attach or otherwise identify any of these materials, or even to specify whether the "Q data" are separate or inclusive of the "Q Journal."[1] The Leonard Disclosure also states that, "based on the data provided for analysis," Dr. Leonard will offer the opinion that "ONLY SOME – NOT ALL – of the 'Q data' share likely common authorship with 'K [Jane Doe 1].'" Id. But the Leonard Disclosure neglects to identify what data were provided for analysis to Dr. Leonard, and which of the "Q data" share likely common authorship with "K

[1] The ambiguity of Dr. Dr. Leonard's opinion is exacerbated by the fact that the disclosure refers to "known" documents alternatively as "Known documents" and "K [Jane Doe 1]"; and "questioned" documents alternatively as "Questioned documents," "Q Journal," "Q data," and "the Q." Def. Disclosure 47-48. It is unclear the extent to which these terms overlap. The defendants' failure to enclose the referenced materials also prevents the government from raising informed objections regarding Dr. Leonard's anticipated testimony. For example, given that the "Q data" appear to include private journal entries, it would be significant to know, among other things, whether the "K [Jane Doe 1] materials" were written in a non-analogous context and setting (e.g., emails written in a workplace).

[Jane Doe 1].” Id. Without such information, it is impossible to comprehend Dr. Leonard’s conclusion in any meaningful way.

The Leonard Disclosure likewise fails to disclose any actual analysis of the cited data that Dr. Leonard will offer. While the Leonard Disclosure asserts that Dr. Leonard’s finding is premised on “a number of linguistic features” based upon the “feature environments” that occur in the datasets that Dr. Leonard compared, it neither identifies any such “linguistic features” nor explains—even at a high level—the analysis he undertook to support his conclusion that “co-authorship” of the “Q data” was the “superior hypothesis” or the confidence interval for his conclusion. Def. Disclosure 47. Moreover, while the disclosure offers a conclusion that [Jane Doe 1] is not “the sole author of the Q,” it also observes that “[t]here are, perhaps, other persons in the world who might generate the features found in both the ‘Questioned’ and ‘Known’ documents.” Id. at 47-48. It is unclear how or why such “other persons in the world” might be in a position to have authored both sets of documents, but not Jane Doe 1. Id.

The significant ambiguities in the Leonard Disclosure undermine the purpose of the expert notice.[2] In addition to prejudicing the government by depriving it of the opportunity to meet the evidence, the defendants deprive the Court of the ability to make an educated determination of admissibility. On that basis alone, Dr. Leonard’s testimony should be precluded. See United States v. Watson, No. 23-CR-82 (EK), Dkt. No. 161 at 10-17 (E.D.N.Y.)

[2] To the extent that the defendants intend to have Dr. Leonard opine on the credibility of any testimony by Jane Doe 1 regarding the authorship of the materials, such an effort would be improper. See United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1988), rev’d in part after reh’g on other grounds, 856 F.2d 5 (2d Cir. 1988) (“The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.”).

(precluding testimony of financial expert where expert disclosure was delayed and inadequate, in part because the expert said "virtually nothing about the 'bases and reasons' for his (opaque) conclusions"); United States v. Ulbricht, No. 14-CR-68 (KBF), 2015 WL 413318, at *6 (S.D.N.Y. Feb. 1, 2015) (precluding defense experts where disclosures "were plainly inadequate" and observing that the approach of "asserting that [an expert] will provide [an] opinion based on some unspecified method . . . based on data from unspecified sources, does not suffice"), aff'd, 858 F.3d 71 (2d Cir. 2017); Mahaffy, 2007 WL 1213738, at *2 ("The purpose of Rule 16(b)(1)(C) is to 'minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" (quoting United States v. Wilson, 493 F. Supp. 2d 484, 487 (E.D.N.Y. 2006))); United States v. Daskal, No. 21-CR-110, 2023 WL 9424080, at [3]*11 (E.D.N.Y. July 12, 2023).

Furthermore, the insufficiency of the Leonard Disclosure renders it difficult to ascertain the relevance of Dr. Leonard's opinion, particularly as, without knowing which materials were analyzed, the government cannot confirm whether it will seek to admit any of them into evidence at trial. See Daubert, 509 U.S. at 588 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").[4] Accordingly, Dr. Leonard's testimony should be precluded because any probative value of an expert opinion that

---

[4] Indeed, the relevance of Dr. Leonard's opinion is even more attenuated, and the potential for jury confusion exacerbated, in light of the fact that the Leonard Disclosure fails to mention, or in any way account for, the fact that the contents of Jane Doe 1's typewritten journals — the only documents he states that he analyzed — were excerpts contained within produced, scanned copies of her handwritten physical journals. It is not clear from the Leonard Disclosure whether Dr. Leonard was aware of, or ever provided with, copies of the handwritten journals, and the extent to which their existence would alter his analysis.

Jane Doe 1 possibly co-authored one or more typewritten journals, which may or may not even be admitted in evidence, would be substantially outweighed by a serious risk of confusion of the issues, misleading the jury, and wasting time. Fed. R. Evid. 403.

