1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 23-CR-146(DG)
                                   :
                                   :
                                   :
       -against-                   : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
RACHEL CHERWITZ AND NICOLE         : Friday, November 15, 2024
DAEDONE,                           : 8:45 a.m.
                                   :
       Defendants.                 :
                                   :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE


A P P E A R A N C E S:


For the Government:   BREON S. PEACE UNITED STATES ATTORNEY
                      EASTERN DISTRICT OF NEW YORK
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                      BY:KAYLA C. BENSING
                         GILLIAN KASSNER
                         Assistants United States Attorney


For the Defendant     AIDALA BERTUNA & KAMINS PC
Rachel Cherwitz:         546 Fifth Avenue
                         New York, New York 10036
                      BY:ARTHUR L. AIDALA, ESQ.
                         IMRAN H. ANSARI, ESQ.


For the Defendant     BONJEAN LAW GROUP PLLC
Nicole Daedone:          303 Van Brunt Street - First Floor
                         Brooklyn, New York 11231
                      BY:JENNIFER A. BONJEAN, ESQ.

Linda A. Marino, Official Court Reporter
225 Cadman Plaza East / Brooklyn, NY 11201
lindacsr@aol.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

*Proceedings*                                                      2

1        THE LAW CLERK:  This is United States v. Cherwitz,

2   et al., 23-CR-146.

3        Will counsel please state your appearances, starting

4   with the U.S.?

5        MS. BENSING:  Kayla Bensing and Gillian Kassner for

6   the Government.  Good morning, your Honor.

7        THE COURT:  Good morning.

8        MS. BONJEAN:  Good morning, your Honor.  Jennifer

9   Bonjean, B-O-N-J-E-A-N, of the Bonjean Law Group, on behalf of

10  Ms. Daedone.

11       THE COURT:  Good morning.

12       MR. ANSARI:  Good morning, your Honor.  Imran H.

13  Ansari, A-N-S-A-R-I, for the Defendant Rachel Cherwitz.

14       MR. AIDALA:  Good morning, Judge.  Arthur Aidala for

15  Ms. Cherwitz.

16       THE COURT:  All right.  We're here on a couple of

17  motions.  Let me hear from each side what's on your agenda for

18  today, what you think the Court needs to decide.  I've got a

19  sheaf of papers here.

20       MS. BENSING:  Thanks, your Honor.

21       From the Government's perspective, the Government is

22  requesting that the Court order the proposed protective order

23  that the Government filed I believe on November 4, your Honor.

24       And, so, I think that's our primary ask of the Court

25  today.

*Proceedings*                                                    3

1        THE COURT:  Okay.  And I have a copy of it here.

2        MS. BENSING:  Yes.

3        MS. BONJEAN:  Thank you, your Honor.

4        Our position, of course, is that the existing

5   protective order protects the interests of all parties.  The

6   proposed protective order will obstruct our ability to do our

7   job, to consult with the people that we need to consult with

8   freely, it will lengthen the time and resources that we need

9   to expend in order to do our job and prepare for a trial that

10  is less than two months away with an exorbitant amount of 3500

11  material that we still don't have.

12       So, I don't want to jump the gun and make my

13  argument, but that is generally our position at the moment.

14       THE COURT:  Shall we talk about the specific

15  provisions of the proposal and start with the Government and

16  then go to the defense to respond on each one?

17       I think that's probably the best way to handle this.

18       MS. BENSING:  That's fine, your Honor.

19       And just for background for the Court, we did

20  attempt to meet and confer with the defense regarding the

21  proposed protective order, including asking them whether there

22  were any specific provisions that they objected to.

23       There was only one change that they requested, which

24  is that both parties be able to seek further court order in

25  the event of any kind of challenged, sensitive, or attorneys'

*Proceedings* 4

1    eyes only provision.  We did make that change in here.  So,

2    from the Government's perspective, we have attempted to

3    incorporate any feedback that we received from the Defendants.

4             So, I just say that for the Court's background

5    because I'm not sure in terms of feedback provision by

6    provision, I'm not sure whether we understand certain defense

7    objections.

8             THE COURT:  I think it makes more sense after

9    hearing what you have to say to have the defense point to

10   different pages and problems that they have.

11            So, why don't we just go page-by-page and have the

12   defense tell us where the first page they have a problem is?

13            MS. BONJEAN:  Yes, Judge.  If you could give me one

14   second, I'm just pulling it up on my computer.

15            THE COURT:  Of course.

16            MS. BONJEAN:  Thank you.

17            (Pause in proceedings.)

18            THE COURT:  Do you have a network here?

19            Are you having trouble logging in?

20            MS. BONJEAN:  No, I'm on Judge.  Thank you very

21   much.  I'm just going to pull it up.

22            THE COURT:  Take your time.

23            MS. BONJEAN:  I should have brought paper copy.

24            (Pause in proceedings.)

25            MS. BONJEAN:  Okay.  I have it.

*Proceedings*                                                    5

1        THE COURT:  I've printed out the order.  So, I have

2   it listed by Document 189-1 and by page number.

3        So, if we could start with Page 1, do you have any

4   problems with Page 1?

5        MS. BONJEAN:  No, your Honor.  Page 1 appears to be

6   acceptable.

7        THE COURT:  How's Page 2?

8        MS. BONJEAN:  Yes, Judge, this is where -- provision

9   two is where we do have an objection to the definition of

10  "defense staff."  And I could give the Court some history

11  on...

12       THE COURT:  Sure.  Let me just read what I have

13  here:  Defense staff, which is defined as nonlawyer staff

14  employed by defense counsel as well as expert witnesses,

15  investigators, and interpreters retained by defense counsel

16  and who sign and agree to be bound by the terms of this

17  protective order.

18       MS. BONJEAN:  That's correct.

19       In prior -- in the prior protective order that the

20  parties have been working on or working off of, "defense

21  staff" also included attorneys for the company of OneTaste.

22       In fact, when I first came into the case, I actually

23  had a meet-and-confer with the Government specifically to try

24  to understand what the scope of the protective order was.  And

25  we agreed, and my understanding was, that defense counsel, if

1    there was a joint defense agreement and they had signed on to

2    the protective order, did and could include attorneys who were

3    employed or represented OneTaste in some capacity.  And there

4    is a number of them.

5           But most importantly, there are attorneys who have

6    worked for OneTaste for many years, that are counsel for

7    OneTaste.  In this provision, the Government seeks to excise

8    that and limit defense counsel to only our law firms and the

9    staff for our law firms.

10          THE COURT:  So, what would the change be that you

11   would write into it?

12          MS. BONJEAN:  I would like to keep the old

13   protective order that included counsel for OneTaste.

14          It will be impossible for us to do our jobs without

15   being able to consult freely with counsel for OneTaste.

16          THE COURT:  Just give me the edit that you would put

17   in and then I'll hear from the Government.

