# Ballard Spahr
### LLP

– – – – – – – – – – – – – – – – – – –
1675 Broadway, 19th Floor
New York, NY 10019-5820
TEL 212.223.0200
FAX 212.223.1942
www.ballardspahr.com

Celia Cohen
Tel: 646.346.8002
Fax: 212.223.1942
cohenc@ballardspahr.com

Michael P. Robotti
Tel: 646.346.8020
Fax: 212.223.1942
robottiM@ballardspahr.com

March 7, 2025

*Via ECF*

Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     United States v. Nicole Daedone and Rachel Cherwitz, 23-CR-146

Dear Judge Gujarati:

Pursuant to Federal Rule of Appellate Procedure 21(a)(1), we attach a copy of our petition for a writ of mandamus filed in the Second Circuit today. We have separately sent paper copies of the petition and its accompanying appendices to you via FedEx.

Respectfully submitted,

Celia Cohen

Michael P. Robotti

# 25-

## United States Court of Appeals

*for the*

## Second Circuit

---

IN RE RACHEL CHERWITZ
AND NICOLE DAEDONE,

*Petitioners.*

---

ON PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK
IN NO. 23-CR-146 (DG), HONORABLE DIANE GUJARATI

## PETITION FOR A WRIT OF MANDAMUS

MICHAEL P. ROBOTTI
CELIA COHEN
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
(212) 223-0200

– and –

JENNIFER BONJEAN
BONJEAN LAW GROUP PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, New York 11231
(718) 875-1850

*Attorneys for Petitioners*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

REQUESTED RELIEF .....................................................................2

STATEMENT OF THE ISSUES.........................................................2

STATEMENT OF FACTS ................................................................4

    I.       The One-Count Indictment...............................................4

    II.      The Theft of OneTaste's Privileged Documents...................5

    III.    The FBI Takes Possession of the Stolen Privileged Documents and Uses Them to Build Its Case ....................7

    IV.    The EDNY Takes Possession of the Stolen Privileged Documents...............................................................11

    V.      Defendants' Motion to Dismiss Based on the Privileged Screenshots................................................................12

    VI.    The District Court Denies Defendants' Motion to Dismiss Based on the Privileged Screenshots...............................15

    VII.   The District Court Denies Defendants' Motion to Dismiss Based on the Privileged Outline and Privileged Risk Assessment ..................................................................17

ARGUMENT ..............................................................................19

    I.       Legal Standard...............................................................19

    II.      Defendants Have No Other Adequate Means of Relief......19

    III.    This Petition is Appropriate Under the Circumstances.......21

    IV.    Defendants Have a Clear and Indisputable Right to the Writ............26

        A.     The Court Should Direct Dismissal of the Indictment .............26

        B.     The District Court's Contrary Rulings are Clearly Erroneous ..................................................................30

i

1.  The Stolen Privileged Documents
    Are Privileged .................................................................. 30

2.  Defendants Have Standing to Assert Their
    Claims ............................................................................. 32

3.  Defendants Did Not Waive the Privilege ....................... 36

4.  Defendants' Motions Were Timely ................................ 38

C.  Alternatively, the Court Should Permit Defendants to
    Submit *Ex Parte* Affidavits and Order a *Kastigar*
    Hearing ........................................................................... 42

1.  *Ex Parte* Affidavit ........................................................ 42

2.  *Kastigar* Hearing ......................................................... 44

CONCLUSION .......................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Breuder v. Bd. of Trs. of Cmty. Coll., Dist. No. 502*,
   No. 15 CV 9323, 2021 U.S. Dist. LEXIS 46773
   (N.D. Ill. Mar. 12, 2021).....................................................................33

*Coplon v. United States*,
   191 F.2d 749 (D.C. Cir. 1951)............................................................28

*Delgado v. Donald J. Trump for President, Inc.*,
   No. 19-CV-11764 (AT) (KHP), 2024 U.S. Dist. LEXIS 113160
   (S.D.N.Y. June 26, 2024)..............................................................32, 33

*Dominion Res. Servs. v. Alstom Power, Inc.*,
   No. 3:16CV00544 (JCH), 2017 U.S. Dist. LEXIS 132212
   (D. Conn. Aug. 18, 2017) ...................................................................33

*Dukes v. Wal-Mart Stores, Inc.*,
   No. 01-cv-2252 CRB (JSC), 2013 U.S. Dist. LEXIS 42740
   (N.D. Cal. Mar. 26, 2013)...................................................................36

*Farhane v. United States*,
   77 F.4th 123 (2d Cir. 2023) ................................................................35

*Fero v. Excellus Health Plan, Inc.*,
   No. 6:15-CV-06569-EAW-JJM, 2019 U.S. Dist. LEXIS 207871
   (W.D.N.Y. Dec. 3, 2019)...............................................................43–44

*HSH Nordbank AG N.Y. Branch v. Swerdlow*,
   259 F.R.D. 64 (S.D.N.Y. 2009) ..........................................................32

*In re City of New York*,
   607 F.3d 923 (2d Cir. 2010) .........................................................*passim*

*In re Gen. Motors LLC Ignition Switch Litig.*,
   80 F. Supp. 3d 521 (S.D.N.Y. 2015) ...................................................31

*In re Grand Jury Subpoenas*,
   318 F.3d 379 (2d Cir. 2002) ...............................................................43

*In re Kellogg Brown & Root, Inc.*,
   756 F.3d 754 (D.C. Cir. 2014)......................................................*passim*

*In re Parmalat Sec. Litig.*,
No. 04 MD 1653 (LAK) (HBP), 2006 U.S. Dist. LEXIS 88629
(S.D.N.Y. Dec. 1, 2006) .......................................................................36, 37, 38

*In re Petition of One Taste, Inc.*,
24-MC-2518(DG) ........................................................................12, 14, 21

*In re Roman Catholic Diocese of Albany, New York*,
745 F.3d 30 (2d Cir. 2014) ..................................................................19

*In re Sims*,
534 F.3d 117 (2d Cir. 2008) .............................................................24, 26

*In re von Bulow*,
828 F.2d 94 (2d Cir. 1987) ..........................................................19, 20, 21, 22

*Johnson v. Sea-Land Serv.*,
No. 99 Civ. 9161 (WHP) (THK), 2001 WL 897185
(S.D.N.Y. Aug. 9, 2001) ......................................................................37

*Kaur v. Maryland*,
141 S. Ct. 5 (2020)...............................................................................43

*Lazare Kaplan Int'l, Inc. v. KBC Bank N.V.*,
No. 1:11-cv-09490 (ALC), 2016 U.S.Dist. LEXIS 96766
(S.D.N.Y. July 21, 2016). ......................................................................33

*Murata Mfg. Co. v. Bel Fuse, Inc.*,
No. 03 C 2934, 2007 U.S. Dist. LEXIS 17224 (N.D. Ill. Mar. 8, 2007)......36, 43

*People v. Joly*,
970 N.W.2d. 426 (Mich. Ct. App. 2021)...........................................30

*Reyes v. City of New York*,
992 F. Supp. 2d 290 (S.D.N.Y. 2014) ..............................................35

*Schultz v. Milhorat*,
No. CV 10-103 (AKT), 2011 U.S. Dist. LEXIS 173925
(E.D.N.Y. Apr. 8, 2011) ......................................................................33

*SEC v. Rajaratnam*,
622 F.3d 159 (2d Cir. 2010) .........................................................9, 30

*Simmons v. United States*,
390 U.S. 377 (1968)...........................................................................4, 25, 43

iv

*State v. Lenarz*,
301 Conn. 417 (2011) ........................................................................27

*State v. Robins*,
164 Idaho 425 (2018)...................................................................27, 30

*State v. Robinson*,
209 A.3d 25 (Del. 2019) ...........................................................29, 30

*Subramanian v. Lupin Inc.*,
No. 17-CV-5040 (RA) (KHP), 2019 U.S. Dist. LEXIS 68776
(S.D.N.Y. Apr. 23, 2019) ...................................................................32

*Supreme Forest Prods., Inc. v. Kennedy*,
No. 3:16-cv-0054 (JAM), 2017 U.S.Dist. LEXIS 4421
(D. Conn. Jan. 12, 2017)....................................................................33

*United States v. Ahmed*,
No. 12-CR-661 (SLT) (S-2), 2015 U.S. Dist. LEXIS 55597
(E.D.N.Y. Apr. 28, 2015) ...................................................................35

*United States v. Allen*,
864 F.3d 63 (2d Cir. 2017) ...........................................................29–30

*United States v. Anderson*,
772 F.3d 969 (2d Cir. 2014) ..............................................................36

*United States v. Beras*,
No. 99 CR. 75 (SWK), 2004 U.S. Dist. LEXIS 11559
(S.D.N.Y. June 23, 2004)...................................................................39

*United States v. Blau*,
159 F.3d 68 (2d Cir. 1998) ................................................................44

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ..............................................................40

*United States v. Bryser*,
95 F.3d 182 (2d Cir. 1996) ...........................................................25, 43

*United States v. Calonge*,
74 F.4th 31 (2d Cir. 2023) ...................................................................7

*United States v. Chin*,
934 F.2d 393 (2d Cir. 1991) ..............................................................27

*United States v. Cuervelo*,
   949 F.2d 559 (2d Cir. 1991) ........................................................27, 45

*United States v. Danielson*,
   325 F.3d 1054 (9th Cir. 2003) ............................................................41

