UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff, :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 23, 2025

Defendants. : 9:00 a.m.

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.

(Appearances continued on the next page.)

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, New York 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Kamille Simons, Paralegal, Ballard Spahr
Keith Garland, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Michele D. Lucchese,
E-mail: MLuccheseENDY@gmail.com
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2272

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: The Honorable Diane Gujarati is now presiding.

THE COURT: Good morning.

THE COURTROOM DEPUTY: You may be seated.

Your Honor, this is United States of America against Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialist Marlane Bosler and Liam McNett, and FBI Special Agent Tricia Quintero.

Good morning, Your Honor.

THE COURT: Good morning, everyone.

MS. FARRELL: Good morning.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Schuyler LaBarge. Kelly Lin is not here, but she will be shortly. Kelly Lin, Keith Garland and Kamille Simons all on behalf of Rachel Cherwitz.

THE COURT: Good morning, everybody.

MS. BONJEAN: Good morning, Your Honor. Jennifer Bonjean and Kelsey Killion on behalf of Ms. Daedone.

THE COURT: Good morning, everybody.

We're still waiting on one juror, so I'm assuming it's a traveling issue, but we can take up a few other issues.

Does the Government want to start? There was something handed to me. It looks like a 302 and some notes. Is that something we need to take up right now?

MS. BENSING: I would like to briefly make a record about it, Your Honor.

THE COURT: Yes.

MS. BENSING: So it's clear for the record.

THE COURT: We're good.

MS. BENSING: The Government inadvertently failed to produce prior to one of the witness's testimony an agent report and notes of that report to the defense. When we realized this yesterday, we immediately after court produced it to the defense. Those are marked 3500-MPI-32 and 3500-MPI-32-A.

We have spoken with the defense about potential options here, including recalling the witness, stipulating to the contents of the 302.

And so I think the defense is still considering what they want to do, but I don't think there is anything for the Court to decide, but I did want to put it on the record so that it's clear.

THE COURT: Does anyone want to be heard at this

time? Or you can be heard at another time as well if you need more time.

MS. COHEN: Yes, just briefly, Your Honor.

This, as the Government said, this was, you know, it's a 302 that should have been disclosed, but it was crucial information about the witness, Max Pixley.

You know, Ms. Pixley, I specifically did not ask Ms. Pixley about the incident that is described in the 302 because I didn't obviously know what she would say about it, so that was very key.

THE COURT: Sorry. What is the event or the -- what exactly did you not ask about the demos.

MS. COHEN: Yes. Well, I asked generally about the demo, but the demo demonstration that she helped and specifically testified about, she was present and we knew she was present from Ms. Halpern's testimony. Obviously, the fact that she didn't remember would have been a significant point for us.

THE COURT: Are you asking for any relief at this time?

MS. COHEN: At this time, no. I mean, the Government has said we can either call her back or stipulate, but, you know, we're thinking about it.

THE COURT: That's fine. I don't want to put you on the spot.

MS. COHEN: Yeah.

THE COURT: When did you get this? This morning?

MS. COHEN: Last night.

THE COURT: Ms. Bonjean, did you want to be heard on this at this time?

MS. BONJEAN: No thank you.

THE COURT: Okay. So I am not taking any action unless somebody asks me to do something in the future about these two documents.

But I do want to understand more how this happened because it's a 302. I assume the Government has some systematic way of collecting 302s from the agency, correct?

MS. BENSING: Yes, Your Honor.

And this one was just simply not produced. It was, I think a contained mistake on the Government's part. As soon as we discovered it, we immediately produced it.

THE COURT: It was in the possession of the trial team and not produced or was it not obtained from the FBI?

MS. BENSING: No. We had it in our possession and had intended to produce it and it just didn't go over, Your Honor.

THE COURT: Okay. So among the other things you'll be doing this weekend is you will be going back through whatever you need to go through to make sure that you have turned over everything that you are supposed to have turned

over.

MS. BENSING: Yes, Your Honor. We already have a plan in place for that. We have already begun doing it, and we anticipate that this won't be an issue again.

THE COURT: Again, if anyone wants any action by the Court on those documents, you will raise it with me.

Is there anything else we need to take up before this next witness? I know there are a number of issues for the witness after that.

MS. BENSING: We just plan to read the stipulations that we've provided to the Court into the record first thing, and then we'll call the next witness. So we just wanted to flag that for the Court.

THE COURT: And the parties are in agreement that they will be read out to the jury?

MS. COHEN: Yes, Your Honor.

MS. BONJEAN: Yes, Your Honor.

THE COURT: Okay.

I do have things to take up with you, but I think if they don't relate to this witness, we can get the jury in because they are going to be leaving early today.

Okay.

(Jury enters.)

THE COURT: Good morning, everyone. You may be seated, everyone.

And Ms. Farrell, the Government can call its next witness.

MS. FARRELL: Thank you, Your Honor.

Before we call our next witness, we would like to read two stipulations into the record.

And Mr. D'Agostino, I would ask that we put these on the ELMO.

THE COURT: And I would ask when you read, to read slowly. People tend to speed up when they read. I need to hear, the jury needs to hear and the court reporter needs to here.

MS. FARRELL: And, Your Honor, first of all, I would like to move into evidence Government Exhibits 5003 and 5004, which are stipulations among the parties.

THE COURT: Any objection?

MS. COHEN: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibits 5003 and 5004 are admitted.

(Government Exhibits 5003 and 5004 were received in evidence.)

MS. FARRELL: Thank you, Your Honor.

So I will begin by reading 5003 which states: United States of America against Rachel Cherwitz and Nicole Daedone, stipulation.

It is hereby stipulated and agreed by and between the United States of America and the defendants, Rachel Cherwitz and Nicole Daedone, through their attorneys, collectively, the parties, as follows:

In connection with the above-captioned case, OneTaste, Inc., OneTaste, collected and produced to the Government e-mails in OneTaste's possession. "The OneTaste e-mails." The OneTaste e-mails listed below are authentic within the meaning of Federal Rule of Evidence 901.

Each OneTaste e-mail accurately identifies the time and date the e-mail was sent and/or received and accurately identifies the participants by name or e-mail address.

And then below there are a list of a few dozen e-mails. I'm not going to read out the Government Exhibit numbers. They are on the document that is in evidence.

Number two: The following corporate entities are all affiliated with OneTaste, Inc.: Caravan Retreats; Great Work Publishing, LLC; Institute of OM, Inc.; OneTaste Media, LLC; OneTaste NYC, LLC; OneTaste Cooperative, Inc., OneTaste Lineage, LLC.

The following corporate entities entered into licensing, rental or other agreements with OneTaste, Inc.: OTBA, Inc., The Next Right Thing, LLC; Texas Limbic Network; the Land Sanctuary, LLC; The Land Operations LLC; The Land Co., LLC.

The following corporate entity was formed by individuals who are also associated with OneTaste, Inc.: OM Free, Inc.

This stipulation, which is marked as Government Exhibit 5003, is admissible in evidence and then it's signed by attorneys for the parties.

Now, I'm going to put on the ELMO and read aloud Government Exhibit 5004, which is another stipulation between the parties.

It is hereby stipulated and agreed by and between the United States of America and the defendants Rachel Cherwitz and Nicole Daedone, through their attorneys, collectively, the parties, as follows: In connection with the above-captioned case, OneTaste, Inc., "OneTaste," collected and produced to the Government text messages threads for the time period January 1st, 2008 through approximately January 1st, 2019, that were obtained from the personal electronic devices of certain individuals affiliated with OneTaste, not including Nicole Daedone and Rachel Cherwitz, who were no longer employed at OneTaste at the time of collection. "The text threads."

The parties agree that the text threads identified by Government Exhibit numbers set forth below are authenticate within the meaning of Federal Rule of Evidence 901. And then the document lists several dozen Government Exhibit numbers

that I'm not going to read aloud, but are found in the document.

For each of the text threads produced by OneTaste, the date and time stamps identified therein accurately identify the approximate date and time that the text thread was sent and/or received. The text thread chat participants are identified as they appear on the phone or device from which the text thread was retrieved.

This stipulation, which is marked as Government Exhibit 5004 is admissible in evidence, and then below is the signature block.

Thank you, Your Honor.

THE COURT: Sure.

And now you can call your next witness.

MS. FARRELL: Thank you, Your Honor.

The Government calls Lyndsi Keves.

THE COURT: You can come right up here.

THE COURTROOM DEPUTY: Step up, remain standing, raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Please be seated. State your full name for the record. Spell your name slowly. Please use the microphone. Thank you.

THE WITNESS: My name is Lyndsi Keves.

Spell my last name?

THE COURT: Yes.

THE WITNESS: K-E-V-E-S.

THE COURT: You may proceed, Ms. Farrell.

**LYNDSI KEVES**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FARRELL:

Q Good morning. Can you please introduce yourself to the jury?

A Hi. I'm Lyndsi Keves.

Q Ms. Keves, where do you live?

A Here in Brooklyn.

Q Do you know an individual named Nicole Daedone?

A Yes.

Q Who is Nicole Daedone to you?

A She was the leader of OneTaste.

Q Do you see her here today?

A Yes.

Q Can you please point her out and identify her by something she's wearing?

A She's standing with the black jacket and pearls.

THE COURT: Would you move the mic a little closer to you? We just need to hear you.

MS. BONJEAN: So stipulated.

THE COURT: Go ahead, Ms. Farrell.
MS. FARRELL: Thank you, Your Honor.
Q Has Nicole Daedone ever harmed you?
MS. BONJEAN: Objection to the form.
THE COURT: Overruled.
Q You can answer.
A Yes.
Q And at a high level, how has she harmed you?
A The cult that she led --
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection.
MR. ROBOTTI: Foundation.
MS. BONJEAN: Foundation.
THE COURT: I want to hear the rest of the answer first.
You can continue.
A -- was highly abusive.
MS. BONJEAN: Objection. Nonresponsive to the question.
THE COURT: I'm going to sustain the objection and strike the answer.
You can ask your next question.
Q Do you know an individual named Rachel Cherwitz?
A Yes.
Q Who is Rachel Cherwitz to you?

A She was also a leader in the organization.
Q And do you see her here today in the courtroom?
A Yes.
Q Can you please identify her by something she's wearing for the record?
A She's standing with the black-rimmed glasses.
Q And has Rachel Cherwitz ever harmed you?
MR. ROBOTTI: Objection.
THE COURT: Overruled.
A Yes.
Q And at a high level, how did Rachel Cherwitz harm you?
And try to keep it specific to Ms. Cherwitz.
A Emotionally, abusive, verbally abusive.
Q You mentioned OneTaste. What is OneTaste?
A It's a cult where a group of people --
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection.
THE COURT: Overruled.
A -- where they taught something called orgasmic meditation.
Q And what is orgasmic meditation?
A It's where one person strokes the clitoris of another person.
Q Were you involved in OneTaste?
A Yes.

Q In what capacities?
A I began attending an intro course and then joined the coaching program, and then I was in several -- attended several courses, retreats. And then at the end of my experience there, I was working on the sales team.
Q And approximately when -- and I'm talking about your entire time at OneTaste -- but approximately when were you involved in OneTaste?
A It was it -- I believe it was November 2016 to around October 2017, so just shy of a year.
Q What sorts of services or products did OneTaste offer during your time there?
A Classes, retreats, coaching circles, intensive retreats. They called them intensive.
Q During the time -- you mentioned you were an employee at the very end of your time there, but during -- looking at your whole time at OneTaste, did you provide any labor or services for the company?
A Yes.
Q And what sort of labor or services did you provide?
A Early on, there was -- I did a lot of volunteering, working like back of house events, and then towards the very end, I was on the sales team.
Q Did you make any payments to OneTaste?
A Yes.

Q Approximately how much did you pay to OneTaste during your time there?
A Tens of thousands of dollars.
Q And what were those payments for?
A Classes, retreats, coaching circles.
Q Did OneTaste ever pay you?
A Yes.
Q What for?
A Being on the sales team.
Q And that was towards the end of your time there; is that correct?
A Yes.
Q Do you remember how much you were paid approximately?
A I think it was around $10 an hour or something.
Q We'll get into the details later, so I'm really just asking a high-level question.
Did you experience any financial harm in connection with your time at OneTaste?
A Yes.
Q And how would you describe the level of financial harm you experienced there?
A Severe.
Q And, again, I'm going to get into the details later, but at a high level, did you experience any psychological harm during your time at OneTaste?

A Yes.
Q And how would you describe the level of psychological harm you experienced at OneTaste?
A Also very high.
MS. BONJEAN: Objection. That's nonresponsive.
MR. ROBOTTI: Join.
THE COURT: Sustained.
Q How, if at all, would you describe the level of psychological harm you experienced?
A I would --
MS. BONJEAN: I'm going to maintain my objection to the questions.
MR. ROBOTTI: Join.
MS. BONJEAN: Vague.
THE COURT: Overruled.
Q You can answer.
A Yeah, I would describe the psychological abuse as being very high.
Q How, if at all, did that psychological abuse impact your willingness to provide labor or services to OneTaste?
MS. BONJEAN: Objection; vague.
THE COURT: Overruled.
THE WITNESS: Can you repeat the question?
Q Sure.
How, if at all, did the psychological harm that you

just described impact your willingness to provide labor or services to OneTaste?
A Like towards -- you mean like towards the end --
Q While you were working there.
A -- when I left?
I mean, it was, you just did what you were told. There was a level of like obedience.
MR. ROBOTTI: Objection; Foundation.
THE COURT: Sustained.
MS. FARRELL: Is that only to that last portion, Your Honor?
THE COURT: No. I'm sustaining the objection.
You can ask your next question.
Q So let's take a step back. Where did you grow up?
A In Michigan.
Q And how far did you go in school?
A I have two master's degrees.
Q In what?
A Education and social work.
Q And prior to joining OneTaste, did you have both of those master's degrees?
A I had the first one in education.
Q What did you do after you graduated college?.
A I did a program called Teach For America, so I taught third grade.

Q How did you first hear about OneTaste?
A It was through somebody that I knew at Unity Church.
Q Approximately, when was that, that you first heard about OneTaste?
A I feel like I heard about it at least a year before, I attended a course. So that would have probably been 2015.
Q And approximately how old were you then?
A 32.
Q And at the time, where were you living?
A Here in New York, in Manhattan.
Q And how were you supporting yourself?
A I was a nanny at that time.
Q For who?
A My sister.
Q Had you stopped teaching?
A Yes.
Q And what was the first OneTaste event that you attended?
A The first OneTaste event was a -- I forget what they called it, but it was like a free communications -- like where they said they played communication games. Yeah.
Q Were there OneTaste staff and community members there?
A Yes.
Q How did they treat you?
A Lots of attention and praise, interest.
Q What was your initial reaction to this first event you

went to?
A Intrigue. It felt positive.
Q Did you meet either Rachel Cherwitz or Nicole Daedone at that event?
A No.
Q Did you eventually meet them both?
A Yes.
Q Do you remember approximately when?
A I met Rachel at the -- it was a New Year's Eve retreat at -- so that would have been just at the end of 2016. And then I met Nicole later. I don't recall exactly when. I want to say like at least a couple months into the -- my time there.
Q And did you come to learn what their roles were at OneTaste?
A Yeah.
Q What were those?
A Nicole was the founder and Rachel was one of -- I understood her role to be one of the top like teachers, leaders.
Q Beside having founded the company what was Nicole's role at the time that you were there?
MS. BONJEAN: Objection. Foundation.
THE COURT: Overruled.
A When I -- when I was there she -- she was the leader, the head of the -- of OneTaste.

Q Did you have an opportunity to observe the two of them interacting?
A Yes. Sometimes.
Q And based on your observations, what was their relationship?
A They were close. Rachel was kind of her right-hand person.
MR. ROBOTTI: Objection. Foundation.
THE COURT: Overruled.
Q So you mentioned at the top orgasmic meditation.
When did you first become familiar with orgasmic meditation?
A Well, I had -- somebody had told me about it at the Unity Church and then I was -- I watched the Ted Talk that Nicole Daedone gave. So that was kind of how I first learned about it.
Q Did you attend a Ted Talk in person?
A No.
Q How did you watch the Ted Talk?
A On my computer.
Q And did this all happen before you went to that first event that you described?
A Yes.
Q And, so, at the beginning of your time at OneTaste, what was your understanding of how orgasmic meditation fit into the

OneTaste curriculum?
A It was one of the practices that they taught but that there was like an overarching kind of theme of classes around spiritual awakening and relationships, intimacy, connection.
Q Was orgasmic meditation a feature of that first event you went to about communication skills?
A No.
Q So when did you -- when was the first time you learned about orgasmic meditation from OneTaste?
A After the communications event, I had signed up for an intro to OM course.
Q How did you come to sign up for the intro to OM course?
A I signed up for it online, actually. Yeah.
Q Was that after you attended that first communications event you described?
A No, I think I actually signed up for it first and then someone called me to tell me about the -- the communications event.
Q So what were your personal views of orgasmic meditation at the time you first joined or started attending OneTaste classes?
A Like upon first hearing about it, it sounded like crazy, something I would not want to do, like that was my initial reaction. But then after watching the Ted Talk, I was curious, and then being at the communications event before the

OM, intro to OM class, it seemed like people are kind and friendly and, so, I started to become more, like, open to the idea.

Q When you became involved at OneTaste, was OneTaste hosting public group OMs at the time?

A No.

Q So you testified that you were at OneTaste for about a year. During your year there, approximately how many OneTaste courses did you end up taking?

A It's hard to keep track of how many. A lot. Probably 20, 20 to 30. There were also all kinds of events in between, you know, like, so, there were official classes or courses. But then there were also just events that I was volunteering at, and then we would support the women's support group, so I was there it seemed like all the time in that year. But some of that time was me taking official courses and some of that time was me volunteering or going to support, like the women's groups, things like that.

Q So following those first two courses -- two classes you described, the communications one and the intro to OM, did there come a time when you signed up for the coaching program?

A Yes.

Q And approximately when was that?

A That was at the intro to OM class.

Q Describe to us how you were -- withdrawn.

So, focusing on the content of the coaching program, in broad strokes, what was the curriculum?
A The curriculum of the coaching program was a lot of communications, relationship building.
Q And how did orgasmic meditation fit into that curriculum?
A They talked about it and could have used it as an analogy for like when you're talking with other people, you know, like giving strokes, like and up stroke or a down stroke when you are speaking with people. They kind of tied it into the language and the communication, but there wasn't -- you weren't learning how to OM at the coaching program.
Q Did either Rachel Cherwitz or Nicole Daedone teach in that coaching program?
A Yes.
Q Was orgasmic meditation a requirement of the coaching program?
A No, it wasn't required but encouraged.
Q And what was the length of the coaching program? In other words, how long did it last and how frequently did you attend?
A I want to say it was -- I don't know. However many months, four or five months. I can't remember exactly, but it was the -- the set up was you attended like one weekend a month and then there were events kind of -- and like gatherings in between those months.

Q Did there come a time when you participated in a feedback exercise in the coaching program?
A Yes.
Q And were either of the defendants involved in that, Rachel Cherwitz or Nicole Daedone?
A Well, there was like a feedback exercise that -- I mean, I'm pretty sure we did it at the coaching program, but I know for sure there was that exercise at the New Year's Eve retreat that I attended.
Q So the New Year's Eve retreat that you testified about separate from the coaching program?
A Yes. It was a separate event or a separate class, but it was happening -- it overlapped with the coaching program.
Q Describe to us what that New Year's Eve retreat was.
A It was supposed to be around, you know, like learning -- kind of starting the New Year setting goals, kind of letting go of the past year, kind of idea, that kind of idea.
Q Did you meet either Rachel Cherwitz or Nicole Daedone at this retreat?
A Rachel Cherwitz.
Q Did you engage in a feedback exercise with her?
A Yes.
Q And describe to us what happened during that feedback exercise.
A So, you were supposed to sit in front of another person

and give them insights about them, things that you observed or thought about them. And Rachel partnered with me. And one of the -- one of the insights she gave me was that I was so fucking irritating because I couldn't just admit what a slut I really was and that I just wasn't wanted to get fucked.

Q Now, at that point were you enrolled in the coaching program?

A Yes.

Q And how much did the coaching program cost, if you remember?

A I think it was around 13,000.

Q And when had you enrolled in the coaching program?

A In November of 2016.

Q And this New Year's program was at the end of the year, the same year?

A The end of December.

Q How did it make you feel to -- for the feedback to be getting that you were just a slut?

A It was really jarring and shocking and hurtful.

Q And, so, did you consider, you know, disassociating with OneTaste at that time?

A Yeah.

Q Why didn't you?

A Well, I had already paid for the coaching program, and I'd also gun a relationship with somebody in OneTaste. He was

a student at the time as well.
Q So tell us about that. Did there come a time when you became romantically involved with someone at OneTaste?
A Yeah.
Q What was his name?
A He went by Rami.
Q And approximately when did you start dating him?
A Pretty early on, like in -- I think it was in the beginning of December.
Q And what was Rami's financial situation?
A He made more money than I did. He made a good amount of money.
Q So you mentioned you attended a number of OneTaste courses over a period of about a year. As a general matter, how much did each course cost?
A I mean, anywhere from a few hundred to 60,000 -- plus.
Q And you testified you took approximately how many classes?
A I want to say between like 10 and 30.
Q So what were the different methods you used to pay for these courses?
A So, initially I had savings. When I started, I had savings. And then Rami paid for some, and I put some on a credit card toward the end.
Q How, if at all, did OneTaste staff assist you with coming

up with ways to pay?
A There was like encouragement of asking Rami to pay for event.
Q Who specifically encouraged you to ask Rami to pay?
A I don't -- it wasn't Rachel or Nicole, and I don't remember exactly who.
Q And what about with respect to credit cards, did you have any discussions about credit cards with staff at OneTaste?
A Yeah. That one I specifically remember was Aubrey Fuller.
Q What happened with you and Aubrey Fuller with respect to paying for a course?
A Yeah. It was like the women's intensive, and she suggested that I open a credit card.
MR. ROBOTTI: Objection. Hearsay.
THE COURT: Response, Ms. Farrell.
MS. FARRELL: Both 801(d)(2) and also I'm about to get into the effect on the listener.
THE COURT: Overruled.
Q So what did you do in response to the suggestion by Aubrey Fuller that you take out a credit card or that you pay with a credit card?
A I went to the bank around the corner and opened a credit card.
Q And why did you do that?

A There was this often like high-pressure sales tactics, so there was -- we were at an event and it was like, you know, everybody is going to the women's intensive, all of these other women that I was close with in the group, and this feeling of, you know, being left behind, a feeling of wanting to like get the approval of the leaders of OneTaste.
Q What was Aubrey Fuller's role at the company at the time?
A She was -- I believe she was in charge of the New York location.
Q And where was she in relation to Rachel Cherwitz and Nicole Daedone in the company?
A I think she was --
MS. BONJEAN: Objection. Foundation.
MR. ROBOTTI: Objection.
THE COURT: Overruled.
A She was up there, like pretty close to the top with them.
MS. BONJEAN: Objection.
MR. ROBOTTI: Join.
THE COURT: Overruled.
Q So when you first started attending OneTaste courses, did you participate in OMing?
A At first, no. It took me a little -- like a couple of weeks or a few weeks to do the practice.
Q And did you start doing orgasmic meditation at some point?

A Yes.
Q Once you started dating Rami, were the two of you monogamous?
A Yes.
Q Did you express that you were monogamous to other participants at OneTaste?
A Yes.
Q How, if at all, or what, if anything, was the reaction to your monogamy with Rami?
MS. BONJEAN: Objection to foundation.
THE COURT: Sustained.
Q Did you share with Rachel Cherwitz that you were monogamous with Rami?
A Yeah. Well, there were like women's groups that met every Sunday, and so the women would gather and talk about their experiences and relationships, and so I shared it with, yeah, the group.
Q Did that include Rachel Cherwitz?
A Yes.
Q What was Rachel Cherwitz's reaction to your being monogamous with Rami?
A Just that I was like clingy and it was discouraged, that I was trying to stay in my comfort zone, I wasn't willing to get messy, that kind of thing.
Q Did you ever discuss this with Nicole Daedone?

A I don't -- like, I never really -- apart from being in Nick's coaching circles, I didn't really have conversations with her.
Q Did there come a time you moved into Rami's apartment?
A Yes.
Q What were the circumstances of your moving in with him?
A So there was the month of the coaching program. It was March, and it was like relationship month was the theme. So, we were encouraged to kind of have some sort of like experiment or project or some kind of challenged within a relationship, something that challenged us. And, so, that's what Rami and I did for that. We moved into together as like a relationship experiment.
Q Did someone in the coaching program instruct or encourage you to move in together?
A I don't remember.
Q While you were dating Rami, what, if any, interest did he have in sort of self-help or exploration?
MR. ROBOTTI: Objection. Relevance.
THE COURT: Sustained.
Q During your time at OneTaste, what, if any, experiences did you have with respect to staff members there discouraging you from being involved in other organizations?
A Yeah. So, Rami was often kind of seeking and exploring and wanting to be in different groups or --

MR. ROBOTTI: Objection. Hearsay.
THE COURT: Overruled.
A -- like learning different things.
I remember at one point he was going to Peru for ayahuasca retreat and that, like, the staff of OneTaste was really discouraging of that, like he was getting off path, and -- yeah. That it was often encouraged to like stay in this community.
Q Who specifically discouraged Rami from participating in this trip to Peru, if you remember?
A I don't remember specifically. I remember being told by somebody at OneTaste.
MS. BONJEAN: Objection. Hearsay.
MS. FARRELL: It's okay. There wasn't a question spending pending. I will move on.
THE COURT: Okay. Go ahead.
Q Did there come a time when you became an employee of OneTaste?
A Yes.
Q And approximately when was that?
A It was toward the end of my time there. So I want to say like the end of -- end of -- like late summer, early fall of 2017.
Q If I showed you a document, would that potentially refresh your recollection?

A Yeah.

MS. FARRELL: May I use the ELMO for the witness only, please.

For the witness only, I'm showing what has been marked Government Exhibit 2677.

Q If you could just take a look at this.

A Okay. Yes.

Q So, does this document refresh your recollection about approximately when you became an employee of OneTaste?

A Yes.

Q And approximately when did you become an employee?

A August of 2017.

Q Was it late August or early August, if you know?

A Late.

Q So before you became an employee of OneTaste in August 2017, did there come a time when you began doing work for OneTaste?

A Yeah, I did a lot of volunteer work.

Q Approximately when did you start volunteering for OneTaste?

A I don't remember. Yeah, I'm not sure.

Q In terms of your time, your year there, was it on the earlier side or on the latter side?

A I would say it was on the earlier side, yeah.

Q And what kind of tasks did you perform?

A So, we would like go before an event and set up chairs, cut fruit, get everything kind of organized for the class or the event. Yeah.
Q And at that time, what were you doing for a living outside of OneTaste?
A I had just stopped officially taking care of my nieces, so I was a nanny for my sister. But when I started OneTaste, I had stopped working for my sister.
Q So were you working to earn money at any job at the time?
A No.
Q When you were doing this work, not when you were a technical employee, but when you were doing these tasks for OneTaste, what were your typical hours?
A It would be an all day-event, start early, finish late.
Q Specifically, when, for example, when you say start early?
A One time we were supposed to flyer at like five o'clock in the morning.
Q And then how late would you be volunteering or working?
A It could have been anywhere. From, I think, like even 9:00, 10:00, 11 o'clock at night.
Q And when you were doing this work before you became a paid employee, who was your supervisor?
A I guess it would have been Aubrey Fuller.
Q And during this time, did you ever interact with Rachel

Cherwitz?
A Yes.
Q And what role, if any, did she have in sort of managing or supervising you as a volunteer?
A She was always one of the kind of senior teachers. And, so, there were times where if she was teaching the course, she would have been involved in kind of what the volunteers were doing.
Q And you described that at your first OneTaste event you were treated with a lot of positivity. Did that continue?
A No. It didn't stay that way for sure.
Q I'm sorry, what?
A It didn't say that way, no --
Q At what point did it change?
A -- consistently.
Well, my first experience of that changing was what Rachel said to me at the New Year's Eve retreat, but then it was, you know, kind of sprinkled throughout my time there. So, other OneTaste employees would, you know --
MS. BONJEAN: Objection.
THE COURT: She needs to be able to get more than a word out.
MS. BONJEAN: I think there was enough to lay a foundation.
THE COURT: Overruled. You should continue.

