UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff, :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

June 2, 2025

Defendants. : 9:30 a.m.

\- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Continued on next page)

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201
jamiestanton.edny@gmail.com
(718)613-2274

(In open court; jury not present.)

THE COURTROOM DEPUTY: Honorable Diane Gujarati is presiding. Please be seated.

*United State of America v. Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialists Liam McNett and Marlane Bosler, and FBI Special Agent Tricia Quintero.

Good morning, Your Honor.

THE COURT: Good morning, everybody.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge, Kelly Lenahan-Pfahlert and Richard Hobbs, all here on behalf of Rachel Cherwitz.

THE COURT: Good morning, everyone.

MS. BONJEAN: Good morning, Your Honor.

Jennifer Bonjean, Kelsey Killion and Ashley Cohen, and Galila Assefa on behalf of Ms. Daedone.

THE COURT: Good morning, everyone.

We are starting late because there was some courtroom technical issues, so we've got those up and running. The jury is here, but I do want to take up with the parties outside the presence of the jury anything that

might relate to the witness who is currently on the stand. I know that there are other issues, that are issues I wanted to raise separate from what the parties wanted to raise as well, but we can do that later. But anything that relates to the witness that is currently on the stand I will hear from the parties on now.

MS. BENSING: Your Honor, just one quick thing.

THE COURT: Sure.

MS. BENSING: Which is, there was one Government Exhibit that was unintentionally admitted from the parties' authenticity stipulation. We have reached a new authenticity stipulation which I am going to go ahead and hand up to the Court.

THE COURT: Okay.

MS. BENSING: It, unfortunately, had that extra paragraph about challenging the admissibility of text threads on bases other than authenticity. We are removing that paragraph, but I want the Court to get this now. That paragraph will be deleted from the final one, but we expect to put it in through this witness, so I just wanted to hand this up to the Court.

THE COURT: Okay.

MS. BENSING: We'll be handing a revised one up to the Court, but I just want you to see the other language.

THE COURT: Okay, that's fine, as long as all

parties agree.

MS. BENSING: Actually, I think we -- it's hot off the printer.

THE COURT: Okay.

MS. BENSING: So I will have the attorneys sign this, and we will hand it up to the Court along with that exhibit. But I just wanted the Court to have copies of this since it's going to come up through this witness.

THE COURT: Okay. Sounds good.

And let me just note, whatever videos were provided have to go through a process through our IT. I think it's a security process. So I have not actually seen what was provided, I think last night or maybe early this morning, as in wee hours of the morning. That will be sorted out, and I don't think that relates to this witness, correct?

MS. COHEN: Yes, those do not relate to this witness.

THE COURT: Okay.

MS. FARRELL: We do understand it relates to the first defense witness, so we will need to take a break to deal with it.

THE COURT: Okay. Let me -- I think I said this the other day, but if I didn't, I don't want the Government to rest in front of the jury until I have a chance to

address the parties outside the presence of the jury. So when you get to the end of this witness, if that is supposed to be the end of your case, I will then send the jury out, or if it's a regular breaking time, we will take a break. But there are things that need to be done outside the presence of the jury before the Government rests.

MS. BONJEAN: I don't know if they are finished raising issues that they have, the Government.

We have a few of our own.

THE COURT: Okay. Relating to this witness?

MS. BONJEAN: Yes.

THE COURT: Okay. Go ahead.

MS. BONJEAN: So, Your Honor, I'm going to try to just deal with these in a little bit of a category sense.

A number of messages, some of which have already come in, but some that are coming down the pike, are text exchanges between Ms. Daedone and Joanna Van Vleck. I scoured the transcripts -- we did, over the weekend -- and I simply do not see how Joanna Van Vleck -- how the Government has established that Joanna Van Vleck is, in fact, a co-conspirator. Not just the majority, the testimony is really confined to Ms. Van Vleck was the President, and she wasn't even really the President until very late in the game, that she was in upper management when she became the President, and it's really sort of the extent of it. As a

result, those messages are coming in.

Now, I know the Government has been saying, well, they can come in for the hearsay purpose under the co-conspirator exception or for context in relationship to Ms. Daedone's admissions. And while -- and that makes some sense. But I think that has to be decided because a hearsay purpose versus a non-hearsay purpose are very different things, and the jury is entitled to know which one it's being offered for.

And I would point out that this is very important because what is happening during these particular text messages is it's typically Ms. Van Vleck updating Ms. Daedone on things going on in the company and Ms. Daedone saying -- and responding. So it's really the contents of Ms. Van Vleck's statements that seem to be being offered. Sometimes she's referencing what other people are saying or doing, so there's like this secondary hearsay component to it.

And so I have grave concerns about those particular text messages coming in, and I want to flag that. Again, I think there is no co-conspirator exception for those particular messages. If they're offering it for a different purpose, then I think we have to address that. That has to be decided and I think the jury needs to be instructed on that. That's one issue.

I will also point out that we're getting into the territory of some messages that reference, for instance, this labor complaint at that time Court already considered in a different context. This is even further removed. This is the fellow that apparently -- and I can't remember what document it was in -- that refused to pay rent and then said I will -- I'll sue you for labor violations if you don't forgive my rent, something along those lines. And, again, the Court had an opportunity, I think, to look at some document where this is discussed, and now it's coming up in a text message.

And --

THE COURT: Tell me, between whom, the text?

MS. BONJEAN: It is between Nicole Daedone and, again, Joanna Van Vleck. Now, the Government has said this is irrespective of the truth of the complaint, but again, it's still double hearsay. And labor complaint -- you know, saying generally I'm going to sue you for a labor complaint from a guy that isn't alleging -- we don't know what he is alleging, is, I think, at the bear minimum -- you know, runs afoul of Rule 403. It's so vague. And we don't even know -- we don't even know how to -- you know, we don't have the ability to cross-examine him on it. We don't know if he's doing this to get out of paying rent. We just don't know. And I should point out that's Government

Exhibit 1283. So that's -- that's one that, you know, I think stands out.

There is discussion in one text between Joanna Van Vleck and Kenan Wang about Ayries Blanck's lawsuit. A number of issues there. Kenan Wang is not, at least, alleged and certainly there's been barely any mention of him as the potential co-conspirator. Joanna Van Vleck, you already know our position on that. And then they're talking about hearsay that's contained within a lawsuit and pontificating about the merits of it and what she's alleged. You know, so that is highly problematic.

And there's messages throughout these -- throughout these text messages, some that, again, are coming down the pike that have hearsay within hearsay. For instance, Ms. Daedone and, I think, Joanna Van Vleck are having a conversation when Brooke is receiving or after she's left. I don't remember exactly, but where Joanna is telling Nicole what Brooke is saying to Joanna. So, for instance, oh, Brooke told us this or Brooke texted me X, Y, and Z, and Nicole's like, well, respond with this. So we have issues of hearsay within hearsay.

In one, Ms. Daedone is discussing what the New York Times article had written about OneTaste. She's quoting from it. That's, again, double hearsay and has a lot of issues in terms of 403. There's one where

Ms. Daedone says something about what her BBL costs, and the Government says, well, it shows that they used OneTaste -- she used OneTaste money to pay --

THE COURT: What her what cost?

MS. BONJEAN: A Brazilian butt lift.

THE COURT: Okay. I didn't hear the initials.

MS. BONJEAN: And then the Government says something along the lines of, this shows that OneTaste paid for it. It doesn't, really. You know, she mentions it in the context of where they're talking. So, again, that's an example of something that I think can be taken out of context.

I know some things are fair inferences rather than -- that I'm not really voicing serious objections about.

THE COURT: I mean, you will be able to make your arguments in summation about any documents, of course, that come in. But I understand what you are saying.

MS. BONJEAN: So, I mean, we can continue to sort of go through these things as we go, but I want -- I want to flag this for the Court.

THE COURT: Yes. I want to hear from the Government on the Van Vleck issue.

MS. BENSING: Yes, thank you.

So first of all, as Ms. Bonjean just put it, many

of these are text messages in which Ms. Van Vleck is updating Ms. Daedone, and so I think they would clearly be admissible under Rule 801(d)(2)(D), a statement by a party's agent. So that is another separate basis for admissibility.

But with respect to co-conspirator statements, the Government does believe it has proven by a preponderance that Ms. Van Vleck is a co-conspirator. And I would point the Court to transcript pages 3381 and 3382, which is Mr. Kandell's testimony where he indicated, among other things, that Ms. Van Vleck was one of the people at OneTaste who used manipulation as a means of directing labor.

And then as the Government indicated on Friday, with respect to this issue, the Court can also look to the body of text messages in front of the Court. So I think it would be -- the Court can't just look at the single piece of evidence, like the single text message, but the Court can look at the body of text messages in reference to one another, which, I think, also clearly establish Ms. Van Vleck as a co-conspirator. And in particular, just, frankly, citing to one of the ones that the defense just raised, where Ms. Van Vleck is having a conversation with Kenan Wang. They discuss that Ayries Blanck felt coerced in some way. And so I think that discussion is incredibly relevant and also establishes her as a co-conspirator, Your Honor.

And so I think the Government has proven Ms. Van Vleck's co-conspirator status by a preponderance.

MS. BONJEAN: If I could just briefly -- oh, I'm sorry.

MS. BENSING: Well, I was also going to say I am also happy to address some of the other text messages that were raised because I think we do think that they are fairly admissible. We have addressed for the Court already in the chart we provided to the Court some of the basis for admission of the hearsay within hearsay. Primarily, the hearsay within hearsay is not being offered for its truth, and the Government has no objection to a limiting instruction along those lines if the defense wants one when those hearsay within hearsay --

THE COURT: Okay. I would need a proposed instruction for those.

But I think there's a larger issue, which is that there appear to be multiple grounds for admission of many of these. You know, I -- I do find that the Government has met its burden, you know, of demonstrating that Ms. Van Vleck is a co-conspirator. And before the Government rests, I will be making my finding as to all the co-conspirator statements that have been admitted. So I do find the Government has met its burden there.

But separate from that, the text messages, at

least what I've seen so far and what Ms. Bonjean is describing, also would be admissible on several other basis, including agent statements, statements for notice, statements that give context to the statements of the defendants themselves. So there are, I believe, many reasons why these would come in. But I do find that the Government has met its burden, which, of course, is a preponderance burden, and I'll discuss more co-conspirator statements outside the presence of the jury after all such statements that are going to come in have come in.

Ms. Bensing, you wanted to talk about some other statements -- texts, rather?

MS. BENSING: I think the Court actually has our bases for admission for those, so unless the Court has any questions or concerns about any of the messages that Ms. Bonjean raised. I mean, with respect to Government Exhibit 2030-D in particular, which pertains to claims made by Ms. Blanck, the Government does believe it has laid a foundation for that. The jury knows who Ayries Blanck is.

THE COURT: Can somebody hand me 2030-D, or tell me where to find it?

MS. BENSING: It is in the Court's binder, Tab 45.

THE COURT: Okay.

MS. BENSING: But I do think that this is a critical piece of evidence from the Government's perspective

in terms of not the content of Ms. Blanck's allegations, which the Government is not seeking to elicit for their truth, but the discussion by Joanna Van Vleck with Kenan Wang regarding that, and it shows that they were put on notice. And that has been a real defense raised here, that the company was unaware, that Nicole was unaware. And as the Court may note, you know, on the very first page of 2030-D, Ms. Van Vleck says, I'm sitting with Nic, who I think testimony has established is a named used by Nicole Daedone.

And so we think that, certainly, this text message thread is admissible. Again, we have no objection to any kind of strong limiting instruction as to the statements by Ms. Blanck or the hearsay within hearsay, but they're not being admitted for their truth, we do not intend to argue that they are truthful. It is just for the context and the notice for the remainder of the conversation, which we do think is admissible.

THE COURT: Well, when you say not for the truth, I mean, this doesn't -- I'm not seeing -- I guess I'm not seeing how that applies here.

You mean not for the truth that someone demanded 3 million or not for the truth of any underlying --

MS. BENSING: Both.

THE COURT: -- foundation?

MS. BENSING: Well, both, Your Honor.

So I think the only statements that would be hearsay within hearsay -- first, I don't think the fact of having sent a demand letter is hearsay at all. But there is a discussion for a list of things we did wrong, mainly things that she claims RT did to her.

THE COURT: Sorry, tell me what page you're on?

MS. BENSING: That's on page 2030-D-002.

THE COURT: Right. But it doesn't give the content of what those things were, right?

MS. BENSING: Well, so then if the Court keeps going, on page 2030-D-004.

THE COURT: Yes.

MS. BENSING: There is a little bit about the content of the claims. And, again, we are not -- we are not seeking to argue that those things are true with respect to Ms. Blanck. We are not seeking to say that they forced her to have sex with all these clients, forced her to go to 12-step meetings, et cetera. We are not intending to argue the truth of that with respect to Ms. Blanck. That is just context and notice, non-hearsay purposes completely for the remainder of the conversation, Your Honor.

THE COURT: Notice to Van Vleck or notice to the defendants?

MS. BENSING: Well, we intend to argue obviously

notice to Van Vleck, but also notice to Nicole Daedone who is sitting there with Van Vleck. At least that's what we intend to argue from the content of this exhibit.

THE COURT: Okay.

MS. BONJEAN: If I could respond briefly, Your Honor?

THE COURT: Yes, go ahead.

MS. BONJEAN: First of all, it's not clear what -- notice that someone is making a claim, and I'm not sure what the relevance -- first of all, this is in two thousand -- I would point out in late 2015. And I would point out that there has been, from our position, no conduct after that point that -- in fact, the only evidence that we can see after November of 2015 about the company is a continuing effort to, you know, improve, put in additional safeguards, et cetera. So I don't know what -- I don't really understand the whole notice argument.

I would also point out that we are still talking about hearsay within hearsay. She's saying this is what Ayries Blanck is alleging, and we have -- this goes to a significant Sixth Amendment issue. We have no ability to cross Ayries Blanck. And, frankly, it would also --

I would also point out that being on notice that someone has made an allegation that they don't believe is true, I'm not sure -- again, this is an allegation that

OneTaste and Ms. Daedone have always alleged was a false one and which --

THE COURT: Well, but it's interesting because Van Vleck says, and out of context, some of that may be true. Right?

MS. BONJEAN: Yes, out of context, some of that may be true. And that is incredibly misleading. We don't know what that means, and it has the capacity to mislead the jury, confuse the jury. And then we --

THE COURT: Mislead them to believe what?

MS. BONJEAN: I'm sorry?

THE COURT: Mislead them to believe what?

MS. BONJEAN: The truth of it. And I don't -- the truth of it. And then we have Kenan Wang saying back to her -- I'm sure there are places she felt coerced in some way.

Again, this is -- without Ayries Blanck, we have no ability to probe that particular area. And the jury is not going to learn that Ayries Blanck was exposed to someone who was willing to fabricate evidence, and her credibility -- the credibility of these statements, we have no ability to challenge.

And I think it's naive to think that this is just for notice, I think it's a ruse to get in the substance of this, and no instruction will be able to cure the prejudice,

and its probative value is nil. Notice to what? That somebody made an allegation? And, again, if this was very early on in the alleged conspiracy, I think, then, perhaps their argument would be stronger. But there's nothing even that happens after November 15th that could arguably be a continuation. I know the Government may disagree, but I don't think they can point to anything that parallels what Ayries has alleged. So this put them on notice of what?

The only thing it put them on notice of is that Ayries has, you know, made allegations that they deem untrue. And, again, I think --

THE COURT: Well, wait, who deems untrue?

MS. BONJEAN: That OneTaste and the that the defendants deem untrue.

So, again, I don't really -- I'm not following the argument that this put them on notice. That is, notice of what and what's that relevant to? Just to say they put them on notice as a way to get around the hearsay problem, to me, is, you know, is not legitimate. Notice is -- it doesn't demonstrate notice for things that preceded Ayries Blanck's allegations, right? It can only demonstrate notice as to events that postdated Ayries Blanck's allegations, which there's been no complainant, I think, who has made allegations that postdate Ayries Blanck's allegations. I could be wrong. Maybe Lyndsi Keves, who, she basically sent

absolutely nothing about coercion, frankly, if you go back and look at her testimony. So I'm not sure what it's putting them on notice for.

THE COURT: Let me hear back from the Government on this.

MS. COHEN: I'm sorry, can I --

THE COURT: Go ahead, Ms. Cohen, yes.

MS. COHEN: Thank you, Your Honor.

I just want to point out, of course this is in the context of which they hear about this lawsuit, and analyzing something under that context without digging into it is a very different situation.

This led to review of Ayries Blanck, led the company to dig in and find out what actually happened with Ayries Blanck, some of which we weren't able to confront, for example, Anthia Gillick on a text messages that contradicted what Brooke -- sorry, Anthia Gillick said regarding Ayries Blanck.

So, you know, this is extremely prejudicial because it's coming in in that context. It has the opinion of Kenan Wang, on whether Rachel is at fault, which is highly prejudicial and irrelevant, and given that he's not a co-conspirator and we don't know exactly -- we can't talk to him and know the extent that he actually knew about the underlying allegations and any truth to that.

So to me, in terms of the context, it's about how this will be perceived when this lawsuit comes out.

THE COURT: Well, let me direct everyone's attention to page 5 of this exhibit, when Van Vleck says that: We can't play like that anymore, even to people we think are in, 'cuz we all thought Ayers was in and now we're dealing with this.

Next page: And Rachel is having to see what her actions do, the weight of it. We, for sure, were not clean.

I'll hear from the Government on that section.

MS. BENSING: Yes. I mean, these are clearly statements in furtherance of the conspiracy. This is clearly a text message conversation in furtherance of the conspiracy.

And the policies do change after that, Your Honor, and I think that's going to be something that the defense is arguing. And so it's vital that the Government is able to put in that they were on notice of a -- of a -- of a complaint. Again, we are not going to argue the truth of any of the Ayries Blanck statements. I think we have made that very clear to the Court and to the parties, and I think we have made a very, very conservative effort with Ms. Gillick's testimony to not do that.

And so I do take issue with Ms. Bonjean's statements that this is just a means of trying to get in

hearsay. That is absolutely not the case. This text message thread is just extremely in furtherance of the conspiracy.

And in addition, there's other text messages later between Daedone and Van Vleck -- oh, no, I'm sorry, Dawson, Daedone and Justine Dawson. This is 2256-R, where Daedone admits that she erased text messages with the legal scare last year. And, again, I think that's another action in furtherance of the conspiracy, Your Honor, that is extremely relevant here, and this text message provides context.

Also, there is evidence in the case following November of 2015, Ms. Keves testified, she wasn't directed to perform sexual services on investors, although she did participate in orgasmic mediation.

And there's a reason why the scheme changed in terms of the scope of the labor. She still testified that she was manipulated. She still testified that she -- that there was, like, some kind of cult-like mindset, directing her actions and manipulating her.

And so, again, the conspiracy continues through 2018. The defendants continue to make a financial benefit through 2018. And, again, the Government is not seeking to admit the underlying statements by Ms. Blanck for their truth in any way and will not do that in any kind of arguments or -- and, again, has no issue with any kind of

limiting instruction with respect to this exhibit or any others.

THE COURT: Is there a way that any portions of this could be redacted or sanitized that the Government thinks would still serve the same purpose? Because I do find that this is relevant. And, again, I do find that the Government's met its burden with respect to Ms. Van Vleck. I would, of course, be willing to consider any specific language the parties have on a limiting instruction if one is being asked for, but are there portions that the Government does not believe need to come in? Because I would also be interested in hearing about redactions.

MS. BENSING: I mean, I think that the Government would be seeking to admit the entirety of it because the -- I mean, really, the only actual -- I mean, I have no objection to redacting: Most likely we will end up somewhere around 300K that we have to give her.

I think the fact of the lawsuit is important, the details of the lawsuit --

THE COURT: Right. What I am wondering is, for instance, this $3 million figure and the 300,000 figure, do those, in your view, have the probative value?

MS. BENSING: No. I think we would be fine to redact demanding --

MS. BONJEAN: No. We want that fact in.

THE COURT: Okay.

MS. BONJEAN: It's the rest of this that is problematic. We are putting in hearsay and Ayries Blanck's statements and her allegations that go to the very heart of these -- these allegations.

Someone who has been demonstrated to have fabricated evidence that we cannot put before the jury, I think it's absolutely, at the very minimum, a 403 problem.

THE COURT: I don't see a 403 problem here at all. I think this is highly, highly probative. And I don't think that the probative value would be substantially outweighed by any of the dangers in 403, particularly in light of the very clear theme of the defense, that the defendants were not put on notice by victims of any of the issues at issue here.

MS. BONJEAN: Right. But we're talking about being put on notice by a witness that didn't testify.

And every single complaining -- this isn't just a defense theory. Every single complaining witness testified that they didn't tell the defendants. That this is not something we are just conjuring up and stretching on. Their own witnesses said this. And this is a witness who didn't testify.

So this is -- I don't -- I don't really understand how somehow we've opened the door to this, where all we've

ever asked is did you tell --

THE COURT: It's not an opening the door issue. It really is a relevance issue and relevance --

MS. BONJEAN: And I would point out that we don't even know what it is meant by this.

For instance, when Joanna Van Vleck says: At some level, this is our wake-up call.

Like a wake-up call to what? That's the thing, we just don't know what she's --

THE COURT: Well, the jury is not going to have evidence in a vacuum. I think that that is -- you can argue whatever inferences you want on that and the Government will argue its inferences, but that's not a persuasive argument here.

MS. BONJEAN: I mean, I think this is highly prejudicial to the point of just directing a verdict in favor of the Government because there's an allegation, they were forced to have sex with wealthy clients, she was forced to have sex for the job. She makes that. We cannot challenge those allegations. The jury is going to hear that there was an allegation in November of 2015, which was resolved by way of essentially nuisance money.

THE COURT: It sounds like from this text message alone that at least one co-conspirator felt that this was significant enough that it was the wake-up and that --

MS. BONJEAN: Yeah, and we don't know whether --

THE COURT: Right?

So I think I'm hearing everybody. Unless there's anything more you want to say, you can propose a limiting instruction and I will address that.

MS. BENSING: Thank you, Your Honor.

MS. COHEN: I would just add, and I understand, you know, the argument can be made that it wasn't -- you know -- we can't play like that. I understand we could make the arguments, well, you know, understanding people and people getting -- you know, that doesn't mean anything.

But that is really beside the point here. Because Ayries Blanck, the very allegations they're talking about, we know them, in fact, not to be true. We know that that was false. In fact, she wasn't forced to have sex based on very, like, lengthy text messages, none of which, we, you know, can use here. And so I think that's really -- I mean, it's misleading as to what the actual underlying facts are about these allegations before the company was able to go in and investigate that.

THE COURT: But it's not disputed that she made allegations. Whether they're true or not is a different story, but the fact of the allegation being made, I don't think that's disputed; is that correct? The fact that these allegations were made.

MS. COHEN: Right, but --

THE COURT: Whether true, false, somewhere in between. The fact that they were made.

MS. COHEN: The fact that they were made, yes, but I think it's very misleading to say -- I mean, it seems as if the company is very concerned about it. I mean, of course they're concerned about allegations and lawsuits. Every company gets that whether or not they think -- I mean, I've defended lots of, you know, people, sexual harassment and things like that where we know not to be true, but they settle it because they don't want it to come out in the public and that's what happens all the time.

But for a jury that doesn't necessarily understand that, it's extremely prejudicial, once again, because we have evidence specifically that would contradict these statements.

THE COURT: Listen, the fact that Joanna Van Vleck, who I find the Government has met its burden on, said this is our wake up that we can't play like that anymore, I think that makes it extremely relevant, I don't think there is a 403 issue here, and I will take limiting instruction if anyone asks for one, I will consider language on that.

MS. COHEN: Your Honor, one proposal we have.

THE COURT: Yes.

MS. COHEN: Is that, you know, on page 4, the

specific allegations, then, be redacted. That we forced her to have sex with wealthy clients, we forced her to go to 12-step meetings, forced her to have sex for the job.

MS. BENSING: Your Honor, I don't think that that would work. It would render the context -- it would just render the context of the rest of the text message incomprehensible.

THE COURT: I agree.

MS. BONJEAN: I would also just make -- point out that I think we should be able to put on evidence in our Case in Chief regarding Ms. Blanck's credibility essentially.

THE COURT: Not if any statements are not coming in for the truth, there's nothing to challenge there, so no.

MS. BONJEAN: I understand. I just want to make the record clear that we believe that the prejudicial effect outweighs any probative value we would be seeking to put in evidence that she, in fact, these lawsuits/allegations are not, in fact, true, that her credibility is diminished by virtue of her conduct in this case that the jury will never hear about.

THE COURT: Well, her conduct starting in, what, 2021?

MS. BONJEAN: No, not just that, Your Honor.

For instance, there was -- during the testimony in

this case that we've heard, there was testimony and I can't remember which witness it was, maybe Ms. Cohen, who said -- oh, I think it was Brooke Sheffer or Ms. Gillick testified that they were instructed by Ms. Daedone to have sex 30 days and 30 -- 30 times -- once a day over 30 days. I can't remember what the exact increment was.

THE COURT: I know what you were talking about, yes.

MS. BONJEAN: And there was a text message in which Ms. Blanck says, hey, guys, here's my plan.

THE COURT: Oh, you asked about that. That testimony did not come out the way you expected, I don't think. But you did ask about that. And you can argue to the jury whatever you want on that, but I recall the testimony.

MS. BONJEAN: I asked about it, but I couldn't confront her with the actual words that were in the text message. I mean, I could not possibly get that into evidence because the Government argued and the Court agreed that that would be hearsay.

And so no, the jury didn't get -- it's not that I didn't get what I wanted from this witness. Yeah, that's true, she's a Government witness who, frankly, had her own spin on everything. But the point is, is we have evidence to show that Ms. Blanck's allegations, back in 2015, were

untrue also.

So, I mean, we're talking about --

THE COURT: Have you subpoenaed Ms. Blanck?

MS. BONJEAN: I'm sorry, Your Honor?

THE COURT: Have you subpoenaed Ms. Blanck?

MS. BONJEAN: I don't know if we've subpoenaed Ms. Blanck. I think we did, actually. I think we subpoenaed her and her sister, yeah.

MS. COHEN: And I will just add, in terms of that text message, Your Honor, I understand what you are saying, but the text message yourself, if you see it, I mean --

THE COURT: Sorry, what text message?

MS. COHEN: Sorry, the one that Ms. Bonjean is talking about, the one about Ayries. I mean, like this is my plan, 25 exclamation points, and it goes on and on.

If the jury were to --

THE COURT: Does it speak to, though, what happened before? Does it speak to the instruction or the stroke that was put out, if I'm remembering the context?

MS. COHEN: No, it doesn't. But I'm telling you, if you see it, this person is so gung-ho and excited and doing this -- she says it is her plan to do this.

THE COURT: Right, but does it address the earlier time period, which the witness testified about, about the, essentially, direction that came down about people doing

this, correct?

MS. COHEN: Of course, but if you put them together, I mean --

THE COURT: Okay.

MS. COHEN: -- it's a different story.

THE COURT: I hear you.

MS. BONJEAN: And Your Honor, I would point out that Ms. Blanck lives in Ireland.

THE COURT: Right, okay.

MS. BONJEAN: And --

THE COURT: Go ahead, Ms. Bensing.

MS. BENSING: Your Honor, just briefly, I think the testimony they were trying to impeach was Ms. Gillick's testimony, that Rachel Cherwitz, she heard, herself, that Rachel Cherwitz directed them to do this.

THE COURT: Yes, correct.

MS. BENSING: And so whatever Ms. Blanck said or didn't say about that is irrelevant because that didn't come in, for its truth or for really any other reason at all. It was about what Ms. Cherwitz directed or did not direct.

THE COURT: I remember her testimony.

At this stage we are going to get to a morning break probably before we get to this, because if the defense is asking for a limiting instruction, I would like to have it in writing or just, you know, give me the exact language

that you want. You can work off the limiting instruction, the generalized one that you asked for and that I had -- actually, not the one you asked for, the one that I had actually given. And if anyone needs a reminder on what that was, we can go over that.

But I don't find any 403 problem here. I do think this is highly relevant on a number of issues that are really squarely within what the jury is going to have to be considering.

MS. BONJEAN: And I would just point out, Your Honor --

THE COURT: Yes, go ahead.

MS. BONJEAN: -- that we have other testimony that we could put in to demonstrate that these allegations were not meritorious, and yet our hands are tied in doing so because the Court has ruled that it's not coming in for the truth. And, again, I think that is an insufficient way to protect the defendants from the prejudice that will result.

So wanted to make that -- I mean, so it's not just that it's being admitted over our objection. We are going to be prohibited from putting in evidence that would refute it.

THE COURT: Right. But I'm going to be giving an instruction, if you are asking for one, about, you know, that it's not those statements about what she -- whatever

was in the demand letter or the demand document are not being offered for the truth of those statements.

That is what the Government is intending, as well, right?

MS. BENSING: Yes, of course. We have no objection to that.

MS. BONJEAN: Yes, again, and per our objection that these other statements that, I guess, could be perceived as admissions by a co-conspirator, by Joanna Van Vleck, our position is, A, it hasn't been established that she's a co-conspirator. She was the President of the company. And even with Kandell's testimony -- you know, everybody directed labor, that's what people in companies do. The question is did she direct it --

THE COURT: There was other testimony, though, from the victim witnesses about Van Vleck as well.

MS. BONJEAN: Not about her conduct. Just that she was -- just her -- just her status in the company.

I mean, mere status, my gosh, you know, I mean, if this -- if this case -- if we're talking about the mere status of someone in upper management is somehow, you know, responsible for --

THE COURT: Well, I think the Government can address some of the more specifics, if you feel that you want to, on the testimony about Van Vleck.

MS. BENSING: Well, I think, Your Honor, we have, and the Court has already made its finding, so I don't know --

THE COURT: I don't mean about -- I mean, on this last issue that Ms. Bonjean is addressing with the victim witnesses testifying about Van Vleck.

MS. BENSING: Oh.

THE COURT: You don't have to, but if you wanted to be heard on that.

MS. BENSING: Your Honor, I think we would want to make sure that we have, like, transcript cites for the Court, which we certainly can do.

THE COURT: Right.

MS. BENSING: But I do think on what we have already proffered and what the Court has already found, she's been established as a co-conspirator.

THE COURT: Yes, she has.

Okay.

MS. COHEN: I'm sorry.

THE COURT: Yes.

MS. COHEN: I just want to point out one other page that's coming up.

THE COURT: Yes.

MS. COHEN: 1265. And there are a couple -- and I did give the Government a list of a few --

MS. BENSING: Oh, can I just? Because we don't intend to admit 1265.

MS. COHEN: Oh, okay. Never mind.

THE COURT: I also just -- I know everyone was busy over the weekend, but Ms. Cohen did sort of preview that she might alert me to some of these more controversial texts over the weekend. That didn't happen. I don't know really know why it has to happen this morning like this. This is not ideal. But these are important issues and I am happy to hear you out, but really not sure why this had to happen. You filed other things over the weekend, there's a lot of attorneys over here, there's a lot of attorneys over here. Not really sure why this is happening now, but --

MS. COHEN: I had given a list to the Government of ones that we had confrontation clause issues on. That's why -- and I hadn't heard back --

THE COURT: It's fine. I understand everybody is working very hard.

MS. COHEN: It sounds like one of them was just resolved, so --

THE COURT: Great. So maybe you didn't need to spend time thinking about that, but now it's done.

Ms. Gupta, how much longer do you have with this witness?

MS. GUPTA: Probably two to three hours, Your

Honor.

THE COURT: Hours. Okay. Okay.

So why don't we start with the jury. I will, again, apologize for keeping them waiting. I will attribute it to me. And we'll get going.

Why don't we bring the witness back and the jury in.

And I think this issue of a limiting instruction can be dealt with at the next break, then, because we're already at 10:15.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Good morning, everyone. You may be seated. It's nice to see the jury here.

I apologize. I kept you waiting today. I don't like to keep you waiting. I know you get here on time and you are very attentive, so you have my apologies for that. I try to avoid it, but sometimes it's unavoidable. So I apologize. It's nice to see everybody.

And Mr. D'Agostino?

THE COURTROOM DEPUTY: Mr. Punzo, the Court reminds you, you are still under oath.

THE COURT: Ms. Gupta, you can resume your direct examination of this witness.

MS. GUPTA: Thank you, Your Honor.

**ANDREW PUNZO**,

resumed as a witness, having been previously sworn/affirmed, was further examined and testified as follows:

DIRECT EXAMINATION

BY MS. GUPTA (continuing):

Q Good morning, Special Agent Punzo.

A Good morning.

Q I would like you to turn to tab 14.

MS. GUPTA: And if we could please pull up Government Exhibit 2034 for the witness only.

Q Special Agent Punzo, what is this?

A An e-mail.

Q From who?

A Nicole Daedone to justine.dawson@onetaste.us.

Q And what is the date of this e-mail?

A December 3, 2015.

Q And does this appear to be a fair and accurate copy of an e-mail from Nicole Daedone to justinedawson@onetaste.us?

THE COURT: Sorry, you are going to have to tell me where this one is.

MS. GUPTA: Oh, apologies. This is Tab 14, Your Honor.

MS. BONJEAN: Your Honor, this is one of the e-mails that was brought up on --

THE COURT: Okay. Give me one moment.

So you are offering this?

MS. GUPTA: Yes, Your Honor.

THE COURT: Is this subject to the stipulation?

MS. GUPTA: Yes, Your Honor.

THE COURT: And is there any objection?

MR. ROBOTTI: Yes, Your Honor. We object on relevance, foundation, and computation clause.

THE COURT: Ms. Bonjean, do you join in that?

MS. BONJEAN: Yes, Your Honor. We raised these objections last time. We stand by them.

THE COURT: Overruled.

Government Exhibit 2034 is admitted.

(Government Exhibit 2034 received in evidence.)

MS. GUPTA: Thank you, and if we could please publish to the jury.

(Exhibit published.)

MS. GUPTA: Apologies, I just want to make sure they have it on their screens.

Okay, great.

Q So Special Agent Punzo, I don't have you read through all of this, but if you can just tell me what the subject line says?

A XO.

Q Then if you could please read the first and second

paragraph.

A Outcome: This course is the microcosm for what we are doing on the planet, the experience of lighting up the power grid; exponential lighting up of each individual until there is one clear connected steady light that spreads into the world.

This is a peak experience in the lives of everyone who is involved from the cooks to Jeff Ridenour on the order of the days in Ray's room where I felt suspended in light, my mind blown by what is actually possible from Erwan opening the energy ball of light to the people entering, the Coreys and others and feeling all of the spae between us as connection. This unity pervades everything in such a way that we are moving as one consciousness, the power of connection so potent that all of the obscurations, the compensatory behaviors created by the illusion of separation dissolve. From suspicion to checking out, from sloth to reactivity, from withdrawal to anxiety, the fullness enters with such concentration that all of the pockets of fear get absorbed and each person gets to experience themselves as whole, they are able to, in a way that alters their existence forever have the experience in the bones, in the viscera, in the blood of non-separation.

Q Thank you.

And if you could just read paragraph four, it

starts from: From the fullness.
A From the fullness of experience, in no way theoretical each individual makes a silent choice to serve love. That feeling that something will be lost if you aren't constantly vigilant looking out for you and yours for the counterpoint of abandoning oneself dissolves instantaneously as the dawning realization that there is in fact no escape, that all roads lead to this unity and that the only option is to move into that flow. That or be tormented until you eventually make that choice. From this realization evolves an organic patience, generosity, compassion and openness with each other that facilitates massive shifts for each person into the place each being used for their unique purpose on the planet. All unnecessary suffering is immediately eliminated.
Q Thank you.
And if you could just read the second-to-last paragraph on this page, the one that starts with Eli.
A Eli - becomes fully equipped to be catapulted into the mainstream as the masculine voice for orgasm. He develops an exquisite subtle stroke of sensitivity that draws out the brilliance in all he encounters which occurs as a great power that he uses fields and conditions where the feminine naturally grows and reveals her brilliance. He is the model of the new man in the way that Bill Gates is the model of

the new entrepreneur, someone who so clearly has learned to live in abundance that the obvious response is to give it all away and learn to enjoy through sympathetic turn on. He invests well and enjoys the silent internal bow of a universe well served.

Q Thank you.

And who is the name listed at the end of the document? Sorry, just at the end of the first page.

A Aubrey.

MS. GUPTA: Thank you, we can put that away.

Next, if we could pull up for the witness only, Government Exhibit 2000-DR and there is Tab 44D.

