UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
June 3, 2025
Defendant. : 9:30 a.m.
\- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Jamie Ann Stanton
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201
jamiestanton.edny@gmail.com
(718)613-2274

(In open court; jury not present.)

THE COURTROOM DEPUTY: Honorable Diane Gujarati is presiding. Please be seated.

*United State of America v. Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta, Sean Fern, joined by Paralegal Specialists Liam McNett and Marlane Bosler, and FBI Special Agent Christine Meyer.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

On behalf of Rachel Cherwitz: Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge, Kelly Lenahan-Pfahlert, and Richard Hobbs.

THE COURT: Good morning, everybody.

MS. BONJEAN: And good morning, Your Honor. Jennifer Bonjean, Kelsey Killion and Ashley Cohen, and Galila Assefa on behalf of Ms. Daedone.

THE COURT: Good morning, everyone.

So Mr. Robotti sent an e-mail to Chambers indicating that the defense intends to rest. Was that both defendants? I just wanted to understand more about what you are anticipating.

MS. COHEN: Yes, Your Honor.

MS. BONJEAN: Yes, Your Honor.

THE COURT: And is that before or after calling additional witnesses? I wasn't sure if you were just saying this morning or now.

MS. BONJEAN: No, Your Honor, in light of the Court's prior rulings, we are going to rest.

THE COURT: You are not going to seek to put in some of the evidence along the lines we discussed yesterday?

MS. BONJEAN: I mean, again, I think the record reflects our disagreement about what type of evidence is appropriate and the Court has ruled. We are stuck with that ruling. And we are going to, you know --

THE COURT: Okay. So you are not going to attempt to put in some of the evidence that I said you might be able to put in. You were going to come back with specifics, but it sounds like you've decided not to do that.

MS. BONJEAN: It's not that. I want to make the record very clear. We have plenty of witnesses that we would have presented, but it's very clear that what we want to present, the Court has disagreed would be admissible. In fact, even with the one witness we put on, you know, even the basics that the Government elicited, you know, we had sustained objections. We are not going to sit here through three days and just get beat up with sustained objections. We believe that the Court has ruled. We respect the ruling.

But that is why we have made this decision.

THE COURT: Okay. It's your decision to make. I'm not precluding you from calling witnesses appropriately, and we had some discussions about what you could do yesterday. But I just wanted to understand that.

I am going to bring the jury out, although I need to allocute the defendants, the individual defendants on, you know, with respect to their decision not to testify. But I want to bring the jury out just to tell them that there are things that I am going to be speaking to the parties about, and then we'll send them back out. I just don't want them sitting back there just sort of thinking we are just running late. I will bring them out, tell them given where we are in the trial, there are just some things I need to deal with the attorneys on.

And then, though, after I allocute the defendants, we will have to bring the jury out so that the defendants each can rest. And then if the Government had a rebuttal case, don't know that you do, but --

MS. BENSING: On this record, we do not have a rebuttal case.

THE COURT: Okay. In any event, then we would bring the jury back and essentially tell them that they could leave for the day because we will do the charge conference. I am anticipating that we will do it about

1:30. I think that should give you enough time, but if people think you need more time, I mean, the issues are all issues that you have briefed and we have discussed to some degree. Anyway, we can decide that afterwards.

Let me bring out -- I think we have our whole jury?

THE COURTROOM DEPUTY: Yes.

THE COURT: Okay. Let me bring the jury out and just let them know that there are things that I will be addressing with the parties.

(Jury enters.)

THE COURT: Okay. Everyone may be seated.

Good morning to the jury. I appreciate everybody being here on time.

I just wanted to bring you out right now just to tell you that there is going to be a period of time where I'm going to have to address some issues with the parties. Just based on where we are in the trial in the ordinary course of the trial, I have to meet with the parties separate from anything that involves you. So I didn't want to just leave you sitting back there, but I am going to send you back there for a bit, and then you'll come back out. But I didn't want you to not know what was going on.

So don't talk about the case. Talk about anything else. And keep an open mind. We'll let you know when it's

time to come back.

(Jury exits.)

THE COURT: Everyone may be seated.

I am going to address each defendant separately. It will be, obviously, repetitive, but I think it's important to do it separately. I am going to chart with Ms. Cherwitz. And you can remain seated. Just make sure you have the microphone close enough to you.

So Ms. Cherwitz, have you discussed with your attorney whether to testify or not testify?

DEFENDANT CHERWITZ: I have, yes.

THE COURT: You have the absolute right to testify.

Do you understand that?

DEFENDANT CHERWITZ: I do.

THE COURT: At the same time, you have the absolute right not to testify.

Do you understand that?

DEFENDANT CHERWITZ: I do.

THE COURT: The right to testify or not testify is your right. If your attorney does not want you to testify, but you want to testify, you have the right to testify. And if your attorney wants you to testify, but you do not want to testify, it is your right to choose not to testify.

Do you understand?

DEFENDANT CHERWITZ: I do, yes.

THE COURT: If you choose not to testify, the jury cannot hold that against you, as I told them in my preliminary instructions to them.

Do you understand?

DEFENDANT CHERWITZ: I do, yes.

THE COURT: Is it your decision not to testify in this case?

DEFENDANT CHERWITZ: Correct.

THE COURT: Are you making that decision voluntarily?

DEFENDANT CHERWITZ: I am.

THE COURT: Does any party think that any additional allocution is necessary? Ms. Cohen, Mr. Robotti?

MS. COHEN: No, Your Honor.

MS. BENSING: No, Your Honor.

THE COURT: I'm not sure it would be relevant if Ms. Bonjean had anything to say here, but for the record, do you have anything to say on this topic?

MS. BONJEAN: I do not.

THE COURT: Okay. Let me now address Ms. Daedone. And again, I said it would be repetitive, of course.

Have you discussed with your attorney whether to testify or not testify?

DEFENDANT DAEDONE: I have.

THE COURT: You have the right, the absolute right to testify.

Do you understand that?

DEFENDANT DAEDONE: I do.

THE COURT: At the same time, you have the absolute right not to testify.

Do you understand that?

DEFENDANT DAEDONE: I do.

THE COURT: The right to testify or not testify is your right. If your attorney does not want you to testify, but you want to testify, you have the right to testify. And if your attorney wants you to testify, but you do not want to testify, it is your right to choose not to testify.

Do you understand?

DEFENDANT DAEDONE: I do.

THE COURT: If you choose not to testify, the jury cannot hold that against you, as I told them in my preliminary instructions to them.

Do you understand?

DEFENDANT DAEDONE: I do.

THE COURT: Is it your decision not to testify in this case?

DEFENDANT DAEDONE: It is.

THE COURT: Are you making that decision voluntarily?

DEFENDANT DAEDONE: I am.

THE COURT: Does any party think that any additional allocution is necessary? Ms. Bonjean?

MS. BONJEAN: No, Your Honor.

MS. BENSING: No, Your Honor.

MS. COHEN: No, Your Honor.

THE COURT: Give me one moment, please.

(Pause in proceedings.)

THE COURT: So I am going to bring the jury back in. I take it each defendant is going to rest; is that right?

MS. COHEN: Yes, Your Honor.

THE COURT: And then I'll send them back out again. And if there are any motions, I will hear them then.

Can we get the jury?

MS. FARRELL: Are you going to send them home after this?

THE COURT: Yes, I'm going to have to.

MS. BONJEAN: We can start closings today.

THE COURT: I mean, you can, but you need the charge first. I am going to send them home. It's not ideal to have them come in for a short time, but I don't know that there's a jury that's going to be sad about not staying a full day.

MS. FARRELL: And it's a nice day out.

THE COURT: And then I would have them come regular time tomorrow and we'd start with closings.

And, again, if we don't finish closings tomorrow, then I will have them come Thursday, but it will have to be in the afternoon.

MS. BENSING: What time do you think we will start on Thursday, Your Honor?

THE COURT: No later than 1:00.

MS. BENSING: Okay.

THE COURT: And I think it's probably better than having them come at lunchtime.

MS. BENSING: Yes. Thank you.

(Jury enters.)

THE COURT: Okay, everyone may be seated.

Ms. Cohen?

MS. COHEN: Yes, Your Honor.

On behalf of Rachel Cherwitz, the defense rests.

THE COURT: Ms. Bonjean?

MS. BONJEAN: On behalf of Ms. Daedone, the defense happily rests.

THE COURT: Does the Government wish to present a rebuttal case?

MS. BENSING: No, Your Honor, thank you.

THE COURT: Ladies and gentlemen of the jury, I won't tell any of your family members or your bosses if you

want to go have a fun day, because there are things that the parties and I need to do that doesn't involve the jury, so you are done for the day. I don't know whether it's a good thing or bad thing that you were only here for about an hour, but I do appreciate you being here. Again, go have a fun day. I won't tell anyone what you go off and do. Just don't talk about the case.

Let me remind you, seriously, what I remind you all the time, which is, you know, don't talk about the case with anyone, including your fellow jurors.

If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino.

Don't read, listen to, or watch any news or other media reports of the trial. Don't conduct any independent research about the case, the matters in the case, or the individuals involved in this case.

Don't talk to the parties, attorneys, or witnesses in the case about anything.

Keep an open mind.

