UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
June 4, 2025
Defendants. : 9:00 a.m.
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Jamie Ann Stanton
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

(In court; jury not present.)

THE COURTROOM DEPUTY: Honorable Diane Gujarati is presiding.

*United State of America v. Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell AND Nina Gupta for the Government. We will shortly be joined by AUSA Sean Fern, Paralegal Specialists Liam McNett and Marlane Bosler, and FBI Special Agent Tricia Quintero.

Good morning.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

Good morning, Your Honor. Celia Cohen, Michael Robotti, Kelly Lin -- Schuyler La Barge ran out, but she is also here -- Kelly Lenahan-Pfahlert and Richard Hobbs, all on behalf of Rachel Cherwitz.

THE COURT: Good morning, everyone.

MS. BONJEAN: Good morning, Your Honor. Jennifer Bonjean, Ashley Cohen, Kelsey Killion, Galila Assefa, and Soph Moazed, all on behalf of Ms. Daedone.

THE COURT: Good morning, everyone. Everyone may be seated.

I think we are still waiting for the jury to come,

but I wanted to take up the issues relating to the jury charge.

I received and reviewed the parties' filings from yesterday, which are document ECF 402 and ECF 403. 402 is the Government's request, and 403 is the defendants' response to that.

I'm just going to go through what changes I am going to be making to the draft that you all had yesterday. The draft was the June 3rd draft.

So, of course, I'm taking out the section about defendants' testimony, of course. That comes out.

Let me just read to you the paragraph about the defendants' right not to testify, because I had some brackets in there, depending on whether one or the other did or did not testify. So let me just read you how the second paragraph of that instruction will read.

"No inference of any kind may be drawn from the fact that the defendants did not testify. Indeed, it was each defendant's constitutional right not to take the witness stand. I instruct you that you must not allow this fact in any way to prejudice the defendants, and you must not consider it as an indication, admission, evidence, or inference of guilt. Simply put, the fact that the defendants did not testify must never enter into your deliberations or discussion."

Okay? Everyone okay with that?

MS. BENSING: Yes, Your Honor.

MS. COHEN: Yes, we're fine with that. Thank you, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, Your Honor.

THE COURT: And, of course, there's no instruction on testimony of defendants.

Let me read to you the limiting instruction, because the defense had asked for some language there.

The limiting instruction will now read as follows: "Certain statements were admitted for a limited purpose only. When those statements were admitted, I instructed you that they were being admitted not for the truth of the statements, but for the purpose of providing context for other statements, and I instructed you that you may consider the statements that were being admitted for context only for that purpose. I remind you now that you must follow the limiting instructions that I gave you. You may not consider evidence admitted for a limited purpose or any purpose other than the purpose for which it was admitted."

MS. BENSING: Sounds great, Your Honor.

MS. COHEN: That's fine with us, Your Honor.

MS. BONJEAN: That's good, Your Honor. Thank you.

THE COURT: Okay.

The next change I'm making is on the section where I set out the elements of 1589(a). And this was to accommodate the request that I refer to combination of means. So let me just get you the page number it was on yesterday.

MS. BENSING: I believe page 18, Your Honor.

THE COURT: Okay.

So now that second, where it's underline "Second" will say: "Second, that the defendant did so through one of, or any combination of, the following prohibited means."

Is that okay with the Government?

MS. BENSING: Yes, Your Honor.

THE COURT: With Counsel for Ms. Cherwitz?

MS. COHEN: Yes, that's fine, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, Your Honor.

THE COURT: Similarly, that change is going to be made on the top of page 19. So again, it will say: "The Government would have to prove that a defendant provided or obtained the labor or services of a person through one of, or any combination of, the prohibited means I reference."

Is that okay?

MS. BENSING: Yes, Your Honor. Thank you.

MS. COHEN: Yes, Your Honor.

MS. BONJEAN: Yes, Your Honor.

THE COURT: The paragraph that reads the term "serious harm." This is the entirety of what I am going to say there: "The term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm that is sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances as the alleged victim to perform or to continue performing labor or services in order to avoid incurring that harm.

And that will be consistent with the statutory language and with the language below about threat of serious harm that I had already.

That's the only change I am making. I am not going to add the language that the Government is asking for.

Okay. Then the next change that I am making is on page 22. And that is just really to move up below the dinkus, which is the three little asterisks, the sentence that says, it will start: "I have just explained to you the crime of forced labor." Then below the second dinkus, it will say: "But, again, the defendants are not charged with," et cetera.

Is everybody okay with that?

MS. BENSING: Yes, Your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: Yes, Your Honor.

THE COURT: Okay.

Ms. Bonjean?

MS. BONJEAN: Yes, Your Honor.

THE COURT: And I think I may have reached the end of my list. One moment.

Okay, those are the changes that I plan to make. I am not going to make the change the Government wanted. So I think we are set to start closing; is that correct?

MS. BONJEAN: Yes, Your Honor.

Would it be possible, and it doesn't have to be right this second, that we can get either an electronic copy of the final version or another paper copy?

THE COURT: I can get you a paper copy for sure. I just wanted to make sure that I told you what the changes would be.

MS. BONJEAN: Yes.

THE COURT: You will certainly have it -- when I read it, you will be sitting there reading it, of course, too, or pretending that you are reading it at that time.

MS. BONJEAN: Yes. I want to make sure that if we argue, I get it right. And I did make notes, but the instructions did change a little bit.

THE COURT: Very slightly, but okay.

MS. BONJEAN: Yes.

THE COURT: Let me ask you about -- it's going to

be Ms. Gupta.

MS. GUPTA: Yes.

THE COURT: And your colleagues said yesterday that the estimate is about three hours?

MS. GUPTA: I think it's slightly longer than that, actually. It might be about four hours, is my best estimate.

THE COURT: Okay, four hours is more than slightly longer than three.

But my question to you is, we're not going straight four hours, they're going to have to take breaks. I can tell you when I was a litigant, the one time the judge interrupted me during a closing statement, it almost gave me a heart attack. And for the record, it was to tell me that I was killing the court reporter because I was talking too quickly, which I'm sure our court reporters here will say I've not gotten better in the last couple of decades.

But I don't want to scare you by interrupting you. I don't want to interrupt you at a bad moment. So, you know, maybe an hour-and-a-half in or so we should take a morning break. But I'll leave it to you maybe to tell me when is convenient, and if for some reason we are going longer and you haven't done that, I might interrupt you. But I can't imagine I will be interrupting you for another reason, but I will interrupt you if we need to take a break.

MS. GUPTA: Thank you.

THE COURT: We will take the regular lunch break, and whenever you finish up, Ms. Cohen will proceed.

Give me one moment. There is some technical work being done in the courtroom I think on the wires to make sure everyone can hear you all while you are doing your closings.

MS. BONJEAN: One other thing, Your Honor.

THE COURT: Yes.

MS. BONJEAN: And again, I know the Court ruled on this yesterday and it's probably logistically -- I don't know. There is like a line, literally, around the bend. I don't know if --

THE COURT: Give me one moment on that.

MS. BONJEAN: Yes.

THE COURT: I am told that because there are so many people, there is an overflow being set up. I guess everybody invited everybody today, which is fine, it's a public courtroom. But we have typically had enough room in this courtroom.

MS. BONJEAN: I understand.

THE COURT: But that's fine. There is one being set up.

MS. BONJEAN: That's great.

THE COURT: And we're not starting for a little

bit anyway. We have to wait for the jury.

If there's nothing else we need to take up now. I will give you all a few minutes.

Ms. Bensing?

MS. BENSING: No, no, nothing. Thank you.

THE COURT: Anything we need to take up before the jury comes out?

MS. COHEN: No, Your Honor.

MS. BONJEAN: No. Thank you.

THE COURT: So when the jury's here, we'll let you know and we'll resume.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

The Honorable Diane Gujarati is presiding. Please be seated.

*United State of America v. Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes. Do you want us to state your appearances again?

THE COURT: I think state it again. It would be helpful. Thank you.

MS. BENSING: Of course.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern for the Government. We're joined by Paralegal

Specialists Liam McNett and Marlane Bosler.

Good morning.

THE COURT: Good morning.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge, Kelly Lenahan-Pfahlert and Richard Hobbs, all on behalf of Rachel Cherwitz.

Good morning.

THE COURT: Good morning.

MS. BONJEAN: Good morning, Your Honor.

Jennifer Bonjean, Ashley Cohen, Kelsey Killion, Galila Assefa, and Soph Moazed, on behalf of Ms. Daedone.

THE COURT: Good morning, everyone.

Okay. The jury is all here. We will bring the jury out, and Ms. Gupta will proceed to her closing argument.

Ms. Gupta, I take it you are going to want the lights on even though we are using that; is that correct?

MS. GUPTA: Yes. Thank you.

THE COURT: Okay.

(Jury enters.)

THE COURT: Everyone may be seated.

Good morning to the members of the jury. Thank you for all being here on time today.

The parties have each rested, as you know.

Therefore, we are now going to be moving to the phase of the trial that I mentioned to you back when we started this trial, which is the closing arguments of the parties. Just in terms of schedule, we are going to still have our usual schedule of a morning break and lunch and an afternoon break.

But right now, Ms. Gupta, do you have a closing argument to present?

MS. GUPTA: Yes, Your Honor. Thank you.

THE COURT: You may proceed.

MS. GUPTA: Good morning, members of the jury.

THE COURT: I think you need the microphone on.

MS. GUPTA: Yes, thank you.

Good morning.

The defendants, Nicole Daedone and Rachel Cherwitz, promised enlightenment, community, and sexual wellness to those who joined OneTaste. They promised they could liberate people and improve their lives. And the defendants created an environment where OneTaste was not just a company. It was an entire way of life, complete with its own rituals, language, and philosophy, over which Nicole Daedone held herself out as a guru and boss, and Rachel Cherwitz served as her top deputy.

But as you've heard throughout this trial, although OneTaste claimed to promote female liberation, it

was, in fact, a company that was based on sexual coercion of certain female workers. And this was not an accident; this was entirely by design.

The business's initial financing, as you heard was, obtained by providing a string of sexual servants to its main investor, Reese Jones. This sexual servitude was directed by defendant Daedone, with Rachel Cherwitz's assistance. And when Jones ran out of money, Daedone, Cherwitz, and other OneTaste leaders directed OneTaste employees to sexually service other clients for sales, and targeted wealthy OneTaste students and community members for their money, and targeted vulnerable OneTaste students and employees for free labor.

Now, there is only one crime that you are here to consider today: Conspiracy to commit forced labor. And the judge will instruct you on the law soon, and, of course, her instructions will govern. But what this crime means is that the only question before you today is whether each defendant entered into a conspiracy to force others to perform labor or services by various means of serious harm.

And the answer to that is obviously yes, based on the evidence that you have seen and heard throughout this trial.

You saw that the defendants conspired to coerce people to do their bidding and grow the company by employing

a variety of financial, emotional, sexual, and psychological abuse tactics. And you know that the defendants did this because you heard the same version of the same story over and over and over again over the span of more than a decade, from women who didn't typically overlap or even know each other. You heard this from Becky, Christina, Dana, Max, Lianna, Michelle, Lyndsi and Anthia. Nine women.

You heard that the defendants indoctrinated the victims to believe that Nicole Daedone was a guru and that her teachings were the path to enlightenment and spiritual growth. You heard that the defendants manipulated the victims to obtain their labor for little or no paycheck check.

They publicly shamed victims. They disrupted victims' personal relationships and isolated them from their friends and family. They psychologically abused and intimidated victims.

And you heard they sexually abused victims by directing them to raise money for OneTaste by engaging in a variety of sexual acts with prospective clients, other students, and the company's most significant investor, Reese Jones.

And you heard that they financially harmed victims by driving them into debt and not paying them for their labor.

For years, the defendants' victims worked around the clock for OneTaste, fearful that if they stopped, they would lose everything that mattered to them. And meanwhile, OneTaste thrived. Nicole Daedone made $12 million off the sale of OneTaste in 2017. And Rachel Cherwitz got what she wanted out of the arrangement, too: Power, prestige, and respect by being Daedone's second in command.

So this morning, members of the jury, I'm going to summarize the evidence for you. I know it's been a long trial. And I'm going to explain how it demonstrates that the defendant are guilty of the charged crime.

Please note that while you can ask for transcripts of witness testimony and exhibits, these slides that you will see on the screens in front of you and what I say are not evidence. So if you see a particular exhibit or a transcript that you might want to review more closely, please take notes. The exhibit numbers and transcript pages will be on the slides, and I will do my best to read them out to you.

So first I am going to briefly summarize the charge against each of the defendants. Second, I will walk you through the evidence you heard during this trial. And third, I'm going to explain how the evidence shows that the defendants are guilty of the charged crime beyond a reasonable doubt.

So the defendants are each charged with one count of conspiracy to commit forced labor, and I expect that you'll hear from the judge that a conspiracy is just an agreement. There are two elements to this crime: First, that two or more persons entered into an unlawful agreement to commit forced labor, and that the defendants acted knowingly and intentionally when they became a member of the conspiracy.

Now, to understand the conspiracy, you need to know about the crime of forced labor. But for this charge, you do not need to find that the defendant actually forced anyone to perform labor. It is the agreement itself that is the crime.

So I will briefly explain the crime of forced labor.

There are two ways to prove this crime. For the first method, first, the defendants obtained the labor or services of OneTaste participants by using any one of or any combination of serious harm, threats of serious harm, or any scheme, plan, or pattern intended to cause that person to believe that if she did not perform, she would suffer serious harm. And that the defendants acted knowingly.

Now, there's another method of proving this crime and that's that the defendants knowingly benefitted financially or by receiving anything of value from

participation in the venture.

Second, the venture was engaged in obtaining labor or services by using any one of, or any combination of: Serious harm, threats of serious harm, or, again, any scheme, plan, or pattern intended to cause that person to believe that if she did not perform the labor and services, she would suffer serious harm.

And for the second method, the defendant knew or recklessly disregarded that the venture was engaged in obtaining labor by any of these prohibited means.

Now, for both of these methods, it's important to note that serious harm can be any harm. It can be physical, it can be nonphysical. And it includes psychological harm, financial harm, and reputational harm. And we submit that it also includes sexual harm.

Now, the only difference in these two ways to prove forced labor is that the second way that we just went over, the Government may prove that the defendants engaged in their conduct as part of a venture, which is simply an association of two or more people, and that they received something of value from participating in that venture.

And here, quite simply, that venture is OneTaste.

Now, I want to be very clear. We don't have to prove that the defendants committed forced labor under either of these methods. Again, this is a conspiracy case.

We just have to prove that they conspired to commit forced labor. And the totality of the evidence that you've heard throughout this trial, including the nine women that you heard from, over the course of years, has proven to you that they absolutely did.

Now that you've had a briefly preview of the law, I'm going to walk you through the trial evidence.

So let's start with this timeline.

Now, this is a timeline of the nine victims you heard from who worked at OneTaste during the conspiracy. And this conspiracy lasted between 2006 and May 2018, which is when Rachel Cherwitz left OneTaste. And the evidence will show to you that while the company changed throughout this time, the defendants' tactics of coercion remained the same. The defendants coerced these nine victims to provide labor and services for this 12-year period.

But let's start at the beginning.

Now, as you heard during this trial, Nicole Daedone cofounded OneTaste in 2004 with Robert Kandell, her co-founder who you heard testimony from, and she served as the leader and the CEO. And you heard from Robert Kandell that OneTaste had its origins in two other communal sex and teaching organizations, The Welcomed Consensus and More University.

And Robert Kandell testified that he met Nicole

Daedone in the late 1990s at The Welcomed Consensus. And he described The Welcomed Consensus to you. He said it was an organization whose members engaged in something called deliberate orgasm, which he described as a partnered practice of stroking a woman's genitals for a set period of time. And as you've heard, Nicole Daedone later put her own spin on deliberate orgasm and re-branded it as orgasmic meditation.

Now, Kandell testified that The Welcomed Consensus used tactics of pressure including physical violence and whip-holds. Kandell and Daedone later used similar concepts at OneTaste. Kandell testified that after some time, both he and Nicole Daedone left The Welcomed Consensus and they joined Moore University, or what he described as the purple people.

Nicole Daedone went on to move to Hawaii where she spent time with Victor Baranco, who is the head of More University, and that's at transcript 3245.

At that time, Daedone expressed to Kandell that she wanted to be the leader of More University. She wanted to take Victor Baranco's spot. And Kandell and Daedone moved to Hawaii to start the process of learning how to take over More University. But Victor Baranco's followers did not want to follow Daedone and ultimately her goal of taking over More University failed.

So members of the jury, why is this important? Because it showed you that Nicole Daedone wanted to be a leader, she wanted to take over. And when they didn't accept her as their leader, she and Kandell started their own organization that used many of the same practices, including communal living, genital massaging, and, as you saw throughout this trial, pressure tactics.

So Nicole Daedone and Robert Kandell ultimately started what later became OneTaste and, as you heard, Daedone tweaked deliberate orgasm and rebranded it as orgasmic meditation, or OM. And OneTaste offered a hodgepodge of classes and services that revolved around OMing: The ritualistic massaging or stroking of a woman's genitals for 15 minutes.

And you saw in this slide from OneTaste teaching materials, Government Exhibit 4636, what an OM looks like.

Now, in May 2004, Robert Kandell signed Articles of Incorporation for Caravan Incorporated, which was later renamed Caravan Retreats. Kandell invested $350,000 in Caravan Retreats while Daedone invested no cash, but they each owned 50 percent of Caravan Retreats.

So why does this matter?

Because you heard throughout this trial that Caravan was often the OneTaste corporate entity that paid victims and that victims paid their rent to.

This is the beginning of OneTaste.

Rachel Cherwitz joined Nicole Daedone and Robert Kandell in January 2007 and she quickly became head of the New York office which began in the summer of 2007. And from there, she rapidly rose in the organization and she became OneTaste Head of Sales.

So Robert Kandell testified that when Rachel Cherwitz joined OneTaste, Nicole and Rachel quickly took to each other. He said they're very similar. And Rachel was looking for a teacher and Nicole was looking for a top student. And Rachel did, in fact, become Nicole Daedone's top student and prodigy. You heard from witness after witness that this close relationship lasted throughout the conspiracy.

Now, OneTaste initially began in a communal warehouse in San Francisco and you heard testimony from Chris Hubbard, Chris Kosley, Rob Kandell and Christina Berkley about these years which they referred to as the Warehouse days of OneTaste.

In the Warehouse, people slept side by side in an open space, pictured here in Government Exhibit 4707 and Defense Exhibit 4-F. Residents shared their beds with at least one other person called their research partners which were frequently assigned by Nicole Daedone. Research partners typically involved sexual activity. And you could

see here, in Government Exhibit 672, the bed assignments in June 2009. This chart includes Kandell, Rachel Cherwitz, who at that time went by Raheli, Yia Vang, Justine Dawson, Christina Berkley, and Chris Kosley.

And you saw this picture, Government Exhibit 4671, of the early community during this time. And at that time, you heard testimony that Nicole Daedone selected residents of the Warehouse and they were voted in by members of the community.

So this is all important because even very early on in OneTaste, you heard how Daedone was in charge. She picked research partners. She controlled who was in and out of the community. And many of these early community members, which included Kandell, Rachel Cherwitz, Yia Vang, those individuals rose in the ranks of the company and became co-conspirators in the forced labor scheme.

And you heard Chris Hubbard testify that even in these early years, Nicole Daedone was already the leader of OneTaste. This is transcript cite 810.

And you heard from Christina Berkley, transcript cite 1022. Even Rob Kandell, who was the co-founder of OneTaste, in these early years was already reporting to Nicole Daedone.

And as you heard Robert Kandell testify about this chart here in Government Exhibit 824, Nicole Daedone was the

vision for OneTaste and the CEO while Kandell ran the strategy of the organization.

Mr. Hubbard testified at 818 of the transcript that in these early days, Nicole Daedone referred to OneTaste as a sex cult.

So why does this matter? Because later, you saw that Daedone tried to put a professional gloss on OneTaste as a real company. But back in the Warehouse days, she openly called it a sex cult which was consistent with its origins in mimicking other communities. And you heard that it was centered around psychological tactics, ritualized activity and communal living.

Now, during the Warehouse days, as you heard from multiple witnesses, including Robert Kandell, here, OneTaste's financial state at this point was challenged and Kandell testified that he continued to put his own money into the company to keep it solvent. They were also funded by Reese Jones. In the summer of 2006, Nicole Daedone met a wealthy tech entrepreneur, Reese Jones, pictured here in Government Exhibit 284.

And members of the jury, this is really the start of the conspiracy. And this phase of the conspiracy lasted for several years. Daedone, with Kandell's assistance, targeted Reese Jones for his money and business acumen. Daedone and Kandell worked together by keeping Reese Jones

happy by orchestrating elaborate sexual scenes for him and also by assigning a string of young women to be his unpaid servant in every respect. These women lived with him, they cooked for him, and they gave him daily hand jobs while using text toys on him. Not long after the scheme was hatched, as you can see, Rachel Cherwitz joined OneTaste in 2007 and she was responsible for making sure that Nicole Daedone was able to start paying Reese Jones back for the money that he was providing to OneTaste.

And you know all of this to be true because you heard and saw ample evidence from many different sources, including from witnesses and text messages, proving this.

You heard from Chris Hubbard that when Nicole Daedone met Reese Jones, she wanted to seduce him. And when asked about the purpose of seducing Reese Jones, Chris Hubbard said he was very affluent and he was going to be the one to bankroll OneTaste. That's at transcript 146. And that's exactly what happened. Daedone used every trick in her book to get and keep Jones interested in her and her struggling company, OneTaste.

You saw Government Exhibit 2430-R, and I know there's small print here, but you might recall Mr. Hubbard wrote seductive e-mails for Jones on Nicole Daedone's behalf, taking on characters of Martin Follet and Madame Jeu to interest and excite Mr. Jones.

Now, of course, these are silly e-mails, but they're important because they illustrate the bizarre lengths that Nicole Daedone went to get Reese Jones's attention and her instincts to manipulate people.

And to be clear, Reese Jones is no hero, but the evidence certainly demonstrated that Daedone set out to use him for his money and get him to do her bidding. And these e-mails set the stage for the dramatic lengths that Daedone and others at OneTaste went to to keep Reese Jones happy, including manipulating a trail of young women to serve as his sexual servants.

You saw this in his discussion of scenes. You saw that Nicole Daedone staged elaborate sexual scenes to hold Reese Jones's interest. Both Chris Hubbard and Rob Kandell testified about these scenes and Rob Kandell testified that Nicole, herself, created the scenes and others in OneTaste participated in them.

So, again, why is this relevant? Again, it shows the lengths that Nicole Daedone and her co-conspirators were going to to keep Reese Jones' interest and to illustrate his importance to the company.

As she set out to do, around July 2006, Nicole Daedone began a romantic relationship with Reese Jones and he began providing both money and business consulting to OneTaste. And this was the entire financing strategy in

OneTaste at this time, was simply to get money from Reese Jones.

You heard this testimony from Robert Kandell. He said that to keep Reese Jones interested and engaged in giving money, he was catered to, he was taken care of. He got a lot of attention from people. He was a VIP. This is at transcript cite 3311. This was all so that he would remain engaged in OneTaste and continue providing money.

To be clear, this was not an accident. This was not happenstance. This was a careful plot among Daedone, Cherwitz, Kandell and other OneTaste leaders to keep OneTaste primary and at that time only investor happy and to keep the money flowing by coercing lower level OneTaste members into sexually servicing him.

Now, we're going to get into the details of the sexual servicing in a moment, but you know from all the evidence throughout this trial that the seduction worked. And this particular point really seems undisputed. And beginning in 2007, Reese Jones loaned just under a million dollars to fund OneTaste. You saw, for example, that Chris Kosley, who served as a videographer for OneTaste, would invoice Reese Jones directly to the tune of thousands of dollars for video equipment. This is in Government Exhibit 786 and 790.

And Kandell testified that Reese Jones invested

equipment, cash, expert opinion and advice, time, introductions, and housing. He said he was just a general supporter of the entire ecosystem.

And he said that between 2007 and 2011 alone, Reese Jones invested close to $800,000 in cash alone, in addition to the equipment and everything else that you've heard about.

And it's important to note that during this time period, OneTaste was in the red. It wasn't making a profit. So Reese Jones' cash investments were really crucial to the success of OneTaste. And his wealth also provided Nicole Daedone personally with a lifestyle and a branding platform that she otherwise wasn't going to be able to afford. And you saw that while OneTaste members lived in the cramped Warehouse and shared beds, Nicole Daedone lived with Reese in a mansion in Russian Hill.

Now, I know these e-mails produced by OneTaste are hard to read here, but here, in 2009, Nicole Daedone is clearly using Reese Jones's money to finance her look and lifestyle and to build her personal brand as well as the brand of OneTaste. She's asking him to sign her up for writing classes, and to get her cowboy boots. And you've seen multiple exhibits throughout this trial referencing books she was working on as well as a New York Times article that discussed OneTaste. All of this was supported by Reese

Jones, and it was really done for the purpose of building her own personal brand and the brand of OneTaste.

You also heard testimony from Robert Kandell that in December 2008, OneTaste opened its residence at 1080, pictured here in Government Exhibit 34. And Kandell testified that they couldn't have done 1080 without Reese Jones' capital investments. That's at transcript 3322.

And when Nicole Daedone didn't feel like being Reese's girlfriend and having sex with him herself, she coerced other women in OneTaste into doing it for her. She framed it as an honor to serve as a handler for OneTaste's most important benefactor. Robert Kandell testified to that here as well at 3313 through 14. Sexually servicing Reese Jones benefitted Reese, Daedone, and OneTaste. And from 2006 to at least July 2014, the end of Kandell's tenure at OneTaste, Nicole Daedone assigned women to be his handler and to sexually service him.

And you heard that they connected it to spirituality. Here, Kandell testifies that the pursuit of orgasm, the pursuit of personal empowerment was their approach. They believed Reese was key to their expansion and growth. He put a lot into the organization. And so they wanted to take care of him as well. He said that it was a two-way street.

And so that's exactly what they did. You heard

from Christina, Dana, and Michelle. They all told you about servicing Reese Jones. They told you about his most intimate sexual proclivities because they were all told by Daedone and other co-conspirators course in OneTaste to provide these services to him. And you saw a number of documents throughout this trial corroborating the provision of sexual services to Reese Jones as well as testimony from other witnesses who knew that these women served as handlers for Reese Jones.

And, members of the jury, you know that this is not normal. We'll talk later about the psychological state that each of these victims was in at the times that they were sexually servicing Reese Jones, but remember, they worked for Nicole Daedone. She was their boss. And she was directing people to provide sexual services to her boyfriend. It is absolutely not normal to provide sexual services to your boss's partner.

Now, let's walk through the testimony of each of Reese's handlers and some of these corroborating documents.

And we'll start with Christina, who was earliest in time at OneTaste. Now, she was at OneTaste during the Warehouse days, starting in approximately 2007. She initially began attending OneTaste events and then soon moved into the Warehouse. And she very quickly began performing labor and services for OneTaste and for the

benefit of the defendants. She washed dishes, she helped out with events, she worked at the massage parlor, and she became Nicole Daedone's assistant. And Christina testified that she worked all the time, every day of the week. She testified about how being Nicole's assistant required an extremely high level of detail such as here, where she describes how she had to learn how to pour water so that the water would make no sound. And she also testified that she had to try to be as invisible as possible.

Now, you heard testimony from Christina Berkley, Chris Kosley and Robert Kandell regarding an orgasmic meditation demonstration that occurred at Reese Jones's house in Simpson Beach. Rachel Cherwitz was the MC for the night, and you might recall her reading Nicole Daedone's life story. That preceded Nicole Daedone being stroked in an hour-long OM demonstration. And you saw at Government Exhibit 3802-C1 a video from right before Nicole Daedone performs that OM demonstration. And this time, when you watch it, and we're going to -- we'll watch the whole thing, but I want you to look to your left, I want you to look for Christina, because she's there during this demonstration acting as Nicole Daedone's assistant. And you also see the importance of Reese Jones.

