UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
June 5, 2025
Defendants. : 1:00 p.m.
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Jamie Ann Stanton
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

(In open court; outside the presence of the jury.)

THE CLERK: This is United States of America against Rachel Cherwitz and Nicole Daedone.

Is the government ready?

MS. BENSING: Yes. Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern. We are joined by Paralegal Specialists Liam McNett and Marlane Bosler. Good afternoon.

THE COURT: Good afternoon, everybody.

MS. COHEN: Good afternoon, Your Honor. Celia Cohen, Michael Robotti, Schuyler La Barge, Kelly Lin, Kelly Lenahan-Phahlert and Richard Hobbs all on behalf of Rachel Cherwitz.

THE COURT: Good morning. Good afternoon, rather.

MS. BONJEAN: Good morning, Your Honor. Jennifer Bonjean, Gabriella Orozco, Ashley Cohen, Galila Assefa and Soph Moazed on behalf of Ms. Daedone.

THE COURT: And good afternoon, everyone.

The jury is all here but before we bring the jury back, I will address the issue that was raised yesterday before we ended for the day.

Defendants made a motion for a mistrial based on the government's closing argument. The government opposed the motion. Upon review of the record, defendants' motion for a mistrial is denied.

We can bring out the jury now.

Ms. Bonjean, approximately how long do you think your closing will be?

MS. BONJEAN: I, I -- I'm so bad at these things, timing. Not less than two hours. Not more than three.

THE COURT: Okay. I just wanted an estimate.

MS. BONJEAN: Yes, I don't think.

(Jury enters.)

THE COURT: Everyone may be seated.

Good afternoon to the members of the jury.

Ms. Bonjean, would you like to present a closing argument?

MS. BONJEAN: I would.

THE COURT: Go ahead.

MS. BONJEAN: I bet when you all walked into this courtroom and Judge Marutollo told you that this is a forced labor conspiracy case, you thought to yourself this is going to be a snoozer, but when you learned that this case involved a practice known as Orgasmic Meditation that involved a meditative practice, with clitoral stroking and this case would involve concepts around BDSM and other sexual practices, I'm guessing you said, Ooh, not going to be a snoozer as it turns out. But what I'm guessing you did not anticipate is that you would be jurors in this very consequential case.

Now, during the government's argument, the government focused and the witnesses focused heavily on Nicole

Daedone's teachings, her philosophies, her beliefs. And you heard witnesses testify that it was those beliefs, those ideas, those expressions that made them do things they otherwise wouldn't have done and that now they regret having done those things.

Now, the government showed you little clips of Ms. Daedone's lectures. They showed you snippets of this, here or there. And, listen, and they took a lot of liberties, by the way, in their closing argument in terms of interpreting those for you.

And I will be honest, I do not always fully understand what the heck Nicole is saying and that's because of the way she teaches. In metaphor. You've heard it. Stories. It's complex. It's layered. It's dense. And I am not sure I always agree with everything I hear. And no one here will be asked to say whether they agree with her philosophies, her ideas, her teachings, Orgasmic Meditation, any of it. But to quote the great philosopher Voltaire: I may disapprove of what you say, but I will defend to the death your right to say it.

So I am here today proudly representing Nicole Daedone. And I am also here to condemn the dangerous testimony and argument you heard and that the witnesses have advanced that ideas and teachings expressed publicly, openly, constitutes serious harm or coercion.

And I want you to think about this, ladies and gentlemen.

You heard testimony, you heard testimony that grown people went to take courses on controversial ideas, and not, not bait-and-switch stuff. They knew it was controversial. They were told it was controversial. You only need to show up at one TurnON event and you know what you're getting into. These grown women went there, they took these courses, they were seeking them out, they wanted their boundaries pushed, and now, 15 years later, they believe that those ideas caused them harm.

But I'm not sure they really believe that and I think you've heard some testimony and I'll quote some testimony from Ms. Halpern.

On cross-examination, she was asked: You have free thought. You can identify the way you want, right? She's the leader of an organization talking about her ideas and teaching them?

Right. Right.

And there's a lot of controversial figures in life who have unusual ideas, right?

That is true.

And you don't have to adopt all of them, do you?

You do not.

Okay. That's called free will, right?

That's what it's called.

And ladies and gentlemen, if Nicole's book "Slow Sex" or any of her writings constitute serious harm, what do we call things like "Mein Kampf" or other controversial writings?

Now, the government's closing argument was designed, designed to get you to agree with them, that Nicole is a cunning, calculated grifter who, along with Rob Kandell and others, decided long ago to get rich off this practice of Orgasmic Meditation in a forced labor scheme.

And anyone, anyone can pull together an ugly narrative based on half truths, absence of context, snippets of text exchanges, or videos. And it's particularly easy to do in a case like this where Ms. Daedone and Ms. Cherwitz and a number of their fellow OneTaste community members speak in their own vocabulary to some degree, using words that don't have conventional meanings, and you've heard a lot about that during the course of this trial.

We're going to go over that a little bit, but it's easy to distort meanings when we're not speaking the same vocabulary. So I want you to remember that when you read things and you are trying to assess what is meant here, and this is -- we're going to talk about it in a little bit, but that's really important when assessing intent.

And we're going to get it cleared up because unlike

the government, we are going to show you all of it. We want -- we're going to go over the facts, the good, the bad, the ugly, not just the facts that we distort to our liking to prove our case or show our case, or not just the convenient ones.

And I do want to stop and really thank you all for your attentiveness, your patience, your hard work, all of it. I know you are exhausted because so am I. I don't know, my whole team is exhausted, and maybe 15 years from now, I'll be indicted for forced labor.

MS. FARRELL: Objection.

THE COURT: Sustained.

MS. BONJEAN: Listen, my client is charged with a very serious crime and she is presumed innocent of this crime and she deserves a fair accounting of the evidence in this case so I beg of you to bear with me as we go through this. I will try to keep it interesting without drawing objections.

Now, you looked at some video in the closing argument, in trial but also in the closing arguments. You've learned a little bit about Nicole Daedone and her background. The government showed you very short clips of Nicole lecturing and teaching.

You heard testimony from a fellow named Chris Kosley that he took terabytes -- and I'm not a techie person, but my understanding is terabytes is a lot of data. He took many

terabytes of video footage of Nicole. And you remember him. He's the guy with the drug problems and the honesty problems who has a habit of, a number of habits, stealing computers and stealing sensitive information that he then sold off to filmmakers.

And what he told you and what I think you can deduce from the fact that there were terabytes of information is that Ms. Daedone -- they recorded everything at OneTaste. Her teachings. The coaching programs. Her darshons, I think. Maybe I have that wrong but, you know, these group settings where there was, like, this sort of teaching moments, coaching circles. These things were either audioed or videoed, et cetera.

So to be clear, these are not people that were operating in secret. And you heard a tiny, tiny bit of it and even that, frankly, was -- even those portions that you heard were not in context.

And they really, you know, reduced Ms. Daedone to a few clips from this Stinson Beach OM demonstration. And you may remember that the government, during closing argument, they played a tiny portion of this video and then argued these conclusions from it and I would like to play a slightly longer version of this just to put some things in context.

This is, as you may recall, the introduction that Ms. Cherwitz gave to Ms. Daedone before there was this OM

presentation which was kind of an unusual presentation because it was sort of theatrical in nature and there was the Buddhist music in back.

And I would like to play that if we could now.

(Video played.) (Video stopped.)

MS. BONJEAN: So you heard a little tiny portion of that in the government's closing argument, specifically, the part where Ms. Daedone says: I had learned that it was good to be smart and learned I was even better to be hot so I can control men and women.

That's what they played you. And they want you to conclude that this is evidence, that even back then, Ms. Daedone just had this grand master scheme to control men and women and that's what she's talking about here. And that this thriving, lucrative business to which she's referencing is OneTaste.

Well, putting it in context, actually, she says something very different. She says, I started this work at 16. She's talking about work in sexuality, not specifically about OneTaste, I posit, but you can make your own conclusions. And they take issue, and we heard this from the closing arguments, with this idea that Ms. Daedone used her, it was better to be hot, and used this in some calculated way with men and women who cannot control themselves.

Well, that's all fine and well. It's fabulous that

young women nowadays don't think that's much of an issue, but for those of us in, you know, in our 50s like Ms. Daedone, like myself, that's a truth. They can say it's not but it's a truth. Women did get more power through looks, through sexuality, those things, and we can deny it but it was a truth and she was saying something truthful there. But she also went on to say and I found both lessons were equally valuable. That is what she was saying. She said it with her own words.

And as you can tell from this clip, Ms. Daedone is a woman who comes from trauma. Now, she wouldn't use that word as I'm sure you all figured out. She would use different words. Darkness, perhaps. And the government has repeatedly argued that Nicole's teachings on trauma and victimhood makes her some type of rape apologist or some type of person who -- I think what Ms. Gupta argued is that Ms. Daedone thinks there's no such thing as a victim and that the way for women to deflect rape is to be turned on. That's a quote.

Now, I'm pretty sure in her own introduction she used the word "victim" or "survivor of incest," and if you want to have a very limited view of what Ms. Daedone is, I guess --

A VOICE: Cherwitz.

MS. BONJEAN: Well, I'm talking about Ms. Daedone. That's her writing.

So if you want to have a very limited view of what

Ms. Daedone's viewpoint is about victimhood or victim and perpetrator, yes, sure, you can chalk it up to whatever you want, but Ms. Daedone has always been a provocateur. I think there's no doubts there.

And, frankly -- and the government played you a clip we saw from this, this video they love of Ms. Daedone, we're going to look at a portion of it, where she's lecturing about, I guess, trauma, and they love playing this clip because she starts off the clip with this crass joke and they played it during the closing argument. I got raped and all I got was this lousy T-shirt. It's meant to shock and awe you.

But here's the thing. Ms. Daedone has earned the right to make a joke like that. She has earned the right to be a provocateur around that. And if you stayed for the whole lecture, you would understand that it's no laughing matter and she has very serious ideas. And what you also understand is she always lectures in the context of "my experience," "I thought this," "this is how I think about it."

And you heard testimony, I think it was Ms. Gillick, I think it was Ms. Gillick, where I asked her that exact question: Didn't Ms. Daedone tell you, like, these are my ideas, you don't have to follow them, but these are my ideas? She said these things in lectures?

And Ms. Gillick said, Yes, she did.

So I would like to play you, again, a little more

context so you do not conclude unfairly that Ms. Daedone doesn't think there are victims or that victimhood isn't a real thing. What she's talking about is what do you do with that and how do you let it not define you. And, again, you don't have to agree, but it's also not fair to misinterpret or mischaracterize.

So let's take a look with a little more context. We're not going to listen to the whole 90 minutes. I think it's in evidence which is pretty interesting, but I will not be playing that and you guys can decide whether you want to listen to the whole thing.

(Video played.) (Video stopped.)

MS. BONJEAN: So not quite, not quite what was characterized.

You know, she tells a story about the shaman and the medicine man begins by falling into the power of demons and by pulling himself out of this stark place, he becomes the medicine man and someone who stays in this place remains the sick person. And that, I think, is a powerful metaphor and whether you agree with her or not is your business, but I'm not going to have the government coming in here and mischaracterizing that and making it cheap for the purposes of an argument.

And you heard over and over again the I's, my's, my story. This is not someone saying, You must, you know,

believe in this. You know, this is very -- she's telling through personal stories and she's teaching. And if you're sitting in this classroom and you don't understand that, that's your problem because this is plainly obvious that she is lecturing about her own experience. It may resonate with you, it may not, and you are free to draw from it what you want.

And I want to play one other clip from this particular lecture.

Go ahead.

(Video played.) (Video stopped.)

MS. BONJEAN: So I wanted to point this out, that repeatedly, To me, To me. Okay? Implicit in all of this, this isn't someone who's dictating from above. This is someone who is making it very clear that I look at victimhood and I look at these things differently and I think you can get your power by not keeping yourself in that place.

And, frankly, you heard witnesses testify when I asked them on cross-examination about this, they agreed. In fact. In fact, even Becky Halpern said they were beautiful ideas. Well, you just said a minute ago that they were the ideas that kept you, I don't know, doing courses at OneTaste. So, like, which one is it?

Now, the government hopes to persuade you, and they have brought this up a number of times, to believe that

Nicole's ideas and thoughts were designed to do harm so that she can build this company around this wild idea of OMing, planning all along to force women to engage in labor and sexual services against their will in the course of 12, 15 years.

What they told you and what was argued, and I'm going to quote: And that's not because OMing was actually spiritual. They connected OMing to spirituality for legal protection and people would follow Nicole Daedone's teachings.

Well, that is just not the case. That is -- and, oh, their evidence of this was this one e-mail or text message, 1456-DR, we'll look at it again, where Ms. Daedone -- this is 2014, you know, long after OneTaste was underway. And they're talking about sort of marketing.

I'm sure it's not been lost on you that OneTaste was, in fact, a business and there's this comment about, Oh, should we, should we stick with our T-shirts that say 'Powered by Orgasm' or should we change it to "Orgasm supercharge and fulfillment" and she says keep "Power By Orgasm," I like the subtle God reference.

That's, that's vague, at best. We don't know what she's meaning by that, but the government wants you to conclude that that means she just came up with the idea to connect it with spirituality and God in 2014. This was all, again, showing her intent. Well, that would require you to

ignore all of their other evidence.

You can take that down.

And, again, I also want to point out that I think another one of their arguments is that there's something improper about turning something that maybe has a spiritual element to it into a business.

I mean I don't know if you -- some of the richest people on the planet are TV evangelical preacher types. Okay? This is not unusual. We are a capitalistic nation and everything is turned into money, but I guess because Ms. Daedone is a woman, maybe, this was seen as, I don't know, off limits. But it's not a secret. Yes, she had this incredible passion. It didn't start out as a business. And, yes, she turned it into a business that many, many years later, became profitable.

Now, this is what I want to point out.

Ms. Daedone's ideas about orgasmic meditation she has been espousing for decades openly, publicly, in writings, on video, in books, on the internet, in TED Talks.

(Continued on next page.)

MS. BONJEAN: (Continuing) And then these ideas became problematic at some point. But they were out there for many, many, many years and they were always connected to spirituality.

So this is a quote from the Government's witness, Becky Halpern. And this is how she described it: At the heart of OneTaste coaching is practice, is orgasmic meditation, OM. OM is a simple sexuality practice that offers practitioners the visceral experience of connection, sensation and turn-on. OM becomes a process for discovery, the answers that we had deep inside of us. It gives us access to what we want in life as a whole. Desire, sex, shadow and relationship becomes crucible of growth.

She seems to still really like this idea, frankly.

There's other evidence that you heard that orgasmic meditation and the practice of OM was always tied with spirituality. This wasn't a belated argument.

You can go to the next slide.

Mr. Kandell testified. And he was with Ms. Daedone from the early days, as you all know.

He was asked the question: How was the term "orgasm" used at OneTaste?

Pretty sure this was on direct examination, too.

It was used for many, many things. There was the physical practice, orgasmic meditation, which led to orgasm.

"Orgasm" meaning not climax, but orgasm being the energetic energy in the body. It was also used as a life source. You know, that thing powered you. Some people even looked to it as a relationship to God, as orgasm as a connection to God.

And who -- who did -- did Nicole teach that?

Yes.

Question: And what exactly did she teach as orgasm being the connection to God?

Answer: I think she meant as just a connection to or the pathway to your spiritual enhancement, your spiritual awareness, spiritual to the unknown.

And did she teach what the pathway was?

Yes.

Christina Berkley. And she -- these are people that were with Ms. Daedone in the so-called warehouse days, long -- you know, in 2007, before OneTaste was even -- even could be conceived as being the business it turned out to be.

When asked what was the spiritual path that she taught -- "she" being Ms. Daedone -- well, there was a way to tap into something deeper and greater than through this practice called orgasmic meditation, that the pursuit of finding our own power was very important, that going down into difficult situations was where you found that power. Kind of this figure eight. Go down and have difficult experiences and you make it through that and then you become more powerful.

And then you come up and you have bright, enlightening experiences and you come back down. It was in the down that there was more focus.

And the reason I point this out, again, it's not to persuade you all to adopt this. It's to show you that her connection, her belief in orgasm to spirituality, Ms. Cherwitz's belief in connection to orgasm to spirituality, people who were involved in OneTaste, their belief in that connection long preceded any success of OneTaste. So it is just unfair to say, oh, in 2014 she just broke out into it as some type of ruse.

And this all does go to important things you will be deciding, which is Ms. Daedone's intent, Ms. Cherwitz's intent.

I would also point out, I think if someone was, you know, this cunning fraudster that wanted to go sell things for a forced labor scheme, there might be easier things to sell than orgasmic meditation.

What's another thing that we need to get into here? Throughout the closing argument, throughout, and then suddenly worked in throughout the evidence, the Government emphasized, frankly, that OneTaste is a cult. That's -- quit pussyfooting around it. That is what they want you to believe, and that Nicole is the leader or guru of this cult. And we're not afraid of the allegations, we're not afraid of the facts. But

we're not going to curate a story around this and nobody should. You heard from the witnesses that this is a complicated question. And what you also learned -- and where I'm going to get to is, it doesn't really matter.

