UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
June 6, 2025
Defendants. : 9:00 a.m.
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Jamie Ann Stanton
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

(In open court; jury not present.)

THE COURTROOM DEPUTY: Honorable Diane Gujarati is presiding. Please be seated.

*United State of America v. Rachel Cherwitz and Nicole Daedone.*

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialists Liam McNett and Marlane Bosler.

Good morning, Your Honor.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge, Kelly Lenahan-Pfahlert, all on behalf of Rachel Cherwitz..

THE COURT: Good morning, everybody.

MS. BONJEAN: Jennifer Bonjean, Galila Assefa, Soph Moazed, on behalf of Ms. Daedone.

THE COURT: Good morning to all of you, as well.

A couple of things to address before the jury comes out, which won't take me very long.

I just want to confirm that the parties have reviewed the full set of admitted exhibits and that there's no disagreements about the universe of what was admitted,

because that's the set of exhibits that will be used if the jury asks for an exhibit.

Can the Government confirm that you have reviewed it and there's no disagreement?

MS. BENSING: Yes, Your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: Yes, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, Your Honor.

(Court Exhibit 12 received.)

THE COURT: Okay.

I also have a copy of -- actually not a copy, the jury instructions that will go to the jury, which is marked as Court Exhibit 12. And I have a copy of the verdict form that will go to the jury, and that will be marked when completed. So if any party wishes to inspect the copies of the jury instructions and verdict form that will go to the jury, let me know, and Mr. D'Agostino will show the documents to you. We're still printing copies, enough copies for everybody, for all of you for the jury instructions, but if anyone wants to inspect the originals, you are more than welcome to do that.

Let me return to an issue that I raised yesterday.

Is there any request that the Court retain the jury to determine the forfeitability of specific property if

the jury returns a guilty verdict?

Government?

MS. FARRELL: We understand that Ms. Daedone, who it's her property that's at issue, is consenting to the Court making that determination, and that can obviously be done at a later date. It doesn't have to be handled immediately after the jury deliberates.

THE COURT: It would only be in the case of conviction, of course.

MS. FARRELL: Correct.

THE COURT: Ms. Bonjean, do you agree that you are not asking that the jury be retained?

MS. BONJEAN: Yes, if that comes to pass.

THE COURT: Right, yes.

MS. BONJEAN: But yes, that would be our position at the time.

THE COURT: Okay. I mean, you have to give your position now.

MS. BONJEAN: Yes, that would be our position.

THE COURT: Okay.

MS. BONJEAN: But, again, I understand.

THE COURT: And just for record purposes, Ms. Cohen?

MS. COHEN: We agree, Your Honor.

THE COURT: All right.

So one other issue is, the parties have given me copies of their illustrative aids that they have used with the jury, and just for record purposes, the Government's are marked Government Exhibit 8001 and 8002. The defendants' are marked Defense Exhibit 30-A and Defense Exhibit 30-B. Of course those aren't evidence, but I think for record purposes, I wanted to make sure that we all are identifying the aids that were used.

So I am inclined to tell the jury that -- they'll get this case before lunch, because I don't think it will take that long to finish rebuttal and for me to read the instructions, but I am inclined to tell them that there will be a certain period of time where everybody will -- they will get their lunch in the jury room, but the parties, we'll be taking a lunch break. I think that makes sense so that you are not kind of mid sandwich or whatever it is if there's a note or something.

So I would propose to tell them that we won't be available from 1 to 2, but they should consider doing whatever they're doing, if they're still doing something by then.

Does everybody agree with that?

MS. BENSING: Yes, Your Honor. Thank you.

MS. COHEN: Yes, thank you.

MS. BONJEAN: Yes, Your Honor.

THE COURT: Okay. So we will do that.

Is there anything that I need to take up that I haven't mentioned before Ms. Bensing resumes rebuttal when we bring the jury out?

MS. BENSING: I don't think so, Your Honor.

THE COURT: Anybody?

MS. BONJEAN: No, Your Honor.

MS. COHEN: No.

THE COURT: It is my plan to, if Ms. Bensing's plan is consistent with what happens today, is just go immediately into jury instructions. And you will have the copies; somebody is going to bring them down by then.

Let me ask the court reporter, if you would like a break in between the summation and instruction.

THE COURT REPORTER: No.

THE COURT: Okay. So we will go straight ahead, then.

All right. We can bring the jury in.

(Recess taken.)

(Jury enters.)

THE COURT: Everyone may be seated.

Good morning to the jury. It's nice to see everybody.

And, Ms. Bensing, you may continue your rebuttal summation.

MS. BENSING: Thank you, very much.

Members of the jury, I will be brief this morning.

I want to start this morning by talking today about the defendants' intent.

So Ms. Bonjean argued to you yesterday that the Government somehow hasn't proven its case because it's hard to know what Ms. Daedone is really talking about. It's complex, it's layered, it's dense, she said. I submit that what you have heard of Nicole Daedone's statements at this trial have been very clear. And you did not just hear ideas, or even controversial ideas.

When she asked Christina Berkley, how good are you at sucking cock, that was clear.

When she wrote to Ken Blackman in 2011 in Government Exhibit 4501-FD, you want to make sure Reese gets stroked every day, that was clear.

When Ken Blackman described in Government Exhibit 4501-GD in 2011 the primary purpose of OneTaste as an entity, and Nicole Daedone said that it was also to create passive income, that was clear.

When she wrote to Joanna Van Vleck in 2015 during the marriage stroke in Government Exhibit 1846-DR that, we need 20 weddings and I'm good, and Joanna Van Vleck responded, we can do that, that was very clear.

When Nicole instructed Van Vleck in 2016 in

Government Exhibit 2075-DR to erase your texts in the context of how OneTaste can be seen as prostitution, that was very clear.

When Nicole had Rachel Cherwitz read for her in the Stinson Beach demo in 2008 and read out that, being hot taught me to control men and occasionally women who had lost control of themselves, and it taught me how to turn that control into a thriving, lucrative business, that was very clear.

And you don't need my arguments or Ms. Bonjean's arguments on this. If you want to draw your own conclusions from that video, I encourage you to ask for it. It's Government Exhibit 3802-A-1. I played the whole thing for you during Chris Kosley's testimony, and I submit that every single part of it supports the Government's case.

And when Nicole Daedone said to Michelle, after Michelle told Daedone how harmed and broken Maddie was when Daedone was asking Michelle to again sexually service Reese Jones, if I ever see that little cunt again, I'll smash her head in the sidewalk, that was very clear. Those are not ideas. Those are the words of a co-conspirator.

So I next want to discuss Rachel Cherwitz's intent, and I want to discuss Government Exhibit 2350-DR.

So this was a couple days ago at this point, but this is the text thread that Ms. Cohen showed you. It's the

one where Van Vleck tells Rachel Cherwitz that she is, quote, "marking risky people," and Cherwitz offers to highlight which people have risk potential. And then Rachel says, Brooke should be on that list. Brooke, who is Anthia Gillick. And Rachel says on the next page: Why now would Nicole be worried about these people?

So Ms. Cohen described this thread to you as Rachel wondering why Nicole would be worried about her teachings being used against her, and she tried to argue this to you as if Rachel didn't think that Nicole had done anything wrong, as if there was genuine confusion.

I do not want there to be any confusion. That is not what that text thread shows. Go back and look at it. They are discussing individuals who they know are risky to the company, and then discussing how they can get them back into their good graces; for example, by inviting them to a retreat. And what does Rachel Cherwitz say? Brooke should be on that list. She's talking about Anthia Gillick, the same person who I went through with you yesterday, wrote out all of her concerns about OneTaste in 2015.

And Rachel Cherwitz does not simply ask why would Nicole be worried. She asks, why would Nicole be worried now. And remember, that text is June of 2017. It's after Nicole sold the company. It's a couple years after Anthia Gillick left OneTaste. Rachel knows why Nicole is worried.

It's not that they've never done anything wrong. The question is, why is she worried now?

Rachel Cherwitz is involved in identifying former OneTaste workers as risky because she knows all about them. She knows Anthia Gillick was risky because Anthia witnessed all of Rachel Cherwitz's abuse. The way she treated Ayries like a dog; the way she instructed Anthia and others to have sex.

Members of the jury, you heard over and over and over again exactly how Rachel Cherwitz treated the other victims in this case, like she owned not only their time and their energy, but also their bodies. The defense tried to write Rachel Cherwitz's abuse off as someone being mean to an employee. Don't let them.

So finally, I want to address some of the broader arguments that the defense attorneys have made about the victims in this case.

Ms. Cohen characterized this case as being about regret. And I feel like a broken record, but she gave you no transcript cite for that and pointed to no exhibit supporting that; none. And, in fact, the testimony was the opposite. Ms. Bonjean actually went through that with you yesterday. This case is not about regret. That is completely irrelevant.

And the defense attorneys told you about how the

Government somehow tried to mold these witnesses to tell a story. I don't know where they're getting that from. These women did come in here and they did tell you that what happened to them was confusing and complicated. And it's true, it was complicated. Abusive relationships are complicated. These witnesses sharing all of this with you shows you that they were telling the truth.

And we welcome you scrutinizing their demeanors on direct and cross-examination. They sat there for question after question after question about what they posted or what they did on a particular day in 2011, in 2012, in 2013, in 2014. And these defense attorneys are now suggesting to you that because they somehow couldn't remember their whereabouts on May 11th of 2011, they are somehow not credible? These victims came in here, they took the stand using their full names in a public courtroom, and testified about some of the most deeply personal, deeply sensitive things in their lives.

Ms. Bonjean wants you to only believe what they said on cross-examination. But when they testified about their experiences with the defendants and how the defendants caused the serious harm they suffered and how that harm led them to work, that they're somehow not credible? Believe them on the vacation they took, but not on the defendants' coercion? That's what these defense attorneys are asking

you to do.

But why would these women come in here and lie to you? It makes no sense. But let's just assume for a minute that that's true. Why would they do that? If they were making this up, if they really had a wonderful time at OneTaste and nothing ever went wrong, why come in here and testify about losing themselves and their identities and being psychologically and financially messed up? Why? To get up and walk past all of you and take the witness stand and take an oath to tell the truth and testify in this courtroom, full of people, about the most vulnerable things in their lives?

Max, a medical resident, wanted to take the stand and get up here and tell you about their physically and verbally abusive upbringing and their mother dying of a heroin overdose, all so they could tell you about how their sense of self was drastically distorted by their time at OneTaste and the trauma that they suffered from it?

Lindsey wanted to take the stand and tell you about her eating disorder?

Michal wanted to take the stand and testify about never having had an orgasm?

