KCB/KTF/NCG/SMF
F. # 2018R01401

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                  Docket No. <u>23-CR-146 (DG)</u>

RACHEL CHERWITZ and
NICOLE DAEDONE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO <u>DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL</u>

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Kayla C. Bensing
Kaitlin T. Farrell
Nina C. Gupta
Sean M. Fern
Assistant U.S. Attorney
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 1

I.   OneTaste Beginnings ............................................................................................. 1

II.  OneTaste's Shift to Sales and Expansion ............................................................. 3

III. The Defendants' Abusive Tactics of Coercion ..................................................... 4

IV. Benefits to the Defendants ..................................................................................... 7

ARGUMENT ...................................................................................................................... 7

I.   Legal Standard ....................................................................................................... 7

II.  The Majority of Defendants' Arguments are Inappropriately Brought Under Rule 29 ........... 8

III. The Defendants' First Amendment Arguments Fail .............................................. 9

    A.  Spiritual and Religious Beliefs are Admissible as Evidence of Criminal Conduct ...... 9

    B.  Defendants' Vagueness Challenge is Without Merit .................................... 12

    C.  The Defendants' Conduct Falls Within the Scope of 18 U.S.C. § 1594 .................... 14

    D.  Evidence of Shunning and Defendants' Leadership Was Properly Admissible ......... 15

    E.  The Canon of Constitutional Avoidance is Inapplicable ............................ 17

IV. The Defendants Have Identified No Other Error .................................................. 18

V.  The Government Adduced Ample Evidence to Support the Defendants' Convictions .......... 19

VI. The Government Established the Requisite Mens Rea .......................................... 22

VII. The Defendants' Remaining Arguments Fail ....................................................... 24

CONCLUSION .................................................................................................................. 26

<u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

<u>Equal Opp'y Employ. Comm'n v. United Health Programs</u>,
   213 F.Supp.3d 377 (E.D.N.Y. 2016) ................................................................... 11

<u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490 (1949) ......................................... 9

<u>Headley v. Church of Scientology Int'l</u>, 687 F.3d 1173 (9th Cir. 2012) ................................ 15, 16

<u>Muchira v. Al-Rawaf</u>, 850 F.3d 605 (4th Cir. 2017) ........................................................ 15

<u>Paul v. Watchtower Bible & Tract Soc.</u>, 819 F.2d 875 (9th Cir. 1987) ........................................ 16

<u>United States v. Allen</u>, 760 F.2d 447 (2d Cir. 1985) ........................................................ 11

<u>United States v. Amer</u>, 110 F.3d 873 (2d Cir. 1997) ........................................................ 11

<u>United States v. Apel</u>, 571 U.S. 359 (2014) ................................................................... 17

<u>United States v. Awadallah</u>, 349 F.3d 42 (2d Cir. 2003) ................................................... 17

<u>United States v. Beasley</u>, 72 F.3d 1518 (11th Cir. 1996) ................................................. 10

<u>United States v. Dann</u>, 652 F.3d 1160 (9th Cir. 2011) ...................................... 13, 16, 24

<u>United States v. Dawkins</u>, 999 F.3d 767 (2d Cir. 2021) ..................................................... 8

<u>United States v. Gjurashaj</u>, 706 F.2d 395 (2d Cir. 1983) ................................................... 8

<u>United States v. Goklu</u>, No. 19-CR-386 (PKC), 2023 WL 184254 (E.D.N.Y. Jan. 13, 2023) ...... 8

<u>United States v. Hawkins</u>, 547 F.3d 66 (2d Cir. 2008) ...................................................... 8

<u>United States v. Kaziu</u>, 559 F. App'x 32 (2d Cir. 2014) ................................................... 9

<u>United States v. Kelly</u>, 128 F.4th 387 (2d Cir. 2025) ...................................................... 15

<u>United States v. Kozeny</u>, 667 F.3d 122 (2d Cir. 2011) ..................................................... 8

<u>United States v. Kozminski</u>, 487 U.S. 931 (1988) .................................................... 13, 14

<u>United States v. Levy</u>, No. 11-CR-62 (PAC), 2013 WL 3832718 (S.D.N.Y. July 15, 2013) ........ 8

<u>United States v. Majeed</u>,
   No. 21-20060-JAR, 2025 U.S. Dist. LEXIS 83060 (D. Kan. Apr. 30, 2025) ......................... 20

<u>United States v. Murra</u>, No. 16-CR-78, 2016 WL 10953909 (N.D. Tex. July 18, 2016) ............. 10

<u>United States v. Nadirashvili</u>, 655 F.3d 114 (2d Cir. 2011) ............................................. 13

<u>United States v. Payne</u>, 591 F.3d 46 (2d Cir. 2010) ......................................................... 7

<u>United States v. Rahman</u>, 189 F.3d 88 (2d Cir. 1999) ............................................... 10, 17

<u>United States v. Rowlee</u>, 899 F.2d 1275 (2d Cir. 1990) .............................................. 9, 11

United States v. Sabhnani, 599 F.3d 215 (2d Cir. 2010) ............................................... 7

United States v. Seeger, 380 U.S. 163 (1965) ............................................................. 11

United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) .................................................. 10

United States v. Sun Myung Moon, 718 F.2d 1210 (2d Cir. 1983) ............................... 10

United States v. Toviave, 761 F.3d 623 (6th Cir. 2014) ............................................... 15

United States v. Velentzas, No. 91-CR-384 (DRH),
    1993 U.S. Dist. LEXIS 5193 (E.D.N.Y. Apr. 16, 1993) ....................................... 8

United States v. Watson, No. 23-CR-82 (EK), 2025 WL 510814 (E.D.N.Y. Feb. 16, 2025) ........ 8

**Statutes**

18 U.S.C. § 1589(c) ...................................................................................................... 14

22 U.S.C. § 7101(b)(13) ................................................................................................ 13

**Other Authorities**

H.R. Rep. No. 106-939, at 100 (2000) (Conf. Rep.) ..................................................... 13

OneTaste: The Truth About Whether It's a Cult, Mar. 2024,
    https://erosplatform.com/blogs/onetaste-the-truth-about-whether-it-s-a-cult (last visited July
    21, 2025) ............................................................................................................... 11

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in opposition to the defendants' motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. See ECF No. 417 (the "motion" or "Mot.").

