UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-00146(DG)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 19, 2025

Defendant. : 9:30 a.m.

\- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Stacy A. Mace
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
United States Courthouse, Room N377A
225 Cadman Plaza East
Brooklyn, New York 11201
smacerpr@gmail.com

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

You may be seated.

This is United States of America versus Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialist Marlane Bosler and Liam McNett and FBI Special Agent Tricia Quintero.

I think as the Court knows, Ms. Farrell had an appointment this morning and will be in as soon as she can be.

THE COURT: That's fine.

Good morning, everybody.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Kelly Lenahan...

MS. LENAHAN-PFAHLERT: Pfahlert.

MS. COHEN: Sorry, I thought I was going to get it today.

...and Kamille Simons all on behalf of Rachel Cherwitz.

THE COURT: Good morning, everybody.

MS. BONJEAN: Good morning, Your Honor.

Jennifer Bonjean and Kelsey Killion on behalf of

Ms. Daedone. And also my paralegal, Soph Moazed, who I believe is doing some work, but will be here shortly.

THE COURT: Good morning, everybody.

Everybody may be seated.

The jury is all here. I will bring them out.

I know Mr. D'Agostino showed you the note, which I think is probably the most predictable note ever, with the jury wondering if we are going to have court Friday for the holiday. We can talk about this at the next break after we have testimony and then I send the jury out. You can think about -- I'll just tell you right now, I'm not intending to cancel court on Friday. We're not having court on Monday. But I would not be necessarily opposed to letting everyone go a bit early. But you can think about and talk to each other about your proposal on that.

But we have the whole jury here, so I think we should bring out the jury.

You can bring out the witness. If you want to go get him.

Am I correct, Ms. Bonjean, you're still on cross-examination?

MS. BONJEAN: That's right, Your Honor.

THE COURT: Okay.

And just for the record, I have marked that jury note Court Exhibit 10.

(Court's Exhibit 10 received in evidence.)

THE COURT: You can just come up here again.

THE WITNESS: Thank you.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

It's nice to see the jury. Good morning.

And Ms. Bonjean, you may resume your cross-examination of the witness.

THE COURTROOM DEPUTY: The Court reminds you, you're still under oath.

THE WITNESS: Thank you.

(Continued on the next page.)

**CHRIS KOSLEY**, having been previously duly sworn/affirmed, was examined and testified as follows:

CONTINUED CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good morning, Mr. Kosley.

A Good morning.

Q You testified on Thursday of last -- Thursday of last week that you provided about 1.3 terabytes of data to a filmmaker named Sarah Gibson, correct?

A Correct.

Q And that is -- did you tell Ms. Gibson that the material was stolen from OneTaste?

A No.

THE COURT: You're going to have to keep your voice up too, sir.

Q Isn't it true, Mr. Kosley, that when OneTaste learned that you had the footage, the company issued you a demand letter to return it?

A Yes.

Q Did you return it?

A No.

Q And did you apprise Ms. Gibson that there was a demand letter to return it?

A I did.

Q And she told you to ignore that demand letter; isn't that

right?
A I don't remember what she --
MS. BENSING: Objection.
THE COURT: Sustained.
Q Do you recall having any conversations about whether or not you should return it?
A I believe we had some conversations about it.
Q Now, you were sued by OneTaste in connection with breaching your employment agreement, right?
A Yes.
Q And that's because your employment agreement had a confidentiality and nondisclosure agreement associated with it, right?
A Yes.
Q And that's because it also defined confidential information within the employment agreement which would include these videos that you were taking, correct?
A That's what my attorneys litigated with OneTaste.
Q I'm sorry?
A That's what was litigated with OneTaste, yes.
Q Right. But you signed the employment agreement, right?
A I signed the employment agreement, yes.
Q And when you signed the employment agreement, you understood what the terms were, I assume, right?
A I signed a lot of papers when I was at OneTaste.

Q Is that a yes, you understood what the terms were of your employment agreement?
A Um, I -- I don't know if I understood. I didn't read everything that I signed at OneTaste, so I don't know that I had a complete understanding of it.
Q You certainly understood that video that you took would be confidential, right?
A No, I wouldn't say that.
Q It was your belief that if you took videos of people, for instance, OMing, that that won't be confidential?
A I would assume that would remain confidential, yes.
Q Okay. And then you understood -- you understand what proprietary information is, right?
A Yes.
Q Okay. And what is it?
A Information that the owner of the copyright holds.
Q It's information that's developed by a company, perhaps, that belongs to them, right?
A Perhaps. I'm not an attorney or a copyright lawyer, so I don't know.
Q Okay. But you understood that, for instance, the courses that you video-recorded were proprietary information of OneTaste, right?
A That was my understanding, yes.
Q And that the lawsuit that was brought against you settled

with the condition that you had to return all video recordings, right?
A Yes.
Q Did you do that?
A Yes.
Q When you -- prior to doing that, of course, you gave the video footage to the U.S. Government, correct?
A Correct.
Q Did you disclose to the Federal Government, when you gave them that footage, that it was stolen from OneTaste?
A No, I did not.
Yeah, there was no representation of any kind.
Q I'm sorry?
A There was no representation of any kind. I just simply responded to the subpoena.
Q Okay. So you didn't disclose that you were giving stolen footage to the Federal Government, right?
A No, because I did not consider it as having been stolen.
Q Well, you knew it didn't belong to you, right?
A Correct.
Q So let me ask it a little differently.
Did you disclose to the Federal Government, when you provided that material, that you were in possession of proprietary information that did not belong to you?
A I made no disclosure of any kind to the

Federal Government.
Q So you -- and I take it no one asked you?
A Correct.
Q Now, during direct examination last week, we looked at some video and audio that captured Ms. Daedone and Ms. Cherwitz in the context of their work at OneTaste, right?
A Yes.
Q Every little bit of video that was shown in this courtroom was material that belonged to OneTaste, right?
A No.
Q What didn't?
A There was some material that was from some of my personal files that I considered mine.
Q Which ones?
A I don't recall at the moment.
Q Well, we didn't look at that much.
We had the Stinson Beach stuff, right?
A Correct.
Q You don't consider that belonging to you, correct?
A No.
Q There was the audio recording, the four-and-a-half hour audio recording of Ms. Daedone teaching or lecturing, right?
A Correct.
Q That didn't belong to you, correct?
A Correct.

Q There was video of Ms. Cherwitz at the Coaching Program No. 9.
Do you remember that?
A Mm-hm.
Q Yes?
A Yes.
Q But that didn't belong to you, right?
A Correct.
Q Let me see. There was -- there was footage, I believe, of Ms. Daedone on a couch doing some lecturing and answering a student's question of some type, right?
A Yes.
Q Okay. That didn't belong to you, correct?
A Correct.
Q Okay. What else was there that you say belonged to you that we looked at on Thursday?
A I reviewed a lot of footage since I've been here working with the prosecution, so I don't -- I mean, some of it might have been mine, some of it might have been from that archive, I don't know. I don't remember.
Q Okay. So what you're saying is you don't actually even remember what video we looked at last week on Thursday?
A No, that's not what I'm saying. I remember what we looked at on Thursday.
Q Okay. So again, was there something that we looked at on

Thursday that you believe belonged to you rather than OneTaste?
A Not that I recall at the moment.
Q You, of course, yourself are depicted in many videos that were taken over the course of your time at OneTaste, right?
A Correct.
Q In fact, you -- some of your teachings in the BDSM variety of work was captured on video, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Did you provide to the filmmaker, Sarah Gibson, any of the video that you yourself were depicted in?
MS. BENSING: Objection.
THE COURT: Sustained.
Q What did you do with the video of yourself?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Relevance. Outside the scope.
THE COURT: Sustained.
Q You testified on Thursday of last week that you did not consider yourself a master stroker, right?
A Correct.
Q What is a master stroker?
A I have no idea.
Q You have no idea?

A No.
Q Did you have an idea at some point?
A Not really.
Q Okay. You remember being interviewed by the FBI on a number of occasions, correct?
A Yes.
Q And isn't it true that on December 31st of 2024, you were interviewed by the FBI and certain members of the prosecution team?
A Perhaps. I don't remember the exact date.
Q Do you remember being interviewed by telephone -- I'm sorry. Strike that.
Do you remember being interviewed in the U.S. Attorney's Office in New York, just down the road a little bit, with -- in the presence of Special Agent Michael Pecas and Ms. Bensing in connection with a number of issues that you were testifying about here last week?
A I do.
Q Okay. And do you remember telling Ms. Bensing and the Special Agent that you were considered a master stroker after your many years of practice at OneTaste?
A I don't recall saying that.
Q Would anything refresh your recollection about whether you said that?
A I don't -- perhaps. I don't know.

MS. BONJEAN: Your Honor, I would like to approach and mark as Government Exhibit -- just for identification or just for the witness Government Exhibit 3500 CK-146.

THE COURT: Sorry, you're saying you want to mark it?

MS. BONJEAN: Well, no, I just wanted to approach him.

THE COURT: Sure. Sure.

Sorry, 3500 CK-146?

MS. BONJEAN: Yes.

THE COURT: Okay, go ahead.

Do I have that?

MS. BONJEAN: I have a copy.

THE COURT: Thank you.

I don't want to take your only copy though.

MS. BONJEAN: You don't.

THE COURT: Okay.

MS. BONJEAN: Thank you.

BY MS. BONJEAN:

Q Mr. Kosley, I would ask that you look at the first page of this document and then the second paragraph, if you would, please. The first sentence.

A Mm-hm.

Q Does this refresh your recollection about whether you told the prosecution and an FBI agent that you were considered

a master stroker after many years of your practice?
A I don't remember saying I considered myself a master stroker.
Q Okay. And today, you don't even know what a master stroker is, right?
A Honestly, no.
Q Okay. You can put that to the side. Thank you.
Isn't it true that OneTaste had an ethics committee?
A It's possible. I don't remember that being the case.
Q Well, do you remember violating the container rule?
A Yeah, I do.
Q And what -- can you tell the Ladies and Gentlemen of the Jury what the container rule is?
A Well, it was never -- it wasn't really a rule until towards the later years or the last year or two that I was at OneTaste.
Q Okay. Well, what was it though? That's my question.
Can you tell the Ladies and Gentlemen what the container rule is?
A The practice of orgasmic meditation was just defined at a certain point to have very specific rules and regulations of how you were supposed to be positioned and how you were supposed to stroke.
And having been in the practice for a long time, I didn't always follow those exact rules.

Q Right.
And you got in trouble for it, correct?
A I don't know if you would say in trouble, but there was some discussions about my method of practice.
Q You also testified on Thursday that you had an ex-partner/ex-girlfriend, Lianna Lifson.
Do you remember some of your testimony regarding her?
A I do.
Q And at one point you drained a joint bank account to support your drug habit; isn't that right?
A I don't remember that.
Q You don't remember draining your joint bank account with her to support your drug habit?
A No, I do not.
Q You remember having a drug habit though, right?
A I remember having a period of time when I enjoyed drugs, yes.
Q Okay. You still enjoy drugs?
MS. BENSING: Objection.
THE COURT: Sustained.
Q In fact, you caused Ms. Lifson a fair amount of financial trouble, correct?
A I don't recall.
Q We also looked at an e-mail communication with

Ms. Daedone where you discussed a relationship with a Courtenay Lapovsky, correct?
A Correct.
Q There was some discussion about the marriage stroke.
Do you remember that?
A I do.
Q You didn't marry Courtenay Lapovsky, correct?
A I did not.
Q Now, at one point you were living at 1080, right?
A Correct.
Q How long did you live there?
A I don't remember exactly. I want to say it was maybe two to three years.
Q And do you recall what years those were?
A I want to say it was between 2009 and 2011 or '12, maybe.
Q Okay.
A Something like that.
Q And 1080 was an OM house, right?
A Yes, it was.
Q And there were rules associated with living at 1080, correct?
A Yes.
Q And one of those rules, as we discussed, was no drugs or alcohol use, right?
A Correct.

Q And while you worked at 1080, you sometimes worked outside of OneTaste, right?
A Correct.
Q You weren't obligated to work at OneTaste exclusively, correct?
A Um, when I was not working for OneTaste, I was not obligated. So, I could find another job.
Q Right. So obviously if you're working full time for OneTaste, you can't have two full-time jobs; most employers wouldn't permit that.
But you weren't obligated to work for OneTaste and live at 1080, is my question, right?
A Yes, that's correct.
Q Okay. And some people did live at 1080, but didn't work for OneTaste, right?
A Correct.
Q And, in fact, at one point you worked for a company called Eveo?
A Correct.
Q What type of company was that?
A They were an advertising agency.
Q And you were terminated from that company, right?
A That's correct.
Q And that's because you stole laptops from Eveo, right?
A That is correct.

Q And then you sold them on Craigslist, right?
A That's correct.
Q And you did this to support your drug habit, right?
A No.
Q Just did it for funsies?

MS. BENSING: Objection.

THE COURT: Sustained.

MS. BONJEAN: Give me one second, please.

THE COURT: Sure.

(Pause in proceedings.)

MS. BONJEAN: I have nothing further.

THE COURT: Mr. Robotti, do you have cross-examination?

MR. ROBOTTI: I do.

THE COURT: Okay. Go ahead.

CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good morning, sir.
A Good morning.
Q My name is Mike Robotti and I represent Rachel Cherwitz.

So I want to see if I understand your history of OneTaste correctly. Okay?

So, OneTaste hired you on the condition you stayed sober; is that right?
A At one time that was the condition of my employment, yes.

Q And OneTaste had a strict sobriety policy; is that correct?
A Yes.
Q And you were a cocaine addict before joining OneTaste?
A No, I would not characterize it that way.
Q Did you use cocaine before joining OneTaste?
A Occasionally.
Q And you had an addiction problem; is that right?
A I don't believe so.
Q So in October of 2013, you relapsed and used drugs while you were employed at OneTaste, correct?
A Correct.
Q And you used drugs --
A Um --
Q -- as a OneTaste student?
THE COURT: I'm sorry, I think he was still answering.
Right?
THE WITNESS: Yeah.
A What year did you say?
Q In October of 2013.
A Oh, okay.
Q That's correct?
A I believe so.
Q And you used drugs with a OneTaste student; is that

right?
A Perhaps, yes.
Q Was that acid?
A Yes, I believe so.
Q And you got fired following that relapse, correct?
A Yes.
Q And you were pretty upset about that, right?
A Perhaps.
Q And you had a conversation with Yia Vang about it; is that right?
A I don't recall.
Q And do you recall begging Yia Vang to come back?
A No, I don't recall that.
Q Do you recall Yia Vang having compassion for you at the time?
A I don't recall the conversations we had, to be honest.
Q Would it refresh your recollection if I showed you a document about this?
A Perhaps.

MR. ROBOTTI: I'm going to show what's been marked for identification as Defense Exhibit 10-J.

Your Honor, may I approach the witness?

THE COURT: Yes.

Is this something I have, Mr. Robotti?

MR. ROBOTTI: Yes, Your Honor. I handed it up this

morning.

THE COURT: Got it. Thank you.

Q Now just looking at the highlighted portion there at 15:15:28.

Does that refresh your recollection about a conversation with Yia Vang at the time?

A I still don't recall the specific conversation, but -- the exact words, what happened.

Q So do you recall that Yia Vang did say that they would hire you back if you got into a treatment program?

Is that correct?

A Yes. I don't remember -- I didn't work a program at that time, but I do remember committing to being sober.

THE COURT: Can you just give me the line number you were asking about, please.

MR. ROBOTTI: Yes, Your Honor. It was 15:15:28.

THE COURT: Thank you.

Q And ultimately, OneTaste did hire you back; is that correct?

A Correct.

Q And so they gave you a second chance in 2014, right?

A Yes.

Q And at the end of 2014, you then violated the OM container with the student; is that correct?

A Sure.

Q And as a result of that, Eli Block banned you from OM group practice; is that correct?
A I don't recall being banned from OM group practice, but perhaps that was how it was characterized.
Q Okay. So you recall that there were -- there was a conversation about the fact that you violated the container, right?
A Yes, I remember getting a talking-to about it.
Q And violating the container means you touched a student in a sexual way that the student found inappropriate, right?
A It was a sexual practice.
Q And the student complained about the fact that you had stuck a finger in her anus without consulting her, right?
A I don't recall the specifics of the incident.
Q Okay. But you do recall that there was a discussion about you breaking the container, right?
A Yes.
Q And OneTaste gave you another chance after that, right?
A I don't recall.
Q Well, you weren't fired at that time, correct?
A No, I don't believe so.
Q Okay. So then in March of 2016, you relapsed with cocaine again, right?
A Yes.
Q And you drove a OneTaste vehicle while you were high; is

that right?
A That is correct.
Q And that was a vehicle OneTaste had rented for an event, right?
A Correct.
Q And so you were on the job at OneTaste while you did that, right?
A Yes.
Q And you left the job and you got hired, correct?
A Yes, that's correct.
Q And you drove with other drivers on the road?
A Yes.
Q And so it's fair to say you endangered other people's lives?
A I don't believe so, but that -- could characterize it that way.
Q You drove while you were high on the road?
A Yes.
Q And there were other drivers, right?
A Yes.
Q And you don't believe that endangered other people's lives?
A Again, I don't believe so, no.
Q And you called this an all-night bender on direct examination, right?

A Yes.
Q And after your drug bender ended, you confessed to OneTaste management; is that correct?
A That's correct.
Q And that's when OneTaste fired you for good, right?
A Correct.
Q And despite the fact that you were fired, people at OneTaste were really kind to you and supportive of your addiction; is that correct?
A I don't believe they would have fired me if they were really supportive of my addiction.
Q Well, do you remember on March 26, 2016 that you told several senior people at OneTaste, including Rachel Cherwitz, that you were in a treatment program?
Do you recall that?
A Probably I was. I got into a treatment program shortly after, yes.
Q And do you recall that they were all incredibly supportive in response to that?
A I don't recall.
Q Could I show you a document to see if it refreshes your recollection?
A Sure.
MR. ROBOTTI: Your Honor, this is Defense Exhibit 10-DN.

THE COURT: Sorry, was that also given to me today?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Thank you.

The Government has it as well?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Thank you.

(Pause in proceedings.)

THE COURT: I think he's done. Do you want to --

THE WITNESS: Yeah, I'm done.

Q So do you recall telling people, senior people at OneTaste that you were in a treatment program at that time?

A Yes.

Q And do you recall them being incredibly supportive in response?

MS. BENSING: Objection. Relevance. Outside the scope.

THE COURT: Overruled.

A They -- in the immediate response to this, they were supportive, yes.

Q And you said "I love you all very much," is that right?

A Yes.

Q And when you told Justine Dawson about your relapse, she said "I love you so much," right?

A That sounds possible, yes.

Q And that you were loved?

A Yes.
Q And when you told Rachel Hemsi about your relapse, she called you "love" and she said let's get you to a meeting; do you recall that?
A I do.
Q All right.
So then, after you were fired, you stole videotape footage from OneTaste; is that right?
A No, that's not how I would characterize it.
Q So fair to say you kept video footage that did not belong to you, right?
A Correct.
Q And it belonged to OneTaste, right?
A Some of it, yes.
Q And you took that with you?
A It was in my possession.
Q And you didn't return it?
A Correct.
Q And you didn't have authorization to keep it?
A Correct.
Q And so you stole it, right?
A I disagree with that characterization.
Q And that was including the footage that we watched last week on Thursday, right?
A Some of it, yes.

Q And some of that video footage that you kept without authorization had very sensitive content in it, right?
A Correct.
Q That's footage of people engaged in OMs, right?
MS. BENSING: Objection. Asked and answered.
THE COURT: Overruled.
Q Footage of people engaged in OMs, correct?
A There was some footage of that, yes.
Q Footage of people undressed?
A Yes.
Q Footage that showed people's genitals, right?
A Correct.
Q And that was footage you had no right to take, correct?
A Again, I -- there was footage I had that I felt I did have the rights to, some of it I did not.
Q All right. So you agree, some of the footage you did not have the rights to?
A Correct.
Q And you had no permission to distribute that, right?
A Correct.
Q And so in violation of the contract you signed with OneTaste, you sold the footage to a media company, right?
A Again, I disagree with that characterization.
Q You sold the footage to a media company, correct?
A No, I did not sell the footage that was not -- that I did

not have the rights to.
Q Okay. You sold some of the footage that you still had in your possession to a media company, correct?
A I sold footage, that I had the rights to, to a media company. And I made the other footage available to them.
Q Okay. And you got $18,000 for that; is that correct?
A I don't recall the exact amount, but that sounds about right.
Q And as you mentioned on your direct examination, OneTaste sued you for breach of contract; is that right?
A Yes.
Q And as you already testified, you settled that lawsuit in 2023, right?
A Correct.
Q And that suit cost you a lot of money in legal fees, right?
A Indeed.
Q And you're pretty angry about that, correct?
A Um, I would have preferred not to have had to spend that money, yes.
Q Now, you met with the Government many times during this case; is that correct?
A I don't know what constitutes "many."
Q Would you say you've met with them for more than a dozen times?

A Not sure if that's true.
Q How many times would you say?
A I don't have an exact count.
Q Do you have an estimate?
A Maybe ten to twelve.
Q Okay. And those meetings were from October 2022 to April 2025, right?
A Yes.
Q And you continued to use drugs during the time period you met with the Government; is that right?
A I don't recall.
Q Well, did you meet with the Government on December 11, 2024?
A I don't recall the date of meeting them.
Q Do you recall meeting with the Government December of 2024?
A In December, yes.
Q And do you recall that when you met with the Government on that date, you told them you still do drugs in a social setting?
A Yes.
Q Okay. So during the time period you were meeting with the Government, you were still doing drugs, correct?
A I would occasionally do drugs on my own time, in my own.
Q And what drugs were those?

MS. BENSING: Objection. Relevance.
THE COURT: Sustained.
Q Did the Government tell you to stop using illegal drugs when you told them this?
MS. BENSING: Objection. Relevance.
THE COURT: Sustained.
Q Did the Government report to you to state authorities?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Sir, you created all sorts of problems at OneTaste, right?
A I'm not equipped to say.
Q Repeated drug use, repeated firings, container violations, theft, a lawsuit?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Cumulative.
THE COURT: Overruled.
Q Is that correct?
A Those things occurred.
Q And despite all of that, you are here today to testify against Nicole and Rachel, right?
A I'm not testifying against anyone.
Q And fair to say that you're biased against Nicole and Rachel?

A No, I would not say that today.
Q That you have an incentive to lie?
A No, sir.
Q Fair to say that your friends at OneTaste tried to help you through all the problems over the years?
A No, that would not be fair to say.
Q No?
They gave you second chance after second chance after second chance; is that right?
A I did get chances to come back to OneTaste, yes.
Q And you turned your back on them, right, in 2016, after you left?
A That's not how I would characterize it, no.
Q And you committed a crime against OneTaste when you left, right?
A Once again, I would not characterize it that way.
Q You agree that you took footage you did not have authorization to take and sold it?
A Again, yes, that's true.
Q And so OneTaste is the victim of your crimes, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q You took that footage and sold it without regard to who your actions might hurt; is that correct?
A No, I don't believe that's true.

MR. ROBOTTI: No further questions.

THE COURT: Ms. Bensing, any redirect examination?

MS. BENSING: Very briefly, Your Honor.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. BENSING:

Q Mr. Kosley, you were just asked a bunch of questions about your provision of video materials to other entities, including a media company.

Do you recall that?

A Yes.

Q Did you provide these materials to the Federal Government pursuant to a federal subpoena?

A I did.

Q And is it your understanding that you're obligated to provide those materials to the Government when you receive a subpoena?

A Yes.

MS. BENSING: I have no further questions.

THE COURT: Any recross-examination?

Ms. Bonjean.

MS. BONJEAN: Yes, Your Honor. One question.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q To be clear, Mr. Kosley, you responded to the

Government's subpoena and provided them with -- this is the same footage you had taken from OneTaste without authority, right?
A It was among the footage, yes.
Q Okay. But when you gave it to Sarah Gibson and Lena Dunham, you --
MS. BENSING: Objection.
THE COURT: Sustained.
Q Prior to giving the footage to the Government, you didn't have -- you didn't give it to the filmmaker for the purposes of -- in response to -- strike that. My apologies.
Before you gave it to the Federal Government in response to a subpoena, you voluntarily gave it to the filmmakers not pursuant to a subpoena, right?
A That is correct.
THE COURT: Mr. Robotti, any re-cross examination?
MR. ROBOTTI: No further questions, Your Honor.
THE COURT: Okay. The witness may step down.
(Witness steps down.)
THE COURT: And the Government may call its next witness.
MS. BENSING: Thank you, Your Honor.
The Government calls Lianna Lifson.
THE COURT: You may come right up here, please.
(Witness takes the stand.)

THE COURTROOM DEPUTY: Please step up, remain standing, and raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record, spell your last name slowly.

Here's the mic.

Thank you.

THE WITNESS: Lianna Lifson, L-i-f-s-o-n.

THE COURT: You may inquire.

MS. BENSING: Thank you very much, Your Honor.

(Continued on the next page.)

**LIANNA LIFSON,** having been previously duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BENSING:

Q Good morning, Ms. Lifson.
A Good morning.
Q Are you familiar with an organization called OneTaste?
A Yes, I am.
Q What is OneTaste?
A OneTaste is a wellness organization, I would say, that was based on the practice of orgasmic meditation.
Q Approximately when did you first become involved with OneTaste?
A 2008.
Q How old were you then, approximately?
A 24.
Q Approximately how long were you involved with OneTaste?
A Six years.
Q So until about what year?
A 2014.
Q Did there come a time when you worked for OneTaste?
A Yes.
Q At a high level, what kind of work did you provide?
A I was a coach and a facilitator and I also did production. I was a city lead as well.

Q Did you provide any sexual labor for OneTaste?
A Yes.
MS. BONJEAN: Objection.
THE COURT: Overruled.
Q What kind?
A I OMed with clients and I also did demos.
Q And when you say OMed, what are you referencing?
A I was a strokee for orgasmic meditation.
Q When you say demos, what do you mean?
A I demonstrated orgasmic meditation in classes.
Q Did anyone direct you to provide those sexual services?
A Yes.
Q Who?
A Rachel Cherwitz and other people in the organization.
Q What was Rachel Cherwitz's role when you were involved with OneTaste?
A She was the sales, the lead -- the head of sales.
Q I'm going to ask that you look around the courtroom and let me know if you see Rachel Cherwitz.
A Yes.
Q And if you could please identify her by an article of clothing.
A She's the one in the gray jacket.
MS. BENSING: Your Honor, I ask that the record reflect that the witness has identified the defendant

Rachel Cherwitz.

THE COURT: Yes.

Q Ms. Lifson, when you were at OneTaste, who did Ms. Cherwitz report to?

A Nicole Daedone.

Q Do you see Nicole Daedone in the courtroom today?

A Yes, I do.

Q And I ask that you identify her by an article of clothing.

A She is in the tan jacket.

MS. BENSING: Your Honor, I ask that the record reflect that the witness has identified the defendant Nicole Daedone.

THE COURT: Yes.

Q What was Nicole Daedone's role when you were at OneTaste?

A She was the head of the organization. I would say she called all the shots. She had different titles, but she was always in charge.

Q And what do you mean "she called all the shots"?

A Um, she was the one who orchestrated everything that was going on. She was in charge.

Q What, if any, impact did your time at OneTaste have on your finances, Ms. Lifson?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A I would say that it had a negative impact on my finances, that I defaulted on my student loans while I was involved with OneTaste and -- um, yeah.
Q Did you accrue any debt?
A Yes.
Q What kind?
A Credit card debt.
Q Did your financial situation contribute to your provision of labor and services for OneTaste?
MS. BONJEAN: Objection.
A Yes.
THE COURT: Overruled.
Q In what way?
A We got paid very little at OneTaste, so I wasn't able to save any money. So, leaving felt more difficult.
Q What, if any, impact did your time at OneTaste have on your psychological state?
MS. BONJEAN: Objection.
MS. COHEN: Objection.
THE COURT: One moment, please.
Overruled.
Q You can answer the question.
A Okay. I -- when I left OneTaste, I was in a really hard place. It was the most difficult thing I've ever done.
Q And what do you mean by that?

A Um, I had become so enmeshed with the organization and the -- we didn't have any days off. We were just -- like, my whole life had become about OneTaste that I was really worn out at the end and I was -- I was just in a -- I was -- it was really hard to function when I left.
Q Hard to function in what way?
A It was hard for me to, like, get up in the morning, get a job. Like, it was just everything felt difficult.
Q And what --
A I --
THE COURT: Sorry. Just let her finish.
And also, if you wouldn't mind just either keeping your voice up or just moving the microphone closer to you.
THE WITNESS: Sure. No problem.
THE COURT: Thank you.
THE WITNESS: Yes.
Is that better?
THE COURT: Yes, that's much better.
MS. BENSING: I apologize.
Q And you can finish your answer. Thank you.
A Yeah, it was just -- I was just in a really bad head space afterwards.
Q And what caused you to come to that head space?
MS. BONJEAN: Objection.
THE COURT: I'm going to sustain.

You can ask your next question.
Q So, you've just testified about the psychological head space that you were in when you left OneTaste.
A Mm-hm.
Q What about during the time that you were at OneTaste?
MS. BONJEAN: Objection. Vague and foundation.
THE COURT: Sustained.
Q I want to focus on the period before you left OneTaste.
A Sure.
Q Did your psychological state -- what was your psychological state right before you left OneTaste? So not after you left, but right before you left.
A Sure.
I was -- I was having a really hard time. I was working about 12, 13 hours a day, every day, with no days off. So I was really, really tired and worn out and I felt really beaten down. I didn't have a lot of self-confidence left. I wasn't sure kind of what -- yeah, I just -- I wasn't sure about anything at that moment.
Q Why did you feel beaten down?
A I would say it was both the hours that I was working, but also -- sorry -- the way that we were treated was, you had to --
MS. BONJEAN: I'm going to object to the plural.
THE COURT: Sustained.

