UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 21, 2025

Defendant. : 9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Stacy A. Mace
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
United States Courthouse, Room N377A
225 Cadman Plaza East
Brooklyn, New York 11201
smacerpr@gmail.com

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: The Honorable Diane Gujarati presiding. You may be seated.

Your Honor, this is United States of America versus Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialist Liam McNett, Marlane Bosler, and FBI Special Agent Tricia Quintero.

Good morning.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler LaBarge, Kelly Lenahan-Pfahlert and Kamille Simons.

THE COURT: You did it.

MR. COHEN: I did it.

THE COURT: Good morning.

MS. COHEN: Good morning.

MS. BONJEAN: Good morning, Your Honor.

Jennifer Bonjean, B-O-N-J-E-A-N, Kelsey Killion and Ashley Cohen, on behalf of Ms. Daedone. Along with our paralegal, Galila Assefa.

THE COURT: Okay. You almost did it too.

MS. BONJEAN: I almost did it.

THE COURT: Good morning, everyone.

MS. COHEN: Your Honor, in my excitement about the name, I think I forgot to say that my client is here.

THE COURT: Yes. I see your client there. Yes. Good morning to her as well.

And good morning to Ms. Daedone as well.

One issue, Mr. Robotti, on the electronic devices.

I believe is it -- it's your colleague, right?

MR. ROBOTTI: Yes.

THE COURT: That entered a notice of appearance.

I don't think she needs a separate order now that she's counsel of record for this case. And you can let me know if that turns out not to be the case.

MR. ROBOTTI: And I believe we also just need an order for our paralegal.

THE COURT: For the paralegals, right. Okay. I'm aware of that and we'll get to that.

MR. ROBOTTI: Thank you, Judge.

THE COURT: Sure.

And we have all of our jurors, which is excellent. So, we will bring them out now.

And Ms. Wright is still on direct examination, correct?

MS. BENSING: Do you want us to get her, Your Honor?

THE COURT: No. Let me just mention to the jury, I think I am just going to mention that I appreciate everybody came yesterday, although we ended up not sitting. And then we can bring her out.

MS. BENSING: Okay, great.

THE COURT: And I do know there are issues we need to take up outside the presence of the jury, but we can do that at a different time.

(Jury enters.)

THE COURT: Good morning, everyone. You may be seated. It's nice to see the jury again.

And I just want to extend my thanks to everybody who was able to come yesterday, even though we were not able to sit yesterday. I do appreciate everybody's efforts every day and it's nice to see everybody here today.

And we will proceed with the continued examination of the last witness.

(Pause.)

THE COURT: Come back up here. Thank you.

(Witness resumed the stand and resumed the stand.)

THE COURTROOM DEPUTY: Ms. Wright, the Court reminds you that you're still under oath.

THE COURT: You may proceed, Ms. Gupta.

MS. GUPTA: Thank you.

**MICHELLE WRIGHT**,

previously called as a witness by the Government, and duly sworn/affirmed by the Courtroom Deputy, was examined and testified further as follows:

DIRECT EXAMINATION (Continues)

BY MS. GUPTA:

Q Good morning, Ms. Wright.

A Good morning.

Q The other day you testified that you attended OneTaste courses and lived in 1080.

As part of attending OneTaste courses and living in 1080, were you sometimes assigned to complete written work product?

A I'm not sure what you mean.

Q Were you sometimes assigned to, for example, send e-mails to 1080 or to the staff in response to a particular assignment?

A Yes.

MS. GUPTA: I'd like to show the witness only Government Exhibit 1045-R. And if we could just zoom in a bit.

Q Ms. Wright, do you recognize this?

A I do.

Q And just looking at the top from the "from" line, is that your e-mail address?

A It is.
Q What is this?
A It is a list of desires.
Q And who did you send this e-mail to?
A To OT Core, to Nicole Daedone and to the OT Residence.
Q What is OT Core?
A It was the Google group e-mail for the executive staff.
Q And what is OT Residence?
A The e-mail group for the residents of 1080 Folsom.
Q And on what date did you send this e-mail?
A September 28th, 2011.
Q What was the purpose of sending this e-mail, without getting into the substance?
A I believe we were prompted to share a list of our desires with the community.
Q And did you review this exhibit prior to coming to court today?
A I have seen it, yes.
MS. GUPTA: And I'll just ask Ms. Bosler to flip through to the second page of this document.
BY MS. GUPTA:
Q And, Ms. Wright, looking at the bottom from the "from" line, is that the same e-mail that we just saw on page 1?
A Yes.
Q And is there a response there from someone?

A Oh, yes. I do see that. Yes.
Q Who responded?
A It looks like Robert Kandell.
MS. GUPTA: And if we could just go to the third page, please. Apologies. The next page, the fourth page. Thank you.
BY MS. GUPTA:
Q And is this, again, your e-mail with another response?
A Yes.
Q And do you see a redaction there on page 4?
A I do.
Q Is this a fair and accurate depiction of an e-mail you sent in September 2011?
A It is.
MS. GUPTA: And, Your Honor, we would move to admit Government Exhibit 1045-R.
MS. COHEN: One moment, Your Honor.
THE COURT: Sure.
You have this, right?
MS. COHEN: Yes, yes.
THE COURT: All right.
MS. COHEN: Yes, sorry.
THE COURT: No, take your time.
(Pause.)
MS. COHEN: Your Honor, we -- it depends on what

this is being offered for, but if it's not offered for the truth of the matter I think we have no objection.

MS. GUPTA: That's correct, Your Honor, it's not being offered for its truth, just the fact that it was sent.

THE COURT: Okay. So Government Exhibit 1045-R is admitted.

(Government's Exhibit 1045-R was received in evidence.)

MS. GUPTA: Thank you, Your Honor.

Could we please publish?

(Pause.)

MS. GUPTA: I'm sorry. Do the jurors have it on their screen? I just want to make sure.

THE COURT: I think you just need to give it a minute.

MS. GUPTA: Okay. Thank you.

(Exhibit published.)

THE COURT: I think everyone has it is now.

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q So, Ms. Wright, can you read the subject line of this e-mail?

A "Desire."

Q And can you just generally describe what this e-mail contains?

A It's a list of desires that I wrote.
Q And why did you send a list of desires to OT Core, Nicole Daedone and OT Residence?
A I don't have a super clear memory of this, but my best guess, based upon the context, is that, you know, we were prompted as community members to share a list of our desires with each other.
Q And why did you want Nicole Daedone to know your desires?
A I can't really remember specific to this time period, but my -- my guess is that --
MS. BONJEAN: Objection.
THE COURT: Sustained.
BY MS. GUPTA:
Q What is your belief as to why you would have sent this to Nicole Daedone?
MS. BONJEAN: I'm going to object to the "would have."
THE COURT: Yes, sustained as to the form of the question.
Q So, directing you just to the middle of this list, you wrote here: "I have a desire to fully get on my orgasm's ride without hesitation or thought."
What did you mean by that?
A In that world, the word orgasm is synonymous with like qi or life force.

So, my best sense of that is to be in alignment with my energy and my desires.

Q And then just two down from that you wrote: "I have a desire to 100 percent support the business by being a total yes to service."

What did you mean by that?

A Essentially, to do whatever was asked of me at that time.

Q And why did you say that?

A I think because to me that meant I was succeeding in that world, in that context.

Q And now directing you to the very bottom of the e-mail. You wrote: "This is a list born out of a struggle between truth and comfort, pleasure and enjoyment, the girl and the woman. Thank you for being a living witness."

What did you mean by that?

A It sounds like I had some conflict about some of the things I was writing. And the girl and the woman, I guess would reference to parts of me that were maturing or that I was working on. Yeah.

Q What was your psychological state at the time that you wrote this?

MS. BONJEAN: Objection.

THE COURT: Overruled.

Q That means you can answer.

A Gotcha. Sorry.

I think probably a mixture of excited and afraid --
Q What -- oh, I'm sorry to interrupt.
What was that?
A I said intimidated. Probably a mixture of excitement, fear and intimidation.
Q What did you fear?
A Not doing it right, I guess, is the best way to describe.
MS. GUPTA: We can take that down. Thank you.
BY MS. GUPTA:
Q Ms. Wright, were you at any point at your time in OneTaste involved in any OneTaste film?
A Yes.
Q What films?
A We made a series of, like, educational sex videos, and I was in one of -- one of those videos.
Q What video were you in?
A I believe it was called Slow Sex or How to Fuck. I honestly don't remember exactly the title.
Q And what were you doing in the video?
A I was having sex.
Q With who?
A Andreas Panosyan.
Q Were you attracted to Andreas?
MS. BONJEAN: Objection.
THE COURT: Overruled.

BY MS. GUPTA:
Q That means you can answer.
A Um, no, not in that way.
Q Who, if anyone, directed you to appear in this film?
A It was a whole group of people running that operation, but I remember Rachel being the person who, like, specifically invited me to come out and do that.
Q Rachel who?
A Cherwitz.
Q And where was the video filmed?
A Los Angeles.
Q Who, if anyone else, from OneTaste was there during the filming of the video?
A The two female directors and producers that we were working with, and I think Nicole was there. I honestly can't totally remember.
Q How did you feel about appearing in this video?
A Mixed, nervous. Like I had to and I didn't really want to.
Q And why did you feel that you had to do it?
A Because that was just the nature of the game in that reality. Like saying no -- I guess the best way to describe it is my training was that everything we were doing was for our own growth spiritually, emotionally, energetically, and that saying no to anything that was asked of us was like

saying no to your own growth and your own power.

So, I think I often felt a sense of, like, if I came up against a boundary or if I came up against a place where I didn't want to do something, I was always questioning myself and never really had a clear sense of: Oh, I should listen to what I feel. Like I was -- I was trained to question that thing in order to push beyond fear. Because fear was considered, like, the enemy or the limitation.

Q Who, if anyone, at OneTaste trained you to think that way?

A I would say all the core staff members, like throughout their teachings in different contexts.

Q And who specifically from the -- from the core staff?

A Rachel, Rob, Yia, Ken, Nicole, Alisha.

Q Do you know what became of the video that you appeared in?

A Honestly, no.

Q Now, you testified the other day that at some point you became Reese Jones's handler.

Who was Reese Jones?

A Reese was Nicole's partner and he was a silent investor in OneTaste.

Q I'd like to show you Government Exhibit 284, which is already in evidence.

Who is depicted here?

(Exhibit published.)

A Reese Jones.

Q And you said he was a silent investor in OneTaste.

What, if any, understanding did you have of his financial involvement?

A My understanding is that he was funding a good portion of the company and that it -- I mean I said silent. I don't know that officially, but my understanding at the time was that it was not meant to be publicly known that he was doing so.

Q And you mentioned that Reese was Nicole's partner.

What, if any, understanding did you have of their relationship?

MS. BONJEAN: Object to the vagueness and foundation.

THE COURT: Overruled.

A I mean I had seen them together many times. Reese would, at times, come to some of the talks or courses that Nicole did.

I mean, obviously, at this point I had been to his home. So, yeah, it was -- it was known that they were together.

Q How did you become Reese Jones's handler?

A Nicole asked my partner Maddie and I to do that job.

Q When was that approximately?

A I want to say 2011, maybe end of 2011. I don't remember

specifically.
Q How long approximately had you been living at 1080 at the point that Nicole Daedone asked you to be Reese Jones's handler?
A I think about a year-and-a-half, something around there.
Q Can you describe the conversation that you had with Nicole Daedone about becoming Reese Jones's handler?
A I remember being in the office at 1080 and her asking Maddie and I if we could sit down and have a private conversation.
My memory is she mostly spoke directly to Maddie and, essentially, described this as a task that was of high importance and something that one wouldn't have arrived at without a lot of hard work and, like, getting to a place of a high level of respect with -- with her and within the organization. And that, you know, she described essentially what the job would be.
Q And what did she say the job would be?
A She was vague about the sexual piece. I don't remember her naming exactly what we would be doing sexually, but she talked about taking care of him, living part-time in his home, cooking for him. Making sure he had what he needed, essentially.
Q What was your understanding at the time of what Nicole Daedone was asking you to do?

A I knew there were sexual things involved because I knew that other members of the staff were doing that for him already.

Q What other members of the staff?

A I think at the time either Alisha or Yia was doing it. I know Rachel had done it at some point previously. I knew that Dana Gill at some point had done it.

Q I'd like to show you what's already in evidence as Government Exhibit 205.

(Exhibit published.)

Q Do you recognize this?

A Yes. That's Alisha Price.

Q So, it was your understanding she was someone who also provided sexual services to Reese Jones?

A Yes.

Q And you mentioned someone named Dana Gill.

MS. GUPTA: Could we show the witness Government Exhibit 297, please?

(Exhibit published.)

BY MS. GUPTA:

Q Who is depicted here?

A Dana Gill.

MS. GUPTA: We can take that down. Thank you.

Q Why did you take from the conversation with Nicole Daedone that you were being directed personally to be Reese

Jones's handler?

MS. BONJEAN: Objection to miss -- misstates the testimony.

THE COURT: Overruled.

A Nicole had an interesting way of getting people to do things that wasn't always direct based upon what she knew about you.

So, I know that she knew that if Maddie went to do that, that I --

MS. BONJEAN: I am going to object to the speculation.

THE COURT: Sustained.

BY MS. GUPTA:

Q And if you could speak to your personal observations only.

A Okay. I'm not sure how to phrase that, but it -- that was my direct experience.

I'm not sure quite how to describe that I knew that she was asking me at the same time, but that was very clear to me.

Q After this conversation with Nicole Daedone, what happened next?

A Maddie and I kind of moved part-time into Reese's home. So, we spent half our time at 1080 and half our time at Reese's home. And at least several days a week we would bring

dinner to him from 1080 and -- yeah, began like providing sexual services for him on a regular basis. And at that time I would attend events with him for his organization and do, like, what we called regeneration for OneTaste... yeah.
Q After your conversation with Nicole Daedone, did anyone else prepare you to be Reese Jones's handler?
A Yes.
Q Who?
A Yia and Alisha.
Q How did they prepare you?
A They sat me down on Reese's bed and, basically, showed me what he liked sexually and how to take care of him.
Q What did they show you?
A They showed me how to put the dildo in his ass. They showed me how to jerk him off. They showed me how to interact with him in order to arouse him.
Q Was anyone else there for -- for that guidance or training?
A Maddie was there as well.
Q Was Reese Jones present?
A Yes.
Q I'd like to show you now Government Exhibits 58 and 59.
MS. GUPTA: If we could do a side-by-side.
(Exhibit published.)
Q Do you recognize these photographs?

A I do.

MS. GUPTA: Sorry. We can also do them one by one.

Q What do you recognize these as?

A That's the patio at Reese Jones's house.

MS. GUPTA: And could we go to Government Exhibit 60, please.

(Exhibit published.)

BY MS. GUPTA:

Q What does this photograph show?

A That is the upstairs kitchen and dining room of his home.

MS. GUPTA: Thank you.

Q So you testified that you lived at Reese Jones's house part-time.

Did you still have a room at 1080 at the time?

A I did, yeah.

Q And were you still paying rent at 1080?

A I was, yeah.

Q From your own personal observations, did Maddie also serve as a handler for Reese Jones?

A She did, yes.

Q How did you and Maddie divide up responsibilities?

A It was kind of like: You go do it. No; you go do it. It was -- I think it just depended on the day and who had the energy and the wherewithal to handle that.

Q How often were you providing sexual services to Reese

Jones?
A I would say at least several days a week, maybe three or four, just depended, like, if he was out of town or home.
Q Did you want to perform these sexual services for Reese Jones?
A No.
Q Why did you?
A Similar to what I described earlier, like the -- the training I had was to say yes no matter what. And that if you had the capacity to say yes and, like, find enjoyment, so to speak, in something, even though you were afraid or you didn't want to or it disgusted you or whatever, that, like, that made you more powerful.

And so, in my mind, one, I was pleasing Nicole, which was, I think, kind of like the ultimate thing you could do. And two, I felt very afraid of the repercussions of saying no.

I mean I would say throughout my entire time working for them, saying no to anything that was asked of me was generally met with, like, shaming and disapproval and kind of like being put in the doghouse socially and professionally. And, you know, this task was considered a VIP task, right. So, it was a big deal to be offered this. It meant that we had risen on the ladder. And saying no to something of that nature was in -- basically, like death, I think, to that -- to

my position in that world.
Q Did you ever express to Nicole Daedone during this time that you did not want to engage in these sexual acts with Reese?
A Not until the very end, I think. For most of the meat of the experience I did not.
Q And why not?
A For the same reasons I just described; the fear of repercussions, the fear of not having her approval; the fear of losing my position there and, like, losing my sense of safety and being cared for and being liked.
Q For approximately you how long did you service Reese Jones during this time?
A I think it was about a year. It's hard to remember exactly.
Q During this time did you ever report to Nicole Daedone about what you were doing with Reese Jones?
A Yes.
Q What would you report?
A I think at times she would just text me and ask me how -- how he was or what he said or if there was anything of note to report about how he was doing.
Q Did you report to Rachel Cherwitz at all during this time about what you were doing with Reese Jones?
A At times, yeah.

Q And what, if anything, would you discuss with Rachel Cherwitz?
A Similar. Just like, I think they often wanted reports on how he was feeling, how he was doing, how -- how it was going between us.
Q Did you ever report to Yia Vang during this time about Reese Jones?
A I think so, yes.
Q And again, what, if anything, would you discuss?
A The same, how -- how he was doing... yeah.
Q And similarly, would you report to Alisha Price during this time?
A I think so, yes.
Q And what, if anything, would you discuss about Reese?
A How he was doing, how the relationship was going.
Q Did there come a time when you moved out of Reese Jones's house?
A Yes.
Q When was that approximately?
A When I was asked to move to Las Vegas, which was, I think, sometime in 2012, like mid -- mid year.
Q Did Maddie Carl also go to Las Vegas?
A She did not.
Q Did she remain Reese Jones's handler while you were gone, to your knowledge?

A Yes.
Q Did you have any understanding of whether Maddie wanted to remain Reese Jones's handler after you left?
MS. BONJEAN: Objection to hearsay.
Q From your personal observations.
THE COURT: Overruled.
A Want is not really a word I would use in that situation. I think it was a matter of like did she keep doing her job? Yes. Did she want to be doing those things? No.
MS. BONJEAN: Objection to --
THE COURT: I'll sustain to the last part.
BY MS. GUPTA:
Q Ms. Wright, how did performing these sex acts with Reese Jones you described affect you during this time period?
A God, heavily. I think it -- the thing I remember most is it, like, wearing me down emotionally. I think it took so much kind of like putting up my shield in order to withstand something that felt so uncomfortable and against what I wanted to be doing. Especially to share that job with my female partner and I knew, like, neither of us wanted -- really wanted to be sexual, especial -- with a man, especially an older man. And like, it felt weirdly like degrading, at the same time as it felt like, wow, look how important we are, we're doing this big job that Nicole asked us to do.
I felt I guess kind of unmoored, like it -- it

removed me from reality in a big way. And I'm gonna say it felt pretty numb during that time period. I don't think I really felt a lot of the effects of it until much later, which was an immense amount of depression and anxiety and trauma.
Q Now, you mentioned that you were sent to Las Vegas as part of your work for OneTaste.
Why were you sent there?
A They wanted me to open a branch of OneTaste in Vegas.
Q Who, if anyone, assigned you to start the OneTaste branch there?
A I would say all of the exec team, essentially. Rachael Hemsi was the person who specifically delivered the information to me.
Q And who did Rachael Hemsi report to?
A To Nicole.
Q Is this a job you wanted?
A No.
Q Why not?
A I didn't want to leave San Francisco. I didn't want to leave my partner. I didn't want to leave my home and my friends. I had no desire to be in a foreign city by my -- essentially by myself, like doing an immense amount of work with very little support.
Q Did you ever express to anyone that you didn't want to go to Las Vegas?

A Yes.
Q Who did you express that to?
A Pretty much everyone. Honestly, I think I was pretty vocal about it.
Q Did you express it to Nicole Daedone?
A Yes.
Q What was her response?
A Largely some form of: You need to push through your fear. Like, this is your -- this is your next big step into womanhood and leadership, and if you let your attachment to Maddie hold you back, like you're never gonna grow into your power as a woman. And, you know, some version of, like, my resistance and my fear was weak and that it was that I was in my own way of my own growth as a spiritual being.
Q What did you understand that to mean?
A That.
Q Did you work with anyone else in Las Vegas?
A Yes.
Q Who?
A Rosa McGill and Ken Blackman. There were other people who came and -- and went at different times, but those were the primary people.
Q I'd like to show you Government Exhibit 254, which is in evidence.
(Exhibit published.)

BY MS. GUPTA:

Q Do you recognize this person?

A Yes. It's Ken Blackman.

Q And what was his role in Vegas?

A Honestly, he didn't do a lot on the ground for the Vegas community. I think, essentially, they wanted an exec member in each of the cities.

He would lead TurnON events with me. And eventually, when we had enough interest to teach classes, he would teach the classes.

Q And what was your title while living in Las Vegas?

A I was city lead, which essentially meant coach, OM trainer, salesperson, lead generator, production manager. Like all -- all the things you could -- all the things that had to be done.

Q What did starting the Las Vegas branch involve?

A Basically, cultivating community and interest in the practice and the business from the ground up. Like, there was very little in place when I got there and it was an immense amount of work.

So, it meant you know, finding venues and find -- like renting chairs that we needed and renting a car. And, like, schlepping heavy shit and setting up events and breaking them down. And, you know, making a lot of sales calls to -- to people who had shown interest at some point. Doing a lot

of lead generation, so going out to different public places and events to try and meet new people and invite them to our events.

Q Who were you reporting to during this time?

A Various different people. Rachel for sales. Nicole a good amount. Those are -- primary people, there were -- like I definitely was always checking in with other staff members for -- depending upon what the subject matter was.

Q And you said you would report to Rachel for sales and then also Nicole.

What would you report to Nicole regarding?

A Nicole had specific interest in me meeting Tony Hsieh, who was the founder and CEO of Zappos, and their headquarters was in Las Vegas. So, part of why she wanted to open a branch there is because she wanted his endorsement of OM and the organization.

MS. GUPTA: I'd like to show the witness only Government Exhibit 414.

BY MS. GUPTA:

Q Do you recognize this?

A Yes, that's Tony Hsieh.

Q Is this a fair and accurate depiction of Tony Hsieh?

A It is.

MS. GUPTA: Your Honor, we would move to admit Government Exhibit 414.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 414 is admitted.

(Government's Exhibit 414 was received in evidence.)

MS. GUPTA: Thank you.

(Exhibit published.)

BY MS. GUPTA:

Q Ms. Wright, who was Tony Hsieh?

A He was the founder and CEO of Zappos.

Q Did Nicole Daedone give you any instructions during this time with respect to Tony Hsieh?

A She did. She said: Go get 'em, like at all costs, whatever it takes. Get him to -- like, basically, her goal was for him to do a private OM training session with her and have a powerful experience of the practice, and then endorse the company publicly.

Q What did you understand "go get 'em" and "do whatever it takes" to mean?

A I mean so much of my training throughout my time at OneTaste was about using my sexuality in order to magnetize things to myself. So, in order to make something happen or get someone to do something or... yeah.

So, it was -- it was clear that if sex was required in order to complete the task, that I was to do that.

MS. BONJEAN: Objection.
A It didn't necessarily have to be that.
THE COURT: Just hold for a moment, please.
THE WITNESS: Sorry.
THE COURT: Basis?
MS. BONJEAN: Foundation.
THE COURT: I am going to overrule that.
You can continue to answer.
A So yeah, I mean at that time my understanding of by any means necessary was, like, use all of your training, which could be sexual.
Q And what was that training?
A You know, as coaches we were trained a lot to be able to read people's energy and body language and, like, get someone to open up and connect and -- you know, manipulate is a strong word, but on some -- in some instances I would say that was applicable.
And, yeah, as I mentioned before, some of that training was about using your sexual magnetism in order to make something happen.
Q What, if anything, did you do in response to Nicole Daedone's instructions?
A I started to, like, meet people who worked for him and find out where he hung out. I went to bars where I knew he would be. I eventually started a conversation with him. I

think I eventually -- we had dinner or drinks or something. He invited me at one point to, like, a Broadway show. We had lunch a few times. I went to his house at one point.
Q Did you engage in any sexual acts with him?
A I did.
Q What sexual acts?
A We, basically, just made out. It wasn't anything super extreme.
Q Did you want to make out with him?
A No.
Q So why did you?
A Because Nicole said by any means necessary and that, to me, felt like -- I could feel that he was attracted to me and that all of the advances I had been making to connect with him to him meant I wanted something sexual with him -- even though that wasn't my motive -- but I felt, like, obligated to follow through with that so that I could seal the deal.
Q What do you mean by sealing the deal?
A Getting what Nicole asked of me, to get him to learn how to OM and endorse the company.
Q And did that end up happening?
A I don't know if he endorsed the company. I believe that he did learn how to OM.
Q During this time did Nicole Daedone request information from you regarding your interactions with Tony Hsieh?

A Yes, pretty regularly.
Q And then did you report to Nicole Daedone your interactions with Tony Hsieh?
A I did.
MS. GUPTA: We can take that down. Thank you.
BY MS. GUPTA:
Q Were you still in a relationship with Maddie Carl during this time in Vegas?
A I was.
Q How was your relationship during this time?
A Distant, challenging. Um, heartbreaking. We didn't see each other very often and, um, yeah, it felt hard.
Q Did you see Reese Jones at all while you lived in Las Vegas?
A A few times, yeah.
Q Can you describe that?
A He came to town for work conferences, I'm assuming, and I was instructed by maybe Yia, maybe Rachel, to meet him at his hotel and spend -- you know, spend a couple nights there with him and do all the things I was trained to do.
Q What were those things you were trained to do?
A Be sexual with him and, basically, keep him company. You know, eat food with him and spend time with him.
Q Did you ever go back to San Francisco while you lived in Las Vegas?

A I did pretty regularly for like bigger courses that we were running, like mostly the coaching program weekends that we would run.
Q Did anyone ever ask you to sexually service Reese Jones again while you were visiting San Francisco?
A Yes.
Q Who asked you to do that?
A Nicole.
Q Can you describe that conversation?
A This was towards the very end of this -- like, essentially at this point Maddie had stopped -- was no longer doing that role. I think she had probably gone to New York and she was -- it's a much longer answer, but she was, essentially, like on her way out of the organization. And she and Nicole were very much at odds at this time.
And, you know, for me it was incredibly emotional because Maddie basically was having, like, a psychotic emotional --
MS. BONJEAN: I'm going to object to the nonresponsiveness.
MS. COHEN: Object.
THE COURT: Sustained.
You can ask the next question.
BY MS. GUPTA:
Q Focusing our your personal observations and your own

experience, can you describe the conversation you had --
A Sure.
Q -- with Nicole Daedone --
A Sure.
Q -- when she asked you to --
A Yes, no problem. The back story has a lot to do with it, but I understand.

Basically, she asked me, like, would I go and spend the night with him. And because of the context I can't share, I finally felt the courage to say no to her. I was just like: No. I'm done doing that. And that made her very angry.

I said some things about how harmed and broken Maddie was about -- like, by the situation. And that I didn't want to do that anymore.

And she said -- she was like: If I ever see that little cunt again, I'll smash her head against the sidewalk.

And, you know, I said some things in her defense and that I love her and that I know that she's a good person, even though, you know, things have come between them. And that I just was -- I was done doing that task for her.
Q Why did you feel the courage to say no at that point?
A 'Cause everything was falling apart. Maddie was being pushed -- pushed out, and I think I was kind of at this emotional breaking point of, like I couldn't ignore anymore, like how depressed I was and how anxious I was and how damaged

I was and how far from myself I was. And, you know, I just felt everything unraveling.

It was like in order to survive all that shit, you had to tell yourself a lie all the time. You had to, like, always be on and always be this face of like: I'm a turned-on woman and don't you want to have what I have. And you know, like, let me go give a talk about what a powerful sexual being I am, and in the background I was struggling immensely and, like, had to pretend that I wasn't.

And I think I just, like -- Maddie leaving was like really -- it just broke me. And I think I didn't have -- like I just had nothing left. I just didn't -- I just didn't want to fucking lie anymore. I was just done.

Q Why did you feel that you had to hide how much you were struggling?

A Because every time I expressed it, it was dismissed. No matter who it was, whether it was my coach or my mentor or Nicole or Rachel or whoever, like it was always dismissed. It was always -- it was always put back on me.

Instead of like: Wow, you're really struggling. Like, what do you need or how can we help you?

It was like: Oh, Michelle, you're so self-loathing.

Like I remember Alisha said to me one time: You're one of the most self-loathing people I have ever met. And that was in response to sharing how much I was struggling and

how anxious and depressed I was, and how much I didn't want to be there anymore.

And, you know, as I've described to previous questions like --

MS. BONJEAN: I'm going to object. I don't know if this is still responsive.

THE COURT: It appears to be responsive. Overruled.

A The training from start to finish was about, like, being turned on. And what that meant in that world was being shiny, being bright, being your most powerful and empowered sexual self and, you know, being -- we were, as employees of this company, we were meant to be representing people who were getting what they wanted, doing what they wanted without hesitation, without anything in the way. Like that was considered you were awake, you were enlightened. Like you had shit people didn't have and you wanted them to come get it from you.

