UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 22, 2025

Defendant. : 9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Stacy A. Mace
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
United States Courthouse, Room N377A
225 Cadman Plaza East
Brooklyn, New York 11201
smacerpr@gmail.com

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: The Honorable Diane Gujarati is now presiding.

THE COURT: Good morning.

THE COURTROOM DEPUTY: You may be seated.

Your Honor, this is United States of America versus Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialist Marlane Bosler and Liam McNett, and FBI Special Agent Tricia Quintero.

Good morning, Your Honor.

THE COURT: Good morning, everyone.

MS. FARRELL: Good morning.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler LaBarge, on behalf of Rachel Cherwitz.

THE COURT: Good morning to you all.

MS. BONJEAN: Jennifer Bonjean, B-O-N-J-E-A-N, and Kelsey Killion on behalf of Ms. Daedone. Along with paralegal, Galila Assefa.

THE COURT: Good morning to everybody.

I know the parties have a couple things they want to take up. I want to just remind everyone that counsel cannot talk over either the witness or me because the court reporter can only take one person down at a time. That was happening too much yesterday. Just be careful with that.

What is it that the parties want to raise with me before we bring out the jury?

MS. BENSING: So, Your Honor, I think the first thing is with respect to two stipulations that the parties have reached with respect to the authenticity of certain text messages and e-mails produced by OneTaste.

I believe we have resolution on this, but I believe the defense wanted to note something for the record with respect to not waiving certain appellate rights, which the Government agrees to.

THE COURT: Well, at some point someone will show me what the stipulation is and we'll deal with this.

But does it need to be done before this next witness comes out?

Because I'll need to look at the stipulation and understand what the issues are. So, I haven't seen that yet.

MS. BENSING: Understood.

So, do you want to make your record now so that we can provide the Court with a signed copy?

THE COURT: I don't know what the record to be made

is. I would like to see the stipulation first.

MS. BENSING: Yes, Your Honor. We can provide a copy.

THE COURT: Okay. Let's move on to the next issue.

MS. BENSING: Okay.

So the next issue, so that the Court is aware, we anticipate that a witness who will be testifying this afternoon, Robert Kandell, will be testifying pursuant to immunity. I think the following procedure is what we would propose to the Court.

Either the witness can take the stand and be sworn under oath in front of the jury, or the witness can take the stand and be sworn under oath outside the presence of the jury and then be resworn in front of the jury.

Either way, the Government would then request, outside the presence of the jury, to ask the witness certain questions, and in response to determine whether or not the witness will, in fact, invoke his Fifth Amendment right.

The Government would then request that either the Government or the Court can inform the witness of the immunity order and order witness to testify.

The jury would then return and the parties are requesting that the Court at that time instruct the jury that the witness will be testifying pursuant to an immunity order.

And I have a proposed instruction that I can read

out to the Court or that I can e-mail to chambers, whatever is most convenient, that the parties have agreed on.

THE COURT: You can just file it on the docket.

MS. BENSING: Okay.

And then the witness would resume his testimony.

So that's what we would propose.

THE COURT: Yes. I think that's fairly standard. I can hear the defense on that.

But are you proposing that you would be seeking to offer the immunity order, itself?

MS. BENSING: Not into evidence, Your Honor. But it will have to be read to him, obviously, when he invokes outside the presence of the jury.

THE COURT: Right. I mean I think that all sounds pretty standard.

So, let me hear from the defense on that proposed process.

And let me just make clear, I would not have him invoke in front of the jury. That would be done under oath outside the presence of the jury.

MS. COHEN: We have no objection to that proposal, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Okay. So that takes care of that.

What is the next issue or is that it?

MS. BENSING: No, there's one more issue.

So with respect to this witness — and, again, we could take some of this up at the lunch break because he won't be testifying until this afternoon — but with respect to this witness, I understand that there are some outstanding evidentiary disputes that we wanted to flag for the Court. And, in particular, the Government is seeking to elicit from this witness certain testimony that pertains to notice. So, not for its truth, but simply as to notice.

THE COURT: Notice of what and to whom?

MS. BENSING: Notice of -- so, there have been claims at this trial with respect to the defendants being on a purported lack of notice of certain kinds of complaints that relate to the charged crime.

And so to rebut that and to prove affirmatively the knowledge and intent element of the crime, the Government intends to offer evidence related to the following:

Government Exhibit 1002, which is an e-mail attaching a New York Times article in which certain individuals raised concerns that OneTaste was cult-like and individuals were being manipulated. That article contains statements of Ms. Daedone, herself.

So, this witness is anticipated to testify that the -- he and Nicole Daedone had discussions about this New York Times article and she was aware of the allegations within

The New York Times article.

We are not seeking to put those in for their truth in any respect, it is simply to, as I just stated, prove knowledge and intent and really notice is the key one.

So that's the first thing.

We don't intend to admit the article, itself. We just intend to elicit testimony with respect to the allegations in it. Again, for notice.

Relatedly --

THE COURT: Why can't that be the subject of a -- either a stipulation or testimonial stipulation, to the extent you're not seeking to put in the actual article?

I do think based on your proffer that there is a -- that what you're suggesting would be relevant on a couple of issues. But is there -- is there no agreement that can be reached as to exactly what is said about this article?

MS. BENSING: My understanding is that the defense are wholesale objecting to it. And so, the parties just have a dispute here.

THE COURT: Okay.

(Pause.)

MS. BENSING: Yes. And I will say, he's an immunized witness. We have not had lengthy opportunities to meet with him, so I am happy to lead for efficiency purposes, particularly on these sort of trickier topics. But I will

note that the Government has not had an opportunity to prepare at length with this witness. We have met with him on a couple of occasions.

THE COURT: Okay. So, what exactly are you seeking to elicit with respect to this New York Times article and what's the date of the article?

MS. BENSING: The date of the article is March of 2009. I think it's March 15. I can get the Court the exact, but it's --

THE COURT: But it's 2009.

MS. BENSING: -- March 2009, yes.

So, what we were seeking to elicit is, essentially, did there come a time -- well, what I anticipate the witness will testify to is that certain community standards were put in place just prior to The New York Times articles coming out in an anticipation of OneTaste getting additional scrutiny after this publication.

And then I anticipate eliciting from him that he discussed the New York Times article with Nicole Daedone. She never indicated that any part of the New York Times article was inaccurate to him. And that The New York Times article indicated that, in part, she -- well, it quoted her that there was a high potential for this, i.e. OneTaste to be a cult. She move out of the communal living in part because, quote, Everybody treated me like a guru. And that the article

reported that individuals had reported to the Times that you stop trusting yourself and start trusting Nicole. And that there were --

MS. BONJEAN: I can't hear Ms. Bensing. I'm sorry.

THE COURT: Just repeat that last part.

MS. BENSING: Well, the article, itself, indicates that an individual reported in the article that you stop trusting yourself and you start trusting Nicole Daedone and allegations of manipulation.

THE COURT: Sorry. You're saying an individual. Was the name used?

MS. BENSING: The name of the individual was used. We don't intend to even elicit that because it's not a victim in this case and it's not coming in whatsoever for the truth of the allegation. Just that at that point in time of March of 2009 Nicole Daedone was on notice that these complaints were being made about the organization that she ran, which I think is highly relevant to some of the cross-examinations and also just more generally knowledge and intent.

THE COURT: Okay.

This is not the witness that's going to be testifying right now, right?

MS. BENSING: No.

THE COURT: I'll hear the defense out briefly but I don't want to keep the jury waiting.

MS. BENSING: Yes.

THE COURT: I also really wonder why with all the litigation we've had over the last year-and-a-half or so, why something like this could not have been anticipated.

I don't -- did you bring this up with me? Am I missing something here?

MS. BENSING: Your Honor, I think -- I think we didn't, perhaps, bring up these specifically instances.

I do think we have raised with the Court issues of notice and putting things in for notice.

THE COURT: Yes, of course, you have. But I mean this seems to be something that was knowable well in advance of trial, if you're telling me it's an article from 2009.

MS. BENSING: Well, Your Honor, part of the reason why we think it is particularly important is because I think that there has been cross-examination about the defendant's lack of notice.

THE COURT: But you would have known that was going to happen.

Anyway, you've raised it now, but I'm not going to keep the jury waiting much longer on this.

I will hear --

MS. BONJEAN: Just briefly.

THE COURT: -- from the defense.

No, of course. Go ahead.

MS. BONJEAN: Just briefly.

This idea that she was on notice that people were accusing her of being a cult. Like, yeah, it wasn't raised with us because they wouldn't even admit that they were going to be bringing out cult issues. So, this is -- and once they did, we have to cross on it. So, it's not us opening the door.

THE COURT: I didn't hear an opening-the-door argument.

Is that the argument?

MS. BENSING: No. I think the argument is that it goes to notice and it goes to knowledge and intent.

THE COURT: Right. That's what I understood your argument to be.

MS. BONJEAN: But the notice of what?

THE COURT: Right. Well, that's I think --

MS. BONJEAN: This is, unfortunately, a conspiracy case and putting Ms. Daedone on notice that some people think she's a cult, that they're a cult, I don't really see how that could be --

THE COURT: I don't think that's the proffer. But, again, let me see the article. You're telling me now an exhibit number. It would have been really helpful to have this, even just yesterday.

MS. BENSING: Your Honor, I will say that we did

send a letter to the defense attorneys yesterday morning.

THE COURT: Okay, but that's not me. They're not making these evidentiary decisions, I am.

MS. BENSING: We wanted to comply with the Court's order that it be joint.

THE COURT: Okay, but there's no joint anything right now.

MS. BENSING: Understood.

THE COURT: And your witness is going to testify today, or maybe not if this issue is not resolved. Because, I'll tell you, I'll take the time that I need if the parties are not giving me the stuff I need ahead of time.

MS. BONJEAN: And this is our position, too. They gave us -- these are big evidentiary questions, they are not small. And they were, I guess, sent to us yesterday in the middle of court.

THE COURT: Yes. Who do you have after Mr. Kandell to testify that can testify to today?

MS. BENSING: We will discuss that, Your Honor.

THE COURT: Okay.

Anything else?

Ms. Cohen, do you want to be heard on this right now?

MS. COHEN: Not right now, Your Honor.

THE COURT: Okay. I think we need to bring out the

jury then. And these stipulations I'm also not going to look at right now.

(Pause.)

(Jury enters.)

THE COURT: Good morning, everyone. Nice too see everyone. Please be seated.

Government, you can call your next witness.

MS. GUPTA: The Government calls Michal Neria.

(Pause.)

MS. GUPTA: Sorry, Your Honor, the witness just ran to the restroom, but will be here shortly.

THE COURT: That's all right. Obviously, we'll wait.

(Pause.)

(Witness enters.)

THE COURTROOM DEPUTY: Miss, please come forward. Please step up.

Remain standing and raise your right hand.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the answers and the testimony you are about to give this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record, spell your last name slowly, and please speak into the microphone.

Thank you.

THE WITNESS: Okay. Michal Neria, N-E-R-I-A.

THE COURT: Good morning.

You may proceed, Ms. Gupta.

(Continued on the following page.)

**MICHAL NERIA**,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GUPTA:

Q Good morning, Ms. Neria.
A Good morning.
Q Do you know an individual by the name of Nicole Daedone?
A Yes.
Q How do you know her?
A I was part of an organization where she was the leader.
Q What organization?
A OneTaste.
Q What was her role at OneTaste while you were there?
A She was -- she was the head teacher, the leader. She was the person that we were learning everything from.
Q Do you know an individual by the name of Rachel Cherwitz?
A Yes.
Q How do you know her?
A She was -- she was -- she was one person below Nicole. She was also a teacher. She was the head of sales in the organization. She oversaw the sales team in New York when I was a part of it.
Q Did she go by any nicknames?

A RC or RT.
Q And what did RC signify?
A Rachel Cherwitz.
Q And what did RT signify?
A Rachel Tayeb.
Q Why was she known as Rachel Tayeb?
A She was married to Hamza Tayeb at the time when I was part of OneTaste.
Q Do you see Nicole Daedone in the courtroom today?
A Yes.
Q Could you please identify her?
A Right there, with the beige sweater.

MS. GUPTA: And, Your Honor, we would ask that the record reflect that the witness has identified defendant Nicole Daedone.

THE COURT: Yes.

BY MS. GUPTA:
Q And do you see Rachel Cherwitz in the courtroom today?
A Yeah, right there with the black jacket.

MS. GUPTA: And, again, Your Honor, we would ask that the record reflect that she identified the defendant.

THE COURT: Yes.

BY MS. GUPTA:
Q Ms. Neria, are you testifying here today pursuant to a subpoena?

A Yes.
Q Approximately when did you first become involved in OneTaste?
A October 2014.
Q How old were you then?
A I was 27.
Q Did you ever perform any work for OneTaste?
A Yes. I was part of the sales team.
Q Did you ever provide any sexual labor on behalf of OneTaste?
A Yes.
Q What was that sexual labor?
A Well, as part of the sales team I was engaging in orgasmic meditation, usually twice in the morning, two rounds, and then in the afternoon on most days as well. So, four times a day.
And I was also engaged in sexual activities with other workers, teachers, leaders. Yes.
Q Did there come a time when you stopped working for OneTaste?
A Yes. That was in September 2015.
Q Did you experience any financial harm while you were at OneTaste?
A Yes. I went into debt, credit card debt.
Q What was the approximate amount of your debt?

A 25,000.
Q Did you experience any psychological harm while you were at OneTaste?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A Yes. I suffered from PTSD, post traumatic stress disorder, and acute depression.
Q Did Nicole Daedone contribute in any way to the financial and psychological harm that you just described?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Sustained means you don't answer.
THE WITNESS: Okay. Thank you.
BY MS. GUPTA:
Q I want to go back to before you became involved in OneTaste.
Where did you grow up?
A I grew up in Israel, in Jerusalem, until the age of 13. And then we moved to the United States and I lived in Long Island.
Q Were you close to your family growing up?
A Very much.
Q Do you have any siblings?
A I have two siblings. I have a younger brother and sister.

Q Are you close to your siblings?
A Very much.
Q Did you attend college?
A Yes, I attended Fordham University where I got my BA and MA in English. And then Teachers College where I got my MA in English education.
Q And what did you do for work after that?
A I worked as a teacher, as a middle school teacher.
Q How did you first learn about OneTaste?
A I went to -- in the summer of 2014, I went to a yoga teacher course -- teaching course, and it was a month-long course in New Haven. And the anatomy teacher taught a section for a couple of days about physical, emotional, psychological health, and she mentioned OneTaste and orgasmic meditation as part of her sexual -- sexual health section.
Q And what personally drew you to OneTaste?
A So, when I first heard about it, I -- you know, it -- it stuck in my mind because she spoke about orgasmic meditation and I also thought it sounded very weird. I did not -- I did not feel drawn at that moment.

But I continued working with that person as a coach and when I told her that I never had an orgasm before and that was something that I wanted to experience in my life and I was worried that I would never be able to experience, she -- she really pushed OneTaste as -- as -- as -- as a good solution.

She said that it was revolutionary for women. And she also said that the people in OneTaste speak my language, meaning that they were sensitive, vulnerable people, where I could, like, build friendships and relationships with, where they would understand where I was coming from.

Q So you testified that you became involved in OneTaste in October of 2014.

What was your initial involvement?

A So -- so, I bought an Intro to OM entrance -- when I was, when I was talking to this person when she was coaching me, that's when I decided to go ahead and get the Intro to OM. And before the class took place, I went to a few TurnON events.

Q What is a TurnON event?

A It's an event that OneTaste organized in order to teach the public about orgasmic meditation. So, we would play three games that were supposed to make you feel the same kinds of feelings that you would have during an orgasmic meditation session.

Q Can you briefly describe those games?

A Yes.

So, one game was just, you know, people would say how they feel and you're supposed to say the first thing that came up to your head. So, like, I'm feeling happy, I'm feeling turned on, I'm feeling nervous. The idea was to feel

in your body the sensations that -- that come up.

Another game was -- was a hot seat. So, a person would be called to -- to a chair and be asked vulnerable or kind of questions that were many times sexual in nature, and they were supposed to answer with the first thing that comes up to their minds. So, again, to make them feel -- usually they said that, like, if they get red in the face or get sweaty, those are the same feelings and sensations that you have during an orgasmic meditation sessions.

Q Where were the TurnON events that you attended located?

A On Broadway in Soho.

Q And then you testified that you attended an Intro to OM course?

A Yeah.

Q When approximately was that?

A So that was November 6th, 2014. And it was in Bank Street -- on Bank Street in -- in the West Village.

Q How much approximately did that course cost?

A I think it cost a hundred-forty-nine dollars, I believe.

Q And what was taught at that course?

A So, it was a whole-day course that taught all about orgasmic meditation. So, you have to take this course in order to practice orgasmic meditation.

So, it -- it -- it -- it taught everything from, like, what the practice is and what it -- and how -- what it

might feel like. And also, all the tenets or some of the main tenets of OneTaste. So, you know, like the eight laws of orgasm, how to get a partner, what -- what OneTaste believes.

Yeah, it was -- it just -- it was a lot of information on that one day.

Q And who taught that course?

A Rachel Cherwitz and Hamza Tayeb.

Q And I think you testified earlier Hamza Tayeb was Rachel Cherwitz's husband at the time?

A Yes, uh-hum.

MS. GUPTA: I'd like to show the witness Government Exhibit 309, which is in evidence.

(Exhibit published.)

BY MS. GUPTA:

Q And who is pictured here?

A Rachel Cherwitz.

MS. GUPTA: Thank you. We can take that down.

Q Where were you living at the time that you attended the Intro to OM course?

A I was living in the upper westside.

Q How were you supporting yourself financially at the time?

A I was an assistant teacher in a Jewish school in Brooklyn.

Q After the Intro to OM course, did you sign up for any additional OneTaste courses?

A Yeah. I signed up for -- to the OM Practice Club, which was a club that met once a week at The Staff House, OM house. And we were taught different topics about orgasmic meditation and practiced orgasmic meditation with -- with some lead teachers kind of leading the practice saying: Today we will concentrate on -- on different aspects of the practice.
Q And you just mentioned that it was located at an OM house called The Staff House.
A Uh-hum.
Q Where was that?
A 365 First Avenue in the East Village.
Q And how much approximately did the OM Practice Club cost?
A So, it was a monthly -- it was like a recurrent payment. I believe that it was something like -- like $49 on a monthly basis. I believe.
Q And who taught OM Practice Club?
A So, it was -- it was a different roster of teachers. So, kind of depending who -- who was there and who was available. So, each -- each weekly session was taught by somebody else.
Q And after the Intro to OM course, did you sign up for any additional OneTaste courses?
A Yes. So I -- I signed up for -- to the Communication class.
Q Who taught that course?
A Rachel.

Q And after these two courses, did you sign up for any other courses?
A Then the next -- so, as part of the OM Practice Club there were a few courses or events that I got for free that were part. So, there was like a Valentine's Day party that -- that I got to go in for free. But the next big course that I purchased was the Coaching Program.
Q Who sold the Coaching Program to you?
A Rachel.
Q How did you come to sign up for that?
A So, Rachel invited me to come meet her at another OM house. It was called The Bunker, which was -- it was located in midtown.
I did not know -- it was about two weeks after the Intro to OM class. I did not know why she was -- why she invited me there. I was very excited to meet with her. I thought that she wanted to get to know me better. We had a lot in common. Rachel spent some time in Israel. She lived in Israel. She also, during the Intro to OM class, she talked about herself and how she came to the practice. So, she said that she also was inorgasmic and that she suffered from depression and -- and past drug use. And I felt, I felt like we had a lot in common. I was very impressed by her and drawn to her. So, I thought she wanted to get to know me better. I did not know that it was that she was -- that she wanted to

sell me anything.

So, when I -- she did. You know, the Coaching Program was pitched a few times during the different events that I was in, so I knew that there was a Coaching Program. I was interested in it, but I did not -- in my mind I decided that I will try to do the New York Coaching Program, which would take place after the San Francisco.

So, the one that was -- that was being sold and pitched is the San Francisco one. And I was very much aware that I could not travel to San Francisco once a month for six months because it started -- it was Friday to Sunday, and I was working a full-time job and I, you know, had to go to work on Fridays. And I also could not afford a trip to San Francisco once a month. I never traveled once a month anywhere. So, I....

So anyway, so I went to meet with Rachel and she took me to her bedroom and we sat together on her bed and -- and then she told me, you know, she said: I feel like you need to attend the Coaching Program. And when I have an intuition, that means that I know that -- that you are supposed to be there.

And then, you know, I told her, you know, I'm thinking about doing the New York one. You know, because I'm -- I'm a New Yorker and it makes a lot more sense. I -- I also, I can't pay. I don't have that kind of money. It was

$12,000 for the Coaching Program. You know, I never spent $12,000 on a course and never in, like, you know -- if -- I spent money on university. Like I would have to think about that. That was a lot of money.

But she -- she's like: I know, I know you're supposed to attend. She said: You know, where there's desire, there's a way. It's -- and she also told me: I've seen it happen many times before where people just put in a deposit and then everything kind of works, in the orgasm world everything kind of works to -- in their favor so that they can -- so they can pay for a course.

So -- and so, you know, I -- I remember feeling very nervous and kind of like overwhelmed. And I -- and I felt a conflict.

On the one hand, you know, my brain was like: You can't pay for it. There is no way. There is a lot of pressure. She wants you to make a decision right now.

And on the other hand, I really wanted to. Like, I was really impressed with her in the Intro to OM class and I really wanted to -- for what she was saying to happen, to work for me to take, you know, to take this big leap of faith and for things to just fall into place and for -- you know, like I wanted to trust her. Like, maybe she -- she did have an intuition.

Like everybody in OneTaste seemed to say, like:

Rachel knows. You know, they trusted her intuition. So, I wanted to take that -- I wanted to believe it. So she said that all I needed to was put a deposit of a thousand dollars on my credit card and that my spot will be saved. And that, you know -- and then when, when I told her that I couldn't, you know, I couldn't put the rest of the money on that credit card, she -- she took out her laptop and told me about the discovery or the Discover credit card where you could -- where you take out a credit card and then you don't have to pay interest on it for 12 months. And she said that within the twelve months I would figure out a way to pay for the course. She said she saw it happen again and again.

So, on her laptop she -- she -- she -- she went to the application link and I filled out my information. And then got that credit card a little bit, like a week or two after in the mail. And that's how I paid for the Coaching Program.

Q How did you feel when she opened up her laptop to the application?

A I was surprised that she kind of -- it seems like she, almost like she knew what she -- what she -- what she had to do to have me sign up. Like, like that was, that was part of a plan. You know, I -- you know, I realized that --

MS. COHEN: Objection, Your Honor.

THE COURT: Basis.

MS. COHEN: Foundation.

MS. BONJEAN: Speculation.

MS. COHEN: Speculation, too.

THE COURT: I am going to overrule.

But you need to ask your next question.

BY MS. GUPTA:

Q Did you, ultimately, attend the Coaching Program?

A Yes.

Q When approximately did that begin?

A I -- the first session was in February of 2015.

Q Did the Coaching Program have a name?

A Yes, CP9.

Q What does the "9" signify?

A It was the ninth coaching program.

Q How long was the Coaching Program?

A It was six months, I believe.

Q And I think you testified earlier that it was once a month, is that correct?

A Yes.

Q How did you get to San Francisco?

A I would fly.

Q Through which airport?

A Either Kennedy or LaGuardia or Newark.

Q At the time, did you have the money to pay for these flights back and forth?

A No.
Q How did you pay for them?
A My credit cards.
Q Was it the Discover credit card?
A It was the Discover or I had a Chase credit card. Yeah.
Q Now, you mentioned that you were living in New York.
Did there come a time when you moved into a OneTaste communal home?
A Yes.
Q What was your role in OneTaste at that time?
A At that time, I was -- I was a member. I was -- you know, I was a new customer, somebody who was very excited about the practice in OneTaste.
Q And when was that approximately?
A So, I moved in -- in I think towards the end of December 2014.
Q Were you performing any labor and services for OneTaste at this time?
A I was doing like back-of-house. I was helping out however I could, like I -- you know, yeah.
Q And what do you mean by "back-of-house"?
A So I was setting up for events. I was putting chairs out for the -- for the TurnON events. And then when they finished, I would take the chairs away. Like, kind of like whatever needed to be done, you know.

Q Were you paid for any of that labor?
A No.
Q Was there a name for the house that you moved into?
A Yeah, the Brooklyn OM House.
Q And where was that located?
A It was located in Bushwick, in Brooklyn.

MS. GUPTA: I'd like to show the witness, for identification only, Government Exhibit 2.

THE WITNESS: Yes. That's -- that's the Brooklyn OM House.

BY MS. GUPTA:
Q How do you recognize this?
A I lived there for a few months, but I recognize the entrance and the building.
Q Is this a fair and accurate depiction of the Brooklyn OM House that you lived in?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 2 is admitted.

(Government's Exhibit 2 was received in evidence.)

MS. GUPTA: Thank you.

Can we please publish?

(Exhibit published.)

BY MS. GUPTA:

Q And is this the house that you lived in in Bushwick, Brooklyn?

A Yes.

THE COURT: Can we remove the blue arrows, please? I think there's just a mark.

BY MS. GUPTA:

Q How many people approximately lived at the Brooklyn OM House at the time?

A Approximately, ten.

Q And how did you end up living there?

A So, one of the people who lived there was moving out and I -- I met him, I met him at an event. And so, I -- I took his place. And he was looking for a place to live in Brooklyn. I just moved from the upper westside to Brooklyn. I lived in my new apartment for about a month, and he -- so he lived in my apartment and took care of my dog.

Q And who was that person?

A Ruwan.

MS. GUPTA: Can we show the witness Government Exhibit 286, which I believe is in evidence?

(Exhibit published.)

THE WITNESS: Yes, that's him.

Q That's Ruwan?
A Yes.
MS. GUPTA: Thank you. We can take that down.
BY MS. GUPTA:
Q Did you have your own room at the Brooklyn OM House?
A I shared a room and -- and a bed.
Q You shared a bed as well?
A Yeah.
Q With who?
A With Kora.
Q Did you pay rent?
A Yes.
Q How much was the rent approximately?
A I -- I think it was approximately 850.
Q And I think you mentioned that you were performing some work for OneTaste and weren't being paid by them at the time.
So how were you supporting yourself?
A I was still working as an assistant teacher for a Jewish school in Brooklyn, so that was my income.
Q And what, if any, other expenses did you have in addition to your rent?
A Food. We -- you know, communal -- communal food. We -- and -- and that's it. I had a car at the time, so to -- to get to and back from work. So, those were my expenses.
Q What was your schedule like when you lived in the

Brooklyn OM House?
A So, we would wake up in the morning, early in the morning. And before I left for work, we would do the practices, meaning that we would do two orgasmic meditation sessions, usually with -- with two different partners. And then we would do fear inventory, followed by ten minutes of sitting meditation. Then we would -- then we would break and some people would cook breakfast. Other people would like -- kinda like set up the table or -- or, you know, clean the floor. And then we would eat together breakfast, and I would go to work.
Q And what about in the evening?
A So, in the evening, I would come back. I usually would, if I can make it, I would go to the Center to do -- to the OM circle that started like I believe 5 p.m. and stay for a TurnON event that followed. And then go back to the Brooklyn OM House around, I don't know, either like probably get back around 8:00 p.m., something like that.
Q You mentioned going to the Center.
What was that?
A So, that was where the sales team worked during the day. And that's also where all the events were taking place. It was a new center, I'm sorry, that just started around that time.
They just rented the space around that time. And

so, the sales team would be there throughout the day. And there would also be -- there would -- practices would be held there. So, morning OM circles and evening OM circles, as well as all the Intro to -- not Intro to OM, the TurnON events.
Q Did you have any involvement with the sales team at that time?
A At that time, no.
Q You mentioned doing something called fear inventory.
What was that?
A So, that was -- it was a written -- a written practice that would follow the orgasmic meditation. And it would list resentments and fears that we had. So you would spend time like free -- free writing it. Everybody would, like, sit at a different spot and it was an individual practice. And then you would share. You would -- you would pair up with somebody else in the house. You would read your fear inventory and they would read their fear inventory. And then you would tear it up.
MS. GUPTA: I'd like to show the witness only Government Exhibit 3147.
BY MS. GUPTA:
Q Do you recognize this document?
A Yes. So those -- that's the directions for fear inventory.
Q And how do you recognize it?

A I've seen it before. And that's what I was -- that's the format what I was told to -- to write.

Q Is this a fair and accurate depiction of the fear inventory requirements?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 3147.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

THE COURT: Ms. Bonjean.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 3147 is admitted.

(Government's Exhibit 3147 was received in evidence.)

(Exhibit published.)

BY MS. GUPTA:

Q Could you just describe this document, please?

A Yes. So it tells you how to write a fear inventory. You're supposed to do it on a daily basis, every morning after an orgasmic meditation session when you're kind of like open and vulnerable. And so, you write:

Dear God or God, I am resentful at... and you fill out a name or a thing. And then you write: Because I have fear that... and then you fill out the rest. And you do it over and over and over again I think for -- I don't know if it

says the time, but I remember it being ten minutes.

And then -- and then you, you know, and then --

Q And if I could just ask you to speak into the microphone.

A Sure.

And then you -- and then you end it at the bottom of the page. You -- you write: God, I ask you to remove these fears and pray only for knowledge of your will for us and your power to carry that out. Thank you.

Q And I just want to direct you to number 9, which is on the second page.

Can you just read that, please?

A If possible, call a neutral person -- in parenthesis -- i.e. someone who will not get triggered by your inventory and read them your list.

