UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
May 28, 2025
Defendant. : 9:30 a.m.
- - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Stacy A. Mace
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Richard Hobbs, Trial Direct, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
United States Courthouse, Room N377A
225 Cadman Plaza East
Brooklyn, New York 11201
smacerpr@gmail.com

(In open court.)

(The Hon. Diane Gujarati, presiding.)

(Defendants present.)

(The following occurs outside the presence of the jury.)

THE COURTROOM DEPUTY: Court is now in session. The Honorable Diane Gujarati, presiding.

*United States of America against Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes. Good morning, Your Honor.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialist Marlane Bosler and Liam McNett, and FBI Special Agent Tricia Quintero.

Good morning.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler Lebarge, Richard Hobbs, Kelly Lenahan-Pfahlert all on behalf of Rachel Cherwitz.

THE COURT: Good morning to all of you.

MS. BONJEAN: Good morning, Your Honor. Jennifer Bonjean, Kelsey Killion, and Ashley Cohen on behalf of Nicole Daedone.

THE COURT: The jury -- one of the jurors was a bit late, but they're all here now.

We do have one jury note which we can deal with at another time, but I will ask Mr. D'Agostino to show it to you, and I've marked it Court Exhibit 11.

(Court Exhibit 11 received in evidence.)

THE COURT: It's a note from Juror No. 7.

Essentially her job wants to know when she's coming back. We can talk about that later, and I will take your proposal on any response that you think is appropriate.

MS. BENSING: Your Honor, could we put one really quick thing on the record.

THE COURT: Yes, go ahead.

MS. BENSING: I think, as we have noted for the Court earlier this week with respect to an agent report with respect to Margaret Pixley that the defendants were considering, any action that they wanted to take in terms of -- any actions that they the defendants wanted to take in terms of reaching a stipulation or recalling the witness.

I just wanted to note for the record that it's the Government's understanding that the defendants do not wish to take either of those actions at this time.

Obviously, they reserve their right to call witnesses in any kind of defense case absent the Government and any kind of rebuttal case, but I wanted to close the loop on that, Your Honor.

THE COURT: Okay. I can hear from the defendants if

they want to be heard. I think earlier it was they were going to come back to me if they wanted the Court to consider any request for relief.

MS. COHEN: Yes, Your Honor. That's -- that's correct. We agree with everything Ms. Bensing said. Just I know the Court had asked the Government make sure there is no additional Brady, Giglio that's been found. So we just want to confirm that that --

THE COURT: I'm not sure if it was ask so much as an instruction but we're talking about the same events actually.

MS. COHEN: Yes, we are. So we just want to confirm there was nothing else; and other than that, we agree.

THE COURT: Ms. Bonjean?

MS. BONJEAN: I take no position on that.

THE COURT: Sorry, you take no position on whether you want to do anything with respect --

MS. BONJEAN: Yes. I -- I -- on behalf of Ms. Daedone, it's not my position to bring Ms. Pixley back but I defer to my colleague.

Is that what you were asking?

MS. COHEN: Yes.

MS. BONJEAN: Okay.

MS. COHEN: Yes. I did think that we were -- it more pertains -- the issue in the case, it pertains more to Ms. Cherwitz. So I think in response to what she was saying.

THE COURT: Nobody is asking me to consider any request for relief, correct?

MS. COHEN: No, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: No, Your Honor.

THE COURT: Okay. Then we can bring the jury out then and you can bring the witness back.

(Jury enters.)

THE COURT: Good morning, everyone, you may be seated. And Mr. Robotti, you may continue your cross-examination.

MR. ROBOTTI: Thank you, Judge.

THE COURTROOM DEPUTY: The Court reminds you you are still under oath.

THE COURT: You may proceed.

(Continuing on the next page.)

**ROBERT KANDELL**, having been previously duly sworn/affirmed, testified as follows:

CONTINUED CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good morning, Mr. Kandell. So let's talk a little bit about Rachel Cherwitz. So in early 2007 you met Ms. Cherwitz; is that correct?
A Yes.
Q And she showed up on the door step at the warehouse in San Francisco?
A Yes.
Q And she was a shaved-headed dynamo as you described her; right?
A Yes.
Q And you just let Rachel and her two friends come in and stay; right?
A Yes.
Q Even though they had no money at the time?
A Yes, they did work trade.
Q And there were several reasons she was invited to stay at the warehouse; correct?
A Yes.
Q So Rachel was young, perhaps 27 or so?
A Yes.
Q She had shown up from Texas and needed a place to stay?

A Yes.
Q She was energetic, a hard worker and strong-willed; correct?
A Yes.
Q And you were immediately drawn to her?
A Yes.
Q And you formed a bond very quickly; correct?
A Yes.
Q And your understanding is that Rachel turned to OneTaste in part because she had her own trauma; correct?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Calls for hearsay.
THE COURT: Overruled.
A She described being --
THE COURT: Sustain as to any hearsay.
BY MR. ROBOTTI:
Q Just a yes or no question. Your understanding is that Rachel turned to OneTaste in part because she had her own trauma?
A Yes.
Q Based on your observations, Nicole Daedone also formed a bond with her very quickly; correct?
A Yes.
Q And she quickly took Rachel under her wing; right?

A Yes.
Q It's fair to say that Ms. Cherwitz quickly rose up the ranks in the company; right?
A Yes.
Q You did not think that Rachel was business minded; right?
A I did not think she was business minded.
Q But she was motivated and dedicated?
A Yes.
Q And in a way that many others in the company were not at the time; correct?
A Yes.
Q Rachel had an ability to manage people?
A Yes.
Q And that was something that OneTaste needed at the time; correct?
A Yes.
Q Now, you testified that Rachel also became your research partner; is that right?
A Yes.
Q And that was someone with whom you explored an OM practice; correct?
A Yes.
Q And more broadly who you explore an emotional and sexual relationship with?
A Yes.

Q And you testified on direct that Nicole encouraged your relationship with Rachel; is that right?
A She did.
Q And Rachel also asked you to be her research partner; correct?
A She did.
Q And your understanding was that Nicole wanted you to be research partners because you and Rachel would balance each other; right?
A Yes.
Q Rachel was young and a bit wild at the time?
A Yes.
Q And you were more mature and stable at the time?
A Yes.
Q Given your seniority in the company, your research partner was seen as a coveted position?
A Yes.
Q And this was seen as a good opportunity for Rachel especially since she was so new; right?
A Yes.
Q Now, is it fair to say that you and Rachel developed a relationship that was on and off again over the next seven years?
A Yes.
Q And your relationship was -- was not monogamous; correct?

A That's right.
Q You had many other OM partners?
A Yes.
Q And many other sexual partners, as well?
A Yes.
Q I'd like to show you what's been marked for identification as Defense Exhibit 4-AU.

(Published to witness only.)

Q Do you see that on your screen there?
A Yes.
Q Do you recognize that as a photograph of you and Rachel Cherwitz?

THE COURT: Wait a moment. I can look at the hard copy for now but if we get to a point where I don't have a hard copy, we might have to pause to get me another copy.

MR. ROBOTTI: Sure, Your Honor.

Q Looking at Defense Exhibit 4-AU is this a photograph of you and Rachel Cherwitz?
A Yes.
Q And is this from about the 2009 time period?
A It looks right.

MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibit 4-AU into evidence.

MS. BENSING: No objection.

THE COURT: Defendants' Exhibit 4-AU is admitted.

(Defendants' Exhibit 4-AU received in evidence.)
MR. ROBOTTI: If we can just publish it to the jury.
(Exhibit published.)
BY MR. ROBOTTI:
Q Again, just for the jury, this is a photograph of you and Ms. Cherwitz from around the 2009 time period; correct?
A Yes.
Q Now, as we talked about, you were encouraged to be in a relationship with her; right?
A Yes.
Q But you also developed a genuine relationship with her; correct?
A Yes.
Q And you both worked hard at your relationship?
A Yes.
Q Is it fair to say that the relationship between the two of you had ups and downs?
A Yes.
Q But you viewed that relationship as beneficial overall; correct?
A Yes.
Q And while were you at OneTaste, it helped Rachel -- in your view, it helped Rachel on her journey to self improvement; correct?
A Yes.

Q And you viewed it as helping improve yourself, too; correct?
A Yes.
Q And even toward the end of your time at OneTaste in 2014, you spoke very fondly of Ms. Cherwitz; correct?
A Yes.
Q At that time you believed she could be sharp and pointed; right?
A Yes.
Q But she had a flip side of pure love and dedication; correct?
A Yes.
Q She could be a smart and caring teacher?
A Yes.
Q You had some amazing times together in New York especially?
A Yes.
Q And you believed that Rachel was the best practice partner you had; correct?
A Yes.
Q And in your view she taught you to get out of your linear break; is that right?
A Yes.
Q And she taught you how to engage with a dynamic, powerful, unilinear woman; is that right?

A Yes.
Q And you believed that this relationship had changed you more than anything else in your life?
A No.
Q At the time is that how you would describe it?
A I would describe my relationship with Nicole as the one that changed my life the most at that point and Rachel being second.
Q Is it fair to say that you and Rachel had an incredible journey together?
A Yes.
Q By 2014, your romantic relationship was over; correct?
A Yes.
Q But you still had a good relationship with Rachel at the time?
A Yes.
Q So, by 2012, after being at the company for a number of years, Rachel's job responsibilities grew?
A Yes.
Q She ended up becoming one of the company's lead sales people; is that right?
A Yes.
Q And that was through tenacity and hard work; correct?
MS. BENSING: Objection.
THE COURT: Basis?

MS. BENSING: Personal knowledge.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Based on your observations of Rachel in her job over the years, was her promotion based on her tenacity and hard work?
A Yes.
Q And because she showed a commitment to the company and to improving people's lives?
A Yes.
Q All right. So, by 2012, fair to say the struggle start up was still struggling?
A Yes.
Q The company had grown but was not yet profitable; right?
A Yes.
Q And at the time the company was living day-by-day to make sure all the vendors were paid?
A Yes.
Q And it was still the case that the company was looking at cash shortfalls each month; right?
A Yes.
Q And you had still not been paid back your original investment from 2004; is that right?
A 2003.
Q 2003. You had still not be paid back; correct?
A Yes.

Q And personally you were making a salary of around $36,000 in 2012 and 2013?
A Yes.
Q And that grew to about $78,000 in 2014?
A Yes.
Q And based on your role as chief financial officer, you were familiar with the salaries of Ms. Daedone and Ms. Cherwitz; correct?
A Yes.
Q And at the time Nicole made about $78,000 in 2012?
A Yes.
Q And that grew to $150,000 in 2014?
A Yes.
Q And Rachel was making about $50,000 in 2014?
A Yes.
Q And before that, in the years before that, she was making more in the 20,000 to $35,000 range?
A Yes.
Q So, fair to say that none of you are receiving enormous salaries during this time period?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Is it fair to say that your differing salaries reflected your differing positions in the company?

A Yes.
Q Now, in 2012, you were aware that Nicole was struggling with her personal cash flow?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Personal knowledge.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Did you have an understanding at that time of whether Ms. Daedone was struggling with her personal cash flow?
MS. BENSING: Objection. Calls for hearsay.
THE COURT: Overruled.
You may answer that question that was just posed.
A Yes.
Q And was that based on your personal interactions and observations of Ms. Daedone?
A Yes.
Q And it was your understanding at the time that she was struggling with her personal cash flow; correct?
A Yes.
Q And in response did you give her guidance trying to help her out with her personal finances?
A Yes.
Q So with the company still struggling to find its footing, it's fair to say that in 2012 it profited?

A Yes.
Q And it's true that during your time at OneTaste, there was a heavy focus on marketing?
A Yes.
Q And spreading the word about the mission of the company?
A Yes.
Q The people at OneTaste were basically shouting from the rooftops about the benefits of orgasmic meditation; correct?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q It's fair to say that the company was heavily marketing the benefits of orgasmic meditation?
A Yes.
Q The company did have some marketing success; correct?
A Yes.
Q And it regularly opened its doors to media attention; correct?
A Yes.
Q But standing alone that media attention and that interest was not enough to make the company profitable; right?
A Yes.
Q You mentioned in 2012 the company shifted its strategy and started focusing on sales, right?
A Yes.

Q And it implemented a sales team?
A Yes.
Q And the company was selling enrollment in its courses, right?
A Yes.
Q And the basic idea was that at OneTaste events a salesperson would talk to potential customers; correct?
A Yes.
Q And try to sign them up for classes; right?
A Yes.
Q And salespersons could also generate leads through outreach through their sales network?
A Yes.
Q And the salespeople would talk to potential customers about the classes; right?
A Yes.
Q And they would explain the benefits; right?
A Yes.
Q And they would talk about their personal experiences; right?
A Yes.
Q And help the potential customers try to figure out payment; correct?
A Yes.
Q So this is a typical sales job?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q So you were involved in starting up the sales team; right?

A Not directly.

Q Were you familiar with the company's efforts to set up the sales team?

A Yes.

Q Is it fair to say that the company looked to other businesses to see how they ran their sales teams?

A Yes.

Q And you used other businesses as a model for your sales team; correct?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Lack of personal knowledge. He testified he wasn't involved in the process.

THE COURT: Overruled.

Q So you looked to other companies as a model for your sales team?

A Yes.

Q And while you were there, OneTaste had several outside consultants come to train the sales team; correct?

A Yes.

Q And is it fair to say that it was hard to sell a new fringe product?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Well, based on your experience as chief operations officer running the business was it hard to sell the OM practice?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Is it fair to say that the company taught its sales team proven sales techniques?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Did the company also put in place daily sales goals; is that right?

A Yes.

Q And those started at about $5,000; correct?

A Yes.

Q And the goal was that between all salespersons on a given day, they would hit $5,000?

A Yes.
Q And that sales goal grew over time; right?
A Yes.
Q So, once the sales team was in place it started to turn the company around; is that correct?
A Yes.
Q The company was making money from its courses all of a sudden; correct?
A We're talking 2012?
Q 2012.
A Yes.
Q And over the next two years the company became profitable?
A Yes.
Q So, even when the company started making money, a lot of money went to pay expenditures; is that right?
A Yes.
Q Money was reinvested back into the company; correct?
A Yes.
Q So that was to pay for the cost of running courses?
A Yes.
Q Renting facilities?
A Yes.
Q Media production?
A Yes.

Q Salaries for staff?
A Yes.
Q Travel, marketing?
A Yes.
Q Outside speakers?
A Yes.
Q And the company had to pay back debt; right?
A Yes.
Q So a lot of this money was put back into the company; correct?
A Yes.
Q All right. So let's talk about the sales practices.
So sales jobs can be stressful; correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Sales jobs at OneTaste could be stressful?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Based on your experience with the sales team and your observations as the chief operating officer, is it your view that the sales job at OneTaste could be stressful?
A Yes.
Q Is it your view that the sales goals created pressure?
A Yes.
Q And part of that pressure led, in your view, to

salespeople being too assertive at times?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Foundation, establishing personal knowledge; which salespeople at what time period.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Now, based on your experience as chief operating officer and director of the overall business, you were familiar with the sales team; correct?
A Yes.
Q And you were familiar with that sales team during the 2012 to 2014 time period; right?
A Yes.
Q And you had the opportunity during coaching programs and various other events to observe the sales team; correct?
A Yes.
Q And based on your experiences, is it your view that at certain times the salespeople could be too assertive?
MS. BENSING: Objection as to which salespeople.
THE COURT: Overruled.
A Yes.
Q And sometimes that meant asking people to take on debt to sign up for courses; correct?
A Yes.

Q Now these were potential customers who had expressed interest in courses; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q The people at the coaching courses who showed up were potential customers who had expressed interest in the program; right?

A Yes.

Q And the people who showed up to the OneTaste programs, they were adults; correct?

A Yes.

Q And the potential students had their own outside jobs; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Now, to be clear, you do not view debt necessarily as being a bad thing; correct?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Now, based on your experience at OneTaste, to your

knowledge the sales team never targeted people with trauma; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q You were familiar with the sales practices at OneTaste based on your position and experience; correct?

A Yes.

Q And you had an understanding of the company's sales practices from 2012 to 2014; correct?

A Yes.

Q And you had the opportunity to observe those sales practices based on your own experience; correct?

A Yes.

Q And based on your own observations and your own experience, the company never targeted people with trauma; correct?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance, lack of personal knowledge as to which people, when.

THE COURT: Overruled.

A Yes, we never targeted anyone with trauma.

Q It's fair to say that OneTaste never sought out, based on your experience, people with trauma; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Based on your experience, again your own observations and your own interactions, you knew that the salespersons talked to potential customers about her sexual wants and needs; correct?

A Yes.

Q I'd like to show you what's been marked as Defense Exhibit 11-FS.

(Exhibit published to the witness, counsel and the Court.)

Q Now, do you recognize this as the sales and business development manual from 2013?

A Yes, I do.

Q And you recognize that based on your role with OneTaste; correct?

A Yes.

Q And you are familiar with this as part of overseeing the business at OneTaste; correct?

A Yes.

THE COURT: Sorry, you're going to have to give that to me.

(Counsel approaches.)

BY MS. BENSING:

Q And this was from the 2013 time period; correct?

A Yes.
Q And this was used to train the sales team?
A Yes.
Q And is this a fair and accurate depiction of the 2013 manual?
A Yes.
MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibit 11-FS.
THE COURT: Any objection?
MS. BENSING: Can I have just one minute?
THE COURT: Yes.
MS. BENSING: I just want to look at it. It's a longer --
THE COURT: Sure.
MS. BENSING: Your Honor, the Government objects on relevance grounds to the entirety of this document coming in.
THE COURT: Give me one moment now.
Sustained, on this foundation.
BY MR. ROBOTTI:
Q All right, well, Mr. Kandell, you were familiar with this document at the time you were at OneTaste; correct?
A Yes.
Q And you reviewed this document; correct?
A Yes.
Q It's your understanding that this was used to train the

sales team; correct?
A Yes.
Q This document was used to inform the sales practices and tactics at OneTaste; correct?
A Yes.
Q And this is a document that the sales team relied upon in reaching out to potential customers; correct?
A Yes.
MR. ROBOTTI: Your Honor, again, we renew our offer of Defense Exhibit 11-FS.
MS. BENSING: Same relevance objection to the entirety of this coming in.
THE COURT: Sustained on this foundation, to the extent you're seeking to offer the entirety.
BY MR. ROBOTTI:
Q Could we turn to page 12 of this document? Actually, can we look at page 11?
Now, on page 11, Mr. Kandell, does that reference the sales process?
A Yes.
Q Okay. And looking from page 11 to page 17, does that give an overview of the sales process?
A Yes.
Q All right. And this was the manual that was used to train the salespeople at OneTaste on the sales process?

A Right.

MR. ROBOTTI: Your Honor, we would move to admit just pages 11 through 17.

THE COURT: Any objection?

MS. BENSING: No objection.

THE COURT: So, Defense Exhibit 11-FS, pages 11 through 17, are admitted.

(Defense Exhibit 11-FS, pages 11 through 17, received in evidence.)

MR. ROBOTTI: All right. And if we could publish to the jury.

(Exhibit published.)

BY MR. ROBOTTI:

Q Do see at the top there it says "Sales Process" on page 11?

A Yes.

MR. ROBOTTI: And if we can turn to page 12, if we can highlight "exploratory session."

Q And could you just read that paragraph, Mr. Kandell?

A "The exploratory session formally opens the relationship. The session should only be 45 minutes long. An exploratory session is not coaching. In this session you dive deeper into getting what the client's desires are, what's blocking them from having what they want and then making them an offer that they can say yes to."

Q Okay.

MR. ROBOTTI: And if we can highlight the portion that says "Safeporting" at the bottom.

Q Can you read the first two sentences under "Safeporting"?

A "You are preparing them for how the rest of the session will go. This allows them to know where the call is moving as it progresses."

MR. ROBOTTI: And the next paragraph -- we can leave the highlight.

Q Can you read that paragraph beginning "Okay"?

A "Okay. Here is how the session is going to go. First, we're going to talk about what you want, goals and desires. Does that make sense? They should say yes. If not, ask them what part they don't understand."

MR. ROBOTTI: And then can you skip down to the last portion beginning "And then."

A "And then we're going to talk about what's blocking you from having the things you said you want. Does this make sense. Yes."

MR. ROBOTTI: Can we turn to the next page?

Q And this first paragraph beginning "Finally."

A "Finally, I will go he over the OneTaste method of coaching, what it is and how we do it. Then we will go over any questions you might have. After that, I will make you an offer. For example, I might recommend so many sessions over X

period of time for this amount of money. You are free to say yes or no. No is always an acceptable answer. My only request is that you make a very clear decision at the end of our time together. Does this make sense?"

MR. ROBOTTI: Now, under the next section "Stroking" can we highlight the paragraph, "What do you want?"

Q Could you read that, Mr. Kandell?

A "Here, the client is tapping into their desires. They might find it hard to identify what they are in the beginning. There might be some silence as they unearth their answers. This is fine. Once they get going, the answers will gain momentum.

MR. ROBOTTI: And can we turn to page fourteen, please?

Q And that top paragraph, "What do you feel is blocking you?"

A "Have the client list all the ways they feel blocked from living the life they want. The sensation in this part of the question might be heavier but stay with the client. If they cry or get emotional, allow them to feel the emotion. Again, refrain from coaching or making additional comments that will take them out of the experience. It's important to let the client experience and feel what is blocking them so they're more motivated to move out of that state."

MR. ROBOTTI: And, lastly, can we turn to the next

page, which is page 15. And can we highlight the top paragraph?
Q Beginning "The second phase."
A "The second phase of coaching is education. This is where we teach you how to live a turned-on life. You will learn to live in the world in a different way; operating from your desire, instead of fear or obligation. Education may include OM practice, communication exercises and written exercises such as a desire contract.
"A desire contract is a living, breathing agreement with your desire where you get in touch with what you -- where you get in touch with what you are here to do, discover how you will achieve it and what your boundaries are, how to ask for what you want and define how someone can be with you. The desire contract will act as a compass you can use at any time to ask, is this moving me closer to or further away from what I desire."
Q Thank you, Mr. Kandell. We can put this document aside.
Now, to your knowledge the sales team would track information about leads in Salesforce; is that right.
A Yes.
Q And Salesforce is a tool used by many companies; correct?
A Yes.
Q And that was information that was tracked so that they could keep their connection with potential customers; correct?

A Yes.
Q Now, you testified on direct that Rachel was very good at her job as the lead salesperson; correct?
A Yes.
Q But it was your understanding that Rachel found this job stressful; correct?
A At times.
Q And, to your knowledge, sales goals in particular were stressing her out?
A At times.
Q Is it fair to say that based on your observations, Rachel pushed her team hard yelled at them?
A Yes, at times.

(Continued on the following page.)

BY MR. ROBOTTI: (Continuing.)
Q And she pushed herself equally hard, correct?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Lack of personal knowledge.
THE COURT: You're asking based on his observations, correct?
MR. ROBOTTI: Correct, Your Honor.
THE COURT: Overruled.
A Yes, at times.
Q And based on your observations, she was often the last one working and trying to meet the sales goals, correct?
A Yes.
Q Now, it's fair to say that sometimes she took the stress out on her team, correct?
A Yes.
Q And at times she would be a tough and demanding boss, correct?
A Yes.
Q At times, she could call people names or yell at them, correct?
A Yes.
Q But your understanding was that she was doing that to try to motive them, correct?
MS. BENSING: Objection.

THE COURT: Sustained.

Q There were times where Ms. Cherwitz successfully motived the sales team, correct?

A Yes.

Q And that helped the sales team earn money for the company and for themselves, correct?

A Yes.

Q And if anyone on the sales team did not want to work for Rachel, they could find another job, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q There was always the opportunity to leave the sales team, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q There were OneTaste employees, based on your own observations, that did leave the sales team for a variety of reasons, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, Mr. Kandell, you oversaw the business, correct?

A Yes.

Q You oversaw the payroll, correct?

A Yes.

Q You oversaw hiring and terminations, correct?

A Yes.
Q Based on your observations, there were people who left the sales team, correct?
MS. BENSING: Objection.
THE COURT: Overruled.
A Yes.
Q And fair to say that during your time there, based on your own observations, there were dozens, if not hundreds of people who left the sales team?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Based on your own observations, there were many people who left the sales team, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q All right. Let's look at Defense Exhibit 1BS.
Now, do you recognize this as the employee handbook from October of 2013?
A Yes.
Q And are you familiar with that based on your work at OneTaste?
A Yes.
Q And were you familiar with this at the time you were at the company?
A Yes.

Q And this was given to employees when they joined the company, correct?

A Yes.

Q And is this a fair and accurate depiction of the employee handbook from October 2013?

A Yes.

Q And there were prior versions of this handbook, correct?

A I don't think so. It's possible.

Q And did this -- to your knowledge, were there later versions of this, as well?

A I don't have any information on that.

MR. ROBOTTI: Your Honor, based on this foundation, the defense moves to admit Defense Exhibit 1BS.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 1BS is admitted.

(Defense Exhibit 1BS, was received in evidence.)

Q I'd like to just look at a couple of pages of this handbook.

MR. ROBOTTI: So can we first turn to Page Roman numeral number two. So it's Page 2 of the document.

Q And under forward, you can just read the first sentence under forward.

A OneTaste is unique organization dedicated to teaching about female orgasm and to spreading the practice of orgasmic meditation.

Q All right. And if we can turn to Page 4. And at the bottom there, under at-will employment, this paragraph carries on to the next page. So if we could read that first paragraph.

A Employment with OneTaste is at-will. This mean employees are free to resign at any time with or without cause and OneTaste may terminate the employment and relationship at any time with or without cause or advance notice. As an at-will employee, there is no guarantee that you'll be employed at OneTaste for any specified period of time. The company has the right to manage its workforce and direct its employees. This includes the right to hire, transfer, promote, demote, reclassify, lay off, terminate, or change any term or condition of employment at any time with or without a reason and with or without notice, unless otherwise required by law.

Q All right.

MR. ROBOTTI: And if we can turn next to Page 9.

And if we can blow up, attire and grooming.

Q And if you could just read the first three sentences of that first paragraph.

A It is important for our employees to project a professional image while at work by maintaining appropriate attire and proper hygiene. OneTaste maintains a business casual dress code. Employees are expected to be neat, clean, and well-groomed while on the job.

Q All right. And if we can have you read the first two sentences of the next paragraph.

A OneTaste is confident that employees will use their best judgment regarding attire and appearance. However, management reserves the right to object to any aspect of your dress and hygiene.

Q All right.

MR. ROBOTTI: And then we can step out of that.

And can we blow up the first paragraph under electric communication and internet use. If we could just have you read that paragraph.

A OneTaste operates in a number of locations around the world and technology is a primary way the employees stay connected. Management uses texting, the GroupMe app and e-mail to communicate and interact with employees. Employees are expected to respond to communication from management in a timely manner. Regular text responses -- regular text response time tests will be completed by manager. Staying connected via technology mediums allows for the team to stay connected in orgasm. This is essential to the success of OneTaste and OneTaste employees and affiliates.

MR. ROBOTTI: And can we go to Page 17, lastly. And under time off, can we first look at that first paragraph there.

Q And could you just read the first sentence.

A To schedule vacation time, employees should request the time off from their supervisor with as much advance notice as possible.

MR. ROBOTTI: And then if we can blow up, checking voicemail and e-mail.

Q And if you could just read that paragraph.

A We strongly believe employees should devote their vacation time to rest and relaxation. Doing so allows employees to recharge their batteries and generally make for a more productive workforce. Accordingly, employees who are on vacation are not expected to check their voicemail or e-mail when away from the workplace.

Q All right. Thank you. And we can put that document aside.

Now, as lead salesperson, Rachel was not in charge of company finances, correct?

A Yes.

Q And based on your interactions with Rachel, she did not have a good handle on the financial issues facing the company?

A Yes.

Q And Rachel was not in charge of making payments to Reese Jones, correct?

A Yes.

Q Now, the Government showed you an e-mail yesterday where Rachel said she would use her witchy magic to calm down Reese

Jones.

Do you remember that?

A Yes.

Q And your understanding was that witchy magic did not mean sexual services in that e-mail, correct?

A Yes.

Q And you also understand that Rachel was not an actual witch, correct?

A Yes.

Q All right. So let's go back to the coaching program for a couple of minutes.

So you mentioned the coaching program had outside speakers; is that right?

A Yes.

Q And those were people not associated with OneTaste, correct?

A Yes.

Q And OneTaste paid them to participate in the program, right?

A Yes.

Q Now, during OneTaste coaching programs and events, the company often played communication games; is that right?

A Yes.

Q And you're familiar with those based on your involvement in the program, right?

A Yes.
Q And one common game during your time there was the hot seat, correct?
A Yes.
Q And the hot seat is where one person gets the full room's attention, correct?
A Yes.
Q And people in the room can ask the person any question they want, right?
A Yes.
Q And the person running the game pulls the person off that hot seat when they perceive there's a peak, correct?
A Yes.
Q Another exercise that was done during the coaching program was the, let out the beast exercise, correct?
A Yes.
Q And that was first done in CP5; is that right?
A Yes.
Q And you spoke about letting out the beast yesterday on direct, correct?
A Yes.
Q So the idea of this exercise was to put on loud music and be coached to let your anger out, right?
A Yes.
Q And it was a controlled environment for about 20 minutes,

correct?
A Yes.
Q Participants could scream and yell; is that right?
A Yes.
Q And they could punch the air or foam?
A Yes.
Q And the goal was to get in touch with their anger and help students get in touch with their anger, correct?
A Yes.
Q And during this exercise, OneTaste used safe words, right?
A Yes.
Q And that's the green, yellow, red system that we've talked about, correct?
A Yes.
Q And to your knowledge, while you were present during these exercises, nobody used red, correct?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: As to which person, during which timeframe, at which course.
THE COURT: Overruled.
Q You could answer.
A I don't remember any time anyone used -- said red during those exercises.

Q And the practice of OneTaste was that if someone said red, they would be pulled out and coached, correct?
A Yes.
Q And if a student wasn't full green at the start, OneTaste practice was to set that person up with a coach, correct?
A Yes. Everyone had a coach.
Q Now, you testified about OM demonstrations on direct, correct?
A Yes.
Q And you participated in hundreds of live demos during your time at OneTaste?
A Yes.
Q And there would be live OM demonstrations at certain courses and events, correct?
A Yes.
Q And OM demos were seen as a symbol of status or progression in the company, correct?
A Yes.
Q They weren't meant for anyone in the beginning of their practice, right?
A Yes.
Q And as a person became more advanced in her practice, she might be asked to demonstrate in front of the class, correct?
A Yes.
Q And this is kind of the equivalent of seeking a brown or

a black belt in karate, right?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Would you use karate as an analogy to describe this?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance.

THE COURT: Overruled.

A I have used karate to explain this, yes.

Q And in your view, you would view this demonstration as the equivalent of seeking a brown or a black belt in karate, correct?

A Yes.

Q And you had to demonstrate a specific level of skill to progress, correct?

A Yes.

Q And it was seen as an honor within the organization to be asked to do this, right?

A Yes.

Q And it was something staff members within the company often sought out and requested to do, correct?

A Yes.

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance.

THE COURT: Sustained.

Q Now, during OM demonstrations, the strokee is taught to project her orgasm into the room?

A Yes.

Q And OneTaste taught that during an OM, other people can feel energy in the room, correct?

A Yes.

Q And again, the practice is about the human connection, right?

A Yes.

Q Now, as someone who has done hundreds of OM demonstrations, you believe that to be true, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Have you felt the energy projected in a room during OM demonstrations?

MS. BENSING: Objection.

THE COURT: Sustained.

Q During OM demonstrations, have you observed coaches push the strokee in the live demo to project that energy?

A Yes.

Q And your understanding that was to help the strokee connect with the people in the room, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, when you viewed OM demonstrations, they can be emotional, correct?
A Yes.
Q And you've seen different people react differently to demonstrations, correct?
A Yes.
Q You've seen people happy afterwards, correct?
A Yes.
Q Or appear relieved or exhausted, correct?
A Yes.
Q And you've seen people cry, correct?
A Yes.
Q You've seen that whole range of emotions after OM demonstrations, correct?
A I have.
Q All right. I'd like to turn back to 1080 for a moment.
And you oversaw 1080 during your time at OneTaste, correct?
A Yes.
Q And you also lived there, correct?
A Yes. On and off.
Q Now, for OneTaste employees who lived at 1080, they were free to come and go as they pleased, correct?
MS. BENSING: Objection.
THE COURT: Sustained.

Q You were familiar during your time -- well, let me withdraw that.

While you lived at 1080 you observed other employees who lived there, correct?

