UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,     :   23-CR-146(DG)

          Plaintiff ,         :
                                  United States Courthouse
       -against-              :   Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE,               :
                                  May 29, 2025
          Defendant.          :   9:30 a.m.
 - - - - - - - - - - - - -    X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Stacy A. Mace
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Richard Hobbs, Trial Direct Controller

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
United States Courthouse, Room N377A
225 Cadman Plaza East
Brooklyn, New York 11201
smacerpr@gmail.com

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: The Honorable Diane Gujarati is now presiding.

You may be seated.

Your Honor, this is United States of America against versus Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. BENSING: Yes.

THE COURT: I don't see, I don't see Ms. Daedone and Ms. Bonjean, so we'll wait.

MS. FARRELL: They were here, Your Honor.

THE COURT: That's fine. We'll wait.

(Pause.)

THE COURT: And Mr. Robotti, how could I forget Mr. Robotti.

MR. ROBOTTI: Good morning, Judge.

THE COURT: Good morning.

MS. FARRELL: Do you mind if I speak to counsel while we're waiting?

THE COURT: No. I think that's a great idea.

(Pause.)

MS. BONJEAN: Sorry, Your Honor.

THE COURT: That's okay. I wouldn't start without

you, Ms. Bonjean.

Do we have everybody we need now?

Is Ms. Killion -- Ms. Bonjean, are we waiting for Ms. Killion?

MS. BONJEAN: No, no, we can start. She's grabbing some things for me.

THE COURT: Okay. I think they are loading some documents on the computer here, so we will just give that a moment.

Okay, we're good. Thank you.

We can call the case now, Mr. D'Agostino.

THE COURTROOM DEPUTY: United States of America against Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern for the Government, joined by Paralegal Specialist Marlane Bosler and Liam McNett, and FBI Special Agent Tricia Quintero.

Good morning.

MS. FARRELL: Good morning.

THE COURT: Good morning.

MS. COHEN: Good morning, Your Honor.

On behalf of Rachel Cherwitz: Celia Cohen, Michael Robotti, Kelly Lin, Schuyler LaBarge, Kelly Lenahan-Pfahlert

and Richard Hobbs.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

MS. BONJEAN: And good morning, Your Honor.

Jennifer Bonjean, Kelsey Killion, Ashley Cohen, and Galila Assefa, all on behalf of Ms. Daedone.

THE COURT: Good morning to all of you as well.

A very serious matter was brought to my attention this morning. I want to make something very clear, and I'm going to repeat this later when there are more people in the courtroom, as has been the case during this trial.

Witness intimidation will not be tolerated, and that's intimidation by anyone, nor will commentary from any member of the public while in this courtroom be permitted. There shall be no speaking, no whispering. If anyone cannot comply with that, you are welcome to get up and leave.

The making of faces at witnesses will not be tolerated either. The Court has a very good view of what's going on here. Moreover, a sidebar is not an opportunity for conversation, let alone efforts to intimidate a witness or a witness's family member.

Everyone is on notice and I will repeat this.

There are likely to be consequences far beyond this trial if this type of behavior continues. Any attorneys who may be participating in this, encouraging this, are put on

notice that there will be very serious consequences.

I am not making any findings at this time. I am simply stating what should be obvious about the way to conduct one's self in a federal courtroom.

Is there anything the parties would like to state on this issue?

MS. BENSING: Yes, Your Honor.

The Government would like to be heard further with respect to one individual who the Government is seeking to not be permitted into the courtroom and, in particular, Marcus Ratnathicam.

The Court already has the report with respect to a witness and a family member with respect to his behavior. But I also want to put on the record that the same individual, Marcus Ratnathicam, was making statements to an FBI agent who was sitting in the gallery yesterday, including at one point turning to her and saying: You could have asked them to pick a better picture of me, when the witness -- when the individual's photograph was put on the screen.

He was also repeatedly whispering and laughing during portions of the witness's testimony as reported to the Government by the agent.

Obviously, the Government is facing the Court and so did not see this, itself, but the agent did. I --

THE COURT: I believe on May 12th I informed

everybody who was in the courtroom that efforts to intimidate will not be tolerated. I am just going to keep repeating that.

MS. BENSING: Yes, Your Honor.

And just to make an additional record with respect to this individual, in particular.

THE COURT: Yes, please.

MS. BENSING: It's my understanding that one of the Government's paralegal's parents were in the -- family members were in the courtroom and the same individual, Marcus Ratnathicam, also made comments to -- to those individuals.

I will also note for the record that the same individual had contact with one of the case agents on the case and asked him where Special Agent Elliot McGinnis was, wanted to know, quote, Where our boy was. And, again, this is like completely inappropriate outreach.

The Government does think that a record has been established to permit the Court to not allow that particular -- I appreciate the Court's admonition.

THE COURT: Is he here now?

MS. BONJEAN: I have not seen him this morning.

THE COURT: If he comes into the courtroom, I would ask that somebody let me know.

Actually, you know what, we'll find out if he's going to come to the courtroom.

MS. BENSING: And I'm sorry, Your Honor, one additional thing is that we do intend to ask this witness about the conduct in the courtroom yesterday.

And I know that we dropped the issue of asking about individuals in the courtroom with respect to Mr. Kandell's testimony, but I think on this record with this witness testifying, we do intend to ask about the efforts to intimidate her.

THE COURT: Well, there's a couple of issues in what you're raising now.

One is, does the Government -- is the Government taking the position that either defendant is behind any of these efforts to intimidate?

MS. BENSING: Your Honor, I don't think that we have facts sufficient to fully support that.

I think there is, though, an individual who the Government has identified as a potential co-conspirator in this case who is coming into this courtroom and seeking to intimidate her. And I think that is directly relevant to her state of mind and her demeanor in testifying. She was clearly nervous yesterday. She was clearly talking fast. The court reporter and the Court had to admonish her several times about that.

And so, I do think it is directly relevant to her testimony regardless of any specific connection to the

defendants directing this.

THE COURT: All right. On this record I am not going to allow that line of questioning, on this record.

Is there anything along these lines of concerns that the Government has with the behavior of the public in this courtroom?

MS. BENSING: Well, Your Honor, I will also say that Yia Vang was in the courtroom yesterday during Mr. Blackman's testimony when Ms. Bonjean was doing her cross-examination and was also repeatedly making faces at that witness.

We didn't raise it at the time, and so I don't think there is any request that we are making of the Court with respect to that. But we do -- we had concerns for months and months in this case, as the Court knows, about --

THE COURT: Yes, you asked, you asked to have the witnesses anonymized.

I took your request seriously, but I took the defendants' argument seriously as well. I did not grant your request for anonymizing the witnesses. But I did at the time say that that was a decision that was based on the information at the time and that something could happen at trial, and I believe what I said was if somebody testifies under their name and there is intimidation, that could change whether I require somebody else to testify under their name.

I am taking these issues very seriously. The

behavior of some members of the public has been disgraceful. But members of the public are welcome to come in. They are not welcome to speak while the Court is in session. They are not welcome to whisper while the Court is in session.

I have said before, sound carries, it's distracting. They are not welcome to intimidate anybody.

I am going to give the defense attorneys here, who I don't impute any of this conduct to, let me make that clear. I am also not imputing it to the individual defendants. I am going to give you an opportunity, though, because you do have a lot of supporters here, people who, obviously, care very much about the individual defendants, to talk to them and let them know what you think is appropriate behavior. Because I have told them what I think is appropriate behavior, and there are going to be serious consequences.

There are lawyers back there. If they are engaging in this behavior, the consequences are going to go well beyond this trial.

MS. BONJEAN: Understood, Your Honor.

THE COURT: So I am going to give you some time to do that, even if that means keeping the jury waiting. It's worth it.

And we are going to take a break now.

MS. BONJEAN: Thank you.

MS. COHEN: Thank you.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

(In open court; jury not present.)

(Judge DIANE GUJARATI entered the courtroom.)

THE COURT: Everyone may be seated. We seem to have an empty courtroom.

Did the defense attorneys have the opportunity to have any conversations they wanted to have with any of their supporters?

Ms. Cohen.

MS. COHEN: Yes, Your Honor.

THE COURT: Ms. Bonjean.

MS. BONJEAN: Yes. And we will continue to have those conversations if anyone else shows up today.

THE COURT: Thank you. I appreciate that. I think it's in everybody's interest to not have what was going on, go on.

I also mentioned, I think, many proceedings ago about the passing of notes from the gallery into the well here. It's not ideal in front of the jury. I know that your paralegal is working super hard, I can tell, and she's getting stacks of documents handed over to her. If that could be done on a break that would be better, but if you really urgently need something and we haven't taken a break, that's fine. She's, obviously, just working very hard, but it is -- it is a

distraction. It's also something happening in front of the jury with contact with the public, which is less than ideal. But I understand that you need some documents from time to time.

I think it's mostly Ms. Bonjean, but maybe just because you're sitting closest to the back.

MS. BONJEAN: Well, we'll be cognizant of that moving forward.

THE COURT: Okay. It's not -- it pales in comparison to this other conduct, which is really quite disgraceful.

But why don't we bring back the witness and the jury and we can continue the examination.

(Witness enters.)

THE COURT: You can come back up here.

(Witness resumed the stand.)

THE COURT: And we will wait for the jury and then we'll resume the testimony.

(Jury enters.)

THE COURT: Good morning to the jury. And I apologize, I kept you waiting a few minutes longer than I had anticipated. Nice to see everybody.

And, Ms. Farrell, you may continue your examination.

Mr. D'Agostino.

THE COURTROOM DEPUTY: Ms. Gillick, the Court

reminds you, you are still under oath.

THE WITNESS: Thank you.

THE COURT: You may resume.

And if I could just remind you, because we're at a different day now, just to try to go a bit more slowly than yesterday.

MS. FARRELL: Understood, Your Honor.

(Continued on the following page.)

**ANTHIA GILLICK**,

previously called as a witness by the Government and having been duly sworn/affirmed by the Courtroom Deputy, resumed the stand and was examined and testified further as follows:

DIRECT EXAMINATION

BY MS. FARRELL:

Q So, yesterday when we left off we were talking about your living at The Bunker.

Do you remember that?

A Yes.

Q So I'd just like to resume there.

While you were living at The Bunker, did you ever encounter an injury or sickness?

A Yes. Ayries Blanck was still dealing -- she had been to India and she was still dealing with some gastrointestinal injuries and like sickness and, um, losing a lot of weight and looking like very gaunt.

Q And with respect to you personally, did you have any injury or illness while you were living at The Bunker?

A Yes. I -- the final day of my aerial silks training program, there was an exam and it -- on a -- on a apparatus similar to a rope, I was spinning and -- and there was a spinner and when I came in to stop, she stopped the rig too soon and I got like a massive twist in my like hip, knee and

ankle of my right leg.
Q And did you seek medical treatment for that injury?
A No.
Q Why not?
A There was kind of a list of like hard practices that were meant to like turn up furnaces and that type of stuff and, like, make you more spiritual and a list of soft practices. And those soft practices included, like, massage and chiropractic. It also included like journaling and like -- like any kind of alone time kind of thing.
So I kept asking if I could go to get a massage or get chiropractic, get something to help heal this injury. And Rachel Cherwitz kept telling me that it was off stroke, which meant yeah, not allowed.
Q And you -- you testified a moment ago about understanding that someone else was ill at The Bunker?
A Yeah.
Q Did you ever observe Rachel Cherwitz discouraging her from seeking medical treatment for that issue?
A Yes.
Q And who was that again?
A Ayries.
Q And what was the issue, to your knowledge?
A An illness left over from a trip in India, like a -- a Delhi-belly kind of sickness .

I also observed Rachel telling Ravi Agrawal not to go get medical attention for his fibromyalgia.

Q And going back to your own decision not to seek medical treatment, why did you listen to Rachel Cherwitz when she discouraged you from getting treatment for your -- your leg injury?

A I mean it was back to that -- that time when I lost the approval and attention of Rachel for those numbers of months at 1080. I was always scared of that for the rest of the time that I was at OneTaste, and so I -- anything that was off stroke was a -- I would a hundred percent not do that.

Q And can you explain to us why lack, like fear of lack of approval was sufficient to have you not seek medical treatment for a serious issue?

A Yeah. Like, so functionally if you -- if you got that, like, lack of approval, it was like a demotion. Basically, the -- like what you were allowed to participate in, if you got selected to do like a demo or teach a class. All that was -- was, basically, contingent on like continued good behavior, basically, and continued following what was on stroke.

And what -- whatever Rachel -- which was constantly changing, but whatever Rachel and Nicole said was the correct thing to be doing. That was the only way that you got, like, moved up. And if you did even like one thing knocked down,

they used the words like "hexed" or "fucked up" or "whacked." Basically, like you -- if you did the one thing wrong, you would get told that you needed to like stop and take a long look at, like, why you were doing that one thing wrong and that you were, like, ill functionally. And you would get sent to a ton of twelve-step meetings. And -- and like you had to do this, like, deep self-examination as to why you had done that one thing off.

And it was just such a high cost, like emotional energy and I mean like you -- you were knocked out. You were like removed from -- like, the worst thing in the world was to be sent home for the day and to have like a day off --

Q But why --

A -- and you were removed from the group for any of that.

Q I'm sorry.

But why was that the worst thing in the world to you as compared to, for example, having a serious injury in your body?

A It was -- it was so -- like there was so much public shame about it, and I mean I personally hate feeling ashamed. And I just would -- like it just -- shame, for me, just sends me into a horrible mental spiral and I didn't want to tolerate it. That was worse than the injury for me.

Q So what was your mental state at the time that you chose not to get medical treatment for this serious issue?

A I would say pretty high alert. Like I was -- like I have often kind of thought of it as, like, paranoia. Like I was just completely paranoid at all times looking for every possibility of anything that I'd done wrong and could possibly get -- they called it down-stroked. But just like told that I was off.

Q And what brought you to that place of paranoia at that time?

MS. BONJEAN: Objection to the leading.

THE COURT: Overruled.

A I -- I mean that was just -- that was part of the training. We were constantly doing additional, like they would call them TurnOn trainings. But there -- there was like these -- these constant -- one of the games in TurnOn, which was the -- one of the like main lead gen events that was marketed like on Meetup and that kind of thing was a game called Hot Seats, where we would -- there would be one person on the hot seat and they would....

They -- they said everything at OneTaste was holographic. So, everything was, basically, like a part of an OM. And so, it was like these verbal -- I mean if you literally picture a stroke, there's like up strokes and down strokes. And so, the up strokes were supposed to be compliments in a verbal sphere, and down strokes were like hard truths or criticisms, but functionally they were like

carte blanche to say anything to you. And it like -- some of them were intensely cutting about like your character. And they used a term from -- from twelve-step of a fatal flaw in like your personality.

And so we would do these hot seat trainings on a very regular basis as Beasties and junior staff. And they were internal, so it was only with additional staff. And -- and you would -- you would just get like public shamed for things you didn't even know were wrong with yourself, basically.

Q And when you -- you referred to "they" and we were trained.

Who -- who was it that was doing the training in the answer you just gave?

A Rachel Cherwitz was almost always in charge of those. It was like every time she was through town we would have, like, an extra hot seat training. And they often just happened in like morning meetings in little ways, but the -- the bigger hot seat trainings were every -- almost every time Rachel was in town.

Q And beside medical treatment, were there any other forms of treatment discouraged within OneTaste?

A Yeah. Therapy was on that list. Any kind of talk therapy. So, there was not -- I didn't speak to a therapist at any point while I was involved with OneTaste.

Q And who specifically discouraged you from seeking therapy?
A Nicole Daedone. It was -- a lot of these things were like in classes. They were -- which I not only took all the classes, but I kind of went to like double and triple the amount of classes just from working back house and sitting there listening to her teachings.
Q And --
A And that was like part of, it was part of the training you needed to listen to what Nicole said and take that on as like extra training.
Q And specifically -- I'm sorry.
A No, go ahead.
Q And specifically, what did Nicole Daedone say about therapy that you took from her?
A Yeah. So, in one of those classes she, basically, like laid out those two lists that I mentioned of like hard practices that were gonna like turn up your -- your turn-on and your orgasm and your spirituality. And then the soft practices that were gonna put you back to sleep. And I mean they talked about it like relative to The Matrix, like *plunk you back into the system* kind of thing.
Q And what were the soft practices that Nicole Daedone --
A Yes.
Q -- had discouraged?

A Those were like journaling, massage, therapy, talk therapy, yeah. And then like because it was off stroke for the doctors and that type of stuff, I interpreted those, as well, to be on that list.

Q And during those talks, did Nicole Daedone share what the -- the basis for her belief that those should not be engaged in?

A Yeah. I mean it was -- that like that was -- that was part and parcel of that like everything -- everything should be at, like, upping the energy in the body. Like turning your furnace on because that was how you, like, burned through your -- like I said, there's like those fatal flaws, anything that was like blocking you in life was by -- by keeping that furnace hot. And so, that was like OMing and sex and meditation, fear inventory, amends — which were very changed from Twelve Steps, but the, like, amends that they did in OneTaste.

Q And did you listen to her teachings on this?

A Yes.

Q Why?

A Again, it's back to that, like, the one step off got you public shaming and demotion. And if you'd, like -- if you could -- I was, again, always looking for the, like, how -- how to be so on track that I -- I wasn't missing a step, even before I could imagine I was gonna miss the next one.

Q So, I want to talk a little bit about your time at The Bunker.
While you were living there, what hours did you typically work?
A I was -- so when I was at The Bunker, I was also doing the aerial silks training program. And we moved to 365 pretty soon after I finished that program, so I was training probably 25, 30 hours out in Bushwick on top of what I was doing for work.
So, I was -- basically, any hour that I wasn't on the subway or out to those hours of training, I was up at probably like 6-ish every morning and was in bed by, I don't know, 1:30-ish. And every minute that I wasn't on the subway or in there, I was working for OneTaste.
Q And when you say you were doing aerial silks training, what does that actually physically involve?
A Yeah, so I mean it was -- it was like an instructor certification program, which doesn't -- there's not much of a board behind it, but I was basically training in every apparatus. So straps, Spanish, web, silks, it's all -- it's all considered the new circus, and then a bunch of conditioning as well.
Q Is it physically demanding?
A Incredibly. I don't know anything other than like the Olympics. I mean it's -- it's Cirque du Soleil, which is done

by primarily excellent bids.

Q Did you ever get any vacations during that time?

A No.

Q Did you take weekends off?

A No -- I had one weekend that I, like, begged Rachel to let me go to for my cousin's wedding. And I was -- on that weekend I was only allowed to go if I gave her weather reports of, like, how I was. And then, basically, checked in with her like three to four times a day.

Q Were you OMing as well during this period?

A I wasn't, and that was like incredibly unkosher.

Q What do you mean?

A Yeah, I was at that point in time still doing like at least four OMs a day. That was pretty much like the bare minimum as staff for anyone. And so, like, to not be doing that, like, my orgasm was functionally like dying for those couple days and I wasn't, like, contributing to what they called the communal bank account.

MS. BONJEAN: I'm going to object to the lack of foundation for these statements that are being made to her.

THE COURT: Sustained.

BY MS. FARRELL:

Q Was OMing an expected part of the practice living in The Bunker?

A Yes.

Q And on a daily basis were you OMing typically?
A Yes.
Q And then when you said you weren't OMing for a time, were you referring to when you went on a weekend away?
A Yes.
Q Okay. How, if at all, did the hours that you were pulling and your daily schedule affect your psychological state at the time?
A I mean that level of sleep deprivation cause caused a lot of brain fog for me. I'm definitely someone that needs like eight hours of sleep to be prime. So, I was -- I was not only like very brain fogged, but extra, like, emotionally vulnerable, I guess. Like, I just -- reactive. I -- I lose control of my emotions when I don't get enough sleep.
Q And how did you typically communicate with other OneTaste staff members?
A Like the means of communication?
Q Yes, exactly.
A At that point I was starting -- I had fully gotten like a hundred texts an hour through various apps, and -- I mean it had ramped up since I was a Beasty in San Francisco and then volunteering in New York, and I was constantly, constantly texting.
Q And how, if at all, did that frequency of texting affect you?

A I found it very hard to like have my own thoughts. Just like the -- like there -- there were occasional times that I was allowed to go to, like, coffees with family or friends if they were in town visiting. And I had to check out -- I mean I had to check out of, like, say offline 20 minutes for OMing, for going to the bathroom, and for those kind of coffees. Like it was like offline for an hour.

But even when I was seeing those friends, it was like I still was keeping an eye on my phone because I would get these texts from Rachel Cherwitz, like, if you didn't respond fast enough, I would get like my name in all caps eight to ten times on the thread until I responded.

Q Were you permitted to consume alcohol?

A No.

Q Did you ever break the rules?

A Yeah. There was one time when I was out scouting a new TurnOn location. I think it was in like the DUMBO area of Brooklyn, but it was for like a new Brooklyn TurnON, and it was like a really nice Sunday afternoon. One of those like perfect spring days. And I saw this like upstairs like beer garden kind of thing on like a rooftop, and I just was like, oh, my God, I want just like one beer.

And so, I went up and had like one beer in the sun and I was absolutely terrified that someone -- they would -- they would say this thing that they could like feel you

basically, better than you could feel yourself. It was -- there's --

Q Who would say that?

MS. BONJEAN: Object to the vague.

THE COURT: Sustained.

MS. FARRELL: And is that just in reference to that last sentence of the answer, Your Honor?

THE COURT: Yes. But you were about to ask another question, or you had. I think we spoke over each other.

What's the next question?

MS. FARRELL: I'm sorry, Your Honor.

THE COURT: No, it wasn't a criticism. Just ask the next question.

BY MS. FARRELL:

Q Why were you so scared about having a beer on that nice day?

A So, Rachel Cherwitz and Nicole Daedone often talked about in -- in classes and personally, you know, in -- with staff a thing that they called limbic connection, which is basically that like mammalian brains can feel each other.

And I was completely freaked out that when I got back to the New York Center that someone was gonna like feel the one beer in my system and, like, slight tipsiness and they were going to know that I had been drinking and I was going to get down-stroked.

Q At any point were you asked to report to Rachel Cherwitz or Nicole Daedone on other members of The Bunker?
A They -- we didn't call it reports, but it was like we were kind of always texting with -- I was always texting with Rachel, and occasionally texting with Nicole, like, about any concerns or things I had -- like I noticed or saw with other people in The Bunker.
And then occasionally, like, with myself, too, like I would have conversations or I would get down-stroked by someone else on the team and -- and like report myself functionally on -- on like text threads. They were -- they were called withholds. And so, they were like, basically, like confessionals, almost where I would like be like I'm -- you know, I'd like to apologize to the team that I've been withdrawn. And like, I would kind of like turn myself in after having talked to a team member.
MS. FARRELL: Your Honor, may I approach with Government Exhibit 655?
THE COURT: Yes.
MS. FARRELL: Thank you.
(Pause.)
MS. FARRELL: If we could pull it up just for the witness, please.
BY MS. FARRELL:
Q Ms. Gillick, do you recognize this document?

I know it's tiny on the print. You can also look at the --

MS. FARRELL: Mr. McNett, if you could go to page 2 and highlight the top there.

A Yeah, this is -- it would be like a leads, sales leads document.

Q And what sort of information would you track in a sales -- putting aside this particular exhibit, what sort of information, if any, would you track in a sales leads document?

A I mean any and everything that we could find out about a lead, it went in either -- well, generally both in a document like this, as well as in Salesforce.

So, like after I made a sales call, I would log any information that I'd found out that was relevant to that person. So that could -- it could be anything from like recently divorced or has a crush on so-and-so. Like, it was -- it was any and all personal information that would help close a sale.

Q And would you share this information with anyone?

A Yeah. These documents were shared with, like, the city sales team. Sometimes the core sales team, and always Rachel Cherwitz. And the Salesforce was, like we all had the same like privileges and viewership of the Salesforce account.

Q You testified a moment ago that you would track personal

information, like getting a divorce or having a crush.

Why would that sort of information help you make a sale?

A Um, so the -- we were -- at one point I was flown out to San Francisco to train with the -- one of the head salespeople with Tony Robbins, and they -- they walked us through this like system of -- they called it like taking someone to their pain.

So, it -- it needed to be like -- like, you basically would find out something that was like a very deep personal pain point in someone's life, like that was -- that was current and that they felt like very overwhelmed by. And then you would kind of dig into that and amp that up and ask them questions like: What would you do if that never changed?

MS. COHEN: Objection to the hearsay.

THE COURT: Overruled.

BY MS. FARRELL:

Q So, how would -- based on your time at OneTaste, how would OneTaste use people's pain to sell courses?

MS. BONJEAN: Objection to the foundation.

THE COURT: Sustained.

Q So, based on this training, did you use people's pain to try to sell courses?

A Yes.

Q And how would you do that?

A Um, so once I, you know, figured out what the pain point was, I would like -- like I said, like turn it up and ask some questions like: How -- how would you feel if that never changed?

And then the next step was to like offer them the solution to letting that change, which was the course.

Q And so taking a look back at Government Exhibit 655 --

MS. FARRELL: Which is Tab 2 in Your Honor's binder. It's very tiny, though.

THE COURT: Oh, I have it. Thank you. I want the magnifying glass.

Q -- is this a true and accurate copy of a document in which you would track personal information about people you were trying to make sales to?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 655 into evidence.

MS. BONJEAN: Your Honor, I would -- I would object.

And, perhaps, I missed it about who authored this document.

MS. FARRELL: I didn't ask.

THE COURT: Ms. Cohen.

MS. COHEN: Yes, also object.

THE COURT: I am going to sustain the objection on this foundation.

BY MS. FARRELL:

Q Ms. Gillick, remind us the name you went by when were you at OneTaste.

A Brooke Sheffer.

Q And did you write any of this document?

A Um --

Q And if you look at the screen, it might be helpful because it's blown up.

A (No response.)

Q And, Ms. Sheffer, I would just refer you to the second page of the document, in particular.

A Yes, that's what I'm looking at.

Q I'm sorry, Ms. Gillick.

A Sorry, that's what I'm looking at.

Yeah, there's a section under my name that would have been my comments. There's a blue section in the middle of page 2 that is -- those were my leads. So, that is -- that is my section that I would have -- that I contributed to.

Q And with respect to the other color sections, what is your understanding of what those are?

A Those are -- those are the sections that the other people who were on this particular document and working, you know, these particular leads contributed. We each had -- we each had people that we were responsible for texting with, talking to, and then reporting back to Rachel Cherwitz.

Q And would this document help you track that?
A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 655.

And to be clear, we're not offering it for the truth of the statements contained.

MS. BONJEAN: Your Honor --

THE COURT: What's your purpose?

MS. FARRELL: To show that they were doing this tracking, but whether it's true that, you know, Joe had this particular issue is of no consequence.

MS. BONJEAN: Your Honor, but there's still a double hearsay problem here.

THE COURT: Okay.

And Ms. Cohen.

MS. COHEN: Yes, the same. And also lack of foundation.

THE COURT: Sustain the objection.

MS. FARRELL: You can put that aside.

THE WITNESS: Okay.

BY MS. FARRELL:

Q While you were working at OneTaste New York, did you have an opportunity to observe Nicole Daedone's lifestyle?
A Yes.
Q What -- describe how you had that opportunity.

A One of the weekends I was -- Raph was busy, Raphael Martinez was busy doing production, and so I was asked to take over some tasks that he normally handled when Nicole was coming into town.

Q So, what tasks did you handle?

A So, I -- I went grocery shopping for her and brought, you know, a list of groceries to her apartment. And then I was asked to clean her apartment down to like the baseboards and like, you know, scum off the inside of the bathtub, and saw the -- saw the inside of her apartment and her clothes and everything else.

Q Who asked you to do that?

A Rachel Cherwitz.

Q And where was Ms. Daedone's apartment?

A I don't remember the address. It was relatively close to The Bunker, but it was like a very top-level amazing apartment.

Q And when you say "amazing," what did it look like?

A The views were like, there was -- there was incredible views. It was a very nice building. There was like Keith Haring inspired kind of art. And -- and like -- like a mirror on the ceiling. It was just -- it was a very nicely decorated apartment.

Q Did you ever pick up Ms. Daedone's dry cleaning?

A Yes.

MS. BONJEAN: Objection to the leading.

THE COURT: Sustained.

BY MS. FARRELL:

Q What other tasks did you do for Ms. Daedone besides cleaning her apartment as you just described?

A I brought her dry cleaning that day to her apartment and all her groceries and -- and put them in the fridge.

Q And besides this one time that you did this, did you ever observe other people doing similar tasks for Ms. Daedone?

A Yes. Rafael Martinez would do that pretty much every time she came into town.

Q How did Ms. Daedone's lifestyle at that time compare to the lifestyle of the OneTaste employees?

A I mean we were, you know, all living in like half the amount of rooms per people. And, you know, the -- the -- I mean as I said in terms of the, like, last couple months I wasn't getting paid for any of my work and I was still paying rent and the food and courses. And like I was -- I was constantly being criticized by Rachel Cherwitz for my wardrobe.

MS. BONJEAN: Objection, nonresponsive.

THE COURT: Sustained.

MS. FARRELL: With respect to that last sentence, Your Honor?

THE COURT: Yes.

Q Did Rachel Cherwitz ever criticize you?
A Yes. She criticized my wardrobe on a regular basis.
Q Why -- I'm sorry.
What did she say about your wardrobe?
A That it was like a grandma's wardrobe. That it was too like Bohemian and colorful, and I needed to look, like, sexy to sell Orgasm.
Q So, I'd like to turn your attention now to OneTaste teachings.
Who -- who, if anyone, taught you the various OneTaste teachings?
A Primarily, Nicole Daedone in the -- at the front of the room for the classes, and then Rachel Cherwitz was kind of constantly, you know, reinforcing that on -- on text threads, as were the rest of the senior staff. But Rachel Cherwitz was the main one that I had contact with.
Q If you could briefly describe for us what were the core teachings of OneTaste.
MS. BONJEAN: I'm going to object to the foundation of that. It's very vague.
THE COURT: Sustained.
BY MS. FARRELL:
Q Did you attend a number of OneTaste courses?
A Yes.
Q Approximately how many in your time there?

