UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
May 30, 2025
Defendant. : 9:30 a.m.
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Stacy A. Mace
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Richard Hobbs, Trial Direct, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
United States Courthouse, Room N377A
225 Cadman Plaza East
Brooklyn, New York 11201
smacerpr@gmail.com

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: This is United States of America versus Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta and Sean Fern, joined by Paralegal Specialists Liam McNett and Marlane Bosler, and FBI Special Agent Tricia Quintero.

Good morning.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

On behalf of Rachel Cherwitz: Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge, Kelly Lenahan-Pfahlert and Richard Hobbs.

THE COURT: Good morning, everybody.

MS. BONJEAN: And good morning, Your Honor.

Jennifer Bonjean, Kelsey Killion and Ashley Cohen, and Galila Assefa on behalf of Ms. Daedone.

THE COURT: Good morning, everybody.

Okay. So our jury is here, and we can bring back our witness and the jury.

And I believe, Ms. Cohen, you're still on cross-examination?

MS. COHEN: Yes. And I have just about 20 minutes, max.

THE COURT: That's fine. And you know what, let's go at 12:25, so you can get upstairs.

MS. COHEN: That would be great.

THE COURT: But if for some reason I don't do it, just get my attention, but you're on my mind.

MS. COHEN: Great. Thank you, Your Honor.

(Pause.)

(Witness entered and resumed the stand.)

THE COURT: Good morning.

(Pause.)

(Jury enters.)

THE COURT: Good morning, everyone. You all may be seated.

And, Ms. Cohen, you may resume your cross-examination.

MS. COHEN: Thank you, Your Honor -- sorry.

THE COURTROOM DEPUTY: Ms. Gillick, the Court reminds you, you are still under oath.

THE COURT: Go ahead.

MS. COHEN: Yes, thank you.

(Continued on the following page.)

**ANTHIA GILLICK**,

previously called as a witness by the Government and having been duly sworn/affirmed by the Courtroom Deputy, resumed the stand and was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MS. COHEN:

Q Good morning, Ms. Gillick.

A Good morning.

Q You testified yesterday that your family disapproved of OneTaste.

Do you recall that?

A Yes.

Q And -- but you also testified that your mom helped with the purchase of OneTaste New York, correct?

A She was on those e-mail threads. Her money was not involved in the purchase of it.

Q Right. But you consulted with her, correct?

A Yes.

Q And she visited you in New York and you talked about how she watched your aerial show, right?

A Yes.

Q And you went to a Matilda play with her. Do you recall that?

A I don't.

Q Do you recall that on September 20th, 2014, you wrote in a chat that you were grateful for your mom's approval of your involvement in your OMing.

Do you remember that?

A I don't. I'm happy to look at it, if you'd like.

Q Sure.

Let me show you what's been marked as Defense Exhibit 12-AW.

MS. COHEN: Just for the witness. And, again, we'll blow this up.

THE COURT: Can you see that?

THE WITNESS: It could be a little bit bigger. Thanks.

THE COURT: Can you make it bigger? It's very hard to read.

MS. COHEN: Can you make it bigger?

THE COURT: I'm having trouble. Is there a way to make it bigger or no?

MS. COHEN: Maybe it's helpful if you could highlight the line starting with the -- here. That would be easier to see.

Oh, you can't see it? Sorry.

(Pause.)

MS. COHEN: I have the paper, but I think it's worse, but I'm happy to --

THE COURT: As long as the witness can read it.
THE WITNESS: I can.
BY MS. COHEN:
Q And does that refresh your recollection that you said you were grateful for your mom's approval of your OMing?
A Yes. This is a gratitude list, which is an exercise that we did a lot.
Q And do you recall that Rachel Cherwitz also -- she told you she loved you in that e-mail, do you recall that?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Do you recall writing that Rachel Cherwitz said she loved you?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Do you recall writing that you -- do you recall expressing your love for Rachel Cherwitz in that e-mail?
I'm sorry.
Do you recall writing to Rachel Cherwitz and expressing your love at that time?
A Yeah, it's written on the page here.
Q And that was in September of 2014, right?
A Yes.
Q Okay. I'm going to show you a series of photos. I handed them up.

A Uh-hum.
Q Okay. They are marked as Defense Exhibit 12-AI.
A Yep.
Q 12-N -- sorry. I have to do this for the record.
A No problem.
Q 12-AJ; 12-AR, as in Ralph; 12-Q; 12-B, as in boy, C, as in cat; 12-B again, E as in Edward, BE; 12-G, as in golf, V as in Victor; 12-GW.

When you've had a chance to look --

THE COURT: Let me just make sure I have those.

MS. COHEN: Sure.

THE COURT: Was the second one just 12-N or was there another letter?

MS. COHEN: Just 12-N, as in Nancy.

THE COURT: And the second -- the third one was 12-A --

MS. COHEN: J, as in Jack.

THE COURT: Okay. Thank you.

BY MS. COHEN:
Q Ms. Gillick, do you recognize these photos?
A Yes.
Q And do you appear in all of them?
A Yes.
Q And are they a fair and accurate depiction of the photographs that were taken at those times?

A Yes.

MS. COHEN: Okay. Your Honor, at this time, the defense moves to admit -- do I need to read them all over?

THE COURT: No, I'll read them.

MS. COHEN: Okay.

THE COURT: Is there any objection to any of these exhibits?

MS. FARRELL: I'm sorry. We're just still trying to --

THE COURT: That's fine. Take a minute. Do you want me to say then again?

MS. FARRELL: Yes, if you don't mind just reading them out.

THE COURT: Okay. And then Ms. Cohen can check me if I'm correct on this.

MS. COHEN: Sure.

THE COURT: 12-A1 -- or is it AI?

MS. COHEN: No, I think it's AI.

THE COURT: AI.

12-N, 12-AJ, 12-AR, 12-Q, 12-BC, 12-BE, 12-GV, 12-GW.

MS. FARRELL: No objection, Your Honor.

THE COURT: Okay. So all of those that I just read out are admitted.

(Defense Exhibits 12-AI, 12-N, 12-AJ, 12-AR, 12-Q,

12-BC, 12-BE, 12-GV, 12-GW, were received in evidence.)

MS. COHEN: Thank you, Your Honor.

So those are admitted. Can we pull up for the jury, Defense Exhibit 12-AI?

(Exhibit published.)

BY MS. COHEN:

Q And, Ms. Gillick, do you --

MS. COHEN: Actually, can we scroll up so she can see the date?

Q Well, first, I'll ask you who's depicted here?

A Myself, Michelle Wright and Aubrey Fuller.

Q Okay. Is that Michelle Wright in the middle?

A Yes.

Q And it's hard probably for the jury to see, but do you see November 10th, 2013?

A Yes.

Q Would that have been when you in CP7?

A Yes.

Q All right.

MS. COHEN: And if we could show Defense Exhibit 12-N.

(Exhibit published.)

Q And this photograph is from March of 2014.

So, this is when you were in New York City, right?

A I don't think the date on that is correct. It may have

been when it was posted, but I don't think it was when it was taken.
Q Do you remember when this was taken?
A Yeah. That was taken before I joined OneTaste at all.
Q Oh, okay. This was in New York City?
A No, it's in San Francisco.
Q Oh, okay. Sorry.
MS. COHEN: Next one, AJ.
(Exhibit published.)
Q And this is May -- this appears to be posted on May of 2014.
Do you recognize this?
A Yes.
Q Where was this taken?
A In San Francisco.
Q And can you tell us who's in the picture with you?
A Henry -- I don't remember his last name -- and myself, Margot Fried, Ali Wahl, Caitlin D'Aprano, Diego Vargas, and Clouds deNavarez.
Q And Clouds is the one we heard about yesterday who you moved in with in 1080, right?
A Correct.
Q And are all these other people part of OneTaste?
A Correct.
MS. COHEN: And can we -- and this -- sorry.

Q May of 2014 is right before you moved to New York City, right?
A Correct.
MS. COHEN: And can we show the next one as 12-AR.
(Exhibit published.)
BY MS. COHEN:
Q And this is -- looks like it's from July 2014.
Would that have been when you were in New York City?
A Yes.
Q Do you remember what you were doing there?
A Getting my nails done with Maya.
Q And Maya, that's Maya Gilbert?
A Correct.
MS. COHEN: And then this next one might be hard on the screen, but we'll try it.
12-Q. It's a little dark.
THE COURT: Oh.
MS. COHEN: Oh, yes. Can you zoom that in? I think this is November 15th, 2014.
Q Is that -- is that right around your birthday?
A Yes.
Q And were you celebrating your birthday here?
A Yes. This is at the Nicole Daedone Intensive.
Q Okay. And it's hard to see, but who's the person bringing the cake?

A Rachel Cherwitz.

MS. COHEN: And then can we look at 12-BC.

(Exhibit published.)

BY MS. COHEN:

Q And this was from January 2015. Do you remember -- is that you in the front?

A Yes.

Q And -- and do you remember where you were?

A This is CP7.

Q And can you see -- do you recognize anyone else in this photograph?

A Yeah. Amanda is in the front. I believe that's Peter Crann next to me. Kenan Wang is in the black T-shirt. Rachel Cherwitz is -- and Rachael Hemsi are standing on either side of the camera. And that's Mark -- I can't remember his last name -- from London.

Q Okay.

MS. COHEN: All right. Can we show the next one? This is 12-B, as in boy, E as in Edward.

Q This is February 2015, I think -- 2015, no --

A Yes.

Q Yes. So you would have been in New York City at this point?

A Yes.

Q And do you recognize the people in this picture?

A Courtenay Lapovsky is there and Dana Lawrence. I vaguely recognize the woman next to the woman in the blue shirt towards the front, but this was like a lead gen event. So these were new people, and I don't remember their names.

MS. COHEN: And can we show 12-GV. G as in golf, V as in Victor.

(Exhibit published.)

Q And so this is from September of 2016.

So that was after you left, a little over a year after OneTaste?

A Yeah. I don't remember this. Like I don't remember if this date is correct or what -- when this is from. I'm assuming it's in LA because Maya and Eli are there, but I don't remember this event.

Q Okay. But it was posted on September 15th, 2016, right?

A According to the paper. Like I said, I don't remember when this was taken or when it was posted.

Q Okay.

A It's on Maya's account.

Q And with respect to when it was posted, it was a little over a year after you left OneTaste, right?

A Correct.

Q And Eli and Maya were still associated with OneTaste at that time, right?

A Correct.

MS. COHEN: And then finally, can we show Defense Exhibit 12-GW.

Okay. I can put it on the ELMO if you've got a problem.

(Exhibit published.)

MS. COHEN: Okay.

BY MS. COHEN:

Q Do you recognize this photograph? Do you know where it was taken?

A Yes, it was taken in Turkey.

Q And this was from May of 2016, right?

A That's correct.

Q So, again, that's about almost a year after you -- you left OneTaste, right?

A Correct.

Q And do you recognize the other woman with you?

A Yeah, that's Summer Engman.

Q And was she also a part of OneTaste?

A Not at the time. She had left as well.

MS. COHEN: Okay. We can take that photograph down.

BY MS. COHEN:

Q And the other person in the photograph, who is --

A That's my husband, Carl Gillick.

Q All right. You -- after you left, do you recall right after sending a message to Rachael Hemsi?

A No, not specifically.

Q Let me -- let me ask you -- well, let me show you Defense Exhibit 12-I.

MS. COHEN: Just for the witness.

Q This is a long one, but --

MS. COHEN: Yeah, if we could just blow up the top part.

Would a copy help or --

THE COURT: I think you should give her a copy.

MS. COHEN: Okay. At least this is a little darker.

THE WITNESS: Thank you.

BY MS. COHEN:

Q I'll just ask you, Ms. Gillick, do you recall sending a message -- does this refresh your recollection that you sent a message to Rachael Hemsi?

A Yes.

Q And do you recall that you expressed your love for Rachael Hemsi as well?

A Yes.

Q And this was after you left, correct?

A Yes.

Q And do you recall that you also expressed concern about Rachel Cherwitz? Do you recall that?

A I haven't gotten to that part.

(Pause.)

Q Are you on --
A Yeah, yes.

MS. FARRELL: Your Honor, I object to improper hearsay and improper refreshment.

THE COURT: The last question was: Do you recall that you also expressed concern about Rachel Cherwitz? Do you recall that part?

And then she turned to the document and said: I haven't gotten to that part.

But what the -- what Ms. Cohen is asking you is about your recollection. She's not asking you to read from the document and tell her what's in the document. She's asking you --

THE WITNESS: Okay.

THE COURT: -- if looking at the document refreshes your recollection.

THE WITNESS: It does.

THE COURT: Okay. Go ahead.

BY MS. COHEN:

Q So you expressed concern, and do you recall that you wanted to reach out to Rachel?
A Yes.
Q Now, after you left OneTaste, you went home to Aspen first, right?
A Yes.

Q And then you went to Hawaii, correct?
A Yes.
Q And you went to Burning Man in August, correct?
A Yes.
Q And do you recall posting on Facebook on August 28th, 2015, and thanking Rachel for the inspiration she had been in the last year?
Do you remember that?
A Vaguely.
Q Is there something that would refresh your recollection?
A If you have a posting.
MS. COHEN: Can you show the witness 12-EZ?
THE WITNESS: Can you make it larger, please?
MS. COHEN: If you can go to the second paragraph. I mean -- sorry -- blow up the second paragraph.
THE WITNESS: Yes.
BY MS. COHEN:
Q Does that refresh your recollection that you thanked her for being an inspiration to you in the past year?
A Yes. Rachel had been doing like a celebration of happiness. This is in reference to an experiment that she'd been doing, and I was inspired by it.
MS. COHEN: Thank you, Your Honor. I have no further questions.
THE COURT: Any redirect examination?

MS. FARRELL: Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. FARRELL:

Q Good morning, Ms. Gillick.

A Good morning.

Q You started cross-examination being asked questions about your memoir --

A Yes.

Q -- do you recall that?

How does your memoir that you're writing differ from your testimony here today?

MS. BONJEAN: Hold on. Objection to form and --

THE COURT: Sustained.

Q Does your memoir differ from your sworn testimony today that you're giving?

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q You testified that your memoir is a work of art, is that correct?

A Yes.

Q And are there fictitious elements to it?

A I've rearranged a lot of the timeline, in particular, to make it flow better.

It's also a teaching memoir, so there's tools and things that I learned before, during and after my time at

OneTaste. It's a broader scope.

Q And would you agree that's different from your testimony in connection with this trial?

A Yes.

Q Is there -- in your view, is there a difference between having no privacy, as you testified for two-and-a-half years, and living in a commune setting?

A Yes. One of the biggest differences, I think, is a choice. And they're like -- there's -- there's a lot of things beyond the -- the privacy that, like, were....

Like in a normal commune, you would, you know, kind of come and go, and you wouldn't -- if you were gonna go to yoga, it wasn't just Bikram. Like, there's -- there's a lot of different aspects that I would say were quite different.

Q We looked at a document where you had listed that a hard no for you was having a bad boss.

A Yes.

Q What -- what changed from when you wrote that document?

A I -- the -- the message of -- I mean, I came to believe very deeply in a lot of the teachings that Nicole Daedone did, as well as the practice, itself. And it -- it -- it, over time, kind of replaced any goals and things that I wanted in my life, and that became my whole mission in life. And there was -- I would put up with almost anything to -- to further that mission as I got further in.

Q And switching topics: Ms. Bonjean cross-examined you and asked, essentially, that you didn't have to take out a credit card to take any of the OneTaste courses.
Do you remember that line of questioning?
A Yes.
Q Did you ever hear or witness either Rachel Cherwitz or Nicole Daedone telling others to take out credit cards to pay for courses?
A Yes.
Q What did you see?
A Several people during my CP7, when they signed up for further courses at the end of the course, as well as, in particular, one of my coaching clients here in New York -- her name was Jen. I don't remember her last name.
MS. COHEN: Objection to hearsay.
THE COURT: Overruled.
BY MS. FARRELL:
Q Continue testifying to what you personally witnessed.
A Rachel Cherwitz asked me to bring her in for a sales conversation to enroll in -- in further classes. I believe she signed up for Mastery.
And I was sitting -- it was at the New York Center and I was sitting in the main room when the door was open to one of our coaching rooms, and I overheard Rachel telling her to open three credit cards to take Mastery because she had

absolutely no money whatsoever.

Q You also were cross-examined about the time you spent with family while you were at OneTaste.

A Yes.

Q Were there any important events in your life that you missed because of OneTaste?

A Yes.

Q What?

A One of my best childhood friends had asked me to be her bridesmaid for her wedding, and it was the -- it ended up being the day that Rachel Cherwitz called me and -- and told me that there was, like, one weekend left in the year that didn't have, like, a wedding scheduled at it to -- to be completed at the end of the course. And so that was the only option left for Raph and I to get married, and it was the same weekend as my childhood best friend who I had known since I was three. And so, I had to call her and tell her that I could no longer be her bridesmaid and or attend her wedding.

Q And ultimately, did you end up attending her wedding?

A I did end up attending her wedding because it was after I left, but not as a bridesmaid.

Q And what was your mental space that you were willing to miss, you know, being a bridesmaid at your best friend's wedding in order to get married at the end of that OneTaste course?

MS. COHEN: Objection.

MS. BONJEAN: Objection. She didn't miss the wedding.

THE COURT: Overruled.

A I -- I was incredibly devastated that I had to make that call, but I felt -- I felt trapped. It felt like the only, like, path forward that was allowed to happen. Like, I was -- I was engaged and I was supposed to get married quickly and that was my one option.

Q So, there were some -- you were cross-examined about selling your aerial silks business in September -- in 2014.

Do you remember that line of cross-examination?

A Yes.

Q And I believe you testified that you ultimately sold it sometime in early November 2014. Is that correct?

A Yes.

Q And you also testified about a person named Po.

Who was Po?

A Po was one of the co-owners of OneTaste New York.

Q And where did Po live?

A In --

Q In which city?

A Here in New York, in Brooklyn.

Q And is Po the person you testified did not live in The Bunker?

A Correct.
Q Was Po also an owner of OneTaste New York City?
A Correct.
Q Along with you --
A Yes.
Q -- and others?
If you know, where did Po have the money to be a OneTaste owner like you?
MS. BONJEAN: Objection; hearsay.
THE COURT: Response?
MS. FARRELL: I can ask a follow-up question, Your Honor.
THE COURT: Okay. Sustained.
BY MS. FARRELL:
Q Given that you and Po jointly purchased a -- a franchise at OneTaste, do you have familiarity with her financial situation?
A Yes.
Q And if you know, what was her financial situation such that she was able to purchase the franchise alongside you?
MS. BONJEAN: It's an objection. It can't be anything but hearsay.
THE COURT: Overruled.
Q You may answer.
A She had a lot of real estate investments, primarily down

in Philadelphia, that she had -- had built up wealth around.

Q Okay.

MS. FARRELL: And I'd like to show the witness what was shown yesterday. It's Defense Exhibit 12-FZ.

And if I may approach with a copy, Your Honor?

THE COURT: Yes.

THE WITNESS: Thank you.

BY MS. FARRELL:

Q Do you -- do you recognize this as one of the text message threads with Po that I think Ms. Bonjean showed you yesterday?

A Yes.

Q And this is in reference to you going to -- where you say" I'm at the doctor's.

Do you recall this --

A Yes.

Q -- line of questioning?

Okay. I want you to look very carefully at this text thread. Read it from the top, all the way to the bottom.

A (Witness complies.) Yes.

Q Now, let me ask -- now, typically, did you and Po live in the same time zone?

A Yes.

Q And in this -- on this October 30th, 2014 text thread, does it appear that you and Po are in the same time zone?

A No.
Q And what, if anything -- why, for any reason, would you have been traveling in -- on October 30th, 2014, out of New York?
A This would have been when I was in San Francisco to close down Aspen Aerials, my business, my aerial silks business.
Q And so -- and this references you going to the doctor, is that correct?
A Yes.
Q Is there a reason you would have gone to the doctor when you were outside of The Bunker, as opposed to while you were in New York?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A Yes.
Q Can you explain that?
A This would have been the first time I got a little bit of time and wasn't as observed.
Q All right. You can put that aside.
Ms. Bonjean asked you yesterday about maintaining friends from OneTaste after you left OneTaste.
Do you recall that line of questioning?
A Yes.
Q Were any of those friends people who also left OneTaste?
A The majority of them were, yeah.

Q And was there a difference between being able to maintain relationships with people who had left OneTaste versus people who remained within OneTaste?
A A large difference.
Q Could you explain that difference?
A Yeah. Just as when I was in OneTaste and I had to go offline and ask permission to see family and friends and it was restricted to an hour, that was the -- the amount -- once I was outside, that was the amount that, like, I got to spend with anyone who was still in OneTaste.

So, they would -- I'm sure they were posting and saying "offline." But like, basically, I would have got just an hour with them.

And it was incredibly hard to arrange. And I did -- I had very few, like, contacts and text messages in between. And I needed to be in the city that they were in. Like, there was no, like, meeting in between. There was no travel.

And that picture with Summer Engman, who -- we were very close for a long time after both leaving OneTaste. You know, she was living in Turkey at the time. My husband and I were traveling in Europe and we were able to, like, meet up there.

So, there was like -- the people who had already left, I could have like a normal sustained relationship where we would, you know, find each other and meet in the middle and

there was lots of, you know, conversations and phone calls and texts and time spent with each other. And it was more -- it was more than that, like, hour in, hour out.

Q And we also looked at a text thread -- you looked at a text thread yesterday from October 2nd, 2014 with Maya Gilbert where you were talking about wanting to have a -- have sexual relations with Rob Kandell.

Do you remember that text thread?

A Yes.

Q And was that after Mr. Kandell had left OneTaste?

A Yes.

Q And so -- and I think you testified about these text messages talking about needing to hide it from Rachel Cherwitz.

Do you recall that?

A Yeah, from -- from everyone. It was -- Rachel Cherwitz and Nicole Daedone had expressly forbidden that we communicate with Rob because he had left.

Q Ms. Bonjean also asked you about the Brooklyn OM House being separate from the franchise that you purchased.

Do you recall that?

A Yes.

Q At the time that you were living at the Brooklyn OM House, was there a New York City, a separate New York City franchise?

A No.
Q It was only after you moved out of the Brooklyn OM House that you purchased the New York City franchise, is that correct?
A Yes. It was -- it was formed after I moved out of the Brooklyn OM House.
Q So the question about them being separate entities was -- was not about -- was about a later-in-time period, is that correct?
A Yes.
Q Okay.
You also, in response to one of Ms. Bonjean's questions, you said: Ravi was always going to be the finances for Ayries.
Do you recall your testimony?
A Yes.
Q What did you mean by that?
A Ayries didn't have any money and she didn't -- like, she would not have been able to afford any kind of investment. So -- and since they were ceremonially married in a relationship, it was like her husband funding a business venture.
Q And do you have knowledge of Ravi's financial situation, given that you participated in a joint financial venture with him?

A Yes.
Q And based on your knowledge, what was Ravi's financial situation?
A Ravi came from a very wealthy family, and he was the main, and to my knowledge still is today, money manager of his -- all his family's finances.
Q We looked at a number or we looked at least at one policy regarding the Coaching Program.
Do you recall that?
A The Code of Conduct?
Q Yes.
A Yes.
Q And I believe you testified that that was relevant to you being a student at the Coaching Program?
A Yeah. It governed the teachers and staff of the Coaching Program that I was a student in.
Q Like their conduct towards students?
A Correct.
Q I want to focus on the policies pertaining to employees or owners of OneTaste. Okay?
A Uh-hum.
Q So, we talked about the student policies applying when were you a student, but let's focus on the time that you're an owner and then an employee.
Were there any -- to your knowledge, were there any

policies in place protecting employees from superiors at the company, instructing them to engage in certain sexual activity?
A I didn't know of any written Code of Conduct for employees, period.
Q Okay. And to the extent there were written policies, is it your understanding that they were always followed?
MS. BONJEAN: Objection to -- objection to the form of that question; foundation.
THE COURT: Sustained.
BY MS. FARRELL:
Q And so just to back up, you don't even recall there being any policies applying to employees, is that correct?
A Correct.
Q Okay. And is that with respect to protection of employees?
MS. BONJEAN: Objection to the foundation.
THE COURT: Sustained.
MS. FARRELL: Okay.
Q So, Ms. Bonjean questioned you about not being in the in-crowd was the only reason for your mental distress.
Do you remember that question?
A I don't remember it phrased as that. I remember something about not being in the in-crowd.
Q Was being in the in-crowd the only reason for your mental

distress at the time?
A No.
Q What were the other things contributing to your mental distress?
You could just list them off.
A Yeah, I mean, I think more than anything, it was the like, as I said, sort of the, like, lack of choice. I didn't feel in control of my sleep schedule. I never picked, like, during work hours, like 11:00 p.m. I could pick, but I never picked what I ate.
There were -- I did not pick any kind of exercise that I did. It was -- it was always like I said, the Bikram, the Soul Cycle. It was exactly the same thing and I had to go.
Yeah. I -- I just like, I felt completely out of control really, and including a lot of times either which sexual partners or the fact that I had to have sex every day didn't -- didn't felt in my control. And to have it governed by a company was very hard to wrap my head around.
Q In fact, you were cross-examined extensively about your belief about whether you were or were not permitted to do certain things, correct?
A Yes.
Q Whether or not Rachel Cherwitz directed you to do certain things?

A Yes.
Q And about whether what you're saying on the stand now is -- is credible, right?
A Yes.
MS. BONJEAN: Objection.
THE WITNESS: Sorry.
THE COURT: Overruled.
BY MS. FARRELL:
Q And you were questioned about whether you have any text messages to prove what you testified to on direct, is that right?
A Yes.
MS. FARRELL: Well, I'd like to approach, Your Honor.
THE COURT: Yes.
Sorry. What are you handing up?
MS. FARRELL: Sorry. I'll put it when I have the mic.
THE COURT: Thank you.
Q Ms. Gillick, I just handed you Government Exhibit 906.
Do you recognize this document?
A Yes.
Q Is this a document you wrote outlining a number of your concerns with respect to OneTaste?
MS. BONJEAN: I'm going to object to the leading.

THE COURT: Overruled.
A Yes.
Q And do you recall when you wrote this?
A Yes.
Q When was it?
A It was in the spring of 2015, before I left.
Q And if I showed you a document, might it refresh you on the particular date or month that you wrote it?
A Yes.
MS. FARRELL: I'm going to ask that Mr. McNett pull up Government Exhibit 1852 for the witness.
If you could zoom in. Just go up to the top, please.
BY MS. FARRELL:
Q Do you see the -- the date of the top e-mail?
A Yes, January 18th, 2015.
Q And does this refresh your recollection that you wrote Government Exhibit 906 either on or before January 18th, 2015?
A Yeah. I had been working on it for at least a couple days before I sent it.
MS. BONJEAN: Objection.
THE COURT: Basis?
MS. BONJEAN: Foundation.
THE COURT: Overruled.
Q So just so the record is clear, does this -- does

Government Exhibit 1852 refresh your recollection that you wrote Government Exhibit 906 either on or before January 18th, 2015?
A Yes.
Q And that is when you were still at OneTaste --
A Yes.
Q -- is that right?
Was it, in fact, about six months before you left OneTaste?
A Yes.
Q And in this document that you wrote at the time that you were at OneTaste, did you express many of the same concerns that you testified about yesterday under oath?
A Yes.
MS. BONJEAN: Objection.
THE COURT: Overruled.
MS. FARRELL: Your Honor, I'll move to admit Government Exhibit 906 as a prior consistent statement.
MS. BONJEAN: Objection to the hearsay. It's -- it's not prior consistent as to everything, and --
THE COURT: Okay. Sustained.
MS. FARRELL: I'm happy to go through page-by-page.
MS. BONJEAN: No.
Your Honor, this is -- this is rank hearsay.
THE COURT: Sustained. Sustained.

