UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 6, 2025

Defendant. : 3:30 p.m.

\- - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.

(Appearances continued on the next page.)

Court Reporter: Annette M. Montalvo
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(Jury trial proceedings commenced at 4:00 p.m., in open court, outside the presence of the jury, to wit:)

THE COURTROOM DEPUTY: Your Honor, *United States of America against Rachel Cherwitz and Nicole Daedone*.

Is the government ready?

MS. BENSING: Yes, Your Honor.

THE COURTROOM DEPUTY: State your appearances.

MS. BENSING: Kayla Bensing, Kaitlin Farrell, Nina Gupta, and Sean Fern, joined by paralegal specialist Liam McNett and Marlane Bosler, and FBI Special Agents Tricia Quintero and Christine Meyer, for the government.

MS. FARRELL: Good afternoon.

THE COURT: Good afternoon, everyone.

THE COURTROOM DEPUTY: Is the defense ready?

MS. COHEN: Yes, Your Honor.

Good afternoon, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge, on behalf of Rachel Cherwitz.

THE COURT: Good afternoon to everyone.

MS. BONJEAN: Good afternoon, Your Honor.

Jennifer Bonjean, B-o-n-j-e-a-n. Along with Kelsey Killion, as well as Sophia Moazed and Galila Assefa, all on behalf of the defendant Nicole Daedone.

THE COURT: Good afternoon to all of you.

I want to bring to the parties' attention two notes

that we have received from jurors since the time that they left Judge Marutollo and came here. And I will show these to you.

But I have marked the first one Court Exhibit 1. It is from a juror, and it reads as follows: I read a headline and subheading in this morning's NYT news feed regarding this case. I did not open the article.

(Court Exhibit 1, so marked.)

THE COURT: The second one is from another juror, a different juror. I am not able to come, and then it lists some dates.

(Court Exhibit 2, so marked.)

THE COURT: My understanding is that this particular juror did not raise an issue with timing, but I will give you these notes to look at, and I will hear from the parties then.

Mr. D'Agostino, can you show the parties -- I have marked the first one Court Exhibit 1, the second one Court Exhibit 2.

I'm going to show you the originals, take them back, and then I can hear the parties out.

(Said documents tendered to counsel.)

MS. FARRELL: May we have a moment to discuss, Your Honor?

THE COURT: Yes. And I will let you know what I am thinking as well, if that might be helpful before you discuss.

MS. BENSING: Sure.

THE COURT: Would that be helpful, Ms. Cohen?

MS. COHEN: Yes.

THE COURT: Let me tell you what I am thinking. I think that would be helpful. I think as to the first note about the person who read the headline and didn't open the article, I think that's, frankly, exactly what he's supposed to do, and so I don't think that there's anything to be done there. I will be giving preliminary instructions to the jury, which will include that they are instructed not to read, listen to, or watch any news. So I don't think there's anything to be done on that note.

Does anyone want to be heard?

MS. BENSING: The government agrees, Your Honor.

MS. COHEN: I'm sorry, Your Honor. Can I just, sorry, see the headline.

THE COURT: I don't know what the headline is. He didn't say what the headline is.

MS. COHEN: Oh, okay.

THE COURT: He just said, I read a headline and subheading, but he did not open the article. And it was a news feed. I don't actually know what he was referring to.

MS. BONJEAN: Your Honor, I think we agree as well. I think that may be inevitable, and as long as they do what they are told, which the Court reminds them, we are fine with

that.

MS. COHEN: Yes, we agree, Your Honor. Actually, the fact that he brought it to your attention, I think, actually says a lot.

THE COURT: Okay. So there's no action that needs to be taken on that.

The second one, I am not inclined to excuse anyone at this point. I think that, first of all, these dates are a bit aways off, and somebody who has been seated after a long process by the parties and by Judge Marutollo should remain seated, and I think can make other arrangements. I don't know why the person is not available or why the person did not raise it earlier. But I will hear from the parties. I also note that this is an alternate juror, a high number alternate. So I will hear from the parties then.

MS. BENSING: We agree with the Court's inclination, Your Honor.

MS. COHEN: We agree, Your Honor. I just wanted to confer because I don't remember her coming up for anything, and so I just want to make sure there's no language or something like that because it is odd.

THE COURT: Sure. Go ahead.

(Short pause.)

THE COURT: The letter is written in English.

MS. COHEN: That's a good point, Your Honor.

MS. BONJEAN: Yes. Your Honor, I actually think she was not even a late-in-the-day juror. She was sitting there throughout most of the day, I believe. So I don't know what the explanation is, but we're fine --

MS. COHEN: Yeah. We're fine.

MS. BONJEAN: -- leaving her as is for now.

THE COURT: Let me just make sure I can confirm with everyone as to both of those juror notes, no party is asking for any specific relief?

Is that correct, government?

MS. BENSING: Yes, Your Honor.

MS. BONJEAN: Yes, Your Honor.

MS. COHEN: Yes, Your Honor.

THE COURT: Okay. Are the parties ready to proceed?

Counsel for the government?

MS. BENSING: We are, Your Honor.

There was one issue that the government wanted to raise. We alerted the Court's deputy prior to opening statements.

THE COURT: You alerted us to the fact that there is an issue, so why don't you raise it now. I am not inclined to take up legal issues that could have been raised earlier, though. We have kept the jury, I think, here for a long day, and we are going to proceed to openings, but I will hear you out now briefly.

MS. BENSING: Yes, Your Honor.

And this is something that we had previously raised in our motions in limine, and so we just wanted to flag for the Court that we expected to open on it, and just in an abundance of caution, let everybody know that the government does intend to indicate in its opening statement, with respect to financial benefit, which is one of the elements of 1589, that Nicole Daedone sold OneTaste for $12 million.

And so I just wanted to flag that for the Court, that we intend to open on that, and for the parties.

THE COURT: Well, let me remind you, I think, of what I said on November 15. I think I said that I would require specific information, and nobody ever came back to me. Is that different than what you remember?

MS. BENSING: Well, Your Honor, I do have it open here. It was the government's understanding that the Court indicated it would not issue a blanket ruling precluding such evidence --

THE COURT: Right.

MS. BENSING: -- and that ultimately the parties heard -- ultimately, the Court heard additional argument from the parties, but it wasn't -- I'm sorry. It was not my -- I guess that's why we are seeking clarification.

THE COURT: You are seeking it when the jury is waiting to come out? We were together twice last week. I am

wondering about the timing now. I am not inclined to have lengthy argument on a legal issue right now.

I will hear from the defendants as well.

MS. BONJEAN: Yes, Your Honor.

As the Court is aware, we moved to preclude evidence of Ms. Daedone's financial condition, and specifically the sale of OneTaste. And that's largely because the sale of OneTaste took place in 2017, long after much of the conduct that the government is, frankly, going to elicit testimony about.

And our position then and our position now is that it's not clear that there is any nexus, frankly, between any acts of forced labor and this financial benefit. The evidence hasn't come in, our position hasn't changed, and, frankly, the 3500 material hasn't elucidated this issue at all.

THE COURT: Well, you and the government take a different position legally about what's required. You used the word "nexus." The parties -- both defendants, I think, and the government have a very different view, as evidenced by some of what's in the jury charge related submission.

Do I have that right, Ms. Bensing?

MS. BENSING: I think it is relevant regardless of the jury charge, as the government briefed, with respect to motive as well. But certainly with respect to the second prong of forced labor, there may be some dispute among the

parties.

THE COURT: I think that -- okay.

So it's your argument that it goes to subsection A or subsection B or both?

