UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 8, 2025

Defendant. : 9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.

(Appearances continued on the next page.)

Court Reporter: Annette M. Montalvo
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(Proceedings commenced at 9:42 a.m., in open court, to wit:)

THE COURTROOM DEPUTY: *United States of America v. Rachel Cherwitz and Nicole Daedone*.

Is the government ready?

THE COURT: Where are the defendants?

MS. BONJEAN: They literally just ran out to use the bathroom.

THE COURT: We'll wait. That's okay. We'll wait.

MS. BONJEAN: They literally asked, and I said, run.

THE COURT: No, that's fine.

(Short pause.)

THE COURTROOM DEPUTY: *United States of America v. Rachel Cherwitz and Nicole Daedone*.

Is the government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Sean Fern, and Nina Gupta, joined by paralegal specialists Liam McNett and Marlane Bosler, and FBI Special Agent Tricia Quintero.

THE COURT: Good morning all.

MS. COHEN: Good morning, Your Honor.

Celia Cohen and Michael Robotti, on behalf of Rachel Cherwitz.

THE COURT: Good morning to all three of you.

MS. BONJEAN: Good morning, Your Honor.

Jennifer Bonjean and Kelsey Killion on behalf of Ms. Daedone. My paralegal's doing some work in the back right now, and she'll be joining us. This is Sophia Moazed.

THE COURT: And good morning to all of you.

MS. COHEN: Your Honor, I should also point out, our associate isn't here, but she will also be joining us, Kelly Lin.

THE COURT: That's fine.

Okay. I think we're ready to bring in the jury.

Is the witness available?

MS. FARRELL: She's available.

May we very briefly just update Your Honor on the exhibit issues that you asked us to resolve last night?

THE COURT: Is it about this witness or the other?

MS. FARRELL: Yes, it's this witness.

THE COURT: Okay. Go ahead.

MS. FARRELL: It won't take long. I understand the defense is stipulating the 3501-37, which is the e-mail that they had privilege concerns about. Everyone's had the chance to look at it more closely, and I think they have withdrawn that issue. Correct me if I'm wrong, but I understand they will stipulate to admission of that document.

THE COURT: Okay.

MS. FARRELL: And then the only other things are those text messages, Your Honor, which I am happy to revisit

with the witness, but I --

THE COURT: Are we -- which text messages are we talking about now?

MS. FARRELL: The ones we discussed last night that were on an Excel spreadsheet, very tiny to read.

THE COURT: Yes.

MS. FARRELL: So I will move again for their admission today with the witness, unless I get contrary guidance from Your Honor.

THE COURT: And have you spoken to the defense about this?

MS. FARRELL: I understand they are still objecting on the same grounds.

Correct me if I am wrong. Is that right?

MS. COHEN: Yes, Your Honor. But we -- I mean, I think our main point was to make sure that the witness identifies -- can identify the phone number.

THE COURT: I mean, if there's a foundation for it and it's texts with the witness, then they are likely to be admitted. But is there some other issue that needs to be taken up?

MS. FARRELL: No.

THE COURT: If the right foundation is laid, they will be admitted.

MS. BONJEAN: All we were saying is we believe they

can lay the authenticity. It was just a matter of some questions that we thought they didn't ask.

THE COURT: That's fine.

MS. BONJEAN: That's the authenticity issue.

THE COURT: Yes.

MS. BONJEAN: The only other issue that I think we raised is, at least I know there's one exchange with Ms. Cherwitz. It's obviously our -- would come in, except I would point out that we had a doctrine of completeness potential problem with those because it's not clear because they are on an Excel spreadsheet where the text start, where it leaves off. She prepared these, I think, or I don't know how they came to be prepared. So we don't know if the whole text exchange is there. If it was just a matter of handing over the phone to the FBI to extract it, that's a different issue, I suppose. I have less concerns, but I just don't -- that is one of my objections to the completeness of this exchange.

THE COURT: Does the government want to speak to that?

MS. FARRELL: That strikes me as something appropriately handled on cross-examination.

THE COURT: Yes. I think that's correct. But do you have a response to the issue of whether this is a complete exchange or not?

I mean, texts are, you know, stand-alone, but also sometimes part of a long, larger conversation. But, again, that can be something that the witness is questioned on.

But do you have a response on that completeness?

MS. FARRELL: I don't.

THE COURT: Okay.

MS. BONJEAN: I think it is a reasonable question just -- and I don't know that she asked it. I understand it came from her, but how did it get into that format. And that's all I want to know. Was it she handed her phone over to the FBI and they put it in that form, or did she provide it in that format.

THE COURT: I'm not sure that it matters in terms of admissibility, but those questions can be asked either on direct or on cross-examination.

And we are talking, I guess, about 3501-16, 17, and 20?

MS. FARRELL: Correct.

THE COURT: Okay. I am going to bring in the jury. We can take up the ex parte filing from last night, obviously, I won't disclose the content of it, but later at the end of the -- before I let the jury come back, or at lunchtime or something, after a break. I do have some questions on this as well. And I know the government know there is was an ex parte filing because the cover letter was filed publicly.

Okay. Let's bring in the jury.

MS. FARRELL: May I bring in the witness?

THE COURT: Yes. That can happen simultaneously.

(Short pause; witness takes the stand.)

THE COURT: Can you just take the same seat you had yesterday.

THE WITNESS: Thank you.

(Jury enters the courtroom.)

THE COURT: Everyone may be seated.

Good morning. Nice to see the jury today.

And we will resume with the examination of the witness from yesterday.

MS. FARRELL: Thank you, Your Honor.

REBECCA HALPERN,

called as a witness herein by the Government, having been previously duly sworn and having testified, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MS. FARRELL:

Q Ms. Halpern, just to remind you --

THE COURTROOM DEPUTY: Ms. Halpern, the Court reminds you that you are still under oath.

THE COURT: Thank you.

MS. FARRELL: Thank you. That's what I was going to say.

So if we can begin, please, Mr. McNett, by pulling up Government Exhibit 3501-37.

And, Your Honor, I understand this document is -- that the defense is stipulating to the admission of this document.

THE COURT: All right. Are you moving it into evidence?

MS. FARRELL: I am moving it into evidence.

THE COURT: And Government Exhibit 3501-37 is admitted.

MS. FARRELL: Thank you.

(Government Exhibit 3501-37 received in evidence.)

Q So, Ms. Halpern, I want to focus you back in October 2013.

MS. FARRELL: And, Mr. McNett, if you can scroll to the first e-mail in the chain. So scroll down, please.

THE COURT: Can we fix this so the entire document is on the screen? Is there a way to get that done? I think sometimes when you zoom it does this, but I think this is a separate problem today. Just give us a moment.

(Short pause.)

THE COURT: We will work around it. If it becomes an issue --

MS. FARRELL: I will put it on the Elmo.

THE COURT: All right. Maybe put it on the Elmo for

now, and then we will get it fixed.

MS. FARRELL: Oh. Is it okay on everyone's screens?

THE COURT: Can the parties all see it properly on their screens?

THE JURY: We are not seeing anything.

(Short pause.)

BY MS. FARRELL:

Q I am showing what's been marked as Government Exhibit -- what's been admitted as Government Exhibit 3501-37. Do you see that, Ms. Halpern?

A Yes.

Q I am going to start at the bottom, and I want you to look at the first e-mail, if you can.

A Yes. Got it.

Q Who is that e-mail from?

A From Adam Jacobowitz.

Q And who is he?

A He was someone who worked for the company. He was a lawyer by trade.

Q And if you can read his e-mail, and I will flip the page when you get to the end of the line.

A He said: Hi, everyone. As OneTaste grows, we are putting in place more of the third dimensional structures to hold our expanding team and organization. Attached is a copy of our new OneTaste employee handbook. Please take a moment

to review it in anticipation of an ongoing basis.
Q And then if we can look at the next e-mail. Who's the first person to respond?
A Rachel Cherwitz.
Q And what does she write?
A She says: Well, how about that?
Q And then what is the next response after that?
A From Summer Engman.
Q Can you read her response, please.
A I'll be at my other work at 10:00 a.m. on Monday. It is not my OneTaste work hours. I don't want to miss out. I don't know what to do.
Q And then who responds?
A Eli Block.
Q And what does he say?
A Tell them you'd love to call out sick, but your orgasm dies a little each time you lie. So you're just taking a sick day because you want to.
Q And then does Ms. Engman respond?
A Yes.
Q And what does she say?
A I just took a sick day to stay in Vegas and finish videos. I can't take again already.
Q And then what is the next response after that?
A It's from Andreas Panosyan.

Q And who does he -- who is on this e-mail chain, now that we can see the very top?
A It's everybody who works for the company because staff at OneTaste is everyone.
Q And did that include you?
A Yes.
Q And that's why you're on this e-mail?
A Correct.
Q And what does Andreas say?
A He says: I just looked at sexual harassment and overtime LOL.
Q And based on your personal experience, why is it LOL that there's sexual harassment and overtime --
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Did you have a chance to look at this new employee handbook in October 2013?
A Yes.
Q And what, if anything, about the sexual harassment -- was there a sexual harassment and overtime policy?
A Yes.
Q And what, if anything, did that mean to you at the time?
A I read it and I laughed out loud.
Q Why?

A I remember, you know, privately joking with colleagues at my level that it was just very ironic and funny to have a sexual harassment policy at all at a company like this.
Q And why did you laugh about overtime?
A Same thing. Like the overtime -- it's just -- it's so -- it's so preposterous and ridiculous. We were working so many hours, that there is no such thing.
MS. FARRELL: So I don't know if it's possible to switch back to the computer now.
All right. Great. Thank you.
Mr. McNett, if we could please pull up Government Exhibit 3768, which is in evidence.
Q Ms. Halpern, we looked at this towards the end of the day yesterday. This is the employment agreement, dated October 2013.
And am I correct that yesterday you -- your testimony, you couldn't quite remember when you started work?
A Correct.
Q I'd like to show you another document.
MS. FARRELL: 35 -- this is just for the witness. It's not in evidence yet. 3501-27.
Mr. McNett, if you could scroll down.
Q Do you recognize this document, Ms. Halpern?
A Yes.
Q What is it?

A This is an e-mail between myself and Rob Kandell about joining the -- being employed by OneTaste.
Q And what is the date of the e-mail?
A July 27, 2012.
Q And is this a true and accurate copy of an e-mail between you and Mr. Kandell --
A Yes.
Q -- about your joining OneTaste?
A Yes.
Q As an employee?
A Correct, yes.
MS. FARRELL: Your Honor, I move to admit Government Exhibit 3501-27.
THE COURT: Any objection?
MS. COHEN: Objection on hearsay, Your Honor.
MS. BONJEAN: Objection on hearsay.
THE COURT: Response?
MS. FARRELL: We believe Mr. Kandell's statement comes in under 802(d) -- sorry, 801(d)(2), and then Ms. Halpern's response is for context.
THE COURT: I am going to sustain the objection.
Q So, Ms. Halpern, irrespective of this document coming into evidence, does this refresh you on when you -- approximate date on which you became an employee of OneTaste?
A Yes. That's more in keeping with what my memory was.

Yes.
Q And what was that?
A That I became employed in the summer of 2012.
Q And approximately when then did you move in to the Morellino? Was it around this time?
A It was a little bit after I became employed, I believe.
Q So then going back to Government Exhibit 3768, the employment agreement that you entered into in October 2013, at that point, had you -- at the time you entered into this document, had you already been employed at the company for a year and some change?
A Yes.
Q Okay. You testified yesterday about your decision to work for OneTaste and move into the Morellino.
How, if at all, did your non-OneTaste friends and family react to your decision to move into OneTaste housing?
MS. COHEN: Objection, Your Honor.
THE COURT: Basis?
MS. COHEN: Hearsay.
MS. BONJEAN: And relevance and hearsay.
THE COURT: I am going to sustain it.
If you want to lay a foundation, you can ask another question. Or you can move on to something else.
MS. FARRELL: Yes. Give me a moment.
Q Are you familiar with a Brooklyn OM house?

A Yes.
Q And what was that?
A That was kind of like an offshoot of the primary New York OM house. It was, at the time I was there, kind of an experiment to see if New York could expand into two houses.
Q And if you know, were there other OneTaste employees who were residing at the Brooklyn OM house in the time that you were at the Morellino?
A There were employees who were helping to set it up. I don't recall if they were actually residing there at the time, but, yes.
Q Yesterday you described being a volunteer at one point for OneTaste. So you just testified that you became an employee around the summer of 2012. Prior to that, did you volunteer for OneTaste?
A Yes.
Q And when you were a volunteer for OneTaste, what sort of, if any, what sort of work or services did you provide to the company?
A When I was a volunteer, I connected with the people who were leading TurnON events and other events in New York to -- and I would just sort of check in with them to ask what was needed so I would help haul things from the car into the, you know, the staging area for where the course was going to be, and go get supplies and coffee and set up for OM circles, and

pretty similar to some of my -- what would become my job later on.

Q So you testified yesterday that around the time shortly before you became an employee of OneTaste you signed up for the CP5 coaching program. And do you recall we discussed the cost of that yesterday?

A Yes.

Q I just want to orient you to where I'm going.

MS. FARRELL: Sorry, I just want to confirm that Government Exhibit 3501-10 is in evidence.

THE COURT: Give me one moment, please.

Yes, it was admitted yesterday. Is that consistent with everybody's recollection?

MS. BONJEAN: What was the number again?

MS. FARRELL: 3501-10.

MS. BONJEAN: Yes.

MS. FARRELL: Thank you.

So if we can put that up on the screen, please, Mr. McNett. If we can go to the e-mail and if you can zoom in.

Q So I am showing you 3501-10. Can you remind us what this e-mail is Ms. Halpern?

A Yes. This is Rob Kandell sending me my payment plan for Coaching Program 5.

Q And this is dated July 2012; is that right?

A Right.
Q And is this -- how does this date line up with approximately when you became an employee for OneTaste?
A Yeah. Didn't we just look at it was like July 12? So just three days later.
Q So earlier when we looked at your employment agreement, it indicated you were being paid $1,500 a month salary; is that correct?
A Correct.
Q So I just want to break down the math. So if you were being paid $1,500 a month, how much were you paying in room and board to reside at the Morellino?
A My memory is that it was around 800. I don't exactly recall if food was on top of that or included in that.
Q Okay. So would sort of the floor be 800?
A Yeah.
Q And then if there was food, maybe some more, if you had to pay for food, but you don't remember?
A Yes.
Q And then according to this document, 3501-10, you were paying off approximately 531 -- $530.95 a month?
A Right.
Q So just putting that aside, that left you with a couple hundred dollars a month; is that accurate?
A Right.

Q And then yesterday you talked about sort of expectation around appearance. Do you recall that testimony?
A Yes.
Q And so did you have to engage in personal care and grooming consistent with that?
A Yes. Absolutely.
Q And who would pay for that?
A I did.
Q And then yesterday you also testified about extensive text message chains that you were on in connection with your job?
A Uh-huh.
Q Did OneTaste provide you with a phone?
A No.
Q Did you provide yourself with a phone?
A Yes.
Q Okay. And did OneTaste pay your phone bill?
A No.
Q Did you pay it?
A I would -- my parents paid it at the time.
Q And then what about Bikram yoga? Who paid for your Bikram yoga, your daily Bikram yoga classes that you were attending?
A I am not a hundred percent sure on that. I feel like it's possible OneTaste paid for that, but I don't recall.

Q And so on a monthly basis, what was your financial situation at the end of the month?
A Nothing.
Q So to the extent -- did OneTaste pay your salary?
A Yes.
Q And how did you receive your salary from OneTaste?
A Direct deposit.
Q And then am I correct that you then also owed OneTaste money for rent and room and board and then also for the coaching program?
A Yes.
Q How did you pay OneTaste on a monthly basis?
A I would write a check for my room and board, and then the portion of the debt that I owed for the courses would be taken out before it hit my direct deposit.
Q Do you know whether your rent was ever taken out before you received direct deposit?
A I don't know if I recall on that granular level. It's possible.
Q Okay. Based on your own experience living at the Morellino and working for OneTaste in 2012 and 2013, do you have any knowledge of whether other OneTaste employees were in a similar situation as what you just described?
A Definitely. Yeah.
MS. COHEN: Objection.

THE COURT: Sustained.
Q So I'd like to draw your attention to your testimony from yesterday, sort of at the beginning where you told us about how you personally witnessed OneTaste employees, including yourself, I think, tracking course participants' trauma that they discussed --
A Uh-huh.
Q -- and whether or not that was later used for sales purposes. I am just trying to orient --
THE COURT: I know. I know that we've had a break of an evening and you are trying to reorient, but I think there's just too much lead up to your question.
MS. FARRELL: Too much orientation?
THE COURT: If she's not sure what you're asking, she'll tell you that. But I would like you to just ask the questions without so much lead up.
Q You understand the topic I'm referring to?
A Yes.
Q So did you discuss course participants' trauma when you were a sales member at OneTaste in sales meetings?
A Yes.
Q Can you describe generally how those conversations would go?
A In a typical sales meeting, we would all sit together and talk about the people that we were working with, the leads we

were going to try to sell to that day or that week, and we would share information about who was likely to buy based on their background and what they'd been through in their life.

So, you know, for example, you know, oh, I know this -- this is an older woman who's just been recently divorced and is really looking -- you know, like she hasn't had sex in decades and wants to find herself again. And like there would be a lot of personal detail gleaned from a previous course or a TurnON event that would factor into what -- how we would kind of treat that client and how we would basically convince them to go one path or another.

Q Did Rachel Cherwitz participate in those discussions?

A Sure.

Q If you can, what was the tone of those discussions?

A Sure.

MS. BONJEAN: Objection to the foundation of who --

THE COURT: Overruled.

Q What was the tone of the discussions you just described?

A I remember the tone of those discussions being pretty flip or pretty -- sometimes kind of callous toward the clients in that we were dealing with really sensitive information about them, and there was an overwhelming culture of not talking with a lot of respect about these people and sort of thinking of them as like --

MS. BONJEAN: Objection.

THE COURT: The last comment I will sustain the objection to.

Go ahead. Ask your next question.

Q Are you familiar with an individual named Beverly Daedone?

A Not really. No.

Q During the time you worked at OneTaste, what, if any, observations did you make about whether Ms. -- the defendant Nicole Daedone's mother had a job at the company?

A I was not aware of that.

Q Yesterday when --

MS. FARRELL: I'm trying to be mindful of Your Honor's admonition.

Q I asked you why you didn't leave.

A Uh-huh.

Q One of your response was you were scared to lose your friends; do you recall that?

A I do.

Q Why were you scared that leaving a job would cause you to lose friendships?

A Because this job was extremely different from a regular job in that a typical job, you know, you can, you know, oh, I got a different job at a different company, but, you know, I'll just -- like let's go out for coffee on Friday.

This was not that case where I knew that if I left,

that these -- that my friends would not be able to speak to me, and I would not be able to speak to them, in large part.

Q What is that judgment based on?

A I'd seen it happen to other people who had left before me, and they were, you know, talked about as --

MS. COHEN: Objection, Your Honor.

THE COURT: I will let her continue the answer.

MS. FARRELL: Thank you.

THE COURT: Overruled.

A They were talked about as though they were now the outsiders and the muggles, and the people who were not a part of the inside community, and talked about in a very negative light. And I'd seen people say, you know, like, well, don't talk to so and so because --

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: I'm going to object to the -- no foundation.

THE COURT: She's just said she saw something. She's allowed to continue.

Overruled.

MS. BONJEAN: By whom?

THE COURT: You can -- excuse me, Ms. Bonjean.

You may continue.

Q Who did you observe giving directions don't talk to this person who's left OneTaste?

A Should I name specific names?
Q Yes.
A A person who comes to mind readily is Christina Berkley, who was a member of the OneTaste community and an employee of the company, as far as I know, prior to when I got there. And there was a lot of -- because she was also in New York and also still engaging in OM practice in her own way, there was a lot of tension there. And I heard from Rachel and others, you know, like she's a really bad influence. Do not engage with her. Do not talk to her. She's crazy. Like, absolutely not.
Q And so just to be clear, Christina Berkley was the person who was being shunned?
A Correct.
Q And who was the person directing her to be shunned?
A What I want to say is everyone, but, specifically, I mean, I know that I was told that by Rachel, and then also by other leadership in New York. So that was -- I remember being told by the leaders at the time at New York, Rafael and -- Rafael Martinez and Gina Lombardo, their message was sort of like --
MS. BONJEAN: Objection to the hearsay.
THE COURT: Go ahead, Ms. Farrell. Do you want to respond to the objection?
MS. FARRELL: It is not sort of a -- what those people said we're not offering for the truth of the matter,

but rather the fact that it was said.

THE COURT: Overruled. She may answer.

A When I was coming in as a volunteer, Gina and Rafael, who lead New York at the time, explained to me about this really tense relationship with Christina Berkley, and they warned me, like, don't tell anybody that, you know, if you go to an OM circle with Christina, like that's a big no-no in OneTaste. So don't let that get back to Rachel, don't let that get back to Nicole, don't let that get back to whoever other leaders were.

Q So circling back to you, how did all these discussions about Christina Berkley and others being muggles and shunned, how did that affect your decision whether or not you could leave OneTaste?

A It was abundantly clear to me that if I were to really leave, that I would not -- that that would be a very permanent decision and that I would not be welcomed back with open arms.

Q All right. Switching gears answer, you testified yesterday that sex was the outlet for everything.

What, if any, relation did that have on your sales job?

A There was discussion in sales meetings about sort of how much sexuality to use when you were selling to somebody, and there were mixed messages. So at some points, kind of earlier on, the messaging was like, yes, use your sexuality, be really

presentable and sexy and cute and flirt with people to make sales. But then it quickly became, well, hang on a second. Don't actually flirt with people to make sales because that's not ethical. So, instead, flirt kind of under the table to make sales.

Q And if I can stop you, was that second directive something that came later in your time at OneTaste?

A Yes.

Q And earlier we looked at e-mails around October 2013?

A Uh-huh.

Q Was it around that time?

A I would say so. Yeah.

Q I'd like to show you what's been marked, it's not in evidence yet, I believe, as Government Exhibit 4788.

Can you see it on your screen?

A Not yet.

MS. FARRELL: Mr. D'Agostino, I think there's something wrong with the screen.

THE COURT: Is this something that I have? It's not in the binder that was given to me, I don't think.

MS. FARRELL: Do you see it, Your Honor, on the screen? It is not a document.

THE COURT: Okay. But it should still have been given to me.

MS. FARRELL: I'm sorry. I didn't realize it wasn't

in the binder.

THE COURT: That's okay. That's fine. Go ahead.

Q Do you recognize this, Ms. Halpern?

A I do.

Q What is it?

A It's a photograph with me in it.

Q Who else in the photograph?

A Margaret Pixley and Emunah Malinovitz and Chelsea Hunter.

Q Is this a true and accurate photograph of the four of you?

A Yes.

MS. FARRELL: I move to admit Government Exhibit 4788.

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 4788 is admitted.

(Government Exhibit 4788 received in evidence.)

MS. FARRELL: If we can display it for the jury, please. Thank you.

Q Can you just describe for us what's going on in this photograph?

A Yes.

This is myself and my housemates and work colleagues dressed up to go to an event. I don't know if it was a TurnON, or maybe a lead generation event where we were going

to sign people up for things. But we were all dressed in that like early 2000s, you know, sexy bandage dress style.

Q And if you -- from left to right, can you identify the people in the photograph?

A Yes. That's Chelsea Hunter on the far left, and then Emunah Malinovitz, and myself, and then Margaret Pixley on the far right.

Q All right. Just a few more things here.

So, again, directing your attention to your testimony yesterday about an incident where Rachel Cherwitz directed you in a sales meeting to leave and have a makeout with Ruwan Meepagala; do you recall that?

A Uh-huh.

Q And you testified that after you did, you went to report back?

A Right.

Q Who did you report back to?

A To Rachel.

Q How did that make you feel?

A Awkward.

Q When you testified yesterday that you followed Cherwitz' orders on this makeout, why did you do so?

A It was a complicated mix of having that directive be really public and knowing that the directive was coming from my boss, and knowing that if I made a big deal about, you

know, not wanting to do it for some reason or asking questions, that it would be -- it would be like a strike, another strike against me, that I wasn't being cooperative.
Q What, if any -- just in terms of orienting us in time, what, if any, abuse had you sustained from Cherwitz at that point in time?
MS. COHEN: Objection, Your Honor.
THE COURT: Basis?
MS. COHEN: It's vague.
THE COURT: I didn't hear you.
MS. COHEN: The characterization in the question.
THE COURT: Sustained.
Q So I'd like to orient us in time to when this occurred.
How long had you been working at the company when you got -- when you received these orders to have a makeout with Ruwan Meepagala?
A I had been working there for a while. I wasn't new any more.
Q And what was your relationship like with Rachel at the time that that had happened?
A It was, to my recollection, only contentious in the way that her relationship was contentious with most people. It was the -- what was considered kind of the normal amount. Like every -- all of my colleagues and myself were very careful --

MS. COHEN: Objection, Your Honor.
THE COURT: Sustained.
Q So just focusing on your relationship with Rachel at the time --
A Okay.
Q -- what was it like?
A I was certainly afraid of her, and I didn't want to upset her, but it hadn't gotten really extreme yet.
Q So branching off your word "extreme," yesterday you testified about the extremeness of how disconnected from reality you were towards the end of your time.
THE COURT: You know what, why don't you just ask a question. I think -- she's testifying.
MS. FARRELL: Understood, Your Honor.
THE COURT: Just ask the question.
Q So towards the end of your time there, what is the sum of what brought you to a place -- I'm sorry. Let me take a step back.
Did you feel disconnected from reality at some point?
A Yes.
Q And when was that approximately?
A It -- that's tricky because I felt disconnected from reality throughout my experience there in various ways, but it increased over time.

Q And at what point was it at its worst?
A Definitely around the time that we spoke of yesterday, with the virus and the demonstration.
Q And what was the sum of events that brought you to the place where you felt disconnected from reality?
A There was a very distinct turning point in my working relationship and my professional relationship with Rachel. Prior to that turning point, we were really friendly and had a really -- what I felt was an extremely close relationship and friendship, and I felt as though, you know, she liked me and I liked her, and even if there were difficulties, that would be okay. And then the turning point occurred when we were on a trip together in Miami.
Q So I think I'm asking a bit of a different question.
A Okay.
Q My question is, what is the sum total of experiences that you had that made you feel disconnected?
MS. COHEN: Objection, Your Honor. This has been asked and answered.
THE COURT: Overruled.
A The sum total of what had me feeling disconnected?
MS. COHEN: Yes.
A I -- on sum level, I knew somewhere in there that I had been, you know, carefully, gently brainwashed over time, and -- but even that little amount of knowing that wasn't

enough. Because I was fully in it and brainwashed. And so that's the disconnection from reality that I'm trying to describe. I didn't see the world as it really was anymore, I saw it through only through the lens of OneTaste.

MS. BONJEAN: Objection. I'm going to move to strike that answer based on our prior motions related to that terminology.

THE COURT: Overruled.

Q In what way did what you just described impact your provision of services and labor for OneTaste?

A Because I had this warped understanding of what was real and what was normal, I did things in my work that I would never do otherwise. You know, just -- even just having these sexual experiences as a part of my day-to-day work, like I didn't -- because it happened slowly over time. I didn't realize how kind of crazy that was. It just -- it kind of snuck up on me, and then it felt normalized.

MS. FARRELL: I would like to show the witness Government Exhibit 3501-20. And this is only for the witness, please.

THE COURT: You said 20?

MS. FARRELL: Yes.

Q Do you recognize this document?

A Yes.

Q And what is it?

A This is text messages between myself and Rachel Cherwitz.
Q And do you recognize the phone number?
A Yes.
Q The 415 phone number?
A Uh-huh.
Q Whose phone number is that?
A That's Rachel.
Q Are these true and authentic text messages between you and Rachel Cherwitz?
A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 3501-20.