## II. The Court Should Preclude Most of the Proposed Testimony of Dr. Kriegman

With the exception of general testimony regarding the characteristics commonly associated with cults and the features that, in his opinion, distinguish cults from "pernicious cults"—to which the government has no objection[5]—the remainder of Dr. Kriegman's testimony should be precluded as it is inadequately disclosed, bears no relevance to the issues to be determined by the jury, and poses a severe risk of unfair prejudice, confusion of the issues, and misleading the jury.

### A. The Court Should Preclude Testimony Regarding Whether Other Businesses, Entities, and Social and Scientific Movements Qualify as Cults

The Kriegman Disclosure states that Dr. Kriegman will opine that "the early versions of all modern, successful religions as well as many successful businesses, many scientific revolutions, and many positive social movements (e.g., women's suffrage and abolitionism)," bear the defining characteristics of cults and that "[t]oday, half the population of the world are believers in two religions that started out as unmistakable cults (Christianity and Islam)." Def. Disclosure 39 (emphasis). The Court should exclude this portion of Dr. Kriegman's testimony in its entirety.

First, the Kriegman Disclosure fails to explain the bases and reasons for such vague and sweeping opinions. Fed. R. Crim. P. 16(b)(1)(C)(iii). The disclosure does not offer

[5] The Kriegman Disclosure does not cite to any specific sources for the identified cult characteristics and feature, as required. See Ahmed, 2015 WL 1611947, at * 1 (E.D.N.Y. 2015). Accordingly, prior to offering such testimony, the defendants must disclose the relevant, supporting scholarship or experience to ensure that such testimony comports with Rule 702.

any analysis of how the defining characteristics of cults apply to these religions, movements and (unidentified) businesses, nor does it cite to any scholarship or literature supporting Dr. Kriegman's broad assertions. See United States v. Tuzman, No. 15-CR-536 (PGG), 2017 WL 6527261, at *11 (S.D.N.Y. Dec. 18, 2017) ("If proposed expert testimony is based on a 'review and analysis of scientific, medical and other peer reviewed literature,' the defendant must supply the literature upon which the expert will rely."). Such testimony therefore should be precluded for failure to meet the requirements under Rule 16(b)(1)(C).

Second, the Kriegman Disclosure does not indicate how Dr. Kriegman, as a trained clinical psychologist, would be qualified to render expert opinions regarding topics ranging from the history of Christianity and Islam to the early women's suffrage movement. See Daubert, 509 U.S. at 589-590 (noting that "knowledge" within the meaning of Rule 702 means more than subjective belief and unsupported speculation); see also Kumho Tire, 526 U.S. at 157 (1999) (noting that "[o]pinion evidence that is connected to existing data only by the ipse dixit of the expert" should not be admitted).[6] Accordingly, Dr. Kriegman's opinion regarding whether such entities and movements qualified, at some undeterminable point in the past, as cults, should be precluded pursuant to Rule 702. Fed. R. Evid. 702(b)-(d); Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006). ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.").

---

[6] According to his website, it appears that Dr. Kriegman was a founder of an "open-source religion" called "Yoism." See "Daniel Kriegman, Ph.D.," available at https://daniel.kriegman.net/ ("While based in empirically verifiable science, Yoism came into being after Dr. Kriegman first saw 'God' in 1969."). To the extent Dr. Kriegman intends to rely on his personal experience as the founder of a new religion to inform his opinions on other organizations and religions, the government respectfully submits that such training and experience would be inadequate under Rule 702.

Finally, an analysis of whether other named and unnamed religions, movements, and businesses would qualify as cults is wholly irrelevant to whether the defendants committed a forced labor conspiracy. See Fed. R. Evid. 402; Stewart, 433 F.3d at 311-12 & n.10 (affirming preclusion of expert testimony; "expert testimony regarding an issue not relevant to the charges under consideration has the potential to confuse the jury"). And, any conceivable probative value of such testimony—and it is not apparent there is any—would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and wasting time. Fed. R. Evid. 403. For instance, in United States v. Zhong, the Second Circuit reversed and remanded a jury conviction for forced labor conspiracy after the government's expert witness testified at trial regarding, among other things, the disreputable history of forced labor worldwide, and the Chinese government's poor forced-labor record. 26 F.4th 536, 544 (2d Cir. 2022). The Circuit found this testimony was "highly prejudicial and, at best, minimally relevant" to the criminal case. Id. Dr. Kriegman's proposed testimony on "cults" raises similar concerns. The testimony should be precluded.

B. The Court Should Preclude Testimony Regarding the Importance of Evidence-Based Assessment of Cults

The Kriegman Disclosure states that Dr. Kriegman will "emphasize the necessity of thorough, evidence-based evaluation of an organizations' practices, impact on participants, and leadership dynamics before classifying it as a pernicious cult." Def. Disclosure 39. Such testimony not only is irrelevant to the charged offense—as the word "cult" will appear nowhere in the jury charge—but also poses a serious risk of confusing the issues and misleading the jury by improperly implying that the jury must make a factual determination regarding whether OneTaste should be properly classified as a cult or a "pernicious cult" prior to rendering a

determination regarding the defendants' guilt. Fed. R. Evid. 702, 403. Accordingly, the Court should preclude this portion of Dr. Kriegman's testimony.