18          MS. BONJEAN:  I would include "any counsel who

19   represents OneTaste."

20          THE COURT:  And where would you put that?

21          MS. BONJEAN:  In the definition of defense staff, I

22   suppose, or defense counsel -- Defendants and defense counsel.

23          THE COURT:  And the specific language?

24          MS. BONJEAN:  After it says "Defendants and defense

25   counsel," I would put in parentheses "including counsel that

*Proceedings*                                                                   7

1    represents OneTaste" or "any counsel who represents OneTaste

2    either as corporate counsel or in parallel litigations."

3              Because there are other litigations going on.  If

4    you give me a second, I'd be happy to write it.

5              THE COURT:  That's okay.  So, are these specific

6    individuals that you can enumerate right now?

7              MS. BONJEAN:  Yes, I think I can identify them right

8    now.

9              THE COURT:  Why don't you do that?

10             MS. BONJEAN:  Let me consult with my client.

11             THE COURT:  As you see, I'm very concrete.

12             (Pause in proceedings.)

13             MS. BONJEAN:  Give me one second, your Honor.  Let

14   me get the spellings correct.

15             (Pause in proceedings.)

16             MS. BONJEAN:  These are the attorneys that I would

17   identify specifically.

18             THE COURT:  Okay.

19             MS. BONJEAN:  Kevin Williams; Rachel Caine, that's

20   C-A-I-N-E; Alan Dershowitz; Brent Newton.

21             THE COURT:  N-E-W-T-O-N?

22             MS. BONJEAN:  Yes.

23             Shaneeda Jaffer.

24             THE COURT:  S-H-A?

25             MS. BONJEAN:  N-E-E-D-A J-A-F-F-E-R.

*Proceedings*                                                    8

1         And Imran just reminded me that, actually,

2    Mr. Dershowitz is not OneTaste counsel.  He's actually of

3    counsel for one of the Defendants.  I guess he wouldn't need

4    to be identified separately.

5         MS. BENSING:  Your Honor, just on that note, the way

6    that this is defined is requiring notice of appearance in the

7    case.  So, I think he would need to be defined as he has not

8    noted an appearance in the case.

9         THE COURT:  Okay.

10        MS. BONJEAN:  Okay.  Paul Pelletier, that's

11   P-E-L-L-E-T-I-E-R; Ezra Landes, that's E-Z-R-A L-A-N-D-E-S;

12   and Ed McPherson, E-D M-C-P-H-E-R-S-O-N.

13        THE COURT:  Okay.

14        MS. BONJEAN:  And then co-counsel for Mr. McPherson

15   is P-I-E-R-R-E P-I-N-E.

16        THE COURT:  Pierre Pine?

17        MS. BONJEAN:  Yes, Pierre Pine.

18        MS. BENSING:  Your Honor, if I may be heard, the

19   Government strongly objects to this.  I think it's completely

20   inappropriate in light of the history of this case.

21        So, I think the Court has our filings, but I want to

22   take the Court back to our August filings and some of the

23   improprieties that were conducted by some of the attorneys who

24   are on this list.

25        And specifically, as we set forth in that August

*Proceedings*                                                    9

1   letter, Paul Pelletier, who is counsel for OneTaste, who was

2   previously receiving materials pursuant to the current in

3   effect protective order in the case.

4           He used those materials to reach out to other

5   witnesses and threaten them with litigation.  And I can say,

6   your Honor, that it has been effective.  Witnesses are afraid.

7   They are afraid of getting sued, they are afraid of having

8   significant financial penalties, and a number of them have

9   expressed that to the Government in this case, as we are in

10  the two months prior to a very contentious trial, your Honor.

11          So, I think it's completely inappropriate to be

12  sharing materials with OneTaste counsel that they can go out

13  during this very sensitive time period and threaten these

14  witnesses, which is exactly what's been demonstrated in this

15  case.

16          The next thing I want to say --

17          THE COURT:  That's one attorney.

18          How many attorneys did that specifically are you

19  referring to?

20          MS. BENSING:  We're aware that happened with Paul

21  Pelletier.  He's the one for whom we have correspondence.

22          But I don't think there's a big distinction, your

23  Honor, with these various attorneys.  I think that they are

24  all kind of working together.  At least that's the

25  Government's understanding.  So, I want to turn now to some of

*Proceedings*                                                    10

1    the other attorneys.

2              And specifically, Ed McPherson and Pierre Pine, it's

3    my understanding that they represent OneTaste in connection

4    with a suit that's been filed in California regarding one of

5    the Government's victims.  He's a civil lawyer.  I'm unclear

6    what he has to do with the criminal case except that at least

7    in the context of the civil case, it has become clear what

8    he's trying to do, which is discourage this witness from

9    cooperating with the FBI.

10             So, I can just kind of outline some of the things

11   that it's my understanding that he said in the civil case.

12   And I think one of the most disturbing things that he said is

13   in a conference I think as recently as last week or the week

14   before.

15             He indicated that the witness, the victim, is

16   obligated under the settlement agreement not to say anything

17   disparaging or defamatory or really anything about her

18   settlement to anyone and that includes the FBI.

19             That is an incorrect statement of law.  He is

20   clearly trying to use the civil case to prevent the victim

21   from speaking with the FBI.  It is clearly improper.  It is

22   clearly something that the Government takes very seriously.

23   It's obstructive conduct, your Honor.

24             The other thing I want to raise is OneTaste's

25   retention --

*Proceedings*                                                          11

1      THE COURT:  I'm sorry, which attorneys are you

2  associating with that remark?

3      MS. BENSING:  That would apply to the civil

4  attorneys, your Honor.

5      So, I confess I'm not familiar with at least a

6  couple of names that were just proposed by the defense, so the

7  Government would want to understand more about some of the

8  people that are on this list.  But my understanding is that

9  Ed McPherson and Pierre Pine are the ones who are attempting

10  to silence the victims in connection with that civil case.

11      I then want to raise issues that we have really

12  outlined, I think, in our filings in connection with

13  OneTaste's retention of the Frank Report.  And I think a

14  number of attorneys were involved in that.  I know that

15  certainly Kevin Williams was.  I believe that Paul Pelletier

16  had communications with the Frank Report.  There's another

17  general counsel named Evan Williams, I believe, who had

18  communications with the Frank Report.

19      But in brief, OneTaste hired the Frank Report to

20  purportedly investigate the Government's case, paying him

21  $20,000 a month.  And he has published really disgusting

22  things about the victims and the witnesses in this case, and I

23  think we've cited some of that for the Court.

24      But, again, it is effective.  Witnesses are

25  reporting to us that they are afraid of this backlash.  And

*Proceedings*                                                    12

1    it's not just reporting on the criminal case, your Honor, it's

2    very derogatory, malicious terms that are being used in these

3    posts of the investigator that was hired by OneTaste.  And

4    concerningly, we've also learned that this OneTaste

5    investigator reached out to a potential witness, knowing that

6    she was represented, and attempted to interview her

7    purportedly on the basis of being a journalist.  But that

8    person was, in fact, hired by OneTaste.