*United States v. DeFonte*,
   441 F.3d 92 (2d Cir. 2006) ............................................................31–32

*United States v. Dennis*,
   843 F.2d 652 (2d Cir. 1988) .............................................................34

*United States v. Hoey*,
   No. 15 Cr. 229 (PAE), 2016 U.S. Dist. LEXIS 7261
   (S.D.N.Y. Jan. 21, 2016)...............................................................26–27

*United States v. Hoey*,
   725 Fed. App'x 58 (2d Cir. 2018) ..............................................*passim*

*United States v. Holmes*,
   No. 18-cr-00258-EJD-1 (SVK), 2018 U.S. Dist. LEXIS 176120
   (N.D. Cal. Oct. 12, 2018).................................................................33

*United States v. Int'l Bhd. of Teamsters*,
   119 F.3d 210 (2d Cir. 1997) .............................................................34

*United States v. Kastigar*,
   406 U.S. 441 (1972).......................................................................44

*United States v. Khan*,
   309 F. Supp. 2d 789 (E.D. Va. 2004) ...............................................43

*United States v. Landji*,
   No. (S1) 18 Cr. 601, 2021 U.S. Dist. LEXIS 222729
   (S.D.N.Y. Nov. 18, 2021) ............................................................9, 25

*United States v. Landji*,
   No. 23-6561 ...........................................................................25, 43

*United States v. Marshank*,
   777 F. Supp. 1507 (N.D. Cal. 1991)............................................28–29

*United States v. Mejia*,
   655 F.3d 126 (2d Cir. 2011) .............................................................31

*United States v. Milton*,
   621 F. Supp. 3d 421 (S.D.N.Y. 2022) ...........................................39, 41

vi

*United States v. Nachamie*,
    91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................................40

*United States v. Nejad*,
    487 F. Supp. 3d 206 (S.D.N.Y. 2020) ..................................................12, 25, 40

*United States v. Prevezon Holdings Ltd.*,
    839 F.3d 227 (2d Cir. 2016) ......................................................................*passim*

*United States v. Reyes*,
    934 F. Supp. 546 (S.D.N.Y. 1996) ...................................................................30

*United States v. Sabri*,
    973 F. Supp. 134 (W.D.N.Y. 1996).............................................................27, 28

*United States v. Schell*,
    775 F.2d 559 (4th Cir. 1985) ...........................................................................28

*United States v. Schwimmer*,
    892 F.2d 237 (2d Cir. 1989) ................................................................29, 32, 45

*United States v. Schwimmer*,
    924 F.2d 443 (2d Cir. 1991) ......................................................................3, 4, 26

*United States v. Shine*,
    No. 17-CR-28-FPG-JJM, 2019 U.S. Dist. LEXIS 98619
    (W.D.N.Y. June 12, 2019) ................................................................................39

*United States v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006) ..............................................................35

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008) ................................................................27, 28, 29

*United States v. Ventura*,
    96 F. 4th 496 (2d Cir. 2024) ............................................................................45

*United States v. Walters*,
    910 F.3d 11 (2d Cir. 2018) ...............................................................................27

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981)..........................................................................22, 23, 31

*Youngblood v. Menard, Inc.*,
    No. 3:22-cv-02822-SMY-GCS 2024, U.S. Dist. LEXIS 148033
    (S.D. Ill. Aug. 19, 2024) ..................................................................................34

**Statutes & Other Authorities:**

U.S. Const. Amend. V.................................................................*passim*

U.S. Const. Amend. VI ............................................................25, 26

18 U.S.C. § 1030(a)(2) ....................................................................7

18 U.S.C. § 1594(b) .........................................................................4

18 U.S.C. § 1832(a) ........................................................................7

18 U.S.C. § 3500 ....................................................................*passim*

28 U.S.C. § 1651(a) .........................................................................1

Fed. R. Crim. P. 12.................................................................39, 41

Fed. R. Crim. P. 41(g) ..........................................................*passim*

*Combating Economic Espionage and Trade Secret Theft: Hearing Before the Subcomm. on Crime & Terrorism, S. Judiciary Comm.*, 113th Cong. (2014) (statement of Randall C. Coleman, Assistant Director, Counterintelligence Division, Federal Bureau of Investigation), available at https://www.fbi.gov/news/testimony/combating-economic-espionage-and-trade-secret-theft...........................................................23

Lisa Monaco, Deputy Att'y Gen., Keynote Remarks at the ABA's 39th National Institute on White Collar Crime (Mar. 7, 2024) ...................................24

Memorandum from U.S. Dep't of Just., Department of Justice Corporate Whistleblower Awards Pilot Program (Aug. 1, 2024) ........................................24

Stuart Madnick, *What's Behind the Increase in Data Breaches?*, Wall St. J. (March 15, 2024), https://www.wsj.com/tech/cybersecurity/why-are-cybersecurity-data-breaches-still-rising-2cfvf08866c ........................................23

## INTRODUCTION

Defendants-petitioners Rachel Cherwitz and Nicole Daedone petition this Court for a writ of mandamus pursuant to the All Writs Act, *see* 28 U.S.C. § 1651(a). Defendants respectfully request this Court to reverse September 27, 2024 and February 26, 2025 Orders (the "Orders") of the U.S. District Court for the Eastern District of New York (Gujarati, J.).

This petition presents important questions of first impression, including whether the government can use stolen privileged corporate material to investigate company executives, without notifying the company, and once notified, over the company's and executives' repeated and vigorous objections. In a ruling that stands to have sweeping implications for the attorney-client privilege in the corporate context, the district court sanctioned such government conduct. The government knowingly and intentionally disregarded Department of Justice ("DOJ") policy, when it took possession of stolen company documents clearly identified and marked as privileged, failed to put in place taint procedures, concealed its possession of the privileged documents, and relied on the privileged material to build its case. Due to its blatant disregard of the attorney-client privilege and DOJ policy, it violated defendants' constitutional rights to counsel and due process. Nonetheless, the district court is on the cusp of permitting the government to present the privileged material at trial, as well as witnesses and evidence derived therefrom. Not only will that ruling

1

irreparably harm defendants and the company—which cannot be rectified through a post-trial appeal—but it also will broadly chill privileged communications in the corporate context, due to the ever-present risk of corporate theft and data breaches. This Court should intervene and reverse the Orders.[1]

## REQUESTED RELIEF

Defendants request that this Court issue a writ of mandamus, directing the district court to dismiss the indictment based on undisputed facts or, alternatively, directing it to (1) permit defendants to submit *ex parte* affidavits in support of their claims, which the government will be precluded from using against them and (2) hold a *Kastigar* hearing, to determine the full extent of the government's tainted evidence and appropriate relief.

## STATEMENT OF THE ISSUES

This Court should grant the petition for several reasons. First, neither defendants nor the company have any other adequate means to protect their privileged material. *See United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 238 (2d Cir. 2016) (noting "liberal use of mandamus" to protect privilege); *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014) (Kavanaugh, J.).

---

[1] "DE," "A," "SEA," and "SA" mean district court docket entry, appendix, sealed *ex parte* appendix, and sealed appendix, respectively. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, alterations and footnotes.

Second, this case implicates "significant and novel question[s] of law," the resolution of which "will aid in the administration of justice." *Prevezon Holdings*, 839 F.3d at 238. Specifically, it will resolve whether (1) the government may purposefully disregard the attorney-client privilege when it obtains stolen corporate documents and uses them to build and prove its case against executives; (2) the district court can force a defendant to choose between waiving her Fifth Amendment right against self-incrimination and asserting the attorney-client privilege; and (3) the district court must shift the burden to the government to prove an independent source for its evidence when it accesses privileged material related to the prosecution's subject matter. These questions have "broad applicability and influence," and their resolution will "forestall future error in trial courts" and "provide guidance for courts of our Circuit in an important, yet underdeveloped, area of law." *In re City of New York*, 607 F.3d 923, 942 (2d Cir. 2010).

Finally, defendants have a "clear and indisputable right" to the writ, given the district court's abuse of discretion on these issues. *Prevezon Holdings*, 839 F.3d at 239; *In re City of New York*, 607 F.3d at 943 & n.21. Based on the undisputed facts here, the government's case is irrevocably tainted, and the district court abused its discretion in failing to dismiss the indictment to remedy the government's violation of defendants' rights to counsel and due process. *See United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991) ("*Schwimmer II*"). Even if not, at a minimum, the

3

district court abused its discretion by failing to (1) permit defendants to submit *ex parte* affidavits to support their privilege claims, which the government could not later use against them, *see Simmons v. United States*, 390 U.S. 377, 394 (1968); and (2) shift the burden to the government at a *Kastigar* hearing to establish an untainted, independent source for its evidence, *see Schwimmer II*, 924 F.2d at 446; *United States v. Hoey*, 725 Fed. App'x 58, 61 (2d Cir. 2018).

The district court's failure to adhere to these constitutional protections risks inflicting irreparable harm on defendants without this Court's intervention. Accordingly, this Court should grant defendants' petition.

## STATEMENT OF FACTS

### I.    The One-Count Indictment

In approximately 2018, the Federal Bureau of Investigation ("FBI"), led by Special Agent ("SA") Elliot McGinnis, initiated an investigation into the wellness company OneTaste, Inc. ("OneTaste" or "the Company"). Defendant Nicole Daedone served as OneTaste's Chief Executive Officer from approximately 2004 to 2017. Defendant Rachel Cherwitz was OneTaste's leading salesperson from approximately 2009 to May 2018. Five years after starting its investigation, on April 3, 2023, the government obtained a single-count indictment charging a forced labor conspiracy under 18 U.S.C. § 1594(b). *See* DE:1.