THE WITNESS: Okay.
A So other OneTaste employees would like yell at me. I got yelled at once from Rami.
MS. BONJEAN: Objection to the foundation.
THE COURT: Overruled.
A -- not -- that I was so clingy that he couldn't spiritually evolve. That was often the theme of me getting yelled at, that I was -- I was like holding him back by wanting to be monogamous.
Q At your early stages at OneTaste, did you share with the other participants at OneTaste what your goals and desires were professionally?
A Yes.
Q What were those?
A So I attended the coaching program thinking that it was like a legitimate coaching program on -- and what I wanted to do was help women with recovering from eating disorders, with their relationship to food and their bodies.
Q And did you have a personal experience in that area?
A Yeah.
Q What was it?
A I had, before OneTaste, struggled with an eating disorder and then recovered, and I wanted to help other women do the same.
Q And did you share your own background, your struggles

with an eating disorder and your recovery with the people at OneTaste?
A Yeah.
Q During that time there, did you come to know the leaders of OneTaste?
A Yes.
Q I would like to go through some photos with you.
MS. FARRELL: If we can switch to the computer, please. And these are all in evidence. If we can start by showing the witness Government Exhibit 306, please.
Q Do you recognize this person?
A That's Nicole Daedone.
Q What was her -- you have already testified about her role.
Let's move to Government Exhibit 309, please.
A That's Rachel Cherwitz.
MS. FARRELL: If we could show the witness Government Exhibit 249.
Q Who is this?
A I know her face, but I can't recall her name.
MS. FARRELL: If we could put it back up on the screen, please. Sorry. This is in evidence, and if we could have it up on the screen, please.
THE COURT: If you will just give us a moment while we check.

MS. FARRELL: I'm sorry. 201.
Q Do you recognize this person?
A Yes, but I don't remember her name.
Q Do you remember her role at the time?
A She was -- seemed to be very close with Nicole Daedone.
Q What is that based on?
A When I was on The Land, she would often be walking with Nicole or sitting next to her eating.
Q What is The Land?
A It was like a retreat center in northern California where they held a lot of classes and retreats.
Q I would like show you Government Exhibit 211.
Do you recognize this person?
A Yes.
Q Who is it?
A I can't remember her name either.
Q Do you -- what was her role at OneTaste at the time you were there?
A She was also very high up. Like she would be at intensives where Nicole was present or like teaching more intensive courses.
Q What about Government Exhibit 290, do you recognize this person?
A Yes.
Q Who is this?

A Also high up in the organization and would teach and was close with Rachel and Nicole.
Q Do you remember her name?
It's okay if you don't.
A I don't.
MS. FARRELL: If we can next show the witness Government Exhibit 242.
Q Do you recognize this person?
A Yes, that's Eli Block.
Q And who was he?
A He was one of the teachers at OneTaste.
Q When you say one of the teachers, was he -- was he at an executive level of the company or know from your perspective?
A He definitely seemed higher up.
MS. FARRELL: If we can next show Government Exhibit 302, please.
Q Do you recognize this person?
A Yes. That's Maya Block.
Q When you say Block, she had the same last name as the last person you looked at. Was there any relationship there?
A They were married.
Q What was Maya Block's role at OneTaste while you were there?
A She was also led like a teacher, would lead classes.
MS. FARRELL: If we can show the witness, please,

Government Exhibit 281.
Q Do you recognize this person?
A Yes.
Q Who is this?
A Her name I think was also Rachel. I don't know her last name, but also pretty high up.
MS. FARRELL: If we can show the witness Government Exhibit 221.
Q Do you recognize this person?
A No.
MS. FARRELL: If we could show the witness Government Exhibit 292.
Q Do you recognize this person?
A That's Aubrey Fuller.
Q And did you testify earlier about Aubrey Fuller?
A Yes.
Q Just remind us who she is?
A She was the one who suggested I open a credit card.
Q What was her role at OneTaste at the time you were there?
A She was in charge of the New York location, I believe.
MS. FARRELL: Then if we could show you Government Exhibit 290, please. Oh, I'm sorry. Excuse me. 284.
Q Do you recognize this person?
A No.
MS. FARRELL: We can take that down.

Q So you testified earlier that at some point you joined the staff of OneTaste?
A Uh-hum.
Q What -- how did that come to be?
A So, I was living with Rami and his lease was up, and we were looking for apartments, and Aubrey Fuller suggested we come have dinner at the staff house. And then we were like invited to live in the staff house at that time, even though we weren't yet staffed.
Q And do you remember approximately when that was that you moved into the staff house?
A It was probably -- so if I started working there the end of August, it was probably either July or the beginning of August.
Q Where was the staff house located, approximately?
A In the East Village, so it was 10th and Second.
Q So, we will get to living in the staff house shortly.
But did there come a time then when you became an employee of OneTaste?
A Yes.

(Continued on next page.)

EXAMINATION BY
MS. FARRELL:
(Continuing.)
Q When did that happen?
A End of August 2017.
Q And how did it come to be that you became an employee of One Taste?
A I don't remember who suggested it but we were living in the staff house and then it was, you know, almost like an invitation to come and work there.
Q And did you receive a document sort of memorializing that you were becoming an employee?
A Yes.
MS. FARRELL: If I could show the witness only, please, what's marked as Government Exhibit 3770.
Q Do you recognize this do you mean, Ms. Keves?
A Yes.
Q What is it?
A It's an e-mail offering me a position at One Taste.
Q And is this a true and accurate copy of the document sent, you know, provided by One Taste?
A Yes.
Q Where you became an employee?
A Yes.
MS. FARRELL: Your Honor, I move to admit

Government Exhibit 3770 into evidence.

MR. ROBOTTI: No objection.

MS. COHEN: No objection.

THE COURT: Government Exhibit 3770 is admitted.

(Government's Exhibit 3770 was marked in evidence.)

Q So looking at this document -- and we can publish it to the jury, please -- what was your hourly wage?

A $10.50.

Q What is date of this letter?

A August 23, 2017.

Q And it says you were an ITO Specialist on the second line.

Do you know what that is?

A I don't remember.

Q What was your actual job putting aside whatever ITO Specialist is?

A I was basically doing the same thing that I was doing when I volunteered. Kind of back-of-house things. But this time I was, like, encouraged to try and sell courses.

Q We can put that aside.

Were you a full-time or part-time employee?

A Full-time. I mean, I was there full-time, I don't know how much I was officially working full-time. I don't remember.

Q And you seem confused, why is that?
A Because I was always there and, like, there were very little boundaries around work hours.
Q Were there other members of the sales team besides you?
A Yes.
Q Who were they?
A Well, Rami, also around the same time, it was hard to know who was working for One Taste and who was just there volunteering.
So in New York -- oh, a woman named Ally Wall was on the sales team. She was -- Keenan -- Keegan, a man. Another woman named Rachel Short. Ally Montgomery. Her husband lived in the house but I don't know if he was working for One Taste.
Q Earlier, we looked at pictures of Maya Gilbert Aubrey Fuller and Rachel Cherwitz.
Were any of them involved in sales in New York?
A Yes.
Q And how were each of them involved?
A So Rachel and Aubrey were very involved in the sales in New York.
And Maya Gilbert is Maya Block, right.
Q Sorry, Maya Block.
A So she was there less often. I think she was more in at the L.A. office but then would sometimes be in New York.

Q So how did the members of the sales team typically communicate?
A There were WhatsApp groups and then also we lived together in the house, so face-to-face and WhatsApp groups.
Q And how frequent were the WhatsApp messages when you were on the sales team?
A Very frequent.
Q And were there any expectations around your timeliness in responding to messages?
A I don't remember explicit instructions to respond in a certain manner, or a certain time, but it was encouraged to, like, always stay connected.
Q Was that a phrase used?
A Yeah.
Q Who was your direct supervisor?
A I guess that would have been Aubrey Fuller, I think.
Q And did you report to Rachel Cherwitz as well?
A When she was living in the house, yeah.
Q Were you encouraged to dress a particular way?
A Yes.
Q And what was that?
A Sexy.
Q And who encouraged you to dress sexy?
A Rachel, among other staff members.
Q And what did that mean concretely to be dressing sexy?

A Like, black short skirt, high heels. Like, have your hair done, put yourself together.
Q Did you engage in sales training as part of your job?
A Yes.
Q And, at the time that you worked there, were you familiar with the One Taste sales culture?
A Getting more and more familiar, yeah, as I worked there.
Q What was the sales culture at One Taste?
A Very high-pressure sales culture.
Q And, generally speaking, did you seek out particular types of customers for sales?
A So everybody -- there was a, like, a spreadsheet on whoever was attending the course. So, yeah, they knew, like, who was more likely.
MR. ROBOTTI: Objection to "they knew"?
THE COURT: It's sustained that last sentence.
Q So what did you know when you were on the sales side? What sort of information would you have when you were setting up to sell a course?
A Like what people did for a living. What their goals were. How likely people were to sign up for something.
Q And where did that information come from, if you know?
A Well, there were calls, like, before a course, if you were enrolled, you would often get a call from some staff at

One Taste asking you questions.
Q And how is that information stored or recorded?
A They had a spreadsheet for each course and for each student or person attending the course, there was information about them.
Q And did the information that was gathered including, like, past trauma that people had?
MS. BONJEAN: Objection to the leading.
MR. ROBOTTI: Join.
THE COURT: Sustained.
Q What sorts of information was solicited in these pre-calls?
A It was, you know, we knew what people's goals were. What they were hoping to get out of the course. And so, you know, in the kind of communication events, for example, people were encouraged to be really open and vulnerable as a way to connect with over people. And so, when people were volunteering, if they were chatting with someone and got information, it was all shared, kind of, after the course as a debrief. So there was kind of, like, an ongoing collection of information about people.
Q And how, if at all, was that used to sell people courses?
A So if somebody had said that they wanted to help women recover from eating disorders, it was --

MR. ROBOTTI: Objection to the hypothetical.
THE COURT: Sustained.
Ask your next question.
Q In your experience, how have you used the information collected to try to make a sale?
A So I knew what they were hoping to get out of the course. And so, kind of hone in on that kind of weakness or goal or desire to in hopes that they would buy the course.
Q And who, if anyone, taught you how to do that?
A There were, like, sales trainings.
Q Did you ever hear the phrase "VIP" being used?
A Yeah.
Q In relation to what?
A It's like people who were more, like, often buying courses or, like, more likely that they would buy a course.
Q And were there particular types of people that you were looking to target for sales?
A I mean, it was anybody who attended the course. We were -- they were hoping to have them buy another course. But, certainly, we knew who made more money and what people did for a living.
MR. ROBOTTI: Objection to foundation.
THE COURT: Overruled.
Q So we talked about the sales culture, I want to talk about the supervision culture.

Are you familiar with what the supervision culture of the sales team from your experience?
A Like the -- yeah, the supervisors, yes.
Q And how were you treated as an employee by your supervisors?
A Not well. I mean, it was, like, Aubrey Fuller was my direct supervisor, I guess. And one, you know, the morning that we were supposed to be out flyering from 5:00 o'clock in the morning another woman and I -- oh, another woman who worked and lived in the house Marla, I believe. She and I were out flyering and we came back to have breakfast before the class started and Aubrey told us that we couldn't eat because we were, like, slowing down the flow of energy, so we weren't allowed to eat our breakfast before the course.
Q Do you recall any specific times where you were staff on an event and it wasn't going well?
A Yes.
Q And was Rachel Cherwitz there?
A Yes.
Q What happened?
A So there was an event that I was working the back-of-house along with several other people, and Rachel, she wasn't making sales. The way that it worked is they would have people, they would, like, take one person at a time behind a, like, a curtain and talk with them and try to

get them to buy another course and nobody was buying. And so, Rachel took us, all of the volunteers or all of the staff, a combination of the staff and volunteers, into the kitchen and berated us for, like, not doing our jobs well. But most of that was directed toward me because Rami was supposed to be, like, running kind of the show, running the back-of-house, and he wasn't doing a good enough job because I had my -- I wasn't -- I was so clingy.
Q Who specifically said that to you?
A Rachel Cherwitz.
Q What was the tone with which she said this?
A Cruel, abusive.
Q Did she raise her voice at you?
A Yeah.
Q Are you familiar with the word tumescents?
A Yes.
Q How, if at all, was tumescents tied to sales?
A My understanding of it was kind of like it being used as a way to kind of refer to the energies. So the clogging or stuffiness of the energy. Things weren't flowing if you were tumesced.
Q So you talked about moving into the One Taste residence shortly before becoming an employee.
Can you describe the layout of the residence?
A Yeah. There were, I think, five bedrooms, one common

room, two bathrooms, a small kitchen, and then two people to a room.

Q And who did you share a room with?

A Rami.

Q Did you Om at the residence?

A Yes.

Q Describe that?

A So every morning there would be, like, group Om at the residence. So, in the living room, everybody in a circle together would do the practice.

Q Did you pay rent?

A Yes.

Q How much did you pay?

A I honestly don't remember because Rami paid it. So I guess I didn't pay rent, Rami did.

Q Did you purchase your own food?

A I don't remember.

Q Okay. Are you familiar with the exercise of completing a fear inventory?

A Yes.

Q What is that?

A So we were -- they did it at events but also it was encouraged -- we did it at the house, too, where you sit and you write a list of everything that you're afraid of.

Q And who did you share -- did you share your fear

inventory?
A Yes. So you were then supposed to partner with somebody and share your list.
Q And who would you typically share your list with?
A One of the other staff members.
Q So I'd like to talk to you about some of the sort of concepts one at One Taste.
Did any One Taste leaders discuss with you how you should approach orgasmic meditation?
A Yes.
Q And who had those discussions with you?
A Some of the staff. I remember Marissa Ward was on the staff as well. Specifically, yeah, a lot of the staff had, like, ideas of how to should be done.
Q Okay. Was Omming ever discussed at any of the courses that you took?
A Yes.
Q And what was -- what teachings were there with respect to orgasmic meditation with respect to those?
MS. BONJEAN: Objection to foundation and vague.
THE COURT: Sustained.
Q At the time you started at One Taste and sort of your initial coursework, was there any teachings on monogamy in particular?
A The kind of official stance seemed to be --

MS. BONJEAN: Objection to --

THE COURT: Yes, sustained.

Q I just want to know what, if anything, you witnessed being taught about monogamy at your early days at One Taste?

A So that was it was an advanced practice.

Q What does that mean?

A So until you were ready for it, that you should be -- you should, like, open up your orgasm, open up your sex, get messy, and, yeah, I was not ready for it apparently.

Q And who taught that?

A One Taste staff.

Q Was there a particular language people at One Taste used?

A Yeah.

Q Are you familiar with the term "aversion" as it was used at One Taste?

A Yes. They talked about something called an aversion practice.

Q What was that?

A People were encouraged to do things that they had an aversion to, like, Om was somebody they found repulsive or have sex with somebody that they weren't attracted to.

Q Are you familiar with the term "victim mindset" as it relates to One Taste?

A Yes.
Q What does that mean?
A There were --
MS. BONJEAN: I'm going to object to the form of that question.
THE COURT: Sustained.
Q What did you learn victim mindset meant from your being a student at One Taste?
MR. ROBOTTI: Objection to foundation.
THE COURT: Overruled.
A It was talked about a lot in courses and communication classes. Just that it was talked about the victim triangle. So you were either a victim, a witness, or a perpetrator.
Q And what did that mean?
A So the victim was somebody who, like, couldn't take responsibility for what was happening to them.
Q And what about the witness and the perpetrator?
A The witness was the observer. So we would often be paired or, like, grouped into three and you would have some sort of, like, scenario. So one person was observing, one person was kind of the perpetrator or, like, giving insights or something and then the victim was the person who if you couldn't --yeah, there was the victim that was labeled as weak or unable to take responsibility for their circumstance.

Q Are you familiar with the term "turned on"?
A Yes.
Q What did that mean in the One Taste context?
A It could many sexually but it didn't -- it wasn't limited to that. It was kind of like a catch-all for, like, if a woman was in her power, charismatic or, yeah.
Q Are you familiar with the term "stroke"?
A Yes.
Q What did that mean?
A Again it could mean like literally stroking the clitoris or they also used it as like if you, you know, people were giving insights or saying something to you that could be considered like a stroke.
Q Was there a One Taste word for the concept of a trend?
MS. FARRELL: I'll withdraw.
A I'm not sure.
Q Did you begin using this vocabulary while you were there?
A Yeah.
Q And how, if at all, did this vocabulary affect your life?
MS. BONJEAN: Objection to that the vagueness of that question.
THE COURT: Sustained.
Q How did your implementing this vocabulary affect your

ability to communicate with others?

A It was definitely the -- kind of made One Taste feel like its own little world, all of the language and lingo that was used there. Yeah, it was like learning a new language.

Q Did you ever hear the phrase "turning no into a yes"?

A Yes.

Q What does that mean?

A It was like one of the kind of sales tactics on the sales team.

Q Were you instructed at One Taste regarding consent?

A Yes.

Q And what, if any, teachings at One Taste were you given about consent?

A Well, there was the idea that desire is co-occurring. So if somebody has a desire about you then you also have -- you must also have that same desire. And so, the idea was, like, well, if you're there, you chose to be here, so you consented. You signed the form beforehand so you consented.

MS. FARRELL: So I would like to show the witness only, please, what's marked as Government Exhibit 3239, please.

Tab 3 in your binder, Judge.

THE COURT: Thank you.

Q You mentioned consent forms. Do you see the document in front of you?
A Yes.
Q Do you recognize this?
A Yes.
Q What is it?
A It's a release of liability and course agreement.
Q And if you could go to the last page and take a look.
Do you recognize this, Ms. Keves?
A Yes.
Q Is this a true and accurate copy of a consent form you signed?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 3239 into evidence.
MR. ROBOTTI: No objection.
THE COURT: I didn't hear you, Ms. Bonjean.
MS. BONJEAN: No objection.
THE COURT: Okay. Do you intend to be redacting the birth date?
MS. FARRELL: Yes, Your Honor. And if we could just -- I see, yes.
THE COURT: Is there any objection to a redaction of the birth date?
MR. ROBOTTI: No, Your Honor.

MS. BONJEAN: Objection.

THE COURT: Are you offering this as redacted to omit the birth date.

MS. FARRELL: Correct.

THE COURT: Government Exhibit 3239 is admitted as redacted to remove the birth date.

(Government's Exhibit 3239 was marked in evidence.)

MS. FARRELL: If we could publish, please, and go to the top of the first page.

(Exhibit published.)

Q So what is the date of this document?

A November 22, 2016.

Q Is this the -- a consent form that you filled out for the coaching program that you first took?

A Yes.

Q And so, you described how there was discussion or teachings around, you know, you signed a consent form. So tell us more about those teachings?

A Yeah, so, I guess it was often kind of used to shut down, like, objections or, like, if people were conflicted with what was going on.

MR. ROBOTTI: Objection, foundation.

THE COURT: Sustained.

Q Did you sign a series of consent forms like this for

all the courses you took at One Taste?
A Yes.
Q And did you ever have discussions, or were part of a class, where Rachel Cherwitz or Nicole Daedone, in particular, discussed the consent forms?
A I don't remember.
Q Were you ever in any courses where a member of upper One Taste staff discussed the consent forms?
A I don't remember the consent forms being discussed explicitly.
Q Well, I think you testified earlier that they were referenced in connection with consent; is that correct?
A Well, yeah. So the kind of culture around it was.
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
MS. BONJEAN: I object to that.
THE COURT: Sustained.
Q Was there a culture around discussing consent forms at One Taste?
MR. ROBOTTI: Same objection.
MS. BONJEAN: Same objection.
THE COURT: Sustained.
Q Did you ever --
MS. FARRELL: Well, withdrawn. We can take this down.

Q Did you attend courses taught by Nicole Daedone?
A Yes.
Q Approximately how many?
A At least two or it was -- she was specifically -- there were more, at least three. One, I was, like, watching the circle or, like, in the back-of-house but I wasn't in the -- in, like, the participants. Two where I was definitely in, like, there was a Nicole Daedone coaching circle and then an intensive. And she was also at, like, some of the -- or at least one of the coaching or the coaching program ones.
Q So for the Nicole Daedone intensive, what was the general curriculum?
A I don't remember there being a curriculum. It was, like -- it was more like people came with questions for her and she -- people would sit in kind of, like, a half circle and she would be at the front. And she would, you know, take turns giving insights or talking with each person who paid to be there to talk with her.
Q Do you recall approximately how much money it cost for you to go to the Nicole Daedone intensive?
A I don't remember but I'm pretty sure it was ten --
MS. BONJEAN: I'm going to object to the speculation.
THE COURT: Overruled, she's not speculating.

Overruled.
A Tens of thousands of dollars.
Q Did you pay for that or did Rami pay for that?
A Rami paid for that.
Q And so, why were you willing to pay tens of thousands of dollars to sit in a circle and have Nicole Daedone give you feedback?
A She was kind of presented as this all-knowing figure. This person, you know, who had the luxury of sitting at her feet and she would tell you something about yourself.
Q Do you recall her --
MS. FARRELL: Well, withdrawn.
Q Are you familiar with a place called The Land?
A Yes.
Q You testified about that earlier, correct?
A Yes.
Q Have you ever been there?
A Yes.
Q And just remind the jury what is The Land?
A It's a retreat center in northern California. So there were, like, cabins and common rooms and places, like, where they held classes and courses.
Q And why did you go there?
A For, I think, it was the intensives. But there were -- I was there at least twice.

Q Did you also attend an L.A. intensive at one point?
A Yes.
Q Do you recall what kind of course that was?
A I don't remember the title of it but Nicole was teaching it.
Q Did there come a time you got engaged to Rami?
A Yes, at that event.
Q Okay. Explain to us what happened?
A It was one of the, I think it was a weekend-long course. And during the coaching program, or during the circle, Rami proposed after another couple had already, like, another couple had gotten engaged there the day before and then he proposed. And I honestly don't remember it was, like, his turn to talk and he got up and got down on one knee and he had been talking with Nicole but I don't really remember the exchange.
Q Okay. So let's back up. Approximately when were you in L.A. for this course?
A I think that one was July.
Q Of what year?
A Of 2017.
Q Okay. And how long have you and Rami been dating at that point?
A It would have been six, seven months.
Q Had you talked about getting engaged?

A Yeah.
Q Were you expecting to get engaged at this event?
A I don't remember. That wasn't, like, the plan or I didn't know that that was going to happen at that event.
Q And so, describe to us in detail like what actually happened at the event?
A So it was a -- I don't remember if it was for just staff or who -- I don't think it was just staff but it was in L.A., it was an intensive course, Nicole was teaching it. And she would go around and talk with each -- like, each person got a turn to talk with her. And when it was Rami's turn to talk with her, he got up, and got down on one knee and after chatting -- I think.

THE COURT: I'm sorry, was there an objection?

MS. BONJEAN: No.

THE COURT: Okay.

Q Let me ask a question. You mentioned that another couple had gotten engaged?
A Yeah.
Q And describe that?
A So, from my memory, it was the woman, I can't remember her name, she was talking with Nicole about desire.

MS. BONJEAN: Objection to the hearsay.

THE COURT: Response, Ms. Farrell.

MS. FARRELL: I don't think she is going to say

the statement she is just saying the topic.

MS. BONJEAN: She already did.

MR. ROBOTTI: The topic.

THE COURT: Yes, sustained.

Q So describe to us how this couple got engaged without, you know, saying what their statements were, please?

A So she was asked, like, if it was her desire to.

MS. BONJEAN: Objection.

Q Who asked her?

A Nicole.

Q Okay. So Nicole Daedone asked this woman something. What did she ask her?

A Something along the lines of, like, did she desire to marry this other person.

THE COURT: I'm going to overrule that last objection.

MS. FARRELL: Thank you, your Honor.

Q So what happened after Nicole asked this woman about her desire?

MS. BONJEAN: Now I'm going to object again, your Honor.

THE COURT: Are you asking for a conversation or are you asking just...

MS. FARRELL: Just what happened.

THE COURT: Overruled.

A Okay. So she said yes.
MS. BONJEAN: Objection to the conversation.
THE COURT: Yes, sustained.
Q I know it's confusing. Just say what you saw happened without reference to what people said?
A They got engaged.
Q Right after that Q and A with Nicole?
A Yes, right there. He went and got a ring right after that and they got engaged.
Q Did the proposal happen in front of the group?
A I don't remember. I think so.
Q Did your proposal happen in front of the group?
A Yes.
Q And was it before or after the other couple got engaged?
A He after.
Q And was Nicole Daedone there?
A Yes.
Q Were there other discussions around marriage during the -- during this event?
A Not that I remember. There wasn't specific, like, topic. It wasn't may specific topic.
Q Okay. During your time at One Taste in 2017, were there other One Taste couples that were getting engaged or married?

A Yes.
Q Approximately how many?
A Just the time that I was there, I know one couple got married, like, at an event. Yeah, and then...
Q What do you mean they got married at an event?
A I wasn't there but my understanding was --
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Did you learn that a couple got married at the end of a One Taste event or during a One Taste event?
A Yes.
Q How did you learn that?
A They told me. They were living --
MS. BONJEAN: Objection.
A -- living in the staff house.
THE COURT: Response, Ms. Farrell.
MS. FARRELL: I'll ask it a different way.
THE COURT: I'll sustain the objection.
Q Did people that you were living with get married while you were living there?
A Not while I was living there, before.
Q Okay. So when you moved in, were they a married couple?
A Yes.
Q And were you aware that they had not been married at

some time before that?
A Yes.
Q Okay. Was either -- was Ms. Cherwitz married at the time?
A When I first started, yes.
Q To who?
A Hamza Tayeb, I think was his name.
Q Was Nicole Daedone married at all while you were there at One Taste?
A While I was there, she was in a relationship but I don't think they were married.
Q And when you say "in a relationship," what was your understanding of the nature of their relationship?
MS. BONJEAN: Objection, vague.
MR. ROBOTTI: Objection.
MS. BONJEAN: And foundation.
THE COURT: Sustained. You can ask your next question.
Q Did there come a time when Nicole Daedone sold her interest in the company while you were there?
MR. ROBOTTI: Objection, foundation.
MS. BONJEAN: Objection, foundation.
THE COURT: Sustained.
Q While you were an employee of One Taste, were you provided information about the ownership of the company?

MR. ROBOTTI: Objection, hearsay.
THE COURT: Overruled.
A Yes.
Q Were you aware, generally, of who was in charge of the company and who owned it?
A Yes.
Q And did there come a time when that changed?
A Yes.
Q And how did you learn that?
A So, Nicole and Rachel, it was an announcement made at one of the events. I think it was the same event where Rami and I got engaged.
Q And what was the announcement?
A That she was selling the company to Anjuli and Austin Ayer.
Q I'd like to show you what has been marked as Government Exhibit 315.
THE COURT: Ms. Farrell, in the next five to ten minutes I would, like to take a break.
MS. FARRELL: Let me do two photos and then we can take a break.
THE COURT: That's fine.
Q Ms. Keves, do you recognize this photograph?
A Yes.
Q Who is it?