Q Special Agent Punzo, what is this?

A It's a chat.

Q Between who?

A Yia and Joanna Van Vleck.

Q On what date?

A August 27, 2015.

Q And does this appear to be a fair and accurate and redacted depiction of the original chat that you reviewed which is subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2000-DR.

THE COURT: Any objection?

MR. ROBOTTI: We object on hearsay grounds.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 2000-DR is admitted.

It's DR, correct?

MS. GUPTA: Yes, Your Honor.

THE COURT: DR is admitted.

(Government Exhibit 2000-DR received in evidence.)

MS. GUPTA: Thank you.

If he could please publish.

(Exhibit published.)

Q So Special Agent Punzo, for this one I will ask you to read Joanna Van Vleck and I'll read Yia.

A Have to talk to RT yet about her teaching.

She's doing that to the team today.

Either you talk to her or I will.

Q Okay, I'll talk to her.

A It's the place where she yells at people to motivate them and then calls that orgasm and electricity.

It will continue to get us in trouble the bigger we get.

She says they are all stupid and self-centered.

Literally says that on the call.

That they are selfish and leave the goal to her.

So, you got to say something or I will.

MS. GUPTA: Now, if we could please pull up Government Exhibit 1755-D for the witness only. And this is at Tab 41D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Rachel Cherwitz, Rebecca Elswit, Justine Dawson, Tazima, Clouds, Chris Kosley, +12066615560, Dustin, Yia Vang, Joanna Van Vleck, Andrew CP7, Kenan Wang, Teresa Diaz, undasea@aol.com.

And that's it.

Q And what is the date of this chat?

A November 3, 2014.

Q And is this a fair and accurate depiction of the original chat you reviewed that's subject to a stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1755-D.

MR. ROBOTTI: Your Honor, we object to the lengthy amount of irrelevant information as well as the cumulative nature.

MS. BONJEAN: Yes, Your Honor, there's -- it's replete with hearsay and also relevance.

THE COURT: I will hear from Ms. Gupta.

MS. GUPTA: Yes, Your Honor.

This includes statements that are 801(d)(2)(A) of a party opponent as well as under 801(d)(2)(E).

And then in terms of the other statements, they're offered for context and not for their truth. And the document also contains instructions and commands, which are plainly non-hearsay.

THE COURT: Objection overruled.

Government Exhibit 1755-D is admitted.

(Government Exhibit 1755-D received in evidence.)

MS. GUPTA: Thank you.

And if we could please publish to the jury.

(Exhibit published.)

Q So Special Agent Punzo, I'll ask you to start at the top, and we can alternate individuals.

A I'm removing anyone not physically here for BOH.

Blank message.

Blank message.

Blank message.

Blank message.

Yes.

Go on inside.

They are probably still Alsace.

So everyone is clear for today. You must come smoothed out, clear, grounded, turned on and ready to serve.

Clouds they are all sleeping so ring the doorbell.
Q Good morning. Emoji.
A The thread with the, emoji, emoji is the one to use.
All others delete now.
Blank message.
Q Dress today is PBO. Confirm with emoji. Leaving Entrada at 6:10 a.m.
A Remember to enter the house quietly. Take off your shoes and no talking 'til you're in the staff bedroom. We want to let the students sleep.
Q Emoji roar.
A Emoji.
Q Remember to enter the house quietly, take off your shoes and to talking 'til you're in the staff bedroom --
THE COURT: If I could just ask you to use the microphone.
MS. GUPTA: Sorry, Your Honor.
THE COURT: Thank you.
Q Remember to enter the house quietly, take off your shoes and no talking 'til you're in the staff bedroom. We want to let the students sleep. You must also have your tumescence handled before you enter this house. Heart.
A Emoji.
Emoji.
Q Blank message.

Delete.

Blank message.

So a few things.

The kitchen must be spic and span moving forward. All common rooms and dishes cleaned. If you cannot manage your tumescence you will be asked to step out until it gets smoothed out. Snacks must be put out in the night, granola bards and such for the students. I need everyone to confirm with a star.

Blank message.

A Confirm.

Q Emoji.

A Star.

Q Please update your phone so the threads don't split.

A Star.

Q Meeting in nine minutes downstairs in staff room.

What is your ETA.

A Three min.

Q Guys, who left the old coffee on the tea table. Not okay.

A Let's meet.

Q Delete.

Blank message.

Blank message.

Blank message.

This thread. It has a emoji. All others delete.

Greg Sickels birthday on Wednesday.

A Great. Thank you.

Q Start letting students know that OMs are in 20 minutes.

A K.

Q How do I turn on music?

A I'll come show you.

Q I here.

I need someone to push the doors to practice room open slightly. Hello, emoji.

A Coming.

Q Guys, we need to have more attention and speed. All binders that got moved need to be brought to practice ASAP. Who is doing that.

Hello?

A On it.

Q Hey guys, watch the banging of the doors.

A Please have clouds check texts.

Q Student schedule. 7:45 a.m. 2 OM plus journaling. 8:45 1 OM breakfast meeting. 9:45 a.m. chore. 10:15 a.m. 2 OMs plus journaling. 11:15 snack. 11:30 a.m. Nicole or meditation and fear inventory. 1:00 p.m. collect yoga gear. 1:15 leave for yoga. 2, yoga beach walk. 3:30 p.m. green juice and travel to house. 4:15 lunch. 5:00 p.m. 2 OMs plus journaling. 6:00 p.m. coursework or Nicole. 8:00 p.m.

dinner. 9:00 book work. 10:00 p.m. bed.
A Nicole said she is coming in at 10A.
Q Oh, yeah, I just didn't update that in here.
A In five min I will total silence the kitchen. Please confirm.
Get them seated quickly.
Q Checkmark.
A Can I have more matte, emoji.
Q Clouds making now.
A Thank you. Peace sign.
Need chair for Ray now.
Q Coming.
A Hello?
He's by the door behind Reese.
I need you guys to attune your hearing please. I needed a regular chair, not a teacher chair.
Q Heading to mansion with Nicole.
A Okay.
Q Okay. We in meeting.
A There was no place to pull in to let Nicole out.
She okay with it but shouldn't happen again.
Q Guys?
Why is this thread so quiet.
I need attention and speed increases tenfold.
A This is the second time this has happened with Nic

team.
Q Bring cleaning supplies out to foyer ASAP.
They start cleaning in a few min.
A Erik going to kitchen to get them.
Q Guys, you need to wake up.
Hello?
A On supply run.
Q Have Tazima check her texts.
A Leave cleaning supplies in supply cabinet. Students will come down and get them. Cancel. Slow texts.
Q Checkmark.
A Headed out Rebecca.
Q Need Alexandra to staircase in practice room ASAP.
A Bring her up now -- I'm sorry.
Bring her now.
Q Hurry up.
And Special Agent Punzo, we can skip page 7. I will just ask you to start on the top of page 8.
A Natalie, Greg, Alexis not going. We have three open slots. After that we pay.
Q Okay, cool.
Anyone have nail clippers?
A Should be a pair on the OM supply table in classroom.
Q Okay. I grab.
A Looking for Rebecca. Ask her to read texts, please.

Q Just got ya.

Yoga is here: Bikram Yoga Marina del Rey 2903 W Washington Boulevard.

A Does anyone recognize these keys. Text me offline. Attachment.

Q My green laundry bag with all me massage has been moved from the garage. Anybody know where I can find it?

A I have it at Entrada.

Q Schedule for rest of day. 4:15 lunch. 5:00 p.m. Nicole. 7:00 p.m. 2 OMs plus journaling. 8:00 p.m. dinner. 9:00 talk by Ed. 9:30 writing. 10:30 p.m. bed.

A Room update.

David is coming tonight and will go in the bed with Lisa which means Margot will go into bed with Greg Sickels and Aubrey.

Kitchen bedroom (the Blue Den). Two: Mandy and Soniya Blue wall bedroom (the Juliette Room). Five: Aubrey, Rodd, and Alexandra Stockwell, Greg Sickels, Margot Gold, curtain bedroom. Four: Staff room den, (the study). Six: Adam Spanier, Maya, Steve Bauer, Natalie and Paul Master (The Ark). Six: Po, Hamza, Eleanor, Chris P, Ravi, Nancy, Dette Red curtain (Dobson 47). Four: Deb, Ed Bassett, Larry and Sarah Forsblad, second red curtain bed (The Chief). Six: Rachelle, Andrew Spencer, Amanda Petts, Alexis, Brooke, Eli Brown curtain (the wall of mirrors).

Six: Marcus, Lisa St. John, David P and Jeff Ridenour, Leah and Ray.

Q Special Agent Punzo, I am going to ask you to skip ahead to page 12.

And if you could just start at the top there.

A Confirm.

Q Confirm.

A Guys.

Stop moving.

If you don't have a task to do, write 15 min of inventory.

Q Andrew and Iris OMing offline 23 min.

A Guys, unless you absolutely have to do something now, sit down and write inventory.

Q Guys, stop moving.

7:00 p.m. 2 OMs plus journaling. 8:00 p.m. dinner. 9:00 book work. 10:00 p.m. bed.

A Can someone make me a cup of Emergen-C for Sarah ASAP. One pack with half glass of water.

Q Hello?

A Yes.

I will.

Q Thank you.

A Thanx. Dustin hand it to her right when we break.

Q And we can stop there, Special Agent Punzo.

MS. GUPTA: Next, could we pull up for the witness only, Government Exhibit 1590-DR, and this is at Tab 38 D.

THE COURT: And this is subject to the stipulation, correct?

MS. GUPTA: Yes, Your Honor.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Ms.joannav@me.com and Nicole Daedone.

Q And what is the date?

A August 1, 2014.

Q And is this a fair, accurate, and redacted depiction of the original chat you reviewed that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1590-DR.

MR. ROBOTTI: Your Honor, we object as irrelevant, hearsay, cumulative.

MS. BONJEAN: Join.

THE COURT: Give me one moment, please.

Overruled.

Government Exhibit 1590-DR is admitted.

(Government Exhibit 1590-DR received in evidence.)

MS. GUPTA: Thank you.

(Exhibit published.)
Q Special Agent Punzo, I will ask you to read Nicole Daedone's messages and I will read ms.joannav.
A When today are Ravi and Maya meeting.
Where is Brooke's money at?
What time Jason and Brian?
Q 10:00 a.m. PST is Brian and Jason and his dad.
Ravi and Maya are at 2:00 p.m. Eastern Standard Time.
I am touching base with Brooke this morning on her money. I need an update.
I will ask Jason what time Brian meeting is at.
A Great.
Q From Maya. Marissa just said on our pod thread: Ruwan and Summer are passing down TurnON Brooklyn to me. I'm getting more info.
A My guess is that they are planning their own thing.
We will need to get strategic with Ruwan fast.
Q Yes.
Reaching out now. He is currently under contract with us which has protection for us.
A Great.
Q Okay. And Special Agent Punzo, I am going to skip ahead to page 5. And I'll ask you to start with Nicole Daedone's message at 10:42:30 a.m.

A How did Ravi go?
Q Ravi call was quick as he was getting on this call.
The nutshell is Ravi doesn't want to be, quote, pushed and Maya is saying put your money where your mouth is.
A Let's just cut Ravi loose.
I'm over it.
Get another investor today.
Period.
Q This is, quote, Ravi's point of view.
Agreed.
A How's the Ravi piece going?
Q Good. Maya talking to the ladies. Jason and I preparing doc for Ravi.
A Yay.
Something moving.
Ravi complete tonight.
With funds in bank.
Q Yes.
Paperwork almost done.
A Yay.
Q Ravi paperwork is ready.
The girls are reviewing it.
Also.
A Oh, my goodness.

Q Something else just came in.
A No way.
Q Jim Kwik just called me. He asked me to keep this confidential. He said his girlfriend would like to master the art of sucking his cock.
I told him about mastery. He said he would rather have something private.
And he thought of me. Emoji.
RC was thinking of a $100K cock sucking mastery program.
Yes.
I said I would need to consult RC on a type of package that would work because we don't normally do this individually for people.
So he is talking to his girlfriend when she gets home from dinner.
A Okay.
I'm going to throw up, but okay.
Q Maya is looking for Ravi.
He hasn't responded.
She is telling him yes, they will take his 100K tonight.
And then we will send the paperwork.
Ravi on a date.
A Oh, my.

Q Emoji.
A These fucking people.
Q That's what I'm saying.
A Okay. Night J.
Jo.
Text me as stuff comes in.
I check.
Q Will do. Sleep well. Emoji. Emoji.
Maya still hasn't heard from Ravi.
(Continued on the following page.)

(Continuing.)

MS. GUPTA: If we could pull up for the witness only Government Exhibit 2075-D-R, which is tab 47-D.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Nicole Daedone and Joanna V.

Q On what date?

A March 9, 2016.

Q Is this a fair, accurate, and redacted depiction of the original Government Exhibit 2075 you reviewed that's subject of stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2075-DR.

MR. ROBOTTI: We object on relevance and 403 grounds as confusing the issues.

MS. BONJEAN: I'm sorry, Your Honor, if you could give me one sec.

THE COURT: Sure.

MS. BONJEAN: Your Honor, page 5, the second page of 2075-DR, we maintain our objections there and would ask that at least this text be presented after the break that we discussed.

THE COURT: Okay. I'm going to sustain the objection at this time, and we can revisit this after the break.

MS. GUPTA: Understood.

Could we pull up, then, for the witness only Government Exhibit 2347-DR, which is tab 58-D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Justine Dawson, Rachel Cherwitz, Yia, Joanna Van Vleck, and that's it.

Q What is the date?

A June 15, 2017.

Q And is this a fair, accurate, and redacted depiction of the original Government Exhibit 2347 you reviewed that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2347-DR.

MR. ROBOTTI: We object as irrelevant, cumulative, 403, confrontation clause.

MS. BONJEAN: Join.

THE COURT: I think you're all going to have to move your microphones a bit closer to you. But I did hear both objections.

The objections are overruled. Government Exhibit 2347-DR is admitted.

MS. GUPTA: If you could please publish. Thank you.

(Government Exhibit 2347-DR received in evidence.)

(Exhibit published.)

BY MS. GUPTA:

Q Special Agent Punzo, for this one, we can alternate. If you could start with Justine Dawson.

A We have a writing project from Nic of collecting all the stories where we could be seen as OTR from throughout the years. Let's brainstorm here.

Q Hahahaha. Um.

A Also thinking of anyone who would say, quote, they did this to me.

Q Oh, lawd.

A Driving now, but will get on stories. Lots.

Q The ladies sucking Bill Chin's cock while someone is sitting in a corner and Allyson is on a chair trying to get Rob to commit to him, was that how it went? Josh proposing to Anya and she didn't say yes, or was it the other way around? I always do love these memories.

A Oh. Actually, let's make a time to do this by phone. Best to not text them.

Q No doing this over text. Please delete all of this.

A Okay.
Q Can everyone do 8 p.m. tonight?
A Yes.
Q That works.
A Rach and I picking up some dinner. We'll be ready at 8:15.
Q Okay. Ready when y'all are. RH remembers a lot of these too.
A Rach is asleep.
Q We get her additions tomorrow.
A I'm ready when you guys are.
Q I ready.
A We're checking out of Whole Foods.
Q Ready?
A Ready in three min.
Anjuli around. Should we make ourselves private?
Q Private.
We don't need her for this round.
She doesn't know any of them.
MS. GUPTA: Your Honor, at this time I'd like to read a stipulation into the record.
THE COURT: Go ahead.
MS. GUPTA: This is Government Exhibit 5008.
THE COURT: Go ahead.
MS. GUPTA: It is hereby stipulated and agreed by

and between the United States of America and the defendants, Rachel Cherwitz and Nicole Daedone, through their attorneys, collectively the parties, as follows:

In connection with the above-captioned case, OneTaste, Inc., OneTaste, collected and produced to the Government text message threads for the time period January 1, 2008 through approximately January 1, 2019 that were obtained from the personal electronic devices of certain individuals affiliated with OneTaste, not including Nicole Daedone and Rachel Cherwitz, who were no longer employed at OneTaste at the time of collection. These will be called the text threads.

The parties agree that the text thread identified by Government Exhibit 2148 is authentic within the meaning of Federal Rule of Evidence 901.

For each of the text threads produced by OneTaste, the date and timestamps identified therein accurately identify the approximate date and time that the text thread was sent and/or received. The text thread chat participants are identified as they appeared on the phone or device from which the text thread was retrieved. This stipulation does not preclude a party from challenging the admissibility of the text thread listed above on bases other than authenticity.

This stipulation, which is marked as Government

Exhibit 5008, is admissible in evidence.

Dated Brooklyn, New York June 22025, and signed by the parties.

At this time, I'd like to pull up for the witness only Government Exhibit 2148-D.

THE COURT: Where is it?

MS. GUPTA: Your Honor, this is the new one that we passed out this morning.

THE COURT: The new one, yes. Thank you.

MS. GUPTA: Your Honor, we would at this time also move to admit Government Exhibit 5008, the stipulation that was just read.

THE COURT: I take it there's no objection to the stipulation being admitted?

MR. ROBOTTI: No, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 5008 is admitted.

(Government Exhibit 5008 received in evidence.)

MS. GUPTA: Thank you, Your Honor.

Q Special Agent Punzo, looking at Government Exhibit 2148-D, what is this?

A A chat.

Q Between who?

A Yia Vang and Rachel Cherwitz.

Q On what date?
A July 14, 2016.
Q And is this a fair and accurate depiction of the original Government Exhibit 2148 that you reviewed?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 2148-D.
MR. ROBOTTI: We object to the, again, lengthy and irrelevant information, cumulative, hearsay.
MS. BONJEAN: And, Your Honor, again, particularly as to the third and fourth page -- actually fifth page, sixth page, we would be asking for an instruction as to this.
THE COURT: Can you move on to something else? I'll sustain the objection for now and we'll take this up later.
MS. GUPTA: Yes, Your Honor.
Q So Special Agent Punzo, we'll switch topics here.
MS. GUPTA: If you could please pull up for the witness only Government Exhibit 1230-DR, which is at tab 29-D.
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Nicole Daedone and Joanna Van Vleck.

Q On what date?
A February 10, 2013.
Q And does this appear to be a fair, accurate, and redacted depiction of the original Government Exhibit 1230 you reviewed that's subject to stipulation between the parties?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1230-DR.

MS. BONJEAN: Your Honor, I could be mistaken, I thought this one already came in. But I could be wrong.

THE COURT: Give me a moment.

MS. GUPTA: I don't believe it has, according to my records.

MS. BONJEAN: My apologies.

THE COURT: I'm not sure that it has. But you're offering it now?

MS. GUPTA: Yes, Your Honor.

MR. ROBOTTI: We object as irrelevant and hearsay.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1230-DR is admitted.

MS. GUPTA: Thank you, Your Honor.

(Government Exhibit 1230-DR received in evidence.)

MS. GUPTA: If we could please publish.

(Exhibit published.)

BY MS. GUPTA:

Q Special Agent Punzo, I'll ask you to read Nicole Daedone and I'll read Joanna Van Vleck.

Question: Are you happy with the way our people are paid now? By commissions on what they sell?

A Yes.

Q Thanks.

MS. GUPTA: Now if we could please pull up for the witness only Government Exhibit 1407-DR, which is at tab 34-D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Joanna Van Vleck and Nicole Daedone.

Q On what date?

A February -- sorry, January 29, 2014.

Q And is this a fair and accurate and redacted depiction of the original Government Exhibit 1407 you reviewed that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1407-DR.

MR. ROBOTTI: We object as irrelevant, hearsay, and cumulative.

MS. BONJEAN: Join that objection.

THE COURT: Overruled.

Government Exhibit 1407-DR is admitted.

(Government Exhibit 1407-DR received in evidence.)

(Exhibit published.)

Q Special Agent Punzo, I'll ask you to again read Nicole Daedone and I'll read Joanna Van Vleck.

A How are things with you and Rob?

What percentages for launch? I though that was worked into the deal.

With respect to RC abet the obsession until it climaxes.

Q Good morning. Rob and I are good. I just heard he says RC is the only place he's shut down. Rob's been a bit pulled back. Each day we've been talking about him coming out.

I'm on him.

Can increase attention.

Regarding launch, it's included in the contract that they will do a launch. It's not always a guarantee. The deal was within the first 45 days of writing, we would figure out splits of launch. Good news is I think I can get them to take less now that Andrew is on board.

Sounds good regarding RC.

A That should have been following figured out beforehand.

Q I worked at that. They said it's what they do to begin the book and then plan launch. I will ensure we get a good deal with them. We have good leverage.
A Okay.
Excellent.
Q I had an idea of having Rob on a text thread and me texting all people like I know you do. He still doesn't quite see what it means to hold people and push it through.
Okay. I begin today.
A And why do we have no cash flow?
Q Cash flow. We have 50K pending from PayPal. We got 40K of it in the middle of the night. 10K from Eventbrite still pending. Then there is 62.5K of intensive money that's been sold and announced and hasn't made it to the bank.
A Hasn't made it to the bank, why?
Q 12,500 from Natalie and Paul. 10,000 from Leah. P30,000 from London. 5,000 from Marc Quinn. 5,000 from Leah M.
That's the 62,500 that needs to come in before month's end.
Yes.
A But notally wrote a check, for example. Get that money, Jo. That will totally clog the system.
Q There have been some mishaps from RC getting yeses,

announcing them, to actually getting cash in the bank.

I am getting it all before the end of the month.

Natalie and Paul have check and asked to wait a week to cash.

A What's the 30K from London?

Q Rohit, Sonya, Maya.

I'm working on RH.

A What's happening.

Yes, but what is happening with the money.

Q For the 62.5K, RC reports before we, quote, get the money.

She just told me she signed up Leah P. yesterday and Kenan said to wait until next week to cash the check.

I told her we need it this month.

A Getting it. Like Rohit, for example.

Q You mean where is it being spent?

People say yes and then they say, quote, my payment needs to come later.

Most of them say in a week.

Rohit is saying, quote, divorce finance troubles.

A Talk to Rachel about that ASAP.

Q Doing it now.

We chatting now.

A Yes.

MS. GUPTA: If we could please pull up for the

witness only Government Exhibit 1456-DR, which is tab 35-D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Kenan, Nicole Daedone, ms.joannav@me.com, and Justine Dawson.

Q On what date?

A March 12, 2014.

Q And is this a fair, accurate, and redacted depiction of the original Government Exhibit 1456 you reviewed that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1456-DR.

MR. ROBOTTI: We object as hearsay, irrelevant, and cumulative.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1456-DR is admitted.

(Government Exhibit 1456-DR received in evidence.)

(Exhibit published.)

Q Special Agent Punzo, for this one, I'll ask you to start and we can alternate.

A For the marketing stuff, I want to build a marketing platform around this new content. I'm debating between two

taglines. Either Orgasm Supercharges Orgasm, or we piggyback on top of, quote, Powered by Orgasm.
Q He likes email.
A Thoughts? I think, quote, Orgasm Supercharges Fulfillment is more informative, but, quote, Powered By Orgasm feels more fun.
Q Keep Powered by Orgasm. I like the subtle god reference.
A Okay. I'll email him. Okay, we stick with Powered by Orgasm then and build the new marketing around that.
There are lots of fun memes/videos we can do with Powered by Orgasm too.
Q Totally.
A Yes. Agreed.
Q Yes.
A Cool.
MS. GUPTA: If we could pull up for the witness only Government Exhibit 1512, which is tab 10.
Q Special Agent Punzo, what is this?
A An email.
Q Between who?
A Nicole Daedone and justine.dawson@onetaste.us.
Q On what dates?
A May 13, 2014.
Q And you look through this document, are there multiple

email threads?
A Yes.
Q What do they start?
A On May 13, 2014.
Q And I'll just direct you to around the middle of the page, the very first email from Justine Dawson, what's the date of that? I think it's up on the screen.
A I see. May 12, 2014.
Q What is the subject line of this email?
A Daily Report.
Q Does this appear to be a fair and accurate depiction of an email between Nicole Daedone and justine.dawson@onetaste.us?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1512.
THE COURT: Do you want to speak to the Dawson portions?
MS. GUPTA: Yes, Your Honor. Those are not being offered for their truth.
THE COURT: Any objection?
MS. BONJEAN: Again, Your Honor, anything that's offered for that purpose, we'd ask that there be a limiting instruction.
THE COURT: Okay. We're going to have to take this up after the break. I'll sustain the --

Is there an objection now?

MR. ROBOTTI: Yes. We object.

THE COURT: I'll sustain the objection and come back to it.

MS. GUPTA: Thank you, Your Honor.

If we could go to Government Exhibit 1549-DR for the witness only. And this is the tab 27-D.

THE COURT: I'm sorry. Tell me the numbers again.

MS. GUPTA: Oh, apologies. I think I have the wrong tab. It's 1549-DR.

THE COURT: Yes, it's not in that tab.

MS. GUPTA: It's tab 37-D.

THE COURT: So 1549-DR.

MS. GUPTA: Yes, at tab 37-D. Apologies.

THE COURT: Go ahead.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A ms.joannav@me.com and Nicole Daedone.

Q On what date?

A June 26, 2014.

Q And does this appear to be a fair, accurate, and redacted depiction of the original Government Exhibit 1549 that you reviewed that's subject to stipulation between the

parties?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1549-DR.
MR. ROBOTTI: Your Honor, we object as irrelevant and hearsay.
MS. BONJEAN: Join.
THE COURT: Overruled.
Government Exhibit 1549-DR is admitted.
(Government Exhibit 1549-DR received in evidence.)
MS. GUPTA: Thank you. And if we could please publish.
(Exhibit published.)
BY MS. GUPTA:
Q Special Agent Punzo, I'll ask you to read Nicole Daedone and I'll read Joanna V.
A How did meeting go?
Q Very good.
Rob and RC were there as well.
They are very turned on.
They will all get a loan for 233K.
They met afterwards to create their business plan.
Brooke is contacting her mom and her money manager today.
We meet again tonight after the lecture to review

their business plan, talk about money and next steps.
A When loan? When signed? Ipolita?
Q Ayries needs to ask Ravi for the money. She can do that after we meet again tonight. Maya's mom is out of town. She and I and Rob are meeting with her step mom tomorrow or Sunday.
I don't have a gauge on how long it will take Brooke to get the money.
It didn't seem challenging to her when we spoke about it.
A Okay. These things need to be secured. So tumescence doesn't get out if hand.
So how will it go?
His will it go Jo? The deposit being 250K. Good. When do Natalie and Paul sign?
Q Got it. Yes.
Special Agent Punzo, we can skip ahead to page 4, and I'll ask you to start at Nicole Daedone's message at 11:03:44 a.m.
A What about asking the girls if they would be interested in one more partner and suggesting Po.
Q Yes. They say, quote, fuck yes. I'm starting the dialogue with Po. They would each then pay 175K.
A That's pretty hot. Wait, how much New York, Maya, Ayries, Po, Brooke? 175x4 equals 700K.

Q 700K up front and 1 million over time has been our offering.
A Oh, oh, great.
When are the girls signing the deal?
Q This is from Po: Let me sit on it. I want to get clear if I'm interested in owning. I've been super responsible since 13 years ode. I'm kind a in, quote, semi retirement. Not sure if I want to be held down. When do you need to know by?
Signatures for LOI Sunday/Monday.
A I'd say they are signing on Sunday.
Q Done.
A No pressure. Just want to keep you in the loop.
Q Yes.
A Following the sales of the cities, the city people will need a ton of training. While we have Marjean, we should create train the trainer type the experiences with her and have her pass on all of her information and video it.
Did Po ever write back. What about Nicole Cox.
Q Yes. I agree about Marjean. We film everything she does and train a ton. We also don't stop looking for the next one. Po wrote back that she will let me know.
A Precisely.
Q Nicole hasn't written back. We never got to the offer because she was sparse on her text. I can speak to Nicole

this weekend.
A I wrote to Marc from TR and just asked straight out who he knows.
And Mike, the guy who is helping with the intensive, was a recruiter and I asked him.
Q Awesome. I will ask Reese about how polish, asterisk, Joe.
A Great.
Q Special Agent Punzo, I'll ask you to just skip ahead to the bottom of page 9, the message at 4:08:48 p.m.
A Could he get the full amount or is there someone else who could? I am always big on having backups because then you can negotiate harder.
Q He's of the investor world. He know that is game.
A This has got to end. It's killing sales.
Q I will find two backups.
A The amount of attention that is going into these sales.
Q Okay. I agree. I feel it. I will find backups.
A What else is happening over there?
Q Rob, Hamza and I en route to lecture. We will know about NYC after lecture. It feels like we'll could anchor in more together. It's been a day of, quote, running around.
A Yes, anchor in. The nail the NYC contract. Let's get this shit handled.

Q Yes. On it. We'll get it handled and finished.
A So give me the precise timeline for New York.
Q Tonight: Get overt yes and timeline set and give them LOI. Friday: Meet with Maya's step mom and ask for their loans. Saturday: Begin to finalize terms. Sunday: Sign LOI and get first 250K. Two weeks: Due diligence and working the final docs.
A When receive 700K.
Q We receive the additional 450K by July 13th.
A Okay. And when is Po writing back? When is Ayries talking to Ravi?
Q I told her we are signing Sunday. I will check in with her tomorrow.
A So tonight we will get a firm yes from Maya, Brooke, and Ayries.
Q Ravi's 250K will be the deposit because that amount is in his checking account.
A Excellent. When is she talking to him, and how much immediate access does Brooke have? She must have quite a bit available.
Q I am finding out what she has access to. RC says she had a fund that is just her own. I will have Ayries talk to Ravi tonight after our meeting.
A Okay, good. And how much are we selling at this lecture?

Q $5,000.
A What?
You can make that selling a pair of panties.
Q I will talk to RC.
That number is the one I text, not a number she told me.
Hahahaha.
13K, two August immersion a paid in full.
A Okay. That's better.
Q Po just wrote: Do you have numbers that show that NYC is profitable?
A I'd write yew.
Yes.
We do, right?
Q Yes, we have many documents. I told her yes.
She joining our meeting tonight.
A Really? That's exs celery.
Excellent.
Q Yes.
Three of them are Scorpios.
We leaving now.
They have 24 hours to be a yes energetically, sign the LOI, and have 250K down.
Now we have call with Jason, the attorney, and then Natalie and Paul.

MS. GUPTA: Now if we could please pull up for the witness only Government Exhibit 1757, and this is tab 13.
Q Special Agent Punzo, what is this?
A An email.
Q From who?
A yia.vang@onetaste.us to --
Q Oh, sorry. Go ahead.
A To Nicole Daedone, joanna.vanvleck@onetaste.us, kenan.wang@onetaste.us, and jason.thompson@onetaste.us.
Q What is the date of the email?
A November 6, 2014.
Q And does this appear to be a fair and accurate depiction of an email from Yia Vang to the individuals you just mentioned?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1757, which is also subject to stipulation between the parties.

MR. ROBOTTI: Your Honor, we object as irrelevant, hearsay, violation of the confrontation clause.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1757 is admitted.

(Government Exhibit 1757 received in evidence.)

MS. GUPTA: Thank you. If we could please publish

to the jury.
(Exhibit published.)
Q Special Agent Punzo, what is the subject line of this email?
A Nov 5 Update.
Q I'd like you to just read the first two paragraphs, please.
A Hi guys. Sorry haven't been updating daily. Haven't had my attention on anything else but NDI since it started. Starting tomorrow I'll be able to put my attention on other curriculum work. We're hitting a flow with the retreat. Spoke to Kenan last night briefly about curriculum planning and goals, so will start looking at that in more detail.
Some student updates. Students are hitting their edges. Brooke - hitting the place where she wants to run because it's too much. Cried tonight. I think she got whacked when RC said Ravi and Maya will be teaching the HTO course in NYC. She's also wanting to go out and get some sun so she's getting cooked.
Q We can stop there. Thank you.
MS. GUPTA: Could we pull up for the witness only Government Exhibit 2033-DR, which is tab 46-D.
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?

A Nicole Daedone and Joanna V.

Q On what date?

A November 23, 2015.

Q And does this appear to be a fair, accurate, and redacted depiction of the original Government Exhibit 2033 that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2033-DR.

MR. ROBOTTI: Your Honor, we object as irrelevant and on 403 grounds.

THE COURT: Ms. Bonjean?

MS. BONJEAN: One second, please.

THE COURT: Sure.

MS. BONJEAN: I would join that objection.

THE COURT: Overruled.

Government Exhibit 2033-DR is admitted.

(Government Exhibit 2033-DR received in evidence.)

MS. GUPTA: Thank you. If we could please publish.

(Exhibit published.)

MS. BONJEAN: I'm sorry, Your Honor, just for clarity's sake -- okay.

THE COURT: Ready?

MS. BONJEAN: I think so.

THE COURT: Go ahead. It's admitted.

MS. GUPTA: Thank you.

Q Special Agent Punzo, if you could please read Nicole Daedone and I'll start with the first message from Joanna V.

Good morning. Got text back from Brooke. She's flying back from Costa Rica this morning. We got some hellos in. She text me when she lands back in the states.

From Brooke:

I did say that. And I do think it's true in a sense. Not that it's necessarily intentional. I think it was often called training. And I experienced a lot of shaming around my desires and being told that things were off stroke and I couldn't do them. Particularly by staff that had been in longer. I haven't found clarity around a lot of this stuff still, to be honest. I know it hurt. A lot. And I know I felt deeply ashamed of my desires and path and existence often. I know what a lot of that was my codependency. I also know that that wall between me and my desires strengthened my backbone and resolve. I love you. And I love everyone I worked with. I'm thankful for absolutely everything I learned at OT.

And much of it hurt like hell and I'm still in pain and healing the wounds. As well as grieving and missing the entire lifestyle deeply. I don't have any answers yet. All I have is a ton of complex and conflicting

emotions and more love than I know what to do with. Part of expressing what I went through is me trying to break the silence and the shame and come to peace and acceptance with it. I have tried to do so as responsibly, consciously, and cleanly as possible. And it looks different than how I did it in OT. If it causes you or anyone else at OT harm, I am willing to clean it up.

A Thank you for that. I want to do anything I can to keep the connection feeling good. From talking with Ulysses to going out to tea. I have not realized there was so much internal conflict, and just as you feel love you don't know what to do with over here, so do I with you. Would it feel good to get together and talk?

Q Sent.

From Brooke: Oh my god Jo, that just brought tears to my eyes. I would love that.

A I'm so sorry you didn't know that. That's my fault. I just haven't known how to love you and miss you and give you your space. Let's do it. What sounds good? Are you in the Bay Area?

Q From Brooke:

I totally understand. I felt that often. God, I missed Billy and Rob and Andreas and had no idea what to do to tell them that or if I should. And on the nights I miss you guys the most, such as last night when Karl pulled over

the car, climbed the center console, kneeled in the passenger foot well, and held my while I balled about missing Raf and OT, I remind myself you miss me too. There's nothing clean or black and white about emotions this deep. And I think much of the anger and pain I and everyone else who's left feels, is truly deep longing and love that's unable to flow. And that doesn't mean it's not compelling. Lunch of coffee or something would be so so good. I think I'll be in SF in January next.

A Perfect. To be honest, it's hard being the one left behind too. I hope that doesn't offend that same love doesn't know what to do with itself for me. Nicole said her coffee with you was so healing and I thought, quote, I want that with her too, but I think I felt rejected and hurt. I am ready now. I don't want to lose you as a friend.

Q Sent.

From Brooke:

I don't either. I never did. It's my hope with so so many OT people that we can share our lives. If we get married. Or have kids. Or 20 careers. Or travel. Or change the world in other mediums together. I want to be a part of it. A witness, a support, a love, arms to catch each other. Friends.

A Parentheses, now you can write whatever you'd write, but you get the vibe. That's our new vibration.

Q Got it.
MS. GUPTA: If we could pull up for the witness only Government Exhibit 2173-DR. And this is tab 51-D.
Q Special Agent Punzo, what is this?
A A chat.
Q With who?
A Nicole Daedone, Joanna, Eli Block, and that's it.
Q On what date?
A August 10, 2016.
Q And does this appear to be a fair, accurate, and redacted depiction of the original Government Exhibit 2173 you reviewed that's subject to stipulation between the parties?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 2173-DR.
MR. ROBOTTI: Your Honor, just one moment.
THE COURT: Sure.
MS. BONJEAN: I'm sorry, Your Honor, one second. I seem to be missing something.
THE COURT: That's fine. Take your time.
It's only one page.
MS. BONJEAN: Okay. That makes it easier. Thank you.
Objection based on -- I don't know, did

Mr. Robotti --

THE COURT: He did not.