And, again, enjoy the day. It's a beautiful day out. I will see everyone tomorrow, again, 9:15, so that we can start 9:30 promptly.

Thank you all. Have a great day.

(Jury exits.)

THE COURT: So in contrast to the jury, you all do not get to go and have a fun day in the sun, unless you plan to read jury instructions in the sun.

Go ahead, Ms. Cohen.

MS. COHEN: We would --

THE COURT: Do you want to make any motions?

MS. COHEN: Yes, we do.

THE COURT: Okay.

MS. COHEN: We, again, make a Rule 29 motion based on the arguments yesterday. Now, at the close of the defense case, we renew our Rule 29 motion.

MS. BONJEAN: Yes. On behalf of Ms. Daedone, we renew our Rule 29 motion based on the arguments yesterday and the filing we made.

THE COURT: Okay.

MS. COHEN: Yes, and the filing.

THE COURT: So let me address the filing, which was at ECF No. 401.

I know you acknowledged in the filing that I had already ruled, so I take it that that filing was just, essentially, papering the record. And I don't mean anything nefarious by that.

But you are now making another motion; is that correct?

MS. COHEN: That's correct, Your Honor, based on

the same argument --

THE COURT: Yes.

MS. COHEN: -- yesterday and set forth in our papers.

MS. BONJEAN: That's right, Your Honor.

THE COURT: Okay. So each defendant's Rule 29 motion is denied. The evidence is sufficient to sustain a conviction on the sole count of the indictment as to each defendant. On the evidence admitted, a rational jury could conclude, beyond a reasonable doubt, that each defendant is guilty of the crime charged in the indictment. And the Court, again, notes that the evidence must be viewed in the light most favorable to the Government, crediting every inference that could be drawn in the Government's favor, and the evidence must be assessed as a whole.

I think there was something else you wanted to say, Ms. Cohen.

MS. COHEN: Yes, Your Honor. I mean, obviously, we can hear from the Government. But our preference, and I think Ms. Bonjean agrees, would be a break of 20 minutes or so for us to finish and then do -- we would prefer, instead of coming back at 1:30, to sort of get going on it, if that works for Your Honor.

THE COURT: I think we need more than 20 minutes, but yes, it doesn't need to be 1:30.

Let me ask the Government for their views on that.

MS. BENSING: That's fine. I think I would need a little bit more than 20 minutes.

THE COURT: Tell me approximately how much time you want.

MS. BENSING: Could we come back in an hour?

MS. COHEN: Yeah, that --

THE COURT: 11:00 a.m.?

MS. COHEN: That works, Your Honor.

THE COURT: That works for me, as well.

Great. So we will see everybody at 11:00 a.m.

MS. BENSING: Thank you.

MS. COHEN: Thank you, Your Honor.

MS. BONJEAN: Thank you.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

You may be seated.

This is the charge conference, *United States versus Rachel Cherwitz and Nicole Daedone*.

State your appearances for the record.

MS. BENSING: Kayla Bensing and Kaitlin Farrell for the Government.

THE COURT: Good afternoon, or morning I guess still.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge and Kelly Lenahan-Pfahlert, all are on behalf of Rachel Cherwitz.

THE COURT: Hello everyone again.

MS. BONJEAN: Good afternoon.

Jennifer Bonjean, Kelsey Killion, and Ashley Cohen on behalf of Ms. Daedone.

THE COURT: Hello, everybody.

So we are here for a charge conference. I have given you the draft charge. And what we can do is go through the charge and we can figure out who has the first comment based on the page numbering.

So we can start with the defense or Government or whoever wants to state the first page where they have a comment.

MS. BENSING: I'm happy to start, Your Honor.

On page 8, I think we can delete instruction number 9.

THE COURT: Okay. Let me ask if anyone had anything before page 8?

MS. COHEN: No, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: No.

THE COURT: Sorry, did you say no?

MS. BONJEAN: Before page 8, no.

THE COURT: Obviously I will take out defendants' testimony. I had given this to you before the defense rested, so I will take that out.

What's the next page?

MS. BENSING: The next page the Government has something on is page 11.

THE COURT: Does anyone have anything before 11?

MS. COHEN: Yes, Your Honor.

Just on page 9, paragraph 13, the limiting instruction, we would like to have the hearsay limiting instruction that you gave before regarding not being offered for the truth.

THE COURT: Isn't that -- oh, I see, okay.

MS. COHEN: Just a little bit more specific.

THE COURT: I see. Okay. So what -- give me one moment.

MS. COHEN: I think the one you gave the first time was a little more general -- was it yesterday? Yesterday or the day before. It was very specific. So we're fine with --

THE COURT: You want the specific or you want the general?

MS. COHEN: I think the general, because the specific one referred to, I think, an example, right, in the text message? So I think --

THE COURT: Yes, the specific one was about context. That's the only limiting instructions I gave. So do you want --

MS. COHEN: Oh, I thought you gave one -- you gave two because there was another --

THE COURT: Right, but that was not tied to any particular purpose, right?

MS. COHEN: Okay. So we will take the context one from yesterday, if that makes sense.

THE COURT: It does makes sense. Just give me one moment, please.

Okay. I will work on that, but I think what I'm understanding you to want is the language that said, "was admitted not for the truth."

Is that right?

MS. COHEN: Correct, yes.

THE COURT: Okay. And do you want me to then just say, "was admitted for a limited purpose," or do you want me to say "for context"? I think the real issue is that it was not for the truth.

MS. COHEN: That's fine.

THE COURT: What is everybody's view on that?

MS. BONJEAN: I think limited purpose.

THE COURT: Okay.

Government?

MS. BENSING: Well, I think if you're going to -- I guess we would just request that you essentially state what you stated previously, but I don't have in front of me immediately, but --

THE COURT: So what I said was -- well, I did it by each exhibit, and I said: The statements by so-and-so are being admitted not for the truth of the statements, but for the purpose of providing context for the other statements. You may consider the statements that are being admitted for context only for that purpose.

MS. COHEN: Yeah, so I think "the limited purpose" makes more sense because it's a little bit more general and isn't referring to something specific.

THE COURT: But I think the Government wants the context in there, right? The word "context"?

MS. BENSING: Well, I think if we're going to get into the specific instruction, then the Court should just re-give the specific instruction.

THE COURT: Okay. So it would really essentially be: Certain evidence was admitted for a limited purpose only. When the evidence was admitted, I instructed you that you could only" -- well, maybe that the statements were not being admitted for the truth, but for the purpose of providing context?

I can work on something and let you know, but I

think that makes sense. Something that roughly tracks what I had said.

MS. BENSING: That makes sense, Your Honor.

THE COURT: Not for truth, but for context.

MS. BENSING: Yes. I mean, obviously our key point is not for truth.

THE COURT: Right. Okay, all right. So I will work on some language on that.

MS. BONJEAN: I think there was an earlier limiting instruction, too.

MS. BENSING: That's what I was looking for, too.

MS. BONJEAN: I don't know if it was limited to context. That was my only thought about that. If it was, I don't think it's an issue, then.

MS. BENSING: Yeah --

THE COURT: The problem is it was a more general.

MS. BONJEAN: Okay.

THE COURT: But it was not tied to any specific evidence. You didn't ask me to give it with respect to any specific evidence, so I think it would be very confusing at this point.

MS. BONJEAN: That's fine. I wanted to make sure. I didn't recall specifically how it came out the first time.

THE COURT: All right. We will go with the specific one that was tied to specific instructions I gave

when certain evidence was coming in.

Somebody had something before 9 or are we up to page 9 only now? Anything before 9 that we haven't talked about.

MS. COHEN: Not that we haven't talked about.

MS. BENSING: No, Your Honor. I think the Government's next one was page 11.

THE COURT: Anything before 11?

MS. BONJEAN: I don't know. I --

THE COURT: Do you want this transcript in there? I mean, there was one transcript that came in as an aid to the jury. I'm happy to leave this in there, but I don't know if you want it or need it.

MS. BENSING: I think we should leave it in, Your Honor, just --

THE COURT: Okay. That's on page 10.

MS. BONJEAN: The only other one is -- that was with stipulations and also objections, but I think you maybe address it in another place.

THE COURT: I address objections later on.

MS. BONJEAN: Okay. I was looking for it.

THE COURT: It's in the part about what is evidence, what is not evidence.

MS. BONJEAN: What is not evidence, okay.

THE COURT: Let me ask you a question. We have

charts and summaries on page 10. There obviously were summaries, and I think the summaries were charts. Is everyone comfortable with the language, "certain charts and summaries."

MS. BONJEAN: Yeah, or "summary charts." I don't know.

THE COURT: I'm not sure it makes much difference. I just want to make sure this covers the universe of what came in.

MS. BONJEAN: I think it was just the financials, right?

MS. BENSING: Financials. So I think charts and summaries is accurate.

THE COURT: I think it's accurate, too, but I just wanted to raise that.

MS. BENSING: Okay.

THE COURT: Now, 11, the Government had something on 11.

MS. BENSING: Yes. So just with the mean of "and" in the indictment.

THE COURT: Yes.

MS. BENSING: Because the Court is going to read the language in the indictment, we would just request a little bit more clarification.