Let's play.

(Video played; video paused.)

MS. GUPTA: So I want to just pause there for a second.

You saw Christine on the left side of this screen serving as Nicole Daedone's assistant waiting for her to be stroked and to assist in any way.

(Video played; video paused.)

MS. GUPTA: Following this OM demonstration, Nicole Daedone and Reese Jones kiss. And I want you to watch how Reese Jones follows closely behind.

(Video played; video paused.)

MS. GUPTA: These videos corroborate that Christina was Daedone's assistant at the time and they show Reese Jones' importance to the company. He was the host for the night. Robert Kandell called him up before the OM demonstration. But Christina's work for Nicole wasn't just getting her water or being by her side during an OM demonstration. As Nicole Daedone's assistant, much of the labor and services Christina provided was sexual.

So you saw here when Christina was first asked to become Nicole Daedone's assistant in 2008, Nicole Daedone asked Christina: How good are you at sucking cock?

And she testified that Reese Jones was present for that conversation and Rob Kandell was also present for that conversation. And then Christina testified that every morning she would get breakfast for Nicole and Reese and

then proceed to go into their bedroom and masturbate Reese Jones.

You also heard Christina testify here, at transcript 1095 through 1097, that Daedone directed her to essentially take her place for a weekend trip with Reese. During that trip, Christina acted as Reese Jones's girlfriend, including sexually servicing him. Here, she said during that weekend, she did everything except penetrating sex.

And while Christina was sexually servicing Reese Jones, the money from Reese Jones kept coming in. Now, Christina left OneTaste and stopped being Reese's handler, and you heard that Yia Vang, one of the co-conspirators in this case, took over and was also handling Reese Jones during this time and she ultimately advanced in the company.

After that, you heard from Michelle Wright, one of Reese Jones's handlers after Christina. And she testified that after about one-and-a-half years of living in 1080 and attending courses and beginning to perform labor and services for OneTaste, in around the end of 2011, Nicole Daedone approached Michelle and her girlfriend at the time, Maddie Carl, with what she framed as a high honor and opportunity to serve as Reese Jones's handler. Here, at transcript 2403 through 04, she describes that this happened the end of 2011.

Now, Michelle testified that at the time she knew Reese was an investor in OneTaste and she knew he was Nicole's partner. During that meeting, you heard Michelle testify here that Nicole Daedone told her she'd be taking care of Reese Jones, living part time in his home, cooking for him, making sure that he had what he needed. But Michelle already knew that what Reese Jones really needed included sexual services. She knew that Yia Vang and Alisha Price were sexually servicing Reese and that Rachel Cherwitz had done it as well. You also heard this from Robert Kandell.

After that meeting between Nicole, Michelle and Maddie, Yia and Alisha detailed exactly what Michelle and Maddie would be expected to do as Reese Jones's handler. She describes how Yia Vang and Alisha Price took her on a tour of Reese Jones's house. They sat her down on Reese's bed and basically showed her what he liked sexually and how to take care of him. This is at transcript 2407. She said: They showed me how to put the dildo in his ass. They showed me how to jerk him off. They showed me how to interact with him in order to arouse him. And Michelle and Maddie were expected to masturbate Reese and stick a dildo in his butt day after day.

And you heard testimony from Michelle that while she served Reese Jones's handler, Nicole Daedone and Rachel

Cherwitz would check in with Michelle, asking her for updates on how Reese was doing and Michelle reported back to both Nicole Daedone and Rachel Cherwitz.

(Continued on the following page.)

(Continuing.)

MS. GUPTA: She said: I think they often wanted reports on how he was feeling, how he was doing, and how it was going between us.

Now remember, when Christina was Reese Jones's handler, Rachel Cherwitz was just getting involved with the company. But this is now later in time in 2011, when Rachel Cherwitz was a core part of OneTaste. This shows Rachel Cherwitz's direct involvement in the provision of sexual services to Reese Jones.

You also saw this text exchange between Nicole Daedone and Ken Blackman, Government Exhibit 4501-KD, in which he updated Nicole on Michelle sexually servicing Reese. And now remember, at this time Ken Blackman testified that he was living at Reese Jones's house with Nicole Daedone.

So Nicole Daedone asks for an update, and Ken described how Michelle and Maddie were doing. He said: Michelle has been doing great overall. Nice having her in the house. But he said: She's a bit shaky today after being brought into the next stage of play with Reese. And then he talks about Maddie, who he says is getting cracked open. He says: Lish and I have an eye on her. Referring to Alisha. And how does Nicole Daedone respond? Oh, Ken, sounds amazing.

Members of the jury, Nicole Daedone knew Michelle and Maddie were struggling. She knew Michelle was shaky. She knew Maddie was getting, quote, "cracked open." But she continued to coerce these women into providing sexual services to Reese Jones because it was beneficial to her.

You also saw the text exchange between Rachel Cherwitz and Yia Vang, Government Exhibit 2148-D. And here, you might recall Yia Vang made a series of admissions to Rachel Cherwitz, and one of them is that she didn't always like stroking Reese Jones herself, and she went on to say that she would pin Michelle and Maddie against each other with respect to Reese. Yia said she liked Maddie more than Michelle, so she was nicer to Michelle -- so she was nicer to Maddie, apologies, and harder on Michelle.

And how does Rachel Cherwitz respond to this message? Those are the bomb. She isn't surprise to hear this. She isn't saddened by this. Because Rachel Cherwitz knew that Michelle and Maddie were providing sexual services to Reese Jones, and she knew Michelle was being manipulated. And the subtext to all of this is that Rachel Cherwitz knew Maddie and Michelle were servicing Reese all along.

Now, you heard from Michelle Wright about how she was moved to Las Vegas in the middle of 2012. But even after that point, her sexual services to Reese Jones continued. She said that Reese Jones traveled to Las Vegas

a few times while Michelle was living there, and she continued to provide him with sexual services during his visits. That's at transcript 2420.

But you also heard testimony from Michelle that at a certain point, she finally hit her breaking point. She testified that she often traveled to San Francisco from Vegas to run coaching programs. And during one of those trips, you heard that Nicole Daedone again directed her to sexually service Reese Jones. But this time, Michelle said no.

You heard Michelle testify that at that time at OneTaste, her former girlfriend, Maddie, had left OneTaste on bad terms. And you heard how much Michelle was struggling herself in Las Vegas, and she finally decided that she had enough. In her words, she said she couldn't take it anymore. She describes saying no to Nicole Daedone as being the beginning of the end, because just a few months later, she was fired from her position in Las Vegas.

Now, you also heard about Michelle's girlfriend at the time, Maddie, who you heard was also Reese Jones's handler. And Michelle testified that she and Maddie both lived part time at Reese's house and sexually serviced him, alternating who would take on that task, because neither of them wanted to do it. And you heard that one of the reasons they actually agreed to do this was because they finally had

alone time at Reese Jones's house, and that at 1080 they never had privacy. That's at transcript 2564. And you also saw the documents that we just discussed corroborating that Maddie sexually serviced Reese Jones.

In addition to the ones that we just saw, you also saw Government Exhibit 1258-DR, which is a text exchange between Rachel Cherwitz and Joanna Van Vleck. Now, here, Van Vleck states that Maddie is still asleep. She said: I am waking her the fuck up. Clearly, Maddie had some work to do. Rachel Cherwitz tries to figure out what's going on with Maddie, and she says: We are getting to the seed of it. And she goes on to say: I got the seed out. She got stuck with Reese. She says: After Yia and Michelle moved out, she didn't want to go through the sound barrier with her sex. And in this next message, Rachel Cherwitz states: Maddie's sobbing. This, too, shows that Rachel Cherwitz knew women in OneTaste were sexually servicing Reese Jones and that they struggled doing so.

You also heard from Dana Gill, another one of Reese Jones's handlers. She testified she was recruited to sexually service Reese in December 2012, when Michelle moved to Las Vegas and Nicole Daedone needed someone to take her place. You heard testimony here that at a point when Dana was incredibly vulnerable, after suffering a traumatic miscarriage, which OneTaste leadership knew about, Yia Vang

asked her to sexually service Reese Jones along with Rachael Hemsi. And they approached Dana with what they presented as a high honor, an opportunity for her to sexually service OneTaste's most important investor.

You heard testimony from Dana, and this is at transcript cite 1298, that she was invited to a concert with Reese Jones. And remember, she described that concert as an audition. The she described how Nicole and Yia watched her dance with Reese to see if he liked her, and they nodded in approval.

After the audition, she quickly moved into Reese's house, but she said she still had to maintain residency at 1080 and continue to pay rent there. And she said Yia showed her a chest of sex toys and showed her what to do. And remember, you heard basically the same thing from Michelle.

Dana described what she would do for Reese Jones. She said she took care of him. She brought him breakfast, she hung out with him, took him for walks, and then sexually serviced him. And she said this was directed by Yia Vang. And who did Yia Vang report to? She reported to Nicole Daedone. Yia Vang, just like she did with Michelle, showed her Reese's bedroom full of sex toys and told her to practice her topping skills, which is a BDSM term.

And remember, she still has her place at 1080.

She still has to pay rent during this time, even though she's living part time at Reese Jones's house.

So for two to three months, Dana lived with him. She engaged in sex acts with him that she did not want to engage in, including topping, fisting, and performing oral sex on Reese Jones. And during this time, OneTaste continues to charge her rent, ensuring that her cycle of debt to OneTaste continued.

Dana also testified about a variety of other BDSM acts that she did. She said she used a dog collar and a leash to walk him around like he was a puppy. And she testified that she was not interested in this kind of sexual activity. She testified that it made her very uncomfortable.

And you also heard testimony that Dana wrote in her journal at the time. She wrote about how the situation with Reese Jones was, quote, "arranged," and that it felt like her job. But Dana was never paid for this job or any other work that she did at OneTaste. And Dana finally stopped servicing Reese when she left OneTaste in the spring of 2013.

And remember, Dana's testimony was corroborated on this point both by the journals you heard her testify about, which you saw her review during her testimony, and Michelle's testimony. Michelle had a similar experience to

Dana. Yia Vang showed her around Reese's house, told her what to do with various sex toys, and Michelle herself testified that she was aware that Dana also sexually serviced Reese.

Members of the jury, there's overwhelming evidence that Christina, Dana, and Michelle sexually serviced Reese Jones at the direction of Nicole Daedone, Rachel Cherwitz, and other OneTaste leaders, including Yia Vang and Rachael Hemsi. This is corroborated by the text messages you just saw with both defendants, and other testimony, including from Robert Kandell and Ken Blackman.

So why did the defendants do this? They did this so that Reese Jones would continue to fund the company. And throughout this time when he's being sexually serviced, he did, in fact, continue to provide money to OneTaste. You saw an example here in Government Exhibit 1013. And this is in September 2008, at the time that Christina is sexually servicing him. Kandell testified that he provided a $15,000 loan.

But Reese Jones also expected a return on his investment. He expected to be paid back for his loans, which then increased pressure on OneTaste, and specifically on Nicole Daedone and Rachel Cherwitz, to make money.

Now, while the pressure was on to make money, in March 2009 you also heard that OneTaste began receiving more

mainstream attention due to a New York Times article that was published at the time. You saw Kandell testify about a New York Times reporter was at that Stinson Beach OM demo that we just watched a video of. Kandell testified that the article was mixed as to its reporting on OneTaste, and that some of its contents hurt Nicole's feelings.

But the article put OneTaste on the map. It led to a book deal for Nicole Daedone and increase the publicity. And now, because OneTaste was starting to get more mainstream attention due to this increase in publicity, they decided to take some steps to clean up their act so that they would be taken seriously as a real company, a far cry from the sex cult origin that Chris Hubbard told you about.

You heard this from Robert Kandell. He testified that Nicole Daedone engaged the services of Reputation.com, and she did this because she didn't want the word "cult" to be the second result in a Google result for OneTaste. And she did this precisely to clean up the company's act and bring more people into OneTaste, both as customers and workers.

Now, the other thing that OneTaste leadership did in response to increased attention from The New York Times article was to keep any sex work under wraps. Now, remember, Christina Berkley testified that she also worked

as an escort. But she testified that after the publication of The New York Times article, suddenly Nicole Daedone told her that it was important to pull back on anything that was happening in the OneTaste space that wasn't legal. This is at transcript 1109. Remember, at this time, this is how Christina was supporting herself. She wasn't making enough from her work at OneTaste. But in May 2009, Nicole Daedone told her that anyone involved in sex work needed to stop doing so.

But sex work and sexual services for OneTaste's benefit continued even after this point in May 2009, when Nicole Daedone expressed concern about, quote, "anything that wasn't legal."

And remember, you also heard testimony from Dana Gill on this point. In late 2009, Dana Gill first learned about OneTaste, and at that time, she testified that her financial situation was dismal. She said she had lost her job because of the economic crash in 2008, and she was drawn to OneTaste because she thought it would offer her community and help her overcome a restrictive religious upbringing.

Rachel Cherwitz signed Dana up for her first formal Coaching Program. It cost tens of thousands of dollars; money that Rachel Cherwitz knew Dana didn't have. But Rachel Cherwitz assured Dana not to worry about the debt. She told her she would find a way to pay for it. And

from that moment on, Dana was in debt to OneTaste.

Over time, you heard that Cherwitz and other OneTaste leaders pressured Dana to purchase more and more expensive courses, continuing her cycle of debt and ensuring that she remained indebted to OneTaste. And you heard from Dana that one of the ways she tried to pay her debt was by engaging in sex work. Aubrey Fuller, another OneTaste member at the time and another co-conspirator, signed Dana up for websites on which she can advertise her sexual services, and Aubrey built her profile and took photographs of her.

And you heard testimony from Dana that when she started working at OneTaste in 2010, core staff at OneTaste, including Rachel Cherwitz, told her that she needed to keep her sex work hush-hush so that OneTaste wouldn't seem like a sex cult. But Dana and Aubrey both engaged in sex work, and people at OneTaste continued to provide sexual services behind the scenes for the benefit of the defendants and OneTaste. And as Dana testified, all the money that she made from sex work went right back to OneTaste.

And, members of the jury, let's just consider the hypocrisy here. During this time at OneTaste, both Christina and Dana made money outside of OneTaste from sex work. They were also doing the exact same thing at OneTaste by sexually servicing Reese Jones. Except at OneTaste, they

weren't getting paid for any of that work, and they were being told to keep their sex work outside of OneTaste, quote, "hush-hush."

You also saw this text exchange between Nicole Daedone and Ken Blackman, Government Exhibit 4501-FD, where Nicole admitted that she needs to make sure that Reese gets stroked every day. And you know from Ken Blackman, what does stroking mean? It means a hand job.

This is a male OM from OneTaste course materials, Government Exhibit 4641. This is not just a male OM, it's a hand job, and that's exactly what these victims were doing for Reese Jones.

Now, around the time that Michelle was sexually servicing Reese -- and remember, this is 2011 to 2012 -- OneTaste starts to make money. In the spring of 2012, Kandell testified that OneTaste finally became profitable, and it was primarily because of the Coaching Program; Coaching Program No. 5, which was an in-person Coaching Program. Meanwhile, during this time, Reese Jones's money had run out. He was in dire straights financially, and he began complaining consistently to Robert Kandell and others that he needed to be paid back.

Kandell testified that in March 2012, this is at 3413, Nicole and Ken Blackman took a walk on the beach. When they came back, they decided to move OneTaste from a

service-based organization to a sales-based organization, and they changed OneTaste's focus to increase sales.

Now let's look at this timeline. We've already walked through most of the left side. You know when Nicole Daedone and Robert Kandell co-found OneTaste and when Rachel Cherwitz joined them. And now this timeline shows the shift that happens in 2012. They're done relying on Reese. Reese Jones's money has run out. They're finally profitable. And the evidence has shown that part of the reason for this shift to sales was to pay Reese Jones back. But another goal was simply to create income for Nicole Daedone.

So to make money and fuel OneTaste growth, Nicole Daedone directed Rachel Cherwitz to engage a full-fledged sales team dedicated to selling increasingly expensive courses which ranged from hundreds to thousands or even tens of thousands of dollars each. And you heard from Robert Kandell that Nicole Daedone set these sales goals. And who implemented them? Rachel Cherwitz; Nicole Daedone's enforcer.

In addition to the Coaching Program, you heard that OneTaste started to put on a variety of other courses; communications courses, other OM courses, and advanced sexual courses. You saw Government Exhibit 3164, The Path to Orgasm Mastery, from OneTaste own materials, and see how it shows taking more and more OneTaste courses. You heart

Anthia Gillick testify about this chart when she said that on the top left, the introductory courses started with How to OM and the OM Practice Club. They went on to Intro to Mastery, Mastery, which you heard testimony was a more advanced sexual course on sex and BDSM, followed by Magic School and Taboo School. And you heard her testimony that at the Magic School, Nicole Daedone would appoint priests and priestesses of orgasm. And at the Taboo course, you heard testimony from Anthia Gillick that she reenacted a rape that she had experienced when she was only 21 years old. That's at transcript cite 3949. And we'll talk about that in more detail later.

At the end of this chart, you also heard testimony about the most expensive course in the OneTaste universe, Nicole Daedone Intensive, or NDI, which you heard cost $36,000. And Michal Neria described how participants in that course were flogged, put into body bags, and then told that they were reawakened. And, of course, you know about the Coaching Program, which was OneTaste's core product.

Members of the jury, this was all a money grab. The goal of these courses was not to enlighten or to reawaken the participants. It was to make money for OneTaste and to bring power to the defendants. And using the money from these courses listed here, as well as predecessor courses and the Coaching Program, OneTaste

continued to pay money back to Reese Jones for his loan to OneTaste, and Nicole Daedone continued directing women to sexually service him. And at the same time, Rachel Cherwitz ensured that Reese was getting paid, which shows her involvement in this conspiracy.

Now, you saw a lot of emails from Reese, and I won't go through all of these in detail, but throughout these emails Reese Jones is following up with Robert Kandell to ask for money. And here, Rachel Cherwitz is updating Reese Jones directly, BCC'ing Nicole Daedone, on the number of people who are signing up for courses and how much money they're making. Again, this shows her involvement in the conspiracy. She's keeping Reese Jones apprised of how much money they're making because she is the person responsible for paying him back.

And here in 2012, you saw that Reese Jones began more aggressively requesting loan repayment. He sent multiple e-mails to Robert Kandell, and Robert Kandell kept trying to put Reese Jones off. He did this here in July 2012. And every time this happened, who did Robert Kandell go to? He went to Rachel Cherwitz and Yia Vang, and he alerted them that Reese Jones was demanding money.

And you saw here that Rachel Cherwitz responded and said that she and Yia would work their witchy magic to calm him the fuck down. And as you heard Robert Kandell

testify, both Rachel and Yia at various points served as Reese Jones's handlers as well.

And what was their witchy magic? You heard Yia Vang was responsible for recruiting women to sexually service Reese at the direction of Nicole Daedone, and Rachel Cherwitz was responsible for sales. She brought in the money to pay Reese Jones, while Yia Vang ensured that he was sexually satisfied. That was their witchy magic.

Here again, Reese Jones is requesting more payment, and Robert Kandell, once again, goes to Rachel Cherwitz and Yia Vang and asks for viewpoints from the forth dimension. And Rachel Cherwitz responded that she would work on getting paid in full from the Coaching Program. And remember, this is what she did. She was head of sales, and she was selling coaching programs and they were going to use to pay Reese Jones back.

And you heard about the coercive tactics that Rachel Cherwitz used with the sales team. And she said: Let's not do anything to put ourselves in danger. But members of the jury, that is precisely what she did. She put other workers in danger through her coercive acts, which we'll discuss more later.

You saw another example in August, the same pattern continued. Reese Jones wanted repayment and continued to put pressure on OneTaste. And this time,

Rachel Cherwitz said she would deliver by getting coaching programs paid in full. And remember, this is around the time that Becky Halpern joined the company and joins the Coaching Program, and you heard from Liana, Max, and Michelle that they were all involved at this point too. Pressure to pay Reese Jones translated to pressure to sell.

You see this again in September. Reese Jones again is requesting cash for what he's describing as an urgent situation, and Robert Kandell is trying to hold him off. And this time, Nicole Daedone also chimed in, and she stated that while they would pay Reese Jones, they could not continue to put OneTaste in the red for these emergencies, lest we harm the system that is covering all of us.

At this point in 2012, it was Nicole Daedone's priority to make OneTaste profitable and stop relying on Reese Jones. Here you saw text messages corroborating this, Government Exhibit 1169-DR between Nicole Daedone and Joanna Van Vleck. And they express that they want to come to a final number with how much they're going to pay Reese Jones. Nicole Daedone is chastising Joanna Van Vleck for giving Reese Jones squirm room on the negotiation, and Joanna Van Vleck replies that she is going to get them free of him. And what did she mean here? She meant free of Reese and his demands for payment.

Now, in June of 2013, as Robert Kandell testified,

OneTaste stopped making payments to Reese Jones. Robert Kandell informed Nicole that he was going to tell Reese that they were done with the payments, and he said here that he wanted to push back hard on Reese Jones. Daedone responded: Not hard, but straight. To be clear, Nicole Daedone is directing all of this.

So in response to this pressure from Reese Jones, Robert Kandell testified that he and Nicole Daedone decided to obtain another loan just to pay Reese Jones back. He testified that in October of 2013, they took out a loan from the mother of a leader in OneTaste, Maya Gilbert, who later changed her name to Maya Block. Her mother was Ippolita Rostagno. And after OneTaste was finally able to pay Reese Jones back, the sexual services to Reese Jones ended when Robert Kandell left the company in 2014. And Nicole Daedone personally acknowledged this.

Take a look at Government Exhibit -- sorry. We'll go back to this.

So in a text message exchange, Government Exhibit 1604-DR, Nicole Daedone had texted Justine Dawson and suggested that they ask Reese to sit in on an important meeting. And this is after they've paid him back. So she suggests that they somehow reward Reese. And she expressed in that text message exchange that Reese will need compensation of some kind. And she goes on to say: But

when I paid him off, that ended all favors.

And members of the jury, what does she mean here? She meant sexual favors. This is yet another admission from Nicole Daedone that she provided Reese Jones with sexual services.

But even after the sexual favors to Reese Jones ended, you heard testimony at this point after 2012 and after 2013 when they stopped making payments to Reese, sexual services continued at OneTaste. They may not have been for Reese Jones anymore, but they were for prospective clients, VIPs, and other community members.

You heard from multiple victims who were at OneTaste later in time who the defendants continued to coerce into providing free or unpaid labor. Labor that included continued sexual services, working in sales, coaching, or back of house.

And as money came in from the sale of OneTaste courses and film, you saw that OneTaste rapidly expanding, opening locations in cities throughout the country and the world, including, as you heard, in Vegas, Los Angeles, London, Boulder, Austin, Philadelphia, and of course, New York.

And as OneTaste expanded to other cities outside of San Francisco and New York, the defendants coerced the victims into providing around the clock labor for very

little for very little pay. They did this to increase sales and profits for OneTaste. And as you heard from multiple people, Rachel Cherwitz was instrumental in this effort.

You heard testimony from Michelle on this point. Remember, she became a city director in Las Vegas when she started in the middle of 2012, and she said she worked constantly around the clock. She said there were no on or off hours. She was expected to be available and responsive at all times. She said it was just constant.

You heard similar testimony from Liana. And remember, Liana, similar to Michelle, was also a city director in Boulder, and she said she worked all day every day to build the OneTaste community in Boulder and try to sell courses during this time as OneTaste was trying to expand.

You saw Liana testify that Rachel Cherwitz, in particular, led what Liana called the sales threat that never slept. She said her phone was constantly going off 24 hours a day, seven days a week. Liana testified that Rachel Cherwitz directed that she should not go to sleep until she hit her sales goals, which meant that Liana was working constantly and wasn't sleeping sufficiently.

And during this time, in addition to working in sales, Liana was also providing sexual labor to OneTaste. She described how she OM'd with potential clients and

participated in OM demonstrations at the direction of Rachel Cherwitz. She testified that OMing became her job. And then she also testified here, at transcript 2164, that Liana engaged in oral sex with an individual who was going to drop out of the Coaching Program, and she said that Robert Kandell directed her to do it. And remember, this isn't new. You heard the same thing from Dana, that she was also directed to engage in sexual services with people who might drop out of the Coaching Program or other courses. The sexual services didn't stop when the company was no longer reliant on Reese Jones.

And you heard testimony about the expansion of OneTaste in New York in addition to Boulder and Vegas, including at The Morellino, which was a communal home in Harlem. You also heard about the Brooklyn OM house, where both Anthia and Michal eventually lived.

Now, in the fall of 2013, after OneTaste had expanded to other cities, OneTaste began to implement so-called policies, including regarding sexual conduct. Remember, Reese Jones had exited at this point and they had brought on a new investor, who you just heard about, Ippolita Rostagno.

So they were trying to clean up their act. But even there, they failed.

You saw this Defense Exhibit, an employee handbook

that was implemented in October 2013, around the time that they're expanding in other cities like Vegas and Boulder. And you saw here the at-will employment agreement. And you see here that OneTaste says it has the right to manage its workforce and direct its employees.

But members of the jury, this was a farce. No company has the right to direct employees to have sex with one another or with potential clients. No boss has the right to direct employees to have sex with one another or with potential clients. These policies change absolutely nothing at OneTaste.

The handbook, interestingly, also included a sexual harassment policy, and it noted here that sexual harassment explicitly includes requests for sexual favors or where submission to sexual conduct is either explicitly or implicitly made a term or condition of someone's employment.

But members of the jury, that is precisely what the defendants did. Nearly every victim who testified in this case testified that they felt that they had to engage in sexual acts with prospective clients and VIPs, even if they didn't want to do that. And this included the victims you heard from who were at OneTaste after this policy was implemented in October 2013, including Michelle, Liana, Becky Halpern, and Max Pixley.

Members of the jury, the policies in this handbook

were a sham, and the people at OneTaste knew it.

You saw this email, Government Exhibit 3501-37. And the sender of the email, Adam, here is passing along the employee handbook that we just reviewed to employees at OneTaste, and he says they're going to put in place more of a third-dimensional structure.

And remember, in OneTaste speak, the third dimension refers to the real world, while the fourth dimension is the OneTaste world. And remember, we are in the third dimension. The courtroom is not in the fourth dimension.

And one of the individuals on this email, Andreas, responded to Rachel Cherwitz as well as others in the company: I just looked at sexual harassment and overtime. LOL. Clearly the policy was a joke to those who worked there.

You also heard testimony from Becky on this point. Now, she joined OneTaste starting in late 2011. She became an employee in the summer of 2012, and she was there through the spring of 2014, including when this handbook was implemented. She lived in The Morellino in Harlem with other members of OneTaste, including Rachel Cherwitz, and she worked on the sales team. And she testified about this policy we just reviewed. She said she read it and she laughed out loud. She said it was ironic to have a sexual

harassment policy at OneTaste, and that the idea of overtime was ridiculous because of the number of hours that they were expected to work.

And while OneTaste was touting its policies and so-called ethical guidelines, behind the scenes Nicole Daedone and Rachel Cherwitz continued to direct young women to provide sexual services to VIPs and other potential clients. Remember, Reese Jones's money had run out. Nicole Daedone and Rachel Cherwitz set their sites on other high net worth individuals and focused their efforts on getting them involved in OneTaste.

Now, in addition to working in sales, Becky testified that she also provided sexual services while at OneTaste. She said she participated in orgasmic meditation with community members and clients. She testified that Rachel Cherwitz directed her to OM with anyone who came in from the street. And as one example, Rachel Cherwitz told her to OM in a private session with an older man who Becky said she normally would not have engaged in sexual activity with.