But before we get there -- I don't want to bury the lead, but before we get there, the Government told you about how orgasmic meditation and OneTaste came into existence. And they said during argument -- closing arguments that the predecessor practice of OM which was, as you heard, called deliberate orgasm, or DOing, was developed in the 1960s and it was written from the perspective of men. And it was, Mr. Kandell told you, Mr. Blackman may have mentioned this, that it was rooted in sort of male domination. And you heard about how Nicole and Rob Kandell met at the Welcomed Consensus, which engaged in this practice of DOing, or deliberate orgasm, and that the head of this group was very power -- you know, was a power -- I guess leaned into his power. He was violent, not a -- doesn't sound like he was a great guy. And then Ms. Daedone and Mr. Kandell ultimately went to Morehouse. Which, by the way, is not the same as Welcomed Consensus, if you got that inflated. Welcomed Consensus was one thing, Morehouse was a different thing. And there was this idea and Ms. Daedone wanted to sort of take up the leadership of Morehouse when the fellow that was in the leadership of Morehouse was on his deathbed, dying

of cancer. And she wanted to bring her ideas there. And it's true. Apparently, the community vetoed that, so she and Kandell went out and they started this new organization.

And the Government uses this and tells you this is evidence she always wanted to be a guru. You can make your own conclusions about that, but I am going to tell you this right now: You're not going to get any jury instructions about what a cult is. I bet you if you all sat around --

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

MS. BONJEAN: Well.

THE COURT: The Court will be giving the instructions to the jury.

MS. BONJEAN: Right.

And you won't see the word "cult" in there. And you won't see the word "brainwashing" in there. Is that a secret? It's not a secret.

And what Ms. Daedone wanted to do was rework the concept of deliberate orgasm from a woman's perspective and turn it into a meditative practice more akin to meditation and yoga. That comes from the Government's witnesses. And the Government suggests in their closing argument this was all pernicious evidence of intent.

And what was said was, the Government argued to you: And you heard it was centered around psychological tactics,

ritualized activity and communal living.

Psychological tactics, ritualized activity and communal living. Maybe kind of like a sorority, fraternities, military, all types of communal living, religions.

I wasn't in a sorority, but I know people who have been. They sound like a lot of fun. You live in community. There are ritualized practices. They all sing these, you know, kind of cute songs. They have weird handshakes. They -- you know, they have loyalty to the sorority. And, you know, some people really like them.

I had two daughters that went and hated it. You know what they did? They left. They left. I don't like this. This is weird. I don't want to be doing all these events. They left.

And I know, I can hear the closing argument -- or the rebuttal argument of the Government to say, well, sororities don't engage in sexual practices or anything of that nature.

Again, not the point. Not the point because, as you will hear a little bit later in my closing argument, people are permitted to engage in whatever practices they want so long as they're not hurting people. And that's where we disagree. That is where the crux of things are. If people are engaging in consensual sexual activities, consensual activities, then mind your business.

Now, if the Government proved otherwise, then we might be in a different position, but they did not.

So I bring this up about the cult and all that because we -- and we brought this up during opening statements. That's a distraction in some ways. There's no definition even amongst laypeople about what a cult is. There's no -- I mean, if there was a cult statute, that's what they would be charged with. And that's a word that gets bandied about all the time, everywhere: Religions, companies, political movements.

And I, personally, kind of like Rob Kandell's definition. You don't have to adopt it. He says "cult" comes from the word "culture." It is a definition of subculture and not a negative connotation.

He was asked: In your view, many other legitimate organizations and companies could be considered cults, right?

Answer: Absolutely.

Again, you don't have to agree with that. But the bottom line is, is it does not matter.

The Government is banking on the fact that when you think of the word "cult," you will think of Jim Jones, or David Koresh in the Waco days. That is manipulation right there.

And even if they joked about the fact that they were perceived as a cult, which is one of their pieces of evidence

that they wanted to present to you, I think there was testimony from -- there was a quote that they put up in their PowerPoint presentation, testimony from Mr. Hubbard where he testified -- ah, here it is. The Government just showed you the first four lines, 7 through 10, but we went to the next question.

Eventually, one of the ways, it was -- Nicole described it and we all described it, it was a sex cult. We said that in public.

Question: What did you take that to mean?

Honestly, mostly it was my -- I took it to mean it was mostly just a way to get a rise out of people that we met.

In what way?

Kind of a controversial statement.

So what?

Chris Hubbard was the fellow who helped create the scenes, the Monsieur Follet, if you remember. The series for Reese Jones.

And on those scenes, by the way, again, you consistently heard these were consenting adults doing these theatrical scenes that sometimes did and sometimes did not involve sexual activities.

So the Government also put in evidence and mentioned it in their closing argument that there's something -- some inference to be drawn from the fact that if OneTaste became --

was growing, there was an effort to get a reputation internet service to disassociate OneTaste from the word "cult." That's evidence that they were, I don't know, trying -- what, not to be associated with a cult? Yeah, no kidding. They didn't want people looking up and that first coming up because it's bad for business. That's understandable.

And at the end of the day, you can call it a cult, you can not call it a cult, it could be cultish, cult-ey, whatever you want to use, it is not relevant for what you are doing here. And the Government cannot, will not meet its burden.

And Ms. Gupta did a very fine job in her closing argument and she weaved together a story that Ms. Daedone, you know, had these questionable motives for creating OM and OneTaste, asking you to draw nefarious conclusions from ambiguous text communications and from witness testimonies which were conclusory every single time until they got on cross-examination.

Were you harmed by Ms. Daedone? Yes, I was harmed.

Self-diagnosis. You know, I spent ten years in therapy after I left OneTaste.

You know, these are -- you know, what -- again, that's conclusory. Where are the facts to support it?

I was brainwashed. I was lost in myself. I didn't know right or wrong. I was manipulated. Well, what are you

going to make of that?

And as to Ms. Daedone, you know, it's clear that people were drawn to her. She was certainly smart, charismatic, had an incredibly interesting history and people wanted to hear what she had to say. And these are all statements about her from the Government's witnesses.

And the Government, you know, wants to argue, well, yes, this is all just brainwashing and therefore she's a guru, et cetera. Okay. You heard Ms. Gillick say, actually, I wanted to go talk to her because she seemed like a successful business woman.

So, you know, again, I think we can leave this point behind. It doesn't matter. Labels don't matter. Labels don't matter. And however you want to define OneTaste will not get you any closer to deciding whether or not Ms. Daedone and Ms. Cherwitz are guilty of the charged offense.

So the Government also makes much of the fact that the people who were involved in OneTaste had their own special vocabulary and they used their own words. We saw that. Many of those organizations have unique vocabularies: Apple, tech companies, you know, military. You could come up with all types of examples.

And the Government's own witnesses told you over and over and over again that these, this terminology, yes, much of it had a literal and metaphorical meaning. And the Government

wants you to ignore the metaphorical meaning and just go with the actual, the literal meaning time and time again. But that's not fair. "Turned on" doesn't always just mean horny, as their own witnesses pointed out.

And I didn't -- this was a quote that I kind of missed. Thank you. We mentioned this in opening statements, but also Mr. Kandell testified about it. And this is where -- this is a Buddhist principle. And, as you all know, that OneTaste and Ms. Daedone's teachings are rooted in a number of things, a combination of Buddhism, 12-step programs, kind of different ideas that she's put together. And this is where the name of the company derived: "Just as the great ocean has OneTaste, the taste of salt, so does liberation and the taste of truth." And that is the origins of the name of Ms. Daedone's company, OneTaste.

Now, as you consider the evidence in this case, and you were shown a great deal of text messages and exchanges, again, I want you to remember some of the actual terms that were used and their real meanings. And this, again, comes from the Government's witnesses.

"Orgasm." We talked about this earlier and this connection to, frankly, spirituality. And Mr. Kandell has testified: It was used for many, many things. There was the physical practice orgasm; meditation, which led to orgasm; orgasm not meaning climax, but orgasm being the energetic life

-- energetic energy in the body. It was also used as life force. You know, that thing that powered you. Some people even looked at it as a relationship to God, as orgasm as the connection to God.

And then even Michelle Wright testified: The word "orgasm" is synonymous with -- I can't see that, but. Oh. Synonymous with, like, chi or life force.

Now, so, "turn on." We don't have to read them all, but you have them there if you want to read them. The Government argued to you in closing that Ms. Daedone says there's no such thing as a victim and the only way to deal with a rapist is just to turn on.

And as you will see, that is not at all what she's saying, if you believe the Government's witnesses and these definitions, is that "turn on" is really about power; it's about flow; it's about what I am doing here right now; it's about what anybody has; they're in their energy. And that is what "turn on" is.

So when you see these text messages that seem a little weird, frankly, to those of us that are not familiar with the vocabulary, "I'm turned on," or "we need to get our turn on," TurnON events, again, yes, it's a play on words because "turn on" could mean sexually -- right? -- but it really is about something greater. It's about your life force, about your power, your energy and what you can do with

it.

Let's go to the next one.

"Aversion practice." You heard a lot about aversion practice. The Government is of the view, and I guess some witnesses have taken this position, that this practice was really designed so women, young women would feel more comfortable engaging in sexual practices with ugly, creepy men.

And, I mean, when Ken Blackman testified, I was like, ah, maybe they do have a point on that. But it's not really what this is about.

This is -- this derives directly from aversion therapy. It's a thing that has been around forever. And it's about going to those places that bring you either fear or that you don't understand and try to figure that out and learn something from it.

And you can look at the Government's own witnesses' testimony on this. Again, they want to ignore it, but their own witnesses said: So, like, aversion, the way it was often used, like an aversion practice. So if you don't particularly like something, you don't particularly want to do something and you're averse to it, the idea is to kind of go towards it rather than move away from it and see what happens to push your boundaries. Aversion, you know, similar to what it is in regular speech, it's like if you're averse to something, you

don't necessarily want to do it, you're hesitant to do it.

But aversion wasn't just about -- it was a general principle. It wasn't just about sex or men or anything of that nature. It was about questioning what do I fear, what do I -- maybe I should be more open-minded and check it out.

You heard a lot about the system. And many witnesses testified about, oh, the system forced me to do it or I felt training from the system or pressure from the system. And they always talked about the system.

Okay. On direct examination, Mr. Kandell testified that system refers to how one -- the OneTaste ecosystem. And there were just certain cultural aspects of our group, communications, the way we did things, the way we understood things, how we communicated.

And you know what? They had every right to. Every right to. They were a system. They lived in community. So unless you're saying that living in community is something inherently bad, what is wrong with this? Yes, there will be pressure to align with each other around ideas that you all have a belief system in. And if you don't share our beliefs, then maybe this isn't the place for you. Name me a religion that doesn't do the same thing.

"Stroke/stroking." You heard about this. Obviously, we've heard so much about stroking I don't ever want to hear the word again, frankly, and I'm sure you don't.

But there's literal stroking, but there is also this idea of stroking that was like to give someone an idea, to give them praise, encouragement, to give them insight into something. And also to give criticism. Up-stroke is, like, the good stuff; down-stroke, maybe not. And it's metaphorical.

Next one.

"Tumescence." Eee. Again, "tumescence," I think it's the sound of the word, I don't know, but there's nothing nefarious about this word. It's just built-up energy. And yes, it can be around sex, but it doesn't have to be.

You could be tumesce in many aspects of your life, according to Ms. Gillick. Again, a Government witness. They would say like "career tumescence" or "purpose tumescence". Basically, there were tons of different ways you could be tumesce and not be progressing through, through, like, something in your life. That's Ms. Gillick, Government witness.

"The fourth dimension." You heard a lot about this. You see things in some of the text message about that.

And Mr. Kandell explained it's the dimension outside the third dimension. Called it the higher realms. It was just another way to look at the world that's not the 3-D, physical world and more in the energetic, spiritual word.

Chris Kosley told you the fourth dimension was understood to be what was happening on sort of a spiritual

level or some higher plane that couldn't be seen or felt directly.

That's so controversial? You may not call it the fourth dimension, but people talk about their spirituality, things we can't prove, things we can't see all the time. It's not nefarious.

Go to the next one.

Is there a next one?

Oh. Okay, hold on one second. I learned from Celia yesterday that...

Okay. This is testimony again from Ms. Halpern. I'll start in the middle. I don't know if you can see it.

Maybe from, you could pull it out from -- I don't know if you can, from the "But the third dimension, as you described."

But the third dimension, as you described is sort of this physical world that constrains us, right?

Answer: Yes.

The world we need to live in that has social order, right?

Yes.

And the fourth dimension is more of the spiritual world, correct?

Right.

And it goes beyond the physical and sort of like

what your connection is to this higher power, right?

Answer: Right.

So, that's the third and fourth dimensions. I think there are plenty of other places where people have discussed these concepts in different -- with different labels.

We can go on.

Ah. Now we're getting to the dry stuff.

So I want to talk about legal principles that I suspect the Judge will instruct you on.

And I think one good way to think about this -- I thought about this -- is that you heard testimony about the container, which is sort of the rules in orgasmic meditation. You heard Chris Kosley broke the container because he didn't follow the rules. So, I like to think of these fundamental legal principles as sort of a container. These are big overriding legal principles that you must always, always, always have in your mind as you deliberate.

And we start with the first one. Everyone thinks they know these things and maybe it feels, you know, like you don't need to go through this. But I think it will be helpful and I think we always need reminding that the Government has the burden of proving guilt beyond a reasonable doubt. That burden never shifts to the Defendants. The Defendants do not have to prove their innocence. That is our system. That is our system that we're proud of. It doesn't ever go to them.

Now we move to reasonable doubt. And this is -- there's a relationship because it is the Government that has to prove reasonable doubt as to each and every element of the offense that they are charged with.

And -- no. Can you go back?

What is reasonable doubt? You will get an instruction, I believe, that will include what is written here. It is doubt based upon reason and common sense. It is doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal affairs. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her affairs.

A little -- again, reasonable doubt, you think you know it, but here's an instruction that you'll get.

And let's go to the next principle, the presumption of innocence. To convict either Defendant, the burden is on the Government. We talked about that. To prove the Defendants' guilt on each element of the charge beyond a reasonable doubt. The law presumes the Defendants to be innocent and never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. They don't have to do any of it. The burden always

rests with the Government.

And in a related instruction -- and the Judge I think already instructed you to some degree -- the Defendants have the right not to testify. And you may be very curious and want to know what would they have said and speculate. No, no. Under our Constitution, the Defendant has no obligation to testify or to present any evidence. Why? Because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt. The Defendant is never required to prove that she is innocent. No inference of any kind may be drawn from the fact the Defendants did not testify. Again, it was each defendants' constitutional right not to take the witness stand.

And you will hear from the jury instructions -- the "I" is not me, but it will be the Court -- in the jury instructions: I instruct you that you must not allow this fact in any way to prejudice the Defendants and you must not consider it as an indication, admission, evidence or inference of guilt. Simply put, the fact that the Defendants did not testify must never enter into your deliberations or discussion.

So, those are the overriding principles.

And you fine jurors were chosen because you swore, when you went through jury selection, that you could abide by principles that are articulated in these jury instructions and

that you would be also fair and impartial. And we have all the faith in the world that you will be.

So, moving on to the charged offense and the evidence in this case.

The Government put some slides up around what the Defendants are charged with. I don't want to be too redundant, but we're going to go through it because it's very, very important. You need to know what you're doing back there and what you're trying to decide.

And the Defendants have been charged with one count -- I will point out, you will -- I think you will get a set of jury instructions, as I understand it.

THE COURT: Yes.

MS. BONJEAN: So I hope I didn't overstep, Your Honor, by mentioning that because I --

THE COURT: No. I'm going to be instructing the jury on the law and they will have a copy of the instructions when they deliberate.

But you may proceed.

MS. BONJEAN: Yes. Thank you.

So, the Defendants are charged with one count of forced labor conspiracy.

And the Defendant -- I'm sorry, the Government's closing argument, you know, again, weave together sort of this wicked tale, really, pointing to, you know, again, partial

text messages and just direct examinations without any reference to the cross-examinations. Which I know -- I mean, I -- listen, you have to have understood by the ninth time that after direct examination, whatever one of these witnesses said, the cross would put a whole other spin on it, right?

And you were also just sort of overwhelmed, swamped with these 12 years, right? This is what we're talking about. A 12-year conspiracy, is what has been alleged, of these salacious sex stories and -- you know, like a bad NetFlix movie.

And Ms. Gupta, during her closing argument, said this to you: This is not normal.

Well, no kidding. Comparing what has been alleged and some of the ways in which the OneTaste community lived is not normal by conventional standards. I mean, these people are from San Francisco. They lived in a warehouse, sharing beds and exploring sexuality. By conventional standards, yeah, sure, it's not normal. But that's irrelevant, whether it's normal or not. The question is whether it's criminal. I mean, yoga wasn't normal for a very, very long time and now it's mainstream.

And there were reasons why you were asked whether you can keep an open mind and to be fair -- and you all said yes -- and that is so that you don't get seduced by a long, tawdry tale that does not shed any light on whether a crime

actually occurred.