Dana, who is now an ordained minister, wanted to take the stand to recount the sex work that she performed to pay for OneTaste courses --

MS. BONJEAN: Your Honor, I'm going to object. When these witnesses testified, they were under subpoena. I don't understand. This is objectionable.

THE COURT: Overruled.

MS. BENSING: Michelle wanted to take the stand to testify about struggling with herpes outbreaks and stress-induced hemorrhoids during her time at OneTaste?

Anthia wanted to take the stand to talk about a prior rape and get cross-examined about whether her father's funeral followed Jewish customs?

Members of the jury, it is hard to imagine more personal and more intimate testimony than what these witnesses gave you on the stand. And by the way, if we just accept for a minute that for some unknown reason all of these women made this up, or is engaging in revisionist history, or is lying to you about any of it, why not come up with an easier story? Why not help themselves out a little bit? Why give you such a nuanced picture? Why agree with all the defense questions about whether they were technically free to stay or free to go?

It is because what happened to them was real. The psychological damage they suffered was real. These women were candid with you. They were forthright about what they remembered and what they didn't remember and what they experienced and what they didn't experience. They took the

stand and they testified about all of these things, including the psychological harm and fear and trauma and financial harm and all of the rest of it that they experienced at OneTaste, at the hands of these two defendants.

And it was the defendants who chose these victims.

You know, they stood up in their closing arguments and mocked Michal Neria for her testimony that the defendants considered themselves to be witches. Members of the jury, the defendants made her believe that. They targeted somebody who would believe that. They are the ones who went after women with trauma and then used it. Women who would be susceptible to psychological abuse and their manipulation. Just because the defense was so flippant about what happened to these women does not mean that you have to be. The vulnerabilities of these young women does not show that they are unreliable; it shows that they were perfect marks.

Ms. Cohen said to you in her summation: Testimony in hindsight doesn't count. That statement is wrong. The judge is not going to instruct you on that. Testimony is always in hindsight. And testimony, sworn testimony in Federal Court absolutely counts. And I submit to you that it is significant that when the victims took the stand in this courtroom, they were no longer under the defendants'

coercive control; they were under oath.

So I said it at the beginning and I will say it again: Scrutinize the evidence when considering this case.

In their closing arguments, defense counsel have focused on the idea that the Government has to prove that the defendants' victims had no choice. I submit to you that is a mischaracterization both of the Government's burden and the Court's instructions. As you will hear when Judge Gujarati instructs you, this case is a conspiracy case. The focus is on what the defendants agreed and intended, not whether any particular victim had a choice.

And you will soon hear that the judge's instruction addresses the issue of reasonable choice and reasonable belief of somebody in the same circumstances as the victim. You heard from victim after victim after victim, who all told you that they experienced a variety of psychological, physical, sexual, reputational, and financial harm from the time that they were performing labor or services at OneTaste. Serious harm. Harm that compelled them to keep working. But all we had to prove is that the defendants conspired to do this. And the testimony of all these women over all these years, combined with the text messages and financial records and all of the other evidence in this case, proves, beyond any reasonable doubt, just that.

Find the defendants guilty because that's what the evidence and justice shows. Hold these defendants accountable.

Thank you.

THE COURT: Now that the evidence has been presented and the attorneys have concluded their closing arguments, it is my responsibility to instruct you on the law that governs this case.

Let me remind you that in accordance with your oath as jurors, it is your duty to follow the law as I state it. You have the important responsibility to judge the facts. And you alone -- not Counsel and not the Court -- are the judges of the facts.

It is my duty to instruct you on the law. You must accept my instructions and apply them to the facts as you determine them.

It would violate your sworn duty to base a verdict on any other view of the law than the one I will give to you. This means that you must follow my instructions regardless of any opinion that you may have as to what the law might or should be, and regardless of whether any attorney has stated a legal principle differently from how I might state it now.

You must also consider these instructions as a whole during your deliberations and may not single out any

instruction as alone stating the law. You will receive a copy of these instructions for use during your deliberations.

I express no view on whether either defendant is guilty or not guilty. You should not draw any inference or conclusion as to whether either defendant is guilty or not guilty from anything I may have said or done. You will decide this case solely on the evidence and the law.

To repeat, no statement, ruling, remark, or comment that I have made during the course of the trial is intended to indicate any opinion as to how you should decide this case or to influence you in any way in your determination of the facts. You also should not concern yourselves with the content of any discussion that I had with the parties at sidebar.

The prosecution is, as you know, brought in the name of the United States, but that does not entitle the Government to any greater or lesser consideration than the defendants. The Government and the defendants are equal before this Court and they are entitled to equal consideration.

The Government has the burden of proving guilt beyond a reasonable doubt. This burden never shifts to the defendants. The defendants do not have to prove their innocence.

I have said that the Government must prove the defendants guilty beyond a reasonable doubt. So the question, naturally, is, what is a reasonable doubt? It is a doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal affairs. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

A reasonable doubt, however, is not an impulse or a whim; it is not speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. And it is not sympathy.

In a criminal case, the burden is at all times on the Government to prove guilt beyond a reasonable doubt. The law does not require that the Government prove guilt beyond all possible doubt; proof beyond a reasonable doubt is sufficient to convict. Again, this burden never shifts to the defendants, which means that it is always the Government's burden to prove each of the elements of the crime charged beyond a reasonable doubt.

Each defendant has pled not guilty to the charge in the indictment. To convict either defendant, the burden

is on the Government to prove that defendant's guilt on each element of the charge beyond a reasonable doubt. The law presumes the defendants to be innocent and never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

In other words, each defendant starts with a clean slate and is presumed innocent of the charge until such time, if ever, that you as a jury decide unanimously that the Government has proven that defendant guilty of the charge beyond a reasonable doubt. The presumption of innocence, unless overcome, is sufficient alone to acquit a defendant.

Under our Constitution, a defendant has no obligation to testify or to present any evidence because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt. A defendant is never required to prove that she is innocent.

No inference of any kind may be drawn from the fact that the defendants did not testify. Indeed, it was each defendant's constitutional right not to take the witness stand. I instruct you that you must not allow this fact in any way to prejudice the defendants and you must not consider it as an indication, admission, evidence, or inference of guilt. Simply put, the fact that the defendants did not testify must never enter into your

deliberations or discussions.

There are two defendants on trial before you. Each has been charged with the same crime. You must return a separate verdict of guilty or not guilty for each defendant.

As I instructed you at the beginning of the case, you must give separate and individual consideration to each defendant. The fact that you find one defendant guilty or not guilty of the offense charged should not control your verdict as to the other defendant.

You have seen and heard evidence in several forms, such as: The sworn testimony of witnesses; documents, images, recordings, and other types of exhibits; and stipulations as to facts.

The following things are not evidence: Anything you may have seen or heard outside the courtroom is not evidence. The indictment is not evidence. The statements and arguments of the attorneys are not evidence. The questions and objections of the attorneys are not evidence.

If the objection was sustained, ignore the question and any answer that may have followed. If the objection was overruled, treat the answer like any other answer.

You should not attach any special weight to evidence that came in over objection.

Certain statements were admitted for a limited purpose only. When those statements were admitted, I instructed you that they were being admitted not for the truth of the statements, but for the purpose of providing context for other statements, and I instructed you that you may consider the statements that were being admitted for context only for that purpose. I remind you now that you must follow the limiting instructions that I gave you. You may not consider evidence admitted for a limited purpose for any purpose other than the purpose for which it was admitted.

As I mentioned to you when trial began, there are, generally speaking, two kinds of evidence. One is direct evidence, which is direct proof of a fact, such as testimony of an eyewitness. The other is circumstantial evidence, which is proof of facts from which you may infer or conclude that other facts exist. You may consider both kinds of evidence.

There is an example that we use to explain the difference between direct and circumstantial evidence. Assume that when you came into the courthouse this morning, the sun was shining and it was a beautiful spring day. Later, as you were sitting here, someone walks in with an umbrella that is dripping wet. A moment or two later, somebody else walks in with a wet umbrella. You have no

direct evidence that it is raining because you have no window in sight, but, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to infer that it had begun to rain. That is all there is to circumstantial evidence. Using reason and experience, you infer from established facts the existence or the nonexistence of some other fact.

The law makes no distinction between direct and circumstantial evidence, and you may give either or both whatever weight you conclude is warranted.

During trial, a transcript of a recording was admitted as an aid to assist you in listening to the recording. The recording is in evidence. However, the transcript is not in and of itself evidence. You decide what is contained on the recording based on what you heard. If you heard something different than what is reflected on the transcript, what you heard controls.

Certain charts and summaries have been admitted into evidence. You should consider those charts and summaries as you would any other evidence.

Among the exhibits admitted into evidence, there are some documents that are redacted. "Redacted" means that part of the document was taken out. You are to concern yourself only with the part of the document that has been admitted into evidence. You are not to speculate as to what

was redacted or why something was redacted.

In this case, there has been evidence in the form of the stipulations of fact. A stipulation of fact is an agreement among the parties that a certain fact is true. You should regard such agreed-upon facts as true.

You must consider whether any act in furtherance of the crime charged occurred within the Eastern District of New York, which includes the counties of Kings, Nassau, Queens, Richmond, and Suffolk, and concurrently with the Southern District of New York, the waters within the counties of Bronx and New York. The Eastern District of New York also includes the airspace above the district. Brooklyn is coextensive with Kings County.

Although the Government's burden as to everything else in this case is proof beyond a reasonable doubt, a standard that I have already explained to you, venue need be proven only by the lesser standard of "preponderance of the evidence." To prove something by a preponderance of the evidence means simply to prove that the fact is more likely true than not true. Thus, the Government has satisfied its venue obligation if you conclude that it is more likely than not that any act in furtherance of the crime charged occurred within the Eastern District of New York.

If you find that the Government has failed to prove that any act in furtherance of the crime charged

occurred within this district, then you must find the defendants not guilty of the crime charged.

The indictment charges that the offense occurred "in or about and between" certain dates. The evidence need not establish with certainty the exact dates of the alleged offense. It is sufficient if the evidence establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged. And the Government does not have to prove that the defendants committed the acts comprising the offense throughout the entire time period.

You will also see that the indictment uses the word "and" where my instructions will use the word "or." This is a result of how the Government formalizes its charges and it is not a statement of the law. Where my instructions use the word "or," that "or" is controlling over any other contradictory phrasing in the indictment.

Because the charge implicates the concepts of knowledge and intent, I will tell you now about these concepts.

The Government bears the burden of proving beyond a reasonable doubt that the defendants acted knowingly and intentionally. Therefore, before you can find either defendant guilty, you must be satisfied that the defendant was acting knowingly and intentionally with respect to the

acts comprising the charged offense.