Following a five-week trial, a jury found the defendants Rachel Cherwitz and Nicole Daedone guilty of forced labor conspiracy, in violation of Title 18, United States Code, Section 1594 for their roles running OneTaste, Inc. ("OneTaste"), a purported sexual wellness company. ECF No. 408. For nearly twelve years, from approximately 2006 through 2018, Daedone, Cherwitz and other OneTaste leaders obtained the unpaid or substantially underpaid sexual services, menial labor and other work from a string of young women whom they subjected to surveillance, indoctrination, intimidation, and economic, sexual, emotional, and psychological abuse. The defendants now move to set aside their convictions, arguing that (1) 18 U.S.C. §§ 1589 and 1594 should be construed narrowly such that their criminal actions should not be considered as contributing to "serious harm" but rather spiritual teachings afforded protection under the First and Fifth Amendments; (2) when so construed, the evidence the government presented was insufficient; and (3) the government failed to meet the requisite scienter element. These arguments wholly ignore the trial evidence and the relevant legal standard, and instead attempt to paint a false picture of religious persecution. The Court should reject this naked attempt to launder the trial record. For the reasons set forth below, the defendants' motion is meritless and should be denied.

FACTUAL BACKGROUND

I.    OneTaste Beginnings

The evidence at trial established that Nicole Daedone co-founded OneTaste in San Francisco in 2004 with Robert Kandell. Tr. 3245-52. Daedone tweaked a sexual practice,

"deliberate orgasm," from another commune and rebranded it "orgasmic meditation" or "OM." Tr. 3249-50. OneTaste offered hands-on classes in orgasmic meditation: massaging a woman's clitoris for fifteen minutes for purported meditative or spiritual benefits. Tr. 106-07; 111-12; 3249-50; GX 3120. Rachel Cherwitz joined OneTaste in January 2007 and quickly became the Head of Sales. Tr. 3276, 3352. OneTaste was a privately held, for-profit company. Tr. 3347, 3413, 3449; GX 4056. It was not, and is not, a religion. No witness testified that OneTaste was a religion and text messages admitted at trial from late in the conspiracy between Daedone and OneTaste's CEO, Joanna Van Vleck, discussed identifying OneTaste through a religious lens as a legal defense strategy. See GX 2075-D-R.

OneTaste first struggled to make money. Tr. 3322. Beginning in 2006, Daedone sought to finance OneTaste through the capital investment of a wealthy entrepreneur, Reese Jones. Tr. 844-45, 3304-06. Daedone lured Jones to become her lover and a OneTaste financier through ruses and elaborate sexual scenes. Tr. 844-56, 3309-12; GX 2430-R. Jones began financing OneTaste (and Daedone personally), and for several years, the company was dependent on him for its survival. Tr. 3303-04, 3310, 3321-35. To keep Jones happy and ensure his continued investment in OneTaste, Daedone instructed a series of OneTaste employees— primarily young, vulnerable women who had joined OneTaste looking for community and healing from past trauma—to serve as Jones's unpaid "handlers," including providing him with daily sexual services. Tr. 1085-86, 1228, 1247, 1270, 1294-99, 1596, 2318-19, 2402-07, 2412, 3272, 3313. Throughout the entirety of the time that Jones made payments to OneTaste and Daedone personally, he was sexually serviced by women at OneTaste. Tr. 3314-15.

Multiple witnesses testified about the "brainwashing," financial coercion, employment retaliation, threats, and emotional and sexual abuse perpetrated by Daedone,

2

Cherwitz and other OneTaste leaders that led them to serving as Jones's handlers.  See, e.g., Tr. 1015, 1056, 1077, 1229, 1270, 1287, 1300, 1301, 1308, 2350, 2404, 2410, 2422, 2320, 2784, 2319, 3313-15.  Both Daedone and Cherwitz were made aware that several of Jones's handlers did not want to sexually service him.  See GX 4501-K-D, 2148-D, 1258-D-R, Tr. 2422-2425.

II.    OneTaste's Shift to Sales and Expansion

By 2011, Jones began demanding repayment of certain loans that he had made to OneTaste.  Tr. 3335-39.  To make money and fuel OneTaste's growth, Daedone directed Cherwitz to engage a full-fledged sales team dedicated to selling increasingly expensive courses. Id.  Men willing to pay for certain courses, typically taught by Daedone, Cherwitz, or other OneTaste leaders, could expect to have their penises stroked or their prostates massaged, or otherwise engage in OM, often by female OneTaste employees.  Tr. 1342, 1721, 1856, 3783, 3956-59.  Daedone set aggressive sales goals, and Cherwitz implemented them.  Tr. 3414-15. By the spring of 2012, OneTaste became profitable, in large part due to its expensive coaching program.  Tr. 3347.  Using the money from these courses and their predecessor courses, OneTaste leaders, including Daedone, Cherwitz, and Kandell, continued paying Jones back for his loans to OneTaste, and Daedone also continued directing women to provide sexual services to Jones.  By June 2013, OneTaste had finished repaying Jones.  See GX 1263.  In August 2014, Daedone texted Dawson, "when I paid him [Jones] off that ended all 'favors.'"  GX 1604-D-R.

But even after the sexual favors to Reese Jones ended, sexual services for prospective clients, VIPs, and other community members at OneTaste continued.  Over the next several years, Daedone and Cherwitz instructed female workers to engage in various unpaid sex acts with clients or prospective customers.  Tr. 114-15, 1280-81, 1282-83, 1687-88, 1691-92, 1721-22, 2347-48, 2419, 2709, 2133, 2164, 3957, 3958-59.  They also instructed employees to have sex with one another and to use dating sites to identify men for sexual acts and involvement

in OneTaste.  Tr. 3959-64.  Daedone and Cherwitz insisted that employees engage in these sex acts—even if they found them disgusting; those who resisted were punished with negative employment consequences, shunning, sexual abuse, and threats of physical violence, among other things.  Tr. 257, 260-61, 297-306, 1268, 1679-80, 1722, 1734-35, 2347, 2419-41, 2444-48, 2458, 3002.  Simultaneously, OneTaste rapidly expanded, opening locations in cities throughout the country and the world.  Tr. 3412.

III.    The Defendants' Abusive Tactics Of Coercion

Nearly every trial witness described how Daedone, Cherwitz, and their co-conspirators engaged in a campaign of indoctrination, grooming, isolation, manipulation, use of past trauma, monitoring, public shaming, relationship disruption, sexual abuse, physical exhaustion, and financial harm to force the labor of certain employees.  The totality of these coercive tactics caused the victims to perform labor and services under serious harm.

A.  Psychological Harm

Every victim who testified described the severe psychological harm they experienced while at OneTaste, including the specific harm the defendants caused them, Tr. 1014-16, 1608, 1639-40, 1742-43, 1748-49, 2963, 3806; DX 3EA, and how that harm in turn caused them to provide labor or services to OneTaste.  Tr. 118-122, 1287, 1919-20, 2102-03, 2320-23; GX 4513-A-R, 4514-A-R.  It is not possible to recount within the page limits of this brief all of the testimony given over a five-week trial of the serious harm caused by the defendants, and the means with which the defendants conspired to break down the victims psychologically, physically and financially—and thus the government incorporates by reference the totality of the trial transcript, including the governments' summation arguments—but every one of the victims described a version of the defendants' "slow whittling down of who I was and how I saw the world and my own personal boundaries," Tr. 1639-40 (Max Pixley testimony),

and causing an "immense amount of anxiety and depression and various forms of . . . . physical and emotional and psychological stress." Tr. 2320 (Michelle Wright testimony). Certain of the tactics that contributed to this psychological harm—which the victims testified caused them to work or continue working for OneTaste—included the following:

- Public shaming and verbally abusing their victims to coerce them to perform labor and services for OneTaste. Tr. 298, 1121-22, 1695, 2409, 2963; GX 2000-D-R.