THE WITNESS: Sorry.
A The way that I was treated was that I had to toe the company line, you had to do what you were told. There were a lot of -- yeah, you just basically had to do what you were told. So, living inside that environment for so long had me feel very beaten down.
Q And why was your self confidence low at that point in time?
A I would say that it was because I didn't -- I don't think I trusted myself anymore. I didn't really trust my own internal voice. Any time that I would speak up or say that something didn't seem right, I was shot down very quickly. And there was also, like, retribution for that, so I just kept my mouth shut.
Q What kind of retribution?
A Some people would get fired from their jobs.
MS. BONJEAN: I'm going to object to the --
THE WITNESS: Oh, sorry. For me.
MS. BENSING: Your Honor, this is just for the witness's own state of mind, not for the --
THE COURT: Just ask your next question, please.
I'm going to sustain the objection.
Ask your next question.
MS. BENSING: Understood.
Q What kinds of retribution impacted you the way that you

just testified?
A I would see other people lose their jobs when they spoke up against people.
MS. COHEN: Objection.
THE COURT: I'm sorry, who -- did somebody --
MS. COHEN: I did.
THE COURT: Overruled.
A So that had me feel nervous about the way that I was to act.
And then you -- yeah, I think that was the biggest one.
Q Did that psychological impact that you just described have any impact on your provision of labor or services for OneTaste?
MS. BONJEAN: Objection to the form of that question.
THE COURT: Overruled.
A Yes. Yes, it did. I felt like I felt so dependant on the organization that it was very difficult for me to say no to anything that was asked of me.
Q Did Nicole Daedone contribute in any way in the harm you just described?
A Yes, she did.
Q In what way?
A She created the environment of OneTaste, I would say is

the largest way.

But also over my time there, she would text me directly, pressuring me to sales.

If I talked to her about a problem, I was shot down by her pretty quickly.

Q Did Rachel Cherwitz contribute in any way to the harm that you just described?

A Yes, she did.

Q In what way?

A She led the sales thread that never slept. So, our phones were constantly going off 24 hours a day, 7 days a week. We had to check in all of the time, even if we were just going for a walk. So they constantly would keep tabs on us.

Q I want to go back to before you became involved in OneTaste.

Where did you grow up?

A I grew up in Westchester.

Q In New York?

A Mm-hm.

Q I will just ask, as a general matter, if you can just answer yes or no for the court reporter's sake.

A Sure.

Q What is your highest degree of education?

A I have a master's degree.

Q In what?
A In education.
Q Approximately when did you obtain your master's?
A 2006.
Q And where were you living at that point in time?
A I was living in New York.
Q When did you first hear of OneTaste?
A When I was living in New York, here.
Q What happened?
A I went to a lecture that Nicole did Downtown.
Q And what do you recall about that lecture?
A I remember her talking about what was then called the warehouse space, that they were doing, like, sexual spirituality. I thought it sounded very San Francisco.
Q How did you hear about that lecture in the first place, that you heard Nicole Daedone speaking at?
A My partner at the time.
Q You mentioned your partner at the time. Please describe that relationship to the jury.
A It was tumultuous and abusive at times. I had met him when I was 18 and he was 30.
Q And in what way was it abusive, at a high level?
A Sexually.
Q What did you do after -- did you -- when you heard Nicole speak at that lecture, did you become more involved in

OneTaste at that time?
A No, I didn't.
Q What did you do after you finished grad school?
A I moved to San Francisco.
Q And approximately what year was that?
A That was 2008.
Q What did you do in San Francisco?
A I taught high school.

(Continued on the next page.)

(Continuing.)

DIRECT EXAMINATION (Continues)

BY MS. BENSING:

Q And did you move to San Francisco for that job?

A Yes, I did.

Q When you moved to San Francisco, where did you live initially?

A I lived in a small basement apartment.

Q What, if any, community did you have in San Francisco when you moved there?

A Very little.

Q What do you mean by that?

A I was living with a friend of my -- my dad's old friend's son, but I didn't really know him before that. And I didn't know anybody in San Francisco.

Q And what about your family, did you have strong family support at that time?

A My parents were going through a very messy divorce, so they were sort of wrapped up in their own stuff.

Q What, if any, relationship did you develop with drugs and alcohol at that point in time?

A I started using both pretty heavily on the weekends.

Q So you've testified earlier that you got involved with OneTaste in approximately 2008.

Was that when you were living in San Francisco?

A Yeah. It was shortly after I moved to San Francisco.
Q What happened?
A I went to a party that was like a send-off Burning Man party.
Q Let me just pause you there.
What is Burning Man?
A Burning Man is a desert festival that happens every year in August.
Q Okay. Go ahead.
A And I met Kal Holczler there and he invited me to an INGroup. And I was like: But I don't have any friends here. And he was like: You do now.
MS. BENSING: I'd like to pull up for everybody, I believe this is in evidence, Government Exhibit 213.
(Exhibit published.)
MS. BENSING: And if we can pull it up for the jurors as well. Thank you.
(Exhibit published.)
BY MS. BENSING:
Q Do you see this on the screen in front you, Ms. Lifson?
A Yes, I do.
Q And who is here in Government Exhibit 213?
A That's Kal.
Q And you testified that Kal invited you to what kind of event?

A An INGroup.

Q What is an INGroup?

A An INGroup was a introductory event to OneTaste.

Q And what happened at the INGroup that you went to?

A There were three games that were played. It's like an introductory game where you went around the room and you said a word after a prompt.

And then there was Hot Seats was the second game where you went up in front of the room if you were called on, and people from the room asked you questions.

And then the third game was called Intimacy is where somebody would say something if they noticed something about somebody else.

Q And at the time that you attended this INGroup, what did you understand the purpose of these games to be?

A Like just an evening of connection, something to do that was different than go to a bar.

Q Did there come a time when your understanding of the purpose of those games changed while you were at OneTaste?

A Yes.

Q In what way?

MS. BONJEAN: Object to the foundation.

THE COURT: Sustained.

BY MS. BENSING:

Q Well, at some point did you take, as already testified,

did you take on a sales role at OneTaste?
A Yes.
Q And as part of that sales role, did you, yourself, conduct these games?
A Yes.
Q And so what was the purpose of these games when you were conducting them?
A To identify people who you could then sell stuff to, to find their places where -- to have them -- sorry. To have them have some sort of an experience, and then to also see places where they were vulnerable so you could then use that to sell them courses.
Q And who trained you in sales, Ms. Lifson?
A Rachel Cherwitz did.
Q Based on your experience at OneTaste, including your sales experience, what kind of information did you attempt to gather at these initial recruitment experiences?
A Say, like, what they -- what they needed. Like, were they unhappy in their marriages, did they have a confidence issue. You learned how to read clothing and body language, and you wanted to just -- you wanted to see what it was that they felt dissatisfied with.
Q Why?
A Because then you could use that information to sell them things.

Q And sell them specifically what kinds of things?
A Courses, coaching, whatever the offerings were at that that moment.
Q On behalf of OneTaste?
A Uh-hum.
Q And is that a yes?
A Yes, sorry.
Q Who, if anybody, do you remember meeting with in the OneTaste community at that first INGroup that you attended?
A I think it was led by Rachel Cherwitz and Robert Kandell.
Q And I'd like to show you and everybody what's already in evidence as Government Exhibit 221.
(Exhibit published.)
Q Do you recognize this person?
A Yes.
Q And who is this?
A That is Robert Kandell.
Q What was his role in the organization at that time?
A He was the co-founder with Nicole, and then he was also the production lead. He did finances. He did all of the -- the nitty-gritty stuff.
Q And was that the case throughout your time period with OneTaste?
A Yes, it was.
Q What happened after you attended that initial INGroup,

did you participate in more OneTaste events?
A Yes, I did.
Q What kinds?
A At first I just participated in weekend courses, and then I became more involved and participated in bigger classes as well.
Q Describe your involvement in OneTaste over the next period of time.
MS. BONJEAN: Objection, foundation.
THE COURT: Sustained.
BY MS. BENSING:
Q What happened next, Ms. Lifson, with respect to your involvement with OneTaste?
A Sure. I went to a couple of weekend classes while I was still working my job as a teacher and I slowly became more invested. Because I didn't have any friends outside of the organization, the people who I met at those weekend courses became -- became my only friends in San Francisco.
Q Who in the OneTaste community became important to you?
A Sure. Aubrey Fuller, Jennifer Slusher, Dana Gill, Michelle Wright.
MS. BENSING: If we could pull up for everybody what's in evidence as Government Exhibit 292.
(Exhibit published.)
Q Who is this?

A This is Aubrey Fuller.

MS. BENSING: And if we can pull up for everybody what's in evidence as Government Exhibit 408.

(Exhibit published.)

BY MS. BENSING:

Q Who is this?

A That's Michelle Wright.

MS. BENSING: And if we can pull up for everybody what's in evidence as Government Exhibit 297.

(Exhibit published.)

Q Who is this?

A That's Dana Gill.

Q Are those the individuals you just mentioned?

A Yes.

MS. BENSING: We can take that down.

Q When do you -- when did you -- did there come a time where you met Nicole Daedone again?

A Yes.

Q And when was that?

A It was at the Body Course, which was the course where you learned orgasmic meditation.

Q What do you recall about the Body Course?

A The New York Times was present at that class, so it was -- there were a lot of people there. There was the press there.

Yeah, it was a weekend-long course and it culminated in an OM.
Q Was this your first -- and you just testified this was your first time meeting Nicole Daedone after you got involved in the organization, is that --
A Yes, correct.
Q Based on your own personal observations at that course, how was Nicole Daedone treated?
A With a lot of reverence.
Q And what do you mean by that?
A People seemed to put her on a pedestal.
Q In what ways?
A Just like when she was teaching, people would run up and give her water and snacks when she -- when they felt like she needed it. And they -- they treated her with a lot of level like -- like, they kept a little bit of space and that feeling of -- of -- yeah, reverence, I think.
Q And what impact, if any, did that have on you?
MS. BONJEAN: Objection.
THE COURT: Overruled.
BY MS. BENSING:
Q You can answer.
A At the time I thought it was really odd.
Q And what about as your time developed throughout the course of your time at OneTaste?

A I started to see -- I saw the same thing more and more, and eventually I started treating her in the same fashion.
Q How did your involvement in OneTaste progress after the Body Course?
A It progressed. I think I took another class called The Leadership Training Program next, which was like a longer weekly class. And then I -- I took a break from OneTaste courses for a little while.
Q How come?
A I just lost interest. They were in a transitionary point. They were moving from the warehouse to 1080 at that moment, and I don't think they had a lot of offerings. But also I was just like, just focused on teaching. I was focused on other things.
Q And when you say transitioning from the warehouse to 1080, what are you referencing?
A The people who lived at OneTaste had lived in the -- in a warehouse on Russ Street, and then they were moving to take over a single-room occupancy hotel, which was 1080.
Q What happened with respect to your teaching job?
A I was generously laid off.
Q What do you mean by that?
A I was -- that was a really hard job and I was not really up for the task in a lot of ways. It was a -- so I had a hard time with student engagement especially. And after two years

at that job, I was laid off.
Q And so what year was that?
A That was 2010.
Q What happened with respect to OneTaste after you were laid off from your teaching job?
A I moved into the residence there.
Q Which residence?
A At 1080.
Q What was -- can you describe 1080?
A 1080, the bottom floor was sort of common areas with a kitchen and a dining room, and also a little seating area, there were benches outside.
And then the second floor was predominantly people who were not affiliated with OneTaste. They were Craigslisters, who wanted short-term stays.
And then the third floor was OneTaste community members.
Q When you moved into 1080, what were you doing for work?
A I think -- I don't remember if I had already been laid off from my job before I moved into OneTaste or I had just been laid off. It -- it happened very close together.
Q Okay. So at some point when you were living in 1080, were you unemployed?
A Briefly, and then I found a job as a youth director at a local synagogue.

Q Okay. And what happened working as a youth director for the synagogue?
A I had -- I had a hard time really focusing on that work. I was taking the OneTaste coaching program at the time, and the two environments sort of together were very jarring.
Q What do you mean?
A Well, I lived -- I lived at 1080. It -- on Folsom Street in San Francisco, and then I commuted every day to the suburbs to a synagogue and taught religion. So they were very different environments.
And -- yeah, it was difficult. It was difficult for me to really -- by then I was doing a lot more for OneTaste. I was taking a lot more courses. All my free time was really going to OneTaste stuff, so it was hard for me to fully focus and be present with my job.
Q So what ended up happening with respect to the synagogue job?
A I was laid off at the end of the school year.
Q And what happened with respect to your employment situation when you were laid off from that job?
A I came home and they needed somebody to cook lunch for the community and they asked if I wanted to do it, and I said yes. And I started cooking for 1080.
Q And who's "they"?
A Rachael Hemsi asked.

Q How were you paid for the 1080 cooking job?
A I was paid in cash.
Q Did you report those earnings?
A No, I didn't.
Q And did you also collect unemployment at that time?
A Yes, I did.
Q What living expenses did you have at that time?
A I paid rent to 1080 and food to 1080. I also had student loan bills from my graduate program. And then I also had a car note.
Q You had what?
A A car note and car insurance.
Q Approximately how much was rent?
A I remember it being around a thousand dollars a month.
Q And I think you also testified that at that point in time you started taking a OneTaste coaching program?
A Yeah, I did, indeed.
Q And what is that coaching program?
A It was -- it was called Coaching Program 2. It was the second one that they did.
It was a ten-month long course with three in-person immersions, and then the rest of it was long distance.
Q And did you have to pay for that coaching program?
A Yes, I did.
Q And approximately how much was that if you can recall?

A I think it was about $24,000. So I was paying $1200 a month.
Q When did you sign up for the coaching program approximately?
A I signed up right after I committed to living at 1080.
Q How -- given your testimony with your employment situation, how did you afford that?
A I took on secondary jobs.
So, I worked for somebody in Sausalito, which is across the bay from San Francisco, and I helped him write a book. So, I was doing that a couple days a week. After, I would go right from the synagogue to that job. And between those two I was able to pay for the coaching program and my rent, but I didn't really have enough money for my car and my student loans. So, I shared my car with the community and got money from some other community members, until eventually I just had to sell it. And I defaulted on my student loans.
Q Okay.
So at some point during the course of the time that you moved into 1080, you sold your car?
A Uh-hum.
Q Did you -- directing your attention to Rachel Cherwitz, what, if anything, did she say to you regarding your financial picture at that point in time?
A I don't remember if Rachel specifically said anything to

me at that time.

Q Okay. Did you talk to anybody about -- at OneTaste about your finances?

A Yeah, I did. I definitely talked to some senior staff members. I don't remember who specifically.

Q And what was your takeaway from those conversations?

MS. BONJEAN: Objection, hearsay.

MS. BENSING: Your Honor, it's not for its truth.

THE COURT: Overruled.

BY MS. BENSING:

Q What was your takeaway from those conversations?

A That I shouldn't worry about it, that the money will come later. That, like, we deal in the fourth dimension and money is a third-dimensional problem, so it's really not that big of a deal.

Q And what was your understanding of what the third dimension was?

A Third dimension is the world that we live in here, the concrete world, but that we were sort of like working on a higher plane.

Q And so, what's the fourth dimension?

A That higher plane.

Q When you lived in 1080, approximately how many people lived there?

A Around 40.

Q Did there come a time where you lived with another person at 1080 or other people?
A Yes. After I lost my teaching job, I had roommates the entire time I lived at 1080.
Q How were your roommates determined?
A They were assigned to us.
Q By who?
A By Rachael Hemsi.
Q And when you say roommate, did you each have your own bed?
A No. The rooms were really, really small at 1080. They were just like little boxes and they had rooms for one queen size bed and like a closet, and that was it.
Q Did you come to share a bed with anybody who you didn't want to?
A Yes, I did.
Q How did that come about?
A I was assigned to room with a person named Alisha, who I didn't really know that well and didn't really want to share a bed with.
Q Did you engage in any kind of sexual activity with Alisha?
A We did OM together.
Q And why did you share a bed with Alisha if you didn't want to?

A See, the philosophy of OneTaste, it wasn't really about wanting to or not wanting to, it was about like if you have resistance toward something, the way it would be framed was that you were supposed to move towards it.

So just because you didn't want to do something wouldn't mean that you wouldn't do it.

Q While you were living in 1080, were you able to personally observe how others around you were able to afford rent and courses?

A Yes.

Q And what way were others able to afford this?

MS. BONJEAN: Objection.

THE COURT: Sustained.

BY MS. BENSING:

Q Based on your only personal observations, Ms. Lifson, in what ways were other people able to offer this?

MS. BONJEAN: Still objection, Your Honor, on the foundation to that question.

MS. COHEN: Objection.

THE COURT: Overruled.

Q You can answer.

A Okay. Some people had full-time jobs, and some people did engage in sex work.

Q What, if anything, did Nicole Daedone teach while you were at OneTaste during this time period about sex work?

A That it was an -- something that was exalted. That it was something that it was positive to move towards.
Q I want to show you and everybody what's in evidence as Government Exhibit 284.
(Exhibit published.)
MS. BENSING: And if we could also publish this for the jury.
(Exhibit published.)
BY MS. BENSING:
Q Do you recognize this person?
A Yes, this is Reese Jones.
Q Who is Reese Jones?
A Reese Jones was a benefactor of OneTaste and, at one point, was Nicole Daedone's boyfriend.
Q Did there come a time based on your own personal observations that the relationship between Nicole Daedone and Reese Jones changed?
A Yes.
Q In what way?
A Nicole started to spend more time at OneTaste -- at 1080 and less time at Reese's house. And specifically was engaging in sexual activity with Marcus Ratnathicam, and it seemed to shift her relationship with Reese.
Q And around this time, based on your own personal observations, what, if any, relationships did Reese Jones have

with other women at OneTaste?
A Nicole sent other women to placate Reese sexually.
Q Which women are you aware of?
A Madelyne Carl and Michelle Wright.
MS. BENSING: I'd like to show the witness only, please, what's been marked as Government Exhibit 217.
BY MS. BENSING:
Q Do you recognize this?
A Yeah, that's Marcus.
Q And is it a fair and accurate copy of a photograph of Marcus?
A Yes.
Q And is that Marcus Ratnathicam?
A Yes, it is.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 217 in evidence.
THE COURT: Any objection?
MS. COHEN: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 217 is admitted.
(Government's Exhibit 217 was received in evidence.)
(Exhibit published.)
MS. BENSING: Hopefully, we can publish it for the jury, and we can take this down please.
Q Ms. Lifson, why was Reese Jones given this treatment, to

your knowledge?

MS. BONJEAN: Objection to the foundation of that question.

THE COURT: Sustained.

BY MS. BENSING:

Q Approximately how long did you live full-time at 1080?

A Approximately two years.

Q And at the end of that two-year time period, what was your involvement like at OneTaste?

A I had been offered a position at -- as city lead in Boulder, Colorado. So I moved to Boulder to spread OneTaste there.

Q And what year was that approximately?

A 2010, I think.

Q Is there a document that might refresh your recollection?

A Yes.

MS. BENSING: If I can please show the witness only Government Exhibit 2079.

And if you can just zoom in.

Q So, Ms. Lifson, just take a look at this and let me know if that refreshes your recollection.

A Yes. It was in 2012. I'm sorry.

Q 2012 that you moved to Boulder?

A Yes.

Q And approximately when in 2012?

A End of May.

MS. BENSING: Okay. We can take that down, please.

BY MS. BENSING:

Q You have testified a little bit about the practice of orgasmic meditation.

When was that practice first introduced to you?

A At the Body Course.

Q And did your relationship with the practice of orgasmic meditation change over the course of your time at OneTaste?

A Yes, it did.

Q Explain.

A At first I just practiced with people who I had relationships with, but then as it progressed I would practice with just like community members.

And when I was first involved with OneTaste, you -- there were OM circles where everybody OMd in the same room and you got to choose your first partner. But then the men just rotated for the second partner, so you didn't get to choose who you OMd with. And it was sort of like through that practice I started OMing with people who I didn't necessarily know.

And then I would say when I was in Boulder, OM was used more -- was used both, like -- it was used as a sales tactic and then also was -- we also just OMd with each other in the community.

Q And when you say that when you were in Boulder OM was used as a sales tactic, what do you mean?
A In -- in a variety of different ways. If I was trying to sell somebody something and they were sort of on the fence, I would schedule an OM with them and then talk to them about it afterwards. So they -- so after having that sexual experience, they were more likely to want to buy something from me.

And then also, it was sort of like the same with demos and classes. So after I had an OM, after somebody had been -- watched me OM with somebody, they were more likely to want to buy things from me as well.
Q And did your understanding of whether you were required to participate in OM change throughout the course of your time at OneTaste?
A Yes.
Q In what way?
A Well, when --

MS. BONJEAN: Objection. I'm sorry, objection to the foundation of that question.

THE COURT: Overruled.

BY MS. BENSING:
Q You can answer.
A Sure. Okay. So when I was at 1080, it was more up to me whether or not I OMd and who I OMd with. But once I was

working for the organization, OM was required regularly. We were supposed to OM every single morning. And then I was expect to OM with community members as well.

Q And who set those expectations?

A I don't remember exactly who they came from.

Q What, if anything, did you learn about a connection between the practice of orgasmic meditation and trauma?

MS. BONJEAN: Objection.

THE COURT: Sustained.

MS. BONJEAN: I'm going to object to the foundation.

THE COURT: Sustained.

BY MS. BENSING:

Q What, if anything, did Nicole teach you, did Nicole Daedone teach you about the benefits of orgasmic meditation?

A She taught that OM would help with trauma.

Q In what way?

A That it would help thaw out places where you felt frozen from that trauma I think is the language that was used.

Q And did that appeal to you specifically?

A Yes, it did.

Q How come?

A I was having a hard time having healthy sexual relationships after breaking up with my previous partner.

Q And did orgasmic meditation help you with that?

A I think in the beginning it did. I felt more safe in the

community than I had, definitely felt safer than going on like random dates with people, and I was able to let my guard down a little bit.

Q And did there come a time when that changed?

A Yes, it did.

Q When?

A When I felt like I had to OM with certain people. When I felt like it was my job to -- to OM with people and I felt like I couldn't -- you know, in an abusive relationship your voice doesn't really matter that much and you learn to be quiet. And I think that I took those lessons from my relationship and brought them over to OneTaste.

So, it was like I was just quiet. Like when the men would rotate and I didn't want to OM with that second partner, I was just quiet. Or if somebody asked me to OM in the community that I didn't really want to but I knew I was supposed to, then I was just quiet.

So, I think in those ways it -- it retraumatized me and solidified some of my trauma.

Q When you were living at 1080 and working in the kitchen, did you perform any other kind of work for OneTaste?

A I did volunteer work. I did back of house, and I also often sat in on courses when they weren't gender balanced.

Q And what do you mean by "gender balanced"?

A When there weren't the same amount of men and women.

Often lots of men wanted to take how-to-OM courses, but not a lot of women.
Q And so what did you have to do in that situation?
A I would, basically, pretend to be new to the practice and then OM with new men.
Q And who asked you or directed you to do that?
A Rachael Hemsi, Rachel Cherwitz, Yia Vang, whoever it was around.
Q And why did you agree to do that?
A Because it was expected in the community.
Q You testified earlier that in May of 2012 you moved to Boulder.
Is that Boulder, Colorado?
A Yes.
Q Why did you move to Boulder?
A Because I was offered a position as city lead. Yeah.
Q Did you take that job?
A I did.
Q What was going on with respect to your coursework at the time that you moved to Boulder?
A I had just signed up for a second coaching program.
Q What happened with respect to the first coaching program?
A It had ended.
Q Was there any connection between your signing up for the second coaching program and your move to Boulder?

A It -- it -- it seemed like it was -- they saw me recommitting to the organization. So it was like a -- a bit of a reward.
Q Who offered you the job in Boulder?
A I feel like it was Justine Dawson who talked to me about that, but I'm not sure.
Q Okay. Describe your physical appearance when you were working and living at 1080.
A After I had left the synagogue, I had pink hair. I had red hair. I was like -- like fluorescing. I dressed super funky. Yeah. Yeah, I was in my twenties and I was in San Francisco, having a good time.
Q Did that change when you moved to Boulder?
A Yes, it did.
Q Why?
A I was told that if I was going to teach OneTaste courses I had to look a certain way.
MS. COHEN: Objection, hearsay.
THE COURT: Sustained.
BY MS. BENSING:
Q Did you have a conversation with Rachel Cherwitz about your appearance when you moved to Boulder?
A Yes, I did.
Q And what did she tell you in that conversation?
A I had to dye my hair brown again, and I -- there was sort

of -- there was like a OneTaste uniform where you wore neutral colors. You were like sexy, but not too sexy. A lot of like -- yeah, like....

So, Joanna van Vleck took me shopping before we left and showed me like the right brands to wear, the right makeup to wear, the right clothes to wear, so I was representing the organization in a way that they felt was the image they wanted to portray.

MS. BENSING: I'd like to pull up what's in evidence as Government Exhibit 201.

(Exhibit published.)

BY MS. BENSING:

Q Who is this?

A Joanna van Vleck.

Q And what was her role at OneTaste at that time?

A I don't know exactly what her title was, but I know she worked on, like, business planning is my understanding.

Q And do you know who she reported to?

A She reported to Nicole.

Q Nicole Daedone?

A Yes.

Q Was Joanna van Vleck involved in sales?

A I don't know.

MS. BENSING: All right, we can take that down. Thank you.

BY MS. BENSING:
Q I think you testified to this, but what was your role going to be in Boulder?
A I was a city lead.
Q And what did that entail?
A At first it just entailed running classes and enrolling for them.
Q And did it change?
A Yeah, it did. As we had more courses, it was like finding -- we had to find a spot to have them and then, like, doing production for them. And I also started doing more production for our national courses. So at the same time I was doing that, I was also flying back to New York and doing production for OneTaste as well.
Q What was your financial situation like when you first moved to Boulder?
A Very precarious. I was working only on commission, and I was selling very inexpensive classes.
Q Okay. When you say you were working only on commission, what does that mean?
A I only got paid for a percentage of the courses that I sold.
Q Were you still collecting unemployment from your California address?
A Yes, I was.

Q How come?
A That was my only real income at that time.
Q When you were in Boulder, did -- were you assigned sales goals?
A Yes, I was.
Q Who assigned those do you?
A Rachel Cherwitz did.
Q What were the expectations set by Rachel Cherwitz regarding sales goals?
A That you didn't go to sleep until you hit your sales goal.
Q And so what did that mean practically for your life?
A It meant that you were up late at night trying to get somebody to buy something to hit a goal.
Q And what, if any, involvement did Nicole Daedone have with respect to sales goals?
A She would periodically text me and just say, like, you need to sell two Masteries today, stuff like that.
Q What, if any, familiarity do you have with the term "mark"?
A A mark was a person who you identified at an introductory event who could -- you could sell things to, who you thought would be a good prospect.
Q And based on your role working for OneTaste sales, who were OneTaste's marks?

A They were often gentlemen who had a lot of money in San Francisco. At that time it was often people in tech.
Q Were you a mark assistant?
A Yes, I was.
MS. BONJEAN: Objection to the foundation, speculation.
THE COURT: Sustained.
BY MS. BENSING:
Q Based on your work as a sales director for OneTaste, did you come to have an understanding about whether or not you were a mark?
A Yeah, I understood that I was given special attention and targeted so I could -- so I would become deeper involved in the organization.
Q And why were you a mark?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q What about yourself made you identify yourself as a mark?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Based on your experience and training in your OneTaste sales role, what, if any, qualifications did OneTaste look for in its salespeople?
A In its sales team?
Q Uh-hum.

A People who were, I would say, younger, attractive, who could use their sexual activity to sell people.

Q You testified earlier that you were paid on commission.

How did that work in practice, do you recall how much you would make per sale?

A I don't recall.

THE COURT: Ms. Bensing, just to let you know that in the next five to ten minutes I'd like to take a break. So, whenever you think is a good breaking point we can do that.

MS. BENSING: Sure. Just a couple more questions, Your Honor.

THE COURT: Yes, go ahead.

BY MS. BENSING:

Q Through which entity were you paid at that time?

A Caravan Retreats.

Q What was Caravan Retreats?

A It was the umbrella company for everything OneTaste.

MS. BENSING: We can actually, I think, pause here if that works for the Court.

THE COURT: Yes.

So we will take a break and come back at 11:15. And the witness can step down.

THE WITNESS: Okay, great. Thank you.

(Witness steps down.)

THE COURT: And keep an open mind. Don't talk about

the case.

(Jury exits.)

THE COURT: Okay. We can come back at 11:15.

You can also think about if you have a proposal on the jury note about Friday.

Okay. We'll break until 11:15.

(Recess taken.)

(Continued on the following page.)

(In open court; jury not present.)

THE COURT: The jury is ready, but I'll hear you out if you want to tell me what you think about Friday. Or we can do it at the lunch break as well.

MS. BENSING: Your Honor, we're amenable to an earlier end time on Friday, but I ultimately defer to the Defense.

MS. COHEN: That's fine for us, Your Honor, as well.

MS. BONJEAN: Agreed.

THE COURT: Okay. So what I would suggest is that we tell the jury 3:00 p.m.

Does that sound early enough to everybody?

MS. BENSING: Sure, that sounds good.

MS. COHEN: That works for me.