And the reality was like, I did not feel that way and I did not feel empowered. I felt manipulated and abused, and I was so trained not to pay attention to how I felt inside that I wasn't even -- like I oftentimes wasn't even able to identify that that's how I was feeling. Because I was like: Oh, no, that's just me, that's just my fear, that's just my resistance. Like that's me in the way of myself. Like the powerful version of me is someone who does all this stuff

they're asking of me and has no fear and no problem with it.
Q Who trained you to be a turned-on woman?
A Everyone, all of them.
Q Who specifically?
A Nicole, Rachel, Yia, Alisha, Rob, Rachael Hemsi, Justine.
Q When you finally said no to Nicole Daedone regarding sexually servicing Reese, how did she respond?
MS. BONJEAN: Objection, asked and answered.
THE COURT: Overruled.
A She was angry. Like I said, she was -- she made very aggressive negative comments about Maddie. She -- she made it clear that I was making a mistake in saying no.
Q Were there any repercussions to you for saying no to Nicole Daedone?
A Yeah. I would say shortly after that I was being kicked out of the company. Like, there were a couple steps or stages to that, but that was definitely the beginning of the end.
Q After that conversation, did you continue to work at OneTaste as the city lead?
A I did.
Q How many days a week were you working?
A Seven.
Q What were your hours like?
A Around the clock. I mean it was probably 7 a.m. until sometimes midnight. Like there was no on or off hours. Like,

I was expected to be available and responsive at all times. Yeah, it was just constant.
Q How long were you in Las Vegas, approximately?
A I think about a year, maybe a little over a year.
Q And how would you describe your time at the company during your time in Las Vegas?
A Incredibly challenging. I was isolated. I was depressed. I was anxious. I was vastly overworked. I had no time to myself. I had no friends around me. I had very little support. I was lonely. I was pushing myself all the time to go beyond, you know, like my -- my needs or my energy levels or... I just felt like the task was never-ending and impossible.

It just felt like the work was never done and we were -- you know, it was tough to get a kudos from like the higher-ups because as a new city, gaining enough interest and traction in order to, like, make a substantial amount of money, you know, would have taken way more time than I even had. And so I think in a way I always felt like I wasn't doing enough. Like I wasn't succeeding, even though I was like working myself to the bone.
Q Did you ever express the difficulties you were having in Vegas to Nicole Daedone?
A Yes.
Q What, if anything, did she say?

A I mean more of what I've already shared. Essentially, that, like, I was in my own way. That I was too attached to Maddie and that that was weakening me. That, like I remember once she or maybe many times she quoted this Leonard Cohen song that was like -- what the hell is it -- it's something about like when you're in love with one thing and one thing only, you can't see the world. But when you let that thing go, you have access to the whole world.

And I mean, to me, that was a continuation of many, many years of beating me over the head with this message that, like, I shouldn't love who I loved and that it was -- that it was weakening me, essentially. And that it was in my -- in the way of my power and me being a true woman. And that, like, the fact that I even liked a woman meant like part of me was missing.

You know, there were some instances in which I felt like definitely publicly shamed around how much I was struggling. You know, she said some pretty intense things about -- it's kind of hard to find exact words, but something about if I could sink to the bottom of my loneliness, I would find myself there. And like, that's where the most powerful version of me lived was, like, in essentially letting go of all the shit that I thought I preferred and cared about. And it was kind of like the message was like, you're -- you're more powerful when you can let everything -- all your

preferences go.

And, again, the message was like, you're -- you know, my feelings and my struggle were very much dismissed. Like it didn't -- it was of no importance.

Q You just described being publicly shamed by Nicole Daedone.

Can you describe that incident?

A Like the context of it?

Q Yes.

A There was this program that we started, like an in-house like staff program in which all of the city leads were getting further training by the executive staff. And so every time that we would come into the same city in order to help run a coaching program, we would do some kind of training course. And this particular time Nicole was doing like a private circle with all of us. And, you know, so there were probably, I don't know, like 15 of us or something sitting there and that was when she said those things to me.

Q The things that you just described?

A Yes.

Q At some point while you were in Las Vegas, did you receive employment agreements from OneTaste?

A At some point. Definitely not before I got there.

MS. GUPTA: I'd like to show the witness only Government Exhibit 3772.

If we could just zoom in on the top there.

BY MS. GUPTA:

Q Do you recognize this?

A Yes.

MS. GUPTA: And could we just flip through.

Q What is this document, Ms. Wright?

A It's an employment agreement for, I think specifically for the city director -- director of Las Vegas.

Q And going to page 6 of this document --

THE COURT: Can you give her a paper document --

MS. GUPTA: Yes, I can do that.

THE COURT: -- if you're going to be going between pages?

MS. GUPTA: Yes.

THE COURT: Thank you.

MS. GUPTA: May I approach?

THE COURT: Yes.

Q Ms. Wright, I'll just ask you to flip to page 6 of that document.

Do you see your signature there?

A Yes.

Q Did you review this exhibit prior to coming to court today?

A I did.

Q And is this a fair and accurate depiction of an

employment agreement with OneTaste?
A It is.
Q And if you'd just go to the first page.
What is the date of this agreement?
A October 1st, 2013.
MS. GUPTA: Your Honor, we would move to admit Government Exhibit 3772.
THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 3772 is admitted.
(Government's Exhibit 3772 was received in evidence.)
(Exhibit published.)
BY MS. GUPTA:
Q Ms. Wright, you said that this agreement is dated October 1st, 2013.
Approximately how long had you been in Las Vegas at this point?
A Over six months, at least, maybe more.
Q Is there a document that would refresh your recollection?
A Possibly.
MS. GUPTA: Could we show the witness only MW-25A -- apologies, 3500-MW-25A.
Q Does this refresh your recollection of when you arrived

in Vegas?
A Yeah, end of July 2012.
MS. GUPTA: And if we could just go back to Government Exhibit 3772.
BY MS. GUPTA:
Q So, approximately how long had you already been in Vegas at this point?
A I guess that's like, what, nine months.
Q And what -- what role is this employment agreement for?
A Specifically, for city director of Las Vegas.
Q Were you already performing this role prior to October 1st, 2013?
A Yes.
Q And I'll just direct you to Duties and Responsibilities, Part A.
Who does this agreement say you are reporting to?
A Joanna Van Vleck and Robert Kandell.
Q And did you, in fact, report to Joanna Van Vleck and Robert Kandell?
A Honestly, not to my memory. I feel like I was more reporting to Rachel and Nicole, but it's possible.
Q And now directing you to page 2, paragraph A, under Base Pay.
How much were you paid according to this agreement?
A 2800 per month.

MS. GUPTA: And if we could just flip to the job descriptions at the end of this agreement. This should be page 7.

BY MS. GUPTA:

Q Can you read out loud the various jobs that are listed here, the ones that are in bold?

A Responsible for overseeing --

Q Oh, I'm sorry, just the -- just the role that's in bold.

A Oh, okay.

Response -- oh, OneTaste city director. Community holder. OneTaste course teacher.

MS. GUPTA: And if we keep scrolling to the next page.

A OneTaste coach and OM trainer. Production support. General staff duties.

Q Are these all roles that you were performing at the time?

A Yes.

Q Did you ever get equity in OneTaste?

A No.

Q When approximately did you leave Las Vegas?

A I believe it was like in October, November of 2013, I think.

Q And why did you leave at that point?

A I was, essentially, fired from my position.

Q I'd like to show you now --

MS. GUPTA: For the witness only.

Q -- Government Exhibit 3771.

And I can bring you up a hard copy.

(Continued on the following page.)

(Continuing)

MS. GUPTA: Your Honor, may I approach?

THE COURT: Yes, go ahead.

BY MS. GUPTA:

Q Mr. Wright, do you recognize this exhibit?

A I do.

Q What is it?

A It is a separation agreement.

Q And what is the date of this agreement?

A October 18, 2013.

Q And if you flip to page 4, is that your signature?

A It is.

Q Did you review this exhibit prior to coming to court today?

A Yes.

Q And is this a fair and accurate depiction of an October 18, 2013 separation agreement with OneTaste?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 3771.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 3771 is admitted.

(Government's Exhibit 3771 received in evidence.)

(Exhibit published.)

Q Ms. Wright, can you explain what this document is?

A I was being let go of my position as city leader of Las Vegas. And I'm not sure if this refers to some of the other positions I was holding at the same time as well, but it was a separation agreement.

Q And what is the date of this agreement?

A October 18, 2013.

Q And is this just 17 days after the employment agreement we just reviewed, Government Exhibit 3772?

A It is indeed.

Q Do you know why you received a separation agreement only 17 days after an employment agreement?

A Probably because they were incredibly late in giving me my employment agreement.

MS. COHEN: Objection.

THE COURT: Overruled.

Q Who was incredibly late in giving you an employment agreement?

A The organization. Rob was generally the person who handled things like that.

Q You just testified that you were fired from your job in Las Vegas.

Who fired you?

A Rob was the person who delivered the information.

Q Do you have any understanding of why you were fired?
A My experience was that --
MS. BONJEAN: I'm going to object.
THE COURT: You can continue to answer. Overruled.
A I was falling apart, having an emotional and nervous breakdown, and that was no longer useful to them.
Q You testified earlier that you had a conversation with Nicole Daedone regarding servicing Reese.
A Yes.
Q And you testified that that was the beginning of the end.
How long was that conversation prior to you getting fired?
A I don't know. I don't remember. I don't think it was that long though.
Q What was your physical condition like towards the end of your time in Las Vegas?
A Not good. I had, like, really, really terrible acne. I had major hemorrhoids from stress that I had to get surgery for. I was, like, having herpes outbreaks every other day. I was, like, overweight. I was exhausted. I was just, like, unwell.
Q And what was your psychological condition like?
A Also unwell. Depressed, anxious, traumatized. I -- yeah, I was having an emotional breakdown.

MS. GUPTA: We can take that down.
Q What did you do after you left Las Vegas?
A They sent me to Los Angeles to live in the OM house in Los Angeles.
Q Who sent you there?
A Aubrey was the person who gave me the information that that was going to happen, but she's not the person who made that directive.
Q Who did Aubrey report to?
A Nicole.
Q When, approximately, did you move to LA?
A It was the end of 2013.
Q How many people lived in the OM community there?
A In that house? Like maybe ten of us. Something around there.
Q Did you share a room?
A Yes.
Q Did you share a bed?
A Yes.
Q And what was your role in LA?
A At that point I had been stripped of all my titles and heavily demoted socially and professionally, so I was essentially like a community member who was -- continued to require to support and volunteer and help out with the events and odd jobs and whatever needed doing. I mean, I did a lot

of supporting Aubrey in whatever tasks she had.

Q What is your understanding of why you were stripped of your titles and demoted?

A You know, I had started to, as I described earlier, rebel a little bit. And I was also very clearly, like, not very stable emotionally. And yeah, I think that's as much as I can gather. I mean, there was no incident in which I didn't do the work I was supposed to do.

Q Did you continue to perform labor and services for OneTaste while you were in LA?

A I did.

Q What labor and services?

A I helped run all the TurnON events.

I helped run any courses that they had.

At times I would do the orgasmic meditation demonstrations for the courses.

I would do back of house for the courses.

I would help Aubrey with -- you know, Aubrey was personal assistant for Nicole at the time, so I would at times, like, help Aubrey with whatever tasks she had for Nicole.

Q What were some of those tasks that you helped Aubrey with for Nicole?

A Grocery shopping, like, going and doing stuff in her apartment. Just, like, running errands.

Q What would you do in Nicole's apartment?
A I remember, like, cleaning, putting food away. Just, like, yeah, keeping it nice.
Q Were you paid for any of the work that you performed in LA?
A No.
Q Why did you continue to provide labor and services to OneTaste at this point?
A Because at this point, for nearly five years, like, this was my world, this was my reality, this was my community, this was, like, everything. So, you know, even though I had technically been fired, I -- I didn't know how to leave, to be honest. I think I was so, like, traumatized and also deeply attached to -- I mean, that was my community. That was where -- that was everything I knew at that time. So for me, it was kind of unthinkable to leave. And if you were there, you were expected to help and do things. Like, that was just the agreement, that if you were a part of the community, you were going to be of service to it.
Q Who, if anyone, set those expectations?
A Really everyone of the core staff. I mean, that was something that was set and known from the beginning of my time there. Like, any course that I took or anyone who taught me or coached me or mentored me, like, that was the understanding.

Q You described a lot of the teachings that you learned at OneTaste.

From your perspective, who, if anyone, benefited from those teachings?

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q What was your experience with OneTaste like during the time that you were living in LA?

A Hard. I mean, for lack of a better word, I felt like a piece of shit. Like, I just felt like I went from someone with respect and status to someone that people looked down upon. So I felt really small. I felt insignificant.

And at the same time, I felt, like, secretly free and relieved. Like, I think it had been such a hard run and I -- it was kind of like I didn't even know what I liked to do anymore.

I remember, like, at times taking a bike ride with one of my friends or going to the beach and just being like, whoa, you can do this? Like it just was like -- it was not -- it had not for so long been part of my reality to just relax and, like, do something I liked for the sake of doing.

Q How long did you live in the OM house in LA?

A I moved in end of 2013 and we left in, like, June or July of 2014.

Q What was your physical condition like during the time

that you lived in LA?
A I mean, similar to what I described before. Like, I was really unwell.
Q Unwell in what way?
A Again, I had terrible acne. I was exhausted. I was stressed. I was anxious. I was, like, sick physically, often. I had really bad hemorrhoids. I had herpes all the time. I had yeast infections all the time. I was like -- like, my body was clearly telling me that I was not okay.
Q And what was your psychological condition like during the time you were living in LA?
A Depressed, sad. Like, like I said, I felt small, I felt insignificant. I felt shame. I felt like this thing I had put absolutely everything I had into, I was no longer welcome to. And that hurt deeply.
Q Did you express these difficulties to anyone at OneTaste during this time?
A Yeah, to Aubrey.
Q Did you express it to Nicole or Rachel Cherwitz?
A A little bit to Nicole. I remember having a couple of conversations with her, yeah.
Q And what did she say in response?
A Um, I can't really remember, honestly. I don't remember being comforted, I'll say that.
THE COURT: Let me just ask you, Ms. Gupta.

Approximately how much longer do you have?

MS. GUPTA: I probably have about 20 or so more minutes.

THE COURT: Okay. Why don't you keep going.

Q I'd like to show you now a series of photos and I'll just ask if you recognize them.

MS. GUPTA: Could we go to Government Exhibit 208, please.

These are all in evidence.

(Exhibit published.)

Q Do you recognize this individual?

A I think this is Nicole when she was younger. I'm not positive.

MS. GUPTA: Could we go to Government Exhibit 260.

(Exhibit published.)

Q Do you recognize this individual?

A That's Lianna Lifson.

Q How do you know her?

A She was my coworker and friend.

MS. GUPTA: Government Exhibit 297.

(Exhibit published.)

A That's Dana Gill.

MS. GUPTA: 382, please.

(Exhibit published.)

Q Do you recognize this person?

A That's Becky Uma.
Q How do you know her?
A Also co-worker and friend. And she was a student of mine in the coaching program.

MS. GUPTA: Could we go to Government Exhibit 265, please.

(Exhibit published.)

Q Do you recognize this person?
A Yeah. That's Margaret Pixley.
Q And how did you know her?
A She was a student in the coaching program when I was one of the staff.

MS. GUPTA: If we could go to Government Exhibit 269, please.

(Exhibit published.)

Q Do you recognize this individual?
A No.

MS. GUPTA: Government Exhibit 228, please.

(Exhibit published.)

Q Do you recognize this individual?
A That's Brooke Scheffer.
Q And how did you know her?
A She was also a student in the coaching program when I was staff. Yeah.

MS. GUPTA: Government Exhibit 327, please.

(Exhibit published.)
Q Do you recognize this person?
A Yes.
Q How do you know her?
A I don't know her name, but it's Ken Blackman's wife.
MS. GUPTA: And last one, Government Exhibit 404.
(Exhibit published.)
Q Do you recognize this person?
A No.
MS. GUPTA: You can take that down. Thank you.
Q Do you know an individual named Beverly Daedone?
A I know of her.
Q To your knowledge, did she ever work at OneTaste?
A Not that I know of.
Q When did you ultimately leave OneTaste?
A I think I was, like, fired yet again from what I was doing in Los Angeles in, like, maybe May of 2014.
Q Who fired you?
A Aubrey.
Q What was your understanding of why you were fired?
A She accused me of poaching clients from OneTaste events for my own personal gain.
Q Was that true?
A No.
Q Why do you believe you were fired at that point?

A I had had some communication with Maddie and they did not want me communicating with her, like, at that --

MS. BONJEAN: Objection to the foundation.

THE COURT: Sustained.

Q You said that Aubrey Fuller accused you of poaching clients, but that wasn't true.

So what, if any, understanding do you have of why you were fired?

MS. BONJEAN: I'm going to object to the foundation.

THE COURT: Overruled.

A I had had communication with Maddie and it was very clear that they did not want me communicating with her.

Q Who --

MS. BONJEAN: Again, objection to the foundation.

THE COURT: Overruled.

You just asked who, right?

MS. GUPTA: Yes.

Q Who did not want you communicating with Maddie?

A Oh, who.

I mean, I know the message came from Nicole. And it was a community-wide sentiment that anyone who left the community and the company was, like, poisonous and we weren't supposed to talk to them.

Q Did anyone ever tell you not to speak to Maddie?

A Yeah.

Q Who told you that?
A Pretty much everyone. I mean, I think Aubrey at that time was the primary messenger and I know that she was regularly receiving messages from Rachel and Nicole and maybe other people.
Q And what was your understanding of why you shouldn't be speaking to Maddie?
A She had left the organization, she had turned away from the orgasm and God, and that, like, she was -- you know, it was -- I had seen other people leave and this kind of thing, and seeing them talked about in this kind of way. And I was seeing it again here, in which, like, if someone who was really dedicated for a long time left, it was like the ultimate sin. And, like, essentially, that their shift in mindset was considered to be poisonous and they didn't want everyone else in the community to be poisoned by that mentality. And so, I was essentially a threat to the community and the organization, having communicated with her.
Q Do you have any understanding of why Maddie left?
A Maddie was deeply traumatized by --
MS. COHEN: Objection.
MS. BONJEAN: Object to the --
THE COURT: Yes, sustained.
Q Sorry. The question was just do you have an understanding of why she left.

A Do I have an understanding?
Q Based on your own personal observations and experiences.
A Um, I'm going to answer in the same way. Like, I know that she was traumatized and she was having an emotional breakdown.

MS. BONJEAN: I'm going to object, Your Honor, on the foundation grounds and the speculation.

THE COURT: Overruled.

Q You can continue.
A Yeah, it's not speculation. It's my firsthand experience of someone I knew and loved.

She was also, at the time, in a relationship with another person in the community. And, you know, as it went in that world, like, relationships were frowned upon, essentially. Like, that was a distraction from what we were doing and from the work we were doing.

And my experience is that they, Maddie and Drea, were essentially set up to fail. Like, I saw them -- Maddie was sent to New York and they were given --

MS. BONJEAN: I'm going to object to the extent that this is based on speculation and hearsay.

THE COURT: Overruled.

THE WITNESS: It's not hearsay. It's my experience.

MS. BONJEAN: Objection, Your Honor.

I would ask --

THE COURT: Well, okay, the witness should just answer the questions that are posed by the person standing at the podium.

You can ask the next question.

Q What was your personal observation as to why Maddie and Drea were pushed out, as you just testified to?

A Because as a partnership, they were no longer useful to the organization. They were focused on each other, they were falling in love, and that meant their energy and attention was going in a direction that wasn't making them money.

Q Making who money?

A OneTaste.

Q In total, how long were you involved in OneTaste?

A Five years.

Q Did you maintain any community outside of OneTaste during this time?

A Very little. No.

Q Why not?

A It just wasn't the culture. It's not like anyone ever said to me don't talk to your friends or family, but I just -- I didn't experience it happening with all the people that were mentoring me and guiding me and shaping me through that time period. It was like you didn't leave, you didn't take vacations, you didn't step out to make a phone call to your friend.

Like, we were always being monitored for how we were using our energy. And essentially, if you weren't putting your energy towards the community and towards the business, you were leaking and you were kind of considered like a leach, like you were taking energy from the community and the organization and not putting it back in. And that was definitely frowned upon. So, you know, to me visiting friends and family that had nothing to do with the organization was that, was a dissipation of energy.

Q You mentioned you were being monitored.

Who was monitoring you?

A My mentors, my coaches, my coworkers. It was just, like, the way that we operate.

Q What was your relationship like with your family while you were at OneTaste?

A Very distant. I didn't have a lot of communication with them. I think I saw my dad and my brother once in that five-year time period. I think I saw my mom once. I went home for, like, my grandfather's passing or something.

Q Why was that, that you didn't see them frequently?

A I mean, again, what I just described. Like, it was -- it just wasn't the culture. It wasn't a thing that you did. It was considered dissipation of energy.

And also, like, because it was such an insular environment that I was constantly inside of, to be honest, it

gave me a lot of anxiety to leave. Like, I felt very, for lack of a better word, like exposed and naked and not sure how to interact with the regular world outside of that community bubble.
Q You mentioned having some health issues during your time at OneTaste.
Did you ever go to the doctor?
A No, never.
Q Why not?
A Again, it wasn't part of the culture. Like, it wasn't encouraged, it wasn't talked about. You know, like any time anyone got sick the response was always like, oh, they're just purifying. Like, which meant energetically they're, like, cleaning something out of their system. And essentially just to, like, leave them alone and let them burn through it. You know, like there was never an encouragement to, like, take care of one's self in that way.
Q Did you ever watch T --
THE COURT: I'm sorry. If you're at the end of a particular topic, I think we're going to take a break. Or if you only have a minute or two, we can finish that out.
MS. GUPTA: We could take a break.
THE COURT: Okay. I didn't mean to cut you off, but --
MS. GUPTA: No, no worries.

THE COURT: -- I want to give the jury a break.

So, we'll come back at 20 after 11:00.

The witness can step down.

(Witness steps down.)

THE COURT: Don't talk about the case, keep an open mind. And I will see you at 20 after 11:00.

(Jury exits.)

THE COURT: Okay. I'll see everyone in 15 minutes.

(Recess taken.)

(In open court; jury not present.)

THE COURT: Okay. I'm ready to bring the jury in, but I understand the parties wanted to raise something quickly.

MS. BONJEAN: Yes, Your Honor. Very quickly. And I apologize, but I do feel it's important.

THE COURT: It's okay. Go ahead.

MS. BONJEAN: We've lodged a number of objections throughout Ms. Wright's testimony. And this has come up with other witnesses, but it seems to be particularly pronounced with her, that much of her testimony about in response to questions of why didn't you do this or why didn't you see your family, why didn't you leave, why did -- all these things, the responses continue to be not as much about what Nicole did or what Rachel did or what Nicole said or what Rachel did or even what unindicted coconspirators did or said, but it's all this

it wasn't in the culture, it wasn't considered. It's all this very passive voice about an entire culture and we believe that's objectionable.

THE COURT: Right. You've made objections, I've overruled them, and you will have cross-examination.

MS. BONJEAN: Okay. I just want to make sure that the record is clear about what our basis was there. I know the Court --

THE COURT: No, I understand. It was clear.

MS. BONJEAN: Okay.

Again, I know the Court maybe is clear on it. I would like the actual transcript to be clear on it.

And also -- and, you know, things like why did Maddie and Drea get pushed out, I understand, and she can say "it's my own perspective" or "my observation." But if it is based on a statement of Maddie, that is still hearsay.

THE COURT: It doesn't sound like it was though. The testimony that came in did not implicate those concerns. It could have, but that's not what the testimony was.

MS. BONJEAN: I think the foundation is lacking and we don't know where it's coming from.

THE COURT: Okay. Well, I overruled the objections and I understood your objections.

MS. BONJEAN: I understand.

THE COURT: Okay. But --

MS. BONJEAN: But I want the Second Circuit to be able to understand my objections.

THE COURT: Okay, but we're in the middle of a trial now; you made your objections, you said "foundation" or you said --

MS. BONJEAN: Yeah.

THE COURT: You know, and they were overruled, some were sustained. So --

MS. BONJEAN: I understand.

THE COURT: Yes.

MS. BONJEAN: I understand, Your Honor. But the Second Circuit will say I waived it if I did not make those timely objections.

THE COURT: You made your objections and you've said the basis. So, you know, that's the way you preserve it.

But I am hearing you that there are certain answers that I agree with you would have, if they were stated the way you're suggesting, could have been sustained objections, but not the way they were actually answered.

So, is there anything else that anyone wants to bring up?

Government.

MS. BENSING: No, Your Honor.

THE COURT: Okay. Ms. Cohen.

Anything?

MS. COHEN: Oh. Oh. Nothing further, Your Honor.
THE COURT: Okay.
MS. COHEN: We join, obviously.
THE COURT: Okay.
And let me just ask Ms. Gupta. How much longer do you have? Only a few minutes?
MS. GUPTA: Yes, only a few minutes.
THE COURT: Okay.
MS. GUPTA: I know my estimates have been a bit off. I apologize.
THE COURT: Okay. That's fine.
MS. GUPTA: But less than ten minutes.
THE COURT: Okay. Let's bring the jury in.
MS. BENSING: Should we get the witness?
THE COURT: Sure.
You can just come back up here.
(Witness resumes the stand.)
(Jury enters.)
THE COURT: Everyone be seated.
Ms. Gupta, you may proceed with your examination.
BY MS. GUPTA:
Q Ms. Wright, following your departure from OneTaste, did you ever hear from Nicole Daedone?
A Yes.
Q Can you describe that?

A There were various different text conversations we had in which I think she invited me to go to tea a couple of times and I declined. She wanted to know how I was feeling. She wanted to know what my experience at OneTaste was. She wanted my feedback. I remember having -- like, sharing pretty sort of, like, direct, raw, honest, open things about what we're talking about today.

Q And following your departure, did you ever hear from Rachel Cherwitz?

A Yes.

Q How did she reach out to you?

A Probably via text because that's usually how everything was done. I can't remember a specific conversation. I know her -- I saw her, like, a few times.

Q In what capacity did you see her?

A I think several years later I went to Rachael Hemsi's wedding, which was held, like, at a location where there was also a -- some kind of, like, VIP course going on where they were all there.

Q And why did you attend Rachael Hemsi's wedding?

A Good question.

You know, the experience I had at OneTaste was not all bad and all negative. There was a lot of really powerful, intimate, fun, positive experiences and relationships mixed in with all of this other stuff we're talking about and I think,

you know, it was a lot to exit that world and lose all of those relationships at the same time. It was basically like breaking up with 50 people at once and it was lonely. It was challenging. And I -- you know, part of me missed them.

Q Have you maintained any relationships with people from OneTaste since you left?

A Some.

Q You've testified a bit about Maddie and Drea leaving OneTaste.

To your knowledge, did they ever return to the OneTaste community at any point?

A Drea did briefly. Not Maddie.

Q And how did that make you feel?

A Not supported as a friend.

Q Did any other members of the core staff ever reach out to you in the years you left OneTaste?

A Yeah. I would -- over the years, like, a lot of different staff members tried to make amends to me. They would text me with like -- asking me if they could make amends, if we could meet up or if they could share X, Y, Z. And generally, I was unresponsive.

Q What do you mean by "making amends"?

A Um, it's a practice taken from Alcoholics Anonymous program in which you take responsibility for ways in which you believe you have hurt someone.

Q After you left OneTaste, where did you go?
A I went home, to my mom's house in Rhode Island.
Q And what did you do at that point?
A Fell apart. Attempted to start healing. Had, like, a part-time job at a flower shop and, you know, cried a lot.
Q You described when you were in LA, going to the beach and relaxing.
Were there other instances like that you had after you left that you had missed?
A Yeah, absolutely.
I mean, being in OneTaste for that long was like missing five years of culture. Like, I don't think I had seen one movie or one TV show or like -- yeah, like I said, like, I had spent very little time doing anything for pleasure. And so there were a lot of things that were, like, brand new for the first time again.
I mean, also part of my experience at OneTaste is that we were -- it was a sober community, so I hadn't drank or taken any substances for over five years. And, you know, I think I kind of ventured into, like, having beer, having a drink and just, like, feeling how -- it almost felt rebellious. It almost felt like I was going against this pact that I had made, but it also felt like reclaiming a part of myself.
Q At the time you left, how would you describe your

financial state?
A Bereft. I had no savings. I had no money. I mean, I hadn't -- I think for the last almost year that I was with them, I wasn't making any money for all the stuff I was doing. So I had nothing. I had to borrow money from a friend.
Q Did you have debt?
A Debt to my friend, but not otherwise.
Q At the time you left, how would you describe your psychological state?
A Also bereft. I felt lost. I felt broken. I felt alone. I felt scared. I felt incredibly anxious. I felt a lot of shame. I felt very confused. Like, I had no idea what to do or where to go. Like, I just had been inside this system for so long in which my life was dictated to me all day, every day. And so to all of a sudden have to, like, do it all on my own was incredibly challenging. Yeah, I was really -- I was really traumatized.
Q How would you describe your emotional state when you left?
A Like I said before, heartbroken, sad. It was like breaking up with my entire life. Like, I lost my job, I lost my partner, I lost my community, I lost my friends. I felt betrayed by teachers and mentors and people -- and friends and people that I thought loved me and cared for me for many, many years that I felt very close to. I felt, like, baffled that I

had given so much, like more than I even had, and they didn't care about me anymore. That was -- yeah, that was hard.