Q And did you, in fact, read your fear inventory to people?

A Yes, every time.

Q Was there anyone, in particular, you would read it to?

A No. You would pair up with kind of somebody else every -- every day or, yeah.

MS. GUPTA: We can take that down. Thank you.

Q For those who lived in the Brooklyn OM House, were there any restrictions on what you could do or who you could see?

A Yeah. So you were not supposed to be -- to watch TV. There was no TV. And it was also like alcohol and drug free. So no -- no -- no drinking or drugs.

And you just needed to tell everybody what you were doing. If -- if you were doing something, if -- if you would go out, outside of the house or -- so, there was -- the rule was stay connected no matter what, which was one of the tenets of -- of OneTaste. So, that meant that we had -- we had a WhatsApp thread for the all -- for the Brooklyn OM House and you would say, like, I have a doctor appointment at 5:00 or I'm gonna see a friend for dinner. I'm expected to be home around 7:30. Like -- or I'm going to a yoga class. Whatever it is, you -- you were supposed to let the house know about your whereabouts and what you're doing.

Q And would you use that message, the WhatsApp message thread to inform people of your own whereabouts?

A Yes.

Q Did you have any serious romantic relationships while you were at OneTaste?

A Yes.

Q Who was your serious romantic relationship with?

A Misha Safyan.

Q What was his role, if any, in OneTaste?

A He was -- he was just a member and a customer of OneTaste. He -- when I met him, he was already part of OneTaste in San Francisco for two years.

MS. GUPTA: I'd like to show the witness only Government Exhibit 407.

THE WITNESS: Yes, that's him.

BY MS. GUPTA:

Q Is this a fair and accurate depiction of Misha?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 407.

THE COURT: Any objection?

MS. COHEN: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 407 is admitted.

(Government's Exhibit 407 was received in evidence.)

(Exhibit published.)

BY MS. GUPTA:

Q How did you meet Misha?

A The first time I met him we had an OM day in the Brooklyn OM House and he was -- he was on a work trip in New York City. So, he stopped by to the Brooklyn OM House, and that's how I met him for the first time.

Q And how did your relationship with him begin?

A Well, he showed interest in me on that day. You know, I could -- he was looking at me for a long time. He sat next to me during breakfast and was talking to me and kinda seemed excited and nervous. I -- he told me that he is in CP9, in the Coaching Program, and I told him I'm in the Coaching Program as well. And, you know, that was it for that day.

I -- and then the -- and then for the Coaching Program I stayed in the OM house in San Francisco where he stayed, where he lived as well. And there was -- Rachel Cherwitz and Marissa Ward at the time told me, you know, Misha is really cute.

MS. COHEN: Objection.

THE COURT: Basis?

MS. COHEN: Hearsay.

THE COURT: Sustained.

(Continued on the following page.)

DIRECT EXAMINATION

BY MS. GUPTA: (Continuing)

Q Did there come a time when you asked Misha to pay for OneTaste courses for you?

A Yes.

Q Did anyone encourage you to ask Misha to pay for OneTaste courses?

A Yes.

Q Who?

A Rachel Cherwitz.

Q What did she say?

A She told me that I could ask him to pay and that it's completely his decision whether to say yes or no, you know, and that -- you know, where there is -- again, this kind of thing of where there's a desire, there's a way. And in the world of orgasm, you can ask people to pay.

MS. COHEN: Objection, Your Honor.

I'm sorry. It's not clear if --

THE COURT: She's relating what was told to her by Ms. Cherwitz.

MS. COHEN: What was told --

THE COURT: Is that correct?

MS. GUPTA: Yes.

THE COURT: Okay. Overruled.

A I was also -- you know, at that time I went to, like -- I

think it was -- I think it was a -- yeah, it was a TurnON event. And Eli was -- spoke about a time how he first paid for somebody to take their first course and that he -- you know, that he's never done it before.

MS. COHEN: Objection, Your Honor.

THE COURT: Yes. Sustained at this point.

Q You mentioned someone named Eli?

A Yeah. Eli Block.

Q I would like to show you Government Exhibit 242, which is in evidence.

(Exhibit published.)

Q Who is that?

A That's Eli Block.

Q And did you, in fact, ask Misha to pay for OneTaste courses for you?

A Yes.

Q Aside from the coaching program, what were the other OneTaste courses that you attended?

A Magic School; Mastery; NDI, the Nicole Daedone Intensive.

I'm trying to think if there was anything else, but I'm not sure at this moment.

Q So I would like to just go through each of those briefly.

What is Magic School?

A So Magic School was a week-long course. That's actually the first course that I asked Misha to pay for. It was -- I

believe it was 5,800 and met at the bottom of Mount Chester in California. And it was supposed to -- you know, it was -- it went into kind of the more magical, witchy aspect of OneTaste. So things -- you know, OneTaste was -- yeah, it was full of -- of also -- of concepts that have to -- that had to do with, like, magical thinking.

So, you know, some of the things was like how an orgasm -- like, if you really have a desire for something to happen, the universe will just come through and those things will happen.

Or there was talk about the fourth dimension --

MS. COHEN: Objection, Your Honor.

THE WITNESS: Yeah.

MS. COHEN: Foundation.

THE COURT: Overruled.

Q You can continue.

A So the fourth dimension, where things happen that are like, you know, in that magical realm.

Also, women were called witches. So, like, Rachel Cherwitz was known as, like, a witch and having witchy tendencies, so she knew things that we didn't know or she could make things happen. And men were called wizards. Again, kind of the same thing, like they had intuitions or they can make magic happen.

And I remember the first time I heard about

Magic School was in a TurnON event that I was -- at the time, I was back of house, I was kind of helping run it. And it was Maya Gilbert who gave a pitch for it. And she said, like --

MS. COHEN: Objection.

THE COURT: Yes, sustained.

Pose another question, please.

Q So, you mentioned a few things.

You mentioned something called the fourth dimension?

A Yeah.

Q What is that?

A We live in the third dimension. I don't have a complete understanding of it, but we live and act in the third dimension and the fourth dimension is another dimension where, like, there is different forces that we are not aware of in the third dimension.

Q And you mentioned that Rachel Cherwitz was considered a witch?

A Yes.

Q Was there anyone else in OneTaste who was considered a witch?

A Yeah. Pretty much all of the staff, all of the female staff. Yeah.

Q When you attended Magic School, were you still living in New York City at the time?

A Yes.

Q So can you describe what happened at the Magic School course?
A Sure.
So, you know, Misha agreed to pay for Magic School for me because I -- you know, at that time I was already in debt for the coaching program that cost $12,000. So I put in -- I put in a deposit for Magic School and he paid the rest, including my flights there. And his request was that if he -- you know, since he paid for it, that I would stay with him in the hotel, that we would share a room and a bed.
Q And did you, in fact, stay with him?
A Yes.
Q Okay.
A So during that time, we had make-outs scheduled and --
Q I'm just going to stop you there.
A Yeah.
Q What is a make-out?
A So a make-out, in OneTaste, was a session between two people where anything could happen. So a make-out can be anywhere from -- you know, from kissing or touching all the way to intercourse.
And it was supposed to kind of follow the same tenets that we learned --
MS. COHEN: Objection.
THE COURT: Sustained as to the last part.

Q Are you familiar with something called the priests and priestesses of orgasm?
A Yes.
Q What is that?
A Those are -- so some of the people in OneTaste were called the priests and priestesses of orgasm. They were supposed to kind of protect and ensure that the knowledge of -- you know, that some of the -- that the knowledge of OneTaste was kind of protected and disseminated to others.
Q Who were the priests and priestesses of orgasm?
A So some of the people were Rachel Cherwitz, Hamza Tayeb, Ravi Agrawal, Aubrey Fuller, Maya Gilbert, Eli Block.
MS. COHEN: Objection, Your Honor. Foundation.
THE COURT: I didn't hear you. I'm sorry.
MS. COHEN: Foundation.
THE COURT: Overruled.
Q And were these individuals couples at the time?
A Many of them were.
Q Who were the couples from the individuals you just mentioned?
A Eli Block and Maya Gilbert were married at the time.
Aubrey Fuller and Ravi Agrawal were a couple and they got married a little bit later on.
Rachel Cherwitz and Hamza Tayeb were married at the time.

MS. GUPTA: I'd like to just pull up Government Exhibit 292, which is in evidence.

(Exhibit published.)

Q Who is this?

A This is Aubrey Fuller.

MS. GUPTA: And could we pull up Government Exhibit 302, which is also in evidence.

(Exhibit published.)

Q Do you recognize this person?

A This is Maya Gilbert.

Q Who, if anyone, designated the priests and priestesses of orgasm?

A Nicole.

Q Who taught the classes at Magic School?

A Nicole.

Q During Magic School, did Misha raise any issues regarding your relationship?

A Yes.

So we were in -- so Nicole held a few Q&A sessions where anybody from the audience could raise their hand and ask her a question and she would respond.

So during such session, Misha raised his hand --

MS. COHEN: Objection, Your Honor.

THE COURT: Basis?

MS. COHEN: Hearsay.

MS. GUPTA: Your Honor, it's effect on the listener.

THE COURT: Overruled.

A So Misha raised his hand and said: You know, Michal and I have tried to have a few make-out sessions and we -- and it's not going well. I'm having -- I'm not feeling turned on.

And, in fact, he did -- he had, like, erectile dysfunction issues and, you know, he experienced those during our make-outs.

And I also did not feel comfortable during our make-outs and I actually felt grossed out during our make-outs, our initial make-outs.

So he -- and he's, like: I don't know what to do.

So Nicole answered him and told him that he needed to have sex every day for a month.

It was obvious that it was not with me because at that time I lived in New York and he lived in San Francisco.

So, we were not -- and you know, we were kind of -- it was the very, very beginning of our relationship. We were kind of in an open relationship. I wasn't sure that I wanted to be in a relationship with him at that time.

But then, when I heard that she assigned to him to have sex with somebody else every day, I started to feel jealous. Because, you know, he just paid -- I think it was $3,000, or maybe something like that, for Magic School and, you know, if he didn't pay for it, I would not be able to be

there. And I wanted to take as many classes as possible. And I started to kind of -- the fact that he paid for me made me feel special, like he really liked me. I never had somebody spend that kind of money on me. And it also made me feel dependent on him. Like, if he didn't pay for me, how else would I take those classes and -- you know, and be able to be in those courses?

And I also felt humiliated. Because when he raised his concerns with me, I felt like, you know, part of what he was saying is that I did not turn him on, that there was something wrong; that he thought he wanted to have make-outs with me, but when those make-outs happened, he did not feel attracted to me.

So, I felt both humiliated and I also felt jealous.

And then when that session -- so I just kind of sat there quietly next to him.

And, you know, and when that session ended, Allison/Allie, walked up to him. She was a saleswoman in San Francisco. And she told him, even though she was in a relationship with somebody else at that time, she told him that she --

MS. COHEN: Objection.

THE COURT: Sustained.

A That she would --

THE COURT: You don't need to answer.

THE WITNESS: Oh, okay.
Q So did Misha, in fact, find a partner to have sex with every day?
A Yes.
Q After this event, did you continue to sign up for and attend OneTaste courses?
A So during Magic School, they pitched the Nicole Daedone Intensive at the end.
MS. COHEN: Objection as to "they."
THE COURT: Sustained.
Next question.
Q Who pitched the Nicole Daedone Intensive?
A Rachel Cherwitz.
Q Did you sign up for the Nicole Daedone Intensive?
A Yes.
Q How did that end up happening?
A So Rachel Cherwitz took me to the side, right after the pitch, and said: I know you want to sign up to the Nicole Daedone Intensive.
And at that time, I very much wanted to sign up. And, you know, I was already -- I mean, you know the debt was just piling up and I felt pulled deeper and deeper into OneTaste.
And she said -- she told me that I could ask Misha to pay for it and he could either say yes or no. Because it's

just like asking for an OM, a person can say yes or no and it's up to them.

And I felt very nervous. My heart rate was up.

And at the same time, when Rachel Cherwitz was talking to me, Rachael Hemsi was talking to Misha, took him to the side and was talking to him.

And so then, when they were done talking to us, I kind of, like, walked up to him and I asked him, like: Misha, I have a question to ask you. Would you pay -- would you help me pay for the Nicole Daedone Intensive? I really want to take it.

So he -- his voice shook as well. You know, he wasn't planning to spend that kind of money. He was already signed up --

MS. BONJEAN: Objection.

MS. COHEN: Objection.

THE COURT: Sustained.

Q How much was the Nicole Daedone Intensive?

A It was -- the one I signed up for that day -- I later changed it, but that one was $24,000.

Q And you said you had changed it?

A Yeah.

Q Why was that?

A Because I wanted to take it with Misha, so Misha would sign up for a different one that cost $36,000.

Q And did you, in fact, sign up for that one?
A Yes.
Q And did Misha pay for that?
A Yes. I think I put another $2,000 on my -- and he paid the rest of the deposit that day and then later put the rest of the money.
Q Now, did there come a time when your relationship with Misha became more serious?
A Yes.
Q When was that, approximately?
A So that was on the last day of the coaching program. We were both part of that coaching program. I -- you know, I -- so the day just ended, the last session just ended and people were just, like, standing around.

I was told -- I was already, during that time, working for the sales team in New York and I was told that I was to teach an Intro to OM course in Philadelphia. So Yia, who is one of the teachers, called me over to the stage and I thought she was going to give me the Intro to OM menu, so I just walked over to the stage. And then the music was brought down and Misha stepped up and he kneeled before me and he proposed. He proposed to me.
Q I would like to show you Government Exhibit 290, which is in evidence.

(Exhibit published.)

Q Do you recognize this photo?
A Yeah. That's Yia.

MS. GUPTA: We can take that down. Thank you.

And I'd now like to show the witness only Government Exhibit 4800.

Q Do you recognize this photograph?
A Yes. That's the proposal.
Q Is this a fair and accurate photograph of Misha proposing to you?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4800.

THE COURT: Any objection?

MS. COHEN: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 4800 is admitted.

(Government's Exhibit 4800 received in evidence.)

(Exhibit published.)

MS. GUPTA: Could we please publish?

Oh, thank you.

Q Can you explain to the jury what this photograph shows?
A Yeah.

So, I was shocked. I did not expect to be proposed to. I felt overwhelmed. And, you know, even though I was smiling and I did say yes, I felt very much put on the spot.

And I felt betrayed by him because the way I -- first of all, I had no idea that he was going to propose at all. We were just dating for, at that time, like three months.

But I felt betrayed because I always imagined my wedding proposal to be intimate and personal and private and I felt that the public nature of it made it seem like it was not personal, that it was more of a show.

And then also, the ring that he gave me, I noticed it was not like -- it was not a fancy ring at all. It was just a very, like, regular, nonengagement ring. And it was very big on my finger, so it did not feel like it was for me.

So, you know, and so I said yes and we kissed. And everybody cheered, you know, took pictures of us.

And then, once we walked off the stage and we walked to a small room, just me and him, I was actually pretty angry with him.

Q So why did you say yes?

A Because, like, many of the things -- because a part of me wanted to. You know, just like I asked him to pay for all this money and he agreed, I felt like he was taking care of me and that he really supported me and I know that he had really strong feelings for me.

And also, everybody else in OneTaste really supported this relationship, like, you know, said how cute we are together, what a great match. I could tell that there

was -- that our status as a couple was very kind of important.
MS. COHEN: Objection.
THE COURT: Sustained.
A And --
THE COURT: That means you don't answer.
THE WITNESS: I'm sorry.
MS. GUPTA: And I'm sorry, Your Honor, just to clarify, was it just the last part?
THE COURT: You just need to ask the next question.
MS. GUPTA: Okay.
Q At the time, did you feel that you loved Misha?
A Yes. I felt like I was growing a strong attachment to him.
Q Did you tell your family about the proposal?
A So at that time, you know, there was Facebook and I knew that everybody was taking pictures and that, you know, OneTaste individuals were very active on Facebook, so I knew that I would be tagged in those pictures and the proposal would be made public that way. So I called my parents soon after the proposal and I told them. I remember talking to my siblings and my parents, told them that Misha just proposed, and they were shocked.
MS. COHEN: Objection.
THE COURT: Sustained.
Q How did they react?

A They were shocked.

MS. COHEN: Objection.

THE COURT: Sustained.

Q Without getting into the substance of your communications with your parents, what was their emotional state, to your knowledge?

MS. COHEN: Objection.

THE COURT: Sustained.

Q With respect to your status within OneTaste, was there any change after you became engaged?

A Yes.

Q What changed?

A Even during that day of the proposal was the first time that I went out to dinner with Nicole and the other higher-ups. I was being invited to different activities with Nicole and her circle.

Q I want to go back now to some of the other courses that you mentioned that you took.

You said you took something called the Mastery course?

A Yes.

Q What was that?

A So that was a course that was supposed to help you be a master stroker for men, for those who stroked, and, like, a master strokee for those who were stroked. But it went in

deeper than the practice of orgasmic meditation. It went into sex and how to delve deeper into the practice of sex and -- yeah.

Q And when, approximately, was this course?

A I think it was in -- it was either in -- I believe it was in June of 2015.

Q And how much did it cost, approximately?

A I think it was something like 3500, is what I remember.

Q And did you have that amount of money to spare?

A No.

So this one took place in LA and Misha paid for this course. At this point, we were engaged and he paid for everything for me. So he paid for this course in full and he paid for my flights to LA as well.

Q Did anything notable happen during the Mastery course with respect to your relationship with Misha?

A Yeah. So two -- the most -- two things happened.

The first one is that at the end of the course, everybody that signed up for it had an orgasmic meditation demonstration, which means that we were -- that Misha stroked me in front of everybody who was there. And it was my first demonstration.

And as part of Mastery, it was a competition. So Rachel Cherwitz and the other teachers gave points to each -- to every pair. And we won the competition, so we were crowned

the king and queen of orgasm for that Mastery course, which means that we were awarded with a free Taboo class later on in October. That happened in New York. I actually did not attend that class.

And the other thing that happened was Misha and I, during that time -- throughout our relationship we had a lot of fights. And we had a very big fight during Mastery because there was one person who did not have a partner and Rachel Cherwitz told Misha and I to pair with that -- so we -- instead of being two people to do a lot of the practices that we were told in Mastery, we were three people. So it was Misha and I and another woman. And Misha gave me an admission later on.

An admission was part of OneTaste's practices, which meant that if you had -- that you could give your partner an admission, meaning you could tell them how you felt about something.

And he told me that he --

MS. COHEN: Objection.

THE COURT: Did you object?

MS. COHEN: Yes.

THE COURT: Sorry. I didn't hear you.

MS. COHEN: Sorry. Objection.

THE COURT: Yes. Sustained.

Make sure you're talking into the microphone.

MS. COHEN: Sorry.

THE COURT: Thank you.

Sustained.

Q So you mentioned another course that you attended called the Nicole Daedone Intensive.

When was that, approximately?

A That took place in August of 2015.

Q And what was the Nicole Daedone Intensive?

A It was a two-week course that cost $36,000. And it was called the Enlightenment course. It said that after this course, you would never be the same. It was also called the Wake-Up course, meaning that -- yeah, that once you took that course, your life -- you would never see the world in the same way. And it was the most expensive course that OneTaste offered. And it was two weeks in a villa where we all stayed, all the people who took it and also the -- like, the back of house who arranged all of the different activities. And then Nicole taught in that course every day.

Q And just generally speaking, at a high level, what did Nicole Daedone teach in this course?

MS. BONJEAN: Objection. Vague.

THE COURT: Sustained.

Ask some specific questions, please.

Q What, if anything, did Nicole Daedone teach in this course regarding enlightenment?

A So there were a few different things that we did.

She would have, like, circles that she would hold every day and we would ask questions.

And then there were a few -- there was one activity that we did where we had BDSM people come and we were told to get naked. And they had like...

Sorry, I forget what those things called, but we were whipped.

And then we were told to get into -- after we were -- we were whipped and we whipped somebody else. So Misha whipped me and I whipped Misha. And then we were told to get into a body bag. And the body bag was zipped up. And we were in the body bag for, I don't know how long, about ten minutes. There was some drumming going on. And then they unzipped the body bag and we came out and we were told that at that point we were -- like, that was -- like, that we woke up. Yeah.

Q Did anything significant for your relationship with Misha happen during the Nicole Daedone Intensive?

A Yes.

I got married to Misha. There was a wedding on the last day of the Nicole Daedone Intensive.

Q And when was that?

A That was on August 14th, 2015.

Q How long, approximately, after your engagement was this

wedding?
A Approximately three months.
Q Did you decide to get married at the Nicole Daedone Intensive?
A In some ways, yes.
Q Why did you want to get married at the Nicole Daedone Intensive?
A Because other people got married at the Nicole Daedone Intensive.

Rachel Cherwitz and Hamza Tayeb got married in the Nicole Daedone Intensive. And other people, I believe. I think Maya Gilbert and Eli Block got married in an Intensive, as well as other people that I know got married in an Intensive.

You know, part of it was like you put so much money into it and it was, like, the highest course and it was another reason for celebration. But it was also -- there was -- like to get married in an Intensive showed loyalty to Nicole and to OneTaste.
Q At that time, did you want to show loyalty to Nicole and to OneTaste?
A Yes.
Q Why?
A You know, I think throughout all my time in OneTaste, I, like -- I was having an internal conflict. On the one hand, I

believed in the mission of OneTaste and in Nicole's mission to spread orgasmic meditation. I believed that it was a practice that can heal and also empower women. I thought that it was, like, a feminist organization that cared about women and wanted to change the world for the better. And, you know, I wanted to be part of this group. There was a lot of talk of living in your purpose in OneTaste and that purpose was, you know, OneTaste and Nicole's teachings.

On the other hand, I was also having terrible anxiety attacks and panic attacks and nightmares at night that got stronger and stronger during that time. And so, you know, I was kind of -- yeah, I was really struggling.

Q Who, if anyone, planned the wedding?

A So OneTaste planned the wedding. I had no hand in the actual planning of the wedding.

So the way they set it up, it was like a --

MS. COHEN: Objection.

Q Who specifically at OneTaste --

THE COURT: I sustain the objection.

You can answer this next question.

MS. GUPTA: Sorry.

Q Who specifically at OneTaste planned the wedding?

A I don't know.

Q Who, if anyone, walked you down the aisle?

A Rachel Cherwitz walked me down the aisle.

MS. GUPTA: I would like to show the witness, for identification only, Government Exhibit 4802.

Q Do you recognize this?

A Yes.

Q What is it?

A This is me and Rachel walking down the aisle.

Q Is this a fair and accurate depiction of you and Rachel Cherwitz?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4802.

THE COURT: Any objection?

MS. COHEN: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 4802 is admitted.

(Government's Exhibit 4802 received in evidence.)

(Exhibit published.)

MS. GUPTA: If we could just zoom in a little bit.

Q And what does this photograph show?

A It shows me walking down the aisle, wearing a white dress that I actually borrowed from another member that same day, and Rachel holding my arm.

Q Who, if anyone, officiated the wedding?

A Yia officiated the wedding.

Q Were any of your family members or friends present for

the wedding?
A No.
Q Did you invite them?
A I called them the day before because I was having so much guilt and stress about getting married behind their back. So I thought that if I invited them, at least it would be up to them to either come or not. Like, if they could get last-minute flight tickets to come.
But when I -- so I called my mom and I told her: Mom, I'm thinking about getting married tomorrow. It's going to be a really small, intimate wedding and, like, not a big deal.
And then my mom started --
MS. COHEN: Objection.
THE COURT: Sustained.
Q What, if any, emotional reaction did your mom have?
MS. COHEN: Objection.
THE COURT: Sustained.
Q Were any of Misha's family members or friends present for the wedding?
A No.
Q Did Misha invite them, to your knowledge?
A No, he didn't.
Q Did you and Misha say vows at your wedding?
A We did.

Q And who, if anyone, wrote your vows?
A We had wrote them.
MS. GUPTA: I would like to show the witness, for identification only, Government Exhibit 902.
Q Do you recognize this?
A Yes. Those are the vows that I wrote.
Q Is this a fair and accurate depiction of the vows you wrote for the wedding?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 902.
MS. BONJEAN: Your Honor, can we have one second, please?
THE COURT: Yes. I would like to read it as well. Thank you.
(Pause in proceedings.)
THE COURT: Any objection?
MS. COHEN: Yes, objection.
MS. BONJEAN: We'll make a relevance objection, Your Honor.
THE COURT: Sustained.
MS. GUPTA: We can take that down. Thank you.
Q Was Nicole Daedone present at the wedding?
A Yes. She sat in the front row.
MS. GUPTA: I'd like to show the witness, for

identification only, Government Exhibit 4801.

Q Do you recognize this?

A Yeah. This is Misha and I at the wedding.

Q Is this a fair and accurate depiction of you and Misha at the wedding?

A Yes.

MS. GUPTA: Your Honor we move to admit Government Exhibit 4801.

THE COURT: Any objection?

MS. COHEN: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 4801 is admitted.

(Government's Exhibit 4801 received in evidence.)

(Exhibit published.)

Q And what does this photograph show?

A It shows Misha and I after, after the wedding ceremony, hugging each other and smiling to each other.

Q So you testified earlier that you were having an internal struggle and that you were having panic attacks.

Why were you having panic attacks?

A Because the way I was feeling on the inside and what was happening on the outside was incongruent. You know, Misha and I were really struggling as a couple. We were fighting almost daily. Like very, very vicious fights that had to do with him giving me admissions that he is --

Q Sorry. I'm just going to stop you for a second.
Without getting into the substance of what he said to you.
A Okay.
And when I brought up those concerns about our relationship to Rachel and Nicole, I was actually told that those -- that the fact that we are fighting so much is a good sign, it means that our relationship is heading in the right direction and is a real thing.
Q Did Misha make any other financial investments in OneTaste for you and him?
A Yeah.
So we signed up for membership, which is $50,000 a person.
Q What was the membership?
A That meant that we could take all of the courses over again for no charge and that we would also be invited to special events with Nicole and her -- and the other higher-ups. And that every time Nicole held an event, we would -- we got to sit in the front row.
Q Did you and Misha complete that membership?
A No, we didn't.
Q And was money ultimately returned to him?
A Yes, once we threatened with legal action.
Q So now I want to go back.

You said that there came a time when you joined the sales team at OneTaste.

When, approximately, was that?

A So that was approximately January 2015.

Q And what was your title, if any?

A I was a saleswoman. I worked on commission.

Q Were you paid a salary?

A No.

Q How was the commission determined?

A Depending on which course you sold, you'd get a certain amount of money.

Q And how much did you typically make?

A Over my whole time on the sales team, which was about six or seven months, I made a thousand dollars, just about.

Q Which legal entity paid you, if you recall?

A Yeah. OneTaste New York.

Q Were your commissions sufficient to support yourself?

A No.

Q Did you have any outside jobs?

A For a while, before Misha and I -- well, for a while I -- after I quit my job as a teacher assistant in order to work as a saleswoman full time, I worked at the Corners coffee and juice place -- it was just a few blocks, it was a few steps away from the center -- to make a little bit more money.

Q Are you familiar with an individual named

Beverly Daedone?
A No.
Q To your knowledge, was anyone with that name a OneTaste employee?
A No.
Q Did you participate in any training prior to becoming a salesperson for OneTaste?
A The training that -- yes. I participated in training in the coaching program. They taught us how to sell OneTaste courses. It was called, like, the Step-up Method. And also, Rachel took me under her wing and told me she would make me a great saleswoman and taught me things as we went.
Q And who, if anyone, supervised you?
A Rachel Cherwitz and the rest of the New York sales team.
Q What was a typical day like in sales for you?
A So after we did morning practices and ate breakfast together, we would sit -- we would all sit around a big table and we would usually hold meetings with the other cities, the rest of the -- of OneTaste employees, and we would kind of be -- we would egg each other on and be in competition about how much money each team would make that day or that week. And we all needed to be very turned on. Like, the more -- and by "turned on," meaning like excited about how much money we were going to make. And after we finished those meetings, we would usually go through a list of names and people who

attended any OneTaste event and we will make cold phone calls to try to sell them other OneTaste events.

THE COURT: Ms. Gupta, just within the next couple of minutes I'm going to want to take a break, so you can tell me when that would be convenient for you.

MS. GUPTA: This is a fine time.

THE COURT: Okay. So we're going to take a break until 20 after 11:00.

The witness can step down.

THE WITNESS: Thank you.

(Witness steps down.)

THE COURT: Okay. We'll come back at 20 after 11:00. Don't talk about the case. Enjoy the next 15 minutes.

(Jury exits.)

THE COURT: See everyone at 20 after 11:00.

(Recess taken.)

(Continued on the next page.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Everyone is here. We can get the witness and the jury back.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Everyone may be seated.

Ms. Gupta, you may resume your examination.

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q Ms. Neria, before the you break you testified about taking courses at OneTaste and joining the sales team. What was your mental state like at that time?

A Well, at the beginning when I first joined OneTaste I was very excited. I felt like I had this new found purpose to spread orgasmic meditation and I also made a lot of new best friends and we called them our chosen family. So it felt like suddenly I had a whole new family with who this whole new life opened up.

Q Did that change for you at any point?

A Yes. As time went by and I got deeper and deeper into OneTaste, I felt more and more stressed out.

Q Why did you feel stressed out?

A Because things were moving so fast. Paying for all the very expensive courses. Also during orgasmic meditation four

times a day did not feel good, and also had a lot of sex outside of that. And fights with Misha. So just, and also my relationship with my family really soured during that time. And I felt a lot of guilt and sadness that we felt, there was so much distance between us.

Q Why were you feeling distance between you and your family at that time?

MS. COHEN: Objection as to the time frame.