A Yes.

Q The employees that you observed while you lived at 1080, they were free to come and go as they pleased, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q When you lived at 1080, you were free to go come and go as you pleased, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Were there any restrictions on your travel there?

A As long as it didn't interrupt my job, I could be -- I had free time. Rarely, but I had some free time, yes.

Q So you could travel, correct?

A Not with my schedule. But yes, theoretically, I could travel.

Q And you were not instructed to cut off contact with your family, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q You were able to use the internet, sign on to social media, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

MR. ROBOTTI: Your Honor, to intent and knowledge.

MS. BENSING: The objection is to relevance, Your Honor.

THE COURT: Sustained.

MR. ROBOTTI: Your Honor, may we a sidebar, briefly?

THE COURT: We can take this up at the next break. You can move onto the next area.

Q Now, you testified about the culture of OneTaste yesterday, correct?

A Yes.

Q And so is it fair to say that there was peer pressure in the company to work harder?

A Yes.

Q And there was peer pressure to stay up late to make sure sales were made?

A Yes.

Q And to work long hours to close sales, correct?

A Yes.

Q There was some peer pressure to integrate the OM practice into your life?

A Yes.

Q And as you testified on direct yesterday, OneTaste could feel like high school at times, correct?

MS. BENSING: Objection. Misstates the testimony.

THE COURT: Sustained.

Q Now, you referenced -- well, let me ask it this way: At times, OneTaste could feel like high school, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q In your view, were there cliques at OneTaste?

MS. BENSING: Objection.

THE COURT: Sustained.

Q You testified yesterday that at OneTaste you could fear losing social status, that was kind of like a high school clique situation gone bad, you could lose, you know, being closer to the cool kids.

Was that your testimony yesterday?

A Yes.

Q So there were cliques at OneTaste?

A Yes.

Q And fair to say you were the equivalent of a popular kid?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, to be with the inner circle at OneTaste, you had to be a hard worker in the company, correct?

A Or -- yes. And offer something of value to the company.

Q And you had to believe in the OM practice, correct?

A Yes. And to offer something valuable to the company.

Q And fair to say sometimes you could climb your way into the in-crowd, correct?
A Yes.
Q And other times, you'd be on the outs, correct?
A Yes.
Q And you felt that during your time there, right?
A Yes.
Q And if you didn't like being on the outs, you could leave the company, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q All right. I'd like to talk about a few people who were associated with OneTaste.
MR. ROBOTTI: Can we pull up Government Exhibit 236.
Q And do you recognize this as Chris Hubbard?
A Yes.
Q And you lived in the warehouse with him from 2006 to 2009, correct?
A I think it was 2006 to 2008.
Q Now, your understanding was that towards the end of his time there, he became disenfranchised with OneTaste?
A Yes.
Q And by 2009, as you previously, OneTaste wanted to put in place more business structures; is that correct?
A Yes.

Q And that's because the company was growing, getting more attention, correct?
A Yes.
Q In your view, Mr. Hubbard did not agree with the direction the company was going?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, Mr. Hubard bard was a BDSM expert, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Did you participate in scenes with Mr. Hubbard and Reese Jones?
A Yes.
Q And you helped him run those scenes, correct?
A Yes.
Q And based on your experience with him running those scenes, he was familiar with BDSM, correct?
A Yes.
Q And the scenes that participated -- the scenes that were run with Reese Jones, those were all consenting adults, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q The green, yellow, red scale was used during those scenes, correct?

A Yes.

Q And you went over the scenes ahead of time with participants to make sure that they understood what they were getting into, correct?

A Yes.

Q You observed Mr. Hubbard at those scenes, correct?

A Yes.

Q And he seemed to be enjoying himself, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, after he moved out of the warehouse, Mr. Hubbard sublet an apartment from OneTaste, correct?

A Yes.

Q And that was at 1079 Folsom?

A 1072 Folsom.

Q And when his lease ended, he refused to leave, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q You interacted with Mr. Hubbard at the time his lease ended, correct?

A I don't know if we had a lease, to be honest. We had an agreement, and when asked to leave, he refused to leave.

MS. BENSING: Objection.

THE COURT: Sustained.

Q Did things end on negative terms with Mr. Hubbard?

A Yes.
Q All right.
MR. ROBOTTI: I'd like to next turn to Government Exhibit 208 which is in evidence.
Q Do you recognize this as Christina Berkeley?
A Yes.
Q And you testified on direct that she handled Reese Jones for a time?
A Yes.
Q All right. So I'd like to talk about your knowledge and understanding of that relationship with him.
Now, you lived in the warehouse with her starting around 2007, correct?
A 2006.
Q And you OMed with her, correct?
A Yes.
Q You observed her interacting with Nicole, correct?
A Yes.
Q And she seemed like she wanted to get close to Nicole, correct?
A Yes.
Q And it was your understanding that she was enthusiastic about handling Reese Jones, correct?
MS. BENSING: Objection.
THE COURT: Sustained.

Q So I want to speak about your knowledge and understanding of this relationship.

Was it your understanding at the time that she was enthusiastic about handling Reese Jones?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Did you have a chance to observe her interacting with Reese Jones?

A Yes.

Q Did she seem enthusiastic about that relationship?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, was it your understanding that it was an opportunity for her to handle Reese Jones?

A Yes.

Q And as part of that opportunity, she had the chance to live in a nice house with Mr. Jones, correct?

MS. BENSING: Objection.

THE COURT: Overruled.

A Yes.

Q And it was your understanding that she was free to leave OneTaste during that time, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Have you had the chance to interact with Ms. Berkeley

since leaving OneTaste?
A Yes.
Q And how often have you had communication with her?
A We taught a workshop together afterwards. We communicated frequently for the first year or two after, and then more sporadically in the last seven, eight years.
Q All right. I'd like to show you what's in evidence as Government Exhibit 408.
Do you recognize this person as Michelle Wright?
A Yes.
Q And Michelle showed up to OneTaste around 2010?
A Yes.
Q And you were aware that she was in a relationship with Maddie Carl for a period?
A Yes.
Q And you testified that Michelle and Maddie handled Reese Jones for a time period, correct?
A Yes.
Q And it was your understanding that this was an opportunity for them, correct?
A Yes.
Q Again, they got the opportunity to live in that house, correct?
A Yes.
Q And they got to share a room together there, correct?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Lack of personal knowledge.

THE COURT: Sustained.

Q Was it your understanding at the time that they got to share a room together?

MS. BENSING: Same objection.

THE COURT: Sustained.

Q It was your understanding at the time they were free to leave OneTaste if they did not want to handle Mr. Jones?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, at some point, Ms. Wright, did stop handling Reese Jones and was reassigned to Las Vegas, correct?

A I think she was in Las Vegas first and then went to be are Reese and then I believe she went to Los Angeles.

Q And the Las Vegas position was a promotion within OneTaste, correct?

A Yes.

Q Now, you maintained contact with her since you left OneTaste, right?

A Yes.

Q And she worked for you for a while after she left, correct?

A She did.

Q And you also had a romantic relationship with her after you left, correct?

MS. BENSING: Objection. Relevance.

THE COURT: Sustained.

Q Now, I'd like to show you Government Exhibit 297, which is in evidence.

Now, do you recognize this as Dana Gill?

A Yes.

Q And she lived at 1080 while you were there, correct?

A Yes.

Q And based on your personal interactions with her, were you aware that she had another job?

A Yes.

Q All right. I'd like to show you what's been marked as Defense Exhibit 2AP.

MR. ROBOTTI: This is just for the witness.

Q All right. And do you recognize this as an e-mail between you and Dana Gill on July 8th, 2012?

A Yes.

Q And in this e-mail, you're discussing --

THE COURT: I'm going to need that, as well.

MS. BENSING: And Your Honor, I would object to questions regarding the discussion of this e-mail, as it's hearsay.

THE COURT: Let me just take a look at it.

MR. ROBOTTI: I'm just laying the foundation, Your Honor.

THE COURT: I'm going to sustain the objection.

Q Now, this is an e-mail between you and Dana Gill on July 2012, correct?

A Yes.

Q And is this a fair and accurate depiction of the e-mail between you two?

A Yes.

MR. ROBOTTI: Your Honor, we're going to move this into evidence for the effect on Mr. Kandell.

MS. BENSING: Objection. Hearsay. Relevance.

THE COURT: Sustained.

Q All right. Do you recall -- just putting that e-mail aside for a second.

Do you recall in July of 2012, Ms. Gill telling you she could not --

MS. BENSING: Objection to the obvious hearsay nature of the question.

THE COURT: Sustained.

Q Do you recall a conversation with Ms. Gill in July of 2012, about a mandatory meeting?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Do you recall there that were mandatory meetings at 1080?

A Yes.
Q Do you recall whether or not there were times that Ms. Gill did not attend mandatory meetings?
A I do remember.
Q Okay. And do you recall that there was a time that Ms. Gill did not attend a mandatory meeting because she had another job?
A Yes.
Q And that was something that she told you, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, do you recall on July 2012 there was a time when Ms. Gill could not attend a OneTaste event?
A Yes.
MS. BENSING: Objection as to the relevance.
THE COURT: Overruled as to that question.
You can go to the next question.
Q All right. And was it your understanding that Ms. Gill could not attend that event because she was attending a family obligation?
A Yes.
Q You have no knowledge of Ms. Gill working with Reese Jones, correct?
A I didn't know about that.
Q So you have no knowledge of that, correct?

A No knowledge or no memory.

Q Have you had contact with Ms. Gill since she left OneTaste?

A Yes.

Q And how often?

A Very rare. Two, three times over the last 10 years.

Q Now, I'd like to show you what's in evidence as Government Exhibit 382.

And do you recognize this as Becky Weiner?

A Yes.

Q And also known as Becky Uma?

A Yes.

Q And you met her around 2011, 2012, correct?

A Yes.

Q And she took classes in CP6; is that right?

A Yes.

Q And then joined the sales team, correct?

A Yes.

Q And to your knowledge, did Ms. Uma carefully review her coaching program agreement before signing?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Do you have a recollection of the conversation with Ms. Uma about her coaching agreement?

MS. BENSING: Objection. Calls for hearsay.

THE COURT: Overruled as to his question.

A I don't have a memory of that.

Q Would it refresh your recollection if I showed you a document?

A Yes.

MR. ROBOTTI: Can we show Defense Exhibit 21AA.

THE COURT: I'll need that too.

(Continued on the following page.)

(Continuing.)

MR. ROBOTTI: Sorry, Your Honor. Do you have a copy?

THE COURT: I don't. We are going to get the technology fixed at the break, but I appreciate the copy.

CROSS-EXAMINATION (Continues)

BY MR. ROBOTTI:

Q All right. Now, do you recall at the time having a conversation with Ms. Uma about her contract?

A Yes.

Q Okay. And at the time, was it your understanding that she carefully went through that contract?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Do you recall giving Ms. Uma a discount for the cost of her course?

A Yes.

Q Now, she joined the sales team at OneTaste, correct?

A Yes.

Q And at a certain point you had to have a conversation with her about her sales skills, correct?

A Yes.

Q And you had to put her on probation, correct?

A Yes.

Q Now, you testified on direct examination that Rachel

directed Becky Uma to have sexual relations with Ruwan, is that correct?
A Yes.
Q Now, you were not present for that event, correct?
A I don't remember if I was present or not. I have a memory of it, but I'm not a hundred percent sure.
Q Okay. So, it's possible you heard about that after the fact?
A Yes.
Q And you did not observe Becky Uma and Ruwan, in fact, have sexual relations?
A No.
Q Do you recall that in December 2013 that Becky Uma directed two people to have sex?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Do you have a recollection of an event in December 2013 regarding Becky Uma, Jess and Casey?
A No.
Q Would an e-mail refresh your recollection?
A Yes.
MR. ROBOTTI: I'm going to pull up Defense Exhibit 21-F.
THE COURT: And I'll take that as well. Thank you.

BY MR. ROBOTTI:

Q All right. Now having reviewed that document, does it refresh your recollection about that event?

A Yes.

Q Now, was there an event in December 2013 where Becky Uma --

MS. BENSING: Objection.

THE COURT: Sustained.

Q To your knowledge, did Becky Uma live at the Morellino residence?

A Yes.

Q And that was three nice apartments up in Harlem, correct?

A Yes.

Q And that residence was for people who were very dedicated to the OM practice, correct?

A Yes.

Q That was not for beginners, correct?

A Yes.

Q And you had an OMing relationship with Ms. Uma, correct?

A Yes.

Q And also a romantic and sexual relationship with her for a time, correct?

A Yes.

Q And have you had contact with Ms. Uma since leaving OneTaste?

A Once right after OneTaste, after we -- after I left OneTaste.
Q All right. I'd like to show you Government Exhibit 228, which is in evidence.
(Exhibit published.)
BY MR. ROBOTTI:
Q Do you recognize this as Brooke Scheffer?
A Yes.
Q Is she also known as Anthia Gillick?
A Yes.
Q So, she started participating in OneTaste around 2011 or 2012, correct?
A Yes.
Q And you two had an OMing practice, correct?
A Yes.
Q And a brief sexual relationship, correct?
A Yes.
Q And based on your observations of her, she was very enthusiastic about the OMing practice?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Is it fair to say that she purchased the New York affiliate of OneTaste?
A That was after my tenure. She was preparing at the end of my tenure to purchase.

Q And at that time she was heavily involved in OneTaste, correct?
A Yes.
Q And you understand or based on your interaction with her there was an accident while she was at OneTaste, correct?
MS. BENSING: Objection.
THE COURT: Overruled.
A An accident with her father?
Q Correct.
A Yes.
Q And he was killed in a helicopter accident, correct?
A Yes.
Q And you and other people at OneTaste were incredibly concerned about that, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Do you have an understanding that Ms. Scheffer was good friends with a woman named Clouds at OneTaste?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, Ms. Scheffer returned to OneTaste after her father's funeral, is that correct?
A Yes.
Q And to your knowledge, she was welcomed to stay home if she wanted to, correct?

MS. BENSING: Objection.
THE COURT: Sustained.
Q I'd like to turn to Government Exhibit 629 in evidence.
(Exhibit published.)
Q Sorry, Government Exhibit 254 in evidence.
(Exhibit published.)
BY MR. ROBOTTI:
Q And you recognize this as Ken Blackman?
A Yes.
Q And he was senior management at OneTaste, correct?
A Yes.
Q And he was heavily involved in coming up with the Coaching Program, correct?
A Yes.
Q And shifting the company's focus to sales, right?
A Yes.
Q He left OneTaste in 2014?
A Yes.
Q And you worked with him for several years at OneTaste, this is about 2006, 2007, correct?
A Yes.
Q And he continues to be one of your best friends?
A Yes.
Q So you're still in regular contact with him, correct?
A Yes.

Q I'd like to show you Government Exhibit 260 in evidence.
(Exhibit published.)
Q This is Lianna Lifson?
A Yes.
Q And she ran OneTaste in Boulder, correct?
A Yes.
Q And that location struggled?
A Yes.
Q And ultimately, it was closed, correct?
A Yes.
Q And then Ms. Lifson asked to get another job within OneTaste, correct?
A Yes.
Q And she was relocated to New York -- to New York to run a yoga studio, correct?
A Yes.
Q And she later asked to be taken off of that job?
A Yes.
Q And she was reassigned to be a coach, correct?
A Yes.
Q And then she was later terminated, correct?
A I think that happened after my tenure ended.
Q Do you recall directing Ms. Lifson and Jenny Slusher to have oral sex with a man named Toby?
A No.

Q And do you recall Ms. Lifson telling you she did not want to do that with this man?
A No.
Q To your knowledge, Ms. Lifson had enthusiastically participated in OMs, correct?
A Yes.
Q As well as other sexual activity at OneTaste?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Have you had contact with Ms. Lifson since leaving OneTaste?
A Yes.
Q And how often?
A We were friends from around when I left, she showed up I think August of 2014, until mid 2015. And we had a business venture together, and her partner was a partner of mine in a business together as well.
Q All right. I'm going to show you Government Exhibit 207.
(Exhibit published.)
Q Do you recognize this as Chris Kosley?
A Yes.
Q And he started participating in OneTaste in around 2006?
A Yes.
Q And ultimately, he was given a role doing media

production for OneTaste, correct?
A Yes.
Q And there were problems with him while he was at OneTaste, correct?
A Yes.
Q Specifically, problems with money and drugs?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Personal knowledge on the foundation.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q You oversaw, you oversaw the business, correct?
A Yes.
Q Including Mr. Kosley's employment?
A Yes.
Q And as his boss, you became familiar with the issues he was facing, correct?
A Yes.
Q And those took a toll on his work at OneTaste, correct?
A Yes.
Q And those issues pertained to money and drugs, correct?
A Yes.
Q And you had to fire him a few times, correct?
A Yes.
Q He was permitted to come back though, right?

A Yes.
Q Because he had media production skills that the company needed, correct?
A Yes.
Q And also, because he was generally loved by the community, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Did it factor in your decision to bring him back that he was generally seen as loved by the community?
MS. BENSING: Objection.
THE COURT: Sustained.
Q You testified about an event at Stinson Beach, is that right?
A Yes.
Q And that was something that Mr. Kosley filmed, correct?
A Yes.
Q You were present at that event, correct?
A Yes.
Q There was a New York Times reporter present there, as well?
A Yes.
Q So, this was not some kind of secret ceremony, correct?
A It was not public, but it was no secret.

Q Well, there was press there, correct?
A There was press, yes.
Q And Nicole did an hour-long OM demo there, is that right?
A Yes.
Q And there was a reading, correct?
A Yes.
Q There was also music and a ceremony, correct?
A Yes.
Q And so this was not a typical OM, correct?
A Yes.
Q Now, you testified on direct examination about your relationship with Allyson Wyeth [sic] and Justine Dawson, is that correct?
A Allyson Wyenn.
Q Wyenn, excuse me.
Is that correct?
A Yes.
Q And you testified that Nicole directed you to end both of those relationships, correct?
A Allyson was more of a suggestion, and Justine was more a direction.
Q Okay. And in response, you did end both those relationships, correct?
A Yes.
Q And in retrospect, you think the relationship with

Allyson was not healthy, correct?
A Yes.
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, you believe or you testified that if you did not end these relationships, you would have lost status within the company, correct?
A Yes.
Q And you believed you would no longer have been in Nicole's inner circle, correct?
A Yes.
Q But you recognize that you could have said no, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
MS. BONJEAN: Your Honor, can we have a sidebar?
MR. ROBOTTI: Yes, Your Honor, I'd request a sidebar as well.
THE COURT: Okay. Well, we are going to take our break. We can take our break now, our morning break. Why don't we do that.
I'm going to ask the witness to step down.
(Witness steps down and exits the courtroom.)
THE COURT: Okay. And we'll come back at 10 minutes after 11:00.
Don't talk about the case, keep an open mind. I

will see you in about a little more than 15 minutes.

(Jury exits.)

THE COURT: Okay. Everyone may be seated.

Mr. Robotti, go ahead.

MR. ROBOTTI: Judge, the issue here from my perspective, and I believe from Ms. Bonjean as well, is Mr. Kandell is an alleged co-conspirator. So his intent and knowledge at the time is highly relevant.

THE COURT: But you just asked him whether now he thinks he could have done something differently.

What's the relevance of that?

MR. ROBOTTI: Your Honor, so I just want to talk about the objections that have gone on for the last hour or so.

So, I --

THE COURT: Well, the one was just made and you asked for a sidebar at that point, too.

MR. ROBOTTI: Right.

THE COURT: So, we can go back. Let's deal with the one that's most recent in time.

Go ahead, Mr. Robotti.

MR. ROBOTTI: So, with the question that I was just asking, the Government specifically yesterday elicited testimony about the fact that Nicole directed Mr. Kandell to break up with Justine Dawson and Allyson Wyenn. And I am in

response eliciting testimony that, ultimately, that this was his choice to do so, that he had the ability to leave OneTaste and keep those relationships versus staying there and following the directions.

So, that is the testimony that I'm trying to get at in direct response to what the Government elicited yesterday.

But I do think --

THE COURT: But you said you recognize that he could have said no. That's -- you're asking him at this point in 2025 does he realize he could have said no a certain number of years ago. Right?

MR. ROBOTTI: I mean, Your Honor, throughout this trial every witness who has gotten on that stand has testified about their understanding of their time at OneTaste in retrospect. And so --

MS. BENSING: Your Honor --

MR. ROBOTTI: So, I'm happy to ask him -- so for this one I'm happy to go back and ask him at that time did you have that understanding.

But I do think, more broadly, throughout his entire testimony here we have been trying to establish his intent and knowledge at the time with respect to this conspiracy. It is highly relevant because the Government has alleged him to be a co-conspirator, the key co-conspirator in this case. Whether he intended to commit forced labor, whether he had knowledge

that forced labor was going on.

I just went through and attempted to ask him with respect to every single one of these alleged victims that were supposedly involved with Reese Jones what his understanding of that relationship was at the time. If his understanding at the time was that these people were not being forced to do anything and, in fact, wanted to be doing this, that is key to the defense case here.

So, I really feel over the last hour critical evidence has been shut out of this case.

THE COURT: You haven't laid proper foundations for some of what you're trying to do, if that's what you're trying to do.

But let me hear from the Government.

MS. BENSING: Yes, Your Honor.

With respect to the last question and the objection that is currently before the Court, I think the question plainly called for speculation, among other issues. So that was one of the bases for the Government's objection.

And I think it also goes back to the motion that we filed after Chris Hubbard testified. There are some people in this case who are being called as victim witnesses, and Mr. Kandell is obviously not one of them. Whether or not he feels in 2025 or whether he felt at the time that he could have left is, from the Government's perspective, entirely

irrelevant to the issues that are on trial.

And with respect to his intent to commit forced labor, obviously, the jury has to have facts before it and then the law from the Court. And so his -- I think the series of questions lacked foundation, lacked personal knowledge, called for speculation.

THE COURT: Yes. There were some real problems with the questions. It may not be that the entire subject matter is problematic, but the way the questions were, they just -- the foundation was not there largely.

MR. ROBOTTI: Judge --

THE COURT: But let me ask the Government, and I'll come back to the defense on this, but the jury, of course, is not going to be asked to determine whether Mr. Kandell is guilty of forced labor conspiracy.

But the Government, of course, has identified him as a unindicted co-conspirator, correct?

MS. BENSING: Well, for the Court.

THE COURT: Correct, correct.

MS. BENSING: For the Court's determination.

THE COURT: Not for the jury, yes.

MS. BENSING: As to pretrial ruling.

THE COURT: Correct.

MS. BENSING: But I'm actually not even sure, I need to go back and double check our list, but the co-conspirator

statements that we've sought to elicit, I'm not positive there was even one by Mr. Kandell, but in any event, we do obviously believe he was a co-conspirator.

MS. BONJEAN: Your Honor --

THE COURT: Go ahead, Ms. Bonjean.

MS. BONJEAN: May I voice my objection here?

THE COURT: Yes.

MS. BONJEAN: First of all, he -- he is the person they identified as having an agreement in 2006. There is no one else that is even in -- in that timeframe. He is absolutely an alleged co-conspirator, and they -- the Government's theory is going to be that he and Ms. Daedone in -- in those early years, before Ms. Cherwitz was there and before most of these people were here, entered into an agreement to carry out forced labor.

The fact that we cannot get into what his state of mind was at that time or really any other time is, frankly, absolutely intrusion and obstruction of our Sixth Amendment right to defend this case.

I would also point out that the complainants have routinely throughout this entire trial, over defense objection, refused to identify conduct specific to Ms. Daedone, words specific to Ms. Daedone, and the same for Ms. Cherwitz; routinely going back to OneTaste, the upper management of OneTaste. They have a group of people that they

routinely refer to.

There's been all of this testimony about how the culture of the environment is -- is what caused them to do X, Y and Z. So, to now limit us so narrowly when he was the COO or the CFO, he was the co-founder, of course, he has knowledge about these things. Of course --

THE COURT: You have to lay the proper foundation, though. There's been a lot of very sort of conclusory questions --

MR. ROBOTTI: Judge --

THE COURT: -- and -- go ahead.

MR. ROBOTTI: May I just respond, Judge?

THE COURT: Yes. Go ahead.

MR. ROBOTTI: I asked him with respect to each of these -- I did the same thing the Government does. They put up these photographs and I asked him: Did you testify yesterday that you had a relationship with Reese Jones?

And then I asked him about his understanding of that relationship at the time.

If the Government is going to sit here today and say that they are not going to allege that Mr. Kandell is a co-conspirator with whom the defendants have an agreement, that's something entirely different than we've heard throughout this case.

But if he is a co-conspirator and they are going to

be arguing that he is part of this agreement, we are entitled to figure out what his intent was and to elicit testimony about what his intent was at the time.

These were very straightforward questions about what his understanding was. And I simply do not see how those are objectionable.

MS. BENSING: Your Honor, if I can respond.

THE COURT: Go ahead.

MS. BENSING: Because I do want to be clear. We do believe he's a co-conspirator. We do intend to argue that he conspired with the defendants. So, I want to make that very clear.

And --

THE COURT: That was clear.

MS. BENSING: Thank you.

And so, I just don't think that the questions that are being asked pertain to that. I think that's where the disagreement here is, and I think the questions are improper. They're calling for things that he wouldn't know about. They're calling for speculation.

And for all of the reasons that the Government has objected to the individual questions that were asked, we maintain that those objections are appropriate, even despite the fact that the Government does intend to allege, in light of his testimony yesterday, that he is plainly a

co-conspirator.

MR. ROBOTTI: Your Honor, if he doesn't know or if his understanding is that they were -- you know, there was no relationship with Reese Jones or that it was a relationship that they were enthusiastically a part of, that goes directly to his intent and knowledge as to whether or not these people --

THE COURT: But you're asking something like enthusiastic. That's a very general term.

You need to ask different questions. Or you can continue to do what you've been doing, but the rulings, the rulings stand.

Is there anything else we need to take up at this time?

MS. BENSING: Not from the Government's perspective at this time.

MS. BONJEAN: I think we need to go back and look at the live feed, frankly, so we can make -- you know, there were so many sustained objections that really went to the core of the defense, and I don't think they're all just based on foundation. I know that --

THE COURT: Well, there's relevance. There's foundation. There's the way the question was asked.

There was many different reasons for the sustained objections, but you can go back and look at whatever you want

to look at.

MS. BONJEAN: The relevance objections were not appropriate and they were sustained. And, you know --

THE COURT: I am not going to debate you. So, the rulings are what they are. If you'd like to --

MS. BONJEAN: I understand that.

THE COURT: -- to -- to --

MS. BONJEAN: One other point I'd like to make.

THE COURT: Yes, go ahead.

MS. BONJEAN: I understand the Court's prior ruling on this --

THE COURT: Yes.

MS. BONJEAN: -- but the Court did make a distinction, and this isn't like the situation --

THE COURT: What prior ruling are you talking about, first of all?

MS. BONJEAN: The prior ruling about, the Court's prior ruling about asking witnesses about whether or not certain things didn't happen, right.

THE COURT: Sorry, you've got to be more specific.

MS. BONJEAN: I'm forgetting the case. I'm blanking on it right this second.

THE COURT: Are you talking about the reasonable person standard that was argued and decided -- addressed on December 10th of 2024, or are you talking about something

else?

MS. BONJEAN: Yes, I am talking about that.

THE COURT: Okay. And at that time we talked about whether people were similarly situated.

MS. BONJEAN: Right.

THE COURT: Whether we were going to have a mini trial within a trial. I said there was a lot of evidentiary problems with the theory being suggested. I said the defendants' relevance argument was not persuasive, that they hadn't presented caselaw to support the position as to relevance. I said that even if relevant, there was a real danger that the probative value of any such evidence would be substantially outweighed by a danger of unfair prejudice, confusing the issues and misleading the jury.

I then, of course, said that should the defendants choose to present testimony from other people that were affiliated with OneTaste, it would have to be on issues that are relevant to issues the jury will have to decide and that does not run afoul of Rule 403.

I don't know whether that's what you're talking about or some other ruling.

MS. BONJEAN: No, that's -- that's -- that's hitting on it.

THE COURT: Okay.

MS. BONJEAN: That's the ruling I'm referencing.

THE COURT: Okay.

MS. BONJEAN: But the Government, through their jury instructions and through their entire theory of the case, has opened the door to the culture of OneTaste. That is their theory. They -- they speak very limited -- they've elicited very limited testimony about specific conduct or words of the defendants. They routinely come back to the culture of OneTaste.

And we have a witness up here who is a co-founder of OneTaste, who is intimately familiar with the culture of OneTaste.

THE COURT: From the perspective of a founder, not from the perspective of -- of someone who is similarly situated to the people who have testified, at least some of them.

MS. BONJEAN: Well, I mean are we doing this similarly -- I mean I took the Court's ruling at face value. That's not what I'm -- that's not what I'm talking about at this point. The Court ruled on that issue.

What I'm saying is when -- when he's asked questions about his understanding and what is going down at OneTaste as the COO and as the head of the -- or a co-founder of the company as a so-called leader of the company, so many of those questions were -- were objected to on relevance grounds. And I, frankly, am at a loss for how his perspective would be

irrelevant when the Government --

THE COURT: Well, you have to lay a proper foundation, though. I mean he wasn't everywhere at every time, just for example. Right?

If you're laying a foundation, I think you did get to this with the -- his observing what was happening in some of the programs. That's very different than asking sort of very amorphously and generally.

MS. BONJEAN: His knowledge, you know, is, I think, relevant.

So, in any event --

THE COURT: There's issues of relevance and issues of foundation.

MR. ROBOTTI: Your Honor --

MS. BENSING: And, Your Honor, if I can just briefly respond?

THE COURT: Was Ms. Bonjean done, though?

MS. BONJEAN: Yes. That's fine, Your Honor.

THE COURT: Go ahead, Ms. Bensing.

MS. BENSING: Well, just to close the loop on this.

There have now been hours of testimony on cross-examination with respect to OneTaste culture. They've put in policy documents --

THE COURT: Right.

MS. BENSING: -- et cetera, et cetera.

The questions that the Government was objecting to, some of them were questions that seem to be trying to get into the victim's minds, which are just completely inappropriate, calls for speculation, lack of foundation, all of the reasons that the Government said.

THE COURT: I understood the objections and I made my rulings.

MR. ROBOTTI: Your Honor.

THE COURT: Yes. Go ahead.

MR. ROBOTTI: Just for the record, we join Ms. Bonjean's Sixth Amendment objection that the Court's rulings prohibiting us from getting into Mr. Kandell's state of mind are denying the defense the right to present -- the defendants the right to present a defense.

THE COURT: Does the Government have any response?

MS. BENSING: I just don't think that the questions went to that, Your Honor.

THE COURT: Yes. The problem is with the questions.

In any event, I am going to give you guys about five minutes, maybe, to take a break, if you need to, but we'll start up in a few minutes.

(Recess taken.)

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURT: You can bring the witness back and we'll get the jury as well.

(Witness entered and resumed the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Mr. Robotti, you may continue your examination.

MR. ROBOTTI: Thank you, Judge.

CROSS-EXAMINATION (Continues)

BY MR. ROBOTTI:

Q So, Mr. Kandell, before the break, we were talking about Justine Dawson, correct?

A Yes.

Q And you recall that yesterday you testified that Nicole directed you to end the relationship with Justine Dawson, correct?

A Yes.

Q Now, at the time that happened, your understanding was that you could have said no, correct?

A Yes.

Q You understood at that time that you could have walked away from OneTaste, correct?

A Yes.

Q You understood that you could have chosen the relationship over OneTaste, correct?

A Yes.

Q And at the end of the day, you understood that you were responsible for that decision, correct?
A Yes.
Q Now, before the break, we talked about Christina Berkley, Michelle Wright and Maddie Carl and Alisha Price, correct?
MS. BENSING: Objection. I don't think that --
MR. ROBOTTI: Apologies.
THE COURT: Sustained.
Q So we talked about Christina Berkley and Michelle Wright before the break, correct?
A Yes.
Q And you testified yesterday as well about Alisha Price and Maddie Carl, correct?
A Yes.
Q And you testified that among other people, they were handlers for Reese Jones, correct?
A Yes.
Q And in your role as COO of the company, you were aware of these assignments, correct?
A Yes.
Q And you testified yesterday that you were also aware of the responsibilities of these assignments, correct?
A Yes.
Q And you were aware of the parameters of this role, correct?