A Twenty-ish.
Q And in doing that, did you learn the core tenets of OneTaste?
A Yes.
Q Can you describe for the jury what those were?
A I mean there were a lot of them.
The main principle was that everything revolved around OMing. There were a lot of stuff about the eight stages of orgasm.
I can -- I can narrow it down if you'd like. It's a long, long list of deep philosophies.
Q So I'd like to turn your attention to Government Exhibit 3164.
MS. FARRELL: May I approach the witness, Your Honor?
THE COURT: Yes.
MS. FARRELL: I am going to hand you a copy.
BY MS. FARRELL:
Q Do you recognize this document?
A Yes.
Q What is it?
A A little over halfway during my time there these, all these classes had been developed. A number of them didn't exist when I first came in, but they were developed by the time I was leaving and this was considered the path. This was

like considered the -- like, courses that you should take to like, progress through your orgasmic path.

Q I'm sorry. And what is the title of the document?

A The Path to Orgasm Mastery.

Q At the front, sorry. If you look at the very front of the document.

A Sorry. Path to Fulfillment.

Q And you testified that you took a number of courses and learned -- did you learn the OneTaste Path to Fulfillment?

A I took all of these courses.

Q And does -- if you could please look through the entire document.

(Pause.)

A Yeah.

Q Does this set out the Path to Fulfillment that was taught to you at OneTaste?

A Yes.

Q And who, in particular, taught this Path to Fulfillment?

A It was Nicole Daedone's creation. She -- she created each of these courses.

Q And so, does Government Exhibit 3164 accurately depict Nicole Daedone's teachings at OneTaste?

A Yeah. That was one of them, yeah.

Q And is this a true and accurate copy of the Path to Fulfillment document that you saw during your time at

OneTaste?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 3164.

THE COURT: Any objection?

MS. BONJEAN: Your Honor, I don't think that a satisfactory foundation has been laid for this document.

THE COURT: Ms. Cohen.

MS. BONJEAN: There's hearsay, double hearsay, authors unidentified.

MS. COHEN: Agreed, Your Honor.

THE COURT: Sustained on the foundation you laid.

BY MS. FARRELL:

Q All right. Let's go through each page, please. If we could start with the second page.

Do you see that?

A Yeah.

Q Is this a true and accurate copy of the Path to Orgasm Mastery that was taught toy by Nicole Daedone?

A Yes.

Q And do you recognize this page, in particular?

A Yes.

MS. FARRELL: Okay. Let's turn to the next page, please.

Q Does this page set forth --

MS. FARRELL: This is page 3 for the record.
Q Does this page set forth things that Nicole Daedone taught you about orgasm mastery?
MS. BONJEAN: Your Honor, I'm just going to object to the questions, whether it's a document she saw or its content.
THE COURT: Sustained.
BY MS. FARRELL:
Q Did you see this document while you were at OneTaste?
A Yes.
Q And what was it explained to you -- what did you understand it to be at the time that you were at OneTaste and received this document?
A This was a document given to all the cities. It was part of our marketing for -- there's -- each one of these pages is for a class, and it's -- it's what was gonna be taught at that class.
And we were -- this -- it was to -- to use for the -- both to speak about the classes, as well as for like placards that were set up on sales tables.
Q In addition to using this for sales, did you attend all these courses yourself?
A Yes.
Q And is what was -- what was -- is what is in this document consistent with the teachings of those courses?

A Yes.
Q And is it true and accurate as to every page with respect to the courses that they reference?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 3164.
MS. COHEN: Still object on lack of foundation regarding who authored this and who provided it.
MS. BONJEAN: Yes. I still think the foundation is --
THE COURT: Okay. Sustained.
BY MS. FARRELL:
Q All right, let's take a look only at page 2, please.
What is this?
A The Path to Orgasm Mastery.
Q What was the Path to Orgasm Mastery at OneTaste?
You can use this to refresh you, but I want you to just testify not describing what's in the document.
A It was the classes that a student starting with the -- with How to OM, which was the lowest-priced class, up to the Nicole Daedone Intensive. It was the classes that went up both in like depth and breadth, as well as cost and commitment to OneTaste.
Q And did you take each of the classes that were on the Path to Orgasm Mastery?

A Yes.
Q And in terms of the lowest class, approximately how much did that cost?
A The How to OM class was $150 -- $149.
Q And then with respect to the most expensive, the Nicole Daedone Intensive, how much did that cost?
A It was originally $36,000, and then the price was dropped down to $24,000.
Q And what did it mean to be on the path to orgasm mastery?
A Um, for me personally, it was training to be a teacher and to be what they called certified to be able to do orgasmic meditation demonstrations or demos.
For a lot of people, it was -- it was like in layman -- like not everyone wanted to become a teacher. That was my personal goals.
Q Did you ever discuss with Nicole Daedone the path to orgasm mastery?
A Yes.
Q Did what she say to you --
THE COURT: I'm just going to stop you for a minute.
If you could take your conversation outside. Thank you.
Go ahead. You may continue.
MS. FARRELL: Thank you, Your Honor.
Q Page 2 only of Government Exhibit 3164.

Is this a true and accurate depiction of the Path to Orgasm Mastery that you discussed with Nicole Daedone?
A Yes.
Q Do you have an understanding of who prepared this particular document?
A The -- there -- there was like a team working on it. I wasn't personally involved with it. It was -- the corporate team were writing this to capture what Nicole's -- like Nicole was the ideas and the, like, concept author.
I don't know who actually typed this up, but it was -- it was to capture Nicole's ideas and put it into cohesive marketing language.
Q And based on your understanding having worked at OneTaste for two years, was Nicole Daedone the one physically typing documents of her ideas?
A No.
Q Did OneTaste materials, nevertheless, reflect her ideas?
A Yes.
Q And does that include this document --
A Yes.
Q -- Government Exhibit 3164, page 2?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 3164, page 2 only.
MS. COHEN: Same objection on foundation, Your

Honor.

MS. BONJEAN: Yes, Your Honor, we object on the same grounds.

THE COURT: Okay, overruled. Page 2 of Government Exhibit 3164 is admitted.

(Government's Exhibit 3164, Page 2, was received in evidence.)

MS. FARRELL: And if we could publish that to the jury, please.

(Exhibit published.)

BY MS. FARRELL:

Q Can you just walk us through what we see here, please.

A Yes. So, there are one, two, three, four, five, six -- these were technically broken up --

Q Let me stop you. Why don't you start at the top and work your way down.

A Okay. So, the How to OM course was the introduction course where people would learn orgasmic meditation and learn the -- the basics of the practice, the rules of how it went, and how everyone was expected to behave in the practice.

The OM Practice Club says it was a 28-day training support. That was -- it was more practically used as a monthly membership. So, we would -- people would sign up with a recurring membership, and it would run until they canceled it.

The Intro to Mastery was like an additional class that was developed to -- into Mastery, but they were related. So, it was supposed -- the Intro to Mastery was functionally used as like advanced OMing practices. Like there were more specific reasons. Some of this was done in the Practice Club, but this was, the Intro to Mastery was more of it.

So, like sometimes they would do male OMs. Some of the OM Practice Club stuff were -- there was like specific OMs like OMing Around the Clock. They were like guided and -- and it was more specific instructions in each of those.

And then Mastery was -- it was -- it was -- it more got into things like oral sex and sex, like sex as OM as like as a ritual practice.

And then Taboo and Magic School, those were actually two separate classes. They were the same costs and sort of the same level of intensity, but they were broken out.

Taboo was into stuff like BDSM and power roles, that kind of thing. And Magic School was more into like Kabbalah. And that's where we had sort of like priests and priestesses of orgasm were in it ninthd. It was like a -- it was like more in the ritual of it.

And then the Nicole Daedone Intensive was the demo training specific, and it was designed as a year-long coaching. You were assigned like a private coach that only had like one or two clients in the Intensive. And then it

ended in a two-week retreat with Nicole as the only teacher.
Q And you took all of these?
A Yes.
Q Okay.
A Sorry, with -- with the exception of Intro to Mastery, which was developed after I took Mastery, but I worked back-of-house for it.
Q So, turning your attention to August 2014, did you attend the Magic School?
A I attended -- yes, that was the first Magic School that I attended. And the second one was in the spring of 2015.
Q And so, what happened at Magic School?
A That -- for the first Magic School that I attended, it was a somar retreat. And I was, basic -- I mean the only thing of note that happened there was I was pulled out and we like did that, like that was like a first signing of the -- like -- like getting into ownership of OneTaste New York.
Q Sorry. While you were at Magic School, you executed the ownership document?
A Yes.
Q And then did you also attend Taboo?
A Yeah, I attended Taboo in like October of that year of 2014.
Q Earlier you testified about a sexual assault you experienced earlier in your life, is that correct?

A Yes.
Q Did there come a time when you addressed that in a Taboo course?
A Yes. There -- sorry.
Q And was Rachel Cherwitz there?
A She was in and out on that course. It was one of the few courses taught by guest teachers, but she was in and out.
Q Okay. And -- and what happened during the Taboo course in connection with your past sexual assault?
A There was a -- one of the exercises that we did during that course was to stage a scene, a BDSM scene, of a past trauma that we had. And we were, like, broken out into groups to do so.
Q And so, did you stage a BDSM scene of a past trauma you had?
A Yes. I --
Q What happened?
A I staged a reenactment of the rape that I had experienced when I was 21.
Q And did it involve the actual -- an actual sexual act?
A Yes. I asked one of the -- my fellow students to -- it was the -- we kind of designed the whole thing as a group.
But what -- what happened was that the other student stripped down, as did I, like we were both naked. And the rest of the group watched while he forced himself on me and

with fellatio and -- sorry, with a blow job. And they were -- the rest the of the group was supposed to watch and start telling me that I was beautiful, which is what my rapist had told me when they noticed that I went from, like, revulsion to turn-on.

Q And what happened to you physically when you were reenacting this thing that had happened to you?

A My whole body was shaking. I was like -- I just remember just dripping sweat. And like I -- when it started I was like, this was a terrible idea. Like it -- you know, it -- when we were designing with the group, I -- I felt like very honored and like, oh, I'm getting picked to do this thing and it's gonna earn me brownie points. And, like, look how like deep I'm going. Because I was constantly chasing these break-throughs of, like, the highs of -- Nicole Daedone would say this thing where like, the lower lows you can experience, the higher highs you can experience.

And so, I was constantly pushing to, like, find places that were gonna hurt to -- to hit the highs on the other side of it. And so --

Q And -- sorry.

A Sorry.

Q Did it help you to reenact this sexual assault that you had experienced?

A I mean I -- I felt a incredible high afterwards. I

remember like laying on the floor and being like, I did it. That was epic.

But I'd like -- I -- as I've learned more and more about therapy, I don't think that's the kind of thing you should put yourself through twice and/or reenact it. That's not -- it's not the softest way to heal from that kind of thing.

Q And what kind of mental state were you in when you were in the process, you know, reenacting a sexual assault of your past?

A Yeah, I mean I was totally freaking out. Like I said, once it started it felt like a very, very bad idea.

Q Well, why did you do it then?

A Again, just for the -- for the accolades, for the break-through, for the -- for being a star student.

Q Did you ever witness Nicole Daedone giving sexual assignments?

A Yes.

Q Can you give some examples?

A Often during classes like for various questions or reasons, she would assign someone to do, like a 30-day research experiment is what they called it. And so, some of those -- sometimes they were like having what they would call a makeout, which could be anything of any kind of sexual interaction with someone for thirty days.

Sometimes there were people assigned to schedule those makeouts and like select those makeouts.

Sometimes it was actually telling people, like, not to have sex, like prescriptions on what people should do with their sex life was very common in her assignments.

Q Did Nicole Daedone ever discuss her own like current sexual exploits in any of the classes you were in?

A Yes.

Q What did she say?

A She was supposedly working on a book at that time. To my knowledge it never got published, but it was called Unconditional Sex. And she would often recruit -- sorry, retell stories about makeouts that she was having with anyone from like strangers off Craigslist, to people on OkCupid. But she was, basically, having sex like no matter where she was, no matter what she was doing, no matter what her day was like, at least once a day.

Q Did people within OneTaste follow that lead, to your --

MS. BONJEAN: Objection to the foundation.

THE COURT: Sustained.

Q What effect, if any, did that -- did her telling those stories have on employees at OneTaste?

MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q Did you end up doing anything similar?
A Yes.
Q Why?
A The -- Nicole would teach, basically — and, again, Rachel would re-enforce— but there was -- there was like a current stroke is what they would call it. And so, sort of like whatever Nicole was doing almost immediately would -- it would filter down to what, like, the rest of us were doing.

So, like often when -- the second I would hear her talk about a thing in a course, I'd -- like I knew that was the next stroke, the next like fad, the next thing we were supposed to be doing as junior and senior staff. And I would often start doing it like that day if I could, to stay ahead of it.
Q Did you ever witness Rachel Cherwitz giving someone similar instructions?
A Yeah. So, on the staff threads there -- it was -- Rachel Cherwitz would post these texts of like: This is the next stroke.

And so like, one of those was -- was the unconditional sex stroke. Like everyone, including myself, was having sex almost -- like at least once a day. And then, you know, like sometimes more like twice a day.

I mean there were days I probably had sex with like three or four people, different people, like during the day

just like if -- if I had makeup -- makeouts lined up. And, you know, some of those strokes included like engagement stroke and monogamy stroke, and there was a marriage stroke. They would use kind of any anything that Nicole was doing next.
Q Okay. We'll get back to the strokes in a moment, but did you -- did you ever personally receive instructions to make out or OM with a prospective client?
A Yes.
Q Who gave you those instructions?
A Rachel Cherwitz at -- at -- like, we would often have these sort of little like check-in huddles right before TurnONs, and Rachel would often assign to me and others OM partners for people -- the idea, basically, was that like an experienced OMer should give one of these like new OMers, who wasn't going deeper, a taste of like advanced orgasm and then that would help with the sale.
Q And did you OM with people that Rachel Cherwitz told you to OM with?
A Yes.
Q Why?
A Again, the accolades, the staying -- staying on stroke, not wanting to get shamed for why I wasn't doing what was asked.
Q What if you weren't attracted to the person?

A That wasn't a part of it with OMing.
Q Why not?
A There was -- basically, with OMings for sure, but even with -- with makeouts, it was -- we were kind of supposed to basically like, your preferences, so like who you were attracted to, it was considered like a small range of the available TurnON that you could access in your life.
And so, you were basically supposed to constantly be trying to broaden that range and push who you OMed with, who you had sex with. Because like you -- like the concept was like you didn't know, like it could be that, like, this person that you're completely disgusted by is actually really, like, hot and amazing and, like, actually has a ton of potential and energy. And so, you were supposed to experiment in any way that you could.
Q And did that teaching affect your provision of labor or services to the company at the time?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A Sorry. I don't -- can you repeat question? I don't understand it.
MS. BONJEAN: The question assumes a legal conclusion, Your Honor.
THE COURT: Overruled.
BY MS. FARRELL:

Q Did that teaching that you just described affect your willingness to provide labor or services to the company at the time?
A Yes.
Q How so?
A I -- I, again, was, you know, wanting to be the star student, wanting to push myself, wanting to like find those TurnONs, so I would -- I was quite willing to for sure to OM with people I wasn't attracted to and, you know, on occasion even -- even when it was incredibly uncomfortable to have makeouts with people that I was disgusted by.
Q Are you familiar with a man named Dennis?
A Yes.
Q What happened with him?
A He was a student of mine in -- inside the CPs there were small groups of students that were assigned, like six or eight kind of students, to individual coaches. They were known as pods.
So, I was his pod leader for his CP. And he was older than my dad for sure, probably in his early seventies at the time. And he was -- had basically -- so while I was in what was known as a woman's group, which were these like once-a-week breakouts of -- all the women in the staff would get together and all the men in the staff would get together, and occasionally Beasties were invited. And there was like a

format to the -- to the meeting and the conversation.

And Rachel Cherwitz said that they'd promised Dennis when he went into CP that he was, basically, gonna like become really attractive with orgasm and get a bunch of ass. And that he -- that hadn't happened and he hadn't had any breakouts during the CP. And she said that someone in this room, meaning at the women's group, should have a makeout with him. And like announced to the community that it was -- that it was really hot and, basically, make a big deal out of it.

And I looked around the room, and this was during the like monogamy stroke, and a lot of people were getting like engaged and married, and I realized that I was the only one that wasn't. Like, I was in a relationship, but I had gone against the stroke I was in and I was getting a lot of flack for that. And so, I wasn't monogamous and I realized that I wasn't the only one. And I was, basically, who was left to have that makeout with Dennis.

Q So, had Dennis paid for the Coaching Program that he was taking?

A Yes.

Q And were you one of his coaches?

A I was -- the CP had finished, I think maybe like a week before that. So I had just stopped being one of his coach after -- after like a -- I'd been his coach for a little over six months.

Q And what did you do with Dennis?
A So I -- there was -- it was like -- I think actually it was the last night, like -- 'cause there was -- during the CP weekends a lot of people would stay at 365 and there were just like mattresses all over the main living room floor.
And so, it must have been that Sunday night from CP because the mattress were still there. And I went to, like, his mattress and we did actually have what people would think of as a makeout. I just kissed him, but I was crazy revolted by it. And that was like the last -- like the least amount of sexual activity that I could muster, and then I announced to the room how hot it was.
Q Are you familiar with a man named Harish?
A Yes.
Q Were you instructed to engage in activity with him?
A Yes.
Q By who?
A Rachel Cherwitz.
Q And just briefly, what happened?
A Um, it was during a Mastery class that I had sold to him. There was an exercise to do a prostate massage. And we always balanced the classes with the number of men and women, but one of the women had to step out and Rachel called me down from the back-of-house booth, AV booth, and she like slapped a pair of gloves on my hand and said I was gonna -- I was gonna do

the prostate massage on Horatio.

Q And did you?

A Yes.

Q Why?

A I -- I mean that was like fire in her eye when she said that. I was in no position to question that. That was -- it was a command.

Q Was she your superior at the company at the time?

A Yes.

Q I want to turn back to this stroke you described earlier about this -- this sex stroke, not the monogamy stroke.

Do you know what I'm talking about?

A Yes.

Q Did you participate in that stroke?

A Yes.

Q What did you do?

A I had sex at least once a day.

Q And did you discuss -- discuss this with Rachel Cherwitz?

A Rachel Cherwitz and the rest of the exec team at New York.

Q And did other people that you were living with also participate in this stroke?

A Yes.

Q What did you all do in order to participate in this stroke?

A I mean it was like announced on the thread, like that we were like constantly like: Oh, like had a hot makeout with this person. It was constantly being discussed. And you needed to, basically, check in once a day with your like makeout.

And we also, at one point Rachel Cherwitz told us all to get on OkCupid and had Maya set up OkCupid profiles for us and take photos of us to make those profiles.

Q And when you say "Maya," who are you talking about?

A I keep blanking on her name. The Maya that I identified in the picture.

Q And who else besides you did Rachel Cherwitz instruct to create OkCupid profiles?

A It was all the women on the exec team. So, it was Ayries Blanck, Po-Hong Yu, myself, and Alexis Ware was living at the -- in The Bunker during that time, and she was also instructed to make one.

Q Did Rachel Cherwitz say anything about how this stroke related to sales in the company?

MS. BONJEAN: Objection to the leading.

THE COURT: Overruled.

A Yeah. We were not making sales at the time. It was just -- this was a common thing that Rachel said, but so she -- she, basically, said that we needed to turn the heat up, meaning that we needed to have -- it could either mean

that we needed to increase the number of OMs that we were doing per day or that we needed to have a lot more sex and makeouts to like, again, fire up the orgasm furnace and -- and pull in more sales leads.

Q Did Rachel Cherwitz ever direct you to engage in sex with other OneTaste staff members?

A Yeah, that was like -- you always did that. I don't know -- I mean I'm sure Rachel Cherwitz said that. Specifically, it was --

MS. COHEN: Objection.

THE WITNESS: Sorry.

THE COURT: Sustained.

BY MS. FARRELL:

Q So just a yes or no answer.

Did Rachel Cherwitz direct you to engage in sex with other OneTaste staff members?

A Yes.

Q What did she say?

A There was -- there was -- one particular time I can remember was I was working back-of-house. I can't remember what course it was, but we like were on our lunch break and Rachel -- it was the first course that I was getting trained to like be the head of back-of-house.

And, again, back to the like limbic brain that they talked about. They, basically, said that like -- when Rachel

Cherwitz specifically said to me that when I was the head of back of house, that the -- the sales from the class were resting on my limbic system. So, like it was -- I was, basically, responsible for if there were sales or not.

And that day she was yelling at me that I was too messed. You know, basically the way interpreted that is like nervous. And I was, I was very nervous about running the back of house. And she said that I needed to have a makeout with -- there were like three staff members in the room at the moment, and I needed to have a makeout with one of those three staff members during that lunch period to burn off my tumescence.

Q Did you do that?

A Yes.

Q Who did you have a makeout with?

A Well, I selected Ravi because I knew that he was gonna be the most, like, kind about it. And when we went back to have the makeout, he -- he asked me if I wanted to actually have sex. And I told him no. And so, we -- we actually -- I didn't end up having sex, I OMed with him instead. But we both told Rachel that we did have -- have a makeout, have sex. Like, we reported that it was hot.

Q You mentioned earlier that this OkCupid stroke involved someone named Ayries, is that correct?

A Yes.

Q What was her role in this OkCupid stroke?

MS. BONJEAN: Objection to the question. I don't -- it's vague. I don't --

THE COURT: Overruled.

BY MS. FARRELL:

Q You can answer.
A She was, basically, like the inspiration for it. We --
Q How so?
A We went out to lunch, and it was -- she was very upset about some things that were going on with --

MS. COHEN: Objection, Your Honor.

THE COURT: Sustained.

Q Without telling me --
A Yes.
Q -- telling us what Ayries said, why was Ayries the inspiration for the stroke?
A Um, to my observation, like I was observing that she was very stressed out and upset, and I saw her crying a lot. She was having a lot of fights with Ravi, and Rachel said that, like, we all needed to like -- the -- the -- that Ayries needed to like pull it together more, and we all needed to help her pull it together more.

And so Ayries, in particular, was gonna be on a -- one of those monthly sex assignments.

MS. BONJEAN: I am going to object, object to the passive --

THE COURT: Sustained as to that last part of the response.

BY MS. FARRELL:

Q Who -- who said -- sorry.

What did Rachel Cherwitz, in particular, say about Ayries?

A Rachel Cherwitz assigned Ayries to be -- to do one of those monthly sex assignments, and Maya -- Rachel Cherwitz assigned Maya to be her person who was gonna arrange all the makeouts.

And then Rachel Cherwitz turned to the rest of us and said: And you all need to also get on OkCupid and set up these profiles and be having makeouts every day this month too.

Q And so, did you do that?

A Yes.

Q And based on your observations, did others in the house do that too?

A Yes, we did.

Q And based on your observations, did it appear that Ayries did that as well?

A Yes.

Q And what -- without saying anything -- without saying anything that she said, what were your observations of her state at the time that this OkCupid stroke was going on?

A She was -- she was, as -- as I mentioned, losing weight,

looking gaunt. She was like extra jittery. I saw her like stepping outside the -- The Bunker and puking. And -- and like sitting down and shaking. And I saw her going in and out of rooms with OkCupid dates, as well as senior staff, to have makeouts, and then coming back into our room afterwards.

Q And during this time that you were observing Ayries' physical demeanor, did you witness Rachel Cherwitz saying anything to her?

A Um, so at that lunch, in particular, that I -- that I mentioned that Rachel took us out to, Ayries was like sobbing in -- in the restaurant and Rachel did that like dog training like ch-h-h-h kind of noise to her and was like: Sit up, pull it together. And kept saying that until Ayries kind of like stopped crying.

And then Rachel turned to the rest of us at the table and said: Do you see that? That's how you need to handle her.

Q You also mentioned something called a marriage stroke?

A Yes.

Q What was that?

A So, we was -- the only exception to -- Nicole Daedone didn't get married, but Rachel Cherwitz was one of the first ones to -- to get married to Hamza. And after that, like everyone was, including myself, was proposing and getting married. And some of them were -- a lot of them were

happening at the end of courses.
Q You -- you mentioned you attended a course called the Nicole Daedone Intensive?
A Yeah, I attended it twice.
Q What, if anything, happened with respect to the marriage stroke at one of the Nicole Daedone Intensives you attended?
A The first one I attended was, basically, when the like monogamy stroke happened.
MS. BONJEAN: Objection. I don't understand the question.
THE COURT: Overruled.
A So, Nicole Daedone was sitting -- sitting at the front of the class and she was dating a guy named Jason. I think his last name was Thompson, but he was a lawyer for OneTaste corporate. And she was talking about and teaching about how they were -- their relationship -- they had decided to become monogamous and how it was like this amazing thing that was pushing her harder than anything else she'd ever done.
And then within those two weeks, like people weren't in relationships at the beginning of those two weeks, and -- and then like kind of one by one they each like announced this thing that -- that Rachel Cherwitz had actually said prior. But like, they had an OM and there was like this big heart opening. They felt this like spot in the back of their throat -- or heart open and they, basically, like fell in love

with each other. And so by the end of those two weeks, pretty much everyone except for me was monogamous.

Q And did you observe anybody getting engaged in any of the courses you attended?

A Yes. I believe it was at the end of that Nicole Daedone Intensive I observed Rachel and Hamza getting engaged.

Q And then to your knowledge did any of your other housemates get engaged at any courses?

A (Nodding.)

Q I'm sorry, give a verbal. I saw you nod your head.

A Yeah, sorry. Yeah.

Q Who?

A Michal Neria got engaged at a course. The engagements weren't only necessarily happening -- happening at courses. So almost everyone got engaged, it just wasn't necessarily at courses.

Q What about you testified about a man named Ravi, did he get engaged at any point?

A Yeah, he got engaged to Aubrey.

Q Who had he been in a relationship with before Aubrey?

A Ayries Blanck.

Q At any point did you get engaged?

A Yes, I got engaged in Raphael Martinez.

(Continued on the following page.)

DIRECT EXAMINATION

BY MS. FARRELL: (Continuing)

Q Describe to us how you got engaged.

A Yeah. Basically, after I was at the sales training that I did in San Francisco, when I flew home from that, everyone else was engaged at that point. I was like the last one. And Raph had moved my stuff and we moved from -- like, moved rooms, I think. Or it might have been to actual 365. But he had moved my stuff in the room and set up these rows. And I was like oh, my God, he's actually a good guy. I was not attracted to him at all. But I was like I would be stupid not to -- like, he was kind of the last senior staff member left, and I would be stupid to not get engaged to him.

Q Did you?

A Yeah. He was asking me why we hadn't been having sex and he was asking if I was thinking about the marriage stroke and I basically said yes. And then I was, like, well, should we? He was joking, and I said no, seriously, I think we should.

Q Where in time did the marriage stroke happen in relation to this OkCupid stroke?

A It was after about by a couple months.

Q Why was everyone getting engaged?

MS. BONJEAN: Objection.

MS. COHEN: Objection.

THE COURT: Sustained.

Q Do you have an understanding of why everyone was getting engaged?

MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q Do you have an understanding of why a number of your friends got engaged in one OneTaste?

MS. BONJEAN: Still objection.

MS. COHEN: Objection.

THE COURT: Overruled.

MS. BONJEAN: Foundation.

A My understanding of it was that basically, like, Nicole and Rachel said that, like -- and it was -- it was just like on all the threads and everything that public perception of OneTaste was basically that we were --

MS. BONJEAN: Objection to the foundation, on the threads.

THE COURT: Overruled.

Q You can continue.

A That OneTaste was a bunch of, you know, kind of like open relationship yahoos and that in order to be reaching more people and getting this practice out there that we needed to kind of of like clean up the public image and more people being married would help that.

Q Did you have occasion to observe Ayries' reaction when

Ravi got engaged to someone else?
A Yes.
Q What was her reaction, without saying what she said?
A When we got back from the first Nicole Daedone intensive, I walked into the Bunker and Ayries found out from Rob Kandell at the women's -- the --
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Again, without --
A Sorry.
Q -- saying what Ayries said.
Were you living with Ayries at the time?
A Yes.
Q Were you living with Ravi at the time?
A Yes.
Q When Ravi got engaged to somewhere else, what was Ayries' reaction?
A I walked into the Bunker with the rest of the exec team and she banshee screamed at me and was incredibly upset and came running at Ravi, and Homsa had to hold her back.
Q Are you familiar with something called the Reconciliation Council?
A Yes.
Q What is that?
A It was run by Ulysses Slaughterhouse [sic], who was not a

OneTaste staff member. He was like an outside expert on forgiveness.
Q So, who -- do you know who brought Ulysses into OneTaste?
A Yeah, Nicole Daedone met him somewhere and brought him in.
Q How do you know that?
A When he first came in to co-teach a class. That's what she said. There -- that was her introduction of him.
Q What was the Reconciliation Council?
A It was basically supposed to be like this safe place run by Ulysses. It was slightly outside, but, like, it was the Reconciliation Council for OneTaste, so it wasn't outside.
Q What was the purpose of the Reconciliation Council?
A It was to give people in the community and the staff of OneTaste a space to kind of like air their grievances and talk through things that were coming up, like problems they had with OneTaste and the people in OneTaste.
Q Approximately when was it formed?
A Around -- I think it was around November, December of 2014.
Q And did you participate in the Reconciliation Council?
A Yes.
Q In what respect?
A The largest, I -- Ulysses was also someone I would text and occasionally I get personal advice from as well. But the

largest meetings that I participated in were a series of ongoing meetings with the New York exec team for about a month plus when Ayries was leaving.
Q And without describing what was said in the meetings, what -- can you describe the structure and the tone of the meetings?
A Yeah. So, the structure of it basically was to allow each person on the team to, like, check in about their feelings and what was coming up for them and have a place to like express that.
Q Who -- I'm sorry. Who participated in those meetings with you?
A Ayries, Ravi, Po, Maya, Hamza was on a number of them, and then Raph came on, and Ulysses and myself.
Q Did anyone instruct you to participate in these meetings?
A Yes. Rachel Cherwitz said that we were all going to do this.
Q Did she participate in the meetings?
A No. She was having separate meetings with Ayries.
Q Did she tell you that?
A Ayries did.
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Sustained, and I will strike that answer.