MS. BONJEAN: No authenticity.
THE COURT: Sustained.
You can ask your next question.
MS. FARRELL: Thank you, Your Honor.
BY MS. FARRELL:
Q So, Ms. Gillick, yesterday on cross-examination you were challenged on your testimony that -- that people were shamed and beat up on, correct?
A Yes.
Q And did you write in this document concerns about people being shamed and beat up on?
MS. COHEN: Objection.
MS. BONJEAN: Objection, Your Honor. It is --
THE COURT: Sustained as to foundation.
Q Did you express concerns about shaming in this document?
MS. BONJEAN: I'm going to continue to object.
THE COURT: Okay. Sustained.
Give me one moment.
MS. BONJEAN: And also, I'd ask for a sidebar.
THE COURT: Give me one moment to read it.
(Pause.)
THE COURT: We're not going to have a sidebar.
You can ask your next question. I sustain the last objection.
Q So, were you cross-examined about whether or not people

were actually shamed at OneTaste?
A Yes.
Q Were you cross-examined about whether or not you were actually leading a monastic lifestyle separate from the outside world at OneTaste?
A Yes. I don't believe the word monastic was used, but yes.
Q Were you cross-examined about whether or not while at OneTaste you were encouraged not to talk to people who had left OneTaste?
A Yes.
Q Were you cross-examined about whether you had genuine fear and paranoia during your time at OneTaste?
MS. BONJEAN: Objection; misstates --
THE COURT: Overruled.
A Yes.
Q Were you cross-examined about whether Rachel Cherwitz actually overstroked you and others?
A I don't believe the word "overstroked" was used, but the concept, yes.
Q And the concept being her berating people, correct?
A Yes.
Q Were you cross-examined about that?
A Yes.
Q And was it suggested you were not accurately depicting

how it had been?

MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: Sustained.

MS. FARRELL: Okay.

BY MS. FARRELL:

Q Were you cross-examined about whether or not you were able to interact freely with family and outside friends?

A Yes.

Q Were you cross-examined about whether it was acceptable to speak up against people in power at OneTaste?

A Yes.

MS. BONJEAN: Objection.

THE COURT: Overruled.

Q Were you cross-examined about whether you had control over going to medical appointments?

A Yes.

Q And about whether your body was in your control versus your boss's control?

MS. BONJEAN: Objection. That misstates the --

THE COURT: Overruled.

A Yes.

Q Were you cross-examined about whether what was best for you came from higher-ups at OneTaste?

A Yes.

Q Were you cross-examined about whether people were actually exhausted and pushed past their breaking points?
A Yes.
Q Were you cross-examined about whether they genuinely felt shame based on what they were told by their superiors at OneTaste?
A Yes.
Q Were you cross-examined about having genuine feelings of being unsafe?
A Yes.
Q Were you cross-examined about people genuinely feeling like they had been harmed?
A Yes.
Q Were you cross-examined about whether you genuinely learned not to trust yourself?
A Yes.
Q Were you cross-examined about whether your life, in fact, had been deeply impacted by what you had experienced at OneTaste?
A Yes.
Q And prior to yesterday and prior to being cross-examined on all of those topics, had you, in fact, documented your concerns on all of the topics that we just discussed --
A Yes.
MS. BONJEAN: Objection.

THE COURT: Overruled.
Q -- while you were at OneTaste?
A Yes.
Q And did you write those down in Government Exhibit 906?
MS. BONJEAN: Objection. This is hearsay.
THE COURT: Overruled.
A Yes.
Q And, again, was that written in January, on or before January 18th, 2015?
A Yes.
Q And so, is document -- Government Exhibit 906 a document in which you expressed all these concerns at that time?
A Yes.
Q Years before you were cross-examined in this case?
A Yes.
MS. FARRELL: Your Honor, we move to admit Government Exhibit 906 --
MS. BONJEAN: Your Honor.
MS. FARRELL: -- as a prior consistent statement.
THE COURT: Are you objecting?
MS. BONJEAN: Yes.
THE COURT: Sustained.
MS. FARRELL: May we have a sidebar, Your Honor?
THE COURT: How much longer do you have?
MS. FARRELL: I'm done.

THE COURT: Okay. Go to sidebar.

(Sidebar held.)

(Sidebar conference held on the record in the presence of the Court and counsel and the defendants, out of the hearing of the jury.)

THE COURT: We're at sidebar and everybody is here, including the two individual defendants.

I sustained the objection. I'm not going to permit the entirety of the document to come in on the foundation you laid.

If there are specific statements that are prior consistent that are appropriate to admit based on the cross-examination, I would consider admitting them, of course. But this entire document I'm not going to let in based on the foundation.

So, if there are statements that you want to pull from Ms. Bonjean's cross-examination and you want to point me to specific statements here, we can do that. But I'm not going to allow this document to come in in its entirety.

MS. BONJEAN: I would also point out, Your Honor, the -- this document does not speak in terms of herself. It says, we, friends. There's -- almost every reference is not necessarily about her own experience even. She's talking about --

THE COURT: Look, I'm not letting in the entirety of

the document --

MS. BONJEAN: Right.

THE COURT: -- because there would need to be a more granular analysis done.

MS. BONJEAN: And I would also point out that my cross-examine didn't -- cross-examination didn't suggest she just made it up now. I mean, I -- no, I think --

THE COURT: Ms. Bonjean, again, we'd have to go through --

MS. BONJEAN: Yeah.

THE COURT: -- statement-by-statement.

MS. BONJEAN: And this was never sent to our clients. So, I know --

THE COURT: That's a separate issue.

MS. BONJEAN: That's a separate issue.

But initially, they wanted it in for notice purposes. It's not notice. It was sent to Mr. Kandell after he left, and he helped edit it. So, there's that problem.

There's an authenticity problem that it's not really even her words. It's also Mr. Kandell's words after he leaves.

MS. FARRELL: That's not this exhibit. You're talking about 907.

THE COURT: Yes. There were two versions.

MS. FARRELL: Right.

THE COURT: I think the Government had said one had the comments of Kandell and one didn't. This is the one that didn't.

MS. BONJEAN: Okay. But I don't know the timing of that.

THE COURT: But that's a separate issue from what your objection was.

MS. BONJEAN: And since it wasn't sent to our -- I just want the record to be clear, it's not a notice issue because it was never sent.

THE COURT: Right, I understand that proffer. It was not notice.

MS. BONJEAN: And if they want to put it in as a prior consistent statement based on something specific she was cross-examined on, I mean, it's certainly not this whole thing.

And also --

THE COURT: But this is what I'm saying. You and I are agreeing, Ms. Bonjean. But the question now is --

You said you had nothing else.

MS. BENSING: Well, Your Honor, can we just make a quick record?

THE COURT: Yes, of course.

MS. BENSING: They attempted to --

THE COURT: You have to speak up a little bit.

MS. BENSING: They attempted to impeach her entire credibility. They suggested that she was making things up for purposes of a memoir, that she was making things up for purposes of a screenplay.

And so, I think the Government has the right under 801(d)(1)(B) to introduce a prior consistent statement. That's before those things --

THE COURT: Yes, but not this entire document.

MS. BENSING: So, I think what we can do, or what we will seek to do, is then go statement -- Ms. Farrell just asked a bunch of things like, did you say X on cross-examination, Y on cross-examination.

So rather than repeat all of those, I think what we will seek to do is just say, isn't it true as of January -- I don't have the exact date.

MS. FARRELL: 18th, 2015.

MS. BENSING: -- 2015, you said X at that time.

And so, rather than going through the whole document, we'll go statement-by-statement.

MS. BONJEAN: They're going to need to point to the actual testimony.

Again, so many of these statements are not even clear that she's referring to something she has personal knowledge of.

THE COURT: Okay. You and I are agreeing,

Ms. Bonjean, that this has to be specific statements and a specific cross-examination, but I do think that there are statements in here that are appropriate for the reasons that you have proffered.

MS. FARRELL: Understood, Your Honor.

Just to reiterate. There are two subsections of the rule, and one is to rebut a specific statement. And then Subsection 2 is to rehabilitate the declarant's credibility as a witness.

THE COURT: Right. Right.

MS. FARRELL: And so, we're really seeking admission of the entire statement on that basis.

THE COURT: I'm not going to allow it.

MS. FARRELL: Not going -- understood. Just to --

THE COURT: Go ahead.

MS. FARRELL: But just rather than -- we think, Subsection 2 allows us, rather than going statement-by-statement based off specific questions, given that her entire credibility was attacked, and to do it more generally.

THE COURT: No, I understand the rules.

I also know that this is a very lengthy document that covers many different categories, and the entirety of it is not admissible based upon what has been established so far.

MS. FARRELL: Understood, Your Honor.

So, my intention is, I have, I think, about ten portions highlighted on my version that are to specific to questions asked by -- on cross-examination. My intention is only to elicit those specific statements.

THE COURT: All right. Why don't you talk to Ms. Bonjean and Ms. Cohen and Mr. Robotti about those, so that I know whether there's going to be objection to specific statements.

MS. BONJEAN: Right.

THE COURT: And it's a bit early to take a break, but we could do that.

MS. BENSING: Well, I assume they're going to object, Your Honor, and so I don't know if it makes sense.

THE COURT: Well, let me --

MS. FARRELL: May I just ask it and then they can object, and you can sustain it or overrule it, based on --

THE COURT: The problem is, you're not going to have in front of you or you're not going to be presenting to me the exact testimony on cross-examination.

MS. FARRELL: That's correct.

THE COURT: Right.

And that will take some time for me to be able to evaluate it. Right?

MS. FARRELL: Understood.

You know, can I talk to Ms. Bensing for a minute?

THE COURT: Yes.

(Pause.)

MS. FARRELL: All right. I'm going to just wrap up.

THE COURT: Okay.

(Sidebar discussion concluded; proceedings continued.)

(Continued on the following page.)

(Continuing.)

THE COURT: You may proceed, Ms. Farrell.

BY MS. FARRELL:

Q Thank you. Ms. Gillick, just to wrap up that thread, fair to say that in January 2015, you expressed and wrote down many of the same concerns that you discussed in your direct testimony?

A Yes.

Q And did you share this document with anyone within OneTaste?

A I expressed a lot of these concerns to Ulysses and Po.

Q And who is Ulysses?

A Ulysses Slaughterhouse of the reconciliation council.

Q The gentleman who was running the reconciliation council?

A Yes.

Q And was that in connection with all of those phone calls you described?

A No, separately.

Q Okay. And then lastly we looked at a document where you had listed one of your -- something that you could bring or offer to OneTaste as being that you trust your gut. Do you remember that?

A Yes.

Q During your time at OneTaste, were you able to trust your gut?

A There was a lot of like discussion and strengthening of intuition and stuff, but -- sort of at the beginning but eventually I became very -- I questioned my gut very deeply because Rachel Cherwitz and Nicole Daedone and many other staff that was there, because of that limbic connection that I mentioned in my testimony earlier, I would say that they could say I could feel better than what I did because they were senior practitioners of OM and I began to question myself very deeply.

MS. FARRELL: No further questions, Your Honor.

THE COURT: Any recross-examination?

MS. BONJEAN: Yes.

RECROSS EXAMINATION

BY MS. BONJEAN:

Q Ms. Gillick, you talked about not having choices, but you demonstrated time and time again that you did have choices; right?

A The choices that I made against the stroke had consequences.

Q Okay. Well, everything happens consequences, right, in life?

MS. FARRELL: Objection.

THE COURT: Overruled.

A Yes.

Q Okay. So you said -- you made some comment that you

didn't have the choice to come and go but that's not in fact true. You went, for instance, to a three-month training for the circus arts right?
A I was not a OneTaste employee during that time.
Q You were never a OneTaste employee; right?
A Correct. I was not a OneTaste owner at that time.
Q Okay. You were an owner, but you were never a OneTaste employee; isn't that right?
A Yes.
Q Okay. And for all of this terrible experience that you had, you decided to buy a franchise; right?
A Yes.
Q So let's talk about coming and going. You went to a three-month training for circus arts or aerial silks; right?
A Yes.
Q You traveled to San Francisco for your business; correct?
A Yes.
Q You went to the Hamptons and San Francisco after you bought the franchise, right?
A Yes.
Q That wasn't with OneTaste people; correct?
A The Hamptons was not.
Q Okay. You went to Bali. You didn't go with the OneTaste people to Bali; right?
A Correct.

Q You went to lunch from time to time with and without OneTaste folks; correct?
A Correct.
Q You went for massages sometimes with and without OneTaste folks; correct?
A Correct.
Q You said you had to go to Bikram, but you also could have gone to Soul Cycle and, in fact, you did?
A There were particular days that we could each as a group and I had to go to the ones that we were all going to together.
Q You didn't have to. You chose to.
A It didn't feel that way.
Q Why didn't it feel that way? I'm still not following. What was it --

What did you experience that you felt like, I have to go to Bikram?
A I felt that if I didn't do what was on stroke and what was happening with the group that I would be punished, ashamed, called out by Rachel Cherwitz in particular.
Q You would get kicked out of the group chat, is that what you were concerned about?
A That was one of the things.
Q Okay. You testified on redirect that you came to believe in the teachings of Ms. Daedone so deeply that it became your

whole mission. Do you remember that?
A Yes.
Q Because her teachings resonated with you, you tried to follow them; right?
A Yes.
Q But she repeatedly told you, you don't have to follow them; this is my experience, but you don't have to make it work for you and maybe it doesn't; right?
A Yes.
Q And, in fact, we even looked at paperwork where you acknowledged that these ideas were controversial because they are and were; right?
A Yes.
Q We looked at paperwork that says you don't have to -- they may not work in your own life; right?
A Yes.
Q But you, for whatever reasons during this time period, found that they did resonate with you; correct?
A Yes.
Q And no one forced that on you, that was your own experience with them at the time; correct?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You could have walked out the door and gone to some other

organization where there were some different teachings right?
A Doing so meant losing everyone in this teaching organization, but yes, I could have.
Q You said losing what?
A It meant losing everyone inside OneTaste.
Q But of course it did, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Leaving an organization where people deeply believe in something that you now have rejected and going to another friend group would necessarily mean leaving the first friend group, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q So in your life, you had friends from childhood; right?
A Yes.
Q And you probably have stayed in touch with a couple of them; right?
A Yes.
Q And that's a normal transformation in life; correct?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:

Q It's not unusual to lose touch with friends because you're no longer in the same place; right?
A Yes, sorry, I'm confused. I didn't lose touch with some of my childhood friends though.
Q You did lose touch with some of them I assume; right?
A Yes, yes.
Q And you're still in touch with some of them; right?
A Yes.
Q How about your college friends; are you in touch with some of them?
A Yes.
Q And you lost touch with some of them; right?
A Yes.
Q Your life looks very different now than it did in college; right?
A Yes.
Q Now you're married; right?
A Yes.
Q You probably have friends that are also expecting kids in your community; right?
A Yes.
Q And those are your friend groups now; right?
A Yes.
Q You're probably on a group chat or two with moms or soon-to-be moms; right?

A I don't have any group chats. I have mom friends that I talk to.
Q Right. And then when you have a child, you'll be friends potentially -- I don't know if you have any other kids, but the kids go to school, right?
MS. FARRELL: Objection. This is going way outside the scope of the redirect.
THE COURT: Sustained.
BY MS. BONJEAN:
Q The point is, Ms. Gillick, when you left OneTaste you knew that one of the consequences is probably you would lose touch and have less communication with the people at OneTaste; right?
A I lost touch with everyone that stayed.
Q Well, that's not true. You had a text conversation with Ms. Cherwitz herself; isn't that right?
A After a while I lost touch with everyone that stayed.
Q Right, because you were no longer participating in that community, right?
A I tried to participate for a long time.
Q Well, did you want -- well, you just testified on redirect that you complained in 2015 about some of the issues you complained about in your testimony. Do you remember that?
A Yes.
Q Okay, so, did you want in or did you want out at that

point?
A I wanted the -- I wanted to stay in very deeply and I wanted things to change.
Q So you wanted the best of both worlds; right?
A Yes.
Q And you understood that they felt very strongly about their belief systems; correct?
A Yes.
Q Are you saying that they don't have the right to feel strongly about their belief systems?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You know there are devout Catholics and evangelicals and all types of religions. Are you saying they don't have the right to feel strongly about their religion?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Do you think you have the right to go to any club that you want to and not follow the rules of that club?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You said on redirect examination that you over heard

Rachel Cherwitz suggesting, encouraging, someone to take out credit cards, right, or take out -- open credit cards to make payments for a course?
A Yes.
Q Okay. You weren't in the room though; right?
A I -- there was an open door and I was a number of feet away.
Q And that person -- did that person ultimately take out a credit card to the best of your knowledge?
A Three of them.
Q And they weren't -- they chose to do that, they filled out the application, right?
MS. FARRELL: Objection.
THE COURT: Overruled.
Q Right.
A Rachel helped them fill out the application.
Q That person had to put in his or her own information into a credit card application. You understand how all of that works; right?
A Yes.
Q So Ms. Cherwitz you understand is a salesperson; right?
A Yes.
Q And you understand that she -- that -- if she's suggesting to you or anybody else you can take out a credit card that person can also say no; right?

A Yes.
Q Your testimony also on direct -- redirect was that you blame OneTaste because you weren't a bridesmaid of one of your childhood friends, do I have that correctly?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Was that what you testified to; that you couldn't go to -- well, you did go to the wedding; right?
A Yes.
Q Okay. And then you came back to OneTaste; correct?
A No, I went to the wedding after I left OneTaste.
Q So, you made the choice to leave OneTaste and go to the wedding, right?
A It wasn't the reason I left OneTaste, but yes.
Q I understand, but you chose to leave OneTaste; right?
A Yes.
Q And you went about your life and did things that you wanted to do; right?
A Yes.
Q And you could have made that choice on day one; right?
A Yes.
Q You could have made that choice on day 30; correct?
A Yes.
Q You could have made that choice on day 60; correct?
A Yes.

Q You could have made that choice on day 365; correct?
A Yes.
Q You could have made that choice on day 649; right?
A Yes.
Q And then you eventually made that choice; right?
A Yes.
Q And you continued to use the word or the Government uses the word "directed," but again directed to have sex -- you didn't have to have sex with all the people you chose to have sex with, did you?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You could decide yourself who you did and did not want to have sex with, right?
MS. FARRELL: Objection I think we're way past the scope.
THE COURT: Overruled.
Q Correct? You could choose who you did and did not want to have sexual activity with; right?
A At certain points, yes.
Q And, in fact, you did choose not to have sex with plenty of people who wanted to have makeout sessions, right?
A Very rarely.
Q But that was a you choice.

A Yes.

MS. BONJEAN: Okay, I have no further questions.

THE COURT: Ms. Cohen, any further cross?

MS. COHEN: Yes.

RECROSS-EXAMINATION

BY MS. COHEN:

Q Ms. Gillick, you testified on redirect examination about OneTaste not approving of speaking to former OneTaste members while you were there. Do you recall that?

A Yes.

Q And you also were asked about a text message concerning your wanting to meet with and talk to and be with Rob Kandell while you were at OneTaste and he was not. Do you remember that?

A Yes.

Q And you had looked at -- you were referred back I believe this morning to the text message regarding your conversation with Maya about meeting up with Rob. Do you recall that?

A Yes.

Q And in that message, do you recall you had also indicated that Rachel Cherwitz had just had lunch with Rob Kandell?

A Yes.

Q So she was meeting with Rob Kandell and he was no longer at OneTaste; correct?

A Yes.

Q And, in fact, in that message, you were concerned about meeting with Rob because you had upset Rachel about Andres who she also had a romantic interest in. Do you remember that?
A Those were very different periods, but yes.
Q You referred back in time to the Andres thing?
A Yes.
Q And you had referred back in that message to your being with Andres and upsetting Rachel at the time, right?
MS. FARRELL: Objection to the hearsay.
THE COURT: Overruled.
A Yes.
Q All right. And in October -- when you sent that message in October of 2014 about Andres, you were still at OneTaste; right?
A Yes.
Q And you were going -- you were talking to Rob Kandell; correct?
A Yes.
Q And you felt you had to be sneaky because you didn't want Rachel to find out that you were also interested in Rob Kandell; correct?
A That's not why I was being quiet about it.
Q Well, you -- you wanted to be with Rob Kandell at that time; right?
A Yes.

Q And you discussed -- you were concerned about your connecting with Rob ever since you mentioned Andres to Rachel; right?
A I believe it was prior to that. I don't remember the exact order of that.
Q In this message, you were concerned that Rachel would find out that you were speaking to Rob Kandell; right?
A Yes.
Q And you referenced Rachel having been upset with you because you wanted to be with Andres, do you remember that?
A Yes.
Q So, isn't it true that you were telling Maya you didn't want Rachel to find out because she would be upset that you wanted to have sex with Rob?
A She would be upset that I was in contact with Rob, period.
Q No, that you wanted to be with him because she was also in love with Rob Kandell?

MS. FARRELL: Objection, asked and answered.

THE COURT: Sustained.

BY MS. COHEN:

Q Isn't it true that were attracted to both Andres and Rob Kandell?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q Isn't it true that Rachel Cherwitz had a relationship with both Andres and Rob Kandell?
A Yes.
Q You also testified on redirect about the privacy, that there was a difference between living in a commune setting and OneTaste in terms of privacy. Do you remember being asked that?
A Yes.
Q And you lived in 1080, you chose to move into 1080; right?
A Yes.
Q So you knew what it was like to life any OneTaste community setting correct?
A Yes, it was very different living in a staff house than 1080, yes.
Q Did you feel that you had privacy at 1080?
A A little bit more than at a staff house, but not much.
Q And you, when you moved into the Brooklyn OM house in New York City, we already established yesterday that you originally wanted to move into The Bunker; correct?
A Yes.
Q And when you couldn't get in there you moved into the Brooklyn OM house; correct?
A Yes.
Q And it's fair to say there's not a lot of privacy in the

Brooklyn OM howls?
A I actually felt more privacy at the Brooklyn OM house.
Q But you had less privacy?
A I don't mean physical privacy, I meant mental and emotional privacy.
Q You testified yesterday that you to move into the Brooklyn OM house because there wasn't another place for you to live, is that your testimony?
A Not within the OneTaste community which I wanted to continue living in.
Q So it didn't have -- you could have gotten your own place; correct?
A Of course.
Q And you chose to -- before you went to The Bunker, you knew what The Bunker was like; correct?
A I hadn't lived in a staff house like since they had been created.
Q But you had been there a lot; correct?
A Maybe once or twice.
Q You visited it?
A Yeah.
Q And, in fact, so much that you expressed in your journal the concerns you had about alcohol and drinking at The Bunker; correct?

MS. FARRELL: Your Honor, I'm going to object to way

outside the scope of the redirect.

THE COURT: Sustained.

BY MS. COHEN:

Q Well, in connection with this privacy as we talked about, you ended up living in The Bunker; right?

A Yes.

Q And Po, who was also a co-owner as you testified, did not live there; right?

A That's correct. Different rules applied to different people.

Q Well, she chose to stay in her apartment because you said she had cats; right?

A She was also approved to stay in her apartment.

Q Well, she lived in her own apartment, right?

A Yes.

Q And she also had her own acupuncture and wellness business on the side; right?

A Yes.

Q And she never gave that up when she was a part owner of the OneTaste New York, right?

A She did.

Q She gave it up during the time that you were there?

A Yes.

Q Okay. And she was also a business owner of that; correct?

A Yes.
Q And while you were living in New York, Rachel was not -- Rachel was also in San Francisco and L.A. often; correct?
MS. FARRELL: Objection to the scope.
THE COURT: Overruled.
A Yes, she traveled a lot.
Q And you also testified that you had to eat certain things and on direct examination you talked about that; correct?
A Yes.
Q But you were part of OneTaste at that point; right?
A At which point?
Q I mean, your complaints are about eating and exercise while at OneTaste?
A Yes.
Q And OneTaste was premised on health, wellness and spirituality; correct?
A Yes.
Q And, in fact, when you moved into these various homes, those are the requirements about moving in; correct?
A What are the requirements?
Q About doing exercise, OMing, eating healthy?
A No, that only applied to staff and owners.
Q Okay. You were an owner at that time, okay, and if you want to move into The Bunker or the Brooklyn OM house, those are the requirements; correct?

A Yes -- not the Brooklyn OM house, just The Bunker.
Q Did you ever see the Brooklyn OM house rules?
A Yes.
Q And the Brooklyn OM --
A The Brooklyn OM house was run independently of OneTaste staff.
Q Right. And those people who ran that independently operated it under the same premise as --
A No, they did not.
Q Would it refresh your recollection to see the Brooklyn OM house rules?
A Yes -- it was based on OneTaste stuff, but it was a very different experience living in the Brooklyn OM house in practice and I'm happy to look at the Brooklyn OM house rules.
Q I can bring it up but let me see if we can agree.
The Brooklyn OM house required OMing; correct?
A Yes.
Q Your inventory; correct?
A Yes.
Q Okay. And you also were asked on cross-examination -- I'm sorry, on redirect about being crossed on -- I don't know the exact words, but the word came out "monastic." Do you remember that?
A Yes.
Q And you said, well, I don't remember that word being

used?
A In the first cross exam. It was used a lot in OneTaste.
Q That was my question. That was a OneTaste word; correct?
A Yes.
Q And did you feel that the staff house was a monastery?
A Yes.
Q And you also testified that you knew of no employee rules, do you remember that?
A By the time that I was an owner, there was not a code of conduct that I was aware of that was being used or circulated.
Q You've seen the employee handbook; correct?
A I don't know that I have.
Q Okay. Well let me show that to you.
MS. COHEN: Can you pull up DX 1-BS and this can go to the jury. It's in evidence.
(Exhibit published.)
BY MS. COHEN:
Q Do you recognize this?
A No.
Q And this is from October 2013 and that was before you were an owner of OneTaste New York; correct?
A Correct.
Q But you were taking classes at the time; right?
A Correct.
MS. COHEN: And can we go to the next page?

Q Do you recognize this?
A No.
Q You were never an employee yourself; correct?
A Correct.
Q But you did own New York OneTaste as an owner; correct?
A Correct.
MS. COHEN: No further questions, Your Honor.
MS. FARRELL: Your Honor, we have the burden of proof. If I may have permission to redirect on some of these?
THE COURT: Yes.
MS. FARRELL: Thank you.

FURTHER DIRECT EXAMINATION

BY MS. FARRELL:

Q Ms. Gillick, as an owner of the OneTaste New York City franchise, if there had been an employee handbook in use would you have been expected to receive that from corporate?
A If it applied to owners, yes.
Q What about people working at the OneTaste New York City branch?
A It probably should have been, but I didn't receive it.
Q Okay. In reference to Po, you testified just now that different rules applied to different people, what did you mean by that?
A There -- one of the things that was incredibly difficult to track, kind of similar to sales calls, there were a lot of

things that were -- and the strokes that I mentioned, there were things that were constantly, constantly changing and I could never map out what -- like, certain things were approved for certain people and not for me and I could never map out what those things were and they changed on a daily basis.

Q And because you were an owner versus an employee, did different rules sometimes apply to you?

A It didn't have to do with my position. It had to do with me individually. It was more individually than your position in OneTaste.

Q Did you think certain rules applied to you versus other employees?

A Yes.

MS. BENSING: No further questions.

THE COURT: I would permit a briefly recross, just on the scope of the brief, re-redirect.

Go ahead, Ms. Bonjean.

FURTHER CROSS-EXAMINATION

BY MS. BONJEAN:

Q Ms. Gillick, the prosecutor just asked you some questions about Po; right?

A Yes.

Q You did not have to ask permission to live outside one of the OM houses or The Bunker, the Brooklyn home OM, you didn't have to ask permission?

A I felt that I did.
Q You didn't work there.
THE COURT: Please lower your voice.
MS. BONJEAN: I apologize.
Q You didn't work there ma'am, right?
MS. FARRELL: Objection. That's not a question she's just yelling at the witness.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You did not work there; correct?
A I owned a franchise that was closely governed by corporate.
Q Ma'am, you owned the franchise for about eight months, do you remember that part?
A Yes.
Q And you chose to live in the OM residences before you owned the franchise; correct?
A Yes.
Q And after you owned the franchise; right?
A Yes.
Q And at no point did you ever ask to live outside any of the residences, did you?
A That's correct.
Q And, ma'am, when you bought the franchise you then became an owner of the franchise; right?