MS. BENSING: Both, Your Honor, which is what we briefed in our motion in limine.

THE COURT: I understand what you briefed. And I also understand where we left things, and I don't know why we are at a situation now where the jury is about to come out, and this is coming up again.

When did you raise with the defendants that you wanted to open on this?

MS. BENSING: We raised it this morning, Your Honor.

MS. BONJEAN: Afternoon, but.

MS. BENSING: I believe it was before the lunch break, but.

THE COURT: Do you intend to do any more than essentially tracking what's in the indictment in terms of the language there, in terms of receiving a benefit or --

MS. BENSING: We intend to say that she profited from the conspiracy, something along the lines of to the tune of $12 million, when she sold the company.

THE COURT: Given the late time at which you're raising this issue, which was an issue that was really left open for more specifics, I am not going to allow you to do

that. There may be something that you're able to say, but at this point, you waited too long to raise this issue, in terms of something you're opening on. I am not commenting on evidence that could come in at trial, but you raised this too late.

MS. BENSING: Okay. Understood, Your Honor.

THE COURT: I would have thought after all the time we spent together and all the times that I have told the parties to try to consult with each other and to work things out and then to raise issue in a timely way, I would have thought this would have been handled differently. I understand the parties have a lot to be working on as you prepare for trial, but this, to me, seems like something that could easily have been avoided by raising it earlier, either with each other or with the Court.

I am not making any ruling on the admissibility of this type of evidence because, as I said back in November, almost six months ago, I need to know the specifics. And I am going to leave it at that.

MS. BENSING: Your Honor, just one other issue.

THE COURT: Yes.

MS. BENSING: The government did want to invoke witness sequestration pursuant to Federal Rule of Evidence 615. We've spoken to the defense about that, and there's agreement here that it would apply to any witnesses in the

courtroom, or any attorneys or company counsel in the courtroom who would be conveying to witnesses the substance of other witness' testimony.

THE COURT: Okay. I was going to get to that shortly.

Let me go back to the question I asked you. You raised this issue, but are you ready to proceed, government?

MS. BENSING: Yes, Your Honor.

THE COURT: Okay. Counsel for Ms. Cherwitz, are you ready to proceed?

MS. COHEN: We are, Your Honor.

THE COURT: And counsel for Ms. Daedone, are you ready to proceed?

MS. BONJEAN: Yes, Your Honor.

THE COURT: I am going to ask Ms. Cohen first.

Have all formal plea offers from the government been conveyed to defendant Cherwitz?

(Short pause.)

MS. COHEN: Your Honor, as far as we know, there's been no plea offer.

THE COURT: Can the government confirm that?

MS. BENSING: I believe so, Your Honor.

THE COURT: Okay. Ms. Daedone's counsel, I will ask you as well, have all formal plea offers from the government been conveyed to defendant Daedone?

MS. BONJEAN: I am aware of none, Your Honor.

THE COURT: Government, do you confirm that?

MS. BENSING: Yes, Your Honor.

THE COURT: Government, have all applicable victim notification requirements been complied with?

MS. BENSING: Yes, Your Honor.

THE COURT: And I will remind you to comply with any victim related requirements going forward.

MS. BENSING: Yes, Your Honor.

THE COURT: And you mentioned you are requesting sequestration of witnesses, that's the government, and that the defendants -- let me get the defendants' position.

Counsel for Ms. Cherwitz?

MS. COHEN: Yes, Your Honor, we have no objection.

THE COURT: Counsel for Ms. Daedone?

MS. BONJEAN: No objection.

THE COURT: Okay. And let me understand what the parties are anticipating with respect to is there an agent who's going to testify, a case agent, who might otherwise be present in court? Is there any paralegal that's going to testify who would otherwise be present in court? Because I would not be inclined to sequester those witnesses.

MS. BENSING: Your Honor, there may be a paralegal who may have to testify at one point, who we would expect to be in the courtroom. I think under the rules that's not a

witness that needs to be sequestered, but I thank Your Honor for bringing this to our attention.

THE COURT: Do the defendants have any objection to the government's paralegals remaining in the courtroom even though they may -- one or both may testify?

MS. COHEN: No, Your Honor. No objection.

MS. BONJEAN: No, Your Honor.

THE COURT: And are either of the case agents potential witnesses?

MS. BENSING: Not the case agents at the table, Your Honor.

THE COURT: Mr. D'Agostino, can you bring the jury in.

Let me give the parties a few reminders. I think I said this last week, but, Ms. Bonjean, you weren't here.

When the jury comes in, everybody stands. When a witness is being sworn in, I do not want activity in the courtroom. I don't want noise, I don't want moving around. That is a very important part of the witness' testimony is when they are sworn in, and so I would like people to respect that.

And I formally grant the request to sequester witnesses.

MS. BENSING: Thank you.

THE COURT: We will bring in the jury.

MS. COHEN: Your Honor, just a small technical thing.

I think we mentioned this before. Starting tomorrow, our defense exhibits, we worked it out in terms of a computer. We actually have someone who's going to, for the first week, be operating it. His name is Keith Garland. I haven't put him on the record, but he was on the jury list of people.

THE COURT: Who is he?

MS. COHEN: Keith Garland. He's a paralegal from our office. Just so you know, he's not here today, but will be tomorrow operating those, and then I think just for the first week, and then the paralegals that are here will operate after that.

THE COURT: That's fine. He's a paralegal with your office?

MS. COHEN: Yes.

THE COURT: That's fine.

Okay. Thank you.

(Jury enters the courtroom.)

THE COURT: Everyone may be seated.

Good afternoon.

Mr. D'Agostino, would you please swear the jury.

THE COURTROOM DEPUTY: Please rise. Raise your right hands.

(Jury duly sworn.)

THE COURTROOM DEPUTY: Thank you. You may be seated.

THE COURT: Good to see everyone. I know everyone has had a long couple of days.

Members of the jury, we are ready to begin the trial of this criminal case. Now that you've been sworn in, I will give you some preliminary instructions to guide you in your participation in this trial. I will let you know what will be presented and will tell you briefly about your role as jurors.

You have already learned something about the case during the process of jury selection before Magistrate Judge Marutollo. I am Judge Gujarati, and I will be presiding over this trial.

You, as jurors, are here to administer justice in this case, according to the law and the evidence. You are to perform this task with complete fairness and impartiality, and without bias, prejudice, or sympathy for or against the government or either defendant.

This case is based on an indictment. During jury selection, Judge Marutollo summarized the indictment for you. I instruct you that an indictment is merely an accusation. It is not evidence of any defendant's guilt.

Because each defendant has pled not guilty, the government has the burden of proving the crime charged in the

indictment beyond a reasonable doubt as to each defendant.

A defendant is not required to prove her innocence. Rather, a defendant is presumed to be innocent of the accusations contained in the indictment. A defendant is not required to testify or to present any evidence at all. If a defendant decides not to testify or present any evidence, you cannot hold those things against her.

As you have already heard, the indictment contains one count. The count charges each defendant with forced labor conspiracy.

I will define the crime charged and its elements for you in more detail in my instructions to you after the presentation of evidence, and those instructions will govern your deliberations in this case.

I will now give you a preview of the stages through which this case will proceed so that you will know what to expect.

The trial will proceed in the following order.

First. The parties have the opportunity to make opening statements. One of the government attorneys will make such a statement. Then the defense attorneys may do so. They are not, however, obliged to make opening statements.

What is said in opening statements is not evidence. Rather, an attorney making an opening statement will attempt to give you an introduction to or an overview of the evidence

that the attorney expects would be produced in the course of the trial.