MS. COHEN: Your Honor, subject to what we discussed on the record earlier, no objection.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Conditioned on our prior objections, no objection.

THE COURT: I think you should make the basis for your objection --

MS. COHEN: Sorry.

MS. BONJEAN: Yes, Your Honor.

Objection to completeness, to the extent it contains hearsay.

MS. COHEN: We join, Your Honor, in the objection.

THE COURT: Overruled.

Government Exhibit 3501-20 is admitted.

(Government Exhibit 3501-20 received in evidence.)

Q So I just want to focus on a few of those in the interest of time.

MS. BONJEAN: I'm sorry, Your Honor. Just relevancy objection to some of these messages as well. I apologize for the late objection.

THE COURT: Overruled.

MS. FARRELL: And so if we could just -- Mr. McNett, can you scroll all the way over to the left so we can walk -- and go all the way to the top so we can see.

Q Do you see -- can you just walk us through -- unfortunately, it looks like the left is getting caught off on the screen. But if you can tell, what is the --

THE COURT: Maybe gave her a paper copy as well. Do you have one?

MS. FARRELL: It is not possible, really, to read it on paper, unfortunately.

THE COURT: Okay. Go ahead.

Q Can you see it on your screen?

A I can see it well. I understand.

Q Okay.

A Yeah.

Q The left-hand column, what is that?

A That's the -- because this is e-mail addresses.

Q Why is it e-mail, if it's text?
A Because we used iMessage on Apple computers.
Q And so it's linked to your Apple account?
A It's linked to my Apple account through my e-mail and phone number.
Q And so what is the left column show?
A That shows our e-mail addresses.
Q And then what does the next column show?
A That shows my name and Rachel's phone number.
Q And then the next column?
A The sent time.
Q And then the next column?
A The actual message.
Q Okay. Great.
A It was so long ago it was called iChat.
Q All right. So I would like to start with the messages on September 24, 2013.
Are these -- it looks like they are in reverse chronological order from the bottom up. Do you see that?
A Uh-huh.
Q So starting with the one, "I got my period," can you read that, please.
A Sure.
I got my period this morning, and it's one of those periods where I feel knocked out. Is it okay if I don't do

yoga today and go for a walk later instead.
Q Who's writing that, you or Ms. Cherwitz?
A I am.
Q And then what is her response?
A No.
Q Can you please keep reading?
A Yoga. Lay on the mat, but you need to go.
Q And then what's your response?
A K.
Q We can go to September 26, 2013, at 6:05:52 p.m. Actually, let's skip that.
If we can go to 9-26 at 6:20:48 p.m.
Can you read that?
A I have not showered yet. My battery is low. I'm asking you, even though I know it makes me look bad.
Q Who writes that message?
A Me.
Q And what is Ms. Cherwitz' response?
A Your battery isn't low. This is always my fear with you. It's just a place you fall back into homeostasis. You are an adult, and you can make the decision, and I would be lying if I said it was the right stroke.
Q What does the "right stroke" mean?
A That's an example of jargon that comes from actual orgasmic meditation. So the stroke literally in orgasmic

meditation is what the stroker is -- how he or she is stimulating the clitoris. In this context, it's -- it means just the right thing. That was -- "stroke" was used quite a lot in a kind of broad sense, but the, yeah, the "right stroke" is the right thing to do in this case.

MS. FARRELL: May I have one moment, Your Honor?

THE COURT: Yes.

(Short pause.)

MS. FARRELL: So we can take this down, please.

Q When we left off yesterday, you were still living in New York. Did there come a time you left New York?

A Yes.

Q Why did you leave New York?

A Because of the events of the virus and the OM demo that were so traumatic. I -- that's why I left.

Q And where did you go?

A To San Francisco.

Q And did you continue working for OneTaste there?

A I did.

Q And how long -- how much longer did you continue working for OneTaste?

A Not all that long. I think it was probably a few months.

Q And what ultimately -- did you leave?

A Yes.

Q What ultimately made you decide to leave?

A One day it was just the straw that broke the camel's back. Like I just finally had enough.
Q So I'd like to -- well, what happened after you left OneTaste?
A I told them I was leaving -- should I get into what I -- how that went or just --
Q Sure.
A -- after -- okay.
I texted with Justine Dawson, and I said that I was really leaving and flying back to New York. And she -- I remember treating me with kindness and understanding and saying, okay, I understand you've got to go.
And on that same day that I -- like I made a decision, I booked a flight immediately that evening, and packed up all my stuff really quickly.
I told the people in my life that I needed to tell, you know, my colleagues and my friends. And it was really hard to leave them. And I still miss them in a lot of ways, you know, those friends.
Excuse me.
And on that day, I remember as I was actually walking out I got a text message from Nicole. She said a few things, but the thing that sticks in my mind is "I release you."
Q Nicole Daedone?

A Correct.
Q What does that mean to you?
A I mean, I remember because it like -- (indicating).
My interpretation of that was that she knew that this was final. She knew I wasn't coming back, and that that was equally a decision on my part and on their part. It was very clearly over.
There was a part of it that was, I think, meant as a kindness and intended as like, you know, it's okay, I'm giving you my permission to go.
I think that, you know, at the time, I also read it as it -- I don't know how to describe that. It felt -- what's the word I'm looking for. It felt really odd to have the highest person at the company say "I release you," as though it was her decision, almost, that I go or not go.
Q After that, did you receive any additional correspondence from anyone on the executive team at OneTaste?
A A little bit. Yeah.
Q I'd like to show you what's been marked as Government Exhibit 1554. Do you recognize this document?
A Yes.
Q What is it?
A Sorry.
It's an e-mail from Justine Dawson.
Q To who?

A To me.
Q And is it dated July 3, 2014?
A Yes.
Q And is this a true and accurate copy of the e-mail that Ms. Dawson sent you that day?
A Yes.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 1554.

MS. COHEN: Objection, Your Honor.

THE COURT: Basis?

MS. COHEN: Multiple.

Hearsay. So not -- I will stick with hearsay right now. And relevancy, I guess, as well.

MS. BONJEAN: Yes, Your Honor. Hearsay, relevancy, and foundation as to --

THE COURT: Okay. Let me take a moment to take a look at it.

MS. BONJEAN: Uh-huh.

(Short pause.)

THE COURT: On the current foundation, the objection is sustained.

MS. FARRELL: Your Honor, may I respond?

THE COURT: No, you can ask the next question.

(Continued on the next page.)

BY MS. FARRELL:
Q Was it your understanding this email was coming solely from Justine Dawson?
A Yes.
Q If you look at the first line, who does she purport to be speaking on behalf of?
THE COURT: Sustained.
Q Ms. Uma, if you can look at the document --
THE COURT: You're using a different name for the witness.
THE WITNESS: That was my nickname.
Q That was the name you went by at OneTaste, I apologize.
Ms. Halpern, and that name is on this document, right?
A Yes.
Q Ms. Halpern, reading this email, who do you understand this communication to be coming from?
MS. BONJEAN: Objection. Asked and answered.
THE COURT: Overruled.
A I -- it came from Justine's email address, but it's from the executive team, it's from all of them.
Q Who does that include?
A Nicole, Rachel, Rob, Yia, Justine, Ken, Joanna, I'm probably missing a few.
MS. FARRELL: Your Honor, on that record I move to admit Government Exhibit 1554.

MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: The objection is sustained on the current record. If the Government proffers a reason its admitting this other than what it just attempt to do, I'll hear you out. But I think you should move on to the next question. We're going to take a break if you want to address this afterwards.

MS. FARRELL: Should we --

THE COURT: How much more time do you have with this witness approximately?

MS. FARRELL: Five to ten minutes.

THE COURT: Why don't you keep going.

BY MS. FARRELL:

Q Ms. Halpern, after you left OneTaste, what did do you?

A I went back to my parent's house in New York.

Q What did you do in the next year of your life?

A I was in really bad shape, like really, really bad.

MS. BONJEAN: Objection. Non-responsive.

THE COURT: Sustained.

BY MS. FARRELL:

Q What sort of physical condition were you in when you arrived at your parent's house?

A I was in bad physical.

Q How so?

A I -- I couldn't -- I couldn't get out of bed for a while and it was really embarrassing. I didn't really share with -- I was living there because I didn't have any money, but I didn't share with them what had happened. I was really depressed and really confused. It was the worst mental health period of my life, for sure.
Q Did you eventually start working again?
A I did.
Q What did you do?
A I slowly got back into teaching yoga.
Q After being a yoga teacher, what did you do next professionally?
A I taught yoga for several years. And then I decided to go to graduate school to become a social worker.
Q Is that what you do today?
A Yes.
Q Do you have a family?
A Yes.
Q Any children?
A I do.
Q And you're expecting, I gather?
A Yes.
Q I'd just like to go through a few additional photographs with you.
And so, your Honor, if I may ask Ms. Bosler to approach

the board, if that's okay with you?

THE COURT: Yes.

Q And these exhibits are already in evidence.

A Ms. Farrell, I immediately remembered the names of the people right away but I never got to say that, if you want me to.

Q Great. If we can start with the woman on the left who does not have a name plate. What is her name?

A Maya Gilbert.

THE COURT: You need to be clear. Which picture? There are two women who don't have a names.

Q There is a gentleman, Eli Block?

A Yes.

Q The woman to his right?

A Is Maya Gilbert.

Q She's wearing a white, sleeveless button down?

A Uh-huh.

Q Then there is Rachel Hemsi next to her. Who is the person to the right of Rachel Hemsi?

A Aubrey Fuller.

Q Then a gentleman to the right of Aubrey Fuller?

A Yes, Reese Jones. Came to me like five seconds later.

Q Ms. Bosler, if you can pull down this one and put it on the ground, and replace it with a different board so we have room.

Mr. McNett, if you can please pull up Government Exhibit 382.
Ms. Halpern, do you recognize this person?
A Yes.
Q Who is it?
A That's me.
Q If you can please pull up Government Exhibit 260. Do you recognize this person?
A Yes.
Q Who is this?
A Lianna Lifson.
Q If you can pull up Government Exhibit 228. Do you recognize this person?
A Yes.
Q Who is this?
A Her first name is Brooke, I think her last name is Holton (ph).
Q If we can pull up Government Exhibit 265. Do you recognize this person?
A Yes.
Q Ms. Bosler, if you can put up the next photo. Who is this person?
A That's Margaret Pixley.
Q If you can please pull up Government Exhibit 269. Do you recognize this person?

A I do.
Q Who is she?
A I don't recall her name. I only met her one time very briefly, not at OneTaste because she came after me.
Q If you can pull up Government Exhibit 374. Do you recognize this person?
A Yes.
Q Who is this?
A Hamza Tayeb.
Q Have you spoken about him during your testimony?
A Yes.
Q If you can just refresh us on what he was involved in, as you recall?
A He, we haven't gotten into the detail of this yet, but he was, he dated Rachel Cherwitz. And I also was a little bit involved with him for a short period of time.
Q If you could pull up Government Exhibit 408. Do you recognize this person?
A Yes.
Q Who is this?
A Michelle Wright.
Q If you could please pull up Government Exhibit 388. Do you recognize this person?
A That's Ayries Blanck.
Q Looking at the board I want to run through each person

briefly.

Skipping over you. Lianna Lifson, who was she to you?

A A colleague.

Q Did she work at OneTaste?

A Yes.

Q Was she a part of the executive team?

A Not at the time, no.

Q How about the next woman, Brooke?

A Same thing, worked for the company, kind of on our level.

Q How about Margaret Pixley?

A Same thing.

Q How about the next person whose name you don't remember.

A I don't know.

Q How about Hamza Tayeb?

A He also worked for the company.

Q How about Michelle Wright?

A Same.

Q And how about Ayries Blanck?

A Same.

Q Were any of them on the executive team?

A No.

Q I would also like to show you Government Exhibit 404, which is in evidence I believe. Do you know this person?

A I don't think so.

MS. FARRELL: You can take that down, please.

Your Honor, is now a good time for a break? The only thing I want to address is that document.

THE COURT: That's fine. We can give the jury a 15-minute break. You can come back at five after 11.

(Jury exits the courtroom.)

THE COURT: I think the witness can step out. And the parties can be seated.

(Whereupon, the witness steps down.)

THE COURT: I think you wanted to address, Ms. Farrell, 1554; is that right.

MS. FARRELL: That's correct, your Honor. So I just want to make a record on our basis for admission.

THE COURT: I think there is two things going on. I think you have a basis for admission, but your witness is testifying how your witness is testifying. And so you have to lay the foundation through a witness not just what your theory is. I think your witness gave an answer and it didn't quite get you there.

MS. FARRELL: Well, I think she clarified that she meant it came from Justine Dawson's email but she understood it came from the entire executive team, which includes the two defendants.

THE COURT: I don't think you laid a proper

foundation. But you can proffer why it is, based on only that, it should be admissible.

MS. FARRELL: That it's a party admission. It contains essentially apologies for what had happened to her.

It's also I think separately we are -- it's not -- I think that's really the principle basis. I also think that when you're offering something like an apology -- I withdraw.

That's the basis.

THE COURT: So your basis is you're offering it as statement of a party opponent.

MS. FARRELL: Correct. It's on behalf of the entire executive team, which includes the defendants.

But if it's not technically written by them then we believe it could come in under 801(d)(2) either D or E, which is an agent of the defendants or co-conspirator statement.

THE COURT: But now you're raising different theories.

What is your theory on this? If it's a co-conspirator statement, it may very well be admissible subject to connection if you can make the showing under Bourjaily ultimately.

But what I understood you to start with is to say that these are statements essentially of the defendants.

MS. FARRELL: We're essentially offering three bases.

I think the most clear cut one is the agency statement given what Ms. Halpern has testified to. Her understanding is that this was coming on behalf the entire executive team and that Ms. Dawson is one agent of the defendants.

But I separately believe we also satisfy statement of a party opponent or co-conspirator statement subject to connection.

THE COURT: So it's your position that Justine Dawson is an unindicted co-conspirator.

MS. FARRELL: My colleague, who is more familiar with, who has previously been identified as an unindicted co-conspirator, is suggesting to me that we should only offer it as an agent statement. I'll take her word for it.

I'll withdraw that basis and offer it as an agent statement.

THE COURT: I'll hear the defendants out on this.

MS. COHEN: Your Honor, Justine Dawson is not an agent of Ms. Cherwitz, for sure. I don't think that that can be established that was she was her agent. It's signed execs. It's not clear what that is. It's not clear whether -- no one else is copied. It's not clear that she was acting as an agent for anyone else in the company.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes, while Justine Dawson may have been an employee of OneTaste, it's not clear at all that Ms. Daedone, being the CEO is encaptured in the execs. It's just ambiguous on that point. They haven't established that. We don't really know who it is coming from. We don't really know whether it's a statement on behalf of an agency statement or a statement on behalf of Ms. Daedone.

But beyond that, it's not even clear that this is being made in furtherance of the organization, rather than apologies from people who worked with her for some other reason or even if you want to call it an apology. I don't think that just because it's sent by an employee of OneTaste that it means that it relates necessarily to the business of OneTaste.

THE COURT: Could you just remind me, any party, of what has come in so far as to Ms. Dawson's role. I can go back and look, but you can might have it more handy.

MS. FARRELL: I believe the testimony has been that she was part of the executive team. At the beginning the witness ran through the people on the bottom of the board, and indicated at Maya Gilbert and Aubrey Fuller were not part of the executive team, but everyone else was members of the top of the company, particularly that top row.

THE COURT: I'm going to sustain the objection to the document.

MS. BENSING: May I raise one other thing that I think is going to come up at cross-examination of this witness?

THE COURT: Yes.

MS. BENSING: We received I believe during the witness's testimony a revised defense exhibit list that adds almost 50 defense exhibits that I understand they intend to raise with this witness.

THE COURT: Have I received that?

MS. COHEN: I was about to raise that. We have three copies for the Court. These are mostly impeachment, but out of an abundance of caution, we're turning over, and particularly in light of the rulings from yesterday realizing there could be, some of these could be admitted now in light of the testimony, in light of what was admitted before. Meaning that, originally it was impeachment; but there may be documents in here that may be offering as exhibits.

THE COURT: The Government is first seeing it when?

MS. BENSING: We don't have them yet, your Honor. If I can make my record?

THE COURT: Yes, go ahead.

MS. BENSING: We don't have a copy of these exhibits. Counsel has represented that they have produced them to us as Rule 16B discovery. But I just have to be make a record about this, your Honor.

THE COURT: It should being marked as exhibits. The Court should have copies and the Government should have copies. You have folks in the courtroom, I think maybe a paralegal, somebody can get that done.

MS. COHEN: It's already --

MS. BENSING: If I may?

THE COURT: I'll let you continue, absolutely. If they have someone here who can make whatever copies there are, that can be done simultaneously.

Go ahead.

MS. BENSING: We haven't seen these before.

THE COURT: I know, you made that record. I'll give you an opportunity to look at these.

MS. BENSING: Just to complete my record briefly. In the past two weeks we've gotten approximately 4500 pieces of Rule 16B discovery. The defense, when they informed us of this this morning, indicated that we had previously received this in 16B discovery. We simply have not had a chance to go through that amount of documents. And A number of what appears to be on this exhibit list is videos. I don't know how long the videos are or when we would have a

chance to review them.

We would move to strike the admission of any video because the Government simply has not a chance to look at them whatsoever.

THE COURT: Nor has the court.

MS. COHEN: Your Honor, these are impeachment, they directly contradict what the witness said yesterday. Obviously, we did not know exactly what the witness was going to testify, that's why we produced all of these exhibits everything --

THE COURT: You've given it to me before, the videos?

MS. COHEN: No, I'm sorry, to the Government.

THE COURT: I'm going to be the one deciding admissibility and what can be used so I need to be able to look at these. Where are they? Is there something you can give me now?

MS. COHEN: We handed them up, your Honor.

THE COURT: A disk?

MS. COHEN: Included in there, yes.

MS. BENSING: I think we have to ask for a delay in the proceedings so we have an opportunity to --

THE COURT: You may very well, I don't know what we're dealing with yet. I'm learning about it now, probably a few minutes after you. So tell me more, make me a proffer

of what these documents are, when the Government received them, if the Court has them, and what use you're planning to make with them.

Actually, I think we should -- how much more time with this witness?

MS. FARRELL: I'm now done.

THE COURT: We'll have to bring her back and you'll indicate that.

Go ahead, Ms. Cohen.

MS. COHEN: From the beginning we have said the witness list was extremely --

THE COURT: I understand, we don't need to go back. Explain to me what the documents are, what are the ones you are going to use first, what are the videos. And I'll take sometime and I'll go look at the videos, if that's what you're going to be doing. If we need to take a delay, we'll take a delay. But you need to tell me what it is that you're handing up now.

MS. COHEN: Okay. We are handing up a couple of the videos -- one of the videos is already in evidence, the Government put in evidence. We are putting up videos like, for example, the photo that was just shown of the women in the dresses, that's actually a video of them singing. And again, it's taken out of context in the photo. I'm showing that to the witness.

In terms of other videos, the witness testified yesterday about her extreme -- I mean today, both days -- emotional distress, everything that she was going through. The entire case is about, I was brainwashed and under mental stay, I couldn't make my own decisions. I think she testified about her physical appearance.

THE COURT: I heard the testimony. What are the documents?

MS. COHEN: The documents are going to show those times she's testifying, singing with everyone, having a good time, contradicting exactly what she is saying. And I will be matching that to the times of what she was saying.

THE COURT: You didn't anticipate this might be the case beforehand? Or you just held the stuff back?

MS. COHEN: We sent it all over to the Government. I did not know what I was going to be able to use because I didn't know exactly what her testimony was. But we put it all over. The Government sent us a letter, they said we need your documents, if you're going to intend to use anything in your case in chief.

We can call this witness back in our case in chief and do it that way. But since she's --

THE COURT: Go through the list. What else? Other than videos, what else is there?

MS. COHEN: Some posts that the witness made

contemporaneous.

THE COURT: You mean social media?

MS. COHEN: Yes, contemporaneous with what she said in the past and on the stand. So a lot of them are posts. Sorry, I'm just --

THE COURT: Take your time.

MS. COHEN: I think those are mainly in terms of the videos. A couple of videos of, for example, at the end of the coaching program, which there was testimony about obviously, and her speech that she gives at the end of CP6.

MS. FARRELL: Whose speech?

MS. COHEN: The witness's.

THE COURT: Is this something the Government has seen?

MS. BENSING: No, your Honor. Just to continue to make a record.

MS. BONJEAN: That's not true.

MS. BENSING: The reason why I alert to the Court to the volume of what was provided to us on the eve of trial after sort of request, after request, after request of 16B material, is that we have not had a chance to go through the almost 4,000 documents that they turned over to us within the past week or two. It's just not practicable.

I don't know if there is hearsay on these. I'm not sure if it's proper impeachment. We have not had a

chance to look at them, from the Government's perspective, which is completely unworkable, your Honor.

MS. BONJEAN: These were produced to them. It's just not --

THE COURT: Tell me when. Pull up the cover letter, email, tell me when these were all produced. Were they ever given to the Court? When?

MS. COHEN: No, your Honor.

THE COURT: Tell me when they were produced to the Government then. Let's talk about with just this witness -- I assume the 4500 piece of the material are not all about this witness, right?

MS. BENSING: Your Honor, I have the dates so I can just --

THE COURT: Tell me how much is with respect to this witness.

MS. BENSING: I don't know because they didn't provide us the Bates numbers of what they are now marking as defense Exhibits. I have no clue.

THE COURT: Let me ask the defense then.

Ms. Cohen or Ms. Bonjean, whoever it is, for each item that you're intending to use for cross-examination, when did you produce it to the Government? Go each one, one by one.

MS. COHEN: There were two productions, your

Honor, including these, about two weeks and one week before trial.

MS. BENSING: The dates of the productions are April 20 they produced 1272 files to us, April 28 they produced 3,353 files to us, and my understanding is there is a third production on May 4 with 126 files.

MS. COHEN: Your Honor, the majority of what we turned over is for impeachment. For us to preview our cross-examination, them meeting with the witness in between all day yesterday, including this morning, and to hand over our entire cross-examination is not appropriate. We were very forth coming in terms of like once we could and figured out who the witnesses were going to be, we produced all of this beyond what we're using.

THE COURT: When did you find out that this would be the first witness?

MS. COHEN: Last week.

MS. BENSING: I think it was early last week.

MS. BONJEAN: Also, it's not the case that we fully anticipated this testimony. That's not the case. There are --

THE COURT: You thought she was going to say that she didn't have any mental effects from any of this? You thought that would be the testimony?

MS. BONJEAN: I think there is some real estate in

between that and what we expected her to say; yes, I think there is.

THE COURT: Okay. So let's talk about what are you going to use first.

MS. BONJEAN: I would point out, she was interviewed by the FBI about 15 times and the story has morphed, morphed, morphed. Yes, we didn't expect some of the testimony. Certainly, didn't expect that they were going to be these random clips of my client at a CP6 lecture pulled out of thin air that that were presented in a way --

THE COURT: You're going to put the rest in.

MS. BONJEAN: I'm going to put in a fair amount, I most certainly am.

THE COURT: The Government has that video.

MS. BONJEAN: And that's not an issue. But for instance --

THE COURT: Let me stop you for a moment. If that's -- is that the first thing you're going to be using?

MS. BONJEAN: Ms. Cohen is going first.

MS. COHEN: The first several points I'm going to make are not issues, because the only video at the very beginning is going to be a video from yesterday that's already in evidence.

THE COURT: Does the Government have an issue with that?

MS. BENSING: No, of course not.

THE COURT: Go ahead.

MS. COHEN: The first issue that I get to, I was not going to put this in, but in light of the testimony about CP5 and the forcing of her to pay for this course and the pressure there, there is a subsequent video of this witness who gets up in front of an entire room of people and tells a story about this experience. And that is directly --

THE COURT: Which experience?

MS. COHEN: About the CP5 that she testified about, being forced to, pushed into the money, and the whole --

MS. BENSING: Your Honor, just even having not seen it but just hearing what they are saying, I don't think that's proper impeachment. She said multiple times she wanted to take the course but she couldn't afford it.

THE COURT: I'm at a disadvantage because I don't have the video. Devil is in the details. Do you have transcripts of the videos, anybody?

MS. BONJEAN: No.

THE COURT: How long is the video?

MS. COHEN: I'm only showing a few clips I think --

MS. BENSING: We have --

THE COURT: Stop, Ms. Bensing.

MS. COHEN: Maybe two minutes, three minutes. It's not very long.

MS. BONJEAN: It most certainly goes to context and state of mind. It goes to her -- it directly impeaches her testimony that she was so trapped she didn't really have --

THE COURT: It may or may not. I can't rule on it if I haven't seen it, hasn't been given to me.

MS. BONJEAN: We are not obligated to pre-try a case. I understand the Court needs to go see these.

THE COURT: I'm not letting something go before a jury if I an admissibility determination.

MS. BONJEAN: Understood. But this idea that the Government gets to preview and approve our exhibits, is ludicrous. I never even heard of such a thing.

MS. BENSING: I don't think that's true. I don't think it's ludicrous or unheard. In most trials, particularly with video evidence where there might rule of completeness issues, which there very well be. I have no idea if this clip is two minutes, how long the entire video is.

I do think the parties share things, and this is something that we have raised over and over again with the Court and the defense.

THE COURT: You have. Everybody has raised their issues.

Why don't we do this. I'm not going to keep this jury waiting. I think we can -- you don't have any more questions for the witness, Ms. Farrell?

MS. FARRELL: That's correct.

THE COURT: You'll indicate that. And you'll start your cross-examination. And you'll not be using materials that nobody has seen yet. We'll get to the lunch break, you'll give me the videos or whatever it is you plan to use that I haven't seen yet so I can make a determination, if it's something that you want to show the jury or have the jury -- you can question her, certainly, but if you're going to be showing documents to the jury, I need them.

MS. COHEN: Yes, your Honor. And this video that I'm talking about you have. Everything you have. If you would like I can --

THE COURT: Just now or -- I have the video certainly from before.

MS. COHEN: We handed up everything. You now have it. I understand you need time to review it. And all the videos on a CD.

THE COURT: Tell me how long the full video is, I know you're only going to use part of it. But how long is

the full video?

MS. COHEN: That video is only a few minutes.

THE COURT: Okay.

MS. BONJEAN: It is the full video, it's her statement.

MS. COHEN: It's the full video.

MS. BONJEAN: It's the full piece of her statement. There is probably more people making statements; it is her statement.

MS. COHEN: A lot of these videos as you heard in the testimony, all day long the entire program is videoed, so same with the videos this is putting in.

MS. BONJEAN: Presumably they even have the entire video for CP6. They pulled out portions of it.

THE COURT: I want to make sure we're talking about -- I think we're talking about two different videos.

The video that was shown yesterday, portions of Ms. Daedone. You're going to use part of that today, or no?

MS. BONJEAN: Yes, in my examination.

But what I was suggesting is that, they used portions of CP6, they may have used portions --

THE COURT: When you're saying CP6, you're talking about the one video -- no, you're talking about what she testified to about the training.

MS. BONJEAN: The coaching program is very long.

The whole thing was video recorded. They subpoenaed OneTaste, I think there is a good possibility -- they had it for years and years actually. I think, because I think all that video was produced.

As the Court may recall, their exhibit list which was 6,000 exhibits with hours and hours and hours of its own video, which they did not pare down until like the last week. We didn't even know she was hitting the stand. I mean, they pared it down little bit, but.

THE COURT: Here's what we're going to do, you're planning to start with which video, Ms. Cohen?

MS. COHEN: The one from yesterday.

THE COURT: Government doesn't have an issue with that because the Government is aware of what that video is. The government put in part of it, and you'll be crossing and potentially putting in more of it.