C. The Court Should Preclude Testimony Regarding Whether OneTaste Is a Pernicious Cult

The Kriegman Disclosure states that Dr. Kriegman will "present his expert opinion on whether OneTaste meets the criteria for a pernicious cult" based on his cult assessment framework. Def. Disclosure 40. Kriegman's anticipated opinion about OneTaste—and any analysis of OneTaste's characteristics and practices—is improper and should be precluded in its entirety.

First, the Kriegman Disclosure fails to disclose what Dr. Kriegman's opinion about OneTaste will be. Instead, it provides a partial summary of a potential opinions Kriegman may offer on a variety of topics, including, among other things, the degree to which OneTaste "practices and philosophies diverged from mainstream culture"; the "existence of an empirical basis for OneTaste's core practice"; "varying levels of involvement and investment by OneTaste participants"; OneTaste's "financial practices" and "leadership and executive management dynamics, particularly the founder's approach to idealization"; and the "impact on external relationships of participants." Def. Disclosure 39-40. But none of these topics clarify what he will conclude about OneTaste. Will he opine that OneTaste is a not a cult? Will he opine that OneTaste is a cult but is not "pernicious"? The government and the Court are left to guess.[7] Accordingly, the disclosure is plainly deficient under Rule 16. Fed. R. Crim. P. 16(b)(1)(C)(iii).

Second, the Kriegman Disclosure also fails to identify the bases and reasons underlying Dr. Kriegman's anticipated opinions about OneTaste. Fed. R. Crim. P.

---

7 The Kriegman Disclosure does not identify a relevant timeframe for his analysis.

16(b)(1)(C)(iii). Because Kriegman had no direct involvement with OneTaste during the charged time period, presumably Kriegman's anticipated testimony on OneTaste's cult classification would be based on information and out-of-court statements provided by the defendants, their co-conspirators, and/or other interested OneTaste executives.[8] While Federal Rule of Evidence 703 permits experts to testify to opinions based on hearsay "if experts in the field reasonably rely on such evidence in forming their opinions," an expert is not permitted "to simply "repeat[] hearsay evidence without applying any expertise," which would allow the offering party "to circumvent the rules prohibiting hearsay." United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008); accord United States v. Dukagjini, 326 F.3d 45, 58-59 (2d Cir. 2003); United States v. Ray, 583 F. Supp. 3d 518, 533 (S.D.N.Y. 2022). Here, it appears that Dr. Kriegman would simply repeat hearsay specifically focused on OneTaste's practices without applying any expertise. While the government does not object to Dr. Kriegman offering general testimony regarding qualities associated with cults based on his training and experience, to the extent they are properly disclosed in his expert notice, the defendants should not be permitted to use Dr. Kriegman's testimony to launder inadmissible hearsay about OneTaste through an expert witness.

Finally, such testimony should be precluded in accordance with Rules 402, 403, and 702. Indeed, it is difficult to conceive of testimony that would be less reliable and more prejudicial than the testimony of an expert vouching for the legitimacy of a company's practices, as compared other unnamed organizations, based exclusively on information provided by the defendants. The confusion is only multiplied give that OneTaste is not on trial, and the jury is

[8] Statements of such individuals to Dr. Kriegman regarding OneTaste's practices are out-of-court statements being offered for their truth—textbook hearsay. See Fed. R. Evid. 801(c).

not tasked with making any factual assessment of any of OneTaste's practices, yet alone whether OneTaste is property categorized as a cult. Furthermore, such testimony would impermissibly provide the defense with an "additional summation" by having the "expert interpret the evidence." Zhong, 26 F.4th at 556 (finding forced labor expert's detailed analysis of an employment contract issued by the defendant improper as it came "dangerously close to usurping the jury's function" by "providing an overall conclusion" of the criminality of the conduct); Dukagjini, 326 F.3d at 53 ("Expert witnesses may not "usurp[ ] the jury's function" by "providing an overall conclusion of criminal conduct." ).

Accordingly, the Court should preclude Dr. Kriegman from providing undisclosed and unreliable opinions about the operations and classification of OneTaste.

## III. The Court Should Preclude the Proposed Testimony of Dr. Marty Klein

The Court should preclude the testimony of Dr. Klein in its entirety. There is no indication that Dr. Klein has sufficient expertise to testify as an expert on the science of memory. Moreover, his disclosure is inadequate, and his proposed testimony falls squarely within the ken of the jury, and therefore is unhelpful and duplicative.