9            So, there is a clear strategy by OneTaste to

10   intimidate these victims and witnesses in basically whatever

11   way they can.  I think there was a violation of the protective

12   order, which we outlined for the Court in our August letter,

13   but I think separately from that there is a more fundamental

14   strategy that is being used by this organization for which the

15   Defendants were principals and it's very improper.  The

16   Government has serious concerns.

17           That then brings us to the protective order in this

18   case.  The one that is currently in this case has effectively

19   governed all of the Rule 16 discovery.  So, that Rule 16

20   discovery has been governed by the prior order and the prior

21   order, unfortunately from the Government's perspective, the

22   protective order in effect does allow the Defendants to share

23   materials under the terms of that order.

24           So, what this revised protective order does is deal

25   with the 3500 material.  That's effectively what we are

*Proceedings*                                                    13

1   talking about, talking about the *Jencks Act* material.  And I

2   think that the law is very, very, very, very clear that the

3   *Jencks Act* requires the production of copies of witness

4   statements for inspection by the defense for purposes of

5   cross-examination.  That is what the law says.

6           There is no basis to share this material with any

7   counsel for OneTaste.  There is none whatsoever, your Honor.

8           MS. BONJEAN:  I'll let Mr. Ansari go first.

9           MR. ANSARI:  Your Honor, I think the Government is

10  somewhat conflating defense of this case with some sort of

11  witness intimidation or seeking to silence witnesses here.

12  That's not the case.

13          I have to make a few points in response to the

14  Government's arguments.

15          First, they cited to Paul Pelletier, who is counsel

16  to OneTaste, reaching out to certain individuals in his

17  capacity as counsel for OneTaste.

18          That was related to the improper taking of

19  intellectual property from OneTaste.  He did nothing wrong.

20  He only sought to assert the rights of OneTaste over that

21  intellectual property by using civil means and using all

22  remedies under the law.  There was nothing improper with that.

23  So, that's one point.

24          The next point, your Honor --

25          THE COURT:  Sorry, what did he do exactly?

*Proceedings*                                              14

1      MR. ANSARI:  Your Honor, he sought to get privileged

2  material back.

3      THE COURT:  This is the document, the thing referred

4  to as "the document"?

5      MR. ANSARI:  Yes, your Honor.

6      THE COURT:  Okay.

7      MR. ANSARI:  There was nothing improper with him

8  doing that.  That was material that was privileged, it was in

9  the capacity of OneTaste, and it was taken improperly.  It was

10  stolen from OneTaste.  He did nothing improper but seek to get

11  back and assert all remedies under the law that he has at his

12  utilization for OneTaste.

13      Ed McPherson, your Honor, and his colleagues filed a

14  civil suit against a witness in this case, Jane Doe 1.  That

15  civil suit was filed before the Government brought their

16  criminal case against these two defendants.

17      Again, that was a civil lawsuit based on a breach of

18  a settlement agreement which had an NDA and for defamatory

19  statements and a breach of that agreement by Jane Doe 1.

20  There is nothing improper with that, your Honor.  In fact, I

21  would submit to you, your Honor, that they are doing

22  everything that is permitted to them under the law.

23      They're using the civil system.  They're bringing

24  lawsuits.  It's all out there under the auspice of a civil

25  suit and also under the watch of a civil judge in California.

*Proceedings*                                                        15

1   There is nothing improper there.

2           So, what I feel the Government is trying to do is

3   trying to hamper the defense in any way they can.  They have

4   an indictment here of a forced labor conspiracy, we have a

5   bear bones indictment, and we are still very much in the dark

6   as to what this case is about.

7           But every move that we take as defense counsel to

8   fully explore the facts that we can for our clients, to

9   investigate the claims that are brought by the Government,

10  they seek to stop us.  There is nothing improper.  There is

11  nothing outside the four corners of the law that any of these

12  attorneys that are associated with OneTaste or defense counsel

13  here, for that matter, have done.

14          Frank Parlato, this investigative reporter, your

15  Honor, he enjoys the protections of the First Amendment.

16  There is not one case or witness or point that the Government

17  can cite to where Frank Parlato has cited to anything under a

18  protective order, has somehow gotten material that he should

19  not have.  And he has every right under the First Amendment as

20  a journalist to report on how he sees this case.

21          But to call that witness intimidation is one thing.

22  The Government brought this indictment.  They have a multitude

23  of witnesses.  Those witnesses now are exposed; exposed not to

24  anything improper, your Honor, but to scrutiny, scrutiny by

25  the defense, because that's what we can do in order to protect

*Proceedings*                                                                16

1  our clients' rights under the Constitution, formulate a robust

2  defense.  And that's all that's going on.

3       There is no need to revise the protective order.

4  And if anything, your Honor, it's going to hamper the

5  defense's ability in these vital weeks to defend our clients.

6  Again, if there is --

7       THE COURT:  Hold on just one minute.  Let me just

8  jump in.

9       So, is what we're talking about past conduct or are

10 we talking about future conduct?

11      If we're talking about past conduct -- in other

12 words, what the Government is objecting to these individuals

13 having done in the past -- that's one thing.  If what we're

14 talking about is the Government saying these individuals

15 should not be able to use 3500 materials to speak to witnesses

16 or intimidate other individuals, that's another issue.

17      And, so, one question I have is do these

18 individuals, these attorneys, have any intention to speak to

19 any of the people that the Government is planning on calling

20 as witnesses?

21      MS. BONJEAN:  No, Judge, and these attorneys have

22 never spoken to these individuals.

23      Now Frank Parlato, as you noticed, he wasn't on the

24 list of people that we're trying to include within the circle

25 of defense counsel.  Frank Parlato, by the way, is -- whatever

*Proceedings*                                                    17

1   happened in the past is in the past.  He is not employed by

2   OneTaste, as I understand it, presently.  He is not involved

3   in this case.  There is no intent by anyone to share any

4   information with Frank Parlato.

5           Again, I do think the Government has conflated these

6   matters a little bit.

7           THE COURT:  Let me just jump in again.

8           MS. BONJEAN:  Sure.

9           THE COURT:  So, the Government is raising a serious

10  concern about witness intimidation and about behavior that

11  happened in the past.

12          If there were a ruling that these individuals cannot

13  speak to witnesses or cannot participate in the conduct that

14  the Government is worried about, would that solve the

15  Government's concerns?

16          MS. BENSING:  I don't think so, your Honor.  So, let

17  me just address some of what has been said.

18          I think, again, I want to kind of just talk about

19  what we're actually talking about here, which is the 3500

20  material, the prior statements that witnesses have made.  That

21  3500 material under the law is only to be used by the defense

22  for purposes of cross-examination.