## II.    The Theft of OneTaste's Privileged Documents

Years before indictment, in June 2017, at the direction of outside counsel Davis Goldberg & Galper, PLLC ("DGG"), OneTaste prepared a document to aid in a legal risk assessment in anticipation of potential litigation. A:62–63 ¶¶8–10; A:70 ¶¶6–8; A:43 ¶3. This internal review related to false allegations circulating at that time against the Company and senior executives, including defendants. A:63 ¶¶10–11. The goal was to gather any allegations that could be made by persons associated with OneTaste to be assessed by outside counsel, regardless of their credibility or veracity. *Id.* ¶¶11–13. OneTaste's then-CEO asked a small team to gather the information counsel requested, and told them the Privileged Risk Assessment was privileged and confidential; indeed, an early outline (the "Privileged Outline"), screenshots of a draft (the "Privileged Screenshots"), and the final document (the "Privileged Risk Assessment"; collectively, the "Stolen Privileged Documents") were clearly marked privileged. *Id.* ¶¶11–15; A:43–44 ¶¶4–6; A:66 ¶¶6–7; SEA:1–2 ¶¶4–6; SEA:4–43.[2]

---

[2] The Privileged Screenshots included two pages defendants agree are not privileged (ONETASTE00167268; ONETASTE00167270). Nine pages are drafts of the Privileged Risk Assessment. Sixteen pages are other documents that also were gathered and reviewed in connection with the Privileged Risk Assessment. For this petition, the Privileged Screenshots have been put in what the defense believes is the correct order and non-privileged pages are omitted.

OneTaste took significant precautions to keep these documents confidential, including limiting access to senior management, maintaining them in a location on OneTaste's servers with limited access, and prohibiting the documents from being emailed. A:63 ¶15; A:43–44 ¶¶4–8; A:66 ¶7; SEA:1–2 ¶¶4–8. On July 17, 2017, members of OneTaste's senior management met with DGG and hand-delivered a single, hard copy of the Privileged Risk Assessment. A:64 ¶16. In other words, the Privileged Risk Assessment was considered so highly sensitive and confidential that OneTaste executives would not even email it to their own outside counsel.

Mitch Aidelbaum, OneTaste's former IT contractor, stole the highly sensitive and confidential Privileged Outline and Privileged Risk Assessment from OneTaste's servers. Aidelbaum entered into a consulting agreement with OneTaste on February 22, 2015 to provide IT services, which he provided until his contract was terminated in January 2016. A:67 ¶¶10–11. Upon his contract's termination, Aidelbaum was no longer authorized to access OneTaste's servers, cloud services, records or documents. *See id.* ¶¶12–13. But sometime after OneTaste finalized the Privileged Risk Assessment in July 2017, Aidelbaum accessed OneTaste's servers—without authorization—and stole the Privileged Outline and the Privileged Risk Assessment, along with numerous other confidential OneTaste documents. *See id.* ¶¶12–14.

6

Based on the location and nature of the cache of stolen documents, Aidelbaum's theft appears to have been an act of corporate espionage. Aidelbaum stole the documents from Yia Vang's computer, who was OneTaste's curriculum director and content producer. A:82; A:44 ¶7. In addition to the Privileged Outline and Privileged Risk Assessment, Aidelbaum stole over 61,000 files. *See* A:81–82; DE:33; DE:34; DE:39. Some of these documents were OneTaste's confidential and proprietary information, which competitors could use to directly compete with OneTaste. *See* DE:33; DE:34; DE:39.

Aidelbaum's corporate espionage violated federal law. *See* 18 U.S.C. §§ 1030(a)(2), 1832(a). The FBI agents should have investigated and prosecuted Aidelbaum for his crimes, as the FBI has done in similar cases. *See, e.g.*, *United States v. Calonge*, 74 F.4th 31, 33 (2d Cir. 2023). But that is not what they did here. Instead of investigating and prosecuting him or at least notifying OneTaste—the victim of his crimes—it helped Aidelbaum cover them up.

III.  The FBI Takes Possession of the Stolen Privileged Documents and Uses Them to Build Its Case

On January 26, 2021, several years after Aidelbaum's crimes against OneTaste, the FBI case agents visited Aidelbaum's home, without prior notice. A:74 ¶1; A:80; A:83. Aidelbaum told the agents he had the document identified herein as the Privileged Risk Assessment, as well as other OneTaste documents. A:74–75 ¶¶2, 5. He specifically informed the agents the electronic file (1) was entitled "Attorney

7

Client Privilege"; (2) was marked "Attorney Client Privilege"; (3) had been created *after* he left the Company; and (4) was taken without OneTaste's knowledge. A:74 ¶3. SA McGinnis's notes and interview report further reflect Aidelbaum told the agents the document was authored by Yia Vang and came from her laptop. A:82; A:85. In short, he told the agents he stole the Privileged Risk Assessment from OneTaste and it was marked attorney-client privileged.

The FBI agents then gave Aidelbaum a thumb drive, to which he saved the Privileged Risk Assessment, and returned it to the agents. A:74 ¶4. The agents did not give Aidelbaum a property receipt for this thumb drive containing the Privileged Risk Assessment. *See id.* Subsequently, on February 1, 2021, the United States Attorney's Office ("EDNY") issued a grand jury subpoena to Aidelbaum for the remaining non-privileged OneTaste documents in his possession, which he then copied to an FBI-provided hard drive. *See* A:75 ¶¶5–6. This time, the agents gave him a property receipt for the non-privileged OneTaste documents, whereas they left no record of taking any privileged documents. *See id.*

In addition to Aidelbaum's sworn declaration he told the agents the Privileged Risk Assessment was marked attorney-client privileged, the case agent's own handwritten notes from the meeting clearly reflect the same. A:84. Thus, it is crystal clear the agents were on notice as of that date that they possessed privileged material. Tellingly, though, the FBI agents left that fact out of their official interview report.

8

That appears to have been their first step in covering up Aidelbaum's crimes, so that they could use the Privileged Risk Assessment to build this entire prosecution.

Indeed, as described further below, the agents did not immediately segregate this privileged material and put in place a taint team, per DOJ policy. *See* DOJ Manual 9-13.420(E)–(F); *see also SEC v. Rajaratnam*, 622 F.3d 159, 183 n.24 (2d Cir. 2010); *United States v. Landji*, No. (S1) 18 Cr. 601, 2021 U.S. Dist. LEXIS 222729, at *68–69 (S.D.N.Y. Nov. 18, 2021). Nor did they notify the privilege holders, which the government has acknowledged is the proper protocol to follow when it obtains privileged material. *See* A:157. Instead, the agents immediately began to rely on the Privileged Risk Assessment.

Five days after taking the material, one of the agents wrote an email summarizing the information contained in the Privileged Risk Assessment and sent it to at least one other agent. The government has refused to produce this email or describe how the agents used the privileged information circulated by email. Despite the government's stonewalling, though, the evidence the agents improperly used the Privileged Risk Assessment goes far beyond that one email. A review of the government's 18 U.S.C. §3500 material produced to the defense on November 18, 2024, as well as other information the defense has gathered, demonstrates the government directly used the Privileged Risk Assessment not only to identify witnesses to interview, but also to determine which topics to ask them about.

For example, in the first two weeks after clandestinely receiving the Privileged Risk Assessment on January 26, 2021, the agents contacted at least seven persons listed in the Privileged Risk Assessment. The first person the FBI interviewed after taking the Privileged Risk Assessment from Aidelbaum is listed on its first page. By July 2021, the agents had contacted at least 15 people listed in the Privileged Risk Assessment. By the end of 2021, they had contacted at least 20 people listed therein, none of whom they contacted prior to taking the documents from Aidelbaum. Some of these people had not been associated with OneTaste for years, and by no means would have been obvious interview candidates. Moreover, during many of these interviews, the agents asked individuals about specific, non-public incidents that were discussed in the privileged material.

In November 2021, another former OneTaste customer, Kara Cooper, also emailed screenshots of a draft of the Privileged Risk Assessment—identified herein as the Privileged Screenshots—to SA McGinnis. Defendants learned from the government that Cooper obtained the screenshots or accessed the Privileged Risk Assessment draft via a former OneTaste employee, who in turn received unauthorized access from Aidelbaum. A:46 ¶6. Again, although the Privileged Screenshots are clearly marked attorney-client privileged, the FBI agents did not put in place a taint team or notify the privilege holders.

10

IV.    <u>The EDNY Takes Possession of the Stolen Privileged Documents</u>

At some point, the Privileged Outline, Privileged Risk Assessment, and Privileged Screenshots all came into EDNY's possession. As discussed below, the first two documents were located in EDNY's *Cherwitz* case file in 2024 and never produced in discovery. EDNY produced the third document in discovery on September 18, 2023. The government has refused to disclose when these documents came into EDNY's possession; however, it is clear it did not implement appropriate taint procedures whenever it obtained the documents. In fact, in the government's discovery letter disclosing the Privileged Screenshots, it failed to describe them as potentially privileged, even though they were clearly marked as such and the government had reviewed them closely enough to describe them and their provenance. It described them only as "[s]creenshots of a document provided by [Kara Cooper]." DE:43 at 3.