A Anjuli Ayer.
Q Is it a true and accurate photograph of her?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 315 into evidence.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 315 is admitted.
(Government's Exhibit 315 was marked in evidence.)
MS. FARRELL: If we could publish that.
(Exhibit published.)
Q So who is this person?
A Anjuli Ayer.
Q What is her role respect to Nicole Daedone selling the company?
A My understanding was that she, Nicole, sold the company to Anjuli Ayer.
Q If we can take a look at Government Exhibit 230, please, only for the witness.
Do you recognize this person?
A Yes.
Q Who is this?
A That's Austin Ayer.
Q Is this a true and accurate photograph of Austin Ayer?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 230 into evidence.

THE COURT: Any objection?

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 230 is admitted.

(Government's Exhibit 230 was marked in evidence.)

MS. FARRELL: If we could publish that, please.

(Exhibit published.)

Q Who is Mr. Ayer with respect to Nicole Daedone announcing she was selling the company?

A I believe he was also -- she was selling it to both Anjuli and Austin Ayer.

Q To your knowledge, what was their relationship with each other?

A Brother and sister.

MS. FARRELL: Your Honor, now would be a good time to take a break.

THE COURT: Okay. The witness may step down.

(Witness leaves the witness stand.)

THE COURT: We'll come back at 11:25. Don't talk about the case, keep an open mind, and I'll see you in 15 minutes.

(Jury exits courtroom at 11:11 a.m.)

THE COURT: I'll let you take day break but let me just mention some of the redactions on the documents.

It's not enough to just simply redact on the screen. If you are offering a document, it has to be clear if you're offering the whole document or if you're offering the redaction. I would encourage everybody to be very careful with personally identifiable information. To the extent you are seeking to admit that, that's fine, but to the extent you just haven't noticed it, or you think you can just redact it on the screen, you're going to have to do things differently.

MS. FARRELL: Understood. I didn't notice it, I apologize.

THE COURT: You all have to notice it. It's really not for me to be noticing what you should be noticing. But I did notice it, and so, I mentioned it. But I think everyone has to be very careful. I'm not saying that personally identifiable information might not come in if there's a reason for it but I don't think that's what you're intending. I think it's just being handled in a bit of a sloppy way.

MS. FARRELL: Understood, your Honor. I wasn't planning on putting document into evidence until she brought it up, so partially --

THE COURT: Just keep it in mind.

MS. FARRELL: Okay. Thank you.

THE COURT: All right. 25 after 11:00.

(A recess in the proceedings was taken.)

(Continued on the next page.)

(Continuing.)

(In open court; jury not present.)

THE COURT: You can bring back the witness and the jury.

You could just head back up here.

(Witness resumes the stand.)

(Jury enters; in open court.)

THE COURT: Everyone may be seated.

Ms. Farrell, you may resume your examination.

MS. FARRELL: So if we could publish these two photographs to the jury, please.

(Exhibit published.)

BY MS. FARRELL:

Q Just to reorient us, before the break you were testifying about an announcement that was made with respect to a change at the company. What was that change?

A That Nicole Daedone was selling the company to Anjuli and Austin Ayer.

Q Did you know Anjuli and Austin Ayer during your time at OneTaste?

A Yeah. Not well, but yeah. They were around.

Q How did you know them?

A I saw them at different events, like different courses.

Q And what, if anything, during that announcement did Nicole Daedone say about why she was selling the company?

A Along the lines of she wasn't able to tell the truth, like, at the deepest level from her current position.
Q And was Rachel Cherwitz there?
A Yes.
Q Are you familiar with someone named Jack Elias?
A Yes.
Q Have you ever met him?
A Yes.
Q And when did you first meet him?
A It was at a, like a staff event on the land, and he was one of the -- he was, like, doing a workshop. They hired him to do a workshop with the staff.
Q Was he -- besides doing this workshop, was he otherwise someone employed by or affiliated with OneTaste?
A The no.
Q And what was the nature of the workshop he did?
A He was a hypnotherapist.
Q And approximately when was this workshop with Mr. Elias on the land?
A It would have been toward the end of my time there. So maybe September or --
Q Of 2017?
A Yeah.
Q After that workshop, did there come a time when you set up a personal meeting with Mr. Elias?

A Yes.
Q And was that meeting in person or remote?
A Remote.
Q And why did you set up a meeting with him?
MR. ROBOTTI: Objection to relevance.
MS. BONJEAN: Join.
THE COURT: Overruled.
A Because during the workshop, he expressed concern over.
MS. BONJEAN: Objection. Hearsay.
MR. ROBOTTI: Join.
THE COURT: Response, Ms. Farrell?
MS. FARRELL: The question is why she set up a meeting with him. So irrespective of the truth of what he said, it's about the effect on the listener.
THE COURT: Overruled.
You may answer.
A He expressed concern over the sales tactics at OneTaste --
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection. Hearsay.
THE COURT: Overruled.
Q So at the time that you set up this personal meeting with him, what was your psychological state?
MS. BONJEAN: Objection.
THE COURT: Overruled.

A I was -- I was kind of starting to have panic attacks around being at OneTaste, feeling like I really wanted to -- yeah, I was just -- I was starting to feel like I needed to anchor into some -- when somebody was expressing concerns, somebody else, I wanted to touch base with him and talk with him about what he was seeing.

Q So why were you in psychological distress at the time, based on your own experience?

MS. BONJEAN: Objection. Misstates the testimony.

THE COURT: Overruled -- excuse me. Sustained.

Q Why were you in the psychological state that you were in at the time in the fall of 2017?

A The environment at OneTaste was really high pressure, controlling --

MS. BONJEAN: I'm going to continue to object. Standing objection to testimony around environment.

MR. ROBOTTI: Join.

THE COURT: Overruled.

A So when -- when he was expressing --

Q I'm sorry.

A Yeah.

Q Let me just remind you, the question is: Why were you in that psychological state at the time in fall of 2017?

A Yeah, because I had been living and attending classes and working there, and it was always high pressure, lots of

emotional manipulation and abuse, and it was emotionally draining.
Q So this is a yes-or-no question, but did Mr. Elias tell you something in your personal meeting with him that had a substantial effect on you?
A Yes.
Q And did he -- did the thing that he told you cause you to take action?
A Yes.
Q And without commenting on its truth, what did Jack Elias tell you during that meeting?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
MS. BONJEAN: Hearsay. 403, as well.
MR. ROBOTTI: Agree.
THE COURT: Overruled.
A He explained to me the cycle of abuse and --
MS. BONJEAN: I'm going to object also on the grounds --
THE COURT: Yes, sustained, sustained.
You can go on to the next topic.
Q After speaking with him, did you soon thereafter decide to leave OneTaste?
A Yes.
Q And was that based on your discussion with him?

A Yes.
Q And so what did you do after speaking with Jack Elias?
MS. BONJEAN: Your Honor, I apologize. I just want to also put on the record objection to the undisclosed expert slash --
THE COURT: No, sustained -- overruled, your objection.
I told you to move on to the next topic.
Q What did you do next?
A I moved out of -- I ended the relationship with Rami, I moved out of the staff house, and then left OneTaste.
Q And at the time, were you engaged to Rami?
A Yes.
Q Did you attempt to stay in the relationship with him while you were leaving OneTaste?
A Yeah.
Q And what happened to your relationship?
A It -- we -- it ended. We -- I couldn't -- I kind of -- I wanted to convince him to leave; he wanted to stay.
Q So I'd like to show you a series of photographs that are in evidence.
MS. FARRELL: We could start with Government Exhibit 382, please. And we could show this to the jury.
(Exhibit published.)
Q Do you recognize this person?

A No.

MS. FARRELL: If we could show the witness Government Exhibit 260.

(Exhibit published.)

Q Do you recognize this person?

A No.

MS. FARRELL: If we could show the witness Government Exhibit 265, please.

(Exhibit published.)

Q Do you recognize this person?

A No.

MS. FARRELL: If we could show the witness Government Exhibit 388, please.

(Exhibit published.)

Q Do you recognize this person?

A No.

MS. FARRELL: If we could show the witness Government Exhibit 228, please.

(Exhibit published.)

Q Do you recognize this person?

A No.

MS. FARRELL: If we could show the witness Government Exhibit 269, please.

(Exhibit published.)

Q Do you recognize this person?

A No.

MS. FARRELL: If we could show the witness Government Exhibit 408.

(Exhibit published.)

Q Do you recognize this person?

A No.

MS. FARRELL: If we could show the witness 297, please.

(Exhibit published.)

Q Do you recognize this person?

A No.

MS. FARRELL: And if we could show the witness Government Exhibit 404, please.

(Exhibit published.)

Q Do you recognize this person?

A That's me.

Q Approximately when did you leave OneTaste?

A Fall of 2017.

Q And where did you go after leaving?

A I moved back in with my sister.

Q And was she in New York?

A Yeah.

Q And why did you go to your sister?

A Well, I didn't have any money, and so I had a free room, but she was my -- my support.

Q And what was your emotional condition at the time that you left?

MS. BONJEAN: Objection to relevance.

THE COURT: Overruled.

A It was really hard.

Q It seems like you're getting emotional. Why is that?

MS. BONJEAN: Objection.

THE COURT: Yes, sustained.

Q Why was it really hard?

A Because for almost a year I had been -- I spent so much of my time, all of my money in that organization, and then it's hard to admit that you -- for me, it was hard for me to admit that I had been so, like, manipulated or persuaded.

Q And specifically what about your experience at OneTaste makes you feel like you were manipulated?

A The entire culture at OneTaste was --

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection.

THE COURT: Overruled.

A It was around, you know -- the philosophy was around, you know, desire, but often it was taught that, like, you don't know your own desire, somebody else knows what you desire. And so I lost kind of -- I felt like I lost touch with myself because I had -- I was being told who I was and what I wanted and what to think. So -- yeah, I'm sorry, I

forgot the question.
Q That's okay.
When was the last time you spoke with Nicole Daedone?
A About -- I believe it was that event where Rami and I got engaged.
Q And what about Rachel Cherwitz?
A It probably would have been after -- like late fall, just before, because Rachel was more around New York.
MS. FARRELL: I have no further questions, Your Honor.
THE COURT: Mr. Robotti?
MR. ROBOTTI: Yes, Your Honor.
THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good afternoon, Ms. Keves.
A Good morning.
Q My name is Mike Robotti, and I represent Rachel Cherwitz. Nice to meet you.
So you're originally from Michigan, correct?
A Yes.
Q And you went to college, correct?
A Yes.
Q Where did you go?

A Michigan State for undergrad.
Q And what was your degree in?
A Elementary education.
Q And you got a master's degree, correct?
A Yes.
Q That was in teaching?
A Yes.
Q And you later got a second master's degree, correct?
A Correct.
Q What was that in?
A Social work.
Q And what year did you move to New York?
A 2012.
Q And you participated in OneTaste from 2016 to 2017; is that correct?
A Yes.
Q Is it fair to say that during that period of time, you had a significant financial safety net in place?
A I don't know how significant, but I had some savings when I began OneTaste, yes.
Q Okay. And your parents were both employed, correct?
A My parents?
Q Yes.
A Yeah.
Q Okay. And your sister, she's an attorney, correct?

A Yes.
Q And her husband, who is your brother-in-law, he's the manager of a hedge fund, correct?
A Correct.
Q And you nannied for your sister's children; is that correct?
A Yes.
Q And you got paid to do that?
A Yes.
Q And you lived there rent free, correct?
A Yes.
Q And that was before you got involved in OneTaste, right?
A Yes.
Q What years did you nanny?
A 2014, I think, to 2016.
Q So that was about two years before you got involved in OneTaste, correct?
A Yeah.
Q And you started at OneTaste while you were still living there, correct?
A Yes.
Q And they lived in an apartment in the SoHo neighborhood of Manhattan; is that right?
A Yes.

Q And did they own that apartment?
A Yes.
MS. FARRELL: Objection. Relevance.
THE COURT: Sustained.
Q And during your time at OneTaste, you also vacationed with them in the Hamptons; is that right?
MS. FARRELL: Objection. Relevance.
THE COURT: Sustained.
Q So is it fair to say that your family had significant resources while you were at OneTaste?
A My sister, yes.
Q Okay. And if you needed to in 2016 or 2017, you could have gotten an Uber and stayed at your sister's place; is that right?
A Yeah.
Q And that's where you lived before, right?
A Yes.
Q I'd like to show you what's been marked for identification as Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC.
MR. ROBOTTI: Your Honor, may I approach?
THE COURT: Yes.
And the Government has all these, right?
MR. ROBOTTI: Yes.
Q Just take a moment and look through those stack of

documents and let me know when you're done.

MR. ROBOTTI: Your Honor, these have been redacted pursuant to the conversation this morning.

THE COURT: Thank you.

Q Now, ma'am, is that stack of documents the consent forms that you signed while you were at OneTaste?

A Yes.

Q And you signed at least seven consent forms; is that correct?

A Yes.

MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC.

THE COURT: Any objection?

MS. FARRELL: No.

THE COURT: Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC are admitted.

(Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC received in evidence.)

MR. ROBOTTI: If we could pull up 9-EW on the screen and publish to the jury.

(Exhibit published.)

MR. ROBOTTI: And if we could go to the first page.

Q Now, ma'am, you reviewed and signed all these forms; is

that correct?
A Yes.
MR. ROBOTTI: If we could zoom in under Assumption of Risk.
Q We're not going to go through all of these, but I'd just like to ask you about a few of them.
So can you see there at the top bullet point: I've reviewed the released parties' literature and am familiar with the sexual nature of the practice of OM?
A Yes.
Q Do you see the third bullet point: Any concepts, notions, ideas, suggestions, and recommendations from the released parties and anyone acting on behalf of the released parties that I accept and/or apply to my life, I do of my own free will.
A Yes.
Q Do you see a couple of bullet points down: The content of the course is controversial?
A Yes.
Q And do you see at the bottom, the last bullet point, that: Certain participants may make statements or take actions that I disagree with or find offensive?
A Yes.
Q And then just on the next page.
MR. ROBOTTI: If we could zoom in at the top.

Q And the second bullet point there: I may choose not to participate in any activity offered in the course. However, if I decide to participate, I do so of my own knowing and free will.
A Yes.
MR. ROBOTTI: We could just move off that screen there.
Q And you initialed right under that, right?
A Yes.
Q All right. And not every consent form has the exact same language, but is it fair to say that all of those forms have the substance of that language in there?
A Yes.
MR. ROBOTTI: I'd like to just pull up 9-EW. I'm sorry, 9-FC.
Q Do you recognize this as a consent form for the June 2017 Intensive? It should also be on the screen right in front of you there.
A Yeah, I don't think -- oh, I see.
Yes.
Q Okay. And just looking at the first paragraph there, do you see that says: OneTaste's work is about putting yourself in an environment where you request go out of control so that you can find out who you really are underneath your identity, so that you can truly play in

life. In order for OneTaste to be able to create this experience for you, you agree to surrender the right to hold anybody but yourself fully responsible for your actions and for your experience, of other people's actions, that you agree to treat this responsibility as yours and yours alone.

Do you see that there?

A Yes.

Q And you signed this form as well, right?

A Uh-huh.

Q So you were repeatedly reminded throughout your time at OneTaste of this type of language in these documents?

A Before each course we signed documents, yes.

Q Right. And you took 20 or 30 courses, you said?

A Around there.

Q And you signed at least these seven forms, right?

A Yes.

Q All right. So I'd like to talk a little bit about the coaching program.

So you did the coaching program from November 2016 to August 2017; is that right?

A Yes.

Q And you didn't start working at OneTaste until August of 2017, right?

A Correct.

Q And you found the coaching program to be very

beneficial at the time, correct?

A Yeah.

Q And you also thought the OM practice was very helpful, right?

A I'm -- I'm sure at the time I did.

Q And you also enjoyed the community aspect of OneTaste; is that correct?

A Yes.

Q And do you recall sending an email on December 29, 2016 describing why you had started participating in OneTaste?

A No.

Q Would it refresh your recollection if I showed you that email?

A Sure.

MR. ROBOTTI: Can we pull up Defense Exhibit 9-A. And if we can zoom in under Why Am I Here.

A Yeah.

Q So do you recall believing at the time: I am here to remember I am powerful?

A Yes.

Q And do you recall believing over time: I had accumulated rules, fears, and beliefs that blocked me from power I knew as a child, that I learned to control, fix, and manage --

MS. FARRELL: Objection, Your Honor.

THE COURT: Yes, sustained.
Q Do you recall believing at the time that you were there to shed the beliefs that had been keeping you from embracing pleasure?
A Yes.
Q Now, on February 9, 2017 you took a coaching circle with Nicole; is that right?
A I believe so.
Q And do you recall telling Nicole how beneficial the coaching program was to you?
A Yeah.
Q Okay. And what do you recall saying?
MS. FARRELL: Objection.
THE COURT: Yes, sustained.
MR. ROBOTTI: Effect on the listener, Your Honor.
Q Do you recall having a conversation directly with Ms. Daedone at the time?
A Yeah. It was part of the coaching circle.
Q Do you recall telling her at that time --
MS. FARRELL: Objection, Your Honor.
THE COURT: Let me let him finish the question.
Q Do you recall telling Ms. Daedone at the time how beneficial the program had been for you?
THE COURT: But that was just asked and answered, right?

MS. FARRELL: Correct.

THE COURT: Can we have another question?

Q Do you recall explaining to Ms. Daedone at the time how you were feeling about your own practice?

A I can't recall the details of the conversation, no.

Q Okay. Would it refresh your recollection to listen to a clip from that session?

A Sure.

MR. ROBOTTI: Could we show Defense Exhibit FD-1.

(Audio played for the witness only.)

Q Now, did that refresh your recollection of that conversation?

A Yes.

MS. FARRELL: Your Honor, I'm going to object. The question was --

THE COURT: I don't think I had the right video. What is the letter you said, Mr. Robotti?

MR. ROBOTTI: Sorry. It was Defense Exhibit FD-1.

THE COURT: Well, that's what I was --

MS. FARRELL: Am I correct the transcript is FD-1-T?

MR. ROBOTTI: Correct.

MS. FARRELL: I think the question was about her own practice, and my understanding is this has nothing to do with that.

THE COURT: Can you give me a minute? Because I don't think that's what I was --

That was not coming up here. Do you have the transcript? Sorry. Is it in one of these binders?

Thank you. Just give me a minute with this.

(Pause in proceedings.)

THE COURT: I'm going to sustain the objection.

BY MR. ROBOTTI:

Q Now, Ms. Keves, OneTaste also gave you certain opportunities that you were looking for; is that correct?

A Such as?

Q For example, you were interested in addressing issues surrounding food and sex; is that correct?

A Yes.

Q And you testified on direct examination that's because you had previously struggled with an eating disorder, right?

A Yes.

Q And OneTaste gave you the opportunity to work on that connection between food and sex; is that right?

A I mean -- what do you mean?

Q So you wanted to host a lecture on this issue, is that correct?

A Yeah, I did.

Q And you were able to do that, right?

A I gave a talk, yes, while I was there.

Q And you co-hosted an event called Women, Food, and Orgasm, where you gave a talk, right?
A Yes.
Q And this was important work you were interested in doing while you were there, correct?
A Yes.
Q And this was your idea to do this work?
A I believe so.
Q And the talk that you gave was about how to explore orgasm and how it relates to food and women conditioning; is that right?
A Yes.
Q While you were at OneTaste, you also quickly met and fell in love with a man; is that right?
A Yes.
Q And that was Hesham Hauter, who also went by Rami?
A Right.
MR. ROBOTTI: So could we show just for the witness Defense Exhibit 9-DA and also 9-DB.
And could we redact the text on the side there.
Q Is 9-DA a photo of you and Rami?
A Yes.
MR. ROBOTTI: Can we look at 9-DB.
Q Is that also a photo of you and Rami?
A Yes.

MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibits 9-DA and 9-DB into evidence.

THE COURT: Any objection?

MS. FARRELL: No objection.

THE COURT: Defense Exhibits 9-DA and 9-DB are admitted.

(Defense Exhibits 9-DA and 9-DB received in evidence.)

(Exhibit published.)

Q So again, just publishing for the jury, 9-DB is you and Rami?

A Yes.

MR. ROBOTTI: And could we go back to 9-DA?

(Exhibit published.)

MR. ROBOTTI: And just redact that text, please.

THE COURT: I'm sorry, I should have made clear, you were offering it without the text, just the photograph?

MR. ROBOTTI: That's correct.

THE COURT: Okay. Photograph only are admitted on both DA and DB.

Q Now, is it correct that not long after you met him, you left your sister's SoHo apartment and you moved in with him, correct?

A Yes.

Q And you became monogamous with him shortly after you

met him at OneTaste, right?
A Yes.
Q Rami was a wealthy guy, right?
A Yes.
Q And he lived in a high-rise building in Chelsea?
A Yes.
Q And he made a lot of money writing poker games; is that right?
A Yes.
Q And he helped pay off some of your credit card debt; is that correct?
A I don't recall that.
Q And he started paying for your OneTaste programs because he had the resources to do that; is that right?
A Yes.
Q And over time, he paid tens of thousands of dollars for you; is that correct?
A Yes.
Q And that was something that you asked him to do, correct?
A Yes.
Q And you made the choice to ask him to do that?
A Yes.
Q And he made the decision to give you the money?
A Yes.

Q And that was his money, correct?
A Yes.
Q And his choice to do that, right?
A Yes.
Q And your understanding was that he did that because he loved you, correct?
A I -- I guess.
Q So your relationship with Rami moved pretty quickly, correct?
A Yes.
Q You two chose to be together?
A Yes.
Q You were in love?
A I thought I was.
Q At the time you believed you were in love?
A Yes.
Q You went home to meet his parents in June of 2017; is that right?
A Yes.
Q And that was a big deal because he had never brought a girlfriend home, right?
A Yes.
Q He had a traditional Muslim family, correct?
A Yes.
MS. FARRELL: I'm going to object to the

relevance.

THE COURT: Sustained.

Q And you also introduced him to your family, correct?

A Yes.

Q Now, by July 2017 he proposed to you, right?

A Yes.

Q And that was, as you testified earlier, at the Nicole Daedone Intensive, correct?

A Yes.

Q And you were thrilled at the time that he proposed to you?

A Yes.

Q And it was around this time that you decided to sign up for the Lineage program, correct?

A Yes.

Q And Rami also paid for that, right?

A Yes.

Q And that was a longer teaching program over the course of three years, correct?

A Uh-huh.

Q That was broken up into six semesters?

A I don't know. I didn't end up doing it.

Q Okay. But at this point it's fair to say you were all in at OneTaste?

A Yeah.

Q And at this point, is it fair to say that you were finding the OM practice beneficial?
A Yeah, at that point I was.
Q And that you were excited about the opportunity of continuing with these OneTaste courses?
A Yeah.
Q Okay. And so in the summer of 2017, you also decided to move in to 156 Second Avenue in the East Village; is that correct?
A The yes.
Q And that was an apartment where certain OneTaste staff members lived; is that right?
A Yes.
Q And that was organized by OneTaste staff, right?
A Yes.
Q That was not run by the company, correct?
A It was -- I'm not sure.
Q That was a residence that was organized by OneTaste staff members, correct?
A I believe so, yes.
Q To your knowledge, the company was not operating that apartment?
A Not to my knowledge.
Q And you lived there rent free; is that right?
A Rami paid the rent, yeah.

Q Rami paid the rent, correct?
And Rami moved in there too, right?
A Yes.
Q His lease was up at the time?
A Yes.
Q And so you two decided to move in together at this location?
A Yes.
Q Your friend Aubrey Fuller also lived there, as well?
A She did.
Q And there were also non-OneTaste staff members that lived there, correct?
A Yes.
Q For instance, one was Rob Montgomery, correct?
A Yes.
Q And it was your idea to move into the East Village residence, correct?
A I agreed to it.
Q Well, do you recall asking Aubrey Fuller to move in on May 27, 2017?
A No, I don't.
Q Would a document refresh your recollection about that?
A Uh-huh.
MR. ROBOTTI: Could we show just for the witness Defense Exhibit 9-BG?

THE COURT: B as in boy?

MR. ROBOTTI: B as in boy, Your Honor.

Your Honor, can I approach with a hard copy?

THE COURT: Yes.

THE WITNESS: Okay, yes.

Q Does that refresh your recollection that you asked to move into that residence, right?

A Yes, after the idea was put out there and we were invited to have dinner there and -- yes.

Q And you excitedly said I want to live there too, correct?

A Yes.

Q And while you were living at the East Village residence, you had a regular OM practice; is that correct?

A Yes.

Q And that was something you wanted to do on a daily basis, correct?

A At the time I thought so, yeah.

Q So at the time you wanted to have a regular OM practice, correct?

A Yes.

Q And that was something that you made the choice to do, right?

A Yes.

Q And, in fact, in May of 2017, you encouraged your house

mates to do a group OM in the mornings, correct?
A I encouraged it?
Q Is that correct?
A That was already set in place.
Q Do you recall a discussion of OMing alone in your rooms versus doing group OMs in the living room?
A Vaguely.
Q And you asked to continue to do the group OMs in the living room; is that right?
A If it was put to a vote and that's what I voted for, maybe yes, but I don't recall.
Q Would a document refresh your recollection?
A Maybe, yes.
MR. ROBOTTI: Let me pull up Defense Exhibit 9-EE.
THE WITNESS: Okay.
Q So do you recall at the time that you voted to keep the group OMs in the living room space?
A Yes.
Q And you testified about wanting to be monogamous on direct examination; is that correct?
A Yes.
Q But in July of 2017, you and Rami opened up your OMing relationship; is that right?
A Yes.
Q And you reached out to Rachel Short to ask to OM with

her boyfriend, Kenan Wang; is that right?
A It's possible. I don't recall the details.
Q Would a document refresh your recollection?
A Probably.
MR. ROBOTTI: Can we show the witness Defense Exhibit 9-BL; B as in boy.
And if we could zoom in on the bottom messages there.
THE COURT: These are really hard to read. Can you read that on the screen?
THE WITNESS: Okay, yes.
Q Now, does that refresh your recollection that you reached out to Rachel Short to ask to OM with her boyfriend?
A Yes.
Q And that was Kenan Wang, correct?
A Yes.
Q Now, in mid 2017, do you recall discussing the benefits of your OM practice in a video?
A Not specifically, but I'm sure you'll refresh my memory.
MR. ROBOTTI: Can we show the witness Defense Exhibit 9-FG.
THE COURT: Sorry, you faded off there. 9 what?
MR. ROBOTTI: 9-FG.
MS. FARRELL: Your Honor, I'm going to object to

improper refreshment. I don't think there's a question posed that she said she couldn't remember the answer to.

MR. ROBOTTI: I believe she said --

THE COURT: She said she couldn't specifically remember discussing the benefits of her OM practice in a video in mid 2017.

Is that the question that's open?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Okay. I'll allow you to show the witness 9-FG.

So I will overrule that objection.

(Video is played for the witness only.)

THE COURT: You said FD or FG?

MR. ROBOTTI: FG, Your Honor.

THE COURT: Okay. I don't have that. If it's a video, I don't have it here. So I need it, unless you have the transcript.

MR. ROBOTTI: We'll come back to that, Your Honor.

THE COURT: Okay. So let's move on to something else.

MR. ROBOTTI: I have the transcript, Your Honor.

THE COURT: Okay. You can hand that up. What is that marked?

MR. ROBOTTI: FG-T.

THE COURT: Does the Government have the video and

the transcript?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Okay.