MR. ROBOTTI: Your Honor --

THE COURT: You can't rely on him if he hasn't said anything yet.

MS. BONJEAN: That's true.

THE COURT: Go ahead.

MR. ROBOTTI: Your Honor, we object as irrelevant and on 403 grounds.

Ms. Bonjean, feel free to join.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 2173-DR is admitted.

MS. GUPTA: Thank you.

(Government Exhibit 2173-DR received in evidence.)

MS. GUPTA: And if we could please publish.

(Exhibit published.)

BY MS. GUPTA:

Q Special Agent Punzo, for this one, I'll ask you to start reading Nicole Daedone and we can alternate from there.

A So just so you all know, last week I told Yia and she could come back from Austin in three months if she becomes our top salesperson. Equals.

Q I love that game.

A Oh, be still my heart.
Q She's doing it.
A And I'm working with Rachel daily. I told her this is like when we had to pay Reese back, only I have a new goal. I want a media company ad. We need money to not be dependent on anyone. She's crazy turns on.
MS. GUPTA: If we could now pull up for the witness only Government Exhibit 2030-D, which is at tab 45-D.
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Kenan Wang and Joanna V.
Q On what date?
A November 15, 2015.
Q Is this a fair and accurate depiction of the original Government Exhibit 2030 that's subject to stipulation between the parties?
A Yes.
MS. GUPTA: Apologies, Your Honor. I think we may have discussed coming back to this one.
THE COURT: Yes. You can go to the next question.
MS. GUPTA: In that case, could we pull up for the witness only Government Exhibit 2256-DR, which is tab 54-D.
Q Special Agent Punzo, what is this?

A A chat.
Q Between who?
A Nicole Daedone and Justine Dawson.
Q On what date?
A January 5, 2017.
Q And does this appear to be a fair, accurate, and redacted depiction of the original Government Exhibit 2256?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2256-DR.

MR. ROBOTTI: Your Honor, we object on relevance grounds.

MS. BONJEAN: I object on relevance, hearsay, not in furtherance.

MR. ROBOTTI: We'll join those too.

THE COURT: Give me one moment, please.

I'll hear from you, Ms. Gupta.

MS. GUPTA: Yes, Your Honor. On relevance --

THE COURT: No, I'll hear from you not on relevance, but on the other objection.

MS. GUPTA: Apologies. They're statements of a party opponent, 801(d)(2)(A), and the other statements are provided just for context and not for their truth.

MS. BONJEAN: I would also object on 403 grounds.

THE COURT: Objection is overruled.

Government Exhibit 2256-DR is admitted.

(Government Exhibit 2256-DR received in evidence.)

MS. GUPTA: Thank you. If we could please publish.

(Exhibit published.)

BY MS. GUPTA:

Q Special Agent Punzo, I will ask you to read Nicole Daedone and I'll read Justine Dawson.

A Where I got to for myself is this.

Not about gratification, non-gratification, none of it.

What the heck things do I have to do to have an honorable discharge.

What have I not completed on my contract.

So much of what I was doing was gratuitous.

Q Yes, that's where I confuse myself.

Like at what point do I pick up the list?

Meaning, how far back in time.

Or what the current status is.

A I sat down in front of the computer and started feverishly writing.

It corrected me.

And added and subtracted stuff.

Q I started that. That's how I got to the sutras. It was the only one that was truly clear beyond fear or ego.

A That's a great start.

Unfortunately I erased everything when the legal scare last year.

Or I would send you mine.

THE COURT: Ms. Gupta, I'm going to want to take a break in the next few minutes. Is now a good time or do you want to go another couple minute?

MS. GUPTA: Could I just do one more and then I think we'll be at a good stopping point?

THE COURT: Sure.

MS. GUPTA: Could we pull up for the witness only Government Exhibit 2350-DR, tab 59-D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Joanna Van Vleck and Rachel Cherwitz.

Q On what date?

A June 18, 2017.

Q Does this appear to be a fair, accurate, and redacted depiction of the original Government Exhibit 2350 that you reviewed?

A Yes.

Q That's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit

Government Exhibit 2350-DR.

MR. ROBOTTI: Your Honor, just one moment.

THE COURT: Sure.

MS. BONJEAN: This is just one page?

THE COURT: No, it's several pages.

MS. GUPTA: No, it's 12 pages.

THE COURT: I have six pages.

MS. GUPTA: Oh, apologies. You're right, Your Honor, that's correct.

MR. ROBOTTI: Your Honor, we object on relevance and hearsay grounds.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, I would join that objection.

THE COURT: Overruled.

Government Exhibit 2350-DR is admitted.

(Government Exhibit 2350-DR received in evidence.)

BY MS. GUPTA:

Q Special Agent Punzo, I'll ask you to read Rachel Cherwitz's messages and I'll read Joanna Van Vleck.

A It's so funny.

They either overextend or massively under extend.

Q Totally.

And having sex is just a part of your daily upkeep.

Not a part of your job.

A Dude.

I think it's something we say tomorrow too, like, yo, you gotta do your practices.

To witch, Andrea - membership PIF. Taisha - lineage. Heidi - membership.

Q Going through the intensive lists, what happened to the Forsblad people.

Are we on good terms with them?

A We are on good terms. They are happy and doing Ayahuasca.

Q Oh, good.

Okay.

I am marking the people who may be risky people.

A Okay. Femke and Sean risky.

Q How is Corey Kashawagi.

A He's happy. Doing his own thing, but happy.

Do you want me to highlight which ones are risk potential.

Q Sure.

Come to the document.

I'm doing in blue.

You can do it with me.

A Okay. I get my laptop.

What do we do with these people?

Q Well, let's think.

Do we invite them for a night on the land.
Some have been.
I think the biggest thing is to keep it warm and open with them.
A Maybe.
Q A reconciliation of sorts.
A Like another reunion?
Q Well.
I think more individually.
A Yeah.
Brooke should be on that list.
Is Nic worried about these people?
Q I think a bit.
She's worried that they have the recorded teachings and that they will use it against her.
In some way. Her strokes.
A Can I ask you something?
Q Yes.
A Why now would she, one, be worried that people would use it against, and two, why would people all of a sudden want to?
I just don't understand.
Q I'm not sure.
I think she got real scared from the hebb thing.
And is worried that things will be used against

her.

That is all I know.

A Aye aye aye. Okay.

She feels scared.

Like in a way I haven't ever felt her before.

Q Yeah. For sure.

I think she feels she stayed too long.

Like after the sale.

And then there is a way she is trying to get all the way out.

MS. GUPTA: Your Honor, I think we're at a good breaking point. Thank you.

THE COURT: Okay. So let me ask the witness to step down.

(Witness leaves the stand.)

THE COURT: Okay. We'll come back at 11:45.

Don't talk about the case. Keep an open mind. I'll see you in slightly less than 20 minutes.

(Jury exits.)

(In open court; jury not present.)

THE COURT: Okay. So here's what I'm going to ask you to do in the next 20 minutes to make this even more efficient. To the extent that there are texts that the Government is going to be putting in that the defense anticipates it will want any sort of limiting instruction

on, maybe you can figure out what's the most efficient way to do that. You can present specific language to me, you can ask me to repeat it after every question or every text, or we can do it sort of more categorically.

I'll hear from the parties on that. But it may just be you've got certain ones that fall into certain groups and can be done that way.

MS. BENSING: That's fine, Your Honor. I sent you over, during this portion of testimony, a proposed limiting instruction. Obviously they probably haven't had a chance to look at it yet, but I do think we need to resolve it during the break because I think we're needing to admit some of these.

THE COURT: Right. What I'm understanding so far is the biggest category is statements that are being offered as context for statements of either the defendants or co-conspirators; is that correct?

MS. BENSING: I think so, Your Honor, but obviously I'll let the defendants speak to that.

MS. BONJEAN: Yes, Your Honor. And again, with the one text where Ms. Daedone is reading from what was said in a New York Times article --

THE COURT: Let me ask you about that one. That one might take a little bit more thought by the parties, if you want to propose an instruction. But that was 2075-DR,

correct?

MS. BENSING: Yes, Your Honor.

THE COURT: And it was really page 2, and it's a statement of Ms. Daedone referencing The New York Times article, correct? Tab 47.

MS. BENSING: Yes.

THE COURT: Is that the one, Ms. Bonjean?

MS. BONJEAN: Yeah. It's a long text. I'm getting to that part.

THE COURT: That's fine.

MS. BONJEAN: Okay. Yes, it's 2075-DR.

THE COURT: Page 2 is what you're really focusing on, right?

MS. BONJEAN: Yes, page 2.

THE COURT: It's a statement of the defendant. So what is it that you think needs to be limited here?

MS. BONJEAN: Well, it's a statement of the defendant, but she's -- she's reading, in part at least, what is contained within The New York Times article.

THE COURT: What exactly are you looking at? Because it looks like she's putting her own words out here.

MS. BONJEAN: Yeah, that's -- that does seem to be, in part, true. Again, it's hard to tell whether she's -- that first sentence, it wasn't clear to me whether she was quoting. But in any event --

THE COURT: Doesn't look like it, right?

MS. BONJEAN: In any event, even though she is talking about how The New York Times is referencing cult, you know, our position is these statements from The New York Times, they are -- ultimately, at their core, they are hearsay statements.

But even if the Court is not persuaded of that, they are, you know, not -- there are 403 issues with these statements because this is just -- has the potential to greatly prejudice the defendants while giving very little probative value, from our perspective. She's commenting on a New York Times article which really the jury shouldn't be learning anything about. Again, I don't see this as a notice issue, so I'm not sure what the probative value is, or at least I would argue that it doesn't outweigh the prejudicial effect.

THE COURT: Okay. So yours is really -- it's not a limiting instruction issue. Just you're objecting to admission on relevance grounds, it sounds like.

MS. BONJEAN: Well, to the extent it's relying on information that was obtained from The New York Times and she's responding to it, I would say in part it's coming from hearsay statements. But I agree that --

THE COURT: I get the sense you don't think that's your strongest argument.

MS. BONJEAN: I don't think it's my strongest argument.

THE COURT: Let me hear from the Government --

I'm sorry, I didn't mean to skip over Ms. Cohen or Mr. Robotti if you wanted to be heard additionally.

MR. ROBOTTI: Nothing beyond what Ms. Bonjean said.

THE COURT: Okay.

Ms. Bensing or Ms. Farrell or anybody else on the Government table there?

MS. BENSING: I don't know much needs to be said. I think it's a statement of the party opponent.

THE COURT: Yes, I agree with that. I don't think there's a 403 issue, and I also think that this is clearly a statement of one of the defendants.

But on the other issue, you'll talk to each other and you'll let me know your proposal in the next, I don't know, ten minutes or so?

MS. BENSING: Yes, Your Honor.

MS. BONJEAN: Yes. We sent over one to them as well.

THE COURT: Yes, I didn't realize there was so much communication between the parties going on while the trial was proceeding. But as long as it's being efficiently done, it sounds good to me.

Okay. We'll see everyone in ten minutes.

(Court is in recess.)

(In open court; jury not present.)

THE COURT: Everyone can be seated.

So it sounds like maybe there's no agreement.

Here's what I'm going to propose, if there's a request for a limiting instruction relating to statements coming in for context and not for the truth, here's what I propose to say:

As I mentioned to you before, there are certain circumstances where testimony or other evidence may be admitted for a purpose other than for the truth of what is said or written. This is one such circumstance. The statements in this exhibit of -- Mr. or Ms. whoever -- are being admitted not for the truth of the statements, but for the purpose of providing context for the other statements. You may consider the statements that are being admitted for context only for that purpose.

MS. BONJEAN: Your Honor, I have no issue with that instruction.

I would point out that just looking at the text exchange between I think it's Joanna Van Vleck and Kenan Wang that references Ayries' allegations -- so there's two types of statements there. There's Kenan Wang's statement, who is for context, and then there's references to Ayries

Blanck's accusations, which isn't for context exactly, but also not being offered for the truth. So Ayries Blanck's lawsuit saying -- Joanna Van Vleck saying what Ayries Blanck is accusing OneTaste of is also not for the truth, but I don't think it's for context either. So I think there needs to be --

THE COURT: You tell me what you're proposing.

MS. BONJEAN: So I think we did come up with -- I think your instruction is fine. I think it will be important to just say something along what the Court has said for context and/or -- I mean, I think with Ayries Blanck, the Government's saying that's for notice, which is not context. And I don't know that the Court should say for notice as much as any statements regarding allegations by Ayries Blanck is not for the truth --

THE COURT: Right, but I think that would be covered by the statements of whoever the person is, right?

MS. BONJEAN: Well, not really because the Government and the Court has found that the statements of Joanna Van Vleck are for the truth.

THE COURT: Yes, I'm talking about Kenan, I think, in this instance.

MS. BONJEAN: For Kenan, I think your instruction is fine. What I'm concerned about is Joanna Van Vleck discussing what Ayries Blanck has accused OneTaste of.

THE COURT: I hear you now.
MS. BONJEAN: That's the most prejudicial.
THE COURT: So how many exhibits does it show up in?
MS. BONJEAN: I think just this one, right?
THE COURT: Tell me the number again.
MS. GUPTA: 2030-D.
THE COURT: Can you tell me the tab number, please?
MS. GUPTA: Oh, tab 45-D.
THE COURT: Thank you.
At some later time you can tell me what order these things are all in.
MS. BONJEAN: I'd like to know, as well.
THE COURT: What page exactly, Ms. Bonjean?
MS. BONJEAN: So everything is fine for context until we get to page 2, where Joanna says: Ayries has sent a demand letter to us demanding 3 million for a list of things we did wrong. That part doesn't --
THE COURT: It's not really a statement, though, right, of Ayries.
MS. BONJEAN: Well, that part doesn't bother me so much.
THE COURT: Okay. Go ahead.
MS. BONJEAN: But if you get to the bottom of 3,

it says, well, you should read her claims that we forced her to have sex with clients, forced her to go to 12-step meetings, forced her to have sex for the job. And those statements in particular is her just telling Kenan Wang what Ayries Blanck is alleging in her demand letter.

THE COURT: Okay. Let me hear from the Government on this.

MS. BENSING: Well, the think the Court's formulation works still because the Court is being very, very clear that those statements are not being offered for their truth. I agree with Ms. Bonjean that they may not want an instruction as to what those statements are being offered for. So I think the way the Court had put it, so long as the Court makes it very clear that those statements are not being offered for their truth, and grouping Kenan and Ayries I think makes sense. You could say, for example, some of these statements are being provided for context, and that just gives one example. Or we could just omit that and just say they are not being offered for their truth. I mean, I don't think the Government has a strong --

THE COURT: Well, I think the jury needs to understand why they're getting something, right?

MS. BONJEAN: The problem is that the Government will get up in closing arguments and say Joanna Van Vleck as a co-conspirator, her statements can be considered for the

truth, and that is largely true with the exception of this double hearsay.

So I think the context word is okay. I don't necessarily need the Court to say "notice." But I think it does need to signal to the jury that if Kenan's statements and any statements made by Joanna Van Vleck that recount, you know, demands -- I mean, again, that part's tricky, but that really is the crux here. And I don't think -- I don't think the jury will know this because they're going to be told that everything Joanna says is for the truth. They're going to be given a very different instruction.

THE COURT: Okay. Let me think for one moment about this.

MS. BONJEAN: I mean, it could be as simple as any conversations about a demand letter by Ayries Blanck is not considered for the truth. I mean, I would --

MS. BENSING: Your Honor, I think I have a proposal, actually.

THE COURT: Okay.

MS. BENSING: So in the Court's formulation, you stay the statements in this exhibit of Mr. Wang or I think you can say Ms. Van Vleck's recitation of Ms. Blanck's statements --

THE COURT: I think we should separate it. I think that might be too complicated.

MS. BENSING: Okay.

THE COURT: I think that --

MS. BENSING: Because I think that's what they were asking for. They were concerned that we were going to say Ms. Van Vleck's statements can be considered. So I think if we're clear that Ms. Van Vleck's --

MS. BONJEAN: Recitation of Ayries Blanck's demands -- I don't know. Again, that part's --

THE COURT: I guess the second part is, what is the jury to be told about why those statements are coming in, right? Because it's a limiting instruction.

MS. BENSING: Yes, but --

THE COURT: If everybody's on board that they don't need to be told any more, I'm okay with that.

MS. BENSING: No, no, I thought the rest of the Court's instruction then works.

THE COURT: Because it references context. So if Ms. Bonjean is saying that's not for context, then --

MS. BONJEAN: I mean --

THE COURT: But if you're okay with the context word, then --

MS. BONJEAN: I'm okay, I guess, for context. I mean, I don't know that we have to distinguish between context and notice. You know, I don't -- I don't know, maybe my colleagues can feel differently about this.

MS. BENSING: I agree, Your Honor. I think the rest of the instruction works. I don't know that we need to get into the purpose of every single statement, and I think that the Court's limiting instruction will have the effect of telling the jury that these are not --

THE COURT: Not for the truth.

MS. BENSING: Yes.

THE COURT: Which is the key point.

MS. BONJEAN: Right. So long as the jury understands that when Ms. Van Vleck is reciting demands or allegations by Ms. Blanck, that that's not for the truth of --

THE COURT: Okay. Let's take this particular exhibit and say: The statements in this exhibit of -- it's Mr. Wang, right? Wang.

MS. BONJEAN: Yes.

THE COURT: And the statements of Ms. Van Vleck that are recounting -- or -- what's the right word?

MS. BONJEAN: Or even relate to, maybe. I don't know.

THE COURT: That reference?

MS. BONJEAN: Yes, reference.

THE COURT: Reference claims by --

MS. BONJEAN: By Ayries Blanck.

THE COURT: Let me just see if they have the full

name here.

MS. BENSING: No, I don't think so.

THE COURT: I think I need to just say Ayries here because they don't say anything about Blanck.

Let me read this to you and you'll tell me if this works for this particular exhibit or any other exhibit where it's just the context issue. If you ask for an instruction, I'll give the instruction that I read earlier that's just for context. But for this one, this is the entirety of what will be said, assuming that this is the first time that we'll be giving the limiting instruction on these texts:

As I mentioned to you before, there are certain circumstances where testimony or other evidence may be admitted for a purpose other than for the truth of what is said or written. This is one such circumstance. The statements in this exhibit of Mr. Wang and the statements of Ms. Van Vleck that reference claims by Ayries are being admitted not for the truth of the statements, but for the purpose of providing context for the other statements. You may consider the statements that are being admitted for context only for that purpose.

Does that work for everybody?

MS. BENSING: Yes, Your Honor.

(Continued on the following page.)

MR. ROBOTTI: (Continuing) Your Honor, I think we had agreed with the Government on one additional point in the instruction we were working on, which is that the parties may dispute whether what was said was true.

THE COURT: No, I don't think that's helpful at all to the jury. I think that would be very confusing. I'm telling them that it's not being offered for the truth.

MS. BONJEAN: Yes.

THE COURT: I think that's much clearer and safer, frankly, for everybody. Okay? I think we can't give the jury sort of confusing instructions.

Ms. Bonjean, are you fine with what I read?

MS. BONJEAN: Yes, I am, Your Honor.

THE COURT: Okay. And Mr. Robotti, anything else you want to be heard on, on this?

MR. ROBOTTI: Just one second, Judge.

THE COURT: Yes. Sure.

Ms. Bensing, in the meantime?

MS. BENSING: No. I think that works, Your Honor.

THE COURT: Okay.

You're going to have me apologizing to the jury all day for keeping them waiting, but I think this is important to not do in front of the jury, obviously.

(Pause in proceedings.)

MR. ROBOTTI: Yes, that works for us, Judge.

THE COURT: Okay. So we'll do that.

Is there any -- you were about to say something, Ms. Bonjean. Go ahead.

MS. BONJEAN: Yes. Just for moving forward.

THE COURT: Yes.

MS. BONJEAN: How would the Court like me to communicate if I can -- if another e-mail comes up for this?

THE COURT: You have to request a limiting instruction.

MS. BONJEAN: Okay.

THE COURT: You can -- you know, if you request a limiting instruction, the one I will give, other than for this document obviously, is the one I read initially without -- you know, with just the context and the one person.

MS. BONJEAN: Okay.

THE COURT: Or number of people, whoever's statements they are.

And I will -- I would ask Ms. Gupta to make clear, when you're offering, if there are statements that you're only offering for context because I think that will help to flag for the Defense that if they want to make a limiting instruction request, they can do that.

Does that work for everybody?

MS. BONJEAN: Yes. Thank you.

MR. ROBOTTI: Yes, Judge.

MS. BENSING: Yes, Your Honor.

THE COURT: Okay. Let's bring back the witness and bring back the jury then.

And I will leave it to you to ask, the Defense, to ask at the time that this document is being offered, for a limiting instruction.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

And again, I apologize for keeping the jury waiting. I know your time is important. And my apologies.

You may continue your examination, Ms. Gupta.

MS. GUPTA: Thank you, Your Honor.

Can we pull up for the witness only Government Exhibit 2030-D which is tab 45-D.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A One moment.

Kenan Wang and Joanna V.

Q On what date?

A November 15, 2015.

Q And is this a fair and accurate depiction of the original Government Exhibit 2030 you reviewed subject to stipulation

between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2030-D.

MR. ROBOTTI: Judge, we maintain our previous objections.

MS. BONJEAN: Yes, Your Honor, we maintain our previous objections and ask for an instruction related to this.

THE COURT: Okay. So I am admitting Government Exhibit 2030-D.

(Government's Exhibit 2030-D received in evidence.)

THE COURT: Ladies and Gentlemen of the Jury, as I mentioned to you before, there are certain circumstances where testimony or other evidence may be admitted for a purpose other than for the truth of what is said or written. This is one such circumstance.

The statements in this exhibit of Mr. Wang and the statements of Ms. Van Vleck that reference claims by Ayries are being admitted not for the truth of the statements, but for the purpose of providing context for the other statements. You may consider the statements that are being admitted for context only for that purpose.

You may proceed, Ms. Gupta.

MS. GUPTA: Thank you, Your Honor.

And if we could please publish to the jury.

(Exhibit published.)

Q So, Special Agent Punzo, for this one I would ask you to read Joanna V and I will read Kenan Wang.

A Kenan.

Q Joanna.

A I have to tell you something and it's confidential. Are you awake for a minute still?

Q Okay. Rachel is looking at my screen right now. You can call me, though. I'm up for another minute.

A I'm sitting with Nic. Can only text.

Q Okay. Tell me. Rachel is going to look away.

Rachel not looking at my screen anymore, so you can tell me.

A Okay. So Ayries has sent a demand letter to us, demanding 3 mm for a list of things we did wrong.

Q Oh, brother.

A Mainly things that she claims RT did to her.

Q That is hilarious.

A (Her attorney sent this letter.) This is confidential.

Q Yeah.

A So, we are going to mediation. Most likely, we will end up somewhere around 300k that we have to give her.

Q That's ridiculous.

A Yep. It's on December 16th. The mediation.

Q Do we feel like that is fair?
A The other option is to let her sue us. Well, you should read her claims, that we forced her to have sex with wealthy clients, we forced her to go to 12-step meetings, forced her to have sex for the job.
Q Omg.
A And, out of context, some of that may be true.
Q Yeah, 12 steps maybe. And I'm sure there are places she felt coerced in some way. That I don't deny.
A Totally. And, we aren't telling people. So this is top secret.
Q And I don't deny that Rachel or any of us aren't at fault. Yes, I won't tell anyone.
A Yeah. On some level, this is our wake-up.
Q But 300k is a lot.
A That we can't play like that anymore, even to people we think are "in." 'Cause we all thought Ayries was in and now we are dealing with this.
Q Yes. Reese was right on the money once. You get to this point, people sue. Yes. We weren't clean.
A And Rachel is having to see what her actions do, the weight of it. We for sure were not clean.
Q Yeah. And that's on all of us to some extent.
A Totally. None of us stopped her.
Q And even used it at times.

A For sure.

So, what I am wondering is if you have any texts with Ayries that are still on your phone.

I've collected her OM Hub posts. That shows she was having a great time.

Q Yeah, possibly.

A And happy as a clam.

We are trying to get stuff that would show she was not perfect herself.

Q I will look.

A Send all if you can. Thank you. I will review. Sounds good. Now go to bed.

Q Okay.

MS. GUPTA: If we could go to Government Exhibit 1512, which is tab 10.

Q Special Agent Punzo, what is this?

A An e-mail.

Q From who?

A Nicole Daedone to justine.dawson@onetaste.us.

Q What date?

A May 13, 2014.

Q And I believe we discussed this one earlier. Does this contain a few different e-mails?

A Yes.

MS. GUPTA: Your Honor, we move to admit

Government Exhibit 1512.

THE COURT: Do you want to speak to the various statements?

MS. GUPTA: Yes, Your Honor.

So, some of the statements are 801(d)(2)(A) and others are not being offered for their truth.

THE COURT: You are going to have to specify which statements are not being offered for their truth.

MS. GUPTA: Yes, Your Honor.

So, halfway down the page, the e-mail on May 12th at 10:55 p.m., those are not being offered for their truth.

THE COURT: And what about the one on May 13th at 8:02?

MS. GUPTA: Correct. That's also not being offered for its truth.

THE COURT: Is it correct to say that these statements of the person who is not Ms. Daedone are not being offered for the truth?

MS. GUPTA: Yes, Your Honor.

THE COURT: Okay. Are you offering this document?

MS. GUPTA: Yes.

THE COURT: Okay.

Any objection?

MR. ROBOTTI: Yes, Judge. We object on relevance and hearsay.

MS. BONJEAN: Yes, Judge. We join that objection and ask for an instruction as to the other participant in the e-mail.

THE COURT: Okay.

Government Exhibit 1512 is admitted.

(Government's Exhibit 1512 received in evidence.)

THE COURT: Members of the Jury, the statements in this exhibit of Ms. Dawson are being admitted not for the truth of the statements, but for the purpose of providing context for the other statements. You may consider the statements that are being admitted for context only for that purpose.

Go ahead, Ms. Gupta.

MS. GUPTA: Thank you, Your Honor.

(Exhibit published.)

Q So, Special Agent Punzo, if you could please start by reading the e-mail from Justine Dawson on May 12, 2014 at 10:55 p.m.

A We made today $24,734 today. $2,234 over the goal.

Leah moved her stuff out this evening, so now the SF transitions are mostly complete and people can start settling. RC moves her things to LA tomorrow.

The morning meeting went well. People didn't have much to say or ask, but they felt good to have things named and on the table.

Henry's last day is Thursday and that will complete this big round of layoffs and changes.

Lianna is having a hard time. I talked to her this evening. We talked about her not making decisions to disconnect from resentment. She heard it and went to a meeting. We'll see how it goes.

I talked to Chris today about taking on production for LA. Something to get him off his computer and more engaged. We had some honest conversations about what it would take in willingness and he's ready to give it a go.

I moved over all of Kenan's pieces today. Chris K is also going to oversee the OPC. Rebecca is taking on the OM Hub. Jo will work with Reese on the science piece. Rob is going to oversee tech. And I reached out to Marjean again to stoke the conversation on her leading sales. I'll let you know where that goes.

With Kenan and Kim gone, we also lost our ethics committee. I am asking Diaz and Ryan to step in to hold it.

Jo and I are meeting tomorrow to lay out plans going forward.

Let me know if you still want to receive these reports, or if you would prefer a once weekly summary.

J.

Q Thank you.

And could you read the response from Nicole Daedone

at 8:01 a.m.?
A I don't understand why once a week instead.
Q And then if you could read the response from just even Dawson at 8:02 a.m.
A Less business stuff in your daily consciousness.
Q And finally, if you could read the response from Nicole Daedone at 8:39 a.m.
A Oh, I see. Thank you, I appreciate that. I need to stay plugged in until the debt is paid off.
MS. GUPTA: Thank you. We can take that down.
Now if we could please go to Government Exhibit 2148-D.
And, Your Honor, this was the new document that was passed up this morning.
THE COURT: Thank you.
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Yia Vang and Rachel Cherwitz.
Q On what date?
A July 14th, 2016.
Q And does this appear to be a fair and accurate depiction of the original Government Exhibit 2148 that you read?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government

Exhibit 2148-D.

MR. ROBOTTI: Your Honor, we object on relevance and hearsay grounds. It's a lengthy text message here.

MS. BONJEAN: Yes. And we'd also object on Sixth Amendment grounds.

MR. ROBOTTI: And we join that.

THE COURT: Give me a moment, please.

There are two persons on this, correct, only?

MS. GUPTA: Correct, Your Honor.

THE COURT: Overruled.

Government Exhibit 2148-D is admitted.

(Government's Exhibit 2148-D received in evidence.)

MS. GUPTA: Thank you.

And if we could please publish.

(Exhibit published.)

Q So, Special Agent Punzo, for this one I will ask you to read Rachel Cherwitz and I will read Yia Vang.

A Hi. One thing I forgot to do with you last night. What are your secrets and what are your financial amends?

Q Okay. I will write them today.

A Okay. Send me. Send me before you do your hour.

Q Yup. Doing that now. Is secrets the same as harm list?

A Yes.

Q K. What about the family, where I borrowed money from them and later they gifted it and say I don't have to pay

back?
A If they gifted, it's okay.
Q Okay.
With Nic we have a family fund that we're supposed to use for beauty and wellness. I felt guilty for using money from it. Would that be a having level or needing to pay it back?
A What does your heart say?
Q That I should have asked if I can use it for those things first.
A Okay. So you'll have that on amends.
Q Okay. If I stole from stores and put them in the financial amends, do I need to put them in secrets too?
A Both.
Q Okay. If it showed up on my inventory, do I need to put it in secrets?
A No. This is anything you didn't tell me.
Q Okay. Okay, done. E-mail it?
A Yeah. Or text.
Q Hehe. It's too big to text.
Secrets.
Nicole - I lied about canceling the Palm Beach tanning and fuck it's still open. I didn't send in the Spirit Rock applications for the August retreat. I don't answer her FB e-mails.

Cha - I seduced her husband. Volleyball girl's dad. Lied to him that my dad's retired.

One of my teachers in elementary school - I went into the classroom and cheated on my homework assignment and copied the answers onto my workbook. And when they asked, said that I didn't.

Mom - stolen from Kmart plenty of times.

Kmart - stole about $1,000 worth of merchandise.

Old grocery store - $5. Stole a sticker magazine.

McDonald's - up to $500. Snuck food to friends.

Sears - up to $500 in merchandise.

Rob - I didn't enjoy sex with him.

Ken - withheld my heart. Secretly wished he would penetrate me, but punished him when he did.

Mom - she still doesn't know what I do.

Chong, Tang, Cher, Mai, Pouah - they don't know what I do and I usually tell them the coaching version of it only.

My whole family - don't know what I do, that I teach OM.

Vi -- I got off masturbating to sexually fantasizing about her once.

Kai - Tantra teacher guy. He wanted the audio of his teaching and I never got back to him and now we don't have it. Never notified him.

David Goddard - Nicole wanted me to pay him for

clearing session he did for us and I never did. I felt guilty that the reason why he left was because I didn't pay him and he saw us as using him only. I've been holding onto that guilt ever since.

Eleanor, Rachel S, Lubka, Angela - I hooked them and befriended them because it was easy to collude with them and stay comfortable with them. I knew they wouldn't penetrate me. I started befriending them to ease the discomfort of what I was going through and to build my own group of friends and to put attention on stroking them so I didn't have to look at myself.

Angela and Rev - being broken and using them from ease and comfort at the last Bible study and Angela had me sit with her and kicked Walker out of the couch.

Jason - I hooked him when we were in SD, singing in the car, making myself seem like the fun loving one when Nic was being serious. I hooked him that night I made dinner for all of us, using my cooking skills to seduce him. In London, when he was having a hard time getting Marcus to help him, I stepped in to turn Marcus around to get him what he needed. I showed off my skill and how good I was. I don't correct him and I collude with him when he talks about how Nicole runs the business.

Nicole/Jason - on the airplane ride back from London, I was feeling shitty still. And when Nicole went to

the bathroom, I snuck some energy from Jason and got a hit of energy and woke up again and was enthused. And when Nic came back to her seat, I lied and said that it was because I just came out of my hole and decided to connect. But really, it was because I got a hit of her energy.

Marcus - in the car, when he came to pick us up from the airport, I told him about the blinking light as a way to control and dominate and emasculate him. I had been jealous that the both of them had been talking a lot and getting close.

Marcus/Nicole - when Nic is going through stuff with Jason last year, they were getting close and she was going to him. I felt jealous, withdrew, and withheld.

Tina - we had lunch one day and I was all nice. And then at the end of lunch, I killed her with my withholds. I had a habit of being nice and withholding what I wanted to say and then doing it the last two minutes to leave her whacked.

Reese - I didn't like stroking him all the time. It was a chore at times.

Maddie/Michelle - I pinned them against each other with Reese, colluding with both and increased the tumescence between them. I liked Maddie more than Michelle, so I was nicer to Maddie and harder on Michelle.

Financial amends.

Sam Gedal - $50 service fee.

Mom - up to $50 that I've stolen from her.

Mom - $2,000 that I got from her to invest in OT community house, but didn't give her the money back after we didn't invest it.

Cha - up to $50 that I've stolen from her as a kid.

Reese - up to $200 worth of food I bought for myself from Lilah Bell's Nicolo. $2,000 for service exchange of photo shoot.

OneTaste - up to $2,000 for little things I've bought along the way and justified them as a business expense. Uber rides, food, office supplies.

Nicole - used $500 on hair and $100 on Botox from family fund and didn't ask if I could use it for those. The $500 ended upcoming out of Nicole's account because fund was low. Justified it by saying they're spending family fund on Dr. G and Jo gets more excess to it than I do.

Nicole - up to $3,000 over the course of assisting where I justify here and there, mainly around food when I buy our food together. I calculate how much she owes me more than how much I owe her.

Nicole - $200 for that time I bought Baxter the pee grass and she had to sell some clothes to pay for it because it costed more than it was supposed to. I bought it without telling her first.

Kmart - stole about $1,000 worth of merchandise.

Old grocery store - $5. Stole a sticker magazine.

McDonald's - up to $500. Sent food to friends.

Sears - up to $500 in merchandise.

Allyson - $300 for teaching yoga at CP from OT.

David Goddard - $500 for the session he did for us that I was supposed to pay him on from OT.

Whew. Okay. Anything else before I meditate?

A Those are the bomb.

Q Oh, I'm the bomb secret person. Hehe.

A Emoji, emoji, emoji.

Q Well, I for sure will go in debt now. Haha.

A Emoji, emoji, emoji.

Q Okay. Now I meditate?

A Yes. Then 6 and 7.

Q Okay. Thank God.

Uh-oh. Some people are popping up.

Shara, Anya, Lianna, Kianga. What do I do with them?

A Hahaha. Okay. You can move on to do meditation and write and we write and read as they come up.

Q Okay.

Attachment.

A Nice.

Q How do we word the amends?

A It comes from column 4. Emoji.

Q Oh, okay. Do we write everything to make amends for?
A Write one. Then we go over it.
Q Okay.
A How's it feeling?
Q Feels real good. Keeping in motion.
A Blank message.
Q Super helped to finished reading.
A Right.

MS. GUPTA: Now if we could please go to Government Exhibit 2075-D-R. This is tab 47-D.

Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Nicole Daedone and Joanna V.
Q On what date?
A March 9th, 2016.
Q And does this appear to be a fair, accurate and redacted version of the original Government Exhibit 2025 that you reviewed that's subject to stipulation?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2075-D-R.

MR. ROBOTTI: We object on relevance, 403 grounds, misleading and confusing the issues.

THE COURT: Ms. Bonjean.

MS. BONJEAN: Yes, we join that objection.

THE COURT: Overruled.

Government Exhibit 2075-D-R is admitted.

(Government's Exhibit 2075-D-R received in evidence.)

MS. GUPTA: Thank you.

(Exhibit published.)

Q And, Special Agent Punzo, I will ask you to read Nicole Daedone and I'll read Joanna V.

A Erase your texts, btw.

Q Got it. Will do. Done. I got the full circle in. We going to keep talking about her desire?

A Can you have Keen do a thorough investigation of meet up and proactively handle that? That feels great.

Q Yes to meet up. Kevin on it now.

A Let's get the word pussy out of the system.

Q Will do.

A I'm thinking. I am not sure what exactly.

I am looking at the NY Times and that other article. One is finger-banging and one is "cult." Both are click-bait for the publications.