So specifically, the language that would be

requesting is: "Where a statute specifies alternative ways in which an offense may be committed, an indictment may allege the multiple ways in the conjunctive; that is, by using the word "and." If only one of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction so long as you agree unanimously as to that alternative."

We just don't want them getting --

THE COURT: The issue you're getting at is something that's already covered when I talk about the difference between A and B, and that they don't have to find or they wouldn't have to find A and B. I think what you are proposing sounds like it complicates things. I think there is the one word "and," correct?

MS. BENSING: Well, just the way that we do the indictments, we would say, like --

THE COURT: Right.

MS. BENSING: -- force, threats of force, and threats of serious harm.

THE COURT: Right.

MS. BENSING: And so I think the "ands" can be very confusing. And so we would request something a little bit stronger here, even if it's just that the jury should disregard the use of the term "and" in the indictment.

And yeah, it's specifically paragraph 23. So

page 13 of the draft charge.

THE COURT: Right.

MS. BENSING: For example, in subsection A, "the abuse and threatened abuse of law and legal process and one or more schemes, plans, and patterns."

THE COURT: But I think it becomes clear when we get the more substantive instructions there.

Read me the language again that you are proposing?

MS. BENSING: So I took this from a different case, which I can give to the Court.

THE COURT: Yes.

MS. BENSING: "Where a statute specifies alternative ways in which an offense may be committed, the indictment may allege the multiple ways in the conjunctive; that is, by using the word 'and.' If only one of the alternatives is proof beyond a reasonable doubt, that is sufficient for conviction, so long as you agree unanimously to the alternative."

I am not wedded to this language, but I do think the Government has a concern that there is -- this instruction doesn't get to the fact that "and" in the indictment is meaningless for the jurors.

THE COURT: Well, they're not going to read this or first be told it and then read it in isolation. We can come back to that.

MS. BONJEAN: That's very confusing to me.
THE COURT: That language is, I agree.
MS. BONJEAN: I don't even know that I understand that.
THE COURT: I think that is confusing. There may be some different language, but I think this is pretty clear where I'm telling them, where I say "or," that's controlling over any contradictory phrasing in the indictment.
MS. BONJEAN: And the indictment is not to be used for any purpose. And I think the jury is going to be told that. And beyond that, they're being told to follow the jury instructions, not --
THE COURT: We can --
MS. FARRELL: I am sorry. You are not sending the indictment back; is that correct?
THE COURT: Yes. Correct. Correct.
MS. FARRELL: So maybe a way to resolve this, because I think you say, "you will also see the indictment uses the word," and they are not getting the indictment.
THE COURT: They'll see the part on page 13.
MS. FARRELL: Right. So maybe you can say: You will also see that the indictment language as set forth in instruction paragraph 23.
Like: You will also see that the indictment language as set forth in instruction paragraph 23, comma,

uses the word "and."

THE COURT: I don't think that's necessary, because what I have is accurate here and we wouldn't have gotten to paragraph 23 yet. I will give it more thought. We can come back to this, but I don't think this is particularly confusing, particularly when they're going to be given more specific instructions about the statute and the different ways in which the statute is violated.

MS. COHEN: Yeah. I mean, we can just say that you'll hear in a moment, like, if that's what's confusing, I don't know, because you are reading the indictment language after.

THE COURT: Okay. Let's get back to that one.

What's the next page anybody had anything on?

MS. BENSING: The Government's next is page 17.

THE COURT: Anybody have anything before 17?

MS. COHEN: Yes, Your Honor, on page 12.

THE COURT: Yes.

MS. COHEN: I know we raised this already, but under "intentionally," we ask that: A person does not have intent to present the requisite intent if she acted in good faith or --

THE COURT: Right. I'm not going to add that.

MS. COHEN: Okay. Just wanted to reiterate for the record our request.

THE COURT: Sorry, next page is? The Government had said, what, 17?

MS. BENSING: Yes, Your Honor.

THE COURT: Anybody have anything before?

MS. BONJEAN: I'm sorry.

THE COURT: Go ahead.

MS. BONJEAN: I didn't hear Ms. Cohen entirely.

THE COURT: She was asking about the good faith request which you had already made in your filings and I am not going to give that language.

MS. BONJEAN: On page 13.

THE COURT: Yes.

MS. BONJEAN: I would ask that in the second element or the second prong of the crime of forced labor that is charged, that the Court reiterate that the defendant knowingly and intentionally became a member --

THE COURT: Wait. What page are you on? I don't think I'm on the same.

MS. BONJEAN: It's actually page 14.

THE COURT: That's why it didn't look familiar. 14, go ahead.

MS. BONJEAN: That the second say: That the defendant knowingly and intentionally became a member of the conspiracy -- and repeat -- with the intent to accomplish the unlawful purpose.

THE COURT: I'm not inclined to make that change. I have that -- more of a discussion of conspiracy, but the element, I think, is commonly and accurately described as I have it.

Does the Government want to be heard on this?

MS. BENSING: We agree, Your Honor. I think these formulations of conspiracy, the two elements there is very, very standard.

THE COURT: Yes.

What's the next comment or page?

MS. COHEN: You had 17?

MS. BENSING: Yes. Page 17.

THE COURT: Okay.

Actually, I have something on page 16.

MS. BENSING: Sure.

THE COURT: So my understanding is that the statute, 1594(b), was enacted or passed on December 23rd, '08, but then there was, I think, a 180-day delay before it was effective which would bring it to, I think, June 21, 2009. But I have actually seen, including in the pattern instructions, a December date. So I want to just make sure everybody's on the same page about the effective date of the statute.

*Sand* has something different. It has the December date, I believe.

MS. BENSING: Yes, we looked into this. We believe it should be June 21st, 2009. And also in an abundance of caution, I think that's the later date, so that would be appropriate here.

THE COURT: Is that the defendants' understanding, too? I think there was this 180-day waiting period before effectiveness.

MS. BONJEAN: Yes, I think that's right. I think it was enacted on December 23, 2008, but it didn't go into effect until the later date.

THE COURT: So that's why I phrased it as "became effective on," and I think that's accurate.

MS. BONJEAN: Yes.

THE COURT: So now we're 17?

MS. BENSING: 17?

THE COURT: Is that what the Government has?

MS. BENSING: Yes, yes.

So we just wanted to request that the Court insert, when laying out the statute, "provides in pertinent part," go through (a), shall be guilty of a crime, we just wanted to insert the word "or." Or (b).

I know the Court explains --

THE COURT: No. I am not going to add that because it's not in the statute that way. I don't think. If it's in the statute that way, I would possibly change my

mind, but I do not believe it's in the statute that way.

MS. BENSING: Understood, Your Honor. It's not.

THE COURT: Give me one moment just to check one other thing.

Yeah, I'm not going to change that, then.

What's the next page?

MS. BENSING: So the next is on page 18 for the Government.

THE COURT: Okay.

MS. BENSING: So we would request that when the Court is saying: As relevant here, those elements are, first, second?

THE COURT: Yes.

MS. BENSING: We would request the addition of: That the defendant did so through one of --

MS. FARRELL: One or.

MS. BENSING: One of or by any combination of the following means, which is from the statute, Your Honor.

THE COURT: That's fine.

I don't think it was in the proposal, which is why I don't think I added it --

MS. BENSING: Yes.

THE COURT: -- but it is in the statute and I think that's reasonable, but I will hear from the defendants on that, if they want to be heard.

MS. BONJEAN: One second, Your Honor.

THE COURT: Sure.

And I think what's being proposed is on page 18, second element, for it to say: That the defendant did so through one or any combination of the following prohibited means.

You may have had it in your -- somebody had it, I think, in the request and the other side did not. But it is accurate and I would be inclined to add that.

The Government did not have that in their request.

MS. BENSING: Yes. I think now that the evidence has come out, we would be requesting that. And it is directly from the statute.

MS. BONJEAN: I'm sorry, can someone direct me to where, specifically, you would --

THE COURT: Sure. On page 18, in the part towards the top that says "second, that the defendant did so through one" -- and the Government would want to add -- "or any combination" -- and then pick up there -- "of the following."

Which does track the statute. The parties just hadn't asked for it, so I didn't add it, but it is accurate and I think that makes a lot of sense to add it there.

MS. BONJEAN: Okay. I was looking at 1589(b), and I was not seeing it.

THE COURT: That's okay.

MS. BONJEAN: This is 1589(a)?

MS. COHEN: It tracks the statute, so.

THE COURT: So okay, so no issue there. I will add that.

What's the next page?

MS. BENSING: So still on page 18.

THE COURT: Yes.

MS. BENSING: The Government would renew its request that the Court instruct the jury that services can include sexual services.

As the Court knows, this was instructed in *Kelly*, the Second Circuit affirmed that and specifically stated that sexual services can constitute services. And the reason for the request is the Government thinks that there may be confusion where something may be an otherwise illegal service that it may not count as labor or services, and that's why we are requesting this particular --

THE COURT: Do you think that this jury sat here and didn't realize that sexual services could be services?

MS. BENSING: Your Honor, the Government's concern is just could there be some doubt -- well, first, I don't know if that's what the defendants intend to argue, but certainly --

THE COURT: Well, if they're intending to argue

that sexual services are not services, then I think we'd have an issue after the argument and I would be inclined to tell the jury that it can be, but I don't think that's what they're arguing.