You heard similar testimony from Liana. She testified that the OneTaste sales team had a term for these individuals. Men with a lot of money. They called them marks. But she said marks could even be women who the OneTaste leadership identified as particularly susceptible

to OneTaste sales practices. The Liana Lifson, for example, testified here that she was a mark and she was given special attention so that she could become more deeply involved in OneTaste. The defendants did this to make money.

You heard testimony on this point from Michelle, for example. She said that Nicole Daedone told her to get Tony Hsieh, who was at that time the CEO of Zappos. She testified here that Nicole Daedone gave her instructions during the time that she was in Las Vegas with respect to Tony Hsieh. She said: Go get him, like, at all costs, whatever it takes.

And what did she understand that to mean? She said that her training throughout her time at OneTaste was about using her sexuality to magnetize things to herself. So she took it as she was required to do anything sexual to complete that task. And Michelle said she ultimately made out with him even though she was not attracted to him and did not want to do anything sexual with him. She said Nicole Daedone told her by any means necessary.

You heard testimony on this point from Margaret Pixley as well, who now goes by Max. And remember, Max began at OneTaste as a participant, just like many of the other victims that you heard about. Max attended OM circles and a winter retreat that cost upwards of $2,000 and then ultimately signed up for the Coaching Program, CP6, which

cost $15,000. Max described themselves as a feminist who was initially drawn to OneTaste's message of women's empowerment and its mission. And Max testified that Rachel Cherwitz initially offered Max a job in production, and so Max moved to New York City for the role. And although Rachel Cherwitz told Max that they would be paid, Max testified that they were not paid for the first two to three months that they worked at OneTaste. Max said that the job was all day and all night. Max described it as a 24/7 job and said there was never a time when they were not on. They were on multiple text threads, they were expected to respond immediately, even when it was the London office who was texting in the middle of the night. And Max said that Rachel Cherwitz was the person who set that expectation.

Max said it felt like OneTaste owned them all the time, and Max never took vacation or days off. And you heard very similar testimony from both Michelle and Liana on this point. And you also heard that Max provided labor and services directly to Daedone. Even though Max was not Nicole Daedone's assistant, Max was responsible for cleaning Nicole Daedone's room, including doing the laundry, making the bed, washing the windows, setting everything up for her, and cleaning Nicole Daedone's bathroom. Even cleaning up used condoms. Max also drove Nicole around whenever she wanted to get coffee, tanning, or get her hair done. And at

that time Max testified that they believed it was an honor to take care of Nicole Daedone.

Now, eventually Rachel Cherwitz asked Max to be her personal assistant. And although Max testified that they did not want to spend any more time with Rachel Cherwitz, Max agreed. Max testified that one of the reasons Max agreed to this was because they didn't really own their know at that point in time, and that any time they were awake, they were working for OneTaste.

The message of female empowerment that drew Max to OneTaste didn't pan out. In addition to performing the menial labor that I just described for Nicole Daedone, OneTaste -- Max testified that Rachel Cherwitz also directed Max to OM with people that they didn't want to OM with, including a VIP client named Jim Kwik.

(Continued on the following page.)

MS. GUPTA: (Continuing) And Kandell corroborated this. He said that Jim Kwik was an owner and a friend to OneTaste. He was considered a VIP.

This is also corroborated by Government Exhibit 1083, where Nicole Daedone and Rachel Cherwitz discuss Jim Kwik and clearly view him as a mark even as early as 2012.

In addition to the sexual services that Max provided to Jim Kwik, Max also testified that during one of the Mastery courses they attended -- and remember, this is another OneTaste course that's on more advanced sex and BDSM -- Max testified that they had to participate in a prostate massage in which Max was the stroker. And Max testified that although they didn't want to participate, they believed that they were benefiting themselves spiritually and personally through aversion practice.

And remember, you heard a lot about aversion practice during this trial. Nearly every victim talked about aversion practice. It was this idea that you should say yes and do things with people you didn't want to do those things with. And Nicole Daedone described that that would somehow increase your spiritual growth, so that's why Max did this.

And this is corroborated by Government Exhibit 1521-D-R, where Yia Vang and the rest of the core staff, including Rachel Cherwitz, discussed conducting prostate massages in Mastery class.

In addition to these sexual services, Rachel Cherwitz also directed Max to OM with Mark Gottlieb, a longtime OneTaste client, who you heard about from many of the victims who testified in this case.

You heard testimony from both Dana and Michelle that they, too, were directed to OM with Mark Gottlieb even though they didn't want to do so. And Rachel Cherwitz did this because Mark was a paying customer. He was paying to OM with young women and so she provided these young women.

And you saw this text exchange, Government Exhibit 401-E-T, where Ken Blackman and Yia Vang are trying to find someone to OM with Mark.

Ken testified on this point that Mark was someone who was paying for OM classes, so they needed to find him a partner. And notably, Ken also testified about this, that actually finding an OM partner for someone was technically against OneTaste's policy at the time, but OneTaste leadership, including Nicole Daedone, Rachel Cherwitz, Yia Vang, and Ken Blackman himself, routinely violated this policy.

Now, around this time in 2014, OneTaste released certain cities and arranged for the purchase of others as franchises. And you heard some testimony from Anthia Gillick on this point. And remember, Anthia Gillick was one of the owners of OneTaste New York.

In 2004, Anthia testified that the Defendants were trying to find buyers for OneTaste New York. But in New York City, she said the Defendants continued to exercise control over OneTaste New York, even though it was technically a franchise.

She said she purchased her stake in OneTaste for $120,000. That's at transcript 3810.

And you also heard from Anthia that she was treated differently from other OneTaste participants because she had money.

You saw Government Exhibit 1544, where Joanna Van Vleck, who was president of OneTaste at the time and reporting directly to Nicole Daedone, approached Anthia with the prospect of purchasing a stake in OneTaste New York.

When asked why Joanna Van Vleck and Rachel Cherwitz approached her to purchase OneTaste New York, Anthia responded that it was because she could afford it. She said it was clear that Rachel Cherwitz and Joanna Van Vleck allotted her more freedom than the other victims you heard from because she was financially well off. She testified that she purchased every OneTaste course with her money.

And behind the scenes -- you saw Government Exhibit 1549-D-R -- text messages between Joanna Van Vleck and Nicole Daedone discussing using Anthia and her money to purchase OneTaste New York.

Here, Joanna Van Vleck says: I don't have a gauge on how long it will take Brooke to get the money, but it didn't seem challenging to her when we spoke about it.

And Nicole Daedone responded: Okay. These things need to be secured on tumescence so tumescence doesn't get out of hand.

In real speak, this was an instruction to get Anthia in line and get her money lined up. And at that point, Anthia had been involved in OneTaste long enough that Daedone knew she would be able to get things secured.

Before Anthia became an owner, you heard testimony from her that she was a beastie, an employee in training who lived in OneTaste housing. And Anthia told you about how the beasties would perform unpaid sexual labor, like shower scenes, to attempt to entice a potential client into paying for a course.

So in August 2014, Anthia purchased OneTaste New York. And she testified here that this was just a few months after her father's death, which she was still reeling from. And she said that the whole New York team, including Rachel Cherwitz, told her this -- or knew about this. I'm sorry.

Rachel Cherwitz also told her that OneTaste was sending a handler to accompany her for her father's funeral and to make sure that she was OMing every day. That was at

transcript 3857. They wanted to make sure that she would be coming back.

Now, you heard testimony from Anthia that she hoped and believed that if she purchased OneTaste New York, she would be treated differently from staff. You heard that she had dated someone on staff named Billy and she observed that staff were working long hours and they barely saw their friends and family. This is at transcript 3879.

But that plan didn't pan out. Anthia still reported to Rachel Cherwitz even as a city owner and OneTaste, the main corporate entity, still taught all the largest courses.

Anthia also testified that a percentage of all the New York profits went to the corporate entity. That's at transcript 3881.

So despite the Defendants' and core staff's representations, Anthia was not at all in control of OneTaste New York. Nicole Daedone, Rachel Cherwitz, Joanna Van Vleck and the rest of the core staff continued to remain in control and they financially benefited from Anthia's work and the money that she provided to purchase OneTaste New York.

And you heard testimony from Anthia Gillick about the labor and services that she provided to OneTaste. Even as a part owner, she was directed to clean for Nicole Daedone. She cleaned the baseboards of what she described as Nicole's amazing and luxurious apartment. And she was not paid to

clean Nicole Daedone's apartment.

You also heard Anthia testify that Rachel Cherwitz directed her to have sex with prospective clients -- again, similar to everything we've heard from all the other victims -- including people outside of her preferences or who she was completely disgusted by.

Anthia described how Rachel Cherwitz directed her to make out with a student in the coaching program named Dennis. And Anthia said she found that revolting. And just like Max, Anthia was also directed to perform a prostate massage during the Mastery course. And Anthia testified that although she did not want to do so, she was in no position to question Rachel Cherwitz's command.

Now, Anthia also testified that while she was at OneTaste, Rachel Cherwitz assigned Anthia and others in New York to have sex with at least one person every day for 30 days. At the time, Rachel Cherwitz said that the New York team was not making their sales, so she said they needed to have more sex to fire up their orgasm and pull in more sales leads.

Your Honor, I know that you asked me to tell you when it's a good stopping point for a break.

THE COURT: Okay. I mean, I would go another ten minutes. But if now is a better time to stop, we can do that.

MS. GUPTA: Yeah, I'm happy to do that. I can keep

going.

THE COURT: Okay. Let's go for another ten minutes. Or something close to that that's convenient for a breaking point.

MS. GUPTA: Now, you heard that there was another shift at OneTaste during this time. You heard this from Anthia Gillick as well. You heard from Anthia and Michal that there was a so-called marriage stroke at OneTaste. And Anthia testified here that the Defendants Nicole Daedone and Rachel Cherwitz were concerned about the public perception of OneTaste. They needed to clean up their public image, and so more people being married who help that public image. So you see here Nicole Daedone herself entered a monogamous relationship and Rachel Cherwitz was one of the first people to get married. And after that, everyone, including Anthia, was proposing and getting married and Anthia herself got engaged.

And here, Anthia describes how the Defendants said the marriage stroke was to clean up the public image. More people being married would help that.

This was corroborated by Government Exhibit 1846-D-R, a text conversation between Nicole Daedone and Joanna Van Vleck. And here, Nicole Daedone informs Joanna Van Vleck that she's worried that if she split from her boyfriend at the time, the whole community of couples would

split. This was in January of 2015.

She also said: We need 20 weddings and I'm good.

Anthia observed Rachel Cherwitz get engaged to Hamza Tayeb at the Nicole Daedone Intensive and then ultimately marry. She also observed Ravi Agrawal and Aubrey Fuller get engaged. And you heard testimony that Maya Block and Eli Block were married. Anthia herself was engaged to Rafael Martinez. And all of this happened because Nicole Daedone and Rachel Cherwitz encouraged people to get married for the good of the business.

You heard testimony from Michal Neria on this point as well. She testified that she met Misha Safyan and the Defendant Rachel Cherwitz immediately encouraged their relationship because he was paying for her OneTaste courses.

And you saw that their relationship developed. You heard testimony that Michal was engaged to and then subsequently married Misha on the last day of the Nicole Daedone Intensive in August of 2015. And who walks her down the aisle? Rachel Cherwitz.

And Michal testified that she thought getting married at the Nicole Daedone Intensive showed loyalty to Nicole and to OneTaste. She said: I wanted to be part of this group. There was a lot of talk of living in your purpose in OneTaste and that purpose was OneTaste and Nicole's teachings.

And you heard from Michal that she did all of this while she was having panic attacks and nightmares and being in what she described as an emotionally abusive relationship.

But again, Nicole Daedone and Rachel Cherwitz both encouraged Michal's relationship with Misha because he was paying for both his and her courses at OneTaste, spending tens of thousands of dollars, $36,000 for the Nicole Daedone Intensive alone, all money that went directly to OneTaste.

You also saw text messages between Nicole Daedone and Chris Kosley on this point. Here, in Government Exhibit 4504-B, Chris Kosley asked Nicole Daedone to explain the marriage stroke. And she says: We can do with marriage what we did with orgasm.

But here, Chris Kosley also brings up an important point, that actual legal marriage has some solid third-dimensional implications. Remember, the third dimension is the real world, the world that we're in currently. He refers to death and taxes stuff. And Nicole Daedone responded: And I think people die whether or not they marry.

Nicole Daedone didn't care about the real-life things that come with marriage. She didn't care about the practical implications for people. She just wanted people in OneTaste to do what suited her. And in late 2014 through 2015, she wanted people to get married to normalize OneTaste.

THE COURT: Is now a good breaking time, Ms. Gupta?

MS. GUPTA: Yes. Thank you.

THE COURT: Okay. We're going to take our morning break. We will come back at 25 after 11.

Now is not yet the time for anyone to be talking about the case, so I will remind you again: Don't talk about the case, even among yourselves, keep an open mind.

And I will see you at 25 after 11.

(Jury exits.)

THE COURT: Everyone may be seated.

And I will see everyone at 25 after 11.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Okay. We have the jury back, so we'll bring them out.

(Jury enters.)

THE COURT: Everyone may be seated.

And Ms. Gupta, you may resume.

MS. GUPTA: Thank you.

Okay. We're back.

So, Members of the Jury, I'm going to keep walking through the timeline, but we are almost at the part where I will talk about the law and how the evidence in this case fits the charges.

But let's pick up where we left off. We were just talking about the marriage stroke at OneTaste.

Now, around the same time as the marriage stroke, the Defendants were continuing to try to clean up problems at OneTaste.

THE COURT: Could you just maybe move the microphone slightly closer to you, please.

MS. GUPTA: Sorry.

THE COURT: Thank you.

MS. GUPTA: Is that better?

THE COURT: Yes.

MS. GUPTA: Nicole Daedone started a reconciliation council to handle serious issues within the bounds of OneTaste. And we submit that the purpose of that was to keep people from seeking help from outside authorities.

Anthia testified that reconciliation council meetings occurred when people were leaving the company or had other issues with the executive staff. But instead of bringing in psychologists or licensed trauma therapists for these meetings, Nicole Daedone brought in a supposed expert on, quote, forgiveness. This is at transcript 3971.

Now, you heard about someone named Ayries Blanck, who is pictured here in Government Exhibit 388. She was a member of the New York sales team. And you heard about her from both Anthia and Lianna. And her issues at OneTaste were the impetus for the reconciliation council.

You heard from Anthia that Rachel Cherwitz was

training Ayries to be the next head of sales under her. That's at transcript 3890.

And Anthia described how Rachel Cherwitz would make a noise at Ayries as if she was training a dog and everything that Ayries did was scrutinized by Rachel Cherwitz. That's transcript 3892.

So, Anthia described here how Rachel Cherwitz assigned Ayries to a monthly sex assignment and she assigned Maya, Maya Gilbert, to be the person who was going to arrange all of Ayries' make-outs. This was one of those have sex with 30 people in 30 days assignments. And here, Anthia describes how Rachel Cherwitz also required the rest of the New York sales team, including Anthia herself, to create profiles on a dating website called OKCupid and engage in sex every day to support Ayries.

Anthia testified that during this time, Ayries was losing weight, she was gaunt and jittery. She observed that Ayries was shaking and throwing up. And Anthia described a time when she was at a restaurant with Ayries and Rachel Cherwitz, where Ayries was sobbing. She said that Rachel made a noise like a dog whistle to Ayries and told her to pull it together. And then she turned to the rest of the group and said: See, that's how you need to handle her.

Anthia testified that she also observed Ayries during this time that she had these sex assignments and she

was frequently sobbing, shaking and throwing up.

You heard testimony from Anthia that Ayries ultimately left OneTaste.

And this is not the only instance that Rachel Cherwitz treated staff in this way.

You saw Government Exhibit 1258-D-R, where Joanna Van Vleck and Rachel Cherwitz discuss a OneTaste employee named Roy and they complain that he's not working hard enough. And Rachel Cherwitz advises Joanna Van Vleck that it's like training a dog. This is how she was viewing her employees.

You also saw Government Exhibit 2030-D. And remember, this is when Ayries is raising allegations. You saw this chat between Joanna V and Kenan Wang.

She says: I have to tell you something and it's confidential. I'm sitting with Nic. Which, as you know, is a nickname for Nicole.

And she says that Ayries has raised allegations that OneTaste forced her to have sex with wealthy clients, forced her to go to 12-step meetings, and forced her to have sex for the job.

And how did Kenan Wang respond here? He said: I'm sure there are places she felt coerced in some way.

And Joanna Van Vleck, again, the president at the company at this time, says: Totally.

And Kenan says: I don't deny that Rachel or any of

us aren't at fault.

Joanna V says: On some level, this is our wake-up, that we can't play like that anymore, even to people we think are, quote, in because we all thought Ayries was in.

And you know that Nicole Daedone knew about these allegations because Joanna said she was sitting with Nic. She knew that OneTaste employees felt coerced, but that coercion still continued.

Anthia began to voice her own concerns about OneTaste issues. She testified on redirect about a document she wrote in January 2015 that set forth many of her concerns, which she shared with the reconciliation council. This is at transcript cite 4230.

And she said that she wanted to go on a vacation with her mother to Bali, in place of her deceased father, and so she negotiated to buy a third and very expensive Nicole Daedone Intensive in the hopes that putting down a deposit for that course meant that she could leave and go on this vacation without repercussions. But when she returned from that vacation, Rachel Cherwitz took away all of Anthia's governance powers as an owner of OneTaste New York and demoted her, just as Anthia had feared.

And after that, you heard from Anthia. She finally had the wherewithal to leave, realizing that no matter what she did, if she stayed, she was going to be subject

to Rachel Cherwitz's abuse and manipulation.

And hearing this conversation about Ayries, Kenan Wang also says: We aren't clean.

And in talking about Rachel specifically, Rachel Cherwitz, Joanna V says: None of us stopped her.

They were all on notice of these types of allegations and did nothing to stop her.

Now, you heard from Lyndsi Keves. She joined OneTaste in late 2016 and moved into OneTaste housing in the summer of 2017. She was hired as a OneTaste sales team employee in August of 2017 and then she was gone less than two months later, in the fall.

And Lyndsi Keves provided important evidence about the conspiracy in this case, both because she's a comparison to the other women who you heard testify and because she shows that this criminal conspiracy continued through 2018.

Now, Lyndsi is the only person who you heard from who started at OneTaste after Ayries Blanck left in late 2014, after you saw Joanna Van Vleck, in the text messages that we just reviewed, state that the allegations that Ayries made were their, quote, wake-up and that they couldn't play like that anymore.

Lyndsi Keves was recruited to OneTaste after that wake-up. And what you learned from Lyndsi is that there were some changes, but much remained the same. The Defendants and

their coconspirators did what they had to do to keep the company afloat so that they, and particularly Nicole Daedone, could dress up the company for sale so that Nicole Daedone could finally profit from the forced labor conspiracy.

And you heard that that's exactly what happened.

Now, Lyndsi's testimony made clear she was not subject to the same level of sexual abuse and coercion that her predecessors suffered. Reese Jones, as you know, was long gone. And as she testified, OneTaste was no longer doing public OM circles by the time she joined. They were only doing OM circles at the staff housing. And that's at transcript 2972.

She also said that at the time that she came in, Rachel Cherwitz was being more careful not to instruct employees to engage in sexual acts with prospective clients.

You heard that from Michal Neria, who also came in around the time of Ayries' departure. Michal told you that in June of 2015, after Ayries had left, Rachel Cherwitz told her not to OM with people for sales, which was a stark contrast to the many times in which Rachel Cherwitz specifically instructed earlier victims to either OM or engage in other sexual acts with prospective clients.

But you saw that for all of those changes that were made later in time, that the Defendants made to avoid the obviously problematic sexual services that had been ongoing at

the company, all of the other coercive tactics remained in place.

Lyndsi told you all about the pressure that she experienced to go into substantial credit card debt to pay for expensive OneTaste courses. She told you how Aubrey Fuller, one of the coconspirators in this case, encouraged her to take out a credit card to pay for a course and Lyndsi went to the bank and opened up a credit card in that moment. That's at transcript 2977.

She also told you about pressure to be in a relationship with someone named Rami and to ask him to pay for courses.

And remember, you heard almost the exact same testimony from Michal Neria regarding the pressure that was being placed on her relationship and the similar encouragement to ask her boyfriend, Misha, and later her fiancé to pay for courses, up to tens of thousands of dollars in courses.

You also heard from Lyndsi that the marriage stroke at OneTaste continued and that there was still pressure to get engaged at a Nicole Daedone led course. This is at transcript 3011.

And OneTaste tried to keep people with money. Similar to what you heard with Anthia Gillick, Lyndsi testified that her boyfriend at the time, Rami, had money and OneTaste was trying to keep him and Lyndsi interested in

OneTaste.

You also heard from Lyndsi that Rachel Cherwitz continued to use tactics of belittling, shunning, public shaming and yelling to get employees to sell courses. That's at transcript 2998 through -99.

Rachel Cherwitz continued to hold the same position as before, as the head of sales, facing no consequences, despite the allegations that were raised by Ayries Blanck.

And employees were still expected to communicate on incessant text threads. Lyndsi testified that the sales team continued to love bomb people and collect information about their personal vulnerabilities to use in making sales. That's at transcript 2996.

She also said OneTaste continued to intermingle the personal and professional in a way that left Ms. Keves working many more hours than what were reflected on the books. And you heard this consistently from the victims, from earliest in time to later, like Lyndsi. This is at 2992 in Lyndsi's testimony.

And, of course, OneTaste continued to rely on unpaid, quote, volunteers to work from morning, noon and night to run courses that earned money for the company and, ultimately, for Nicole Daedone. That's at transcript 2983.

And then finally, you heard from Lyndsi Keves how Nicole Daedone sold her interest in OneTaste in 2017.

And you saw the purchase agreement. On March 3rd, 2017, Nicole Daedone sold OneTaste for a whopping $12 million to Anjuli Ayer, Austin Ayer, Amanda Dunham and Sujo Offield.

And the sales contract not only shows that Nicole Daedone benefited financially from the OneTaste venture, it also provides a window into her intentions. When she told her stake in the company for $12 million, not a single dollar of that was shared with the people who helped build the company, who gave their time, their labor and their trust. But she did ensure that her mother, Beverly Daedone, was taken care of. Her mother, who had been on the OneTaste payroll for years even though you heard from witness after witness during this trial that they never saw Beverly Daedone work at OneTaste.

And here, you saw Nicole Daedone's resignation letter in Government Exhibit 3608. She officially resigned from the company around the time of the sale.

But the conspiracy didn't end here. Even after Daedone sold her interest in OneTaste, she and Rachel Cherwitz continued to receive payments from OneTaste through 2018. In other words, they continued to reap the financial benefits of their forced labor conspiracy through 2018.

You saw Government Exhibit 3767, Rachel Cherwitz's separation agreement from the company. She finally leaves on May 11th, 2018. And as part of her separation agreement, she

was paid severance of $70,000.

Members of the Jury, this is the full timeline of the conspiracy.

And again, you could see how the company changes over time, from being supported by Reese Jones in its early years to a sales model in 2012.

And you can also see the tenure of each of the nine victims that you heard from during this trial. And again, although they were at the company at different times, you heard all about the manipulation and coercion that they experienced. They had strikingly similar stories about the Defendants.

During the Reese Jones years, Nicole Daedone and Rachel Cherwitz coerced victims into serving as his handlers.

And then, during the later years of OneTaste, Nicole Daedone and Rachel Cherwitz coerced victims into sexually servicing other funders of OneTaste, like prospective clients and VIPs.

And they continued to coerce victims all along into working long, grueling hours for little or no pay.

So now let's go to the charge and how the evidence fits the crime in this case.

Now, as we discussed earlier, the Government must prove that the Defendants agreed to obtain labor or services from the victims. And remember, the agreement itself is the

crime.

Now, you only need to find that the Defendants each entered an agreement with one other person. That means that you don't even have to find that Nicole Daedone and Rachel Cherwitz entered into an agreement with one another, although we submit that they very clearly did. It would even be sufficient for you to find that they entered an agreement with someone else.

And we expect that the Judge will instruct you that the Government must only prove that this offense was committed during any part of the charged time frame, which is 2006 to May 2018.

So, let's talk about the agreement.

The evidence has shown that Nicole Daedone and Rachel Cherwitz agreed with each other to obtain labor and services from these nine victims.

You've heard from nearly every victim that Nicole Daedone and Rachel Cherwitz was a pair and that Rachel Cherwitz reported to Nicole Daedone.

You saw here in Becky Halpern's testimony, transcript 122, she said: They were a pair and a unit, Nicole at the very top and Rachel being her right-hand woman.

She said: They worked as a close pair.

Chris Kosley likewise testified, at transcript 1945, that Rachel appeared to be Nicole's second or right-hand

person.

And you heard throughout this time that throughout OneTaste development, from a communal warehouse to having a full-fledged sales team, Nicole Daedone directed Rachel Cherwitz and Rachel Cherwitz directed others in response.

Now, you saw the relationship between Rachel Cherwitz and Nicole Daedone as early as 2008. And remember, this is the OM demonstration at Reese Jones's house at Stinson Beach that we watched earlier. This was only about a year after Rachel Cherwitz had joined OneTaste. Now, this was the one that you heard was put on for investors. And even in this early time at the company, she was selected to introduce Daedone before the demo, which demonstrates her importance to Daedone only one year after joining the company and it corroborates that they were working together to make money for the company.

And you saw Rachel Cherwitz in this video reading Nicole Daedone's life story. Let's watch some of that.

(Video played.)

MS. GUPTA: So let's just stop there.

(Video stopped.)

MS. GUPTA: Rachel Cherwitz recited how Nicole Daedone learned how to control men and control women and turn that control into a thriving, lucrative business.

In the remainder of the video, she also described how Nicole Daedone learned to play life's latest games and how orgasm taught her that everyone wants the same things, including to play and to be played.

This reference to games and control goes hand and glove with the way that Nicole Daedone treated her followers.

And you heard testimony that following Rachel Cherwitz's presentation of Nicole Daedone's life story, that OM demonstration followed, where Nicole Daedone fully undressed, laid on a table and her genitals were stroked for an hour. You saw a clip earlier right before the OM demonstration with Christina next to her.

And notably, this is not how OMs were typically done. As you heard in this trial, typically only bottoms were removed and OMs only lasted for 15 minutes. But instead, Nicole Daedone put on this display for investors. And Nicole Daedone's lieutenant, Rachel Cherwitz, introduced her and stood by her side as she put on an exaggerated performance.

You heard testimony on this point from Chris Kosley. He testified about how while Nicole Daedone was being stroked, investors approached her on the table to touch her thigh and, as Chris Kosley put it, to feel the energy that's being generated from the practice. And he said the person who was inviting people up to touch Nicole Daedone's body was Rachel Cherwitz. Again, this shows their agreement.

And you saw Robert Kandell identify these photographs, 4795 and 4796. These were other investors in OneTaste. And of course we know Reese Jones was there. And remember, Kandell also testified that a reporter from the New York Times was present for this demonstration.

Nicole Daedone, Rachel Cherwitz and Robert Kandell did this to bring money into OneTaste and to gain power and prestige. Together, they used OneTaste -- they used sex to sell OneTaste that day. And they would continue doing so in the future, this time in reliance on the victims' coerced sexual activities.

For example, you saw these texts between Rachel Cherwitz and Ken Blackman. And here, you see how Rachel Cherwitz is in charge of getting Reese paid back. She says: We need to pay Reese 27,000 by July 1st, so let's go get 'em. And she directs the sales team to sell a coaching intensive to at least five people. Reese was putting pressure on Nicole Daedone to pay him back and, in response, Rachel Cherwitz tried to sell as much as possible. This is also evidence of their agreement.

And you heard from Robert Kandell. He said: I think Nicole put a lot of pressure on her to make these sales calls, especially as they got higher. And he said that she runs Rachel and Rachel runs the team. That, too, shows that they acted as a unit.