Now, I know, as I said, this would be a good time, I -- my colleagues here at the Government's table will have the last word. And that's how it works. Why? Because they have the burden of proof. So, they get the last word. And you won't hear from me again. Good or bad, I don't know, you won't hear from the Defense again. And they're going to tell you their argument and they're going to give you their argument. And they're going to respond to some of my arguments. And what I would just ask of you is that when you are sitting here listening to the rebuttal argument, knowing that neither Defense attorney will get up and be able to address you again, that you think like the Defense. Question, well, what would Ms. Bonjean say about this or what would Ms. Cohen or Mr. Robotti say. Challenge. Because you're not going to get another side of it.

So as the Government pointed out, the crime that is charged here is a conspiracy. It's not actually the underlying offense of forced labor. It's an agreement to commit forced labor. And what you have to prove -- I'm sorry, I've been sick this whole time, too. I'm sure you're annoyed by my coughing, as am I, so I apologize.

To prove a forced labor conspiracy, the Government must prove beyond a reasonable doubt, one, the existence of a conspiracy; membership in the conspiracy; and the object of

the conspiracy, which is, in this case, forced labor.

THE COURT: Again, I'm just going to remind the jury, Ms. Bonjean, that the Court will be giving the legal instructions and they will include that the crime of forced labor conspiracy has two elements.

You may proceed.

MS. BONJEAN: Understood, Your Honor.

And the two elements are existence of a conspiracy and membership in the conspiracy.

And you will also be given an instruction about forced labor, which is the object of the conspiracy. But, of course, the Judge will give you the instruction.

Okay, we can go to the next.

So, the first element: Existence of the conspiracy. The first element that the Government must prove beyond a reasonable doubt to establish the crime of forced labor conspiracy is that two or more persons entered into an unlawful agreement to commit forced labor. So it's the agreement.

And the Government simply has no evidence. I mean, the most, frankly, subpar evidence of a conspiracy that I think you will agree when you consider it. What is their evidence that there was an agreement to commit forced labor? Well, they showed you that Nicole and Rachel were close. Showed you lots of e-mails, testimony about Nicole was --

Rachel was loyal to Nicole. There was mentions that, like, Nicole was the boss and Rachel was her right hand. I think in opening statements Mr. Fern called Ms. Cherwitz Nicole Daedone's first lieutenant like this was, you know, they're prosecuting the mafia. They worked together. There's text messages where they discussed the financial health of the company. They discussed the need to pay Reese Jones. They did a demo together, the Stinson Beach video. All of these things may show that these were individuals who were working together. What it doesn't show is that there was an agreement to commit forced labor. Evidence that people agreed to make money, that talked about making money, that talked about in engaging in pursuing their mission, none of that means anything unless there's actually an agreement to do the unlawful stuff. And that's the part that the Government has failed to show.

I think the Government relied on -- I forget the exhibit number, but...

Is it 27-D-R?

One second.

Oh. Actually, it's four -- no. 27-D-R. My apologies. That's right.

And this was an exhibit that the Government relied on and showed you.

And going to the second page, you may remember this

text exchange between Nicole Daedone and Joanna Van Vleck, where it's clear that in 2016 there is some negative press about OneTaste. It looks like New York Times and some other article. And Ms. Daedone is discussing, you know, her, I guess, frustration with it, her observations about it and then talks about how to combat it. Okay?

The Government wants to make the argument that this is evidence of a conspiracy. I mean, anyone who has worked in a business, of course, knows that if a business gets bad press, there's going to be discussion about it, what should we do. And you will see that there is discussion about how to handle the bad press. That's all this is. Meetings, talking about -- having meetings people they're consulting with about this. Ideas about, well, how can we move this in a direction that reduces our risk?

And listen, 2016 was a very different time than 2006 in San Francisco. They are all over the world, frankly, at this point. There's a cultural shift in attitudes. Of course. It's a company. They're going to be discussing this. This isn't evidence of intent to have committed forced labor.

And Ms. Daedone says, you know, maybe we should take the most conservative stance, like seriously just switch to just philosophy and the OM aspect can happen either for free or like OMG yay. You know, in some other context because obviously OMing, being what it is, was not necessarily -- at

least at this time it was getting some criticism.

So I encourage you to look at these text messages. And again, these are Government exhibits that I'm up here putting up. Because I do want you to look at them and I want you to remember that these are portions of text messages. Emojis are even being removed. I mean, come on. An emoji can change an entire context of a text. So keep that in mind when you read this, if you do read these text messages when you're considering them. Do I really know what is being said here? Do I really know what the Government is saying I should infer from this? And we would submit that a text message like this where she's discussing with Joanna Van Vleck, you know, how to handle bad press is not evidence of an intent. Frankly, it's the opposite. This shows someone who is very devoted to this product, to her work and is concerned about how it might be perceived or misperceived.

Okay. So the second element of conspiracy is that the Government must prove beyond a reasonable doubt to establish the crime of forced labor conspiracy, that the Defendant knowingly and intentionally became a member of the conspiracy.

"Intentionally and knowingly became a member of this conspiracy."

And the Government told you every person on this board over here, on the left board, played a role in the

conspiracy. Well, this is a conclusory statement. You need to ask yourself, what is the evidence that they played a role in this conspiracy? Because it's not enough just to play a role in a business.

In fact, you'll get an instruction that says mere association with one or more members of the conspiracy does not automatically make an individual a member. Mere similarity of conduct or the fact -- not the fat -- that they may have assembled together and discussed common aims and interest does not necessarily establish membership in the conspiracy.

That's what you're seeing. Seeing so much evidence -- these are people getting together and talking about common aims and interests.

Now, what does the Government say the evidence that there were -- all these people were part of a conspiracy and -- well, and that the Defendant, Ms. Daedone, joined into a conspiracy with any one of these people, Ms. Cherwitz. I think that's what they argued. And so, what was their evidence of that?

Well, they argued Michal Neria, who you saw testify, testified that she saw Rachel texting with Nicole about Brooke and Brooke's money. Um, okay. Brooke was investing in this franchise, Michal saw them texting. Okay. I mean, I don't know, you can do what you want with that, but that certainly

doesn't sound like evidence that would suggest that two people got together to commit the act of forced labor.

I mean, let's look at Government Exhibit 2148-D.

Yes, these, these are -- this is a text message between Yia Vang and Rachel Cherwitz that the Government says is evidence that these individuals knowing and intentionally entered this -- became members of this conspiracy.

And if you go to the next page.

Go to the next page.

Oh, yeah. Here's a good one. This is Yia Vang making amends.

Now, you've heard the word "amends" through the course of this trial. And this is, as you know, pulled from a 12-step program, that you make amends. You ask people for forgiveness. That is what its purpose is. And it's not just a OneTaste thing. It's really for any 12-step programs.

So, Yia Vang is making amends to different people in her life. She's literally making amends from stealing from Kmart as a child. Okay? And that's the Government's evidence that there's some conspiracy going on.

Making amends to Rob: I didn't enjoy sex with him. I withheld my heart. Secretly wished that he would penetrate me, but punished him when he did.

My mom: She still doesn't know what I do.

Okay. She goes on and on making amends. Not sure

what this -- how this is evidence that she entered -- that Ms. Daedone was in a membership of -- was in the conspiracy with Ms. Vang or Rachel Cherwitz. So that's what the Government says is evidence of this conspiracy. I submit that this is just meant to distract.

You saw so many e-mails where people -- where there were lists of people who worked there, franchises, consultants. There was I think an argument that Ms. Daedone, there was a write-up in one of the e-mails about students and these were the students in the classes giving summaries. Okay, that's what they did there. This was a place about wellness and pushing boundaries. Yes, they talked about -- this wasn't to get, like, you know, information about people that they could use against them. This was the whole curriculum. When people joined the courses or signed up for the courses, they signed -- they filled out these applications and they told some of their inner secrets because that's why they were there. It was not something that was done for some nefarious purpose. "My desires." You saw some of this, these documents. "Why do I want to be here."

So, I think the Government pointed out that there were no psychologists. Yes; no, there were not. And they were very upfront about that. No one claimed to be a psychologist. And these people didn't want a psychologist. Probably many of them had psychologists. I think Michal Neria

said: Yeah, I wanted this because I wanted to get off antidepressants. She made that decision before. She wasn't encouraged to do that. But some people wanted to start this experience. They thought it could help them find some inner truths, some learning.

What else does the Government claim was the evidence that proved conspiracy? Well, they argue that because Kandell, Mr. Kandell, testified that all upper leadership used manipulation as a means to obtain labor, that means it's a conspiracy. Well, this is not evidence that there was an agreement to carry out forced labor. Mr. Kandell told you right out of the gate: I do not accept that I did anything illegal. And every company uses manipulations to obtain labor.

I mean, Ashley's wearing that gorgeous green suit over there that I bought her because she was up 'til about 2 in the morning with me. Is that manipulation? I don't know. My kids manipulate me, I manipulate my kids. Manipulation is a part of life. Every time you get on social media, particularly in this day and age, you are being manipulated into buying something, doing something, believing something.

And Mr. Kandell gave you his definition of manipulation. And by the way, I think we can all agree there could be any number of definitions of manipulation, but here

was Mr. Kandell's definition of manipulation. And he said: Manipulation was used towards a higher goal. Sometimes people were pushed past their abilities, but the intention was to push them to a higher goal. And that showed you that, whether you agree with it or not, he did not have an intent to commit forced labor with Ms. Daedone or anybody else.

He would not agree with the Government saying Mr. Kandell admitted that manipulation and they used it for forced labor. What he said is: We believed it could be a good thing to push people. That's why people came to OneTaste.

Every last time, those witnesses for the Government testified: I came there to be pushed, my boundaries to be pushed.

And I get now, they, you know, regret it or whatever their feeling is about it, but that does not mean that there was some intent to manipulate people into doing things they did not want to do.

You saw other text messages. And I'm not going to pull them up, but the Government had you look at this text message where Ms. Van Vleck -- well, we can put up one page. I'm not going to read it all to you. But it's this text exchange between Ms. Van Vleck and Nicole Daedone, where Nicole Daedone is narrating -- well, Ms. Van Vleck is telling Ms. Daedone what Brooke is texting here.

This is -- I'm sorry -- Government Exhibit 2033-V-R. Sorry.

So it says here -- well, go to the first page. Good morning. Got text back from Brooke. She's flying back from Costa Rica this morning. We got some hellos in. She text me when she lands back in the States. And I think this text is after Ms. Gillick had parted ways.

And there's this back and forth where Ms. Van Vleck tells Nicole Daedone what Ms. Brooke is communicating, or Ms. Gillick.

And for one thing, there's a lot of "I love you" there. Okay? I love you. And I love everyone I work with. And I'm thankful for absolutely everything I learned at OneTaste.

And Ms. Daedone responds, basically saying, oh, tell her this.

You can go to the next page, Rich.

The response: Thank you for that. I want to do anything I can to keep the connection feeling good, from talking with Ulysses to going out to tea. I did not realize there was so much internal conflict. Just as you feel loved -- so much internal conflict. And just as you feel loved, you don't know what to do with over here, so I -- there's so much internal conflict and just as you feel loved, you don't know what to do with over here, so do I with you.

Would it feel good to get together and talk?

Okay. Well, the Government will tell you no, this is all part of the scheme, as opposed to, you know, she feels bad. Brooke has left, she's upset. And what Ms. Daedone says here, through Joanna Van Vleck, is: I didn't realize you were having so much conflict. I didn't know. Again, lack of intent.

What they would be saying would be like something along the lines of: Can you believe this?

That's not what they're saying. This is a text message going back and forth.

And the fact that Ms. Daedone is sort of dictating to Joanna is because Joanna is the one talking to Brooke.

And you can look at the whole thing. We don't need to look at it right now. But again, these text messages that the Government says is evidence of intent, I submit to you, is not evidence of intent. In fact, it's evidence of lack of intent.

One of my favorites is this one. The Government argued that evidence of an agreement to commit forced labor was when Aubrey Fuller, someone they have on the coconspirator side, set up Dana Gill's Sugar Daddy and Red Book profiles. And you remember Dana Gill, of course. This was the woman who gave herself the moniker Mother Teresa of Orgasm and she was one of the witnesses who talked about getting involved in sex

work unrelated to OneTaste. And again, no judgment, but that was her testimony. She was doing that separately from OneTaste. And that's important for this reason -- and we'll get to this -- these women all had significant connections outside of their lives with OneTaste and this is an example of one.

And she testified: Well, I didn't really want to and Aubrey Fuller set it up for me.

Fully trying to push responsibility as if, you know, Aubrey Fuller was just putting up the profile.

And Dana Gill eventually had to acknowledge: Well, yes, she did it with my consent. I gave her the information. I was the one that went out on the date with the sugar daddy. I was the one that got paid. I was the one that did that.

But Ms. Gill wants to, you know, push responsibility off on Aubrey Fuller, who wasn't even part of upper management at the time.

So that's evidence of the conspiracy?

So, more importantly, this was not OneTaste activity. Ms. Gill wants to say, oh, but it was so normalized. She basically identified two or people besides herself who were engaging in sex work. Okay? So she and her two friends were engaging in sex work, but that's also OneTaste's fault. Everything is Nicole Daedone's fault. Everything is OneTaste's fault. Every decision I made is

OneTaste's fault.

And Dana Gill is the one that came from that Evangelical Christian background and that she was drawn to OneTaste because we didn't talk about sexuality, ultimately, in our house. Okay, I mean, a lot of people do not. That's OneTaste's fault, too? You know, by that logic, maybe you have to sue your parents or something for having indoctrinated you for not being open about sexuality. I mean, this is a very slippery slope.

So, we looked at conspiracy and now you have to look at the object of the conspiracy that the Government -- to find the Defendants guilty of forced labor conspiracy, you also have to find that the Government proved beyond a reasonable doubt that the Defendants conspired to commit forced labor. And someone cannot commit forced labor conspiracy unless they knowingly and intentionally agreed to carry out every element of the offense of forced labor.

So, let's look at the forced labor statute.

Oh, we missed a slide.

Okay. This -- you'll get this. You're going to get this instruction, but I do want to read it to you because this goes back to the conspiracy.

Mere knowledge without participation in the unlawful plan is not sufficient. The fact that a person without any knowledge that a crime is being committed merely happens to

act in a way that furthers the purposes or objectives of the conspiracy does not make that person a member.

So, if someone is somehow helping this alleged conspiracy along but they don't know they are or they don't realize they are, if, you know, Rachael Hemsi is agreeing to do something, but she has no idea we are -- this is all part of some forced labor, forced labor scheme, that is not sufficient.

What is necessary is that the individual must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

Okay. So now we have to look closely at the forced labor statute. And the Government discussed it and pulled up some slides as well.

First, the Defendant provided or obtained the labor or services of a person. And you'll get a definition about labor and services. We can go to the next slide for that.

Labor and services of a person can be pretty much everything. "Labor" means the expenditure of physical or mental effort. We're all laboring in here.

"Service" means conduct or performance that assists or benefits someone in any way. This is not very controversial.

(Continued on the next page.)

(Continuing.)

MS. BONJEAN: What's controversial is if you were forced into it.

You can go back.

And this is where all the action is at, right here. That the defendant did so through one of or any combination of the following prohibited means. And the first prohibited means is force, threats of force, physical restraint, or threats of physical restraint to the person or another person.

This case --

THE COURT: I'm sorry, Ms. Bonjean.

MS. BONJEAN: Yes?

THE COURT: I'm not sure what you're -- are you purporting to refer to an instruction -- a Court's instruction or something else?

MS. BONJEAN: Should have been.

THE COURT: I think you might want to take a moment and --

MS. BONJEAN: Absolutely, Judge. I certainly don't want to misstate anything.

THE COURT: I think you might have been looking at a different page.

MS. BONJEAN: What's that?

THE COURT: I think you were looking at a

different page.

MS. BONJEAN: Probably so.

Let me just read -- we were just looking at the elements of forced labor and I am going to read -- we were at the prohibited means section. And the first one we looked at was, it has to be by force, threats of force, physical restraints or threats of physical restraint against the person or another person.

And this is not a case where there had been allegations of physical force. In fact, you heard over and over and over again: I wasn't forced to, nobody forced me. There's certainly not evidence of physical restraint. I wouldn't say I was forced, no. No one forced you to stay, right? No. You said no and Daedone said okay, do you remember that? Yes. Bottom line, ma'am, you were able to leave OneTaste at any time, correct? Yes. There was no physical force. And so after about 90 days are left, you quit, right? Yes. And nobody made you do that, right? No, they did not. And no one forced you to do the work trade, correct? No.

Time and time again, every last witness who testified agreed that there was certainly no physical force of any kind. They had phones. They had computers. They had keys to come and go as they wished. These were not people locked in basements being forced to do, you know,

without immigration papers. These were educated women who were free to come and go. There was no force. And I submit to you, ladies and gentlemen, manipulation alone is not force. Manipulation is not physical force. And it's not force.

Now, the other prohibited means is something called serious harm or threats of serious harm. And what is serious harm?

"Serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm -- and I would point out the Government misled you on the facts, it also misled on the law, frankly, during their closing remarks, because they stopped the definition of serious harm right after reputational harm.

Remember, there was none of that part after. But this is what you will be instructed on and it says: That is sufficiently serious under all surrounding circumstances to compel a reasonable person of the same background and in the same circumstances as the alleged victim to perform or to continue performing labor or services in order to avoid incurring that harm.