A person acts "knowingly" when she acts intentionally and voluntarily, and not because of ignorance, mistake, negligence, accident, carelessness, or any other innocent reason. Whether a defendant acted knowingly may be proven by her conduct and by all of the facts and circumstances surrounding the case.

A person acts "intentionally" when she acts deliberately and purposefully. That is, a defendant's act must have been the product of a conscious, objective decision rather than the product of a mistake or accident.

A person need not be aware of the specific law that her conduct may be violating, but her acts must be taken intentionally.

The indictment contains one count, which charges the defendants with forced labor conspiracy.

The indictment reads in pertinent part as follows:

In or about and between 2006 and May 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants, Nicole Daedone and Rachel Cherwitz, together with others, did knowingly and intentionally conspire to :

(a), provide and obtain the labor and services of one or more persons by means of, and by a combination of means of: (i) force, threats of force, physical restraint,

and threats of physical restraint to a person; (ii) serious harm and threats of serious harm to a person; (iii) the abuse and threatened abuse of law and legal process; and (iv) one or more schemes, plans, and patterns intended to cause a person to believe that if he or she did not perform such labor and services, a person would suffer serious harm and physical restraint, contrary to Title 18, United States Code, Section 1589(a); and

(b) benefit, financially and by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any such means, knowing, and in reckless disregard of the fact, that said venture had engaged in the providing and obtaining of labor and services by any such means, contrary to Title 18, United States Code, Section 1589(b).

The indictment alleges a violation of Title 18, United States Code, Section 1594(b), which, as pertinent here, makes it a crime to conspire to violate Title 18, United States Code, Section 1589.

A conspiracy is a kind of criminal partnership -- an agreement by two or more persons to accomplish some unlawful purpose. A conspiracy to commit a crime is an offense distinct from the underlying crime that the conspirators agreed to commit.

The crime of forced labor conspiracy that is

charged in the indictment has two elements:

First, that two or more persons entered into an unlawful agreement to commit forced labor; and

Second, that the defendant knowingly and intentionally became a member of the conspiracy.

The first element that the Government must prove beyond a reasonable doubt to establish the crime of forced labor conspiracy is that two or more persons entered into an unlawful agreement to commit forced labor. One cannot commit the crime of conspiracy by oneself. Rather, the proof must convince you that at least two persons had joined together in a common criminal scheme.

In order for the Government to prove this element, however, you need not find that the alleged members of the conspiracy met together and entered into any express or formal agreement. Similarly, you need not find that the alleged conspirators stated, in words or writing, what the scheme was, its object or purpose, or every precise detail of the scheme or the means by which its object or purpose was to be accomplished. What the Government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish the unlawful act of forced labor by means of a joint plan or common design.

You may, of course, find that the existence of an

agreement to disobey or violate the law has been established by direct proof. But because conspiracy is, by its very nature, characterized by secrecy, you may also infer its existence from the circumstances of this case and the conduct of the parties involved.

The second element that the Government must prove beyond a reasonable doubt to establish the crime of forced labor conspiracy is that the defendant knowingly and intentionally became a member of the conspiracy. I have previously instructed you as to the terms "knowingly" and "intentionally."

An individual's knowledge is a matter of inference from the facts proven. I instruct you that to become a member of the conspiracy, an individual need not have known the identities of each and every other member of the conspiracy, nor need she have been apprised of all of their activities. Moreover, an individual need not have been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on her part. Furthermore, an individual need not have joined in all of the conspiracy's unlawful objectives.

In addition, a conspirator's liability is not measured by the extent or duration of her participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators

play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the individuals within the ambit of the conspiracy.

I want to caution you, however, that an individual's mere presence at the scene of an alleged crime does not, by itself, make her a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make an individual a member. A person may know, or be friendly with, a criminal without being a criminal herself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge, without participation, in the unlawful plan is not sufficient. Furthermore, the fact that a person, without any knowledge that a crime is being committed, merely happens to act in a way that furthers the purposes or objectives of the conspiracy does not make that person a member. More is required under the law. What is necessary is that the individual must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

The indictment charges each defendant with forced labor conspiracy, in violation of Title 18, United States Code, Section 1594(b). To convict either defendant of this charge, you must find beyond a reasonable doubt that the forced labor conspiracy existed on or after June 21, 2009. A defendant cannot be found guilty by you solely on evidence of acts that occurred prior to June 21, 2009. That is because Title 18, United States Code, Section 1594(b) became effective on June 21, 2009.

To determine whether the Government has proven beyond a reasonable doubt that either defendant engaged in the forced labor conspiracy charged in the indictment, you need to know about the crime of forced labor. The Government need not prove that either defendant actually committed forced labor, but in order for you to find either defendant guilty of the conspiracy charged in the indictment, the Government must prove that the defendant conspired with at least one other person to commit forced labor. I will therefore explain to you the crime of forced labor.

The statute for the crime of forced labor, Title 18, United States Code, Section 1589, provides in pertinent part:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any

combination of, the following means:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be guilty of a crime.

(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be guilty of a crime.

As reflected in the language that I just read to you, there are two alternative means by which a defendant can violate the forced labor statute: Namely, by violating Section 1589(a) of Title 18 of the United States Code or by

violating Section 1589(b) of Title 18 of the United States Code.

There are three elements of the crime of forced labor under Title 18, United States Code, Section 1589(a). As relevant here, those elements are:

First, that a defendant provided or obtained the labor or services of a person;

Second, that the defendant did so through one of, or any combination of, the following prohibited means:

(1) force, threats of force, physical restraint, or threats of physical restraint against the person or another person;

(2) serious harm or threats of serious harm to the person or another person; or

(3) a scheme, plan, or pattern intended to cause the person to believe that if the person did not perform such labor or services, the person or another person would suffer serious harm or physical restraint; and

Third, that the defendant acted knowingly.

The first element of the crime of forced labor under Title 18, United States Code, Section 1589(a) requires that a defendant must have provided or obtained the labor or services of a person.

To "obtain" means to gain or acquire. "Labor" means the expenditure of physical or mental effort.

"Services" means conduct or performance that assists or benefits someone.

For the crime of forced labor under Title 18, United States Code, Section 1589(a), the Government would not have to prove that a person performed work for a defendant in the economic sense, although that would satisfy this element. All the Government would have to prove is that a person performed labor or services as I just defined those terms.

For the second element of the crime of forced labor under Title 18, United States Code, Section 1589(a), the Government would have to prove that a defendant provided or obtained the labor or services of a person through one of, or any combination of, the prohibited means I referenced, namely: (1) force, threats of force, physical restraint, or threats of physical restraint against the person or another person; (2) serious harm or threats of serious harm to the person or another person; or (3) a scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, the person or another person would suffer serious harm or physical restraint.

The term "physical restraint" is to be given its ordinary meaning.

A "threat" is a serious statement expressing an

intention to inflict harm, at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. For a statement to be a threat, the statement must have been made under such circumstances that a reasonable person who heard or read the statement would understand it as a serious expression of an intent to cause harm. In addition, a defendant must have made the statement intending it to be a threat, or with the knowledge that the statement would be viewed as a threat.

The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances as the alleged victim to perform or to continue performing labor or services in order to avoid incurring that harm.

A "threat of serious harm" includes any threat that is sufficient under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances as the alleged victim to perform or to continue performing labor or services in order to avoid incurring that harm.

In determining whether a defendant made a threat of serious harm that could reasonably be believed by a person, one should consider a person's physical and mental

condition, age, education, training, experience, intelligence, and particular vulnerabilities. A threat of serious harm must be sufficient in kind or degree to cause a reasonable person of the same background and in the same circumstances as an alleged victim to believe that there was no reasonable choice except to perform or to continue performing labor or services for the defendant.

The words "scheme," "plan," and "pattern" are to be given their ordinary meanings.

For the second element of the crime of forced labor under Title 18, United States Code, Section 1589(a), if one finds that any of the prohibited means I referenced was used, one must then determine whether such use was sufficient to cause an alleged victim reasonably to believe that she had no choice but to perform or to continue performing labor or services for the defendant. In making this determination, one may consider the cumulative effect on the alleged victim of the defendant's conduct.

I instruct you that some warnings by an employer to an employee can be legitimate and warnings of legitimate but adverse consequences of an employee's actions, standing alone, are not sufficient to violate the forced labor statute.

The third element of the crime of forced labor under Title 18, United States Code, Section 1589(a) requires

that a defendant must have acted knowingly. I have previously instructed you as to the term "knowingly."

I have just explained to you the elements of the crime of forced labor under Title 18, United States Code, Section 1589(a). I will now turn to the elements of the crime of forced labor under Title 18, United States Code, Section 1589(b).

There are three elements to the crime of forced labor under Title 18, United States Code, Section 1589(b):

First, that a defendant knowingly benefitted financially or by receiving anything of value from participation in a venture;

Second, that the venture was engaged in providing or obtaining labor or services through any one of, or any combination of, the prohibited means that I previously identified; and

Third, that the defendant knew or recklessly disregarded the fact that the venture was engaged in providing or obtaining labor or services by any of these prohibited means.

Title 18, United States Code, Section 1589(b) does not require that a defendant engaged in providing or obtaining the labor or services of a person. It only requires that there was a venture that engaged in one of the prohibited means, that a defendant knew or recklessly

disregarded the fact that the venture was involved in forced labor, and that a defendant knowingly participated in some way and benefitted financially or by receiving a thing of value from participation in that venture. A "venture" is two or more persons associated in fact, whether or not their association forms a legal entity.

With respect to the first element of the crime of forced labor under Title 18, United States Code, Section 1589(b), it is sufficient to find that a defendant played any role in the venture, even if that role was minor, and even if that role was not related to actually obtaining a person's labor or services. A defendant needs to have knowingly benefitted, financially or by receiving something of value, from participation in the venture. A thing of value need not involve monetary exchange and need not have any financial component, though it can. I have previously instructed you as to the term "knowingly."

With respect to the second element of the crime of forced labor under Title 18, United States Code, Section 1589(b), I have previously instructed you on the prohibited means of providing or obtaining labor or services.

The third element of the crime of forced labor under Title 18, United States Code, Section 1589(b) requires that a defendant must have known or recklessly disregarded

the fact that the venture was providing or obtaining labor or services by any of the prohibited means. I have previously instructed you as to knowledge. "Reckless disregard" as pertinent here means deliberate indifference to facts that, if considered and weighed in a reasonable manner, indicate the highest probability that the venture was engaging in forced labor.

I have just explained to you the crime of forced labor. To prove the crime of forced labor, the Government would not need to prove that a defendant committed forced labor under both Section 1589(a) of Title 18 of the United States Code and Section 1589(b) of Title 18 of the United States Code. But the Government would need to prove beyond a reasonable doubt every element under Section 1589(a) or every element under Section 1589(b).