- Indoctrinating the victims to believe that Daedone was a guru and spiritual leader, and that they should do as Daedone and her leadership team said. See, e.g., Tr. 213, 1243-44; 122, 1945, 2684, 3938.

- Isolating their victims so that they believed that OneTaste was all they had. See, e.g., Tr. 254-56, 1051-52, 1066, 1259, 2154, 2448-49, 2770.

- Shunning people who left OneTaste, which made those at OneTaste believe they too would lose everything if they left. See, e.g., Tr. 372, 1080, 1125, 2422, 2998-99.

- Keeping tabs on their victims and controlling nearly every aspect of their lives, including requiring employees to surveil and report on one another to Cherwitz and Daedone, see, e.g., Tr. 1698, 1839, 3930; GX 2676; directing their victims to prepare "fear inventories" or "withholds" of their deepest fears and read them to the executive team, including directly to Cherwitz, Tr. 1229; and directing victims to attend addiction meetings, such as Alcoholics Anonymous and Narcotics Anonymous, even if they were addicted to neither, see Tr. 2774-75.

- Using workers' past trauma against them. See, e.g., Tr. 149-50; 3949-50.

- Disrupting intimate relationships between OneTaste participants to further their own goals. Tr. 1040, 1120, 1312, 2449 3277; GX 3212-R.

- Using the information they obtained, combined with their positions of power and leadership over the victims, to employ tactics of manipulation as a means of directing labor, Tr. 3381, including techniques such as "[t]hreats," "fear of losing position," and retaliatory employment decisions, Tr. 3382-3385; see also id. at 3383-84 (Kandell testimony as to Cherwitz specifically that "she would basically do whatever it took to make our sales goals," including "us[ing] any tool she had, any knowledge of the person to push them in the direction of increasing sales and attention and dedication to the organization," which included "love bomb[ing]," making promises, "bring[ing] up their faults" and "embarrass[ing] them in front of a group"); id. at 3289, 3384-85 (Kandell testimony describing Daedone using a "carrot and a stick effect" to cause fear of being kicked out of the inner circle and employing other tactics to force people to work harder and longer hours, beyond their own self limits, and to manipulate people to provide sexual services).

B. Financial Harm

Many of the victims in this case also suffered extreme financial harm. Victims testified that they were driven into debt because of OneTaste's expensive courses and the defendants' sales tactics, which the victims took because the defendants made their victims believe that they needed to take more OneTaste courses to reach enlightenment and sexual wellness. See, e.g., Tr. 1056, 1270, 2123, 2319, 2344, 2694-96, 2784, 2977. And meanwhile, the defendants paid the victims little to nothing while the victims worked around the clock for the defendants. See, e.g, Tr. 2102; GX 856, 1283-D-R, 1331-A-R, 1332-A-R, 2200. Witnesses testified that they were constantly in debt to OneTaste in light of such financial tactics, which made it difficult for them to leave and kept them working for OneTaste. See, e.g., Tr. 2102, 2123, 2319, 2784; GX 3501-3, 3501-5.

C. Sexual Abuse

In addition to grooming the victims to participate in all sorts of sexual acts, the defendants also subjected them to sexual abuse, contributing to both physical and psychological harm. See, e.g., Tr. 290-91, 304-5, 1227, 1280-83, 1596, 1688-89, 2319, 2350, 2356, 2407-09. The defendants directed women to sexually service Jones, VIP clients, prospective clients, and community members. See id. As Michelle Wright testified, sexually servicing Jones contributed to "wearing [her] down emotionally," felt "degrading," and "removed [her] from reality," leaving her "numb" and unable to feel the effects until much later, which included depression, anxiety, and trauma. Tr. 2412-13. Cherwitz also forcibly massaged Rebecca Halpern's genitals without her consent during an OM demonstration after Halpern explicitly said she did not want to participate. Tr. 304-06.

D.  Physical Exhaustion

Finally, every victim testified to being physically exhausted and overworked while at OneTaste.  For example, Michelle Wright and Lianna Lifson, who both served as city leaders for OneTaste in Las Vegas and Boulder, respectively, testified regarding the abusive employment conditions they experienced.  Tr. 2425-26, 2107, 2137.  Lifson testified that she was frequently sick from how much she was working and developed shingles.  Tr. 2155-56.  Anthia Gillick similarly testified regarding the hours she worked, the sleep deprivation, and the impact that her physical exhaustion had on her psychological state, as did many of the other victims.  Tr. 3927; 244, 252, 2425-26, 2107, 2137, 2794.

IV.    Benefits to the Defendants

OneTaste, Daedone, and Cherwitz all benefitted from the systematic exploitation of these employees.  With Daedone at the helm and Cherwitz leading the sales team, OneTaste grew into an international, multi-million-dollar company; when the business sold in 2017, Daedone made $12 million.  GX 4056; Tr. 4318.  And many of the benefits from the scheme were not strictly financial: for years, Daedone was waited on hand and foot by OneTaste adherents, see, e.g., Tr. 1663, and Cherwitz became an idolized leader and power broker at the company while making a salary greater than the victims.  See, e.g., GX 862, 3808-A-1.

ARGUMENT

I.    Legal Standard

In analyzing a defendant's Rule 29 motion, the Court must "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility."  United States v. Sabhnani, 599 F.3d 215, 241 (2d Cir. 2010); see also United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010) ("[a]ssessments of witness credibility and choices between competing inferences lie solely

within the province of the jury"). In undertaking this review, this Court "consider[s] the government's case in its totality rather than in its parts," mindful that the sufficiency test may be "satisfied by circumstantial evidence alone." United States v. Hawkins, 547 F.3d 66, 70-71 (2d Cir. 2008). Following this review, the Court "must affirm the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011) (internal quotation marks omitted).

II.    The Majority of Defendants' Arguments are Inappropriately Brought Under Rule 29

At the outset, the majority of the arguments advanced in the defendants' Rule 29 motion are procedurally improper because they do not address the sufficiency of the evidence but instead are veiled challenges to the Court's jury instructions and the legal scope of the forced labor statute. As courts have consistently held, "the very nature of [Rule 29] motions is to question the sufficiency of the evidence to support a conviction." United States v. Gjurashaj, 706 F.2d 395, 399 (2d Cir. 1983). Rule 29 "is not an open-ended opportunity to relitigate unfavorable rulings, contest jury instructions, or advance new legal theories." United States v. Goklu, No. 19-CR-386 (PKC), 2023 WL 184254, at *4 (E.D.N.Y. Jan. 13, 2023).