THE COURT: But that would just be for the jury. So there may be some issues we need to take up. It wouldn't be a formal charge conference, but there are issues with the charge that I think maybe we want to start talking about sooner rather than later. So I would just ask the parties not to expect to get out at 3:00. And if we need a little bit of extra time, we will do that. But I will tell the jury. We can tell them that. You know, at the end of the day, I think we can tell them about Friday.

Okay. We'll bring out the jury.

Actually, do you want to get the witness.

MS. FARRELL: Sorry, would you do like a shorter, earlier lunch that day?

THE COURT: Possibly.

But let's see where we are and what is natural with whatever witness is on the stand and what is happening in the trial.

MS. FARRELL: Right.

THE COURT: But yes, I mean, I'd like to get as much as we can in before that day.

Okay. Let's bring in the witness and the jury.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Bensing, you may resume your examination.

MS. BENSING: Thank you.

BY MS. BENSING:

Q So we were just -- I think you were just testifying before the break regarding your payment structure when you first moved to Boulder and that you were paid on commissions only; is that correct?

A Yes, it is.

Q Did there come a time in December -- in December 2012, what, if anything, happened with respect to your paychecks?

A Is there -- I don't -- I don't recall.

Q Is there a document that might refresh your recollection?

A Yes, please.
MS. BENSING: And if I could show the witness only, please, what has been marked as Government Exhibit 1217.
Q Just take a minute to review this, please.
A It looks like --
Q Let me ask you.
A Sure.
Q Does this refresh your recollection about a paycheck from December of 2012?
A Yes, it does.
Q And what happened with respect to one of your paychecks in December of 2012?
A Somebody was accidentally charged twice for a course, so I got that commission twice. And I requested the mistake not be taken out of that particular paycheck --
MS. COHEN: Objection, Your Honor.
A -- because it would have negated basically the whole paycheck.
THE COURT: I didn't hear you.
MS. COHEN: Objection. The witness is reading from the document.
THE COURT: Okay. Sustained.
Q Well, without looking at the document.
A Sure.
Q Just what do you recall having happened?

A That somebody was charged twice for a course and I asked for that not to be taken out of my paycheck because it would have negated most of my paycheck.
Q And so how much were you being paid at this point in time?
A I don't recall. Probably less than a thousand dollars a paycheck.
Q How much were you working when you first moved to Boulder and were making these commission-based payments only?
A I was working all the time.
Q And by "all the time," what do you mean?
A Seven days a week.
Q And how many hours per day?
A Most of the hours that I was awake. So probably 10 to 12 hours a day with, you know, like, meal breaks and stuff like that.
Q How did your experience living in Boulder change your relationship with OneTaste?
A When I moved to Boulder, I became a full-time employee of OneTaste for the first time. I didn't have the side jobs that I used to have in San Francisco and I didn't have the small friend base that I had in San Francisco as well. I was completely -- the only thing I had in Boulder was my OneTaste job.
Q Describe what your working conditions were like when you

moved to Boulder.
A I lived in an apartment with the other person that was sent out there, Eli Block, and we just sold every day all day. We found events to go to and we talked about OneTaste, we followed up with leads. Yeah, we just -- we tried to -- we tried to get people signed up all the time. The sales thread was going all the time, so we were on that pretty constantly as well.
Q Who did you report to in Boulder?
A I reported to Rachel Cherwitz, Rachel Hemsi, Rob Kandell, and Nicole Daedone.
Q Did you provide an accounting of your days at OneTaste?
A Yes, I did.
Q What level of detail were you expected to provide?
A Basically what you're doing every single hour.
Q You have testified about being a participant of sales threads?
A Yes, I was.
Q What are the sales threads you're referencing?
A They were a place where all of the sales of the day were posted. And then where we were supposed to check in with leads that we were working, basically say what we were doing regularly throughout the day.
Q How quickly did you respond on the sales threads?
A I avoided it as much as I could until being called out.

Q And what do you mean "being called out"?
A If my name was specifically called on the sales thread, or Boulder, I would reply, but I tried to stay off the thread.
Q And what were the expectations with respect to the thread?
A The expectation was to be present on the sales thread all the time.
Q And can you give the jury a specific example?
A Um, I don't know if I recall a specific example.
THE COURT: Ms. Bensing, could you just give us a moment to deal with a technology issue.
MS. BENSING: Oh, of course.
THE COURT: Appreciate it.
(Pause in proceedings.)
THE COURT: You may continue. Thank you.
MS. BENSING: Thank you.
Q Did you identify on the sales threads if you needed to step away from your phone?
A Yeah. We would identify if you needed to go coach a client or OM or sometimes even use the bathroom.
Q And how would you identify, for example, if you needed to use the bathroom?
A You would say, like: Bathroom break, 15 minutes.
Q Who set these expectations with respect to the sales threads?

A Rachel Cherwitz did.
Q And what happened if you didn't respond?
A You would be called out on the thread, you might get a phone call, you might -- you would -- you would get unwanted attention.
Q And what did you understand the purpose of these threads to be?
A To keep us --
MS. COHEN: I'm going to object.
MS. BONJEAN: Objection to form and foundation of that question.
THE COURT: Overruled.
Q You can answer.
A To keep the salespeople plugged in or turned on, is the language that was used.
Q And what do you mean by that?
A Focused on sales. So it was harder to physically have control over everybody when we weren't on the same location, so the sales thread was a means for us to -- was a means of control, basically, was a means of -- for them to have constant tabs on the salespeople so our attention didn't waiver, even though we were further away.
Q And how, if at all, did these conditions impact your sleep?
A You weren't supposed to go to bed until your sales goals

were made. So sometimes you wouldn't go to bed until 12:00, 1:00 in the morning, even though you weren't selling anything at midnight. Nobody was buying an OM course at, you know, 1:00 a.m., but it had it be that you slept very little.

Q And again, who set those expectations?

A Rachel Cherwitz did.

Q Did there come a time where you stopped being paid by commissions only?

A Yes, there was.

Q What happened?

A I started to make more money on commissions. OneTaste started offering some bigger-ticket items and all of a sudden our paychecks became decent paychecks. Probably something between, I don't know, 2- and $3,000 a paycheck. For a very short period of time, though. And once those paychecks started to become larger, they put us on salary.

Q Okay. And when you say "they put us on salary," who are you talking about?

A The executive team at OneTaste. So Nicole Daedone, Rob Kandell, Rachel Cherwitz, Joanna Van Vleck.

MS. BENSING: I would like to show the witness only what has been marked as Government Exhibit 3743.

And Your Honor, if I can just hand a copy, a hard copy up to the witness.

THE COURT: Yes.

Q Do you recognize this?
A Yeah. This is an employment contract for when I started to be full-time with OneTaste.
Q And I'm going to direct your attention to page 10.
Do you recognize what's on pages 10, 11, 12, 13, and 14 of this document?
A This is an employment letter. And then -- that's 10 and 11 -- is the job offer letter. And then it looks like 12 and 13 is a confidentiality agreement.
Q And page 14, is that a continuation?
A Yes, it is.
Q And then the first nine pages of this document, is that a revised employment agreement?
A Yes, it is.
Q Is this a fair and accurate copy of the employment letter and employment agreement you just testified to?
A Yes, it is.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3743 into evidence.
THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 3743 is admitted.
(Government's Exhibit 3743 received in evidence.)
MS. BENSING: Okay. And if we could please publish

this to the jury.

And I'd like to start at page 10.

(Exhibit published.)

Q Okay. Ms. Lifson, what are we looking at here on page 10?

A We are looking at the letter I received as an offer of my full-time employment at OneTaste.

Q And what is the date of this letter?

A March 11, 2013.

Q And so approximately how long had you been in Boulder by the time you received this?

A Since May of 20 -- oh, gosh, now I don't remember.

Q I think you testified earlier that you moved to Boulder in May of 2012?

A Yeah, since May of 2012. So almost a year.

Q Okay. And directing your attention to paragraph 2 there, what does this indicate about your salary per month?

A I was only making $2,200 a month.

Q And after you stopped getting paid by commissions only, is this how much you were paid per month?

A Yes, for a time.

Q Okay. What happened?

A Um, eventually they raised our wages to $2,800 a month.

Q Did you still make commissions when you were making 2,200 and then $2,800 per month?

A No, I did not.
Q And by the way, the next sentence in that second full paragraph, can you read that out to the jury, please? Starting with "your work schedule".
A "Your work schedule shall be determined from time to time by Robert."
Q Was your work schedule set by Robert Kandell?
A There was no work schedule. We worked all the time.
Q Okay. So there was no work schedule.
And fair to say there was no work schedule set by Robert Kandell?
A No, there wasn't.
MS. BENSING: Okay. If we can turn to page 1 of this agreement -- of this exhibit. I'm sorry.
Q Okay. So I think you just testified that there was a time when your salary increased to $2,800 per month; is that correct?
A Yes, it is.
Q And is that reflected in this revised employment agreement dated October 1st of 2013?
And I can direct your attention to page 2, the top of page 2.
A Yes, it is.
Q Okay. So once again, turning back to page 1.
How did this agreement in October 1st of 2013 come

about?
A Um, I don't remember why they upped our pay.
Q Okay. And looking at paragraph 1A, what did your job title become at that point in time?
A The director of Boulder.
Q And it indicates that you shall report directly to Joanna Van Vleck and/or Robert Kandell.
Who did you report to?
A I reported to, I would say, Robert Kandell, Rachel Cherwitz, and Nicole Daedone.
I don't think I ever reported to Joanna.
Q And I want to direct your attention to page 7 of this exhibit.
MS. BENSING: And I'm just going to ask Ms. Bosler to scroll through.
Q What is reflected here in page 7 and then page 8?
A That is my extremely lengthy job description.
Q And does that continue into page 9?
A It does.
Q And just looking at "general staff duties" on page 9, do you see the second bullet point there?
A "Support for local city"?
Q Under "general staff duties."
A Oh. "Hive on business threads."
Q What does "hive" mean?

A Hive means that you were responsible to be responding and to be on those threads at all times.

MS. BENSING: And if we can go to page 8, please.

Q What is the last bullet point under "turn-on," the subsection that says "turn-on leader"?

A "Uphold the integrity of OneTaste philosophies and transmission of orgasm."

Q What did you understand that to mean?

A I mean, I would say, to be a good representation of OneTaste, to say things and do things as the company would do them.

Q And I'll just ask you to read the bullet point right above "turn-on leader."

What does that say?

A "Report to exec team of individuals that may be tumescent bumps."

Q What is a tumescent bump?

A Somebody that was a troublemaker in the community. So, somebody who felt like they weren't getting their money's worth or they felt like they -- somebody who was hanging around the community a lot and not buying anything as well would be considered a tumescent bump.

Q So you were required to report to the executive team about that?

A Yes.

MS. BENSING: Okay. We can take that down.
Q Ms. Lifson, although you've testified that your employment agreements changed, did your hours change at all?
A No.
Q Did your job responsibilities change at all?
A No.
Q At any point, did you ever get equity in OneTaste?
A No.
Q Which entity began paying you?
MS. BONJEAN: Objection. Foundation.
THE COURT: Overruled.
A Began paying me when?
Q Were you always paid by Caravan?
A I believe so.
Q Okay. When you were living in Boulder, what was your relationship with non-OneTaste friends and family like?
A Strained at best. Really, the only time I would talk to friends outside of OneTaste would be to try and sell them something from OneTaste.
Q And why was it strained?
A Because all of my energy and attention was going towards OneTaste-related activity.
Also, like, there was a fair bit of shame that I was carrying around about not being paid enough, not having any health insurance. So I was hiding those things from my

friends and family so they wouldn't feel concerned about me.
Q You testified earlier that when you lived in 1080, you were sometimes directed to OM with other community members or participants; is that correct?
A That is correct.
Q Did you provide any sexual services when you were living in Boulder?
A Yes, I did.
Q What kind?
A I was directed to OM with community members when they bought OM training packages.

Then I also did the demonstrations for all of our courses.

And I would also OM with community members in order for them to buy courses and packages.
Q And what was your psychological state at this point in time when you were working in Boulder and working the hours you testified to?

MS. BONJEAN: Objection.

THE COURT: Overruled.
A I was completely dependent on OneTaste.

I was definitely, like, not as, I would say, a rebellious spirit that I had at 1080, had definitely been subdued. I was exhausted. I was sick frequently. I had shingles from being so run down and not getting enough sleep.

And I was just -- I was just trying to do the best that I could to make it through. I felt very -- I felt like this was my life and I had to keep that way.
Q You testified that you engaged in sexual labor through OM training packages.
What are OM training packages?
A After a How to Om course, we would sell packages to mostly men of OM training so they could learn how to do the practice of orgasmic meditation.
Q So what was your involvement with respect to that?
A I was expected to be -- participate with them as the strokee when they didn't basically know any women who would come and do it with them.
Q Who sold those OM training packages when you were expected to be the strokee?
A Rachel Cherwitz did.
Q Did she ask you whether you would agree to be the strokee?
A No, she did not.
Q Did you do it?
A Yes, I did.
Q Why?
A Um, it was -- it was what was expected at the organization. I had seen the same thing at 1080 with other people. I wasn't expected to do that because I wasn't working

for the organization at the time. So I knew that it was an expectation and it would not be looked kindly upon if I had said no.

Q Where did the profit from those lessons go to, the training package?

A To OneTaste.

MS. BONJEAN: Objection. Foundation.

THE COURT: Overruled.

Q To OneTaste?

A Yes.

Q Are you familiar with an individual named Eric Swanson?

A Yes, I am.

Q Who is that?

A He was a community member who came out to Boulder to help, to help with production.

Q Did you engage in a relationship with Eric Swanson?

A Yes, I did.

Q What kind of relationship?

A It was sexual.

Q What happened with respect to that relationship?

A Nicole said that I should not engage in that relationship. We were moving into an OM house at the time and she said he should not be allowed to move into the OM house, so we ended that relationship.

Q And why did Nicole direct you to no longer be in a

relationship with Eric Swanson?

MS. BONJEAN: Objection.

THE COURT: Overruled. I mean, sorry. I'm sorry. Sustained. Sorry. Sustained.

Q Did Nicole say anything to you about why you could no longer date Eric Swanson?

A She just said that his energy was wrong.

Q And so what happened with respect to Eric Swanson?

A He was alienated from the community.

Q In what way?

A He wasn't allowed to move into the OM house, and then he was kind of like -- he didn't come around anymore.

Q What, if any, impact did that have on you?

A He was helping out quite a bit, so it increased my workload significantly for -- to not have him around.

And it was also just -- it was sad. Like, I was -- he was -- came out as a support when I wasn't doing too well and it had me feel further isolated to have him gone.

Q So why did you break up with him at Nicole's direction?

A Because it was Nicole's direction and because my allegiance was to OneTaste.

MS. BENSING: I want to show you what's already in evidence as Government Exhibit 242.

And we can publish this to the jury as well. Thank you.

(Exhibit published.)

Q Who is this?

A This is Eli Block.

Q And I think you testified earlier that you worked with Eli Block in Boulder?

A Yes, I did.

Q What was his role at OneTaste?

A He was a salesperson.

Q When you were working with Eli in Boulder, how did he recruit people into OneTaste?

A In Boulder, he would go to events and try and recruit people in.

Q Any other ways?

A Yeah. Previously, in San Francisco, he would go on OKCupid and get dates with people and then bring those dates to events and recruit people in that manner.

Q Were you directed to participate in orgasmic meditation with Eli Block?

A Yes, I was.

Q By who?

A I don't recall.

Q Did Rachel Cherwitz direct you to participate in orgasmic meditation?

MS. COHEN: Objection.

MS. BONJEAN: Objection. Leading.

THE COURT: Sustained on the leading.
MS. BENSING: Oh.
Q Any instances that you can recall of participating in orgasmic meditation with Eli Block?
A Yes.
Q Where?
A Our OM circles or home, both.
Q And did that happen in Boulder?
A Yes, it did.
Q Who, if anybody, directed you to engage in orgasmic meditation with Eli Block in Boulder?
A Rachel Cherwitz did.
Q Did she tell you why?
A It was supposed to help cement our relationship so we were working as a team.
Q And did you do it?
A Yes, I did.
Q Why?
A Because I was supposed to.
Q Besides you and Eli Block, did you work with any other OneTaste members in Boulder?
A Alisha Price.
Q I would like to show you what's already in evidence as Government Exhibit 205.
(Exhibit published.)

Q Who is this?
A This is Alisha Price.
Q And what was her role in Boulder?
A She was supposed to help as another city lead, I think.
Q And what was her role within OneTaste prior to coming to Boulder?
A She had been part of the executive team. But she was having personal problems with some of the other members, so she was sent to Boulder kind of as -- she saw it as a punishment.
Q What impact, if any, did this have on you?
A She was not in a good head space when she came out to Boulder and she was not particularly kind to me.
Q When you were in Boulder -- and by the way, when you knew her at OneTaste, was she experiencing any kind of health problems?
A Yeah. She had some severe health problems. She was living at Reese's house and she was having some severe health problems.
Q At whose house? I'm sorry.
A Reese.
Q Okay.
A And then she came and lived at 1080.
Q Okay. Do you know why she moved out of Reese's house to 1080?

MS. BONJEAN: I'm going to object to the extent it calls for a hearsay response and foundation.

THE COURT: Overruled.

Q Do you know why?

A I do know why.

She said that --

Q Well, without -- do you know why because she told you?

A I know why because she told me, yes.

Q Any other reason that you know why?

A No. Just that she told me.

Q Okay. So when you were in Boulder, who were you dating at the time?

A Chris Kosley.

MS. BENSING: I would like to pull up what's in evidence as Government Exhibit 207.

(Exhibit published.)

Q Who is that?

A That is Chris Kosley.

Q Did you share a bank account with Chris Kosley when you were living in Boulder?

A Yes, I did.

Q How did that come about?

A We had been dating in San Francisco and we were both frequently getting overdraft fees on our accounts, so we decided to merge our shared paltry financial resources so we

would get less overdraft fees.
Q Did anything happen with respect to that bank account when you were living in Boulder?
A Yeah. He drew it down significantly.
Q You testified that you were in a poor financial condition after you got involved with OneTaste.
Did this contribute to it?
A This, it definitely didn't make it better, but it was already -- I was already defaulted on my loans long before he drew down on my bank account.
Q Did you ultimately stop sharing a bank account with Chris Kosley?
A Yes, I did.
Q Approximately when?
A When I was living in New York, after I left Boulder. I'm not sure of the year.
Q I think you testified earlier that when you were living in Boulder --
MS. BENSING: We can take that down.
Q When you were living in Boulder, you sometimes traveled back and forth to San Francisco; is that correct?
A That is correct.
Q For what purpose?
A To participate in Coaching Program 5.
Q And what was Coaching Program 5?

A It was a -- there was a monthly immersion and it was the program that I signed up for before I was offered the Boulder position.
Q Did you also perform any kind of work while you were traveling back to San Francisco?
A I did occasionally perform sexual labor.
Q And what kind of sexual labor?
A There was a participant who was going to drop out of the course, or that they thought was in danger of dropping out of the course, so Robert Kandell asked me to engage in sexual activity with him so he can stay and continue making his coaching program payments.
Q So what happened?
A I did as I was asked and he continued to stay in the program.
Q And when you say you did as you were asked, what do you mean?
A I engaged in sexual activity with the client.
Q And how did that come about?
A I brought him up to the room I was using at 1080.
Q And then what happened?
A And then I performed oral sex on him.
Q Did he remain in the program after that?
A Yes, he did.
Q How do you know?

A Because I continued to attend -- I continued to attend immersions.
Q How did that make you feel, Ms. Lifson?
A It made me feel like I was doing my job.
Q In what way?
A That I was contributing positively to the company.
Q In what way?
A That I was in the -- OneTaste's words: That I was using my orgasm to continue to help the awakening of this gentleman.
Q And who taught you that?
A Nicole Daedone.
Q When you were living in Boulder, did Nicole Daedone ever visit Boulder?
A Yes, she did.
Q And did you make arrangements for her visits prior to her arrival?
A Yes, I did.
Q What kind of arrangements?
A I would rent Airbnb for her to stay in and then we would always fill the fridge with very specific groceries before she got there.
Um... Yeah.
MS. BENSING: I would like to show the witness what has been marked as Government Exhibit 1120.
And, Your Honor, could I hand up a hard copy?

THE COURT: Yes.

THE WITNESS: This is really blurry.

THE COURT: Yes, she's going to give you a hard copy of it.

THE WITNESS: Great. Thanks.

Q And I'm just going to ask that you take a minute to look at this.

A Sure.

Q Do you recognize this?

A Yes. This is an e-mail from Yia to me and Eli.

Q Is it a fair and accurate copy from Yia to you and Eli?

A Yes, it is.

Q Is it dated June of 2012?

A It is indeed.

Q Were you living in Boulder at that time?

A Yes, I was.

MS. BENSING: Your Honor, the Government would move to admit Government Exhibit 1120 with the remainder of the exhibit redacted except for the first portion of the exhibit.

THE COURT: I'm not sure I know what you mean by the first portion of the exhibit.

MS. BENSING: I'm sorry, Your Honor.

Underneath "begin forwarded message," from there, it would be redacted, Your Honor. So just the top portion of the e-mail.

THE COURT: Starting with "begin forwarded message" is redacted?

MS. BENSING: Correct. Yes, Your Honor.

THE COURT: Any objection?

MS. COHEN: Yes, Your Honor. Objection on hearsay and relevance.

MS. BONJEAN: Join.

MS. BENSING: Your Honor, it's not being admitted for its truth.

MS. BONJEAN: The relevance objection remains.

THE COURT: Objection is overruled.

Government Exhibit 1120, but only the first page before the part that says "begin forwarded message" --

MS. BENSING: Yes.

THE COURT: -- is admitted.

MS. BENSING: Thank you, Your Honor.

(Government's Exhibit 1120, only first page before the part that says "begin forwarded message" received in evidence.)

MS. BENSING: And if we could please publish this to the jury.

(Exhibit published.)

MS. BENSING: If you could zoom in on the admitted portion.

Q So, Ms. Lifson, will you please read out to the jury the

e-mail that you received from Yia Vang in June of 2012?
A Sure.
"Lodging for Nicole.
Lianna, I just heard from RC that Nick's changed her food, so wait until RC gets there to go shopping."
MS. BENSING: Okay. And we can take that down.
Q Did you pay for Nicole Daedone's food when she came to Boulder?
A We put it on the Caravan Retreat credit card.
Q So her food was paid for on the company's credit card?
A Correct.
Q Did anyone else at OneTaste use the company's credit card for personal expenses, based on your own personal observations?
A Rachel Cherwitz did.
Q In what way?
A She would take us out to dinner on it when she was in town.
Q Okay. I'd like to ask you about a couple of terms.
I think you testified earlier about tumescent bumps?
A Mm-hm.
Q How was "tumescent" used at OneTaste?
A "Tumescence" was used as like somebody who was not being compliant, I would say.
Q In what way?

A If you were agitated about a rule, if you didn't want to follow the crowd, if you didn't want to do something you were told, you would be labeled tumescent.
Q What about the word "muggle"? How, if at all, was that word used at OneTaste?
A That was used for a word as an outsider, somebody who was not involved in OneTaste.
Q How about "loyalty test"? How, if at all, were those used at OneTaste?
A Those were used as simply aids to see if you were -- what your resolve was towards the organization.
Q And what do you mean by that?
A So, like, people were fired and then, like, would they stick around. And that would be a loyalty test.
Q Are you familiar with somebody named Beverly Daedone?
A I am not.
Q To your knowledge, did Nicole Daedone's mother ever work for OneTaste?
A Not to my knowledge.
Q So you testified briefly earlier that there came a time when you moved to New York; is that correct?
A That is correct.
Q How did that come about?
A OneTaste was closing down its direct influence on the centers, on most of its remote centers. So, in Austin and in

Boulder. And I don't know where else it was at that time. But they were closing down all of those centers. And then anybody who they wanted to retain was being moved to New York or California.
Q Okay. So when you were working in Boulder, did OneTaste have centers in other locations than San Francisco, Boulder, and New York?
A Yes, it did.
Q And there came a time where those shut down except for New York and San Francisco; is that correct?
A That's correct.
Q Okay. So what happened to you?
A I was told that I had about somewhere between a week and ten days to get the affairs in order of the city, the business, the lease that we had on an office space where we did our courses and the lease that we had on the OM house, say my goodbyes and leave.
Q Are you familiar with the concept within OneTaste of rapidly changing reality?
A Yeah.
Q What is that?
A An RCR. It was the idea that at any moment they could shift your entire life and the customers have to go along with it.
Q And was this an example of that for you?

A Yes, it was.
Q So what did you do?
A I left.
Q Did you want to move back to New York?
A I did not.
Q Why not?
A I loved Boulder and I loved the mountains. And even though I didn't have a lot of spare time there, I had grown very fond of the city. And then I also felt like I had a responsibility to the community that I had helped build there and it felt irresponsible to slough that off onto other community members and just depart so quickly.
Q Approximately when did this happen, the move from Boulder to New York?
A 20 -- Christmas of 2013.

(Continued on the next page. )

(Continuing.)

EXAMINATION CONTINUES

BY MS. BENSING:

Q And where did you move to?

A I moved to The Morellino in Harlem, New York.

Q What's The Morellino?

A It's a building. OneTaste was renting two apartments there, I think.

Q And which apartment did you move into?

A I moved into the apartment where other employees lived.

Q Okay. And so who else was living in The Morellino when you moved into The Morellino?

A I think Hamza Tayeb was living there at that time. Kim Howerton was living there at that time. Eli Block was living there at that time.

I don't remember who else.

Q Did you live in The Morellino the whole time that you were in New York?

A No, I did not.

Q What happened?

A The Morellino decided that they did not want us there anymore because there were too many people coming in and out, and for a variety of different reasons the Morellino asked us to leave. So I was given the task to find a new place for us to live that had four to five bedrooms in New York on a what

felt like a kind of impossible budget. So we found what was then nicknamed The Bunker in midtown.

Q What was The Bunker?

A It was in Hell's Kitchen. It was a five-bedroom, partially underground recently renovated apartment.

Q And who lived in The Bunker with you to the best of your recollection?

A Eli and -- who else lived in The Bunker? Hamza and Kim. I don't remember who else lived there.

Q Are you aware of any other OneTaste or orgasmic meditation communities New York that the time?

A There was a OM house in Brooklyn as well.

Q And what is the OM house in Brooklyn?

A It was a community-run house where Ravi lived and Ayries lived there -- or no, maybe they lived in -- I don't know in Ravi and Ayries lived there. Sorry. Where community members lived.

Q When you moved to New York, what -- did you continue working for OneTaste?

A I worked for a yoga studio in Harlem.

Q And what was the yoga studio?

A The yoga studio was a studio that was in a bad financial place and at this time there was this whole push in OneTaste towards orgasmic business practices, so they wanted to see if we could turn around the yoga studio around. So, I became the

manager there.

Q And so, were you still working for OneTaste?

A OneTaste owned part of the yoga studio. So I was working part-timely for OneTaste, partly for Bikram Yoga East Harlem, but I was also attending TurnON events, teaching courses on nights and weekends after working at the yoga studio.

Q What were your days like when you were living in New York working for the yoga studio?

A Long. I would get up at 5:30 in the morning, go over to Bikram Yoga, open up. We -- we also completed a renovation while we were there, so I would be there first thing. Run a class. Do all of the maintenance that the yoga studio required that day, try and fix up whatever it was that we were fixing up. There were like closets full of trash. There was an old water heater that needed to be moved out. So I was dealing with all of those things.

I would finish, the last yoga class would finish at 6:30 usually, 7:00, and then I would go -- I would change my clothes there at the yoga studio and go back directly to a OneTaste event, those two things, a TurnON event or something like that.

And then at the weekends I would either be at the yoga studio or at a OneTaste event.

Q Were you still a participant on these sales threads?

A I don't recall.

Q Okay. Did you continue to make the same salary? Did anything change with respect to your salary when you moved to New York?
A I don't think it did. I don't recall.
Q Did you want to be performing this labor in New York?
A I did not want to work at the yoga studio.
Q And so why were you doing it, what was going on in your life?
A At that point, you know, I had thought about staying in Boulder when they moved me, I just didn't know -- I had no money. I didn't know what I could do, like I didn't know what to write on my resumé for the last couple years at that point. I felt pretty lost without the organization.
So, when they asked me to run the yoga studio, I was all right, that's what you want me to do, that's what I'm gonna do. I was a -- I was a soldier in OneTaste, so I was just continuing to do what I was told.
Q And why did you feel lost within the organization?
A I just felt like -- I felt lost outside of the organization, I would say. Inside OneTaste was the only thing that made sense to me at that moment.
Q And why did you feel lost outside of the organization?
A Because I had been -- it had taken over my whole life. And I didn't feel like -- there was a lot of narrative inside that the regular world was boring, toxic. That normal people

had these terrible lives and terrible jobs, and I had really started to believe that.
Q And who was teaching you these things?
A The senior staff at OneTaste.
Q Which was who at that time?
A It was Nicole Daedone, Joanna van Vleck, Rachel Cherwitz, Robert Kandell.
Q You mentioned a couple names earlier. I want to show you what is not yet in evidence, Government Exhibit 311.
Do you recognize this?
A I do.
Q And who is this?
A This is Ravi Agrawal, and that's how I pronounce his last name.
Q Is it a fair and accurate copy of picture of him?
A Yes, it is.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 311 into evidence.
THE COURT: Any objection?
MS. COHEN: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 311 is admitted.
(Government's Exhibit 311 was received in evidence.)
MS. BENSING: And if we can briefly publish this to the jury.