Q Why did you feel betrayed?

A Um, I mean, I had given so much. I had worked so hard. I had dedicated myself in every possible way: Sexually, physically, spiritually, emotionally, socially, like. And to just be kicked out and, like, falsely accused of something that I didn't do, that I knew they knew I didn't do.

And I think specifically with Aubrey, she was a really close friend of mine and confidant and the fact that she fabricated a lie in order to --

MS. BONJEAN: I'm going to object.

A -- kick me out --

MS. BONJEAN: I'm going to object to the foundation of this.

MS. GUPTA: Your Honor, she had previously testified to this incident of being fired and believing it to be based on false information.

MS. BONJEAN: Then it's asked and answered and she's speculating.

THE COURT: Sustained.

You can move on to the next topic.

MS. GUPTA: Your Honor, may I have a moment?

THE COURT: Yes.

(Pause in proceedings.)

MS. GUPTA: And, Your Honor, just to clarify, was it sustained just to as that last part of the answer?

THE COURT: I think there was only one part of the answer.

Give me one moment.

(Pause in proceedings.)

THE COURT: Yes, as to the last part of her -- the last sentence of her answer, I will strike.

MS. GUPTA: No further questions.

THE COURT: Ms. Cohen, any cross-examination?

MS. COHEN: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good morning, Ms. Wright.

My name is Celia Cohen and I am an attorney for Rachel Cherwitz.

A Good morning.

Q So I just wanted to go back in time for when you first joined OneTaste or first learned about it.

So when you first learned of it, you were living in Arizona, right?

A Correct.

Q And you were dating Maddie at that time?

A I was.

Q And you were living also at that time, at one point, at

yoga ashram?
A I wasn't living there. I was training; like, studying and working there.
Q You said you were working.
And is that when you were dating Maddie?
A Some of that time it was. I think I met her after I had wrapped most of that up, honestly.
Q But you were living in Arizona and dating her around that time; I guess it's fair to say?
A Yes, I was living in Arizona when we first met. Yes.
Q And Aubrey Fuller, who you just spoke about, she was Maddie's childhood friend, right?
A Yes.
Q And that's how you first learned about OneTaste?
A Yeah.
Q And so you and Maddie went to -- even though you were living in Arizona, you went to check it out in California, right?
A Yeah.
Q And you stayed at 1080 for a night or two?
A Yeah.
Q And that time you were about 20, 21?
A Somewhere around there, yeah.
Q Early twenties?
A Yeah.

Q And you had a college degree, right?
A I did.
Q University of Rhode Island?
A Yeah.
Q And I think you were also a masseuse at this time in Arizona?
A No, not yet.
Q Now, when you got to 1080, you testified that you went to a TurnON event, right?
A Yes.
Q And that's where you first met Rachel Cherwitz?
A Yes.
Q And that was where you would be told you learned more about what OneTaste is, correct?
A Yeah.
Q And it was also -- I mean, it was a sales event as well, right?
A Yeah. Mostly, yeah.
Q And right away, as soon as you got there, you learned about orgasmic meditation or you heard about it, right?
A I heard about it, yeah.
Q And as guests at 1080, you sort of got a sense of what 1080 was about in that it was a communal home, right?
A To a degree, yeah.
Q And did you stay in one of the bedrooms there?

A I think we stayed in Aubrey's room. I don't remember super clearly.
Q And then you went back to Arizona after that, right?
A Yes.
Q And after you went back, you and Maddie actually broke up for a little while, right?
A No.
Q You don't -- do you remember telling the Government that you and Maddie broke up for a little while?
I may be...
A Further in the future, but not at the moment you're referencing.
Q Let me see if I can refresh your recollection.
THE COURT: She hasn't said that her memory is faulty. She's answered your question.
So, do you have another question to ask?
Q Did you at one -- before, do you recall telling the Government that you and Maddie had broken up?
A There was a time period in which we were separated prior to my joining OneTaste, yes.
Q Okay. And at that time, Maddie went to Oakland, correct?
A Yes.
Q And at that time, is that the time you attended the Thai massage school?
A Yes. I went to Esalen to study massage and she went to

Oakland.
Q And it was around that time you also went to Burning Man; does that sound right?
A I would say that was a little after. Like, we were together at that time, so I had already left Esalen and come back, had come to -- joined her in Oakland at that point.
Q That was in 2009?
A When we went to Burning Man?
Q Yes.
A I think.
MS. COHEN: I'm just going to show, just for the witness, what has been marked for identification as 3-AQ.
Oh, it should come up on your screen in a minute.
Q Do you know -- do you recognize this?
Is that from Burning Man?
A It is.
Q Does that refresh your recollection as to the time?
A I can't read that image very well. I think it says 2009.
MS. COHEN: Can you just blow that up a little bit?
A Yeah, it says 2009.
Q Okay. So just -- I just wanted to orient ourselves there.
MS. COHEN: You can take that down.
Q Okay. And while you had been I guess at the Thai massage school, at that point Maddie moved or starting getting

involved with OneTaste, correct?
A Yeah.
Q And so you got back together, you decided that you wanted to get involved in OneTaste as well?
A Eventually, yeah. It was not immediately, but yes.
Q And at that time, you attended an intro -- or around that time, early on, you attended an Intro to OM course?
A I didn't, no. I actually was trained to OM as part of the CP1, like, practice training sessions.
Q So -- and was that early on in 2010, do you think?
A I believe so.
Q Pretty early on though, right, you learned how to OM?
A I believe it was in the beginning of 2010.
Q And early on, you learned that that was a core practice of OneTaste, right?
A I did.
Q That was kind of the whole reason that you would -- one would join OneTaste, right?
A No, I wouldn't say that.
Q You joined OneTaste for community?
A That was a big reason, yeah.
Q But if you didn't like to OM, is it fair that you would not join OneTaste?
A OMing was definitely a core practice of what OneTaste did. You were -- like not -- I wouldn't say that's the only

reason someone would join.

Q Well, I guess, yes, you wouldn't move into 1080, certainly, if you didn't want to OM, correct?

A I'm not going to agree that that was my reason for moving in.

Q Well, I'm not asking if it was your reason. I'm just saying, in general, people in 1080 were required to OM, correct?

A Most people in 1080 had a practice of orgasmic meditation, yes.

Q All right. And you described the OMing as a mindfulness practice, right?

A Yeah, it was.

Q And it was essentially a meditation on sensation without a goal. You also described it as that, right?

A Yeah. That is also one thing that it is.

Q And when you got -- when you got back with Maddie, Maddie at that point wanted an open relationship, correct?

A She did.

Q She wanted to explore other people, right?

A Yes.

Q And in fact -- and she moved into 1080 first, right?

A She did.

Q And in fact, you know, if you didn't want to explore other people, it might not be a good place to move into, 1080,

right?
A One can say that.
Q Okay. Now, you testified that you didn't have much money when you got to OneTaste, right?
A No, I didn't.
Q You had paid for the Thai massage class, right?
A I had, yeah.
Q And you traveled -- you moved to California at that time, right?
A I did, yeah.
Q Around that time, yeah.
And you finished the class, the Thai massage class, but you didn't have a job at that point, right?
A No, I didn't.
Q And that's when you wanted to move into 1080, correct?
A I did not move into 1080 immediately after getting back from Esalen.
Q Right.
But you wanted to, right?
A No, not immediately. No.
Q And in fact, you didn't immediately, even though Maddie was there, right?
A No.
Honestly, when I first came back from Esalen, I spent a decent amount of time living with a friend in Oakland.

Q And at some point you testified that you were told you couldn't move into 1080.
Do you remember that?
A Yeah, I do.
Q And actually, the person who was in charge at 1080 was Rachael Hemsi, correct?
A Yeah.
Q She was the one who really made the decision of who could move in and what rooms they could move into, correct?
A I wouldn't say she was the only person dictating that, but she was one of the people.
Q And you also -- and do you recall talking to Rachael Hemsi that you didn't want to move into 1080 immediately?
Do you remember that?
A I don't.
Q And in fact, you moved in -- you testified about moving into an apartment nearby with former OneTaste people, right?
A It was a house. I got a room in a house of other members of the OM community.
Q And these were people that just participated in OMing, right?
A Yeah.
Q And Rachel Cherwitz actually helped you, brought you over to there, correct?

A I don't remember who brought me to the house, honestly.
Q Well, you testified that Rachel Cherwitz wouldn't let you move in because she called you a leach.
Do you remember that?
A That is one of the things she said to me, yes. She was the first and primary person to tell me that I was not welcome to move in.
Q So it's your testimony that she called you I think a leach and a parasite, you said on direct?
A Yeah, that's true.
Q And your testimony is she called you that right away and you still -- and you wanted to move into 1080?
A I'm not sure what you mean by "right away." That wasn't like the very first conversation we ever had, but there was a moment in which we had a conversation about me moving in and some of those things were said.
Q Rachel Cherwitz didn't even know you very well at that point, right?
A No, I don't think she did.
Q And you have a specific memory now that she said that when you first were talking to her about moving into 1080?
A It was one of our early conversations. It was not the first conversation we ever had.
Q But despite that, you still wanted to move in 1080, right?

A I did, yeah.
Q And you didn't have any money to pay rent at that time, right?
A No.

(Continued on the next page.)

(Continuing.)

CROSS-EXAMINATION

BY MS. COHEN:

Q And you lived at this other place with OM community members rent free; right?

A I believe so.

Q Now, at that time, you also participated in a lot of events at 1080; right?

A Yes.

Q You were there all the time?

A I was there quite often.

Q And you had fun, right?

A Sure. Some of it was fun, yeah.

Q I just want to show you.

MS. COHEN: Just for the witness.

Okay. We can come back to it on the break.

BY MS. COHEN:

Q Okay. So as I already asked you, you knew what 1080 was like before you moved in; right?

A I mean, as much as one can know about something before fully experiencing it. I had an idea of what it was like.

Q And you knew there were several floors within it; correct?

A Yeah.

Q And you knew that people shared rooms; right?

A Yeah.
Q And you knew that people were assigned to rooms; right?
A I didn't know that, no.
Q You knew that once Maddie was living there; right?
A I guess so.
Q And, in fact, you had stayed there before; right?
A Many years prior when we visited, I had stayed there one night.
Q And you knew that if you wanted privacy, it wasn't a good place to move into; correct?
A I -- no, I don't necessarily -- I can't can agree to that necessarily.
Q So you stayed there for a night, you saw that people shared bathrooms; correct?
A I knew that the bathrooms were public.
Q And that you went to visit Maddie there; right?
A Yeah.
Q And you saw where she was living; correct?
A Uh-hum.
Q And you -- let me show you a photo. You saw a similar photo, but I want to show you a different one.
MS. COHEN: DX3-DC, just for the witness.
THE COURT: I'm sorry, 3-DC?
MS. COHEN: Yes.
THE COURT: Okay. So it's not on your list, right?

MS. COHEN: Oh, sorry.
THE COURT: It's okay. Do you have a copy here?
MS. COHEN: Yes.
THE COURT: You gave me a copy. It's a photograph.
MS. COHEN: Give me one minute because I'm not sure I have a copy. I actually --
THE COURT: Sure.
MS. COHEN: It's an almost identical one that's in evidence.
THE COURT: I don't have a copy, but you can just put it on the screen for me.
MS. COHEN: Okay, thanks. 3-DC. Oh, you don't have it? I will just put it on the ELMO.
THE COURT: You only want the witness and the parties to see it?
MS. COHEN: Yes, it's not in evidence.
Q Do you recognize , Ms. Wright -- let me see if I can?
A I do.
Q What is this?
A That's the front of 1080.
Q And is it a fair and accurate depiction of the front of 1080?
A Yes.
MS. COHEN: Your Honor, I would like to offer 3-DC. There is a similar photo in evidence.

THE COURT: Okay.

Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibit 3-DC is admitted.

(Defense Exhibit 3-DC received in evidence.)

MS. COHEN: We can publish that to the jury.

Q And 1080 was the entrance over on the left side. I think you can see someone coming out there?

A Yeah.

Q And on the right side, there was a cafe?

A Correct.

Q And up above on the second and third floor, those were all bedrooms?

A Yes.

Q All right.

MS. COHEN: Can we also show just for the witness, I think this one may also not be -- through the Elmo, 3-DA?

Q Do you see that photo?

A Yeah.

Q What is that a photo of?

A That's a picture of the dining table in 1080.

Q And is that a fair and accurate depiction of the dining table and what it looked like dining there at the time?

A Yes.

MS. COHEN: At this time, the defense offers 3-DA

into evidence.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibit 3-DA is admitted.

(Defense Exhibit 3-DA received in evidence. ).

Q Okay. So you shared beds with different people while you were at 1080; right?

A Yeah.

Q At one point, you did share a bed with Maddie in a room; right?

A No, we were not permitted to have the same room.

Q You -- I think you talked about -- did you know that when you moved into 1080?

A No.

Q So you went and moved in and didn't ask whether you could stay with Maddie?

A Sorry. I just remembered. When I first moved in, we did share a room and a bed. Sorry.

Q And part of moving into 1080 was to be exploratory, that's part of what 1080 offered; correct?

A Yeah.

Q And you knew that going in; right?

A Yeah.

Q And despite knowing that, you chose to move in there; correct?

A Correct.
Q And when you moved in, you weren't paying rent; right?
A No, I started paying rent right away.
Q And you were eating there; right?
A Yeah.
Q And you also were conducting errands basically in the beginning; right?
A Yeah.
Q That was your first job you described; right?
A Uh-hum.
MS. COHEN: I'm sorry. Give me one moment. .
Can we pull up for the witness Defense Exhibit 3-CY?
I can walk a copy up, Your Honor.
THE COURT: Yes, that would be great. Thank you.
Q Do you recognize 3-CY?
THE COURT: I'm sorry, I don't have that one either.
MS. COHEN: I'm sorry, Your Honor?
THE COURT: You did give me a whole lot of exhibits, but I don't have these ones particularly.
Thank you.
Q Do you recognize that? Take your time.
A I don't, honestly. I mean, it makes sense in terms of what I experienced in living there, but I don't remember this document.
Q Okay. Do you remember getting any document around the

requirements of 1080?
A I don't, no.
Q But you recognize -- I will ask you, but do you recognize those generally as to the rules and requirements of 1080?
A Yeah.
Q And do you remember that there was a difference between the second and the third floor of 1080?
A I do, yeah.
Q And you moved into the third floor; right?
A Not need immediately, no.
Q The second floor was for -- really less intense; correct?
A I guess that's one way to put it.
Q I mean, if you just -- and you're not fully immersed on the second floor? Is that a fair description?
A The second floor was for -- more for members of the community. It wasn't necessarily -- like the third floor was more for staff members and people who were like part of some of the training, deeper training programs.
The second floor was more like people who didn't necessarily work for the business. Sometimes they had random people off the street renting a room, like it was mixed.
Q Okay. And one of the purposes of the second floor was to support people who were curious about orgasmic meditation; correct?
A I don't know specifically.

Q Well, as you just described, I mean, it's not someone totally immersed in all of the OneTaste programs; right?
A Yeah.
Q And you wouldn't have as many requirements on the second floor as you would on the third; right?
A I guess that's true.
Q For someone who moves into the third floor, that's someone who's more committed to the practice?
A Agreed.
Q Okay. And by committing to the practice on the third floor, you're committing to daily OMs; correct?
A Yeah.
Q And you're committed to taking some of the courses; right?
A Yep.
Q And that was -- do you remember being referred to as the immersion program?
A I'm not sure what you're referencing to.
Q The third floor.
A No, I don't remember that.
Q All right. But you remember that, again, you said you had to OM. You also had to do daily yoga or some kind of program for exercise. Do you remember that, movement?
A Yeah, I remembered the digestive practices were encouraged.

Q And one of the philosophies of OneTaste, especially for those being more immersed into the program, was to push your boundaries; right?
A Yeah.
Q And to explore; correct?
A Yeah.
Q And that's what you signed up for; right?
A Sure. In a way, yeah.
Q Okay. So going back to your first job at OneTaste. You were living in a communal home, so you had to do some work around the house in general; right? I mean, people had to keep their places clean; correct?
A Yeah, it was expected that we would contribute to the community if we lived there.
Q People had different odd jobs, trash, et cetera; right?
A Not really as you're suggesting, but yeah, everyone was expected to contribute.
Q They also did have someone come and help clean, but you had to generally keep the place clean, those who lived there; right?
A You were expected to keep your room clean, is my memory.
Q And another requirement, for example, one night a month, each resident was assigned to wash dishes. Does that refresh your recollection?
A Yeah, I guess, yeah.

Q And there were other rules in the house designed to keep it a safe environment; right?
A I'm not sure what you mean by that.
Q Well, there was no alcohol; correct?
A That's true.
Q No smoking; right?
A A lot of people smoked.
Q Inside the apartment?
A No.
Q I meant inside, right?
It was also a drug-free environment, 1080; correct?
A That's true.
Q And you had to provide notice if guests were going to come; correct?
A Yes.
Q But you could have guests; right?
A I guess. I don't have a large memory of that, to be honest.
Q In fact, you were a guest; right?
A Sure. At one point, I was, yeah.
Q And you chose -- you said at first you moved into the second floor and then you chose to be in the more intense third floor; correct?
A Yeah. Eventually, I moved rooms, yeah. Yeah.
Q Okay. And let me show you what has been marked for

identification as DX 3-Z. I believe you have this?
Do you recognize this photo.
A I do.
Q And what's this photo?
A That is a picture of me and a bunch the women who lived at 1080 that were friends of mine. We all were dressed up.
Q Is this a fair and accurate depiction of a photo of you and these other women at the time when you were at 1080?
A Yes.
MS. COHEN: Your Honor, at this point, the defense offered Defense Exhibit 3-Z.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Okay. Defense Exhibit 3-Z is admitted.
(Defense Exhibit 3-Z was received in evidence.)
MS. COHEN: And I'm showing you another photo -- I'm sorry. I forgot to publish that to the jury.
Q Let me ask you a couple of questions.
So is that you all the way on the right?
A That is.
Q And who are you next to?
A Sasha Hood.
Q And who is next to that?
A Maddie Carl.
Q Next to that?

A Aubrey Fuller.
Q Next to Aubrey in the middle?
A Kim Howerton.
Q Who is next to her?
A Lianna Lifson, Dana Gill, Maya Gilbert. I don't know who that other person is.
Q And all of these people lived at 1080 with you?
A Everyone except that person on the far left.
MS. COHEN: And let me show you just for the witness Defense Exhibit 3-D, as in David, B, as in boy, DB. Sorry. D, as in David, B, as in boy.
THE COURT: I don't have that one.
Q Do you recognize this photo?
A I do.
Q And where is that photo taken?
A That is the bench outside of 1080.
Q Who are the individuals or do you recognize the individuals?
A Most of them.
Q Do you recognize yourself?
A I do.
Q Is that a fair and accurate depiction of the photo outside 1080?
A Yeah.
MS. COHEN: Your Honor, at this time, defense offers

3-D, as in David, B, as in boy.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibit 3-DB is admitted.

(Defense Exhibit 3-DB was received in evidence.)

MS. COHEN: Publish that.

Q And then, Ms. Wright, can you describe, starting on the right with the man in shorts?

A I don't know who that is. Then it's me, Maddie, Dana, Aubrey and James. I can't remember James' last name.

Q Is this around the early days at 1080?

A Yeah.

Q All right. And at 1080, you also had free WiFi; right?

A I have no idea.

Q There was WiFi in the building; correct?

A Yeah, I guess. Yeah.

Q Okay. You used computers in the building; correct?

A I -- yeah. Yeah.

Q And if you missed a meal, they would have a plate reserved for you if you wanted; right?

A If you wanted, yeah.

Q They had quiet hours in the house; right?

A Yeah.

Q And there was a common area known as a -- the chill room on the second floor; right?

A Yes.
Q They had -- and there were no children, of course, permitted; right?
A No.
Q And, you know, when you were living there, as we said, you had a lot of fun. It was kind of like being in college at the beginning; right?
A Yeah, there were a lot of fun things about living there. Sure.
Q In fact, you had indicated previously that, you know, it was sort of like the best party in town. Do you remember telling the Government that?
A I mean, that was a phrase that was often used at OneTaste, so, yeah.
Q You were living with like-minded people in the community; correct?
A Yeah.
Q And you were given your own key to your room for 1080, right?
Oh, sorry, to the outside, you had your own key?
A Not to my room. To the outside front door, yeah.
Q And you could use that whenever you wanted to come and go; correct?
A This is true.
Q And you actually did have a friend. You had a friend

named Kayt, K-A-Y-T? Does that ring a bell? Kayt came and visited you?
A Yeah. Yeah.
Q That was in June of 2011. Does that sound right?
A I have no memory of the date, but I do remember her visiting.
Q In fact, when she visited, you told the other members of 1080; right?
A I don't remember, but I'm assuming I requested permission to have a guest.
Q Okay. Let me just show you, to refresh your recollection.
MS. COHEN: Can you bring up for the witness Defense 3-B, as in boy, V as in Victor? Oh, can we switch just for the witness?
Q Do you recognize that e-mail?
A It looks familiar, yeah.
Q You wrote this e-mail; correct?
A It looks like I did.
Q Is that your e-mail address; right?
A Yes, that's my e-mail. .
Q And you sent it to the 1080 group; correct?
A Yep.
Q And does this refresh your recollection that Kayt came to stay with you in June of 2011?

A It does.
Q And in fact, you sent a photo of the two of you around to everyone; right?
A I did.
Q And you wanted the people to interact and say hi to your friend; correct?
A I did.
Q All right. And, so you moved into 1080 around October 2010; correct?
A Yeah, around that time.
Q Okay. And while you were living there, I think, it looks like your birthday is maybe in February?
A It is.
Q And for your birthday when you were there, you sent your desires for your birthday. Do you remember that?
A Yeah.
Q Okay. Well, let me -- do you remember --
MS. COHEN: Let me pull up DX-3AB, just for the witness. 3-AB. That's AD. Oh, I'm sorry. A, as in apple, B, as in boy. There we go.
Okay. I'm going to just bring you up -- is it easier to bring up a copy?
THE COURT: Yes, bring up a copy. It's too hard to read on the screen and too small and blurry.
Q And Ms. Wright, does this refresh your recollection of

your birthday at -- in 2012 and your desires?
A I don't remember writing this, but yeah, it looks familiar.
Q And for your birthday, you wanted to dress up in costume. Do you remember that?
A I don't really remember it, but it sounds right.
Q Those are some of the fun things you guys used to do; right?
A Yeah.
Q You played games with funny outfits. That was one of your requirements; right?
A Requirements?
Q The thing you desire for your birthday?
A Yeah.
Q And you wanted to have a make-out schedule; right?
A Yeah, with my girlfriend, yeah. .
Q So you don't remember this specifically, but you remember scheduling two make-outs. You would schedule make-outs for everyone to see with your girlfriend?
MS. GUPTA: Objection, Your Honor. The witness doesn't appear to be on the e-mail.
THE COURT: Sustained.
MS. COHEN: Let me just rephrase.
Q So I said you scheduled make-outs and your answer was, with my girlfriend?

A I don't know why you said for everyone to see. That's not implied here.
Q Well, didn't you send this -- I'm sorry, I didn't mean to say make-outs.
THE COURT: Sorry, what is the question?
Q The question is, did you tell all the people on the e-mail that you wanted to schedule two make-outs?
MS. GUPTA: Objection. This isn't from the witness.
THE COURT: I can't hear you.
MS. GUPTA: I'm apologize. This e-mail's not from the witness.
THE COURT: Sustained.
Q Is this -- just to refresh your recollection, that document, yes, is not from you. But was that created by a friend of yours?
A It looks like this is something that Aubrey wrote on my behalf. It's like a schedule of things we were doing for my birthday.
Q And that was based on your desire list; correct?
A I don't know.
Q But you remember -- okay. Well, Aubrey.
You talked a little bit on direct examination about work trade. You became a cook at 1080; right?
A I did.
Q And you also assisted in OneTaste video production;

right?
A I did some audio editing as one of my first jobs.
Q And you would do setting up and breakdown for OneTaste event courses; right?
A I would.
Q And you were excited for that work at the time; right?
A I was. Yeah, I liked it.
Q And when you would work -- this is called back of house, right? When you worked at an event, you would not have to pay for the event, but you could hear what was going on; correct?
A I'm not sure what the question is.
Q Did you do back of house?
A I did do back of house.
Q What is back of house?
A Back of house referred to doing like production support for a course or an event. So whatever was physically, you know, required in order to put an event on.
Q And while you were helping doing this back of house, you were able to attend the event for free; correct?
A I mean, that's not how I would describe it, but I suppose that's true. I wasn't paying to work for them.
Q Well, my question is, you got to hear what was going on at whatever event was happening; correct?
A Yeah, that's true.
Q So if there was a course being given where people were

paying for it and you were working back of house, you could listen to the course; correct?
A I mean, the reality is anything that I was back of house for was something I had already done myself. So it's not like I was gaining something for free.
They were -- you weren't invited to do back of house unless you had already taken a course and had that experience and knew how to support it.
Q Okay. Towards the beginning of your time there, though, you were back of house at times; correct?
A At times, yeah.
Q Right. And you may be at courses, but there are different people speaking all of the time; correct?
A Yeah, there were different teachers that taught different events or led different classes.
Q So every word that was spoken was not taught at every class; right?
A No.
Q Now, at this time that you were living at 1080, you could have also gotten a job outside of 1080; correct?
A I could have. Sure. I guess. I mean, I don't think I really had time to.
Q From the moment you worked in there, you went to 1080, you started doing this work; correct?
A What do you mean by this work?

Q You started doing work trade?
A I did, yeah.
Q Okay. And no one forced you to do work trade; correct?
A No.
Q No one forced you to move into 1080; correct?
A No.
Q You wanted to be there; correct?
A I did.
Q And you wanted to do that work; right?
A I did.
Q And, in fact, at one time you did want to get some more outside money and started doing massages out of 1080; correct?
A I did. They allowed me to use one of their office spaces to do massage, yeah.
Q Right. You used the space at 1080 and you didn't pay for that space; correct?
A I don't believe they charged me to use the space, no.
Q And you actually kept time of your -- you kept track of your time working as a masseuse there; correct?
A I did. Although, all of the money I made went to pay for my courses and my room and board. So I didn't get paychecks.
Q Right. Because you wanted to take the courses; correct?
A Yes.
Q And you wanted to live at 1080; right?
A I said that, yeah.

Q And, in fact, if you didn't live at 1080, you would have to pay rent somewhere; correct?
A I don't know. Depends where I would have lived.
Q That's true. You could have lived with your brother in Santa Cruz; right?
A Ostensibly. I don't know. Not necessarily.
Q You could have lived with your parents; right?
A Ostensibly, yes.
Q And you did move back in with your parents after OneTaste; right?
A Many years later, yeah.
Q Unless you had a friend or family, though, and you wanted to live somewhere, you would have to pay rent, correct?
A I wasn't paying rent before I moved in there. So that's not necessarily true.
Q You were staying with the OneTaste people that let you stay with them?
A No. I'm referencing to before I came to join OneTaste, I was not paying rent.
Q Okay. Is that in Arizona?
A No. I spent a long time in California before I joined OneTaste.
Q With your friend in Oakland -- or sorry. Your friend's friend?
A We lived all over the place, honestly.

We spent some time at Maddie's mom's house. We spent some time in Tahoe. We spent some time in Northern California. I mean, there was lots of different stages to my life before I joined OneTaste.
Q So you were very lucky you never had to pay rent, is that your testimony?
A I didn't say those words, but, no, I wasn't paying rent.
Q You were staying with people you knew, right? Or somebody you knew?
A I was with my girlfriend.
Q So, she then must have known the people, is that fair?
A At times, yeah.
Q I guess are you saying that strangers would take you in rent-free?
A No, I'm not saying that. I'm just not sure what you're trying to get at.
Q I'm just simply asking you unless you know someone, if you need to live somewhere, most people have to pay some kind of rent or money to live at places.
A All I'm telling you is that I wasn't paying rent.
Q Okay. I guess you could have kept living at places and not pay rent. Is that what you're saying?
MS. GUPTA: Objection, calls for speculation.
THE COURT: Overruled.
You could answer.

Q You could answer.
A I don't know what to say other than like for a long period before I moved into OneTaste, I lived in various different locations and I was not paying rent.
Q But you knew that you had to pay rent at 1080; right?
A I did know that, yeah.
Q And Maddie had to pay rent too; right?
A Yeah.
Q Along with everyone else else who lived there; right?
A That's true.
Q And you decided to move in; correct?
A This is true.
Q All right. And at times, you would direct -- on the spreadsheet that was kept about massage hours, you would direct when that money should go to rent; correct?
A I know that I kept track of my hours on a spreadsheet that Rob had access to. I don't know that I would direct what money went where, when.
Q You don't remember making notes to Rob as to what should be deducted for rent?
A No, I don't believe it was my responsibility to name those things.
Q I will come back to that.