THE COURT: Sustained.

BY MS. GUPTA:

Q In the 2015 time period when you joined the sales team, why did you feel there was distance between you and your family?

A For two reasons. I did not see them as often as I used to see them when I was not part of OneTaste. And also once I signed up for the -- they were fine when I first told them about orgasmic meditation because they knew that I was, that I wanted to better my life sexually and they knew about my problems; I confided in my parents. But when they saw that I was spending so much money and flying to San Francisco and left my apartment into the OM house --

MS. COHEN: Objection, your Honor, hearsay.

THE COURT: Sustained.

BY MS. GUPTA:

Q What was your understanding of what was causing this

distance between you and your family without getting into the substance of conversations with them?
A They were very worried about me.
Q When you joined the sales team, what was a typical work day like for you?
A We left the OM house early in the morning before 7:00 o'clock and we arrived in the center. We did two orgasmic meditation sessions back to back, followed by fear inventory that we then read to each other, followed by a sitting meditation, and then clean up and service, breakfast, and then we started working as a sales team. We finished the day with, again, another OM circle, two orgasmic meditations, usually followed by TurnON or another event. And then we would go home around nine or 10:00 p.m.
Q How would you describe the sales culture at OneTaste at that time?
A Very competitive, very cut throat. I think it was, the sales culture underlied everything that we did there.
Q Were there sales goals?
A Every day.
Q Who set those sales goals?
A Usually like the sales leader, Rachel for New York and other leaders for the other teams.
Q You had testified earlier that Rachel Cherwitz supervised you how. Would you describe her as a supervisor?

A I think there were two sides to her. Sometimes she was like almost like a best friend or a sister, very warm, physically loving like showing affection, smiling, made you feel like you're special, like she really cared about me and my well-being. Then other times she would get very angry and cold, and would humiliate me in front of others. And usually during those times I felt very -- I wanted to get on her good side again.
Q In what way would she humiliate you in front of others?
A She would yell at me in front of the group.
Q In front of the sales team?
A Yes.
Q Did you ever offer to OM with anyone as part of your work on the sales team?
A I knew that as a sales woman I needed to look very attractive and be turned on and OM with as many as people as possible.
Q Did you ever have any conversations with Rachel Cherwitz about that?
A No, that was kind of the culture that I came into.
Q Did you ever have any conversations with Rachel Cherwitz about you offering to OM with someone for sales?
A Yes.
Q What, if anything, did Rachel Cherwitz say to you during that conversation?

A She told me not to offer it directly, or to not offer to OM somebody for sales.
Q Did you have any understanding at the time of why she said that?
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Sustained.
BY MS. GUPTA:
Q What was the result of that conversation?
A I apologized and I told her that I understood that, I got it.
Q Why did you believe it was appropriate to OM with someone for sales?
A You know, we sold orgasmic meditation. And the way it was, was that once they learned how to OM in the intro to OM class, you could OM with anybody and everybody. There was no differentiation between like staff and customer. We were -- we could partner, partner with a newbie who just learned how to OM yesterday or who just attended an intro to OM, and we could partner with your boss. So my understanding was that once they did the intro to OM class it was a free for all.
Q Did you travel to Philadelphia for sales at any point?
A Yes. I traveled with Rachel Cherwitz to teach my first intro to OM course.
Q Did there come a time during that trip where you observed

Rachel Cherwitz and Nicole Daedone communicating regarding sales?
A Yes.
Q What did you observe?
MS. COHEN: Objection, your Honor. Foundation.
THE COURT: Overruled.
A So we were in a car and I was sitting in the backseat. And Rachel was sitting in the front passenger seat and she was texting with Nicole and I could see the texts.
Q And what did you observe on those texts?
A So.
MS. COHEN: Objection.
MS. BONJEAN: Objection. Foundation, authenticity.
THE COURT: Overruled.
A So they were texting about Brooke Scheffer, who was on the sales team and she just left OneTaste. She was one of my best friends there. They were talking about how much money she still owed for her courses to pay herself and her, at the time, her fiancee for NDI.
Q What, if anything, did they discuss in those messages that you saw about what they wanted to do to get that money?
A They discussed purely numbers, like how much she still owed and, like, yeah.
Q I'd like to show you Government Exhibit 228, which is in evidence.

A This is Brooke Scheffer.
Q Had Brooke Scheffer left OneTaste at the time you saw these text messages?
A Yes, she left a few weeks earlier.
Q We can take that down.
So I want to go back to your testimony regarding a time where Rachel Cherwitz told you not to OM with someone for sales. What were the circumstances surrounding that conversation?
A So I just taught my first intro to OM class. It was a very small, it was very small attendance. I think, I don't know, about five people who attended that class. And one of them was a young guy. And you know, at the time I was in an open relationship with Misha and I think after the class I was just kind of talking to him. I don't think, from my memory, I don't know that, I don't think I offered to OM with him directly but I said, you know, now that you took the class you can OM with anybody in the circle. Like, you know -- and I think there was a flirtatious nature to our conversation.
Q When approximately was this conversation?
A When? Like after that class?
Q Yes.
A When was that class? I think it was maybe June, but I'm not sure.
Q June of 2015?

A Yes.
Q Did you also at any point express an interest in leaving the New York sales team?
A Yes, in like September of 2015.
Q Did you at any point move out of the Brooklyn OM house?
A Yes.
Q When approximately was that?
A That was like March, it might have been February of 2015.
Q Where did you move to?
A Into the staff house at 365 First Avenue.
Q What prompted that move?
A I was invited to move in.
Q Who invited you?
A I think at the time it was Ravi Agrawal.
Q Did anyone from the higher-ups in OneTaste live there at the time?
A Yes.
MS. COHEN: Objection.
THE COURT: Can you speak into the microphone?
MS. COHEN: I withdraw it.
THE COURT: Okay. Go ahead.
A Rachel Cherwitz.
Q Were there any rules or restrictions for those who were living at the staff house?
A It was same rules of no TV, alcohol or drugs, and to tell

them about our whereabouts.
Q Did you, in fact, have discussions about your whereabouts with Rachel Cherwitz?
A Yes.
Q Were any of those discussions via text message?
A Yes.
Q I'd like to show the witness for identification only Government Exhibit 4514AR. I can pass up a copy for the witness.
Your Honor, may I approach?
THE COURT: Yes, you may.
Q Do you recognize this?
A Yes.
Q What is it?
A Text messages between me and Rachel.
Q And how do you know it's with Rachel Cherwitz?
A I remember these conversations.
Q Did you review this exhibit prior to coming to court today?
A Yes.
Q Did you at some point provide these text messages to the Government?
A Yes.
Q How did you download these messages in the format that you see in front of you?

A I copy and pasted them into a Word document then saved them as a and sent them over.
Q Did you alter these messages in any way?
A Never.
Q What date do these messages begin?
A June 8, 2015.
Q If you just flip to the end, on what date do these messages end?
A June 11, 2015.
Q Is this the entirety of the messages that you exchanged with Rachel Cherwitz between June 8, 2015 and June 11, 2015?
A Yes.
Q Do you see certain redactions before and after these dates?
A Yes.
Q Were you on the sales team at this time between June 8 and June 11, 2015?
A Yes.
Q Was Rachel Cherwitz your supervisor at that time?
A Yes.
Q Were you living in the staff house that you mentioned during this time?
A Yes.
Q Did you discuss your work in sales with Rachel Cherwitz via text message?

A Yes.
Q Given that you lived in the same location as Rachel Cherwitz, did you also at times discuss your living situation with her via text message?
A Yes.
Q Is this text message exchange a fair and accurate depiction of text messages you exchanged with Rachel Cherwitz from June 8, 2015 to June 11, 2015?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 4514AR.
THE COURT: Any objection?
MS. COHEN: Yes. We object. Taken out of context, authenticity, and hearsay.
MS. BONJEAN: Completeness.
THE COURT: Response?
MS. GUPTA: Your Honor, this is the entirety of the messages exchanged between those dates. The witness's testimony was quite clear on that point. As to hearsay, these are statements of the defendant and the witness's statements are there for context, and she's available to testify as to them.
THE COURT: Overruled.
Government Exhibit 4514-AR is admitted.
(Government Exhibit 4514-AR, was received in

evidence.)

BY MS. GUPTA:

Q Can we please publish. Thank you.

Who is speaking in the gray bubbles on the left here?

A Rachel.

Q And who is speaking in the blue bubbles on the right?

A Me.

Q So I'll read Rachel Cherwitz's messages and I'm going to ask you to read your own.

A Okay.

Q I'll stop you along the way with questions.

A Okay.

Q Hey, lady. You feel a little out there?

A Hey, I'm at the airport ready to come home. I feel excited and alive. How's it going in New York? It feels like a lot is moving.

Q It's on and hopping.

A So good.

Q So you feel a little out there and not all the way plugged in?

A I'm ready to do all that it takes to plug all the way in.

Q Okay. Good.

A Can I keep some of my clothes that need to be hanged in your closet? There is lots of closet space in this room.

Q Sure.
A I'm going to reverse engineer right now. It's better than me staying here super fucked up.
Q I'm going to stop you there, and ask you, what do you mean by reverse engineer?
A That is something that Rachel told me to do. Meaning that, so if you're all fucked up, which means in when OneTaste like you're not turned on, you're feeling very messy, you have strong feelings erupting, like anger or sadness, or you're confused, so you reverse engineer. You see how you got to that point by taking steps back to see what led you to this point so then you can do something differently the next time.
Q So I'm going to continue here.
Okay. Good do it fast.
A I'm writing.
Q You may have skipped.
A Yes. I'm writing.
Q Okay.
A Dharma Gate: Right now I'm in a position --
THE COURT: I'll ask you to read slowly. People tend to read quickly, but the court reporter needs to take this down.
A Yes. Dharma Gate: Right now I'm in a position that I know I'm not taping into my real power. I'm stuck right between desire and fear. And I vacillate between the two

constantly. The voice of fear, doubt and resentment for the life that I'm choosing is loud and clear. The problem is that once you have this OneTaste of what is possible, the new realm of relating and orgasm that permeates everything. I'm not willing to let go or go back.

Q I'm going to stop you there.

What do you mean by orgasm that permeates everything?

A So orgasm in OneTaste it's not only like an individual's orgasm but it's the force, it's a life force that permeates everything. In OneTaste like orgasm is more than just, it's more than just a physical feeling, it's like everything that we stand for.

Q If you can just continue starting with: In this in-between phase.

A In this in-between phase I'm asked to make choices. I'm asked to let go of my old values, old ways of relating, and choose to step into a bigger game, over which I have no control. To let the feminine lead and to throw myself in with faith and devotion to God. I'm ready to let go of my co-dependent ways and start to recovery. Since the last Intro To OM, or ITO, this is what happened.

One, I became fat and lazy about making money thinking that I can pay for rent and food with some money I had saved up and the money I was making from the NYC team.

Two, I spent too much time with my family for my sister's graduation, four days, letting them emotionally hit and abuse me for choosing to live my life for orgasm. Our arguments were painful and draining.

Three, I spent too much time processing and thinking about my new relationship with Misha. I got swept up and unconscious in this new kind of relating that I never had before. I got intoxicated on his attention and financial help. It put me to asleep and I get turned off to my surroundings.

Q I'm going to stop you there. What did you mean by: Put me to sleep?

A Meaning that it made me like not be motivated to do things on my own, to be the best sales woman that I could be. It made me, it made me lazy because I got things in an easier way.

Q If you could continue with number four, please.

A Four, I used teacher training and CP, coaching program, immersion as an excuse to not work. I had surface layer thoughts that explained these as training for my purpose. I didn't realize what I, what I didn't realize is that I actually used them as a way to opt out when the energy got high and compression in New York started.

Five, I'm now using mastery and NDI as a way to opt out of New York because I'm not yet unified my purpose with my

desire. I'm relying on those programs to help me figure it out. Help me find my power, although I know that no program can do this for me. I need to choose to live fully now.

Six, I use my stories of insecurities and fears to help keep me small. This is a story of me as a victim, as a broken person who cannot handle this life because it's too overwhelming and difficult. This story is garbage. Life is a game, and the only way to live is to play, be creative, and notice all the subtle messages that God sends our way.

Q I'm going to stop you there. What did you mean: This is the story of me as a victim and the story is garbage?

A I meant that I was saying that I was under conflict. So what I'm talking about here, I'm talking about the conflicts that I was having. I felt, I felt a lot of fear, I felt overwhelmed, I felt like my situation was difficult with Misha and my family, and also trying to make money and trying to make ends meet.

It is a very hard job to be a sales woman of orgasm. You don't make a lot of sales and money. But in OneTaste I learned that, they taught at the coaching program that victim, perpetrator, and bystander are part of the same triangle; they are all part of the same thing. If you're a perpetrator, you're also a victim, you're also a bystander. And so the way to live was to be outside of the triangle.

To be a victim in OneTaste was really was something

that you chose for yourself and was looked down upon. Like you're playing the victim right now was a really bad dis.

Q If you can continue reading through the end of the message.

A What number?

Q I think number seven.

A Seven, I also had an STD scare. And since I was little, my mother always used STDs to threaten me against the dangers of sex. The tests came out negative, and since then I keep on getting yeast infections. I think this is my way of my body telling me that I'm out of alignment and out of purpose.

I use this physical ailments as an excuse to opt out. Every time I concentrate on them, fears come up in my mother's voice that says that sex is dangerous, that this is my fault, that I'm being irresponsible. I wallow in that voice and feel existential anxiety.

I take full responsibility over my feelings, the situation, and not making sales last month. No one is to blame but me.

My addict came out this month and I found ways to get intoxicated and fell out of devotion.

Q I'm going to stop you there. What do you mean: My addict came out this month?

A In one OneTaste, like every time you got lazy and fat, meaning you didn't go for sales, you weren't turned on or

excited about making money and getting more people coming through the door, that meant like you're addict, like your addictive patterns came out and took over. So we would like go to Narcotic Anonymous meetings or Alcohol Anonymous or sex addict meetings. 12-Step was a very big part so that we would kind of live our lives and be on the sales team without our addictions coming in our way.

Q Did you have any type of addiction at the time?

A No.

Q I'll ask you to keep reading.

A I'm sorry for abandoning myself. I'm sorry for opting out. From here on I choose to see and not to be blinded. And if I do, to remember, I choose to live in connection and not teetering on the edges of it, or use fake mimics of what it means to be connected.

I'm aware that is not the easy path. I'm not going to lie to myself any more that this is supposed to be easy. The trick is to find the joy and love in the struggle for freedom.

Q What was your psychological state at the time that you sent this message?

A I really wanted to make Rachel love me again.

Q Why?

A Because I felt like I fell out of favor.

Q I'll just continue.

Michal, that's beautiful. You did it. You really saw it.
A Thank you. I feel so much clearer now.
Q Maybe tell the team, if you feel comfortable.
And I'll just stop there and ask you, what team did you understand her to mean?
A The sales team.
Q And you can continue, thank you.
A Yes, I put it on the thread now. Let me know when is a good time to make bed.
Q Come on in. So there, next time have the subway card out.
A Will do. Can I have a role.
Q Yes. You fluff.
A Great. I love to fluff.
Q So what is fluffing?
A Fluffing meaning, so we were probably at a TurnON event there were new people from the public that came into that event. I was supposed to go around and then make them feel good and show them that, like, OneTaste had something special to offer.
Q We can take that down. Thank you.
So earlier you testified that in approximately June of 2015 Rachel Cherwitz told you not to offer to OM with a particular client. Before that conversation, did you believe

that it was acceptable to do so?
A Yes, I didn't give it much thought; but yeah, I didn't know there was really any rules about that.
Q Why did you feel that it was acceptable to do so?
A Because we were selling orgasm. And we were doing it through our person, like we dressed in a certain way, we talked in a certain way, and we taught a specific practice that had to do with stroking female genitalia, including ours. I didn't know where the line was.
Q Were you surprised that Rachel Cherwitz told you not to OM with a client for sales?
A Yes. I was surprised and also remorseful; because, again, I felt like I got Rachel mad.
Q Did you discuss with her the reason that she told you this?
A No. Once she kind of told me not to, I was just like, yep, I'll never do that again.
Q Did you learn anything about the circumstances of her instruction to you?
A No.
Q Were there any times where your family visited you either at the Brooklyn OM house or the staff house?
A Yes. There was one time that my brother visited me at the Brooklyn OM house.
Q Did your family ever visit you at the staff house?

A No.
Q Did you occasionally visit your family while you lived in either the Brooklyn OM house or the staff house?
A Yes, more so in the beginning, and less and less as time went on.
Q Why was it less as time went on?
A I became busier as a salesperson and somebody who was always traveling to different courses. We also worked during the weekends and we worked during holidays. And also my relationship with my family became more and more strained, so it was really hard for me to go home.
Q Were there any instances in which Rachel Cherwitz reacted to you visiting your family?
A Yes.
Q Can you describe that instance?
A Yes. So we were at the New York City center and we were just having a check in morning circle. So every morning we sat in a circle at some point after practices and each person had to say how they are feeling. At that time, you know, in the beginning until I learned better, I thought that we were actually checking in like, we were supposed to say the truth about how we were feeling because and let each other in. I didn't realize that the right answer was: I'm turned on, I'm so excited to be here.
So I said something like, I feel really bad about my

parents. They are really mad at me. I feel disconnected at that. Rachel said: Stop. I'm at red.

At OneTaste we have green, orange, red safety words. When somebody says they are in red, you are supposed to completely stop what you're doing and not continue.

I could see she was fuming. She's like, you need to stop, like you need to stop talking about this, like you're not in your power, like you're just, you're draining the energy. I'm sick of hearing you talk about your parents. Enough is enough. And that just shut me up.

Q You mentioned this concept of red, yellow, green. Other than that moment where Rachel Cherwitz said that she was at red, did you ever hear red, yellow, green used?

A In the intro to OM I heard about how to use the safe words during a OM practice. I never heard it used in-person, no.

Q Were there any instances where Rachel Cherwitz told you to leave an event?

A Yes.

Q What happened in that instance?

A So we were -- I was doing back of house for intro to OM course at Bank Street in the West Village. It was a big course. And at that time I was having a really difficult time in my relationship with Misha. And I think we just had a big fight the night before. And I showed up in the morning, I

felt really rattled. And I was still processing the things that he said to me and my reaction to them.

And Rachel came up to me and she told me that I am, you know, that I can't be in here like this, my energy is like not welcome here. And I, you know, I realized that I must look upset. And that she wanted me to be smiling and turned on. So I was ready to like apologize and just pick myself up, and then she told me, she's like, you have to go, you have to leave. And I tried to convince her otherwise, I'll be okay, like, Misha and I had a big fight, but like I wanted to stay I wanted to be part of the day that's where everybody else were.

Then she sent me out. She told me not to text anybody from the team. She told me to not text Misha who was my, you know, fiancee at the time, my number one person.

And she told me to go to either to an NA or AA meeting so I can work out my addiction to feeling bad. And once I went to the meeting she told me to go back to the house and stay there until she tells me otherwise. So I did that.

The house was completely empty. Totally quite. And I was just, I couldn't reach out to anybody. I think I might have reached out to somebody in a different team in San Francisco just telling them I was feeling really anxious and bad.

But I asked Rachel if I could come back to the event to help out. I told her I was feeling much better and ready

to come back on. And she told me that I couldn't.
Q Why were you feeling anxious and bad?
A I was, you know, I was kicked out. One of the biggest fear was to get kicked out of the group, to be told that you are not worthy of being here, or that they don't want you. So to be ostracized and also humiliated like, I was only one kicked out at that event, so I felt like everybody knew that I did something wrong. I also felt really anxious. I felt cut off from everybody.
Q Did you have any discussions with Rachel Cherwitz about this incident via text message?
A Yes.
Q I'd like to show the witness for identification only Government Exhibit 4513AR. I'll pass up a copy.
Your Honor, may I approach?
THE COURT: Yes.
Q Do you recognize this?
A Yes.
Q What is it?
A It's text messages between Rachel and I.
Q And how do you recognize this?
A I saw this communication before and I remember this interaction.
Q And are these part of the same messages that you provided to the Government?

A Yes.
Q And again, how did you download these messages in the format you see in front of you?
A In the same way, I copy and pasted to a Word document and then saved it to a PDF and sent it over.
Q Did you make any changes to this when you copy and pasted it?
A No.
Q What date does this exchange begin on?
A July 10, 2015.
Q If you flip to the end, what date does it end on?
A July 12, 2015.
Q You were still on the sales team at this time?
A Yes.
Q Was Rachel Cherwitz still your supervisor?
A Yes.
Q You were still living at the staff house at this time?
A Yes.
Q Did you continue to discuss your work and sales with Rachel Cherwitz?
A Yes.
Q And did you continue to discuss your living situation with Rachel Cherwitz?
A Yes.
Q Did you also discuss your relationship with Misha with

Rachel Cherwitz?
A Yes.
Q Were some those discussions via text message?
A Yes.
Q Do these text messages relate to the incident that you were just testifying about?
A Yes.
Q Is this a fair and accurate depiction of text messages you exchanged with Rachel Cherwitz on July 10, 2015 through July 12, 2015?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4513AR.

MS. BONJEAN: Objection. Relevance.

MS. COHEN: Join.

THE COURT: Overruled. Exhibit 4513-AR is admitted.

(Government Exhibit 4513-AR, was received in evidence.)

BY MS. GUPTA:
Q Who is speaking in the gray bubbles on the left?
A I am.
Q Who is speaking on the blue bubbles on the right?
A Rachel.
Q I'm sorry. Are you the blue bubbles?
A I am the blue bubble, Rachel is the gray bubble.

Q I'm going to read Rachel's messages and I'll ask to you read your own. I'll stop with you questions along the way, is that okay?
A Sure.
Q Okay.
Hey, if you need to go to another yoga class that's fine, but it needs to be communicated to the team beforehand in a way we can work out that everyone can go together instead of you going off and inviting people. Does that make sense?
A Yes. Makes total sense going forward. Thank you. I decided to go to yoga with team today. See you at meeting. Let me know if you need anything.
Q Thanks. Are you clear on teacher handling?
A I didn't feel like Chris' download was clear, but I'm on it.
Q Then talk to him about Michael.
A I'm in an Uber.
Q That's on you.
A Okay.
Q Send a text and stop waiting around to be told what to do and take some initiative.
A Got it.
Q Let me know when it's handled.
A Okay.
Q So what is Rachel Cherwitz referencing there? What does

she want you to handle?

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q Continue reading.

A What would you like to drink this morning and what would you like for breakfast?

Q I'll handle, love. Thanks.

Who are you getting breakfast for?

A The teachers.

Q You can continue?

A I got the download. Breakfasts are handled. Food and drinks throughout the day, and keep my full on attention on them throughout the day.

Q Excellent.

What was your role at this time?

A I was on the sales team, I was paid on commission. I was also doing, I was doing anything and everything that I could, so I was doing back of house, getting ready for events. I was also running around to get teachers food. Whatever they were telling me to do, I did whatever was needed.

Q Who were teachers were you getting food for?

A I don't remember that particular, which course that was for.

Q Maybe a meeting. It's not punishment, but you aren't clear and it affects the field. Please move quickly.

A I'm going to 12:00 o'clock meeting.
Q Great. Let's check in after lunch.
A Okay.
Q I'm going to stop you there. What do you mean by: Meeting?
A This is a 12-Step meeting.
Q Which one?
A This was I -- it was either NA or AA, I don't remember.
Q Why were you going to a meeting?
A That's when I was told to go to a meeting, I think that was on that day, yeah, that was on that day in that intro class when she told me to leave.
Q When Rachel Cherwitz said: It's not punishment but you aren't clear and it affects the field. What did you understand her to mean by that?
A Like I'm not going to a meeting as a punishment, for the way I was in the intro to OM, why she told me to leave. But that I needed to clear up my energy so that I won't affect the other people around me and the atmosphere of the intro to OM course.
Q If you can continue, please.
A Meeting does not start until 1:00 o'clock. I'll reverse engineer right now. Reverse engineering.
Q I'm going to stop you. What do you mean by: Reverse engineering?

A The second time I did reverse engineering. I'm supposed to explain how I got to this point, why I was in such a -- why my energy was the way it was in the intro OM class, why she kicked me out. I'm supposed to show her that I understand what led to this moment and so that I wouldn't do that again.
Q You can keep going, thank you.
A My system was not clear and grounded today in order to have principle over personality in a way that is necessary in order to be back of house, BOH. I was trying to do BOH for my personality and ego, and was not taking the stroke until a meeting was suggested to me. I woke up feeling a victim to my circumstances and blamed others for my condition. I blamed my family for making me feel week, small, stupid, guilty and out of control. I blamed them for demonizing the feminine and/or orgasm and not accepting me, Misha, and my purpose of being a medium for orgasm to be in this world.
Q So I'm going to stop you there. What did you mean by: My purpose of being a medium or orgasm to be in this world?
A So when we worked for OneTaste as a salespeople, we were like missionaries. We were supposed to spread orgasm by making more and more people pay for intro to OM classes so we can spread the mission of OneTaste. So being a medium, I meant like being a person through which other people come through the doors.
Q Can you continue, please.

A I blame them for not approving of me. I abandoned myself during dinner with my family, retracted and became small. I stopped talking and pulled into myself for safety. I blamed Chris for the way he asked me if I wanted to be teacher handler and not giving me a clear download. I already felt yesterday like things were not handled, and I didn't say anything. I said yes because I want to say yes any time a bigger game is offered to me, and I take myself out of range. Instead, I should gradually grow into my purpose and the player that I want to be. I want to play an infinite game and when I take myself out of range by saying yes without actually checking with where my system is at, I end up playing a finite game because the voices in my head get too loud and I get stuck in the Matrix.
Q I'll stop you there. What do you mean: I want to play an infinite game?
A An infinite game is something we learned in OneTaste. That, like, I want to continue to play, to be a player in the game of orgasm, to push myself to my limit and to not play small, to yeah, you know.

(Continued on next page.)

DIRECT EXAMINATION (Continues)

BY MS. GUPTA:

Q Who taught you about this concept of an infinite game?

A I heard about it from the beginning in, like, the Intro to OM class and just people talking about it. Yeah.

Q And then you said: I get stuck in The Matrix.

What did you mean by that?

A That I get stuck in, like, in my reality, in my -- in my fake reality of problems, you know.

This is all to tell -- this is all lingo. Much of it is lingo that I learned in OneTaste. So, while sometimes I wrote in ways that I didn't fully understand all the concepts, I'm actually -- you know, I'm like, I know some concepts were taken from like all over the place: Buddhism, from The Matrix, from Harry Potter. I just, like, I don't know those -- like I don't know Harry Potter. I haven't watched The Matrix. So for me, I just like heard it and internalized what I thought it meant and -- and, you know, connected my own dots.

Q And why did you use this type of language when you say you didn't fully understand it?

A Because I wanted to -- I wanted to impress Rachel. I wanted her to feel like I knew what was happening to me and what I was doing. And reverse engineering is all about taking responsibility.

In OneTaste we had -- there was a lot of emphasis on taking responsibility for our actions. Like nobody else made you do anything, it's you who -- who messed up. You know, so I wanted to show her that I'm taking full responsibility. That I know what happened to me. That I will never do it again. That she can trust me.
Q Okay. You can just keep reading, please. I think you're at "my ego was hurt."
A Yeah. Sorry. Oh, here we go.
My ego was hurt and I became resentful when I admitted that being a teacher handler was out of my range. This is the first time I did BoH for ITO and did not know how to be a teacher handler. I got resentful that Jenna's system feels so much clearer than mine and that she should actually be teacher handler. In my head I noticed all the voices that said that she didn't even do CP yet and that she is more capable than me.
I got resentful for being called meek because it's true that I get meek when I get knocked out and I abandon myself. I didn't take Rachel's stroke to go for a walk and get clear because my ego was trying to prove that I can handle it when in truth I couldn't, because it was in my way of being in my optimal state.
I was resentful at Misha because I felt like he is better than me. He was on and I was off. My ambient

attention was on him and I was co-dependent on his state in order to figure out my own. At some point instead of serving tea and being in my purpose, I was watching him in his power and thinking about how much I love him and wanted to marry him -- parentheses -- partly to save me from myself, knowing that I was delusional thinking that marrying him will make me more powerful. Then he came over to the tea table and made a comment about his desire for other women that knocked me off and made me hate him and want to kill him. I felt self-hatred and sorry for myself. Now I see that I was not fit to be in service to the students as we usher them into the world of orgasm.

Q So, I'll just stop you there.

What did you mean by you were not fit to be in service to the students as you usher them into the world of orgasm?

A Um, I was not -- I was not turned on and, you know, the world of orgasm you're supposed to be like turned on all the time and excited and kind of like, you want other people to want what you have.

That's how -- you know, when I first saw Rachel I want what she had. And so I needed to -- and -- and -- but I was really upset at that time and I was having a really hard time, so I was not fit. I was -- I was not in the best kind of -- in my best position to sell -- it's all about selling --

to -- to -- I was not in my -- I was not in my best position to help OneTaste sell more classes.

Q Why were you having a hard time during this time?

A Because Misha gave me an admission that he was attracted --

MS. COHEN: Objection.

THE COURT: Overruled.

A Misha gave me an admission that he was -- that he had desire for other people there.

Q And you talked about this idea of needing to be turned on all the time.

Who taught you that you needed to be turned on?

A Rachel.

Q You can keep reading, please.

A In order to be clear and on, I need to make sure that I attend more meetings, three to four a week, even if it means to be away from the team during that time. I need to dedicate 20 minutes a day to step work. I need to make it a practice to communicate my feelings and ask for help when I need it. I need to up my attention and awareness of my system and gauge where I'm at so that I don't take myself out of range all the time because my big D is to teach and serve Orgasm. I need to concentrate on my small d's and make sure that I love myself in the process.