A Yes.
Q And as COO of the company, your understanding at the time was that they were free to leave this assignment, correct?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Relevance and lack of personal knowledge.
THE COURT: Overruled.
A Yes, they were free to leave at any time.
Q All right. So, I want to go back to 2014.
That's when you left the company, correct?
A Yes.
Q So in total, you were at the company for about ten years, right?
A Yes.
Q And before we get to why you left the company, let's talk for a minute about why you stayed for a decade. Okay?
So you believed deeply in the company, correct?
A Yes.
Q You believed in the practice of OM, correct?
A Yes.
Q And although you were working hard, you found this to be a fulfilling job, correct?
A Yes.
Q And aside from your belief in the company, you also were

having a great time at OneTaste, correct?
A Yes.
Q You were working with fun and interesting people, correct?
A Yes.
Q You met your best friends there, correct?
A Yes.
Q And you got to work day in and day out with them, right?
A Yes.
Q And you were also working on bettering yourself, correct?
A Yes.
Q You also had OMing practice with numerous persons at OneTaste, correct?
A Yes.
Q Sexual relationships with numerous people, correct?
A Yes.
Q And you've described the experience as just total growth, the best time, the worst times, everything in between, correct?
A Yes.
Q And that you've said that it really formed you as a man, correct?
A Yes.
Q So, fair to say, you felt you had a full life at OneTaste?

A Yes.
Q And at a certain point, you thought you were going to spend the rest of your life doing that job, correct?
A Yes.
Q And fair to say that walking away for you was incredibly hard?
A Yes.
Q And to leave meant walking away from the life you had built, correct?
A Yes.
Q And your relationships and the startup you nurtured and your teaching practice, correct?
A Yes.
Q So, when the direction of the company changed to focus on sales in 2012, you didn't quite agree with the direction of the company, correct?
A In 2012, I did agree with the direction of the company.
Q But over time you felt you didn't agree with where it was going, correct?
A Specifically, I agreed that it was right for the company, it just wasn't right for me.
Q Okay. So this wasn't an overt disagreement you had with Nicole or anything like that?
A No.
Q All right. And you didn't say I have a better idea of

where this should go or anything like that?
A I did not.
Q And you recognized that the company as a for-profit company needed to make money, correct?
A Yes.
Q And the sales team was, in fact, a good business idea for how to make money, correct?
A Yes.
Q But as a personal choice, you didn't want to focus on sales?
A Yes.
Q So, in the summer of 2013, you were also relocated, is that right?
A Yes.
Q And you were living in LA at the time, trying to help open OneTaste in LA, correct?
A Yes.
Q And at the time, OneTaste was expanding into different cities, correct?
A Yes.
Q And so the management of the company often had to be moved from one city to another, correct?
A Yes.
Q And you were going back and forth between San Francisco and LA for a few years, correct?

A Yes.
Q And from 2011 to 2013, you moved back and forth three or four times, is that right?
A Yes.
Q But this time, in the summer of 2013 when you were relocated back to San Francisco, you reacted differently, right?
A Yes.
Q You felt you had a mental shift when you arrived back in San Francisco, correct?
A Yes.
Q And you thought: I don't want to spend the rest of my life doing this?
A Yes.
Q So you spent the next year or so thinking about this, right?
A Yes.
Q And during that time, you started setting up the company for your exit, correct?
A Yes.
Q Fair to say that many of the systems and operations weren't documented processes at that point?
A Yes.
Q And as a young company, you kind of just ran things the best way you knew how, correct?

A Yes.
Q And you were pretty integral to all of these systems, right?
A Yes.
Q So it wasn't going to be easy for a new person to just come in and take over, correct?
A Yes.
Q And you had a lot of responsibilities?
A Yes.
Q A lot to hand off, right?
A Yes.
Q And so you started to show people what to do, correct?
A Yes.
Q And to really try to focus on professionalizing the organization on your way out, correct?
A Yes.
Q And as you testified yesterday, you also waited a year to leave the company so they had the funds to buy you out, correct?
A Yes.
Q So, in July of 2014, you decided to tell Nicole you were leaving, correct?
A Specifically, I told Nicole that I wasn't going to stay my entire life, that I would stay another year or two past July 2014, but eventually, I would go off and do my own thing.

Q Okay. And you did that over lunch in the East Village --
A Yes.
Q -- in New York City, correct?
A Yes.
Q And Nicole Daedone was incredibly gracious, correct?
A Yes.
Q And not long after that, you ended up resigning your position, correct?
A Yes.
Q And by the time you left, the company had become profitable, right?
A Yes.
Q And you did negotiate a favorable severance package, right?
A Yes.
Q Among other things, you got a $372,000 promissory note that matured a few months later, correct?
A Yes.
Q And a payout of $1.35 million over five years, correct?
A Yes.
Q And so, you would say you left the company on pretty good financial terms?
A Yes.
Q And at the time you left OneTaste, you looked back on your experience there as positive, correct?

A Yes.
Q And you sent a departure e-mail to the company on July 31st, 2014, correct?
A Yes.
Q And at the time of your departure, you believed OneTaste had been the best job ever, correct?
A Yes.
Q And that you felt complete with your contribution to the mission, correct?
A Yes.
Q And you believed the process of separation with the company had been built with the same love and care that you had felt while you built the company, correct?
A Yes.

MR. ROBOTTI: No further questions, Judge.

THE COURT: Ms. Bonjean, any cross-examination?

MS. BONJEAN: Just very few. Very brief.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good morning, Mr. Kandell.
A Good morning.
Q My name is Jennifer, and I represent Ms. Daedone.
A Yes.
Q You testified on direct about a darshan. Do I have that

correct?
A Darshan.
Q Darshan, my apologies.
And can you elaborate a little more about what a darshan is?
A My understanding of a darshan, I believe it's a Buddhist term, and it's a group teaching where a teacher sits, often with a Socratic method of teaching, of the students asking questions and the teacher and the participants sharing knowledge.
Q Okay. And did Ms. Daedone routinely hold darshans back in the warehouse days?
A We did for a period of time, yes. It was the warehouse times.
Q And we looked at a transcript, a portion of a transcript for darshan.
Do you remember that?
A Yes.
Q And do the darshans kind of have a theme usually?
A Nicole was a voracious researcher, so she would find things and hear things and often bring the ideas to the darshan to share and to explore.
Q And did you find yourself that darshans were helpful to personal growth?
A Yes.

Q And did Darshans continue later on into the history of OneTaste or the progression of OneTaste, or was it more in the old days?
A I don't have -- I think they ended 2009, 2010.
Q Now, you testified on direct examination about manipulation being used at OneTaste.
Do you remember that?
A Yes.
Q And you also testified that manipulation has a negative connotation.
Do you remember what you meant by that?
A Yes.
Q Can you explain?
A Manipulation -- my opinion, manipulation has a negative connotation that one person does covertly to another.
My personal opinion is that we're manipulating each other constantly, consciously or unconsciously. We're asking for things, we're pouting, we're yelling, we're being human beings with each other.
And so, my belief is that there's a conscious manipulation and unconscious manipulation. And so I have it as value-neutral connected to what's the intention behind it.
Q And I think you also testified that in connection with your work at OneTaste, that manipulation was used towards a higher goal?

A Yes.
Q And that sometimes people were pushed past their abilities, but the intention was to push them to a higher goal.
Was that right?
A Yes.
Q You also testified on direct examination about -- I think the Government asked you about, you know, what techniques were used. And you testified that there were, I believe, threats of like losing your position within the -- in the company.
Is that right?
A Yes.
Q Okay. And when you say "threats," you mean like a fear of losing social status, right?
A Social status, possible income, position, coaching, teaching, doing the OM, you know, the -- the perception of loss or the possible loss.
Q Okay. And you certainly never prevented anyone from leaving OneTaste, right?
A I never prevented anyone.
Q And did you ever see anyone in the upper management at OneTaste prevent somebody from leaving OneTaste?
A We would certainly talk to someone to consider, to hear, but there was never a prevention of someone leaving.
Q Okay. You also used the word "love-bombing."

Can we agree that that wasn't a term that was used back then? Or maybe it was, I don't know.
A No, it was -- it was present back then. It wasn't the popular term it is now, let's say that.
Q Okay. And you testified, I think, that love-bombing is, basically, placing, you know, a significant amount of attention on someone so they feel a particular way, right?
A Yes.
Q Did OneTaste get involved in projects that benefited people outside the community of OneTaste?
A Yes.
Q What were those projects?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Outside the scope and relevance, consistent with the Government's pretrial briefing on this.
THE COURT: Overruled as to this question.
BY MS. BONJEAN:
Q Can you just provide us the names of the projects, if you recall them?
MS. BENSING: Objection.
THE COURT: Sustained.
MS. BONJEAN: Okay.
Q But you would agree that OneTaste tried to help the community on the outside of OneTaste?

A Yes.
Q And was there a program called Fill Up America?
MS. BENSING: Objection.
THE COURT: Sustained.
Q You and Nicole talked about the issues of having a joint community and company, right?
A Yes.
Q And that seems like it was a conversation that went on for, frankly, like years, right?
A Yes.
Q And am I correct that in 2013, there was an actual affirmative announcement of splitting community and company?
A Yes.
Q Like a formal announcement that was made to the entire community?
A Yes.
Q I think you said in 2014, when you were departing OneTaste, OneTaste was -- had revenue somewhere north of $4 million.
Does that sound right?
A Yes.
Q And do you know if or how much the revenue increased following your departure in 2015, 2016, 2017?
A Just what I read in the Inc. 5000. I think it was 11.1 million.

Q Okay. So it continued to increase, right?
A Yes.
Q And when you left OneTaste, you had really devoted almost whatever period of time to that company, right?
A Yes.
Q You put in not just money, but sweat, blood, tears, all of it, right?
A Yes.
Q And you also, you know, made a significant risk by putting in that initial money that you did, right?
A Yes.
Q The Government asked you about an individual who is reflected in Government Exhibit 228.
THE COURT: Do you want it up?
MS. BONJEAN: Yes, please.
(Exhibit published.)
Q This is --
THE COURT: Sorry, it looks like we're having some difficulties with the tech still, but I think everyone gets the idea.
MS. BONJEAN: Okay. I think it's okay on the others.
THE COURT: It's all the same on the others.
Q This is a woman who was -- her name is Anthia Gillick or, at least, one of her names is Anthia Gillick, is that right?

MS. BENSING: Objection.
Q What do you know her as?
THE COURT: Sustained.
You can answer that question.
A I knew her as Brooke, and I also knew her as Anthia, which was her stage name.
Q Okay. So she was an actress?
A Yes.
Q And I think you said you maintained a friendship relationship with her even after you both had departed OneTaste, right?
A Yes.
Q Okay. And did you have any role in her efforts to sell a book or a TV series about OneTaste?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Relevance.
THE COURT: Sustained.
Q Do you have any knowledge about her efforts to sell like a tell-all book or TV series about OneTaste?
MS. BENSING: Objection.
THE COURT: Sustained.
MS. BONJEAN: Okay. Give me one second, please.
THE COURT: Sure.
(Pause.)

MS. BONJEAN: I have nothing further for Mr. Kandell.

Thank you.

THE COURT: Ms. Bensing, any redirect?

MS. BENSING: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. BENSING:

Q Mr. Kandell, you were asked on cross-examination about sales goals set by OneTaste, correct?

A Yes.

Q And you testified that they started at 5,000?

A Yes.

Q And they grew from there?

A Yes.

Q And it's your view that they put people on overwhelm, is that correct?

MR. ROBOTTI: Objection to leading.

THE COURT: Overruled.

A At times, people put people on overwhelm.

Q And your view is that when you are overwhelmed, you lose touch with your core, correct?

A That can happen, yeah.

Q And that's something that you believed happened at OneTaste, correct?

A Yes, occasionally.

Q You testified on cross-examination that information people shared with salespeople was tracked and used to make future sales, correct?
A Yes.
Q And, in fact, you're aware that OneTaste salespeople were trained to take people to their pain.
Do you recall that?
A I'm not familiar with that specific term, or I don't remember that specific term.
Q Is there something that might refresh your recollection?
A E-mail, text message.
MS. BENSING: Your Honor, I'd like to approach the witness, and I can give a copy to the Court as well, with what's been already marked -- and which the defense has -- as Government Exhibit 3163.
THE COURT: Go ahead. Thank you.
MR. ROBOTTI: Your Honor, does the Government have a paper copy for the defense?
MS. BENSING: I have one extra, which I am happy to give to the defense team.
THE COURT: Sorry. Is this the first time you're receiving it, though?
MS. BENSING: No. It's an old marked Government exhibit.
THE COURT: If you need a minute with it,

Mr. Robotti, let me know.

MR. ROBOTTI: Yes. Thank you, Judge.

THE COURT: Or Ms. Bonjean.

MS. BONJEAN: Yes, I need a second.

THE COURT: Go ahead.

(Pause.)

MS. BENSING: We can pull it up on the computer as well.

THE COURT: Just for the --

MS. BENSING: Yes, just for the -- it's not in evidence.

And I'm going to ask the witness to look at page 2 to see whether that refreshes his recollection.

THE COURT: Okay. But give everyone a moment.

MS. BENSING: Of course.

THE COURT: But you can put it on though, before the question.

(Pause.)

MR. ROBOTTI: Your Honor, we object. This postdates his time --

THE COURT: But she's not offering this. She's not offering this.

MR. ROBOTTI: Okay. We object just because it postdates.

THE COURT: And let's wait for the question then.

Okay. Go ahead.
BY MS. BENSING:
Q Mr. Kandell, my question is whether or not this refreshes your recollection that OneTaste salespeople were taught to take clients to their pain?
A I have no memory of this or that specific statement.
Q Your -- you were asked on cross-examination regarding your observations and views of Rachel Cherwitz's sales techniques, is that correct?
A Yes.
Q And it's your view that Rachel Cherwitz had carte blanche with respect to sales, is that correct?
MR. ROBOTTI: Objection to the form, Your Honor.
MS. BONJEAN: Join.
THE COURT: Sustained.
BY MS. BENSING:
Q Well, Mr. Kandell, have you described that Rachel Cherwitz has carte blanche with respect to sales previously?
A I don't believe I described it as carte blanche.
I think a lot of leeway. But to me, carte blanche means total freedom, and that wasn't the case in my experience.
Q And so, you don't recall indicating that she had carte blanche with respect to sales, is that correct?
A I don't remember.

MS. BONJEAN: Objection; foundation.
THE COURT: She asked if he recalled. And I didn't hear the answer.
MS. BENSING: Yes, if he recalled writing that previously.
A I don't remember that.
THE COURT: Overruled. Objection overruled.
MS. BENSING: And I am going to ask the witness to -- if we can pull up for the witness, which is Tab 50 of the Court's binder, Government Exhibit 1852.
BY MS. BENSING:
Q Just take a look at the first page, please, Mr. Kandell.
MS. BENSING: And then I'm going to ask that we turn to page 4 -- sorry, page 5.
A I remember this document now. Yes, I did say "carte blanche."
Q That Rachel Cherwitz had carte blanche to do as she pleased because she provided sales?
A Yes.
Q And that she was impossible --
MS. BONJEAN: Objection. Objection.
THE COURT: Yes, sustained as to the form of the question.
Q Is it your view that she was impossible to control?
A At times.

Q Except for Nicole Daedone, who could control her?
A Yes.
Q Mr. Kandell, you were asked questions yesterday about OneTaste's Ethics Committee.
Do you recall that?
A Yes.
Q And you were asked on cross-examination whether people sent in ethics requests to the committee?
A Yes.
Q You didn't sit on the Ethics Committee, right?
A No.
Q But you sent in requests for exceptions, right?
A Once or twice.
Q Once or twice?
Well, does that include on September 19th of 2009?
A It sounds right.
Q And does that include on March 2nd, 2010?
A Sounds right.
Q And on August 27th, 2012?
A Yes.
Q And on March 27th, 2013?
A I guess so.
Q Is there something that would refresh your recollection?
A All the e-mails.
MS. BENSING: Your Honor, I'd like to hand up to the

witness what's been marked as Government Exhibit 2684, 2685, 2686, 2687, 2688 and 2689.

I've given copies to the defense, and I have copies for the Court.

THE COURT: Thank you.

THE WITNESS: Thank you.

BY MS. BENSING:

Q And I believe I had just asked you about March 27th, 2013, is that correct?

A (No response.)

Q And so I'd ask you to look at Government Exhibit 2685.

A Yes.

Q And so, you sent a request for an exemption from the Ethics Committee on that date, correct?

A Yes.

Q And on September 4th, 2013?

A Yes.

Q And on February 3rd, 2014?

A The one on September 4th, 2013, was not sent in by me. It was sent in by another person.

Q With respect to you?

A With respect to me.

Q And then you were asked for your views, is that correct?

A Yes.

Q And that was approved, correct?

A Yeah -- yes.
Q And another request was sent in with respect to you on February 3rd, 2014, correct?
A Yes.
Q And that request was approved, correct?
A Yes. That wasn't sent by me, though.
Q Okay, but it was with respect to you?
A Yes.
Q And all of the other prior requests that I asked you about, those were approved, too, right?
A Yes.
Q Fair to say that you were never denied approval from the Ethics Committee as far as you can recall, correct?
A That is correct.
Q You testified on cross-examination that OneTaste was a true startup company, correct?
A Yes.
Q And you were asked whether it was typical of startup culture that people were working hard at the company, right?
A Yes.
Q And you said it was?
A Yes.
Q And it's typical for startups, Mr. Kandell, to offer equity to employees, right?
A Stock options.

Q And OneTaste didn't do that to its employees, right?
A That is correct.
Q Instead, you manipulated people, correct?
A Yes.
MR. ROBOTTI: Objection.
Q You had --
THE COURT: Sorry.
MR. ROBOTTI: Objection to leading.
MS. BONJEAN: Foundation.
MR. ROBOTTI: Foundation.
THE COURT: Overruled.
BY MS. BENSING:
Q You were asked a lot of questions on cross-examination today regarding your departure from OneTaste, correct?
A Yes.
Q And when you left, you got $1.3 million, correct?
A Yes.
Q Fair to say that made your departure from OneTaste easier, Mr. Kandell?
A Yes.
Q And you're aware that when other employees of OneTaste left, they were wrecked, correct?
MS. BONJEAN: Objection; form.
THE COURT: Sustained.
MS. BONJEAN: Vague.

THE COURT: Sustained.
Q Fair to say that when other OneTaste employees left, they were financially depleted, correct?
A Yes.
Q And psychologically depleted?
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection.
MR. ROBOTTI: Timeframe; form.
THE COURT: Sustained. Sustained.
BY MS. BENSING:
Q You knew that when OneTaste -- when certain OneTaste employees left the company, that they had rough exits around money, correct?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
MS. BONJEAN: Vague.
MR. ROBOTTI: Timeframe; form.
THE COURT: I mean, sustained as to foundation.
Q Mr. Kandell, you were asked on cross-examination about Christina Berkley.
Do you recall that?
A Yes.
Q And you were aware that her exit from OneTaste -- her exit from OneTaste was what you've called pretty nasty, correct?

MS. BONJEAN: Objection.
MR. ROBOTTI: Objection to form.
MS. BONJEAN: Form.
THE COURT: Overruled.
A Yes.
Q And you're aware that since her departure in 2009, she has still been recovering --
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained. Sustained.
BY MS. BENSING:
Q You were asked on cross-examination about Lianna Lifson.
Do you recall that?
A Yes.
Q And you were asked whether you recalled directing her to engage in any kind of sex acts.
Do you recall that?
A Yes.
Q And you testified during direct examination yesterday that you observed OneTaste leaders direct employees to engage in sex acts.
Do you remember that?
MS. BONJEAN: Objection, misstates.
Q Did you testify --
MS. BENSING: I can restate.

MR. ROBOTTI: Objection; misstates.

THE COURT: Okay. Sustained.

Next question.

Q Did you testify yesterday that you observed OneTaste leaders direct employees to engage in sex acts?

MS. BONJEAN: Object to the foundation.

MR. ROBOTTI: Join.

THE COURT: Overruled.

A Yes.

Q And you can't recall all of the instances in which that happened, correct?

A Yes.

Q Correct that you cannot recall?

A Correct, I cannot recall.

Q You testified on cross-examination yesterday that you denied committing a crime.

Do you remember that?

A Yes.

Q You're not a lawyer, Mr. Kandell, right?

A That is correct.

Q You're not a judge?

A Yes.

MR. ROBOTTI: Objection.

Q You never --

THE COURT: Basis?

MS. BONJEAN: Relevance.

MR. ROBOTTI: Relevance.

THE COURT: Overruled.

BY MS. BENSING:

Q Fair to say, you've never studied federal criminal law?

A Yes.

Q You have not, correct?

A I have not.

Q You're a life coach, correct?

A Mostly business consultant at this point.

Q And you're here testifying before this jury because the Government compelled your testimony, correct?

A Yes.

Q You were asked some questions on cross-examination yesterday about CrossFit and how you used CrossFit to get into shape.

Do you recall that?

A I do.

Q When were you at CrossFit, you went, at most, a few times a week, right?

A Three to four times a week, yes.

Q When you were at CrossFit, you didn't move into a CrossFit communal living space with assigned bedmates, correct?

A No.

Q Nobody assigned you a research partner at CrossFit?
MS. BONJEAN: Objection to the relevance.
THE COURT: Overruled.
A No.
Q Nobody expected you at CrossFit to comply with sales goals from morning to night?
A That is correct.
Q Nobody assigned you to serve as somebody's handler at CrossFit, right?
A That is correct.
Q You didn't have to take care of the sexual needs of CrossFit's investor, right?
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection.
THE COURT: Overruled.
A That is correct.
Q Nobody pulled you over at CrossFit and said: I'd like you to end your relationship or I'm going to end it for you, correct?
A That is correct.
Q You were never directed by anybody at CrossFit to engage in sexual acts because there was negative energy between you and another person, correct?
A That is correct.
Q When you were at CrossFit, were you assigned to sexually

service investors or any patrons of CrossFit?
A I was not.
MR. ROBOTTI: Objection to leading.
THE COURT: Overruled.
A I was not.
Q When you were at CrossFit, were you told to go in debt to pay for it?
A I was not.
Q When you were at CrossFit, were you encouraged to prostitute yourself to pay for it?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
BY MS. BENSING:
Q You were asked on cross-examination about your knowledge that some people on the internet called OneTaste a cult.
Do you remember that?
A Yes.
Q And then you were asked about your own subjective definition of the term "cult," right?
A Yes.
Q Fair to say that you have no idea what the people on the internet meant when they were referencing the word "cult," correct?
A I cannot state what their -- their viewpoints were, no.

Q But OneTaste responded to that, right?
A Yes.
Q It engaged the services of Reputation.com?
A Yes.
Q And it, in fact, spent thousands of dollars for that service, correct?
A Yes.
MS. BENSING: I have no further questions.
THE COURT: Any recross-examination, Mr. Robotti?
MR. ROBOTTI: Yes. Briefly, Judge.

RECROSS-EXAMINATION

BY MR. ROBOTTI:

Q So, Mr. Kandell, you were asked about the Ethics Committee, correct?
A Yes.
Q And about a number of requests that you submitted to the Ethics Committee, correct?
A Yes.
Q And you were asked whether any of those requests were ever denied, correct?
A Yes.
Q Do you remember a request to the Ethics Committee for Karynne Boese?
A Yes.
Q And that request was, in fact, denied, correct?

A I don't remember that.
Q Would a document help refresh your recollection?
A Yes.
MR. ROBOTTI: I'm going to show what's been marked as Defense Exhibit 4-BE.
THE COURT: Do you have a copy for me, Mr. Robotti?
MR. ROBOTTI: Yes, Judge.
THE COURT: Thank you.
Thank you.
BY MR. ROBOTTI:
Q Now, looking at Defense Exhibit 4-BE, does that refresh your recollection that an ethics request for a relationship between you and Karynne Boese was denied?
A She applied and her application was denied, yes.
Q All right. You were asked whether Ms. Cherwitz had carte blanche as a member of the sales team, correct?
A Yes.
Q And as a COO and director of the overall business, you were her boss, correct?
A No.
Q You were the one who was in charge of overseeing the business, correct?
A The operations of the business.
Q Correct.
And Ms. Daedone was also her boss, correct?

A Yes, I would call Nicole her boss.
Q Okay. So there were people that Ms. Cherwitz reported to, correct?
A Yes.
Q You were asked about Ms. Berkley's departure from the company, is that right?
A Yes.
Q And Ms. Berkley actually left OneTaste and started a competing business, is that correct?
A She did.
Q She started a company called Go, correct?
A Yes.
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Outside the scope.
MR. ROBOTTI: On redirect --
THE COURT: Sustained.
BY MR. ROBOTTI:
Q On redirect examination, you talked about her departure from OneTaste, correct?
A Yes.
Q And there was significant friction after her departure as a result of her starting a competing business, correct?
MS. BENSING: Objection.
THE COURT: Sustained.

BY MR. ROBOTTI:
Q You received a grant of immunity from the Government, correct?
A Yes.
Q And that's a significant benefit to you, correct?
A Yes.
Q You testified a little bit about this CrossFit analogy on redirect examination, correct?
A Yes.
Q The purpose of going to CrossFit was to help your personal growth, correct?
A Yes.
Q Just like it was when you went to OneTaste, correct?
A Yes.
Q And at CrossFit, everyone was free to leave, correct?
A Yes.
Q Just like at OneTaste, correct?
A Yes.

MR. ROBOTTI: No further questions.

THE COURT: Ms. Bonjean, do you have any recross-examination?

MS. BONJEAN: I do.

THE COURT: Go ahead.

(Continued on the following page.)

///

RECROSS-EXAMINATION
BY MS. BONJEAN:
Q Mr. Kandell, you received a grant of immunity from the Government, right?
A Yes.
Q Okay. It wasn't from the defense, correct?
MS. BENSING: Objection.
Q And --
THE COURT: Sustained.
Q -- your obligation is to come in here and tell the truth, right?
A Yes.
Q The Government told you that, correct?
A Yes.
Q And you testified that -- on direct examination on questioning by the Government about the Reputation.com services.
Do you remember that testimony?
A I do.
Q Okay. And you also gave your definition of what a cult is on direct examination, right?
A I did.
Q And that was, again, on questioning from the Government, correct?
A Yes.

Q And did you hire Reputation.com's services because you believed the world out there shared your definition of cult?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Well, I guess I'll wait 'til the end of the question.

THE COURT: I think she asked the question. It's ended.

MS. BONJEAN: Yes.

MS. BENSING: Okay. Withdrawn.

THE COURT: Go ahead. You may answer.

A I did not believe that the general public shared my viewpoints on the word "cult."

Q Right.

What was your belief about how the general world viewed the word or perceived the word "cult"?

A They hear cult, they think Davidian Branch, you know. ATF destruction. I think they think of the worst versions of it, Charles Manson, et cetera, et cetera.

And so, the general view on the word "cult" is highly negative.

Q And is that why you hired Reputation.com?

A Yes.

Q You also were asked a series of questions on redirect around CrossFit.

Do you remember that?
A Yes.
Q You joined CrossFit to get in shape, right?
A Yes.
Q They didn't offer you a commune to live in, right?
A They did not.
Q And if they had, you would understand what went along with living in a commune, right?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q When you went to CrossFit, your purpose was to engage in some intense physical activity, correct?
A Yes.
Q And that's what was marketed to you, right?
A Yes.
Q But when you decided to start OneTaste with Ms. Daedone, the purpose was to promote the practice of orgasmic meditation in part, right?
A Yes.
Q It was a sexual wellness company, right?
A Yes.
Q It was also designed to encourage sexual exploration, correct?
A Yes.

Q It was designed to push your boundaries around sexuality, correct?
A Yes.
Q It was designed to create an incubator at The Warehouse where people have different experiences around sexuality, correct?
A Yes.
Q You didn't conceal that from anybody, right?
A We did not.
Q In fact, you marketed it as such, right?
A Some things more overtly than others, but yes.
Q And when people came, they clearly saw what was involved in living in The Warehouse, right?
A People heard about The Warehouse, were intrigued, and then pursued living in The Warehouse.
Q It was actually something that people wanted to participate in, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q And when you showed up at The Warehouse, it was pretty clear that you were living in a communal living space, right?
A Yes.
Q There were no doors around -- around the beds, right?
A That is correct.
Q And also, when people wanted to join 1080 Folsom, the

residence there, they were -- had to apply, right?
A Yes.
Q So, there was an understanding about whether somebody really wanted to live in that type of environment, correct?
A Yes.
Q And that was true for all the OM residences as far as you know, right?
A I don't have information about the OM residences outside my scope.
Q But within your scope, there was no hiding what communal living meant in an OM residence, correct?
A Yes.
Q Okay.
MS. BONJEAN: I have nothing further.
MS. BENSING: Your Honor, I just have one follow-up question with respect to Defense Exhibit 4-BE.
MS. BONJEAN: That's outside the scope.
MS. BENSING: No. Mr. Robotti --
THE COURT: No, it's not outside the scope, and I will allow it.
Go ahead.

FURTHER DIRECT EXAMINATION
BY MS. BENSING:

Q Mr. Kandell, you were asked about Defense Exhibit 4-BE.
Do you recall that?

A Yes.
Q And about whether or not the Ethics Committee denied something with respect to somebody named Karynne Boese?
A Yes.
Q And, in fact, when you followed up with the Ethics Committee, that request was approved, correct?
A Yes.

MS. BENSING: Nothing further.

THE COURT: If there's anything on specifically 4-BE, I would allow you to be heard, but otherwise, we'll move on.

MR. ROBOTTI: Can't resist.

THE COURT: Go ahead, Mr. Robotti.

I didn't hear what you just said, but you're walking, so I assume you have something else.

Go ahead.

FURTHER CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Mr. Kandell, the ethics request between you and Karynne Boese was initially denied by the Ethics Committee, correct?
A Yes.
Q After a time period went by, it was resubmitted, correct?
A Yes.
Q The Ethics Committee considered it, correct?
A Yes.

Q And they approved it, correct?
A Yes.
Q That was the process at OneTaste, correct?
A Yes.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Nothing further.

THE COURT: Okay. The witness may step down.

(Witness steps down and exits the courtroom.)

THE COURT: And the Government may call its next witness.

MS. GUPTA: The Government calls Ken Blackman.

THE COURT: Ms. Gupta, is there anything you want to leave up here for the witness now?

MS. GUPTA: No, thank you.

THE COURT: Okay.

(Witness enters and takes the stand.)

THE COURTROOM DEPUTY: Sir, please step up. Remain standing. Raise your right hand.

Do you solemnly swear or affirm that the answers and testimony you are about to give this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record, spell your last

name slowly, and please use the microphone.

Thank you.

THE WITNESS: My name is Kenneth Saul Blackman. The last name is spelled B-L-A-C-K-M-A-N.

THE COURT: You may proceed, Ms. Gupta.

MS. GUPTA: Thank you, Your Honor.

(Continued on the following page.)

**KENNETH SAUL BLACKMAN**,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GUPTA:

Q Mr. Blackman, do you know someone named Nicole Daedone?
A I do.
Q Do you know someone named Rachel Cherwitz?
A Yes.
Q How do you know Nicole Daedone and Rachel Cherwitz?
A Nicole, I met at an organization that we were students at, and also through working at OneTaste. And Rachel, I met working at OneTaste.
Q What was Nicole Daedone's role at OneTaste?
A She was the leader, the COO, the visionary.
Q And what was Rachel Cherwitz's role at OneTaste?
A It changed over time. She was a teacher, and then later she was head of sales.
Q Do you see Nicole Daedone in the courtroom today?
A Yes.
Q I'll ask you to just identify her.
A She's that woman right there, standing up.

MS. GUPTA: And, Your Honor, we would ask that the record reflect that the witness has identified the defendant,

Nicole Daedone.

THE COURT: Yes.

BY MS. GUPTA:

Q Do you see Rachel Cherwitz in the courtroom today?

A Yes, I do.

Q And I'll ask you to identify her as well.

A She's the woman standing now.

MS. GUPTA: And, Your Honor, again, we would ask that the record reflect that the witness has identified the defendant, Rachel Cherwitz.

THE COURT: Yes.

MS. GUPTA: Thank you.

Q Mr. Blackman, when did you first become involved in OneTaste?

A Around 2008.

Q And what was the nature of your involvement?

A In the beginning, I was just a friend. And later, I became an instructor there, the lead instructor for orgasmic meditation.

Q And did there come a time when you left OneTaste?

A Yes.

Q When was that approximately?

A In late January of 2014.

Q Now, you testified that you met Nicole Daedone initially at another organization.