MS. FARRELL: Thank you, Your Honor.
Q Did Rachel Cherwitz tell you she was participating in Reconciliation Council meetings?
MS. BONJEAN: Asked and answered.
THE COURT: Overruled.
A She also did, yes.
Q And who did she tell you she was participating in the meetings with?
A She told me she was participating in them with Ayries. She also told me she was participating with a lot of people in the community. She told me that her feeling was that it was her whole job at the time.
Q And when you say her, who are you referring to?
A Rachel Cherwitz.
Q And approximately how long did you participate in these Reconciliation Council meetings?
A So those with the exec teams was like a little over a month.
Q And what was the -- again, without saying what anyone said, what was the outcome of those meetings?
A Ayries left the company and I personally felt just very, very like emotionally turmoiled and upset and questioning obviously everything after this meeting. It really rocked me.
Q At the time that you were participating in those meetings, how, if at all, were your feelings about OneTaste

affected?
A I --
Q Again -- I'm sorry. Please be careful about not saying what other people said.
A I had been kind of questioning my involvement with OneTaste a little bit before that and I was -- it was like deeply, deeply increasing. I was very concerned that, like, that this was a cult, that I was involved in a cult, that I was harming other people. Yeah, that I was like wrecking lives, and I was really morally grappling with that and if I could continue working with this company.
Q Did you write down your feelings in any way?
A I did.
Q Did you share what you wrote with anybody?
A Yeah, I shared it with Rob Kandell.
Q Did you share it with anyone else?
A I shared the more general sentiments with Ulysses.
Q And was Rob Kandell still at the company at the time?
A No.
THE COURT: Ms. Farrell, just in the next ten minutes or so, I would like to take a break, so just tell me when that's convenient.
MS. FARRELL: Give me one moment. Now is actually a good time, Your Honor.
THE COURT: I think you should go for at least

another few minutes.
Q Did you ever discuss -- withdrawn.
Were you -- approximately when did Ayries leave OneTaste?
A It was I think like early January of 2015.
Q And at or around the time that she left, were you present for a fight?
A Yes.
Q Can you describe what happened?
A A couple weeks after Ayries left, she came back through -- to New York to pick up some stuff that she left at 365 and, like, say goodbyes to the team, and she -- she -- we all individually went out. I went out to coffee with her and Po was out at a coffee with her, and then she left the coffee and came up to the -- to 365 and came in the door, and Marissa tried to, like, hide Aubrey behind a shoji screen. And Ayries ripped the shoji screen and punched Ayries in the jaw. And then Raph was also there and he grabbed Ayries and took her into the stairwell and I followed them. And Ayries was, like, not going down the stairs. And Raph was trying to get her down the stairs. And she had her feet up against the railing and was trying to buck Raph into a wall, and Raph managed to getter her out the door.
Q And separate from this, were there any other violent incidents that you were a part of towards the end of your time

at OneTaste?
A Yes.
Q What happened?
A Raph and I got in a fight just a couple of weeks before I left. And we were -- like just a couple fight, verbal fight. We were kind of like, you know, arguing late at night and then into the morning. And we came to the New York Center in the morning and we were still arguing and Rachel Cherwitz pulled us aside and was like what is going on? You guys need to turn on and figure this out quickly. And she closed us in the kitchen of the New York Center and said that -- gave us a -- she said she was going to set a two-minute timer. So we had two minutes to figure out -- she told us that we had two minutes to figure out our fight and, like, get over it.
And I -- like, when the door closed, I just had, like, no idea what to do. We were in kind of a couple fight that was going on for a number of days and I didn't know how to finish it in two minutes. Like, that's not enough time to say anything. And, so, I, like, got back to one of Nicole's teachings, just like let your body deal with it once. And then the first thing that came to my mind was to bite him. I bit him on the shoulder.
Q And what happened after you bit him?
A He, like, strangled me and like crushed down on my neck to the point that I couldn't breathe. And I went down on my

knees and was, like, starting to lose, like, vision and consciousness when Rachel called like a 30-second warning through the door of the kitchen. And then Raph let go. And I was able to catch my breath. And then Rachel opened the door and said is everything good, and I nodded.

MS. FARRELL: I think now would be a good time, Your Honor.

THE COURT: All right. I'm going to ask the witness to step down.

THE WITNESS: Thank you.

(Witness steps down.)

THE COURT: Okay. We will back at 11:35, which is 15 minutes from now. Keep an open mind. Don't discuss the case. I will see you in 15 minutes.

(Jury exits the courtroom.)

THE COURT: I will see everyone at 11:35.

MS. FARRELL: Thank you.

(Recess taken.)

THE COURTROOM DEPUTY: All rise.

THE COURT: We can get the witness back and the jury.

MS. FARRELL: Yes, Your Honor.

(Witness takes stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Farrell, you may resume your examination.

MS. FARRELL: Thank you, Your Honor.

BY MS. FARRELL:

Q Ms. Gillick, before the break, you had just testified about a biting and a strangling incident?

A Yes.

Q Had you ever been violent like that before?

A No.

Q What brought you to that place?

A Desperation. I just felt like I had to figure something out. And I think also just, like, the sheer -- you know, like I said, the emotional control was very difficult for me when I'm sleep deprived, and I had been sleep deprived for a number of years and so I was like -- I was out of control.

Q Were there times when you wanted to leave OneTaste?

A Yeah, I wanted to leave OneTaste and was trying to figure out how to leave OneTaste for about six, seven months before I actually did.

Q Why didn't you leave until you did?

A One of Nicole's teachings in her classes was that, like -- basically, like, when people -- when people left, if they left on a down stroke or basically if they were like pissed off or resentful or had negative feelings towards OneTaste, like, they got stuck there. When people left, they were like considered dead and -- like all communications would

be cut off with them. It was kind of like an excommunication, and I wanted to see if I could figure out if I was the first person to do this. I wanted to see if I could figure out how to leave on a slightly more positive note when I wasn't super upset.

Q I'd like to show you a series of photos that are in evidence.

MS. FARRELL: If we can start, please -- and this can be published to the jury, please. We can start with Government Exhibit 408.

Q Do you recognize this person?

A Yeah. It is Michelle Wright.

Q And how do you know her?

A She was a coach and a friend of mine during my CB. She was one of the back of house people.

MS. FARRELL: If we can next pull up Government Exhibit 239, please.

Q Do you recognize this person?

A Not very well. She was like before my time. I think her name was Alisha. I'm not sure.

MS. FARRELL: If we can pull up Government Exhibit 260.

Q Do you recognize this person?

A Yeah. That's Lianna Lifson. She was my first pod coach. I ended up switching pod coaches. But she was my first pod

coach at CP.
Q I would like to next show you Government Exhibit 228. Who is that?
A That's me.
Q And I'd next like to show you Government Exhibit 382. Do you know this person?
A Yeah, that's Becky Uma.
Q How do you know her?
A She was a student, a little bit before my time, but we did do mastery together. We had a make-out at one point. Yeah. She was in London more of the time that I was in -- we had, like, missed each other a decent amount, but we were friends, acquaintances. Yeah.
Q I'd next like to show you Government Exhibit 265. Do you recognize this person?
A Yeah. She went by Margaret Pixley at the time and I knew her by Max.
Q How do you know this person?
A She was a student in New York a little bit before my time. We crossed over a little bit. And then I got to know her a little bit better. I did Mama Gena's after leaving OneTaste and there was more afterwards.
Q I would next like to show you Government Exhibit 269.
Do you recognize this person?
A Yeah. That's Michal Neria.

Q And did there ever come a time when you had a phone call with Michal Neria's mother? It's just a yes-or-no question.
A Yes.
Q How did that phone call come about?
MS. BONJEAN: Objection to the extent it calls for hearsay.
THE COURT: Overruled.
A Michal Neria's Michal mother attended a lecture -- sorry, a demonstration of OM by -- and it had a lecture attached to it by Nicole Daedone here in New York, and followed up with -- we did follow-up calls with everyone who attended the lecture. We did by, of course, by the following morning.
Q And at the time that you were making the phone call, did you realize it was Michal's mother?
A No, not until after -- partway into the call and then afterwards.
Q And so without saying what she said on the call, did what she say on that call affect you?
A Yes. It upset me a lot.
Q Did you -- during that call, did you realize who she was?
A I guess partway through, I started to realize who it was and collected the call log and last name and put it together.
Q And what was the tone of the conversation with her?
A She was incredibly upset and like yelling on the phone call.

Q And did that phone call affect you?
A Yeah. Like I said, I was very upset afterward.
Q Did it ultimately affect your decision to leave OneTaste?
A It was a big light bulb moment for me. I realized another like part of what wasn't making sense to me about OneTaste.
Q So, without commenting on the truth of what she said, but given that it affected you, what did she say to you?
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Overruled.
A She asked me if there were any licensed psychologists working for OneTaste.
Q What else did she say?
A That we were like digging around in people's psyches and not qualified to do so.
Q I'd next like to show you Government Exhibit 388.
Do you recognize this person?
A Yeah, that's Ayries Blanck.
MS. FARRELL: All right. We can put that down.
Q Did there come a time when you asked Rachel Cherwitz or if you asked OneTaste leaders if you could take a trip to Bali?
A Yes.
Q Who did you ask?

A I asked Rachel Cherwitz.
Q And what happened?
A I -- well, it was partially an ask and partially I basically bargained. I said that I would buy a third of a Nicole Daedone intensives, put a deposit on it, if she was trying to get her sales quota for the day, and then that would take us over that sales quota, so if I could go on this trip to Bali with my mom.
Q What was the trip for?
A My dad had bought a trip with like a spiritual teacher guy that he wanted to do the trip with the year prior, but the trip was scheduled only after a month after that. My mom had not felt up to it. And so she had gotten like a credit for the following year and she really wanted me to go. It was the first international trip she took after my dad passed.
Q How much -- did you end up putting money down for the third Nicole Daedone intensives?
A Yes, I went to the Bali trip.
Q And how much money did you put down for the NDI, approximately?
A I think it was 1,500 that day.
Q And you testified you went on the trip?
A Yes.
Q What happened when you returned from the trip?
A I was asked to step down from the exec team, so like

basically --
Q By who?
A Rachel Cherwitz had like told the team that I needed to step down and the meeting that I had where they actually -- sorry, Rachel Cherwitz actually called me to a meeting with Po and Aubrey, and Po and Aubrey were the ones who actually told me I needed to step down.
Q And how did that experience affect you?
A I didn't sleep that night. I stayed up just sobbing. It was almost like an exact experience the night. It destroyed me.
Q And did that affect your decision to leave OneTaste?
A Very much so.
Q What ended up happening after the meeting where you were -- fair to say demoted?
A Yeah.
Q What happened after that meeting?
A I -- it was -- so I had flown back from the Bali trip in like in the last couple days. That was it the second magic school I attended, so I pretty much was like a crying shell for the last couple of days of magic school.
And I -- there were like a number of meetings that happened with the exec team where like all the exec teams kind of these various cities kind of sat together and during like one of the lunches, I walked up to go sit with the New York

team, and Rachel Cherwitz looked at me and said you're not needed at this table. And, so, I just like hung out in the shadows for the rest of those last couple of days.

On the last day, I was -- Rachel Cherwitz messaged me and asked me to come up to -- there was like this house where the senior staff was staying a little bit, like removed from the rest of the retreat.

And she asked me to sign a piece of paper that basically gave her, you know, like carte blanche to come to New York and fully run the city. She could make any moves inside of the business that I was, you know, still monetarily an owner of but no longer going to be on any of the exec threads or in any of the exec meetings unless it was like a major decision like dissolving the LLC.

And I was told to sign that paper and give Rachel carte blanche power over that company, essentially.

Q And did you?

A Yes.

Q And how long after that did you end up leaving?

A Maybe six weeks. I don't know. It was not long.

Q And what came of your ownership of OneTaste NYC?

A So when I finally told Rachel that I was ready to go, Ravi bought me out of my ownership portion minus the wages I'd earned, and I left. I, you know, signed some like, you know, goodbye papers and -- and had like one more like final

reconciliation meeting with Ulysses and I got in my car and drove away from New York.
Q And did you sell the company to Ravi for --
A Yeah.
Q Did you sell it for less than what you had purchased it for?
A Yes.
Q And I'd like to show you Government Exhibit 4414.
Do you recognize this document?
A Yes.
Q Is this the contract you signed to sell the company -- the company to Ravi?
A Yes.
Q Is it a true and accurate --
MS. FARRELL: If we can scroll down to the last page? There were a number of drafts of this.
THE COURT: I don't think I have this particular one.
A Yes, this is a true and accurate....
MS. FARRELL: I'm sorry. We're getting a copy.
THE COURT: Thank you.
MS. FARRELL: Late edition.
May my paralegal approach, Your Honor?
THE COURT: Yes. Thank you.
THE WITNESS: Thank you.

Q Is this an executed copy of the contract that you signed selling your portion of the business to Ravi?
A Yes.
Q Is it a true and accurate copy?
A Yes.
MS. FARRELL: Your Honor, I move admit Government Exhibit 4414 into evidence.
MS. COHEN: No objection.
THE COURT: Ms. Bonjean?
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 4414 is admitted.
(Government's Exhibit 4414 received in evidence.)
MS. FARRELL: Thank you. If we can publish it to the jury?
(Exhibit published.)
Q What is the date of this contract?
A July 22, 2015.
Q Is that approximately when you left OneTaste and sold your portion of the business?
A Yeah, I think I left on like July 2nd or 3rd, but it took a few weeks to execute this so, yes.
MS. FARRELL: If we can scroll down a little bit to 1.2, the purchase price.
Q What did it say the purchase price is?
A 175,000.

MS. FARRELL: All right. We can take that down.
Q Did you just discuss your departure with Nicole Daedone?
A Yes.
Q What did she say to you, if anything?
A I mean, you know, sorry to see you go. It was -- there was never any like bars on leaving. In fact, Nicole frequently said in like even in sales pitches, you know, fuck. Get away from this. Run.
It was more -- it was the fact that I was going to leave, you know, lose all my friends and family -- like they're called my friends and family. It was like a death of a whole life, like that was the hard part, but it was not that Nicole or Rachel were stopping me from leaving.
Q Did you discuss your departure with Rachel Cherwitz?
A Yes.
Q What did she say?
A She -- I think she said, okay, love.
Q Where did you go after you left OneTaste?
MS. BONJEAN: Objection; relevance.
THE COURT: Overruled.
A I drove across the country. I went home to my mom's house. Yeah.
Q And why did you go there?
A To find -- I mean, more than anything, I needed to really finally grief my dad's death, like I pushed it aside and I --

yeah. I hadn't really spent much time with my mom since his passing.

Q What was your emotional condition at the time you left OneTaste?

A Totally devastated. I mean, I -- I like when I said, you know, I was looking for that upstroke, I got enough to like teach a class.

My, like, dog, my family dog, the dog my dad owned died the day I taught that class. I just felt like it was grief on top of grief on top of grief for, I mean, acutely for a number of months afterwards and then for years for me.

Q What was your financial condition at that time?

A So, I mean, I had been bought back out. That portion, the money that I did invest in OneTaste New York was -- it was my -- it was the only money to my actual name. My family had wealth, but it was in trusts and not mine.

So, the -- it came from like my college fund. It was supposed to be for my grad school. So, you know, I had gotten that back and, you know, I was at my mom's. So I was living at my mom's. I was quite recovered relative to what I had heard from people.

MS. COHEN: Objection.

THE WITNESS: Others.

THE COURT: Overruled -- I mean, I'm sorry, sustained on the last comment.

MS. FARRELL: Thank you.
Q And what was your psychological condition at that time?
A Like I said, I mean, just devastated, grief.
I was also like really like -- like scraping my mind and brain. I ended up doing another run through amends.
I was trying to figure out some way to like live the lifestyle because like the whole reason I like left was I felt like I couldn't be an individual, like I couldn't be myself inside of OneTaste.
Because as I mentioned that there are like the -- that there was like the strokes. You did exactly what everyone else was doing and that was like the only way that got approval, that got like continued promotion.
I didn't feel like there was any space for like the things that I wanted, like I wanted a husband, I wanted kids, I wanted acting. I always wanted to be an actor. That was like my five-year-old dream and none of that could exist.
There were a couple of very senior strokers that were kind of allowed to hang around, but I never observed any, like, longstanding strokees that hung around the community and weren't pushed to continue to take courses and being very, very involved, sort of like you could only go in. You could never like step back out and still be involved --
Q Okay.
A -- and I was trying to live the philosophy and killing

myself at it.

MS. FARRELL: May I have a moment, Judge?

THE COURT: Yes.

MS. FARRELL: No further questions.

THE COURT: Any cross-examination? Is it going to be Ms. Bonjean?

MS. COHEN: Yes.

THE COURT: Sure.

MS. BONJEAN: Your Honor, we did our best to make sure you have exhibits.

THE COURT: Okay. I do have a binder. Thank you.

MS. BONJEAN: There were some things that were pulled at the break. So hopefully, they're in there.

THE COURT: Okay. You may proceed, Ms. Bonjean.

MS. BONJEAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Gillick. My name is Jennifer Bonjean and I represent Nicole Daedone.

Ms. Gillick, as of March of 2024, you were working on a memoir that you wanted to publish, is that right?

A Yes.

Q Are you still working on it?

A Yes.

Q And you also were working on an adaptive television

series related to your time at OneTaste?
A Yes.
Q Still doing that?
A Yes.
Q And these projects are going to be based on personal experience, but not entirely factually true; isn't that right?
A They are memoirs, so they're works of art.
Q Right. But they're not entirely factually true; correct?
A They are to my memory and modified for dramatization to make sense of the events in a more -- in a more streamlined way.
Q Do you remember telling the federal government that you were working on these projects and they were based on your personal experiences, but not entirely factually true?
A I don't remember saying that exact sentence, but I might have.
Q I'm sorry?
A I don't remember saying that exact sentence, but I might have.
Q Are they going to be factually true or not?
MS. FARRELL: Objection; Asked and answered.
THE COURT: Sustained.
Q So but do you remember telling the federal government that they were not going to be factually true?
A There, again, they're based on my memory and they are as

-- as factually true as makes sense inside the art.
Q The art?
A Yeah.
Q Is that what you call lies?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q I'm going to have you look at --
MS. BONJEAN: Could we pull up 3500 AG-13, Your Honor.
And if you could look at the screen?
It's just for the witness.
THE WITNESS: Can you make it bigger?
MS. BONJEAN: The bottom paragraph, if you could pull that up.
THE COURT: Does she have a paper copy, too?
MS. BONJEAN: I can give her one.
THE COURT: I think it's better to have a whole document in front. Thank you.
MS. BONJEAN: It's only one page, Your Honor.
THE COURT: Yes, but it's not all showing up on the screen.
MS. BONJEAN: May I approach? (Handing.)
THE COURT: Yes.
THE WITNESS: Thank you.
MS. FARRELL: Your Honor, I'm just going to object

to improper impeachment of the witness.

THE COURT: She hasn't done anything yet, so let's wait until the question.

Q Ms. Gillick, did you have a chance to read that second paragraph?

A Yeah, let me -- I have one more sentence.

Yes.

Q Okay. And do you remember telling Agents Elliot McGinnis and Daniel that your projects would be based on your experiences, but were not intended to be completely factual?

MS. FARRELL: Objection; improper refreshment.

THE COURT: Overruled.

A The -- yeah, I mean, that's -- I feel like I just said that as well. This is what I mean by modifying the timeline and protecting the identities of those that aren't me.

Q Well, your writing projects were also going to include -- are going to include consolidated fictional characters; isn't that right?

A Yes.

Q Okay. Fictional characters; correct?

A Yes.

Q Okay. When did you start working on these writing projects?

A I started writing down thoughts and like, I don't know, I guess you could call them kind of like a glorified journal

right after I left, like months after I left.
Q And are you intending on selling those writing projects as a TV series?
A That's the hope. I have no idea what will happen with them.
Q But that's your goal; right?
A Yeah.
Q And you told the Government about your manuscripts that you were writing; isn't that right?
A Yes.
Q Did you provide a copy of them to the Government?
A No.
Q Did you offer to provide a copy to the Government?
A No, they're not finished.
Q Did any government agency, FBI agent say, will you please provide us with a copy of them?
A No.
Q And this glorified journal, did you provide a copy to the Government?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Did you provide your writings that memorialized your experiences at OneTaste to anyone in the federal government?
MS. FARRELL: Objection.
THE COURT: Sustained.

Q Did they ask you to -- did anyone, Agent McGuinness or Schmidt ask you to provide your writings regarding your experience at OneTaste?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q Okay. You didn't bring them here with you today, though; right?

A No.

Q You didn't think they would be beneficial for the jury to hear about, right?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q Okay. So you moved to San Francisco from Colorado in your 20s; right?

A Yes.

Q And you did that to start a business in circus arts; is that right?

A Yes.

Q And you had already earned a Bachelor's degree; correct?

A Yes.

Q In what area of expertise -- or again, what area did you study?

A Anthropology.

Q Anthropology.

And what did you get, a B.A. or is that a B.S.?

A It's a B.A.
Q And you had a close-knit family; right?
A Yeah, relatively close-knit.
Q You're an only child, as I understand it?
A Yes.
Q You have parents who were involved in your life; right?
A Yes.
Q I think you testified that you came from a wealthy family; right?
A Yes.
Q You had access to financial resources?
A Yes.
Q And in 2012, you were living in Santa Monica; correct?
A Yes.
Q You had a nice large loft that your parents were paying for?
A Sorry, not Santa Monica. 2012?
Q Yes.
A No, I was living in San Francisco in 2012.
Q I'm sorry. I didn't hear you.
A I was living in San Francisco in 2012. Wait. Sorry. Yes. 2012, San Francisco.
Q San Francisco?
A Yeah.
Q Did you live in Santa Monica at some point?

A Yeah, years later.
Q Okay. My apologies.
Okay. So, in 2012, you were living in San Francisco in a large loft, work/live loft that your parents were paying for; right?
A Yes.
Q And you meet this guy on the beach who is cutting his toenails named James Barford; right?
A On a street in the Southern Market District, not the beach, but, yes.
Q And did you stop to talk to him while he was cutting his toenails?
A No. He came running after me and started talking to me and I responded to him.
Q Okay. And he invited you to coffee; correct?
A Yes.
Q And you go to have coffee with him; correct?
A Yes.
Q And he tells did you that he's living in a commune; right?
A Yes.
Q And you know the concept of a commune; correct?
A Yes.
Q You know that people live in communes, which are also known as intentional communities; correct?

A Yes.
Q What's an intentional community?
A They're generally houses, group houses organized around, you know, their particular interest, sort of particular belief or a particular pursuit, I suppose.
Q Right.
People intentionally move into a group setting because they share beliefs or ideas; right?
A Yes.
Q And you testified on direct examination that these communes were not uncommon in San Francisco; correct?
A Yes.
Q There is a long history of communes, particularly in San Francisco. Would you agree?
A Yes.
Q You also at that time had been involved in a number of spiritual practices; correct?
A Yes.
Q Meditation; right?
A Yes.
Q You were involved in meditation and spiritual practice since your like your teenage years; right?
A Yes.
Q Yoga; is that right?
A Yes.

Q And community-based philosophical discussion groups?
A Yes.
Q Holistic healing practices?
A Yes.
Q And a healing system known as biogenesise (phonetic)?
A Biogenesis.
Q Oh, it's biogenesis. That's just my typo. Sorry.
And what is biogenesis?
A It's a like crystal-based healing system that's owned by a company.
Q You said crystal-based?
A Yes.
Q Like the pretty crystals that you can see in a store sometime?
A They are like -- it's glass, crystal-infused glass objects.
Q Okay. And all -- there's a common theme in these -- in these practices you had been previously involved in, insofar as they were around like spiritual growth; right?
A Yes.
Q And human development; right?
A Yes.
Q Does this healing system known as biogenesis have some sort of mystical qualities as well?
A Yeah. One of the family members who founded it gets

messages downloaded from a higher being.
Q Right. And all these ideas from these spiritual practices you learned all predated your contact with Ms. Daedone; right?
A Yes.
Q So you start hanging around with James and he invites you to a turn-on event; right?
A Yes.
Q And as I understand it, you weren't interested initially at least; correct?
A Correct.
Q But you ended up eventually attending a lecture that was being given by Ms. Daedone?
A Yes.
Q And do you recall -- well, we know this was what, 2013; right?
A Yeah. I believe it was '12, 2012.
Q Oh, 2012?
A It could have been early 2013. I'm not positive.
Q And this lecture that you attended, this first lecture was about an hour, an hour and-a-half?
A Roughly, yeah.
Q And the lecture was about OneTaste, right?
A Yeah, about orgasm meditation.
Q Right. The core tenet of OneTaste is orgasmic

meditation; right?
A Correct.
Q And so she lectured about the practice; right?
A Correct.
Q She gave an overview of how she developed the practice; correct?
A Yes.
Q She gave an overview of her long journey developing the practice into this very successful wellness company; right?
A Yes.
Q And you understood that OneTaste was a sexual wellness company with these like spiritual elements; right?
A Yes.
Q There was paper, marketing materials available at this lecture, I assume?
A Yes.
Q There were -- you understood that orgasm didn't necessarily mean only, you know, climax, but was more about energy; right?
A Yes.
Q It pulled from Buddhist principles like the concept of qi; right?
A Yes.
Q They have slogans like "powered by orgasm"; right?
A I'm not positive that was being used at the time, but it

was definitely being used later.
Q Okay. And also that orgasm was metaphorical; right?
A Yes.
Q It was about a source of energy; correct?
A Yes.
Q And this resonated with you; right?
A Yeah, the philosophies resonated with me. The practice was what I was opposed to, but the philosophies did.
Q Awesome.
It took you awhile to get onboard with the practice, but the message was something that resonated with you. Do I have that right?
A Yes.
Q Of course, you understood when you went to this, you weren't going to a lecture about how to start a small business or anything; right?
A Yes.
Q You weren't going to a wine course or anything like that; correct?
A No.
Q It was in the realm of sexual wellness, spirituality, and sort of human potential; right?
A Yeah. I mean, the title of the lecture was, you know, Orgasmic Meditation by Nicole Daedone. It was in the title.
Q And you were -- you testified on direct you were very

impressed by Ms. Daedone; right?
A Yes.
Q And you said you were impressed because she was a successful businesswoman; right?
A Yes.
Q And she was a successful businesswoman; right?
A Yep.
Q She had built an entire company off of this ideal; right?
A Uh-hum. Yes.
Q In fact, I think you said on direct examination if she can sell orgasm, I can sell circus arts; right?
A Yes.
Q That was inspiring because she had built an entire sort of massive company out of these teachings that she developed; right?
A Yes.
Q But you didn't sign up for a course right away; right?
A Correct.
Q I'm assuming there was a sales pitch at some point during that lecture.
A Yes.
Q And, you know, now having had the experience with OneTaste, there was always some type of sales pitch with these events; right?
A Yes.

Q That's how she became a successful businesswoman; right?

MS. FARRELL: Objection.

THE COURT: Overruled.

Q Correct?

A Yes.

Q And then you had the opportunity to have this one-on-one kind of little coaching session with her at this event; right?

A I --

Q Or was that later?

A It was after the event, and it was 15 people with -- like we each got an individual amount of time. It wasn't one-on-one.

Q Okay. So was the event that you went to, did it include this little I guess kind of group coaching circle?

A No, that was a few days later.

Q Okay. So you went to this initial event and you were so moved, you kind of almost immediately decided to do this coaching circle with Ms. Daedone; right?

A I -- I had -- definitely had to go think about it for a few days. I don't know that I would agree with immediately.

Q Right. You gave it a couple of days and then you signed up for the coaching circle; right?

A Yes.

Q And then you went to this.

And you went to this coaching circle for the

opportunity to have a one-on-one conversation with her basically; right?
A To ask Nicole a question directly.
Q Right.
And, of course, you knew she wasn't an expert in circus arts; right?
A Yes.
Q Okay. And you testified that you went because you really just wanted to know how to get your business going; right?
A Yes.
Q And she responds with a question about your sex life and your sexual wellness; correct?
A Correct.
Q And you said you found that strange?
A I did.
Q You found it strange that a woman whose entire company and core tenet centers around energy coming from orgasm would ask you about your sexual wellness?
A I found it strange that she didn't answer my question directly and that it was it -- that it was like -- it felt like an abrupt subject change to me.
Q Well, maybe that.
But certainly looking back, you're not surprised that Ms. Daedone didn't answer your question directly; right?
A Sure. I mean, I guess there were other times that she

didn't answer questions directly.
Q Right. That's not really how she teachers, is it?
A You could say that, yeah.
Q Yeah. She teaches with stories and metaphors and narratives; correct?
A Yeah.
Q Okay. And you, of course, at least now understand that it is her belief that your success in life comes from being turned on; right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q She testified at length about Ms. Daedone's views and teachings?
THE COURT: Sustained objection.
Q Did Ms. Daedone teach in these classes that you attended, okay, that your source of energy comes from your orgasm?
A Orgasm? Nicole Daedone taught us that orgasm was synonymous with God and synonymous with like a soul and, so, that like our -- your source of energy came from God and soul orgasm.
Q Right.
A Yes.
Q So no surprise then to you, at least looking back, that that would be where she would focus her questions on you; correct?

A Yeah.
Q This wasn't like a class on how to write a business plan, was it?
A No.
Q And how long was this brief one-on-one interaction that you had with her?
A How long did I specifically talk to her?

(Continued on next page.)

BY MS. BONJEAN (Continuing):
Q Correct.
A A few minutes.
Q So a couple minutes. Two, three, less than five?
A Yeah, call it -- yeah, less than five.
Q And in the course of this, you know, less than five-minute conversation -- and you are in a room, you're with other people, right?
A Yeah.
Q You discuss the fact that you aren't a girl's girl, right?
A Yeah.
Q I think you testified that you missed the girl's code, right?
A Yes.
Q And that was something that you felt was lacking in your life; is that right?
A I felt that, like, female friends, and a sense of belonging I was lacking in my life, yeah.
Q And you testified on direct examination that Ms. Daedone basically told you in sum and substance, you know, go out and fuck a bunch of men in the OneTaste community who were with women; is that the message you received?
A Yes.