A Yes.
Q Did you and the other owners prepare an employee handbook for your employees?
A No.
Q Did you see the Government exhibit where there was an employee handbook that was actually in existence you could have used?
A I didn't know of that handbook's existence.
Q Did you ask as an owner of the franchise, hey, can you guys send me over your employee handbooks and documents so we can use them with our employees? Did you do any of that?
MS. FARRELL: Objection.
THE COURT: Overruled.
A No.
MS. BONJEAN: No further questions.
THE COURT: Ms. Cohen?
MS. COHEN: Nothing further, Your Honor.
THE COURT: The witness may step down.
(Witness excused.)
THE COURT: Okay. We're going to take the morning break. I just want to let you know about schedule. We're going to take lunch a little bit on the earlier side as well.
We'll have a break now, but right around 12:30 we're going to have lunch so I can accommodate some other scheduling issues. So, we'll come back now at 20 after 11 and we'll be

back for maybe a little more than an hour. Keep an open mind and don't talk about the case.

(Jury exits.)

THE COURT: Okay, I will see everyone as 20 after 11.

(Recess taken.)

THE COURT: Everyone can be seated.

MS. BENSING: The next thing we intend to offer and admit into evidence is Government Exhibit 5005, the stipulation.

THE COURT: That is fine.

(Jury enters.)

THE COURT: Everyone may be seated and you can proceed, Ms. Bensing.

MS. BENSING: The Government offers Government Exhibit 5005, a stipulation between the two parties into evidence.

THE COURT: No objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 5005 is admitted.

(Government Exhibit 5005 received in evidence.)

MS. BENSING: And we can use the screen to publish this to the jury. Thank you.

(Exhibit published.)

MS. BENSING: So, it's hereby stipulated and agreed by and between the United States of America and the defendants through their attorneys as follows: Effective tax year 2013, OneTaste, Incorporated, or OneTaste, was classified as an S corporation under subchapter S of the Internal Revenue Code, 26 United States Code, Sections 1361 to 79.

According to the Internal Revenue Service, an S corporation is a corporation that elects to pass corporate income, losses, deductions and credits through to its shareholders for federal tax purposes. An S corporation's shareholders are entitled to a proportionate share of that corporation's profits, losses, tax deductions and tax credits and a proportionate share of voting rights in that corporation.

For tax year 2013, OneTaste's shareholders were Nicole Daedone who owned 49.505 percent of OneTaste and who resided in California; Robert Kandell, who owned 49.505 percent of OneTaste and who resided in California and Ippolita Rostagno, who owned .99 percent of OneTaste and resided in Brooklyn, New York. For tax year 2015, the OneTaste shareholders were Nicole Daedone who owned 99 percent of OneTaste and who resided in California, and Ippolita Rostagno who owned one percent of OneTaste and who resided in Brooklyn, New York. For tax year 2016, OneTaste shareholders were Nicole Daedone, who owned 99.467 percent of OneTaste and who

resided in California, and Ippolita Rostagno who owned .533 percent of OneTaste and who resided in Brooklyn, New York.

And this stipulation, Government Exhibit 5005 is admissible in evidence and I believe has now been admitted.

THE COURT: Yes, it has.

And the Government may call its next witness.

MS. FARRELL: Thank you, Your Honor. The Government calls Mark Lubin.

Your Honor, while we're waiting, for the Court's understanding, in the binder for this witness the certifications are in the front on the left.

THE COURT: Yes, I see it. Thank you.

THE COURTROOM DEPUTY: Sir, come here, please.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Raise your right hand. Do you solemnly swear or affirm that the answers and the testimony that you are about to give this Court will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Please be seated state your full name for the record and spell it slowly and use the microphone.

THE WITNESS: Mark Lubin, M-A-R-K, L-U-B-I-N.

(Continued on the next page.)

**MARK LUBIN**,

called by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FARRELL:

Q Mr. Lubin, where do you currently work?

A I work for the Federal Bureau of Investigations.

Q And is that also known as the FBI?

A Yes.

Q What is your current position with the FBI?

A I'm a forensic accountant.

Q What does it mean to be a forensic accountant?

A I assist the -- I review financial records and assist the special agents in their criminal investigations.

Q Approximately how long have you worked as a forensic accountant for the FBI?

A Nine years.

Q What is the highest level of education you've completed?

A I have a Bachelor's of Science in business administration from the University of Missouri, majoring in economics and post-baccalaureate studies in accounting from the University of Houston.

Q Do you have any certification in the field of accounting?

A Yes, I do.

Q And what are those?
A I am a certified public accountant and I'm a certified fraud examiner as well.
Q And a certified public accountant, is that also known as a CPA?
A Yes.
Q And what does it mean to be a CPA?
A Well, I received my certification in the state of Texas. It means I've taken the prerequisite accounting courses, college accounting courses. I passed the state examination in Texas and I take continuing professional education every year, 40 hours.
Q And you mentioned you're a certified fraud examiner. What does that involve?
A Again, I took course work, passed a certification examination given by the entity and have 20 hours of continuing professional education for that certification.
Q Can you briefly describe your professional experience before you joined the FBI?
A Yes. I was in industry banking and consulting and in the consulting area primarily forensic accounting.
Q And you described your field as forensic accounting. What is does forensic accounting mean?
A Forensic accounting is used to examine financial records and used in financial -- financial information, analyze those

records and that is used in civil litigation and criminal investigations.
Q And is that kind of accounting backwards-looking?
A Many times, yes, it is.
Q As opposed to, like, preparing statements for companies?
A Oh, absolutely. Absolutely.
Q What sort of tools or techniques do you use to conduct forensic accounting?
A Quite a few. We have -- we use software. I use a lot of Excel. We have proprietary databases at the FBI. We have proprietary software at the FBI to help facilitate and analyze books and records.
Q Did there come a time when you were asked to work on a project related to this case?
A Yes.
Q And approximately when was that?
A November of 2024.
Q And briefly what was the scope of your involvement in this case?
A I was asked to review financial records.
Q And what -- just at a high level, we'll go through the specifics shortly, but what types of financial records or documents did you analyze in connection with this case?
A This case, I reviewed books and records which would be signature cards, account statements, withdrawal slips, deposit

slips, signature cards. I reviewed wire records as well. In addition, I reviewed tax information, information filed with the Department of Labor, information provided by the IRS. That's basically the information that I've obtained.

Q Did you also review documents from the company OneTaste and its corporate affiliates?

A Oh, yes, of course. I looked at general ledgers and Intuit records, yes.

Q And who provided you with all the categories of records that you just described?

A Well, those records would be provided via a federal grand jury subpoena.

Q Okay. They were obtained by subpoena; is that correct?

A Yes.

Q And then who actually provided you with the records that you reviewed?

A The FBI.

Q And what did you do after you received the sets of the various financial records that you were asked to look at?

A Well, depending upon the records, review them and analyze them and in instances I would put the information into an Excel spreadsheet and then perform an analysis on that data.

Q And why do you take information from, like, books and records, for example and put them in a spreadsheet?

A Well, it's -- if I have the information in the

spreadsheet, I can easily -- I can categorize the information from the bank. I can add it together and I can do various analyses using the Excel spreadsheet.

Q And did you prepare a work product like that in connection with this case?

A Yes, I did.

Q So beyond reviewing and analyzing records, did you participate in any interviews?

A There was one phone call that I listened to with the accountant who had provided some services to the company. That was the only involvement that I've had in the interviews.

Q And was that to help assist your understanding of the records provided by the company?

A Yes.

Q Okay. So now I want to go through in more detail the specific types of records you reviewed and their Government exhibit numbers.

MS. FARRELL: And Your Honor I would ask that I be permitted to lead him with respect to the numbers. I understand the defense does not have an objection.

MS. BONJEAN: No objection.

THE COURT: What do you mean "the numbers"?

MS. FARRELL: We're going to reference the specific Government exhibits you reviewed so I'm going to say the numbers instead of asking him to recall it off the top of his

head.

THE COURT: Go ahead. That's fine.

BY MS. FARRELL:

Q Mr. Lubin, I would direct you to 3500-ML-20 if you need help remembering the various records that you reviewed.

So, you mentioned wage and income tax records. Did you review some of those as part of this case.

A Yes.

Q And you testified that you reviewed IRS records; is that correct?

A Yes.

Q And did those include Government Exhibit 4461-B?

A Yes.

Q Were those individual tax records for Nicole Daedone from 2007 to 2018?

A Yes.

Q Did you review Government Exhibit 4461-C?

A Yes.

Q And were those individual tax records for Rachel Cherwitz for 2007 to 2018?

A Yes.

Q And did you review Government Exhibit 4462?

A Yes.

Q And were those Internal Revenue Service documents for OneTaste and various other OneTaste-related corporate

entities?
A Yes.
Q And I would just like to list those out and if you can confirm for me that these are all different entities you looked at: OneTaste Inc., The Next Right Thing LLC, OTBA, Inc., Caravan Retreats Inc., OneTaste Media LLC, OneTaste Cooperative Inc., OneTaste Lineage LLC, Great Work Publishing. The Landco LP, The Land Sanctuary, Inc., The Land Operations LLC a/k/a OM Free, Inc. Feminine Rising Foundation, Inc. On Her Terms LLC, OneTaste Cooperative Inc., Institute of OM Foundation, Institute of OM Inc., Unconditional Freedom, OM Free Inc. and OneTaste NYC LLC?
A Yes.
Q Did you review records from those entities from quarter one 2004 through quarter two 2024 to the extent there were relevant records?
A Yes.
Q Okay. And all of the IRS records we just reviewed by their Government exhibit number, were those all certified public documents of various IRS stamps on the face of the document?

(Continued on the following page.)

DIRECT EXAMINATION
BY MS. FARRELL: (Continuing)
Q Okay. So let's now turn to Department of Labor records.
Did you review records from the California Department of Labor?
A Yes.
Q And are those found in Government Exhibit 4455-A?
A Yes.
Q And did the California Department of Labor certify those records as certified public records in Government Exhibit 44535-A-1?
A Yes.
Q Did you also look at New York Department of Labor records?
A Yes.
Q Are those denoted by Government Exhibit 4455-C?
A Yes.
Q And did New York certify those documents as public certified records in what is marked as Government Exhibit 4445-B?
A Yes.
Q For what individuals did you look at materials from the California and New York Departments of Labor?
A I looked at Nicole Daedone, Rachel Cherwitz, and various individuals provided to me by the prosecutor.

Q And is that -- is your understanding that these are individuals that the Government identified to you as certain testifying witnesses in this trial?
A Yes.
Q And you just know that because the prosecutors told you, but not because you have seen any of this trial, is that correct?
A That's correct.
Q And were those records all obtained pursuant to Grand Jury subpoena as well?
A Yes.
Q And the wage records that you looked at, were those also supplemented by two documents that have been produced by the defense?
A Yes.
Q And what were those two documents?
A Those were two 1099 -- 2013 1099 documents, 1099 forms.
Q And were those documents certified -- I'm sorry. Was that Government Exhibit 4463 and 4464?
A Yes.
Q And were those two documents certified as business records by OneTaste in the certification marked as Government Exhibit 5006?
A I'm sorry. Will you please repeat the question, please?
Q Sure.

Were both of those documents certified as business records by OneTaste pursuant to the certification marked as Government Exhibit 5006?

A Yes.

Q Okay. What were you reviewing the Department of Labor records for?

A I was looking for reported wages for the individuals provided to me by the prosecutor, and for Nicole Daedone and Rachel Cherwitz.

Q All right. Now, did you also review bank records in preparation for your testimony here today?

A Yes, I did.

Q What kind of bank records did you review?

A These were Wells Fargo bank records.

Q And were these for an account number ending in 8202?

A Yes.

Q And who is the signatory to that bank record?

A Nicole Daedone.

Q Were those records found in Government Exhibit 4437?

A Yes.

Q And were they certified as business records by Wells Fargo pursuant to Government Exhibit 4437-A?

A Yes.

Q Did you also review certain wire records from Wells Fargo?

A Yes.
Q And were those found in Government Exhibit -- are those marked as Government Exhibit 4447?
A Yes.
Q And are those wire records certified by Wells Fargo as business records pursuant to the document marked Government Exhibit 4447-B?
A Yes.
Q Going back to Government Exhibit 4437.
Do those records also contain statements for an account ending in the numbers 3986 with signatories Nicole Daedone and Yia Vang?
A Yes.
Q And were the relevant dates of the records contained therein from 2014 to 2018?
A Yes.
Q Okay. Now, let's move to the next category.
Did you review corporate accounting records as part of your work on this case?
A Yes.
Q So let's start with an entity called A.L. Nella. Are you familiar with that entity?
A Yes.
Q What is A.L. Nella?
A It's an accounting firm.

Q Why is A.L. Nella relevant here?
MS. BONJEAN: Objection.
THE COURT: Sustained.
MS. FARRELL: Sorry.
Q For whom did A.L. Nella provide accounting services?
A OneTaste, Inc.
Q Are A.L. Nella records that you reviewed denoted by Government Exhibit 4378?
A Yes.
Q And are those records certified as business records pursuant to Government Exhibit 4460?
A Yes.
Q And did you also review Intuit records?
A Yes.
Q What is Intuit?
A Intuit is a software company that provides software for companies -- for like tax services, like QuickBooks, quite a few other products.
Q And are the Intuit records that you reviewed set forth in Government Exhibit 4434, 3744 and 3749?
A Yes.
Q And are those all certified as business records in Government Exhibit 4434-A?
A Yes.
Q And did you also look at Intuit records marked as

Government Exhibit 4446?
A Yes.
Q And are those marked or certified as business records under Government Exhibit 4446-A?
A Yes.
Q All right. Then finally, did you review documents, corporate documents produced by OneTaste?
A Yes.
Q And are those marked as Government Exhibits 4096, 4110, 4132, 4152, and 4056?
A Yes.
Q And are those all certified as business records in Government Exhibit 5002?
A Yes.
Q All right. So is that -- with respect to your testimony today, is that kind of the universe of materials that you reviewed in preparing your analysis?
A Yes.
Q And all of the documents that you reviewed were certified as either certified public records or certified business records by the various entities?
A Yes.
Q Okay. So, now I'd like to -- for you to take a look at one more set of documents. And they're in your binder, starting with Exhibit 853, 856 and 862. If you could just

take a look at those.
A Which tabs?
Q If you would look at the front of your binder, there should be a key and then looks like 25, 26, and 27. I'm sorry, 24, 25, and 26.
A Yes.
Q What are these documents?
A These are exhibits that I helped prepare.
Q Are they summary charts of information contained in these like voluminous records that you just testified to reviewing?
A Yes.
Q When you say with you helped prepared these, what was your role in preparing them?
A My role was to analyze financial records and provided the numbers for the exhibits.
Q So you -- did you do sort of the graphics of the Exhibit?
A No.
Q But are the numbers the numbers that you came up with?
A Yes. Absolutely.
MS. FARRELL: So let's take a look first at Government Exhibit 853, if we could?
Q What is this document?
A (No response.)
Q It's behind tab 24. It's also in front of you on the screen, if you need to look.

A I'm good.
Q Great.
A This shows the -- for Nicole Daedone, the reported wages and income received from OneTaste, Inc., Caravan Retreats, Inc., Texas Limbic Network, LLC; OneTaste New York, LLC.
Q And specifically, which exhibits of voluminous records did you rely on to create this chart?
A These would be for the California Department of Labor and Internal Revenue Service.
Q And if you look at the bottom of the chart, does it have the Government Exhibit numbers listed that you relied on?
A Yes, it does.
Q Could you read those aloud, please?
A 4461-B and 4445-A.
Q And so the records that comprise the information contained on this summary chart, are they voluminous?
A Yes.
Q And can they not be conveniently examined in court today if we were to go page-by-page?
A That is correct.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 853 into evidence.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.

THE COURT: Government Exhibit 853 is admitted.
(Government's Exhibit 853 received in evidence.)
Q I'm going to go ahead and talk to you about the other two summary charts and we'll come back to this. Okay.
So if we could turn to the next chart, which is Government Exhibit 856?
Do you see this document?
A Yes, I do.
Q And what is this?
A These are for individuals' reported wages received, OneTaste, Inc., Caravan Retreats, Inc. and OneTaste New York, LLC.
Q And the select individuals on this chart, are these the individuals the Government told you would be testifying witnesses in this case?
A Yes.
Q Okay. And how was this document created?
A This document was created by compiling, going through various records that I had for the Department of Labor for New York and California, and looking at 1099 records and looking at the -- using the exhibits that were provided by the defense as well.
Q Well, when you say 1099 records, what is a 1099?
A Yeah. So, basically, when you work for a company, you're an employee. You're going to get a W-2.

THE COURT: If I could just ask you to move the microphone a little bit closer? It's a little bit low.

THE WITNESS: Of course.

MS. BONJEAN: I'm going to object to that question.

MR. ROBOTTI: Join.

THE COURT: Sorry. I'm not sure which question you were objecting to.

MS. FARRELL: I asked him what a 1099 was.

MS. BONJEAN: I guess I'm moving to strike his answer because it didn't answer the question.

THE COURT: Sustained. I'll strike the answer.

You can ask your next question.

Q When you refer to the numbers 1099, what are you referring to?

A Yes. For an individual who -- or for an entity, an individual who provides services for a company but is not an employee of a company, they will receive a 1099 form from the company for payment for their services.

Q Is there a threshold for like a certain amount of money you need to have earned in order to get a 1099?

MS. BONJEAN: I'm going to object; foundation.

THE COURT: Sustained.

MS. FARRELL: Okay.

Q And you also I think mentioned W-2s. What is a W-2?

A W-2 is a form that when you work for a company, you

receive a W-2 from them showing your wages that you earn.
Q So looking back at Government Exhibit 856, is this summary chart based on voluminous records you reviewed in order to come up with this chart?
A Yes.
Q And, again, what kinds of records does this chart represent?
A Payroll records, Intuit records, 1099 records, W-2 type records.
Q And if you would look at, for example, an Intuit record and also someone's W-2, would there sometimes be overlap?
A I'm sorry. Can you repeat the question, please?
Q Withdrawn.
Is the information contained in Government Exhibit 856, would it be difficult to review the underlying materials because of their volume here in court today?
A Yes, it would.
Q And is this a summary chart of information contained in those underlying materials?
A Yes, it is.
Q And are the underlying -- are the specific Government Exhibit numbers that comprise the underlying materials referenced at the bottom of the document?
A Yes, they are.
Q And if you could just read those numbers for us?

A 3744, 3749, 4378, 4434, 4446, 4445-A, 4445-C, 4463, 4464.

MS. FARRELL: Your Honor, we move to admit Government Exhibit 856 into evidence as a summary chart.

THE COURT: Any objection?

MR. ROBOTTI: No objection.

MS. BONJEAN: Can I have one second, Your Honor?

THE COURT: Yes.

MS. BONJEAN: I just want to look at this.

THE COURT: Sure.

(Pause.)

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 856 is admitted.

(Government Exhibit 856 was received.)

Q Okay. And then just turning to the last summary chart, Government Exhibit 862.

Do you recognize this document?

A (No response.)

Q It's behind tab 26.

A I have 863 behind eight.

Q Do you have Government Exhibit 862 in your binder?

I can bring up a copy. It's also on the screen if you look at it.

A I will just look at the screen.

Q Great.

Do you recognize this document?

A Yes, I do.
Q What is it?
A These are reported wages and income of OneTaste, Inc., Caravan Retreats, Inc. and OneTaste New York, LLC, for Rachel Cherwitz.
Q And what is the date on which this document is based?
A Department of Labor records provided by the State of New York and California and Internal Revenue Service records provided.
Q And are the underlying documents that this document summarizes voluminous?
A Yes, they are.
Q Can they be conveniently examined in court today?
A No, they cannot.

MS. FARRELL: Your Honor, we move to admit Government Exhibit 862 as well.

THE COURT: Any objection?

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 862 is admitted.

(Government's Exhibit 862 received in evidence.)

MS. FARRELL: Okay. Let's take a look first at Government Exhibit 853. If we could publish it for the jury, please?

It's kind of -- my screen is messed up. I don't

know if anyone else is. It's shifted over to the left.

THE COURT: I think they are all probably like that.

MS. FARRELL: It looks fine on the jurors' screen, so we can continue.

THE COURT: Okay. Just us.

Q So what is depicted in this document here? If you could just walk us through it.

A Just one moment. The binder popped open.

Q Sure.

A Okay. I'm ready.

Q All right. So what is the title of this chart?

A 853?

Q Correct, 853, thank you.

A Nicole Daedone, reported wages and income received from OneTaste, Inc., Caravan Retreats, Inc., Texas Limbic Network, LLC and OneTaste New York, LLC.

Q And in preparing this chart, did you look through the records the IRS provided for all of the related OneTaste entities that we described earlier?

A Yes, I did.

Q And are these the ones listed here in the title the ones where you -- where there were records of payments to Ms. Daedone?

A Yes.

Q Okay. And looking at the chart in the middle, what is

the top row of boxes in the dark blue represent?
A Those are years.
Q And what span of years does this chart cover?
A 2007 through 2018.
Q And then below the years, what is contained in the boxes there?
A Those are the wages and income that I calculated for each year.
Q And this is based on reporting to government entities?
A Yes.
Q Okay. How much does this chart indicate OneTaste and related entities reported to the authorities that they paid Nicole Daedone in 2007?
A $5,759.
Q How about in 2008?
A $10,507.
Q In 2009?
A Zero.
Q 2010?
A Zero.
Q How about 2011?
A $32,247.
Q 2012?
A $77,546.
Q 2013?

A $113,742.
Q 2014, sorry.
A $151,953.
Q 2015?
A 4141,720.
Q 2016?
A $259,866.
Q 2017?
A $109,316.
Q And 2018?
A 55,500.
Q Does this chart include partnership distributions?
A No.
Q Okay. And what's the total for -- what is the total wages and income received from these entities by Nicole Daedone across the years 2007 through 2018?
A $958,156.
Q If we can take a look now at Government Exhibit 862, does this report -- does this chart show the same information but for Rachel Cherwitz?
A Yes, it does.
Q And does it cover 2007 through 2018?
A Yes.
Q And what is the total?
A $421,853.

Q Actually, going back, sorry, to Government Exhibit 853 -- strike that. I'm sorry.

Let's now take a look at Government Exhibit 856. Can you explain to us what this chart is showing?

A Yes. This is showing wages, income received for the individual provided to me by year.

Q So if we could go down the list of the individuals that this chart covers, who is the first one?

A It's -- I'm going to go back to the binder. It's cut off on my screen.

Q Sure thing. Let me know if you don't have a paper copy and I will bring you one.

A Christina Berkeley.

Q Who is below her?

A Dana Gill.

Q Who is below her?

A Michelle Wright.

Q Who is below her?

A Lianna Lifson.

Q Who is below her?

A Rebecca Weiner.

Q Who is below her?

A Margaret Pixley.

Q Who is below her?

A Brooke Scheffer.

Q Who is below her?
A Michal Neria.
Q The last one?
A Lyndsi Scott Keves.
Q In preparing this chart, did you take a look at entities besides OneTaste, Inc.?
A Yes.
Q And why did you look at entities besides OneTaste, Inc.?
A I wanted to capture all income that -- wages that these individuals would have received. I looked at everything.
Q From anything that you understood to be related to OneTaste or OneTaste affiliates?
A Absolutely.
Q And that was based on information that the prosecution team provided you?
A From Grand Jury, the information, yeah, Grand Jury subpoena information that I used.
Q And the Government exhibits that are listed on the bottom, are those the exhibits that contained the relevant data of what you examined?
A Yes.
Q And looking at the first row in dark blue, what are those numbers?
A Those are the years.
Q Okay.

Why do some -- so looking down, for example, that column under 2007, what does that number represent? I'm just going to touch it. What does that number right there represent?
A Those are the wages and income I was able to find for that individual.
Q In that year?
A In that year.
Q Okay. Let's just walk through this.
For the year 2007, how much were you able to find reported in the records that were subpoenaed for Christina Berkeley.
A $3,469.
Q How about 2008 for Christina Berkeley, based on what was reported from the Grand Jury subpoena materials?
A $9,418.
Q How about for Dana Gill, was there anything reported?
A No.
Q All right. Moving next to Michelle Wright, how much was reported for her based on the materials cited in this exhibit for the year 2012?
A $7,311.
Q And how about for 2013?
A $28,057.
Q For 2014?

A $1,244.
Q Going next to Lianna Lifson, how much was reported for her in the year 2013, based on the subpoenaed documents that you reviewed?
A $29,658.
Q And how about for 2014?
A $6,678.
Q Moving next to Rebecca Weiner, how much for her in 2013?
A $14,607.
Q And how much for Rebecca Weiner in 2014?
A $6,600.
Q For Margaret Pixley in 2013?
A $8,875.
Q For Brooke Scheffer in 2015?
A $6,000.
Q For Michal Neria in 2015?
A $1,175.
Q And for Lyndsi Keves in 2017?
A $2,362.
Q And if we look all the way over to the column on the right, does this show the total for each individual?
A Yes.
Q And then did you calculate a total for all of these individuals?
A Yes.

Q And what is that number?
A $125,355.
Q And that's for all these individuals from the years 2007 through 2018?
A Yes.
Q Okay. I'd like to turn to a different topic now.
Based on your review of the OneTaste records that you testified about at the very beginning of your testimony, what, if anything, happened with respect to OneTaste Incorporation's ownership in 2017?
A It was sold.
Q How do you know that?
A Because I reviewed records that reflected the sale of the entity.
MS. FARRELL: So if we could take a look at -- what has been marked for identification as Government Exhibit -- and this is. I'm sorry. Not for the jury, Drew, Government Exhibit 4056.
Your Honor, I believe this is in the back of your -- is that correct, tab 23. Thank you.
It's tab 23 for those of you who have binders.
THE COURT: Thank you.
Q Do you recognize this document, Government Exhibit 4056, Mr. Lubin?
A Yes, I do.

Q And what is it?
A This is the sale agreement for OneTaste.
Q And was this document certified as a business record by OneTaste in what is marked as Government Exhibit 5002?
A Yes.
Q Okay. So based on --
MS. FARRELL: Your Honor, I move to admit Government Exhibit 4056 into evidence.
THE COURT: Any objection?
MS. BONJEAN: No objection.
MR. ROBOTTI: No objection.
THE COURT: Government Exhibit 4056 is admitted.
(Government's Exhibit 4056 received in evidence.)
MS. FARRELL: Thank you.
Q If we could just take a look first at the cover page. If you could read what this says for us, Mr. Lubin?
A Yes. OneTaste, Incorporated, Stock Purchase Agreement among OneTaste, Incorporated, Nicole Daedone and OneTaste Investments, LLC, OneTaste Holdings, LLC, Amanda Durham and Sujo Offield.
Q I think it's Dunham; is that right?
A Yes. Dunham. Sorry.
Q If we can look at page 2 of the document, please, on the screen?
What is the date of the Stock Purchase Agreement?

A March 3rd, 2017.

MS. FARRELL: If we could then look at page 5, please? If you could zoom on Article II, Purchase and Sale. Liam, if you can. Thank you.

Q Mr. Lubin, what was the purchase price for the sale of these shares?

A $12 million.

Q And if we can go to page 22, who are the signatories to this document?

A OneTaste Investments, LLC. Sorry. I'm sorry.

The seller is Nicole Daedone and the company buying is Van Vleck.

Q And, now, if we could scroll down. Who are the buyers? Starting with the top.

A (No response.)

Q I could read it if it's helpful.

Does the top person say Anjuli Ayer?

A Yes.

Q And moving to the next one, Austin Ayer?

A Yes.

Q Moving to the next one down, Amanda Dunham?

A Yes.

Q And then the last one, Sujo Offield?

A Yes.