Second. After the opening statements, the government will introduce evidence in support of the charges contained in the indictment. Evidence can come in different forms. Evidence may be testimony from witnesses, evidence may be physical items, documents, images, recordings, or other types of exhibits, and evidence may be in the form of what are called stipulations. That is where the parties agree to certain facts or agree that if a particular witness were called to testify, that witness would give certain testimony.

There are two kinds of evidence: Direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. You may consider both kinds of evidence.

A word about what is not evidence. I have already told you that the indictment is not evidence. The questions and objections of the attorneys also are not evidence. And the statements and arguments of the attorneys are not evidence.

If the government presents witness testimony, one of the government attorneys will do direct examination, and the defense attorneys will have the opportunity to do cross-examination, asking questions of the government's

witness. After that, there might be some redirect examination, which is an opportunity for the government to ask some follow-up questions based on the cross-examination. And there might be some recross-examination by the defense attorneys.

You should at all times pay careful attention to the testimony given by the witnesses. However, if in the course of your deliberations you have questions as to what a witness, in fact, said on any matter, you will have access to that testimony. The court reporter will be available to read back to you any portion on which you have questions, or you will be provided with copies of the relevant portion of the transcript.

(Continued on the next page.)

THE COURT: If an item is received in evidence, for example a physical object or document, the attorneys may choose to have you look at it here in court right after it is received. Whether they do this or not, however, you will have the opportunity to examine the evidence when you deliberate.

Third, when the Government has concluded putting in its evidence, either or both of the defendants may present evidence; but as I mentioned earlier, they are not required to do so. The burden is always on the Government to prove every element of an offense charged beyond a reasonable doubt. The law never imposes on a defendant in a criminal case the burden of calling any witness or introducing any evidence.

As I mentioned when describing what will happen if the Government will present witness testimony, if either defendant chooses to present witness testimony, defense counsel would do direct examination, and there would be then the opportunity for cross-examination, redirect examination, and maybe recross-examination.

Four, if either defendant chooses to put on any evidence, the Government may not wish to put on further evidence for you to rebut what the defense has set forth.

Fifth, once all of the evidence has been presented, each party has the opportunity to present a

closing argument, also called a summation to you. What is said in these arguments is not evidence. The party making the argument is simply presenting to you its view of what the evidence has shown and suggesting to you the inferences or conclusions you should draw from the evidence.

You may find an argument sound and persuasive or you may not. Because the Government has the burden of proof in the case, it has the right to argue first, followed by the defense if an attorney for either defendant chooses to give a closing argument. After which the Government may give a rebuttal summation.

Sixth, after you have heard the closing arguments, I will instruct you on the applicable law.

Seven, you will then retire to consider your verdict. Any verdict as to Ms. Cherwitz must be unanimous and any verdict as to Ms. Daedone must be unanimous. You must give separate and considerable consideration to each defendant.

Members of the jury, you have a tremendously important task as jurors. It is to determine the facts. Our constitution gives a defendant a right to have you, who are members of the community, to find those facts. You, not the Court, are the sole judges of the facts. As sole judges of the facts you must determine which of the witnesses you believe, what portion of their testimony you accept, and

what weight you attach to it.

In the course of the trial the attorneys may from time to time stand and say that they object to a certain question or to certain evidence. They are asking me to make a ruling of law as to the admissibility of that evidence. There are certain rules that apply to the receipt of evidence in trials.

If I sustain an objection, it means that I have determined not to permit receipt of the evidence in question. If there is an objection to a question asked, and I sustain the objection, you are to disregard the question asked. You are not to speculate about how it might have been answered. You simply have no evidence before you on that subject. If I sustain an objection after the answer has been given, I will strike the answer, meaning you are not to consider it at all in your deliberations. You are to act as if that answer had never been given.

On the other hand, if I overrule an objection it means I have determined to allow the evidence to come before you. You should not, however, attach any special weight to evidence that comes in over objection. Simply consider it together with all other evidence.

It may happen that I instruct you that an item of evidence is being offered for a limited purpose only. If so, you must follow that instruction.

No statement, ruling, remark, or comment that I may make during the course of the trial is intended to indicate any opinion as to how you should decide the case or to influence you in any way in your determination of the facts.

At times I may ask questions of the witnesses. I do so simply for the purpose of clarification or to bring out matters that I think should be brought out and not in any way to indicate an opinion about the facts or the weight you should give the testimony of a particular witness.

At times it may be necessary for me to speak with the parties outside of your presence on issues that are of no concern to you. If so, I might excuse you from the courtroom or bring the parties to sidebar. Please do not take offense at this or speculate as to what we are discussing.

You must not be influenced by anything that you may have seen or heard outside of the courtroom or that you may see or hear outside of the courtroom during the course of the trial. This case must be decided by jurors who base their decision solely on the witnesses testimony and the other evidence introduced at trial. What you see or hear outside of here is not evidence.

From today until the end of the trial you must not conduct any independent research about this case, the

matters in this case, or the individuals involved in this case. In other words, you should not consult dictionaries or other reference materials, search the Internet, look to websites or blogs, or use any other tool electronic or otherwise to obtain information about this case or to help you in your decisions as jurors. Do not try to visit any of the places that may be mentioned at this trial, whether they are physical places or on the Internet. You are instructed not to read, listen to, or watch any news or other media reports on the case if there were any. If there were to be any publicity about this case, you must completely disregard it and not be influenced by it. It is very important that your decisions be made solely on the basis of the evidence presented in this case and that you not seek or obtain information from any source outside the confines of this courtroom.

There are several rules that should govern your conduct during any recess or break that we take in the trial.

First, do not discuss the case with anyone else during any recess, not with your friends, not with your family, not with your co-workers, not with anyone, and not even among yourselves. When I say do not discuss, I mean by any means in-person, by phone, by video, by email, by text through social media, or by any other means.

Even among yourselves it is important that each of you keep an open mind until all of the evidence is in and you have heard the attorneys' summations and my instructions on the law. Only after all of the evidence is in and you have heard the attorneys' summations and my instructions on the law will you begin to exchange views among yourselves and reach your verdict. But until you retire to the jury room at the end of the case to deliberate on your verdict, you are simply not to talk to anyone about this case. When you retire to deliberate you may begin discussing the case with your fellow jurors but you still cannot discuss the case with anyone else until the case is over and you are discharged as jurors.

I've spoken to you about not discussing the case with others; similarly, you should not permit any other person to discuss the case with you or in your presence. If anyone should approach you in an effort to discuss this case with you, you should report that back to me. You should tell that person you cannot discuss this case.

You should not, however, discuss with your fellow jurors the fact that someone tried to discuss the case with you or any other fact that you feel or you may feel necessary to it bring to my attention. The reason is, if something occurs that affects the ability of a juror to continue to serve fairly and impartially and that juror

communicates that to a fellow juror or fellow jurors, more than one of you may be affected.

To communicate with me, please write a note and give it to my courtroom deputy Mr. D'Agostino, who you have met, and he will ensure that will get to me promptly.

Although it is normal that people that we are thrown in the day to day contact with, please do not while you are serving as jurors in this case have any conversation with the parties, the attorneys or any witnesses in this case whether in the courtroom, in the hallways in the elevator, outside or anywhere else. By this I mean, not only don't talk about the case, do not talk at all even to pass the time of day. Someone seeing a juror in conversation with a party, lawyer, or witness might think that something improper was being discussed. To avoid even the appearance of impropriety, have no conversations. The lawyers as officers of the Court are particularly sensitive to this. So I can tell you that if they pass you in the halls without even acknowledging your presence, they do not mean to be rude. They are doing what they should be doing.