MS. FARRELL: It's in evidence, your Honor.

THE COURT: I mean, presenting it.

MS. COHEN: That's correct, your Honor.

THE COURT: Okay. Then the second one is a couple of minutes.

MS. COHEN: Yes.

THE COURT: And the Government right now is not familiar with what it is.

MS. FARRELL: That's correct, your Honor.

THE COURT: That will not be happening before the lunch break. The Government needs to look at it. I need to look at it. What format?

MS. COHEN: A thumb drive.

THE COURT: I'll make sure that I can access that.

What else? What are the other documents? Are those the only two videos.

MS. COHEN: No, some of the videos of singing, things like that.

THE COURT: How long are those?

MS. COHEN: Two seconds, very short.

THE COURT: All right, after the lunch, after the Government can look at it. What else? There are paper documents, I assume.

MS. BONJEAN: There are paper documents that are OneTaste materials that they had in their position for a very long time. They may not have not used them or admitted them, but they are OneTaste materials responsive to subpoenas. I'm sure they studied it at length. That's a collection of documents.

THE COURT: How big a volume?

MS. COHEN: It depends on -- some of these I might use most of these as impeachment on --

THE COURT: You mean for questioning and not to actually admit.

MS. COHEN: I would like to admit some, I don't know exactly the number.

THE COURT: Are there any foundational objections understanding you haven't spent time with them?

MS. FARRELL: Here is the issue with the OneTaste documents, they were not produced to us with Bates stamps.

THE COURT: From OneTaste or from the defense?

MS. FARRELL: From OneTaste, also from the defense actually. The OneTaste Bates stamps is OneTaste with a date, it's not a specific number for each document. Frankly, I'll point out, that the defense is refusing to stipulate to the authenticity of the OneTaste documents. And so, in order for us to assess whether this is a document that in fact was produced by OneTaste, it's not as simple as us comparing Bates numbers because we can't, because they weren't produced to us with Bates numbers. So it's just not as simple as it might be in a normal case with a normal production where we can quickly pull something up with a Bates stamp.

THE COURT: You think you can lay a foundation that these are -- what are they, business records or something else?

MS. COHEN: They are this witness's statements. Everything we're going to showing her is something she will be able to authenticate herself.

THE COURT: But given that it's the witness's statements, what would be your basis for admitting?

MS. COHEN: To show her state of mind at the time; also, directly contradicting what she said her state of mind was.

THE COURT: That's a different issue.

MS. BONJEAN: Just so your Honor is aware. Some of these documents, the principles of OM or what is OM packet, they have those. They are also actually, some of these materials were produced when the Court set a deadline six, seven months ago on our exhibit list.

THE COURT: You said you produced them?

MS. BONJEAN: Yes, they were produced. And just so we're not comparing apples and oranges. Our objections on foundation tend to relate to the communications that were gathered from people's phones, not OneTaste documents. We never objected to stipulating to the course material, the curriculum, those types of materials. That whole long list of exhibits that they read off on the beginning, we stipulated to. So that's not quite right either.

THE COURT: I think the Government needs at least a little bit of time to figure out what these documents are, if they are going to have any objections. But I think we can start the cross-examination now.

MS. COHEN: Yes.

THE COURT: Go ahead.

MS. COHEN: I'm sorry. I was going to say, to the extent -- what time are we breaking for lunch?

THE COURT: It depends on what needs to be established during lunch. Let me finish this conversation.

MS. COHEN: I can move things around in my order to avoid doing things that would call -- if I can have a moment.

THE COURT: I think the most important thing will be for the Government to be able to take sometime to look at these materials and to figure out if they are materials that they have no issue with. If they have issues with them, we may need a break, an extended break. I think we can get started.

MS. BONJEAN: Your Honor, moving forward so this can go smoothly, one of the women who is going to take the stand is a complainant, if you will. I don't know if she'll hit the stand today, my guess is she'll probably hit the stand tomorrow, there is one in between. And so my understanding is her testimony is going to be fairly lengthy. So I am anticipating certain exhibits that will be used on cross-examination. They have been provided already in discovery production at least two or three weeks ago, I can't say exactly when. We will be marking them.

I guess the question is, what is the balance? We

don't think we should have to preview our cross before their direct.

MS. FARRELL: May I respond to that on a granular level?

THE COURT: Yes. But, I need to have the documents, Ms. Bonjean.

MS. BONJEAN: We're prepared to --

THE COURT: I'm the one making the decisions about the admissibility. So if I don't see the documents, we'll have a delay. I'm hearing you about, yes, you do not have to preview all of your cross-examination, of course you don't.

But we're talking about now a volume of materials that not only the Government needs to be able to react to, the Court needs to be able to react to. I'm not sure why the defendants would want to keep the material from the Court because I'm not letting in unless I've had a chance to see it and think about it.

MS. BONJEAN: We're not trying to keep it from your Honor. We're just trying to figure out how to give it to your Honor without also giving it to the Government, and thereby previewing our cross. We're trying to find the right balance.

So when this witness hits the stand, I don't think I should have to give over my exhibits prior to their

direct. Then they'll just craft their direct around it, which kind of defeats the purpose.

I'm happy to provide the Court by the end of the day the exhibits that we intend to use with that witness moving forward so there is no delay. But again, I'm objecting to the extent that we have to identify our exhibits in advance of a direct examination.

THE COURT: Let me hear from, Ms. Farrell.

MS. FARRELL: Here is the issue from our perspective, your Honor. It's not about getting a preview of their cross at all. In order to impeach a witness with their prior inconsistent statement, there is a specific formula. It has to be a contradiction, and you're typically not allowed to put in external evidence of the contradiction.

In order for us to evaluate while the questions are being asked whether the formula has been met, we have to be able to look at the statement that they are trying to impeach with in the moment. If it's in a video that we haven't seen and we don't have a transcript for, I can't make that objection in the moment. I don't think we're going to sit here and watch with headphones in silence the video as it's being shown while the impeachment is happening. At a very basic granular level, that is the issue we're having.

THE COURT: It's not so much granular, it's just practical.

MS. BONJEAN: Then we're getting into a different issue. Because some of this material is not about just impeaching for prior inconsistent statement. Some of this is admitting evidence or showing evidence that puts context and further elaborates on her state of mind, which contradicts her testimony but it's not like you said X on this occasion now you're saying Y.

This case is like soup. And they put on a whole case about her state of mind, the culture of OneTaste, what it was like working there. And we have the right to rebut that.

If we want to call her back, we can do it that way. That's the only other option.

But it's not going to be a one-sided story here. We need to be able to do that either through cross-examination, if the Court -- I can understand if that's not how we're going to do it, but then she needs to come back and we'll do it that way.

THE COURT: I can't comment on any of what you're planning on using because up until a few moments ago when it was handed to my Deputy, it wasn't given to my Court. I still haven't seen. I can't make any admissibility determinations.

I'm not disagreeing with the defense that they are permitted to cross-examine and impeach witnesses. But it has to be done in a way that they are going to lay the right foundation, et cetera. And if it's something that the Government needs more time on and should have been produced earlier, that's one issue. If the Government just needs more time because this is how things happen during cross-examination, then the Government is going to have to scramble a bit.

We're talking in generalities here because I haven't seen this. What I have been told, more specifically, is that the first video that the defense plans to use is one that the Government has no issues with because they are aware of it and they put part of it in yesterday. I think we should start with that.

To the extent you have other video clips that are short, that are the entirety of a clip and you're not taking something out of context, or you're not taking a portion of a larger body of material, then the Government can look at it during the lunch break. That's the way it's going to be. There is a certain reactive nature to both cross-examination and redirect examination. So, we're going to do it that way.

I see very clearly what is going on. I've been presiding over this case for about two years now. I see

what is happening here. All of this could have been done differently. But, parties have chosen to behave like this.

We're going to continue with this trial and I'll take these issues up as they come.

I do encourage the defendants to give me the information that I need. Because nobody is going to move this case along if I'm not ready to make rulings because I haven't been given information. I'll decide whether we're going to proceed or not. The defense is encouraged to be more forthcoming about its documents, its exhibits, with the Court.

MS. BENSING: Your Honor, obviously we would object to the provision of materials to the Court on an ex parte basis.

THE COURT: I don't think they are ex parte, they would be given to the Government as well.

MS. BENSING: So long as they are given to the Government, that's fine, your Honor.

THE COURT: I don't think they are not planning on giving me information that you will never be receiving. They are saying they don't want to have to preview for you. I'm saying, that if there is going to be documents that the Court needs to address, I need to have them.

MS. BENSING: Of course. If there is a provision of exhibits by the defendants to the Court, the Government

would also necessarily need a copy of those.

THE COURT: You would need them at some point before a decision is made, but you may not need them -- I need them before you need them, to some degree.

MS. BENSING: I guess we made our record.

But with respect to affirmative exhibits that are being admitted under the defense case --

THE COURT: I think that's different.

MS. BENSING: -- the Government does request to have advanced notice of those so we can raise issues like rule of completeness, and things like that.

THE COURT: I think what I'm hearing, though, is we're talking about impeachment at this point.

MS. COHEN: There is both. That's why we handed over -- yes, there are a couple of impeachment that we did not, that we're previewing now, we didn't know if we needed it. But for the most part, that's why we handed over the exhibits --

THE COURT: I'm hearing you. I don't think it's worth taking the time now, because I think we need the time for the break.

MS. COHEN: I agree. I wanted to clarify that if we gave them to you before the Government, they will be documents they have in their position, just not necessarily --

THE COURT: But the Government wants sufficient time to be able to make any objections or even agreements with the defense, and the Court also needs time. I'm trying to strike a balance here. If we're talking about impeachment material, I think I see no down side to the Court having that material early.

Does the Government think there is any reason the Court cannot have it early?

MS. BENSING: No. I think if we were talking a few documents, it wouldn't be an issue. We're talking about almost 50 new exhibits that are listed at defense exhibits that they may --

THE COURT: For this witness.

MS. BENSING: Correct, your Honor, for this witness alone, some of which are videos.

THE COURT: All right. Let's bring the jury back.

MS. FARRELL: I'm going to get the witness, your Honor.

THE COURT: Yes.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Everyone may be seated. We'll continue the examination of the witness.

MS. FARRELL: Your Honor, I have no further questions for this witness on direct examination.

THE COURT: Thank you. Is there cross-examination, Ms. Cohen?

MS. COHEN: Yes, your Honor, thank you.

THE COURT: Go ahead. I'll give you a minute to get set up.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good morning, Ms. Halpern.

A Good morning.

Q Yesterday and today you testified about a lot of events, I just want to make sure I understand the timing. I just want to do a brief overview of that with you if that's okay.

A Sure.

Q You testified you first went to OneTaste event I think you were living in San Francisco at the time, correct?

A Correct.

Q And that was in late 2010?

A I believe it was in that ballpark of 2010, 2011.

Q You went to what was called the Turn On event, right?

A Yes.

Q That was the foundation of everything, of what OneTaste was about, you learned about that at the event, correct?

A Yes.

Q And certainly you learned about OM at that point,

right?
A Yes.
Q And then you went to a few events after that, correct?
A Yes.
Q And then you left to, you said you stopped going to things at that point regarding OneTaste for about a year; is that right?
A Right.
Q And then you moved to New York in 2012?
A Right.
Q Early 2012 is that about, right?
A I think so.
Q You started to take OneTaste classes at that point, correct?
A Yes.
Q You also took a second OM class, I believe that was in New York?
A Yes.
Q In June 2012 you signed up for the coaching program, right?
A Uh-huh.
Q That was what we've been referring to as CP5. That just means, all these coaching programs, the one you're in is a number, right, but they are very similar?
A Correct.

Q And three months into that, in November of 2012, you decided you wanted to switch into the CP6 class, correct?
A Correct.
Q And then around that time, maybe, you talked about when you moved into the Morellino around that time; is that fair?
A Uh-huh.
Q Late 2012. Then the CP6 course started in February 2013?
A Right.
Q That continued for ten months, right?
A Uh-huh.
Q That brought us, that brings us to November 2013, right?
A Sure.
Q And you testified today that you started sales, I forgot to mention, sometime in August 2012 summer of 2012?
A I think June or July, yes.
Q But you also testified in October of 2013 you signed an employment agreement with OneTaste as a salary employee, right?
A Right.
Q Then in December of 2013 you moved back to San Francisco?
A Yes.
Q And then in February 2014 you testified that you left

OneTaste, correct?
A It was March, yes.
Q March, okay. That was after you were fired from OneTaste, correct?
A Yes.
Q Now I'm going to go back. I wanted to get that out so we have the time frame.
You grew up in Westchester; is that right?
A That's right.
Q As a kid you grew up in theater?
A Uh-huh.
Q You were in theater in high school?
A Yes.
Q Your family is fourth generation in the Broadway advertising business?
A Yes.
Q You're also a singer, right?
A Uh-huh.
THE COURT: If I can ask the witness, you're sort of saying uh-huh. But just say yes or no if it's a yes or no question.
THE WITNESS: Sure thing.
BY MS. COHEN:
Q I'll repeat that. You're also a singer, right?
A Yes.

Q And in fact, you've been a performer your whole life?
A On and off.
Q You're also a college graduate?
A That's right.
Q And you testified today you later got your Masters in social worker?
A That's right.
Q Before you went to OneTaste you were a yoga instructor?
A Yes.
Q You did both yoga and meditation?
A Right.
Q And you actually lived in and worked in a yoga community?
A I did.
Q That's sort of living with other people, correct?
A Yes.
Q In a similar way that people lived together at OneTaste, correct?
A Similar in someways.
Q You also said that you originally heard about OneTaste through a man you met on OK-Cupid?
A Yes.
Q That's a dating website, right?
A Yes.
Q You didn't know this person you met.

A Okay.
Q You is said you testified something in his profile that intrigued you about OneTaste, right?
A That's right.
Q You decided you wanted to try orgasmic meditation, correct?
A I don't know if I knew that term then, I don't recall exactly what it said in the profile.
Q Something intrigued you, you knew it wasn't regular meditation.
A Again, I don't know exactly that it was on the profile that intrigued me. It could have said meditation on it, but I'm not 100 percent sure.
Q Certainly you ended up going to this first class, correct?
A Yes.
Q Right away you knew it was orgasmic meditation, right?
A Yes.
Q In fact, you told the Government in previous meetings with them that you were instantly hooked, correct?
A That's right.
Q You were excited about it?
A I was.
Q You went on your own to this event?
A I went with that person that I met on OK-Cupid.

Q No one forced you to go, correct?
A No, they did not.
Q Then after you went there, you went back and signed up for an intro to OM course, correct?
A Yes.
Q Again, there was no confusion as to what was going on here. You actually signed up for the OM course where you then saw a demonstration; is that right?
A That's right.
Q You weren't surprised by the demonstration, correct?
A I was surprised by the demonstration, but I did have prior knowledge that it was going to be happening.
Q You knew what orgasmic meditation was at that point, right?
A I never seen it in-person, but I knew about the concept certainly.
Q But to do it, you knew there was a stroking of a women's genitals, correct?
A I did, yes.
Q You went to that event, correct?
A I did.
Q You received at that time an OM basic manual, which I think we looked at yesterday. Do you recall that?
A I do.
Q Can we bring that up, Government Exhibit 3120. This is

the manual you were given out at that class, correct?
A Yes.
Q If you can go to the next page. Can you focus in on where it says: Why OM.
In this description it basically tells you about -- everyone can read it -- it's describing why people OM, correct?
A Yes.
Q And you think of it like yoga or meditation or running, right?
A That's what it says here.
Q And in that way it's a practice, correct?
A Yes.
Q And it talks about how sometimes you won't -- sometimes you'll feel amazing and sometimes you won't feel anything at all, right?
A Yes.
Q But over time, you will see noticeable positive changes in your sex and your life, right?
A That's what it says here.
Q It also gives you reasons why you should do it. Those are bulleted, right?
A Yes.
Q Deeper connection to your partner, right?
A Yes.

Q A way to work sexual connection into a busy schedule, right?
A That's what it says.
Q A sense of empowerment from taking ownership of your sex, right?
A Yes.
Q And in fact, you believed these things about the OM practice, correct?
A Today?
Q At the time you believed these about the OM practice. In fact, throughout the time that you were there, you believed these about the OM practice.
A I think my understanding of these concepts did vary overtime depending on where I was and how long I had been there. Are you asking about in the beginning?
Q That's fair. We'll get to that.
Let's talk about the beginning. In the beginning you felt this way, correct?
A In the beginning I was exposed to these concepts and I felt like those were all intriguing things, certainly.
Q And then if you -- go to the next page. This manual then tells you all about OM things you need to know. Keep going.
A If you can make it bigger. Yes.
Q Okay. And this tells you what you will need to

practice OM, right?
A Yes.
Q And in fact, you can practice OM without being a part of OneTaste, correct?
A Yes.
Q And in fact, this manual tells you exactly what you need to do that, right?
A Yes.
Q What the kit is; is that correct?
A Yes.
Q And while OneTaste is recommending their signature OM kit, it also talks about how you can create your own OM kit at home, right?
A Right.
Q In fact, if you wanted to order their kit, you could go online and never come back, correct?
A Yes, that's right.
Q Now, when you moved to New York you testified that you took a second OM class, right?
A Yes.
Q And in fact, can Nicole Daedone taught that class, correct?
A I don't entirely remember. My memory is that Justine taught that class. It's possible that Nicole did.
Q It was a big deal, you testified yesterday, if Nicole

came to a class?
A It was.
Q The second OM class, your big -- when you moved to New York, you do not recall that Nicole taught the class?
A Genuinely, no. I wasn't, I was -- it was so early that I wasn't -- she wasn't a big deal to me yet.
Q After that class, in fact you signed up for what is called an exploratory session. You're familiar with that term, correct?
A Yes.
Q That's where you could meet somebody from the company to talk more about it and getting more involved, correct?
A Right.
Q In fact, that's what led you to meet with Rachel Cherwitz, right?
A I haven't thought about this in a while. I haven't thought about the term exploratory. I believe, yes, I think so.
Q You met for coffee; is that right?
A Yes.
Q When you met at a coffee shop?
A Yes.
Q And the purpose of that was to actually talk about the courses, the courses you might be interested in, correct?
A Correct.

Q That was a sales discussion, correct?
A It was.
Q In fact, after that meeting, you decided you wanted to sign up for CP5, right?
A That's right.
MS. COHEN: One moment, your Honor, I think the Government will -- I want to check on an exhibit in light of our discussion.
THE COURT: Sure.
(Continued on next page.)

CROSS-EXAMINATION

BY MS. COHEN: (Continuing)

Q Ms. Halpern, you had to sign waivers before you took courses, correct?

A Correct.

MS. COHEN: Your Honor, I'm going to show just for the witness DX 21-L.

THE COURT: And do I have a copy of that?

MS. COHEN: Yes, Your Honor.

THE COURT: Is that something that was just handed today?

MS. COHEN: Yes, Your Honor.

I believe it has been also marked as a Government exhibit, so you might actually --

THE COURT: I will go with your exhibit number now.

You said 21-L?

MS. COHEN: 20 -- sorry. DX -- yes, it's 21-L. Correct, Your Honor.

THE COURT: Let me just get to it.

Sorry, let me just ask you, Ms. Cohen.

MS. COHEN: Yes.

THE COURT: Defendants provided an exhibit list to the Court. It doesn't have numbers in the 20s at all.

You can continue with this, but we might have to take it a little bit slow. And I will need an actual exhibit

list from the Defendants.

Okay. Go ahead. I have a copy now.

THE WITNESS: Is it possible to blow this up a little bit?

MS. COHEN: Yes.

If you could just -- I think she can't read it. Blow the whole thing up so she can see what it is.

THE WITNESS: Thank you.

MS. COHEN: Is that better, Ms. Halpern?

THE WITNESS: Yes, it is. Thank you.

BY MS. COHEN:

Q Do you recognize this document?

A Yes.

Q And without talking about the substance of it, generally, what is it?

A It's a confirmation of my application for the coaching program.

MS. COHEN: And if you scroll down -- oh, sorry. Scroll back up there.

Q An initial there, do you see an initial?

A Yes.

Q And whose initials are those?

A That's my initials.

MS. COHEN: And could you scroll down further? To the bottom.

Q And that's also your signature down there as well, correct?
A Yes. Correct.
MS. COHEN: Your Honor, at this point we offer Defense Exhibit 21-L into evidence.
MS. FARRELL: No objection, Your Honor.
THE COURT: Defense Exhibit 21-L is admitted.
(Defense Exhibit 21-L received in evidence.)
MS. COHEN: Okay. So could we scroll back to the -- and keep it this big so that the jury can see it. Scroll back to the top.
(Exhibit published.)
Q So this is essentially the contract you had for the coaching program, right?
A Right.
Q And I believe this one was for 2013. So this was for CP6, correct?
A I believe so, yeah.
Q But the coaching program contract is the same regardless of which one you take; do you recall?
A As far as I know. I'm not sure.
Q And your -- below there you see the financial agreement, correct?
A I do.
Q And that's -- you had to initial that, correct?

A Yes.
Q And, in fact, typically, the cost of this program, as you talked about yesterday, is actually about $12,000.
Do you recall that?
A I do.
Q And you received a discount, correct?
A According to -- yeah, sure. Yes.
Q Now, this document also has --
MS. COHEN: If you scroll down.
Sorry. Cancellation -- go up.
Right there.
Well, yeah. One up, it goes.
There you go. Yes.
Q It has a cancellation policy, correct?
A Yes.
Q And if you sign up, that you can cancel within three days and get your whole deposit back and everything, correct?
A Right.
Q And then 30 days or more before the event --
MS. COHEN: If you scroll down.
Q -- it's fully refundable, correct?
Other than the deposit.
A Correct.
Q Right?
So you had a nonrefundable application fee of $500?

A Right.
Q And then after that, you could get 50 percent back, correct?
A Right.
Q And in addition to signing this --
MS. COHEN: You can take that down.
Q -- there was also a release of liability form for the coaching program.
Do you remember that?
A I'm sure there was.
Q Well, let me see if you can recall this.
MS. COHEN: Can we pull up DX 21-J.
Q Do you recognize this exhibit, Ms. Halpern?
A I do.
Q And generally, what is it?
THE WITNESS: I can't really see it.
Can you pull it up again? Sorry.
Thank you.
A This is the course agreement.
MS. COHEN: And can we go to the bottom of this?
Q This is something you received before you started the coaching program, correct?
A I believe so, yes.
MS. COHEN: Okay. Sorry, can you go to the bottom-bottom? Is that bottom?

Q And do you see there on the bottom, that's your signature, correct?
A Right.
Q And you reviewed this document, right?
A Yes.
Q And you signed it?
A Right.
Q And that was on September 8th, 2012, correct?
A Right.

MS. COHEN: Your Honor, at this point we offer Defense Exhibit DX 21-J into evidence.

THE COURT: Any objection?

MS. FARRELL: No objection, Your Honor.

THE COURT: Defense Exhibit 21-J is admitted.

(Defense Exhibit 21-J received in evidence.)

MS. COHEN: Okay. So if we could publish that for the jury.

(Exhibit published.)

MS. COHEN: Sorry -- oh, you got it. Thank you.

You can take down the signature right now.

If you go back up to the first page, I just want to focus in on the first few bullets under the "assumption of risk."

THE COURT: Can you make it bigger?

MS. COHEN: Yeah. I think he's going to pull out

the --

THE COURT: Just in general, make the entire thing bigger.

MS. COHEN: Owe.

THE COURT: All right. Go ahead.

BY MS. COHEN:

Q So as I mentioned, this is the assumption of risk, correct?

A Correct.

Q And when you read this document, it says, "I understand, acknowledge and agree to the following," correct?

A That's what it says, yes.

Q And if you could just read the third bullet.

A "That any concepts, notions, ideas, suggestions and recommendations from the sponsors and anyone acting on behalf of sponsors that I accept and/or apply to my life I do of my own free will."

Q Okay. And can you continue with the fourth bullet?

A "That while sponsors believe that the content of the course to be valuable, sponsors do not guarantee it will solve any particular issue or problem I may have. I alone will decide and accept responsibility for how and for what purpose I apply the content of this course."

MS. COHEN: And if you could scroll down to the ninth bullet, where it says "that I may choose"?

Yes.
A "That I may choose not to participate in any activity offered in the course. However, if I do decide to participate, I do so of my own knowing and free will."
Q And if you could read the next one as well.
A "That I have assessed my own emotional, mental and physical well-being and I have concluded that I wish to and am able to participate in the course."
Q And finally, the twelfth bullet. "That if I" -- "that if my condition"-- sorry, "if my condition could result".
A "That if my condition could result in any significant harm, the written approval of a licensed physician or therapist may be required as a condition of my acceptance into the course."
Q And then the following one?
A "That regardless of any disclosures or written approvals upon acceptance into the course, I continue to bear sole responsibility for my well-being."
Q And you also, finally, acknowledge that there are emotional and mental risks associated with participation in the course, correct?
A That's the next bullet.
Q Now, on the next page --
MS. COHEN: Go to the next page.
I believe it's the second. Psychotherapy

disclosure. The third paragraph. Yeah.
Q And here you also agreed that the course is not and is not promoted as a substitute for psychotherapy and is not therapeutic in nature, correct?
A Yes, that's what it says.
Q And that you understood that any value you obtained from the course was obtained via your own free will and participation, right?
A Right.
Q And you signed that, correct?
A I did.
Q Okay. I want to move to talk a little bit about --
MS. COHEN: You could take that down now.
Q So this is September 2012 when you started CP5, right?
A Right.
Q And then you testified yesterday that you were in New York at the time, right?
A Yes.
Q And CP5 was in San Francisco.
And in order for you to participate, you participated via video, correct?
A That's right.
Q But, of course, part of this is being with everyone and being immersed in the program and that, you felt, wasn't sufficient, right?

A Yes.
Q But you had been in it for three months at that -- sorry.
You continued to be in CP5 for three months at that time? So September to November?
A I believe you. I don't exactly recall.
Q Well, I can pull it up. We saw correspondence where you're asking -- actually...
MS. COHEN: I have something.
One second. Sorry.
Sorry, Your Honor.
THE COURT: That's fine. Take your time.
MS. COHEN: Based on our discussion, I moved some things around.
THE COURT: That's fine. Take your time.
MS. COHEN: So if we could just pull up for the witness DX 21-AD.
Q Do you recognize this, Ms. Halpern?
A Yes.
THE WITNESS: Can you make it a little bigger, possibly?
Thank you.
MS. COHEN: If you could just go to the date.
Q Do you see the date of that?
A Yes.
Q And what's the date?

A October 23rd, 2012.
Q Does this refresh your recollection of when you wanted to change to CP6?
A Yes. It seems -- I don't remember when the CPs were, but in October I wanted to be in CP6.
MS. COHEN: You can take that down.
Q Okay. So it's fair to say, even though you don't recall the date, you started out in CP5 --
A Yes, absolutely.
Q -- as you testified about yesterday?
A Absolutely.
Q And for starting out in CP5, you learned about the beast, that we heard about yesterday, and the coaching class? You had a preview of that, correct?
A That's entirely possible. I don't have strong memories of CP5. My memories of CP6 are much stronger.
Q But the coaching programs have some concepts that are maintained throughout, right?
A Yeah.
Q So you don't have any reason to believe that you had never heard of the beast before you went to CP6, correct?
A No.
MS. FARRELL: Objection, Your Honor.
THE COURT: Sorry.
MS. FARRELL: Objection, Your Honor, to the

question.

THE COURT: Overruled.

Q And the Government, yesterday, showed you clips from a beast exercise, right?

A Yes.

Q That was CP6, correct?

A Correct.

Q And we just saw some clips of that, but that was a much longer video? Or much longer -- you were there for a long time, correct?

A Right.

MS. COHEN: Okay. So, let's bring up that video.

And I want to play you some other parts of that video and ask you some questions, put it into context.