### A. The Court Should Preclude Dr. Klein's Testimony on Memory

The defendants seek to call Dr. Klein to testify concerning three topics related to the science of memory: (1) the assertion that individuals commonly change their narrative of their sexual experiences retrospectively; (2) the "Misinformation Effect," i.e., a phenomenon whereby recall of personal memories can become less accurate upon the receipt of post-event information; and (3) additional factors, including challenges to sexual identity, confusion about consent, and conflict between personal experiences and societal expectations, which may affect memory, perception and recollection. Def. Disclosure 32-33. As explained in detail below, this testimony should be precluded.

First, it is not apparent from the Klein Disclosure that Dr. Klein is qualified to testify on the science of memory. To the contrary, it appears that the defendants have engaged an experienced sex therapist who they seek to call as an expert in field of memory. There is no indication that Dr. Klein has ever been qualified as an expert on memory by any court. The defendants note that, "Dr. Klein has been qualified as an expert in various state and federal courts in areas including human sexuality, sexual dysfunction, adult entertainment, obscenity, pornography, sexual behavior, fetishes, sexting, cybersex, sexual fantasy, and age role-play." In reviewing prior state and federal cases in which Dr. Klein has sought qualification as an expert, his qualifications were within the realm of individuals' sexual behavior and fantasies. See Colorado v. Battigalli-Ansell, 492 P.3d 376, 380 (Colo. April 22, 2021) (noting the trial court "significantly limited the opinions Dr. Klein could provide to the jury and ultimately he testified about "fantasy-based erotic role-play and its context in online chat rooms"); United States v. Kirkpatrick, No. 15-41201, 2016 WL 944655, at *30 (5th Cir. 2016) (noting Dr. Klein was permitted "to explain that sexual fantasies are normal and that it is not uncommon for people to explore those fantasies online"), conviction affirmed by 662 F. App'x 237 (5th Cir. 2016); California v. Severt, No. A143499, 2016 WL 4367204, at *2 (Cal. Ct. App. Aug. 16, 2016) (noting defense expert Klein "was prepared to testify to the 'prevalence of age-play and sex play throughout culture,' and about how 'people engage in erotic fantasy role-playing for many reasons.'"); United States v. Levinson, No. 11-13268-EE, 2011 WL 5036857, at *11 (S.D. Fl. 2011) (noting the district court excluded Dr. Klein's testimony as a defense expert on fantasy role-playing with children as it "did not meet the standard as promulgated by Daubert), aff'd, 504 F. App'x 824, 828 (11th Cir. 2013) (finding "[t]he district court did not abuse its discretion in granting the government's motion in limine to exclude the testimony of Levinson's proposed

expert witness, Dr. Marty Klein. Klein's opinions did not meet the Daubert standards for admissibility"); United States v. Stagliano et al., No. 08-093 (RJL), 2010 WL 3536840 (D.D.C. 2010) (defendants withdrew their motion to have Dr. Klein testify as an expert before trial but initially sought Dr. Klein to be expert in the area of scientific value of video materials and prurient appeal); California v. Niblett, No. B205293, 2009 WL 1759532, at *3 (Cal. Ct. App. June 23, 2009) (noting defense expert Dr. Klein testified that there "was no established link between the use of pornography and anti-social behavior" but that "child molesters sometimes used pornography to 'groom' their victims"); United States v. Marcus, No. 05-CR-457 (ARR), ECF Dkt. Nos. 121 & 128 (E.D.N.Y. 2006) (defendant withdrew Dr. Klein as a defense expert on "the general nature of consensual bondage, domination, and sadomasochism ('BDSM') relationships" and "the redeeming social value of the images the government alleges are obscene" before trial following government objection to his qualifications).

Dr. Klein's career also does not reflect any relevant training or experience with respect to memory, such as counseling, clinical experience, research, articles or publications, conference participation, speaking engagements, teaching or forensic or legal work. He is a licensed marriage and family therapist and a certified sex therapist. He has written seven books[9] and numerous articles and book chapters — none of which appear to discuss the science of

---

[9] The titles of Dr. Klein's books are: Your Sexual Secrets: When to Keep Them, When & How to Tell (Dutton, 1988); Ask Me Anything: A Sex Therapist Answers the Most Important Questions (Simon & Schuster, 1992); Let Me Count The Ways: Discovering Great Sex Without Intercourse (Tarcher/Putnam, 1999); Beyond Orgasm: Dare to be Honest About the Sex You Really Want (Ten Speed Press, 2002); America's War On Sex: The Attack on Law, Lust, and Liberty (Praeger 2006, 2nd edition 2014); Sexual Intelligence: What We Really Want From Sex, and How to Get It (HarperCollins, 2012); His Porn, Her Pain: Confronting America's PornPanic With Honest Talk About Sex (Praeger, 2016).

memory. Indeed, a search of the blog on his website, which contains 127 pages of entries dating to at least 1997, reveals a single blog entry — which, needless to say, is not peer reviewed — from February 2014 that briefly touches on memory, in which Dr. Klein states that

> human memory is more like a digital photo that is constantly being photoshopped . . . it's surprisingly common for people to believe that certain things happened to them that actually didn't. And its surprisingly easy to implant false memories in both children and adults. For more on this, see the work and Ted Talk of world-renowned scientists Elizabeth Loftus.