23          THE COURT:  Right.

24          MS. BENSING:  There has not been any coherent

25  explanation of why civil attorneys who are involved in a

1   lawsuit against one of the Government's victims or why any of

2   these other people need access to these materials.

3           And in fact, what we just heard from the defense is

4   that they want to be able to seek all remedies available to

5   the company under the law, but that is exactly what's

6   improper.  The 3500 material is to be used by the defense for

7   cross-examination.

8           The way that the defense is defined in this

9   protective order is standard.  There is really no basis for

10  sharing these materials.

11          And again, it's really more a question of timing.

12  We are two months before a very serious, very large criminal

13  trial and there's no basis to share the 3500 materials if --

14  these witnesses will be testifying at the trial, your Honor.

15          So, I think in this very sensitive pretrial period,

16  where witnesses have expressed to the Government fears of

17  retaliation by OneTaste, which are very well-founded, I don't

18  think that there can be a real distinction between past and

19  future conduct in light of the conduct in this case.

20          MS. KASSNER:  Your Honor, I just want to add

21  something for your awareness.

22          The 3500 material, the reason it causes particular

23  concern in this case is it details very sensitive matters,

24  including matters that deal with histories that some of the

25  witnesses have had, including child sexual trauma, including

1  other really quite significant things that have happened to

2  them that could threaten their employment if people were to

3  find out.

4         The concerns here are quite concrete.  People have

5  told us they are worried about what will happen to their

6  careers, what will happen if their families find out.  This is

7  sensitive information, much of which has been disclosed to the

8  FBI, that doesn't even have to do with OneTaste.

9         Witnesses have expressed that they're afraid they

10  will be sued, they're afraid that it will be posted on the

11  Frank Report or some other media outlet.

12         And by the way, he doesn't need to access 3500

13  material for that to happen.  You can identify witnesses and

14  you can identify to him things that he could look into without

15  explicitly sharing the actual paper with him.

16         So, the concern we have is these witnesses have seen

17  how other witnesses have been treated.  They have looked at

18  the online postings that are calling witnesses fat, that are

19  calling witnesses stupid, that are outing their full names

20  even if they've been changed, they're outing where they work,

21  they're showing their photos at various points.  It is direct

22  intimidation, your Honor, and we are concerned about it

23  because it is having an effect.

24         And the 3500 material in this case is quite

25  sensitive.  And, so, absent a specific showing as to why,

*Proceedings*                                                    20

1    again, a civil lawyer would have any reason to access this

2    material -- civil lawyers are lawyers that have never appeared

3    in this case, have no, as far as we're aware, connection to

4    this case.  We just don't understand the basis for it and

5    we're quite concerned about it.

6              THE COURT:  Final remark.

7              MS. BONJEAN:  Yes, if I may respond to a couple of

8    things.

9              Again -- and I think it's important for the Court to

10   understand why we need other attorneys for OneTaste to be able

11   to work with us and have access to these materials.

12             Now, the civil attorneys are a different matter.

13   The civil, you know, we can have a different conversation

14   about the civil attorneys if that's their real concern.

15             The bigger problem is that we're learning more

16   information about our own criminal case from the civil

17   attorneys, not the other way around.  So, it's not us sharing

18   information with them, what this is really about is them not

19   sharing the information with us and we're learning from the

20   civil attorneys that, from our perspective, *Brady* material --

21   that's a different matter -- but the civil attorneys are one

22   bucket, I guess.

23             The bigger problem is that the Government's

24   indictment charges a forced labor conspiracy under Section

25   1589(b), as in "boy."  And what that states is:  Whoever

*Proceedings*                                                                21

1    knowingly benefits financially or by receiving anything of

2    value from participation in a venture -- a venture -- which is

3    engaged in the providing or obtaining of labor services by any

4    means described in Subsection A.

5              So, in essence, the Government has indicted OneTaste

6    without indicting OneTaste.  But they have indicted the

7    Defendants and are now holding the Defendants responsible,

8    essentially vicariously, for every single act that anyone in

9    OneTaste has taken over the course of twelve years.  If you

10   had a chance to look at their 133-page motion in limine, you

11   would see that that is their intent, that they believe that

12   every person who worked for OneTaste is an agent of OneTaste,

13   and, therefore, their conduct is attributable to these

14   Defendants.

15             The Government's position is that any statement by

16   really anyone in the higher echelon of OneTaste over the

17   course of twelve years is a co-conspirator statement.  Again,

18   that is going to come in as evidence against them.

19             There's a witness list which is fairly meaningless

20   because there's so many people on the witness list, including

21   a dead person.  So, we don't really even know who their real

22   witnesses are.  There's been no effort to pare that down.

23             So, what I'm trying to say here is that our ability

24   to understand this case requires us to consult with lawyers

25   for OneTaste who have been with OneTaste for so many years

*Proceedings*                                                                    22

1    that we can't -- we'll never be able to be ready for trial in

2    two months if we can't say:  Hey, who is this person?  This

3    person said X, Y, Z.  What of it?  This is what they've

4    accused OneTaste of doing or someone in OneTaste.

5            The witness statements, by the way, which we have

6    not seen, of course are going to include allegations not just

7    of the Defendants but probably any person who has ever worked

8    for OneTaste over the course of twelve years.

9            We cannot be in a position where we're going to get

10   hundreds of thousands of pages or tens of thousands of pages,

11   whatever it is, and not be able to consult with the attorneys

12   of OneTaste.  And, frankly, even the upper executives of

13   OneTaste, which I guess are potential witnesses, and they

14   don't necessarily have to have copies of materials.  But we

15   need to be able to have a back-and-forth with the attorneys of

16   OneTaste.

17           All I can tell you is since they charged it this

18   way, with the venture essentially being -- the venture itself

19   is an unindicted co-conspirator, so we have to be able to free

20   flow information.  If we have to sit on Zooms and just show

21   pictures and treat everyone as a witness rather than these

22   attorneys as defense counsel, we won't be ready for trial.  It

23   will be impossible.  We're already not going to be prepared,

24   frankly, and this is something we've been complaining about.

25           Frank Parlato is irrelevant.  It's a red herring.

*Proceedings*                                                      23

1   No one is sharing anything with Frank Parlato and no one ever

2   did.  Frank Parlato did what he did on his own.  He said some

3   unkind things, he did some petty name calling.  Yes, that's

4   unfortunate.

5           But what we do know about this process is that the

6   openness of this process, even if it means certain witnesses

7   may not like the discomfort of having to come into court and

8   point fingers, that's sort of the whole purpose of this

9   process.  It's not supposed to be comfortable.  You're not

10  supposed to do it in secret.

11          Want to know why?  We don't do it in secret because

12  it's much easier to lie in secret than it is to lie in

13  private.  That's the whole concept of the Sixth Amendment.

14          So, if there are issues related to child sexual

15  abuse and that stuff, that's a different matter.  There can be

16  a provision with sort of attorneys' eyes only for the very

17  most sensitive nature.  If that would make the Government

18  happy, we would be willing to compromise on that.