In total, during 29 discovery productions, the government produced over 2.6 terabytes of data, containing more than 710,700 files, which includes over 10,000 videos, 8,000 audio files, and 171,100 images.  Not surprisingly, given the government's ongoing and voluminous discovery productions—including almost 160,000 pages in September and October 2024 alone—and that it had not flagged this document as potentially privileged, it took defendants time to identify this document as potentially privileged. *See*, *e.g.*, A:46 ¶2; A:72–73 ¶¶12–14; DE:41;

11

DE:43; DE:50; DE:52; DE:58. On April 20, 2024, the Company identified the potentially privileged nature of the document, *see* A:46 ¶3; on April 24, 2024, after verifying it was privileged, the Company demanded its return from the government, *see* A:49. The government put in place a filter team for the first time. A:46 ¶5. In response to a later follow up inquiry, the filter team represented it had no other versions of the Privileged Screenshots—a representation that turned out to be wrong. A:46–47 ¶¶6–7.

V.   <u>Defendants' Motion to Dismiss Based on the Privileged Screenshots</u>

In short order, defendants and the Company filed appropriate motions. A:52–60 (pre-motion letter); SA:1–43 (motion to dismiss); *In re Petition of One Taste, Inc.*, 24-MC-2518(DG), DE:1 (Federal Rule of Criminal Procedure 41(g) motion). In support of their motion, defendants' sought to submit affidavits without waiving their Fifth Amendment right against self-incrimination. *See* SA:34; SA:99–101. In response, among other things, the government claimed waiver, arguing defendants had not found the Privileged Screenshots fast enough, even though it is the government's policy and practice to notify privilege holders, rather than to misidentify and bury a privileged document in a mountain of discovery. *See, e.g.*, *United States v. Nejad*, 487 F. Supp. 3d 206, 218–27 (S.D.N.Y. 2020) (discussing government conduct warranting dismissal, including burying *Brady* material among other documents).

12

The government also specifically reserved the right to use the Privileged Screenshots at trial, stating: "[T]he government reserves the right to do so should, for example, a court—or OneTaste—determine[] the Document is not privileged and/or is subject to an exception to the attorney-client privilege, and defendants assert a defense or testify inconsistently with the Document." SA:55.

Meanwhile, defendants and the Company conducted their own investigation regarding the Privileged Screenshots, and learned from Aidelbaum that he had turned over the final version of the Privileged Screenshots (the Privileged Risk Assessment) to FBI agents in January 2021. Thus, with their September 6, 2024 reply, defendants filed a declaration from Aidelbaum and incorporated the material Aidelbaum had provided the FBI into their privilege assertion, even though neither they nor the Company had yet received the material from the government. A:74–76.

In its September 20, 2024 response, the government suddenly admitted it had the Privileged Outline and the Privileged Risk Assessment—*since January of 2021*—which it had located at the FBI. These two versions were located in a folder *with Aidelbaum's name on it*, *where they were both saved with "file names [including] the words 'Attorney Client Privilege: Confidential and Privileged.'"* SA:112 (emphasis added). It also conceded the agents had accessed, reviewed and disseminated information from the Stolen Privileged Documents. As noted above, it admitted that, five days after the Aidelbaum interview, an agent sent an email

13

containing a "bullet point list of information...associated with [Aidelbaum]," which appeared to be derived from the Privileged Risk Assessment. *Id.*

The government also claimed the documents were "not sent to the [EDNY] until they were provided to a member of the Privilege Review Team in September 2024." *Id.* By October 7, though, the government was forced to admit it was wrong again, disclosing the Privileged Outline and the Privileged Risk Assessment, in fact, had been located in EDNY's *Cherwitz* case file. A:115–16. The government also reserved the right to use these documents at trial. *In re Petition of OneTaste, Inc.*, 24-MC-2518(DG), DE:17 ("[T]he government is preparing for trial against the *Cherwitz* defendants and the Challenged Materials could be necessary or relevant for a number of legitimate purposes at trial, including in re-direct examinations, for potential cross examination of defense witnesses, or in the government's rebuttal case to respond to unanticipated defense arguments."). The Company filed a second motion for return of all Stolen Privileged Documents on November 12, 2024.[3]

---

[3] Defendants have requested the government keep the Stolen Privileged Documents segregated pending resolution of this petition and the Company's Rule 41(g) motion. In response, the government has said the documents will remain segregated with the Filter Team pending resolution of the Rule 41(g) motion.

14

## VI. The District Court Denies Defendants' Motion to Dismiss Based on the Privileged Screenshots

As noted above, defendants asserted privilege over the Privileged Outline and the Privileged Risk Assessment as soon as they learned of their existence. *See* SA:83–109. The court directed the government to submit those two documents on September 23, 2024. DE:158. Subsequently, at the September 27, 2024 conference, the court specifically declined to rule on those two documents, directing the parties to meet and confer regarding them before bringing any additional motion. *See* A:93 ("The issues raised about those other documents in the additional filings should be addressed by the parties with each other in the first instance, including, as appropriate, with the Filter Team rather than the Trial Team. I have considered the entirety of the record, but will address only the two bases raised in the instant motion, one of which relates to the [Privileged Screenshots]."). The court set no deadline.

The court then made a brief oral ruling on defendants' motion to dismiss pertaining to the Privileged Screenshots. *See* A:104–12. Notably, it concluded defendants had not shown good cause as to why they had not filed their motion to dismiss based on the Privileged Screenshots by the district court's January 16, 2024, motion deadline, even though the uncontroverted record shows defendants were not aware of this document's privileged nature until April 20, 2024. *See* A:105–06. The court attributed no fault to the government for failing to put in place a taint team, failing to notify the privilege holders it had taken possession of the Privileged

15

Screenshots, failing to describe the document as potentially privileged in its discovery letter, or for burying the document in a mountain of other evidence. *See id.* Rather, the court deemed the motion untimely, because defendants did not seek an extension to file its motions—which almost certainly would have been denied—to look for a document they did not know existed and had no reason to believe would be in discovery. *See id.* Similarly, the court concluded defendants waived privilege by "having waited so long to assert privilege," A:111, even though the Company asserted privilege immediately after verifying the document's privileged nature and defendants sought leave to file a motion to dismiss within weeks.

The district court also rejected defendants' request for an evidentiary hearing. Instead, it ruled the Privileged Screenshots were not privileged and defendants lacked standing to assert the privilege. It further held defendants were not permitted to submit affidavits to support their privilege claims in a manner that addressed their concerns about waiving their Fifth Amendment right against self-incrimination. *See* A:110–11; SA:34. Finally, without shifting the burden to the government to show an independent source for its evidence, the court concluded that the record did not support the claim that, but for the use of the Privileged Screenshots, the indictment would not exist. A:111. Regardless, if it had found a constitutional violation, the court held the only appropriate remedy would have been to preclude the government from using the Privileged Screenshots at trial, not dismissal. *See id.* at 111–12.

VII.   The District Court Denies Defendants' Motion to Dismiss Based on the Privileged Outline and Privileged Risk Assessment

As noted above, the government disclosed the FBI possessed the Privileged Outline and Privileged Risk Assessment on September 20, 2024. SA:112. On October 7, 2024, the government disclosed EDNY also possessed them. A:115–16. Subsequently, on November 18, 2024, the government disclosed its 3500 material. Thereafter, the defense reviewed it and conducted a painstaking comparison between the Stolen Privileged Documents and the 127 sets of witness reports to develop the record the court had demanded at the previous status conference, establishing the agents had used the Stolen Privileged Documents to build this case and secure the indictment. On December 25, 2024, an issue arose with Ms. Cherwitz's prior counsel that ultimately led to their disqualification on January 8, 2025. She retained new counsel, who appeared on January 15, 2025. As such, little work was done by Ms. Cherwitz's prior counsel during this time period. Moreover, the government declined to meet and confer with Ms. Daedone's counsel pending Ms. Cherwitz's retention of new counsel. Just over one week after appearing, new counsel requested leave to file a renewed motion to dismiss the indictment on January 24, 2025. A:117.

Prior to doing so, defense counsel met and conferred with the government on January 23, 2025, as the court had previously directed. During the meeting, the government specifically refused to agree that, under *Simmons*, defendants were permitted to file *ex parte* affidavits in support of their motions, which the

17

government could not later use against them. Thus, in its request for leave, defendants requested a ruling from the court under *Simmons* that it could file such affidavits, and also sought a *Kastigar* hearing. A:129, 138.

On February 26, 2025, in a brief oral ruling, the district court denied defendants' renewed motion. A:153–56. Although (1) the facts necessary for defendants' motion were disclosed between September 20, 2024 and November 18, 2024, including voluminous 3500 material the defense had to subsequently review, (2) Ms. Cherwitz thereafter obtained new counsel, and (3) there was no deadline for the renewed motion, the court found it untimely because defendants did not file it by January 16, 2024. *See id.* Yet again, the court attributed no fault to the government for its purposeful reliance on privileged material, its failure to put in place a taint team, and its failure to disclose the documents for nearly *four years*. *See id.* The court also summarily referred back to its September 27 ruling regarding the Privileged Screenshots—a different document the FBI obtained 11 months after the Privileged Outline and Privileged Risk Assessment—and denied defendants' motion on the same grounds. *See* A:156.

Given the gravity of the constitutional rights at stake, the risk of improper disclosure of privileged material, the court's incorrect rulings, and the broad implications thereof, defendants now seek mandamus.