THE WITNESS: Okay.

Q So in mid 2017, you'd been OMing for about nine months; is that correct?

A Uh-huh.

Q And do you believe --

At that time, did you believe it had changed your relationships?

A Yes.

Q And at that time, did you believe you had --

You had previously been terrified of people, men in particular?

A Yes.

Q But that the area of your life -- that area of your life had completely shifted as a result of your OM practice?

A Yes.

Q And that you were having much more of a connection and intimacy in your relationships as a result?

THE COURT: Sorry. Are you asking her if that's how she felt or if that's what she said on some video? It's unclear what the question is.

MR. ROBOTTI: I'm asking her if that's how she felt in mid 2017, Your Honor.

THE COURT: Okay. So if you could just pose each question the way you want her to hear it, that would be helpful.

MR. ROBOTTI: Yes, Your Honor.

Q So in mid 2017, did you feel that as a result of your OM practice, you were having much more of a connection and intimacy in your relationships?

A Yes.

Q Now, you met Rachel Cherwitz through the coaching program; is that correct?

A I met her first at the -- at the New Year's Eve retreat. But yes, she was also at the coaching program.

Q Okay. And you really liked and admired Rachel, right?

A That's not how I recall feeling.

Q Okay. Well, in May of 2017, do you recall sending an intake form in which you described your feelings about Rachel?

A No.

MR. ROBOTTI: Can we pull up Defense Exhibit --

Q Would a document refresh your recollection?

A Yes.

MR. ROBOTTI: Can we pull up Defense Exhibit 9-Y.

And if we could zoom in on the bottom third of the page or so.

THE COURT: Sorry, what's the number?

MR. ROBOTTI: 9-Y, Your Honor.

Q Now, does that refresh your recollection that in May 2017, you believed that Rachel was a powerful example of a woman who loves fiercely and chooses truth over comfort or pleasing others?

A That's what I wrote.

(Continued on the following page.)

CROSS-EXAMINATION
BY MR. ROBOTTI: (Continuing)
Q And that's what you believed at the time; correct?
A Yes.
Q And at the time, did you also recall having an aversion to any woman who you perceived to be better than you in any way?
A As part of this assignment, yes, that's what I wrote.
Q Is that what you believed at the time?
A I guess so. I wrote it as part of the assignment.
Q Okay. And do you recall that you had that aversion because such a woman reminded you of what you wanted and what you could be, and if I didn't believe I could have it or do that --
MS. FARRELL: Objection, Your Honor.
THE COURT: Yes. Sustained.
You can ask a question, but not read from the document.
Q Why did you recall having that aversion at the time?
A Why do I recall having an aversion? Because it was an assignment during the course that they asked us to write about.
I'm not sure I understand your question.
Q Let me rephrase.
Do you recall why you had an aversion to any woman

who you perceived to be better than you at the time?
A I mean, what I wrote was because she's reminding me of what I want and what I can be, and if I don't believe that I can have that, it feels painful and irritating.
Q Now, Rachel stayed at that East Village apartment with you at times?
A Yes.
Q And that wasn't all the time because she traveled for work a lot; correct?
A Correct.
Q And on July 17th, 2017, while Rachel was traveling, you and your housemates sent her a video. Do you recall that?
A Vaguely.
Q All right.
MR. ROBOTTI: Can we show the witness Defense Exhibit 9-DP?
This should be on your computer, Your Honor, as well.
THE COURT: This is a video?
MR. ROBOTTI: Yes.
THE COURT: Sorry. DP, right?
MR. ROBOTTI: Yes.
Q Now, in this video, you and your housemates say hi to Rachel; is that right?
A Yes.

Q And you all dance around; correct?
A Yes.
MS. FARRELL: Objection, Your Honor.
THE COURT: Yes. Sustained.
Q At the time, were you wearing an Orgasm State t-shirt?
A Yes.
Q And you and your housemates were having fun at that time; correct?
A Yes.
Q And you sent a video to Rachel to let her know that; correct?
A I don't remember whose idea it was or why. It certainly wasn't mine, I know that.
But yes, we would -- I'm sure we -- yeah. It was somebody's idea. I don't know if it was for a birthday or what, to cheer her up about something, but yes, we sent her that video.
Q Okay. And after this, you asked to get more involved with OneTaste; is that correct?
A I don't recall, but yeah. That was kind of the theme. You kept getting deeper and deeper and deeper.
Q But in August of 2017, you asked to be on the sales team; right?
A As a response to an idea or invitation to, yes.
Q So you ultimately asked to be on the sales team; right?

A Yes.
Q You wanted the job; correct?
A Yes.
Q All right. And Rami was also working at OneTaste as well, too?
A Yes.
Q And he was also in sales; is that right?
A Yes.
Q Now, your schedule before you started working at OneTaste was not particularly grueling; right?
A My schedule before working at OneTaste?
Q Before you joined the sales team.
A You mean as a volunteer at OneTaste?
Q Before you started with the sales team in August of 2017, you were not working a grueling schedule; is that correct?
MS. FARRELL: I'm going to object to the form of the question, actually.
THE COURT: Sustained.
Q All right. Do you recall that on August 2017, you and Robbie spent the day watching a movie, eating Thai food, having sex and taking a nice long nap?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Do you recall that before you were working on the sales team, you were living rent-free in the East Village and not

working?

MS. FARRELL: Objection.

THE COURT: Basis?

MS. FARRELL: Foundation.

THE COURT: Overruled.

That means you can answer.

A Yes, I had just stopped nannying for my sister.

Q Okay.

A So I was not working.

Q And you were not working back of the house every day, correct, for OneTaste?

A No.

Q You weren't working 5:00 a.m. to midnight every day; correct?

A No, not every day.

Q You were doing that occasionally; correct?

A I don't recall the exact frequency, but, yes, it was not every day.

Q Okay. So when you spoke about putting flyers up on direct examination, that was one day you were speaking about; right?

A One day of flyering, yes.

Q Okay. And you had no experience in sales; correct?

A Correct.

Q And sales can be a demanding job; is that right?

A I guess so.
Q And you had previously only worked for Teach of America and as a nanny for your sister; is that correct?
A Well, I've had other jobs, but those were my two latest jobs, yeah.
Q Okay. But this is the first time you had done a demanding sales job; right?
A It's the first time I had done a sales job.
Q And you were excited to start that job; correct?
A At the time.
Q And ultimately, you were on the sales team for two-and-a-half months; is that right?
A Yes.
Q That's less than 90 days; correct?
A Yes.
Q And that's how long you actually worked at OneTaste; right?
A Uh-hum.
Q And you and Rachel did work together a little bit during this time period; correct?
A Uh-hum.
Q But you actually reported to Aubrey Fuller; right?
A Yes.
Q Not to Rachel?
A Yeah.

Q And you -- is that a yes?
A I mean, it was -- it wasn't like structured. I mean, yes, I believe Rachel was technically my supervisor, yes.
Q Okay. But you were reporting day-in and day-out to Aubrey Fuller?
A Aubrey Fuller was, yeah.
Q And you certainly weren't reporting to Nicole Daedone; correct?
A No.
Q You had the opportunity to lead some classes with Rachel during this time period; is that right?
A I don't recall specifically leading a class with Rachel, but maybe.
Q Do you recall giving talks with Rachel?
A Maybe.
Q Okay. Or attending evening events?
A Yes, for sure.
MR. ROBOTTI: All right. Could we show the witness Defense Exhibit 9-DL and 9-DN?
Q And do you recognize 9-DL as a photograph of you and Rachel giving a talk?
A Yes.
Q And on 9-DN, and do you recognize this as a photo of you and Rachel attending an evening event?
A Yes.

MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibits 9-DL and 9-DN.

THE COURT: Any objection?

MS. FARRELL: No objection, Your Honor.

THE COURT: Okay. Defense Exhibits 9-DL and 9-DN are admitted.

MR. ROBOTTI: If we can publish 9-DL to the jury?

(Defense Exhibits 9-DL and 9-DN were received in evidence.)

Q This is looking at 9:00 DN. So this is the evening event; correct?

A Uh-hum.

Q And then 9-DL.

And then this is you and Rachel giving the talk; correct?

A Yeah.

Q And this is towards the end of your time at OneTaste?

A Yeah, I believe so.

Q Now, you testified on direct examination that the sales team wasn't for you; is that right?

A Yes.

Q You didn't like it?

A No, not at the end.

Q All right. So after two-and-a-half months, you quit; right?

A Yes.
Q And you left OneTaste in early November 2017; is that correct?
A Yes.
Q And you made the choice to leave; right?
A Yes.
Q That was a decision that you made because you didn't like your job; right?
A Correct.
Q Right?
And you moved back with your sister in Soho; correct?
A Yes.
Q And you resumed your nanny job; correct?
A No.
Q Did you ultimately get another job?
A Yes.
Q What was that?
A I served at a restaurant.
Q Okay. And, so, you left OneTaste and you got another job; right?
A Yes.
Q Okay. And when you left, you and Rami also broke up; correct?
A Correct.

Q And when you left, you recall telling Yia Vang that you no longer wanted to participate in the program?

MS. FARRELL: Objection.

THE COURT: Let me let him get the question out.

Q Do you recall having a conversation with Yia Vang in November of 2017 about why you left?

A No.

MR. ROBOTTI: Can we show the witness Defense Exhibit 9-AP? That's small, so I can give you a hard copy if that's better.

THE WITNESS: I can't see that at all. Okay. Now I can see it. Uh-hum.

Q In November of 2017, do you recall telling Yia Vang you were leaving the program because you couldn't afford it on your own?

A Yes.

Q Do you recall explaining that you had broken up with Robbie?

A Rami.

Q Rami; correct?

A Yes.

Q And do you recall that she responded with compassion?

A Yes.

Q Asking, aw, honey, how's your heart?

A Yes.

Q You ultimately talked about your decision to leave OneTaste with Rami; is that correct?
A Uh-hum.
Q And you wanted to leave and he wanted to stay; is that right?
A Yes.
Q And up until that point, your relationship had had some troubles; correct?
A Yeah.
Q And on direct examination, you testified that you broke up with Rami as a result of this conversation with a psychotherapist; is that right?
A Yes. Initially, I broke up with him and there was some back and forth, yes, after that.
Q But you all had actually -- you and Rami had actually had a pretty volatile relationship in the months leading up to that; right?
A Yeah,
Q And you had gotten into repeated fights in the East Village residence?
A Yes.
Q And at one point, you threw a glass at his head?
A I threw a glass at the wall.
Q Which almost hit him?
A Yeah.

Q And your housemates had to ask you to stop doing that; correct?
A Yeah. One housemate asked us to stop doing that.
Q That was Maya Gilbert?
A Yes.
Q And that wasn't the first time you had been throwing things in the East Village residence; right?
A That's the only time I recall.
Q Had there been previous fights where that happened?
A Where I threw a glass?
Q Where you threw something on the floor or at the wall?
A Maybe. I don't recall throwing something another time, but ...
Q Is it's fair to say there were troubles in the relationship leading up to the breakup; right?
A Yes.
Q And he ultimately decided to stay; right?
A Yes.
Q So he chose to stay rather than keeping the relationship with you?
A Yes.
Q And that was his choice; right?
A Yeah.
Q And you were upset about that at the time?
A I was hurt, for sure.

Q And even after you left, you tried to make it work with Rami; is that right?
A We both did, back and forth for a short time.
Q And about a month later, you both tried to get together again; right?
A Yeah.
Q Okay. And at that point, he said that he had -- had a relationship with his ex-girlfriend. Do you remember that?
A Yeah.
Q And you were furious and you stormed out; correct?
A Yeah.
Q So, again, there's a lot of independent problems here in this relationship aside from OneTaste; right?
A Well, there's no relationship with Rami beside OneTaste. It was all within OneTaste.
Q Sure. But the problems in the relationship were independent; correct?
A No, there was no independence of the relationship outside OneTaste. The relationship happened in OneTaste.
Q Now, regardless of OneTaste, you and Rami were fighting and he had a relationship with somebody else; correct?
A Yeah.
Q Now, is it fair to say perhaps your friends at OneTaste were perceiving some of the problems in this relationship?
A Yeah, everybody lived together.

Q Okay. And that's why they were questioning whether the relationship was something that you wanted?
A I don't know why they were questioning -- I mean, can you ...
Q Is it fair to say as a result of the problems your friends at OneTaste were perceiving, that led to some of those questions about the relationship?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Now, you later learned that Rami got together with Aubrey Fuller; right?
A Yes.
Q And that's while they were both still at OneTaste; correct?
A Yes.
Q And Aubrey told you about that?
A Yes.
Q Is it fair to say that's something that made you jealous?
A Yes.
Q And this is the same Aubrey Fuller that you've testified about today; right?
A Yes.
Q Now, she's the one that you said pressured you into opening up a credit card to pay for OneTaste's courses; is that right?

A Yes, that was before.
Q Okay. And today, you're blaming her for your decision to open up a credit card; is that right?
A I'm just recalling the facts, but she suggested I open a credit card and I did it -- but I did it, yes.
Q It was your choice to open the credit card; right?
A I opened the credit card.
Q And your testimony is not that Rachel Cherwitz asked you to open a credit card?
A Correct.
Q And it's not that Nicole Daedone asked you to open a credit card?
A That's right.
Q And you actually thought a lot about how to pay for your courses at OneTaste; correct?
A Did I think a lot about it? I mean, they were expensive, so yeah.
Q During your time at OneTaste, you evaluated your finances; correct?
A Yeah.
Q And you thought a lot about how to come up with a plan for how to pay for those courses; correct?
A Yes.
Q And that's a conversation you had with Marissa Ward, for instance; right?

A Probably.
Q And Marissa Ward was a salesperson at OneTaste; correct?
A Yes.
Q And you talked with her about the fact that you were thinking of applying for a business credit card; right?
A Maybe. Yeah.
Q Right?
And another plan that you had was to try to pay for the courses through your own coaching business; is that right?
A Yes.
Q And you were hoping to get a few clients a month, so that you would be able to use that income to pay for the courses; is that right?
A Yes.
Q So you were thinking through your finances and how to pay for this; right?
A Yes.
Q The only option for you was not to go into credit card debt; correct?
A Correct.
Q And if you did open a credit card, that was a choice you made after carefully thinking about it; right?
A I opened the credit card, yes. I made the decision to do that.
Q It's fair to say you were in charge of your own personal

finances?
A Yes.
Q You were an adult at the time?
A I was.
Q You knew OneTaste was a for-profit company?
A Yes.
Q And you wanted to buy its products; right?
A Yes.
Q And that's because you were excited about the OM practice?
A It's in part, but it was also that was the culture, that was the environment. You just kept buying courses and you had to figure out how to do it.
Q You had to figure out how to do it; right?
A Yes.
Q You looked at your finances and made a careful decision about whether or not to spend the money?
A Yes.
Q Okay. And you also had a significant safety net at the time; right?
A Well, I had spent all of my savings.
Q All right. But if you got into too much debt, you could turn to your parents or your sister or your brother-in-law; is that right?
A Well, their money is not my money. I did get into

significant debt and then I worked myself out of it.
Q Correct.
But if you had too much debt or needed a place to stay, you had places to go?
A I had a place to stay, yes, with my sister.
Q And you lived there rent-free before; right?
A Yes. Well, I was nannying. I was an in-house nanny. So yes, I took care of my nieces there.
Q Okay. So that was like a work trade situation? You provided nanny services and in exchange, you got a place to live?
A Yes.
Q Now, you testified on direct examination that you were upset that you had been called some names; is that right?
A Uh-hum.
Q And one of the events that you testified about was this New Year's Eve retreat; is that correct?
A Yes.
Q And you testified about some names that Rachel called you during that; correct?
A Yes.
Q And that was a communications exercise; right?
A Yes.
Q And the purpose of that exercise was to push boundaries; correct?

A Yeah.
Q And you had been advised repeatedly in consent forms; correct?
A Well, at that point, I had only signed, you know, it was early on. I began in November and it was December, but, yes, I signed the consent form --
Q Right.
A -- for that course.
Q So you had signed the consent form and you knew the purposes of these courses was to push boundaries; right?
A Yes.
Q And to explore sexual boundaries; right?
A Yes.
Q And to identify problems and help you work through them; right?
A Yes.
Q And you knew that one of the ways that OneTaste did that was to be direct and confrontational; correct?
A Yes.
Q And, so, despite knowing that, you were upset that Rachel was directly confrontational with you?
A Yes.
Q Now, you talked about some spreadsheets that OneTaste maintained; is that right?
A Uh-hum.

Q And some of these spreadsheets were maintained in what's called Salesforce; is that correct?
A Yes.
Q And Salesforce is a company that supports many sales companies; is that right?
A I believe so.
Q And it helps them track customer information?
A Okay.
Q Is that what the purpose of the spreadsheets were for?
A Yes.
Q Okay. And the purpose of keeping information on sales targets is so that people can remember details about potential customers; is that right?
A Okay. Yes.
Q And that's so you can connect with the customer next time you talk to them; right?
A Uh-hum.
Q Is that yes?
A Yes.
Q Sorry. Just for the court reporter, you have to say yes or no.
A Yes.
Q And that's a common sales technique; right?
A I don't know. I've only worked -- I hadn't worked in sales.

THE COURT: Mr. Robotti, I don't want to cut you off if you're kind of in mid-topic, but we are going to have to break for lunch and because we're starting at -- excuse me, ending earlier today, I want to take a lunch break soon.

MR. ROBOTTI: Yes, Your Honor. I don't think I have much left, but I think it would be a good point.

THE COURT: Is this a good time?

MR. ROBOTTI: Yes. Uh-hum.

THE COURT: Okay.

So the witness can step down.

(Witness steps down.)

THE COURT: Okay. I'm just going to ask the jury to come back at 1:35, so 55 minutes from now.

Enjoy your lunch. Don't talk about the case. Keep an open mind, and I will see you at 1:35.

(Jury exits.)

THE COURT: I will let you go.

Just approximately how much longer, Mr. Robotti? You said you didn't have too much.

MR. ROBOTTI: I think less than 15 minutes, Judge.

THE COURT: Ms. Bonjean, do you have an estimate?

MS. BONJEAN: I can't imagine I would be more than 15 or 20 minutes myself.

THE COURT: Okay.

MS. BONJEAN: I would appreciate if we could have a

couple minutes before the jury comes back after lunch. I would like to raise a motion with the Court.

MS. BENSING: And, Your Honor, I just wanted to flag because the next witness will be Mr. Kandell, it sounds like we may actually be able to at least start his examination today.

THE COURT: Okay.

MS. BENSING: I'm wondering if the Court would want him here before the lunch break ends and we can do that portion of his --

THE COURT: I'm not going to take him out of order to do that portion. If this witness is still on, we'll finish; however, I think we can do that portion after three o'clock though, because there is a certain portion that needs to happen outside the presence of the jury; right?

MS. BENSING: No. I think it just depends if we're -- if we end with this witness by 2:15 or something like that, then we would want to start.

THE COURT: Yes. Yes. No, I agree. I thought you were asking me something different.

MS. BENSING: No, no. So then I guess we will just excuse the jury for a short time period.

THE COURT: Yes. But I won't keep the jury past 3:00, having told them that they can go at 3:00.

MS. BENSING: Of course.

THE COURT: So if we're getting -- if it looks like it could go beyond that, I don't want to do it at that time.

MS. BENSING: Of course. Of course.

THE COURT: So I will see everyone a few minutes before 1:35 then.

(Lunch recess.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

You may be seated.

THE COURT: Okay. We have everyone back. The jury is here, but I know Ms. Bonjean wanted to be heard on a motion.

Go ahead, Ms. Bonjean.

MS. BONJEAN: I do.

At this point, the defense would be making a motion for a mistrial based on testimony of the last witness, Ms. Keves, over defense objection multiple times that were overruled, was permitted to testify or at least get out in a very obvious way impermissible hearsay that violated Rules of Hearsay as well as the Confrontation Clause as it relates to -- and an objection that I didn't get on the record at the time because the Court screamed at me.

THE COURT: The Court has not screamed at you. I don't appreciate you trying to make a false record.

Go ahead. Go ahead.

MS. BONJEAN: I'm going to make my record because that's my job, and I was trying to provide --

THE COURT: Please lower your voice.

MS. BONJEAN: And you did yell at me, as you've done many times throughout this trial.

THE COURT: Ms. Bonjean, please lower your voice.

MS. BONJEAN: My voice is no lower -- no higher than your's has been consistently.

THE COURT: Ms. Bonjean, please lower your voice. You can say substantively what you want to say.

MS. BONJEAN: Okay. And I'm going to.

And what I'm saying is that at the time, I anticipated very keenly that she was going to testify about what the hypnotherapist had told her about the organization, and we made multiple objections. They were overruled.

And then, eventually, the Government was able to get out -- and it is here in black and white -- that -- that -- and that she was -- she was able to get out -- she was able to testify that Mr. Elias told her about the cycle of abuse that she has basically -- and then, I checked it again. At that point, the Court sustained it.

Of course, the harm has been done because the jury has now heard cycle of abuse.

THE COURT: Did you ask for the testimony to be stricken at that time?

I don't believe you did.

MS. BONJEAN: Well, you know what, Judge? When you're getting screamed at, it's --

THE COURT: Ms. Bonjean, you're trying to make a false record.

MS. BONJEAN: I'm not.

THE COURT: Ms. Bonjean, Ms. Bonjean, your voice is very loud. And I'll hear you out now, but the jury is waiting.

So, do you have more on your mistrial motion?

MS. BONJEAN: I do. And the Court responded, as I said, I'm going to object also on the grounds. I didn't even get another basis out.

THE COURT: I had already sustained the objection.

The objection was sustained, not overruled.

MS. BONJEAN: Your Honor, the Second Circuit will not assume the basis for my objection. In fact --

THE COURT: But you were sustained, Ms. Bonjean, not overruled.

MS. BONJEAN: I understand.

THE COURT: You wanted to then pollute the jury with additional information and opinions.

MS. BONJEAN: No. Absolutely not. Absolutely not.

THE COURT: You wanted to mention expert in front of the jury after I had sustained your objection.

MS. BONJEAN: No, I didn't.

THE COURT: I know what you were trying to do, Ms. Bonjean.

Is there anything else you'd like to raise?

MS. BONJEAN: You're not in my mind, and you don't

know what I'm doing.

THE COURT: You're screaming right now.

MS. BONJEAN: No, I'm not. And I would like to finish my thought. I would like to finish my thought.

THE COURT: Lower your voice and finish your thought.

MS. BONJEAN: The Second Circuit has held in *Ryan versus Miller* that testimony need not contain an explicit --

THE COURT: The court reporter also needs to be able to take you down.

MS. BONJEAN: The Second Circuit has held that testimony need not contain an explicit accusation in order for it to be excluded under the Sixth Amendment Confrontation Clause or on hearsay grounds.

And what led up there is that it was very clear to the jury, even before she said cycle of abuse, that this doctor had told Ms. Keves that OneTaste was either a cult or had some type of negative -- it was some type of bad place that was communicated to the jury through a doctor.

I did object at least two times when it was on its way out of her mouth and the Court overruled it. Then she gets it out. Then the Court sustained it after, and I was trying to also object on the basis not just from that question, but from the whole line of questioning that this was also improper expert testimony.

THE COURT: You have to object to a question, not a line of questioning, and I had already sustained your objection. So everything else was just improper to raise before the jury.

But let's go back to the testimony. The testimony, I believe -- and you can correct me or the Government can correct me -- was that this particular hypnotherapist, Elias, I believe, was someone who was presenting at a program of OneTaste.

Is that correct?

MS. FARRELL: Yes, Your Honor.

THE COURT: Okay. And made whatever comment he made that led this victim to think -- this victim-witness to think that he was perhaps someone she could reach out to about her own concerns.

Do I have that testimony? I'm paraphrasing, of course.

MS. FARRELL: Yes, Your Honor.

MS. BONJEAN: Okay.

THE COURT: Okay. So on that record, you know, I made the rulings I did.

MS. BONJEAN: On that record, it is still wildly inappropriate to leave the jury with information that he told her at some later point in a private conversation with this witness, not a victim-witness, frankly, that he had an opinion

that this was a cycle of abuse here, that there were high pressure sales tactics that were abusive and that was what was left with the jury.

The record will speak for itself.

THE COURT: Yes, it will.

She was asked about why she did certain things or why she felt a certain way, if I recall correctly.

Ms. Farrell, do you want to respond?

MS. FARRELL: That's correct.

I asked: Did he tell you something that had a substantial effect on you? Did the thing he told you cause you to take action?

THE COURT: Correct. And that is a proper purpose for it.

Your mistrial motion is denied.

MS. BONJEAN: I'm not done.

THE COURT: Go ahead.

MS. BONJEAN: Okay.

And the Court can disagree with me about what was signaled to the jury, but I am going to make the record that it's been more than one.

I am permitted to make a record to say that I believe it's been signaled to the jury that the Court does not appreciate when we are doing our job of making objections.

And I was not trying to make a speaking objection.

I was trying to provide a basis which the Second Circuit has cited --

THE COURT: The court reporter is having trouble taking you down because of the tone and the pace, I believe. I won't speak for her, but if you would just make --

MS. BONJEAN: Hopefully, there's some audio recordings we can get for these proceedings.

THE COURT: Well, if anyone's improperly recording in here which --

MS. BONJEAN: No.

THE COURT: -- there was an incident before.

Why don't you go ahead.

MS. BONJEAN: I was talking about the court reporter. I was not talking about anybody else, for the record, to be clear, in any event.

So that's the basis for my objection on those grounds.

And I do think I the record will reflect that it has been signaled to the jury -- and I'm not saying not necessarily intentionally -- but that the Court has essentially interfered with our ability to object.

The Court does not hold sidebars, which is unusual.

THE COURT: That is not correct, Ms. Bonjean. You can try to create a false record, but that is not correct.

What I had said previously -- first of all, we had a

sidebar -- but what I had said previously is that typically, they're not necessary. I don't want to waste the jury's time.

And the reason they are not typically necessary is because we are together for a long day. You can raise issues in the morning, at a break, at lunchtime. We are doing it now. We're keeping the jury waiting, but I think this is important to have this conversation now.

But there is no prohibition against sidebars if they are appropriate and required and necessary and are on issues that cannot be anticipated.

So, you know, this notion of making a record doesn't mean anyone gets to say whatever they want to say. And, you know, the Court has an obligation to make sure that this trial is running appropriately and, you know, that doesn't mean the parties get to say whatever they want, whenever they want in whatever tone they want.

So is there anything substantively more on your mistrial motion?

MS. BONJEAN: This is substantive.

THE COURT: Go ahead.

MS. BONJEAN: The Court yelled at Ms. Cohen yesterday for yelling at a witness when she did not yell at a witness.

THE COURT: Well, you know what? She was very loud, and yes. You know what? She -- she, after that, didn't do it

again.

And, you know, look. Look, this is a waste of the jury's time right now. You made a mistrial motion. Do you have anymore substantive you'd like to say?

MS. BONJEAN: Yes, I do.

THE COURT: Okay. Go ahead.

MS. BONJEAN: And the question is, what about my clients? I know the jury has to wait an extra five minutes, but I'm concerned about my client right, and that seems to be lost in all of this.

THE COURT: No, it's not lost. I think you're trying to create a false record here.

So, in any event, does the Government have a response?

Go ahead.

MS. BENSING: Your Honor, I do think that the Court has been sustaining objections for both parties, as is the Court's job.

MS. BONJEAN: I have another motion to make.

THE COURT: Yes?

So let me just ask, is Ms. Cohen joining in on behalf of Ms. Cherwitz on the mistrial motion?