Our other issue is being seen as prostitution. In a sense, we are getting hit the way Hillary is, the way a woman would be. We need three things: A super savvy political type campaign person to change the story for us that we are getting

hit precisely because we are the feminine and that is what makes us great.

We need massive science and fast. And we need stars. I am thinking some kind of PR management company that can take the stars, like maybe Gweneth, and capitalize for the woman, who along with Gloria Steinem, promoted OMG yes, maybe a strategic relationship with OMG, someone to manage all of the public-facing stuff from Yelp to Press. Another key piece will be to get politicians behind it. Your Planned Parenthood would be great connection, but to really work on government folks so a three-tier program: Science, overall campaign and story, and association with stars.

Q Yes, yes, yes. I have one connection to a government person in Sacramento. We can start the in there. I will talk to Brian M as well about political people he may know.

Done in meetings. Learned a lot from Nancy. We have some things we will want to discuss. Overall, it was good. We talked where we are, strategies, and we got what we needed for the co-op offering document. The biggest thing is it boils down to this: One, OM is digital vaginal stimulation. Vaginal stimulation is considered a lewd act; two, is OM for sexual arousal or gratification? What would a prosecutor say the purpose of OM is? We look at our courses, assess the risk and say what are we comfortable with? There are some quick things we can do, some intermediate steps and

some possible long strategies. For this meeting, I went in with an open heart and the feeling in my body that OM has already won. With what I just kept asking God what do we do here? How would we move the chessboard here? It's a puzzle and one we will move with precision influential friends and love.
A I'd like to take the most conservative stance we can possibly take. Like seriously, maybe we switch to almost all philosophy. And the OM aspect can happen either for free or like OMG yea.
Q Yes. We talked about the only thing people pay for is the education. I had a thought. Maybe the ITO class using the stroking technology instead of a lab and then people OM on their own or in the free OM circles in communities. The cities could house practices at the beginning of courses, whatever city we are in, and the course could start after that.
A I love it. Exactly. Did you ask her thoughts on that?
Q We can host OM for free and many of our risks go away.
A Then for sure.
Q Oddly, they're less concerned with OM and NDI because it's clear we are providing so much more than "genital stroking."
A NDI gets tricky. Oh, that's funny.
Q We are providing meals, luxury lodging, other teachers,

et cetera. NDI was the one they were least concerned about.
A Okay, great. Everything else for free or technology.
Q Yup. One long-term strategy is to set something up in a place where prostitution is legal. Then, if everything hit the fan, we would have a place set up that we could go to and operate. Like, we would still have a way to operate. I took many notes. I would like to read them to you and the gist of it is above.
A I am super down with that. Great. We are agreed to go conservative fast.
Q Yes.
One more thing they said is we are at less risk if we begin to say that it's for higher consciousness or spiritual awakening. We gain a bit of protection from the First Amendment and people can see it's not focused on sexual arousal.
A I am so down with that. Maybe we can get some spiritual teachers to go -- to back it.
Q Yes.
Now I find Justine and chat with her.
Stephen DeBerry and I texting. He says he's been talking about OM. Wants to get together one of these weeks. He will be a good intro to the political scene.
A Let's secure it.
Q On it.

A We will need a board of directors to show up as spiritual physicians and for the political good.
Q Yes.
A Jo? Question what about demo. We need to either form strategic relationship with OMG yes or build I in a month.
Q Demo is interesting. A demo falls more under performance, which is protected by the First Amendment.
A Will you ask if there can be like a Tinder for OM?
Q I think we could build it in a month. I will ask about Tinder. Last meeting I did and they were unsure of their legal risks.
A I want to get very clear in how people can OM for free connected to a class and what's legal. I think the solution is people sign up for an ITO. The course ends. They get access to, like, an OMer's Tinder and technology training. And free on circles.

Also, I'd love to have Nancy look at the Joseph Kramer serological bodywork laws and also what it would take us to work with getting the laws in our favor offensively.
Q Yes. I will tell her. She was unfamiliar with sexological bodywork. It seems the legal professionals don't know that realm super well. We talked about working to get the law in our favor. She suggested making friends with law makers, getting lots of public opinions to support us. That

is what marijuana did. And to get supporters of OM outside of OT. Companies and people who will back this as a movement. She was okay about science. She said it may help and it won't be a shoe in for law makers.
A Yes. Let's get the people who ran the pot campaign.
Q A very good drug attorney is in LA. She said she will intro us. Brian M and I speak tomorrow about all this. I give him all the updates.
A Great.
MS. GUPTA: Now if we could just pull up what's already in evidence as Government Exhibit 585.
And this is tab 66. Apologies.
(Exhibit published.)
Q Special Agent Punzo, what is this document?
A It's a State of New York Department of State document.
Q And what is it for?
A OneTaste NYC, LLC.
And they're --
Q And -- oh. Please, go ahead.
A And they're articles of organization.
Q Okay.
And directing you to page 2. Who is the agent who is listed here for OneTaste New York City, LLC?
A Maya Gilbert.
Q And going to page 3.

Who filed this?
A Brooke Sheffer.
Q Okay. And if we could jump ahead to page 7 of this document.
What is this document?
A A New York State Department of State document.
Q And what is it for?
A The articles of dissolution of OneTaste NYC, LLC.
Q And what does it say here for the date that the articles of organization were filed?
A July 15th, 2014.
Q And then going to the next page.
When were the articles of dissolution filed?
A August 20th, 2020.
MS. GUPTA: Thank you. We can take that down.
Now if we could pull up for the witness only Government Exhibit 1283-D-R. And this is tab 33.
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Nicole Daedone and Joanna Van Vleck.
Q On what date?
A August 2nd, 2013.
Q And is this a fair, accurate and redacted copy of the original Government Exhibit 1283 you reviewed that's subject

to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1283-D-R.

MR. ROBOTTI: Your Honor, we object as irrelevant, hearsay, 403, and complication violation clause.

THE COURT: Ms. Bonjean.

MS. BONJEAN: Yes, Your Honor. I would join that objection insofar as relevance, hearsay, Rule 403.

THE COURT: Overruled.

Government Exhibit 1283-D-R is admitted.

(Government's Exhibit 1283-D-R received in evidence.)

MS. GUPTA: Thank you.

And if we could please publish.

(Exhibit published.)

Q So, Special Agent Punzo, I will start by reading Joanna Van Vleck and ask you to read Nicole Daedone.

I want to talk to you about Soheil. Rob asked him to move out. He isn't paying his 1080 rent and refuses to have a roommate. He owes us about 6k for CP and 1080 debt. When Rob told him this, he said we couldn't do that. And if we did, he would go to the labor boards and tell them he worked for us for two years with no pay. He told Rob he had talked to an attorney already. Rob spoke to him, talked him

off the ledge, et cetera.

A few things. We could have Maya go in there and smooth them out. She seems to be the one he listens to the most. We can offer his debt cleared off if he signs a paper saying OT not liable for anything, similar to what we did with Carol. We can work on fourth dimension to have him out and not talking to labor boards. I wanted you to know.

Let me know if you have any thoughts?

A Oh, boy. Have Maya start.

Q Okay. On it. This needs to be done very skillfully between them.

A Totally. Did he work for us without pay? Reese good with him too.

Q He did opps stuff for two years and we didn't pay him in monetary sense. We paid him in many dimensions.

A Oh, boy.

Q Yeah.

MS. BONJEAN: Your Honor, I neglected to ask for the instruction as to the statements of that individual. My apologies for the late request.

THE COURT: Are you referring to Soheil?

MS. BONJEAN: Yes. The statements that seem to appear on the first page of this. The recounting by Ms. Van Vleck.

THE COURT: Let me just see the parties at sidebar

for a moment.

MS. BONJEAN: Yes.

(Sidebar.)

(Continued on the next page.)

(The following occurred at sidebar.)

THE COURT: I think we have everybody at sidebar, including the individual defendants.

Just tell me more specifically, Ms. Bonjean, exactly what you're referring to.

MS. BONJEAN: Sure.

So Joanna Van Vleck is recounting, apparently, a conversation she had with Rob about the situation with Soheil. And what she's -- this is really two levels of hearsay, where he says he told Rob he has talked to an -- or he -- when Rob told him this, he said we couldn't do that. And if he did, he would go to the labor boards and tell he worked for us for two years with no pay. He told Rob he has talked to an attorney already. Rob spoke to him, talked him off the ledge. So it's those statements of what -- this fellow, Soheil. I don't know if I'm saying that correctly.

THE COURT: So statements with -- or references to statements by Soheil?

MS. BONJEAN: Yes, to Rob is what I -- well, yeah.

THE COURT: There are no other ones, right?

MS. BONJEAN: I don't --

THE COURT: References to...

MS. BONJEAN: I think that's right.

MR. ROBOTTI: I think it's Soheil's complaint.

MS. BONJEAN: Yeah, Soheil's complaint to Rob.

Yeah. Or his statements to Rob.

THE COURT: Okay. Let me hear from the Government. Whoever.

MS. GUPTA: We have no objection to a limiting instruction.

THE COURT: Okay. And again do you want the same instruction that I gave which, again, references context?

MS. BONJEAN: That's fine for us.

MS. COHEN: Yeah.

MR. ROBOTTI: Works for us.

THE COURT: So both Defendants are fine with that, Government is fine with that.

Okay, so I am going to be -- it will be references to statements by Soheil. Okay.

MR. ROBOTTI: Thanks, Judge.

THE COURT: Okay.

(Sidebar ends.)

(Continued on the next page.)

(In open court.)

THE COURT: Okay. Members of the jury, the statements in this exhibit referencing statements by Soheil are being admitted not for the truth of the statements but for the purpose of providing context for the other statements. You may consider the statements that are being admitted for context only for that purpose.

You may continue, Ms. Gupta.

And I believe I said that this was admitted, but if I didn't, Exhibit 1283-D-R is admitted.

MS. GUPTA: Thank you, Your Honor.

If we could now go to Government Exhibit 2142 for the witness only. And this is tab 49-D.

Q Special Agent Punzo, what is this?

A A chat.

Q With who?

A Rachel Cherwitz, Rachael Hemsi, Joanna Van Vleck, Maya Gilbert, Aubrey Fuller, Yia, +44 (785) 456-0066.

And that's it.

Q What is the date?

A July 5th, 2016.

Q And is this a fair and accurate depiction of the original Government Exhibit 2142 that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2142-D.

THE COURT: Do you want to speak to the various statements, Ms. Gupta?

MS. GUPTA: Yes, Your Honor.

So there are statements of Rachel Cherwitz under 801(d)(2)(A).

There are statements from Rachael Hemsi and Joanna Van Vleck and Aubrey Fuller under 801(d)(2)(E).

And the remaining statements are 801(d)(2)(D).

And apologies, Yia also for 801(d)(2)(E).

MR. ROBOTTI: Your Honor, we object on hearsay and relevance grounds.

MS. BONJEAN: Yes. And Sixth Amendment grounds, Your Honor.

MR. ROBOTTI: And we join in that.

THE COURT: One moment, please.

Overruled. Government Exhibit 2142-D is admitted.

(Government's Exhibit 2142-D received in evidence.)

MS. GUPTA: Thank you.

And if we could please publish to the jury.

(Exhibit published.)

BY MS. GUPTA:

Q And Special Agent Punzo, if you could just start reading on the first page with Rachel Cherwitz and then we can

alternate from there.

A Emoji. Step study outcome. We spent five days excavating, diving, emptying out, clearing out and dismantling. This is what we have come for. True ego annihilation at every level. Honesty, open-mindedness and willingness. Each day provides a chance for freedom and an admission that our primary purpose is to stay electric and our common welfare should come first. Our turn on comes from sisterhood and connection. This is how we hold the frequency of light, of orgasm. The resistance burns off after the second day. And by the time we hit the third step, prayer, we are on our knees turning our will and our life over to the care of God. The women go dep, thorough and honest with each step. With each line of inventory written, with each fifth step read the power of God shines through more and more. No more holding on, no more blame, no more when am I -- when I am getting mine or what am I owed. No more separation and isolation. It's all radiant light and grace. The more the sludge moves out, the more gratitude shines through. The net of sisterhood is being woven deep and we all come back to the realization we are all friends and our success depends on each other. We fall back in love with orgasm and with each other and emerge from the darkness into the light with a renewed commitment to live electric and love full out.

Q Now that is amazing.

A Emoji, emoji, emoji, emoji, emoji.
Q Yes. Emoji.
A Amen.
Q Love, love, love. Emoji, emoji, emoji?
A Beautiful, Rach.
Q Emoji, emoji.
A All previous OT employees: Maddie Drea Kim Lianna Rob Ken Blackman Pail Joanne Mitch David V Sarah Kianga Beth Elder Rachelle Madjida Jessica Taranto Johnny T Audrey Kozer Aram Kenan Henry Soheil Summer Bill Roy Piper Billy Lindsay Ruwan Chelsey Hunter Beth Critenden Alisha Kelly Nicole Halper Alison Suzanne cats ex Jenny Michelle Rosa James Barford Amy Jones Adam Jacob Ali Joshua Andy Roy Emily Lani Kal Chris Hubbard Dave Burns Beth Crit Hutch Rafael Alexis Audrey Wright Eduardo Leanne Kellal Brooke Po Candice Carol Kandell Mai Vu Jeff Jacobson Bez Dana Gill Dana Levine Hadass Shara Ogin Greg Squire Sean Cumming Jamarr Marc Quinn Jeanette James Kim Marjean Jorge Christina Berkeley Isaac Rebecca Elswit Patrick Aaliyah Laurel Matthew Hock George Streeter George Lawton Nicole Diaz Nirmala Pooja Brig Carlotta Reese Ryan Elena Weisberg Stephen Horvath Toby Rave Laura Han Becky Uma Ken Vanisky.
Q Oh, good list.

MS. GUPTA: If we could please go to Government Exhibit 2200-D for the witness only. And this is

at tab 52-D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Rachel Cherwitz, Rachael Hemsi, and Joanna Van Vleck.

Q On what date?

A March 21st, 2018.

Q And is this a fair and accurate depiction of the original Government Exhibit 2200 that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2200-D.

MR. ROBOTTI: Your Honor, we object on relevance grounds, hearsay grounds, and 403 in terms of confusing the issues and misleading.

THE COURT: Do you have one, Ms. Bonjean?

MS. BONJEAN: One second, Your Honor.

THE COURT: Sure.

MS. BONJEAN: Yes, Your Honor. I would join those objections and point out also not in furtherance of, in light of it, the date.

THE COURT: Overruled.

Government Exhibit 2200-D is admitted.

(Government's Exhibit 2200-D received in evidence.)

THE COURT: And Ms. Gupta, after this exhibit, we're going to take a lunch break.

MS. GUPTA: Okay. Thank you.

(Exhibit published.)

Q So, Special Agent Punzo, for this one I will ask you to start with Rachel Cherwitz and then we can alternate?

A Hi. I don't want to put this on our sister thread.

Q Tell me.

A Because I have some charge and don't want to activate anyone else's.

Q Tell us.

A I just talked to Lisah Barry and Michele Wellington about Marla's hours and people want to be paid more and I am like OMG, I didn't get paid for years in orgasm.

Q Oh. Keep going. This is great.

A It's so fucking dumb-ass stupid.

Q RH told me. More money equals less orgasm.

A That is true.

Q RH told you what?

A Well, if we aren't paying you in orgasm, we pay you in money. And if we are paying you in money, you get less orgasm. Like Danielle and Peggy, they get more cash and less orgasm.

Q Emoji, emoji.

THE COURT: Okay. It's a little bit after one. I

am going to ask the witness to step down, please, for the lunch break.

(Witness steps down.)

THE COURT: Okay. We will come back from the lunch break at 2:00. Enjoy your lunch. Don't talk about the case. Keep an open mind.

(Jury exits.)

THE COURT: Okay. Everyone may be seated.

I am going to let you go to lunch, but I wanted to raise a couple of things.

One is just let me get a sense from Ms. Gupta of how much more time she has on this witness.

MS. GUPTA: Maybe about 45 minutes, Your Honor.

THE COURT: Okay. And do you anticipate lengthy crosses or no?

MS. COHEN: No, Your Honor. Just a few questions.

MS. BONJEAN: Yes, no lengthy crosses.

THE COURT: Okay. So it sounds like the Government will be at a position to rest today.

I know that the parties have given a couple of different lists, I think, of exhibits to my chambers. Obviously, things will have to be updated based on today. Is there any discrepancies that the parties have about what did go into evidence or didn't go in or whether something was redacted or not redacted? Or is everybody on the same page?

MS. BENSING: I think with the list that we provided to the Court, we're on the same page.

THE COURT: Does that include the Defense list.

MS. BENSING: Yes.

THE COURT: Okay. But everybody has checked both lists and feel that they're accurate, correct?

MR. ROBOTTI: That's correct, Judge.

THE COURT: Okay.

MS. BENSING: Yes, Your Honor.

MS. BONJEAN: Yes, Your Honor.

THE COURT: Okay, that's fine.

Okay. So let me talk about schedule.

Assuming we end the Government's case sort of early or mid-afternoon today, is the Defense prepared to put on a case starting this afternoon?

MS. BONJEAN: Yes, Your Honor.

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Okay. And you've told the Government which witness or witnesses that would be?

MS. COHEN: Yes.

MS. BONJEAN: Yes.

THE COURT: Okay.

MS. FARRELL: So we understand it to be Marissa Ward.

And, Your Honor, this gets back to the issue of

recorded video statements by the individual.

THE COURT: Yes.

MS. FARRELL: We understand that was produced in camera to Your Honor late last night.

THE COURT: Yes. I haven't looked at it yet because, again, they had to be uploaded and go through the security protocol here.

So tell me what it is, what purpose you were giving it to me for. Just tell me about the material.

MS. BONJEAN: First off, Your Honor, I just want to make the Court aware of the fact that she's not going to be the first witness that we call. We have a fellow by the name of Antonios.

THE COURT: Okay.

MS. BONJEAN: So we can do that first. And I don't know that will go to the end. He's a pretty short witness.

THE COURT: Who is Antonios? Just in terms of subject matter.

MS. BONJEAN: He was a participant in the community and he speaks directly to an allegation that was made by Dana Gilport about being directed to have sexual relations with him.

THE COURT: And was that a direction -- I'm just not recalling the testimony well enough at this moment.

Is that a direction that was made in front of him?

MS. BONJEAN: No, but I have -- no, but I have testimony to provide that will rebut that, rebut the allegation.

I don't think I should have to -- I know how to try a case. And now I'm being asked to signal to the prosecution what --

THE COURT: That's fine. Put him on. And if it's inappropriate, there will be sustained objections. If it's appropriate, it will come in.

MS. BONJEAN: Yes. I understand what the Court is --

THE COURT: Yes, I think that's fine.

MS. BONJEAN: It's not for because you heard that or -- but there is another reason why that would rebut.

THE COURT: Okay. We'll see how the testimony comes in. That's fine.

MS. BONJEAN: Okay.

THE COURT: Ms. Bensing, you look like you want to say something.

MS. BENSING: Well, I think we just wanted to raise the issue of 26.2 material more generally, so if now is the time to do that.

THE COURT: Sure. Go ahead.

MS. BENSING: So I think there are a few issues.

So first, last night, around midnight, we received

about 50 files of purported 26.2 material, which we obviously have not had an opportunity to take a look at yet. I don't know if there were any for Antonios or not because we haven't had an opportunity to fully dive into that. And so that obviously raises serious questions of problems of timing, which the Government has been raising with the Court for months now.

Second, with respect to the two videos from the Defense concerning Marissa Ward and David Hutchison, you know, it's the Government's position that these have been in the Defendants' possession all along and the very belated disclosure is concerning.

In addition, the Government is aware that videos exist for a number of other individuals who are on the Defense's witness list. I don't know if all of those individuals have come off. It sounds like some of them have, but I think we would like to understand that since they clearly have access to these.

And then the Defense filed a letter without providing the Government's position on the reliance of the work product doctrine. But that's misplaced in the 26.2 context.

So the governing case on this I believe is *Goldberg versus United States*, 425 U.S. 94, pincite 106, a Supreme Court case from 1976. And it concluded that the

district court in including that the work product doctrine barred production of writings otherwise produceable under the Jencks Act. It was under the Jencks Act the courts have since applied that to 26.2 material, which is the mirror image of the Jencks Act. And so I think that's why, for example, that in Miller, in the Federal Practice and Procedure, in discussing 26.2, have concluded that it contains no general work product exception. There is a Seventh Circuit case on this, *United States versus Wallace*, 326 F.3d 881, Seventh Circuit case from 2003.

And so, we're asking that the Court review it in camera. If there are portions that -- and I'm not sure what the work product is with respect to these two Defendants, but if there are portions that could somehow constitute work product, obviously the Court can manage that. But otherwise, the Government is entitled to a video statement of the witness themselves. This is not Defense notes, you know, defense attorneys' notes or things like that which sometimes courts do find to be work product protected. This is the witness's own statements. And so I think it's very concerning that we're getting this so last minute, given the record that the Government has established here.

And I would also note that we have still received no text messages whatsoever between Defense witnesses and the Defendants. And I think it's become clear through the course

of this trial that at least Ms. Daedone has access to her text messages, as they've been pulled out and repeatedly shown to witnesses in court.

And so I think based on the history to date, the request of relief from the Government is that these witnesses be precluded from testifying.

THE COURT: And exactly which witnesses? Ward and Hutchison?

Hutchison is the one who was teaching the class?

MS. BENSING: Hutchison we think is --

THE COURT: That's a separate issue?

MS. BENSING: Yes.

We also think he has relevance issues.

THE COURT: Yes.

MS. BENSING: But yes, certainly with respect to Ward.

And there are other witnesses who are on their Defense list --

THE COURT: Tell me who Ward is more generally.

MS. BENSING: She was somebody who worked at OneTaste. I really -- given the lack of 26.2 material, I'm not entirely sure what the scope of her testimony would be.

THE COURT: We're talking about how many videos now?

MS. BENSING: Well, those are two videos, but we are aware that videos exist for other folks on the Defense list.

Again, they may have come off, but the other individuals are Sasha Hood, Alexis Ware, Aubrey Fuller, Peter Crane, Kal Holczer, Courtney Lapovski, who I understand they're not intending to call, Rafael Martinez, Jenny Slusher.

I think that's it.

(Continued on the next page.)

(Continuing.)

MS. COHEN: We told you we are only intending to call four this morning.

MS. BENSING: This morning, but I think the issue will exist for the rest of the defendants.

MS. COHEN: No, I'm saying we told --

THE COURT: She told you this morning that she is only calling four.

MS. COHEN: Four total.

THE COURT: Total witnesses.

MS. BENSING: Oh, sorry, that was not clear to me.

THE COURT: Okay.

MS. BONJEAN: Your Honor, there's a number of things to address here.

THE COURT: Yes.

MS. BONJEAN: And I don't know if the Court wants to do it now.

First of all, this was teed up a long time ago. We've lodged our objections about the video.

We fundamentally disagree that you can impute video that belongs to OneTaste to our clients. Not only that, what the Government is arguing is that the defendants have constructive possession. And I think their argument is that because Ms. Daedone sued the BBC, I think, along with OneTaste, that that means she has these videos. And I have

consistently said that that is not -- that is an assumption and I don't think -- the question of whether she constructively possesses it is a complicated question. It was raised. It was in letters. So we stand by that.

Now, I think Mr. Robotti produced video and out of a concern and out of an interest in providing that video, but that didn't -- it is an assumption that that video came from my client or Ms. Cherwitz. So I want to point that out.

It is also an assumption that Ms. Daedone presently has access to old text messages from a decade ago. Again, also an assumption on their part.

THE COURT: But are you representing that she doesn't?

MS. BONJEAN: I mean, I -- I'm not aware of her having any -- what hasn't been produced.

I would also point out that there was an enormous production in Rule 16 from OneTaste responsive to a grand jury subpoena that is -- I mean, there's hundreds and hundreds and hundreds of text messages from Marissa Ward that I think were produced in Rule 16 material. So --

THE COURT: Okay. The videos that -- I think there's two sets of videos we're talking about, right? Two that were produced to the Government and some that were produced ex parte.

Is that correct? Do I have that right?

MS. COHEN: No. Those are the same. One and --

MS. BENSING: Well, so the Government has some videos from OneTaste.

THE COURT: Okay.

MS. BENSING: But I don't think that relieves the defendants' obligation to provide the Government with videos under 26.2.

THE COURT: So the entirety of the videos that were given to me in the last 12 to 24 hours is two videos or something else?

Again, I haven't seen these yet because they do have to go through a security protocol here.

MR. ROBOTTI: Your Honor, on the videos.

THE COURT: Yes.

MR. ROBOTTI: My understanding is there were seven videos that were disclosed to the Government a couple of years ago in connection with a presentation that was made to the U.S. Attorney's Office. Those were referenced in a footnote in Judge Chen's order.

THE COURT: Okay.

MR. ROBOTTI: There were two -- at that time the other videos were not produced by OneTaste that were the subject of that order.

Last night we produced two additional videos that

had not previously been produced to the Government to the Court for in-camera review. We have taken the position, as Ms. Bonjean noted, that those are not in the possession, custody and control of the defense, nonetheless out of an abundance of caution --

THE COURT: But you just gave them to me, so I'm not understanding that argument.

MR. ROBOTTI: Out of an abundance of caution, we turned them over so the Court can assess the work product assertion that has been made and we believe --

THE COURT: Who is asserting work product over this?

MR. ROBOTTI: OneTaste has previously asserted work --

THE COURT: But they gave it to you?

MR. ROBOTTI: We got it in connection with the joint defense agreement, which is, you know, in a privileged setting. We turned them over to the Court so that the Court can assess the work product assertion that has been made here.

Under our understanding of Rule 26.2, which we have cited to the Court previously, is that there is a carveout for work product.

THE COURT: When did you get them from OneTaste?

MR. ROBOTTI: We got them previously in connection

with -- I'm not sure of the exact date, but we got them in connection with a joint defense agreement.

THE COURT: Okay, but when? I'm asking you when.

MR. ROBOTTI: I'm not exactly sure.

THE COURT: Well, was it within the last two days or months ago?

MR. ROBOTTI: It was not within the last two days, Your Honor.

THE COURT: Well, give me some more timeframe here.

MR. ROBOTTI: It was previously -- I'm not sure, since we came on the case.

THE COURT: All right. So it was before January, before you came on the case? That the defense team that was representing Ms. Cherwitz at the time had it or no?

MR. ROBOTTI: I don't know when the defense team --

THE COURT: Well, I'm going to want to know when this got to the defense, because it was given to me, I think, at, what, 12:30 this morning, something like that?

MR. ROBOTTI: Your Honor, the other point here is that under Rule 26.2, we don't have an obligation to turn anything over to the Government until the witness has testified.

So I understand that the Government is making an

assertion here that we're belated in turning this information over, but the obligations aren't triggered until, in fact, the witnesses have testified.

And the other thing I would point out is that the defense spent a fair amount of time this weekend really trying to narrow down its case and narrow down these issues. We did not know until last night, after we had spent the whole weekend working on this, who we were going to call in our case and we didn't want to turn over a bunch of irrelevant material that was going to have no relation to who we were actually calling.

Once we made the --

THE COURT: Not even to the Court, to give the Court more than, what, nine hours between when you sent it over and when Court was beginning? Really? That's what you are telling me?

MR. ROBOTTI: We made these decisions late last night, Your Honor.

THE COURT: Okay.

MR. ROBOTTI: And with respect to these videos, they aren't lengthy. And, you know, I think that they're short --

THE COURT: And you've decided that -- at what hour of my day have you decided that I should be looking at these?

MR. ROBOTTI: Yes, Your Honor, we apologize if we turned them over late, but we were really trying to streamline things here in order to --

THE COURT: Doesn't streamline for me.

MR. ROBOTTI: I understand, Judge.

MS. BENSING: Your Honor, can I briefly be heard on that?

THE COURT: You can.

MS. BENSING: On November 15th of 2024, the Court sent a deadline for the provision of 26.2 material of --

THE COURT: What I think I said was that I didn't see any reason it couldn't be done by a certain date and the defense agreed.

Is that correct?

MS. BENSING: Well, the minute entry says: Defendants will provide Rule 26.2 material to the Government by November 22nd, 2024.

THE COURT: Right, but if you look back at the transcript, it's not exactly how you phrased it, but yes, they were going to produce it by a certain date.

MS. BENSING: Yes. And so obviously it's deeply concerning to hear that they have had these videos for months, particularly when Ms. Bonjean, I believe, made representations to the Court that the defendants were not in possession of them.

MR. ROBOTTI: Your Honor --

THE COURT: Well --

MR. ROBOTTI: -- just in response to that.

We briefed this specific issue. We submitted a letter to the Court on April 14th in response to the Government's request that we turn over these videos. And the Court specifically ruled at that time in response to our objections that we did not have to produce these materials at that time.

So the Government renewed this motion, I think, on Friday about these videos. And then in response to that, we, you know, over the weekend, you know, worked to get this information to the Court.

THE COURT: Why don't you make the work product argument now? Save us all some time. What's your work product showing on this?

MR. ROBOTTI: So Your Honor, these videos already have been held to be work product by Judge Chen. And the Government conceded before Judge Chen that they were, in fact, work product. So I don't think the work product issue is in dispute.

THE COURT: Okay. Then you need to tell me why you think that it applies, that you can assert that at this time.

MR. ROBOTTI: Your Honor, I think that we have the

same basis to assert this as the company does because these were provided to us in a privileged setting. So we had provided them to the Court so the Court can assess OneTaste's assertion of the work product doctrine here, as this has already been held to be work product protected by another judge.

And I think what --

THE COURT: But I'm asking you something different.

I'm asking you, having gotten the information from OneTaste, why you believe you can still assert a privilege?

MR. ROBOTTI: Well, Your Honor, I don't think that there was any contention that OneTaste providing this to us as part of the joint defense agreement would waive the privilege or waive work product.

THE COURT: What's the scope of the agreement?

MR. ROBOTTI: The agreement is that in connection with the common interest, we are sharing privileged information and privileged materials in order to facilitate the common defense here.

So I think in connection with that agreement, the fact that OneTaste provided work product protected material wouldn't waive that. And then certainly providing it to the Court in connection with an in-camera proceeding doesn't waive it.

THE COURT: If you have a protection that you could assert, yes, providing it to the Court is not waiving it, that's not what I'm saying.

MR. ROBOTTI: Yes, Your Honor.

THE COURT: My question is preliminary to that.

MR. ROBOTTI: Right.

Your Honor, I think what we've done here is provided this to the Court so the Court can evaluate OneTaste's assertion of work product here, which has not been contested. The issue that has been --

THE COURT: Right. And I am supposed to do that at 1 o'clock in the morning, apparently.

MR. ROBOTTI: Yes, Your Honor.

And, again, we have been working to try and narrow the case down and to try and streamline this for the Court. We didn't want to provide the Court with a dozen videos that it didn't have to look at, for instance. So we provided the two --

THE COURT: But if you had given it to me weeks or months ago, that would helpful, I would have been happy to look at it.

MR. ROBOTTI: From our perspective, Judge, this was ruled on before trial and the Government did not re-raise this argument until Friday. So we have -- then in response to that, we worked to get this to the Court.

THE COURT: All right. I hear you.

MR. ROBOTTI: Judge, just one final point.

THE COURT: Go ahead.

MR. ROBOTTI: I think the issue here is substantial need. That is the question that Judge Chen left open in her order about whether the Government had shown there was a substantial need to invade the work product protection that they conceded applied.

Judge Chen held that the Government had not taken the appropriate steps, right, to reach out to these witnesses.

We asked over the weekend whether the Government had taken any additional steps since Judge Chen's orders to reach out to these witnesses. They did not respond.

So as far as we know, there is no substantial need for the Government to have access to these materials.

MS. COHEN: I just want to add one other point regarding the other 26.2.

THE COURT: Yes.

MS. COHEN: We did make three productions of thousands of pages of 26.2 material including communications regarding the witnesses we're calling. We went back, as an abundance of caution, to just make sure that there was nothing else that we could find and we came up with 46 different documents which we turned over yesterday.

THE COURT: Okay.

MS. COHEN: But we were under the impression that we had, because there are tons of communications regarding these witnesses already produced.

MR. ROBOTTI: And the 46 documents we turned over yesterday, Judge, I mean, there are some communications in there, but there's a lot of Facebook posts and other things like that. You know, it shouldn't take the Government more than an hour to get through these.

THE COURT: Okay, but you are deciding what hour they do that, too, right? That's the issue here, right? I mean, yes, they're here, right? I mean, they can multitask to a degree, just like you can multitask to a degree, but --

MR. ROBOTTI: I think the point is, Judge, that we had no obligation to turn these over until after the witnesses get on the stand.

And, again --

THE COURT: Look, you were not here for the months leading up to trial, but it's a bit disingenuous, given what has happened in this case.

MR. ROBOTTI: And I do --

THE COURT: The Government was under no obligation to turn over 3500 material until after its witnesses left the stand on direct examination, but as a practical matter, that would never work in a case of this length and of this

nature.

MR. ROBOTTI: That's why, Judge, we turned over voluminous Rule 16 productions in advance of trial which included most of the 26.2 material. All we did over the weekend was go back and make sure we didn't miss anything.

THE COURT: Okay.

MR. ROBOTTI: And in response to that review, we identified a limited set of 46 documents to turn over for these remaining witnesses. The vast majority of this was already turned over before trial. And we have done what we said we would do, which was try to turn this over in advance so that things would move along expeditiously.

THE COURT: The videos are from Mr. --

MS. BONJEAN: No, this is Ms. Ward.

THE COURT: Ms. Ward. And she's not going to be testifying today?

MS. BONJEAN: I mean, Antonios is who we intend to put on first. We have no 26.2 as to him.

THE COURT: Okay.

MS. BONJEAN: There's no videos.

THE COURT: Okay.

MS. BONJEAN: He has limited -- he was involved as, like, a customer. He wasn't someone who was --

THE COURT: Okay.

MS. BONJEAN: -- texting with Ms. Daedone. So

there is --

THE COURT: I am going to consider the Government's request and we're not going to have to resolve this now because the first witness for the defense is not going to have videos.

MS. BENSING: Can I just make one brief response --

THE COURT: Yes.

MS. BENSING: -- to some of Mr. Robotti's comments, because I do think that's a mischaracterization of the record. The Government has been asking for these videos over and over and over again. It is not something that we just raised on Friday, obviously.

And second, the work product doctrine, the cases that I just cited, the question is not whether or not these are work product protected; the question is whether these are statements in a fall within 26.2, because if they are, then they should be produced to the Government.

And I would also just note that it is very, very clear on the record that we have before us that the defendants in this case are using attorney-client privilege and work product as both a sword and a shield. They plainly have access to Ms. Daedone's text messages. They are getting them live in court. We are all witnessing it. They plainly have access to these videos, and now, I believe

despite Ms. Bonjean's representations, we are learning that they did have access to these videos for it sounds like a long period of time.

And so, again, I --

MS. BONJEAN: I did not have access to those videos and I'm not -- I did not have access to those videos.

THE COURT: Did your client, though?

MS. BONJEAN: Well, I mean, I don't believe that is the case. I mean, the Government is conflating my --

THE COURT: Seems to me that would be knowable.

MS. BONJEAN: They are conflating OneTaste with my client.

THE COURT: No. No. I don't think Ms. Bensing is doing that. I think she is stating that she believes that the defense, defendants, Ms. Daedone, had certain materials.

Is that what you are suggesting, Ms. Bensing?

MS. BENSING: Yes. And Mr. Robotti, Counsel for Ms. Cherwitz, also plainly has had access to them.

MR. ROBOTTI: Judge, we have taken the position, and I think we have been clear about that, that there are materials that are shared under joint defense agreement, but that does not mean that we have the ability to take everything off of OneTaste's servers --

THE COURT: Right. Ms. Bonjean made this argument many months ago, too. I understand the position. I think

Ms. Bensing is saying something different.

MS. BENSING: Right. We're just literally reciting what he just said, which is that he has had access to these videos for a lengthy period of time.

So the Court has the Government's request with respect to these witnesses.

I will note that at least in one trial before Judge Komitee last summer, the Court did preclude defense witnesses from testifying for failure to comply with 26.2 --

THE COURT: I am aware of that, but that case was that case and this case is this case.

MS. BENSING: Understood.

THE COURT: I am aware of that, certainly, and of course it is an option. Regardless of whether one of my colleagues did it or not, I am fully aware that it's an option.