MS. BONJEAN: It's definitely not what we're arguing. I think it goes without saying -- they asked it of every single witness, over my objection, I would point out, so -- and the Court was very clear from the beginning that they're permitted to have the witness identify the services, which they did, over and over again. And then they specifically identified what they believed the services were and I don't even think we crossed on whether these could be services. I don't really think it's in dispute. And to me, this is -- you know, this is putting the finger on -- interfering a little bit with the jury's determination, but I don't -- I think they understand what can be services and what can't. And this -- that, to me, feels a little heavy-handed.

MS. BENSING: Let me just say, then, that in light of that, I don't think it's necessary. I think the Government's concern was that there was going to be some argument to that effect, when that is, in fact, a true statement of the law, so that's fine.

THE COURT: What's the next page? Anybody has anything?

MS. BENSING: So we, on page 19, would just request the same marrying language. So: The defendant provided or obtained the labor or services of a person through one or any combination.

THE COURT: Or any combination, yes.

MS. BENSING: Yes.

THE COURT: It has to be consistent. Nobody has an issue, I take it, on page 19?

MS. COHEN: No.

MS. BONJEAN: No.

THE COURT: Okay. What's the next page?

MS. BENSING: Staying with page 19.

THE COURT: Yes.

MS. BENSING: The Government does think that there is some confusing potential language between the Court's definition of "threat" on page 19, and then the definition of "threat" on page 20.

And specifically, on page 19, there's a discussion that -- there's like a discussion of a reasonable person. And then on page 20, there's discussion of -- that they should consider a reasonable person of the same background and in the same circumstances of an alleged victim.

So the Government has a concern that the threat as defined on page 19 is confusing when you add in the language on page 20. And I was hoping to understand from the Court

where the Court derived that language of "threat" from.

THE COURT: Sorry, which? Are you talking about on page 19?

MS. BENSING: Yes.

THE COURT: I believe that's taken from *Sand*.

MS. BENSING: The definition?

THE COURT: I believe so. Give me a moment.

It's from *Sand*.

MS. BONJEAN: And one is a definition --

THE COURT: Right.

MS. BONJEAN: -- and one is elaboration on how the jury goes around determining this.

THE COURT: That's the intention of this instruction. So the threat -- let me just take a look and make sure that it's exactly from *Sand*.

It's exactly from *Sand*.

MS. BENSING: I think what's confusing is that when that is taken into the forced labor context, where --

THE COURT: It's in the forced labor statute, statutory section of *Sand*.

MS. BENSING: Yes. I just think that there is --

THE COURT: It's under the second element, force or restraint, from *Sand*.

MS. BENSING: Okay. The Government's concern is that there is potential to be confusion between the

statement "must have been made under circumstances that a reasonable person who heard or read the statement would understand it," and then on the next page --

THE COURT: But that's describing, then, how something could be reasonably believed, what you're supposed to look to, which, I think, tracks the Second Circuit, which is that you're looking essentially at the characteristics -- for lack of a better word -- of the victim, but the reasonable person with those characteristics.

Right?

MS. BENSING: Right. So that's why I think it is twofold and so that's why I think the instruction as to "threat" on page 19 just by reference to a reasonable person, could cause confusion.

THE COURT: Okay, let me look at this one more time.

MS. COHEN: I would also point out, Your Honor, that I think that that language comes from a threat, the definition in that paragraph, whereas the explanation comes from a threat of serious harm --

THE COURT: Serious harm, correct.

MS. BENSING: But I do think that that's confusing, because I'm not sure that there are other threats that are at issue in this case.

MS. COHEN: Again, I would say it's explaining

what that threat is, then what serious harm is, and then what a threat of serious harm is.

THE COURT: Well, really, the paragraph on 20 is the analysis of determining whether the threat of serious harm could reasonably be believed, right?

MS. COHEN: Right.

THE COURT: So that to me is a different point.

MS. BONJEAN: They're both -- they're not the same thing and they're both important concepts, I think, which is why they are set forth in *Sand* and in other cases that have defined --

THE COURT: Yeah, I'm not seeing the confusion, but if you are, I want to think about this a bit more.

MS. BENSING: Okay, let us give it some thought, too.

THE COURT: Okay.

MS. BENSING: And if we have anything, we'll try to file something tonight so that the Court --

THE COURT: Okay, that would be helpful.

MS. BENSING: Yeah.

THE COURT: Thank you.

So we were back on page 19. Is there anything else on 19, or what's the next page?

MS. BENSING: Yes. The Government has more on page 19.

THE COURT: Okay. Go ahead.

MS. BENSING: So I think for the definition of serious harm, so I think the paragraph starting, "The term 'serious harm' --"

THE COURT: Yes.

MS. BENSING: "-- includes," I think we would be requesting, given that the Court has obviously narrowed some of what the parties requested with respect to --

THE COURT: Yeah, you wanted all your theories in. I am instructing on the law, not the parties' theories, but you are welcome to argue your theories.

MS. BENSING: Understood, but I think in light of that, we would be requesting that the Court instruct as to the exact statutory language.

So the statute says that the term "serious harm" means any harm, whether physical or nonphysical, so we would be requesting, "the term 'serious harm' means any harm including both physical and nonphysical."

THE COURT: Well, again, I've taken this from *Sand*.

MS. BENSING: So this does come from the statutory definition of serious harm. So that's in 1589(c)(2).

THE COURT: No, because then you're leaving out the rest of it.

MS. BENSING: So my second request is to add in

the rest of it for the Court's definition of "serious harm."

THE COURT: But that's repeating already -- I think this -- the point here is not to repeat what's below. It's just to make clear that we're talking about different categories here.

MS. BONJEAN: Right. And I think -- I think in this case, the definition of any harm that this -- what the definition is, "serious harm means any harm, whether physical or nonphysical," it is, nonetheless saying, when we describe harm, it could be physical, it could be nonphysical. It can't be spiritual harm. It can't be -- like, I think it's very misleading. Then we're getting into --

THE COURT: No. I think the Government wants -- they want to say it's just any harm. They want to say that it's "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm that is sufficiently serious under all" -- and it goes on. But that's what I have below in terms of the sufficiency of the seriousness, right?

MS. BONJEAN: Right.

THE COURT: So I think this sentence here, maybe there's a different way to do it, but I think that is just designed to indicate the type of a harm, not the severity or the sufficiency of it, but just that it could be

physical/nonphysical.

MS. BENSING: I understand, but I think we are requesting -- because this case is not just about threats of serious harm. It's also about the infliction of serious harm as a means of -- of getting the provision of labor or services. And so I think we would be requesting that what the Court has for "threat of serious harm" just be instructed with "serious harm" itself rather than "threat of serious harm." So the Court would really just provide the statutory definition of "serious harm" and then just say: A threat of serious harm includes any threat of serious harm as I have just defined that for you.

If the Court even finds that necessary. I think what we are requesting, though, is the statutory definition of "serious harm," not disjointed into "serious harm" and "threat of serious harm," but the definition of "serious harm" itself.

MS. BONJEAN: I'm not really following.

THE COURT: I think I am following. I think that what Ms. Bensing is saying is that it's not just threats of harm that they're focusing on; it's actual harm which is a different mean.

Is that what you are saying?

MS. BENSING: Correct, exactly, in subsection (a)(2) by means of serious harm.

MS. BONJEAN: But "serious harm" is defined here.
MS. BENSING: It's actually not defined.
MS. COHEN: Right above.
"The term serious harm" --
THE COURT: No, she -- I think she --
MS. BENSING: That's why I'm asking for the statutory definition. "Any harm including" -- and then all of the rest of it.
THE COURT: It has to be consistent with what's below, though, for "threat of serious harm," right? Would it be that under that circumstance?
MS. BENSING: Yes. I think you have it in there, I just -- we're requesting that the definition of "serious harm" come all together and include the statutory definition.
MS. BONJEAN: So what do we do with the paragraph after "threat of serious harm"?
THE COURT: Not the paragraph after the term.
MS. BONJEAN: The paragraph before.
THE COURT: The paragraph before.
MS. COHEN: Because under the statute, it says, "the term 'serious harm' means any harm --
THE COURT: But Ms. Bensing wants the entirety of that paragraph.
MS. BENSING: Yes.

So just to make it very clear, what I would be proposing is, "The term 'serious harm,'" da, da, da, finishing out what the statute defines it as.

THE COURT: Okay, go ahead.

MS. COHEN: You mean that is sufficiently serious, all of that.

MS. BENSING: Yes, all of the statutory definition.

"The term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious" -- until the end of that sentence.

THE COURT: Okay. And then the next paragraph, would that make sense, still?

MS. BENSING: Yeah. I think the Court could say, if we want to keep the next paragraph: A threat of serious harm includes any threat of serious harm using the definition that I just provided to you.

Or -- or whatever the parties --

MS. BONJEAN: It's --

THE COURT: I do see what she's saying. There is a nuance there.

MS. BONJEAN: But it's not any threat of serious harm. It's a threat of serious harm. Like this is --

MS. BENSING: I'm not even sure that second

paragraph is even necessary, because the Court then just goes on to define "threat." Like "serious harm" is then already defined and then the Court goes on to define "threat."

But I'm really ambivalent. I just am asking for the statutory definition of "serious harm."