Here, he says Nicole Daedone described the two biggest hunters at OneTaste. She said it was Rachel and herself.

You also heard testimony on this point from Christina. And she testified about a conversation that she had with Nicole Daedone about Rachel Cherwitz. And again, this is in the earlier years. Christina was there around 2008, so Rachel Cherwitz had not been at the company for very long. And even in these early years, what does Nicole Daedone say about Rachel Cherwitz? She's loyal.

And this was true. Rachel Cherwitz was loyal to Nicole Daedone. Throughout this trial, the evidence has shown that Rachel Cherwitz constantly did Nicole Daedone's bidding, whether it was making money to pay Reese, putting extreme pressure on the sales team to increase profits, or coercing vulnerable women into performing sexual acts with VIP clients and other prospective customers.

You also heard testimony on this agreement between Nicole and Rachel from Michal Neria. She testified that on a bus ride up, Rachel was sitting in the front passenger seat and she could see that she was texting with Nicole. She said they were texting about Brooke Scheffer. And again, this is Anthia Gillick. She had just left OneTaste -- Michal said she was one of her best friends at the company -- and they were talking about how much money Brooke still owed for her

courses.

And you saw that they were texting about her, discussing purely numbers, how to get money from Brooke.

And you saw this and heard this repeatedly from Brooke's testimony; that because she was well off, they were trying to get money from her for OneTaste New York and for courses.

Michal also testified as to the agreement between Nicole Daedone and Rachel Cherwitz that Nicole Daedone was the head teacher. And she said Rachel Cherwitz was one person below Nicole; she was also a teacher.

And you also heard testimony on this from Anthia Gillick. She said: Nicole was the head teacher and Rachel Cherwitz was constantly reinforcing on text threads, as were the rest of the senior staff.

Rachel Cherwitz was constantly reinforcing Nicole Daedone's teachings. Again, this is compelling evidence of the agreement.

And what did those teachings include? They included things like aversion practice, which we've already discussed, where people have sex with people they find unattractive or even repulsive, and the idea that having more sex, including with potential clients, would somehow free them.

This was presented as a benefit to the student, a way for them to reach enlightenment, but you know better.

This was also a way to ensure that OneTaste had a steady supply of attractive young women willing to engage in sex acts with older, wealthier men.

The evidence has shown that both Nicole Daedone and Rachel Cherwitz also agreed with others to obtain labor and services from the victims, in addition to their own agreement.

And I also want to note that although Rachel Cherwitz didn't join OneTaste until 2007, the Judge will instruct you that the Government does not have to prove that the Defendants committed the charged act throughout the entire time period. It is enough that Nicole Daedone and Rachel Cherwitz entered into a conspiracy at the time Rachel Cherwitz joined OneTaste.

And you know that this conspiracy continued well into 2018. Here are just a few examples, and you saw all of these the other day. E-mails where Rachel Cherwitz e-mails Nicole Daedone with student write-ups, where she's describing sensitive details about prospective students and sharing them with Nicole Daedone. And several of these are in 2017 into 2018, after Nicole Daedone has already left the company.

Now, in addition to this agreement between Nicole Daedone and Rachel Cherwitz, every person on this board here played a role in the conspiracy.

First, there's Robert Kandell, the cofounder of OneTaste, who you've already heard a lot about. You know he

OneTaste in 2004 with Nicole Daedone. And by 2006, the evidence has shown that they entered into an agreement to obtained forced labor from participants at OneTaste.

Robert Kandell testified to this himself. He said that he, Nicole Daedone, Rachel Cherwitz, Rachael Hemsi, Yia Vang, Joanna Van Vleck, again, all participants who are on that board, used manipulation as a means of directing labor from individuals in OneTaste.

(Continued on the next page. )

MS. GUPTA: Now, you also saw evidence of Nicole Daedone and Robert Kandell's agreement through all the emails with Reese. Robert Kandell was the person who was making sure that Reese would get paid back. He was also in the agreement with Nicole Daedone to ensure that sexual services were being provided to Reese Jones so Reese would continue to invest in the company.

In addition to the agreement between Nicole Daedone and Robert Kandell, you also saw evidence of the agreement between Rachel Cherwitz and Robert Kandell. You saw several instances, and this is Government's Exhibit 1141, where Robert Kandell was trying to pay Reese Jones back. And remember, in each of those instances he went to Rachel Cherwitz and Yia Vang. And remember, Rachel Cherwitz said she would work on getting paid in full for coaching program so they could pay Reese back. The evidence has shown that Robert Kandell was one of the defendants co-conspirators.

Second, there is Yia Vang. As you heard throughout this trial, Yia Vang was responsible for training the women who became Reese Jones' as handlers. She showed Michelle and Maddie how to stick a dildo in Reese Jones' butt. And showed Dana his sex toys.

As we saw earlier, she told Dana to, quote, "practice her top." And to use a dog collar and leash to walk Reese Jones around the room like he was a puppy. Nicole

Daedone wanted Reese Jones handled, and Yia Vang made sure he was.

Even after Reese Jones, you heard testimony on this point. Becky testified, for example, that Yia was very connected to Nicole, that's at transcript 144. And Becky testified that Yia often acted as a liaison to tell everyone in the staff what Nicole said or what Nicole wanted. You also saw in the transcript that we just saw from Robert Kandell where he admitted that he, Nicole Daedone, Rachel Cherwitz, Yia Vang, Joanna Van Vleck and Rachael Hemsi all manipulated people at OneTaste as a means of obtaining labor. Yia Vang is also a co-conspirator.

And then there is Rachael Hemsi. As you just heard, she was in on the manipulation scheme that Robert Kandell testified about. You also heard testimony that Racheal Hemsi was one of the individuals who introduced Dana and Reese Jones, and encouraged Dana to have a relationship with Reese so she would continue to provide him with sexual services; even though Rachael Hemsi knew at the time that Dana was in love with someone else. And Rachael Hemsi did this at the direction of Nicole. She told Dana that Nicole Daedone knew Dana would be dating Reese Jones, even before Reese Jones himself knew, that's at transcript 1584.

Rachael Hemsi was also aware that just prior to become being Reese Jones' handler, she suffered a traumatic

miscarriage in the months leading up, that's at transcript 1300. You also heard testimony from Christina Berkley on Rachael Hemsi's role in the scheme. She testified that she frequently observed Rachael Hemsi writing emails to Nicole Daedone giving her updates on the details of different members of the community. That's at transcript 1065.

You also saw these text messages, Government Exhibit 4501C, in which Chris Kosley and Nicole Daedone discuss Rachael Hemsi. Here they are discussing complaints that both Rachel Cherwitz and Rachael Hemsi were directing people on what to do, referencing a culture of manipulation.

You also heard testimony on Rachael Hemsi from Lianna Lifson. Lianna testified that Rachael Hemsi was one of the individuals who directed her to OM with new men, along with Rachel Cherwitz and Yia Vang. Rachael Hemsi was also a co-conspirator.

Then there is Joanna Van Vleck who served as the president of OneTaste. Robert Kandell also testified about Van Vleck's participation in the manipulation scheme. You saw countless text messages between Nicole Daedone and Van Vleck where she was doing Daedone and Cherwitz' bidding, including in one instance that we saw which is Government Exhibit 2033DR, where Van Vleck was writing text messages to Brooke Shepard that were being narrated by Nicole Daedone. Joanna Van Vleck is also a co-conspirator.

Finally, there is Aubrey Fuller who quickly rose up in the ranks at OneTaste and was on the sales team in New York. You heard testimony from Dana Gill that Aubrey Fuller was the person who signed her up for SugarDaddy website, so she could use that money to pay for OneTaste courses. Then you heard testimony from Michelle Wright that Aubrey Fuller oversaw her when she was fired from her job in Las Vegas and moved to the LA community. And of course, Aubrey Fuller also reported to Nicole Daedone. And Anthia Gillick testified that after she returned to New York from a trip with her mom, Aubrey was one of the individuals who fired Anthia from the executive team in New York. Aubrey Fuller is also a co-conspirator.

Members of the jury, we proved an agreement between the defendants and each of these individuals. All whose actions may be considered as evidence of the conspiracy, as we expect the Court will instruct you.

Now, next, the Government must prove for either method of proving the crime that we discussed earlier, that the defendants conspired to obtain labor or services from the victims.

I won't dwell on this for long, because you already heard about all of the labor and services that the victims performed at OneTaste. This is really undisputed.

You heard about back of house, which involved

setting up events and courses. Nearly every single victim at trial worked at back of house. You heard about the sex and sexual conduct, including OMing with of prospective clients and VIPs. You heard about sex acts with Reese Jones. You heard about coaching, sales, marketing, event production. You heard testimony from several victims who served as assistants for Nicole Daedone or Rachel Cherwitz, which included both Christina and Max. And you heard from victims who cleaned for Nicole Daedone, including Max and Anthia. And you heard from victims who were responsible for cooking, like Michelle Wright.

You also heard about participation in OneTaste promotional material. As part this material you heard from both Dana and Michelle that OneTaste began producing sexual how-to films. Dana, for example, testified that she was in one of those how-to videos with Robert Kandell, that's at transcript 1286.

And Michelle Wright testified that Rachel Cherwitz directed her to appear in another how-to film with a community member named Andreas, in which they had sex. That's at transcript 2400. Neither Dana nor Michelle were paid for this work.

Members of the jury, the Government has proved that the defendants conspired to obtain labor or services from these victims. Collectively, these nine victims performed

labor and services that spanned a decade. And as you heard, they performed everything from menial tasks to sexual services.

So now let's talk about serious harm. So for both methods of proving this crime, the Government must prove that the defendants agreed to obtain labor and services by using any one of or any combination of means of serious harms, threats of serious harm, or a scheme, plan or pattern intended to cause a person to believe that if they did not perform such labor or services they or another person would suffer serious harm.

I know that's a lot. The judge will instruct you on this as well. I know it's been a long morning but this is really the heart of the case.

The damage that the defendants did to these women who came up here and testified to you, is their serious harm, the damage inflicted on them to get them to work.

As we discussed earlier, serious harm, again, is any harm. It can be physical. It can be non-physical. It can be psychological, financial, reputational, and it can also be sexual crime.

Now you heard from nine victims on this point. Again, some of them overlapped while at OneTaste and others didn't know each other at all. But you heard strikingly similar stories.

The defendants controlled these victims using the same tactics. These victims showed the scheme, plan or pattern that the defendants employed to obtain free or cheap labor for OneTaste benefit and for the defendants' own personal benefit. So let's discuss the tactics of coercion that the defendants used.

I'm going to walk through each of them: Indoctrination grooming, isolation, manipulation, use of past trauma, monitoring, public shaming, disruption of relationships, and sexual abuse. All of these tactics in combination resulted in extreme psychological harm to these nine victims. Remember, sexual abuse is also physical harm.

I'm also going to discuss the physical exhaustion the victims testified to. As well as the financial harm that the defendants caused them.

So let's talk about the first tactic. Now you heard throughout this trial that the defendants indoctrinated the victims in this case to believe that Nicole Daedone was a guru and spiritual leader. You heard this from Dana Gill: She was in many ways a spiritual leader. You heard from Becky: Dana said she was God. And Nicole Daedone taught at OneTaste courses where the only path to enlightenment.

As we just discussed about these agreements, you heard testimony from multiple witnesses that Rachel Cherwitz was Nicole Daedone's second in commanded, or her right hand,

that they were a unit and she emphasized Nicole Daedone's teachings.

You also heard that the defendants used a particular language at OneTaste that ultimately contributed to the victims' feeling that they were in another world entirely.

You saw and heard emphasis these terms throughout trial. Terms like TurnON and muggles and the matrix and tumescence. This was all done to indoctrinate the victims.

Now remember, we talked about how the defendants refer to this world, the real world, as the third dimension while their world is fourth dimension. This is in Government Exhibit 38754 where Nicole Daedone discusses this concept.

(Video played)

MS. GUPTA: So here you heard Nicole Daedone personally describe the third dimension a world with rules and laws, while the fourth dimension, in her mind, doesn't have any of those things. And OneTaste was in the fourth dimension.

Now, you also saw Government Exhibit 1456DR. Nicole Daedone taught that orgasm was God. And even for OneTaste marketing in this chat exchange she stated that she liked the subtle God reference and the marketing slogan: Powered By Orgasm.

But Nicole Daedone and Rachel Cherwitz didn't just indoctrinate their victims with teachings to coerce them into

doing their bidding, they also personally connected spirituality to OMing to protect themselves.

You saw Government Exhibit 2075DR, a chat between Joanna V and Nicole Daedone where they are discussing the legalities of OMing. And here Joanna V proposes saying that if for only higher consciousness or spiritual awakening. She said: We gain a bit of protection from the First Amendment, and people can see it's not focused on sexual arousal. And Nicole Daedone responded: I'm so down with that.

And that's not because OMing was actually spiritual. They connected OMing to spirituality for legal protection, and so people would follow Nicole Daedone's teachings.

Now let's discuss grooming. Over time the defendants slowly groomed the victims into doing things they previously would not have done for the benefit of the defendants and for OneTaste's benefit.

Again, you heard the practice of aversion practice. Leaning into their aversions and doing things they found disgusting because that served OneTaste. It served OneTaste for young women to be engaging in sexual services with prospective clients.

You also heard testimony about the concepts, turn a no into a yes, and got off on every stroke. This is Michelle Wright's testimony at 2350. She was asked if Nicole Daedone ever discussed the concept of consent at OneTaste. Michelle

said, rare. On the other hand, Michelle was well aware of the phrase, turning a no into a yes, and get off on every stroke, which is another way of saying, like, can you find a yes inside of yourself no matter what is happening, even if something is outside your preferences or if it's uncomfortable and you don't like it. This is what Nicole was teaching.

And let's be clear about these teachings, they were intentional and purposeful. Nicole Daedone taught these concepts so that her employees would only say yes to her. Remember, Michelle Wright testified that saying no to Nicole Daedone was in Michelle's words: Basically like death.

You heard testimony that Nicole Daedone as the spiritual leader of OneTaste taught OneTaste participants that there is no such thing as a victim, and the way for a woman to deflect rape is being more, quote, "turned on". Let's watch this in Government Exhibit 3875.

(Video played)

Members of the jury, all of these teachings are in line with Nicole Daedone's ultimate purpose to use sex for sales. And let's just be clear, these are not one-time teachings. These concepts were drilled into the victims' heads every day from morning until night by the leaders and supervisors of OneTaste.

You heard from the victims. Nearly all of them lived in OneTaste housing and were subjected to these

teachings incessantly. They all told you about how they started to doubt their own inner conscious and voice and their ability to separate what they wanted from what Nicole Daedone and Rachel Cherwitz wanted for them.

After grooming the victims to believe that they should never say no to Nicole Daedone and that they should get off on every stroke, the defendants used a variety of additional variety psychological tactics to manipulate their victims and ultimately control them.

Isolation. The defendants tried to isolate their victims so they felt like OneTaste was all they had. Remember, people outside of OneTaste were called muggles, and the defendants and their inner circles discouraged the victims from associating with muggles. You heard testimony from nearly every victim that they ultimately ended up cutting ties with many of the people who were important to them outside of OneTaste, until they felt like OneTaste was all they had. The defendants and their inner circle shunned people who left, which made those at OneTaste believe that they too would lose everything if they OneTaste.

You heard Max testify on this point. Max replaced two people on the production team in New York City who at that time left OneTaste, Maddie and Drea. And Rachel Cherwitz told Max not to speak to either of them because they had quit abruptly. You heard similar testimony from Michelle Wright,

at 2422.

Now remember, Michelle's then-girlfriend, Maddie, left OneTaste. And at that time Nicole Daedone said: If I ever see that little cunt again, I'll smash her head against the sidewalk.

Members of the jury, let's be clear, Daedone's words did not only cause severe psychological called to Michelle Wright, but they were also a direct threat of physical harm. These words were a warning to Michelle. You heard, even if she was struggling during her last months at OneTaste while in Vegas, she remained there and continued to provide labor and services. She said she put on a face that she was a, quote, "turned on woman" because that's what she was supposed to be at OneTaste. But in realty they was broken and she said she had nothing left, that's at transcript 2423.

Members of the jury, there may not have been physical chains holding the victims in place. There may not have been locks on the door. But as you heard repeatedly throughout this trial the victims who testified did not feel like they could leave OneTaste. All of them felt isolated from their family and friends, and felt like their whole world was OneTaste. It was their community, their friends, where they worked, and they where lived. And the defendants did all of this by design.

The defendants also used tactics of manipulation.

As you saw earlier, Robert Kandell testified that manipulation was used as a means of directing labor. He said he, Daedone, Cherwitz, Yia Vang, and Joanna Van Vleck all manipulated people to further the goals of OneTaste. He said they directed people past their comfort zones. He testified that they used threats, fear of losing positions, fear of losing social status, moving people to different cities, and making promises that were then taken away as part of these manipulative tactics.

Here Robert Kandell testified directly to Rachel Cherwitz as being part of this manipulation scheme. And he talked about how Rachel Cherwitz would love-bomb on staff. She would promise something, she would bring up their faults, and then she would embarrass them in front of the group. She did all of these things to push people in the direction of increasing sales and attention for the goal of the organization.

The defendants manipulated people to work harder and longer hours beyond their only self-limits. Kandell's testimony corroborated that victims worked ten to 12 hours a day, and were exhausted from how much the defendants and other core staff at OneTaste were pushing them.

He also testified that manipulating people to provide sexual services was specifically the defendants' territory.

You also heard testimony from Robert Kandell on this idea of a carrot-stick affect. He said: You know, you had the carrot to do more, to be involved, to get closer to the inner circle; and then there was the fear of being kicked out. He testified that in even in the early days of OneTaste you heard about this in/out game at OneTaste. He said that was also used as a manipulative tactic during the Warehouse days. These are all examples of the manipulative tactics the defendants used to obtain labor. Love-bombing in order to groom victims to work for little or no pay. Using Fear tactics to get people to do what Daedone and Cherwitz wanted them to do. Then physically exhausting them through long hours, unable to say no.

The defendants also used employee's past trauma to their advantage. Now you heard testimony from many of the victims who joined OneTaste that they were looking for meaning in their lives. Many of them had suffered some sort of prior trauma or hardships, and were particularly vulnerable. And they were drawn to the defendants' promises of enlightenment and community. You heard this from Dana for example, and you heard it from Max. But the defendants shared and used this information to their advantage. They used it to make sales and they used to manipulate their employees.

For example, you saw Max's testimony on this point. She testified regarding her traumatic upbringing. She told

her life story to Nicole Daedone. Nicole Daedone during a course told Max to retell her story in a Daffy Duck voice, making light of Max's traumatic childhood. And Max said that she felt like she had failed Nicole Daedone's assignment because she was unable to do it.

You also heard from Becky Halpern on this point. She testified that participants in OneTaste regularly discussed and viewed details regarding participant's past trauma in public settings. She said it was widely shared among the employees. This is at transcript 149 through 50.

Similarly, you heard testimony from Anthia on this point. Anthia had been raped at 21 years old. She informed OneTaste leaders of that during a trauma course at coaching program. You heard that during a Taboo course she participated in, she participated in reenacting her rape. She described how one of the exercises in the Taboo course she attended was to stage a scene involving a past trauma. She and partner undressed. And her partner are forced her to perform oral sex on her, to reenact her prior sexual assault. Anthia described how the rest of the group in that course watched her and told her she was beautiful, which is what her rapist and told her. Anthia described the purpose of the exercise was to, quote, "move from revulsion to turn on." And also heard earlier in the video that we watched, this is precisely what Nicole Daedone taught to victims regarding

sexual assault. Anthia described how her entire body was shaking during this incident. She was sweating. She realized as they began the reenactment that it was a terrible idea, but she did it because of the psychological state she was in at the time she was in at OneTaste. This is all the 1349 through 50 of the transcript.

Now you also heard testimony about monitoring. You heard testimony that the victims who worked at OneTaste lived in communal homes where the defendants were able to keep tabs on their victims and control nearly ever aspect of their lives. You saw how the defendants and their executive team assigned OneTaste members roommates and in some instances even bedmates, and those bedmates and room assignments can be changed at every time.

You heard they have their meals with other OneTaste members. All of their outings were with other OneTaste members, no privacy whatsoever. They had no privacy whatsoever. And they have the same schedule everyday. Every morning at 1008, the communal home in San Francisco, or the Morellino the communal home in Harlem, or the Brooklyn OM House, began with morning OM practice. Then the defendants would direct their victims to prepare fear inventory of their deepest fears and bring them to core staff, including directly to Rachel Cherwitz.

Dana Gillick in particular testified that she read

Rachel Cherwitz her fear inventory and that Ms. Cherwitz knew the depths of her fears and insecurities.

The defendants also called the victims addicts and directed them to attend addiction meetings, even if they didn't have an addiction. You heard testimony on this point from Michal Neria. She repeatedly went to Alcoholics Anonymous and Narcotics Anonymous meetings at direction of Rachel Cherwitz, even though she was addicted to neither.

The victimless worked for OneTaste and lived for OneTaste.

You also heard that Rachel Cherwitz instructed staff to report on others in OneTaste, including prospective clients and other team members.

Max testified to this point. As part her role as Rachel Cherwitz's assistant, Rachel Cherwitz instructed Max to provide her reports and daily updates on the dynamics at the Morellino and on the activity of the sales team. Max testified too that they never experienced this kind of reporting and monitoring in any other jobs that Max had had. Max further testified that Max believes there were other motives in Rachel getting these reports that had to do with power dynamics and keeping tabs on us.

You saw an example of this reporting. You saw Government Exhibit 2676, which is one of the emails that Max Pixley sent to Rachel Cherwitz regarding things that she was

noticing about the team. Look at the time that Max sends this email, 12:44 a.m. This is further corroboration of the demanding hours at OneTaste. Max testified that this was the end of her work day, that it was representative of the hours she worked. This is at transcript cite 1701.

You heard similar testimony from Anthia on this point. She constantly texted with Rachel Cherwitz and Nicole Daedone when she was a part owner about what she noticed with respect to people living in the Bunker, another communal home in New York City.

You also heard about the tactic of public shaming. You heard Christina testify that she attended a lunch with Nicole Daedone and others in 2009. And at that time members of OneTaste disapproved of Christina's romantic relationship. The Christina described no one at lunch spoke to her. But Nicole Daedone spoke about her as if she wasn't there. And Christina testified that she felt publicly shamed. This is at transcript 1121 through 22.

You also heard Becky testify on this point. She testified that Rachel Cherwitz publicly shamed and berated her in front of a group of OneTaste employees calling her a virus and telling her that the cancer needed to be cut out of her. Rachel Cherwitz instructed the other OneTaste members not to speak to or associate with Becky. These were people she lived with and worked with, and they listened to Rachel Cherwitz.

Becky testified that they stopped communicating with her for days or possibly weeks, causing that Becky to eventually leave the New York office. This is at transcript 298.

And Becky was not the only one who was called a virus by Rachel Cherwitz. Max Pixley testified that they frequently had mental breakdowns while at OneTaste due to the stress and heightened experiences.

During one of those mental breakdowns, Chelsea Hunter, another OneTaste participant at the time was comforting Max. And Rachel Cherwitz told Chelsea to stop and referred to Max as a virus. This is at transcript 1707 through 08.

Robert Kandell corroborated this. He testified that Rachel Cherwitz routinely used the word virus to single people out especially on the New York sales team.

You heard Max testify that Rachel Cherwitz frequently called people out in front of everyone. And if she didn't like you, she could make your life hell. That's at transcript 1695.

Michelle similarly testified that saying no to Nicole Daedone or Rachel Cherwitz was met with shaming and being put in the dog house. That's transcript 2409.

Rachel Cherwitz's treatment of employees is corroborated by text messages between co-conspirators Yia Vang and Joanna Van Vleck. You saw this in Government Exhibit

2000DR. They also discussed concerns they had about Rachel Cherwitz's behavior. Here Van Vleck says: Have to talk to RT yet about her teaching? She's doing that to the team today. Either you talk to her or I will. And Yia says: Okay, I'll talk to her. Van Vleck goes on to say: It's the place where she yells at people to motivate them, and then calls out orgasm and electricity. It will continue to get us in trouble the bigger we get. She says they are all stupid and self-centered. Literally says that on the call, that they are selfish and leave the goal to her. So you got to say something or I will.

You heard Anthia Gillick testify about her fear of public shaming. While she was at OneTaste, Anthia testified that she sustained a serious physical injury for which Rachel Cherwitz encouraged her not to seek medical treatment, because that would be, quote, "off script". Anthia testified that despite her physical pain, she listened to Rachel Cherwitz because she feared public shaming and losing everything that mattered to her. Her fear was so great that she testified that any public shaming or psychological impact on her would be worse than any of the physical pain that she was experiencing.

Finally, you heard about Lyndsi Keves testify that Rachel Cherwitz was emotionally abusive and verbally abusive. Lyndsi was at OneTaste later in time, Rachel Cherwitz's

emotional abusive tactics continued. That's at transcript 2963.

Now think about this for a moment. Rachel Cherwitz is these individuals' boss. She's calling her employees a virus and saying the cancer needs to be cut out of them. That is not a normal or appropriate workplace.

The defendants also disrupted inmate relationships between OneTaste participants to further their own goals; again, this was intentional. The defendants did this for the benefit of themselves and for OneTaste. You heard about several instances of this throughout trial, so I'm going to summarize a few.

You heard from Christina Berkley. She testified that she was in love with her research partner, a man named Isaac. But to stay at OneTaste Daedone decided that Christina could not be with Isaac, because she, quote, "falling asleep and giving up her power." Transcript 1040.

Christina testified that Nicole Daedone taught that, quote, "falling asleep" meant that she was not on her spiritual path and was not contributing to the system, which meant Christina was not contributing to the goals of OneTaste. And giving up her power meant that she was too focused on her research partner and not focused enough on her work. So Christina testified that while she was allowed to stay at OneTaste, she and Isaac had to be separate parts of the

Warehouse, and could not be together. Christina testified that this instance made her believe that whatever she did it had to be for the benefit of the system, OneTaste; and whatever Nicole Daedone wanted.

Similarly, you heard testimony from Christina that Robert Kandell and Justin Dawson, another core staff member, were together and in a happy relationship. Nicole Daedone broke them up because the relationship was, quote, "bad for the system." And Daedone asked Christina to watch Robert Kandell and report back to her.

You also heard Robert Kandell testified about this. He said that Daedone directed him to breakup with Justine Dawson and date Rachel Cherwitz instead. And that Nicole Daedone directed this because she believed that Rachel Cherwitz was upset and it was negatively impacting the organization's sales. That's at transcript 3277.

Approximately one month after Rachel Cherwitz joined OneTaste, Daedone directed Kandell to become research partners with Rachel Cherwitz.

You saw Government Exhibit 3212R, a transcript of a Darshawn, a Q&A learning process, between Nicole Daedone, Robert Kandell and Christina Berkley on July 10, 2008. In this transcript Nicole Kandell and Christina discussed Nicole's disruption of Kandell's relationships as well Christina's struggles related to Isaac. Years later you heard

that Nicole Daedone did this to Christina a second time with a man named Vladimir. Yia Vang who reported to Nicole Daedone told Christina that she had to choose between that relationship or OneTaste. That's at transcript 1120.

You also heard that from Michelle Wright. Michelle Wright joined OneTaste in or around 2010 with then-girlfriend Maddie Carl. And while Maddie moved into 1080 immediately, you heard Michelle say that Rachel Cherwitz initially didn't allow her to do that. And she called Michelle a leech. She made it clear that Michelle would be on probation for several months and prove herself to OneTaste before she could move in and be with her girlfriend.