It's a mouthful. And yes, serious harm can be a number of things, but the important point, we submit, is that it has to be sufficiently serious that would compel a reasonable person of the same background and in the same

circumstances as the alleged victim to perform or to continue perform the labor and services, to avoid incurring that harm.

There was nothing reasonable about thinking you could not leave OneTaste. Even for the people within OneTaste, it wasn't reasonable. You heard from nine people and, again, this conspiracy allegedly lasted 12 years, you heard they had offices all over the world, London, New York, Las Vegas, et cetera, thousands of thousands of employees, people who got involved with OneTaste at any level of intensity they wanted to, and even under those circumstances, even the people who moved into the OM residences who were more emersed into a community, not just working there, even if you take that as your -- the circumstances, it was not reasonable. This was not reasonable at all. People could leave, and they actually told you they could leave. And you know what? They did leave. They left. They came back. And when they did leave, nothing happened. The worst that happened is, I didn't get to talk to my friends anymore. Okay, that's what happens. And particularly with an organization like this, they're very close-knit, they have a very strong belief system. Yeah, you're probably not going to be half in and half out. So what, that's not a crime. That's like a lot of organizations. You could compare it to churches, you

could compare it to all types of things. Yeah, you don't get to be only in the sorority part of the time. When you are out of the sorority, you are kicked out of the sorority. And guess what? You get shunned, you get shunned. You're not coming to this party, you're not coming to that party, and that is just life. It is not enough that these women came up 15 years after the fact and said this is how I feel now, reflecting on my experiences back then.

THE COURT: Ms. Bonjean, just let me know in the next few minutes when is a good time to take a break.

MS. BONJEAN: Yes.

Let's just go on to the next slide, if we could, which is the threat of serious harm. And I promise we are almost done with the law stuff, but it's important for, I think, for when you examine really the evidence in this case.

THE COURT: Take your time, Ms. Bonjean. I just wanted to let you know we are going to do a break.

MS. BONJEAN: No problem. Thank you, Your Honor. It will be a good time to stop after this.

You have the definition of serious harm, and threats of serious harm are similar.

In determining whether a defendant made a threat of serious harm that could reasonably be believed by a person, one should consider a person's physical and mental

condition, age, education, training, experience, intelligence, and particular vulnerabilities. A threat of serious harm must be sufficient in kind or in degree to cause -- some typos here -- to cause a reasonable person of the same background and in the same circumstances as an alleged victim to believe that there were -- was no reasonable choice except to perform or to continue performing labor or services for the defendant.

They don't even come close. In fact, their own witnesses repeatedly said, I had a choice. And what did they really fear? It's insane, actually. What did they fear? They feared getting kicked out of the group chat, that they thought was so abusive. They feared being kicked out of the actual organization that they claimed was the organization doing them harm.

Makes no sense.

And these were not children. These were not women who didn't have education. My gosh, the educations between all of them. I mean, there's women coming in here with multiple Masters degrees, a doctor -- and I get it, she wasn't a doctor at the time, but these were very smart women. And you know what? It is absolute nonsense that they didn't have support or resources with maybe -- you know, I would put Max Pixley in a slightly different category and we're going to talk about them individually in

a little bit, but these were people that stayed connected to their family and yeah, maybe they didn't want to tell their families they are involved in this weird organization, but that's not OneTaste saying you can't talk to your family. That's yourself in a position of being, I don't want to be explaining where I'm living or what I'm doing.

So I think we can pick it up there, Your Honor.

THE COURT: That's fine.

Members of the jury, we are going to take a break until 3:15 and then we will come back and Ms. Bonjean will continue her argument at that time.

Don't talk about the case, not even among yourselves -- that's okay, you can stand -- and don't talk to anybody about the case, even among yourselves and keep an open mind and I will see you at 3:15.

(Jury exits.)

THE COURT: I will see everyone at 3:15.

(Recess taken.)

THE COURT: We can get the jury now.

(Jury enters.)

THE COURT: Everyone may be seated.

And Ms. Bonjean, you may continue your argument.

MS. BONJEAN: Thank you.

Before we broke, we were looking at a slide that was defining threat of serious harm. We had looked at

serious harm and threat of serious harm.

And there's also a third element of forced labor that relates to knowledge. And it's not just that the defendant must have used one of these prohibited means or a combination of these prohibited means, but the defendant must have acted knowingly. Knowingly. Okay? And this is important because you heard time and time and time again that these witnesses said, I didn't really want to do that. We would ask, well, did you tell anybody? Did you tell Ms. Daedone you didn't want to do something? No, I didn't say anything. Why not? Well, I didn't want to disappoint her. I didn't want to get pushed out of the inner circle. I didn't want to lose an opportunity. You know, time and time again, there was no communication to Ms. Daedone or really anyone in the upper management staff or Ms. Cherwitz. You heard the testimony over and over again.

THE COURT: Let me just interrupt you for one moment, Ms. Bonjean. You have a slide on that says third element: Knowingly.

The jury will take the instructions from the Court, but I want to make sure that there's no confusion that the crime charged has two elements: The crime of forced labor conspiracy. What you are talking about now is an object. There's not a third element to the crime of forced labor conspiracy.

MS. BONJEAN: No, there's a third element of forced labor, which is the object of the conspiracy.

THE COURT: Yes. I want to make sure there's no confusion being injected here on the legal standard. I will be instructing the jury on the law.

MS. BONJEAN: Right.

THE COURT: Go ahead.

MS. BONJEAN: Just like --

THE COURT: Go ahead, go ahead, please.

MS. BONJEAN: We could talk about the prosecution --

THE COURT: Go ahead, please.

MS. BONJEAN: Okay.

I don't think you're very confused, but if you are, you'll follow the judge's advice --

THE COURT: Not advice. Instructions. The judge will be giving instructions. Not advice.

MS. BONJEAN: Okay.

THE COURT: You may continue, Ms. Bonjean.

MS. BONJEAN: I will.

So the object of the conspiracy is forced labor. And you will get these instructions. But, yes, Ms. Daedone and Ms. Cherwitz, either defendant, must have acted knowingly, in both the conspiracy -- in the conspiracy, as well. You can't inadvertently or you can't accidentally

cause serious harm or accidentally get into a conspiracy.

Now, you've heard from the witnesses and, again, they took the stand and they admitted they were free to leave, that they could leave. Time and time again they told you I have friends outside, sometimes, yes, most of my friends were in OneTaste, but I had jobs outside, I went on vacations with my family sometimes, I went to holidays with my family sometimes, I went to massages and manis and pedicures and I did all these things and the reason this is important is because the Government wants you to believe that these people were isolated. They were not isolated. They may have chose to be in community with their friends, but they were not isolated. No one prevented them from keeping their friendships, from working at the cafe, from taking that three-month course in aerial silk arts. That's not isolation.

And the witnesses, self-serving accounts, 15 years later, when they are telling you how they feel now, looking back, can never amount to serious harm. It's reflection. What matters is whether there was serious harm and they were compelled to stay in their situation at the time. And what they're telling you is, no, 15 years later, I think I was brainwashed or something of that nature.

And you know why the Government can never meet its burden? Because reasonable people of the same background

would simply not be compelled to OM or have sex with customers or jerk off Reese Jones unless they agreed to it. And the type of pressure that they -- that was placed on them was not the type of pressure, wasn't sufficiently harmful to keep them in that place or that condition. And you know why we know this? Because when they did say no, they had no problem saying no. They left. Sometimes they came back. And the only consequence anyone can point to is, hmm, I feel like I let someone down, I feel like people were mad at me, et cetera.

Now, you can use your common sense, obviously, in making these determinations, but sufficiently serious under all circumstances to compel a reasonable person of the same background in the same circumstances as the alleged victim to perform or continue to perform labor and services in order to avoid incurring the harm, is that standard. It's a reasonable person standard with consideration of the background of the person and the circumstances.

Now, I do want to talk about some of the factors that the threats of serious harm instruction identifies.

If we could go back to that.

You will receive an instruction that you can consider a person's physical and mental conditions, age, education, training, experience, intelligence, and particular vulnerabilities, okay? And, again, it has to be

reasonable -- a reasonable person, but you can consider these things.

So let's talk about these complaining witnesses for a second. These were women in their twenties, mid to late twenties, sometimes earlier twenties, but not teenagers, not children. Physically in good shape. Some of them had talked about sort of coming in with certain things in their background. Lianna Lifson talked about having been in a sexually abusive relationship, she talked about. And one of the reasons she wanted to come to OneTaste was to explore that. This was not a secret.

Some of the other things the Court -- or you may want to look to. Age, we talked about that. Education. These were highly educated women. They all had educations, training, clearly intelligence, experience in life. And the Government suggests that they had particular vulnerabilities. Certainly Max Pixley, you know, has -- came up, you know, in difficult circumstances. She talked about being orphaned. But the rest of these women, you know, what are their particular vulnerabilities? They came from loving families, most of them -- all of them with the exception of Max Pixley, talked about how, yeah, they got distanced from their family from time to time, you know, Dana Gill, for example, told you, you know, she separated herself because of the religious dogma that she was exposed

to. Many of them had drug problems when they came into OneTaste and they, you know, afterwards, they didn't have a drug problem. Seems like a good thing.

But there was nothing, particular vulnerabilities that's inconsistent with really anybody we might know. The Government wants to tell you that these women didn't have age -- because they were so fragile. No, they weren't. They weren't that fragile. And you saw that. And just because 15 years later they are here treating the witness stand as a therapy couch does not mean that they were particularly vulnerable or that their mental condition prevented them from leaving OneTaste or having the strength to distance themselves from OneTaste.

Now, the Government used -- there's a bunch of buzzwords. You heard the Government identify sort of different tactics that they claim were all used, this -- you know, that have all types of different meanings, indoctrination. I think what they're saying there is like brainwashing, but we already talked about this earlier. Ideas, thoughts, mind -- there was no mind control, these were teachings Ms. Daedone gave, and you can accept it or leave it and these people had the absolute power to do so, they could walk out the door if they didn't like what they were hearing.

You remember Becky Halpern, this is the young

woman who lived in Westchester, loving family, educated, worked in the family business, didn't like the family business, she started going to classes, she left, she came back, she knew exactly what she was getting into. No one forced her to stay, she says that. She was one of the first who testified on direct. If you remember, she talked about how she felt so pressured to buy the Coaching Program from Rachel and -- but when you looked at her e-mail, which is in evidence, she was asserting herself, saying, you know what, I don't really think I want to take this, it's a little overwhelming, et cetera. And she ends up going to CP5 and she admits -- she gets on the stand and tells this funny story about how when she panicked, you know what she did? She closed down her checking account. She closed down her checking account. And then you know what she did? She reopened it. So she paid twice. She not only thought to herself, oh, I'm a little overwhelmed, let me not pay for this. But then she reassessed and paid twice. And she even said and admitted from the witness stand that Rachel didn't even have to try that hard. So when she came in here and told you otherwise, that was not entirely truthful story. It just wasn't.

What else do we know about Becky Halpern? And listen, I want to point out, sometimes people remember things differently. It doesn't necessarily mean someone's

completely lying or anything of that nature, but this is the problem with people testifying about their reflections from things 15 years earlier.

If you remember from Becky Halpern, when she finished her Coaching Program, she basically said, this was fantastic, I found -- the man I was with, I found my husband, and it was a positive experience.

Now, Becky Halpern and, you know, there's so many quotes, but we pulled out a few here. This was someone who really loved the practice and wanted to be part of that culture, she said, very much. You remember she talked about The Morellino -- we don't need to look at all these documents again. You have them available. But it was no secret what was going on at The Morellino and what you were signing up for. None whatsoever.

In fact, why don't we just pull out 3500-W-12 as a reminder, and look at the Rules of Play.

I mean, it could not be more clear what people were signing up for and what they were moving into. And the Government wants to conflate community with OneTaste, the organization. And honestly, it's pretty easy to do. I mean, those lines got blurred. You were living amongst your coworkers, you were living in community, you were living with your bosses. But a lot of what these people did, they would have been doing because they were part of the

community. They lived in community. And, in fact, the Morellino handbook says part of being in here is doing service for the system. That's what they signed up for. They wanted that. And that's why they did it and that's why no one needed to force them to do it. Because they had wanted to work back of house. They loved going to these courses. And yeah, there were some things they were like, I didn't like to do that so much. But again, there's a lot of things you do in your life, you look back and say I didn't really enjoy that very much.

So OneTaste and this OM residence was very clear that this was intended for adults. Spiritual, emotional, psychological and physical adults. You are moving in because you want something, a deeper sense of your orgasm, actualization, and connection. The nature of this work is that, on your path to search for these things, you will be confronted. At some point, you'll probably want to blame the people around you for your experience. You'll most likely be up against your demons. We find that these rules of play help us remember, that we are coming into the house as fully volitional beings ready to take responsibility for our own experiences.

Right? And for them to come now, 15 years later, and say, oh, I didn't really know what I was doing and people gave me the thumb's up or the thumb's down and I felt

shamed. I mean, you know, you've got to really look at what is alleged was the serious harm that caused them to stay that they never communicated to anybody.

Looking at -- another thing about Becky Halpern. She testified, of course, that at one point her father came to a lecture. She wants to say she was brainwashed, but you cannot brainwash people who are free to come and go. The whole purpose of brainwashing is that you keep them isolated so they can't hear other people say, hey, that's crazy, you shouldn't do that. That is the purpose of isolation. So you -- and these women are using that word very loosely.

Now -- and on this isolation thing, we were talking about it. I mean, so many of them had these lives outside of OneTaste. And yeah, it's true, they probably spent most of their time in their OneTaste community, but they went to AA and other 12-step programs and the Government says, okay, they were forced to go to AA. Okay, well, think about this for a second. If you've ever been to AA, I have not, but think about the fact that this AA program was run by non-OneTaste people. They are getting messages -- some people think AA is sort of its own cult. They are getting messages from people outside of OneTaste. Why would OneTaste, if they wanted to isolate someone so that they could have no contact in the rest of the world to mess with their heads and engage in mind control send people

to a whole different organization where they're going to get entirely different messages? What's the sense of that? Why let them work outside at the cafes or other organizations? Why let Ms. Gillick go to San Francisco and have a whole nother company she runs? Why? That makes no sense. Nobody was trying to isolate them. And if they disconnected themselves from their family for whatever reason because they were -- you know, didn't want to talk about where they were living and what they were doing, that's on them. That's not because of OneTaste. But they're going to come in here and say -- you know, Christina Berkley was a great example. I didn't tell her. My parents were like strict Romanian immigrants. You didn't tell them. OneTaste didn't tell you not to tell your parents that you were involved in OneTaste.

Let's talk about Christina Berkley for a second. She's a woman from the Warehouse days. She was associated with OneTaste for like seven years. She's the one that went out and started her own competing business. This is the woman that was educated, went to McGill, was married to a professor. And then she decided she didn't -- I think her words were, I just didn't want to be a professor's wife. She loved the Warehouse. And you know what? It's okay, you don't want to be a professor's wife, so you chose a different path.

Excuse me one second, I'm going to get some water.

(Pause in proceedings.)

MS. BONJEAN: And she's the one who told you she knew she was giving up two salaries when she went to the Warehouse, she had two salaries, lived a good life. She understood this isn't a place where I'm going to be making a lot of money, but I still want in. And it's not because anyone told her to.

Now, what did she say about the experience she had there? On cross-examination, I asked her, I asked her to specifically identify what was the coercion? What was it? And she said she didn't like that there was some interference with her desire to have a relationship with this fellow, Isaac, which, oh, by the way, if you listen to her testimony, she went ahead and had a relationship with Isaac. I mean, she didn't really take the advice and no one interfered, she ultimately did it.

She talked about a circumstance where Ms. Daedone apparently suggested -- and I don't even think she said Ms. Daedone, but somebody else suggested this guy Brian Bert be her research partner, but she went out on a date with him and she didn't like him. She went out with him. And do you know what she did? She wasn't a research partner with him. She said no.. she said no. And do you know what happened? Absolutely nothing. Other than maybe Ms. Daedone made some

comment in a group setting, you know, well, if you really want to be engaged in OneTaste or in our program, maybe you should accept our research partners or our suggestions for research partners. That's it. That's it. She stayed seven more years.

What else did she say? I was shamed. Humiliated publicly. And I pressed her. What was the humiliation? What was it? Well, there was this process where everybody voted on whether you could stay in the Warehouse. Okay. Everybody went through that process? Yes. And then they gave you a thumb's up or a thumb's down. That was the shame.

Okay. I mean, that was their process, but if you didn't like it and you were shamed by it and you thought that these people were real jerks for it, you know what? Maybe you decide this isn't for me. But no. And now, what is it, we're like two decades later and that thumb's up and thumb's down is her example of the shaming that compelled her to stay for seven years? I don't think so.

Now, I want to go back to -- let's see. We pulled up some quotes here.

She says right here: Isn't it true, Ms. Berkley, that you had no regrets about OneTaste and would do it again? OneTaste felt like a choice.

Answer: True.

She's saying that today.

Question: You said no and Daedone said okay. Do you remember that?

Yes.

No one forced you to leave your husband and that second income, correct?

It felt like my choice.

Compelled? I think not.

You can go back to the Halpern one.