But, again, the defendants are not charged with committing the crime of forced labor. They are charged with committing the crime of forced labor conspiracy. I explained the crime of forced labor to you only because you need to know about the crime of forced labor in connection with your consideration of the forced labor conspiracy charge, which as I have said is the only charge in this case.

A conspiracy is often referred to as a partnership in crime. As in other types of partnerships, when people

enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy. Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy are deemed, under the law, to be the acts of all of the members and all of the members are responsible for such acts, declarations, statements, and omissions.

Thus, if you find beyond a reasonable doubt that either defendant was a member of the conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy at the time those acts were committed or statements were made may be considered against that defendant so long as the acts or statements were reasonably foreseeable to the defendant. This is so even if such acts were done and statements were made in the defendant's absence and without her knowledge.

However, before you may consider the statements or acts of a co-conspirator in deciding the issue of a defendant's guilt, you must first determine that the acts and statements were made during the existence of, and in furtherance of, the unlawful scheme. If the acts were done or the statements made by someone whom you do not find to

have been a member of the conspiracy, or if they were not done or said in furtherance of the conspiracy, they may not be considered by you as evidence against either defendant.

In deciding what the facts are in this case, you must consider all of the evidence that has been admitted. In doing this, you must decide which testimony to believe and which testimony not to believe. You are the sole judges of credibility of the witnesses and the weight their testimony deserves. In deciding whether and to what extent to believe a witness's testimony, you may take into account any number of factors, including the following:

The witness's opportunity to see, hear, and know about the events he or she described;

The witness's ability to recall and describe those things;

The witness's manner in testifying, whether the witness was candid and forthright or whether the witness seemed as if he or she was hiding something, being evasive, or suspect in some way;

How the witness's testimony on direct examination compared with how the witness testified on cross-examination;

Whether the witness had any possible bias, any relationship to a party, any motive to testify falsely, or any possible interest in the outcome of the trial; and

Whether the witness's testimony was contradicted by his or her other testimony, by what that witness said or did on a prior occasion, by the testimony of other witnesses, or by other evidence.

If you find that any witness has willfully testified falsely as to any material matter, you have the right to reject the testimony of that witness in its entirety. On the other hand, even if you find that a witness has testified falsely or inaccurately about one matter, you may reject as false or inaccurate that portion of his or her testimony and accept as true any other portion of his or her testimony.

You heard the testimony of law enforcement officials. The fact that a witness may be employed as a law enforcement official does not mean that his testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of any other witness. You should evaluate such testimony in the same manner as you would the testimony of any other witness.

Under the law, Congress has granted the Government the right to request that a witness be compelled to testify after asserting his constitutional right against self-incrimination. In this case, the Court, upon request of the attorneys for the Government, compelled Robert Kandell to testify and granted him immunity from

prosecution. Where a witness has testified under an immunity order, his testimony may not be used against him in a criminal case, except in a prosecution for perjury, giving a false statement, or otherwise failing to comply with the immunity order.

It is important for you to understand that it would be improper and in violation of your oath to question the wisdom or propriety of the policy of permitting the Court to immunize a witness, or the decision by the Government to obtain immunity for a witness. The matter of immunity is relevant, but only as to your consideration of the credibility of a witness who has been immunized. You should examine the witness's testimony with caution and weigh it with care taking into account the fact that the witness testified pursuant to an immunity order.

It is proper for an attorney to interview a witness in preparation for trial.

The attorneys in summing up have asked you to draw certain inferences from the evidence in the case. Any inference you draw must be reasonably based on the evidence and you may infer only such facts that your reason and common sense lead you to believe follow from the evidence. You are not to engage in speculation based on matters not in evidence.

Although the Government bears the burden of proof,

the law does not require the Government to produce as witnesses all persons who may have been present at any time or place involved in the case or who may appear to have some knowledge of the matters in issue in this trial. Nor does the law require the Government to produce as exhibits all papers and things mentioned during the course of the trial.

You have heard testimony about evidence obtained through certain investigative techniques. Whether you approve or disapprove of how this evidence was obtained should not enter into your deliberations. I instruct you that the Government's use of this evidence is lawful. You must therefore give this evidence full consideration along with all of the other evidence in the case in determining whether the Government has proven either defendant's guilt beyond a reasonable doubt.

There is no legal requirement that law enforcement agents investigate crimes in a particular way or that the Government prove its case through any particular means. While you are to carefully consider the law enforcement evidence introduced by the Government, you are not to speculate as to why the techniques used were used or why other techniques were not used.

Your concern is to determine whether or not, on the evidence or lack of evidence, either defendant's guilt has been proven beyond a reasonable doubt.

I remind you that each of you has undertaken a solemn obligation, a sworn obligation, to decide this case solely on the evidence. You must carefully and impartially consider the evidence, follow the law as I state it, and reach a just verdict, regardless of the consequences. You are to perform this task with complete fairness and impartiality, and without bias, prejudice, or sympathy for or against the Government or defendants.

The question of possible punishment of the defendants is of no concern to the jury and should not enter into or influence your deliberations. The duty of imposing a sentence rests exclusively with the Court. Your function is to weigh the evidence in the case and to determine whether or not each defendant is guilty beyond a reasonable doubt, solely upon the basis of the evidence. Under your oath as jurors, you cannot allow a consideration of the punishment that may be imposed upon either defendant, if convicted, to influence your verdict in any way or to enter into your deliberations at all.

You have heard evidence about the involvement of certain other people in the crime charged in the indictment. That these individuals are not on trial before you is not your concern. You should neither speculate as to the reason these people are not on trial before you nor allow their absence as parties to influence in any way your

deliberations in this case.

During deliberations, you are entitled to your own opinions, but you should exchange views with your fellow jurors and listen carefully to each other. That is the very nature of the deliberative process. Do not hesitate to change your opinion if you are convinced that another opinion is correct. But each of you must make your own decision.

Any verdict you reach must be unanimous; you must all agree.

In a few minutes, I will supply you with a copy of my instructions. If you refer to these instructions, keep in mind that you should consider them as a whole. Each part of these instructions is important in your deliberations. And, most importantly, do not let my giving you the instructions discourage you from asking for further instructions or clarification should the need arise.

If you wish during your deliberations to communicate with the Court, for any reason, send a note to me through the Marshal. No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing.

If, in the course of your deliberations, you have any questions as to what a witness said on any matter, you will have access to that testimony. The court reporter will

be available to read back to you any portions on which you have questions or you will be provided with a copy of the relevant portion of the transcript. Please try to be as specific as possible if you make requests for testimony; in other words, if you are interested only in a particular part of a witness's testimony, please indicate that in your note. Bear in mind that it may take some time to locate the testimony in the transcripts, so please be patient.

If you want to see any of the exhibits, please send me a note. Depending on what you ask for, you will either come to the courtroom to view it or it will be sent to you in the jury room.

During the trial, I permitted the taking of notes by those of you who wished to do so. As I instructed you at the beginning of the trial, your notes are not a substitute for the official court record and you are not to rely on your notes in place of the official record. The court reporters took down what the witnesses said and you will have access to that testimony if you need it during your deliberations. During your deliberations, your notes are to be used solely to assist you. You are not to share them with other jurors.

I have already spoken to you about not discussing the case with others or conducting independent research about this case. When you retire to deliberate, you may

begin discussing the case with your fellow jurors. However, you may only deliberate when all of you are together. And, you still cannot discuss the case with anyone other than your fellow jurors until the case is over and you are discharged as jurors; during your deliberations, you must not communicate with anyone else about this case by any means, including in person, by phone, by video, by e-mail, by text, through social media, or by any other means.

You should not consult dictionaries or other reference materials, search the internet, look to websites or blogs, or use any other tool -- electronic or otherwise -- to obtain information about this case or to help you in your decisions as jurors. It is very important that your decisions be made solely on the basis of the evidence presented in the courtroom in this case.

When you go to the jury room to begin your deliberations, you should first select someone to be the foreperson. The foreperson will be responsible for signing all communications to the Court and for handing them to the Marshal during your deliberations.

You will receive a verdict form to fill out. When you are ready to report your verdict, check the verdict form carefully to make sure that it accurately reflects the jury's verdict, and bring it to the courtroom when summoned by the Court. Please make sure that the verdict form is

dated and signed by the foreperson.

Bear in mind that you are not to reveal to any person -- not even to me -- how the jury stands numerically on the question of whether a defendant is guilty or not guilty, until after you have reached a unanimous verdict. At that time, you should send a note to me saying, "We have reached our verdict." Do not indicate in your note what your verdict is. When you send a note to me saying "We have reached our verdict," you will be brought to the courtroom and the verdict will be taken.

Members of the jury, your oath sums up your duty, and that is, that you will well and truly try this case and render a true verdict according to the evidence presented to you in court, and according to the law as I have just instructed you.

Members of the jury, you will soon begin your deliberations. But first I will meet briefly with the parties at sidebar. Please remain in the jury box, without speaking to each other, while I speak to the parties.

(Sidebar.)

(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: We're at sidebar. We have everybody present, including the two individual defendants.

Is there anything anyone wants to raise with respect to the jury charge that I just read?

MS. BONJEAN: No.

MS. COHEN: No.

MS. BENSING: No, Your Honor.

THE COURT: So no party has indicated they want to raise any issue with respect to the jury charge, so I will go back and take it from there.

MS. FARRELL: Do you mind if we just take a look at the physical copy real quick to confirm it's 31 pages?

THE COURT: Absolutely. That's a good idea. Let's do that now.

What I am showing to the parties is the original, it's got an original exhibit sticker on it, it's the jury instructions and it's 31 pages. You are welcome to flip through it. And also the verdict form, which is one page. Why don't you all take a look.

And it is stapled and binder clipped because they always come back very ratty.

MS. FARRELL: Perfect. Thank you, Judge. Those look fine to us.

THE COURT: Okay.

I am going to obviously address the alternates now. Typically, the alternates will have stuff in the jury room and I need them to get it out before we send the jury in to deliberate, so after I go over what you have already seen, we will probably just have the alternates go get their stuff. We have a room for the alternates that's separate from the room that the 12 jurors will be deliberating in. I am going to keep the alternates here today because if by any chance that we need somebody, we don't want to have to wait until they come back, some of them are far away, I think. We will have them here. They are not going to be with the deliberating jury unless somebody needed to be released. So that's the plan.

MS. FARRELL: That's good.

(Sidebar conference ends.)

(Continued on following page.)

(In open court.)

THE COURT: The noise muffler always sounds like a waterfall. I feel like it takes us somewhere else.