Where, as here, a defendant uses a Rule 29 motion to argue that the Court erred in instructing the jury or interpreting the statute—as opposed to challenging the evidentiary basis for the verdict—the motion must be denied. See, e.g., United States v. Dawkins, 999 F.3d 767, 780 n.12 (2d Cir. 2021); United States v. Watson, No. 23-CR-82 (EK), 2025 WL 510814, at *4 (E.D.N.Y. Feb. 16, 2025). Numerous courts have rejected Rule 29 motions that "rehash certain jury instruction arguments," United States v. Levy, No. 11-CR-62 (PAC), 2013 WL 3832718, at *3 (S.D.N.Y. July 15, 2013), or "effectively [seek] reconsideration of certain evidentiary rulings," United States v. Velentzas, No. 91-CR-384 (DRH), 1993 U.S. Dist. LEXIS 5193, at *3 (E.D.N.Y. Apr. 16, 1993). Because most of the defendants' motion fails to argue that the trial

8

evidence was insufficient to support the jury's finding of guilt on the charged conspiracy, much of the instant motion should be denied on that basis alone.

III.    The Defendants' First Amendment Arguments Fail

    A.    Spiritual and Religious Beliefs are Admissible as Evidence of Criminal Conduct

The defendants first argue that the Court should disregard all evidence of the defendants' purported spiritual beliefs and teachings in considering whether a rational trier of fact could have found the essential elements of forced labor conspiracy.  Mot. 2-16.  Though the defendants disguise the argument as one based in the canon of constitutional avoidance, the defendants are in reality renewing their pretrial motion to "preclude the Government from making improper arguments that attack OneTaste's religious and spiritual beliefs and practices or offering evidence to suggest that such beliefs and practices were used to exercise coercion over OneTaste students or employees."  Def. Mots in Limine, ECF No. 171, at 9.

As the government argued pretrial, the defendants cite no case law indicating that a jury cannot consider evidence—here, use of purported spiritual practices to direct individuals to, among other things, perform sexual acts and go into debt for a for-profit business—on such grounds.  The First Amendment "does not . . . prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." United States v. Kaziu, 559 F. App'x 32, 35 (2d Cir. 2014) (summary order)); see also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949) (rejecting contention that "the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute"); United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir. 1990) (recognizing that "speech is not protected by the First Amendment when it is the very vehicle of the crime itself").  Just as people who associate can have that association used against them in a trial, and people who speak can have that speech used against them in a trial, the same is true of

the use of spiritualism where such use establishes the elements of a crime or proves motive or intent.  Such evidence is relevant and admissible.  See, e.g., United States v. Beasley, 72 F.3d 1518, 1527 (11th Cir. 1996) (holding that "evidence regarding [defendant's] religion was relevant, because religious teachings were used to justify, rationalize, and promote crime"); United States v. Sun Myung Moon, 718 F.2d 1210, 1233 (2d Cir. 1983) (holding that evidence of a person's beliefs is admissible where probative and finding that it was "inevitable that some Unification Church practices would creep into the trial in order to illustrate Moon's control over the activities of other church officials"); United States v. Murra, No. 16-CR-78, 2016 WL 10953909, at *6 (N.D. Tex. July 18, 2016) (same, as to forced labor conspiracy).

Courts have repeatedly rejected attempts to shield criminal conspiracies with religious or ideological justifications.  See, e.g., United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999) (affirming convictions based on sermons that constituted criminal solicitation and conspiracy and holding that "one is not immunized from prosecution . . . merely because one commits [a crime] through the medium of political speech or religious preaching"); United States v. Stewart, 590 F.3d 93, 115 (2d Cir. 2009) (holding that "freedom of speech and of religion do not extend so far as to bar prosecution of one who uses a public speech or a religious ministry to commit crimes," including conspiracy).  As Stewart reaffirmed: "Words that instruct, solicit, or persuade others to commit crimes . . . violate the law and may be properly prosecuted regardless of whether they are uttered in private, or in a public speech, or in administering the duties of a religious ministry."  Id.

The same principle applies here.  The defendants' teachings, group dynamics, and "spiritual" frameworks were part of a coordinated scheme to isolate, dominate, and extract labor from OneTaste members under threat of serious harm.  The defendants repeatedly claim that the

government criminalized their spiritual philosophy.  That is false.  The government prosecuted

conduct—not belief.  The First Amendment does not shield that conduct simply because it was

carried out in spiritual garb.  As <u>Rowlee</u> makes plain, speech that is the "very vehicle of the

crime" is not protected.  899 F.2d at 1278.[1]

---

[1]    Though irrelevant to their legal claims for the reasons set forth herein, the defendants also mischaracterize law and the evidence in asserting that "the OM practice and Defendant[s'] spiritual beliefs and teachings are protected under the First Amendment" as a religion.  Mot. 3-5.  "To determine whether a given set of beliefs constitutes a religion for purposes of . . . the First Amendment . . . courts frequently evaluate: (1) whether the beliefs are sincerely held and (2) whether they are, in the believer's own scheme of things, religious."  <u>Equal Opp'y Employ. Comm'n v. United Health Programs</u>, 213 F.Supp.3d 377, 394 (E.D.N.Y. 2016) (internal quotation marks, citation and alteration omitted).  In so analyzing, "[c]ourts must be mindful to differentiate between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud."  <u>Id.</u> at 395.  Notably, not one witness at trial defined OneTaste, or the practice of orgasmic meditation, as a defined "religion," and OneTaste itself has an entire page devoted to explaining that it is not, and never was, a religion.  <u>See</u> <u>OneTaste: The Truth About Whether It's a Cult</u>, Mar. 2024, https://erosplatform.com/blogs/onetaste-the-truth-about-whether-it-s-a-cult (<u>last visited</u> July 21, 2025) (decrying Daedone as a "prophet," "God" or "guru"; defining participants in the OneTaste community as "practitioners" and not "followers, worshippers" or "believers" and specifically stating that terms that apply to OM are "terms of art, not of ideology or religion"); <u>see</u> <u>United States v. Allen</u>, 760 F.2d 447, 450 (2d Cir. 1985) (rejecting defining practice as religion where "appellants ask us to recognize as a 'religion' what that religion's alleged adherents have not identified as such"); <u>United States v. Seeger</u>, 380 U.S. 163 (1965) (distinguishing religious beliefs from "political, sociological, or philosophical views").