(Exhibit published.)
BY MS. BENSING:
Q Who is this?
A This is Ravi.
Q Who was that?
A He was a community member who I met in Boulder, who had since moved to New York.
Q When you first met Ravi, was he dating anybody?
A Yes, he was dating Ayries Blanck.
MS. BENSING: And if I can show the witness what's already in evidence as Government Exhibit 388.
Q Who is this?
A This is Ayries.
MS. BENSING: We can take those down.
Q When you moved to New York, were Ravi and Ayries also living in New York?
A Yes, they were.
Q What, if anything, did you personally observe about how Ravi was treated within OneTaste?
A Ravi seemed to be --
MS. BONJEAN: I'm sorry. I didn't hear the question entirely.
MS. BENSING: I'll repeat it.
THE COURT: Go ahead.
Q What, if anything, did you personally observe about how

Ravi was treated within OneTaste in New York?

MS. BONJEAN: Objection, foundation. Also, relevance.

THE COURT: Overruled.

BY MS. BENSING:

Q You can answer.

A Ravi seemed to be treated with a lot of respect at OneTaste, like where they wanted to keep him very close to the chest.

Q Why?

MS. BONJEAN: I'm going to object to the --

THE COURT: I am going to sustain that last question.

Move on to another question.

Q Do you know why, Ms. Lifson?

A Because Ravi had --

MS. BONJEAN: Objection to the foundation still.

THE COURT: Yes. Sustained.

Q You can just answer yes or no whether you know.

A Yes.

Q Okay. And why?

A Because --

MS. BONJEAN: I'm sorry, Judge. Objection.

THE COURT: Can you just ask another question?

MS. BENSING: Yes.

THE COURT: Sustained, and just ask another question.

MS. BENSING: Yes.

BY MS. BENSING:

Q Ms. Lifson, you just testified that you know why Ravi was treated differently within OneTaste. Why?

MS. COHEN: Objection.

MS. BONJEAN: Objection still to the foundation.

THE COURT: Yes, sustained.

Q Based on your own personal observations, why was Ravi treated differently within OneTaste?

A Because he had very deep pockets.

Q And what do you mean by "deep pockets"?

A He had --

MS. COHEN: Objection, still to the foundation.

THE COURT: Overruled.

Q You can answer.

A He had access to a lot of money.

Q I want to show you what's in evidence as Government Exhibit 302.

(Exhibit published.)

Q Do you recognize this person?

A Yeah, that's Maya Gilbert.

Q And who is she?

A She was an employee of OneTaste.

Q Do you know Maya Gilbert's mother?
A I met her briefly.
Q And who is she?
A She runs a jewelry company. I don't know her name.
Q And do you know whether she had any involvement within OneTaste?
A She didn't have any involvement while I was involved at OneTaste.
Q Okay.

MS. BENSING: We can take that down.

BY MS. BENSING:

Q What happened while you were living in New York working at the yoga studio, did there come a time when you stopped working at the yoga studio?
A Yes, there did.
Q What happened?
A I expressed to Nicole that I didn't want to work at the yoga studio anymore, that I wanted to go back to teaching courses, which was my favorite part of my job. And I was reprimanded for that.

But shortly afterwards I was dismissed from the yoga studio. I, basically, got a phone call one morning saying don't -- don't go to work. We're no longer going to be involved in the yoga studio.
Q Okay. So going back, you said you raised with Nicole

that you no longer wanted to work at the yoga studio?
A Correct.
Q Nicole who?
A Nicole Daedone.
Q And you said you were reprimanded for that. What happened?
A In our conversation, she implied that I was only working at OneTaste to feed my own ego and that I didn't like to work the yoga studio because it was unglamorous.
Q At this point in time how many days a week were you working?
A Seven days a week.
Q How many hours per day?
A Fourteen hours probably a day.
Q And so you said shortly after this you were dismissed from the yoga studio?
A Correct.
Q And how did that come about?
A I was just told not to -- to go to the yoga studio that day.
Q Who told you that?
A I don't recall.
Q So, what happened?
A I got a call from the other owner, the woman who had opened the yoga studio, asking where I was, why I hadn't

opened that day. Nobody had talked to her about the shift in management. So, I was just told not to -- not to show up. And -- yeah, I don't know what happened with the yoga studio after that.

Q And what happened to you?

A I was told to -- I think I was given lead production of New York. But shortly after that I was fired.

Q Okay. So, what happened?

A That time is really hazy. I remember that I was given a production role, and then I was -- I was heavily criticized for everything that I was doing during that time. And I had this -- this feeling that I was about to be fired. A lot of people were being let go at that time. And then I was.

Q And why is that time hazy for you?

A I think it's just the lack -- the lack of sleep. Also, it was a long time ago.

Q Did you, ultimately, get fired from OneTaste?

A Yeah, I did. I got let go from that position, but they told me I could, basically, continue living in the OM house, continue coaching, and then work my way back up into the organization if I desired.

Q And did you view this as the loyalty test you testified about earlier?

A Correct.

Q Do you remember approximately when you were let go?

A May of 2014.
Q Okay. So you'd been at -- in New York for approximately five or six months?
A Correct.
Q Did you have to sign any paper work to be able to leave?
MS. BONJEAN: Objection to the leading.
MS. BENSING: Oh.
THE COURT: Overruled.
BY MS. BENSING:
Q You can answer.
A Yeah, I was asked to sign an NDA.
Q Okay. And did you receive any kind of severance?
A I received, I think, $1500 in severance.
Q Okay. Is there something that might refresh your recollection?
A Yes.
MS. BENSING: If I can pull up for the witness only what's been marked as Government Exhibit 825.
And if you can just zoom in on the top half. Sorry, the top half of the page.
BY MS. BENSING:
Q Okay. And if you can just read that, Ms. Lifson, and let me know if that refreshes your recollection about how much you received when you left.
A Yes, it does.

Q Okay. And approximately how much?
A I received $1500 of severance, and then $600 for -- excuse me -- back wages.
Q And you just testified that you signed an NDA. What is an NDA?
A A non-disclosure agreement.
Q And what is that?
A It says that I wouldn't talk about anything that happened at OneTaste.
MS. BENSING: You can take that down. Thank you.
BY MS. BENSING:
Q You testified at the very beginning of your direct examination that you were originally from Westchester?
A Correct.
Q When you lived in New York, what, if any -- did you have family in town?
A Yes, I did.
Q What, if any, impact did that have on you?
A It made it easier for me to take some space after I was fired and then eventually leave the organization for good.
Q And what do you mean by that?
A I had some very close family friends that I was able to go stay with and sleep and clear my head. And it became clear to me that it was time for me to move on. And then I was able to visit with my mother and get a loan from her so I could

have some money to restart my life.
Q Where did you go after you left OneTaste?
A I went to Los Angeles, California.
Q Did you continue to have some involvement with OneTaste after you left?
A I lived -- briefly after I left I -- I continued to coach for OneTaste.
Q And how come?
A Because I -- I needed the money. I wasn't really ready to let it go. I didn't know what I was going to do next.
Q And what happened with respect to that involvement?
A I ended that arrangement when I was pressured to sell a Mastery course to a client.
Q How difficult, if at all, was leaving OneTaste?
A It was the hardest thing I've ever done in my life. And I have two toddlers, which is also pretty hard. But leaving OneTaste was harder.
Q And what made it so difficult?
A It was my whole identity. It was -- my whole self had really become invested in it. It wasn't just leaving a job, it was leaving a job, it was leaving a home, it was leaving all of the friends I had made for the past six years. I didn't know what I was going to -- who I was gonna be after that.
Q What was the aftermath like of leaving OneTaste for you?

A It took a really long time for me to get myself together again. Even like, I started off working part-time time, and then slowly I was able to work full-time again.

There was a lot of figuring out what ideas were mine, what ideas weren't mine. What -- who I wanted to be inside of relationships. Yeah. It was a lot. It was -- it was -- I was very unmoored for a while.

Q And what do you mean when you say, when you testify trying to figure out which ideas were or were not your own?

A Well, you know, there's a lot of very specific language used inside of OneTaste. So you tend to adopt those mindsets as you're around it. It -- it becomes part of who you are.

So, I had to figure out which of those things I actually believed and which of those things were just told to me so I would comply with the program.

Q Ms. Lifson, are you familiar with the location called The Land?

A Yes, I am.

Q What is The Land?

A The Land is a piece of land that, I believe, OneTaste purchased after I left the organization.

Q Have you been to The Land?

A Yes, I have.

Q Approximately when?

A About three years after I left OneTaste, that would be in

2017.
Q Why did you go to The Land in 2017?
A I was staying in Mendocino on a small farm still, I would say, trying to get my life together after OneTaste. And they were having an event there at the same time, very close to where I was living. And I wanted to go and get some closure and see my old friends.
Q And what do you mean by "closure"?
A I think I wanted to see what it looked like from outside, what the organization looked like, what it felt like.
Q And what happened when you -- did you -- did you go to that?
A I did.
Q And by the way, you mentioned the word Mendocino. What is that?
A It's a county in California, northern California.
Q So what happened when you went to The Land?
A I saw some people that I knew. I met with Nicole Daedone. I noticed the tension in the people that were working there still, and I -- yeah, I really cemented the fact that I had made the right decision to -- to leave.
Q You mentioned that in that 2017 visit to The Land you spoke with Nicole Daedone.
What did you speak about?
A We spoke about her lawsuit with Robert --

MS. BONJEAN: Objection to the -- I don't -- I don't know where this is headed.

THE COURT: Do you want to speak to Ms. Bensing?

MS. BENSING: Yes.

THE COURT: I'll give you a moment.

MS. BENSING: Thank you.

(Pause.)

THE COURT: Do you want to pose that same question or do you want to move on to something else?

MS. BENSING: I do want to pose the same question, and I think we may need to have a brief sidebar with the Court. And I apologize.

THE COURT: That's fine. But how much more do you have?

MS. BENSING: I'm at the very end, Your Honor.

THE COURT: Okay. We will have a sidebar.

MS. BENSING: Okay.

(Sidebar held.)

(Continued on the following page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: All right. So we're at sidebar. Everybody is here, including the two defendants.

Ms. Bensing, go ahead.

MS. BENSING: Yes. So what I expect her to say is that she had a conversation with Nicole Daedone regarding a lawsuit involving Robert Kandell and a lawsuit involving Ayries Blanck.

I do not expect to get into the substance of that, but the lawsuit involving Ayries Blanck is important, the fact of it, to show notice. And there has been a lot of discussion at this trial regarding notice to the defendants the conspiracy was ongoing at that point in time.

I'm not going to get into the what the substance of what the lawsuit was about.

THE COURT: So, what is your argument about notice if you're not planning to get into the substance, notice of what?

MS. BENSING: A different witness will identify that the treatment of Blanck that she personally observed, coming later.

THE COURT: But the entirety of what you're intending to ask about the lawsuit is the fact that there was

a lawsuit filed by a person?

MS. BENSING: By Ms. Blanck.

THE COURT: Right. But no content?

MS. BENSING: No content. A different witness we anticipate will identify that while she was at OneTaste, Ayries Blanck won a lawsuit and the company changed its policies in response to that.

THE COURT: Go ahead, Ms. Bonjean or Ms. Cohen.

MS. BONJEAN: Okay. So there's a couple issues here, which I think probably we could have addressed a little earlier.

But first of all, I'm not sure this -- the -- at least the indicted conspiracy is still going on at this point. I don't -- I know it ends in 2017 according to the indictment and this happens in 2017. Unless I have that wrong.

B, I don't know what the mere fact of the lawsuit would mean if you don't get into the substance of it.

And then connecting it up to someone else just saying they observed something still doesn't explain to the jury that the lawsuit has anything to do with what they observed.

We have no ability to cross-examine Ms. Blanck. And as the Court well knows, we have a fair amount of issue with getting into that subject matter, particularly in light of the fact that the note we have -- well, particularly in light of

the fact that we would challenge the allegations, themselves. And so --

THE COURT: So, you mean the allegations of the underlying suit?

MS. BONJEAN: Well, yes, the allegations of the underlying suit, the allegations of Ms. Blanck. And, you know, the whole notice of, again, like notice of what?

I don't know how they're getting that in. All they can do is get someone -- if they're going -- there's no nexus between there was a lawsuit filed by someone and someone saying: Oh, I observed this go on with Ayries Blanck. Even if that is -- even if they were able to get that in, which we'll object to, I don't see what that nexus is.

THE COURT: Ms. Cohen, did you want to be heard?

MS. COHEN: I just want to add that we feel this has opened the door to --

THE COURT: In what respect?

MS. COHEN: -- the issues that came up with respect to Ayries Blanck and her -- her fabrication of evidence in connection.

THE COURT: It doesn't, but I am not persuaded by the Government's argument that this goes to notice without any -- any additional content, the mere fact of a lawsuit.

MS. BENSING: The content will come from a different witness that, that the witness was aware that Ayries raised

claims after Ayries left.

MS. BONJEAN: Well, then that's hearsay.

MS. COHEN: No.

MS. BENSING: No, no, no, it's not coming in for its truth, just the fact that they were put on notice of that.

THE COURT: Okay. I am going to sustain the objection to this last question.

MS. BENSING: Okay.

(Sidebar discussion concluded; proceedings continued.)

(Continued on the following page.)

(In open court; jury present.)

MS. BENSING: Your Honor, may I proceed?

THE COURT: Give me one moment, please.

(Pause.)

THE COURT: I am sustaining the objection to the last question.

You may proceed.

MS. BENSING: Thank you very much.

EXAMINATION (Continues)

BY MS. BENSING:

Q I want to show you a series of photographs, and I'd like to start with what's in evidence as Government Exhibit 208.

MS. BENSING: And this can be published to the jury.

(Exhibit published.)

Q Do you recognize this person?

A Yes, I do.

Q Who is that?

A Christina Berkley.

Q And how do you know her?

A She was involved with OneTaste -- I don't know if we overlapped at all -- but before I was.

Q And have you spoken with Ms. Berkley since you left OneTaste?

A No, I haven't.

Q I'd like to show you Government Exhibit 382.

(Exhibit published.)
Q Do you know who this person is?
A Yes, I do.
Q Who is that?
A This is Becky Uma.
Q How do you know that?
A She was involved in the New York community when I lived there.
Q Have you spoken to this person since you left OneTaste?
A Maybe a brief message on social media.
Q And did you discuss the content of your experiences at OneTaste?
A No, I did not.
Q I'd like to show you Government Exhibit 265.
(Exhibit published.)
Q Do you know this person?
A That is Margaret Pixley.
Q And who is that?
A She worked in New York at the same time that I did.
Q Did she leave OneTaste while you were working in New York?
A Yes, she did.
Q And what, if anything, did you speak about with Rachel Cherwitz regarding her departure?
A I expressed concern for Margaret because she left

abruptly and seemed distraught when she did. But Rachel just said she'll be fine.

Q I'd like to show you Government Exhibit 269.

(Exhibit published.)

Q Do you recognize this person?

A No, I do not.

Q I'd like to show you Government Exhibit 228.

(Exhibit published.)

Q Do you recognize this person?

A No, I do not.

Q I'd like to show you Government Exhibit 327.

(Exhibit published.)

Q Do you recognize this person?

A No, I do not.

Q I'd like to show you Government Exhibit 404.

(Exhibit published.)

Q Do you recognize this person?

A No, I do not.

MS. BENSING: May I have one second, Your Honor?

THE COURT: Yes.

(Pause.)

MS. BENSING: All right. I have no further questions.

THE COURT: Okay.

Is it going to be Ms. Bonjean? Okay.

Ms. Bonjean, let's start the cross-examination. We'll take a lunch break maybe in 15 minutes.

MS. BONJEAN: Sounds good, Judge.

THE WITNESS: I have to use the restroom. Can we do that before?

THE COURT: The witness has to use the restroom, so I think we should probably do our lunch break now instead of doing two breaks.

MS. BONJEAN: Got it.

THE COURT: It's 12:30 now. The witness can step down and I'll ask the jury to come back at 1:30.

(Witness steps down.)

THE COURT: Enjoy your lunch. Don't talk about the case.

(Jury exits.)

THE COURT: Let's see everyone at 1:30.

(Luncheon recess taken.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURT: You can bring the witness in.

(The witness entered the courtroom.)

THE COURT: You can come back up.

(The witness resumed the stand.)

(Pause.)

(Jury enters.)

THE COURT: Everyone may be seated.

And, Ms. Bonjean, I believe you were about to start your cross-examination.

MS. BONJEAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Lifson.

A Good afternoon.

Q My name is Jennifer Bonjean, and I represent Ms. Daedone.

You grew up in Westchester, New York, is that right?

A That's correct.

Q Okay. And you graduated college in what year?

A Which college?

Q Well, you attended two, right?

A I attended three colleges actually, yeah.

Q Okay. Did you earn a Bachelor's degree at some point?
A Yeah, I earned a Bachelor's from Smith College in two-thousand-and -- oh, I feel nervous -- 2006.
Q Okay.
A And then I graduated from NYU in 2008.
Q That was a graduate program, right?
A Correct.
Q But you actually started college at Colorado College, right?
A That's correct.
Q And when did you start Colorado College?
A Two-thousand-and -- I took a semester off in between high school and college, so winter of -- it was 2003.
Q Okay. And you transferred out of Colorado College, right?
A Correct.
Q And that's because you molested one of your friends, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Were you accused of molesting one of your good friends?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Why did you leave Colorado College?
MS. BENSING: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q You transferred to Smith, is that right?

A That's correct.

Q Okay. By the time you transferred to Smith, you had already commenced a serious drug and alcohol problem, right?

MS. BENSING: Objection, relevance.

THE COURT: Sustained.

Q In 2007 you were a graduate student at NYU, is that right?

A That's correct.

Q And you testified that you attended a lecture or a speech of Nicole Daedone's, correct?

A That's correct.

Q What were you studying at NYU?

A I was studying education, English education.

Q Okay. And your family was still close in Westchester County?

A That's correct.

Q And this speech you attended of Ms. Daedone's was sexual spirituality, right?

A As I recall.

Q And it resonated with you, right?

A I thought it was interesting.

Q But you did not become associated with OneTaste at that

time, right?
A No, I did not.
Q In fact, you had that experience, and then it was your -- you didn't run out to sign up for OneTaste classes, right?
A I did not.
Q Okay. Now, in 2008, though, you did move to San Francisco for a teaching job, correct?
A That is correct.
Q And you started a teaching job in October of 2008, right?
A September -- August actually, 2008.
Q And that was around the same time that you met Kal Holczler?
A Correct.
Q And that is also around the same time that he invited you to what was known at the time as an INGroup, correct?
A Correct.
Q And I think then later it became known as a TurnON event?
A Correct.
Q And you understood that that was a sales event, right?
A I did not at the time.
Q There were people there signing up people for classes, correct?
A I don't recall.
Q How long after this event did you sign up for your first class?

A They called me to follow up, I would say, a week or two after the event.
Q So you gave your information at the event, right?
A Kal already had my phone number.
Q All right. And you testified that at that time that you attended this event, you were -- I think you said this -- were involved in a sexually abusive relationship, right?
A Previously, not at the time that I attended the event.
Q Okay. And you testified that it was your belief that you were a mark for, I guess, OneTaste, right?
A That is correct.
Q And one way in which you were a mark is because you had these vulnerabilities, in part, because of this sexually abusive relationship, right?
A Correct.
Q And isn't it true that you actually sought out OneTaste because you were having a hard time connecting with people sexually?
A I didn't -- no, that is not correct.
Q Do you remember being interviewed by the FBI and certain members of the U.S. Attorney's Office --
A Um.
Q -- during -- hold on, let me finish my question.
A Sure.
Q -- over the last several years?

A Yes.
Q Okay. Do you know how many times you've been interviewed by the U.S. Attorney's Office or --
A Countless. A lot.
Q A lot, right?
A (No response.)
Q And specifically, do you remember being interviewed on November 25th of 2024, by FBI Agent Christine Meyers and Assistant United States Attorney Ms. Bensing at the -- over the telephone?
A I don't recall that specific incidence, but it sounds like, yeah.
Q Okay.
And do you remember telling the agent and Ms. Bensing that after this abusive relationship ended, you moved to San Francisco and you had a hard time connecting with people sexually and dating people and you thought that -- you hoped OneTaste could fix your past trauma?
A Yes, I do, but I didn't seek it out for that reason.
Q Okay. But you had hoped that OneTaste would be able to address your challenges with connecting sexually and with your past trauma, right?
A Correct.
Q And isn't it true that at that time one of the reasons you were taking OneTaste courses is because you had been

engaging in very high risk sexual activity?

MS. BENSING: Objection.

THE COURT: I am going to sustain on this foundation.

BY MS. BONJEAN:

Q Ms. Lifson, do you remember publicly posting about a little bit of your history and how your story brought you to OneTaste on a public post on October 18th of 2012?

A I -- I don't recall.

Q Okay. Would anything refresh your recollection, perhaps?

A Sure.

MS. BONJEAN: I am going to -- Defendants' Exhibit 20-AV as in Victor.

May I approach, Your Honor?

THE COURT: Yes, but just tell me the number again.

MS. BONJEAN: It's Defense Exhibit 20-A, as in apple, V as in Victor. I'm not sure you have a copy.

THE COURT: Okay, I'll take a copy. Does the Government have a copy?

MS. BENSING: Yes, Your Honor.

THE COUR: Okay.

BY MS. BONJEAN:

Q Ms. Lifson, just take a minute to read through that and let me know when you've had opportunity to take a look at it.

A Sure. (Pause.)

Q Did you have an opportunity to read that?
A Yes, I did.
Q Do you remember posting publicly about your story in October of 2012?
A I -- I don't remember posting it, but yeah, this does look like something I've posted.
Q Okay.
And as of October of 2012, you credited the practice of orgasmic meditation with saving you, isn't that right?
A It appears I did here, yes.
Q And you did, in fact, credit the practice of orgasmic meditation of saving you from a pretty dark past, right?
A Correct.
Q And part of that dark past involved a sexually abusive relationship, right?
A Yes, it did.
Q It also involved a -- highly risky sexual behavior, correct?
A Correct.
Q And it involved also your descent into a dark world of the BDSM community at a young age, right?
A Correct.
Q Your relationships with sexually violent men, correct?
A Yes.
Q Feeling broken and angry as a result of those

relationships?
A Correct.
Q And that all predated your involvement with OneTaste, correct?
A Yes, it did.
Q In addition to that behavior that was potentially detrimental to your health and well-being, you were involved in drug and alcohol use, correct?
A That is correct.
Q Okay. So when you came to OneTaste, you had a number of things you were challenged with, correct?
A Yes.
Q And you, at least as of October of 2012, credited OneTaste with saving you from that, from that behavior, from that risk, and from that lifestyle, correct?
A That is correct.
Q And, in fact, OneTaste had a very strict sobriety rule, isn't that right?
A That it right.
Q And it helped you get clean and sober, right?
A That is correct.
Q And you credited OneTaste with helping you reduce the risk in your sexual behavior, right?
A Yes, I did.
Q All right.

Now, you started taking courses with OneTaste in 2008, is that right?
A That is correct.
Q And I think you'd agree that prior to that date, you didn't -- you -- you were doing your own thing and you really didn't think you needed OneTaste, right?
A I don't think I thought about OneTaste at all before I started doing courses.
Q Well, going back to what you posted in October of 2012.
You agree that at that time you felt pretty sexually liberated yourself, right?
A Yeah. I felt like I needed community and friends when I came to OneTaste more than anything else.
Q Okay. But you also said that you wanted something softer, right?
A Correct.
Q And you didn't want to just be having sort of this random sexual activity, right?
A Correct.
Q And you wanted to be more connected, correct?
A Correct.
Q And you thought that OneTaste was a place where you could achieve that, right?
A Yes.
Q And you didn't move in right away to any OM house,

correct?
A No, I did not.
Q Okay. In fact, you -- you had a job teaching?
A Correct.
Q And, again, when I say "a job," I mean like a job outside of OneTaste, right?
A Yes.
Q Was this like a high school teaching job?
A Yes, it was.
Q You had co-workers at your high school teaching job, right?
A I did.
Q You didn't live in a OneTaste OM house, you lived in an apartment, like most San Francisco -- I don't know what they call San Francisco -- I don't know what they call --
A San Franciscans.
Q San Franciscans, that's it.
Like most San Franciscans you lived in an apartment, right?
A I did.
Q There were lots of opportunities to socialize in a big city like San Francisco, correct?
A Correct.
Q You had all of these opportunities, right?
A Uh-hum.

Q And you took a couple courses. And, again, you didn't immediately move into an OM house, right?
A I did not.
Q All right. You did your research, right?
A I did.
Q You also had a Master's Degree, you were a pretty educationally advanced individual, right?
A Yes.
Q In fact, you previously told the FBI that you had an education and challenged things often at OneTaste, so you were not as easily manipulated, right?
A I don't know what you mean "easily manipulated."
Q Well, do you remember talking to the FBI and again the U.S. Attorney's Office on October 26th of 2022?
A It's hard for me to recall the specific instances.
Q Do you remember one of your first meetings with the FBI and the U.S. Attorney's Office?
A Not specifically.
Q Okay. Let me see.
Do you remember -- again, we'll just say in the fall of 2022 telling the federal government, the FBI and the U.S. Attorney's Office, that fortunately, because you had an education, an advanced education, you were not really as easily manipulated?
A I -- I don't recall whether or not I said that.

Q Okay. Would anything refresh your recollection?
A Sure.
Q Okay.

MS. BONJEAN: I am going to ask that I be permitted to approach the witness with Government's Exhibit 3500-LL-2. Number 2.

THE COURT: Yes, go ahead.

Is there a way to pull it up on the screen just for the Court and the witness and the parties?

MS. BONJEAN: Sure, absolutely.

THE COURT: That would be fine. We'll take a hard copy too, if you have it. But if you don't --

MS. BENSING: Your Honor, I think we have previously provided the Court with the hard copy.

THE COURT: Then I don't need it.

MS. BONJEAN: Okay.

THE COURT: Thank you.

BY MS. BONJEAN:

Q Ms. Lifson, I'm going to have you look at the second page of this document, and if you go down to sort of the middle of the page at the paragraph and right in the middle there. Take a look at that.

MS. BONJEAN: Or we can pull it out, if we can, for her.

Q It's also on the screen if you'd like to see it, ma'am.

A Yeah, I see it.
Q Okay. Now, having had an opportunity to look at this document, does it refresh your recollection about whether or not you told the FBI that fortunately you had an education and challenged things often, so you were not as easily manipulated?
A Yes.
Q You recall saying that?
A I -- I see that it is written here and it sounds like something I may have said.
Q Because you have called yourself sort of a rebel, right?
A I was -- yeah.

(Continued on the following page.)

BY MS. BONJEAN: (Continuing)
Q Yeah. You were someone who did challenge the status quo, right?
A I would say so. Well, in the beginning.
Q Correct.
And your education gave you some of the skills to challenge what felt right and what felt wrong, right?
A I would say in the beginning, before I became an employee there.
Q Okay. Certainly at the beginning you had the capacity to make your decisions all on your very own, right?
A I -- I decided to move into OneTaste on my own, correct.
Q And, in fact, you did so after conducting your own research on the place, right?
A I did.
Q In fact, you even thought, ey, this might be an unusual place to go. I think you even thought it feels a little culty, but I'm still going to sign up anyway, right?
A That is correct.
Q And that was something you -- that was a conclusion you drew before you even moved into 1080, right?
A Um, yeah, I thought I could handle it.
Q You thought -- in fact, you told the FBI that you actually Googled it and you knew that OneTaste was B.S., but you didn't have anything better going on, so you moved in,

right?
A I don't think I used those words.
Q Okay. I'm going to have you look at LL-2. I think -- is it still there, ma'am, in your hands?
A Yeah.
Q Okay. I'm going to have you look at the third page of that document, if you could.
A Okay.
MS. BONJEAN: And the third paragraph on that page, if you could pull that out just for the witness.
A Yeah, I don't -- I don't recall -- I don't recall putting it in those terms.
Q Okay. So you don't remember tell -- do you remember telling the FBI that you knew OneTaste was B.S.?
A I don't.
I do remember telling them that I Googled it. And I did Google it beforehand and read some scathing reviews of OneTaste.
Q Right.
And notwithstanding what you read, you decided: I'm going to still get involved. Right?
A I did.
Q And you testified on direct examination that OneTaste was responsible for --
MS. BONJEAN: You can take that down, by the way.

Q You testified on direct examination that you believed that OneTaste was responsible for certain financial struggles you face, right?
A I think that OneTaste exacerbated certain financial troubles.
Q Right. Because you already had some pretty significant financial troubles before you moved in to 1080 Folsom, right?
A I was up to date on all of my payments and debts before I moved into 1080 Folsom.
Q Well, isn't it true, ma'am, that on July 22nd of 2020, that you told the FBI that you moved into 10 -- the 1080 residence after you lost your job as a high school teacher?
Right?
A Yes, that's correct.
Q You moved into 1080 after you stopped paying your student loans, right?
A No. I stopped paying my student loans after I moved into 1080.
Q You told the FBI that you stopped paying taxes and owed the IRS 13k after?
A That was also after I moved into 1080.
Q And that before you moved into 1080, you had a shared bank account with a guy who had a cocaine habit?
A That was all after.
Q Okay. I'm going to have you look at 3500 LL-1.

I'll give you a paper copy.
A Sure.
MS. BONJEAN: Would you like a paper copy, Your Honor?
THE COURT: I have one. Thank you.
MS. BONJEAN: Okay.
Q Okay. Ms. Lifson, I'm going to have you look at what has been marked as 3500 LL-1.
A Yeah, this is not correct.
Q Okay, hold on. Hold on a second.
A Sorry.
Q I'll ask a question.
I'm going to have you look at paragraph 3, which looks like you already did.
A Yeah.
Q And, first of all, do you remember interviewing with FBI Agent Elliot McGinnis and Christopher Mills on July 22nd of 2020?
A I don't recall.
Q Do you remember two male FBI agents coming to visit you back in 2020 for the first time?
A Yes, I do.
Q Okay. And do you remember having a conversation with them?
A Yes, I do.