Now, you dated both men and women before you dated Maddie; correct?

A Yes.
Q And when you first arrived at OneTaste, you were resentful of Maddie; correct?
A I'm not sure what you're talking about.
Q Well, you wrote at one point about your story with Maddie. Do you remember that?
A I'm not sure what you're referencing to.
Q Okay. Let me show you what has been marked for identification as 3-BR.

MS. COHEN: Just for the witness.

THE COURT: I'm sorry, you said 3-BR?

MS. COHEN: 3-BR. B, as in boy, R, as in Ralph.

THE COURT: Go ahead.

Q If you want to take a moment, let me know when you've had a chance to review it.

THE COURT: It's five pages of very small print, so it might take us a bit.

THE WITNESS: Do you want me to read the entire thing?

THE COURT: Just enough to refresh your recollection. Does the document refresh your recollection?

THE WITNESS: No, honestly. I don't remember writing this.

THE COURT: Okay. We will take a moment and review it.

Take your time. I'm just noting there will be some quiet time.

(Pause in proceedings.)

THE WITNESS: Okay. I have a general sense of what it says.

Q Does that refresh your recollection that you didn't completely trust Maddie when you first got to OneTaste?

A I mean, reading this document now, I would say that my perspective of myself was not exactly clear at that time. I think I had an immense amount to learn at that time about myself when I was pretty young emotionally.

So, yeah, there's a lot of details in here about my feelings, but I don't know that they were all true and accurate as to what was going on inside of me.

Q Well, you just stated that, you know, when you were young, you had different feelings and -- I'm sorry. I don't have the transcript in front of me, but that you learned to grow from things that you learned about when you were young; correct?

A What? I'm sorry. I'm not understanding.

Q You just were talking about the fact that you wrote this -- these feelings about when you were younger; correct?

Were you reflecting back in this story?

A There are a few paragraphs in which I talk about my childhood, yeah.

Q And you talked about when you first arrived at OneTaste; right?
A Uh-huh.
Q And you talked about how you were feeling at that time; correct?
A Yeah.
Q And as I said, at first when you got there, you didn't trust Maddie. That's how you felt at that time; right?
A That's one of the things I wrote.
Q And you felt that you didn't know at that time, looking back, how to really be honest. Is that right?
A I think again what I will say is, like, that may have been my perspective of myself at the time. And I know that I was really struggling emotionally and I had a lot of, I guess, for lack of a better word, emotional blind spots, and I think there's probably a lot of things in here that I wrote about myself that were not necessarily an accurate depiction of what I had been experiencing.
Q In fact, when you wrote this, you were writing about all of the benefits of OM that had had on you; correct?
A Yes. The movement is -- yeah, about my story and my first experience with OM and how it affected my life. Yeah.
Q Right. In fact, at the time that you wrote this, you were very happy with OM; correct?
A I was, yeah. Like, OM definitely had a very positive

impact on my life in many ways, yeah.
Q And at the time -- sorry. That was -- on your life, you said. I didn't mean to overlap on your words. That was the last thing you said. Yeah. Right.
And at the time, you were looking back to how you felt when you joined OneTaste; correct?
A Yes.
Q And this was hindsight looking back a couple years prior; correct?
MS. GUPTA: Objection. Misstates the testimony.
MS. BONJEAN: I cannot hear you.
MS. GUPTA: Sorry. Misstates the testimony.
THE COURT: Overruled.
A I'm not sure what your question is.
Q Well, you wrote this sometime in 2013. You had been at OneTaste for a little while, but you can't remember exactly; right?
A I don't see a date on this document, so I don't know.
Q Based on what you wrote, you had been there for some time; correct?
A I don't know. I don't see a date. I don't know when I wrote this.
Q I have an e-mail showing that. I'll get that in a little bit.
THE COURT: Maybe just ask the question and don't

add anything to it, your own views of what you have or don't have.
Q I'm just asking, you said -- you talk about it being a year and a half in at OneTaste. Do you see that? On page -- refreshing your recollection. On the third page, third paragraph.
A I'm sorry. I didn't read every word of it. It's quite long.
THE COURT: Why don't you take the time to read it.
If you're going to do extensive questioning on this long document, she should take the time to read it. And the Court might need more time to read this as well.
Do you want to do that now? We can do that.
MS. COHEN: Yeah.
THE COURT: Okay. Why don't you go ahead and read it. Take your time.
MS. COHEN: Your Honor, I can ask some specifics questions.
THE COURT: Yes. Go ahead.
MS. COHEN: And come back to it.
THE COURT: That's fine.
Q Ms. Wright, looking back at the second to last page, do you see that -- does it refresh your recollection, on the last paragraph, that you had -- as to how long you had been at OneTaste at this point?

Fourth line down?
A Second to last paragraph of the second to last page?
Q Sorry. Second to last page. On the bottom it says, 10262. Do you see that?
A Uh-hum.
Q And then it's the last full paragraph, because there is a sentence at the bottom. You go four lines down.
A Yeah, it says, In the two years --
THE COURT: Don't read from the document. It's not in evidence yet. She will ask you a question.
MS. COHEN: Sorry.
Q Does that refresh your recollection as to the general time when you wrote this?
A Yes.
Q It's fair to say two years in, you were at one point in this story reflecting back on your initial experience at OneTaste; correct?
A Yeah.
Q You -- going back to what I was asking you before, you -- you said that at the time that you got there, you didn't know how to be honest. That was one of the things that you reflected on; correct?
A It does say that.
Q And these were your words. You wrote this; correct?
A I don't remember writing it, but, apparently, yes.

Q But these are thoughts and feelings that no one would know beside you; correct?
A I don't know.
Q All right. And you also wrote that manipulation was your main form of getting what you wanted at the time when you first got there; right?
MS. GUPTA: Objection. Hearsay.
THE COURT: Sustained.
Q Do you remember writing that, manipulation?
A I don't remember writing any of this.
Q And do you remember, though -- does this accurately reflect your feelings on OMing, that you felt that OMing changed your life?
A I did feel that at that time, yeah.
Q And in this story, you wanted to open up how you were feeling; right?
A I'm not sure what you mean by that.
Q Well, you talked about how scary it was, opening up sex to the world. Do you remember that?
A No. I mean, I didn't get to read the entire document, so I'm not sure what you were referencing to.
THE COURT: Maybe you can go back to this document.
MS. COHEN: Sure.
THE COURT: I'm happy to have you do something else and come back to it.

MS. COHEN: Let's do that.
Q In fact, you also -- you spread the world about -- the spread word about OneTaste yourself, around; correct?
A I did.
Q Because you believed in the practice; right?
A I did.
Q And, in fact, at one point in -- and I can refresh your recollection, but do you remember in May of 2011 you sent an e-mail out to the yoga community and Craig's List about the practice of OM? Do you remember that?
A No memory of that.
Q Let me show you DX 3-BN.
THE COURT: Sorry. You faded out when you turned around.
MS. COHEN: Sorry, 3. B, as in boy, N, as in Nancy .
THE COURT: Thank you.
Q And just at the top --
THE COURT: There is no way anyone is going to be able to read that off the screen. It's just too small.
THE WITNESS: Agreed. Thank you.
MS. COHEN: You're welcome.
THE COURT: It's not even easy in hard copy, but we will work with that.
Q Do you recognize your e-mail address at the top?

A Yes.
Q And I know there is a lot of e-mail addresses listed here. But if you look at the top, does it refresh your recollection that this was sent out to the yoga center and Craig's List?
A I do see where it says an e-mail address for a yoga center. I don't know what you mean by Craig's List.
Q Just looking at some of the e-mail addresses, I think we can agree that there is a page and a half of e-mail addresses.
A I'm not sure what that has to do with Craig's List, but there are a lot of e-mails here, yeah.
Q Well, if you go to the top, the very top --
MS. COHEN: Just zoom in.
Q Do you see that it was sent -- you said to the yoga arts. Do you see a Craig's List address there as well?
A There is an e-mail address that says numbers at Craig's List dot org, so that was someone's e-mail address, I'm assuming.
Q Again, it goes all the way down to the next page. This was sent to people beyond OneTaste; correct?
A Yeah. It was. Yeah.
Q Okay. And you wanted to share in this e-mail how the movement had -- of OneTaste had impacted your life; right?
A Yeah.

Q Okay. Now, you described, when you first started testifying --

MS. COHEN: You can take that down.

Q When you first started testifying yesterday, you described Rachel as a friend, right, Rachel Cherwitz?

A I did, yes.

Q And a mentor?

A Yes.

Q And you joined the sales team about a one and a half to two years in; is that right?

A I think so.

Q Okay. And no one forced you to join the sales team; right?

A No.

Q And, you know, you -- you talked about Rachel being the one who taught you how to do sales; right?

A She did.

Q And she was -- she was good at sales; right?

A She was.

Q And she could be a tough boss; right?

A Yeah.

Q But you learned through example; right? Or as an example?

A What's the question?

Q You learned sales tactics through Rachel; correct?

A I did, yeah.
Q And she supervised you; right?
A She did.
Q In fact, you ended up teaching sales to other people; correct?
A Not to my memory.
Q Okay. Well, let me refresh your recollection -- or maybe not teaching, but do you remember before -- do you remember posting about sales?
A No.
MS. COHEN: Can we show just for the witness 3-DF, D, as in David, F, as in Frank.
You don't have this? Just for the witness.
THE COURT: I have it.
MS. COHEN: This is kind of hard to see, so I'm going to kind of....
THE WITNESS: Thank you.
Q Okay. Do you recognize this?
A I don't.
Q Is this -- do you recognize your name at the top?
A I do.
Q And do you recognize this as a post?
A It looks like it's a Facebook post.
Q And it is your Facebook account; correct?
A It is.

Q And the date, October 14, 2012, that would have been when you were in Vegas; correct?
A Yeah.
Q And you were in charge of sales in Vegas; right?
A I was.
Q And in this post, you talked about what sales is; right?
A I make a statement about --
THE WITNESS: Am I allowed to read off of this?
THE COURT: No.
MS. COHEN: Your Honor, the let me just ask a couple more questions.
Q Ms. Wright, do you -- you posted this to tell the community what you were feeling at the time; correct?
A I honestly don't remember don't know. I don't remember writing it.
Q Do you have any reason to doubt that you did not write this?
A No, I don't.
I'm just saying I don't know what my intention was, but I don't remember writing this. There's a mixture of different things that I've written here, and I'm not totally sure what the purpose of the post was.
Q Okay. So you were head of sales in Vegas at the time; right?
A I was.

Q And part of being sales was selling OneTaste products; correct?
A 100 percent.
Q And you would post in order to get people to buy products from OneTaste; correct?
A Sure. Yeah. As an active promotion, I would post on Facebook.
Q And you would also post to the OneTaste community; correct?
A I don't know what you mean by that.
Q Well, people in OneTaste would also see your posts; correct?
A I'm not sure if you are referencing to like a Facebook group that OneTaste was part of it. I don't really know what you mean by that. I imagine other people in my community saw my posts, yeah.
Q You were also, in addition to selling, you were also coaching when you were in Vegas; correct?
A I was, yeah.
Q And part of coaching people is instructing them on sales as well? Isn't that one part of coaching, what you did?
A No, nothing to do with it.
Q Fair to say in this post -- do you recall that you were posting about what sales is and what you do when you try to sell someone something?

A Yeah. I guess so.
Q I mean, yesterday you testified that Rachel Cherwitz would say don't take no for an answer. Do you remember that?
A I didn't testify yesterday.
Q I'm sorry. The day before. Days are running into each other. Monday?
A Can you ask the question again.
Q That you testified that Rachel at one point the sales culture was not taking no for an answer?
A Yeah, that's true, yeah.
Q And you said that Rachel was a mentor of yours; right?
A She was.
Q It's fair to say in this post, though, you were saying to the community yes, you continue with someone and no, you end the conversation? Do you remember saying that?
A I don't remember writing this post, but that is what it says.
Q And that honesty is the best friend in sales. Do you remember saying that?
A I don't remember writing this post, but that is what it says.
Q Okay. And this post is, at the time, in 2012; correct?
A That's what it says.
Q And that's when, again, you were actively selling on behalf of OneTaste; right?

A That's true.
Q And Rachel was the person who you learned from; correct?
A Initially, yeah. She's not the only person. But, yeah.
Q And you also claimed that you were overworked at OneTaste?
A I was.
Q That you didn't sleep very much. You said that; right?
A I did.
Q And I think you testified that you worked around the clock?
A I did.
Q And that you didn't want to work all those hours; is that right?
A No, I think I would have preferred to have a little more rest.
Q And you never told anyone that; right?
A I can't say that that's true.
Q You can't say that you never told anyone that?
A I can't.
Q I'm sorry. I didn't hear.
A No, I cannot say that I never told anyone that I wanted to work around the clock.
Q In fact, you told people that you did want to work all those hours. Do you remember that?
A I don't, no.

MS. COHEN: Actually, Your Honor, do you want to go until 1:00?

THE COURT: Do you need time?

MS. COHEN: Yes.

THE COURT: Okay. Then we can do a lunch break now.

MS. COHEN: Okay.

THE COURT: So the witness can step down.

(Witness steps down.)

THE COURT: Okay. We will will do the lunch break now. If you could come back at ten minutes to 2:00. Enjoy your lunch. Keep an open mind. Don't talk about the case. Don't let anyone talk to you about the case. And we will see you back at 10 to 2:00.

All right. I will see everyone back at 10 to 2:00.

(Lunch recess.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Yes. We can get the witness and we'll get the jury, as well.

(Pause.)

(Witness entered and resumed the stand.)

THE COURT: You can just come back up here.

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Cohen, you may proceed.

MS. COHEN: Thank you, Your Honor.

(Continued on the following page.)

**MICHELLE WRIGHT**,

previously called as a witness by the Government and duly sworn/affirmed by the Courtroom Deputy, was examined and testified further as follows:

CROSS-EXAMINATION (Continues)

BY MS. COHEN:

Q Ms. Wright, I want to go back to the story that we were talking about, the long one before the break.

I've put up in front of you two documents, just to refresh your recollection.

Sorry, let me -- you said that you didn't remember the timing of this story. You testified about that, right?

A Uh-huh.

Q And you didn't remember who or what it was for, right?

A I did not, no.

Q Okay. So just --

THE COURT: What exhibit are you talking about?

MS. COHEN: Sorry. We just handed up to Your Honor, I was just about to say Defense Exhibit 3-DR — D as in dog, R as in Robert — and 3-E, as in Edward, A, as in apple.

THE COURT: Thank you.

MS. COHEN: And the witness has a copy of both.

Q Does this refresh your recollection that you sent this story to Nicole Daedone and Robert Kandell?

A I can see that I did. I don't remember.

Q And does it refresh your recollection that you felt that it was profound to write the story and you thanked them for the opportunity?
A That's what it says here.
Q Okay. Now going back to this story, what you wrote here, and this is Defense Exhibit 3-B, as in boy, R, as in Robert, that we looked at before.
In this story you talked about how you were feeling before you arrived at OneTaste in one part of it, right?
A In one part of it, yeah. I mean I just -- I still haven't read the entire thing, just so you know.
Q Well, that's okay. I'll refer you to specific paragraphs.
But you described how you were tattered when you arrived at OneTaste, right?
A Um....
Q If you go to the second page -- sorry, third page. Third paragraph down.
MS. COHEN: We could pull this up. Oh, you have it?
A I see it.
Q Okay. And you described that you were tattered when you got to OneTaste, right?
A I see that that's what I wrote, yeah.
Q And you also felt deeply resentful at yourself, right?
A I see that that's written here, yeah.

Q You were resentful at Maddie, correct?
A There were definitely things I was resentful about, yeah.
Q You were resentful at sex, right?
A I see that I wrote that, yeah.
Q You were resentful, you said you were resentful about a lot, correct?
A Sure.
Q And you didn't trust anyone at that time, right?
A I am not gonna make that blanket statement about myself at that time, but I see that that is what's written in this document.
Q You were writing about your feelings at the time that you arrived at OneTaste, right?
A I was. And as I stated earlier, I don't know how complete and accurate of a picture this is of everything that I felt, especially given that I was sending it to my employers.

Like, do you always tell your employers absolutely everything about how you feel?
Q Well, in fact, whether you did or not, these were your words and your feelings, correct?
A That's true.
Q Right. And you felt that you were buried inside layers of shame and fear and victimhood and rage, right?
A I'm sorry, I don't -- like, I don't remember every word

of this document, so I don't -- it's a little challenging for me to reference it.
Q Yes. Well, it's up on the screen, highlighted.
Does that refresh your recollection that you wrote at the time that you were buried inside layers of shame, fear and victimhood, martyrdom and rage?
A I don't remember writing this document, so that will be my answer every time. It's not like recalling my memory. I don't remember writing it.
Q Okay. But there are details about you living in Arizona, right?
MS. GUPTA: Objection.
THE COURT: Yes, sustained.
Q You described your childhood and living in Arizona in this document, correct?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q Does this refresh your recollection as to whether you described your childhood and time in Arizona?
A This paragraph right here on the screen?
Q No. Let's go to the first paragraph on this page.
Does this refresh your recollection that you talk about a time in Arizona?
A It does --
MS. GUPTA: Objection, asked and answered.

THE COURT: Sustained.
BY MS. COHEN:
Q Does this document refresh your recollection that you also discussed your time at the yoga ashram?
A It does.
Q And you were the one that did these things, correct?
A (No response.)
Q You lived in Arizona, right?
A I did.
Q And you lived in a yoga ashram, right?
A I didn't live there --
MS. GUPTA: Objection --
Q Sorry, withdrawn.
You spent time or practiced at a yoga ashram, right?
MS. GUPTA: Objection, asked and answered.
THE COURT: Overruled.
A I did, yes.
Q You were describing things in your life, correct?
A I believe I was.
Q And you also described that when you started OMing, you realized that you actually had a shell, do you remember that?
If you go down to the last paragraph of this document.
A The last paragraph where?
Q Sorry, the document -- we're going to pull it up.

THE COURT: Does she still have the hard copy? It might be easier?

MS. COHEN: Yes. Yes, she does.

Q Last paragraph, last page.

THE COURT: Whatever's easier. If it's easier to look at the hard copy --

THE WITNESS: I don't know what page we're on, so I have no way of knowing --

MS. COHEN: We're on the third page --

THE WITNESS: In reference to the hard copy, there's no page numbers, so I don't know what you're referencing to.

BY MS. COHEN:

Q Okay. So on the bottom there's a number 10261. It's the third page in the document, last paragraph.

A Yes. Last paragraph?

Q Yes.

A What's the question?

Q You didn't know before doing OM that you had a shell?

A Yeah, I see that here.

Q And that OM made you realize that you were angry, right?

A Again, this document does not necessarily -- necessarily reflect everything about my experience at that time. So yes, that is what it says here, but there's more to reality than what I wrote in this document.

Q You were describing how you felt when you first started

OMing, correct?
A I was.
Q Is it your testimony that you were lying about how you felt when you first started OMing?
A No, I'm not saying that. I'm just saying it's maybe not necessarily absolutely everything that was happening.
Q Your -- and I think we said that this was -- this was sent in March of 2012.
Did that refresh your recollection of that?
THE COURT: Sorry. Can you just ask a question? I'm going to sustain that question.
What is your question to her? Not what you're telling her.
BY MS. COHEN:
Q Do you remember when this document was sent?
A I don't remember writing this document for the tenth time. So, I don't know.
Q Okay. But we looked at Defense Exhibits DX 3-EA and DR?
A We did. I see what you're referencing to, and I'm just telling you I don't have a personal memory of writing this.
Q But this was your e-mail and it was sent on March 14th, 2012, correct?
A It looks that way, yeah.
Q Okay. And you also described that you didn't realize you had a roaring sexual beast that wanted more than just Maddie,

right?

MS. GUPTA: Objection, relevance.

THE COURT: Sustained.

Q Do you remember writing that?

MS. GUPTA: Objection.

THE COURT: Asked and answered, or what's the objection?

MS. GUPTA: Yes, Your Honor.

THE COURT: Sustained.

BY MS. COHEN:

Q You -- you participated in something called a beast exercise, correct, when you were at OneTaste?

A Yes, that's an exercise that we did.

Q In fact, you taught that exercise yourself, correct?

A Um, I don't know if I taught it. I think I helped facilitate it as part of some of our larger programs.

Q But -- well, you had spoken about the beast at -- on several videos.

Do you remember that?

A Sure. I imagine I did.

Q And, in fact, at the time that you first started OMing, you realized that your beast had been kept in a cage for a long time and that your beast was pissed, right?

MS. GUPTA: Hearsay, relevance.

THE COURT: Sustained.

MS. COHEN: Your Honor, I'm not offering this for the truth, but how this witness felt at the time.

THE COURT: Sustained.

BY MS. COHEN:

Q As you began to OM, you began to trust yourself more, right?

A I had a lot of experiences. I don't know that that's specifically what I would say about it.

Q Okay. Well, going back to this document on the following page, the fourth page marked 10262 at the bottom. Down to the third paragraph, second sentence.

Does this refresh your recollection that you began to trust yourself more from OMing?

A Yeah, it looks like that's what I said.

Q And, in fact, you began to trust Maddie more, correct?

A It looks like that's what I said.

Q And you also in the two years you were at OneTaste, your relationship with Maddie expanded and contracted indefinitely, right?

A I did read that somewhere in here.

Q Well, it started sometimes you were together and sometimes you weren't, correct?

A I don't think that's what expanded and contracted means in that context. I think it means that our relationship changed over time.

Q You -- in fact, it went from a finite and a fixed version of codependence and mostly monogamous, right, to an open bisexual relationship, right?
A Sure. Technically, yeah.
Q And at the time you wrote this, Maddie was no longer your girlfriend, right?
A I don't know.
Q Well, if you look on the -- the last paragraph on 10262, the fourth page.
Does it refresh your recollection that at this time Maddie was no longer your girlfriend?
A What I read is no longer my girlfriend in quotes. So, to be honest, I'm not totally sure what I meant by putting quotes around that.
I -- I would say that in my experience, we were together throughout my time there and that the way in which that manifested changed often.
Q She was always your friend, right?
A That's true, yeah.
Q Oh, what you would describe as a life-long friend, right?
A I can't say that we're friends now, but she's someone I care about.
Q At the time you felt like she was a life-long friend, correct?
A I did, yeah.

Q Okay. And -- and as a result of -- of OMing, you also felt that sex and intimacy with men was something you also openly craved at the time, right?
A I mean I had been with men at lots of different points in my life, so I don't think OM was something that showed me that. I -- that is an experience I had at OneTaste.
Q And you felt that opening up your sex not just to men, but to the world, enabled you to gain the world, right, that's how you felt?
MS. GUPTA: Objection, hearsay.
THE COURT: You're asking her how she felt, you're not asking her about any document at this point, correct?
MS. COHEN: Correct.
THE COURT: Yes. Overruled.
A I'm not sure what the question is.
Q Did you feel like you -- by opening up your sex to the world, you gained the world; is that something you felt at the time?
A I -- are you referencing to a particular line in this document?
BY MS. COHEN:
Q I'm just asking you the question: Is that how you felt?
A Do you know what you mean when you say opening up your sex?
I mean does that mean something particular to you?

Q What does it mean to you?
A I guess it means to feel empowered in one's sexuality.
Q And that was actually an important philosophy of OneTaste, correct?
A It was, yeah.
Q And that -- because of that, you felt you gained the world, correct?
A I don't know.
Q Well, you felt that at the time you wrote this document, right?
A Is there a place in here that you're trying to get me to look at that says those words? Because I don't know that that's how I would describe it.
Q Okay. Well, take a look at 10263, the last paragraph of this document.
A It does say those words.
Q And you wrote those words, correct?
A I guess I did.
Q And because of OM, some of the most -- you now felt that you had sensitivity, correct?
Just asking you if you remember whether you felt you had sensitivity because of OM?
A I think I'm unclear. Like, are you asking me to reference this document? Are you asking me just what my general feeling about my experience of OM is?

Because they're different things. I don't remember writing this.
Q Okay. At a time did you feel that OM made you more sensitive?
A Yeah, absolutely.
Q Okay. It made you feel compassion?
A I don't know, I wouldn't necessarily describe it like that.
Q It made you feel -- well, you wouldn't describe it now, but you described it back then as that.
Do you remember?
A I don't remember --
Q I can refresh you. Okay. So, take a look again at that paragraph.
A The same, the last paragraph?
Q Yes, third sentence.
A What's the question?
Q Did you feel that -- do you remember feeling that OM made you a more compassionate person or feel compassion?
A It says --
Q Not what it says.
A Am I allowed to read it?
Q No, sorry.
A That actually isn't what it says. So, I'm not sure what you're trying to get at.

Q All right. Do you feel -- did you feel at the time that sensitivity, innocence and compassion were some of the most strong and most vulnerable traits you could name as a result of OM?

MS. GUPTA: Objection, hearsay.

THE COURT: Overruled.

A You did just read a sentence out of this document. It says that.

Q Okay. And these were your words, correct?

A I think they were.

Q Okay. Now, right before the break we also were talking about the hours that you testified that you worked around the clock. Right?

A (No response.)

Q And you said --

MS. COHEN: And we can take that document down. Sorry.

Q And I had asked you, do you recall -- well, do you recall teaching CP6?

A I never taught CP6, no.

Q Do you remember speaking at CP6?

A Not as a presenter, no.

What do you mean by that?

Q Well, in September of 2013 you were in Vegas, correct?

A I was, yeah.

Q And do you remember talking to the students in CP6 that time?
A What time?
Q In September of 2013.
A No. I mean you're gonna have to give me a more specific reference.
Q Okay. Do you remember telling the students in CP6 that when you make new friends and they're -- ask you about how much you work all the time, you replied: I don't need your pity. I have a great life. I love what I'm doing; do you recall that?
A No, I don't.
Q Okay.
MS. COHEN: Can we play for -- just for the witness --
THE COURT: What's the question you're going to ask her?
You want to ask her a question?
If you're trying to refresh her memory, you've got to ask her a question.
MS. COHEN: I just asked her if she remember saying that.
THE COURT: I know that question, but do you have another question?
MS. COHEN: Okay.

BY MS. COHEN:
Q Do you remember -- yes. Would anything refresh your recollection as to saying that?
A I have no idea.
Q You made a speech in September 2013 in Las Vegas. Do you remember that?
A In Las Vegas?
Q Yes.
A First of all, CP6 was never held in Las Vegas. So if you're trying to reference something about CP6, that makes no sense.
Q Okay. Well, where was CP6?
A I believe it was mostly New York. Might have been San Francisco. I honestly can't remember which one was where. There were many.
Q Okay. It's possible I got it wrong. It could be another coaching program.
Do you remember speaking at any coaching program in September of 2013?
A I was a staff member that participated in the coaching programs during that time. I don't know what you mean by was I speaking at the coaching program. I wasn't a teacher. I wasn't a presenter.
Q Well, September 2013 was during CP6, correct?
A I don't know. I honestly don't know the dates of CP6.

MS. COHEN: Well, Your Honor, I would like to refresh the witness's recollection of speaking at an event, see if she can remember where she was.

THE COURT: Okay. So you're going to show her something?

MS. COHEN: Yes.

THE COURT: Okay.

MS. COHEN: And this is, for the Court, is a video marked for identification as Defense Exhibit 3, D as in dog, G as in golf. And I also have a transcript just for --

THE COURT: I'll take the transcript because this computer wasn't set up yet.

MS. COHEN: Okay.

I'm just going to play one clip, so we can move it along, Your Honor, 3:13 to 3:58.

And I'm going to hand up to Your Honor -- or do you have a transcript?

THE COURT: If it's marked, you can give me the number and I'll look, but I don't have anything.

MS. COHEN: It's marked as 3DG-T for transcript.

THE COURT: Sorry, I don't -- well, give me a minute. I don't think I have it.

MS. COHEN: We did hand it up, but we can --

THE COURT: Okay. Well, give me a minute. Let me see if I can find it.

Thank you.

MS. COHEN: You've got one?

(Audio recording played for the witness only.)

THE COURT: That doesn't seem to be loaded on the computer that I was given. I'm going to look at the transcript, but it's not here.

MS. COHEN: Sorry.

THE COURT: That's okay. Go ahead.

MS. COHEN: Our paralegal could come up and try to find it.

THE COURT: I don't want to delay things. You can go ahead.

MS. COHEN: Okay.

BY MS. COHEN:

Q Ms. Wright, does that refresh your recollection of speaking about work to -- or do you remember what that was?

A No, I have no memory of saying that or why it was recorded or where or when it was.

Q Okay.

MS. COHEN: I'm sorry, Kamille, can we go back up?

Q Let me -- since that didn't refresh your recollection, let me just -- if you could listen to the first couple of -- just the minute of the beginning to see if that brings you back to give you more context.

A No problem.

Q And this is 0 to 1:26.

(Audio recording played for the witness only.)

A This isn't giving a lot of context for a time period. I reference a talk that Joanna gave. That's the only reference point it's giving me.