Q So you say -- you said I need to make sure that I attend

more meetings, three to four a week.

What meetings are you talking about there?

A 12-step meetings, like NA or AA.

Q And you refer to your -- your big D is to teach and serve Orgasm.

A Yeah.

Q What is your big D?

A So I wanted -- that's what I thought. From the beginning, from when I first took my Intro to Ohm class I kind of wanted to be like Rachel, and eventually also like Nicole. Meaning that I wanted to be a teacher and a mentor. I wanted to live in the same way. You know, I wanted to be confident like them.

Q And what does big D actually mean, what does the D signify?

A Yeah, desire. So, it's big desire. We learned that lingo for the Nicole Daedone Intensive like big D's and small d's.

Q And who taught you that?

A Rachel and Nicole.

Q Love yourself in the process.

A Thank you. Meeting is finished. I'm going to talk with a possible sponsor. I'd like to come back if that's all right stroke. I feel clear. The meeting was on the fourth step. It was amazing. I also shared. Thank you for suggesting it.

Q So you testified earlier that you were not actually addicted to narcotics or to alcohol at this time.
A No.
Q So why were you attending these meetings?
A Well, we did step work as part of -- as part of our work in -- on the sales team, especially part of our work before attending a Nicole Daedone Intensive. We needed to -- we got a workbook. That was a 12 steps workbook and in it we had to work out our demons, whatever they said that we were addicted to.

So, in OneTaste, like, you don't need to be addicted to narcotics, you can be addicted to feeling bad, or you can be addicted to feeling sorry for yourself, or you can be addicted to, you know, anything really. And your addictions stand in the way of serving Orgasm. And by serving Orgasm I mean selling classes.
Q And who taught you that?
A Rachel and Nicole.
Q Okay. If you could please continue.
A Can I come back?
Q No. We'll check in when I'm home and see about tomorrow.
A Okay.
Q Please don't pull on Misha.
A Yes, I won't.
Q Or anyone else from BoH.

A Ok. Got it. I feel myself going down.
Q That's your choice.
A I know -- I know it is. I'll go to yoga.
Q I trust you to find a way to be an adult here.
A Yes. I want to be an adult in this spot. Thank you for trusting me.
Q So when you say "can I come back," what are you referring to?
A Can I come back to the Intro to Ohm course to be with everybody else.
Q And when Rachel Cherwitz said "Please don't pull on Misha," what did you understand her to mean by that?
A That I'm not allowed to text him.
Q Okay.
Prayasi and Adriana will sleep in your bed tomorrow. You guys have the top bunk free, yeah?
A Yes.
Q Great. They'll move to your room tonight.
A For the night?
Q You can work it out with Aubrey, but if you have a free bed people need to be sleeping in there and not with me. It's ridiculous that wasn't mentioned when they needed a place to sleep.
A It was mentioned. I said they could sleep with us.
Q They will moving forward.

A Sounds good.
Q So just stopping right there.
Why are you and Rachel Cherwitz discussing bed assignments?
A Because we lived in the same house. We had different rooms and she wanted to put people in my room.
Q And who, if anyone, was making those bed assignments?
A Rachel.
Q Okay. And if you could just start with July 12th.
A Hey, Rach, I feel a lot of things moving through me, especially fears about my self worth that have been inside for a long time. I feel vulnerable -- vulnerable and raw. It's very uncomfortable.
Q Sounds like good excavation.
A My voices are really loud about being left out, jealousy, loneliness. That kind of stuff.
Q I hear that your voices are loud. Sounds like good place for self-excavation.
A Yes. The things that come to mind are fear inventory and I'm going to a meeting later on. I can see myself looking for a quick fix. Something that get me -- that will get me clear fast, and I know that it's not it. I've been doing the cutting the cord meditation with family members. I feel grief. I feel loss. I have surges of really strong emotions about Misha that make me feel unstable and unhinged.

Q So I hear that you feel like you are looking for a quick fix and feel unstable and unhinged. Is that right?
A Yes.
Q Sounds intense.
A It is.
Q Where are you at in your step work?
A Step 1.
Q Powerless and unmanageability, yep. Emoji.
A Lol. Yeah. That sounds about right.
Q How's it going?
A It's going ok. Feeling better. Did step work and a meeting. At dinner with a friend I haven't seen in a long time.
Q Smiley face and heart emoji.
So, after this exchange did you end up being able to go back to the event?
A No.
Q Did you return to the Staff House?
A Yes.
Q What was your psychological state at the time you wrote this?
A Really bad.
MS. BONJEAN: Objection, relevance.
THE COURT: Overruled.
A I mean I was asking Rachel for help in these text

messages when I'm -- when I told her that I'm feeling that my voices are really loud, that I'm feeling really unhinged, lonely, scared. Like I was -- I was trying to -- to get some help.

Q And why were you feeling this way?

A Because I was -- you know, she kicked me out of the event. I felt like I was out of her favor.

I felt like I also -- you know, at that time, even though Misha and I were fighting terribly, I also -- he was the person I loved the most and I couldn't -- you know, she told me not to get in touch with him. So that door was closed. I felt stuck.

And then I felt my terrible guilty feelings about my family and not being able to reach them because, you know, they -- they were mad and angry and upset with me. So I pretty much felt like I had no one, and I was scared.

Q Why did you care about being in Rachel Cherwitz's favor?

A Rachel Cherwitz was -- to me and to others on the team was known as mom. She, like, took -- she was like the role of a mother .

You know, and you always want your mom to love you unconditionally no matter what, you know. And even if you make mistakes and, you know, you get her angry, you hope that she will never stop loving you. And I had that kind of, like, dependency with Rachel where I -- I felt like she could just

kinda take away her love and -- and abandon me or -- or -- or tell everybody that she saw that I wasn't any good. So, yeah, I always tried to like win her back.

Q How did you come to have that dependency on Rachel?

A It was -- it was built gradually from the beginning, from my first meeting with her. You know, when she told me to take out that credit card. Like she -- I felt like she saw something special in me, you know, and that she -- she wanted me to -- to do great things for OneTaste and Orgasm. And she -- yeah, and she had faith in me.

But at the same time, you know, she was also a boss and a mentor, like, and -- yeah, and that she could punish me as well. Like it was just like a lot of different sides to our relationship.

Q And you said that she -- she came to feel almost like a mom.

A Uh-hum.

Q Did you have your own mother at that time?

A My mom and I had -- our relationship has really -- was -- I mean was -- yeah, really soured by that time. She was -- we barely spoke.

Q I'd like to now show you a series of pictures and just ask if you recognize the individuals.

MS. GUPTA: Could we go to Government Exhibit 297, please.

THE WITNESS: I recognize the face, but I don't know the name.

MS. GUPTA: Oh, these are in evidence.

(Exhibit published.)

BY MS. GUPTA:

Q I'm sorry, you said you recognize the face, but not the name?

A Yeah.

MS. GUPTA: Could we go to 208, please.

(Exhibit published.)

Q Do you recognize this person?

A I recognize the face from Facebook.

Q Do you know this person?

A No.

MS. GUPTA: Could you go to Government Exhibit 408, please?

(Exhibit published.)

Q Do you know this person?

A No.

MS. GUPTA: Government Exhibit 260.

(Exhibit published.)

Q Do you know this person?

A No.

MS. GUPTA: Government Exhibit 382.

(Exhibit published.)

Q Do you know this person?
A No.
MS. GUPTA: Government Exhibit 265.
(Exhibit published.)
Q Do you know this person?
A No.
MS. GUPTA: Government Exhibit 327.
(Exhibit published.)
Q Do you know this person?
A I recognize the face, but I don't know the name.
MS. GUPTA: And Government Exhibit 404.
(Exhibit published.)
Q Do you know this person?
A No.
MS. GUPTA: We can take that down.
THE COURT: Ms. Gupta, just in the next five minutes we are going to break for lunch.
MS. GUPTA: Okay, that's fine. I think I have a little more than that.
THE COURT: Okay, then just keep going for the next five minutes. Thank you.
MS. GUPTA: Okay.
BY MS. GUPTA:
Q When did you ultimately leave OneTaste?
A I left in October 2015.

Q Why did you leave at that point?
A I wanted to save my marriage with Misha.
Q Why did you think that leaving OneTaste would save your marriage?
A I thought that we could, like, move into a house of our own and have a normal relationship, have children one day.
Q Did you ever want to leave OneTaste earlier?
A It was since my -- right after NDI, the Nicole Daedone Intensive, I was very disillusioned and little by little I realized that I wanted to leave.
Q Why did you became disillusioned?
A Because it was called The Wakeup Course, you know, and we were taught the exact same stuff we were taught in every course in OneTaste. Like a lot of the information that we were taught, a lot of pages were just like recycled and just said in different ways. But there wasn't -- I didn't wake up. You know, I didn't feel any different. I knew in my soul and body that I was the same person that I was before I started this course. And so, I felt like I was lied to and manipulated.
Q In what way did you feel manipulated?
A I felt like I kind of understood that this was a scheme.
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Overruled.

BY MS. GUPTA:

Q What do you mean by "scheme"?

A That, like, I was climbing this ladder that led to nowhere.

Q What do you mean by that?

A Like every course, every course that I took, every time I went deeper and deeper into OneTaste I, you know, paid more money. I devoted all of my time and energy and effort to this thing and that -- that I wasn't getting anything in return. That it was just about me giving them money and free labor.

Q So why didn't you leave earlier when you first wanted to after the Nicole Daedone Intensive?

A Because I devoted so much -- not only money and my time, but so much of my like soul into this. Like, you know, I worked -- I fought with my family every time I saw them to convince them that this was an organization that did positive in the world and that was -- you know, that the mission was good.

And for me to -- to admit to myself that I was led on, that this was a lie, that I just spent all this money, that I got married to somebody I just met several months ago, that I, like, threw so much of my life away for this thing, it was a very -- it was a very big deal and it took me time to -- to have the courage to do that.

Q What did you do after leaving OneTaste?

A Misha and I tried to make things work. We took a trip to Israel. He had a work trip and I wanted to show him my childhood home and my -- my childhood friends from Israel.

It was a terrible trip. We then came back and we moved to -- to San Francisco. And we broke up. We broke up like, I'm trying to think, we broke up in November, so we broke up about a month after and filed for divorce.

Q Did you --

THE COURT: Is now a good time to stop or do you want to finish something here?

MS. GUPTA: Oh, that's okay. We can stop.

THE COURT: Okay.

We are going to take the lunch break now and I am going to give you slightly longer.

The witness can step down.

(Witness steps down and exits the courtroom.)

THE COURT: Okay. We will come back at 1:45. So that's a little bit more than an hour. Enjoy your lunch. And don't talk about the case. Don't let anyone talk to you about the case. Keep an open mind, please, and enjoy the lunch.

(Jury exits.)

THE COURT: Okay. I just want to get an estimate of how much longer you have on direct and if you know how much approximate time on cross-examination.

MS. GUPTA: Your Honor, I think I only have five to

ten minutes left.

THE COURT: Okay.

And I won't hold you to it, but a rough estimate.

MS. COHEN: Yeah. Probably two hours.

THE COURT: Ms. Bonjean.

MS. BONJEAN: I -- it just depends. I mean --

THE COURT: Okay.

MS. BONJEAN: It could be -- it's definitely not going to be two hours. It could be 30 minutes, it could be than hour. It just depends.

THE COURT: Okay. I guess I'm just trying to figure out whether this witness is anticipated to take us to the end day, and it sounds like it might very well.

MS. COHEN: It might Your Honor. I'm going to try to finish.

THE COURT: No, that's fine. I just wanted to know for planning purposes.

There are some issues to take up, but we will take them up when we come back. I'm just going to ask you to come back at 1:40. There's a couple things I want to mention to the parties at that time.

All right. We'll adjourn for now.

(Luncheon recess now taken.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

You may be seated.

THE COURT: We're going to bring out the jury in a minute. There are just a couple of issues I wanted to raise with you.

I know the Government made a filing. I have certainly not had enough time to look at that. So I assume you're not going to be calling that witness today. If you are, you're not going to be permitted to put in certain evidence because you hadn't given me sufficient time to properly consider it.

MS. BENSING: So, Your Honor, I think our plan would be to see where we're at towards the end of the day. If we end up calling that witness, we would address other things with the witness and then our plan would be to continue with his examination tomorrow.

THE COURT: Well, even other things, you've proposed an instruction about immunized witnesses. I wonder why that wasn't done in a request to charge when you could have anticipated that you would be having an immunized witness. I don't see any reason to give that instruction at the time a witness testifies. You wouldn't do it if a cooperator testifies, you don't give the law enforcement witness

instruction at that time. It would be appropriate at the end of the trial.

But, again, you know, it was given today, so you're not going to call this witness today. It's not practical given the timing of your filing.

On the issue of the stipulation, I don't think it's appropriate to put before a jury what is in paragraph 3 of the document at 5003 or paragraph 4 of the document at 5004. There is no evidentiary value. The jury does not need to be told that a party can challenge the admissibility of information. Of course, the parties can agree to that and the Defendants can make their objections at the time of the admission, the offer of these documents, but that's not evidence, the fact that a party can challenge something. And I'm not sure why the parties think that should go to the jury.

MS. BENSING: Your Honor, that's fine. We can remove that.

MS. COHEN: That's fine with us, Your Honor.

MS. BONJEAN: Yes, Your Honor. That makes sense.

THE COURT: Okay.

Is there anything else we absolutely have to take up before the jury comes out?

MS. BENSING: I don't believe so.

I believe that the witness has a medical -- something that she's dealing with that I think we should just

take, like, five or ten more minutes, Your Honor. I don't want to -- maybe even two minutes. I just don't want to put it on the record.

THE COURT: No, I understand. That's fine. Tell me if it's going to be two minutes. Because if it's going to be ten minutes, I'm going to go do other things.

MS. BENSING: Yes. Let me just get an update very quickly, Your Honor.

THE COURT: Okay.

MS. BONJEAN: And, Your Honor, I believe you had mentioned -- I haven't looked at PACER, but that the Government filed a letter related to those exhibits?

THE COURT: They are not related to the exhibits.

MS. BONJEAN: Oh.

THE COURT: Related to the next witness that they were anticipating calling.

MS. BONJEAN: Yes.

With -- I assume it's the exhibits that we're objecting to with --

THE COURT: It seems to be several things.

MS. BONJEAN: Okay.

THE COURT: But I have not spent enough time with it because it was filed just now.

MS. BONJEAN: We've been working on giving a written response, but it's been literally in between, like, witnesses.

THE COURT: Right.

MR. BONJEAN: So I do intend to file something as well. I will do it within enough advance notice so the Court has the benefit of it tonight, as soon as we get back. But same position, though; I have to look at it. I don't know --

THE COURT: You have to look at it because it actually seems to be more expansive than what was mentioned this morning.

MS. BONJEAN: Okay, fine.

THE COURT: Which is why I'm not going to address it now.

MS. FARRELL: And, Your Honor, in light of our re-ordered witnesses potentially later for today, I may just step out to handle that.

THE COURT: Yes. Go ahead.

MS. FARRELL: Thank you.

MS. COHEN: And Your Honor, sorry, in the cross I already told the Government the only video, just because I know that's -- is, I think, it's 40 seconds around it's no sound. And they're aware of it and have it.

THE COURT: Do I have it?

MS. COHEN: And you have it.

And I believe there's a computer.

Oh, it's in front of Drew, sorry.

THE COURT: Is it one that I've seen before today?

MS. COHEN: Yes, yes.
And so we clipped it really, really small.
THE COURT: Okay. Can you just tell me which one it is?
MS. COHEN: Oh, sure.
It's just this witness with her fiancé, then-husband, just outside of class.
THE COURT: All right.
MS. COHEN: I mean, it's almost like a photo, but it moves for 40 seconds.
THE COURT: Okay. Is there going to be -- do you anticipate an objection to this or no?
MS. GUPTA: Are you trying to admit it?
MS. COHEN: Yes.
MS. GUPTA: I think I object on relevance.
THE COURT: All right. Well, I don't mean to do that now.
MS. COHEN: Yeah, I just wanted you to...
THE COURT: Let me also suggest something to the parties.
There have been a lot of exhibits that were not objected to, but they've kind of come in one by one. And there may be strategic reasons you want to do that, I think there are -- you know, any party that wants to lay, you know, foundation or testimony. But if you're really just going to

put a bunch of pictures in, you might want to talk to your adversaries and decide whether or not that's a good use of anyone's time to go one by one or just to put them in en masse if they're not objected to. But again, if there is some strategic reason, I'm not getting involved in that. But it's just a thought. Because some of it seems to be pretty cumbersome the way that things are going in.

Okay. Is it two minutes or ten minutes?

MS. BENSING: She's going to come in, Your Honor.

THE COURT: Okay. Let's bring her in and bring in the jury.

You can just come back up here.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: I hope everyone had a good lunch.

Everyone may be seated.

Ms. Gupta, you may resume your examination.

MS. GUPTA: Thank you.

DIRECT EXAMINATION

BY MS. GUPTA: (Continuing)

Q Before lunch you were testifying about what you did after OneTaste and how you and Misha hoped to stay together.

Did you plan to have another wedding with Misha where your parents would be present?

A Yeah, we did, shortly after we came back from NDI.

There was a reason for it. One is that I didn't tell my parents or my family that I got married, so we wanted to do another wedding so that way we could be husband and wife in the open around my family.

The other reason is that we wanted to have a wedding with our families present and with friends from before our time in OneTaste. So we thought about having a big party with OneTaste people and non-OneTaste people.

Q And did you invite people from OneTaste to attend that wedding?
A Yes.
Q Why?
A Because at that point we were still -- I mean, we still had not talked about us leaving. We were trying to imagine our life together as a married couple both being part of OneTaste and also, you know, with our family at large.
Q And did that wedding happen?
A No.
Q Did there come a time when you divorced?
A Yes.
Q When was that, approximately?
A It was November 11th, 2015.
Q You had mentioned earlier in your testimony that as part of the psychological harm you suffered at OneTaste, you had PTSD?

A Mm-hm.
Q What, if anything, caused that?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q When you left OneTaste, what was your financial state like?
A I was in debt, credit card debt, that I couldn't pay for.
Well, once -- when I left OneTaste, I was still with Misha, so he -- he did some credit card payments for me, from his job and his money. But once Misha and I got divorced, I -- yeah, I didn't have -- I was in debt and I didn't have any income.
Q What was your physical state like when you left OneTaste?
A I felt like a wreck. I was not sleeping well. You know, I -- yeah, I was not eating well. I felt haunted. I felt very distressed.
Q Why did you feel haunted?
A Because I didn't know if I made the right decision to leave. You know, in OneTaste, I was told that if I left, everything would fall apart.
And I felt -- you know, I -- I felt like I lost everything. I lost my friends. I wasn't talking -- I was talk -- there was one person that I talked to a little bit here and there, but mostly I didn't talk to anybody from the team, I didn't see any of them.

And I lost my purpose. Like, I no longer -- I was not sure what I thought about orgasmic meditation, what I thought about my experience in OneTaste.

And I -- I mean, and I was heartbroken from my breakup with Misha. At that time, I missed him terribly.

Q And what was your psychological state like when you left OneTaste?

A Anguished. I was in constant panic, fear, shakiness, you know, crying a lot and at times suicidal.

Q You mentioned fear.

What were you afraid of?

A I was scared that I was cursed, that I will never find happiness again, that my family didn't love me anymore, that -- yeah, that I would never find love again.

You know, I always wanted to be a mother and to have a family and -- you know, and I lost Misha and that dream seemed further from reality than I ever felt it before.

Q And what, if anything, about your experience at OneTaste made you feel this way?

MS. BONJEAN: Objection to the foundation.

THE COURT: Overruled.

A I think, you know, I -- for that, for the year that I was in OneTaste, you know, a year is both a really short time and a really long time as well. And I, I gave everything that I had to make it work, to make my life as a disciple of orgasm,

as a disciple of Nicole. I wanted it to work with all my heart. You know, I gave my money, my time, my body for this thing. And everything went so fast. You know, I -- it was like as if I was in a time machine and everything was so high intensity. And there was so much pressure exerted on me in my intimate relationships and financially that by the time I got out, I felt like I didn't recognize myself anymore.

Q Who, if anyone, was exerting that pressure on you?

A Nicole and Rachel.

MS. GUPTA: May I have a moment, Your Honor?

THE COURT: Yes.

(Pause in proceedings.)

MS. GUPTA: No further questions.

THE COURT: Ms. Cohen? Ms. Bonjean?

Ms. Cohen.

MS. COHEN: Yes.

THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good afternoon, Ms. Neria.

A Good afternoon.

Q My name is Celia Cohen and I represent Rachel Cherwitz.

So I just wanted to get a general timeline of your time at OneTaste. You've testified a lot today about that, but I just want to summarize.

So, October 2014, you took an intro class, right, Intro to OM?
A October 2014 I went to a TurnON event.
Q Sorry, yes.
A In November I took --
Q In November you took the Intro to OM. Right. Sorry.
And after that, you signed up for the coaching program and, by the end of December, you moved into the Brooklyn OM house, right?
A Yes.
Q And you, in July -- well, then in -- during the -- well, July is when you ended the CP9 course and became engaged to Misha, right?
A Yeah. June or July, yeah.
Q And then you left, you said, in October of 2015?
A Yeah. We left in, like, the end of September of 2015.
Q Okay.
A Yeah.
Q Yup. End of September. Okay.
And all in all, you worked for OneTaste, in sales, for about six months or a little less, right?
About March to September?
A Yeah. Or February.
Yeah, the way it worked is -- I think it was actually February. I think February is when I left my job as

a teacher assistant and came on the sales team.
Q Okay. Well, we'll talk about that.
Okay. But generally, that's the time frame?
A Yes, that is.
Q And during that time, you -- so you said Intro to OM, you said CP9, right?
A Mm-hm.
Q The Magic class, correct?
A Magic School.
Q Magic School. Sorry.
You also took the Communications class at the beginning, right?
A Yes.
Q You took the Mastery course, right?
A Mm-hm.
Q And Nicole Daedone Intensive?
A Mm-hm.
Q And ultimately, Membership, right?
A Mm-hm.
Q And then the whole time was, between moving into the OM house until you left, about eight months, approximately?
A It was from December to October.
Q Ten months?
A Ten months, yeah.
Q Okay.

All right. Now, going back, you said you first heard about OneTaste while you were at a yoga retreat, right?
A Yeah. Mm-hm.
Q And, in fact, the year of two thousand...
A '14.
Q '14, leading up to OneTaste, you had taken a lot of yoga that year, right?
A I've been a yoga practitioner for a long time.
Q And in fact, in 2014, you spent just over $10,000 on yoga courses?
A I do not believe so.
Q Well, you put them on your -- you charged your Chase card for those classes?
A I -- what do you mean?
Q Your Chase credit card?
A Yeah.
Q You put the yoga classes on your Chase credit card?
A I, I paid for yoga classes, but I would take yoga classes that are $20 a class, you know, two to three times a week. So I don't know how much money I spent on yoga classes.
Q Okay. And you also took the month-long, which was --
A I took the month-long. That was $4,000. And that was the most I ever spent on any kind of -- but that was a teacher instruction course. So my hope was to be a yoga teacher.
Q And through that, you met a woman, you mentioned, that --

a lecturer, I think, while you were at --
A She was anatomy teacher/expert, I don't know. Yeah.
Q And you began -- you met her there and you spoke to her more than once, right?
A Yeah. I actually took coaching with her after the yoga teacher course ended.
Q And you had struggled in your past with depression, right?
A Yes.
Q And that was one of the things that she was helping you with, correct?
A Yes.
Q And she was the one that told you about OneTaste, right?
A Yeah. She actually, her partner -- I did not know that at the time, but her partner was a long-time OneTaste member.
Q And when you say "member," he took classes?
A I -- he took classes and lived in an OM house, I believe.
Q But this woman, the woman you met, she told you about OneTaste, but she was not a OneTaste participant, correct?
A She -- I mean, she did the Intro to OM before and did practice orgasmic meditation. But as far as I know, she wasn't an active member.
Q And she did not -- she didn't work for OneTaste, right?
A As far as I know, she didn't.
Q And you said that you wanted to become a yoga teacher,

but starting in September of 2014, you actually became a teacher at a Jewish middle school, right?
A Starting when?
Q Did you start right then or had you been?
A I think that was the first year in that school, yeah.
Q Okay. So September of 2014?
A Yes.
Q And you had gone to school -- you got a graduate degree from Fordham, right?
A I have a graduate degree from Fordham and from Teachers College.
Q And from Teachers College.
And you grew up in Manhattan, right?
A No, I didn't.
Q Oh, sorry. I'm sorry.
You grew up in Israel and moved to Long Island?
A To Long Island. Mm-hm.
Q Sorry about that.
A Mm-hm.
Q And you're close with your family?
A Very close, yeah.
Q And both of your parents, they're psychologists?
A My dad is a psychologist and a researcher. My mom is a social worker.
Q And at the time that you started or you went to the

TurnON and started getting interested in OneTaste, you said you had your own apartment in Brooklyn, right?
A Yeah. I just moved to Brooklyn for the first time after living in the Upper West Side for about seven or so years.
Q And you had your own apartment on the Upper West Side as well?
A A studio apartment, yeah.
Q And then the one in Brooklyn was by yourself, correct?
A Yes, yes.
Q Okay. And then you -- during the Intro to OM course, you obviously learned about what OMing is, right?
A Yes.
Q You saw a demonstration?
A We did, yeah.
Q And then at the end of that, you were -- I think it was a day course, you said?
A Mm-hm.
Q You were given the option to do an OM, right?
A Mm-hm.
Q And some people could come with partners, right?
A Mm-hm.
Q You did not, correct?
A I did not, yeah.
Q So you ended up doing an OM with a man sitting next to you, correct?

A Not sitting next to me.

So we were told to find a partner. So we were all walking around the room and the first -- I wanted to make sure that I don't end up not having a partner, so the first guy I saw I, like, kind of went up to him and asked would he like to OM.

Q And so you OMed with that person?

A Yeah. Mm-hm.

Q And you didn't know that person, right?

A No.

Q And after that OM class, you were very interested in OMing, correct?

A Yes.

Q You went to -- well, you called them Practice Club. Is it also called OM circles?

A No. The OM Practice Club was something else. It was a practice club that OneTaste offered for people who did the Intro to OM class in order to delve deeper into orgasmic meditation and the concepts behind it.

Q Okay, got it.

And you learned the way that orgasmic meditation was is that while it helps with sexuality, the practice was, in fact, a meditative practice. That's what you were told, right?

A That's what I was told, yeah.

Q And that's what you believed in when you started there, correct?
A For me it was always about getting in touch with my sexuality, getting in touch with the sensations in my body that, you know, came from genital stroking. So it was never like a meditative practice that had -- that did not have a sexual component.
Q So that's how you viewed it?
A Yeah.
Q From the very beginning?
A From the very beginning, yeah.
Q And OMing, though, wasn't in a bed, right?
A No. It was in a nest.
Q And, in fact, you -- oh, actually, hold off on that for a second.
Okay. And then -- but you -- in any event, you were very into it from the beginning?
A I was very hopeful.
Q And, in fact, after you took the classes, you had asked on multiple occasions about the coaching program, right?
A Oh, I was told about it, yeah, many times.
Q And you yourself inquired about it, correct?
A I think yes, I was interested in CP10.
Q Well, when you -- and you testified on direct examination about Rachel helping you open up a credit card to pay for this

class.

Do you remember that?

A Of course.

Q And you -- your testimony is she suggested that you could open up a credit card, right?

A She told me to open up a credit card.

Q And you were 27 years old at this time, right?

A Yes, I was.

Q And you were a teacher at a school, right?

A Yes, I was.

Q And you had your own apartment, right?

A Yeah. Mm-hm.

Q You were close with your parents at this time, right?

A Yes.

Q And you could have discussed this with them, right?

A I actually told Rachel that I would like to discuss it with my parents.

And she said: They're Israeli. I'm Israeli. I know how Israelis are. I would be happy to speak with them.

But she wanted to make sure that I put a deposit first.

Q But you weren't forced, right?

You weren't forced to sign up for it?

A Well, I was not -- I wouldn't say I was forced, no.

Q You didn't know Rachel that well at the time, right?

A I didn't know her well. I was in a class where she was the main teacher. You know, and she was very charismatic and I -- like I said, I really wanted to be close to her. I wanted her to notice me, get to know me. Yeah.
Q But you saw something in her, right?
A Yes. Mm-hm.
Q And you wanted to be -- to have some of her qualities; is that right?
A Yeah, you could say that.
Q Okay. And as I just said a minute ago, you loved OMing and you loved it so much you moved into the Brooklyn OM house within, let's see, a month of taking the -- or sorry, yeah, a month of taking the OM class?
A Yeah. So I wouldn't say I loved OMing. Actually, my first OM I didn't feel anything.
But Rachel did tell us before our first OM, she said for the first, like, I don't know, some time when you first start practicing, you might not feel anything because, she said, that the clit is like an iceberg that needs to thaw and melt and then you start feeling sensations. So I was very hopeful that if I practice more and if -- that I will start feeling more sensations and that eventually I will be able to have an orgasm.
Q You were so hopeful that you didn't even wait to sublet your apartment, right?