When approximately was that?
A 2000, 2001, around then.
Q And what was that organization called?
A That was called The Welcomed Consensus.
Q Was there a leadership team at OneTaste?
A Yes.
Q And were you on it?
A Yes.
Q Was Nicole Daedone on it?
A Yes.
Q Was Rachel Cherwitz on it?
A Yes.
Q To your knowledge, did Nicole Daedone ever direct anyone who worked at OneTaste to engage in sexual acts with particular individuals?
MS. BONJEAN: Objection.
A Yes.
THE COURT: Sorry. Sorry. There was an objection. Right, Ms. Bonjean?
MS. BONJEAN: Objection; foundation.
THE COURT: That's sustained.
BY MS. GUPTA:
Q While you were at OneTaste, did you have an opportunity to observe Nicole Daedone?
A Yes.

Q Did you have the opportunity to observe Rachel Cherwitz?
A Yes.
Q And all three of you were members of the leadership team as you testified, correct?
A That is correct, yes.
Q In your capacity as a member of the leadership team and in your observations of Nicole Daedone, did you ever observe her direct anyone who worked at OneTaste to engage in sexual acts with particular individuals?
MS. BONJEAN: Still same objection.
THE COURT: Overruled.
A Can you repeat the question?
Q Yes.
Based on your personal observations of Nicole Daedone and your own knowledge, did Nicole Daedone ever direct individuals who worked at OneTaste to engage in sexual acts?
A Yes.
Q Who did she direct people who worked at OneTaste to engage in sexual acts with?
A That I know of --
MR. ROBOTTI: Objection; time period.
MS. BONJEAN: Objection.
THE COURT: Sustained. Sustained.
Q You were at OneTaste between 2008 and 2014, correct?
A That's right.

Q During that time period, who did you observe her direct people to engage in sexual acts with?
A Three that I know of are --
MS. BONJEAN: I mean, object to the "know of," personal knowledge.
THE COURT: Overruled.
BY MS. GUPTA:
Q You can respond.
A Alisha Price, Michelle Wright and Madelyn Carl.
Q And who did Nicole Daedone direct those individuals to engage in sexual acts with?
MR. ROBOTTI: Objection to foundation.
THE COURT: Overruled.
A Reese Jones.
Q Who is Reese Jones?
A Reese Jones was Nicole's boyfriend and an investor at OneTaste.
Q And how did you know Reese Jones?
A I met him as Nicole's boyfriend, as an occasional student of the classes. And for a time, I also stayed at his house.
Q When approximately did you stay at his house?
A 2010.
Q Where was his house located?
A In San Francisco. It was at the top of Russian Hill.
MS. GUPTA: I'd like to show what's been marked

as -- sorry, what's been admitted as Government Exhibit 56.

(Exhibit published.)

BY MS. GUPTA:

Q Do you recognize this?

A Yes, I do.

Q What is that?

A That's Reese Jones's house.

Q Is that the house that you stayed in?

A Yes.

MS. GUPTA: Could we pull up Government Exhibit 60, which is also in evidence?

(Exhibit published.)

Q Is this part of Reese Jones's house as well?

A Yes, that's the top level.

MS. GUPTA: You can take that down. Thank you.

Q Who else lived there at the time that you lived at Reese Jones's house?

A Nicole lived there -- Nicole lived there. And for a time, I lived there. And for a time, Yia lived there.

Q Yia who?

A Yia Vang.

MS. GUPTA: I'd like to pull up Government Exhibit 205, which is in evidence.

(Exhibit published.)

Q And, Mr. Blackman, who is this?

A This is Alisha Price.
Q This is one of the individuals you mentioned who was directed to engage in sexual acts with Reese Jones?
A That's correct.
MS. GUPTA: I'd like to go to Government Exhibit 408.
THE COURT: Do you want these to be displayed if they're in evidence?
MS. GUPTA: Oh, yes, please. They are in evidence. Thank you.
(Exhibit published.)
BY MS. GUPTA:
Q Mr. Blackman, who is this?
A This is Michelle Wright.
Q And this is one of the individuals you testified who engaged in sexual acts with Reese Jones?
A Yes.
MS. GUPTA: I'd like to go to Government Exhibit 261, also in evidence.
(Exhibit published.)
Q Who is this?
A This is Madelyn Carl, Maddie.
Q And is this also one of the individuals you just testified who engaged in sexual acts with Reese Jones?
A Yes, that's correct.

Q To your knowledge, did Michelle and Maddie have any kind of relationship with each other?
A Yes, they -- for a time, they were a couple, yes.
MS. GUPTA: You can take that down. Thank you.
Q Mr. Blackman, while you were at OneTaste between 2008 and 2014, did you exchange text messages with other people who worked there?
A Yes, quite a bit.
Q Did that include Nicole Daedone?
A Yes.
Q Did that include Rachel Cherwitz?
A Yes.
Q And did that include Yia Vang?
A Yes.
MS. GUPTA: I'd like to show the witness for identification only Government Exhibit 4501.
THE COURT: I don't think I have a 4501. I have additional letters.
MS. GUPTA: Oh, yes, Your Honor. This is thousands of pages, so we didn't print it. It's for identification only and we don't plan to admit it.
MS. BONJEAN: What's it called?
MS. GUPTA: 4501.
THE COURT: In fact, I do have it, I'm told. Thank you.

(Pause.)

BY MS. GUPTA:

Q Mr. Blackman, do you recognize this document?

A I do.

Q What is it?

A This is an output of phone calls -- I mean, sorry, text messages that I -- that were on my phone prior to 2011.

Q And did you at some point provide this to the Government?

A Yes, I did.

Q How did you obtain these text messages in the format that you see in front of you?

A Yes. I was getting a new phone, and at that time there was an app you could use that would actually go to the local database on the phone or on the computer and just actually grab all the records from -- from the phone.

And so, I just created a backup, so that I could go to a new phone.

Q And with respect to the format you see in front of you, is this how you provided it to the Government?

A Yeah, it was just a raw database of -- of texts.

Q Did you alter these messages in any way before providing them to the Government?

A Um, yes. I had deleted some messages from another company that I worked at before -- before OneTaste. So, there was a company called VideoEgg, one word, and I wasn't in

contact with any of those people anymore. I just deleted them from the messages.
Q And to be clear, did you alter the content of these messages in any way?
A No, I did not.
Q Okay.
MS. GUPTA: And if we could just scroll up at the top.
Q What is the date of the first message?
A The date of the first message is September 5th, 2008.
MS. GUPTA: And if we could scroll to the very last page?
Q When did these messages end?
A They end January 30th, 2012.
Q And does this document list the individuals with whom you were texting?
A Yes, it does.
Q Does it include the date?
A Yes.
Q Does it include the time?
A Yes.
Q And does it include the content of the messages?
A Yes, it does.
Q Have you reviewed certain excerpts from this larger document?

A Yes.

MS. GUPTA: I'd like to show the witness only Government Exhibit 4501-FD.

And I have a hard copy binder for the witness, Your Honor.

THE COURT: Go ahead. You can bring it up.

(Pause.)

BY MS. GUPTA:

Q Do you recognize this?

A Yes, I do.

Q What is it?

A These are a text exchange between myself and Nicole Daedone from the larger document that we just looked at.

Q And are these messages only with Nicole Daedone?

A Yes.

Q On what date?

A These are on 2011, February 19th, 2011.

(Continued on the following page.)

BY MS. GUPTA: (Continuing.)
Q And is this a portion or subset of what we just looked at in Government Exhibit 4501?
A Yes, it is.
Q Was it generated the same way given that it's a subset of that document?
A Yes.
Q And the exhibit you see in front of you 4501-FD is this an easier-to-read version than the version that you provided?
A Yes.
Q Is it the same in terms of its substance?
A Yes, it is.
Q Did you review this exhibit prior to come to court today?
A I did.
Q Now, did you and Nicole Daedone ever discuss Daedone's assigning of women to engage in sexual acts with Reese Jones?
A Can you repeat that?
Q Did you and Nicole Daedone ever discuss her assigning women to engage in sexual acts with Reese Jones?
A Yes.
Q Did you discuss that via text message?
A Yes.
Q Is this a fair and accurate depiction of text messages you exchanged with Nicole Daedone on February 19, 2011?
A Yes, it is.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4501-FD.

MR. ROBOTTI: Your Honor, we object on authenticity and completeness grounds due to the unspecified deleted messages.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, all of the above and doctrine of completeness.

THE COURT: Overruled. Let me just ask, though, this document is four pages or two pages?

MS. GUPTA: I'm just double checking myself, Your Honor. I believe it's two pages.

THE COURT: I have some extra pages. I want to make sure that everyone is on the same page. It's just a two-page document. Is that what everyone has?

MR. ROBOTTI: We're trying to pull it up, Your Honor.

THE COURT: Okay, that's fine.

MS. BONJEAN: I have two pages.

MS. GUPTA: Your Honor, just to clarify, I believe you have the demonstrative version and the raw version which perfect --

THE COURT: You're offering the first?

MS. GUPTA: I'm offering the demonstrative version.

THE COURT: The objection is overruled. Government

Exhibit 4501-FD, which is two pages, is admitted.

(Government Exhibit 4501-FD received in evidence.)

(Exhibit published.)

BY MS. GUPTA:

Q Mr. Blackman, looking at this text message exchange, who is speaking on the left?

A On the left is Nicole Daedone.

Q And who is speaking on the right?

A Myself.

Q I'm going to ask you to read your own messages and I'll read Nicole Daedone's.

A Okay.

While I was reading (sic) that, Yia --

THE COURT: I am going to -- are you reading off the screen or off the hard copy?

THE WITNESS: I can use either one.

THE COURT: Just make sure you're reading accurately, please. Go ahead.

A While I was writing that, Yia was giving Robin an extremely warm, sensual kiss. Now she's flirting with Kenan. And now she's kissing him. Now they're closing the door.

Q Oh, my. It takes a lot of love to torturer a man.

A She's fucking consummate as it. It's just a procession of men passing through that room. You'd think she was running a drivethrough sex shop in there.

Q Hilarious?
A Thanks a lot, Nic.
Q I'll trade you problems, Yia for Reese, any day.
A You're on.
Q Okay. You want to make sure Reese gets stroked every day, gets fed and takes a walk every now and then so he doesn't die and I'll make fun of Yia the way she likes.
So, Mr. Blackman, this first message on the top right, Thanks a lot, Nic, who is Nic?
A That would be Nicole, the person I'm texting with.
Q Is that a nickname for her?
A Yes.
Q And when Nicole Daedone says, Okay, you want to make sure Reese gets stroked every day, what do you understand stroked to mean in this?
A Daily getting a handjob.
MS. BONJEAN: Objection. He's not answering the question.
MR. ROBOTTI: And foundation.
THE COURT: Hold on.
Sustained as to the form of question.
BY MS. GUPTA:
Q When Nicole Daedone said, Okay, you want to make sure Reese gets stroked every day, what did you understand her to mean?

MR. ROBOTTI: Objection, foundation.
MS. BONJEAN: Speculation.
THE COURT: Overruled.
A Getting stroked means a handjob. So daily he would get --
MS. BONJEAN: Objection.
THE COURT: Sustained as to the last part.
MS. BONJEAN: Move to strike.
MS. GUPTA: Could we pull up Government Exhibit --
THE COURT: Hold on, give me a minute.
I'll strike the last sentence that he started.
Go ahead you can ask the next question.
BY MS. GUPTA:
Q Based on your discussions with Nicole Daedone around this, time how frequently was Reese getting stroked?
A Daily.
Q By Alisha, Michelle and Maddie as you testified earlier?
A One or the other.
MS. GUPTA: I'd like to show the witness only Government Exhibit 4501-HD.
(Exhibit published to the witness, counsel and the Court.)
Q Do you recognize this document?
A Yes.
Q What is it?
A It's a text exchange between Yia Vang and myself.

Q On what date?
A February 28, 2011.
Q And is this a portion of what you provided to the Government in the larger PDF document we saw Government Exhibit 4501?
A Yes, it is.
Q And, again, is this Government Exhibit an easier-to-read version than the version you provided?
A Yes.
Q Is it substantively the same?
A Yes, it is.
Q Did you review this prior to coming to court?
A I did.
Q You testified earlier that Yia Vang also lived at Reese's house while you lived there?
A Yes.
Q Were there times when you and Yia would discuss your living arrangement?
A Yes.
Q Did you have those discussion over text messages?
A Yes, we did.
Q Is this a fair and accurate depiction of text messages you exchanged with Yia Vang on February 28, 2011?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government

Exhibit 4501-HD.

MR. ROBOTTI: The same objections as before, completeness then the.

MS. BONJEAN: And also hearsay, Your Honor.

MR. ROBOTTI: And hearsay.

THE COURT: I did not hear the last part of what you said Ms. Bonjean.

MS. BONJEAN: Hearsay, in light of the people in the conversation.

THE COURT: Okay. The objection is overruled. Government Exhibit 4501-HD is admitted and, again, this one is just one page.

MS. GUPTA: Correct.

(Government Exhibit 4501-HD received in evidence.)

MS. GUPTA: Could we publish to the jury?

(Exhibit published.)

BY MS. GUPTA:

Q Mr. Blackman, I'll read Yia Vang's portions and I'll ask you to read your own.

Are you going to be at the house all day?

A No, but flexible. What do you need?

Q Maddie and Michelle are coming up to cook at 3. Checking to see if I need to be there. I'll let you know.

What house is Yia Vang referring to?

A Reese Jones' house.

Q And to your knowledge why were Maddie and Michelle coming to cook at Reese Jones' house?

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q Do you know why Maddie and Michelle were coming to cook at Reese Jones' house?

A Yes.

Q Why?

A To cook for him.

Q Was that part of their role?

A Yes.

MS. GUPTA: Can we show the witness only Government Exhibit 4501-KD.

(Exhibit published to the witness, counsel and the Court.)

Q Mr. Blackman, do you recognize this?

A I do.

Q What is it?

A It's a text message exchange between Nicole Daedone and myself.

Q On what date?

A This is on October 31, 2011.

Q And is this another portion or subset of what you provided to the Government in Government Exhibit 4501, the longer PDF document we reviewed?

A Yes, it is.

Q And was it generated the same way given it's a subset of that document?
A Yes.
Q And is this Government exhibit you see in front of you an easier-to-read version than the version you provided?
A It is.
Q But is it substantively the same?
A Yes.
Q Now, you testified earlier that you lived at Reese Jones' house with Nicole.
Were there times when she wasn't present at the residence?
A Yes.
Q Were there times that you provided updates to her regarding Reese and his house while she was absent?
A Yes.
Q Were some of those updates via?
A They were.
Q Did you review this exhibit prior to coming to court today?
A Yes, I have.
Q Is this a fair and accurate depiction of text messages you exchanged with Nicole Daedone on February 21, 2011?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government

Exhibit 4501-KD.

MR. ROBOTTI: Objection on authenticity, completeness, hearsay.

MS. BONJEAN: Join.

THE COURT: Overruled. Government Exhibit 4501-KD is admitted.

(Government Exhibit 4501-KD Exhibit received in evidence.)

MS. GUPTA: Can we please publish to the jury?

THE COURT: And, again, this is one page.

(Exhibit published.)

BY MS. GUPTA:

Q I'll read Nicole Daedone's messages and I'll ask you to read your own.

Just sent. How is the house?

A Writing. Longer response coming, one second. Felt fired up and ignited over the weekend. Big influx of energy. Partly from L.A., I'm sure, and partly from shaking off the next layer of doubt. Moving the next notch into my true role of who I am and decided to own it and live from there. Alisha looks and feels the best I've seen her in months, happy, sane. We had an intimate conversation about all of her feelings in both directions. She expresses joy unabashedly and sorrow without a traits of victimhood, just fully feeling it and letting it go. Michelle has been doing great overall. Nice

to have her in the house. A bit shaky today after, A, being brought into the next stage of play with Reese and, B, something about her relationship with Maddie who I take it is getting cracked open. Lish and I have an eye on her. Michelle. Looking forward to the return of the L.A. crew and thinking of you. Valjean suffered more than anything from his own inner incongruity.

Q Oh, Ken, sounds amazing.

So when Nicole Daedone said "how is the house," what house is she referring to?

A Reese Jones' house.

Q And are Michelle Maddie and Alisha who you described in here the three individuals we just reviewed in Government Exhibit 4?

A Yes.

Q Now, you said regarding Alisha, "she expresses joy unabashedly and sorrow without a trace of victimhood."

What did you mean by "without a trace of victimhood"?

MS. BONJEAN: Objection. Calls for hearsay.

THE COURT: Overruled.

A She had just been let go of --

MS. BONJEAN: Objection, calls for hearsay.

THE COURT: Overruled.

A She had just been let go from her -- the role that she

had with Reese Jones and she was expressing her feelings about that.

Q Then you go on to discuss Michelle and you said, "A bit shaky today after, A, being brought into the next stage of play with Reese and, B, something about her relationship with Maddie."

What did you mean by that?

MS. BONJEAN: Object to the extent it calls for a hearsay response.

THE COURT: Overruled.

A Being brought into the next stage of play with Reese, referring to stroking him. Giving him a handjob and her -- and being -- something about her relationship with Maddie. Maddie is upset because --

MS. BONJEAN: I'm going to object to the extent it calls for hearsay.

THE COURT: Overruled.

A -- because of Michelle's new role with Reese.

Q And you said "Maddie, who I take it is getting cracked open," what did you mean by that?

A Cracked open means that she is having some strong feelings and is being vulnerable and allowing those feelings to come.

Q And why did you have this second message here about Valjean suffering?

A I don't remember.
Q In addition to having women assigned to him, did Reese Jones receive any benefits to your knowledge?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection, foundation.
THE COURT: Sustained, sustained.
MS. GUPTA: I would like to show the witness only Government Exhibit 4501-BD.
THE COURT: Say the letters again.
MS. GUPTA: BD, and this is one page as well.
(Exhibit published to the witness, counsel and the Court.)
BY MS. GUPTA:
Q Do you recognize this Mr. Blackman?
A Yes, I do.
Q What is it?
A A text message exchanges between Rachel Cherwitz and myself.
Q On what date?
A This would be on September 14, 2009.
Q And is this a portion of what you provided to the Government in Government Exhibit 4501?
A Yes, it is.
Q And is this Government exhibit an easier-to-read version than what you provided?
A Yes.

Q Is it substantively the same?
A Yes, it is.
Q And did you review this prior to coming to court?
A Yes.
Q Are you familiar with scenes?
A Yes, I am.
Q What are they?
A A scene is a theatrical production for one particular person where they're the center of attention and the scene is designed to give them a particular experience.
Q Are they sexual in nature?
A They can be.
Q Did people at OneTaste design scenes for Reese Jones while you were there?
A Yes.
Q While you were at OneTaste did you discuss scenes with Rachel Cherwitz?
A Yes, I did.
Q Were any of those discussions via text message?
A Yes.
Q Is this a fair and accurate depiction of text messages you exchanged with Rachel Cherwitz on September 14, 2009?
A Yes, it is.
MS. GUPTA: We move to admit Government Exhibit 4501-BD.

MR. ROBOTTI: Objection, irrelevant, cumulative.
MS. BONJEAN: Join.
THE COURT: Overruled. Government Exhibit 4501-BD, which is one page, is admitted.
(Government Exhibit 4501-BD received in evidence.)
MS. GUPTA: Thank you. If you can publish for the jury.
(Exhibit published.)
BY MS. GUPTA:
Q I'll read Rachel Cherwitz's messages and I'll ask you to read your own.
Do you have the day off on Thursday?
A No, but I'm taking today and tomorrow off this week. What's happening Thursday?
Q Reese's birthday. We're doing a scene. Our part is in the morning. Wanted you to do the OMing part?
A Let's talk about it tonight.
Q Emoji.
Do you recall what scene this was?
A I don't.
Q Was this a scene being conducted for Reese Jones' birthday?
A Yes.
Q And what part were you being asked to do here?
A There's going to be some OMing taking place and they want

me to be the stroker in that.
Q Did you participate in the scene?
A I can't remember.
Q Did anyone else other than Reese Jones receive scenes, to your knowledge?
A Yes, it was a regular thing.
Q Who else would receive them?
A I can't remember.
MS. GUPTA: We can take that down, thank you.
BY MS. GUPTA:
Q During your time at OneTaste between 2008 and 2014 did the company grow?
A Yes, it.
Q And how, if at all, did you see OneTaste grow from the classes that you taught?
A We went from, you know, ten, fifteen, sixteen to 200, you know, 150, 200 people in a course.
Q I'd like to show you for identification only Government Exhibit 4501-AD.
(Exhibit published to the witness, counsel and the Court.)
Q Do you recognize this document?
A Yes, I do.
Q What is it?
A This is a text exchange between Rachel and myself.
Q On what date?

A This would be on July 13, 2009.
Q And is this a portion of what you provided to the Government in Government Exhibit 4501?
A Yes, it is.
Q Was it generated the same way?
A Yes.
Q And is this Government Exhibit an easier-to-read version than the version you provided?
A It.
Q But is it substantively the same?
A Yes, it is.
Q Did you review this prior to coming to court?
A Yes.
Q What was your role at OneTaste at this point in July 2009?
A I was teaching classes. I was teaching more advanced classes than what they had -- than what had been taught there up to that point.
Q What was Rachel Cherwitz's role at OneTaste at this point?
A She was starting to do sales.
Q While you were at OneTaste, did you have discussions with Rachel Cherwitz about selling and filling courses?
A Yes.
Q Were some of those discussions via text message?

A They were.
Q Is this a fair and accurate depiction of text messages you exchanged with Rachel Cherwitz on July 13, 2009?
A It is.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 4501-AD.
MR. ROBOTTI: Objection, I recall.
MS. BONJEAN: Join.
THE COURT: Overruled. Government Exhibit 4501-AD is admitted and it's four pages.
(Government Exhibit 4501-AD received in evidence.)
MS. GUPTA: Yes, thank you.
(Exhibit published.)
BY MS. GUPTA:
Q Mr. Blackman, I'll ask you to read your portions and I'll read Rachel Cherwitz's portions.
A Okay.
Hey, you might hear from Natasha. Beth said she wanted to sign up for a practice too. Oh, well, next time and Rose left me a message still interested and debating and running her withholds.
Q We can put two more people in it. Anthony Mays want to take it. I say we do it.
A It's really tempting, but I would rather not. One, the course would suffer. Two, I'm already thinking about the next

time we run it. I'll be really glad I've got those people in it.
Q How would the course suffer? I'm not clear.
A I don't want any more in it than I've got.
Q So it's a personal thing?
A I'm not sure what that means. Fourteen is a good size for this course. We decided this some time ago.
Q I don't understand why you won't allow more people in the course. It feels weird that I can't get a straight answer.
A Reread the e-mail thread where we talked about it and decided. It's a closed issue.
Q No, Ken, it's not and the fact that you won't engage here is childish. We can handle a lot of people in an OMing course, so what exactly is the issue and why are you being so strict and weird?
A Who is being childish? Who's being weird?
Q Ken, give me an answer. There are people wanting to deepen their OMing practice and you're saying no and won't give a straight answer. Seriously you're going to have to learn how to engage here and not throw back an answer when you don't like something. I'll continue enrolling and not consult you.
A I'll ask them to leave. This isn't the last class ever and stop corrupting the beautiful concept of engagement. I'm engaged. I'm just not doing something you want.

Q You're really unbelievable. This isn't the Ken Blackman show. You're going to need to learn how to work with a team of people and communicate or next time can enroll yourself. You're treating people poorly here and it feels awful. Okay, Ken, and by the way your approach is disgusting. This isn't the Ken Blackman show?
A Reread the e-mail thread and recall the conversations on the topic and how big the course should be.
Q Okay, Ken.
A My approach is disgusting?
Q I don't want to have this conversation over text message. It feels awful. We can talk when you get home and we can sit face-to-face like two friends.
A Okay.
Q So what are you and Rachel Cherwitz discussing here?
A So I'm teaching a new course. It's probably the first or second time I'm teaching it. We've talked about how many people to put in it and there are some extra people that want to be in. From my point of view, the course is full. Rachel is pushing, in an increasingly hostile way, towards signing up more people.
Q And what is your understanding of why Rachel Cherwitz wanted more people in the class?
MR. ROBOTTI: Objection.
THE COURT: Was there an objection?

MR. ROBOTTI: Objection, relevance.

MS. BONJEAN: And also --

THE COURT: As framed, sustained.

BY MS. GUPTA:

Q Did you have any understanding of why Rachel Cherwitz wanted more people in the classes that you just testified to?

A Yes.

Q What was your understanding?

A That she was head of sales and the more sales, the better.

Q And why did you want fewer people in the class?

A Because it was a very intimate course and at that size I knew that I could have good quality attention on every single student. All the students were different and needed attention and that was the size at that time that I knew that I could do a good job.

Q Was it unusual to have this kind of exchange with Rachel Cherwitz?

MR. ROBOTTI: Objection, vague.

THE COURT: Sustained.

Q Did you and Rachel Cherwitz frequently have these types of exchanges about filling courses?

MR. ROBOTTI: Objection, relevance.

THE COURT: Overruled.

A Yes. This was probably one of the first, but this was

ongoing throughout the rest of my time at OneTaste.
Q And would this kind of disagreement be escalated to Nicole Daedone?
A Yes.
Q Why?
MR. ROBOTTI: Objection.
THE COURT: Sustained.
BY MS. GUPTA:
Q Do you know why it would be escalated to Nicole Daedone?
MR. ROBOTTI: Objection.
THE COURT: Sustained.
BY MS. GUPTA:
Q When you had disagreements with Rachel Cherwitz, did Nicole Daedone ever tell you how to handle them?
A Can you repeat the question?
Q When you had disagreements with Rachel Cherwitz like this one, for example, did you ever have conversations with Nicole Daedone where she told you how to handle those disagreements?
A Yes.
Q What did she say?
A Well, there was one conversation in particular where she told all of staff to stop arguing with Rachel, that Rachel was doing what Nicole wanted her to do and all the people who were pushing back on Rachel, objecting to Rachel, disagreeing with Rachel, we should all just do whatever Rachel wants.

Q Mr. Blackman, to your knowledge --

MS. GUPTA: And we can take this down. Thank you.

Q To your knowledge did OneTaste have any policies regarding orgasmic meditation classes and who could be paired for OM?

A Yes.

Q At a high level what's your recollection of those policies?

A That the students were -- we were not going to provide any, like, pairing up. We were teaching them a practice and we would teach them skills to know how to ask for an OM, how to say yes or no to that, but we wouldn't pair them up. They had to actually do the work to find someone they wanted to have an OM with, ask them if they wanted to have an OM, get a yes or no and do all of that themselves.

Q Based on your observations, did Nicole Daedone follow these policies?

MS. BONJEAN: Objection, foundation.

THE COURT: Sustained.

BY MS. GUPTA:

Q Did you have an opportunity to observe Nicole Daedone and Rachel Cherwitz organize OM classes?

A Yes.

Q Based on your observations, did Nicole Daedone follow the policies that you just described?

MS. BONJEAN: Objection, foundation, vague.
THE COURT: Overruled.
A I know of cases where those rules weren't followed.
Q And based on your observations did Rachel Cherwitz follow the policies that you just described?
A The same answer.
MS. GUPTA: I'd like to show for identification only Government Exhibit 4501-ED.
(Exhibit published to the witness, counsel and the Court.)
BY MS. GUPTA:
Q Do you recognize this?
A I do.
Q What is it?
A This is a text exchange between Yia Vang and myself.
Q On what date?
A This would be on October 6, 2010.
Q And what was Yia Vang's role at this time at OneTaste?
A Various things. She was a teacher and handled various things.
Q Did you and Yia Vang teach OM courses together?
A Yes, we did.
Q Did you discuss those courses?
A Yes.
Q Were some of those discussions via text message?
A Yes.

Q And is this document a portion of what you provided to the Government in Government Exhibit 4501?
A Yes.
Q And is this an easier-to-read version than the version you provided?
A It is.
Q But is it substantively the same?
A Yes, it is.
Q And did you review this prior to coming to court?
A Yes.
Q Is this a fair and accurate depiction of text messages you exchanged with Yia Vang on October 6, 2010?
A It is.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4501-ED.

MR. ROBOTTI: Objection to hearsay and cumulative.

MS. BONJEAN: Same.

THE COURT: Overruled. Government Exhibit 4501-ED is admitted.

(Government Exhibit 4501-ED received in evidence.)

MS. GUPTA: Thank you. If we can please publish.

(Exhibit published.)

Q So, Mr. Blackman, I'll read Yia Vang's messages and I'll ask you to read your own.

Hey, I don't think Maddie is here to have OM with

Mark. Is there a backup?
A Hmm, where is she?
Q Out of town. Kim or Aubrey?
A We should ask Maddie to contact him. Aubrey would be good. We could have him ask her.
Q Well, I can't get ahold of her now.
So, Mr. Blackman, who is Maddie here?
A This would be Madeline Carl.
Q Who is Mark?
A Mark was a student. He was buying courses and I was coaching him.

(Continued on the following page.)

(Continuing.)

MS. GUPTA: Can we go to Government Exhibit 267. This is in evidence.

BY MS. GUPTA: (Continuing.)

Q Do you recognize this person?

A Yes.

Q Who is it?

A This is Mark, the Mark that the text exchange refeed to.

Q Did he frequently attend OneTaste courses?

A He did.

Q Did he pay for those courses?

A Yes.

MS. GUPTA: Could we go back to Government Exhibit 4501ED, please.

Q So what is your understanding, if any, of why Yia is trying to find someone to OM with Mark?

MS. BONJEAN: Objection. Speculative. Foundation.

MR. ROBOTTI: Joined.

THE COURT: Overruled.

A Mark is someone who's spending money on courses, on personal coaching, he's a money maker.

Q And when Yia asked, Is there a back up, what did you understand her to mean?

A That she wants to find someone else for him to OM with.

Q Was this in line with OneTaste policies, Mr. Blackman?

A Not official policy, no.
Q Why not?
A In general, we -- our policy was not to find partners for people.
Q And is that what you and Yia Vang are trying to do here?
A Yes.
MS. GUPTA: We can take that down. Thank you.
Q As a member of the leadership team, did you have a general understanding of OneTaste's financial situation?
A A general understanding, yes.
Q And what was your understanding of how OneTaste was funded?
MS. BONJEAN: Objection. Foundation. Vagueness.
THE COURT: Sustained.
MS. BONJEAN: And time period.
THE COURT: Sustained.
Q While you were at OneTaste between 2008 and 2014, did you have any understanding of how OneTaste was funded in its earlier years?
MS. BONJEAN: Same objection.
THE COURT: Overruled.
A Yes.
Q At a high level, what was your understanding of how it was funded?
A That a lot of money was coming from Reese Jones, among

other people.

Q Were there ever discussions regarding paying Reese Jones back?

A Yes.

Q And how, if at all, was Reese Jones' contributions reflected in OneTaste's business?

MS. BONJEAN: Objection. Vagueness.

THE COURT: Sustained.

Q Well, was the money that Reese Jones provided to OneTaste at all reflected in OneTaste business?

A Yes.

Q Based on your personal experience?

A Yes.

MS. BONJEAN: Same objection.

THE COURT: Sorry. What was the basis, Ms. Bonjean?

MS. BONJEAN: It's vague.

THE COURT: Sustained.

MS. GUPTA: I'd like to show the witness for identification only 4501DD.

Q Do you recognize this?

A I do.

MS. BONJEAN: Can you -- one second, please.

MS. GUPTA: Oh, sure. It's DD.

MS. BONJEAN: DD?

MS. GUPTA: Yes.

MS. BONJEAN: Thank you.

Q Do you recognize this?

A I do.

Q What is it?

A This is a text exchange between myself and Rachel Cherwitz.

Q On what date?

A This would be on May -- sorry, June 22nd, 2010.

Q And is this a portion of what you provided to the Government in Government Exhibit 4501?

A It is.

Q Is this an easier-to-read version than the version you provided?

A Yes, it is.

Q But is it substantively the same?

A Yes.

Q And did you review this prior to coming to court today?

A Yes.

Q Now, you testified that Reese Jones provided financial contributions to OneTaste.

Did you discuss the topic of paying Reese Jones with Rachel Cherwitz?

A Yes.

Q Was that topic discussed via text message?

A Yes, it was.

Q And is this a fair and accurate depiction of text messages you received from Rachel Cherwitz on June 22nd, 2010?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 4501DD.
MR. ROBOTTI: We object as to cumulative.
MS. BONJEAN: Join.
THE COURT: Objection overruled. Government Exhibit 4501-DD is admitted.
(Government Exhibit 4501-DD, was received in evidence.)
Q And Mr. Blackman for this --
MS. GUPTA: Oh, I'm sorry. Could we please publish. Thank you.
(Exhibit published.)
Q And Mr. Blackman, for this one, I'll just read Rachel Cherwitz's text messages and then ask you some questions.
A Okay.
Q Hi guys. Great news. We a new money game. We need to pay Reese $27,000 by July 1st, so let's go get them. As of today, please text me all the money transactions coming in. Thanks. Go team, go.
What did you understand Rachel Cherwitz to mean by, we have a new money game?
A So we've come to some sort of agreement about how to pay

Reese back and we now have an amount and a deadline that we -- that we've agreed to to start pay him back.