Q And this is -- that's sort of your recollection of it, correct?
A Yes.
Q And you weren't in the OneTaste community at that point, right?
A No.
Q So she was suggesting that you just go to the OneTaste community and have sex with the OneTaste men?
A You had to get OM trained to become a part of the OneTaste community, so it was, like, part and parcel of that was to get OM trained.
Q Part and parcel what?
A In order to, like, ask for make-outs and participate in the OneTaste community, you needed to be OM trained.
Q So she was suggesting that get OM trained and explore sexuality at OneTaste, right?
A Yes.
Q And you understood, of course, that monogamy was not -- at least, at that time -- a wildly popular practice in the OneTaste community, right?
A Yes.
Q So there weren't actually men and women who were, like, monogamous or at least very many men and women, right, at that time?
A They weren't monogamous, but there were plenty that

were in open relationships.
Q Right, exactly. There were many people who were in open relationships, right?
A Yes.
Q But it's still your contention that Ms. Daedone said go take other people's men?
A Yes.
Q Okay. How could you be taking anyone else's men if people were in open relationships?
A I mean, I've personally never understood how anyone else can own anyone else, but it was -- it was that they were connected and that there were -- I was -- I learned from them and from Nicole Daedone's teachings that there was basically like a way to ask permission from the woman in order to have a make-out with the men and that it, like --
Q Let's stay focused on this initial conversation, though, because that's what I'm asking about.
A Okay.
Q If it was your takeaway that Ms. Daedone was saying go get OM practice and then join the OneTaste community and have these sexual experiences with men that were actually in open relationships, right?
A Yes.
Q You testified on direct that?
MS. BONJEAN: One second.

THE COURT: Sure.

(Pause in proceedings.)

BY MS. BONJEAN:

Q You testified on direct that you signed up for some free coaching with Rachel Cherwitz, right?

A Yes. I was offered a one-hour free exploratory with Rachel following the morning after the --

Q Right. This was an exploratory session, correct?

A Yeah.

Q And the exploratory session was really just like a sales pitch, right?

A Yeah. It was -- it was functionally an hour-long version of, like, take people to your pain process that I described earlier.

Q Right. And this take people to your pain concept is sort of like getting to what they really want and need, right?

A Yeah. And what's blocking them from it, like, what they're --

Q Right.

A -- what their issues are.

Q And this is a -- this is a tactic that was used, at least according to your training, in other settings, correct?

A It was the basis of all sales at OneTaste.

Q Okay, but it was pulled from other sales curriculums, correct?
A Yes.
Q This wasn't just something that OneTaste came up with; they actually had outside people come teach this, right?
A I don't know if they had outside people come teach it before I was there, but during my time there, yes.
Q And this idea was that find out what people are struggling with, take them there, and then, you know, offer them what you have to offer that might help them get through it, right?
A Yes.
Q And this exploratory session was part of that process, correct?
A Yes.
Q And you're a bright woman, you understood you were pitched, right?
A Yes.
Q But you also liked the product, right?
A I still wasn't sure I wanted to OM, if that's the product you're referring to.
Q Well, you understood that the community, the intentional community was based around the practice of OM, right?
A Yes.

Q Okay. And there were other things about the community that were attractive to you, right?
A The main thing that was attractive to me was Nicole and the way of being that she had.
Q Right. She was -- she was a smart woman and charismatic and all those things, right?
A Yes.
Q And she had an impressive pedigree in terms of what she had built, correct?
A Yes.
Q Okay. But you did understand that her entire philosophy was built around OM, right?
A Yes.
Q And when you looked around in this community, there wasn't anybody in the community who was just rejecting the practice of OM, right?
A No, yeah, you were either an OMer and in the community unit or not or you didn't take part of the practice and you were not in the community.
Q And you could still actually go to the courses and not OM, right?
A No.
Q Well, you could go to a course -- well, you weren't OMing in the courses, were you?
A Yes, we were.

Q Okay. Which course did you OM in?
A Every course I took.
Q In Intro to OM?
A Yes.
Q Okay.
A Well, they're -- so they -- I will correct. They had a -- not during my Intro to OM, but partway through my time there, they broke off the OM practice into what was known as a lab. And they technically closed the class --
Q Okay.
A -- and you could -- supposedly no one was actually allowed to -- you could leave the -- without OMing during that lab.
Q So let's go back.
Certainly at the lecture you attended, nobody forced you to OM, right?
A That -- that wasn't what I would consider one of their courses.
Q And when you signed up for a course, you understood there was OMing involved, right?
A Yes.
Q Now, during this time when you're getting more familiar with OMing and with OneTaste, you were also developing a closer relationship with James, right?
A Yes.

Q And you were attracted to him, fair?
A Yes.
Q And you started spending time with him. That was even before you went to the Nicole Daedone coaching circle, correct?
A Yeah. Before I went to the Nicole Daedone coaching circle, we had gone to two coffees together.
Q And then after this Nicole Daedone coaching circle where you had your three- or four-minute conversation with her, you started having a more physical relationship with James, right?
A Yes.
Q Who you then later found out was married, right?
A He told me he was married right after I kissed him the first time.
Q After you kissed him the first time, he told you he was married, right?
A Yes.
Q Was he married to someone within the OneTaste community?
A Yes.
Q And did he also tell you he had an open relationship or what?
A Yeah, he told me it was an open marriage.
Q And as a result, you decided to have a physical

relationship with him, right?
A Yes.
Q That's kind of what goes on at OneTaste, right?
A At the time.
Q Yeah. And you testified on direct that, you know, I did this because Ms. Daedone told me to, right?
A Yes.
Q But that was literally the community you were getting involved in, right?
A Yes.
Q Okay. So it wasn't just that Ms. Daedone told you in some coaching session to go sleep with people who are in relationships; it was -- the fundamental of the company and the community was to explore your sexuality, right?
A Yes.
Q And can we agree that if people are in an open relationship or open marriage, that's not really off limits to sleep with other people or generally not off limits, right?
A I would say that every open relationship has its own rules. But the definition of it, right, is that there are -- there are ways to have relationships with other people outside that relationship, right.
Q And you have no reason to believe that James and his wife had any problem with you having this relationship with

him?
A She was intensely mad at me and we had -- we had a -- a long road to any kind of understanding after that because I didn't speak to her before him, but yes.
Q Oh, because you were deceptive about it?
MS. FARRELL: Objection.
THE COURT: Overruled -- I'm sorry, sustained, sustained.
Q Because you didn't communicate with her about it, right?
A I didn't know -- James did not discuss with me that that was their rule and I did not know that that was how their relationship functioned. I had never encountered an open relationship at the time.
Q So you signed up almost immediately for the coaching program thereafter, right, in May of 2013?
A I signed up for the coaching program during the exploratory with Rachel.
Q Right. And that was on, I think, May 13th of 2013, right -- or mid-May 2013?
A Yeah.
Q Sound right?
A Yes.
Q And in order to be a part of the coaching program, you had to take the Intro to OM course, right?

A Yes.
Q And Rachel said, you signed up for the coaching program, you can take the Intro to OM free of charge, right?
A Yes.
Q And that's what you did on May 25th of 2013, right?
A Yes.
Q And you had to fill out an application to participate in the coaching program; isn't that correct?
A There was, like -- there was a number of paperwork things going into that course, yes. I don't remember it being an application, like, to get accepted, like that's what I think of the definition of application, but there were a number of, like, desire contracts and, like, agreements that were written down. There was a lot of paperwork going into the course.
Q Well, do you remember --
So you mentioned a Desire Contract. What is that?
A That was a document that OneTaste had created that I presume Nicole came up with, but that had, like, a number of steps, basically, of like what you wanted. I think I mentioned this before. It was kind of like a -- it's a life coaching way of seeing if you got the results. For instance, what you want and, like, what your -- like, what the metrics would be of getting those desires.
Q And you said OneTaste created it? I mean, it was a

OneTaste coaching program, right?
A Yeah. On the booklet, like, it had this, it said, like, Desire Contract, like, OneTaste Property or Company, I don't remember what it said under it. But it had the name OneTaste and Desire Contract on the title page.
Q And the Desire Contract was designed for participants in the coaching program to identify a number of things, right?
A Yes.
Q And this was all about making sure that the coaching program was useful to you, correct?
A Yeah, personally, there was also like -- like in that contract was like ways to handle me and, like, things that like freaked me out and -- and, like, how to -- like, it was sort of like some keys to psyche.
Q Right. It was -- I mean, that's -- that's the purpose of the program, correct?
A It was one of them.
Q Right. And one thing you were supposed to identify were your big D desires, correct?
A Yes.
Q And a big D is sort of your, you know, your beacon, right?
A Yeah, I would call them like your highest goals.
Q So they're like goals, right?

A Yeah.
Q And then there were little D desires, correct?
A Yeah. Those were kind of, like, things you'd also like to accomplish or get.
Q And you had to identify -- make admissions, correct?
A Yes. That was part of the, like, things to know about me.
Q Right. Things that you wanted to work on, correct?
A Yeah.
Q There was something called offerings, right?
A I don't remember that section or really what it meant, but it -- I -- you're welcome to show me.
Q We'll get there.
Offerings, though, were about what you brought to the community, right?
A Yeah. Like I said, that was not a term that was used very much.
Q Okay. And then you had hard nos, right?
A Yes.
Q And what are hard nos?
A Those were supposed to be like boundaries and things that you were unwilling to do.
Q And then also there was a section on how can we support you, right?
A Yeah.

Q And you filled this out on September 10th of 2013, correct?
A Sounds about right.
Q And we're going to go back to that, but before you even filled out this application, you had decided to move into 1080 Folsom, right?
A Yes.
Q And 1080 Folsom was the OneTaste commune that James was living in?
A Yes.
Q And this was within, really, a couple months of that first couple-minute lecture with Ms. Daedone, right?
A Yes.
Q And you understood that it was -- I think you called it a kids playground for sexual freedom, right?
A Yeah. I mean, I don't remember -- I don't remember saying that, but, yeah, it was -- it was definitely a place of experimentation of anything sexual for sure.
Q Do you remember calling it a sexual freedom utopia?
A No.
Q And you gave up your 3,000-square-foot loft to go live in this commune, right?
A Well, it was flooded and I had no sense from the landlords as to when -- how long it was going to take to repair, so I -- I decided to move out. And the place that I

decided to move into was 1080.
Q So are you suggesting this was some sort of like you didn't have a place to live, so you decided to go to --
A Yeah. I needed -- I needed a new place to live. My place was flooded.
Q Okay, but isn't it true that on July 30th of 2013, you asked Amy Jones for an application for the 1080 residence?
A Yeah. You had to apply through Amy Jones to move into 1080.
Q And you wanted to know when you could move in, correct?
A Correct.
Q And you wanted her to give you an estimate, correct?
A Yes.
Q And you didn't mention anything about your place being flooded, right?
A It had -- it had flooded before then. And I was living with a friend, with a woman named Heather.
Q And isn't it true that you told her you had to put in a 30-day notice at the spot you were living in?
A Yeah. So they -- after it had flooded, they -- I mean, they weren't kicking us out. We were -- we were allowed to stay and wait out the construction period. They just, like I said, had no estimate on how long that was going to be.
Q Right. So you weren't really in an emergency situation. You had to give 30 days notice regardless,

right?
A I had to tell them I wasn't coming back.
Q Right.
A Yeah.
Q Yeah. And so it wasn't like you were, like, living in this flooded place, you had nowhere to go; you had interim living, right?
A Once again, I was staying with a friend, because --
Q You were staying --
A -- my -- the place that I was living was uninhabitable. There was no functioning kitchen or bathroom. So I was staying with a friend who had a habitable place to be.
Q Right, but who did you have to give 30 days notice to, then?
A The -- I had to let the landlords know that I was not going to come back even after they finished the construction, so the landlords of the live-work loft.
Q So you had this 3,000-square-foot loft that's being renovated, right?
A Repaired, but yes.
Q Repaired, renovated, fixed, right?
A Yeah.
Q You're staying with a friend in the interim, correct?
A Yeah.
Q And you decided that you wanted to go to the commune

instead of going back to your loft, right?
A Yes.
Q And, again, your parents are paying for your rent, correct?
A They were paying for my rent at the live-work loft. They didn't pay for my rent at OneTaste.
Q And how much was the rent at your 3,000-square-foot live-work loft?
A 3400.
Q So cheaper than the commune, correct?
A No.
Q I mean, I'm sorry, I got that backwards.
More expensive than the commune, right?
A Yes.
Q Like double the price, correct?
A Yes.
Q So to be clear, you had other options than going to the commune, right?
A I wasn't homeless, if that's what you're asking.
Q It's not just that you were homeless. You could have decided to live somewhere else other than 1080 Folsom, right?
A Yes, yes.
Q Because on direct you sort of made it sound like you had nowhere to go.

MS. FARRELL: Objection.
THE COURT: Sustained.
Q You weren't trying to mislead anybody about that, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q So you could have waited for your nice loft to get fixed, right?
A Yes. There -- I could have waited for that. There're plenty other places to live in the world. I had other options.
Q Right. And you received an application that you had to fill out in order to live at 1080 Folsom, right?
A Yes.
Q And when you were inquiring --
MS. BONJEAN: Well, strike that.
Q You actually did fill out the application and sent it to Amy Jones pretty promptly, right?
A Yes.
Q And you had to answer questions in the application, fair?
A I don't remember the application at the time, but I'm sure I did.
Q Would anything refresh your recollection?
A Sure.

Q I'm going to have you look at 12-AD, as in dog.

MS. BENSING: May we have a copy, please?

Q Do you recognize this document, Ms. Gillick?

A Yes.

Q And what do you recognize it to be?

A I mean, again, this is my application and this is my information about where I was living and how I was employed.

Q I'm sorry, could you speak into the microphone?

A Sorry.

This is my application and this is my information about where I was living and how I was employed.

Q Okay. And you were asked questions such as whether you had ever lived in a community setting before, right?

A Yeah.

Actually, could we zoom in on the bottom half?

THE COURT: Does she have a hard copy? I think if it's better, if you are going to use a document, just to give her a hard copy. Thank you.

Q They asked you, of course, what your experience was living in a community setting, right?

A Yes.

Q They asked you why you wanted to live in a community setting, right?

A Yes.

Q And what's your understanding of why they asked those

questions?
A To see if it was a good fit.
Q Right. Make sure you're right for them and they're right for you, right?
A Yeah.
Q They asked you about what is your experience with the container of a practice and your intentional living.
What did you understand that to mean?
A The container, it was talked about in the How to OM course was, basically, you know, again, everything was split, the holographic, and the OM practice expanded basically. And the container for the OM practice was the 15-minute, you know, so there were gloves worn and lube used and it was particular order of things and that -- the expansion of that was, like, there were particular rules in the community.
Q Right. The rules of OMing, right?
A Yeah. And the rules of, like, community participation kind of thing.
Q And they asked you about your experience in intentional living, right?
A Yes.
Q And they asked you about your prior experiences -- or, I'm sorry, your prior practices or your practices outside of OM, that's a better way to put it, right?

A Yes.
Q They asked you to tell them about yourself, fair?
A Yeah. A little bit.
Q What brought you there. Why you're there. What you want to get out of it.
You can turn it on the other side.
A Thank you. Give me a minute to read, please.
(Pause.)
A Yes, I did.
Q And when you filled out this application, you didn't say, like, I need a place to stay because my loft flooded or anything like that, right?
A No.
Q You didn't say anything like, you know, I just want Ms. Daedone to tell me how to be a girl boss, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q You didn't tell -- you didn't put in your application to live in a community that you just wanted to learn how to start a business, right?
A No, I did not.
Q Okay. And by this time, that you filled this application out, you are practicing OM, correct?
A Yes.
Q It wasn't as if, like, you were still unsure about

whether you wanted to engage in the practice at this point, correct?
A Correct.
Q And you told the folks at OneTaste that you were there to explore your sex life, relationships, and career and personal growth, right?
A Yes.
Q And Ms. Daedone didn't stand over you while you filled out that application, right?
A No.
Q Ms. Cherwitz didn't stand over your shoulder while you filled out that application?
A No.
Q You filled that application out yourself, at either a computer or -- I assume a computer, right?
A It's typed, so yes.
Q You testified on direct that you didn't really connect with the practice, but when you applied for this -- when you applied to live in 1080 Folsom, you actually said the whole practice fits me like a tee.
A This was a number of months after -- like, that same when I didn't connect with the practice was before I tried the practice.
Q So before you tried the practice, you weren't sure about it, but then you practiced it and you liked it --

A Yes.
Q -- correct? Okay.
And there were no surprises about what type of community you were moving into, right?
A No.
Q And you even said that you found OMing to be a profound reawakening for you, correct?
A I don't -- I don't remember using those words, but, I mean, OMing was an amazing practice. I believed in it deeply, yes.
Q Do you want to look at the other side of this, the second page of this application?
A Reawakening, yes, thank you.
Q And no one promised you anything in exchange for writing these words, right?
A No. I mean -- no, except, the -- if -- I could get accepted into living into 1080.
Q What the community had to offer, apart from that, right?
A This -- it was just the application to move into 1080.
Q Right. And you also put down that you were looking to be close to people in the house and you wanted to push each other, right? Last sentence of that.
A Yes.
Q Now, you testified on direct examination, when the

Government was asking you questions, whether you had any privacy when you were living in an OM residence.

Do you remember those questions?

A Yes.

Q And you said in response, in your two-and-a-half years, you had no privacy.

Remember that?

A Yes.

Q You also testified that you are definitely someone who needs solo alone time, right?

A Yes.

Q But when you were applying to live at 1080 Folsom, you told the people at 1080 and OneTaste that you had experience living in college dorms, but you didn't live with open doors or shared communal areas and you wanted that.

Remember that?

A Yeah. I was -- I was curious about it at the time.

Q So you wanted to live in a setting where there were communal areas and you didn't even have doors, right?

A We had doors to the rooms. Like, there -- it -- I -- I -- open doors is in quotes in here. I meant that as like a -- that like it was more --

Q What did you mean?

A -- community based. A dorm I think is not very community based.

Q So you wanted community based and you understood that if you are sharing a bed with somebody, you're probably not going to have much privacy, right?
A Yes.
Q And you knew that going into it, correct?
A I knew about that level of not having privacy.
THE COURT: Ms. Bonjean, we are going to take a break for lunch in a couple minutes unless right now is good for you.
MS. BONJEAN: Just a couple of questions and then it would be a good breaking point.
THE COURT: Go ahead.
Q In fact, when you submitted your application, you not only understood that you would be having a roommate; you asked that you be paired up with Clouds, right?
A Yes.
Q And that was before you even moved in?
A Yes.
Q So, again, you were very clear on the fact that you were going to have a roommate and that you would be living in a communal setting, right?
A Yes.
Q And you also understood from this application that it was a zero tolerance policy towards drug use and alcohol on the premises, right?

A Yes.
Q This is an alcohol and drug-free environment, right?
A Yes.
Q And the community, itself, was alcohol and drug-free, right?
A Yes, it was.
Q I mean, you testified on direct that you were terrified to go have a beer.
Remember that?
A Yes.
Q But in a sexuality setting where people are engaging in these very types of activities where consent is very important, you could understand why you would want a community that was drug-free and alcohol-free, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Were you quarreling with -- okay, you have issues based on the Government's question that you couldn't have a beer, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Maybe I missed it. Did you say you felt terrified about having a beer?
MS. FARRELL: Objection.
A Yes.

THE COURT: Overruled.
A Yes.
Q Okay. And that was a rule associated with living and working at OneTaste, right?
A It was a -- it was a written rule about 1080 and that it was an understanding about the rest of the larger community that I gained after moving into 1080.
Q Right. And this was -- this was -- you weren't surprised that that was what the community expected from you, right?
A No.
Q A community you voluntarily chose to be a member of, right?
A Yes.
Q And lastly, even at the bottom of this application, the community -- or, I'm sorry, the people there at 1080 and the OneTaste made it very clear that this intentional living experience was around the practice of Orgasmic Mediation, you understood that, right?
A Yes.
Q And that it was deeply woven into daily life at 1080, right?
A Yes.
Q And that the values of connection, engagement and contribution were paramount to this intentional community

living scenario, right?

A Yes.

MS. BONJEAN: We can take a break, Your Honor.

THE COURT: I will ask the witness to step down for the lunch break.

(Witness steps down.)

THE COURT: We'll come back at 2 o'clock. Enjoy your lunchtime. Don't talk about the case. Keep an open mind. See you at 2 o'clock.

(Jury exits.)

THE COURT: I will see everyone at 2 o'clock.

(Luncheon recess taken.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURT: Everyone may be seated. You may get the witness and the jury.

MS. BONJEAN: May we raise one issue before the witness comes out?

THE COURT: Yes.

MS. BONJEAN: I think the Government and I agree that it's probably something that needs to be raised sooner rather than later.

So, this witness testified that Rachel Cherwitz and Ms. Daedone directed Ms. Blanck and others on these sexual prescriptions of having sex thirty days -- thirty days or thirty weeks. There were direction to set up OkCupid accounts and other dating websites, that type of thing. And we have text exchanges that include Ms. Sheffer that do not bear that out.

We have a text message, in fact, from Ms. Blanck that says: Hey guys, this is my plan. And I'm going to have -- and I don't have it right in front of me, but it's sex with thirty -- thirty in thirty days. My plan.

And, you know, the Government says that's hearsay, but there's been a false impression left with the -- and

Ms. Cherwitz is not on the text thread. Ms. Daedone is not on the text thread.

Now, maybe she'll say something along the lines of we were just implementing something we were told, but it certainly does not seem that way in the text exchange.

THE COURT: But she was testifying about direction she received from one or the other defendant, right?

MS. BONJEAN: Correct.

THE COURT: So, that's her testimony. I think you can cross her on her testimony, but I don't think you can bring in this external hearsay evidence. I mean -- but I'll hear from the Government on this.

MS. BENSING: Well, just to be clear, I mean I don't know that we necessarily -- we, obviously -- they can cross her however they want to cross her. I just -- we were very careful in not eliciting any hearsay statement of Ms. Blanck.

THE COURT: Right.

MS. BENSING: And so, we don't want this cross-examination to then somehow open the door to some kind of argument for them to say that they want to, like, bring out evidence, and then try to impeach that evidence with evidence related to Ms. Blanck.

THE COURT: Right.

MS. BENSING: Because the Government has not -- has tried very hard to keep that out.

THE COURT: But I think if you're saying it's text messages with this witness on -- I mean she can be crossed, but I don't think you can get in those statements.

MS. BONJEAN: Okay. Then they've misled the jury.

This witness said that the inspiration, the inspiration behind this thirty days, thirty men, was Ms. Blanck.

THE COURT: Right. But it doesn't sound like, at least what you just described, and I know you were just summarizing, but that does not seem directly contradictory to anything the witness has said.

MS. BONJEAN: No, no. The inspiration was Rachel Cherwitz -- Rachel Cherwitz's inspiration for this directive was Ayries Blanck. And that -- and that is what the jury heard, and we have no way to rebut it now because that was hearsay. We objected to it at the time. And --

THE COURT: They didn't elicit any hearsay.

MS. BONJEAN: I mean I understand. We believe they did through -- you know, there's a way to -- implicit hearsay is a thing. It's not just expressly.

The jury was left with the impression that Ms. Cherwitz told Ayries Blanck and others to engage in all this sex.

THE COURT: But this witness testified that's what she heard, correct?

MS. BONJEAN: But --

THE COURT: Then there's no problem with that testimony.

MS. BONJEAN: Yeah, but it's a lie is the problem.

THE COURT: You're going to say she -- you're going to somehow figure out a way to get her to say she didn't hear that?

MS. BONJEAN: The point is I shouldn't have to get her to admit it. I should able to confront her with her text messages with other people that show her credibility is -- is off, that this didn't happen that way.

MS. FARRELL: I want to be very clear about the Government's position. We have no issue with the defense cross-examining the witness about her own statement.

THE COURT: Correct. Correct. I understand that, yes.

MS. FARRELL: But what we want to avoid, and what we have tried to studiously avoid thus far, is that they then create an issue with Ayries Blanck hearsay, and then get to impeach it by creating the problem.

THE COURT: Right. No, I understand.

MS. BONJEAN: We didn't create the problem.

MS. FARRELL: We have no issue with them crossing the witness on this document, and potentially even admitting it if the proper foundation is laid and it's appropriate. I

obviously, don't know what that is at this point, but that is our --

THE COURT: But the statements of Blanck would not be coming in for the truth.

MS. FARRELL: Correct.

THE COURT: Okay. I think we can bring the jury out and the witness back.

MS. FARRELL: Thank you.

(Pause.)

(Witness entered and resumed the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

And, Ms. Bonjean, you may continue your cross-examination.

(Continued on the following page.)

**ANTHIA GILLICK**,

previously called as a witness by the Government and duly sworn/affirmed by the Courtroom Deputy, resumed the stand and was examined and testified further as follows:

CROSS-EXAMINATION (Continues)

BY MS. BONJEAN:

Q Okay. Ms. Gillick, we were -- we were discussing 1080 before we broke for lunch. And you learned from Amy Jones that you would be able to move into 1080 on around September 1st.

Do you remember that?

A Sounds about right.

Q And that you could you move in -- you could share a room with your friend Clouds, correct?

A Yes.

Q And you were traveling for like two weeks in the last half of August anyway, right?

A I don't remember that, but I could have been.

Q Was it routine for you to travel in the summer?

A I like traveling. It's a particular season that I travel.

Q Okay. Originally, you had thought maybe you could share a room with Heather for the first two weeks of August, and then you were gonna travel for the last two weeks of August anyway.

Does that ring a bell?
A Like I said, it could have been. I don't remember specifically the travel.
Q You wouldn't be surprised if you were traveling through half of August, right?
A No.
Q And to be clear, when you moved into 1080 you were not working for OneTaste, right?
A Correct.
Q But you were volunteering for them, correct?
A I believe I started volunteering for them a little bit after I moved in, but it could have been before. It was around the time I moved in.
Q Okay, fair enough.
So you moved in. And you didn't start volunteering right away, but you eventually did; right?
A Yes.
Q And when you volunteer, you don't expect to earn wages, right?
A Yeah. So I was generating sales leads and working back-of-house. I -- I don't know that the term volunteer was used, but I wasn't expecting pay for those actions at that time.
Q Okay. Generally speaking, when you go to volunteer, whether it's at a church or a not-for-profit or even a -- a

company, you understand you don't expect to get paid as a volunteer, right?
A Yes.
Q Okay. And you weren't hired by OneTaste when you first moved into 1080, right?
A Correct.
Q But because you were part of the community, you were participating in certain activities, back-of-house, other things like that, right?
A More because I was a part of the Beasties crew, because I was like in -- in training and had -- was like a part of people who were going on to be teachers. It wasn't the whole community who participated in that.
Q Okay. So you were part of a subgroup of a community that had a desire to eventually be a teacher, right?
A Yes.
Q And it was sort of like an apprenticeship-type thing?
A I guess you could call it that, yeah.
Q I mean, obviously, they were called the Beasties, but the Beasties weren't getting paid, correct?
A Correct.
Q And that was -- you were -- you were doing these tasks, activities, in a volunteer capacity, correct?
A Correct.
Q And the word Beasties, of course, is a play on one of the

concepts that Ms. Daedone talked about in the Coaching Program?
A Yes.
Q The idea that you have these inner fears and inner darkness that you need to address and contend with, otherwise they can consume you, right?
A Yes.
Q And that was -- there was a concept that resonated with you, right?
A Yes.
Q Okay. Now, let's go -- let's talk about this Coaching Program.
Coaching Program 7 is the one you were in, right?
A Yes.
Q And in order to participate in the Coaching Program, you had to sign a waiver, right?
A Yes.
Q And do you remember signing a waiver in connection with, like a release of liability and a waiver?
A Yeah. I don't remember all the details of it. It was -- it was a number of pages long, but I remember signing one.
Q Okay.
(Pause.)
MS. BONJEAN: One second, Your Honor. I'd rather use one that's in evidence.

THE COURT: That's fine. Take your time.

(Pause.)

BY MS. BONJEAN:

Q I'm going to have you look at Defense Exhibit 21-J, as in jam.

MS. BONJEAN: And this is in evidence.

(Exhibit published.)

Q Okay. Are you able to see this document, Ms. Gillick?

A Yes, only the top paragraph at the moment, but yes.

Q Yes. And I understand that this isn't exactly your Coaching Program, but does this -- do you recognize this release of liability form?

MS. FARRELL: Objection.

THE COURT: Basis?

MS. FARRELL: The question was I recognize this wasn't the one you were in -- to the form of the question.

MS. BONJEAN: You know what, just take it down. We'll look at a different one.

MS. FARRELL: Okay.

MS. BONJEAN: I'm going to have, just for the witness, pull up -- it's 12-B as in boy, Y as in yellow.

And I'm gonna ask you to pull up the last, second-to-the-last page, if you would. Okay. Actually, the last page.

THE WITNESS: Sorry. Could we make it larger,

please?

MS. BONJEAN: Yes. The last page actually, and pull out the bottom.

THE COURT: Can you give her a hard copy, too?

MS. BONJEAN: Yes.

THE COURT: Thank you.

THE WITNESS: Thank you.

BY MS. BONJEAN:

Q Ms. Gillick, I'm going to have you go actually to the last two pages of this document.

A Uh-hum. Okay.

Q Do you recognize it?

A Yeah.

Q And do you see your signature at the end of the second page?

A Yes.

Q And what do you recognize this document to be?

A The Code of Conduct. This was one of the documents that I signed on the way into the Coaching Program.

Q Okay. So, are you looking at the first page right now?

A Um, yes.

Q Okay. So you recognize the Code of Conduct --

A Yes.

Q -- document?

A Oh, sorry, it might be out of order. You're -- the

signature --
Q Just let's start with the very first page. We'll go that way. Okay?
A Yes.
Q What do you recognize that to be?
A The Code of Conduct.
Q Code of Conduct?
A Uh-hum.
Q And do you remember getting a copy of the Code of Conduct in connection with the Coaching Program?
A Vaguely. I -- there had been other Code of Conducts, yes. But I mean, like I said, there were a number of documents that I didn't -- didn't remember all of them specifically, but this refreshes my memory.
Q Okay. And now let's look at the last two pages, which is what I am most interested in at the moment.
A The release of liability form.
Q You remember signing that, right?
A Yes.
Q And do you see at the end of that document your signature and a date?
A Yes.
Q And did you sign this in connection with your participation in Coaching Program 7?
A Yes.

Q Does the date look right?
A Yes.
Q Okay.

MS. BONJEAN: And at this point, Your Honor, I would ask to admit just the release of liability form, the last two pages of that.

THE COURT: Any objection?

MS. FARRELL: No objection. We'll consent to admission of the whole document if they want.