Q Okay. Were you able to verify whether Nicole Daedone

actually received the purchase price?
A Yes, I was.
Q And how did you do that?
A I verified these dollar amounts were received into her Wells Fargo 8202.
Q Is that the account that is certified as a business record with certification 4437-A?
A Yes.
MS. FARRELL: Okay. So let's first pull up what's marked as Government Exhibit 4468-R, which is behind tab 9-R.
Q Mr. Lubin, is this a redacted version of a March 2017, account statement for the account ending in 8202 in the name of Nicole Daedone?
A Yes.
Q And did you review this as part of your analysis?
A Yes.
Q And this is, again, a certified business record pursuant to certification No. 4437-A?
A Yes.
MS. FARRELL: Your Honor, can I move to admit Government Exhibit 4468-R in evidence?
THE COURT: Any objection?
MS. BONJEAN: No objection.
MR. ROBOTTI: No objection.
THE COURT: Government Exhibit 4468-R is admitted.

(Government's Exhibit 4468-R received in evidence.)

MS. FARRELL: Thank you.

If we could publish to the jury, please? And then if we can move to the first or second page of the document? If we could zoom in for Mr. Lubin to see.

Q Mr. Lubin, what are these transactions that we see here that are marked on 3-3 and 3-six?

A Yes. These show the wire transfers received from OneTaste Holdings, LLC for a million dollars and OneTaste Investments, LLC, for a million dollars.

Q And then is there another transaction on March 6th?

A Yes. It's a wire transferred received from Sujo Offield for $6,830,000.

MS. FARRELL: And then if we look at the next page. If we could zoom in on those?

Q Is there another transaction on March 9th?

A Yes.

Q How much that for?

A $170,000.

Q Is that a deposit into this account?

A Yes, it is.

Q And then if we look down at March 10th, what do you see?

A I see another deposit for $600,000.

MS. FARRELL: And if we'd turn to the next page. I'm sorry, two pages in. It's page 6 on the document, Liam.

Q Is there a transaction on March 23rd?
A Yes, there is.
Q What is that transaction?
A It's a million dollar wire received, deposit into the account.
MS. FARRELL: If we could also -- if we could take that down. And then if we could also pull up what's marked -- for the witness only -- what's marked as Government Exhibit 4467-R.
And this is behind tab 17-R for those of you who have a binder.
Oh, I'm sorry. I misread that. I switched the numbers. Apologies. One second. Sorry, 44 --
A Do you mind if I pour?
Q By all means.
A Thank you.
Q So 4467-R is correct. I was mixed up in my head with 44 --
THE COURT: Tell me where to find it.
MS. FARRELL: It's tab eight, Your Honor. Apologies.
Q And Mr. Lubin, is Government Exhibit 4467-R an April 2017, statement from account -- the account number ending in 8202 of Nicole Daedone's?
A Yes.

Q And is this account statement also certified as a business record pursuant to the certification marked Government Exhibit 4437-A?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 4467-R into evidence.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 4467-R is admitted.
(Government's Exhibit 4467-R received in evidence.)
MS. FARRELL: Thank you.
And if we could go to page 5 of the document, zoom in.
Q What is this transaction?
A That is a deposit for $600,000.
Q And were you able to find the backup -- this is a deposit made in a branch; is that correct?
A Yes.
Q In the records are additional -- were there additional documents showing like what that deposit was?
A Yes.
MS. FARRELL: If we could pull up what's marked as Government Exhibit 4465-R, which is behind 6-R, for those you who have binders.

Q Do you recognize this document, Mr. Lubin?
A Yes, I do.
Q Is this also a certified business record from Wells Fargo pursuant to certification 4437-A?
A Yes.
Q And is this a copy of a record you reviewed in connection with your analysis?
A Yes.
MS. FARRELL: I move Government Exhibit 4465-R into evidence.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 4465-R is admitted.
(Government Exhibit 4465-R was received.)
THE COURT: Ms. Farrell, we are going to stop in another minute or two, so --
MS. FARRELL: That's fine. I don't have much left.
THE COURT: Is now a convenient time to stop?
MS. FARRELL: May we just published this now?
THE COURT: Yes.
Q Is this a copy of the check that we saw the $600,000 deposit for in the April 2017 statements?
A Yes.
MS. FARRELL: That's all, Your Honor. Thank you.

THE COURT: I'm going to ask the witness to step down for the lunch break.

(Witness steps down.)

THE COURT: Okay. We're going to do the lunch break now. We will give you a slightly longer break and we'll come back at 1:40.

So enjoy your lunch. Don't talk about the case. Keep an open mind. We'll see you at 1:40.

(Jury exits the courtroom.)

THE COURT: Okay. I will see everyone at 1:40.

MS. GUPTA: Thank you.

(Lunch recess.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Okay. I understand there's an issue that the parties wanted to raise. Is that right?

MS. GUPTA: Yes, Your Honor.

We wanted to raise one issue with respect to two exhibits that we were planning to introduce with the publication witness, and we just wanted to raise it now.

THE COURT: What's the publication witness?

MS. GUPTA: Oh, apologies, Your Honor, the summary witness.

THE COURT: Not this witness?

MS. GUPTA: Correct. So it will be the next witness.

So, they're Government Exhibits 4064 and 4398.

THE COURT: Yes, okay.

MS. GUPTA: They should be tabs 64 --

THE COURT: We pulled those.

MS. GUPTA: Yes, great.

So, the first one in time is 4398. It's a November 1st, 2017 expense sharing agreement between OneTaste, Inc. and Nicole Daedone.

So, we understand that for both of these documents, I believe the parties stipulate as to the authenticity. And we have an authenticity certification from OneTaste.

But where I think there is still some disagreement is I understand from Ms. Bonjean that she would object to introduction based on relevance and hearsay.

So, we just wanted to briefly address that in advance.

THE COURT: Okay. Go ahead.

MS. GUPTA: The reason we believe the documents are highly relevant or that this is now after Ms. Daedone has left OneTaste, but she continues to have a partnership with OneTaste and continues to receive benefits from them, even after her departure.

THE COURT: When you say "a partnership," do you just mean relating to this book and the sharing of costs, or do you mean something else?

MS. GUPTA: No. Correct, Your Honor. I mean with respect to this document --

THE COURT: Okay.

MS. GUPTA: -- and the expense sharing agreement.

So maybe a better way to say it is they continue to have a relationship. She continues to receive financial benefits from the company. So, that's the relevance prong.

And then as to hearsay, we just wanted to raise that

we believe the contract is not hearsay because it's not being offered for the truth of the statements in the document, but just the fact that the contract was entered into.

THE COURT: But if it's not being offered for the truth, what does it matter that something was entered into?

I'm not following you on that.

MS. GUPTA: So, Your Honor, I would -- I have a case I can point you to, if that's helpful. It's United States v. Connolly. The Westlaw cite is 2018 Westlaw 2411760, which provides that a contract is not hearsay because its language binds parties to its terms without regard to the truth of the statements in the contract.

And so that, that would be our basis for it not being hearsay, Your Honor.

MS. BONJEAN: May I respond, Your Honor?

THE COURT: Let me just take another moment to read it more carefully, both of them.

MS. BONJEAN: Yes, sure.

THE COURT: And then you can respond.

(Pause.)

THE COURT: Okay. Go ahead, Ms. Bonjean.

MS. BONJEAN: So, it's clear they want to offer it for the truth because they want to argue that it shows that she continued to receive benefits. So, that is precisely the context that they want to offer it for.

And in reality, the hearsay exception, and I also have a case as well. If we're looking at Crawford versus Franklin Credit Management, it's out of the Southern District, 2015 U.S. District Lexis 38737. This was a loan documents case. And what the rule is, is if the significance of an offered statement lies solely in the fact that it was made, no issue is raised as the truth of anything asserted and the statement is not hearsay. But that's not how they're using it, not to just show that there was a contract made.

We could -- we would stipulate that there was -- well, actually I wouldn't even stipulate to that, but -- you know, I think the better point is that they're trying to use it to show that she received financial benefits, which is the statements contained within the document.

THE COURT: Well, one of these documents, 4064, appears to be outside the timeframe of the charged conspiracy, right?

MS. BONJEAN: Yes.

THE COURT: So one is July of 2018, and I believe the indictment goes to May 2018. Correct?

MS. GUPTA: That's correct, Your Honor. This is really just provided for completeness. This is actually termination of the agreement. So, it's discontinuing the agreement. That was the only reason it was provided.

MS. BONJEAN: And their indictment charged when it

terminated. They don't get to -- that would be a variance to ask the --

THE COURT: No, no, I think she's saying that it terminated this agreement about the expenses, not the conspiracy.

MS. GUPTA: Correct.

MS. BONJEAN: Either way --

THE COURT: I still want to go back to the issue of relevance here.

Ms. Gupta, do you want to be heard further on relevance?

MS. GUPTA: Yes, Your Honor.

It's relevant because Ms. Daedone resigned from the company in March of 2017, and we plan to introduce her resignation letter as well. And it's relevant because even after that point, within the charged conspiracy time period, she continued to have an agreement with OneTaste, which is evidenced by Government Exhibit 4398.

And it's not for its truth because it's just the fact that these two parties entered into an agreement.

THE COURT: What's the evidentiary value of the two parties entering into an agreement if it's not for what the truth of what the agreement was?

MS. GUPTA: Because, Your Honor, it shows that they continued to have an agreement even after Ms. Daedone left the

company. So after she is no longer in her position with OneTaste, she is continuing to enter into a contract with OneTaste and receiving benefits from -- pursuant to that contract.

THE COURT: But so what? I mean, so what? What is really the relevance of that?

MS. GUPTA: Your Honor, again, I think it's relevant because it shows that OneTaste and Ms. Daedone continued to have some, some partnership, some agreement after she leaves the company while the conspiracy is continuing. It shows her continued involvement with the company.

MS. BONJEAN: If the agreement was I'm going to volunteer free for you for the next year, they wouldn't want it in. So, it is about the context. It's about the financial nature of it. So, it is the context. It's not just the mere agreement. Because the mere agreement doesn't have any relevance necessarily, unless, again, they're trying to put it in to show that there was a financial agreement, which we argue, and I think the caselaw is pretty clear, the specifics of this would be for the truth.

I mean I don't think they get around the hearsay problem.

THE COURT: Do you want to be heard further on this?

MS. FARRELL: So, we cited that case for Your Honor, that cites a different case. If Your Honor looks at the --

it's Arasinowicz versus Best Foods, Inc., 81 F. Supp. 2d 526.

Our review of the caselaw is that it's a commonly understood application of the Rules of Evidence that any contract is -- it's a verbal act.

THE COURT: I'm not -- I'm really focusing on relevance here.

MS. FARRELL: Understood.

So, obviously, our theory is that OneTaste, the company, is built on the backs of forced labor. That the company, itself, grows and is able to make money because there were a number of people — many of whom have testified in this trial — who worked for free or for very little wages doing labor as instructed by the defendants. And that that labor then helped build the company ultimately, which Ms. Daedone and Ms. Cherwitz financially benefited from.

That financial benefit did not cease upon Ms. Daedone's exit from the company in March of 2017. She continued to have a relationship with OneTaste in which the agreement that they entered into was an expectation that she would continue to share revenue. And given that -- our theory is the source of that money, in part, was the forced labor that we are trying to prove.

THE COURT: But this doesn't talk about any amounts, anything like that, right?

MS. BONJEAN: There's no --

MS. FARRELL: Correct.

MS. BONJEAN: -- specifics and there's no -- nothing about that letter that says it actually happened either. There is just a letter of, I guess, perhaps a Letter of Intent.

And I would point out that the cite, the case they just cited is a contract case. It's a breach of contract. And in a breach of contract, of course, you have to look at the contract and the terms of the contract. That makes sense. That is -- I don't know how they can cite that case in good faith.

THE COURT: Is there other evidence you're intending to try to put in on this topic of the book and the agreement to reimburse?

MS. FARRELL: No. No.

THE COURT: Okay.

Well, do we need to address -- to resolve this right now --

MS. FARRELL: We don't.

THE COURT: -- when we have the jury waiting?

MS. FARRELL: If I may just respond to not making this argument in good faith.

We are citing United States versus Connolly, which is a criminal case from the SDNY that cites Arasinowicz. So, of course, we are making it in good faith. We're citing

another criminal case that's not a breach of contract.

THE COURT: I don't think there's any lack of good faith in the argument, I'm just not sure it's particularly persuasive.

But we are going to take this up after we continue with this witness.

MS. FARRELL: Thank you, Your Honor.

THE COURT: Okay. We can bring back the witness and the jury.

(Pause.)

(Witness entered and resumed the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

And, Ms. Farrell, you may resume your examination.

MS. FARRELL: Thank you, Your Honor.

(Continued on the following page.)

**MARK LUBIN**,

previously called as a witness by the Government duly and sworn/affirmed by the Courtroom Deputy, resumed the stand and was examined and testified further as follows:

MS. FARRELL: If we could please pull up Government Exhibit 4465-R, which I believe is just the last document we had looked at when were taking a lunch break.

DIRECT EXAMINATION (Continues)

BY MS. FARRELL:

Q And, Mr. Lubin, just remind us what this document is, please.

A This is a cashier's check.

THE COURT: Could you just hit the microphone? There's a button on the base.

Try again. Yes, very good.

A This is a cashier's check for $600,000.

MS. FARRELL: And then if we could please, for the witness only and the parties, pull up Government Exhibit 4469-R. And that is Tab 10-R of your binder.

Q Mr. Lubin, is this a May 2017 account statement for the account ending in 8202 owned by Ms. Daedone?

A Yes.

Q And if you turn to the second page -- I'm sorry.

And is this document certified by business records certification number 4437-A?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 4469-R.

THE COURT: Any objection?

MS. BONJEAN: No objection.

MR. ROBOTTI: No objection.

THE COURT: Government Exhibit 4469-R is admitted.

(Government's Exhibit 4469-R was received in evidence.)

MS. FARRELL: Thank you.

(Exhibit published.)

MS. FARRELL: If we could please pull up the second page of the account statement, and if you can zoom in for us.

BY MS. FARRELL:

Q What is -- is there a transaction on May 3rd?

A Yes. It is --

Q And what -- what is the amount?

A The amount is $800,000.

Q And similar to the one we looked at before the lunch break, is this -- does this reflect a deposit made at a bank?

A Yes.

Q And were you able to look at the underlying check from the bank records?

A Yes.

MS. FARRELL: And if we could please pull up

Government Exhibit 446-R -- sorry, 4446-R.

THE COURT: What tab?

MS. FARRELL: 4446-R.

THE COURT: What tab?

MS. FARRELL: I'm trying to find it, Your Honor.

THE COURT: Oh, sorry.

MS. FARRELL: I'm sorry. I think I have the wrong number.

BY MS. FARRELL:

Q Were you able to confirm that this was a check in your review of the documents, this 800-thousand-dollar deposit?

A I think -- I think it is a -- like, I believe it was a withdrawal from an account and a deposit into an account.

Q Okay. Let's take a look at 4466-R, which is behind 7-R.

A Yes, yes.

Q Is this document the backup for the 800-thousand-dollar deposit --

A Yes.

Q -- that we just saw?

A Yes, it is.

Q And is this a record that was also certified by the certification marked as Government Exhibit 4437-A?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 4466 [sic] into evidence.

THE COURT: Any objection?

MS. BONJEAN: No objection.

MR. ROBOTTI: No objection.

THE COURT: Government Exhibit 4466-R is admitted.

(Government's Exhibit 4466-R was received in evidence.)

THE COURT: It was R you wanted, correct?

MS. FARRELL: That's correct. And it's page 115 on the -- sorry.

May I put it on the ELMO, please?

(Exhibit published.)

BY MS. FARRELL:

Q Is that the May 5th, 2017 transaction we saw?

A Yes.

Q And that's Government Exhibit 4466?

A Yes.

Q And so, what is -- what is this showing?

A That is a deposit into Nicole Daedone's account 8202 in the amount of $800,000.

Q Okay.

Now, all of the exhibits we just looked at, plus the ones we looked at before the break, did those total up to $12 million?

A Yes, they did.

Q And what does that $12 million represent?

A Those are the sales -- sales proceeds of OneTaste, Inc.
Q And who did they go to?
A Into Nicole Daedone's account.
Q And based --
A Into Nicole Daedone's Wells Fargo account.
Q Okay. And based on your review of her Wells Fargo account, did she further disburse that money to anyone else?
A No.
Q Okay. So we looked earlier at Government Exhibit 853.
MS. FARRELL: Which if we could just pull that up, please.
(Exhibit published.)
Q And these are reported wages and income for Ms. Daedone, is that correct?
A Yes.
Q In addition to the payments that are shown in this document, did you identify additional disbursements from OneTaste that are not on this document and also were not part of the sale proceeds that were not captured in the documents that you reviewed to create this exhibit, 853?
A Yes.
MS. FARRELL: Okay. If we could please pull up for the witness Government Exhibit 4480-R, which is 21-R, Tab 21-R.
Q Is this a September 2016 account statement for the Wells

Fargo account ending in 8202 owned by Ms. Daedone?
A Yes.
Q And is this a certified business record that is certified pursuant to certification Government Exhibit 4437-A?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 4480-R.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 4480-R is admitted.
(Government's Exhibit 4480-R was received in evidence.)
(Exhibit published.)
MS. FARRELL: And if we could go to page 5 of the document, please. If you could zoom in.
BY MS. FARRELL:
Q And on September 14th, 2016, did OneTaste, Incorporated make a transfer of money to Ms. Daedone?
A Yes.
Q And how much was that?
A $150,000.
Q And just to be clear, the -- is the reason that this is separate from your summary chart that we looked at earlier is because this was not a transfer of money that was captured in

either W-2s or 1099s?
A That is correct.
Q Okay.
MS. FARRELL: We can take that down.
Q As part of your work on this case, did you review OneTaste's general ledgers?
A Yes.
Q What are general ledgers?
A A general ledger is a system that a company uses to record all financial transactions, such as changes in revenues, all expenses, changes in assets, liabilities and owner's equity.
MS. FARRELL: If we could please pull up Government Exhibit 4096-FR, which is Tab 2-R in your binder, Your Honor, and Mr. Lubin. It's very tiny, I apologize.
First of all, actually, can we go to Government Exhibit 4096-F.
BY MS. FARRELL:
Q Mr. Lubin, is 4096-F one of the general ledgers you reviewed in this case?
A Yes.
Q And so, if we look at Government Exhibit 4096-F-R, is that a redacted version of the general ledger?
A Yes.
Q And what is reflect -- I'm sorry.

And are these -- is this redacted version of the exhibit and the original exhibit certified as a business record pursuant to certification Government Exhibit 5002?
A Yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 4096-F-R into evidence.
THE COURT: Any objection?
MS. BONJEAN: Your Honor, we would object only to the extent that it -- the contents of it, we believe, are hearsay. But I understand they've been authenticated by the company, so -- but I maintain my hearsay objection to the truth of the information on the ledger.
MR. ROBOTTI: We join.
THE COURT: Overruled.
Government Exhibit 4096-FR is admitted.
(Government's Exhibit 4096-FR was received in evidence.)
BY MS. FARRELL:
Q And so looking at this Government Exhibit 4096-FR, what is reflected in the general ledger here on the screen?
(Exhibit published.)
A Contributions and distributions.
Q And what does it show that OneTaste paid for?
MS. FARRELL: Mr. McNett, can you please zoom in? Right here. I'll show you. Yes, thank you.

A The --
Q What does it reflect?
A The second line item -- you want --
Q What is on the screen in front of you?
A Okay. It says OT paying Nicole's CA taxes 2014. OT paying Nicole's 2014 federal tax.

And I am having difficulty reading the last one.
Q So, did the general ledger for OneTaste in 2015 reflect that OneTaste paid Ms. Daedone's federal income taxes for 2014?
A There was a federal -- federal tax payment made by OneTaste, Inc. for her 2014 taxes.
Q And were you able to confirm that in the underlying IRS records as well, or are you getting it from this document, the OneTaste general ledger?
A Just -- just from the general ledger. It wouldn't show who paid that payment.

MS. FARRELL: And then if we can look at Government Exhibit 4110-C, which is behind Tab 3.

BY MS. FARRELL:
Q Mr. Lubin, is this another one of general -- excuse me, OneTaste general ledger?
A Yes.
Q And is this a certified business record pursuant to the certification in Government Exhibit 5002?

A Yes.
Q And then if we look at Government Exhibit 4110-CR, is that a redacted version of the same document?
A Yes.
Q Okay.

MS. FARRELL: Your Honor, we move to admit Government Exhibit 4110-CR.

THE COURT: Any objection?

MS. BONJEAN: Same objections, Your Honor.

MR. ROBOTTI: We join.

THE COURT: Overruled.

Government Exhibit 4110-CR is admitted.

(Government's Exhibit 4110-R was received in evidence.)

(Exhibit published.)

BY MS. FARRELL:
Q And, Mr. Lubin, does 4110-CR -- what does it reflect about OneTaste with respect to Ms. Daedone's federal income taxes?
A The payment -- the payment for 2015 federal income taxes.
Q So, the top line reflects what year?
A 2013.
Q And then the next line down reflects which year?
A 2015.
Q Okay. Finally, as part of your work -- well, let me do

this.

Going back to Government Exhibit 853, which is the summary chart of Ms. Daedone's reported wages and income.

If we look all the way over here at 2018 (indicating), do you know what the dates of those payments were or could you know that from the underlying records?

A I believe there is a deposit for one of those items. I recall seeing that.

Q Okay.

MS. FARRELL: So if we could take a look at Government Exhibit 4482-R, which is Tab 31-R.

Q Mr. Lubin, is this a June 2018 account statement from Wells Fargo for the account ending or for an account, the holders of which were Nicole Daedone and Yia Vang?

A Yes.

Q And is this document a certified business record pursuant to what's marked as Government Exhibit 4437-A?

A Yes.

Q And one of the transfers you're referring to that the summary chart showed, is that contained in this document?

A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 4482-R.

MR. ROBOTTI: No objection.

THE COURT: Ms. Bonjean.

MS. BONJEAN: I'm sorry, what was the date?

MS. FARRELL: June 2018.

THE COURT: Sorry. 4482-R, right?

MS. FARRELL: Correct.

MS. BONJEAN: I'll object on relevance grounds.

MS. FARRELL: Your Honor, this is to show -- so, we already have the summary chart in evidence showing payments in 2018, and the relevance of this is to show the specific date of one of those payments.

THE COURT: Overruled.

Government Exhibit 4482-R is admitted.

(Government's Exhibit 4482-R was received in evidence.)

(Exhibit published.)

MS. FARRELL: And if we could please go to page 4 of the document. If you could zoom in on the transaction.

BY MS. FARRELL:

Q What is the date of this $40,000 payment into the account from OneTaste, Incorporated?

A June 5th.

Q What year?

A 2018.

Q Okay. And then as you just testified, both Nicole Daedone and Yia Vang are accountholders of this account, is that correct?

A Yes.

MS. FARRELL: And so, if we could please take a look at Government Exhibit 32. Sorry, that's wrong. That was Tab 32. Government Exhibit 4461-B1, which is behind Tab 32.

BY MS. FARRELL:

Q Do you recognize this document, Mr. Lubin?

A Yes, I do.

Q What is it?

A It's a document provided by the Internal Revenue Service.

Q And was that included in the certified records that the Internal Revenue Service produced to the Government?

A Yes, it was.

Q And does this relate to the 40-thousand-dollar transaction we just looked at?

A Yes.

Q Okay.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 4461-B-1.

THE COURT: Any objection?

MS. BONJEAN: If I could have a second.

THE COURT: Yes.

MS. FARRELL: Do you need a copy?

MS. BONJEAN: No objection.

MR. ROBOTTI: No objection.

THE COURT: Okay. Government Exhibit 4461-B1 is

admitted.

(Government's Exhibit 4461-B1 was received in evidence.)

MS. FARRELL: If we can publish that.

(Exhibit published.)

BY MS. FARRELL:

Q Mr. Lubin, does this document show who the payee of that $40,000 transfer was?

A Yes.

Q And who was it?

A Nicole Daedone.

Q And this is for that June 2018 transfer we looked at a moment ago?

A Yes.

Q Okay. And then, Mr. Lubin, as part of your work that you were asked to do for this case, did you identify any wages reported to be paid by OneTaste or related entities to Beverly Daedone?

A Yes, I did.

MS. FARRELL: If we could please pull up Government Exhibit 4455-A-2.

Q Is this a document from the California Labor Department?

A Yes.

Q And was it certified as a public record pursuant to the certification marked as Government Exhibit 4455-A?

A Yes.

MS. FARRELL: Your Honor, I'd move to admit Government Exhibit 445-A-2 [sic] into evidence.

THE COURT: Any objection?

MR. ROBOTTI: Objection on relevance.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 4455-A is admitted.

(Government's Exhibit 4455-A was received in evidence.)

MS. FARRELL: Thank you.

(Exhibit published.)

MS. FARRELL: And if we could zoom in.

BY MS. FARRELL:

Q Were you able to total up the payments made to Ms. Daedone over a period of years from this document?

A Yes, I was.

Q Okay. So let's just walk through it, if we can.

MS. FARRELL: Give me one moment. Sorry.

Q So if we can look at this first page, please. What is the total there?

A $18,870.

Q Then if we could go to the next page, what is the total there?

A $14,169.29.

Q If we could go to the next page, please. What is that?
A The -- the amount is $14,150.68.
Q And if we could go to the next. How much is that?
A $14,160.
Q And if we could go to the next.
A $14,160.
Q And if we could go to the next.
A $14,160.
Q And are these, each of these amounts that we've seen, are they paid quarterly?
A It's re -- it's reported -- yeah, reported quarterly.
Q Okay. And what is the time period covered by this document?
And if it's easier to look at the hard copy, it's behind Tab 5.
A 2015 to 2017.
Q And for all the records you looked at, what was the total amount of payments to Beverly Daedone from OneTaste?
A Approximately $103,000, a little bit more than $103,000.
Q And what was that time period?
A Again, 2015 through the '17.
Q Okay.
MS. FARRELL: No further questions, Your Honor.
THE COURT: Any cross-examination?
MS. BONJEAN: Yes, Your Honor. Just a little bit.

THE COURT: Go ahead.

MS. BONJEAN: May I give these to you, Your Honor? They're documents that may or may not --

THE COURT: Okay.

MS. BONJEAN: -- be used.

THE COURT: Thank you.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Mr. Lubin.

A Good afternoon.

Q My name is Jennifer Bonjean, and I represent Nicole Daedone.

Sir, you are an FBI agent, correct?

A No.

Q Oh, my apologies.

You work for the FBI?

A Yes.

Q Okay. And you are an accountant employed by the FBI, do I have that right?

A I'm a forensic accountant employed by the FBI.

Q And you assisted the federal government in the investigation of this case, correct?

A Yes.

Q And you are, of course, familiar with the charge in this case, right?

A No, no.
Q You don't know what the defendants are charged with?
A Not -- not really. I just know looking at the financials. I'm really not into what was charged, per se.
Q Okay.
Do you know they're not charged with fraud?
A I believe they were not charged with fraud.
Q Okay. Not charged with tax fraud, wire fraud?
MS. FARRELL: Objection, Your Honor.
THE COURT: Sustained.
BY MS. BONJEAN:
Q In any event, notwithstanding the fact that you're unfamiliar with the charges, you did review a number of records in this case, right?
A Yes.
Q And I think you identified some of them; IRS records, right?
A Yes.
Q Department of Labor from California and New York?
A Yes.
Q Records that were provided by OneTaste, Incorporated, correct?
A Yes.
Q And those were provided via the prosecution through a Grand Jury subpoena, is that correct?