If you want to take notes during the trial, you may do so. Each of you have been given a notepad, but you are not required to take notes. If you do take notes, I want to caution you about a few things.

First, please make sure that your note taking does

not interfere with your listening to and considering the evidence.

Second, your notes are not a substitute for the official court record, and you're not to rely on your notes in place of the official road. The court reporters, who are excellent, take down what the witnesses say and you will have access to that testimony if you need it during your deliberations.

Third, your notes are to be used solely to assist you. You're not to share them with other jurors. And if you chose not to take notes, remember that it is your own individual responsibility to listen carefully to the evidence. You cannot give this responsibility to someone who is taking notes.

Fourth, please be sure to leave your notepad face down on your seat before each break and leave your notepad in the jury room at the end of each day. Do not take it home with you.

Please do not make up your mind until after you have heard all of evidence, after I have instructed you on the law, and after you have deliberated with your fellow jurors. Keep an open mind.

Those of you who have been selected as alternate jurors should listen just as carefully and conscientiously as the other jurors. You may very well be called upon prior

to the conclusion of the case to take the place of one of the jurors, and then you will have to render a verdict. So please pay strict attention at all times.

Before I end these preliminary instructions, a word about schedule. I anticipate that we will start each trial day here in the courtroom, and we're in courtroom 4B, at 9:30 a.m. sharp. In order for that to happen, you will need to assemble in the jury room here on the fourth floor by 9:15 a.m. Please budget enough time to get to the courthouse, pass through security, and get to the jury room by 9:15 a.m.

We will take a 45 minute to one-hour lunch break each day at approximately 12:30 or 12:45. We will also take a short break in the morning and a short break in the afternoon. We will end each day at approximately 5:30 p.m. If there are any schedule changes we will inform you of that.

I want to thank you in advance for your jury service. With that, by way of introduction, we will now hear from the prosecutor.

Do you have a microphone that you can use?

MR. FERN: I do.

THE COURT: You may proceed.

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

MR. FERN: For over a decade the defendants,

Nicole Daedone and Rachel Cherwitz, worked together to coerce vulnerable woman to perform labor, including sexual labor for their benefit. These women typically came from traumatic backgrounds and they were looking to improve their lives. The defendants lured these women into their supposed community. A community called OneTaste.

OneTaste claimed to promote female empowerment. Daedone was OneTaste's leader and Cherwitz was her top deputy. After gaining their victim's trust, the defendants set out on a criminal scheme to control these women.

The defendants drove their victims into debt. The defendants isolated their victims from the world outside of OneTaste and interfered with their family and romantic relationships. The defendants tracked their victims inner most fears. The defendants used psychological tactics to control their victims. They gaslit them and deprived them of sleep and privacy. They subjected them to sexual abuse.

The defendants did those things, and others, to coerce their victims to perform unpaid or underpaid labor for OneTaste. Working long hours, performing meaningless tasks, sexually servicing OneTaste clients and OneTaste's most prominent investor. These victims came to OneTaste seeking personal growth. They left as shells of their former selves.

What did the defendants get out of this? Power,

prestige, and money.

Before I continue, let me briefly reintroduce the prosecution team. My name is Sean Fern. I'm an Assistant U.S. Attorney in the Eastern District of New York. I'm joined by my colleagues, Assistant U.S. Attorneys Kayla Bensing, Kaitlin Farrell, and Nina Gupta. And by paralegal specialists Liam McNett and Marlane Bosler. We're also joined by Special Agents Tricia Quintero and Christine Meyer of the Federal Bureau of Investigation. Together, it is our privilege and duty to represent the United States.

Nicole Daedone founded and led OneTaste. As you'll learn, she took preexisting practices from communes and religions and rebranded them. OneTaste was selling hands-on courses involving what Daedone called orgasmic meditation, or OEM. OEM involved rubbing a woman's naked genitals for 15 minutes. As you'll hear, Daedone aggressively marketed OneTaste's genital rubbing course, holding herself out as a OneTaste guru.

Rachel Cherwitz was OneTaste's head of sales and Daedone's top lieutenant. For over a decade, the two of them worked together to grow OneTaste on the backs of the unpaid or underpaid labor of the vulnerable women they manipulated to doing their bidding. Much of that labor involved sexually serving OneTaste investors, as you'll see throughout this trial. Who the defendants coerced victims

to sexually service changed over time as OneTaste needs for money changed.

At its beginning, OneTaste relied on funding from a wealthy tech investor. Daedone and others recruited multiple women to sexually service him to keep him happy so he would fund and continue funding OneTaste. After they used up his money, the defendants switched to targeting anyone whose money they could get, charging them tens of thousands of dollars for what the defendants claimed to be advanced programs, exclusive memberships, and so-called personalized coaching sessions. That labor also included selling courses, transcribing notes, cleaning, cooking, setting up events, and attending to Daedone. You will hear that these women were expected to cater to Daedone's every whim.

Later on, when OneTaste started expanding and facing outside scrutiny, the company made superficial changes and introduced sham policies to mask Daedone and Cherwitz's continued coercion and manipulation. But nothing really changed.

Throughout this trial you'll hear from a series of women who turned to OneTaste for healing but left that community as remanents, broken remnants, of their former selves. Collectively their time at OneTaste spans over a decade. Some of these women knew each other, others did not

overlap at all. But the evidence will show a pattern in the way these defendants treated their victims. A pattern that clearly shows their plan to coerce their victims into performing labor and services for the defendants' benefit. It is a pattern that includes indoctrination, debt, isolation, weaponizing past trauma and breaking down personal boundaries. And it is a pattern the defendants relied on to get their victims to work for little or no pay. As you'll hear from the defendants' victims, the pattern repeated itself again and again and again.

For instance, you'll hear from Dana. Dana will tell you how she came to rely on OneTaste for her housing and basic needs. She will tell you how she was psychologically manipulated by the defendants. How she was coerced into debt by their claims that the path to personal growth ran through more and more expensive courses.

To payoff that debt, the defendants ordered Dana to work. That work involved rubbing perspective client's penises until they climaxed. And serving OneTaste's primary investor by taking care of his garden, making him breakfast, and performing sex acts on him.

You'll hear from Michelle. Michelle will tell you how she came to live in a OneTaste residence. To pay her for rent and OneTaste courses, the defendants ordered Michelle to perform a variety of labor, including working in

the kitchen, and sexually servicing that same wealthy OneTaste investor.

You'll hear from Becky. She joined OneTaste after that investor's money ran out. Becky will tell you how she was drawn to OneTaste's message of female empowerment. Like Michelle and Dana, Becky worked off substantial debt brought on by OneTaste by becoming a member of the OneTaste sales team where she was directed to let perspective clients rub her naked genitals. Becky will tell you about the psychological manipulation defendants subjected her to and about how Cherwitz sexually assaulted her in front of a room full of people.

You'll of also hear from a number of other women. Some of these women worked seven days a week from early in the morning until late at night. They slept in shared beds. They were expected to work through illness and to answer calls and text messages immediately. They all provided a variety of sexual services to support OneTaste. For this work, they were paid very little or nothing at all.

These victims will explain the tactics used against them that made them do this work. They worked because they were taught that the way to enlightenment was to obey the defendants' demands. They worked because they were isolated from their friends, their families, and the world outside the OneTaste. They worked because they were

taught there was no such thing as being a victim, and that doing the things they found sexually disgusting was the path to freedom. They worked because if they refused, they were shunned, called viruses or addicts and sent to addiction meetings designed to cause them to mistrust their own intuition.