Oh, sorry. Yes, it's a Government exhibit.

THE COURT: Are you looking for the number?

MS. COHEN: Yes. Thank you, Your Honor.

THE COURT: No, I don't have it. I was just wondering if you have it. I can't find it.

MS. FARRELL: I believe it's 3879.

MS. COHEN: 3879?

I can get the list. Sorry. I had all these marked but that one. It seems to be missing.

THE COURT: That's the coaching program?

MS. COHEN: Yes.

THE COURT: Okay. 3879.

MS. COHEN: 3879. Thank you, Your Honor.

Wrong one. Sorry.

3875. Apologies.

THE COURT: And I'm sorry, are you playing the entire video? What are you playing?

MS. COHEN: I am, but I'm going to fast-forward, so don't worry.

THE COURT: That's fine. I just wanted to know.

MS. COHEN: You don't have that?

MS. FARRELL: We can play it for you.

MS. COHEN: Is it possible?

Sorry, I think that was my fault.

Thank you. Yes, sure.

Thank you, Liam. I will tell you when to pause. Thanks.

So in the interest of time, when you pull it up, if you could go to 24:40, 24:42.

Oh no, sorry. I'm sorry. 11:50.

11:50 is -- oh, you have it? No, no, that's the time.

11:50. Thank you.

Q Okay. So we're going to fast-forward a little bit.

I think you've identified this video by looking at this and you identified the individuals, I believe yesterday,

as Robert Kandell and Justine Dawson, right?
A Sure. Yes.
Q And you're sitting in this --
(Video played.)
MS. COHEN: Can we just pause for the moment.
(Video stopped.)
THE COURT: Sorry, is that the way it's supposed to sound?
MS. COHEN: I mean...
THE COURT: Are you able to hear it and make out the words?
MS. COHEN: Am I able to? I mean, I, I -- it may be because I know it. It is low though, Your Honor. I didn't recall it being that low, but...
THE COURT: Okay. Go ahead.
MS. COHEN: Well, let me just...
Q Were you able to hear that, Ms. Halpern?
A Some of it.
Q And who is speaking there? That's Rachel, right? Rachel Cherwitz?
A That's Rachel with the microphone.
Q And Rachel just said "we could play checkers," right?
A Yeah.
Q And someone said "fuck that," right?
A Yeah.

Q And then she said "we're going to do the beasty," is that right?
A Yes.
Q And then you heard shouts from the audience of excitement, correct?
A Yes.
Q And I think we'll see more of this in a minute, but you might remember. Do you see yourself a little bit in this video?
A That might be my head there, but I can't quite tell from this angle.
Q Well, okay, we'll keep playing and you will see it in a minute.
A Okay.
(Video played.)
MS. COHEN: Pause there.
(Video stopped.)
Q You saw it there?
A Okay, that's me. On the far left.
Q On the far left, yeah. And I think it's cut off a little bit.
But did you see before with -- you had pumped your arm; isn't that right?
A I was shaking my arms, like this.
Q Well, actually, you did a fist pump. Did you see?

We can go back.

MS. COHEN: We can go back to, I would say -- I can't really see your times.

If you can go back to 12. That works.

(Video played.)

MS. COHEN: Okay, there.

(Video stopped.)

Q That was you, right?

A Yes.

Q That's your arm?

A Yes.

Q And you're excited at this point, correct?

A I was.

MS. COHEN: Keep going.

(Video played.)

MS. COHEN: We can pause here.

(Video stopped.)

Q So this is Rachel explaining what's going to happen, right?

A Yes.

Q And if you remember, but we can -- we'll fast-forward to it.

In fact, after that, she gives a demonstration herself of what it's like to do this exercise, correct?

A Yes.

Q And the purpose is that so everybody knows what's going to happen, right?
A Right.
MS. COHEN: So can we go to 24:42.
(Video played.)
MS. COHEN: We can just pause, sorry, for one second.
(Video stopped.)
Q So I was trying to -- in the interest of time, this exercise, you're going to be able to hear them behind that post. I think in this video you can't see them completely at this point, but we'll see them come out.
MS. FARRELL: Objection, Your Honor.
Is that a question?
MS. COHEN: Your Honor, withdrawn.
THE COURT: Just ask a question.
MS. COHEN: Yeah. Withdrawn.
You know what, let's play it and then I will ask it after.
Go ahead.
(Video played.)
MS. COHEN: So we can pause that for a moment.
(Video stopped.)
MS. COHEN: And I'm sorry, if you could just go back a little earlier, just to maybe 24:30, just so we can see what

was happening with it.

(Video played.)

MS. COHEN: Sorry.

(Video stopped.)

MS. COHEN: Can you go back a little bit further? 24:20.

(Video played; video stopped.)

MS. COHEN: 24:10.

(Video played; video stopped.)

MS. COHEN: Okay. That's okay. We'll move on.

BY MS. COHEN:

Q Do you remember this demonstration, Ms. Halpern?

A Yes.

Q And during that demonstration, they were screaming at each other similar to what we saw yesterday, correct?

A Right.

MS. COHEN: Okay. Now if we could go forward to 27:16.

(Video played.)

MS. COHEN: Can we pause for one minute.

(Video stopped.)

Q What Rachel was just saying now, safe words, you know about that, right?

A I do.

Q And that, before any kind of exercise, that instruction

was provided, right?
A In the coaching program, yes.
Q And green means I'm all in, right?
A Right.
Q Yellow means I'm having some reservations, but I'm okay?
A Mm-hm. Yes.
Q And the reason for that, right, is because these exercises and the things that you did at OneTaste were meant to push your boundaries, right?
A Correct.
Q So, for example, if you're at the gym and you're working with a trainer, right, you want that trainer to push you, correct?
A Right.
Q And you're paying for that, right?
A Right.
Q In fact, sometimes you don't feel like continuing those exercises, but you do, correct?
A Right.
Q So this is a similar concept, right?
A Within the coaching program, yes.
Q If you are at the gym and not feeling well and you say stop, then, of course you stop, correct?
MS. FARRELL: Objection, Your Honor.
THE COURT: Overruled.

Q Or you're able to stop, right?

The trainer would, if you're saying I absolutely have to stop, you would expect your trainer to stop, correct?

A At the gym, sure. Yes.

Q And when you say red, that is what that means: Stop and don't do anything further. Correct?

A Correct.

MS. COHEN: Can you continue.

MS. FARRELL: I'm sorry, can I just have what that timestamp was? I missed it.

MS. COHEN: Oh, sure. That was starting at 27:16.

MS. FARRELL: Thank you.

(Video played.)

MS. COHEN: So we can pause at that point.

(Video stopped.)

Q So no one in the class said that they were red, correct?

A No.

I shook my hand like -- like, sort of.

Q That wasn't my question.

A Oh, excuse me.

Q Yeah.

No one said they were red, correct?

A Correct.

Q She said, "Is there anyone who is not a green?" And a couple of people raised their hands, correct?

A Correct.
Q And you said you shook it like maybe you weren't a green? Maybe you were a green, but you weren't sure?
A Right. Like I wasn't sure.
Q All right. Then we saw yesterday a little clip of what the exercise was.
You recall that, right?
A Yes.
Q And then after the exercise, we saw you sitting on the floor next to Mr. Kandell, correct?
A Correct.
Q And at that point, the purpose of that is everybody goes around the room and says what they're feeling after the exercise, correct?
A Right.
MS. COHEN: So if you could just move forward to 50.
(Video played.)
MS. COHEN: I'm sorry.
(Video stopped.)
MS. COHEN: Could we go back to 55:53? The sound isn't great.
55:53. I think we just missed it, right?
Okay. Yeah, you can go to that.
(Video played; video stopped.)
THE COURT: Ms. Cohen, are you hearing this

properly?

MS. COHEN: It is hard to hear, Your Honor.

THE COURT: I mean, I'm happy to have you play it, but --

MS. COHEN: Yeah. If we could go to 55:53.

THE COURT: I don't think it's the sound either, the level. I think it's the quality. But if there's something you can do.

MS. COHEN: Yeah. If we could just get to -- sorry -- to 55:53. I was trying to give a full context.

(Video played; video stopped.)

Q Okay. So, Ms. Halpern, that was you and your comment right?

A Yes.

Q And in that comment you said you felt fairly tested, right?

A Right.

Q And during this going around in the room, some people said they felt turned on, right?

Some people -- is that a yes?

A Yes.

Q Some people felt relieved?

A Yes.

Q Right?

Some people were emotional, correct?

A Correct.
Q In fact, we heard someone who was emotional just now, right?
A I think so. I couldn't understand a lot of it.
Q But that was part of the beast, correct?
A Right.
Q The part is to get things out that are bothering you, right?
A Absolutely.
Q And to confront things, right?
A Yes.
Q And sometimes that is emotional, right?
A Absolutely.
Q And these are things that are inside you that are upsetting you; not you, but generally can be, correct?
A Right.
MS. COHEN: Can we show, just to the witness, Defense Exhibit 21-Y. DX 21-Y.
Q And while we're pulling that up, Ms. Halpern, this was early on in the coaching in CP6, correct?
A Yes.
Q And that was at the end of February 2013?
A That sounds right.
Q I could pull it back up. The beginning of the video said that.

A Correct, yeah. Yeah.
Q Yup.
THE COURT: Sorry, I think my pack goes from -- oh, is it a video?
MS. COHEN: No.
THE COURT: My pack goes from W to Z.
MS. FARRELL: Correct. We don't have a copy either, Your Honor.
(Pause in proceedings.)
THE COURT: Does the Government now have it?
MS. COHEN: Yes, Your Honor.
THE COURT: Okay. Go ahead. I'm going to take a look at it while you continue.
MS. COHEN: Sure, Your Honor.
Q Showing you what has been marked as Defense Exhibit 21-Y.
Do you recognize this, Ms. Halpern?
A Yes.
Q And what is it?
A It looks like a Facebook post of mine.
Q And do you recognize the name at the top?
A Rebecca Leigh. That's my Facebook name.
Q Do you see when it's dated?
A March 5th, 2013.
Q And is this something that you posted on that time on Facebook?

A Yes.

MS. COHEN: Your Honor, at this point I would offer Defense Exhibit 21-Y as the -- under 803(3).

MS. FARRELL: Objection.

THE COURT: Ms. Farrell, do you want to be heard briefly?

MS. COHEN: Yes, Your Honor.

THE COURT: Sorry, I said "Ms. Farrell."

MS. COHEN: Oh, I'm sorry.

MS. FARRELL: Yes, Your Honor.

It's hearsay and there has not been a proper foundation laid for impeachment.

THE COURT: Yes. I need to look at it, so give me a moment.

(Pause in proceedings.)

THE COURT: Sustained.

Q Ms. Halpern, after you -- or while you were in CP6, you often posted on Facebook, correct?

A Yes.

Q And yesterday when we watched this, you testified -- we watched a scene in which you were crying, correct?

A In the coaching program?

Q Yes.

A Yes.

Q And that was when you were emotional, correct?

A Correct.
MS. COHEN: One moment.
(Pause in proceedings.)
Q After the coaching program -- or after this scene that we saw, after the -- the exercise on the beast program, correct, you posted about it, correct?
A Yes.
Q And you posted about it, how much you loved it, correct?
MS. FARRELL: Objection.
A In what I'm looking at?
MS. COHEN: We can take that down. I'm just going to talk about it.
Q Do you recall posting about the beast?
A Not specifically. I didn't get a chance to -- I don't remember posting. But I'm sure I posted all the time.
Q Was there something that would refresh your recollection?
A Is there something that would refresh my recollection?
Q Yes. I will show you something that --
A Oh, sure.
Q You just saw it.
A Yeah.
MS. COHEN: Can we pull that back up?
Q Does this refresh your recollection about posting about the beast program?
A I posted about the beast, yes.

Q And this was for others to see, correct?
A Others within the same program as me.
Q And do you recall talking about how much you loved that program?
MS. FARRELL: Objection, Your Honor. Hearsay.
THE COURT: Sustained.
A I don't see -- I haven't seen --
MS. FARRELL: I'm sorry. You shouldn't answer when she sustains.
THE WITNESS: Oh, I'm sorry.
Q In the post after, it's fair to say you were posting about how you felt in the course, correct?
A Yes.
MS. FARRELL: Objection, Your Honor.
THE COURT: Overruled.
Q Yesterday you testified about the beast exercise, right?
A Yes.
Q And you talked about how you were breathing really heavily and crying, correct?
A Right.
Q And you said you were standing on the sidelines throwing up your hands, right?
A Right.
Q And that was at the end of February 2013, right?
A Yes.

Q And you posted on March 5th, several days later, about this exercise, right?
A I did.
Q And when you posted it, you said, "My beast just wants to" --
MS. FARRELL: Objection, Your Honor.
THE COURT: Yes, sustained.
Q You posted about positive feelings about how you felt about the exercise, correct?
A Um, I don't say in here anywhere that I loved it. I was posting about my feelings, definitely.
Q Well, you never posted about how you were crying, correct?
A Not that I can see.
Q You never posted that you didn't like it, right?
A No.
Q You never posted that it made you feel terrible, right?
A No.
Q In fact, you posted about all of the positive --
MS. FARRELL: Objection.
THE COURT: Overruled.
Q You posted...
MS. COHEN: Your Honor, I...
Yeah, sorry.
THE COURT: Keep going.

Q You posted how the beast made you want to actually have sex more, correct?

MS. FARRELL: Objection.

THE COURT: Overruled.

A It's a long post. I'm just trying to -- yes, that's part of what I --

Q You wrote "the beast just wants to fuck," right?

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

Q You talked about what the beast did for you in terms of your sex life, right?

MS. FARRELL: Objection, Your Honor.

THE COURT: Sustained.

Q And you said anyone in the CP --

MS. FARRELL: Objection, Your Honor.

Is she going to read the whole statement in into evidence?

THE COURT: So I don't need to hear that much.

Sustained.

You certainly can ask questions about posting, but to the extent you're reading from a document that is not --

MS. COHEN: Yeah, I wasn't reading from it, Your Honor.

THE COURT: Okay. Go ahead.

Q To the extent you said that you posted, anyone in the CP6

coaching group could see this, right?
A Right. It was not a public posting. It was only within the group of CP6. Correct.
Q And that included Rachel Cherwitz, correct?
A That's right.
Q Now, when you signed up for the coaching program, you also had to fill out what was called a desire contract, correct?
A Yes.
Q And the purpose of that contract was to tell the coaching program coaches what were you looking for, right?
A Yes.
Q Why did you want to take this class, right?
A Right.
Q And, in fact, that same concept was applied throughout sales, right?
A Yes, with desire.
Q Yes. That was the sales concept, in terms of getting people in and finding out what their desires were, correct?
A Right.
Q Because this was a wellness company that was trying to help people, correct?
A I don't -- I don't think I would characterize it that way.
Q Well, let me say this. We just watched the coaching

program that had a -- I didn't count, but a lot of people were there at that program, correct?
A Correct.
Q And tons of people did not work for OneTaste in that group, right?
A True.
Q And, in fact, you may not -- do you remember everyone in that group?
A It's possible that I don't remember everybody.
Q And some of those people took that class and never took anything again, correct?
A That I don't know.
Q There were no requirements to work for OneTaste if you took a class, correct?
A Correct.
Q But it was important to find out what your desires were so that OneTaste could help you get them, correct?
Let me rephrase that. So the coaching program could get you there, correct?
A Yeah, that was -- that was the idea of the coaching program.
Q And in this desire contract, you had a desire that -- to be a walking clit and feel every stroke. You wrote that, right?
A I don't remember specifically, but that's probably --

yeah. I mean, sure.
Q You also wrote about how you like attention, correct?
A Again, I don't remember specifically but, that sounds possible, yeah.
Q You wrote how you could be manipulative, correct?
A I am not looking at any of this, so I don't know.
Q So you don't remember?
A No, I don't recall specifically.
MS. COHEN: Let me pull up, just for the witness, DX 21-AG.
Q Do you recognize this, Ms. Halpern?
A Yes, I do.
Q And if you go down to --
MS. COHEN: If you go down to the...
Keep going. Okay.
Q And in that first paragraph, does that refresh your recollection as to whether you said you could be both -- you could be manipulative, right?
A In No. 1?
Q Well, actually, let's start with the -- that you like attention, in No. 1.
MS. FARRELL: Objection.
THE COURT: Yes, sustained.
Q Just take a look at the document and see if it refreshes your recollection as to whether you --

MS. COHEN: Sorry, you have to go down to...

MS. FARRELL: Objection.

What is the question?

MS. COHEN: Whether it refreshes her recollection as to whether she said she liked attention.

MS. FARRELL: Objection.

THE COURT: Sustained.

Next question.

MS. COHEN: Okay. We can take it down.

Q You also -- do you recall saying that you tried to become Rachel Cherwitz?

That was another one of your issues, right?

A When did I say that?

Q In your desire contract.

A I did not -- I didn't see that.

MS. COHEN: Look at the document again. Can we bring that up.

Blow it up.

You have to go down to the next page. Can you keep scrolling down to the second page.

Q Does this refresh your recollection?

MS. FARRELL: Objection.

THE COURT: Yes, sustained.

Q Is it true that you wanted to become Rachel Cherwitz?

A No. And that's not what it says here.

Q So you're saying it doesn't say --
A You want me to read it?

THE COURT: No, no, no. Excuse me. No.

Sustained.

You ask her a question. If she doesn't remember, you can try to refresh her recollection. But you're not going to start reading from a document that's not in evidence.

MS. COHEN: No, that's not --

THE COURT: Go ahead. Go ahead.

Q If you look at paragraph 1, does that refresh your recollection?

THE COURT: Why don't you back up, Ms. Cohen, and ask what question you want her to answer and take it from there.

MS. COHEN: She was trying to become Rachel Cherwitz, RC.

A No, that does not refresh my recollection of that. That's not what it says.

THE COURT: Okay. Next question.

Q You also, one of your -- you also had to do admissions in this contract, correct?
A Oh, that's the -- that's the -- yes.
Q And part of that was because you wanted to -- you had to admit what are the things you want to work on in this coaching program, correct?

A Ye s.
Q One of the things you wanted to work on was that you used your --
MS. COHEN: You can take that down now.
Q -- that you used yourself as bait to get what you wanted, correct?
A I don't -- I don't know. Is that in the...
Q Did you say that?
A I don't recall.
Q Do you recall saying that you are an attention whore?
A I don't recall.
What am I referring to? It's the same document?
Q It's in your contract.
A I don't have it up here anymore.
Q Would that refresh your recollection as to whether you said that?
A I'm sorry, I'm just confused. Can you back up a second?
Q Do you remember saying that you are an attention whore?
MS. FARRELL: Objection.
THE COURT: Basis?
MS. FARRELL: The formulation was "do you remember saying" as opposed to "did you say."
THE COURT: Sustained.
Q Did you call yourself an attention whore?
A I don't specifically recall that.

Like, in this document that I'm looking at?
Q Do you ever remember calling yourself an attention whore?
A Not specifically. It's possible.
Q Well, if we --
MS. COHEN: Can we pull that up again?
Go to the second page.
If you go to first and second, just blow those up.
Q Take your time.
Does this refresh your recollection?
A Yes.
MS. COHEN: You can take that down.
Q In fact, you also had said that you looked up to higher-ups at OneTaste, right?
The higher-ups were important to you, correct?
A Yes.
Q In fact, you wanted to be the popular girl, correct?
A I'm just confused about the protocol because you're referencing this document, but I don't know if it's --
THE COURT: Ms. Cohen, it might be helpful if you're asking her about a particular time frame.
THE WITNESS: I'm sorry, I'm not trying to be difficult. I'm just confused.
Q In terms of your desire contract. And this was before you took the coaching program, correct?
A Yes.

Q And as we said, you had to make certain admissions about things that you wanted to work on, correct?
A That was in the desire contract, right.
Q And one of -- another one of those is you admitted that you wanted to be a popular girl, right?
A I didn't see that when I was scanning through this.
Q So if -- is there something -- I will show you to refresh your recollection.
Let me just show you a different document.
You had to fill out a desire contract for both CP5 and CP6, correct?
A That sounds right.
MS. COHEN: Can we show, just for the witness, 21-AG.
THE COURT: Isn't that the one we were just using?
MS. COHEN: Oh, I'm sorry, it's the same one. Yes, okay.
Oh, sorry, I didn't realize it was double-sided. I thought it was a different document.
Okay. We could scroll to the second page. Go down to the second half of 4.
THE COURT: So the same page we were on earlier?
MS. COHEN: Yes. It's hard to read.
Q When you've had a chance to read it, let me know.
A Which number would you like me to read?

Q 4.

THE COURT: To yourself.

MS. COHEN: Yes.

THE WITNESS: Okay.

A Yes. Okay.

Q Does that refresh your recollection?

A Yes.

Q And you wanted to be a popular girl, correct?

A That's part of what it says.

Q And you wrote this, right?

A I did.

Q These are your words, correct?

A They are.

Q You also have told the Government in the past that everyone wants to be like Rachel, right?

A That everyone in OneTaste wanted to be like --

Q Like Rachel, right?

A Like Rachel, yeah.

Q Everyone wanted to be on sales, right?

A I mean, not technically. But, I mean, I wanted to be on sales, certainly.

Q And that's because sales had a higher status of community, right?

A That's how it felt to me.

Q And you cared about status, right?

A I did.
Q You cared about that from the very beginning, correct?
A I think so.
Q In fact, you have described your relationship with Rachel as a love-hate, right?
A Yes.
Q You described that at times you felt like her cub, correct?
A That's right.
Q And she called you her little cub, right?
A That's right.
Q And she was teaching you; isn't that right?
A That's right.
Q And when you first got there, you wanted to be taught, correct?
A I did.
Q You wanted to dress like her, right?
A Yeah.
Q And you also wanted to lead, correct?
A I did.
Q And you pushed yourself to be a leader, right?
A Yes.
Q And you and Rachel, is it fair to say, often butted heads, right?
A Yes.

Q You're a competitive person, correct?
A Um, not particularly, but I remember feeling competitive at the time, yes.
Q In fact, in your contract that we were looking at, you also described yourself as competitive, correct?
A I don't remember that, but I -- oh, here. Yes. Yes.
Q In fact, your competitiveness has a dark side, right?
A That's what I wrote.
Q And once again, those are your words, right?
A Those are my words.
Q And Rachel is also competitive, right?
A Yes.
Q And you felt that she was jealous of certain relationships that you had within OneTaste, right?
A Potentially. I --
Q In fact -- I'm sorry.
A No, that was my -- that was what I was assuming was happening.
Q You were dating, at one point, Robert Kandell?
A Correct.
Q Or you were having a sexual relationship with him, correct?
A Correct.
Q And Rachel was in love with Robert Kandell at various points, correct?

A I never heard her use those words, but that sounds -- that sounds true, from what I observed.

Q From what you observed.

In fact, it's fair to say there was a little bit of jealousy between the two of you, correct?

A I would say so.

Q And, in fact, you mentioned today you also had a relationship with Hamza Tayeb, correct?

A Right.

(Continued on the next page.)

(Cross-examination, cont'd)

BY MS. COHEN:

Q And we saw his picture up there on the board, right?

A That's right.

Q And after you were with Hamza, he was also with Rachel, right?

A He was with Rachel before I -- before I knew him, and I didn't know that until later.

Q And you were with him, you just said, and she was with him again after that, correct?

A I believe so.

Q And, in fact, Hamza was still texting you when he was with Rachel, right?

A I'm not entirely certain of the timeline overlap. That's possible.

Q In fact, one time Rachel got mad because he was texting you, right?

A That's right.

Q And you were aware of that, right?

A I don't think they were together at the time, as far as I know, but I was not aware of their relationship at the time of the showing her the texts.

THE COURT: Ms. Cohen, just let me know when it would be a convenient time in the next few minutes to take the lunch break.

MS. COHEN: This is fine, Your Honor.

THE COURT: Okay. We will take a lunch break. I am going to give the jury a little bit of extra time and ask you to come back to the jury room at 5 minutes to 2:00. 5 minutes before 2:00. And I hope that maybe you will get outside. There's no window here that we can see out, but I am assuming it is still a nice day.

Keep an open mind. Don't talk about the case with anyone, not even among yourselves, and don't let anyone discuss the case with you.

Enjoy your lunch, and see you at 5 minutes to 2:00.

(Jury exits the courtroom.)

THE COURT: The witness may step down.

MS. FARRELL: As she's doing that, I want to make a record. We view it as a necessity that agents stay with her, but we have instructed them not to speak with her about her testimony, and, obviously, we don't intend to speak with her, but I just don't want there to be any misapprehension.

THE COURT: That's fine.

MS. FARRELL: Thank you.

THE COURT: Okay. You may step down.

THE WITNESS: Thank you.

(Witness leaves stand.)

THE COURT: And I will ask the parties to come back also at five minutes to 2:00.

And, Ms. Cohen, I will be reviewing the video that you provided. Is that what you are going to be addressing next?

MS. COHEN: Yes, Your Honor.

THE COURT: Is there anything else that you would like to flag for me as what you are going to be addressing next?

MS. COHEN: Yes. Also, the video, as I said, the other ones are just videos that this witness actually made herself that are very short.

THE COURT: Okay. But they're all on this thumb drive you have given me?

MS. COHEN: Yes. All on the thumb drive.

THE COURT: Is the sound quality a problem on the video or on the equipment?

MS. COHEN: I believe that is the video, but maybe we can just test it.

MS. BONJEAN: We can test against the -- because yesterday the speech from Ms. Daedone was very clear.

THE COURT: Yes, it was. But that was a different video. So I'm not sure --

MS. BONJEAN: Right. It was a video. So I mean --

MS. FARRELL: And there were subtitles so people were reading along.

THE COURT: No, it was just a clearer video, though,

too, I think.

MS. BENSING: Your Honor, I've watched these videos. I can proffer I think it's the video.

THE COURT: Okay.

MS. FARRELL: Sorry. May the government just have the numbers of the videos we should be looking at in advance? Thank you.

THE COURT: And, actually, while you're all still here, we don't need to get into this in substance, but the text that we were talking about yesterday evening, I know the government said you wanted to provide it to me in a form that was more easily readable.

MS. FARRELL: Yes. We are working on getting those.

THE COURT: Okay. Even if you can get me a portion of that sooner rather than later, I would like to start looking at exactly what these are.

MS. FARRELL: Understood.

THE COURT: Okay.

MS. FARRELL: You want hard copies, correct?

THE COURT: Yes. You are giving me something?

MS. COHEN: These are just two photos that were inadvertently not --

THE COURT: Okay.

MS. BENSING: Can we get a copy?

(Documents tendered to the Court and counsel.)

THE COURT: Thank you.

MS. BONJEAN: Are we excused, Your Honor?

THE COURT: Yes. We are adjourned until 1:55.

(Recess taken.)

A F T E R N O O N  S E S S I O N

(Proceedings continue in open court; no jury present.)

THE COURT: Everybody is here, including the two defendants.

Bring the witness out and the jury.

MS. FARRELL: Your Honor, if I may just make a record.

There were three additional videos that were provided during lunch, after we had pulled the ones off of USAfx, and we were just alerted to them, so there are still three videos we haven't seen.

THE COURT: Okay. Then they won't be used this afternoon, or at least until the next break.

Let's bring the witness and the jury out.

MS. COHEN: We want to raise -- sorry. We wanted to raise an evidentiary -- I guess we will raise it at the end of the day.

THE COURT: Okay.

MS. COHEN: I think it affects all of this. Can we -- okay.

Your Honor, I want to --

THE COURT: The witness is entering the room.

MS. COHEN: It is --

MS. BONJEAN: We need to raise an issue, though.

THE COURT: Okay. The witness can go back out.

I mean, the time to tell me this is earlier. To tell my deputy that you have an issue to raise.

Any way, go ahead.

MS. COHEN: Okay. Your Honor, I think that this applies to a lot of the evidence coming in, right. The post and the things that I -- all right.