See Marty Klein, "Sex Abuse: Truth, Lying or False Memory?" (Feb. 10, 2024), available at https://www.martyklein.com/sex-abuse-truth-lying-or-false-memory.

According to the Klein Disclosure, his three opinions involving memory are based on "years of professional and clinical experience" and "a large body of research." Def. Disclosure 32. Dr. Klein cites to three published books from 1979, 1980 and 1996 authored by Dr. Elizabeth Loftus, a professor at University of California, Irvine, who studies the science of memory, and notes that Dr. Loftus has published peer-reviewed journal articles describing memory experiments (although the names of specific journal articles are not provided). Concerning the fallibility of memory, he also cites to two additional journal articles by other authors. Def. Disclosure 33 n.1 & 2. Notably, he fails to provide the bases and reasons for his own expertise on memory, apart from perhaps reviewing a small portion of Dr. Loftus's work. Riegel, 451 F.3d at 127 ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."); Tuzman, 2017 WL 6527261, at *11 ("If proposed expert testimony is based on a 'review and analysis of scientific, medical and other peer reviewed literature,' the defendant must supply the literature upon which the expert will rely."); see also Kumho Tire, 526 U.S. at 157 ("[o]pinion evidence that is connected to existing data only by the ipse dixit of the expert" should not be

admitted). To the extent, Dr. Klein seeks to rely on his decades as a marriage and sex therapist, it is unclear how that experience qualifies him to speak to the science of memory. While presumably his patients could discuss their own memories and their perceived accuracy of these memories, there is no scientific controls in such a setting to determine the underlying accuracy of such observations.

Second, the Klein Disclosure on his testimony as to memory is inadequate under Rule 16. In a three-page disclosure, the defendants state that Dr. Klein is expected to testify about the reliability of memories related to sexual experiences. But Dr. Klein provides no information about his actual, expected testimony on this subject. See Watson, 23-CR-82 (EK), Dkt. No. 161 at 10-17 (precluding testimony); Ulbricht, 2015 WL 413318, at *6 (same); Mahaffy, 2007 WL 1213738, at *2. He provides no information how his testimony on sexual memories compares to the general field of the science of memory, perception, and human recall. While he states that individuals commonly change their memories of their sexual experiences, he fails to explain how often memories purportedly change, how these memories purportedly change, the time period in which such memories purportedly change, or why memories purportedly change. Nor does Dr. Klein provide any additional specifics on his testimony on how later information affects memories. He does not define post-event information or explain how such information affects memories. He also is expected to testify that personal experiences and societal expectations affect memories of past sexual encounters, but again, does not explain how and under what circumstances. The disclosure falls fall short of the requirements set out under Fed. R. Crim. P. 16(b)(1)(C)(iii) and should be precluded on that basis.

Third, Dr. Klein's proposed testimony on memory invades the province of the jury and is likely to confuse, mislead, or unduly influence the jury, among other things. As a

general matter, memory, perception, and the fallibility of human recall—that is, how people may remember, misremember, or forget past events—are within the ken of the jury. See United States v. Carter, 410 F.3d 942, 950 (7th Cir. 2005) ("In general . . . jurors understand that memory can be less than perfect."); United States v. Smith, 148 F. App'x 867, 872 (11th Cir. 2005) (affirming district court's exclusion of expert testimony on memory and perception, including the impact of stress on memory, in context of eyewitness reliability because proposed testimony would not assist the jury); United States v. Labansat, 94 F.3d 527, 530 (9th Cir. 1996) ("It is common knowledge that memory fades with time."); United States v. Curry, 977 F.2d 1042, 1050-53 (7th Cir. 1992) ("[S]uch testimony may be properly excluded where the testimony addresses an issue of which the jury is generally aware."); United States v. Shiraishi, No. 17-CR-582, 2019 WL 1386365, at *5 n.7 (D. Haw. Mar. 27, 2019) (where testimony "falls within the common knowledge of the average layman, [it] is improper testimony under Rule 702"); United States v. Heine, No. 15-CR-238 (SI), 2017 WL 5260784, at *3 (D. Or. Nov. 13, 2017) (finding expert testimony concluding that memories are fallible and may deteriorate over time to be "within the ken of the ordinary juror"); United States v. Redwood, 216 F. Supp. 3d 890, 897-99 (N.D. Ill. 2016) (excluding memory expert under Rules 702 and 403, and noting that "[w]hile in unique circumstances expert testimony regarding memory and perception may be warranted, this is not one of those cases"); United States v. Libby, 461 F. Supp. 2d 3, 12 (D.D.C. 2006) (noting "jurors inevitably encounter the frailties of memory as a commonplace matter of course.").[10]