19          But we cannot be stymied in our ability to defend

20  the case and that's really what the problem is here.

21          THE COURT:  You're talking about a consulting

22  attorney, really, someone who can consult with you and tell

23  you who the witnesses were, how they fit in, what the history

24  is, one or two.  And the Government's concern seems to be with

25  leakage; if we have this large group of people here, we won't

*Proceedings*                                                     24

1   know who is going out there intimidating people and how that

2   happened and who leaked the information.

3            One solution in my mind would be to give you a

4   limited number of people from OneTaste, like Mr. Williams and

5   Mr. Pelletier or someone else.

6            MS. BENSING:  Your Honor, those are the two

7   individuals who we allege have -- not allege, I mean the

8   records speak for themselves, who have used the discovery

9   material.

10           And just on the note about --

11           THE COURT:  If you were just going to have one or

12  two people that they could use as consultants, who would those

13  be?

14           MS. BENSING:  I'm familiar with some of the people

15  on the list; Brent Newton, Shaneeda Jaffer.  You know, we'll

16  have to sort of understand who these people are.

17           But look, I think that they have received voluminous

18  Rule 16 discovery.  That discovery includes things like

19  journals of potential victims.  I don't think that there is

20  really any serious way that they can say that they have no

21  clue what the case is about and the 3500 will reveal that.

22  They have Rule 16 discovery that was governed by the prior

23  protective order.  And, so, I think that that would allow the

24  free flowing of conversations.

25           What we're talking about is sensitive witness

*Proceedings*                                                      25

 1    statements.  And I think that the concerns here are

 2    ill-defined by the defense.  They're talking about lying in

 3    secret.  I'm not sure what that is even a reference to.  These

 4    witnesses will be testifying at a public trial.  What we're

 5    talking about is 3500 material that is supposed to be used for

 6    the purposes of cross-examination.

 7            THE COURT:  My understanding of what counsel is

 8    saying, though, is that in order to fully prepare, once they

 9    see the witness list, they'll need to have conversations with

10    someone who has been associated with OneTaste for a period of

11    time and who has knowledge of the individuals, the cast of

12    characters, et cetera.

13            MS. BENSING:  But they have the witness list, your

14    Honor, so they can have those conversations now.

15            Again, there's been a lot that's been produced in

16    the case under the prior protective order.  That is a

17    different protective order.  Including the production of the

18    Government witness list, including the Government's voluminous

19    motions in limine that make certain identifying information.

20            THE COURT:  Right.

21            MS. BENSING:  So, they have that and they can have

22    those conversations based on the material that's been provided

23    to them.

24            What we're talking about is sensitive 3500 material.

25            THE COURT:  It could be that if we looked at what

1   categories of 3500, both irrelevant and sensitive, that might

2   be another way to approach this.  For example, let's say

3   childhood incest or history of -- I'm not sure what, but I'll

4   bet you can probably come up with a list of the kinds of

5   topics that could not be shared, 3500 material that couldn't

6   be shared.

7            I think targeting it that way, as I think about it,

8   is the best way to balance the interest of the Government and

9   the interest of the defense in being able to mount a defense.

10           MS. BENSING:  We do have, your Honor, designations

11  in the proposed protective order.  And I would also note that

12  the proposed protective order does permit the sharing of

13  information under the protective order to potential witnesses.

14           So, although I think it would be unusual and

15  certainly we could cross-examine defense witnesses if they

16  were shared the statements of other witnesses, if that's what

17  the Defendants wish to do there is a provision for that in

18  this proposed protective order.  So, I don't think that there

19  is a real stymie of an ability to confer and prepare a defense

20  here.

21           But I will say in terms of the 3500 material, it is

22  voluminous.  And most of the witnesses do have statements

23  interspersed throughout that deal with sexual trauma, prior

24  trauma before coming to OneTaste, trauma endured at OneTaste,

25  and other topics that are of a very, very sensitive nature.

*Proceedings*                                                27

1   And, so, I think it would significantly delay the production

2   of 3500 material if we were going to go back and propose

3   redactions to all of that.  We have been trying to get it over

4   to the defense, the defense counsel in this case, for purposes

5   of preparing this case and for cross-examination in this case.

6          And if there is some sort of specific need as to a

7   specific statement after we produce the 3500 material, we're

8   very open to having that conversation with the defense.

9          THE COURT:  So in other words, another way to look

10  at it would be to turn over the 3500 material, the defense

11  would then come to you and say, "We need to get more

12  information and I need to consult with so and so about this."

13         Will you agree that that's permitted and if you

14  disagree that you can come to the Court?

15         MS. BENSING:  And that's essentially what we have

16  outlined in the proposed protective order.  At that time, if

17  they want to propose an attorney who needs to have access to

18  this, we can then evaluate that.

19         But this kind of blanket list that includes civil

20  attorneys, attorneys who retained -- it's a little shocking to

21  hear the defense say that Frank Parlato just acted on his own

22  when he was getting paid $20,000 a month by OneTaste.  So, we

23  will have to have conversations about that.

24         But the protective order that we proposed does

25  provide for this back-and-forth, your Honor.

*Proceedings*                                                    28

1      THE COURT:  Please point me to a page or paragraph.

2      MS. BENSING:  Sure.  If the Court looks at I believe

3 paragraph ten.

4      And there's a provision in here for attorneys eyes'

5 only designation.  The Government anticipates using that very,

6 very sparingly.  So, I think what we're talking about here is

7 the sensitive material designation.

8      THE COURT:  So, how would this work for the

9 particular issues that we're talking about, the Government

10 would then designate certain kinds -- I think this is what we

11 were just talking about a minute ago -- certain kinds of

12 materials as sensitive and then it would be up to the defense

13 to do what, to say that "we'd like to share this with" and

14 they'd have to specifically designate who they want to share

15 it with?

16      How does that work?

17      MS. BENSING:  The protective order has a list of

18 signatories in Attachment A.  The protective order also,

19 again, also allows for the sharing of materials, even

20 designated as sensitive, to potential witnesses.  That's in

21 paragraph nine of the protective order.

22      THE COURT:  So, you'll be making the designation of

23 certain materials as sensitive before you release the 3500

24 materials and the ball would then be in the defense's court

25 to...

*Proceedings*                                                    29

1        MS. KASSNER:  Your Honor, if I could make a

2   proposal.

3        THE COURT:  Sure.

4        MS. KASSNER:  We hear the concern that we do have

5   trial in about two months beginning.  Any kind of review of

6   the 3500 material, which is voluminous, if we were to go

7   through line-by-line and try to work out an agreement about

8   specific sentences that are truly dispersed throughout it will

9   take us weeks, I think.