18

ARGUMENT

I.    Legal Standard

There are three conditions for a writ of mandamus under the All Writs Act: (1) "the party seeking issuance of the writ must have no other adequate means to attain the relief [it] desires"; (2) "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances"; and (3) "the petitioner must demonstrate that the right to issuance of the writ is clear and indisputable." *Prevezon Holdings*, 839 F.3d at 237; *see In re City of New York*, 607 F.3d at 943 & n.21 (discussing abuse-of-discretion standard for mandamus).

II.   Defendants Have No Other Adequate Means of Relief

The first mandamus factor is satisfied here. "[A] remedy after final judgment cannot unsay the confidential information that has been revealed." *Prevenzon Holdings*, 839 F.3d at 237. That concern "may account for the liberal use of mandamus in situations involving the production of documents or testimony claimed to be privileged or covered by other more general interests in secrecy." *Id.* at 238. This Court has repeatedly issued writs to prevent disclosure of confidential and privileged information. *See, e.g.*, *In re Roman Catholic Diocese of Albany, New York*, 745 F.3d 30, 33, 35–37 (2d Cir. 2014); *In re City of New York*, 607 F.3d at 934; *In re von Bulow*, 828 F.2d 94, 98–99 (2d Cir. 1987). "[A]ppeal after final judgment will often come too late because the privileged materials will already have

19

been released. In other words, the cat is out of the bag." *In re Kellogg*, 756 F.3d at 761.

Here, the government has reserved the right to use the Stolen Privileged Documents at trial, and the district court's rulings set the stage for their potential introduction at trial. *See In re von Bulow*, 828 F.2d at 98–99 (post-trial review inadequate because "confidential communications will already have been disclosed during the trial"). But even if the government did not intend to use the privileged material at trial, the government had access to these privileged documents for four years and built its case based upon them; the presentation of evidence at trial derived from the Stolen Privileged Documents is just as damaging as the presentation of the privileged material itself. *See Prevezon Holdings*, 839 F.3d at 238 (adverse use of confidential information "includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject, and innumerable other uses"). Moreover, additional dissemination of the Stolen Privileged Documents to the trial prosecutors—to the extent they have not already viewed them—will further damage the defense in a way that cannot be undone post-trial, even if the government does not affirmatively use the documents at trial. *See id.* (noting "risk that...while not explicitly using confidences, [opposing

counsel] may use such confidences to guide" its case). [4] Accordingly, post-trial relief is inadequate to vindicate defendants' privilege assertion.

Furthermore, other pretrial forms of relief are not adequate here. *See id.*; *In re City of New York*, 607 F.3d at 933–38; *In re Kellogg*, 756 F.3d at 761; *In re von Bulow*, 828 F.2d at 98–99. The Supreme Court has "repeatedly and expressly reaffirmed that *mandamus*…remains a useful safety valve…to correct some of the more consequential attorney-client privilege rulings." *In re Kellogg*, 756 F.3d at 761. Mandamus is the only adequate means by which defendants may seek review of their attorney-client privilege claim.

## III.   This Petition is Appropriate Under the Circumstances

The second mandamus factor also is satisfied here. "To determine whether mandamus is appropriate in the context of a discovery ruling, [the Court] look[s]

---

[4] For these reasons, the Company's pending Rule 41(g) motion has no bearing on this petition. *See In re Petition of One Taste, Inc.*, 24-MC-2518(DG)*.* The district court has ruled the Stolen Privileged Documents non-privileged in this case. If the court ultimately also rules them non-privileged in the Rule 41(g) proceeding (contrary to the sworn evidence), that ruling would further reinforce the need for mandamus relief here. But even if the court affirms the privileged nature of the Stolen Privileged Documents in that proceeding, this Court still should issue the writ for two reasons. First, the district court may permit introduction of the documents at trial under the theory defendants lack standing (over defendants' objection). Second, even if the district court ultimately precludes the government from using the documents at trial, the government already has relied upon the privileged material to build its case, and it will be introducing at trial evidence and witnesses derived directly from the Stolen Privileged Documents.

primarily for the presence of a novel and significant question of law…and…the presence of a legal issue whose resolution will aid in the administration of justice." *In re City of New York*, 607 F.3d at 939 (alterations in original). "Mandamus is appropriate when the appellate court is convinced that resolution of an important, undecided issue will forestall future error in trial courts [and] eliminate uncertainty…." *In re von Bulow*, 828 F.2d at 99.

This case presents several important questions of first impression related to the attorney-client privilege. Most significantly, it presents the novel question: Can the government use stolen privileged corporate material to prosecute a company's executives, rather than the company itself, without notifying the company and/or over the company's and the executives' objection and refusal to waive privilege? The district court's answer is yes.

The broad chilling effect of this ruling is readily apparent. A company can only act through its people. *See Upjohn Co. v. United States*, 449 U.S. 383, 391 (1981). If a company's employees recognize that whatever privileged communications they have with company attorneys may be stolen and readily used to prosecute them, they will be disinclined to seek advice from the company's attorneys and participate in privileged legal discussions for the company's benefit, and company counsel will be disinclined to provide written legal advice. *See In re Kellogg*, 756 F.3d at 762–63. As the Second Circuit has stated, "[a] client cannot

22

fully and candidly discuss its situation with counsel if the client must worry that such confidences could be used to implicate him in the very crimes for which he hired that attorney to defend him, significantly undermining the lawyer-client relationship." *Prevezon Holdings*, 839 F.3d at 238; *see In re City of New York*, 607 F.3d at 942 ("[P]otential litigants must be able to predict which of their materials will be protected by the privilege," otherwise, they "may become overly cautious in creating materials"). The district court's ruling injects significant uncertainty into the protections afforded to privileged communications in the corporate context. An "uncertain privilege, or one which purports to be certain, but results in widely varying applications by the courts, is little better than no privilege." *Upjohn Co.*, 449 U.S. at 393.

Corporate theft is ever-present, so the court's ruling in this case stands to have broad implications for the attorney-client privilege in the corporate context. Corporate data breaches continue to rise.[5] Targeted corporate espionage for anti-competitive purposes—like the theft that occurred here—also remains a constant threat to companies.[6] And, recent DOJ policy has encouraged corporate

---

[5] Stuart Madnick, *What's Behind the Increase in Data Breaches?*, Wall St. J. (March 15, 2024), https://www.wsj.com/tech/cybersecurity/why-are-cybersecurity-data-breaches-still-rising-2cfvf08866c.

[6] *Combating Economic Espionage and Trade Secret Theft: Hearing Before the Subcomm. on Crime & Terrorism, S. Judiciary Comm.*, 113th Cong. (2014) (statement of Randall C. Coleman, Assistant Director, Counterintelligence Division,

whistleblowers to come forward and has prioritized prosecuting executives over companies.[7] Corporate executives, therefore, are keenly aware of the possibility that their companies' most sensitive data, including privileged material, may end up in the hands of hackers, thieves, and claimed whistleblowers, who may publicly disclose it or directly turn it over to authorities. If courts permit DOJ, absent waiver, to use stolen privileged material to prosecute corporate executives, few will take the risk of gathering and memorializing sensitive information necessary for company counsel to render legal advice. The risk would not be worth it.

Resolution of this significant issue will aid in the administration of justice. These "potentially far-reaching consequences," which "threaten to vastly diminish the attorney-client privilege in the business setting," warrant mandamus review to settle the scope of the privilege and provide guidance to the district courts. *In re Kellogg*, 756 F.3d at 762; *see In re Sims*, 534 F.3d 117, 129 (2d Cir. 2008).

Two other related, important issues of first-impression are also present in this case, which require prompt resolution. First, whether the district court may force a

---

Federal      Bureau      of      Investigation),      available      at
https://www.fbi.gov/news/testimony/combating-economic-espionage-and-trade-secret-theft.

[7] *See, e.g.*, Memorandum from U.S. Dep't of Just., Department of Justice Corporate Whistleblower Awards Pilot Program (Aug. 1, 2024); Lisa Monaco, Deputy Att'y Gen., Keynote Remarks at the ABA's 39th National Institute on White Collar Crime (Mar. 7, 2024).

defendant to choose between submitting an affidavit to assert the attorney-client privilege under the Fifth and Sixth Amendments and waiving her right against self-incrimination under the Fifth Amendment. *See, e.g.*, *Simmons*, 390 U.S. at 394; *United States v. Bryser*, 95 F.3d 182, 186 (2d Cir. 1996). Second, whether the burden must shift to the government to prove an independent source at a *Kastigar* hearing, when it improperly accesses privileged material related to the prosecution's subject matter—an issue this Court has only previously addressed in a summary order. *See Hoey*, 725 Fed. App'x at 61; *Landji*, 2021 U.S. Dist. LEXIS 222729, at *69 (noting "dearth of law in the Second Circuit as to when the burden shifts for purposes of a *Kastigar* claim premised on access to privileged materials").[8] A defendant's ability to assert the government has violated the attorney-client privilege in a criminal case turns, in large part, on these predicate questions' resolution, and this Court should decide them.

Finally, while not issues of first impression, this petition also raises important questions related to waiver of the attorney-client privilege and a defendant's ability

---

[8] This issue has been raised on the pending appeal in *Landji*. *See United States v. Landji*, No. 23-6561. DOJ's disregard of its procedures in a manner that invades defendants' constitutional rights is a recurrent problem. *See Landji*, 2021 U.S. Dist. LEXIS 222729, at *69 n.32 (stating government's "failure to recognize the need to implement a taint team earlier, and to take appropriate steps to ensure that members of the investigative team were not exposed to privileged material, suggest[s] a lack of appropriate training at the [SDNY] concerning the handling of potentially privileged material"); *Nejad*, 487 F. Supp. 3d at 211.

to raise constitutional violations based on facts she discovers after a court's motions deadline. To avoid other cases following the district court's erroneous rulings to thwart future privilege claims, this Court should resolve these issues. *See In re Sims*, 534 F.3d at 129 ("[N]eed to prevent the development of discovery practices that will undermine the privilege" weighs in favor of mandamus).