MS. COHEN: Yes, Your Honor.

THE COURT: Okay. And the mistrial motion is denied. It's without merit.

Go ahead. What else do you have?

MS. BONJEAN: The other issue, Your Honor, is through -- and Mr. Robotti can also elaborate on this.

On the cross-examination that was done of Ms. Keves, the Court precluded her from testifying about statements that she made to Ms. Daedone about how she felt about the OM practice at OneTaste. This has been sort of a common theme that we've not been able to elicit testimony that goes to the state of mind not only of the witness at the time --

THE COURT: Tell me exactly the statement you're talking about, the testimony.

MS. BONJEAN: Go ahead.

MR. ROBOTTI: Your Honor, I think that the testimony that Ms. Bonjean is referring to was the audio recording of Ms. Keves speaking to Ms. Daedone at the teaching program.

THE COURT: But that's the one I don't have, though, right?

MR. ROBOTTI: We handed up the transcript of it.

THE COURT: Right. But I don't have the video. I think you said you would move on to something else. Is that the one?

MR. ROBOTTI: That was the later one.

There was a statement -- and then I had her recount the statement orally that she made to Ms. Daedone.

THE COURT: YES.

MR. ROBOTTI: And I think that from the perspective of the defense is that not only the oral testimony should be coming in but also the recording that at the time of the witness making the statement, because that goes to the state of mind of the defense when they are hearing from these witnesses that they are having a good time, they want to be there, they enjoy the practice. That shows that they do not believe that those witnesses are being forced.

And I do agree with Ms. Bonjean that we have tried repeatedly to get statements of the witnesses in at the time for that very purpose.

THE COURT: Okay. But part of what is an issue here is that there seems to be some inability to properly refresh someone's recollection, so sometimes it appeared that you are setting up for refreshing your recollection, and maybe your trying to do something else, but it is not clear. It seems like you are reading documents that are not in evidence to a witness and saying hey, did you say that.

MR. ROBOTTI: Your Honor, I think the foundation that I laid there in that instance was asking the witness whether she was at a program with Ms. Daedone, asking her whether at that program she stated that the practice was beneficial, and then asking to play the recording to verify that the recording, or the working transcript were those statements. I think that those should be coming into evidence

as substantive evidence of what is being said to the defendants at the time. It goes directly to their state of mind and intent.

THE COURT: Let me hear from the Government in response on this one.

MS. FARRELL: Well, on that particular one, I did object properly, I believe, because the predicate question was did you share that the practice of OM had benefited you.

THE COURT: Yes, I'm remembering now. Yes. It was the problem with the question was not meeting a video. That was the problem on that one.

MS. FARRELL: The transcript has nothing to do with the practice of OM,.

THE COURT: Correct.

MS. FARRELL: It was about how she's feeling. She used to feel small and miserable and now she's having more fun. So, no dispute she was sharing her feelings with Nicole Daedone, but it wasn't about how the practice of OM has benefited that was the purpose of the objection.

THE COURT: I remember that now. You're still on cross-examination.

MR. ROBOTTI: I understand, Your Honor. I do think the same issue comes up with the recording that was sent to Ms. Cherwitz where the witness is dancing around in an orgasm state T-shirt and saying that they're having a great time.

The fact that it was sent to Ms. Cherwitz at the time --

THE COURT: It's the foundation I think that you're laying. You might want to go back and think about how you're asking the questions. You're still on cross-examination.

MR. ROBOTTI: I understand. I just think that this has come up several times.

THE COURT: You have to ask the right questions, right. And the witness, more importantly, has to be responding in a particular way because it seems like you know what you are trying to do, but you're not necessarily getting the right answers out of the witness or maybe not asking the right question.

But you are still on cross-examination. You can attempt to lay the proper foundation.

MS. BONJEAN: We should not be having to get in testimony by getting them to admit things just through refreshing.

THE COURT: No, I agree with you. But you have to have a proper way of getting the evidence in otherwise. And if you are going down the path of refreshing recollection and then you switch to something else, you're asking if a witness's recollection needs refreshing, I just think you need to be careful with your questions.

Anything else on this topic?

You're still, Mr. Robotti, on cross-examination.

Does the Government wish to be heard on anything before we bring the jury back?

MS. FARRELL: No, thank you, Your Honor.

THE COURT: Okay. Let's bring them in and let's bring back the witness.

(Continued on next page.)

(Witness takes the witness stand.)

(Jury enters courtroom at 1:48 p.m.)

THE COURT: Everyone may be seated. I hope you had a good lunch.

THE WITNESS: Mr. Robotti, you may continue your examination.

CROSS-EXAMINATION

BY MR. ROBOTTI:

(Continuing.)

Q Good afternoon, Ms. Keves.

A Good afternoon.

Q Have you met with the Government before today?

A Yes.

Q How many times?

A You mean like spoken with the FBI agents?

Q How many times have you met with the prosecutors who are sitting at this table and the FBI agents?

A Once in person, I guess a few times on the phone.

Q And, in fact, you've spoken with them between five and ten times; is that fair to say?

A Probably, yeah.

Q Did they go over your testimony here today?

A Yes.

Q So you prepared with them for your testimony today?

A Yes.

Q Before the break, I played for you, or showed a transcript of a February 2017, coaching circle with Nicole; do you recall that?
A Yes.
Q And you remember that coaching circle?
A Yes.
Q And during that coaching circle, you told Ms. Daedone how beneficial your time at One Taste had been; do you recall that?
A Yes.
Q And you said that you had come through the door a little over two months ago and your live was completely different now; do you recall that?
A Yes.

MR. ROBOTTI: Your Honor, at this time, the defense moves Defense Exhibit FD.

THE COURT: Now, that you've given to me I can listen to it.

Is it audio or video?

MR. ROBOTTI: It's an audio recording.

THE COURT: You have it made.

MR. ROBOTTI: FD-1 is a clip of FD.

THE COURT: Let me see if you've given me that.

Okay. Give me a minute then. Just audio, correct.

MR. ROBOTTI: Just the audio, your Honor.

THE COURT: Give me one moment.

(A brief pause in the proceedings was held.)

THE COURT: So tell me, Mr. Robotti exactly, what you're offering. The clip?

MR. ROBOTTI: The clip FD-1 and the transcript which is FD-T or, I apologize, FD-1-T for the affect on the listener, your Honor.

THE COURT: Are you offering the transcript as an aid to the jury or as an exhibit?

MR. ROBOTTI: As an aid to the jury, your Honor.

THE COURT: Any objection?

MS. FARRELL: Yes, Your Honor. Objection on the basis of hearsay and improper foundation.

THE COURT: I'll sustain the objection but I'll allow to you ask some more foundational questions.

EXAMINATION BY

MR. ROBOTTI:

(Continuing.)

Q Now, Ms. Keves, do you recall at this time what you explained to Ms. Daedone?

A You're referring to the clip you had me listen to earlier.

Q Did the clip you listened to a moment ago refresh your recollection?

A I didn't listen to anything a moment ago. There was nothing playing a moment ago.

Are you talking before the break?

Q Before the break.

A Yes.

Q During the coaching circle; do you recall that?

A Yes.

Q Do you recall what you said to Ms. Daedone at that time?

A Yes.

Q And what did you say?

A I was talking about how Om had changed my life and being a part of the organization had changed my life.

MR. ROBOTTI: Based on that foundation, your Honor, we renew our request to admit Defense Exhibit 9FD-1 for the effect on the listener.

MS. FARRELL: Same objection. I don't think she's testified about it. She wasn't even able to hear the clip that they're moving in, she just testified.

THE COURT: Yes, I'm going to sustain it.

Do you want to listen to it again and you can ask more questions.

MR. ROBOTTI: I believe she testified she recalled listening to it before the break.

THE COURT: I know that was a while ago.

MR. ROBOTTI: Can we play for the witness again 9FD-1.

THE COURT: Just the shorter clip, right?

MR. ROBOTTI: Yes.

THE WITNESS: I'm not hearing anything. Nothing.

MR. ROBOTTI: I'm going to approach with the transcript, your Honor.

THE COURT: Sure.

A I hear it now.

(Audio file played for the witness only.)

Q Ma'am, do you recognize your voice on that clip?

A Yes.

Q Do you recognize Ms. Daedone's voice on that clip?

A Yes.

Q And, again, during that clip, did you tell Ms. Daedone how beneficial the practice had been for you?

A Yes.

MR. ROBOTTI: Your Honor, we renew our request to admit Defense Exhibit 9FD-1 for the effect on the listener.

MS. FARRELL: We object to improper foundation.

THE COURT: Overruled. Not Defense Exhibit 9FD-1 is admitted and are you still seeking to admit -- offer the transcript as an aid to the jury.

MR. ROBOTTI: Yes, Your Honor.

THE COURT: So any objection to that?

MS. FARRELL: No, Your Honor.

THE COURT: So Defense Exhibit FD-1, I'm sorry, it's FD-1-T.

MS. FARRELL: 9FD-1.

THE COURT: I'm sorry. Okay. This is a very strange numbering system but we're working with it.

9FD-1-T is admitted as an aid to the jury.

(Defendant's Exhibit 9FD-1-T was marked in evidence.)

MR. ROBOTTI: Can we play that audio clip for the jury?

(Audio file played in open court.)

(Audio file concludes.)

EXAMINATION BY
MR. ROBOTTI:
(Continuing.)

Q All right. Just to be clear, you recognized your voice there at the end as the one saying, Yeah, things are different. I feel really good.

A Yes.

Q Do you also remember before the break that you watched a video of you and your housemates saying, Hi, Rachel?

A Yes.

Q And you saw yourself on in that video?

A Yes.

Q You saw your housemates in that video?
A Yes.
Q And you understood the purpose of that video was to send it to Rachel; correct?
A Yes.

MR. ROBOTTI: Your Honor, based on the witness's previous viewing of the video and that foundation, we move Defense Exhibit 9DP for the effect on Ms. Cherwitz.

THE COURT: Any objection?

MS. FARRELL: Yes, foundation.

THE COURT: I need you to give me a few more words.

MS. FARRELL: Sure. I don't think -- so she's testified that it's a true and accurate copy of anything which is sort of an obvious one.

THE COURT: Okay. I will.

MS. FARRELL: One more thing.

THE COURT: Yes.

MS. FARRELL: I don't think it's been established it was sent to Ms. Cherwitz.

THE COURT: I'm going to sustain the objection and allow you to ask some more questions if you wish.

MR. ROBOTTI: Yes, Your Honor.

Q Ms. Keves, is that a true and accurate depiction of you and your housemates singing and dancing and saying hello to

Rachel?
A Yes.
Q And, to your knowledge, you said the purpose of that video was to send to Ms. Cherwitz; correct?
A I believe so, yes.
Q And do you know who recorded the video?
A I don't.
Q Do you know whether it was, in fact, sent to her?
A I don't.
MR. ROBOTTI: Your Honor, we still renew our proffer based on the purpose of it was to be sent to Ms. Cherwitz.
MS. FARRELL: Objection.
THE COURT: Sustained.
Q All right. Ms. Keves, before the break, you were testifying about the sales practices of One Taste; do you recall that?
A Yes.
Q And you said that the company collected information about its potential customers' desires; do you recall that?
A Yes.
Q And this was a sales tactic that was taught to One Taste by an outside consultant; do you recall that?
A No.
Q Do you understand that One Taste collected that

information because it was a company focused on sexual wellness?

A Yes.

Q So the relevant information to discuss with customers had to do with sex; right?

A Including that, yes.

Q Okay. And that helped salespeople connect with customers and assess which One Taste product might be right for them; correct?

A Yeah.

Q Okay. You didn't like the sales practices at One Taste; correct?

A Correct.

Q And so, after about 90 days or less you quit; right?

A Yes.

Q You left and you got another job at a restaurant; right?

A Yes.

Q And that was a decision you were able to make; correct?

A Correct.

Q All right. You testified that you didn't like the dress code; right?

MS. FARRELL: Objection.

THE COURT: Yes, sustained.

Q You also testified regarding the dress code at

One Taste?
A Yes.
Q You testified that you had to wear a black skirt and heels; is that right?
A Yeah, we were encouraged to dress sexy.
Q Okay. Had you ever worn a black skirt and heels outside One Taste?
A Yes.
Q Can we Agree that companies often have standards for dress and appearance?
A Yes.
Q The UPS guy has to wear a brown shirt?
A Yes.
Q The New York Yankees have to wear pinstripes?
A Yes.
Q Okay. So it's not unusual that One Taste would have a dress code; right?
A No.
Q And, in fact, One Taste had a written policy requiring appropriate attire and grooming; do you recall that?
A No.
Q Do you recall that it had a policy under which management reserved the right to object to any aspect of your dress and hygiene; do you recall that?
A No.

Q Do you recall that any employee who was improperly dressed will be counseled and may be sent home to change to suitable clothes?
A I don't recall.
Q Okay. Fair to say if you didn't like the dress code policy you could leave and get another job?
A Yes.
Q And you ultimately did that; right?
A Correct.
Q Okay. You testified that you didn't like One Taste's teachings on monogamy; is that right?
MS. FARRELL: Objection.
THE COURT: Yes, sustained.
Q You testified regarding One Taste's teachings on monogamy; do you recall that?
A Yes.
Q Okay. Fair to say you joined an organization focused on sexual exploration?
A Yes.
Q And after you joined that company, you immediately got into a monogamous relationship; right?
A Yes.
Q And you knew, based on your experience at One Taste, that most people had multiple sexual partners; is that right?

A Yeah.
Q And that was part of the exploration process; correct?
A Yes.
Q And most of the people you were interacting with are Omming with multiple partners; is that fair?
A Yes.
Q So it's no surprise that people within the company may not share the same views as you on monogamy; right?
A Right.
Q And this is the company that you signed up to work with; right?
A That's right.
Q You testified you didn't like working long hours at One Taste; correct?
MS. FARRELL: Objection.
THE COURT: Yes, sustained.
Q You testified that you worked long hours on the sales team at One Taste; correct?
A Yes.
Q And that was something that you did not like doing; correct?
A Correct.
Q Okay. Now, it's true that you were responsible for entering your time while you were at One Taste; right?
A Mm-hmm.

Q Is that yes?
A Yes.
Q Okay. You had to enter how many hours you work; correct?
A Yes.
Q And is it fair to say that you entered time from about August 2017 until November 2017; is that fair?
A Mm-hmm, why he.
Q Isn't it accurate that in that time period you worked on a weekly basis at most between 22 and 56 hours per week?
A Well, what was entered wasn't always what was worked.
Q Okay. Well, ma'am, you were responsible for keeping track of your hours; right?
A There was -- there were blurry lines between work and other participation.
Q Well, you agree that you were responsible for entering and submitting your hours; correct?
A Yes.
Q And that, at the most hours you entered during that time period was 56 hours; is that correct?
A I don't know.
Q And the least hours you entered were 22 hours; do you recall that?
A No, I don't.
Q Will your time slips refresh your recollection?

A Yes.

MR. ROBOTTI: Can we pull up 9K1 just for the witness, please.

THE COURT: I'm going to need it as well. Thank you.

Q Now, ma'am, look, at 9K1. Does that refresh your recollection about the hours that you worked during this pay period?

A Am I supposed to be seeing something?

Q Is it on the screen in front of you there?

A No.

Q Okay. Now, ma'am, looking at 9K1, does that refresh your recollection that on your payday of September 6, 2017, you worked 22 hours?

A I entered 22 hours.

Q You entered 22 hours, okay.

And looking at, I believe, it's 9K2, does that refresh your recollection that for the payday of September 20, 2017, you entered 47.5 hours?

A You said 9K2?

Q My apologies, 9K3?

A 9K3 says 44 hours.

Q Okay. And looking at 9K2, does that refresh your recollection for the payday of October 20, 2017, you worked 56 hours?

A It says 56 hours, yes.
Q Okay. All right. And you made minimum wage of $10.50 an hour; right?
A Yes.
Q And you didn't did think that was enough money for you?
A I never said that.
Q Fair to say if you didn't like your hours or your wages you could get a different job; right?
A Yes.
Q That's a decision you ultimately made; correct?
A Yes.
Q So can we agree that you were free to come and go as you pleased at One Taste?
A Yes.
Q No one locked you in anywhere; right?
A No.
Q No chains on the door?
A No.
Q If you wanted to leave go to your sister's place in SOHO you could do that; correct?
A Yes.
Q You always had the ability to leave One Taste at any time; right?
A Yes.
Q And when you stayed it was because you chose to stay;

correct?
A Yes.
MR. ROBOTTI: No further questions.
THE COURT: Ms. Bonjean, any cross-examination?
MS. BONJEAN: Yes.
(A brief pause in the proceedings was held.)

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Keves, my name is Jennifer Bonjean and I represent Ms. Daedone.
You heard about One Taste through your church; is that right?
A Yes. Through somebody at my church, yes.
Q And that's Unity Church?
A Yes.
Q And then, as I understand it, you went and took a course?
A Yes.
Q Was that the Communications Course?
A That was the first one, yes.
Q First Communications Course. Is that something you paid for?
A The first one, no. That was a free event.
Q So this was, like, an introductory event that you could show up for and learn more about the organization; right?

A Yes.
Q And it also had a sales pitch; correct?
A Yes.
Q And I think you said that after you went to the course, you weren't so sure about it; right?
A I mean, yeah, I was still hesitant around the practice.
Q You weren't immediately drawn to the practice of orgasmic meditation; right?
A I had signed for the Intro to Ohm class before I had gone to the Communications Course. So I was, yeah, I was interested to know more, I was curious about it, but I was also hesitant.
Q So let me understand the subsequent. You were recommended to One Taste; right?
A Mm-hmm.
Q And I think some point you said you watched a TED Talk?
A Yes.
Q Is that after you got the recommendation from your friend at the church?
A Yes.
Q Okay. And the TED Talk, these are videos; right?
A Yes.
Q And they there's lots of TED Talks; correct?
A Yes.
Q Have you watched any other TED Talks?

A Yes.
Q Okay. And would you agree that TED Talks are videos from sort of expert speakers from all disciplines; right?
A Yes.
Q Education, business, science, design, art, et cetera?
A Correct.
Q Okay. And the whole concept around TED Talks is bringing new ideas to the public, correct?
A Yes.
Q A lot of the ideas are cutting-edge ideas; correct?
A Yes.
MS. FARRELL: Objection.
THE COURT: Basis.
MS. FARRELL: Just the witness not having personal knowledge.
THE COURT: Overruled.
That means you may answer.
Q You watched TED Talks before; right?
A Yes.
Q You are familiar what the TED Talks are; correct?
A Yes.
Q And you watched Ms. Daedone's TED Talk on YouTube did you say or on some other platform?
A I don't recall.
Q Okay. I may have assumed that, I apologize.

And did you happen to see how many times Ms. Daedone's TED Talk had been viewed?
A I don't recall.
Q Okay. And that after you watched her TED Talk, you were interested in orgasmic meditation or the ideas that she was espousing; right?
A Yes.
Q And to be clear, she stated in her TED Talk that it was about female orgasm; right?
A Yes.
Q There was no secret there, she was very up front about what her subject interest was; correct?
A Correct.
Q Okay. So after you hear Ms. Daedone's ideas about orgasmic meditation, that prompted you to sign up for the Intro to Ohm course; correct?
A Correct.
Q And, again, you didn't do that based on, well, you didn't do it based on a sales pitch because you did it online; right?
A Right.
Q And you did it just based on hearing what you heard from a TED Talk; right?
A Right.
Q A TED Talk that anybody could access on the internet;

right?
A Yes.
Q And then it sounds like before you started the Intro to Ohm course, you went and took this free communication course; is that right?
A Yes.
Q Okay. You wanted to make sure that this was something you were still -- you wanted to learn more; right?
A Well, the phone, somebody calls you before each class and somebody had called me to talk about what I was hoping to get out of the Intro to Om class and let me know about the free Communications Course.
Q Got it. So you signed up online; right?
A Yes.
Q And someone called you up with a follow-up kind of sales call; right?
A Yes.
Q Asked you what you were looking to get out the class; correct?
A Yes.
Q And then said you can always also this free course in advance; right?
A Yes.
Q All right. And you understood that One Taste was a sexual wellness company; right?

A Yes.
Q It was a self-help company; correct?
A Yes.
Q The idea was if you wanted to go there with some desire that correlated with sexual spirituality or sexual exploration or however you want to define it, that was a place you could go; correct?
A Yes.
Q You understood that you weren't signing up for a cooking course, for instance; correct?
A Correct.
Q Okay. And then you attended the Communications Course and that didn't -- that didn't deter you; right?
A Right.
Q And you said the people were nice; right?
A Yes.
Q And then I take it you then took the Intro to Ohm course?
A Yes.
Q All right. And it's based on your testimony that you provided on direct examination you were enjoying the course and you signed up for another course pretty quickly; correct?
A Yes.
Q And do you remember what the next course was that you

signed up for?
A At the Intro to Ohm course, I signed up for the coaching program.
Q That's a more intense program; correct?
A Yes.
Q And you understood that; right?
A Yes.
Q And that's sort of like a, you know, what, six-month ten-month commitment type thing?
A Somewhere in there, yeah.
Q And in the process, you made some friends that you liked; yes?
A Yes.
Q And at what point did you meet Roomy?
A Rami.
Q Rami, sorry?
A I met hem in November.
Q Was that in the coaching course or before?
A I met him in the coaching course. So it was either November or beginning of December.
Q All right. You testified about an interaction you had with Ms. Cherwitz during a New Year's Eve retreat; right?
A Yes.
Q And do you know where in your experience at One Taste in that ten months or whatever it was, 11 months, that

New Year's retreat took place?
A Yeah, I began in November and that retreat happened at the end of December.
Q Okay. So, at the end of December -- makes sense -- at the end of the December, you do the New Year's retreat and this was also a communications-centered retreat; right?
A Yeah, I mean, there were always -- communication was kind of always one of the topics, yes. Relationships, communication, intimacy, yes.
Q And you talked about this exercise that you did with Ms. Cherwitz, right?
A Mm-hmm, yes.
Q This is the first experience where you were like, I think your words were, it was jarring, shocking, and hurtful; right?
A Yes.
Q And this was the first time you had felt that way; correct?
A Yes.
Q And this was an exercise called bull mating wasn't it?
A I don't recall the name of it.
Q And the whole purpose of the exercise was for your partner to say something triggering to you; do you remember that?
A I don't recall exactly. I remember it being like they

were supposed to -- yeah, give insights into...

Q Because when you testified about this really seemingly ugly thing that Ms. Cherwitz said to you, you didn't mention that it was in the context of an exercise where the goal was to say something triggering to somebody?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q You didn't tell the jury that part; right?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q All right. So in the context of this exercise designed to trigger you --

MS. FARRELL: Objection.

Q -- I think you said?

THE COURT: Sustained.

Q Do I have that wrong? Was the exercise designed to trigger each other?

A I don't recall the intention -- what was -- if that was laid out in the directions, I don't recall.

Q Okay. I thought you just said a minute ago, I thought you agreed with me a second ago, which one is it?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q Do you or do you not know what the purpose of the communications exercise was?

A I don't know.
Q Okay. In any event, you would agree it was a communications exercise?
A Yes, I do.
Q Okay. And, in the course of this communications exercise, Ms. Cherwitz said something like, You're irritating, you won't admit that you're, like, just a slut who wants to get fucked or something like that?
A Yes.
Q And you found that jarring, shocking, and hurtful; correct?
A Why.
Q You found that offensive, didn't you?
A I did.
Q Okay. I'd like to show you Defense Exhibit 9EW which is in evidence.
If somebody could get rid of the blue things that would be helpful.
We looked at this release of liability and course agreement previously; right?
A Yes.
Q And you signed a number of these things?
A Yes.
Q Okay. And I just want to pull out if we could the bottom bullet point as soon as this gets going here.

At the very bottom bullet point.
Can you read that?
A That certain participants may make statements or take actions that I disagree with or find offensive.
Q Right. And you assume the risk of that; right?
A Yes.
Q And you understood that these courses could be provoking in that way; correct?
A Yes.
Q And also after -- you can take it down -- and after hearing that, and feeling the way you did, you were perfectly within your right to say this isn't for me, I don't really want to have someone tell me something like that; right?
A Yes.
Q But you didn't; correct?
A Correct.
Q You stuck around for several months longer; right?
A Yes.
Q In fact, you got more involved by working there; correct?
A Yes.
Q And you even moved into the staff house; correct?
A Yes.
Q Also, to be clear, before you again working there, you

were volunteering there; right?
A Yes.
Q And you understood when you volunteer you don't have an expectation of getting paid; right?
A Yes.
Q Okay. So you moved in and I think you stated on direct and on cross that the lines got blurred; right?
A Yes.
Q And you would agree that if you move in with your employers and your co-workers that possible lines could get blurry; right?
A Yes.
Q You understood you were living with your employers and your co-workers; correct?
A Yes.
Q And that's because you were all living in community together; right?
A Yes.
Q It was an unusual setup by at least most normative standards; correct?
A Yes.
Q And you understood that this was unusual; right?
A Yes.
Q You didn't have any friends from your graduate program that were living in that type of environment; right?

A No.

Q Okay. Another thing you took issue with on direct examination was that you felt that One Taste had discouraged Rami from participating in this ayahuasca retreat in Peru; right?

MS. FARRELL: Objection.

THE COURT: Sustained.

(Continued on the next page.)

(Continuing.)
BY MS. BONJEAN:
THE WITNESS: She can ask the next question.
Q Well, did you testify on direct that you thought that OneTaste discouraged people from getting involved in other -- other activities?
A Yes.
Q Okay. And the example you provided on direct examination was this Ayahuasca retreat. Do you remember testifying to that?
A Yes.
Q Okay. And you know that Ayahuasca is a hallucinogen, right?
A Yes.
Q And you understand that OneTaste had a very strict sobriety policy, right?
A Yes.
Q You had a personal interest in how to use your teachings at OneTaste to help women battle eating disorders. Do I have that right?
A Yes.
Q Okay. OneTaste didn't really have a program around that issue, correct?
A Correct.
Q But you -- you wanted to take those learning -- those

teachings and adapt it to something you felt pretty strongly about, right?
A Yes.
Q You discussed the fact that --
You discussed some of the other events that you thought were, quote/unquote, I think abusive. I want to ask you about those, okay? We talked about the statement that Rachel made in that setting.
I think another example you gave was that people at OneTaste said you were holding Rami back because of their I guess aversion to monogamy, right?
A Yes.
Q And that's something you felt was abusive?
A Yes.
Q And yet Rami, within months of getting to know you, nonetheless proposed to you, right?
A Yes.
Q I think you gave another example of the abuse that you felt had been imparted on you when you were out putting out fliers with, I don't know if it was somebody else, and you returned, and Aubrey said you guys couldn't eat because you're slowing down the flow of energy, right?
A Yeah.
Q Okay. Because there was an event coming up; was that right?