Let me talk about one other scheduling issue which is that I had intended to give you a draft charge today. I don't know that that's still going to be possible with all these other things that have come up, but certainly no later than first thing tomorrow, you will have the draft charge. I think we should probably plan on letting the jury go tomorrow a bit early and having a charge conference given the fact that the defense is now saying their case is going to be shorter or at least fewer witnesses than anticipated.

Do the parties think that that timing would work? I would let them go maybe around 3:00?

MS. BONJEAN: It would work, Your Honor.

I do want to -- that is where we're at, at the moment, but honestly, the question of whether the defendants will testify is still a moving target.

THE COURT: That's fine. That's fine.

MS. BONJEAN: Particularly, you know, in light of testimony we're hearing, we're not through this witness. So I just want the Court to be aware of that.

THE COURT: That's fine. I think that would only, in terms of the charge, though, affect the charge about defendants' right not to testify or defendants' testimony. So I don't think that should prevent us from having a charge conference.

MS. BONJEAN: I am fine with the charge conference on Tuesday. I just didn't want the Court to be working under the assumption that we had put that to bed.

THE COURT: No, that's fine.

And I should let you know that the Court is not available on Thursday morning this week. My current thought is that we should probably just not have the jury come in. I think to have them come in for, you know, half a day, maybe, doesn't make a whole lot of sense. But we can also wait and see where things are before we decide that.

So I just wanted to let the parties know. If I don't have the jury come in on Thursday and depending on where we are, I would still want the parties to be available Thursday afternoon if there were issues that we needed to take up.

Does anyone want to be heard on that?

MS. FARRELL: I'm sorry, if the defendants decide not to testify, do you anticipate us closing before Thursday or not until Friday?

THE COURT: Well, depends on when the defense case ends. We're already at Monday, you know, afternoon. So if we're only going to keep the jury 'til about 3 o'clock tomorrow, it's possible we could do closings on Wednesday, but it sounds ambitious based on what the defense is anticipating.

MS. FARRELL: Okay.

THE COURT: I'll hear anyone else out on that schedule.

MS. FARRELL: I think our request would be if it's close, we would just rather push it -- like if it's Wednesday afternoon, our preference would just be that we push it to Friday so that --

THE COURT: Let me ask you, it may be premature for you to know this yet, but approximately how long are the summations? Because what I don't want to end up doing is

having summations and not being able to charge the jury or summations and then charge and then they immediately go home for a weekend.

I mean, it can be done. They will have my charge with them in the jury room, but is it possible that all of that can happen in one day?

MS. FARRELL: Probably not, honestly. I think we're looking at three hours or less for the Government summation.

MS. BENSING: For the opening summation, I think, and then obviously the Government would have a rebuttal.

THE COURT: Maybe we do need to have the jury come in on part of Thursday potentially.

Why don't we hold off on telling them anything until at least end of day tomorrow, if not Wednesday. I think that might make more sense. I mean, I can probably tell them today that we'll let them go early tomorrow or maybe not even that. Let me think about that.

But I think we should plan tomorrow to do the charge conference given where we are in the trial. And I will get that charge to you first thing in the morning.

MS. FARRELL: Can we understand that if the defendants testify, that will push everything back a few days?

THE COURT: Yes, yes, yes.

MS. BONJEAN: I would think so.

MS. FARRELL: Yeah.

THE COURT: I will see everyone at 2 o'clock.

(Luncheon recess taken.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURT: Everyone may be seated.

We will bring back the witness and the jury.

(Witness takes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

An Ms. Gupta, you may resume your examination.

MS. GUPTA: Thank you, Your Honor.

Can we please pull up Government Exhibit 1083 for the witness only, and this is at Tab 4.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A An e-mail.

Q From who?

A Nicole Daedone to rachel.cherwitz@onetaste.us.

Q On what date?

A February 23rd --

Q And is this --

A -- 2012.

Q And is this a forwarded e-mail?

A Yes.

Q And who is the original e-mail from?

A Nicole Daedone to Reese Jones.

Q On what date?

A February 21, 2012.
Q And does this appear to be a fair and accurate e-mail from Nicole Daedone to Rachel Cherwitz?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1083, which is subject to stipulation between the parties.
THE COURT: Any objection?
MR. ROBOTTI: Your Honor, we object as irrelevant and cumulative.
MS. BONJEAN: Join.
THE COURT: Overruled.
Government Exhibit 1083 is admitted.
(Government Exhibit 1083 received in evidence.)
MS. GUPTA: Thank you.
And if we could please publish to the jury.
(Exhibit published.)
Q So Special Agent Punzo, beginning with the first e-mail on February 21, 2012, what is the subject line?
A Reese action items.
Q And can you just please read that e-mail?
A One, Stephen Kotler on board to write first chapter/Atlantic article that lays this book out as a path for love, sex, relationship, man woman dynamics that elevates the aforementioned for mere pleasure (with

diminishing returns) to enjoyment using the concepts of flow. It will also show a path that alternates between Flow and Slow or high intensity experience and meditative and how Orgasm is the way to include both poles. The basic concept is that our operating system is obsolete and this is the new way. Ken will complete three paragraphs with these basic ideas today.

Two, Jim Kwik on board to do overall publicity specifically with assistance in internet marketing.

Two, contact the TLC guy of London.

My basic marketing will be: TLC.

Tony Robbins.

Media - Dr. Oz contact, David Wright, Ted and Lisa of NBC, Patti Brown.

All bloggers who helped with Slow Sex, Luminaries like Mamma Gena.

Bryn with television.

Sandy with their site.

Internet marketers like Amish and maybe Frank Kern.

The guy who made Tim Ferris video who likes us.

Tim Ferris.

My blog.

The team is working on everyone who could possibly help, making lists and next steps.

Q Thank you.

And at the top, how much time passes before Nicole Daedone forwards this e-mail?

A About two days.

MS. GUPTA: Thank you.

We can take that down.

Can we pull up for the witness only Government Exhibit 1097, which is Tab 6.

Q Special Agent Punzo, what is this?

A An e-mail.

Q From who?

A Rachel.cherwitz@onetaste.us to reesejones1@gmail.com.

Q And is there a forwarded message?

A Yes.

Q And who is that e-mail from?

A Rachel Cherwitz to Katie@therentalgirl.com.

Q And on what date?

A March 17, 2012.

Q And does this appear to be a fair and accurate e-mail between Rachel Cherwitz and Reese Jones?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1097, which is subject to stipulation between the parties.

MR. ROBOTTI: Your Honor, we object on relevance

grounds, hearsay.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1097 is admitted.

(Government Exhibit 1097 received in evidence.)

(Exhibit published.)

MS. GUPTA: Thank you.

Q So Special Agent Punzo, I will ask you to start by reading the message from Rachel Cherwitz to Katie@therentalgirl.com.

And if you could just read the first and second paragraphs to start.

A As requested, here is additional information regarding the one-year leasing of this Venice Beach apartment unit.

Best-selling author, Nicole Daedone, is the principle author of a series of books now in production. She is working on completing the second book in the series (the first already in mass market publication). Nicole prefers writing in Venice Beach with assistance of additional writer, editors, and research assistants and experts who spend time working together on these writing projects at the Venice Beach location.

Q Thank you.

And if you could read through the rest of the e-mail?

A This year-plus long project is underwritten by Nicole's worldwide print publisher (Hachett Fitapaldi's Grand Central Publishing, based in New York) and also finance underwritten by two corporate entities based in San Francisco (OneTaste Inc. and IP Media Inc.)

Rachel Cherwitz, who is personally signing this lease, is employed by OneTaste Inc. (that will be paying the lease rents directly) and Rachel is assisting Nicole on these writing projects (assistance, which includes living in this apartment along with Nicole as these writing projects are developed and completed). Additional books are planned and frequent trips to New York and San Francisco are expected.

Any questions about these projects can be directed to Reese Jones at IP Media Inc. based in San Francisco at 415-922-7586. Rachel Cherwitz, author Nicole Daedone, and book editor Ken Blackman met at the proposed Horizon apartment at 10:00 a.m. Saturday, liked the space, have corporate approval, and have submitted the lease application form, to be leased in the name of Rachel Cherwitz.

Please let me know if you have any questions or need additional information.

Best regards, Rachel Cherwitz.

Q Thank you.

And how long passes before Rachel Cherwitz

forwards this to Reese Jones?
A About two days.
MS. GUPTA: Thank you. You can take that down.
Can we now pull up for the witness only Government Exhibit 2134-R, which is at Tab 15. Tab 15R, apologies.
Q Special Agent Punzo, what is this?
A An e-mail.
Q From who?
A Rachel.tayeb@onetaste.us to ndone1@gmail.com.
Q And is anyone CCd?
A Yes.
Q Who?
A Jlv@onetaste.us and marcus.ratnathicam@onetaste.us.
Q And what is the date of this e-mail?
A July 2, 2016.
Q And other than -- are there redactions contained in this exhibit?
A Yes.
Q Does this appear to be a fair and accurate depiction of an e-mail sent from rachel.tayeb@onetaste.us to Nicole Daedone?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 2134-R, which is also subject to stipulation of the parties.

MR. ROBOTTI: Your Honor, we object on relevance grounds.

MS. BONJEAN: Yes, Your Honor. I would reiterate the relevance objection in light of the profile --

THE COURT: Give me a moment, then, please.

Overruled, Government Exhibit 2134-R is admitted.

(Government Exhibit 2134-R received in evidence.)

MS. GUPTA: Thank you.

And if we could please publish to the jury.

(Exhibit published.)

Q Special Agent Punzo, what is the subject line of this e-mail?

A Student profile.

Q And generally speaking, what does this e-mail contain?

A A list of names along the left-hand side. And along the right, paragraphs that appear to describe those names.

MS. GUPTA: And if we could please go to page 2 of this exhibit. And if we could scroll a little bit further.

Q Do you see one name there that's not redacted in full?

A Yes.

Q What is that name?

A Sujo Offield.

Q And could you read the description next to it, please?

A She wants to stay true to herself and recognize her brilliance so she can lead others. Wants to be turned on so

much Jim forgets that he doesn't want sex.

Worked as an executive assistant for IT firm. Recently quit. Took CP6, moved from Iowa, friend of Clouds. Is now enrolled in September Intensive and Orgasm Membership.

MS. GUPTA: Thank you.

We can take that down.

Can we now pull up for the witness only Government Exhibit 2269-R, which is at Tab 16R.

Q Special Agent Punzo, what is this?
A An e-mail.
Q From who?
A Rachel.tayeb@onetaste.us to Nicole Daedone.
Q On what date?
A February 9, 2017.
Q And are there redactions contained in this e-mail?
A Yes.
Q Is this a fair and accurate and redacted depiction of the original Government Exhibit 2269 that you reviewed?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2269-R, which is also subject to stipulation between the parties.

MR. ROBOTTI: Your Honor, we object on relevance grounds.

MS. BONJEAN: Also, Your Honor, can they put it up on the screen? I'm having --

THE COURT: Yes, give us a minute, please.

MS. BONJEAN: I'm sorry, one second, Your Honor.

THE COURT: Yes, take your time.

MS. BONJEAN: I see what's there. Thank you.

We join in that objection.

THE COURT: Overruled.

Government Exhibit 2269-R is admitted.

(Government Exhibit 2269-R received in evidence.)

MS. GUPTA: Thank you, and if we could please publish.

(Exhibit published.)

Q Special Agent Punzo, what is the subject line?

A Student write up.

MS. GUPTA: And then if we could scroll to page 2, the un-redacted portion.

Q Could you please read that?

A Lyndsi Keves. She started OMing in November and jumped into CP12 a month late. Is now dating Rami Hauter (also in this coaching circle). She has a long history of eating disorders, has gone through life with a very convincing wounded bird persona. She wanted the Sisterhood Path and did not play well in a sales conversation, said she felt bullied and pressured so she wouldn't have to take

responsibility for her desire. Since then, we stopped stroking her for next steps and she had to come all the way out with her desire to make it into this circle once a spot opened. She was given very clear rails of what was required, to show up as an adult who is 100 percent responsible for their own experience. She agreed and then Rami paid for her to do the circle. She wants to own her desire more, and to celebrate her appetite in every sense of the word (food, sex, power, et cetera).

MS. GUPTA: Thank you. We can take that down.

Next, could we pull up for the witness only, Government Exhibit 2274-DR, which is at Tab 5060.

Q Special Agent Punzo, what is this?
A A chat.
Q With who?
A Rachel Cherwitz, Nicole Daedone, Yia, Angela Richardson, Maya Gilbert. And that's it.
Q On what date?
A February 15, 2017.
Q And does this appear to be a fair, accurate, and redacted version of the original Government Exhibit 2274 that you reviewed that's subject to stipulation between the parties?
A Yes.

MS. GUPTA: Your Honor, we move to admit

Government Exhibit 2274-DR.

THE COURT: Do you want to speak to the Richardson and Gilbert statements?

MS. GUPTA: Yes, Your Honor.

Your Honor, these are all provided for context. They're not for their truth.

THE COURT: You are offering the exhibit?

MS. GUPTA: Yes, Your Honor.

MR. ROBOTTI: Your Honor, we object on hearsay, relevance, 403 grounds.

MS. BONJEAN: Join, and ask for an instruction as to the context piece.

THE COURT: Specifically as to Ms. Gilbert and Ms. Richardson; is that correct?

MS. BONJEAN: Yes, Your Honor.

THE COURT: Do you join in that?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Members of the jury, the statements in this exhibit of Ms. Gilbert and Ms. Richardson are being admitted not for the truth of the statements, but for the purpose of providing context for the other statements. You may consider the statements that are being admitted for context only for that purpose.

And that is 2274-DR that's admitted.

(Government Exhibit 2274-D received in evidence.)

MS. GUPTA: Thank you.

And if we could please publish.

(Exhibit published.)

THE COURT: And obviously the objection is overruled.

(Continued on the following page.)

(Continuing.)
BY MS. GUPTA:
Q Special Agent Punzo, I'll ask you to read Rachel Cherwitz and then we can alternate from there.
A Students who are awake and moving: Amber, Michael Lesser, Rachel Regan, Erik, Matt and Anjuli, Rachelle, Manny, Juliette, Chris Davis. Lesser and Davis were firestarters. Parentheses, attachment.
Q It's super cute.
A I can see them from the window.
Q Amber is laying on the floor screaming and crying.
Gina and her assistant are with her.
A And now screaming on the floor.
Q Gina told her story about how she found sound healing through her trauma.
A And crying.
Q Okay Amber, that's enough of that.
A Laughed at, quote, okay Amber, that's enough of that.
Amen.
Marissa up on the table doing first group sound healing.
Q She in the center of the room.
A Rachel Short on the table now.
Doing it on her heart.
Eleanor crying.

Eleanor up now.

Working with her throat chakra. She's crying a lot.

Quote, knowing god before you die and what needs to go will go. Who I am now that I don't have those 10 pounds. What will I be able to do. Ask me how I will know.

Q It looks like flowers from Whole Foods should be wholesale.

A Okay. Tejas on the table now. Heart chakra.

Inviting him to get his wail on and let his grief out.

Q Get yo wail on.

A Eleanor just crying and crying.

Loved, quote, get yo wait on.

Q Loved, quote, get yo wail on.

A Thank you Jesus. Let it go, Ele, let it go.

Q Loved, thank you Jesus. Let it go, Ele, let it go.

And we can stop is there.

MS. GUPTA: If we can please pull up for the witness only Government Exhibit 2320-R, and this is tab 17-R.

Q Special Agent Punzo, what is this?

A An email.

Q From who?

A rachel.cherwitz@onetaste.us to Nicole Daedone.

Q On what date?
A April 7, 2017.
Q And are there certain redactions in this document?
A Yes.
Q Does it otherwise appear to be a fair and accurate depiction of the original Government Exhibit 2320 you reviewed?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2023-R, which is also subject to stipulation between the parties.

MR. ROBOTTI: Your Honor, we object on relevance grounds.

MS. BONJEAN: Yes, Your Honor, we object on relevance grounds and to the extent that they contain hearsay of the individuals identified.

THE COURT: Overruled.

2320-R is admitted.

(Government Exhibit 2320-R received in evidence.)

(Exhibit published.)

MS. GUPTA: Thank you.

Q So Special Agent Punzo, what is the subject line of this email?
A Notes on students for the circle.
Q And could you read the first two paragraphs?

A The overarching theme is most of these women are achievers. Two of them, quote, Linda and Josie, were Tony Robbins plats, do Mama Gena and S Factor. All of these women have some version of purpose tumescence and some who have had sexual trauma.

Here's a quick snapshot.

Q Thank you. What does the remainder of this exhibit show?

A A list of names along the left-hand side, and along the right-hand side appears to be paragraphs describing those names.

Q Thank you.

MS. GUPTA: We can take that down.

Could we show the witness for identification only Government Exhibit 2379-R, which is at tab 19-R.

Q Special Agent Punzo what is this?

A An email.

Q From who?

A Rachel.cherwitz@onetaste.us to Nicole Daedone.

Q Is anyone cc'd here?

A Yes.

Q Who is cc'd?

A rachael.hemsi@onetaste.us and marcus.ratnathicam@onetaste.us.

Q On what date was this sent?

A October 5, 2017.
Q And are there redactions in this document?
A Yes.
Q Is it a fair and accurate depiction of the original Government Exhibit 2379 you reviewed other than the redactions?
A Yes.
MS. GUPTA: Your Honor, we moves to admit Government Exhibit 2379-R, which is also subject to stipulation between the parties.
MR. ROBOTTI: Your Honor, we object on relevance and hearsay grounds.
MS. BONJEAN: Yes, Your Honor, we object on relevance, yes, and embedded hearsay of these people.
THE COURT: Overruled.
Government Exhibit 2379-R is admitted.
(Government Exhibit 2379-R received in evidence.)
MS. GUPTA: Thank you. And if we could please publish.
(Exhibit published.)
Q Special Agent Punzo, what is the subject line of this email?
A NCC Students.
Q I'll just ask you to read the first few lines there, up to XO.

A The overall theme seems to be, it's your last hoorah, everyone who needed their daemon seen signed up for the circle, smiley face. Thing to seed is membership and teacher training. Let us know if you need anything else. XO.
Q What does the remainder of this exhibit show?
A A list of names along the left-hand side, and along the right-hand side appears to be paragraphs describing those names.
Q And if you can scroll up just to the top of page 1, are there headers for the chart of names that you just mentioned?
A Yes.
Q And what do they say here?
A Names and what you need to know.
Q Thank you.
MS. GUPTA: We can take that down.
Can we now show the witness only Government Exhibit 2443-R, which is at tab 20-R.
Q Special Agent Punzo, what is this?
A An email.
Q From who?
A rachel.cherwitz@onetaste.us to marcus.ratnathicam@onetaste.us, and Nicole Daedone.
Q What is the date?

A December 15, 2017.
Q And are there redactions in this email, as well?
A Yes.
Q Is this a fair and accurate depiction of the original Government Exhibit 2443 that you reviewed other than the redactions?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 2443-R, which is also subject to stipulation between the parties.
MR. ROBOTTI: Your Honor, we object on relevance and hearsay grounds.
MS. BONJEAN: Join the objection. And as to embedded hearsay again.
THE COURT: Overruled.
Government Exhibit 2443-R is admitted.
(Government Exhibit 2443-R received in evidence.)
(Exhibit published.)
Q Special Agent Punzo, what is the subject line?
A LA NCC students.
Q If you could just read the first line of the email.
A 20 students in the circle. Three have worked with Nicole before. A lot were at the CP15 Friday night demo.
Q What does the remainder of this exhibit show?
A Names with brief descriptions along the left-hand side,

and along the right-hand side appears to be paragraphs describing those names.

Q Okay. Thank you.

MS. GUPTA: We can take that down.

If we could pull up for the witness only Government Exhibit 2478-R, which is at tab 21-R.

Q Special Agent Punzo, what is this?

A An email.

Q From who?

A rachel.cherwitz@onetaste.us to --

Q And -- sorry, go ahead.

A To Nicole Daedone.

Q On what date?

A January 29, 2018.

Q And are there redactions in this email, as well?

A Yes.

Q Is it otherwise a fair and accurate depiction of the original Government Exhibit 2478 that you reviewed?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2478-R which is subject to stipulation between the parties.

MR. ROBOTTI: Your Honor, we object as to irrelevant, cumulative.

MS. BONJEAN: Object further to the hearsay

statements of the unknown individual.

MR. ROBOTTI: We join.

THE COURT: Overruled.

Government Exhibit 2478-R is admitted.

(Government Exhibit 2478-R received in evidence.)

MS. GUPTA: Thank you.

(Exhibit published.)

Q Special Agent Punzo, what is the subject line?

A Notes on circle students.

Q And what does this exhibit appear to contain?

A A list of names along the left-hand side, and along the right-hand side appears to be paragraphs describing those names.

Q Thank you.

MS. GUPTA: We can take that down.

Could we now go to Government Exhibit 2149-DR for the witness only. And this is at tab 50-D.

Q Special Agent Punzo, what is this --

THE COURT: Can you give me one moment? I think I'm having a technology issue here.

(Pause in proceedings.)

THE COURT: I'm sorry. Go ahead.

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.
Q With who?
A Nicole Daedone and Joanna Van Vleck.
Q On what date?
A July 15, 2016.
Q Does this appear to be a fair, accurate, and redacted version of the original Government Exhibit 2149 that you reviewed that's subject to stipulation between the parties?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2149-DR.

THE COURT: Could you give me the tab number, please?

MS. GUPTA: Yes. It's tab 50-D.

THE COURT: Thank you. Give me one moment, I'm sorry. I'm catching up from my technology issue there.

Any objection?

MR. ROBOTTI: We object as irrelevant and under 403.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 2149-DR is admitted.

(Government Exhibit 2149-DR received in evidence.)

MS. GUPTA: Thank you. If we could please publish.

(Exhibit published.)
Q So, Special Agent Punzo, for this one I'll start with Joanna Van Vleck, and I'll ask you to read Nicole Daedone.
After paying Ippolita her money, we have 1.1 million in the bank.
The last two large payments to make, besides taxes that are due in September, is me and Yia's first payments.
Pushing krupps, parentheses, lightly, on OM guide launch.
A Okay. Are we doing a big chunk then payments?
Q We were going to start with 40K or 45K and then do quarterly payments starting in 2017 of 17K each.
It will be paid off in seven years.
With the option to pay off early if want to.
A Okay, great. My BBL only 18.8K.
Q You have less to lipo.
A Can I pay more and get more off.
Q Only if you eat more.
A I'm trying.
Q I walked through all the pieces. I said, money aside, who do we feel best with. The click was for sure with Feldmar. Like he would be our friend long term is how it felt.
And the fact that yours was lower cost is a sign.
A Haha. My only nervousness is we won't get big results.

Q Emoji.
We won't get a real ass.
A Or even hard core lipo curves.
MS. GUPTA: Could we please pull up for the witness only Government Exhibit 2264-DR, which is at tab 55-D.
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Nicole Daedone and Joanna Van Vleck.
Q On what date?
A January 24, 2017.
Q Does this appear to be a fair and accurate depiction of the original Government Exhibit 2264 that you reviewed that's subject to stipulation between the parties?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 2264-DR.
THE COURT: Any objection?
MR. ROBOTTI: Just one moment, Your Honor.
THE COURT: Sure.
MR. ROBOTTI: We object as cumulative and irrelevant.
MS. BONJEAN: Join the objection.
THE COURT: Overruled.

Government Exhibit 2264-DR is admitted.

(Government Exhibit 2264-DR received in evidence.)

MS. GUPTA: Thank you. And if we could please publish.

(Exhibit published.)

Q Special Agent Punzo, I'll read Joanna Van Vleck and I'll have you read Nicole Daedone.

Do you feel fully good about 12MM for the company?

I want to make sure that number feels good to you. Not too low.

A This is very wonderfully excellent.

Q Before we fully start papers and things today, I wanted to check in.

A You know I heard, Nicole, do not allow greed to stop this. 12MM is enough. There will be endless opportunities to make more money. I get scared in all directions, but that is what I feel.

Q Okay. That feels good.

I trust that voice.

A I think we will need to looks at several things. Do a forecast for the land and how much it can make. Look at the media company. Honestly, will I need to invest? When can it make money? How much will have to go to taxes? What happens if I improve the land and taxes? What if I buy my mom a house? And what about Reese?

Q Yes, all these things on my mind.
I have a list of all of these things. We can go over the forecast that I see today for these things.
Just off with Rich. There's no way to get tax write-offs by buying your mom a house.
Tomorrow morning he and I speak to the accountants.
Rich is racing to find a buyer for 22MM just to see what comes.
A That's sexy.
I totally believe you and how did sever this one as a tax write-off.
MS. GUPTA: If we could now pull up for the witness only Government Exhibit 2289-D, which is at tab 57-D.
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Nicole Daedone and Joanna Van Vleck.
Q On what date?
A The February 22, 2017.
Q Does this appear to be a fair and accurate depiction of the original Government Exhibit 2289 you reviewed that's subject to stipulation between the parties?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2289-D.

MR. ROBOTTI: Your Honor, we object as irrelevant and on 403 grounds.

MS. BONJEAN: Join in the objection.

THE COURT: Overruled.

Government Exhibit 2289-D is admitted.

(Government Exhibit 2289-D received in evidence.)

MS. GUPTA: Thank you. If we could please publish.

(Exhibit published.)

Q Special Agent Punzo, again I'll read Joanna Van Vleck and ask you to read Nicole Daedone.

Getting on the phone with inder now. Slow to respond for 10 min.

Amanda called Dave. He didn't answer. He will call her back.

Austin, Anjuli, Amanda headed over to Sujo's for their meeting.

No reports yet from there meeting.

Working with Reese and Jason on esalin.

A Don't they know you need half hourly meetings.

Q Right?

I haven't trained them yet.

A This is cute for my mom.

I realized likely on Monday I will need a money manager.

Not super, because most will be invested in real estate.

Link.

Q That house is beautiful.

I will check on it.

Yes to money manager. Accountant and I talked about that.

Most of your money should be growing for you.

You will get 30K per month from Land LLC. The amount land operations pays.

And then your earnings from teaching, et cetera.

And we want it all growing.

A I agree.

Why am I getting 30K a month?

And that house is really beautiful, right?

Q That house is really beautiful.

Land operations has a lease. Need to legally to land operations.

The amount it pays would have gone to Jim/mortgage. So now it would go to you.

It's included in your money, quote, in column.

A I see. Okay.

Q It's a good way for you to get steady money every

month.

And land operations need to be in a reasonable lease.

A We will need to get it profitable ASAP.

Q Yes.

April is our month.

Jason knows.

I keeping my eyes on him.

And revenue for land operations.

For San Diego house, we may be able to buy one out of foreclosure since you will have cash.

So we could get a deal.

Also, I have assumed OT will take your mom off payroll once the deal is done.

We will have to find something for Reese's 5K per month. If company somehow still pays.

A Ooh.

I know I need to do my mom ASAP that is why I am looking.

I would have her look, but don't want to start until I know for sure money.

She's crazy picky.

Q Thank you.

MS. GUPTA: If we could now go to Government Exhibit 3608, at tab 61.

Your Honor, the parties have stipulated to admission of this document, so we would move Government Exhibit 3608 into evidence.

THE COURT: Any objection?

MS. BONJEAN: No objection.

MR. ROBOTTI: No objection.

THE COURT: Government Exhibit 3608 is admitted.

(Government Exhibit 3608 received in evidence.)

MS. GUPTA: Thank you.

If we could please publish.

(Exhibit published.)

Q Special Agent Punzo, I'll ask you to just read through this document, please.

A OneTaste resignation. I, Nicole Daedone, hereby resign from my position as a director of OneTaste Incorporated, a California incorporated company, and from all offices I hold with OneTaste Incorporated, including my office as CEO, effective March 3, 2017.

Signature: Nicole Daedone.

Name: Nicole Daedone.

Date: March 2, 2017.

Q Thank you.

MS. GUPTA: If we could now pull up for the witness only Government Exhibit 4398, which is at tab 65.

Your Honor, may I have a moment?

THE COURT: Yes.

(Pause in proceedings.)

Q What is the date of this document, Special Agent Punzo?

A November 1, 2017.

Q And what is this document? Without reading it.

A It's an expense sharing agreement between OneTaste and Nicole Daedone.

Q Is it signed by Nicole Daedone?

A Yes.

MS. GUPTA: Your Honor, we would move to admit Government Exhibit 4398.

MS. BONJEAN: Your Honor, this is an exhibit we discussed previously. We maintain the objections we raised, I think relevance and hearsay.

MR. ROBOTTI: We join.

THE COURT: Sustain the relevance objection.

MS. GUPTA: Could we please pull up for the witness only Government Exhibit 1405. This is at tab 8.

Q Special Agent Punzo, what is this?

A An email.

Q From who?

A Joanna.vanvleck@onetaste.us to Nicole Daedone.

Q What is the date of this email?

A March 10, 2018.

Q Does this appear to be a fair and accurate depiction of

an email from joanna.vanvleck@onetaste.us to Nicole Daedone?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1405, which is also subject to stipulation between the parties.
MR. ROBOTTI: Your Honor, we object on relevance grounds.
MS. BONJEAN: Yes, same objection.
THE COURT: Overruled.
Government Exhibit 1405 is admitted.
(Government Exhibit 1405 received in evidence.)
MS. GUPTA: Thank you.
(Exhibit published.)
Q Special Agent Punzo, what is the subject line of this email?
A The report: Friday, March 9th.
Q And could you just read the first paragraph -- sorry, ending at moved.
A Things to know.
Yesterday was a day of completing cycles, moving things all the way through. There was joy and connection in all things moved.
Q Thank you.
Looking at the bottom of the email where it says OT, could you start reading there?

A OT. Org and deliverables had a lot of movement yesterday. That is almost complete. The team is enjoying it.

Membership is being looked at.

Lineage feels well held by the sisters.

Investors is top of mind and discussion for Shawn, Anjuli, and I.

Sales still down a bit.

Emails need more attention.

Closing cycles. Clearing it out. Next right action.

I love you.

Joanna.

Q Thank you.

MS. GUPTA: We can take that down.

Could we now show for the witness only Government Exhibit 2559-DR, which is at tab 60-D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Rachael Hemsi and Joanna Van Vleck.

Q And what is the date of this chat?

A July 5, 2018.

Q And are there redactions contained in the document?

A Yes.

Q Does this appear to be a fair, accurate, and redacted copy of the original Government Exhibit 2559 that you reviewed that's subject to stipulation between the parties?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 2559-DR.
MR. ROBOTTI: We object on relevance and hearsay grounds.
MS. BONJEAN: Yes, Your Honor. Object on relevance and hearsay.
THE COURT: Give me a moment. It's a bit of a lengthy document.
(Pause in proceedings.)
THE COURT: There are two individuals on this document, correct?
MS. GUPTA: Yes, that's correct.
THE COURT: Overruled.
Government Exhibit 2559-DR is admitted.
(Government Exhibit 2559-DR received in evidence.)
MS. GUPTA: Thank you.
And if we'll could please publish --
MS. BONJEAN: Your Honor, I'm sorry.
The other objection is post the date -- you know, not in furtherance because of the date.
MR. ROBOTTI: Outside the time frame.

MS. BONJEAN: Yeah, outside the time frame.

THE COURT: Overruled.

(Exhibit published.)

Q Special Agent Punzo, for this one I will ask you to read Rachael Hemsi and I'll read Joanna Van Vleck.

A Let's see what I'm trying to think with sales. I mean, we always did put more attention on anyone who was gonna sell something.

Sorry, buy something.

People have sec next to each other.

I don't know who might know the story. But Rach wasn't allowed in the center unless she had sex.

30 days of cock sucking was often recommended to people.

I think sleeping with people out of your preferences is something people will complain about.

Q Yes.

A The most of the complaints around that time is that we all did exactly what we were told. That's my guess.

About to take off. Then I think what else.

Q Okay.

A Link.

I don't know if that's helpful, but he lived at the Warehouse, Bob Gower.

And he's the one who is talking to Cosmo.

I don't think there was much complaint about work with no pay.

Or low pay.

Everyone was desperate to be around. Most people had outside jobs to be able to pay for rent and food. We paid a few people to actually work. Everyone else volunteered after work.

You know the story I remember. That kind of gives a sense. Patrina hit Haplern and Nic turned to Haplern and said why did you want her to hit you. Or Sam hit Yia and Nicole was like what in your wanted to be a battered wife. It was like everything was about. Why did you create this.

Oh, the woman needing to be in the courses. Like putting woman in during lunchtime to help get the participants turned on. And then the ten woman want you to know class. The woman were expected to be the woman in the class. And we would have to kind of talk them into coming.

Q It's so funny.

You say it with no charge.

And when Yia and J say it they have so much charge.

A It was the best time ever. I can't describe to you the fun we had, Joanna.

Q I can feel it.

I wish I was there.

A I mean, it is all fun and that was just wonderful.

You were in a way.

Everything Nicole has ever created is fun.

Q Amen.

A Some Airbnb with Court and Short and Amanda, I believe.

Q Okay.

A For sure.

I'm excited.

Q We can skip the next few pages. If we could skip ahead to page 10, please. I'll ask you to pick up at 2:36:38.

A And me and Eli, that's our crew.

Q Her coworkers.

A It's horrible.

And man are they training here.

Like I'm like of course they don't like you if you say that. Lord.

Yia, I think she needs to speak up more. And perhaps she might just not want it.

But she does need to be here.

Q RC telling me her job is hard.

And dealing with them.

MS. GUPTA: Your Honor, we're just having a technical difficulty, if I might put this on the ELMO?

THE COURT: There seems to be that going around today. That's fine, take your time.

MS. GUPTA: Thank you.

(Pause in proceedings.)

Q Apologies. I'm not sure where we left off.

Do you mind starting at 6:39:58 p.m.?

A It's horrible.

And man are they training her.

Like I'm like of course they don't like you if you say that. Lord.

Yia, I think she needs to speak up more. And perhaps she might just not want it.

But she does need to be here.

Q RC telling me her job is hard.

And dealing with them.

What do you mean speak up more?

A She sees things and doesn't say it. Or like saying to the owners, like hey, let's all clean up. She just keeps everything to herself and then gets resentful.

Q Yeah.

For sure.

A How's Florida.

What is it like.

I have never been.

Where are you?

When do you meet with Brian?

Q Have not seen any of Florida except for the drive here.

Are you lonely?
A Oh, good. Tell me.
Q He was saying he had a big psychotic break after he left OT.
He was claiming it was an adult.
A Oh, that feels good, Jo.
Q Yeah.
A I agree.
So good.
Q It's good.
Got to the hotel at 8 p.m. Had three calls. Took a salt bath and I'm in bed working.
Tomorrow at 9 a.m. we meet.
Not lonely at all.
Happy.
Going to listen to some church soon.
Ryan K. and I had an interesting text dialogue.
Saying he knew he had a big role in it.
It was interesting.
And I really stood up for who we are.
I'm sick of these people blaming us.
It's ridiculous.
A Today is good.
Around people. It's nice.
Q How are you today?

MS. GUPTA: We can now pull up for of the witness only Government Exhibit 2559-DR -- I'm sorry, Government Exhibit 2578, which is at tab 22.

Q Special Agent Punzo, what is this?

A An email.

Q Who is it from?

A courtney.walker@onetaste.us to yia.vang@onetaste.us, anjuli.ayer@onetaste.us, and marcus.ratnathicam@onetaste.us.

Q And does this appear to be a fair and accurate email from Courtney Walker to the individuals that you just named?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2578, which is subject to stipulation between the parties.

MR. ROBOTTI: We object as irrelevant and hearsay and 403.

MS. BONJEAN: Yes, Your Honor. I don't even know who this Courtney Walker is.

THE COURT: Sustained.

(Continued on the following page.)

THE COURT: (Continuing) Mr. Robotti, could you just move the mic closer to you in general.

MR. ROBOTTI: I'm sorry.

THE COURT: Go ahead, Ms. Gupta.

MS. GUPTA: Thank you.

Could we show the witness Government Exhibit 3767, which is at tab 63.

And Your Honor, I believe the parties have stipulated to the admission of this document, so we would move to admit Government Exhibit 3767.

THE COURT: I apologize. Give me the tab number again.

MS. GUPTA: Tab 63.

THE COURT: Is there any objection?

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Okay. Government Exhibit 3767 is admitted.

MS. GUPTA: Thank you. And if we could please publish.

(Exhibit published.)

Q Special Agent Punzo, what is the title of this document?

THE COURT: This is already in evidence.

MS. GUPTA: Oh, right.