THE COURT: I understand what you are asking for. I can give the defense a minute to think about that, too.

I think you need both paragraphs, whether you expand the first one or not, because I do think they're two different means. There is "serious harm" and there is "threat of serious harm."

MS. COHEN: Yes, that is our position. Our position is that we would keep it --

MS. BONJEAN: Yeah.

MS. COHEN: -- because it explains exactly what serious harm is.

THE COURT: But with the rest of the statutory provision, right? It's a bit clunky, but --

MS. BONJEAN: Yeah, I mean, I think --

MS. COHEN: "That is sufficiently serious," you mean that part?

THE COURT: Yes.

MS. COHEN: To include it there. "A threat of serious harm" --

MS. BONJEAN: So this is -- this is our position --

THE COURT: Yes.

MS. BONJEAN: -- for the Court to consider.

You need both because the statute mentioned both --

THE COURT: Yeah.

MS. BONJEAN: -- serious harm or threats of serious harm.

THE COURT: Right.

MS. BONJEAN: So there is no question that it really does require both.

I think the way the Court has it is sufficient because then we're getting redundant and I think the *Sand* instruction kind of accomplishes that, but either way we definitely need both.

THE COURT: So I think -- I mean, this is I think the way *Sand* does it, but that doesn't mean that it's dispositive of anything.

Do the defendants want to be heard further on specific language on that?

I mean, does anyone have an issue with any --

MS. COHEN: Okay -- I'm sorry, Your Honor.

THE COURT: Who was speaking? That's okay, I couldn't tell where it was coming from.

MS. COHEN: I think you were about to say what we were going to suggest, I don't know. It's fine to include under "serious harm," that's the statutory definition, it's fine, and then just repeat, "a threat of serious harm" -- I mean, it's clunky and we think unnecessary, but we believe it should be separate so, if Your Honor is inclined to add that.

MS. BENSING: I mean, I think the Court can define "serious harm" and then say "a threat of serious harm is a threat of serious harm as I have just defined it for you" or the Court can restate it.

Just the Government wants the entirety of the statutory --

THE COURT: Okay.

MS. BENSING: -- definition in one place, Your Honor.

THE COURT: Okay. I think I'm inclined to do that.

MS. BONJEAN: Judge, I will just, for the record --

THE COURT: Yes.

MS. BONJEAN: -- our position is what the Court has is what we would request, but --

THE COURT: Okay.

MS. BONJEAN: -- over my objection, I guess. But

I think it's -- I would just say the Court's language, I think, is sufficient.

MS. COHEN: Yeah, I mean -- and we agree, Your Honor. I was just --

MS. BONJEAN: But --

MS. COHEN: The most important thing is we think it is separate.

THE COURT: There are two different means, at least, right, or portions of -- two separate -- there's four main means, but there's different ways within those, so it's really more than four, frankly.

MS. COHEN: Yeah.

THE COURT: Or as we are going to be charging the jury, three, because nobody wanted the threat of legal abuse of legal process.

MS. COHEN: In looking, to me, it's less confusing if you keep it the way it is because it gets into more specifics. Like, what is a threat of serious harm. You describe serious harm. Then what is the threat. And all the language is there.

THE COURT: This is definitely, exactly -- I'm looking at *Sand* now -- exactly from *Sand*.

MS. BENSING: But, Your Honor, that does not --

THE COURT: It's not dispositive, of course.

MS. BENSING: And that does not include the

statutory definition, which, from the Government's perspective, is something that we are requesting.

THE COURT: Okay.

What's the next?

MS. BENSING: So the next is also at the top of page 20.

So this is kind of a similar issue. Here, the Court defines it by "In determining whether a defendant made a threat of serious harm," but I think should be "in considering serious harm or a threat of serious harm" because this is referencing a definition of "serious harm." A reasonable person of the same background and in the same circumstances.

So we would be requesting, both, in considering serious harm and whether a defendant made a threat of serious harm. It should be, I think, by reference to both.

THE COURT: I think that's probably right, but I will hear from the defendants on this. Because if "serious harm" is a means and "threat of serious harm" is a means --

MS. BONJEAN: How does that language look, though?

THE COURT: That's what I'm wondering, too.

MS. BENSING: I think it could just be: In considering serious harm and in determining or considering whether a defendant made a threat of serious harm --

THE COURT: No, I think it has to both be tied to

defendant, right? Because here, you're looking at "in determining whether a defendant," it could be, I suppose, "used serious harm or made a threat of serious harm," something like that, right?

It can't be detached from -- it's not just in the abstract they're going to consider serious harm.

MS. BENSING: Right. I guess it could be: In determining whether a defendant obtained the labor or services by means of serious harm or a threat of serious harm.

THE COURT: But this paragraph is talking about whether it's the reasonable belief by a person, right?

MS. BONJEAN: And if they get their "serious harm" instruction right out of the statute, then they've gotten what they want.

THE COURT: No. It's a bit different because the Government is saying that one means is using serious harm and then another means is threatening serious harm. And both are under the statute.

MS. BONJEAN: Yeah, but under the second element, it says "serious harm or threats of serious harm." There's already an "or" there at the top of page 19. The jury certainly knows that they consider serious harm or threats of serious harm. And it is -- what is being --

THE COURT: Oh, I guess you're right, what is

being believed is a threat -- not -- right?

MS. BONJEAN: What's being instructed here is in determining whether a threat. This is -- this is specific to threat. And that is -- that is specific to this paragraph and that's -- and this isn't about whether -- I mean, if they want a definition of "serious harm," such as that's in the statute that goes all the way through, they're getting -- "that is sufficiently serious under all the circumstances." That's the language they want there.

And then the threat of serious harm is similar, but it's -- it's -- it's specific to the threat because there are two different concepts.

THE COURT: Yeah, if you look a couple of paragraphs down on 20, then, that paragraph that begins, "for the second element," I think that would cover both harm and threats of harm.

MS. BONJEAN: Yes. And even in the first paragraph, it's very clearly serious harm or threats of serious harm.

MS. BENSING: Your Honor, may I respond?

THE COURT: Yes.

MS. BENSING: I don't think that's right.

So in this paragraph where the Court is defining that "could reasonable be believed by a person, one should consider a person's physical and mental condition,"

et cetera.

THE COURT: That carries over to harm, is what you are saying?

MS. BENSING: Yes. That does not just apply to serious harm, it also applies to the jury's consideration of serious harm as defined by the statute.

THE COURT: Let me think about this. We can come back to this.

What's the next issue?

MS. COHEN: Your Honor, on that same page.

MS. BONJEAN: 19?

THE COURT: 20, I think we are on.

MS. COHEN: At the top, and I think we requested this before, we reiterate our request. After "particular vulnerabilities" and "any reasonable means or chances a person may have had to escape."

THE COURT: I will hear from the Government on that.

MS. COHEN: "Or terminate the relationship."

MS. BENSING: No --

THE COURT: Do you want to say more than just that?

MS. BENSING: -- I mean, similarly, the Government thinks that the Court should instruct that victims have no affirmative duty to leave.

I do think that there's going to be argument by the defense that the victims should have or could have left and so I do think it's relevant that the Court instruct the jury that the victims had no affirmative duty to leave, but it seems like the Court has struck all of that language.

And so if that's the Court's ruling, that's the Court's ruling, but I --

THE COURT: There's nothing in the statute this says someone has to leave or try to leave or if they -- you know, just, again, I think the parties can argue their theories, but I'm interested in instructing the jury on the legal elements here and what they really have to do.

Okay. Anything? So I'm not going to add subtract from there. Anything -- what's the next page?

MS. BENSING: Sorry --

THE COURT: Yes.

MS. BENSING: -- just sticking with that top paragraph --

THE COURT: Yes.

MS. BENSING: -- of 20.

May I have one minute, Your Honor?

THE COURT: Yes.

(Pause in proceedings.)

MS. BENSING: Never mind, Your Honor.

THE COURT: What's the next?

MS. COHEN: Your Honor, I think we already said that, but just in that same paragraph.

THE COURT: Yes.

MS. COHEN: I think the "be believed by a person," is really where I'm getting hung up on --

MS. BONJEAN: Sorry, Celia, can you speak?

MS. COHEN: Sorry. On page 20, just going back to the Government's request --

THE COURT: Yes.

MS. COHEN: -- and I think Ms. Bonjean may have said this, but, "In determining whether the defendant made a threat of serious harm that could reasonably be believed by a person," this is what you should consider.

THE COURT: Yes.

MS. COHEN: And so I think that's why -- I just want to make sure that's -- I think that's why I think the Government's request would not make sense there. And I think that was said, but I just -- I just kind of got it.

THE COURT: Okay. Okay.

We're going to get back to this for, sure.

MS. COHEN: Okay.

MS. BENSING: Yes. Because I agree that that language is confusing and I don't think it's tethered to the definition of "serious harm" under the statute, which is where this "reasonable person of the same background and in

the same circumstances" comes from. It's not just --

THE COURT: And then they read the next sentence, right?

MS. COHEN: It's specifically talking about the threat, so that's -- okay.

MS. BENSING: Right, but statute defines "serious harm" by that -- by that "reasonable person of the same background and in the same circumstances."

THE COURT: Right.