Similarly, you heard testimony from Dana. Nicole Daedone and others taught Dana monogamy was highly discouraged at that time and then Dana fell in love with Robert Bakhshai, another OneTaste participant. She wanted to pursue a monogamous relationship with him. But as you heard her testify, OneTaste leaders including Daedone, Yia Vang and Rachael Hemsi told Dana that she was pulling on Rob and taking him away from his duties to OneTaste. They encouraged her to pursue a monogamous relationship with Reese Jones instead. That was because they wanted Dana to continue to sexually service Reese, because that relationship suited them better than Dana being with Rob Bakhshai. That testimony is at 1312.

Now, in addition to grooming the victims to

participate in all sorts of sexual acts, the defendants subjected many of them to sexual abuse, contributing to both physical and psychological harm. Now you heard a lot of examples of this already this morning and throughout this trial so I'm just going to focus on a few examples.

You heard from Becky. Becky testified regarding Rachel Cherwitz sexually assaulting her. Sometime after Rachel Cherwitz called Becky a virus in front of a group of people, Becky testified that Cherwitz organized a OM demonstration at Morellino, the communal home in New York. You heard Becky testify that Cherwitz called Becky up to do an OM demonstration, to which Becky responded no. At that tine she was upset, no one in the community was speaking to her. After going back and forth with Rachel Cherwitz, you heard Becky say she finally relented. She undressed from the waist down and went up to the table. Then Cherwitz directed Rafael Martinez, another OneTaste participant, to massage Becky's genitals in front of the group.

After a few minutes of that, Cherwitz herself began massaging Becky's genitals. Becky was very clear during her testimony that she did not consent to that, she did not agree to Cherwitz massaging her, she did not want Cherwitz massaging her. And while Cherwitz massaged her, you heard Becky testified, that Cherwitz asked another OneTaste participant, Hamza Tayeb, to go into another room and asked him if he

could, quote, "feel her orgasm."

And Cherwitz berated Becky while still massaging her genitals. Transcript 304 through 306.

(Continued on following page.)

(Continuing.)

MS. GUPTA: Becky testified that she was shaking and sobbing and the only other times that she's reacted that way was after surgery. And even after this horrific incident, Becky testified she continued to provide labor and services to OneTaste even while she was enduring the severe psychological and sexual abuse. She finally left after she said in her own words, I couldn't withstand the berating and the sexual abuse and the emotional abuse and the psychological abuse that was happening behind closed doors. This is at 790 through 791.

You also heard testimony regarding sexual abuse from Max. You heard testimony from Max that Rachel Cherwitz directed Max and an individual named Eli Block who was part of the core staff to OM together because they didn't get along. Rachel Cherwitz directed Max to stroke Eli which meant give him a hand job. And although Max didn't want to do this, they testified that at the time due to their mental state, they would have done any assignment Rachel Cherwitz gave them. This is at transcript 1688 through 89.

Max also testified about another incident. Max testified that at a particular sales meeting in New York, Max, Becky, Ruwan Meepgala and Chelsea Hunter were present. And Rachel Cherwitz was angry because New York was not meeting it's sales goals and she blamed it on tumescence and

the sales team. Specifically, she blamed it on tumescence between Becky and Ruwan. And so Rachel Cherwitz's response to that was to instruct Becky and Ruwan to go have sex in another room. And you heard Max testify that Ruwan at the time was in a relationship with Chelsea. Max described how Chelsea was absolutely broken after this incident. And this incident was corroborated by both Robert Kandell and Becky herself. That's at 290 through 91. Max testified that Rachel Cherwitz's conduct in that moment made Max realize her values were not aligned with OneTaste.

And finally, as part of the sexual abuse, of course, we have discussed Reese Jones and the many victims who served as his handlers.

And members of the jury, again, keep in mind that during this entire time, Rachel Cherwitz and Nicole Daedone are these women's bosses. Their bosses are the ones who are directing them to engage in sexual acts with other employees, potential customers, and investors.

Members of the jury, the tactics that we just went to, the totality of these tactics, resulted in severe psychological harm to each of the victims. Every single victim who testified described the severe psychological harm they experienced while they were at OneTaste and they all discussed how the defendants specifically harmed them.

You heard from this point from Lianna. Lianna

said she was in a really hard place. Leaving OneTaste was the most difficult thing she had ever done. She was so enmeshed with the organization. And then she said after she left, it was hard to get up in the morning and everything felt difficult.

You also heard from Max about psychological harm. She said: I think there was kind of a slow whittling down of who I was and how I see the world and my own personal boundaries when I was in that organization. And Max testified that: It's taken me a lot of years since leaving to feel right with myself. Max also said: I think my whole world view got slowly broken down and reshaped until the way that I understood myself and my identity and what reality was, was really based on the group think at OneTaste. Max said: I didn't have a sense of self anymore. Max also said: I was in fight or flight every day. I think my nervous system was really activated. Max testified about having a trauma history and how being at OneTaste put her in fight and flight mode. Max went on to say that: Life became a prison for me at OneTaste. And ultimately, Max had to muster up an escape plan to leave.

You also heard about the severe psychological harm that Christina experienced at 1015 through 16 of the transcript. Again, similar to what the other victims had said: My sense of my own instinct and intuition and

feelings of what is right and wrong and values slowly became formatted into a style, that was the OneTaste style.

You heard from Becky. Becky said her psychological harm was really extreme and that it was difficult to be in this room, difficult to testify in front of the defendants. She said she's been in therapy and working through what she experienced there.

And you heard from Lindsey, that it was emotionally -- that Rachel Cherwitz specifically was emotionally abusive and verbally abusive.

Dana Gill testified as to the psychological harm she experienced and stated that it undermined my ability to trust myself, made me wholly dependent on the OneTaste community.

And members of the jury, you heard these themes echoed throughout the victims' testimony.

Dana said the trauma has not gone away. It's like death by a million paper cuts. And she discussed how the coercion was so subtle. Someone constantly telling me that my inner voice is wrong and that I need to listen to them. It doesn't go away. I don't remember the specifics of the details, but the pain stays.

Anthia Gillick psychologically felt a lot of damage from her time at OneTaste.

Michelle Wright, an immense amount of anxiety and

depression and various different forms of physical, emotional, and psychological stress.

And on Michelle, you saw this defense exhibit, 3EA, and I know this is long and the text is quite small, but basically she wrote to Nicole Daedone that her motivations for what she did were for the external approval of Rachel Cherwitz and Nicole Daedone. Everything she did at OneTaste was for the defendants. And you saw Michelle cry on the stand when read this text message. And when asked why it made her feel emotional, she testified that she had put her heart into OneTaste, but felt that her vulnerabilities were used against her to make money no matter what the cost was to her own well-being. And she testified that she was so deeply broken at the time that she wrote this that they didn't know how to see that she had not done anything wrong. Her tendency was to send a long apology to Nicole Daedone, to gravel to Nicole Daedone because she had fallen out of her good graces. But the reality was the defendants were the ones who had abused her and as she said, she didn't know at the time how to say that this wasn't right. But she finally did. She testified before you all and told you none of what happened to her was right.

You also saw Michal Neria's text messages to Rachel Cherwitz. And I want you to take a close look at

these, Government Exhibits 4513-AR and 41514-AR, and look at how they are remarkably similar to what we just saw Michelle Wright writing to Nicole Daedone. Similar to Michelle Wright, Michal is apologetic about things that she shouldn't be apologizing for, like here, spending four days with her family.

Members of the jury, from these writings, you can see the psychological influence that Nicole Daedone and Rachel Cherwitz had. You could see it by the way that their victims write to them. Michelle and Michal didn't know each other, they didn't work at OneTaste at the same time, but the way in which they spoke with the defendants was strikingly similar. This was all part of the defendants' manipulative tactics.

Now, you also heard about physical exhaustion, and I won't dwell on this because you heard a lot about the victims testifying that they were overworked and physically exhausted. And as just one example of this, Lianna testified that she was frequently sick from how much she was working. She had shingles from being rundown and not getting enough sleep. That's at transcript 2155 through 56. And you heard similar testimony from Becky and Michelle about how they were overworked, exhausted and didn't get enough sleep.

Now, let's talk about financial harm.

Victims testified that they were driven into debt because of OneTaste's expensive courses. Nicole Daedone and Rachel Cherwitz made their victims believe that they needed to take more and more courses to reach enlightenment and sexual wellness. And you saw that exhibit with the chart of various OneTaste courses that resulted in more and more money for OneTaste and for the defendant. And meanwhile while the victims worked for OneTaste, they were paid little to nothing while they worked 'round the clock for the defendants.

As you saw here, Michelle Wright described the Coaching Program as the ticket into everything, or so she believed when she signed up for it.

Michal had similar testimony. She said she was climbing this ladder that led to nowhere. Every course that she took, she went deeper and deeper into OneTaste and paid more money, devoting all of her time, energy, and effort to this thing where she wasn't getting anything in return. It was just about giving them money and free labor.

And she was right. The victims in this case weren't just working for OneTaste. They were paying into it, over and over again, while being told that that was the path to growth and enlightenment.

You heard from Michelle. Several victims ended up with debt and suffered financial harm when they left because

they were paid little to nothing for their work and they continued to accumulate debt as they bought more and more OneTaste courses. As Michelle said here, she was primarily in debt to OneTaste the entire time she worked for them and most definitely in debt when she left after working nonstop around the clock for almost five years.

Christina also testified about her debt, saying that she ended up with $20,000 to $30,000 in debt.

She testified that she was paid around $1600 per month, but her rent was $800, leaving her with just $800 per month. And she testified that she worked around the clock and continued to purchase more and more OneTaste courses resulting in 20 to $30,000 in credit card debt.

You heard similar testimony from Lianna. She said she was paid very little and she wasn't able to save money. She also accrued credit card debt and ultimately defaulted on her student loans. And Lianna said that when she expressed concern regarding her financial situation to people at OneTaste, OneTaste told her not to worry about it; that money was a third-dimensional problem. In other words, a real world concern.

And you heard similar testimony from Lyndsi, and, again, this is later in time that the same tactics remain. She was told to get a credit card from Aubrey Fuller.

And you heard similar testimony from Michal, who

testified that Rachel Cherwitz invited her to her room and opened up a credit card application on her laptop from Michal.

Anthia similarly testified that she overheard Rachel Cherwitz sit in an office with a woman named Jen while she opened three credit cards online to pay for the mastery course. That's at 4215 of the transcript.

You heard about the debt that Dana suffered. Dana was constantly in debt to OneTaste. Over time, she purchased more and more expensive courses and she worked both at OneTaste and took outside jobs. But for her work at OneTaste, which, again, included sexually servicing Reese Jones, she was paid nothing. And any money that Dana earned from outside jobs went right back to OneTaste.

And you heard from Becky. Becky testified that she came into OneTaste with very little savings and left with absolutely nothing as if she had not worked at all for the three years she was there. And you saw here, in Government Exhibit 3501-3, Becky was pitched on the $12,000 Coaching Program and that Rachel Cherwitz told her she would have to pay over $200 a week to pay for the program. And here, Becky informed OneTaste leadership in this e-mail of the financial harm that they were causing her. She said she felt panicked, misled, and manipulated when she realized how much she would need to pay for the Coaching Program.

Here, in Government Exhibit 3501-5, Becky informed Rachel Cherwitz directly that she did not have money to pay and that she had given OneTaste all of her savings. Rachel Cherwitz knew that Becky was in financial distress and she took advantage of her. Becky testified that once she signed up for that $12,000 Coaching Program, from that point on, she was indebted to OneTaste and had to work there to pay off her debt. That's at 169 through 70 of the transcript.

Lyndsi also testified that she experienced severe financial harm. She paid tens of thousands of dollars for courses to OneTaste including $13,000 alone for the Coaching Program.

And members of the jury, the lack of payment to victims who worked for OneTaste also contributed to their debt. And the evidence has shown that the defendants knew employees were not being paid sufficiently or, in some cases, at all.

You saw Government Exhibit 1283-DR, a text message exchange between Joanna Van Vleck and Nicole Daedone in August of 2013. And Van Vleck here is informing Nicole Daedone about this individual, Soheil, who said he worked for OneTaste for two years with no pay and was considering going to labor boards. She stated they could work on fourth dimension to convince him not to speak with labor boards.

And you see here that Nicole Daedone asked: Did

he work for us without pay? And Joanna Van Vleck responded: We didn't pay him in monetary sense. We paid him in many dimensions.

Members of the jury, we're in the real world where money matters, where people expect a salary when they work. Nicole Daedone knew that people were working without pay. And while she personally had assistants and a steady salary from OneTaste herself, she obtained labor and services from all these victims without paying people for their work.

Now, Rachel Cherwitz also knew people weren't being paid.

In Government Exhibit 1331-AR that you saw during this trial, Rachel Cherwitz differentiated between people on the sales staff who Yia Vang referred to as the quote, the legal salespeople. And Rachel Cherwitz referred to these people as the ones we, quote, actually pay to do sales.

And why did she differentiate between people who are actually paid to do sales and others? Because Rachel Cherwitz knew at the time that people were working for OneTaste and not getting paid.

You also saw Government Exhibit 1332-R, and I encourage you to ask for these. On October 17, 2013, in a chat between the core staff of OneTaste, including Rachel Cherwitz, Joanna Van Vleck said that the leadership team at OneTaste needed to cut employees and move others to

part-time. And in that chat, Robert Kandell wrote that they also cut and did things illegally and he noted that OneTaste growth was based on risky practices. And he described that as the way they paid people and the way that they switched people in employment the status. He also testified that the leadership team was ignoring basically all the rules.

You also know that the defendants entered an agreement to obtain free or cheap labor because one of their main co-conspirators, Robert Kandell, admitted to it. He testified that volunteers were the backbone of the organization and that they manipulated people into performing labor. And he also testified that OneTaste used work trade arrangements which were not reported to the IRS or state labor boards in any way.

But you know that the victims in this case were not simply volunteers. You saw Government Exhibit 2142-D, for example, where Maya Gilbert sent a list of former OneTaste employees.

And remember, on cross-examination, Robert Kandell was asked about Dana Gill and he testified that she was just a community member. But this is an explicit acknowledgment that Dana was, in fact, a OneTaste employee and she received zero dollars from her work for OneTaste that spanned over years.

You also saw Government Exhibit 2200-D. Here,

Rachel Cherwitz knew people weren't being paid enough and she complained about it here. She called the fact that people wanted to be paid so "fucking dumb ass stupid."

Members of the jury, you saw this chart, Government Exhibit 856. Remember the wages that the victims were paid. And Mark Lubin testified before you that it was his job to squeeze every dollar he could to show how much the victims had earned in reported income each year. Christina Berkley made just a few thousand dollars in 2007 and 2008 during the time she was sexually servicing Reese Jones. Dana Gill, as we just discussed, made zero dollars for all the work that she did including servicing Jones.

What OneTaste did was not simply unconventional. It was calculated. The defendants agreed to exploit their victims. These meager wages were not an accident. They were a tool. They were designed to create dependance and compel the victims' labor.

And these employees, many of whom, as you heard, joined OneTaste seeking community and purpose, were paid so little that they became dependent on OneTaste for their basic needs. Out of these already inadequate wages that you see, these victims were required to back a portion of their income to OneTaste for rent and communal housing, for food prepared in communal kitchens and for courses.

Imagine that? Working long hours, sometimes for

free, and then the paycheck goes right back to your employer. Just so people can eat, sleep, and keep their place and their company. This was not just underpayment. This was financial harm.

THE COURT: Ms. Gupta, I just want to let you know we are nearing 1 o'clock. Is now a convenient time to stop or another few minutes? I don't want to go beyond that before we take a lunch break.

MS. GUPTA: Maybe just one second?

THE COURT: That's fine. Yes, absolutely.

MS. GUPTA: The Government has proved that the defendants entered into an unlawful agreement to commit forced labor.

And when we come back, I'll talk about intent.

So now's a great time to break. Thank you, Your Honor.

THE COURT: Ladies and gentlemen, we are going to take the lunch break today. We'll come back at five minutes to 2:00. Don't talk about the case, not even among yourselves. Keep an open mind. And I will see you at five minutes to 2:00.

(Jury exits.)

THE COURT: Everyone may be seated for a minute.

Ms. Bonjean, when we were talking about the jury charge, you said that you didn't quite take down something.

If you want me to repeat something, I could do it now.

MS. BONJEAN: No, it was just the limiting instruction.

THE COURT: I will read it to you now if you want.

MS. BONJEAN: Yes, if you could, just because we do intend to use it and I don't want to get it wrong.

THE COURT: Of course.

One thing I forgot to mention, it's very minor, but when I added the statutory definition of the serious harm, which I read to you this morning, the phrasing in the statute is "under all the surrounding circumstances," there's no "of" in there and the paragraph below had an "of," so I just took it out to make it conform.

MS. BONJEAN: And you are just following the statutory language there, right?

THE COURT: Well, yes, except for the statutory language, it doesn't have a reference to any person because it's only part of it. So I am doing exactly what I had done for the part below that everybody had approved yesterday.

Do you want me to read that again, too?

MS. BONJEAN: Is that the serious harm one on page 19?

THE COURT: Yes.

MS. BONJEAN: Yes, if you don't mind.

THE COURT: Why don't I read that, and then I will

read the limiting instruction.

MS. BONJEAN: Great.

THE COURT: Okay.

The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances as the alleged victim to perform, or to continue performing, labor or services in order to avoid incurring the harm.

And then that will be consistent with what we already had in the next paragraph, except I took out the word "of" before "the surrounding circumstances."

MS. BONJEAN: Got it.

THE COURT: And they you want me to read the limiting instruction.

Anyone remember what number that was?

MS. BONJEAN: That's number 13, that's page 9.

THE COURT: Certain statements were admitted for a limited purpose only. When those statements were admitted, I instructed you that they were being admitted not for the truth of the statements, but for the purpose of providing context for other statements and I instructed you that you may consider the statements that were being admitted for context only for that purpose. I remind you now that you

must follow the limiting instructions that I gave you; you may not consider evidence admitted for a limited purpose for any purpose other than the purpose for which it was admitted.

MS. BONJEAN: Got it.

THE COURT: So I think everybody's got everything they need?

MS. BONJEAN: Yes.

MS. BENSING: Yes, Your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: Yes, Your Honor. Thank you.

THE COURT: Ms. Gupta, if you have an estimate of how much longer you have, that would be helpful.

MS. GUPTA: I think just about 20 minutes or so.

THE COURT: So we will be back at five minutes to 2:00.

And then, actually, let me ask Ms. Cohen, is your estimate still about the same? Because it would be wonderful if we could get yours in today, but I don't want to rush you.

MS. COHEN: I'm sorry, we think it will be done at 2:00?

THE COURT: No, we're coming back not 'til 2:00, so about 2:30.

MS. COHEN: 2:30, I think I will be able to get

done today.

THE COURT: I am just mindful of the fact that we are only going to be here in the afternoon tomorrow and I would not have to --

MS. COHEN: Split mine up, I know.

THE COURT: I mean, we will do what we need to do, but it probably is better if we could get it all in. But again, I'm not rushing you on that. I just want to get a sense.

MS. COHEN: Thank you, Your Honor.

THE COURT: Thank you. Have a good lunch, everyone.

(Luncheon recess taken.)

A F T E R N O O N S E S S I O N

(In open court; jury not present.)

THE COURT: We could bring in the jury.

MS. BONJEAN: Your Honor, I just wanted to place on the record that Gabriella Orozco, who has an appearance on file is just sitting right here. And my other paralegal, Mike Sawyer, who was identified in the court order, in case you were wondering --

THE COURT: I was wondering, but one of them looked familiar.

MS. BONJEAN: Okay.

THE COURT: Thank you, though.

(Jury enters.)

(In open court; jury present.)

THE COURT: Everyone may be seated. I'm so impressed that everyone came back on this nice sunny day. I hope everyone had a good lunch.

Ms. Gupta, you may resume your closing argument.

MS. GUPTA: Thank you.

Good afternoon, members of the jury.

So where we left off was the Government has proved that the defendants entered into an unlawful agreement to commit forced labor.

So next, for either method of proving this crime,

the Government must prove that the defendants knowingly and intentionally entered the agreement to obtain labor and services through serious harm or threats of serious harm.

For the first way to prove forced labor, the Government must prove that the defendants knowingly and intentionally entered an agreement to obtain labor and services from the victims via serious harm or threats of serious harm, and that they did so knowingly. And remember, that's the first method of proof that we showed at the start of this case.

Now, for the second way to prove forced labor, the Government must prove that the defendants knowingly and intentionally entered an agreement to benefit from a venture -- and here, that is venture is OneTaste -- that obtained labor or services from the victims through any combination of serious harm or threats of serious harm, and that they did so knowingly or in reckless disregard of the fact that OneTaste was engaged in getting work through those means.

And I expect the judge will instruct you that reckless disregard means deliberate indifference to facts that, if considered and weighed in a reasonable manner, indicate the highest probability that the venture was engaging in forced labor.

So let's discuss now how we know that Nicole

Daedone acted knowingly and intentionally.

The evidence has shown that Nicole Daedone was fully aware that her actions caused serious harm to the victims and that she intended exactly that result.

First, at the start of this, as Rob Kandell told you, the very origins of OneTaste were Nicole Daedone's desire to lead what he referred to as the Purple People. She was a student and a community member of two different organizations that engaged in sexual and psychological tactics in communal living settings, and Daedone and Kandell founded OneTaste because she was unable to become the leader of one of those communities. Her intention from the very beginning was to be the guru of a communal sex organization, not the CEO of a wellness company, even though that is what OneTaste eventually evolved into.

Second, Nicole Daedone assigned a series of women to sexually service Reese Jones, and we've obviously heard about that a lot. These women quickly burned out, and Nicole Daedone had to replace them one by one. She knew that this was harmful to these women given their rate of replacement and she knew that it was work. She was the one who told these women that it would be an honor, that it would be good for them spiritually. You saw her and Ken Blackman texting about how Michelle and Maddie were doing when they were servicing Reese Jones; getting cracked open,

shaky. Daedone was keeping close tabs on the women who were servicing Reese Jones. It was work that she didn't want to do herself, but that she benefited from in the form of his financial support to OneTaste and her own lifestyle.

Third, the other way that you know Daedone is acting knowingly and intentionally is that you saw her efforts to hide OneTaste's identity as a cult, such as by employing Reputation.com, although she had openly identified OneTaste as a sex cult during its early years, as you heard from Chris Hubbard and as we saw this morning. She was aware of OneTaste's reputation for controlling people, because that was a reputation that she helped to develop.

And fourth, you saw Government Exhibit 4501-GD, which is a conversation between Ken Blackman and Nicole Daedone. And here, Ken Blackman is describing OneTaste as a prep school for potential mystery students. And Nicole states: And to create passive income. She texted Ken Blackman that one of her primary goals for OneTaste was to create passive income for herself. This shows that her intent was always about personal financial gain.

And of course, as you know now, she met her goal. She sold the company for $12 million. And none of the women who spent years of their young lives giving Reese Jones hand jobs or OMing with old men as part of aversion practice shared in those profits.

Fifth, you saw text messages and emails showing that Nicole Daedone was deeply interested and aware of the company's finances. She was getting constant updates from Joanna Van Vleck, for example, and that she was happy with how OneTaste employees were being paid. She wasn't above the fray. She was keeping close tabs on the company's financial situation.

And sixth, as you saw earlier, you saw that at a certain point in November 2015, a woman named Ayries Blanck raised certain allegations about being forced to have sex. And what did Nicole Daedone do in response to those allegations? She didn't stop the coercion, as you heard from the victim whose later joined OneTaste. Instead, as you see here in Government Exhibit 2075-DR, she erased texts, and she encouraged others she worked with to do the same.

You saw this again in Government Exhibit 2256-DR, where she admitted to Justine Dawson: Unfortunately, I erased everything when the legal scare last year. This is powerful evidence of a guilty mind and that she acted knowingly and intentionally.

Seventh, you saw Nicole Daedone had OneTaste paying her mother as a salaried employee. Beverly Daedone received over $100,000 from OneTaste. And you heard nearly every witness say they had no idea who Beverly Daedone was,

much less that she was working for OneTaste. Even Robert Kandell, Nicole Daedone's co-conspirator and the COO -- former COO of OneTaste, couldn't really explain what Beverly Daedone did for the company. But Daedone ensured that OneTaste paid her mother over $100,000. And meanwhile, the women who were actually working around the clock to grow the company were paid little or nothing at all.

Nicole Daedone knew that coercing people into sexual services and unpaid labor would cause them serious psychological, financial, and sexual harm, and she intended to cause that harm because it served her own purposes. It made her money and it gave her power.

Now, I want to talk about Rachel Cherwitz's intent. And before we discuss the evidence of Rachel Cherwitz's knowledge and intent, I want to focus for a moment on her motive. In other words, the reason why she participated in this conspiracy. And although motive is not an element of the crime, it's important to understand Cherwitz's motive because it underpins all the evidence that shows her intent in taking part of this conspiracy.

To be very clear, Cherwitz's motivation was different from Daedone's. Unlike Daedone, she did not have the large potential for a payout and she wasn't attempting to finance a luxurious lifestyle. But she had other things to gain from the conspiracy, things that very much mattered

to her. Her personal brand and status and identity were intimately tied to her role in the conspiracy. You heard she had top status in an organization where workers literally worshipped their leaders. She was the right-hand woman to Daedone, the leader of OneTaste, which garnered her respect, a tremendous amount of power, and belonging. Remember the introduction that she got in Government Exhibit 3808-A-1 and how the cried went wild which Cherwitz came out on stage. That was her motive. Power and prestige.

So now let's look at the evidence of Rachel Cherwitz's intent. We submit to you that it is overwhelming.

You heard over and over again that Cherwitz was unrelenting in leaning on employees to do exactly what she said. You saw her text shouting at people in all cap to do what she was telling them to do. You heard Rachel Cherwitz personally directed numerous victims to engage in countless sexual acts. You heard that she sexually assaulted Becky Halpern during an OM demonstration, after which Becky was sobbing. Cherwitz directed Max Pixley to stroke Eli Block, and Max then cut her hair and abruptly left the organization. Cherwitz ordered Becky Halpern and Ruwan Meepgala to have sex to eliminate their tumescence. These were their employees.

Cherwitz slapped a pair of gloves in Anthia's hands and told her to give a burn victim a sexual prostate massage at a mastery course. And she instructed many of the victims to lay down, take off their pants, and subject themselves to orgasmic meditation with strangers and men, and told them that doing so was good for their spirituality and part of the cleansing aversion practice. And remember, Anthia Gillick told you that Rachel Cherwitz treated Ayries Blanck like a dog, making dog training noises and instructing everyone else in the bunker to treat Ayries badly.

These weren't accidents or misunderstandings, and this wasn't just a bad boss. These were intentional acts designed to control and coerce. Rachel Cherwitz did these things and she intended to do them. Her actions speak loudly and clearly as to what was going on inside her mind. She was enforcing Nicole Daedone's dogma for the benefit of OneTaste.

And let's be clear. Both Daedone and Cherwitz certainly acted in reckless disregard of the fact that OneTaste was obtaining labor or services from the victims through serious harm. And remember, this is the second way of proving forced labor. The defendants absolutely knew and were repeatedly put on notice of this fact.

This is not a case of good intentions gone wrong.

This is not a case of unconventional business practices. This was a deliberate and calculated conspiracy to exploit vulnerable people for money and power. The defendants knew exactly what they were doing, and they intended every bit of the harm that they caused.

As we discussed earlier, Becky put Rachel Cherwitz on notice of her financial difficulties. And remember, that's Government Exhibit 3501_3. Dana too informed Rachel Cherwitz that she had no money when she signed up for the $12,000 coaching program. That's at transcript 1239. Both Becky and Dana were immediately indebted to OneTaste. And Nicole Daedone was on notice. She knew Michelle was shaky when she started servicing Reese Jones, and Rachel Cherwitz knew that Yia Vang pinned Michelle and Maddie against each other when they were servicing Reese Jones.