This quote, I mean, she spent two days on the stand crying and at the end, she's asked: And now you look back and you regret your time, at least in part, at OneTaste, right?

That is a big oversimplification.

Is that a yes?

No.

So you don't regret it?

No. I actually don't regret it.

THE COURT: Quiet please.

MS. BONJEAN: So we had to listen for three days of testimony and in the end, you didn't really regret it?

All right.

THE COURT: I'm just going to remind anyone sitting in the public section of the courtroom, no speaking, no -- nothing audible. Sound carries. It's inappropriate.

And you will be asked to leave if you are making noise.

You may continue, Ms. Bonjean.

MS. BONJEAN: Thank you.

I want to stop here. And I do want to talk, obviously, about Reese Jones. Let's talk about Reese Jones.

Now, this is Reese Jones and Nicole here. And the Government spent a lot of time talking about how Reese Jones was an investor. Yeah. That's not in dispute. He was an investor. He was Nicole Daedone's boyfriend. They had a very long-standing relationship. It is also not true -- it is also not untrue, it is true, actually, that he invested in the company and at one point, she wanted to pay him back. Absolutely true. We didn't need to look at two hours of FBI exhibits or two hours of FBI testimony reading text messages for that point.

The question is whether or not what Christina Berkley, Michelle Wright, and Dana Gill did in terms of their handling of Reese Jones was done either because of a threat of serious harm or whether they agreed to it and consented to it. And the Government wants to shock the conscious of this one. They talked ad nauseam about these scenes and, you know, putting dildos up people's asses. And every single time the people came into this courtroom, including those women who now, understandably regret it, they said that they agreed to it. And whether it makes

sense to us or not, they told you they agreed.

And yes, some of them said I didn't get paid for this service, but, again, they agreed and they never complained or objected. And you know what happened? Michelle Wright told you, when I did object and said no, she surmised that Nicole was not happy with her. But guess what? She went about her business and didn't do it anymore. Now, maybe it was transactional in some way. They wanted to be closer to Nicole, they thought it was some type of sweet gig that they could do this. You've got to remember, they're already living in a community where there's all types of sexual activity going on and experimenting with people -- not just with your boyfriend or people -- this is the nature of this community. But maybe it was a sweet gig, I mean, living in Reese Jones 'fancy house. I don't know. But the reality is Christina Berkeley -- I think we have a quote up from her.

And that was something you were excited about, right?

Answer: Yes.

That was something you wanted to do, correct?

Answer: Yes.

When Michelle Wright gave testimony about this, she was asked by the Government: How did you become Reese Jones' handler?

And what she said was: Nicole asked my partner Maddie and I to do the job. Now, the Government repeatedly asked the question, did anyone direct you -- they like the word direct. But what Michelle said was I was asked.

And then she was asked: What was your understanding at the time of what Nicole was asking you to do?

Answer: I knew there was sexual things involved because I knew that other members of the staff were doing that for him.

So again, no bait and switch. This was part of it.

You remember Christina Berkley, she told you that Nicole and Reese were sitting at a table or somewhere and Nicole said, you know, how good are you at sucking cock or something of that nature, if you remember that. And it was clear in that moment and she testified, I knew exactly what I was getting into. Reese Jones was right there.

And with Michelle Wright, she was asked: Did you ever express to Nicole Daedone during this time that you did not want to engage in a sexual act with Reese?

Answer: Not until the very end, I think. For the most or the meat of that experience, I did not.

And Dana Gill said the same thing. She agreed to it. Nobody forced her. She agreed. And at no point did

any one of these women say to Nicole, I don't want to do this. And when Michelle Wright did, she didn't do it anymore.

Now, I get it, it's distasteful, it's unsavory, it's troubling, but it does not make it forced labor if it was not done under serious harm or threats of serious harm. Period. And no, being asked to do something by someone you admire or you see as some type of, you know, spiritual guru, does not mean that you are compelled to say yes. And we know this because these women did say no. It wasn't yes, yes, yes, yes, yes. They did say no.

And also, Ms. Daedone -- and they knew this, they testified about this, what did you think would happen if you said no, probably find someone else, it was a coveted position. So it's unsavory, it's scandalous, but it was not forced.

Speaking of Dana Gill, many of these women were asked if they left OneTaste, you know, in debt. They came to OneTaste in debt and they left in debt some of them. Not all of them. And Dana Gill was someone who worked, I think, in the kitchen. She did a lot of work trade. The Government talks about how some of these people didn't get paid well or at all.

Well, many of them agreed to work for work trade. They wanted to be part of this community and they were

getting compensated in two ways: Through room and board, through food, and through taking courses that they wanted to take.

And Dana Gill was one of those people. Now, you heard a little testimony from the defense star witness, Antonios, and the purpose of his testimony in part relates to Dana Gill, because he testified on direct that he was directed -- and I don't know if it was Ms. Daedone or somebody else in upper management -- to go have sex with him because he was talking about leaving the Coaching Program.

And this is why you just can't trust this testimony and whether it's memory or whether it's lying, doesn't matter. Because he told you and he had no reason to lie about this, said: Yeah, I had a sexual encounter with her that first weekend at the Coaching Program and I didn't see her again and I didn't even decide to even -- I wasn't even thinking about leaving the Coaching Program until three months later. So it is impossible that that was the reason Dana Gillport was having sexual relations with him. It was not because somebody said, oh, he's thinking about leaving the program. It's just not accurate.

Lianna Lifson. This was -- oh, I'm sorry, you can go back to that.

These are some questions. We talked about Dana Gillport a little earlier, but she was asked: When you told

people at OneTaste that you were moving out, they just let you go, right? Yeah. Each time you left, you made a choice to come back and keep associating with OneTaste, right?

Answer: Yes.

And that reminds me, something else about Dana Gillport. She left and moved in with her boyfriend for like a whole year. And then she came back. I guess she had this very -- a distressing miscarriage. And where does she come after this distressing event? She came back to OneTaste. But remember, she left and was with a boyfriend in a whole nother apartment and was not connected really or at least strongly connected with OneTaste at that point. I mean, how do you hold someone in isolation when they're in their own apartment? You know what else she told you? She was involved in her church when she was at OneTaste. What type of brainwashing cult would say, sure, you can go hang out at your church where you're getting all these other philosophies? She even talked about seeing a therapist. No one said you can't see a therapist. We'll get to that with Ms. Gillick. But again -- and she worked outside of OneTaste. There were plenty of opportunities in community she was working in. Her coworkers outside. Her church members. Her therapist. She was going to, I think, Walt Disney World, I think she testified that some of these people were not OneTaste people. She was working in the sex

industry with people and customers and other people unrelated to OneTaste.

So it makes you ponder, how do you get brainwashed when you have all of this access to the rest of the world?

Lianna Lifson. This was -- Ms. Lifson, as you may recall, in 2008, moved to San Francisco for some type of teaching job, she was a teacher. She quickly quit. And she told you that she had hoped OneTaste would be able to address her challenges with connecting sexually because she had gotten involved in sort of this dark world of BDSM at a young age, was with a sexually violent man who had drug and alcohol issues. That's what she told you. What's amazing is she admitted that she looked up, Googled OneTaste before she even got involved and she said, yeah, I knew it was BS, I knew it was a cult. Sign right up.

She admitted that she was never directed to share a room. She also had her parents, her father come listen to a lecture of some type. She had clients -- she did some writing projects, she had clients outside of OneTaste. She admitted that in 2010 she sent an e-mail expressing deep gratitude to OneTaste in part for giving her financial stability. She complained about how, I think, Rob Kandell had directed her to do some make-out session with a guy named Toby, but admitted -- I didn't tell him, though, I didn't want to do it. She was deeply involved. She ended

up being the lead director in Boulder. She admitted that she didn't have a great work ethic. There was a lot of talk about -- they were on the text exchanges, group text messages constantly. Okay, silence your phone. Silence your phone. It's that simple. It really is that simple. And if you get in trouble for it, then -- then quit. That's what a reasonable person does. But she was very clear.

You could have just said I'm quitting, correct? I could have at that point.

And nobody made you do that, right?

No, they did not.

Question: But at any point, you could have called him up and said, you know what, this is not working for me anymore, I want to come home and your family would have taken you back, right?

Yeah, they probably would have.

These are people that could have -- their families would have been there for them right away.

Max Pixley we talked about, lovely young -- she was Margaret Pixley, now Max Pixley. She was a doctor. And she is the one that seems to have the most difficult childhood, but also seemed to be the most honest about her experience. That was -- that's incredible. She was candid. She said.

Question: And at any day, through whatever period

of time that you lived there, you could have walked out the door and not come back, correct?

Yes, and eventually that's essentially what I did.

Question: You could have done it at any point leading up to the time you actually did it, right?

Yes. I'm a person with free will.

So the person that had the most amount of childhood trauma, arguably, is the one who's freely acknowledging I had free will, I could have gone -- and yeah, she complained about some of the OneTaste -- what it was like to live there and she had complaints about it and she expressed how she felt about it. Again, it was a lot of, you know, people expressing their feelings as if a criminal prosecution is the place to do that, but in any event, she still came back to this, I had free will. And they all did.

Michelle Wright. This was another person who became involved. She came to OneTaste. Ended up living with -- at 1080 Folsom. She was one of the San Francisco women. And she talked about how she was in a relationship with Maddie Carl. And Ms. Carl was -- got involved with OneTaste along with their friends Aubrey Fuller. And Michelle said that she was kind of upset because she wasn't immediately accepted into 1080 Folsom. And part of that, she testified about how Rachel said some unkind things and

questioned whether she was a fit. It doesn't really matter, you know, whether Rachel was kind all the time. But the point is, is that, yeah, they didn't hide the point that they did not want people there who were not onboard for what this community, living in community around orgasm meant. And, again, that is their right. And they wanted to make sure that if you were moving in to one of these communal residences, you knew what you were getting into. You don't need anyone who's going to come in and be like, whoa, what happened? So they worked really hard to vet people. And I guess, for whatever reason, they didn't immediately know if Michelle Wright was a fit, but eventually she was and she moved in. And again, she has a lot of pent-up, obviously, emotion, about her time there. I think it has probably more to do with her relationship with various people. She felt that there was interfering in her relationship.

At the end of the day, she, too, admitted she was thereof her own free will. She felt manipulated at times. But she did not express an objection to the circumstances under which she was working, living, and even in connection with Reese Jones, she didn't say that. And some of her quotes:

Question: You wanted to be there, correct?

I did.

And you wanted to do that work, right?

Answer: I did.

And no one forced you to do the work trade, correct?

And you remember also she told us this story about how devastated she was and how unhappy she was in Las Vegas and then she felt that there was this incident where she was asked to have a sexual encounter with Reese Jones and she said no and then she felt that --

Go back.

And she tries to tie it to the fact that, you know, I was fired then several months later, but she stayed in the homes with OneTaste. She then goes to Los Angeles and she tried to tell all of you that she was underweight, she was looking so bad, she was sick, she had cystic acne, she was over weight, she looked at crap, she didn't feel well.

We looked at a bunch of pictures where they looked fantastic, frankly. And she looked happy in Los Angeles and yes, of course, a picture doesn't really tell you what's going on inside of somebody, but she stayed in the OneTaste community. She did not get ex-communicated. She just lost her job. She wasn't performing in Las Vegas. And that is an adverse consequence to not performing well, that is appropriate.

So you can compare these two pictures. One is

like when she is in OneTaste and one is allegedly in Los Angeles when she's left and, you know, I think she looks better when she went to Los Angeles, but that's for you to decide. I do not think her testimony was very compelling on that point. You will decide for yourself. She may have been disappointed that she lost her job? Vegas, but she didn't have -- you know, that she was separated from her relationship with Maddie because Maddie went to New York. Those are all legitimate complaints, but it is not serious harm or threats of serious harm that force you to do work that you otherwise wouldn't.

We're getting to the end, here.

Michal Neria. This is the woman who went to, like, one to two TurnON events and then went, like, full force into OneTaste, abandoned her lease and her dog and decided I'm just going to move into this OM house and she was all in. This is the woman that said she went to her grandfather's funeral and she had recently started either working or was in the community with OneTaste or her phone was blowing up. She was on a group chat. And what she said was I didn't silence my phone essentially because I was interested, I wanted to be part of that. That's not forcing you. That's you having fomo. I mean, having fomo isn't serious harm.

She talked about how she ended up getting in a

relationship with this Misha guy and she want -- remember, this is the woman, she takes no responsibility, none. Marries a man because she is under some impression that, you know, people are getting married now in OneTaste. And Ms. Daedone was in a monogamous relationship and they're all taking their cues from her. But nonetheless, she's out here buying rings, you see photos. She gets engaged. She says she's a little upset because he does it in public. But during that month before she gets married, she's never like, hey, slow down, I don't want to get married, okay? And this is -- this is the woman who, if you recall, thinks they were all witches or that they said they were witches. And when I asked, I said, do you really think that they think they're witches? 100 percent. Absolutely.

Didn't know you were at the Brooklyn witch trials, did you?

But at the same time, she -- again, you know, there's just no evidence that she was there against -- being compelled to be there or being compelled to work.

Question: Now this was -- this is the witch comment, we don't need to go back to that. Each and every one of these things was offered to me and, yes, I made the choice, too. When she was asked about threats, she said: No, they did not come from threat. It came from a desire to heal. She had supportive parents, parents who did not want

her there, so she could have left at any point.

This was someone who told you that she was very interested. She learned about OneTaste through -- when she was at some yoga three months studying somewhere. And there's just no evidence that this woman was compelled to work there. She was on the sales force for a while. She didn't do very well. And she left. Wasn't even there very long.

Anthia Gillick. You remember her. This was the woman that ultimately bought a franchise. That, when asked about some of the ways in which she suffered serious harm or was compelled, I think one of her complaints was that we always had to go to Bikram yoga as opposed to, what, Vinyasa or something. That was really like the extent of it. This is the woman that denied over and over that she could travel or see her friends, but, oh, she's going to Fiji, she's going to San Francisco, she's going to the Hamptons. She's the one who told you she was told that she couldn't see a doctor, but meanwhile she's confronted with evidence where she -- where she does talk about getting injured on her aerial silks, and to say, my mom was there, I fell, but I'm going out still. And then admitting that, oh, yeah, guys, I'm at the doctors. Going to get manis and pedis. Going to the acupuncturist. But she's up here saying we couldn't do any of that. (Continued on the following page.)

MS. BONJEAN: (Continuing) She testified that Rachel Cherwitz, when her father died, sent a handler with her. And this was not just -- this was Klaus. This was her friend. The person she wanted to live with. It was a kind thing. And she brought the franchise.

She consulted an accountant. She consulted her mother. She's, she's -- she didn't -- nobody told her she had to buy a franchise. In fact, you heard testimony where I confronted her with messages with Ms. Daedone in which before she signed the paperwork, Ms. Daedone said, Hey, you sure you want to do this? She admitted that. She was all in. And even this story, again, meant to shock and awe.

She talked about this class she went to where there was this, really what is like aversion therapy. She did this re-rape situation. And to her credit, she acknowledged that she planned it. And that was not even a course that was taught by Ms. Daedone, by the way. She didn't blame anyone for it. She said she did it. She thought it was powerful. She wrote in her journal that she got so much out of it.

And now, again, ten years later, she says from the witness stand, Eh, I don't think it was the best way to handle my trauma. Okay, yeah, I kind of agree, but it doesn't mean that when you did it, you didn't choose to do it and it doesn't mean you were forced to do it or compelled to do it.

I mean, you know, this is -- it's, frankly, you

know, ridiculous. Everybody can look back at experiences in their lives. They can look at relationships, marriages, all types of things where they felt manipulated, where they felt like they were taken advantage, where they felt like they did things the other wives wouldn't have done, where they invested time, where they didn't want to leave, where they grappled with do I want to leave this guy, we were done within 5 years, we share a house, all of those things are normal. That is life, life, life, life. But you don't come in 15 years later and say, Hmm, I just had no free will and I was just coerced by, you know -- again, really, there's just no evidence of what the actual coercion is. I know there's a lot of terms being bandied about, but at the end of the day, this is not reasonable. Reasonable people do not respond to a thumb's up, thumb's down by staying in a company for seven years. Okay? That's not reasonable.

And then Ms. Gillick was actually pretty forthcoming ultimately.

She said: I understand.

But you chose to live at OneTaste, right?

Yes.

You understood that the community, the intentional community was based around the practice of OM, right?

Yes.

No, no questions there. And she didn't even work

for OneTaste. She ended up buying a full franchise.

And I think even after she departed, we looked at a text message where, between she and Ms. Daedone which we don't have to read the whole thing. I think the government showed it to you in closing.

My apologies. I got mixed up.

We looked at a text message from Michelle Wright, it's in evidence, Michelle Wright telling Ms. Daedone -- and you can look at it. This was not someone who was indicating in any way how displeased or unhappy she was. And this is when she's allegedly as unhappy as she can possibly be. It's not what she's communicating. And, again, this goes back to Ms. Daedone's intent, knowledge. She's not a mind reader. She tells her, Thank you for seeing me and guiding me.