So at this time, Jurors 1 through 12 will begin deliberations. I'm going to ask that the alternate jurors remain here in the courthouse during deliberations. After Jurors 1 through 12 leave the courtroom to begin deliberations, I'll give the alternates more schedule and logistical information. During the time that the jury is deliberating, alternate jurors should not talk about this case with anyone, even among yourselves. There is always a possibility, until a verdict is reached, that one or more of you could be called upon to deliberate with the jury, so it's very important that you not talk about the case until a verdict is reached. If anyone attempts to talk to you about the case, please report that to me immediately.

So what I am going to ask is, I think, probably some of the alternates might have belongings in the jury room. I am going to just ask Mr. D'Agostino, if you could just take the alternates to just get their belongings and bring them back to the courtroom, both the people and the belongings. So just the folks that are not the first 12, yes.

(Alternate jurors exit.)

THE COURT: So the five alternates have left.

They are going to get their belongings, they are going to come back, at which time the Marshal will be sworn in and Jurors 1 through 12 will begin to deliberate.

I might as well tell you now about the schedule.

So that the Court and the parties and everybody can have a lunch break, we will not be available between 1:00 and 2:00 today. If you have any notes, we just will address them afterwards. You will get lunch, but I want to make sure that the parties and the Court and everybody else also gets lunch. And the deliberation phase, you know, you are on your own to deliberate in the jury room, but we will not go past 5:30 today, so if you are still deliberating, we would just come back on Monday, but it is Friday evening and so I want to just let you know that, you know, we will end at the usual time, if you are still deliberating.

(Alternate jurors enter.)

THE COURT: Mr. D'Agostino, would you please swear in the Marshal?

THE COURTROOM DEPUTY: Will the marshal please approach.

Please raise your right hand.

(Marshal sworn.)

MARSHAL: I do.

THE COURT: And, Mr. D'Agostino, I am going to give you the jury instructions, which have been marked Court

Exhibit 12, and the verdict form, to give to the jurors. And the jurors will begin their deliberations.

(The jury retired to commence deliberations at 11:00 a.m.)

THE COURT: Everyone may be seated.

Let me address the alternate jurors.

So again, as I said, you know, there's always a possibility that until a verdict is reached, one or more of you could be called upon to deliberate with the jury.

So what we have is we have a room that's separate from the jury room where the deliberating jurors are. We have a room for your use and we'd ask that you be there. You will also get lunch, as well, and we will end at 5:30 today, if the jury is still deliberating.

So again, don't talk about the case among yourselves. I'm sure maybe by now you've found other common interests or things to talk about, but, you know, we are going to have you separate in a separate room. Thank you all. So I will let you get to that room.

(Alternate jurors exit.)

THE COURT: Everyone may be seated.

Are the defense and Government teams going to be in the courthouse or what's your plan, generally? I obviously need you close enough that if we get a note, it doesn't take you too long to get here.

MS. BENSING: We may not stay in the courtroom, but we'll be close, Your Honor.

MS. COHEN: We will be close.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, we will be here.

THE COURT: And, again, 1:00 to 2:00 is off limits for anyone who wants to actually eat during this day.

We will recess. If we don't get any notes or anything from the jury, I would still plan to bring them in at 5:30 to discharge them for the evening, if that's where we end up.

MS. FARRELL: And should we all just give your clerk our cellphone number? Or if you get a note and we're not in the courtroom, what's the plan?

THE COURT: I think we would just e-mail you, but are you not going to be able to have access to your e-mail?

MS. FARRELL: That's fine.

MS. COHEN: That's fine for us.

THE COURT: I think everybody's on the their phones, I think.

We are in recess.

(Court in recess, awaiting verdict of the jury.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: We have a jury note. It is asking for

certain evidence. I am going to have Mr. D'Agostino hand it out. I've marked it Court Exhibit 13.

(Court Exhibit 13 received.)

THE COURT: I will give you a chance to look at it. I think it may be something where the parties need to talk to each other and let me know if you come to agreement on what is being asked for exactly. And I can read it out. There's three different requests:

Can we please see e-mail/text of number two witness Chris Hubbard -- it looks like it says 5/9, but there's also -- I don't know if it's 5-1-9-1 or 5 slash 9 with an extra slash. In any event, with Nicole -- W, slash, Nicole Daedone. Thank you.

Then text messages between Nicole Daedone and witness Blackman.

And then transcript with Becky Uma, witness number one, OM demo.

So I am going to let the parties talk to each other and you can let me know your proposal for what you think is responsive to these requests.

MS. FARRELL: Your Honor, with respect to transcripts.

THE COURT: Yes.

MS. FARRELL: Do you do readbacks, or do we send back transcripts?

THE COURT: I think it's going to depend on how voluminous this is and how quickly we can get the transcripts. I will hear from the parties. I don't have a preference. It can be done either way, but I think the most important thing is to have the parties give me their input on what they think is responsive and we can take it from there.

MS. FARRELL: Understood.

THE COURT: I am going to leave the bench, let you talk to each other. When you are ready, just let Mr. D'Agostino know and I'll come back down.

(Recess taken.)

THE COURT: Everyone may be seated.

I understand that in response to the note which is Court Exhibit 13, the parties have largely agreed upon what should go back or what should be read back to the jury, but there are some areas of dispute.

Let me just go through what I understand the state of things is.

So I understand that the parties agree with respect to the first request, that Government Exhibit 2430-R should go to the jury; is that correct?

Government?

MS. FARRELL: Yes, it is, Your Honor.

THE COURT: And Ms. Cohen?

MS. COHEN: Yes, yes, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes. This is the -- just to be clear for the record, this is the May 9th e-mail, I guess, at least it's an e-mail that was presented through Chris Hubbard on May 9th; is that right? I mean, I know which e-mail it is, but I just want to confirm that that's what we're talking about here.

MS. FARRELL: It's a very redacted e-mail discussing Madame Jeu and Monsieur Follet.

THE COURT: And thankfully transcripts don't take down pronunciations.

So 2430-R will go to the jury.

Then I understand that the parties agree with respect to the second request that 4501-FD -- F, as in Frank, D -- 4501-GD, and 4501-JD should go back to the jury.

And I believe there is some dispute over 4501-KD.

Do I have that as the correct state of affairs?

MS. FARRELL: Yes.

MS. COHEN: Yes.

THE COURT: And Ms. Cohen?

MS. COHEN: Yes, Your Honor.

THE COURT: So 4501-FD will go back. 4501 GD will go back. 4501 JD will go back. And 4501-KD, I will hear the parties out, but it went into evidence and I'm not sure

why it wouldn't go back, but I can hear the parties out.

MS. BONJEAN: This is our motion.

THE COURT: Yes.

MS. BONJEAN: So Your Honor, I guess the more appropriate motion to bring at this point is a motion for a mistrial, frankly. This was a text exchange -- and it is a motion for a mistrial, so I will be clear so the record is clear and the Court knows what I am asking for.

The jury is asking for a text message between Mr. Blackman and Ms. Daedone, it is -- it was, over our objection, introduced. We did lodge a hearsay objection on both trial record 3727 and then -- I'm sorry 3726 lines 2 through 4. And then after it came in, there was further questioning about it, including a question from the Government at page 3728, when Mr. Blackman was asked: Then you go on to discuss Michelle and you said a bit shaky today after, A, being brought into the next stage of play with Reese and, B, something about her relationship with Maddie. He was asked what she liked about that. I then objected to the extent it called for a hearsay response. Those were overruled. We continued to object on hearsay.

I don't know what the hearsay objection -- or the hearsay -- why the hearsay objection was overruled. I think perhaps at the time he was being considered a potential co-conspirator. That wasn't obviously proved up. So our

hearsay objection remains. We think -- I guess -- you know, I don't know what the exact solution is, but we believe it should never have been introduced for the truth. And our hearsay objections were overruled. So I think the fact that the jury wants to hear it suggests that they're going to consider it for an improper purpose and that would be the basis for the objection and for the motion for a mistrial.

To the extent there is a way to cure that err, we are certainly open to that.

THE COURT: Excuse me one minute. I am having technical issues with the computer.

(Pause in proceedings.)

THE COURT: I'll hear from the Government.

MS. FARRELL: We oppose the motion for a mistrial.

The portions of the transcript relevant to the admission of this exhibit are pages 3725 and 3726. This was not admitted subject to connection or proving up a co-conspirator. We didn't take the position Mr. Blackman was a co-conspirator. We sought its admission, it's Ms. Daedone's statements, it's a statement of a party opponent. Mr. Blackman's statements are in the text message for context and for notice.

We would also note that this particular exhibit was argued in Ms. Bensing's rebuttal as proving notice to Ms. Daedone and so --

THE COURT: Yes.

MS. FARRELL: This admission was proper and we oppose the motion.

THE COURT: Yes, the admission was proper and no limiting instruction was requested.

MS. BONJEAN: It was -- the hearsay objection was overruled.

THE COURT: Yes. It came in for non-hearsay purposes and no limiting instruction was requested.

MS. BONJEAN: The hearsay objection was overruled. Who would ask for a limiting instruction when you've admitted it for hearsay? That is just -- that is dishonest. That is dishonest, I'm sorry. That is dishonest because we objected on hearsay, the Court overruled it, and now they are saying it's for notice only?

THE COURT: It was very clear at the time.

MS. BONJEAN: No, it was not. No, that's dishonest. And that is not -- we objected on hearsay grounds. What would be the basis -- the whole purpose of a limiting instruction is when the Court acknowledges that it shouldn't be admitted for hearsay, which the Court did not do. The Court overruled the hearsay objection. That's -- in what -- on what world do the rules of evidence say when a Court overrules a hearsay objection, you are entitled to a limiting instruction? That's just not the case.

THE COURT: Does the Government want to be heard on this?

MS. FARRELL: We would just note that the foundation laid by Ms. Gupta before she moved for admission made clear that it was about Mr. Blackman providing updates to Ms. Daedone and so --

THE COURT: It did --

MS. FARRELL: -- the foundation was clear that it was for notice purposes.

THE COURT: Correct.

MS. BONJEAN: Okay, then there should be an instruction with the admission of the evidence.

THE COURT: One should have been requested if one was wanted.

MS. BONJEAN: I'm not getting blamed for this one. I am not.

THE COURT: Ms. Bonjean, please lower your voice. Lower your voice.

MS. BONJEAN: No --

THE COURT: Stop screaming at the Court.

MS. BONJEAN: That is just dishonest.

THE COURT: You can call the Court dishonest or whatever other name you want. It's inappropriate. It's unprofessional. But lower your voice while you're doing it.

MS. BONJEAN: What's unprofessional is all of us

pretending the fiction here when we should have asked for a limiting instruction when the Court overruled the hearsay objection. That is just illogical. If anyone knows the rules of evidence in this room, that would be illogical. If it's admitted for hearsay purposes, we wouldn't be entitled to a limiting instruction.