Likewise, the defendants selectively quote from the government's summation and rebuttal in arguing that the government violated the First Amendment.  Mot. 13.  Rather, the trial evidence established that the defendants positioned OneTaste as a corporation, prioritized sales and profit ahead of wellness and sought to reframe OneTaste operations in a more religious light only once concerns about potential illegal practices were discussed internally.  <u>See</u> GX 2075-D-R-011 (Van Vleck and Daedone discussing minimizing legal risk "if we begin to say that [OM is] for higher consciousness or spiritual awakening" to "gain a bit of protection from the 1st amendment").  Nor did the defendants simply engage in "<u>some</u> secular components," Mot. 5 n.2 (emphasis added); rather, the defendants shaped OneTaste operations around making money— which directly related to their motive and incentive to conspire to coerce labor from the victims in this case.  In any event, even were defendants entitled to some protection under the Free Exercise Clause (or some other constitutional provision, which the defendants have failed to articulate), the defendants have provided no rationale, and no case law, that any such protection would somehow shield them from criminal liability.  <u>See, e.g.</u>, <u>United States v. Amer</u>, 110 F.3d 873, 879 (2d Cir. 1997) ("A neutral law of general applicability does not violate the Free

B.      Defendants' Vagueness Challenge is Without Merit

The defendants next argue that "[t]he forced labor statute should not be interpreted to characterize the spiritual teachings and voluntary activities" of the defendants as evidence of forced labor conspiracy because doing so would render the statute unconstitutionally vague. Mot. 8 (citing ECF No. 401 at 10-14). They also claim the statute is unconstitutionally vague as applied. ECF No. 401 at 10-13. The parties already briefed the defendants' void-for-vagueness claims pretrial and the government incorporates its responses here. See ECF No. 230 at 18-23. The Court should again reject the defendants' vagueness and vagueness-adjacent arguments post-trial for the same reasons previously briefed and as set forth herein.

As a threshold issue, the argument is rooted in the false premise that the defendants were convicted based on their spiritual teachings, "voluntary activities," Mot. at 8, or "traditional, widely accepted practices," Mot. at 9; see also ECF No. 401 at 12. Not so. The defendants were convicted because the government proved they knowingly and intentionally conspired to build a financially successful business through the criminally coerced labor of certain of its workers. Defendants have not, and cannot, point to any record evidence or case law providing a religious or other constitutionally protected justification for coercing multiple employees to stroke the penis of the company's primary investor so that he would continue to fund the company. Whether the product the company was selling—OM—is "rooted in religion and spirituality," as the defendants now claim, is a non-sequitur in the face of such evidence. ECF No. 401 at 12. Also notably absent from defendants' vagueness and constitutional avoidance arguments is any analysis of trial evidence that, for example, Cherwitz sexually assaulted an employee, Tr. 304-06; or Daedone threatened another employee that, "[i]f I ever see

_____

Exercise Clause simply because the law imposes an incidental burden on a religious practice."). Indeed, the case law discussed above and pretrial is directly to the contrary.

that little cunt again, I'll smash her head against the sidewalk," Tr. 2422; or the many text messages in which the defendants' and their co-conspirators discussed the conspiracy to coerce labor and deleting evidence, GX 2075-D-R; 2256-D-R; or using financial debt as leverage to coerce an employee to sexually service the company's main investor, Tr. 1270. None of these actions in furtherance of a forced-labor conspiracy are constitutionally protected activity meriting a narrow construction of the statute. Defendants cite no cases to the contrary.

Nor can there be any serious suggestion that the defendants could not have known that their campaign to use serious psychological harm to coerce labor is illegal, such that the statute violates the Due Process Clause. See ECF No. 401 at 10. Congress enacted 18 U.S.C. § 1589—the statute the defendants were convicted of conspiring to violate—for the express purpose of criminalizing the use of psychological harm to coerce labor following the Supreme Court's contrary decision in United States v. Kozminski, 487 U.S. 931, 949 (1988). See H.R. Rep. No. 106-939, at 100 (2000) (Conf. Rep.) (describing reason for passing statute "to address issues raised by the decision of the Supreme Court in Kozminski."); 22 U.S.C. § 7101(b)(13) (legislative findings); see also Taylor v. Salvation Army Nat'l Corp., 110 F.4th 1017, 1030 (7th Cir. 2024) (Congress added Section 1589 to "combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski."); United States v. Dann, 652 F.3d 1160, 1169-70 (9th Cir. 2011). Here, the statute provided ample notice that the defendants' conduct was illegal.

Additionally, "[i]n an as-applied challenge, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." United States v. Nadirashvili, 655 F.3d 114, 122 (2d Cir. 2011) (rejecting as-applied vagueness challenge when defendant's "conduct falls clearly within its intended scope"). Here, too, the defendants' conduct

13

is unquestionably within the scope of the statute.  And as discussed in the government's pre-trial brief, courts across the country have consistently rejected claims that Section 1589 is void for vagueness.  See Dkt. 230 at 30.  In the face of substantial trial evidence that the defendants engaged in a conspiracy to (and did) cause serious harm to their employees to force them to perform labor for the defendants' benefits, this Court should likewise reject the defendants' vagueness arguments.

      C.    <u>The Defendants' Conduct Falls Within the Scope of 18 U.S.C. § 1594</u>

      The defendants next argue that a narrow construction of the forced labor statute is "constitutionally required" because the statute was not "intended" to regulate political or religious conduct or "every bad employment relationship," Mot. 8-11, principally citing to <u>Kozminski</u>, 487 U.S. 931.  The Court has already rejected the defendants' pretrial motion to dismiss, principally based on <u>Kozminski</u>, that Congress exceeded its powers or did not intend to criminalize forced labor by nonphysical harm—in direct contravention of the statute's plain language—and the government incorporates by reference its prior briefing on Congress' express repudiation of <u>Kozminski</u>'s definition as too narrow.  Mot 9-10; 18 U.S.C. § 1589(c); <u>see also</u> ECF No. 230 at 15-18 (collecting cases and citations).  Indeed, even though Congress did not define "serious harm" to <u>expressly</u> include nonphysical harm until a 2008 amendment, circuit courts interpreting congressional intent in enacting the TVPA have found the statute always included precisely the harms challenged here.  <u>See</u> ECF No. 230 at 16-17 (collecting cases where numerous courts have upheld forced labor convictions for defendants who used psychological coercion to secure victims' labor).

      The other out-of-circuit precedent relied on by the defendants in making the argument also fail, as they were based on fact-specific analyses with different sets of circumstances—none of them, for example, involved sexual labor or severe financial harm—and

hardly stand for a blanket proposition that the Court should set aside the jury's verdict in this case.  See, e.g., Headley v. Church of Scientology Int'l, 687 F.3d 1173, 1174-80 (9th Cir. 2012) (out-of-circuit decision pertaining to a recognized church holding that under totality of factual circumstances, plaintiffs had not shown "that the adverse consequences" there applicable were "overwhelmingly [] of the type that caused them to continue their work"); Muchira v. Al-Rawaf, 850 F.3d 605, 625 (4th Cir. 2017) (holding that record failed to establish substantive forced labor where family from Saudi Arabia did not "knowingly" coerce plaintiff); United States v. Toviave, 761 F.3d 623, 629 (6th Cir. 2014) (holding that forced labor statute did not federalize traditionally state-regulated area of child abuse).