Q Okay. And do you remember you giving them information about your time at OneTaste?
A Yes, I do.
Q And do you remember telling them that you moved into the 1080 residence after you lost your job, after you stopped paying student loans, after you had a debt to the IRS for 13k, and after this shared bank account with a guy who had a cocaine habit?
MS. BENSING: Your Honor, objection to misreading the statement.
THE COURT: Give me a minute, please.
Could you repeat the question, Ms. Bonjean.
MS. BONJEAN: Yes, Your Honor. And I can summarize it.
Q Do you remember telling these FBI agents that not only did you lose your job, but you were already in all of this financial debt, including debt on your student loans and the IRS, at the time prior to moving into 1080?
A No.
MS. BENSING: Objection to the mischaracterization.
THE COURT: Overruled.
She can answer. I believe she answered "no."
A Yeah, the document is incorrect.
Q Okay.
A The document also -- my name is spelled wrong and there's

a lot of discrepancies in this particular document. It should say "before" and not -- or it should say that I -- all of that happened after I moved into the residency. So, yeah, I'm not sure about the -- I can see that the document is incorrect.
Q Okay. So your testimony is that that financial hardship came after you moved into 1080, not before?
A That's correct.
Q Well, certainly then you would have gotten it right when you were interviewed again on October 29th of 2024, right?
A Um, I -- I don't remember.
Q Okay. I'm going to have you look at LL -- 3500 LL-4. I'm going to have you look at page 3 of this document.
You could look at the third paragraph towards the end of that paragraph if you would, please. Well, you can look at the whole paragraph of it.
A Yeah, that is...
Q Let me ask a question first. Okay?
Have you had a chance to look at it?
A Mm-hm.
Q Okay. Did you tell the Federal Government again, or on October 29th of 2024, that at the time you moved into OneTaste or in the 1080 residence, you had lost your job? Right?
A That's correct. It happened around the same time, so that's correct.
Q You were struggling to feed yourself. You couldn't make

enough to feed yourself, right?
A Oh, that's not actually what I meant by that. I had enough money to feed myself. I was just like -- I just was in my early twenties and was like, you know, microwave popcorn is a great dinner tonight. So in that way, I was struggling to, I would say, give myself adequate nutrition. And at 1080, there was a meal plan and meals were cooked for you, and that looked better for me than me trying to figure it out. But it wasn't a financial -- I was making enough money to feed myself for sure.
Q And your money was going towards your drug use as well, right?
A Um, I mean, I was -- I had plenty of money to feed myself. I didn't -- I was not spending an exorbitant amount of money on drugs.
Q Okay. So you didn't tell the Federal Government that you were struggling to feed yourself?
A I was struggling, um -- like, the context of that is I was struggling to, like, create healthy meals for myself. It's not that I was struggling with enough money to feed myself.
Q Okay. So it was -- you were struggling to have nutritious meals?
A Yes. I was struggling to, yeah, make good food choices, I would say, would be a better way to say it.

Q Okay. But you did lose your job, right?
A I did lose my job, but I -- I had -- I got a new job within three months of losing my job.
Q Okay.
A So that wasn't -- didn't cause financial hard -- like, a significant amount of financial hardship at that time.
Q And you told the Federal Government though you needed help, that's why you moved in to 1080, right?
A I -- I was definitely looking for the support that 1080 provided.
Q Okay. Let's talk about 1080 for a second.
1080 was an OM community, right?
A Correct.
Q And there were certain responsibilities that came with living in a OneTaste communal setting separate and apart from working there, right?
A Sure.
Q And 1080 had a second floor and a third floor living situation, right?
A Correct.
Q Did you live on the second floor or the third floor?
A I lived on the third floor.
Q Okay. And the third floor was an immersion program, wasn't it?
A Um, it shifted what it was at a variety of times, I would

say.
Q Well, it wasn't just a place to rent. It was a commitment to the OneTaste community, right?
A Yes, it was.
Q It wasn't a place where you expected to have a lot of freedom -- or a lot of privacy, right?
A It was not a place where you expected to have a lot of privacy.
Q Right.
And there were expectations about OMing, right?
A There were expectations about OMing.
Q Right.
It was a core tenet of OneTaste, right?
A Correct.
Q So when you moved in there, you understood that you were going to be living amongst people who shared a viewpoint about the benefits of OMing, right?
A Correct.
Q There were expectations that you would commit certain hours of service to OneTaste businesses, right?
A I don't recall.
Q There were expectations that you would have sort of meetings with your fellow resident members and people who were I guess staff at OneTaste, right?
A Yeah, I don't recall either.

Q Okay. And you went there because you wanted to experience what it was like to be immersed in OneTaste, right?
A I went there I think because many of my friends had moved into OneTaste, because the food program really appealed to me, because I thought it could be a healthy place for me to live.
Q And there was an application process, wasn't there?
A Um, I don't recall what the application process was.
Q Well, not everybody could just move in. You had to have some experience with taking OM classes, right?
A Um, I don't remember.
Q Would something refresh your recollection, you think?
A Sure. Yeah.
Q I'm going to have you look at Defense Exhibit 3-CY.
MS. BONJEAN: I think you should have this, Your Honor.
MS. BENSING: I think I might need a copy.
THE COURT: Thank you. I have it.
Do you need it, Government?
MS. BENSING: I do need a copy.
Q Ms. Lifson, I'm going to have you look at the second page of this document.
A Sure.
Q And if you could peruse that and let me know when you've had a chance to look it over.
A Yes, I've had a chance.

Q Okay. And then if you could look at the third page. Just if you could look there as well.
A Mm-hm.
Q And do you see in the middle of the page, specifically review there.
A Yes.
Q Does this document refresh your recollection about whether or not there was a program application procedure for the San Francisco's living center?
A Yes, it does.
Q Okay. And there was, right?
A Yes.
Q And part of the application process was that you had to have taken a Foundations course and have some OM training, right?
A Yes.
Q Okay. And also, do you remember that there was a second-floor program as well?
A Yes, I do.
Q In fact, the second-floor program wasn't as intense as the third-floor program, right?
A No, it wasn't.
Q So you could have chosen to be on the second floor, but you chose to be on the third floor, right?
A Yes, I did.

Q And also part of the commitments of living in the 1080 Folsom, San Francisco residence was to commit a certain amount of hours to service of OneTaste, right?
A Yes, it was.
Q And also to, again, engage in the practice of OM on a regular basis, right?
A Yes, it was.
Q Now, you testified on direct examination that -- I think that you believed that either research partners were specifically assigned by Ms. Daedone. But that wasn't the case, right?
A I don't think I said that on direct examination.
Q Okay. In fact, there were research partners who were suggested, perhaps, but nothing was mandated, right?
A I never had research partners, so I don't think that's pertinent to me.
Q Research partner and roommate, you see as different?
A I do see that as different, yeah.
Q But Ms. Daedone never said you have to share a room with a particular person, right?
A I was not instructed by Nicole to share a room with anybody, no.
Q But you weren't instructed by anyone that you had to share a room with a particular person, correct?
A Um, I don't remember how forcefully it was recommended.

I know that it was strongly recommended to share space sometimes with people that you didn't want to.
Q When you first went to 1080 Folsom in 2010, you shared a room with who?
A Oh, gosh. I don't remember who I shared a room with when I first moved in. Or if I -- I may have had a single room. I'm sorry, I don't remember.
Q So you could have had a single room at 1080, right?
A Yeah. It's more expensive.
Q Okay. And you also could have told anyone at OneTaste that you didn't want to share a room with someone, right?
A Um, yes, there was -- yeah.
Q And I think you testified at some point there was a roommate or a partner, whatever word you want to use, that you were not particularly keen on. But you never told anybody that, right?
A I don't recall.
Q In fact, at one point your dad even visited; isn't that right?
A I don't remember my dad ever coming to the residency.
Q Do you remember him coming to a course or a class?
A He did not come to a course. He went to a lecture once.
Q Okay. Lecture/course.
So he came and heard Ms. Daedone speak, right?
A He did when she was in New York.

Q Oh. That was in New York, not in San Francisco, right?
A Correct.
Q And his recommendation was this is not good, get out, right?
A Correct.
Q And you didn't take it, correct?
A I did not.
Q But at any point you could have called him up and said, you know what, this is not working for me anymore, I want to come home, and your family would have taken you back, right?
A Um, yeah, they probably would have.
Q Now, you testified on direct examination that -- about how much money you made at OneTaste, right?
Do you remember that line of questioning?
A Correct.
Q Isn't it true that your first salaried job at OneTaste paid you around $50,000 a year?
A Not to my recollection.
Q Again, I'm going to look at LL -- the document that says 3500 LL-2. It's in front of you. If you need me to come over and find it for you, I can. Otherwise, we'll pull it up.
And we'll go to the second page and fourth paragraph down.
A Which document is that? The one in front of me? I'm sorry.

Q I'll pull it up on the screen. I think it will be a little easier.
A Okay.
That's not correct.
Q Hold on. Let me ask you a question. Okay?
Do you remember being interviewed by three different FBI agents in October of 2022? That is Agent McGinnis, Daniel Schmidt, and Tricia Quintero?
A Yes, I do.
Q And that was along with Assistant United States Attorneys Gillian Kassner and Lauren Elbert?
A If you say so. I don't remember.
Q Do you remember, though, being in a conversation with three agents --
A Yes. I remember -- yes.
Q Let me finish.
A Sorry.
Q Three agents and two U.S. -- at least two U.S. attorneys in October of 2022?
A Yes, I do.
Q And you telling them that your -- actually, your first salary position at OneTaste earned you about 50 grand a year?
A No. I told them my first salary job -- that was teaching -- earned me $50,000 a year. So this document is a mistake.

Q Okay. So the FBI got it wrong again?
MS. BENSING: Objection.
THE COURT: Sustained.
Q And isn't it true that you told them that that felt like a good deal of money, you didn't have any dependents, you didn't --
A Um.
Q Hold on. Let me finish.
You had enough to live off of, you didn't have any real bills?
A But that was my teaching job. That wasn't my OneTaste job.
Q Okay.
A I never made that much at OneTaste.
Q Okay. So that was just a mistake?
A That was a -- I mean, like I said, they got the spelling of my name wrong, I can see a bunch of typos. We can go through all the mistakes if you'd like, but that one is also a mistake.
Q Okay. Fair enough.
Let me ask you about this: You said that your -- you paid about $24,000 for I think the first coaching program you took?
A Correct.
Q You remember that?

A Yes.
Q That's what you testified to here on direct examination, right?
A Yes.
Q Isn't it true that you told the Federal Government, in October of 2022, that you paid $10,000 to participate in a coaching program?
A I don't recall.
Q Okay. I'm going to have you look at 3500 LL-2. We're going to go to page 2 and it's the paragraph right beneath the one we just looked at.
A Oh, yeah, that -- I, I, I -- honestly, like, I don't remember exactly how much money it was.
Q Okay. So when you said it was 24 grand, you just made that up? Or where did you get the number?
A I, I, I thought it -- I thought that's what I remembered, but I could be mistaken. It was a long time ago.
Q Okay. You understand you're under oath, right?
A I am recollecting things as truthful as I can.
Q Okay. So today you have -- you said the class was 24,000. But you would agree that you told the FBI, back in 2022, that it was actually $10,000?
A I don't remember if that's what I told them.
Q Okay. As you sit here today, now on cross-examination, how much did you actually pay for the coaching program?

A I don't remember.
Q You testified that you worked as a cook at OneTaste when -- shortly after you moved into 1080 Folsom, right?
A I think it was about eight months after I moved in.
Q Okay. And you really liked that job though, right?
A I did.
Q And you were able to support yourself and live as you pleased at that time, right?
A Yeah, I had a variety of jobs and that was one of them.
Q Okay. Now, you also, when you were working -- strike that. I'm sorry.
When you were living at 1080 Folsom, there were times when you worked outside of OneTaste, right?
A Correct.
Q Tell the Ladies and Gentlemen of the Jury what jobs you held after you moved into 1080 Folsom.
A I did some freelance, like writing with -- I was helping somebody edit their self-help book.
And then I also had the job in Sausalito where I went and helped somebody write a novel.
Q So you had colleagues outside of OneTaste, right?
A I had clients outside of OneTaste, yeah.
Q You had clients outside of OneTaste, right?
A Correct.
Q You weren't just living, working at 1080 Folsom around

the clock, right?
A No.
Q Nobody stopped you from leaving to go do your work elsewhere, correct?
A They did not.
Q You had a phone that you could use to do your business, right?
A Mm-hm.
Q Yes?
A Yes.
Q You had a computer, I assume?
A I -- I did.
Q You had friendships outside of OneTaste?
A They were becoming fewer and fewer, but I still had some.
Q And that was your choice though, right?
A That was, I would say, the circumstances that I was living in.
Q Nobody stopped you from having friends that weren't associated with OneTaste, right?
A Um, living at OneTaste made it harder to have friends outside of OneTaste, but nobody was physically stopping me from having friends.
Q Nobody was even telling you that you couldn't have friends outside of OneTaste, right?
A Um, people would say that when you hung out with people

outside of OneTaste, the -- the verbiage that they would use would be an "energy leak."
Q Okay.
A So they would say that those people are energy leaks and that you're taking energy away from the inside of the organization and that it was better to date people, friend people, sort of like hang out with people inside the organization.
Q Okay. So some people inside the organization told you it's better to have friends in the organization than outside, right?
A Yeah.
Q Okay. But they didn't tell you you couldn't have friends outside, right?
A Um, no. But they -- they suggested to spend my energy inside.
Q You were a grown woman, right?
A Correct.
Q You weren't in high school, fair?
A Fair.
Q And you chose, based on whatever suggestions you received, to spend your time at OneTaste, correct?
A Correct.
Q Now, at some point you decided you wanted to do this coaching program, correct?

A Correct.
Q And the coaching program teaches you to be a coach, fair?
A Fair.
Q And to be a coach, you're teaching people how to OM, right?
A That was one part of coaching.
Q Well, what was the other -- what were the other parts of coaching?
A Well, there was just coaching that wasn't related to OM as well.
Q Okay. And what was that, like lifestyle coaching or life coaching?
A Yeah, it was life coaching.
Q All right. As of October 25th of 2010, you were extremely happy with what you had signed up for at OneTaste, right?
A I -- I don't recall exactly how I felt in that month, in that moment.
Q Well, you had financial stability, right?
A Um, no.
Q You had friends who loved you, right?
A Um, I did have friends.
Q You had a number of intimate, loving relationships, correct?
A Correct.

Q You had a job that you were very happy with, working in spirituality, correct?
A In October of 2010?
Q Mm-hm.
A What was I doing then? I think I was working in the kitchen then.
Q Okay. Were you also working outside of OneTaste as well?
A Yeah. But I wasn't -- I wasn't doing any coaching at that point.
Q I understand.
But you were very happy, as of October of 2010, in both your personal and professional life, right?
A Um, I -- I think so.
Q And is this when you were working with the -- my apologies that I'm failing to -- maybe the temple or you were working with kids?
A Yeah, let me think about the timeline for a second. I'm sorry.
Q Would something refresh your recollection?
A Yes, it would.
Q Okay. I'm going to have you look at Defendants' Exhibit 20 --
MS. BONJEAN: Is it 20-Z?
MS. KILLION: Yes.
MS. BONJEAN: Okay.

MS. BENSING: I'm looking.

THE COURT: I don't think I have it.

MS. BENSING: I don't think I have it either.

THE COURT: If we could put it on for the witness and the Court and the parties. Thank you.

MS. BONJEAN: Yes, Your Honor.

Can we use the ELMO on this one, Your Honor?

THE COURT: Let me just make sure that we could do it without publishing it yet.

MS. BONJEAN: Oh.

THE COURT: I think that's fine.

Q Do you see that, Ms. Lifson?

A Yeah, I do.

Q Okay. You have the paper copy as well, right?

A I do.

Q Okay. So again, as of October 25th of 2010, you were -- you had everything you asked for, correct?

A I, I see that I wrote that on this paper. I don't -- I don't think it was totally true, but I -- yeah, I see that I wrote that here.

Q Right.

So your words at the time were that you were thrilled with your life, right?

A Those seem to be my words at the time.

Q Right.

And only now, 15 years later, are you saying that's not really what you were feeling back then, correct?
A Um, I think that -- I don't -- I think if you asked me two months later, I wouldn't have been feeling the same thing. I think that's probably what I felt in that moment, but like, I -- like, probably a month after this I broke up with the person that I had been seeing and I, I -- there's -- there's some issues with this.
Q Okay. But you --
A Yeah.
Q You sent an e-mail to a number of people expressing your deep gratitude for what OneTaste had brought to you, right?
A Yeah, it appears so.
Q Okay. And among those things was financial stability, right?
A Yeah. Which is -- which is super interesting that I put that on there.
Q Yes.
And also, you were excited about the opportunity to be a leader at OneTaste?
A Yes, I was.
Q You were also in a relationship with a woman that you really liked, right?
A Yes, I was.
Q And you had friends and mentors that you enjoyed and were

learning from?
Yes?
A Yes.
Q And you were also not immersed, really, in OneTaste entirely. You still had a job outside of OneTaste, right?
A Yeah. I was still working at the synagogue.
Q Right. Okay.
And you were working with kids, correct?
A Yeah. I was a youth director.
Q And you were, you know, happy about teaching them and exploring God with them?
A I enjoyed aspects of that job.
Q And fair to say that you really felt that you had a number of blessings and had a lot to be grateful for at the time? And again, we're talking about in October of 2010.
Right?
A Correct.
Q Now, when did you say you moved to Boulder?
A I moved to Boulder, gosh, in May of...
Q 2012?
A Yes.
Q Okay. And that was an opportunity to be a director of OneTaste in Boulder, right?
A Correct.
Q And that was an opportunity to create a whole nother

OneTaste program in another city, right?
A Correct.
Q And you were pretty excited about that?
A Correct.
Q When did you start dating Chris Kosley?
A While I was still in San Francisco.
Q I'm sorry?
A When I still lived in San Francisco.
Q So this is before you went to Boulder?
A Correct.
Q Okay. So I want to focus in on the time when you were still in San Francisco, before you went to Boulder.
You took -- you continued to take courses at OneTaste, right?
A Yes.
Q You continued to live at 1080, right?
A Correct.
Q You took the coaching program, right?
A Yes.
Q You were OMing regularly, correct?
A Correct.
Q It was a practice that was working to your satisfaction, right?
A Early on it was.
Q Well, even before you went to Boulder it was, right?

A Yeah. I would say while I still lived at 1080 it was.
Q You didn't tell anybody that you were dissatisfied with the practice of OM, correct?
A Not that I recall.
Q You certainly didn't tell Ms. Daedone or Ms. Cherwitz or anyone in the upper management of OneTaste that you did not like what OneTaste was offering, right?
A No.
Q You were pretty excited about -- in getting even more immersed in the program there because you wanted to be a teacher and a coach, right?
A That was the path that I was on.
Q Okay. At some point you became -- you started teaching Mastery courses.
Do you remember that?
A Um, yes.
Q Okay. And can -- do you remember when you started teaching Mastery courses?
A I don't remember. I'm sorry.
Q Okay. Was it before you went to Boulder?
A No. It was after I went to Boulder.
Q Did you teach any courses before you went to Boulder?
A No.
Q So in and around May of 2012, you moved to Boulder.
Did you move with Chris Kosley at that time?

A No. I moved with Eli Block.
Q Okay. And the agenda was to create this program in Boulder much like there was one in New York and one in San Francisco, right?
A Correct.
Q And you were excited to participate in that project, fair?
A That is fair to say. Yes, I was.
Q And like many startups, there's not always initial financial returns on something like that, but the hope is that in the future you can turn something into a financial success, right?
A Correct.
Q Okay. And isn't it true that when you -- in May of 2012, when you arrived in Boulder, you posted publicly that you were extremely excited about joining the Boulder community on behalf of OneTaste?
A Um, I -- I don't recall.
Q Do you remember posting publicly that you were grateful for the opportunity?
A I don't specifically remember, but that does sound like something I would have posted at the time.
Q And you also said that you loved the work deeply.
Do you remember that?
A I don't remember specifically.

Q Okay. Again, would anything refresh your recollection?
A Sure.
Q This is Defendants' Exhibit 20 A, as in apple, T as in Tom.
MS. BONJEAN: Can I use this? This won't publish, right?
THE COURT: No, you're fine.
Q Okay. I'm having you look at Defendants' Exhibit 20-AT.
MS. BONJEAN: Just for the witness.
Q Let me know when you've had an opportunity to look at that, Ms. Lifson.
A Yes.
Q So fair to say that you publicly announced how excited you were to be coming to Boulder and starting the program there, right?
A Yes.
Q And that you were deeply -- you loved the work deeply, correct?
A That is what I stated.
Q And that was after you graduated from the coaching program that you took in San Francisco; is that right?
A That's correct.
Q Now, speaking of the coaching program in San Francisco, there was a ten-week course, right? I'm sorry, ten-month course?

A Ten-month course.
Q Pretty intense course, right?
A Yes.
Q And you covered -- you heard a great deal of teachings from Ms. Daedone during the course of that coaching program, right?
A Correct.
Q And you were already familiar with, you know, the OneTaste philosophy, right?
A Correct.
Q And when you signed up for that coaching program, you signed a release of liability form, right?
A I don't recall.
Q Would anything refresh your recollection?
A Yes.
Q I'm going to have you look at Defendants' Exhibit 20-AE, as in Edward.
Ms. Lifson, do you see this document in front of you?
A I do.
Q Do you recognize it?
A Yes.
Q What you do you recognize it to be?
A A release of liability form for the coaching program.
Q Okay. And if you could go to the second page.

Do you recognize anything on the second page of this document?
A Yeah. I recognize my signature.
Q And do you recognize when you signed this document?
A It looks like 9/8/2012.
Q And does it appear to be a fair and accurate representation of what you signed on September 8th of 2012 in connection with the coaching program?
A Yes, it does.
MS. BONJEAN: Your Honor, at this point we would move the release of liability form into evidence.
MS. BENSING: No objection, Your Honor.
THE COURT: Defendants' Exhibit 20-AE is admitted.
(Defendants' Exhibit 20-AE received in evidence.)
(Exhibit published.)
MS. BONJEAN: Thank you.
Q Ms. Lifson, I'm going to go to the second page here.
A Sure.
Q Do you see your signature at the end?
A Yes, I do.
Q Okay. And you signed this, right?
A I did.
Q And when you signed this document, you understood that you were releasing OneTaste of liability and assuming the risk of what the coaching program had to offer you, right?

A Yeah.
Q And, in fact, the document that you signed says, "I understand and acknowledge and agree to each of the following."
The first bullet point there says that the content of the course is controversial.
Do you see that?
A I do.
Q And, in fact, it is, right?
A Yes.
Q And you assume the risk of taking a course that has controversial subject matter, right?
A Yes.
Q And then the second bullet point says that not all the activities occurring in the course are known and foreseeable, right?
A Yes.
Q OneTaste was sort of known for pushing boundaries; that's kind of what you signed up for, right?
A Yes.
Q The third bullet point says that "any concepts, notions, ideas, suggestions, and recommendations from sponsors and anyone acting on behalf of sponsors that I accept and/or apply to my life I do of my own free will."
Do you see that?
A Yes. (Continued on the next page. )

(Continuing.)

CROSS-EXAMINATION (Continues)

BY MS. BONJEAN:

Q The next bullet point says that while sponsors believe that the content of the course to be valuable, sponsors do not guarantee it will solve any particular issue or problem I may have. I alone will decide and accept responsibility for how and what purpose I apply the content of this course.

Do you see that?

A Yes.

Q And you assumed the risk of that statement, right?

A Yes.

Q Or what's reflected in that statement.

You also assumed the risk of the fifth bullet point that says that I may not agree with all the content of the course and accept that possibility?

A Yes.

Q Moving on.

That the participants in the course may come from diverse backgrounds and hold beliefs and opinions different from mine, right?

A Yes.

Q And that the participants may make statements or take actions that I disagree with or find offensive.

Do you see that one?

A Yes.
Q Okay. You also assumed the risk when you signed this liability form that you may -- that certain participants may disagree with or find offensive statements you may take [sic] or actions you take, right?
A Yes.
Q Underneath that, can you read that one under -- the bullet point underneath the one we just read there?
A That I've assessed my own emotional, mental --

THE COURT: If you could just read more slowly for the court reporter.

THE WITNESS: Oh, sorry.

A That I have assessed my own emotional, mental and physical well-being and I have concluded that I wish to and am able to participate in the course.
Q And you affixed your signature at the end of this document after reviewing this particular provision?
A Yes.
Q I think you skipped one. If you could read the one above that.
A That I may choose not to participate in any activities offered in the course. However, if I do decide to participate, I do so of my own knowing and free will.
Q So during the coaching program you didn't have to participate in all the activities, right?

A Correct.
Q In fact, there was a CP -- this was CP2 you were in, right?
A Correct.
Q In CP2, Ms. Daedone did a whole lecture on boundaries, right?
A I honestly don't recall.
Q Okay. Do you recall the concept of red, green or -- yeah, green, yellow, red?
A Yes.
Q Okay. And what is that?
A It means that if you feel like you want to stop, you say red. If you feel like you -- that the course is moving too fast, you say yellow. If you feel like everything is good to go is green.
Q And that was a way that participants in the course could communicate with each other so that everyone was making sure we're on the same page about consent, right?
A Correct.
Q And that was a tenet that was utilized in the OneTaste OM houses as well, correct?
A Somewhat, I would say.
Q And just so you could read the last, the last bullet point of this doc -- the first page of this document.
A That I voluntarily and knowingly accept and insure each

of the risks and other matters set forth in this paragraph.
Q This was something that you signed back in September of 2012, right?
A Correct.
Q And you were -- were you already living in Boulder at that time?
A No, I wasn't. I was in San Francisco at that time.
Q Okay. So, do you know -- you had said you started the Boulder program in May of 2012.
Were you going back and forth?
A I was going back and forth for Coaching Program 5. 2 had already been concluded before I went to Boulder.
Q I see. So this seems to be from 5, is that right?
A I think that's from 2. It's 2010.
Q This one is from 2012.
A That one is from 2012, so then that must have been from 5, yeah.
Q Okay. So even when you redid the coaching program in 2012, you continued to or you assumed the risk of what was associated with that coaching program in 2012, right?
A Correct.
Q Again, whether it was 2010 or 2012, you never told anybody or any -- you didn't tell Ms. Daedone or Ms. Cherwitz or anyone of the upper staff that you were not comfortable with what was being taught in the coaching program, correct?

A Correct.
Q You never told Ms. Daedone or Ms. Cherwitz or anyone in the upper management staff that you were no longer comfortable with the practice of OM, right?
A Correct.
Q In fact, at this time period you never objected to any sexual activity that you engaged in at OneTaste either to Ms. Daedone, Ms. Cherwitz, or anyone in the upper management staff, right?
A I don't recall. I know that I talked to Eli about not wanting to OM with community members in Boulder around this time, but I'm not sure if I talked to anybody in upper management.
Q Okay. Did you OM with community members in Boulder?
A I did.
Q Okay. And you didn't at any point say: I'm not up for this anymore, I'm not doing this; you participated in it, right?
A I did participate in it.
Q No one told you you had to, correct?
A It was an expectation.
Q Okay. Well, you joined OneTaste as, you know, a community member and as a coach. That would be an expectation, right?
A As a -- to be a coach, the expectation was to teach OM,

not to OM with clients. So the expectations of the job description of a coach was different.
Q Well, coaching is coaching clients, right?
A Coaching is coaching clients, not being stroked by clients.
Q Okay. And you chose to be a participant in the OM practice with clients in Boulder?
A I was instructed to be part of the OM practice with clients in Boulder.
Q What do you mean "instructed"?
A I mean that OM packages were sold specifically for Eli, my partner, out there to coach and for me to be the strokee.
Q Yes, but you were the director of Boulder, you were the one selling the packages?
A Rachel Cherwitz came out and sold those packages.
Q Okay. You were the director of the program, am I wrong?
A I was the director of the program, but for that specific instance when that occurred, Rachel Cherwitz was selling those packages.
Q You didn't tell Rachel Cherwitz: I don't want to be the director of Boulder anymore?
A It wasn't that I -- I just didn't want to have to OM with clients.
Q I understand. But you never communicated that to Ms. Cherwitz?

A I did not communicate that.
Q Was she supposed to read your mind since --
MS. BENSING: Objection.
THE COURT: Sustained.
Q -- since you had --
MS. BENSING: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q All right. How long were you the director of OneTaste Boulder?
A About two years.
Q Okay. So, for a full two years you were building OneTaste Boulder, correct?
A Correct.
Q And during this time you were also teaching Mastery classes, right?
A Correct.
Q And could you tell the ladies and gentlemen of the jury what a Mastery class was?
A It was a weekend immersion in New York that was about mastering the tenets of OneTaste, best as I can remember.
Q OneTaste?
A Of sexuality and OneTaste, yeah.
Q Okay. Did it involve more high level types of sexual behavior?