BY MS. COHEN:

Q Okay. You recognize your voice, correct?

A Yeah, I did.

Q And that was you speaking, right?

A Yes.

Q And you said you referenced a talk that Joanna gave, right?

A Yes.

Q And does it refresh your recollection that, in fact, you told -- you were talking to other people, right?

A I assume so.

Q Okay. In fact --

MS. GUPTA: Objection, that's a speculation.

THE COURT: Overruled.

Q In fact, when you were speaking on it, you referenced "you guys," right? Do you remember that?

A I did, yeah.

Q And you talked about the fact that being stretched makes the thing -- makes your life different from another job you could have.

Do you remember that?
A Um, that's like a paraphrase, but yeah, the concept it true.
Q You said that.
And you actually talked about the experience when you tell people out in the world, and when you make new friends, about your job, they ask you: Why are you working all these hours?
Do you remember saying that?
A Yeah, I --
MS. GUPTA: Objection, hearsay.
THE COURT: Yes, sustained.
BY MS. COHEN:
Q You said those words, right?
A I did hear that in the recording.
Q And those were your words recorded, right?
A It sounds like me.
Q And you told whoever you were talking about that when people ask you about that, you tell them: I don't need your pity, I have a great life, I love what I'm doing; correct?
MS. GUPTA: Objection, hearsay.
THE COURT: Response.
MS. COHEN: Your Honor, I asked her if she remembered saying that. She said no.
I asked her if this refreshed her recollection, and

I'm asking her if she remembers saying this.

THE COURT: Overruled.

You may answer.

A I don't remember this talk. No, I don't remember giving it.

Q Okay. But those are your -- that was your voice, correct?

A Yeah, that was my voice. Yeah.

Q Okay. And you said those things at the time, correct?

A If there's a recording of it, that's true, yeah.

Q And --

THE COURT: Sorry. I'm just going to ask you to sit back, unless there's something immediately you're going to be doing up there.

MS. COHEN: Just one moment.

THE COURT: Okay.

(Pause.)

MS. COHEN: Okay. We may -- we may need her.

THE COURT: That's fine.

MS. COHEN: Just one question.

THE COURT: That's fine.

BY MS. COHEN:

Q Do you remember also talking to another class about how OneTaste operates differently than a lot of other businesses, do you remember that?

A No, I don't.
Q Do you remember saying in August 2013 that you operate by the rules of play, rather than the rules of production?
Do you remember saying that?
A I don't remember saying that, no.
Q All right.
MS. COHEN: If you could also play Defense Exhibit DH, just for the witness. And I have a transcript.
Your Honor, do you need a copy of the transcript?
THE COURT: Yes, I think I do. But I might have it.
Oh, I have it. I have it. Sorry, you said DH. I have it.
MS. COHEN: Do the whole thing.
THE COURT: So, DH is the recording and DH-T is the transcript, is that right?
MS. COHEN: Is the transcript, yes.
THE COURT: Okay.
(Audio recording played for the witness only.)
BY MS. COHEN:
Q And you just listened to that.
Does that refresh your recollection that you discussed how OneTaste operates differently than a lot of other businesses?
A It does say that in the recording, yes.
Q And that was you being recorded?

A It sounds like my voice, yes.
Q And you also -- does it refresh your recollection that you said that we operate by the rules of play rather than the rules of production?
Do you remember that?
A I don't remember any of it. But yes, it says that in the recording.
Q You said that in the recording, correct?
A It is a recording of me talking.
Q And you indicated that -- does it refresh your recollection that you said every person there is there of their own volition because they want to play, right?
A It says that, yeah.
Q Again, you said that --
A Yeah.
Q -- correct?
A Yep, I did say that.
Q Okay. Now, you first signed up -- you signed up for CP3 was the coaching class you took, correct?
A It is.
Q And that was back in November of 2010. Does that sound right?
A That sounds right.
Q And that was a -- about a 10-month program, coaching program, correct?

A I thought it was a year, but it could have been ten months.
Q Yeah, okay, a year, that makes sense.
And that was when you first moved into 1080, correct?
A Yeah.
Q And you didn't have any money at that time, correct?
A No.
Q And you, in fact, signed a --
MS. COHEN: Can we, just for the witness, show --
Q And I'm going to just show you what's been marked for identification as Defense Exhibit 3B, as in boy, H, as in happy.
I can also walk a copy up for the witness.
THE WITNESS: Thank you.
BY MS. COHEN:
Q And on that -- when you -- when you signed up for this class, you received a payment plan.
Do you remember that?
A Yes.
Q And you knew exactly how much the class was going to cost, correct?
A I did.
Q And you signed up for it anyway, correct?
A I did.

Q And OneTaste allowed a payment plan, right?
A They did.
Q And to pay for the course, you were doing work trade, correct?
A Correct.
Q Now, we --
MS. COHEN: You can take that down.
Q -- we also -- you also testified on or took a look at a document that's already in evidence, Government Exhibit 1045-R, as in Ralph.
And this was --
MS. COHEN: This can go to the jury, it's in evidence.
(Exhibit published.)
BY MS. COHEN:
Q And this was a list of your desires, right?
A That's what it looks like, yeah.
Q And you wrote this in September 2011, correct?
A That's what it says.
Q And you sent that to Nicole Daedone, right?
A I did.
Q And you sent it to the 1080 residence, right?
A Uh-hum.
Q And at the time, Rachel Cherwitz was also living at 1080, is that right?

A She was.
Q And so both would have seen this, presumably would have seen this?
Well, you sent it to Nicole and you sent it to everyone at 1080, correct?
A Presumably, she could have seen it.
Q And in this e-mail you talked about the things that you wanted to accomplish, right?
A That's what it looks like.
Q You wanted to teach courses, right?
A Yeah, it says that.
Q You wanted to train others with OM, right?
A Uh-hum.
Q You wanted to help the business flourish?
A Yep.
Q You wanted to own your own branch of the business, right?
A I guess.
Q And you wanted to help plan and design new ways to reach people, right?
A That's what it says.
Q And that was how you felt at the time, correct?
A It sounds like it, yeah.
Q Okay. Now, while you were at OneTaste, you -- while you were living at 1080, we already talked about that you -- you had a lot of fun, right, at the beginning?

A There was fun sprinkled throughout the whole thing, yeah.
Q You had fun. You made -- you made deep friendships, correct?
A I did, yeah.
Q You went out with people from 1080 from time to time to restaurants, right?
A I don't have a lot of memory of that, honestly. We went to the cafe nextdoor sometimes.
Q Well, let's see. Let me just see if I can refresh your recollection.
MS. COHEN: Can we show the witness DX 3-AR?
BY MS. COHEN:
Q Can you see this on your screen?
A Yeah.
Q Do you recognize it?
A Yeah.
Q And what is it?
A It's a picture of myself and Maddie and Dana and Drea and we are -- I believe that's the cafe nextdoor to 1080.
Q And this was from March of 2011?
A That's what it says.
Q Is this something that was posted?
A It looks like a Facebook post made by Aubrey.
MS. COHEN: Your Honor, at this time the defense moves Defense Exhibit 3-AR into evidence.

THE COURT: With or without text?

MS. COHEN: There's nothing substantive, so we'd offer with.

THE COURT: Okay. Is there any objection?

MS. GUPTA: No objection.

THE COURT: Okay. So it's Defense Exhibit -- sorry it's not stamped there, is it?

MS. COHEN: Yes, it is.

THE COURT: Okay. 3-AR is admitted.

(Defense Exhibit 3-AR was received in evidence.)

MS. COHEN: Yes. You can publish that to the jury.

(Exhibit published.)

BY MS. COHEN:

Q And are you -- it's hard to tell in the picture which one is you?

A The one on the right.

Q And the one all the way on the right, okay.

And is that Maddie next to you?

A Yeah.

Q And then who is she, the woman who's kissing her?

A That's Dana.

Q Dana.

And who is the other person?

A Drea.

Q Drea. And you --

MS. COHEN: Let's also show DX 3-AS.

BY MS. COHEN:

Q Do you recognize this photograph?

A I do.

Q And who is that?

A That is myself and Audrey Wright.

Q And who is Audrey?

A She was one of my colleagues at OneTaste.

Q And is this from -- this is from a July 2011 posting?

A That's what it says.

Q Do you remember where you were?

A We were at -- what's the name of that park? It's such an awesome park. I can't remember the name of it in San Francisco.

Q Okay, a park in San Francisco.

MS. COHEN: Your Honor, at this team the defense offers Defense Exhibit 3-AS, as in Sam.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibit 3-AS is admitted.

(Defense Exhibit 3-AS was received in evidence.)

(Exhibit published.)

Q Okay. And let me also show you Defense Exhibit 3-AT.

Do you recognize this?

A I do.

Q And who is that?
A That's myself and Aubrey.
Q And where are you?
A We're in the backseat of a car.
Q Okay. And this is from -- is it from April 10th, 2013, it seems like a post?
A That's what the date is on the photo.
Q And is that when you would have been living in Las Vegas -- oh, no, actually right after, right?
A I believe I was already in Vegas at that time, yeah.
Q Okay.
MS. COHEN: Your Honor, at this time we'd offer Defense Exhibit 3-A, as in apple, T, as in Tom.
THE COURT: Any objection?
MS. GUPTA: Objection as to relevance.
THE COURT: Do you want to make a proffer?
MS. COHEN: Sure, Your Honor.
THE COURT: Or ask another question to lay the foundation.
MS. COHEN: Yeah.
BY MS. COHEN:
Q You -- you just testified that this was Aubrey Fuller, right?
A And myself, yeah.
Q And yourself.

And this is -- I think you also testified that you left Las Vegas in October 2013?
A It was around that time, yeah.
Q Right. And in April of 2013 you were living in LA at that time, right?
A No. I don't -- I was not in LA yet.
Q Okay. So wait, you -- I'm sorry. You -- you left -- oh, right, okay.
You were still in Vegas at this time in April 2013, because you left in October 2013?
A Correct.
Q So you were in Vegas at this time.
And you were very close -- were you dating Aubrey Fuller at the time?
MS. GUPTA: Objection, relevance.
A No, she's my friend.
THE COURT: It's sustained.
MS. COHEN: Your Honor, in terms of the relevancy, I'm offering it in terms of what was going on around the time of 2013, and this witness testified as to how she was feeling in Las Vegas and --
THE COURT: I'm going to sustain the objection.
MS. COHEN: All right. Okay.
BY MS. COHEN:
Q Showing you DX 3-AU. Do you recognize this photo?

A I know the people in the picture.
Q Okay. And who's in this picture?
A It's Aliyah (phonetic) and Dustin and Sasha, and I can't remember the other people's names.
Q Are these people you met through OneTaste?
A I don't know if I met all of them, but most of them, yeah.
Q And did all of them work for OneTaste?
A No.
Q And is this -- did you visit Texas at some point?
A Not while I was working for OneTaste.
Q Do you remember where this photo was taken?
A I don't, honestly.
Q And this was from August 2013.
Is that when you were in Las Vegas?
A Yes.
MS. COHEN: Your Honor, at this time we offer Defense Exhibit 3-AU.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 3-AU is admitted.
(Defense Exhibit 3-AU was received in evidence.)
(Exhibit published.)
THE WITNESS: Your Honor, am I allowed to say anything?

THE COURT: No. You can respond to the questions, unless you need a break or something.

THE WITNESS: No, I'm good.

THE COURT: Okay.

BY MS. COHEN:

Q Okay. You also testified that -- well, you -- you had a, originally had a close relationship with your parents when you grew up in Long Island, right?

A I grew up in Rhode Island.

Q Rhode Island, yes. Sorry, Rhode Island.

But prior to OneTaste your relationship with your parents wasn't great, right?

A No, I didn't -- don't think I said that.

Q You don't remember telling the Government that prior to OneTaste, your relationship with your parents wasn't great?

A I don't remember saying that, no.

(Pause.)

MS. COHEN: Okay. Can you pull up, just for the witness, and I'll -- do you have a copy as well -- Government Exhibit 3500-MW-2, and go to page 7. The top paragraph.

Q Ms. Wright, let me know if you'd like a --

THE COURT: She needs a hard copy.

MS. COHEN: A hard copy, yes.

THE COURT: Actually, I don't know that I have this either.

Sorry, what's the number you said again?

MS. COHEN: 3500-MW-2.

THE COURT: Okay. I do have it. Thank you.

BY MS. COHEN:

Q Just the first top paragraph.

A Thank you.

Q Does that refresh your recollection?

A What I state here is that I struggled with my parents during my time at OneTaste, not before.

Q Okay. And do you recall posting in October of 2012 about telling your mother about the coaching program? Do you remember that?

A I don't.

Q And also on the same paragraph, do you see a little bit further down where you -- does that refresh your recollection, the last -- second-to-last -- sorry, second-to-last sentence, that prior to OneTaste you told the Government that your relationship with your parents wasn't great?

A I do see that here, yeah.

(Continued on the following page.)

BY MS. COHEN: (Continuing)

Q And showing you what has been marked now for identification as DX 3-CO.

And I'll just provide a copy as well, since it's dark.

If you have a chance to take a look at this and see if it recollects -- refreshes your recollection about telling your mom about the coaching program.

A Yeah, I remember this conversation with my mom.

Q And you remember -- does it refresh your recollection that you also told her about OMing?

Correct?

A Yes.

Q And that, in fact, loving and understanding with your mom was an amazing growth process.

Do you remember saying that?

A I do. Yeah, it says that here. Yeah.

Q So, in fact, OM helped you improve the relationship with your parents, correct?

A That isn't what it says.

Q Well, you wrote about how the road to accepting and then approving and then loving and understanding with your mom has been an amazing growth process, correct?

A I did say that. And I don't credit it to OM. I just share that it's been an amazing growth process to that point

with my mother. But I'm not crediting OM for it.
Q Okay. And this was in October 2012 you wrote this?
A Yeah.
Q And, in fact, the reason you wrote about this -- strike that.
You wrote about this -- your desperate desire for her to understand you and approve, correct?
A Yeah.
Q And you had been, at this point, at OneTaste for two years, right?
A About that, yeah.
Q And again, after OneTaste, you went back and lived with your parents, correct?
A Several years later, yeah.
Q Now, we talked about the story that you wrote about how you felt before OneTaste.
You also wrote, in November of 2012, again about how you felt, where you were before OM. Do you remember that?
A Do I remember the reference in the document?
Q No, sorry. I'm talking about another.
Do you remember sending another e-mail about where you were before OM?
A Are you referencing to something specific? I don't know what you're talking about.
Q I'm asking if you remember sending an e-mail about that.

A No, I don't.

MS. COHEN: I'm going to show to the witness, for identification, Defense Exhibit 3-B, as in boy, P as in Peter.

I'll bring up a copy as well.

A Do you want me to read the entire document?

Q No. I'll just refer you to specific things.

My question first is does this refresh your recollection that you wrote -- you sent an e-mail in November of 2012 about where you were before OM?

A I see that that's what this is. I don't remember writing it.

Q But this -- do you recognize your e-mail address there?

A I do.

Q And you recognize the e-mail address of the person you sent it to?

A I do.

Q And who is that?

A Eli Block.

Q And do you remember being asked to write something about where you were before OM?

A I think OneTaste was often looking for testimony to OM and how it had changed our lives, so yeah, I have a memory of those things being asked of us.

Q And, in fact, you wrote about the vicious cycle of relationships you had prior to OneTaste, right?

A It says that, yeah.
Q And that, in fact, before OM, things weren't really working too well.
You talked about that, right?
A I don't see those words.
Q Well, if you look at the third -- the -- let's see. We'll pull it up on the screen.
If you could just read the top.
THE COURT: To yourself.
Q Yes, to yourself. Sorry.
A Mm-hm.
Q Okay. So before OM, the formula, as you described as you felt about your life, wasn't working well, correct?
That's how you felt at the time?
A Yeah, it sounds like I didn't feel that great about my relationship patterns.
Q In fact, before you got -- before you -- before OM, you put your passions on hold.
Do you remember saying that?
A I don't remember saying that.
Q Does this refresh your recollection that you, in fact, wrote that?
A I can read that that's what it says here.
Q And you wrote this, right?
A I believe I did.

Q And that prior to OM, you were throwing all your self care out the window, right?
A That's what it says.
Q You were throwing your social life and skills to the wind.
That's also how you felt?
A That's what it says.
Q But that changed when you found OneTaste and orgasmic meditation, correct?
A If I'm not referencing to this document, I could say that probably a lot of what I'm talking about is about the year prior in which I was with Maddie, before coming to OneTaste, and that I did struggle with a lot of self-care during that time period. I don't think I'm referencing to my entire life.
Q No, not -- that's not what I'm asking.
I'm just saying, in November 2012, at the time, you wrote about the change that happened when you found OneTaste and orgasmic meditation, right?
A Yeah. Yeah, I did. Yeah.
Q And you stayed at OneTaste for -- for years, right?
A A little more than that, yeah.
Q Four to five years, yeah.
And again, you believed in the practice, correct?
A Yeah. Totally.
Q And it made you start to trust other people and your own

body, correct?
A I would say it definitely changed my relationship with my body, yeah.
Q And, in fact, what OM and OneTaste made you realize, that you had experienced what it was like to feel whole and confident without being attached to another person.
Do you remember saying that?
A It sounds familiar.
Q Well, if you take a look at the next page under "what I realized."
THE COURT: Maybe don't read from it, please.
MS. COHEN: Sorry, Your Honor. I didn't mean to.
Halfway through. Yeah.
A What section?
Q Do you see the bold there that's just highlighted?
A Yeah.
Q And the last sentence on the -- in the first paragraph.
A Yeah, that is what it says.
Q And does it refresh your recollection that you now learned what it was like, to experience what it was like to feel whole and confident without being attached to someone else?
Do you remember feeling that way?
A I remember feeling incredibly attached during that time period.

Q But these were your words that you wrote in November 2012, correct?
A They are my words, yeah.
Q And, in fact, you also felt that you had tasted freedom, right?
A I did say that.
THE COURT: Ms. Cohen, just approximately, how much longer do you have?
MS. COHEN: I have probably about another 30 minutes, Your Honor.
THE COURT: Okay. You can keep going.
MS. COHEN: Maybe a little bit longer, but.
THE COURT: Go ahead.
MS. COHEN: Okay.
Q And you posted often on the -- or you posted sometimes on the OM Hub.
Do you remember that?
A Vaguely, yeah.
Q Okay. And you posted about OM being power.
Do you remember that?
A I don't remember that specific post.
Q This document here, I'll hand up a copy. This is Defense Exhibit 3-CA. This is very small. We'll try it, but I think it's better on the screen. I will have her blow it up, but I'll just give a copy just in case.

A Okay. Thank you.
Q I will just refer to specific things and I will zoom in.
A Okay.
MS. COHEN: Okay. So if you could go to the second page and that big -- no, back up. Sorry. The second page of the document.
Can you blow up -- no, stay where you are.
Oh, it's on page 2. I'm sorry, you're right. Page 2. Sorry.
Yeah, the last -- yeah, you got it.
Q Actually, I'm sorry, I should have said, the question, that orgasm was power.
Do you remember writing about orgasm being power?
A It says, "Orgasm is the power that runs" --
THE COURT: Sorry, I ask you not to read from it.
Q Yeah, just what -- does this refresh your recollection that orgasm -- that you wrote that orgasm was power?
A That's not what it says.
Q Or that orgasm was power that ran through your body and awakened you to the truth.
Do you remember writing that?
A Yeah, it says that.
Q And you posted this, correct?
A It says my name. I don't remember it, but yeah.
Q And you also posted about how your OM practice was the

thing that grounded you into the present moment and your body.
Do you remember saying that?
A I see that that's what I wrote.
Q And that OM made you feel deeply connected to the people you love.
Do you remember writing that?
A I don't remember writing any of this, but I see that that's what it says.
Q And you talked -- in terms of OM, OM was something throughout your time that was very important to you, correct?
A Throughout my time at OneTaste?
Q Yes.
A I would say for a good portion of my time there it was very important. There probably came a point at which it was not.
Q And part of that, your practice at OneTaste, was to OM every single day, correct?
A That was the encouragement, yeah.
Q And, in fact, you posted about OMing, correct?
We can go through more.
Right? You posted about that?
A I did, yeah.
Q Yeah.
And we also looked at some writings that you made about how OM changed you, correct?

A We have, yeah.
Q And you didn't use OM as a sexual practice, correct?
A We were instructed not to view it in that way, but that does not mean that it was not sexual.
Q You were there for five years, almost, right?
A That's true.
Q And you OMed on a daily basis, correct?
A Sometimes many times a day, yeah.
Q And you wrote about your feelings at the time and how OM changed who you were, correct?
A It did, yeah.
Q It opened you up, right?
A That's kind of a vague statement. But yeah, it did a lot of things for me, it had a lot of positive effects.
Q It made you more honest, you said?
A I don't -- I don't know if that's how I would describe it today.
Q Well, we looked at some of your prior statements.
It made you feel more compassion, correct?
A I don't know if that's how I would describe it today.
Q I'm not asking you how you would describe it today. I'm asking you how you felt at the time, when you were at OneTaste, about OM.
A I think I felt a wide range of things about it, not all of which I wrote about in Facebook posts and letters to

Nicole.
Q And no one stood over your shoulder and made you -- told you what to write in these things, correct?
A No.
Q And at OneTaste, there was -- OneTaste taught about policies on saying no, correct?
A I don't have a strong memory of that.
Q Well, you made a video about if you don't want to say yes to an OM, you don't have to.
Do you remember making that?
A No, I don't remember that.
Q I'm sorry. Audio, I should -- yes, it was an audio. It was a voiceover for production.
You don't remember doing that?
A I don't remember that.
MS. COHEN: Okay. Can we show the witness...
Q Let's see if we could refresh your recollection with DX 3-CJ.
Does that refresh your recollection of -- or did you see yourself in this video and audio there?
A Yeah, I did.
Q And does it refresh your recollection that that was a voiceover for OM instructional video?
A I don't know. I don't know what that was for.
Q You have no recollection of doing that video?

A No, I have no idea.
Q But does it refresh your recollection that, in fact, you were giving instruction on saying not to say yes to an OM that you don't want to have, correct?
A It does say that, yeah.
Q You said that on the video, correct?
A I say that on the video.
Q And you also taught concepts at these coaching courses about green, yellow, and red.
You know what that is, right?
A I taught those concepts?
Q No. I said there were classes taught where they would describe green, yellow, red.
Correct?
A That was sometimes referenced.
Q And it was important to you to be in the inner circle at OneTaste, correct?
A It was.
Q You didn't want to just be somebody who did the practice, correct?
A I wanted to participate.
Q You wanted to be all in, right?
A I mean, there's not really a straight answer to that. I think I felt a lot of different ways and there were a lot of different pressures on me emotionally and spiritually and

psychologically. And a lot of the evidence that you're presenting, as I've said, is not the entirety of how I felt. And a lot of things that I wrote were products of me being asked to promote my story in a positive way so that other people would want to do this. And the reality, as you probably heard in my testimony earlier, is that it wasn't all positive. So yes, I may have written and said positive things, but, like, that's not the entirety of my experience.

Q You were writing things at the time that you were at OneTaste, correct?

A Obviously. Yeah.

Q Obviously.

It is now 2025, right?

A I believe it is.

Q Yeah.

And it's been years since you were at OneTaste, right?

A It's been 11.

Q 11 years.

And during that time, in the last -- since 2022, you've met with the Government over ten times, right?

A Yeah.

Q And you've gone through all of these -- you talked to the Government about your experience at OneTaste, right?

A I have.

Q And you're telling them about how you feel now about OneTaste, right?
A I have.
Q And at the time you wrote these stories and e-mails and posts, that was when you were at OneTaste, correct?
A The things you've shown me in the last little while, yeah.
Q And we were just -- I was just saying that it was important for you to be in the inner circle at OneTaste, right?
A I think that was part of what I wanted. And as I said before, I think there were a lot of other things at play that are not visible here.
Q I'm just asking --
A Yes-and.
Q You wanted to at the time, correct?
Is that a yes?
A It's a "yes-and." I think it's a lot more complex than just "yes."
Q You didn't have to move into 1080, correct?
A Nobody held a gun to my head.
Q You didn't have to go on the third floor, correct?
A I didn't have to, no.
Q And people on the third floor were more all-in at OneTaste, correct, as opposed to the second floor?

A That's one way of describing it, yeah.
Q In fact, you could have gotten a job outside of OneTaste at that time, right?
A Ostensively, I didn't really have the time, to be honest. Once I was participating fully in the community, it didn't really afford me the space to go do something like that.
Q When you got to OneTaste, you could have gone out and gotten a job, correct?
A Sure. I could have done anything I wanted.
Q Yeah. You were a college graduate.
You are a college graduate, right?
A I am.
Q You finished -- you spent money on classes to learn how to do massage, correct?
A At that time I had taken one massage course.
Q You ended up doing some massage out of OneTaste, right?
A I did. That was the way that I made money independent of what I was doing for OneTaste.
Q Yeah.
But you could have done that; you could have gone and decided to be a masseuse, correct?
A No. I didn't have a license to practice massage in California, so no.
Q But you could have tried to get that license, right?
A I didn't have the money to do that, honestly. And I was

doing work trade for them for everything I did, so the only way I afforded what I was doing is because I was working for them. So no, I couldn't have gone out and taken a $15,000 program at that time.

Q Okay. But you did spend -- you did do a program at OneTaste for thousands of dollars, correct?

A That I worked off via trade to them.

Q But that was what you chose to do, correct?

A Absolutely.

Q Right. Okay.

And you could have gone out and gotten a job at a restaurant, correct?

A Ostensively, yes.

Q Yeah.

You were also a college graduate. What was your major?

A I had a bachelor of finance.

Q So a wide variety of things that you could have tried to get a job at, correct?

A Yeah.

Q And you didn't, right?

A That's true.

Q You went to OneTaste instead, right?

A That's true.

Q Okay. And you, by the time you went and were a handler,

you testified, for Reese Jones was March of 2012, right?
A I don't remember the exact date, but I honestly think it was sooner than that. But I honestly don't remember.
Q And at the time that you -- you testified on direct examination about Nicole asking for you to be a handler for Reese, right?
A Yes.
Q And you originally told the Government that Nicole indirectly asked you by asking Maddie.
Do you remember that?
A I do.
Q And you were actually hurt that Nicole didn't ask you, right?
A I didn't say that.
MS. COHEN: MW-7. 3500 MW-7, just for the witness.
(Pause in proceedings.)
MS. GUPTA: Your Honor, I don't believe there is a question pending.
THE COURT: Yes, I don't think there is either.
Ms. Cohen, what is your next question?
Q Oh, my question was did you remember that you were actually hurt that you weren't directly asked to be a handler for Reese.
THE COURT: Well, she didn't have any faulted memory. She said she didn't say that.

So, is there another question you want to ask?

MS. COHEN: Okay, well...

THE COURT: Ask your next question.

MS. COHEN: Okay.

Q You told the Government that you were hurt by the fact that Ms. Daedone did not ask you to be a handler for Reese?

A No, I didn't.

Q So let me -- so, okay.

You didn't tell the Government that?

A No, I did not.

MS. COHEN: Let me just show -- can I show the witness and refresh her recollection?

THE COURT: Yes.

Well, she hasn't said there's any faulted recollection. So you can show her something if there's another purpose, but otherwise just move on.

THE WITNESS: It also doesn't say that in this document.

Q You don't remember telling the Government that you felt quite insulted and left out when --

A No.

I just read this and it doesn't say that.

Q So at Mr. Jones' house, at Reese Jones' house, you had your own room there, right?

A Maddie and I had had a room there, yeah.

Q And one of the reasons that you were happy to go there was because you finally had privacy with Maddie, right?
A I wasn't happy to go there. Although, it was a perk to finally have a little bit of privacy, yes.
Q In fact, you told the Government that it was appealing to stay at Reese's because you wanted alone time with Maddie.
Do you remember telling them that?
A I don't remember telling them that it was appealing. I do remember expressing that it was a perk that I got to have some personal space and some time alone with my partner, which was not something that I generally had.
MS. COHEN: Okay. Just for the witness, can we show DX -- oh sorry, not -- wrong one.
THE WITNESS: Can I just comment that this is incorrect? Like, whoever wrote this note, that, I didn't say that.
MS. COHEN: Okay. So you're --
THE WITNESS: "Wright felt quiet insulted and left out," I --
THE COURT: I ask you to not read from the document that's not in evidence.
Please let me finish speaking. Let me finish speaking, Ms. Cohen, and the witness as well.
Do not read from the document unless you're asked to read from it, please.

Ask your next question.

MS. COHEN: Okay.

Q So do you remember telling the Government that -- oh, sorry. Hold on.

MS. COHEN: Showing just -- okay.

Showing, just for the witness, Defense Exhibit 4-AP.

Q Do you recognize this?

A It looks like one of the bedrooms from Reese's house.

Q And is this the bedroom where you stayed?

A It's not.

Q And showing you what has been marked as Defense Exhibit 4-AR.

Do you recognize this photo?

A No, I don't.

Q And how many bedrooms were there in Reese's apartment?

A I don't know.

Q Okay. So you went there for a few days a week, right?

A Yes.

Q And you still stayed at 1080 on the other days, right?