A I didn't sublet. I -- no. I gave my apartment to Ruwan for a little bit while I moved into his place in the OM house.
Q But you were still paying for your apartment, right?
A For that -- yeah. For four months, yeah.
Q For two months, right? And you subletted it sometime in the end of February?
A I don't have -- I moved in at the end of December, so it could be that -- yeah, it could be that February was the first month that I didn't have it because in January my grandfather passed away.
Q Yes. Sorry about that.
I believe it was -- does February 28th sound -- does that refresh your recollection? I can show you a document.
A You can show me a document.
MS. COHEN: Oh, Your Honor, I was going to -- oh, sorry.
I'm just going to pull up a packet to give the witness just in case there are other documents.
THE COURT: Yes, that's fine.
MS. COHEN: Okay.
Q Okay. If you look at -- so you see the top there it's Defense exhibit numbers?
A Yeah.
Q If you flip through, I just -- I gave you everything in case you need to refresh so we don't go back and forth.

A Okay.
Q All the way to number 36. Which I can tell you the page number is also...
At the bottom it has 5098, if that helps as well.
A Yeah.
Q At the top it's DX 11-ET --
A Yeah, I see it.
Q And where it's highlighted.
A Yes.
Q Does that refresh your recollection that you were able to rent it out?
THE COURT: Sorry. Could you just tell me what document number you're talking about?
MS. COHEN: Yes. DX 11-ET-36.
THE COURT: Okay. Say that again, please.
MS. COHEN: So --
THE COURT: It's a lot of letters and numbers.
MS. COHEN: I know.
THE COURT: Give it to me one more time, please.
MS. COHEN: 11, E as in Edward, T as in Tom, dash 36.
THE COURT: Thank you.
MS. COHEN: This is part of a larger chain.
THE COURT: Okay.
Q So Ms. Neria, does that refresh your recollection that it

was the end of February that you rented out your apartment?
A Yes.
Q And before you moved into the OM house, you had actually stayed there a night or two?
A I believe so, yeah.
Q So you knew what it was like when you moved in, right?
A Yes.
Q And this OM house --
A I mean, I -- can I just go back?
Q Oh, sure.
A I mean, I knew -- I had some notions of what it might be like. I mean, I knew what the house looked like. I didn't know what it would be like to live in that house until I lived there.
Q Yes, in a communal home and what the people were like, et cetera, right?
A Yeah, yeah.
Q But you knew you would share a bedroom, right?
A Yeah.
Q And this OM house was run by the community of people interested in OM, correct?
A Yeah, but it was also -- there was some staffers who also had -- you know, would come in and say how to do things as well. Like, yeah, it was not independent of the staff.
Q But it was in the practice of OM and that was the purpose

of the house?

A Yeah. It was people -- yeah. It was for members who were enthusiastic and really wanted to live a desire-based life -- which is, you know, what OneTaste called it -- who wanted to practice every day together and live in that way together.

Q Right.

And not all those people worked for OneTaste, right?

A No.

Q Okay. All right.

And when you moved in, you received OM house rules.

Do you remember that?

A I don't remember that.

Q I mean, more specifically, OM House Codes of Play.

Does that ring a bell?

A I don't know if I received them.

I heard about, like, a manifesto of the Brooklyn OM house. I -- yeah.

Q Okay. Let me just see if you've seen this before.

MS. COHEN: If we could pull up, for the witness only, Defense Exhibit 1-BA.

I'll bring you the full document as well.

Q Do you recognize this document?

A No.

Q Okay. So you can put that aside.

Okay. And -- but you testified on direct about what your schedule was like in the OM house, right?
A Mm-hm. Yeah.
Q And as you said, one of the reasons you moved in there was to do the practice of OM, right?
A Mm-hm.
Q So you would have OM morning practice, right?
A Mm-hm.
Q And then, of course, you would eat and do fear inventory?
A Fear inventory before eating, but yeah.
Q Oh sorry, before eating. Okay.
A Mm-hm.
Q And then after that, people would go on their day, after they cleaned up, and go back to --
A Yeah. There was a few of us who had, like, day jobs who would leave for work.
Q And again, you knew about these practices, including fear inventory, before you moved in, right?
A I think I -- I don't know if it was -- I don't know exactly when I learned about it. It could be when I just moved in. It could be -- I'm sure I've heard of it. I think the first time that I -- the first time that I did a fear inventory was the first time when I did, like, a full morning practice.
Q And your birthday is January 4th?

A Yeah.
Q I actually have the same birthday.
A Mm-hm.
Q And on your birthday, you had just been living there for a little bit, right?
A Yeah.
Q And you had -- the people in the house said, you know, what do you want for your birthday, your desires.
Do you remember that?
A I remember that there was a -- they did a surprise, like, birthday -- not a birthday party, but a birthday circle. And that meant a lot to me.
Q And you actually listed things that you wanted for your birthday.
Do you remember that?
A I don't.
Q Do you remember listing that you wanted to do fear inventory?
A No.
Q Okay. Let's take a look at 11-E-22.
A 11-E-22?
Q To the second page of E-2. If you flip on the back.
THE COURT: Sorry. What are the numbers you're saying?
MS. COHEN: 11-ET-2.

A Just one second. Because I'm looking at --
Q Sorry. It's the very second page in the packet.
A Oh, okay.
Q Yeah. It's 11-E-2 -- 11-ET-2 and then on the back.
A Just one second.
Q Sure.

THE COURT: Could you just go up to the exhibit sticker for me, please?

MS. COHEN: Yes. Sorry.

11-E, as in Edward, T as in Tom.

THE COURT: That says 22. Is that what you're saying?

THE WITNESS: No.

THE COURT: It says 22.

MS. COHEN: That's so weird. I have a different...

MS. GUPTA: I think I have 11-ET-2.

THE COURT: Well, that's not what is on the screen.

MS. COHEN: Yeah. Sorry.

THE COURT: Okay. Now you've got -- is this the one you need to have on the screen?

MS. COHEN: Yes.

THE COURT: ET-2? Not 22.

MS. COHEN: Yes.

THE COURT: Okay.

MS. COHEN: Sorry. I wasn't looking at the screen.

Q If you go to the next page.
A Oh, to the next page?
Q Yeah.
A Okay.
Q So do you see on the back -- and actually, at the very top, I didn't highlight.
A Okay.
Q You can look there. That might help as well. And then what's highlighted.
And if you could look at --
A I'll let you know once I'm done.
Q Sorry?
A I'll let you know once I'm done.
Q Oh, yes, that would be great.
A Okay.
Q Okay. So does that refresh your recollection that you sent a list of things you wanted for your birthday?
A Yeah. I completely forgot about this.
Q And one of those things was fear inventory, right?
A Yes. Let me see what number that is.
Q 18.
A 18. Fear inventory, yeah. Mm-hm.
Q And you also wanted to do naked yoga with Cora?
A Yeah.
Cora actually did the same teacher certification.

Not the same. With the same teacher, so we had that in common.
Q So you knew her?
A No. No, we just -- I knew the kind of yoga practice that she did.
Q Got it.
And you also wanted -- instead of two OMs, you wanted three OMs, right?
A Not every day, but at that point, yeah.
Q On your birthday?
A It says three OMs. Okay.
Q Okay. And, you know, at the OM house, you could have visitors, correct?
A But you had to tell everybody that somebody is coming over.
Q Right.
In fact, you were living with, what, seven or eight people. Right? Something like that?
A Something like ten people, but yeah.
Q Ten people.
And part of the policy would be courteous as to when you would have guests, correct?
A I don't know if it's courteous. You had to let everybody know that somebody from the outside is coming into the house so nobody is surprised to see somebody they don't know or

taken aback. Also, so people know not to -- you know, they don't want to be naked or if they don't want to do practices out in the open. We had to let people know if somebody is coming out or if you're leaving the house to go someplace on your own.
Q And, in fact, you had your friend Cass visit, right?
A Yeah.
Q You had your brother over?
A So I had Cass and my brother over, yeah.
Q And your mother came at one point?
A You know, I thought so, but I actually don't believe that my mom came.
Q Well, you at least told the people at the OM house your mother was planning on coming.
Do you recall that?
A Perhaps, yeah. I remember something like that, yeah.
Q And, you know, yes, I mean, in the OM house, you'd want to know before somebody who doesn't know about OMing might walk in and be surprised.
That could be one of the issues, right?
A One of the issues, yeah.
Q It's also respectful to roommates to tell them who's coming in and who's leaving, right?
A You know, I mean, it depends. I think that, you know, there are some places where you live that you can have

visitors without having to alert everybody that you are having visitors. But in this house, we had to make sure to give everyone a heads-up if anybody is planning to come.
Q Okay. And Nicole and Rachel were not on this text thread, right?
A No.
Q This was the community of OMers that we previously discussed, correct?
A This was only the people who lived in the Brooklyn OM house.
Q Yes.
And once again, during this time from when you moved in until the end of February, you had an apartment in Brooklyn that you could have gone back to any time, correct?
A During -- yes. Mm-hm.
Q And the people in the OM house really cared about each other, right?
A Yeah, we developed strong friendships. Yeah.
Q In fact, you often texted that you love them, right?
A Yes.
Q People in the house would show concern when people were sick, correct?
A Yes.
Q You supported people with their families and the issues they were going through, right?

A Yes.
Q And, in fact, when you -- you said when your grandfather died, you went to Israel at the beginning of your --
A Yeah. To sit Shiva. Yeah.
Q Yeah. And you kept in contact with members of the OM house at that time, right?
A Yeah.
It was actually -- yeah. It was a pretty complicated trip for me.
I was very close to my grandfather. And he passed away on the day after my birthday, on January 5th. And we flew -- we flew right away, either on the 5th or on the 6th, to sit Shiva for him with my family in Israel and Italy.
And the whole time I was there, I felt like I couldn't really be present for -- like, to be with my sadness and, like, grieve for my grandfather or to be with the rest of my family because I was thinking all the time about being online, like on the text thread, like kept -- I kept getting messages, I kept seeing what everybody was doing in the house.
Part of it, I felt like I was missing out. Like, I missed the friends that I just made. And, like, you know, his death at that moment, you know, was a -- it was unexpected. But also, I felt like -- almost like -- like I, I -- yeah, I -- like, I couldn't process my grief or, like, be with my grief because I was so kind of into -- like, everything that I

was learning in OneTaste was just floating in my head and all the people that I met. And, like, yeah, I just -- that's -- yeah.

Q Okay. So, I mean, the first time you appear on this chat, the Brooklyn chat, is January 3rd of 2015, right?

If you go to -- at 11 -- well, 11-ET-1. If you look at the bottom, the first page and the top.

A Yes.

Q I don't believe you're on there, but I think you can tell -- tell me if that refreshes your recollection as to whether you were yet living in the house.

A I think I was not. Yeah.

Q And if you go to 11-ET-2, the next page.

A Uh-huh.

Q Does this refresh your recollection that this is your first text?

A Makes sense, but -- oh, no, I see another text. If you see, if you go up.

Q Oh, yes.

A Yeah.

Q Sorry. The day before.

A Yeah. It says: JB coming tomorrow, Sunday.

But I feel like maybe -- let me see.

Q Yeah, there's, you know, the holidays and perhaps you were on earlier.

A Because I feel like if it was my first text ever, I would have said something like --
Q Yeah.
A -- I'm joining --
Q Yes. No, that makes sense.
So, but in any event, in December of 20 -- December 23rd of 2014, we can agree you were not on the text, right? Because you were going to come visit then?
A Yeah, I think that makes sense. Yeah.
Q So by the 3rd, as I said, given the holidays in that last text, it couldn't have been more than five days?
A Sorry. Ask the question one more time.
Q Sorry.
A Yeah.
Q If we don't have your very first day, it's certainly -- I guess the 23rd is two days before Christmas.
A Uh-huh. So probably around that time.
Q Yeah. So maybe around that time. So we're talking a week, maybe?
A Yeah. Like the end of December is what I thought that I probably moved in.
Q Okay.
A Yeah.
Q So you had been -- when your grandfather died, you had been on this chat for a week, maybe?

A Yeah, I'd been on the chat.
But before that, I -- you know, I -- I had been -- I went -- I started -- I went to several TurnONs in October.
And then I did the Intro to OM.
Then I started the OM Practice Club once a week.
I went to a Valentine's Day.
I did the Communications course.
I was, like, fully --
Q You were fully in it, right?
A I was fully in it.
Q You enjoyed it?
A I wouldn't say that I really enjoy -- I mean, to some -- I think I gave myself fully into it, yeah.
Q You made a choice to do each and every one of these things, correct?
A Each and every one of those things was offered to me and yes, I made the choice to.
Q You made the choice, right?
And you were not working for OneTaste at this time, correct?
A Correct.
Q So no one was threatening you, right?
A No. No, they did not come from threat. It came from a desire to heal.
Q Yes. Okay.

So when you were in Israel, as I said, you continued to -- you messaged a few times from Israel?
A Yeah.
Q And, in fact, you were a little bit -- you messaged the group that you were a little bit nervous about not OMing for eight days.
Do you remember that?
A I don't remember in details, but I believe you.
Q Well, I can show you, refresh your recollection.
If you go to 11-ET-5 where it's highlighted.
A Mm-hm. ET-5. Yeah.
Q And you didn't want to stop OMing because it was a powerful way to stay grounded and connected?
A Mm-hm.
Q Does that refresh your recollection?
A Mm-hm. Yes.
Q Yes, can you just -- was that a yes?
A Yes.
(Continued on the next page.)

CROSS-EXAMINATION (Continues)

BY MS. COHEN:

Q All right.

A Yeah, I mean I believed, you know, I even learned in the Intro to OM and in the OM Practice Club that OMing every day was very important in order to feel grounded, you know. We were taught it was a way of getting clear, of releasing energy, of -- of -- you know... and so, you know, I really wanted to, I wanted to do it right.

I wanted to, like I said I wanted to, for my body to, I wanted to be able to have an orgasm. I wanted to -- and I just started on, you know, I was like a couple months into this really new world that was exciting. And -- and I was -- and suddenly I was in Israel, you know, in my aunt's house. We didn't leave anywhere, with my family, sitting shiva for my grandfather. And it was like two completely different worlds that did not -- you know, I felt -- yeah, I felt very far away from the Brooklyn OM House and the practice that I found.

Q Okay. And then when you got back, you -- in fact you, yourself, would arrange for OMs often, correct?

A That's what we were told to do. Everybody arranged for their OMs. You know, like we were taught to ask others for OMs.

Q And on these threads, though, it was you often organizing for everyone the OM practices.

Do you remember that?
A No.
Q Do you remember somebody named Malcolm?
A Yes.
Q Okay. And you found Malcolm or you spoke to Malcolm about coming to be a stroker, correct?
A Malcolm was already a stroker in the community. He -- I believe he must have taken the Intro to OM class and I found him on -- I don't remember the first time I met him, but I think it was on the Hub, the OM Hub.
Q And you had privately OMd with him before, right?
A Yeah. He was my first -- he was one of my first OMs. I don't know if my first OM, but one of my first.
Q He was one of your first you said?
A One of my first, yeah.
Q Okay. And you invited him to come over to the Brooklyn OM House. Do you remember that?
A Yeah. But I actually OMd with him before. When I was living in my apartment, I OMd with Malcolm once.
Q Okay. And then when you were if the OM house, you got him to come over?
A Yeah. I arranged for an OM with him, yeah.
Q And do you remember Maurice and Andrew?
A Yeah, I remember Andrew.
Q And do you remember telling the people on the thread that

they were also interested in moving into the house?
A Yeah.
Q Do you remember you told everyone the theme was pussy power? Do you remember that?
A No.
Q If you take a look at 11ET-20, which would be on the screen as well. And it's 5000 --
A Okay.
Q -- is the number at the bottom.
A Yeah. I think there was -- yeah, I think there were open spots in the house. The house was not filled and we were always looking for more strokers, so yes.
Q So, you wanted to entice them to come, is that right?
A Yeah, uh-hum. Uh-hum.
Q And on I think the next day, the next -- well, I'll ask you if you remember this first.
On February 4th, again you're asking somebody in the house to reach out to Malcolm so that you would make sure you had another stroker in the house for the next week.
Do you remember that?
A Where are we talking about? 11.
Q The next one 11ET-21. I think it's on the back. Sorry, on the next page though.
A Oh, yeah.
Q Is that a yes?

A Yes.
Q Okay. And you, yourself, would text with Andrew and Malcolm about coming over to do OMs, correct?
A Right. But I wasn't the only one that OMd with them.
Q Well, yes. I'm --
A Yeah.
Q But you were making these arrangements, right?
A For my OMs with them, yes.
Q And for the house, right?
A For them to come over, yes. Yeah.
Q And actually when you first moved in, it was difficult, the OMs were at 7:00 originally.
Do you remember that, 7:00 a.m.?
A Yeah, uh-hum.
Q And when you were teaching, that was a problem, right?
A Yeah. I would be late to -- to my job if -- if -- yeah. I needed to leave earlier.
Q So you got them to move it to 6:50, do you remember that?
A Yeah. They moved it ten minutes earlier so that I could practice too.
Q Now, you would, as you said, people came over, you went to friends' houses, right, during that time?
A Yes. I went maybe once or twice to a friend's house. At the beginning I went much more. My -- my -- my connections to the outside world were still strong and it took a while for me

to -- to kinda, you know, not talk to my family and not talk to friends, and so....
Q In fact, people in the house, they went out to hear music, right?
A Probably. I don't remember a specific time, but we had a musician in the house. We had, you know, a bunch of very talented people.
Q And you were invited to go hear some music.
Do you remember that?
A I don't.
Q Do you remember going to Castle Spa?
A Yes.
Q As we said, people in the house worked outside of the OM house, correct?
A Some of them, yeah. But when we went to Castle Spa, it was like, you know, we went as -- as a group of OMers. I went once or twice. I think maybe once, yeah.
Q No one was restricting you from leaving, correct?
A No, but I had to keep everybody informed of my plans.
Q Some people had boyfriends or girlfriends outside of the house, right?
A I -- who are other OMers?
Q Yes.
A Yes, who didn't live in the house, but maybe used to live in the house or lived in another house or all were connected

to the OneTaste community, yeah.
Q So is it your testimony no one had a relationship outside of OneTaste in this house?
A I don't remember.
Q And you -- one of the reasons for keeping connections at OneTaste was also part of the philosophy, right?
Connections to individuals were something you were supposed to be doing and wanting to do it to get what you were supposed to get out of the practice, correct?
A Yeah, one -- one of the -- one of the sayings that was -- that I heard from the very beginning is: Staying connected no matter what.
Q And no one -- you had a computer, right?
A Yes.
Q You had a cell phone, correct?
A Yes.
Q In fact, I think you were on your family's plan on the cell phone?
A I'm still on my family plan.
Q Lucky.
And you -- okay. And you were, again, at the beginning still working at your teaching job, right?
A Uh-hum.
Q Okay. Now in December, the end of December, you decided you wanted to quit, right?

A Yes.
Q And that was a decision you made on your own, correct?
A Yeah. I mean I remember telling Rachel that I want to devote -- that I want to become a salesperson and I want to, yeah, to devote my time to orgasmic mediation and OneTaste.
Q But your decision, though, to quit your job had nothing to do with becoming a salesperson, right?
A I wanted to work on the sales. I wanted to work in OneTaste. I didn't -- I never wanted to be a salesperson, but I wanted to be -- I mean, ideally, a teacher of orgasmic meditation, but I understood soon that there were no other jobs really in OneTaste besides sales and technology and stuff like that.
Q Those were the only jobs you were told about?
A Those were the only jobs that I knew, yeah. Like the sales -- everybody -- everybody was in sales, except maybe the one technology guy.
Q That you knew about, right?
A Yeah. Yeah, that I knew about.
Q And you -- the first time you went to the Intro to OM, you met Marissa Ward, right?
A Yes. I don't know if that's -- it might be the first time that we met.
Q Okay. At some point she became a friend of yours, right?
A Yeah. She was a very good friend, yeah.

Q And she lived in the -- she moved into the Brooklyn OM House with you?
A No, we did not live in the Brooklyn OM House together.
Q Okay. But you met her early on, right?
A I met her early on. I think I -- I think I -- the first time I actually saw her she was doing the front desk in an Intro to OM class.
Q Okay. And you messaged with her on -- do you remember messaging with her on December 31st, 2014 --
A I wish I had that kind of memory.
Q -- about you wanting to quit your job?
A I don't remember the conversation.
MS. COHEN: I am going to -- let's bring up just for the witness 11-FF, but I think I'll have to walk a copy up.
Your Honor, this is one that is going to be hard to see, but --
THE COURT: We'll do our best --
MS. COHEN: -- we'll see if the witness can read it.
THE COURT: Okay.
BY MS. COHEN:
Q I won't have you read the whole thing because it's hard to see.
A Okay.
Q I'll try to draw your attention to it.
Ms. Neria, if I could draw your attention to --

well, do you recognize this at all?
A (No response.)
Q Your name in the middle and the date.
A Uh-huh.
Q And if you look at --
A Okay, so got it. So I'm the gray, right.
Q Yes.
A Marissa's the blue.
Q Yes.
A Got it. Okay, so let me -- just give me a second.
Q It's just the top part.
A Yeah. Okay.
Q Okay. And does that refresh your recollection that you told Marissa --
A Yeah.
Q -- on December 31st that you were gonna quit?
A That I'm -- I'm -- yeah, I'm getting my courage up to quit. Yeah.
Q Okay. I just asked you don't read from it because we can only refresh.
A Oh, do you want me to read from it?
Q No, no, I'm sorry. I just want to ask you questions because it's not in evidence.
A Oh, okay. Okay.
Q Yeah, no problem.

And you -- you told her that you were getting up the courage you said to quit, right?

A Uh-hum, uh-hum.

Q And that you had to follow your intuition, that was the reason you were gonna do it, right?

A Uh-hum, uh-hum, yeah.

Q You didn't say anything about working for OneTaste, right?

A But that was -- that was, for me that was the reason. I didn't say anything here, but I wanted -- I quit my job in order to work for OneTaste.

Q Okay. You didn't line up a job at that point with OneTaste, right?

A No. But I believed because I was told in OneTaste where there is a desire, there is a way. I believed that if I made my desire clear to work for OneTaste, I will find a way to work for OneTaste.

Q Okay. And you had just — again, to orient ourselves — November you took the Intro to OM class and this is a little over a month later, right?

A Yeah, I went -- I mean by that time I spent -- you know, I sign up for $12,000 class. Took a bunch of other classes. Left my home. I was deeply in it, wanted to show my commitment, you know. There wasn't -- I had both of my feet like, you know, in the water. I didn't leave one out.

Q You had both feet in because you chose to have both feet in, correct?
A Because it felt like a current was taking me. It was -- the whole -- the whole -- there was a system and a path laid out for people like me.
Q What do you mean by people like you?
A By vulnerable people who come in with -- with something that they want to heal.
Like, for example, I came in because I never had an orgasm in my life. So -- and while -- and I tried to seek help in other settings and was never able to solve that problem. So, I came in with that vulnerability, with the fear that I will -- you know, that there was something wrong with me, either with my body or psychologically, that I would never be able to have fulfilling sexual experiences.
And so, OneTaste had, you know, numerous courses available for people like me who wanted to get connected to their body, who wanted to -- to have a healthier sex life, you know, who wanted their well-being to improve. It just came with -- with an immense cost.
Q Okay. So that was the point, to help you and to improve you in the ways that you needed, correct?
A That's what I was hoping, yeah.
Q Okay. And there was another teacher in the house, Courtenay Lapovsky?

A At the time, yes -- yes, yes.
Q She was a teacher as well?
A Yes, a school teacher.
Q And you talked to her, as well, about quitting, right?
A Yes, I think I did. Yeah. Uh-hum.
Q And you encouraged her to quit, right?
A I don't recall that, but....
Q But she didn't quit at that time, correct?
A No, she was a -- she was a teacher for -- yeah, she was still a teacher.
Q And when you were quitting, this was in February of 2015, right?
A Uh-hum.
Q And it was the middle of the school year, correct?
A Yeah, uh-hum.
Q And, in fact, you discussed with her about the problems with quitting in the middle of the school year, right?
MS. GUPTA: Objection, hearsay.
THE COURT: Yes, sustained.
BY MS. COHEN:
Q In any event, you eventually quit about mid-February.
Do you remember that?
A I remember quitting, yeah.
Q And you had to have a meeting with, I think it was, the --

A The teacher.
Q -- the principal or the head teacher?
A I had meetings with both of them, yeah.
Q And you -- you told the text thread about that meeting, right?
A I don't recall.
Q Okay. Showing you 11ET-26.
So in your packet, and before you look at that, you not only told the people in the house that you were gonna quit, but you actually told them about the meeting and you -- you said you were gonna tell them: Adios, mother-fucker.
Do you remember that?
MS. GUPTA: Objection, hearsay.
THE COURT: Yes, sustained.
Q Well, going to -- okay.
See if this refreshes your recollection that you told the Brooklyn OM House that you were going to quit at the bottom of 26.
A Yeah.
Q Okay. And, in fact, you did -- and then you reported back to them after you did quit, right?
A Yes.
Q And the school was very nice about it, correct?
A Yes.
Q In fact, you -- you told the house that you were -- if

you wanted to go back the following year, they would accept you back, right?

MS. GUPTA: Objection, hearsay.

THE COURT: Yes, sustained.

MS. COHEN: I'm just offering that for the effect on the listener, Your Honor.

THE COURT: Sustained.

BY MS. COHEN:

Q All right. Again, your choice, you chose to quit your job, correct?

A Yeah. And I see how everybody say congratulations and they're so excited for me, yeah.

Q That was because that's what you wanted, correct?

A Yeah, because I took that step towards my desire. Like we -- in OneTaste, we lived a desire -- desire-based life. That was one of the concepts that we were told to follow.

So, it's -- so I, you know, I took it to mean what it's supposed to mean. Like, if I -- if being a teacher assistant was not my purpose and I wanted to do something else, and then I would take the step towards doing that thing, believing that my desire will -- will lead me in the right direction, will -- will make those things that I want happen. So --

Q In fact -- oh, sorry.

A No, go ahead.

Q When you told Marissa about it, you also told her that you still needed to take ownership and responsibility over your life and your actions.

Do you remember telling her that?

MS. GUPTA: Objection, hearsay.

THE COURT: Sustained.

BY MS. COHEN:

Q Did you feel that you needed to take ownership and responsibility over your life?

A Responsibility and ownership was another thing that we heard often about in OneTaste in our -- you know, so they wanted to make clear that all the decisions that we were making, we were making them on our own. That it was our choice, our desire, our responsibility, because they didn't want people to come back to them --

MS. BONJEAN: I'm going to object to the speculation of what other people wanted.

THE COURT: She's answering the question.

Give me one moment.

(Pause.)

MS. BONJEAN: And speculating.

THE COURT: Sustained. You can ask a different question though.

BY MS. COHEN:

Q You would agree with me that taking ownership of your

choices is important, correct, or ownership of your decisions, I'm sorry?
A When you make -- when the options you have -- when -- you know, if -- if nobody is trying to manipulate you and you -- and you make choices in a free way, it's important to take ownership. It's a sign of maturity.
When you go into an organization that has -- that is offering classes that are meant to do one thing, but do another, and cost so much money and you could just go from one thing to the other because you believe that you're in one way or another self-improving, I think at that point you're not making free choices anymore.
Q Okay. But my question is it's important to like in your life to take ownership of your decisions, correct?
A I agree with that, yeah.
Q And, in fact, you said that the house congratulated you when you made the decision.
But when you first said you were gonna quit, some people wanted to make sure you were okay with that, right?
A Yeah. There were -- yeah. Well, I think Courtenay -- Courtenay talked to me about it. I don't remember exactly the conversation, but yeah.
Q Okay. And Courtenay had been living at the OM house a lot longer than you, right?
A Oh, yeah, yeah. She is still in OneTaste, in fact.

Q Well, at the time she had been living in the OM house longer than you is my question?
A Yes, uh-hum.
Q And she continued on as a teacher at that time, correct?
A Yes. Yeah, at some point she quit and became a full-time, but I'm not sure when.
Q Okay. And you ended up getting a job at a coffee shop you said, right?
A Yeah. In order to make ends meet, yeah.
Q But after you quit your teaching job, correct?
A Yes.
Q And you started working that coffee shop or you were working, at some point in February you were working at that coffee shop, correct?
A I think so, yes.
Q And you told your housemates how much you loved your job working at the house -- at the coffee shop?
A I mean it was kind of perfect at the time because it was seriously on the corner of where the Center was. It was right on Canal and Broadway. So I had to come out of the Center and take five steps and I was at my new job.

So it really allowed me to be there for morning practice and to be there for evening practice, and to come in between when I had breaks. It -- you know, unlike my job as a teacher where I couldn't be on my phone, I couldn't be

connected to other OneTaste members or the sales team, now I could be in full communication with them.

They actually would come over and stop and get coffee and juice from me. So, there was multiple check-ins throughout the day.

Q But you described your job at the coffee shop at the time as, quote, fucking awesome.

Do you remember that?

A I don't, but I believe it's written here.

Q Okay. Well, do you want me to refresh your recollection? This is on 11ET-29.

A It's not highlighted.

Q Oh, sorry. And I realize I forgot. It's on the second page, 5075, and then it's one, two, three, four, five, six lines down or on your screen it's highlighted.

THE COURT: Well, are you asking her if what's she's looking at refreshes her recollection about something?

MS. COHEN: Yes. About saying that about her job.

A Okay, yeah.

Q Do you remember that?

A (No response.)

Q And no one forced you to get that job, right?

THE COURT: Wait, let her answer that question. You asked her did she remember that and she hasn't answered.

MS. COHEN: And she said yes.