Q Okay. And I'm just going to read the next message.

Okay guys. We're going to run our first 10-day coaching intensive August 27th to through September 5th. People five at $5,000 equals $25,000. So let's aim and direct our energy in that direction. Let me know if you have any questions. Go team, go. XO.

What was the coaching intensive, Mr. Blackman?

A That was a course that we had designed.

MS. GUPTA: We can take that down. Thank you.

Could we show the witness for identification, only, Government Exhibit 4501JD.

THE COURT: And after this exhibit, we're going to do our lunch break.

MS. GUPTA: Sure. Thank you.

Q Do you recognize this?

A I do.

Q What is it?

A This is a text exchange between Nicole and myself.

Q On what date?

A April 25th, 2011.

Q Is this a portion of what you provided to the Government in Government Exhibit 4501?

A Yes, it is.

Q And is this an easier-to-read version than the version you provided?
A Yes.
Q But is it substantively the same?
A Yes.
Q Did you review this exhibit prior to coming to Court today?
A Yes.
Q As part of your role on leadership team, Mr. Blackman, did you and Nicole Daedone discuss investments in OneTaste?
A Yes.
Q Were some of these discussions via text message?
A Yes, they were.
Q And is this a fair and accurate depiction of text messages you exchanged with Nicole Daedone on April 25th, 2011?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4501JD.

MR. ROBOTTI: Same objection. It's cumulative.

MS. BONJEAN: Same objection.

THE COURT: Objection overruled. Government Exhibit 4501-JD is admitted.

(Government Exhibit 4501-JD, was received in evidence.)

MS. GUPTA: Thank you. If we can please publish.

(Exhibit published.)

Q Mr. Blackman, I'll read Nicole Daedone's messages and I'll ask you to read your own.

I had Justine ask Benjamin to borrow 20K for OneTaste.

A Okay. Good to know. I'll let you know what, if anything, comes up his sessions. He's out of town for a week.

Q And invited him to invest 300K with no paperwork, but we'll get percentage.

I think there's one more message from you.

A Okay.

Q Mr. Blackman, who is Justine?

A That would be Justine Dawson.

Q And what was her role in OneTaste at the time?

A She was on the leadership team.

Q And who is Benjamin?

A Benjamin Buhl. He was a student and someone that I was coaching.

Q When Nicole Daedone stated, And invited him to invest 300K with no paperwork, but will get percentage, what did you understand her to mean by that?

MS. BONJEAN: Objection. Foundation. Speculation.

THE COURT: Overruled.

A That there wasn't going to be a contract or anything, it

would just be a verbal agreement, no paperwork, under the table.

MS. BONJEAN: Objection to the characterization. Agreements can be verbal.

THE COURT: Overruled.

MS. GUPTA: And Your Honor, I was just about to move to another exhibit. So if you wanted to take a lunch break.

THE COURT: Yes. I think we do. I'll ask the witness to step down for the lunch break.

(The witness steps down.)

THE COURT: Okay. And we'll come back at five minutes to 2:00. Enjoy your lunch. Don't talk about the case. Keep an open mind.

(Jury exits the courtroom.)

THE COURT: I just wanted to go back to the jury note from this morning. And if anyone has any thoughts, my initial thought would be just to tell the jurors that during jury selection before Judge Marutollo, he told that you the trial was likely to last for approximately six weeks, and that remains an accurate estimate. But I will not tell them that if that is not correct.

So let me hear from the Government and from the defendants, and you can let me know if you have a different proposal.

MS. BENSING: Well, I think that would be safe. I

think the question is how long the defense case might be at this point. If the Court wants to perhaps give them a shorter estimate. But I think --

THE COURT: No. I don't think I want to give them a shorter estimate.

MS. BENSING: Understood. So I think the question is how long the defense case would be. I think the Government hopes to rest on Friday or perhaps on Monday, depending on the pace of cross-examinations. But we are at the end of our case, and so I think the question then is a defense case. They did narrow their defense witness list, still around 20 people on the defense witness list. So if that is the case, then if they really anticipate calling 20 people, I think we could be here longer. I just don't know.

MS. COHEN: Your Honor, we anticipate it will finish within the six weeks. It could be earlier. I agree with you we should not say that. We do have 20. We've narrowed it down. Obviously, there were witnesses this week, and so we're still assessing, and we will continue to narrow it down. But we just wanted to give the full extent of people that we may call.

THE COURT: Okay. Ms. Bonjean, are you generally in agreement with what you've heard?

MS. BONJEAN: I'm generally in agreement. I think it's appropriate to say we're on track or something of that

nature.

THE COURT: Okay. I'll say what I suggested I would say. I think that's the safest at this point, and it sounds accurate. So as that's what we'll tell them. I'll tell them at the end of the day.

All right. I'll see everyone at five to 2:00.

(A recess was taken.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All ruse.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: If we could bring back the witness and the jury.

MS. BONJEAN: Your Honor, I know it's not exactly how you want to do things.

There were things that came up during direct.

THE COURT: That's fine.

MS. BONJEAN: I have some material to give you.

THE COURT: That's fine thank you.

And the Government has them as well, or no?

MS. BONJEAN: I'm going to give them, too.

THE COURT: Okay. Thank you.

You can just come back up here, sir.

(Witness entered and resumed the stand.)

(Jury enters.)

THE COURT: You all may be seat.

And, Ms. Gupta, you may resume your examination.

MS. GUPTA: Thank you.

(Continued on the following page.)

///

**KENNETH SAUL BLACKMAN**,

previously called as a witness by the Government, having been previously duly sworn/affirmed by the Courtroom Deputy, was examined and testified further as follows:

DIRECT EXAMINATION (Continues)

BY MS. GUPTA:

Q Mr. Blackman, I'd like to show you for identification only, Government Exhibit 4501-GD.

Do you recognize this?

A Yes.

Q What is it?

A This is a text exchange between Nicole and myself.

Q On what date?

A On February 27th, 2011.

Q And is this a portion of what you provided to the Government in Government Exhibit 4501?

A Yes, it is.

Q And is this Government exhibit an easier-to-read version than the version you provided?

A Yes.

Q But is it substantively the same?

A Yes, it is.

Q And did you review this exhibit prior to coming to court today?

A I have.

Q While you were at OneTaste as part of your role on the leadership team, did you and Nicole Daedone ever discuss her goals for OneTaste?
A Yes.
Q Did you ever discuss those goals via text message?
A Yes.
Q And is this a fair and accurate depiction of text messages you exchanged with Nicole Daedone on February 27th, 2011?
A Yes, it is.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4501-GD.

THE COURT: Any objection?

MS. BONJEAN: One second, Your Honor.

THE COURT: Sure.

(Pause.)

MS. BONJEAN: Your Honor, we have objection to the extent that this actually is -- this is rank hearsay. It's one comment of Ms. Daedone, which is not the purpose of them bringing this in. If you look at it, it's just Mr. Blackman's, it's just Mr. Blackman's statements.

THE COURT: That's okay. I don't think that's correct, but I will sustain and allow you to lay a foundation.

MS. GUPTA: Thank you, Your Honor.

Q Mr. Blackman, you were just testifying that as part of

your role on the leadership team, you and Nicole Daedone discussed her goals for OneTaste.

Is that right?

A Yes.

Q Did she ever tell you what her goals for OneTaste were?

A Yes.

Q What did she say?

A We had conversations about wanting to grow the business, wanting to grow it to 10,000 people, wanting to bring back the concept of a mystery school.

Q And what is a mystery school?

A A mystery school is like underground -- it's like a secret -- it's like a secretive school club, kind of like they had in Roman times. There was like mystery -- mystery groups, mystery schools that would teach stuff that wasn't talked about publicly.

MS. GUPTA: And, Your Honor, we would now renew our motion to admit Government Exhibit 4501-GD.

THE COURT: I want to make sure that Ms. Bonjean is looking at the same thing.

This is a document where it's more than just one statement, correct?

MS. GUPTA: Correct.

MS. BONJEAN: Maybe I'm not, but I see --

THE COURT: Maybe you could just make sure that

Ms. Bonjean has the right document.

MS. GUPTA: Yes.

(Pause.)

MS. BONJEAN: Okay. So, my objection remains that apart from one line, these are statements of Mr. Blackman, which constitute hearsay.

Now, the Government just said they're not coming in for the truth, so I don't know if that's how they're offering them, but I would maintain that they are hearsay. They're irrelevant on top of it. And, again, they're just statements of him.

MS. GUPTA: Your Honor --

MR. ROBOTTI: We join.

MS. GUPTA: -- to clarify, we're not offering Ken Blackman's statements for his truth.

THE COURT: Okay.

MS. GUPTA: These are --

THE COURT: Go ahead.

MS. GUPTA: Sorry.

THE COURT: No, go ahead. All right. Overruled. Government Exhibit 4501-GD is admitted.

(Government's Exhibit 4501-GD was received in evidence.)

MS. GUPTA: Thank you.

Can we please publish to the jury?

(Exhibit published.)

MS. GUPTA: Sorry. I just want to check before I begin.

Do the jurors have it on their screen?

Okay, great.

BY MS. GUPTA:

Q So, Mr. Blackman, I'll ask you to read your statements and I'll read Nicole Daedone's.

A The primary purpose of OneTaste as an entity is to provide a steady supply of students to the mystery school. If we had a ready supply of mystery school students, then OneTaste would simply be a mystery school. That's what it started out as, and the reasons that didn't succeed are the same as the underlying motivations that OT evolved into something different and became a separate entity from the mystery school.

Does that sound right?

What if we designed OT as a prep school for potential mystery school students?

That's, basically, what our poster suggests. The personal evolution of one's practice is from orange to OT to mystery school.

Q And to create passive income?

A Right.

Q So, Mr. Blackman, when you refer to mystery school here,

what are you referring to?
A Well, prior to my time at OneTaste, apparently that there --
MS. BONJEAN: I'm going to object to relevance and "apparently."
THE COURT: Sustained.
BY MS. GUPTA:
Q So, Mr. Blackman, based only on this text exchange, what are -- what are you referencing as mystery school?
A A secretive school where we teach stuff -- secretive things, like esoteric things.
Q Esoteric things like what?
A I would have a hard time answering that.
Q And you said that OT evolved into something different and became a separate entity from the mystery school.
What did you mean by that?
A Well, like a mystery school is -- is secretive, so you can't advertise it. You can't grow. You can't have lots of -- it's hard it's hard to get people in.
So, OneTaste and OM, in particular, became a product that we could use to sell to bring people into the community, into the courses, and then those people would be potential customers of the mystery school or members of the mystery school.
Q And then Nicole Daedone stated: And to create passive

income.
What did you understand that to mean?
A That OneTaste was a money-making -- it was a business. It was a business. It was a money-making business and she wanted passive income.
MS. GUPTA: We can take that down. Thank you.
BY MS. GUPTA:
Q Mr. Blackman, while you were at OneTaste, did there come a time when Nicole Daedone used your personal credit card?
A Yes.
Q How much money did she spend on your personal credit card?
A Approximately $10,000.
Q What did she purchase?
A Just living expenses. We would go out to eat or just -- living expenses.
Q And were these her own personal expenses?
A Sometimes, yes.
Q Are you familiar with someone named Beverly Daedone?
A Yes.
Q Who is she?
A She is Nicole Daedone's mother.
Q Did you ever see her working at OneTaste?
A No.
Q While you were at OneTaste, did you move to Las Vegas at

any point?
A I did, in 2012.
Q And what was your job in Las Vegas?
A We wanted to start a new OM community there. I -- my purpose there was to teach courses and to support the two women who were -- who were also there to build the OM community.
Q And who were those women?
A Michelle Wright and Rosa something, I don't remember her last name.
Q And what was Michelle Wright's role in Las Vegas at that time?
A To enroll -- to get people interested, to invite them to our free evening events where we would play communication games, and to sell them into courses and to generate a -- an OM community.
Q Were you and Michelle trying to recruit clients in Las Vegas?
A Yes.
Q Were there any clients, in particular, that you and Michelle Wright tried to recruit?
A We were very interested in Tony Hsieh. Tony Hsieh is the -- the head of or was the head of a company called Zappos that was based in Las Vegas. And that was one of the reasons we were there, because we thought because he was doing very,

very innovative things in his business that he might be interested in OneTaste.

Q And who, if anyone, at OneTaste told you and Michelle Wright to reach out to Tony Hsieh?

A Nicole.

Q You testified that you left OneTaste in approximately January of 2014.

What do you do now for a living?

A I coach couples on relationships.

Q Do you teach OM?

A No, I don't.

Q Are you married?

A Yes, I am.

Q Who are you married to?

A Ana del Castillo.

Q Was she involved in OneTaste at any point?

A She was at one point, yes.

Q Did you meet at OneTaste?

A No, we met years later.

Q Did you overlap at all while you were at OneTaste?

A No, we did not.

MS. GUPTA: Your Honor, may I have a moment?

THE COURT: Yes.

(Pause.)

MS. GUPTA: No further questions.

THE COURT: Any cross-examination? Is it going to be Ms. Bonjean first?

MS. BONJEAN: Yes.

THE COURT: Okay.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Mr. Blackman.

A Good morning -- good afternoon.

Q Yes, it is the afternoon.

My name is Jennifer Bonjean, and I represent Ms. Daedone.

You grew up in Berkley, California, right?

A Yes.

Q And you graduated from college?

A Yes.

Q Are you unsure of that?

A Junior college.

Q You graduated from a junior college?

A That's correct.

Q And did you eventually go to a four-year college?

A I did not.

Q Well, how did you become a software engineer?

A I had skills that Apple needed at the time. I had worked on specific pieces of hardware and software that -- that they needed at the time.

Q I see. So, this was more on-the-job training type of situation?
A Yes.
Q Okay. And you were a nerdy guy, right?
A Sure.
Q You had a hard time relating to women back in these times when you were coming up in your early twenties, right?
A Yes, I did.
Q And as a result, you joined The Welcome Center, right?
A The Welcomed Consensus, that's right.
Q The Welcomed Consensus, is that right?
A Yes, that's correct.
Q And you were looking for ways to connect with women, right?
A Yes.
Q Because you were unsuccessful at doing so in the, like, normative world, right?
MS. GUPTA: Objection.
THE COURT: Sorry, what?
MS. GUPTA: Sorry. Objection to the form.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Well, Welcomed Consensus is a community, right?
A Yes.
Q It's a sexual -- a sexual -- sexually-focused community,

right?
A Yes. And an educational facility, yes.
Q Right. And they practice something called deliberate orgasm?
A Yes, that's correct.
Q Something called "doing"?
A Yes.
Q Okay. And you became a part of that community, at least in part, because you were having a hard time connecting with women outside of that community?
A Yes, I would agree with that.
Q Okay. And you became pretty entrenched in that community, right?
A Yes.
Q You became a teacher there, right?
A Yes.
Q This enabled you to relate to women better, right?
A The training did, yes.
Q Uh-hum. And it enabled you to have sex with more intimacy, right?
A Yes.
Q And who was the leader The Welcomed Consensus?
A A man who went by RJ Testerman.
Q That was your friend, right?
A Questionable.

Q Okay. And he was someone that you looked up to, right?

MS. GUPTA: Objection, outside the scope.

THE COURT: Overruled.

A Early on I did look up to him.

Q Right. And he was a very violent guy, right?

A He was pretty violent, yes.

Q And isn't it true that you eventually left Welcomed Consensus?

A Yes.

Q And that was after Ms. Daedone and Mr. Kandell left, right?

A Yes, years after.

Q Years after, right?

A Yeah.

Q How long were you there?

A Seven, eight years.

Q At Welcomed Consensus?

A Yes.

Q Were you one of the original, like, founding people, community members?

A Of the Welcomed Consensus, no, not at all.

Q Okay. And at some point you connected with Ms. Daedone by reaching out to her on Facebook, right?

A That's correct.

Q And you started hanging out at OneTaste events, is that

correct?
A Yes.
Q And then you eventually started working for OneTaste, right?
A That's correct.
Q And you said Ms. Daedone was a visionary at OneTaste, right?
A Yes.
Q And you, yourself, considered yourself a master stroker, right?
A I would never have used that term, but that term was used for the role that I had.
Q Okay. You would call yourself the person that would be the most accomplished at stroking, right?
A Yes.
Q And then you were hired as an instructor at OneTaste.
You said the lead instructor, correct?
A The lead instructor of orgasmic meditation, yes.
Q All right. And you were -- you were someone who stood up to Ms. Daedone, correct?
A More than other people, yeah.
Q You challenged her, right?
A Sure, from time to time.
Q You were someone who didn't hesitate to disagree with her when she said something that you didn't agree with, right?

A I would say that's correct.
Q Okay. And she listened --
A Sometimes.
Q Right. And she listened to you?
A Sometimes, yes.
Q Sometimes, right?
A (No response.)
Q Now, you said she used your personal credit card and spent $10,000 on it, is that right?
A Yes.
Q Did you give it to her?
A Yeah, I did.
Q Okay. And so, it's not like she stole it from you, right?
A No.
Q Okay. And were you living together when that happened?
A Yes.
Q Now, you mentioned in your testimony that you knew that Ms. Daedone had directed Alisha Price, Michelle and Maddie to engage in sexual activities with Reese, is that right?
A Yes.
Q You weren't present when Ms. Daedone asked Michelle Wright to be Reese's handler, were you?
A No.
Q So you have no idea what Ms. Daedone said to Ms. Wright,

right?
A That's correct.
Q And you don't know what Ms. Wright said to Ms. Daedone during that conversation, correct?
A That's correct.
Q Okay. You were not present when Ms. Daedone asked Maddie to be Mr. Jones' handler, right?
A That's correct.
Q So you don't know what Ms. Daedone said to Maddie in that conversation, correct?
A That's correct.
Q And you don't know what Maddie said to Ms. Daedone in that conversation, right?
A That's correct.
Q And that's, of course, true for Alisha Price as well, right?
A Yes.
Q So, you don't know how Ms. Daedone asked these women to take up this role, right?
A That's correct.
Q And you don't know how they responded, right?
A True.

MS. BONJEAN: My apologies.

THE COURT: That's all right.

BY MS. BONJEAN:

Q During direct examination you were asked to look at some text exchanges, right? Do you remember that?
A Yes.
Q And these were text exchanges that you provided to the Government, correct?
A Yes.
MS. BONJEAN: I'd like to pull up, if we can, what's already admitted into evidence Government's Exhibit 4501-F as in Frank, D as in dog. 4501. I think we have it.
(Exhibit published.)
BY MS. BONJEAN:
Q Now, this is a text exchange -- well, strike that.
Before we get there, how -- how many thousands of pages of your text exchanges with Ms. Daedone and other members of the upper management were you able to download?
A I don't -- I don't know the number. I know the dates.
Q It was thousands, though, thousands of pages, right?
A I imagine.
Q Okay. Well, you did it, right?
A I didn't count the pages.
Q Okay. But was it -- it was a big stack of them, correct?
A Oh, it was online. It was just one long file, so....
Q Okay.
A So, it was a long file.
Q It was a long file, right?

A Yes.
Q And how many years did it cover?
A 2008 or '9 through 2012.
Q So we're talking about your text exchanges between 2008 or '9 to 2012 in their entirety with Ms. Daedone, Ms. Cherwitz, and other members of the upper -- upper management staff of OneTaste, right?
A Yes.
Q And then other people who were either students or coaches or employees of OneTaste, right?
A Yes.
Q And this was a company that promoted staying in contact through text messaging, right?
A Yes.
Q So lots of text messages, fair?
A Yes.
Q So, in 4501-FD, we have about ten messages here.
And in the first part of these messages you're complaining about Yia, right?
A I wasn't complaining. I was lamenting.
Q You were upset that she was exploring sexuality at OneTaste?
A I was -- I was feeling the jealousy that she intended that I feel.
Q She what?

A I was feeling this -- the jealousy that she intended that I feel.
Q You're very good at figuring out what other people's intentions are --
MS. GUPTA: Objection.
Q -- is that one of your skills also?
THE COURT: Sustained.
Q So it 's your belief that she wanted you to feel jealous?
A Yes.
Q Maybe she just didn't want to be with you, don't you think that's a possibility?
MS. GUPTA: Objection.
THE COURT: Overruled.
A No.
Q Really? I mean you know what aversion practice is, right?
A Yes.
Q What is it?
MS. GUPTA: Objection, outside the scope.
THE COURT: Overruled.
A When you're told to be with someone that you don't want to be with.
Q Right. So you are a direct beneficiary of aversion practice, right?
A I don't know what you mean by that.

Q Well, you benefited from people trying out aversion practice, correct?

MS. GUPTA: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q So, you're absolutely confident that Yia was not with Rob because she wanted to be, but just to make you jealous, is that your testimony?

A I didn't say she didn't want to be with him.

Q Okay. And on the second page you --

MS. BONJEAN: Yes, there we go.

(Exhibit published.)

Q -- you pointed out that Nicole Daedone said to you: I'll trade you Reese for Yia, right, as kind of a joke?

A Yes.

Q Okay. And you didn't make any response to that, right?

A I -- I went along with the joke.

Q Okay. You didn't say: That's not funny, Nicole, it's not even close to the same situation; right?

A I'm not sure what you mean.

Q You didn't -- you didn't -- you didn't -- you didn't object to her statement, right?

A No.

Q You didn't say: It's wrong to be having people servicing Reese Jones, right, in this text message?

A No.
Q You didn't give any indication during this text message about what you testified to here today regarding Alisha or Maddie or Michelle, right?
A That's correct.
Q You also were asked to look at text messages at Government Exhibit 4501-KD as in dog, which is in evidence.
(Exhibit published.)
A Yes.
Q And you were living in Reese Jones's house, is that right?
A Yes.
Q Were you friends with Reese Jones?
A No.
Q Okay. Were you servicing him also?
A No.
Q Okay. But Nicole asked you about how the house was, right?
A Yes.
Q And you gave her sort of a rundown of what was going on, right?
A That's correct.
Q And you said: Felt fired up and ignited over the weekend, big influx of energy; right?
A Yes.

Q You didn't say: This is craziness over here, we have to stop; you didn't say anything like that, right?
A No.
Q You didn't express any concerns about it being, you know, a problem that Reese Jones was receiving sexual activity from other individuals, right, you didn't say anything around that, correct?
A That's correct.
Q And same thing with 4501-B as in boy, D as in dog.
(Exhibit published.)
Q Rachel Cherwitz asked you about whether you have the day off on Thursday, and you said: No, but I'm taking tomorrow and Friday off this week. What's happening Thursday?
Do you see that?
A Yes.
Q First of all, you had a day off on Thursday, right -- I mean could have had a day off on Thursday, right?
A I -- I don't know why I wasn't taking Thursday off.
Q All right. But you were taking two days off.
You were taking off whatever tomorrow was, which I'm assuming is Wednesday, and Friday, right?
A Yes.
Q Okay. You just told Ms. Cherwitz that you were taking those days off, right?
A Yes.

Q Okay. You could take days off, correct?
A Sure.
Q And --
A Well, with having made arrangements for it, yes.
Q Right. Well, that's like any job; isn't it?
A Yes.
Q Reese's birthday, we're doing a scene. Our part is in the morning. Wanted you to do the OMing part.
Do you see that?
A Yes.
Q Okay. And you said: Let's talk about it tonight; correct.
A Yes.
Q You didn't say anything like: I'm not doing a scene with Reese; right?
A I would have said that in person. I didn't want to say it here.
Q Okay. Why?
A I -- why didn't I want to say it on text?
Q Yes. Why didn't you just say: I'm not down to do a scene with Reese?
A Because I knew there would be pressure and I didn't want to have that conversation over the -- over text. I wanted to have it in person.
Q Okay. And did you do the scene with Reese?

A I can't remember if I did or not.
Q All right. But you were someone who would stand up to Nicole Daedone, you certainly could stand up to Rachel Cherwitz, right?
A Sure.
Q In fact, we heard a whole little spat between the two of you in some of these text messages, right?
A Yes.
Q Now, you testified on direct examination about sort of -- you testified on direct examination about some of your issues about having too many people in the course that you thought was, I guess, of a complex nature.
Do I have that right?
A Yes.
Q And that was kind of the source of your fight with Rachel?
A Yes.
Q And you were concerned around sort of the ethics around that?
A I was concerned that the students wouldn't be handled well if the course was too big.
Q So you were concerned about the students not being handled well, do I have that right?
A Yes.
Q Okay. And isn't it true that in January of 2009 you were

of the view that the whole building are just potential shills for doing OM?
A I -- I don't know what you mean by that.
Q Do you recall taking the position with your fellow people in the leadership that forget about gender balance, just pull people out and make them OM if we need to balance the gender in classes?
A I don't recall that.
Q Okay. Would anything refresh your recollection?
A Sure.
Q Okay. I'm going to have you look at Defendant's Exhibit 24-B as in boy, D as in dog.
(Pause.)
A Yes.
Q Did you have a chance to read that?
A I did.
Q Does it refresh your recollection about whether or not you considered, basically, students and other community members just to be shills?
A I wouldn't say just, but yes.
Q So you were perfectly okay with just pulling people out and having expectations that they OM just to --
A I wasn't perfectly okay with it. This was the kind of thing that I knew would happen if the courses starting growing too big.

But yeah, I -- this is what needed to be done in order for the course to go forward.
Q All right. But this was your suggestion?
A Yes.
Q Okay.
A Yeah, I was making the course work.
Q Right. It was your suggestion in order to make the course work, to make it a procedure, basically, to just make people come in regardless of where they are to balance the gender, right?
A That's right. That's where we had gotten to by that time.
Q But that was your idea?
A It was -- yes.
Q Okay. And that was actually something that there was a lot of pushback on, correct?
A I -- I don't remember.
Q You had a couple of your own ethics violations, right?
A Yes.
Q Including you were put on ethics probation when you fondled a student's breast who didn't give consent?
MS. GUPTA: Objection, outside the scope.
THE COURT: Overruled.
A When we talked -- yes, I -- yes, I was. And when we talked through it later, it turned out that she had given

consent.
Q She did what?
A She had given consent.
Q She had given consent?
A Yes.
Q Isn't it true that she didn't verbally give consent, even though that's part of the practice when you're safe wording?
A That's right, but once -- once we talked through it, she -- we -- the ethics violation was dropped.
Q So, you understand what safe wording is, right?
A Yes.
Q And what is it?
A It's telling someone what you're gonna do before you do it.
Q Okay. And that's one of the rules of OMing, right?
A Yes.
Q And that's something you didn't do, correct?
A No, I did do it. That was the point.
Q Okay. So --
A I said I -- I said: I'm going to touch your breasts.
Q Okay.
A And then I did. And then afterwards someone pointed out to you: Hey, he just felt you up. And she's like: Oh, yeah. There's -- there's ethics about this.
So then I was put on probation. And then once it

was talked through: Oh, actually he did safe word her. Then the -- the ethics violation was dropped.
Q So somebody put it in her head that you had done that; is that right?
MS. GUPTA: Objection, misstates the testimony.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Who were you talking to when you said the "you," that was your testimony, he touched you without consent, who said that?
A I don't -- I don't remember who it was.
Q Okay. You also had an ethics violation when you were doing an OM demonstration with Maddie.
Do you remember that?
A Yes.
Q Okay. Tell the ladies and gentlemen of the jury what you did there.
A Yeah --
MS. GUPTA: Objection, outside the scope.
THE COURT: Sustained.
Q Well, do you remember doing -- we've talked about Maddie Carl here, right?
A Yes.
Q Okay. And isn't it true that you bit her thigh without her consent during an OM demonstration?
MS. GUPTA: Objection, outside the scope.

THE COURT: Overruled.
A Yes, that's correct.
Q Okay. And those are the real reasons why you are so angry about what's going -- strike that.
These are situations where you felt unfairly treated, right?
A No.
Q You felt -- you thought you deserved an ethics violation for biting Maddie's thigh without her consent?
A I thought it was appropriate.
Q But that violated the rules of OMing, right?
A Yeah, it did.
Q Now, you were also a big proponent of male OM, right?
A Yes.
Q And OneTaste had discontinued male OMing as a course, right?
A That's right.
Q And you didn't like that, did you?
A I -- I was asked by multiple students why it had stopped. So, I had conversations with community members to find out why it had stopped. And I thought there is a way we can teach this that will be -- that will be ethical and clean and won't mess with the OM practice.
So I spent actually a couple years thinking through how to teach it in a way that would be clean.

Q And you were met with resistance from Ms. Daedone, right?
A I don't remember.
Q Okay. You were met with resistance, though, about reintroducing male OM, correct?
A I think everyone wanted it to be clean. Everyone wanted it to be clean.

I didn't hear any objections about bringing the practice back unless it could be in a way that -- like didn't cause, like, tit-for-tat. And that people understood that male OM was very different from just a regular OM.

(Continued on the following page.)

BY MS. BONJEAN: (Continuing.)
Q Okay --
A There were lots of guys there who were like, oh, why can't I get stroked and I was the one who would explain to them this is a clitoral stroking practice.
Q Kind of a different practice; right?
A Yeah.
Q Okay. It's not that -- there was some of that teaching going on in the mastery course; right?
A Yes.
Q Okay. So there was an opportunity if somebody wanted to actually seek that out, they could have; correct?
A Well, the mastery course was much later. The mastery course was long after that.
Q But you wanted to make it more on par with the clitoral stroking?
A Correct. I was being requested and I thought it could be taught in a clean way and so I figured out how to do that.
Q These were men requesting it?
A Men and women. Women would come to me and say I really want to stroke my partner and I would talk to them about the fact that we were putting a course together where they could learn how to do that.
Q Okay. And, so, you talked about the fact that Mr. Jones had handlers that stroked him -- or a handjob, I forget the

word you used; right?
A Yes.
Q But you routinely, yourself, asked members of the community to stroke you; isn't that right?
A No. That's not correct.
Q You sure about that?
A Yes.
Q Okay. Government Exhibit 4501, which is the -- we looked at --
MS. BONJEAN: Your Honor, it's the 2,000-page document and I'm going to -- I've pulled out the ones that I would like to reference.
THE COURT: Thank you.
BY MS. BONJEAN:
Q Specifically I'm going to ask you, Mr. Blackman, isn't it true that you asked Justine Dawson to stroke you on November 27th --
A I can't -- this is too small for me to read.
Q If you can't remember, I will refresh your recollection.
A Okay.
Q Okay. Do you remember asking Justine Dawson to stroke you on September -- November 27, 2009?
A I don't recall that, but I don't doubt that it happened.
Q Okay, would you like to see your text messages or your -- text messages?

A Sure.
Q Defendant's Exhibit 24-AL.
A Again, this is too small for me to read.
THE COURT: Can you just give him a paper copy?
(Counsel approaches.)
A I can see it now.
Q Does that refresh your recollection whether you asked Justine Dawson to stroke you on November 27, 2009?
A Yes.
Q She agreed; right?
A Yes.
MS. GUPTA: Your Honor, just objection to the characterization of the document.
MS. BONJEAN: He said yes.
THE COURT: Overruled.
BY MS. BONJEAN:
Q And then jumping around, May 17, 2010 did you text Ms. Vang and say would you stroke me?
A I don't recall it.
Q You don't doubt it though, right?
A If you have a text, I can see it.
Q Sure.
THE COURT: Let me know what you're handing up.
MS. BONJEAN: Defendant's Exhibit 24-M, as in Mary.
A Yes.

Q Correct, you did?
A Yes.
Q July 3, 2010, you asked Rachel Cherwitz to stroke you or male OM, right? I can show you.
A Yeah, I would like to see it.
(Counsel approaches.)
MS. BONJEAN: This is Defendant's Exhibit 24-AN.
A Yes, I see it.
Q There were times when you asked Maya Gilbert to stroke you, do you remember that?
A I don't, but I'd like to see the text.
Q What about Kelly Notaras?
A Again, I don't remember.
Q I'm sorry?
A Again, I don't remember.
Q I'm going to have you look at Defendant's Exhibit 24-AR.
(Counsel approaches.)
Q Does that refresh your recollection you asked Kelly Notaras to stroke you?
A I again don't remember it, but I see it in the text.
Q You said you don't remember asking Maya Gilbert?
A Correct.
Q I'm going to show you what's marked as Defendant's Exhibit 24-AQ?
(Counsel approaches.)