MS. BONJEAN: All right.

THE COURT: Do you want to offer the whole document or just part of it?

MS. BONJEAN: Yes, I do actually. I was going to come back to the other to the two.

THE COURT: Okay. So, Defense Exhibit 12-BY is admitted in its entirety.

(Defense Exhibit 12-BY was received in evidence.)

MS. BONJEAN: Thank you.

(Exhibit published.)

BY MS. BONJEAN:

Q All right. So let's look at the last two pages, if we could, which is the release of liability form.
A Uh-hum.
Q This was a form that you filled out in connection with Coaching Program 7, and also with other classes you took at

OneTaste, right?
A There were liability release forms at many of the courses. I don't remember if they were exactly this one.
Q Okay. And you would agree that there were certain assumptions of risk you took in connection with taking the Coaching Program 7, right?
A Yeah. If you want me to weigh in on specifics, I'd like some time to read the whole document.
Q Okay. Well --
A But assumption of risk is part of the liability form.
Q Yeah. We'll go through it. We'll go through it one by one. It's a long form. So we'll go through it. If you need more time, you'll let me know. Okay.
You would agree that there's a portion that says Assumptions of Risk, right?
A (No response.)
Q You can look on the screen, too, if it's helpful.
A Yeah, it's easier on here.
Q Do you see that?
A Can you direct me to where it is exactly?
Q If you look at the screen, it's just highlighted right there.
A Yes, okay. Assumptions of Risk. Thank you.
Q Okay.
And right underneath it, it says: I understand and

acknowledge and agree to each of the following.
Do you see that?
A Yes.
Q And I'm going to pull out a few of them. We won't go through all of them. Okay.
The first bullet point is that the content of the course is controversial?
A Yes.
Q And you understood that just from attending the course as well, right?
A Yes.
Q The third bullet point is that any concepts, notions, ideas, suggestions, and recommendations from the sponsors, and anyone acting on behalf of sponsors, that I accept and/or apply to my life, I do of my own free will.
Do you see that?
A Yes.
Q The next bullet point says that while sponsors believe that the content of the course to be valuable, sponsors do not guarantee it will solve any particular issue or problem I may have. I, alone, will decide and accept responsibility for how and for what purpose I apply the content of this course.
Do you see that?
A Yeah.
Q We are going down to the eighth bullet point that begins

"that certain participants."
A Yes.
Q That certain -- participants may disagree with or find offensive statements I make or actions I take.
A Yes, I see that.
Q And also, the corollary that certain participants may -- may make statements or take actions that I disagree with or find offensive.
Do you see that?
A Yes.
Q There is two more down, the bullet point that begins "that I have assessed."
That I have assessed my own emotional, mental and physical well-being, and I have concluded that I wish and that I'm able to participate in the course.
Do you see that?
A Yes.
Q And right below that, that I agree to disclose any psychological or physical health problem, condition or limitation to sponsors at the time of application and in any event prior to the course commencing.
Do you see that?
A Yes.
Q And just specifically, you didn't disclose to Ms. Daedone or Ms. Cherwitz or anyone associated with the upper management

of OneTaste that you had psychological or physical health problems, did you?
A No.
Q Two from the bottom, that there are emotional and mental risks associated with participation in this course.
Do you see that?
A Yes.
Q And at the very bottom it says that I voluntarily and knowingly accept each of the risks and other matters set forth in this paragraph.
Do you see that?
A Yes.
Q And you signed this document, right?
A Yes.
Q And then going to the next page, there is a paragraph that says Psychotherapy Disclosure.
Do you see that?
A Is it highlighted? I don't -- wait, hang on. I don't think I have that.
Q The very last page of the document.
A I don't think I have that page in my physical document. It's two-sided. Hold on.
Q Want me to put it back together for you?
A Maybe.
Q Here. Let me have it.

A Oh, here, okay, okay. Yes. Psychological Disclosure, I see.
Q Can you read that out loud?
A I understand and agree that the course is not and is not promoted as a substitute for psychotherapy and is not therapeutic in nature. I understand that any value I obtain from the course I obtain via my own free will and participation.
Therefore, to the extent not already covered in the above release, I hereby forever release released parties from any and all liability from any adverse and negative or negative reactions or effects that my experience at the course may have on me.
Q Okay. And you -- you put your signature down at the end of that document, right?
A Yes.
Q So, you testified on direct that there were, as far as you knew, there was no one who was a psychologist or psychiatrist or mental health specialist participating in this Coaching Program, right?
A Correct.
Q But also, no one represented that they were a psychologist or psychiatrist from OneTaste, right?
A Correct.
Q In fact, OneTaste was really not therapeutic in nature,

as much as pushing boundaries in a way that, you know, were -- were controversial, right?
A Yes.
Q And on the first page of this document, which is marked as 12-BY, this was a Code of Conduct for teachers, coaches, leaders and support staff.
Do you see that?
A Yes.
Q And this was a Code of Conduct that you would have been subject to as a teacher, and even as a support staff member, right?
A Yeah. I don't know that I would have considered myself support staff at the time, but --
Q Well --
A -- I was a student in the Coaching Program.
Q Okay. Well, why don't we look at where it says "positions" on the first page.
MS. BONJEAN: If we can pull that out.
Q Do you see that it indicates that support staff includes dental staff, back of house, and sales staff?
A Yes.
Q And -- do you see that?
A Yes, I do. I never worked back of house for CP7.
Q Okay.
A I was in it.

Q Okay. But upon graduation from CP7 you would have, as a member of the Beasty group, been support staff if you attended any of these events, right?
A Yes.
Q And that would make you subject to this particular Code of Conduct, correct?
MS. FARRELL: Objection.
THE COURT: Basis?
MS. FARRELL: I think she just testified it didn't apply to her. Asked and answered, sorry.
THE COURT: Overruled.
A This -- I didn't sign a thing like this for my time after CP7 that I -- I believe this is dated -- yeah, this is dated September 12th. I'm not -- I'm not sure when -- when this ended is my point.
Q Ma'am, you signed a Code of Conduct on September 12th of 2013, right?
A Right.
Q And I understand you're saying that when you participated in the Coaching Program you were just a student, right?
A Yes.
Q But you understood by signing it that when you did become support staff or a teacher or any of those positions, you'd still be subject to a Code of Conduct, right?
MS. FARRELL: Objection.

THE COURT: Basis?

MS. FARRELL: Foundation.

THE COURT: Overruled.

BY MS. BONJEAN:

Q Did you understand that?

A Okay. So, there was -- there was like a Code of Conduct and an ethics board and that type of thing when I was a -- a CP7 student. And then it wasn't talked about or used in practice when I became -- like at the time that I started volunteering later.

Q Okay. So, you started volunteering right after you started CP7, right?

A Not as back-of-house as any of the definitions of support staff on there.

Q Okay. So, you're telling us you're not subject to this Code of Conduct, is that what you're saying?

A My understanding of when I signed this was that this was what the teachers, coaches and the leaders and the support staff that were going to be teaching CP7 were being held to.

Q Okay. Put the document aside for a second.

A Okay.

Q And my question is different.

At some point you understood you were subject to a Code of Conduct that was set forth by OneTaste, right?

A I -- not in those words. I like -- I was at some point

staff and that came with certain responsibilities. I was never, like, quoted a Code of Conduct at me.

Q So it's your testimony that you don't think your signature is on another one of these documents later down the line?

A It might be. But like I said, I signed this when I was a student.

Q Right. And I asked you to put the document aside and I'm asking you a different question now. Okay?

A I'm not sure. I don't remember.

Q Okay. But you understood that there were ethics in place that you were obligated to follow as a teacher, a coach, and someone working for OneTaste, correct?

A During the time of CP7, yes.

Q Okay. And are you saying that there were no ethics you had to follow once you were out of CP7?

A I'm saying that there was an ethics board in place when I was in CP7, and it like stopped existing around the time that CP7 ended.

Q Well, that's not true because you reached out to the ethics board to get permission to have sexual interactions with your teachers, right?

A Please remind me of the date on that.

Q Uh-hum.

MS. BONJEAN: One second.

BY MS. BONJEAN:
Q Do you remember on September 22nd of 2013 asking to enter into a sexual relationship with your coach and OM trainer, Billie Stubblebine?
A Yes.
Q So that Ethics Committee existed, right?
A That is during the time that I was in CP7.
Q Right. And you asked again in February of 2014?
A Yes. I was still in CP7.
Q Right. CP7 lasted ten months, right?
A Correct.
Q But you weren't just in CP7, you were doing other things as a member of the community as well, correct?
A Correct.
Q Okay. So you asked to engage in a relationship with Jeff Ridenour in February of 2014?
A Correct.
Q And you sent that request to the Ethics Committee, correct?
A Correct.
Q Now, also as part of your -- part of your entry into the Coaching Program, we discussed this desire contract that you filled out.
Do you remember that?
A Yes.

Q Okay. And you sent that to Lianna Lifson on September 10th?
A Yes.
Q And I think you explained earlier about the big D's and little d's, and certain -- you made out certain desires you had at the time, right?
A Yes.
Q And as part of the Coaching Program, you were very happy with the OM practice at that point, correct?
A Yes.
Q You were open to not only OM, but open relationships, do you remember --
A Yes.
Q -- that?
You were very interested in assisting in running of your own business; that was important to you, right?
A Yes.
Q You were still working in your own business at that time, correct?
A Correct.
Q You wanted to be able to articulate your desires very cleanly and sharply to other people, right?
A Yes.
Q You wanted to conquer the unknown, that was an important thing for you?

A Yes.
Q Conquer your fears?
A Yes.
Q And you were looking to find a financial advisor to help you with your business, right?
A I don't remember that specifically, but if I wrote it down, then yes.
Q Okay. So, you -- you knew what you wanted when you went to coaching -- the Coaching Program 7, right?
A Um, I would say generally, as much as any 25-year-old does.
Q I'm saying in the moment that's what was important to you, right?
A Sure.
Q And just to be clear, neither Ms. Daedone nor Ms. Cherwitz told you what to put down for your desires, right?
A No, they didn't.
Q You also made some admissions, correct?
A Yeah, that was part of the desire contract.
Q Right. And some of the admissions you made is that you pretend to be a good girl, but that sometimes you only do it because you want to get what you want as early as possible?
A Yes.
Q You admitted that you don't -- you're not a girl's girl,

you don't really trust women and they don't really trust you?
A Yes.
Q And you knew that OneTaste, of course, was a very female centric place, right?
A Yes.
Q Do you remember testifying on direct examination about, you know, coming from a wealthy family and there was, you know, questions around -- around that and Clouds going with you to your house in Aspen? Do you remember that?
A Yes.
Q But in your contract, your desires contract, you told everybody you came from a wealthy family, right?
A I don't see that section. I don't remember that.
Q But do you remember saying in your admissions that you sometimes think you don't need to make money because you already have a lot of it?
A I don't remember saying that, but that is something that is true.
Q Would you like to see it or --
A Sure.
Q Okay.
MS. BONJEAN: We'll pull up 12-E as in Edward. I'll give you a paper copy, too.
THE WITNESS: Thank you.
Q And I'm going to draw your attention, just for

expediency, to -- let's go to page 3, and we'll look at number 7.
A Okay. Yes.
Q Okay. So what I said earlier, that was an admission you identified for yourself?
A Yes.
Q And also another admission you had identified was that you wanted everyone to like you, right, number 12?
A Yes.
Q Another thing that you admitted, and I think we touched on earlier, that is you like -- you like -- you like magic and the esoteric and those things, right?
A Yes.
Q That wasn't something you got from Ms. Daedone, that was something you had an affinity for even before you came to OneTaste, right?
A Yes.
Q In fact, you liked the concept of everyone sort of being like a little a witchy crew, right?
A Yes.
Q That was fun, right?
A Yes.
Q And it was kind of metaphorical, you don't really think you have witch abilities, do you?
A Correct.

Q Okay. You -- you admitted that you tried to hide your money or how much money you have or your wealth, right?
A Sorry. What number is that?
Q 20.
A Yes.
Q Okay. And the point is, is that you weren't hiding how much -- and the resources you had access to from OneTaste, right?
A No.
Q Okay. That was -- that was something you were forthcoming about, correct?
A Yes.
Q You also admitted you were terrible with financials?
MS. BONJEAN: Guilty as charged.
A Where is --
Q That's number 23.
A Yes.
Q And one of the purposes of admissions is to identify the things you don't take responsibility for, right?
A I -- I always thought of it as things that like I -- any human tries to hide, the insecurities, I suppose, things that people try to cover up.
Q Do you see, just for refreshing your recollection, under the number 24, there is a -- two sentences there?
A Uh-hum.

Q Did you write those sentences?
A (No response.)
MS. BONJEAN: No, under 24.
A Um...
Q If you don't remember, that's okay.
A I believe that that was part of the --
Q The form?
A -- definition. Yeah, part of the form.
Q Okay. And part of the definition of this desire contract was to identify places where you don't take responsibility, right?
A Yes.
Q And then on the next page, there were offerings that you identified and --
A Yes.
Q -- and these are items where they're sort of your skills and talents that you can dedicate to achieving your desires, right?
A Yes.
Q And then at the bottom there's the hard no's section, right?
A Yes.
Q And you testified on direct examination that you were, again, fearful to get a beer after you were part of the community because it was such a no-no in the community to use

drugs and alcohol, right?
A Yes.
Q But isn't it true that right when you started the Coaching Program, for yourself, you wanted to stop drinking and doing drugs or to numb yourself with those substances, that was a goal you set for yourself, you said that was a hard no, right?
A Um, so I want to clarify that this was not something, this is not something that I had. Like, I wasn't in a place where I felt like I was abusing alcohol or drugs before I came into OneTaste. It was not something I didn't feel like I needed to quit. I didn't feel like I was an addict. I still don't.
And this -- by this point, I was already several months in. And so, yes, I did write that here. And I -- like when I read this, I can hear myself reiterating values, again as I mentioned in my direct, for the approval of the community, reiterating values that I'd learned already at that point.
Q Right. You also said a hard no was work -- working for boss that sucks, right?
A Yes.
Q That was a hard no for you, right?
A Yes.
Q Okay.

MS. BONJEAN: We can put that aside.
BY MS. BONJEAN:
Q And you would agree that OneTaste also had a refund policy, right?
A I didn't know about a refund policy at the time of CP7.
There was definitely a refund policy later that I was aware of. It -- it could have been and I might have missed it in fine print, but I didn't know about it at the time.
MS. BONJEAN: If we can look at Government Exhibit 665. Go to the second page, and the third page.
Q Okay. Can you take a look at that and --
A Can you make it larger, please?
Q Yes.
And just look at it tell me if it refreshes your recollection about whether there was a refund policy.
MS. BONJEAN: You can go to the next page. You could stop.
Q Or cancellation policy, do you see that?
A You're talking about the paragraph at the top that says OneTaste provides a three-day right of rescission?
Q Yes. That OneTaste provides a three-day right of rescission.
Do you see that?
A Yes.

Q So you recall at the time that OneTaste offered a cancellation policy that allowed you to actually get a hundred percent of your payment back three days after enrollment?
A Yes.
Q And then you also could get less back if you waited longer, right?
A Yes, that's what is written on this document.
Q Now, you took other courses -- while you were in that ten-month Coaching Program, you took other courses during that period of time too, right?
A Yes.
Q You took -- did you take the Ignited Man Demo?
A No. That was not a -- the Ignited Man class was for men. I attended one of the demos, but I didn't take a class.
Q Okay. So you attended the Ignited Man Demo, but you didn't take the course, right?
A One of them, yes.
Q Okay. And you took the Taboo course, right?
A Not during CP7.
Q Okay. After CP7?
A Yes.
Q What was the order you took them in? You had CP7.
You took the Nicole Daedone Intensive, right?
A Much later, yeah.
Q Okay. That was later?

A Uh-hum.
Q Where did Taboo come into the mix?
A It was after CP7.
Q What about Mastery?
A Mastery overlapped for a few months.
Q And what is Mastery?
A Mastery was like more of an exploration of sexual, oral sex, as well as outside of that -- like sex's kind of ritual in a certain way.
Q There were like BDSM-type subject matters in there?
A No, not in Mastery.
Q Taboo?
A That was Taboo, yeah.
Q Okay. You also took the Magic School, right?
A I believe that was after CP7, but I need a refresher on the date.
Q I think you said you took every course they offered, right?
A I did.
Q And you really -- you -- you were able to afford the courses, you didn't have to take out a credit card to buy the courses, right?
A Correct.
Q And, in fact, you didn't really have to be hard sold on the courses, you were -- you liked them, correct?

A Yeah. I liked -- I liked -- I liked them the first time. It was hard to get on board taking them again.
Q Yeah, I know you said you took them a second time.
A Yeah.
Q I think in one instance you said you had to swap that for -- to be able to go on a trip to Bali?
A I used signing up for the third Nicole Daedone Intensive as a bargaining chip to go on the trip to Bali.
Q You didn't need Rachel Cherwitz's trip to go on a trip to Bali, did you?
A I'm sorry. Can you repeat the question?

(Continued on the following page.)

BY MS. BONJEAN: (Continuing.)
Q You did not need Rachel Cherwitz's consent to go on a trip to Bali?
A I felt I did at the time.
Q Well, what would have happened in your mind if you said I'm going to Bali, peace out?
A Well, I did get demoted for going on that trip, but I felt that it would probably have been even worse.
Q What would be worse?
A Getting kicked out of the community entirely. I'm not sure. I mean, I could give you all sorts of scenarios I imagined in my head.
Q That you would be -- that you would be kicked out of the in crowd; right?
A Yeah.
Q All right. That you would be asked to leave this place that you now have decided is a terrible place; right?
A I mean, at the time I was even though I was considering leaving, like, it was everything to me. It was my whole worlds it was my friends. I was engaged to someone. It was a lot.
Q It wasn't your whole world. You had a family. They weren't in OneTaste were they?
A They weren't and I was barely speaking to them.
Q Well, that's not entirely true either. You were spending

time with your family from time to time; right?
A It would take a lot to get to spend time with them but yes from time to time.
Q Well, let's talk about -- you testified on direct examination that Rachel Cherwitz prevented you and Ayries Blanck and Ravi from seeing doctors; right?
A She told us it was off stroke. She told me it was off stroke.
Q What does off stroke mean?
A It meant that it was -- I mean what was on stroke for Rachel at all times was sales and almost anything other than that was off stroke was not what we needed to be spending our time on.
Q Okay. So she's the sales queen; right?
A Yes.
Q She wants to sell classes; correct?
A Yes.
Q There was no ambiguity about what was important to Rachel Cherwitz; right?
A Correct.
Q Okay. And it would be obviously for her -- she's not taking vacations; correct?
A Correct.
Q Okay. She's working as hard as she's expecting everybody else to work; right?

A Yeah.
Q Okay. But you did go on vacations; correct?
A I went on one vacation during my time at OneTaste.
Q Do you remember going to the Hamptons?
A That was for my cousin's wedding for a short weekend.
Q Do you remember going back to San Francisco?
A That was for a sales trip.
Q Do you remember going to -- you remember Bali, of course; right?
A Yes.
Q Do you remember going to Antarctica?
A That was when I was a student before I was a staff member.
Q So, you did travel a fair amount more than most people in a two-year span; right?
A I don't have any basis for that. I don't know what other people do every year.
Q You know the people you socialize with, but that's a lot of traveling you're going out of the country on at least two occasions; correct?
A Again, it was other more than a year, but yes.
Q Okay. You also testified that you said you weren't having any contact with your family; right?
A I said I was having very little, yes.
Q And you told the jury this story of how you fell and

injured yourself during your surface acts and aerial activities; right?
A Yes.
Q And you said that you really -- you really hurt yourself and Rachel Cherwitz and Nicole Daedone either implicitly or expressly, it's unclear, discouraged you from getting medical treatment; right?
A They did and, like, in a normal job if you worked normal job there would be hours outside. There was never any hours outside of work to go and get that kind of medical.
Q Okay. And it's your testimony that you didn't actually go see a doctor; is that right?
A Correct.
Q Ma'am, isn't it true that on September 7th of 2014, you actually did a performance, the performance you fell at, and your mom was present?
A She had flown out for the weekend.
Q Right. So this family that you're having minimal contact with, she flew into New York to see your performance; right?
A Yes.
Q Okay. And you let people, your friends, know; Ayries and Maya; correct?
A Let them know what?
Q That you had fallen and that your mom was in town. Do you remember that?

A Yes.

Q And on the night you fell and hurt yourself so badly you said you're going to go out with the girls for a bit I'll be home after midnight. Do you remember that?

A No.

Q I'm going to have you look at Defense Exhibit 12-GA.

(Exhibit published to the witness, counsel and the Court.)

MS. BONJEAN: I don't know if you have a copy.

THE COURT: I can see it on the screen, but thank you.

BY MS. BONJEAN:

Q Okay. You looked at some text messages earlier during your direct examination. Do you remember those?

A Yes.

Q Okay. And do you remember texting your friends on September 7th of 2014 about how you fell at your performance?

A Yes, I texted Ayries and Maya.

Q And your mom was there, right?

A Yes.

Q And you said --

MS. FARRELL: I'm going to object to improper impeachment.

THE COURT: Sustained.

BY MS. BONJEAN:

Q You celebrated that you rocked the part; right?

A The performance went long -- I completed the performance despite my injury, yes.
Q You not only completed the performance, you went out afterwards, right?
MS. BONJEAN: Objection, improper impeachment.
THE COURT: Overruled.
A I don't remember -- I don't know who the girls are in this text, but --
Q They're not the girls from OneTaste, right? Right?
A Probably not.
Q They're your friends from outside of OneTaste; correct?
A I did have a couple of friends still from college. I don't remember going out with them that night.
Q That's fine that you don't remember, but you have said that OneTaste was your whole world, you had minimal contact with your family, but in fact you did have contact with your mother; right?
A I, again, I said minimal, not none.
Q Enough where she's going to fly in from Colorado to watch a performance of yours; right?
A Yes.
Q And you had friends that you socialized with that were not associated with OneTaste?
A I socialized with them less and less and I had to ask permission to go out and see them.

Q Who did you ask permission from?
A After about this time I had to ask Rachel Cherwitz's permission to see anyone -- to go out for an hour.
Q How many thousands of pages of text messages did you provide the Government?
A Not actual text messages. They're from other apps and I'm not sure.
Q Okay. Did you show the Government a single text where you were asking Rachel Cherwitz for permission to go out?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Can you provide me with a single text message demonstrating that you had asked permission to go out?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Is it your testimony under oath to this jury that you had to ask Ms. Cherwitz to go out?
A Yes.
Q And what were the consequences if she said you couldn't go out?
A I wouldn't get her attention and approval and there were results like being demoted or not being asked to teach the next class or there were consequences to those kinds of actions.

Q So you would lose her attention and approval, right? That's one of the consequences?
A Yes.
Q And she would not let you do something because she thought you were prioritizing something else; right?
A Yes.
Q Sounds like a job; right?
A Again, a job has hours that stop and you were allowed a social life outside of it. That was not the case here.
Q Right, but you chose that for yourself; right?
A A long way in when I was in the kind of mind when I started, I chose to be an owner and I thought that I would actually not be subjected to that kind of rules as an owner and then I was.
Q You saw how hard these people worked; right?
A Yes.
Q Did you really think that if you bought a franchise that you would somehow be the exception to the rule?
A I may have been delusional, but yes.
Q Okay. You also testified under oath that you didn't -- that you didn't -- you didn't go on trips and you mentioned something about going back to San Francisco which you said was actually for a sales meeting; right?
A It was for a sales training, yes.
Q Okay. But isn't it true on September 8 of 2014, you let

the group -- you let Ms. Daedone know that you were going back to San Francisco to handle Aspen Aerials?
A Yes, it was during the Nicole Daedone intensive. My coach Yia Vang told me that I needed to sell Aspen Aerials and get rid of that business and so I was going back to sell it.
Q So, now, Yia Vang is telling you you have to sell your business. Is that what you're testifying to?
A Yes.
Q Okay. Do you have any contemporaneous proof that Yia Vang told you you had to sell your company.
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q So Yia Vang told you you had to sell your company. Is that your testimony under oath here?
A Yes.
Q When did she tell you that?
A Leading up to the first Nicole Daedone intensive.
Q Where? Where were you?
A I was in New York.
Q How did she tell you this?
A By text message.
Q Do you have that text message?
A My -- I broke --
Q It's a yes or no question?

A No, I do not.

Q Thank you.

THE COURT: Excuse me, Ms. Bonjean. You have to let her finish the answer. Next question, please.

BY MS. BONJEAN:

Q By the way, when you told Ms. Daedone that you were going back to San Francisco because you needed to handle Aspen Aerials, isn't it true that she told you so long as it makes your team happy, I'm good.

MS. FARRELL: Objection, hearsay.

MS. BONJEAN: It's not for the truth.

THE COURT: Overruled.

A To my recollection, yes, I would also not mind seeing these text messages.

MS. BONJEAN: Let's show her Defense Exhibit 12-FS.

(Exhibit published to the witness, counsel and the Court.)

A Yes, it was Nicole's response.

Q And it's also the fact that you told her you weren't selling your company; you wanted to get things back on track?

A Yes. This was in September and I sold my company in November.

Q But you were going to San Francisco in September not to sell a company, but to get things back on track; right?

A Yes.

Q Ms. Daedone didn't say don't go, stay here; right?

A Correct.
Q And Ms. Cherwitz didn't say you can't go to San Francisco and work on your other company, did she?
A Not on this text.
Q At any point?
A Not that I remember.
Q Right. And, just to be clear, your other company had nothing to do with OneTaste; right?
A Correct.
Q You had a team associated with that company; right?
A I had an assistant and a number of aerial teachers.
Q Your aerial teachers and assistants, they weren't part of OneTaste; right?
A Correct.
Q And you had customers; right?
A Correct.
Q Vendors?
A No.
Q Colleagues in your industry?
A Yes.
Q Okay. Again, those are all people that weren't part of OneTaste; right?
A Correct.
Q So OneTaste wasn't your whole world, was it?
A It became more and more so, especially after I sold this

company.
Q Right. Again, you testified you were discouraged from seeing doctors, et cetera, but in October of 2014 you and Paul went to see an acupuncturist; right?
A That was for that injury. It was one of the only appointments I had for it. I think I had one other massage.
Q Actually on October 30th, you went to the doctor's, didn't you?
A I'd be happy to see that. I don't remember that.
Q Sure. Defense Exhibit 12-F, as in Frank, Z, as in zebra.
(Exhibit published to the witness, counsel and the Court.)
A It looks like I did, yes.
Q I'm sorry?
A It looks like I did, yes.
Q Now, so whether you were discouraged or not, you still went to the doctor's; right?
A Sorry, apparently I went at least once. I still deal with these injuries. Normally if I had had that injury, I would have gone to a bunch of physical therapy for an ongoing basis and, again, if I had a 9-to-5 job I would have done it outside of work hours. And I, to my memory, do not remember going to the doctor to the degree that would have healed the injury and I still deal with it.
Q And are Nicole and Rachel responsible for you falling from the aerial silks?

A No.
Q And do you take responsibility for really anything about your own personal wellbeing during this time?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You know -- you did go to the doctor's; right?
A Apparently I did go at least once.
Q So that suggests that you could go to the doctor's; correct?
A It didn't feel that way.
Q But you went.
A It still didn't feel that way.
Q Well, were this any consequences for going to the doctor's?
A I don't remember if there was a direct consequence for going to the doctor on October -- in October of 2014.
Q What about going to the acupuncturist; were there any consequences of going to the acupuncturist?
A I don't remember any directly related to that.
Q You didn't remember it, but you were happy to tell the jury that you were told not to go to a doctor; right?
A I was told not to go to a doctor.
Q And, by the way, did Rachel text you that?
A Yes.

Q Do you have that text?

MS. FARRELL: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q You did provide texts to the Government. They elicited that on direct examination.

A I did not provide any texts. I had three iPhones broken right when I left. I have no texts of any kind on any record prior to 2015. All of the texts and correspondence that I provided were from apps, which was not my primary communication with Rachel or Nicole.

Q Okay. I want to go to the subject matter of the scenes that we discussed. You participated in what is known as a scene; right?

A Yes.

Q And I think you gave us a pretty good definition. It's sort of theatrical thing, right?

A Yes. It's an agreed-upon BDSM scenario.

Q It comes from the BDSM community; right?

A Yes.

Q And it's something that people participate in that it can involve sex it often does, but it doesn't have to?

A I would argue that it often doesn't, but yes.

Q Okay. Fair enough.

And you're familiar with the green light, yellow

light, red light that is also derived from the BDSM community?
A Yes.
Q And when you were asked to participate in this scene, I guess, this was for Cole? Do you remember Cole's last name?
A I don't.
Q But it was Cole who the scene was for; right?
A For one of them, yes.
Q I'm sorry?
A For one of them, yes.
Q And you agreed to participate in the scene; right?
A Yes.
Q And, again, scenes were also about pushing limits; correct?
A Yes.
Q Not your normal dormitory setting activity; correct?
A Correct.
Q And it was your testimony that the scene was done for Cole to persuade him to sign up for CP8, right?
A Yes.
Q But that's not true, is it?
A That was my understanding at the time.
Q Well, he participated in CP7 with you?
A Okay. Perhaps my memory -- perhaps I'm misremembering that, but it was to sign up for a course. I could be misremembering which course.

Q All right. So if he had already done CP7 --
A He would not have been doing CP8, that's correct.
Q And this was a ritual shower sort of thing; right?
A That was one of the scenes for the day.
Q And you testified on direct that it was Rachel Cherwitz who was directing you to do this; correct?
A Yes, she was in charge of the experience for the day.
Q But when you're using the word "direct" you're not saying mandated; you're saying she was directing the production of it; correct?
A Yes.
Q I mean, you -- she asked you?
A Yes.
Q -- and you could have said no; correct?
A Yes.
Q And, again, you weren't even employed by OneTaste at this time; right?
A Yeah, these kinds of things were, like, a huge honor and I felt I earned a lot of brownie points from participating in it and that's why I did it.
Q You wanted to get closer to the center; right?
A Yes.
Q Because you admired these women; right?
A Yes.
Q And you were vibing with the messages; correct?