A Yes.
Q A company known as Intuit, records from a company called Intuit?
A Yes.
Q What type of company is Intuit?
A It's a software company. They provide a software for businesses, like payroll and taxes and such.
Q Okay. You didn't look at any corporate documents for the various corporations, right?
A No, I did not.
Q Like organizational documents, like incorporation documents or anything like that, right?
A I did not.
Q You didn't look at any employment agreements, right?
A I did not.
Q You didn't look at any other types of agreements between Ms. Daedone and OneTaste, right?
A I did not.
Q And to be fair, you cannot confirm that the records that you did review completely and accurately reflect income or losses from the various corporations, right?
A Would you repeat the question, please?
Q You cannot confirm that the records you reviewed completely and accurately reflect actual income or losses from the corporations that were referenced in the direct

examination?
A That is correct.
Q You're working with a set of records that were provided to you by the U.S. Attorney's Office, right?
A I'm using records that were provided via a federal Grand Jury subpoena.
Q Okay, right.
But the documents were actually given to you by the U.S. Attorney's Office or the federal agents? How did you get them?
A They were available in the FBI system.
Q Okay. And as you pointed out, those documents were obtained through a federal Grand Jury subpoena, right?
A Yes.
Q Okay. And so you don't have any first-hand knowledge about how those entities gathered the information to respond to the Grand Jury subpoena, right?
A Correct.
Q And, of course, you cannot guarantee that all documents that were responsive to the subpoena were actually provided, right?
A That is correct.
Q And, in fact, the IRS was unable to give you complete documents for the entire span of 2007 to 2000-and I guess it was '18, right?

A We received records from the IRS for that -- for that period.
Q Right. And they also -- they also indicated to you that they had no records available in some time periods, right?
A I don't recall that.
Q Would anything refresh your recollection?
A I simply don't recall it.
Q Right. But did you look at all the documents that were provided to you?
A Yes, I did.
Q Okay. So, if you were provided with a document, would it be helpful to look at that document to determine and be able to answer my questions?
A Yes, I guess. Yes.
Q Okay.
MS. BONJEAN: I'm going -- Your Honor, I'm going to ask that the witness look at Defense Exhibit 25-H, as in Henry.
THE COURT: Okay. He has a hard copy, right?
MS. BONJEAN: No, but I'll give him one. Probably.
MS. FARRELL: I'm sorry, what's the defense exhibit number?
THE COURT: 25-H.
MS. FARRELL: Thank you.
Q Mr. Lubin, can you thumb through that and let me know

when you've had a chance to do so?
A (Witness complies.) Yes.
Q Okay. Do you remember seeing this document in your review of all those materials?
A Yes, yes.
Q And does it refresh your recollection about what the IRS produced to you?
A Yes, it --
Q Okay. And would you agree that the IRS, for instance, was not able to produce all income tax returns during certain periods of time for the various entities?
A For these entities, yes.
Q Okay. And, in fact, for OneTaste, Inc., was there -- did the IRS indicate that it had no records for a particular period of time for employer's quarterly payroll tax returns?
You can look at page -- do you want a page number?
A That is correct.
Q Were you able to see that?
A It's on -- no record -- yes. I see that on the page ending 6567.
Q Okay. And tax account -- what's a tax account transcript, by the way?
A It's a certain type of reporting provided by the IRS. I can't give you more than that at this time.
Q Can you tell me --

A It's transcript -- I think it's transactional tax -- tax information.
Again, I -- I -- at this point, I -- I don't recall the definition of the transcript-type information.
Q Okay. So you're able to deduce that a tax account transcript has something to do with taxes?
A Yes.
Q But you can't tell us what information goes into a tax account transcript?
A I believe it's -- at this point, I -- I cannot.
Q Okay. You looked at materials for Caravan Retreats, Incorporated, right?
A Yes, I did.
Q And were you able to review any U.S. income tax returns for the year of 2007 to 2013 for Caravan Retreats?
A Repeat the question, please.
Q For Caravan Retreats were you able to review any U.S. income tax returns for that corporation for the years 2007 to 2013?
A I was not.
Q Fair to say, these summary charts that you have testified about do not contain information from those documents, right?
A From this -- from this document, that is correct.
Q Well, I'm not asking you about this document.
I'm saying if you didn't have access to those

materials you just identified, that is the income tax returns from 2007 to 2013 for Caravan Retreats, you would not have been able to rely on those materials in conducting your work, right?

A We have records from Department of Labor in New York, which showed Caravan Retreats, Inc. reported income --

Q Right. I understand --

A -- for individuals.

Q I understand. I'm not asking you what you did rely on. Right now I'm asking you what you didn't rely on.

And what I'm asking you is to confirm that you -- because you didn't have tax returns for Caravan Retreats between 2011 [sic] to 2013, you could not have possibly relied on them?

A That is correct.

(Continued on the following page.)

BY MS. BONJEAN: (Continuing.)
Q And similarly, if you didn't have employers quarterly payroll taxes for OneTaste as you previously testified, you would not have relied on those particular documents in conducting your analysis; right?
A That is correct.
Q Now you did have access to OneTaste's tax returns for 2013, 2014, 2015, 2016 and 2017; right?
A Yes.
Q And they file their tax returns as an S corporation, yes?
A Yes.
Q And do you have those documents in front of you, or would you like a copy?
A I do not have them in front of me.
MS. BONJEAN: How about I hand it to you.
I'd like to approach with Defendant's 25-F, 25-J, 25-E, 25-C and 25-B.
THE COURT: F, J, E and C?
MS. BONJEAN: Yeah -- 25-F, J, E, C and D.
THE COURT: Got it, thank you.
(Counsel approaches.)
Q These were among the documents you had in your possession when you did your analysis; correct?
A Yes.
Q And these are tax returns filed by OneTaste; right?

A Yes.
Q And if you need to refresh your recollection on anything, please feel free to do so.
Mr. Lubin, what was the total income for OneTaste in 2013?
MS. FARRELL: I'm going to object to the relevance, Your Honor.
THE COURT: Do you want to respond, Ms. Bonjean?
MS. BONJEAN: I do. I think -- I think the wages issue is an issue and what I'm going to ask about.
THE COURT: Okay. Give me one moment.
Overruled go ahead.
BY MS. BONJEAN:
Q Mr. Lubin, what was the total income that OneTaste generated in 2013?
A Total income on line six shows 2,487,788.
Q Okay. How much did they spend in salaries and wages?
A Line eight shows salaries and wages 866,374.
Q Okay. Can we go to 2014, please?
A The total income in 2014 for OneTaste?
Q The total income in 2014.
A Line six shows total income of 4,200,012.
Q How much in salary and wages?
A 1,269,142.
Q And how about 2015? I would ask you first to tell us

what the total income was for OneTaste in 2015?
A 5, 084, 664.
Q And at that time salaries and wages?
A 730,504.
Q 2016, income?
A Line six, total income, 7,357,995.
Q And salaries and wages?
A 931,166.
Q And 2017, what was the total income?
A 8,965,373.
Q And salaries and wages?
A 1,062,543.
Q Okay. Fair to say that between 2013 and 2017 the income continued to rise over the course of that period for the company?
A Yes.
Q You can put that aside.
I would like to have you look at these charts that we looked at briefly. Let's start with Government Exhibit 853.
(Exhibit published.)
Q And the wages that Ms. Daedone received over the course of eleven years -- well, let's just say ten years, through 2017. I know the number is off a little bit, but was under $1 million; right?

A Correct.
Q And, by the way, did you compare the wages she received to her tax returns?
A Yeah, I tied out the amount of wages that she received to her W-2 income, that is correct.
Q Well, I understand you're saying the W-2 income. Did you review her actual tax returns?
A I reviewed IRS records, information from her tax returns.
Q You of all people know that the IRS has a bajillion (sic) -- it's not a word, but if it's appropriate it's here, different types of forms they expect people to fill out, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You understand that IRS records encompass many different types of records; right?
A I don't understand the question. Sorry.
Q Well, for instance, IRS records could include tax account transcripts, right -- wait. We don't know that one.
They could include returns; right?
A It includes return -- yeah, return information, W-2, 1099 income, yes.
Q All types of different records; correct?
A Types of -- yes.

Q Okay. And what I'm asking you is when you did your analysis did you actually review specifically Ms. Daedone's tax returns?
A No. I reviewed the information that was in the IRS records, in the California Department of Labor records.
Q Sir, didn't it true, didn't you review -- you looked at Nicole Daedone's IRS records; right?
A Yes, I did.
Q Okay. Did you review specifically her tax returns?
A Tax returns information was provided in the records.
Q Can you just answer my question? Did you look at the returns, like the returns you just looked at did you look at those for Ms. Daedone?
A I do not recall at this time.
Q And if you did, I take it you don't know which years you looked at; right?
A I would have looked at all the records. At this point, I do not recall.
Q Do you know if you had all of her tax returns for the years that are reflected on this chart that we're looking at, that is 2007 through 2018?
A Can you repeat the question, please?
Q Yes, sir. Do you know whether you had in your possession individual tax returns for Ms. Daedone for every year reflected in Government Exhibit 853? It's up on the screen,

sir, if you need to see it.
A I do not recall.
Q Okay.
A I'm sorry.
Q And suffice it to say that you don't -- you know that from your work that there were -- this was wages received from OneTaste by looking at OneTaste documents that were then reflected here; correct?
A I'm sorry, can you repeat the question, please?
Q Sure. It wasn't a great question.
You derived the information on this chart really solely from OneTaste records. You didn't cross-reference it with records that were related to Ms. Daedone, right, that she had through IRS records, those types of things?
A I cross-referenced the California Department of Labor income records with the income in the IRS records.
Q Which IRS records?
A With the IRS records provided for Nicole Daedone.
Q Can you be a little bit more specific, which ones you were looking at?
A Yes, I -- it's provided in the -- the tax information provided shows her reported -- you know, reported income for 2007 through 2014 that she reported and then 2015 afterwards that showed the income that was attributed to her that was reported by OneTaste to the IRS. So, the initial records were

what she reported to the IRS and the subsequent records is what OneTaste income provided to the IRS.
Q Okay, what records are you referencing that she reported to the IRS?
A The -- well, the tax return information that was reported to the IRS, that's provided in the early records of what they provided.
Q Who is the "they" in that sentence?
A It's the -- it's the reported income by the individual that's given to the -- that's reported to the IRS.
Q That's what I'm asking you, what specific documents did you review that you claim reflect what Ms. Daedone reported herself to the IRS?
A The IRS records that -- for Nicole Daedone specifically shows the reported income per -- the income that she reported.
Q Where did she report it? That's what I'm asking. What records?
A This is information that's provided by the tax -- by the taxpayer or the taxpayers preparer to the IRS.
Q Right. And that's what I'm asking you. Did you look at the her tax returns? I thought you said you didn't previously.
A We look at the information that's reported to the IRS, that's including what's stated in the IRS records.
Q Sir, I'm really just asking you to be a little more

specific. You did this analysis; right?
A Yes.
Q You are vouching for this summary chart right here because the records were so voluminous, and we're taking your word for it because you reviewed it; right?
A That is correct.
Q Okay. So my question is, when you came up with the number -- we'll just do it randomly, 2011, $32,247, which you say are Nicole Daedone's reported wages and income received. Do you see that?
A Yes, I do.
Q Where specifically did you get that number? And a little bit more specific than IRS records.
A I don't have that specific record in front of me, but it's clearly stated in that record. If you want to pull up the IRS -- pull up the IRS record I can show you exactly where it is.
Q That's what you're here to do. You're here to testify about where you got that number.
A And I got that number from the IRS records.
Q Which IRS records?
A I don't know the page number of that record. It's in probably the first 20 pages of the tax return records for Nicole Daedone.
Q Sir, you didn't even have the tax returns for Ms. Daedone

for between 2007 and 2013; isn't that right?
A I had the reported information that was reported to the IRS. Those are the records that I used.
Q Reported by whom?
A Reported by either Nicole Daedone or Nicole Daedone's tax preparer.
Q Okay. I would like you to tell me specifically what documents you relied on, if you are able.
A I need the -- I need to pull up the IRS document, if that's possible and I can show you where the number comes from.
Q I'm happy to help you, but you have to identify it for me.
A In the return for Nicole Daedone, her IRS records.
Q And you mean her returns?
A The return information that was reported to the IRS.
Q Okay. We're going to put a pause on that because I have to go do your job for you.
THE COURT: What is the next question? No commentary.
What's the next question, Ms. Bonjean?
BY MS. BONJEAN:
Q 2018, you said that you looked at -- you said that in 2018 that Ms. Daedone reported wages and income to the tune of $55,000; right?

A Yes. There were --
Q 55,500?
A Yes.
Q And then we went back and looked at Government Exhibit 4482-R which is a joint account for a deposit of $40,000; right?
A Yes.
Q Okay. Now, simple math will tell us that's a $15,500 difference; right?
A Yes.
Q So, how are you able to connect this $55,500 to the $40,000?
A I'm able to connect that in 2018 there were two 1099 forms from OneTaste Inc., one for $40,000 and one $15,000 showing that Nicole Daedone is the beneficiary of that 1099 income.
Q Okay. So you looked at 1099s there; right?
A Yes, I looked at two 1099s that were reported by the IRS.
Q On direct examination you just looked at some deposits into her account, do you remember that?
A Yes.
Q Or a deposit?
A Yes.
Q And that was a deposit of $40,000; correct?
A Of -- a deposit of $40,000 from OneTaste Inc.

Q Right. And -- but what you're saying is that you also had the benefit of two 1099s but we just didn't look at them; is that correct?
A I'm sorry, can you repeat the question?
Q Yes. So on your direct examination you said based on this chart that she received 55,500 but then you also then just pointed to a deposit of $40,000 and I'm trying to understand why there's a discrepancy in those numbers.
A Well, this -- I attributed that 40,000 deposit associated with the $40,000 1099 income she received from OneTaste Inc.
Q Okay. And we didn't look at that 1099, though, on direct examination, right?
A We did look at that 1099. It was shown on the screen the 1099 information from the IRS.
MS. BONJEAN: 4461-B-1, let's pull that up.
(Exhibit published.)
BY MS. BONJEAN:
Q Is this a 1099?
A Yes. It shows 1099, document type, 1099-miscellaneous.
Q And it says $40,000; right?
A $40,000. That is correct.
Q And what is the -- is the one beneath it saying 15,500 or above it?
A Yes, it does.
Q Okay. So that's the document that you're referencing

that's how you arrived at 55,500; right?
A That is correct.
Q Okay. And you know of course that Ms. Daedone was no longer an employee of OneTaste at some point in 2018; right?
A I do not know the relation -- her business arrangement with OneTaste apart from the sale.
Q You knew that she sold the company though; right?
A Absolutely.
Q And, so, you can't say what this $55,500 worth of income was for; right?
A I had no idea what services were provided for this income.
Q Got it. And you don't know if it was, like, continued consulting or something along those lines?
A I have no idea what it was for.
Q But it was via a 1099 rather than a W-2; right?
A That is correct.
Q So for Ms. Daedone, Beverly Daedone, you didn't get into what services, if any, she provided; right?
A I have no idea what services Beverly Daedone provided.
Q I would like you to look at Government Exhibit 856.
(Exhibit published.)
Q Now, this was a chart that was put together by you or your colleagues?
A By myself.

Q You put this chart together?
A I compiled the numbers for the chart.
Q You put together the information that went into the chart; is that right?
A That is correct.
Q But you didn't do the formatting and so forth, right?
A That's correct.
Q And you have -- this chart reflects ten different individuals; right?
A Nine.
Q I'm bad at math. Nine.
And you don't know any of these individuals; right?
A I do not.
Q You don't know anything about how long they worked for the company; correct?
A Nothing.
Q You don't know if they worked part-time, full-time; right?
A No idea.
Q You have no idea whether they were paid under the table or whether they were paid on the books; right?
A I have no idea.
Q You have no idea whether they worked in a work/trade type of arrangement; right?
A I have no idea.

Q You have no idea whether or not how many hours they worked, right?
A I do not know, sorry.
Q And the amounts that you have incorporated here could be 1099s or W-2s right?
A This -- yes, 1099 or W-2, that is correct.
Q Anything else that you could think of that it could be?
A No, no.
Q And you don't know if it was salary versus commissions or anything like that?
A I just know W-2 or 1099.
Q Okay.

MS. BONJEAN: I have nothing further, Your Honor.

THE COURT: Mr. Robotti?

MR. ROBOTTI: Yes, Your Honor, briefly.

CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good afternoon, sir.
A Good afternoon.
Q My name is Mike Robotti and I represent Rachel Cherwitz.

MR. ROBOTTI: So, I would like to pull up Government Exhibit 856 which is one of the summary charts.

(Exhibit published.)

MR. ROBOTTI: And if we could highlight Christina Berkeley.

BY MR. ROBOTTI:
Q So, in 2007, Ms. Berkeley made $3,467; is that correct?
A Those are the -- those are the wages, the income that I was able to identify her with, yes, correct.
Q And in 2008 the income you were able to identify was $9,418; correct?
A Yes.
MR. ROBOTTI: Can we just turn to Government Exhibit 862.
(Exhibit published.)
Q Now, can we look at the numbers for Ms. Cherwitz in 2007 and 2008?
So, in 2007, Ms. Cherwitz had income of about $5,860; is that correct?
A Attributable to OneTaste, Inc., yes.
Q And in 2008 that was 12,434; correct?
A Yes, that is correct.
Q So there's only a few thousand dollars apart between Ms. Cherwitz and Ms. Berkeley in those years; correct?
A Can you show me that again?
MR. ROBOTTI: Can we go back to Government Exhibit 856?
(Exhibit published.)
A For Christina Berkeley say 12 -- 12,900 approximately and for Rachel Cherwitz, it's approximately -- a little over

$18,000.
Q Sir, I'm just asking in 2007 --
A Sorry.
Q In 2007 Ms. Berkeley made a few thousand dollars less than Ms. Cherwitz according to these documents, yes?
A Yes, a little over $2,000 less.
Q And 2008 the same thing, Ms. Berkeley made a few thousand dollars less than Ms. Cherwitz, yes?
A $3,000 less.
MR. ROBOTTI: Let's go back to Government Exhibit 856.
(Exhibit published.)
Q And can we look in 2013 the numbers for Michelle Wright and Lianna Lifson. Those are about $28,000 and $28,000 respectively; right?
A Yes.
Q Let's go back and look at what Ms. Cherwitz made for 2013.
MR. ROBOTTI: And that's on Government Exhibit 862.
(Exhibit published.)
Q So she made about $33,600 that year; is that correct?
A Yes.
Q That's only a few thousand dollars more than Ms. Wright and Ms. Lifson made in those years; is that correct?
A 5,000 and $4,000.

MR. ROBOTTI: Can we pull up Government Exhibit 862?
(Exhibit published.)
Q I want to walk through the numbers for Ms. Cherwitz. So, in 2007 she made about $5,800; correct?
A Yes, that's correct.
Q In 2008, she made about $12,400; correct?
A Yes.
Q In 2009 she made zero dollars; correct?
A That is -- I was -- I didn't find any income in 2009.
Q 2010 the same thing, about zero -- zero dollars; correct?
A Yes.
Q All right. In 2011, $20,600; correct?
A Yes.
Q 2012, about $24,000; correct?
A That is correct.
Q And 2013 about $33,000; correct?
A Yes.
Q All right, sir, are you aware that Ms. Cherwitz made less than average income in the United States in each of those years?
MS. FARRELL: Objection.
THE COURT: Sustained.
A I have no idea.
THE COURT: Sustained means you don't answer.
THE WITNESS: I'm sorry.

THE COURT: That is okay.

THE WITNESS: Sorry.

THE COURT: That is okay.

BY MR. ROBOTTI:

Q So in 2014 she made about $51,000; correct?

A Yes.

Q And then according to your document in 2015 her income jumped to about $107,000; correct?

A Yes.

Q All right. Does your chart reflect how hard she worked each year to get those raises?

MS. FARRELL: Objection.

THE COURT: Overruled.

A The chart reflects the income I was able to identify. I have no idea how hard she did or didn't work for that income.

Q Okay. So all this chart reflects is numbers; correct?

A Yes, it's numbers.

Q And in these numbers --

MR. ROBOTTI: We can step out of the highlight here.

Q So these numbers show that on average she made 35,156.92 each year.

A It would be eleven divided by -- I don't have my calculator here, but it would be 421,000 divided by eleven, so approximately, I guess, 35, $36,000. I don't have my calculator with me.

Q Is this the type of calculation the Government asked you to do?
A An average? To determine an average income? I don't have it on the chart. But I did prepare the chart and I vouch for all of these numbers.
Q You did prepare the chart. Did you decide which number to blow up in big print at the bottom?
A No, I did not determine which -- how to graphically show the number. My responsibility was to make sure that that number was absolutely correct.
Q Okay. So the Government decided which number to blow up at the bottom, correct, the prosecution team?
A Again, I did not do the graphics. I did the numbers.
Q And they didn't ask you to do the equation of how much she made per year during this time period; right?
A I did not do a calculation of the average income during this period of time. If I had a calculator I could derive that average income for that period of time.
Q So you did not do it and the Government did not ask you to do it; correct?
MS. FARRELL: Objection. Asked and answered.
THE COURT: Sustained.
MR. ROBOTTI: No further questions.
MS. FARRELL: I have some redirect.
THE COURT: Go ahead.

And we'll take a break shortly.

Go ahead with your redirect.

REDIRECT EXAMINATION

BY MS. FARRELL:

Q So, Mr. Lubin, Ms. Bonjean cross examined you a lot on Ms. Daedone's IRS records. Do you remember that?

A Yes, I do.

Q Okay.

MS. FARRELL: If we could please pull up for Mr. Lubin Government Exhibit 4461-A which is one of the certification documents I believe we referenced earlier and if we could go to the third page of the document.

(Exhibit published.)

Q Does this refresh your recollection with respect to personal IRS records for Ms. Daedone?

A Yes, thank you.

Q And so just to confirm did you -- go ahead.

A Yes. And this is what I was -- maybe if I may --

Q Let me ask a question and then you can answer.

So do you want to clarify anything having looked at this now?

A Absolutely.

Q Go ahead.

A Thank you. Okay. Because as I had stated earlier, it says individual master. If you look at the second row it says

"individual master of file online posted return data."

That's the data I stated that was reported in the tax return, in her tax return, that shows up in the IRS system. This reflects her tax return. This is that data. And then we see here the information returns processing transcript request. Okay, whatever you want to call it, but the IRPTRO, that's what the company reported, okay? And we see that the company is showing W-2 information, the company is showing 1099 information. That's the information that I was looking to.

Q You were looking at Ms. Daedone's income vis-à-vis OneTaste as opposed to an analysis of every -- everything in her financial history.

A I'm sorry, can you repeat the question?

Q I'll withdraw it.

MS. FARRELL: I'd like to show Mr. Lubin Government Exhibit 4461-B.

(Exhibit published to the witness, counsel and the Court.)

Q Do you see it on the screen?

A Yes.

Q Is this the approximately 1,500 page document that has the information for Ms. Daedone's individual tax returns that you reviewed?

A Yes.

(Continued on the following page.)

REDIRECT EXAMINATION

BY MS. FARRELL: (Continuing)

Q And, so, were you able to recall while you were being cross-examined precisely the page of this 1,500-page document that referenced what Ms. Bonjean was asking you?

A No, I do not. It's in the first 20 pages. If you flip through this, I can show you where the exact number comes from.

Q Okay. If we could look at page 6 --

THE COURT: Is there a question?

Q Do you see where it says "wages"?

A Yes, I do.

Q What is the number?

A $32,247.

Q And what year is this for?

A I think this would be probably for 2009 -- filed in 2011. It was filed in 2009 -- processing date.

If we can go back to the slide showing the income.

MS. FARRELL: If we could go to Government Exhibit 853, please.

Q Now we're on 853, if you'd look at 2011.

A Yes, 2011, it stayed the same.

$32,247, the exact amount reported in the IRS records.

Q Okay. And I'll spare everyone, but is the same process

the same for each of these years in this summary chart, Exhibit 853?
A All of the information in here is reflected in those IRS records.
Q Okay.
And you also -- Ms. Bonjean also cross-examined you on whether -- you don't how the entities responded to the Grand Jury subpoena; correct? You were asked that question?
A Yes.
Q Is it your understanding that individuals or companies that received Grand Jury subpoenas are obligated to respond?
A Absolutely.
Q Okay. And do you have any reason to believe that they weren't complied with?
A I have no reason to believe that they did not fully respond to the Grand Jury subpoena.
Q And what about -- okay.
You also testified about how you did not only rely on IRS records, but also Department of Labor records. Can you explain that, please?
A Absolutely. What I did was, I cross-referenced them. I would identify the income that was provided by the, say, New York Department of Labor and the California Department of Labor, and I'd have those numbers. I used my spreadsheet. I'd add those numbers together, and then I compared those

numbers to what accountants call tie-out. I tied out those numbers to the numbers that are in the records for the IRS.
Q And do you have -- based on your experience as a CPA, do you have an understanding of why the Department of Labor has this information?
A Well, companies are required by law to report -- my understanding is for all the states, but differently in California and New York, on a quarterly basis, and that's important for employees for like benefits and unemployment and such. So it's important they have the information as properly reported to the states.
Q So to the extent that there were very old IRS records that were not in what you reviewed, were you able to review the Department of Labor records and rely on those?
A I reviewed the information that was available that was given to me and I was able to -- for Nicole Daedone and Rachel Cherwitz, I was able to tie out the income reported, the wage income to the IRS records.
Q And then looking at 856, Government Exhibit 856 in particular, which is for the many individuals, is it accurate that everything here is information that was reported to the government?
A Yes. This is -- it's pulled -- it's pulled different from different sources. Now, it could be Intuit, Intuit records. It could be a 1099, a W-2.

I wanted to capture every penny that these individuals received from OneTaste and related entities. That was my objective, and that's what I did.

MS. FARRELL: Okay. May I have a moment?

THE COURT: Yes.

MS. FARRELL: No further questions, Your Honor.

THE COURT: Any recross-examination?

MS. BONJEAN: A little bit.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q Just a couple of questions.

A Great.

Q I'm going to have you look at Government Exhibit 4461-A that we just looked at, if you could, okay?

Let me know when you see it.

A Yes.

Q We looked at a document that looked a lot like this, but as it related to the entities, and that was Defense Exhibit 25-H? If not, it's okay if you don't remember.

A Actually, I don't remember offhand.

Q That's okay.

So Government Exhibit 4461-A, if you go to the third page, it indicates what types of tax information was provided by the IRS; right?

A Yes.

Q And on the individual -- and I'm talking here, the individual, Nicole Ann Daedone. Do you see that?

A Yes, I do.

Q Okay. And I was asking you on cross-examination if you looked at her individual income tax returns, and you were at the time unable to answer that question. Do you remember that?

A Yes.

Q Okay. And would you agree that the IRS only provided you with her income tax returns for 2017 and 2018?

A That is correct; yes.

Q Okay. And then you pulled information from some online master file; right?

A Yes. That is correct.

Q And that's where you got the other information; correct? Or strike that.

That's where you pulled information from which you relied on in creating these charts; right?

A Well, that is information that either I did use that information and the corroborated information that I had from the California Department of Labor records.

Q Okay. So and the California Department of Labor records would be the records that OneTaste would have disclosed; correct?

A I don't understand the question.
Q You're not looking at Department of Labor records for Ms. Daedone. You're looking at the Department of Labor records for the entity that's paying out for the labor; right?
A I'm looking at the information by OneTaste or Caravan Retreats, Inc. or whatever entity reported by individual, okay, to the California Department of Labor.
Q You mean listed by individual?
A Yeah.
Q Not by the individual?
A Yes. That is correct. That is correct. Listed by individual. Thank you.
Q But that's what I'm asking.
What you looked at primarily was what OneTaste or whatever related entities disclosed or reported -- that's the better word -- reported to the Department of Labor?
A That is correct, which tied out to -- equaled the information in the IRS records.
Q Okay. And these IRS records, you're talking about a file that's online; right?
A I'm talking about the two -- the groups of records, the transcripts that we have here and the, you know, plus the data returns.
Q The transcripts, there were no records for -- there were no transcripts for the years 2007 through 2014; right?