But they also worked because they were scared. They were afraid that if they said no, they would be exiled from their homes and the only community they had. They were afraid if they said no, they would be spiritually ruined. They were afraid that if they said no, they would be verbally abused and humiliated. And they were afraid if they said no, they would be financially devastated.

These victims lived in fear that if they refused to do the work that the defendants demanded of them. They would lose their entire source of support, community, spirituality, and identity. Dana, Michelle, Becky, and others will tell you how the defendants tactics broke them down financially, physically, and psychologically until OneTaste was the only thing the victims had.

Meanwhile, OneTaste expanded globally, including to right here in Brooklyn. And Nicole Daedone and Rachel Cherwitz profited from the crimes.

For their action, the defendants are charged with the crime of forced labor conspiracy. While the judge will

provide you with specific legal instructions at the end of the case, a conspiracy is just another word for agreement. Forced labor is when someone gets another person to work for them by making that other person fear serious harm if they don't do the work. Serious harm can be any harm including financial, reputational, physical, and psychological.

During this trial the Government will prove that defendants committed this conspiracy beyond a reasonable doubt, through witness testimony, documents, video, photographs, and financial records.

First, you'll hear witness testimony. You will hear from former OneTaste participants who will give you an inside look into how this company operated. This will include some of the women the defendants exploited, as well as others that witnessed that abuse.

Second, you will see videos and photographs. You will see the OneTaste residences the victims lived in. You will see pictures of the victims. You will see where and how the genital massaging practice the defendants based their company on took place.

Third, you'll see documents. You'll see emails and you'll see communications including text messages with and about some of these victims. Messages that confirm the victim's testimony describing how their experience in OneTaste was damaging them financially, psychologically, and

otherwise. The types of work that they were doing and how they were coerced into doing it. You'll see financial records. You'll see the company's own records showing just how much these victims paid for OneTaste courses. And you'll hear how little the defendants paid their victims for their work.

You'll see that as victims were coerced to providing labor to OneTaste, Nicole Daedone and Rachel Cherwitz benefited. As these victims lived in shared beds and crowed spaces working long hours, Daedone used OneTaste's funds to enjoy a lavish lifestyle.

Members of the jury, the evidence will come in witness by witness. It won't always come in chronologically, but you'll see how this evidence fits together and how it proves that the defendants agreed to force their victims to work for them under threat of serious harm.

At the conclusion of this case we'll have an opportunity to speak to you again and review all of this evidence with you. At that time, we will ask you to return the only verdict consistent with the evidence that you have seen and that you have heard, guilty. Thank you.

THE COURT: Thank you, Mr. Fern.

Counsel for Ms. Cherwitz, do you wish to make an opening statement?

MR. ROBOTTI: Yes, your Honor.

OPENING STATEMENT ON BEHALF OF DEFENDANT CHERWITZ

MR. ROBOTTI: Good afternoon, ladies and gentlemen.

So as you've already heard over the last couple of days, my name is Mike Robotti along with my colleague Celia Cohen, Kelly Lin and Schuyler La Barge. It is our privilege to represent Rachel Cherwitz.

Sorry, folks, I know the Government threw a lot at you there, a frightening tale a lot of drama, a lot of scary buzz words, none of which is a crime. We're going to talk about that.

I want to reset here for a minute and talk about what this case is really about. It boils down to this, freedom to stay or freedom to go. Freedom to stay or go. It's very simple at the end of the day.

Put aside for a second orgasmic meditation. It was a very beneficial practice for so many people, but it's not going to be everybody's couple of tea. I don't want that to be a distraction while we talk about the key question in this case.

The same choice that people make every day whether they are a librarian, a construction worker, postman, a lawyer or anything else: Do I want to keep doing this job or do I want to quit and do another job. If the exit door

is always open, then you are free to stay or go.

The evidence will show that the exit door at this company was always open. No one held a gun to anyone's head to make them work. No one threatened physical violence. No one locked the door and said you're not leaving until you finish the job. This case is the exact opposite of that. The people stayed because they believed in this company and they wanted to work there.

The Government is going to spend the next several weeks doing all sorts of mental gymnastics. You heard them start today. They are going to try to convince you that people cannot walk out the open door right in front of them if they didn't want to do this job. But you'll see it's really not that complicated. The simple truth is that the exit door was always open and that the Government's proof of this crime is non-existent. It's not even close to proof beyond a reasonable doubt.

So there is only one conclusion that you should reach at the end of this case, and that is, Rachel did not commit this crime and she's not guilty.

So with that overview, I want to take a couple of minutes and dive a little bit deeper.

So the charge here is one count of forced labor conspiracy. The judge will instruct you on the law at the end of the case. You must listen to the judge, but we

expect her to tell that you that to prove this charge beyond a reasonable doubt the Government must prove an unlawful agreement to force someone to do work against their will through serious harm or threats of serious harm. That just did not happen in this case.

There was no agreement. There was no force. There was no threats of serious harm. There was certainly no serious harm itself.

The evidence will show that Rachel was a salesperson at OneTaste, a wellness company. I'll talk more about the background of OneTaste and Rachel in a minute.

But let me say this up front, this company was no secret society. You'll hear that people worked for it because they loved it and they believed in the practice. They told everyone about it, bragging to their friends, posting on social media, and doing lots of press. Everything was done in the light of day. It was not the dark and scary story that you just heard. Just like any mission-based organization that people cared deeply about, the staff wasn't in it for the money. Some staff were paid, the others volunteered to help out to be a part of the experience.

(Continued on next page.)

(continuing)

MR. ROBOTTI: It was a blast to be there. For many, it was the best time of their lives. But if it wasn't, there was no obligation to stay. If you didn't like your boss, you could get a new job. If you didn't like your hours, you could get a new job. If you didn't like your assignments, you could get a new job. The employees always had that option. And when people stayed, it was because they made the choice to stay.

Now, the Government's going to spend the next several weeks tossing around some hot-button terms, and they're all distractions from the fact that the Government does not have proof in this case beyond a reasonable doubt.

You will hear a lot about orgasmic meditation at trial, a practice and philosophy that adults are free to do. Don't let the unique nature of this practice distract you.

You will hear a lot about nontraditional sex practices in relationships, like open and bisexual relationships, sexual fantasy games and BDSM. These are all things that adults have the right to do. Don't let the salacious details of these practices distract you.

You will hear exaggerated claims of high-pressure sales tactics; tactics that were, in fact, based on a standard model that many companies use. And whether that model is good or bad is not the question here. Don't let this sideshow

distract you.

Throughout this trial, in the face of these distractions, the Defense will keep refocusing on the key issue here: Freedom to stay or freedom to go. And we ask that you pay careful attention to that evidence, that everyone could make the choice to leave.

Okay. So let me turn to some background for a couple of minutes.

During trial, you will hear that OneTaste is a start-up company found in 2004, in San Francisco, by Nicole Daedone and Robert Kandell. The company focuses on the practice of orgasmic medication, or OM, spelled O-M, as a way to improve a person's sexual health and overall well-being. So, it's a wellness company.

You've heard what the OM practice involves: A fully-clothed man or woman stroking a woman's genitals for 15 minutes. It may sound like sex, but you will learn that OM was not about the sex act; it was about the meditation focused on the connection between two people. Done right, its practitioners believe it leads to spiritual awakening or truth. It's a female-centered practice focused on empowering women, but also on teaching men how to improve their sexual relationships with women.

And similar to yoga or CrossFit or any other class at the gym, some people just go occasionally, other people do

it regularly as part of a healthy lifestyle, and some people get really involved and become the equivalent of yogis. They teach, they go on retreats, and their friendships and their community revolve around this practice. You will hear that OneTaste had all such levels of interest.