These statements, her then contemporaneous statements, just like the government argued in their motion in limine about journals, are coming in as her state of mind at the time. But, more importantly, they contradict her entire testimony from yesterday.

THE COURT: So let me stop you on that. Because to the extent you are trying to impeach her on certain testimony, it has to be specific. So, so far, I haven't seen anything that specifically contradicts, but that, you are welcome to bring that out.

MS. BONJEAN: Your Honor, I think we take issue -- the impeachment doesn't have to be specific. The -- in this sense.

THE COURT: Well, you are talking about credibility or you're talking about impeachment on certain testimony?

MS. BONJEAN: Not impeachment by prior inconsistent statement. I am not talking about that. We're talking about

credibility and the fact that the government --

THE COURT: That's different.

MS. BONJEAN: The government really was able to elicit an entire world of characterizations, not just her observations, but her beliefs, her understandings, her experiences, for literally a four-year period, going so far as to hypothesize about what things caused her harm, how she processed things, what her feelings were, and then there is contemporaneous statements from her that contradict that and go to her credibility, which is frankly more reliable than her retrospective version of what she --

THE COURT: But you haven't laid that foundation properly, as to Ms. Cohen's question. She hasn't done that. Let's bring out the witness at this point. We've got to get going.

(Jury and witness enter the courtroom.)

THE COURT: Everyone may be seated. I hope everyone had a good lunch, and we will continue with the cross-examination.

CROSS-EXAMINATION (cont'd)

BY MS. COHEN:

Q Good afternoon, Ms. Halpern.

A Good afternoon.

Q Before the break we were talking about your desires contract; do you recall that?

A Yes.
Q And the purpose of that contract was to describe your goals, if you will, for the coaching program, correct?
A Right.
Q And that was a coaching program that was going to happen in the future, right?
A Yes.
Q And the other goal -- the other point was to, as we talked about, provide admissions about things that you wanted to work on, correct?
A Right.
Q And that would be in the future coaching program, correct?
A Right.
Q You also provided what -- we didn't talk about this, but hard no's; do you remember that?
A Yes.
Q And that is your -- things that you would not want to do, correct?
A Correct.
Q And that means you did not want to do them in the upcoming coaching program?
A Yes.
MS. COHEN: Can we show for the witness, 21-AG.
THE COURT: And that's the one we were using before?

MS. COHEN: Yes, Your Honor. Since we had the break, I just want to remind her --

THE COURT: That's fine.

MS. COHEN: -- of what I'm talking about.

Q And the questions I just asked you were about this same desire contract, right?

A Yes.

Q And you already testified these were -- this is your words and you filled those out?

A Correct. I did.

MS. COHEN: Your Honor, at this time we would offer Defense Exhibit 21-AG into evidence under rule 803(3).

THE COURT: Any objection? Go ahead.

MS. FARRELL: Yes. We object, Your Honor.

THE COURT: Sustained.

Next question.

MS. COHEN: Yes. One moment.

Okay. Let me take that down.

Q We talked about you had a relationship with Robert Kandell, right?

A Yes.

Q And, in fact, when you were becoming a salesperson at OneTaste in the summer of 2012, you were heavily flirting Mr. Kandell, right?

A Sure. Yes.

Q And that was at the time that you were negotiating on the coaching class, correct?
A Negotiating on the -- like for my --
Q For your pay?
A -- price?
Q Yes.
A Yes.
Q And you testified yesterday that Mr. Kandell was, in the coaching program, one of the coaches; is that right?
A Yes.
Q And, in fact, OneTaste had a rule about coaches and students, correct?
A I'm not sure.
Q Showing you what has been marked --
MS. COHEN: I actually think this might be in evidence, Government Exhibit 3224. No?
MS. BONJEAN: Yes.
MS. COHEN: That's in evidence?
MS. FARRELL: If we can have a moment.
THE COURT: Yes, it is.
MS. COHEN: Okay. You can publish this to the jury.
You could zoom in so that we can see what this is.
Q You identified this yesterday, correct? This is the code of conduct?
A Yes.

MS. COHEN: And if you could scroll down.
Q And in this coaching program, any coach that wanted to have a sexual relationship with a student had to apply to the ethics committee, correct?
A Yes.
Q And, in fact, Rob did that about you, correct?
A That's news to me. I don't recall that specifically, but that's possible.
Q In addition to Mr. Kandell, you also dated Peter Crann, right?
A I did.
Q He was your boyfriend at one time while you were in OneTaste?
A That's right.
Q And you also had sexual relationships with Ruwan at many times, correct?
A No. Just that one time.
Q Your testimony is you never had sex with Ruwan?
A Not that I recall, no.
Q You had sex with Ravi?
MS. FARRELL: Your Honor, objection. There was a motion in limine on this with respect to Rule 412, and that's the basis of the objection.
MS. BONJEAN: I'm not sure it was ruled on. I think it was --

THE COURT: Let's table this for now. I'm going to sustain the objection for now. We can take it up at a break, if you still want to persist in this.

MS. COHEN: Sure.

Q You testified you had a relationship with Hamza, we discussed, right?

MS. FARRELL: Same objection, Your Honor.

MS. COHEN: She already testified to it.

THE COURT: Can you elicit a time frame?

Q While you were --

THE COURT: Because I am going to sustain it without additional foundation. You can come back.

MS. COHEN: Yeah. She already testified about a relationship, but --

THE COURT: Okay.

Q Do you remember when you had the relationship?

A I would not call it a relationship. We like hooked up a few times, a handful of times. It was not a relationship the way it was with Peter Crann, for example. I --

MS. FARRELL: Objection, Your Honor. I believe the testimony was about her flirting with Hamza Tayeb. This is calling for what we're objecting about.

THE COURT: Sustained.

MS. COHEN: Okay. We'll come back to that.

THE COURT: Yes. Go ahead. Next question.

Q You testified that Rachel Cherwitz had a relationship with Hamza after you, correct?
A I believe so. Yes.
Q And before that you had sex with Hamza?
MS. FARRELL: Objection, Your Honor.
MS. COHEN: I think she opened door, Your Honor. Establishing the time period.
THE COURT: I'm going to sustain it for now. We're going to take this up. Move onto the next topic.
Q Okay. Going back to the course CP5, right, you testified that you took a long time, basically -- withdrawn.
You took a long time to decide about CP5, correct?
A Yes.
Q You first told Rachel you wanted to do it, correct?
A Yes.
Q Then you got the e-mail about the price or you learned about the price at some point, right?
A Yes.
Q And you did not want to do it or had concerns about the price at least, right?
A That's not exactly my memory of what happened. It was not the price that I was concerned about so much as not being there in person. I was also concerned about the price as a separate issue.
Q Yes. Sorry. Let me go back.

June of 2012. You had concerns about how you were going to pay for it, right?
A Yes.
Q And you had a lot of exchanges that we looked at --
A Right.
Q -- with Rob and Rachel, correct?
A Correct.
MS. COHEN: If we can just pull up Government Exhibit 3501-5, which is already in evidence.
Can you blow up the top there.
Q So in this e-mail, you e-mailed Rachel about your concerns, correct? With the money, right?
A Yes. Correct.
Q And Rob responded and talked about the $1,000 deposit, correct?
A That's Rachel talking.
Q Sorry. Rachel.
A Uh-huh.
Q I hear you, and to secure your spot, I will need $1,000 deposit, right?
A That's what they said.
Q She also said she was happy to wait, correct?
A Yes. That's what she said.
Q She was happy to wait and make it official for when you had the funds to do so, right?

A Correct.
Q Okay. And then you -- you can take that down.
Ultimately, you did decide to do CP5?
A Yes.
Q And, in fact, while you were making that decision, though, before you did, when you were concerned about the money, you closed your bank account at that point, the bank account that was supposed to take out your deposit, correct?
A I don't recall that specifically. Do you know which bank account it was? Or when?
Q Well, why don't we -- let's -- showing you --
MS. COHEN: Just to the witness, just a still, of DX 21-CT.
THE COURT: Wait. I'm sorry, tell me, 21-CT?
MS. COHEN: T. Yes.
Just to avoid inadvertent playing, Your Honor, is it possible to turn --
THE COURT: What is this? Is this a video?
MS. COHEN: Yes. Just to refresh -- just for the witness.
THE COURT: How are you planning to do that? Have you arranged for that technology to be able to just play it for the witness?
MS. COHEN: I just want to play a still for identification.

THE COURT: Oh, yes.

MS. BONJEAN: She wants to show her the still.

MS. COHEN: Just a still.

THE COURT: A picture. Yes.

MS. COHEN: I just wanted to make sure that the sound --

THE COURT: I see.

MS. COHEN: -- does not come on.

THE COURT: That makes more sense. Go ahead.

BY MS. COHEN:

Q Do you recognize this video, Ms. Halpern?

A I think so, yes.

Q Is that you in the video?

A That -- yes, that's me.

Q Do you recall that that is when you were --

MS. FARRELL: Your Honor, I am going to object. This is one of the videos that we haven't reviewed.

THE COURT: Is this one that was given before lunch, or no?

MS. COHEN: I am refreshing her recollection.

THE COURT: Wait. Does the government have it?

MS. COHEN: They have it.

MS. FARRELL: It was sent to us mid lunch. We haven't had a chance to review it.

THE COURT: Maybe you should talk to each other,

Ms. Bonjean and Ms. Cohen.

MS. COHEN: Your Honor, I didn't realize this wasn't one that was provided earlier, but I am simply at this time trying to refresh a witness' recollection.

THE COURT: Okay. Are you doing anything more than showing this still right now, with this document -- with this exhibit?

MS. COHEN: No -- well, I would like to show another still of the video just to -- if the witness doesn't -- just to give it a little more context. But not to the jury.

MS. FARRELL: That's fine.

THE COURT: Show the government what it is you are planning on showing.

MS. COHEN: That's fine. That's enough.

THE COURT: Can the government see what's being shown?

MS. FARRELL: I can see.

THE COURT: Do you maintain an objection to showing these two items to the witness?

MS. FARRELL: No, but just given that we haven't seen the video, I --

THE COURT: Okay. Let's see -- so I will -- there's no objection right now. Ask your question. We will take it from there.

Q Does this refresh your recollection of a story about a

bank account?

A I'm sorry, it does not. I don't know when it is from or where we are.

MS. COHEN: All right. You can take that down.

Q You told a group at CP5 that you had closed your bank account to avoid paying for the class; do you recall that?

A I genuinely don't, but I believe you.

Q And you did that because you freaked out, right?

MS. FARRELL: Objection, Your Honor.

THE COURT: Overruled.

A I'm sorry, I did that because I freaked out?

Q You freaked out about the money with CP5?

MS. FARRELL: Objection, Your Honor. I don't think there's a proper foundation. She said she didn't remember.

THE COURT: The answer was that she believes you, Ms. Cohen, but she didn't remember. So I think you need to also -- I will sustain that. You need to ask the next question.

MS. COHEN: I will re-ask.

Q You closed your bank account to avoid paying CP5, correct?

A I truly don't remember doing that. But, again, I believe you, that that could be true. I don't recall that moment.

THE COURT: Next question.

MS. COHEN: Your Honor, I believe at this point I

would use the video to impeach her.

THE COURT: She hasn't said that she didn't say it or did say it. She doesn't remember and she's crediting what you are telling her. I am going to sustain an objection to that.

Next question.

Q Okay. So at some point, as we said, you wanted to change to be in CP6, correct?
A Yes.
Q And you wanted to be in CP6 so badly that you wrote to both Rachel -- you wrote about it to Rachel, right?
A Yes.
Q And to Amy Jones; is that right?
A I believe so, yes.
Q And who is Amy Jones?
A She was someone who lived in the San Francisco OM house and also managed the San Francisco OM house. Managed like the food and the rent and things there.
Q And you told her that you wanted to be in CP6, in all caps; do you remember that?
A Yes.
Q You were very excited?
A I was.
Q And you took a long time to think about this, didn't you?
A I believe so.

Q And, in fact, you had complained about the issues with CP5, right?
A Yes.
Q And you felt that if you didn't do CP6, you might regret it for the rest of your life, correct?
A I don't recall specifically saying that, but that sounds like how I felt at the time.
Q So that's how you felt, right? If you didn't do CP6, you would regret it, correct?
A That's how I felt at the time.
Q That's how you felt at the time.
And you loved, in fact -- not only did you love the coaching course, but you loved coaching, right?
A I did.
Q And coaching hours became your favorite time of the week, right?
A That's sounds true.
Q In fact, you said that you would do it all day if you could, right?
A Again, these are things that were from a long time ago that I don't specifically remember saying, but that seems like how I felt at the time.
Q And in addition to the desires contract, you also had to fill out an application for the coaching program, correct?
A Yes.

Q And in the application, it asked you why you wanted to coach others in OM and the OneTaste method, right? Do you recall that?
A Yes.
Q And you believed that sexuality is something that needs to be talked about, right?
A Yes.
Q You believed that OM is a practice that connects a human being in a way that is different from anything else you had experienced, right?
A Same thing. I don't remember specifically writing or saying that, but that is probably close to how I felt at the time.
Q In fact, you said you had grown so much through OM and the OneTaste method that you wanted to share what you learned so far and allow others the same privilege, right?
A I don't know what you are reading from.
Q You don't remember writing those words?
A I don't.
MS. COHEN: Okay. Let me show Defense Exhibit 21-N, just to the witness. Page 10.
THE COURT: I'm sorry, I don't think I have N.
MS. COHEN: "N" as in Nancy.
THE COURT: Yes, I heard you, I just don't think I have it.

MS. FARRELL: I don't think I have it either.

THE COURT: Does the government have it?

MS. FARRELL: I don't see it in this pile, Your Honor.

THE COURT: All right. While you are getting that, go on to the next topic.

MS. FARRELL: Your Honor, I would just have a standing objection to when the witness answers "I don't know," there's a proper procedure --

THE COURT: Correct.

MS. FARRELL: -- to refresh.

THE COURT: But it requires a document, and none of us have it right now. So we are going to wait for the document, and she will go through the procedure.

Next question.

Q And in addition to -- you posted often about how much you loved the coaching program, correct?

MS. COHEN: Sorry, Your Honor. I might have had the wrong --

THE COURT: Maybe your team can help you. I think Mr. Robotti is trying. If you need a minute, that's fine.

MS. COHEN: That's fine.

THE COURT: Go ahead.

Q You posted often about how you loved coaching, correct?

A Yes.

Q And you posted about -- you wanted to live in this place, right?
A Yes.
Q And you wanted to live life feeling this beautifully worked, stretched full of love, and electric and orgasmic, right?
A Again, I don't know. I don't specifically remember that post.
Q But you don't dispute that you posted about how much you loved it?
A I posted in general, yes.
Q About how much you loved the coaching program, correct?
A I did love the coaching program.
Q You also loved to sing, right? You said you were a singer?
A That's right.
Q And you sang sometimes at OneTaste, right?
A A little bit.
Q And you wanted to be famous, you said, so that you could tell the entire world about OM, right?
A I don't specifically remember saying that, but that -- I mean --
Q Are you testifying you didn't say that, or you don't remember?
A I don't remember.

MS. COHEN: Sorry. There's some exhibits that might be missing. I hope you have this one. DX 21-U, just for the witness.

THE COURT: I do.

Does the government have it?

MS. FARRELL: Yes.

Q And when you are done reading, you can just look up.

A Can you make it a little bigger?

Q Sorry. Just the top part.

A Okay. I've got it. Can you repeat your question?

Q Sure.

Does that refresh your recollection as to whether you wanted to be famous so that you could tell the entire world about OM?

A That's not what this says.

THE COURT: The question is, does looking at what Ms. Cohen has handed you refresh your recollection about the question she asked you, not -- she's not asking you about what this document says.

THE WITNESS: Okay.

Q Just about what you were feeling at the time.

A I don't remember wanting to be famous, in particular. I don't -- I did want to sort of shout from the rooftops about OM. I was very excited.

Q In fact, you wanted to be a famous pop star, right?

A I don't remember feeling that way, and that's also not what this says.
Q If you were a famous pop star, you would use that vehicle to shout from the rooftops about OM, correct?
MS. FARRELL: Objection, Your Honor.
THE COURT: Basis? Is it a time frame basis or something else?
MS. FARRELL: Form of the question and also the timing.
THE COURT: All right. I am going to sustain it to the form of the question, but you may ask about this topic.
Q In April of 2013, while you were in CP6 -- that was when you were in CP6, right?
A Yes.
Q And during that time, you posted about how much you loved it, right?
A I did.
Q And you posted about you were walking down the street singing, right?
A Yes.
Q And you got a flash, that if you became a famous pop singer, you would tell the entire world about OM, right?
A Yes. That's -- yes. That's close.
MS. COHEN: You can take that down.
Q And you thought that the courses at OneTaste made you a

better person, right?
A I really felt that way, yes.
Q In fact, it made you feel -- you began to live unconcealed? You said that, right?
A Yeah. That was common in the parlance of the time, yes.
Q And, in fact, you posted that, right?
A Again, I don't specifically recall these Facebook posts, but it characterizes how -- I did feel that way at the time.
Q And the other thing that it did is instead of molding yourself around other people, you expose yourself and don't worry if they like you? That's something you said as well, right?
A I don't specifically recall saying that, but it is the same answer to all of these.
Q That's how you felt, right?
A Can you repeat it?
Q Instead of molding yourself around other people, you expose yourself and don't worry if they like you?
A That sounds -- yeah. I assume I felt that way. Yeah.
Q Those are things that you were learning from the coaching program, correct?
A I would say so.
Q Now, you testified that you moved into the Morellino house, right?
A Right.

Q And we have established that that was sometime in late 2012, you weren't exactly sure, but you said that sounded right, correct?
A Yes. Correct.
Q And no one forced you to move into the Morellino house, correct?
A No, they did not.
Q And, in fact, you had your own apartment before that, right?
A I did.
Q And you could have stayed in that apartment, correct?
A Correct.
Q In fact, you had to fill out an application to live in the OM house, right?
A Yes.
MS. COHEN: One moment, Your Honor.
Q Ms. Halpern, the application asked you a series of questions; do you remember that?
A I don't recall what was on it.
Q Do you remember that you had to tell the OM house what your goals and intentions were for living there?
A This sounds in keeping with what happened. I don't specifically remember that application.
Q You also had to advise them if you'd ever lived in an OM house before, correct?

A Again, that sounds right. I don't recall this in detail.
Q Okay. Well, let me show you a document that might refresh your recollection.
MS. COHEN: Can we just pull up 3500-RW-13.
THE COURT: Sorry, is that something that was --
MS. COHEN: This was the 3500 material.
THE COURT: Was this used yesterday?
MS. FARRELL: No, Your Honor.
MS. COHEN: No, Your Honor. I am not seeking to admit it. Just refreshing.
THE COURT: Do you have a copy for me?
MS. COHEN: Sure.
THE WITNESS: If you can zoom in so I can read it.
MS. COHEN: We haven't put it up yet. It is for the Judge.
THE COURT: Thank you. Go ahead.
BY MS. COHEN:
Q Just take a look at Government Exhibit 3500-RW-13. And look up when you're -- tell me if you are done with the first page, and we will scroll to the second.
A It is just still too small. Sorry.
MS. COHEN: Can you zoom in?
Q Tell us if we are going too fast.
THE COURT: You know what? Why don't I just give her the hard copy. I think that's more efficient.

Here you go.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're welcome.

MS. COHEN: Thank you, Your Honor.

THE WITNESS: Yes. This is helpful. Thank you.

A And what was the specific question? Sorry.

Q I'd asked you whether the application, if you recall, required you to -- or you testified that you filled one of these out, correct?

MS. FARRELL: Objection. I don't think that's the testimony.

THE COURT: I'm not sure she testified to that, but you can ask her the question --

Q Sorry.

You filled out one of these -- you had to fill out these housing -- community housing applications before you went in, right?

A That seems totally plausible. I don't specifically remember this particular paperwork, but that seems right.

Q Do you remember some of the -- well, we'll talk about the rules in a second.

Okay. So you don't specifically remember, but -- as to filling this out.

THE COURT: She said she had to fill out an application.

MS. COHEN: Yeah.

THE COURT: Are you asking her about this specific one?

MS. COHEN: This specific application.

THE COURT: Go ahead.

A It seems right to me.

Q Okay. Showing you what is already in evidence as Government Exhibit 3500-RW-12.

THE COURT: All right. I'm going to take a hard copy of that, unless you only have one, in which case I will give it to the witness.

MS. COHEN: This is already in evidence.

MS. BONJEAN: It is.

THE COURT: Okay. So can you see the screen?

MS. COHEN: She will zoom in.

THE COURT: All right. Go ahead.

Q Okay. You see the screen now, Ms. Halpern?

A I do.

Q And this is the OM residential handbook, guidelines to living in an OM house, right?

A Right.

Q And you were provided this when you went to live at the Morellino, right?

A I assume so, yes.

Q There's no reason to think -- you'd seen this document

before, correct?
A Like everything else, this is not big in my memory, but I completely believe you that I did.
Q And, in fact, everyone had to be given this before they could live in the OM house; isn't that right?
A That sounds right.
Q And in this document, if we scroll down to the rules of play -- and by rules of play, these are the rules of the house, correct?
A Yes.
Q And one of the rules is that an OM house was intended for adults, right?
A Correct.
Q There were no children allowed?
A Correct.
Q And in the handbook, it also indicated that you agreed you're moving in because you want something, right?
A Absolutely.
Q You want a deeper sense of your orgasm, right?
A Sure. Yes.
Q Actualization and connection, correct?
A Right.
Q And, in fact, yesterday you said you wanted to go to the Morellino because you were lonely, right?
A Absolutely.

Q But, in fact, you had, before you got to the Morellino, you had been -- you had, in San Francisco, had a boyfriend, right?
A What period of time are you referring to? Sorry.
Q When you were, sorry, back in between 2011 when you stopped participating in classes and before you moved to New York, you had a boyfriend in San Francisco, right?
A Oh, I did at that time. Yes.
Q And then you broke up and you moved to New York, right?
A That's right. Uh-huh.
Q And I think you -- in your apartment, did you live alone or did you have a roommate?
A I had roommates.
Q Yes.
So you were living with other people at the time, right?
A I was.
Q So it wasn't just that you were lonely, you wanted to go to the OM house because of the things that we just talked about, correct?
A Oh, definitely. Yeah.
Q And in these rules of play, it also talks about the nature of this work is that you're on your path to search for these things. You will be confronted, correct?
A Yes.

Q At some point it also indicates you'll probably want to blame the people around you for your experience, right?
A Right.
Q You'll most likely be up against your demons?
A Right.
Q And these rules of play were meant to remind you of that, correct?
A Right.
Q Because that's what you were signing up for, right?
A Right.
Q And you were signing up to be pushed in these boundaries, right?
A I'd say so.
Q And it also tells you to remember that you are coming into the house by your own volition, correct?
A Correct.
Q And that you were being ready to take responsibility for your own experiences, correct?
A Correct.
Q And you could leave the Morellino house at any time, right?
A It's a complicated question. You could physically walk out, if you needed to, yes.
Q You could.
And, in fact, you did. You went to visit your

parents, right?
A Yes.
Q And your parents, as we said, live in Westchester, right?
A That's right.
Q And the Morellino house is in Harlem, correct?
A That's right.
Q And it's about a 30-minute train ride home?
A Yes. That's true.
Q And, in fact, you did visit your parents, right?
A I did.
Q And looking back at this document, it also talks about staying connected no matter what, right?
A Yes.
Q And, in fact, that was one of the tenets to OneTaste, correct?
A Yes.
Q It was people coming together to get more connected, right?
A Yes.
Q And that was why you went there, right?
A Absolutely.
Q And it also tells you that you agree to let the other person in when your feelings are hurt, when you're mad, or when you love them, right?
A Yes.

Q Vulnerability, being vulnerable, was another very important thing at OneTaste, correct?
A Yes.
Q And you don't get to check out from the house for a week without telling your house manager and housemates what is going on, right?
A That is what it says.
Q And that's because the point of the OM house was to stay connected, right?
A That was one of -- yeah. Yes.
Q And when you went to move in there, you knew that everyone shared a room, right?
A I did.
Q Even Rachel Cherwitz shared a room, correct?
A Correct.
Q And, in fact, you knew going in that people shared beds as well?
A I did.
Q And you chose to do that, right?
A Yes, I did.
Q In fact, you could have had your own bed at your own apartment, right?
A Absolutely.
Q And staying connected, the rules go on to say, means that even in the face of the most uncomfortable realization, you

let the other people you live with in, right?
A That's what it says.
Q And that was part of why you were all on text chains and communicating with each other, right?
A That's how it was explained to me, that text messages were to, quote, stay connected, yes.
Q That was your understanding at the time, correct?
A Yes.
Q Now, the next paragraph, if you go down, talks about safe words. And we talked about safe words before in connection with the coaching class, right?
A Yes.
Q And before, as I said, every exercise and everything you do, you're told that you can use safe words, right?
A That's right.
Q And in these rules, it indicates that the house is a place for us to play, right?
A Yes.
Q And by "play," we do -- you do OMing, correct?
A Correct.
Q People are having relationships with each other, correct?
A Correct.
Q People are sleeping in the same beds with each other, right?
A Right.

Q Fair to say that it -- you expected to be involved in relationships going into it because that was the purpose of it?
A Yes.
Q And it also indicates that you are also responsible for communicating your own boundaries, right?
A Yes.
Q And it is up to the individual to say, "green," right? "Yellow," right? Or "red"?
A Correct.
Q And you never used the term "red" when you were at OneTaste, correct?
A My memory is that I used it -- that I -- there might have been other times, but I remember using it once.
Q You recall saying the word "red"?
A In the -- yes.
Q Okay. And when you said "red," people stopped, correct?
A Correct.
Q And as it explains in here, "red" means I feel like I'm in danger, right?
A Right.
Q And, again, yellow is something is challenging, is arising for me, right?
A Yes.
Q But that is not supposed to stop anything, right?

A That's right.
Q Because everybody in here wants their boundaries to be pushed, correct?
A Correct.
Q And on the next page, we go down to fear inventory. You talked about this a little bit on your direct yesterday.
MS. COHEN: Can we go to -- sorry. Did you skip a page? One second. Oh, I'm sorry. Go down -- actually, stick on this page for one minute. Go down to OM.
Q And OM -- this is telling people that are moving into the Morellino or other OM houses that orgasm is the basis of all activities, right?
A Right.
Q And it's a foundation of your practice, right?
A Correct.
Q And having a daily practice was an integral part of being a member of the community, right?
A Right.
Q So by going into the Morellino house, you know that you're going to be engaging in this practice every day, right?
A Yes, of course.
Q And that was where you went there?
A Yes.
MS. COHEN: And going down on that same page, could you just go to service. All right.

Q And as a part of the house, each resident also agreed to take on a service project, right?
A Yes.
Q And service is a foundation of the OM lifestyle?
A Yes. I am just pausing because I don't -- I don't know how that actually worked out in real life, but --
Q So you don't remember taking on a service project?
A Do you have an example of what one of those -- was it for the house or was it for an individual?
Q I am just asking you if you recall if you did a service project.
A I mean, I am not remembering right now, but I will think about it.
Q Okay. And then the next one was movement, if we go down to that. And living in an OM house means you have an increased amount of energy running through your body, right?
A Uh-huh. Yes.
Q You would agree with that?
A Yes.
Q Again, that's sort of the purpose of the OM practice, one of them, right?
A Yeah. Yes.
Q You tap into that energy, right?
A Sure.
Q And movement keeps you sane and has your body feel good,

right?
A Yes.
Q And you felt that while you were -- that's, again, why you did OMing, correct, one of the reasons?
A Correct.
Q And, in fact, as it says here, we recommend Bikram. And that's yoga, right?
A Correct.
Q And the reason they recommend Bikram is because you sweat out all of the impurities you build up, right?
A That's what it says.
Q And the OM house rules include that because the purpose of moving in here and to getting deeper in this practice is helping you establish your goals, right?
A Yes.
Q Because that's what you signed up for, right?
A Yes.
Q Okay.
MS. COHEN: If we can go to the next page, to fear inventory.
BY MS. COHEN:
Q Before we look at this, you testified yesterday about fear inventory and how it came from Alcohol Anonymous? Do you remember that?
A Yes.