---

[10] While some federal courts have permitted expert testimony on the science of memory, they have done so on a case-by-case basis, depending on the special circumstances or particular facts of a case and only when such opinions are based on reliable science and fit the facts of the case. See, e.g., Libby, 461 F. Supp. 2d at 9-10 ("There is no clear case authority, or absolute rule, on when an expert should be permitted to testify on issues regarding memory and perception. . . . [T]here is no per se rule for or against the admissibility of such testimony [on

Accordingly, courts, however, must exercise "judicial oversight" in this area. See R.D. v. Shohola, Inc., No. 3:16-CV-01056, 2019 WL 6053223, at *10-13 (M.D. Pa. Nov. 15, 2019). "Left unregulated, memory expert testimony can invade the fundamental province of the jury—determining witness credibility," and must be excluded as unduly prejudicial under Rule 403. Id. at *6 (citing cases); see also Heine, 2017 WL 5260784, at *2 (excluding expert testimony under Rules 702 and 403 because it would not be helpful to the jury and would "invad[e] the jury's role in assessing the credibility of witnesses," and because the trial did "not involve issues of repressed or recovered memories," among other things); Libby, 461 F. Supp. 2d at 14 (excluding testimony of Dr. Loftus as a memory expert because it would not be helpful to the jury, invaded the jury's province, and was likely to confuse, mislead, or unduly influence the jury).

Here, Dr. Klein's proposed testimony concerning how memories can change over time, the accuracy of memory, and the effect of personal sexual experiences and societal expectations on memory should be excluded under Rules 702 and 403 because such testimony would not aid the jury. As courts have recognized, an expert is simply not needed to "point out that memory decreases over time." United States v. Welch, 368 F.3d 970, 973-75 (7th Cir. 2004) (excluding eyewitness memory and perception expert). As one court explained in excluding a memory and perception expert:

> [O]n a daily basis the average juror is personally faced with innumerable questions of memory and cognition, as everyone in their daily lives is called upon to store, encode, and retrieve information he or she has been subjected to. Although the average juror may not understand the scientific basis and labels attached to causes for memory errors, jurors inevitably encounter the frailties of memory as a commonplace matter of course.

memory and perception]. And a court presented with a proffer of expert testimony must determine its admissibility on a case-by-case basis." (citing cases)); see United States v. Maxwell, No. 20-CR-330 (AJN), Dkt. No. 516 (Nov. 21, 2021) (permitting limited testimony by Dr. Loftus on the science of memory).

Libby, 461 F. Supp. 2d at 12-13. These concepts are common knowledge, and any proposed testimony is likely to impermissibly confuse, mislead, or unduly influence the jury. Accordingly, the Court should preclude Dr. Klein's testimony concerning memory.

B. The Court Should Preclude Dr. Klein's Testimony on Changing Societal Expectations

The Court should also preclude Dr. Klein's testimony on his second proposed topic of testimony — "how societal expectations about sexuality have changed over the past 10 years and how those shifts in attitude can impact perspectives on issues related to consent." Def. Disclosure 33.

First, the disclosure of this topic insufficient under Rule 16. The totality of the description — described in a single sentence in the three-page disclosure — leaves the government and the Court with more questions than answers. For one, Dr. Klein fails to identify the changing societal expectations about which he plans to testify, specifically what those expectations were a decade ago and what they are now. He also fails to identify how and why these expectations have changed. Nor does he explain how he intends to define "society" — is it a specific community or the whole of the country? Furthermore, he intends to testify that these changes "can impact perspectives on issues related to consent." There is no additional detail on whose perspectives or which issues "related to" consent Dr. Klein intends to discuss.

Second, the defendants make no attempt to identify any source for these generalizations, much less demonstrate the reliability of Dr. Klein's testimony on this issue. Even assuming Dr. Klein will rely on his clinical experience, he provides no explanation of how such experience supports his conclusions concerning changing societal expectations.

Third, to the extent, Dr. Klein wishes to summarize current events from the last decade, this too is inappropriate expert testimony, because the average juror does not need an

expert to opine as to recent current events (and the court can inquire as to jurors' opinions and awareness of those topics in voir dire). See Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules (noting that the use of expert testimony is improper when "the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute"). Therefore, this subject of testimony is not "beyond the ken of the average juror," and the Court should preclude expert testimony on this topic. See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994).

IV. The Court Should Preclude the Proposed Testimony of Dr. Ley

The Court should preclude Dr. Ley's testimony in its entirety because it is inadequately disclosed, bears no relevance to the issues to be determined by the jury, and poses a severe risk of unfair prejudice, confusion of the issues, and misleading the jury.