10        THE COURT:  We don't want to do that.

11        MS. KASSNER:  I think what we would propose is we

12   can produce the materials very quickly.  I think we're

13   prepared to do it if not today then on Monday.  We can produce

14   all of it under -- we would propose under this protective

15   order, which if they receive the materials and they have a

16   chance to actually see what they are, because right now we

17   know what they are but they don't, they can come back.  And if

18   there's -- if they think there's a provision under the

19   protective order that shouldn't apply to sets of materials

20   that they can identify that they think they need to share,

21   then they can approach us first or they can -- we can go to

22   the Court -- the protective order allows that -- and then we

23   can talk about specifics.

24        And it could be very well that we don't have an

25   objection to some of it.  But our goal is to get this material

*Proceedings*                                              30

1   out as quickly as possible.  We want them to have it well in

2   advance of trail.  They've asked to adjourn the trial.

3   Judge Gujarati has denied that request.  So, our goal is to

4   get this material in their hands so that they can begin

5   reviewing it and doing whatever they -- whatever investigatory

6   steps they want to take.

7            Our proposal is to get it out in the first instance,

8   to do it pursuant to this order, and that way we can talk

9   about concrete reasons why doing so might be inappropriate,

10  where the Court could actually look at it or everyone could

11  talk about the specifics and -- you know, we don't need

12  necessarily -- we want to make sure that -- I just think it

13  would be a more productive conversation and that way they'll

14  have it already and we'll revisit some of these issues if

15  needed.

16           THE COURT:  So, it's a question of timing, then.  If

17  you're willing to revisit the issues, you want to get the 3500

18  materials out, as Judge Gujarati does.  And the best way to do

19  it would be to allow the defense to come back and say, well,

20  we really need to share this material with such and such

21  person to answer certain questions.

22           MS. BENSING:  Yes, your Honor.

23           And just anticipating any kind of potential

24  attorney-client privilege or defense work product issue, the

25  protective order also allows the defense to go directly to the

*Proceedings*                                                    31

1    Court if they don't want to have that conversation with the

2    Government.

3                MR. AIDALA:  Judge, if I may be heard.

4                THE COURT:  Yes.

5                MR. AIDALA:  Just for a tiny bit of background,

6    Mr. Ansari and myself and my law firm met our client six weeks

7    ago.  Six weeks ago.  Some of the lawyers here have been

8    around for twelve years.  They know minutia.  We're doing the

9    best we can, we're working real late, but you cannot

10   substitute some of the institutional knowledge that these

11   lawyers have for Mr. Ansari and me with 45 or whatever, 60

12   days under our belts here.

13               I don't want them knowing who I want to talk to.  I

14   don't want them knowing who I'm focusing on.  I got to go ask

15   them permission, "Oh, can I go share this document with Kevin

16   because he knows more about this than I do?"

17               I don't want them to know that.  They have no right

18   to know what my investigation is, what my strategy is, what my

19   brain is.  That's preposterous.

20               If they want to put something in saying there's a

21   sliver that's for attorneys' eyes only, fine.  Let them

22   designate whatever those are.  If they're very personal

23   things, that's fine.  Besides that, they have absolutely no

24   right to know who I want to talk to about what.

25               And you know, they're treating this case like this

*Proceedings*                                                          32

1    is La Cosa Nostra.  Look at my Defendants, Judge.  They're

2    really intimidating people, right?  They're gonna scare the

3    heck out of people and keep them out of the courtroom.

4            It's beyond preposterous.  I need to know that I can

5    get the materials and, like I do in almost every other case --

6    you know these protective orders, your Honor, over the last

7    couple years they're handing them out like their cotton candy.

8    When you were and I were lawyers, practicing lawyers, there

9    were barely protective orders, Judge.  When someone was really

10   intimidated by an organized crime member, then there was a

11   protective order.

12           They have every right, every right, to talk to

13   whomever they need to talk to to defend them.  They're trying

14   to put them in jail for the rest of their lives.  For the rest

15   of their lives.

16           And they can't talk to people who know this case

17   better than their own trial attorneys do?

18           That's ridiculous.

19           So, your Honor, here's what I'm asking for:  If they

20   want to designate certain things attorneys' eyes only -- and,

21   also, it is a little offensive.  I know we don't know each

22   other that well, but we're very ethical lawyers.  32 years I

23   don't have a scratch on my armor regarding my ethics.  Not a

24   scratch.

25           All of a sudden I'm going to go around intimidating

*Proceedings*                                          33

1  witnesses, giving out things to the press that they're not

2  entitled to?

3          I take umbrage to that fact.  We're all in here to

4  conduct ourselves professionally and to the height of

5  professionalism.  And that should be a given or guarantee.

6          So, if they have certain things that are attorneys'

7  eyes only, fine.  Anything else, Judge, how do you handcuff us

8  from talking to lawyers who are better than us -- maybe not

9  better than us in talking to a jury and convincing a jury,

10 speaking to the trial judge, but they're better than us in

11 being able to decipher and understand what that 3500 material

12 is all about?

13         And to handcuff them, it's almost like a violation

14 of their right to counsel because those counselors are better

15 than these counselors.  And I'm putting that on the record in

16 terms of the minutia of the details of this case.

17         Mr. Ansari and I and Mr. Jaccarino, who will be

18 joining us, I'm sure are going to give up our Christmas

19 vacation and holiday vacation to be on top of this because we

20 have these women's lives in our hands.

21         But to tell us we can't use these tremendous human

22 legal lawyers -- I'm not asking to go out and talk to the guy

23 who I know on the corner, I'm talking about lawyers who have

24 done all the corporate documents, all the corporate

25 compliance, who have made sure that everything they did was

*Proceedings*                                              34

1   above the law; not at the law, above the law.  And now they're

2   like:  Oh, no, you can't talk to them because they're going to

3   go out and intimidate witnesses.

4            Why is that an assumption?

5            It's offensive.  It's absolutely offensive.

6            And for us to do our job, I'm putting it on the

7   record right now it would almost be malpractice for my law

8   firm to try this case without consulting with them because

9   they know so much more about the history and the details, and,

10  as Ms. Bonjean said, they are basically charging them as the

11  corporation.  And now they don't want us to talk to the

12  lawyers of the corporation.

13           That makes no sense, your Honor.

14           I apologize for my enthusiasm, but it's -- for me,

15  this is elementary.  It's absolutely elementary, the way I was

16  raised as a prosecutor and as a defense attorney, that they

17  have every right to talk to people who have knowledge.  Like,

18  very valuable knowledge, Judge.  I'm not asking to just chat

19  with people, hey, let me bounce this off of you.

20           They know more than we do and I need them.  Thank

21  you, Judge.

22           MS. BENSING:  Your Honor, may I briefly respond to

23  that?

24           THE COURT:  Yes.

25           MS. BENSING:  Because I just want to make clear that

*Proceedings*                                                     35

 1   the Government is not saying that these defense attorneys over

 2   at the table are going to violate the protective order.  We

 3   have no basis to think that and I don't think that.