IV.    Defendants Have a Clear and Indisputable Right to the Writ

The final mandamus factor also is met. The district court indisputably erred in its legal rulings on the novel and important questions discussed above. This Court should issue the writ.

A.    The Court Should Direct Dismissal of the Indictment

Defendants request that this Court order dismissal of the indictment on two separate grounds: (1) the FBI agents' intentional invasion of the attorney-client privilege violated defendants' right to counsel under the Fifth and Sixth Amendments and (2) the agents' intentional collection of and reliance on stolen privileged material and cover up of that theft is outrageous government conduct that violated defendants' right to due process under the Fifth Amendment.

As to the first ground, when the government intentionally invades the attorney-client privilege, the defendant need not show prejudice to warrant the indictment's dismissal, if the government's conduct was "manifestly and avowedly corrupt." *Schwimmer II*, 924 F.2d at 447; *United States v. Hoey*, No. 15 Cr. 229

26

(PAE), 2016 U.S. Dist. LEXIS 7261, at *19 (S.D.N.Y. Jan. 21, 2016). Even where not manifestly and avowedly corrupt, though, dismissal may be warranted where the government's invasion taints a prosecution, and there is no other remedy to eliminate the taint. *See United States v. Stein*, 541 F.3d 130, 144 (2d Cir. 2008); *Schwimmer II*, 924 F.2d at 447; *State v. Robins*, 164 Idaho 425, 437 (2018); *State v. Lenarz*, 301 Conn. 417, 451 (2011).

As to the second ground, if the government "violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction if the government's conduct reached a demonstrable level of outrageousness." *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991). "[T]he existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience." *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991). If a defendant meets the burden of showing "outrageous governmental misconduct," the remedy is dismissal. *United States v. Walters*, 910 F.3d 11, 27 (2d Cir. 2018); *see United States v. Sabri*, 973 F. Supp. 134, 146 (W.D.N.Y. 1996).

Here, dismissal is warranted on both grounds based on the undisputed facts. There is no serious dispute that FBI agents took the Stolen Privileged Documents from Aidelbaum, knowing they were both stolen and marked privileged. The agents' meeting notes, the documents themselves, Aidelbaum's affidavit, and the

27

government's September 20 and October 7 letters establish these facts. Rather than investigating Aidelbaum for this theft—or, at least, following standard government protocol for implementing a taint team and notifying privilege holders—the agents covered up Aidelbaum's criminal conduct for nearly four years. All this so they could use the Stolen Privileged Documents to build a high-profile case against defendants. Indeed, there is no real dispute that the agents relied on this material in building this case: the government has conceded the agents summarized and emailed some of the privileged material five days after taking it from Aidelbaum. And, the government's 3500 material shows they interviewed 20 witnesses identified in those materials, asking about specific, non-public events referenced therein.

This intentional invasion of the attorney-client privilege rises to the level of misconduct where courts have concluded dismissal is warranted. *See, e.g.*, *Stein*, 541 F.3d at 136 (dismissing due to government interference with right to counsel); *United States v. Schell*, 775 F.2d 559, 562–63, 566 (4th Cir. 1985) (holding defendants' due process rights violated when attorney represented them during grand jury proceedings, and later participated in their prosecution); *Coplon v. United States*, 191 F.2d 749, 757–60 (D.C. Cir. 1951) (reversing conviction where government wiretapped defendant's phone calls with attorney); *Sabri*, 973 F. Supp. at 138, 147 (dismissing due to "government's manipulation of the attorney-client relationship," where it used defendant's attorney as informant); *United States v.*

28

*Marshank*, 777 F. Supp. 1507, 1524 (N.D. Cal. 1991) (dismissing indictment after government investigated defendant using information received from his attorney, collaborated with attorney to build case, and hid it from defendant and court); *State v. Robinson*, 209 A.3d 25, 66–67 (Del. 2019) (Strine, J., dissenting) (concluding indictment's dismissal appropriate due to intentional invasion of attorney-client privilege, failure to establish taint team and reliance on privileged material).

The district court incorrectly stated that, even if it found a constitutional violation, the proper remedy here would be to preclude the government from using those documents at trial. It should go without saying the government may not rely on the Stolen Privileged Documents at trial. The government has no right to access or to use those documents over the privilege holders' objections. And, in any event, that proposed remedy falls far short of what is required to cure the prejudice here. Because the government relied on the Stolen Privileged Documents in building its entire case—specifically, in interviewing at least 20 witnesses—there remains no practical way to eliminate the illicit taint, other than to dismiss the indictment. *See United States v. Schwimmer*, 892 F.2d 237, 244–45 (2d Cir. 1989) ("*Schwimmer I*"); *Stein*, 541 F.3d at 144 (dismissal appropriate if "necessary to restore the defendant to the circumstances that would have existed had there been no constitutional error").

Even if dismissal were not appropriate (which it is), significant sanctions would be required to attempt to remedy the illicit taint here. *See United States v.*

29

*Allen*, 864 F.3d 63, 91 (2d Cir. 2017). At a minimum, to attempt to eliminate that taint, all witnesses and evidence derived from access to the Stolen Privileged Documents must be suppressed. *See, e.g.*, *United States v. Reyes*, 934 F. Supp. 546, 553 (S.D.N.Y. 1996) (suppressing evidence derived from right to counsel violation); *People v. Joly*, 970 N.W.2d. 426, 435 (Mich. Ct. App. 2021) (suppressing evidence where agent inadvertently came across privileged email containing key incriminating evidence, but then intentionally "used the privileged information to further his investigation of defendant"). Furthermore, the Court should disqualify all agents, prosecutors and other prosecution team members who had access not only to the Stolen Privileged Documents, but also to any evidence derived therefrom, including any government witnesses named in the Stolen Privileged Documents. *See, e.g.*, *Robins*, 164 Idaho at 437; *Robinson*, 209 A.3d 25 at 60; *Rajaratnam*, 622 F.3d at 183 n.24. Given the pervasive use of the Stolen Privileged Documents in this investigation, defendants submit these measures are insufficient to cure the taint. But these are the minimum measures that would be required, if the Court does not grant their motion to dismiss.

### B.    The District Court's Contrary Rulings are Clearly Erroneous

#### 1.    The Stolen Privileged Documents Are Privileged

The district court ruled that the Stolen Privileged Documents are not privileged. Its ruling was wrong.

30

The attorney-client privilege protects communications that are "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). In an internal investigation, "so long as obtaining or providing legal advice was one of the significant purposes of the internal investigation, the attorney-client privilege applies, even if there were also other purposes for the investigation.'" *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 530 (S.D.N.Y. 2015)).

Here, defendants have submitted sworn affidavits establishing a small group of OneTaste's senior management created the Stolen Privileged Documents at outside counsel's direction as part of an internal review of false allegations against the Company and members of senior management, including defendants; the review's primary purpose was to obtain legal advice in anticipation of potential litigation; the documents were treated as highly sensitive and confidential; the Company secured the documents by limiting access to them and not emailing them; and the Company hand-delivered the Privileged Risk Assessment to counsel.

Based on this record, the Stolen Privileged Documents are indisputably privileged. *See Upjohn*, 449 U.S. at 396–97 (communications among non-attorneys in corporation privileged if made at counsel's direction, to gather information to aid counsel in providing legal services); *United States v. DeFonte*, 441 F.3d 92, 96 (2d

31

Cir. 2006) (per curiam) ("[O]utline of what a client wishes to discuss with counsel" and subsequently discussed with counsel is privileged).

### 2.    Defendants Have Standing to Assert Their Claims

The district court incorrectly ruled defendants lack standing. *See* SA:56. Defendants have standing to assert their right to counsel claim for two reasons.

First, they have standing under the common-interest doctrine. *See Schwimmer I*, 892 F.2d at 243. As the undisputed evidence shows, the information in the Stolen Privileged Documents was gathered and provided to outside counsel, "[a]s a result of increased negative (and false) commentary about OneTaste and the senior executives of OneTaste, including Ms. Daedone and Ms. Cherwitz," so that outside counsel could "provide legal advice for addressing the negative and false commentary and in anticipation of possible litigation by those critical of OneTaste." A:63 ¶10. Because the false allegations and related potential litigation were against both the Company and defendants, defendants had a "common legal interest" with the Company, and the Stolen Privileged Documents were created and provided to counsel to further that common interest. *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 71–72 (S.D.N.Y. 2009).