A Yeah.
Q Okay. And you didn't say, listen, I need to take a minute and eat, right?
A I don't recall what I said.
Q Okay. Did anything else happen in that exchange that you found to be abusive?
A No.
Q All right.
Another example of the abuse you said you suffered was a situation where there was an event and you were working the back of the house, and Rachel was upset that there were not more sales being made, right?
A Yes.
Q And then she got everyone in the back by the kitchen and berated everybody for there being no sales, right?
A Yes.
Q Okay. And her voice was raised, correct?
A Yes.
Q Anything else happen in that moment that was abusive other than what you describe?
A Yeah.
Q Okay. Well, what apart from her berating you was abusive?
A The public shaming that happened afterward.
Q Okay. So she called you guys out for not doing a good

job with sales; is that right?
A Well, when the course started again, she call would me up in front of the entire class to talk about how I was -- have stifling and -- she had me talk about my relationship with Rami and why I was so clingy.
Q Okay. That's right. I forgot about that one. So that was connected to that event?
A Yes.
Q And her complaint was that you were more focused on this relationship you were trying to build than actually your job of sales, right?
A No. The complaint was that outside of -- that somehow energetically I was distracting Rami from doing a good job. But nobody wasn't doing their job. Everybody was doing their job. She was -- there wasn't -- nobody was buying the courses.
Q So you disagreed with her, right?
A Yes.
Q You didn't look that she said that you were interfering with Rami's energy because you were too clingy, correct?
A Yes.
Q And certainly, you said back to her, well, that's not accurate, just like you're saying here today?
A Questioning wasn't -- you were shamed or yelled at or shut down. It wasn't the open conversation or open

environment to exchange ideas or -- like, there was a hierarchy, so no, I did not.
Q You didn't even try. You didn't push back at all, right?
A No.
Q And people did have open dialogue in these settings all the time, right?
A And were often shut down.
Q Okay. People were often shut down and ideas were dismissed and some ideas were accepted, right?
A Yes.
Q Okay. And if you didn't like the vibes or the tone, you could have just said, this isn't for me and I'm outta here, correct?
A Yes.
Q Have you ever belonged to a sorority?
A No.
Q Ever been in the military?
A No.
Q Now, ultimately, for all the pressure around monogamy, it didn't really work very well because you and Rami got married -- or got engaged, correct?
A We got engaged.
Q And then you ultimately left and he didn't want to leave; is that right?

A Yes.
Q And as a result, then, your ideals went in different directions, philosophies went in different directions, and you broke up. Fair?
A Yes.
MS. BONJEAN: Give me one second.
Q Oh, one other question about -- you talked about some of the teachings of Ms. Daedone, right?
A Yes.
Q Fair to say that Ms. Daedone has focuses, at least in part, on this idea of victimhood, right?
A Yes.
Q She rejects the idea that you should allow your past as a victim or bad things that have happened to you to define you, correct?
A Yes.
Q And she's very open about that, right?
A Yes.
Q And you were free, as an educated woman, to agree or disagree with that idea, correct?
A Yes.
Q And at the time, you were intrigued by the idea, correct?
A Yes.
Q Okay. Maybe now you don't feel that way, but at the

time you were open to hearing this new approach to victimhood?
A Yes.
MS. BONJEAN: One second.
(Pause in proceedings.)
MS. BONJEAN: I have nothing further.
THE COURT: Ms. Farrell, any redirect?
MS. FARRELL: Yes, Your Honor.
REDIRECT EXAMINATION
BY MS. FARRELL:
Q Ms. Keves, are you testifying here today pursuant to subpoena?
A Yes.
Q We looked at a document, Defense Exhibit 9-Y -- I'm sorry, 9-A, titled Why Am I Here.
MS. FARRELL: I don't know if we can pull that up for the witness only.
Well, that's okay. We don't have to look at it.
Q We looked at 9-A, a Why Am I Here document. You looked at 9-Y, where you listed out three women you have an aversion to and three women that you admire.
Do you know what I'm talking about?
A Yes.
Q Are these documents you prepared on your own, spontaneously, or were you prompted to prepare them?

A No, I was prompted.
Q What was the context of your writing these things?
A Within OneTaste courses.
Q The three women that you wrote that you respected and admired, were those all people who worked at OneTaste?
A Yes.
Q And then the three women you had an aversion to, who were they?
A Outside of OneTaste.
Q Were they women in your family?
A Yes.
Q Is it accurate to say that you admire three OneTaste women more than your mother and your sister?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Basis?

MR. ROBOTTI: Relevance --

THE COURT: Wait, sorry, let me listen to Ms. Bonjean first and then I'll listen to you.

MS. BONJEAN: Relevance, and it wasn't phrased as a competition.

MR. ROBOTTI: Relevance to time frame of now.

THE COURT: Sustained.

Q You wrote that in May --

MS. FARRELL: I'm sorry. Can I just put it up on

the screen for the witness to refresh her so she knows what I'm talking about?
Q Did you write that in May 2017?
A I don't think this is working.
Q Oh, okay.
MS. FARRELL: May I approach the witness?
THE COURT: Yes.
Q Did you write that in May of 2017?
A Yes.
Q And at the time, was it accurate that you admired these three OneTaste women and had aversions to women in your own family?
A I mean, I wrote that, but I don't think at the time it was even accurate.
Q Then why did you write it?
A The -- the culture was around -- or I'll just say, I often felt like I would do things to -- to gain approval of the teachers or, like, stay in their good graces. Like, it was -- I wrote kind of what I thought was expected of me.
Q And so can you explain to the jury why saying you admired three women in OneTaste and that you had aversions to your mother and your sister might, in your mind, gain you the approval of your teachers at OneTaste?
MR. ROBOTTI: Objection to hindsight, speculation.
THE COURT: Overruled.

A Because there was this, like, if you're in OneTaste, you're turned on and you're powerful, and those who aren't in are not those things.
Q And did that include your mother and your sister?
A Yeah, my mother and sister were not in OneTaste.
Q Besides the Ayahuasca retreat, were there other interests that Rami had outside of OneTaste that he was discouraged from participating in?
A Yes.
Q Can you name some?
A He was involved with Landmark, and then there was a, like, a vacation that we took together that was being organized by -- I think he was kind of like a martial -- I want to say he was, like, a martial arts teacher that Rami was taking classes with him, so he led a retreat or like a vacation, and so we went to that, and there was some discouragement around that, getting off course.
Q And what does that mean, to get off course, based on your understanding at OneTaste at the time?
A It was, like, not staying on your purpose, and the purpose was, you know, to be at OneTaste and spread orgasm.
Q And Mr. Robotti showed you a series of videos and audio clips and pictures of you expressing your enjoying your time at OneTaste and your valuing the OM practice.
Do you remember that?

A Yes.
Q So what changed from the time that you said those things?
A So the clip, the audio clip was pretty early on, and as I was involved more and more, I started to just feel panicky around attending another event or being there in general.
Q And why?
A Because it was a high -- high control group, high pressure group, all consuming.
Q And when you say it was high control or high pressure, like what specifically made you feel that way? What about your experience there?
A Well, the sales were always high pressure. You were taken -- after every single event you were taken into a back room with one of the teachers or salespeople, and it was very, very high pressure to purchase something else. And then just the environment of living in the staff house, it was everybody did the same thing together. You didn't go anywhere really alone. You stayed connected; you stayed in community. So, yeah, it was all encompassing in that way.
MS. FARRELL: And so for the witness, I don't know if it's possible to pull up 9-BL.
Q Was there measure around OMing?
A Yeah. I mean, I got pressure to OM, to open up the OM practice between me and Rami. Mostly it was coming from

Rami, but there was, like, the whole, like, in the vacuum of OneTaste that was not really -- monogamy was not really encouraged or OMing monogamously was not really encouraged. It was more encouraged to, you know, get messy, to open up your orgasm.

Q So if you can look at your screen, we looked at 9-BL earlier. Do you recognize that?

A I don't have it.

Q Oh, I'm sorry.

A That's okay.

MS. FARRELL: May I approach, Your Honor?

THE COURT: Yes.

MS. FARRELL: I'll give you a paper copy.

Q So, Ms. Keves, I believe Mr. Robotti showed you 9-BL as a text message exchange.

Do you recognize this?

A I -- I don't think he showed me this.

Q I believe he asked --

Do you recall being asked questions about whether you and Rami were opening up your OMs --

A Oh, yeah. He didn't show me, but he referenced it, yeah.

Q Okay. And so looking at this now, do you recognize this text thread?

A Yes.

Q Who is it with? If I know.
A I think it's Rachel Short. Oh, I see where he -- it's later down, but yes, I see where he was referencing. Yes, he showed me. It's the bottom part.
Q Take a minute to read it and make sure you recognize the text thread.
(Pause in proceedings.)
A Yes.
Q Is this a true and accurate copy of a text thread between you and Rachel Shore in August 2017 that Mr. Robotti showed you?
A Yes.
MS. FARRELL: Your Honor, I move to admit Defense Exhibit 9-BL into evidence.
THE COURT: Any objection?
MS. BONJEAN: What's the basis? I'm sorry, I didn't hear it.
THE COURT: I'm asking if there's any objection.
MR. ROBOTTI: Judge, I believe it's hearsay. I mean, improper for refresh.
THE COURT: Would you like to respond, Ms. Farrell?
MS. FARRELL: Yes.
I'm offering it as a prior consistent statement based on the comment by Ms. Keves at the bottom of the

thread.

THE COURT: Can you blow that up?

MS. FARRELL: Yes.

Can you please blow that up for her?

MS. BONJEAN: Objection to that basis.

THE COURT: Let me just take a moment to look at it.

I'm sorry. I'm not sure what you're asking me to look at.

MS. FARRELL: Sure.

THE COURT: Let me just grab a hard copy of this. I think that would be easier.

MS. FARRELL: It's the defense's exhibit. I don't have another one, I'm sorry.

THE COURT: Tell me exactly which portion you're seeking to admit or the entire document?

MS. FARRELL: I'm seeking to admit the entire thing. I can ask the witness some more questions, if it may help orient you.

THE COURT: Why don't you do that.

BY MS. FARRELL:

Q Ms. Keves, did Mr. Robotti --

MS. FARRELL: You can keep that blown up, please.

Q Did Mr. Robotti ask you about the fact that you had reached out to this woman Rachel -- sorry, what was her last

name?
A Short.
Q Rachel Short, about whether it was okay for you to ask her boyfriend, Kenan, to OM with you later in the day?
A Yes.
Q Do you remember that?
A Yes.
Q And then in that same conversation, what, if anything, did you say to Ms. Short about your reluctance to open up your OM practice?
MR. ROBOTTI: Objection. Hearsay.
THE COURT: Response?
MS. FARRELL: Again, I think there was an incomplete -- there was a question that suggested an incomplete version of this conversation, and I'm trying to --
THE COURT: Overruled. Go ahead.
MS. FARRELL: Thank you.
Q What, if anything, did you say to Ms. Short about your reluctance to open up your OM practice beyond you and Rami? And don't read from the document, but just --
A Yeah, just that I was resistant to opening up the OM practice.
MS. FARRELL: And so in light of that foundation, Your Honor, we're moving to admit Defense Exhibit 9-BL into

evidence.

THE COURT: Any objection?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

Q And so were you super resistant to opening up your OM practice beyond you and Rami?

A Yes.

Q And did you ultimately agree to open it up?

A Yes.

Q What was that based on?

A Just pressures, outside pressures to open up. But I was -- you know, all the continued conversation around me being too clingy and stifling.

Q And was there a reason you asked to OM with Kenan in particular?

A He lived at the house. He was, I guess, somebody I felt more comfortable with.

Q Ms. Bonjean --

MS. FARRELL: We can take that down.

Q Ms. Bonjean asked you a series of questions about monogamy and then the fact that you got engaged.

Do you remember that line of questioning on cross?

A Yes.

Q And I think earlier you testified there were a number

of couples within OneTaste that got engaged or married; is that correct?
A Yes.
Q Based on your observations, the other couples in OneTaste that were getting engaged or married, were they remaining monogamous with each other as a general matter?
A No. It didn't -- didn't seem that way, no.
Q Okay. What, if any, observations did you make about all of these people getting engaged or married at OneTaste?
MS. BONJEAN: Objection. Relevance.
THE COURT: Overruled.
A Can you repeat the question?
Q Sure.
What did you make of all these people getting engaged or married at OneTaste, but not remaining monogamous, as you just testified?
MS. BONJEAN: Objection --
THE COURT: I'm sorry, I didn't hear you, Ms. Bonjean.
MS. BONJEAN: It's also just a vague question, "what did you make of" it.
THE COURT: Sustained.
Q Did you have any observations about why people within OneTaste were getting engaged or married?
MR. ROBOTTI: Objection.

MS. BONJEAN: Foundation.
THE COURT: Sustained as to foundation.
Q Were you able to observe whether or not people were getting engaged or married at OneTaste?
A Yes.
Q And based on your own observations, what was your understanding of why that was happening?
MS. BONJEAN: Objection. Foundation still.
THE COURT: Overruled.
Q That means you can answer.
A Okay. So, I mean, at the time it seemed like --
MS. BONJEAN: Objection to the "seemed like."
THE COURT: Overruled.
A Like, oh, people are finding their partners here or people are having relationship success, which I think looked -- looked good to the -- to the group or to people coming in, your finding a relationship. I think there were pairings that were beneficial to --
MS. BONJEAN: Objection. Foundation.
THE COURT: Overruled.
MS. BONJEAN: Speculation.
THE COURT: Overruled.
A There were pairings that were beneficial to the organization.
Q In what way?

MS. BONJEAN: Objection.
THE COURT: Overruled.
A Financial, for one. And at one point I remember it was suggested that Rami and I --
MS. BONJEAN: I object to the "it was suggested." There are two defendants on trial.
MS. FARRELL: That's fine. I'll just --
THE COURT: No.
MS. FARRELL: Sorry.
THE COURT: Sustained.
You can ask the next question.
MS. FARRELL: May I just ask that that last sentence be struck?
THE COURT: Ms. Bonjean's sentence?
MS. FARRELL: No, the witness, the rest of her --
THE COURT: Yes, that will be stricken.
MS. FARRELL: Okay. And that the rest of her answer before the objection remain.
THE COURT: You just need to ask your next question.
MS. FARRELL: Okay.
BY MS. FARRELL:
Q So I think --
MS. FARRELL: I'm sorry, I just don't have the transcript in front of me. One moment, sorry.

THE COURT: You want to know what your last question was?

MS. FARRELL: I'll look.

(Pause in proceedings.)

THE COURT: Your last actual question was: In what way?

MS. FARRELL: Yes. And then I think you sustained the answer. Is that correct, Your Honor?

THE COURT: Yes, the answer.

Sorry. You asked for the answer to be stricken, right? Or no?

MS. FARRELL: Just the part after the objection, with respect to --

THE COURT: Just ask another question at this point.

BY MS. FARRELL:

Q Well, in what way was it beneficial to OneTaste for certain pairings to happen?

MS. BONJEAN: Objection. Foundation.

MR. ROBOTTI: Objection.

MS. BONJEAN: Speculation. No firsthand --

THE COURT: Excuse me. Sustained.

You can try to lay a different foundation if you want, or you can move on to something else.

MS. FARRELL: No further questions, Your Honor.

THE COURT: Is there any recross examination, Mr. Robotti?

MR. ROBOTTI: Yes, Your Honor. Briefly.

RECROSS EXAMINATION

BY MR. ROBOTTI:

Q Ms. Keves, on redirect examination you were asked about Defense Exhibit 9-Y. Do you still have that in front of you?

A Yes.

Q And that is the email that you sent to Angela Richardson; is that correct?

A It's the Women's Intensive intake form.

Q Which was an email from you to Angela Richardson at OneTaste, right?

A Correct.

Q And on cross-examination I asked you if that refreshed your recollection that at the time, you said that Rachel Cherwitz was a powerful example of a woman who loves fiercely and who chooses truth over comfort or pleasing others.

Do you remember that?

A Yes.

Q I then asked you: And that's what you believed at the time? And your answer was yes.

Do you remember giving that testimony today?

A Yes.
Q And do you remember changing your answer to something completely different when Ms. Farrell asked you the same question?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Did you change your answer when Ms. Farrell asked you the question?
A There were two different questions. I mean, at the time I did believe that. Now, why did I believe that --
Q Ma'am, at the time, you did believe what you wrote about Ms. Cherwitz, correct?
A I wrote it.
Q And that's what you testified earlier today when I asked you that same question, right?
A Yes.
Q And you didn't complain about Ms. Cherwitz in this email, correct?
A Correct.
Q You didn't say, I don't want to work at OneTaste, right?
A Correct.
Q You didn't say I don't want to work for Ms. Cherwitz, right?
MS. FARRELL: Objection. Outside the scope.

THE COURT: Overruled.
A Right.
Q Okay. Now, Ms. Farrell also asked you about Defense Exhibit 9-BL. Do you still have that in front of you?
A Yes.
Q And this is the text exchange you testified to earlier about wanting to open up your OM practice with Rami, correct?
A I did not want to open it up. But yes, this is the text exchange.
Q Well, Ms. Farrell asked you if at the time, you were super resistant to opening it at first; is that correct?
A Yes.
Q Did you also --
Does this refresh your recollection that you also said during that text exchange: I'm feeling much better about it now, meaning opening up your OM practice?
A I said I was super resistant to opening at first, but I'm feeling much better about it now.
Q And Ms. Farrell didn't ask you about that part, right?
MS. FARRELL: I believe I tried to admit it.
A Right.
THE COURT: We're going to stop in a couple minutes, Mr. Robotti. I'm just telling you that for your planning purposes.

MR. ROBOTTI: I'm almost done, Your Honor.
Q Now, you were asked about whether there was pressure about not doing outside activities.
Do you recall that?
A Yes.
Q You did a lot of outside activities while you were at OneTaste, right?
A Some.
Q Including with Rami, right?
A Yes.
Q You traveled to Spain with him, correct?
A Yes.
Q You went to the Hamptons with him to visit your family?
A Yes.
Q You took a helicopter ride, right?
A Yes.
Q Those are all outside activities that you didn't do with OneTaste, correct?
A Correct.
Q And on August 7, 2017, you were at OneTaste at that time, correct?
A August 2017?
Q Correct.
A Yes.
Q And do you remember what you did at that day?

A No.

MS. FARRELL: Objection. Outside the scope.

THE COURT: Overruled.

Q Does it refresh your recollection if I showed you a text exchange?

A Yes.

THE COURT: What are you showing her?

MR. ROBOTTI: This is Defense Exhibit 9-CQ.

THE COURT: Okay. That has to be blown up. She's looking at a hard copy. I need it blown up here, though. It's way too small.

Q Does that refresh your recollection?

A Yes.

Q And what did you do that day?

A Watched a movie --

MS. FARRELL: Objection, Your Honor.

THE COURT: Sorry. What's the basis?

MS. FARRELL: I think she's just reading from the document.

Q Putting the document aside, what did you do that day?

A Watched a movie and ate food and --

Q And had sex and took a nap?

A Had sex and took a nap, yes.

MS. FARRELL: Objection.

THE COURT: Yes, sustained.

Q Bottom line, ma'am, you were able to leave OneTaste at any time, correct?
A Yes.
MR. ROBOTTI: No further questions.
THE COURT: I'm going to end unless, Ms. Bonjean, you have a couple of minutes only.
MS. BONJEAN: Yes. Maybe one question.
THE COURT: Okay. Then go ahead.
RECROSS EXAMINATION
BY MS. BONJEAN:
Q Ms. Keves, Defense Exhibit 9-Y which we looked at, which was part of that intake for the Women's Intensive, do you remember looking at that?
A Yes.
Q And those questions that were asked of you about three women you have an aversion to and why and three women you respect and admire and why, you could answer that question any way you wanted to, right?
A Yes.
Q Okay. And no one --
And you answered that on your own computer by yourself, right?
A Yes.
Q Okay. And --
A At the prompting of, you know, this assignment, yes.

Q Yeah. There was -- you were taking a course, right?
A Yes.
Q There are sometimes assignments with prompts, correct?
A Yes.
Q That is sort of the nature of courses, correct?
A Yes.
Q Okay. And you answered the question as you wanted to in the moment, right?
A Yes.

MS. BONJEAN: I have nothing further.

THE COURT: The witness may step down.

(Witness is excused.)

THE COURT: Okay. It's 3:01. I think that was pretty close to on target.

Thank you all for being so attentive, as always. I wish that I could say that I could predict excellent weather for all of us for the long weekend. I don't know that I can, but I wish you all an excellent weekend. I hope you have a good time with family, friends, loved ones, or maybe since you've been sitting together with 16 other folks, just all alone if that's what you prefer for the long weekend.

But let me just remind you before we break until Tuesday of what I have reminded you many times before, but we are going into a long break now. Over this break, don't

discuss the case with anyone, including with your fellow jurors. If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino. Don't read, listen to, or watch any news or other media reports of the trial. Don't conduct any independent research about the case, about the matters in the case, or the individuals involved in the case. Don't talk to the parties, the attorneys, the witnesses in the case about anything. And keep an open mind.

And again, I wish you all a very relaxing few days. For Tuesday, same time, 9:15 in the jury room so we can start up at 9:30 promptly.

Thank you. Have a great weekend.

(Jury exits.)

(In open court; jury not present.)

THE COURT: Okay. Everyone can be seated.

So I don't think we should deal with the next witness now in light of timing.

MS. BENSING: Your Honor, may I just say one thing on that?

THE COURT: Yes.

MS. BENSING: I understand that the witness's attorney is here and may have a conflict first thing on Tuesday morning. I'm wondering if we can do that portion where the witness invokes outside the presence of the jury

briefly now, and then we can just start up with his testimony on Monday morning.

THE COURT: I would prefer not to --

MS. BENSING: Tuesday.

THE COURT: But is his attorney completely unavailable?

MR. SPEKTOR: I can make myself available, Your Honor.

THE COURT: I think given the long break, I think we should do that Tuesday morning.

MS. BENSING: Sure.

THE COURT: We can do that at 9:15 so that we can be ready to -- that is the next witness, right?

MS. BENSING: Yes.

THE COURT: All right. So that we can be ready to go with the jury at 9:30, assuming it won't take longer than that. And I assume that his attorney has already consulted with him, but of course can be in the courtroom if there is a need for additional consultation.

MS. BENSING: Yes. Thank you.

THE COURT: And I appreciate the attorney's willingness to be available on Tuesday, as well.

Okay. There are a couple other issues I want to take up with the parties, including the one they mentioned the other day about jury instructions. So we can do that

now. If you feel like you need a couple of minutes break, we can do that too.

MS. BENSING: I'm okay, Your Honor.

THE COURT: Ms. Cohen? Mr. Robotti? Ms. Bonjean?

MS. COHEN: Could we take a quick break, Your Honor?

THE COURT: Okay. So 3:15. Ten minutes.

MS. COHEN: Thank you.

(Court is in recess.)

(Continued on the following page.)

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Okay. We are all back.

I will hear from the parties if there is anything on the jury instructions along the lines of what I mentioned yesterday. Obviously, this is not the charge conference. There will be a full charge conference after you have had -- you will have a draft at that point to work with.

So I just want to hear if anything really material has changed in your positions, your views, your requests.

So I can start with whoever has something they want to raise.

MS. BENSING: I'm happy to start, Your Honor --

THE COURT: Go ahead.

MS. BENSING: -- just because there were a few things that I think we can limit, which I think would be helpful for the Court.

THE COURT: Okay.

MS. BENSING: So I think at this point --

THE COURT: Sorry. Ms. Bonjean is having trouble hearing you, I think. Just speak up.

MS. BENSING: Ms. Bonjean is always telling me to speak up.

MS. BONJEAN: I'm losing my hearing.

MS. BENSING: And I'm laughing, for the record.

So, I just wanted to -- there's a few things that I think we can limit.

Assuming the evidence continues to come in the way that it has, the Government does not see a need for the jury to be charged on the abuse or threatened abuse of law or legal process. I think that was one that we had flagged initially as perhaps not being necessary, but we wanted to wait until the close of the evidence in the case.

So that is one that I think we can take out of the running, from the Court's perspective.

THE COURT: And does the defense disagree on that?

MS. COHEN: Yes.

MS. BONJEAN: No.

THE COURT: One yes, one no.

MS. BONJEAN: Okay. I'm sorry. Maybe I misunderstood.

Yes, we would agree.

MS. COHEN: We agree.

MS. BONJEAN: We objected, I think to that --

THE COURT: Yes. Okay.

So assuming nothing changes in terms of the testimony, there is no request for that sort of prong to be instructed on? Okay.

MS. BENSING: Correct.

And then I think we had requested -- the Government request No. 9, uncalled witness equally available to both sides, if applicable.

I don't think that there have been arguments by the defense with respect to that. And so, again, at this point, I don't think the Government sees a need for that charge to be given. So I just wanted to flag that for the Court.

THE COURT: And do the defendants agree with that, obviously, based on so far what's happened?

MS. COHEN: Can we think about that?

THE COURT: Of course.

Ms. Bonjean, do you want to think about it, too?

MS. BONJEAN: Yes, I would like to give a thought.

THE COURT: That's fine. That's fine.

Okay. What's next?

MS. BENSING: We had requested in Government request No. 12, uncharged acts considered for a limited purpose, if applicable.

From the Government's perspective, the evidence that has come in is -- is direct evidence of the conspiracy, and so that is not necessary. I don't know if the defense agrees with that, but I think from the Government's perspective, everything has been direct evidence.

THE COURT: Does anyone want to be heard on that? I mean, again, we're still not at the end of trial, so something

could change, but --

MS. BONJEAN: I think there are a couple of acts that I would put in the category of uncharged acts, rather than part of the conspiracy.

THE COURT: Do you know what they are now or do you want to think about it?

MS. BONJEAN: Well, for one, I don't know if it's been really completed yet, but this business that you've heard about -- that Ms. Daedone, Beverly Daedone worked for OneTaste, which is Ms. Daedone's mother.

I suspect at some point, there is going to be an effort to show that she was getting paid for not working there or something.

THE COURT: I think that's in one of the filings, isn't it?

MS. BENSING: Yes, Your Honor. And from the Government's perspective, that is evidence of the benefit to the defendant, which again, is one of the elements that the Government would need to prove under 1589(b), as in "boy."

MS. BONJEAN: Yeah, I think I have -- I can voice the objection now.

I think that's a stretch. It may be -- I think it's more in the vein of if the allegation is there is some type of, you know, sort of a dishonesty or fraudulent type of activity, I don't see how Ms. -- and I don't even know --

again, I'm not conceding that there was anything improper about that because I've not -- all I've heard is that people didn't know she worked there.

THE COURT: Right.

MS. BONJEAN: I don't know what Kandell will say.

But regardless, that's let's just game it out from the perspective of the Government, which is that she was getting payments that she did not work for and then the Government's theory is that somehow the labor -- or the service that was obtained through threats of harm or serious harm was a benefit to the mother who was getting paid, I guess.

I think that's a little far removed to provide that as a basis for the conspiracy or evidence of the conspiracy. I think that is more in the vein of a bad act or an uncharged bad act.

THE COURT: Okay. But so far, you're right. It's not completed what the Government intends to do or elicit on that.

I can hear the Government out, but we can also have a more thorough discussion about this once more testimony comes in.

MS. BENSING: Yeah. I do expect the witness to testify about this on Tuesday.

So to the extent that it also goes to knowledge and

intent, then perhaps this charge would be applicable. Again, the Government sees it as direct evidence of financial gain, but we can obviously see how the testimony comes out, Your Honor, but I do anticipate the witness will testify about that.

THE COURT: All right. Is there anything else that either Ms. Cohen or Mr. Robotti or Ms. Bonjean thinks would fall under an uncharged acts category?

Because nobody, of course, has asked for a limiting instruction when anything has come in, so. But maybe you're anticipating some other evidence coming in. I don't know. Again, you don't have to be pinned down now. I just want to start thinking about some of these issues.

MS. COHEN: Okay. We will certainly think of that and let you know.

THE COURT: Anything else?

MS. BENSING: Well, the Government -- I mean, not on that one.

THE COURT: Okay. Yes.

MS. BENSING: On my list.

THE COURT: Yes.

MS. BENSING: So the Government also objected at the time, but maintains its objections to a number of the defense requests, which were request numbers 15 through 19.

I guess this is not the charge conference, so like

to the extent there is still a dispute between the parties, it sounds like the Court doesn't want to take that up now.