THE COURT: Go ahead.

MS. GUPTA: Thank you.
Q Special Agent Punzo, what is the title of this document?
A Separation Agreement and General Release.
Q And who is this between? Looking at the first full paragraph.
A OneTaste Incorporated and Rachel Cherwitz.
Q And if we could go to the paragraph titled 1) Last Day of Employment.
What is the last day of employment that's provided for there?
A May 11, 2018.
Q And could you please read No. 2, Termination Payments?
A Termination payments. Provided that you sign and return this agreement and observe its terms following your separation date, OneTaste will, provided that you sign and return this agreement and observe the its terms following your separation date, pay you the gross amount of $70,000 as severance pay for twelve (12) months in monthly increments of $5,833.33 on the 15th day of each month.
MS. GUPTA: Thank you.
And if we could please flip to the last page of this document, which is page 11.
Q Special Agent Punzo, who signed this document on behalf of OneTaste Incorporated?
A Hun Julie Ire.

Q And on what date was it signed?
A May 14, 2018.
Q And who else signed this document?
A Rachel Cherwitz.
Q On what date?
A May 14, 2018.
MS. GUPTA: Your Honor, may I just have a moment?
THE COURT: You may.
MS. GUPTA: No further questions.
THE COURT: Any cross-examination?
I think we'll start before our break.
MS. COHEN: Sure. I just have a few questions.
THE COURT: Okay. Go ahead, Ms. Cohen.
CROSS-EXAMINATION
BY MS. COHEN:
Q Good afternoon, Agent Punzo.
A Good afternoon, ma'am.
Q You've been at the FBI for three years, you testified?
A A little over three years.
Q And you're not the case agent on this case, correct?
A No, ma'am.
Q Which means you didn't originally investigate this case?
A Correct.
Q And you're aware, though, that thousands of pages of text messages and e-mails were produced by OneTaste and this

company, right?
A I am aware of records were produced. I'm not sure how many.
Q You're aware, though, this is just a small subsection of what was produced?
A I'm aware it's a portion. I'm not sure how big or small.
Q So you haven't reviewed every single message in this case?
A No, ma'am.
Q And you haven't reviewed every single e-mail, correct?
A No.
Q And you don't know the context around which these messages were sent, correct?
A I don't know.
MS. COHEN: One moment.
Nothing further from me, Your Honor.
THE COURT: Ms. Bonjean.
MS. BONJEAN: I have a couple of questions.
THE COURT: Go ahead.
CROSS-EXAMINATION
BY MS. BONJEAN:
Q Good afternoon, Agent.
My name is Jennifer Bonjean and I represent Ms. Daedone.
A Good afternoon.

Q We've spent many hours listening to you read text messages that involve Ms. Daedone, Ms. Cherwitz and a number of other people.

Would you agree that's what we've been doing?

A Yes.

Q And, of course, you don't know if any of those contents of those conversation are, in fact, true or not true, right?

A I don't know.

Q And you certainly don't know whether any discussions contained in those conversations about future plans were carried out or abandoned, right?

A I don't know.

Q And you don't know if people were saying things in jest or kidding or anything like that, right?

A I don't know.

Q In fact, you saw emojis in there.

These messages at least don't even tell us what those emojis are, right?

A Correct.

Q And I just want to show you, like, Government Exhibit 2034, which is in evidence, that I think you read.

I want to draw your attention to the first two paragraphs of this Government exhibit that you were asked to read out loud.

Do you see that?

A I'm sorry, it's not coming up for me here.
THE COURT: So what tab is it in?
I think he has a hardcopy.
(Exhibit published.)
THE WITNESS: It's up on the screen now.
MS. BONJEAN: Okay.
Q Are you able to see it on your screen, sir?
A Yes.
Q If you want to go ahead and look at it again. I think you read the first two paragraphs.
Do you remember that?
A Yes.
MS. GUPTA: It's tab 14. If that's helpful.
Sorry to interrupt.
THE COURT: Thank you. That is helpful. Thank you.
Q Do you have the slightest clue what any of that means?
THE COURT: Are you asking him to read it and tell you what he thinks it means?
MS. BONJEAN: I'm just asking him if he has any clue about what it means.
MS. GUPTA: Objection.
MS. BONJEAN: What's that?
MS. GUPTA: Objection.
THE COURT: Overruled.
A No.

MS. BONJEAN: I have nothing further.

THE COURT: Any redirect?

MS. GUPTA: No, Your Honor.

THE COURT: Okay. I think we're going to do our afternoon break now and I'll ask the witness to -- actually, the witness is done. I will ask you to step down.

(Witness steps down.)

MS. BONJEAN: Too late.

THE COURT: Sorry, did you need something Ms. Bonjean?

MS. BONJEAN: No. I was standing.

THE COURT: We will be in a minute.

MS. BONJEAN: Already ready to stand.

THE COURT: Okay. We'll do our afternoon break now. We'll come back at 3:30. Keep an open mind. Don't talk about the case.

(Jury exits.)

THE COURT: Everyone may be seated.

So, outside the presence of the jury, there is one issue I wanted to address and that relates to coconspirator statements.

With respect to each of the coconspirator statements admitted, I find that the Government met its burden of proving by a preponderance of the evidence that a conspiracy existed, that the declarant and the Defendants were members of the

conspiracy, and that the statement was made during and in furtherance of the conspiracy.

So I take it the Government is going to be resting in front of the jury when we're bringing them out. Is that correct?

Or is there anything else you want to put on.

MS. BENSING: No, there's nothing else, Your Honor. We intend to rest.

THE COURT: Okay. So I will bring them out at 3:30, you will rest in front of them.

If the Defendants have any motions, obviously I will be doing that outside the presence of the jury. So, you know, they'll be here for the one sentence about the Government resting, and I will send them back out again.

I take it you will have motions?

MS. COHEN: Yes, Your Honor.

THE COURT: Okay, so that's how we will do it. It's a bit clunky for a jury to come in for a sentence and then out, but I think that's the most effective and proper way to do it in light of the discussions we have to have outside of their presence.

Is there anything else, before I let you have 15 minutes, that needs to be taken up at the moment?

MS. BENSING: Your Honor, I'll just note during the break we will try to cross-reference with each other the

exhibits that came in today just so we can all be on the same page.

THE COURT: Okay.

MS. BENSING: So maybe just if we can briefly touch base before we bring the jury back in after the break.

THE COURT: Yes, that's fine. Yes, I think that's fine.

And we will be getting copies, right? Hardcopies of the exhibits? Not today, but if you can have them tomorrow.

MS. BENSING: Well, I think we -- obviously, the Court has the entire set of Government exhibits. We intend to have one hardcopy available for the jury for purposes of deliberations.

THE COURT: Right. Yes, I mean, I need a set that is -- the way we're going to do it when the jury retires to deliberate, is that I'm going to make sure that all parties have looked at the set of what we'll call the originals, the hardcopy set, so that if the jury asks for something, then it can go back. But I want to make sure that the Court also has a set of just that universe.

MS. BENSING: So one set total, Your Honor, right?

THE COURT: No, two sets. Two sets. One set that the Court will have and another set that you can send back if the jury asks for things as they ask for things.

MS. BENSING: That's fine, Your Honor. We may just

pull from the extra copies here.

THE COURT: You can absolutely do that. I just want to make sure that those were given before certain things were redacted. So it's got to be whatever exactly went in. It has to be identical sets to what you have all agreed is the universe that would go to the jury in they ask for something.

MS. BENSING: Of course, yes.

THE COURT: Okay.

Anything along those lines that we need to take up, any logistical issues before I let you take a couple of minutes?

MS. COHEN: No, Your Honor.

THE COURT: Okay. We're back at 3:30.

I will see everyone at 3:30.

(Recess taken.)

THE COURT: I think we just need to bring the jury in. And you'll rest in front of the jury and then I will send them back out again.

Sorry, let me ask the Defense. Do I have a binder for your first witness?

MS. BONJEAN: There's no documents. No documents. I'm raw-dogging this.

(Jury enters.)

THE COURT: Okay. Everyone may be seated.

Ms. Bensing.

MS. BENSING: Yes, thank you, Your Honor. The Government rests.

THE COURT: Okay.

So Ladies and Gentlemen of the Jury, don't get too comfortable in your seats. I am going to send you back out again because the Government has rested and so there are some things I need to address with the parties. So I don't know exactly how long we'll be. Certainly not before 4:00 will we be back. So just be back in the jury room at four. If it takes a little bit longer, Mr. D'Agostino will come get you. But I am going to send you back out. And don't talk about the case, keep an open mind.

(Jury exits.)

THE COURT: Okay. Everyone may be seated.

I will hear from anyone who wants to raise anything outside the presence of the jury.

MS. COHEN: Your Honor, at this time we move for -- under Rule 29 for a judgment of acquittal.

We can go through -- we will go through our arguments now. We also have a written motion that we can subsequently provide Your Honor.

THE COURT: I can take your arguments now.

MS. COHEN: Okay.

So our first argument is that the Government did not introduce sufficient evidence that the Defendants conspired to

commit forced labor in violation of Section 1594(b). While the Government called thirteen witnesses who testified about alleged abuse and psychological manipulation they experienced, it did not introduce any evidence of an agreement between Ms. Cherwitz and Ms. Daedone or any of the other alleged unindicted coconspirators.

They -- you know, there was testimony about Ms. Daedone's teachings, about her views and about how people followed. There's also testimony that Ms. Cherwitz pushed people to do sales, on occasion suggested to people to go have sex to clear up tumescence but no evidence that Ms. Daedone and Cherwitz agreed to a scheme to force these witnesses to labor.

And the witnesses, in fact, on cross-examination, admitted that they were willing, that they never informed or advised the Defendants that they didn't want to perform these acts. They testified that they went to OneTaste to explore their sexuality, have their boundaries pushed, and that this is what they signed up for.

They also, you know, in terms of courses, of course, signed consent forms. They volunteered most of the time at the beginning and could, of course, leave any time.

And so there's no evidence that there was any agreement to have some kind of let's get together and psychologically manipulate and force these people to labor.

THE COURT: Let me just stop you for a moment. You're focused on agreement between the two individual Defendants.

Do you want to speak more broadly to just your client agreeing with anybody?

MS. COHEN: Yes, sure.

Specifically as to Ms. Cherwitz, you know, there really hasn't been -- I mean, Ms. Cherwitz, number one, started at OneTaste volunteering herself, was head of sales, but worked her way up. There's been no testimony that Ms. Cherwitz was forcing people to labor. Was she pushy for sales? Yes. Was she a tough boss? Yes. But there's no evidence that she and Ms. Daedone got together and decided to -- that Rachel was going to carry out some forced labor scheme.

In fact, there's -- Ms. Cherwitz made over ten years, approximately 38 -- I mean, if you divide it up, $38,000 per year. There's no motivation for her to force these people to work, to -- for what? And she worked hard because the evidence showed, and Mr. Kandell actually testified in this, that she believed in the cause. And she was a hard worker and she pushed people. And that we opened on, that we embrace.

But there has been no evidence that she forced anyone to do any labor.

The most we heard was two incidents, one with Becky Uma, who testified about a demo. But Becky Uma did not tell Rachel she didn't want to do the demo. She said she faked it. And we heard multiple witnesses Anthia Gillick, Mr. Kandell, I believe Max Pixley as well and another witness as well, who all testified that a demo was extremely prestigious, and it was part of it, and it was what everybody was there for. So to say that that forced someone to labor, I don't see any connection. There's no connection there.

Second, there were instances in which there was testimony about Ms. Cherwitz suggesting someone go have sex. Ms. Uma herself -- or, sorry, Halpern, I think she was Uma at the time, Halpern herself testified that she went up with Ruwan, the person, and they didn't have sex, I think made out. Max Pixley said they actually had sex, but of course, she wasn't there. Mr. Kandell was asked about it. Mr. Kandell admitted he wasn't even in the same building at the time.

And that's it. Whether or not you can find that is something she didn't -- shouldn't have done or wasn't right, I mean, this was a place where people went to get their boundaries pushed. So, yes, to get their boundaries pushed.

And Ms. -- again, Ms. Cherwitz's actions weren't to get someone to do labor. And that's another issue here. Is that the whole culture of OneTaste, the whole reason people there were trying to take classes and get their boundaries

pushed, were also -- some of these people were working there. So it was very intertwined at the same time. I mean, every morning they would get up and do practice sessions for OMing and yoga. And that was what you signed up to do, is to be part of OneTaste. So whether you worked there or not, which we heard testimony, there are people in the Brooklyn OM house that did those things day in and day out and had other jobs. So that was part of it and that really needs to be separated because that's what people were coming there for.

And again, these people agreed and could have left at any time.

With respect to evidence concerning Reese Jones -- and I'll let Ms. Bonjean speak more on that, but just vis-à-vis Ms. Cherwitz, there's absolutely no evidence connecting Ms. Cherwitz to servicing to asking people or forcing anyone or having anything to do with Mr. Jones. And, in fact, there was testimony by Mr. Kandell that Ms. Cherwitz at one point assisted Mr. -- not sexually, but assisted Mr. Jones as well.

So with respect to Ms. Cherwitz, I do not see there is any evidence connecting her to an agreement or any of her actions being to force someone to commit labor.

Again, and then going to serious harm -- do you want me to keep going?

THE COURT: Yes. I mean, this is your motion and we

will hear you out fully.

MS. COHEN: Sure. Thanks.

In terms of compelling labor through serious harm or threats of serious harm, there's been, again, no evidence that anyone felt threatened or that they were going to suffer serious harm if they did not do what Ms. Cherwitz was asking.

In fact, Ms. Halpern specifically testified that it would be a long conversation. Other people testified similarly. Sure, there was, again, Ms. Cherwitz yelling or being mean or -- is similar to not wanting to tell a teacher or -- not you, but the Judge -- that you don't want to do something because they're your boss or they're -- you want to please them. But that is not sufficient to prove serious harm in this case.

First, there is no evidence of physical violence or threats of physical violence, of course. There was -- you know, at most, again, it's the psychological manipulation or other tactics, including shunning, brainwashing was another, ostracizing or fear of losing social status within OneTaste. And actually, that last one was we heard most; I wanted to be on the inner circle, I didn't want to be on the outs. And that is not sufficient to cause serious harm.

In addition, losing, like even assuming that our argument is shunning, brainwashing, again is not sufficient to be psychological harm. We also made a motion as to whether

that violates freedom of religion and under the First Amendment.

But putting that aside for the moment, even if that could be considered psychological harm, there is no evidence that Ms. Cherwitz intended to use such alleged harm or threatened harm to make these people remain at OneTaste and continue to be employed.

And the scienter element under the statute is that the Defendants intended to force the defendant to remain, not to make them unhappy.

THE COURT: You're talking about the substantive statute now.

MS. COHEN: Yes. Or to make them leave, right? Yes, in terms of the serious harm.

So I think there was testimony concerning -- sorry, that you could fear -- yeah, lots of testimony that you could fear your losing of your social status. There was kind of like there was testimony a high school clique situation gone bad and you could lose being closer to the cool kids to being outcasted and lose your position. And that, people did testify that that was what was important. And if they didn't do this, that they would lose that kind of status. But again, that is not serious harm.

The victim, the alleged victims in this case all testified that they chose to work, that they signed up

voluntarily, that they were free to leave any time. Again, their feeling that they weren't -- not free to leave was just I wanted to please Nicole, I wanted to please Rachel, but not that I couldn't leave.

And many of the witnesses also, when pressed, they admitted that they made these choices and they weren't forced.

In terms of the -- we also feel the Government has not introduced any evidence within what we have an argument is the five-year statute of limitations for forced labor conspiracy in this case. And again, this is a more complicated argument that we have written up as well, but the ten-year statute of limitations is within 18 U.S.C. 3298. And that does not apply to the forced labor conspiracy under 18 U.S.C. 1594. Our position is that it's five years and the Government has failed to introduce evidence of an overt act in furtherance of the conspiracy during the five-year preceding indictment.

Essentially, 15 -- sorry, 1594, the subject statute, has a ten-year statute of limitations, but it was amended in 2008 to include the forced labor conspiracy two years after 3298's enactment in 2006 and when Congress enacted, implemented the ten-year statute of limitations for 3298, it did not apply to this conspiracy, to the ten-year, you know the amendment. If Congress had intended it to also apply as a ten-year statute of limitations, it could have and would have

included that.

And since, you know, upon a plain reading of this the ten-year statute of limitations of 3298 does not apply to the forced labor conspiracy under 1594 and, therefore -- and given that there is no evidence of any overt act, again, in furtherance of the conspiracy during that five-year period, the statute of limitations should bar this indictment.

We also, alternatively, if the Court determines that this is a factual issue for the jury, we request that the Court include a specific question to the jury on the verdict form as to whether the Government has proven an act in furtherance of the conspiracy after April 3rd, 2018.

We also further move for a judgment of acquittal as a matter of law that they're not guilty of forced labor conspiracy when 1589(b) was not in effect until 2009. And we have previously made this argument. Again, I understand that you can reach back for the *ex post facto* clause, but given that this is conspiracy, typically that's when you know for example, somebody had, you know, illegal immigrants locked up and in their basement for, you know, years before the conspiracy. Obviously, you can reach back and point to those acts because they were doing the substance of the alleged later conspiracy and, of course, it continued.

In this case, that is not here. There is no act other than the conspiracy itself. So there's nothing to reach

back to.

And in addition, the recklessness under part B here of reckless, you know, not having a specific intent, but being reckless, our argument would be one cannot conspire to commit a reckless act. So that was another argument in terms of the lack of knowledge.

And, of course, Your Honor's already ruled, we also have already argued that you should exclude evidence of alleged coconspirator statements because the Government has not met its burden of proof to submit such evidence. I know you already ruled on that.

And then another prong of our argument is that the statutory definition of serious harm has not -- is vague. It hasn't provided Defendants with fair warning that their conduct was against the law, and that the prosecution's also seeking to apply the statute in a manner that publishes the free exercise of religion as we set forth in our motion as well.

So first, the application of 1589 and 1594(b), violates the Fifth Amendment due process clause because the statutes are vague as applied in this manner. These terms do not provide an owner or person with fair notice that the statute applies to the Defendants' alleged conduct.

THE COURT: Sorry, you're making this argument now in connection with a Rule 29 motion? Because you obviously

made these arguments before or maybe your predecessor counsel did and, of course, the Court's denied various motions to dismiss.

MS. COHEN: Yes, we're renewing them in connection with our Rule 29.

We also argue that although a facial vagueness challenge to a criminal charge may be properly raised in a pretrial motion to dismiss the indictment and as applied vagueness challenge must be raised in a Rule 29 motion because it depends on the prosecutor's evidence of the Defendants' alleged specific conduct related to the charged offenses, so that's why we are renewing that here. I can provide you case law or we can --

THE COURT: I don't need the case law. Thank you.

MS. COHEN: Okay. We're done.

THE COURT: I will hear from, I think it makes sense to hear from Ms. Bonjean first and then hear from the Government in response to both motions.

MS. BONJEAN: Thank you, Your Honor.

I will endeavor not to be repetitive.

THE COURT: No, I think you should make whatever motion you want to make. Obviously, the two Defendants are individual, so you can make whatever motion you want to make and I will hear you out as fully you want to be heard.

MS. BONJEAN: Yes, thank you, Your Honor.

It's our position that the Government did not meet its burden in connection with demonstrating that there was an agreement between --

THE COURT: Sorry, you're making a Rule 29 motion, I take it? Let's start with the basics.

MS. BONJEAN: I'm sorry. Yes, we are making a Rule 29 motion and then we will also renew some of our constitutional challenges that --

THE COURT: Okay go ahead.

MS. BONJEAN: -- we've raised earlier.

Yes, it's our position that the Government has not met its burden in connection with demonstrating by proof beyond a reasonable doubt that there was an agreement between Ms. Daedone and any individual.

The Court, of course, is aware that Ms. Cherwitz came into the picture of OneTaste a little later, after the alleged conspiracy commenced, according to the Government. Really, the only individual who the -- Ms. Daedone could have theoretically been in a conspiracy with is Mr. Kandell. It's our position that the Government has not demonstrated that Ms. Kandell A, is a coconspirator, or that any other evidence has demonstrated that he was a coconspirator. At best, the evidence shows that he was a member -- he is a cofounder, he was a member of upper management.

His own testimony acknowledged that sometimes they

were manipulative of people, that at times there was pressure placed on people, but that in and of itself does not satisfy the Government's burden of demonstrating that the two entered into an express or implicit agreement that they were going to carry out a forced labor scheme.

And at no point has the evidence demonstrated that Ms. Daedone or any individual, again, entered into an agreement with the specific intent to carry out a forced labor scheme either under 1589(a) or 1589(b). While there's plenty to criticize along the way, the question of whether there was an agreement to enter into this criminal activity, we believe the Government has come up short on their proofs.

In fact, even the Government's evidence, from our perspective, demonstrates quite the opposite; that there was an intent to create a community and a business. And yes, those two things sometimes overlapped and that sometimes there was confusion around the -- or the lines were blurred as it related to both the community and the business, but at no point was there evidence that this was all part of some agreement to carry out this scheme.

So we reiterate the arguments that have been advanced by Ms. Cohen and further make the arguments specifically as to Ms. Daedone.

And again, this also goes hand-in-glove with our prior arguments regarding other individuals who we believe the

Government has not shown were coconspirators. At best, they were members of upper staff, but nobody ever had this grand scheme or plan or specific intent to carry out a forced labor scheme.

(Continued on the next page.)

(Continuing.)

MS. BONJEAN: Moving on to one of the elements of this offense is whether or not the Government has demonstrated serious harm or threats of serious harm. And this is where I think the Government has come up very short, and this is why.

While there's certain -- a fair amount of flexibility with the terms serious harm or threat of serious harm, what the Government has alleged, essentially, is that -- and what the evidence has demonstrated is that there were people who participated in OneTaste and then later determined that they were psychologically harmed. Not that in the moment psychological harm was the reason they stayed. At best, they have, on reflection, given vague assessments that I was brainwashed, which again, you know, our position is that is not competent evidence, should not have been brought in. But they have these -- the testimony is essentially that at the time, I didn't trust my judgment, I felt that there were messages that made me confused, I was, you know, kind of like mind control type arguments.

As that is on a slippery slope, there's zero authority out there, there's never been a case where you can equate serious harm or threats of serious harm with these vague concepts of brainwashing or mind control. And while, yes, they do identify certain sort of coercive tactics that

they claim were used against them, manipulation, some vague concepts, but this is all -- they all universally admit that in the moment, that at the time, they understood that they were free to leave. What kept them there was fear of being kicked out of the group chat. That was what kept them there. They wanted -- it was social coercion, spiritual coercion. It wasn't coercion that kept them there other than we still want to be part of this community, otherwise known as we want to be part of this community and we don't want to give up what the community offers.

And this gets us into some very worrisome First Amendment issues, because the First Amendment protects people's right to assemble as they see fit. Scientologists are permitted to fraternize with Scientologists. Churches are permitted to socialize with people that share their beliefs. They are permitted under the First Amendment to say, you don't share our beliefs, therefore you may not be part of our community. And OneTaste also, not just as a business, but as a community was permitted to say, we share these beliefs, we live by them ourselves, if you don't want to live by them, then you will have to leave.

Or you may be a customer, you can attend classes, you can be on the outer circles, but you may not be in, you may not be in the inner circle, because this is our community and these are things that we share, these are

beliefs that we strongly adhere to, and we don't want people who don't believe in these principles. And no matter what we feel about those principles, they had a First Amendment right to live in community around these principles, and that people were afraid that they would be kicked out because they didn't want to accept these principles or the rules or any of those things that were required by the community is not -- it's not coercion. In fact, it's protected by the First Amendment.

This goes back to the whole shunning idea, which again we've cited caselaw in the past and we stand by that, that really what they were afraid of most is conduct that is protected by the First Amendment in the same way that any community, whether it's a church or other spiritual practices and other organizations that some people feel are -- you know, had these cultish type attributes.

So that type of fear is not the type of fear that was contemplated by the lawmakers when they passed this legislation, the paradigmatic types of cases that we all know come down to, you know, coerced, you know, more like -- again, like illegal immigrants being kept in scenarios where they have been denied their papers, they've lost their freedom either physically or they have lost their freedom in ways that prevent them from leaving the situation.

We have seen evidence in other cases that we

talked about in the past, whether it's *United States v. Maneri* or *United States v. Kelly*, where you have actual manipulation in conjunction with threats of physical violence. Even if physical violence isn't used, but there's a threat of it, that's the type of coercion that the lawmakers had in mind, not some type of social coercion or fear that you're going to be kicked out of the group, and that is what we've heard of.

In fact, time and time again we've heard these witnesses testify, when pushed, I could leave, I didn't need to stay, but I felt like I didn't have a choice. Well, just because you felt in the moment that you didn't have a choice, what they're really saying is I felt like I didn't have a choice and also get to stay, and that is what they have testified about. They wanted to stay, and that's why they did. And that is -- our position in our argument is that as a matter of law, that cannot satisfy the serious harm and threats of serious harm prong.

I think I'll rest on my comments on that particular aspect. Again, you know, time and time again we've seen where people were free to leave. Every last one of them admitted as much.

Focusing a little bit on the Reese Jones allegations, we heard from three witnesses who discussed what they describe as being asked to handle Reese Jones, and

that one aspect of that responsibility was providing, you know, sexual -- the Government calls it sexual services, but that it involved sexual encounters with Reese Jones, primarily, you know, stroking, whether it's male OM or just stroking, you know, masturbating him.

Here's the thing on that point. As distasteful as that may seem to us, I want to point out two things. This was a company where sexual exploration was the norm. People went there for that purpose. This is not like running a restaurant and asking a waitress to stroke, you know, the investor. That is, this was a place where people went for sexual exploration. So the ask itself, it was not a crazy ask.

Certainly people had the right to say, no, I'm not interested in doing that. Christina Berkley, Dana Gillport, and even Michelle Wright, for as upset as she is, they all admitted -- and Christina Berkley in particular, but they all admitted that they were asked, they accepted, they saw it as a benefit, that they wanted to -- that it allowed them to be sort of in this inner circle. And at the time, it was a coveted position. And I know that that might be a crazy thought, but none of that matters if it wasn't forced. And there was only one bit of evidence where Michelle Wright said, I said no. She was not forced. She was not -- she was -- you know, she felt that -- she said I felt that

Nicole was upset with me. But in the end, there was no actions taken to compel from her continuing to engage in sexual encounters with Reese Jones.

Similarly, every single one of these witnesses admitted, I didn't tell her no, therefore they have no idea and cannot say that there would have been any effort on the part of Ms. Daedone to force them to engage. In fact, it sounds very much like the only thing that would have happened is there was a line of people who were lining up for this and Ms. Daedone would have asked the next person.

So whatever the act is, as distasteful as it is, as troubling as it is, it does not change the fact that none of these women objected when they were -- they were asked, they understood what was being asked of them, and they participated, and that is -- that is not evidence, therefore, of either forced labor or a forced labor conspiracy.

So I will leave my remarks on that particular aspect of it there.

I will adopt, without further elaboration, our Statute of Limitations argument. If we are right, that the five-year Statute of Limitations is applicable in a forced labor conspiracy, it is our position that the Government failed to demonstrate any overt acts in the five-year period that preceded the indictment.

I would adopt, again, the First and Fifth Amendment argument we made regarding notice around serious harm.

I do want to just elaborate quickly on 1589(b). This is a statute that is rarely used. At least there's not an abundance of caselaw around it. It is, I believe -- this may be the first case where there's been a one-count allegation of conspiracy under 1589(b). I know the Government has charged both. But if we look specifically at that subsection, I'm not sure there's ever been a case that conspiracy to commit forced labor under that section has been brought.

As Ms. Cohen alluded to, there is proofs issue, there's also legal issues, Constitutional issues around whether or not you can have a conspiracy to act recklessly, essentially. And 1589(b), as the Court knows, it's a little convoluted of a statute, but it essentially says that whoever knowingly benefits financially by receiving anything of value from participation in a venture, in this case that would be OneTaste, as the Government alleges, which is damaged in the providing or obtaining of labor or services by any of the means described in subsection A, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of those labor and services by any such means.

So this is a dilemma, because the Government has charged a conspiracy, which is they're saying there was an intent to carry out a forced labor -- there was an intent to commit forced labor. And if we look at subsection B, that can be accomplished through their knowing or reckless disregard of the fact that the company was engaging in this -- in these obtaining of labor through these prohibited means.

THE COURT: But you would agree that 1594(b), which is the actual charge here, makes it a crime to conspire with another to violate, among other sections, 1589, and it does not specify only (a) or only (b), right?

MS. BONJEAN: Right, that's true. And I think the problem that arises is that the Government -- I'm sorry, the jury, I assume, is going to be charged in the alternative, and unless we have a special verdict form, we won't know exactly what theory that they have found on, whether it's 1589(a) or 1589(b). If it's 1589(a), then I don't think this argument I'm making is applicable. But under 1589(b), we are in the territory where we are arguing that there was a specific intent to act recklessly.

And I would point out the U.S. Supreme Court has not addressed this issue precisely. This issue has come up. And what the United States Supreme Court has said is that even if you have a lesser mens rea than intent such as

knowing or recklessness, so long as these -- the offense that people are conspiring to do is a crime with or without -- notwithstanding any attendant facts, then that's not a problem.

But we are in a different territory here because this isn't just a matter of, for instance, conspiring to commit assault, like, on a police officer, like the attendant fact is a police officer, that an assault is still an assault and you don't have to prove that there was a conspiracy and an agreement to commit an assault on a police officer. And the U.S. Supreme Court says that's fine.

But here we have a scenario where the conspiracy, the specific intent to carry out the forced labor under (b) is the crime itself, without the reckless behavior --

THE COURT: But is your argument that Congress didn't mean what it said when it enacted 1594(b) when it spoke of conspiracy to violate 1589?

MS. BONJEAN: I think that Congress did not think through what that meant for 1589(b). Yes, I do think that. In fact, I think the law is -- there's -- there's a durth, if not complete devoid of law on what it means to have a conspiracy under 1589(b). There are very few cases that are brought under 1589(b) anyways.

And so, again, I think there is a problem with the concept of a specific intent to carry out a reckless act,

and also we are going to the heart of what the conspiracy is rather than some attendant fact or extraneous fact that is unnecessary for the crime to have been committed.

So we've raised that. We do intend to follow up with a written motion that --

THE COURT: Well, you also raised it in connection, I think, with the jury charge.

MS. BONJEAN: Right. And again, I think this is potentially a jury instruction issue.

THE COURT: Well, you've raised it in connection with that as well.

MS. BONJEAN: That's right.

And with that, I'm not going to re-raise our arguments that we've already raised. I would just stand by those arguments.

THE COURT: Okay. Let me hear -- I don't know who from the Government team is going to be speaking, but whoever wants to be heard, or maybe multiple people.

MS. GUPTA: Yes, thank you, Your Honor. I'll start it and then pass it along.

I'll just start by addressing the agreement.

Your Honor, there's been ample evidence throughout trial that there was an agreement not only between the two individual defendants, but also between the defendants and Robert Kandell, Yia Vang, Aubrey Fuller, Joanna Van Vleck,

Rachael Hemsi, and I can go through I think some of the facts that establish that.

But even looking to Robert Kandell's testimony alone, he admitted that he, Rachel Cherwitz, and Nicole Daedone would manipulate staff into working longer hours, working harder. He said, and this is at page 3382 of the transcript: We would direct people past their comfort zone in certain situations, and certainly they knew they were doing this. And as to Rachel Cherwitz specifically, he said: She was in charge of sales and she would do whatever it took to meet our sales goals. And we saw some of this in the text messages that were introduced throughout trial.

So, for example, we know from the evidence that Reese Jones was funding the company for a period of time, and Nicole Daedone, as part of that agreement with Reese Jones to get money from Reese, was providing him with sexual services. And while Rachel Cherwitz may not have been the person directing women to provide him with sexual services, certainly the effort to pay Reese back translated into sales goals. We saw that in a text that was introduced by Ken Blackman in which Rachel Cherwitz said: We owe $27,000 to Reese by this date, we have to sell five coaching programs. So that was Rachel Cherwitz's role as part of that agreement between Nicole Daedone, Robert Kandell, and Rachel Cherwitz.

Obviously Yia Vang was a part of that as well.

She was one of the individuals who was directing women, including three people who testified at this trial -- Dana Gill, Michelle Wright, and Christina -- into performing sexual services for Reese Jones, providing trainings to both Michelle and Dana on precisely what they were supposed to do. So certainly there's been a conspiracy shown with respect to Yia Vang.

And then I'll speak to as to Rachel and Nicole specifically. Not only did we see this from Robert Kandell's testimony, that nearly every victim who testified at this trial said that Nicole Daedone and Rachel Cherwitz were a unit, Rachel Cherwitz was Nicole Daedone's right-hand woman and they worked as a close pair. We also saw this in the Stinson Beach video that was introduced in which Rachel Cherwitz was reading Nicole Daedone's life story prior to an OM demonstration. There were investors present at that particular OM demonstration, and this was yet another effort to provide money to the company and directly to Nicole Daedone.

So certainly from even very early years -- Rachel Cherwitz started at the company in 2007, by 2008 she was reading Nicole Daedone's life story at the Stinson Beach demo. So she was immediately part of the conspiracy.

I'll also address the serious harm prong. And here I should note that serious harm can be any harm. It

can be reputational, it can be psychological, it can be financial. And nearly every victim who testified at this trial, and Your Honor heard from nine different victims whose time at OneTaste spanned between 2007 to late 2017, and each one of them testified about the very serious psychological and financial harm that they experienced while they were at OneTaste while performing a variety of labor and services for the company. That included everything from back of house and running events, to being Nicole Daedone's assistant, to cleaning her bathroom, to coaching, sales, and sexual services that were provided not only to Reese Jones, but to VIP clients and other prospective clients, including other community members who were purchasing courses.

(Continued on the following page.)

(Continuing.)

MS. GUPTA: Just to provide a few examples of this throughout trial, Dana Gill testified about how the defendants caused her severe psychological harm and coerced her into performing sexual acts at OneTaste, not only with Reese Jones, but with VIP clients and others. She described the coercive tactics that were used as like by death by a million paper cuts because the coercion was so subtle over time. That's at 1608 of the transcript.

Similarly, Michelle Wright testified that she was afraid to say no to Nicole Daedone and that's precisely why she ended up agreeing to sexually service Reese Jones.

Daedone and Rachel Cherwitz taught Michelle and others at OneTaste that saying no to something Nicole asked of them was, quote, basically like death, which is at page 2409 of the transcript. So she always felt she had to say yes even to things she plainly did not want to do such as engaging in the sex acts with Reese Jones.

And then yet another example, and this is slightly later in time, of Max Pixley, who testified that they frequently had mental breakdowns while at OneTaste due to the stress and heightened experiences. And as one of the examples that they provided they said that Chelsea Hunter, another OneTaste participant at the time, was comforting Max Pixley and Rachel Cherwitz told Chelsea to stop and referred

to Max as being a virus. And Max described that as causing her very severe psychological harm, yet she continued to provide labor and services at OneTaste.

They testified that they felt they were in fight or flight every day and that life had become a prison. That's at page 1919 of the transcript.

So Your Honor, that's really only three victims pulled out of the nine, but it's very clear, even just from those three, that there are a variety of psychological tactics being used both by the defendants and multiple co-conspirators that caused these individuals severe psychological harm. And that's not even to mention the severe financial harm that occurred as a result of these women really being paid, Dana Gill made nothing during her time at OneTaste. And I know that there was some cross-examination attempting to portray her as a community member rather than an employee, but we saw in one of the Government exhibits that was just put in that she was specifically referenced as a former OneTaste employee who made zero dollars from her time working at OneTaste.

And certainly other people were underpaid throughout the years. And we saw in text messages, Government Exhibit 1332, for example, where Rachel Cherwitz, Robert Kandell, Joanna Van Vleck and Yia were discussing moving employees from staff to part time or independent

contractor positions where they would lose their salary. So they knew exactly what they were doing and that goes directly to their intent, that they knew that these individuals were being financially harmed. They knew they were working for little or no pay under these psychological tactics.

And I also briefly address, I know there's been arguments that people were free to leave at any time. That's not an element of the statute. The fact that people were physically free to leave doesn't speak to the fact that they felt psychologically entrapped.

And I will pass it over to my colleague for -- to address the statute of limitations.

THE COURT: Go ahead.

MS. BENSING: Thank you, Your Honor.