MS. BENSING: I think the Court understands, there's two different things: Means of serious harm and threats of serious harm.

THE COURT: Correct.

MS. BENSING: And this language at the top of page 20 would apply to both, but here it's framed --

THE COURT: Yeah, no, I understand that. And like I said, we're going to get back to that because I would like for you to propose some specific language or show me this has been done before. I think it may -- I don't think I have seen that formulation you're suggesting, but that may be because other cases are focusing on threats of serious harm. It may be whatever theories were advanced in those cases are different than here. That's one of the things about this particular statute, the underlying statute, the substantive statute, that there's many ways to violate it,

therefore some of the cases are just not analogous enough because the parties either didn't ask for certain instructions or certain theories just were not available based on the facts.

But I will hear, if there is specific language that you think could be added in a way that does not make it more complicated that covers "serious harm" as well as "threat of serious harm," but this paragraph really is getting at whether someone can reasonably believe a threat.

(Continued on the following page.)

(Continuing.)

MS. BENSING: I understand.

THE COURT: I don't -- I mean, the Second Circuit case, the Rivera case was in the context of threats.

MS. BENSING: So let me go back and look at it and see if we can --

THE COURT: Okay.

MS. BENSING: Because I think do the statute is broader than that, so I just want to think about --

THE COURT: Yes. But this is dealing with the threat part of it. This isn't trying to -- it flows right from threat of serious harm.

So anyway, you can get back to me on that.

What's next after 20?

MS. BONJEAN: Also on page 20, Your Honor, just to reiterate, the last paragraph --

THE COURT: Can you just move your mic towards you?

MS. BONJEAN: Sorry about that.

Before we go to the third element in the last paragraph, I know the Court rejected this language, but we would just reiterate our desire on the adverse consequences and to include language --

THE COURT: I gave you adverse consequences.

MS. BONJEAN: I know, but I'm being greedy.

THE COURT: Okay. What do you want?

MS. BONJEAN: We're still looking for language about the Court should consider whether such alleged threats were covered by the First Amendment.

THE COURT: Yes. I'm not going to do that.

MS. BONJEAN: I just want to reiterate our request for that language.

THE COURT: Okay. I take it the Government does not want the First Amendment language in here.

MS. BENSING: No, the Government objects to the entirety of that instruction, including with respect to the First Amendment.

THE COURT: Yes.

MS. BENSING: And on that note, the Government would move to preclude reference to the First Amendment in defense summations. I think it would be entirely improper and outside of the province of what the jury has to decide.

THE COURT: Yes. I mean, that would be an instruction on the law, which is not appropriate for the jurors.

MS. BONJEAN: Well, maybe they shouldn't have put in that text message that references the First Amendment. I mean, they put that text message in. I'm not saying I'm going to give the definition on the First Amendment, but if they put a text message in where there's discussion about

the First Amendment, I think it's fair game to discuss the text message. So --

THE COURT: But what would be the discussion of the text message?

MS. BONJEAN: Well, I don't know. I haven't written out --

THE COURT: Yes, because I'm not going to let you instruct the jury or even come close to instructing the jury on the First Amendment.

MS. BONJEAN: Again, they put in the text message that referenced the First Amendment, and I think it does go to -- it's not about the First Amendment, but it does go to intent. They put it in for intent. Talking to their lawyer in the wake of a bad article. I mean, they went there. You know, many times they've gone places --

THE COURT: Remind me, anybody --

MS. BONJEAN: Yes.

THE COURT: -- whose statement it was. I remember the text. I just don't remember who --

MS. BONJEAN: It was a conversation between my client and I believe Joanna Van Vleck in the wake of what appears to be --

THE COURT: Articles.

MS. BONJEAN: -- some changes, maybe it was an article -- I can't remember -- allegations of Ayries Blanck.

I don't remember exactly what. I don't think it's entirely clear what they're referencing, but it is clear that they are seeking legal advice about criticism that they received and what they need to do to clean up their act. As the Court may recall, there was some language about that.

And Joanna -- and again, let's point out that we objected to this being hearsay within hearsay and where the --

THE COURT: Well, you objected that you don't think Joanna Van Vleck was a co-conspirator, right?

MS. BONJEAN: That's true. But also, I objected separately that they're referencing conversations with outside counsel about this subject matter, and she's saying Nancy is saying this, that, and the other. I mean, I don't really -- I don't really know how it could be improper to reference this conversation. Again, I'm not saying --

THE COURT: Well, I don't think that's what the Government would have an issue with. If it's evidence, you could reference the evidence, certainly. But to the extent that your going to be suggesting any particular either definition of what's permissible or not permissible under the First Amendment --

MS. BONJEAN: No.

THE COURT: -- that would really usurp the role of Court.

MS. FARRELL: May we address that --

MS. BONJEAN: I wouldn't be giving any definitions of the First Amendment or whether -- that's not what the intent is.

THE COURT: Okay. Let me hear from Ms. Farrell.

MS. FARRELL: So we are now hearing that this text message apparently references legal advice. From the face of the document, that is not clear.

THE COURT: It was not clear.

MS. FARRELL: It appeared to us that there was some sort of, like, public relations analysis going on, and we specifically flagged this exhibit for the defendants -- not for the defendants, for defense counsel, to make sure that they weren't going to assert privilege over it, because it wasn't clear to us from the context who they were talking to and we wanted to ensure, given the various privilege assertions in this case, that it wasn't inadvertent. They did not in any way suggest to us, in response to our inquiry, that it was privileged. There's no --

THE COURT: I don't hear her saying that it's privileged now.

MS. BONJEAN: I'm not saying it's privileged.

MS. FARRELL: Or that there was discussion with a lawyer --

MS. BONJEAN: OneTaste gave it over. OneTaste

gave it over.

MS. FARRELL: There is no --

MS. BONJEAN: I'm fairly certain I understand the Court's rulings on prior privilege issues, and I'm going to go out on a limb and say that when OneTaste, in response to a grand jury subpoena, handed over a text message, that the Court would find that that was a waiver of the privilege. We didn't assert it. We're not asserting it.

THE COURT: Let me just -- you know, we're in the context of talking about the jury charge.

MS. BONJEAN: Right.

THE COURT: I am not instructing on the First Amendment.

So then the question becomes, what's permissible to be argued in front of the jury.

Do you want to be heard on that, Ms. Farrell?

MS. FARRELL: Yes.

I just don't think there's any evidence in the record that the person about whom they're speaking is a lawyer. I think we want to think about it some more. But we -- I don't --

THE COURT: Well, I don't think she's going to stand up there and add to evidence. Ms. Bonjean is a seasoned lawyer. She knows she's not going to testify.

MS. BONJEAN: I am not going -- I'm not going to

say Nancy is a lawyer. I do think there are reasonable inferences that can be drawn from that text message. And I'm not even saying the reasonable inference is that she's a lawyer. She could be anybody. But she's clearly giving advice. That is --

THE COURT: What do you plan to say? Because I don't want to have to stop you during a closing.

MS. BONJEAN: Well, that is a risk either way, but probably hopefully not. Obviously I understand what the Court's rulings are and I plan to abide by them.

But I don't know how you cannot look at that text message on its face and see that there is advice being given, we're okay here, we think that -- it's clear on its face not that it's necessarily a lawyer, although I would say if someone's giving advice whether something's protected by the First Amendment, it's a good inference that they're talking to a lawyer. But --

THE COURT: Oh, not necessarily. People give advice about all sorts of things outside their realm of expertise, Ms. Bonjean.

MS. BONJEAN: And that's fair, which is why I do not intend to say and they're talking to their lawyer, because I think that there's no evidence that Nancy was their lawyer. I happen to know it was their lawyer, but my client didn't take the stand and say that it was her lawyer.

But I do think that when Ms. Van Vleck and when Ms. Daedone are -- and again, I don't have the text message memorized, but when they're discussing their response to this bad press or these allegations and they're seeking counsel from somebody else or advice from somebody else, that goes to intent. They put it in. I can argue what's a fair inference from that.

THE COURT: I'm not sure that they're objecting to that.

MS. FARRELL: Yeah, we're going to argue about that text also.

THE COURT: Right.

MS. FARRELL: So maybe we can just take this offline.

THE COURT: I think there are arguments to be made with that text, but I am going to be very careful in stopping any party that thinks they're going to instruct the jury as to what is or is not permissible under the First Amendment.

MS. FARRELL: Understood.

THE COURT: Okay. What else do we have? We're on 20. So the Government wants out the adverse inference. It's staying. I'm sorry, adverse consequences.

MS. COHEN: Sorry. Just the sentence before that. In light of the fact that we -- this is: "In making a

determination, one may consider its cumulative effect," which is not in the statute, and the combination language has been added. So we would ask that this --

THE COURT: Well, the combination is the combination of means. This is talking about you don't look at one point in time, you look at cumulative. So it's a different point, and it has been given before. I'm not sure that there's really a legal basis to object to that, but I'll hear you out further if you want. It's making a different point.

MS. COHEN: Yes. I mean, to me this is more argument. The cumulative effect, which is clearly going to be the Government's argument, can be made rather than telling the jury that they can consider the cumulative effect, it seems. I mean, they're going to present all the evidence, they can put all the evidence together and decide whether they met the requirements under the law.