You saw Government Exhibit 4504-C, the text messages between Daedone and Chris Kosley, where she knows that Liana Lifson felt victimized for how she was treated. She knew Liana was angry about the, quote, culture "of manipulation at OneTaste and people being directed what to do." Liana even pointed specifically to Maddie, Becky, and Max Pixley as exemplifying this pattern. And Nicole Daedone just said that Liana is, quote, "suffering unnecessarily."

And you saw the text messages about Ayries Blanck,

where Joanna Van Vleck told Kenan Wang that she could see how Ayries felt coerced, and Van Vleck responded, totally, while sitting with Nicole.

Nicole Daedone knew about these allegations of coercion, but the coercion continued. They turned a blind eye to the obvious fact that people were being harmed. They saw victims crying, shaking, throwing up, breaking down, but they continued to demand more sexual services and more labor. And you saw the text messages we showed between Michal and Rachel Cherwitz, where Rachel Cherwitz knew that Michael clearly was not okay. She repeatedly said that she felt grief, doubt, and anxiety. She expressed all of those things in the text messages you saw. That's Government Exhibits 4513-AR and 4514-AR. Rachel Cherwitz and Nicole Daedone knew these victims were suffering.

You also saw this text message exchange, Government Exhibit 2274-DR, which included both Nicole Daedone and Rachel Cherwitz. And here, they're discussing participants in a course who are crying. And what is their response? Nicole Daedone simply says: Get yo wail on. And Rachel Cherwitz loves Nicole's message. This evidence makes clear the defendants were on notice. They knew and they were deliberately indifferent to victim suffering. It was expressed to them over and over again. They knew that the tactics they were using were causing victims serious harm.

And now finally, to prove the second method of proving this crime, the Government must prove that the defendants agreed to benefit financially or by receiving anything of value from participation in the venture. And a thing of value need not involve money or anything financial, although it can. And in Nicole Daedone's case, those benefits were significant. You heard numerous witnesses tell you about the work they did for Nicole Daedone. Max Pixley told you how they cleaned Nicole Daedone's house, cooked her food, cleaned up used condoms from her bathroom.

But those services were not the only benefit that Nicole Daedone received from this conspiracy. You saw Government Exhibit 853. And forensic accountant Mark Lubin showed you bank records and IRS records demonstrating exactly how much Nicole profited and that she earned a salary consistently from OneTaste that was significantly higher than any of the victims.

Second, Nicole Daedone, who at one point owned and controlled 99 percent of OneTaste, used the company as her personal piggybank. Look at Government Exhibits 4096-FR and 4110-CR. OneTaste paid for Nicole Daedone's personal federal income tax liability in 2013, 2014, and 2015. And just think about that, a company paying an employee's personal income taxes.

Third, Nicole Daedone received payments,

distributions on top of her salary from OneTaste, including a $150,000 wire transfer in September 2016. That's Government Exhibit 4480-R. And as we already discussed, those transfers continued even after Nicole Daedone left the company, including $40,000 from OneTaste in June of 2018. That's because even though she was not formally part of the leadership, she continued to be a part of the company.

Fourth, as Mark Lubin testified and as we previously discussed, OneTaste paid Nicole Daedone's mother over $100,000 for a no-show job.

And finally, Nicole Daedone cashed out when she sold the company for $12 million, and Mark Lubin showed you exactly how that $12 million reached Nicole Daedone's bank account. No one else saw a penny of that buyout. This was not some startup where OneTaste employees shared in the equity of the company. It all went directly to Nicole Daedone.

And that $12 million sale is significant because it tells you not only who benefited the most. It shows you that behind the language of empowerment was a structure built to enrich one person -- Nicole Daedone -- at the expense of many. The sale of her stake in OneTaste isn't just a financial detail. It shows that Daedone personally profited immensely from the labor of people who were told that they were part of a mission, while being denied the

most basic protections.

You've heard testimony about the long hours, the unpaid labor, the coercion, and control. What was that for? It wasn't for community. It wasn't for healing. It was to make OneTaste more profitable and more valuable so that when the time came, Nicole Daedone could cash out. And she did.

Now the benefits to Rachel Cherwitz. She also benefited from participating in this scheme. She earned a salary, yes. But more significantly for her, Rachel Cherwitz was Daedone's second in command. And because she participated in the venture to obtain labor or services, she rapidly rose through the organization.

As you heard from Robert Kandell, just a few months after she arrived at OneTaste, she was already leading the San Francisco office of OneTaste and then quickly rose to head of sales from there. Rachel Cherwitz didn't do this for the money, though she did make money off of this. And you saw how much she made. Although she made more than the victim necessary this case, she did not make nearly as much money as Nicole Daedone. Rachel Cherwitz did this for power and prestige. She did it for the status that came with being Nicole's right hand woman.

And finally, I want to briefly discuss venue.

You must consider whether any act in furtherance of the conspiracy occurred in the Eastern District of New

York, which includes Brooklyn, as well as the air space above the district. And I expect the judge will instruct you that venue has been satisfied if any act in furtherance of the conspiracy occurred within the Eastern District of New York. A flight to JFK can be venue; a flight to LaGuardia can be venue. And you heard about those flights during this trial, including from Max Pixley who was one of the many witnesses in this case flying back and forth between New York and San Francisco to support OneTaste courses, which was part of the labor they performed. That's at transcript 1711.

And here, you also heard testimony from Michal Neria, who lived in an OM house in Brooklyn. She testified that the Brooklyn OM house was not a separate entity from OneTaste, because Rachel Cherwitz had a say in what they did and did not do. She stated that the house was not independent. And Michal also testified that she performed labor and services for OneTaste while she was living in the Brooklyn OM house, including back of house for OneTaste events.

You heard similar testimony from Anthia. She too worked back of house for OneTaste while living at the Brooklyn OM house. That's at page 3869 of the transcript. This alone constitutes venue.

But here, there's more. You also heard about

Ippolita Rostagno, who owned part of OneTaste, and you saw here in Government Exhibit 5005 that Ippolita was based out of Brooklyn, New York. This too constitutes venue.

Members of the jury, the Government has proved that the defendants committed conspiracy to commit forced labor beyond a reasonable doubt. They entered into an unlawful agreement and knowingly and intentionally became a member of the conspiracy.

Members of the jury, this case is about a group of women who gave everything to these defendants. Their money, their time, their bodies, their dignity, and ultimately their sanity. The defendants built a business on the backs of a select group of women who they targeted, abused, and exploited. They claimed they would free them. They claimed they could cure them. But instead, they drove them into debt. They groomed them to perform sex acts to bring in money for their business. And they drove them to their psychological brinks to get them to keep working. They had a criminal agreement, and that agreement is clear. That is what the evidence in this case has proven beyond a reasonable doubt.

And what I submit to you that's remarkable here is that the women on this board, nine victims came before you and took the stand and testified at this trial. Many of them didn't even know each other. They came from different

time periods at OneTaste, at different phases of the conspiracy. But what they testified to was remarkably similar. You saw the transcripts. They all suffered financial abuse. They all suffered sexual abuse. They all suffered psychological abuse. They lost themselves. They stopped trusting their sense of self. And they gave everything to OneTaste. And perhaps the most disturbing part of all of this is that the defendants targeted these women, the ones who have the misfortune of being all in, because they knew those women were particularly vulnerable to exploitation. Many of the women you heard from told you that they had confided in the defendants, that they had been abused or neglected or sexually assaulted or had suffered some other prior trauma. Some of them had no savings to speak of and nowhere else to live. They were young. They were looking for answers. They trusted the defendants.

And, members of the jury, I want to remind you, this courtroom is in the real world. And in the real world, money exists, and it matters. And you know from your own life experience and common sense that pressuring people to take on thousands or tens of thousands of dollars in debt can cause real lasting financial harm. In the real world, you know that putting a dozen people in a small space and depriving them of sleep and of privacy and of boundaries and having them work around the clock with little to no time off

when they were physically and emotionally worn down can make people more susceptible to abuse.

In the real world, you know that it's fundamentally wrong to tell people who work for you that their purpose is to fuck the war out of men, and that instructing employees to have sex with their coworkers, with VIP clients, and company investors, particularly if they find it repulsive, has the power to cause deep and lasting psychological harm, especially if you tell them that this is the only way to cure them of their prior trauma.

And here in the real world, bosses are not allowed to subject their employees to this degree of coercion and abuse to get them to keep working for their company. It's not just illegal; it's criminal. These women took the stand and made themselves vulnerable to you in the process. And who did they say every time did this to them? Nicole Daedone and Rachel Cherwitz.

Now the trial is at its conclusion, and the responsibility of carrying out justice is in your hands. The evidence is overwhelming. The defendants are guilty beyond a reasonable doubt.

Thank you.

THE COURT: Ms. Cohen, do you wish to present a closing argument?

MS. COHEN: I do. Thank you, Your Honor.

THE COURT: Go ahead.

MS. COHEN: Ladies and gentlemen of the jury, the real world. You've been sitting here for a month, and you have heard the real world in this courtroom.

The Government just spun you their version of the events. They completely ignored the cross-examinations in this case of every single witness showing their contemporaneous statements. Their statements at the time that they were in OneTaste. Not now. Not in hindsight. You know who brought out those statements of how they were feeling and what they were doing? It was the defense, not the Government.

And the Government is, once again, cherry-picking the facts, and they're cherry-picking the law. They don't want you to focus on what you need to focus on in this case, is that the defendants agreed that they had the intent to cause serious harm to these people? Serious harm, so that these people, these witnesses felt that they had no choice. No choice. That is what they're failing to tell you. That is the crux of this entire case. These witnesses had a choice.

Now, they started out -- or really ended, talking throughout the entire time, about the practices of OneTaste, about OMing, about things that maybe shock the conscience and aren't normal for maybe a law firm or a business or

whatever, wherever you're employed, okay? This is not what we're talking about. We know that this is a different kind of organization. But you know what it was? It was a place where these people went because they wanted to go. They went in there with eyes full open. They went in there knowing everything about it.

The Government told you the stories from these witnesses on direct. But again, every witness showed you a different story. This is the Government's story. They groomed their witnesses to fit their narrative. But on cross, you saw what happened when they were confronted with their actual statements. These witnesses wanted to take OneTaste courses. They wanted to do the practices. When they came in, they signed up for it. Every witness admitted, this was what they came for. OMing changed their lives, and they loved it. It's what they went there for.

The Government wants to take these practices, these people's desires as adults to do the things that they want to do and they want to intertwine it with labor.

But that is not what happened here. It's not about their OMs, it's not about their practices, it is not about the ideas of OneTaste. Whatever you think of those ideas, you are not here to decide if it's normal or right. This is about whether or not there is a conspiracy to commit forced labor. One count.

The Government stood up for hours and presented all of these witnesses over four weeks to prove this one count. They tried to shock you with details about sex and orgasm and forced sexual conduct.

But, ladies and gentlemen, the most shocking thing about this case is that not a single one of these witnesses ever came forward to report a crime at the time that these things happened. They claim that these women were in some kind of forced sexual labor. But no one filed a police report. No one called the FBI. No one claimed they were being forced to have sex or labor.

So what really happened? They didn't see themselves as victims. Not until the Government came knocking years later. And as a result, the only evidence you've seen in the Government's case is the evidence of regret, of feelings, of shame, and embarrassment that the Government has twisted into a crime.

It's very easy being young and being in this organization and wanting to participate in it and feeling open around people with like-minded views on things. But when you're sitting across from an FBI agent being questioned about this years later, ten, 15 years later, it doesn't seem -- it's kind of embarrassing maybe at that point looking back in hindsight because it wasn't to the FBI maybe or to anyone, normal behavior. It was outside the

bounds of decency maybe. But that's not what you're here about. Again, it's about whether these people were forced into it.

(Continued on the following page.)

MS. COHEN: The fact they are regretting the actions that they took when they were younger, is not evidence of a crime. And given that there was no evidence of the Government witnesses who reported this crime that they were being forced to have sex --

MS. FARRELL: Objection, your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: Your Honor.

THE COURT: Sidebar.

(Continued on the next page.)

Case 1:23-cr-00146-DG-RML Document 422 Filed 07/17/25 Page 155 of 234 PageID #: 8780



(Sidebar conference.)

THE COURT: We're at sidebar. We have everybody here including the two individual defendants.

Ms. Farrell.

MS. FARRELL: So Ms. Cohen has now gone on for several minutes about people not reporting things to the FBI. None of this is in evidence. Nobody was crossed on this issue. This is totally outside the boundary of what was the evidence in this trial.

MS. BONJEAN: She said there was no evidence of it.

MS. COHEN: I said no evidence.

THE COURT: You said no one called the FBI.

MS. FARRELL: That's not factually true.

THE COURT: I wondered what you were referring to. Why don't you correct that.

MS. FARRELL: Thank you.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

MS. COHEN: So once again. We are talking about the evidence in this case, and there is no evidence of people specifically reporting these crimes. And there is no evidence that people specifically told Rachel or Nicole Daedone that they didn't want to be doing these sexual acts that the Government is now claiming they were being forced to do. And they weren't told that they didn't want to do it, so how in the world can Rachel and Nicole be guilty of knowingly and intentionally committing this crime? Instead, these witnesses at the time that they were in OneTaste, they were telling everyone that they loved it.

Not to mention that the Government's theory that these people were manipulated is undercut by the evidence that the defense showed you. Evidence that at the time these witnesses were running towards OneTaste, begging to be included, shouting from the rooftops about how much they loved it.

Remember on cross-examination we presented them with their posts, their texts, their handwritten journals; things they did at the time. And when confronted with that, they admitted their feelings at the time. They weren't being forced to stay, forced to have sex; they wanted it. They wanted to stay at OneTaste. They wanted to be part of all of this. They wanted it badly.

And the Government's theory that the defendants committed forced labor through serious harm or threat of serious harm, is that the witnesses were harmed because they were afraid that if they didn't do what they were told they would no longer be part of the inner circle. That they were sad because they would be shunned. Or they would be on the outside looking in. This is not forcing someone to do something. These are people that wanted to do it. That wanted to be part of the inner circle.

Now maybe you're looking at that and say, well, the inner circle, it was mean, it wasn't right, they were cool or they wanted to be in. But that is life. We might as well go out and arrest high school bullies. These were people that the witnesses signed up and wanted to be a part of.

You are not here, again, to express your view on whether these activities were moral, decent, respectable, or good. You're determining whether there was a crime committed. Whether these acts violated the law. Whether the defendants agreed to make people feel that they had no choice. And you are not here to determine whether they violated some kind of standard of decency.

We're going to walk through the evidence, and as we do I want you to focus on three main factors.

The defendants, one, had no intent or knowledge.

Two, there was no agreement, no conspiracy.

And three, that there was no serious harm or threats of serious harm. That's because they had a choice.

We're going to keep coming back to these points as we walk through the evidence that shows that the Government cannot meet its burden of proving the elements beyond a reasonable doubt.

Before we dive in, in terms of the Government's claim of conspiracy, you'll hear from the judge that conspiracy is characterized by secrecy. Let me point out here that OneTaste was the very opposite of secret. Everything was documented over text messages, emails, posts, public posts. Every class, every lecture was videotaped. They advertised. They shouted it from the rooftops.

And remember, there were thousands of customers who participated in courses and lectures and never worked for OneTaste. And there were tons of people that are not in this courtroom that did work for OneTaste. And you heard about some of them.

Now when the judge instructs you on the law, she'll tell that you that to find the defendants agreed to cause serious harm or agreed to use threats of serious harm in this case, again, you have to find that they also agreed to make these witnesses reasonably believe that they had no choice. I'm going to keep coming back to that, no choice.

But what the evidence shows from the witness' own

mouths is that they always had a choice. I want to walk through the -- I'm going to walk through the evidence now to talk about why and what these witnesses actually said about choice at the time that they were there.

Okay, so we go to the next slide to pull out a few of these lines from the each of these witnesses. As you'll see here, again, we have the transcript cites as well so you can look for these. You can see the questions and the answers, and again these are on cross-examination.

Once again you chose to work at OneTaste, right?

Answer: Yes.

And that's because you are choosing to be at OneTaste.

Absolutely.

You signed up to do it?

Answer: Yes.

These are when confronted with Becky Halpern's statements at the time she was at OneTaste, she admits she chose to be there. Go to the next one.

Chris Hubbard. You chose to live at the OneTaste residence.

Correct.

You made the choice to leave OneTaste.

Correct, yes.

He made the choice to leave.

Christina Berkley, she chose to stay at OneTaste. She admits this time and time again. You can see under each red "choice" there is a statement about this.

She chose to stay.

Correct.

Are you blaming others for your choices here today?

No.

Question: That's because you agreed that OneTaste was a choice and you took it? Right?

I don't remember telling them that. I did go there and I did decide to go there.

So that's a choice, right?

Answer: Yes.

Question: Yes.

Answer: Yes.

Dana Gill.

She signed up for OneTaste knowing about the practice.

Yes.

Each time you left you made a choice to come back and to keep associating with OneTaste.

Yes.

And during the time that you lived at 1080, you were free to come and go.

Yes.

And at the end, when you told people at OneTaste that you didn't want to stay, they just let you go, right?

Answer: Yes.

Max Pixley. She made a choice to quit her job as a chiropractor. She didn't have to do that. OneTaste didn't make her quit her job. She knew what the job entailed at OneTaste. Everyone knew from the very beginning.

And you could have stayed in San Francisco at your own apartment, right?

Yes, I could have chosen not to move.

Your participation in the New York community was a decision you made all on your own.

Answer: Yes.

And you could have walked out the door at any time.

Answer: Yes.

And remember, some of these people we're going to talk about, some of these communal homes, but Max Pixley, as we established, moved into the Morellino. Remember, the Morellino was the staff house, it was the most intense. And you knew that going in. We're going to talk about that. Let's continue here.

Lianna Lifson. You could have chosen to be on the second floor but you chose to be on the third.

Again, that goes to the same point, the more intense floor.

And you chose to live with them, right?

Yes.

And you chose based on whatever suggestions you received to spend your time at OneTaste.

Correct.

They knew what was going on from day one. These are choices.

Michelle Wright. And no one forced you to work? Trade, correct?

No.

No one forced you to move into 1080, correct?

No.

In fact, she wanted to move into 1080 and couldn't at the beginning. That's what she said.

And you want to do that work, right?

Answer: I did.

You didn't have to go on the third floor, correct?

I didn't have to, no.

Again, the third floor, the more intense floor at 1080 Folsom.

And then Michal Neria. You weren't forced to sign up for it?

Well, I wouldn't say I was forced, no.

You made a choice to do each and every one of these things, correct?

Each and every one of those things was offered to me, yes, and I made the choice. Once we made the decision nothing obstructed us.

So no one was threatening you.

No.

And that was a decision you made on your own?

Yeah.

Again, your choice, your choice to quit the job. That was her teaching job, if you remember. She spoke about with other OneTaste people, she made the choice to quit her job. She also made the choice to move into an OM house when she still had her apartment that she still had to pay for for two more months. She wanted it so badly she couldn't wait the two months.

And lastly, Lyndsi Keves. This one we almost don't -- her entire cross-examination showed you how much she wanted to be there.

Bottom line is, you were able to leave OneTaste at any time.

Yes.

You made a choice to leave. That was a decision you ultimately made. And you did a lot of outside activities when you were at OneTaste.

She could have gotten Ubers. She could have stayed at her sister's place. Just like every other witness, but

they chose to stay.

Okay, so, what about these witnesses is also interesting is they were all educated. Every single witness had a college education, several had Masters degrees. And they were all drawn to OneTaste practices and teachings, and that's why they went there. Every single one of them said that. When they went there and they got there, they couldn't get enough.

You heard from really all of them that they immediately began volunteering, working back of house, setting up, cleaning up from courses. Even Rachel herself when she first got there, she also volunteered. One of the benefits was of doing that was you could hear lectures for free without paying for them.

And volunteer work happens, as I'm sure you know, all of the time. You volunteer for your church, you volunteer for your temple, you volunteer at a museum, you volunteer at libraries, pick your cause. People do this all the time. Why? Because they believe in it and they wanted to, no one forces you to volunteer. They could leave at any time.

And these people volunteered, most importantly, at the beginning of their time at OneTaste. What kind of manipulation could there be on day one, even if you thought there could be some kind of manipulation? Now looking back they are saying, oh, I had to volunteer, I was forced. That

is ridiculous. That is not what happened when they were there.

You heard that OMing was a meditative practice that was life changing for these people and had a spiritual aspect to it. In fact, OneTaste, you heard this from Robert Kandell, was founded in part on Buddhist principles. It comes from a Buddhist teaching: As the great ocean has one taste, the taste of salt, so also this teaching and discipline has one taste, the taste of liberation. That's what Robert Kandell, the Government's witness, told that you Nicole was striving for at OneTaste, that's why people went there. They wanted a taste of freedom. They wanted to explore their sexuality in different ways. And they wanted to improve themselves. Many were involved in yoga or other meditative practices before they got to OneTaste. In short, they were seekers and OneTaste had what they were looking for.

You know, it's interesting about OMing, how it was just discussed by the Government. Had to take their pants off, as if like this is something crazy that in the middle of this this happened. This was every single day. This was the practice when you went in. You knew what OMing was, that's why they went there.

Once people had the taste of what they did, these witnesses testified, they wanted all in. They moved in to some kind of OneTaste community space. And you also heard

that not everybody did this, they didn't have to. It was just the opposite. You had to apply to get in. And several witnesses testified that they couldn't even get in at first. There was different kinds of housing, as we've said, more intense floors. There was also the OneTaste -- the OM houses that weren't run by OneTaste, but were affiliated by it by people who had the common interest in OMing. They got together and lived there. And not all those people worked at OneTaste.

And there were rules in those houses. The purpose was to live in community and deepen the practice. Here are these rules, which everybody got before they moved in. Here are the house rules. They tell you: No alcohol, no smoking, no drugs, it's drug free. These are people trying to play and explore sexuality in a safe environment. The second, communication. They tell you up front, you have to join the Google group, you have to have monthly house meetings, your guests can stay for a maximum of eight days.

It's not a secret society, you know exactly what is involved going in.

And they gave you free Internet, you had access to the Internet, people had their phones. There were common areas. And you had a monthly food plan and you got your food there as well.

Finally, it specified orgasmic meditation, OM. It

tells you all about it. Why in the world would you go and live there if you didn't want to do OMing? That's the whole point, there is no other point.

The Government made a big point, they did it again today, they asked all the witnesses about privacy, as if they were forced to live in this squalor, to labor. Those questions just don't work in this case. This isn't immigrants who are forced to have no money and no access to a passport and don't speak English and they are down in living in squalor.

That's not what this is. These people asked to be in here. They knew they would have to share the bed, that's the whole purpose. They knew they would have research partners, they wanted that. They wanted to explore.

They also made a big point that these classes that they took were somehow part of this scheme. Get these people I guess expensive classes, force them to pay it off with work.

First of all, tons of people purchased these classes and didn't work at OneTaste. Again, these were choices that these people made.

So let me talk for a moment about these classes themselves. The Government made a big deal again about the expenses, but they never focused on what actually people were getting in the classes. They had outside lecturers. Nicole would lecture. There would be various exercises. It required

a whole team of staff to put these on. In fact, if you were recall, the Government showed you one of these exercises, the beast exercise. I'm sure you might remember that it had loud music, getting your beast out. You saw in that video how many staff members were present. How much went into these programs. People came from all over the world to take these classes. And they had them over and over again and were able to fill them, CP1 all the way to CP11, you heard about. They kept having them. Why? Because people loved them. They wanted to partake in them.

And as you can see, here is the orientation package, it's ten months, ten months of weekends with Nicole Daedone and senior faculty. Again, weekly OM training, coaching practice labs, twice month coaching, peer coaching, OM training. This was not a fly-by-night course designed to take people's money, this was a real product.

And no one was forced to work to pay it off. Lot of people took these classes and worked elsewhere. These were grown, educated adults who made the choice to take these classes. If they regretted signing up, they could get a refund or partial refund depending on the time of the request, just like other courses someone might take.

It's not like OneTaste hid the amount of the courses. It was set forth in the agreement. They allowed for payment plans. Some of these witnesses admitted that they

didn't even end up paying in full for these classes. Michal Neria told you she got say refund.

Now, once they were working, if they didn't like the work, it's what we said when we stood up here four weeks, they could have gotten different jobs. The jobs at OneTaste included sales, production, video tech, coaching, all skills that could be used at other jobs by witnesses who had college educations. They were educated. Most of them had family that helped them that they talked to throughout their time at OneTaste. They all had choices.

You'll see in the employee handbook, they were at-will employees. They could resign at any time. They could be terminated at any time. The Government claims that these people were manipulated to stay, that they were subject to such intense pressure and psychological coercion that they couldn't think for themselves. They want you to think they were part of this dangerous cult that they couldn't get out of. That their minds were so controlled that they had to keep working.

Well, first of all, we heard the Government's own witness, their own witness Robert Kandell, tell you, he thought OneTaste was a cult, just like Crossfit is a cult, veganism is a cult, pickle ball is a cult, he even said the Catholic church. Any time you get like minded people together with a common goal, you can name them a cult.

What the Government is trying to do is make this a nefarious aspect of it, to make it seem like you were in this cult and you couldn't get out. That's not what the evidence shows here.

Think about it. Almost every witness, as I said, testified that they were in touch with their family.

Brooke, her mom actually helped her buy and looked at the documentation to buy OneTaste New York. She was talking to her mom. Her mom visited her in New York. She talked to her.

Michelle, she also admitted when shown with the contemporaneous document, that she talked to her mother. That she got to her understand and tried to get her to accept OMing. She posted about that.

Michal talked to her parents throughout the whole time. Now maybe, she testified, that her parents wouldn't approve of it, but that's not what we're talking about. We're talking about did they have this communication with their family.

Same with Becky. She told you her parents were a train ride away, 35-mile train ride away to Westchester. She told them all about OneTaste. She testified about that.

These witnesses tried to say that OneTaste looked down on them talking to people outside of OneTaste. But when they were confronted with their actual texts, posts, emails

from the time, the evidence shows that just wasn't true. It's an essential part of the Government's narrative, but it is not true. It was not true at the time.

If they were in touch with their families and this was some kind of dangerous cult, how come we didn't hear any evidence that any family members went over to get them out or called the police to get them out? How come when they went home or away with their family on trips, there was no intervention? They were so brainwashed that they could work against their will, how did none of these witnesses tell their family that? Because it just isn't true.

And more to the point now, the witnesses again said that they wanted to be at OneTaste. They participated in the activities and they worked because they wanted to.

They did what Rachel and Nicole, maybe they did what they wanted them to do, because they wanted to be close to them, they want to be in the club. And maybe you think, well, that wasn't nice that Rachel and Nicole, maybe they were too cool, maybe them subjected these people to peer pressure, and that people did things that they didn't want to do so they could stay in their good graces. They were fighting over the same romantic partners. Maybe they were jealous. Maybe there was cattiness. Maybe they did try to breakup relationships, maybe. But if that's the case, once again, we should go arrest the high school mean girls. We should round them up,

because that's what we're looking at. Okay.

They are taking that and they are trying to get you to say, oh, well, this is a forced sexual act. But that's not what this was. Again, you can't look at it from the lens of a regular company.

Serious harm, has to be sufficient to cause a reasonable person of the same background and circumstances. We have to look at the circumstances of OneTaste. And that under those circumstances, a place that they went into with eyes wide open, that they had no reasonable choice, except to perform labor. That's not what the evidence is showing.

(Continued on next page.)

(Continuing.)

MS. COHEN: The consequences that this witnesses testified, again, about what they would do -- what would happen if they didn't do what they were told?

You heard they would be called names, maybe. They would be told that they might have a long conversation. They might be excluded. They might be made to feel bad. But welcome to real life. It's hard. You have to grow up and accept the responsibility for the actions that you take, even if you regret them.