And then lastly, Lyndsi Keves who was there, I think, four months. I mean I don't know how brainwashed you can get in four months when you -- but I'm not even sure what the point of her testimony was because she, she literally does not claim that she was compelled or forced to do anything. Nothing. She's here to complain about OneTaste.

Bottom line, ma'am, you were able to leave OneTaste at any time, correct?

Yes.

And so after about 90 days or less, you quit, right?

So, in totality, it's the same story over and over

and over again. And it's not enough to just say, Oh, they're saying it; therefore, it must be true.

Two things. One, they're saying it 15 years later, that they were compelled, that they were being shamed, that they were being bullied, that they were, you know, whatever they're saying. But beyond that, you have to determine whether it's reasonable. Was it reasonable. No, it's not reasonable. It's not reasonable.

If what really happened impacted them the way they say it is now, they would have left. These women do not actually get as much credit as they should because they did have agency. I refuse to believe and the evidence doesn't show that they did not have free agency. It may be convenient now because whatever they're feeling, to take on some other identity, but they had free will then and they demonstrated it in ways that you can see, including leaving.

Okay. We are nearing the end.

I do want to have -- there was one -- I want to have you look at a text exchange that the government used, 2030-D. And you heard something about, you heard some things about Aries Blanck. And Ms. Gillick, I believe, told you she saw some observations about her.

Now, I don't think it's lost on you that you have not have heard any testimony from Ayries Blanck. And I guess the government wants you to make assumptions, but she didn't

come here and testify, you don't know her story, and all we know is that she, you know, she did eventually leave.

And the government points to this one e-mail or text exchange identified as 2030-D which, by the way, is between Joanna Van Vleck and this guy Kenan Wang which nobody's heard of either.

And I want to remind you because I think it's important, the government went through this on their closing argument but they didn't reiterate this, that Kenan Wang, what he says, you may not consider for the truth. Okay? This was just for context. The Court gave a limiting instruction on this at the time this evidence was received. You will get another limiting instruction when you go back to the jury room with the jury instructions.

And as to Joanna Van Vleck, portions are also not considered for the truth and I'll point them out to you.

So she says to Kenan: I got a secret to tell you. And on the first page, she says: I'm sitting with Nick. Can only text.

The government wants you to believe, of course, that Nicole is privy to this. It's not clear. If someone says, I'm sitting with Nick, I can only text, maybe it is not something that is being shared with Nick but, again, this just goes to the point of very hard to read in between the lines in text messages.

And he says: Rachel not looking at my screen anymore so you can tell me.

She said: Ayries sent a demand letter demanding 3 million for a list of things we did wrong.

He said, Oh, brother. Mainly things that she claims RT did to her. Her attorney sent this letter. This is confidential.

She said, We're going to mediation. Most likely we'll end up, you know, settling with her about 300,000.

And he says: Do we feel that's fair?

And she said: Yeah. The only other option is to let her sue us.

By the way, this is normal talk in companies where people get sued, like what are we doing. Whether it's true or not, we've got to deal with this lawsuit.

And she says: Well, you should read her claims.

And, again, her claims are not being offered for the truth of the matter asserted. We do not hear from Ayries Blanck. This is just Joanna saying what her claims are. You may not consider it as true.

But she says that we were forced -- that we forced her to have sex with wealthy clients. We forced her to go to 12-step programs, forced her to have sex for the job. Okay.

And Kenan says: OMG.

And what Joanna says, out of context: Some of that

may be true.

He says: Yeah, 12 steps maybe. I'm sure there are places she felt coerced in some way. That I don't deny. Totally.

And then they go on to talk about: This is top secret.

And Joanna says: We can't, we can't do this. We can't be, you know, we can't play that anymore even to people that we think are in our inner community. We've got to be more careful.

And this goes back to that text message that we looked at earlier where Nicole is talking about the New York Times article and they're talking about, hey, we've got to change our ways a little bit. Okay?

And, you know, as I said at the beginning of this, I'm not afraid, I'm not going to be here over here just showing you the good stuff. We're looking at even the stuff that looks, looks not good on the surface. But what that shows is a lack of intent. That shows that they were, like, wow, can't believe she's saying these things, what is going on.

And you will notice from all of these other text messages that you looked at, there was a real effort to do self-reflection. I'm not going to go back over them. You remember them. They were looking deep down, what can we

change. What that shows is this wasn't some concerted effort to carry out a forced labor scheme. These are people that were like, Yeah, you know, maybe we should do things a little better here. Okay? Because it could be misinterpreted.

That's what it shows, because if you conspired amongst all of -- if you conspired together to carry out a forced labor scheme and you were called out for it, your messages would look a little different and they were concerned.

I think at one point, Ms. Daedone said, you know, I don't know what would, what would a zealous prosecutor do with this. Well, I guess we got an answer to that question. But it does not show that there was intent to carry out a forced labor scheme or any of these women that we heard from were compelled to do anything.

There's another way in which the government can prove the object of a conspiracy or the forced labor under a different theory. We don't need to spend much time on it because it still goes back to the fact that OneTaste had to engage in providing or obtaining labor services by any of the prohibited means that we discussed. Okay? And that we looked at that earlier. Either force, serious harm, threats of serious harm, some combination of these things, and it's really no different. The analysis is the same.

None of these women did what they did because they

were under serious, suffering serious harm or facing threats of serious harm, or by any type of physical force. So that's the same and you will have this instruction, the Court will instruct you on this and you will get a copy of the jury instructions.

I want to discuss real briefly the issue of Ms. Daedone's sale of the company.

You saw Ms. Daedone's salary over the course of 12 years. I think that's Government Exhibit 853. And let's not forget she's the visionary, the CEO, she created the company, and she toiled away at least for the first five years making an average, I don't know, you can do the math better than me. In 2011, she made 32 grand.

And then 2012, which Rob Kandell told you is when the company started making money, and, yes, her focus did switch to sales or not switch, but, you know, there was a focus of sales. She was still focused on the message and the vision but, yes, she wanted to make it profitable. She wanted to make a business out of it and there's nothing absolutely wrong with that.

Yes, there would be something wrong if you were forcing people in labor, but we posit that the evidence has not shown that and the government has not proved that. So what we have here is a company that she built and that she made a very modest salary, all things considered, for CEOs

over the course of, what is this, 11, 12 years? Less than $1 million, and then she sold it.

And I want you to look at something else, the chart of -- yes, we saw this. The government presented this.

Again, these were people there for short periods of time. They did -- they didn't always make money. Dana Gil did work trade. I mean, yeah, you wouldn't see money here on this. Some of them worked on commission. Some of them weren't very good salespeople. They weren't there for very long, yes. And to compare the CEO of the company to, like, the guy that works in the mail room, I mean, you know, I mean that's just living in la-la land. It just is. And nobody questions it when we're talking about CEOs of JPMorgan and other big companies, of course.

But, again, a lot of these women volunteered, they worked off the books sometimes, they did work trade. This is not necessarily a fair reflection of what they actually brought in but it doesn't matter. It doesn't matter because they were doing it of their own free will.

And going back to Ms. Daedone's, the company itself, you heard testimony from Mr. Lubin, the CPA who struggled to figure out what a tax transcript was but, in any event, he did look at OneTaste's returns and you can see from 2013 to '14, '15, '16, '17, income started going up and there were salaries and wages being paid. You can see it right here.

Ms. Daedone sold the company in 2017, I guess, for $12 million when it was making profits of $9 million. That is not unheard of in valuating companies particularly with this trajectory. So the government wants you all to think that this is a crazy $12 million amount. It's not really crazy. The company was -- she probably could have sold it for more. The company was making money and making money and, again, it was not doing it on the backs of any forced labor because these women were there voluntarily.

I mean you may question, like, why would anybody work for such low wage. I don't know. They were getting something else out of it, that's their business, but they were there of their own free will.

So, what's important, ladies and gentlemen, again, I want to remind you you're not going to hear from me again. You are going to hear from the government. Obviously, they have their case, they look at it very differently, but I implore you to critically examine it and analyze it as you listen, but our position is pretty clear, that the government has not demonstrated that any of the women that you heard from or that there was any evidence that anyone was doing something against their free will, compelled, suffering serious harm, facing threats of serious harm, none of that.

They made their choices, they wanted to be part of this community, and they did it knowing what the community was

about. There was no bait-and-switch. And you cannot point to Ms. Daedone's ideas, beliefs, that she routinely put in the context of my beliefs, this is my experience, my sad story, my victim story, you heard that, and as I started with my opening statement, this is a case of grown women making grown decisions that have free agency, no matter what the government says.

Thank you.

THE COURT: Ms. Bensing, are you ready to proceed?

MS. BENSING: I am, Your Honor.

THE COURT: Okay, with the rebuttal argument from the government.

MS. BENSING: Good afternoon, members of the jury.

Before I begin, I do want to say thank you for your service and your attentiveness during this trial. This process could not happen without you and so I want to thank you for everybody on our team for being here.

Members of the jury, to hear defense counsel tell it, all of the evidence that you've heard over the past five weeks, all of the testimony and exhibits that my colleague Ms. Gupta went through in painstaking detail with you yesterday amount to nothing much at all. You haven't heard from more than a dozen witnesses about the manipulation and doctrination, surveillance and emotional trauma inflicted by the defendants and their associates. You haven't read e-mails

from victims saying you have everything I have, I have nothing left; the text messages where the defendants talk about how to get employees to do more work, where they talk about manipulating them.

According to the defense, we haven't proven any actual crime here. These are just a bunch of women who went to OneTaste to explore their sexuality and have their boundaries pushed. They signed up for this. The defendants didn't need to psychologically manipulate anybody, didn't need to sexually abuse them, didn't need to push them to work all hours of the day or night, didn't need to highly control every aspect of their lives. The company, according to them, was apparently doing just fine without all its unpaid labor. Reese Jones didn't have any expectations. The company was thriving on orgasmic meditation all on its own.

Members of the jury, that makes no sense in light of the evidence that you've seen and heard at this trial.

Now, the Judge will instruct you the defense does not have any burden at all. The burden of proof rests solely on the government and we welcome that burden, but that does not mean you have to take defense counsel's arguments, innuendo, speculation and theories at face value.

The evidence that you have heard plainly shows that for years, the defendants conspired to use and abuse a group of vulnerable women and the defendants dominated them until

they gave up everything they had to perform labor and services for OneTaste.

And, yes, they did it gradually. Day by day by day. They whittled them down by taking away their money, controlling their relationships and, yes, indoctrinating them with so-called spiritual teachings and practices, shaming them, humiliating them, subjecting them to sexual abuse. And why? To lower their boundaries, to break them down, to remove their willpower, to make sure they had fully surrendered, to be willing to do what Rachel and Nicole directed them to do, to keep working, keep OMing, keep giving Reese Jones hand jobs, have make outs, make sales.

You know, Ms. Bonjean can pull out clips of testimony and say there's no evidence but that completely ignores the totality of what these women said to you. These defendants are not guilty because I say they're guilty or because Ms. Gupta does or because Ms. Bonjean and Ms. Cohen say they're not. They're guilty because the evidence you've seen at this trial prove they're guilty.

Ms. Cohen said to you yesterday you can't look at this company through a regular lens. I'm not sure what that means, but the Judge is going to instruct you that you can use your common sense. And if you look at the evidence in this case, if you look at it critically but with common sense, then you cannot reach the conclusion that defense counsel is asking

you to reach because you do not get reasonable doubt from facts that are irrelevant. What you have heard yesterday and today from defense counsel is an attempt to distract you from the evidence, from what happened in this case: A conspiracy to extract labor from victims based on psychological, sexual, reputational and financial harm.

So let's start with the question you heard defense counsel ask many times in this trial, whether the victims were free to stay or free to go.

Members of the jury, I submit that in this case, that is a complete red-herring. Neither the government nor any of these victims ever suggested to you that anybody was physically incapable of leaving OneTaste. There were no chains on wrists. There were no locks on doors. In fact, every single one of these victims did leave. This is not a kidnapping case. It's a forced labor conspiracy. The question is not could they leave. It's why did they stay, why did they work.

The defendants are arguing that there is no force or more aptly for this case, no serious harm, that this was just high school tactics, a case of being kicked out of the group chat, name calling, a demanding boss, cross-fit.

Members of the jury, that is not what you heard from these victims. That is a gross mischaracterization of what these women testified to, to the coercive reality that caused

them significant trauma.

You heard from these women. Many of them testified that they are still recovering, that there are lasting effects on their sex lives, their personal relationships, making sense of the world. You heard from nine victims on that stand. You saw scores of documents confirming what they told you. You saw financial records demonstrating OneTaste's gain and, ultimately, Nicole Daedone's $12 million gain on the backs of these victims' labor.

I'm not going to go back through all of the victims' testimony that Ms. Gupta went through with you yesterday, but you sat through it yourself. When they told you that they stopped trusting themselves, they lost themselves, they lost their identities, they were psychologically, physically, financially and sexually broken down, and by the end of that, by the end of that abuse, of course, the answer is I did what Rachel told me, I did what Nicole told me. That's the entire conspiracy. They're being whittled down into the various things that they identified it as brainwashing, loss of identity, loss of self esteem, exhaustion. That is serious harm that left them feeling like they had no choice.

Ms. Cohen said to you repeatedly yesterday that when you're considering serious harm, when you're considering what's reasonable, you have to look at the circumstances of OneTaste.

On the one hand, these defense attorneys are calling it a business, a startup. And on the other hand, they're saying you can't look at it like a regular business.

Members of the jury, they can't have it both ways. OneTaste was a business. It certainly was not a not-for-profit. Everything you heard about happened in the workplace. The men and women who testified, they were not laboratory subjects. They were human beings and employees and for them, this was their livelihoods. The defendants were their bosses and their landlords, and they exerted an immense amount of control over these men and women even before they engaged in the extreme forms of psychological coercion that drove people to their brink.

So do not let the defense normalize what happened here by conventional or unconventional standards. And don't let them make light of it. OneTaste does not get an out because it's OneTaste.

It is not okay to teach your employees that their spiritual purpose is to fuck the war out of men and that if they stray from the past set by OneTaste and by Nicole Daedone, they will be spiritually ruined. It is not okay to instruct your employees to rub your boyfriend's penis every morning. It is not okay for your boss to break up relationships as a sign of surrender. And surrender to what? To do more work, to serve Nicole, to serve OneTaste, to serve

orgasm, to serve Rachel Cherwitz.

It is not okay to rub your employees' genitals without their consent. It is not okay to instruct your employees to go have sex, to be so in control of their bodies and their time and their minds to dictate that for the purpose of decreasing tumescence and increasing sales. It is not okay to demand that women open up the most sensitive part of their bodies to have their genitals touched day in and day out from men off the street, investors, VIPs, you name it.

And the government is not manipulating anything by not using the word "stroking." That is the defendants' word. But what this was was touching a woman's clitoris or a man's penis.

It is not okay to be told that money is the third dimension, to take out credit cards, to engage in work trade, let your debt pile up while you go deeper and deeper into OneTaste. It is not okay for your boss to be your spiritual coach and then tell you to go to Sex Addicts Anonymous meetings like they did to Becky to the point where she believed she was a sex addict when she wasn't. Or to tell Michal to go to NA or AA meetings when she didn't have an addiction.

And Ms. Bonjean just asked, well, why would OneTaste do this, why would they direct them to these NA and AA meetings if it's outside of OneTaste.

It's about control, members of the jury. To be told you are an addict, you are a virus, you are less, you aren't surrendering, you are standing in the way of serving orgasm, or serving orgasm means selling courses.

It is not okay to have your boss enforce around-the-clock work schedules where you either get no vacations or you have to barter or beg for them, to be constantly surveilled on group chats with people reporting back to Rachel.

(Continued on next page.)

MS. BENSING: (Continuing) And like many, many of the witnesses testified that they did, to never have alone time, to report even when you go to the bathroom, to have to report to your bosses, fear inventories or withholds, to have no time or energy or space for independent thought. It is not okay to reduce these women, and all of them testified to some form of this; to intense feelings of guilt, shame, depression, anxiety and paranoia.

Members of the Jury, where are the facts, Ms. Bonjean just asked you. Those are the facts. This is isn't high school bullying. This isn't a sorority. At least not any high school or sorority that I've ever heard of.

So, let's be clear: You do not have to be a child to be subject to abuse. You do not have to be uneducated to suffer abuse. You do not have to be chained down or in a locked room to suffer abuse.

The Defendants argue that these were grown women, these were adults. And they were educated, they were smart. They did walk in here with degrees and careers and they were clearly thoughtful, conscientious people. Members of the Jury, that just shows how powerful the coercion was in this case. You heard from people who were from all walks of life and they were all coerced. They were all traumatized by this. And not just after the fact. They all, each and every one of them, testified to performing labor or services after they had

been psychologically damaged.

And I submit to you that in addition to the totality of these women's testimony, you can infer from their actions alone what kind of mental state they were in.

Because you may have been thinking to yourself, during this trial: This sounds crazy. Why would Christina dedicate herself to learning the fine art of pouring Nicole Daedone a glass of water? Why would Max work with no pay, picking up Nicole Daedone's used condoms? Why would Becky or Max or Michal or Anthia pour their hearts out to Rachel Cherwitz, only to have her subject them to verbal, physical, sexual abuse? Why did all these women agree to OM or have sex with people decades older than them, people who were a gender who they weren't even attracted to or they found repulsive, or agree to have make-outs with VIPs all for little or no money and certainly not enough money to help them be free of the cycle they were in?