So I think this is not fair. I don't think it's right. I think it's misleading. And I think it's purposefully misleading this jury how about they can consider Ken Blackman's statements. And to blame the defense for that is just unconscionable.

THE COURT: Does the Government want to be heard about the requirement that a party ask for a limiting instruction if they want one?

MS. FARRELL: That is what happens normally.

MS. BONJEAN: For what? A limiting on what? They did not indicate at all that it was being -- where in the record does it say that it's being offered for a non-hearsay purpose? Please. Someone tell me.

THE COURT: Would you like to respond, Ms. Farrell?

MS. FARRELL: If the defense wanted a limiting instruction at the time, they should have asked for it.

MS. BONJEAN: Okay --

THE COURT: And the Court would have granted one.

MS. FARRELL: Yes. And we think --

MS. BONJEAN: Then why did it overrule the hearsay objection?

THE COURT: Ms. Bonjean, you are screaming.

MS. BONJEAN: I know. I am very upset, obviously. And I think the Court is being dishonest.

THE COURT: Okay, but you can make your argument without screaming.

MS. BONJEAN: No. It is not appropriate to shift the blame to the defense when we made the -- we did what we could do, which is object on hearsay grounds, and the Court overruled that. And you know what, we have dealt with so many bad rulings from this Court and we live with it. Now the Court has to live with its rulings.

THE COURT: Yes, in fact, the Court does live with its rulings.

MS. BONJEAN: Okay.

THE COURT: And this exhibit will go back to the jury.

MS. BONJEAN: That's fine. And there will be a very excellent record of prejudice should it come to that.

THE COURT: And the record will make clear that Ms. Bonjean is screaming.

MS. BONJEAN: My apologies for being passionate and upset that there's been an injustice.

THE COURT: Passionate and zealous is appropriate. Screaming at the Court is not appropriate.

MS. BONJEAN: Okay, well, I --

THE COURT: So you know what, the rules apply to everyone in this courtroom including you, Ms. Bonjean.

MS. BONJEAN: I -- it doesn't seem that way.

THE COURT: Okay. Well, let's turn to -- so 4501-KD will be going back to the jury, as well.

Let's turn to the transcript.

I understand that the parties agree that 302, line 8, through 307, line 8, should read back to the jury; is that correct?

MS. FARRELL: Yes, Your Honor.

THE COURT: Government.

MS. FARRELL: Sorry, can you read that one more time?

THE COURT: That is part of it. 302, line 8, and 307, line 8.

MS. FARRELL: Yes, that's correct.

THE COURT: And then 308, line 9 through 14 -- lines 9 through 14; is that correct?

MS. FARRELL: Mm-hm, yes.

THE COURT: And do the defendants agree that 302 line 8 through 307 line 8 and 309 lines 9 through 14 should be read back to the jury?

MR. ROBOTTI: I think the second citation, Your Honor, is 308, 9 to 16.
THE COURT: Oh, 'til 16?
MR. ROBOTTI: Sorry, 308, 9 to 14.
THE COURT: That's what I had.
MR. ROBOTTI: Sorry, I believe you said 309 lines 9 through 14.
THE COURT: Let me say it again. Let me do the whole universe again.
302 line 8 to 307 line 8 and 308 lines 9 through 14.
MR. ROBOTTI: Correct.
THE COURT: Government?
MS. FARRELL: Correct.
THE COURT: Ms. Bonjean?
MS. BONJEAN: Correct.
THE COURT: Now, I understand that -- is it defendant Cherwitz wants additional lines?
MS. COHEN: Yes, Your Honor.
THE COURT: And I do think, I have looked at the lines, they're appropriate although there is some colloquy that should come out with the Court.
MS. COHEN: Yes, Your Honor.
THE COURT: But let me just tell you what I think where we ended up on that.

So I think you wanted 572 line 12 to 574 line 13; is that right?

MS. COHEN: Correct, Your Honor. And I think there was some colloquy, I don't have that either.

THE COURT: So I think the lines that are colloquy are lines --

MS. COHEN: 572 19 through --

THE COURT: 24, correct?

MS. COHEN: -- 24, correct -- 25 -- oh, no, 24, yes.

THE COURT: So what would come in is essentially 572 lines 12 through 18 and then 572 line 25 to 574 line 13; is that right?

MS. COHEN: I think -- let me look.

THE COURT: Sure.

MS. COHEN: Yes, that's correct.

THE COURT: Let me just say that again.

572 lines 12 through 18.

MS. COHEN: Yes.

THE COURT: And 572 line 25 to 574 line 13.

MS. COHEN: Correct.

THE COURT: Government agree? I know you disagree with the second.

MS. FARRELL: We disagree. Our request would be if you are going to put that in, that you put in 572,

starting at line 1, which is sort of what is leading up to this line of questioning from Ms. Cohen, which is: At the time you claim Ms. Cherwitz told you to make out with Ruwan, you and Ruwan had been arguing.

And then what we would request is that Ms. Halpern's direct examination testimony about this instance of Ms. Cherwitz telling Ruwan and Becky to go make out be admitted. And I have those transcript cites.

MS. COHEN: I'm sorry, I'm sorry, I don't mean to interrupt you. You know what, I think it makes it clear. It was 574 to line 15, not 14. Line 14 is really what ties that e-mail to:

That was after the OM demonstration, correct?

Answer: Correct.

Line 15. Sorry, I didn't mean to interrupt, Ms. Farrell, I just want to make that clear.

THE COURT: Go ahead.

MS. FARRELL: Our argument is that this line of questioning doesn't have anything to do with the OM demonstration. It's just setting this totally other thing happening in the timing of her direct exam. So we don't think it should come in. We don't think it's responsive to the jury 's request.

However, if it's going to come in, we think that it needs to be fully contextualized, which is starting out

at line 572 line 1, which is explaining the setup for why she's asking about this e-mail in the first place. And then we would want Ms. Uma's testimony about Ms. Cherwitz telling her to have a make-out with Ruwan to also be provided in order to complete the testimony on this, like, new issue that's being introduced.

THE COURT: I think that makes sense. It does sort of pick up in a strange spot if we just start at 12 as I'm looking at this again.

MS. COHEN: Your Honor, that's fine if we want to include all that.

Let me just -- momentarily to explain my --

THE COURT: Yes.

MS. COHEN: -- where we picked it up, line 12, in fact, this is starting to talk about the e-mail. You told people to have sex, correct? And then it ends with: And that was after the OM demonstration.

So showing this witness's state of mind at the time and goes directly to her credibility regarding her saying, I was so upset by the OM demonstration, this happened subsequently. I did talk about the make-out with Ruwan and then talk about this, but the relevant question is regarding the OM demonstration. I mean, if the Government wants all of that in, yeah, I don't see that the Ruwan direct testimony is relevant to the OM demonstration.

Again, the point here is that they're talking about how she felt at the OM demonstration and the questions were that she wanted to get out of there and she was so distraught by the OM demonstration, so I'm talking about -- I ask her about this e-mail and she tells two people to go have sex and I say specifically: And that is after the OM demonstration. Correct, she says.

So again, the purpose of this is about her state of mind after the OM demonstration which was established on direct examination by the Government about how she was feeling at the time of the OM demonstration and afterwards.

MS. FARRELL: That's not what the jury is asking for. They're asking for the testimony on the OM demo. But if the Court --

THE COURT: Well, but I do think that Ms. Cohen's point is well taken, that page 574 does reference the OM demo.

MS. FARRELL: So then our request would be in order to -- so now we're introducing this line of cross that references this make-out she had with Ruwan and then later she is telling people to have sex, then we would request that her testimony about this make -out with Ruwan, which is page 289 lines 15 --

THE COURT: Wait, sorry. 289?

MS. FARRELL: Yes.

THE COURT: You are talking about the direct?

MS. FARRELL: Yes, now we are on the direct.

Page 289 line 15 through page 291 line 8.

MS. COHEN: Your Honor, I don't see really how this is -- the questions leading up to that: And you testified yesterday, in fact, that when people were upset not working things out, that was a way to release, was a way to go make out with someone, for example.

She says, answer: Yes.

Then I started a new thing: And, in fact, you told two people to have sex, correct?

I'm not sure.

Then I go through the whole thing, then I say: And that was after the OM demonstration.

Correct.

So again, I'm getting at the time and how she was feeling at the time, her state of mind. And specifically, again, going to her credibility about the OM demonstration and how she was feeling.

So I mean, it's specifically related to that OM demonstration. The Ruwan thing is a completely separate and at a separate time. So just because that happened right before I asked a question about this e-mail, the purpose of introducing this e-mail was it was in December 2013, after the OM demonstration.

MS. FARRELL: Right, but it's in connection with the fact that she had previously been told by Rachel Cherwitz to have sex with Ruwan and then you're making the point, well, you went and did the same thing later. And so, I mean, that is 572 line 1. And our request would be that her direct testimony about that episode come in because otherwise this is incomplete.

MS. COHEN: I mean, again, I think that these are two different things. In addition, Ms. Halpern testified she did not have sex with Ruwan. So, you know, again, the purpose of asking about this e-mail was in connection with the timeframe which was December 2013. They were asking about Ruwan and that instruction specifically asking about the OM demonstration. And my question was: This incident, this e-mail was sent after the OM demonstration, which was specifically about her state of mind after the OM demonstration.

So I don't understand -- to me, it's confusing to add in the Ruwan piece of that in that context. It's a separate question there.

THE COURT: Okay. I am going to take a few moments and consider this issue further.

For the record, the mistrial motion is denied.

And I will be back in a few moments.

MS. COHEN: Thank you.

(Recess taken.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: We are back on the record.

I am going to revisit, notwithstanding the absolute lack of professionalism by Ms. Daedone's lawyer, I am going to revisit 4501-KD.

It was upon the defendants to ask for a limiting instruction. They did not do so. I denied the mistrial motion request.

Are you requesting a limiting instruction now?

MS. BONJEAN: Yes.

THE COURT: Okay.

Government, do you want to be heard on that?

MS. FARRELL: I think the time to do so was when it was admitted in evidence.

THE COURT: It was.

MS. FARRELL: And our view is that the foundation laid by Ms. Gupta at the time makes very clear, like, what it's being admitted for.

THE COURT: It did.