Indeed, in Toviave, the Sixth Circuit described that "paradigmatic forced labor" included "prostitution . . . or forced domestic service" that "may be federally criminal even though the force is not physical at all, but merely psychological, such as isolation and pretended threats to the victim's friends or relations."  761 F.3d at 626-27.  And as the Second Circuit recently held, "evidence showing" "ensare[ment]," "control," and "secur[ing] [victims'] compliance . . . through verbal and physical abuse, threats of blackmail, and humiliation" is sufficient to permit a jury to infer a "'scheme, plan or pattern intended to cause the [victims] to believe'" that they would suffer serious harm if they did not comply.  United States v. Kelly, 128 F.4th 387, 416-17 (2d Cir. 2025).  Thus, far from "(mis)us[ing]" the forced labor statute, Mot. 10, the jury appropriately convicted the defendants of forced labor conspiracy in this case.

      D.    <u>Evidence of Shunning and Defendants' Leadership Was Properly Admissible</u>

For the reasons already discussed herein, the defendants' arguments that "shunning" and the defendants' leadership roles should somehow not be considered on constitutional grounds also fails.  As the government already argued above—and to the Court when the defendants sought a jury instruction on "shunning"—the defendants' reliance on

Headley is misplaced because there, the Ninth Circuit determined that where the only adverse consequence the plaintiffs could have faced was shunning by a church, that was insufficient on those facts. Headley, 687 F.3d at 1180 (describing the "one adverse consequence" the plaintiffs could have faced as "potentially" losing contact with family and friends and holding that "[a] church is entitled to stop associating with someone who abandons it"). Here, the defendants conspired to use a variety of psychological, financial, physical and sexual coercion to compel the victims to work for their for-profit company; Headley is inapposite. The same is true of the only other criminal case on which the defendants rely, Dann, 652 F.3d 1160. There, the Ninth Circuit affirmed a forced labor conviction based on a combination of tactics, including financial and psychological coercion, and rejected the defendant's argument that the victim remained "voluntarily." 652 F.3d at 1170-71. The remainder of the cases cited by the defendants are civil matters that have no bearing on the instant case. See, e.g., Paul v. Watchtower Bible & Tract Soc., 819 F.2d 875 (9th Cir. 1987) (holding that the religious practice of shunning by Jehovah's Witnesses, without more, is not actionable in tort); Taylor, 110 F.4th 1017 (addressing motion to dismiss civil forced labor claims against the Salvation Army pertaining to its operation of rehabilitation centers, in which the Seventh Circuit held that the Salvation Army was entitled to condition its provision of food, housing and clothing to participants in their programs on satisfactory participation, and addressing none of the psychological and sexual coercion present in the instant case). In sum, none of the cases relied on by the defendants hold that the abuse they conspired to subject victims to over decades—summarized in part above and elicited at trial—is immune from scrutiny where it is weaponized through the totality of circumstances to extract labor.

        The defendants' arguments regarding the government's evidence as to the

defendants' leadership roles is even more attenuated from any law.  The defendants appear to argue that the Court should not consider evidence of the defendants' leadership roles within OneTaste.  See Mot. 15.  While defendants invoke the right of spiritual leaders to guide their communities, that right does not extend to directing, orchestrating or perpetuating a coercive scheme to extract labor through threats of serious harm.  The trial evidence plainly established their knowing participation in a conspiracy to compel labor through coercive means; even had the defendants held positions of spiritual leadership, that does not transform this otherwise admissible and probative evidence into some kind of First Amendment violation.  See, e.g., Rahman, 189 F.3d at 116-17 (religious leadership position used to recruit and direct followers in furtherance of a criminal conspiracy).

     E.     The Canon of Constitutional Avoidance is Inapplicable

Because there were no First Amendment or other constitutional deficiencies in this criminal prosecution, the canon of constitutional avoidance is inapplicable.  The Court should reject the defendants' attempts to improperly use that statutory interpretation tool as a means of bypassing actual constitutional issues (of which there were none).  See, e.g., United States v. Apel, 571 U.S. 359, 372 (2014) ("Apel also attempts to repackage his First Amendment objections as a statutory interpretation argument based on constitutional avoidance.  But we do not 'interpret' statutes by gerrymandering them with a list of exceptions that happen to describe a party's case.  The canon of constitutional avoidance is not a method of adjudicating constitutional questions by other means." (internal citations omitted)); United States v. Awadallah, 349 F.3d 42, 55 (2d Cir. 2003) (holding that the canon of constitutional avoidance, "which facilitates a choice between alternative interpretations of an ambiguous statute, has no bearing if the meaning of the statute is known").

IV.    <u>The Defendants Have Identified No Other Error</u>

The defendants argue repeatedly that without such evidence of their purported spiritual beliefs, and without evidence of "shunning," the instant prosecution would have "fail[ed] as a matter of law." <u>See. e.g.</u>, Mot. 15.  Not so.  First, the Court carefully instructed the jury on every element of the charged crime, including with respect to the law of conspiracy, "by means of," and "serious harm."  Indeed, with respect to the defendants' request for an "adverse but legitimate consequences instruction," over the government's objection, the Court instructed the jury that "some warnings by an employer to an employee can be legitimate and warnings of legitimate but adverse consequences of an employee's actions, standing alone, are not sufficient to violate the forced labor statute."  Tr. 5292.  The jury is presumed to follow the Court's instructions, and the defendants do not appear to take issue with those instructions.

In any event, the defendants repeatedly misstate the record throughout their brief with respect to the government's arguments.  For example, the defendants assert that the "government's entire summation was a plea to the jury to find a crime based on Defendants' non-traditional spiritual beliefs and practices."  Mot. 14.  That assertion is patently false.  To the contrary, the government was clear in its summation that "[n]obody is asking you to convict on ideas," that "Ms. Daedone is allowed to believe and teach whatever she wants.  She is not on trial for her lectures," and that the sole question for the jury was whether the defendants had conspired to commit forced labor conspiracy.  Tr. 5250.  Rather, the government argued that the defendants were guilty because of the evidence presented at trial of the actions they took— including preying on victims' vulnerabilities to induce them to go into debt; insisting that they engage in sexual acts with men, claiming it was for their better good; shaming and humiliating them; and physically and emotionally abusing and breaking them down for the defendants'

financial gain.  See generally Tr. 4892-5028.