A Yes, it did.
Q Like what types of things?
A I -- I don't recall exactly what I taught there.
Q BDSM, perhaps?
A Yes, we did do a BDSM demo there.
Q BDSM demo?
A Yes.
Q Okay. You actually created the curriculum for it, right?
A I -- I may have.
Q Right. You and your boyfriend Chris Kosley created a whole BDSM curriculum for the Mastery program, right?
A I don't remember.
Q You taught the course with him, correct?
A I did teach the course with him.
Q And nobody made you do that, right?
A No, they did not.
Q You didn't have to go back to New York and teach that Mastery course, right?
A It was part of my job at that time.
Q Speaking of your job, you did sign an employment agreement, right?
A Correct.
Q You looked at it earlier?
A Correct.
Q I think it's Government's Exhibit 3743.

MS. BONJEAN: Do we have that? That's in evidence, I believe.

BY MS. BONJEAN:

Q Okay. We looked at this a little bit earlier, and I think during your direct examination we also looked at the job description, but just to be clear:

On the sixth page of this document --

MS. BONJEAN: If we could go there.

Q -- you signed the employment agreement, right?

A Correct.

Q And I know looking back you don't think the terms were very good of it, but you did agree at the time, right?

A I -- I did. I did agree at the time.

Q Okay. And you read it, right?

A I would presume so.

Q Right. You had a Bachelor's and a Master's Degree at the time you --

A I was capable of reading it, correct.

Q Correct.

And you also were familiar with what the job description was because it's right here in black and white, right?

A Correct.

Q It seemed like you had a lot of responsibilities, right?

A I had many responsibilities.

Q I mean, but it was a startup company, right, or a startup program?
A That is one thing you could call it.
Q Right. And, again, no matter what your feelings are today, at the time you agreed, correct?
A At the time I agreed.
Q Right. And it is all here in black and white, correct?
A Correct.
Q Okay. Now, even while you were working in Boulder, you still had contact with your family, right?
A I had some contact with my family, yes.
Q Do you remember posting about going home to see your family for Passover in March of 2013?
A I do not remember.
Q Okay. Do you recall letting your colleagues know when you were going to be visiting your parents or your mother back in 2013 or 2014, we'll say?
A I don't remember.
Q You're not -- you're not denying that you had contact --
A I'm not denying that I continued to have contact with my family, no.
Q And I would assume you would agree that you had the ability, of course, to spend time with them if you wanted to, correct?
A Well, I would say limited time.

Q I mean I know you were working hard, but nothing stopped you from going and visiting your family if you really wanted to?
A Well, we didn't have any designated days off and we didn't have any designated vacation days, so that made it pretty hard.
Q Well, when you say you didn't have any designated days off, is there a reason you would agree to an employment scenario where you worked seven days a week?
A I mean the reason was because I had been deeply immeshed in the organization at this point.
Q Right.
A I mean it doesn't -- it does not make sense to my current self that I would agreed to that, but yeah. I did work seven days a week then.
Q And was it because you were trying to build Boulder OneTaste and be a part of that from the ground up?
A It was because that was what was expected of me by the organization.
Q Right. But you were trying to be -- you were trying to move your way up the ranks in the organization, correct?
A But that's not why I worked seven days a week.
Q Okay.
A I don't -- I personally don't have that type of work ethic.

Q Wow.
A I mean now I do because I'm a mom, but -- and I work seven days a week again, but yeah it was expected of me by the organization.
Q Okay. And who -- who -- do you have any -- did you ever find any documentation that you provided to the Government that said you were required to work seven days a week?
A I -- I -- I don't think I was responsible for documentation.
Q Okay. Did you -- did you do any search for your own documentation?
A I have not.
Q Because to be clear, you were the highest person on the totem pole in Boulder, right?
A Correct.
Q You were managing your own hours?
A I was not really managing my own hours.
Q No one was there to tell you when to wake up or go to sleep, right?
A Well, I was told when to wake up or go to sleep by the thread, the sales thread that we had. And then I was required to hold morning practices. So, there were certain requirements that had me wake up and go to sleep in a certain pattern.
Q Right. You had responsibilities with your job, but there

was no boss there telling you when you could leave work or when you needed to get to work, right?
A There was no physical person in Boulder.
Q Right. There -- there was -- in fact, as far as the text exchanges go, they didn't say: Lianna, you have to be there at this hour, right?
A It said: Don't go to bed until you meet your sales goal.
Q Right. It says you have obligations you have to meet, right?
A (No response.)
Q Correct?
A Yeah, I wouldn't quite put it that way.
Q Okay.
A But --
Q You had obligations you had to meet and if you didn't meet those obligations, the message was --
A You're not allowed to go to sleep.
Q -- well, get your obligations done before you go to sleep?
A It was not messaged in that way.
Q Okay. And, again, you were trying to build something in Boulder and you were tying to move your way up the ranks of the company, correct?
A That's correct.
Q And ultimately, you did not meet those goals and you

couldn't stay in Boulder, right?
A I actually -- I don't remember exactly why Boulder -- yeah, I -- that -- that time is hazy for me. I just don't remember.
Q Right. In fact, they had you shut down Boulder and you came back to New York, right?
A I do not recall if they shut down Boulder because we weren't making enough money. That -- that -- that is not how I remember it.
I'm not -- I'm not sure exactly why Boulder got shut down.
Q Okay. But you did ultimate -- you agree that you did ultimately come back from Boulder and come back to New York, right?
A Yeah, because that's what I was -- I was instructed to do.
Q All right. But, again, you say you were instructed to do that, but you could have just said: I'm quitting, correct?
A I could have at that point.
Q You could have gone home to Westchester, correct?
A That home didn't exist anymore.
Q You could have gone home to wherever your parents were, your family was?
A They were both living in one-bedroom apartments separately, so that would have been challenging.

Q But your mother, ultimately, did give you a loan, right?
A She did.
Q So you could have gone for help, you could have sought help from your mother or your father?
A I could have sought help.
Q Okay. And that's something you could have done after Boulder, the Boulder project failed, and you came back to New York, right?
A Yeah. It would have been -- I mean I did end up leaving, you know, six months later, which was very -- which was very difficult for me. So, I did consider it at that time and didn't -- didn't see a clear path for myself towards leaving at that juncture.
Q You moved back into The Morellino, which was another OM residence, right?
A Correct.
Q And The Morellino, again, had sort of the same expectations as 1080 Folsom, right?
A I -- I don't remember.
Q Again --
A But yes, OMing in the morning, that type of thing.
Q Journaling, fear inventory, those things?
A Correct.
Q And, again, some of the activities that you engaged in when you were in The Morellino were associated with living in

The Morellino versus just working at OneTaste, right?
A It didn't feel separate to me.
Q Well, that would make sense if you're living with your co-workers, right?
A Correct.
Q But there were people that were living in The Morellino that did not work for OneTaste, correct?
A Actually, I don't remember who -- everybody who lived at The Morellino at that time. I feel like everybody who lived there did work for OneTaste, but I'm not sure.
Q Okay.
Fair to say that when you're living with your bosses and your co-workers, those lines are gonna get a little blurry, right?
A Correct.
Q That's sort of common sense, correct?
A Yeah, those lines did get blurry.
Q Right. And, again, you knew that when you moved into The Morellino?
A Correct.
Q Now, how long did you live at The Morellino before you ultimately decided that you were going to move on from OneTaste?
A Well, we moved to The Bunker after The Morellino.
Q Right.

A And I think my total time in New York was only about six months.
Q And were you still with Chris Kosley at that time?
A No, we had broken up.
Q Chris Kosley had a drug problem, correct?
A Correct.
Q And, in fact, he put you in some financial problems as well?
A Correct.
Q And took money from your joint account for a drug binge, right?
A Correct.
Q And that contributed to your financial distress, I assume?
A It contributed somewhat. I would say that I was already in pretty bad financial straights since being so grossly underpaid by OneTaste. So, there wasn't a lot of -- there wasn't a lot for him to take.
Q But, again, at any point you could have decided to go back and be a teacher with a Master's Degree if you wanted to and still stayed with OneTaste?
A I don't think I could have done both.
Q Well, you did do both.
A No, I -- I -- I left teaching. Yeah, I don't think I could have done both. I mean I -- yeah.

Q Did you -- did you ask?
A No.
Q You could have taken a job as a teacher and still remained part the community and not worked at OneTaste, right?
A Yeah. That would have been -- that would have been very difficult after I had already become an employee of OneTaste.
Q You mean difficult for you emotionally or something, right?
A I mean difficult -- yeah, I mean -- yes. I could have left -- I was -- I think I was nervous at that time, too, about the fact that, like, my name was connected to OneTaste. I didn't know how that would impact future employment.
So, yeah. I don't know. It didn't feel like an option in that moment.
Q Okay. But, again, you didn't -- you didn't test that out with anybody because you didn't even try, right?
A I didn't think of that as an option in that moment.
THE COURT: Ms. Bonjean, just for planning purposes, how much longer do you have?
MS. BONJEAN: I don't think -- maybe -- I do not think I have much longer, maybe five minutes or so.
THE COURT: Okay, then go ahead.
MS. BONJEAN: Okay. Maybe more like ten.
THE COURT: That's fine, go ahead.
MS. BONJEAN: All right.

BY MS. BONJEAN:

Q Ms. Lifson, you recounted an event on direct examination related to Rob Kandell telling you to engage in some sexual activity with somebody that was going to be leaving the coaching program?

A Correct.

Q What was that person's name?

A I think it was Toby, but I'm not totally sure.

Q Okay. And you didn't tell Rob Kandell that you didn't want to go have a hookup or a makeout session with this guy, right?

A I did not. But Rob Kandell was my boss at the time.

Q I understand, but you didn't tell him: Hey, I don't want to, I don't want to do a hookup with this guy; right?

A I did not feel comfortable telling him that at that moment.

Q And --

A He was my -- my boss.

Q Right. Well, you -- but you -- that was sort of something that you had done probably countless times in the past, right?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q How many times do you think you did a hookup with someone

as part of OneTaste?

MS. BENSING: Objection.

Q I mean --

THE COURT: Overruled.

A I mean, like, under my own volition, I had hooked up with a lot of people at OneTaste.

Q Okay. And whether you felt it or not, did you say: Hey, Rob, this is crossing a line here, I'm not doing that; you didn't say that, right?

A I did not.

Q Okay. And did he -- did he -- isn't it true that you previously told the federal government that it was actually you and Jenny Slusher that went and hooked up with this guy?

A Yes.

Q Okay. You didn't mention that it was with somebody else on direct, but is it correct that it was with Jenny Slusher?

A Yeah, I think it was with Jenny Slusher.

Q Now, even after you parted ways with OneTaste, you continued to stay associated with the company, right?

A Briefly I coached for them afterwards.

Q You coached for them.

What did you coach?

A I did relationship coaching.

Q You did relationship coaching.

You went -- you socially associated with members or

people in the community, right?
A I did.
Q You went to weddings, right?
A I went to one wedding, yes.
Q Who got married?
A Rachael Hemsi.
Q Okay. So you went to Rachael Hemsi's wedding, right?
A I did.
Q And you had a good time, correct?
A I -- it was -- it was an interesting experience.
Q You posted about it, correct?
A I think somebody else posted a picture of me on social media about it.
Q All right. And then even two years later you went to a reunion for OneTaste on The Land, correct?
A I did.
MS. BONJEAN: And let's pull out, if we could -- one second.
(Pause.)
MS. BONJEAN: One second. Here it is. This is Defendants' Exhibit 28-D.
If I may, Your Honor?
THE COURT: Yes.
BY MS. BONJEAN:
Q Do you recognize the people in that photograph?

A I do.
Q Do you remember taking that picture?
A I do.
Q And does the other -- are you able to identify all four people in that photograph?
A I am.
Q And who are they?
A It's Maya Gilbert, Maddie Carl, Aubrey Fuller, and myself.
Q Okay. And does it fairly and accurately represent what the four of you looked like at the OneTaste reunion in 2017?
A It does.
MS. BONJEAN: At this point, Your Honor, we would move that exhibit into evidence.
THE COURT: Okay, there's also text. Are you moving the text or just the picture?
MS. BONJEAN: Oh, no not -- no. Not yet.
THE COURT: Just the picture?
MS. BONJEAN: Oh, the text on there. Yes, I would be moving the text. I can lay some more foundation if the Court would prefer.
THE COURT: Go ahead.
BY MS. BONJEAN:
Q Do you recognize the date that is depicted on that photograph?

A Yes.
Q Okay. Does that -- does that date accurately reflect when the reunion was, when that picture was taken?
A Correct.
MS. BONJEAN: Okay. So, at this juncture, Your Honor, I would be moving both, the picture with the text on the side, into evidence.
MS. BENSING: No objection.
THE COURT: Okay. Defendants' Exhibit 20-AD is admitted.
(Defendants' Exhibit 20-AD was received in evidence.)
MS. BONJEAN: I think I gave all my copies away.
THE COURT: I can give my back.
MS. BONJEAN: Yes, sorry.
(Exhibit published.)
BY MS. BONJEAN:
Q Ms. Lifson, can you tell the ladies and gentlemen of the jury who is depicted in this exhibit?
A Maya Gilbert, Maddie Carl, Aubrey Fuller and myself.
Q And this was, again, a OneTaste reunion in 2017, right?
A Correct.
Q And, in fact, after this reunion, you texted Rachael Hemsi and said: I'm -- I'm glad I went.
Do you remember that?

A I don't remember that, but it's very possible.
Q Okay. And you were glad you went, right?
A It gave me some closure.
Q And you enjoyed being with your friends, fair?
A Yeah. There are people that I -- I deeply loved that I met at OneTaste.

MS. BONJEAN: One second.

(Pause.)

MS. BONJEAN: I have nothing further.

THE COURT: Okay.

Is it Ms. Cohen or Mr. Robotti?

MS. COHEN: Ms. Cohen.

THE COURT: Cross-examination.

Okay. Why don't we start for a few minutes and then we'll take a break.

MS. COHEN: Okay.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good afternoon, Ms. Lifson.
A Good afternoon.
Q My name is Celia Cohen, I represent Rachel Cherwitz. I just want to ask you a few additional questions.

You testified when you started out on direct examination about OMing, and you referred to it as a sexual act.

Do you remember that?
A Correct.
Q But when you went to OneTaste, fair to say the entire premise of OneTaste is built around orgasmic meditation, correct?
A When I first went to OneTaste, actually they weren't leading with orgasmic meditation. I was involved for a couple of months before I even heard of the practice.
Q So your testimony is that you went to OneTaste and had never heard for a couple months about orgasmic meditation?
A When I first went to OneTaste, there were two classes you had to take before you really learned about orgasmic meditation. So you took -- what were they called?
Q Intro to OM?
A No, that was when you -- Intro to OM was later.
You took Foundations, which was a weekend-long course. And then you took a course called Mind that was a weekend-long course. So, those courses had no OM in it.
And then the third course I took was called Body, and that's what the Intro to OM was for -- course was called in 2008.
Q You testified when you were living I think in New York, though, you had heard a lecture or heard Nicole speak, correct?
A Correct.

Q And is it your testimony that Nicole never mentioned orgasmic meditation?
A I don't recall if she did or not.
Q It was a long time ago, right?
A I was a long time ago.
Q In the course of your six years at OneTaste, every lecture by Nicole Daedone had some reference to orgasmic meditation, correct?
A Many of them did, correct.
Q And after six years in OneTaste, you would agree with me that orgasmic meditation is a core principle of OneTaste, correct?
A Correct.
Q And as a coach, you becoming a coach, your whole job is really to coach and teach the philosophy of OneTaste, right?
A Yes.
Q And it's kind of hard to be a coach if you don't believe in the OM practice -- I'm sorry, I should specify.
It's hard to be a coach for OneTaste if you don't believe in the OM practice, correct?
A That's correct.
Q And you met with the Government, I think we established on -- with Ms. Bonjean, over ten times in this case, correct?
A It has -- I didn't keep count, but it has been many times.

Q And you first started meeting with them in January of 2021.
Does that ring a bell?
A Yeah, that sounds right.
Q And throughout the course of all of your meetings with the Government, you never -- you never told them that Rachel forced you to engage in sex acts, did you?
A I absolutely did not.
Q In fact, one time you mentioned that in terms of Eli, which I think you testified in direct examination when you were in Boulder, you talked about engaging in maybe OM with Eli.
Do you recall that testimony?
A Yes.
Q And, in fact, you had told the Government that Rachel didn't tell you to do anything, but she intimated, you felt she intimated it.
Is that your --
A Yeah, I -- yeah, I don't remember what the exact words were.
Q Okay. Because Rachel was not living in Boulder when were you there, correct?
A She was not.
Q And, in fact, you never had sex with Eli Block, correct?
A I don't think so.

Q And even if she had intimated, nothing -- nothing happened to you by not engaging in any sexual act with Eli Block, correct?
A No.
Q In fact, throughout the ten times you met with the Government you thought, you referred to Rachel as a victim, wasn't that right?
A That's correct.
Q You said she was manipulated, isn't that right?
A That is correct.
Q And then today after all those meetings with the Government you testified that she actually forced you to do sex acts, is that right?
A I said that she sold OM packages with me as the strokee.
Q You decided to become a -- the head of the Boulder office for sales there, right -- well, actually let me rephrase that.
You were the director of the Boulder office, right?
A Correct.
Q And as part of the director you were engaging in sales, right?
A Correct.
Q And part of sales involved selling coaching programs, correct?
A Correct.
Q OM courses, correct?

A Yep.
Q And when you went out there to be the director of the Boulder office, you knew that when you were selling a product, part of selling is to demonstrate to others what the product is, correct?
A I didn't realize I would have to OM with clientele when I -- when I left for Boulder. I probably should have because I saw people doing it in 1080, but I had not done that before and I -- I didn't really realize that was gonna be part of my job.
Q Well, actually going back. We were talking a second ago about Intro to OM.
You did take Intro to OM eventually, correct?
A I did.
Q And that's where you learned what in detail the OM practice was all about, correct?
A Correct.
Q You may have heard about it, but that's where you really see it, right?
A Yes.
Q And in order to see if OneTaste is right for people, they have to know what it is about, correct?
A I don't know if they need to be doing live demonstrations of OM to know what it's about. I know that that's how they did it, but whether or not it was a necessity, I think it was

probably more of a titillation, to be honest.
Q Well, the OM practice was sold as a meditative practice, correct?
A That's how it was sold.
Q And, in fact, you testified on cross-examination just now about all of the positive aspects of orgasmic meditation, correct?
A That is correct.
Q In fact, you posted about them, right?
A Yes.
Q And you told others about the benefit of orgasmic meditation, correct?
A Correct.
Q And at these demonstrations at an OM circle, the people teaching that class are explaining how this is a beneficial practice, correct?
A Correct.
Q It is not -- no one is saying it's anything about sex, correct?
A That's not what they're saying.
Q Right. And you -- you -- you watched these demonstrations, right?
A I did.
Q And you watched many demonstrations over the course of your time at OneTaste, correct?

A Correct.
Q And, in fact, doing an OM demonstration within OneTaste is a prestigious thing to be asked to do, correct?
A Correct.
Q And, in fact, that's what people at OneTaste believed, correct, that it was a prestigious act, correct?
A Correct.
Q And, in fact, you never told Rachel Cherwitz you believed otherwise, correct?
A Correct.
Q And you never told Nicole Daedone you believed otherwise, right?
A That's right.
Q And you met -- sorry.
You had a lot of friends, you became friends with a lot of people at OneTaste, correct?
A Correct.
Q You were friends with Michelle Wright, right?
A Yes.
Q You were friends with Dana Gill, correct?
A Correct.
Q You were friends with Jenny -- sorry?
A Slusher.
Q Slusher, correct, Jenny Slusher?
A Yes.

Q And when you got to OneTaste, you had a lot of fun, right?
A At first, I did.
Q In fact, at 1080 you would walk into a lobby when you first walked into 1080, right?
A Yes.
Q And that was filled with a lot of people often having fun, correct?
A Correct.
Q People playing guitar, correct?
A Yes.
Q People singing, right?
A Correct.
Q In fact, you were often joining in on this singing, correct?
A I wasn't much of a singer.
Q Well, joining in everybody else singing, right?
A Yes.
Q And at first you started cooking at 1080, that's the first thing you did there, right?
A That was the first employment that I had with OneTaste, yeah.
Q Yes. So leading up, we just -- I think you just went through you were a teacher for a couple of years?
A Uh-hum.

Q And you -- you were not able to continue, you were terminated from that job, correct?
A Yes, I was laid off.
Q And then you worked for the synagogue, right?
A Correct.
Q And you -- you were terminated from that job, correct?
A I was laid off from that job as well.
Q Well, in fact, you told the Government you -- you were -- well, first of all, in connection with the teaching job, you admitted that you were at that time partying every weekend.
Do you remember that?
A Correct.
Q You were commuting 40 miles a day to work, right?
A I was, indeed.
Q And -- and then when you went to the synagogue, they felt that -- you were fired because you weren't doing everything that you were supposed to be doing, right?
A Yeah, technically I was laid off from that job.
Q But that had to do with your performance, correct?
A It did.
Q Now, you described, though, cooking at 1080 as one of the best jobs you ever had in California, right?
A That is correct.
Q You got to hang out with people while you cooked, right?
A Yes.

Q You got to socialize, right?
A Yes.
Q And you weren't paid by OneTaste for that work, correct?
A No, I was paid under the table.
Q Right. And that was for the OneTaste community, correct?
A That was for the 1080 community, this was for Caravan Retreats.
Q The community of people living at 1080?
A At 1080.
Q Those were the people that benefited from your cooking, right?
A Correct.
Q And that was the community that you were having fun with, correct?
A Yes.

MS. COHEN: Your Honor, did you want to go till --

THE COURT: Is now a good time for you to break?

MS. COHEN: It is only because I desperately need one.

THE COURT: That's fine. We could take our afternoon break now, it's 25 after. So we'll reconvene at 20 minutes to 4:00.

The witness can step down.

(Witness steps down.)

THE COURT: And the jury, we'll see you back at 20

to 4:00. Keep an open mind. Don't talk about the case.

(Jury exits.)

THE COURT: Okay. See everyone at 20 to 4:00.

(Recess taken.)

(Continued on the following page.)

(Continuing)

THE COURT: We can get the witness and the jury as well.

MS. COHEN: I have a question about the ELMO, Your Honor.

THE COURT: Yes.

MS. COHEN: Is this -- can we -- I have two photos that I just handed up.

THE COURT: Okay.

MS. COHEN: They're not electronic.

I can walk them up and then publish on the ELMO.

I think the ELMO is only for everybody, right?

THE COURT: No, you could do it for just the parties and the...

THE COURTROOM DEPUTY: Witness.

THE COURT: Yes.

Just tell us what you want.

MS. COHEN: Okay, great.

Thanks.

THE COURT: You can just come back up here.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Cohen, you may resume your examination.

MS. COHEN: Thank you, Your Honor.

BY MS. COHEN:
Q Ms. Lifson, we were talking with -- about a lot before, just before the break, so let me just go back a moment to our discussion around OMing.
A Sure.
Q You said -- you testified that -- well, yeah, you testified about your -- that you went to the Intro to OM classes, correct?
A Correct.
Q And you also did OM circles, right?
A Correct.
Q And, in fact, at OM circle they would often rotate partners, right?
A That is correct.
Q And sometimes -- once again, being part of OneTaste, if you don't like to OM, you probably wouldn't be there, right?
A Correct.
Q And sometimes you can't find a partner, you know, right?
A Um, usually you would OM with somebody you knew.
Q And sometimes you didn't, correct?
A Sometimes. That's correct.
Q So, in fact, on -- you know, you talked about OMing with clients, but if you did that, it wasn't the first time you OMed with someone that you didn't know, correct?
A That is correct.

Q In fact, you had been a part of OneTaste for about four years before you started getting involved in sales, right?
A Yes, that's correct.
Q And we also talked about how you met with the Government many times in this case, right?
A Many times.
Q And, in fact, in addition to talking to them about your experiences at OneTaste, you also went over your testimony for today, correct?
A Um, we -- we talked about my testimony.
Q And throughout the -- since 2021, you had repeated a lot of the same topics throughout the time, correct?
A That's correct.
Q You were asked about OMing a lot, correct?
A Correct.
Q And on -- and the Government helped you talk about OMing and sex, correct?
A No. They never instructed me how to talk about anything.
Q And they asked you about -- we talked about your friends, right?
They asked you about Dana Gill, right?
A Correct.
Q They asked you about Michelle Wright, correct?
A Correct.
Q They asked you about Becky Uma, right?

A Correct.
Q And Dana and Michelle, you said, were your good friends, right?
A Yes.
Q And Becky. Becky, you knew well?
A I knew her, yeah.
Q You knew her. You weren't as close with her. She was in New York, right?
A She was in New York, correct.
Q And same with Margaret Pixley, right?
A Correct.
Q And Ayries, you also said, was also someone you knew in New York, correct?
A Correct.
Q And you've talked with some of those people after you left OneTaste, right?
A Correct.
Q And you have talked to them recently, correct?
A I have talked to some of them recently.
Q Okay. Now going back to 1080, we were talking about your experience there. You talked on direct examination about who your roommates were at 1080.
Do you remember that?
A I did.
Q And, in fact, when you first got there, you roomed with a

woman named Hadass.

Do you remember that?

A I do remember that.

Q Yeah. It was about three months in you roomed with her?

A I don't recall exactly, but I do remember rooming with her.

Q And, in fact, the rent in 1080 varies on the room, correct?

A Correct.

Q Like if you have your own room, you've got to pay a little more, right?

A Correct.

Q And your rent at 1080, whether you put it altogether or not, the money, it also included your food, correct?

A Correct.

Q And on -- so you roomed with Hadass.

And, in fact, some months you roomed by yourself, correct?

A Correct.

Q And you also, you said what -- and one month you roomed with a man named Elijah.

You talk about that on direct, right?

A Correct.

Q But you never had sex with Elijah, right?

A No.

Q And you didn't like rooming with him, right?
A Not my favorite roommate.
Q And after that month, you were again by yourself.
Do you remember that?
A I don't remember the exact chronology.
Q Well, after that you were also roommates with Maddy Carl.
Do you remember that?
A I do.
Q And she was another one of your friends, right?
A Correct.
Q And then Jenny Slusher, right?
A Yes.
Q You roomed with her, right?
A I did, yes.
Q And she was also one of your good friends?
A Correct.
Q And speaking of friends, you talked about -- well, OneTaste sort of became your world, right?
A Correct.
Q You were with these people all the time, right?
A Yes.
Q You lived with them, right?
A Yes.
Q And you chose to live with them, correct?
A Yes.

Q And when you're living with someone, with people around a certain -- like OneTaste -- group, fair to say that that, that links you up in a way in and of itself, correct?
A What do you mean?
Q Well, let me see.
So you, you have a common link together by your involvement in OneTaste, right?
A Yes.
Q So sometimes you might not, outside of OneTaste, have so much in common with a person. But because you're in this group together, it brings you more together; is that fair?
A Yeah, I would say that the philosophy of OneTaste was, in and of itself, had it be that you interacted less with the outside world.
You're right in the fact that, like, living with people, like-minded people, you become close to them. But there were also, I would say, specific tenets that had you interact with the world less, outside of that natural cohesion.
Q So I guess you probably do yoga from being at OneTaste, right?
A I, I -- I used to before I had my babies.
Q And if you meet people at yoga, for example, that brings you in common with one thing and that would be yoga, right?
A Sure.

Q And if you're at synagogue with someone, that also makes that aspect -- that in common with the other person, right?
A Correct.
Q And sometimes that brings you together, correct?
A Yeah.
Q Now, before you came to OneTaste, you testified that you were an alcoholic, right?
A I testified that I drank and used drugs frequently.
Q Okay, sorry. Drank and used drugs.
And you credit OneTaste for helping you stop doing that, correct?
A Correct.
Q And that was one of the rules at OneTaste. You weren't allowed to do that, correct?
A Correct.
Q And, in fact, when Rachel left for New York, do you remember there was a little going-away party?
A I don't remember.
Q Do you remember crediting Rachel for helping you get out of sort of that aspect of drinking and doing things that weren't right for you?
A I don't remember.
Q But you do remember that OneTaste helped you out, correct?
A Correct.

Q And that wasn't the last time you did drugs, right?
A No.
Q And you did drugs while you were at OneTaste?
A Correct.
Q And you weren't supposed to do those, right?
A Correct.
Q And you drank when you were at OneTaste?
A Very minimally.
Q Okay. Now, you, as you testified, that you then were -- went to Boulder to lead that new site, right?
A Correct.
Q And OneTaste -- I mean, since that -- that wasn't very developed in Boulder, right?
A No, it wasn't.
Q And OneTaste took a chance on you with Boulder, right?
A Yes.
Q And that was considered like a promotion, right?
A It was a completely new role for me. I didn't work for OneTaste before Boulder at all. I just worked -- I worked for 1080, so that was a shift.
Q And it was important -- one thing that was important for you at OneTaste was to sort of be part of what you call the inner circle, right?
A Um, I don't know if that was important to me or not.
Q You wanted to rise up in the ranks at OneTaste, right?

A Yeah, I wanted to teach at OneTaste for sure.
Q And even though you had lost two prior jobs before OneTaste, they still gave you this opportunity, right?
A Correct.
Q And when you were there, you talked about your schedule was very intense, you said, right?
A Correct.
Q In fact, though, your schedule would always start with morning practice, right?
A Correct.
Q Everyone at OneTaste, that was sort of what you were signing up for, right?
A Yes.
Q And then you would also engage in yoga, correct?
A Correct.
Q And again, the philosophy of OneTaste was trying to help you improve in your wellness, essentially, right?
A That was the philosophy.
Q And part of that is having a practice like yoga, correct?
A Correct.
Q And then -- so after you would have morning practice, you would also do fear inventory, right?
A Correct.
Q And that was, you know, getting your things that were bothering you or things that were upsetting to you out, right?