A Yeah. Part time.

Q And you were also, at the same time, dating Henry Debusmann?

A No.

Q Okay. Well, let me see if I can -- you don't remember that?

A I never dated Henry Debusmann, ever, so no.
Q Let me show you DX 3-AD.
THE COURT: Sorry, what is the last letter you said?
MS. COHEN: AD, as in dog.
THE COURT: Thank you.
MS. COHEN: Okay, sorry, this is the wrong -- let me withdraw that question.
Q Do you remember -- around March of 2012, around the time that you were at Reese's, do you remember talking to Nicole about your jealousy with Maddie?
A I don't, no.
Q Okay. Then take a look at this and see if this refreshes your recollection.
MS. GUPTA: I'm sorry, what exhibit number is this?
MS. COHEN: 3-AD.
MS. GUPTA: Okay.
THE COURT: It's a little blurry. Can you read it off the screen or no?
MS. COHEN: Oh, I have a copy.
THE WITNESS: I can read it.
THE COURT: Okay, she can read it. That's fine.
MS. COHEN: Okay.
Q Do you remember writing to Nicole about your jealousy with Maddie?
A I don't remember this, but I can see that I did mention

jealousy in this e-mail to her.

Q And at the time, you both were, you described, doing intimate dances with men.

Do you remember that?

A I don't remember that, but I can see that that's what it says here.

Q And you were excited about that, right?

A Um...

Q You described it as being exciting?

A That's what it says.

Q And during the time that you were at Reese's, you never told Nicole how you felt about being at Reese's, correct?

A I don't remember, honestly, whether I told her or not, all the different ways that it made me feel.

Q You -- and no one -- she didn't force you to go live at Reese's, correct?

A She did not force me physically, no. But there was an immense amount of emotional manipulation and coercion that ran throughout my entire experience there.

Q You felt, at the time, that you wouldn't be in the inner circle if you didn't do the things you were asked, correct?

A That's true.

Q And there were other people who desired to live at Reese's, given the space, correct?

A I have no idea.

Q And you never told Rachel Cherwitz about your feelings about staying at Reese's, correct?
A I don't know, honestly.
Q And you spent about six months doing this with Reese, being his handler?
A I think it was longer, but I don't really have a specific memory of dates.
Q And as you said, during the time, you could have -- you could have gone back to your parents at that time, correct?
A That did not feel like an option anywhere inside my reality at that time, no.
Q You wanted to stay at OneTaste at that time, right?
A I think part of me wanted to stay and part of me wanted to run. I think I was full of a lot of confusion and fear. And yes, part of me wanted to be there.
Q And nobody told you you couldn't leave, correct?
A No.
Q Okay. And then you went to Vegas in August of 2012, right?
A That sounds about right.
Q And fair to say that was a promotion, correct?
A That's one way to describe it. It didn't feel like that.
Q I mean, you were running the Vegas -- opening and running the Vegas center, right?
A What I'll say is that it was presented as a promotion and

the reality is that it was way more work and way less reward. And it was incredibly hard and I did not want to be doing it and I wasn't excited to be getting a promotion.

Q Well, you testified on direct that you went there, you were lonely and by yourself.

Do you remember?

A Yeah, I did say that. Yeah.

Q But you also -- Ken Blackman was there, correct?

A He was there on and off. He was not there all the time. He traveled a lot as a teacher and a, like, coach, as a, you know, bigger part of the company.

Q And Eli Block -- and Eli Block was there, right?

A He was there for a time period. I don't remember how long it was, but it was, like, maybe after a year of my being there.

Q He would -- he never went to Vegas before one year, before your first year?

A I don't think so. I was, honestly, mostly on my own leading the city. Like, at times Ken would teach things with me, but because he was an executive staff member, he did very little in terms of, like, the jobs of what was needed to be done on a daily basis.

Q Well, Erin Veet (ph.) was there?

A For a short time, she was there.

Q Rosa McGill?

A She was there, yeah.
Q And Rob Bakhshai?
A For a short time, he was there.
Q And you basically said you did not enjoy being in Vegas. Is that your testimony?
A I did not.
Q But you had fun while you were there, correct?
A Honestly, no, it was not fun. It was pretty torturous.

MS. COHEN: I'm going to show this for the witness. Can we play for her DX DC -- sorry. DX 3-C, as in cat, P as in Peter.

THE WITNESS: Your Honor, do you mind if I take a bathroom break?

THE COURT: Yes.

You know what, we need to take a break, so I think now is a good time to do it.

And you can get the video teed up or whatever it is you're going to show.

MS. COHEN: Okay.

THE COURT: The witness can step down.

(Witness steps down.)

THE COURT: You can shut that. Yes, just shut the lid. Thank you.

Or that won't shut it off?

Great.

Okay. We'll come back at 20 of. Enjoy the next 15 minutes. Don't talk about the case. Don't let anyone talk to you about it. We'll see you in 15 minutes.

(Jury exits.)

THE COURT: Everyone may be seated for a minute.

MS. BENSING: Your Honor, can we briefly be heard on something? I know the Court wants to say something. We just --

THE COURT: Yes. Go ahead.

MS. BENSING: I just want to note for the record that this cross-examination has now gone on quite a bit longer -- or, you know, quite a bit, but it has gone on longer than the direct examination.

THE COURT: So maybe I should speak first then.

MS. BENSING: Okay.

THE COURT: What I was going to say to the parties is that to the extent that any attorney is intentionally trying to run out the clock, that won't be tolerated. If something else has been going on today, I will hear the parties out on that, but whatever has been going on is extremely inefficient, there is still fumbling around. If someone is trying to buy time, it ends now.

MS. COHEN: Your Honor, I'm not trying to buy time. It was a difficult witness who, you know, I have to show a lot of things to. I mean, she's not even agreeing to her own

words, so it's, you know, taking me a lot. I'm getting to the end.

THE COURT: Okay.

But just, I'll remind you -- and again, this is really towards, to everybody -- nobody should be playing around with the schedule. This jury has been told that this would take six weeks. Again, I think that really was just way too long an estimate. But we're not going to waste their time. But really, have the exhibits ready, have them all lined up. There are still things that I don't have, which is odd. I did listen to the three things that were given, you know, today.

But anyway, let me go back to Ms. Bensing, because I cut you off a bit, and then we can hear anybody else.

And I do want to give you ten minutes to take a break.

MS. BENSING: Yes.

I just wanted to briefly note for the record as well that I think a lot of what is happening is improper refreshing of her -- purported refreshing of her recollection or then subsequent improper impeachment.

THE COURT: Well, there weren't objections. If you think there is something improper, you object in the moment.

MS. BENSING: Yes.

THE COURT: I'm not disagreeing with you, but you

know, I ruled on whatever objections were made.

MS. BENSING: I understand, Your Honor. And we will continue to object where appropriate.

I just wanted to note that we did have some concerns about the length of the cross-examination, as we have already indicated for the record.

THE COURT: Okay. I'm going to give you all until 20 of.

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: We can bring back the witness and the jury.

THE COURTROOM DEPUTY: Please be seated.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Cohen, you may resume.

MS. COHEN: Thank you, Your Honor.

BY MS. COHEN:

Q Ms. Wright, you testified on direct examination about not wanting to do a sex film.

Do you remember that?

A I did.

Q And, in fact, you -- do you remember -- strike that.

You did do a sex film that you did enjoy.

Do you remember texting about that?

A I did do a sex film. I don't remember saying that I enjoyed it.

Q You don't remember saying that it was connected, deep, present, slow, hot, sensitive, playful, fun, open, sweaty, dynamic?

Do you remember writing that?

A No, I don't.

Q All right. Let me show you 3-DE. See if that refreshes your recollection.

A Can I ask, who is this a text with?

THE COURT: Sorry. Could you put it on the screen for me as well?

I don't have this one, I don't believe.

MS. COHEN: Sure.

THE COURT: I do. Sorry. You gave it to me.

MS. COHEN: Oh, okay.

I can do the ELMO if we --

THE COURT: No, that's good.

MS. COHEN: Okay.

Q My question to you is: Do you remember sending a text message with your feelings with -- with saying that you were connected, deep, present, slow, hot, sensitive, playful, funny, open, sweaty, dynamic?

Do you remember sending that text message?

MS. GUPTA: Objection. Asked and answered.

Q Does this refresh --

THE COURT: You misread. So, sustained.

Q Does this refresh your recollection that you wrote that it was connected, deep, present, slow, hot, sensitive, playful, fun, open, sweaty, dynamic?

A No, it does not refresh my recollection.

Q Do you see your name on this text message?

A I do.

Q And does it refresh your recollection that you described it as pretty amazing?

MS. GUPTA: Objection.

THE COURT: Sustained.

Q You described it as pretty amazing, right?

A I see that's what's written here in this copy of the text.

Q Okay. You also testified about being in Vegas, being isolated and depressed.

Do you remember that?

A I do.

Q And that you had no friends there, right?

A I didn't say I had no friends, but I said I felt very alone.

Q And, in fact, in 2012, OneTaste had a policy regarding --

for certified coaches who wanted to have relationships with students.
Do you remember that?
A I'm not sure what you're referencing to.
Q Well, they had, if you want -- if you were a coach and you wanted to have a relationship with a student, you had to send an e-mail to the ethics@OneTaste account.
Do you remember that?
A Yes, I remember.
MS. GUPTA: Objection. Relevance.
THE COURT: Overruled.
A I remember.
Q And, in fact, while you were in Vegas, you made eight requests to make out or have sexual relationships with other people, right?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q While you were there, you made requests to the ethics@OneTaste account, right?
A I can remember one specific request. I'm not sure of all of the other ones you're talking about.
Q Okay. Well, let me show you what has been marked as Defense Exhibit 3-B, 3-C, 3-D, 3-E, 3-G, and 3-H.
A Okay.
Q In fact --

A What is your question? Sorry.
Q You made ethics requests while you -- from 2012 through 2014, right?
A So two of these are after I left Vegas, just to be clear. These are December 2013 and I was already living in LA, so.
Q You made requests to the ethics@OneTaste account to be with other people, correct?
MS. GUPTA: Objection.
THE COURT: Overruled.
A I did.
Q Okay. And you also testified that you were -- when you were fired from Vegas, that it was Aubrey Fuller, that Fuller had made a lie on you.
Do you remember testifying to that?
A I didn't say that.
I referenced Aubrey Fuller making up a lie to when I was fired from, like, the remaining bits of what I was doing in Los Angeles.
Q You went to live with Aubrey Fuller in Los Angeles, correct?
A I went to live in the Los Angeles OM house where Aubrey also lived.
Q And she was your good friend, correct?
A She was.
Q And you lived in LA, after you left Vegas, for several

months, right?
A Yeah, I don't remember exactly how long it was. It was, like, maybe about eight months or something.
Q Eight months.
And you helped out with OneTaste events at that time, right?
A I did.
MS. COHEN: And I'm just going to show to the witness -- strike that.

(Continued on the next page.)

(Continuing)

CROSS-EXAMINATION

BY MS. COHEN:

Q And you lived there, you said, for eight months.

And you -- and after you left Vegas, you kept in contact with people from OneTaste; correct?

A After I left Vegas?

Q No, after you left OneTaste.

A Some of them, not everyone.

Q You went back in 2015 to -- and you had a picture with the LA team. Do you remember that?

A Went back where?

Q Well, let me see if you think this is an accurate picture, DX-3AH.

THE COURT: Sorry. You faded out again.

MS. COHEN: I'm sorry. A-H.

THE COURT: Thank you.

Q While we're -- do you recognize this photo?

A Yeah, I know all the people in the picture. I don't actually remember that moment, but yeah.

Q Okay. Do you know who then is in this picture?

A It's me, Aubrey, Rochelle, Kim, Maddie, Drea, and Sasha.

Q And this picture was posted sometime in 2015?

A Yeah. It says January 2015.

Q And the person next to you, you said was --

A Aubrey.
Q Aubrey.
MS. COHEN: Your Honor, at this time, the Defense moves Defense Exhibit 3-AH into evidence.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defendant's Exhibit 3-AH is admitted.
(Defense Exhibit 3-AH was received in evidence.)
Q Again, this is after you left OneTaste; right?
A January 2015. Yeah, it is.
Q Okay. And you also hung out with Robert Kandell after you left OneTaste; right?
A I worked for him for a time.
Q And you lived near him for a time?
A I did, yeah.
Q And you lived with other OneTaste people after you left; right?
A I did, yeah.
Q You lived with --
A I will add that they were friends and community members. They weren't like staff.
Q They were people that used to work at OneTaste; right?
A Not all of them, no.
Q You went traveling with Ayries and Ruwan. Do you remember that?

A I did not go traveling with them.
Q Or you went hiking?
A I did take a hike with them.
Q You went to dinner with Rob and Ayries Blanck. Do you remember that, for Rob's birthday?
A I did. I don't remember that specifically, but that sounds familiar.
Q You did have dinner with them?
A Sounds familiar.
Q And you still talked to Rob Kandell; right?
A Very intermittently.
Q You still talk to Dana? She was a friend of yours?
A I've had very, very little communication with Dana over the last 10 years.
Q Still talk to Ayries?
A I haven't had any contact with Ayries.
Q Lianna, are you friends still?
A Lianna and I are close friends, yeah.
Q Just before you went to Vegas, you also drafted your Vegas desire contract. Do you remember doing that?
A I don't.
Q And in that contract, you talk about admissions, things that you wanted to work on, right?
A Uh-hum.
Q And in that Vegas contract, in fact, you said in your

mission, you are a great liar and if you don't want to tell the truth, you tend to go on and on with a story and tell a lot of unnecessary details in an attempt to make your story sound more credible or believable?

MS. GUPTA: Objection.

Q You said that, right?

THE COURT: Sustained.

Q You wrote Vegas desires; right?

A Don't know.

Q Let me show you what has been marked -- or bring up Defense Exhibit 3-BB.

If you go down to the bottom, does this refresh your recollection that you wrote admissions in your desire contract?

A I don't have a specific memory of writing this, but I see that it is -- well, honestly I don't even see my name on it, so.

MS. COHEN: Hold on.

Q You were going to Vegas to lead up the Vegas center; right?

A I did go, yeah.

Q Okay. And you would do -- you don't remember doing a contract, but these are your words; correct?

A I don't know. My name is not on this document and I don't remember writing it.

Q Okay.

MS. COHEN: One moment, Your Honor.

Your Honor, I have no further questions.

THE COURT: Thank you.

Ms. Bonjean, any cross-examination?

MS. BONJEAN: Yes, I do.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Wright.

A Good afternoon.

Q My name is Jennifer Bonjean, and I represent Ms. Daedone.

A Nice to meet you.

Q Nice to meet you.

You testified on direct examination about the psychological state you experienced when you went to LA at the end of your time at OneTaste. Do you remember that?

A Yes.

Q And you said you felt like a piece of shit. Do you remember that?

A Uh-hum.

Q And you described feeling things like shame and fear and feeling abused and victimized; right?

A I don't remember saying the words abused and victimized, but yes, I did feel a lot of other things like that.

Q And those were the same exact emotions you felt when you

joined OneTaste in 2010; right?
A I don't know. I can't confirm that.
Q Well, we looked at a five-page single-spaced document that's been marked as Defense Exhibit 3-BR, and you would agree that that document contained a bit of biographical information about you; right?
A I would agree.
Q Okay. And I know you said you don't remember writing it, but you would agree that it appears to have been written by you by virtue of its contents. You remember that?
A I do.
Q Okay. And then we also looked at a number of e-mails that you don't recall writing, but you can -- through context clues, you can conclude, for instance, that it looks like you sent that five-page single-spaced document to Ms. Daedone; right?
A I don't remember who it was sent to, honestly, but yeah, it looked like I wrote it, yeah.
Q Okay. And I am trying to go quickly, but if you want to see the e-mail that we looked at earlier, I can show it to you, but do you recall looking at an e-mail that appeared to have Ms. Daedone's e-mail address and your address?
A Yes.
Q Okay. And it had attached to this, again, five-page single-spaced document that you don't recall writing, but you

think you probably did; right?
A Yes.
Q Okay. And you would agree that notwithstanding the fact that you don't recall writing it, the document expressed a wide range of emotions about the author's life, their relationships, their feelings; right?
A Yeah. Yeah.
Q Uh-hum.
And -- and you've testified that although you believe you wrote this document, you can't really trust the accuracy of the author's, you, most likely, feelings as reflected in that document; right?
A I don't know if I would say I can't trust it, but I know that I did not -- I know from my own experience that that was not all of the way that I felt.
Q Okay. But you would agree that at the time you wrote that document, you were recounting your time prior to coming to OneTaste; right?
A Some of it, yeah.
Q Right.
And, again, the author of that document used words such as rage, shame and fear and resentment. Remember that?
A I remember some of those things, yeah.
Q And I think you testified on cross that you can't, you know, you wouldn't concede that you were actually feelings

those things when you wrote that document; correct?
A I believe what I said is that that is not the whole picture of how I felt at that time, I think especially if it was something I was sending to Nicole, like I was very much curating how and what I was writing because I really wanted her to see me in a particular light, and we were I think at that time, I had been at OneTaste for many years. So I had already been groomed and trained to present, act, feel like a very specific way.

So, like, sure, I may have written a lot of things. Were all of them the entirety of how I felt? No.
Q You can't put much trust in that; right?
A Trust is not the word I'm going to use.
Q Okay. But you expect the jury here today to trust your feelings about what happened at OneTaste concerning events that happened 10, 11, 12 years ago; right?
A I don't expect anything. I'm just here telling my experience.
Q Right. And you're curating your story today based on over a decade of reflection; right?
A I'm not curating anything. I'm literally just answering the questions to the best of my ability.
Q Right. Based on your mental state here today, over a decade after those events occurred; correct?
A Yeah, it's been a decade and today is today, and today is

how I feel, yeah.
Q Okay.
Now, throughout your testimony on cross-examination, you were confronted with your own e-mails, right?
A Uh-hum.
Q Certain writings that appeared to have been written by you; correct?
A Yeah.
Q Certain desire contracts or desire writings, I'll call them?
A Sure. Yeah.
Q Social media posts; right?
A Yes.
Q You listened to some videos; right?
A Yeah.
Q And to be fair, you didn't recollect nearly a word of what you had heard or written from the time period in which it was actually written; right?
MS. GUPTA: Objection, misstates the testimony.
THE COURT: Sustained. Sustained.
Q Well, again, when you were confronted with certain writings, you had a hard time recollecting that you actually wrote those things; right?
MS. GUPTA: Objection.
THE COURT: Sustained.

Q But today, your account is based entirely on your recollection of events from over a decade ago; right?
A Yeah. How else do we make an account of history?
Q I don't know. Maybe by writings you did at the time, but you're saying you don't remember those.
A I'm not --
MS. GUPTA: Objection.
THE COURT: Sustained. Sustained.
Q Now, when you accepted this job to go to Nevada and start the program there, you knew what was involved; right?
A I think I had an understanding of the structure of what would be required of me. I don't -- I did not know the intensity of all of what I was in for, no.
Q Your friend, Lianna Lifson had started a director position in boulder; right?
A That's true. Boulder is a very different city than Vegas, Nevada.
Q Well, that may be the case, but they were both community programs that were being started by people working for OneTaste; right?
A That's true, yeah.
Q Okay. And to be clear, you accepted the job as director of the OneTaste Nevada; right?
A Via a lot of pressure and manipulation, yes. I eventually did say yes.

Q You -- you said yes. You didn't decline it; correct?
A I will repeat that via a lot of pressure and manipulation, both emotionally, socially and professionally, I eventually said yes.
Q Right. You claimed that -- you claimed that OneTaste just wanted to send you to start a whole new program in another city to get you away from Maddie, right? That's your theory?
MS. GUPTA: Objection.
A No, I don't --
THE COURT: Sustained.
Stop.
Q Didn't you testify that you thought that was the real agenda to sending you to Las Vegas?
A I do not, no.
Q Okay. So I got that wrong?
A I don't know. I'm just saying I don't believe that to be the entirety of the reason I was sent there.
I think some of that was true. I don't think that was all of it. I think that I had a skillset that was valuable to them, and that is why they wanted me to run a branch of their company.
Q Right. And you were -- you were so depressed in Las Vegas because Maddie didn't want to be with you. That's the reason; right?

MS. GUPTA: Objection.

THE COURT: Overruled.

A I was depressed for a lot of reasons, man.

Like being away from Maddie was one very hard part of that package, but I was depressed because I was in a foreign place, doing incredibly hard tasks with very little help and it was just like hot and lonely, and I had none of the comforts or familiarities of what I was used to.

Q Right. Starting new jobs in other states is hard; right?

A Depending. That was my first time doing a thing of that nature.

Q And you signed an employment agreement; correct?

A About a year after I got there.

Q Right. Let's talk about that for a second.

Government's Exhibit 3772 reflects an employment agreement that you signed.

MS. BONJEAN: I think it's in evidence, right, counsel?

MS. GUPTA: Yes.

MS. BONJEAN: If we can go to the last page.

Q You see your signature there; right?

A I do.

Q Okay. And I know you indicated that you signed this employment agreement, you know, nine or ten months after you actually started at OneTaste, starting working in Las Vegas;

right?
A Yeah.
Q Okay. And that's because I think you said OneTaste is disorganized sometimes with their paperwork; right?
A That was my experience. They are like -- yeah, that was my experience.
Q And then when you finally did get this employment agreement, you certainly read it; right?
A I can't say I read the whole thing. I mean, as I testified earlier, it was an incredibly turbulent time, and so, it's quite possible that I just signed it without reading it.
Q Okay. Did you expect someone to read it to you?
A I don't think I did.
Q Okay. So you signed it. You may or may not have read it; right?
A May or may not have read it.
Q But fair to say at no point did you say to Rob Kandell or anyone else, hey, this isn't what I've been doing for ten months; right?
A I'm not sure what you mean by that or what your question is.
Q You had the benefit of having worked there already for nine or ten months according to you; correct?
A I don't know if I'd call it a benefit, but I had been

there for nine or 10 months.
Q Well, we can quarrel over words all day. You had the experience of having worked there already for nine or 10 months; right?
A Yes.
Q Okay. And when you were presented with this employment agreement, at no point did you say, wait a second. There's something inaccurate in here. I -- I'm -- this job description, I'm doing much more than this. This isn't accurately capturing what I was supposed to be doing. You didn't voice that objection; right?
A I would say that I voiced various objections about my work there. I don't know if I voiced it specifically in reference to this document.
Q Right. You didn't say, Rob, I'm not signing this. This isn't -- this doesn't reflect the terms of my employment at all, did you?
A That would have been a really smart thing of me to do. I wish I had done that.
Q But you didn't?
A No, I didn't. Yeah.
Q You didn't say, for instance, you know, yeah, I know this says the base pay is $2,100 per month, but, you know, this doesn't accurately reflect what I've actually been earning or anything of that nature; correct?

A I don't recall honestly what I was actually earning. I don't know. I don't know the answer to that.
Q So you -- okay.
A I know that the contract says 2,800 a month, but I don't recall what I was actually making.
Q Right. Do you not recall it now or do you think you never really looked at it?
A All I said is, I don't recall how much money I was making.
Q Right. But what I'm saying is, when you eventually signed this employment agreement in October of 2013, you didn't communicate in any form or fashion, verbally, orally, e-mail, anyway that the terms of the employment agreement did not match what you had been actually doing for the company up until that point, did you?
A Not to my memory, no.
Q Okay. And then you also admit you were actually fired, right?
A Yes, I was fired.
Q And you actually signed a separation or termination agreement with the company; correct?
A I did.
Q And that is, I believe, marked as Government's Exhibit 3771.
MS. BONJEAN: Is that in evidence?

THE COURT: Yes, it is.
Q We've looked at that already.
You signed the separation agreement, which is in evidence as Government's Exhibit 3771; right?
A I did.
Q All right. And in that separation agreement, you made a number of acknowledgments; right?
MS. BONJEAN: Go to the first page. If look at the second paragraph as an example.
A It's too small. I can't read it.
Q Give it a second. It's coming.
So when you signed this, you acknowledged payment of wages; right?
A Yes.
Q Okay. You also acknowledged separation compensation; correct?
A Yes.
MS. BONJEAN: Go to the next page, please.
Q You gave -- signed the separation agreement that contained a general release and waiver of claims provision; right? Do you see that?
A Yes.
Q All right.
MS. BONJEAN: You can go to the next page. We'll pull up No. 9 as another example.

Q When you signed the separation agreement, you agreed that if you had any claims against OneTaste, you would agree to arbitrate them and they would likewise do the same; right?
A Yes.
Q Okay. And, again, you never told Rob Kandell in any form or fashion that the terms of this separation agreement were not satisfactory to you; right?
A I definitely expressed in conversation to him that this felt incredibly unfair and confusing to me at the time. But I did sign the contract.
Q And you testified on direct that you had communicated with Nicole that you were unhappy in Vegas; right?
A I had, yeah.
Q And, in fact, sometimes you chatted with her; right?
A Generally.
Q Or texted?
A Over texts generally, yeah.
Q And in October of 2013, you told her that you really were unhappy there and displeased and you knew you had not lived up to the expectations of the company; right?
A I don't know about the second half of that statement.
Q Okay. You apologized to her. Do you remember that?
A I do.
Q Do you remember telling her that really it was about Maddie was the reason you couldn't perform in Vegas?

A I don't remember telling her I couldn't perform, nor do I remember saying it was about Maddie.

Do you have a document in reference to me saying it?

Q I'll get to it when I'm ready. Let me ask you some questions first.

A Okay.

Q And Ms. Daedone said she loved you. Do you remember that?

A No, I don't, actually.

Q Okay. Let me ask you this. You don't remember any of that sort of nature of the conversation with Ms. Daedone on October 1st of 2013; right?

A Not specifically, no.

Q Okay. Would anything refresh your recollection?

A Could possibly.

Q How about a text exchange with Ms. Daedone?

A How about it? Let's look at it.

MS. BONJEAN: Your Honor, unfortunately, this was not one that I was able to give to you previously, so I'm going to have to give it to you in paper. I apologize.

THE COURT: That's fine.

Thank you.

MS. BONJEAN: I know it's small print, so I can put it up on the ELMO for the witness only, please. I don't know if that will help.

THE COURT: I'm not sure if you said it's 3-EA.

MS. BONJEAN: 3-EA.

Q Let me know when you've had the chance to review that.

A I'm almost through. The text is really small.

Q I apologize.

A Okay.

Q Does this refresh your recollection about the conversation you had with Ms. Daedone about your experience working in Vegas and your mental state in Vegas on October 1st of 2013?

A It does.

Q It does, right?

And you expressed to her how unhappy you were; right?

A I expressed a lot of different things, yeah.

Q Right.

You expressed that you are having this fight with codependence and all these external crutches that you were relying on while you were there; right?

A It does say that, yeah.

Q But you said that, not just that it says it. You said it; right?

A I wrote that here, yeah.

Q And that you realized that you were, you know, really trying to please her and Rachel, but you couldn't live up to

it; right?
A I don't see the part about not being able to live up to it. Sorry.
THE WITNESS: Is there a way to put it on the screen, so I can see it bigger? It's just -- it's hard to find the individual spots you're referencing to.
MS. BONJEAN: I'll try. I don't think it will help. All right.
THE COURT: You should be able to zoom in a bit. I don't know how much it will help.
MS. BONJEAN: I will move it.
THE COURT: That's not going to help because it's -- only the right side of the words are cut off. You just need to -- on the top, so it's zoomed out a bit more.
MS. BONJEAN: How's that? I won't be on this for long.
THE COURT: Slightly more maybe, and then you've got it, I think.
Q Can we make that work, Ms. Wright?
A It's pretty blurry, honestly. What's the part you're asking me to look for?
Q Well, do you recall telling her -- telling Ms. Daedone that when Maddie pulled out, it was like the ultimate crutch having been pulled out from underneath you?
A Yeah. I do, yeah.

Q You didn't say when you made Maddie go away to New York; right? You said when Maddie pulled out?
A In this text, that is not what I said and I can see that this is some form of me attempting to crawl back into her approval after some kind of falling out that we had.
And I don't -- like, I know that my tendency with Nicole was like very strong towards like overly taking responsibility and feeling ashamed and feeling guilty and feeling like I did something wrong. And if I said things of that nature, she would bring me back into her good graces quickly.
So, I think I also felt a lot of other ways about the things I had experienced besides what I'm writing here in this text to her.
Q Okay. But we have to take your word for that 11 years later about what you were really feeling at the time; right?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q Is there anything you can point us to in all of these writings that you made that show us what you actually felt at the time?
MS. GUPTA: Objection.
A No. Maybe a journal entry.
Q Do you have one?
A No, I don't.

Q But, again, this is another example of you just making writings that didn't accurately reflect what you actually felt in the moment; right?

MS. GUPTA: Objection.

THE COURT: Overruled.

A I want to reiterate that so much of --

Q I just really want a yes or no.

A Maybe.

THE COURT: No, she can answer the question.

You may continue your answer.

A I want to reiterate that so much of the writing that you guys are using as examples of things I said and did are like things that were used for promotion either in-house or publicly.

And so yeah, of course I'm going to say things that make OM sound amazing and make OneTaste sound great because it was my job to promote this. So of course I'm going to say things and put things in a positive light.