BY MS. COHEN:
Q Right?
A I didn't not say yes.
Q Oh, I'm sorry. I'm sorry.
Does that refresh your recollection?
A Yes.
Q Okay. All right. And so you talked a little bit about your -- your family.
A Uh-hum.
Q And, you know, throughout your time at OneTaste that you did often go to dinner with your father, right?
A I wouldn't say I often went. Before OneTaste, I used to have like a Tuesday dinner ritual with my dad where every Tuesday he would drive from his job to meet me in the evening and we would have -- we would have dinner together.
Q Okay. Well, on the thread you messaged many times about on March -- in March you went to dinner with your dad.
Do you remember that?
A No.
Q Do you remember sleeping over, telling the OM house thread that you were going to sleep over at your parents'?
A So, my parents' lived in Westchester at the time. So to get to my parents' from Brooklyn, it's about a two-hour trip.
And also, before I moved into the Brooklyn OM House, I would go spend weekends with my family all the time. So,

that was the beginning of my time at OneTaste. I still tried to keep up with my family in the same way.
Q Okay. And we talked before about your mother visited the Brooklyn OM House. You, at least, notified people in the thread that your mother was going to come over.
Do you remember that?
A Yes. I don't think she actually came over, but I think there was -- yeah, I was talking to my mom about -- I wanted her to come over.
Q And that your mom listened to a livestream of Nicole Daedone's lecture in March?
A She actually went to Nicole's lecture in March at Bank Street. So she didn't listen to a livestream, she was there in person.
Q And in July you went for your dad's birthday. Do you remember that?
A Yeah, I -- you know, it would take a lot for me to miss my dad's birthday.
Q You would joke about your mom doing taboo class, do you remember that?
A No, I don't.
Q You talked on the phone with your parents, right?
A Here and there I'm sure I did, yeah.
Q And people generally at OneTaste knew who your parents were, right?

A I don't think I understand that question.
Q Well, in August you were chatting with Marissa Ward telling her you were on the phone with your mom.
Do you remember that?
A No.
MS. GUPTA: Objection, hearsay.
THE COURT: Sustained.
Q Throughout the time of your time at OneTaste, the eight, nine months, you never lost touch completely with your parents, correct?
A So my time at OneTaste was about a year, right. I took TurnON events in October and I left at the end of September.
Q You were taking classes from November to December, you moved into the OM house the end of December, correct?
A Right.
Q All right. Now let's talk a minute about the Coaching Program.
You, when you signed up in November, you signed a program waiver.
Do you remember that?
A I think we signed waivers for every big course.
Q I'm going to show you --
MS. COHEN: Just for the witness.
Q -- Defense Exhibit 11-R.
A Do I have it here?

Q I can bring it up. It's also on the screen.
A Yeah, I can't really see. Thank you.
Q Okay. Do you recognize this document?
A I recognize this document, though I don't -- I don't remember that first part.
Q Do you see your signature -- your initials at the bottom?
A Yes, I do.
Q -- of the each page?
And do you see your signature at the end?
A Yes.
Q And do you see the date?
A Yes.
Q December 27th, 2014?
A Yeah, uh-hum.
Q And is that around the date that you would have signed this Coaching Program waiver?
A With Rachel, yes.
Q And does this fairly and accurately depict the CP9 coaching waiver that you signed in December 2014?
A I believe so, but it's not like I sat there and read the whole waiver. I was, you know, sitting in Rachel's bedroom. I was in and out of their probably and the whole thing was like 25 minutes.
Q You testified that you -- you met with Rachel in November and signed up for the class.

Do you remember that?
A Yes.
Q Okay. But you signed this in December --
A Oh, okay.
Q -- 2014?
A Okay.
Q But you did sign it, right?
A Yes.
Q And that's your signature, correct?
A Yes. You have to sign it in order to attend.
Q Okay.
MS. COHEN: Your Honor, at this time I offer Defense Exhibit 11-R into evidence.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit R is admitted.
(Defense Exhibit R was received in evidence.)
MS. COHEN: Thank you, Your Honor.
Can we publish this for the jury?
(Exhibit published.)
BY MS. COHEN:
Q Okay. So on this first page, Ms. Neria, this is the refund policy, correct?
A Correct.
Q And if you cancel more than thirty days prior to the

beginning of the course, you can get a refund, minus a 15 percent cancellation fee, right?
A Uh-hum.
Q Okay. And then after the first day or weekend, you can't get a refund, right?
A Uh-hum.
Q And then if you go to page 2, this outlines the assumption of the risk.
Do you see that, Assumption of Risk, right?
A Yeah.
Q And these bullets, let's just go through some of them.
These are the risks you're assuming when you sign this document, correct?
A Uh-hum.
Q Okay. And in the sixth bullet down you agreed that the content of the course was controversial.
Do you remember that?
A Okay, yes.
Q You also agreed in the next bullet that while sponsor believes that the content of the course to be valuable, sponsor does not guarantee it will solve any particular issue or problem I may have. I alone decide and accept responsibility for how and for what purpose I apply the content of this course.
It says that, right?

A Yeah. So, this is a perfect example of --
Q I'm just asking if you said that.
A -- OneTaste.
Q And that you also agree that certain participants may make statements or actions that you disagree with or find offensive.
Do you see that?
A Which bullet is it?
Q Second -- third bullet up from the -- highlighted on the screen.
A Uh-huh.
Q And at the top under the fourth bullet, it also has you agree that any concepts, notions, ideas, suggestions and recommendations from sponsor and anyone acting on behalf of sponsor that I accept or apply to my life I do of my own free will, right?
A Yes.
Q And on the next page, the first bullet also indicates that you've assessed your own -- I have assessed my own emotional, mental and physical well-being and I have concluded that I wish to and am able to participate in the course.
That's another one, right?
A Uh-hum, yes.
Q And also -- and the second-from-the-last bullet, that regardless of any disclosures or written approvals upon

acceptance into the course, I continue to bear sole responsibility for my own -- for my well-being?
A Yes.
Q Okay. And then down at the bottom -- oh, sorry, down further, where it says Psychotherapy Disclosure.
A Uh-hum.
Q You understand -- I understand and agree that the course is not and is not promoted as a substitute for psychotherapy and is not therapeutic in nature. I understand that any value I obtain from the course I obtain via my own free will and participation.
Right?
A Uh-hum.
Q And you signed this document, correct?
A Correct.
Q All right.
And at this time you signed this document after you had met with Rachel, right?
A Yes.
Q Yes.
A It seems like it, yeah.
Q So at this point, before you signed it, you had some time, even more time to think about it, correct?
A Time to think about the Coaching Program?
Q Yes.

A Yeah.
Q And you chose to do it at that time, right?
A Yes.
Q And you started this course in early February, right?
A That was the first immersion, but I actually missed that one.
Q Okay. It was a snowstorm?
A It was a snowstorm, and I also had -- I was sick. I'm trying to remember what it's called when you have a sore throat.
Q Strep?
A Strep throat, yeah.
Q I think you talked about that in the thread too, right?
A Yeah, uh-hum.
Q And you testified on direct that you wanted to wait and do the course in New York, right?
A I wanted to -- yeah. I mean that made so much more sense to me, yeah.
Q But you were very -- fair to say throughout your course in OneTaste you did things pretty quickly, correct?
A Correct.
Q I mean by -- as we said, within a month you were in the OM house, right?
A Correct.
Q So you were excited and wanted to start the Coaching

Program as soon as possible, correct?
A I would say I was excited to start the Coaching Program, and the Coaching Program was around the corner.
Q And, in fact, you loved it when you did the Coaching Program, right?
A Yes. The first couple of immersions were a lot of fun. People came from all over the world. It was a big group of people. I don't know, 90 people or something like that.
Q And lots of these people you never saw again, correct?
A I saw them throughout for six months.
Q Yes, I'm sorry. After the course.
A Many of them I haven't, and then some of them I have, yeah.
Q And not all those people worked for OneTaste, correct?
A No, but -- but -- but definitely some of them did and a lot of them wanted.
So, the Coaching Program is you learn how to be an orgasmic meditation coach so that you can make money as a coach for orgasmic meditation. And kind of -- it's another way. So in order to OM, you can either do a private course, a private session with a coach, with a certified coach by OneTaste that tells you how to OM. And then you can go ahead and do it with a partner or you can take an Intro to OM class.
So, the Coaching Program was another way to making coaches to spread the practice.

Q And you and Marissa Ward did the CP9 together, right?
A No. Marissa, I believe, did CP8. I don't believe she was in CP9.
Q Let me see if you recall this picture.
MS. COHEN: Can you show me DX 11-FK?
THE COURT: Sorry, you faded off there.
MS. COHEN: Sorry. DX 11-FK.
THE COURT: FK, okay.
MS. COHEN: FK.
THE COURT: Thank you.
MS. COHEN: And actually, I'll do them together and also 11-FL.
BY MS. COHEN:
Q So, first this is FK.
Do you recognize this?
A I recognize Marissa and I, but I also see Dana Lawrence in the background and Dana was definitely not in the Coaching Program. So this is not a picture that was taken in the Coaching Program in San Francisco.
Q Okay. So, maybe the next one will see if you recall where this was taken.
MS. COHEN: Can you show her 11-FL?
THE WITNESS: That is from the same -- I mean we're wearing the same clothes.
Q Yeah, yeah. Do you know where you were?

A No.
Q All right. But this is a picture of you and Marissa?
A Yes.
Q All right.

MS. COHEN: The defense offers Defense Exhibit 11-FK and 11-FL into evidence.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibit FK and Defense Exhibit FL are admitted.

(Government's Exhibit 11-FK and 11-FL were received in evidence.)

(Exhibit published.)

BY MS. COHEN:
Q Okay. So finally, you get into sales in -- at least, your first commission is sometime in March.

So that's why I assume that's when you started?
A I think that I started earlier. It was just -- it takes a long time to sell an orgasmic meditation ticket.
Q When you started, you started sales, you ended up moving into the 365 address, right?
A The staff house.
Q The Staff House. And that was in March of 2025, right?
A Yes.
Q Okay. And, again, it was commission-based, right?

A Yes.
Q So it's like, you know, you get paid on what -- what you do, right?
A Yes.
Q So you don't -- you could walk away from that at any time, you don't have a -- you don't have to give any, any leave time, right, if you wanted to quit, right?
A No.
Q And you testified that Rachel was your boss, right?
A Yes.
Q But do you recall that Aubrey was your technical boss, do you remember that?
A Our -- Rachel was like -- Rachel was also Aubrey's boss. So, in that way she was -- she was my -- she was my boss as well. Aubrey was my boss for a while. Paul was my boss. Marissa Ward was my boss. The bosses kept changing.
Q And Aubrey worked with Ravi, right?
A She was also Ravi's girlfriend and then wife, but yes.
Q And together they ran OneTaste New York, right?
A Yes.
Q So Aubrey was under OneTaste New York, correct?
A Right.
Q And Rachel you said was also a mentor, right?
A Yes.
Q You thought she was good at what she did, right?

A I mean she -- she would say: I'm the best saleswoman there is.
Q And -- and you felt that she wasn't in it for the money, right?
A I knew that higher-ups and -- were making about $40,000 a year.
Q Right. And as an executive, that's not a lot of money, correct?
A Right.
Q And OneTaste New York, by the way, that was a separate business owned by Ravi, Ravi and Aubrey, correct?
A I wouldn't say that it was a separate business. I think the proceeds went to the same place. You know, but it was -- it was a branch of that business.
Q And you also testified that Rachel was sort of like a mother figure, right?
A Right.
Q And Rachel was actually trying to help you at many times throughout your time there, right?
A She said she'll make me a great saleswoman.
Q And she was giving you advice, correct?
A Yes, but she was giving everybody advice.
Q And she was -- she was intense, correct?
A Very.
Q She could yell at you, right?

A Oh, yes.
Q But there was also warmth between you two, correct?
A Yes.
Q And when you were in -- your first sales class was in Philly, do you remember that?
A My first and only.
Q Okay. And you were -- you were a little upset at -- at yourself, how you did.
Do you remember that?
A Yeah. I -- yes.
Q And, in fact, Rachel gave you advice about that, correct?
A I think she -- she told me that it gets easier from what I remember.
Q And that you can learn from mistakes, right, do you remember that?
A I don't remember our exact conversation, but I was very hard on myself on how I did. Yeah, teaching an Intro to OM class is -- it's complicated and hard.
Q And she was encouraging, correct?
A Yes, uh-hum.
Q And she -- she advised you that it was -- it's a long game.
Do you remember that?
A Yes, uh-hum.
Q And -- and, you know, it's a long game because you do

move fast in your life, right?
A No. It's a long game because it -- you know, she told me that she's been over a decade in -- in OneTaste and, you know, learned her craft throughout the years.
So, you know, there are many members that are a decade or longer at OneTaste. At that point, I was there for only a year.
Q Well, not even?
A Not even a year.
Q She wanted you to have patience, is that fair?
A That I will get better with -- with time.
Q Yes.
A Yes.
Q And -- and she, instead of beating yourself up, right, she wanted you to look at how well you did.
Do you remember that?
A No.
Q Let me see if I can refresh your recollection.
DX 11-FN. I am going to come up or I'll tell you the page.
A It's 11-FN?
Q Yes, FN. I am going to tell you which page. Sorry. Sorry, one second.
(Pause.)
MS. COHEN: Okay, sorry.

BY MS. COHEN:
Q Page 007. Can you see the screen okay or do you want me -- oh, it's not in that packet, sorry.
A Oh, okay.
Q I can come up with another one.
A Yeah, if you can, please. Do you have a paper copy?
Q I'm coming.
A Okay.
THE COURT: So this is a 33-page exhibit, right?
MS. COHEN: Yes. I'm just showing one page, 7 to -- page 7, 007 at the bottom.
A Okay.
Q Does that refresh your recollection that she -- that she told you not to beat yourself up?
A Yes.
Q And to look at what you did well, right?
A Yes.
Q And that's how you learn, right?
A Yes.
Q And there were times Rachel was frustrated with you, right?
A Yes.
Q And she wanted -- she wanted you to take initiative, correct?
A Right.

Q She wanted you to become an adult, right?
A Yes. That's what she would say, yeah. Uh-hum.
Q All right. You -- you also talked about the fact that Rachel told you not or told you you shouldn't have OMd with a potential client.
Do you remember that?
A I didn't -- I don't think I OMd with a potential client. I think maybe I offered to OM, though I don't remember that. But she told me that I couldn't offer.
Q Or that you, either you told him or you did OM, is that -- I'm sorry.
Can you repeat that?
A Yes. From what I remember, I -- I -- I flirted with him. Maybe I suggested that we OM in the future. I'm not sure exactly, you know. This is -- I'm not sure exactly what I said to him, what he said back to me. But I know that later Rachel had a conversation with him and then came back to me telling me, like, I can't do that.
Q Right. And that you can't do that as a way to get them to sign up for a class?
A Yeah.
Q Do you remember that?
A Yeah.
Q And do you remember her telling you that you don't need to bait-and-switch or seduce people, they either will or they

won't?

Do you remember that?

MS. GUPTA: Objection to the hearsay.

THE COURT: Yes, sustained.

BY MS. COHEN:

Q Do you remember what Rachel told you --

A No.

Q -- at that time?

Well, let me show you the same document that we've been looking at, 11-FN. If you can take a look at page 9 at the top.

A Uh-hum. Uh-hum.

Q And does that refresh your recollection that she, basically, told you --

A Yes. She told me that I can't --

MS. GUPTA: Objection to the hearsay, Your Honor.

THE COURT: Ask the question again, please.

Q Does that refresh your recollection as to what she told you?

A Yeah. But I disagree with what you said she told me.

Q Okay. Well, what do you recall her telling you?

A So, she said I can't --

THE COURT: You can't read from it.

MS. GUPTA: Objection.

THE COURT: Sustained.

MS. COHEN: We'll move on.
BY MS. COHEN:
Q Essentially, Rachel told you not to do that with a potential customer, correct?
MS. GUPTA: Objection to hearsay.
THE COURT: Ms. Cohen.
MS. COHEN: Again, it's not offered for the truth, but for the effect on this listener.
THE COURT: Sustained -- I mean excuse me. Overruled. She may answer.
A Can you repeat the question?
Q Sure. On the same grounds.
A Yeah.
Q Rachel told you that you didn't need to OM with someone to get them to do a sale, correct?
A Yeah. And -- yeah.
Q All right.
A Yeah.
Q And that a person either will or they won't, correct?
A Yeah, and I --
Q That's what --
A Yeah. Can I say about my response, or no?
Q No. My question was what -- what you understood.
A What Rachel said to me.
Q Yes.

A Okay.
Q All right. And you talked briefly about the set-up sales model.
Do you remember that?
A Step up.
Q I'm sorry. Step-up Sales Model.
And that's a sales model that's developed by outside consultants, right?
A Who OneTaste hired during the Coaching Program to teach us about Step-up, yeah.
Q Yes, okay.
And that the goal there is to help people solve the issues that they're facing, right?
A That's a very nice way of putting it.
Q And it's -- the Step-up Sales Model, in fact, was a model used by other companies other than OneTaste, correct?
A The only experience that I have with it is in OneTaste, so I don't know.

(Continued on the following page.)

(Continuing.)

BY MS. COHEN:

Q Let's talk about Misha for a few minutes. You met him in Brooklyn, right?

A Right, the first time, yes.

Q You started dating him around April 2015, right?

A So in the coaching program there was, it was called relationship by design, and we were doing a practice relationship; meaning, that we were supposed to choose somebody to act as if we were in a relationship with them and to practice together being in a relationship. So during the coaching program, Misha and I were practice relationship partners.

Q Okay. So around April 2015 you started dating him; is that right? Or you don't remember?

A So it's not like we never -- like, we didn't go on dates. It's not like you start dating in the real world outside of OneTaste. It was like we were research partners together. We did some make-outs, which you did with people you were in a relationship with or weren't. I think, in my view, our relationship started the first time I asked him for money.

Q Okay. You asked him -- and make-outs, by the way, you did make-outs when you were living at Brooklyn OM house too, right?

A Yes, uh-huh.

Q And back to Misha now. He moved to New York with you early on, right?
A He moved to New York I think somewhere in March or April.
Q All right, maybe that's where I'm getting that date from, right?
A Uh-huh, by then we were fully a couple.
Q All right. So no one forced him to move in with you, right?
A No, he wanted to move in with me.
Q And you told the Government before that you weren't intimate with Misha for about a month into your relationship, right?
MS. GUPTA: Objection. Relevance.
THE COURT: Sustained.
Q And you finished CP9 with him, that would have been sometime in July 2015?
A Yes.
Q And that was around when you proposed, right?
A When he proposed.
Q I'm sorry, when he proposed, yes. When you got engaged?
A Yes.
Q Let me show you what has been marked as DX11AN and DX11FP. Do you recognize this photograph?
A Yes.
Q And who is in the photograph?

A Misha and I.
Q Is that a fair and accurate depiction of the photograph of you two?
A It's a photograph, yes.
Q And showing you the next one, Defense Exhibit 11-FP. Do you recognize this photograph?
A I recognize us, yes.
Q Is that you and Misha?
A Yes.
Q And at the time -- you had feelings for Misha, you testified on direct, sometimes you were angry but you also ended up having feelings for him, correct?
A Yes. It was, it was a complicated relationship. I had feelings for him that were positive feelings, like I enjoyed some of our time together. We were close. We took care of each other sometimes; but we also fought terribly, sometimes it got physical. And at the beginning of our relationship I actually, I was not attracted to him at all. I had to really push through my comfort zone in order to be inmate with him. I did it because we were told that a virgin practice expands our orgasm.
Q Your testimony is you ended up getting in with dating Misha and marrying him because of a virgin practice?
MS. GUPTA: Objection. Misstates the testimony.
THE COURT: Sustained.

Q You originally got together with him because of a virgin practice, is that what you are saying?

MS. GUPTA: Objection. Misstates the testimony.

THE COURT: Sustained.

MS. COHEN: Withdrawn. Let me offer Defense Exhibit 11-FP and 11-AN.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibits 11-AN and 11-FP are admitted.

(Defense Exhibits 11-AN and 11-FP, were received in evidence.)

MS. COHEN: If I can publish those.

BY MS. COHEN:

Q Do you remember where you were here?

A I don't.

Q We can show the other one. Do you remember where you were in this photo?

A By the pillows behind us it looks like we were at the New York City center.

Q And by the end of CP9 graduation, by that point you were already engaged, right?

A Yes, on the last day of CP9 we got engaged.

Q And let me see, I don't know if this is that day but I'm going to show you something and see if its -- if you open up

the computer, there is a little video. It doesn't have any sound. I'm going to have you watch it. Let us know. You just click on it. Did you get it?
A Yes.
(Witness watching video.)
Q Are you finished?
A Yes.
Q Do you recognize the people in that?
A No.
Q You don't recognize yourself in there?
A Yes, I recognize Misha and me, but I don't recognize the other people.
Q I should have clarified. You recognize yourself in there, right?
A Yes.
Q And Misha.
A Yes.
Q Is this from CP9?
A It doesn't appear to me. I don't remember the wall looking like that and there being one chair and that concrete table. But it could be. I'm not sure.
Q If it's not CP -- it's at a course; is that fair?
A Yes, it's something, an event or a course.
Q And at the time of this video, the cameras, you didn't know you were being filmed, correct?

A Right, yeah, no.
Q This accurately reflects your movements on the day in question?
A Yes.
MS. COHEN: Your Honor, defense offers Defense Exhibit 11EP into evidence.
MS. GUPTA: No objection.
THE COURT: Defense Exhibit EP is admitted.
(Defense Exhibit 11-EP, was received in evidence.)
THE COURT: No sound, right?
MS. COHEN: No sound.
BY THE COURT:
Q Is that you and Misha there?
A Yes.
THE COURT: I want to make clear, it's 11-EP that was admitted.
MS. COHEN: 11-EP, yes.
THE COURT: Go ahead.
BY MS. COHEN:
Q After you got engaged to Misha, you went ring shopping together. Do you remember that?
A During NDI, right before, like a day or two before our wedding, we went ring shopping.
Q Let me show you what is marked Defense Exhibit 11EA and 11DZ. Your Honor, you have these but I realize they were very

small.

THE COURT: You have a bigger, copy, okay, great. Thank you.

BY MS. COHEN:

Q We're looking at 11EA, do you recognize this?

A I recognize Misha and I, but I don't think that's when we went ring shopping.

Q Let me show you 11DZ.

A Yes, that's at the jewelry store.

MS. COHEN: The defense offers Defense Exhibit 11EA and 11DZ into evidence.

MS. GUPTA: No objection.

THE COURT: Defense Exhibit 11-EA and 11-DZ are admitted.

(Defense Exhibits 11-EA and 11-DZ, were received in evidence.)

BY MS. COHEN:

Q And after you got engaged you also met Misha's parents, right -- sorry, I forgot to publish to the jury.

A This is ring shopping here. He only bought a ring for himself and he gave me his grandmother's ring.

Q Can we show the next picture. You said this wasn't ring shopping, but you appear to be in some kind of a store?

A We appear to be in some kind of store. Where we went to get the ring was a very small store, this looks like a bigger

store. I'm not sure where that is.

Q I was saying after you got engaged you met Misha's parents, right?

A Yes, in one of my -- in one of my trips to San Francisco, it could be also that I met them one time before we got engaged, I'm not sure.

Q But his mom was there when you got the ring, it was from her father, right?

A His mom was not there. But he got the ring -- I don't know if he got his ring from his mom or his mom already gave him the ring, but he gave me the ring.

Q That was the ring that his mother had, correct?

A That's his grandmother's ring. So her mom gave it to her when they fled Ukraine.

THE COURT: Ms. Cohen, to let you know, in the next five to ten minutes I'd like to take a break.

MS. COHEN: I probably have about 20, 15 left. I can keep going.

THE COURT: Let's go for another five then.

MS. COHEN: No problem. I'm getting to the end.

BY MS. COHEN:

Q But you did go to dinner with Misha's parents? Do you remember that?

A I don't remember this particular time, no.

Q I'm going to show you what has been marked for

identification as Defense Exhibit 11AF. This is very small I think it's easier when they blow it up. Take a look at this see if it refreshes your recollection. We could highlight the line there.

That does that refresh your recollection that you went to dinner with his parents?

A Yes, but I really do not remember her giving me the ring, but it says it there, yes.

Q Right after you got engaged you celebrated your dad's birthday with him. Do you remember that?

A My dad's birthday?

Q Yes, July 10?

A July 9 is my dad's birthday.

Q Maybe on the tenth you went out with him?

A Where do you see that?

Q I can show you, defense Exhibit 11AA.

A Okay.

Q Does that refresh your recollection that after that you --

A It seems like we must have met them for dinner in the city, but I don't remember that dinner.

MS. COHEN: I only have two topics left, do you want me to go into the next one?

THE COURT: Let's take a break, that's easier. The witness can step down.

(Whereupon, the witness steps down.)

We'll come back at five minutes to four. Don't talk about the case. Keep an open mind and enjoy the next 15 minutes.

(Jury exits the courtroom.)

THE COURT: I'll see everyone in 15 minutes.

(Brief recess.)

THE COURT: We can bring the jury out.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Everyone may be seated. Ms. Cohen, you may resume your examination.

MS. COHEN: Thank you, your Honor.

BY MS. COHEN:

Q Ms. Neria, I put -- let me ask you first. I put some other documents up there, but I'll tell you in a second. Do you remember I was asking you that you said your employer was OneTaste New York, correct?

A Yes.

Q And that's who you received your money from, right?

A I believe so.

Q Documents to your left.

A Here?

Q Yes. Can you turn those over. Do you see 11FX?

A Yes.

Q Do you recognize this?
A Yes, yes.
Q What is it?
A It's 2104 form.
Q Form for taxes, right?
A Yes.
Q And that form you received through OneTaste New York, right?
A I don't remember receiving that form, but it's very possible that I did.
MS. COHEN: Your Honor, at this time defense offers Defense Exhibit 11FX.
MS. GUPTA: No objection.
THE COURT: Give me a moment, please. Your basis for?
MS. GUPTA: Your Honor, actually I think there are certain parts of it should be redacted.
MS. COHEN: Yes, okay.
THE COURT: Yes, I'm not going to -- I'm going to not allow this in in its entirety at this time.
MS. COHEN: That's fine. I don't need to publish it at this time. We'll offer it in a redacted form later.
THE COURT: Come back to it, if you want to come back to it. I'm not going to admit it now.
MS. COHEN: Sure, okay.

BY MS. COHEN:
Q Ms. Neria, can you look at 11FW?
A Yes.
Q Do you recognize that?
A I've never seen this document before.
Q Okay. So you -- okay. Never mind. But you were paid into your account through OneTaste New York, that's who you received your money from, correct?
A Yes.
Q And as you said, OneTaste New York was run by Robbie?
A I think Robbie was the main owner, but there were other people who were part owners as well.
Q Just take a look just to see if this refreshes your recollection, Defense Exhibit 11FY. Go to the second page. Do you recognize the name on the second page?
A Maya Gilbert.
Q Did she have something to do with OneTaste New York as well?
A Not that I know of.
Q Okay. And on the last page, Brooke Scheffer, did she have anything to do with OneTaste New York?
A I think she owned some stock in OneTaste New York.
Q And Rachel Cherwitz or Nicole Daedone did not own OneTaste New York, correct?
MS. GUPTA: Objection.

THE COURT: Basis for objection?
MS. GUPTA: Foundation.
THE COURT: Overruled.
A Not that I'm aware of.
Q All right. Let go back to -- so you talked about your wedding to Misha. Several people told you throughout you're time at OneTaste to slow down. Do you remember that?
A I remember one conversation.
Q Do you remember Courtney Lapovsky telling you to slow down?
MS. GUPTA: Objection to hearsay.
THE COURT: I'll hear you out.
MS. COHEN: Just for the effect on the listener.
THE COURT: Overruled.
A No.
Q You don't remember Courtney Lapovsky telling you that?
A Slow down? No.
Q Do you remember her saying it with respect to your job?
MS. GUPTA: Objection to hearsay.
THE COURT: I'm going to sustain the objection. You can lay down a foundation.
Q Do you remember whether Courtney Lapovsky told you to slow down with respect to your job?
MS. GUPTA: Objection.
THE COURT: Basis?

MS. GUPTA: Same objection, hearsay, foundation.

THE COURT: Overruled.

A It's possible that we had a conversation about it. What I do remember is that OneTaste --

Q I'm asking if you remember Courtney Lapovsky saying. Is your answer no or yes?

A The problem with that question is that I read a Medium post that OneTaste published about me that says that, so I can't tell like what I remember and what I read recently in that medium post.

Q You don't have an independent recollection, that's all I'm asking you.

A Of her saying to slow down --

Q In connection with your job?

A I remember that we talked, that she, that we talked about it. I don't remember the details of the conversation.

Q Okay. And you said that you do remember a conversation with someone who told you to slow down, right?

A Yes.

Q Who was that?

A Guy Shahar.

Q Is that somebody from the OM house?

A The Brooklyn OM house. He said that before I moved into the staff house.

Q He told you that. And as we looked at before, Rachel

told you at times, it's a long game. We looked at that, right?
A Yes, yes.
Q And in fact, Aubrey, who was your boss there, also told you that marriage is a long game. Do you remember that?
MS. GUPTA: Objection. Hearsay.
MS. COHEN: Again, the effect on the listener.
THE COURT: I'll take a relevance proffer.
MS. COHEN: That this witness was told to slow down and not rush into a wedding.
THE COURT: Sustained.
Q Do you remember -- at the wedding you were also warned by others that, not warned, but told that you did not have to go through with the wedding, correct?
A There was one person who came up to me and said that the night before.
Q Who was that?
A Angela.
Q And you said that, you testified on direct examination that you borrowed a dress?
A Yes.
Q But actually Joanna Van Vleck took you shopping. Do you remember that?
A We did not buy a dress. We bought sandals, the most expensive sandals I ever purchased.