Q Did you ask her to stroke you?
A Yes.
Q She didn't want to stroke you, right, or said she couldn't, made up something?
MS. GUPTA: Objection to the characterization.
THE COURT: Sustained.
BY MS. BONJEAN:
Q How about Aubrey Fuller, did you ask her to stroke you?
A I don't recall.
Q Would something refresh your recollection?
A Huh?
Q Want something to refresh your recollection.
A Yes.
MS. BONJEAN: Defendant's Exhibit 24-AS.
(Counsel approaches.)
A Yes.
Q Do you remember texting Ms. Daedone in March of 2006 advocating lifting the ban on male OMs?
A I don't remember the conversation but --
Q Okay and that was the same day you asked Kelly Notaras to stroke you again. Do you remember that?
A Okay.
Q Do you remember or would you like to --
A I'd like to see it.
Q Defendant's Exhibit 24-AT.

(Counsel approaches.)
Q Does this refresh your recollection about whether or not in March of 2011 you asked Kelly Notaras whether she would be willing to stroke you? You can look at the screen if it helps.
A I'm a slow reader.
Q It's only about six words.
A I'm looking at the next text that's also --
Q My question right now, and I'll give you an opportunity to look if necessary, did you ask Kelly Notaras if she would be willing to stroke you?
A Yes.
Q And also that same day I would like you to look at the text from Ms. Daedone.
A Yes, I'm looking at it.
Q Take a second to look at that one.
A (Reviewing.)
Yes.
Q Do you remember advocating to bring back male OM?
A Yes.
Q And one of your pitches is that you didn't think the guys in the res were so creepy and you needed the ban?
A That's correct.
Q You didn't see yourself as creepy; right?
A No.

MS. GUPTA: Objection.

THE COURT: Overruled.

MS. BONJEAN: I'm going to give him the stack so I don't have to keep going back and forth.

THE COURT: Is it the same stack you gave me?

MS. BONJEAN: Yes.

THE COURT: Go ahead.

(Counsel approaches.)

BY MS. BONJEAN:

Q Mr. Blackman, do you remember asking Kelly Notaras again on May 26, 2011 to stroke you?

A Yes.

Q Okay. And if you need to refer to this to refresh your recollection, let me know. What about Aubrey Fuller, again in June of 2011? I'll have you look at Defendant's Exhibit 24-AV to refresh your recollection as necessary.

A Yes.

Q Okay. What about in October of 2011, Rachael Hemsi?

A Yes.

Q In October of 2010 you asked Rachel Cherwitz to be a stroker for a male OM demo you wanted to do; is that right?

A Yes, for a course.

Q Okay. Was that in April of 11 you asked Justine Dawson to stroke you again?

A Yes.

Q You asked her again in October of 2011?
A Yes.
Q Rachel Cherwitz again in April of 2011?
A Yes.
Q Justine Dawson again in November of 2011; right?
A Yes.
Q You can put those aside.
You are currently still in the business of teaching clitoris-based activities or sex; right?
A Rarely does it come up in my coaching, but if it's something I think a couple can use then I will teach it.
Q And is that something you do with your wife?
A Yes.
MS. GUPTA: Objection.
THE COURT: Sustained. What's the something?
Q Clitoral based teaching.
A I stroke my wife's clitoris.
Q I should hope so.
Did you also start a program called the New Masculine program after your departure from OneTaste?
A Yes.
Q And what type of a program was that?
A It was for men to help them become more confident in life, to feel better about themselves.
Q And you also offered -- you also offer coaching packages

to the tune of 72 grand; right?
A There was a time when, yes, I was charging that much.
Q What did you get for 72 grand?
A A year of coaching.
Q It wasn't, like, unlimited coaching sessions as much you wanted, was it?
MS. GUPTA: Objection.
THE COURT: Sustained. Ask the next question.
Q This wasn't unlimited coaching sessions; correct?
A I was on call, yes. We had weekly schedules, but I was also available by text. If they needed support in between, I was available.
Q For an emergency?
A For -- yeah, if a couple was getting into trouble or got into an argument, I didn't want them to wait until next Tuesday to get my support around it.
Q You're not a psychiatrist; right?
A No.
Q You're not a marriage therapist; right?
A No.
Q You're not a relationship therapist, right?
A Not licensed, no. I'm not a therapist.
Q Your expertise is in clitoral stroking and male OMing; right?
A And relationships.

Q All right.

MS. BONJEAN: One second.

(Pause in proceedings.)

MS. BONJEAN: I have nothing further, Your Honor.

THE COURT: Mr. Robotti any cross-examination?

MR. ROBOTTI: No questions.

THE COURT: Any redirect examination, Ms. Gupta?

MS. GUPTA: Short, Your Honor.

REDIRECT EXAMINATION

BY MS. GUPTA:

Q Mr. Blackman, you testified regarding an incident where you bit Maddie Carl's thigh during an OM demonstration. Do you recall that?

A Yes.

Q OneTaste continued to employ you after that, right?

A That's correct.

Q And throughout all of the various requests for male OMing that you just went through, OneTaste continued to employ you throughout that time; correct?

A That's right.

Q In fact, OneTaste continued to employ you for several more years after both the incident with Maddie Carl and the request for male OMing; correct?

A That's right.

MS. GUPTA: No further questions.

MS. BONJEAN: I just have --
THE COURT: You have questions?
MS. BONJEAN: Yes.
THE COURT: Okay, Ms. Bonjean.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q Mr. Blackman, there was nothing wrong with asking for male OMing, right?
A Well, when it was banned then, no, you wouldn't ask for it. But once we -- once we had taught it, then it was okay to ask, yes.
Q So I guess I'm confused. You were asking people to have a male OM with you; right?
A Yes.
Q And they can say yes or no; right?
A Yes.
Q And you respected that; right?
A Yes.
Q You didn't force people to masturbate you; right?
A That's correct.
Q But you were an advocate of it; correct?
A Yes, on behalf of the men and women who wanted to bring the practice back.
Q All the people who wanted it in the program; right?
A Yes.

Q And OneTaste did actually respond to both of your ethics violations; correct?
A Yes.
Q Okay.
MS. BONJEAN: I have nothing further.
MS. GUPTA: Nothing further.
THE COURT: Okay. The witness may step down.
(Witness excused.)
MS. GUPTA: Your Honor, may we briefly approach and discuss a scheduling issue?
THE COURT: Yes, you may.
(Continued on the following page.)

(Sidebar conference held.)

THE COURT: We have everybody at sidebar including the two individual defendants. Go ahead.

MS. GUPTA: It's just the next witness is on her way. She's pregnant and moving a little slowly. Can we go ahead and take our break now and we'll have her on the stand after the mid-afternoon break?

THE COURT: Can she be here in the next twenty minutes?

MS. BENSING: She's not immediately here.

MS. GUPTA: We timed it poorly not realizing how long it would take her.

THE COURT: We can take a break now unless anybody has an objection.

MR. ROBOTTI: No.

MS. BONJEAN: Nope.

THE COURT: We can do that now.

(Sidebar ends.)

(Continuing.)

THE COURT: We're going to take our afternoon break a little bit early. We'll come back at 3:20. Don't talk about the case and keep an open mind. See you in about 15 minutes.

(Jury exits.)

THE COURT: Everyone can be seated. I wanted to raise one or two issues to make use of this time productively.

Going to the jury instructions that we had talked about some issues the other day, I just wanted to make sure I understood something the Government said the other day and how that might affect the charge. I think I understood -- I believe it was Ms. Bensing to be saying that she did not think there was a need to have the language about abuse and threatened abuse of law and legal process in the instruction; is that correct?

MS. BENSING: As of right now, yes.

THE COURT: Okay.

MS. BENSING: But theoretically something could change by the time the jury is charged.

THE COURT: What I want to make sure I understand everybody's position on is that you don't believe that it needs to be referenced both when I state what the indictment language is and when I cite what the statutory language is or just when I'm explaining the elements and I think it's really

element two of A, which I guess also is referenced later on as well.

But is that what the parties want, what the Government wants? And I can ask the defendants what they want.

MS. BENSING: Well, I think what I --

THE COURT: I just want to know what you're envisioning by that.

MS. BENSING: What I was envisioning was the portion where the Court explains the applicable law and not the statutory language, but I can --

THE COURT: That's what I thought you -- but I wanted to make sure I wasn't misunderstanding that.

Was that everybody's understanding too that they -- in explaining the second element essentially is where it comes up of the substantive A, which again they'll be told there's no substantive charge here; that I won't instruct on that if everything stays the same on the abuse and threatened abuse of law and legal process.

MS. COHEN: That was my understanding.

MS. BONJEAN: Yes, I think that was my understanding too.

THE COURT: Great and then -- I wondered if the parties thought there was a need for an investigative techniques instruction. That typically comes up if there's

searches or wiretaps or some specific technique that's specific to testimony. And I'm making a distinction between not needing to use any specific technique as opposed to techniques used that were legal. And I'm not sure that that's something that the parties feel is necessary here, the one about investigative techniques themselves.

MS. BENSING: If you give me a minute, Your Honor.

MS. BONJEAN: Did we include that?

THE COURT: I am just asking. Now that we have the benefit of three and a half weeks of testimony, I'm trying to focus in on the issues that really need to be instructive. You don't have to answer me now. I can give you a break, but I want to raise these issues as something to think about.

MS. BENSING: If the Court is amenable to it, I would just like to read it and talk to the team and get back to you.

THE COURT: That is fine.

And then there was I think only one transcript has gone in as an aid to the jury. I don't know if you want a separate transcript instruction. I don't think it was used when the -- I can't remember if it was audio or video came in. I'm happy to give one or not give one.

MS. BONJEAN: I think with the videos, there were subtitles so I don't know --

THE COURT: That is not what I would be talking

about in transcripts. I think there was only one transcript.

MR. ROBOTTI: I think that one transcript we may use in closing. I don't think we have a position on a transcript instruction, but we can consider it.

THE COURT: You can let me know what you think on that one.

Then the only other one I wanted to ask about is if anyone thinks there's a need for "and other acts" instruction. I will listen to the parties and let me know what they think it refers to. We're at this stage and we're not done with the trial yet.

You don't have to give me your answers now, but if you want to talk to each other about that and let me know.

MS. BENSING: I think the Court -- this is something I raised on Friday, so I think the Court has the Government's position.

MS. BONJEAN: Yes. This witness just basically testified that Ms. Daedone took his credit card and spent $10,000 which, again, I think -- I don't know where, A, I don't know what was --

THE COURT: He said he gave it to her; right?

MS. BONJEAN: He gave it to her. I mean they elicited it, not to show she's such a great lady. They elicited it to suggest that she did something wrong. So I think it is another bad act that potentially requires an other

acts instruction, but I don't know if the Court wants to rule on that now. I think there's other --

THE COURT: You can let me know what you think would be under the umbrella of other acts and what instruction you would be proposing, but --

MR. ROBOTTI: Judge I would flag the issue of prostitution that came up both yesterday and today that's something they may want to consider as well.

THE COURT: I will, of course, be very clear in the instructions that there's one crime being charged here, right, and they will know what it is and they will also know that it is not the substantive crime. So you'll see that language, but I'm also going to make very clear that the conspiracy charge -- sorry, the conspiracy that the instructions they're talking about was the conspiracy charge which was one of the defendant's main themes and some of their comments on the request to charge. So I think that will be very clear. So you can think about whether you think there's a reason to flag for the jury anything else specific. You'll think about that and you'll let me know and I'll let you know if I think it's appropriate, but I want to make sure that you know that it will be clear to the jury; two defendants, one crime they're considering.

Okay, I'm going to let you take a few minutes.

(Recess taken.)

(Continuing.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Ms. Cohen, we can ask for them to make it warmer in here. I can tell you're freezing. I can tell. You had the blanket or something there. I don't think anyone else can tell, but I can see it.

MS. COHEN: I was trying to cover, but thank you.

THE COURT: No, no. It's fine. You do what you need to do. But we can ask to make it a little warmer.

We can bring in the witness. No, I'm sorry. This is a new witness.

Let's bring in the jury and then you'll call the witness.

(Jury enters the courtroom.)

THE COURT: Everyone may be seated. And the Government can call its next witness.

MS. FARRELL: Thank you, Your Honor the Government calls Anthia Gillick to the stand.

THE COURT: You can just come right up here.

(The witness takes the stand.)

THE COURTROOM DEPUTY: Please step up, remain standing, raise your right hand.

Do you solemnly swear or affirm that the answers and the testimony you're about to give this Court shall be the truth, the whole truth, and nothing but the truth, so help you

God?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record and spell your last name slowly. And use microphone. Thank you.

THE WITNESS: My name is Anthia Gillick, last name is G-I-L-L-I-C-K.

THE COURT: You may proceed, Ms. Farrell.

MS. FARRELL: Thank you, Your Honor.

(Continued on the following page.)

**ANTHIA GILLICK**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FARRELL:

Q Good afternoon, Ms. Gillick.

Besides your name, Anthia Gillick, have you ever gone by other names?

A Yes. I also went by Brooke Sheffer, and that was the name that I had when I was in OneTaste. Last name is spelled S-H-E-F-F-E-R.

Q Thank you. Do you know an individual named Nicole Daedone?

A Yes.

Q Who is Nicole Daedone to you?

A She -- it was the owner and CEO of OneTaste at my time when I was there.

Q And do you see her here today?

A Yes.

Q And can you identify her by an article of clothing she's wearing?

A Yeah. She's wearing the tan wrap.

Q Has Nicole Daedone ever harmed you in any way?

MS. BONJEAN: Objection.

THE COURT: Overruled.

Q You can answer.

A Psychologically, there was -- I felt a lot of damage from my time at OneTaste.
Q Do you know an individual named Rachel Cherwitz?
A Yes.
Q And who is Rachel Cherwitz to you?
A She was the head of sales at OneTaste when I was there.
Q And do you see her here in the courtroom today?
A Yes. She's wearing the off-white blazer.
Q Has Rachel Cherwitz ever harmed you?
MS. COHEN: Objection.
THE COURT: Overruled.
A Same.
Q And at a high level, how has Ms. Cherwitz harmed you?
A Same thing.
Q What do you mean, same thing?
A That they were both in charge of OneTaste while I was there and it caused me a lot of psychological and a bit of physical harm.
MS. FARRELL: And Your Honor, I would just ask the Court to confirm the identifications on the record.
THE COURT: Yes.
MS. FARRELL: Thank you.
Q So you mentioned OneTaste.
Were you involved with OneTaste?
A Yes.

Q And in what capacities?
A I was a student for about a year and then became a owner of OneTaste New York, LLC, which was a franchise branch of OneTaste at the time, for a year and a half.
Q And approximately what were the -- was the span of years that you were involved in OneTaste?
A About two and a half years.
Q From when to when?
A From, like, spring 2013 to summer 2015.
Q Did you ever live in OneTaste housing?
A Yes.
Q And approximately how old were you during that span of time you just testified about?
A I was 25 in 2013, and 27 in 2015.
Q What type of business was OneTaste?
A It was, you know, billed as a wellness and, like, health company that taught an array of practices and coaching things. There were high level, but I often liken it to, like, Tony Robbins kind of a transformational coaching company.
Q Was there a particular practice that the company revolved around?
A Yes.
Q What was that?
A The main practice was called orgasmic meditation or OM, for short.

Q And if you could just briefly explain what OMing was.
A It is a 15-minute partnered pussy stroking practice was the way that they described it, but almost only of the female genitalia.
Q And besides OMing, were there other actual services that OneTaste offered during your time there?
A There were other practices in classes that ranged from, you know, other sex acts and demonstrations to stuff, like, BDSM or, like, you know, kind of, like, ritual piercing and stuff, like. They were like -- magic school is what they called it. But yeah.
Q So putting aside OMing.
These other sexual services you testified about, who were those offered to?
A For pay, they were inside classes. So students who were paying large amounts for, like, one-week retreats to six-month or 10-month classes.
Q During the time you were involved at OneTaste, did you provide any labor for the company?
A Yes.
Q And what labor did you provide?
A I was -- I did everything from organizing volunteers to moving supplies in and out, to we called lead gening, but recruiting new sales leads, at tons of different events. Training other people, like, coaching and un-coaching other

people.

Q Did you provide any services for the company?

A Yeah. I mean, those were all services and labor.

Q What about sexual services?

A The -- I mean, mostly I was asked specifically for, you know, like OMs with other people that were paying clients, and then there was an occasional time where I would be asked to do a thing with a paid client that went into more sexual realms.

Q We'll get to that later.

Did you make payments to OneTaste?

A Yes.

Q Approximately how much?

A I would say they generally averaged about a thousand a month for classes and then, like, around 1200 a month for rent and food, like, they called it a meal plan.

Q And you testified that you also were a part owner of OneTaste?

A Yes.

Q Did that involve a payment, as well?

A So I was considered a part owner for, like I said, it was a little over about a year and a half. But I was not actually on paper an owner until the last six months of that, and during that time, I can't remember what the term is, but I got, like, withheld ownership payment of 3,000 a month.

Q So let me break this down.

So right now I'm asking you about payments that you made to OneTaste.

A Right.

Q So I think you described paying for courses; is that correct?

A Yeah.

Q Paying for room and board?

A Yes.

Q And did you make any payments to anyone in connection with your becoming an own owner of OneTaste?

A Oh, yes. I bought in for about 120,000 for the part ownership of the franchise.

Q And then we'll get into the details later. So I'm really just asking a yes-or-no question now.

But did you experience any financial harm in connection with your time at OneTaste?

MS. BONJEAN: Objection. Vague.

THE COURT: Overruled.

A I -- the money that I did get, I mean -- so I ended up -- by the time I left, I think I'd spent somewhere between, like, I don't know maybe, like 67 and $75,000 on classes. I remember seeing 67 is a number pretty closer to when I was leaving. But I think I paid some additional money after that. And then I did get -- the money that I did get paid for the six months got removed -- I was bought out when I left. But

that money got removed from being bought out. So the classes were -- that was for a service that was out of pocket, but the, you know, I came out at a loss from the money that was removed from my purchase into the franchise.

Q Okay. And again, we will get to the details later.

But at a high level, did you experience any psychological harm during your time at OneTaste?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A Yeah. That was -- I definitely did. Lots of details, obviously.

Q We'll get to that in a moment.

But how would you describe the level of psychological harm that you experienced?

MS. BONJEAN: Objection vague.

MS. COHEN: Objection.

THE COURT: Sustained.

Q How, if at all, did the psychological harm you just testified about impact your willingness to provide labor or services to OneTaste while you were there?

MS. BONJEAN: Again objection.

MS. COHEN: Objection.

THE COURT: Overruled.

A Like, you're asking about the psychological state that I was in when I was there?

Q Yes.
A It was everything. OneTaste became my world. It became my entire belief system. It was my, like, my moral campus. I would have done anything.
Q And did that include providing labor and services?
A Yes.
Q So let's take a step back and start at the beginning. And also, I'll just ask to you slow down a little for our court reporter.
A Sorry, I talk fast.
Q So first, where did you grow up?
A In rural Colorado.
Q And how far did you go to school?
A I got a bachelor's degree.
Q And what did you do after completing undergraduate?
A I moved to San Francisco to start a business in aerial silks or circus arts.
Q And what are aerial silks?
A If you've ever seen Pink, the sheets that hang from the ceilings was my main apparatus, and so that was aerial silks, and I taught that.
Q Sorry, what do you do on the sheets?
A Circus tricks, performances.
Q When did you first learn about OneTaste?
A Pretty soon after -- so I was living in various

neighborhoods in San Francisco, and then I moved down to the South of Market District, and pretty soon after I moved, I was walking down the street and there was a guy clipping his toenails on a bench who came running after me and he was in CP6, I believe. He was a student at OneTaste and he asked me to coffee.

Q And what happened after that?

A We went to coffee and he didn't mention anything. He just basically said he was living in a commune in San Francisco which are very common. So I was not very interested. And then we kept running into each other. And eventually, he kept asking me to his event that was run called Turn On, and the name kind of freaked me out, so I kept saying no. And then eventually, he invited me to a lecture that Nicole Daedone was doing on just -- it was informational on orgasmic meditation.

Q And did you attend that?

A Yeah. And I agreed to attend that after going to another coffee with him where I grilled him for 45 minutes.

Q And what was that man's name?

A James Barford.

Q At the time that you were going to these coffees with James Barford, how were you supporting yourself?

A I was working at a restaurant, I was hosting at a restaurant, I was teaching aerial silks at other company that

wasn't mine, and I was working at Trampoline Park. But my, like, some of my main income, like, what was paying my rent was from my parents. They were helping me out.
Q And did you have family wealth at the time?
A Yes.
Q So you mentioned that you attended a OneTaste event in which Nicole Daedone spoke?
A Mm-hmm.
Q Tell us about that event.
A Yes. It was a lecture kind of at a pop-up venue. It was very, like, chic and hip and kind of, I don't know, felt like buzzy. And I went and it was probably, I don't know, an hour, hour and a half kind of thing and Nicole basically told her, like, story of how she'd gotten into his practice, and then you know, described the practice and gave kind of, like, a pitch for signing up for classes and everyone was encouraged to at least sign up for How to OM before they left.
Q And when you say, she, being Nicole Daedone described a practice, what practice are you talking about?
A Orgasmic meditation.
Q And what was your reaction to Nicole Daedone's talk that night? That day?
A I was pretty amazed by her.
Q And what was it about her that made you amazed?
A Yeah, I'd never met anyone who, like, knew themselves so

well and was so, like, aware of their flaws and willing to just, like, own them and just, like -- it was like she had mapped her entire psyche, basically, and was able to just talk about it. And it just seemed very powerful and I really wanted to -- like, I was struggling with my aerial silks business, it was not going very well, and I really wanted to become a powerful businessman and I sort of thought if it woman could sell orgasm, I could sell circus, she could teach me to sell circus. But I was not interested in the practice at all.

Q So after attending that first event, what did you do?

A I kind of ran out the door. They were trying to persuade me to take a How to OM class and I wanted no part of it.

Q When you say, they were trying to pursued, you who were you talking about?

A There was, like, a sales team in the back. I think Marcus Ratnathicam might have been there. I don't remember. Rachel might have -- Rachel was definitely there as, like, head of sales. I don't remember it well so it might have been Margo or Allie.

Q What you say, Rachel, who are you referring to?

A Rachel Cherwitz.

Q So did you sign up for an additional class that night?

A I did not.

Q And then but did you come to sign up for something else?

A Yeah.
Q So describe what happened?
A So a couple of days later, I was still kind of thinking about and thinking about if I could just -- like, I had been texting James whose number I had at that point, and I kept thinking, like, if I could just ask Nicole, like, how she did what she does, that that would be, like, enough for me. And the other thing that had been on the offer that night was a $300, like, 15-person coaching circle where you were allowed to sit in front of Nicole and ask her anything, basically. So I texted James back a few days later and asked if I could sign up for that.
Q So did you attend a coaching circle with Nicole Daedone?
A Yes.
Q What happened at that coaching circle?
A A number of the people I think were probably already enrolled in classes. She seemed to have a lot of rapport with them. So she went around and, like, talked to them, kind of coached them through various relationship things, and it seemed like a lot of them got a lot of attention and, like, her expertise.
Q And what happened when it came time for her to speak to you?
A So when it came time for her to speak to me, I asked basically, like, how do I get my business going, how do I do

what you do, and she didn't answer. She asked me how my sex life was, and I, like, didn't have much of a response. It was -- that was -- I was very surprised by that. I must have stumbled out something about the fact that it wasn't great. And then she also asked me how my relationship with women was. And that was a very sore point for me. I just -- I don't know, I missed girl code growing up.

So she basically -- she -- between those two things, she told me that I should come in to the OneTaste community, and she basically said that I should sleep with or fuck a bunch of the women -- sorry, the men who were with women inside the OneTaste community and piss the women off, and that that was, like, going to -- I would learn girl code from that, that they would teach me.

Q So after that coaching session, did you become further involved in OneTaste?

A So again, as it was with almost every class at OneTaste, you weren't supposed to leave without signing up for something. And so I was, like, pushed -- I still didn't want to sign up for How to OM, but I was pushed to sign up for -- the next morning they were called exploratories. So they were, like, one hour free coaching circles with Rachel Cherwitz.

Q Okay. Did you sign up for that?

A Yeah. So I signed up for one of those. And during that

hour, that next morning, you know, I kind of, like, had his free coaching session with Rachel and just kind of, like, divulged everything that was going on in my life. I probably felt good about getting, you know, a free coaching and wanted everything out of it. And she basically sort of, like, offered me her friendship inside that, which I was pretty desperate for, and also, like, she rightly identified that I'm like a Harry Potter fan and wanted something, like, magic and special in my life and she called the coaching program Hogwarts, and said that they were witches who liked to trip acid sober, and the whole thing sounded amazing appealing, and I signed up for the coaching program. It was CP Number 7, and I put a deposit.

THE COURT: I'm sorry, could I ask both of you to give a little pause between the question and the answers. I think it's difficult. I'm seeing the court reporter who is excellent looking at me to maybe slow things down a little bit.

THE WITNESS: Apologies.

THE COURT: Okay. Go ahead.

Q You said in that answer that you were desperate for --
A For female friendship.
Q And did you tell that to Rachel Cherwitz during this?
A I -- no. But I think between, you know, Nicole's assessment of me the night before and, like, it was probably

written all over me.
Q So you talked about a man named James who introduced you to OneTaste. Did there come a time around his time period with your had a physical relationship with James?
A Yes.
Q How, if at all, did Nicole Daedone's discussions with you that first day affect your decision to get physical with James?
MS. BONJEAN: Objection.
THE COURT: Sustained.
A Sorry, do I answer that?
THE COURT: When I say sustained, it means you don't answer.
THE WITNESS: Thank you. I appreciate it.
Q I'll ask another question.
What made you decide to have a physical relationship with James?
A I was attracted to him from the beginning. We sort of flirted on and off, but I -- we had never gone further until after that coaching circle. And --
Q Was he -- sorry.
Was he in a relationship with someone else at the time?
A Yeah. So that -- I found out after that coaching circle -- like, after that coaching circle, he kind of took me

on a date, and we -- things got, like -- we kissed afterwards and that's that he was what he confessed to me that he was married to someone.

MS. COHEN: Objection. Hearsay.

THE COURT: Sustained.

THE WITNESS: Oh, sorry.

Q Did you understand James to be married at some point?

A Yes.

Q Did you decide to engage a physical relationship, nonetheless?

A Yes.

Q Why?

A I recalled in my head what Nicole had said about sleeping with men who were taken by women and in the community and the women teaching me.

Q And did James -- was James a member of OneTaste?

A Yes.

Q Did he come to your apartment at the time that you all had a relationship?

A Yes.

Q And what was your apartment like?

A It was a -- it's called live-work loft. It was, like, a pretty fancy new-build, like, modern lofted space that had, like, kind of a bedroom on one side and a setup over on the other, and my silks were hanging from the 18-foot ceilings.

It was probably like 3,000 square feet.

Q How did you afford an apartment like that in San Francisco?

A My parents were covering the rent.

Q Did you later come to understand anything about whether your personal wealth had been reported back to OneTaste leaders?

MS. BONJEAN: Objection. Foundation. Hearsay.

THE COURT: Sustained.

Q So you mentioned that you signed up for the coaching program request?

A Yes.

Q And which coaching program was that?

A CP7.

Q And what were you hoping to get out of it?

A And during that exploratory session, when Rachel offered me that, I told her I did not want to be a life coach, like, that was -- I already had a business that I wanted to do. And she mentioned that, like, I could basically coach myself and that it could be, like, an education on spirituality and knowing myself, and I felt like if I took CP, I would get closer to that goal of becoming the, like, powerful businesswoman that I'd seen in Nicole who knew herself inside and out.

Q What did the CP cost, approximately?

A It was $10,000 at the time.
Q I'm sorry what?
A It was $10,000 at the time.
Q Could you afford that?
A Yes.
Q Where did the coaching program take place?
A In San Francisco.
Q And who were the instructors?
A Nicole came to like, she taught at every one of the weekends which was the main draw from me. I just wanted to hear her talk. But then it was also taught by Rachel Cherwitz and Rob Kandell, it was Ken Blackman. It was a series of teachers who all taught together for each weekend and Nicole made her, like, I don't know, couple-of-hour appearance each weekend.
Q And how long was the coaching program?
A Ten months.
Q And how frequently each month?
A Once a week -- like one weekend a month.
Q What topics did the coaching program cover?
A A lot of it was, you know, OM training and How to OM train other people and how to life coach other people. But a lot of it was also, like, you know, exercises and things that we could do with our clients, but, like, that were to draw things out of us, like, our power or we had, like, a -- like,

a staged psycho-drama kind of thing where the voices in your head were acted out by other people and they talked to each other. Yeah. So it was a variety of exercises.
Q To your knowledge, were any of the teachers at the coaching program licensed therapists?
A No.
Q Or doctors?
A No.
Q Members of clergy?
A No.
Q Okay. Are you familiar with the term, letting your beast out?
A Yes.
Q Did that come up in the coaching program?
A Yeah.
Q What is it?
A That was one of the exercises that we did. It was known as beast exercise. Letting your beast out was basically, like, that we all have, like, caged feral creatures inside us, basically, that that was, like, part of how you gain your power, is by being in touch with that beast. And so one of the exercises that they did was to -- like, the music -- they put music on and kind of, like, amped it up and got all the way to, like, very loud metal and, like, we were paired off and, like, almost wrestling with each other to, like, piss

each other off to get our beast out.

Q You mentioned OM training was part of the coaching program?

A Yes.

Q Was that just traditional OMing or did it include male OMing, as well?

A We did do a male OM, I believe one weekend at CP7, yeah.

Q Did -- what, if any, sort of interaction with the community outside of the coaching program was there as part of the coaching program?

MS. BONJEAN: Objection to the form.

THE COURT: Sustained.

Q Was there any -- was there any interaction with the outside community?

A Yeah. So pretty soon after -- because Rachel threw in the How to OM class for free when I signed up for CP7, so I did get OM trained. I had to get OM trained before I started CP7.

So pretty soon after I was OM trained, which was still a couple of months before CP, I requested joining what was known as morning practice. It was open only to basically, like, very senior community members or residents of 1080. And after that, I had pretty much -- there was two OMs for morning practice, sometimes -- but usually, it was just those two OMs, and I would go to that almost every day. And then I also

right around when CP started, my live-work loft flooded and I moved into the 1080 housing. So I was also living in 1080 at the time. So there were community members in morning practices and OMs, as well as 1080.

Q Okay. We'll get to that in a moment.

Are you familiar with an area of San Francisco called the Tenderloin?

A Yes.

Q What is that?

A It's generally considered, like, the roughest neighborhood in San Francisco, and it's relatively close to -- it's, like, across Market Street from South of Market from the district where 1080 was and my live-work loft.

Q Did you do any activities at the tenderloin as part of the coaching program?

A Yes.

Q What did you do?

A There was an activity that I understand was kind of part of Byron Katie's -- just another transformational coach. But it was an activity that they ran where -- that OneTaste ran in the coaching program where we had to, like, beg from someone and then give to someone, and then I think, like, do an act of service and then, like, receive help. It was, like, four exercises of, like, giving and taking. And we did that both in the tenderloin and in the Marina District within a day of

the coaching program.

Q As part of the coaching program, are you familiar with something called a trauma resolution weekend?

A Yeah. I can't remember if it was called that at the time that I was there. But that was a term used.

Q And what was that trauma resolution weekend?

A So the way that -- it was run during my CP was we basically, like, wrote out, like, we -- they, like, put on some, like, music and we wrote out in as much detail as we could possibly remember, a time that we had a sexual trauma, and I'd been raped at 21. And so, like, I wrote out my whole rape story and then read it to a partner during that weekend, aloud.

Q Was -- did anyone at OneTaste bring that sexual assault up in the future?

A I mean, I -- my partner at, like, during that course was Po-Hong Yu which was -- she was an owner of OneTaste later with me in New York. And I mean we talked about it plenty. Things like that kind of became common knowledge in -- like, that was something I talked about, as well, in other times after that.

Q While participating in the coaching program, were you encouraged to purchase additional courses?

A Yeah. When -- especially if they, like -- like, complemented, like, were -- there was these community

leadership courses that, you know, anyone who was, like, looking to start coaching businesses or they started rolling out these affiliate cities was willing to purchase and encouraged to purchase those, and there was also, like, winter retreats. So I purchased one of those. And then they came out with a new program called Mastery. So during my coaching program, there were new programs rolling out.

Q And were you taking these simultaneously with your ongoing coaching program?

A Yes.

Q Okay. You mentioned that at one point you moved into 1080?