A Yes.
Q All right. Now, also you testified that your father passed away in January 2014 in a very terrible helicopter accident and for that, I am sorry, but after that tragic event everyone in the community supported you; right?
A For a while. So, yes, I got a lot of support particularly for that first month and then I started feeling like I was getting, like, very left behind in my grief; like the rest of the Beasties were moving on to training and teaching and I was not doing any of that.
Q Right. And that's sort of the nature of grief, isn't it; everyone is real supportive in the first month and then you're still suffering and the world goes on?
A I would say so, yes.
Q And you testified that you -- you were upset you had not gone home for Christmas before he passed away; right?
A Yes.
Q And you blame OneTaste for that also; correct?
A Rachel suggested that I stay and it was that I would be, like, left behind from Beasties if I didn't stay.
Q Right. She wanted you to stay and, you know, continue to work in the community; correct?
A Yes.
Q And you were a volunteer at the time; right?
A Yes.

Q Now, you do understand as a grown woman you don't have to take people's suggestions, right?
A Yes. Again, that was not the mental state that I was in at that time.
Q Okay, but you understand that Ms. Cherwitz, despite her witchy abilities, had no knowledge that your father was going to pass away in January, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You would agree that she wouldn't have had any advance knowledge of this tragic accident; right?
A I agree she's not psychic.
Q Okay. So, therefore, in December when she said don't go home for Christmas, stay here, by your own words it was a suggestion; right?
A It was a strongly worded suggestion that came with those implied consequences that I was terrified of.
Q Which were what?
A Getting left behind, not being able to continue with the Beasties, not getting trained to teach and all of the things that you mentioned that I wanted to get closer into the organization.
Q Sometimes -- for instance, I have an associate who wants to go on vacation rather than be on this trial. There's

consequences for that; right?
A Yes.
Q But they're natural consequences; correct?
A I'm not sure what you mean by "natural."
Q Like, if -- you may think it's very intense and unfair, but if Ms. Cherwitz says, listen, I want everyone here; if you're not going to be here it's okay, but there are going to be consequences, you may not get to do X, Y and Z, that's fair, isn't it?
A I don't know that I would agree with the word "fair." It's, like -- in a normal job setting there would be a three-strike rule or something like that. There was nothing like that. There was nothing that you were able to track in this circumstance. It was -- it was very, very malleable and changeable and I never could predict what was going to happen.
Q You weren't an employee.
A That is correct.
Q What do you mean three strikes and you're out? You were volunteering.
A I was scared I would never become an employee and I wanted to become one.
Q You wanted to impress the boss; right?
A Yes.
Q And you knew that if someone like Maya Gilbert didn't go on vacation, she might impress the boss more than you would;

right?
A She was in New York at the time and I didn't know her, but sure.
Q Okay. That's just life, isn't it?
A I suppose so.
Q Okay. And, by the way, what OneTaste or what Rachel and OneTaste was focusing on was they were doing this big Christmas food bank volunteer program; right?
A Yes.
Q And that was to help people outside of the community of OneTaste; do I have that right?
A Yes.
Q But when, of course, your father passed, Ms. Cherwitz, you know, nobody -- everybody supported you in going and they took care of somebody going with you, right?
MS. FARRELL: Objection to the form.
THE COURT: Yes, sustained.
BY MS. BONJEAN:
Q Did Clouds, your friend, go with you?
A Yes.
Q And I know on direct examination when the Government was asking you questions you said as a handler, but she was your friend; right?
A Yes -- yeah, I mean she wasn't someone that I was so close with I would have wanted her at ever inch of my father's

memorial, but she was a friend.
Q She's a person you shared a bed with?
A It doesn't mean someone is your best friend.
Q For most of us it does, actually, but --
A But it didn't there.
Q But she was your friend and, in fact, you asked to share a room with her when you first went into 1080; right?
A Yes.
Q And when Ms. Cherwitz said we'll send Clouds with you, you didn't say no; right?
A No.
Q And in hindsight you thought it was weird, but at the time Ms. Cherwitz was doing it, as you understand, it was a gesture of kindness; correct?
A Yeah, I felt that it was an honor at the time to have a handler.
Q You mentioned -- I guess I'm just confused about this, but you mentioned sitting Shiva; right?
A Yes.
Q You also said the body was in the room?
A Yes. My family is reformed Jewish. We follow some traditions and not others.
Q So it was a wake/Shiva?
A Sure.
Q Okay. And when you then returned to 1080, obviously you

were grieving; right?
A Yes.
Q And, by the way, not only did nobody suggest that you should sell Aspen Aerials, in March of 2014 OneTaste did business with Aspen Aerials, didn't they?
A I would love a refresher on what you're referring to.
Q Do you remember them engaging you to be a vendor at the OMX experience?
A I remember asking for that. I don't remember what, if anything, we did there.
Q Okay.
MS. BONJEAN: Do we have 12-BZ, as in zebra?
(Exhibit published to the witness, counsel and the Court.)
Q Just take a look at this and when you have a chance to look at it, let me know when you are finished.
A (Reviewing.)
I'm finished. Thanks.
Q Does that refresh your recollection about whether you were a vendor at one of the OneTaste events?
A Yeah, I don't believe I manned the booth. I was volunteering at OMX so I think my assistant Maya manned the booth. To my memory it was, like, a promotional. She was there promoting Aspen Aerials. I don't remember anything past that.
Q But they were promoting your company as a vendor at this

event; right?
A Yes.
Q Now, do you remember in December of 2013 there was sort of a formal big announcement that Nicole, and I guess Rob, was still around, they were splitting the community and the business; right?
A Yes.
Q They were making a decision to really put a separation there; right?
A Yes.
Q And that they were actually closing 1080, right?
A Yes.
Q They were moving to a model where staff and teachers did not live in the same residential center; correct?
A Yes.
Q And this was, again, in around late 2013, sound right?
A Yes.
Q Now it's your testimony that Rachel asked you to find housing; correct?
A Correct.
Q And that meant you were doing searches and going to look at potential alternative housing situations?
A Correct.
Q Were you looking for the students or the staff?
A I was looking just for the Beasties and the staff.

Q Okay. And were the Beasties at this point considered staff?
A They were -- yeah, staff in training.
Q And you wanted to help with this project; right?
A Yes.
Q And you also decided to sign a lease with your -- you had an ex-boyfriend?
A Yes.
Q And it wasn't just you who signed the lease, there was other people; right?
A It was only Diego and I.
Q So it was just the two of you?
A Yes.
Q But you took up the role of sort of house mom at the Beasty house; right?
A Right, for the first couple of months.
Q And, again, the Beasties, they were sort of volunteers; right?
A Yes.
Q And then, as I understand it, you kind of right after that moved to New York. Do I have that correct?
A So, I got into the aerial instructor certification program. That was a three-month program, so my intention was to go for three months and come back.
Q To New York and come back?

A Yes.
Q And this three-month program wasn't a OneTaste program; right?
A Correct.
Q How many students were in that program?
A I believe eight.
Q So you had some friends in that program; right?
A I was never very close with any of them. It was only a couple of months.
Q But --
A I don't keep in touch with any of them now. I wouldn't have considered them friends.
Q You do keep in touch with some of your OneTaste friends; right?
A Yes.
Q It turns out you can maintain relationships after OneTaste; right?
MS. FARRELL: Objection.
MS. BONJEAN: I'll withdraw it.
BY MS. BONJEAN:
Q Ms. Gillick, you had teachers at the program that you were attending?
A Yes.
Q All right. Now, around this time you understood that OneTaste, again, was changing its structure; correct?

A Yes.
Q And that they started selling franchises, right?
A Yes.
Q And the company had grown significantly and this was now a new area of development; right?
A Yeah, that was my understanding.
Q And one of those franchises was the New York-based franchise; correct?
A Yes.
Q Was that also the Brooklyn OM house?
A No, the Brooklyn OM house was, like, an individually run -- it was not part of the New York franchise.
Q There was the New York franchise and then separately there was an OM residence that is known as the Brooklyn OM house; right?
A Yes.
Q And who ran the Brooklyn OM house?
A Raph ran it some, like, Patricia Black helped. It was kind of like a house mom/house dad kind of a thing.
Q Do you know how many people were staying in the Brooklyn OM house?
A I believe it averaged like eight to ten.
Q And it's around this time, like, I guess in spring of 2014 where you started discussing purchasing a franchise; right?

A Yes, summer of 2014.
Q Do you remember Exhibit 1554? I think it's in evidence. We looked at an e-mail from Joanna Van Vleck to you. Do you remember that? 1544. I think it's in evidence.
THE COURT: 1544 is in evidence, yes.
(Exhibit published.)
Q And if you could pull out the top part and you remember we looked at this and in June of 2024 -- I'm sorry, June 24th of 2014, Joanna Van Vleck and you have an e-mail communication about you possibly -- and you and others buying a franchise; right?
A Yes.
Q And you responded if we can go down and you're at -- and you responded. You were looking for revenue numbers and profit and loss statements; right?
A Yes.
Q You were asking about what you would owe per year on a ten-year plan because they were willing to essentially loan you like, I think, a million dollars or the bulk of the price of the franchise; right?
A Yes.
Q And then you were asking about interest on top; right?
A Yes.
Q And, so, you had some financial knowledge, enough to ask the questions; right?

A Yes.
Q And, in fact, you also hired an accountant; correct?
A It was my mother's accountant.
Q You got your mother involved; right?
A Yes.
Q Where was the part where you're not talking to your mother anymore? Because I'm confused because you said you had almost no contact with her.
A I said minimal. I did not say that I was not talking to her.
Q Enough contact to have her advise you on you buying a whole franchise of a company?
A It was a large sum of money and it was going to be more than I had in that 529 Plan or whatever you call them.
Q So you called her up when you needed the money?
A That was one of the times, yes.
Q And Ms. Van Vleck provided you with an overview of revenue and expenses and income statements in that information; right?
A The document attached here was a twelve-month revenue and it was very minimal and vague. It was a long time after this that I saw a P&L.
Q Is that right?
A Yes.
Q Well, let's look at Defense Exhibit 12-F --

A At least it felt like a long time. I don't know the exact date.

Q Right. 12-F, as in Frank, Q, as in Queen.

(Exhibit published to the witness, counsel and the Court.)

Q Does this refresh --

A I don't have it.

MS. BONJEAN: Just for the witness, please.

Q You were provided with additional income statements, right?

A Yes. So, yeah, this was, to my memory, after Ravi got involved and we managed to get these P&Ls.

Q It was before you bought it though?

A Yes.

Q Before you wired your 202,000, or whatever it was, you had information; right?

A I don't remember the exact date of when I wired that.

Q We can look at it.

A If we can blow it up again, that would be great.

Q Sure. But even before that, even before that, you and Ms. Gilbert and Ayries Blanck came up with a business plan for your company; right?

A Yes.

Q That was on June 30th of 2014?

A Sure. That sounds about right.

(Continued on the following page.)

CROSS-EXAMINATION (Continues)

BY MS. BONJEAN:

Q And you shared it with your mother, right?

A I -- I don't remember, but I might have.

Q And actually, Rob Kandell helped you develop it, right?

A I don't remember that, but he might have.

MS. BONJEAN: Well, let's look at 12-C as in cat, D as in dog. And we'll scroll through it.

If you want a paper copy, let me know.

Q Let me know if it refreshes your recollection.

A Yes. I see that I was asking Maya for the business plan.

Q I'm sorry?

A I see that I was asking Maya for the business plan on June 30th.

Q And if you go to the second page, does that refresh your recollection about whether you shared it with your mother?

A I don't have the second page.

MS. BONJEAN: Hold on.

Q It's a different exhibit. We'll look at that one. It's 12-D as dog, D as in dog.

A I'm sorry, I still can't read it.

Q That's all right . We'll -- give them a second.

A Thank you.

Q Do you remember Rob Kandell helping you create a business plan for your mom?

A Yeah.
Q And who did you share your business plan with, apart from -- this business plan with?
A I -- I don't remember. I don't have a lot of memories surrounding the business plan.
Q Do you know what a from/to looks like?
A Sorry. Is it -- is it in this document?
Q Yes. You see your e-mail address, right?
A Yes.
Q You see who you shared with e-mail with?
A Yes, Maya, Po and Ayries.
Q Okay.
Now, you also -- hold on one second, please.
THE COURT: Ms. Bonjean, we'll have to do a break soon. Do you want to do it now?
MS. BONJEAN: Yes, I'm like a chaos over here. So if we could take a little break.
THE COURT: I appreciate the honesty.
Let's take a break. Let me ask the witness to step down.
(Witness steps down and exits the courtroom.)
THE COURT: Okay. We'll come back at 4 o'clock. Keep an open mind. Don't talk about the case. I'll see you in 15 minutes.
(Jury exits.)

THE COURT: Everyone may be seated.

I'll let you go, but I just want to know approximately how much long do you expect, Ms. Bonjean?

MS. BONJEAN: Let me look at my outline.

THE COURT: Sure, that's fine.

And then maybe in the meantime, Ms. Cohen, if you have an estimate?

MS. COHEN: Oh, I'll be pretty short. I think based on what Ms. Bonjean does --

THE COURT: Okay.

MS. COHEN: -- I think I'm probably no more than 20 minutes.

THE COURT: Okay.

MS. BONJEAN: Yes, I think I'm an hour still, though, Your Honor.

THE COURT: That's fine.

Can we just talk briefly about tomorrow's schedule? Ms. Cohen has a court appearance at 12:30?

MS. COHEN: 12:30, just upstairs.

THE COURT: Yes. And Ms. Bensing had a block of time.

Can you tell me a bit more about your constraints given where we are and what you anticipate happening tomorrow here?

MS. BENSING: I'm fine to miss tomorrow, Your Honor.

I don't even know that I'll miss that much. I tried to schedule it for when the Court takes lunch.

THE COURT: That's fine. We should be able to work around everything.

I'll see everybody at 4 o'clock.

MS. FARRELL: I'm sorry.

So, it sounds like we're going to get pretty close to the end of the day. The next witness is the financial summary witness. We've made a lot of progress talking with the defense.

If we get close and it's like 5:20, I think we're going to read in a stip. And our request would just be can we wait until tomorrow to put the financial witness on because I think we might be able to significantly streamline him?

THE COURT: Yes, you are not going to get there, I don't think.

MS. FARRELL: Okay.

THE COURT: Based on what I just heard, you're not getting there; but yes.

MS. FARRELL: Thank you.

THE COURT: If we are at 5:20 and it would be time for another witness, you can read a stip and we can all go.

MS. FARRELL: Thank you.

THE COURT: See you at 4:00.

(Recess taken.) (Continued on the following page.)

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: We can bring back the witness and the jury.

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Bonjean, you may continue your examination.

MS. BONJEAN: Thank you.

CROSS-EXAMINATION

BY MS. BONJEAN: (Continuing.)

Q Okay. Ms. Gillick, we were talking about your acquisition of a OneTaste franchise before we took our little break here. And pulling up Government Exhibit 1544 again. Is Barbie Sheffer your mother?

A Yes.

Q Okay. So she's copied on these e-mails; right?

A Yes.

Q And not only is she copied on your e-mails -- these e-mails, you have an accountant, Elizabeth Hanley also copied on these e-mails as well?

A Yes, that's my mother's assistant.

Q So you were getting advice from your mother and your mother's accountant before doing your due diligence before you bought this franchise; right?

A My mother is not particularly business-minded.

Q But she does have an accountant who actually told -- directed or advised you to get PNLs; right?
A Yes.
Q You did, in fact, get that; correct?
A Yes.
Q Now, we also discussed the fact that you did ultimately -- you ultimately agreed to buy the franchise; right?
A Yes.
Q And a franchise is a business, but there is also still a relationship with the corporation; right?
A Yes.
Q In fact, when you buy a franchise, you have an obligation to follow certain expectations because the corporation expects there to be consistency and continuity; right?
MS. FARRELL: Objection; vague.
THE COURT: Sustained.
Q Well, you bought a franchise; right?
A Yes.
Q Okay. And you understood when buying the franchise that -- that part of franchise agreement involved agreeing to certain expectations from OneTaste national corporate; right?
A I don't remember that specifically from the franchise agreement, but I did understand that from like just discussions with Nicole and Rachel.
Q Right. You can't buy a McDonald's and sell Burger King;

right?
A Correct.
Q And also there was a financial relationship as well; right? They still get some cut; right?
A Yes.
Q Okay. And you ultimately, after you agreed, you wired the money on April 28, 2004. Does that sound right? I'm sorry. Strike that.
August 28th, 2014? Would you like to see that?
A Yes, please.
MS. BONJEAN: It's Government's Exhibit 4318.
THE COURT: Sorry. 43 what?
MS. BONJEAN: 18.
THE COURT: 18.
A Yes, that's correct.
Q And that was on August 28th; right?
A Correct.
Q And isn't it true before you actually wired the money, you had a conversation with Ms. Daedone?
A About purchasing the franchise?
Q Yeah.
A Yes.
Q And isn't it true she wanted to check in and make sure you really wanted to do it; right?
A Yes.

Q In fact, before you wired the money, she wanted to make sure, you know, it was really a fit for you; correct?
A I don't remember the conversation a lot. If you have it in writing, I'd be happy to see it, too.
Q I'm going to have you look at 12-F, as in Frank, T, as in Tom.
MS. BONJEAN: Just for the witness.
A Yes.
Q Okay. And you would agree that just generally speaking, she was checking in to make sure that you wanted to go through with it; right?
A Yes.
Q And she also communicated how important it was to her that -- it wasn't just about you. It was about also she had an interest in making sure you were going to do a good job; right?
A Yes.
Q And you reassured her that you were in it; right?
A Yes.
Q And she told, I'm not -- it's okay. You can egg out of it; right?
A Yes.
Q So she literally gave you an out to do it; right?
A Yes.
Q And you didn't take it; correct?

A Correct.
Q And so you ended up purchasing this franchise with your friends; right?
A Yes.
Q And was Ravi part of it at this point or just Ayries?
A Ravi was always going to be the finances for Ayries, and then at this point, he was stepping in to be like he was becoming more and more involved.
Q Okay. And do you remember sort of immediately having some conflict because you had made plans to go to D.C. and the Hamptons before all this?
A Yes.
Q And do you recall that you were pretty assertive with your friend, saying listen, I made these plans before and I'm going? Do you remember that?
A Sure.
Q And you did go?
A Yes. Yes.
Q All right. And Ravi was pretty actively involved and was a savvy financial guy; right?
A Yes.
Q And he had an interest because even though he wasn't necessarily an owner, but he provided some of the funds, the investment funds; right?
A Yes.

Q Now, you said on direct examination that you thought being an owner would somehow give you more free time and more freedom to travel and do the things you wanted to do; right?
A Yes.
Q And that wasn't the case; right?
A Correct.
Q And that's not just a OneTaste thing. When you're a small business, you know, you know, it gives you less time usually; right?
MS. FARRELL: Objection, Your Honor. Objection.
THE COURT: Sustained.
Q Well, you said, I think in your testimony, you thought it was going to be more glamourous, you were going to be on magazines and things like that; right?
A That was one of the things I was told, yes.
Q Well, they were on magazines; right?
A It was also one of the things I was told by Nicole and Rachel.
Q Right. If you work hard enough, you can get those things; right?
A Some people can.
Q Right.
And Rachel didn't say you can go to the Hamptons and chill and get those things. She said if you put your whole heart and soul into this, you can achieve anything; right?

MS. FARRELL: Objection.
THE COURT: Sustained.
Q You just said that was something you were told. Told by who?
A Rachel Cherwitz and Nicole Daedone told me that that was part of what they told us would happen as owners.
Q If you worked hard; right?
A I don't remember being contingent on that.
Q You need someone to tell you that good things happen when you work hard?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q So you thought based on Nicole and Rachel saying, hey, we got all this stuff going on with this company. You have a franchise in one of the biggest cities in this country. We can be featured in all of these magazines. You remember something like that; right?
A Yes.
Q And that was one of the reasons Nicole reached out to you to make sure you were up for it; right?
MS. FARRELL: Objection.
THE COURT: Overruled.
A Yes, she did.
Q Right.
And again, it wasn't just because, you know, I think

it was a lovely text, but it wasn't just for you she was checking on. She wanted to make sure you were going to represent OneTaste New York City fully and completely invested; right?

MS. FARRELL: Objection.

THE COURT: Basis?

MS. FARRELL: Form of the question.

THE COURT: Overruled.

A Can you ask it again?

Q Yeah.

I mean, the thrust of her checking in with you was not just to say, hey, if you're not up for it, you can bow out. No issues here. But it was also to ensure that you were going to live up to representing OneTaste overall by taking up the helm of OneTaste New York; right?

MS. FARRELL: Objection again.

THE COURT: Sustained.

Q You were expected to -- strike that.

Ms. Daedone communicated to you she didn't want OneTaste New York failing; right?

A Yes.

Q In fact, she told you in no uncertain terms she wanted it to thrive; right?

A Yes.

Q And you said -- you told her you were all in; right?

A Yes.
Q Then in the end, you realized it wasn't for you; correct?
A Yes.
Q And you mentioned something about your salary; right? You did get a little salary; correct?
A Yeah, for a couple of months, I got about three to thousand a month.
Q We looked at a W-2 that said 6,000. I don't know for what period of time that was, but do you remember that?
A Yes.
Q But the whole issue with running a franchise that eventually, there would be returns that would, you know, become profits; right?
A Yes.
Q That was the idea of investing in the company; correct?
A Yes.
Q And in less than a year, you wanted out; right?
A Yes.
Q And you were actually lucky enough to find someone who would actually buy you out of your position; right?
A Yes.
Q And you took a little bit of a haircut or a discount, but you had sold it less than a year after you had bought it; right?
A Yes.

Q You got the bulk of your money back because Ravi stepped in; correct?
A Yes.
Q Okay. And then you moved over to The Bunker; right? Is that around the time you moved to The bunker?
A I moved to The Bunker around when I was asked to become an owner.
Q Okay. So you were already at The Bunker at that time?
A I wasn't living at The Bunker. I'm sorry. I'm not sure what time period you're talking about.
Q You -- we know you purchased or you started looking into purchasing the franchise in June --
A Yes.
Q -- of 2014; right?
A Yes.
Q You ended up closing the deal in August of 2014; right?
A That was when the money was transferred. It wasn't when I signed any paperwork of it.
Q Okay. And when did you move into The Bunker?
A Probably a few weeks into July. It was like right around end of June, beginning of July time period.
Q So the summer of 2014?
A Yes.
Q All right. And were you -- so you were -- you were doing the franchise. Were you still living at The Bunker when you

sold the franchise?
A No.
Q So that was kind of -- that corresponded with when you kind of left OneTaste altogether; right?
A No, all the staff moved from The Bunker to 365 partway through my ownership.
Q What's 365?
A It was the next staff house down on the Lower East Side.
Q Okay. Okay. So where were you living in -- let's see. So in July of 2014, you were living at The Bunker; right?
A Yes.
Q You were living with your friend, Maya; right?
A Maya was never much of a friend, but yes, I was living with Maya.
Q And Po?
A No, Po was not living in The Bunker.
Q Where was she living?
A She was living at her house in Brooklyn.
Q Like her own house?
A Yes.
Q So you could live in housing separate and apart from OneTaste; right?
A She fought tooth and nail for that because she didn't want to get rid of her cats and then she was getting a lot of down stroking from Rachel about it.

Q Okay. But she did it?
A She did it.
Q All right. Rachel Cherwitz didn't cast a spell on her; right?
MS. FARRELL: Objection.
THE COURT: Overruled.
A I -- we, I established that magic isn't real.
Q Po was allowed to stay involved in OneTaste; right?
A She was.
Q In fact, she even got the honor of being a part owner of a franchise; right?
A Yes.
Q Even when she said no to Rachel Cherwitz, she was not excommunicated; correct?
A Correct.
Q Okay. You -- oh, let me touch on something.
You took this taboo course; right?
A Yes.
Q And you actually wrote a journal about the course; correct -- or wrote into a journal about the course; right?
A I may have. I didn't journal very often. I don't think I have a copy of that, but if you do, I'm happy to look at it.
Q Well, you provided a copy to the Government; right?
A Okay. I did provide a copy of a journal. I don't remember specifically if there was a date at that point. I

guess I wasn't journaling very often during that time.
Q Why don't we have you take a look and you can tell me?
A Great.
Q It is Defense Exhibit 12-GN.
A Can you make it bigger, please?
MS. BONJEAN: I can get you a paper.
THE COURT: I'm going to need a paper copy, too.
MS. BONJEAN: Sure.
THE COURT: Thank you.
MS. BONJEAN: We both marked it. This is the Government's marking.
THE COURT: Whatever -- you said 12-GN?
MS. BONJEAN: Yes.
THE WITNESS: Can you scroll down, please?
MS. BONJEAN: Hold on. Let me get you a copy that you can look at more easily.
THE WITNESS: Thank you.
MS. BONJEAN: Here you go.
Q First, I'm just going to ask you, do you recognize your handwriting?
A Yes.
Q Do you remember doing some journaling around your class, a taboo class?
A Yeah. Like I said, there were occasional times that I had time to journal.

Q I'm sorry?
A There were occasional times that I had time to journal and this was one of them.
Q Okay. And the taboo class is kind of like what it sounds. It really pushes the edges or the boundaries out even further than other courses there at OneTaste; right?
A Yeah, it was BDSM-based and taught by other teachers.
Q In fact, it wasn't taught by Ms. Daedone; correct?
A She stopped by, but no, primarily.
Q And I don't want to get into it too much, but one of the exercises there was kind of going to this really extraordinarily traumatic place; right?
A Yes.
Q And you testified on direct examination that you participated in sort of a re-enactment of really this awful thing that happened to you; right?
A Yes.
Q And you agree that you willing participated in that; right?
A Yes. Again, it was a thing, all those kind of things that were breakthroughs that got Brownie points that I wanted.
Q Right.
And well, at the time, at least at the time you believed it was going to help you, I guess cope or deal with some of the trauma around that; right?

A Yes, we used the word "transmute."
Q Transmute.
Turn this awful experience into something that you understood better; right?
A Yes.
Q And whatever your feelings are about today, I think you testified about that.
At the time, you found it helpful; correct?
A At the time it was intensely mixed and I, yeah, with them.
Q When you journaled about it, you actually said the amount of joy you felt on the backside was unbelievable; right?
A Yes.
Q Is that because you felt like you had sort of overcome something?
A As I testified earlier, it was like an incredible high from the experience.
Q And at the time, you actually journaled about your feelings which were pretty consistent with what you testified to here today; right?
A Yes.
Q You can put that aside.
Now, in July of 2014, you were living at the Bunker with the women we previously identified; right?
A Yes.

Q And you testified that it was so -- it was so looked down upon or so taboo to drink that you were, again, fearful of having a beer at some point; right?
A Yes.
Q But isn't it true you texted with your girlfriends, your friends, your housemates, whatever you want to call them, in July of 2014, that -- July 13th of 2014, that you were going to give up drinking completely?
A I would have to see that.
Q Do you want to see it?
A Please.
MS. BONJEAN: 12-F, as in Frank, L, as in Larry.
I think the screen is easier.
THE WITNESS: That's fine. Thank you. It's really small, the paper.
Q Okay.
A Yes.
Q Do you see it?
A Yes.
Q So at least as of July 13th of 2014, you had not even given up drinking; right?
A Like I said, you know, and I say right here that it was occasional and the temptation, I wasn't drinking much.
Q But it had nothing to do with OneTaste; you didn't want to drink?

A No, it had everything to do with OneTaste.
Q Ma'am, you were letting your friends know that you're giving up drinking completely for a couple of years; right?
A Yeah, I was -- so one of the things that we were doing at OneTaste was Rachel, Nicole, all of us were constantly going to AA meetings and 12 Step meetings. Everyone was in some kind of program.
And I was panicking about the fact that I was an alcoholic because I was having thoughts of occasionally having a beer.
Q Okay. But by the way, OneTaste didn't run those 12 Step programs; right?
A No.
Q Okay. So you were getting messages from outside of OneTaste about what is and what is not an alcoholic; right?
A I was being told by OneTaste to go to those meetings and then, yes, at the meetings, getting that message.
Q And you didn't have to go; right?
A Once I got in, I felt that I had to.
Q Right.
Because you would have not been in the in-crowd; correct?
A Correct.
Q And you understood that a lot of people at OneTaste did get a lot out of those programs because they had addiction

issues from their past; right?
A Yes.
Q And in any event, you actually had not, though, sworn off alcohol when you joined OneTaste; correct?
A When I first started taking classes with them, no.
Q Okay. And in fact, as of July 13th of 2014, based on your message, you had not sworn off alcohol; correct?
A I don't know when I had had a drink prior to this, but, yeah, I don't remember when I had had a drink prior to this.
Q You said you were going to experiment with being sober; right?
A Yes.
Q Okay. On October 1st of 2014, you were then living at The Bunker; right?
A Yes.
Q And you testified on direct examination about how you were -- you and I guess Ayries and I don't know the other people you were living with -- were told either by Rachel or Ms. Daedone to have, what was it, 30 days of sex, something like that?
A Yes.
Q And you were told somebody set up an OkCupid?
A Yes.
Q Who was that?
A Maya.

Q And isn't it true that in reality, it was you and your friends that came up with the plan for the 30 days, 30 men or 30 sexual experiences?
A No. My recollection was that is Rachel Cherwitz told us we needed to do that because Ayries was going to do it.
Q Okay. But let's look at Defense Exhibit 12-F, as in Frank, E, as in Edward.
THE COURT: She's going to need a hard copy. It's very faint and small.
MS. BONJEAN: Yes, I have a better one here.
THE WITNESS: Thank you.
Q Let me just have you look really at the first, let's call, 10 lines here, 20 lines.
A Okay.
Q By the way, this is a text exchange?
A It looks like it, yes.
Q Okay. Rachel Cherwitz isn't on it; right?
A No.
Q Okay. And it was actually you ladies talking about setting up OkCupid profiles; right?
A Yes.
Q And this whole idea of 30 meetings, 30 men in 30 days, that was a plan that you all hatched?
A Again, my recollection is that Rachel Cherwitz told Ayries and the rest of us to do this. I assume it was before

this. I don't remember us coming up with the idea ourselves.

Q Okay. You'd agree that no one mentions Rachel Cherwitz in this communication; right?

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

Q Can you point us to anything that suggests that it was Rachel that suggested this?

A May I have time to read the --

Q Sure.

A Thanks.

That's correct. I don't see any mention of Rachel on this page.