A Oh, that is correct. That was -- those years are just what the individual reported as opposed to what the company reported.
Q Right.
And I'm focusing right now on Ms. Daedone, just the individual. So all you really had to work with going back to pre-2015, meaning 2007 to 2015, was this master file online; right?
A Yes. The information that was reported by either her or the preparer to the IRS. That's correct.
Q Do you know what information is contained in that master file? Is it just like brute numbers or does it have -- or all the information you would find in an individual tax return?
A It had specific numbers reported from the -- it would have the 1099, it would have the W-2 information, for example.
Q Okay.
A As well as other information, just as we saw in the previous screen a little bit ago.
Q So that screen we looked at, is that an example of an online file?
A That is the -- yes, the $32,000-whatever figure.
Q Forty and 1550?
A Yeah.
Q But that information was just like a little -- if we're speaking the same language, that was just like a little, I

guess transcript almost or like a little entry. It wasn't an entire tax return; right?

A That is a specific amount that is -- that is fed from the tax return.

Q Right.

So you're not able to look at that and, for instance, tell whether she had any deductions; right?

A I was focusing on simply the reported income.

Q Right.

And you have no idea whether she had, for instance, income from other sources; right?

A There are other -- there is income reported, but, again, I was just isolating in those records the income that I could attribute to OneTaste, Inc.

Q Okay. And you were asked questions about the assumption that people comply with subpoenas; right? Do you remember that question?

A Yes, I do.

Q You have no idea, though, whether entities comply with subpoenas either purposefully or maybe inadvertently, right, that they failed to comply?

A I believe that entities, when they receive a Grand Jury subpoena, reply to the subpoena to the best of their ability.

Q Okay. That's fair.

But as you sit here today, for instance, Intuit, you

have no idea whether someone made a mistake or whether it was complete. You don't have firsthand knowledge about that; right?

A Oh, I have a high degree of certainty that the records from Intuit were complete. It shows the individuals and it shows the -- it shows it was filed with the IRS.

I have no reason to believe that the Intuit records aren't complete, let me put it that way. If I saw those records and if I saw like there was a page missing or, you know, we had -- we go from A to B and then we start with people -- with letters M through Z, I would say, yeah, I'm missing something.

But I didn't see that. Everything I saw looked complete in my eyes.

Q Yeah. My question is a little different.

I understand that you have no reason to believe it's incomplete. You don't have firsthand information one way or the other?

A I cannot say with absolute certainty it's, you know, everything -- the information is perfect, but I saw nothing in those records to show me it was incomplete.

Q Okay. And you said on that chart we looked at for the employees, select employees -- or select individuals I think it said up at the top -- do you remember that?

You said you wanted to capture every penny that you

could capture. Do you remember that?
A Yes.
Q Okay. But you can only capture anything they were -- anything that was reported; right?
A I can only capture the information that was provided to me.
Q Right. And that's the only information that was reported; correct?
A That was W-2 information, Intuit records, the Department of Labor in New York and the Department of Labor in California, and records provided by the accountant.
Everything I could capture, that's what I used to compile that data.
Q So you looked at -- you looked from top to bottom at the records you were provided?
A Absolutely. I wanted to capture -- I didn't want to understate anybody's income.
Q Okay. I'm not suggesting you do. I'm just asking you could only go off of what was reported from the materials that you were provided; right?
A I could only -- I could only show the numbers of information that I have.
Q Okay. Thank you.
MS. BONJEAN: I have nothing further.
MR. ROBOTTI: Nothing further, Your Honor.

THE COURT: Okay. The witness may step down.

THE WITNESS: Thank you.

(Witness steps down.)

THE COURT: It's about 3:30. We'll take our afternoon break now. We'll come back at a quarter to 4:00.

Have a good break. Don't talk about the case. Keep an open mind.

(Jury exits the courtroom.)

THE COURT: Everyone can sit.

I have a question.

Ms. Cohen, whose phone is Ms. Cherwitz using?

MS. COHEN: Oh, it's my phone. She's not using it, but I had information I wanted her to see about the case.

THE COURT: Okay. It's your phone?

MS. COHEN: Yes. Yes.

THE COURT: Thank you for that clarification.

I'll see you at a quarter to 4:00.

MS. COHEN: Thank you.

(Recess taken.)

THE COURT: Okay. We can bring in the jury.

MS. BENSING: So, Your Honor, I just want to flag for the Court briefly that we do not anticipate calling the victim-witness we mentioned.

THE COURT: Okay.

MS. BENSING: So the next witness will be the FBI

summary witness. I understand the defense is just going to lodge objections document-by-document.

THE COURT: Okay.

And do I have this set or --

MS. FARRELL: Yes.

MS. BENSING: It was the set that was previously provided to the Court.

MS. FARRELL: That has the color-coded chart in the front with the blanks for defense objections.

THE COURT: Andrew Punzo?

MS. BENSING: Yes.

THE COURT: Give me one minute. I'm not sure that I have the chart down here. Do you have an extra one? Although I'm not quite sure I need the chart if we're just going to be doing this in realtime.

MS. BONJEAN: Well, Your Honor, we do have a chart with our objections, but I think we need to maybe put it on the record anyway. I don't know how the Court wants to do it and --

THE COURT: Yes. At this point, I'm not going to be reviewing a 20-page chart with various objections. So you might as well object as the evidence comes in.

MS. BONJEAN: I think generally speaking although, Your Honor, we do take the position that the individuals who -- some of the individuals on these texts exchanges, the

Government has not made a prime fascia showing or a sufficient showing of co-conspirator.

I don't think they're putting on anymore witnesses, so I don't know if it will be subject to -- you know, I just want to let the Court know that I think that's our position.

THE COURT: Okay.

MS. BENSING: We just noted multiple different bases for admission, so if the Court does not find that a particular individual is a co-conspirator even though the Government believes it has established that, almost all of these are with the defendants themselves.

THE COURT: Okay. We'll bring in the jury and then you can call your witness.

(Jury enters.)

THE COURT: Okay. Everyone may be seated.

And the Government may call its next witness.

MS. GUPTA: Your Honor, the Government calls Special Agent Andrew Punzo.

THE COURTROOM DEPUTY: Please step up, remain standing and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Please be seated. State your full name for the record, spell your last name slowly. Please use the microphone.

THE WITNESS: Andrew Punzo, P-U-N-Z-O.

THE COURT: Ms. Gupta, you may proceed.
MS. GUPTA: Thank you.

**ANDREW PUNZO**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GUPTA:

Q Good afternoon.
Where do you work?
A Federal Bureau of Investigation.
Q Is that known as the FBI?
A Yes.
Q What is your title there?
A Special Agent.
Q How long have you been a special agent?
A A little over three years.
Q Are you assigned to any particular group or squad?
A Yes.
Q Which one?
A Civil rights.
Q Generally speaking, what are your duties and responsibilities in that role?
A Investigate violations of federal law, collect evidence and conduct operations like arrests and search warrants.
Q And what did you do before you were a special agent with

the FBI?
A I was an attorney.
Q And are you based in New York?
A Yes.
Q Are you familiar with John F. Kennedy International Airport?
A Yes.
Q Is it sometimes called JFK Airport?
A Yes.
Q And where is it located?
A Queens.
Q Are you familiar with La Guardia Airport?
A Yes.
Q And where is that located?
A Queens.
Q Are you aware of an investigation into Nicole Daedone and Rachel Cherwitz?
A Yes.
Q Are you one of the case agents?
A No.

MS. GUPTA: Your Honor, at this time, I would like to move to admit into evidence pursuant to Federal Rules of Evidence 803(6), 902(4), 902(11), and 902(13) the following self-authenticated exhibits: Government Exhibits 585, 822 and 822-A, and 3767.

THE COURT: Any objections? Do you need a minute?
MS. BONJEAN: Yes.
THE COURT: Do you want to let me know what tabs they're in?
MS. GUPTA: Yes, Your Honor.
THE COURT: Or just hand them up separately, whatever is easier.
MS. GUPTA: 822 and 822-A are tab 62 and 62A.
Government Exhibit 585 -- oh, I'm sorry.
THE COURT: Give it to me.
MS. GUPTA: 62 and 62-A. And then Government Exhibit 585 is at tab 66.
THE COURT: The last one?
MS. GUPTA: 3767 is at tab 63.
THE COURT: Okay. Let me take a look at those.
Do you have any objection?
MS. COHEN: Sorry. One moment.
THE COURT: No, just take your time.
MS. GUPTA: Your Honor, could I just have a moment to point defense counsel to --
THE COURT: Sure.
MS. BONJEAN: I don't think I have an objection, Your Honor. One second.
THE COURT: I'm still trying to find some of these.
MS. GUPTA: I'm sorry, Your Honor.

THE COURT: The number you're cross-referencing with the tabs is not the smoothest, but give me a minute.

Defendants can let me know when they're ready and have had a chance to look at it.

MS. BONJEAN: I have no objection.

MS. COHEN: No objection, Your Honor.

THE COURT: Let me make just sure I have the right numbers: Government Exhibit 585, 822, 822-A and 3767.

And no objection from the defense?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: All four of those are admitted.

MS. GUPTA: Thank you, Your Honor.

(Government's Exhibits 585, 822, 822-A and 3767 were received in evidence.)

MS. GUPTA: Thank you, Your Honor.

Can we please go to Government Exhibit 822 and publish to the jury.

(Exhibit published.)

Q Special Agent Punzo, what is this document?
A This is Google subscriber information.
Q What are subscriber records?
A Information about an individual for an account.
Q What account is this for?
A ndone1@gmail.com.

Q And who is the subscriber for this account?
A Nicole Daedone.
Q And when was the account created, according to these records?
A November 9th, 2006.

MS. GUPTA: We can take that down. Thank you.

Could we pull up for the witness only Government Exhibit 1030?

And, Your Honor, this is tab one in the binder.

THE COURT: Thank you.

Q Special Agent Punzo, what is this?
A An e-mail.
Q What is the date of the e-mail?
A October 7th, 2009.
Q I'm sorry. Who is this from?
A Nicole Daedone.
Q And who is it to?
A reesejones1@msn.com.
Q Is anyone cc'd?
A yia.v.vang@gmail.com.
Q And does this appear to be a fair and accurate depiction sent from NDone1@gmail.com on October 7th, 2009?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1030.

THE COURT: Any objection?

MS. BONJEAN: Yes, Your Honor. We object on relevance; hearsay.

THE COURT: Ms. Cohen? Is it from Rob?

MS. COHEN: No. And join, as well as cumulative.

THE COURT: Give me a moment, please.

Overruled. Government Exhibit 1030 is admitted.

(Government's Exhibit 1030 received in evidence.)

MS. GUPTA: Thank you.

Could we please publish to the jury?

(Exhibit published.)

Q Special Agent Punzo, I'll just ask you to read through this e-mail from the top.

A Good morning, Reese. I apologize if I caught you off guard this morning. I am never quite sure when or how to broach these topics without inspiring a small cyclone.

I have several things that I would like to handle. I will put them in e-mail form to give you a chance to go over at your leisure.

One, as I mentioned earlier for you to call Glowgow and set up payment for services today. The number is 564-1621.

Two, please sign me up for the following two writing classes starting October 20th, but will fill up. And there is a link following that.

Three, I would like to order those boots. They are the Golden Goose knee-high cowboy boots size 10, from the Broadway New York store. The person that Yia was speaking to was Emannuel at the San Francisco store and the number is 268-3563.

Four, I would like to go to go to Tahoe Saturday through Thursday around noon, sink in and write.

Five, I would like to set up appointment for us on Friday for acupuncture in the afternoon. Does this work for you?

Six, I was also thinking of a Thursday night massage at the Ayurvedic place on Hayes. Does this work for you?

Seven, I had an agent contact me on Facebook. I will forward.

I know, I know -- I know, I know we have David, but just in case, since David seems a bit difficult at best to reach.

Eight, let's look at when we want to return to New York, if we could to do the planning. There are two plays I would like to see and perhaps meet this agent and do other coaching intro and you can meet the CEO.

Nine, I am also thinking about closet and flooring for my room. It may be too earlier, but to let you know it's on my mind.

Ten, the Sun Conference. Did you sign up for it?

It's the one on October 30 and November 1 in Eselen. Maybe bring Kelly? Just a thought.

Eleven, Kelly will be out on November 14/15 and will need a place. The apartment would work fine.

Twelve, I suspect then that we need to talk about apartments and a longer term plan, so let's schedule to discuss. Mint Street, the house, and Stinson. Maybe Saturday on the way up to Tahoe.

I think that's it. Thank you for the New York experience. I feel like a lot got cleared.

I love my new suitcase and tennies. Thank you. But mostly, it was the time and depth we got to go to, open parenthesis, doesn't this make it seem like I am that woman on the plane from the Upper East Side who was very, very organized? Close parenthesis. Love you, comma, N.

MS. GUPTA: Thank you.

Can we pull up for the witness only Government Exhibit 1055 and this is tab 2.

Q Special Agent Punzo, what is this document?
A An e-mail.
Q Who is it from?
A rachelcherwitz@onetaste.us.
Q And who is it to?
A Reesejones1@gmail.com.
Q Is anyone cc'd or bcc'd here?

A Yes bcc'd, NDone1@gmail.com.
Q And what is the date?
A October 31st, 2011.
Q Does this appear to be a fair and accurate e-mail from Rachel Cherwitz at OneTaste.US to ReeseJones@gmail.com and Nicole Daedone?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1055.

THE COURT: Objection?

MS. COHEN: Relevance.

MS. BONJEAN: Relevance.

Relevance, 403; hearsay.

THE COURT: Overruled.

Government Exhibit 1055 is admitted.

MS. GUPTA: Thank you. Can we please publish to the jury?

(Government's Exhibit 1055 received in evidence.)

(Exhibit published.)

Q Special Agent Punzo, I will ask you to read through this, please.
A Hi, Reese. I miss you and Bax. The trip has been amazing. IN group was packed with 22 new bright players. Two people signed up for the OM class. One woman registered for the turned on woman's course in SF. Nicole knocked their

socks in the class.

On Saturday, the room was thick with electrical turn on. The demo was sexy, deep and rich. Was Yia sat up, the room was sitting fat in her orgasm. They couldn't get enough. All but two stayed to OM. The get off was honey sweet and golden.

Since arriving here Thursday night, we have made a total of $9,400. OM class, $2,600. TOW enrollment, $300. Coaching, $6,700. All in all, I would say the trip has been wildly successful.

Looking forward to returning home with all the turn on and continuing the upward motion of sales. See you tonight. XOXO, Rachel.

MS. GUPTA: Thank you.

Can we please show for the witness only Government Exhibit 1074-DR, which is tab 23-D.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Nicole Daedone and an unknown individual.

Q And what is the date of this chat?

A February 3rd, 2012.

Q Is what is depicted here an easier to read version than the original exhibit that you reviewed, Government Exhibit 1074?

A Yes.
Q Is this a fair and accurate depiction of Government Exhibit 1074?
A Yes.
MS. GUPTA: Your Honor, we'd move to admit Government Exhibit 1074-DR into evidence.
THE COURT: I don't think I'm looking at the right thing, I'm sorry. 1074?
MS. GUPTA: Yes. It should be tab 23-D.
MS. BONJEAN: Is it a subsection?
MS. GUPTA: It has a redaction on top.
THE COURT: Give me one moment.
Was this document -- was this the subject of a stipulation read last week or earlier?
MS. GUPTA: It is subject to the authenticity stipulation, yes.
THE COURT: Do you have a copy of the stipulations that these are subject to?
MS. GUPTA: Yes, I can hand it up.
THE COURT: Why don't you do that?
And it would be helpful if you could indicate, when you are dealing with a document, that it's subject to a stipulation because the stipulations have a lot of exhibit numbers.
MS. GUPTA: Yes, Your Honor. I will do that.

THE COURT: I think it will be easier for the defense to follow and it's certainly easier for the Court to follow that. Thank you.

So, now, you are offering 1074-DR, is that correct?

MS. GUPTA: Yes, Your Honor.

THE COURT: I'm sorry. Were there objections?

MS. COHEN: Yes, Your Honor. Hearsay.

MS. BONJEAN: Relevance and cumulativeness.

THE COURT: Okay. Give me one moment, please.

MS. BONJEAN: I'd also say foundation, Your Honor, to this one.

THE COURT: Overruled.

Government Exhibit 1074-DR is admitted.

(Government's Exhibit 1074-DR received in evidence.)

MS. GUPTA: Could we please publish to the jury?

(Exhibit published.)

Q Now, Special Agent Punzo, I will ask you to start reading at page 2, starting at the message at 10:42:18 a.m.

MS. GUPTA: And if we can scroll up a little bit? There we go.

Q Can you tell us who is this chat between?

A Nicole Daedone and an unknown individual.

Q Okay. So I will ask you to please read Nicole Daedone, and I'll read the unknown individual.

So starting at 10:42:18 a.m.: Was Reese like this

for you in the beginning?

THE COURT: Where are you?

MS. GUPTA: I'm on page 2, the chat at 10:42:18 a.m.

THE COURT: Okay. Go ahead.

Q Was Reese like this for you in the beginning?

A Well, Joanna, there's a difference.

Q Reese actually got it and you were skilled.

A And he paid a million dollars and loaned a million more.

Q Exclamations. And a whole team.

A BTW book launch countdown should be at the end of list on blog.

Q Okay. I am seeing, seeing that I can accept Steve as a game and take the things come as consequence. Take the things that will result. Or, I cannot. I can back out and gain my power in another way. There is something that tells me there is a piece in there for me. And I must loose myself to do it, I have also experienced this morning around work that will be required -- exquisite attention on all things and nothing even a bit extra. I had this realization and then Johnny and I downloaded the next video. It's incredible. Came quickly. And is it. We left immediately after the last words came. It's going to be epic. I'm so grateful. For you. For orgasm. For practice. For this life.

A Beautiful.

Q Special Agent Punzo, based on what you just read, who do

you believe this chat to be between?

MS. BONJEAN: Objection; speculation.

THE COURT: Sustained.

MS. GUPTA: Can we pull up Government Exhibit 1153-DR for the witness only? This is at tab 24-D.

THE COURT: This is also subject to the stipulation; is that right?

MS. GUPTA: Correct, Your Honor.

Q Special Agent Punzo, what is this exhibit?

A A chat.

Q Between who?

A Nicole Daedone and an unknown individual.

Q On what date?

A August 15, 2012.

Q And does this appear to be a fair and accurate copy of the original Government Exhibit, 1153 which is subject to an authenticity stipulation?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1153-DR.

THE COURT: Tell me the tab it is in.

MS. GUPTA: Tab 24E.

THE COURT: Any objection?

MS. BONJEAN: The same objection.

MS. COHEN: Join.

THE COURT: I'm going to ask you to respond to the objections.

MS. GUPTA: Yes, Your Honor.

Were the objections as to relevance?

MS. BONJEAN: Relevance and foundation and hearsay, because of lack of foundation.

MS. GUPTA: Your Honor, this corroborates existing testimony that we have had as to need to pay Reese Jones.

MS. BONJEAN: And the cumulativeness as well.

THE COURT: Overruled.

Government Exhibit 1153-DR is admitted.

(Government's Exhibit 1153-DR received in evidence.)

MS. GUPTA: Thank you.

Could we please publish to the jury.

Q Special Agent Punzo, I will ask you to read Nicole Daedone's statement and I'll read the unknown individual.
A I want to tell you but I think you know. Any money in goes to Reese as quickly as possible.
Q Yes, we are on the same page.
A Excellent. Keep Rob there as well. Smiley face.
Q I will. How do you like New York?
A It's awesome, Joe. I'm in my element. How are you?

MS. GUPTA: Could we please show the witness only Government Exhibit 1166-D.

AND this is, Your Honor, at tab 26D. And this is

also subject to the stipulation, Your Honor.

THE COURT: Thank you.

Q Special Agent Punzo, what is this exhibit?

A A chat.

Q Between who?

A Joanna Van Vleck and Nicole Daedone.

Q On what date?

A September 10, 2012.

Q Is this a fair and accurate depiction of the original Government Exhibit 1166 which is subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1166-D into evidence.

MS. COHEN: Objection on hearsay and cumulative.

MS. BONJEAN: Maintain our objections also previously raised and emphasize cumulativeness.

THE COURT: Overruled. Government Exhibit 1166-D is admitted.

(Government's Exhibit 1166-D received in evidence.)

MS. GUPTA: If we could please publish to the jury. Thank you.

Q Special Agent Punzo, what is the date of this exhibit?

A September 10, 2012.

Q Okay. I will ask you again to read Nicole Daedone's

statement and I'll read Joanna Van Vleck's statement.
A Can you do immediately? Today's exec meeting is figuring out how to pay off Reese loan in full by Thursday.
Q It's Tracy soon to be ex-husband. And yes, I can do immediately, whoo-hoo. Yes.
A We need everyone posting daily on own OM hub and cp and Ken should be on there as an expert it will help his coaching practice as well.
Q Yes.
A Daily. Everyone. Without fail.

Priorities one, Reese money.

Two, daily income.

Three, hold students incl posting and check ins and making sure boh is on 4. Set up turn on training.

Five, London secured so we aren't losing money.

Q Got it.

MS. GUPTA: Could we please show witness only Government Exhibit 1169-DR, which is tab 27D. This also subject to the stipulation.

Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Nicole Daedone and Joanna Van Vleck.
Q On what date?
A September 12, 2012.

Q Is this a fair and accurate depiction of Government Exhibit 1169 which is subject to stipulation?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1169-DR.
MS. COHEN: Same objection: Cumulative and hearsay.
MS. BONJEAN: Same objection.
THE COURT: Overruled.
Government Exhibit 1169-DR is admitted.
(Government's Exhibit 1169-DR received in evidence.)
Q And Special Agent Punzo, again, I'll read Joanna Van Vleck's statements and ask you to read Nicole Daedone's.
Rob and I just got done with Reese. We walked away with Reese getting a quote settlement number to us by Sunday as to what he will feel comfortable with to end this relationship. We will negotiate from there based on what he brings back. It was civil. He does not know if possible, very soon buyout.
A Aha. Does he know the number we owe him?
Q We had an agreed upon $1 million. We were asking him to agree that is all. He was squirming. He doesn't want to make, quote, records available of any money owed over and above 600K, the wire transfers to Caravan.
A But wait, Jo. We only owe him 400K more after today, right?

Q That's the part he's trying to squirm on. And when I asked him for records, he squirmed too.
A Okay. You Gita need to pin him.
Q Absolutely. We agree he would come with numbers Sunday and we would negotiate. Made it clear there would be negotiations.
A Okay. I'm not sure we should have talked to him until we had money. We should have said this amount in cash, open parenthesis, according to our records, closed parenthesis, for continued payments, period.
I'm not sure why you have him squirm room. I totally agree. Where's Rob?

(Continued on next page.)

DIRECT EXAMINATION (Continues)
BY MS. GUPTA:
Q I am going to get you and us free of us. There is no other way.
He went to put his laundry in. Reese still sitting on couch at 1080.
He won't go.
A I think we owe Reese 400k. We offer him that in cash. Maybe minus interest. That's it. Period.
He does.
Q I did feel a lot of compassion. He has a lot of crazy shit happening in his life.
A He's probably in shock. The man really loves us. The fear has gripped him -- the fear has him gripped.
You need to not let Rob's fear run this show.
How much did you give Reese today?
Joanna.
Q Just -- just done with OM. Sorry I missed you. We gave him 53k.
A So you and Rob need to discuss how it was that you gave Reese this squirm room. It's a major pain in my ass. We are the ones holding the cards.
Q He's getting his laundry. Rob handed him an envelope. I didn't see what was inside.
A Where's Rob? Did Reese sign the contract today getting

me out of the media contract?
Q I saw a letter yesterday informing him that a relationship was over. Was there a contract with that?
A I got it, thanks.

MS. GUPTA: Can we show the witness for identification only Government Exhibit 1222-DR, Tab 28-D.

And this is also subject to stipulation.

BY MS. GUPTA:
Q And, Special Agent Punzo, what is this?
A A chat?
Q Between who?
A Nicole Daedone and Joanna Van Vleck.
Q On what date?
A January 8th, 2013.
Q And is this a fair and accuract depiction of the original Government Exhibit 1222 that's subject to stipulation?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1222-DR.

MS. COHEN: Same objections as the last, Your Honor; hearsay, cumulative.

MS. BONJEAN: Same objections; relevance, hearsay and cumulativeness.

THE COURT: Overruled.

Government Exhibit 1222-DR is admitted.

(Government's Exhibit 1222-DR, was received in evidence.)

MS. GUPTA: Thank you.

And if we could please publish.

(Exhibit published.)

BY MS. GUPTA:

Q Special Agent Punzo, I'll again ask you to read Nicole Daedone and I'll read Joanna Van Vleck.

A Now, what we need is the massive enrollment and press released.

Q Yes. Massive awareness around it.

A If each city does 100 people, we are cool. Talk to Reese.

Q K. I will text him now. Texting with Reese now.

A Great. Messages from your orgasm are awesome, by the way.

Q Thank you. I connected to a man last night who is going to help us make them, quote, shareable from the e-mail format they come in, I'm excited for them to spread. They have 50 to 60 percent open rate, which Leanne says is unheard of.

A They really are amazing, Jo.

Q Emoji. Update. I've had two meetings with people in sales consultant-type roles. They are very different. One is scrappy and could work more quickly. Doug is larger scale and he will take longer. Both were initial conversations. I am

following up with materials and we will talk again early next week.

I just met with Reese for an hour. First note, I can't believe you lived in that house for so long. It doesn't feel like you at all. Secondly, he had a few ideas. The biggest was that he thought we should charge less and not use the number 1000 in the title. Don't tell how many people you want to have there.

A Oh, Jesus, and girl I die whatever it takes to keep the doors open. Emoji.

Q Emoji.

MS. GUPTA: If we could show the witness only Government Exhibit 1596-DR, which is Tab 39-D.

And, Your Honor, this is also subject to the stipulation.

MS. BONJEAN: Did you say 1596?

MS. GUPTA: 1596-DR.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Ms.joannav@me.com and Nicole Daedone.

Q On what date?

A August 4th, 2014.

Q And is this a fair and accurate depiction of the original

Government Exhibit 1596?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1596-DR.
MS. COHEN: Your Honor, objection to relevance, hearsay and cumulative again.
MS. BONJEAN: Join.
THE COURT: Overruled.
Government Exhibit 1596-DR is admitted.
(Government's Exhibit 1596-DR was received in evidence.)
(Exhibit published.)
BY MS. GUPTA:
Q And, Special Agent Punzo, again, I'll read msjoannav and ask you to read Nicole Daedone.
Note about London. The team there is meeting with Adam Spanier in 45 minutes. RH is saying she thinks he will want to put in 100k pounds and be a bigger part of the team.
A Oh wonderful. Brooke's money.
Q Yes. She has all the final pieces she needs. I will check with her now on when she transfers.
NYC has a list of things they are doing today.
They are in motion.
Meeting with Maya's mom on Wednesday.
I have a list of all things needed for cities today

and this week.

Currently, LA and NYC are moving the fastest. London is coming up quickly. FYI, I still have no texts from SF.

A Yeah, they are going to text with each other for a while.

Q Ok. Justine just text Marcus and asked if he would talk to her about how he got money in. Shall he talk to them?

A Argh. His response should be with a lot of help and talk to Jo.

Q And I'll just ask you to pick back up at the message at 12:48:16.

A I need an accounting of all money given to Reese following the loan repayment ASAP.

Q Oak. Getting it now. Rough estimate is between 5k and 10k. Getting accurate now.

A It's more than that.

Q Ok. That was a rough estimate. Getting figures from QuickBooks now.

A You're positive.

Q Ok. Got it. From OT, Inc. total equals 24,000 8/19 -- or August 19th, 2013 equals 2,500; July 25th, 2013 equals 3,000; June 28th, 2013 equals 2,000; June 27th, 2013 equals 1,000; March 25th, 2013, equals 3,500; September 10th, 2012 equals 12,000. Triple checking when the payoff date was for the big loan.