You will also learn that as a start-up company, OneTaste struggled financially for years. But you will hear that they had a great time while they were trying to figure their business out. Work was a party. They threw fun events, often free, to develop interest: Parties at their center, home instructional courses, and naked yoga classes, which generated a lot of interest.

And look, while OneTaste was a legitimate company, it was not your average startup. After all, it was focused on orgasmic meditation, so it's not surprising that the regular practitioners, including the staff, who were seeking a sexual awakening, had a lot of sex and talked about sex a lot.

It was a very sex-positive community with a lot of open relationships. And that was part of the allure. Word spread about OneTaste and the OM practice over the years and by 2009 they were the talk of the town, everyone wanted to join the party.

And that's around the time that OneTaste figured out its product: Coaching programs and seminars. It was going to educate people about the OM technique and more generally how

to improve sexual health. And like any educational institution, it charged tuition for its courses, with introductory courses being cheaper and more advanced courses and retreats being more expensive.

OneTaste courses pushed people's boundaries because that's what they signed up for. That's what the OM practice is designed do. It's the same as when you get a personal trainer at the gym; you pay the trainer to help you push your muscles to grow. That's what the trainer is for. OneTaste was a coach for people's sexual health.

In the beginning of 2012, it turned its focus to sales and professionalized its sales force, training them with outside consultants. And in the years that followed, the struggling startup began to turn a profit and it worked through its growing pains on its path to success.

Now, it's important to understand the OneTaste start-up story so you can understand Rachel's parallel story. Like OneTaste, she herself was a startup. During trial, you will hear that in her mid twenties, Rachel hopped in a car with a couple of friends and drove from Texas to San Francisco. With her shaved head and raw energy, Rachel was a dynamo. And she showed up at OneTaste's doorstep in San Francisco saying she's heard about it and wanted it. OneTaste welcomed her with open arms.

You will hear at trial that Rachel started working

regularly with the practice, indicating it was incredibly beneficial for her in dealing with issues that affected her own sexual health. And she committed to OneTaste with enthusiasm about OM's practice -- OM practice's ability to help others. Rachel was tenacious and hard-working, first as a volunteer and then later as paid staff, just like countless others who were committed to the company's success.

Rachel was an energetic and talented salesperson and there were few better ambassadors to spread the company's message, so she rapidly rose up to the company's ranks with her unique ability to get new customers. You'll learn that by 2012, she was the company's lead salesperson. Rachel led sales teams in several cities at different times, including San Francisco, New York and London.

Look, sales is a hard job, especially when you're selling a product that is just breaking into the mainstream. But her teams got results, generating a lot of revenue for OneTaste.

You will hear that Rachel could be a tough boss. She expected a lot from her team. She worked long hours and she expected them to work long hours with her. She had daily sales goals that she was responsible for hitting and she pushed herself and she pushed her team to meet those goals.

You will also learn that Rachel could be an incredibly caring boss, checking with her staff regularly,

helping them work through personal issues and relationships and mentoring newer employees. But in her quest to motivate the staff, she could at times be harsh. The goal, though, was always to help the company grow and help salespeople make money, which she did.

Many people loved working with Rachel and respected her as a teacher and a leader. But if someone did not like working with her, they didn't have to. There was no obligation to be a salesperson at OneTaste. They could always find another job inside OneTaste or within another company. And for all sorts of reasons, many people did leave to pursue other jobs and opportunities. The evidence will show that no one was forced to work for Rachel and Rachel did not force anyone to do anything they did not choose to do. Everyone was free to stay or go.

So, why are we here? You'll see that we're here because the Government has cherry-picked a hodgepodge of unhappy former employees to complain about Rachel, Nicole, and OneTaste. And it's important that you carefully listen to their testimony to understand why it is biased and cannot be trusted. These are people with axes to grind and they are a small minority of the hundreds of OneTaste employees and thousands of OneTaste customers.

Just to give you some examples. They are ex-husbands and lovers, fired employees, and people with

competing businesses, people who have been trashing them for years on the internet and in the press, admitted liars and criminals, and people who regret the choices they made when they were younger. That is what the Government's case is built upon.

And here's the common thread that is going to run through the testimony: They're all full-grown adults who cannot take responsibility for their own actions. Listen to these witnesses deflect blame. These often well-educated adults, often with significant means, who don't believe they are personally responsible for their own decisions. Make a sexual decision you regret, blame OneTaste. Make a relationship decision you regret, blame OneTaste. Make a financial decision you regret, blame OneTaste. Bad career choice, OneTaste's fault. A poor relationship with your mom and dad, OneTaste is responsible.

You'll hear that these consenting adults all went into OneTaste well aware of the OM practice. In fact, it was the reason that they were there. OneTaste was not hiding in the dark. OneTaste was operating in the full light of day. It was literally shouting from the rooftops about the benefits of orgasmic meditation.

You will learn that OneTaste was also transparent that it was a for-profit company. Employees and customers alike signed consent and waiver forms acknowledging the nature

of the practice and their desire to participate in it. The company also had clear codes of conduct about the practice. And employees were told that this was a hard job with long hours and not a lot of money for dedicated people.

OneTaste was not their parents, they were not their financial advisors, they were not responsible for making sure that people in their mid twenties and early thirties did not make decisions they later would come to regret.

On top of their irresponsibility, what you're going to hear from these witnesses is a bunch of high school drama about peer pressure and mean girls. But being mean is not a crime. And this made-for-TV drama that you're about to hear is not proof beyond a reasonable doubt. These witnesses are going to ask you to believe that they were tricked into working against their will because of peer pressure and because Rachel was mean to them sometimes. That's the claim that you're going to hear at this trial.

Weighed against that claim is the clear evidence you will hear that these witnesses were free to stay and go as they pleased. They were not locked in anywhere. They had access to their phones and the internet. They traveled around their cities. They got on planes and went to other destinations. They went out with their friends. They saw and stayed with their families. They had other jobs and belonged to other organizations. They saw countless employees leave

OneTaste to pursue other opportunities. They knew they could leave at any time and that they had the means to do so.

Why did these witnesses stay at the company? Mostly, they stayed because they were having fun and they were having sex. They were happy and they believed that the OM practice was benefiting them and others. And that's what they told people at the company at the time.

So let me repeat that: They were free to leave and they were telling the company that they wanted to stay. How could Rachel possibly believe she was forcing them to work against their will? She could not. She had no intent and no agreement to force their labor. And if any of them in their minds believed otherwise, that was completely unreasonable.

At the end of this case, my colleague, Celia, will get a chance to come back and talk to you again and we will come back to this same point: Freedom to stay or go. They all had that choice. The exit door was always open. Until then, we ask that you stay focused on this evidence during these long few weeks ahead. We are confident that if you do, you will easily conclude that the Government cannot meet its burden here and that our client, Rachel, is not guilty.

Thank you.

THE COURT: Thank you, Mr. Robotti.

Does counsel for Ms. Daedone wish to make an opening statement?

MS. BONJEAN: Yes, Your Honor.

THE COURT: Go ahead.

I think you need the microphone.

OPENING STATEMENT ON BEHALF OF DEFENDANT DAEDONE

MS. BONJEAN: Good afternoon/good evening, Ladies and Gentlemen.

I know it's been a long day. I will try not to repeat my colleague's words. We do have some overlap because we look at this case very similarly.

But before I get started, I do want to reintroduce my team. As you know, my name is Jennifer Bonjean. My co-counsel over here is Kelsey Killion. My dynamic duo paralegals Sophia and Galila are here at the back table. And together, we proudly represent Nicole Daedone.