Q And that's the 12 step process, right?
A That's right.
Q And at OneTaste -- well, let's look at this first. Sorry. Withdrawn.
In the manual, it says fears, explains this, are the charges that build up and have us disconnect from other, right?
A That's what it says.
Q And fear inventory is actually designed to promote flow and release of the charge intrinsic to this environment, correct?
A That's what it says.
Q And the idea is, again, to get these things out that are inside of you and may be preventing you from being happy, correct?
A Preventing you from being happy. That's one way to look at it. It was used in a wide range of different ways.
Q Well, I'm not asking why it was used, but the purpose of a fear inventory is to get out things that are bothering you, that are holding you back, and making you overcome what your goals are, right?
A Yes. That's the idea.
Q And the OM house rules say, in addition to a regular fear inventory schedule, residents are expected to make use of this tool as needed, correct?

A Correct.
Q Because, again, the OM house rules and OneTaste are trying to get you to achieve your goals and get through things that are maybe blocking you from achieving them, correct?
A That's right.
Q And at OneTaste, you were supposed to write these fear inventories down by hand, right?
A That's right.
Q And the purpose of writing them down by hand is because you were then supposed to read them to someone, right?
A Correct.
Q And then you were supposed to rip them up, correct?
A Correct.
Q And it was supposed to be cathartic to write this down, right?
A That was the idea. Yes.
Q And really to rip them up, right?
A Uh-huh. Yes.
Q And it also promoted flow?
A Sure.
Q So after you would write these inventories, you would rip them up, correct?
A I did.
Q And, in fact, you haven't been shown any fear inventories in this court, correct?

A I don't believe so. No.
Q Because those don't exist, they weren't kept by anyone, right?
A To my -- I mean, I don't know if anyone kept them, but I don't think I kept any of mine.
Q You ripped them up, as you're supposed to, right?
A I believe so.
Q Turning back to the same document, 3500-RW-12.
MS. COHEN: Go down to TurnON attendance.
Q And we already -- you already mentioned TurnON events, right?
A Yes.
Q And TurnON is held every week, correct?
A Correct.
Q And you were encouraged to attend them, correct?
A Yes.
Q And the purpose of the TurnON was to connect to other members of the community and people who might be interested in orgasm, right?
A That's one of the purposes.
Q And it's where you would put your attention out on others and give them the experience of having attention on them, right?
A That's how it's described here.
Q On the next page, go to where it says drugs and alcohol.

An OM house, you were not permitted to drink, correct?
A Right.
Q You couldn't smoke, right?
A Right.
Q No drugs were permitted whatsoever, right?
A Right.
Q And part of the reason for that was that OneTaste was based in consent, correct?
MS. FARRELL: Objection.
THE COURT: Overruled.
A Can you repeat that?
Q Part of the reason that alcohol and drugs were not permitted is because OneTaste was based in consent?
A That's not how the drug and alcohol policy was framed to me.
Q Well, let me re-ask: OneTaste was based in a consent, correct?
A That's not how I would characterize it, personally.
Q Well, you testified yesterday, at the beginning, that safeporting is where someone had to ask you before they touched you, correct?
A That's correct.
Q And we also talked about safe words, right?
A Yes, we did.

Q And if someone is on drugs or alcohol, you would agree with me that it could be confusing as to whether they are actually consenting or not, correct?
A That is true.
MS. COHEN: Okay. We can take that exhibit down now.
BY MS. COHEN:
Q You also testified about the cost of your rent at Morellino, right?
A I did.
Q It is about $800 a month, right?
A That's what I remember.
Q And that included the meal plan, correct?
A I'm not entirely sure, but I think it was in that ballpark with the -- I don't know if room and board was separate or included.
Q You were interviewed by the government in this case prior to your testimony today, correct?
A I was.
Q In fact, you were interviewed, I've sort of lost count, maybe 12, 13 times before you got to the trial?
A I don't know how many it was, but it was a handful for sure.
Q It was a lot.
And the first time you were interviewed was in 2018;

do you remember that?
A I do.
Q And you would agree with me that it was closer in time to the events we're talking about than today, correct?
A Yes.
Q And when you first met with the government, you told them that the rent included a meal plan; do you remember that?
A Not specifically, but, I mean, that sounds -- that sounds right.
Q You have no reason to dispute your original statement from 2018, correct?
A No. I don't have it in front of me, but that very well could be true.
Q It would be helpful if I showed it to you. Hold on. Let me --
A Sure.

MS. COHEN: RW-1.

THE COURT: I'm sorry, say it again, the number? 3500-RW-1.

MS. COHEN: Yes. Just for the witness. Let me tell you the page.

THE COURT: Do I have that?

MS. COHEN: I can hand you a copy. I'm sorry.

THE COURT: Thank you.

MS. COHEN: Sorry. I might have misspoke. I'm

sorry. It was RW-2. Correction.

THE COURT: Same question: Do I have that?

MS. COHEN: On page 2. I will hand up a copy right now.

THE COURT: If you want the witness to read it, it is blurry. You have to fix that.

THE WITNESS: Thank you.

MS. COHEN: I can hand up a hard copy.

THE COURT: Okay.

BY MS. COHEN:

Q I will direct your attention to the second page, Ms. Halpern, at the bottom. When you have had a chance to review it, just let me know. The very bottom.

A I am just looking to see what it is, and then I will --

Q Sure, sure. Take your time.

A Thank you. Okay.

Q Does this refresh your recollection as to whether your rent money also included the food plan?

A What it says here --

THE COURT: Don't read from the document.

THE WITNESS: I'm sorry, I'm sorry.

THE COURT: The question to you --

THE WITNESS: I'm sorry.

THE COURT: That's okay. The question to you is just looking at that, does it refresh your memory about the

question that Ms. Cohen is asking you, about the topic she is asking you about.

A Not specifically about the food.

Q And when you meet with the government, though, you have to be truthful, correct?

A Of course.

Q Okay. You also paid that rent directly yourself, correct?

A Yes.

Q And you also talked about yesterday how OneTaste made you eat healthy food, correct?

A They ordered healthy food. They weren't, you know, forcing us to eat.

Q Yeah. You could eat whatever you wanted, correct?

A I mean, this is like --

Q Let me --

THE COURT: Let her answer the question.

MS. COHEN: Okay.

A It's like little details. But, you know, there was a food order that came that was decided by whoever was kind of running the house. And one could request, you know, specific things that they needed or wanted, but there would be sometimes pushback of like, oh, you want sugary cereal or whatever. Like, do you really want that? So it was kind of in the middle.

Q And that was a part of the food plan at the house, right?
A It was.
Q But you could also go outside and get whatever you wanted to eat, if you did, correct?
A If we had money, we could.
Q And you -- again, part of OneTaste, the orgasmic meditation, the yoga, as we just talked about, was keeping healthy and achieving your goals, correct?
A Yes.
Q And you said that if you had money, you just said.
Now, as I said before, your parents, your father was Broadway advertising, right, is his --
A At the time.
Q And you lived in Westchester, correct?
A Correct.
Q It's an affluent area, correct?
A It is.
Q And your parents actually paid for your cell phone, correct?
A They did at the time.
Q And you told your parents about OneTaste, correct?
A I did.
Q And you, in fact, in visiting them one time, you told your dad about it, right?
A I did.

Q And he didn't -- he wanted sort of on a need to know basis; is that fair too say?
A No, not exactly. It was -- I don't know where you are going. Go on.
THE COURT: Next question.
MS. COHEN: Sure.
BY MS. COHEN:
Q Do you remember posting about your visit with your father?
A I don't remember that.
Q Do you remember that your father -- you provided -- your father wanted to know how your weekend at OneTaste was; do you remember that?
A I remember many conversations with my father. I don't remember that specific.
Q Do you remember posting about it to the OneTaste community?
A That seems entirely possible. I don't remember that detail.
Q Okay. Just showing you for -- just to the witness --
A Thank you.
Q -- DX 21-Z.
If you could just take a look at this, Ms. Halpern, and let me know if it refreshes your recollection.
THE COURT: Can you read that well enough? It is a

bit blurry.

THE WITNESS: Yeah, it is. Okay. Thank you.

MS. COHEN: I can provide copies, if you need it.

THE COURT: What's the question?

MS. COHEN: Does she remember talking to her dad about OneTaste.

A I do remember talking to him.

(Continued on the next page.)

BY MS. COHEN:
Q Do you remember that you told him that you were happy?
A At that time, yes.
Q You also told your mom about it, right?
A I did.
Q You told her more details than your father, correct? Just if you remember, if you need it --
A It seems so.
Q And back in 2013, February of 2013, you had already testified, this is when you started the coaching program, right?
A Yes.
Q And when you told your parents about your feelings about OneTaste you were in-person, correct?
A We had many conversations over a longer period of time.
Q Because you visited them, right?
A I did.
Q You could call them anytime, right?
A Around this time, absolutely.
Q In fact, your parents were paying for your cellphone, right?
A They were.
Q You could text with them, correct?
A I could.
Q In fact, when you filled out your employment

application you had to list their address and phone number, correct?
A That sounds possible. It listed their address as my own or?
Q As an emergency contact.
A Oh, sure, that sounds possible, sure.
Q You did that, right?
A That's a detail I don't specifically remember, but I feel like I would put them as my emergency, yes.
Q I'll show you just for the witness DX 21-E. If you could zoom into the --
A Yes.
Q Does that refresh your recollection as to whether you supplied their information to notify them in case of emergency?
A Yes, I did. Thank you.
Q In fact, after -- when you left OneTaste in February of 2014, you went to live with your parents, right?
A I did.
Q Now, you testified on direct examination this morning that you also volunteered, correct?
A Correct.
Q And by volunteered, that means you wanted to do the work, correct?
A Yes.

Q And in fact, you sent an email about the kind of work that you wanted to do to people who could give you the work, correct?
A I don't know what email that would be.
Q Do you recall sending emails about the type of work you wanted to do?
A It's just a little too general for me to know exactly.
Q Do you recall -- you actually requested to work back of house, right?
A Emailing somebody who worked at OneTaste to ask?
Q Just at any point. You volunteered to be back of house, right?
A I think so.
Q You volunteered to do welcome emails, right?
A I think so.
Q You want to do sales, you volunteered at the beginning, right?
A I'm not sure, but that seems possible.
Q In fact, you also wanted to send a newsletter, right?
A That's not something I particularly recall, but sure.
Q Showing you what has been marked as Defense Exhibit 21-AE, just for the witness. If you can zoom in on that.
And Ms. Halpern, when you've had a chance to review it, let me know.
A Okay.

Q Does this refresh your recollection that you wanted to send the newsletter?
A It does, thank you.
Q You also talked about on direct examination your schedule. Do you remember that testimony?
A Yes.
Q You said that it was grueling hours, correct?
A Yes.
Q Once again, you chose to work at OneTaste, right?
A I did.
Q You talked about having to wake up early, right?
A Yes.
Q And that's around 7:00 a.m.?
A Roughly, yes.
Q And you had to OM in the morning, right?
A That's right.
Q And in addition to OMing, you would do your fear inventory, right?
A Yes.
Q And the morning obligations also included meditation, right?
A Yes.
Q And it also included sharing your fears with other people, correct?
A Sharing your fear inventory?

Q Fear inventory, correct.
A Correct.
Q And then ripping it up, correct?
A Yes.
Q These were a part of your schedule required, right?
A Yes. I mean, some of them were sort of more or less enforced or more important than others, but yes.
Q Because it was, again, the goals that we read about in the OM house handbook, the goals to get more connected, correct?
A Right.
Q To overcome your fears or concerns within you that are preventing you from being empowered, correct?
A Yes.
Q So again, this is what you were signing up for, correct?
A It was.
Q And then part of this day was there going to Bikram, right?
A Yes.
Q Because in order for OneTaste to achieve the goals that you wanted to go in, this is what OneTaste thought -- excuse me, withdrawn. This is what OneTaste advised would bring you to those goals, correct?
A Yes.

Q You were working when you first were -- you first signed up for the CP5 in the summer of 2012, you were working for your father at that time, correct?
A Yes.
Q And you worked in the family business, right?
A I did.
Q And you were the advertising account manager, correct?
A Yes.
Q And you made more money than you could make at OneTaste, right?
A That's right.
Q But you hated that job, right?
A Hate is a strong word. I was bored by it. It wasn't my thing.
Q Well, you -- one second.
A I believe that I at one time said I hated it, that's fine.
Q When you joined CP5, your father actually fired you, right?
A He was very mad.
Q And then he hired you back, right?
A Maybe. I'm a little fuzzy on that timeline, I'm not sure.
Q You don't remember describing it as one of the most painful experiences with another person?

A No, that I remember. I remember the fight we had, certainly.
Q In the summer of 2012?
A Yes.
Q But then you continued to work for him, right?
A I didn't think so, but maybe.
Q Showing you just for the witness what has been marked for identification as Defense Exhibit 21-V.
Ms. Halpern, when you've had time, just look up. This is to refresh your recollection to the fact that your father rehired you back.
A No, it does not. Is there more underneath? Okay.
Q Does that refresh your recollection?
A Yes, it does. Thank you.
Q So your father hired you back, right?
A Seems so.
Q You can take that down.
You would describe your father as hyper-volatile, right?
A I did describe him that way.
Q That job made you feel frightened and trapped, correct?
A That's how I felt at the time.
Q You also, I think you said this before, you felt that it was boring, right?
A I did.

Q And thankless, right?
A Uh-huh.
Q You know this is a case about forced labor, right?
A Yes.
Q You're aware of that, right?
A Yes.
Q And you're testifying for the Government because you claim you're a victim of forced labor, right?

MS. FARRELL: Objection.

THE COURT: Sustained.

BY MS. COHEN:

Q Forced labor is a situation where you can't leave, correct?

MS. FARRELL: Objection.

THE COURT: Sustained.

The jury will take the legal instructions from the court.

Next question.

BY MS. COHEN:

Q When you left the job with your father -- you eventually left the job, correct.
A I did.
Q And that was about May of 2013; is that correct?
A Sure.
Q When you left that job, your father berated you again,

right?
A Yes.
Q He called you a fool, right?
A Sounds right.
Q He told you he wasn't going to pay for your phone any more, right?
A Sounds right.
Q He tried to force you to stay with him, correct?
A I think he was more just upset that I was leaving.
Q You left any way, correct?
A I did.
Q You know how to do that, right?
A I do.
Q You, in fact, are a person who has options, correct?
A I do.
Q When you didn't like working for your father you left, correct?
A I did.
Q When did you didn't want to work in New York any more you went to San Francisco, right?
A I had to ask for permission for that.
Q You had to ask for permission to move to a different office in San Francisco, right?
A Yes.
Q And that was granted, right?

A Yes.
Q You were a yoga teacher before?
A Yes.
Q Before you went to OneTaste?
A Yes.
Q You left that job too, right?
A Yes.
Q After you left OneTaste, as we said, you moved back in with your parents, right?
A I did.
Q You were talking about -- you were in a relationship with Peter Crann, correct?
A Yes.
Q And in fact, you traveled to London with him, correct?
A I don't think so.
Q Let me rephrase. You met up with him in London or you were with him in London at some point, right?
A I don't think so, that would be weird if I forgot that. I don't think so. He came to New York.

THE COURT: Ms. Cohen, within the next five to ten minutes I'm going to ask you when is a good time to take a break.

MS. COHEN: We can take a break now. Is that okay?

THE COURT: Why don't we do that then. It's 25

after three now. We'll come back at 20 to four.

(Jury exits the courtroom.)

THE COURT: The witness can step down.

(Whereupon, the witness steps down.)

THE COURT: I want to meet with the parties for two minutes.

The witness is out of the room.

Do you need a minute, Ms. Cohen and Ms. Bonjean?

MS. BONJEAN: No.

THE COURT: I want to take up the issue, I sustained an objection and said we would address this issue at the break. It relates to the sexual activity of the witness and those questions. And I want to hear the parties out.

I want to remind the parties of the discussion we had I believe in the November 15, 2024 conference, and I set a deadline at that time for compliance with Rule 412. I just want to hear the parties out whether that notification was made, whether a motion was made. I'll hear the parties out here.

As I understand it, and the parties can correct me if my recollection is wrong, but the Government had moved in limine to exclude evidence of an argument regarding victim witnesses -- again, this was more general not just this particular person -- involvement in sexual behavior outside

of their experiences at OneTaste.

So I wasn't sure exactly where you were going. And I want to hear you out more on that now. But I want to also make sure that if you're getting to an area where you were supposed to give notice, that you did that, because there was a deadline in December for that. I will hear the parties out.

I didn't want to do this in front of the jury. I want to hear what you were planning to elicit, and then we'll take it from there.

MS. COHEN: Thank you, your Honor. This is regarding -- any person mentioned, these are all people at OneTaste. This is her experiences while at OneTaste. Obviously, this goes to her bias, her credibility, and her motivations as well.

THE COURT: Just tell me what exactly you were going to ask her about. I stopped you so that we could have this conversation.

MS. COHEN: I was just listing certain people at OneTaste that she was in consensual sexual relations with, including one of the individuals that she claimed Ms. Cherwitz told her to have sex with, and that she never had sex with him before.

THE COURT: What are you trying to elicit?

MS. COHEN: To make out with him.

THE COURT: Wait. The devil is in the details.

I want to know exactly what you're going to ask her about. This make out or something else?

MS. COHEN: That make out. She was with this person. And again, she's denying that she was with him. I'm trying to establish, well, she was also --

THE COURT: What is the time frame? I didn't --

MS. COHEN: This is purely limited to while she was at OneTaste.

THE COURT: Right. But you're saying she's denying what exactly?

MS. COHEN: She claims that when Ms. Cherwitz said go have a make out with this individual, that she had never been with him before.

THE COURT: Okay.

MS. COHEN: So that's one.

Two, I had already established with her that she had a relationship with Hamza. My recollection, I don't think the transcript is here --

THE COURT: Are you talking about two different people now?

MS. COHEN: Yes, multiple people. It goes to her credibility and the fact that she's with these all other men and she can't maybe remember whether she was with someone or not.

THE COURT: So if you're "all of these other men," did you comply with Rule 412?

MS. COHEN: It's at OneTaste. My understanding was prior --

THE COURT: There is two separate issues. There is a motion what they were trying to preclude; but there is also compliance with 412. They can be overlapping but two separate issues. Right.

I don't know what the scope of what you're asking about is. And I want to make sure that you have complied with the rule.

MS. COHEN: I'm only going into her credibility. I'm not asking about specifics as to any of these relationships. But the fact that she had relationships with multiple people in OneTaste does go to her credibility. She's claiming she was a shell of a person, that has psychological pressure to have sexual acts. And in fact, I'm trying to establish that she herself wanted to have sex with a lot of these men.

THE COURT: It's not what you're trying to establish --

MS. COHEN: But --

THE COURT: I'm asking if you complied with Rule 412. I did set a deadline for compliance, it was in December the deadline. I can hear the Government out on

this, as well as I can hear from Ms. Bonjean as well.

MS. BENSING: To the Government's knowledge, no compliance with Rule 412 notice requirements have been made.

I would also say that I don't think a foundation has been established with respect to, for example, Peter Crann. Simply because the witness had some kind of sexual relationship with somebody during the time period that she was herself with OneTaste does not make it a sexual experience at OneTaste. So I think the Government also just disagrees on the scope in particular with respect to that individual even setting aside the notice requirements.

And on the purpose that was just stated for the reason that they are seeking to admit these, I just want to repoint the Court to that *Rivera* case in the Second Circuit which we cited in our motion in limine, which is the very purpose of the rule to preclude defendants from arguing that because the victim previously consented to have sex for love or money her claims of coercion should not be --

THE COURT: That's not the argument. There's lots of different issues here. Relevance is one, credibility, et cetera.

I'm focused right now on whether there was compliance with Rule 412. Because we discussed this in November and I set a deadline of December 2. And I want to have the defense confirm whether or not they complied.

MS. COHEN: Yes, your Honor. Because we do not -- Rule 412 applies to other sexual conduct that is outside of the charged crime. This conduct is within the charged crime.

And in fact, I believe *Rivera* addressed this exact same thing. I understand if she had prior sexual activities with people outside of OneTaste or outside the time period. Agreed. But in this case, we're not saying it's -- we're not talking about that.

We're talking about her consent to individuals within OneTaste demonstrating that -- again, going to her credibility to saying she didn't do these things with individuals.

MS. BENSING: May I respond?

THE COURT: Yes.

MS. BENSING: The crime is forced labor. No one is suggesting that Ms. Halpern had a relationship with Peter Crann as part of the forced labor scheme. So I do not see how the reason that they are proffering somehow takes this without the ambit, outside the ambit, of Rule 412.

THE COURT: What I'm concerned about too, is that I did set a deadline for 412 compliance. Nobody argued at that time that there was no need to comply with 412. We had a discussion at the time, I have my notes on this. You can check the transcript on this. We had a discussion about

this. I did indicate that we were -- it was clear that I needed to have more specifics and that compliance needed to be made by December 2. So if I'm hearing now that you don't think that Rule 412 applies, I'm not sure I heard that. We can check the transcript.

MS. BONJEAN: May I weigh in?

THE COURT: Of course.

MS. BONJEAN: Thank you.

THE COURT: I said I would hear from you after the Government. Go ahead, Ms. Bonjean.

MS. BONJEAN: I appreciate that.

I would point out in of November we didn't have a lick of 3500 material. We had no idea how many people she slept with or what her circumstances were. It would be impossible frankly to have to raised a 412. 412 doesn't apply. We're not using this to show her sexual predisposition. That's already been established. It's pretty much established for anybody who joined OneTaste.

THE COURT: Slow down for the court reporter and for me.

MS. BONJEAN: It's kind of a rather ridiculous proposition when the whole purpose of joining OneTaste was to explore sexuality and to have this open sexual -- she has testified to it as length. This isn't about sexual predisposition. And we're not using it for that purpose;

hence, why there would --

THE COURT: The rule is about behavior or predisposition, not just -- I think you're thinking on the predisposition part.

MS. BONJEAN: Offer to prove the victim's sexual behavior and alleged sexual predisposition. I think --

THE COURT: Let's see, it's two different things.

MS. BONJEAN: Agreed.

THE COURT: Right there is A1 and A2. A1 is sexual behavior, two is about predisposition.

I think we're focusing on the behavior part. What I'm asking about is, was notice given?

MS. BONJEAN: I guess, we have opened the door -- the Court has allowed the Government to, for an entire four-year period, pick and chose what sexual behavior she wants to testify about from her entire time at OneTaste. And now, when we want to get into some other aspect of the picture --

THE COURT: Tell me exactly what aspect you're -- what sexual activity are you going to be asking her about specifically. What is the time frame? With whom? What is the relevance? And then can I make a determination whether it needed to be addressed by 412.

MS. BONJEAN: I'm going to let Ms. Cohen address that.

I would point out that this goes to -- it's not about sexual behavior predisposition. It goes to a different bias and motive as it relates to Ms. Cherwitz. That their beef, their arguments, their discord had to do with other relationships and being interested in the same men.

THE COURT: I don't know that I'm disagreeing with you, Ms. Bonjean, on the issue of whether it's relevant or whether it should come in.

I'm asking simply whether the defense has complied with the requirements of giving notice. I did set a deadline. You're telling me you didn't have the information with which to make a proper motion, I think. But I don't believe, we can check the docket, I don't believe there was an extension request. That's what I'm asking. I know you're making other arguments. I'm not sure I disagree with some of the other arguments you're making. But I'm asking something much more fundamental, which is, was the notice provided.

MS. BONJEAN: Our position is there was no need to make notice under Rule 412. It is the literal conspiracy that they have alleged for this entire period of time where everyone's sex acts come in, apparently when it's relevant to the Government but not to the defense. That's not 412 material in our position. That's why no notice was made.

Not because we didn't blew a deadline. We didn't have any 3500, that's a separate issue. Even if we did, we would have no basis to bring a Rule 412 motion because we're not using it for the purpose the 412 is intended to address.

THE COURT: I'll hear from the Government in response.

MS. BENSING: The Government has to correct the record about what the defense had at the time of the Court's deadline. The 3500 was produced on November 15, that was well before the Court's deadline for Rule 412.

The reason the Government briefed this in its initial motions in limine is for this very reason. Because compliance with Rule 412 clearly covers evidence offered to prove that a victim engaged in other sexual behavior. And with respect to at least some of what the defense is asking about, we think that squarely falls within 412.

THE COURT: It sounds like it, but perhaps not all, that's why I'm trying to get to the specifics.

Does the Government agree that there is, I think Ms. Cohen was getting at some testimony that would be appropriate.

MS. BENSING: Yes, I think that's right. I think some of that, I think, is outside the scope. For example, the questions about Peter Crann and some of that with respect to, for example, the witness testified that she was

in a sexual relationship with her boss, Rob Kandell. So obviously that is fair game for cross-examination, from the Government's perspective.

THE COURT: But I think what Ms. Cohen was getting at -- I'll give her a minute to talk to her client -- what I think what Ms. Cohen was getting at was that she believed that the witness, correct me if I'm wrong, denied something that you believe to be true. Is that right, or no? I thought that's where you were going.

MS. COHEN: That's correct. But it also goes to bias and motivation to lie. I'll explain to you why, your Honor.

All of these men who I am mentioning also had sexual conduct with my client -- not sexual conduct, sexual relations with my client. I've established already that there was, again, a jealousy between the two. She admitted to that. These relationships and this complicated relationship between the witness and Ms. Cherwitz is extremely important. And will also demonstrate why this witness would lie to the jury. So it goes to -- and why she might be biased against Ms. Cherwitz. It goes all to that.

THE COURT: Do you need to elicit the sexual nature or not? Because I really do have a concern about 412 here. Particularly because this is not -- this was not raised with me and we discussed this in connection with the

motions in limine. And I went to the formality of setting a deadline and I didn't hear at that time that there was a reason there needed to be no deadline because it didn't apply. And I didn't hear that we needed an extension.

This was something I also believe that I -- give me one moment, please.

I encouraged the parties in November to have conversation on this issue about parameters under different scenarios, including what would happen in a witness got up on the stand and said certain things. I would encourage the parties to look at the transcript from November 15 I believe of 2024.

I think it seems unlikely we'll finish cross-examination today, so we will pick this up. I don't want to keep the jury waiting any longer.

Go ahead.

MS. COHEN: Can I put a case on the record for, your Honor --

THE COURT: You can.

MS. COHEN: -- that may be helpful? Our position is that what we're trying to elicit does not implicate Rule 412. I want to be very careful about that. The *Raniere* case, the exact same issue came up, and the Court ruled that no 412 notice was needed. Because, it is again, in that case were seeking permission to introduce evidence that is

intrinsic to and purportedly undermines in that case the claims of conversion that are at the heart of many of the charged crimes.

THE COURT: Every case obviously stands on its own facts. What I would need to know here is what exactly are you trying to elicit here, and why you don't think it doesn't fall within 412? I'm not going to waste the jury's time right now. We wasted enough time today. We'll bring them back. It's 20 to four. I assume you have more than enough to take you through the end of the day?

MS. COHEN: That's correct.

THE COURT: And Ms. Bonjean will have a chance to cross-examine as well.

The parties can be heard further, but I'm not going allow the questioning at this time. I do think the parties should go back and look at what the Court had already informed the parties. I know, Ms. Cohen, you were not in the case at that time. And let me take the time to commend you for how quickly you've gotten up to speed on this case and how evidently hard you have been working on this, you and your team. But there were rulings made before you got into the case.