A. The Court Should Preclude Testimony on the Science of Orgasmic Mediation

Dr. Ley's proposed testimony on the benefits of orgasmic mediation should be precluded as irrelevant, unreliable and unduly prejudicial. See Def. Disclosure 1-12.[11]

As to reliability, the jury must determine whether the defendants entered into a criminal conspiracy to (1) obtain labor or services, (2) through one of the specified prohibited means, and (3) did so knowingly, see 18 U.S.C. § 1589(a), or whether the defendants entered into a criminal conspiracy to (1) benefit financially or receive anything of value from their participation in a venture, (2) the venture was engaged in providing or obtaining labor or services through any one of, or any combination of, the specified prohibited means, and (3) the

[11] The government previously sought to preclude such testimony about the so-called scientific benefits of orgasmic meditation in its motions in limine as irrelevant and unduly prejudicial. See ECF Dkt. No. 170 at 104-05.

defendants knew or recklessly disregarded that the venture was engaged in providing or obtaining labor or services by any of these prohibited means, see id. § 1589(b). The jury is not tasked with rendering a determination regarding whether the services the defendants offered to the public through their employment at OneTaste provided any benefits, or whether the practice of orgasmic mediation has inherent value. See Daubert, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (quoting 3 J. Weinstein et al., Weinstein's Evidence ¶ 702[02]); United States v. Powers, 59 F.3d 1460, 1472 (4th Cir. 1995) ("The relevance standard requires a defendant proposing expert testimony to "provide a substantial link between the expert testimony and his theory of defense.").

Permitting an expert witness to opine about the benefits of orgasmic mediation should also be precluded under Rule 403, as any potential probative value of such evidence would be outweighed significantly by the danger of unfair prejudice, confusion of the issues, misleading the jury, and brining about undue delay and wasting the time of the Court, jury and government. See Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) (explaining that Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation"). Indeed, permitting expert testimony on the benefits of orgasmic meditation would invite jury nullification by suggesting that a defendant who obtained labor and services of individuals through prohibited means cannot be convicted if such labor and services furthered the greater good. As courts have recognized, individuals can be victims of forced labor schemes even where such schemes benefit others or even themselves. See, e.g., Zhong, 26 F.4th at 545–46 (noting the defendant, who was convicted of forced labor conspiracy after a jury trial, transported Chinese workers to the United States "for a salary that substantially surpassed what they would make in China"). Such

potential for unfair prejudice and misleading the jury is significant because the jury may well assign undue weight to Dr. Ley's testimony in weighing the issues, even though his testimony itself has little to do with the case. In addition, Dr. Ley's proposed testimony regarding the scientific benefits of orgasmic meditation would needlessly prolong the trial, particularly as the government is not arguing — one way or other — as to the inherent value of OneTaste's products and services. Accordingly, the Court should preclude this testimony.

B. The Court Should Preclude Dr. Ley's Testimony on Coercive Control/Grooming

Dr. Ley seeks to testify that there are "no well-validated, normed assessments to objectively or consistently measure 'coercive control' or grooming." See Def. Disclosure 1, 12-15. The Court should preclude this testimony for numerous reasons.

First, Dr. Ley's curriculum vitae does not indicate that he has any background or experience in victimization, coercive control, or interpersonal violence. This alone is grounds to preclude his testimony on the topic. See Ray, 583 F. Supp. 3d at 544 (precluding defense expert testimony on coercive control because "[t]he defense's argument amounts to the claim that because a doctor is qualified to testify about psychotic disorders, substance abuse disorders, and those with "dual diagnoses," he also is qualified to testify about anything else to which a psychologist could testify").

Second, the government has insufficient notice as to Dr. Ley's opinions on coercive control and his bases and methodologies. Fed. R. Crim. P. 16(b)(1)(C)(iii). He states he will provide an opinion that "coercive control is an extension of the vague concept of grooming" and that there are "no well-validated, normed assessments to objectively or consistently measure coercive control." Def. Disclosure 15. However, he fails to provide the bases and reasons for his opinion. While the Ley Disclosure cites to eight works on grooming,

these appear to discuss the grooming of minor victims by sexual predators, not the application of the coercive control on adult victims.

Third, whether "well-validated, normed assessments to objectively or consistently measure coercive control" exist is a gatekeeping matter for the Court, not a matter for the testimony of a defense expert. To be sure, clinicians across the world use multiple modes of measurement, including clinical interviews, to evaluate coercive control. Clinical interviews have been widely accepted and have been the subject of expert testimony in numerous courts, including courts in this Circuit. See ECF Dkt. No. 180 at 6-8 (citing cases in the government's opposition to defense motion to preclude Dr. Raghavan). Moreover, another district court addressed this criticism in a challenges to expert testimony on coercive control and found that its evaluation by clinical interviews is explained by "a practical reason that should be obvious to all," namely:

> Studying the circumstances and psychological drivers of trafficked women is not like studying diseases or potential cures in laboratory animals. In those studies, laboratory conditions literally can be achieved. A scientist can undertake a controlled and randomized experiment of a tested drug or an environmental factor. A scientist can roll out a huge volume of experiment subjects. He or she can then make careful substitutions of variables one by one to try to isolate the extent to which a particular one is or is not causative of a condition or ailment or a potential cure. That strictly quantitative mode of inquiry is not realistic or even ethical in the context of studying sex trafficking . . . . [T]he vocabulary of error rates and statistical significance is an unusually poor fit.