 4        The concern is the attorneys for OneTaste, for whom

 5   we have laid out a record of having used materials in improper

 6   ways and in ways that have intimidated witnesses.  And, so, I

 7   just want to make that distinction very clear because I don't

 8   think that the Defendants can have it both ways.

 9        I don't think that they can say these people are

10   absolutely necessary to our defense and share materials with

11   them and also kind of disclaim any actions that the same

12   people have taken to attempt to retaliate against witnesses.

13        THE COURT:  And specifically, you're talking about

14   Mr. Williams and Mr. Pelletier?

15        MS. BENSING:  Mr. Williams, Mr. Pelletier, the civil

16   attorneys --

17        MS. BONJEAN:  Judge, we need to have a hearing.

18        You cannot just accuse people of violating

19   protective orders because -- and if you look at the

20   submissions of the Government, it is so flimsy.

21        What did Kevin Williams do?

22        I want to know right here and now what specifically

23   he did.

24        I cannot try this case without Kevin Williams.  Or

25   Rachel Caine.  Those are attorneys that have been with this

*Proceedings*                                                        36

1   firm.

2          The civil attorneys, fine.  If they think the civil

3   attorneys are leaking information, I mean it's -- I think they

4   will be very upset to hear that those allegations are being

5   made in a public courtroom in the Eastern District of New

6   York.

7          But be that as it may, I cannot do this case without

8   the institutional knowledge of Kevin Williams.  Can't do it.

9          And they can say we want to get this into the hands

10  of defense counsel.  It does me no good.  You can give it to

11  me all today.  But if I can't start going through witness

12  statements, "Who is this?  Who is this?  Is there any truth to

13  this?  What's the story here?  This happened in 2007, do you

14  know this person?" if I can't do that with Mr. Williams or

15  Ms. Caine --

16         And I will point out Ms. Cherwitz wasn't even

17  associated with OneTaste for the course of some of this

18  alleged conspiracy.  So, she really is in the dark about some

19  of these things.  My client -- it was a large organization.

20  She doesn't know herself personally many of the people on the

21  witness list.

22         This is not a situation where we can even go to our

23  own clients and get the information.

24         I cannot -- if I can't consult Mr. Williams or

25  Rachel Caine, who are counsel for OneTaste, I can't do my job.

*Proceedings*                                                      37

1    And if that's what the Court is going to rule, then I think

2    there needs to be more than just, "Our allegation is somehow

3    we believe he may have had something to do with information

4    that went to Frank Parlato," which, by the way, was never

5    under protective order to begin with.  There's no nexus to a

6    violation of the protective order that justifies forcing us to

7    sit here amongst ourselves and go:  I wonder who this person

8    is.  Let's get on the phone and maybe we can ask someone about

9    this person.

10              It is going to slow us down --

11              THE COURT:  Let me just ask you a question.  This is

12   just hypothetical.

13              MS. BONJEAN:  Yes.

14              THE COURT:  If you were allowed to speak to

15   Mr. Williams and Ms. Caine, is that it?

16              Is that who you need or who else do you need?

17              MS. BONJEAN:  Well, the only other person, your

18   Honor, that is part of sort of -- that is part of the defense

19   but she's not an attorney who works for OneTaste --

20              THE COURT:  Who is this?

21              MS. BONJEAN:  Her name's Shaneeda Jaffer.

22              What firm does she work for again?  Benesch.

23              She's an attorney.  She's not in-house counsel for

24   OneTaste, she works for a firm.

25              THE COURT:  So, those three.

*Proceedings*                                                      38

1        MS. BONJEAN:  Those would be the bare minimum, yes.

2        THE COURT:  And then if there were a prohibition

3   against their speaking to any witnesses?

4        MS. BONJEAN:  Yes, that's never -- they've never

5   spoken to any witnesses.  That's the thing, I don't really

6   even know where that's coming from.

7        The Government cannot, cannot, identify a single

8   instance where Mr. Williams has ever spoken to -- at least for

9   the purpose of this criminal defense, as far as I know.  If

10  they have something, then they should say so.  I'm unaware of

11  that.

12       THE COURT:  I think we've all exhausted the issue

13  but let me hear from the Government.

14       MS. KASSNER:  Your Honor, just very briefly, I

15  actually think that as written, the protective order would

16  allow the sharing of information with Kevin Williams or Rachel

17  Caine because they are potential witnesses in the case.  They

18  were at OneTaste at the time of a lot of these events, which

19  is why they have so much institutional knowledge.

20       And, so, the protective order doesn't prevent them

21  from consulting people who were there at the time who know all

22  these people who have personal knowledge of those facts.  And,

23  so, I actually think that as written, it was allowed.  And we

24  actually discussed this at our meet-and-confer, that it would

25  allow them to share those materials.  They would need to sign

*Proceedings*                                                    39

1    the protective order and agree to abide by it, but as long as

2    they do there's no problem.

3              THE COURT:  You made a statement on the record,

4    counsel heard it on the record.  I think the issue is

5    resolved.

6              MS. BONJEAN:  Yes, Judge.  They already are on the

7    protective order and they would sign the new protective order.

8              THE COURT:  All right.  So, that's resolved.

9              And they will not be speaking directly to witnesses.

10             MS. BENSING:  Yes, they would be signing the

11   protective order.

12             THE COURT:  Right.  Are there any other major

13   issues?

14             MS. BENSING:  The Government would -- for

15   clarification, the Court will be signing the proposed

16   protective order?

17             THE COURT:  I just want to know if there are any

18   other major issues with the protective order.

19             MS. BONJEAN:  Judge, just so I'm clear, because when

20   we had our meet-and-confer, I asked this specific.  This was

21   the argument that they said:  Well, they can't.  You can't

22   share information with them, then.

23             I said:  So, I can actually share a document with

24   them, like if I said, Here, can you look at this document and

25   read it?

*Proceedings*                                                    40

1      As the Government has pointed out, there's
2  voluminous 3500 material.
3      Can I share it?
4      And she said:  Well, you can't actually share the
5  document.  You can share the information.
6      So, how would I possibly be able to do that?
7      THE COURT:  Let's cut to the chase on that.
8      MS. BENSING:  That's inaccurate, your Honor.
9      The protective order, if they read it, allows for a
10  sharing of sensitive materials but not the retention of those
11  materials by a witness.
12      MR. ANSARI:  Your Honor, just on a practical --
13      THE COURT:  Hold on.  I want to establish that this
14  is now clear on the record that 3500 material can be shared
15  with these individuals but they may not retain them.
16      "Retention" means after the close of the case?
17      MS. BENSING:  No, retention means for potential
18  witnesses, the defense counsel and defense staff can retain
19  them as designed in the protective order.
20      Potential witnesses, those witnesses are not
21  permitted to retain the 3500 material under the protective
22  order.  They can view it and then they have to return it to
23  the defense attorneys in this case.
24      MS. BONJEAN:  Therein lies the issue a little bit.
25      How long can they view it for?