Those documents are protected under the common-interest privilege. *See id.*; *Delgado v. Donald J. Trump for President, Inc.*, No. 19-CV-11764 (AT) (KHP), 2024 U.S. Dist. LEXIS 113160, at *13–15 (S.D.N.Y. June 26, 2024); *Subramanian*

32

*v. Lupin Inc.*, No. 17-CV-5040 (RA) (KHP), 2019 U.S. Dist. LEXIS 68776, at *9 (S.D.N.Y. Apr. 23, 2019); *Schultz v. Milhorat*, No. CV 10-103 (AKT), 2011 U.S. Dist. LEXIS 173925, at *10–11 (E.D.N.Y. Apr. 8, 2011). Defendants have standing to assert privilege over common-interest material. *See Delgado*, 2024 U.S. Dist. LEXIS 113160, at *13–15; *Breuder v. Bd. of Trs. of Cmty. Coll., Dist. No. 502*, No. 15 CV 9323, 2021 U.S. Dist. LEXIS 46773, at *12–13 (N.D. Ill. Mar. 12, 2021); *Dominion Res. Servs. v. Alstom Power, Inc.*, No. 3:16CV00544(JCH), 2017 U.S. Dist. LEXIS 132212, at *10 (D. Conn. Aug. 18, 2017); *United States v. Holmes*, No. 18-cr-00258-EJD-1 (SVK), 2018 U.S. Dist. LEXIS 176120, at *7–8 (N.D. Cal Oct. 12, 2018).

Second, considering that outside counsel's legal advice also pertained to false allegations against them, defendants were co-clients of DGG along with the Company, and they have standing to assert privilege on that basis. *See Supreme Forest Prods., Inc. v. Kennedy*, No. 3:16-cv-0054 (JAM), 2017 U.S. Dist. LEXIS 4421, at *4–10 (D. Conn. Jan. 12, 2017) ("[T]he focus is on whether the respective co-clients 'have expressly or *impliedly* agreed to common representation in which confidential information will be shared.'"); *Lazare Kaplan Int'l, Inc. v. KBC Bank N.V.*, No. 1:11-cv-09490 (ALC), 2016 U.S. Dist. LEXIS 96766, at *9 (S.D.N.Y. July 21, 2016).

The test articulated in *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 215 (2d Cir. 1997), does not apply here to determine whether defendants were co-clients of DGG. That test governs situations where there are "competing claims to privilege," in which an employee's assertion of privilege over a company's waiver "may create a personal privilege that could effectively destroy the corporation's ability to waive its own privilege." *Id.* at 216. Rather, the "reasonable belief" test discussed in *Teamsters* or the similar test set forth in *Dennis* should apply, to determine whether an attorney-client relationship exists between a corporate attorney and an employee in cases, such as this one, where neither the company nor employee waived privilege. *See id.*; *United States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1988) ("The key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential."); *Youngblood v. Menard, Inc.*, No. 3:22-cv-02822-SMY-GCS, 2024 U.S. Dist. LEXIS 148033, at *9–15 & n.5 (S.D. Ill. Aug. 19, 2024) (rejecting application of *Teamsters*, where company's and employees' interests were not "adverse"). Indeed, *Teamsters* specifically distinguished *Dennis* on the grounds that it did *not* involve "competing claims of privilege between corporations and their employees." 119 F.3d at 216 n.3. Such a standard is satisfied on the record here. But if not, or even if *Teamsters* applies, as described below, the district court should have

34

given defendants the opportunity to submit *ex parte* affidavits establishing they met whichever standard applies.

Separately, defendants also have standing to assert a due process right not to be prosecuted based upon the Stolen Privileged Documents. The government did not dispute defendants' standing to bring this claim before the district court, and the district court did not specifically rule they lacked standing on this claim. For that reason alone, this Court should conclude they have standing here. *See Farhane v. United States*, 77 F.4th 123, 126 n.4 (2d Cir. 2023). In any event, defendants have standing to assert their due process claim. *See United States v. Stein*, 435 F. Supp. 2d 330, 357 (S.D.N.Y. 2006); *Reyes v. City of New York*, 992 F. Supp. 2d 290, 297 (S.D.N.Y. 2014); *United States v. Ahmed*, No. 12-CR-661 (SLT) (S-2), 2015 U.S. Dist. LEXIS 55597, at *3–5 (E.D.N.Y. Apr. 28, 2015).

To hold defendants lacked standing here would set a dangerous precedent. For example, suppose FBI agents secretly broke into a law firm that represented a company and stole privileged information about a corporation and top executives. Thereafter, the government indicted the executives, but not the company, based upon that privileged information. The executives would have no recourse to challenge the unlawful search and seizure, because the agents broke into a third-party's office. *See*

*United States v. Anderson*, 772 F.3d 969, 974 (2d Cir. 2014).[9] And, if they lacked standing to assert a violation of their rights to counsel and due process, they would be left with no recourse at all. In a legal system that prizes the protections of the attorney-client privilege, this cannot be the law. *See Murata Mfg. Co. v. Bel Fuse, Inc.*, No. 03 C 2934, 2007 U.S. Dist. LEXIS 17224, at *13 (N.D. Ill. Mar. 8, 2007).

### 3.    Defendants Did Not Waive the Privilege

This Court likewise should reject the district court's conclusion defendants somehow waived their privilege claim by not bringing their motions sooner. "[I]nvoluntary or compelled disclosure does not give rise to a waiver." *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK) (HBP), 2006 U.S. Dist. LEXIS 88629, at *28 (S.D.N.Y. Dec. 1, 2006); *see Dukes v. Wal-Mart Stores, Inc.*, No. 01-cv-2252 CRB (JSC), 2013 U.S. Dist. LEXIS 42740, at *15 (N.D. Cal. Mar. 26, 2013). Nonetheless, "[e]ven when the initial disclosure of privileged documents is involuntary, waiver may, nevertheless, result if the party asserting the privilege fails to take steps "reasonably designed to protect and preserve the privilege." *Parmalat*

---

[9] This standing rule makes sense in the search and seizure context, where the issue is whether the *process* by which evidence was obtained violated a person's rights. A defendant cannot challenge an unconstitutional process used against a third party to obtain otherwise competent and admissible evidence. Here, that rationale does not apply because the issue is not the process, but the *evidence itself*. The government should never have access to or be able to use privileged material, absent a waiver. Thus, any defendant should be able to challenge the use of such material against them in building a criminal case.

*Sec. Litig.*, 2006 U.S. Dist. LEXIS 88629, at *30–31. "[T]he length of delay in claiming the privilege should be measured from the time the producing party learns of the disclosure, not from the time of the disclosure itself." *Johnson v. Sea-Land Serv.*, No. 99 Civ. 9161 (WHP) (THK), 2001 WL 897185, at *7 (S.D.N.Y. Aug. 9, 2001).

Here, with respect to the Privileged Screenshots, the undisputed record establishes the privilege holders became aware the government possessed these privileged documents on April 20, 2024. Although the government had disclosed them earlier to defendants as part of its voluminous discovery productions, the government did not flag them as potentially privileged in its discovery letter (despite specifically describing them and their provenance). Nor did it notify the privilege holders of their potentially privileged nature. *See Parmalat Sec. Litig.*, 2006 U.S. Dist. LEXIS 88629, at *34–36 (concluding "record does not establish" privilege holder "knew or had reason to know" of unauthorized disclosure, given "treasure hunt" to find documents in voluminous discovery). Immediately after the Company learned of the privileged material, it notified the government to assert privilege, and the government put in place a taint team. With the status quo preserved, several weeks later, defendants sought leave to dismiss the indictment, and the Company filed a Rule 41(g) petition for return of property. In light of these prompt actions to protect the privilege, there was no waiver here.

37

In its September 6 reply, defendants incorporated the Privileged Outline and Privileged Risk Assessment into their privilege assertion and motion to dismiss, even though the government had told the Company it did not have those documents. Then, on September 20, the government finally disclosed it had those documents, which it turned over to the filter team—again, maintaining the status quo. *See* SA:112. The Company then filed its second Rule 41(g) motion. After the government notified the defense it had these documents on September 20, 2024, the prosecution team had no ongoing access to them, and the privilege was preserved pending litigation. *See Parmalat Sec. Litig.*, 2006 U.S. Dist. LEXIS 88629, at *30–31. Thus, there was no waiver of privilege while defendants prepared their motion to dismiss.

    4.   <u>Defendants' Motions Were Timely</u>

Constitutional rights should not be decided in a game of "gotcha." Yet, that is what happened before the district court. The government repeatedly claimed defendants' motions to dismiss were untimely, despite the government's concealment of keys facts and slow drip of long-delayed disclosures that prevented defendants from bringing their motions sooner. To deflect blame from its failure to follow DOJ policy and reckless disregard for defendants' constitutional rights, it blamed defendants, while they were still trying to uncover the breadth of the government's misconduct. While the district court accepted the government's narrative, this Court should not.

38

"Good cause" in the context of Rule 12(c)(3) "requires at a minimum that the party seeking a waiver articulate some legitimate explanation for the failure to timely file." *United States v. Milton*, 621 F. Supp. 3d 421, 426 (S.D.N.Y. 2022). "[W]here the grounds for the motion are not discoverable by the defendant until after the deadline, good cause is established." *United States v. Shine*, No. 17-CR-28-FPG-JJM, 2019 U.S. Dist. LEXIS 98619, at *8 (W.D.N.Y. June 12, 2019); *United States v. Beras*, No. 99 CR. 75(SWK), 2004 U.S. Dist. LEXIS 11559, at *2 n.2 (S.D.N.Y. June 23, 2004). Moreover, where a defendant's argument has merit, and barring her from raising it would "cause [her] extreme prejudice," the court should hear the motion; to do otherwise would be "contrary to the interests of justice." *Milton*, 621 F. Supp. 3d at 427 & n.5.