THE COURT: No. I just want to hear whether there is any changing of positions, views, anything you think has become more crystallized for you based on the testimony to date because I'm going to be spending a lot of time with these jury instructions this weekend, so.

MS. BENSING. Understood.

THE COURT: So I'm doing my homework. I'm giving you the opportunity to weigh in now before you see a draft.

MS. BENSING: Yes.

So those were the things from the initial joint request that I wanted to flag for the Court from the Government's perspective.

There is -- I think that we had initially requested the Court's usually charge as to dates approximate. I think the Government would like to propose a charge to the Court on that.

THE COURT: In light of the statutory framework or what's the change?

MS. BENSING: No, because I think we included that in our joint request-to-charge --

THE COURT: You did.

MS. BENSING: -- With respect to the 2006 to 2009 time period.

THE COURT: You did.

MS. BENSING: I think we had requested initially that the Court instruct the jury with respect to its usual instruction as to dates approximate, that the indictment -- the dates in the indictment are approximate and may not be exact. I think we just want to propose a specific formulation to the Court, which we can do.

I think there are also two defense requests, which they sent us over this morning. One is with respect to some kind of First Amendment charge. So I think the parties are looking at that and are going to try to propose something to the Court.

And then the defense had some additional language, and I just got it this morning, so I can't remember what the additional language was, in terms of the First Amendment or the other part.

MS. COHEN: Yes. And we will work on it with the Government. It was just an addition to the request that we had already asked about adverse, but legitimate --

THE COURT: Yes. Yes. I wanted to ask you about that as well.

But are you still talking to each other about that?

MS. BENSING: I mean, we oppose that, and we continue to oppose that, so I don't think we've reached agreement.

They have some additional language that I think they want the Court to look at. We were going to take a look at it. My sense is that we're going to oppose it, but those, from the Government's perspective, are the three outstanding things for the Court.

THE COURT: You said more than three things, so sorry. Tell me the three.

MS. BENSING: The dates approximate.

THE COURT: Yes.

MS. BENSING: A First Amendment-type charge.

THE COURT: Uh-hum.

MS. BENSING: And then this additional language from the defense as to the adverse but legitimate consequences.

MS. BONJEAN: Which is also rooted in the First Amendment. I think they're both kind of First Amendment-type issues.

THE COURT: Is there something about the trial evidence that's causing you to add language or is it just you've thought about it more on the adverse but the legitimate --

MS. BONJEAN: No, I think we had that initially --

THE COURT: Okay.

MS. BONJEAN: -- because we anticipated it. I think we maybe tweaked the language a little bit.

THE COURT: Okay.

MS. BONJEAN: But that's about it.

Am I right?

MS. COHEN: Yes, that's right.

THE COURT: And what testimony or evidence are you mainly thinking of when you're thinking of that charge?

MS. BONJEAN: The shunning testimony.

THE COURT: Okay.

MS. COHEN: And that was the additional language we added to what we are proposing, but we are talking through with the Government on that.

THE COURT: Okay. So tell me a little bit more.

MS. BONJEAN: So the United States Supreme Court has essentially said that you're -- you have a First Amendment right to assemble in the way you want to assemble and if someone -- you think about it in terms of churches, but it's not just -- in terms of searches -- I think the seminal case involves the Salvation Army. We've thought about that.

And essentially, when people are not living up to expectations of the group, that you have a constitutionally-protected right to basically kick them out of the group, shun them from the group. I'm using the word shunning. And that is protected under the First Amendment.

So again, that's a little different than the more generalized First Amendment instruction, I think, we're looking at, but that was the instruction that I think we

proposed and the language that we proposed. And that's the concept there. I think we cited the case law in our original --

THE COURT: Yes. No, no. I want to make sure there's nothing additional that's dramatically different from what you gave me before.

Okay. Is that the end of your list, Ms. Bensing?

MS. BENSING: That's the end of my list.

THE COURT: Okay.

MS. BENSING: So those are the things that we thought we could remove --

THE COURT: Yes.

MS. BENSING: -- and then there's the three things that I think we're going to maybe proposed to the Court.

THE COURT: Okay. So let me hear from the defense if there's anything additional to what Ms. Bensing has already mentioned.

MS. COHEN: I mean, yeah. Sorry. On the serious harm, we submitted papers, our supplemental --

THE COURT: Yes. I'm considering, obviously, the sort of long submission then, there was the supplement, but both of those were joined.

But I'm really wondering if there is anything different and really, on some of the statutory language, if the parties have different thoughts than they did before.

MS. COHEN: No. I think in terms of -- it's really grossly around the First Amendment. I think we were considering it could change that we haven't proposed yet, but we have a good faith defense surrounding these First Amendment issues.

THE COURT: Sorry. Good faith being separate from your First Amendment instruction or -- because there is obviously different good faith instructions depending on particular statutes, and I'm not sure what you're thinking about.

MS. COHEN: Yeah, I mean, I think if -- we would say if the jury can find as if someone acted in good faith, that the charge -- that that goes to the intent to act in a certain way the law forbids. And so we do have the cases. I just haven't briefed this yet.

THE COURT: Okay.

MS. COHEN: It was something we started thinking about today, but we just want to think about it, and as we were sitting here, it came to mind.

THE COURT: That's fine.

MS. COHEN: I'm just not prepared to discuss it.

THE COURT: That's fine.

MS. COHEN: I just wanted to raise that.

THE COURT: Any comment on that?

MS. BENSING: We would oppose that.

THE COURT: Yes. I'm not sure that that would be appropriate, but I haven't seen it, and I will consider anything you want to give me.

MS. BENSING: Okay. Great.

MS. BONJEAN: Your Honor, I do think a couple issues that were raised by the original joint --

THE COURT: Yes?

MS. BONJEAN: There were some legal arguments in there, objections to the statute or the instructions regarding the forced labor statute itself, and it's been a while since we were working on those.

But I do want to flag for the Court that we lodged objections about the inconsistencies in the mens rea from the forced labor statute under A and B, and that's not -- I don't know if that's an instruction issue as much as our, you know, an issue with the statute itself.

I can tell you from looking at the research, it's not really been addressed, but I want to make sure that I'm preserving objections with those issues and I don't really know exactly what I'm asking the Court to do at this moment.

THE COURT: Okay. I mean, because you will be proposing particular language. You have already.

MS. BONJEAN: Yeah.

THE COURT: And I will be giving you a draft and then you'll be telling me if you have any objections or want

to add any language for my consideration.

So beyond that, I'm not really sure what you are asking me or if you are asking me anything.

MS. BONJEAN: I'm really not.

THE COURT: Okay.

MS. BONJEAN: I think when we get a proposed charge from the Court, there may be objections that we continue to raise, which, again, may be objections that appeared in the original joint proposed jury charge, but --

THE COURT: I think it will be easier once we have a draft for everybody to be focusing on.

I think there were a few places where one party or another thought maybe the charge was giving too much of another party's theory, maybe.

You know, I'm intending to instruct them on the law. The parties will be making their arguments in summation, and that's not the function of the charge.

MS. BONJEAN: Yes. I think we made an objection on a number of times where we believe that the Government was -- their charge included language such as you need not prove this, you need not prove -- they need not -- the Government need not prove this, the Government need not prove that. There was like a lot of examples.

And I understand that that is sometimes appropriate, but I think our objections where -- it was more about what

they didn't have to prove than what they did.

And, again, I think I articulated that in the submission, so I don't know that I need to go back over that again.

THE COURT: I think that's right. Okay.

Did you want to be heard on that?

MS. BENSING: No. I do think we had very thorough briefing on these issues for the Court. So unless the Court has any questions -- I think the one place where we thought we could narrow was with the abuse of legal process.

THE COURT: Okay. So how quickly do you think -- I guess something like the First Amendment charge, which was not proposed before, if you have one, it's something I would want to see before.

MS. COHEN: Yes.

THE COURT: Oh, you have one already now?

MS. COHEN: No. Sorry. I was going to say that we proposed something that the Government is disagreeing with, that we would like to work it out, so we can come to you with a joint proposal that would be easier for you than --

MS. BONJEAN: We provided a draft to them.

THE COURT: Okay. I don't want a lot of submissions this weekend, frankly, but I do want to be working on this particular project, and I have been working on it. So I do want anything on this sooner rather than later because I don't

want to -- I'm not going to give you a draft that doesn't have things that you think are important for me to be considering at least.

MS. COHEN: Right.

THE COURT: So we're not going to do this in more waves. We're in the middle of trial now.

MS. COHEN: Yes. Well, that's why we were hoping to work out the language here --

THE COURT: Okay.

MS. COHEN: So at least you can say that both parties agree on it, rather than giving you two separate versions.

THE COURT: Okay.

THE COHEN: That's what we're hoping, so --

THE COURT: If you don't agree, you don't agree, that's fine. I will take what you have. How quickly can you do that?

MS. BENSING: So we received a draft just this morning --

THE COURT: Okay.

MS. BENSING: -- from the defense.

THE COURT: Okay.

MS. BENSING: So I just haven't had a chance to dig into it, but I will do that. And so perhaps we can get the Court something on Sunday if that works and then the Court --

whatever the Court prefers.

THE COURT: I know you all have a lot else to do for this trial, too, and, frankly, I have a lot else to do, too.

But sooner rather than later. If you can get it to me by tomorrow at some point?

MS. BENSING: Okay.

THE COURT: If that's possible? But if you think it's useful to spend more time talking to each other and in the end, that will eliminate issues, then you can get it to me a little bit later than tomorrow.

MS. BENSING: Okay. We'll do our best, Your Honor.

THE COURT: That's fine. I understand. I know everybody's working hard.

MS. COHEN: And we'll also -- this good faith, we will get that to you by tomorrow, I believe.

THE COURT: Okay.

MS. COHEN: But we're going to think that over.

THE COURT: Okay. But you'll get something to the Government on that as well?

MS. COHEN: Yes.

THE COURT: Okay. Let me deal with a couple of other issues. I really do want to let you get out of here, though.

I think earlier in the week Ms. Farrell had anticipated that maybe the Government wanted to put in some of

this financial-related evidence as early as today. I figured that was not going to be the case since we lost the day with the juror. But I do want to turn back to that.

So let me turn to the Government's motion to admit certain financial evidence. That motion is filed at ECF No. 382.

The proffered evidence in general appears to be highly relevant to the crime charged, and the probative value of the proffered evidence does not appear to be substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury or any of the other dangers set forth in Rule 403.

I had previewed on November 15, 2024, that I did not anticipate Rule 403 counseling against admission based on what had been presented to the Court up to that time now that I have significant additional detail, it is clear Rule 403 does not counsel against admission.

I will not preclude the proffered evidence as a general matter, but, of course, the Government must comply with the Federal Rules of Evidence when offering specific testimony or other evidence.

I think I'm still waiting on a submission on the experts; is that right?

MS. BENSING: Yes, Your Honor.

So the Government does, as I previewed for the Court

yesterday, has its portions prepared. We were waiting to get something from the defense.

I think we have spoken to the defense. And if it works for the Court, we will go ahead and file our portion now. And the defense, I understand, is still working on what their proffered expert might say.

And they may be two unrelated issues, so I think if it could benefit the Court to see the Government's proffer as to its expert now, we can provide that to the Court to review, since it's prepared.

THE COURT: What do you mean by unrelated issues?

MS. BENSING: Because I think what they intend to provide to the Court -- and correct me if I am wrong -- obviously, would be their own proffer of their -- of what their own expert might say.

THE COURT: Right.

MS. BENSING: Which I think is a little bit different.

I think the Government -- from the Government's perspective, we believe that the expert's testimony is relevant and probative, and I think the Court had asked us to provide more of an outline of what exactly the expert would say --

THE COURT: Right.

MS. BENSING: -- and whether or not we can like

limit that in some way from what we had actually proposed, and that's what we've done.

THE COURT: Right.

MS. BENSING: So that's what we're prepared to provide to this Court immediately.

MS. BONJEAN: And we are going to -- our goal is to provide a written objection. We still object to the admission of expert testimony.

And I guess in the alternative, if the Court permits it, to -- I think the Court would want to hear what our expert would be inclined to testify to or is prepared to testify to and what we would be proffering him for.

THE COURT: Right. That's exactly what I wanted.

MS. BONJEAN: So we did get the -- I think they sent over the written submission.

Last night, I was working on the materials for Kandell.

THE COURT: Yes, and that was a very helpful submission.

MS. BONJEAN: So I think you have our respective positions on that.

And so I think what Ms. Bensing is suggesting -- and I can go either way, either they file their position on the experts and we file a separate submission in response or if you want us to wait and put it together in a joint submission,

I can do that, but it's not happening tonight. It can happen tomorrow.

THE COURT: Yes. That actually would be helpful if I can get the joint submission tomorrow.

MS. BONJEAN: Okay. I can do that.

(Continued on next page.)

(In open court; 3:46 p.m.)

THE COURT: That's fine.

Let me take up part of what's in the submission that Ms. Bonjean filed, whoever I think it was, Ms. Bonjean who filed last night. I know it's all joint.

MS. BONJEAN: Yes.

THE COURT: What was a response to the Government's submission.

And what I'm talking abut now is the Government's submission at 387 and the defense at 388.

I don't think we need to get into everything right now because some of this does not relate to Mr. Kandell and some of it, frankly, I don't think I could possibly rule on because it seems to be lacking context at the moment. So I would need to know more about what exactly the foundation would be for some of this.

But let me just talk about the Kandell testimony, about the New York Times article. And I want to understand more specifically, and I know that you said that, I mean you don't know exactly what Mr. Kandell will say, but I need to understand more specifically what you think the testimony would be.

MS. BENSING: Yes. So one thing that I wanted to make clear is that we don't intend to admit the article.

THE COURT: I know, yes.

MS. BENSING: Okay. So what I anticipate the testimony would look like is I anticipate that he will testify that One Taste established an ethics committee or ethics standards approximately around the time that the New York Times article was coming out in an effort to shore up its standards in light of what might be getting more widespread attention following -- that that prompted them to implement some of these ethics standards that I think the defense attorneys have been asking some of our witnesses about on cross-examination.

And so, that's kind of the first piece of development in the times article. That obviously doesn't get in the content of the articles whatsoever, just the effect of it.

But with respect to that, I think we would also anticipate eliciting that in the article itself, which Mr. Kandell discussed with the defendant Daedone, that the article itself has allegations that One Taste manipulated people; that One Taste had a cult-like atmosphere. And then there are statements, obviously, in the article by Daedone that One Taste had a high potential to be a cult and that she was treated as a guru.

And so, I think that's are --

THE COURT: Let me just stop you there for a moment because you're not going to be offering the article.

So you're going to be offering testimony from Mr. Kandell, and is it the expectation that he would say that he spoke with Ms. Daedone about specific statements in the article?

MS. BENSING: What I anticipate he will say is that they discussed the article, like, so we have an e-mail that shows the article being sent to her among other One Taste executives I think by Reese Jones, that doesn't matter. But I anticipate that he would say that they discussed it. She thought that some things in it were misrepresentations. He thought that it was a fair article. And the point of all of this is just to demonstrate notice.

THE COURT: Okay. Let me stop you there. Notice of what?

MS. BENSING: Notice that the defendant -- that the defendant was on notice that there were these allegations about the way that she was running One Taste including her own statements about the way that she was running One Taste that I think go to the heart of this psychological --

THE COURT: What is her own statement about the way she was running One Taste that you are talking about?

MS. BENSING: That it had a high potential to be a cult and that people treated her like a guru. I think that shows that she was on notice of her position of power over this group-like atmosphere.

THE COURT: Isn't that controverted? That she was at the top of this organization.

MS. BONJEAN: Not even a little bit. Every single witness we've heard from said she is the leader, the founder, the visionary. Every word possible.

MS. BENSING: Your Honor, I think there has been a defense theory in this case where they are asking witness after witness, well, didn't you say -- did you ever tell Nicole this? Did you ever tell Rachel this? Did you ever tell them that you felt manipulated? Did you ever tell them you had concerns. This is a conspiracy case.

So, in 2009, the defendant, at least Daedone, and at least Daedone is on notice that people felt manipulated. People felt that this was a coercive environment. And so --

THE COURT: You're saying "manipulative" and then you're saying "coercive."

Where is the coercive part?

MS. BENSING: Well, so there on Page 3.

THE COURT: You're talking about the article?

MS. BENSING: Of the article. What I think is Page 3 of the exhibit.

THE COURT: Yes.

MS. BENSING: There's a reference that she manipulated individuals. At least one individual indicated

that, quote, you stop trusting yourself and start trusting Nicole. That they're losing their identity which is, I think, very on par with what --

THE COURT: Let me go back to the conversation because, again, you're not seeking to put in the article.

Is it going to be that granular that you expect Mr. Kandell will say he had a conversation about these specific statements in the article?

MS. BENSING: No. I mean, I don't know but I don't think so. That's not my present understanding.

THE COURT: Okay.

MS. BENSING: My present understanding is that he would say that the article came out, there was discussions between him Nicole Daedone about the article. That she felt that some parts of it was a misrepresentation and that he felt that it was a fair-and-balanced article.

THE COURT: How is that going to be at all helpful to a jury in deciding anything if they don't have the article?

MS. BENSING: Because I would ask him, did the article report X?

THE COURT: That's what I'm asking you.

MS. BENSING: Yes.

THE COURT: It's what I'm asking.

Is the conversation going to be oh, no, I think

maybe you and I are talking past each other.

You're just going to ask him -- he's going to give general testimony about a conversation with Ms. Daedone about the article where she said she thought some of it was not accurate and he said he thought the whole thing was fair and balanced, right? I'm paraphrasing what you just said.

MS. BENSING: Something along those lines. And I don't know exactly what he's going to say.

THE COURT: But then you -- it does sound like you then are going to go through what the article said.

MS. BENSING: Well, I just want to draw out the points of what the article said with respect to manipulation, her own statements about having a cult-like atmosphere because the fact that they then talked about it shows that she was on notice to of those things. So, again, it's not more the truth of any of those things but thought that she was on --

THE COURT: I understand your argument is not for the truth of it for notice. What I'm focusing on is notice of what?

MS. BONJEAN: Your Honor, if I could interject on one thing.

THE COURT: Yes.

MS. BONJEAN: That's terms, and this is the problem of the case but I don't get on my soap box there.

But the bottom line is words like "manipulation" and "cult-like" are we don't know how those words were being used; we don't know how they were being interpreted. They are so general in nature.

THE COURT: Right. When a witness is on the stand of course you can ask but now you're talking about the article.

MS. BONJEAN: I'm talking about we don't know at the time when, in 2009, whatever that anonymous person communicated to that reporter that went into a news article that got funneled down to Kandell and Ms. Daedone, we don't know what was intended by the person who said, "the detractors," who said that she was the a manipulator. And we don't know how it was perceived by them.

And that some people called it a cult-like organization which, by the way, there's been testimony to that effect, I don't know there's any great surprises there. But because of the general nature, it doesn't necessarily mean that they're on notice of what they specifically charged here or what the allegations are. It's just too tenuous.

I could see a different type of allegation but I don't think those are the allegations. And, frankly, it's contrary to what the Government -- the position the Government took much earlier which is we're not saying

there's anything wrong with a cult, there's nothing inherently wrong with a cult. Cult can be pernicious, cults can be okay, cults can be somewhere in between. And to suggest this suggests automatically mind control and coercive tactics and that the notice they're saying that a cult-like organization reference would put her and that's just not the case. There are plenty of lovely cults out there, apparently. And we could talk about what's a cult and what's not.

I won't go into a politics but the point is, is that is that there are that word is bandied about in a very loose way. And the fact that it appears in an article how would that put her on notice of really anything? I think, you know, people say CrossFit is a cult because of the whole like-minded group thinking. But it doesn't necessarily mean it puts something on notice that bad things are happen.

MS. BENSING: Your Honor, can I just respond?

THE COURT: Yes.

MS. BENSING: Because I don't think that words like manipulation or the quote, having cult-like powers over her followers, manipulating people, people indicating that you stopped trusting yourself and start trusting Nicole. Nicole's statements that there was a high potential for this to be a cult and that everybody treating me like a guru are at all vague or at all broad. I think they pertain directly

to the type of manipulation, psychological harm that the Court has heard evidence of in this case.

And so, I understand that there may be legitimate points for cross-examination by Ms. Bonjean but I don't think that that should preclude admission of Mr. Kandell who, as the Court knows, we consider to be a co-conspirator. His testimony that the company, and he and Nicole in particular, were on notice of these kinds of claims in March of 2009.

THE COURT: Do you anticipate testimony from him that he took actions as an, I don't know, if he was, what his role was at that time, but in response to this article?

MS. BENSING: Well, so, the next kind of point that I want to draw out through him is that the company did start paying reputation.com which is like a --

THE COURT: We need to talk about that as well.

MS. BENSING: Yes. To clear their associations with a cult. And so, I think the company did tart making efforts to try to kind of white wash this history of their association with the word "cult" and some of the allegations in the New York Times article but, no, he's he stayed until 2014.

And so, that's also relevant I think, your Honor, that the people who were leading this company were on notice, or this organization, were on notice of these kinds

of claims and didn't make changes based on it.

MS. BONJEAN: I think we're really wading into First Amendment territory right now. There is nothing inherently illegally about a cult, there just isn't. And there is an assumption based on this argument that if there are people saying that this is a cult that automatically has a negative connotation such that it puts you on notice that you're doing something wrong. That is what the Government is arguing here lest there be any doubt saying something is cult-like or cultish and that One Taste may have understood that the common perception of cults is a negative one, which, ironically, we argued in jury selection, that in our request on jury selection, that exact point and the Government said, no, people -- we're not saying that they're inherently pernicious or anything of that nature. There's no negative association.

But now that's exactly what they're saying. They're saying just the mere use of the word "cult" means that it put Mr. Kandell and Ms. Daedone on notice. And the fact that they wanted to repair their reputation because of the association is some type of admission of guilt.

And I can't keep the Government straight on this because they are really are talking out of both sides of their mouth. Are we cults are always bad or are we saying it depends. If we're saying it depends, then what that

means is just people using the word cult shouldn't put people on notice of anything.

MS. BENSING: Your Honor, I don't think we're saying one thing or another.

We're not saying that. We're not trying to prove that One Taste was a cult. We are just trying to show that they had notice as of 2009 that people were making claims about cult-like powers of their followers. That they were manipulating people. And, by the way, this is like in the same time period that Daedone is sending women to service Reese Jones. And that continues, by the way, through 2012 through 2013.

And so, I think that it is highly relevant that she was aware that there were these claims particularly in light of defense arguments that, you know, X, Y, and Z person didn't tell Nicole at the time X, Y, and Z thing. The company was on notice about the way that it was running its organization with respect to its followers. I mean, I think the Court understands our argument.

THE COURT: I do.

MS. COHEN: Your Honor, we've heard witness after witness after witness testify and their experiences in length. This, whatever is in this article, whatever this is about, has nothing to do with these witnesses and what has been testified in this courtroom.

And if you think about it from a company standpoint, I mean, I worked for a large financial institution and I heard complaints and issues in the company in dealing with that, it's constant, right? So you're always hearing complaints about and reevaluating it and doing and taking positions at a company. That does not mean that the defendants were on notice of what is coming in in testimony in this courtroom based on this article. So, you know, along with the other reasons.

MS. BONJEAN: I think it is also true that they may have been aware of the perception, the perception of them as a cult is very different than them saying, oh, I know there are legitimate complaints out there about coercive tactics. And I just don't think that these items are sufficient to show that they were on -- they were certainly on notice that they were perceived as a cult. We can all agree on that but the question is, so what does that have to do with this case exactly unless the Government is suggesting that the fact that the company was aware that they were perceived in this way automatically means that they were on notice that these were tactics that were being used. And I think that's where, you know, we have a disagreement on that point.

THE COURT: Yes. I know I hear the Government talking about notice but I keep asking the same question

which is notice of what? I mean, you know, we have a very specific charge here, right? There is one count and the notice, it's not just notice in general of somebody saying something, right?

MS. BENSING: Yes, of course.

Notice as to serious harm, your Honor. And the serious harm here is any harm under the statute including reputational harm, including psychological harm, I don't think financial harm really pertains to this particular New York Times article. And so, it's notice as to the methods of causing serious harm or threats of serious harm in a conspiracy case, your Honor.

And I think, you know, to take Ms. Cohen's example, for example, like in an insider trading case if there were, like, allegations or complaints that the company had an insider trading, that would be relevant to an insider trading conspiracy.

And so, here the issues are, I think, a little more complex because we're talking about a definition of serious harm that I think is in some ways complex. But I think these allegations about, I mean, I just keep going back to the language cult-like powers over her followers, manipulating individuals, stop trusting yourself and start trusting Nicole. Nicole's own statements that there was a high potential for this to be a cult. I mean, these are

things that she was on notice of as of 2009 and I think Ms. Bonjean is saying that it's not in dispute that One Taste was on notice of these things. But I think that is in dispute because I think that the defense had been asking questions of the witnesses suggesting that the defendants had no idea that these claims were being made which is just like a false picture.

(Continued on the next page.)

(Continuing.)

THE COURT: I don't think I've heard any testimony that says that either of the individual defendants didn't know that some people thought of the organization as a cult, right?

MS. BONJEAN: I think -- I think Mr. Hubbard testified, their own witness, that Ms. Daedone leaned into it in some way and said, oh, I'm the leader of a sex cult. Now, he said it was like, you know, in a sort of, you know, provocative way of something of that nature. But again, I don't think it's in dispute that that was something, like, almost from the start that they understood that they were being perceived that way. You know, I don't -- again, I think we just disagree about what that means.

Now, I will say this. Here's where the problem is. And it does come down to the definition of "serious harm," which I think this case is coming down to no matter what, in every sense of the word. The allegation in the article is manipulation, certain methods that were used, right? Allegedly. We don't know what that -- people call their bosses manipulative all the time. People call their mother-in-laws manipulative. People call their children manipulative. It is such a -- it's not like, you know, he tied me up and locked me in a bedroom. That's pretty clear and concrete. Someone was manipulative and you stop

thinking for yourself. I mean, I can't think of any more scenarios.

The point is, I'm not saying that they don't -- they can make their argument that that constituted serious harm. The problem is, when we're looking at an article with multiple levels of hearsay, what was intended by that person and how it was perceived by the people who read that article is a different matter. We don't know that it was intended the way that we're looking at it in this courtroom 20 years later or 15 years later, or that Ms. Daedone or Mr. Kandell read that in the way that we understand it today in this courtroom. And that's why it's not admissible under notice, because it's manipulation. They're seeing it through their lens at this point, with all this benefit of the hindsight, which is also a theme. But that doesn't mean in the moment, it put them on notice of what we are here battling about today. And that's why I think it's improper.

MS. COHEN: And I'll just add in terms of the example of insider trading, that is very specific. I mean, if you have evidence that a company was aware that there was insider trading and didn't do anything, that we understand. But that's the exact point here, that the incidence of alleged force labor in this case that we've heard in the courtroom, that is what -- the question of whether they were on notice. And the question that the defense has been

asking, of course, is about what was -- what the defendants' knowledge was, which is obviously a key element of the case, and if we weren't asking those questions, I don't think we would be doing our jobs. And the point is, you know, these witnesses were saying they're forced, and was that conveyed, did the defendants know that what they were doing was actually forcing these people to work.

THE COURT: Okay.

MS. BENSING: Can I just make one more comment, Your Honor?

THE COURT: Go ahead.

MS. BENSING: Which is, I understand what they're saying, but the person who is going to be eliciting that is somebody who the Government is alleged to be a co-conspirator. They can cross him on their understanding at the time, his conversations with Daedone at the time, the company's response to this at the time. He's available to testify. And so --

THE COURT: What you're proffering is that he's going to testify simply that he had a conversation with her about the article, but not about any of the specific comments in it, right?