So just returning to the text of 18 United States Code, Section 3298, it plainly provides that conspiracy to commit, among other things, 1589, forced labor, has a ten-year statute of limitations.

And so I'm not sure I understood the ins and outs of Ms. Cohen's argument, but I think the plain language of the statue clearly establishes a ten-year statute of limitations. But even if the Court were to disagree, obviously, here, we have numerous text messages that date into the 2018 period that show the continuation of the

conspiracy as well as numerous financial payments that were made into 2018 that also --

THE COURT: After the April date of the indictment?

MS. BENSING: Yes, yes, Your Honor.

For example, we just saw one where Rachel Cherwitz got a payment in May of 2018, $70,000.

So I don't think it's a five-year statute of limitations, but even if it were, I think that there is significant evidence that goes through at least June of 2018, Your Honor.

With respect to the -- some of the First Amendment arguments, I think the Government would refer the Court back to its prior briefing on that. And the same goes with respect to these arguments about conspiracy to violate 1589(b). I think we clearly outlined and even addressed that Supreme Court case that Ms. Bonjean was just citing in connection with our briefing there.

So unless the Court had any questions on that, I think we would rest on our papers with respect to those arguments.

THE COURT: I don't have any more questions for you on that.

I saw all of the briefing, of course, on the jury instructions, many of which are overlapping with the

arguments today.

Is there anything else the Government wanted to address at this time?

MS. BENSING: I mean, obviously, we would be relying on the totality of the record here and I think just to make that very clear that when you look at each individual victim's testimony and then you put their testimony together and you combine that with all the text messages that we've seen in this case, including text messages involving the Nicole Daedone and Rachel Cherwitz, that that in totality should be presented to the jury to determine whether or not the defendants violated the statute.

THE COURT: I think everyone has been heard fully, but I will hear the defendants, if you want to respond to what the Government had to say, but I think they were primarily responding to you.

MS. COHEN: Yes, Your Honor.

THE COURT: Sure.

MS. COHEN: I would just add a few points with respect to the argument that Rachel Cherwitz conspired an agreement with Ms. Daedone as evidenced by the Simpson Beach video as one of the arguments.

The evidence that this trial has shown that Rachel Cherwitz worked harder than anyone. In fact, Mr. Kandell

and others said that she worked extremely hard. That is why she was close to Nicole Daedone. She, herself, wanted to be part of Nicole, wanted to be in the inner circle. That doesn't make her part of the conspiracy.

And, you know, I think we did touch on this, but the psychological harm that these witnesses testified to, number one, again, you know, we confronted about specific statements at the time that they were there and what they felt at the time.

The testimony in this Court is in hindsight and in looking back and, you know, in terms of the acts that some of these people did when they were in their twenties and potentially regret it or have different views about it now doesn't mean that at the time of this, they felt compelled to do these things.

In fact, as we argued before, many of them conceded that they wanted to be there. Some of them said, when confronted with pictures and about their time there and about the love they felt for the community, admitted all that, that they loved it and they loved the people there and the people loved them back.

So, you know, the fact that they're testifying about this psychological harm, not to mention some of these people -- and I know this is a Government argument, that they were vulnerable people, they went there because they

had these issues.

What OneTaste was offering was a meditative practice to help people, a spiritual practice. A lot of these people were people who came from yoga, came from other meditative practices. That's what they were looking for because they did have problems in their lives.

So to blame what happened at OneTaste for every issue that they have in their lives is not appropriate in this case.

And I know there was some mention of Dana Gill. You know, I think we showed that Dana Gill, shortly thereafter, had made many statements about her time there and about what she wanted to do and that she was happy to do. And Michelle Wright, I know specifically had literally not one thing to say specifically about Ms. Cherwitz and also conceded that she could have said no and could have left. And by saying no, it was death. It was death maybe to their social status, but, again, that is not serious harm, particularly here, where they wanted and were telling the defendants how much they wanted to be there and how much they loved it.

And so the fact that these two defendants would know that they were forcing someone under those considerations, I don't think the evidence showed that at all.

And in connection with being called a virus. I mean, number one, names, we were taught young, you know, calling someone names and being mean is not a crime. Being a tough sales -- pushing sales is not a crime. It happens all of the time when people go to places and people push them. I mean, everybody's goal of a business, if there's sales involved, is to make the sales.

And the fact that Rachel may have been trying to get a loan repaid, we've got -- let's push, let's make sales, doesn't make -- isn't proof that she agreed to force these people into labor to do so. She's a salesperson and she is selling a product.

And, again, that is not criminal. Being pushy is not a crime.

So that's --

MS. BONJEAN: I just have a couple remarks.

THE COURT: Go ahead.

MS. BONJEAN: A conspiracy has to involve an agreement to essentially cause serious harm or threats of serious harm. And there's just no evidence.

How OneTaste interacted, they did it amongst themselves, they did it with everybody, and they didn't hide it. This wasn't a bait-and-switch situation.

In fact, their marketing materials, what they were about, was pushing boundaries, was getting into psych-- you

know, getting into sort of psyches and exploring your fears and exploring your beasts and all of that. And every single one of those individuals went there just for that. You could go to an opening -- you could go to a turn on event, which was just sort of an initial event that you could go to for free and you would learn that that's what they're about. That is they what went there and they got exactly what they sought. And now they're looking back ten, fifteen years later, and they're saying, you know what? I don't think that was so great for me. I don't think that was so good for me. And I remember feeling depressed and I remember feeling sad and I remember feeling confused.

And honestly, you know, many of us could look back at times in our lives and say that about our entire twenties or we could look about that in terms of marriages we were in. You know, I was -- I was manipulated by my ex-husband. I was confused. I was all of those feelings. I'm not talking about him specifically at the moment. I'm just saying --

THE COURT: I didn't know where you were going with that, Ms. Bonjean.

MS. BONJEAN: No, my kids are in the courtroom. I will leave this hypothetically.

I am saying people can look back on experiences in their lives and say, you know what, that wasn't good for me

at the time. But that does not mean I was forced to stay in the moment. And there is the distinction I think we're trying to make.

Ms. Gupta says it doesn't matter. Of course it matters. Of course it matters that they could leave. Of course it matters not only physically leave, but they could leave without any real repercussions and nobody has identified a single repercussion other than Nicole might be mad at me, I would be kicked out of the circle, or that I wouldn't be able to be a part of the community.

And so, you know, we come back to this. We think that the Government has not satisfied its burden, A, that there was serious harm, or that the defendants or any of their co-conspirators intended to threaten serious harm to keep them there.

And so that was all I wanted to add.

MS. BENSING: Your Honor, I can briefly respond --

THE COURT: Go ahead, that's fine.

MS. BENSING: -- if it's helpful.

I think that there's a real belittling by the defense of what the actual testimony was in this case which included a combination of tactics that was designed plainly to whittle away at each of these victims, at each of their identities, to put them in a psychologically compromised state so that they would work.

And that is the Government's entire theory of the case, including sexual abuse, including financial coercion, including psychological abuse.

And so it's the combination of all of these, and some of which I don't even think were really addressed by the defense at all, that is what we are alleging compelled these victims to work.

So I just wanted to be very clear that we are talking about the totality of each of these tactics and not each individual one.

THE COURT: Okay.

Each defendant's Rule 29 motion is denied.

The evidence is sufficient to sustain a conviction on the sole count of the indictment as to each defendant. On the evidence admitted, a rational jury could conclude beyond a reasonable doubt that each defendant is guilty of the crime charged in the indictment.

The Court notes that the evidence must be viewed in the light most favorable to the Government, crediting every inference that could be drawn in the Government's favor, and the evidence must be assessed as a whole.

So, again, each of the Rule 29 motions is denied.

Is the defense ready to start its case? Cases, I should say.

MS. BONJEAN: Yes. One moment.

THE COURT: And if you could just also let me know when the jury comes out which one of you is going to be starting so I can properly announce it.

MS. COHEN: Yes. That will be Ms. Bonjean.

THE COURT: Okay, go ahead.

(Pause in proceedings.)

THE COURT: So Ms. Bonjean will be starting?

MS. BONJEAN: Yes.

MS. COHEN: Yes.

THE COURT: So I think what I would do is just ask if either defendant wishes to present a case and then you can each say that you do, I suppose, because you are both going to be, correct?

MS. COHEN: Yes.

THE COURT: And then, Ms. Bonjean, you can call the first witness.

So is your plan for every defense witness to have both counsel or at least one counsel for each defendant questioning or not necessarily?

MS. COHEN: Not necessarily. Unless something comes up.

MS. BONJEAN: I don't know necessarily. I think we reserve our right to do so.

THE COURT: Of course.

MS. BONJEAN: My guess is probably not for most.

MS. COHEN: And I would imagine maybe -- yeah, I think that's right, yes.

THE COURT: Okay, that's fine.

MS. COHEN: Sorry.

THE COURT: I just wanted to know so we're not surprised one of you says you have no questions.

Let's bring out --

MS. FARRELL: I'm sorry, can we briefly address issues about the defense case?

THE COURT: Yes.

MS. FARRELL: So we understand the first witness is a gentleman named Antonios and that they anticipate it being a pretty short witness. And then I think the only other defense witness available today is Marissa Ward for whom we have had the discussion about the 26.2 material.

THE COURT: Right.

And let me actually address Mr. Robotti on that.

So I did get the video. It's an hour long. So I watched some of it so far, but we didn't take an hour of lunch break, so I couldn't watch the whole thing.

I will watch the rest of it, but that's something you are claiming work product protection?

MR. ROBOTTI: Yes, Your Honor.

The video, as we discussed earlier, has been held to be work product protected by Judge Chen.

THE COURT: Without getting into content, of course, but what is that video? I mean, in terms of -- it's obviously somebody being asked questions and answering questions, but I don't know beyond that because it doesn't tell me anything on the video.

MR. ROBOTTI: So my understanding is that this was a video interview conducted during an internal investigation at OneTaste by company counsel for OneTaste. So I think the work product assertion is that it reflects the attorneys' mental processes about what to question Ms. Ward about during the scope of this investigation.

THE COURT: Are you sure they are attorneys?

MS. BONJEAN: Yes.

MR. ROBOTTI: Yes, Your Honor.

MS. BONJEAN: Yes. And not just in-house Counsel.

THE COURT: I am going to need to know who it is because nobody is visible other than the person being interviewed at least in the twenty-something minutes I watched. I need to know more information.

MR. ROBOTTI: We can provide that information. Yes, of course.

THE COURT: I won't get into the content too much, but at about a minute twenty-two, there is a statement I found very interesting about the purpose of the statement being made. So you can take a look at that.

MR. ROBOTTI: Yes, Your Honor.

THE COURT: I'm not --

MS. FARRELL: Our request would be that we at least not start that person's cross, maybe not even their direct.

THE COURT: Yes, no, I think that's a fair. I would normally go until 5:30, if that meant we put her on, we put her on, but given this issue, we are not going to be able to do that unfortunately.

So we can now bring out -- what's Antonios's last name?

MS. BONJEAN: I cannot pronounce it. It's a very long Greek name and he will just have to pronounce it.

THE COURT: Okay. Why don't we get the jury?

The jury comes in, I think I will tell them that we are likely to end early, but I won't give specifics. I just think if they have transportation issues, they should just have it in their head that they might need to be flexible.

(Jury enters.)

THE COURT: Okay. Everyone may be seated. I'm not doing too well with my estimates on timing, but I appreciate the jury's patience.

Does either defendant wish to present a case?

MS. COHEN: Yes, Your Honor.

MS. BONJEAN: Yes, Your Honor.

THE COURT: Is it Ms. Bonjean that wishes to call the first witness?

MS. BONJEAN: Yes.

THE COURT: Okay, go ahead.

MS. BONJEAN: I am going to call Mr. Antonios -- I am going to have him pronounce his last name if that's okay?

THE COURT: Yes.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Step up, remain standing, raise your right hand.

(Witness sworn.)

THE WITNESS: Yes, I do.

THE COURTROOM DEPUTY: Please be seated. State your full name for the record and spell your last name slowly. Please use the microphone.

THE WITNESS: My name is Antonios Hadjigeorgalis. It's H-A-D-J-I-G-E-O-R-G-A-L-I-S.

THE COURT: Can I ask you just to pronounce that for me one more time?

THE WITNESS: "Hadjigeorgalis."

THE COURT: "Hadjigeorgalis."

THE WITNESS: That's it.

THE COURT: You may proceed.

MS. BONJEAN: Thank you.

**ANTONIOS HADJIGEORGALIS**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BONJEAN:

Q Antonios, I'm going to call you Antonios --

A Okay.

Q -- if you don't mind because I will be going over that last name forever, so I apologize out of the gate.

You have introduced yourself to the jury.

Antonios, can you tell the ladies and gentlemen of the jury where you presently live.

A I live in Narvon, Pennsylvania.

Q How long have you lived there?

A Since 2011.

Q What do you do for work, Antonios?

A I work in sales as an engineer, cross between software engineering and sales.

Q And are you presently married?

A I am.

Q And when did you get married?

A In 2011.

Q And how old are you?

A I'm 54.

Q Did you go to college?
A I did.
Q Whereabouts?
A Undergrad, went to University of Maryland at College Park. And graduate school, I went to Drexel University in Philadelphia.
Q And what types of degrees did you earn from U of Maryland and Drexel, respectively?
A I have a Bachelor of Science in mechanical engineering from Maryland and an MBA in finance from Drexel.
Q And after earning your MBA from Drexel, what type of work did you do?
A So directly after Drexel, I worked on Wall Street briefly. Then I went back to my family's business for a little while. We had a grocery business when I was growing up. Then I ended up back in something called trade technologies in New York.
Q Just for timeline, can you tell me what year you graduated from Drexel?
A Yeah. It was 2001.
Q And then --
A I'm sorry, 2000, May 2000.
Q 2000?
A Yeah, May 2000.
Q And where were you living during that time period?

A In New York.
Q And it sounds like --
A Oh, wait a minute. I'm sorry. You are talking about in school or after school?
Q Yes. After school when you began working.
A Yeah, when I began working, I was living in New York.
Q And you said that you went back to the family business and then at some point returned?
A Yes.
Q And returned to New York, is that what you meant?
A Yeah, mm-hm.
Q What year was that?
A 2007.
Q In and around 2010, where were you living?
A 2010, I was living in the Union Square area of Manhattan.
Q And at that time, approximately how much money were you making a year?
A In 2010, I made about 160.
Q And what type of work were you doing?
A Similar to what I do now, it's called solutions engineering, back then, helping salespeople with technical concepts.
Q Did there come a time when you heard about a company known as OneTaste?

A Yes.
Q How did you come to learn about OneTaste?
A It's kind of hard to remember, like, the exact first time I heard about it, but I definitely remember my first interaction with OneTaste was some meet-ups that they had, some events that were being held, like, I was curious about.
Q And were these free events or did they cost money?
A The very first one I went to was definitely -- I'm not sure how many, but there were a series of ones that were free that I went to.
Q And do you remember the names of any of those free events that you attended?
A I mean, I think there was one that had something to do with communication. And then there was, like, kind of a one that they had more often, like, kind of a regular thing that they had on, I think, meetup.com is where I found it.
Q Okay. During your -- during those events, did you eventually come to purchase courses --
A Yeah.
Q -- or a course from OneTaste?
A Yeah. I think February 2010 was the first time I spent some money on a course.
Q And what course did you buy?
A I believe it was called, like, advanced orgasmic meditation or something like that.

Q And in the process of taking that course, did you learn the practice of orgasmic meditation?
A Yeah, yeah. I had heard about it in the other ones, but that was the first time I learned about it.
Q And did you practice orgasmic meditation?
A Yes.
Q Did you do it in the context of OneTaste, or how did you end up actually practicing?
A With people I met through the OneTaste community.
Q Did you do it in OM circles or outside of that context?
A Both OM circles and outside of that context.
Q And did you find it beneficial?
A Yes, I did.
MR. FERN: Objection.
THE COURT: Sustained.
And I will strike that answer.
Q Did there come a time when you purchased a coaching program?
A Yes.
Q What month and year was, it if you recall, when you purchased the OneTaste coaching program?
A That would have been in the fall of 2010, probably paid for it in October.
Q So fall of 2010?
A Mm-hm.

Q And how did you -- how did it come about that you purchased the coaching program in the fall of 2010?
A Well, one, it was I had heard about they had this coaching program to, like, learn the techniques more in depth and learn all this stuff more in depth around the topics that they were talking about frequently, which I was interested in. But this one was remote. So I worked full time in New York, so it was feasible that I could go and learn some more within this program. So I decided to join up.
Q And were you pressured in any way to purchase the coaching program?
A No.
MR. FERN: Objection.
THE COURT: Sustained.
Q Did there come a time after you purchased the coaching program where you traveled anywhere in connection with the coaching program classes?
A Yeah. Part of the program were two immersive events in San Francisco and I went to the first one in November of 2010.
Q So again, can you tell the ladies and gentlemen of the jury when you went to this immersive event in San Francisco?
A I don't know if I know -- remember the exact dates. It was in November of 2010.

Q Okay.
A Yeah.
Q So -- and when you went to the immersive event in San Francisco in 2010, where did you stay?
A At the OneTaste facility. Folsom Street, it was.
Q And did you share a room or have your own room?
A No. I had my own room.
Q How long in total were you there? Can you remember?
A I believe it was a long weekend. I don't think I would have been able to take off too much more from work.
Q Okay. So during that immersive weekend in connection with the coaching program, did there come a time when something happened in one of the classes that took you by surprise?
A Yes.
Q And I'm specifically talking about did anybody indicate something that they wanted from you during that coaching --
MR. FERN: Objection.
THE COURT: Basis?
MR. FERN: Hearsay.
THE COURT: This question -- overruled as to this question.
MS. BONJEAN: Okay.
Q Did you -- did anyone indicate that they wanted to have a sexual encounter with you?

MR. FERN: Objection.
THE COURT: Sustained.
Q Well, did you have a sexual encounter with someone?
A During that time there, yes.
Q And who was that?
A A woman named Dana.
Q Okay. And how did that happen?
A So I'm not sure if it was the same day. I think it might have been. Like, there was an activity we were doing, a bunch of people in a group talking about -- I think the topic was desire, things that you wanted, and she mentioned that --
MR. FERN: Objection.
THE COURT: Sustained.
THE WITNESS: Okay.
Q And did you invite her to have a sexual encounter?
A No.
Q And during this long weekend in San Francisco, did Ms. Gilport come to your room at some point?
A Yes.
Q And after she came to your room, did you engage in a sexual encounter with her?
A Yes.
Q Now, after that weekend, did you go back to New York?
A Yes.

Q And, again, are we still in November of 2010?
A Yeah, I mean, it was only a couple days in probably early November.
Q Okay.
A Yeah.
Q And when you went back to New York, were you still participating in the coaching program?
A Yes.
Q And had you told anybody at that point that you didn't want to participate in the coaching program?
A No.
MR. FERN: Objection.
THE COURT: Sustained.
Q Well, when you went back to New York, did you continue with the coaching program?
A Yes.
Q How long did you continue with the coaching program?
A So the first time I asked about getting out was on January 24th.
Q Okay.
A Yeah.
Q Is that 2011?
A 2011, yeah, mm-hm.
Q So prior to 2011, had you made any indications that you were interested in leaving the coaching program?

A No, not at all.
Q And by the way, did you have any sexual experiences with Dana Gilport other than the one you told us about in November of 2010?
A No. Only that one time.
Q By the way, were you issued a refund once you did decide you wanted to leave?
MR. FERN: Objection.
THE COURT: Sustained.
Q And why did you want to --
What was the impetus to advising that you wanted to leave the coaching program?
MR. FERN: Objection.
THE COURT: Basis?
MR. FERN: Relevance.
THE COURT: Sustained.
MS. BONJEAN: Okay.
Your Honor, a lot of this material is to the effect on the listener and relevant to rebutting testimony from Ms. --
THE COURT: Ask your next question.
MS. BONJEAN: And rebutting other evidence as well.
THE COURT: Okay, but ask your next question, then.

MS. BONJEAN: Sure.

Q To be clear, Antonios, how many sexual encounters did you have with Dana Gilport?

A Just one.

Q And at the time that you had that sexual encounter with her, did you have any intention of dropping out of the coaching program?

A No.

MR. FERN: Objection.

THE COURT: Overruled.

MS. BONJEAN: I have nothing further.

THE COURT: Ms. Cohen or Mr. Robotti, do you have any questions?

MS. COHEN: No questions, Your Honor.

THE COURT: Government, do you have any cross-examination?

MS. FARRELL: We do, Your Honor. One minute.

CROSS-EXAMINATION

BY MR. FERN:

Q Good afternoon, Mr. Hadjigeorgalis -- is that right?

THE COURT: No, no, no. I am going to ask him to repeat it again. I am not going to embarrass you by repeating it.

Tell them your proper name, please.

THE WITNESS: It's Hadjigeorgalis.

THE COURT: It's not that hard.
Q Mr. Hadjigeorgalis.
A There we go.
Q Good afternoon, Mr. Hadjigeorgalis. My name is Sean Fern. I am one of the assistant attorneys in this case.
You just testified that in 2010 you were working in tech, right?
A Yes.
Q As a software engineer?
A I mean, it was partly engineering, partly sales.
Q And you took a number of OneTaste courses around that time?
A Yes.
Q And that was a long time ago, right?
MS. BONJEAN: Objection.
Q That was 15 years ago?
THE COURT: Sorry I heard an objection.
MS. BONJEAN: Objection to that was a long time.
THE COURT: Overruled.
Q That was 15 years ago?
A Yes.
(Continued on the following page.)

(Continuing.)
BY MR. FERN:
Q That was 15 years ago?
A Yes.
Q And you took one-on-one coaching courses as part of your time with OneTaste?
A It was a group program. I did do I think a couple of like outside of the group program that I was in, I did some one-on-one.
Q And as you just testified, you ultimately took a coaching program; is that right?
A I signed up for it, yeah.
Q And that was called CP2?
A I believe it was, like, distance learning coaching program. It was mostly remote except for those instances in San Francisco.
Q Did you attend a course called CP2?
A Well, I checked my e-mail. I think it was called DLCP, from what I remember.
Q And that program cost thousands of dollars; is that right?
A It did.
Q Cost you $7,000?
A All together, yeah.
Q And it's fair to say that in or around 2010, you were a

OneTaste customer?
A In 2010? Mm-hm.
THE COURT: You have to say yes or no so the court reporters can take it down.
THE WITNESS: Sorry.
THE COURT: That's okay.
A Yes. Yes, I was.
Q And about halfway through the course, you were at least considering canceling your membership or your participation in the course?
A I don't think it was exactly halfway. It was -- I went to a different type of event in January and decided I wanted to spend some more time, other activities, so that's when I started asking about getting out.
Q Isn't it true you were interviewed by the FBI in September of 2021?
A Yes, that's true.
Q And at the time you told that that the coaching program cost you -- that about halfway through the course you decided to cancel the course; isn't that right?
A I probably told them that, yeah. I ended up getting -- actually, it was -- well, timing-wise, whatever it was.
Q Okay. And during the coaching program, as you just testified, you visited San Francisco; is that right?
A Yes.

Q And that was as part of the coaching program that you were enrolled in?
A Mm-hm.
Q And that's where you met Dana?
A Yes.
Q And Dana was involved with the OneTaste community at the time; is that right?
A She was.
Q She was living at the communal residence?
A I believe so.
Q And she was working there?
A Not 100 percent certain of her, like, employment status with OneTaste. She was living there, I was pretty certain of that, but --
Q Well, isn't it true that when you were interviewed by the FBI in September of 2021, you told the interviewing agents that she was working at OneTaste at the time?
MS. BONJEAN: Objection. Not impeaching. Hearsay.
THE COURT: Overruled.
A I don't recall exactly if I said she was working there or not. I definitely didn't have any official knowledge of her employment records.
Q Is there something that would refresh your recollection of what you said at the time?
A Not that I can think of.

Q Would the interview report?
A I mean, I can look at the interview report. It depends what's in there.
Q I will show you what has been marked as 3500-AH-1.
MR. FERN: And I have copies.
MS. BONJEAN: I have it.
THE COURT: You could give it to the witness, and also if you have a copy for me, that would be great.
MR. FERN: Yes, yes.
THE COURT: Thank you.
THE WITNESS: Is there a certain paragraph you would like me to look at here?
MR. FERN: Yes, one second.
Okay.
Q On page 2, it's the second full paragraph.
A Well, it clearly says here I --
THE COURT: You're not being asked to read from the document.
Why don't you pose your next question, Mr. Fern.
Q Does this refresh your recollection as to whether you told the agents that Dana Gillport was working at the communal residence at the time?
MS. BONJEAN: Objection. This is not -- it's not impeaching.
THE COURT: Overruled.

A I mean, this clearly says that I thought she was working there. I mean, like I said, I have no actual knowledge of her employment status.

Q Okay. And you just testified that she initiated contact with you; is that right?

A Yes.

Q And you were attracted to Dana; is that right?

A She was an attractive woman.

Q And you just testified that while you were in the coaching program, she showed up to your room?

A Mm-hm.

Q And came on to you?

A Mm-hm.

Q And you engaged in sexual activity with her?

A Yes, I did.

Q Have you OMed with her?

A I don't recall, to tell you the truth. There was a -- you know, there was OMing that happened during that program, so I may have or may not have. I don't recall.

Q And it's fair to say that you believed that she wanted to have sex with you, right?

A Well, yes. I mean, she showed -- yes. I mean, she stated it before she showed up at my room.

Q And that was based on how she was acting, as well?

A No. She just stated it, like, in an open forum with a

bunch of other people, like, in the same room, and that was the first I had heard about it, and then she showed up later to my room.

Q So your testimony is that Dana Gill just showed up at your door and decided to have sex with you?

A Well, I mean -- yes. Yes, she literally, like, knocked on the door and then we started talking and --

Q But you don't know why she wanted to have sex with you?

A Well, she stated that she already did earlier, so I didn't question it beyond that.

Q But you would agree that you don't know the full scope of her feelings; is that right?

MS. COHEN: Objection. Asked and answered.

THE COURT: Overruled.

A I'm sorry, what was your question again?

Q You don't know the full scope of her feelings, do you?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A I know she stated she wanted to have sex with me and she showed up at my room.

Q You're not a mind reader, are you?

MS. BONJEAN: Objection.

MS. COHEN: Objection.

THE COURT: Sustained, sustained.

MS. BONJEAN: We'll stipulate to that.

THE COURT: Sustained.
Q You would agree only she would know why she wanted to have sex with you or why she had sex with you, right?
A That would be reasonable.
Q And you would agree that you don't know everything that led up to her having sex with you; is that right?
A Only what I've told you is all that I know that led up to it.
Q You don't know whether someone instructed her to have sex with you, do you?
A I don't know why somebody would do that.
Q You weren't with her for 24 hours a day?
A No, I was not with her 24 hours a day.
Q You didn't see every interaction that she had with members of OneTaste in the time period leading up to her having sex with you?
A No.
MR. FERN: No further questions.
THE COURT: Any redirect?
MS. BONJEAN: Yes.

REDIRECT EXAMINATION

BY MS. BONJEAN:

Q Antonios, at the time that Ms. Gillport announced in an open class that she wanted to have sex with you and then later showed up at your door, had you told anybody that you were

dropping out of the coaching program?
A No.
MR. FERN: Objection.
THE COURT: Yes, sustained.
MS. BONJEAN: Your Honor, I have to be able to --
THE COURT: Excuse me. Sustained.
Q So fair to say that Dana Gillport did not seduce you in order to keep you in the coaching program?
MR. FERN: Objection.
THE COURT: Is it a foundation objection?
MR. FERN: Yes.
THE COURT: Okay. Sustained.
Q Antonios.
A Mm-hm.
Q You didn't communicate to Dana Gillport that you were dropping out of the coaching program, right?
MR. FERN: Objection.
THE COURT: Sustained.
Q Did you communicate to anyone at OneTaste that you at the time -- strike that.
At the time that you were in San Francisco -- and when was that again?
A It was very early in the coaching program. If I remember correctly, it was, like, one of the first things that happened.

Q Right.
And so do you remember what month it was, approximately?
A November 2010.
Q Okay. And how many times did you actually go to San Francisco?
A Just that one time.
Q How many times did you interact with Dana Gillport in a sexual way?
A Well, having sex was one time, and then I don't know if we had anything else, like, activity-wise during the, you know, the days that we were there, I don't recall.
Q You're talking about in that weekend there?
A That weekend, yeah. Yeah, I don't recall doing anything else with her that weekend.
Q Okay. And at that time, you were committed -- were you committed to the coaching program?
A Oh, yeah, no, I -- I was very fully in.
Q And when did you decide that you wanted or were contemplating leaving the coaching program?
A That was in January.
Q And what year?
A January 2011.
Q Okay.
A Yeah.

Q How many months after your sex with Dana Gillport did you even begin contemplating leaving the coaching program?
A That would have been, like, two and a half months, maybe.
Q Okay.

MS. BONJEAN: One second.

I have nothing further.

MR. FERN: Nothing more.

THE COURT: The witness may step down.

THE WITNESS: Okay.

(Witness steps down. )

MS. BONJEAN: I'd walk you out, but --

THE WITNESS: It's okay.

THE COURT: Okay. I think, given that it's 5:15, we're going to stop for the day.

And it's possible that we may have a shorter day tomorrow, earlier than we normally do. I'm not entirely sure yet. But I just wanted to let you know in case you had to be flexible on your travel arrangements. So it's possible we'll be ending earlier than we normally do.

Since we're heading into another evening, let me remind you of what I reminded you before. Over the break, don't discuss the case with anyone, including among yourselves. If anyone approaches you and tries to discuss the trial with you, please let me know immediately through Mr. D'Agostino.

Don't read, listen to or watch any news or other media reports of the trial.

Don't conduct any independent research about the case, about the matters in the case, or about the individuals involved in the case.

Don't talk to the parties, the attorneys, the witnesses about anything.

And keep an open mind.

Get a good night's sleep, and I will see everyone tomorrow.

And again, I apologize that you had some extended waiting times. I do try to avoid it, but sometimes it's unavoidable. So I will see everyone tomorrow again at 9:15 in the jury room. We'll come out here at 9:30.

Have a good evening, everyone.

(Jury exits.)

THE COURT: Okay. Everyone may be seated.

Okay. I want to address the filing at ECF No. 396. And that's the one related to Dr. Ley.

The Defendants are seeking to offer expert testimony from Dr. Ley.

More specifically, they seek to offer testimony from Dr. Ley, quote, "related to the historical and spiritual roots of Orgasmic Meditation, 'OM', and the scientific research that suggests health benefits to the practice." Closed quote.

Defendants state that Dr. Ley, quote, "is expected to offer his expert opinions on the scientific effects of the practice of orgasmic meditation, the potential benefits of orgasmic meditation, and the relationship of orgasmic meditation to existing sexual therapeutic techniques, as well as to historical spiritual practices." Closed quote.

Defendants do not seek to offer testimony from Dr. Ley as to coercive control tactics or grooming.

Defendants argue that the testimony they seek to offer is relevant and Defendants point to the issue of intent.

The Government opposes the admission of testimony from Dr. Ley. The Government argues that Dr. Ley's anticipated testimony should be precluded as irrelevant, unduly prejudicial and unreliable. The Government also argues that the Defendants' expert disclosure as to Dr. Ley is wholly deficient.

At the November 15, 2024 conference, I discussed at some length the relevant law and legal framework with respect to expert testimony, referencing, inter alia, Rule 702 and Daubert. I incorporate that discussion of the law and legal framework here. And of course, the parties are familiar with the applicable legal standards.

The Defendants' request to offer the testimony of Dr. Ley is denied and the Government's request to preclude is granted.

The Court cannot conclude that Dr. Ley qualifies as an expert by knowledge, skill, experience, training, or education.

The Court also cannot conclude that the proffered testimony is sufficiently reliable to permit it to be considered.

Further, even if the Court concluded that the qualification and reliability prongs of the applicable legal standard were met, the Court nevertheless would be unable to conclude that the proffered testimony would help the jury to understand the evidence or to determine a fact in issue.

Moreover, any arguable probative value of the proffered testimony would be substantially outweighed by various of the dangers set forth in Rule 403, including the dangers of confusing the issues and misleading the jury.

The Defense has also filed a submission relating to another potential witness. When in the order of things, if permitted, would you anticipate calling that witness?

MR. ROBOTTI: Your Honor I think we would expect him on Wednesday.

THE COURT: I will hear the parties out -- and I'm talking, of course, about Mr. Hutchinson. I will hear the parties out on the request, which is at ECF No. 397. Do you want to start, Mr. Robotti? Or whoever on your side there.

MR. ROBOTTI: Sure.

Your Honor, I think from the perspective of the Defense, I think his testimony is really relevant for two reasons.

One is that he trained Ms. Cherwitz and the rest of the sales team on common sales techniques that are used throughout, you know, a number of different companies in order to help them, you know, establish a more structured sales program. And I think that's relevant here because the Government has argued that there's something -- or elicited testimony that suggests that there is something nefarious about this notion of selling to someone's pain. And they used that to suggest that Ms. Cherwitz was engaged in an effort to coerce the sales team in order to, you know, commit labor and to pressure people into buying these courses.

But the reality is that Ms. Cherwitz was following the teachings of Mr. Hutchinson and other outside consultants and attempting to implement that common sales techniques at OneTaste. And I think that goes to her intent here with respect to whether or not she's engaging in a forced labor scheme.

Second, with respect to Ms. Sheffer or Ms. Gillick and Ms. Neria, who also admitted that they took the sales program, I think it is relevant to their state of mind during the time period that they are on the sales team because, again, the theory here from the Government is that they were

told to do something improper or nefarious in pressuring these customers, and that contributed to this climate of fear or climate of coercion because they felt trying to exploit someone's pain and didn't want to do that.

But the reality is that what Mr. Hutchinson is teaching is that you identify a problem a customer has, you talk to them about that problem, and then you find a way through your product to help fix that. And there's nothing improper about that. That is --

THE COURT: You're proposing to call Mr. Hutchinson to say what he had said on a prior occasion?

MR. ROBOTTI: I'm -- I think that the training is relevant for the effect on the listener.

THE COURT: Why is it not hearsay, first of all?

MR. ROBOTTI: It's not being offered for its truth. It's not being offered for the truth that, you know, someone's taking someone to their pain is a specific thing. It is being offered to show that this is what people were taught or instructed while they were members of the sales team, and that is the effect on Ms. Cherwitz in terms of her intent, and that is on the effect on the state of mind of these particular witnesses about what they were taught to do while they were at OneTaste.

THE COURT: Did you cross-examine these witnesses about what they were taught from Mr. Hutchinson?

MR. ROBOTTI: We did, Your Honor, and I think that's set forth at the relevant portions of the transcripts.

THE COURT: On page 3 of the letter? Is that the entirety of the discussion? I don't see Mr. Hutchinson's name, although perhaps it did come up at some point during the trial.

MR. ROBOTTI: I don't think it was specifically about Mr. Hutchinson, but we did -- we did cross-examine them about the step-up method, which is what he teaches. And Ms. Gillick specifically mentioned that Mr. Hutchinson was the lead salesperson for Tony Robbins, and that was a reference to Mr. Hutchinson.

And so I think the predicate here is laid by the fact these witnesses testified specifically about the training that they have had and that Mr. Hutchinson's testimony is being called to avoid misleading the jury about the nature of that training.

THE COURT: But did you cross-examine more fully about that? It doesn't appear to. I don't recall, and you can correct me if I'm wrong, I don't recall you saying, well, isn't it true that Mr. Hutchinson, in fact, told you X and not Y?

MR. ROBOTTI: Well, I believe it wasn't specific to Mr. Hutchinson, but we did cross-examine about the method and about what taking someone to their pain means. And we did ask

the witness if that means, you know, helping someone explore their sexual desire and helping them, you know, reach a resolution for any --

THE COURT: Right. And the witnesses gave you their understanding of what it meant.

MR. ROBOTTI: That's correct Your Honor.

But I think what Mr. Hutchinson is instructing them is relevant to show their state of mind and whether or not their view of these classes and these programs, you know, is credible and bears out, and what they're relaying to the jury explains that.

THE COURT: That's a stretch. That's a real stretch.

What else do you have?

MR. ROBOTTI: Well, I think, as I mentioned at the outset, it goes to Ms. Cherwitz and also Ms. Daedone's state of mind that they have brought in an outside consultant to lead these programs for their sales team under a very common sales technique and a very structured program.