THE COURT: I'll hear from the Government.

MS. BENSING: I think as Your Honor noted, I don't think that this is making any party's argument. It is simply providing explanation of the law, which is the Court's function in delivering jury instructions.

THE COURT: And I don't think that a jury would necessarily know that they could consider the cumulative effect versus looking at each event in isolation. So I

think this is proper.

MS. COHEN: Okay.

THE COURT: What do we have next? Are we going to get off page 20?

MS. BENSING: Yes. I have nothing further on page 20.

MS. COHEN: I don't think we have -- hold on, let me just check my notes.

THE COURT: Let me just confirm, there were no physical objects put into evidence, correct?

MS. COHEN: Correct.

THE COURT: Okay. Because I usually would list that as evidence. But here I don't think there was any.

MS. BENSING: No, I don't believe so, Your Honor.

THE COURT: That might have opened up a whole other world that --

MS. BONJEAN: Well, I did ask for a demonstration.

THE COURT: A demonstration. You did, you did, Ms. Bonjean, you did.

MS. FARRELL: Can we reopen the evidence for that?

MS. BONJEAN: Notably, no one took me up on my offer.

THE COURT: Don't be offended.

Okay. What's the next that we have?

MS. COHEN: Nothing further on behalf of Defendant

Cherwitz.

THE COURT: Ms. Bonjean?

MS. BONJEAN: One second, Your Honor, if I could.

THE COURT: Yes.

Does the Government have anything more?

MS. FARRELL: Yes. On the bottom of 22, I think this is a perennial problem, like when you're done explaining the substantive crime and then you say, but really we're only focused on the conspiracy here. I think the way it was written, at least as I was reading it, after the sort of three the asterisks, where you have: To prove the crime of forced labor, the Government would not need to prove this, but the Government would need to prove this. And then you go -- it suggests --

THE COURT: I know. It is hard when we're talking about, in a case where the substantive is charged, what does the Government have to prove, versus here where conspiracy is charged.

I'm open to a suggestion if you have a suggestion. I think it's very clear from this charge that the jury knows it's only deciding conspiracy, that defendants are not charged with a substantive. But they have to understand the substantive because it is the object of the conspiracy.

MS. BONJEAN: Yes, exactly, that's our point. I think you need to -- you need to have that.

THE COURT: Yes. Is there some --

MS. FARRELL: I have a suggested edit that I think makes it more clear, as you're reading it, what's going on.

THE COURT: Okay.

MS. FARRELL: But feel free to reject it.

But what I would suggest is that you move up the sentence, "I have just explained to you the crime of forced labor," that you actually move it up to the paragraph ahead, so that it says: "I have just explained to you the crime of forced labor. To prove the crime of forced labor," blah, blah, blah, blah, blah. And then after the second set of the asterisks, it would say: "However, the defendants are not charged with committing a crime of forced labor."

THE COURT: That might work.

What do the defendants think about that?

Maybe I can just do: "Again, the defendants are not charged," or, "But again." I think I like that better than "however."

Does that work?

MS. BONJEAN: We're okay with that.

MS. COHEN: Yes, that's fine.

THE COURT: I think that does make it a bit clearer. So I'll move that sentence.

What else?

MS. BONJEAN: I wanted to put on the record that

we did decide we do not need the other charged act.

THE COURT: I thought you would come to that conclusion. Okay.

What's the next?

MS. BENSING: Nothing further from the Government.

THE COURT: Let me just go back, then, to the issues I said I would go back to, which I believe are the meaning of "and" on page 11. I think the Government maybe was going to think about that more, correct?

MS. BENSING: Yes. I mean, I would just be proposing -- I think -- just the Government has some concern that the jury is going to get confused that "and" in the indictment means "and" and not "or." So if there's anything --

THE COURT: Well, "and" in the indictment means "and." But my instruction is telling you that notwithstanding the use of "and," it is "or," right?

MS. BENSING: Yes. Well, I mean --

THE COURT: I mean, you used the words. I mean, I don't know why the "and" is in there, but it is -- forever and ever and ever the Government does that. I fully get it, but --

MS. BENSING: You would have to ask my front office, Your Honor.

THE COURT: And decades past too. I mean, I'm

instructing them on "or."

MS. BENSING: Yes. I guess the instruction that I provided to the Court is from 20-CR-433, *United States vs. Watson*, it's at ECF No. 117-2. So the Government would be requesting that language or some --

THE COURT: It's interesting because I think this language that I'm using is more standard, and I'm wondering why the Government's having an issue with it here.

MS. BENSING: I think --

THE COURT: Within the context of this case, you think somehow this is confusing?

MS. BENSING: No, I think we genuinely just think that the jury might be confused and think that the reference to that means that we have to prove all of that, which is obviously not the case.

MS. BONJEAN: I'm sorry. Can you tell me where you're back to?

THE COURT: Page 11.

MS. FARRELL: Page 11, number 21.

THE COURT: I have one other question too.

On venue, what I have certainly is accurate. I have seen different formulations. I think this really covers everything. Nobody seemed to have an issue with it. I just wanted to flag that.

MS. FARRELL: In EDNY, we always like to include

the airport instruction, so we would ask to add that here.

THE COURT: The actual airport?

MS. FARRELL: Correct.

THE COURT: No. I did think it was worth explaining to people that Kings County is Brooklyn.

MS. FARRELL: Yes.

THE COURT: So I'm not sure that that's obvious to everybody who doesn't reside or work in Brooklyn.

Okay. We're back on page 11.

MS. FARRELL: Are people going to be confused by the word "coextensive," I wonder.

THE COURT: I do not know.

MS. FARRELL: Brooklyn is in Kings County --

THE COURT: It's not in. It's coexisting. I think that's accurate, but if anyone has any issue with that, I suppose they can come back with a note asking what "coextensive" means.

MS. BENSING: Yes. There seem to be some smart jurors who will know what "coextensive" means.

THE COURT: I'm not inclined to charge the "and" in the indictment part, but I will take a look at that and see if there's any language you want to give.

Does the defense find this confusing at all?

MS. COHEN: No, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: No, Your Honor.

THE COURT: And then the other issue that we're going to go back to, and I think this is one that Ms. Bensing wanted to think about, was really on page 20.

I am inclined to add the rest of the statutory language on page 19 for "serious harm." I think it was really Ms. Bonjean -- sorry, Ms. Bensing was going to give more thought to the top paragraph on page 20, and if there's something you wanted to submit, you can do that.

MS. BONJEAN: And Your Honor, I think our position is if the Court does the full definition of "serious harm," which includes "under all the surrounding circumstances to compel a reasonable person of the same background and the same circumstances" that changing "threat of serious harm" would be unnecessary because it's --

THE COURT: Sorry. Do you mean the paragraph immediately below or the paragraph on the next page?

MS. BONJEAN: No, the paragraph on the next page. I think that -- the paragraph on the next page I think is sufficient, particularly since in the definition of "serious harm," it's the same type of language.

THE COURT: I think what it doesn't have, though, is sort of how you figure out what the reasonable person looks like, essentially, right? The considering education, training, et cetera.

Anyway, why I don't I leave it to the parties maybe to talk or to Ms. Bensing to propose some language, but I think that point is different from just definitional and it needs to be made.

This is the way that this is done. I have not seen what Ms. Bensing is suggesting, but that could just be that no case has teed it up that way.

MS. BONJEAN: Yes, because then the language has to be something along the lines of whether the defendant caused serious harm --

THE COURT: Used, it's really used harm, right? I think it is -- it may inject some confusion, but I will hear the parties out more on that.

MS. COHEN: That, and I just said that to Mr. Robotti, that it doesn't make sense because then it's you believed.

MS. BONJEAN: And I think it does then become not only confusing, but arguably contradictory -- like I think that's in a perilous territory to be using that verb that is not actually used in the statute.

THE COURT: Okay.

MS. BONJEAN: That's my concern.

THE COURT: Okay. Maybe you can think about that a bit more because I think there's a reason why this doesn't -- why this gets given this way.

But I think maybe adding the statutory language earlier would go a long way.

MS. FARRELL: But isn't it like the eggshell skull concept, which is whether you're causing serious harm to somebody or threatening is really dependent on that person's --

THE COURT: The problem is I think we're talking there about -- it would be the using of harm, right? It's because we're talking about the means, which is different here because we've defined the threat, which is the means, and now we're explaining how you know the threat is reasonable, right?

MS. BENSING: But I think that's where there's maybe just a disconnect, because that language about a reasonable person of the same background and in the same circumstances is applicable to serious harm more generally.

THE COURT: Yes.

MS. BENSING: I know you understand.

THE COURT: I do understand. I'm just not seeing the exact language. But you can propose that. And I don't know that you have proposed it already, right? This was not in -- was it in --

MS. BENSING: I mean, our language was just so different from what the Court is using that I think in our heads we had included that, but it's just different than

what the Court proposed. So I just am trying to --

THE COURT: I mean I think there was much more narrative going on and there were lots of concepts, but it wasn't really tracking, so here are the terms that need to be defined for the jury, here is the task that they have to do to figure out if something could be reasonably believed.

So I'm trying to do this very methodically and very accurately for the jury and not sort of tell the story. I'm telling them the elements of the crime.

So within this framework, if you want to propose a fix for the issue that you're raising, I can consider that.