And when we talk about manipulation, let's not forget, again, what the Government's own witness, Robert Kandell said. He told you that there was manipulation at OneTaste, but in the way they used people to push their higher goals.

Let's face it, manipulation happens every day in a sense. Look at Instagram. Advertisements designed to cure your wrinkles or to get you something that you think you need. You spend the money and you regret it. You realize it wasn't what you thought it was going to be. So maybe in hindsight these people do feel manipulated. But, again, when confronted with their statements and their posts at the time, they admitted that they loved it. They said that they were shouting how much they loved it. Let's look a little bit at this.

First of all, we showed you a lot of pictures of people there at the time and you have these back, if you want, to look at these pictures, and see how they looked at the time.

The one at the bottom is Brooke celebrating her birthday. There's Rachel Cherwitz giving her a cake. You can see Michal and Misha buying rings, her looking up at him. You can see what she looked like with him at the time and judge for yourself how she felt at the time. And you can see -- and here's people all together outside 1080 Folsom. There's the building. You see pictures of Michelle Wright there at a time when she was in LA claiming that she was terribly unhappy.

Look at these pictures. And there's them eating down in the left corner at 1080 Folsom as a community together, the community they signed up to be with.

And here are more pictures. Again, the three on the right are Michelle Wright and other OneTaste members. And there's Michal with her friend Marissa Ward and there she is with Misha.

And there's Becky, the pictures of Becky. You could see down in the bottom right in August of 2013, when she testified that she was so unhappy and tired and couldn't deal with anything, look at her. Look how she was at the time, singing and shouting and smiling and laughing. And

there, they are out to dinner in the middle there, out to dinner in New York City. She talked about that. She talked about her friends with other people, her close friendship with the people she's depicted in with these pictures.

And this is Lyndsi Keves and you heard about her and how happy she was at OneTaste. And I think we can listen to that for a moment. Remember how she denied how she didn't want to be there and then on cross-examination she was confronted with her own statements at the time.

(Audio played; audio paused.)

MS. COHEN: It's hard to hear, but you can read her statements there. How happy she was. How OM changed her life for the better. Those are her actions and words at the time.

And, you know, when these people had enough, when the parties stopped and it felt like work, they weren't happy anymore, do you know what they did? They left. And do you know who's doing the manipulation now? It's the Government. The Government, who tries to mold these witnesses to tell a story that these defendants forced them to take these actions, that they were manipulated and coerced. That's why they met with them in this case over and over and over again, but, again, their words and actions at the time is what should govern, showing that they weren't forced.

And it wasn't just freedom to leave. They were desperate to be a part of it, running towards it; not away.

And you heard witnesses in sales testify that Rachel was tough on them and made them stay in constant communication.

Rachel was doing her job. The tough job of sales. And sometimes these people were making commissions and she'd push them to make more money for themselves. But these witnesses asked to be in sales. And maybe she was a hard boss and maybe she could be mean and say things, but that is not a crime. If you don't like your boss, you can get another job.

Now, there are circumstances where people have family and they have to support people and maybe they can't get a job right away. But the people weren't saying I have to get out and weren't able to get out. These were people in their twenties that had families, had access to other things, that were college-educated, that could have gotten other jobs, but they never stood up here and said that they tried and couldn't get any other job and they didn't know what else to do and were forced. That's not what happened.

And in terms of communications, what would happen if they didn't respond? I mean, they could have silenced their phone. They could have walked away and never come back. What's going to happen if they don't respond? Could

they get fired? Maybe. Could they get shamed? Maybe. But, again, these things are not serious harm because they had a choice. They would, again, be subject to maybe a long conversation, but these consequences are real life consequences. You go to work, your boss asks you to work late, you don't want to, you don't have to. You could leave. You can get a new job.

These were people, again, in their twenties who signed up with their eyes wide open. They didn't say to Rachel or Nicole I don't want to do this job. Until they didn't. And they left.

And why would Rachel make these people do labor? The Government came up with this theory that she wanted to be this great cool person, but look at what Rachel made when she was at OneTaste. She made an average of $35,156, a regular income, a modest income, over 12 years. They are claiming she was the head honcho there. They have her next to Nicole Daedone. They have Robert Kandell, who made $1.5 million when he left the company, they have him down below. Because she wanted the prestige, that's why she worked for all -- for this amount of money, over 12 years? It doesn't make any sense. And that's why the Government -- they said they don't have to prove motive, but they know it is an important factor because if you are going to force someone to do labor, why would you do that? Why would you

risk that and do that? Not to make much money.

And -- and, not to mention, if you compare Rachel's salary with Christina Berkley and Michelle Wright, the ones in red there, they made a few thousand dollars less than Rachel did on those times, in those years. She was making ends meet.

And if she was calling people names and making them feel bad, let me be clear: Being mean is not a crime.

And the Government said multiple times that the company was built on the backs of people's labor.

First of all, the company was built -- if it was built on anything, it was built on Nicole Daedone's teachings and it continued to expand through people, including Rachel Cherwitz, with a tough sales mentality. And you know when you build a company, it's hard work. And that's what these women did. Rachel was a hard worker.

And the people who came and did testify that they saw something in Nicole and Rachel, that they were enamored by Rachel's teachings, that they were awakened by them both spiritually and sexually and they saw that Rachel was close to Nicole and that she was someone they wanted to be like, wanted to be close to.

But, again, that's not a crime. Doesn't mean that Rachel intentionally and knowingly forced these people to do labor because they might have been enamored with her.

And remember, these witnesses complained they were concerned about being kicked out, about losing their jobs, about not being included, not that they were forced.

So again, they had a choice. That's what the evidence shows. That's why there's no intent to cause serious harm. Because at the time they enjoyed it. If they were secretly unhappy, that was not the fault of Rachel and Nicole. How could they know that they didn't want to work there when all the things that they were doing were the things that they signed up to do? Testimony in hindsight doesn't count.

No knowledge or intent, no serious harm and no agreement.

Another reason you know that this isn't some kind of evil and dangerous cult that forced people to labor is because even though it was a startup, from the very beginning, OneTaste always focused on consent.

And even though the classes aren't labor, some of the things that the Government is alleging the defendants forced people to do is tied into these classes and the OneTaste practices. That's why that doesn't make any sense. Day in, day out, they were OMing. You heard that an OMing demo was something that was prestigious. You heard that over and over again. This is what the people signed up for.

And they had safe words from the very beginning.

Green. Yellow. Red. We had multiple people testify about the early days, Chris Hubbard and Robert Kandell. And we not only heard some witnesses testify that; we saw it in the Government's own evidence, in their video, showing the beast exercise at CP6, with Becky Halpern.

Let's watch.

(Video played; video paused.)

MS. COHEN: That happened at every course. Everyone knew what they were getting into. They could stop at any time. And you remember, Becky Halpern was shown this video and she testified that she wasn't happy about doing it. And when I presented her with the video again and showing her pumping her fist, oh, yes, she had to admit, she was excited for the class because, again, confronted with what was happening then.

Okay. And from the very beginning, in 2006, there were consent forms. Robert Kandell told you that no one could participate without signing a consent form. And no witness, no witness denied signing these consent forms. In fact, we looked at many of their signatures throughout trial. And once again, let's look at what these witnesses were agreeing to.

Okay. They were really the same throughout. This is one from 2006. They told customers right from the beginning the content of this course is controversial. They

told them that any concepts, notions, ideas and recommendations from the sponsors and anyone acting on behalf of sponsors that you accept and/or apply to your own life, you do of your own free will. You alone, they say, they have to sign. I, alone will decide and accept responsibility for how and for what purpose I apply the content of this course. I may not agree and I accept that possibility. And again, you could choose not to participate in an activity.

If you choose to, it's of your own free will.

I assess my own emotional, mental and physical well-being and I conclude by signing this that I am able to participate.

It's very clear.

On the next page, there's a psychotherapy disclosure. The Government, throughout the trial, pointed out that OneTaste had no psychologists or psychiatrists working there. Hello. They told you that from the beginning. It's in every single form. That's not this was -- that's not what this was. They're not doctors. They were not their parents. They made sure each and every person knew -- each and every adult person, adults only -- knew what they were getting into. This isn't a dark society that was manipulating people to stay and work for them. If it was, they wouldn't need consent forms.

And in 2010, we had these all the way through, we saw the same consent forms and you heard Lyndsi Keves, she signed seven of these forms. Same with Michal.

And you also heard about safeporting. Safeporting is telling someone what you are going to do before you do it. And that was important. People were coming to OneTaste for the practice of OM. Again, they chose to do that. From the beginning, the OM class and manual told people exactly what it was. You knew from day one. The manual talks about safeporting, right? It tells you what it is. I'm going to touch you. It tells you exactly what's going to happen.

People were allowed to just take this manual and do it in the privacy of their own home and many did. There was even a website. And the Government took you through this as if it was, during the testimony, some kind of dirty magazine. They showed you where the clitoris is. Well, thanks, Government, that was important. And by the way, they tried over and over and over again to turn OMing into this sexual practice. It's in their opening statement, they refer to it as genital rubbing. Today, they called it massaging. Okay, no one at OneTaste, no one in this courtroom, ever called it rubbing. It was stroking. The Government wants to dirty this up. Stroking was the practice. Stroking was the language. Even look at the manual. It tells you. It actually says never rub. That's

not what it was. That's designed to influence you in this courtroom.

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

MS. COHEN: To think that it is something bad.

But again, this is one thing you knew, day one, you know what it is.

The manual also tells you from the beginning what to expect. It says what to do. It says it's not sex; that it's the foundation of the company. And some witnesses said, well, OMing was like asking for a cup of tea. You didn't have to be in the mood, it tells you. It's a practice, right? A practice. So if you're not in the mood when you sign up, it says it has ways to deal with that. Some of the OMs start when one or both of you really don't want to, but it tells you how to get around that when you are doing a practice. It's like I don't want to go to yoga today, but I'm supposed to go. It talks about that and how to deal with that.

Again, this is a practice that people wanted to do.

And you had heard these witnesses say that they felt that they had to OM with people that they didn't know and didn't want to. Even if that were true, how would Rachel and Nicole know that? That was the whole idea. They

were on OM hubs, searching for partners that they didn't know, themselves. You heard Max Pixley, she went to Philadelphia and posted if there was an OM partner for him -- for her. That wasn't anybody she knew. She did that on her own. People would go to OM circles and OM with people they didn't know. In fact, Michal Neria told you on day one she OM'd with a stranger. Oh, I forgot, Michal, though, testified that she was so psychologically coerced on day one. You know, day one, she said, that she was forced to do this, even though she had never met Nicole or Rachel at that time. That's her looking back. She wanted to do that. She wanted so bad, she moved into the OM house. And we talked about and she was confronted with her text messages from that time, for which she was setting up the OM, she was finding people to OM with, and she was excited about it.

We also talked about the fact that OneTaste was a startup company. Now, Robert Kandell testified about the early days in forming the company with Nicole. And just like any company that starts, there are growing pains. It's typical of a new company. And you heard in the early years that it was just like a tight-knit community. We saw some of these photographs as they were developing. And then the company started to focus on making it more structured and becoming more business-focused as it grew up. They were

trying to figure out its product.

And here's some of the early days, the photos of being in the Warehouse and the spaces by which they were having OM practices and yoga and other things that they were offering at the time. And there is a photo of Rachel and Rob, who you heard they dated at one point. And there is a picture of the kitchen and some of the beds.

And the company developed the Coaching Program as its product and they built it out and the people came. And at CP5, you heard that the company shifted into sales. They were expanding and they wanted to make money. But, again, we already looked at the CP5. It was an actual product that gave these people what they were looking for. They also had, in terms of getting structure, they put in place employee handbooks, they put codes of conduct in place.

Now, the Government points out -- and here is the code of conduct -- that this was really OneTaste covering themselves; that they were previously doing something wrong, so they created these. But that's no different than any company. Any company looks inside, gets complaints maybe, looks -- does an analysis of their company and says, hey, let's see how we can improve this. They talk to lawyers, they put policies and procedures in place. That's what new companies do as they grow. And, again, this is a different kind of company. You have to put it into that perspective.

And here, we see the guidelines about having relationships between the coaching, the heads -- the people that were coaching at the time. In fact, in the early days of the company, they implemented this ethics committee. They created rules about the relationships between coaches and staff members or volunteers. And you heard that the committee denied some of these relationships. And, again, some of these issues that they were trying to get these manuals and codes of conduct around, I mean, imagine a company where people are living and working together and exploring sexuality together. Okay, this is very different. What does it guarantee you? It guarantees drama, tears, anger, jealousy, all the things we saw during the four weeks of testimony.

And in 2012, as I said, the company shifted into sales. In order for the company to grow, they have to make money, and sales became part of the Coaching Program. People could work for OneTaste and do sales, or they could just sell on commission and many did. And they taught people how to do sales.

So let's look at this manual from 2013, the sales and business development.

The sales product talked about safeporting, safeporting with sales, asking people what they wanted, telling people what they were about to do. First we're

going to talk about goals and desires. What are the things blocking you from what you want? Just like any other sales pitch.

And while the Government has worked with these witnesses to weave a narrative that the salespeople --

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

MS. FARRELL: Thank you.

MS. COHEN: That the Government's witnesses talked about how salespeople were taught to go after people with vulnerable weaknesses and trauma. The documents and e-mail and testimony do not support that.

Rob Kandell, the Government's own witness, testified that he never -- they never targeted anyone with trauma. And while Brooke told you that she was taught in sales training to use people's pain to try and sell courses, take your pain, that's not what that was. The point was to find out what people were struggling with. What -- then offer them a way to get through that, like any sales. What do you need? What is your desire?

And you heard from Brooke that this tactic -- excuse me, from Anthia Gillick, who was Brooke at the time, the tactic was pulled from other sales curriculum. It was the basis of all sales at OneTaste. And these sales tactics were created through an outside consultant. An outside

consultant. They hired someone from the outside to come and teach them how to do sales better. If they had the intent to sell to people that were vulnerable, why would they do that and hire someone from the outside?

Let's face it, there were people that came into OneTaste with trauma. It's because it's not your average company. It's a company, again, helping people with their sexuality, their communications, their relationships. So of course these kind of people came flocking. But that was them coming in. They looked at the consent form. They signed up for it knowing that it wasn't psychotherapy. Knowing what the risks were. They could have gone to a therapist. They came to OneTaste openly. But OneTaste didn't target these people and go after them.

Now, let's talk about -- I was talking a little bit about it generally. Let's talk about evidence against Rachel specifically. And as we do that, let me just talk for a moment again about Rob Kandell who was the co-founder, the COO, for ten years.

Okay, he, himself, the Government's own witness, told you that he never committed a crime. And we have his transcript up here.

He said in connection with the Government's granting of immunity, you did not admit to committing any crime, is that correct? That is correct. You denied

committing any crime. Correct. You maintain your innocence. Correct.

That was the Government's witness. They gave him immunity, meaning he couldn't be prosecuted for anything he says. He came in here --

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

MS. COHEN: They gave him immunity --

THE COURT: That's the objection, correct? Sustained.

MS. COHEN: He could be prosecuted here in this courtroom for saying --

MS. FARRELL: Objection.

THE COURT: Repeat the sentence or start a new one.

MS. FARRELL: Maybe I'm misunderstanding what she's saying.

MS. COHEN: There's no motivation for Mr. Kandell to lie. He's under oath here in this courtroom. And again, the Government called him. This is their witness. And he told you the truth, that he didn't commit any crime, that he maintains his innocence.

And let's talk about what he said about Rachel. When he was asked on direct examination by the Government, he said: She was everything. She was a passionate,

inspiring leader. We talked a lot about the negative terms, but she was also incredibly -- and incredibly dedicated, worked with people, were patient with people, wanted them to succeed, wanted the organization to succeed. At the best of times, that's what came across. In the worst of times, she got annoyed because people weren't doing what they were doing or they were lazy or they were argumentative. And so the whole spectrum of what a sales manager has to deal with.

It's interesting that the Court will instruct you that the defense doesn't have to lift a finger in a criminal trial. It is the Government's burden. They put on the case. The defense can sit back and do nothing. And the defense ended up putting on a single witness which we'll talk about later. And while we don't have to explain ourselves, I wanted to point out that we didn't need to put on a case because the Government's best evidence was even better for us. It's their witness. How could we sum up Rachel better than Rob Kandell did by questioning from the Government?

And we saw texts between Rachel and Michal Neria, that she was being tough on her. But even Michal admitted that Rachel was a mother figure who was trying to help her, who was trying to give advice, and who was a great saleswoman. And she also admitted that there was warmth between them.

And you heard Michelle Wright, who was also in sales, she described Rachel as a mentor and a friend.

And even Anthia Gillick, a month after she left OneTaste, she posted a thank you on social media to Rachel for being an inspiration that past year.

That's how the people felt at the time. And we said there were some times, of course you heard testimony, that Rachel could be harsh, that she could yell and be frustrated with them, but everyone agreed that she's hard worker, she worked constantly. Maybe she expected too much from people. But, again, remember she wasn't benefitting from this. You saw how much money she made. And she was not only Head of Sales. She worked constantly. She was also a constant speaker and a coach. And she trained people.

(Continued on the following page.)

(Continuing.)

MS. COHEN: Now, I want to speak a little bit about the emails that the Government mentioned with Rachel and some of the people at the houses, at the Morellino. They called them reporting emails as proof of manipulation. But if you really take a look, and I ask you to go look at those when you go back and deliberate, Rachel is asking how people are feeling. The people reporting -- for example, Pixley, that's the one that we saw, she's asking, well, how are you feeling? What do you feel? And Pixley's reporting on people, well, so-and-so is upset, so-and-so didn't have a good day. Go back and look at those emails. This isn't reporting on who is doing sales and what's happening. This is reporting -- this is -- this is telling a executive, a boss to some of these people, a leader, a coach, a caring person, and finding out what was going on in the house when she was gone, the house where she lived in, the Morellino. Look at those texts -- those emails, sorry. Those -- those are her reaching out to see how the staff was feeling.

And they talk about the time of night. And there's no evidence that if they didn't respond -- what was going to happen at night? These people were up, they were in a community with their friends all of the time. And again, they could leave. At that point, Pixley had just started in -- Max Pixley, sorry, had just started in June, I

think had just moved to New York June of 2013. And Pixley, if you look at her responses, is not upset by them. Pixley is professing love to Rachel in those messages.

And fear inventory, they mentioned fear inventory again like some is some kind of problem. You heard from people over and over again. You know day one if you go into these homes, part of what you do is you fear inventory. That is the practice. And you rip it up after you've read your fear.

And as you also heard, those are based on AA, right, and often people testified how they would be sent to AA meetings or some other kind of meetings; not for alcohol, but for the process and the way those meetings were run. They're sending them, they're suggesting that they go to an outside guide, with people who could guide them. If you're so concerned about talking to people out of OneTaste and making people stay, why would they go and tell them to meet with these people to work through issues? And remember, OneTaste was pushing boundaries. That's, again, why they were there.

They also quoted I think it was Anthia Gillick. She testified that when she left OneTaste, she still did an inventory, fear inventory. She liked the practice. Remember, let's also stop for a moment about Anthia Gillick. She never was staff. She's trying to say these things.

She was never staff. She owned the company for about five, six months. That was it. She was there, her own choice.

Okay. Now, the Government showed you a bunch of text messages at the end, that was the last thing they did, to the FBI and read those messages to you. Now, most people would not want their private messages read into the courtroom, private things; people were talking about others, being mean. Mostly it was Rachel not saying nice things. But we've heard about that. She was complaining about coworkers. People do that.

But remember, most importantly, this is a small subsection from 11 years of communications, okay? The FBI agent admitted that this was only a small subsection over 11 years. The Government cherry-picked those. There's no context for them.

Let's look at a few of them. One is Rachel saying Michelle is a bitch. Okay, she's complaining. One of them, she tells Yia to write amends to Nicole. She was venting about the fact that people wanted to be paid more when she was paid in orgasm for years. We already know she wasn't paid that much herself, but she was committed to the cause.

And look at 1755, there's a message talking about a deletion. Again, this is designed to tell you to look at, oh, delete, delete, it's bad. But this is a benign thread. Rachel's removing those who are not in the right thread.

She's saying: I'm removing anyone not physically here from back of house. The thread, an emoji, is the ones to use. All others delete now.

There's nothing nefarious about that.

And look at 2350 -- sorry, Government Exhibit 2350. In this message, Rachel is talking to Joanna Van Vleck, and she can't understand: Why would she be worried? "She" meaning Nicole. She's wondering why Nicole would be worried about her teachings being used against her. It shows that in 2017, when this message was written, at the end of the Government's alleged conspiracy, Rachel doesn't think Nicole did anything wrong. She's like, why would anyone say that? She didn't think they were doing anything wrong. They didn't have the knowledge and the intent because they listened to the people who wanted to be there. These texts are a metaphor for everything in this case; cherry-picked, overreaching, and taking out of context.

And speaking of taking out of context, there was another text about a lawsuit filed by Ayries Blanck. First of all, in that message you can see that the allegations in the lawsuit were called ridiculous by Kenan Wang. The company talked about settling it for $300,000, when the demand was 3 million. Lawyers call that sometimes a nuisance fee, a nuisance value. It was the opinion about someone who just learned about what was being said in these

allegations and what would happen if they were taken out of context. And the Judge will instruct you, you cannot look at those allegations and take them for the truth. They are there to put things into context.

And that's what people assess when they get a legal claim at a company; how is this going to look if this person sues? What should we do? Not whether it's true or not. These are allegations, just like allegations here. You can't take them as true. Just the fact that they were discussed when this appears.

And the person who made these allegations, Ayries Blanck, she's not here. She didn't testify. You know what we heard about her? All you heard was that she violently attacked another woman, Aubrey Fuller. You heard that from Anthia Gillick. She was there. And that is the only violence you heard about in this case. No one suffered physical violence. The only violence was created by this person.

And you also heard from Anthia Gillick, again, that Rachel was mean to her. And the Government credited Anthia Gillick's statement that Rachel told Brooke to have a plan -- or told Ayries to have a plan for 30 days and 30 men. That was on direct. But on cross-examination, when confronted with a text message, Brooke admitted that they were, she and her friends -- Rachel Cherwitz was not on the

text thread, she admitted that -- they were setting up OkCupid profiles. And while Brooke tried to nevertheless blame Rachel, she admitted that despite talking about the plan, Rachel wasn't even on the text. This was their idea, their plan, and they were excited about it.

If they were doing it against their will, they would have been having a very different conversation than when Rachel wasn't around. And remember, Brooke was testifying about an event that occurred over ten years ago, and the defense showed her a contemporaneous text message. When you evaluate her testimony on a whole, think about that again.

Now, there were also allegations that Rachel forced people to open up credit cards in order to put people in debt.

THE COURT: Ms. Cohen, I want to let you know that we're going to do a break soon. I don't know if you're switching topics now or if you want to continue for a bit, but soon we'll need to do a break.

MS. COHEN: I can stop right here if you'd like to do a break.

THE COURT: If you need a few minutes, that's fine too.

MS. COHEN: No, just I'm getting into a --

THE COURT: I thought you were switching topics.

MS. COHEN: Yes.

THE COURT: Okay. We're going to take the afternoon break now, and we'll come back at 4:00.

Again, don't talk about the case, even among yourselves. Keep an open mind.

(Jury exits.)

(In open court; jury not present.)

THE COURT: Everyone may be seated.

Ms. Cohen, I didn't want to raise this in front of the jury, but you have gone beyond the evidence and proper inferences from the evidence during your summation. For example, you said: Do you know who is doing manipulation now? It's the Government.

Do you believe that that is commenting on the evidence or inferences from the evidence?

MS. COHEN: Yes, Your Honor. I'm going to be going through the number of meetings that the Government met with them over and over and over again.

THE COURT: Does the Government want to be heard on this?

MS. FARRELL: Yes. And we may ask for a strengthened instruction on the issue of the propriety of meeting with witnesses, but that's wholly improper argument. There is, I believe, a motion *in limine* pretrial about not putting the Government on trial, and that's exactly what's

happening here.

THE COURT: I mean, you seem to be not talking about the witnesses and the evidence. You seem to be accusing the Government of manipulating. And that's -- you said: Do you know who is doing the manipulation now? It's the Government. Do you think that's a proper comment on any evidence or proper inference from the evidence that the prosecutors here are manipulating, doing manipulating?

MS. COHEN: I think, Your Honor, that yes, that they're going over the same story over and over again. We have contemporaneous things at the time showing that the Government met with all of these people, that they're saying the same story over and over and over again. And, yes, I mean --

MS. BONJEAN: I mean, their argument was manipulating. They cherry-picked things. They argued things for the truth of the matter that weren't supposed to be argued for the truth of the matter. We didn't object. That argument was highly manipulative, and I think we should be able to say as much.

THE COURT: There's no evidence to support that the jury is going to be considered to support this. I mean, this to me seems really inappropriate.

You also seem to be going just beyond facts here. I would caution you to be more careful. I think the

Government has exercised some restraint in making objections, and I'm certainly not going to make their objections for them. I think they're okay with some of this coming out. But some of what you're doing is improper.

I'll see you at 4:00.

MS. FARRELL: Thank you.

(Court is in recess.)

THE COURT: Our jury is back, but I understand the Government has an application.

MS. BENSING: Yes, Your Honor.

The Government is requesting that the Court provide the instruction that the Government requested in the parties' second joint filing.

THE COURT: Do you want to read it out?

MS. BENSING: Sure.

There was testimony at trial that attorneys for the Government interviewed witnesses when preparing --

THE COURT: Just slow down, please, for the court reporter.

MS. BENSING: I apologize.

THE COURT: You can all sit down, as well.

MS. BENSING: Oh, thank you.

There was testimony at trial that attorneys for the Government and the defendants interviewed witnesses when preparing for trial.

I don't think testimony about the defense interviewing witnesses came out, so we would request that that portion be excised.

There was testimony at trial that attorneys for the Government interviewed witnesses when preparing for trial. You should not draw any unfavorable inference from that testimony. To the contrary, you should understand that the attorneys are obligated to prepare their case as thoroughly as possible, and in the discharge of that responsibility, properly interview witnesses before this trial began and as necessary throughout the course of the trial.

This is an instruction that is routinely given in criminal cases, Your Honor, and we provided the authority for that as well.

THE COURT: I am going to decline to give that instruction at this time. I've made my observation about what has been going on, and we can resume the closing.

We'll bring the jury out.

(Jury enters.)

(In open court; jury present.)

THE COURT: Everyone may be seated.

Ms. Cohen, you may resume your argument.

MS. COHEN: Thank you, Your Honor.

When we took the break, we were talking about

allegations that Rachel was forced to open credit cards that put people in debt. Once again, these are grown people, grown adults that wanted to take classes, and Rachel gave them the option. Pushy sales, again, is not a crime. Telling grown adults that if they want to buy something, they can find a way to do it, helping them find ways to pay is not a crime. Rachel, again, was not these people's parent. OneTaste was not their parent.

These people could think for themselves. If someone told them to open up a credit card in a sales pitch, that was the person's prerogative to do that, to open it. But they were told up front how much these things cost. They knew their own finances and they had the ability to walk away. Once again, you heard from Michal Neria, she had just been introduced to OM. It was right away that she claimed she had this conversation with Rachel and was manipulated into opening a credit card.

One thing we learned in this case is that Rachel wasn't actually able to cast a spell over anyone, despite the Government's suggestion.

Finally --

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

MS. COHEN: Despite Michal's suggestion of witchiness.

And let's turn to the Government's arguments that Rachel -- the allegations concerning the direction of sexual acts. And let's take each of these in turn.

First, Max Pixley. They admitted that they never told Rachel that they did not want to OM with Jim Kwik. This, again, goes back to the same point. Max Pixley was living in the Morellino, where you OM day in and day out. That's why you want to be there. It could have been -- again, Max Pixley didn't have to live not only at the Morellino, but could have lived at a Brooklyn OM house where it wasn't as intense. Not saying that Max Pixley couldn't change their mind. But what is important here is what was conveyed to Rachel. Why would Rachel think at that moment that Max Pixley didn't want to OM with Jim Kwik? Max Pixley OM'd all the time.