You may ask yourself who in their right mind would stay after enduring all of this. But Members of the Jury, that's common sense. These women were not in their right minds. They answer is: They kept working day after day because they were damaged because of the serious psychological, financial, sexual and reputational harm and trauma the Defendants and other members of OneTaste's inner circle had inflicted on them, the harm they were already

suffering, and the harm they feared they would continue suffering.

Choice wasn't even part of the equation for them. Choice wasn't something they were in a psychological state to even consider, and that means they could make no reasonable choice. Losing your job or your friends or your family or your belief system or your lover or your home, any one of those things can cause serious damage to a person. Losing all of them, losing yourself, the witnesses who came in told you how that destroyed them.

And I also want to say there seems to be a big misconception here. This case is not about what is in the victims' minds. It's a conspiracy case. It's about the Defendants. It's about their intent. So the question for you is not whether these victims should have been stronger or whether they should have had the guts or resources or wherewithal to leave sooner or say no. It's not about whether these victims actually suffered serious harm and whether they actually caused them to work. That is absolutely not the question of this trial.

The Judge will instruct you on the law and, again, her instructions govern. But those instructions will confirm that the question for you is what the Defendants intended. The question for you is whether the Defendants agreed to use psychological, sexual, and financial pressure tactics to get

women, any one of these women, to perform services for them. And the answer to that question is obviously yes.

And on that, the Defendants have argued that these women are a small minority of the hundreds of OneTaste employees and thousands of OneTaste customers. You know, I'm not sure that the actual evidence presented in this trial supports that statement. But even if it did, this is another one of those arguments that is completely irrelevant. If you have a doctor who cures hundreds of patients but seriously harms one or two or even three, you still harmed those three. And by the way, the only doctor that you heard of if in case is Max Pixley.

Also, on the law of conspiracies, Ms. Cohen said to you yesterday that you'll hear from the Judge that conspiracy is characterized by secrecy and OneTaste was the very opposite of secret. Of course OneTaste wasn't secret. But the strategy of the company's leadership to manipulate people to do their bidding for little or no pay was. You didn't see anything about that in the disclosure forms. You didn't hear a single witness testify that they came in knowing that Nicole and Rachel would be gas-lighting them, shunning them, shaming them, manipulating them, and attempting to financially ruin them at the expense of their personal well-being.

Consider a couple of concrete examples.

You heard from Max Pixley that when they moved to

New York, they expected to get paid for their work. But when they arrived, they didn't get paid for months.

You also heard from Rob Kandell and Chris Hubbard that even from the early days of OneTaste, the plan was to manipulate people for their labor. That is the illicit agreement that we're talking about. No one is suggesting that OneTaste itself or anything about it was secret. That's nonsensical.

And the Judge will tell you, you can infer a conspiracy's existence from the circumstances of this case and the conduct of the parties involved.

And I want to emphasize something else about the law here. If you believe that the Defendants agreed to unlawfully extract even one form of labor or service from even one victim, any single one, then they are guilty. Here, you have seen overwhelming evidence that the Defendants agreed to get labor and services from a number of people, but it only takes one.

By the way, one other thing I want to say on conspiracy. Ms. Gupta painstakingly went through with you yesterday the evidence of conspiracy, so I'm not going to repeat it. But Ms. Bonjean threw up on the screen just now Government Exhibit 2148-D -- this is the amends chat between Yia Vang and Rachel Cherwitz -- and she argued that it was irrelevant. But just to be very clear, the part that is

relevant is where Yia Vang says: Reese - I didn't like stroking him all the time. Maddie/Michelle - I pinned them against each other with Reese, colluding with both to increase the tumescence between them. I like Maddie more than Michelle, so I was harder on Michelle.

Put that in context of the very real, very powerful testimony that you heard from Michelle.

She testified, in response to the question: How did performing these sex acts with Reese Jones you described affect you during this time period?

Answer: God. Heavily. I think it -- the thing I remember most is it, like, wearing me down emotionally. I think it took so much kind of like putting up my shield in order to withstand something that felt so uncomfortable and against what I wanted to be doing, especially to share that job with my female partner. And I knew, like, neither of us wanted -- really wanted to be sexual with a man, especially an older man. It felt weirdly, like, degrading. I felt, I guess, kind of unmoored. It removed me from reality in a big way. And I am going to say I felt pretty numb during that time period. I don't think I felt the effects of it until much later, which was an immense amount of depression and anxiety and trauma.

This was not some sort of sweet gig as Ms. Bonjean just described it. This was sexual abuse.

Next, I have to address the argument that the Government somehow cherry-picked the evidence in this case. And I submit to you that that doesn't withstand even a moment of scrutiny. These witnesses got up there and testified for hours, explaining their experiences at OneTaste, the good and the bad. And I submit to you that much of what the Defendants did in these summations was to play fast and loose with the testimony in this case. For example, they put up a bunch of times when the victim said they chose to do X, Y and Z thing, but they didn't show you the context behind any of those.

For example, when Ms. Cohen put up those slides about when the victims chose to do various things, most of that was choosing to get involved in OneTaste. Of course all of the victims chose to get involved in OneTaste. That's why they're here. That's how they got involved in this organization. That doesn't tell you anything.

Another example of this is that audio recording they played of Lyndsi Keves. And Ms. Cohen herself pointed out that was only a couple months into Lyndsi's time as a OneTaste student. She was in a new relationship with another student that she was in love with. Of course she's going to say positive things about the company at that point. What matters is what happened to her after the, quote, emotional and verbal abuse she sustained from Rachel Cherwitz. And that's at transcript page 2963.

Let's take another example. Ms. Cohen stood up here and told you that what is important here is what people were telling Rachel and Nicole. And I disagree with that, which we'll get to later. But she stood up here and told you that Becky didn't tell Rachel she didn't want to participate in that OM demo that Rachel forced her to. Ms. Cohen said all Becky said was that during the demo, she was, quote, faking it and trying to do the right thing. And then Ms. Cohen asked you how did that come across to Rachel, who does this all the time? How could she know that she was doing anything wrong?

Members of the Jury, Ms. Cohen is misrepresenting to you. She's asking you to ignore the evidence. What did Becky actually testify to on that? Ask for page 304 of the transcript if you have any doubt there. When Rachel demands that Becky do the demo, she told you that she said: No, no, I don't want to right now. And then Rachel, her boss, demanded that she get up there, and so Becky did. She undressed from the waist down. She tried to disassociate. Rafael Martinez started stroking her. And Rachel brushed him aside and started stroking Becky herself. Becky did not consent to that.

Page 305 of the transcript, Becky said: I was not into it. I was freaking out. I didn't want to be there and I said no.

And then Becky described trying to fake it, trying

to do the right thing. And after Rachel stopped, while Becky was lying there on the table with her genitals exposed, Rachel started laying into her, calling her a virus, telling her her orgasm is broken, that she's infecting everyone. That's at page 306 of the transcript.

That's what the evidence actually was on that assault.

Let's take another example. Ms. Cohen stood up here and told you that Michal told you she was psychologically coerced on day one, that on day one she was forced to do X, Y and Z things even though she had never even met Rachel and Nicole. Well, that is not her testimony. That is nowhere in the record. Ms. Cohen made that up. Michal Neria did not testify to that. Instead, she described how in her first intro to OM class she OMed with a person she didn't know and, after that OM class, she continued to be interested in OMing. The coercion and abuse happened after she got involved, Members of the Jury.

Let's take another example. Ms. Cohen attempted to claim that on cross-examination Anthia Gillick walked back her testimony that in late 2014 Rachel Cherwitz instructed Ayries Blanck and Anthia Gillick to have sex with 30 men in 30 days. Ms. Cohen tried to make it seem like it was their plan. But again, that's simply not true. Look at the transcript, pages 3959 to 3965 on direct and page 4122 on

cross. Ms. Gillick clearly testified that that was Rachel Cherwitz's direction.

We'll take another example. And I'll only do a couple more. But I submit to you that the point is that the Defense attorneys have not been careful with the record.

Ms. Cohen said to you yesterday that Max Pixley's testimony was that they never took a vacation while working for OneTaste and that that was somehow incorrect. But again, that is entirely false. What Ms. Cohen pointed you to was a trip that Max took before they started working for OneTaste. You know, Ms. Cohen made a big deal --- and Ms. Bonjean, I think, said today, too -- that, you know, some of these things came out on cross-examination, not direct examination. But that's true. We did not ask witnesses about vacations that they took before they started working at OneTaste because that is irrelevant.

The Defense also told you yesterday that the Defendants are not guilty because Rob Kandell said he did not think he committed a crime. Well, that's not how this works. You should listen carefully to Judge Gujarati and her instructions and I expect that she will tell you that you are the judge of the facts and she is the judge of the law. Rob Kandell is the judge of nothing. His opinion about the law means nothing. The way it works in this courthouse and in this country is that you look at the evidence, you listen to

the witnesses, you consider what these Defendants did to them and you alone decide who did or did not commit a crime. So when the Defense tells you that you should accept Rob Kandell's opinions on the law or his opinion on manipulation or his opinion on cross, that is just another attempt to distract you from the evidence.

Ms. Bonjean briefly talked about Antonios, the Defense witness that you heard from. Members of the Jury, I want you to think about all the ways that he actually corroborated what Dana's testimony was. He said that there was a time when he thought he was going to leave the coaching program; that's consistent with Dana's testimony. He confirmed that she turned up at his door randomly to have sex with him; that's what she testified to. And she told you that she did that because she was directed to. And so the Defense makes much of his testimony that he came up on the stand talking about a random sexual encounter that he had 15 years ago and they're saying, well, look at the timing of what he testified to. But Members of the Jury, he told you he talked to the FBI in 2021. He wasn't even clear on that timing. I submit to you that his testimony only supports what Dana testified to. And by the way, her testimony about being directed to have a sexual encounter with a customer from OneTaste was supported by the testimony of all of the other victims in this case.

So, this is another irrelevant argument in light of everything I've just discussed, but I do want to spend a few minutes on these so-called policy documents, the consent documents, the waiver forms, the policies that the Defense spent a lot of time in going through in all of those cross-examinations. And I think what they're arguing is actually something broader, that the victims who you heard from got what they signed up for, they were simply pushed to grow. But Members of the Jury, you can't waiver your way out of a crime. The issue is not whether these women could have sued the company. This is a criminal case. This is a case about serious harm, any harm, including nonphysical harm, including psychological harm, including financial harm, including reputational harm, including sexual harm.

So, what is the argument that the Defense attorneys are really making here? That the victims signed up for serious psychological harm? That they asked for this consciously or unconsciously? Think about what that means when they asked all these victims all these questions about consent policies and wanting to get involved in the OM practice and wanting to move into communal living. They are arguing that they asked for it, that whatever happened after that, the Defendants get carte blanche because the victims got involved in the first place. That is not how this works.

I will give you an analogy. Just because you show

up to a date and agree to have dinner with your date and agree to let them walk you home and even agree to let them come up for a drink and even kiss them doesn't give them permission to sexually assault you.

Just because the Defendants got involved in OneTaste did not give the -- just because people got involved in OneTaste did not give the Defendants license to strip away their sense of financial security, psychological security, and sexual security. And I submit to you that that is common sense. A person who is not in a sound mental state is not in a position to make choices. A person who is not in a sound mental state cannot give permission, cannot consent.

The witnesses explained this to you. Chris Hubbard, he's the guy from the early warehouse days. What did he tell you? He raised concerns. And what were his concerns? Quote: One of the ideas I got -- one of the ideas I was trying to convey is that you only get to people's yes if they have a free no. If somebody can't freely say no, then they also can't freely say yes. They can't consent. That's in the transcript at page 842.

Christina Berkley testified very similarly. She described the concept of consent and informed consent. You're saying yes, quote, but you don't know all of the facts of what you're saying yes to. And some of what was happening or what was going on was this covert influence. And so it wasn't like

you were consenting or saying yes or choosing, fully knowing all of the things that were going to be happening at the same time to influence what your choice would be. And then she went on to describe all of the psychological tools that these Defendants used. That's at pages 1400 to 1403 of the transcript.

Dana testified to the same thing. She was asked again and again whether she consented to something. And what did she say? I'm struggling with the term consent because in my mind there was coercion over a period of time. That's at transcript 1544.

Lianna testified to the same thing. She was asked: What role, if any, did consent play outside of the two-day period of the coaching program? Very little, she said.

So, let me be absolutely clear: A signature on a piece of paper does not make a crime legal. Consent is not a box that you check or a form that you sign. Consent must be freely given and it must be informed. And the evidence in this case shows that these forms were signed in a context of manipulation, psychological and financial coercion, deception and abusive power. That is not consent. That is control.

But it is worth highlighting that when you actually dig into these forms, they are a joke. First, Ms. Gupta went through yesterday with you that it is very clear that these forms were just damage control. And Ms. Cohen argued

yesterday to you, sure, that's no different than any company, they analyze and put policies in place as they grow. The problem with that is that the policies Ms. Cohen showed you yesterday were blank, unsigned and, more fundamentally, not used.

Take the ethics committee that you heard about that. You heard how that actually went in practice. Every single time Rob Kandell asked to OM or have sex with a subordinate, he was approved. I showed picture after picture of the testifying victims in this case and almost every single one of them, he had engaged in sexual activity with even though he was their superior at the company. That's how effective the OneTaste ethics policy was.

And then you heard about some other policies. The Defense I think put into evidence a couple of OM house rules, a couple codes of conduct. But what did the testifying witnesses actually say about those?

Dana couldn't remember any of them. That's at transcript 1624.

Anthia Gillick testified that she was unaware of any code of conduct. That's at transcript 4262.

Michal didn't remember the OM house rules. That's at transcript 2810.

Becky testified that this was legalese and that was separate from the reality of what's happening in real life.

That's at transcript 789.

Becky testified, as Ms. Gupta went through with you yesterday, that the sexual harassment and overtime policies were actual jokes.

Ms. Cohen pulled up yesterday the one video of Rachel Cherwitz talking about red, yellow, green in one course and she said to you that happened at every course. Well, Members of the Jury, Ms. Cohen was not careful with the evidence yesterday. You heard absolutely no testimony that that happened at every course.

As Lianna testified, the consent was for the clients, not for the employees more deeply involved in the organization.

It's the same thing with the waiver forms. First of all, a number of these were unsigned, undated. But even more telling, these aren't safety protocols. These aren't codes of ethics. They're liability waivers designed not to protect participants but to shield the company. They fundamentally don't address what these women went to. They treated it like a trip down a ski mountain.

And these forms, they were not even comprehensive. If you take Defense Exhibit 20-A-E, Lianna Lifson signed that waiver for a three-day window, September 7th to 9th, 2012. Well, first of all, she signed it on September 8th, so after the time period that it was supposed to start.

The same thing happened with Becky. That's in Defense Exhibit 21-J.

But even if those didn't only cover a three-day period, what kind of meaningful consent is this?

Robert Kandell testified on cross-examination that before he left OneTaste in 2014, he digitized, quote, boxes and boxes of hard copy consent forms. Where were they? The Defense didn't have to admit a single exhibit -- the burden is on the Government -- but they did. And it is a handful of policies for only a handful of victims for only a handful of dates. The Defense attorneys are not being careful with the record. Do not fall for it.

You also saw some employment agreements in this case. Not much, but a few. They were Government Exhibits 3743, 3768 and 3772. This is for Lianna, Becky and Michelle. And if you have any questions about OneTaste paperwork, put those agreements up side by side when you're deliberating. What is the date on all of them? October 1st, 2013. That is no coincidence. Three different employees already working for OneTaste suddenly get employment agreements on the same date.

But then you heard that Michelle got a separation agreement only 17 days later, on October 18th. That's in evidence at Government Exhibit 3771.

And I want you to think back. That was one day after that group chat in Government Exhibit 1332-R that I put

into evidence through Rob Kandell where Yia says, quote: We just hired all these people legally. She's talking about the October 1st agreements.

And Kandell said: We cut and do things illegally. Our growth is based on very risky practices.

Rachel Cherwitz, by the way, is an active participant on that discussion.

And what did Yia say? We've gotten scarce and fearful of the 3-D legal stuff and it's outweighing what the purpose of what we actually do is. People are starting to use money as a way to threaten the flow of orgasm.

And one day later, they fire Michelle.

Kandell told you about the risky practices he was referencing; sales techniques, the way they paid people, the way they switched around 1099s and W-2s.

And what did Michelle believe about all of this, about why she was being fired? This is the in the transcript at 2436: I was falling apart, having an emotional and nervous breakdown and that was no longer useful to them. That's what they made her believe.

So, what does this one example tell you? Michelle was broken down, depressed, anxious, traumatized. That's what she testified to about the end of her time period in Las Vegas. And she had recently said no to Nicole; she got an employment agreement that was terminated a little under two

weeks later.

The company, including Rachel Cherwitz, is discussing illegal sales practices and then they send Michelle to LA. And what did she do after they took away her employment agreement? She continued to work. She was absolutely broken down, but she felt compelled and coerced to work. She ran the TurnOns, she did the OM demos, she did back of house, she helped Aubrey Fuller with tasks for Nicole. That's in the transcript at 2438. She wasn't paid for any of it.