MS. FARRELL: And I think -- here's the issue, Judge. I think at this stage, where the trial is already closed, the evidence is closed, the Court giving a limiting instruction on a document after the trial has closed is going to draw, I think, inappropriate attention on whether

or not they can count on this exhibit in a way that --

THE COURT: Well, no. The Government offered it for a particular purpose. There were a couple of purposes for which it was properly offered and admitted. And I agree with the Government, that the defense should have asked for a limiting instruction, if they had wanted one. And, in fact, you know, the caselaw's very clear that courts have to be careful about not offering limiting instructions when not asked for because there are strategic reasons sometimes that defense attorneys don't want to do that. So I am understanding that it wasn't strategic here. But I am inclined to give an instruction because I don't think the Government argued it for any purpose that was improper.

So I am going to ask the parties to -- understanding that the Government doesn't think that there should be a limiting instruction, I am going to ask the parties to come up with what they think is the proper language there.

We can -- yes?

MS. FARRELL: Okay. Am I right -- I guess we'll have to go back to the transcript, but Your Honor provided an instruction, I think, on notice --

THE COURT: No. I think --

MS. FARRELL: Not on this document. I just mean --

THE COURT: Yes. I did a general instruction, yes.

MS. FARRELL: Preexisting language.

THE COURT: Which is why it is somewhat frankly shocking that there was no request or ask at the time for a limiting instruction, but be that as it may, we are where we are at this point.

And I think what you are referring to, Ms. Farrell, is the May 15th instruction?

MS. FARRELL: No. I think it was more recent.

THE COURT: Well, there was a June 3rd and there was a May -- the June 3rd was about context.

MS. FARRELL: Oh, okay.

THE COURT: The May 15th was the more general one, but it was not tied to any specific evidence because the defense never asked for that up until -- asked for a limiting instruction up until that point.

MS. FARRELL: I'm trying to pull it up, if you can give me a moment.

THE COURT: Sure. And it was May 15th.

In any event, I think what might make most sense is to have the jury out and do the testimony, but let me get back to the testimonial issue, then.

Having looked at all of the pages and lines that the Government is seeking to have the Court put in,

additional to what the parties had agreed on, and what Ms. Cohen is suggesting, although I understand why the Government is asking for it and it's certainly not unreasonable, I do think that what the jury is asking for is more limited. And so I am going to stick with the lines that I said I was going to be having read back to them.

It starts with a little bit of lack of context, but I think read as a whole, I think the jury will understand.

MS. FARRELL: We would just renew or request that the section Ms. Cohen has requested not be read because we do not think it's at all responsive to what the jury has requested, which is testimony about the OM demo.

THE COURT: I disagree with you. It is. It mentions the OM demonstration on page 574.

MS. FARRELL: Okay.

THE COURT: So why don't we -- do you want me to give a few minutes to propose a limiting instruction or do you want to do the read back first? Given that it's 4:30. We can even give them the rest of the documents or we can just give them the 2430-R?

MS. FARRELL: I am sorry, I am just looking at this limiting instruction.

THE COURT: That's okay.

MS. FARRELL: I apologize. What are you -- I'm

sorry?

THE COURT: I'm just asking if you want me to give you a few minutes to come up with a limiting instruction that -- understanding the Government doesn't want one given, but that would be appropriate to that document, or do you want me to bring the jury out and we will do the readback now, we will send them back with, you know, either maybe just the first 2430-R, which is on a different topic than the exhibit that we're talking about?

MS. FARRELL: My suggestion would be if you could give us five minutes?

THE COURT: I can.

MS. FARRELL: And then we can do everything all at once.

THE COURT: And I have been addressing Ms. Daedone and the Government, but I want to make sure that Ms. Cherwitz's Counsel is fully looped in on this as well.

Do you want to be heard on this issue of -- are you asking for a limiting instruction?

MS. COHEN: Yes, Your Honor, we are.

And Your Honor, we are okay, you know, if you are sending -- sorry, yes for that answer.

In terms of the readback or testimony sent, we're okay if you just want to send the clips, the pages, or read back. I don't know if that helps in terms of timing.

THE COURT: It probably is quicker just to have them come out, but I will hear from the Government.

How quickly could you put together the --

MS. FARRELL: I'm doing it right now.

THE COURT: And you are redacting out the portions and the lines that are not going to be included, right? I think I am asking about something else other than what you are answering.

MS. FARRELL: We will do the readback, I think.

THE COURT: I think that's quicker.

MS. FARRELL: Yeah.

Sorry, I'm working on the instruction.

THE COURT: Yes. Let me give you five minutes. Okay. I will be back.

And actually, when you have something, if you could just give it to Mr. D'Agostino?

MS. FARRELL: Can I just e-mail it to her?

THE COURT: Yes. But make sure you are dealing with the defense attorneys on this, as well.

(Recess taken.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Okay.

(Court Exhibit 14 received.)

THE COURT: We have a second note from the jury today and it says -- and I've marked it Court Exhibit 14:

Can we please send us text thread pertaining to Rob Kandell and Yia Vang, discussion of hiring staff legally. This was presented to jury May 27th. Kandell testimony.

Let me deal with that separately from the first note. And I have the proposal that Ms. Bonjean proposed. It came through the Government, so I assume that you just forwarded it along and you added bolded language that you wanted.

MS. FARRELL: That's correct, Your Honor.

THE COURT: So I am not going to give the bolded language. I am going to give the instruction, I know the Government objects to it. I am going to tweak it slightly, Ms. Bonjean, just to really parallel exactly how I said it before or close enough. So let me read it to everybody.

As I previously instructed, certain statements were admitted for a limited purpose only. Government Exhibit 4501-KD, which I will be giving you a copy of along with other exhibits responsive to your first note, contains statements of Ken Blackman that were admitted not for the truth of the statements, but for the purpose of notice to Ms. Daedone. I remind you now that you must follow the limiting instructions that I have given you. You may not consider evidence admitted for a limited purpose for any purpose other than the purpose for which it was admitted.

Is that acceptable to the defense?

MS. BONJEAN: It is. Thank you.

THE COURT: Ms. Cohen?

MS. COHEN: Yes, Your Honor. Thank you.

THE COURT: Okay. And that's --

MS. FARRELL: We object --

THE COURT: Yes.

MS. FARRELL: But --

THE COURT: And I overruled that objection.

Again, I had explained that it was proper that it came in. There was no limiting instruction requested, but there has been one requested now and I am going to give it now. And the parties agree on the language that I read, understanding that the Government wanted additional language if I was going to give any language at all, correct?

MS. FARRELL: Correct.

MS. COHEN: Correct, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, Your Honor.

THE COURT: This is what I propose given that we are close to five o'clock. What I propose is we bring out the jury. We do the readback of the testimony they wanted. And then I give them the exhibits that we've all just discussed relating to the first note, not the second note, with this instruction when we hand them the exhibits.

Does that work for everybody?

MS. FARRELL: That's fine. We do think the answer to the second note is very simple.

THE COURT: Oh, okay. I will hear from everybody.

MS. FARRELL: The Government believes it's 1332-R is the document they're requesting.

THE COURT: Does the defense agree?

MS. COHEN: We agree, Your Honor, but we also feel that the note specifically references the Kandell testimony, so our request is the portions of the Kandell testimony, both on direct and cross, related to this specific text thread. Also --

THE COURT: I think they were just asking and identifying that it was on May 27th in the Kandell testimony that it came up. I think they're asking for the text thread. That's how I read this.

MS. FARRELL: Same.

MS. COHEN: Okay. Well, I guess --

THE COURT: We can give them the text thread and if they want more, they'll ask for more.

MS. COHEN: Yes, I would see if they are referring to the testimony.

THE COURT: You agree it's 1332-R.

MS. COHEN: We do, Your Honor. I would just say we would prefer if they ask are you also just requesting the testimony or just the text thread just to make it clear.

THE COURT: I think if I do that, we are suggesting things that they might want. This jury seems to be very proactive in asking for what they want, so we'll give them this and if they want more, they'll tell us.

Let me just take a look at this exhibit.

MS. COHEN: Okay.

THE COURT: Okay. So it's four pages and it's got some redactions. In fact, the last page is completely redacted, but I think we still just give it to them because it's the exhibit.

Is that what everybody has, four pages?

MS. FARRELL: Yes, Your Honor.

MS. COHEN: Yes, Your Honor. I don't know if it was clear. I think you said is that correct for everyone?

THE COURT: I don't think I heard from Ms. Bonjean.

Ms. Bonjean, is that the correct document?

MS. BONJEAN: I believe so. I'm just looking at it.

THE COURT: Yes, go ahead.

MS. BONJEAN: This involves a text exchange of more than just Mr. Kandell and Ms. Daedone, right?

(Pause in proceedings.)

MS. BONJEAN: So Your Honor, here's where I think I have an issue with, is that unless I'm missing something,

the jury is asking -- they're referencing something that came in through testimony rather than the text because I'm not finding the language in the text. So I guess I'm confused about what they're asking for.

The text doesn't actually reflect discussion of hiring staff legally. That was --

MS. BENSING: Yes, it does, Your Honor.

MS. BONJEAN: What's that?

MS. BENSING: It does.

MS. BONJEAN: Maybe -- could you tell me what line you are at, then?

MS. BENSING: Yes. 9:29:52. We also cut and do things illegally. 9:29:52. Our growth is based on very risky practices.

Then there's discussion from Yia Vang. I think we've gotten scares and fearful of the 3D legal stuff and it's outweighing what the purpose of what we actually do it is. People are starting to use money as a way to threaten the flow of Orgasm.

THE COURT: Can you confirm that it was put before the jury on May 27th?

MS. BONJEAN: It also was not with Yia Vang that portion.

MS. BENSING: Yes. And I'm sorry. It's 9:20:57, Yia says: I agree we need to tighten up and this can feel

bloated and we just hired all these people legally.

I think it's very clear.

MS. BONJEAN: That's 9:29, what?

MS. BENSING: 9:20:57.

THE COURT: The problem is this document is very tiny print. Maybe you can just point out to Ms. Bonjean exactly where it is.

MS. BENSING: At 9:20:57.

MS. BONJEAN: I see now what this references.

Again, I think we would just renew or objection that there should be corresponding testimony with it, but I do think this is probably the text message they're referencing.

THE COURT: I don't read this to be asking for the testimony. I just think they were trying to point us, because I told them in my instructions to be very specific, I think they were trying to tell us where to find what they wanted.

So I will send back -- is it 1332-R?

MS. BENSING: Yes, Your Honor.

THE COURT: And if they want something else, of course, I assume they will come back to us and ask for that.

Again, that's Court Exhibit 14, if I had not said that, that's the second note.

Let me go over exactly what we are giving to the

jury.

Government Exhibits 2430-R, 4501-FD, 4501-GD, 4501 JD, 4501-KD and I will be telling them the limiting instruction, 1332-R.

And then we will be reading back to them page 302 line 8 to 307 line 8; page 308 lines 9 through 14; page 572 lines 12 through 18; and, 572 line 25 to 574 line 15.