V.    The Government Adduced Ample Evidence To Support The Defendants' Convictions

Many of the defendants' remaining assertions simply rehash arguments made to—and rejected by—the jury.

For example, the defendants argue, in asserting that their conduct was protected by the First Amendment under the guise of a "spiritual community," that this case is about no more than "practitioners" choosing to live in "monastic residences" and "freely committing to" participate in a host of OneTaste practices.  Mot. 5-8.  But the argument ignores the evidence—and in particular, every victim-witnesses' testimony that after becoming involved with OneTaste they no longer felt that they had "choice" or "freedom,"—but rather, felt compelled to work through the scheme outlined above.  See, e.g., Tr. 380 (Halpern testimony); Tr. 1201 (Berkley testimony); Tr. 1560 (Gill testimony); Tr. 1692-98 (Pixley testimony); Tr. 2104-05 (Lifson testimony); Tr. 2322-23, 2643 (Wright testimony); Tr. 2923-24 (Neria testimony); Tr. 2992-99 (Keves testimony); Tr. 3958-59 (Gillick testimony).

Relatedly, the defendants renew their argument that OneTaste handbooks and liability waivers meant that the victims' actions in this case were somehow volitional.  Mot. 5-8.  But the evidence at trial established that such waivers were limited in time period and scope.  Tr. 5233-36.  And, of course, such handbooks and liability waivers never stated that the victims would be coerced to sexually service Jones, potential OneTaste clients and other community members.  See, e.g., GX 3500-RW-12.  Indeed, OneTaste's employee handbook contained a sexual harassment policy that prohibited the very unlawful conduct the defendants engaged in—directing victims to have sex.  See DX 1BS at 2 (defining sexual harassment to include "requests for sexual favors . . . where . . . submission to such conduct is made either explicitly or implicitly a term or condition of an individual employment").  In any event, most of the witnesses could

19

not recall any house rules or codes of conduct, see, e.g., Tr. 1624 (Gill testimony); Tr. 4224-25, 4264 (Gillick testimony); 2810 (Neria testimony); multiple witnesses testified that they rarely heard about consent at OneTaste, Tr. 1270 (Gill testimony); 2313 (Lifson testimony); 2350 (Wright testimony); participants in OneTaste perceived the idea of a sexual harassment and overtime policy at OneTaste to be a joke, see GX 3501-37; and, of course, one cannot meaningfully consent to coerced conduct, see, e.g., Tr. 1200-03.

The defendants also argue that obtaining another person's labor "by means of" serious harm should not include the defendants' spiritual beliefs or their act of teaching those beliefs. Mot. 11-14. The argument cannot withstand the weight the defendants attempt to give it, because the government did not argue that such beliefs, standing alone, were illegal. Rather, the entirety of the trial record proved that the combination of the coercive tactics the defendants used—including physically exhausting victims and using tactics of psychological, financial, and sexual abuse—seriously harmed the victim-witnesses. Tr. 4892-5028. And ultimately, the government was not required to prove that any victim was actually forced to perform labor by means of serious harm or threats of serious harm; the government was only required to, and did prove, that the defendants conspired to do so. Use of such evidence in combination was entirely proper. See, e.g., United States v. Majeed, No. 21-20060-JAR, 2025 U.S. Dist. LEXIS 83060, at *44 (D. Kan. Apr. 30, 2025) (denying Rule 29 motions in forced labor conspiracy where defendants, part of a religious organization, indoctrinated victims to believe that founder of organization was Allah, their membership in organization was their "ticket to salvation," and they were to blindly follow the rules and directives of leadership).

The defendants also argue that the evidence at trial "failed to meet a properly construed reasonable person standard," and that the victims did not have "objective

vulnerabilities." Mot. 16-18. But the jury was instructed that serious harm and threats of serious harm under the forced labor statute refers to harm "that is sufficiently serious, under all the surrounding circumstances, to compel a <u>reasonable person of the same background and in the same circumstances as the alleged victim</u> to perform or to continue performing labor or services in order to avoid incurring that harm." ECF No. 407 at 19-20 (emphasis added). The instructions further provided that to determine if the defendants made a threat of serious harm that could be reasonably believed, they should consider particular vulnerabilities. <u>Id.</u> at 20. The defendants do not challenge the jury instructions, and the evidence at trial properly met this standard within the context of the charged conspiracy. As described above, nine victims—many of whom did not overlap or even know each other at OneTaste—experienced strikingly similar physical, psychological, financial, and sexual harm. Tr. 118-19, 1015-16, 1287, 1608, 1639-40, 1742-49, 1919, 2102-03, 2320, 2963, 3806; DX 3EA, 4513-A-R, 4514-A-R.

Finally, the defendants argue that the Court should hold, as a matter of law, that it is unreasonable for an individual who "voluntarily submits herself to the requirements of a spiritual community . . . to later claim that such a choice was the result of psychological coercion." Mot. 18. The defendants misunderstand the victims' testimony. Every victim acknowledged that it was their choice to join OneTaste, and their testimony was not that their choice to join was the result of psychological coercion. Instead, the victim-witnesses uniformly testified that they <u>stayed</u> at OneTaste and <u>continued</u> to perform labor and services under serious harm or threats of serious harm because of the defendants' coercive tactics and the combination of psychological, financial, and sexual abuse the defendants inflicted on the victims. <u>See, e.g.,</u> Tr. 790-91, 1124-25, 1288, 1748, 2412-13, 2425, 2778.

Ample evidence supported the jury's verdict, and the Court should reject the defendants' scattershot claims of insufficient evidence in their entirety.

VI.    The Government Established the Requisite Mens Rea

Similar to the above assertions, the defendants largely rehash arguments made to the jury that the defendants lacked intent. Mot. 18-20. They argue, for example, that the victims could have left OneTaste, and therefore, there was no evidence that the defendants could have believed they were forcing anyone to work. Mot. 19. The jury correctly rejected these arguments.

As an initial matter, again, the government only had to prove that the defendants knowingly and intentionally entered into an agreement to commit forced labor, which the government did. See ECF No. 407 at 14. As to Daedone, for example, ample evidence at trial established that her intention from the beginning of the charged conspiracy, as shown through testimony from Kandell and Chris Hubbard, was to lead OneTaste by using psychological tactics to coerce OneTaste participants. See, e.g., Tr. 844, 3289. After meeting Reese Jones, Daedone assigned a series of women to sexually service him in exchange for money and business advice. Tr. 3313-14, 3321; GX 1604-D-R, 4501-F-D, 4501-K-D. Daedone was fully aware that sex work is unlawful: as she told Christina Berkley, who was working as an escort while at OneTaste, anyone engaged in sex work would need to stop because it was illegal. Tr. 1109-10. Yet, she continued to direct women to provide sexual services to Jones for years thereafter. And even after sexual favors to Jones ended, Daedone and Cherwitz assigned women to sexually service prospective clients, VIPs, and other community members, see, e.g., Tr. 2419, as well as to perform unpaid or underpaid menial labor, including cleaning Daedone's bathroom and being Cherwitz's assistant. Text messages between Daedone and her co-conspirators or other OneTaste senior leaders, such as Ken Blackman, showed that Daedone's primary goals for

22

OneTaste were to create passive income and otherwise financially benefit from OneTaste.  See, e.g., GX 4501-G-D.  Meanwhile, Daedone was aware of and happy with how OneTaste's employees were being paid—which was very little or not at all.  See GX 1283-D-R, 1332-R. Finally, multiple text messages showed that Daedone deleted text messages and instructed others to do so following allegations raised by Ayries Blanck against the company, which is powerful evidence of her intent and guilt.  See, e.g., GX 2075-D-R; 2256-D-R.