A Yes.
Q And you would rip those up afterwards, correct?
A Sometimes.
Sometimes I'd just sit them on the computer, whatever. Yeah.
Q But the practice was supposed to be ripping them up and getting rid of it, right?
A Not every time.
Q All right. So this schedule though, you would -- all of these things happened in the morning, the yoga, the OM practice, the fear inventory, correct?
A OMing always happened in the morning.
Yoga, you had to fit it in throughout your day. It was a requirement.
Q And that was a requirement of OneTaste, right?
A Was -- yeah. I mean, of working at OneTaste, you were supposed to have a regular yoga practice.
Q But even not working at OneTaste. One of the tenets, like living at 1080, you were supposed to do these things, right?
A Yes. But in Boulder I wasn't living in an OM house. I was just living with Eli. So it was the requirement of my job at that time.
Q And you were not reporting to Eli, correct?
A No.

Q So actually, you -- no one would really know if you didn't do those things, correct?
A Well, Eli probably would have told on me.
Q The whole purpose of doing all of this is something you wanted to do because you joined OneTaste, right?
A At the beginning.
Q But you wanted to go -- you were excited about Boulder, right?
A Yes.
Q Now -- and after the morning practice and the yoga, then you would engage in sales calls, correct?
A Correct.
Q And suffice it to say that Boulder was not successful, correct?
A Um, yeah, I don't remember the exact sales numbers at Boulder. I know that we did -- we did generate some revenue for OneTaste.
Q But it wasn't sufficient to keep Boulder, correct?
A I, I actually don't know if that's true or not. I don't remember why Boulder was shut down. I know that we had done quite a few sales, so I was -- I remember being confused at that moment, but I don't remember -- I don't -- I don't remember a P&L.
Q You did sales, right? You sold classes, right?
A I did.

Q But that doesn't necessarily mean it was successful, correct?
A I -- again, I would have to see our numbers to say whether or not it was successful. I'm not sure that it was shut down because it was a failure.
Q Okay. But in any event, OneTaste gave you another chance in New York, correct?
A Yeah, I don't -- I wouldn't say it was another chance. I would say it was -- I was laterally moved to New York.
Q And you weren't a very successful salesperson, correct?
A No, I don't think that is correct.
Q You ended up running the yoga studio, correct?
A Correct.
Q Well, actually, I'm sorry. Let me go back to the sales point.
A Sure.
Q I mean, OneTaste was in the business of making money, right?
A Absolutely.
Q And in part of doing sales, you talked about finding people's -- these are my words, but to summarize, and tell me if this is right or wrong -- like weaknesses or things that were bothering you. You testified about that on direct, right?
A Correct.

Q Right.
But actually, what the sales tactics were was to find out what people's desires were, correct?
A I would not say that that's how it was. That may have been sort of the explanation that we were given, but that's not how it was in practice.
Q Well, when you're finding out people's needs, you have to find out things about them, correct?
A Correct.
Q And if people are going through a difficult time, whether it's sexually or in their relationships or something of that nature, that is something that OneTaste offers to help with, correct?
A They do.
Q And then because that is the very philosophy of orgasmic meditation, correct?
A Correct.
Q All right. And you also talked about Rachel -- or I don't know if it was Rachel -- who you said about keeping tabs on you in Boulder. Do you remember that?
A Specifically around, like, the sales thread? I'm not sure what you're specifically referencing.
Q Yeah. I think you were talking about the sales thread, right?
A Correct.

Q And that's because she was living in New York, correct?
A I don't remember where Rachel was living at the time.
Q Okay. But she was the head of sales, right?
A Correct.
Q And so she wanted to know about sales in Boulder, correct?
A Correct.
Q And, in fact, I think you testified that you would have to say if you were going to the bathroom.
Do you remember saying that?
A I do remember saying that.
Q But that's -- no one would know whether you were going to the bathroom or not, correct?
A They would only know if I was not replying on the thread.
Q And you were in Boulder --
A We were instructed to stay on the thread whether or not you were taking a bathroom break.
Q Okay. So someone instructed you not to go to the bathroom?
A Somebody instructed me to report it on the thread if I was going to take a bathroom break.
Q Okay.
A You were supposed to be reporting all of your movements.
Q Okay. So those would have been a lot of reporting from a lot of people, right?

A It would have been a lot of reporting.
Q Yeah.
A For sure.
Q But one of the facts of telling the head of sales what's going on is because the head of sales needs to know what's going on in each city regarding sales, correct?
A I would say that we told them a lot more than what was just going on with sales.
Q Okay. But the purpose of -- well, strike that.
If you are in a sales program for a city and you have a boss or somebody -- maybe not a boss, but the head of the sales, you would agree with me that they would want to know how it's going, correct?
A I wouldn't agree that that was a correct characterization of what we were -- like, we didn't just have like a briefing in the morning about how it was going. If that's how it was run, I would totally agree with what you are saying. But that's not how it was. It was -- it was different than that.
Q But you would agree with me they need to know what's going on on the ground, correct?
A I do not agree that they need to know in the minutia that they asked for.
Q Now, when you were at -- well, throughout the whole time at -- you know, whether it was at 1080 or in Boulder or in New York, you could come and go as you pleased, correct?

A Correct.
Q And, in fact, you -- and when you were dating Chris Kosley, you went to Disneyland with him, correct?
A Um, correct.
I think that was before I worked for OneTaste though.
Q Right. Before you went to Boulder, correct?
A Yeah. I wasn't an employee of OneTaste before I moved to Boulder.
Q And I'm going to show you what has been marked for identification.
MS. COHEN: Just for the witness.
Q Can you see that there? Defense Exhibit 10-C, as in cat, P as in Peter?
Do you see that on your screen?
A Yes. Yes, I do. Sorry.
Q And do you recognize this photograph?
A Yes, I do.
Q And what is it?
A It is a picture of me with Chris Kosley, outside of a baseball game.
Q And you posted this, correct?
A Yes, I did.
Q And does that refresh your recollection of when it was posted?

A I don't see a date on there. The screen is -- it's super -- it's super black.
Q It is super black.
Let me come up with a...
MS. COHEN: Oh. Thank you.
Q Does that top part refresh your recollection as to about when that was?
THE COURT: Just go back to the podium before you ask a question so we can pick it up on the microphone.
MS. COHEN: Yes.
Q Does that refresh your recollection about when that was?
A Yeah. That was in 2011. So that was before I moved to Boulder.
Q Right.
And you were living at 1080, correct?
A Correct.
MS. COHEN: Your Honor, at this time the Defense offers Defense Exhibit 10-CP.
I'm just going to -- just there's a little comment there. That would be the only redaction.
MS. BENSING: No objection.
THE COURT: Okay. Defense Exhibit 10-CP, as redacted to remove the comment, is admitted.
(Defense Exhibit 10-CP, redacted, received in evidence.)

MS. COHEN: And if we could just publish that then to the jury.

(Exhibit published.)

Q Okay. And 2011 was -- you had been --
A I was living at 1080 and working in the kitchen.
Q As a cook, right?
A As a cook, correct.
Q And fair to say going to Disneyland costs money, correct?
A Correct.
Q And you also went out with your friends. You went to baseball games, correct?
A Correct.

MS. COHEN: Once again, just for the witness.

Q Do you recognize this, these photographs?
A I do.
Q And what are they?
A That's of me and Dana at a baseball game.
Q And does the date refresh your recollection about when that would have been?
A That's May 12th, 2011.
Q And was this posted by you or by Dana?
A It looks like it was posted by Dana.

MS. COHEN: Your Honor, at this time the Defense moves Defense Exhibit 20-AW into evidence.

THE COURT: Is it AN or AW?

MS. COHEN: AW.

Did I say AN before? I'm sorry. It looked like N, but it was --

THE COURT: It's a W?

MS. COHEN: It's a W, I believe, yes.

Sorry, Your Honor.

THE COURT: It's okay.

And you're offering it with the text as well?

MS. COHEN: Yes. For context.

MS. BENSING: No objection.

THE COURT: Okay. So Defense Exhibit AW is -- I'm sorry, 20-AW is admitted.

(Defense Exhibit 20-AW received in evidence.)

MS. COHEN: If you could publish that to the jury.

(Exhibit published.)

Q And that's you and Dana?
A Correct.
Q Do you know who the other people are?
A Yeah. That's Chris Kosley, me, Dana Gill and Chris Nisi.
Q And is that someone affiliated with OneTaste as well?
A No. That was a friend of Chris Kosley's.
Q And then you're at some kind of game?
A Yeah. We're at a baseball game.
Q Baseball game. Yeah. Okay.

All right. And we talked -- you talked before about

you dated Chris Kosley for a while, right?
A Right.
Q And you were sharing your bank account with him, correct?
A Correct.
Q And eventually you broke up with him, correct?
A Correct.
Q And you actually felt that it was terrible that he handed over footage from OneTaste without permission, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q You discussed Chris Kosley with the Government, right?
A Um, I -- I'm sure I have. In those ten or so meetings, yeah, I'm sure he came up.
Q And did you tell the Government that you were aware of footage that Mr. Kosley had?
A Yes.
Q And you -- did you express feelings about that?
MS. BENSING: Objection. Relevance.
THE COURT: Sustained.
Q And you also testified about Rob Kandell and you were upset with Rob Kandell because of an incident with someone you said whose name was Toby?
A Um, I didn't say I was upset. I just was relaying what had occurred.
Q So your testimony was that he forced you to engage in a

sexual act?

A My testimony is that he instructed me to engage in a sexual act.

Q And actually, when you left OneTaste, you ended up going into business with Mr. Kandell, correct?

A My then-partner did. I didn't have any stake in that business.

Q You didn't have any involvement with Mr. Kandell; is that your testimony?

A No, I -- um, my partner at the time went into business with him, but I wasn't part of that business.

Q But that was your partner?

A That was my partner.

MS. COHEN: One moment, Your Honor.

THE COURT: Sure.

MS. COHEN: I think I'm wrapping up.

(Pause in proceedings.)

MS. COHEN: Couple more questions.

Q After you left New York, you continued to do coaching, correct?

A For a short amount of time.

Q And you also said that when you -- when you were fired from New York, you didn't know what to do because you didn't know how to do a resumé or what would you say on a resumé.

Do you remember that?

A I felt like yeah, I was -- I was concerned about how OneTaste would look on my resumé.
Q And you were -- you got your graduate degree from NYU, correct?
A Correct.
Q You had been at Colorado College originally, right?
A Correct.
Q And then you went into Smith?
A Correct.
Q Obviously top schools, correct?
A Correct.
Q You had had a teaching job for two years?
A Correct.
Q You also worked at the synagogue, correct?
A Correct.
Q But those are difficult because you didn't have -- you didn't leave -- you were terminated. You didn't leave on your own, correct?
A Correct.
Q But you did write a book, you said, or helped someone write a book while you were at OneTaste?
A I helped edit a book for a client.
And then I -- yeah, I was helping somebody else write a book while I was there as well.
Q And you had, now, experience in sales, correct?

A Um, yes, I had some experience in sales.
Q And working at a yoga studio, correct?
A Correct.
Q And you were close with your family, correct?
A I wouldn't say I was close with them at that time.
Q But you talked to your family all throughout your experience at OneTaste, correct?
A Correct.
Q While you were in New York, you went to dinner with your mother?
A Correct.
Q You went to lunch with your mother, right?
A Correct.
Q And as you testified, you could have called them any time if you weren't doing what you wanted to do, correct?
A Yeah. I mean, it was complicated, I would say.

MS. COHEN: Just give me...

THE COURT: Sure. Take your time.

MS. COHEN: One moment.

(Pause in proceedings.)

MS. COHEN: No further questions. Thank you.

Thank you, Ms. Lifson.

THE WITNESS: Thank you.

THE COURT: Ms. Bensing, any redirect?

MS. BENSING: Yes. Briefly, Your Honor.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. BENSING:

Q Ms. Lifson, you were shown a series of reports to refresh your recollection regarding meetings with the Government during cross-examination, right?

A Correct.

Q Did you review any of those before coming to court today?

A Um, the -- no, I haven't.

Q And were you able to verify the accuracy of any of those reports?

A I certainly was not.

Q You were asked about a reference to sharing a bank account with a guy who had a cocaine habit.

Who was that?

A That was Chris Kosley.

Q And did you even know him prior to living in 1080?

A I did not.

Q You were asked questions on cross-examination about a document that you authored in October of 2010 where you cite to financial stability.

Do you recall that?

A I do recall that.

Q When did you first move into 1080, Ms. Lifson?

A Two thousand and -- oh, my God. All the dates are

running together for me now.

I first moved in in 2010.

Q Okay. So around the time that you authored that e-mail?

A Right.

Q And what happened to your financial stability after you moved into 1080 and got involved with one OneTaste?

A It went downhill after that e-mail.

Q You were asked questions on cross-examination regarding your testimony about how much the coaching program cost.

Do you recall that?

A I do.

Q And I think you testified on direct examination that you thought it may have cost 24,000; is that correct?

A That's correct.

Q And then on cross-examination you testified you could not recall the exact amount; is that correct?

A That's correct.

Q Was the coaching program expensive to you at the time that you took it?

A Yes, it was.

Q And what impact did it have on your financial situation?

A It definitely made it worse. I, I don't remember the total because I know I just -- I paid it in monthly installments and it was -- I remember it was a fairly large chunk of the total money that I had. That's -- I just don't

remember exact numbers.
Q And were you making payments towards that coaching program?
A Every month. Yeah. That's when I stopped paying my student loans. So I was paying the coaching program. I used to pay my student loans. And with part of that money plus other money went to the coaching program instead.
Q You were shown on cross-examination a series of photographs from when you were living at 1080 and a series of things that you authored when you were living at 1080.
Do you recall that?
A I do.
Q What changed with respect to your relationship at OneTaste after you moved to Boulder, after your time at 1080?
A After I -- well, becoming an employee at OneTaste was when things really shifted for me.
At 1080, I still -- I worked for the -- for 1080. I didn't work for OneTaste. The -- the demands on me really shifted when I became an employee.
MS. BENSING: I'd like to pull up on the ELMO what's been put into evidence as Defendants' Exhibit 20-AE.
So this can be for everybody.
(Exhibit published.)
Q Ms. Lifson, do you recall being asked questions on cross-examination about this release of liability form?

A I do.

Q Just directing your attention to the top right-hand side of the screen, what dates did that release of liability form cover?

A The weekend of 9/7/12 to 9/9/12.

Q So an approximately two-day period?

A Correct.

Q Was your involvement in OneTaste longer than two days?

A Yes, it was.

Q And what role, if any, did consent play outside of this two-day period of the coaching program?

A Very little.

MS. BONJEAN: Objection to form.

THE COURT: Overruled.

Q You can answer the question.

A Okay.

Yeah, I don't think anybody read these before they signed it. The -- it wasn't really about consent. It was more about pushing your own boundaries.

Q And what role, if anything, did these waiver of liability forms play outside of the coaching program?

A No role.

Q What role, if anything, did consent, the concept of consent play outside of the coaching program?

A I would say that the value system was such that you were

supposed to move towards things that weren't comfortable for you, which is part of what had me question whether or not I was doing the right thing. It's very distorting, that idea. So it's like even if you didn't want to do something, you were supposed to move towards it.

Q And what was that practice called?

A It was called, like, moving towards resistance.

Q You were asked about your education and whether or not you were easily manipulated. On cross-examination.

Do you recall that?

A I do recall.

Q Were you manipulated at OneTaste, Ms. Lifson?

A I absolutely was.

Q In what ways?

A I think that the language and the philosophy and the ideas, like, get into your brain. It's like I thought when I moved in that I could handle it, that I could continue to keep my autonomy and be a part of OneTaste at the same time, sort of, like, take what I liked and leave the rest. But the reality was that the culture was too strong for me to fight. And when certain types of language was being used all of the time and the ideas were being impressed upon me consistently, I began to conform more and more to the ideals of the organization, leaving, I would, say my own ideas behind.

MS. BENSING: I have no further questions.

THE COURT: Is there any recross examination?

MS. BONJEAN: A little bit, Your Honor.

THE COURT: I didn't hear you. I'm sorry.

MS. BONJEAN: Yes.

THE COURT: Okay. Go ahead.

RECROSS EXAMINATION

BY MS. BONJEAN:

Q Ms. Lifson, whether the coaching program was 24,000, 10,000, 100,000, could we agree you signed up for it?

A Yes, I did.

Q Okay. And you signed up for it irrespective of whether it was going to put you in financial distress or not, right?

A That is correct.

Q You didn't even pay the whole amount of it, did you?

A Um, I think I paid the whole amount of Coaching Program 2, but I don't recall.

Q Okay. You only paid $4,000 of the coaching program.

Do you remember that?

A I don't remember that.

Q So as you sit here today, you don't actually know how much you paid off, right?

A I don't know. I think I paid more than $4,000 though.

Q It wasn't uncommon for people to be on payment plans and never pay it off to OneTaste, right?

MS. BENSING: Objection.

THE COURT: Sustained.
Q Well, you testified earlier in your examination that you lived amongst a lot of people who participated in the program, right?
A Correct.
Q And I think the Government asked you about, you know, based on your own observations, how did people afford, you know, to take courses and so forth, right?
A Correct.
Q Okay. And so based on your own observations, not everybody even ever paid off their coaching programs, correct?
MS. BENSING: Objection. Outside the scope, Your Honor.
THE COURT: Sustained.
Q Well, you were asked just on -- you were just asked on redirect about the expense of the coaching program, correct?
A Correct.
Q And how it was a lot of money to you, right?
A Correct.
Q And how it caused you some financial distress, right?
A Correct.
Q And as you sit here today, you cannot even tell the Ladies and Gentlemen of the Jury that you paid off the whole thing, can you?
A Um, I just -- I, I don't recall how much money I ended up

paying towards it.
Q You said you were manipulated at OneTaste, right?
A Correct.
Q Okay. And that's an assessment you've made now, 15 years later, right?
A Has it been 15 years?
Q Or ten years. Whatever it is. I can't do math.
A Yeah, I don't think it's been 15 years. I mean, I don't think I'm that old yet.
Q Well, fair enough. Let's get the math right. Because you're right, you were actually going to --
A Oh, yeah. Maybe I started 15 years ago, yeah.
Q Okay.
A But I left about ten years ago.

(Continued on the next page.)

RECROSS-EXAMINATION (Continues)
MS. BONJEAN:
Q Okay. So the feeling that you've been manipulated by OneTaste is a perspective you have now ten years after the fact, correct?
A It is, I would say, a perspective that I've had for a long time now.
Q Again, if it was a perspective you had at the time, you would have just left, right?
A I don't think that's true.
Q Okay. But your assessment of it being manipulative is something that has come since 2014 or '15 when you left, right?
A I -- I feel like I felt that way towards the end of my stay there.
Q Okay. And you left, right?
A I did leave.
Q It wasn't that hard to leave in the end, was it?
A It was extremely difficult.
Q Well, you missed your friends, correct?
A It wasn't just that.
Q Okay. You -- you gave up a lot -- you had decided to make OneTaste a big part of your identity, right?
A I mean OneTaste had become my entire life, --
Q Right.

A -- so leaving that was extremely difficult for me.
Q You chose that for yourself, right? You were a grown woman who chose that for yourself, correct?
A Yeah. I mean I -- that it ended -- it's more complicated.

MS. BONJEAN: Give me one second.

(Pause.)

THE COURT: I'm sorry. The last one it's more complicated, just because the door opened and there was noise.

THE WITNESS: I just said it's complicated, yeah.

BY MS. BONJEAN:

Q In terms of consent, consent was actually a tenet that you had to agree to to live in The Morellino, right?
A I don't recall.
Q Do you remember the green light, red light, yellow light?
A I don't recall having that be a tenet to, like -- yeah, I just -- I don't recall.

MS. BONJEAN: I think this is already in evidence. I'm going to ask that the witness look at, I think it's 3500-RW-12.

THE COURT: Sorry. Do you have it for her?

MS. BONJEAN: I think it's coming up, Your Honor.

THE COURT: All right. And you want everyone to look at it?

MS. BONJEAN: Yes, it's in evidence, correct.

THE COURT: Go ahead.

MS. BONJEAN: I'm going to ask that the first paragraph be pulled out for the witness, with the title.

(Exhibit published.)

BY MS. BONJEAN:

Q Ms. Lifson, do you recall receiving an OM residential handbook and guidelines to living in an OM house when you were living in the Morellino?

A I don't recall receiving that when I was living in The Morellino.

Q Okay. You're not quarreling about whether you would have received it, you just don't remember?

A I just don't remember.

MS. BONJEAN: And if we could go to the second paragraph, please.

(Exhibit published.)

Q If you could take a look at that and tell me if that refreshes your recollection at all about some of the guidelines and rules about living in an OM house.

A I do -- I do remember reading something like this while I was at OneTaste. I don't know if I received it before I moved into The Morellino.

Q Okay. But these are not concepts that are foreign to you, correct?

A No.

Q Okay.

MS. BONJEAN: And if we could just take that down and look at Use of Safe Words.

No, no, I'm sorry. My apologies. I meant that paragraph. The paragraph of Use of Safe Words.

BY MS. BONJEAN:

Q You're familiar with the Use of Safe Words, right, Ms. Lifson?

A I am.

Q You taught it yourself, correct?

A Correct.

Q You taught BDSM courses, correct?

A I -- I think I taught one, yes. I did teach safe words.

Q Okay. And certainly inherent in teaching that type of content, you would have taught safe words, right?

A Yes.

Q It was a concept that was used throughout OneTaste, right?

A I would say once you were deeper involved inside the organization, there wasn't -- there was not a lot of talk of -- the consent was for the clients more than it was for us.

Q Okay. Well, this -- this Morellino packet wasn't for clients, right?

A Yeah, I don't -- I don't know actually.

Q And maybe one of the reasons you weren't talking about it

is because if you worked there, it was a part of the -- the -- it was the understanding that everyone was working with, right?

MS. BENSING: Objection --

A No.

MS. BENSING: -- to the form.

THE COURT: Overruled. And she can answer.

I think she said no.

THE WITNESS: I said no.

BY MS. BONJEAN:

Q Do you remember being part of the coaching programs when Ms. Daedone taught about safe words?

MS. BENSING: Objection, outside the scope.

THE COURT: Overruled.

A I don't specifically remember. I know that there was teachings of safe words, yeah.

Q And safe -- and safe wording, yes?

A Yes.

Q Okay.

MS. BONJEAN: I have nothing further.

MS. COHEN: Nothing further, Your Honor.

THE COURT: The witness may step down.

(Witness steps down.)

THE COURT: And the Government may call its next witness.

MS. GUPTA: The Government calls Michelle Wright.

THE COURT: Just come right up here.

(Witness enters and takes the stand.)

THE COURTROOM DEPUTY: Please step up, remain standing and raise your right hand.

Do you solemnly swear or affirm that the answers and testimony you are about to give this Court will been be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS: I do.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please be seated and state your full name for the record, spelling your last name slowly, and talk directly into the microphone.

Thank you.

THE WITNESS: Michelle Wright.

THE COURT: Could you just spell the last name?

THE WITNESS: W-R-I-G-H-T.

THE COURT: Thank you.

You may proceed.

(Continued on the following page.)

**MICHELLE WRIGHT**,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GUPTA:

Q Good afternoon, Ms. Wright.

Ms. Wright, do you know someone named Nicole Daedone?

A I do.

Q How do you know her?

A She's a former employer of mine.

Q Do you know someone named Rachel Cherwitz?

A I do.

Q How do you know her?

A A former supervisor and friend.

Q And where was Nicole Daedone your former employer?

A At OneTaste.

Q What is OneTaste?

A OneTaste is an organization that teaches courses and classes about sexuality, relationships, communication, and teaches a practice called orgasmic meditation.

Q What was Nicole Daedone's role at OneTaste?

A She is the founder.

Q And what was Rachel Cherwitz's role at OneTaste?

A Primarily, the head of sales.
Q Do you see Nicole Daedone in the courtroom today?
A I do.
Q Could you identify her by an article of clothing she's wearing or where she's seated?
A She's wearing a beige shawl.
MS. GUPTA: And, Your Honor, we would ask that the record reflect that the witness has identified the defendant Nicole Daedone.
THE COURT: Yes.
BY MS. GUPTA:
Q Do you see Rachel Cherwitz in the courtroom today?
A I do.
Q And can you identify her by an article of clothing she's wearing or where she's seated?
A She's wearing a gray suit jacket.
MS. GUPTA: And, Your Honor, again we would ask that the record reflect that the witness has identified the defendant Rachel Cherwitz.
THE COURT: Yes.
Q Ms. Wright, what was your involvement with OneTaste?
A I was a staff member, an OM trainer, a coach. I was the city lead of Las Vegas for a time. I was the student coordinator of the coaching program.
Q And when, approximately, were you at OneTaste?

A 2010 to '14.
Q How old were you when you joined OneTaste?
A I believe I was 24.
Q Did you provide any labor or services to OneTaste while you were there?
A I did.
Q At a high level, what labor or services did you provide?
A I was a coach. I was an OM trainer. I was a teacher. I was a leader of the Las Vegas branch. I was a -- the director -- sorry, the student director of the coaching program.
Q In addition to the work that you just mentioned, did you perform any sexual services while you were at OneTaste?
A I did.
Q At a high level, what kinds of sexual services?
A Primarily, I was, I guess, what you would refer to as the handler of Reese Jones.
Q What does it mean to be a handler?
A I guess to take care of a particular person.
Q And what do you mean by "take care of"?
A I was assigned to provide specific sexual services to him on a regular basis, as well as make him food, keep him company, like attend particular events with him, live part-time in his home.
Q What kind of sexual services?

A Like very specific?
Q Yes.
A I, essentially, was trained to jerk him off and put a dildo in his butt.
Q Did anyone direct you to perform those sexual services?
A Yes.
Q Who?
A Alisha Price and Yia Vang, I believe.
Q And who did Alisha Price report to?
A Nicole.
Q And who did Yia Vang report to?
A Also Nicole.
Q Were you paid for the labor and services that you provided to OneTaste?
A Not those specific ones.
Q Ms. Wright, while you were at OneTaste, did you suffer any financial harm?
A Yes.
Q What financial harm?
A I guess I would say I was primarily in debt to them the entire time I worked for them, and was most definitely in debt when I left after working non-stop around the clock for almost five years.
Q And while you were at OneTaste, did you suffer any psychological harm?

A Absolutely.
Q What psychological harm?
A That's challenging to answer. It's -- I guess the best way to say it is I've been in therapy for the last ten years --
MS. BONJEAN: Objection, Your Honor. Non-responsive.
THE COURT: Overruled.
BY MS. GUPTA:
Q You can answer.
A I guess the best way for me to respond to that question is that I've been in therapy for the last ten years unpacking that experience and healing from it. And I guess like learning how to re-enter the world and live in a way that is not inside this, I guess, cult or tiny bubble, for lack of a better word.
And, yeah, there was a lot of fear mongering. There was a lot of control over how I thought, how I thought about myself, how I thought about the world, how I interacted with people around me. I would say I had an immense amount of anxiety and depression and various different forms of, like, physical and emotional and psychological stress from that experience.
Q You referred to control.
What kind of control?

MS. BONJEAN: Objection to the form and the foundation.

THE COURT: Sustained.

BY MS. GUPTA:

Q You referred to fear mongering. Can you describe what you meant by that?

A I would say like one of the primary ways in which we were, like, as staff and community members, that we were driven to do the things that were asked of us was through fear tactics.

Q What kind of fear tactics?

A Um, primarily the threat of ostracization, like professionally and socially. Like the threat of being put down. Like quite often publicly in front of a lot of other people, in front of colleagues and friends. Being just like shamed in -- in different ways about, like, you know, our inability to do certain things or show up in a certain way or, you know, hold a certain emotional state.

Q Did Nicole Daedone contribute in any way to the harm that you just described?

MS. BONJEAN: Objection, Your Honor.

THE COURT: Overruled.

A Yes.

Q How?

A In my experience, Nicole was always orchestrating

everything, like most often from the background. But it was generally -- she was generally the place where all of the directives came from through -- that came down through other people.

Q And did Rachel Cherwitz contribute in any way to the harm that you just described?

A Yes.

Q How?

A Rachel was my primary, like, boss, and supervisor for -- specifically for my time as a sales representative. I -- it's a challenging thing to describe. Like it's not a black-and-white one-sided experience, but you know, there were positive things and there were negative things, but I definitely had the experience of being afraid of her wrath, so to speak, of like the way in which she might come at me if I didn't perform in the way that they wanted me to perform.

Q Despite the harm that you just described, did you continue to provide labor and services while you were on the OneTaste?

A Yes.

Q How did the harm that you suffered impact your provision of labor and services to OneTaste?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A I would say, if anything, it drove me more. Like, again,

that -- that fear mongering tactic I think was kind of like the whip or the tool that drove a lot of us forward in terms of --

MS. BONJEAN: I'm going to object to the collective.

THE COURT: Yes, sustained. You could ask her about herself.

BY MS. GUPTA:

Q And just speaking of your own personal experience.

A Sure.

Yeah, my experience is that fear was often the tool that was used to drive us forward as employees, and just as members of the community as well. I mean more so as employees. So, I think the fact that I was often afraid of being put down or shamed or turned away from, or it's kind of like there was -- there was -- there was a system of like you were either in the light of approval and you were the best thing that ever happened to them, or you were in the doghouse and it was like the most terrible experience you could imagine.

So, I think that that fear drove a lot of how you operated.

Q I want to take a step back now and just ask you a little bit about yourself.

Where did you grow up?

A In Little Compton, Rhode Island.