Does that mean that was all of my experience and all of the ways I was feeling? No.

And yes, you have to take my word for it, and I have no reason to sit up here and lie. I just took and oath and I'm telling the truth.

Q But you're telling the truth about what you feel today. I get that.

A No, no, no. I'm telling the truth about what I know about my experience.
Q Okay. And this is not promotional material. This is private text exchange between you and Ms. Daedone; right?
A I'm not calling this particular document promotional material.
Q That's not my question.
A I was referencing to something else.
Q I'm asking you the question and I'm asking you specifically about this document. Okay?
A This document is a private conversation I had with Nicole, and what I said before about the nature of my relationship still stands.
Q Okay. And also what stands is that Ms. Daedone said -- she gave you positive reinforcement, saying, I love you, I really do. You're really growing up; right? Even after all of this failure in Las Vegas; right?
A Nowhere in this document do I admit to failure in Las Vegas, and nowhere in my memory of my time in Las Vegas did I fail at my jobs. Nowhere in here am I admitting that.
Q Okay. You got terminated though, right?
A I was terminated, but that does not mean I did not meet the requirements of my job for the length of time that I was there.
Q All right. And isn't it true that you told her in this

text that you were sorry for the wreckage that you caused and the compensation it had taken on everyone?
A I'm pretty sure -- if my memory serves, I'm pretty sure what I'm referencing to is the conversation in which she asked me to service Reese one more time, and I was incredibly resistant and like that.
We essentially had an argument and a falling out, and so I felt, you know, falling out of Nicole's good graces was really painful in that time period, and it basically meant like, I mean, yeah, I loved her. I cared about her a lot. I wanted her approval. I wanted her attention.
Q But at no point do you mention Reese Jones in this text message; right?
A I don't say his name, but I'm referencing a particular experience. Whatever you are suggesting I'm referencing, is not what I was referencing. I didn't say I failed at my jobs in Las Vegas and it cost you too much money.
Q You mentioned Vegas a number of times in this text message, but never Mr. Jones; right? That's a yes or no?
A That's true.
Q And you don't mention anything about Ms. Daedone asking you to go back to service Mr. Jones in here anywhere; right?
A I don't say those words, but I know what I'm referencing to by repeating it. I know what I'm talking about.
Q You're remembering what you felt 10 years ago; right?

But you didn't say it; correct?
A I'm telling you I just read this as you asked me to, and there's a section that you keep referencing to in that -- in which I know what I was talking about.
Q Okay. Again, you didn't say anything about Reese Jones, right?
A I don't mention Reese's name, no, but I know what I was talking about because I know the falling out that I'm referencing to, and why the nature of this long message I wrote her is essentially me like groveling to get back in her good graces and be like, oh, God. I'm so sorry. Do you still love me.
Q And she doesn't mention anything about Reese Jones; right?
A Reese's name is not mentioned.
Q Right. She doesn't say anything about having asked you to service Reese Jones or anything; correct?
A Not in this little chat window that you guys have captured. Maybe there's other sections of the conversation that I don't see right here.
Q You were on the other side of it. Have you found any other text messages that would back up what you're telling us today?
A I don't have all of the records of my old text messages, to be honest.

Q And you thanked her in this text message and she said she loved you; right?
A That's true, yeah.
Q And you -- and she said, you know, it hurts like a son of a bitch, and you said -- I can't even read it. It looks like an emoji and she said, but so worth it. You said, indeed. In some crazy way it is; right?
A That is what it says.
Q Right.
You claim that Ms. Daedone and the upper management staff there at OneTaste just expected these unreasonable work hours, no ability to have relaxation; right?
A There was very little time for relaxation.
Q But isn't it true Ms. Daedone did encourage you to go have fun; right?
A To go have fun? I don't know about that.
Q Do you remember texting in a group message with Ms. Daedone and yourself and another person? I can't tell who it is, but where Ms. Daedone says, oh, Lord --
MS. GUPTA: Objection.
THE COURT: Sustained.
If you want to refresh her recollection you can put the document before her, but please don't read from it.
MS. BONJEAN: Okay.
THE COURT: And just tell me what the number is.

MS. BONJEAN: Defense Exhibit 3-EB; E, as in Edward, B, as in boy.

THE COURT: Thank you.

Q Does this refresh your recollection about a text exchange that you had on July 14th of 2013, while you were in Vegas?

A Yes.

Q Okay. And you would agree that Ms. Daedone was actually encouraging you to go have some fun and you said, you know, okay. Work pool parties it is; right?

MS. GUPTA: Objection; hearsay.

THE COURT: Sustained.

Q Do you remember her -- does this refresh your recollection about this text exchange?

A I have a vague memory of. I will say like Nicole telling me to go have fun was few and far between in comparison to most of my communications with her throughout my time there.

So she may have said this in one moment, but is that a reflection of everything? No.

Q But she did tell you to go have fun sometimes; right?

MS. GUPTA: Objection; hearsay.

THE COURT: Overruled.

A I think when it came to her getting what she wanted, she would say whatever was necessary.

Q Right. That's you putting yourself in her brain, but I'm just asking a very simple question.

You -- she told you to go have fun while you were in Vegas. She didn't just say work, work, work, work; right?
A I don't have a lot of memory of that, but I see in this one text message, the exchange that shows about three exchanges, she says that bun time.
Q Okay. You remember going to pool parties in Vegas though; right?
A I don't, actually.
Q Okay. Do you remember posting pictures of your poolside?
A I don't, no.
MS. BONJEAN: Okay. Come back to that.
Q Now, you had an opportunity to look at the Vegas desire contract that you had. I know you said your name wasn't on it, but you did look at it; right?
A I did look at that document.
Q Can you just tell the ladies and gentlemen of the jury what a desire contract is?
A It's something we used in OneTaste in order to state -- like official state one's desires.
Q And do you -- and do you recall preparing one when you went to work in Vegas or at some point during your work at Vegas -- in Vegas?
A I don't recall, no. I mean, there is so many details of reality then, but like I can look at this and it looks like something I might have written, but I don't have a specific

memory of it.
Q Do you recall, though, whether it's this document or any document saying that one of the things in your desire contract was not just desires, but hard nos; right?
A Actually, I didn't read every detail of the document, but I know that that was sometimes a part of these contracts.
Q And one of your hard nos at the time was you're not going to have anyone touch you after you've said no; right?
A It says that.
Q But putting aside what it says, that's the way you felt at the time; correct?
A Yeah.
Q And you expressed that when necessary; right?
A There were a lot of times in which I didn't express that.
Q Okay. But that's sort of on you, right, because you didn't express it?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q Well, you told Ms. Daedone, when according to you, she asked you to have some sexual interaction with Reese Jones, and you told her no; right?
A At the very, very end of my time there, yes, I told her no once.
Q Right, but before, you hadn't told her no?
A For a lot of reasons, I was afraid to say no.

Q I understand. The question is simple: You did not utter the words, I don't want to do that, Nicole. You didn't say that to her?
A For a lot of reasons, I was afraid to say that.
Q So that's a yes? You didn't say that?
A I eventually said it.
Q Right. And when you said it, you still ended up being associated with OneTaste for what, one or two more years?
A No, I don't think so. I think that was very close to the end of my time before I got fired. Yeah.

(Continued on next page.)

(Continuing.)

CROSS-EXAMINATION (Continues)

BY MS. BONJEAN:

Q Well, you went to -- you got fired in October or November of 2013, right?

A From Las Vegas.

Q Correct.

A An then I continued to do things for them from Los Angeles.

Q Right. So this whole, this whole Reese Jones interaction where you said no, happened before October or November of 2013, right?

A I actually don't recall exactly when in that time it was, to be honest.

Q Well, where were you living when it happened?

A I remember that conversation. I remember being in San Francisco for a coaching program immersion. It's -- I was probably still living in Vegas, yeah, because I was still -- I was still an employee, so I was still living in Vegas.

Q All right. So it was before you were fired from Vegas.

So we can agree it happened sometime before what, October, November of 2013, right?

A Sure, yes.

Q And then you did not actually leave or depart OneTaste fully until what was it, July of 2014?

A I -- I still held various roles in the community, so I was fired from specific positions, but I still was like an -- I believe I was still an independent contractor as a coach and an OM trainer, and I was still living in the community houses and --
Q Until when?
A The date you just stated.
Q Okay. So that's my question. That's the date, July 2014 roughly?
A Roughly, yes.
Q Okay. So at some point prior to October 2013 you tell Ms. Daedone: No, I'm not gonna go -- I'm not gonna go mess around with Reese, but you still stayed part of the community until July 2014. We can agree on that, right?
A We can, yeah.
Q Now, -- and you weren't ex-communicated entirely from the community when you said no to Ms. Daedone, right?
A A lot of things happened that dramatically changed my position and experience within the community, but no, I was not immediately ex-communicated.
Q Okay. And you never messed around or had sexual interactions with Mr. Reese ever again, right?
A Not after that, all that, no.
Q After you said no, never again, right?
A That's true.

Q Now, you testified that it was just devastating when you were terminated from Vegas, right?
A I don't remember saying that.
Q Okay. Well, I think the Government asked you about four times what your mental state was when you were terminated from, fired from your position in Las Vegas, right?
A Uh-hum.
Q What your psychological state was, right?
A Correct.
Q And it was pretty bad as I recall, right?
A Yeah. It was bad, yeah.
Q Okay. And you were then -- you said you were sent to Los Angeles, but, in fact, you were -- you were given a place to live in Los Angeles rent-free, right?
A I was sent to the OneTaste OM house in Los Angeles, yeah, which was a pretty normal way to live during that time period.
Q Right. You -- you -- you became an OM community member in Los Angeles, right?
A I wasn't just a community member, I still had like a certain degree of jobs, yeah.
Q I understand. But it didn't -- it wasn't the responsibility that you had has a director in Las Vegas, right?
A No, no, clearly not.
Q And it took you out of the inner circle that you had

really desperately fought to get into, correct?
A I wouldn't say desperately fought. I would say I worked my fuckin' ass off to get to that spot. I don't know that I desperately fought, but, yes, I lost a lot of privileges and positions that I had worked very hard for.
Q Right. So you were terminated from a job you hated, right?
A I didn't hate my job. I did not like being the director of the city of Las Vegas. I had a lot of different jobs at that time. I could probably name ten different hats I was wearing, and I did not hate everything about all the jobs I was doing. But being in Las Vegas was incredibly hard.
Q Right. You didn't like -- you didn't like being in Las Vegas, right?
A Yeah, I did not.
Q You wanted to choose which city you were in, right?
A I wanted to stay in San Francisco, to be specific.
Q And you could have, right?
A I mean that's a very loose like -- that's not really the way reality worked there. Like you couldn't -- it wasn't just like, oh, do whatever you want, cool. Like that's just not what it was like.
Q No, you actually could have stayed wherever you wanted, isn't that correct?
A Ostensibly, I could have done literally anything I wanted

at any moment during any of that time period.

Does it mean I felt free and safe to do and say all of the things I wanted to? No.

Q Okay. Now, you go back Los Angeles and now you don't have the pressures of this director position and you are a community member and doing more like odd jobs, right?

A Just to be fair, I didn't complain about the pressures of the job. I simply stated that it was really challenging.

Q I thought on direct we heard you talking about the pressures of the job. My apologies.

But it wasn't that pressure-some, is that what you're saying now?

A No. I'm just saying I wasn't -- I wasn't complaining about the pressure of the job. My -- my experience is that it was way too much work for one person for too little pay with not enough support.

Q Right. Don't tell my team that.

MS. GUPTA: Objection.

A Woo, there's cults all over the world, I get it.

Q Well –

THE COURT: Let's move on to the next question, please.

BY MS. BONJEAN:

Q Okay. You testified on direct examination that when you got to Los Angeles that you were in terrible physical health,

right?
A I was.
Q I think you said you had acne?
A Yeah, I had terrible cystic acne. It was a definite indicator of my health at the time.
Q Okay. I think you said you were overweight you thought?
A I was the most -- like, I was definitely like out of shape for what I'm used to being in a healthy state.
Q I think you said you were depressed, right?
A Yeah.
MS. BONJEAN: And I would like to -- I would like to show like a group exhibit, Your Honor.
THE COURT: You mean multiple pages?
MS. BONJEAN: Yes, multiple pages at once to --
THE COURT: Yes, please.
MS. BONJEAN: I'm going to ask that the witness look at Defendant's Exhibit 3-D, as in dog, T as in Tom.
THE COURT: Sorry, just go back to the microphone please. It's easier for the reporter and for me to hear you.
MS. BONJEAN: My apologies.
3-D, as in dog, T as in Tom. Defendant's Exhibit 3-DU, 3-DV, 3-DX, 3-DY, 3-DW, and 3-DZ.
And I think we handed those up already, Your Honor. If not, I can give you another collection.
THE COURT: Let me just take a minute to look. I am

not, at least, immediately seeing them.

MS. BONJEAN: Okay, I have it. Another collection of that.

THE COURT: Yes. I don't seem to have them.

MS. BONJEAN: Okay.

(Pause.)

THE COURT: Thank you.

MS. BONJEAN: Okay.

BY MS. BONJEAN:

Q Looking at Defendant's Exhibit 3-D, as in dog, T as in Tom, which is the first, I think, picture or document.

Do you recognize what's reflected there, Ms. Wright?

A I do.

Q What do you see?

A That's a picture of me with a poster that says Los Angeles --

THE COURT: I guess please don't read from it at this time.

Q Do you see a picture of yourself?

A I do.

Q And this was a picture that was taken in Los Angeles, right?

A Yes.

Q And this was after you had been fired from the Las Vegas position, correct?

A Yes.
Q And this is -- was this posted by your friend Aubrey Fuller?
A Yes.
Q Was Aubrey also living in Los Angeles at the time?
A She was.
Q Okay. Does this fairly and accurately reflect what you -- what -- yourself in Los Angeles in November of 2013?
A It does.
Q Okay.

MS. BONJEAN: At this juncture, Your Honor, I'd ask to display this to the jury.

THE COURT: Do you want to offer it first?

MS. BONJEAN: Yes.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Okay. Defense Exhibit 3-DT is admitted.

(Defense Exhibit 3-DT was received in evidence.)

THE COURT: And you want to publish it to everybody, right?

MS. BONJEAN: Yes, Your Honor, I do.

THE COURT: Okay.

(Exhibit published.)

BY MS. BONJEAN:
Q Ms. Wright, you recognize yourself there, right?

A I do.
Q This is in November of 2013?
A Yes, that's the date that's put.
Q Okay. And this is you in Los Angeles?
A It is.
Q And this is at the -- in the OM community that you were staying in?
A Yes.
Q Okay. Can you tell the ladies and gentlemen of the jury what you were doing in this picture?
A It looks like me standing next to a poster that is stating, like, a list of things that we have planned for the Los Angeles community.
Q Okay. And does this fairly and accurately reflect what you looked like at the time?
A I believe it does.
Q Let's go on to Defendant's Exhibit 3-D, as in dog, U, as in umbrella.
If you could look at that, ma'am, and tell me if you recognize what's reflected in that exhibit?
A It looks like a picture of members of the Los Angeles OM community.
Q Okay. And do you see yourself in there?
A I do.
Q And are those the people you were living with and

fraternizing with in Los Angeles?
A I didn't live with all of those people, but some of them, yes. And most of those people are -- were just part of the community there.
Q Okay. Some people were part of the community, but didn't live in the residence, correct?
A Yeah.
Q And is this the residence where you were staying?
A I don't think so. I don't recognize this location, to be honest.
Q Okay. And does this fairly and accurately reflect you and your community members, friends and colleagues, from the OneTaste community back in December of 2013?
A Yeah.
Q Okay.

MS. BONJEAN: I'd ask for leave to admit Defendant's Exhibit 3-D, as in dog, U, as in umbrella, and publish to the jury.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Okay. Defense Exhibit 3-DU is admitted and can be published.

(Defense Exhibit 3-DU was received in evidence.)

(Exhibit published.)

BY MS. BONJEAN:

Q Can you tell the ladies and gentlemen of the jury what you're wearing, so we know who you are in this picture?
A I'm the person, like, in the very middle with my legs crossed.
Q With a black tank top on?
A Yeah, something like that. It's hard to tell.
Q All right. Moving on to Defense Exhibit 3-D, as in dog, V, as in Victor.
If you could look at that.
A Uh-hum.
Q Is that a picture that you posted yourself?
A Yeah, it looks like it is.
Q And what is -- can you tell me what it reflects?
A It is myself and Jason Appel.
Q And is that a friend of yours?
A Yes.
Q And is this, again, when you were in Los Angeles after you were fired from the Las Vegas job?
A Yes.
Q And does this accurately and fairly reflect what you and your friend Jason appeared like on December 9th, 2013 in Los Angeles?
A Yes.
Q Okay.
MS. BONJEAN: I'd ask for leave to admit and

publish.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Okay. So that's -- you've got to wait until I -- you just have to wait until I admit it.

Defense Exhibit 3-DV is admitted.

(Defense Exhibit 3-DV was received in evidence.)

MS. BONJEAN: Thank you. Sorry.

(Exhibit published.)

BY MS. BONJEAN:

Q Okay. Going on to Defendant's Exhibit 3-D as in X -- 3-DX.

Do you have that in front of you, Ms. Wright?

A I do. I do.

Q Do you recognize this?

A I do.

Q And what do you recognize it to be?

A It's a photo of me and my coaching pod from the CP7 coaching group -- the coaching program, rather.

Q And when was that photo taken?

A January 2014.

Q And this is when were you Los Angeles as well, right?

A Yes.

Q And you posted this?

A Yes.

Q Does it fairly and accurately reflect you and your coaching -- people from your coaching pod?
A Yes.
MS. BONJEAN: I'd ask for leave to admit and publish.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Okay. Defense Exhibit 3-DX is admitted and you can publish it.
(Defense Exhibit 3-DX was received in evidence.)
(Exhibit published.)
BY MS. BONJEAN:
Q Am I correct that you're the person right here (indicating)?
A Yes.
Q Is this Aubrey Fuller next to you?
A No, it's not.
Q Who is that, do you know?
A That is Daniella Moltitan (phonetic).
Q And these were all people who were part of the OneTaste community in Los Angeles, right?
A No, they were part of the CP7 coaching program. So, they lived in various place.
Q Okay. So these were people that came from OneTaste communities sort of all over the country?

A Yeah.
Q Almost there.
I'll ask you now to look at 3-D, as in dog, Y as in yellow.
Do you recognize this photo, Ms. Wright?
A I do.
Q And what does it depict?
A It's myself and Eric Swanson.
Q Okay. And when was -- you posted this photo, right?
A Yes.
Q And you posted it in January of 2014?
A Yes.
Q And does it fairly and accurately reflect you and Mr. Swanson --
A It does.
Q -- in January of 2014?
A It does.
MS. BONJEAN: Okay. I'd ask for leave to admit and publish.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 3-DY is admitted, and you can publish it.
(Defense Exhibit 3-DY was received in evidence.)
(Exhibit published.)

MS. BONJEAN: Thank you.
BY MS. BONJEAN:
Q Okay. And was this picture taken in Los Angeles?
A I don't know honestly.
Q All right. And fair to say that as of January 2014, at least, you were at least publicly stating you were grateful for friends and connections, right?
A I was.
Q Defense Exhibit 3-DW, ma'am, if you could take a look at that.
A Yep, I see it.
Q All right. What does this photo reflect?
A That is a picture of me and Jason Appel and Eric Bass and Eric -- I can't remember the other Eric's last name, and Jason's cousin and her husband.
Q And these are your friends and colleagues from OneTaste?
A None of them are colleagues; friends.
Q Friends from the community, right?
A Yeah.
Q And this was taken in February of 2014?
A Yes.
Q And, again, in February of 2014 you still associated with OneTaste, right?
A I did, yeah.
Q And does this fairly and accurately reflect you and your

friends from this time period?
A It does.
MS. BONJEAN: Okay. I'd ask for leave to admit and publish.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 3-DW is admitted.
(Defense Exhibit 3-DW was received in evidence.)
THE COURT: You can publish it.
(Exhibit published.)
BY MS. BONJEAN:
Q Do you remember what you guys were doing here or going off to?
A We were at a party.
Q Okay. And do you remember if that party was in --
MS. BONJEAN: Sorry, I'm moving away.
Q Was that party in Los Angeles or somewhere else?
A It was in LA, yeah.
Q And lastly, I'm going to have you look at Defendant's 3-DZ, as in zebra, if you would.
THE COURT: That one you didn't give me, but do you have an extra? If not, it's okay.
MS. BONJEAN: I don't --
THE COURT: It's all right. Go ahead.
Q Do you recognize what's reflected in this photograph,

Ms. Wright?
A I do.
Q And what is reflected here?
A It's a picture of my face.
Q Okay. And is it a selfie that you took of yourself?
A It looks to be.
Q And this is -- what date was this posted?
A February 23rd, 2014.
Q And, again, was this in the Los Angeles area of California?
A I would assume, but I don't know for sure.
Q It says Venice Beach, right?
A Oh, yeah, yeah, you're right. Sorry about that.
Q And does it fairly and accurately reflect, at least in this moment, what you looked like when you took this selfie?
A It does.

MS. BONJEAN: Okay. I'm going to ask for leave to publish -- I mean admit and then publish.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: All right, Defense Exhibit 3-DZ is admitted and you can publish.

(Defense Exhibit 3-DZ was received in evidence.)

(Exhibit published.)

(Continued on the following page.)

BY MS. BONJEAN: (Continuing)
Q And again, on February 23rd of 2014, you wrote this "beautiful day in the neighborhood," right?
A I did.
MS. BONJEAN: Thank you. You could put those aside.
Q I want to show you another picture that I was able to put my hands on.
MS. BONJEAN: I think you have it, Your Honor. It's Defense Exhibit 3-A, as in apple, Z as in zebra. It was premarked, I believe.
THE COURT: Just say it again. A?
MS. BONJEAN: AZ, as in zebra.
THE COURT: Yes, I do.
MS. BONJEAN: Okay.
THE COURT: Thank you.
MS. BONJEAN: May I approach?
THE COURT: Yes.
Q Ms. Wright, do you recognize this photograph?
A I do.
Q Now, what do you recognize it to be?
A It is a picture of myself in a bathing suit.
Q And where was it taken?
A It looks like Vegas. It could be LA. I don't know.
Q Do you remember when this photograph was taken?
A I don't.

Q Do you remember -- does it appear to be a Vegas -- when you say it could be Vegas, what makes you think it's Vegas?
A I'm just looking at palm trees and tall buildings, so that could be LA or Vegas.
Q Okay. And would this -- and does this refresh -- let me ask it this way: Does this refresh your recollection of whether you sometimes did socialize poolside in Vegas?
A I guess I did, at least one time, go to a pool, yes.
MS. BONJEAN: Okay. You can put that aside.
Q Now getting back to the Reese arrangement, if you will.
You testified on direct that you understood that when you were approached by Ms. Daedone and I think Reese and -- I don't know if someone else was there. I think it was Ms. Carl, right?
A Yeah, she was present for -- are you talking about the initial conversation about the agreement?
Q Correct.
A Yes.
Q Yes.
You understood that there was sex involved, right?
A I did.
Q Okay. And you also knew that previous people had held that position, correct?
A I did.
Q And then there were people that held it after you,

correct?
A Yeah.
Q And as -- putting aside how you feel about it today, at the time it was perceived as a good position to have within the company, right? At the time.
A At the time, I felt very mixed about it. And within the context of the organization it was, like, a high honor of a position to be offered.
Q Right.
And you, whatever was going through your head at the time, you accepted that position at the time, right?
A Yes.
MS. BONJEAN: Just a couple more points. I'm going to get us done today.
THE COURT: You're fine, Ms. Bonjean. You're fine on time.
Q Do you remember the voiceover that you listened to, that Ms. Cohen had you listen to?
A Yeah.
Q Okay. And I think you said you didn't really remember it?
A I mean, it -- it was obviously me. I didn't really remember making it, yeah.
Q You saw yourself in it, right?
A Yeah.

Q You saw yourself in the video?
A Yeah, correct. Yeah.
Q And we can look at it again, but let me ask you a couple of questions before we do that.
Do you recall being recorded to do a voiceover in July of 2014, or at any point really, for, like, an instructional OM packet?
A Not specifically, no.
Q Okay. And do you recall ever being asked to do voiceovers at all?
A No, not specifically. No.
Q Couple more questions.
Putting aside whether you recall doing this voiceover, do you recall either teaching or being taught that you ask for an OM when you want an OM, that it's not -- you don't treat it -- it's not a doorway?
A Yeah.
Q Okay. And do you remember teaching or being taught that if it's actually something else you want, then ask for that?
A I do.
Q Do you remember teaching or being taught that if the other person says no to an OM, just say thank you?
A I do remember that teaching, yeah.
Q And do you remember teaching or being taught that an explanation isn't necessary?

A I do.
Q And lastly, do you remember teaching, or being taught, don't say yes to an OM that you don't want to have?
A I do, yeah.
Q Okay. Do you recall texting with Ms. Daedone after you fully left OneTaste July of 2017?
A I recall various different text conversations with her.
Q Okay. And you don't -- I take it you don't have any of those text messages anymore, right?
A No, I don't.
Q All right. Do you recall, in August of 2013, conversing with her about how you were feeling at that time?
A I remember various different text conversations I had with her after I left OneTaste. I can't say I have a specific date in my head of, like, oh, I said this thing on this date.
Q Do you recall telling her you were still really torn up about Maddie?
A That sounds like something I would say.
Q And that you -- and that you hated it, and the "it" being that Maddie left?
A You're asking if I recall saying those words?
Q Yeah.
A I don't specifically remember saying that. And I know that the reality is that she didn't just leave on her own. There were a lot of things that led to that happening.

Q Right.
But do you remember telling Ms. Daedone that the source of your distress was that Maddie had left?
A One of the things that was distressing was that, yes.
Q And do you recall telling Ms. Daedone, in August of 2013, that you felt that you missed her and you felt abandoned by her?
A Yeah. Yeah, I do.
Q And then eventually, you reconnected with Maddie, right?
A After some time, yeah.
Q And you felt -- I think you said you were upset that Maddie and Drea had started a relationship, right?
A That is a thing I was upset about. I don't know -- remember a specific conversation. But yeah, that is a thing I was upset about.
Q And at some point I think Maddie and Drea also left OneTaste, right?
A They did, yeah.
Q And then at some point I guess Drea came back.
Is that your understanding?
A Yeah. Many years later Drea came back for like a short stint.
MS. BONJEAN: Okay. Give me one second.
THE WITNESS: Sure.
(Pause in proceedings.)

Q Ms. Wright, just one last question.
Was it Alisha Price that -- did Alisha Price first tell you -- introduce you to the idea of working with Reese?
A Um, no. It was Nicole.
Q Okay. And was Alisha Price the person who was sort of handling him before you?
A I believe so.
Q Okay. So you kind of -- I guess you and Maddie sort of took over for her, right?
A I believe so.
Q Okay. And to be clear, during that period of time, whatever you felt about it at the time, you did not tell Nicole or Rachel, or really anyone in the upper management, that you wanted no part of that, right?
A I did not feel safe to share those feelings.
Q Okay. And when you did share them, you -- there were -- you went about your business and never did it again, right?
A I mean, to be honest, the job was already over by the time I felt the courage to share that, so I -- if you're trying to prove something with that, I'm not sure what it is.
Q Oh, I'm trying to -- I'm not trying to prove anything other than to say that when you did say no, you didn't actually -- you weren't actually in any way forced to go back and do something you didn't want to do, right?
A No, but there were dramatic repercussions for the fact

that I said no.
Q Meaning Nicole was disappointed or upset? Was that the dramatic repercussions?
A I mean I was fired from all of my positions there and, like, demoted and shamed and, like, had all of my friends and colleagues turn away from me and, like, belittle me.
I mean, if you want me to go into detailed stories of the terrible things people said to me and did to me to make me feel like I was no longer a valuable person in that community, like, we could hang out here all day.
Q Yeah, I understand. I understand what your feelings are today, but the point is, is --
A Those are my feelings then and now.
Q Yeah, but the point is, is you don't even remember when that conversation happened, right?
MS. GUPTA: Objection. Misstates the testimony.
THE COURT: Sustained.
Q When did the conversation happen where you allegedly told Ms. Daedone that no, I'm not doing this anymore?
A So you're stating that because I don't remember --
Q I'm asking a question.
A -- a specific date, it doesn't -- it's not legitimate, my feelings?
Q I --
A Like, who remembers every date --

Q I'm asking a question.
A -- of everything little thing that happened in their life?
MS. GUPTA: Objection.
THE COURT: Sustained.
Why don't you pose a question.
And listen carefully to the question and then answer the question.
Go ahead, Ms. Bonjean.
Q You're telling these ladies and gentlemen that you believe there's some correlation between you having said no to Ms. Daedone and you getting fired from Vegas, right?
A A thousand percent.
Q Okay. But you can't point us to any writing that would suggest as much, right?
A Any writing?
Q Yeah.
A Um...
I don't -- not that I can specifically remember. Like, the chain of events was clear.
Q And the chain of events that followed this conversation would require us to know when that conversation took place.
Are you able to tell us at least the month when she allegedly asked you to do this and you said no?
A I'm almost positive that Nina referenced a date to that

conversation at some point on direct. Like, I can't tell you I remember the exact date, but I know it was very close to the end of my time in Vegas and it was right after or during the time in which Maddie left OneTaste.