Q You also offered to have a bond ceremony. Do you remember that?
A I was offered that?
Q Yes.
A I don't remember that.
Q You didn't have to get married, correct?
A Correct.
Q At that point you had -- by the time you got married, you already signed up for every class, not every class, but many classes at OneTaste, right?
A Yes. We were still -- we paid some of our membership and we still owed some more money for membership.
Q But no one told you that you had to get married, correct?
A It was planned. It was planned into the schedule of NDI. It was on the last day. It was a party that was planned. They created the ceremony.
Q You agreed to get married, correct?
A I agreed to get married, yes, but I was, I felt very conflicted about it.
Q A lot of people worked for OneTaste and did not get married, correct?
A And also a lot of people worked for OneTaste and did get married.
Q And Nicole Daedone never got married, correct?
A But Nicole Daedone was --

Q Just yes or no. Did she get married or not?

THE COURT: Please don't raise your voice. You can ask for yes or no, but do not scream at the witness, or back up from the microphone.

MS. COHEN: I didn't think I was.

THE COURT: It was very loud.

MS. COHEN: Sorry.

BY MS. COHEN:

Q Nicole was not married, correct?

A Correct.

Q And when you went to Nicole Daedone Intensive you also had to sign a waiver, right?

A Yes.

Q That was DX11U. Do you recognize this?

A I don't remember it, but yes.

Q If you look at the last page?

A Yes.

Q You see your --

A I see my name, that does not look like my signature. I'm guessing that maybe it's like a finger signature, but I see my name.

Q It has your date of birth, right?

A Yes.

Q And it appears to be electronically signed; is that right?

A Yes, it appears to be.
Q That would be why your signature looks like that. Is that a yes?
A Probably.
Q Well, you said that you had to sign one of these before you did all the courses, correct?
A Yes, uh-huh.
MS. COHEN: At this time defense offers Defense Exhibit 11U.
MS. GUPTA: No objection.
THE COURT: Do you want to redact out?
MS. COHEN: We'll redact out the last page.
THE COURT: The full birth date needs to be appropriately redacted.
No objection to that as redacted?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 11-U, with the birth date appropriately redacted, is admitted.
(Defense Exhibit 11-U, was received in evidence.)
MS. COHEN: I think we just did that so we can publish the first page to the jury.
BY MS. COHEN:
Q This release of liability, this was for the Nicole Daedone Intensive, right?
A By the date it seems so, yes.

Q It's similar to the other release that you signed that we went through?
A Yes, it looks similar.
Q Okay. You also had to fill out an intake form before you did Nicole Daedone Intensive, right?
A Yes.
Q And in that intake form, you had to communicate your desires, right?
A Right.
Q And that's basically what you wanted to get out of the program?
A Yes. It was like the small Ds and the big Ds.
Q You also had to write ten admissions in the document, right?
A I don't remember that, but maybe yes.
Q Okay. Let me show you to refresh your recollection, Defense Exhibit 11V, as in Victor. If you can go to the third page. Does that refresh your recollection that you had to also write admissions?
A Yes.
Q If you go down further on that same page. You also had to write five edges that you wanted to explore, right?
A Yes.
Q And on direct examination you talked about Nicole Daedone Intensive having flogging?

A Yes.
Q One of the edges you have wanted to explore was BDSM, flogging, and bondage, right?
A Right.
Q You also admitted that at the time that you tend to go to victimhood. Do you remember that?
A Yes, but that was something that was talked to us often about, about being a victim.
Q And you wrote -- these are your words, right, in this document?
A Yes. Can you point me to where?
Q The third page, number four.
A About my edges?
Q On the top.
A Yes.
Q And this is, again, you've been -- now you're coming to the end of your time at OneTaste at this point, right?
A Uh-huh.
Q And you admitted that you go to victimhood instead of taking responsibility, right?
A Yes, but that was something that was told to me about me.
Q You wrote those words, correct?
A Yes, but Rachel said those words to me also.
Q No one stood over your shoulder when you wrote these words, correct?

A Correct.
Q And another thing you didn't like or that you admitted about yourself, was that you didn't like that you didn't believe you could come up with the money on your own. Is that something that you admitted?
A Yes.
Q And that you didn't like how would you seek money from your parents and your partner, right?
A Right.
Q And your partner at that time was Misha, correct?
A Right yes.
Q You also admitted that you lie when you don't feel safe to fully stand up for your desires, right?
A Where is that?
Q Line ten.
A Yes, I wrote that.
Q Again, when you were at the Brooklyn OM house, on those texts and threads Rachel or Nicole was not on the thread, right?
A At the Brooklyn OM house, right.
Q In fact, no staff members lived at the Brooklyn OM house, correct?
A Correct.
Q The Brooklyn OM house was a separate entity of like-minded community members, correct?

A I know that -- I know that --
Q Just yes or no.
A No.
Q It was a group of people who came together as a community to OM based on the principles of OneTaste, correct?
A Correct.
Q You made a decision to move into the OM house within a month of coming into OneTaste, right?
A Right.
Q And within that year, or less than a year time, you took many courses of --
A It was more than a month, it was about two months, but yes.
Q The time that you heard about the coaching program in November of 2014, it was about a little over a month, right?
A At the time, I heard about the coaching program in my intro to OM course.
Q When you decided to leave in September, people were nice to you, correct?
A Yes, at the end; but there was, at the beginning there was some resistance.
Q No one stopped you from leaving, correct?
A I was told that I will regret that decision for the rest of my life.
Q In fact, Aubrey told you -- in fact you told Aubrey you

loved her when you left, right?

MS. GUPTA: Objection to hearsay.

MS. COHEN: Not offered for the truth.

THE COURT: What is it offered for?

MS. COHEN: Her state of mind.

THE COURT: Overruled.

A I told several people I loved them.

Q And she told you she loved you too, right?

A I don't remember the specific interaction, but maybe, probably.

Q Let me show you DX11SH-1.

A I don't have this.

Q I'm coming with it. Does that refresh your recollection as to whether Aubrey also expressed her love for you?

A I do not recognize this conversation as with Aubrey, but it could be.

Q You could go back to the beginning if you would like.

A Okay. This seems like my conversation with Aubrey.

Q And Rachel also wished you well when you left, right?

A Right.

Q After you left, you in fact, as you testified, sent out a save-the-date to have another wedding with friends and family, correct?

A I think that was before we left.

Q In that save-the-date, you invited friends and family you

said, right?
A I think at that point we only sent it to OneTaste people, I don't think we sent it to friends and family yet.
Q But you were -- that was the intention, you said, to send it to friends and family?
A The intention was to have a real wedding, a mixed wedding, yes.
Q You included some OneTaste people in that as well, correct?
A Yes, our good friends.
Q After you left, you continued to speak to some people from OneTaste, right?
A I spoke to Marissa. I met with her once and I think we exchanged a couple of text messages, that's it.
Q You kept in touch with Brooke?
A Brooke already left OneTaste, she was not in OneTaste.
Q But you kept in touch with her?
A Yes, she was a good support for me.
Q And you continued to talk to Brooke?
A Right now? Today?
Q Not today -- did you talk to Brooke today?
A No.
Q You continued to talk to Brooke in your life?
A The last was a quick text message, like, I would say like four months ago.

Q You met before today with the Government over ten times, right?
A Yes.
Q And maybe even 15, does that sound right?
A I didn't count, but I would say somewhere around ten.
Q That was to review your time at OneTaste, right?
A Yes.
Q And your time working there for just under six months, correct?
MS. GUPTA: Objection. Misstates the testimony.
THE COURT: Overruled.
A About my time working there, yes.
Q Which was about March to September of 2015, correct?
A No, I started working there when I left my job in February or.
Q So about six months then, right?
A Yes.
MS. COHEN: Nothing further, your Honor.
THE COURT: Ms. Bonjean, any cross-examination?
MS. BONJEAN: Yes.
THE COURT: Go ahead.

CROSS-EXAMINATION
BY MS. BONJEAN:

Q Good afternoon, Ms. Neria. My name is Jennifer Bonjean. I represent Ms. Daedone.

A Good afternoon.
Q In 2014 you had a year of doing quite a bit of yoga, as I recall from your testimony, right?
A I did a teacher/instructor course.
Q At some point you met a woman by the name of Ellen Heed, right?
A Yes, that's an anatomy teacher.
Q Anatomy and sexologist though, right?
A Uh-huh.
Q Was she some type of coach?
A She also was a coach.
Q A life coach?
A Yes.
Q How did you meet her?
A In the yoga teacher program she was the anatomy teacher. She came in for two days and gave an anatomy breakdown.
Q This was a woman who was a coach who was associated with this course you took in 2014, right?
A Right.
Q And this was a course that you took that you signed up for, right?
A Yes.
Q And it was premised in yoga principles, right?
A It was just a yoga course, yes.
Q A yoga course, but it was, what, a month long?

A A month long to become a yoga teacher --
Q I didn't mean to interrupt.
A A 200-hour course.
Q So 200-hour course. And was it to learn how to teach yoga?
A Yes, you get a yoga teaching certification.
Q At that time when you met Ms. Heed you had a history of depression, right?
A I struggled with depression on and off since my teenage years, yes.
Q At the time that you were working with Ms. Heed you were eager to get off antidepressants, right?
A Yes.
Q And Ms. Heed helped you get off antidepressants, right?
A We tapered my antidepressants together.
Q So when you actually got introduced to OneTaste you were already off your antidepressants, right?
A Correct.
Q You were also anorgasmic, right?
A I never had an orgasm before.
Q I'm using the word you used, correct?
A I don't think that's the correct term.
Q I'm not saying I agree, I'm using the word you used. What would you prefer to use?
A That I never had an orgasm before.

Q So you never had previously achieved an orgasm, that was the another reason why you were talking to Ms. Heed, correct?
A That was something that I brought into our conversation.
Q And she was the one that introduced you to the OneTaste organization, correct?
A She was the one who told me to sign up for an intro to OM class.
Q She had herself taken an intro class, correct?
A Yes.
Q And she wasn't living in an OM house, right?
A Not -- no, I don't think so.
Q She never worked for OneTaste, correct?
A Not to my knowledge.
Q And sounded like she, according to you, she wasn't even an active member but had some association through her partner, correct?
A Her partner lived in an OM house.
Q So you understood when you signed up for OneTaste that it was a sexual wellness company, correct?
A Yes.
Q That's the reason you went there, right?
A Yes.
Q Because you had not an achieved orgasm, you were trying to explore your sexuality, right?
A I was trying to help myself, yes.

Q Right. So you testified on, I guess on cross or direct I don't remember, that somehow it made you vulnerable. But the reality is, you were looking precisely for an organization that was going to help you connect with your orgasm, right?
A Yes.
Q You wouldn't -- if you're trying to connect with orgasm and sexuality you wouldn't go sign up for a Cross Fit course, right?
A I think that if you want to -- I think that's a vulnerable desire to want to connect to your sexuality and to achieve orgasm; so in that way I was in a vulnerable position.
Q No doubt. But it was still your desire to achieve orgasm.
A Yes, I felt like I was missing something in my life.
Q Understood. And so you were recommended to an organization that helps you do that, right?
A Yes.
Q The practice is literally called orgasmic meditation, right?
A Right.
Q Your first introduction was through a TurnON event, right?
A I already bought my intro to OM, but before that went to -- went to a few TurnON events, that was my first introduction to the people.

Q Was this in October?
A Yes.
Q How many TurnON events did you go to in the month of October?
A Maybe two.
Q Okay?
A Maybe, two or three.
Q All right. Those are events that are designed to tell you about OneTaste, correct?
A Yes, and the practice, yes.
Q And there are also sales pitches, correct?
A Yes.
Q Any reason you went to three?
A You're asking what is the reason?
Q Why did you go to three of them in one month?
A Because I wanted to learn about the practice, and I felt interested in the practice. And I also felt interested in getting to know the people better. When I first walked into an event, people talked to me in a way that I've never been talked to before.
Q So the people at these events were warm, I take it, right?
A They were very warm. They made eye contact. They asked me questions I've never been asked before. They seemed very interested in me and my story.

Q And then you did sign up for this intro to OM. Do you know when you took the intro to OM? Did you say November?
A I believe it was November 6 the class.
Q Again, that's the course that you signed up for, correct?
A Uh-huh, yes.
Q And you had to pay for that one, right?
A Yes.
Q Were the TurnON events free?
A They were free. I think it was a $10 entry.
Q Got it. How long was the intro to OM class that you took?
A It started, it started at either eight or nine in the morning and lasted until 6:00 p.m.
Q So it was a day-long course?
A Yes.
Q And the TurnON events are, what, an hour long?
A An hour and-a-half, something like that.
Q You took a couple of TurnON events that were about an hour and-a-half, then you took the intro to OM in November, right?
A Uh-huh, yes.
Q That was a day-long course. What other courses did you take before you up and moved into the OM house?
A I think I took the communication course, I think. I'm not sure if it was right around the time that I moved or right

before. From my recollection it was like a week or two after the intro to OM.
Q So in fairness, you had taken, you had gone to two TurnON events and took an intro to OM, maybe a communications course before you fully plunged into the OM commune, correct?
A Yes.
Q Of all the people that you went to that introduction to OM course with, how many of them did that?
A A bunch of them became members, but I don't recall anybody from that course moving into the house.
Q Right. You, of course, could have become a community member without moving into the OM house, you agree, right?
A Yes.
Q And you can't identify a single person who took the introduction to OM course and then within weeks moved into the OM house, right?
A I'm sure it happened before, but I don't remember it from those course.
Q And then, you also had just moved into your own studio on the Upper West Side, right?
A No. I lived in that studio for about seven or eight years. I just moved to my own apartment in Fort Greene, Brooklyn.
Q My apologies, okay. So you had just moved into your own apartment in Brooklyn when you switched course and decided to

go into the OM house, right?
A Right.
Q And you did a swap with somebody; is that right?
A Yes.
Q You even gave up your dog, didn't you?
MS. GUPTA: Objection. Relevance.
THE COURT: Overruled.
A I didn't give up my dog. I -- so Ruwan, who moved into my house, took care of my dog. And then my dog moved to my parents house and lived at my parents house for another 15 years.
Q I'm not saying you -- let me rephrase. You couldn't bring the dog to the OM house, so you decided to give your dog ultimately to your parents to care for, right?
A Yes. I tried to bring her into the OM house, but she was a rescue and she it was too much for her with all the people coming in and out and the different people living there. So, yeah, I saw it wasn't good for her. So my parents took her.
Q The point is, is that you were so committed to moving into the OM house you were willing to let your parents care for the dog, right?
A Yes, that's one of my biggest regrets is my dog.
Q Now, I think you testified at some point that I think shortly after you moved into the OM house you did have to, you did have to go, you flew to Israel to be with your family

after the passing of a grandparent, right?
A My grandfather, yes.
Q And you hadn't been living in the OM house very long when that happened, right?
A No.

(Continued on next page.)

CROSS-EXAMINATION (Continues)

BY MS. BONJEAN:

Q How long?

A Probably a couple of weeks, a few weeks, yeah.

Q Okay. And you said within a couple of weeks you were already, I guess, feeling like you were missing out or -- is that right?

A Yeah. When you -- so, living in the OM house we were in constant communication with one another, and, you know, spending so much time with each other, eating all meals, talking about everything.

So it was -- you know, I never dormed in college, so I never had that kind of social experience with other people, but I would imagine, you know, that the intensity is so much more acute.

Q Right. So for a few weeks you were living sort of this group setting and there was a lot of communication, right?

A Yes.

Q Okay. And, of course, you know how to -- you know how to silence your phone.

You could have silenced your phone if you didn't want that, right?

A No. You needed to be -- you needed to be on your phone. Like if they would ask a question, you needed to respond. That's part of living in the OM house. You couldn't silence

your phone.
Q Well, Ms. Neria, you weren't working for OneTaste, right?
A No, but part of the community living we -- you know, like as you saw, there were house rules. There were expectations. And one of the expectations is -- is to -- to be connected no matter what.
Q Right. There was an expectation by the community -- were you living in community, right?
A Right.
Q And living in community means we look out for each other, correct?
A Different communities mean different things.
Q Right. This particular community was, in part, listen, we stay connected to each other, right?
A We stay connected via phone and messages all the time.
Q That's how everyone stays connected nowadays, but that was the case back then as well, right?
A That was the first time that I was in that kind of situation.
Q Right. You had been there a full three weeks, right?
A Uh-hum.
Q You could have messaged -- you could have -- you could have silenced your phone?
A Then that would have felt like I was doing something wrong if I silenced my phone.

Q It's your testimony that after one Intro to OM class and living in the OM house three weeks that you believed that you would have been doing something wrong if you silenced your phone at your grandfather's funeral?
A We -- we got so many text messages on that phone. Like if you look like, I don't know how many text messages per hour, but it's an immense amount. You know, they expected the house members to answer questions, like, you know, to be part of things.
I'm sure that in the actual funeral I silenced my phone, but otherwise I just kept seeing text messaging -- messages popping up on my phone non-stop. And this is not just the beginning, this is throughout my whole time at OneTaste.
Q But no one was asking anything of you, right?
A I -- at that time when I was at my grandfather's funeral, they knew that I was away in a different country.
Q Right. No one was addressing you, you weren't working there, right?
A No, but I was living there. This was my -- you know.
Q No one was asking you to do anything, correct?
A At that moment, yeah; no.
Q You weren't obligated to respond to any text messages, right?
A Right, but it's not -- it's not an obligation, it's more

of a feeling of an obligation or feeling of being involved.
Q Right. You had a feeling of wanting to stay connected, that was your feeling, right?
A Yes.
Q You testified that there was, there was -- somehow television was discouraged at OneTaste, right?
A We had no televisions in the house.
Q Right. There were no televisions in the OM houses, correct?
A And there was also talk that in the production world, which what is they called the outside world, like TV was a numbing agent. So people would watch TV nonstop to numb their feelings and we, in the Orgasm world, did not do that.
Q Right. That tracks.
OneTaste would say: Listen, TV is just not good for you, right?
MS. GUPTA: Objection to the commentary.
THE COURT: Yes. Sustained. Please ask the next question.
BY MS. BONJEAN:
Q Ma'am, did you have your phone?
A Yes.
Q You could have -- you can look at all types of things on your phone, right?
A But I didn't.

Q I understand.
You had a phone that you could look at shows on, news, whatever you wanted, right?
A Yeah. But the only thing I looked at was thread text messages when I got them.
Q But the question is nobody blocked any apps on your phone, right?
A No; yeah.
Q What type of phone did you have?
A An iPhone.
Q Okay. So, you had an iPhone.
So you could have, you could have pushed the -- an app that told you what the news was of the day, right?
A Right.
Q You could have played a game on the phone if you wanted, right?
A Right.
Q You could have gotten on Safari and streamed something a YouTube video, right?
A Sure.
Q Your phone could have operated as a television, in terms of getting you streaming shows, right?
A Yeah, but if somebody would have seen me, like, watch television on my phone, they would have said something. Like, why are you numbing out? Why are you disconnecting?

Q Okay. And why wouldn't you have said: Mind your business?
A Because I actually am not a person who watches a lot of TV. So, I was -- I was more interested in the people around me.
Q Okay. So you liked that, you liked the fact that there was this rule that made sense to you, correct?
A I did, yeah.
Q Okay. Now, Misha, who we've talked about today, he worked outside of OneTaste, didn't he?
A Yeah.
Q And you testified that you weren't terribly attracted to him initially, right?
A Yes.
Q And based on your direct examination, there was a moment where it seemed he wasn't terribly attracted to you either, correct?
A I think he was very attracted to me from the beginning, but in that, when he brought that up, it felt humiliating.
Q You're talking about when he said out loud about having issues --
A Yeah, about our makeouts not really going anywhere.
Q And that was sort of one of those things that people did at OneTaste, right, is to -- to, in group settings, talk about their sexual experiences, right?

A Yes.
Q And people did it in order to sometimes get feedback, right?
A Yes. We -- yeah, we used to ask Nicole for help.
Q Right. And Nicole's advice is go out and have a bunch of sex, right?
A She told him to have sex every day.
Q Okay. Did it help the erectile dysfunction?
MS. GUPTA: Objection.
THE COURT: Yes, sustained.
BY MS. BONJEAN:
Q Did it improve things between you and him?
MS. GUPTA: Objection, relevance.
THE COURT: Overruled.
A No.
Q Okay. But you, nonetheless, decided -- but it made you jealous, it sounds like?
A Yes.
Q Okay. And then, ultimately, you -- your relationship got a little more serious, correct -- a lot more serious?
A When you ask somebody for thousands of dollars, your relationship becomes more serious.
Q But you're the one that was asking him, right?
A I was told to ask him.
Q You were recommended to ask him, right?

A I was told I could ask him.
Q Well, you were told you could ask him, there is a "could" in there, right?
A I was told that's one way to pay for my courses.
Q Right. Well, that's just common sense.
You know you can ask people for loans or money, right?
A I never asked somebody for loans or money until that first time.
Q Okay. And that's Rachel's fault?
A Rachel and other higher-ups put that idea in my head. I would have never come up with it by myself.
Q So, you take no responsibility for asking Misha to pay for your courses?
A I take no responsibility.
MS. GUPTA: Objection.
THE COURT: Sustained.
Q You didn't have to ask him to pay for your courses, can we agree on that?
A Then I wouldn't have been able to take those courses.
Q Right.
A Yeah. This is not the first time that somebody -- that a woman asked a man with a lot of money in OneTaste to pay for her courses.
Q Yes, I understand that.

A This is something that preceded me. That went after me.
Misha paid for other women's courses before me. It's not that -- it's not something that I came up with and did. That was a custom that was something that --
Q Right.
A -- people did often in OneTaste.
Q Right. And it worked for you because you wanted to take the courses?
A It worked for OneTaste because they got money out of it.
Q Right. And you got to take the courses that you wanted to take?
A Yeah, which I say were -- which I said were very redundant.
Q Okay. Well, you're the one that took about twelve of them.
Didn't you figure that out after the sixth?
MS. GUPTA: Objection, misstates the testimony.
THE COURT: Yes, sustained.
BY MS. BONJEAN:
Q OneTaste was a business, you understood that, right?
A Not at the very beginning. I -- I under -- you know, as I went in, I was really surprised because they talked about the production world out there. But I never saw a more capitalistic, money-hungry business than OneTaste in my life.
Q It was a San Francisco tech -- a San Francisco startup

company. You understood that, right?
A No.
Q It was a sexual wellness company that started in San Francisco. It was a business, correct?
A It was a sexual wellness company that I thought cared about the well-being of women.
Q Okay. Well, you can be a business and care about your customers. Those things can be consistent.
I understand you don't think they are, but they can be consistent, right?
MS. GUPTA: Objection to the commentary.
THE COURT: Sustained. Sustained.
Ask a question, please.
BY MS. BONJEAN:
Q Ms. Neria, did you think it was a not-for-profit company?
A I did not think about what kind of company it was at the beginning.
Q Okay. But you knew -- you knew that the courses that they offered were expensive and you could not afford them, right?
A Right.
Q And Rachel told you: Hey, you're seeing Misha, you could ask him and maybe he will or maybe he won't pay for them, right?
A I wasn't seeing him at the time.

Q So you asked someone to pay for your course that you weren't even seeing?
A Exactly.
Q And why would you do that, because Rachel told you to?
A Yes, and I really wanted to take that course.
Q Okay. And Rachel told you, you know, you could ask, but he could say yes and he could say no, that's what you testified to, right?
A She told me I should ask him and if there is -- if he desires to pay for it, he will pay for it.
Q And he desired to pay for it, right?
A Right. I would have never asked Misha if I was not told to ask Misha.
Q If Rachel told you to jump off a bridge, would you have jumped off a bridge three weeks into OneTaste?
MS. GUPTA: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You took this Magic School course, right?
A Right.
Q And this Magic School Course was kind of a theatrical fun course, wasn't it?
A Fun for who?
Q I don't know, for you. You took it and then you took classes after that?

A I actually didn't have that much fun there.
Q Okay. But there was -- you would agree that this Magic course or -- yes, Magic School was kind of getting into the mystical -- mystical concepts, right?
A Mystical concepts of OneTaste and Nicole, yeah.
Q Well, not just -- but it was rooted in other mystical consents that predated OneTaste, right, the story of Ephesus.
Do you remember that?
A Yeah, Nicole told us about that story.
Q But that's not her story, that --
A No, but she used it to make a point about OneTaste.
Q Yeah, because she -- she taught the course. That's what teachers do, right?
A Yeah, but she said like OneTaste is in the tradition of -- that's what we are doing in the modern day is what they did in that story.
Q Right. She -- she taught a belief, right?
A Right.
Q And you're a teacher. You have two Master's Degrees in teaching, right?
A I have one Master's Degree in teaching.
Q Okay.
A English literature.
Q And you sometimes teach your interpretations of English literature, correct?

A No. I -- no, I mean no. What I teach is students to come up with their own interpretations of different stories and narrative.

Q Okay. But you --

A Encourage their critical mind.

Q Your middle school?

A Middle school teacher.

Q But you do do some teaching in middle school, right, you don't just expect the students to teach you, or maybe you do?

MS. GUPTA: Objection.

THE COURT: Yes, let's stop with the commentary.

Ask a question. Sustained.

BY MS. BONJEAN:

Q Teachers actually teach, don't they?

The whole point is that they give their students ideas to rip off of, correct?

MS. GUPTA: Objection to the commentary.

THE COURT: No, that's -- overruled.

A Different teachers teach in different ways.

Q Right.

A Nicole taught in her own way, which was to put a lot of ideas -- a lot of ideas into our heads.

Q Right. She had a lot of interesting controversial ideas, that we can agree on, right?

A Right.

Q And you were a grown woman with a graduate degree, correct?
A That's one way to -- to describe me.
Q Okay.
A That's not the only way.
Q Now, there was this whole business of then calling each other witches.
That was playful, wasn't it?
A No.
Q You think that they thought they were actually witches?
A A hundred percent. I don't think it, I know it.
Q That they are witches?
A That they thought they were witches.
Q Is that everybody at OneTaste or just Nicole?
A Nicole, Rachel and Maya Gilbert, Marissa Ward, Aubrey Fuller, they thought they were witches.
Q Now, you testified about when Misha proposed to you, right?
A Right.
Q This was at the Coaching Program, correct?
A Right.
Q And your relationship had gotten very serious very quickly, right?
A Right.
Q And by the time you finished the Coaching Program, how

many courses in total had you taken at One -- OneTaste, not including the TurnON events?
A I -- four.
Q Okay. And --
A Two of them were like smaller courses, and one of them was a bigger course. So, three besides the Coaching Program.
Q All right. And when he -- you didn't like that he proposed to you sort of in a public way, right?
A Yeah. On the stage, yeah.
Q That made you uncomfortable, correct?
A Yes.
Q So when you went in private with him, you certainly said to him, Why would you have ever done that?
A Yeah. Yes, I did.
Q Okay. And you, nonetheless, said though, I'm still going to marry you, correct?
A Correct.
Q You didn't call off the engagement, correct?
A Correct.
Q And you testified on direct that you wanted to, or at least partially wanted to, because he was taking care of you, correct?
A Yes, financially.
Q He had strong feelings for you, right?
A Right.

Q You felt supported in the relationship?
A I felt supported financially. I don't think I felt supported in the relationship.
Q Okay. So -- so that's a reason to get married is because someone is financially supportive?

MS. GUPTA: Objection, misstates the testimony.

THE COURT: Yes, sustained.

BY MS. BONJEAN:
Q Was there anything else that wanted you to -- was there anything else about Misha, about Misha, that made you want to marry him, other than the fact that he was paying for you?
A Well, I had my first orgasm with Misha.
Q Well, it looks like OneTaste did what it said it was gonna do, right?

MS. GUPTA: Objection.

THE COURT: Yes, sustained.

Q Okay. So you had a connection then with him, correct, that was important?
A Yeah.
Q We'll call it that.

I think you said you felt loved by him, right?
A Yeah. I -- we loved each other, even though it was a very dysfunctional relationship.
Q Okay. And then you were engaged for a good month before you ultimately tied the knot, right?

A I think it was a couple of months.
Q Actually, that's right. You said more like three months?
A Yeah, something like that, two to three months.
Q So during that three-month period you didn't call off the marriage, right?
A No.
Q And, in fact, I think you testified, and if you didn't correct me if I'm wrong, that you did tell your parents that you were engaged, right?
A I told them right after the engagement took place because I did not want them to see it on Facebook.
Q And they had never met this guy before, correct?
A I believe they have not met him yet.
Q I can't imagine a parent would be real happy about you getting engaged to someone they had never met, is that right?
A Yeah --
MS. GUPTA: Objection.
THE COURT: Overruled.
A Yeah, I think I broke their heart.
Q Okay. But you were still gonna do it, right?
A I was hoping that they will meet Misha, that they will get to know him, and then they will like him.
Q Okay. So, ultimately, you and Misha decided to take the Nicole Daedone Intensive, right?
A Yes.

Q That was a very expensive course that he paid for, right?
A Yes, but he -- yeah, he most -- yeah, I think I put $2,000. He put $34,000.
Q And you did this course -- where did the course take place?
A In a villa in San Francisco.
Q All right. How many people attend the NDI?
A I think something like twelve people.
Q So, it was a pretty intimate course?
A Yes.
Q And you testified on cross-examination that you couldn't really call off the wedding because it had already been planned.
Did I get that right?
MS. GUPTA: Objection, misstates the testimony.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You knew when you went to the end -- the Nicole Daedone Intensive that you were getting married at the end of it, right?
A Yes.
Q Okay. You had to get a marriage license, right?
A We -- yes, we got a marriage license.
Q And the day before you had gotten rings, correct?
A We got one ring.