A Yes.

Q What happened?

A So, yeah, like I said, there was a flood in my building at my live-work loft, so where my -- both where I was living and working. And so I didn't have anywhere to live, and I basically was looking to find a new place to live, and one of the options that came up was both James Barford and Claudia Denevarez who had become my friend from 1080 encouraged me to move in.

MS. FARRELL: If we could please show the witness what I believe is in evidence as Government Exhibit 34, please.

Q Can you see that?

A Yes.
Q Do you recognize this?
A Yeah. That's 1080.
Q And if you could describe the layout for us.
A Yeah. So the downstairs had, like, a big common area with, like, a dining room and a common kitchen, and the OneTaste office was off to the side. So that was where all business was run. And then upstairs was two floors of residences, the like, middle floor, the second floor was where I lived, and that was where students and, like, newer practitioners lived, as well as, sometimes when people would pay for, like, the emersion kind of thing, so if they wanted to come in and experience what it was, like, to live in 1080, they would stay in that floor for a week. And then the upper floor was senior staff and more long-term practitioners, and it was, like, a nude floor. Like, it was clothing optional.
Q Did you share a bed?
A Yes.
Q With who?
A Clouds. Claudia.
Q Did others share beds?
A Yeah. Everyone shared beds. Most of them were, like, queen-sized and people frequently were moved around or shuffled in these rooms, especially when the emersion clients came in.

Q Did you pay rent?
A Yes.
Q How much?
A So that was the first time I was paying that, like, kind of 1200 with I think it was like a thousand or 900 for rent and the like two to 300 for food.
Q Are you familiar with a company called Caravan Retreats?
A Yes.
Q What is that company?
A They were, like, the LLC. Like, OneTaste was a DBA of Caravan Retreats.
Q While you were living at 1080, were you an employee of OneTaste?
A No. I was what was known as like a beastie. I was, like, an employee in training. And that was -- I was starting to go out to events and like, like I said, do the lead gening, but I wasn't an official employee.
Q And was that term beastie used commonly?
A Yeah. It was like a -- there was, like, a small group of, like, teachers and staff in training that were known as that.
Q What sort of things would the beasties do?
MS. BONJEAN: Objection. Vague.
THE COURT: Overruled.
A Sorry, can you ask again.

Q What sort of tasks would the beasties do?

A So like I said, it was the lead gening events, so we would go out to those kind of things and meet people and sometimes had, like, we had these business cards that described orgasmic meditation, and we would hand those out or leave them around place and talk to people and try to get, like, names and phone numbers, e-mails, and people to follow up with the next day to see if they wanted to take How to OM.

And then we would also help out with some of the immersion clients and, like, their experiences when they came in for the week. And then we also were, like, the shortlist, like, the top short list of volunteers for any classes we weren't taking, to work back of house, like, to work production of the event.

Q So approximately when did you move into 1080?

A I think it was about September of 2013.

Q And you mentioned immersion clients?

A Yeah.

Q What was an immersion client?

A Yeah. So immersion clients were people who wanted to, like I said, either experience living in 1080, but they didn't maybe live in San Francisco, or they wanted sort of -- like, sometimes Nicole would do these, like, diagnosis kind of things where it was like prescriptions almost, of what people needed in courses. So, like, sometimes people in CP7 would --

like, she would say they were tired and wired, so it was like basically they needed -- they would call it to be put at effect. So they needed to have rest functionally. So sometimes it was usually women. But -- they were considered tired more. But they would be, like, offered to come in to 1080 and, like, have massages and meals brought to them, and like, pussy sucking partners once a day kind of thing. Like, they were supposed to be relaxed and pampered for the week, so it could be anything from, like, sexual fantasies for certain people to just, like, pampering.

Q And would the immersion clients, if you know, would the immersion clients pay for that experience?

A Yeah. I think the emersions ran around like five or 6,000 for the week.

Q Are you familiar with an individual named Perry?

A Yes.

Q How about an individual named Cole?

A Yes.

Q And how about an individual named Rob Shaw?

A Yes.

Q Are you familiar with the terms scenes, as used at OneTaste?

A Yes.

Q And what is a scene?

A It's a BDSM term. But it's basically, like, staging a

particular experience that's, like -- it's, like, usually pretty laid out. So it'll be either for, like, a set amount of time or, like, in BDSM there's, like, Saint Andrew's crosses or flogging or like, it would be set tools, you know, or it could be to -- OneTaste used it often, to, like, achieve, not like a particular goal, but like a state, kind of thing like, I said to be put in effect or to be, I don't know, like turned on, but not climaxed. There were like particular things from each scene.

Q So you testified earlier that when you first attended the Nicole Daedone talk, you weren't particularly interested in orgasmic meditation.

By the time that you're a beastie at 1080, are you participating in orgasmic meditation?

A Yeah. Generally, like, four plus times a day.

Q And what about some of these other sexual things that you've described?

A Yeah.

MS. COHEN: Objection. Vague.

MS. BONJEAN: I join.

THE COURT: Overruled.

A I -- yeah, I was -- when I became a beastie, I was -- it wasn't until I became a beastie that I was then asked to participate and help with the scenes and emersions.

Q So we talked about someone named Perry, Cole, and Rob

Shaw.
A Mm-hmm.
Q While you were a beastie, did you participate in any scenes involving any of those people?
A Yes. All three.
Q So let's start with Cole.
Who is that?
A So Cole was Perry's boyfriend at the time.
Q And who was Perry?
A Perry was a student in I believe it was CP8, the CP after me.
Q And did there come a time when you participated in a scene involving Cole?
A Yes.
Q Tell us what happened.
A Yeah. So I was asked by, like, Allie Wall was coordinating it for Rachel Cherwitz. Rachel was on the, like, text thread that was running this, to participate in an experience for Cole. It was basically, it was supposed to be his day, because Perry had signed up for CP8 and Cole was not. He had been offered to, like, sign for CP and had not signed up. So it was his day that was planned to help him, like, make the decision and sign up for CP. And I was asked to participate in a section of that day that was, like, a ritualized shower in the upstairs shower of 1080.

Q And who -- did you do the ritualized shower with anyone else?

A Yeah. It was me and Margo and Leah Mendleson, I believe, and Allie Wall. I can't remember if she came in the shower or just, like, dropped us off. But she was part of that.

Q So what happened in the shower scene?

A We had, like, hung sheets from these, like, clothing lines, kind of going across the shower room because it had like three opened -- there was, like, three showerheads in the stalls, and the sheets kind of created a pathway to the shower and there was, like, music on and we were -- we, like, brought Cole into the shower room and bathed him, everything, just you know, like head to toe. And it was, like, this foot soaking ritual that was -- that Nicole talked about a lot of. It was supposed to like mimic the Temple of Ephesus, where the whores, like, fucked the war out of warriors when they came back into ancient Greece.

Q Were you clothed?

A No.

Q What about the other women involved?

A No.

Q And then what about Cole?

A No. None of us were clothed.

Q And so when you and the others were done bathing him in the shower, what happened after that?

A He was picked up, you know, by other people and Perry was brought with -- she was, like, in a robe and they were, like, escorted back to her room.
Q And to your knowledge, did Cole sign up for the coaching program after that experience?
A No.
Q And who, if anyone, sort of directed that whole experience?
MS. BONJEAN: Objection. Objection to the word directed.
THE COURT: Overruled.
Q You can answer.
A Sorry. Thank you. I'll get this by the end of the day. Rachel Cherwitz was the, like, senior staff, like, on that thread. Like, when the senior staff was put on a thread, they were, like, in charge of the experience and in charge of monitoring it.
MS. COHEN: Objection, Your Honor. Foundation.
THE COURT: Sustained.
Q Let's -- you mentioned someone else named Rob Shaw?
A Yes.
Q Did you participate a scene for him?
A Yes.

(Continued on the following page.)

DIRECT EXAMINATION (Continues)
BY MS. FARRELL:
Q Tell us about that, please.
A So, it was very similar, the same kind of shower setup. And he was in CP8 at the time, so that was -- that was a number of months later.
Q You mentioned text messages.
Were you on text messages in order to execute this scene?
A Yes.
Q I'd like you to take a look, and I'll bring up a paper copy in a moment.
MS. FARRELL: For the witness only, I'd like to pull up a series of exhibits. It's Government Exhibit 2646 through 2653.
And may I approach the witness, Your Honor?
THE COURT: Yes.
Q If you could just take a moment to look at them.
Do you recognize these documents?
A Yes.
Q Okay. Taking a step back, did you -- did you provide copies of text message threads that you were on to the Government at any point?
A Yes. They weren't actually text messages. It was -- it was from an outside app, but messaging threads.

Q I got it, not technically a text, some messaging app?
A Yes.
Q Got it.
And on that messaging app, did you and others in OneTaste send messages about executing a scene?
A Yes.
Q And is -- the messages that you're looking at in front of you, are those messages in which you and other folks at OneTaste were texting about executing a scene in the moment?
A Yes.
Q And can you -- can you see what the date is of those messages?
A Yeah. It says March 10th, 2014.
Q And if you can look, just look through each page, please.
Who is on these -- well, first of all, 2646 through 2653, are these sequential pages all of the same text?
A Yes. Sorry, I don't know about 2653, but -- yeah.
Q And is Rachel Cherwitz on these?
A Yes.
Q How is she identified on the thread?
A She's identified as Mamma Rach0.
Q And are you on this thread?
A Yes.
Q How are you identified?
A Brooke Sheffer.

Q And are another of -- other individuals affiliated with OneTaste also on this thread?
A Yes.
Q And are those people who were all involved in executing a scene on March 10th, 2014 with you?
A Yes.
Q And this entire document, all of the pages, 2646 through 2652, are these all messages about executing a shower scene with these folks?
A Yes.
Q Is this a true and accurate copy of the messages that were exchanged about executing that shower scene?
A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibits 2646 through 2652.

THE COURT: Not 53?

MS. FARRELL: Oh, I'm sorry, 53, apologies.

THE COURT: You originally said 53, I just want to make sure.

MS. FARRELL: Yes, you're correct, Your Honor. I apologize. 2646 through and inclusive of 2653.

THE COURT: Any objection?

MS. COHEN: Yes, Your Honor. Object on hearsay, relevance. I think that's it.

MS. BONJEAN: Yes, I would join that objection, and

completeness.

MS. COHEN: Yes.

THE COURT: Response, Ms. Farrell.

MS. FARRELL: Certainly.

So, with respect to the hearsay, the witness has testified that Rachel Cherwitz is on it, and the rest is for context.

And then the relevance I think has already been established.

And then with respect to the completeness, the surrounding messages have been provided to the defense to the extent they want to include other pages in their cross.

MS. BONJEAN: I'd also point out it's cumulative to the testimony, Your Honor.

THE COURT: Overruled.

Government Exhibits 2646 to 265 -- let me just actually state them all out. I think that's better.

2646, 2647, 2648, 2649, 2650, 2651, 2652 and 2653 are admitted.

(Government's Exhibits 2646, 2647, 2648, 2649, 2650, 2651, 2652 and 2653 were received in evidence.)

MS. FARRELL: If we could start by publishing to the jury 2646.

(Exhibit published.)

MS. FARRELL: And if we go about two-thirds down the

page where it says:

Mamma Rach0: Vinay, we are working on it. Text Jamie offline.

Do you see that?

A Uh-hum.

MS. FARRELL: If you could zoom in on that, please, and below that.

Q So, first of all, who is Mamma Rach0?

A Rachel Cherwitz.

Q And does she say: Brooke and Leah, go set up the third floor shower?

A Yes.

Q And then what do you respond?

A Doing it.

Q And she says: Let me know when complete?

A Correct.

MS. FARRELL: Then if we could go to the 2647, please.

(Exhibit published.)

Q And do we see at the top there that: Let me know when complete of this, can you see that?

A Oh, yes. Sorry.

Q So this is another -- a screenshot of the message continuing, is that correct?

A Yes.

Q Okay. And then does Mamma RachO or Rachel Cherwitz write: I need the siren picture on my bed to be rolled up and tied with a ribbon and placed on Rob's bed during shower scene.

Do you see that?

A Yes.

Q And so, whose shower scene do you understand this text message thread to be about?

A The shower scene that I was involved in.

Q And does it involve someone named Rob?

A Yes.

Q And who is that?

A Rob Shaw was a student of CP8.

Q Why, if you know, why were you all doing a shower scene for Rob?

A To my memory --

MS. BONJEAN: Objection, foundation.

MS. COHEN: Objection.

THE COURT: Sorry, there was an objection.

Basis?

MS. COHEN: Foundation.

MS. BONJEAN: Foundation.

THE COURT: Sustained.

BY MS. FARRELL:

Q Did you discuss ahead of time with Rachel Cherwitz why

you all were doing a shower scene for Rob Shaw?
A Yeah. It was assigned during CP7.
Q What does that mean?
A During CP7 Rob would have asked a question -- I don't know remember what the question was at that time, but a question to Nicole and she like said that he should have this immersion experience and we should do this, do it for him.
Q And then at the bottom Mamma Rach0 writes: Everyone needs to chill the fuck out now.
Do you see that?
A Yes.
Q Do you recall what was going on at the time?
A Yeah. Basically, like the -- there was a truck pickup. I mean you can see this further up. So, Jamie Rosenberg, who was CP7 student with me, was supposed to pick up Patrick and Vinay, and she needed an address.
And like these texts came in incredibly fast and there would be information kind of like -- like it wasn't -- so many people would be texting at the same time that things would not be in order. And so Jamie had asked for the address of where to pick up Patrick and Vinay a couple of times and hadn't gotten it, and Rachel was telling us to, like, calm down and stop texting so fast. And at least we'll get the information in a more ordered fashion.
MS. FARRELL: And so if we can look at 2649.

(Exhibit published.)

BY MS. FARRELL:

Q If you see the second text down from Mamma Rach0 --

A Yes.

Q -- says: Guys, bring the two tumescence down now.

What does that mean?

A Again, it was basically that the nerves and the intensity and the -- in the group were going up and the -- the texts were coming in so fast that the information was getting scrambled.

And that was one of the ways they used the word tumescence at OneTaste.

Q What is tumescence?

A Technically it's unutilized, like sexual potential. Like it's arousal that isn't completed.

But it's -- it was used as a term for a lot of different things. It was, basically, like nerves, lack of movement. They would say like career tumescence or purpose tumescence. Basically, there were tons of different ways you could be tumesced and not be progressing through -- through like something in your life.

Q And then further down Mamma Rach0 writes: Brooke, Margot Leah, Ali, start setting up in the shower.

A Yes.

Q Patrick, you will walk him to the bathroom where he will

be undressed. Everyone please confirm.
What is Rachel Cherwitz discussing here?
A So, that was, basically, how the shower scene, which was the same like ritual foot washing, was to begin.
MS. FARRELL: If we could go next to 2650.
(Exhibit published.)
BY MS. FARRELL:
Q At the top Patrick writes: K. Blindfolded after intake is done.
What is that in reference to?
A So that would have been for -- for these kind of things, and for a lot of courses as well, there were like desire contracts or intake kind of forms, basically, where someone would like say what they wanted out of an experience.
And so, Rob Shaw would have done like some kind of intake form with Patrick, basically, stating like what he wanted, how he would know he'd gotten it. Like it was sort of like a way to break down a coaching experience like from the -- from the date that he was gonna have, and then Patrick says that he should blindfolded after that.
Q And then further down you write: Shower done. And Leah Petrusich -- did I say that right?
A I was wrong. It looks like it was Leah Petrusich, not Leah Mendelson, involved in this. I had the wrong Leah.
Q And you write: Shower done; and she writes: Confirmed?

A Correct.
Q And so what did that mean?
A That we had completed the shower scene with Rob and we had bathed him.
Q Well, did you -- did you set up the shower before the scene?
A Oh, yes.
MS. FARRELL: And then if we go to 2651.
BY MS. FARRELL:
Q If you look at the bottom of the page, does Rachel Cherwitz write: Patrick, you and Amanda will walk him in and up to the shower. The music should be on.
A Yes.
MS. FARRELL: And then if we could go to 2652.
(Exhibit published.)
A Yes.
Q And the third text down does Rachel Cherwitz write: Ali, follow my instruction and do not change what I am doing. Patrick is walking him into the shower. Patrick, please confirm.
Do you see that?
A Yes, yes.
MS. FARRELL: All right. We can put that aside.
Q So, were you paid to participate in these scenes for people?

A No.
Q Why did you do it?
A As a -- so, sort of as a Beasty, but in general I was pretty much always looking for accolades and for like more like attention and time with -- with Rachel and Nicole and other senior staff members.

And there -- a little bit before this time I'd also had an experience of like what it was to not have that attention. And I was very scared of not -- not getting that attention to like what it felt on the other side of it.
Q What had happened?
A I was asked to be like a women-in-waiting. There was a course called The Men's -- The Men's Course. And Rachel did a demo, a demonstration of OMing for that course. And the -- it was an all men's course. So, basically, like she would have been the only woman walking into the room. And so there were a number of like other women who went as sort of a cohort with her for that experience. And I'd been asked to -- to be one of those women.

And the -- like the morning of the event we did what was known as like a check-in circle where Rachel would give a prompt and we would go around the circle answering it. And one of the questions was like: This is something that's like turning me on or like a hot -- maybe I can't remember what the exact question was, but my answer was that I wanted to have

sex with Andreas Panosyan. And I didn't know at the time, but apparently Rachel and him were together and -- and like the whole room went silent. And I'd like knew I'd done something wrong, I just didn't know what it was.

And it took me probably three or four months to figure out what that was. I kept asking her like what I had done wrong and what was going on. And I kept getting the response from her that I knew. And I -- I couldn't figure it out.

And it wasn't until the New Year's winter retreat when I saw them kind of flirting in the corner and I asked them sitting next to me if they were together. And, apparently, they were.

Q And so after you had expressed this interest in being with Andreas, specifically how did Rachel's attitude towards you change?

A It got incredibly cold. I like functioned in the sense she wouldn't make eye contact with me. I was just ignored --

Q Did — sorry?

A -- for months. Sorry, yeah.

Q Did other people ignore you as well, or just Rachel ?

A Just Rachel.

Q And so why did that experience make you eager to please her?

A I mean it felt terrible, especially after everything I'd

been through with other women and -- and that Rachel had promised to be my friend. I was just completely beating myself up trying to figure out the whole thing and asking everyone what had gone on. And there was kind of like a general sentiment of --

MS. COHEN: Objection.

THE COURT: Sustained.

BY MS. FARRELL:

Q And at that point how invested were you in OneTaste?

A Monetarily?

Q Yes.

A I was taking CP7, that was it.

Q We talked -- just to go back to the scenes briefly.

Did you witness other scenes put on for OneTaste clients?

A I knew -- I knew they were going on inside 1080. I didn't see them with my own eyes.

Q Does that relate to the -- sorry, I'm forgetting the word you used, but the --

A Like the being put-at effect.

Q Sorry, what?

A The being put-at effect at retreats.

Q You mentioned something called women being tired and wired?

A Yes.

Q What was --
A Sorry. That was also called being put-at effect where someone was like at a retreat.
Yeah, I saw those being assigned during the Coaching Program, but I wasn't involved in the execution of them.
Q And so during your time as a Beasty, did you become familiar with the various OneTaste senior staff members?
A Yes.
Q All right. I'd like to show you a series of pictures.
MS. FARRELL: If we could start with Government Exhibit 306, which is in evidence.
(Exhibit published.)
BY MS. FARRELL:
Q Do you recognize this person?
A Yes.
Q Who is it?
A Nicole Daedone.
MS. FARRELL: And let's take a look at Government Exhibit 309.
(Exhibit published.)
Q Do you recognize this person?
A Yes, that's Rachel Cherwitz.
Q Government Exhibit 211.
(Exhibit published.)
Q Do you recognize this person?

A Yes, that's Justine Dawson.
Q What was her role as OneTaste?
A She was another teacher who taught CP7, and she was kind of like in charge of Nicole's like spiritual teachings and writings.
Q Did you interact with her much?
A Some.
Q I'd like to show you Government Exhibit 201, please, which is in evidence.

(Exhibit published.)

Q Do you recognize this person?
A Yeah, that's Joanna Van Vleck.
Q And who is she?
A She was sometimes called the president of OneTaste. She was -- she was, basically, like the business-minded side of the company.
Q What was the difference between her role and Nicole's role?
A Nicole was kind of like the, like, philosopher, like she was basically -- she would go -- come up with the teachings and that type of stuff and she was the face of it all.

Whereas, Joanna was kind of more like on the strategy of like new business, like the franchise models or the affiliates, that type of stuff.

MS. FARRELL: If we could show the witness

Government Exhibit 290.

(Exhibit published.)

BY MS. FARRELL:

Q Do you recognize this person?

A Yeah.

Q Who is that?

A That's Yia Vang.

Q And what was her role at OneTaste during your time there?

A She was primarily Nicole's handler was the term for it. She was kind of always with Nicole, help taking care of any of her needs. Yeah. That was most of it.

MS. FARRELL: If we could show the witness Government Exhibit 242.

(Exhibit published.)

Q Do you recognize this person?

A Yes, that's Eli Block.

Q And what was his role at OneTaste during your time there?

A When I first came in, he was helping with sales a lot. And then after Robert Kandell left, he moved up to being in charge of all the men's programs and being the primary male teacher.

MS. FARRELL: If we could show the witness Government Exhibit 302.

(Exhibit published.)

Q Do you recognize this person?

A Yeah, that's Maya.
Q And what was her role in OneTaste at the time you were there?
A She was -- she was kind of like -- she was sort of under Rachel Cherwitz, basically, as like head of sales in New York. And then she moved over to part owner of LA before I left.
MS. FARRELL: If we could show you Government Exhibit 281.
(Exhibit published.)
BY MS. FARRELL:
Q Do you recognize this person?
A Yeah, that's Rachael Hemsi.
Q What was her role at OneTaste at the time you were there?
A She was another teacher, and then she -- I can't remember if she -- I don't think she became an actual owner, but she become like the senior staff member in charge of OneTaste San Francisco.
Q If we could show you Government Exhibit 217.
(Exhibit published.)
Q Do you recognize this person?
A Yeah, that's Marcus Ratnathicam.
Q And what was his role at the time that you were in OneTaste?
A Mostly sales, and then he became an owner of OneTaste LA.
Q I'd like to show you Government Exhibit 221.

(Exhibit published.)
BY MS. FARRELL:
Q Do you recognize this person?
A Yeah, that's Robert Kandell.
Q And what was his role while you were at OneTaste?
A He was the co-founder of OneTaste with Nicole, and then he was the like senior-most male teacher when I started.
Q And did you say he left during your time there?
A Yes.
Q Did you stay in touch with him after he left?
A I did.
Q I'd like to show you Government Exhibit 292.
(Exhibit published.)
Q Do you recognize this person?
A Yeah, that's Aubrey Fuller.
Q And what was her role at OneTaste while you were there?
A Poet. I'm not really sure. She was like high junior staff member, I guess, and friends with all the senior staff members in a way that no one else was.
MS. FARRELL: And if we could show the witness Government Exhibit 290, which is also in evidence.
(Exhibit published.)
MS. FARRELL: I'm sorry, 284.
(Exhibit published.)
THE WITNESS: Yeah, that's Reese Jones.

Q And how did you know Reese Jones during your time at OneTaste?
A He came and sat in a lot of the -- like the back of our CP7 courses, and Nicole would kind of announce -- made announcements like her dear friend and said that he had helped finance some of OneTaste's early days.
And then I went out to dinner with him one time.
Q Tell us about that.
A I went to -- it was like -- I think it was like an Izakaya restaurant in San Francisco with a number of other Beasty women. We -- we just were told to go like be his entertainment for the evening, and -- and we just went to dinner with him.
Q Who told you that?
A Rachel did.
Q Rachel Cherwitz?
A Yes.
Q So, I'd like to turn your attention to January 2014.
A Sure.
Q Did something happen in your personal life at that time?
A Oh, sorry.
Yes, my dad died in January 27th in a helicopter accident. He was a pilot and crashed his helicopter.
Q At the time of your father's death, were you attending OneTaste's courses?

A Yeah, I was -- I think I was attending one almost every weekend in the month of January.
Q And were you also enrolled until the Coaching Program?
A Yes.

(Continued on the following page.)

BY MS. FARRELL:
Q And at that time were you still acting as one of the Beasties performing tasks for OneTaste?
A Yes.
Q Had you gone home for Christmas the month before?
A No.
Q Why not?
A I had been home for Thanksgiving. So I had only been home like a month before and I -- you know, having been recently out of college, I assumed I would go home for Christmas and I think, like, basically told Rachel that I was going to go home for Christmas and she gave me -- she would do these things where she would go (indicating) and it was basically that's a very bad idea and you need to rethink that. And, so, she said "hmm" to me and I was like a deer in the headlights and she told me that none of the other Beasties were going home and I should consider staying and helping out with the Christmas food bank volunteer event that we were throwing.
Q And when you say "Rachel" you mean Rachel Cherwitz?
A Rachel Cherwitz, yes.
Q Did you go home that Christmas?
A No.
Q When your father died, how if at all did you feel about having not gone home for Christmas?

A Horrible.

MS. BONJEAN: Objection.

MS. COHEN: Objection.

MS. FARRELL: Basis?

THE COURT: Sustained.

BY MS. FARRELL:

Q Were you able to go home for your father's funeral?

A Yes.

Q Did anyone accompany you when you went home?

A Yes, my roommate Clouds.

Q And how did you first learn that Clouds would be joining you for your dad's funeral?

A Rachel told me she was going to sent Clouds as my handler.

Q What did you understand the term handler to mean?

A The way the EO was with Nicole as -- a handler was someone who would like attend to someone's every needs ideally before they even knew they had them.

Q And describe what Clouds did while they were home with you for your father's funeral?

A She was with me most hours of the day. She was my, like -- she was my stroker, so she would do orgasmic meditation with me probably twice a day most days. She was intensely involved in everything with my family. My family still talks about it how involved she was. She turned my

dad's body.

MS. BONJEAN: Objection, hearsay and relevance.

Q What involvement did Clouds have with your father's funeral?

A The funeral itself?

Q Or the preparations.

A I was there for, like, two weeks. I mean, she was just -- she was basically by my side at all times.

Q You mentioned something with your father's body?

A She was a masseuse and we did, like, a -- it's a Jewish -- like a signature -- we sat Shiva with him and so there was 36 hours -- sorry, 72 hours that you, like, read -- you put the body on ice and it's like an open casket in the house and you spend every hour with the body and so he had to, like, be dressed and anointed and prepared in order to sit in the open casket and she was the one who turned him.

Q And without getting into what they said, at the time what was your family's reaction to having this handler with you at the funeral?

A I definitely got a lot of looks and it was very weird and, as I said, they still tell me it was weird, talk about it.

MS. COHEN: Objection, hearsay.

THE COURT: I sustained it. Go ahead to the next question, Ms. Farrell.

BY MS. FARRELL:
Q And where were you staying when you were at the funeral?
A At my mom's house.
Q And where is that?
A In a town called Basalt in Colorado.
Q And is it a nice house?
A Yes, it is.
MS. BONJEAN: Objection to the relevance about how nice is the house.
THE COURT: Yes, sustained.
BY MS. FARRELL:
Q Does your family have money, Ms. Gillick?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Was Clouds present in a place that showed the sort of upbringing that you had during the funeral?
MS. BONJEAN: I'm going to object --
THE COURT: Sustained.
MS. FARRELL: May we have a sidebar, Your Honor?
THE COURT: Okay.
(Sidebar held outside of the hearing of the jury.)
(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: We're at sidebar and everybody is here including the two individual defendants.

MS. FARRELL: I apologize for the brief sidebar. We want to make a relevance proffer. So, Ms. Gillick is going to testify that it's her understanding based on a series of things that her family's considerable wealth was reported back to the leader of OneTaste and that that informed a lot of what she's about to testify to and that's the basis for --

THE COURT: When you say the leaders of OneTaste, who specifically and what will the testimony be?

MS. FARRELL: Ms. Cherwitz and Ms. Daedone. With respect to the apartment she lived in in San Francisco and separately at her family's home in the Aspen area.

THE COURT: Who will she say she reported it back to --

MS. FARRELL: In this case Clouds and later that she learned they had an understanding of their wealth.

MS. BONJEAN: There's a foundation and hearsay --

MS. BENSING: There's also relevance.

THE COURT: It's not the relevance issue. It's the foundation.

MS. BENSING: Just to establish the foundation for some of the text message evidence that we intend to proffer --

put on through the FBI summary agent. There's discussions with defendant Daedone with respect to Ms. Sheffer's wealth.

THE COURT: Discussions between?

MS. BENSING: Daedone and I can't remember if it was Van Vleck or somebody else who's either a coconspirator or otherwise involved in OneTaste, but there's discussions regarding her wealth and how they're trying to get her to buy OneTaste NYC, putting pressure on her and so we want to lay a foundation for the future text messages --

THE COURT: So you're offering, subject to connection, certain testimony?

MS. BENSING: Yes. Well, it's these text messages and it will establish the foundation that she, in fact, had money and that they were aware of it.

THE COURT: You have to lay a proper foundation for any questions on this topic. The topic of her wealth or her family's wealth or the fact that somebody was interested in her because of her wealth is not a topic that is off limits, but there has to be a proper foundation.

MS. BONJEAN: And, Your Honor, it sounds like they're going to get it in through Ms. Daedone. This speculation that Clouds was the person is still hearsay. I don't understand how --

THE COURT: Correct. That's why I'm saying there has to be a foundation, but the topic of this witness's or her

family's wealth at the time is relevant.

MS. BENSING: Yes. So, just to be clear, is Ms. Farrell permitted to ask with this relevance proffer whether or not Ms. Gillick's family had money? That was the question.

THE COURT: That is a different question that than what was being asked. This comes down to the questions, not the topics. She is permitted to ask about the wealth at the time. I think one of the questions that was asked was does your family have money or wealth and I don't know that there's any relevance whether they do now so the question has to be proper.

MS. BONJEAN: If the house was nice, she would have noticed that the house was nice and that type of --

THE COURT: Any more questions on this?

MS. BENSING: No, Your Honor.

THE COURT: Ms. Farrell looks confused.

MS. FARRELL: We'll muddle through.

THE COURT: There was no question pending as to which there's an objection at this point.

MS. FARRELL: I think that's right. I'll just ask a new question.

(Sidebar concludes.)

(Continuing.)

THE COURT: Ms. Farrell, you can ask your next question.

MS. FARRELL: Thank you, Your Honor.

BY MS. FARRELL:

Q You testified about going home for your father's death how did that experience affect you?

A I mean, it was incredibly traumatizing. I was grieving for months, if not years, after that. I had kind of like a weird experience where I couldn't taste or, like, experience any kind of pleasure. Like, sex was nothing -- a lot of things felt like ash afterwards for a long time afterwards and my memory -- I was very much in and out of consciousness for a few months.

Q After the funeral did you return back to 1080?

A Yes.

Q After you returned did there come a time when 1080 closed?

A Yes.

Q And what happened?

A 1080 closed and everyone moved out and I was told to help find housing for the senior staff that were going to be staying in San Francisco as well as the Beasties along with Chris Pegasus, the two of us were supposed to find housing.

Q When you say Rachel Cherwitz asked you to find housing,

what do you mean exactly?
A We were supposed to search Craigslist and rental sites and ideally we were looking for a ten bedroom and we found two five-bedroom houses and we were supposed to go to the viewings and vet them.
Q Did there come a time when you were asked to sign a lease on behalf of OneTaste?
A Yes.
MS. BONJEAN: Objection to the leading.
THE COURT: Overruled.
Q You can answer. You said yes?
A Yes.
Q Who asked you?
A Rachel Cherwitz did and I signed a lease for the Beasties house which was one of the two five-bedrooms that we found.
Q And did you have any discussions with Rachel Cherwitz about why you were in a position to sign a lease like that?
A Yes. There was both me and my -- he was my ex-boyfriend at the time, Diego Vargas -- at the time we were both able to afford and, you know, put down both the deposits and sustain the rent. Obviously people would pay into the pool, but we would be the bottom line on the Beasty issues.
Q And did you have discussions with Rachel Cherwitz about that financial situation in particular?
A Yes.