Q Okay. And you also testified on direct examination that during this period of time, you know, there was, everyone was so overworked. People were -- you said Ayries Blanck was vomiting. I think you said she went to India. She traveled to India?

A The year prior.

Q Okay. OneTaste didn't have any objection to her going to India; right?

A She was a student at the time.

Q Student where?

A A student. I believe she was taking OneTaste courses. She was not a OneTaste staff member.

Q Right. Like you weren't a OneTaste staff member?

A At which point? Sorry.
Q You really have never been a OneTaste staff member, have you?
A No, I was an owner.
Q Right.
You were a franchise owner for about less than a year, but you never really were a staff member; correct?
A Correct.
Q And isn't it true, though, that, you know, in February, for instance, February of 2015, you and Clouds went and got massages; right?
A Clouds was a masseuse. I probably got one from her.
Q Well, and in fact, no, you went and got a massage with her; right?
A Sorry. What was the date?
Q February 27th, 2015.
A Was it Clouds or Po?
Q Clouds.
A I believe that I would have gotten one from her.
Q Do you want to look at it?
A Yeah. Sure.
MS. BONJEAN: Defense Exhibit 12-GC.
A Okay. Yes.
Q You went and got a massage with her; right?
A Yeah, that was -- yes. Yes.

Q You don't remember having any repercussions for having that day of, I think you called it pampering?
A Every once in a while, I did get days like that. It was very rare.
Q All right.
A And that this was one of them.
Q Well, what about in November of 2015, when you got a massage and your nails done and then you went with Lauren Harkness in Miami for dinner?
A I'm sorry. When was this?
Q November of 2015.
A That was after I left OneTaste.
Q Oh, but you were still in contact with people from OneTaste, though; right?
A A few.
Q Okay. So you weren't completely can excommunicated from your friends; right?
A I was off all text messages and like I was off all threads and barely talking to people.
Q Ma'am, you were on a thread with Ms. Cherwitz who said nice?
A Yes.
Q Right?
A There -- there was one thread that had Rachel in it and it was -- I -- like I said, I went from being incredibly

connected to them to not talking to them hardly at all.

Q Right.

But the whole point is, is you said you were fearful of Ms. Cherwitz and it was your whole world, OneTaste; right?

A Yes.

Q And that your greatest fear is that you would be kicked out and not have your community of friends anymore; right?

A Yes.

Q And what I'm asking you about is literally after you left OneTaste, you went to Miami with somebody from OneTaste; right?

A Lauren Harkness was very involved in the Mama Gena community and I went to a Mama Gena conference, which was outside of the OneTaste community.

(Continued on next page.)

CROSS-EXAMINATION (Continues)
BY MS. BONJEAN:
Q Okay.
A Which was outside of the OneTaste community.
Q My question is, is Ms. Harkness was also involved in the OneTaste community, right?
A Yes.
Q And you had a group text that Ms. Cherwitz was on, and when she -- you said you were getting a massage and nails done and dinner in Miami, she said "Nice"?
A I was no longer OneTaste staff, owner, or involved with OneTaste at all, so that was fine at that point.
Q Yes, but my point is you actually maintained a friendship with Rachel Cherwitz?
A A very small degree of friendship for a little while.
Q You weren't kicked out of -- you weren't kicked out of -- well, strike that.
You didn't lose all your friends is my point?
A It felt like that.
Q All right. When you leave a community that is an intense community, you're not going to be as connected to that community, right; that goes without saying, right?
A Yeah, I suppose so.
Q I mean if you tell your priest you're gonna start worshipping Satan, he's probably going to tell you you're not

welcome back at the church, right?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q All right. You -- let's see. Had you left by August of 2015?

A Yes.

Q All right. And in August of 2015, you still had a nice relationship with Ms. Daedone also, right?

A I went to a coffee with her.

Q And in August of 2015 you texted with her, correct?

A Yes, that sounds about the right time.

Q And do you remember in August of 2015 sharing with her some of the work about your conversations that you had with your therapist, right?

A I might have, yeah.

Q And you testified that Ms. Daedone was anti-therapy, right?

A Yeah.

Q Okay. But she told you: Kiss your therapist for me, with a smiley face, right?

A Yeah, I remember that.

Q You remember that, right?

A Yes.

Q She was -- she didn't say anything like you shouldn't be going to a therapist, right?

MS. FARRELL: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q And you didn't have any reservations about telling her you were seeing a therapist, correct?

A I -- I did. I was very concerned after I left, but I was trying to do everything I could to like uphold the lifestyle and like still be an OMer and be connected. And I was feeling quite ashamed about talking to a therapist.

Q But you didn't even tell her and you did?

A Correct.

Q Now, let's talk about your relationship a little bit with Rachel.

You suggested that because you told her or you announced that you wanted to sleep with -- what's his name?

A Andreas.

Q -- Andreas, that she somehow was angry or held it against you, right?

A Yes.

Q And do you remember in October of 2014 you were planning on romantically seeing Rob Kandell behind everyone's back?

A I don't remember it being behind everyone's back, but I was seeing -- like I was sleeping with Rob at the time.

Q And you understood that that was -- you kept that as a secret?

A I don't remember keeping it secret.
Q Okay. Do you remember --
A Do you have --
Q Yeah.
A Okay. Well, show it to me.
MS. BONJEAN: Defense Exhibit 12-F as in Frank, K as in kite.
BY MS. BONJEAN:
Q Do you need a paper copy?
A No, this is fine.
(Pause.)
A Yes. I was thinking here it would have been a different timeframe. I was definitely keeping this very secret.
Q Right. You even mentioned -- I mean you mentioned it to Maya and the people --
A Maya, I think, was the only person I might have told. I'm not sure if I told someone other than this. I don't remember.
Q Right. And you knew that there had been, or at least you felt that there had been conflict over Andreas, right?
A So, Rob had left at this time. I believe Andreas had left at this time. And when people left, we were told not to have any contact with them.
Q Okay.
A So, I was very against rules to be in touch with him at

all.
Q And yet, once again, you didn't really care and you did what you wanted to do, right?
MS. FARRELL: Objection.
THE COURT: Basis?
MS. FARRELL: Bullying the witness.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Ma'am, you testified all day about the pressure you felt not to do things, but time and time again you did them anyway, right?
A Um, sure. I -- yes.
Q Yeah. Whether it's going to a doctor, right?
A Very rarely.
Q And whether it was getting a beer, correct?
A Very rarely.
Q Whether it was sleeping with Rob Kandell, right?
A So, I wasn't sleeping with him at this point.
Q Later, right?
A No, much earlier. And I had talked to Rachel about it and had permission with that.
Q So, you communicated it with her?
A Yes.
Q Okay. But again, your -- your -- your testimony is that they wouldn't have liked you talking to them, Kandell and

Andreas, but you did it anyway, right?
A Yes.
Q You not only did it, you shared it with another member of the community, right?
A Yes.
Q Okay. So, you weren't that worried, right, that you would get in trouble?
A I was incredibly worried.
Q And, again, remind us, what were you worried about?
A Losing favor with Rachel, getting punished, getting publicly shamed, getting demoted.
Q Okay. Can you tell me what you mean by punished? Punished how?
A By not being, like, given the next honor and the next, like, thing that -- that my peers were given.
Q Okay. Anything else in the punishment category?
A Not that I can think of at the moment.
Q Where's the public shaming, public shaming how?
A As I mentioned with the TurnONs and -- sorry, the TurnON training and our check-ins in the morning, they were -- they were known as down strokes, and they were like incredibly intense criticisms and hard truths was the thing with them.
Q Down strokes was just part of, that was part of the culture there, right?
A Yes, but you got down-stroked when you did something that

was like off stroke.
Q Right. Because it was -- there was like this radical honesty with each other, correct?
A Yeah.
Q Like the whole point of OneTaste is I'm gonna say what I'm feeling to you, and you're gonna -- like that's sort of the whole concept there, that's what you signed up for?
A Sorry. Can you give me a little context?
Q I mean one -- we looked at so -- we looked at a few documents, okay, and you understood that by -- from the beginning that you were signing up for these courses and this lifestyle that pushed boundaries, right?
A Yes.
Q And many of these exercises were about doing things that were exceptionally uncomfortable, offensive, outside, you know, thinking of, you know, the rest of us, right?
A Yes.
Q Right. And so, going to a morning meeting where you're getting criticized was part of what you signed up for?
A I don't know that I knew that that was happening when I first started, but yes it was something that became very normal.
Q Okay. You talk about this marriage stroke, and I guess what I'm hearing is that at some point it was your belief that there was some message to get married because Nicole was in a

monogamous relationship, do I have that right?
A Primarily because Rachel got engaged and then married.
Q Okay. So because Rachel got married, now everybody has to get married, is that right?
A Yes.
Q Okay. You didn't get married though, right?
A I was engaged and had a wedding date set.
Q Okay. You didn't get married, did you?
A No.
Q And Ms. Neria, she got married, right?
A (No response.)
Q Anybody else that you know that actually got married?
A Ravi and Aubrey got married. Maya and Eli got married shortly after I left. Rachael Hemsi got married.
Q When?
A I believe a little before I left. I don't remember the date on that.
Q So what you're saying is that when you were there, Michal Neria got married, right?
A Yes.
Q And Rachel got married, right?
A Yes.
Q And then there were some people that got married after you left, correct?
A Yes. Like I said, I don't remember when Hemsi got

married.
Q Right.
So you've identified two people, two couples that got married when were you at OneTaste, correct?
A Four, I believe.
Q Who else?
A Sorry, Rachel, Maya -- oh, you're saying while I was at OneTaste, is that the delineation?
Q I said while you were at OneTaste --
A Yes.
Q -- okay, you saw two couples get married, right?
A That I remember right now, correct.
Q Okay. And how many franchises were there?
A Four.
Q Do you know how many people from those franchises got married?
A I don't remember at the moment.
Q And you'd agree that nobody said you should get married directly or anything, right?
A I don't remember anyone saying it directly. It was the stroke that was happening.
Q Right, because you saw your friends getting married and then you decided you wanted to get married, which is really not that different than being outside of OneTaste sometimes, right?

A I wanted to get married. I did not want to marry Raph.
Q And it sounds like you didn't?
A That's correct.
Q And isn't it true that when Ms. Daedone talked, she made it clear, like: Listen, this is -- do what you want with this information, this is my experience, this is what I believe in, but I am not telling you to do anything; she said that?
A She said that a lot. It wasn't what happened in practice.
Q Whose fault is that?
A (No response.)
Q That's your fault then, right?
A I wouldn't use the word fault.
Q Ms. Daedone literally stood up and said: You're here to learn from me and I am going to teach you. I'm going to give you my ideas, but do what you want with that information; right, she said that?
A Yes.
Q And you actually signed a paper, you signed a waiver that also reinforced that this is not meant to direct you in any aspect of your life, right?
MS. FARRELL: Objection.
THE COURT: Basis?
MS. FARRELL: Form of the question.
THE COURT: Overruled.

BY MS. BONJEAN:
Q Do you remember signing that paper?
A Yes, I signed that paper for CP7. Once I was in deeper, it was -- I was -- I was in that -- that mental state where there was the -- all the things I was afraid would happen and I -- I -- I was -- it -- it felt expected of me that I was going to do what Nicole said and taught at all times.
Q But nobody, nobody told you you had to, right?
A On occasion and for specific circumstances, Rachel Cherwitz would get on the company threads and say: This is the stroke. This is what's happening.
Q This is the stroke, that's your -- that's your command from God on high?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q So this is the stroke, this is what we believe in, but you didn't have to do it, right?
A Again, I -- I felt that I had to.
Q Right. And in the end, you walked out that door just fine, nobody stopped you, right?
A Correct.
Q And you actually had a friendly relationship with Rachel after you left, correct?
A For a little while, yes.
Q And you also had a very lovely relationship with

Ms. Daedone after you left?
A For a little while, yes.
Q You fell out maybe because you're on different paths, but there was no consequence to you leaving in terms of your friendship with these people, correct?
A I wouldn't say that.
Q Well, you couldn't be in OneTaste anymore if you left OneTaste, that was a natural consequence, right?
A I was hoping that there was a way that I would have been able to be more involved than I was.
Q Right. You were hoping that the rules didn't apply to you in life, right?
MS. FARRELL: Objection, Your Honor.
Q Right?
THE COURT: Sustained.
Q Ms. Gillick, when can we expect your fictional account of your memoir and your time --
MS. FARRELL: Objection.
Q -- at OneTaste?
THE COURT: Sustained.
MS. BONJEAN: I have nothing further.
THE COURT: Ms. Cohen, do you have any cross-examination?
MS. COHEN: I do, Your Honor.
THE COURT: Go ahead.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good evening --

A Hello.

Q -- Ms. Gillick. My name is Celia Cohen. I represent Rachel Cherwitz.

I just want to go over a quick timeline for you.

So you began, to refresh us, you began in September -- sorry, spring of 2013, I think you said, for the Coaching Program in May of 2013, is that right?

A Yes.

Q And then you left in early, very end of June, early July of 2014 -- '15, correct?

A Correct.

Q And so that's about two years, right?

A Yeah, a little over.

Q And during that time you were never a staff member, correct?

A Yes.

Q And, in fact, up until you decided to go in on the franchise and be an owner there, you volunteered, all your work at -- at OneTaste was volunteer, correct?

A Yes.

Q And so you didn't have any boss, right?

A I was training under Rachel Cherwitz, but I wouldn't have

called her a boss.
Q You were training because you went to OneTaste to learn how to be a coach and to do the things that OneTaste taught you to do, correct?
A Yes, and because I wanted to become a teacher.
Q Right. Now, you met with the Government in this case 15 times, right?
A That sounds about right.
Q You met with them starting in 2018, do you remember that?
A That's probably the first time I got a phone call, yeah.
Q You met with them in 2022, do you remember that?
A That sounds about right.
Q And in 2023?
A Yeah.
Q And then in 2024 you met with them eight times, do you remember that?
A That sounds about right.
Q And then in 2025 you met another five times, is that about right?
A Yeah.
Q And that doesn't include any prep that you had this month, correct?
A Probably.
Q Now, one of the reasons you said you were happy to be an owner of the OneTaste New York franchise was because you

didn't want to be -- because you wouldn't be staff, right?
A Correct.
Q And you had been a business owner already or you were a business owner, correct?
A Yes.
Q And it was important for you to succeed at a business, that was one of your early desires, right?
A Yeah.
Q And when you were the owner, again, you didn't have a boss, correct?
A Again, Rachel Cherwitz was my -- like, she -- she was still the person that was above me and we were working under OneTaste corporate. So, at that time I would have actually called her my boss.

(Continued on the following page.)

BY MS. COHEN: (Continuing.)
Q But technically she wasn't, you were the owner along with Ravi, Po and Aubrey, right?
A Yeah, in so much that a franchise is still under corporate, but not -- we were owners of the franchise.
Q And as new owners the franchise, in order to succeed you guys had to sell; right?
A Yes.
Q And sales is hard work; correct?
A Yes.
Q And, in fact, in this -- what you're selling at OneTaste has an added layer of difficulty given that it's not your average product; correct?
A Yes.
Q And, in fact, Rachel was really around to help train and assist you guys on how to increase your sales; isn't that right?
A Yeah.
Q And eventually when you said that you were -- and you called it that you were demoted at the end, but that's not really true; you just got out of being an owner; correct?
A No, I was asked to step down from the exec team and not be part of any decisions other than for dissolving the LLC, but I hadn't left the company.
Q But, in fact, it was Ravi who was the person that paid

you back your money; correct?
A A couple of months later; correct.
Q Not Rachel Cherwitz; correct?
A Right.
Q And Ravi and Aubrey and Po as decisionmakers of OneTaste New York, they're the ones that made that decision; correct?
A It was my understanding that Rachel Cherwitz and Nicole Daedone had made the decision that I shouldn't be in the exec team any longer, but this was when I was out in Bali, so I wasn't a part of that conversation.
Q Okay. So -- but the person you heard from was Ravi correct, directly?
A No, I heard directly from Po and Aubrey.
Q Okay. And you testified about a trip that you went on to Bali and that was spring of 2015; is that correct?
A Correct.
Q So that was not too long before you left; correct?
A Correct.
Q And you had really started the franchise -- by the time you signed the agreement it was January of 2014; correct?
A 2015.
Q I'm sorry, I meant 2015, yes.
A Yes.
Q So at this time you and Po and Ravi and Aubrey were really working hard to make this thing get off the ground;

correct?
A Yes.
Q And you were a partner in that; right?
A Yes.
Q And when you came back from Bali in fact, you recognized that you needed to make more sales; right?
A Yes.
Q And you -- in fact, in the days leading up to when you decided to leave in June of 2015, you were on several texts encouraging and trying to get sales to improve, do you remember that?
A Yes.
Q And, in fact, and Rachel Cherwitz wasn't on any of those chats. I can show you that if you need me to.
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. COHEN:
Q Do you remember if Rachel Cherwitz was on any of those chats?
THE WITNESS: Did you say "sustained"?
THE COURT: Yes.
You can ask the next question.
BY MS. COHEN:
Q Do you remember if Rachel Cherwitz was on any of those sales chats?

A I'm not sure what sales chats -- there were a lot, so I'm not sure what you're talking about.
Q Let me show you what's been marked for identification as Defense Exhibit 12-DT.
(Exhibit published to the witness, counsel and the Court.)
Ms. Cohen: If we can blow that up.
We have paper copies, but we can blow it up on the screen.
A (Reviewing.)
It's a short thread, but it is just me and Po on this thread.
Q Okay.
MS. COHEN: And you can take that down.
Q And isn't it true that you stroked for sales?
A Yes.
Q And isn't it true that you also would alternate with your friends, like Po, in fluffing and closing sales?
A Yes.
Q And you also used charm to get lead generation, do you remember that?
A I don't know what you mean by that.
Q Okay, well, let me just show you again another one, 12-DS.
(Exhibit published to the witness, counsel and the Court.)
Q And this is -- do you -- you can see the date is June 18,

2015. And that is right before -- again, I think it's the same day as the other one, but as -- a couple weeks --
A I see the line that you're referring to.
MS. COHEN: Okay you can take that down.
Q Does that refresh your recollection of using charm to get lead generation?
A I mean, I said that I was getting phone numbers with my charm and smile. I don't know. Anyway, I think it was just banter.
Q And Rachel Cherwitz wasn't on that text thread; correct?
A I did not see her name on that page.
Q And --
A Again, these were long text threads and I don't know if she chimed in on other parts.
Q And you tried to push -- in that final month you tried to push people for sales numbers, do you remember that?
A Yeah. We were all having like inner-city competitions on reaching goals and that was one of our jobs as owners.
Q And, in fact, you were often telling the group, let's double it. Do you remember that?
A Sure. There was a thing we were all saying and I'm sure it was echoing.
Q And shortly before you left in May of 2015, do you remember telling Po how grateful you were to do more demos? Do you remember that?

A Not specifically, but I was grateful to do demos.
Q Because that was something that was held in high regard at OneTaste?
A Yeah. It was an enormous honor.
Q Okay. And, in fact, in June again of 2015, again, just a month before you left, do you recall that Nicole was teaching a class for only $195? Do you remember that?
A No, not specifically.
Q It was a one-day communications class, is that --
A They ran communications classes. I don't remember Nicole teaching one.
MS. COHEN: If we can pull up Defense Exhibit 12-DR.
(Exhibit published to the witness, counsel and the Court.)
Q Let's see if that refreshes your recollection.
A (Reviewing.)
Sure, yeah.
Q And, in fact, at the time you felt that everyone in the community should go to that class; right?
A Yeah. Around this time -- I mean, Nicole was only teaching larger classes as well as she was charging 1,500 an hour for individual sessions with her. So, it was a steal to be in front of her for 195.
Q Right, because you still believed in her teachings; correct?
A Why he.

Q And, once again, Rachel Cherwitz is not on that thread; correct?
A Not on this page.
Q Now, you also testified on direct examination about how rough your schedule was. Do you remember that?
A Yes.
Q I mean, your schedule would often start -- on most days would start with OM practice; correct?
A Yes.
Q Yoga?
A We sometimes took Bikram around the middle of the day.
Q Soul Cycle?
A About once a week.
Q You would have breakfast together; correct?
A Yeah.
Q And the sales calls would start around noon usually, 12:15 around?
A I remember them starting a lot earlier than that, but --
Q Let me show you a few.

MS. COHEN: Can we show Defense Exhibit 12-EB?

THE COURT: B as in boy?

MS. COHEN: Yes. B as in boy.

(Exhibit published to the witness, counsel and the Court.)

A Yes, it looks like that was the schedule on this day.
Q So on, that day you did Soul Cycle and you did your OMs

and you did your inventory; right?
A Yes.
Q And your sales calls start at 12 --
A It was a sales meeting at 12:15.
Q Okay.
MS. COHEN: Can we show 12-EC?
(Exhibit published to the witness, counsel and the Court.)
THE COURT: What is the question pending?
Q Sorry. I'm sorry, I forgot to -- yes.
And also were there other days that you did Bikram and started sales at 12:15?
A So, again, these are when sales meetings happened, not when the sales calls started. I remember doing sales calls and texts far earlier in the day than that. That was, like, the circle up team meeting often happened at noon.
Q But you really weren't able to do much before 12 given the schedule that you guys set for OMing and breakfast or Bikram or Soul Cycle?
A So, sometimes community members came to the morning practices and sometimes sales happened then and I always had a constant running thread of sales all day long. So there were text messages that were continually going so it would have happened interstitially to these scheduled events.
Q Okay. And you were setting these schedules; correct?
A I seemed to be in charge of putting them on the text

thread. At this time I was not in charge of setting them.
Q All right. And you also testified -- actually let me also --

You testified about a -- about going -- that Rachel finally agreed to let you go to a cousin's wedding.
A Yes.
Q Was that the same cousin that you went to the wedding where there was an intense bachelorette? Do you remember that?
A We had -- we had -- one of the days before the wedding was a small bachelorette party at that cousin's wedding. It was a little bachelorette party on Friday and the wedding was Saturday, Sunday.
Q Was there another wedding in August of 2014?
A That was the wedding in August of 2014.
Q And you don't remember describing this bachelorette thing as intense?

MS. FARRELL: Objection.

THE COURT: Yes. Sustained.

BY MS. COHEN:
Q Do you remember describing it as intense?
A No.
Q Do you remember being happy that you weren't there for the whole week?
A I do remember my family was questioning me pretty

intensely about OneTaste at the time and I do remember being glad that I hadn't been gone for a long time.

Q Take a look at Defense Exhibit 12-H.

(Exhibit published to the witness, counsel and the Court.)

Q You can see where the highlights are for the first plan and if you can go a little bit down further.

A Can you pull it back up?

Q Sorry. There you go.

A Yeah, that's what I mean.

Q And then down --

A Yeah, that's what I mean.

Q You don't say anything about your family asking about OneTaste in this?

MS. FARRELL: Objection.

THE COURT: Sustained.

BY MS. COHEN:

Q You didn't tell people that the issue was about your family asking for OneTaste, did you?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q Do you recall telling the group that it was an intense week and you were glad you weren't there for the whole week?

A Yes.

Q Now, you also testified --

MS. COHEN: You can take that down.

Q -- that you moved -- you moved to New York City in the summer of 2014; correct?
A Yes.
Q And you wanted to move there; right?
A It was my intention to go for the three-month period and go back to San Francisco.
Q And that was for the aerial silk class; correct?
A Yes.
Q And you actually testified yesterday that you felt that you were done with OneTaste at that time?
A Yeah, after my dad's death during that first intense grieving period, I was feeling very left behind and, like, all my peers and all the other Beasties were graduating up to staff and teaching and I started to wonder if I had just gotten what I needed out of OneTaste and it was time to go.
Q Okay. And so you felt like you were done, that's your testimony?
A Yes.
Q But you moved into the -- sorry into the Brooklyn OM house; correct?
A Yes, I was living in the Beasty house. In San Francisco and that was the equivalent of the Beasty house. So I felt that it was the same. It was a cheap place to live for those three months versus anything I could get for a short-term rental and be in the community and able to keep OMing.

Q But money, you testified on cross-examination, was not really the issue for you; correct?
A My family had money. I didn't have a lot to my personal name.
Q You wanted to move in, though, to this -- I mean, you wanted to participate in OM. You continued --
A Yeah, I wanted to stay a part of the community. What I mean is I felt like I was done taking classes and going deeper into teaching and that kind of thing.
Q Got it. But you wanted to continue with the community; correct?
A Correct.
Q You wanted to continue to do fear inventory; correct?
A It wasn't my favorite practice, but, yes, it was part and parcel of a lot of it.
Q I'm sorry?
A I wouldn't say I was like, yes, every morning I'm going to get up and write fear inventory. It wasn't very fun.
Q But after you left OneTaste actually, you talked about how fear inventory was a helpful thing and telling people to do it. Do you remember that?
A Yes. Like I stated, I was trying to live all of the principles on my own outside of the community when I left.
Q And no one was telling you to do anything at that point; correct?

A Correct.
Q And so you say you moved into the OM house but you actually wanted to move into The Bunker initially; correct?
A I don't remember that, but I might have.
Q In fact, you wanted to move in there, but you couldn't get in there. Do you remember writing that in your journal?
A I'd be happy to take a look at it.
Q Okay. This is marked as Government Exhibit 0920, 111 through 113?
THE COURT: Give me those again.
MS. COHEN: 0920, a Government exhibit, pages 111 through 113.
BY MS. COHEN:
Q Do you need a paper copy?
A Or zoom in on each page.
THE COURT: It's kind of dark. Maybe if you have paper copies.
MS. COHEN: I have paper copies.

(Continued on the following page.)

CROSS-EXAMINATION

BY MS. COHEN: (Continuing)

Q I can direct your attention, if that's helpful.

A Sure. Either that, or I can read the whole thing.

Q Yeah. If you look at the very bottom.

A Of which page?

Q Sorry. Of the first page, the last paragraph, second sentence to the next page, the end of that sentence.

A Yeah. It looks like Rachel Hemsi had asked me if I wanted to move into The Bunker and I was considering that.

Q Right.

But you had previously -- you had previously not been able to. You talk about that in here; right?

A I didn't get to that part. Where is it?

Q That, again, the second page where -- starting so --

A I'm still not seeing what you're referring to.

Q Okay. Well, let's go with what you said. You said that you were now given the option to move into The Bunker?

A Yeah. I see the third page, maybe. Anyway.

Q Let me ask you, one of the issues that you were debating or you debated is you were worried about drinking at the staff house. Do you remember that?

A No, but maybe I mentioned it.

Q Okay. So if you go to the second page?

A I didn't see anything on the second page about that.

Q Last paragraph?
A Well, I just saw this, what we were talking about before. I feel like I'm on a different page.
Q So, sorry. Does it refresh your recollection that you originally wanted to go in The Bunker?
A Yes, it did.
Q Okay. And now -- so sorry. Let me know when you're done.
A Yeah.
Q And one of the --
A That refreshes as well.
Q And one of the issues you were debating now at this time about The Bunker is you were worried about drinking at the staff house. Do you remember that?
A Yes.
Q And, you know, you ultimately felt that what does it matter, you're not staff. Do you remember feeling that way?
A I wrote that in my journal, so, yes.
Q And that even if people judge you, it doesn't matter because you're not staff. You wrote that; correct?
A Yes. Yes.
Q So -- and fair to say, moving back into The Bunker is not getting less involved with OneTaste; correct?
A Correct.
Q And this was -- I don't remember the exact day in here.

So, you also -- you had written a story about your OM story. Do you remember that like being in March?
A Like OM kind of things, yeah.
Q Right.
And do you remember talking about how orgasm returned you to yourself? Do you remember that?
A I don't remember what I wrote very thoroughly.
Q Okay. Let me show you, to refresh your recollection, Defense Exhibit 12-C.
You don't have to read the whole thing.
A I mean, I remember writing this, having gotten --
Q Let me -- sorry. Let me point you to the last paragraph.
A Uh-hum.
THE COURT: Sorry. Are you trying to refresh her recollection or something else?
MS. COHEN: I was trying to refresh her recollection.
THE COURT: What's the question?
MS. COHEN: If she remember about writing that orgasm returned her to herself.
THE COURT: The last answer she gave is she remembered writing this. Is there another question?
Q Do you now remember writing this story?
A Yes. And I see the sentence that says that.
Q Does that refresh your recollection that you felt that at

that time?
A Yes.
Q And you felt that, you know, in addition to orgasm, that you had found your home. Do you remember feeling that way?
A I don't know if I said that in here, in fact.
Q Well, you could just take one more look at the last paragraph.
THE COURT: Are you asking her if she wrote something or if she remembers it?
MS. COHEN: If she remembers --
THE COURT: Okay.
THE WITNESS: Yes, it's written there.
Q So you remember that.
And do you also remember that you felt that you found your people at OneTaste?
A Yeah. I mean, that was one of the things that was a big part of the OM community was like a family, and I did feel that in being there. It was one of the biggest draws.
Q Yeah. I was going to say because one of the things that you had, I don't know, maybe it was one of the -- that we looked at today, I think, but you felt lonely before; right?
A Yes.
Q And this gave you a sense of community?
A Yes.
Q And you met very good friends there; right?

A I met some. Not everyone that I was there with has been a friend, but, yes.
Q And you also, in the Nicole Daedone Intensive, you also filled out a questionnaire before that. Do you remember doing that?
A Yes.
Q Do you recall writing about key defining moments in your time at OneTaste?
A Not specifically, but I -- it rings a bell. I don't remember what I wrote.
Q Well, if we can -- do you remember -- maybe this will refresh your recollection, that one of the key moments was when Rachel showed you how much she loved you right before CP late in October. Do you remember writing that?
A Not specifically. If you want to pull it up, I'm happy to take a look.
MS. COHEN: 12-D, as in dog. This might be one of the....
THE WITNESS: Thanks.
MS. COHEN: Your Honor, do you have a paper copy or do you need another one?
THE COURT: I have one. Thank you.
Q Does this refresh your recollection that was one of your defining moments?
A I wrote that. I don't remember what that's referring to

specifically.
Q Okay. And do you remember also writing that when Nick -- is that Nicole Daedone? Do you refer to her as Nick?
A Yes.
Q When she gave you the stroker, you needing to rest after your father's death?
A Yes.
Q And do you recall that another stroke was, I'm sorry, another defining moment was when you agreed to buy OneTaste New York?
A Yes.