A And where are we at with the money?
I need all focus on money today.
Closing cities collecting, et cetera.
And a good vision of where we are.
Is any of that from cities?
How much is owed out?
Q And I'm just going to ask you, Special Agent Punzo, to pick back up on the 1:16:18 p.m. on page 5.
A And 150 goes to Justine of that goes through.
Q Yes. 150k goes to Justine. We will get 100k of that back in about twenty days.
A So we are actually behind.
Q We are not behind utilizing the 100k that just came in from Ravi. Justine's payout is calculated by using the city proceeds for it.
Update on Reese money. The 12K listed was paid to him before the big final payoff.
So the total money paid to him that is in our records is 12K.
Since the loan payoff.
A Ok.
Q So, 12K total to Reese is what is in our books. That is double-checked.
A Ok, thanks.
Q From OneTaste, Inc., total equals 12,000, August 19th,

2013 equals 2,500; July 25th, 2013 equals 3,000, June 28th, 2013 equals 2,000; June 27th, 2013 equals 1,000; March 25th, 2013 equals 3,500.

Accurate total and dates for money to Reese above. Yes.

A So LA and NYC come in when?

I need to pay Rob, but I need to give money -- give Reese money. Have we paid Ippolita for the month?

Q We have till September 1st to pay Rob.

LA will close by then.

Ippolita has not been paid for the month, that will be on the 23rd.

My apologies. It will be paid on the 25th.

It is 23k.

Let me do some math on our cash.

Here is where we are: We have 158k in our normal business accounts, after we pay the checks we have written. We have 200k in our prudent reserves if we pay Reese 100k and Justine 155k. We will be left with 103k total, no prudent reserves. The prudent reserves will be filling up again soon.

If Justine goes to London her 100k may come back sooner at this rate, as London got a verbal yes on almost half of their money today.

Both Justine and Reese payments are accounted for in our proceeds from the city sales.

A So we are getting how much by August 31st?

Ravi 100k in plus.

977 total.

Q And I'm going to ask you now if we could go to page 12 of the document.

And, Special Agent Punzo, I'll just ask you to start reading at 3:38:51 p.m.

A I am pushing them out SF very, very hard.

They will come back in nicer and more surrendered and we will say basically if Chris is a yes, and yes we will be talking to him. You are to accept him.

This tumescence will end. Period.

Q I like it.

On board.

Praise God.

A But only a quiet God.

Q Hearing it at a whisper from God.

A Sometimes Jo I will just be like, oh, my God, I am a very, very hard core person. I wonder of that's okay.

Q You have are hard core from a deeper place of love than most can feel.

A My God, it's like watching a me doing it and -- and watching it and the watcher --

MS. BONJEAN: I'm going to object. There's some inaccuracies in the reading, if you could -- I think.

THE COURT: Do you want to just read that last part again?

Q So, Special Agent Punzo, I'll just ask you to read the message at 4:06:40 again.

THE COURT: It might be easier. Do you have a hard copy?

MS. GUPTA: He does.

THE COURT: Whatever is easier for you to read it more accurately, the screen or the hard copy.

Go ahead.

A My God, it's like there's a me doing it and -- and watching it and the watcher is like, um, Nicole I'm not so sure this is on.

Ok.

Q Asterisk you are. It's beautiful.

A It won't be stopped so I sure hope it's God's will.

Q God is with us. I know that for sure.

A Phew.

Q God's will is coming through.

A Ok, then it's mighty strong.

And a little controlling.

It's like it's generous, but as soon as someone gets greedy or pissy, look out.

Q That came to me today. That it's an intense gain and it feels there are places where it's getting more exacting.

Like, greed.

That was the one that came to me today.

A Yes.

MS. GUPTA: Okay.

Could we pull up for the witness only Government Exhibit 1604-DR, which is Tab 40-D.

And this is also subject to the stipulation, Your Honor.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Nicole Daedone and Justine Dawson.

Q On what date?

A August 12th, 2014.

Q And is this a fair and accuract depiction of the original Government Exhibit 1604 that's subject to stipulation?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1604-DR.

MS. COHEN: Same objection, Your Honor.

MS. BONJEAN: Join.

MS. COHEN: Cumulative and hearsay.

THE COURT: Overruled.

Government Exhibit 1604-DR is admitted.

(Government's Exhibit 1604-DR was received in evidence.)

MS. GUPTA: And if we could please publish.

(Exhibit published.)

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q And, Special Agent Punzo, who is this chat between?

A Nicole Daedone and Justine Dawson.

Q So I'll read Justine Dawson, and I'll ask you to read Nicole Daedone.

Brian talks to dad Thursday and then comes to SF Friday.

So, hopefully, we can land him Friday. He told Paul he actually feels really good with Jeff. He wants to follow another investor's lead and the terms they agree to. So them talking could be good. Because Jeff isn't so concerned with the details in the way Brian is.

A Oh, good.

We should ask Reese to sit in with them.

And somehow reward Reese.

Q Oh, that's a great idea. I'll text Reese and ask him.

That will probably soothe Brian too -- to hear from a vc like Reese.

A Yes.

Q Oh.

You're pretty sure he won't add any charge, yeah?
A Well, 80 percent, sure.
Q Ha ha. Yeah. It's all a risk. I can talk to him first too.
A But Reese will need compensation if some kind.
Q Like financial?
A Something.
You can work out what feels ethical and good.
Q Ok. Let me talk to Nat and Paul. Maybe we could have him over for a dinner. We don't even have money to pay them yet.
A But when I pay him off that ended all, quote favors.
For OneTaste.
Just an FYI.
Q Got it. Yes. Let's not accrue any more, quote, debt.
A Precisely.
MS. GUPTA: If we could now pull up for the witness only Government Exhibit 1258-DR, which is at Tab 32-D, and is also subject to stipulation.
BY MS. GUPTA:
Q Special Agent Punzo, what is this?
A A chat.
Q With who?
A Joanna Van Vleck and Rachel Cherwitz.
Q On what date?

A May 12th, 2013.
Q And is this a fair and accuract depiction of the original Exhibit 1258 subject to stipulation?
A Yes.

MS. GUPTA: Your Honor, we moved to admit Government Exhibit 1258-DR.

MS. COHEN: Your Honor, objection on hearsay, relevance and 403.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1258-DR is admitted.

(Government's Exhibit 1258-DR was received in evidence.)

MS. GUPTA: If we could please publish.

(Exhibit published.)

MS. GUPTA: Thank you.

BY MS. GUPTA:
Q So, Special Agent Punzo, for this one I'll ask you to read Rachel Cherwitz, and I will read Joanna Van Vleck.

And I will start at page 2, 9:59:44 a.m. or, sorry, if you could start at page 2, 9:59:44 a.m.
A Oh boy.
Q FYI Maddie is asleep. I am waking her the fuck up. It's 10:00 a.m. No mic runners. No hot water. No BOH rounding people up.

A I'm here.
Q Drea said she isn't sure she wants to wake up?
A Yup. Hang on. She texting me.
Roy.
We are grounded this shit.
How your heart Jonanna?
Q It's open. Trembling.
Working to stay open.
A I have extra today, so I am sending you love.
Q Heart emoji.
A Maddie and I texting. She waking up.
Ok, how does it feel now?
Q She's rubbing her eyes.
A Ok, but how does it feel?
Ugh.
Q She not in the room.
How's it going with Drea?
A I just said, quote, are you sure you want to abdicate responsibility here in a way I collude with you and render you incapable, end quote?
It hard.
I know I'm still texting her.
Ok.
Q Maddie still asleep. She not hearing, rounding up students, nothing.

A Sending Maya and Eli back.
Q K.
A What do you need? I will come back there if I need to.
Kim and Rob shouldn't have to. They teaching.
You don't have to do it all alone, lady.
I have a lot of extra.
Q We good. Kimmie and Rob are good. We holding it.
Thank you.
Heart emoji emoji.
A We are getting to the seed of it.
Q Good.
A I got the seed out.
She got stuck with Reese.
Q What was it?
Way back when?
A After Yia and Michelle moved out.
Q Wow. Ok.
A She didn't want to go through the sound barrier with her Alex.
Asterisk sex.
Yeah.
Q Wow. Ok.
A I can feel Maddie again.
Q Awesome.
A Phew. How it feel to you?

Yeah, girl. It is.

She sobbing.

Big.

She pretty much admitted she using Drea as a shield from it.

Q That is intense with Maddie.

Room feels good. Moving the energy.

Big exhale.

A Yeah.

Q Wow.

A I was just about to text you.

Q FYI, I just have Roy a stroke about going faster on his list.

His responses are basically like...I don't have any time.

A WTF.

Q Seriously. These biatches need to speed up.

A Dude.

Q He has the... on his screen. Means he's writing a long ass response.

All that's needed is, quote, yes.

A Ha ha, I know. Bottom line it, bitch.

Q I need to give myself some flexibility here. There are certain things you want right away and I have a sense of how long it will take you [sic]. I have to juggle in non-OT

projects, I am part-time with you and I need to balance out other things I am doing. I do not feel comfortable making changes to the timeline right now. If I complete certain things on time or ahead of time, I can move other things up.

That's from Roy.

How do I best educate here?

A We should just give him a schedule.

Q What I said in reply: Ok. It sounds like you have a lot on your plate right now. I will hand this off to someone else. When you're clear about what you want to do, we can renegotiate.

A Ok. What did he say?

Q So, I'm going to skip ahead to page 11, starting at 11:20:47 p.m.

FYI, Roy getting his ass in gear in terms of projects.

He has completed three today.

Now he's telling me via text he has worked nine hours today.

A LOL.

Q Because he was afraid I would be mad and he's unhappy.

I am telling him we all work from fear. It's part of getting ignition.

He says he hasn't left his couch.

What I want to say is... awesome, you are now

showing signs that you can get a day's worth of work done.
A Yes, and be loving and supportive. It's like training a dog.
Q Emoji emoji heart.
A I know. Did you write back?
Q Something simple. He asked me to do fear inventory emoji.
A He's an ass.
Q He cracks me up.
A Right.
Q Tonight I don't even care if he's mad at me.
A He does this thing that Drea does where he regurgitates what he hears, but it's not true or integrated.
We so close to making the goal.
Girl, I'm tired of hustling.
I like to hunt, but hustling a lot of work.
Q You doing really well with the team.
A Emoji emoji.
Q Keeping them going and hiving and energizing.
A Thanks, Joj. They have to start lead grinning.
Asterisk genning.
Q Yes. Absolute.
A Emoji.
MS. GUPTA: Could we show the witness for identification only Government Exhibit 1521-DR. This is at

Tab 36-D. And it's also subject to stipulation.
BY MS. GUPTA:
Q Special Agent Punzo, what is this exhibit?
A A chat.
Q Between who?
A Rachel Cherwitz, plus-44793906992. And that's it.
MS. BONJEAN: Your Honor, can we --
A I apologize.
Q I think there's if you keep going --
A In addition, Yia, Joanna Van Vleck, Rachael Hemsi, Justine Dawson, and that's it.
Q What is the date?
A May 24th, 2014.
Q And is this a fair and accuract depiction of the original Government Exhibit 1521 you reviewed?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1521-DR.
MS. COHEN: Just one moment, Your Honor, I feel like we might be missing it.
THE COURT: You don't have it?
MS. BONJEAN: How many pages is it?
MS. GUPTA: Um, let me just check.
THE COURT: I have seven pages. Is that correct?
MS. GUPTA: Yes, that's correct, seven pages.

MS. BONJEAN: Okay, I think I have it.

Yes, I have it in front of me now. Do you have it? Do you want to see it?

(Pause.)

MS. COHEN: Okay. Your Honor, objections to relevance, hearsay and foundation.

MS. BONJEAN: Yes, Your Honor. It definitely has hearsay and also foundation, given the unknown number there.

THE COURT: Ms. Gupta, do you wish to be heard?

MS. GUPTA: Yes, Your Honor.

There are statements of a party opponent contained within, as well as co-conspirator statements. I think the context makes clear who the plus-44 number is.

And the remaining statements are additional co-conspirator statements, as well as statements that are simply there for context.

MS. BONJEAN: We object to the characterization of -- of a co-conspirator and object on hearsay.

THE COURT: Overruled.

Government Exhibit 1521-DR is admitted.

(Government's Exhibit 1521-DR was received in evidence.)

MS. GUPTA: If we could please publish.

(Exhibit published.)

MS. GUPTA: Thank you.

Q So, Special Agent Punzo, I'll ask you to read Rachel Cherwitz and I'll read the plus-44 number on the first page.
A Who is running the sales call and nationwide call?

(Continued on the following page.)

BY MS. GUPTA: (Continuing.)
Q I'm free to run either. I'm hacking at home free all day today.
A Great. Can you run both. No one sent the feedback from call script. I need it back ASAP.
Q Will do.
A I also need a very clear and laid out plan of how we are making money today.
Q What's the normal format of that?
A Rob, do you understand what I am asking here?
Q I understand the concept and request an example of how you normally do it.
A What am I asking?
Q You want to know how we're going to make our goal today. In the past, I've seen Eli's grid what's the current format if any?
A Don't use Eli's grid. That system doesn't work.
Q Fair enough.
A I want a clear and laid out plan for how SF, L.A., London and NYC are making 20 K a day.
Q I'll ask you to read the same and we can alternate.
A Do you all remember if we did prostate massage in class last mastery or did we just have the demo?
Q Demo. Wait, maybe we did. Yeah, no oral sex but prostate, yes.

A They practiced for sure. All the men got on the ground and spread their legs.
Q Oh, yeah, I remember Deb jamming her hand into Steve Bauer. Oh boy, image get out.
A Okay, awesome. I will tell him.
Q I'll say one of my concerns with this mastery in terms of voltage is that the six months had time to get to know each other so they're willing to do anything. These guys don't know each other and they're compressed for five days.
A I think the container we hold can affect it a lot. And let's plan for lots of adjustments possibly more people stepping out of exercises.
Q Let's also change the writeup on the website for future mastery. Who is a good zen or meditation purpose who can talk about deepening practice on the last day?
A Rob, can you run the staff call at 10 a.m.?
Q I can look up my NYC peeps for mediation?
A Yeah.
Q Landed. Rob said he was offline.

MS. GUPTA: Can we pull up for the witness only Government Exhibit 1796-DR, tab 42 D and this is also subject to the stipulation.

(Exhibit published to the witness, counsel and the Court.)

Q Special Agent Punzo, what is this?
A A chat.

Q Who are the participants?
A Ms.JoannaV@me.com and Nicole Daedone.
Q And what is the date?
A January 14, 2015.
Q And does this appear to be a fair and accurate depiction of the chats you reviewed at Government Exhibit 1796?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government 1796-DR.
MS. COHEN: Objection on relevancy and hearsay.
MS. BONJEAN: Join.
THE COURT: I'll take a relevance proffer.
MS. GUPTA: Your Honor, this corroborates witness testimony regarding Nicole Daedone and treatment of employees.
THE COURT: Give me a moment.
Q And if I could ask the witness to just repeat the participants. I think I may have misheard him.
THE COURT: Go ahead.
A Ms.JoannaV@me.com and Nicole Daedone.
Q Are you looking at 1796-DR, Special Agent Punzo?
A What's the tab number?
Q 42-D. I want to make sure we're on the same document. It's also on the screen if that's easier for you.
A My apologies. Ms.JoannaV@me.com and Rachel Cherwitz.
Q Thank you.

MS. GUPTA: I would add to the relevance proffer how employees treated Nicole Daedone.

MS. BONJEAN: Your Honor, I maintain the objection.

THE COURT: Yes.

MS. COHEN: Yes, agreed, Your Honor.

THE COURT: Overruled. Government Exhibit 1796-DR is admitted.

(Government Exhibit 1796-DR received in evidence.)

MS. GUPTA: And if we could please publish to the jury.

(Exhibit published.)

BY MS. GUPTAA:

Q And, Special Agent Punzo, I'll read Joanna V and I'll ask you to read Rachel Cherwitz.

Lady, we need to witch some shit. Can you help? Via bought Nic and Jason the wrong tickets and now the show Nic wants to see tonight is sold out, emoji. We gotta help Yia. Just text me I don't know what it's called. It's her friend.

A Yes, what show? Jo? Okay, hang on. I know.

Q Okay. I'm managing Yia.

A Okay, Yia needs to say that Nic is the best friend of the person doing the show.

Q I'm trying to get to the venue.

A I am making their be tickets at Will Call. Tell Yia not

to panic. I am getting inside the box office.
Q Okay, blank message.
A There are tickets. We are okay. I just need Yia not to panic, emoji, emoji.
Q Okay. I am telling her by D.
A Yes.
Q Not to panic.
A No panic, emoji. Tell her it's handled. God it's good.

MS. GUPTA: If we can pull up for the witness only Government Exhibit 1846-DR which is at tab 43 D and also subject to stipulation.

(Exhibit published to the witness, counsel and the Court.)

Q What is this?
A A chat.
Q Between who?
A Ms.Joanna -- Ms.JoannaV@me.com and Nicole Daedone.
Q On what date?
A January 14, 2015.
Q And is this a fair and accurate depiction of the Government Exhibit 1846 you reviewed with redactions?
A Yes.

MS. GUPTA: Your Honor we move to admit Government Exhibit 1846-DR.

MS. COHEN: Objection on relevance, Your Honor and hearsay.

MS. BONJEAN: Join.

THE COURT: Overruled. Government Exhibit 1846-DR is admitted.

MS. BONJEAN: Your Honor, I want to place on the record also that the absence of emojis also is a basis for objection for all of these.

THE COURT: What do you mean the absence of the emojis?

MS. BONJEAN: I mean, emojis can change the meaning.

THE COURT: You mean where there's a word emoji?

MS. BONJEAN: We don't know what emoji is being used.

THE COURT: Overruled.

You may continue.

BY MS. GUPTA:

Q Thank you. And if we can please publish to the jury.

(Exhibit published.)

Q Special Agent Punzo, I'll ask you to read Nicole Daedone and I'll read Joanna V.

A Can I tell you a secret? I'm so scared that if I ever split from Jason the whole community in couples would split, emoji.

Q Thank you for telling me. I am positive that whatever stroke happens will lead to what's the next right thing. I will remind you when and if that time comes. It's going to be

great and I think quite a few couples would stay together, emoji.
A Okay. Then I am going to marry the man who is sitting next to me in the AA meeting.
Q Emoji, emoji. What did he feel like?
A A man. Like a man, man, man, man, man. We need 20 weddings and I'm good.
Q Let's do it. We can get that in the near future.
MS. GUPTAA: If we can please show the witness Government Exhibit 2034 which is tab 14 and also subject to stipulation.
(Exhibit published to the witness, counsel and the Court.)
THE COURT: Give me the number again.
MS. GUPTA: Tab 14, Government Exhibit 2034.
BY MS. GUPTA:
Q Special Agent Punzo, what is this?
A An e-mail.
Q Who is it from?
A Nicole Daedone.
Q And who is it to?
A Justine.Dawson@onespace.us.
Q On what date?
A December 3, 2015.
Q And does this appear to be a fair and accurate depiction of an e-mail sent from Ms. Daedone on December 3, 2015?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2034.

MS. COHEN: Your Honor, objection on confrontation issue and relevance.

MS. BONJEAN: And I need a minute, Your Honor.

THE COURT: Can you move on to another exhibit? It's small print and it's quite long. I don't think it's a good use of time while everybody looks at it.

MS. GUPTA: Can we go to Government Exhibit 1232-DR which is tab 30 D?

(Exhibit published to the witness, counsel and the Court.)

Q Special Agent Punzo, what is this?

THE COURT: You're going to have to give me the number again.

MS. GUPTA: Government Exhibit 1232-DR and it should be tab 30 D in the binder.

THE COURT: Thank you.

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Joanna Van Vleck and Rachel Cherwitz.

Q On what date?

A February 12, 2013.

Q And does this appear to be a fair and accurate depiction of the original exhibit which is subject to stipulation between the parties?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1232-DR.
MS. COHEN: Objection on hearsay, cumulative and relevance.
THE COURT: Overruled. Exhibit 1232-DR is admitted.
(Government Exhibit 1232-DR received in evidence.)
MS. GUPTA: If we can please publish. Thank you.
(Exhibit published.)
BY MS. GUPTA:
Q I'll ask you to read Rachel Cherwitz, Special Agent Punzo.
A No more meetings. Team should OM five X a day.
Q Yes.
A Can you announce? I'm not doing meeting. It's too much.
Q Yes, no problem.
A Heart. I love you too Jonanna.
Q I love you.
A Can you run sales threads?
Q Yes. How are you doing, lady?
A How you?
Q I'm good. I want to know how to have our team make

money?
A Electricity. They need to OM a lot.
Q Okay.
MS. GUPTA: And if we can pull up for the witness only Government Exhibit 1235-DR which is tab 31 D.
(Exhibit published to the witness, counsel and the Court.)
BY MS. GUPTA:
Q Special Agent Punzo, what is this?
A A chat.
Q Between who?
A Rachel Cherwitz and Joanna Van Vleck.
Q On what date?
A February 28, 2013.
Q Is this a fair and accurate depiction of the original Government Exhibit 1235 that's subject to stipulation between the parties?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 1235-DR.
MS. COHEN: Hearsay, relevance, 403.
MS. BONJEAN: I join.
THE COURT: Overruled. Government Exhibit 1235-DR is admitted.
(Government Exhibit 1235-DR received in evidence.)
BY MS. GUPTA:

Q I'll start reading Joanna and you read Rachel Cherwitz.
We have Katie at 5:15 your time then Michele. FYI, been texting with Rosa. Apparently, Michele has been bitchy since this a.m.
A Michele is a bitch. I'm quitting.
Q Michele needs to pull her head out.
A She is too messed. It's a major conference. She cannot present there. She's sneaky. It's a major conference for medical professionals. She cannot present.
Q What the fuck is she talking about? I have never heard about it?
A She's hex around Sujo.
Q Totally.
A Can you handle?
Q Yes.
A Have her start with universities. She has a lot of charge. We need to address it. How did she get so fucking resentful? You have to be fierce Joanna. Joanna, be fierce please. Don't let her with bully you. This is bullshit.
Q Will do.
A Ah, I got it she feels left behind. Her little world.
Q Talking to Amy. Then I call you?
A Okay. Well?
Q Three minutes, or 3 min?
A Okay. Let's cut the botch, asterisk bitch. I'm on other

line for five min Rob.
Q Ha, ha, ha.
A What's she saying?
Q We talking about what it takes for you to be on?
A She's a cunt. Sorry, oh, my goodness, say something. From Ken, what is we make Michele the offer for Robert to be sales lead. Tell her Robert is ready to take it on and take the heat and the pressure. If she wants to keep it, she can't complain or get wigged out anymore. Something like that. WTF is he talking about?
Q I don't know.
A How is Yia?
Q She has been spending time with Reese.
A Ah. A YouTube link. Fire everyone. What did she say. You do it, Jonanna.
Q I think we got to do what we did last year. I've been talking to Nic. She said this year I got it.
A I went to pare down sales team. Marcus, George, Eli Andreas, Mark, Quinn, Jessica, Drea, say more.
Q She said I have to learn this one. I had this feeling the same as last year that people are resting and then Rob brought the news that people like Maya, Sasha and Amy are about to get a commissions of 4,600. Of all of them Sasha is the one who should get it. The rest don't do much. I asked Nic if we were to clean out. She said massively.

A Yes. Can I pare the sales team down? Can I also say it is fucking ridiculous for FS to be paid that much. Where you going?
Q Took a call. Back now. Totally. It makes me ill that they all make that much? You, Rob and Ken did the work of the IM weekend.
A So did Andreas, by the way.
Q Okay.
A I do. It's still too much weight.
Q You want Michele and RH off the sales, correct? Yup, the team is heavy. I think it feels right and what role shall Michele and Marcus have?
A We do tomorrow? Who cares?
Q FYI about to start an OM.
A Okay.
Q Done.
A I'm going to bed and, FYI, I don't want anyone on the team new on sell and tell Yia to top being a fucking cunt. It's ridiculous.
Q I will get in there.
A You keep saying that.
Q She is a slippery one.
A In what way?
Q Got to go slow to get it all the way in her ass?
A Just handle her. I mean it. She's being a bitch.

Q Okay. Has she been via text to you as well?

MS. GUPTA: Your Honor, if we can pull up for the witness only Government Exhibit 1162-DR, tab 25 D.

(Exhibit published to the witness, counsel and the Court.)

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q With who?

A Rachel Cherwitz, Keenan, Ms.JoannaV@me.com, Justine Dawson and that's it.

Q On what date?

A October 2, 2014.

Q And is this a fair and accurate and redacted copy of the original Government Exhibit 1162 subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1162-DR into evidence.

MS. COHEN: Objection as to hearsay and relevance.

MS. BONJEAN: Same objections.

THE COURT: Ms. Gupta, do you want to be heard as to the Keenan portions?

MS. GUPTA: Yes, Your Honor. Those are offered just for their context, not for their truth.

THE COURT: What do you mean for their context?

MS. GUPTA: Just to provide context to the chat, but they're not offered for their truth.

THE COURT: Objection overruled. Government Exhibit 1162-DR is admitted.

(Government Exhibit 1162-DR received in evidence.)

(Exhibit published.)

BY MS. GUPTA:

Q So, Special Agent Punzo, I'll ask you to read Rachel Cherwitz and then we can alternate.

A FYI, I am having the NYC team make a play with Ayries. Her and Ravi are pretty deep in the thick of their addiction and she hasn't been working since I left NYC. The play is to put her on probation for 30 days.

Q Probation with the New York business?

A Yes.

Q Okay.

A She needs a pretty serious wake-up call.

Q Okay. They all got to wake up. A few updates on some things Nic downloaded today. We are writing out a to-do list for the entire business of what's needed next week. It is centered around galvanizing what we have and optimizing. We have all the pieces. Now we put them together and get them out. I will send you all the list tomorrow.

A I good at galvanizing. You tell me what to do.

Q We need to start allocating our paths to creation, like

supporting OT Foundation and other charities and people's businesses that are based in orgasm that we believe in. We are going to tighten up with spending and use as much money as possible to allocate towards greatness in the world with orgasm. We need the cities to really start feeling like they can do it on their own, so our attention is freed up to do the next phase that we need to build. So, we will guide the sittings that way. I am willing to make a companywide presentation and make it to the team when we are in SF for the last mastery.

A Jo, this is really gorgeous.

Q Simple things too, like getting out three new YouTube videos up a week, taking what we have, galvanizing Danielle. Keenan and I have been working with Daniel, Jennifer Gray's guy, around messaging. He is brilliant and he's helping us to see that we need to be more of who we are in person, online. More to come on that in the next week as it develops. We're going to find an awesome way to give employee feedback in a way that is dignified and fun. And as always sales is our barometer for how much TurnON we have in our employees. The sales is the number one focus and we all doing this together. Emoji, heart, emoji, heart, heart, emoji.

A Okay, Jo. This is great and you got to go to bed. FYI, I am getting on with NYC soon to lay out the terms of Ayries' probation.

Q Okay.

Go ahead please.

A Emoji, heart.

Q Girl, got to wake up.

A Oh, that was for the DP.

Q Oh, hey, emoji, emoji, emoji, emoji, emoji, emoji, emoji.

A Hey, hey.

Q Oh my God, I love NYC. They got totally on board with Ayries.

MS. GUPTA: If we can pull up for the witness only Government Exhibit 1755-D which is tab 41 D.

(Exhibit published to the witness, counsel and the Court.)

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q With who?

A Rachel Cherwitz, Rebecca Elswith, Justine Dawson, Tazima, Clouds, Chris Cosely, +1-206-661-5560, Dustin, Yia Vang, Joanna Van Vleck, Andrew CP7, Theresa Diaz, Keenan Wang, undasee@aol.com. And that's it.

Q And what date?

A November 3, 2014.

Q And is this a fair and accurate depiction of the original Government Exhibit 1755, that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 1755-D.

MS. BONJEAN: Your Honor, again, rather than repeat with hearsay and cumulative, lacks foundation and it's just again irrelevant.

MS. COHEN: Join.

THE COURT: I am going to have you respond or you can move on to something else, given the time that we're at and come back to this.

MS. GUPTA: I'm happy to come back to it, Your Honor.

THE COURT: Go ahead.

I am sustaining the objection for now.

Go ahead.

MS. GUPTA: If we can move to Government Exhibit 2000-DR which is tab 44 D.

(Exhibit published to the witness, counsel and the Court.)

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Yia and Joanna Van Vleck.