And on behalf of Ms. Daedone, we want to extend our gratitude for your patience -- we know it's been a long two days for all of us -- and your willingness to serve. And we understand that personal sacrifices are made to serve and be fair and impartial jurors, which is a tall task, and we are very grateful for it.

My colleague, Mr. Robotti, gave you a little introduction into the story of OneTaste and I want to tell you a little more about the founder, my client, Nicole Daedone.

Nicole is many things.

For starters, she has been and is a devout

practitioner of, first, Zen and then Tibetan Buddhism. You will see her -- she has little beads. You probably noticed them during jury selection.

She is an author of numerous books -- I think at least a dozen -- focused on spirituality, social change, and women's empowerment and sexual liberation.

In fact, OneTaste doesn't have some nefarious sexual meaning, actually. OneTaste comes from this great quote by a Buddha: Just as the great ocean has one taste -- the taste of salt -- so also this teaching and discipline has on taste, the taste of liberation. And that is what Ms. Daedone was striving for in creating OneTaste.

Ms. Daedone is an educator.

And yes, she is an entrepreneur.

She is also the creator of this practice known as orgasmic meditation which will sometimes be referred to as OM.

She has devoted most of her adult life to studying, practicing and developing OM, which is a mindfulness practice that's designed to bring people in alignment with their own sexuality and to promote human connection. That's the idea. That is what she has practiced and really devoted her life's work to.

You will hear a little more about it. You will hear probably more than you want to hear about it in some instances. But in summary, it is a 15-minute safe-partner

protocol that is rooted in consent. It starts with consent: Yes, you want to do this? Yes, I do. Let's do this.

Now, I want to make clear about something. From our perspective, this trial is not exactly about orgasmic meditation. The Government wants to make it about orgasmic meditation. And this isn't about whether it's good or bad or whether you think there's any benefits to it, whether you think it's weird or icky; it really doesn't matter. OM, as you will find out, is a scientifically-based practice with proven benefits. But it is not for everyone, and Ms. Daedone would tell you as much. This was not something she was shoving down anyone's throat.

Now, I want to turn back briefly to OneTaste, this company that was co-founded by Ms. Daedone in 2004. It was in the wellness and sexuality space, which is a space in which people develop businesses. Her goal was to create a clean, well-lit place where women's sexuality could be explored, plain and simple.

Like many start-up companies, in its early days it consisted of a small group of people passionate about the practice and philosophy of orgasmic meditation. And at its core, it was and remains an educational company designed to teach the practice of orgasmic meditation, not unlike yoga, not unlike other meditative practices, for people who wanted it. For people who wanted it.

Now, OneTaste's business model was pulled for many different modalities. And in 2007, you will learn, that it started receiving wide-spread attention and Ms. Daedone and her partner and executives in the company decided that they wanted to expand it, they wanted to make it more mainstream, they wanted to make it widely available. And that was the path they embarked upon, to make it more mainstream. In fact, it got even a celebrity following. It was a very popular practice. And again, as Mr. Robotti told you, nobody was hiding the nature of this practice. For goodness' sake, it's called orgasmic meditation.

Now, in 2007 when this expansion took place, there was a rapid, rapid expansion and people who were OneTaste sometimes started as OneTaste, students that became employees, branched off and started their own little OneTaste centers in different settings across the country. Even across the country. And a very, very small percentage of those people chose to live in communal settings that centered their lives around the practice of OM and sexual exploration. It wasn't the whole company, but a very small percentage of people. And no one was forced to participate at this level of intensity with OneTaste. The vast majority of people took one or two class or they signed up with their husband or their boyfriend and girlfriend in trying to figure out, you know, how they might be able to better communicate their sexuality. That was

the vast majority of people who took classes at OneTaste.

Some people really enjoyed it. Some people said: Eh, not for me; it's a little, you know, strange.

And let me be clear about something. You didn't walk in to your first day at OneTaste and, like, start OMing in front of a group of people. Okay? This was a practice by people who were very skilled. And people were interested in learning more and a lot of people got something out of it.

Now, some people got a great deal out of it. They continued to take courses. Sometimes they signed up for more courses. But they still maintained their lives outside of OneTaste: They had regular jobs; they had friends outside of OneTaste; they showed up and took classes; they engaged in the practice sometimes a couple of days a week, maybe once a week, maybe less. But they got a lot out of it. And then, as I said, there were people that found the practice so transformative that they decided to live and work within a OneTaste community.

And regardless of how immersed people came into the community, this community was guided by curriculums, protocols, consent forms, releases. People knew exactly what they were signing up for and the evidence is going to show that. You will see that through the course of this trial. You will look at more paper that OneTaste generated than you care to.

Now, I know that there is this sexual aspect of it, but this is really very no different -- this is really no different than, for instance, some people who try out yoga. They like it, they don't like it. They go for a couple of classes. Maybe they come back, maybe they don't. There are some people who make it a routine part of their life. They go to a class three times a week, but they still, you know, have their regular day jobs, they don't make it their identity. And then there are people who literally decide to quit their day job, go out and learn how to be a yoga instructor. Sometimes they go live in yoga communities or yoga ashrams, as they call them, and they had devoted their life to this because they get meaning from it. And many people did that with OneTaste. OneTaste was no different. It was like yoga with a twist.

But these were people within a community and these were grown people, grown people with resources, education, graduate degrees, friends, people who had jobs sometimes outside of OneTaste; sometimes they decided to work for OneTaste. These were not vulnerable people who did not have the ability to make choices for themselves. And that is what they did. People who chose to live in the community -- and those are people who you're going to hear largely from during this trial -- they did so as a matter of choice. And some of them continued to work outside of OneTaste. They literally

lived in the community and then went to their job as a teacher or some other type of profession and then came back and were with their friends and then did this practice and they enjoyed themselves.

The doors were never locked, the phone cords were never cut. No one's phones or electronics were taken away from them. They could have friends over to their living arrangements. They could have family. They left to go on vacations. They went to go see their families. You'll see text messages: I got to go see Dad, I'll be back next week. These were people who had freedom to do and go as they wished. And these people chose to become part of the OneTaste community, at least for a period of time.

Now, the Government has painted a -- you know, a clearly nefarious picture of what went on at OneTaste. But you are going to learn that it is a tiny fraction of people who will be coming before you who had -- he stole my word, but an axe to grind. And that is what you're going to hear. Many of these people are belatedly complaining. Not complaining at the time, but belatedly complaining that they were forced to do things they didn't want to do. People who are doing this for financial benefit, for their 15 minutes of fame, but many of whom are just straight-up embarrassed because they are no longer at that place in their life.

And I think we all -- I think this will resonate

with every last person -- look back in our lives and we look at things we did, we look at relationships we had -- heck, we look at marriages we had -- and we say gee, that wasn't great and I maybe feel like that person manipulated me, or you make excuses. But that's not force, that's not coercion. That's regret. And it may even be growth.

And the witnesses you will hear from, whether it's Dana, Michelle, or Becky, or any of them, these are women who had full and complete autonomy over their brains and their bodies and they made their choices. And now that they're married and have kids and don't want their neighbors to know what they were up to in their twenties want to reframe an experience and point fingers at other people when, at the time, they were having a blast. They want to blame others for their choices.

Now, over the next, I don't know, four to six weeks, we've been told, you are going to hear a lot of evidence about, you know, these unconventional sexual escapades between consenting adults. Don't let it distract you. Consenting adults can do what they want in this country. And as long as it's consenting, it is their right. It may not be what you choose to do, it may not be what I choose to do, but that is not what this case is about. It's not about judging grown, consenting adults from engaging in conduct that they choose to engage in. You are not here to pass judgment on lifestyles.