We're going to bring the jury out.

MS. BENSING: May I run to the bathroom, your Honor?

MS. FARRELL: May we -- given that timing issue and the likelihood that the witness will need to stay here another night, we need to speak to her about that logistical issues.

THE COURT: Okay. Five minutes everybody. We're adjourned.

(Brief recess.)

THE COURT: Everyone may be seated.

The Government can get the witness. And Mr. D'Agostino can get the jury.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Everyone may be seated.

We'll resume with the witness.

CROSS-EXAMINATION

BY MS. COHEN:

Q You testified that you could leave but didn't -- you were afraid of losing your friends. Do you recall that?

A I do.

Q In fact, there had been other people at OneTaste that were there and left and came back, right?

A Yes.

Q And you also testified about, we talked before about healthy eating, right?

A We did.

Q And we talked about drinking, right?
A Yes.
Q And in fact, you often, you would go out to dinner while you were living at the Morellino, correct?
A Sometimes, correct.
Q You would go out to Balthazar or you went out to Balthazar?
A Me? No.
Q In November 2013 you don't remember going out with a group to Balthazar?
A Maybe, as like a celebration of something special.
Q So you did go out to Balthazar?
A I don't really remember that.
Q Can you show the witness 21-BG?
THE COURT: Say that the number again?
MS. COHEN: 21-B as in boy, G as in golf.
Q Can you just zoom in for the photo.
Do you see that?
A Yes.
Q And does that refresh your recollection as to whether you were at Balthazar?
A It looks like we all went out together as a whole team.
Q And this was in November of 2013, correct?
A Will you pull it back so I can -- yes.
Q And in 2013, November, that was just shortly before you

left for San Francisco, correct?
A Yes.
MS. COHEN: Your Honor, at this time we would offer not to the comments, we would redact that, but without any writing on this we would offer Defense Exhibit 21-BG into evidence.
MS. FARRELL: I don't think they've asked the proper questions to authenticate it.
THE COURT: Do you have an objection?
MS. FARRELL: Yes.
THE COURT: I'll sustain the objection. If you want to ask additional questions then.
MS. COHEN: Sure.
BY MS. COHEN:
Q Ms. Halpern, do you recognize yourself in this photo?
A Yes.
Q And is it a faired and accurate depiction of the photo that was taken at Balthazar in November of 2013?
A Looks like it.
MS. COHEN: Your Honor, at this time I offer Defense Exhibit 21-BG.
THE COURT: Any objection?
MS. FARRELL: No objection, subject to them redacting the material on the side.
THE COURT: Yes. So I will admit 21-BG but only

the photograph portion. I'll expect the defendants to give me a copy tomorrow that has only that.

(Defense Exhibit 21-BG, was received in evidence.)

MS. COHEN: Yes, your Honor. And we have redacted it already for the jury. Is that okay if we publish it?

THE COURT: Yes.

BY MS. COHEN:

Q This is the picture that we were just talking about, correct?

A Correct.

Q And that picture was -- do you recall whether that picture was posted?

A I don't recall but it seems like it from what you've shown me.

Q I'm going to show you what has been marked for identification as Defense Exhibit 21-AN -- I'm sorry, just for the witness.

Ms. Halpern, do you recognize this photo?

A Yes.

Q And do you see yourself in that photo?

A Yes.

Q And does this -- is this a fairly -- and is this a photo of -- do you remember this photo being taken?

A Not particularly.

Q Do you recall being out to dinner with people in May of

2013?
A Yes, that happened from time to time.
Q Is this a fair and accurate depiction of a photo that was taken of you?
A Yes.
MS. COHEN: Your Honor, at this time I offer Defense Exhibit 21-AN in the redacted form.
MS. FARRELL: Can I ask some voir dire questions?
THE COURT: Yes. You have to go to the podium for it.

VOIR DIRE EXAMINATION
BY MS. FARRELL:

Q Ms. Halpern, the date of this photo that you just testified to is that based on your memory or based on what you are looking at?
A Based on what I'm looking at.
Q If somebody posts something on social media, does it necessarily mean the picture is from the day the picture is posted?
A No.
Q Sitting here today, do you have any clue what date this photograph was taken?
A No. If there was not a date on the side I would not be able to date it.
MS. FARRELL: Your Honor, we object on relevance

grounds given what has just been established.

THE COURT: Do you want additional questions?

MS. COHEN: Yes.

CROSS-EXAMINATION

BY MS. COHEN:

Q Do you recognize the other individuals in this photo, Ms. Halpern?

A Some of them are hard to see, but I recognize most of them.

Q Can we zoom in more to the faces? I'll ask you, are these individuals that also participated in OneTaste?

A Yes. I cannot tell who that is in the far back, but yes.

Q Everyone else?

A Yes.

Q And these are people -- are these people that also participated in the CP6 course?

A That's right.

Q The CP6 course went from February 2013 to November 2014, correct?

A Right.

MS. COHEN: Your Honor, we would offer this as, again, a photo into evidence. I think we've established that this is at the time of the period of the CP6 course.

THE COURT: Any objection?

MS. FARRELL: Your Honor, we don't object to what is on the screen currently. We do object to I think the way they had it redacted, they still had the date and the poster. We would request all of the text to be redacted.

THE COURT: I'll hear you out, Ms. Cohen.

MS. COHEN: That's fine, your Honor.

THE COURT: I will admit 21-AN, just the photograph nothing else.

(Defense Exhibit 21-AN, was received in evidence.)

MS. COHEN: Yes.

THE COURT: You'll redact that and provide a redacted copy, and you can show just the photograph to the jury.

MS. COHEN: Thank you, your Honor.

BY MS. COHEN:

Q Let me ask you a couple of questions about this, Ms. Halpern. At dinner you all put your drinks together for cheers, correct?

A That's right.

Q And there is alcohol there, right?

A I assume that's what in the glasses, yes.

Q Because even though there were rules at the Morellino, you could also go out and do whatever you wanted outside of the Morellino, correct?

A From time to time, sure.

Q Showing you what has been marked for identification as Defense Exhibit 21-AM, as in Mary.

THE COURT: Just to the witness and the Court and the parties.

MS. COHEN: I apologize.

BY MS. COHEN:

Q Showing you on the screen for identification 21-AM. Ms. Halpern, do you recognize yourself in this picture?

A Yes.

Q Do you recognize the two men that are standing next to you?

A Yes.

Q And are those two men also in the CP6 course with you?

A Yes.

Q And is this a fair and accurate depiction of the photo that was taken of the three of you?

A Yes.

MS. COHEN: At this time your Honor the Government -- the defense offers Defense Exhibit 21-AM.

THE COURT: Any objection?

MS. FARRELL: No.

THE COURT: 21-AM is admitted as redacted. What is being admitted is just the photograph.

(Defense Exhibit 21-AM, was received in evidence.)

BY MS. COHEN:

Q Can you please publish that for the jury?
Ms. Halpern, is it fair to say this is a photo of you eating dinner or eating at night, I guess is fair to say, right, you're eating dinner with your fellow CP6 individuals?
A We're at the halal guy's cart.
Q Is that in San Francisco?
A It's in New York.
Q At this point -- yes, in New York. CP6 was in New York?
A Uh-huh.
Q We can take that down.
Also showing you what has been marked for identification only, just the witness, as Defense Exhibit 21-AQ. Let me ask you, Ms. Halpern do you remember going to a reggae hang out?
A Not particularly.
Q A reggae hang out on 134 Street, does that refresh your recollection?
A No, not really.
Q Did you sometimes go out with other OneTaste people to bars and music?
A Sure.
Q Showing you what has been marked for identification as Defense Exhibit 21-AQ. Do you recognize this?

A The photograph, yes.
Q Do you recognize yourself in this photograph?
A I do.
Q And I know it's a little fuzzy. Do you recognize the individuals around you?
A Yes, I do.
Q Are these also CP6 individuals?
A They are.
Q And was this picture taken while you were in CP6 with these individuals?
A I believe so.
Q Do you recall, were you out on the town or out somewhere at this point?
A That's what it looks like, yes.

MS. COHEN: Your Honor, at this time, again, redacted version of Defense Exhibit 21-AQ.

THE COURT: Any objection?

MS. FARRELL: No, your Honor.

THE COURT: 21-AQ, the photograph only, is admitted.

(Defense Exhibit 21-AQ, was received in evidence.)

BY MS. COHEN:

Q That's the photo we were just discussing, right?
A Yes.
Q You testified a lot about the relationships you had at

OneTaste with people, right?
A Yes.
Q The friendships. And you had a lot of friendships, right?
A Yes.
Q And you had fun with these people, correct?
A Absolutely.
Q Showing you for identification what has been marked as Defense Exhibit 21-AP, just to the witness -- this one can you redact except for the top?
Ms. Halpern, do you recognize this photograph?
A Yes.
Q And what is this?
A It's a picture with myself and two friends.
Q You recognize yourself. Do you recognize the other two friends?
A I do.
Q And who are they?
A Chelsea Hunter and Margaret Pixley.
Q Is this a photograph that you posted?
A Yes.
Q And was that posted in July of 2013?
A That's what it says here.
Q Is this a fair and accurate depiction of the photo that you posted on that date?

A Yes.

MS. COHEN: Your Honor, at this time we would offer -- Government Exhibit -- Defense Exhibit 21-AP.

THE COURT: Just the photograph?

MS. COHEN: And the top part, as that was from this witness.

MS. FARRELL: That's fine. We don't object.

THE COURT: Government Exhibit 21-AP is admitted as redacted, so it will only include the photograph and the first blurb on the top.

MS. COHEN: Thank you, your Honor.

BY MS. COHEN:

Q This was the photograph we were just discussing?

A Yes.

Q These are Chelsea Hunter and Max Pixley, these are your good friends, right?

A I was -- they were both my roommates at the Morellino.

Q You seemed to hesitate there. They were your good friends?

A I was definitely good friends with Chelsea Hunter. I was a little bit less with -- I'm assuming they go by Max now, with Max Pixley.

THE COURT: Let me stop you. I misspoke.

Defense Exhibit 21-AP is admitted as redacted.

(Defense Exhibit 21-AP, was received in evidence.)

BY MS. COHEN:

Q Sorry, Maxine Pixley at the time. You had said Maxine, sorry.

MS. FARRELL: Objection.

A They changed their name since I knew them. I knew that person as Margaret Pixley.

Q Margaret, I'm sorry. You're right.

That's the person you remember as Margaret Pixley?

A Correct.

Q And you said you were friendly, she lived in the Morellino?

A That's right.

Q You would describe your relationship with Chelsea as closer than Margaret?

A Yes.

Q You called her Pixley, everyone called her Pixley?

A Or Pix.

Q And do you remember the purpose of this post?

A It just says: Intentional polka dots synchronicity. We were all just wearing polka dots.

Q Right, you all showed up in polka dots.

A Correct.

Q And you posted this, correct?

A Yes.

Q You were all in CP6 at the time?

A Correct.
Q I'm also going to show you what has been marked for identification only, Government Exhibit --
THE COURT: Defense.
Q Defense Exhibit AL. If you can just redact the bottom, where the thumbs up is and downwards.
THE COURT: There are two thumbs up. You mean the blue one?
MS. COHEN: Yes, just the blue one.
BY MS. COHEN:
Q Do you recognize this photo, Ms. Halpern?
A Yes.
Q What is this photo?
A It's a photo of myself and Chelsea Hunter.
Q Did you post this photo?
A Yes.
Q Does this fairly and accurately depict the photo that you posted?
A Yes.
Q That was in July of 2013?
A Yes.
MS. COHEN: Your Honor, I would also offer Defense Exhibit 21-AL.
MS. FARRELL: No objection.
THE COURT: As --

MS. COHEN: Redacted format.
THE COURT: Okay. So any objection?
MS. FARRELL: No objection, your Honor.
THE COURT: So 21-AL, Defense Exhibit, will be admitted as redacted.
So everything from I guess what is shown on the screen now.
(Defense Exhibit 21-AL, was received in evidence.)
MS. COHEN: The blue thumbs up down is redacted.
THE COURT: Go ahead.
BY MS. COHEN:
Q This is the picture we were just talking about?
A Correct.
Q Is that a picture of you, and Chelsea laying down at the Morellino?
A I can't really tell where we are, but that would make sense.
Q That was when you were both in CP6, correct?
A June 2013, yes.
Q In the summer of 2013, right?
A Right.
Q And that was when you were also doing sales for OneTaste at that time, right?
A Yes.
MS. COHEN: Your Honor -- I'll move on. Can you

give me one moment, your Honor? Sorry.

THE COURT: Yes.

MS. COHEN: May I have a moment with the Government?

THE COURT: You can.

(Discussion off the record.)

THE COURT: Give me win moment. We're having some technical difficulties with the computer.

I still need a moment.

MS. COHEN: Okay, good. Take your time. Thank you.

THE COURT: I'll get the computer fixed, you get organized.

(Brief pause.)

THE COURT: We're going to put this aside. We're going to continue and if I have to ask the court reporter to read something back, I'll ask. But I have access to the exhibits, so we'll deal with the technology issues on our own time. Go ahead.

MS. COHEN: Thank you.

BY MS. COHEN:

Q I'm going to show what has been marked for identification as Defense Exhibit 21-AO.

And your Honor, I've already discussed this with the Government. This is a video that we're not seeking to enter

at this time. We're just going to show -- we have a photograph of this and I don't know where it is, so we're going to show it as a still.

THE COURT: That's fine. No objection from the Government?

MS. FARRELL: That's correct.

THE COURT: You're showing stills from 21-AO; is that correct?

MS. COHEN: That's correct.

BY MS. COHEN:

Q Ms. Halpern, do you recognize this photograph?
A Yes.
Q And do you see yourself in there?
A Yes.
Q Do you recognize the other individuals?
A Yes.
Q Who are they?
A Ruwan Meepagala.
Q And do you recall when this was taken?
A No.
Q Do you know where this was taken?
A No.

MS. COHEN: Your Honor, at this time we would offer Defense Exhibit 21-AO.

THE COURT: You're offering the entire video?

MS. COHEN: No, just the still.

THE COURT: I think you're going to want to give it a different name then. Maybe AO-1 and maybe stamp --

MS. COHEN: And stamp it separately.

THE COURT: So 21-AO-1 is admitted -- and no objection from the Government?

(Defense Exhibit 21-AO-1, was received in evidence.)

MS. FARRELL: No objection.

MS. COHEN: For the purposes of today, even though it will be remarked, I'll ask that the still be published to the jury.

THE COURT: Yes.

MS. COHEN: Okay.

BY MS. COHEN:

Q Fair to say you're laying down in this photograph together?

A It looks like it.

Q And Ruwan is the one that you claim Rachel told you to go have a make out with, correct?

A Correct.

Q And your testimony was that you had never been with Ruwan before, correct?

A I don't think so.

Q Now, it's fair to say the Morellino and other places at

OneTaste, hooking up or making out with people was part of a regular day life, correct?
A It was.
Q And in fact, it was -- beyond the OM practice, sort of the point was exploring sexuality as well, correct?
A It was part of the point, sure.
Q In fact, these homes like the Morellino, essentially people were fairly young who lived there, correct?
A It was a wide range of ages. We were certainly all young.
Q A lot of the people we looked at today were also young?
A Yes. Again, there was a wide range of people who participated.
Q In the Morellino, it's fair to say there were people in their 20s, correct?
A Yes.
Q And people in their 30s?
A Yes.
Q And all living together, correct?
A Correct.
Q And you testified I think on direct, there were about 12 to 15 maybe people living there?
A Yes.
Q All of those people were around those ages, correct?
A I believe -- yes.

Q At the time that you claim Ms. Cherwitz told you to make out with Ruwan, and you Ruwan had been arguing, correct?
A I don't recall.
Q You don't recall that you had been bickering with Ruwan for a little bit at that point?
A No.
Q And you testified yesterday, in fact, that when people were upset and not working things out, that was a way to release, was to go make out with someone, for example?
A Yes.
Q And in fact, you told people to have sex, correct?
A I'm not sure.
Q You told Rob Kandell that you told two people to have sex, correct?
A I'm really not sure.
Q Showing you just for identification, for the witness only, Defense Exhibit 21-F, as in Frank.
THE COURT: I don't have that either.
MS. FARRELL: I don't have that.
THE COURT: We don't have it.
MS. COHEN: We'll sort these out tomorrow.
THE COURT: I can see it on the screen. 21-F?
MS. COHEN: Yes.
BY MS. COHEN:

Q Ms. Halpern, when you've had a chance, does that refresh your recollection that you told two people to go and fuck?
A I don't specifically remember sending this email, but it seems, it seems like a real email for sure.
Q And the reason you told these two people to have sex was because -- you can take it down -- because you felt the energy being sucked out of the room by their tumescence?
A That's what it said.
Q And by tumescence, that's sort of the stuff going on inside, the negative energy, correct?
A It could mean negative energy. It could mean pent-up sexual energy. It had a broad definition.
Q And so because you felt that, you told them to go have sex, correct?
A That's what it said there. I don't recall sending that, but sure.
Q While they were having sex, you made two sales, right?
A That's what it said.
Q Despite telling these two people to go have sex -- withdrawn.
That was in December of 2013, correct?
A I don't know.
Q Let me pull that back up to see if that refreshes your recollection.

A That's the date on it, yes, December 2013.
Q And December 2013 was right around when you moved to San Francisco, correct?
A Yes, I believe so.
Q And in fact, this was --
A Because those two people are in San Francisco, that makes sense.
Q Correct. So after you claim you had an incident with Ms. Cherwitz earlier, you sent this email after that, correct?
A I did. I was emulating that.
Q My question is, did you send that after that incident?
A Correct.
Q That was after the OM demonstration, correct?
A Correct.

(Continued on next page.)

CROSS-EXAMINATION

BY MS. COHEN: (Continuing)

Q And, in fact, you -- let's see.

MS. COHEN: Excuse me one moment, Your Honor.

THE COURT: Sure. Take your time.

Q Before you left for San Francisco, you made sure to tell everyone goodbye, correct?

A Yes.

Q Because you were leaving your good friends, right?

A Yes.

Q And you asked to leave at that point, correct?

A Correct.

Q And you told -- sorry, it's hard to read this.

You sent -- you told Chelsea that you're her family and family is forever, correct?

A Yes.

Q And that you loved her thoroughly and so damn much, right?

A I did.

Q And you also told Pixley that -- "God, I love you," you said, right?

A Yes.

Q And that she felt like a sister to you, correct?

A I'm not looking at it, but I believe you.

Q A sister, one that you also liked to grope, you told her?

A I'm not looking at it. I don't know exactly what was said.
Q Well, is there something that would refresh your recollection that you said that?
A Yes.
MS. COHEN: Okay. Showing you for -- let's just go -- we'll have to zoom in, it's very hard to see -- for identification, just to the witness only, Government Exhibit --
THE COURT: Is it a Government exhibit?
MS. COHEN: Sorry.
THE COURT: All right. Go ahead.
MS. COHEN: -- 1371.
And if you could go to page -- well, actually, if you could zoom in for the witness so she could see the whole document.
And then I will specifically go to page 2 to refresh your recollection.
Scroll down to the second page.
One more. There you go.
THE COURT: Do you have a paper copy? It's not for me, but for the witness. It's very difficult to read.
MS. COHEN: I do, but I -- I might, but the screen is easier.
THE COURT: It's all right.

Okay, the Government can hand up one.

MS. COHEN: Oh.

THE WITNESS: Thank you.

MS. FARRELL: You're welcome.

THE COURT: Thank you.

BY MS. COHEN:

Q Just let me know when you've had a chance to take a look.

A This makes me really sad.

Yes, I remember.

Q And it's true that you wrote that Pixley felt like a sister, right?

A I did.

Q One that you also liked to grope, correct?

A That's what I said.

Q And that you would defend your friendship with her to the death, right?

A That's what I said, yes.

Q Yes.

Whenever you're done, I'll ask --

A Yeah.

Q Just because you have to testify from your memory and not from the document.

A Okay.

Q Okay. But if you need it again, just let me know.

A Okay.

Q And that was correct, right?
A Yes.
Q In fact, you also wrote a message to Rachel in that, correct?
A I did.
Q Right?
And you said that there were so many moments, right?
Again, I'm just asking if you remember this.
A I haven't read that part.
Q If you need it, we'll -- you could go back to the first, the -- sorry, the last --
A I got it here. It's okay. Thank you.
Q Second to last.
A Okay.
Q Okay. And you told her -- you talked about how there were a lot of memories, moments between the two of you, right?
A Yes.
Q And you described all the hugs, right?
A Yes.
Q All the cries, right?
A Yes.
Q All the spats?
A Right.
Q Right?
And as you testified before, you did -- you had a

lot of spats with her, right?
A For sure.
Q All the ridiculous jokes, right?
A Yes.
Q And you told her that it was a welcomed challenge and a deep privilege caring for her, right?
Take your time.
A Yes, it was.
Q And you said "you're my family," right?
A That's how I felt.
Q And when you went to San Francisco in December of 2013, you were welcomed with open arms, right?
A Yes.
Q In fact, the people in San Francisco worked to surprise you, right?
A I'm not remembering that right now.
Q Do you remember that they got you your favorite foods?
Do you remember that?
A I don't exactly remember that, but that sounds nice.
Q They got you -- they had your favorite songs ready when you came.
Do you remember that?
A I don't, actually.
Q Do you remember that they were -- they had your favorite scents?

A No, I don't, unfortunately.
Q But you do remember them welcoming you?
A Yes.
MS. COHEN: I'm sorry, Your Honor, I have this exhibit number and I -- can I have one moment to find its place?
THE COURT: Yes. Sure.
MS. COHEN: Oh. I know where it is.
(Pause in proceedings.)
MS. COHEN: Sorry.
(Pause in proceedings.)
MS. COHEN: Oh, I'm sorry, yes.
Showing the witness for just identification as DX -- Defense Exhibit 21-B, as in boy, N as in Nancy.
I'm sorry. Yes, can you please redact that?
Q Ms. Halpern, do you recognize this photo?
A Yes.
Q And what do you recognize it to be?
A I'm sorry, I just haven't seen this in a really long time.
Q I understand. Take your time.
A This was some of the people who lived in the San Francisco OM house, welcoming me there.
Q And you posted this picture, right?
A Yes.

Q And you posted it on December 16th --

MS. COHEN: Or, I'm sorry, withdrawn.

Q Do you recall when this photo was posted?

A Off the top of my head, without the date on there, no, I wouldn't exactly recall. But that seems right.

Q And does it seem right because that's when you --

A Yes.

Q -- went to San Francisco?

A Right.

Q And does anything else refresh your recollection about that being the time that you arrived, right around, in San Francisco?

A No, that seems -- that seems right.

Q And as you said, you identified yourself in this photograph, correct?

A Yes.

Q And the people standing around you?

A Yes.

MS. COHEN: Your Honor, at this time the Defense seeks to admit Defense Exhibit 21-BN, redacted, in the redacted form as it appears here, except for the witness's own portion.

THE COURT: So starting the redaction from the blue thumbs-up down?

MS. COHEN: Correct.

THE COURT: Any objection?

MS. FARRELL: No objection.

THE COURT: Okay. So Defense Exhibit 21-BN, redacted as I just described, is admitted.

(Defense Exhibit 21-BN received in evidence.)

MS. COHEN: Can you please just publish that to the jury?

(Exhibit published.)

MS. COHEN: And if we zoom in a little bit more.

Q On your comments, you indicated in here, in your post, that this was a welcome committee, right?

A Yes.

Q And they made you feel welcome when you got to San Francisco, right?

A Yes, they did.

MS. COHEN: I'm showing you what has been -- actually, hold on before we do that.

I'm showing you what has been marked for identification, which is Defense Exhibit 13-AP, as in Peter.

And I believe this is the -- a video that I've already discussed with the Government, who has no objection to its --

THE COURT: Okay. You're playing the video, not stills, at this point?

MS. COHEN: I'm going to play the video.

Just to confirm with the Government, this is a video of the still that the Government already put into evidence.

MS. FARRELL: That's correct. No objection.

THE COURT: Okay. So you're going to play a video now?

MS. COHEN: Yes, Your Honor.

THE COURT: Which is Defense Exhibit 13-AP.

The Government has no objection to that, correct?

MS. FARRELL: We have no objection, understanding that they redacted the hearsay on right. It looks like it was.

MS. COHEN: Yes, we did.

MS. FARRELL: Thank you.

THE COURT: Okay.

MS. COHEN: So hopefully we have sound.

THE COURT: And yes, that is admitted.

And Ms. Bonjean, you should feel free to speak up if you want to be heard on the admission of these.

(Defense Exhibit 13-AP received in evidence.)

(Video played; video stopped.)

THE WITNESS: Well, that was embarrassing. Thank you.

MS. COHEN: I don't think it was embarrassing. You have a wonderful voice.

THE WITNESS: Oh, my God.

BY MS. COHEN:
Q Do you remember making that video?
A Yeah.
Q And, in fact, that video was something that you and your friends came up with on your own, right?
A I'm not sure, but yeah, probably.
Q And it was something you were posting about, right?
A Right.
Q And you were hoping to get people to come to the TurnON event, correct?
A Yeah. Exactly.
Q And that's because posting about fun things and women in nice dresses could potentially bring people in, right?
A Right. That's the idea.
Q You talked about, on direct examination, that OneTaste, that it put you -- it depleted all your funds, is what I think -- I'm not quoting you exactly, but --
A Sure.
Q What you were trying to say, you didn't have money when you left, right?
A Right.
Q When you decided to take these courses, you thought a lot about it, right? I think we already established that.
A Right.
Q And you thought about how you were going to pay for these

courses, right?
A Right.
Q And, in fact, as you said, you thought about it so much that you canceled the CP5, tried to cancel it at first or worked it out, correct?
A Right. And then moved to CP6.
Q And you went to CP6?
A Right.
Q And in CP6, in fact, you said you decided to pay for it with your own money, right?
A Yeah, through the -- through my salary.
Q Because you didn't want to be in debt, right?
A Right.
Q And, in fact, you told individuals at OneTaste that you looked at your income and saw places that you could shave it off, right?
A Um, I don't remember saying that, but that sounds right.
Q Okay. I'll come back to that.
And as I think we established, but just at the time that you were looking at it and trying to shave off, you were still working for your father's company at that point, right?
A Um...
Q That was in October/November of 2013? I'm sorry, 2012?
A Again, I don't specifically recall this exchange or post or whatever, but around that time period I was figuring out

how to pay for the coaching program.
Q Right.
And you were still working with your father, correct?
A I think so.
Q Yeah, because we -- in fact, we looked at the post -- sorry.
We -- I refreshed your recollection from a -- I believe it was March 2013 earlier -- we could pull it back up -- in which you talked about how you didn't like your job, right?
A Okay. Yeah, sure.
Q Now, we've seen a lot today about that you were posting, correct?
A Yes.
Q And you said, you know, you wanted to tell the world about OneTaste, you weren't hiding, right?
A That's right.
Q No one was, right?
A Um...
Q I shouldn't say that.
There was nothing in the dark that was hidden. It was very much -- people posted all the time?
A Yeah, a lot, a lot of...
MS. FARRELL: Sorry. I was objecting.

THE COURT: Oh, I'm sorry. I didn't hear you.

MS. FARRELL: No, no, it's okay. We interrupted each other.

Objection to the form of the question.

THE COURT: Okay.

MS. FARRELL: You don't have the real time?

THE COURT: No, but it's fine. I heard you.

Overruled.

Q You're aware that other people posted, correct?

A Sure. Absolutely.

Q In fact, they posted pictures of you, right?

A Yeah.

Q And they posted pictures from events at OneTaste, right?

A Yeah, of course.

Q And you also posted on -- there was an OM hub, right?

A Yes.

Q And you would post on there as well?

A Yes.

Q And that was for the OM community to see, only for the OM community, right?