United States v. Randall, No. 19-CR-131 (PAE), Dkt. No. 335 at 29-30 (S.D.N.Y. 2020) (permitting expert testimony on trauma bonding and coercive control). Accordingly, permitting this testimony poses a risk of confusing the issues and misleading the jury by improperly suggesting that the jury must in some way "objectively" measure coercive control prior to rendering a determination on guilt. Fed. R. Evid. 403, 702.

Finally, Dr. Ley's description of "grooming" is inapposite to the case being tried, as it does not comport with the dynamic in which the defendants maintained and exercised control over other adult individuals. Accordingly, it not only would not add anything to the jury's comprehension to the evidence, but also would risk confusing and misleading the jury. See Fed. R. Evid. 403, 702.

C. The Court Should Preclude Dr. Ley's Testimony as to Whether the Defendants or the Company Targeted Vulnerable Individuals

The Ley Disclosure states that Dr. Ley will "refute the contention that that OneTaste, Cherwitz and Daedone targeted vulnerable individuals by engaging in grooming or coercive behaviors consistent with that of sexual predators." Def. Disclosure 1. Dr. Ley's opinion about the defendants' actions or mens rea is improper and should be precluded.

As an initial matter, the Ley Disclosure fails to specify Dr. Ley's opinion on this subject, including how he will refute the contention that the defendants targeted vulnerable individuals, as required. It is not clear whether Dr. Ley believes no individuals were targeted, the individuals were targeted but were not vulnerable, sexual predators as a general matter do not target vulnerable individuals, or something else entirely. The Ley Disclosure also fails to identify the relevant timeframe for his analysis. Accordingly, the disclosure is deficient under Rule 16. Fed. R. Crim. P. 16(b)(1)(C)(iii).

Second, the Ley Disclosure also fails to identify the bases and reasons underlying Dr. Ley's anticipated opinions about OneTaste and the defendants. Fed. R. Crim. P. 16(b)(1)(C)(iii). Because Dr. Ley had no direct involvement with OneTaste during the charged time period, presumably his anticipated testimony on OneTaste or the defendant's actions would be based on information and out-of-court statements provided by the defendants, their co-conspirators, and/or other interested OneTaste executives. The Ley Disclosure notes that Dr.

Ley "reviewed materials provided by defense counsel, including the government's Motion in Limine," Def. Disclosure 15, but does not provide a complete list of the materials reviewed and his specific determinations concerning those materials. As explained above in the context of Dr. Kriegman's testimony, this runs afoul of the Federal Rules of Evidence because an expert is not permitted "to simply "repeat[] hearsay evidence without applying any expertise," which would allow the offering party "to circumvent the rules prohibiting hearsay." Mejia, 545 F.3d at 197; Dukagjini, 326 F.3d at 58-59; Ray, 583 F. Supp. 3d at 533. Dr. Ley cannot simply transmit otherwise inadmissible facts to the jury.

Third, expert testimony regarding the defendants' intent in targeting vulnerable individuals would run afoul of Rule 704(b), which precludes experts from stating "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charges or of a defense." Fed. R. Evid. 704(b).

Fourth, evidence regarding the defendant's intent and actions, and the victims' vulnerabilities, would both substitute "expert opinion for factual evidence," Mejia, 545 F.3d at 190, and "usurp[ ] the jury's function" by "providing an overall conclusion of criminal conduct," Zhong, 26 F.4th 536 at 556 (quoting Dukagjini, 326 F.3d at 54) (reversing and remanding conviction when the government's expert witness testified that an employment contract in a forced labor prosecution was "troubling" and raised "major red flags" because the expert came "dangerously close to usurping the jury's function" by "providing an overall conclusion of criminal conduct"). Allowing an individual deemed an expert by the Court to opine that the defendants (or their organization) did not use coercion in a forced labor prosecution would be tantamount to permitting an expert to offer a conclusion as to the defendants' guilt or innocence and would improperly invite the jury to substitute the expert's

judgment for their own. Accordingly, the Court should preclude Dr. Ley from opining in any way about OneTaste or the defendants.

V. In the Alternative, the Court Should Conduct a *Daubert* Hearing

If the Court denies the government's motion to preclude the defendants' proposed experts, the government respectfully requests that the Court conduct a Daubert hearing to evaluate the relevance and reliability of the proposed experts' testimonies. The disclosures are replete with cursory and vague conclusions, and those conclusions alone raise significant questions regarding the relevance and reliability of the proposed testimony, as well as the reliability of the experts' bases and methods. A Daubert hearing would therefore be appropriate before any of this confusing and prejudicial evidence is presented to the jury.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that, with the exception of general testimony regarding the characteristics and features of cults, the defendants' proposed expert testimony be precluded in its entirety.

Dated: Brooklyn, New York
November 1, 2024

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York

By: /s/
Gillian Kassner
Kayla Bensing
Devon Lash
Sean Fern
Assistant United States Attorneys
(718) 254-7000

CC: Clerk of Court (DG) (by ECF and Email)
Counsel of Record (by ECF and Email)