*Proceedings*                                                           41

1          THE COURT:  That's my question.

2          MS. BENSING:  Well, your Honor --

3          THE COURT:  If they need to review it up to the time

4    of trial, can they do it?

5          MS. BENSING:  Your Honor, I don't think it's

6    appropriate to just give potential witnesses 3500 material.

7    That is truly unlike anything I have seen in my experience as

8    a prosecutor, your Honor, just handing out 3500 material to

9    potential witnesses.

10         THE COURT:  I understand it's unusual, but the

11   witnesses are lawyers.

12         MS. BENSING:  May I have one moment, your Honor?

13         (Pause in proceedings.)

14         MS. BENSING:  Your Honor, the Government would agree

15   to have Kevin Williams and Rachel Caine be, I guess, defined

16   as "defense staff" pursuant to the protective order, though

17   they could then under the protective order retain it.

18         But again, the concern here is that Kevin Williams

19   was involved in retaining Frank Parlato, who -- I don't know

20   if the Court has looked at that blog, but it is really sort of

21   disgusting comments that are being made.  So, the Government

22   does have a real concern here.

23         And, so, he absolutely needs to sign it and I think

24   that there needs to be some real policing or real strong

25   warning given by the Court that this use of litigation and use

*Proceedings*                                                    42

1   of blogs to intimidate witnesses is really kind of part and

2   parcel with some of the manipulation and coercion that's

3   alleged in the indictment.  And the Government has a real

4   concern here.

5          And, so, we want to be reasonable but we have a real

6   concern here, including with those two individuals; in

7   particular, Mr. Williams.

8          THE COURT:  The Court has a real concern about many

9   of the concerns, but one concern is certainly that no one

10  should be allowed to intimidate witnesses or do anything that

11  is unethical.  At the same time, there has to be a right of

12  the defense to be able to consult with those who have

13  knowledge in order to prepare a defense.

14         So, I think that balancing those two, we've

15  established that those two individuals can definitely have

16  access to those materials.  They're considered part of the

17  defense staff.

18         Without making any findings as to what happened in

19  the past -- the Court hasn't held a hearing -- the Court will

20  say that it is certainly not permitted to intimidate witness,

21  to either individually speak to any witnesses or to send

22  others to speak to witnesses, or to intimidate them either

23  directly or indirectly.

24         And if the Court finds out that's happening, the

25  Court will take very, very serious action and it would

*Proceedings*                                                43

1    jeopardize the legal careers of those individuals as well.

2            MS. BENSING:  I appreciate your Honor saying that.

3            So, to be clear, the Government will agree to define

4    defense counsel or I suppose really defense staff --

5            THE COURT:  Staff.

6            MS. BENSING:  -- which is defined as nonlawyer staff

7    employed by defense counsel, as well as expert witness,

8    investigators, and interpreters retained by defense counsel,

9    along with Kevin Williams and Rachel Caine, who agree to sign

10   and be bound by the terms of this protective order.

11           THE COURT:  The Court is making no finding either

12   way, but the Court is very serious about the consequences if

13   there is intimidation or harassment.

14           MS. BONJEAN:  We understand, your Honor, and we take

15   that seriously too.

16           I would point out that Mr. Parlato was also a

17   Government witness at one point too.  So, I don't -- this is a

18   character that --

19           THE COURT:  I don't think we need to go into that.

20           MS. BONJEAN:  That's fine.  They found him

21   trustworthy at one point, but I understand.

22           THE COURT:  The proposed revised protective order

23   then is satisfactory with everyone?

24           MS. KASSNER:  Yes, your Honor.

25           THE COURT:  And the 3500 materials will be released

*Proceedings*                                                          44

1    today or tomorrow.

2              MS. BENSING:  I think it will likely be on Monday,

3    your Honor, because we didn't have these designations, so just

4    our staff needs some time to apply them to be able to produce

5    it.  But we will begin the rolling production of 3500 material

6    as soon as we can.

7              THE COURT:  Are there any other issues that need to

8    be decided today?

9              MS. BENSING:  Not from the Government, your Honor.

10             MS. BONJEAN:  I don't think any before your Honor.

11             THE COURT:  I can create some if you'd like.

12             MS. BONJEAN:  So can we.

13             MS. BENSING:  We have too many, your Honor.  Please

14   don't.

15             THE COURT:  There have been a lot of issues that

16   have been bandied about back and forth, but it seems to me

17   your focus now is getting prepared for trial.  So, I'm not

18   going to raise any other issues.  If they become important to

19   you, they certainly can be raised, obviously, to

20   Judge Gujarati and she can refer to me if she thinks

21   appropriate.

22             MS. BONJEAN:  Judge, there's one thing I'm unclear

23   on.

24             I thought, and maybe I'm mistaken and maybe the

25   Government can clarify, that the issue of referring to

*Proceedings*                                                45

1   witnesses or intended victims since this is a conspiracy case

2   as Jane Does, I don't know if that was referred to your Honor.

3           THE COURT:  I think it was.

4           MS. BONJEAN:  No?  It was, I think it was.

5           MS. KASSNER:  Your Honor, we have a status

6   conference before Judge Gujarati at 10:30.  It's also a

7   subject of a motion in limine.  So, I'm not sure.

8           We can find out if she still intends to -- because

9   there have been subsequent filings that are before her on the

10  same matter, so it might make sense to clarify with her

11  whether --

12          THE COURT:  I think you're right because whoever is

13  unhappy with the ruling will go to Judge Gujarati anyway.  So,

14  it probably makes sense to go to her directly.

15          What I was thinking, though, is that Judge Gujarati

16  did make a ruling on that issue before and said that she

17  needed to see additional case support for the Government's

18  position.  I assume that that meant that she's probably going

19  to remain deeply involved in that issue and she would know

20  best whether or not she's satisfied with the case law you

21  presented.

22          MS. BENSING:  Yes, I think that makes sense, your

23  Honor.

24          MS. BONJEAN:  That's fine, your Honor.  We will --

25  if she wants us to come back to you, I'm assuming you'll

*Proceedings*                                                        46

1   entertain us.

2          THE COURT:  I'm here today.  If you need to come

3   back to me, I'm here.

4          Anything else?

5          MS. BENSING:  No, your Honor.  Thank you.

6          MS. BONJEAN:  No, your Honor.

7          THE COURT:  Thank you.

8          Actually, just to clarify before we go totally off

9   the record, will the Government be resubmitting the proposed

10  protective order as revised today?

11         MS. BENSING:  Yes, we can do that, your Honor.

12         THE COURT:  Thanks.  Just file it as motion for

13  protective order.

14         MS. BENSING:  File it as a motion?

15         THE COURT:  Yes; otherwise, it doesn't show the

16  gavel.

17         MS. BENSING:  Thanks, your Honor.

18

19         (Matter concluded.)

20

21

22

23

24

25