As discussed above, with respect to the Privileged Screenshots, the government disclosed them in its voluminous September 18, 2023 discovery production, while disclosing almost 160,000 documents in September and October. The government did not identify the Privileged Screenshots as potentially privileged, even though they were clearly marked as such and the government had obviously reviewed the document, given that it particularly described it as "[s]creenshots of a document provided by [Kara Cooper]." DE:43 at 3. Defendants had no reason to believe privileged material would be in the reams of discovery, so it is not surprising that it took time to identify the document's privileged nature. On April 20, 2024, the

Company and defendants identified it and promptly moved to assert privilege. The government is not permitted to bury such critical information—indeed, the foundation of a meritorious motion to dismiss—in its discovery. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *Nejad*, 487 F. Supp. 3d at 218–27; *United States v. Nachamie*, 91 F. Supp. 2d 565, 568–69 (S.D.N.Y. 2000). Considering the government's actions, defendants have established good cause for filing their motion after the court's January 2024 deadline.

With respect to the Privileged Outline and Privileged Risk Assessment, as discussed above, defendants incorporated them into their privilege assertion and motion to dismiss in their September 6 reply, even though the government had denied having those documents. The government did not disclose until September 20, 2024 that the FBI had, since January 2021, maintained concealed possession of the Privileged Outline and Privileged Risk Assessment. Then, on October 7, 2024, it disclosed it had discovered them on EDNY's servers, despite denying they were there just weeks earlier. And, it was not until the government disclosed its 3500 material, on November 18, 2024—and the defense subsequently conducted a painstaking comparison between the Stolen Privileged Documents and the 127 sets of FBI witness interviews—that the defense was able to prove the agents used the Stolen Privileged Documents to build this case. The government had this information for years, which is material to the defense, yet it has steadfastly refused

to produce it. *See United States v. Danielson*, 325 F.3d 1054, 1070 (9th Cir. 2003) ("[I]n such cases the government and the defendants will have unequal access to knowledge."). Furthermore, given the disqualification of Ms. Cherwitz's prior counsel, which stalled work from December 25, 2024 through January 15, 2025, there was little time to file a renewed motion to dismiss based on the 3500 production that revealed the agents' reliance on the Stolen Privileged Documents—evidence the district court had required in September. On January 24, 2025, just over one week after appearing, new counsel requested leave to file a renewed motion to dismiss.

The motion thus was timely for several reasons. First, although defendants incorporated the Privileged Outline and Privileged Risk Assessment into their reply, the Court specifically declined to address them in its ruling, and set no deadline for a new motion, instead directing defendants to first confer with the government. A:93. Absent a deadline, the deadline for a motion to dismiss is "the start of trial." Fed. R. Crim. P. 12(c)(1). Second, even assuming the January 16, 2024 deadline governed— even though the government did not disclose it had these documents until nine months later—defendants have submitted more than a "legitimate explanation" demonstrating good cause. *Milton*, 621 F. Supp. 3d at 426. Especially considering that defendants attempted to raise this issue in their September 6 reply—and the court declined to rule—its later motion, based on additional facts developed thereafter, is timely. *See id.* Lastly, failing to consider this motion to dismiss would

cause defendants extreme prejudice by denying their meritorious claim, while there is no prejudice to the government in resolving the motion now, particularly because the government caused the delay. Denying the motion on timeliness grounds was contrary to the interests of justice.

C.    Alternatively, the Court Should Permit Defendants to Submit *Ex Parte* Affidavits and Order a *Kastigar* Hearing

Short of granting the motion to dismiss, the district court should have (1) permitted defendants to submit *ex parte* affidavits in support of their privilege claim and (2) held a *Kastigar* hearing to determine if the government had an independent source for its evidence. If this Court does not direct the district court to dismiss the indictment, it should, at a minimum, direct it to take these steps and further consider defendants' motion to dismiss, based on a complete record.

1.    *Ex Parte* Affidavit

In support of both motions to dismiss, defendants requested to submit affidavits in support without waiving their Fifth Amendment right against self-incrimination. The government refused to agree to defendants' request until after they filed their renewed motion, and the district court declined to rule they could submit such affidavits, thereby, forcing them to choose between waiving their right against self-incrimination and asserting the privilege based on a complete factual record. The court committed a significant legal error in doing so.

42

It is black letter law that a defendant cannot be forced to choose between waiving her constitutional right against self-incrimination and asserting another constitutional right. *See, e.g.*, *Simmons*, 390 U.S. at 394; *Bryser*, 95 F.3d at 186. The government conceded as much before the district court. *See* DE:269 at 7–8. In accordance with that principle, courts have specifically held that an individual cannot be forced to give up the attorney-client privilege in exchange for preserving a constitutional right. *See Murata*, 2007 U.S. Dist. LEXIS 17224, at *13–14; *United States v. Khan*, 309 F. Supp. 2d 789, 798–800 (E.D. Va. 2004); *see also Kaur v. Maryland*, 141 S. Ct. 5, 6 (2020) (Sotomayor, J., concurring). Here, pursuant to *Simmons*, the court should not have forced defendants to choose between waiving their right against self-incrimination or waiving their right to assert the attorney-client privilege based on a complete record. If defendants are not able to submit affidavits prior to trial, they will lose the opportunity to do so entirely, and the record will not be preserved for any appeal.

In addition, the district court should have authorized defendants to submit these affidavits *ex parte* for *in camera* review. Defendants expect the content of any affidavits they submit also would be protected under the attorney-client privilege; thus, it would be inappropriate for the government to further invade the attorney-client privilege by having access to that information. *See Landji*, No. 23-6561, DE:47; *In re Grand Jury Subpoenas*, 318 F.3d 379, 386 (2d Cir. 2002); *Fero v.*

43

*Excellus Health Plan, Inc.*, No. 6:15-CV-06569-EAW-JJM, 2019 U.S. Dist. LEXIS 207871, at \*11–12 (W.D.N.Y. Dec. 3, 2019). The district court's clearly erroneous rulings warrant mandamus.

2.    *Kastigar* Hearing

Finally, the district court clearly erred in failing to shift the burden to the government to prove an independent source for its evidence at a *Kastigar* hearing. The Second Circuit has only addressed in one summary order the standard for shifting the burden to the government in this context. *See Hoey*, 725 Fed. App'x at 61. In *Hoey*, this Court imposed only the minimal burden to show the government had access to privileged materials pertaining to the prosecution's subject matter. *See id.* (burden shifts once defendant shows "factual connection between the allegedly privileged information and the charges in this case" (citing *United States v. Blau*, 159 F.3d 68, 72–73 (2d Cir. 1998))); *United States v. Kastigar*, 406 U.S. 441, 469 (1972) (burden shifts once defendant demonstrates "he has testified, under a state grant of immunity, to *matters related to the federal prosecution*" (emphasis added)).

Defendants have easily met this burden. The Stolen Privileged Documents relate directly to this prosecution's subject matter. There is no dispute the FBI agents obtained those documents from Aidelbaum, reviewed the information therein, disseminated the information via email five days later, and then had unrestricted access to those documents on FBI servers for four years. There is also no dispute the

44

documents were located on EDNY servers in the *Cherwitz* case file. The government has admitted these facts. The burden must shift to the government based on these undisputed facts at a *Kastigar* hearing. *See Schwimmer I*, 892 F.2d at 245 (remanding for *Kastigar* hearing).

The district court's denial of defendants' repeated requests for a *Kastigar* hearing has prevented them from fully developing the record. *See* A:131–32 (detailing factual disputes requiring hearing). Although, as discussed above, defendants believe there are sufficient facts in the record for this Court to order the indictment's dismissal, if this Court disagrees, it should direct the district court to order a hearing to fully develop the record. *See Cuervelo*, 949 F.2d at 567. Such a record is not only necessary for defendants to properly assert their privilege claim, but it also is necessary to develop a complete record for appeal, in the unlikely event of a conviction in this case. *See id.*; *United States v. Ventura*, 96 F. 4th 496, 498 (2d Cir. 2024) (reversing and remanding for evidentiary hearing).

<u>CONCLUSION</u>

For the foregoing reasons, this Court should grant defendants' petition for a writ of mandamus and reverse the Orders.

Dated: March 7, 2025

/s/ MICHAEL P. ROBOTTI
MICHAEL P. ROBOTTI
CELIA COHEN
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
(212) 223-0200

– and –

JENNIFER BONJEAN
BONJEAN LAW GROUP PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, New York 11231
(718) 875-1850
*Attorneys for Petitioners*

## CERTIFICATE OF COMPLIANCE

I hereby certify this Petition complies with the word limit requested in our simultaneous motion to file an oversized petition.  I further certify that according to the word count feature of the word processing program used to prepare this petition, this petition contains 10,729 words, excluding the parts of the Petition exempted by Federal Rule of Appellate Procedure 32(f).

This Petition complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 7, 2025

By: _____
        Michael P. Robotti

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Petition and Appendices with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on March 7, 2025. In addition, I hereby certify that on March 7, 2025, the foregoing Petition and Appendices were served on the counsel listed below by FedEx Overnight Mail:

Kayla C Bensing     Kayla.Bensing@usdoj.gov
Gillian Kassner     gillian.kassner@usdoj.gov
Nina C. Gupta     nina.gupta@usdoj.gov
Sean Michael Fern     sean.fern2@usdoj.gov
United States Attorney's Office
for the Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201

I further certify that on March 7, 2025, a copy of the foregoing Petition and Appendices were served on the following by FedEx Overnight Mail:

Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*/s/ Melissa Pickett*
COUNSEL PRESS