MS. BENSING: I -- I don't -- I don't fully know, Your Honor. I haven't, like, had a full opportunity to explore comment by comment with him. So I just don't want

to --

THE COURT: Okay. That's fine. I understand the parties' positions.

Let me just address what I think is the final issue that relates to Mr. Kandell, at least in terms of the submission that the Government put in that the defense responded to, which is this -- I think it's a Texas incident? No, maybe it's --

MS. BENSING: Yes.

THE COURT: Is it a Texas incident?

MS. BENSING: Austin. I can give a little more context.

THE COURT: Okay.

MS. BENSING: Because I don't think as much of this is going to come out.

THE COURT: Well, maybe none of it is.

MS. BENSING: So here's what I anticipate he will testify to.

There were some questions by the defense about the closing of the Boulder location with respect to Liana Lifson, who testified. I anticipate that I will ask Mr. Kandell why these kind of outposts closed, like Austin and Boulder, and why people were moved to, for example, the larger cities in New York and San Francisco and I think maybe LA. And I anticipate what he'll say is that there was

an incident in Austin involving some kind of alleged sexual assault, and that precipitated the closure of some of these outposts.

THE COURT: Including Boulder?

MS. BENSING: Including Boulder, yeah. And so it's going to be as limited as that. It's essentially to explain why these were closed, and I think the suggestion from the defense was that it was closed because of Liana Lifson's poor sales. That's just --

THE COURT: Okay. But maybe there's a way you can sanitize the reason.

MS. BENSING: Yeah, I think that's fine. I think I could instruct him on Monday to not get into the nature of the allegation. It's just to demonstrate what happened with respect to these other cities. At least that's my understanding of what he'll testify to.

THE COURT: Let me ask the defendants about their position on that.

If there is some sanitizing of what exactly happened, but that there was something that happened with, you know, an employee that is -- I don't know if you want to say who it is or not who it is, but making clear it's not one of the two defendants, that caused the company to decide to close certain places. Is that --

MS. BONJEAN: So, first of all --

THE COURT: If that's what's to be believed.

MS. BONJEAN: -- I didn't see that in the 302. Maybe I missed it. So maybe this is something --

THE COURT: I have the 302 here?

MS. BONJEAN: I don't know. I don't remember if it's in there.

MS. BENSING: You have a 3500 binder.

THE COURT: Okay. But it's not part of your motion?

MS. BENSING: No, no.

THE COURT: Okay.

MS. BONJEAN: That Mr. Kandell may testify to this, I guess, is news to me. And so that's one thing. So I guess I have to digest that because that's not my understanding. But maybe I'm wrong about that.

But now -- so now I'm a little confused, though, about what is the reason the Government is offering it. Are they offering it to show that it's not true that Boston closed down because Liana Lifson did a lousy job -- that Boulder closed down because Liana Lifson didn't do a great job, or is it because of notice of something. And some random guy going into -- I mean, that could happen at any large company, a random man that goes into another woman's space and grabs her breast, which I think is what the allegation is. What would that possibly -- that would just

say that there's some guy that you've got to kick out of your company.

THE COURT: Right. So it was pitched in the motion as notice, and I have the same question about this. But what I'm hearing now is something different.

MS. BENSING: Yeah, I think it's what we wrote here in number 3 on pages 1 to 2 of our motion: Testimony regarding a complaint posted which subsequently led to the closure of OneTaste, the affiliates, including Austin and Boulder.

THE COURT: Right. But the whole first paragraph of your motion says you're not offering this for the truth, but rather to show that the defendants were put on notice of certain facts. So --

MS. BENSING: Maybe that was inartfully worded. We're not offering the alleged assault for the truth of it.

MS. COHEN: So why are you offering it?

MS. BENSING: We're offering it to show the steps that the company took with respect to Austin and Boulder. It's not for his truth. The point the Government was trying to make is we're not trying to prove whether or not the assault happened or didn't happen.

MS. BONJEAN: I guess it's not following what the relevance is, unless, I don't know, maybe they're trying to say OneTaste did a good job? I'm just not following --

THE COURT: I think what Ms. Bensing just proffered was that she wants to be able to elicit why some of these -- I don't know what you call them, satellite offices, whatever it is -- these city offices were closed.

MS. BENSING: Yes.

THE COURT: The reason why the company closed some of these, including Boulder, where a witness testified she worked and it was closed.

MS. BENSING: And I'm not sure that there should be a huge issue here. I don't think I have an issue with sanitizing it in the way that the Court just proposed. So again, in an abundance of caution --

THE COURT: I tend to agree with the defense on this, that sort of one person with this one activity, I'm not sure what anyone is supposed to do with that.

MS. BENSING: I don't think -- I don't think we have a real disagreement here. We've put it in our motion to let everybody be aware of what we anticipated the testimony might be. I don't think we have a strong objection to removing the nature -- the nature of the alleged incident.

MS. COHEN: The fact that both were closed -- I'm missing why Boulder is connected to Austin.

THE COURT: It sounds like they decided to close multiple locations based on that incident, if what

Ms. Bensing is saying is what's going to be the testimony.

MS. BENSING: He will testify to what he testifies to. I'm trying to give the best proffer that I can about this based on my understanding.

MS. BONJEAN: I would also point out that the incident was posted in 2013, and Austin closed in 2017. So I'm not sure what Mr. Kandell's going to testify to, but I still have questions about, like, this correlation. It sure seems to me that the goal is to put something, you know, pretty prejudicial, that really doesn't make it more or less likely that any of these allegations are true.

THE COURT: Well, they're not going to put in the sexual part.

MS. BENSING: That is literally not the goal, because we're agreeing not to do it.

MS. BONJEAN: Well, if they're not putting in the sexual part, then -- I think they are trying to put in the sexual part.

MS. BENSING: No, we're not. I don't know how else to say it.

MS. BONJEAN: There was just a complaint that came in and it closed down?

MS. BENSING: Your Honor, the testimony is going to be what the testimony is going to be. If Ms. Bonjean wants to cross him on it, obviously she is well within

her --

THE COURT: Well, wait. There has to be some parameters here, though, because I'm making a, at the very least, a 403 determination, but first I have to make a relevance determination.

MS. BENSING: Yes, of course.

And so my understanding is he will talk about the closure of Boulder, which is I think what is relevant here, and my understanding is that it will be tied to this incident that happened in Austin. And so I can instruct him not to get into the nature of the incident in Austin.

MS. COHEN: Oh, I missed that in the letter that it said Austin and Boulder.

MS. BONJEAN: Yeah, this is kind of just new information. I didn't even know the connection between Boulder and Austin and this incident --

MS. BENSING: It's on pages 1 to 2 of the Government's letter that we filed.

MS. BONJEAN: Well, again, there's been no prior notice, and maybe I'm not -- I'm not saying anything, I'm just saying, like, we have not been notified about this proposed testimony. It seems like it would have come up, but --

THE COURT: Okay. Do you have any objection to the Government eliciting such testimony sanitized to not

mention any sexual assault or whatever you want to categorize it as?

I mean, give me a proposal, Ms. Bensing, of what you would want to have the witness be constrained to saying.

MS. BENSING: There was -- why did the Boulder -- why did OneTaste pull out of Boulder? And then I can instruct him to the extent that the answer to that would be pertaining to this incident in Austin, I can instruct the witness not to testify about the nature of the incident.

THE COURT: So what would that look like in practice?

MS. BENSING: So I can instruct him not to talk about the fact that it was a sexual assault.

THE COURT: So what does that leave him?

MS. BENSING: Oh, that there was an incident that happened in Austin that led the company to want to pull -- to pull back from these cities.

THE COURT: I think it almost would have to be --

MS. BENSING: We can --

THE COURT: It would be less mysterious than that, though. The defense might have an issue with it being so mysterious.

I'll hear from them on this.

MS. COHEN: Yeah, I mean, I guess the question is was Boulder -- was Boulder -- did the closing of Boulder

have nothing to do with the financial failings of it. If that's the goal, to contradict Liana, then --

MS. BONJEAN: I mean, I don't --

MS. COHEN: Not contradict, I'm sorry.

THE COURT: I know what I mean.

MS. BONJEAN: Yeah, I guess I'm still a little -- I'm still a little confused about how this is going to play out, particularly since it appears as if Austin closed later, it's so incongruent. Like why would Boulder close because of an incident in Austin and then Austin doesn't close until three years later. It just doesn't make sense to me.

MS. BENSING: Your Honor, she --

MS. COHEN: They don't seem related to us, at least from our understanding.

MS. BENSING: She can ask him these questions.

MS. BONJEAN: I still have the right to --

MS. BENSING: We do not have --

THE COURT: One at a time.

MS. BONJEAN: We have the right to know based on the fact -- let's not forget that this all got teed up because they -- the Government showed us a public posting that they believed they thought was relevant. So that's kind of our starting point. Now, they're saying we're not going to talk about that incident itself. That's fine. But

I guess I'm just -- I do think we have the right to have some contours of what this testimony looks like given the fact that we started from a place where they wanted to elicit testimony about a random sexual assault of some type by some random guy in Austin, and I guess I'm just not following what --

THE COURT: All right.

MS. BONJEAN: We can continue to talk about it.

THE COURT: I don't think that's helpful, because everybody has made really clear they have no idea what Mr. Kandell might say.

MS. BONJEAN: Right.

MS. BENSING: Well --

THE COURT: But I am going to let the Government know that I will not allow you to elicit that there was a sexual assault.

MS. BENSING: Yes, I understand.

THE COURT: Beyond that, I'll have to see what the testimony is as to whether it's relevant and whether you've laid a foundation for it.

MS. BENSING: Yes, understood.

THE COURT: Okay.

Is there anything else relating to Mr. Kandell's testimony that we need to take up? I don't think any of the other items in your filing at 387 deal with Kandell; is that

correct?

MS. BENSING: I believe that's correct.

THE COURT: And who is after Kandell in terms of the lineup?

MS. BENSING: Well, we are nearing the end of the case, but I think we do still have some longer witnesses. So there is another victim witness who we intend to call. We intend to call an individual named Ken Blackman. So those might be the two that come after him. I do anticipate that Mr. Kandell may take some time on Tuesday, and so we may not get past him on Tuesday.

THE COURT: Take some time because of the content or because you think he will be a challenging witness?

MS. BENSING: Because of the content.

THE COURT: I mean, you have a lot to do with him, is that what you're telling me?

MS. BENSING: Yes, yes. The Court has our binder and I flagged --

THE COURT: I know, but the binder sometimes bears no relation to the layout of the exam.

MS. BENSING: No, no. I think, as I flagged for the Court last week, we are intending to introduce a number of documents through him, which the Court has in its binder and which we have put the defense on notice of the exact documents, as well.

THE COURT: Okay.

Is there anything that the defense thinks we need to take up with respect to Mr. Kandell, and then I don't know for the next witness after that, if there's any issue? Otherwise, I'm going to let you all go and take care of some of the things you need to take care of.

MS. BONJEAN: Nothing from Ms. Daedone.

MS. COHEN: Nothing from Ms. Cherwitz.

MS. FARRELL: Your Honor, given that we're talking about this issue, you know, one of the categories is with a witness, one of the victim witnesses, and given that we're all here talking about the issue, it may just make sense to briefly discuss her testimony.

THE COURT: Okay. Go ahead.

MS. FARRELL: Because it's come up.

So this witness lived in the house with Ayries Blanck and was a percipient witness to things that happened between Ms. Cherwitz and Ms. Blanck. I have absolutely no intention to elicit from the witness things that Ayries Blanck said for their truth or even probably at all, but she is going to testify about what she saw happen with Ayries Blanck and Ms. Cherwitz and other members of the house. We put that in our motion.

But I know that is a topic that is of great concern to the defense, and so happy to discuss it now,

discuss it later.

THE COURT: Tell me a little bit more about what the nature of the testimony would be in terms of what was seen.

MS. FARRELL: Sure.

So she saw, for example, witnessed conversations between Ms. Cherwitz and other co-conspirators telling Ayries Blanck to and helping her set up an online -- I can't remember if it's Tinder or Match.com, one of those online accounts, where she was instructed to have sex with 30 different men in 30 different days. Everyone else was told to do something similar in support of Ayries. They all stripped naked, got in the bathtub, took photos -- or took glamour shots in the tub with rose petals and milky water, and then created -- again, I'm not sure if it was Tinder, I can't remember, but a profile on something like that. And that they were all told to, like, be promiscuous that month in support of this stroke that Ayries was going through in order for her to, you know, I don't know, clear her -- blow her lines clean, I think is --

THE COURT: These are the statements of whom?

MS. FARRELL: Statements of nobody. This is all a percipient witness talking about what she witnessed.

THE COURT: But she witnessed somebody saying something.

MS. FARRELL: Right, you're right. She witnessed the defendant, Ms. Cherwitz, and -- I'm doing this by memory -- potentially one other co-conspirator, I believe Ms. Gilbert, telling -- telling Ms. Ayries to set up this profile and have sex with 30 men in 30 days. So that's going to come out. There's going to be lots of testimony about what Ms. Cherwitz said to Ayries, including, like, berating her, shunning her, calling her out in front of the other staff members in the house. That's going to be, like, a pretty substantial portion of the end of her testimony.

I have no -- like I said, I am being very careful about not eliciting Ms. Blanck's statements for their truth or at all. I think there may be some, like, documents we intend to put in through the FBI summary witness that may contain, like, Ayries Blanck's statements for context with Ms. Cherwitz.

But I just want to be clear, we have zero intention of putting in Ms. Blanck's statements for their truth, or if at all. But it is coming up, and I know that this is something that the defense cares about, so I just want to flag it while we're all here.

THE COURT: I can hear from the defense on this --

MS. COHEN: Yes.

THE COURT: -- or we can wait until this comes up.

MS. COHEN: Okay. Well, I mean, our position is

that the foundation of this is based on hearsay statements of Ayries Blanck and conversations that potentially Ayries had with this witness. And again, that would, our position, you know, lead to confrontation issues, lead to us not being able to present evidence regarding Ayries Blanck and her untruthfulness.

So again, you know, it's hard inside this vacuum. Obviously a witness can testify about observations, but to the extent -- we believe that these are based on hearsay statements. So we would object on that foundation, particularly, again, because it concerns this particular witness -- sorry, this particular former witness, Ayries Blanck.

THE COURT: Go ahead, Ms. Bonjean.

MS. BONJEAN: I think this is potential hearsay. I guess we don't really know because I haven't heard the foundation entirely. Obviously this witness's credibility will be and should be -- you know, if we have the reason to challenge it, the cross-examination should be robust on it.

THE COURT: When you're saying "this witness," you don't mean the one who is going to be testifying.

MS. BONJEAN: Correct.

THE COURT: You mean Blanck?

MS. BONJEAN: No, no, no, no, no, the witness who is going to be testifying.

THE COURT: Okay.

MS. BONJEAN: I'm just saying if -- I don't know if she's going to be trying to get in hearsay statements of Ayries Blanck. It's not clear to me from this proffer. She's saying that she's going to testify to things she heard herself, which to me means she heard Ms. Cherwitz or I guess Ms. Daedone say things to them as a group. That would seem to me what they are suggesting as how the testimony will come in. Obviously if she is saying -- if this witness is going to testify that Ayries told me about something Ms. Cherwitz said to her, then that would be hearsay. You know, I think we all understand that. So we'll object to that.

(Continued on the following page.)

(Continuing)

THE COURT: I hear you. I think the Government is saying that she's just going to testify -- she, meaning the witness -- is going to testify about statements that Ms. Cherwitz made in the witness' presence.

MS. FARRELL: That's correct.

And then the other category of testimony in this vein here is that when Ms. Blanck was in the process of leaving, there was something called a Reconciliation Council form and there were all these a phone calls that the members of the New York house had with the leader of the Reconciliation Council, this man named Ulysse Slaughter.

I don't intend to elicit like the specific statements that were said during these phone calls, but I do intend to elicit the fact that they happened, and generally what the topics were that were discussed, what the tone of them -- what the tone of these calls were.

And then, ultimately, the fact that Ms. Blanck left in a very like vocal manner about her complaints of the company, again, not eliciting what the complaints were, but the fact that she made a lot of complaints, well-publicized them among all the people in New York, left, and the effect it had on this witness, which is that she started feeling that way herself.

She wrote out, as part of this reconciliation

process, she wrote her own -- the witness, not Ms. Blanck -- the witness wrote out her own sort of complaints and observations, shared it with upper management at OneTaste about the perceived problems of the company, which are relevant to this case, and the fact that she shared those complaints with the company.

She will obviously be on the stand and can be cross-examined about her own beliefs and what she wrote. But we do intend to elicit all of that as part of this notice rubric.

THE COURT: You mentioned a Reconciliation Council, but I don't think you told me who was on these phone calls or what this council is.

MS. FARRELL: Sure.

So it was a gentleman named Ulysses Slaughter was brought in. He had some kind of background in like mediation or I think he had a -- he, too, had a very troubled childhood and has dedicated his life to -- I think he would say -- he's not going to testify -- but would say like people understood that he was brought in to essentially mediate complaints within the organization, and that there were phone calls between all of the people who were living in the New York house while all of these fights and screaming and berating and whatnot were going on, where everyone was just getting out their emotions and their complaints with each other.

The witness will testify there were numerous phone calls where they were trying to like work it out with Ms. Blanck and with the other members of the New York house, and that those were ultimately unsuccessful.

THE COURT: The witness is on these calls or no?

MS. FARRELL: Yes, she is. She's on them.

So, that's what the Reconciliation Council is.

MS. BONJEAN: Again, I don't how this is going to come out. It's sounding a little bit like a side trial, a little Ayries Blanck's experience there. And, you know, I think they may be opening the door to some issues as it relates to Ayries Blanck's credibility.

Now, Again, I don't know what this woman exactly saw. And I don't know how the evidence will come out or what they intend to elicit, but if we're going to be presenting Ayries Blanck's story as gospel here, I think, you know, this jury's entitled to know that Ayries Blanck is not a credible historian of really much of anything. Now again, that may or may not what comes out because this woman presumably is going to testify about what she saw with her own eyes.

And the whole notice thing doesn't make a whole lot of sense because I don't know -- the allegations that we're talking about here all predated this incident, or, at least, Ayries Blanck's departure. So I don't know what relevance the notice would be at that point, so --

THE COURT: Is it an issue of notice or is it an issue of the witness who's going to be testifying wrote something because she had an understanding that somebody else had written something?

MS. FARRELL: No. She wrote something that was like her feelings about what the problems were at OneTaste and shared it with upper management at OneTaste. And Reconciliation Council phone calls are happening the end of 2014. This witness writes her feelings down sometime I think in early 2015.

THE COURT: Why is the Blanck piece needed? Is this separate from Blanck -- I'm sorry if I missed what you're saying.

MS. FARRELL: So the reconciliation calls with Ms. Blanck are what caused this witness to look at her own experience.

THE COURT: Right. That's what I thought you were saying.

MS. COHEN: Yeah. And that in, I think lies the problem here, because again, if the -- if what this witness has felt and was upset about and was alerting management is based on Ayries Blanck's statements, right? Even if she weren't on these calls, whatever, again, we would be able to impeach her with the degree of information about this hearsay evidence, because this witness lied in fabricated journals, as

we now know. Who's to say she was telling the truth at this time?

THE COURT: Well, would it matter, though, if really what was happening was this witness, who is going to testify, heard that Ayries had done or said something, regardless of whether what she did or said was accurate or true, and this witness reacted.

MS. COHEN: Right.

THE COURT: It's explaining why this witness took an action; right?

MS. COHEN: Right. But if the action was taken because of lies, you know, I mean, the jury could decide that for themselves, we would be able to impeach with those lies, to show that the person who is complaining is liar and fabricator.

THE COURT: But what does that have to do with this witness taking an action? I'm not sure that there's a --

MS. COHEN: Well, because if that was fake statements, right? If Ayries Blanck was making that up then and this witness, now we're saying, oh, but this witness was so upset to about hear this, and told the defendants and they were therefore on notice -- you can see that it creates a layer of like they were on notice about some lies over here that this witness believed were true.

You know, to me, that's, again --

THE COURT: I think if the witness is being asked why she did something, though, then really what becomes relevant is what she did and she'll say why she did it, but it wouldn't the veracity of what she was basing on it on. She was reacting at the time to whether it was, true, false or somewhere in between.

MS. COHEN: Right. But we should be able to say and confirm that if that complaint was fake, would it have changed the actions that you took or how you felt at the time?

I mean, if I was, you know, heard that someone had all these complaints and something terrible happened to them, I may take certain actions and then if I learned that that was fake and never happened, I would feel like, oh, my gosh. I feel so bad. I campaigned to so-and-so, and that's not even true.

MS. BONJEAN: This comes back down to like how the jury will use the information. Like if they are using it for notice and other purpose, then I guess what Ms. Cohen is suggesting wouldn't be unfair, wouldn't be a risk.

But I think we know that there's a high risk that the jury will use that information for a purpose other than notice, and maybe an instruction could deal with that or something of that nature.

THE COURT: I mean, if you want specific limiting instructions, you're always welcome to propose, whether it's

tailored to notice or any other non-hearsay reason.

MS. BONJEAN: I do want to point out, though, and it's unclear to me -- I think the Government is referencing a writing.

Is this the Government 906, 907 writing?

MS. FARRELL: Yes.

THE COURT: Somebody has to tell me what that is.

MS. BONJEAN: Well, that is -- that's the writing that they're just referencing.

THE COURT: That's the writing? Okay.

MS. BONJEAN: This is the first time I've heard who even authored it, right here, right now. We had no knowledge that it was sent to anybody. It's not dated. It's not signed. There's not an e-mail, I mean.

THE COURT: But that presumably would be the foundation that they would lay with a witness or else, you're right. There has to be some understanding.

MS. BONJEAN: I understand now how they intend to use it.

MS. FARRELL: I did send that one in reference to this.

THE COURT: Is it that 906 or 907 are slightly different or are they the same?

MS. FARRELL: Yes. She sent it to Rob Kandell, and he -- there's like commentary. So I think some of the

statement is hers. In one of the versions, some -- it has Rob Kandell's writing as well, which I don't think -- I really am more focused on just her.

MS. BONJEAN: And Rob Kandell didn't even work there at the time, I don't think. I don't know how -- again --

MS. BENSING: We're not trying to put in his statements whatsoever.

MS. BONJEAN: You mean the papers themselves? They're not being offered?

MS. BENSING: Her statements, we may offer, but --

THE COURT: Not his commentary.

MS. BENSING: -- not the portion with his commentary.

MS. BONJEAN: Judge, I don't want to work this out in front of you.

THE COURT: That's fine.

MS. BONJEAN: It's literally right now clicking for me who that belonged to.

THE COURT: Okay.

MS. FARRELL: Understood. We know this is something that the defense cares a lot about. We're all here and I wanted to raise it before the weekend.

THE COURT: I think I've got it. Thank you.

So I'm expecting tomorrow to get the joint expert submission and then the joint requests-to-charge-related

submission.

MS. BENSING: Yes.

THE COURT: I'm not expecting anything else. I will be working on the request-to-charge.

Yes?

MS. BENSING: Your Honor, I think we had raised this now a couple of times this week, but we still have a list of 49, perhaps, defense witnesses.

I do think it's possible -- I'm always optimistic that the defense case will start next week, and so obviously, the Government needs some kind of notice as to who will be called.

MS. COHEN: Yes, Your Honor, and that was one of the reasons for the delay in the jury instructions. We have been working on that and we plan to get that to the Government at some point over the weekend, at least to exclude, you know, hopefully, a lot of the witnesses. It may still depend on the testimony that comes in, of course, as to who.

THE COURT: Do you think you're really going to need that many witnesses, 49?

MS. COHEN: No, we are certainly -- that's what I'm saying. We will get you a list.

THE COURT: Right.

MS. COHEN: It may not be the exact -- we may have to alter depending on the testimony that's coming up.

THE COURT: I understand.

MS. COHEN: We will do that this weekend now that we have time to focus on it and figure out scheduling and all of that.

THE COURT: I'll ask you to do the same thing that the Government -- that I've asked them to do, which is to let them know who is coming earlier rather than later in your order, if you know that.

MS. COHEN: Yes. Absolutely.

THE COURT: Okay. And obviously, recognizing you don't have to put on any case at all, either defendant, but to the extent you think you are going to and you know the order, let the Government know that as well.

MS. COHEN: Yes, Your Honor.

THE COURT: I think you asked me, Ms. Farrell, about what I would need from you in terms of your anticipated cross materials?

MS. FARRELL: Correct.

THE COURT: I think you know what the materials are more than I do.

MS. FARRELL: Once we narrow the witnesses, maybe.

MS. BENSING: We really don't because we don't know who they're calling.

MS. FARRELL: Obviously, this is a decision they have to make and one we won't know in advance.

But if the defendants testify, I'm sure there will be a lot of video and documents that we want to reference, which we are pulling together.

THE COURT: Okay. Is it separate from the videos and documents that you have already identified; right?

MS. FARRELL: There is some overlap, but there will be additional things.

THE COURT: Okay.

MS. FARRELL: Yes.

I'm sorry. One more thing.

So we have done -- I'm sorry, Jennifer. I didn't hear you. I'm so sorry. This will be quick.

The financial evidence is largely in the form of summary charts, Your Honor. The underlying documents are literally thousands of pages long. It is not our intention to provide you hard copies of those.

THE COURT: Thank you.

MS. FARRELL: Okay. Just checking. Thank you.

THE COURT: Is there going to be argument about foundation or authenticity?

MS. FARRELL: They're all business records. They're mostly certified records produced by Government's -- like the Department of Labor or the IRS. So I don't know if they have objections to that, but that's pretty standard business records.

THE COURT: If the certifications match the rule, it certainly is, and I would ask the defense to take a look and let me know if you have any issues with that.

MS. FARRELL: And then some, I think, some are OneTaste business records.

THE COURT: And those are certifications as well?

MS. FARRELL: Correct.

MS. BONJEAN: If they have certifications, I can't imagine we would be objecting on authenticity.

MS. COHEN: I agree.

THE COURT: Okay. I missed that comment, but okay.

Everybody looks happy. We will end on that. Have a great weekend. I know some of you are under the weather.

MS. BONJEAN: Yeah. Sorry for the coughing.

THE COURT: Everyone stay healthy. Get some rest.

I'll see everyone Tuesday at 9:15 so we can do the Kandell part outside the presence of the jury.

MS. BONJEAN: All right. Thank you.

(Matter adjourned to May 27, 2025 at 9:15 a.m.)

oooOooo

# I N D E X


| WITNESS | PAGE |
| --- | --- |
| LYNDSI KEVES | |
| DIRECT EXAMINATION BY MS. FARRELL | 2961 |
| CROSS-EXAMINATION BY MR. ROBOTTI | 3031 |
| CROSS-EXAMINATION BY MS. BONJEAN | 3109 |
| REDIRECT EXAMINATION BY MS. FARRELL | 3128 |
| RECROSS EXAMINATION BY MR. ROBOTTI | 3142 |
| RECROSS EXAMINATION BY MS. BONJEAN | 3147 |

# E X H I B I T S


Government Exhibits 5003 and 5004 2957

Government's Exhibit 3770 2992

Government's Exhibit 3239 3007

Government's Exhibit 315 3018

Government's Exhibit 230 3019

Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC 3035

Defense Exhibits 9-DA and 9-DB 3044

Defense Exhibits 9-DL and 9-DN were 3064

Defendant's Exhibit 9FD-1-T 3099