If they were seeking to improperly pressure people or seeking to create a coercive environment or seeking to do something illegal, they wouldn't be bringing in an outside sales consultant to teach the same program that is taught to Tony Robbins and to Apple and to other companies as well. And so I think the fact that they are seeking outside help to lead

a legitimate program bears on their intent with respect to the sales program and the sales tactics that are used.

I understand the Government's going to argue that they didn't follow those rules to a tee or they didn't follow that practice particularly, and they can make that argument. But it's still --

THE COURT: Is he going to testify, if allowed to testify, that on X date at a presentation or a class, or whatever it was called, where either Ms. Neria or Ms. Gillick were present, that he said X, and that's contradictory to anything that they said.

MR. ROBOTTI: Yes.

THE COURT: Okay. Tell me.

MR. ROBOTTI: He will be able to testify -- well, we have, I think, already the testimony that these two individuals were present for the step-up training. He will be able to testify that he gave that training on particular dates, followed a particular outline and program, and instructed these individuals on this particular process. And it was the entire sales team; it wasn't just them.

And so -- and I believe that this happened over a series of different sales programs over the course of, you know, a two-year period or so. But he did train the sales team and he did put in place the program.

THE COURT: Okay. I'll hear from the Government in

response.

MS. BENSING: Your Honor, first, I do think this is hearsay. It's not hearsay of, like, the model itself, but what we're seeking to put him on for is testimony about the truth of what they were trained on. And so I think it's --

THE COURT: It seems like it, yes.

MS. BENSING: So the first thing is, I think it's inadmissible. Really, the entirety of his testimony is inadmissible hearsay. To the extent that it's being offered as somehow relevant to the victim witnesses' states of mind, again, they were on the stand, they were cross-examined about this. They could have cross-examined them more about it. Although, frankly, I don't think that that is even relevant at all to begin with, because what we're talking about is one-off sales presentations as opposed to the entirety of the time that they were trained, and from the Government's perspective, really groomed by Rachel Cherwitz.

And so, again, I think we've kind of outlined the full scope of the testimony that has been elicited on this, which is, first of all, not much. But to the extent that it was relevant to Ms. Gillick or Ms. Neria, I think they were available here and they should have been cross-examined on it.

And again, I don't see how it is relevant to Ms. Cherwitz's intent, but obviously Ms. Cherwitz is able to testify in her own defense.

MR. ROBOTTI: Well, that's not the standard, Your Honor, right?

THE COURT: It is not, it is not. Correct, it is not the standard.

But Ms. Bensing makes the point of not only hearsay, but also relevance.

MR. ROBOTTI: Well, I think on the hearsay, this is the effect on the listener, which has been something that we've argued throughout this case. It goes to Ms. Cherwitz's state of mind. She was told how to follow a particular established sales technique. She was taught this. And when she's relaying this to the sales team, it is relevant that she is relaying something that is an established method versus some kind of, you know, nefarious scheme that she came up with to try to exploit people's trauma, which is what the Government has argued. That is the opposite of what happened here. She was taught something that was established, that is used throughout corporate America, and she attempted to implement that, and that goes directly to her intent. I would say it's critical here when the Government has put the sales practices of this company on trial.

And in terms of cross-examining the witnesses, they gave their own views, that's true. But we're also entitled to say, this is what they actually were told.

THE COURT: But you were also entitled to confront

them with them and you didn't do that, right? That's what I'm getting that.

MR. ROBOTTI: We did cross-examine them about the step up program.

THE COURT: Well, what exactly did you say -- I don't remember you saying this, but did you say that's not what you were taught, you completely misunderstood, that's not what Mr. Hutchinson said; in fact, he said something absolutely opposite to what you're saying now?

MR. ROBOTTI: Well, Your Honor, I think in this case, the teachings --

THE COURT: Did you say anything along those lines?

MS. BONJEAN: A hearsay objection that would have been sustained.

MR. ROBOTTI: And, Your Honor, I think throughout this case Ms. Daedone's teachings that have been given to these witnesses have been directly, you know, what the Government has argued influenced their state of mind and influenced them to do certain things. It's the same idea that we are putting on the salesperson who taught them how that state of mind influenced them in a positive way and their reaction to that is not appropriate or not proper.

So I don't think we should be limited to just cross-examining them about this when there is fair rebuttal evidence that shows actually taught and undermines the

testimony that they gave on the stand in terms of the effect that it had on them.

THE COURT: That's the part where I think you don't have a persuasive argument where it undermines what they said on the stand. That's the part that's just not at all persuasive.

MR. ROBOTTI: Well, I do think -- I mean, Your Honor, they did, I think, say they were taught and, for instance, Ms. Sheffer said that underlying the entire sales program is this notion that you're supposed to look to someone's pain and find that and then use that to sell. And that, the way she described it is different than the way Mr. Hutchinson would describe that, which is that this is an established technique that people are taught. So she described it in a very nefarious way and gave that testimony and this testimony will directly rebut that in terms of what she was actually taught while she was at OneTaste.

MS. BONJEAN: Your Honor, may I just add something here?

THE COURT: Yes.

MS. BONJEAN: This is not just a matter of putting on evidence that would rebut a particular witness who took something -- whose interpretation of this was whatever she testified to.

This evidence should stand alone, frankly, as

evidence that OneTaste did not engage in the tactics that the Government is saying that they did or that Rachel Cherwitz, again, did not come up with this scheme that was outside the realm of normalcy and normal sales practice. It should stand alone as relevant evidence irrespective of what people testified to because it goes to intent.

Even if nobody ever mentioned it, our position is if someone provided these outside services to OneTaste for purposes of training on sales, that would go to the defendant's intent regardless of what any witnesses testified to. So I just wanted to note that.

THE COURT: It seems to me it has very minimal relevance, if any, but I will think about your arguments and I will let you know more tomorrow, but I'm not persuaded.

Did you want to say anything else, Ms. Bensing?

MS. BENSING: Well, just the last thing, Your Honor, is I do think it runs the risk of really confusing the jury so we have a 403 argument, as well.

THE COURT: Yes, I'm concerned about that as well, but I want to think about the arguments that the Defense has made which I think are going beyond a bit what was in the letter.

MR. ROBOTTI: Well, Your Honor, just in terms of confusing the jury, there has been testimony about this program, right? This is already a concept that has been

introduced. And I agree with Ms. Bonjean entirely that this stands alone as evidence of the intent here. But I don't think it's going to confuse the jury to explain something that they already heard about.

MS. BENSING: It will, Your Honor, because it's being -- because then they're offering it for the hearsay purpose which the Government believes it's being offered for, which is the truth of what they were trained on, which, again, the Government does not believe is relevant here.

MR. ROBOTTI: But I think what the jury's been left with this impression that this step up program is something improper that the Defendants came up with on their own to --

THE COURT: No. The testimony was that outside consultants came in, correct?

MR. ROBOTTI: There was testimony that outside consultants came in, but it wasn't fully explained in terms of what the program was and how it was implemented at OneTaste.

THE COURT: But how it was implemented, he does not know. He knows what he taught, but he does not know what happened after that.

MR. ROBOTTI: Well, he was there over a two-year period.

THE COURT: Well, unless there's something more than what you're proffering, he's not going to testify about what he saw happened and how it was implemented. He's just going

to testify about what he taught; is that correct?

MR. ROBOTTI: Well, I think in my understanding of his relationship is he taught specific training courses, but then he also consulted with members of the OneTaste sales team, including Ms. Cherwitz, about how to implement that training and to give specific advice, specific recommendations over this two-year period. So it is a little bit more than just beyond this one or two training sessions. He was consulting about the proper way for the company to be selling.

And again, if the argument here is -- from the Government -- is that they had an illegal scheme to exploit people's pain and trauma to pressure them into courses, it is relevant that they were seeking to put in place a structured known sales practice.

THE COURT: But how does simply what was taught, without any connection to how it was implemented, demonstrate intent here, or anything relevant to what the jury is going to have to decide?

MR. ROBOTTI: Well, on the flip side, if there was no outside consultant and the Defendants got together with other people within OneTaste and said let's come up with a plan here to exploit people's pain and let's really use trauma to get them, that is certainly something the Government would be putting on as evidence of intent of this crime.

We're seeking to put on the opposite to show that

they did the opposite, that they reached out to try and get help just to do this the right way.

And that goes directly to their intent here as to whether or not they're seeking to put in place an illegal scheme.

MS. BENSING: Your Honor, if I can just respond to that?

THE COURT: Sure.

MS. BENSING: Again, these sales presentations I don't think is probative of the forced labor conspiracy. So this evidence is relevant to show what the Defendants gathered about the victims, the sales tactics that they taught to the victims as implemented by Ms. Cherwitz recounting things to the victims. It's not just like, you know, an impeachment of OneTaste's general sales practices. This is a forced labor conspiracy. We're concerned with the victims and the Defendants' intent with respect to those victims.

MR. ROBOTTI: Well, I mean, he did teach with respect to these particular victims.

And Your Honor, the breadth of the case that the Government put on here to argue this case is too broad I think is a little bit, you know, not correct at this point, as I would say.

I think the argument here is that -- from our perspective, is that the Government has put OneTaste sales

tactics on trial, they have argued that these sales tactics were improper and used as a means -- it's charged in the indictment -- used as a means and method of the conspiracy. And we're entitled to put on evidence that show that the means and methods that are alleged here is not what the government says they are.

(Continued on the next page.)

(Continuing.)

THE COURT: But that's where your argument falls apart, because simply being told something doesn't mean that that's what ended up happening.

MR. ROBOTTI: That's true. That's true. I think that's a jury argument, Your Honor, that's not an admissibility argument. That's an argument -- I'm sure the Government will make that -- the defendants did not implement this sales process correctly, but I still think it is relevant for us --

THE COURT: Tell me exactly, boil it down to a few sentences of what is Step Up and what do you think you should be permitted to have before the jury about this program or this, you know, outside consultant that came in from time to time and said something?

MR. ROBOTTI: So the step-up process, I don't have the acronym in front of me, but the step up is, you know, an acronym. And part of the acronym is to, you know, identify the customer, connect with the customer, figure out what the problem is that has brought them to the company, talked to them about the problem, and figure out a solution that the company can offer in terms of a product to help them solve that problem.

So, you know, Mr. Hutchinson, uses the example of going to the doctor, right? So if you go to the doctor, the

reason you are there is to explain I broke my ankle or I broke my -- your kneecap. And the doctor figures out how to help, that's a way to address your pain, right?

It's the same analogy that you use in the sales context, for instance, in the step up model, identify what the problem with pain is and help the person solve it.

And so he is going to testify that a commons sales technique that he teaches that he helped OneTaste implement.

THE COURT: When you say "he helped OneTaste implement," that's where I'm not understanding you. He stood up and gave some lectures. What do you mean, he helped them implement?

MR. ROBOTTI: He stayed as a consultant for a nearly two-year period.

THE COURT: But what did he do? I mean, what did he implement?

MR. ROBOTTI: He worked directly with the OneTaste sales team in terms of, how can you do sales better, how can we make this a more successful program? And I will point out he also advised on hiring as well, as he advised the hiring of Michal Neria, who was one who testified to. So there are connections to these witnesses.

But I think he worked -- you know, when you are consulting you are working on an individualized basis with the company to help improve their program based on the

structure that he teaches. It wasn't just a one-off of: Hey, OneTaste, here's a program, follow it and good luck. It was: Let's talk about how we can implement this and how we can improve OneTaste program over time based on these concepts.

And, again, I think this goes directly to the intent that OneTaste was trying to put in place a legitimate sales program which undermines the Government's theory that this was all some nefarious scheme to exploit people and their trauma.

THE COURT: Go ahead.

MS. BENSING: Your Honor, again, I think that, like, even more extended proffer makes more clear how improper this is.

First of all, I would point the Court to the portions of the transcript which are already in evidence, which, first of all, there has been very, very little evidence over the course of this four-week trial on this step-up training method. But they have already elicited that it was -- OneTaste hired during the coaching program to teach us about step up.

So they've already elicited that this was from some outside company.

And with respect to -- I was just trying to take notes on what he just said, like, that it was common -- they

helped OneTaste implement it, he was a consultant for a two-year period who worked with the OneTaste sales team.

I mean none of this seems to be probative of the forced labor conspiracy that the jury is going to be asked to decide.

And with respect --

THE COURT: His argument is that it goes to intent. I think they've come off a bit from impeaching.

Right?

MR. ROBOTTI: I think it goes to both, but that doesn't seem to be persuasive.

THE COURT: It's not, it's not persuasive.

But they are arguing that it goes to the issue of intent.

MS. BENSING: I guess I'm just completely not understanding how it would go to the issue of intent.

THE COURT: I think the argument, and you can correct me if it's not this, is that the defendants or whoever it was that was doing the hiring, brought in an outside consultant, which shows that they didn't intend to do anything nefarious, that they were trying to bring in someone legitimate who does this for other companies.

Do I have that right, Mr. Robotti?

MR. ROBOTTI: That's correct, Your Honor.

And, again, this is a tactic, a means and methods

of the conspiracy that the Government has alleged, right? They have alleged improper pressured sales tactics over and over throughout this case. This is evidence that shows that is not what happened.

MS. BONJEAN: Or at least it makes it less likely and that's what the relevance standard is. It makes it less likely that the Government's theory around the sales practices and their intent to carry out coercive sales practices, if, in fact, they brought an outsider in. And I think if they didn't bring an outsider in, the Government would say it's more likely they didn't bring anybody in to consult. They were doing their own crazy stuff behind the scenes.

So I think the relevance standard is pretty low and --

THE COURT: Well, but there's a 403 concern here, a serious one.

MS. BONJEAN: That is a different issue.

THE COURT: It is. I have to determine whether this is relevant and also whether it should be permitted under 403.

Go ahead, Ms. Bensing.

MS. BENSING: Again, I would just point the Court back to our briefing which I know the Court has already carefully read.

But it is a real non sequitur here. That just because the training existed means that it was implemented in x, y, and z way or really has any bearing on the way that OneTaste actually -- not OneTaste, the way that Rachel Cherwitz actually implemented this with the victim witnesses of this case. It just seems very far afield and I do think it runs the real risk of juror confusion as to what the issues are here.

MS. BONJEAN: Well, that argument assumes the truth of their witnesses. I would say there is a theory, crazy enough, as the Government -- where the Government's witnesses are not actually credited or their versions are not credited.

Like we can't work with the assumption -- this is for a jury to decide. So if we are working with the assumption that there's a possibility that the jury might not find that the testimony of all these witnesses was entirely credible, I think it does, in fact, go to the forced labor conspiracy charges. It just makes it less likely that they were --

THE COURT: I am having trouble seeing that. I will think about it more overnight, but I am not at all persuaded that it's relevant or that, if it is, has some relevance, that it is not completely -- or at least substantially outweighed by the danger of really misleading

the jury and confusing the jury.

But I will think about it more. It also may be that there is some part of what Mr. Hutchinson would say that the Government doesn't have a problem with, and I would encourage the parties to think about a narrow testimonial stip, if you want to go that route, because I don't know that the Government disputes that they may have brought in an outside consultant who taught x, y, z.

MS. BENSING: I think that testimony is, frankly, already in the record.

MR. ROBOTTI: Well --

THE COURT: In part, but not --

MR. ROBOTTI: I'm always happy to talk to the Government, but I think, you know, the stipulation of this testimony is a lot different from hearing somebody describe it and hearing somebody explain it.

And, look, we're happy to work with the Government to try to put on a limited, more narrow universe. We think that misleading the jury is --

THE COURT: I think it's a real concern on this -- on this.

MR. ROBOTTI: I think from our perspective, you know, we have trouble seeing why it would mislead the jury when it's already been elicited and we are simply going to explain that what this program was and how it was

implemented at OneTaste.

THE COURT: You keep saying how it was implemented. And I think that's where we're having a disconnect here.

MR. ROBOTTI: Right.

THE COURT: Because if you mean how was it presented that on "x" day he came and said "x" thing, but if you are talking about implemented, to me that means what did the people do with the information, how in practice, was it used or not used.

MR. ROBOTTI: I think from our perspective we would like to put on how he, you know, consulted the company on a regular basis and worked with them to try and improve and legitimize their sales techniques and professionalize their sales force.

Again, the crux of the argument is the one Ms. Bonjean and I have raised here, which is that it makes it more likely that they were not seeking to exploit people and pressure people improperly, given that they brought in a professional outside sales consultant. And that is the point we want to make. And we can keep it narrow to make that point and not go off on, you know, extended testimony here. I think we could do this pretty briefly. But I do think it is a point that the jury should hear in light of the means and methods that the Government had alleged in the

indictment in this case, putting the sales tactics on trial.

THE COURT: Are you anticipating he would just testify as to what the training was; not any of these subsequent conversations about ongoing consulting? Because that, to me, I think you would have a real evidentiary problem there of getting any of that in.

MR. ROBOTTI: Well, I think -- Your Honor, I think he could testify to both. I think he could testify that the witnesses were, you know, present or the sales team was present at a particular training and taught a particular method, but he certainly can also testify about the daily or weekly work that he did over a two-year period with OneTaste trying to help them improve their sales program.

THE COURT: Do any of these presentations that he gave, are they taped?

MR. ROBOTTI: I would have to check on that.

THE COURT: Have you turned that over? I guess not if you are just checking about it.

MR. ROBOTTI: Yeah, we are still, obviously, you know, determining whether or not he will be permitted to testify, which --

MS. BONJEAN: I think the Government provided the PowerPoint for him, though. I think that was used in the Government's examination, his PowerPoint.

THE COURT: Yeah, the PowerPoint is different than

what was actually said.

Does anyone have that?

MS. BENSING: Yes, Your Honor. The Government is aware -- the Government produced in discovery a sales presentation by --

THE COURT: Video or something else?

MS. BENSING: It is a video. It is a video.

THE COURT: Like I said, I am not yet convinced, but I do think it would be worthwhile for the parties to talk about the scope of anticipated testimony, but I do have a real concern about misleading this jury and confusing this jury.

Okay. Again, I am going to get you a jury instructions draft tomorrow. And we will do a charge conference probably late afternoon.

Go ahead, Ms. Bonjean.

MS. BONJEAN: Yes. I hate to do this, but I did want to raise a concern about -- that has been addressed, but I think it's worth readdressing.

I suspect that the Government, based on their examinations of certain witnesses, will take the position that their complaining witnesses can all corroborate each other and that they've asked questions, like, do you recognize this person or do you recognize that person. And I think what we're likely to hear is, listen, these were

women that didn't even work together at the same time and they're all sort of telling the same stories, right?

Meanwhile, we continue to object that we are prohibited from putting on witnesses who were living under the same roofs at the same times with the same women to present a -- present testimony about what it was like and what they experienced and what they saw other people experience.

The fact -- and I don't know that they're going to do that, but it would be exceedingly improper for them to say -- to mislead the jury based on seven people and saying, listen, they all corroborate each other, this is what it was like. When we have no opportunity to say, no, it wasn't like that. Actually, all these women lived in The Morellino or 1080 or the bunker at the same time. And they didn't see this. They didn't experience this. And that type of testimony should come in notwithstanding any witness's ability to specifically refute allegations of --

THE COURT: We had this conversation many, many months ago. And the indictment does not charge that everybody was treated this way. It's very clear what the charge is here.

MS. BONJEAN: Yes, but --

THE COURT: And so we have had this discussion already. I made my ruling. I think I said I was not likely

to allow this testimony in, but I was going to allow eyewitness testimony or, you know, depending on exactly what it is.

Just for somebody to say that they, themselves, didn't feel coerced, is not going to come in. If you are saying that there is somebody on the sales team, for instance, that will say -- you know, and I don't know if this is the case -- that they did not have to be on the texts all the time, at the same time, maybe that's something I would consider, but I don't know that you have that, but maybe you do.

MS. BONJEAN: I understand, Your Honor, but I think the pretrial ruling is now, you know, should be re-examined in light of the fact that the Government lists three types of evidence, namely, this sort of climate, culture, and teachings. It's not just, you know, this person experienced that. They're talking about -- in fact, some of these witnesses said we enforced each other. It was about the climate. It was about the culture.

THE COURT: But do you have somebody who is going to say, let's just take one of the victim witnesses, at that same time, was living in that same place, had the same either job or volunteer role, and was not expected to do the things that the victim witnesses said they were expected to do, for instance, to be on the text thread? Do you have a

witness that will say that? Because I do think that, yes, you can certainly try to address certain testimony, but I think more generally, sure, there were some people that, you know, were not victimized, I suppose, even under the Government's theory.

MS. BONJEAN: Well, there is sort of an objective reasonableness standard --

THE COURT: Right, but that is not -- that is going to be -- we have discussed this all.

MS. BONJEAN: I understand. And I am saying in light of the testimony, the way it came in, our position is -- we maintain our position that we have been precluded from presenting a robust defense under the Sixth Amendment by not being able to present witnesses who experienced the same living environment as these individuals that testified.

And the jury is left with the impression that this place was what it was based on --

THE COURT: Well, proffer to me what testimony you are talking about. Who do you have and exactly what would they say?

MS. BONJEAN: I would say that we have various witnesses who lived at the Morellino at the same time as Dana Gillport, as Becky Uma, as Max Pixley.

THE COURT: And who? What would they say? What's the name and what would they say and what time frame? Tell

me exactly the specifics.

MS. BONJEAN: Dana's 1080.

We have Sasha Hood.

THE COURT: What would Sasha Hood say? Let's start with Sasha Hood.

MS. BONJEAN: She would say that she had experience as living in the same residence, subjected to the same rules, the same expectations, and that not only did none of those people she was living with complain, but that this was not an environment that was -- it was not an environment that could reasonably be expected to coerce someone --

THE COURT: Okay, she can't give that kind of testimony. I mean, that's the ultimate decision for a jury -- or one of the decisions the jury is going to have to make. She's not going to be able to get on the stand and say this wouldn't have been reasonable for someone to think this.

MS. BONJEAN: No, I'm saying it would go to -- her testimony would go to that decision-making process of the jury.

She can say, yes, we were -- you know, if you were a part of the sales team, there was a lot of text messages. She can talk specifically to -- and again, I mean, we can line up exactly the areas of inquiry that the Government's

complainants testified about. And we have people that would say that didn't happen or I never saw that happen and I was there under the same roof at the same time.

MS. COHEN: And we have --

THE COURT: But I think I used this example months ago with you, where I said, sure, if somebody is going to say that they were with someone 24/7 and didn't see an event that the person testified happened, sure, you could have them testify, absolutely. So that's why, really, the devil is in the details, here.

I think if you have specific testimony, you can talk to the Government about it and see if they have an objection and you can raise it with me tomorrow morning.

MS. BONJEAN: I don't think we are going to find someone that was with someone for 24 hours, but the minute they went into a climate and climates of fear, I think that one person's climate of fear, I think we should be able to put on evidence where people are, like, I was there at the same time and there was no climate of fear. Like that seems -- that seems --

THE COURT: Let me hear from the Government. I suspect I know the answer, but why don't I hear from you now since we are on this topic.

MS. BENSING: Sure, Your Honor.

I guess I would just refer the Court back to our

pretrial briefing, where I think we indicated that we wouldn't have an objection to a witness testifying to something that would impeach the statements of -- of course, this is a trial. So of course there can be defense witnesses who would make statements that would bear on the credibility of the witness's testimony for things that they saw the witness do or x, y, and z and of course the Government intends to argue in its summation that is some of these witnesses didn't know each other, but they heard very similar things. That goes to the witness's credibility, and so of course the defense is entitled to impeach the witness's credibility.

But I don't think that in a vacuum --

THE COURT: It goes to other things than credibility as well. It goes to the conduct.

MS. BENSING: Sure. Of course.

THE COURT: And the length of time.

MS. BENSING: Of course.

And I think we do expect to have a couple of defense witnesses tomorrow who are going to testify about some of the things that they saw and observed and experienced at OneTaste. So I think that there is going to be testimony on this, at least that's what I anticipate.

But with respect to putting on a bunch of individuals who had positive experiences with OneTaste,

that's what I think is irrelevant for all of the reasons that we briefed pretrial for the Court.

MS. BONJEAN: Just to be clear, it's not about putting on people who had positive experiences. It's about responding to them, opening the door about a culture, a culture which was the coercion. They did that. They opened the door to that. And we are stuck with it without being able to say, no, there was no culture. That is the problem. That is the fundamental problem here --

THE COURT: But I think you're not listening to me or not hearing me, Ms. Bonjean. I think that there is something you can do, it just has to be specific.

I mean, does the Government disagree with this?

MS. BENSING: No, no, Your Honor.

MS. BONJEAN: I think someone who's been around somebody for 24 hours for the sole purpose of just impeaching some factual allegation --

THE COURT: No, that's one example, but do you have somebody else who was in the same position as the people who were on that sales thread that testified that they had to say when they were going to the bathroom, that they would be offline for ten minutes? Do you have someone who was in that position who would say --

MS. BONJEAN: We have -- we have sales threads with four and five and six people. We can call five of

them. It's only one of them that testified for the Government. We can call the other five to say I was on that sales thread. Yeah, Rachel, you know, often was like, hey, you know, hurry up, hello, I need you guys. And that was part of the culture there. It was accepted. We all knew it. That's what we signed up for. Only this person, 15 years later, has said that they didn't like it, you know, and it caused them psychological trauma rather than others things.

That's exactly what we're trying to put in. And what my understanding is, is that we can not.

MS. COHEN: I think just to add to that, Your Honor, I think at least my understanding was we can't -- we were under the impression we could not do that. We had to tie it to a specific act or something that this witness or whatever witness would testify about. And that is why, you know, we had a larger list and we were trying to get specific instances, but, you know --

THE COURT: I mean, would any of these witnesses say that these particular victim witnesses who testified did not have to, for instance, respond very quickly, they weren't being required to report that they were going to be offline for a certain period of time? I mean, do you have that kind of specifics?

MS. COHEN: I mean, we do have witnesses that will

say that.

MS. BONJEAN: Yes.

MS. COHEN: Yes.

THE COURT: And based on what? What is their foundation for saying that?

MS. BONJEAN: They were there. They were getting the same orders from Rachel Cherwitz.

MS. COHEN: Yeah.

THE COURT: And they will say that these particular victims were not required to do something that the victims said that they were told to do?

MS. BONJEAN: Well, the problem is these women are only saying this 15 years later. They are not saying that they weren't -- they, themselves, admit that they didn't at the time object or see this as problematic. Or if they did, they certainly didn't say it out loud.

So I don't know -- you know, again, I think we look at this case very differently on what types of evidence we think would be appropriate. And it is about impeachment and bias. Maybe not impeachment by a prior inconsistent statement, but impeachment as to the credibility of what they are describing was going on. We have people went through the same or similar things, no, maybe not 24 hours a day, but people saying I was living that same experience largely and that's not what was going on. And that is used

to call into question the credibility of what these women are saying 15 years after the fact.

MS. COHEN: Yeah -- I'm sorry, just to add to that, Your Honor. For example, let's take Ms. Gillick's testimony about her doing the shower scene or something.

We have witnesses who will say, we did that kind of stuff all the time. Everybody wanted to do that. I remember her participating. Does he remember the exact incident and say, like, oh, this was so and so? No.

THE COURT: But what is the relevance of that? She testified that she thought it was an honor and she did it.

MS. COHEN: No, that was the OM demonstration, not the shower scene.

THE COURT: No, I think it was the shower scene. Am I misremembering that?

MS. FARRELL: She explained that the shower scene happened and that she was asked to do it, but I don't think she testified -- it was factual testimony about the fact that it happened.

THE COURT: Right, right. Okay.

MS. FARRELL: And obviously, Ms. Gillick is situated differently from the other victims given her financial situation. If that's not clear to everyone, we will make it very clear in our closing, but she's situated

differently.

THE COURT: I think that was clear.

MS. BENSING: And Your Honor, just to reorient us all to the statute which defines serious harm as sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances --

THE COURT: That's why I'm focusing on that because that is the standard. And so that's why I am asking if you had people who were exactly the same circumstances -- but what I am hearing is more generality. So I think maybe you can talk to each other tonight and then you can present in the morning if there is something you think is specific enough because I do think there is evidence that you can put in along the lines of what you want to put in, but, you know, just getting a parade of people to say that they didn't feel coerced, the Government has never taken the position, the indictment doesn't charge that everybody was coerced; in fact, to the contrary.

MS. BONJEAN: They can testify to what the culture was like from a different perspective and that's what we're asking for.

I would also say that maybe the Government shouldn't have climate of fear in their jury instructions. Maybe they should argue culture and climate and ideas.

THE COURT: It doesn't really matter what the Government puts in it. It matters what I put in it.

MS. BONJEAN: I understand. We object to that then.

THE COURT: Right now I don't have climate of fear in there. You will see it tomorrow, but I don't have climate of fear in there.

And while we are on the topic of jury instructions, I think I said this the other day. The jury instructions are going to instruct the jury on the law. They are not to make anybody's, you know, arguments for them. They are not to shovel in people's theories for them. So you can put in whatever request you want, but the instructions are going to be the legal instructions that the jury needs. You will have closing arguments. I am not going to give you a time limit. So you will be able to make your arguments to the jury. You will be able to present your theories to the jury. But the instructions are going to be very straightforward legal instructions because that's what the jury needs from me.

Okay. We can take up additional issues tomorrow, but --

MS. BENSING: Just.

THE COURT: Yes, go ahead.

MS. BENSING: One really fast thing.

I guess because it relates to 26.2 material for the witness who may testify tomorrow.

Obviously, if the Court determines based on the caselaw that we provided earlier that its appropriate to provide a video statement of a witness who is being called by the defense to the Government under 26.2, we would just obviously need time to review that.

THE COURT: I mean, I will tell you, again, I've made it only not maybe even halfway through that video, but I am not sure what the relevance of that witness would be to begin with, if it's along the lines of what I heard so far.

Do you want to make a proffer on the witness's relevance?

MR. ROBOTTI: No. The video -- and I'll let Ms. Cohen speak to that in a moment, but the video is different than what she would be testifying about tomorrow.

THE COURT: Sorry, are you taking a position that it's not even 26.2 because it's not on the subject matter?

MR. ROBOTTI: No, no, no. It is certainly related to her time at OneTaste, but it was focused on a particular issue.

THE COURT: So what is she going to testify about?

MR. ROBOTTI: I will give that to Ms. Cohen.

MS. COHEN: Yes, Your Honor. She will testify that she was in sales, that she met Michal Neria, she was

her good friend. She will testify all about Michal Neria's entire experience there, including the fact that she was at the Nicole Daedone intensive where Michal got married, and up until the end and beyond she knew her. She will testify about that. She will testify that she also lived in the bunker with Brooke Sheffer or Anthia Gillick and has testimony regarding her as well as Lyndsi Keves, so they really has three different --

(Continued on the following page.)

THE COURT: (Continuing) Okay. Because all I've been seeing so far on that video relates to a different person.

MS. COHEN: Yes.

THE COURT: Who is not a testifying witness.

MS. COHEN: Correct.

THE COURT: So is that relevant?

MS. COHEN: I don't think, no. No, other than --

THE COURT: When do I get to the relevant part in this video?

I mean, anything about what you just said about Neria, about Keves, about Gillick, what minute is that in the video?

MS. COHEN: Yeah, I don't think it was. I think that it was just for a different purpose. We were --

MS. BONJEAN: Yeah, I don't -- I've never actually seen the video, so I wouldn't say that out loud. I mean, I -- so, there's that.

Secondly, my understanding is that it was addressing other things that were pertinent at the time that the video was taken. And --

THE COURT: Okay.

MS. BONJEAN: So, but I think -- I mean, I think that it was in light of the Government's great concerns and some efforts to -- I guess it was just out of an abundance of caution. But I don't frankly -- I've not seen it, but my

understanding is that what she will testify to, is not really the subject matter that was covered in that it was related to other issues that were going on at the time.

THE COURT: So far it sounds like it, but I haven't read -- watched the whole thing.

MS. BENSING: Your Honor, I think it would still be relevant to bias to the Government.

THE COURT: Yes. No, I understand that aspect of it as well.

Okay. I will finish watching it and we can talk further tomorrow on this.

MS. FARRELL: Well, I guess if they're planning to call both Maddie and Marissa tomorrow, perhaps Maddie can go first.

THE COURT: There's no video from Maddie, correct?

MS. COHEN: Yeah. Marissa has a -- the witness for tomorrow has to be on a six-something flight.

THE COURT: Well, we're ending early tomorrow, so.

MS. COHEN: Right. And yeah, I was just concerned if we do Maddie Carle first, I was afraid that --

THE COURT: How long do you expect that testimony to be?

MS. BONJEAN: I think Maddie will be longer than Marissa, but.

MS. COHEN: Yeah.

MS. BONJEAN: I mean, I don't -- I'm a little hesitant to give an estimation because I think we probably disagree about what's fair game with both the Government and maybe the Court, so it's hard to know.

THE COURT: Okay.

MS. COHEN: Yes.

And you know, I think with respect to the video, let us talk. But I do agree, Your Honor, that it's not relevant to the testimony. It was done for another purpose and doesn't have anything to do with what --

THE COURT: Okay. And somebody's going to tell me who the people are. There's at least two people so far that I've heard asking questions, or at least making comments to the person who is giving a statement, so I've got to know more about that.

MS. COHEN: Your Honor, we're going to talk to the Government and maybe we can come to an agreement on this.

THE COURT: Okay.

MS. COHEN: Can we let Mr. D'Agostino know?

THE COURT: You can.

Let me just comment on something about Mr. D'Agostino, who I've known for over two decades now. He is one of the finest public servants that I have ever met. However, that does not mean that people should be e-mailing him things at 12:30 a.m.

MS. COHEN: He's up always, I've noticed. He's so responsive.

THE COURT: He -- yes.

So, listen. He works for the Court, he doesn't work for you all. And he does not complain about it, but I would really encourage you to send things at a more appropriate time.

MS. COHEN: Yes, Your Honor.

THE COURT: Okay.

MS. COHEN: We will make this decision quickly.

THE COURT: Have a good evening, everyone.

I will see you in the morning.

(Matter adjourned to Tuesday, June 3rd, 2025, at 9:00 a.m.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| **ANDREW PUNZO** | |
| DIRECT EXAMINATION BY MS. GUPTA | 4499 |
| CROSS-EXAMINATION BY MS. COHEN | 4677 |
| CROSS-EXAMINATION BY MS. BONJEAN | 4678 |
| **ANTONIOS HADJIGEORGALIS** | |
| DIRECT EXAMINATION BY MS. BONJEAN | 4728 |
| CROSS-EXAMINATION BY MR. FERN | 4738 |
| REDIRECT EXAMINATION BY MS. BONJEAN | 4746 |

# EXHIBITS


| | |
|---|---|
| Government Exhibit 2034 | 4500 |
| Government Exhibit 2000-DR | 4504 |
| Government Exhibit 1755-D | 4506 |
| Government Exhibit 1590-DR | 4514 |
| Government Exhibit 2347-DR | 4521 |
| Government Exhibit 5008 | 4524 |
| Government Exhibit 1230-DR | 4526 |
| Government Exhibit 1407-DR | 4528 |
| Government Exhibit 1456-DR | 4531 |
| Government Exhibit 1549-DR | 4535 |
| Government Exhibit 1757 | 4541 |
| Government Exhibit 2033-DR | 4543 |
| Government Exhibit 2173-DR | 4548 |
| Government Exhibit 2256-DR | 4551 |
| Government Exhibit 2350-DR | 4553 |
| Government's Exhibit 2030-D | 4572 |
| Government's Exhibit 1512 | 4577 |
| Government's Exhibit 2148-D | 4580 |
| Government's Exhibit 2075-D-R | 4588 |
| Government's Exhibit 1283-D-R | 4595 |
| Government's Exhibit 2142-D | 4601 |
| Government's Exhibit 2200-D | 4604 |

| | |
|---|---|
| Government Exhibit 1083 | 4635 |
| Government Exhibit 1097 | 4638 |
| Government Exhibit 2134-R | 4641 |
| Government Exhibit 2269-R | 4643 |
| Government Exhibit 2274-D | 4645 |
| Government Exhibit 2320-R | 4649 |
| Government Exhibit 2379-R | 4651 |
| Government Exhibit 2443-R | 4653 |
| Government Exhibit 2478-R | 4655 |
| Government Exhibit 2149-DR | 4656 |
| Government Exhibit 2264-DR | 4659 |
| Government Exhibit 2289-D | 4661 |
| Government Exhibit 3608 | 4664 |
| Government Exhibit 1405 | 4666 |
| Government Exhibit 2559-DR | 4668 |