MS. BONJEAN: Yeah, I think it would be useful to look at other jury instructions as well.

THE COURT: I've done this task, you know, and I'm sure you all have as well, and I'm not seeing that. But I take your point.

MS. FARRELL: I'm sorry, I heard, like, caused and then used. Is that coming from somewhere?

MS. BONJEAN: No, that's my point, it's not coming from somewhere.

THE COURT: When I was looking at the statute, the defendant did so through one of the following prohibited means. So if we're talking about serious harm, we're talking about a means.

MS. FARRELL: Got it.

THE COURT: That's what I'm getting at.

MS. FARRELL: Understood.

THE COURT: And when we're talking about a threat, we're talking about as understood by whom, right? We're talking about the believability of a threat in this paragraph.

MS. FARRELL: Right.

THE COURT: Which doesn't translate exactly to -- it's not believability of serious harm, right? So I think you have to play it out that way.

MS. FARRELL: Okay.

THE COURT: So if there's language you want to propose. But I do think I will add the rest of the statutory language under the term "serious harm." I don't think anyone has an issue with that.

Okay. I think -- oh, yes, there was one other issue.

I have throughout used the "provides" or "obtains" language of the statute, of the indictment. I think it is appropriate here on the facts.

The parties did not, or at least not consistently in their proposals, use that. So again, I went back to the statute, I went back to the indictment, I went to the standard charges. And so I think the "provides" or "obtains" is accurate, but it's not something the parties

have really focused on.

MS. BONJEAN: You're talking about the services?

THE COURT: Well, it's the defendant knowingly providing or obtaining, right? Because you could not be the one getting the services, you could be the one, you know, providing somebody services.

MS. BONJEAN: I understand.

THE COURT: So I have it in there. I don't think the parties had -- sometimes you had the ellipses and it was not entirely consistent throughout the various charges. So I think this is appropriate here on the facts of this case, but if you don't think it is, you can let me know that.

MS. BENSING: We agree, Your Honor.

THE COURT: Okay. Is there any issue that I said we would come back to that we haven't come back to? Anything? Any additional charge anyone's asking for that we haven't already addressed?

MS. BONJEAN: I think just, again, this is more for the record's sake, I don't know what additional argument is necessary. I think we did propose a more elaborate First Amendment argument --

THE COURT: You mean more elaborate than the nothing that I'm putting in about the First Amendment?

MS. BONJEAN: Yeah.

THE COURT: You did, in fact.

MS. BONJEAN: I think we did in our joint instruction, and I think Ms. Cherwitz's counsel did supplemental.

THE COURT: Yes, you did.

MS. BONJEAN: Just to reiterate our standing on that request, but I don't need to argue it further.

THE COURT: The other issue I do think I want to raise with you is on page 11, the dates approximate. I did it slightly differently because I thought it was a bit clearer, this phrasing. It sounds like nobody has an issue with it. Of course the jury is told in no uncertain terms that they can't convict based solely on pre-June 2009. So I think this is fine. I just wanted to raise it. It's not exactly what you'd proposed, but I found what you proposed to be a little cumbersome.

MS. BENSING: We noticed and understood, Your Honor.

THE COURT: Okay.

And then the last thing is just the verdict form. I don't know if you've even looked at it, but it's very straightforward, frankly. I'm doing it obviously for the two defendants, I'm doing it in the order of the indictment, order of the caption, that's the only reason for the order.

Anyone want to be heard on that?

MS. BENSING: No, Your Honor.

MS. COHEN: No, Your Honor. It's straightforward.

THE COURT: Ms. Bonjean?

MS. BONJEAN: No, Your Honor.

THE COURT: Okay. So it's 1:00 now. If there's any language you're going to be proposing, if you could do that in the next few hours. Obviously I'm not giving the charge tomorrow, but I do want to make sure that you all know what the charge will look like. There's not extensive changes except for a couple of these issues that you want to think more about.

MS. BONJEAN: We'll send that over at midnight.

THE COURT: Yes, to Mr. D'Agostino, please.

MS. COHEN: As long as it's not under threat of serious harm.

THE COURT: Well...

Okay. One more moment. My clerk will let me know if I've forgotten anything.

(Pause in proceedings.)

THE COURT: Why don't we meet tomorrow about 9:00, maybe a few minutes after, just to resolve any of these issues if they are still outstanding, just because I really do want you to know going into closing, you know, where we landed on. It's really only on this one issue, I think, that is one that's, you know, a little bit more substantive than some of the others.

MS. BONJEAN: And just housekeeping issues.

THE COURT: Yes.

MS. BONJEAN: Will there be an overflow room, do you know, Your Honor?

THE COURT: No, I don't think so. We've always had capacity to fit a lot more people than have been fitting in here. People can sit closer to each other.

MS. BONJEAN: That's fine. I just wanted to know.

And I think the Court said, were there time limitations?

THE COURT: No, I said I was not going to give you limitations on time, but could you just give me your estimate? Ms. Bensing wants a limit? No?

MS. BENSING: I'm just looking at Ms. Bonjean because we were joking about it earlier.

I think the Government's summation will be approximately three, maybe a little bit over three hours, Your Honor.

THE COURT: Okay.

And then who do you think will do the first defense closing?

You, okay, Ms. Cohen?

MS. COHEN: Yes. And I think about three.

THE COURT: And Ms. Bonjean?

MS. BONJEAN: Well, I wouldn't be as long as that,

but I think, you know, not less than two.

THE COURT: Okay. So --

MS. BONJEAN: And I really do not want to split it up if the Court --

THE COURT: I don't think we have any choice but to split it up if you're telling me there's going to be eight hours of argument.

MS. BONJEAN: No, but I'm saying, like, I don't want to start it and have to pick it up on a --

THE COURT: Oh, you don't want to split your own.

MS. BONJEAN: My own.

MS. BENSING: And Your Honor, just for the Government's estimate, that was the opening summation.

THE COURT: No, I know.

MS. BENSING: There would be a rebuttal.

THE COURT: So you don't know what the rebuttal length will be until you hear the defense closings.

MS. BENSING: Correct.

THE COURT: Let's think about the timing on this. We've got all day tomorrow, certainly, and then we've got -- I think we should probably have the jury come in at 1:00 on Thursday, so we would have some number of hours.

I would prefer not to charge them on a different day than they've heard any summation, but if that has to happen, that has to happen. But I think we can probably

wrap the closings up and jury charge and get them the case by Thursday, late afternoon, I would think, or maybe -- we'll see.

MS. BENSING: I guess that just depends. I mean, the Government would not have an objection if the Government does its opening summation, Ms. Cohen does hers, and then we start up with Ms. Bonjean on Thursday.

THE COURT: Let me just see where we end up.

MS. BENSING: Sure.

THE COURT: Because this jury -- they're a perfectly agreeable jury and it doesn't seem like they're problematic in terms of schedule, but I do want to get the most out of a day with them. So we can do that.

MS. BENSING: Sure.

THE COURT: Are you comfortable revealing who is giving your opening summation?

MS. BENSING: Yes. Ms. Gupta will be, and I'll be delivering the rebuttal.

THE COURT: Anything else we need to take up?

MS. BONJEAN: I don't think so.

MS. COHEN: No, Your Honor.

MS. FARRELL: I do just want -- sorry, to go back to the overflow issue.

Am I right that there were defendants' family members that were not able to come in? I think that's just

the issue the Government wants to make sure.

THE COURT: But we've never had that packed courtroom.

MS. COHEN: It was because Judge Marutollo was still here and we thought the opening -- the openings were that day. Remember we had jury selection in the morning, and so my husband and son were turned away.

THE COURT: That couldn't have been because -- I don't know what happened there, but it wasn't packed.

MS. BONJEAN: Oh, they could have fit more people in, but --

MS. COHEN: But the guys outside --

THE COURT: I am not anticipating --

MS. COHEN: I said to tell them who I am.

MS. BONJEAN: And it didn't matter.

MS. COHEN: It didn't work.

MS. FARRELL: We just want to avoid any issues on that front.

THE COURT: I mean, the defendants' family members certainly can be here, but I don't think we're going to have an issue. We really have not had standing room only.

MS. BONJEAN: I do have four kids, so they'll take up some space.

THE COURT: Well, I think we'll be just fine.

MS. BONJEAN: Okay.

THE COURT: I mean, people will have to sit closer than they've been sitting to each other and make a friend.

Okay. So tomorrow at 9:00, and please get me anything you want me to consider by way of exact language.

MS. BENSING: And would it be possible to get a copy of the revised charge tonight? Just when the Government is referencing the elements of the crime, we obviously want to make sure that we're doing it -- I know the Court won't have that one little piece.

THE COURT: Well, there's not much I'm going to be revising other than -- I mean, you didn't give me a lot.

MS. BENSING: I think it's just the definition of serious harm. I just want to make sure we're tracking it exactly.

THE COURT: Well, I think it's going to be the statutory definition of serious harm.

MS. BENSING: Great.

THE COURT: I'm not going to give you another draft until I'm ready to have a final.

MS. BENSING: Okay, great.

THE COURT: So I'll see everyone at 9:00 tomorrow.

(Trial is adjourned until on Wednesday, June 4, 2025, at 9:00 a.m.)