Again, you've got to look at this in the context of this organization and the people and what their circumstances were, which was where they were about exploring sexuality and pushing boundaries. That's what they signed up for. Why would you move in there if you didn't want to OM with people? And again, Max Pixley has a right to change their mind. But it's about what Max Pixley was saying to Rachel.

And remember, Anthia Gillick told you that the staff houses at OneTaste referred to them as monasteries.

That's how OneTaste treated them. You go into a monastery for a specific purpose and you are expected to follow those rules. It was the same. And while Max Pixley testified that she was directed by Rachel to OM with Eli, you heard on cross-examination, when confronted about her statements in prior meetings with the Government, she admitted that it happened a long time ago and that her memory is not perfect.

Becky Halpern, remember her? She testified that Rachel directed her to have a make-out session with Ruwan. Ruwan and Becky were friends, they lived in the house together, and she testified that she and Ruwan went off and they had a make-out session. She said they didn't have sex. They went off in a room. Obviously they could have done whatever they wanted to do and not said anything to Rachel. They didn't have to do anything. They could have refused. They could have pretended they did. In fact, I think the testimony was by Max Pixley that they went into the room and had sex. But Becky herself told you that didn't happen.

And it wasn't in the context of labor at the time. That's the other thing we keep forgetting. We have to look at what was happening at the time. These were people that had done the Coaching Program, that were living together in the Morellino, that were trying to be coaches. It's an intense environment where people want to explore, push their boundaries, and play in a safe environment.

And remember, Becky also told you about the demo that she was made to do by Rachel. Remember when Becky Halpern first testified in the morning that day -- or it might have been the day before, I think she went over twice -- but she told you she never did anything without safe porting. But then when she came back after lunch and she was talking about this, she suddenly said, oh, there was one time where safe porting didn't happen. She testified about how it was this terrible experience for her. But over and over, you heard every single witness. Why would you be here if you didn't think the OM demonstrations were prestigious? Everybody wanted to do them. They happened all the time.

But go back and look at her testimony again. What is important here is what people were telling Rachel and Nicole. Go back and look at her testimony. She tells you: I'm, like, faking it and trying to do the right thing just to get out. Okay. Again, faking it. How did that come across to Rachel? Rachel, who had been at OneTaste for all these times, who they do demos all the time with people who moved into the Morellino?

Again, it's about what Rachel's knowledge was and what her intent was. And this wasn't go and do an OM demonstration because it's going to get you some work or anything like that. This was training. This was what

people were there for. There's no labor combined with this. That's all it was. And you heard Rob Kandell on direct examination testified about the make-out, that he had heard -- or that -- actually, on direct it sounded like he was there, between Becky and Ruwan. But then upon cross-examination, he admitted he wasn't there.

And Rob Kandell also told you that OM demonstrations, they cause people to be emotional. Other people testified about that as well. That the process of OM often causes people to be emotional, to cry. If Becky was crying afterwards, it would not be unusual. It would not cause Rachel to realize that Becky didn't want to do the demo.

Becky also claimed that Rachel called her a virus. Again, we've heard about these mean words. But again, the fact of calling someone a bad name, not saying it's okay and it's not nice maybe, but again, it's just mean; it's not forced labor.

Now, Max Pixley also said that Rachel directed them -- oh, sorry, I already talked about that.

Finally, Anthia Gillick, she was directed, she said, to pick between two men to have sex with. First of all, at that time Anthia Gillick was not staff. She was never staff. She owned OneTaste New York from January of 2014 until she left at the end of June in 2014 with Ravi and

Po. She wasn't staff.

At that time, she was a student. She said she picked Ravi, they went into a room, and they didn't do anything. And regardless, why would she go in that room? She said she wanted to please Rachel. But she didn't do it because of labor. She wasn't working for the company. She looks back now, she says she didn't want to. But you heard that this was in courses, exploring in 1080. She moved into 1080. You saw an email where she was asking -- or she testified about an email where she was asking to go into 1080.

(Continued on the following page.)

MS. COHEN: (Continuing) She had plenty of money. You heard her testify about that. She didn't have to go.

And she was exploring. You heard about her testimony about a lot of the things she did. Again, she signed up for these things.

And one of her -- she also testified about is that experience in Taboo and that, you know, it sounds crazy. And she testified about that it was harmful to her. But then, on cross-examination, she was confronted with her own handwritten journal about her experience there and it was a positive one. That's what she wrote at the time.

Again, we can't judge these people for how they felt and what they were doing. That's not what we're here for. We're here to determine if this was forced labor. Again, she wasn't working for them, she signed up for the Taboo class, she signed the consent form. And, in fact, she wrote in her own handwritten journal, she admitted how she felt at the time.

Now, the Government spent a lot of time talking about Reese Jones. Let me say from the beginning: No one was forced to have sex with Reese Jones. And we're going to go through that testimony.

They may be saying now -- Michelle may be saying now about her experience with Reese Jones. But she told you that she never told anyone no. She never told Nicole no. She was

asked, she didn't remember.

But she told us that Rachel was her mentor and friend.

Let's look at what these witnesses said about Reese Jones.

I love the experienced players like Marcus, Keith, Eric and Reese.

Is that --

THE COURT: I'm sorry. Ms. Cohen, do you have something you could maybe read off of or maybe focus the microphone closer? It's very hard to hear you from here when you're over there.

MS. COHEN: Sorry, Your Honor.

THE COURT: That's okay.

Can you read from there, though?

MS. COHEN: Yes, I can, Your Honor.

Is this on?

THE COURT: It's not connected because of this one.

MS. COHEN: That's okay.

THE COURT: You could just speak louder, I guess.

MS. COHEN: Yes. Well, I'll try to. I think I can -- oh. Oops. Can I?

THE COURT: Or maybe you have a printout you could read from at the podium?

MS. COHEN: Oh, here we go. Yeah.

Oh, that's hard. Sorry.

I can read this.

I guess I have to get my eyes checked.

You're expressing...

THE COURT: That's all right. Just go over there and if you could maybe speak more loudly.

MS. COHEN: This is Dana. Sorry. Dana Gill.

You're expressing romantic love towards Mr. Jones?

Of course.

Answer: Of course.

Fair to say you were friends?

We were friendly. We didn't become friends until after I started living with him.

Again, on direct examination, Ms. Gill testified about how she didn't want to do this. But when she was confronted with her own handwritten journals, she talked about her feelings for Reese Jones.

And there's other testimony about this.

But let's also just focus on Rachel for a minute here.

Now, Rob Kandell testified that Rachel was not in charge of company finances. She was not responsible for paying Reese back. She was in charge of sales and helping the company make money. At most, the messages show that Rachel was aware that the company was paying back an investment. And

a that's perfectly typical business situation.

But even if she had been aware, again, go back and look at some of these testimony -- the testimony of Christina Berkley, the testimony of Dana Gill, the testimony of Michelle Wright -- and actually what they said at the time. Nobody said I'm being forced to do this against my will.

Now, they're making leaps at this point. The Government's making leaps to point to the claim that Rachel somehow knew that Dana, Michelle, Maddie and Christina were being forced to handle Reese Jones. But there is no evidence of that in this case.

In fact, Robert Kandell told you that Rachel herself had been a handler; that Yia Vang, who is also considered by the Government a coconspirator, that she was also a handler.

At most, Rachel knew the company owed Reese money and that women had made the choice to handle Reese, which was seen as an opportunity in the company.

Again, you can't look at this through the regular lens. You have to look at what these people said about their experience. And again, even if they didn't want to do it at the time and didn't tell anyone, it matters about what the intent was of these two women, of Rachel Cherwitz and Nicole Daedone.

On cross-examination they admitted -- Christina Berkley admitted that she wanted to do this.

And again, Ms. Bonjean will speak more on this for you tomorrow, but with respect to Rachel, focus on Rachel and Reese Jones. Rachel never told anyone to have sex with Reese Jones. There's no evidence that she knew or would have known that anyone was being forced to do it. Because you heard about what people were saying at the time.

And again, I said this from the beginning. You have -- years later, we're talking 10, 15 years later, people have different lives. They're married, they have children potentially. This is about what they felt at the time when they were in this organization.

And again, you heard that it was prestigious. As strange as that sounds, that is not what we're here to judge. Were they forced? Did they have a choice?

And even Michelle Wright admitted that she got privacy, that she stayed there in the house with Maddie, who she wanted to be private with.

Out of all the people in this case, Michelle, Christina and Dana were the only ones that told you anything about this. And we're going to talk about -- a little bit more about their credibility in a moment.

Actually, let's do that now.

The Judge is going to instruct you on the law, of course, when we're done. And she's going to instruct you how to evaluate witness credibility. So just look at that for a

moment.

You have to look at the witnesses' ability to recall and to describe things.

The witnesses' manner in testifying. Did the witness testify in the same manner that they did for the Government as to the Defense?

How the direct testimony compared to cross-examination. Obviously, that's one of our biggest points here. Look at that. Look at the comparisons between the direct and the cross. The Government only focused on the direct today. We're asking you to focus also on the cross-examination because we show these alleged victims what they were thinking at the time through their own messages.

And finally, whether the witnesses' testimony was corroborated. Again, we'll go through that, something we showed as the Defense, even though we have no such burden.

Okay. So, there was a lot of testimony. I know it's been a month. And don't worry, I'm not going to hold you long through it all. I know that you all have been very -- paying careful attention and we are very appreciative of that. So, I'm just going to hit some highlights for you, some themes through each of the witnesses.

And I want you -- these themes is basically -- I want you to think about this -- overlapping issues that the witnesses are testifying over and over again about hindsight,

about things that match the Government's theory, about not being confronted on direct examination with their own statements.

Two: Hindsight, regret and embarrassment. It's one thing, as I said on opening, to talk about this stuff, to be in the moment, to be in the community with like-minded people who wanted to do this. But to stand up in front of people all these years later and admit that you signed up for this and wanted to do it, it's tough. It's a different situation. You're looking at it through a different lens. But again, we've got to look at it from the lens at the time.

Faulty memory. You heard -- and we'll talk about that. But generally, you heard certain witnesses say memories fade. When they were confronted with what they wrote at the time, they remembered.

And finally, changing stories.

And all of these witnesses, all of these issues have led these witnesses to blame OneTaste instead of taking personal responsibility, personal responsibility for their actions while they were there.

Okay. So, first I just want to point out a couple of things about Dana Gill. I've mentioned her a few times. She testified on direct examination that she was groomed to be a sacred prostitute. Here, we have a picture of her at Disney World. She said that training as a sacred prostitute

was a deviation from her values. But on cross-examination, when she was confronted with her own words from a podcast in 2011, she said she loved being a prostitute, that it was her favorite job ever, that she loved having sex and got paid to have sex with random men and that, quote, was really exciting. There was an edge. It was really thrilling.

And while she admitted finally that she spoke those words in 2011, she denied remembering, just like she denied remembering nearly every other statement she was confronted from, from her time at OneTaste, including her own private journal, handwritten journal. She even forgot her trip to Disney World with her non-OneTaste friends.

The one thing she did remember, of course, on cross-examination was her elaborate immigration scheme where she entered a fake green card job with someone she met with her non-OneTaste co-worker and that she lied to the Federal Government about it.

Now, against this backdrop, she claims she was directed to have sex with Antonios Hadjigeorgalis to keep him in the CP3 program. Now, the Defense called Mr. Hadjigeorgalis and he told you that he met Dana the very first weekend of CP3 and that he had no intention of leaving the program. It had just begun. It was the first weekend. He didn't leave the program until months later. So, Dana's testimony on this point is simply not credible.

We called Antonios. I know it's one witness, but we called him to make a simple point that applies more broadly in this case, and that is that there are two sides to every story.

Anthia Gillick, a/k/a Brooke Scheffer. I say that because you've heard both names, so to make it -- it gets a little confusing. You listened to Brooke's testimony on direct. You watched her demeanor. And on cross, you could see for yourself when confronted with many inconsistencies in her story. You heard about her manuscript that she's turning in to make a movie. She claimed that she never got to go to the doctor, that she wasn't able to go, but the messages from the time showed you otherwise. She actually claimed that she injured herself on the aerial -- the aerial -- silks. Thank you. The aerial silks. And that Rachel wouldn't let her go to the doctor.

But this story was not true. The Defense showed her her own statements from the very night that she was hurt. Her mother was there watching. Her mother was there. And she went out with her friends that night. And that was the mom, the mom she also said that she never spoke with when she was at OneTaste. She had minimal contact with her, she said. Her mother was visiting New York. Her mother reviewed her papers to buy OneTaste New York.

She claims she never got to leave OneTaste, but we

heard that she went to DC, the Hamptons, Bali. And remember, she was only the part owner from January to June and she went to Bali in that time. Before that, she wasn't even a staff member, so of course she can do, like everybody else could, what she wanted.

You also saw that she tried to blame Rachel for every little thing, including not to be a able to go to a friend's wedding, which she ultimately went to.

She called Rachel her boss. Again, she was the owner of OneTaste New York with Robbie and Po. She admitted that she was never staff.

She also told you on direct examination that she was forced to move into the bunker and she didn't want to move in there. But then you heard about her testimony concerning her own handwritten journal that proved that she wanted to live there all along but that she was worried that she wasn't going to be able to drink.

I could go on and on about her, but you saw her testify, you observed her credibility and saw her credibility on cross-examination.

Becky Halpern. She was the first witness. She, right off the gate on cross-examination, admitted she's an actress. I think if you look at her demeanor on her direct examination, you could see that. She admitted it. But what's interesting about Becky Halpern is that as the

cross-examination went on and as she was confronted with her own statements and her videos and her pictures with the OneTaste community and her statements about her love for it, she broke down. She broke down because she couldn't hide her true emotions and that was about how she felt at the time.

She also told you how she herself knew how to leave a bad job. She worked with her father at the family theater business. And despite her father being mean to her and cutting her off from her phone and taking away her insurance, he threatened her, she left anyway. She said on cross-examination: Yes, I am someone who has always had options.

She told everyone at OneTaste how much she hated working for her father, how much she loved OneTaste. These are the things, again, you need to evaluate when you consider whether she was forced to do anything. What was in the minds of the people around her when she was saying these things, the people reading these posts, the people talking to her, the people interacting with her about her enthusiasm?

And what about the payment of the coaching program? The Government brought this up in closing that Rachel was pushing her, and you remember there was correspondence back in time that she had to pay for this coaching program and she couldn't afford it. But on cross-examination, she admitted that she was concerned about it and closed her bank account.

Because she could. She had access to her own finances.

But then what did she do?

I'm trying to be loud, Your Honor.

But then what did she do?

She was shown a video to refresh her recollection. And she went back and she said: I put another deposit down.

Right? Because she thought about it and she still wanted to do it.

And then Rachel joked: You closed yourself.

Meaning you closed the sale yourself.

And she said: What?

Question: You closed yourself. Like you closed the sale on yourself.

I don't hear about that part, but sure.

Question: But that's how it went down, right?

Right.

This was a video that she watched of herself, CP5, talking about how she closed her bank account and then reopened it because she wanted to do the class. And we saw -- we heard her testimony when confronted about lots of other texts and posts about how excited she was, she switched to CP6.

Again, look at that testimony about what she was feeling. And remember, she's talking to -- she's next to Rachel at this point, telling her how much she wants to do it.

Again, that is what -- that is what matters. It's the knowledge and the intent of Rachel Cherwitz and Nicole Daedone.

Obviously, I'm focused on Rachel and Ms. Bonjean will get up to you tomorrow and speak more about Nicole Daedone.

Now Michelle.

Oh. We can go back.

Okay. Michelle. We'll go back to Max Pixley.

You can compare her demeanor on direct and cross. Remember, on direct -- or, sorry, on cross-examination, at the very beginning, getting her -- the anger that -- or the confrontational aspect of her nature compared to the direct examination just on questions like: Wouldn't you have had to pay rent somewhere if you didn't leave at OneTaste -- didn't live at OneTaste? Not even answering those simple questions and fighting all along the way. And you could see that difference in her demeanor.

But with respect to Rachel, Michelle told you that Rachel was a mentor and a friend, as I said before. She also admitted that she loved Nicole. You saw their text message -- or you heard about their text message.

And Michelle also testified that she lived and hung out with OneTaste after she left. She chose to leave, she wasn't shunned, she remained part of the OneTaste community.

We saw pictures from that.

And she testified about her terrible time in Vegas after she left and she suffered there. And she said, you know, she went to LA and she was in a terrible state and feeling terrible. But we showed you pictures from her time at OneTaste, her happy, living again in the community, smiling with those photos. Take a look at those photos and evaluate her credibility. Again, what she was thinking, what she was saying at the time.

Sorry, can we go back to Max Pixley?

We've already -- I already talked a lot about Max Pixley, so I won't go -- I just wanted to point out one thing that was raised in closing today, that she wasn't able to take a vacation. This is another theme in the Government's case.

Now, if you recall, we showed her a -- she took -- she started in June of 2013 and in May, when she tried to get -- put in her application for The Morellino, she took a two-week vacation and then she quit in November 2013. So to say that she never made a -- took a vacation doesn't make any sense. And she quit. Max Pixley told you she didn't want -- she worked for Rachel as her assistant and she didn't want to anymore. And what did she do? She quit.

But she didn't run out. She didn't have to have an escape plan like the Government told you. She gave two-weeks'

notice. We talked about that in cross-examination. She didn't want to continue to work, she left, no serious harm. She was not forced to stay.

Now, Chris Kosley, it's sort of unclear why the Government called him because they didn't even raise him in their closing argument, but this shows the exact type of witness they are relying on in this case.

He was welcomed to the OneTaste community and given second chance after second chance and repeatedly took advantage of their forgiveness. He used drugs, including while on the job, violated the container rule by touching a student inappropriately during OM, he stole footage, he drove a company car while high and endangered others on the road, and refused to acknowledge any of this on the stand.

And after being finally fired for this conduct, he stole a bunch of footage from OneTaste, including sensitive footage of individuals, exposing them without their consent.

OneTaste was a victim of his crimes.

Michal Neria. You probably remember Michal, who turned this trial into a literal witch trial.

She refused, on cross-examination, to take responsibility for Misha paying for her courses.

She complained that she had to OM, while her simultaneous chats in the OneTaste -- sorry, in the Brooklyn OM house told a different story. She admitted she set up the

OMs. And she had just gotten there. She talked about people she met. Maurice was one of the names. You can look at her testimony. She set those up. She wasn't even working for the company at the time, she wasn't living with Rachel.

She claimed she didn't want to be with Misha and the photos and the videos show otherwise.

(Video played.)

MS. COHEN: This video, I think, is important because the camera -- they do not know -- the course isn't going on, people are milling around, and you can see a private moment between the two of them.

And despite being told by the student coordinator, Angela Richardson, at the NDI in August that maybe she was moving too fast into marriage, she continued on. She married him.

She wasn't forced to marry him. She wanted to marry him. Maybe regretted it, maybe got caught up in the moment, but she left and she stayed with him at first. And you heard testimony that she sent a save-the-date out. She was going to have another wedding. So it's not like she was forced there and she left to get away from him. She wanted to be with him.

She was complete revisionist history as to what happened.

And let's not forget, she worked for OneTaste for a total of six months in sales. Much of that time was spent in

courses that she chose to do over and over and over again. She was doing the CP6 -- I think it was CP9. I'm not quite -- but you can see that in the testimony. She was doing the courses, the coaching course. And much -- and she did the NDI. So much of that time was spent in courses. And she got engaged and married all in that time.

And let's cap it off with Lyndsi Keves. Lyndsi Keves, who worked for OneTaste for less than 90 days after enthusiastically taking seven OneTaste courses and signing consent forms all along the way. And we heard her today. We played -- again, that was hard to hear, but you can read it, you can read the transcript. She admitted to carefully thinking through before paying for courses, she admitted on the stand. She admitted she asked her fiancé to pay for her. They took trips to the Hamptons, to Spain during her time at OneTaste. And she admitted that she always had the option to go back and live with her sister at her SoHo apartment and resume her nanny gig. Or get another job, which she ultimately did.

Her testimony against Rachel amounted to that one conversation, that one communication exercise, an exercise where Rachel said something mean to her. Okay, that was an exercise. The whole point of the exercise was to do this kind of communication. And you could look at that. Look at that transcript. And she admits it.

The fact that she had to one day -- I think she had to get up early and miss breakfast for it, for distributing fliers, that was her other complaint.

Ladies and Gentlemen, that is not forced labor. Not even close.

And speaking of schedules, we heard a lot of testimony about the tough hours. Again, people chose to do this.

But let's actually look at what their schedules were. These witnesses said that they had to get up and OM and meditate and go to yoga and eat breakfast and then they would start doing sales calls or whatever it was around 12:00 p.m.

Okay. Well, first of all, all this early practice -- oh, and the fear inventory -- this is all part of the practice. This is why they moved into these places, why they wanted to do it. So to lump that in with their work schedule doesn't make any sense. That's what they're here for.

And this was part of a wellness company. It said it when you went in you agreed to do yoga, you agreed to do these things. If you didn't want to, you wouldn't move in. That has nothing to do with forced labor.

And at the end of the day, the worst thing these witnesses said was that they were conflicted about how complicated the experience was at OneTaste. And you heard

this from witness after witness. We put some transcripts up here. They had mixed feelings about their experience, in hindsight. And when pressed on cross about those experiences, they admitted that they had good things to say, positive things to say at the time.

If the Government's witnesses, their own witnesses can't get up here and tell you about whether they were forced or not, that it was complicated and they have mixed emotion, how can you possibly find proof beyond a reasonable doubt? They don't even know how they felt at the time. It's complicated. But you know what we can tell from the time? Again, their own words.

There was no agreement in this case, not even close. There was no intent and no threats of serious harm. Not that were given to the Defendants. These witnesses made choices, choices to stay in the community that they loved with the people they loved at the time. And when they did not like it anymore or they wanted to do different things, they left.

And they may have told you things, again, that didn't sound good, but remember, that was how they were feeling at the time -- or they would testify now about things that they don't like and ways that they were behaving back then, but that's not what they were feeling at the time. And that's what the Defense showed you.

Now, when you go back to the jury room to

deliberate, consider their testimony. Consider, as the jury instructions require you to do, that they chose to be at OneTaste. No matter what you think about OneTaste and what they were doing, they chose it. They knew what it was about. And ask yourselves whether Rachel Cherwitz forced them to do the things they now regret.

We are confident when you look at all of this evidence and you study the jury instructions after the Court instructs you, you will see and look at the lack of evidence here and find that Rachel Cherwitz is not guilty of the crime charged.

Thank you.

THE COURT: Let me see the parties up at sidebar.

(Sidebar.)

(Continued on the next page.)

(The following occurred at sidebar.)

THE COURT: We're at sidebar and we have everybody, including the two individual defendants.

I just wanted to talk scheduling.

So, how long is your closing going to be?

MS. BONJEAN: It's going to be a little bit.

And I -- yeah, it's going to be -- I don't know, how long was Celia's? I don't remember.

MS. FARRELL: I think it was under two and a half.

MR. ROBOTTI: Two and a half.

MS. BONJEAN: Yeah, I don't think it's going to be longer than that. And maybe it will be two.

I mean, honestly, you know, I do not want to break it up. I don't think that's fair, frankly. And I understand the Court wants to stay on schedule, but at the same time, I feel like it would be more --

THE COURT: We can stop.

MS. BONJEAN: Okay. I will make it more efficient if I take the night to, like, not redo --

THE COURT: I'm not going to make you split it up. That's fine.

Approximately how long is rebuttal?

MS. BENSING: I do think that the Government's rebuttal may be longer than anticipated. There were a number of mischaracterizations of the record that were not correct.

THE COURT: That's fine. We're only sitting tomorrow starting at one. If it has to carry over to Friday, it will carry over to Friday.

MS. BENSING: I would like to finish tomorrow, but it may be a little bit longer than I anticipated.

THE COURT: That's fine.

So I don't think there's anything else we need for the jury. We will let the jury leave.

MS. BONJEAN: I want to raise something with the Court when the jury is out of here.

THE COURT: Yes.

So I will tell them to come back tomorrow at 12:45 so we can start at 1:00.

MS. BONJEAN: Thanks.

(Sidebar ends.)

(Continued on the next page)

(In open court.)

THE COURT: Okay, we're going to end early today so that we don't have another argument start then have to stop midway. We're actually only sitting tomorrow in the afternoon so you don't need to come until 12:45 and we'll start at one. You get a little bit of extra time today and a little extra time in the morning. Be here at 12:45 promptly to start at one.

Over the recess, don't discuss the case with anyone, even among yourselves. If anyone approaches you or tries to discuss the trial with you, let me know about it immediately or Mr. D'Agostino. Don't read, listen to, watch, or watch any other news or other media reporting of the trial. Don't conduct any independent research about the case, about the matters in the case, or about the individuals involved in the case. Don't talk to any of the parties, the attorneys, the witnesses about anything.

Keep an open mind, and again, have a good evening. And we'll see you in the jury room at 12:45 then we'll start at one. Have a good evening.

(Jury exits the courtroom.)

THE COURT: Everyone may be seated.

Ms. Bonjean, you had something you wanted to raise.

MS. BONJEAN: Yes, your Honor.

Respectfully, the defense would move for a mistrial

on account of the commentary during closing argument related to and touching on Ms. Daedone's spirituality, her belief systems, in violation of the First Amendment.

There was all of this conversation the Government attempted to preclude us from even mentioning the First Amendment; meanwhile, they bring out the text message of the First Amendment. And took a position, contrary to what they represented all along, that OM is not a legitimate practice, that it's not a legitimate spiritual belief. And there was argument to the jury that they should, essentially, hold it against the defendants that they believe in this practice.

And this is precisely the issue I was concerned about, precisely the issue that we had raised previously, and why we asked for a jury instruction. And the Government did exactly in their closing argument what we expected and suspected they may do.

They may not adhere to the view that orgasmic meditation is a spiritual practice. But there is a strong record that predates long before OneTaste was even anything of a company that this was a belief system that Ms. Daedone, Mr. Kandell, back in the late 90s, believed. In fact, it was a practice that began in the 60s, according to Mr. Kandell.

So to suggest that this is just some type of gimmick that has no basis -- they can make whatever arguments they want, but they crossed that line into asking this jury to hold

their spiritual beliefs against them.

It's our belief that that was improper and a violation of the First Amendment. So I wanted to make that record.

THE COURT: Response from the Government.

MS. BENSING: Obviously, the Government of opposes the motion. And that that's a gross mischaracterization of the summation by Ms. Gupta.

The Government is not seeking to hold anything against anybody. The Government is making arguments from the evidence in this trial.

There was no argument that in a vacuum that orgasmic meditation is good or bad.

There is no argument that a belief in orgasmic meditation should be held against somebody.

The Government was simply making arguments from the evidence in this case. By the way, we did not make any arguments about the First Amendment. We did not stray into any legal territory, or even any argument about the First Amendment.

This is a gross, gross mischaracterization of the record and the Government opposes the motion.

THE COURT: Okay, well, I will address this tomorrow.

MS. BONJEAN: Very good.

MS. COHEN: For the record, your Honor, Ms. Cherwitz joins in that motion.

THE COURT: Yes, okay. And the Government is opposing the motion and I'll address it tomorrow.

MS. BENSING: Thank you, your Honor.

THE COURT: I'll see everyone tomorrow at 1:00 o'clock.

(Proceedings adjourned at 5:00 p.m. to resume on June 5, 2025 at 1:00 p.m.)

# I N D E X


| SUMMATIONS | PAGE |
|---|---|
| Government by Ms. Gupta | 4892 |
| Defense by Ms. Cohen | 5029 |