Members of the Jury, that one example proves this forced labor conspiracy. That is what the OneTaste forms show you.

So to the extent that these policies are relevant at all, they are relevant to show the Defendants' intent. Again, that is what this case is about. It may be that the company never implemented these, that they were meaningless to these victims, but they should have been meaningful to the executive team, to Rachel Cherwitz and Nicole Daedone.

So, if you want, if you care about these policies, you can take a look at Government Exhibit 3224. That was the OneTaste coach and trainer association code of conduct in effect in 2013. And you will see in there that OneTaste coaches agreed not to, quote, push clients beyond their boundaries, that they agree not to exploit their authority,

that they agree not to offer illegal services or sexual entertainment in exchange for money.

Members of the Jury, compare that to what you heard in this case.

Kandell's definition of -- even Kandell's definition of manipulation: Manipulation is directing someone towards the higher goal, past their own perceived self-abilities and self-limitations.

And by the way, you heard Ms. Bonjean try to say that this was somehow a positive view of manipulation, whatever that means. But his testimony could not have been clearer: We would direct people past their comfort zones into situations, either through sales or through connections with others or courses, to further the goal of the organization. And they used various techniques to do that.

I asked him: Who would you do that to?

He said: Pretty much anyone on staff that we could get to do something we wanted them to do.

That's transcript page 3384.

(Continued on the next page.)

(Continuing.)

MS. BENSING: He said Nicole did that. He said Rachel did that. And by the way, when I asked him who was in charge of sexual services, he said Nicole and Rachel.

That is pushing people beyond their boundaries, contrary to OneTaste policy. That is exploiting authority, contrary to OneTaste policy. And agreeing not to offer illegal services or sexual entertainment in exchange for money, that is this entire case, members of the jury, that is what Nicole and Rachel did to these women for years and years. Completely contrary to their policies.

So members of the jury, I want to discuss another defense argument that is entirely irrelevant. That because they put on the screen a series of smiling faces of these women that means that there was no forced labor conspiracy here. That because these women posted on social media or the OM hub, that means they weren't victimized.

First, that argument makes no sense on its face. In many instances these women were doing their job: They were going out with other Coaching Program students, they were posting for their work. This was labor. They were supposed to be turned on women.

As Becky testified: The expectation was to kind of talk to anyone that you see and tell them -- and proselytize, really, for the company. That's at transcript

page 113.

And as Michelle testified about those photos that Ms. Bonjean just put up on the screen: The dramatic affect of what the defendants had on her life was fucking painful. And honestly, I really did believe in the mission. I thought we were helping people. I thought we were doing something that was going to change the world. And that doesn't make an excuse for abuse and manipulation. You know, so you can show all these pictures of me where I ostensibly look like I'm good and I don't have acne and I'm having a good time, but everybody knows that makeup and camera filters do a lot and can make it look like you're having a good time when you're not. And I was also -- I was deeply ashamed of everything I had gone through.

That's at transcript pages 2643 to 44.

If you have any doubt about the scheme in this case, about the manipulation, about what the defendants actually did to these women, ask for their testimony and, in particular, I would encourage you to ask for Michelle's testimony, but really the testimony any of them.

But this case is about the defendants. And you saw evidence that this thing about the OM hub post was going to be a tactic used by the defendants a long time ago. I don't have many slides for you today, but I do have a couple. And I want to pull up Government Exhibit 2030-D.

This is part of the exhibit that Ms. Bonjean just went through with you. This is the one where Van Vleck, the defendant's co-conspirator, agrees earlier in the text thread, where you saw that, yes, she was sitting with Nic. She agrees with Kenan Wang's statement that I'm sure there are places that Ayries felt coerced in some way. She says: Totally. Van Vleck said: Rachel is having to see what her actions do. We for sure were not clean.

And after admitting that, what does Van Vleck say? I've collected her OM hub posts that show she was having a great time.

Members of the jury, even Joanna Van Vleck, sitting with Nicole Daedone, acknowledging what she agreed was coercion, knew that happy photos --

MS. BONJEAN: I am going to object to that. That's -- that's --

THE COURT: Hold on.

MS. BONJEAN: It didn't come in for the truth.

THE COURT: Wait a minute.

(Pause in proceedings.)

THE COURT: I think Ms. Bonjean is thinking you are talking about one member, one of the two people you spoke about. I'll sustain that, but if you make clear who you are talking about.

MS. BENSING: Let me be very clear.

In that text exhibit, Kenan Wang says: I'm sure there are some places where Ayries felt coerced.

And Joanna Van Vleck said: Totally.

She acknowledged the coercion, members of the jury. Even Joanna Van Vleck, sitting with Nicole Daedone, knew that happy photos, OM hub posts, doesn't erase what she agreed was coercion.

We can take that down.

So I do want to also address notice. You've heard a lot about this from the defense attorneys, the idea that these women should have put the defendants on notice of their own forced labor. The idea that these women wanted this or that they should have spoken up or that they did something wrong and they should have done more. You should outright reject this. You will not hear the judge say that these victims had to do a thing. And that is important. The law does not require a victim of a crime to put up resistance, to report it right away, to report it to anyone, ever, at all. There is no requirement that a victim subject herself to the scrutiny and the burden that comes to reporting something like this. What the law does require is that the defendants not conspire to commit forced labor.

And by the way, Ms. Cohen told you yesterday -- and this is another instance where she flat out misrepresented the record to you, but she told you yesterday

that nobody came forward to report a crime, nobody called the FBI. Well, first of all, that's irrelevant, as I've just explained, but second, it's just not true. You can look at page 1635 of the transcript. Dana testified she called the Federal Government; not the other way around. You know, these victims didn't have a playbook for this, for being abused and manipulated. So the concept of somehow blaming them for not doing enough to stop the defendants' actions is absurd, but it is in line with everything you've heard about how these defendants treated these women throughout the conspiracy. And the arguments that these defense attorneys are making really double down on what the defendants told the victims day in and day out: There is no such thing as a victim, because if there's no such thing as a victim, there's no such thing as a perpetrator. We can do anything we want and you take responsibility for it. You TurnON.

Members of the jury, of course these victims weren't speaking up. They were subjugated. They were afraid. They didn't want to be accused of being disloyal. But if you were at all persuaded by the idea that victims have to tell their perpetrators anything, you did hear that the defendants knew exactly what was going on. That was everything Ms. Gupta went through yesterday with you.

But just to hit a few instances, Chris Hubbard

testified during the Warehouse years he warned Daedone about forcing people to do stuff.

In 2012, Becky wrote to Cherwitz: I feel panicked, misled and manipulated. That's Government Exhibit 3501-3.

In 2013, Justine Dawson in an update to Nicole Daedone told her: Lianna is having a hard time. We talked about her not making decisions to disconnect from resentment. She heard it and went to a meeting. We'll see how it goes. That's Government Exhibit 1512.

In 2015, Cherwitz knew Michal felt victimized. The documents show it. Michal said she was feeling vulnerable, raw, deeply uncomfortable. That's Government Exhibit 4514-AR. And yet Cherwitz kept pushing her.

That same year, Daedone knew Brooke felt ashamed and was told she was, quote, off stroke. That's Government Exhibit 2033-DR.

And as to Michelle, she was shaky about being brought into the next stage of play with Reese. That's Government Exhibit 4501-KD. And when Michelle eventually said no, what did happen? She was demoted and eventually fired and then continued to work for OneTaste.

As to Dana, Cherwitz knew Dana was terrified and broke while still signing her up for expensive courses. Dana testified that she gave Rachel Cherwitz her last $20.

That's in the transcript at 1239 to 40.

And by the way, Anthia also testified about this. She testified about a document that she wrote in the spring of 2015, before she even left OneTaste, where she expressed many of the same concerns that she testified about before you. That's at transcript pages 4228 to 4229.

And the defense objected to that document coming in, but you have testimony about it. You can look at transcript page 4230 to 4233. She testified that in 2015, prior to even leaving OneTaste, she had documented her concerns on the following topics: That people were shamed at OneTaste, encouraged to isolate, had fear and paranoia, that Rachel berated people, about whether it was acceptable to speak up against people in power at OneTaste, about whether her body was in her control versus her bosses' control, about whether people were exhausted and pushed past their breaking points, about whether she learned not to trust herself.

Members of the jury, nobody saw themselves as victims until the FBI came knocking? That is nowhere in the record and, in fact, the record establishes the opposite. And these are just a few examples.

And then you saw Government Exhibit 4504-C. And these are the last slides I have.

You can pull that up.

These are text exchanges that you saw between Chris Kosley and Nicole Daedone. And Chris Kosley is reporting on what he heard Lianna tell him: So part of where she's so angry is what she calls --

MS. BONJEAN: That's hearsay objection to this, without purpose.

MS. BENSING: Your Honor, this is in evidence.

THE COURT: One moment.

(Pause in proceedings.)

THE COURT: Overruled.

You may continue.

MS. BENSING: He says: So part of where she's so angry -- and he's talking about Lianna -- is with what she calls, quote, a culture of manipulation, places where she saw RC -- who you know as Rachel Cherwitz -- or Hemsi -- who you know as Rachael Hemsi -- or whoever, essentially directing people on what to do. And she points to the people who left over the course of time. Maddie, Drea, Becky, Pixley, et cetera. That it exemplifies this pattern of which she feels a part of naturally.

That is certainly notice, members of the jury. And Nicole Daedone isn't surprised. She blames the victim. Look at what she says.

Lianna is just stuck unnecessarily. Suffering unnecessarily. And you can see how a shift in

consciousness, not circumstances, would alleviate so much pain. She should just shift the way she views it.

And they go back and forth on this. And then Nicole says -- and she's talking about these women: Either they wake up and help or they get traumatized.

You heard in this trial what waking up and being asleep meant. Being asleep meant not working for OneTaste, not being on your purpose.

Nicole Daedone knew exactly the harm she was wreaking on these victims. Either they wake up and get help or they get traumatized.

And then she goes on to say: We are like burglars who got recruited for the FBI.

Members of the jury, you heard no evidence that Nicole Daedone was recruited for the FBI, so what is she saying here? She knows she's harming them. Burglars break into homes. And it doesn't matter if what she's saying is that she somehow was doing this for a good purpose. You heard Ms. Bonjean talk a little about this and I want to be very clear. You can believe in something and still be guilty of a crime. Religious or spiritual motivation for committing a crime does not exonerate you. This is a basic concept. The ends do not justify the means. Because the law says as long as they agree to use serious harm or threats of serious harm or put these victims in a situation

where they would make them believe that they would really suffer if they stopped serving this organization through their labor, then they are guilty.

Just because you have beliefs does not mean that you have a right to prey on people's vulnerabilities and induce them to go into debt. It doesn't mean you can sit next to them and open new lines of credit so they can purchase expensive courses that you know full well they cannot afford, and then up sell them again and again, plunging them deeper into debt. It does not mean that you can insist that they engage in sexual acts with men that they find disgusting, claiming it is for their better good. It doesn't mean you can call them viruses and shame and humiliate them until they have repeated breakdowns.

It is irrelevant under the law if they really believed in the mission of orgasm. It is irrelevant under the law if they thought they were entitled or in service to some higher power to emotionally abuse, financially manipulate, and psychologically damage these women for their own purposes, to further Orgasm to make sales or to make money. They weren't.

And to be clear, there is nothing spiritual about having all of these women work away for you, catering to your needs, so that you can sell off your company for $12 million.

On a related note, the Government is not suggesting that you are not allowed to be around people who share your beliefs or to have sex with whoever you want or to enjoy having an orgasm. It is not your role to decide whether orgasmic mediation is good or bad and Ms. Bonjean and I agree, it is not your role to decide whether or not you think OneTaste was a cult. It is not your role to decide anything in this courtroom about our collective culture attitudes regarding sex or anything that Ms. Bonjean just went on about. None of that matters. All of that is a distraction.

Nobody is asking you to convict on ideas. Ms. Daedone is allowed to believe and teach whatever she wants. She is not on trial for her lectures. She's on trial because she, Rachel Cherwitz, Rob Kandell and others used aspects of her teaching to force OneTaste employees to provide labor in combination with many, many other tactics. In the same way that a Nazi, to use Ms. Bonjean's analogy, is free to express abhorrent ideas, but can't use those ideas to justify crimes.

You are here to decide whether the defendants in this case conspired to commit forced labor; whether the leaders of this company, Nicole Daedone and Rachel Cherwitz, coerced and compelled these women through serious harm to believe that they had no reasonable choice not to work.

THE COURT: Ms. Bensing, I don't want to interrupt you, but we are getting close to 5:30. We can stop for the day and pick up tomorrow morning? I don't want to rush you, and I also don't want to keep the jury late today.

MS. BENSING: I really want to finish today, Your Honor.

THE COURT: I think I'm going to make the decision for you, then. I think we're going to stop because it really is just about 5:30.

MS. BENSING: Okay.

THE COURT: And the jury has been so attentive today and I just think that there's no reason in rushing. We are going to be back tomorrow.

So we will resume tomorrow, same plan as always. If art at 9:30.

You have heard some of the summations, but we haven't finished that yet and you also haven't heard my instructions which you will hear after all the summations are done. So it is not yet the time to talk about the case, so do not talk about the case with anyone, including among yourselves. If anyone approaches you and tries to discuss the trial with you, please let me know immediately through Mr. D'Agostino. Don't read, listen to, or watch any news or other media reports of the trial. Don't conduct any independent research about the case, the matters in the

case, or the individuals involved in the case. Don't talk to the parties, the attorneys, the witnesses about anything. And, again, I really appreciate your attentiveness today as always. Keep an open mind. And have a good evening and I'll see you tomorrow at the usual time.

(Jury exits.)

THE COURT: Everyone may be seated.

We almost got there, but I really didn't want to keep this jury long today. They've sat and listened for a long time, even though we were a short day, it was a lot. And in any event, they have to be back tomorrow.

Approximately how much time do you have left?

MS. BENSING: Oh, maybe just ten to 15 minutes. I was really almost there.

THE COURT: A couple of things.

One is that I take it that no party is seeking that the jury be retained to determine the forfeitability of specific property if the jury returns guilty verdicts, and, of course, I don't have any prediction nor would I offer one, nobody has submitted any proposed special verdict form or any other documents, so is that correct?

MS. FARRELL: I don't know if that's correct, Your Honor. We have been trying to work out -- so there are two bank accounts that were seized. There is some money left, about a million dollars. And it's the -- it's Ms. Daedone's

decision whether to have the jury make that determination or the Court and, as I understand it, that decision has to be made before the jury retires to deliberate. I understand, we have been trying to work this out with Ms. Bonjean this week, but I think she's obviously been focused on her closing.

THE COURT: And nobody certainly had proposed any jury instruction, any special verdict form, anything along those lines, or raised any issue.

MS. FARRELL: That's correct, Your Honor. We have the materials prepared. We will file them tonight if we can't reach agreement.

THE COURT: And you thought that that was a good time to do it? Yes, the rule requires before, but no mention of this ever? I mean, it's --

MS. FARRELL: We apologize, Your Honor.

THE COURT: -- pretty extraordinary, frankly, in a case like this where the jury has been given a certain time estimate, where we have, for months, you know, you have been going back and forth on jury instructions. The deadline for a verdict form was months ago. Really wondering why anyone thought that this would be the way to do this.

MS. FARRELL: We apologize, Your Honor. Honestly, it was an oversight and we're trying to fix it now.

THE COURT: I mean, you are seeking specific

property or a money judgment?

MS. FARRELL: It's specific property. It's these two accounts that have been seized. We will submit the paperwork tonight and try to work it out with Ms. Bonjean, as well.

THE COURT: I don't know if anyone wants to be heard on that.

That's fine. Not necessary.

Let me just ask for the parties' input, which I may or may not follow, but on deliberations. There's a couple of options. They'll start deliberating tomorrow. The charge, I don't know, will take me maybe an hour, if that, to read, although I will try for the sake of the court reporter to read slowly, which means that they will be, you know, deliberating tomorrow.

I can tell them that we won't stay past 5:30. I can tell them a different time. I can tell them they can let us know. But it is Friday and I don't know that we necessarily want to leave it entirely up to the jury.

So I will listen to the parties if they have a view on this. Anybody?

MS. BENSING: We would just defer to the Court, Your Honor.

MS. BONJEAN: I think we would just -- I guess we would just like to see the normal getting out time.

THE COURT: You don't want to spend Friday night here in this courtroom, I take it?

MS. BONJEAN: We definitely don't, but --

THE COURT: Yes. I won't be an offended by that. I don't think anybody really wants to spend a Friday night in a courtroom.

Ms. Cohen?

MS. COHEN: Yes, we agree. Just regular time.

THE COURT: I think that's reasonable, so I think we'll let the jury know we will be on the regular schedule.

Thank you all. We'll see you tomorrow. It might be worthwhile coming 15 minutes before, 9:15. We're adjourned.

(Trial adjourned to Friday, June 6, 2025, 9:15 a.m.)

# I N D E X


| SUMMATIONS | PAGE |
| --- | --- |
| Defense by Ms. Bonjean | 5117 |
| Rebuttal by Ms. Bensing | 5212 |