Does everyone agree that that's what we are sending or reading to them?

MS. COHEN: Yes, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, Your Honor. Thank you.

THE COURT: Ms. Farrell or Bensing?

MS. BENSING: Yes, Your Honor.

THE COURT: Okay. I think the only thing we need to do is just to give a moment to give the reporters the hard copies because they were reading off the hard copies, I think that's easier than reading off of the real-time or the feed.

MS. COHEN: Is that from us, Your Honor?

THE COURT: No, no.

MS. COHEN: Oh, you have it.

THE COURT: We're doing it.

MS. COHEN: Okay.

THE COURT: Thank you, though. I appreciate it.

And what I will do is I'll just tell them that they've asked for exhibits and testimony. We're going to have the testimony read back. We'll give them the exhibits. And I will read the limiting instruction.

Everybody still wants the jury to be able to leave at 5:30; is that correct?

MS. BONJEAN: Yes.

MS. COHEN: Yes, Your Honor.

THE COURT: Government?

MS. BENSING: Again, we defer to the Court.

THE COURT: Okay.

MS. BENSING: We are willing to stay or go.

THE COURT: I think I already told the jury that we would sit the regular time, so I think that makes sense to do, unless for some reason they send us a note saying they want to stay, I suppose we could entertain that, but I'm guessing it's Friday and they may not want to stay beyond 5:30.

(Pause in proceedings.)

And just for the court reporters, I will state what page and line number and then you will read it and then I will do the next one.

Does that work for the court reporters?

THE COURT REPORTER: Yes, Your Honor.

(Pause in proceedings.)

THE COURT: It's not a verdict. Sorry, I realized that I should make that clear upfront.

(Court Exhibit 15 received.)

THE COURT: I am going to read, we will give you copies later, but I'm marking it Court Exhibit 15.

Hi. Do you have any idea of when we would be receiving a response to our submitted questions? We understand this takes time, but we were hoping to have something back today. Thank you. With two exclamation points.

So Court Exhibit 15, I think we bring the jury back out and do what we planned to do. Okay, they're going to keep us on a schedule.

MS. BENSING: Your Honor, if it's faster, we've actually just gone ahead and prepared redacted copies of the transcript if that's faster to just send it back to them.

THE COURT: What do the defendants want to do on that? I don't have a preference.

MS. COHEN: That's fine with us, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: That's fine.

THE COURT: I think that's easy enough.

So I will just read out to them what we're giving them, then. And if I misspeak on any of the line numbers, stop me.

(Pause in proceedings.)

(Jury enters.)

THE COURT: Everyone may be seated.

Members of the jury, we have your three notes and I know that the third one was simply asking when we would be responding to the first two. I appreciate your patience. It does take us a while to compile everything.

But here is what I am going to do. I am going to give to you what you have asked for to take back to the jury room. And starting with your second note, I am going to be giving to you Government Exhibit 1332-R. And your first note, I am going to be giving you Government Exhibit 2430-R. And I am going to be giving you the following additional exhibits: Government Exhibit 4501-FD, Government Exhibit 4501-GD, Government Exhibit 4501-JD, and Government Exhibit 4501-KD.

As I previously instructed, certain statements were admitted for a limited purpose only. Government Exhibit 4501-KD, which I will be giving you a copy of along with the other exhibits responsive to your first note, contains statements of Ken Blackman that were admitted not for the truth of the statements, but for the purpose of notice to Ms. Daedone. I remind you now that you must follow the limiting instructions that I have given you. You may not consider evidence admitted for a limited purpose for

any purpose other than the purpose for which it was admitted.

And, again, that's Government Exhibit 4501-KD.

I am also going to be giving you the following pages of testimony and lines of testimony. And this is responsive to your first note, as well.

Page 302 line 8 through page 307 line 8.

Page 309 lines 9 through 14.

I'm sorry --

MS. FARRELL: 308.

THE COURT: I apologize. Let me say that again.

Page 308 lines 9 through 14.

Page 572 lines 12 through 18.

Page 572 line 25 to page 574 line 15.

And I am going to just ask the parties if I read those numbers out correctly?

MS. FARRELL: You have, Your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: You have, Your Honor.

THE COURT: And Ms. Bonjean, did I read the numbers out correctly?

MS. BONJEAN: Yes, Your Honor.

MS. COHEN: Yes. I think they picked it up that I said it, but --

THE COURT: Let me just see the parties at sidebar

for one moment.

(Sidebar.)

(Continued on the following page.)

(Sidebar conference held on the record out of the hearing of the jury.)

THE COURT: We have everybody here, including the two individual defendants.

I just want to confirm, Ms. Bonjean, that the limiting instruction that I read is the one that you are comfortable with, correct?

MS. BONJEAN: Yes, I am. Thank you, Your Honor.

THE COURT: And Ms. Cohen?

MS. COHEN: Yes, Your Honor. Thank you.

THE COURT: And I know the Government had put in an objection to it, but in terms of the language, I obviously didn't give the language you wanted and I gave an instruction you didn't want, but other than that, did I read it the way that you expected me to read it?

MS. FARRELL: We agree that you read it as expected.

THE COURT: There we go.

So we'll give everything to the jury. And do you want me to remind them that they should come back at 5:30 or do you want me to just -- let's see what happens? I'm flexible on this.

MS. BONJEAN: I think if they're expecting 5:30, maybe if we wanted to ask if they wanted to stay longer.

THE COURT: I guess what I can do is I can tell

them that, you know, they can let me know if they would like to stay a little bit longer. If not we'll expect -- we'll come get them at 5:30. Let's do that.

(Sidebar conference ends.)

(Continued on following page.)

(In open court.)

THE COURT: We are just going to check and make sure we have everything lined up for you, we will give it to you.

In the meantime, I think I said yesterday that we would end at 5:30, so I'm happy to do that. If the jury decides when you are back there that you want a little bit more time, you could just write a note and let us know that. If not, someone will come get you at 5:30.

Oh, one other thing I neglected to mention is that the foreperson should be signing the notes. So going forward, any notes should just be signed by the foreperson.

And I am just giving my very hardworking clerk a moment to make sure that we have everything lined up properly for you.

Do the parties want to look at what's going to the jury?

Why don't one of you --

Josh, show them.

(Pause in proceedings.)

THE COURT: Mr. D'Agostino, if you could just hand those to the Marshal to give to the jury or just hand them directly to the jury, whatever the Marshal's preference is. Thank you.

And the jury can resume deliberations. Thank you.

(The jury retired to continue deliberations at 5:15 p.m.)

(Jury exits.)

THE COURT: I think it probably makes sense to stay very closeby. We will let you know, either if we get a note or we don't get a note, we'll just be back here, why don't you be back here at 5:30. Thank you.

(Recess taken.)

THE COURT: There are no more notes, so we are just going to bring -- you can sit until the jury comes -- we are just going to bring the jury out and I will let them go for tonight.

I think I am just going to bring the 12 out. The alternates are in a different room. And Mr. D'Agostino will just tell the alternates to come to that separate room, I guess they could come at 9:30, I think. The alternates, they're not going to be here at 9:15.

Is that acceptable to everybody?

MS. COHEN: Yes, Your Honor.

MS. BENSING: Yes, Your Honor.

MS. BONJEAN: Yes, yes, Your Honor.

(Jury enters.)

THE COURT: Everyone may be seated.

So we will end for today. It's Friday night, so we will resume on Monday morning. And what I would like to

do is just to have you come at your usual time, but I am going to bring you out at 9:30. We will make sure everyone is here together, and then you will continue, you will resume your deliberations.

Even though the case has gotten to the deliberation stage, over this recess you are still not to discuss the case with anyone, including your fellow jurors, until you are back all together to deliberate on Monday.

You can only deliberate, as I told you before, when you are all together. So don't discuss the case with anyone. If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino.

Don't read, listen to, or watch any news or other media reports of the trial. Don't conduct any independent research about the case, the matters in the case or the individuals involved in the case. Don't talk to the parties, the attorneys or witnesses in the case about anything. And keep an open mind. I appreciate everybody's attentiveness, as always.

Have a wonderful weekend. And jury room at 9:15. We will just come out here to all be together just for a minute at 9:30 on Monday morning.

Have a good evening, everyone, weekend.

(Jury exits.)

THE COURT: Okay. Everyone may be seated.

There's nothing additional that I need to take up with the parties. If there's anything additional the parties want to take up, we could do that. If not, I will see everybody on Monday morning.

MS. BENSING: Nothing from the Government. Thank you.

MS. COHEN: Nothing, Your Honor.

Just a question for our own --

THE COURT: Yes.

MS. COHEN: If a note comes back when there is a verdict, when you tell us there's a note, do you usually say there's a verdict or do you just say there's a note?

THE COURT: No, of course I'll tell you there's a verdict. I'm sorry, when did you think you would learn about that?

MS. COHEN: Before we get here, sometimes it's just we received a note and then do not know it's a verdict until you get here.

THE COURT: I will be the one to tell you, not Mr. D'Agostino. So sometimes, I think today, because we were getting to the end of the day, I wanted you to see the note quickly so that if you wanted to talk about exhibits.

MS. COHEN: Okay.

THE COURT: I will take the bench and I will tell

you that we have a note and I will read it to you and tell you what it says.

MS. COHEN: Right, but when you are getting us, we don't know what it is. Sorry, just wanted to know.

MS. BONJEAN: Celia's nervous.

MS. FARRELL: She means when we get an e-mail saying there is a note, if it's a verdict, will the e-mail say it's a verdict?

THE COURT: Oh, yes. Sorry, I was misunderstanding.

MS. COHEN: Sorry, Your Honor. It's just to note that there is a note and then you are like is it going to be a verdict.

THE COURT: No, no. Got it. Thank you for clarifying.

I think I was asking something and I heard from everybody except Ms. Bonjean.

MS. COHEN: If there was anything further.

MS. BONJEAN: Nothing further.

THE COURT: One question about timing of verdict, if there is a verdict.

I just want to remind the Government of what I reminded you, I think, in the beginning of the trial of the Government's obligation to comply with any applicable victim notification requirements.

And I will see everyone -- have a wonderful weekend -- I know that everybody has worked very hard, so I will see everyone on Monday.

(Trial adjourned to Monday, June 9, 2025, 9:35 a.m.)

# I N D E X


| SUMMATION | PAGE |
|---|---|
| Rebuttal by Ms. Bensing | 5264 |
| CHARGE OF THE COURT | 5273 |


## E X H I B I T S


| | |
|---|---|
| Court Exhibit 12 | 5260 |
| Court Exhibit 13 | 5312 |
| Court Exhibit 14 | 5334 |
| Court Exhibit 15 | 5343 |