As to Cherwitz's intent, there was ample evidence that she too knowingly and intentionally joined the conspiracy shortly after joining OneTaste in 2007.  Cherwitz checked in on and received reporting from women sexually servicing Jones, see, e.g., Tr. 2410-11, GX 2148-D, and she knew many of these women were struggling.  See, e.g., GX 1258-D-R.  As described above, after Jones stopped financially contributing to OneTaste, Cherwitz agreed with Daedone to assign women to perform sexual acts for prospective clients, VIPs, and other community members, including directing Max Pixley to OM with Jim Kwik and stroke Eli Block's penis, ordering Becky Halpern and Ruwan Meepagala to have sex to eliminate their "tumescence," and ordering Anthia Gillick, Ayries Blanck, and others on the New York sales team to have sex every day for a month.  See, e.g., 1688-96, 3963-65, 3964.  Notably, Cherwitz personally sexually assaulted Halpern during an OM demonstration, after Halpern repeatedly said she did not want to participate in the demonstration and was shaking and crying throughout. Tr. 304-06.  Cherwitz repeatedly described these actions as necessary to induce people to work harder for OneTaste.  See, e.g., Tr. 3961-65 (Gillick testimony).

Cherwitz was also responsible for OneTaste's profitability.  See GX 1136, 1141, 1159; Tr. 3414-15.  Cherwitz made clear that employees could not sleep until they hit their sales goals, Tr. 2137, forced employees to constantly check in with her, and "led the sales thread that

never slept." Tr. 2107. Indeed, the defendants' co-conspirators, including Yia Vang and Joanna Van Vleck, noted that Cherwitz "yell[ed] at people to motivate them," and treated employees so poorly that Vang and Van Vleck were concerned her behavior would "continue to get us in trouble the bigger we get." GX 2000-D-R. Cherwitz, with Daedone and other co-conspirators, also knew that people who worked at OneTaste were not being paid for their labor, see, e.g., GX 1331-A-R; 1332-R, calling the fact that people wanted to be paid "so fucking dumb ass stupid." GX 2200-D. Ample evidence established that Cherwitz and Daedone acted knowingly and intentionally.

Finally, the defendants make much of the fact that the victims had the ability to physically leave OneTaste, Mot. 19, but the elements of the charged crime do not require that the victims be unable to physically leave.[2] Indeed, such a requirement would ignore that the forced labor statute provides that serious harm includes "any harm, whether physical or nonphysical," 18 U.S.C. § 1589, and would incorrectly limit the statute to only providing for instances of physical restraint. See, e.g., Dann, 652 F.3d at 1169 ("Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion," as well as through "physical or legal coercion"). The defendants' arguments that there was insufficient evidence as to their intent should be rejected.

VII.    The Defendants' Remaining Arguments Fail

The defendants' remaining arguments—which they raised in their prior written Rule 29 motion, ECF No. 401, and incorporate by reference in their second motion, ECF No.

---

[2]    As discussed above, the cases the defendants cite are inapposite. Mot. 19.

417 at 1—similarly fail:[3]

- <u>First</u>, the statute of limitations for forced labor conspiracy is ten years rather than five.  <u>See</u> 18 U.S.C. § 3298 ("No person shall be prosecuted . . . for . . . <u>conspiracy to commit a non-capital offense under section</u> . . . 1589 (Forced Labor) . . . unless the indictment is found or the information is instituted not later than 10 years after the commission of the offense").  Thus, conspiracy to commit a violation of § 1589 has a 10-year statute of limitations.  Though the statute is abundantly clear, even if it was five years as the defendants argue, the evidence at trial proved that Daedone and Cherwitz continued to receive payments from OneTaste through 2018.  Daedone received $40,000 from OneTaste in June 2018, GX 4482-R, after resigning from OneTaste.  And Cherwitz did not leave OneTaste until May 11, 2018, and her separation agreement provided that she be paid severance of $70,000.  GX 3767.  Thus, the conspiracy continued within the five-year statute of limitations window.

- <u>Second</u>, the defendants argue that because 18 U.S.C. § 1589(b) was not in effect until 2009, application of the conspiracy statute to conduct prior to June 2009 would violate the *Ex Post Facto* clause.  But as argued extensively pretrial, the Court addressed this by instructing the jury that they "must find that the forced labor conspiracy existed on or after June 21, 2009," and that the defendants "cannot be found guilty . . . solely on evidence of acts that occurred prior to June 21, 2009.  ECF No. 407 at 16.

- <u>Third</u>, the defendants argue that conspiracy to commit forced labor under 18 U.S.C. § 1594(b) is somehow legally invalid because one cannot agree to commit an act recklessly.  ECF No. 401 at 8.  This argument fails for the reasons set forth by the government pretrial, and the government incorporates by reference its prior briefing on this topic.  ECF No. 223 at 42-43.

---

[3]    Because the Court has already denied the motions raised in ECF No. 401, Dkt. Entry dated 06/02/2025, the government has not extensively briefed the issues raised therein to the extent they were not re-raised in the instant round of motion practice.  Though the defendants renew these arguments by reference herein, their prior filing did not comply with the Court's individual rules (including with respect to formatting and page limitations) and, thus, the government respectfully requests leave to supplement its briefing on any topic raised therein should the Court be inclined to reconsider its prior denial of that motion in its entirety.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the defendants' motion should be denied in its entirety.

Dated: Brooklyn, New York
      July 22, 2025

                                            Respectfully submitted,

                                            JOSEPH NOCELLA, JR.
                                            UNITED STATES ATTORNEY
                                            Eastern District of New York
                                            271 Cadman Plaza East
                                            Brooklyn, New York 11201

By:    /s/_____
                                            Kayla C. Bensing
                                          Kaitlin T. Farrell
                                          Nina C. Gupta
                                        Sean M. Fern
                                          Assistant United States Attorneys
                                          (718) 254-7000

cc:    Clerk of the Court (DG) (by ECF and Email)
       Defense counsel of record (by ECF and Email)