Q And what was your childhood like?
A Largely positive. I mean both my parents were very loving and supportive. I got great grades. I had lots of friends. I played sports. I loved to play in the woods. I had pets.
I would say, I mean a family not without its challenges, but largely loving, positive.
Q And what were some of the challenges?
A My dad is an active alcoholic, so that was definitely something that has and continues to impact, I would say, my emotional life.
Q Did you attend college?
A Yes.
Q What degree did you obtain?
A A Bachelor of Fine Arts.
Q And what did you do after college?
A Initially, I went to Sedona, Arizona, and I started to formulate like a arts therapy program for a private school there. And I was also studying yoga and on Ayurveda.
Q How did you first learn about OneTaste?
A Through my partner at the time, Madelyne Carl.
Q I'd like to show you what's in evidence as Government's Exhibit 261.
(Exhibit published.)
Q Who is this?

A That's Maddie.
Q And how was Maddie connected to OneTaste?
A Initially, through Aubrey Fuller.
Q I'd like to show you now Government Exhibit 262, which is also in evidence.
(Exhibit published.)
Q Who is this?
A Aubrey Fuller.
Q And what was Aubrey Fuller's connection to OneTaste at the time?
A At the time, she was living at 1080. I know she was taking the -- the pilot coaching program. I don't know if she was working for them yet. I'm not sure.
Q And where were you living at the time that you first became involved in OneTaste?
A In Sedona, Arizona.
Q Were you working at the time?
A Yes.
Q What was your financial situation?
A I mean it wasn't great, it wasn't terrible. But I was like someone fresh out of college who didn't really have a robust career yet.
Q What was the first OneTaste event that you attended?
A A TurnON in San Francisco.
Q And what is a TurnON?

A A TurnON is their primary, like, public-facing event that's used as a funnel to bring people into other courses and classes.
Q And when, approximately, did you attend your first TurnON event?
A Maybe 2008, '9, something like that.
Q What did you do at the event?
A I mostly sat in the back row.
Q Was there a sales pitch?
A Yes.
Q Who conducted the sales pitch?
A I believe it was Rachel Cherwitz.
Q And what was your initial reaction to the TurnON event?
A It was mixed. I mean I think it was like, edgy and exciting and intriguing and, like, I had kind of -- I had never been around a group of people quite like that, so there was a part of me that was intrigued. And I was also very intimidated.
Q After the TurnON event, did you stay involved with OneTaste?
A Not initially, no.
Q So then how did you become involved in OneTaste later?
A A couple years later, Maddie and I moved to the Oakland area and she had started to get involved. I think she had taken a class. And then eventually I went with her and we

learned how to OM.
Q Did you begin attending OneTaste classes with Maddie?
A Not classes initially, we just did an OM training. And then I think we kind of semi regularly went to those TurnON events.
Q And where were you living at the time?
A In Oakland with a friend.
Q Were you living with Maddie at any point?
A Yes, at that time. Yes.
Q Did there come a time when Maddie moved into 1080?
A Yes.
Q And what is 1080?
A It was the primary OneTaste residence in San Francisco.
Q Did you move into 1080 with Maddie?
A Eventually, but not initially.
Q And why didn't you initially?
A When we first arrived, they did not want me to move in. Like, Rachel specifically was against my moving in.
Q Did you discuss this with Rachel?
A Yeah.
Q What did she say?
A She said that I was a leach and I didn't have, like, my own purpose or my own meaning. And that I was following Maddie around and that, you know, she thought I was there just to like leach off the energy of the community and that I

didn't actually know why I was there or want to contribute.
Q Where did you end up living instead?
A They offered another home, which was like just outside San Francisco, not far away, where some, like, ex-community members had a house where the other OMers lived.
Q And did you and Maddie stay in a relationship during the time that you were living in different places?
A Yes.
Q You testified earlier that you eventually did move into 1080.
When approximately was that?
A I don't really remember how long that time period was. It was maybe six months, maybe less.
Q Is there a document that would refresh your recollection on when you moved into 1080?
A Not that I could think of.
Q Who, if anyone, decided that you could move in at that point?
A Rachel.
Q And what was your understanding of what changed such that you could live there?
A I remember being in touch with her over that time period and she was kind -- she was very clear that it was like a probationary time period in which she was kind of monitoring my participation in the community and, like, that she would

let me know when I was ready.
Q And what was your involvement in the community during that six or so months before you moved into 1080?
A I was going to morning and evening OM practice, probably every day. I think I was going to TurnON events every week. I was -- I think, essentially, I was there as much as I possibly could be.
Q Were you taking any OneTaste courses?
A Yes. I think I took the Intro, how to OM course during that time period. I think.
Q Where was 1080 located?
A Folsom Street in downtown San Francisco.
Q I'd like to show you Government Exhibit 34?
(Exhibit published.)
Q What does this photograph show?
A That is the front of 1080.
Q And what -- what part of this exhibit is 1080?
A The brown and maroon building.
Q Can you describe the space at 1080?
A It's kind of like a dorm in a way. The first floor was like open floor plan with a kitchen and like a big dining room. And the upper floors were all resident's bedrooms. There were, I think, two floors of bedrooms. And most of them like pretty small, shared, but with two people for the most part. And there was -- on the second floor the showers were

like a group. It was like a giant shower where you group showered with many people. Like there was, like, four or five showerheads in one room.

Q Approximately how many people lived there?

A 75, I think.

Q And what was the sleeping arrangement?

A Um, it depended on the room size that you had. But a lot of people shared a room with somebody else in -- in one bed.

Q Did you share a room?

A I did, yeah.

Q Did you share a bed?

A I did.

Q With who?

A I -- the first person I can remember is Louie Buhl, but I can't -- there was probably somebody else.

Q And who, if anyone, decided the room assignments?

A Them. I don't know exactly -- I mean I think Rachael Hemsi, she was primarily the overseer of 1080. I don't -- I don't know who exactly made those decisions, though.

Q Do you know why you didn't share a bed with Maddie if you were in a relationship?

A They were pretty clear they did not want us to have a room together. They thought that, like, kinda from the get-go they were pretty against our relationship and thought that we were a distraction to each other.

Q Who is "they"?
A I'm just saying "they," to refer to OneTaste as an entity. Like --
MS. BONJEAN: I'm going to object.
A That is just my experience.
MS. BONJEAN: I'm going to object to the reference of the organization as the --
THE COURT: Overruled.
BY MS. GUPTA:
Q Can you recall who specifically did not want you to be in a relationship with Maddie?
A I mean I could name every single head staff member. It was my experience that all of the people that ran the business and the residents, which were at the time, essentially, the same thing, like I would regularly receive feedback and comments to that degree.
Q And what was your understanding of why the OneTaste leadership disapproved of your relationship with Maddie?
MS. BONJEAN: Objection, foundation, form.
THE COURT: Sustained as to form.
Q Did you have any understanding of why OneTaste leadership did not approve of your relationship with Maddie?
A The understanding I had was that we were a distraction to each other. Like, they would often use the word --
MS. COHEN: Objection, again, Your Honor, in terms

of "they."

A I'm not sure what word you want me to use, but --

THE COURT: I am going to overrule the objection.

You can continue. You can continue to answer.

BY MS. GUPTA:

Q You can continue.

A Okay. I'm saying "they" because it was never just one specific person. There were often different people relaying this message to me. I guess my experience was that we were considered to be, like, draining of each other's energy. That we were a distraction to each other. That -- yeah, that was the primary sentiment.

Q While living at 1080, what was a typical day like for you?

A I think we had morning practice at 7:30 every day, so it was like wake up right before that and go to the practice space to OM with, you know, 20 or 30 or so other people. And then have breakfast together in the dining room. And then, you know, head off to whatever particular jobs or tasks you had at the time. And then we had an evening practice at 5:30, I think. And then we would often have events or classes or something like that in the evening.

Q When did you usually go to sleep each night?

A I think it depends if it was earlier days or later days, because that changed over time.

Q Are you familiar with something called "fear inventory"?
A Yes.
Q What is it?
A It's a practice that we often used, basically, a form of -- I think it was borrowed from Alcoholics Anonymous, but it's basically a form of writing all your fears on paper in order to, like, declutter your mind.
Q And was that part of your routine at OneTaste?
A Yes.

(Continued on the following page.)

BY MS. GUPTA: (Continuing)
Q Did you remain in contact with people at OneTaste throughout the day?
A I did.
Q How?
A Primarily by text. But that was like a pretty constant thing from moment one.
Q Did you have any privacy while you lived at 1080?
A No. Never.
Q Did you have any contact with people outside of OneTaste?
A Pretty rare.
Q Why was that?
A Um, it just wasn't the culture. I mean, I think I quickly learned by I guess osmosis or watching other people, it just wasn't the culture. Like, it was a very insular culture and the message was always like this is the best party in town and there's nowhere else you need to be.
Q Were you charged rent while you lived at 1080?
A Yes.
Q How much was rent?
A I believe it was 1,100 a month for room and board.
Q How did you pay for room and board?
A Primarily by trade.
Q What do you mean "by trade"?
A Whatever work I would do for them, we would kind of like

decide on an hourly rate and track my hours and that would go towards my rent.
Q Did you have any additional expenses besides your rent and food?
A Yeah. I mean, I started taking classes with them pretty quickly, so I, you know, owed them for classes pretty much all the time.
Q Approximately how much did those classes cost, to your recollection?
A The smaller classes depended. It was always different.
But I joined the coaching program, which was a year-long training. It cost like something over 12 grand.
Q How did signing up for these courses affect your finances?
A I think it meant that I was never pocketing any money, like I didn't have the finances to leave and do something else. Like, it was just like whatever I made went to them.
Q I'd like to now show you some photographs, starting with Government Exhibit 306.
Do you recognize this person?
A Yes.
Q Who is it?
A Nicole Daedone.
THE COURT: Do you want this published?
MS. GUPTA: Oh, yes, please. It's in evidence.

Thank you.
(Exhibit published.)
Q So, you testified earlier that Nicole Daedone was the leader of OneTaste.
What interaction, if any, did you have with her during your time at OneTaste?
A Um, initially, not that much.
But over time, like pretty consistently we were interacting. Oftentimes over text, but definitely, you know, in person. Like when she would teach courses, I was helping run whatever events or courses we were doing.
Obviously down the line, as I started to do more things, we would sometimes have a dinner together or whatever. Yeah, it was a little bit more social as time went on.
Q I'd like to now show you Government Exhibit 309.
(Exhibit published.)
Q Who is this?
A Rachel Cherwitz.
Q And you testified earlier that she was the head of sales?
A Yes.
Q What interaction did you have with her during your time at OneTaste?
A Basically every day. I mean, she was my primary overseer and mentor and friend. I would say we wore a lot of different hats together. We were pretty close. I think -- she was

definitely my teacher, like for certain pieces of my coaching program or different courses that I took. She was sometimes like an overseer of coaching things that I did or OM training things that I did.

MS. GUPTA: I'd like to go to Government Exhibit 201, which is also in evidence.

(Exhibit published.)

Q Do you recognize this person?

A Yes.

Q Who is it?

A Joanna Van Vleck.

Q What was her role at OneTaste?

A She was the president.

Q What interaction, if any, did you have with her during your time at OneTaste?

A Pretty regular. We all worked in the same office. And I mean, yeah, like we fraternized a lot. We were social. Like, I don't think I really reported to her very directly in terms of my job.

MS. GUPTA: If we could go to Government Exhibit 290.

(Exhibit published.)

Q Do you recognize this person?

A Yes.

Q Who is it?

A Yia Vang.
Q What was her role at OneTaste?
A She was the primary teacher of the orgasmic meditation courses with Ken Blackman. She was -- for most of my time there, she was Nicole's assistant.
Q And what interaction, if any, did you have with her during your time at OneTaste?
A A lot. Daily. I mean, I think she was -- for my coaching program, she was my teacher of OM. And then again, just socially. We were always in the office together. Like we were, you know, working on different projects together.
MS. GUPTA: Go to Government Exhibit 211.
(Exhibit published.)
Q Do you recognize this person?
A Yes.
Q Who is that?
A Justine Dawson.
Q What was her role at OneTaste during your time there?
A She was part of the core staff. She was a teacher. She was -- she did a lot of the OM demonstrations with Nicole. She did a lot of the, like, content creation and overseeing of content. Things of that nature.
Q When you say "core staff," what do you mean by that?
A That was the word that was used to refer to, like, the executive team of the company.

MS. GUPTA: Go to Government Exhibit 242.

(Exhibit published.)

Q Do you recognize this person?

A Yes.

Q Who is it?

A Eli Block.

Q And what was his role at OneTaste?

A He was a coworker of mine, we were on the sales team together. He was a friend. He was a lover. He, for a time, was my copartner in Las Vegas, like running that branch.

MS. GUPTA: And Government Exhibit 281.

(Exhibit published.)

Q Do you recognize this person?

A I do.

Q Who is it?

A Rachel Hemsi.

Q And what was her role at OneTaste?

A She was the manager of the 1080 residence. She sometimes taught. She definitely helped, did a lot of like production help with the bigger courses and coaching programs and stuff like that.

MS. GUPTA: And Government Exhibit 221.

(Exhibit published.)

Q Do you recognize this person?

A Yes. Robert Kandell.

Q And what was his role at OneTaste?
A He was the cofounder with Nicole. He was chief financial officer. Maybe also CEO. He -- I mean, my experience of Rob is he kind of ran most of the background of the company. He also taught and ran all the men's programs. He was often like a teacher of TurnONs and some of the bigger courses.
Q Based on your personal understanding and observations, are any of the individuals we just discussed licensed psychologists?
A No.
Q Are any of them social workers?
A No.
Q And are any of them licensed medical doctors?
A No.
Q I want to talk now about some of the labor and services that you provided to OneTaste.
When did you first begin providing labor to OneTaste?
A Pretty immediately.
Q And how old were you at that time?
A 24.
Q What was your first role at OneTaste?
A I think initially I was just doing a lot of running errands. There was always odd jobs that needed doing. Like, oh, we need -- go run to the store and pick up this thing. Or

go -- you know, Nicole needs blah, blah, blah, drive this to her house. Like, there was a lot of just like odd-job stuff like that. That was probably my primary initial position.
Q And were you paid for that job?
A Not to my memory.
Q And did you at any point. Have a different role within OneTaste?
A Yeah. I think the next thing I did was audio/video editing.
Q Were you paid for that role?
A I -- it was -- I was trade. So I would track all of my hours for that on a spreadsheet and it would go towards my rent and my courses that I owed money for.
Q And what did you do after audio and video editing?
A I joined the production team. I started to do some massage. I eventually started cooking in the kitchen. Sometime after that, I started doing sales.
Q Okay. So you mentioned the production team. What did the production team do?
A We were in charge of all the events, like production for any course, class, public-facing event that was held.
Q Were you paid for that work?
A Not to my memory. I don't remember tracking any of my hours for that work.
Q And you mentioned massage.

A Yeah.
Q Were you paid for that work?
A I was, yeah. I do remember tracking my hours for that.
Q And then you mentioned cooking in the kitchen. Was that at 1080?
A Yeah, correct.
Q Were you paid for that work?
A I was. Yeah.
Q And then you mentioned working on the sales team eventually. Were you paid for that work?
A Um, eventually. Not initially.
Q As part of your work for OneTaste, did you post on social media?
A Yes.
Q Who, if anyone, told you to do that?
A I definitely remember Rachel encouraging me to do so. There were probably multiple other, you know, like higher-up staff members who encouraged that. I think it was kind of a company-wide thing that was encouraged.
Q And you said Rachel. Rachel who?
A Cherwitz.
Q In these various roles that you had, how many days a week did you typically work?
A Seven.
Q And what were your hours like?

A I mean, it depends what time period you're asking about.
If it's earlier days, it was not much.
But as time went on, it was like, you know, pretty much around the clock.
Q Now, you testified earlier that you continued to attend OneTaste courses.
How did you pay for those?
A Through the work that I did for them by trade.
Q Did anyone ever direct you to ask men in OneTaste to pay for courses?
A Yes.
Q Who told you to do that?
A In my memory, Rachel, but I'm sure there were other people.
Q Rachel who?
A Cherwitz.
Q Did you ever, in fact, do that?
A I did.
Q Now, you testified earlier that there was a time when you participated in the coaching program at OneTaste.
When was that?
A I joined the coaching program like about a month after I moved into 1080. So pretty quickly.
Q And what was the name of the coaching program?
A It was like -- I think that particular one was like a --

just CP3 Distance Learning Program. Something like that.
Q And what does the 3 in CP3 indicate?
A That it was the third coaching program.
Q Who were the instructors?
A Nicole, Rachel, Rob, Ken, Yia. Alisha, maybe.
Q And you testified earlier that it cost around $12,000; is that right?
A Yes.
Q Did you have that much money to spare?
A No.
Q So how did you pay for it?
A Through trade. Just through the work that I was doing for them.
Q And why did you participate in the coaching program?
A It was kind of like the ticket into everything. Like, if you were anyone who is anyone in that community, you had done that program.
Q What do you mean it was "the ticket into everything"?
A Um, essentially it was like, at the time, their highest level of training. And if you had that level of training, you had more opportunities.
Q After you completed the coaching program, did you immediately become a coach?
A No, not immediately. I had a certain number of, like, practicum hours I had to complete.

Q How many hours?
A Oh, a hundred, over a hundred, I can't remember.
Q And were you paid for those coaching hours?
A No.
Q Did you eventually become a coach?
A Yes.
Q And what did you coach?
A I mean, our training was to be coaches in the realm of sex and relationship communication, energetics, OM. So anything within that realm.
Q I want to discuss now some of the topics and the courses that you took.

In the OneTaste courses that you took, did Nicole Daedone ever discuss enlightenment and freedom?
A Yeah.
Q What, if anything, does she teach about that?
A She talked a lot about how, like, freedom was the capacity to follow one's desire without -- like with no ambitions or with no -- yeah. So, I think like a lot of it was talked about through the lens of sexuality, through the capacity to -- that enlightenment was or freedom was, like, our ability to -- or anyone's ability to, like, have all the sex they wanted, like have -- you know, like, go after any desire that could have possibly arisen with nothing in the way.

Q Did Nicole Daedone ever recount any myths to you?
A Yeah.
MS. BONJEAN: Objection to form.
THE COURT: Overruled.
A Yeah.
Q What kind of myths?
A The primary one I can remember is that she used to tell a lot of stories about the Corazons that would -- um, that would fuck the war out of the soldiers.

(Continued on the next page.)

DIRECT EXAMINATION (Continuing)
BY MS. GUPTA:
Q Was there a particular language people at OneTaste used?
A Yeah.
Q Are you familiar with the term "aversion" as it was used at OneTaste?
A Yes.
Q What did you understand aversion to refer to?
A Something you don't want to do that's outside your preferences.
Q And what are some examples of that?
A Like a person that you aren't attracted to that you wouldn't want to sleep with.
Q Did Nicole Daedone ever direct you to engage in aversion?
A Yes. Through courses and classes, yeah.
Q And did Rachel Cherwitz ever direct you to engage in aversion?
A I don't have a specific memory of that.
Q I'd like to show you Government Exhibit 267, which is in evidence.
(Exhibit published.)
Q Do you recognize this person?
A Yes, Mark Gottlieb.
Q And how did you know Mark Gottlieb?
A He lived in 1080. He was a member of the community at

one point.
Q Did you ever OM with him?
A I did.
Q Why?
A Essentially, because I was encouraged to. Like, I think he was someone who most women did not want to OM with and we were often pushed towards him.
Q And who would push you towards him?
A I remember Joanna saying things. I remember Hemsi saying things. I remember maybe Rachel. I don't -- I don't know. That's vague, my memory.
Q And did you, in fact, OM with him?
A Yeah.
Q Did you want to?
A No.
Q Why did you?
A The pressure of that system, like there wasn't a lot of -- I think the illusion of choice was always there, but there wasn't, in reality and in practice there wasn't a lot of room for saying no.
Q Why did you feel that there wasn't room for saying no?
A Because there were always repercussions. There was always some kind of social or professional punishment waiting for you.
Q Did you ever hear the phrase "golden pussy" used?

A Yes.
Q What did that mean?
A I think it meant like if you were kind of precious about who you would have sex with.
Q Did you ever hear Nicole Daedone use that phrase?
A Yeah.
Q Are you familiar with the term tumesced? What did it mean to be tumesced?
A It, basically, means you have a backup of unpotentiated energy that wants to go somewhere and it shows up in the form of agitation or annoyance or something like that.
Q Are you familiar with the phrase "research partner" as it was used at OneTaste?
A Yes.
Q What did you understand that phrase to mean?
A I mean OneTaste was, essentially, like a sexual/social incubator, and so the term research partner often referred to someone you were -- you had, like, joined into an experiment with for a certain period of time. Like, oh, we're gonna research jealousy and blah, blah, blah is my partner in this research project.
Q Did you ever observe members of the core staff giving sexual assignments to people at OneTaste?
A Yes.
Q Who?

A Everyone.
Q And what are some examples of the kinds of sexual assignments that were given?
A You're too messed, go OM. Like, you're too weepy, go get fucked. You're too angry, go suck a dick. I don't know. The list goes on.
Q And who on the core staff would give those assignments?
A Anyone, all of them.
Q Did Nicole Daedone ever discuss the concept of consent at OneTaste?
A Rare.
Q Did you ever hear the phrase "turn a no into a yes"?
A Yes.
Q What did that mean to you?
A There was another phrase that was often used called "get off on every stroke," which is another way of saying, like, can you -- can you find a yes inside of yourself no matter what's happening, even if something is outside your preferences or it's uncomfortable or you don't like it.
Q So, you testified earlier that there was a time that you worked in sales.
When approximately was that?
A I want to say it was about a year into being there. I don't have a strong memory of that.
Q And did you participate in any training or shadowing when

you joined the sales team?
A Yes.
Q Who trained you?
A Primarily, Rachel.
Q What did your training involve?
A Mostly just sitting in on her day, like her -- listening in on her calls and being in the office with all the sales team and just sort of like, you know, listening to what they did. Learning how to use the sales force system that we used. You know, getting instruction on ways to work with leads, ways to follow up. Like, you know, that kind of thing.
Q And who, if anyone, supervised you when you were on the sales team?
A Mostly, Rachel.
Q Were there particular sales practices that Rachel Cherwitz taught you?
A Yeah.
Q What were those?
A I don't know if she ever used these words out loud, but what I observed was to be bold and to be aggressive and to, like, not take no for an answer. And to find a way to get past people's sort of like hesitance or fear. And kind of mine them for their desires.
Q And what were you selling?
A Primarily, the courses or OM training packages or

coaching packages or some of the bigger programs, like the coaching program or we had -- eventually we had other, like larger programs.

Q Were there any sales goals?

A Yeah. We had a daily goal every day at some point. Not initially, but eventually.

Q And who set those sales goals?

A I believe it was Nicole. I mean Rachel was usually the person who was transmitting that information to us, but my guess is Nicole was the person setting those things.

MS. BONJEAN: Objection.

THE COURT: Sustained.

BY MS. GUPTA:

Q Did you have other jobs for OneTaste while you were on the sales team?

A Yes.

Q Which jobs?

A I was a staff coach. I was a staff OM trainer. I was a cook in the kitchen at the residence. I ran some of the TurnON events. I did production for a good amount of the events and courses.

Q Were you paid a salary?

A Not initially.

Q And you were eventually paid a salary?

A Once I started running the Vegas branch, I believe, was

the first time I was salaried.
Q When you were on the sales team, were you ever salaried?
A Well, I was still on the sales team once I was in Vegas, but not initially, like not before I went to Vegas.
Q And were you paid commissions when you weren't on salary?
A Yes.
Q How much approximately were your commissions?
A I don't know. I have no idea.
Q Based on your personal observations as a member of the sales team, how would you describe the sales culture at OneTaste?
A Aggressive.
Q What made it aggressive?
A Yeah, as I described earlier, I think it was about not taking no for an answer. Like finding -- you know, using the other skills we had been trained in, in the realm of coaching in terms of, like, reading -- reading other people and being able to work them into a place and where they felt like they wanted what you had.
Q Are you familiar with the term "VIP"?
A Yes.
Q What does that mean?
A Very important person.
Q Did you ever hear Nicole Daedone use that term?
A Yeah.

Q In what context?
A We had various different, like, I would say very wealthy, high-level clients. Like, either they were wealthy or they were like -- had some sort of like high societal status and we would create specific programs for them.
Q What kinds of programs?
A Each one was totally personalized based upon the -- either the couple or the individual's desires or things that they wanted to work on. They would generally be a combination of coaching sessions and OM training sessions and experiences. So, we would create like unique experiences for people that would often be referred to as games that gave someone, you know, like a -- like a realtime experience of something they were afraid of or confronting or, you know, an edge they wanted to push. Something of that nature.
Q Are you familiar with the term "scenes"?
A Yes.
Q Were those done for VIPs?
A Some.
Q What is a scene?
A It's kind of hard to distinguish. I guess a scene could be anything from a flash mob dance to a musical play to, like, you know, I don't know, bringing someone into a like BDSM dungeon.
Q Did you ever hear Rachel Cherwitz use the term VIP?

A Yes.
Q In what context?
A The same context.
Q Prior to joining OneTaste, had you and your girlfriend Maddie been in a monogamous relationship?
A I would say we were semi-monogamous. We were technically open, but not really practicing.
Q Did that change when you were in OneTaste?
A Dramatically.
Q In what way?
A The culture was such that, like, if you were moving in and, like, participating in this community, you were expected to participate in the social/sexual experiment. So, I think pretty immediately we both started interacting sexually with other people in the community.
Q Were you ever instructed to engage in sexual acts with potential clients or VIPs?
A I would say not VIPs, to my memory. Like, definitely for courses, but yeah, that's my best answer I can give you to that.
Q Sorry, you said not for VIPs.
Were you ever instructed to engage in sexual acts with potential clients?
A Maybe you can phrase that another way. I'm not quite sure how to answer that.

Q Well, were you ever instructed to engage in sexual acts with anyone while you were in the OneTaste?
A Yes.
Q Who?
A Eric Swanson was -- is a specific memory.
Q Who is Eric Swanson?
A He was a community member.
Q And who instructed you to engage in sexual acts with him?
A I honestly can't remember who -- who it was, but there was a course in which I was instructed to do that.
Q Did you have any understanding of why you were instructed to engage in sexual acts with him?
A They were having trouble filling the course and they wanted us to go and, like, find men from the community who we knew had money to, like, take the -- you know, go and help fill the course, essentially. And the course, part of the course required that you do sexual activities with people in the class. And they were like: Oh, go partner with Eric and tell him you want to do the class with him and that way, like, he'll take it.
Q And did you, in fact, engage in sexual acts with Eric?
A I did.
Q Why?
A Because it was part of what I was asked to do.
Q Were you attracted to Eric?

A No.

THE COURT: Ms. Gupta, we're going to wrap up in the next couple minutes or now, whatever is more convenient for you.

Are you a good breaking point now?

MS. GUPTA: I am actually, yes.

THE COURT: Okay. And we're getting to 5:30. We'll stop for the evening. The witness can step down.

(Witness steps down.)

THE COURT: Before I let the jury go for the evening, I just wanted to mention something about schedule.

So, obviously, a week from today is Memorial Day and, as much as I like seeing you all, we are not going to be here on next Monday.

We are going to be here on Friday, but we are going to stop at 3:00 p.m., rather than 5:30.

So, with that, I would just remind you of what I've told you before, which is don't discuss the case with anyone.

Don't allow anyone to discuss the case with you. If anyone approaches you and tries to discuss the case with you, report that to me through Mr. D'Agostino immediately.

Don't read, listen to, watch any news or other media reports of the trial.

Don't conduct any independent research about the case, about the matters in the case, or the individuals

involved in the case.

Don't talk to the parties, the lawyers, the witnesses about anything.

And keep an open mind.

I appreciate everyone being so attentive.

I hope you have a very good evening. And, again, if you could come at 9:15 tomorrow, so that we can start promptly at 9:30 in the courtroom.

With that, I will let you go for the evening.

(Jury exits.)

THE COURT: Okay. I will see everyone in the morning.

I think I need to return this to somebody, though. And you know what, when you give it to me again, I don't need the earbuds because I am just going to use the larger headphones. So you can just take the computer back.

Thank you. Have a good evening, everybody.

(Matter adjourned to May 20, 2025 at 9:30 a.m. )

oooOooo

# I N D E X


| WITNESS | PAGE |
|---|---|
| **CHRIS KOSLEY** | |
| CONT'D CROSS-EXAMINATION BY MS. BONJEAN | 2069 |
| CROSS-EXAMINATION BY MR. ROBOTTI | 2082 |
| REDIRECT EXAMINATION BY MS. BENSING | 2096 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 2096 |
| **LIANA LIFSON** | |
| DIRECT EXAMINATION BY MS. BENSING | 2099 |
| CROSS-EXAMINATION BY MS. BONJEAN | 2197 |
| CROSS-EXAMINATION BY MS. COHEN | 2266 |
| REDIRECT EXAMINATION BY MS. BENSING | 2302 |
| RECROSS EXAMINATION BY MS. BONJEAN | 2307 |
| **MICHELLE WRIGHT** | |
| DIRECT EXAMINATION BY MS. GUPTA | 2316 |

**E X H I B I T S**


| Exhibit | Page |
|---|---|
| Court's Exhibit 10 | 2068 |
| Government's Exhibit 217 | 2127 |
| Government's Exhibit 3743 | 2149 |
| Government's Exhibit 1120, only first page before the part that says "begin forwarded message" | 2167 |
| Government's Exhibit 311 | 2176 |
| Defendants' Exhibit 20-AE | 2241 |
| Defendants' Exhibit 20-AD | 2265 |
| Defense Exhibit 10-CP, redacted | 2295 |
| Defense Exhibit 20-AW | 2297 |