You're rolling your eyes, but you're asking me for --

Q No, no.

A You're asking me --

Q I --

THE COURT: Stop, stop. Everybody stop.

Let her finish the question.

I wasn't looking at you to know whether there was eye-rolling. I don't really need to go there at this point. But please, let her finish the answer.

Q Go ahead.

Are you finished?

A No, I'm not.

THE COURT: Please finish your answer.

THE WITNESS: Yes.

A You're asking me to, like, prove a specific date of that conversation. I'm giving you the best reference points that I know, which are, I know it was very close to the end of my time in Vegas and I know it was after Maddie had left. So, I'm sure there are documents giving dates to mark those things, so we could probably figure it out. But I can't give

you a date off the top of my head.
Q Okay. So you're relying on the Government to tell you the date?
MS. GUPTA: Objection.
THE COURT: Sustained.
MS. BONJEAN: I have nothing further.
THE COURT: Ms. Gupta, any redirect?
MS. GUPTA: Briefly, Your Honor.
THE COURT: Go ahead.
MS. GUPTA: Can I show Defense Exhibit 3-AZ for the witness only? I'll just put it on the ELMO.
THE COURT: It's facing in a strange direction.
MS. GUPTA: Oh, sorry about that.
THE WITNESS: It's upside down.
MS. GUPTA: Okay. Oops.
There we go. Better?
THE WITNESS: Sort of.
MS. GUPTA: Okay, there we go.

REDIRECT EXAMINATION

BY MS. GUPTA:

Q Do you recognize this?
A I do.
Q Was this one of the exhibits that you were shown on cross-examination?
A It is.

Q And what does this picture depict?
A It is me in a bathing suit at some pool.
Q Is this a fair and accurate depiction of you?
A It is.

MS. GUPTA: Your Honor, we would move to admit Defense Exhibit 3-AZ and publish to the jury.

THE COURT: Any objection?

Ms. Cohen or Ms. Bonjean.

MS. BONJEAN: No objection.

MS. COHEN: No objection, Your Honor.

THE COURT: Defense Exhibit 3-AZ is admitted.

(Defense Exhibit 3-AZ received in evidence.)

Q And Ms. Wright, again, can you just let us know where you are in this picture, if you remember?
A I actually don't remember. My guess is Las Vegas or Los Angeles.

MS. GUPTA: Could I show the witness only Defense Exhibit 3-AU?

Oh, I apologize. This is in evidence. This can be for everyone. 3-AU.

(Exhibit published.)

Q Do you recall being shown this on cross-examination?
A I do.
Q When you were shown this photograph, you had indicated there was something you wanted to say.

What is it that you wanted to say about this photograph?
A Um...
Q If you remember.
A It wasn't in reference to the photograph. It was to the conversation that was happening around it.
Q Are you in this photograph?
A I'm not.
Q Were you in Texas at the time?
A I was not.
Q Why were you posting about OneTaste Texas?
A I'm guessing that -- so this is the Austin, like, OM community team and I am guessing that Sasha shared --
MS. COHEN: Objection, Your Honor.
THE COURT: Yes, sustained as to any guessing.
Q Was it part of your job to spread the word about OneTaste?
A It was.
Q Was it part of your job to post about OneTaste?
A It was.
Q And did you often do that on social media?
A I did.
Q You were also shown the OM Hub.
Was it part of your job to post on the OM Hub?
A It was.

Q Who, if anyone, told you to post on social media and OM Hub about OneTaste?
A I remember Rachel telling me to post.
I kind of just remember it was like a company-wide thing that was encouraged, for all of us to publicly promote what we were doing in the organization.
Q And when you say Rachel told you to post, are you referring to Rachel Cherwitz?
A I am.
MS. GUPTA: I would like to show the witness only Defense Exhibit 3-EA.
Q And Ms. Wright, I think you still have this in front of you.
A I do.
Q And you testified on cross that this text exchange was towards the end of your time in Vegas; is that correct?
A It was.
Q And prior to this, Nicole Daedone had directed you to again sexually service Reese Jones, correct?
A Yes.
Q And she had directed you to get Tony Hsieh, correct?
A Yes.

(Continued on the next page.)

REDIRECT EXAMINATION
BY MS. GUPTA: (Continuing)
Q And you testified on cross-examination that after those conversations with Nicole where you pushed back on sexually servicing Reese, you had this text exchange; correct?
A Yes.
Q And is there a fair depiction of the text exchange that you had with Nicole Daedone on October 1, 2013?
A It is.
MS. GUPTA: Your Honor, we move to admit Defense Exhibit 3-EA.
THE COURT: Any objection?
MS. BONJEAN: No objection.
MS. COHEN: No objection.
THE COURT: And Defense Exhibit 3-EA is admitted.
MS. GUPTA: Could we publish to the jury.
(Defendant's Exhibit 3-EA received in evidence.)
Q Ms. Wright, given the text is quite small here, could you just read your message here at 11:53?
A A lot of my time here in Vegas and with sales has been this rabid fight with codependence and all of the external crutches I've had for a long time.
I realize that most of my motivations for sales and Vegas in the past were for the external approval of Rachel and you -- and I'm referencing Nicole -- and the Cores, and I had

hit a wall with it, where that fuel was no longer working, and I felt locked in place in terms of my growth into power with the way I was relating to the world and my responsibilities.

When Maddie pulled out, it was like the ultimate crutch getting pulled from beneath me and it's taken everything I have to stay connected and remember who I am.

You have been an unwavering light for me in this process. Like no matter how lost I feel, if I look up and ask you, you are there with so much love and understanding, it almost hurts.

I've been working to hack my way through this tangled ramble of negative associations to sales and Vegas of death and loss and malnourishment of my heart and lack of self love and intense lockjaw determination that actually kept me from getting dressed or leaving my post at the computer ever. All of that has turned into a big ball of resentment and fear that that is the only way it can be and I'm somehow being punished.

I have such an intense love for everyone and this work and you and what we are doing -- and what we are doing, and I get stuck behind my fear of not being able to have it all and do it all and be truly seen in how much love and loyalty I feel. When I get stuck there, I become hard and mean and immovable. Something very deep is cracking in me.

I know a new version of me is rising through the

cracks and she is generous and humble and she loves herself and she looks everyone in the eye as an equal and owns the sight and magic and power that she has to offer.

I'm sorry for making it unpleasurable to hold me --

Sorry.

THE COURT: Take your time.

A -- for you and the whole team. I'm sorry for any wreckage I have caused and the compensation it has taken on everyone's part around me.

I'm sorry if I've hurt your feelings in any way or made you feel unreceived. I want you to know that I am here, and I heard you, and I'm falling into surrender and I love you.

Q Ms. Wright, why does reading this make you emotional?

A I mean, so much of what I said is true. I'm deeply emotional.

I feel the part of me that was struggling so intensely and really truly did feel loyalty and love and dedication to our mission and what we were doing and what I believed it meant, and for Nicole.

You know, like, I think all of my relationships with everyone there were really special.

And I'm crying because of all of the, like, I guess just how much of my heart I put into this and how much I was -- those vulnerabilities were used against me, like how much I

was manipulated and how much my vulnerabilities were used against me to get me to use things for their gain to make them money to further the organization, like no matter the cost to my well-being or my sense of self, that there was like something in me at that time that was so deeply broken that I didn't know how to see that I hadn't done anything wrong, and that my tendency was, as I said before, like to go and grovel and act as though I had done something wrong because Nicole was displeased with me, because I had fallen out of her good graces. And, like, the reality was there was a lot of abuse going on, and I didn't know how to stand up for myself, and I didn't know how to say, like, hey this isn't right, you're not treating me well. Like, I didn't have the confidence. I didn't feel safe. I didn't feel the freedom to say those things.

I think there was some of it that I didn't see yet, that I didn't even have the awareness of. It took many, many years to unravel the experience I've had and, like, name the abuse and the ways in which I made excuses for it.

So, I'm crying because this is complicated because the love is real. I care about that person. And I care about that person. I care about the history and the relationship we had.

The dramatic effect it's had on my life is fucking painful. And, honestly, like, I really did believe in the

mission. I thought we were helping people. I thought we were doing something that was going to change the world. And that doesn't make an excuse for abuse and manipulation.

You know, so you can show all these pictures of me where I ostensibly look like I'm good and I don't have acne and I'm having a good time. But, like, everyone knows that makeup and camera filters do a lot and can make it look like you're having a good time when you're not.

And I was also -- you know, I was deeply ashamed of everything I had gone through and I think in a lot of ways I blamed myself for a lot of it.

And...yeah.

MS. GUPTA: No further questions.

THE COURT: Is there any recross examination, Ms. Cohen?

MS. COHEN: No, Your Honor.

THE COURT: Ms. Bonjean.

MS. BONJEAN: I just -- give me that exhibit.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q Do you still have this in front of you, Ms. Wright?

A Yeah.

Q I just have a couple of questions. Let's just finish reading it.

After you read the passage that you wrote to Ms.

Daedone, I'll read what she said and you'll read what she said in response. Is that okay?
A Yes.
Q After you read that, she says: I know, love. Really, really I do. You're really are growing up.
THE COURT: I'm sorry. Can you use the microphone.
MS. BONJEAN: Yes. I'm sorry, Your Honor.
Q Ms. Daedone said: I know, love. Really, really I do. You really are growing up.
And you said what?
A Thank you for seeing me and guiding me.
Q And Nicole said: Aha, I just love you?
A I said: Yeah, you do. I know that for real.
Q It looks like there were some emojis. Then what did you say?
A Growing up hurts, man.
Q And what else did you say?
A I've missed you. I went away and I can feel all the space inside of me and my head wants to fill it with guilt, but I know it's just space to fill with trust.
Q Ms. Daedone said: That's beautiful. I'm here. And yep, it hurts like a son of a bitch.
And it looks like there are some emojis.
She says: It's so worth it.
And how do you respond?

A Indeed. In some crazy way it is.

MS. BONJEAN: I have nothing further.

THE COURT: The witness may step down.

(Witness steps down.)

THE COURT: Okay. I will not start the next witness now.

We will break for the evening and be back at the same time tomorrow, 9:15 for the jury, so we can start at 9:30.

I will remind you what I remind you each evening. Don't talk about the case with anyone, including your fellow jurors. If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino.

Don't read, listen to, or watch any news or other media reports of the trial. Don't conduct any independent research about the case, about the matters in the case, or the individuals involved in the case. Don't talk to the parties, the attorneys or the witnesses in the case about anything. Keep an open mind.

And I again thank you for paying attention and I wish you a good evening. And we will see you tomorrow 9:15 in the jury room and we will come out here at 9:30. Have a good evening.

(Jury exits the courtroom.)

THE COURT: Everyone may be seated. I'm just going to keep you for another couple of minutes, not too long.

I wanted to address the Government's filing at ECF No. 385, which was a joint filing. And it's on the expert testimony issue. And I just want to understand from the Government exactly what they would be seeking to offer by way of testimony from Dr. Raghavan if she were permitted to testify. I know that you have given sort of a general category. I want to show very specifically what it is you are seeking to offer.

MS. GUPTA: Yes, Your Honor, Dr. Raghavan would testify to the tactics of coercive control, some of which have been mentioned during this trial, the concept of grooming, for example, love bombing and how those coercive control tactics can make people sometimes react in counterintuitive ways to a particular situation, so, for example, why someone who undergoes those particular tactics may not leave an abusive situation.

And Dr. Raghavan has not spoken with any of the victims in this case, so it would truly be kept to just general background concepts.

THE COURT: Well, let's talk more specifically about the tactics. You said grooming, love bombing.

What else?

MS. GUPTA: Micro regulation is one of them, Your

Honor. The idea of monitoring someone, monitoring, for example, the parts of their day and their schedule.

I apologize, Your Honor. I just want to open up the document --

THE COURT: That's okay. Take your time.

MS. GUPTA: -- so I can tell you more precisely.

Your Honor, I'm having a bit of trouble connecting. But I'm also happy to submit a letter with the precise topics of expected testimony if would that be helpful.

THE COURT: Let me turn to the defense for their response. I mean, obviously, you have responded in the past. But I would like to hear, not really your response to their proffer, but if the Court were to permit that testimony, and I haven't made any decision on this, other than the decision I made pretrial, what, if any, expert testimony would you be seeking to offer?

MS. BONJEAN: Well, Your Honor, we have to testimony from Dr. Ley, who is has provided an expert report on a couple of subject matters, one relates to the scientific benefits of OMing, which is sort of a different issue, which is still tabled, and I think the Court tabled that discussion.

But putting that aside for the moment, he also is an expert on such matters as grooming. He will address some of the coercive control tactics. It would be to some degree responsive to Dr. Raghavan. And -- but I do believe that

there is -- - you know, again, this is assuming that the Court allows it. I will say that, you know, our position is that putting aside whatever Dr. Raghavan's expertise is on these subject matters, they are not within an organizational setting.

THE COURT: So that's what I was going to ask you about next. I understand that that's one of your main argument, if not really the lead argument.

What, if anything, is the experience of someone like Dr. Ley in the organizational setting?

MS. BONJEAN: I mean, so, he is -- he would speak to grooming, you know, in an interpersonal relationship, the same way she's going to speak to grooming in an interpersonal relationship. Frankly, there has been no expert offered, I don't think it is passed a Daubert challenging, frankly, in the district court this is really getting into coal expert versus.

THE COURT: That's why I'm asking you these questions about exactly what the testimony is, what you think you would be meeting it with and what the expertise of these various people are and you're making the argument that the organizational aspect of this is different than some other aspects.

MS. BONJEAN: Yes. I think it is because what you've heard from these witnesses, and particularly this

witness, you've heard a lot of the coercion came from the culture, the culture of the organization. She says, you know, started with Ms. Daedone. So, you know, that is very different than being in an abusive relationship or having someone sex trafficking you, your pimp.

THE COURT: Well, that is why I want to know more about what the Government is anticipating and really flesh out the details here.

MS. GUPTA: And, Your Honor, I have that in front of me now.

THE COURT: Okay.

MS. GUPTA: So, the tactics that Dr. Raghavan would testify to are isolation, for example, so, restricting access to outside sources of support, which many witnesses have testified to during the trial, intimidation. So engaging in behaviors that induce fear or self-blame or compliance without the threats of physical harm. Micro regulation, I mentioned already.

Economic exploitation, deprivation, so denying basic needs, such as sleep or emotional needs, for example, degradation, using tactics designed to erode a person's sense of self worth. And, finally, sexual coercion and abuse. So, I think that's been fairly obvious from some of the witness's testimony.

THE COURT: I think I'm still left wondering whether

you're seeking to really have an expert give more definitional testimony or how it plays out in practice. I'm not entirely clear what you're seeking to do.

MS. GUPTA: I think it would be a little of both. It would certainly be explaining these concepts, and then also explaining the effect that these tactics of coercive control can have on individual.

MS. BONJEAN: Your Honor, again, I'm jumping around a little bit here. But let's say for argument's sake, that this was reliable. We don't believe it is.

THE COURT: I understand.

MS. BONJEAN: Let's get past this. These witnesses have really been great latitude to define and, frankly, accurately define, a least according to Dr. Raghavan's expert report, what these tactics were.

They all apparently become expert themselves because they are defining the tactics and then explaining to the jury how it caused them to do things and the effect it had on them. The work has been done on that. And I don't think -- you know, there's been no real cross-examination on that. The only thing is the brainwash thing, which never should have come in, in my estimation. Brainwashing isn't a -- that definitely has not satisfied any type of Daubert challenge. It's a colloquial term.

THE COURT: But nobody has testified as an expert.

These witnesses have testified as to their experience, to their understanding.

I hear you. But I really want to focus on the content of what the Government is seeking to admit and your response in terms of what you would be seeking through an expert to admit, because one possibility is that you bifurcate explaining concepts with how they typically play out if the argument is that this is not typical in terms of the structure.

(Continued on next page.)

(Continuing.)

(In open court; jury not present.)

MS. GUPTA: And, Your Honor, we would be fine with just an expert opining on the definitions and explaining those because, although some witnesses have testified to their experiences, as many of them have said on cross-examination, they are not experts in these concepts and they have had difficulty explaining what they were feeling and how these tactics played out.

MS. BONJEAN: But she didn't examine them. This is all speculation.

THE COURT: But she wouldn't be able to be an expert if she had examined them --

MS. BONJEAN: Not --

THE COURT: -- on this, on this area.

MS. BONJEAN: Not necessarily true. I think there are cases where people have used it as an affirmative defense.

THE COURT: A different kind of expert, though.

MS. BONJEAN: I understand.

I think -- I think the jury does not need to be educated on basic concepts of manipulation. And to the extent they want to use it, they want to use it to bolster the witnesses' testimony that they've already given. I think it's cumulative. I think it's unduly prejudicial.

And, frankly, if we're just gonna do definitions,

then I'm not sure that I don't want to get into all of it because there is a lot of question --

THE COURT: What do you mean when you say you don't want to get into it, you mean with an expert or --

MS. BONJEAN: I mean on cross-examination. Like, what she's testifying to would be -- again, her expertise is in these interpersonal relationships like a domestic violence relationship, a sex-trafficker pimp/with their victims.

THE COURT: But do you think something like micro regulation or isolation has a different meaning?

I'm not talking about the application now. I'm trying to bifurcate just for purposes of this discussion now the concept of what do these terms mean or these concepts mean versus how do they play out in a sex trafficking context or a domestic violence context, which is different, or may be different. I don't know what the experts would say. But I'm trying to separate those for purposes of this discussion.

MS. BONJEAN: Right. And the problem is, is that there are just two defendants here. There isn't an organization on trial.

THE COURT: Right.

MS. BONJEAN: And so --

THE COURT: But you raised organizational issue.

MS. BONJEAN: Right. I'm saying, though, what -- what these witnesses have testified to, to some very tiny

degree, is what Nicole or Rachel did or said specifically. The vast majority of the testimony is more in the vein of, the organization, the culture, the environment.

Which it just wouldn't have happened that way because when they were asked by the Government: Well, who -- who said that? Really anybody -- that Nicole, Rachel and everybody in the upper management. And so that's the kind of testimony that's come in.

So, what they are saying is that it's an organizational pressure that they are feeling.

Now, if they were saying there was something specific Nicole or Rachel --

THE COURT: Well, that is an over-generalization. I mean each witness testified to different things. I mean there was some commonalities, but there were some specifics also.

MS. BONJEAN: I think that I -- my recollection of the testimony is, again, the specifics really weren't so much about coercive -- specifics as to these defendants, who are the people sitting at -- defending this case. The coercive control tactics were not as specific. I think there was some examples of shaming. You know, the thumbs up, thumbs down thing.

And, frankly, I mean I don't think we need an expert to say that, you know, maybe -- maybe that would be hurtful. I don't know. I think a jury can assess those things. I

think there are some examples of that.

But I think looking at the totality that what they are talking about, what they are saying the coercion is is an organizational coerciveness, and I do not think that this type of testimony --

THE COURT: Not -- yes, I think you're over-generalizing.

MS. BONJEAN: I think not.

THE COURT: But it's really not relevant so much for purposes of what I'm asking about right now.

MS. BONJEAN: Okay.

THE COURT: And I haven't made any decision on this.

I, of course, before trial, before hearing the testimony, before seeing a lot of these exhibits, had made a determination in terms of usefulness to the jury, but the Government has re-raised it and I am considering it. But it looks like somebody at the Government wanted to say something additional.

MS. BENSING: Well, Your Honor, just to briefly respond to the factual points.

THE COURT: Yes.

MS. BENSING: I do think that there has been, even beyond the question like: What is your scientific definition of brainwashing?

I think there has been questions on cross-

examination about like high school tactics I think is something that Ms. Cohen used and things like that.

And so, I do think that where the statutory requirement, one of the statutory requirements of serious harm that the Government is, obviously, relying on here is psychological harm. And there is a need for these concepts to, at least, be explained to the jury by a licensed professional in that area.

And so I understand that the Court is looking for a very specific proffer, which we didn't provide it today. We can certainly take a look and try to give the Court a better proffer in the morning or whenever is convenient for the Court.

But just on the factual points, it hasn't been one instance of cross-examination. Even on direct examination the victim witnesses have struggled at times to explain the very complicated dynamic that's been going on. Although, they are clear that they suffered psychological harm and abuse.

MS. BONJEAN: I would disagree, Your Honor.

I think the witnesses have gone on and on and on about their own psychological harm. They've self-diagnosed themselves. I mean I think it's, frankly, improper all the way around that they've been permitted to do it. And then to add an expert on there on top of it. I mean -- and then prevent us from even putting witnesses on to talk about the

culture, which this Court has already, you know, given us a preliminary ruling on.

So, I think we are going on a territory where the defense is being severely limited pursuant to the Sixth Amendment, and -- and -- and it's, basically, directing a finding in favor of the Government on coercive control. That is -- that is the way I think it's coming in.

You know, again, I'm not expecting anyone to agree with me on this, but I also think it was proper cross-examination on the brainwashing. I objected to that coming in. She testified to it. It was improper. There's no such thing as brainwashing. Even Dr. Raghavan doesn't talk about brainwashing or mind control.

THE COURT: People use words colloquially all the time. We had discussed this at pretrial.

But I think you're answering my questions now. If the Government wants to provide a more specific proffer, but I'd ask you to give that to the defense first because if they then have a more specific proffer on any potential expert they would want... Dr. Ley. Who else? Anybody else?

I know there were several before trial, but we left off where you were going to sort of rethink depending on what happened, and I had already pretrial said I was provisionally not going to allow the Government to do it. So --

MS. BONJEAN: Yes, Your Honor. We had Kriegman as

well.

THE COURT: Yes. Remind me what -- well, maybe don't remind me. Just tell me now in this context what you would purport to do with him, if the Government called him.

MS. BONJEAN: Dr. Kriegman is the so-called cult expert, which, again, we proposed him only to the extent that we could not get a clear response from the Government at the time about whether they were going to make the cult allegation. Which, of course, they have and so have the witnesses. It is a cult case. If they had a cult statute, that what --

THE COURT: The Government hasn't made an allegation, but there's been testimony referencing cult in the colloquial terms and we --

MS. BONJEAN: The record will reflect what has happened, and cult has been testified to on a number of occasions.

THE COURT: Yes.

MS. BONJEAN: And there's literally no definition of cult. And that's one of the things, I guess, a cult expert would say is there's no real definition of a cult. There are -- there are benevolent cults. There are pernicious cults. There are a wide range of cults.

THE COURT: Right, but the jury is not going to be asked to determine whether something is a cult. Right?

MS. BONJEAN: Well, they're not going to be asked to determine that, but what they are going to be asked -- what they are being asked, and we would be sitting here with our head in the sand if we suggested otherwise, that they're saying OneTaste was a cult that used these coercive tactics, which amount to brainwashing and mind control. And, therefore, that is the coercive control.

There is a direct line, that is the argument. The Government -- that is what -- that is what is being argued here. We can act like it's not, but it's absolutely what's being argued here. And it's novel, it's never been done. There's not a case that we can look to for guidance on this.

THE COURT: Can you point to an organization that is analogous to OneTaste?

MS. BONJEAN: Well, sure. I mean I think I mean --

THE COURT: Tell me.

MS. BONJEAN: Like Scientology as an example. I mean some people call it a cult.

THE COURT: Is there a sexual element there? Genitals involved?

MS. BONJEAN: Okay.

THE COURT: I'm just, I'm just -- really, I'm asking you whether there is something analogous.

MS. BONJEAN: Give me one second, Your Honor.

THE COURT: Yes, of course.

MS. BONJEAN: I want to listen to my client for a second.

THE COURT: Absolutely.

(Pause.)

MS. BONJEAN: So, I think that -- so, again, this is why Dr. Ley's expertise is important. So if the Court, you know -- to get to that question, you have to assume that OMing is not a meditative practice, right?

THE COURT: No. You don't have to assume that at all.

MS. BONJEAN: Okay.

Well, I mean I don't know that there's anything about it -- just because it involves clitoral stroking, which by the way is rooted in practices that precede by centuries --

THE COURT: You've laid this out, yes.

MS. BONJEAN: Okay. So I don't know that -- you've asked me for a organization that is sort of akin to OneTaste.

THE COURT: Right, right --

MS. BONJEAN: And --

THE COURT: -- because you're commenting on the testimony in this case. And I'm asking you: Do you have something analogous?

And I think the answer is probably no, and I'm not surprised that that would be the case.

MS. BONJEAN: But you didn't clarify if you wanted

an analogy about sort of the core element, which is the -- the OMing piece.

I think that this is not -- less about the OMing piece than it is about this was a cult. And I think that is -- there's a lot of examples.

THE COURT: So tell me. Tell me those examples that you think are analogous here that you want me to think about.

MS. BONJEAN: Well, I think there are religions. I think there are --

THE COURT: Tell me though. Not generalities, just tell me.

MS. BONJEAN: I mean other religions -- maybe I need to understand the question.

That other cults that -- that -- I've never heard of a cult being prosecuted in this way, so I can't give you an example in the law. I've never seen an actual prosecution like this. There is none. We can't because it doesn't exist.

And are there organizations that, again, colloquially I could say this seems a little bit like Scientology. It could be like Evangelical Christians, Pentecostal things. There could be all types of examples that are --

THE COURT: No, I am talking about legally.

MS. BONJEAN: Well, I don't know one. This is --

THE COURT: Right.

MS. BONJEAN: This is a novel prosecution.

THE COURT: Okay.

MS. BONJEAN: And maybe, maybe, maybe it will be EDNY making groundwork on coercive control being --

THE COURT: That's not the issue here.

The issue is the arguments that you're making about the evidence in this case and you don't have an analogy. And I'm not faulting you for that. I'm not surprised that that's the case.

But anyway, Ms. Bensing, you look like you want to say something.

MS. BENSING: Well, I was just going to very briefly, this is essentially what the Court was just asking. So you can stop me if you don't want to hear from me.

But I was just going to say very briefly that just as in a securities fraud case, for example, somebody would come testify about complicated terms that are used in a securities fraud case. From the Government's perspective, this is the came. I mean it's obviously not a securities fraud case. We have different kinds of concepts that we're talking about. But in terms of the need for an expert to explain some of these concepts, I do think it is analogous.

THE COURT: Okay. If the parties want to give me more detail on what you think appropriate expert testimony is. And, obviously, there's issues of reliability, but I'm really

talking about the content and why you think it would be helpful to a jury or not helpful to a jury. You can put in a joint letter on that.

I want to raise one other issue. There has been no motion to quash that's actually been filed yet, but -- and I have made, of course, no determination then about any, you know, alleged work product protection or any attorney-client privilege.

But I will say that if someone refuses to testify on the alleged basis of work product protection or attorney-client privilege after being directed by the Court to answer a question posed, that person will face contempt proceedings, the result of which may be that the person will be remanded to the custody of the United States Marshals Service. And I just wanted to note that.

It may not be an issue because there may not be a motion, but I wanted to let everybody know that so that we don't have delay and everybody knows what will be coming.

Is there anything else we need to take up right now?

If not, I'll let everybody go.

MS. BENSING: I don't think so, Your Honor. Thank you.

MS. COHEN: Nothing from the defense.

THE COURT: Ms. Bonjean, anything?

MS. BONJEAN: No thank you.

THE COURT: Okay. So I'll see everyone back tomorrow morning.

Have a good evening.

(Proceedings adjourned to May 22, 2025 at 9:30 a.m.)

ooo0ooo

**I N D E X**


| WITNESS | PAGE |
| --- | --- |
| **MICHELLE WRIGHT** | |
| DIRECT EXAMINATION (Cont'd) BY MS. GUPTA: | 2394 |
| CROSS-EXAMINATION BY MS. COHEN | 2460 |
| CROSS-EXAMINATION BY MS. BONJEAN | 2583 |
| REDIRECT EXAMINATION BY MS. GUPTA | 2636 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 2644 |

**E X H I B I T S**



| Exhibit | Page |
|---|---|
| Government's Exhibit 1045-R | 2397 |
| Government's Exhibit 414 | 2417 |
| Government's Exhibit 3772 | 2430 |
| Government's Exhibit 3771 | 2434 |
| Defense Exhibit 3-DA | 2475 |
| Defense Exhibit 3-Z | 2481 |
| Defense Exhibit 3-DB | 2483 |
| Defense Exhibit 3-AR | 2539 |
| Defense Exhibit 3-AS | 2540 |
| Defense Exhibit 3-AU | 2543 |
| Defense Exhibit 3-AH | 2580 |

# E X H I B I T S


| Exhibit | Page |
|---|---|
| Defense Exhibit 3-DT | 2616 |
| Defense Exhibit 3-DU | 2618 |
| Defense Exhibit 3-DV | 2620 |
| Defense Exhibit 3-DX | 2621 |
| Defense Exhibit 3-DY | 2622 |
| Defense Exhibit 3-DW | 2624 |
| Defense Exhibit 3-DZ | 2625 |
| Defense Exhibit 3-AZ | 2637 |