Q Okay. You went and got some expensive sandals for your dress, correct?

A Yeah. I was supposed to get a dress, but we didn't find a dress. So, Joanna found sandals that she really loved, and I ended up buying them.

Q I see. So that's Joanna's fault, too?

MS. GUPTA: Objection.

THE COURT: Sustained.

(Continued on the following page.)

CROSS-EXAMINATION

BY MS. BONJEAN: (Continuing)

Q Is it your testimony that you only bought the sandals because Joanna liked them?

A And that I felt like I needed to wear something special for my wedding and, yeah, we didn't find a dress.

Q Okay. But in any event, it's not that you were surprised that you were getting married at the end of the Intensive, correct?

A Correct.

Q You testified, I think on direct, that you -- you thought it was somehow a show of loyalty to Nicole to marry Misha.

Do I have that right?

A 100 percent.

Q Okay. Why on Earth would it be a show of loyalty for you to marry Misha?

A Because we're marrying in the name of orgasm. We are having a OneTaste ceremony which means that we are dedicating our lives to the practice of orgasm, to the teachings of OneTaste.

Q But you didn't -- you didn't have to get married at the OneTaste Intensive, did you?

A We didn't have to get married. That's how I saw other people who have gotten married and they were, you know -- and I wanted Misha and I wanted us to be like them.

Q Okay. I mean, it would make sense that people that live in community with each other would get married amongst their community friends and other people in the community, right?
A In very expensive courses?
Q You did it, not me. I mean, I'm asking you.
THE COURT: Sustained.
MS. GUPTA: Objection.
THE COURT: Sustained.
Q No. Ms. Neria, you're the one that chose to do it that way, so I guess --
THE COURT: Is there a question?
MS. BONJEAN: Yes.
THE COURT: Ask the question.
Q Why would you choose to get married in an Intensive if you didn't want to?
A It's not that I didn't want to. It wasn't so clear-cut like that.
Q Okay. You know, Ms. Daedone, of course, as we pointed out, she's not married, right?
A Right.
Q There are plenty of people at OneTaste that were not married, correct?
A Yeah.
Ms. Daedone is always an exception to the rule.
Q Okay. Well, she's actually been married and not married.

She's done both, right?

MS. GUPTA: Objection.

THE COURT: Sustained.

Q There are other people at OneTaste who were not married, right?

A Right.

And there were many people who were married.

Q That were married.

And there were many people, tens of thousands of people who attended courses that didn't go live in an OM house, right?

A You're speaking over the whole history of OneTaste. I don't know those people. I don't know who lived in an OM house and who didn't before I was there. I know only for the less than a year that I was there.

Q Of all the people that took a class with you, how many of them lived in an OM house?

A In CP, many.

Q How many people lived in an OM house that were in those introductory classes you took, whether it's a Valentine's class, the Intro to OM?

A Yeah, those, those classes -- so it's like a funnel, you know? Those classes are more like open to the public and many people take it. And the hope is that those people will sign up for the next course.

Q Right.
A In the next course, like CP, because CP was pitched in the Intro to OM, all of -- like, most of those people lived in OM houses. So, you know, it gets more and more specialized as you go. The more in, the more involved people are.
Q Right. The more involved you choose to get?
A Yeah. Out of every Intro to OM class, you know, there are some people who choose to get more involved.
Q And most of them do not; that's correct, right?
A Probably, right.
(Pause in proceedings.)
THE WITNESS: OneTaste would not exist if --
MS. BONJEAN: Excuse me. There's no question.
Judge, Your Honor, I don't want to speak directly to the witness if there's no question pending.
THE COURT: Okay. So ask the next question.
Q Now, after -- after you got married, shortly thereafter, you actually ended up leaving OneTaste with Misha, right?
A Right. Yes.
Q Not long after, correct?
A Not long at all.
Q Wasn't that hard after all, was it?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q Wasn't that hard to leave.

You didn't have any difficulties leaving OneTaste with Misha, right?
A It was very emotionally hard to leave.
Q Right. You have to leave some friends, it was a little emotional.
But you didn't have any real obstacles to leaving, correct?
MS. GUPTA: Objection to the commentary.
THE COURT: Overruled.
You can answer.
A We -- you know, we lost -- we invested so much financially and emotionally into this group and into those teachings that leaving was very hard.
Q Right. It felt emotional leaving, but nothing obstructed you from leaving, right?
A Once we made the decision, nothing obstructed us.
Q Right.
And, in fact, you did actually get or at least Misha got a refund for a good part of that -- what was it called? The --
A Membership.
Q Right.
Like, that's the top -- the top, most expensive course that OneTaste offers, right?
A It's not a course. It's a membership.

Q Right. So it's a membership.
Basically, you can take as many courses as you want as many times as you want, right?
A Right.
Q And you and Misha each got a membership for that, correct?
A We put a deposit for that membership.
Q Right.
And he paid for both of those things, correct?
A Correct.
Q And then when you decided to leave a month after you bought that, you got most of that back, correct?
A We asked for the money back. OneTaste said no. And then we spoke to a lawyer. Once we told them we spoke to a lawyer, we got the money back within a couple of hours.
Q Okay. And that's because the -- you did not ask to cancel it within the refund policy, right?
A I don't know why, but yes.
Q We looked at some refund policies.
After 30 days, you don't get it back, right?
A Okay.
Q Is that right?
A That's right.
Q And then ultimately you escalated it and they did give it back, correct?

A Correct.
Q Isn't it true -- hold on one second.
Isn't it true that Rachel Cherwitz actually suggested that you not get married?
A I don't recall that.
Q Isn't it true that they were concerned that you and Misha were getting married?
A I don't recall that. I, I recall the opposite.
MS. BONJEAN: Okay. One second.
Your Honor, I would like to show the witness an exhibit marked Defense Exhibit 11-FZ for refreshing purposes.
THE COURT: Sorry. What is the question you're going to refresh her on?
MS. BONJEAN: Whether she recalled that Rachel Cherwitz had expressed concern about her actually marrying Misha.
THE COURT: Okay. So she said she recalled the opposite.
MS. BONJEAN: Well, initially she said "I don't recall that."
THE COURT: So pose another question.
MS. BONJEAN: Okay.
Q Do you have any recollection of Rachel Cherwitz or anyone in the upper management of OneTaste expressing concerns that perhaps you and Misha should not get married?

A No.

I remember Angela coming the evening before to tell me that we didn't have to go through with it.

Q Right.

So at least Angela told you you didn't have to go through with it?

A That was after the phone call with my mom.

Q Okay. And you, nonetheless, chose to go through with it, correct?

A Yes. Mm-hm.

Q And Angela was the student coordinator, right?

A Yes.

MS. BONJEAN: I have no further questions.

THE COURT: Ms. Gupta, any redirect examination?

MS. GUPTA: Yes. Just briefly.

THE COURT: Go ahead.

MS. GUPTA: I'd like to put Defense Exhibit 11-R on the ELMO. This is in evidence. If we could display that.

(Exhibit published.)

REDIRECT EXAMINATION

BY MS. GUPTA:

Q Do you recall being shown this document?

A Yes.

THE COURT: I'm just going to ask people in the back to keep -- sound carries here. I don't want any speaking in

the back.

Go ahead, Ms. Gupta.

Q Do you recall seeing this document, Defense Exhibit 11-R?

A Yes.

Q And do you recall, I believe it was Ms. Cohen who was going through some of these bullets that are listed here?

A Yes.

Q So if you look to the seventh bullet which states at the end: I alone will decide and accept responsibility for how and for what purpose I apply the contents of this course.

A Yes.

Q You started to say this is the perfect example and then you were cut off.

What did you want to say?

A That this is the perfect example of the kind of language that OneTaste used over and over again, that it's our responsibility, our sole responsibility for the decisions we make, that we're adults, that -- you know, that -- about the, like, victim mindset.

So in that sense, we internalized this idea that whatever was happening to us was our fault and our own doing. That's why every time I reverse engineered, I had to take full responsibility for what had happened to me, even though there were many forces in the OneTaste community that -- you know, that had to do with what happened to me. It wasn't my own

creation in a vacuum. I was part of an organization and a system that was meant to lead me in the direction that I was taking.

Q What were those forces in the community you're referring to?

A Like, all the pressure to buy courses. You know, the sales -- the nonstop sales pitches.

And also, the pressure to sell courses and to make money for OneTaste to show our devotion for OneTaste.

The pressure to engage in orgasmic meditation practices multiple times a day even when we're sick and when we're on our periods.

The pressure to stay connected no matter what and tell people what we're up to 24/7.

And then also, the pressure to speak alike, to act alike, to look alike. You know, we all dressed the same way. We used the same language. We made the same expressions with our faces.

There was just -- there was a lot going on that was happening under the surface that, at times, I was not even aware of it until later.

Q You mentioned using the same language.

What do you mean by that?

A I mean, you know, there were so many new concepts and lingo that I learned in OneTaste. You know, like fluffing,

stroking, tumescence. You know, the different meanings of orgasm, make-outs. You know, the feminine. These were all things that I did not know going into OneTaste.

Q And you referred to looking the same.

What do you mean by that?

A All the women wore, like, black dresses, short black dresses many times. You know, I went shopping with Rachel in the same clothing store and got the exact same dresses that she had. Rachel actually went through my closet and threw out a lot of my old clothes so that I would have new clothes that represented OneTaste and orgasm. So we would put red lipstick, all of us, the same color. You know, it's -- yeah.

Q Now, you testified, when asked by Ms. Cohen on cross-examination, that you thought Rachel Cherwitz was making about $40,000 a year.

Do you recall that testimony?

A Yes.

Q What is that based on?

A That was something that I heard.

Q And did you know how much Nicole Daedone was making?

MS. BONJEAN: Foundation. When?

THE COURT: Overruled.

A I did not know.

Q Now, you were asked on cross-examination about the Brooklyn OM house and whether it was a separate entity from

OneTaste and you testified that it was not.

Why did you say that?

A Because I know that Rachel had a say in what we did and did not do.

Q And what do you mean by that?

A She would -- she had communication with the house leaders, like if there was -- they had opinions about the Brooklyn OM house. It was not fully independent.

Q Who is "they"?

A Rachel and other higher-ups.

Q Now, you testified on cross-examination regarding the concept of aversion practice.

Who, if anyone, at OneTaste taught you about that?

A Nicole Daedone and Rachel Cherwitz.

Q And you testified on cross-examination that you were also taught about this concept of victimhood.

A Yes.

Q Do you recall that testimony?

A Yes.

Q What were you taught about that?

A About, like, you know, when you feel like a victim, you are not in your power. So, you know, I -- Nicole said that, you know, women use victimhood to not be in the power to say, like, this man did this to me or this thing happened to me, but it's not my fault. When in reality, according to Nicole,

like, if they would have OMed that and been in their power, they could flip that on their head and actually enjoy that experience.

Q Now, you were shown a document on cross-examination, Defense Exhibit 11-B. I think you may still have it. And you were asked about something you wrote about victimhood, some tendency to go victimhood?

A Yeah.

Q Who, if anyone, said this about you?

A Rachel said that about me.

Q And what was your state of mind at the time that you wrote this?

A You know, this is something -- I wrote it because I wanted -- you know, this was -- this was a questionnaire before the Nicole Daedone Intensive, so I wanted to show readiness to take part of it. Like, you know, in part, I used that language -- like, it was used at me and I used it back to show them that I understood what was expected of me, what -- the kind of work that I was supposed to do in the Intensive.

Q And why did you use their language back at them?

A That's what we did in OneTaste. We used that language back and forth.

Q And in this same document, you testified that you wrote in this survey about this concept of lying when you don't feel safe to fully stand up for your desires.

Do you recall that testimony?
A I do.
Q What was your mental state at the time you wrote that?
A It was the same mental state that I wanted to be -- I wanted -- I wanted to impress, I wanted for them to understand that I was ready to do the work.
Q And why would writing that impress them?
A You know, because it shows that I take responsibility over my actions. So I actually -- you know, I don't know -- I don't think I wrote it in regards to anything specific, to a specific lie. But it shows that I'm taking responsibility over my weaknesses, that I am willing to tell the truth fully, you know. Yeah.
Q You were also asked on cross-examination about the Ephesus story.
Apologies for mispronouncing that.
A Yeah.
Q What, if anything, did Nicole Daedone teach about that story?
A So she taught about how these women, these priestesses used to --
MS. COHEN: Objection, Your Honor.
THE COURT: Basis?
MS. COHEN: Relevance.
THE COURT: Overruled.

A -- used to fuck the war out of these warriors.

Like, they would go out to sea and come back all, like, torn down, hurt, you know, they -- you know, probably with PTSD from the battle. And then these women would fuck the war out of them.

So she said that that was our job, you know, was for orgasm to, like, clean, to make new, to reawaken and that our job was to fuck the war out of the world, out of the people that came to us.

Q So to be clear, Nicole Daedone told you it was your job to fuck the war out of men?

A Out of the world.

MS. BONJEAN: Objection, Your Honor.

THE COURT: Overruled.

Q Now, you were asked on cross-examination about your marriage. And you testified that -- in response to one of Ms. Bonjean's questions about why you got married, you testified that it wasn't so clear-cut.

What did you mean by that?

A My relationship with Misha was abusive. You know, we were in an abusive cycle that kept happening and we were not able to break that cycle. We absorbed that -- trying to -- we were using the concepts that we learned in OneTaste in our relationship and that caused the abuse.

So it was not clear-cut because I loved him, but I

also greatly suffered in this relationship and wanted it to end, wanted to leave it, but couldn't leave it, couldn't walk away. The cycle that we were in was very, very powerful.

Q Now, you testified your wedding took place on the last day of NDI, right?

A Yes.

Q Who, if anyone, decided it would be on the last day?

A I don't know who decided. It was not my decision.

Q And your wedding was made the centerpiece of NDI, right?

A Yes.

Q Who, if anyone, decided that?

A I believe that Nicole decided that.

Q You also testified, when asked about various married couples at OneTaste, that Nicole Daedone was always the exception to the rule.

What did you mean by that?

A Nicole Daedone was the one who made the rules and then everybody else followed. But she didn't necessarily -- but she -- you know, she was the brain behind, the creator of the rules of what we did, but she, you know -- but I don't know to what extent that she did those things.

For example, she -- for example, all the teachers made $40,000 and Nicole Daedone made millions of dollars.

MS. BONJEAN: Objection. Basis. Foundation.

THE COURT: Sustained.

Q You testified on cross --

THE COURT: And I'm going to strike that answer.

MS. BONJEAN: Thank you.

Q You testified on cross-examination that while you were at OneTaste, you had both feet in the water and it felt like a current was taking you.

What did you mean by that?

A It felt like my life got out of my control, that I was being carried away, the current into OneTaste without being able to stop myself.

MS. GUPTA: No further questions.

THE COURT: Any recross? Ms. Cohen.

MS. COHEN: Just briefly, Your Honor.

RECROSS-EXAMINATION

BY MS. COHEN:

Q Ms. Neria, you testified just now on redirect about OneTaste telling you to take responsibility for your actions, right?

A Yes.

Q And when you first got involved with OneTaste and first moved into the Brooklyn OM house, you had friends outside of OneTaste at that time, right?

A Right.

Q You had family right?

A Right.

Q You had a college education, right?
A Right.
Q And you decided in December of 2014, a little over a month after taking the Intro to OM class, that you were going to quit your teaching job, right?
A I'm not clear on the date.
Q We can bring out -- you remember the December 30th --
A Was that at the end of December? Okay.
Q It was at the end of December, right?
A Mm-hm.
Q And, in fact, you had a Master's in teaching, correct?
A Right.
MS. GUPTA: Objection, asked and answered.
THE COURT: Overruled.
A This was not my first teaching position.
Q And you also testified on redirect about the pressure to engage in orgasmic meditation?
A Yes.
Q But when you moved into the One house -- sorry, excuse me.
When you moved into the OM house, you were the one arranging these orgasmic meditation sessions, correct?
A Each person was supposed to arrange their own orgasmic meditation session.
Q And you were reaching out to people outside the house to

join these sessions, correct?
A Right. To people I met in the OPC, the OM Practice Club, and in the community. There was OM Hub, which was a social network created to arrange OMs.
Q So that's a yes, right?
A Yes.
Q And you also talked about dressing like others at OneTaste?
A Right.
Q When you talk about Rachel, dressing like Rachel, you wanted to be like Rachel when you got there, right?
A I was enamored by Rachel.
Q And a lot of people were, right?
A Right. Yes.
Q And you were socializing with all of these people?
A Right. Yes.
Q And you talked about different terms on redirect about stroking and orgasms. You were asked about other terms, as well.
A Mm-hm.
Q Stroking and orgasm, those are the very reasons you went to OneTaste, correct?
A Not stroking. I went -- I went to OneTaste in order to learn how to have an orgasm.
Q Right. And from the first moment you learned about it,

you learned that orgasmic meditation involves stroking, correct?

A Right. Yes.

MS. COHEN: Nothing further, Your Honor.

THE COURT: Ms. Bonjean, any recross?

MS. BONJEAN: Yes.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q Ms. Neria, you indicated that everybody started -- everybody was wearing, like, the same uniform; is that right?

A That a lot of the women had the same clothes.

MS. BONJEAN: Can we pull up Defense Exhibit 11-FL. I believe it's in evidence, right?

MS. COHEN: Yes.

(Exhibit published.)

Q Fair to say you and your friend here are not even dressed remotely similar to each other, right?

A Yeah. Not every time. But here you can see I am wearing a short black dress. There are many pictures of Marissa wearing short black dresses.

Q Many women in New York wear short black dresses, right?

A And many women in OneTaste wear short black dresses.

Q You wore a lot of short black dresses?

A I had like -- I had a couple.

Q Okay. And I just want to get this straight. It's your

testimony that Nicole's ideas is the reason you did everything that you did for an entire nine months at OneTaste; is that right?

MS. GUPTA: Objection. Misstates the testimony.

THE COURT: Overruled.

A Yes.

Q Okay. So an idea had the power to make you marry someone, right?

A It was like a religion.

Q Okay. An idea that -- you know you can reject ideas; you know that, right?

A Right. Yes.

Q As a teacher, you know that you read things that you don't always agree with, correct?

A Right.

Q And you understood in listening to Nicole speak, that she speaks metaphorically quite a bit, right?

A Nicole is very convincing.

Q My question, ma'am, is do you understand that she speaks metaphorically?

A Not always.

Q You know what a metaphor is right, obviously?

A Of course.

Q You understand that when she tells stories, it's not literal, sometimes there's metaphors involved, correct?

A Many times her stories are very literal.
Q I didn't say it was all the time. I said often she speaks metaphorically. Correct?
A Sometimes. I think like the Greek mythology, there was some metaphor there.
Q Right. She wasn't actually saying there was some men coming back from war that you should fuck the war out of, right?
A No, but when she talked about unconditional sex and having sex with men off of Craigslist, that was not metaphorical.
Q Okay. Well, I don't know what you're talking about right now, but --
THE COURT: So let's sustain that and just ask a question.
MS. BONJEAN: Right.
BY MS. BONJEAN:
Q So when she talked about victimhood, she has her own viewpoints about how victimhood keeps women in stasis, right?
A Right.
Q She chooses to reject the idea that even if something bad happens to you, that you come in and just claim victimhood because it hurts you.
That is her idea, right?
A Well, I think that idea serves her very well.

Q And that's okay. It doesn't have to serve you though, correct?
A It serves her very well as a person who does bad things to people.
Q Okay. I understand that's your opinion.
My question is, is that you did not have to accept that idea for yourself, did you?
A Right.
Q Right. You can wallow in your victimhood all you want, you are entitled to do that; right?
MS. GUPTA: Objection.
THE COURT: Overruled.
Q Right?
A Right.
MS. BONJEAN: Thank you.
THE COURT: And the witness may step down.
THE WITNESS: Thank you.
(Witness steps down.)
THE COURT: We reached the end of the day and I will remind you tomorrow is the day that we're only going to have you here until 3:00 p.m.
So make sure you come on time again tomorrow at 9:15, so we can start at 930. We might take a slightly shorter lunch break, but we'll see. But we will get you out of here at 3:00.

Again -- I'll wait. That's okay, I can wait.

Over the break, just the evening I should say, take it easy, don't discuss the case with anyone, don't let anyone discuss the case with you. Don't even discuss it among yourselves. If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino.

And I know I'm repeating myself, but I think it's important to tell you this every day.

You must not read, listen to, or watch any news or other media reports of the trial. You must not conduct any independent research about the case, the matters in the case, or the individuals involved in the case. Don't talk to the parties, the witnesses, the attorneys about anything. Keep an open mind.

And, again, have a good evening and we'll see you tomorrow for a shorter day.

(Jury exits. )

(Continued on the next page.)

(Continuing.)

THE COURT: Everyone may be seated.

What is the witness lineup for tomorrow? It's a short day.

MS. BENSING: Yes, your Honor. So I think given where we are, the Government anticipates calling a victim witness first thing in the morning. She's a shorter witness, so I would expect that she may finish. Then the Government would like to call Robert Kandell.

On that note, your Honor, if the Government -- if the Court doesn't want to give the immunity instruction, the Government has no objection to not giving it at that time. It's up to the Court but I wanted to Court to --

THE COURT: If you call an immunized witness there will be an instruction with the rest of the jury instructions at the end of the trial.

Does the defense agree that that's the appropriate time to do it? That's typically what's done. We wouldn't typically break in a talk about a cooperator testimony when a cooperator is testifying, or a law enforcement witness testimony when a law enforcement witness is testifying. I don't see any reason to break it up and give an instruction. It's not a limiting instruction, it's just describing a type of witness. So I don't see a need to do that. If anyone wants to be heard on that?

MS. BONJEAN: I don't think I have a position on it.

MR. ROBOTTI: We're fine with it, your Honor.

THE COURT: There will be one, if there an immunized witness there will be one with the jury instructions at the end of the case. And I can consider your language on that, I got some standard language as well. That's fine.

The bigger issue, though, is Mr. Kandell is, the submission that the Government put in today, and the defense I understand is going to put something in shortly. So I'll wait on that and we'll see where that goes. It may be that he can start to testify and maybe by virtue by the fact that we're sitting a shorter day he may not finish any way, but it may be that we can't finish if there are issues that the Court needs more information on or more time on. That's what we're going to do.

MS. BENSING: And your Honor, just to be clear, some of what was in the Government's filing pertain to other witnesses. We tried to make it clear which pertain to him and which pertain to later witnesses just for --

THE COURT: I saw that. But again, I haven't had much time because you filed it today.

MS. BENSING: Yes, of course.

THE COURT: I did see that.

MS. BENSING: The last thing is that we do intend to read into the record tomorrow morning revised copies of

Government Exhibit 5003 and 5004, which I believe we provided to the Court.

THE COURT: They are not executed though.

MS. BENSING: We've got them signed. We can provide signed copies to the Court. We wanted the Court to have the language.

THE COURT: Okay. Is it the same as what you had before just without the part about objections?

MS. BENSING: Yes.

THE COURT: You could give a copy to Mr. D'Agostino.

MS. BENSING: Yes, we will. We just want to scan the signed copies.

THE COURT: That's fine. Are you anticipating that you'll be reading them or just offering? It's a lot of numbers to be reading. How are you anticipating publishing this to the jury?

MS. BENSING: I think we will move it into evidence, and read out portions of it. I don't think we need to read in every single Government exhibit number. That's how we intend to proceed.

THE COURT: Okay, that's fine.

MS. BONJEAN: In light of our reaching an agreement on this, it's my understanding that the Government has no objection to people who were previously sequestered no longer being sequestered by virtue of the fact that they are no

longer under subpoena and the issues are resolved.

THE COURT: The only requirement that is that people who are going to be testifying not be listening to other testimony. So you all know the people that that applies to and who it doesn't.

MR. ROBOTTI: In connection with the stipulations, the parties agree that the defense can preserve their objections to authenticity and --

THE COURT: Not authenticity.

MR. ROBOTTI: We are agreeing to stipulate to authenticity, but the Government agreed that we can preserve our objection for appeal in connection with that. We didn't put it in the stipulation --

THE COURT: That doesn't work. That doesn't work. In order to allow this to go before the jury, the Court has to determine authenticity. Right.

MR. ROBOTTI: Your Honor, the idea was that, had the Government called the witnesses we would have objected to authenticity, and the Court would have made a ruling one way or the other.

THE COURT: But now there is a stipulation, so the stipulation is meaningless if you haven't stipulated to something. I'll leave you to talk about that tonight; but that doesn't work.

MS. BENSING: Your Honor, just one other thing

because I just wanted to follow-up on the Court's request for additional information regarding the scope of the Government's proposed expert. We have prepared that. I understand that the Court wants a joint filing, so I just wanted to let the Court know that we have prepared it. We're waiting for --

THE COURT: I'll take it when you have it, but sooner rather than later.

MS. BENSING: Thank you, your Honor.

THE COURT: And then I'm not going another day without having the defense exhibits in an organized fashion for the rest of the trial. I need them. We're not doing these folders with supplemental handouts where I'm stapling things because it's coming in loose papers.

Exhibits were due to the Court months ago. They were not provided to the Court. I've given leeway. It's not working. So every of exhibit you might possibly use, it will be provided to me tomorrow, including videos, whatever it is. I understand that there may be things that you don't know yet that you need, and that can be a minimal amount you can add, but we're not doing it any more. I'm not doing this. I will prevent you from putting in certain evidence if I don't have it.

MS. FARRELL: Your Honor, relatedly, just so we have sufficient time to work on this over the coming weekend. I think we are, knock on wood, reaching the end of the

Government's case. We understand there will be a defense case.

We currently have a list of 49 potential defense witnesses. We've asked for that to be trimmed.

In any event, we obviously intend to cross-examine them and would like to provide the Court with what the Court needs advance in the format that you would like it.

Obviously, the ultimate decision that the defendants have to make is whether they will testify. If they testify, there will be a lot of documents and videos that the Government intends to use on cross-examination. So we want to take the weekend to get that under control and make sure we provide your Honor what you need in advance of the Government cross-examining defense witnesses. And so you don't have to tell us now, but if in advance of the weekend if we can get guidance on exactly what your Honor needs in terms of formatting, we will spend the weekend preparing that.

And we would ask for a revised or smaller list of witnesses from the defense because.

THE COURT: Okay, fine. We're going to talk more tomorrow at the end of the day. I told the jury they can leave at three, but we're going to stay for a while. I raised this probably last week, maybe earlier this week, to the extent that the parties have different thoughts about any of the proposed jury instructions that have already been

submitted, I want to know about that tomorrow. And ideally it will come as a joint request. Even if you don't agree, you can give me two or three different versions, whatever it is, but I need to hear from you. I don't want to be working with outdated versions of what the parties want me to be working with.

MS. FARRELL: Do you want us editing the existing version of the proposal or just a supplemental letter or document?

THE COURT: I want you to come prepared to talk about it tomorrow, come prepared to tell me if any of the proposed requests have changed. I don't mean a word here and there, I mean something significant that you feel differently about or you didn't put an instruction in that you want to put an instruction now, I want to know about those.

MS. BONJEAN: Your Honor, for clarity. Since we obviously proposed different instructions on some of these, we're prepared to address our respective proposed instructions, and if there is a supplemental or a change be prepared to --

THE COURT: Exactly. I just want to make sure that the materials that I have that the parties have already given me, which was an initial -- it was really a revised, I think -- but a more lengthy submission, and then there was a supplement. I just want to know if the parties have in any

material way changed their position on any of what they have already given in terms what you want the Court to do.

I'm asking that because now that you have seen some of the evidence you may be thinking about things differently. I think there were places in the submissions where maybe it was the Government, maybe both, where all parties said maybe depends on what happens at trial. That's the kind of thing I would like to know. I would like to get a draft charge to the parties sooner rather than later, but I really need to hear if you have changed anything because I don't want to waste anybody's time by using outdated materials from the parties.

I will see everyone here at 9:30.

(Proceedings adjourned at 5:40 p.m. to resume on May 23, 2025 at 9:30 a.m.)

ooo0ooo

# I N D E X


| WITNESS | PAGE |
|---|---|
| **MICHAL NERIA** | |
| DIRECT EXAMINATION BY MS. GUPTA | 2684 |
| CROSS-EXAMINATION BY MS. COHEN | 2796 |
| CROSS-EXAMINATION BY MS. BONJEAN | 2886 |
| RECROSS-EXAMINATION BY MS. COHEN | 2931 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 2934 |
| REDIRECT EXAMINATION BY MS. GUPTA | 2922 |

# **E X H I B I T S**


| **Exhibit** | **Page** |
|---|---|
| Government's Exhibit 2 | 2699 |
| Government's Exhibit 3147 | 2704 |
| Government's Exhibit 407 | 2707 |
| Government's Exhibit 4800 | 2721 |
| Government's Exhibit 4802 | 2731 |
| Government's Exhibit 4801 | 2734 |
| Government Exhibit 4514-AR | 2749 |
| Government Exhibit 4513-AR | 2764 |
| Defense Exhibit R | 2845 |
| Government's Exhibit 11-FK and 11-FL | 2852 |
| Defense Exhibits 11-AN and 11-FP | 2865 |

# E X H I B I T S


| Exhibit | Page |
| --- | --- |
| Defense Exhibit 11-EP | 2867 |
| Defense Exhibits 11-EA and 11-DZ | 2868 |
| Defense Exhibit 11-U | 2879 |