Q Besides you and Diego Vargas, were others at OneTaste, to your knowledge, asked to sign leases?
A Yes.
Q Who?
A In, like in New York, Ravi Agrawal was frequently asked. There were other people that were in other cities asked to sign leases. Oh, and I think Chris might have -- you know, people signed for the lease ses for the OMs --
MS. COHEN: Objection, Your Honor, to the speculation.
MS. BONJEAN: Join.
THE COURT: Sustained.
BY MS. FARRELL:
Q After you signed the lease were you in charge of that house?
A Yeah, there was, like, you were known as house mom or house dad and so I was, like, the house mom on the Beasty house.
Q And who, if anyone -- sorry. Withdrawn.
Did you take direction from anyone in that role?
MS. COHEN: Objection, vague.
MS. BONJEAN: Join.
THE COURT: Overruled.
A Yes, the Beasty house is -- just like the Beasty group, was under Rachel's supervision.

Q And by "Rachel" you mean Rachel Cherwitz?
A Yes.
Q Was that something called an OM house?
A Yes.
Q And were there other OM houses?
A Yes.
Q And how, if at all, was the OM house that you rented related to the other OM houses?
A We were sort of, like, because it was the Beasty house specifically, it was kind of more like a senior house -- like it was -- you had to be like invited to live there and it was, like, more closely connected with OneTaste staff.
Q Did there come a time when you began living in New York City?
A Yes.
Q Why did you move to New York?
A I -- I got into the aerial silk training program that was happening here in New York for the summer. It was a three-month program.
Q And was that summer of 2014?
A Yes.
Q When you moved to New York City, were there OM houses in New York?
A Yes.
Q Where?

A The one that I lived in -- I don't know if there were others, but the one I lived in was the Brooklyn OM house.
Q And so did you move to the Brooklyn OM house?
A Yes.
Q How long did you live there?
A I think it was about six weeks.
Q And approximately when did you live in the Brooklyn OM house?
A It was, like, June or July -- through July.
Q Is that while you were attending the aerial silk school you described?
A Yes.
Q If you can remember who else was in the Brooklyn OM house at the time?
A Ravi Agrawal and Ayries Blanck, Patricia Black, Ruwan -- Rafael Martinez and Courtenay Lapovsky was in and out a lot, but I don't think she actually lived there.
Q You mentioned someone named Ayries Blanck and someone named Ravi Agrawal?
A Yes.
Q What, if anything, was their relationship at that time?
MS. BONJEAN: Objection, speculation, foundation.
MS. COHEN: Join.
THE COURT: Sustained.
BY MS. FARRELL:

Q What was Ayries Blanck and Ravi Agrawal's relationship at the time?

MS. BONJEAN: Objection.

MS. COHEN: Objection.

THE COURT: It's the same question. Sustained.

BY MS. FARRELL:

Q Would you believe that two people can be in any number of types of relationships?

MS. BONJEAN: Objection.

MS. COHEN: Objection.

THE COURT: Overruled.

A Yes.

Q So, of all the people that you just listed, were any of them in romantic relationships?

A Yes, Ayries and Ravi.

Q What was the relationship?

A They were ceremonially married is what it was called.

Q What does that mean?

A Rachel Cherwitz had run a marriage ceremony. It wasn't, like, a legal marriage but they were -- they were calling themselves married.

Q What was your level of involvement with OneTaste at the time you were living at the Brooklyn OM house?

A I was pretty far out. I was kind of thinking I was done with OneTaste and was focusing on my aerial silk, business and

I graduated from CP7 and I don't believe I was taking any other classes, but I was still volunteering for them for back-of-house.
Q While you were living at the Brooklyn OM house?
A Yes.
Q Did there come a time when you got more involved with OneTaste after that summer?
A In the middle of the summer, Johanna called me and asked me if I could -- I was on the subway, if I could get out and sign an NDA and I -- I went to a print shop or Kinko's and printed an NDA and called her back and she called me and asked if I wanted to buy into OneTaste New York.
Q Did you correspond with Johanna Van Vleck and Rachel Cherwitz over e-mail about this request for you to consider buying OneTaste New York?
A There was a lot of correspondence for a long time so I'm sure that was one of them.
MS. FARRELL: I'd like to show the witness Government Exhibit 1544 for identification.
(Exhibit published to the witness, counsel and the Court.)
MS. FARRELL: May I approach the witness?
THE COURT: Yes.
(Counsel approaches.)
BY MS. FARRELL:
Q Do you recognize this document?

A Yes.
Q What is it?
A It's a chain of e-mails with Johanna about the purchase and Rachel Cherwitz is included in some of the later ones, as well as an accountant.
Q And just, if you look at this document, is the first in time chronologically at the top and the last in time chronologically at the bottom? Do you see that?
A Yes.
Q And that's -- that's different sometimes than we see other e-mails. I want to be sure you understand. Do you see that?
A Yes.
Q Okay. And, so, what is the first date on this document?
A June 24, 2014.
Q And what is the last date on this document?
A July 14, 2014.
Q Does this contain discussions that you had with Johanna Van Vleck and Rachel Cherwitz about your potential purchase of OneTaste New York City?
A Yes. This is, like, basic information about the purchase details.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 1544 into evidence.

MS. COHEN: Your Honor, objection as to hearsay, not

in furtherance and relevance.

MS. BONJEAN: Your Honor, hearsay objection and potentially double hearsay issues.

THE COURT: Ms. Farrell?

MS. FARRELL: So we are offering this for Ms. Cherwitz's statements as well as Ms. Van Vleck's and Ms. Sheffer's are for context.

MS. COHEN: There's also, Your Honor, at the bottom another individual in there.

THE COURT: Do you want to respond on that Ms. Farrell?

MS. FARRELL: We're not offering that portion for the truth.

THE COURT: Give me a moment.

Government Exhibit 1544 is admitted.

(Government Exhibit 1544 received in evidence.)

(Exhibit published.)

(Continued on the following page.)

(Continuing.)

MS. FARRELL: If we could publish this to the jury, please.

Q Just starting at the top which is the first chronologically, what is the subject matter of this message from Ms. Van Vleck?

A OneTaste NYC.

Q And I'm just going to read her e-mail to you.

Hi lady. I've attached some basic information about around OneTaste NYC. It is a profitable business. We are asking for 1.7MM for OT NYC. We are willing to finance 1 million of the purchase price over a period of eight to 10 years. Essentially, we are backing you all doing well. It's our topic priority it ensure you are all successful. As it stands, if you were to buy in, you, Mya, and Ayries would need to come up with 700K to purchase NYC up front. The other 1 million paid off over time to OT as you all make money. NYC is a profitable business already. In the last years, revenue was just under 450K. See attached summary. I have many more documents for the city and you have many more questions. This is to get started with. See you Thursday. Let me know if you have any questions. Joanna.

What is she referring to when she refers to you, Maya and Ayries?

A The three of us were the three initial owners asked to

buy in to OneTaste New York.

Q And when you first got this call from Ms. Van Vleck asking to you buy into OneTaste New York City, was that a surprise to you?

A Yeah. I was -- I was -- not only had I not discussed it anyone prior to that, it was also the reason for signing the NDA was it was not a known business move at the moment that they were going to be selling -- it was, like, a temporary idea, because they basically hadn't announced to the community that they were going to be splitting off cities from -- from corporate, from the larger company.

Q Okay. And when you say, NDA, what are you talking about?

A Like it was like a non-disclosure agreement about the business move. So that basically I was supposed to not tell anyone until they announced to the larger community.

Q And did Ms. Van Vleck or Ms. Cherwitz ever tell you why they were asking you to -- if you were interested in this?

A Because I could afford it.

MS. FARRELL: And then just scrolling down to the bottom of the second page.

Q Does Ms. Cherwitz jump in at some point in this e-mail?

A Yes.

Q And so looking at the one on Page 3, the third, down.

A Sorry, Page 3?

Q It's July 4th, 2014 at 5:56 p.m.

A Yes.
Q Does Rachel -- well, looking above one.
Did you write to her, I don't think any of us know where to start?
A Yes.
Q And does she reply, Okay. I hear that. Based on the numbers below what would feel good?
A Yes.
Q And then can you read what you write in response?
A I wrote, See this is where I hit my head on this level. Like, I'm not holy shit if we could make 30K a month that would be amazing, and I know that's just going to cover costs.
Q What are you talking about there?
A Let me read it for a second.
It looks like we were trying to figure out a number that we would estimate that we could pay per month.
Q All right. So you can put that aside.
Did there come a time when you had exclusivity for considering this offer?
MS. BONJEAN: I'm going object to the leading nature of that question.
THE COURT: I can't hear you. I'm sorry.
MS. BONJEAN: Objection. Leading.
THE COURT: Overruled.
A I didn't -- I didn't at any time know that there was --

there wasn't any competition that I knew of for considering this. But I didn't sign anything that said it was, like, an exclusive time to consider.

MS. FARRELL: Well, let's take a look at what's marked, just for the witness, please, what's marked a Government Exhibit 4230. We can just see this on the screen for the witness.

Q Do you see this document?

A Yes.

Q Do you recognize it?

A Oh, yeah. Yes, I do. Sorry.

Q And so does this --

A Ten years.

Q Does this refresh your recollection?

A Yes, it does.

Q So what happened --

THE COURT: Let me just remind you, you need to get the question out, maybe take a pause, and then answer. I think you're stepping on each other's words.

MS. FARRELL: Apologies.

THE COURT: That's okay. Ms. Farrell, go ahead and ask the question again.

Q Well, if you could take a look at the document.

Do you recognize this?

A Yes.

Q What is it?
A It's a letter agreement of exclusivity.
Q And what is it dated?
A June 27th, 2014.
Q And if you go to the second page, who are the parties to this agreement?
A Po, Ayries, Maya, and myself and Robert.
Q Robert who?
A Robert Kandell.
Q And who is Po?
A So after the beginning of this e-mail chain, Po was also asked to come on as the fourth owner, the fourth initial owner of OneTaste New York.
Q And so towards the end of June 2014, did the four of you enter into an agreement with OneTaste to consider this purchase?
A Yes.
Q And is Government Exhibit 4230 a true and accurate copy of this letter agreement for exclusivity that you signed?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 4230 into evidence.
THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
MS. BONJEAN: No objection.

THE COURT: Government Exhibit 4230 is admitted.

(Government Exhibit 4230, was received in evidence.)

MS. FARRELL: Thank you. And if we could publish that for the jury, please.

(Exhibit published.)

MS. FARRELL: If we could show the second page.

Q Is that your signature toward the bottom there?
A Yes.
Q And on the left, is that Robert Kandell's signature?
A Yes.
Q Was he signing on behalf of OneTaste?
A Yes.
Q Around the time that you're having these -- this correspondence about buying the New York City branch of OneTaste, what was your emotional state?
A So this was still only a few months after my dad had died, and I was still reeling from that a lot.
Q And did you share the fact that you were still struggling with your father's death with anyone at OneTaste?
A Yes.
Q Who?
A The whole New York team, including, Rachel Cherwitz.
Q Did you end up buying OneTaste New York City?
A Yes. Not until, like, the next January, but yes.
Q And did you buy it alone or with others?

A No. So the owners shifted by the time we actually signed the purchase, and it was -- I bought it with -- the only two other monetary contributors were Ravi and Po.
Q And Ravi who?
A Sorry. And Maya, and then she switched. She switched right before the purchase. Ravi Agarwal.
Q Did there come a time in August of 2014 where you made a financial transfer in order to initiate the sale?
A Yes. It was a small amount on that document.
MS. FARRELL: And if we could take a look, please, at Government Exhibit 4318, which is tab 31 in your binder, Your Honor.
THE COURT: Thank you.
Q Do you recognize this document?
A Yeah. So this was the large amount. So there was a --
THE COURT: Sorry, if you could slow down a bit.
A The prior document that we were just looking at, had like a tiny deposit and then this was the rest of the amount that I put in to OneTaste New York. But we hadn't actually signed the documents yet at this point.
Q So on August 28th, 2014, how much money did you transfer for the purchase of the OneTaste New York City branch?
A $202,000.
Q And is Government Exhibit 4318 true and accurate copy of the wire transfer instructions you sent for that?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 4318 into evidence.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: All right. Government Exhibit 4318 is admitted.

(Government Exhibit 4318, was received in evidence.)

Q And did you later wire additional funds for the purchase?

A I don't believe so. But I don't remember.

Q Okay. And so just taking a step back, why were you -- why did you buy into OneTaste New York City?

A I mean, the other things that Rachel and Joanna told me when I bought in was, you know, that, like, they felt like this was a game big enough for me. And one of the biggest reasons that I personally bought in is when I was living at 1080, I was dating a woman Billy Stubblebine, and she was a staff member, like, a relatively senior staff member, and I had, like, a very close perspective on what it was to be senior staff, and it seemed incredibly intense, and like, scary, and abusive, and just your whole life and time, and I didn't want any part of being staff, even though I really wanted to teach the practice. Like, I really believed in the practice and wanted to teach.

Q So let me stop you.

So in your view, was being an owner different than being staff?

A Yes.

Q And in what way?

A The reason -- so the reason that I bought in as an owner --

MS. COHEN: Objection. Foundation.

THE COURT: Overruled.

A The reason that I bought in as an owner is because I was really hoping and I really believed and wanted to be treated differently and have more of a life and an individuality, and I thought that as an owner, I would have a different experience than I would as staff.

Q And so what formed the basis of your belief at this time that being staff was a really difficult job that you didn't want to do?

A As all the insights that I got from dating Billy and really seeing what it was.

MS. COHEN: Objection. Hearsay.

THE COURT: Overruled.

Q And specifically, what about being a member of staff did you understand to be particularly difficult?

And I want to be clear, I'm not asking for anyone's statements, but just what you observed.

A Just -- I think one of the biggest things was the hours. They were just up at crazy hours. It was clearly everyone was working from --

MS. COHEN: Objection as to everyone.

MS. BONJEAN: And foundation.

THE COURT: Overruled.

Q You can keep going.

A Was working from like 6:00 a.m. to midnight, you know. It seemed like it was all day, every day. I never saw anyone take any days off. And it didn't seem that they had, like -- I would -- I didn't observe people visiting family or friends or doing anything other than working for --

MS. BONJEAN: Objection. Foundation.

THE COURT: Overruled.

Q And so why did you think that your being an owner would be different?

A I don't know. Pure hope. It seemed -- Rachel and Nicole and Joanna, the people before, also, there was a -- like, it was sold and billed as kind of like glamorous and we were going to be on Inc. Magazine and the Times and, like, it sounded like a more normal life than staff was having and I really hoped it would be that way.

Q And did it turn out to be different?

A No.

Q Okay. Can you describe OneTaste New York City's

relationship to OneTaste Inc. following this transaction?
A Yeah. So it was basically, like, the four biggest cities, so New York, San Francisco, L.A., and London, all split off in these franchise branches. So as the owners of New York, we were, like, to run the City and have it turn a profit and a portion of our profits went to OneTaste corporate, and OneTaste corporate still taught, like, the big classes, like, the coaching programs and magic school and kind of any of the larger retreats, and persons were taught by OneTaste corporate, and the senior staff still. But what kind of became the new junior staff, the owners of the cities, were responsible for teaching How to OM courses, the -- there was like the OM practice club, running Turn Ons, and some of the other courses, like, the men's course.
Q Did you continue to have a loss while you served as co-owner of OneTaste New York City?
A On paper, no. In practice, yes.
Q Who, in practice, continued to be your boss?
A Rachel Cherwitz.
Q Anyone else who was your superior?
A I mean, there was a hierarchy inside what was known as the exec time, the owners of OneTaste. It was Maya, initially, and then when her -- at one point her and Aubrey swapped cities and then Aubrey became, like, my more senior exec team member.

Q And what was your relationship with Nicole Daedone when you became an owner of OneTaste New York City?
A So when my father passed, I was, like -- she gave me her phone number and it was, like, a huge honor. So I had her phone number at that point, and would, like, text her on a fairly regular basis -- not like super frequently, because I was terrified to text her. But, like, I would text her probably, I don't know, every week or so, every two weeks maybe. But, like, any kind of advice or things I was having a particularly hard time and I started basically having an ongoing I guess you could call it -- an ongoing coaching relationship with her with specific questions that I couldn't figure out on my own.
Q Did you earn a salary once you became a OneTaste owner?
A So that was the -- not until the actual papers were signed in January. Then I started getting that, like, 3K a month, that was like, the owner pre-withheld. I can't remember what it's called. It's a business term.
Q And did there later come a time when you sold your interest in OneTaste New York City to someone else?
A Yes. When I left at the beginning of July 2015, Ravi Agarwal bought me out of my monetary portion of my shares, basically, of OneTaste LLC.
Q And did you make any money own that sale?
A No. I lost money.

Q At any point, did you become a member of the sales team?
A Yeah. I -- as an owner, I was kind of considered a member of the sales team, but then I started getting, like, more and more like formal training and like --
THE COURT: Sorry, if you could slow down a bit and repeat that last sentence.
THE WITNESS: Apologies. I need to go to the bathroom, so I'm trying to talk faster. But we're almost done, so I think I'll make it.
A So I was partially sales as just an owner and then there -- like, around the time when Ayries left, I was getting more and more formally trained as sales, and Rachel Cherwitz was telling me to do -- like, to not do back of house anymore.
Q Okay. I'd like to show you what's marked as Government Exhibit 4315. And that's tab 30 in your binder, Your Honor.
THE COURT: Thank you.
Q You mentioned you started getting $3,000 a month payment in January of 2015; is that correct?
A Yes.
Q So did you get a W-2 for the year 2015 from OneTaste?
A Yes.
Q And is Government Exhibit 4315 a W-2 of yours?
A Yes.
Q And is it true and accurate copy of your 2015 W-2 from OneTaste New York City, LLC?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 4315.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 3315 is admitted.

(Government Exhibit 4315, was received in evidence.)

MS. FARRELL: If we could publish that for the jury, please.

(Exhibit published.)

Q How much did you make as W-2 wages in 2015, according to this document?

A 6,000.

Q And did you also sell your interest in New York City in 2015?

A Yes.

Q Okay. As someone who was part owner of New York City for a period, are you familiar with how the New York City staff was paid?

A Not much. I was very infrequently involved in any of the financial accounting.

Q Okay. Where did you live while serving as co-owner of OneTaste New York City?

A At the -- it was known as the bunker which was up on 43rd

I believe between 8th and 9th, and then 365 which was -- that was the address, it was 365, I think 21st street. Might have been First Ave. I can't remember. Any ways. Right around there.

Q So starting with the bunker, when did you move there approximately?

A Within probably about a week of when I got offered to buy into OneTaste New York. So in July 2015.

Q And why did you move there?

A Rachel invited me and was basically moving in all of the owners to the bunker.

Q So when you moved to the bunker, who else did you live with?

A Ayries was brought over, Po resolutely refused, but she was encouraged to move in.

MS. COHEN: Objection to the comment.

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q So just to back up, who, without commentary, who else lived with you at the bunker?

A Ayries, Ravi, Alexis Ware was there, Maya, Rachel would always stay with us when she was in town, Ryan, and Koser.

Q And who's Koser?

A Chris Kosley?

Q And who's Ryan?

A I'm blanking on his last name at the moment. But he was a back of house staff member.
Q So who of those people were co-owners with you?
A Ayries, and Maya, and then eventually Ravi and Hamza also lived there, as well.
Q Were all of the people living with you there employees of OneTaste or owners of OneTaste?
A Yes.
Q Did OneTaste people still live at the Moralino at the time?
A No.
Q Did you pay rent to live at the bunker?
A Yes.
Q Approximately how much?
A I believe it was still around that 1200.
Q And can you just briefly describe the layout of the bunker?
A Yeah. It was, like, up a couple steps to like a common area there was, like, two bedrooms on sort of that first floor and then, like, a no-windows, like, very small kitchenette and a little couch. And then there was a restroom upstairs, and downstairs was three more bedrooms and an additional restroom. And that was underground.
Q Were there shared beds?
A Yes.

Q And how were the bed assignments handled?

A As they were at 1080.

Q Which is what?

A There was two to beds, like, a queen-sized bed and they were frequently swapped around.

Q While you were living there, did you have any privacy?

A No. I never had any privacy at OneTaste, like, the whole time I was there for the two and a half years.

Q And how, if at all, did the lack of privacy affect you?

A I mean, it was intensely pressing on my mind. I am definitely someone who needs some, like, solo alone time, and I was never alone. You know, and I would get like 100 texts an hour. It was like very insistent.

Q What, if anything, was Rachel Cherwitz's role in the bunker?

A So I mean, when I first moved in, she was, like, the most senior staff member. She wasn't -- the bunker didn't really have a house mom. It maybe would have been Maya, but it wasn't really set up like other OM houses.

And then she kind of continued to be the, like, boss senior staff member of New York as things progressed with the purchase of the franchise.

Q While you were living at the bunker with Ayries and it sounds like Rachel was there occasionally, did you have occasion to observe Rachel Cherwitz and Ayries interact?

A Yes.

Q Can you describe -- without saying what anybody said, but in a general sense, what did you observe?

A Ayries was being trained as the next head of sales.

MS. BONJEAN: Objection. Foundation.

THE COURT: Sustained.

(Continued on the following page.)

DIRECT EXAMINATION (Continues)
BY MS. FARRELL:
Q Do you have an understanding of Ayries' role at the time that you moved into The Bunker and the first few months you were living there?
MS. BONJEAN: Objection vagueness.
THE COURT: Overruled. Overruled.
A She was --
Q The question was just do you have an understanding of Ayries's role --
A Oh, yes.
Q -- during the time you moved into The Bunker and the first few months you were living there?
A Yes.
Q Okay. What was that role?
A Training for head of sales under Rachel.
Q And in that living -- during that time did you observe the interaction between Rachel Cherwitz and Ayries Blanck while living in The Bunker?
A Yes.
Q And describe what you observed.
MS. COHEN: Objection as to --
THE COURT: Sustained.
Q How did Rachel Cherwitz and Ayries Blanck interact during that period of the first few months you lived in The Bunker?

MS. BONJEAN: Objection.
THE COURT: Sustained.
MS. BONJEAN: Vague.
THE COURT: Sustained.
BY MS. FARRELL:
Q With respect to Ayries being trained as the upcoming head of sales, what did you observe with respect to their interactions?
MS. COHEN: The same objection.
THE COURT: Overruled.
A Rachel and Ayries were in very tight communication. Ayries was my bedmate, so I, you know, often saw or she told me -- sorry -- I often saw her texting Rachel. I think they had like an ongoing text thread. And when Rachel was in town, they would have a lot of meetings and Ayries was kind of her shadow when she was in town.
Q And -- and how did -- during that specific period you just testified about and in that context, how did Rachel Cherwitz treat Ayries Blanck?
MS. BONJEAN: Objection, vague.
THE COURT: Overruled.
A There -- she -- she often had a very intense tone with Ayries. It was sort of like it was almost like dog training, like she would make this noise --
MS. COHEN: Objection.

THE COURT: Overruled.
A It would -- it was a noise that would just like ch-h-h-h. And it was like everything that Ayries did was scrutinized and guided by Rachel.
Q And when you say it was like dog training and she would say ch-h-h-h, who is the "she" you're saying?
A Rachel Cherwitz.
Q And during this time when you observed Ayries, how would you describe her -- her health?
A She was --
MS. COHEN: Objection, Your Honor.
THE COURT: Sustained. And actually, it's 5:30, so I think we're going to stop.
And the witness can step down for today.
(Witness steps down and exits the courtroom.)
THE COURT: Okay. We are going to stop for today.
Before I remind you of what I remind you of every day, I just wanted to mention something about schedule.
During the jury selection, Judge Marutollo let you know that the trial was likely to last for approximately six weeks. And I just want to let you know that that remains an accurate estimate. So, I thought I would let you know that today.
And I will also remind you of what I tell you every day because it's important: Over this evening break, don't

discuss the case with anyone, even among yourselves. If anyone approaches you to try to discuss the trial with you, please let me know immediately through Mr. D'Agostino.

Don't read, listen to, or watch any news or other media reports of the trial. Don't conduct any research, any independent research about this case, the matters in the case, or the individuals involved in the case.

Don't talk to the parties, witnesses, attorneys, about anything.

Keep an open mind and have a wonderful evening.

The same schedule for tomorrow, 9:15, and then we'll start at 9:30. I appreciate everyone's attentiveness, and have a good evening, everyone.

(Jury exits.)

THE COURT: Okay. Everyone may be seated.

Was there a scheduling issue for this Friday that anyone wanted to pursue?

I think there was something mentioned several weeks back, but I don't know if that's still an issue.

MS. BENSING: Yes, Your Honor. I have a doctor's appointment that I have to go to on Friday.

THE COURT: What's your timing roughly?

MS. BENSING: At 1:15. So, I'd have to leave here at around 12:45. I think it should be quick, but it's hard to predict.

THE COURT: Okay. And what is the request?

MS. BENSING: Well, I think it depends on where we are. If it's a Government witness who's not my witness, I'm happy to just be gone. If we are onto a defense case, it would be my preference to be present, Your Honor.

THE COURT: Okay. Does anyone else want to be heard on this?

MS. COHEN: Well, Your Honor, I had an issue on a CJA case with a bail hearing, so I tried to coordinate it for lunch on Friday. It was Judge Amon on at 12:00. I got it pushed to 12:30.

So, I was hoping that we would do -- I can also, if it's not my witness, run up, you know, if it's 15 minutes. And I would imagine it would be no longer than thirty minutes. So, I should -- I shouldn't have any other problem, but I did try to time it with her appointment.

THE COURT: Okay. I'll do my best to accommodate everybody.

One thing possibly to think about is depending on where the case is to have a charge conference on Friday afternoon and let the jury go earlier. I'm not sure that that makes a lot of sense if the Government is about to finish its case, but I'm not sure that we will know that until at some point tomorrow.

MS. BENSING: Yeah, I think that's right.

We have this witness. We anticipate then putting on some of the financial evidence. We anticipate then we may call another short witness, we may not. We're trying to trim as much as possible. And then we anticipate putting on this FBI summary agent.

And so, I think we are hoping to get some kind of ruling with respect to the exhibits that we would put on through him, and that may dictate his length. That will dictate his length, obviously, because --

THE COURT: Is this the chart that was missing the objection?

MS. BENSING: Correct, Your Honor.

THE COURT: Okay.

MS. BENSING: So we're almost at that point.

THE COURT: Does it have objections on the chart yet?

MS. COHEN: We're working on it.

MS. BONJEAN: We're getting through it.

THE COURT: Okay.

MS. BENSING: So, we may be seeking to put him on, depending on how much longer this witness goes with direct and cross-examination and how long the financial witness goes, maybe, maybe tomorrow afternoon, but otherwise I think he would be on on Friday. And so, it would be great to finish with him before the weekend because the Government anticipates

resting after that unless we --

THE COURT: I am not letting the Government rest until everybody goes through those exhibits.

So, I said it a couple of times.

MS. BENSING: Yes.

THE COURT: I will not let you rest in front of the jury until the parties agree as to what evidence has come in.

MS. BENSING: Yes. So we can see where we are tomorrow and then, perhaps, it would be prudent to take the weekend to like sort all of this out. We could rest on Monday morning. We may still be going on Monday morning, I just don't know --

THE COURT: Right.

MS. BENSING: -- quite how long things will take.

THE COURT: Ms. Bonjean has a question for me. You seem confused by what I was asking.

MS. BONJEAN: I am confused.

I know there are two agents or there's a summary FBI agent, as well as the financial person. And then we have the remainder.

THE COURT: I think the Government said there might be one other witness as well.

MS. BONJEAN: Yeah.

THE COURT: No, they mentioned that yesterday. Right?

MS. BENSING: Yes.

THE COURT: In the victim witness category, or no?

MS. BONJEAN: Is this the same one?

MS. BENSING: Yes. Jennifer knows. I'll clear it up with Ms. Bonjean.

THE COURT: Okay.

MS. BONJEAN: I just want to make sure --

THE COURT: Okay.

I want to make sure you understand what I'm saying about the exhibits. I just want, I want -- I am going to have the Government do this because this is your case-in-chief at this point. I need a list that makes some sense.

I feel like these numbers are coming out, it's like we're playing a bad bingo game. I mean there are just letters, numbers, you know, sometimes five different letters and numbers for one exhibit.

I'm keeping track. My team is keeping track, but I need the parties because the exhibit lists that were given to me were never complete. And I need one list in -- in number, letter, whatever order is an actual order, of the exhibits that went in.

Some of the exhibits early on, at least, were coming in and the Government hadn't redacted them in hard copy yet, I think. They had only redacted in -- online. There are going to need to be redacted copies.

So we need to have copies, an exhibit list of everything that went in, and copies, copies of everything. I think that is in everybody's interest to be on the same page as what -- about what went in. So whatever you need to do to coordinate with each other, because then that will have to come to the Court and I'll have to do what I do on my end to make sure that it's consistent with what I think came in.

Does everybody get that?

MS. BENSING: Yes, Your Honor.

MS. COHEN: Yes.

MS. BENSING: And, Your Honor --

THE COURT: I just think in a case where the numbers are all over the map and the lists are not complete, we have to do something to make sure that this is all orderly.

MS. BENSING: And because we are seeking to put in a large number of documents through the summary agent, obviously, we can come up with a list in advance and then we'll have to just take a minute to revisit it after his testimony.

THE COURT: Yes, of course. Of course. That's fine. I just think you should start sooner rather than later.

MS. BENSING: Yes. And we have been tracking it, of course, Your Honor.

THE COURT: Right.

MS. BENSING: So we'll coordinate with the defense.

THE COURT: Okay. I think that's fine.

And if there is any more that the parties want to tell me about their requests on jury instructions along the lines of what I was asking about, you can let me know that sooner rather than later. If not, I'll be getting you a draft and we can take it from there. But I think if there is specific language that you want on some of these instructions or if you don't want certain instructions that I mentioned earlier, you can let me know that.

MS. BENSING: So, can we let the Court know tomorrow morning? Maybe we can get here slightly early and we can let the Court know.

THE COURT: That's fine.

MS. BENSING: Just one other thing to flag, Your Honor. Ms. Farrell had to run out.

THE COURT: I heard.

MS. BENSING: But she has been discussing with the defense attorneys a slight narrowing of the Government's financial exhibits. And so, we are going to provide updated copies of those to the defense attorneys and to the Court tonight. It's nothing new, it's just narrowed.

So I just wanted to put that on the record that we're going to be getting that, because I do expect that witness to testify tomorrow.

THE COURT: Okay. And the issue of the summary

chart, has that been resolved?

MS. BONJEAN: I think we have worked it out. This morning we had a good conversation. I think we're at a meeting of the minds.

THE COURT: Okay, good.

All right, everybody, have a good night. I'll see you tomorrow morning.

MS. BENSING: Thanks, Judge. You, too.

(Proceedings adjourned to May 29, 2025 at 9:30 a.m.)

ooo0ooo

# I N D E X


| WITNESS | PAGE |
|---|---|
| **ROBERT KANDELL** | 3580 |
| CROSS-EXAMINATION BY MR. ROBOTTI (CONT'D) | 3580 |
| CROSS-EXAMINATION BY MS. BONJEAN | 3671 |
| REDIRECT EXAMINATION BY MS. BENSING | 3679 |
| RECROSS-EXAMINATION BY MR. ROBOTTI | 3694 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 3697 |
| FURTHER DIRECT EXAMINATION BY MS. BENSING | 3702 |
| FURTHER CROSS-EXAMINATION BY MR. ROBOTTI: | 3703 |
| **KENNETH SAUL BLACKMAN** | |
| DIRECT EXAMINATION BY MS. GUPTA: | 3706 |
| CROSS-EXAMINATION BY MS. BONJEAN | 3764 |
| REDIRECT EXAMINATION BY MS. GUPTA | 3794 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 3795 |
| **ANTHIA GILLICK** | 3805 |
| DIRECT EXAMINATION BY MS. FARRELL | 3805 |

**E X H I B I T S**


| Exhibit | Page |
|---|---|
| Court Exhibit 11 | 3577 |
| Defendants' Exhibit 4-AU | 3585 |
| Defense Exhibit 11-FS, pages 11 through 17, | 3603 |
| Defense Exhibit 1BS | 3611 |
| Government Exhibit 4501-FD | 3719 |
| Government Exhibit 4501-HD | 3723 |
| Government Exhibit 4501-KD Exhibit | 3726 |
| Government Exhibit 4501-BD | 3731 |
| Government Exhibit 4501-AD | 3734 |
| Government Exhibit 4501-ED | 3741 |
| Government Exhibit 4501-JD | 3749 |

**E X H I B I T S**


| Exhibit | Page |
| --- | --- |
| Government Exhibits 4501-GD | 3758 |
| Government Exhibits 2646, 2647, 2648, 2649, 2650, 2651, 2652 and 2653 | 3839 |
| Government Exhibit 1544 | 3871 |
| Government Exhibit 4230 | 3877 |
| Government Exhibit 4318 | 3879 |
| Government Exhibit 4315 | 3885 |