THE COURT: Ms. Cohen, it's 5:29. If you have one or two more questions on this topic, you can do that. If not, we can stop for the evening.

MS. COHEN: Yes, I'm sorry. I have probably about 15 minutes more.

THE COURT: Is now a good time to stop?

MS. COHEN: Yes, that's fine.

THE COURT: Okay. So we're going to do that.

I'm going to ask the witness to step down for the evening.

(Witness steps down from the witness stand.)

THE COURT: Okay. We will reconvene at the usual time tomorrow, and everybody has been so punctual. I really appreciate it. So 9:15 in the jury room, so that we can start

at 9:30. I know I kept you waiting a little bit this morning. I apologize for that again.

Over the evening break, don't discuss the case with anyone, including among yourselves. If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino.

Don't read, listen to or watch any news or other media reports on the trial, and don't conduct any independent research about the case, about the matters in the case or the individuals involved in the case.

Don't talk to the parties, the attorneys, the witnesses about anything. Keep an open mind and get a good night's sleep. I will see you tomorrow.

(Jury exits the courtroom.)

THE COURT: Okay. Everyone could be seated.

Can you give me the lineup for after this witness is off the stand?

MS. BENSING: Yes. I think after her, we expect to call the financial analyst and after that, we may call another victim witness or we may not, in which case we would go directly into the FBI summary agent, who I anticipate would be the last Government witness.

THE COURT: Okay. Tell me approximate timeframe on the financial analyst. Maybe that will depend on what you work out with the defense. I don't know can.

MS. BENSING: For how long it will take?

THE COURT: Yes.

MS. BENSING: Maybe around an hour, Your Honor.

THE COURT: Okay. And then for the summary agent?

MS. BENSING: Well, that depends in large part on the admission of the text messages that the Court has.

THE COURT: Okay. And then the potential other witness, approximately how long?

MS. BENSING: If we call her, I think she would be around an hour to 90 minutes on direct examination, but we may not call her, Your Honor.

THE COURT: Okay. But you'll have the person available?

MS. BENSING: Yes.

THE COURT: Because I don't want to take any breaks.

MS. BENSING: Yes.

THE COURT: Then we'll end in time tomorrow for lunch, so Ms. Cohen can get upstairs for her conference.

And you think it's going to be relatively short?

MS. COHEN: The conference? Oh, yes. It's a bail revocation.

THE COURT: So you will still have a little bit of time for lunch. Okay.

Ms. Bensing?

MS. BENSING: If we could, it sounds like we may not

be in a position to rest tomorrow, but I'm always optimistic.

So if we are, I think the Government's request would be to take the weekend to just ensure that both parties, that we have all of the admitted exhibits. We have provided a copy of the exhibits that we believe have been admitted to the defense. So that is a process that's underway, Your Honor. I just wanted to raise that and then with respect to --

THE COURT: I guess the issue is, though --

MS. BENSING: The Court needs to have it as well.

THE COURT: Correct.

MS. BENSING: Understood.

So we've provided it to the defense. They are going to take a look at it. We have been talking to them about it.

THE COURT: Okay.

MS. BENSING: Then we should have a defense exhibit list, a Government Exhibit list. We've noted the places where either party like made redactions, so we can make sure that we have the appropriate admitted copies.

THE COURT: Great.

MS. BENSING: I think we're going to have it organized for the Court, I hope. But we're in the process of doing that, as the Court requested.

THE COURT: Yes. I'm not going to let you rest until I've got the exhibits and everybody has agreed on what came in. I don't think it's smart to do that. So whatever

you can to do to speed that along.

MS. BENSING: And then can you remind me, Your Honor, what's the Court's preference is -- you don't send all of the exhibits back with the jurors; right?

THE COURT: I don't.

MS. BENSING: Okay.

THE COURT: Nor do I send the indictment back, which I think was a question that somebody had at some point along the way.

MS. BENSING: Okay.

THE COURT: There will be a snippet of the indictment that is set out in the jury instructions, but I don't send the indictment back. I do send the instructions back.

MS. BENSING: So what I think we'll plan to do amongst the parties is to have a hard set of all the admitted exhibits, so if the jurors ask for it, it will it be ready to go back to them.

And the Government plans to have a clean -- like nothing else on a laptop that we can put video exhibits or audio exhibits on, unless the Court wants to play them out here.

THE COURT: I think it will depend on exactly what they're asking for and the volume. And let's see how that goes.

MS. BENSING: Okay.

THE COURT: Is whatever you would be proposing to load it onto, something that would be very user-friendly for a juror to navigate if they needed to play something?

MS. BENSING: Yes, the way we normally do it is to have a log we can give to the jurors and -- whatever the parties agree on and the Court agrees on should go back in a folder on a desktop. So very obviously placed.

THE COURT: Okay. Have you talked to the defense about this?

MS. BENSING: I talked briefly with one set of counsel. I haven't had a chance to talk to the other set. We will do that.

THE COURT: Okay.

MS. BENSING: And then I just wanted to raise with respect to the defense case.

They've told us who they anticipate I think their first witness to be. There are still about 20 witnesses on this list. I'd note that we don't have any kind of 26.2 material for I think around ten of them.

And so the Government would be requesting some kind of proffer as to what these people would be testifying about, so that we have some kind of understanding of whether or not we would want to preclude their testimony, whether or not we think it's appropriate or relevant for them to testify.

THE COURT: Right.

MS. BENSING: What the scope of it would be. We have really no idea and no way to prepare.

If we get 26.2 material at this point, I would have to take a look at the volume, but I think we would be moving to preclude them calling the witness, given that we have been raising this issue of 26.2 material over and over and over again for the past however many months.

I just did want to put that on the record that we are still kind of in a position of having really no idea what some of these witnesses --

(Continued on following page.)

(Continuing.)

THE COURT: Right. Is there 26.2 material forthcoming?

MS. COHEN: All of the material, Your Honor, has already been produced that we have, and we made a massive production.

MS. BONJEAN: Yes. We made a huge production of material. I don't --

THE COURT: Ms. Bensing, do you know what they're referring to?

MS. BENSING: Yes. We received some 26.2 material for some of the witnesses. There's about 10 of the 20 who they've identified for whom we don't have any 26.2 material.

And so again, I'd be asking for some kind of --

THE COURT: Ms. Cohen looks like she's not sure about what you're saying, Ms. Bensing.

MS. COHEN: No, no. I'm saying we produced Rule 16, we produced 26.2. You know, we produced a massive amount of material. If there's nothing related to the witnesses, we don't have it.

But I think pretty much, I can't think of anyone we mentioned that there -- that there isn't anything about them. I did give a proffer of, you know, what -- what some of these witnesses will say. We can do certainly do that more.

I think we have -- we can -- you know, we have a

little bit of a narrower list. And I now know -- now that we know the timing, I think I know who our first three witnesses will be.

THE COURT: Who are they?

MS. COHEN: Sorry.

MS. BONJEAN: I was going to say some of the witnesses we have identified they interviewed. At least --

THE COURT: Okay. But are you representing that you produced any 26.2 material to the Government --

MS. BONJEAN: Yes.

THE COURT: -- for the witnesses that you anticipate calling?

MS. COHEN: Yes.

MS. BONJEAN: We have produced what we have. But what I'm saying is to the extent that they want an additional proffer, a lot of these people they interviewed themselves.

THE COURT: I think what they were asking for is the 26.2 material.

You've now represented that you've given everything that would fall within 26.2 for the witnesses you anticipate calling.

MS. BONJEAN: Correct.

MS. COHEN: Yes.

MS. BENSING: I -- I hear what they're saying.

So with respect to some of these witnesses, though,

I still have no idea what they're going to testify to. We would want some kind of an actual proffer as to that so that -- you know, there a number of pretrial rulings as to the scope of what --

THE COURT: Well, who are the witnesses? Let's just go through.

MS. COHEN: Yes. And I will say as I started to proffer some of them the other day, we are trying them to specific testimony in this case. We are aware of the ruling.

So, the first three witnesses -- let me just confer and make sure Ms. Bonjean is in agreement.

THE COURT: Okay.

(Pause.)

MS. COHEN: Okay. So I believe in terms of order, now this -- we'll give exact order, but within these four people.

THE COURT: Yes.

MS. COHEN: Madelyn Carl, Marissa Ward. I'm going to butcher that last name.

MS. BONJEAN: Antonios -- I can't pronounce it.

MS. COHEN: It's a tough one. We'll get the --

MS. BONJEAN: H.

MS. COHEN: We'll just go with H.

But the Government did interview that witness, so they know who that is. And the fourth person is Courtenay Lapovsky.

MS. BENSING: Your Honor, just because the Government may have interviewed a witness or attempted to interview a witness I don't think really solves the problem of having no idea of what the defense is intending --

THE COURT: Right. So tell me what the subject matter of the testimony you anticipate from Ms. Carl and then Ms. Ward and Mr. H and Courtenay L?

MS. BONJEAN: Your Honor, I mean we're happy to do that, but --

THE COURT: Just in general.

MS. BONJEAN: -- in general, first of all, Maddie Carl, as the Court may recall, was Michelle Wright's friend, lover, was alleged to have been Reese Jones's handler. There's a whole host of -- at the same time living with Michelle Wright.

There was -- you know, the Government knows what she's going to testify about. They put Michelle Wright on.

THE COURT: I'd like to know.

MS. BONJEAN: Yes. Well, I'm giving -- I'm giving the broad strokes, no pun intended.

I am telling the Court that it's, basically, all the subject matters that Michelle Wright testified to that would correspond to when they were together. For instance --

THE COURT: So, will she be testifying about things she observed about Ms. Wright, is that what you're telling me,

or no?

MS. BONJEAN: Well, she was -- according to Ms. Wright, she and Ms. Carl were asked to be Reese Jones' handler at the same time.

THE COURT: But that's what I'm asking you.

Are you anticipating she will be testifying to things she saw or heard that you think are relevant?

MS. BONJEAN: Sure, of course.

MS. COHEN: For sure, for sure.

MS. BONJEAN: Yes.

Antonios is a witness who Gana [sic] -- Dana Gillport indicated she was forced or maybe she didn't the use the word forced, but asked to have sex with for sales. So, we will testify regarding specifically that type of testimony. And that was her testimony.

He's allegedly the customer that the Government contends was part of the labor, right.

Who else?

MS. COHEN: Marissa Ward, who will testify specifically about her observations concerning certain testimony from this past witness, Anthia Gillick, as well as Michal Neria.

And then Courtenay Lapovsky lived in the OM house with Michal. I believe she overlapped with Brooke. Sorry, with --

MS. BONJEAN: And these are people at the same classes, doing the same things, like Michal Neria.

THE COURT: I understand now more what you're saying about who they are, but are you anticipating that they will be testifying as to things they saw or heard or did themselves?

MS. COHEN: Correct.

MS. BONJEAN: Yeah. Yes.

THE COURT: Okay. And then you said there was -- that's it, four of them?

MS. COHEN: Those are the first four, yes.

THE COURT: Okay. Okay. And are there -- I guess are there categories of people that are not similar to these people?

MS. BONJEAN: So, there are some people who are for a very limited purpose to address a specific allegation --

THE COURT: Okay.

MS. BONJEAN: -- that was made by one of the government witnesses.

And I'm not saying we're calling her, but I think Jenny Slusher is on our list. That's an example of -- I think one of the witnesses said that Rob Kandell -- I think it was -- was it Lianna Lifson, I believe, testified that Rob Kandell directed her and Jenny Slusher to go makeout or give oral sex, whatever it was, to a particular person.

So, if we were to call Jenny Slusher, you know,

that -- that event would be fair game because they made it fair game. That's the type of evidence we're talking about.

Now, if something changes, we will pull people off the list. But, you know, again this is --

THE COURT: Do you have any reason to believe that any of the people that are going to testify or that you're planning to call will invoke?

MS. BONJEAN: Not at this time. And nobody we've -- well, I don't know. There's a couple people who I think the Government has said are unindicted co-conspirators, but I mean that list has grown for them. I don't -- you know, I don't know what to make of that.

But most of the people on our list have never been identified. Maybe tomorrow they'll identify them as unidentified co-conspirators, but so far most of them are not.

MS. BENSING: Your Honor, I think there was just one individual who was on their list, Aubrey Fuller, for whom the Court has heard significant testimony.

THE COURT: Okay.

MS. COHEN: And Ms. Fuller, we've already told the Government, has counsel.

THE COURT: That was going to be my next question.

Okay. I thought you said something.

MS. BENSING: No, no. I was just going to say so there's just a number -- you know, there's 20 people still on

this list. So there's a number of people beyond these four or five now that we've heard about for whom we don't know what the scope of their testimony would be.

THE COURT: All right. So, let's just go through them.

Who else do we have?

MS. BENSING: So they have an individual for whom they haven't provided -- I'll just go through the ones for whom we have no 26.2 material.

Henry Debusmann, Alison Wahl, Alexis Ware.

I think they've indicated they're not calling Andrea Marz. Is that correct?

MS. COHEN: That's correct.

MS. BENSING: Kal Holczler.

I believe that you've indicated, Celia, that you're not calling -- well, David Hutchinson, Malacai Kenji.

I think those are the individuals remaining for whom we don't have any 26.2 material.

THE COURT: Okay. So, who is Mr. Debusmann?

MS. BONJEAN: Mr. Debusmann is the individual that's been referenced a number of times who set up this reconciliation, I guess, committee.

And, Your Honor, we're happy to do this, but like we have to talk to our clients and we might be in a better position to let the Government know whether --

THE COURT: Okay. I mean there's one issue.

There's the issue of letting the Government know and giving them what they're entitled to so we can have an efficient end to this trial.

The other issue is that I need to have sufficient information if there are materials that you're going to be using because I anticipate that I will be having to make evidentiary rulings. So, I need more information sooner rather than later.

Recognizing that you don't have to put on anybody. So, you know, maybe your list is over-inclusive at this point, but I do need to have a sense of who these people are.

MS. BONJEAN: Sure.

THE COURT: And what you would anticipate doing with them.

MS. BONJEAN: Understood.

THE COURT: I don't need all the nitty-gritty details necessarily, but -- but in, you know, just general terms are these eyewitnesses to events? You know, what's the purpose of them?

MS. BONJEAN: Yeah. I mean I think Debusmann was, again, an eyewitness to the extent that he was the person that set up this reconciliation.

THE COURT: This is not Ulysses?

MS. COHEN: No.

THE COURT: This is somebody other than Ulysses.

MS. BENSING: But, again, with something like that, I think the Government would have a relevance objection to that testimony if that's the proffered scope of the testimony.

THE COURT: Depends on what it is.

MS. BENSING: Yes. So, if he's talking about setting up the reconciliation committee --

MS. BONJEAN: I don't think we should have to pre-try our case either.

THE COURT: No, that's right, but there will be objections and --

MS. BONJEAN: Understood. We understand what the Court's ruling is. We, obviously, disagreed with it.

THE COURT: I made several rulings.

MS. BONJEAN: No. I mean about this issue, about the scope of testimony --

THE COURT: Yes.

MS. BONJEAN: -- about the types of witnesses we can call.

We maintain our objections that the Government went far and wide about the culture of OneTaste and we should have the opportunity to rebut it beyond just specific allegations. That's our position. And we believe, you know --

THE COURT: All right. So, Debusmann.

MR. ROBOTTI: And Mr. Debusmann also shared a room

with Dana Gill. So, he was her roommate during the time period that she testified about and, you know, I expect him to testify about her activities while she was there, which has been an issue with her testimony.

THE COURT: But you wouldn't be seeking to try to put in any hearsay statements, I take it?

MR. ROBOTTI: No. This would be his observations.

THE COURT: Okay.

Wahl, what was her role? I mean, obviously, all these names have been mentioned.

MS. COHEN: Yes. So, she has specific testimony regarding Michal Neria and Misha and their relationship. She also -- I don't have my notes in front of me, but I believe she also has information about certain -- certain things that were testified about today.

Again, none of this is -- it's going to be their observations about specific events. So --

THE COURT: Okay.

MS. COHEN: -- I need to regroup on her, but I know there are a few more issues --

THE COURT: Okay.

MS. COHEN: -- a few more details we could provide that I just don't have.

THE COURT: Okay. And Ware? Did I get the name right, Alexis Ware?

MS. COHEN: Oh, yes. This -- that is possible we may not be able, based on scheduling. We anticipated going into the following week and I don't know we'll make it. So, let us go back and I think she can only testify the following Monday.

THE COURT: Okay.

MS. COHEN: Again, I think it was more helpful if I could -- if we could talk and look at our notes.

THE COURT: That's fine.

MS. COHEN: Just because there's so many names now.

THE COURT: That's fine. I do want to know the general type of witness somebody is. And part of it, too, is to figure out the length of these examinations.

MS. COHEN: Yeah. I think most of them will be, again, because, you know, we're talking about specific -- specific testimony.

MR. ROBOTTI: And while she's looking that up, Your Honor, Mr. Hutchinson, we advised the Government yesterday he's an outside sales consultant. He authored a presentation the Government used yesterday to attempt to refresh a witness's recollection about the Step-Up sales procedure. They referenced this a number of times as the process by which someone is taken to their pain.

So if he does testify, he would testify about the fact that he trained OneTaste on this process and explain what

exactly that means in this context.

MS. BENSING: But again, the Government, I guess, on that proffer would move to preclude this witness's testimony. I don't see any basis for the relevance of that, Your Honor.

MR. ROBOTTI: The Government introduced this testimony repeatedly about the sales tactics used by OneTaste, and we have introduced evidence that they were trained by outside sales consultants. They have raised this issue repeatedly that supposedly they were taught to take people to their pain. That has a very specific meaning that they were trained upon, which is at odds with the Government's representation.

THE COURT: But who is the "we"? Is this person going to say that a particular person was trained by him?

MR. ROBOTTI: He trained the entire sales team in the 2014 time period. He's the outside consultant that came in and trained them about the process to use in order to sell this product.

And the Government has made repeated issue about the sales tactics that were used here. We have argued repeatedly that these were common sales tactics that are used, and he will talk about the fact that he has trained OneTaste on these sales tactics.

THE COURT: But what does that matter if what they testified to is different than what the training was?

I don't -- I don't -- I'm not saying it is or is not, I don't remember well enough exactly the testimony you mean, but to me I do think there would be a relevance issue potentially. But, again, it depends on the specifics.

MS. BENSING: Yes.

So, just again on that proffer, what is relevant here is what the witness's testimony was and how it impacted them and the actions that they took. And they've already readily agreed where it came up that an outside salesperson trained them. So, if there were other questions about the scope of that training or what the training meant, the witness was here and they could have asked about it. So, I don't -- again, we would move to preclude that witness based on the proffer.

But this is kind of the problem is that we don't know. And so, I think it's going to be very deeply inefficient to have the Government be objecting to every question when we have no clue what people are going to be testifying to. And I think --

THE COURT: All right. Let's --

MS. BENSING: I'm sorry, Your Honor.

And just as is typical in every trial I've ever done, we've gotten, at least, some kind of proffer with respect to defense witnesses so we can have these kinds of motions prior to the witness testifying.

MR. ROBOTTI: And, Your Honor I'm having a hard time with this representation right now because I told Ms. Bensing yesterday that the presentation she tried to introduce into evidence was the substance of this testimony.

So, we did tell her yesterday about what this testimony was going to be.

In addition, the Government has put at issue what it means to sell to someone's pain. And it has a very specific meaning that they are misleading the jury about because this outside sales consultant taught the company about what that means. We should be entitled to explain what that means because they opened the door to it.

THE COURT: I'm not convinced yet, but, you know, you can try to convince me on this. It doesn't sound relevant at all or appropriate.

Let's go to Mr. -- that was who, that was Hutchinson?

Let's go to Malacai. I don't know the last name. I didn't take it down.

MS. COHEN: Yes. There was specific testimony regarding Malacai from Dana Gill.

MS. BONJEAN: And Michelle Wright, I think they all lived together.

MS. COHEN: And Michelle Wright.

THE COURT: Okay.

MS. BONJEAN: And I think they were all living this sort of nomadic life and they all went to OneTaste together.

THE COURT: Okay.

MS. BONJEAN: It was Dana Gill, Michelle Wright, Malacai. I think -- who?

THE COURT: Okay.

Did I cover everybody or did I miss Mr. Holczler?

MS. BONJEAN: One other thing that I wanted to raise Your Honor.

THE COURT: Yes.

MS. BONJEAN: I am going to just briefly point it out.

One of the expert witnesses that we proffered on -- om potentially was Dr. Ley, beyond the coercive control stuff, which, of course, we're not -- we're not trying to put in.

THE COURT: Right.

MS. BONJEAN: And we're not trying to put on the so-called cult expert.

But the one narrow issue that is still up for grabs, and I think -- I think -- I don't know if the Court ruled expressly on it and I don't know the Court -- I just don't remember. I feel like the Court left it open.

THE COURT: What's the issue?

MS. BONJEAN: It's about the science behind orgasmic meditation.

(Continued on the following page.)

(Continuing.)

THE COURT: Nobody is arguing that there wasn't a benefit, right? I mean, I think pretrial many, many months ago when the defense wasn't quite sure what the Government was going to be arguing, I think there were discussions more about this, but I would not think it would be at all helpful to a jury to have an expert talk about the science of orgasmic meditation, if that's what you're anticipating.

MS. BONJEAN: I just want a ruling on it, Your Honor.

THE COURT: What is your proffer on why you think that that would be appropriate at this time for all three prongs of Daubert?

MS. BONJEAN: Yes. So, for one, if -- the Government has not taken a position that it's beneficial. They've taken the position that it's a sexual act that was used for prostitution essentially.

THE COURT: The Government isn't taking positions in front of the jury. The witnesses are testifying.

MS. BONJEAN: Calling it genital rubbing. That's not what it's called it.

THE COURT: Well, there was a document that went up on the screen at one point that referenced genitals and rubbing and I believe it was a OneTaste document.

MS. BONJEAN: It is genitals and rubbing, but --

that's how it done --

THE COURT: But I think you took issue with the term the Government used, but I think it was in a OneTaste document.

MS. BONJEAN: The opening statement, I'm sorry, did not portray orgasmic meditation as a meditative practice. They were very clear in how they presented it, that it was a genital rubbing practice.

THE COURT: Does anybody know what document I'm referring to? It was a lengthy document. I flipped through it and one of the pages used "genital rubbing."

MS. BENSING: Yes. I think in other places at least there's an admitted exhibit that refers to it as a sexual practice, but to --

THE COURT: Ms. Bonjean is still talking.

MS. BONJEAN: We're not really pushing back -- I think it would be silly to say that you can't perceive it as a sexual practice, but it a meditative practice and a sexual practice. I think that's fair for most -- I don't know that Ms. Daedone would agree with that, but I do think it is a fair interpretation and that's not really my quarrel with the Government.

I think that because of the nature of the practice and the way the Government has laid out its case that the practice was used -- was used to -- it was used for a

financial benefit much in the way other sexual acts are used; basically, again, as an analog to essentially prostitution and I think that that has the potential to prejudice the jury. They may see it only in that light.

THE COURT: I do not know -- you listened to the same testimony I've listened to, right? There's been a variety of views from various witnesses about it being -- what it is, whether it's beneficial, whether it's not.

I think largely the view was everybody was interested which is why they went to the organization. So what exactly would you want an expert to testify to?

MS. BONJEAN: That there's actual scientific data that has been done that has been accepted in the scientific community that demonstrates that there are health and medical benefits to it.

THE COURT: And you think that's relevant to the jury's determination of the two elements that they're going to have to determine?

MS. BONJEAN: Yes, because I think it's relevant to demonstrate that Ms. Daedone and Ms. Cherwitz's ideas were not just some cult-like craziness and that they were creating this scheme. They believed in the practice and it turns out the practice has been proven in the scientific world to have medical and health benefits.

I mean, the Government is going to argue that this

was just a scheme; that this was just a way to make money by using this practice and our position is that it makes it more likely that it was not a scheme and it was not just done as some sort of --

THE COURT: You don't think the jury can understand these issues based on the very clear testimony, varying testimony, across witnesses? We can take this up more tomorrow, but I'm hearing your argument, but I'm not particularly convinced at this point, but we can take this up more if you have more specifics that you think it's relevant to.

I think the Government is not doing what you are basing this argument on. I think there may have been arguments. There was a lot of briefing prior to trial motion practice, but in terms of what is actually coming out on the witness stand and through the exhibits, I'm not convinced that this will be appropriate.

MS. BONJEAN: I will concede at the minimum that there are plenty of witnesses who agreed that it was a beneficial practice and some who even agreed to this day that they thought it was a beneficial practice, while there were others who took a different position.

THE COURT: Who are you thinking of in terms of taking a different position on the practice itself?

MS. BONJEAN: When asked what was sexual labor many

of them said the OM practice itself, which suggests that they don't see it as a meditative practice; they see it as a sexual practice from which OneTaste financially benefited, so --

THE COURT: But that doesn't seem like it would be inconsistent about what you're arguing about there being science behind it.

So, I have a very strong concern about jury confusion on some of these issues.

MS. BONJEAN: Understood.

THE COURT: And the witnesses are all saying their own experiences, their own views. They're not all consistent with each other. Different people have different views on things, which is not surprising.

I can hear the Government out on this, but we can also take it up tomorrow.

MS. BENSING: I think our perspective is that it's wholly irrelevant and the way that we previewed the case and the way the case has come out has been that people feel differently about the practice.

It's not the practice that's on trial, it's the defendants and the question OF whether or not there was a conspiracy to commit forced labor which has nothing to do with the scientific benefits of orgasmic meditation.

THE COURT: Okay. It's 6 o'clock. I'm going to let you all go.

MS. FARRELL: Your Honor, I'm sorry. While we're on 26.2 can we very briefly address -- I think Your Honor even this morning acknowledged or noticed that the defense has been receiving defense exhibits throughout the trial from OneTaste lawyers passing things up.

As you may recall, there are dozens of video interviews of people who were involved in OneTaste.

THE COURT: Yes.

MS. FARRELL: The Government was given a very limited production of those in connection with I think an innocence proffer many years ago and, throughout, the defense has claimed that they don't have access to those videos. I think we had briefed this issue. We had said that Ms. Daedone was a plaintiff in a lawsuit that I think relied on those videos. We briefed it. Whatever is in the brief is accurate and I think what I'm stating is consistent with that, but if I'm wrong, the brief is correct.

But if any of these people have recorded videos which the defense has access to, which they clearly do. They're getting unlimited, it seems, materials from OneTaste, we would like those videos. And if they're not produced to us, we would definitely move to preclude those on the fact that Rule 26.2 materials were not provided to us. We wanted to flag it for the Court again.

MS. BONJEAN: First of all, there's a lot of

assumptions being made about where we get materials. It's not the case that we have access to OneTaste servers or -- we don't have access to these videos and we've briefed this issue. I mean --

THE COURT: Have you been denied access or you have not asked for access?

MS. BONJEAN: My understanding is that they were found privileged by Judge Chen.

THE COURT: Which -- I think there's a different set of videos that the Government is talking about.

MS. FARRELL: No. Videos were -- there was a subpoena sent for the videos and at the time Judge Chen held that there was an assertion of work product by OneTaste and the Government at the time years ago had not established exhaustion and -- I'm forgetting the other element.

But now we're in trial, we don't have access to the videos. These people are going to testify. It seems that they have -- that the defense has full access to these materials.

THE COURT: She's saying she doesn't.

MS. BONJEAN: I don't. I mean, we don't have full access.

THE COURT: So the company is refusing to give it to you; is that right?

MS. BONJEAN: First of all, I don't know what the

list is of the people and I don't know if anyone on our list are people that there are videos for. So that's a starting point. I would have to do a comparison. I'm not sure that they would give me that information.

The Government -- we are not one and the same. I cannot be clearer about that and we do not always -- you know, we have obviously, you know, a -- there's a relationship --

THE COURT: That is clear. Different relationships I'm sure on different issues.

MS. BONJEAN: Correct, but it's not as clear cut and I'm not going to, based on -- there's certain privileges I'm not going to reveal here, but the Government is making some assumptions that I can tell you are inaccurate.

MS. FARRELL: Our understanding is that there is a lawsuit in which Ms. Daedone and OneTaste are aligned, are jointly parties in which those videos have been used. And, so, even if defense counsel does not have access to the videos, our understanding is that at least the defendant does based some filings in this earlier in time lawsuit.

MS. BONJEAN: You should have moved to compel somewhere else. I don't know ma to say. I don't know what lawsuit they're referencing. OneTaste has a couple of lawsuits. We all know that.

I don't know what lawsuit they're referencing, but I think they did issue a subpoena and they tried to get them.

They were denied. They didn't, as far as I know, appeal it. They didn't bring it up again and now they're ready to rest and they're bringing it up now as if it's our job to do their job and it's not.

MS. FARRELL: But if a defendant has access to these videos that constitute 26.2 material and they're not being produced and these individuals are called as defense witnesses, that's where the problem lies.

MS. BONJEAN: They're not employees of OneTaste. They're just not. Ms. Daedone and Ms. Cherwitz are not employees of OneTaste.

THE COURT: I think that is a different issue.

MS. BONJEAN: There's no cult exception as far as I know.

THE COURT: She's making a distinction between materials in your client's possession, if not in your own.

MS. BONJEAN: Sure. I understand. And what I will do is out of an abundance of caution is ensure that my -- if my client has any statements that are of witnesses that we intend to call that we will produce those. I will have her do a double-triple check. I can do that. I understand what 26.2 is but the videos are a different bucket of information.

THE COURT: Okay. You'll talk to each other, but that's a helpful representation.

Is there anything else?

MS. FARRELL: Nothing, Your Honor.

MS. BONJEAN: Nothing.

THE COURT: I'll see everyone tomorrow then, 9:30.

(Matter adjourned until 9:30 a.m., Friday, May 30, 2025.)

- ooOoo -

# I N D E X


| WITNESS | PAGE |
|---|---|
| **ANTHIA GILLICK** | |
| DIRECT EXAMINATION BY MS. FARRELL | 3917 |
| CROSS-EXAMINATION BY MS. BONJEAN | 3991 |
| CROSS-EXAMINATION BY MS. COHEN | 4138 |

**E X H I B I T S**



| Exhibit | Page |
|---|---|
| Government's Exhibit 3164, Page 2 | 3946 |
| Government's Exhibit 4414 | 3987 |
| Defense Exhibit 12-BY | 4049 |