Q On what date?

A August 27, 2015.

Q And is this a fair and accurate and redacted copy of the original Government Exhibit 2000 that you reviewed that's subject to stipulation between the parties?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 2000-DR.

MS. BONJEAN: One second please, Your Honor.

MS. COHEN: Our objection is hearsay, particularly given that there's neither defendant on here and relevance.

MS. BONJEAN: Yes, Your Honor. Objection, hearsay. This does not involve communications between either of the defendants and they have not met their burden sufficiently as to other matters.

THE COURT: Okay. Ms. Gupta, do you want to be heard on relevance and foundation here?

MS. GUPTA: Yes, Your Honor. This is corroborative of Rachel Cherwitz and treatment of employees that they have testified to throughout this trial.

(Continued on the following page.)

(continuing)

THE COURT: And your foundation for the first text on this? Your argument about that?

MS. GUPTA: The one at 5:34:77 [sic] a.m.?

THE COURT: Yes.

MS. GUPTA: Your Honor, that's relevant because it shows that the leadership was intending to speak with Rachel Cherwitz about this particular issue.

THE COURT: That's not evident from the face of this. So I'm going to sustain the objection.

MS. GUPTA: Could I add one thing, Your Honor?

THE COURT: It's also clear from testimony that RT refers to Rachel Cherwitz.

THE COURT: You're going to have to let me know what testimony that is. You can come back to it if you want.

MS. GUPTA: I'm happy to come back to it.

THE COURT: I'm sustaining the objection for now.

MS. GUPTA: If we can pull up Government Exhibit 2242-DR, which is tab 53-DE.

DIRECT EXAMINATION

BY MS. GUPTA:

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Rachael Hemsi and Rachel Cherwitz.

Q On what date?
A December 27th, 2016.
Q And is this a fair and accurate and redacted depiction of the original Government Exhibit 2242 you reviewed, subject to stipulation between the parties?
A Yes.

MS. GUPTA: Your Honor, we'd move to admit Government Exhibit 2242-DR.

MS. COHEN: Objection on hearsay; 403 as well.

MS. BONJEAN: Join on the hearsay objection.

THE COURT: Do you wish to be heard, Ms. Gupta?

MS. GUPTA: Yes, Your Honor. It's statements of a party-opponent, and the statements of the other, I believe we've met our burden as to co-conspirator statements. But if not, there's really not much of substance there and they're for context.

THE COURT: Overruled.

Government Exhibit 2242-DR is admitted.

(Government Exhibit 2242-DR was received.)

(Exhibit published.)

Q Special Agent Punzo, I'll ask you to read Rachel Cherwitz and I'll read Rachael Hemsi.
A Marla just texted. She's not sure if she wants membership. She got scared about the debt.
Q Oh, geez.

A You wanna call or you want me too?
Q You do it. That's right.
A Okay. I will get her lil mousy ass.
Q That's right. You will.
MS. GUPTA: Now, if we would please pull up Government Exhibit 1079, which is tab three.
Q Special Agent Punzo, what is this?
A An e-mail.
Q Who is it from?
A Rachel Cherwitz.
Q Are there multiple e-mails here?
A Yes.
Q So I will ask you to just -- who are all of the participants to these e-mail threads?
A Joanna Van Vleck, Justine Dawson, and that's it.
Q Is there another name? If you'd look at the top e-mail?
A Is this 1079?
Q Yes. I believe you said Joanna Van Vleck and Justine Dawson?
A And Rachel Cherwitz.
Q Okay. And what is the date of this e-mail exchange?
A February 9th, 2012.
Q And does this appear to be a fair and accurate e-mail chain between Rachel Cherwitz, Joanna Van Vleck and Justine Dawson?

A Yes.

MS. GUPTA: And, Your Honor, this is also subject to the stipulation between the parties.

We'd move to admit Government Exhibit 1079.

THE COURT: Any objection?

MS. COHEN: Objection on hearsay; relevance.

MS. BONJEAN: And also on this one, doctrine of completeness, Your Honor.

THE COURT: Do you wish to be heard on those objections, Ms. Gupta?

MS. GUPTA: Yes, Your Honor.

As to relevance, this corroborates scenes which several witnesses have testified to.

As to hearsay, they are statements of a party-opponent of a co-conspirator and remaining statements are for context only.

And as to completeness, we're not aware of any more e-mails on this particular chain, and defense has not pointed us to any.

MS. BONJEAN: That doesn't change the completeness problem.

THE COURT: Overruled.

Government Exhibit 1079 is admitted.

(Government's Exhibit 1079 received in evidence.)

Q So Special Agent Punzo, I'm going to ask you to start

with the most recent -- apologies -- the top e-mail and then just read down from there.

And if you could please clarify who the e-mail is from before you read, that would be great.

A From Rachel Cherwitz to Joanna Van Vleck and Justine Dawson: I know that we are waiting for her proposal and I need her to stop telling people about a residential program where people can come and stroke and get stroked, please.

From Justine Dawson to Rachel Cherwitz, cc, Joanna Van Vleck: What happened?

From Rachel Cherwitz to Justine Dawson, cc, Joanna Van Vleck: She needs to stop telling people about 1080 and scenes and shit like that.

From Joanna Van Vleck to Rachel Cherwitz, cc, Justine Dawson: I have talked to her about this. For today, I think we need to wait for her proposal for any more contact. She said it would be any time.

Q Thank you.

And what is the subject of this e-mail?

MS. GUPTA: If we could scroll to the top?

A Kelly.

MS. GUPTA: Can we pull up for the witness only Government Exhibit 1590-DR, which is tab 38-D?

THE COURT: 1590?

MS. GUPTA: 1590-DR.

THE COURT: Thank you.

Q Special Agent Punzo, what is this?

A A chat.

Q Between who?

A Ms.JoannaV@me.com and Nicole Daedone.

Q On what date?

A August 1st, 2014.

Q And is this a fair and accurate and redacted copy of the original Government Exhibit 1590 you reviewed, that's subject to stipulation between the parties?

A Yes.

MS. GUPTA: Your Honor, we'd move to admit Government Exhibit 1590-DR.

THE COURT: Does everyone have it?

MS. BONJEAN: I don't think I have all 13 pages. It looks like it's changed.

MS. GUPTA: Let me see.

THE COURT: All right. You know what? It's 5:25 on a Friday. I think it's a good time to stop. We can take this document or anything else up on Monday.

Is everybody in agreement? The parties in agreement on that?

MS. GUPTA: Yes, Your Honor.

THE COURT: Okay. I'm going to ask the witness to step down for today.

(Witness steps down.)

THE COURT: Okay. It is, in fact, Friday. Thank you all for your attentiveness. I hope everyone has a wonderful weekend and relaxes.

I will remind you what I remind you of every day, especially since we have a weekend coming up, although unfortunately, not another long weekend.

But over the weekend, don't discuss the case with anyone, including with your fellow jurors. If anyone approaches you and tries to discuss ask the trial with you, please let me know about it immediately through Mr. D'Agostino.

Don't read, listen to, or watch any news or other media reports of the trial. Don't conduct any independent research about the case, the matters in the case or the individuals involved in the case.

Don't talk to any of the parties, the attorneys, the witnesses about anything.

Keep an open mind and, again, thank you for your attentiveness, and I hope everyone has a good weekend.

Same timeframe on Monday, 9:15 in the jury room, so we can start at 9:30. Have a good weekend, all.

(Jury exits the courtroom.)

THE COURT: Okay. Everyone may be seated.

Ms. Gupta, approximately how much longer do you

think you would have for the witness on Monday?

MS. GUPTA: Let's see, I think I'm about halfway. Probably not. Sorry. I think I'm almost halfway. So maybe another two hours -- maybe another two hours.

THE COURT: Okay. It's probably hard for you to give an estimate of cross, given that --

MS. BONJEAN: I don't know what -- I don't think we would have a long cross.

MS. COHEN: Yes.

MS. BONJEAN: Our issues are with the admissibility; I think maybe if it's helpful over the weekend. I mean, it looks like we're doing okay ruling on the fly if there is a long document or something, perhaps.

THE COURT: Yes. I mean, my understanding from the Government is that they're offering the vast majority of these either as defendants' statements and/or co-conspirator statements.

Perhaps some of the statements are for context of defendant's statements, but it doesn't seem like that's -- at least today, been happening for the most part.

Is there any other category that you want to mention at this time?

MS. BENSING: No. I mean, some of them don't even constitute hearsay.

For example, we just looked at a long kind of back

of house sales thread. Much of that is not for its truth.

I just can put on the record for the Court to consider with respect to RT, we would point the Court to --

THE COURT: I don't know what you mean. Oh, the name? The initials? Yes. RT. Okay. I thought you were giving me an exhibit number.

MS. BENSING: No.

THE COURT: There are so many letters here.

RT. Go ahead.

MS. BENSING: So I would point the Court to the transcript at pages 2684 to 85. There was testimony from Michal Neria with respect to Rachel Cherwitz, did she go by any nicknames? RC or RT. And then we listed what RC stood for and what RT stood for, Rachel Tayeb. She was married at the time, Your Honor.

THE COURT: I just couldn't recall it in the moment.

MS. BENSING: I wanted to make that record, yes.

THE COURT: Okay. So is there anything the defendants want to be heard further on this general category? I have one other issue I want to raise with the parties, too.

MS. BONJEAN: Your Honor, I think we've already made a record, but we disagree that for instance, Joanna Van Vleck, I understand she was in the upper management, but just being in the upper management does not per se make you a co-conspirator. So I think we disagree with the Government's

assessment of who is and who is not and whether they have demonstrated anything more than, you know, people in senior management.

So I think I made the objection. We will maintain that objection.

THE COURT: I will hear from the Government.

MS. BENSING: Sure.

I think Mr. Kandell's testimony plainly established that she was one of the individuals who was involved in the conspiracy, particularly when you combine that with the content of all of these messages.

So obviously, the Court can look at an individual exhibit and still have to make a ruling as to co-conspirator statements, but then the Court can look at the entire body of these text message exhibits. I think the entire body of these establishes her status as a co-conspirator in addition to Mr. Kandell's testimony.

THE COURT: I mean, do you want to put on the record now who the universe of co-conspirators are that you believe fall within the co-conspirator statement rule?

I mean, I think it's been clear throughout the trial, but probably no harm in having you do that right now.

MS. BENSING: Yes. I just don't want to forget anybody.

But I think Yia Vang, Joanna Van Vleck, Robert

Kandell.

THE COURT: Go more slowly, please.

MS. BENSING: I'm sorry.

THE COURT: That's okay.

MS. BENSING: Yia Vang, Joanna Van Vleck, Rob Kandell, Rachael Hemsi, and Aubrey Fuller. Those are the ones who we would identify at the current moment. There may be more, but I'm just not -- I just want to consult with my team. But those individuals.

THE COURT: And Justine Dawson?

MS. BENSING: We are not seeking to admit anything through Justine Dawson as a co-conspirator, Your Honor.

THE COURT: So to the extent there are any Dawson statements, they are offered for context, correct?

MS. BENSING: Correct.

THE COURT: And that would be on chains with defendants?

MS. BENSING: Correct. I think she's only on chains with defendants.

THE COURT: Give me one moment, please.

I'm not sure that it's relevant, but I can't recall all of the testimony, but I think you made a representation yesterday about the individual coming into court about being a co-conspirator, correct?

MS. BONJEAN: A what?

THE COURT: A co-conspirator.

MS. BENSING: Yes.

THE COURT: Marcus.

MS. BENSING: I'm sorry, I don't think we are seeking to admit any of his statements as co-conspirators statements.

THE COURT: Right. Yes. I didn't think you were, but I wanted to just get the universe of people that you have represented are co-conspirators.

MS. BENSING: Sure. Yes. I think he may have been identified in one of our pretrial briefings.

THE COURT: I think you said it the other day.

MS. BENSING: Yes, I think I identified him as somebody we had alleged in our pretrial briefing was a co-conspirator.

THE COURT: Okay.

MS. BONJEAN: There is like 20 people they allege in their pretrial briefing. Again, we maintain that --

THE COURT: No. I understand. I'm assuming your position is the general position that there was no conspiracy.

MS. BONJEAN: Well, yeah. We don't think there is a conspiracy.

THE COURT: Or, at least, that your clients are not involved.

MS. BONJEAN: Okay.

THE COURT: That much I've got. So I will be addressing, you know, the Court's finding on co-conspirators' statements before the Government's rests, but you are still putting in statements.

MS. BONJEAN: Okay.

THE COURT: If the Government wants to be heard on that issue or anyone wants to be heard on that issue. I understand the defense position that there may be no conspiracy and certainly certain people up think are not co-conspirators.

MS. COHEN: Yes.

THE COURT: So there are many reasons why the Government has been offering certain documents. It's not just for co-conspirators. Sometimes it is also because they're statements of the defendant or they are statements of agents or they are not offered for their truth. So, I think everybody is on the same page on that.

There is one other issue I wanted to raise.

MS. COHEN: I'm sorry. Are we done, because I want to raise one other issue.

THE COURT: Does Mr. Robotti have to leave?

MR. ROBOTTI: I do, Judge, I think soon.

THE COURT: I'm happy to end relatively soon. But the other thing I have to say is going to take a couple minutes. But you are welcome to leave.

MR. ROBOTTI: I will hang out.

THE COURT: Go ahead.

MS. COHEN: I just want to also raise that a few of these are hearsay within hearsay. We see some confrontation clause issues. We haven't come to those. I think one of them was put aside. So we can --

THE COURT: Do you want to talk to the Government about those specific ones, though, because I would rather have less said in front of the jury than more, certainly.

MS. COHEN: Yes. And we can also, if it's helpful, just flag them for Your Honor over the weekend so you can take a look at them ahead of time.

THE COURT: Sure. It would have been helpful at the beginning of the week when I got this bare chart that had a whole column empty where it should have been defense objections.

MS. COHEN: There aren't that many.

THE COURT: Yes. I want to hear you fully, so whatever you want to give me.

MS. COHEN: Okay.

THE COURT: Was there anything else on this general topic?

MS. COHEN: No.

THE COURT: I'm not sure there is a more efficient way than you have been doing here. I almost cut you off a

half hour ago simply because it's Friday afternoon, and it sort of a cumbersome process -- and the jury looked like they were hanging in there and they were paying attention. By Monday, everybody will be fresh. I don't know if there is another way for you to do it. That's up to you. Give it a thought.

Okay. I wanted to go back to the issue of Dr. Ley. At the proceeding on December 10th, the Government actually withdrew without prejudice its motion to exclude defendants' proffered expert witnesses that had been at ECF Number 188.

So if the defendants still seek to call Dr. Ley and the Government, again, seeks to have the Court exclude his testimony, the Government can file a new motion and in the interest of time, that can be a letter motion. I think you probably have all that you need.

But I do recall at that conference -- I don't know if it was with respect to Dr. Ley specifically, but I think the defense was going to give more information to the Government. It may have been Leonard. Was that one of the other folks?

MS. BONJEAN: Yes, Leonard and I think there was another --

THE COURT: Kriegman?

MS. BONJEAN: There was one other guy, too. I'm blanking out on his name.

But he is not in the mix. Kriegman is not in the mix at this juncture.

I think Ley, again, was a twofold-type of issue. The issue he was kind of addressing, coercive control tactics and grooming as well as sort of the science. I do think, particularly on the science issue, which is what we will be offering him for, his report absolutely satisfies the rules.

THE COURT: Okay. So there was nothing else on him that the Government had asked for that you hadn't given because you did say you were going to give them more, but I don't remember if it was on him.

MS. BONJEAN: I don't think it was on him, but if it was, it would have been to the coercive control tactics.

THE COURT: I see.

MS. BONJEAN: But we're not putting on anyone else. Obviously, there is nothing to rebut on that. So we're not addressing that.

We are only offering him specifically on the benefits that have been established through the science in the OM practice. That's it. And I know they object, but that's where we're at.

THE COURT: Okay. It sounds like it can be a very short -- even a joint letter is actually fine, but I would want to have it by tomorrow by 5:00. Could you do that for me?

MS. BONJEAN: Sure.

THE COURT: I think you all have the information. I think, as a formal matter, because the Government had withdrawn without prejudice, I think I would like the formal motion. It can be a letter. And it should address specifically what you anticipate the witness testifying.

I think at the last -- at the conference where we discussed this last, I think you had described it as the scientific research examining the practice and the historical background regarding OM in sexual cultural practices. It was some description like that.

MS. BONJEAN: Yes. And that's what he lays out. And we can do a -- we can file a letter with the Court.

I think the scope of it can be, you know, pared down, too. I think that's what we were asking for in terms of, again, the benefits and the historical practice of OMing.

THE COURT: And I know the Government opposes that, but -- and I don't need you to belabor it. Just maybe put a joint letter in by 5:00 with the positions and then I can make a decision for you on that.

Is there anything else that we need to take up today?

(Continued on next page.)

(Continuing.)

MS. BENSING: I think so, Your Honor. Just --

THE COURT: Yes.

MS. BENSING: -- for scheduling purposes for next week.

THE COURT: Yes.

MS. BENSING: I just want to understand from the Court when we might have a jury charge --

THE COURT: Yes.

MS. BENSING: -- or a charge conference.

THE COURT: Yes. So, yes. My goal is to get you a draft charge Monday.

MS. BENSING: Okay.

THE COURT: I was sort of waiting to see in terms of when we'd have the charge conference, where we ended up, and if -- you don't have to tell me now, but if there's going to be a defense case for sure. You know, we can figure out what makes sense schedule wise.

I think doing a charge conference at 5:30 at night is not the best idea. So, I think that we would probably let the jury go earlier or come later. Probably let them go earlier.

There is a possibility that on Thursday we won't be sitting a full day. I'll let you know for sure on Monday for a couple reasons, but so that could possibly be a day, but I

think that might be too late. I just don't know.

I don't know how long your case is, but we will certainly be having a formal charge conference at an appropriate time, and you'll have the charge before then.

Do you want --

MS. COHEN: I think that sounds right.

THE COURT: Was there anything you wanted to tell me about the charge along the lines of what we talked about the other day?

You were going to look, Ms. Bensing, at one of the charges to see whether you wanted or didn't want to request it.

MS. BENSING: I think we still want to request it, Your Honor.

THE COURT: Okay. And this is on investigative techniques?

MS. BENSING: Correct, Your Honor.

THE COURT: Okay. I think I asked you another question about the charge.

MS. COHEN: Yes, the other acts, I believe.

THE COURT: Yes, yes. The other acts, yes.

MS. COHEN: And I took a look at our prior objections, I think we maintain our prior objections in the jury -- what it was, the December filing on that. I think --

THE COURT: But I didn't give you a draft yet, what

do you mean your objections?

MS. COHEN: I mean the objections that were submitted to the Court before.

THE COURT: Oh, you mean objecting to each other?

MS. COHEN: Yes, I think a joint was filed.

THE COURT: Yes, it was.

Go ahead, Ms. Bonjean.

MS. BONJEAN: Just the proposed positions we took I think is what Ms. Cohen is referencing.

MS. COHEN: Yes.

THE COURT: But I think I still need you, if you're asking for an instruction, to give me a specific one then.

MS. COHEN: Okay.

THE COURT: I think at this point, because I thought it was, I can look back, but I thought it was maybe more general or maybe overinclusive. I don't --

MS. COHEN: Yes. I know we object -- I saw that we objected or Ms. Bonjean and prior counsel objected.

THE COURT: Yes.

MS. COHEN: So, I was just saying I think we maintain that objection, but if --

THE COURT: I think I'm confused. Object to giving an instruction or not giving the instruction?

MS. COHEN: Giving the instruction.

MS. BONJEAN: I think -- I think we took a position

that there should be other bad act instruction if there was other bad act evidence introduced, and I think there is an argument that other bad act evidence was introduced.

But I think over the weekend maybe I would have to identify it --

THE COURT: Yes.

MS. BONJEAN: -- very specifically for the Court.

THE COURT: That's what I was asking because I'm not certain --

MS. COHEN: Okay, I'm sorry.

THE COURT: -- you were going to want one or that one is appropriate.

What is the Government's position?

MS. BENSING: So, it's the same as what I represented to the Court, I think last week, which is that from our perspective I don't think it's necessary.

But, obviously, we are fine with an other act instruction. We proposed one for the Court, if necessary. I don't think it's necessary, but I'm happy to hear what --

THE COURT: Right. And I'm not going to give one in a vacuum, though. That's what -- I need to know what it would be, what you think it would be addressing, and if it's something that the parties want.

But can you let me know that sooner rather than later?

MS. BONJEAN: Yes, Your Honor. I'm not even sure we would be proposing one actually. I'm of mixed mind on it. So, I would like --

THE COURT: I thought you might be. No, that's why I'm raising it. I want the parties' position on that.

MS. BONJEAN: Yeah.

THE COURT: Okay. Ms. Bensing.

MS. BENSING: Okay, so sorry. Just for scheduling for --

THE COURT: Yes, I'm sorry. I left you midstream on that thought.

MS. BENSING: No. I just -- I think we have the first four defense witnesses.

MS. COHEN: Yes.

MS. BENSING: We have still not received a narrowed list from Ms. Cohen. I think she had indicated she was going to provide one today.

MS. COHEN: Yes, I -- okay. I thought Mr. Robotti was working on that during -- that's one we will get that. He conveniently left. We will get that out shortly to you.

MS. BENSING: And then I will note that Special Agent McGinnis remains on the defendant's witness list. The Government would renew its motion to preclude testimony from him.

I am still hard-pressed to think of any relevant or

admissible testimony from him. So, I wanted to renew the Government's motion.

THE COURT: Okay. Well, so far there's been no proffer of any testimony he might give. There's been no indication, at least on that list you read out yesterday, that he's testifying or that you intended to call him.

So, if you intend to call him, I would want to know what you think he has by way of relevant, admissible testimony.

MS. COHEN: I think we --

MS. BONJEAN: I think it's best, if we're not -- we will give the Court our best argument about why we would want to call him. Right now I think is not the time, if the Court -- we're not prepared to make that argument right this second. We need to consult, and maybe we won't have that argument.

THE COURT: No, that's fine. I just would need to know before you would be trying to call him to the stand.

MS. BONJEAN: No, understood. Understood.

THE COURT: And the Government would need to know because I also am not -- it is not evident to me that he would have relevant, admissible testimony.

But you can raise it with me if you think he does.

MS. BENSING: And, Your Honor, just we would need to know a little sooner than later because we do have to

coordinate with the FBI. There is a two-week process.

THE COURT: Yes, I know.

MS. COHEN: We did do it --

THE COURT: We did the request.

MS. COHEN: Yes, right.

MS. BENSING: We still have a process on our end.

THE COURT: Yes.

MS. BENSING: And so, to the extent it's, for example, impeaching a witness statement, I don't even know what that would be on this record, but there are other agents who are on those 302s. Again, this is all in a vacuum because I don't know what they would be seeking to elicit through him.

THE COURT: Okay.

Is there anything else by way of defense witnesses that we need to take up?

MS. BENSING: I guess we'll just -- we'll continue to work with Ms. Cohen and Ms. Bonjean with respect to our 26.2 arguments as well.

THE COURT: Okay.

And, obviously, this is not the time for you to have to make any decision on this, but to the extent that either or both defendants decide that they don't want to testify, I will be wanting to, outside the presence of the jury, just allocute them --

MS. BONJEAN: Sure.

THE COURT: -- with respect to their rights in that regard.

MS. BONJEAN: Understood.

THE COURT: Okay.

MS. BENSING: Oh, and, Your Honor.

THE COURT: Yes.

MS. BENSING: We haven't yet heard back from the defense on the admitted Government/Defense exhibits, but I'm hoping to hear back from them. And then we can provide that to the Court because I do think we'll rest on Monday.

So I want to -- so I don't know if there's an update on timing.

MS. COHEN: Yes, I had indicated before, we are good on the list.

MS. BONJEAN: We have it. We had one like where we were -- it was almost exact, we had one or two exhibits where we didn't have it on our list and they didn't have one on their list, but I think we've gotten it.

THE COURT: Okay. I mean you can, obviously, check the transcripts, too. They should be complete in that regard.

Okay. So you'll get that to me when you have that.

MS. BENSING: Yes. Hopefully, like tonight or tomorrow so that the Court has time to review it.

THE COURT: But you are going to get me a list, but also the exhibits, right?

MS. BENSING: Yes.

THE COURT: Okay. Sounds good.

I will see everybody on Monday morning, but please do file the expert related submission by 5:00 p.m. tomorrow.

If you want to request a other acts charge, if you could do that by 5:00 p.m. tomorrow, too. If you don't want to, then there's no need to file anything.

And I think that's it. Okay.

MS. COHEN: Thank you.

THE COURT: Have a good weekend, everybody. I'll see you on Monday morning.

(Proceedings adjourned to Monday, June 2, 2025 at 9:30 a.m. )

ooo0ooo

# I N D E X


| WITNESS | PAGE |
|---|---|
| **ANTHIA GILLICK** | |
| CROSS-EXAMINATION (Resumed) BY MS. COHEN | 4199 |
| REDIRECT EXAMINATION BY MS. FARRELL | 4213 |
| RECROSS EXAMINATION BY MS. BONJEAN | 4243 |
| RECROSS-EXAMINATION BY MS. COHEN | 4254 |
| FURTHER DIRECT EXAMINATION BY MS. FARRELL | 4263 |
| FURTHER CROSS-EXAMINATION BY MS. BONJEAN | 4264 |
| **MARK LUBIN** | |
| DIRECT EXAMINATION BY MS. FARRELL | 4270 |
| CROSS-EXAMINATION BY MS. BONJEAN | 4331 |
| CROSS-EXAMINATION BY MR. ROBOTTI | 4352 |
| REDIRECT EXAMINATION BY MS. FARRELL | 4358 |
| **ANDREW PUNZO** | |
| DIRECT EXAMINATION BY MS. GUPTA | 4373 |

# E X H I B I T S


| Exhibit | Page |
| --- | --- |
| Defense Exhibits 12-AI, 12-N, 12-AJ, 12-AR, 12-Q, 12-BC, 12-BE, 12-GV, 12-GW | 4203 |
| Government Exhibit 5005 | 4267 |
| Government's Exhibit 853 | 4285 |
| Government Exhibit 856 | 4288 |
| Government's Exhibit 862 | 4289 |
| Government's Exhibit 4056 | 4298 |
| Government's Exhibit 4468-R | 4301 |
| Government's Exhibit 4467-R | 4303 |
| Government Exhibit 4465-R | 4304 |
| Government's Exhibit 4469-R | 4316 |
| Government's Exhibit 4466-R | 4318 |

# EXHIBITS


| Exhibit | Page |
| --- | --- |
| Government's Exhibit 4480-R | 4320 |
| Government's Exhibit 4096-FR | 4322 |
| Government's Exhibit 4110-R | 4324 |
| Government's Exhibit 4482-R | 4326 |
| Government's Exhibit 4461-B1 | 4328 |
| Government's Exhibit 4455-A | 4329 |
| Government's Exhibits 585, 822, 822-A and 3767 | 4376 |
| Government's Exhibit 1030 | 4378 |
| Government's Exhibit 1055 | 4381 |
| Government's Exhibit 1074-DR | 4384 |
| Government's Exhibit 1153-DR | 4387 |

# E X H I B I T S


| Exhibit | Page |
| --- | --- |
| Government's Exhibit 1166-D | 4388 |
| Government's Exhibit 1169-DR | 4390 |
| Government's Exhibit 1222-DR | 4394 |
| Government's Exhibit 1596-DR | 4396 |
| Government's Exhibit 1604-DR | 4403 |
| Government's Exhibit 1258-DR | 4405 |
| Government's Exhibit 1521-DR | 4412 |
| Government Exhibit 1796-DR | 4417 |
| Government Exhibit 1232-DR | 4422 |
| Government Exhibit 1235-DR | 4423 |
| Government Exhibit 1162-DR | 4428 |

# E X H I B I T S


| Exhibit | Page |
|---|---|
| Government Exhibit 2242-DR | 4434 |
| Government's Exhibit 1079 | 4436 |