And no one, at the end of this case, is going to ask you to render a judgment or a decision about the merits of orgasmic meditation or open relationships or group sex or BDSM, whatever it is. That is not what you're going to be asked to do.

What you're going to be asked to do is whether -- is find whether the Government has proven by proof beyond a reasonable doubt -- and it is their burden -- that these women, Ms. Cherwitz and Ms. Daedone, agreed either with themselves or with other people to engage in some scheme to obtain these services through force, physical force or harm or threats of harm. And you are going to find, Ladies and Gentlemen, at the end of this trial, that it's not even close. You're going to find that grown people made grown decisions that they don't want to stand by, but that doesn't mean a crime occurred. And you are going to render a not guilty verdict as to Ms. Daedone and Ms. Cherwitz.

THE COURT: Thank you, Ms. Bonjean.

Okay. It's 5:30 now and I know you've had a long day, so we are going to recess for the day. But before we do that, I just want to remind you of a few of the things that I said earlier today when I was giving you some preliminary instructions.

Over this recess, you're not to discuss the case with anyone, including your fellow jurors.

If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately.

You must not read, listen to, or watch any news or other media reports of the trial and you must not conduct any independent research about this case, the matters in this case or the individuals involved in this case.

You must not talk to the parties, attorneys or witnesses in this case about anything.

And please keep an open mind.

I may not remind you and repeat all of these things every time that we break, but please keep them in mind throughout the entire trial.

And I think I've asked you to do one more thing tonight, which is just to relax and enjoy your evening. I know it has been a long couple of days for you.

Again, tomorrow we will be starting promptly at 9:30, but that means you have to be in the building, up in the jury room here by 9:15.

And I appreciate everybody paying such good, careful, close attention today and I appreciate your service.

And we will adjourn for today. The jury will be excused and I will ask the parties to stay.

(Jury exits.)

(Continued on the next page.)

(proceedings continue in open court; no jury present.)

THE COURT: Okay. Everyone may be seated.

I don't need to keep the parties here. We can adjourn for the evening. I will ask that the parties, though, be here between 9:00 and 9:10. If there's any issues to take up, we can do it then.

Let me ask you about all of the materials that you have here.

During the course of this trial, we will be using the courtroom on certain days for other matters, maybe towards the end of the day, but, largely, we will just be on trial.

So if you need to leave things here, that's fine. I don't know whether you've figured that out yet. But you can speak to my deputy when he comes back, if there's any kind of logistical issues like that. If we have a proceeding, I will ask you to move things to the side or something like that. But I think, for the most part, I don't want the parties to have to feel they have to constantly clean out everything and bring it all back. But whatever's most convenient, we can figure that out.

MS. BENSING: We appreciate it, Your Honor.

THE COURT: Is there anything else, or we can break for the evening? I think everybody's had a long day. Well, you all have had a long day, in any event.

MS. BENSING: Nothing further from the government. Thank you.

MS. COHEN: Nothing from the defense here.

MS. BONJEAN: Thank you. Nothing, Your Honor.

THE COURT: Okay. Actually, there is one thing I have, which is, what is the lineup for tomorrow?

MS. BENSING: Yes, Your Honor.

Do you want us to indicate the witnesses now, or can we provide them to the Court separately? What is Your Honor's preference in terms of --

THE COURT: I would ordinarily want you to provide the witnesses, although, of course, I had a ruling about a particular category of witnesses, and I had said that the names would not be publicly mentioned unless and until they testified. So if a person falls in that category, just tell me it's a person that's falling in that category.

MS. BENSING: It's a person who falls in that category, but we can e-mail it to the Court right away.

THE COURT: I am not sure that I need that then, as long as the defense knows who you are planning to call, and --

MS. BENSING: They have.

THE COURT: -- as long as -- I believe you have given some materials for certain witnesses to the Court; is that right?

MS. BENSING: Yes, that's correct, Your Honor. And

they know.

THE COURT: And are you anticipating that the next witness will be the whole day, or there will be multiple witnesses tomorrow?

MS. BENSING: Probably not the -- I mean, certainly not direct examination would not be the whole day, Your Honor. And so the witness after that is an individual, Chris Hubbard.

THE COURT: Okay. And behind -- is Chris a woman or a man?

MS. BENSING: Male.

THE COURT: Behind Mr. Hubbard is who?

MS. BENSING: I don't expect we would get to that witness until the following day, but it's another witness who falls into that category, Your Honor. And we have informed the defendants who that is.

THE COURT: Okay.

MS. COHEN: I was just going to say, yes, we know those three. We'd love to know the one after, if possible. Again, we will -- just for counsel and our clients, but that would be very helpful if we could know who they anticipate, if possible.

MS. BENSING: We will continue to provide names on a rolling basis, Your Honor, as we figure out the pace, especially at the beginning here.

THE COURT: Okay. I think they want to know the

fourth person. Is there a reason not to let them know that either on the record or separately?

MS. BENSING: Your Honor, we have provided two other individuals who we expect to testify. I think that we may actually end up having to brief some issues with respect to those individuals, and so the schedule is just a little bit up in the air, but we will absolutely continue to provide them with notice of our lineups.

THE COURT: When you say brief issues, are you talking about impeachment type of issues or what kind of issues?

MS. BENSING: Your Honor, we anticipate --

MS. FARRELL: We intend to write on this. Your Honor will get plenty of notice of the issue. But we anticipate that -- well, OneTaste has told us they're going to make privilege assertions over certain basic factual questions of records custodians, and so our intention was to call two records custodians, but we actually think now, having received an information from the company last night, that we need to address these issues ahead of time with Your Honor. So depending on how all of that shakes out, we would like to call those people, but I think we will probably end up not doing so until we resolve the issues in front of -- we don't want the issues to be played out in front of the jury.

THE COURT: Okay. I know those issues you have

spoken to defense counsel about or just one --

MS. FARRELL: Yes. And we've written a letter. We've provided the letter to the defense to put their section in, and we will be filing that with Your Honor. So this is all to say, we have given them, I think, up to five witnesses, but two of which may get bumped because of this issue. And we will provide them the next person as well.

THE COURT: Okay.

All right. We are adjourned.

Again, I'd like the parties in -- one moment.

(Short pause.)

THE COURT: All right. We are going to adjourn, and we will reconvene tomorrow. If the parties can come at 9:00, and then we will -- is there something else, Ms. Farrell?

MS. FARRELL: One thing I want to note, tomorrow's witness, the first witness, is very pregnant, and so we -- I just want the Court to be prepared, if the witness needs it, we may need to take a few more breaks then we normally would with other witnesses.

THE COURT: You mean rest room breaks?

MS. FARRELL: Correct.

THE COURT: Okay. Fine.

We will adjourn, and I will see everyone back here in the morning.

Thank you.

MS. FARRELL: Thank you, Your Honor.

MS. BENSING: Thank you, Your Honor.

MS. COHEN: Thank you, Your Honor.

MS. BONJEAN: Thank you, Your Honor.

(At 5:39 p.m., the proceedings were adjourned until 9:00 a.m., Wednesday, May 7, 2025.)

INDEX


PROCEEDING PAGE

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT 28
BY MR. FERN

OPENING STATEMENT ON BEHALF OF DEFENDANT CHERWITZ 37
BY MR. ROBOTTI

OPENING STATEMENT ON BEHALF OF DEFENDANT DAEDONE 49
BY MS. BONJEAN

EXHIBITS
(No exhibits received)