A Correct.

Q And you would post your feelings on there, right?

A Yes.

Q And how you felt in a particular time --

A Yes.

Q -- that you were posting, right?
A Sure.
Q It could have been related to an OM, correct?
A Sure.
Q Or could have just been generally how you were feeling, right?
A Right.
Q In fact, in August of 2013, you posted about why you chose to be at OneTaste, right?
A I don't specifically recall. But I posted all the time about OneTaste, yes.
Q Well, you talked about -- you said you choose to be here because you want to change and grow.
Do you remember that?
A Not specifically, but sure.
Q You've also said that you chose to be there because your decisions were your own and no one else's, right?
A Again, I don't remember this specific -- like, this particular thing that you're looking at.
Q Well, do you remember stating that?
A Not exact -- no.
Q So let me just show you to refresh your recollection.
A Thank you.
MS. COHEN: I'm showing you what has been marked as Defense Exhibit, for identification, 21-AT, just to the

witness. T, as in Tom.

Your Honor, let me know if you don't have it.

THE COURT: I do have it. Thank you.

MS. COHEN: If you could just zoom in on the first post.

Q Let me know when you've actually had time to review it.

A Yes. It's an unusual format for a post.

Q Does it refresh your recollection though, even though the format may be different, of writing -- of saying these words?

A It's the same thing where I don't specifically recall posting this, but it looks true.

Q Do you have any reason to think that this -- that you didn't make those statements?

A No, I -- I don't think so.

MS. COHEN: You can take it down.

Q And that's because you did choose to be at OneTaste, because you wanted to change and grow, right?

A Absolutely.

Q And your decisions to do that were your own, right?

A To stay?

Q Yes.

A Um... Hm, I think that's a complex answer. I think it's a combination of really truly wanting to be there and also not knowing how else to be at that point, not knowing what could be next.

Q I'm just asking not to rationalize.

I'm just asking, you said at the time, in August 2013, that you chose to be here, meaning OneTaste, because you knew -- because -- sorry.

You chose to be here because your decisions were your own and no one else's. Those were your words, right?

A Again, I don't recall specifically saying that, but that seems like something I posted.

Q And you also chose to be at OneTaste because you wanted to know what true power felt like. That's another one of your reasons, right?

A Yeah.

Q And you also chose to be there because you wanted to be an adult, correct?

A Yes.

Q And you, in fact, admitted that you are responsible for what happens in your life, right?

A In this post?

Q You've said that, correct?

A I don't -- same thing. Like, I don't specifically recall saying that, but that seems like something I could say.

MS. COHEN: Okay. Well, we can bring this up. Defense Exhibit 21-AT.

And just zoom in so the witness can see it.

A I'm sorry, can you repeat the question?

Q Yeah. I was saying, you've said that -- sorry, I lost my place.

You said that you wanted to be responsible, I said, for what happens in your life.

A That's what it says here.

Q And you have no reason to -- these are your words, correct?

A Again, I don't really remember posting this, but I have no reason to believe that it was something else.

MS. COHEN: You can take that down.

Q And another reason you chose to be at OneTaste was because you wanted to conquer your stories, right?

A Sure, yes.

Q Your patterns, right?

A Yes.

Q And your -- what you call your virus, right?

A Yeah, I noticed that.

Q And that's because that was a common term that was used at OneTaste?

A It was term that was certainly used.

Q And you used that about your own issues that you had, correct?

A I did.

Q And, in fact, you posted often about how much OM changed your life, right?

A It did.
Q And in September of 2013, as we already established, you were in CP6, right?
A Right.
Q And we looked at some videos. Well, you looked at one of the videos today, from February of 2013. That was the beast exercise.
A Right.
Q And we looked at some videos yesterday of Nicole. And that was around August of 2013, right?
A Yeah, I think so.
Q And, again, the course continued until November of 2013, right?
A Right.
Q And you attended another lecture with Nicole in September of 2013, right?
A I don't know which lecture you're referring to.
Q Well, it was one in which you told Nicole, in front of the class, about how much OM had changed your life.
Do you recall that?
A Not specifically. I don't know which thing this was.
Q Are you saying you don't recall or you don't -- you didn't -- you didn't say that?
A I don't recall.
MS. COHEN: One moment, Your Honor.

(Pause in proceedings.)

MS. COHEN: Your Honor, at this time I'm not going to refresh the witness's recollection, given this was a video. But we may seek to do that with Ms. Bonjean's cross.

THE COURT: Okay.

Are you done with your cross?

MS. COHEN: No.

THE COURT: Okay. Continue then.

MS. COHEN: I would have done it, but I'm just saying --

THE COURT: Okay. Go ahead.

MS. COHEN: Thank you, Your Honor.

THE COURT: Sure.

Q Now, going back to sort of the time that you moved to San Francisco. Again, December -- we already established that's December 2013.

I'm going to show you another photo that --

MS. COHEN: I need to have the right-hand side fully redacted. You can show it to the witness, but before it's published.

Q -- identified as Defense Exhibit 21-B, as in boy, D as in dog.

Do you recognize this photo?

A Yes.

Q And what is it?

A It's of myself and Hamza Tayeb and Lea Mendelson. I believe it's at the winter retreat.
Q Where was the winter retreat?
A I think it was sort of north of San Francisco, if I'm remembering right.
Q And does it fairly and accurately depict a photo of you at the winter retreat?
A Yes.
MS. COHEN: Your Honor, at this -- again, subject to the -- I think we've already redacted it and we will get Your Honor a redacted copy -- we offer Defense Exhibit 21-B, as in boy, D as in dog.
MS. FARRELL: No objection.
THE COURT: Sorry, objection or no objection?
MS. FARRELL: No objection. I'm sorry.
THE COURT: 21-BD, which is just a photograph, as redacted, is admitted.
(Defense Exhibit 21-BD received in evidence.)
MS. COHEN: And can we just publish this for the jury?
(Exhibit published.)
Q Do you remember this photo, other than seeing it?
A I do, yeah. Yeah.
Q Do you remember what you were laughing about?
A No.

Q And this is Hamza, who we spoke about before, correct?
A Correct.
Q And do you remember who the other person is?
A Lea Mendelson.
Q Now, as an employee of OneTaste that's in sales, you had to meet certain sales numbers, right?
A Right.
Q And, in fact, if you didn't meet those numbers, you were put on probation, right?
A Yes.
Q And, in fact, I think it's already in evidence. I can show it to you if you need it. But in the employment agreement it sets forth the fact that you have to make these sales numbers, right?
A Right.
Q And it also sets forth the -- that you agree to go on probation if you're not performing at standards, right?
A Right.
Q And if you fail to meet those standards, you could be fired, right?
A Right.
Q And you were at -- you could be fired at any time. It says that in the employment agreement, correct?
A Yes. It was at will, yes.
Q At will, right.

And, in fact, at one point you were put on probation, correct?
A Yes.
Q And Robert Kandell put you on probation, right?
A That's right.
Q And that's because you weren't making the sales, right?
A That's right.
Q In fact, you testified on direct that you weren't very good at sales, right?
A That's right.
Q Sales, it's a hard job, right?
A Yeah. It wasn't for me.
Q Yes, it wasn't for you.
Some people are good at it and some people aren't, correct?
A Totally.
Q And it's a job that required you to really pound the pavement and push, right?
A That's right.
Q And that's in any sales job, correct?
A Correct.
Q And, in fact, you admitted even to OneTaste people, to Rob, that you were bad at sales, right?
A Yes.
Q And that you had tried for a year, but it didn't work out

for you?
A Yes. And I requested to be moved to other positions because of that.
Q And while you were working at OneTaste, you also were doing mushrooms at that time, right?
A Um, I wouldn't say I was doing them. There was one time that we did, yes.
Q And drugs weren't permitted at OneTaste, right?
A Not on premises.
Q In fact, doing mushrooms is typically cause for termination at many jobs, right?
A I mean, not if you're -- not if you're not in the -- not at your job. No, certainly not when you're working. But we were -- we were not in the job space.
Q But Rachel knew that you had done shrooms, right?
A Yes, she did.
Q In fact, you talked to her about it, right?
A Yeah.
Q And you weren't terminated because of that, right?
A No.
Q And Rachel, you said, was a tough boss, right?
A Yes.
Q She demanded improvement, correct?
A Right.
Q And, in fact, you know, we -- fair to say that, as you

said, you weren't meeting your numbers and she was a hard-charging boss who wanted you to meet your numbers, correct?
A Correct.
Q And she was pushing you to meet those numbers, right?
A Right.
Q And, of course, you could have gotten a different job, right?
A Outside of OneTaste?
Q Yes.
A Ostensively. It would have been a little hard, but sure, I could have.
Q You could have gone to work back for your father, right?
A Maybe.
Q You didn't ask to go back and work for your father, right?
A No.
Q You didn't like that job, correct?
A Right.
Q You could have become a yoga teacher again, right?
A That's what I did after, yes.
Q Yeah, I was just going to say you did that afterwards?
A That's right.
Q And when you had complaints, you made them, right?
A Yes.

Q And when you wanted to go from part time to full time, they let you, correct?

Or I should -- I think you changed your employment to a full-time salary employment at one point? I mean in October of 2013.

A That totally sounds right, yeah.

Q And ultimately, as we already established, you were terminated in February of 2013, right?

A I requested to be terminated.

Q But you were terminated?

A That's right.

Q You were provided a separation agreement, correct?

A I was.

Q And you received a severance check, correct?

A I did. That's why I asked for it.

Q And, in fact, when you were fired, they also did an exit interview, correct?

A Yes.

Q And that was done with Rob Kandell?

A I believe so.

Q And you testified yesterday about Nicole Daedone's birthday and some money that was collected.

Do you remember that?

A Yes.

Q And, in fact, birthdays were a big deal at OneTaste,

right?
A To some extent, yeah.
Q And they will celebrate, lots of people bringing cakes or things like that for people's birthdays, right?
A Sure.
Q People posted those pictures, right?
A Sure.
Q And after you left OneTaste, you weren't prohibited from speaking with anyone, right?
A I was not technically prohibited in some formal way, no.
Q In fact, you still kept in touch with people from OneTaste, didn't you?
A A little bit in the beginning, yeah.
Q And you saw OneTaste people, correct?
A There was a small handful of times where I saw a few individuals.
Q And one of those individuals was Ruwan, right?
A That's right.
Q And, in fact, you continued to post after you left OneTaste, right?
A Just generally online?
Q Yes.
A Yeah.
Q And, in fact, OneTaste people commented on your posts, right?

A Sure.
Q And they were positive posts, right?
A I don't know specifically which posts. But I'm sure there were positive posts, yes.
Q And people from OneTaste were still following you, correct?
A That's right.
Q And they were still happy for you, right?
A That's right.
Q In fact, there was a picture you posted of you and your mother on Mother's Day.
Do you remember that?
A I don't, but that sounds nice.
Q I can show it to you. But my point is, people commented on that post.
Do you remember that?
A I don't specifically, no.
MS. COHEN: Okay. Well, let me just refresh...
21-CW, just for the witness.
And you can leave in all the comments. This is just for the witness.
Q And just take a look at that, Ms. Halpern, and let me know when you've had a chance to read it and if it refreshes your recollection.
A Yes. I believe that's maybe an Instagram post of mine.

MS. COHEN: You can take that down.

Q Does that refresh your recollection whether people from OneTaste were commenting on your post?

A I can see two names of OneTaste people.

Q And Eli Block commented on your post, right?

A Yes.

Q Yia Vang commented on your post, right?

A That's right.

Q And there were others. We can't see who they were, right?

A Yeah, I don't --

Q We don't know if they're OneTaste or not, but other people did comment on your post?

A Right.

Q And you also texted with Rob Kandell after you left, correct?

A I don't know when you're referring to, but I remember speaking with him after he had already left as well.

Q It was maybe your birthday.

Do you recall receiving a text message ever from him on your birthday?

A Not specifically. But that sounds like something that -- you know, happy birthday.

MS. COHEN: Well, I believe this is already -- is Government Exhibit 3501-16 in evidence?

MS. FARRELL: No.

MS. COHEN: No. Okay.

If we could just show that just to -- yes, just to the witness.

Yes, sorry. 3501-16, just to the witness.

THE COURT: I don't think I have it.

MS. COHEN: Oh, you don't have it?

Okay. Oh.

THE COURT: But you could just put it up for me, too.

MS. COHEN: Yeah. Yeah.

Q I'm just drawing your attention to the bottom half, Ms. Halpern.

THE COURT: Sorry, am I supposed to be looking at an Excel spreadsheet?

MS. COHEN: Yes, Your Honor.

THE COURT: Okay.

MS. COHEN: And again, this is Government Exhibit 3501-16, but it's not in evidence and we're not seeking to admit it.

A Sorry, what was the question?

Q Does that refresh your recollection as to whether Mr. Kandell and you texted after you left OneTaste?

A Yes.

MS. COHEN: You can take that down.

Almost done. Can I have just a few more -- one minute, Your Honor?

THE COURT: Yes. Sure.

(Pause in proceedings.)

MS. COHEN: Your Honor, I wanted to -- actually, if I could have a moment with the Government.

THE COURT: Sure.

(Pause in proceedings.)

MS. COHEN: Your Honor, I wanted to show a -- just a still, just to the witness, of DX-21B, as in boy, R as in Ralph.

THE COURT: And you've shown it to the Government?

MS. COHEN: Yes.

Sorry, 21B, as in boy, R as in Ralph.

THE COURT: And I wouldn't have that because it's coming from a video.

MS. COHEN: Just a still though.

THE COURT: Right, but I don't have it.

MS. COHEN: Oh, you don't have it.

THE COURT: Yes. Just put it on the screen. That's fine.

MS. COHEN: Yeah.

Oh, sorry.

THE COURT: That's not a still. That's moving.

MS. COHEN: Yeah. This is -- okay.

Sorry, can you show a still again?

Actually, I could -- if there's no sound, I think we can show it to the witness.

THE COURT: What are you ultimately going to do, just have her look at it to refresh her memory or you're going to try to put it in?

MS. COHEN: I want to put it in.

THE COURT: So is there an agreement about what is going to be shown?

MS. FARRELL: There is not. No.

THE COURT: No.

MS. COHEN: But I would like to establish it and have the witness lay a foundation.

THE COURT: Go ahead. Go ahead.

MS. COHEN: So we'll just do it without the sound, if that's okay, just for the witness?

THE COURT: Yes.

MS. COHEN: Okay. No sound.

BY MS. COHEN:

Q Do you recognize this video?

A Yes.

Q And do you recognize yourself in it?

A Yes.

Q And do you recognize the other people in it?

A Yes. I can't see everybody, but yes.

Q And who are those people?
A The people that I'm looking at right now are Casey Tip (ph.) And Lea Mendelson.
Q And are those OneTaste individuals?
A Yes.
Q And were they living in San Francisco?
A That's right.
Q And was this video taken when you were in -- or when was this video taken, approximately? Or if you recall.
A I don't recall, but I can see the date on the --
Q And does that fairly and accurately depict the video -- do you remember -- I'm sorry. Let me rephrase.
Is that the video that you remember being in?
A It seems like the right time frame, yes.
Q And, in fact, you're also filming at the same -- is that a video that you see yourself --
A I can't tell what's in my hand. But I assume it's a phone, probably.
Q And this is -- does it refresh your recollection as to when this was taken?
A If I were just looking at the video, I would have no idea. But again, that seems like the right time frame.
Q But you would know that it was after you moved to San Francisco, right?
A Yes, that's right.

MS. COHEN: Your Honor, given the time frame of this video, we offer this into evidence.

MS. FARRELL: We object.

THE COURT: Basis?

MS. FARRELL: Relevance primarily and hearsay.

MS. COHEN: Your Honor, I believe there's no words other than music.

THE COURT: What is the relevance?

You're going to proffer the relevance?

MS. COHEN: Do you want me to --

THE COURT: Well, has she established the time frame?

MS. COHEN: Yes.

THE COURT: She said it sounds about right.

MS. COHEN: Yeah. Well, she also established that even if she didn't remember, it was in San Francisco.

THE COURT: Okay.

MS. COHEN: Which was after December 2013 and before she left in --

THE COURT: Okay. So what exactly are you offering though? Because what you've got up here is a video, you played some of it.

Did you play the whole thing? Just without sound?

MS. COHEN: We can -- I think so.

Did you go to the end?

THE COURT: How long is the video?

MS. COHEN: It's very quick. It's 30 seconds or something like that. I think we watched the entire thing.

THE COURT: Okay. So you're offering the video without sound?

MS. COHEN: No. I'd like to offer with sound to show this witness's state of mind at the time.

THE COURT: I don't know what is on there, so I'm not going to allow it at this time.

MS. COHEN: Your Honor, it's just music. There's no one speaking on it.

THE COURT: Has the Government had an opportunity to look at this and listen to it?

MS. FARRELL: We have, Your Honor.

THE COURT: Okay. Do you maintain --

MS. FARRELL: And we object.

THE COURT: And that's on relevance grounds?

MS. FARRELL: Correct.

MS. COHEN: Your Honor, I think we've established the relevancy, given the time period.

THE COURT: All right. I'm going to overrule the objection.

But you're representing that there's only music, no --

MS. COHEN: Only music, Your Honor.

The Government has seen it.

THE COURT: Okay. And there's some text on the side.

MS. COHEN: Yes. We're going to redact that.

THE COURT: Okay. So what you're offering as Defense Exhibit 21-BR is a short video with no sound, no words, correct? No text, rather, correct?

MS. COHEN: Yes. I think the bottom of it, sorry, I think we have to -- there's a name at the bottom, too.

THE COURT: I'm sorry, you're offering with the sound. I'm sorry. With the sound --

MS. COHEN: With the sound, Your Honor, which is --

THE COURT: -- which you represent is only music.

MS. COHEN: Correct, Your Honor.

THE COURT: And there's no text. You're redacting the text.

MS. COHEN: There's no text.

MS. FARRELL: Your Honor, we viewed this during lunch and I believe there is speaking in --

THE COURT: Okay, then I'm not going to allow it at this time. We can table this until tomorrow so I can look at it again. I did take a quick look over the lunch break at whatever you gave me. But if there is any speaking on this, I am not allowing it at this time.

MS. COHEN: Okay. Your Honor, I -- it's singing.

I -- yes, but --

THE COURT: But by the participants, right?

MS. COHEN: Yes.

THE COURT: I'm making a distinction between the radio, or whatever people listen to nowadays, being on and the people in this picture speaking or singing.

MS. COHEN: Yes.

Okay. So we reserve to admit this at a future time.

THE COURT: Okay.

I mean, I will allow you, if you want, to admit it with no sound at this point, but I'm not sure that's what you want to do.

MS. COHEN: No. But I'll ask the witness a few questions about it and then we can come back to it.

THE COURT: That's fine.

BY MS. COHEN:

Q Ms. Halpern, do you remember where you were going at this time?

A No, I'm not sure.

Q Now, I think we touched on this before. You met with the FBI and the Government many times in this case before the testimony here today, right?

A That's right.

Q And most of those meetings, before -- I'd say the chunk of them, I think before the trial started gearing up, there

were about maybe 11 or 12 and the majority of them were with an FBI agent named McGinnis; is that right?
A I don't know how many meetings there were off the top of my head. But yes, I met with Agent McGinnis.
Q And you met with Agent McGinnis and others over and over again, correct?
A Yeah. I met with them several times.
Q And you met with them more than -- you met with them over ten times, right?
A Again, I have no idea how many meetings there were. That sounds like the right ballpark.
Q Okay. I could show you to refresh your recollection.
And I think we already established that your first meeting was in January -- in 2018?
A That's right.
Q Right?
A Yes.
Q And so over a period of six years you continued to meet with the Government, right?
A Right.
Q And, in fact, you met with the Government and you learned that other people met with the Government as well, correct?
A Yeah. I mean, they were not allowed to share with me who or any details, but I assumed so.
Q You knew other people that you may or may not have known

had met with the Government, right?
A Obviously, yeah.
Q But you became aware of that over the years, correct?
A Yeah, of course.
Q And, in fact, you met with the Government to prepare for your testimony yesterday, right?
A Sure, yes.
Q And while you were on direct, you continued to meet with them, correct?
A Like, on direct in this trial?
Q Yes.
You met with them on breaks yesterday?
A To discuss logistics, like the hotel and things like that. We didn't discuss the case.
MS. COHEN: Just one moment, Your Honor. I'm about done.
(Pause in proceedings.)
Q Oh, one other question.
You testified on direct about another OM house, as you called it, in Brooklyn, I believe?
A Yes.
Q And in addition to The Morellino and the Brooklyn OM, there were other OM houses, as they were called, correct?
A Yes.
Q And you also testified that the Brooklyn OM house had --

you weren't should if it had staff there, right?
A It was like -- it was starting to open up while I was there.
Q But those OM houses aren't necessarily a OneTaste property, correct?
A Yeah, that's complicated because there was a time when the sort of business model shifted a little bit and there started to be these affiliate houses.
Q And by "affiliate houses," putting aside the business -- affiliate houses mean people who practice OM get together and live in an OM house, correct?
A That's my understanding.
Q And they model their ways around the OneTaste ideas and way of living, correct?
A That's right.

(Pause in proceedings.)

THE COURT: Do you have more questions, Ms. Cohen?

MS. COHEN: I think not, Your Honor. I just -- I'm sorry, I just want to make sure before I end for the day.

And, actually, if my...

(Pause in proceedings.)

MS. COHEN: One moment, Your Honor.

(Pause in proceedings.)

MS. COHEN: Your Honor, I think I only have a couple of questions, but at this late hour, if we can just finish the

few other questions in the morning?

THE COURT: No. No, let's finish them now.

MS. COHEN: Okay.

You can't find it?

THE COURT: If you don't have your materials, that's a different issue. But I would like to continue a couple of minutes.

MS. COHEN: While I'm waiting, just there were a few issues that we would also -- I mean, we left open. If we could --

THE COURT: Do you have any more questions now or no?

MS. COHEN: Well, I would if we could address some of the issues. That's why I'm --

THE COURT: Okay, but do you have any other questions you can ask right now?

MS. COHEN: I do if I could get the materials. I'm sorry.

THE COURT: Are they in the courtroom, you think?

MS. COHEN: They should be.

THE COURT: Okay. Well, I will give you another minute. Let's try to find those materials.

(Pause in proceedings.)

THE COURT: Okay, you know what, I'm not going to keep the jury waiting while we look for materials. I don't

think it's necessary to do that at 5:28 p.m. So, we will break with the jury for the evening.

Let me just -- I think we can ask the witness first to step down, if somebody could take care of that.

And then I'll talk to the jury for a minute.

(Witness steps down.)

THE COURT: Okay. Thank you, all. I'd like to tell everyone again who is paying very close attention, it is much appreciated.

Let me just remind you of some of the things I said yesterday. You will hear me say these things over and over again.

But over the recess, just go enjoy, relax, have a good evening.

Don't talk about the case with anyone.

Don't let anyone talk about the case to you.

Don't talk amongst yourselves about the case.

If anyone tries to approach you to discuss the case, let me know through my deputy.

Don't read, listen to, watch any news or other media reports of the trial.

Don't conduct any independent research about the case, the matters in the case, the individuals in the case.

Don't talk to any of the parties, the witnesses, the attorneys.

And please just keep an open mind.

And again, I appreciate everyone's attentiveness.

If we could make sure that everybody is in by 9:15 tomorrow. I know how hard it is to travel around to get here and some of you come from farther than others. But please do everything you can because if anybody comes late, then everybody is kept waiting, your fellow jurors and also everybody here. So, please do whatever you can to be here by 9:15 so that we can start at 9:30.

Again, I appreciate everybody's attentiveness and have a good evening.

(Jury exits.)

THE COURT: Okay. Everyone may be seated.

Okay. Ms. Cohen.

MS. COHEN: Yes.

Your Honor, I --

THE COURT: I have no issue with the content, but your pacing has got to pick up.

MS. COHEN: Yes.

THE COURT: You're spending a lot of time in between questions, shuffling materials. We've got to keep this moving.

MS. COHEN: Yeah.

THE COURT: It is not the content of the questions. It is how long you are pausing and it just has to speed up.

MS. COHEN: Yes.

And I completely understand, Your Honor. I was going to start with -- obviously, this was our first witness.

THE COURT: Right.

MS. COHEN: We had some kinks and we're --

THE COURT: I understand.

MS. COHEN: We will have this figured out by our next witness.

So, I appreciate everyone's patience and thank you.

THE COURT: Okay.

I don't know if there's anything we need to take up right now on the issue that we had discussed earlier.

If the parties want to be heard more on the 412 issue, you could put in the joint submission by the deadline that I had given. And that, I don't know whether you can come to some agreement with each other on how you're going to proceed on that. But to the extent that there is information that may or may not implicate 412, I would like to hear the parties' positions on whether they think it does implicate 412. If it implicates 412, whether the Defense is seeking to be excused for their delay and their failure to comply with the deadline. And, most importantly, I want to know exactly what it is that is contemplated to be elicited. But I don't think it's worth anyone's time right now to do that. I think the parties should talk to each other and the parties should

also look back at the discussions that we have had on the record about this in the past.

Anything else we need to take up today? If not, I will see everyone back here at 9:15.

MS. BENSING: Your Honor, I just --

THE COURT: I'm sorry, did you want to do this on the record? You're handing up something.

MS. BENSING: Well, just for the record, we're handing up the text messages that I think is relevant to the privilege issue that the Court is considering.

THE COURT: Okay. Thank you.

And that's something that --

MS. BENSING: The Defense has.

THE COURT: -- everybody has?

Okay. All right. Thank you. I appreciate you pulling that together.

Have a good evening, everybody. I will see everyone at everyone at nine -- be here at 9:15.

And the jury, with any luck, everybody -- they're doing pretty well, but there were some stragglers. So hopefully they'll be here on time so we could get started on time.

And I don't think we're going to get probably past the witnesses you've already disclosed, Government, tomorrow. But if you think there's a possibility, you need to tell the

Defense who the next witness is.

MS. BENSING: No, Your Honor. I will say we're moving at a slower pace, unfortunately, than we anticipated.

THE COURT: Yes, I think we need to all speed it up. And I don't, again, mean the content. I just mean the pace.

MS. COHEN: We will, Your Honor.

THE COURT: Okay.

And, you know, there was a little bit of delay, we dealt with some issues. But again, I think we need to move this along. I think it's a lot to ask a jury to sit for as long as they're sitting. It's also a lot to ask them to have downtime while we take care of things that perhaps could be taken care of on our time and not theirs.

All right. Everybody have a good evening. See you tomorrow.

(Matter adjourned to Friday, May 9, 2025 at 9:15 a.m.)

# INDEX


| WITNESS | PAGE |
|---|---|
| REBECCA HALPERN (resumed) | 355 |
| DIRECT EXAMINATION BY MS. FARRELL (resumed) | 355 |
| CROSS-EXAMINATION BY MS. COHEN | 425 |
| VOIR DIRE EXAMINATION BY MS. FARRELL | 557 |
| CROSS-EXAMINATION BY MS. COHEN | 558 |

| EXHIBIT | RECEIVED |
|---|---|
| Government Exhibit 3501-37 | 356 |
| Government Exhibit 4788 | 375 |
| Government Exhibit 3501-20 | 382 |
| Defense Exhibit 21-L | 439 |
| Defense Exhibit 21-J | 442 |
| Defense Exhibit 21-BG | 556 |
| Defense Exhibit 21-AN | 559 |

| | |
|---|---|
| Defense Exhibit 21-AM | 560 |
| Defense Exhibit 21-AQ | 562 |
| Defense Exhibit 21-AP | 564 |
| Defense Exhibit 21-AL | 567 |
| Defense Exhibit 21-AO-1 | 570 |
| Defense Exhibit 21-BN | 582 |
| Defense Exhibit 13-AP | 583 |
| Defense Exhibit 21-BD | 594 |