UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 12, 2025

Defendant. : 9:30 a.m.

\- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Annette M. Montalvo
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(Proceedings commenced at 9:12 a.m., in open court, outside the presence of the jury, to wit:)

THE COURTROOM DEPUTY: Your Honor, *United States of America against Rachel Cherwitz and Nicole Daedone*.

Is the government ready?

MS. FARRELL: Yes.

MS. BENSING: Kayla Bensing, Nina Gupta, Sean Fern, Liam McNett, Marlane Bosler, for the government, joined by FBI agent Christine Meyer.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin. And, actually, a new associate helping us in the back, also, named Kelly.

THE COURT: Is she an attorney?

MS. COHEN: Yes, she is.

THE COURT: Give the full name to me, please.

MS. LENAHAN-PFAHLERT: Kelly Lenahan-Pfahlert.

THE COURT: Thank you.

MS. COHEN: We are joined here, with our client, Rachel Cherwitz.

THE COURT: Yes. Good morning.

MS. COHEN: Good morning, Your Honor.

MS. BONJEAN: Jennifer Bonjean, B-o-n-j-e-a-n, on behalf of Nicole Daedone. Kelsey Killion is grabbing some

things. She's here as well as Galila Moazed (sic.).

THE COURT: Good morning, all.

Everyone may be seated.

We have several issues to take up this morning.

I want to start with the topic I addressed last week, and I'll repeat this again because I think people are slow to trickle in today, but we usually have a large crowd.

Everyone in the public section of the courtroom should understand that no one is required to speak with anyone in the gallery that they do not wish to speak with.

The public is welcome in this courtroom, courthouse staff is welcome in this courtroom, and no one should be the recipient of any unwanted interaction in this courtroom. No one has to provide any information about themselves to any member of the public.

Efforts to intimidate and/or to deter the presence of any member of the public or courthouse staff will not be tolerated.

Turning to the next issue.

At the proceeding on April 29, 2025, the Court addressed local criminal rule 23.1. The government had raised the issue in writing prior to that proceeding. Ms. Bonjean was not present at that proceeding, but Ms. Killion was.

It has come to my attention that there are statements that have been publicly attributed to Ms. Bonjean

and are reported to have been made during trial. That if indeed made by Ms. Bonjean during trial, appear to violate Rule 23.1.

I will not be holding an evidentiary hearing or considering sanctions at this time, but all attorneys are reminded that they must comply with local criminal rule 23.1. This is something the Court takes very seriously.

Turning to the next issue --

MS. BONJEAN: Can we --

THE COURT: -- the government filed a letter last night --

MS. BONJEAN: Your Honor? Your Honor?

THE COURT: -- ECF -- I will hear you out later on, Ms. Bonjean.

MS. BONJEAN: I would like to know what the statements are.

THE COURT: Excuse me. I will hear you out later on. Please don't speak over the Court. You have a tendency to do that --

MS. BONJEAN: You have a tendency not to let anyone make a record.

THE COURT: Ms. Bonjean, please be quiet.

Turning to the next issue.

The government filed a letter last night, ECF No. 369, providing additional information regarding the custodian

of records that OneTaste has offered up to testify about the texts produced by -- to the government by OneTaste.

Does the government seek permission to ask Mr. Williams leading questions if he is called to the stand?

MS. FARRELL: Yes, Your Honor.

Our preference would not be to call him at all, given what happened two Fridays ago. But, yes, we would want to lead him, if he were to call -- be called to the stand.

THE COURT: Okay. Mr. Williams is an attorney, and the government has indicated that he is barred, b-a-r-r-e-d, for the court reporter -- in the state of California. He should know the proper manner in which to answer questions, and he should know that a witness stand is not a soapbox.

Turning to the next issue.

The government filed a motion in limine last night to curtail certain cross-examination and/or to put time limits on cross-examination. The motion is at ECF No. 370.

The government makes persuasive arguments. The cross-examinations last week were not efficient. The Court will expect the parties to efficiently present their direct and crosses.

Turning to the next issue.

Defendants filed a motion for a hearing today. That motion is at ECF No. 371. Of course, we're here today. We'll talk about the some of the issues in that filing. Defendants

also filed a motion with respect to Rule 412, and that is at ECF No. 372. We can address that to the extent it relates to the witness that I believe is going to be coming after the current witness.

There are a couple housekeeping matters. I think the defense was going to provide a time stamp on defense Exhibit 21-DG. That can be done when we are on the record.

There was a request for electronic devices in the courtroom, and that is ECF No. 368.

I will say it again, any request for relief must be filed as a motion on ECF. We discussed this recently, Ms. Cohen.

MS. COHEN: Yes, Your Honor.

THE COURT: ECF No. 368 was not filed as a motion nor was the printer request at ECF No. 367, which I granted, in any event.

Second, if additional attorneys want to bring electronic devices into the courtroom, they must file notices of appearance and sit at counsel table. If any paralegal or other support staff wants to bring electronic devices, they must sit at counsel table, and they can only have access to their devices on days when they are sitting at counsel table.

So the request at No. 368 is denied without prejudice to renew.

Let's take up the issues in the evidentiary issues

that relate to the current witness.

Who wants to be heard on this? Because if it's not relating to the current witness, we've got our entire jury here and we'll continue.

MS. BONJEAN: Mr. Hubbard, are we speaking about?

THE COURT: Yes. Yes.

MS. BONJEAN: Well, there is a video that we want to confront him with that is his own words from the relevant time period that reflect his state of mind at the time. And the government has repeatedly put on witnesses who are musing about their retrospective memories 20 years ago about their time at OneTaste, in sweeping terms. And the jury should hear what these people were saying at the time. That is fair. It goes to credibility, it goes to bias, it goes to interest. It is not hearsay, but it goes to what these people were saying in the moment.

Because we can all look back at this situation and have all types of opinions, which the government is also doing through its witnesses, is putting on essentially expert testimony through lay people about what OneTaste what was about, having them speculate about the intent of OneTaste, all with this sort of hindsight.

But when the defense wants to actually demonstrate and show what these people were saying at the time in the moment to show whether or not their testimony is to be

believed, we have been prohibited from doing so.
THE COURT: What's the video exactly, and do I have it?
MS. BONJEAN: Yes. You have it. The government got it.
THE COURT: When did it -- when was it produced to me?
THE COURTROOM DEPUTY: This morning.
THE COURT: This morning.
MS. BONJEAN: Yes.
THE COURT: Okay. So I haven't had a chance to look at it. How long is it?
MS. BONJEAN: One minute.
THE COURT: Okay. And is that something that is going to be teed up here, or I can do --
MS. BONJEAN: Yes.
THE COURT: We can do it at the next break, I can look at it, because I haven't seen it yet.
MS. BONJEAN: Yes. It's a video, again, that only came to light and seemed to be relevant once he testified.
THE COURT: What's the -- just tell me the date and roughly the content.
MS. BONJEAN: It's in 20 -- my understanding is, it's in around 2006, during the Warehouse days. He gets up in sort of a speech. He talks about his work there, he talks

about, you know, some of -- you heard his testimony where he said, you know, he never really had fun, he never really was engaged in this. He talks about how he did it for women's empowerment, blah, blah. And yet he's up here talking about wanting to build, you know, a room of cock. He talks about some BDSM that is frankly a little troubling. He is a different man than what we heard hear today, and the jury should be permitted to listen to that, to decide whether what he's saying today is credible.

THE COURT: Okay. So you're offering it for impeachment purposes.

MS. BONJEAN: I'm offering it for impeachment, and not specific to a prior inconsistent -- a statement, a prior inconsistent statement, but for impeachment as to his credibility here today about his testimony about what was going on at OneTaste in 2006, and his own -- again, bias, motive. He's here, 20 years later, saying some things that are not consistent with how he was viewing OneTaste at the time.

THE COURT: Okay. I can take a look at that.

MR. ROBOTTI: Your Honor?

THE COURT: Yes. Go ahead, Mr. Robotti.

MR. ROBOTTI: Just to follow up on that --

THE COURT: Yes.

MR. ROBOTTI: I join and agree with Ms. Bonjean's

arguments.

There was the other video that we also used to refresh Mr. Hubbard's recollection on Friday. That's a 2007 video where he, at length, describes why he is staying at OneTaste, why he is choosing to be there, that it's made a huge impact on his life, that his life was terrible beforehand. He's laughing, he's having fun, he's talking about his future goals. These are all things that undermine the government's testimony that it elicited on direct, saying that the culture of OneTaste was something that was forcing people to do things that it did not want to do.

THE COURT: But you crossed him on this, and you are now seeking to put in intrinsic evidence of that; is that right? Is that what you're trying to do?

MR. ROBOTTI: Yes, Your Honor. I think --

THE COURT: Okay. All right. I just wanted to understand what your position is on that.

MR. ROBOTTI: Just on that point, Your Honor, I think it is entirely different for the jury to hear his own statements that he makes at the time.

THE COURT: No, I understand.

MR. ROBOTTI: Versus a hostile witness who, you know, statement one by one by one is acknowledging begrudgingly that he said these things in 2007. It has an entirely different effect.

THE COURT: Well, "begrudgingly" is your characterization. When you do your arguments to the jury, you can do that.

MR. ROBOTTI: Of course, but I think the case on point here is the Supreme Court case in *Old Chief*, which talks about the fact that it is not about, you know, just eliciting a naked admission from a witness, where they acknowledge something that happens. It's about being able to show the jury the whole picture of what's going on here. And that is key to the defense. That is what we are doing here, is painting a picture of the fact that people wanted to be there, that they chose to be there. And we can't do that --

THE COURT: Well, but I know you were --

MR. ROBOTTI: -- with a simple admission.

THE COURT: I know you weren't in the case at the time, but there was significant pretrial litigation about sort of the scope of what the defense could do in terms of the, you know, reasonable person topic. And if that rings a bell to you, I know you weren't here.

So, you know, he is not being -- testifying as a government's victim witness. He is testifying as just a, you know, person who was involved and provides testimony about things that happened there.

So, you know, I also have to be considering 403 concerns here, but I'm hearing you now and what you're telling

me. I am going to hear from the government. Go ahead. Did you want --

MR. ROBOTTI: One follow-up point.

THE COURT: Sure. Go ahead.

MR. ROBOTTI: I do think for this particular witness that it really does go to impeachment. I do think this rebuts and contradicts the testimony that he had on direct examination about the fact that he thought the culture of OneTaste was manipulative and used to control people and that he complained about it all the time.

So for this particular --

THE COURT: Let me -- if you could --

MR. ROBOTTI: Sure.

THE COURT: -- because we have to talk about specifics, right? Pull out the testimony that you think it's impeaching of, and then we can have a more specific conversation.

I'll let you do that right now, and let me talk to the government now and hear you on this issue.

MS. FARRELL: So, Your Honor, we do not disagree that they should be able to impeach witnesses with their prior inconsistent statements. Our issue, which we briefed at Docket No. 370, is really the manner by which they are attempting to do so. And I'll just give -- I will give an example.

We cite a number of examples in our letter, but there are many times where the witness was asked a question like, you had fun at OneTaste, didn't you? And he would answer yes.

THE COURT: Right. So there's nothing to impeach in terms of showing a moment where he was having fun, right? Is that your argument?

MS. FARRELL: Exactly.

THE COURT: Okay. I understood the parties' arguments on Friday, I understand them now.

Go ahead, Ms. Farrell.

MS. FARRELL: And just with respect to *Old Chief*, so the relevant rule is -- for impeachment with a prior inconsistent statement is Rule 613 and 613(b), which postdates -- the current formulation postdates *Old Chief*, requires that the party who's cross-examining give the witness an opportunity to explain or deny the statement. And so --

THE COURT: Right.

MS. FARRELL: -- as long as -- if they agree, if they are refreshed on their statement, and then they agree they made it, you don't get to offer extrinsic evidence like a video of what they said.

THE COURT: Let me go back to just something I said to Mr. Robotti I think on Friday evening, as we were wrapping up. And this is no fault of Mr. Robotti. You and your firm

came into this case late. You know, the cross-examination I think could have gone more smoothly in terms of being more organized. You've had the weekend now. I expect that things will be done differently. Mr. Robotti knows the rules of evidence. I have no doubt that he understands Rule 613.

MR. ROBOTTI: Your Honor, and I do want to raise the point that we raised in our filing yesterday. This isn't --

THE COURT: Wait, wait. Tell me what filing because you filed lots of things yesterday.

MR. ROBOTTI: Yes. This is Docket No. 373, where we talk about the rule of impeachment by contradiction.

THE COURT: Right. Your mistrial motion that was denied this morning? Is that the filing?

MR. ROBOTTI: That's correct, Your Honor.

THE COURT: Okay.

MR. ROBOTTI: But we do, I think, discuss at length some of the evidentiary issues that are being raised here. And this isn't just about the rule in 613 of prior inconsistent statements. This is about impeachment by contradiction, which is when a witness puts facts at issue in their direct testimony, the defense has the right to introduce evidence that directly contradicts that.

And, here, we had incredibly broad testimony about the culture of OneTaste that was raised. And it is not enough for it to simply him to say, acknowledge, oh, I had fun

sometimes. We're entitled to put in evidence at the time, contemporaneous statements that undercuts that, that shows the jury that what he is saying is not, in fact, true. And that's what we are trying to do here. And so it is not within the rubric of prior inconsistent statements. This is under --

THE COURT: But it is the rubric of impeachment, right?

MR. ROBOTTI: It is impeachment, Your Honor, yes. But it is broader than --

THE COURT: No, I understand your argument.

MR. ROBOTTI: -- 613.

THE COURT: Let Mr. Robotti finish, please.

MR. ROBOTTI: And we are pulling the transcript cites, Your Honor.

THE COURT: Okay. I'll go back to the government then.

MS. BENSING: I just wanted to alert the Court. For the transcript cite with respect to this witness already testifying that he sometimes had fun at OneTaste, it's transcript page 890, Your Honor.

And with respect to the video that Ms. Bonjean provided to the government yesterday, again, I also think that Rule 611 is relevant here. I do not see how -- the Court will listen to the video. I do not see how it even is remotely relevant to the proceedings at hand, and it seemed to just be

intended to create undue embarrassment for this witness.

So I am just making my record as to --

THE COURT: So you're making a -- sorry. I didn't mean to cut you off. Go ahead.

MS. BENSING: No, no. Then that's it, Your Honor.

THE COURT: Okay. So you're making a Rule 613, 611, and it sounds like maybe a 403 argument.

MS. BENSING: Correct. Exactly, Your Honor.

THE COURT: I understand your argument.

Ms. Bonjean, you wanted to be heard.

MS. BONJEAN: Yes.

This man got up here and testified about his mission at OneTaste being about women's empowerment.

THE COURT: Right.

MS. BONJEAN: He testified about that.

THE COURT: Right.

MS. BONJEAN: He testified -- and he's stated this multiple times, that his real reason for being there was so --

THE COURT: I understand. I was here.

MS. BONJEAN: -- women could have liberation, and, you know, the daughters of his daughters will, too, okay.

That's nonsense. It's not true. And his statements reflect it. And his --

THE COURT: Okay. So let me watch the video then, Ms. Bonjean, because --

MS. BONJEAN: I think we would all agree, and if we can't agree on that, then we're probably not going to agree on much moving forward, but his statements --

THE COURT: Okay. But I don't know what they are yet. I will listen to it.

How much more time do you have -- I mean, it wasn't given to me until this morning.

MS. BONJEAN: I understand.

THE COURT: So, I mean, I trust you, I don't think you are misstating what's on the video, but I need to watch it.

Mr. Robotti, was there something more you wanted to say?

MR. ROBOTTI: Yes.

THE COURT: Sure.

MR. ROBOTTI: A couple things.

In terms of the transcript cites, we cite the relevant portions of the transcript at Docket No. 370, at page 3. This is our response to the government's motion to limit cross-examination. The relevant portions are transcript 830, transcript 842 and 844, which are excerpts where Mr. Hubbard testifies about the control that is exercised through the culture of OneTaste, which is a broad, a hugely broad statement, that we're entitled to put in evidence that from the time of contemporaneous statements, it shows that he did

not hold those views about the culture at the time.

And then just in terms of the cross-examination going forward, Your Honor, I agree things could have gone more efficiently --

THE COURT: It's fine. Again, I'm not criticizing you. You are starting a large trial, you came into this case late. You're also coordinating with cocounsel. There's going to be some lack of, sort of, elegance. But --

MR. ROBOTTI: I understand.

THE COURT: -- move along.

MR. ROBOTTI: Part of the issue is, right, we are having this process, where in order to get into evidence what we think is critical for our defense, these contemporaneous statements, we are doing this process where we have to play a video and ask about each individual statement one by one.

I would prefer not to have the jury sit there and watch and listen.

THE COURT: You could just question the witness. I mean, that's typically the way that it's done, and then if there's something you think is inconsistent, you impeach like every other lawyer impeaches.

So I disagree with there being anything wrong with the process here. I don't always agree with what you think is relevant or impeaching. So that, really, may be what your main, you know, main issue is with here.

But let's take it -- we can talk about this for another ten minutes. But the jury is waiting. Let's kind of go from there.

How much longer on cross with this witness for you, Mr. Robotti?

MR. ROBOTTI: I think maybe 15, 20 minutes, tops.

THE COURT: Okay. Ms. Bonjean?

MS. BONJEAN: It is hard to predict with him, but I don't expect it to be longer than 30, 40 minutes, my cross.

THE COURT: And --

MS. BONJEAN: If that.

THE COURT: Okay. Where in the order of your cross are you planning to get into this video? I do need to watch it. I'm not going to keep the jury waiting.

MS. BONJEAN: I understand.

THE COURT: We can take our first morning break and do it then.

MS. BONJEAN: I think that will work out fine.

THE COURT: All right.

MS. BONJEAN: Just one other thing I wanted to flag.

THE COURT: Yes. Go ahead.

MS. BONJEAN: I don't think -- I think the government, we've discussed this. I think we have some agreement here.

The Court may recall that there was this isolated

e-mail that was introduced into evidence --

THE COURT: By this --

MS. BONJEAN: -- by the government.

THE COURT: While this witness was on?

MS. BONJEAN: Correct.

THE COURT: Yes. It is the one with the alter ego; is that correct?

MS. BENSING: Correct.

THE COURT: Okay.

MS. BONJEAN: Yeah. The false persona game.

THE COURT: Yes.

MS. BONJEAN: So I provided to the government over the weekend, and to the Court -- or did I?

THE COURT: I don't think I have gotten any -- I didn't get the video until the -- I don't even still have it. My deputy has it.

MS. BONJEAN: The video is this morning. I have -- I will provide -- it is for -- it is basically just to refresh, but I will provide it to the Court. It is some additional e-mails from that exchange, essentially, or like in the context of that --

THE COURT: Yes.

MS. BONJEAN: -- that --

THE COURT: Between the witness and Ms. Daedone or something else?

MS. BONJEAN: Between the witness and Mr. Reese, Reese Jones.

THE COURT: Right. Okay.

MS. BONJEAN: And gives this game some more context.

THE COURT: Okay. And you're planning to do what? Just show it to him? Okay.

MS. BONJEAN: Refresh, and hopefully he will remember what this was all about.

THE COURT: All right. Dare I ask, Ms. Bonjean, do you have an exhibit list for me?

MS. BONJEAN: I have an exhibit list in that binder we provided, but this is something brand new.

THE COURT: Okay. The binder you provided when?

MS. BONJEAN: Friday, actually.

THE COURT: Okay. But I think on Friday I asked you for a more comprehensive defense exhibit list. You said you didn't want to give it to the government, you said you were going to give it to the Court.

MR. ROBOTTI: Yes, Your Honor. We will have that for the Court.

THE COURT: Okay.

MR. ROBOTTI: After this next witness is done, we will have an updated exhibit list, which will cover our expected exhibits for the rest of trial.

THE COURT: That's fine.

MR. ROBOTTI: And just one final point, Your Honor. I just want to make sure we're clear. So Defense Exhibit 16-A1, which is the video that I played to refresh his recollection on --

THE COURT: The BBC?

MR. ROBOTTI: No. The 2007 interview.

THE COURT: Oh. Yes.

MR. ROBOTTI: Yes.

So we are seeking to admit that and play it for the jury. That can either be done during my cross-examination or Ms. Bonjean's. But for all the reasons we discussed, we think that that video contradicts what he said on his direct testimony about the culture of --

THE COURT: All right. I'm going to have to look at the video again.

MR. ROBOTTI: I understand, Your Honor.

THE COURT: That was a little bit longer video. Seven minutes, was that the one?

MR. ROBOTTI: I think we had a --

THE COURT: You had teed it up?

MR. ROBOTTI: -- three-and-a-half minute excerpt in clip one, and perhaps a minute and a half in clip two.

THE COURT: Okay. Are you going to -- where is that? Are you going to set up me with that laptop, or is there another way you want me to watch this?

MR. ROBOTTI: We do have the laptop that we can hand up to the Court.

THE COURT: Okay.

MR. ROBOTTI: Again, this can be done during Ms. Bonjean's cross-examination, if you want to do it then.

THE COURT: I mean, I just need to watch all of what it is you want me to watch. The entirety of what it is you want to put in. Because I think you had teed up some parts of it. I watched some of it, but not with this request in mind.

MS. BONJEAN: Your Honor, before the witness that comes after Mr. Hubbard, there are a couple things that I want to raise, but I think the government talked -- we talked out most of it.

THE COURT: Government doesn't object to the issue of the sex worker, is that what we're talking about? Or sex work, I should say.

MS. BONJEAN: That part we worked out, but there's a couple things that I do want to place on the record. And I think we have an understanding, but I don't want to be making a motion after the fact saying that I was bamboozled or something. I just want to make sure that we're -- not that they would do that, but that we just have some transparency, and I do my job making sure that our understanding -- we have a meeting of the minds.

THE COURT: Okay. On that issue, I don't know that

you need to be heard, but is there something --

MS. BONJEAN: I don't know when you want to do that, though, is my point, if we want to do it now or --

THE COURT: If it's quick. But, again, this jury came on time, so.

MS. BONJEAN: I think it will be quick --

THE COURT: Go ahead.

MS. BONJEAN: -- if the Court -- okay.

So, again, I don't know if you want to call it a renewal, but we continue to object, and I want to make the record clear that we object to witnesses referencing OneTaste as a sex cult, as a cult, or referencing Ms. Daedone as a sex cult leader. The government has said that they do not intend to elicit that information, but it's possible that their witness will so testify.

THE COURT: This witness coming up?

MS. BONJEAN: Yes. And others, I suppose. We have already heard, obviously, others.

THE COURT: Right.

MS. BONJEAN: Again, we believe there's really no definition for "cult," this is all very subjective. It's highly prejudicial because of the associations. We did raise this in a motion in limine.

I don't want to be objecting constantly in front of the jury. So, you know, if the Court is going to allow

witnesses to testify and characterize it as a sex cult, which they've done thus far, some have, or at least one has, that's the Court's ruling, but I do have an obligation to object to that.

THE COURT: Of course, of course.

MS. BONJEAN: And that is -- I want to make that clear.

THE COURT: The Court doesn't have a problem, Ms. Bonjean, with you objecting and stating the basis. What the Court has a problem with is you kind of giving long speaking objections in front of the jury on issues that -- you know, telling them what's their job and not, you know, other's jobs. But, yes, of course, make your objection.

You raised this -- this issue was thoroughly litigated. The Court informed the parties that it was not going to make a blanket ruling precluding the use of the term "cult." The testimony that came out, I don't know what day it was, at some point last week, from the first witness, with respect to "cult," was highly relevant and I did not think it ran afoul of 403 on the facts of this case.

But, of course, if there's testimony that you want to object to, I know you will object, and I understand why you're objecting, and it may be relevant the way it comes up with another witness, it may not.

But I think that we have to see, you know, what the

relevance is, and, you know, the purpose for which it is being offered, or how it is coming up. I just think -- I don't know what these witnesses are going to say. But so far what's come in I have found highly probative and not running afoul of 406. Go ahead.

MS. BONJEAN: And that's also true for, just as a related, is also true for this, again, self-characterization or self-diagnosis of brainwashing, which, again, is just colloquial term, as far as I can tell. I don't think there's some scientific term --

THE COURT: Right. And she wasn't testifying as a scientific term.

MS. BONJEAN: That's true. But it is, in my view, is frankly irrelevant, and its prejudicial effect severely outweighs any probative value so I just want that record to be clear.

THE COURT: Okay. I disagree with you, of course. I find it highly relevant, and I find it does not run afoul of 403.

Sorry. Go ahead, Ms. Bensing.

MS. BENSING: May I make just one quick comment about the e-mails --

THE COURT: Very quick.

MS. BENSING: -- that Ms. Bonjean handed up.

THE COURT: Yes.

MS. BENSING: The government obviously doesn't object to her showing the witness whatever she wants to refresh his recollection.

If Ms. Bonjean were to introduce them into evidence, the government just objected on the redactions of the sender and recipient. So I just --

THE COURT: You do want the redactions or don't want the redactions?

MS. BENSING: We don't think entirely redacting the sender or recipient is appropriate if they are admitted into evidence.

THE COURT: I don't know what they say because I only have a redacted copy.

MS. BONJEAN: So the only thing that's -- there's a couple things redacted, which is the e-mail address.

THE COURT: Yes.

MS. BONJEAN: And the explanation for this is I don't have an unredacted. This is like a screenshot. This is a very old e-mail. We're talking 2006, 2007. This is what I was able -- I think it will refresh his recollection.

THE COURT: Okay.

MS. BONJEAN: I have no doubts he's the one e-mailing from the infinitegames Gmail address.

THE COURT: Is the government's objection to having redacted a foundational objection, or authenticity, or what is

the --

MS. BENSING: Just to the admission of them, as redacted. I have no issue with her questioning him about it, and it sounds like --

THE COURT: What's your objection to if she wants -- if she lays the foundation, if they're relevant, what would be your objection, simply because they are redacted? If he lays a proper foundation and can satisfy authenticity.

MS. BENSING: We don't think the redactions are appropriate, Your Honor.

THE COURT: Why?

MS. BENSING: Because I think that it raises issues, as the Court said, of foundation and authenticity. I mean, he may be able to say I remember this e-mail, and this is the e-mail address. I guess we'll see how specific his testimony is, and, again, I don't have any --

THE COURT: Okay.

MS. BENSING: Okay.

THE COURT: Thank you.

MS. BONJEAN: If he can identify it, I don't see what the problem is. I would provide, as I told the government, we have been searching for an unredacted -- these are old e-mails. So we'll see what he says.

THE COURT: Okay. Fine. I think that --

MR. ROBOTTI: Your Honor, apologies.

THE COURT: Mr. Robotti, yes. Go ahead.

MR. ROBOTTI: There's one correction. So I got my videos flipped. So it is 16-L is the video that we are seeking to admit, which is the 2007 interview. We have the laptop here for the Court, if you would like to listen to it now.

THE COURT: No. I am not going to keep the jury waiting. No. We're already ten minutes over with the jury. This jury got here on time on a Monday morning, so I am going to start with them, but we'll take it up at the first break.

Let me just very quickly mention one other thing. There was a suggestion by the defense that one of the government's paralegals was behaving improperly in court. I have a view as to what's happening, and I didn't observe anything along the lines of what the defense was suggesting, but I would just remind everybody to comport themselves properly in court.

I also want to note that the Court has moderated its responses to the conduct of defense counsel. Going forward, the Court will not be as tolerant as it was last week. If Ms. Bonjean or any other attorney is unable to comply with the Court's rulings and instructions or attempts to talk over the Court, or huffs and puffs into the microphone, the Court will address the conduct in front of the jury.

I don't expect that will happen again today.

Government, you may get the witness, and, Mr. D'Agostino, you may bring out the jury.

(Short pause; witness takes the stand.)

(Jury entered the courtroom.)

THE COURT: Everyone may be seated.

It is nice to see the jury. I hope everyone had a good weekend. It is a rare thing when we get two nice weather days.

So welcome back. And I appreciate everyone being here so punctually. It's much appreciated.

THE COURTROOM DEPUTY: Mr. Hubbard, the Court reminds you, you are still under oath.

THE WITNESS: Thank you.

THE COURT: And, Mr. Robotti, you may continue with your cross-examination.

MR. ROBOTTI: Thank you, Judge.

CHRISTOPHER HUBBARD,

called as a witness herein by the Government, having been previously duly sworn and having testified, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. ROBOTTI:

Q Good morning, Mr. Hubbard.

A Good morning.

Q So you testified last week that you were involved in the

OneTaste coaching program; is that correct?
A Not quite. Initially Nicole asked me to create a coaching program for OneTaste. I didn't finish that process, and then OneTaste then did offer a coaching program which was unrelated to anything that I had been working on.
Q So you were initially asked to help design the program; is that right?
A I was initially asked to -- sorry.
I was initially asked to design a coaching program.
Q And you wanted to design that on your own terms, correct?
A I wanted to make sure that some of the things that I wanted included in the coaching program were included.
Q And that was on your own terms, correct? That's what you told the government on April 22, 2025?
A To the extent to which there were components that I wanted included, yes.
Q And then Nicole decided to take the OneTaste coaching program in a different direction; is that right?
A She did that, yes.
Q And that upset you, correct?
A I thought it would be better to create people who had more professional training than the kind of stuff that was being proposed at the time with the coaching program that OneTaste went with.
Q So it upset you that you were initially asked to do this,

and then you were told they were going in a different direction, right?
A Probably a bit. I don't remember particularly being lectured about it.
Q And you didn't like the OneTaste coaching program's focus on money; is that right?
A I didn't like -- my main concern with the coaching program, as it was implemented, was that it was more about kind of the OneTaste ideas and less about coaching, and it was too expensive for that, in my opinion.
Q And you told the government on April 22, 2025, that you viewed the coaching program's only purpose as to make money, right?
A I may have said that, and that would be a part of my view.
Q And you knew OneTaste was a for-profit business, correct?
A No, I did not. I presumed it was, but I had no -- I had never seen any of the legal documentation for OneTaste.
Q Well, it was a company, correct?
A Again, presumably. I never saw any of the legal documentation for OneTaste.
Q There's nothing wrong with a company wanting to make one, right?
A There's nothing wrong with a company wanting to make money.

Q And you just wanted the company to go in a different direction; is that correct?
A Yes. Basically.
Q And you're entitled to have your opinion about which way the company goes, right?
A I hope so. Yeah.
Q And the company had no obligation to listen to your opinion; is that right?
A Yes.
Q And it annoyed you that the company didn't listen?
A Sometimes, yes, sometimes no.
Q Fair to say you wanted to be in charge?
A No.
Q And you wanted them to listen to you, right?
A I would love to have been heard and some of the ideas implemented, yes.
Q So you got frustrated when the company didn't listen to you, right?
A Sometimes. Sometimes, no.
Q And ultimately bitter about that?
A No.
Q So you had jobs before and after OneTaste, right?
A Yes.
Q You worked for other companies, correct?
A Yes.

Q Including Microsoft?
A I was a contractor for Microsoft, yes.
Q And those companies had corporate structures in place, right?
A Yes.
Q And they had rules for their employees, right?
A Depending on the company, yeah. It varied wildly.
Q Policies and procedures, correct?
A Most of the time, yes.
Q By 2008, 2009, OneTaste was trying to put in place certain requirements, right?
A Okay.
Q Certain business structures?
A You're telling me information I don't think I know.
Q Well, it is a question for you. Was OneTaste trying to put in place structures at the time?
A Not that I'm particularly aware of.
Q And OneTaste was generally asking people to shift to a more business-focused mentality; is that right?
A The only thing that I'm aware of in that -- where that question kind of makes sense is there was more emphasis on sales.
Q And you didn't like that OneTaste was putting this structure in place, correct?
A No, incorrect. I would say it was mostly immaterial to

me.
Q And you referred to the structure as mandated behavior; is that right?
A No. I am not actually sure how to answer this right now because that piece of evidence wasn't allowed into --
Q In terms of corporate structures in place, did you view that as mandated behavior?
A No.
Q Is it fair to say you didn't like the fact that OneTaste was putting in place structure, right?
A No.
Q And you like the more freewheeling culture that had been in place in 2006, 2007, correct?
A I definitely enjoyed parts of the freewheeling culture. I don't know that I liked it more.
Q And it's fair to say you complained about the direction that OneTaste was headed, right?
A With regard to the emphasis on sales? I almost certainly complained about that.
Q And, ultimately, at the end of the day, it wasn't your investment in one taste, right, you didn't put up any money?
A I did not invest in the corporation OneTaste. I did spend my own money when I was there in support of OneTaste, and I also spent however many years of my life there.
Q And, ultimately, it was not your call which direction

OneTaste went in, right?
A Of course not. It was Nicole's.
Q After the left the -- you ultimately decided to move out of the Warehouse in 2009; is that right?
A I actually think it was a little bit before that, but in that time frame, like early 2009, late 2008.
Q And after you left the Warehouse, you moved into an apartment that you subleased from OneTaste; is that right?
A At some point in 2009 we were in there. I think there was another residence or another place we stayed in for a while before that.
Q And when you -- when the lease ended, you refused to leave that apartment; do you recall that?
A We were trying to stay there, yes.
Q And you had a dispute between you and OneTaste over that?
A I believe -- my understanding was a dispute between us and the landlord.
Q And it nearly led to eviction proceedings; is that right?
A I actually don't remember that. Maybe. I don't remember.
Q And, ultimately, you finally agreed to leave, correct?
A We did, yes, leave.
Q Overall, you stayed at OneTaste for a couple of years, correct?
A Yes.

Q And as you testified last week, you stayed because you believed in the vision, right?
A Initially, yes.
Q And you stayed because you wanted women to be empowered across the country?
A Still do.
Q And you wanted to make a difference in the country, right?
A Still do.
Q And you also stayed for other reasons, right?
A It was where I was living, so, yeah. I had some friends and it was -- yeah.
Q Now, when I asked you whether you -- last week, whether you stayed because you were having sexual relationships with women, you said not so much, right?
A The main focus of my being there wasn't about having sex with women.
Q But that's not what you told the BBC in 2020, right?
A I don't remember what I told them in 2020.
Q Well, in describing your experience at OneTaste, did you say there was a lot of women who wanted me to stroke them or OM with them, so I was -- I had my hands on a lot of pussy, and that's probably my favorite thing in the world.
That's what you said, correct?
A Probably.

Q You don't recall saying that?
A I don't recall saying exactly what I said to the BBC five years ago, no.
Q Pretty memorable quote to forget, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q So you also posted a OneTaste internal chat board; is that right?
A Are you -- if you're referring to the OM wiki, then, yes. Otherwise, I don't know what you are talking about.
Q So this is something you helped develop while you were at OneTaste, correct?
A Oh. Yes.
Q The internal chat board or the OM wiki?
A I did not -- the OM wiki is a Facebook page or group. I didn't develop that. But there was a lot of development I did for OneTaste when I was working there.
Q And that would include the internal chat board?
A Yes.
Q And that was available to other people at OneTaste, right?
A Yes. Pretty much the entire community.
Q So that would include Nicole and Rachel, correct?
A Yes.
Q And on that chat board you described how your life had

improved at OneTaste, correct?
A I haven't seen that in nearly 20 years. I don't remember what I typed or posted there.
Q Do you recall describing your practice at OneTaste as compelling?
A Sure. I don't -- sorry. I do not recall that. Could I have said that, yes.
Q And that your practice allowed you to feel intense feelings?
A Again, I don't remember what I posted there. Almost 20 years ago.
Q And do you recall saying that there's gold in those feelings, hang with them, and you may find a way to riches?
A Again, I don't remember what I typed 20 years ago.
Q And regarding the practice of sharing beds with different people, you posted that was damn cool, right?
A Again, I still don't remember what I wrote back then.
Q And you said that it helped you confront your issues about acceptance and rejection; is that right?
A I still don't remember.
Q And you also met your wife Beth at OneTaste, right?
A I did meet my wife Beth Aucoin at OneTaste. Yes.
Q And you spent a lot of time together at OneTaste, right?
A During different chapters or phases of OneTaste, yes. And sometimes we weren't spending time together.

Q Okay. So you fell in love at OneTaste, right?
A Oh, yes.
Q Okay. So there were all sorts of reasons you stayed at OneTaste, correct?
A I fell in love with a bunch of people at OneTaste.

MR. ROBOTTI: No further questions.

THE COURT: Ms. Bonjean, any cross-examination?

MS. BONJEAN: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Hi, Mr. Hubbard.
A Good morning.
Q My name's Jennifer Bonjean, and I represent Ms. Daedone.
A Good morning.
Q You were introduced to OneTaste in 2006, right?
A Roughly that time frame, 20 -- late 2006, early 2007, somewhere in there.
Q And that would have been about the same time you first met Ms. Daedone, correct?
A Yes.
Q And then my understanding is, you moved into the Warehouse about three to six months after being introduced to OneTaste and Ms. Daedone; sound right?
A About that, yes.
Q And, to be clear, you were in your 40s, at the time,

right?
A Yes. I think it was early 40s, like 41, 42-ish.
Q Counts as 40s, right?
A Uh-huh.
Q And were you married at the time?
A I was either -- like the divorce decree had just come down, or it was just about to come down in that time frame.
Q So when Mr. Robotti asked you about meeting your wife at OneTaste, this is a different wife, right? Your second wife, correct?
A My second wife, correct.
Q Now, you testified on Friday that at the time you met Nicole Daedone in whatever, 2006-ish, she was the leader of OneTaste; do you remember giving that testimony?
A When I first met Nicole, she and Rob were kind of coleaders, with her more in the driver's seat than Rob, and then that transitioned to her being the main, sole leader.
Q Isn't it true that, you were interviewed by the FBI on September 1 of 2021; do you recall that?
A I recall being interviewed by the FBI during COVID, in and around that time frame.
Q Do you remember a federal agent by the name of Elliot McGinnis being present?
A I certainly know the name. I actually think it was a different agent who did the interview, but I don't --

Q They were federal agents, though, we can agree on that?
A Oh, yes. Absolutely.
Q And there was an Assistant U.S. Attorney present as well?
A There were a few people, like four, five people on the call, as I recall. I wouldn't be able to repeat their names or remember their names.
Q Was it a call or was it in person, in 2021?
A It was a Zoom call.
Q Your lawyer was present?
A Yes.
Q All right. And you were told during this interview that you had to be truthful, right?
A Yes.
Q And that you might be subject to criminal charges if you did not tell the truth during that meeting, correct?
A Yes. It was -- but the meeting was a proffer.
Q Right. A proffer session?
A For the day.
Q And you were there a long time or the meeting went on a long time, right?
A It was a couple hours, as I recall.
Q All right. And on September 1 of 2021, isn't it true that you told this group of government personnel, US Attorneys and FBI agents, that when you met Daedone, she was in a core group of about five or six people and was not yet the leader?

A Yes. So she was in a core group, and mostly Rob and Nicole were the leaders of that group.
Q You told them she was not yet the leader when you first met her --
A Right.
Q -- correct?
A She was not yet the leader. That's correct.
Q Right.
And that she was in a core group of about five or six people, correct?
A Uh-huh.
Q And then you recalled deliberate transition where Ms. Daedone took up a leadership role in the company, right?
A Where she transitioned mostly from being coleaders with Rob to being the sole leader.
Q You told the government that she was one of a core group of five or six people, not that she was a coleader with Rob initially when you met her, right?
A Show me the transcript, and I'll agree to that, but she was always the leader of the, you know, a leader in that group.
Q Yeah, I know that's what you are saying today. I am asking what you said in 2021, which was that she was one of five or six people in a core group; do you recall that?
A No, I do not recall it, but she -- there was a core group

of people who came over and started OneTaste, as I understood it.
Q And she was one of those five or six people, correct?
A Yes.
Q Okay. And at some point you recalled this deliberate transition where Ms. Daedone did take up a leadership role in the company, right?
A Yeah.
Q And isn't it true that Ms. Daedone was actually not sure whether she was up for that role of taking on the leadership role of OneTaste, right?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Lack of foundation. Calls for speculation.
THE COURT: Overruled.
A I'm sorry. Can you repeat the question?
Q Isn't it true, based on your observations and understanding, that Ms. Daedone was actually not sure whether she wanted to take up the leadership role in OneTaste?
A That's a good question.
You're asking from an angle I hadn't thought of. I always assumed that she wanted to be the leader of OneTaste. Whether it was my experience that she did or did not want to be the leader, I'm not sure. It was kind of a fait accompli

it was going to be her, but, why, I'm not sure.
Q Isn't it true that you told this same group of government personnel FBI agents and US Attorneys that Daedone indicated that she did not know if she could pull it off, or that she was up for it, in reference to taking a leadership role?
A That could be consistent with what I saw in the conversation she was having with Kevin Kanarek in the foyer of the Warehouse.
Q Okay. But, of course, it would make sense that the face of OneTaste should be a woman, right?
A Absolutely.
Q Okay. Made sense that the cofounder of the company might be the face of the company, right?
A It would make sense for a woman, particularly Nicole, especially Nicole, to be the face and the voice of OneTaste.
Q It'd hardly make sense for a company centered around female orgasm to have a man be the face of the company, right?
A Absolutely.
Q Okay. Now, Ms. Daedone during this time period we're talking about was not in control of the finances of OneTaste. Again, I am talking about in 2006, when the company was coming into some formal structure. Would you agree?
A No idea. I had never had access to that information.
Q Well, you told the government that it was Ken Vanosky who was the chief financial officer of OneTaste during this time

period, right?
A My knowledge of Ken Vanosky being the CFO of OneTaste is after the events that we're currently talking about. Whether he was the CFO at the time, I don't know, if I had met him yet.
Q Isn't it true that you told the government that Vanosky was the CFO, and, quote, controlled the finances?
Do you remember telling the government that on September 1 --
A I don't --
Q 2021?
A -- but he was the CFO. My understanding -- like I didn't meet Ken until sometime later.
Q My question is, do you remember telling the government that?
A No, I don't. But I could have.
Q Okay. Do you quarrel with what I am suggesting is that you told the government that, or would you like to see something to refresh your recollection about that?
A Sure. I will see a recollection or a refreshing.
MS. BONJEAN: Okay.
THE COURT: What are you handing up, Ms. Bonjean?
MS. FARRELL: It is marked at 3500-CHU-1. It may have been marked.
THE COURT: Yes. Friday, I think.

MS. BONJEAN: I don't know if it was marked as an exhibit or not. I have a paper copy for the Court.

THE COURT: That's fine. I don't need it. It was addressed the other day.

MS. BONJEAN: May I approach?

THE COURT: Yes.

Q Okay. I am going to draw your attention to page 6 of 8, Mr. Hubbard.

And then I am specifically going to draw your attention to the -- I guess it's the fourth full paragraph that starts with Vanosky.

A I see that.

Q Okay. Have you had a chance to look at it?

A I am on the second sentence right now.

Q Okay.

A Okay.

Q Okay. Do you recall now telling the government that Vanosky was the CFO and controlled the finances of the company?

A Again, I don't remember what I said, but, yeah, this is --

Q Okay.

A -- probably a fair and accurate --

MS. BONJEAN: We may have to go back, Judge. Is it okay if he just leaves it up there, turned over?

THE COURT: Yes.
A Turn it over?
Q Just turn it over and put it aside. Thank you.
Now, during the early days of OneTaste, you agree that they struggled with generating money, right?
A That was part of the conversation in the community was the struggle to pay for what we were doing.
Q Right. And that's not atypical of sort of startup companies; would you agree?
A I would say it is typical of most companies.
Q And at some point there was a shift to different types of courses and the amount of money that was being charged, right?
A There were a number of shifts.
Q That was one of them?
A Yeah.
Q And there were also different types of people who were getting involved, such as rich men in tech, right?
A Really, the only one who clearly fits that description would be Reese Jones.
Q Well, isn't it true that you told the government that there were different types of people getting involved and that this included rich men in tech and that concerned you?
A I don't remember it concerning me as much as that was just what we were doing.
Q I am going to ask you again to look at page 6 of 8 in the

document we had an opportunity to review.

I'm going to have you look at that same exact paragraph, the last sentence, if you would, sir.

A Okay.

Q Would you agree that you told federal agents, US Attorneys, during this interview on September 1, 2021, that different types of people were coming into OneTaste, such as rich men in technology, which concerned you?

A I would agree that that's what's written here. I don't remember saying that. I may have. I just don't remember.

Q Okay. And one of those individuals you referenced was Mr. Jones, Reese Jones, right?

A Yes.

Q Now, Ms. Daedone and Jones actually met at like a kink or BDSM party, right?

A Nicole told me that she had met him at a kink.com party.

Q Okay. And can you tell the ladies and gentlemen of the jury what a "kink party" is?

A I didn't go. Presumably it's a place where --

MS. BENSING: Objection.

THE COURT: Sustained.

Q I am not asking you whether you were at that party. I am asking you to describe, based on your vast experience with BDSM, what a kink party is?

A So this was a kink.com party, not a kink party. The only

kink.com parties that I have been to were something called the upper floor, and I don't think that's what Nicole went to. I don't know that I have ever been to a party that was organized and presented the way the party that Nicole went to.
Q Well, you weren't there, were you?
A I was not there.
Q Okay. But you have been to BDSM parties and had a presence in BDSM clubs long before your entry into OneTaste's community, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Well, this false personas game you testified about, that's sort of an element of -- it's a sex game, right?
A Not one that I have ever done before.
Q Well, you testified that you were very adept at it because Ms. Daedone was awful at it; do you remember that testimony?
A I don't remember saying that I was adept while she was awful at the false persona game, whatever that was.
Q Well, so is it your testimony that this false personas game you testified about was your first time doing that?
A Yes.
Q Never had any involvement in sex games prior to that?
MS. BENSING: Objection. Relevance.
THE COURT: Sustained.

Q Well, your testimony that you provided on Friday about this false personas game that you helped Ms. Daedone participate in to seduce Reese Jones into OneTaste, we would agree that that was like a sex game, right?
A It was more of a seduction game and less -- like my participation in it wasn't about sex.
Q Well, it led to the scenes you produced, right?
A It led to scenes that I helped produce.
Q Okay. And those scenes come from the BDSM curriculum, if you will, right?
A Only in their wildest imaginations.
Q I have no idea what you mean by that. Explain it.
A I have been to maybe 10, 20 BDSM events, like formal BDSM events in my life. I have never seen anything like what we had done at OneTaste.
Q Okay. But you would agree, I think you even testified to this, that scenes, doing these scenes, is a game that you might find being played by people who are in the BDSM community, right?
A Sort of. Scenes are an encapsulation of an activity between members in a BDSM community where they consent to specific activities with each other.
Q Okay. Sounds like a yes, right?
A Not sure about the "yes" part.
Q It sounded to me like you just agreed with me that scenes

is a part of the activities that might exist within the BDSM community; yes?
A So within the BDSM community, some of the people in those communities, like me, would refer to interactions, like formalized interactions or consensually agreed upon interactions as a scene because it has a formal beginning and end. You don't presume the relationship continues after the scene.
Q Okay. Thank you for that.
Ms. Daedone -- last week you testified on Friday, that you believed that Jones was a wealthy person and, quote, he was going to be the one to bankroll OneTaste. Do you remember giving that testimony on Friday?
A Yes.
Q Okay. But Ms. Daedone did not expressly tell you that she was interested in Jones as an investor for OneTaste, right?
A No, she said she -- he was the person who was going to bankroll OneTaste.
Q It is your testimony that she said he was going to be the one to bankroll OneTaste?
A Yeah.
Q She did not tell you he was -- what she told you was he was a wealthy guy and it would be good to bring him in as a customer, right?

A That is -- well, the first part of that, yes. The second part, not so much.
Q Do you remember telling the government back -- one second.
Do you remember telling the government that Ms. Daedone never told you directly that she was interested in him as an investor?
A Right. Because she would never talk to me about investors. That's not something I was doing -- involved in at OneTaste.
Q Okay. And, again, you didn't like that rich men were being brought into OneTaste, right?
A No, that's inaccurate.
Q Well, you previously just admitted that you didn't like that there were rich tech guys coming in. It concerned you. How about that?
A What concerned me was what --
Q I asked if it concerned you. Yes?
A There was a part of it that concerned me.
Q Right. And that was because it reduced your chances of getting pretty, young research partners, right?
A Incorrect.
Q Okay. And on Friday you did discuss your role in creating scenes for Jones; fair?
A Yes.

Q And one second.

THE COURT: Take your time.

Q You testified -- maybe I am not catching what you are saying, but you previously testified on direct examination that your knowledge of the term "scenes" predated OneTaste from the BDSM community where in the BDSM clubs, for example, I could be in a scene with somebody.

That was your testimony? Do you remember that?

A Yes.

Q Okay. So you are not quarreling with that now because you gave it on Friday, right?

A I am not quarreling with it now. It doesn't have anything to do with Friday.

Q Well, you testified under oath. Do you remember that part, where you promised to tell the truth?

A Yeah.

Q And you testified under oath on Friday that you learned about scenes from the BDSM community and in BDSM clubs; do you remember that?

A Uh-huh.

Q Okay. And you are not retracting that presently, correct? No?

A No.

(Continued on the next page.)

(Continuing.)
BY MS. BONJEAN:
Q Now, you told the jury about this email exchange that you had with Mr. Reese on, I guess, Ms. Daedone's behalf, we'll call it that, in order to seduce him into OneTaste, right?
A If you're referring to the email exchange where I would craft -- created a draft for Nicole to send to Reese, then that's -- I did testify about that on Friday.
Q You were the one writing from the infinitegames@gmail.com account, right?
A I don't remember that account. I -- I thought I was writing from the mfollet@gmail.com account initially when I was playing the role as the Martin Follet. I don't remember what email account Nicole was using. It may have been the infinitegames one, it may have been something else.
Q You were using all of the accounts; the infinitegames account, right?
A I actually remember two. There may have been a third; I don't actually remember.
Q Well, why don't we look at the email that was admitted into evidence as a starting point. Okay?
A Okay.
THE COURT: Just provide the number, Ms. Bonjean.
MS. BONJEAN: Yes. Government Exhibit 2430. I

think it's in evidence. We can pull it up.
Q If you have a hard time reading it, I have paper copies, sir.

THE COURT: I think it's 2430-R that went into evidence. Is that what you're looking at? I don't think 2430 is in evidence. It's just the R.

MS. BONJEAN: I think it's the next page. If the Government, before we publish, perhaps the Government --

THE COURT: Yes, don't put anything up yet, please.

MR. FERN: We admitted 2430-R.

THE COURT: Yes. Is that what you're looking at, Ms. Bonjean?

Does someone want to give it to Ms. Bonjean?

MS. BONJEAN: I think I have it.

THE COURT: Ms. Bonjean, if you could just look at the sticker and make sure it's marked the right number that we're talking about, 2430-R.

MS. BONJEAN: Okay.

THE COURT: Do you want it published?

MS. BONJEAN: Yes, I do.

THE COURT: If you could, Mr. D'Agostino, just put it up.

(Exhibit published.)

THE COURT: Thank you.

Q Again, if you need the paper, let me know.

THE COURT: Well, no one can read it this small.

THE WITNESS: I can't read this.

THE COURT: Can you blow it up?

MS. BONJEAN: Let me know if you can see it well enough. And if you want the paper, we can do that.

THE WITNESS: I would love the paper.

MS. BONJEAN: Okay. No problem.

Q Do you remember looking at this, Government Exhibit 2430-R, on Friday?

A Yes.

Q Okay. And it looks like Chris Hubbard at your email address is chris@wildcharacters.com, right?

A Yes.

Q And you wrote Nicole. Fair?

A Yes.

Q It says:

I created a draft email for Mr. Jones. It's in the draft folder in the infiniteplay Gmail account.

Do you see that?

A Yes, I do.

Q So you drafted this email from an infinite Gmail address, right?

A Yes.

Q And then you tell her what it's going to say:

Here it is again: Mr. Jones, I suppose I should enjoy the glacial pace of your responses. Or did you not have the reference with you? Maybe I should hand your game down to one of my cadets for handling. Cordially, Ms. Jeu.

Did you write that?

A Yeah.

Q That was you writing that?

A Yes.

Q It's kind of silly, right?

A Absolutely.

Q Okay. And then you told Nicole:

I'm thinking of setting up another Gmail account for Ms. Jeu's cadet.

Do you see that?

A Yes.

Q And then sending an email to Mr. Jones with the setup for the next scene from the cadet's email account. The cadet's email would be something like: Mr. Jones, I would like to introduce yourself, I am M. Follet, your handler. I have consulted with Madame Jeu and we are ready with your next activity.

Do you see that?

A Yes.

Q That was you; you wrote that, right?

A Yes.

Q Please provide me with three different one- to two-hour times during lunch when you are available in the immediate future. It is our hope that we can increase the pace of your gain. Please include any thoughts on how we can achieve this goal. Thank you. M. Follet.
Do you see that?
A Yes, I do.
Q You wrote that, right?
A Yeah.
Q And then you told Ms. Daedone:
If you want to keep the handlers with feminine names, then how about Mademoiselle Follet, Mademoiselle Cordet.
You gave her some suggestions there, right?
A Yes, I did.
Q That was all you, right?
A Yes, I wrote this.
Q Those were your ideas, correct?
A The suggestions? Yes.
Q Yes. Okay.
And, sir, isn't it true that Mr. Reese responded to the infinitegames@gmail account, correct?
A He definitely responded. To which account, I'm not -- I don't remember.
Q Would something refresh your recollection? Perhaps

some emails?
A It may.
Q Okay.
MS. BONJEAN: We can take that down.
I have a group exhibit, Your Honor, that I provided you, it's 16-AL. It's just for --
THE COURT: Sorry, what do you mean by "a group exhibit"?
MS. BONJEAN: It's a series of emails.
THE COURT: Multi pages, okay.
MS. BONJEAN: Yeah.
THE COURT: Yes, I have it. 16-AL?
MS. BONJEAN: Yes.
May I approach?
THE COURT: Yes. And the Government has a copy as well, correct?
MS. BONJEAN: Yes.
BY MS. BONJEAN:
Q Do you want to take a look, thumb through those emails and let me know if it refreshes your recollection regarding whether or not Mr. Jones responded to the emails that we discussed.
(Pause in proceedings.)
A Okay.
Q Do you remember Mr. Jones responding to the invitation

to play the game that was sent from the infiniteplay@gmail.com account that you wrote?

A I'm assuming these are all Mr. Jones. His name and email has been redacted.

Q Do you recognize -- putting aside that, do you recognize your writing?

A I don't recognize them, but the last two are definitely me.

Q Okay. Let's look at those.

A And possibly the third. Possibly the third one, but I don't actually remember that one.

Q Okay. But generally speaking, you were writing from the infinitegames Gmail as well as from these other Gmail accounts, right?

A I was definitely writing from the mfollet@gmail.com, and I remember towards the end of this activity sending stuff from the infinitegames, but initially it was Nicole.

Q Okay. But your testimony on Friday was that she wasn't really good at it, so you took over for her because you were good at it, right?

A I don't remember that being my testimony on Friday. When -- how I got involved in this is they asked me to edit an email they were writing.

Q Right.

A And they liked it.

Q Right.
A So I kept going.
Q You said he was more responsive to you than her, right?
A He responded -- it seemed like he responded faster to the M. Follet, and then once he started responding, we started transitioning that.
Q And emailing Mr. Reese from a Gmail account that says "infinitegames," that suggests this was a game, right?

THE COURT: Sorry, maybe I'm not looking at the right documents. What I'm looking at doesn't have "infinitegames." Is there something I should be looking at that's not this document that you handed up?

MS. BONJEAN: Well, at the top of 16-AL there's a "from" and then "to" and "infinitegames."

THE COURT: Not on my copy, there's not. Am I looking at something different than what you have?

MS. BONJEAN: I'll give you my copy.

THE COURT: I don't see anything that says "infinitegames" here.

MS. BONJEAN: In the blue, Your Honor.

THE COURT: I'm reading the blue. It doesn't say that.

MS. BONJEAN: Oh, my apologies, my apologies. Infiniteplay, infiniteplay.

THE COURT: Okay.

MS. BONJEAN: Infiniteplay.

THE COURT: So we're looking at the same document. I'll give you back your document.

MS. BONJEAN: My apologies.

THE COURT: Go ahead, you can re-ask your question.

BY MS. BONJEAN:

Q You remember sending and receiving emails from the infiniteplay@gmail.com account, correct?

A I remember having access to that account, the one that Nicole had created, or presumably Nicole had created.

Q Right. But your recollection is she actually created that account?

A Yes.

Q You were the tech guy, right?

A I don't work for Google.

Q That wasn't my question.

I said: You were the tech guy at OneTaste, right?

A At this time? No, I was not.

Q Okay. But we looked at your email where you were telling her all the things you were going to do to seduce Mr. Jones into the company. Do you remember that email?

A Yeah. It's right here.

Q Okay. So you were telling her what you were going to write, right?

A So she would tell me, in mostly broad strokes, what she wanted included in the emails, and then I would go and create a draft for her to review, and then I would send it to her for her to review.
Q And you came up with the names, right?
A I came up with M. Follet; she came up with the Jeu.
Q You remember that vividly, it was you got the Follet and she was the Jeu?
A Yeah.
Q And you told her in that email what you were going to say to Mr. Jones, right?
A Yes. Again, she told me what to write in broad strokes, and I crafted an email I thought was appropriate.
Q Okay. And so you helped, quote/unquote, seduce Mr. Jones into OneTaste, right?
A Presumably, yeah.
Q And then you were the production manager of the scenes that were put on for Mr. Reese, right?
A I was -- I don't recall ever being called the production manager. There was a group of us who were producing these things, and after we had done a few, I helped run some of the scenes, doing some of the logistics.
Q So you're using the word "run," I used the word "produce." We'll use your word.
You helped run the scenes for Mr. Reese, right?

A Yeah.
Q In fact, you testified on Friday that some of the scenes you did alone with him, right?
A Yes.
Q Just the two of you, correct?
A Yes.
Q Did those end in, like, sexual relations too?
A I did not have sexual relations with Reese.
Q Okay.
A Or him with me.
Q So not all scenes end in sex, correct?
A Right.
Q Now, you knew that Jones and -- Mr. Jones and Ms. Daedone at least eventually became romantically involved, like a couple, correct?
A Yes.
Q Do you know how long their romantic relationship lasted?
A I do not.
Q All right. Do you know how long Mr. Jones was associated with OneTaste?
A I do not.
Q Now, you testified on Friday, sir, that Ms. Daedone herself had referred to OneTaste as, quote/unquote, a sex cult. Do you remember testifying to that?

A Yes.
Q I think you also testified -- let me get it right -- that it was mostly just a way to get a rise out of the people that we met. It was a controversial statement.
Do you remember saying that?
A That's my opinion of what -- like, we were living, you know, as a community, residential community, and rather than try to fight against the term, cult, we kind of leaned into it.
Q Right. But when you were first interviewed for several hours by the FBI during that initial proffer session on September 1st of 2021, you never told the FBI that Nicole herself had called OneTaste a sex cult, did you?
A I don't recall.
Q Would you like to look at the report?
A Sure.
Q Okay. Or do you want to agree with me that you never told the FBI, during your initial many-hour proffer session, that Ms. Daedone had referred to OneTaste as a sex cult?
A No, I'm not going to agree with you. If they asked me if we were in a sex cult, I would have answered it. They may not have answered it.
Q You think the FBI didn't ask you whether this was a sex cult when you met?
MS. BENSING: Objection.

THE COURT: Overruled.
A Ma'am, I still don't remember what all was said in that interview.
Q Okay. In fact, you didn't even mention anything about sex cult in that initial nine-page -- or in that initial many-hour proffer session, did you?
A Again, I don't remember everything that was said in that interview.
Q You can look, if you will, at -- if you want to take your time looking at it, by all means. If you find the part where you said Ms. Daedone called it a sex cult, let me know.
MS. BENSING: Objection.
THE COURT: Sustained.
MS. BENSING: And, Your Honor, I'm not sure if there was a question --
MS. BONJEAN: I'm asking --
THE COURT: She's asking him to take a look and then she's going to pose a question.
Go ahead, pose your question, please.
Q Is there anyplace in that report where you told the FBI that Ms. Daedone calmed OneTaste a sex cult?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Well, do you remember telling the Government or the FBI

on September 1st of 2021 that Ms. Daedone told you or said aloud that OneTaste was a sex cult?
A I don't remember whether I said in that session that Nicole had said or we discussed OneTaste as being a sex cult.
Q Okay. Do you remember yourself ever telling the federal government, the FBI, or any of the U.S. Attorneys that you viewed it as a sex cult during the September 1, 2021 meeting?
A In a September -- again, I don't remember the content of the conversation or the interview I had with the federal government on that September call.
Q After that meeting, did the federal government suggest to you that you should call it a sex cult?
A No. We called it a sex cult when I was at OneTaste.
Q Right. But you didn't tell the Government that in 2021 when you were interviewed, right?
A Again, ma'am, I don't remember the content of that call.
Q Now, you explained on Friday that a research partner was someone who you OM'd with or had other sexual activity with, correct?
A Generally, yes.
Q And that being a research partner didn't require sex, but it might be part of the relationship, right?

A Yes.
Q Now, was Christine Berkley one of your research partners?
A I don't -- I don't remember. I do remember she and I had sex and -- well, I consider OMing sex, so yes.
Q Then you had sex with, like, hundreds of people, right?
A Hundred --
THE COURT: Just let him answer and then --
Are you done with your answer?
THE WITNESS: I think I lost the question, sorry.
THE COURT: Can you just ask the question?
Q If you consider OMing sex, that means you've had sex with hundreds and hundreds of people, right?
A Certainly hundreds, yes.
Q Okay.
Now, you testified on Friday that you were at OneTaste because you wanted to help women in the community develop a culture where women were equal to men in all ways, right?
A Yeah.
Q And that included so that your daughters and your daughters' daughters could have freedom of expression. Do you remember testifying about that?
A Yeah.
Q And you explain that eventually you came to believe

that OneTaste really wasn't living up to that mission, right?
A Yes.
Q And, of course, then when you started your own company in the sex space, you had that same goal in mind, to advance a culture where women were equal to men, correct?
A I don't recall starting the company in the sex domain, or however you phrased that. Which company are you --
Q Do you remember creating Our Gourmet Life, which created erotic dinners with naked women serving people?
A Yes, I did create, with my wife, the Our Gourmet Life, right, erotic dinners.
Q And these were women that were -- women, like exclusively women walking around naked serving people for dinners, right?
A Incorrect.
Q Okay. And do you also remember that in creating this company, those women that were serving people naked didn't get paid?
A People serving --
MS. BENSING: Objection. Relevance.
THE COURT: Sustained.
Q You didn't pay the people that were giving sex work to your company, did you?
MS. BENSING: Objection.

THE COURT: Sustained.

Q Was that your contribution to the empowerment of women --

MS. BENSING: Objection.

THE COURT: Sustained.

MS. BONJEAN: It goes to credibility --

THE COURT: Sustained. Next question, please.

MS. BONJEAN: Well, it goes to the video --

THE COURT: Next question, please.

MS. BONJEAN: My next question is about a video that we need to address.

THE COURT: Do you have something after that?

MS. BONJEAN: No.

THE COURT: Okay. So we're going to take our morning break at this time. We will come back at ten minutes to 11:00.

Don't talk about the case and keep an open mind, and we'll see you at ten minutes to 11:00.

And the witness may step down.

(Witness leaves the stand.)

(Jury exits.)

THE COURT: Everyone may be seated.

Tell me exactly what it is you want me to review by way of video. Where is it and what timestamp?

MS. BONJEAN: It's a one-minute video I gave to

your --

THE COURT: Is that the only thing on the thumb drive you gave?

MS. BONJEAN: I believe so.

THE COURT: Does it have some identifier that somebody can give me in case it's not? Maybe a paralegal?

MS. BONJEAN: It's DX 16-AK.

THE COURT: There was another video that somebody wanted me to look at, Mr. Robotti?

MR. ROBOTTI: Yes, Your Honor. It's 16-L. The timestamps for that are zero to 3:49 and 5:08 to 6:58.

THE COURT: Okay. Sorry, 5:08 to 6:58?

MR. ROBOTTI: 6:58.

THE COURT: Okay. I'm going to go listen to that.

We're adjourned until ten minutes to 11:00.

(Court is in recess.)

THE COURT: You can bring out the jury, and we can bring the witness back.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Bonjean, you may resume your cross-examination.

MS. BONJEAN: Yes, Your Honor.

BY MS. BONJEAN:

Q Mr. Hubbard, do you remember at the time that you were involved in OneTaste back in the Warehouse days --
First off, that's an expression that you use, right, the Warehouse days?
A Yes.
Q And it refers to a specific period of time in OneTaste's history, right?
A I refer to it as that, yeah.
Q Okay. And it was kind of -- you would call it a little more underground at that time, right?
A I may have done -- it's not ringing a bell.
Q Do you recall being video-recorded during your time at OneTaste back in 2006 or 2007, in the Warehouse days?
A I didn't until Friday when I was shown that video.
Q What video is that?
A The first cross showed me a video of me sitting on a chair with kind of a gold curtain background, and I was being asked questions.
Q Okay. Do you recall giving statements to the OneTaste community at a microphone on, like, an improv night type of thing. Do you remember that?
A No, I do not.
Q Do you remember telling the community of OneTaste that you were part of the construction team that had worked on creating the space at OneTaste?

MS. BENSING: Objection. Hearsay.

THE COURT: Sustained.

MS. BONJEAN: It's not offered for the truth.

Q Do you remember telling the people that you wanted to make a room of cock?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Do you remember, during your early days at OneTaste, expressing, in very vivid terms, your love of pretty extreme sexual activity?

MS. BENSING: Objection.

THE COURT: Overruled.

A Do I recall telling OneTaste my love of extreme sexual activities?

Q Yes.

A No, I don't recall that.

Q Okay. Do you recall discussing publicly within the OneTaste community your desire to engage in throwing women over a wall?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Do you recall espousing your desire for exerting dominance --

MS. BENSING: Objection.

A -- in the context of the BDSM approach?

MS. BENSING: Objection.
THE COURT: Sustained.
Q You're here today, what is this, 20 years later?
A Almost, yeah.
Q And you're telling this jury about your views of what happened 20 years previously, correct?
A Roughly, yes.
Q But at the time, you were all in to the sexual exploration that was occurring at OneTaste back in 2006 and 2007, right?
A Not all in, but mostly.
Q Right. You were all into the sex part, right?
A No. There was things I was not into.
Q Okay. I said you were into the research partners, having sex with them, right?
A When she consented, yes.
Q And you were into the OMing and touching the pussy, I think is the word you used. You were into that part, right?
A Yeah, sure.
Q And that was exciting for you at the time, right?
A From time to time it was exciting. Sometimes it was not.
Q Okay. I just have one final question: Do you still go by the name M. Follet?
MS. BENSING: Objection.

THE COURT: Overruled.

A That Facebook page still exists. I don't go by the name M. Follet. I don't introduce myself as that.

Q You have a Facebook page of Mademoiselle or Monsieur Follet?

A Martin Follet. It was brought up in direct on Friday.

Q You created a whole Facebook account around it?

A Yes. I testified to that on Friday.

MS. BONJEAN: No further questions.

THE COURT: Any redirect examination?

MR. FERN: Yes, Your Honor.

THE COURT: Go ahead, Mr. Fern.

REDIRECT EXAMINATION

BY MR. FERN:

Q Mr. Hubbard, at whose direction did you create those Facebook profiles?

A Nicole's -- well -- yeah, Nicole's.

Q And you were asked on cross-examination about your emails to Reese Jones using various personas. Who directed you to do that?

A Nicole.

Q You were also asked on cross-examination about running scenes for Reese Jones. Who directed you to do that?

A Nicole.

Q Now, defense counsel on cross-examination asked you

about reports of your meetings with the Government.

A Yes.

Q When you met with the Government, was someone taking notes?

A My understanding, and I didn't realize it at the time, but somebody on the prosecution's team was taking notes.

Q Was there a stenographer there taking an exact transcript?

A No.

Q Did the Government ever show you the notes?

A No. We asked for them, but they were not ever provided.

Q Did the Government ever show you the report?

A No. We asked for it, and it was not provided.

Q Did you ever confirm what was written in the report?

A I couldn't because we never saw the reports.

Q You were asked on cross-examination by Mr. Robotti about whether you complained about mandated behavior vis-à-vis the corporate structure of OneTaste. What was the mandated behavior that you complained about?

A The mandated behavior, when I use that phrase, was in an email that I had sent to Nicole in roughly 2009.

Q And what was that mandated behavior?

MS. BONJEAN: Objection. Hearsay.

THE COURT: Sustained.

Q You testified on cross-examination that you believed in the stated vision of OneTaste. Why did you use the word "stated"?
A Well, because the way, when I was at OneTaste, we talked about OneTaste was a particular vision of the world, and then -- but the actual, like, implementation was somewhat different.
Q In what way?
A For example, we were doing withholds, which is, in my opinion, a disempowering activity, which is in contrast to a stated vision, which is empowering people. There would be other examples like that.
Q You testified also on cross-examination that you believed that you were going to make a difference?
A I certainly hoped so.
Q What happened?
A At some point the conversation -- well, there was a conversation about whether we were going to go wide or whether we're going to go deep, as in whether we were going to try and hit as many people as possible -- engage as many people as possible or have it, like, more of a core focus group who explored these concepts deeper. And I wanted to go deeper, and Nicole took it wider.
Q Did there come a time at OneTaste when you no longer believed that you were helping to empower women?

A Yeah, slowly, and certainly towards the end when I started hearing feedback --

MS. BONJEAN: Objection to the hearsay.

THE COURT: Sustained.

Q What happened that you believe that you were no longer helping to empower women?

A A few women who I was closer to told me that they were --

MS. BONJEAN: Objection to the hearsay.

THE COURT: I'll hear the Government.

MR. FERN: I'll rephrase my question.

THE COURT: Sustained.

Go ahead. Ask the next question.

Q Why did you believe that OneTaste was no longer empowering women?

A Based on conversations I was having with women --

MS. BONJEAN: Objection.

THE COURT: Overruled.

A Based on conversations I was having with women who had been in and around OneTaste; some women around OneTaste.

Q What specifically?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A One woman specifically felt -- she did not enjoy the OMing practice and she felt that it was inappropriate for

her desires, and she felt that she -- the only way to be in OneTaste was to kind of, like, suck it up and OM, and that doesn't sound right to me. It's an example.

MR. FERN: One second, Your Honor.

THE COURT: Yes.

MR. FERN: No further questions.

THE COURT: I'll allow a brief redirect, Ms. Cohen or -- I'm sorry, excuse me, Mr. Robotti or Ms. Bonjean.

Go ahead, Mr. Robotti.

RECROSS EXAMINATION

BY MR. ROBOTTI:

Q Mr. Hubbard, you just mentioned that during your time at OneTaste, you felt it became disempowering, right?

A For -- well, that's a gross summation, but I'll go with it.

Q You said that at a certain point you felt that it was no longer empowering women?

A I felt that -- well, it was my view that for some women, it was not empowering them.

Q And you recall the video I showed you on Friday of that 2007 interview?

A Yes, I do.

Q And during that interview, at no point did you raise any concern like that, correct?

A I believe that's correct.

Q And, in fact, during that interview, you were laughing and talking about how much fun you were having?
A Yes.
Q And how beneficial the practice had been for you?
A I'd have to watch the video again, but along those lines.
MR. ROBOTTI: Your Honor, defense moves into evidence Defendant's Exhibit 16-L.
MS. BENSING: Objection. Improper impeachment --
THE COURT: Sustained.
Q You testified about the scenes on redirect examination; is that correct?
A Did we just talk about scenes?
Q A moment ago you mentioned the scenes that we've discussed during your testimony, correct?
A Oh, yes, yes. Thank you.
Q All those scenes were consensual; is that right?
A It's my understanding, yes, they were.
Q And they were all with adults, correct?
A Absolutely.
MR. ROBOTTI: Thank you.
THE COURT: Any recross-examination by Ms. Bonjean?
MS. BONJEAN: Yes, Your Honor. Just a couple of questions.

RECROSS EXAMINATION

BY MS. BONJEAN:

Q You just gave an example of a woman who did not find OMing empowering, right?

A Yes.

Q OM was, like, the literal fundamental tenet of OneTaste, wasn't it?

A It was one of the core principles.

Q Yes, right. And so if you find a core principle unempowering, you should probably leave the group, right?

A If it's one of several, then maybe, maybe not. It's on that person to decide.

Q This woman that you were referencing that didn't find OM empowering, she could leave, right?

A Yeah. In fact, she did.

Q She did leave, right?

A Uh-huh.

Q That's how the world works. You don't like it, you leave, right?

A When you can, yes.

Q And she could, correct?

A She did.

Q Okay. And you said you at some point didn't find that OneTaste was empowering women. What did you do to empower women?

A In regard to OneTaste or something else?
Q Ever. Well, during this time period, what did you do to empower women?
A Initially when I was at OneTaste, my intent was to support Nicole in building up OneTaste as a form of empowerment for women.
Q But what did you do to empower women?
A When women asked me to do something for them, like OM with them, then I would say yes.
Q So you empowered women by OMing?
A That would be an example.

MS. BONJEAN: Okay. No further questions.

THE COURT: The witness may step down. You're excused.

THE WITNESS: Thank you.

(Witness is excused.)

THE COURT: The Government may call its next witness.

MS. BENSING: Your Honor, before we call our next witness, the Government would like to offer a series of exhibits that I understand the parties have agreed on the admission.

Government Exhibits 56, 57, 60, 203, 205, 213, 247, 272, 273, 275, 297, 327, 3127, 4617, 4624, 4627, 4666, 4671, 4678, 4691, 4698, 4707, 4715, 4716, and 4719.

The Government offers those exhibits into evidence.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: The following exhibits are admitted:

Government Exhibits 56, 57, 60, 203, 205, 213, 247, 272, 273, 275, 297, 327, 3127, 4617, 4624, 4627, 4666, 4671, 4678, 4691, 4698, 4707, 4715, 4716, and 4719.

(Government Exhibits 56, 57, 60, 203, 205, 213, 247, 272, 273, 275, 297, 327, 3127, 4617, 4624, 4627, 4666, 4671, 4678, 4691, 4698, 4707, 4715, 4716, and 4719, received in evidence.)

THE COURT: You can bring in the witness.

MS. BENSING: The Government calls Christina Berkley.

(Witness takes the stand.)

THE COURT: You can come right up here.

THE COURTROOM DEPUTY: Please step up, remain standing and raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Please be seated.

State your full name slowly and spell it slowly into the microphone.

THE WITNESS: Christina Berkley.

THE COURT: Could you just spell that?

THE WITNESS: C-H-R-I-S-T-I-N-A, B-E-R-K-L-E-Y.

THE COURT: Go ahead, Ms. Bensing.

MS. BENSING: Thank you very much.

**CHRISTINA BERKLEY**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BENSING:

Q Good morning, Ms. Berkley.

Are you testifying here today pursuant to a subpoena?

A Yes.

Q Are you familiar with an organization called OneTaste?

A Yes.

Q What is OneTaste?

A It's a educational company that focuses on a sexuality practice that runs events and workshops.

Q And how are you familiar with OneTaste?

A I was a participant there for -- from around 2006 to 2010.

Q How old were you in approximately 2006 when you first became involved with OneTaste?

A 28.

Q Do you know somebody named Nicole Daedone?
A I do.
Q I'm going to ask you to look around the courtroom and let me know if you see her.
A I do. She's standing in the blue suit.
MS. BENSING: Your Honor, I'd ask that the record reflect that the witness has identified the defendant, Nicole Daedone.
THE COURT: Yes.
Q What, if anything, was Nicole Daedone's role when you were at OneTaste?
A She was the founder, the leader, the main teacher.
Q Do you know somebody named Rachel Cherwitz?
A I do.
Q I'm going to ask you to look around the courtroom and let me know if you see her.
A Yes, she's wearing a gray jacket.
MS. BENSING: Your Honor, I'd ask that the record reflect that the witness has identified the defendant, Rachel Cherwitz.
THE COURT: Yes.
Q What, if anything, was Rachel Cherwitz's role when you were at OneTaste?
A At first she was a student, and then she became the head of sales.

Q What other names or nicknames did Rachel go by, Rachel Cherwitz, at that time?
A Raheli and RC.
Q Ms. Berkley, did you ever perform work for OneTaste?
A I did.
Q And at a very high level, what kind of work did you provide at OneTaste?
A I was running the massage studio there, some work at the front desk, I was Nicole Daedone's assistant. I eventually ran the New York office.
Q Did you perform any sexual services?
A I did.
Q What were those?
A I, as part of my being her assistant part, one of the things I did every day was stroke her boyfriend's cock in the morning.
Q And who was her boyfriend at the time?
A Reese Jones.
Q Ms. Berkley, what, if any, impact did your time at OneTaste have on your financial situation?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A It -- I ended up in a lot of debt. It was bad. It was very bad.
Q What, if any, psychological impact did your time at

OneTaste have on you?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A It had a very dramatic impact on me psychologically that then took many years to come out of. It changed my identity and sense of self that I had to slowly piece back together what was me and what was not me that I had picked up that was -- I had been kind of formed into. So I had to reclaim myself on my own afterwards.

Q What do you mean --

MS. BONJEAN: Same objection to the relevance and expert testimony.

THE COURT: Overruled.

Q What do you mean by that? Just speaking to your own experience, Ms. Berkley.

A Over the four years that I was there, in a slow way, my sense of my own instinct and intuition and feelings of what is right and wrong and values slowly became formatted into a style of -- like a box or an algorithm that was the appropriate one, that was the OneTaste one. And then my own sensing, I would just doubt anything in my head that was my own that wasn't this.

So once I left, I had to, like, relearn to sense my actual beliefs and values and feelings and thoughts and be able to trust them, which was really hard because I -- it

was very conflicting and confusing --

MS. BONJEAN: Can I have a standing objection, Your Honor --

THE COURT: Overruled.

MS. BONJEAN: -- to this line of testimony?

THE COURT: Overruled.

Q Go ahead.

A And it didn't fit with the world. Like, the world became scary. The world became sort of full of people who were well meaning, but not really understanding -- just no one could understand where I was coming from. It was really hard to relate to people. So I had to sort of resocialize myself over time to be able to be in the world and enjoy life in the world as it was and not just feel like I was an alien and just walking through a gray world again.

Q Who, if anyone, caused that psychological harm to you?

MS. BONJEAN: Objection.

THE COURT: Sustained.

MS. COHEN: Join.

THE COURT: Sustained.

Q You described psychological harm that you experienced at OneTaste. Who contributed to causing that psychological harm?

MS. BONJEAN: Same objection.

MS. COHEN: Objection.

THE COURT: Sustained.
Q I want to go back to before you became involved in OneTaste.
Where did you grow up?
A In Toronto, Canada.
Q What were your circumstances like growing up? At a high level.
A We were immigrants from Romania from before the Iron Curtain fell. My parents were very concerned and strict and came from a very different culture, so they were very, very -- they didn't know how to raise me in a way that fit into Canadian culture, so I was really awkward and very bullied. In school, like any school that I moved to -- I think I went to four different schools before university -- I would always end up being the kid in the class that everyone would gang up on and sort of bully really badly. It was tough.
Q How, if at all, did that impact your later time at OneTaste?
MS. BONJEAN: Objection. Relevance.
THE COURT: I didn't hear. Ms. Cohen, did you say something?
MS. COHEN: I didn't say anything, but I join in that objection.
THE COURT: Okay. Sustained as to form.

Q How, if at all, did that background that you just described to us regarding bullying impact your involvement in OneTaste?

MS. BONJEAN: Same objection.

MS. COHEN: Objection.

THE COURT: Sustained as to form.

Q Ms. Berkley, when you first became involved in OneTaste, what appealed to you about OneTaste based on the background that you just described?

A There was an instant experience of people really like me, and being surrounded by people just saying really nice things about me and being kind of like my best friend really fast, and it was the opposite of what I'd experienced before. So that sense of belonging that I never had was instantly there. It was, like, a nutrient that I needed that I had never had, which was just -- it was like moth to a flame.

Q You testified that you grew up in Toronto. Did there come a time when you moved to San Francisco?

A Yes.

Q What brought you there?

A My boyfriend at the time, who became my husband, moved to study at Berkeley, to do his Ph.D. at Berkeley. So if we wanted to stay together, I needed to move with him, so we moved together to San Francisco.

Q And what was your husband's first name at the time?
A David.
Q What, if anything, did you do for work when you first moved to San Francisco?
A While I was waiting for my green card, I was volunteering at animal shelters. And then when I got it so I could work after we got married, I ended up as a doctor's assistant at a veterinary clinic.
Q How did you first hear of OneTaste?
A I was at work, and this woman, one of my coworkers brought a flier that someone at a bar had given her the night before, and it was for a party called the Gypsy Nights Party, and on the flier, it said: And there will be a demonstration of a women in orgasm for 15 minutes. So she brought the flier to work to sort of have us laugh at it because it was, like, ha-ha, how funny and ridiculous, and instead I was like, oh. And I went on the website and I liked what I saw on their website, and so I went home and I was, like, hey, honey, want to go to a thing? And we went.
Q And did you go?
A We did, yeah.
Q Describe what happened in those first few weeks after you heard about OneTaste and you attended that initial event.
A The event was really interesting. I thought that that

demonstration would be someone faking it, and it wasn't. So I was really interested. And so then he and I began to explore the other offerings that they had on their calendar. So we went to something called In Group at the time, which was this evening of these communication games, and it was really fun. We instantly were welcomed.

We went to a course, or I went to the course -- we both liked the courses -- and learned the practice, the orgasmic meditation practice. Both of us found -- we had -- we were looking to open up our relationship, but we didn't know how. We didn't have any friends who did that and we didn't know what to do with that. But here, there were these conversations around sexuality and relationship that were really interesting and helpful. And so we both, in our going there to different events, found people that we found interesting, and so we began to have sexual relationships and experiences with other people. We opened up our relationship, yeah.

Q I want to show you what's in evidence as Government Exhibit 272.

MS. BENSING: And this can be for both the witness and the jury, please.

(Exhibit published.)

THE COURT: If we could clean the lines on there, as well, or the arrows.

MS. BENSING: We'll just give the system a minute to warm up.

There we go.

Q Ms. Berkley, can you see on the screen in front of you?

A Yes.

Q Okay. Who is depicted here in Government Exhibit 272?

A Nicole Halpern.

Q Who is that?

A She was the head of sales when I first arrived at OneTaste. She -- I think it was after the first In Group I went to, she called me and invited me to come by for tea, which I thought was really nice. And I came by and we had this really nice tea, and she was so --

MS. BONJEAN: I'm going to object to the nonresponsiveness.

THE COURT: Sustained.

You can ask the next question.

Q At the time that you met Nicole Halpern, did you know who she reported to?

A No.

Q Did you come to later learn who Nicole Halpern reported to?

A Yes.

Q Who did she report to?

MS. BONJEAN: Objection. Calls for hearsay.

THE COURT: Overruled.
A Nicole Daedone.
Q You've already testified about Nicole Daedone. What, if any, nicknames did Nicole Daedone go by?
A Nic.
Q Who were some of the other leaders of OneTaste when you first became involved in OneTaste in approximately 2006 or early 2007?
A Rob Kandell was the co-founder. Ken Vanosky was I think the CFO.
MS. BENSING: I'm going to ask to briefly put up Government Exhibit 221, which is already in evidence.
(Exhibit published.)
Q Who is this?
A That's Rob Kandell.
Q What was his role at the company when you joined?
A COO.
Q Did you come to learn who Rob Kandell reported to?
A Yes.
Q Who?
A Nicole Daedone.
Q I'm going to show you Government Exhibit 380 which is in evidence.
(Exhibit published.)
Q Who is this?

A Ken Vanosky.
Q I think you testified that his role was CFO?
A That's right.
Q Did you come to learn who Ken Vanosky reported to?
A Nicole Daedone.
Q Approximately --
MS. BENSING: We can take that down. Thank you.
Q You testified earlier that Rachel Cherwitz's role changed at some point when you were at OneTaste; is that correct?
A That's true, yeah.
Q What was her role at the beginning?
A She was a student, yeah, like me, taking workshops and living at the Warehouse where we were all living.
Q And when you first arrived --
When you first got involved in the OneTaste community, was Rachel Cherwitz involved in the OneTaste community?
A When I first arrived?
Q Yes.
A No.
Q Approximately how long after you got involved with the OneTaste community did Cherwitz arrive?
A I'd say somewhere between six months and a year. I'm not sure.

Q And what were the circumstances? Who did she arrive with?
A Her partner at the time, his name was Kal. I think she came from Texas. She -- yeah, she was sort of there how I was there, sort of a seeker --
MS. COHEN: Objection, Your Honor.
THE COURT: Sustained.
MS. BENSING: And just for clarity of the record, Your Honor was sustaining that last portion?
THE COURT: Yes, the last statement the witness made.
MS. BENSING: Thank you.
Q I want to show you Government Exhibit 213.
(Exhibit published.)
Q Do you recognize this person?
A That's Kal.
Q Do you remember his last name?
A Holczer? I don't know how to pronounce it. Something like Holczer.
Q I want to show you Government Exhibit 281 which is also already in evidence.
(Exhibit published.)
Q Who is this?
A Rachael Hemsi.
Q Who is that?

A She was one of the participants and core members of the community. She was more like a community -- holder of the community, sort of community mom sort of role.
Q And did there come a time when her role changed while you were involved with OneTaste?
A She became the leader of the New York branch for a while. I don't know if there were other ones in between.
MS. BENSING: We can take that down. Thank you.
Q You mentioned that when you first got involved in the OneTaste community, you and your then husband attended some events. Where were those held?
A They were held at the Center on Folsom Street, the main teaching space.
Q I want to show you what's in evidence as Government Exhibit 4624.
(Exhibit published.)
Q Do you recognize this?
A Yes. That's the Center.
MS. BENSING: Can we please pull up 4627.
(Exhibit published.)
Q Do you recognize this?
A That's also the Center. Then right beside it is where the massage studio was. So the brown door is into the Center, and then the two doors beside it with the posters on them is to the massage center.

Q And I think you testified earlier that at some point you started work other at the massage center, right?
A Yes.
Q Okay. We'll come back to that.
MS. BENSING: We can take that down.
Q Where did the individuals who you met within the OneTaste community principally live?
A The Warehouse.
Q What is the Warehouse?
A It was just down the street from there, like a few doors down from there, a big space with a lot of beds that had sort of different rooms attached in different ways. But we were all there together in a very co-living situation.
MS. BENSING: If we can pull up Government Exhibit 61, which is in evidence.
(Exhibit published.)
Q You just testified that the Warehouse was a few doors down from there. Where did you mean?
A I think it's that gray building behind the red dumpster.
Q I'm sorry. What is the gray building?
A The Warehouse.
Q Okay. And you said the Warehouse was a few doors down from the Center?
A Yes.

Q Did there come a time when you began living at the Warehouse?
A Yes.
Q Approximately how long after you first had this first introduction into OneTaste did you move into the Warehouse?
A I moved in part time November, December. I first came in August, and then I think around sometime in the fall, late fall, winter, early winter.
Q Of 2006?
A Of 2006, yeah, part time.
Q I want to show you Government Exhibit 4707, which is in evidence.
(Exhibit published.)
Q What is this?
A That's the Warehouse.
Q Does in differ in any way from when you were living at the Warehouse?
A Yeah. There used to be curtains. There were curtains in between the beds, but not in front.
MS. BENSING: And I'd like to pull up Defense Exhibit 4-A.
(Exhibit published.)
MS. BENSING: May I have one minute, Your Honor?
THE COURT: Yes.
(Pause in proceedings.)

THE COURT: Is there another number after 4-A?

MS. BENSING: That I'm going to show the witness, Your Honor?

THE COURT: Yes.

MS. BENSING: Yes. We can move on.

THE COURT: I just wasn't sure what exhibit you're talking about.

MS. BENSING: Oh, no, it's just Defense Exhibit 4-A is the name of the exhibit. We can come back to it, though.

(Continued on the following page.)

DIRECT EXAMINATION BY
MS. BENSING: (Continued.)
Q So I'd like to pull up Government Exhibit 4715. What is this?
A The Warehouse, the main space.
Q And again, the difference here is that there were no curtains between the beds?
A That's right.
Q Were there also curtains in front of the beds, Ms. Berkley?
A No.
Q So just dividing the in between sides of the beds?
A Yes.
Q Approximately, how many people lived in the Warehouse when you moved into the Warehouse?
A Between this and the other few spaces, 30 to 40, depending.
Q And what was the setup of the Warehouse?
A There's this room. We would keep our belongings on the shelves that you see in the back, the cubbies. Through that door there was another kind of hallway lounge area where there were more cubbies for personal stuff, the bathroom and the showers were off of there, and in the front room were some couches where people could sit around, and the front door to the street.

And then up higher there were stairs going up to a kind of loft space with three more beds, kind of where this picture is taken, and there was another door that went into another property on Russ Street that had a few more beds, as well, and also in the front that went off to the street there were stairs that went up to another space. There were four, five beds up there, also.

Q And here in Government Exhibit 4715 we see a series of beds. How many people slept to a bed?

A Two, usually two.

Q I want to pull up Government Exhibit 4716 and 4719. You testified a minute ago about a lofted area. Do you see the lofted area in Government Exhibit 4719?

A Yes.

Q Where is that?

A At the top of the stairs.

Q How many beds were up there, if you can recall?

A Three.

Q You testified that there was a bathroom shower space. How many showers were there?

A It was like there were a number of shower heads in one open shower, four maybe, four different shower heads.

Q So it's a communal shower?

A Communal shower, yeah. I don't if there are four or six, or something. I think four.

Q And people shared it?
A Yes.
Q What about bathrooms?
A There were two toilets and two sinks and a bunch of shelves for toiletries.
Q And, again, did everybody share those?
A Yes.
Q When you moved into the Warehouse, did Nicole Daedone live there?
A No.
Q And where did she live, to your knowledge?
A She lived with her partner in his townhouse in a different area part of town.
Q Which partner is that?
A Reese Jones.
Q And that's the individual you testified earlier that you performed sexual acts on?
A Yes.
Q I want to show you Government Exhibit 284. Who is this?
A Reese Jones.
Q I want to show you Government exhibit -- by the way, when you arrived at OneTaste, was Reese Jones already involved with OneTaste?
A Yes.
Q What was his role?

A I know that he was investing in OneTaste. I don't know how much, or I didn't at the time, but he was always there. He was often there with Nicole.
Q I want to show you Government Exhibit 56. Do you recognize this?
A Yes. That's his townhouse.
Q And that's where Nicole was living at the time that you were living in the Warehouse?
A Yes.
Q Where was this house located?
A I think it was Russian Hill, at the top of Russian Hill.
Q I want to show you Government Exhibit 57. What is this?
A The townhouse.
Q I want to show you Government Exhibit 60. What is this?
A The living room and kitchen in the townhouse, and the view.
Q The townhouse where Reese Jones and Nicole Daedone lived?
A Yes.
Q We can take that down. Thank you. Ms. Berkley, are you familiar with the phrase research partner?
A Yes.
Q What is a research partner?
A It's someone that you're typically sharing a bed with and you're doing some kind of research into something to do with sexuality or relationships. So it could be your actual

boyfriend, girlfriend, partner. It could be your husband, wife. It could be somebody that you have some sort of thing with you're jealous about or you're not into, or whatever it is that you want to be researching what can it be like to be with somebody like this that's outside the norms of somebody I normally might be with.

So you share a bed that you could be full-time research partners, part-time research partners, researching what you want to be researching with each other.

Q Did you have research partners when you were living at the Warehouse and involved with OneTaste?

A Yes.

Q Approximately, how many?

A Three, that I remember clearly.

Q And did you also have a sexual relationship with each of those research partners?

A No.

Q How many did you have a sexual relationship with?

A One the whole time, one just a little bit, and one not at all.

Q So is it fair to say that sometimes those research partners were sexual in nature and sometimes they weren't, at least with respect to you?

A Yes.

Q I want to show you Government Exhibit 247. Do you

recognize this person?
A Yes.
Q Who is that?
A Isaac Levine.
Q Who is Isaac Levine?
A He was my main research partner while I was there.
Q We can take that down. How was it determined which bed you would stay in in the Warehouse?
A What bed was available, what bed the person was in before you became research partners and their person would move, so then you would move into their bed. There could be kind of like better spots up on the loft or whatever. So when that would become available, oh, let me move to that one. Generally, it was where things were available.
Q You mentioned -- you testified earlier that you initially moved into the Warehouse part time. Did there come a time when that changed?
A Yes.
Q How come?
A My interest and involvement deepened and got more focused, and I decided that I wanted more of the experience. And my relationship with Isaac got more real and my desire to be immersed in the experience there was heightened, and I thought I was going to be there for a limited period of time before leaving. So I worked it out with my husband to be

there full time. Yeah.
Q When you first moved into the Warehouse on a temporary basis, how many nights per week did you stay there?
A I think it was three.
Q And do you recall, approximately, when you moved into the Warehouse full time?
A I think it was around December, maybe.
Q Did there come a time when your husband left San Francisco?
A Yes. He went on to become a professor. I stayed back and we ended up separating and divorcing.
Q During the time when you were living at the Warehouse part time, did you still have a job?
A Yes.
Q What was that job?
A At the veterinary clinic as a doctor's assistant.
Q Did there come a time when that changed?
A I eventually quit that job and ended up working at OneTaste.
Q Approximately, when?
A I don't remember exactly, early to mid 2007.
Q And you said you quit your job at the vet clinic and began working for OneTaste?
A Yes.
Q So you just testified about how in the space of just a

few months you moved into this community, you left your husband, and you left your job. Why?

A It was -- there was such a strong pull. There was so much there that was of interest to me, and I was learning so much. And previously I was training to be a therapist. And there was so much that I was learning about people, and this living experience without any privacy really allowed me to see like who people are.

There's like this experiment of like leave any conditioning at the door and try stuff and see who you really are, and being in that was like wow. And the relationship that I had with Isaac was really intense, and so there was that.

And the feeling of being surrounded by people who were like all my best friends at the same time was just so powerful for me, because I had never had that experience, that it felt like there's something going on here that's really unique and really special and I can't get that anywhere else in the world that I could think of.

So I kind of had to decide for myself what would I regret more, not taking the opportunity to learn everything I could learn in this environment and feel all these feelings I never felt before or not, go off and be a professor's wife sort of life.

Q At the time that you immersed yourself into this

community, what was OneTaste's mission, to your understanding?
A To teach this orgasmic meditation practice and the philosophies around it, and spread that in the world as far as possible.
Q Who taught that?
A Nicole Daedone.
Q Did there come a time when you had to commit in a formal way being involved with OneTaste?
MS. BONJEAN: Objection.
THE COURT: Sustained as to form.
Q How did you get initiated into this community, Ms. Berkley?
MS. BONJEAN: Objection.
THE COURT: Sustained as to form.
Q Did there come a time where you became formally involved with the OneTaste community?
A Yes.
Q What happened? What was that process?
A I don't know about formally, but like a whole another level of intense involved. There was this closed sort of community. Everyone that lived there, sort of class, I guess, or gathering, gathering of the community that was set up. I guess there was something where Reese Jones had decided he was going to --
MS. COHEN: Objection.

MS. BONJEAN: Objection.
THE COURT: Sustained.
MS. BENSING: I take it from the Court that the Court is sustaining that last answer for the record?
THE COURT: Yes. That's correct. Ask your next question.
Q So you testified that there came a time where you became involved at another intense level. What was that process of becoming involved at that level?
A So there was this community gathering where Nicole let us know that we're moving into another phase of seriousness with the mission, and that there was no -- the possibility for that because of the investment that was happening.
Q Let me pause there. What did Nicole say about the investment that was happening?
A Specifically, I don't remember exactly.
Q What was your understanding as Nicole was relaying in that meeting about why that meeting was happening?
A That Reese had decided to invest in OneTaste.
Q Reese Jones?
A Reese Jones, yes.
Q And so why was the meeting being held?
A So that we could determine like everybody who wants to continue further with the mission would be fully and like really focused that this is what we're here for and

participating in. So determining who in the community really wanted to be all in like that and who could be all in like that, or who the community decided they want to come along to be all in like that with them and that focused, and who wouldn't make it to the next phase, whatever the next phase would be.

Q Who led that meeting?

A Nicole Daedone.

Q What happened in that meeting, vis-à-vis you?

A There was a beginning part of it where she spoke and it felt more like a class or a community gathering. And then there came a time when we went from person to person and the entire community had to either give a thumbs up or a thumbs down on whether the person could stay in the community, or if they wanted the person to be in to move on to the next phase.

And so all the people that got thumbs up, I think it had to be unanimous, would stand up and went to stand on the side of the room, a side of the room, and then everybody else was sort of left in the chairs where we were.

And the second part of the day, the people who were left had to go up in front of everybody and then the reasons that they weren't deemed to be good potential members for the next phase were brought up. And we had to really acknowledge the truth of that and make concessions or say yes, we would shift whatever it was about the way that we were being in

order to be able to participate and continue to participate and not get kicked out, basically.

Q What happened when it came time for you to be presented in this way?

A I was the last one left. So it was like my high school nightmare. It was awful. Everyone had made it past. No one had gotten kicked out and I was the last one left. And I went to the front and it was that my research partner, Isaac, who at that point I was very connected to and infatuated with, in love with, we weren't to be together if we wanted to continue because I was falling asleep and giving up my power in that relationship.

And somehow it was deemed that that relationship was not right or good for the community, and so we had to be apart and I had to agree to that.

Q Let me pause you there, because there's a couple of phrases you used I want to ask you about. First of all, I think you testified already that Nicole Daedone was generally leading this meeting. Was she also leading the part with respect to you?

A Yes.

Q And you said that the discussion around you was that you were falling asleep. What does that mean?

A That my energy and attention was on the happy coziness of being within a partnered relationship and not on my purpose or

something to do with the system, with OneTaste, or whatever it is, other than being in this relationship, and that just having a comfortable life, a happy life wasn't being on your spiritual path. So you weren't waking up. You were falling asleep.
Q Who taught this spiritual path?
A Nicole Daedone.
Q What was the spiritual path that she taught?
A Well, there was a way to tap into something deeper and greater than through this practice called orgasmic meditation, that the pursuit of finding our own power was very important, that going down into difficult situations was where you found that power, kind of this figure eight.
Go down and have difficult experiences and you make it through that and then you become more powerful and then you come up and you have bright enlightening experiences and you come back down. It was in the down that there was more focus.
Q And at this point in time when they had this thumbs up, thumbs down meeting, approximately, how long had you been involved in the OneTaste community?
A Four to six months.
Q At that point in time how did you view Nicole Daedone?
MS. BONJEAN: Objection. Vague.
THE COURT: Sustained.
Q At that point in time how did you view Nicole Daedone,

vis-à-vis the spiritual teachings that you're talking about?
A She was so smart and so tapped in and radiant, and really opened me to so much more that was possible for me to experience and have in life and be.
She was like, to me, a not quite like an enlightened person, but like so advanced and who just knew so much and had this way of seeing that was so accurate I never experienced from anybody else before, where she could just know something deep about you that was like how did you even see that, wow. So yeah it was amazing. She was amazing.
Q You testified that in this meeting she indicated to you that you were falling asleep or giving up your power. What does giving up your power mean?
A Putting my attention with someone else or somewhere else and using my energy and productivity and sort of life force energy for the benefit of being close to somebody, or somebody else other than myself.
So my locus, my center of knowing and being and doing what I want moves from me to somewhere else, in this case being Isaac, my partner.
Q You testified already that the concept of falling asleep meant that you weren't contributing enough to I think you used the phrase the system. What is the system?
A I don't know if it's called that anymore, but at the time the system referred to the OneTaste organization but sort of

all the different people and pieces and culture of it, sort of like an organic whole of everything that is OneTaste and how it operated.

Q And so, just to make sure I understand, are you saying that you were told that you were falling asleep by not devoting your purpose to the system?

MS. BONJEAN: Objection to leading.

THE COURT: Sustained.

Q Let me make sure that the jury understands what you're talking about here.

THE COURT: Let's just ask the next question.

MS. BENSING: Yes, Your Honor.

Q So when you say falling asleep and giving up, falling asleep with respect to the system, what did that mean to you? What did you understand that to mean?

A That I was there sort of having a good time for myself but I wasn't contributing to the mission and the goals of the orgasmic community and getting OneTaste into the world.

Q So what happened after this discussion?

A It was long. I was crying. Eventually there was somebody who was in the community who agreed to quote unquote sponsor me.

So that's how I finally -- everyone finally relented that it was okay that I stay. Then Isaac and I were not to -- we were split up. We couldn't be in the same bed anymore, but

were like in different sections of the building. We couldn't really be around each other much.

So there was this attention and watching that we weren't sort of falling back in with each other. So there was this like -- and then really trying to be good and not get pulled back in with him, because I believed everything I was told. So we, for a while, stayed apart.

Q So you testified that you were crying in this meeting. Why?

A It was like -- it was just such intense shame and humiliation being put on the spot. Everyone that I cared about in this thing that I was moving my life towards, and like I wasn't really talking to my parents anymore, my friends, it was my whole world was this world.

And everybody in it all of a sudden had their eyes on me, like I was so bad and doing this terrible thing, that it was just felt very ashamed. It was really, like my body was in shock. It was very difficult.

Q So the result of this was you and Isaac were no longer allowed to be together?

MS. BONJEAN: Objection to the characterization and leading.

THE COURT: Sustained as to leading.

Q What was the result of this, just to be clear, with respect to you and Isaac?

A That we were separated and not to be together.
Q What affect did this have on you?
MS. BONJEAN: Objection. Relevance.
THE COURT: Overruled.
Q You can answer the question.
A I became keenly aware of the power of the system and that if I don't move in the direction that it's moving, or wants to move, then something like that could happen. And so I didn't want something like that to happen again. And so then I was more I guess you would say compliant, or more looking to see what can I do that's good for the system.
In a sense I had given up my power to the system because I was now looking at it as knowing what's right and sort of handing over some level of I think this is weird, but that was no longer happening in my brain. It was like okay. In order to belong here and not get kicked out, I need to find a way that whatever the theme of what's going on in the system is right. So I'll pretzel myself on the inside in order to find the agreement to what's going on, regardless of what I'm feeling in here until after a while there is no more real sense of my own feeling in here. It was just being what the system wanted.
Q So you just testified with respect to your own relationship with Isaac at OneTaste. What, if anything, did you personally observe about other long-term relationships

either working or not working while you were involved with OneTaste?

MS. BONJEAN: Objection, foundation.

THE COURT: Overruled.

A There were some -- it depended on -- it was like there were concentric circles of how close in you were. So it sort of depended on what concentric circle someone was in in terms of someone taking courses and someone at the core, like living there, working there in the core. And relationships on the outside were sort of left alone but closer in.

There's another one that I know of specifically that was like no, we can't have these two people be close to each other, or in a relationship with each other because it's draining for the system in some way.

MS. COHEN: Objection.

THE COURT: Basis?

MS. COHEN: Foundation.

THE COURT: Sustained.

MS. BENSING: Your Honor, is it just to the last portion?

THE COURT: Yes.

Q Did you have an opportunity to observe with respect to the center concentric circle and, again, just based on your own personal observations how relationships worked within the inner concentric circle?

A There was a time when Rob and his partner was Justine Dawson. They were really happy together and they were both in the core place. After a while, that was no longer a good thing and they were -- pressure was starting to be put on them.

MS. BONJEAN: I object to the extent it calls for hearsay.

THE COURT: Overruled.

Q I just want to back up a second. You mentioned the name Rob. Who are you talking about?

A Robert Kandell.

Q And you mentioned that pressure was being put on them. Who was putting that pressure on them?

A Nicole Daedone.

Q What was the result?

A They broke up.

Q If I could pull up Government Exhibit 211. Who is that?

A Justine Dawson.

Q At the time that you first became involved with OneTaste, what was Justine Dawson's role?

A I think she may have come right after me. So she was at first a student, and eventually became part of the core and was helping Nicole write. She was writing something called the Desire Sutra at the time, but even before that. So helping her in flushing out ideas and writing.

Q And you testified that you personally observed this break between Rob Kandell and Justine Dawson. What role did you have at OneTaste when this was happening?
A I was Nicole's assistant.
Q What, if anything, did Nicole ask you to do with respect to Rob and Justine?
A She asked me to sort of watch and keep an eye on the Warehouse, on Rob specifically, on how he was being in this relationship.
Q Did she tell you why?
A No.
Q Did you do that?
A I did.
Q What did you report to her?
A I don't remember at the time what it was.
Q Did there come a time where Rob Kandell and Rachel Cherwitz began dating?
A Yes.
Q When was that in relationship to this Rob and Justine break up?
A It was earlier. I don't know. It was a year earlier. Rob had gone to New York and come back, and that's when he was with Justine. But he had been with Rachel Cherwitz before he went to New York. So maybe a year before that.
Q Did there come a time when you were research partners

with Rob Kandell?
A Yes.
Q What happened with respect to that?
A We tried to be part-time research partners, I think it was two nights a week, but that didn't last more than a week. We couldn't make it through.
Q Why not?
A Because Rachel Cherwitz didn't like it.
Q What was Rachel's role at the time?
A I don't remember.
Q If we could pull up Government Exhibit 4617, which is in evidence. Who is this?
A Rob and Rachel.
Q We can take that down. You just testified to one instance in which Nicole Daedone directed you and Isaac to break up.

Generally describe how your relationship with Isaac developed or changed throughout the course of the rest of your time at OneTaste.
A He and I eventually got back together and there were a number of then pressure for us to be apart, and then we would get back together until eventually that pressure went away. And then eventually the relationship ran its course naturally and we ended up breaking up of our own desire to.
Q When you talk about a time when that pressure went away,

was that after you had moved out of the Warehouse?
A Yes.
Q Where were you living at that time?
A New York.
Q We'll come back to that. In the other instances that you testified with respect to pressure being there, who conveyed that pressure to you?
MS. BONJEAN: Objection to the vagueness of that question and the foundation.
THE COURT: Sustained.
Q Well, you testified with respect to the time period you and Isaac being together, correct?
A Yes.
Q What, if anything, did you feel whether or not you could be in a relationship with him?
A There were times when it felt fine and there were times when I felt like I was doing something wrong.
Q The times you felt like you were doing something wrong, who was making you feel that way?
MS. BONJEAN: Objection. Assumes.
THE COURT: Sustained.
Q Who, if anyone, was making you feel that way, Ms. Berkley?
A Nicole, and then people in the community.
Q And what, if anything, did Nicole say to you about your

relationship with Isaac?
A Different things at different times. Thought I was falling asleep and giving up my power to him. There was a time when I was working as her assistant where I wasn't able to put enough attention on her because of that, relating to Isaac, and also that this wasn't a place for those kinds of relationships. If people wanted to do that, they could do that somewhere else.
Q You testified about this a little bit earlier, but at this point in time when this thumbs up, thumbs down meeting happened, did you still maintain a community outside of OneTaste?
A No.
Q Why not?
A All of my interests had just shifted from my friends and activities and the co-workers I didn't have anymore. But even while I was with my co-workers, still had my job, all I'd talk about was OneTaste. I stopped having things in common with them and they'd start coming at me with concern that I was in a cult and I would say no, you don't know what you're talking about. This is amazing. I kind of lost them.
I just ended up on a completely different track than what they were interested in. The real interesting people were all the people at OneTaste. So the husband went away, the friends went away. I couldn't talk to my parents because

there's no world in which this kind of thing would make sense to my parents or they would just be mortified. So yeah, slowly devolved.
Q I want to show you Government Exhibit 4671, which is in evidence. Can you see this in front of you?
A Yes.
Q Are you able to identify yourself in this photograph?
A Yes.
Q Where are you?
A Bottom row, second from the left.
Q Do you have blond hair?
A Yes.
Q And, by the way, if we can blow that back up, the bottom left. Who is just to your right when we're looking at the photograph?
A Yia Vang.
Q We can zoom back out. I want to direct your attention to the right half of the screen. Who are the individuals who you can see, starting at the very top left?
A Alisha Price, Josh Boshnack and Rachel Cherwitz are standing. I think that's Marcie Prohofsky sitting right there. In front of her is Beth Crittenden and beside her is Nicole Halpern.
Q We can take that down, please. You testified earlier that you left your job and began working for OneTaste. What

was your initial position?
A I was managing the massage center there. So I would make sure that it was clean and stocked. I guess there was a directory of different massage therapists that were on it. And so if someone called up looking for a massage, I scheduled that, or organized scheduling.
I would do massages a little bit, but I ended up not doing many because I realized pretty soon after I got my massage therapy license that my hands hurt. So that wasn't something I ended up doing a lot. I was managing that, and then I would work at the front desk at the Center, sort of welcoming, answering phones. I would have shifts at the front desk.
Q And before you got that formal job, did you volunteer with OneTaste?
A Yes.
Q And what kind of work did you perform volunteering?
A I remember the first thing I did was a shift, I think was at the cafe where I washed dishes after dinner. So I would do dinner clean up, I guess. I remember flowers, in charge of flowers.
Q After you got a formal job, after you got hired for the massage center, did you have other responsibilities besides massage center and working the front desk?
A Yes. So whatever was going on, I would be there helping

at. So whether it was like there were usually some kind of an event going on in the evenings, depending on the evening or courses during the weekends.

So I would be there to support in production of those events or participate as a participant, if I could in a group. I think I was beginning to do a little bit of marketing web site stuff at some point.

Q You mentioned courses. Were those recorded in any way?
A Yes.
Q What kind of recording?
A I think they were audio recorded and transcribed, maybe video. Could have been, I'm not sure. But there were definitely transcriptions.
Q Who transcribed them?
A Judy Silber.
Q How much did you make when you started working for OneTaste?
A 1,600 a month.
Q You just described various job responsibilities that you had. What were your hours like?
A All the time. Like they weren't really hours. There was, I guess -- I don't know what time the massage stuff would begin, 8:00, 9:00 in the morning, when the shifts would end, but it wasn't like a 9:00 to 5:00 situation. It was just whatever needed to be done.

There was my official things that I was doing and then there was whatever needed to be done that I was participating and helping. That's a hard question to answer.
Q How many days per week did you work?
A All the days.
Q Through what entity were you paid?
A Caravan, Inc.
Q Did you have health insurance?
A For a while, for a short period.
Q What happened?
A It stopped being offered, I believe. I believe it was because Reese Jones started having --
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Sustained as to that last part.
Q Do you know why it stopped being offered? Do you know why you stopped receiving health insurance?
MS. COHEN: Objection, Your Honor. Relevance.
THE COURT: Overruled.
Q You can answer.
A I think it was because Reese stopped --
MS. BONJEAN: Objection to the speculation.
THE COURT: Sustained.
Q The question is, do you know why your health insurance stopped getting paid?

A I don't.
Q You testified that you were making approximately 1,600 a month?
A That's right.
Q What expenses did you have at this time?
A Rent was 800, and then I don't remember if food was included in that or not. And then clothes, toiletries, anything, entertainment I would have to pay for, laundry. And then if I wanted to take a course as a participant I would pay for the course, as well.
Q Did you accrue any debt at this point in time?
A Yes.
Q What was that?
A I ended up with like 20 or 30,000 in debt.
Q To who? What kind of debt?
A Credit card.
Q What did your average day look like during this time period when you first began working for OneTaste?
A We would wake up at 7:00 and walk -- at the Warehouse and walk over to the Center. Then we would have our morning practice, which was to OMs and the withholds, and then breakfast and then start the day, whatever the day's business was to be done.
And then over the course of -- there would be lunch at some point, and then most evenings there was something

going on that we would be there for.
Q And you mentioned OMs, what is an OM?
A Orgasmic meditation.
Q I want to show the witness only what's been marked as Government Exhibit 4636. Do you recognize this?
A Yes. That looks like the position of two people doing an OM, having an OM.
Q Is it a fair and accurate depiction of a OneTaste OM?
A It is, except for he's not wearing gloves.
Q Apart from that, is a fair and accurate representation?
A Yes.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 4636 into evidence.

MS. COHEN: Objection as to cumulative and prejudicial at this point.

MS. BONJEAN: Objection to cumulative. I think it was admitted as part of another exhibit.

THE COURT: Overruled. Government Exhibit 4636 is admitted.

(Government's Exhibit 4636 was received in evidence.)

MS. BENSING: If we could publish 4636 to the jury, please.

Q I think you just testified that this looks like a OneTaste OM, except that one of the participants isn't wearing

gloves. Which one?
A The man.
Q And otherwise, does this depict the layout of an OM?
A Yes.
Q Did Nicole Daedone participate in the morning practice OMs?
A No.
Q Are you familiar with the term demo?
A Yes.
Q What is a demo?
A It's a demonstration of an OM. So there were ones that were in classes or for educational purposes in a class, or they were sort of at like the party that I went to, sort of for the public to experience what that is, if they were interested. Then there was a more intensive version of it where it was an hour long and a personal training for one's own spiritual path. That was more involved and took a long time. It was sort of like an initiation or a rite of passage.
THE COURT: Ms. Bensing, are you going to be using the exhibit that's on or can that be taken down?
MS. BENSING: I have one more question, Your Honor.
Q Did come a time when Nicole Daedone participated in a demo to your recollection?
A Yes.
Q How, if at all, did that demo differ from the depiction

of OM depicted here?
A It was on a massage table. So it was raised. There were people there watching. The stroker was standing to her side, beside her on the massage table.
Q We can take this exhibit down now. Thank you. You just testified about that demo. Where did that demo take place that Nicole Daedone participated in?
A Stinson Beach, which was a property that Reese was renting.
Q And apart from that one instance, did you ever see Nicole Daedone participate in OM or demos?
A I saw her maybe once or twice having an OM at the Warehouse, maybe she was training for that demo with Josh. I saw her stroking. Well, it wasn't a demo. Was your question specific about demos?
Q My question was, apart from that demo, when, if ever, you saw Nicole Daedone participate in an OM as a strokee?
A As a strokee, yes, that demo and then a couple times at the Warehouse.
Q What is a strokee?
A The person who is being stroked, so the person who is having the orgasm.
Q You testified about participating in OMs on a daily basis during your morning practice. Throughout your time at OneTaste, did you participate in OMs in other situations?

A Yes.
Q What were some of those?
A I did demos for sort of educational purposes, and then in courses when they needed -- there wasn't an equal number of men and women participants, and so people who were supporting in the back would jump in and have OMs with people. Personally, I would be OMing three to five times a day. So I would have my own OMs.

THE COURT: Ms. Bensing, it's about 12:30. If you're going to switch to another topic, we can take the lunch break now. If not, we can go 10 to 15 minutes more, but I don't want to go much more than that.

MS. BENSING: Can I ask two follow-up questions on this?

THE COURT: Go ahead.

Q We'll discuss this more later. What impact, if any, did participating in these OMs during courses come to have on you?
A Over a really extended period of time of doing that and with more intensity, as I ended up being more involved as a teacher, it just got to where I got really tired of that but I didn't want to have any of my own. Even after I left OneTaste, I was just done with it.
Q Was that also the case at the end of your time at OneTaste?
A I was 70 percent of the way there, let's say.

Q And what about the practice ended up having that impact on you personally?
A Being -- I was having -- this thought came to mind in a conversation later after I had left where I was just tired of being --
MS. BONJEAN: Objection to the extent it references a conversation.
THE COURT: No. Sustained. She can answer. I'm sorry. Overruled. She can answer the question.
A I was tired of being a practice pussy.
MS. BENSING: I think we can pause here, Your Honor, if that works for the Court or I'm happy to keep going.
THE COURT: I think that's fine. It's 12:30 and the witness can step down. I'll ask the jury to be back in the jury room by 1:30. Please just be on time. I know that you will be. Enjoy your lunch, don't talk about the case, don't let anyone talk to you about the case. Just go enjoy your lunch.
(Jury not present.)
THE COURT: See everyone at 1:30.
(Recess taken; continued on next page.)

A F T E R N O O N   S E S S I O N

(Open court; no jury present.)

THE COURTROOM DEPUTY: Remain seated.

THE COURT: You can get the witness back on the stand, and we will bring in the jury.

(Jury re-enters the courtroom.)

THE COURT: Okay. Everyone may be seated.

Ms. Bensing, you may resume your direct examination.

MS. BENSING: Thank you very much.

DIRECT EXAMINATION of CHRISTINA BERKLEY (cont'd)

BY MS. BENSING:

Q Before the break, you testified about living in the Warehouse. I just want to pull up Defense Exhibit 4-A4, which is already in evidence. I'm sorry. Actually -- well, I will show you this.

What is this?

A This is the first floor of the Center, sort of a main kind of lounging area.

Q And is this what it looked like at the time you were involved?

A Yes.

MS. BENSING: Okay. We can take that down.

Q I also want to direct your attention to the board that's

in the courtroom.

Can you read off the individuals that are now depicted on the board?

THE COURT: Can you see that?

THE WITNESS: Enough.

THE COURT: Can you just angle it for her? I think it is a bit hard to see.

Q Just for the record, if you could just read out the individuals who are now depicted on the board.

A Nicole Daedone, Robert Kandell, Ken Vanosky, Rachel Cherwitz, Nicole Halpern, Rachael Hemsi, and Reese Jones.

Q And are those some of the individuals that you have already testified about?

A Yes.

Q All right. I want to return back to the morning practice that you testified that you engaged in. You mentioned withholds. What is a "withhold"?

A A withhold is a certain exercise, a communication that you don't make to somebody. So something that you think in a moment that something happens and you don't say it, and then it sort of like builds up and you get very like -- whether you get irritated or whatever about it. And so there's a practice in the morning that we would do where we were paired with somebody, and the one person would act as a sort of receiver of someone who can witness you.

And they would say, tell me something you've withheld from me. And the person doing the withholds would say, Sally, that one time when you dropped the cup of tea, I thought you were clumsy. And then the person would say thank you. Tell me something you withheld from me. And the person would then say someone else's name and something that when this thing happened, when you slept with my boyfriend, I felt this.

With all of the emotional charge that you want to say to the person, you would say it to this neutral individual so that then you could sort of get that out so that then you could have a more clear, calm conversation with the actual individual.

Q And you testified -- well, how often did you participate in withholds?

A Every day.

Q And what was your understanding of the point of this practice?

A Well, there was the sort of what was -- the point was -- said to be the point, where we were getting rid of the charge that was built up over the course of a day or our lives, engaged in these really intense experiences with each other around sexuality so that we could sort of bring down the charge, the energy, the intensity, psychologically, emotionally, so we could be in communication with each other.

And at the same time, I pretty quickly was like, wow, this is -- for me, I am noticing this is a really good way for everyone to know everything about everybody.

Q Did Nicole Daedone participate in withholds?

A No.

Q Did there come a time when you learned that Nicole Daedone was receiving information about residents at the Warehouse?

A Yes.

Q Explain.

A When I was in New York -- I had moved to the New York Center, and Rachael Hemsi was running it at the time, and I saw she was writing an e-mail to Nicole, sort of giving updates on different members of the community there. And I asked her about it, and she told me that --

MS. BONJEAN: Objection to the hearsay piece.

THE COURT: Go ahead.

MS. BENSING: Your Honor, I was going to say, it is not coming in for the truth, but just the fact.

THE COURT: Overruled.

Q Sorry. You can finish your answer.

A That -- oh, yeah. That she said that she would send these reports with sort of what was going on with different people.

Q And you observed these reports, correct?

A That one, for sure. I don't know, I don't remember if I saw others.

Q Okay. After you moved into the Warehouse, you testified earlier that you lost touch with friends and family, correct?

A Yes.

Q What, if any, direction from Nicole did you ever receive with respect to seeing friends or family?

A Personally?

Q Yes.

A I don't remember any personally.

Q Did there come a time when you took a trip?

A Yes.

Q And what happened?

A So that was with friends from within the community versus outside friends. That I think there were four of us, and I organized -- it was early on, it was in my first year there so I was pretty new. I organized a trip for four of us to go to Death Valley for five days, a week, I don't remember how long. Something like that.

And, you know, we had a great time and came back. And when I got back, it was made clear to me that that was me taking energy out of the system. That wasn't a good thing to do. And sort of made to feel bad about taking four people out of what was going on for that week, et cetera. So I didn't do that again.

Q And who was making you feel that way? Who was expressing these things to you?
A Different members of the community. I don't remember who they were exactly.
Q Did Nicole speak with you about this?
A I don't remember that she did. I assumed that it was from her, but --
MS. BONJEAN: Objection to the assumption.
THE COURT: Sustained. And I will strike that answer.
Q Are you familiar with the phrase "VIP"?
A Yes.
Q And what is that in the context of OneTaste?
A That's somebody who comes in who, for some reason, is of interest more than a regular course participant. Somebody who has a lot of money or who has connections or resources that might be useful to the mission purpose of OneTaste.
Q How did being a VIP impact the OneTaste experience from your observations?
A It was awesome. That kind of feeling of welcoming and things being organized for them on their behalf, including research partners, was something that regular participants wouldn't have.
Q And what do you mean by that?
A For some, they would be assigned or given a research

partner that they could come and have sleepovers with at the Warehouse.

Q And who assigned research partners?

A Nicole.

Q Nicole Daedone?

A Yeah.

Q At some point during your time at OneTaste, did you become familiar with an individual named Brian Bert?

A Yes.

Q And was that when you were living at the Warehouse?

A Yes.

Q Who is Brian Bert?

A He was someone who came in who was a VIP. I don't remember why exactly. I think he had a podcast or some sort of audience or networking connections or something like that.

Q What happened with respect to Brian Bert?

MS. BONJEAN: Objection to vagueness.

MS. BENSING: I can rephrase, Your Honor.

THE COURT: I will sustain that, and you can ask the next question.

Q What, if any, interactions did you come to have with Brian Bert?

A I got a phone call from Nicole Halpern one day, and she was very like happy, and was like we have this great idea for you. We thought of something really great for you. And I was

very excited. I was like, oh, what is it? And she said, we think it would be amazing if you were Brian Bert's --

MS. BONJEAN: Objection.

MS. COHEN: Objection, Your Honor.

THE COURT: Basis?

MS. COHEN: Hearsay.

THE COURT: Sustained.

MS. BENSING: Your Honor -- okay.

Q I think you already testified to this, Ms. Berkley, but who did Nicole Halpern report to?

A Nicole Daedone.

Q Okay. And was that the case when you came to know Brian Bert?

A Yes.

Q And at that point in time, what happened with respect to Brian Bert? How did he first come to your attention?

A I might have seen him at one of the events, so I knew his name, so I knew who he was. But then on this phone call, I was -- it was suggested to me that I be his research partner.

Q And who suggested that to you?

A Nicole Halpern.

Q Did you understand that request to encompass sexual activity?

A Yes.

Q Why?

A Because as a research partner, the person -- that would imply that they're going to be sharing my bed. And he was a VIP, and I noticed the way that Reese was being treated so I understood that that's what that meant, to make this person have a good time.
Q What did you say?
A I said no.
Q Why did you say no?
A I wasn't interested in him, and I didn't want to do that with someone or be in that kind of situation.
Q And at this point in time, were you dating Isaac?
A Yes.
Q So was this before that thumbs up, thumbs down vote that you testified about earlier?
A I don't remember.
Q Okay. What happened after you said no?
A Nothing happened for a couple weeks, or a week or something, and then there was a community, another community just community course. I believe it was at Stinson, and it was this really great course, and in the buildup of it, there came a moment near the end of the course where Nicole had this really rousing, inspiring thing she said, which was like, oh, it was like wonderful. And then she said, who wants to be part of that, or who wants their freedom or their power or something. I forget exactly what it was.

And I raised my hand really fast, and another girl did, too. Our hands shot up in the air. Like, we do.

And Nicole turned to look at me, and it was like silence in the room. And she said something to the effect of, well, then you'll take the research partners that are suggested to you.

And it was a shock, and it was in front of everyone, and I was doing it wrong, and I am obviously failing, was what I was feeling and thinking. And I don't want to let her down, and I am obviously not on my path, and also totally embarrassed and humiliated, everybody's watching. So I felt like all of this pressure to say -- to change my mind.

Q And let me stop you there.

When you said that Nicole said this to you, which Nicole?

A Daedone.

Q When Nicole said, well, then take the research partners we suggest to you, what did you understand her to be referencing?

A Brian Bert.

Q How did you react to this?

A I don't remember in the class, in that moment, but, afterwards, when the class broke, I was very like inside embarrassed, kind of wanted to hide, and then also was like, okay, how do I do this. I do really want to be on my purpose,

I do really want this awakening that's available here. I have given up all this stuff in my life, now this is it, and I trust her completely. So what do I need to do on the inside to figure out a way to say yes to this, and I guess there's something to learn here that I don't know about, so take the opportunity and find a way to say yes. And, also, I want to be a good student, and I want her approval. And not like I want to play a big game.

So I changed -- I called Nicole Halpern, and I said that I would do it.

Q You just testified that at that point in time you had given up all this stuff in your life. What do you mean by that?

A My friends, my family, my husband, my job.

Q So what happened with Brian Bert?

A The day came for our first night together, and I remember being in a car, parked on the street with Isaac, and he was crying. He was upset, we were together at the time, that I was going off to do this thing with somebody else, that was set up in this way.

And I was like convincing him. It's like, no, this is good, this is for me to learn and be my purpose. And just having faith that this was for a good reason. And then I went to dinner with Brian Bert and tried to be a good representative. You know, like try to be like pleasing and

interested in him, and finding within myself some way to find something with him that I was attracted to, and like really just be nice.

And halfway through dinner he was being how he was being, and I just couldn't go through with it. I just broke my facade kind of thing where I was like -- I was like I just became me again, my actual self. And I said to him, would you like some coaching? Some like feedback and advice on how to date women and how to talk to women so that you could really know in your life how to do that.

And so he relaxed and was like, yeah, totally. And so then we had like a regular -- the genuine connection that would was there was, I am like, okay, I can teach you how to be with women in that way. And then it was clear that we weren't going to go to my bed that night, and then that was done.

Q So did you end up sharing a bed with Brian Bert?

A No.

Q You testified that you agreed to this because you wanted to be in your purpose. What do you mean by that?

A At that time, my purpose was OneTaste's purpose. Like it was -- it had become whatever is best for OneTaste and getting OM into the world is what my life is for and about. So, yeah.

Q And so why would -- why was going on this date with Brian Bert within your purpose?

A Because that would support the organization to have whatever the resources were that Brian Bert could bring with him.
Q Are you familiar with the phrase "white rabbit"?
A Yes.
Q What is that?
A That's someone in the community, usually a woman, who's young and attractive, and turned on, and very alluring and playful and seductive, or just feels really interesting, who is at community events and courses and around, that's almost like allure, kind of the white rabbit in Alice in Wonderland. So sort of people will follow into the rabbit hole kind of thing.
Q Ms. Berkley, having lived in the Warehouse, did you have knowledge of other research partner assignments at OneTaste?
A Yeah. There was one where Ken Vanosky --
MS. BONJEAN: Objection. This is nonresponsive. I think it called for a shorter answer.
THE COURT: Overruled.
Q You can answer, Ms. Berkley.
A Ken Vanosky had a number of research partners. Like more than two. I don't remember how many more than two. Three or four.
Q And who? Who do you recall?
A I remember Alisha being one, and then I'm not sure of the

rest. Nicole Halpern, Rachel Cherwitz. I don't know if there's somebody else.

Q When you say Alisha, who are you talking about?

A Alisha Price.

MS. BENSING: Can we pull up Government Exhibit 205, which is in evidence.

Q And who is this in Government Exhibit 205?

A Alisha Price.

MS. BENSING: We can take that down. Thank you.

Q Ms. Berkley, you have testified about some of your experiences getting involved in the OneTaste community. What, if any, impact did these experiences have on your psychological state when you were living in the Warehouse?

MS. BONJEAN: Objection. Calls for expert response.

THE COURT: Overruled.

A I was -- at that time, I was really committed and focused, like single-minded focused on the only things that were interesting and I wanted to do in my life were the things that were going on here.

I was really attempting to fit in to what was required of somebody who is on their path in the way that was prescribed by the philosophies there. I was having fun and researching a lot of things.

I was starting to like just fit a certain kind of way of being that was very -- like there's one way of being

that was the ultimate way of being, and I was trying really hard to be that kind of way of being. And anything inside my own mental thoughts that were outside of that I would work with myself to find a way that what everyone else was saying around me, that seemed likes truth. But I felt like that's maybe not quite true.

I would do all kind of gymnastics on the inside to figure out a way that that was true, because I really believed that, ultimately, like just Nicole knew everything and was right and cared and was some like more ascended than most people. And so I really wanted to please her, wanted to be like just a really good student, like a really good girl. Like just really wanted her attention and interest and to learn. Just very eager to learn.

Q You testified earlier that you worked in the massage studio at the front desk at the center.

Did there come a time when you took a different position within OneTaste?

A Yes.

Q What was that?

A I became Nicole's assistant.

Q How did you get that role?

A I was at the front desk, it was in the evening. I was at the front desk, and Rob came to me and asked me to come on over, and Nicole and Reese were sitting at a table in the

middle of the sort of lounge space.

Q I'm just going to stop you. When say Nicole and Reese, which Nicole?

A Nicole Daedone --

Q Okay. Go ahead, please.

A -- and Reese were sitting at the table.

And I kind of knew that something was up with her previous assistant, so I knew that position was sort of open. So as I was -- Rob was calling me to that table, I was thinking, like, could this be? Like, really? No?

And got to the table and was offered the position. Told that it was of interest to them that I be their assistant.

Q And what, if anything, did Nicole Daedone say to you when offering you the position?

A How good are you at sucking cock.

Q And who else was there for that?

A Reese Jones was there. I believe Rob was there.

Q What happened next?

A We talked about the position -- I said I was good at it.

We talked about the other elements of the position, I believe, and then I became her assistant.

Q Who was -- you mentioned an assistant before you. Who was Nicole Daedone's assistant before you?

A Alisha Price.

Q Was that the same individual who we just looked at in Government Exhibit 205?
A Yes.
Q What happened to Alisha Price?
MS. BONJEAN: Objection to the vagueness.
THE COURT: Yes. Sustained.
Q At that point in time, what had happened to Alisha Price that she was no longer Nicole's assistant, to the extent that you know?
A I don't know what happened.
Q And based on your own personal observations, what were Nicole Daedone and Alisha Price's relationship like?
A They were very close. They were -- Alisha was very -- in the same way that I was really interested in Nicole's approval and teachings, in that way she had a similar devotional kind of respect for her or relationship with her. Yeah. It was very close, and then something happened and then it became less close.
Q What did it mean to you be Nicole Daedone's assistant?
A It was extraordinary. It was like the top training opportunity, like, possibility. It was like being close to the sun. It was just -- it was such an amazing, yay, wow, this is going to be great thing.
Q And as a practical matter, what did it mean for your life?

A I would go to morning practice every day, like usually I am living in the Warehouse, but then after that I would spend the rest of day attending to all of the different things that Nicole needed to have happen in her world.

So I was -- the training was in orgasmic -- not so much the orgasm practice, but in how to pay really, really exquisite attention on somebody else's needs, and almost to the point of being able to anticipate them, sort of like a, you know, like you would at a three star Michelin restaurant kind of thing, quality of care and attention.

And then, also, being in kind of heightened levels of stress that one would think is beyond their capacity in order to be able to build the capacity to have attention and stay conscious and perform under a lot of pressure, to just get stronger and more powerful.

Q At that time when you took the role of Nicole Daedone's assistant, what kind of psychological state were you in?

MS. BONJEAN: Objection to the vagueness. Foundation. And relevance.

THE COURT: Overruled.

A I was completely in 100 percent in the OneTaste -- yes to everything OneTaste was about and wanted from me, and was completely focused on the mission and totally ready and willing to do anything.

Q And what are the ways in which you were brought to that

place?

MS. BONJEAN: Objection to the vagueness of that.

MS. COHEN: Yeah.

THE COURT: Sustained.

Q So you testified at that moment in time that you were completely into OneTaste and saying yes.

What are the specific ways that got you to that place?

A I had now had a lot of experience with the initial -- kind of that way, where like the people here were so friendly to me, like so kind, and so much warmth, and so much vulnerability, and we were having so much -- I was accepted and I belonged.

There were these experiences that were like these sort of peak experiences where I had to get on board or else I'd be kind of shunned or kicked out of the community. And so then I had started like -- I was no longer critically thinking on my own. I was just formed -- like making myself be a yes in order to be able to keep doing this really meaningful work that I was doing, that I did see bring tremendous positive things to me. So the learnings, the teachings, there were some that extraordinarily good. So I was growing, I was waking up, I was more powerful, I was more aware, I was more turned on. But there was like no room for anything outside of -- in order to get closer in -- how do I put this.

The closer I was to whatever it was that was required by the system and by what Nicole wanted or needed, the closer I'd be able to come in to work to be close to her. And so over a period of a year and a half or two years of doing that, and having that kind of behavior reenforced in a positive way, it just became that that was now the default.

Q When you were working as Nicole's assistant, were there set hours?

A No.

Q How many hours per day? What was your -- what was that job expectation in terms of hours?

A I was on call 24/7.

Q How many days a week?

A Seven.

Q Were you paid the same as before?

A Yes.

Q What were some of your duties as Nicole Daedone's assistant?

A There was -- I had -- in the morning, I'd go to Whole Foods and I would get food for Reese. There would be things like picking up dry cleaning, and cleaning her room, and making sure she and Reese had the food that they needed, and going doing errands, and booking travel, picking up food, doing dishes. Whatever was sort of needed around the house. And then whatever she needed, as she was moving through the

world, like, taking her coat and her purse when she would walk into a space. Making sure she always had a glass of water, tea in the morning. That kind of thing. And then also every morning to stroke Reese.

Q How did you -- when you say that you every morning had to stroke Reese, what do you mean?

A After getting breakfast, I'd go to the Townhouse, and she will have already been awake and somewhere else. So I'd go into their bedroom, and Reese was there on the bed, and I would stroke him until he came.

Q And when you say "stroke him," what do you mean?

A Stroke his penis.

Q Who directed you to do this, if anyone?

A Nicole Daedone.

MS. BENSING: And I want to show the witness only, please, what's been marked as Government Exhibit 4641.

Q Do you recognize this, Ms. Berkley?

A Yes.

Q What is it?

A It looks like a male OM, like a position, although I think the position may have been more -- there were variations or variable in a way that would be comfortable for the woman. But this looks like a male OM.

Q What is a male OM?

A It is when the stroker is -- the woman and the strokee is

the man. So he's the one that is getting the genital stimulation.

Q And I think you just testified that they were multiple ways to be in position for a male OM; do I have that right?

A From what I remember. There's a little more flexibility just for leverage and angles and stuff.

Q And although the position might change, is this a fair and accurate depiction of a male OM?

A Yes, except the gloves. She would be wearing gloves.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 4641 into evidence.

THE COURT: Any objection?

MS. BONJEAN: Yeah.

MS. COHEN: Objection, Your Honor. Cumulative, prejudicial.

THE COURT: I couldn't hear you, Ms. Bonjean. Did you have --

MS. BONJEAN: It is relevance, as I understand it.

THE COURT: Okay. Overruled.

Government Exhibit 4641 is admitted.

(Government Exhibit 4641 received in evidence.)

MS. BENSING: If we could publish that to the jury, please.

Q So, Ms. Berkley, you just testified that this is a position for a male OM, except that the female stroker would

be wearing gloves; is that correct?
A That's right.
Q When you were directed to stroke Reese, was that consistent with the male OM?
A No.
Q In what ways was it not?
A An OMing, there's a 15-minute container, like 15-minute time, and that is very intentional in that it isn't about sort of the climax ejaculation part of what an orgasm is, but about all the other things an orgasm things is, an orgasmic state. So it is very much 15 minutes, and it isn't about ejaculating, whereas with what I was doing with Reese, I wasn't wearing gloves, and there was no time, it was just until he ejaculated.
MS. BENSING: Okay. We can take that exhibit down.
Q What, if anything, did Nicole say to you about why you were -- why one of your job responsibilities was to stroke Reese?
A What did she say to me about why? I don't --
Q Why did you stroke Reese Jones?
A Because she asked me to. And then I had an understanding of why.
Q And what was your understanding of why?
A Because he's the main major investor in OneTaste, and from the time that I started coming to any OneTaste events, he

was already being treated like this VIP and all sorts of different sexual scenes and experiences were created for him. And so I understood that him being happy and pleasured in a sexual way was important to the system, the purpose of OneTaste.
Q Were you physically attracted to Reese Jones?
A No.
MS. BONJEAN: Objection. Relevance.
THE COURT: Overruled.
A No.
Q So why did you agree to do this, Ms. Berkley?
A Because I believed her completely, trusted her completely, that this was part of my training and was part of me growing and becoming more powerful, and because I wanted her approval. And because it was -- I didn't think that I would be able to be in this training position, top training position if I didn't do it. So it was fine.
Q What, if any, other services did you provide to Reese Jones while serving as Nicole Daedone's assistant?
A I would -- a few times we went to a different -- I think it was a sexological body worker, a different person who gives massages of a sexual nature. So he'd be on a massage table, and this other person would be massaging him, and then ultimately stroking his cock and leading these breath work exercises so that would amplify the orgasm, and I'd be also

massaging him at the same time, so he was getting like a four handed massage with this big climax at the end.

And then there was a time that I spent a weekend with him, if she wasn't there.

Q Before we talk about that, are you familiar with the terms "scene"?

A Yes.

Q What is a scene?

A It's a discrete location and period of time where something is set up for someone to have an experience, usually in the context of OneTaste, it usually involved some kind of power dynamic agreement change, shift in power dynamics, often of a BDSM-related style of experience that was organized and produced and created to have like a really interesting different kind of sexual experience.

Q And what, if any, scenes were you personally a part of?

A There was one that I remember where it was at the room that was at the back of where the massage studios were, it was more like a yoga room, and there were a whole bunch of women, I think, I don't think there were any men, at the doorway, who were naked, and we were all -- we had oil on us. So we were covered in oil and naked, and we kind of made this little corridor of bodies that were all slicked up.

And so when Reese came in, he was brought in, and he had to kind of go through the bodies that were covered in oil,

and then was led to a corner where he needed to -- so he was in the bottom position in sort of that power dynamic, needed to perform oral sex on someone, and then he was moved over to another like rigged up rope thing. And so he was tied up in the middle of the room, and we were all there. And Nicole sort of came in and did sort of a dominatrix style experience for him.

Q And was this before, during, or after the time period that you served as Nicole's assistant?

A It was before or during. I don't remember.

Q Where did this take place?

A In the yoga room at the back of the massage center.

MS. BENSING: And I want to pull up Government Exhibit 4666. And this is in evidence, so for the jurors as well, please.

Q What is depicted here in 4666?

A That's that back yoga room.

Q Where the scene that you were just referencing occurred?

A Yes.

Q What, if anything, else happened in this room?

A There was a period of about three months-ish where we would have something called darshon, where there'd be a massage table set up, and it was two hours long every day, about, something like that, and it was totally free, and anyone in the community could come, but also anybody else

could come. And it was inspired off of the darshona amma, the hugging saint would do, where people would line up and go and get a hug.

So in this case, people came, Nicole would do a talk. Like she'd speak to whatever was interesting, top of mind, of inspiration that day. And then she would stroke whoever wanted to get on the massage table. But like maybe three people per day. So yeah.

Q You just testified a little bit about BDSM. Were you ever directed to engage in any kind of BDSM activity with Reese Jones?

A Yes.

Q By whom?

A Nicole Daedone.

Q What happened?

A It was the first night. So it was either that night where I got the job kind of thing or the next night after that. We went to the Townhouse. It was my first time at the Townhouse, and he was there and --

Q I am just going to interrupt you for a second. When you say "the Townhouse," what are you referencing?

A The home on top of Russian Hill.

Q That we saw the exhibits earlier, Government Exhibits 56, 57, and 60?

A That's right.

Q Okay. Sorry. Go ahead.
A So we went up to the bedroom, and at some point there was me and her and Alisha and Reese. And there was the -- so Reese naturally was a submissive, enjoyed being submissive. And so I was directed to take on the role in that power dynamic of being dominant, and I was very awkward at it. It was very clear that I wasn't -- that wasn't -- I wasn't going to be good at that.
But in any case, my awkwardness was obvious, and Alisha took over kind of that experience, and I was there helping out, and Nicole was there.
Q And when you say Alisha, are you talking about Alisha Price?
A Yes.
Q What, if anything, did Nicole Daedone say to you before or about this encounter?
A Sort of more about the whole thing was don't write a book about this.
Q You mentioned earlier some other tasks that you performed as Nicole Daedone's assistant. What, if any, level of detail was part of the job requirements?
A At a really, really high level of detail, like I was shown how to pour a glass of water. So how to tilt the glass and pour the water in such a way that the water wouldn't make any sound. And then when placing the glass down on the table,

putting it down on the table so that it didn't make any sound when it touched the table. And then placing it in a position where it would be like right where the person would reach. And then making sure when -- if there was a conversation that Nicole was having with somebody -- so the glass was -- I was always to have my attention on if there was water in the glass, whatever was going on. And when I'd reach to take it or put it back, to make sure that it didn't disrupt the energetic flow of the conversation that was happening.

And then my own presence was sort of like -- was training to be invisible, so that there's that invisible service, that I wasn't sort of pulling for "good job," you know, like for her to see that I did a thing and I did it good, did it well. So there's sort of that invisibility aspect of it, so precision in that way.

(Continued on the next page.)

(Continuing.)

BY MS. BENSING:

Q Who trained you to do this?

A Nicole Daedone.

Q You testified earlier that one of your job responsibilities was arranging food for Reese Jones and Nicole Daedone. Do I have that right?

A Yes.

Q Who bought the food?

A I did.

Q With what money?

A My money. Some of the food, some of the food, not all of the food. Some of the food.

Q And I think you testified that you would pick up dry cleaning for Nicole Daedone; is that correct?

A Yes.

Q Who paid for the dry cleaning?

A I did.

Q With what money?

A Mine.

Q And, if at all, would you get reimbursement?

A I'd collect the receipts and then give them to I believe it was Rob with a spreadsheet, I think, of how much it was. I'd write it all up somehow and submit it, and then I'd eventually get reimbursed.

Q And when you say Rob, who is rob?
A Rob Kandell.
Q At the time that you were purchasing this food and dry cleaning, how were you affording this? How were you able to pay for it?
A In the beginning, I was getting reimbursed pretty regular -- like regularly, like two weeks out or the end of every week, whatever it was. And so it was I could sort of do it. But then there came a time when I just wasn't getting reimbursed and I'd have to wait and wait and wait, and that accumulated, and then it was very stressful. Yeah, it made me angry.
Q And so how did you pay for it?
A Credit cards.
Q I want to show you Government Exhibit 4691, which is already in evidence.
MS. BENSING: And we can publish this for the jury, too. Thank you.
(Exhibit published.)
Q Who is depicted in this photograph, Ms. Berkley?
A Reese Jones and Nicole Daedone.
Q You've testified a little bit --
MS. BENSING: We can take that down. Thank you.
Q You've testified a little bit about the Russian Hill townhouse. Is that where Nicole was still living when you

were her assistant?
A She was splitting her time between there and another place called Stinson Beach. It was an estate, so it had like, this really cool, beautiful house, and then there were, like, other homes, buildings on the property and the beautiful gardens. So she'd spend time there to write and to have different kinds of meetings with sort of different thinkers that she'd like to have interesting conversations with. Different events would be run there.
Q And how was she able to use the Stinson Beach estate?
A Reese rented it, I think, yeah.
Q What if any other locations did you travel to with Nicole Daedone while you were her assistant?
A There was also a house in Tahoe. It sort of had -- it was beautiful.
Q What is Tahoe?
A It's north of San Francisco. It's a lake, and then there are mountains around it and there's a lot of skiing that happens there. It's really beautiful.
Q And how was Nicole able to use this Tahoe property?
A It was Reese's.
Q You testified earlier about a demo at Stinson Beach. What location are you referencing?
A The main house at Stinson Beach.
Q The estate you just testified about?

A Yeah, yeah.
Q By the way, were you working as Nicole Daedone's assistant during that demo?
A Yes.
Q What was your role in the demo?
A I was standing on the other side of the massage table from where the stroker was standing and I was making sure that she had water or adjusted her pillows as she needed so that she had everything that she needed to be comfortable while she was having the hour-long demo.
Q How did you view Nicole Daedone at that point in time?
MS. BONJEAN: Objection to the vagueness.
THE COURT: Yes, sustained.
Q Did there come a time when Nicole Daedone began dating somebody else?
A Yes.
Q Who?
A Om Rupani.
Q Om Rupani?
A That's right.
Q You testified earlier that there was a weekend that you spent with Reese Jones.
A Yes.
Q Can you explain how that came about to the jury?
A So Nicole started seeing are Om Rupani, who was at the

time in the New York Center, and he was coming out to -- he came out to San Francisco to see her demo, and they were going to spend, I think it was Easter weekend -- it was over three days, two or three days, and I think it was around Easter, together.

Q When you're referencing "the demo," are you referencing that Stinson Beach demo?

A Yes.

Q And so what happened?

A So a little while before that, she said to me -- I don't know, like a week or two weeks before that was going to happen, she mentioned to me that she was thinking of seeing if I wanted to do something or suggesting to me to do something, where I would be there with Reese sort of taking her place in a different way than I was with him up until that point while she went to be with OM for the two or three days. It was a different scenario. Like, I'd kind of be the woman for the house kind of thing for three days.

Q And what do you mean by that? What was different about that than you had been doing previously?

A I'd be sleeping in her bed, I would be with him 24/7. It would be more like being his girlfriend than just seeing him in the mornings and stroking him. So we would -- we went to dinner, we went shopping, we drove around, we talked. It was a very different being with him completely

and in all the ways than just stroking him in the morning.
Q And to be clear, were you still working as Nicole Daedone's assistant when this happened?
A Yes.
Q What, if anything, did Nicole Daedone say to you before she left for that weekend?
A The morning that she left, I had gone in to stroke him that morning, as usual, and we had started talking about something, about technology or biotechnology or something. We were both very interested in science; I have a science background. And so we were talking about something in science and really got into the conversation, so I was in the room longer than usual.
When I came out to the living room where Nicole was, and Om was there, I wanted to make sure that she got that the reason I was in there for longer was because we were talking about science or something. And she looked at me and really softened her gaze and was like, that's okay. And then she said, go all the way in, like she was encouraging me or giving me permission that during this time to not just sort of be with him physically, but to open and genuinely be in a connected relationship, whatever that was, to go all the way into that experience with him.
Q And during that weekend that Nicole Daedone was away, did you engage in sexual activity with Jones?

A I did.
Q What kind?
A Everything except penetrating sex.
Q Ms. Berkley, what happened when Nicole Daedone got back after that weekend that you spent with Reese Jones?
A It was awkward. I had asked him -- I think the day that she got back was also Easter or something, and so his family was coming to visit for Easter, and he and I had talked about his daughters. He and I over the two, three days had sort of connected and felt at ease and good and friendly and fun with each other. And so I asked him -- I thought they were on the same page, so I asked him, you know, how do I -- this is all -- I'd never done anything like this, and they're sort of authorities here and they know what's happening. So I asked him, like, how do I be? Like, what do I do now? Do I go back to being in the background, you know, doing dishes and just service, or is it, like, what this -- is there a transformation here? Like, are we still being friendly in this way? So looking for direction on what to do here. And he said, just be yourself.
So when she came back and his family came and there was this whole Easter thing, I did do the things that I was doing as an assistant -- like, I did water things and I did dishes and I did whatnot -- but I also sat on the

couch and took part in the conversation, because I had been sitting on that couch as though it's, like, my couch for three days. I just got comfortable and thought that was normal, and he said just be yourself, so I thought, okay.

That was clearly not okay. Like, Nicole was giving me kind of signals, you know, like notice this woman's doing the dishes, one of the people there were doing dishes, and I was like, yeah, and I had done dishes already for a couple of hours, but I'd go back and help. But I didn't really catch it as much as she wanted me to and just sort of retreat back into the background, and now it's like, oh, wow, that must have been really awkward, like I realize that -- yeah, that I didn't have directions to go back into the background, which I would have done. And so it was awkward.

Q So did you understand from that that you were supposed to go back to just full assistant role?

A Yes.

Q When you say "Nicole" in what you just testified to, are you talking about Nicole Daedone?

A Yes.

Q During the weekend with Reese Jones, what, if anything, did he purchase for you?

A Two dresses, two sweaters, and a pair of pants, I believe.

Q And did you report that to Nicole Daedone?
A Yes.
Q And what happened?
A Things got weird in terms of my and her working relationship. But before that, so there was the financial stress that I was under, plus I was paying for the food and was delayed getting reimbursed, so I was in financial distress. So I asked her if it would be okay if he wanted to buy me clothes again, would that be okay, because that relieved some of the stress for me. And that wasn't okay. Like, she had a reaction to that and there was a distancing on how she'd use me for work offer that.
Q And --
A Something with amiss there.
Q And you describe a distancing in how she used you for work at some point after this weekend.
A Uh-huh.
Q What, if anything, did you do with respect to stroking Reese Jones every morning?
A Continued to.
Q So that part didn't change?
A It did not.
Q At some point when you were still working for Nicole Daedone's assistant, what if anything happened with your relationship with Isaac, your original research partner who

you testified about earlier?
A He had been moved out into another house in a suburb of San Francisco when I started training with her. And after a while, after about six months or more, I'm not sure exactly, he moved back into the Warehouse, into the community, and he and I began to see each other again.
Q And what, if any, reaction did Nicole Daedone have to that?
A She didn't like it.
Q And how do you know?
A She -- during one of the darshans, she said to him something to the effect of sort of being careful or watching what he's doing because she needs my attention on her.
Q Did there come a time --
And by the way, approximately when did you start working as Nicole's assistant?
A I don't remember exactly the date.
Q Do you remember approximately the year?
A 2007, 2008. One of the two.
Q Is there something that might refresh your recollection?
A Yes.
MS. BENSING: Your Honor, if we could pull up for the witness only, please, 3500-CB-10.
Q I'll just ask that you take a look at this and let me

know if it refreshes your recollection.

THE COURT: Can you zoom in? It's very small.

MS. BENSING: Oh, yes.

THE COURT: Thank you.

A In 2008 sometime.

Q And did there come --

MS. BENSING: We can take that down. Thank you.

Q Did there come a time when you stopped working as Nicole's assistant?

A Yes.

Q What happened?

A Things with me and Isaac started back up again. And as that was happening, sometimes things would happen in our relating, or he'd have sex with someone at the Warehouse when I was up in Tahoe or in other places, and I'd get very emotional. It began to be disruptive in that I wasn't having the same quality attention all the time on her and eventually got moved into being a personal assistant or doing some work for Reese's friend. I was just sort of moved out of that position.

Q You testified that you got moved out to a different position.

A Uh-huh.

Q Sorry. For who?

A Reese's friend Marta; I don't know her last name.

Q And who is Marta?
A She was some kind of business partner, friend of Reese Jones.
Q What did you do for Marta?
A Just basic tending to her; cleaning, organizing her space, her home.
Q During this time period, you testified earlier that you were paid through an entity called Caravan. When you were Nicole's assistant, which entity paid you?
A I believe it was Caravan Inc.
Q And what about when you went to work for Marta?
A I don't remember. I think it was Marta.
Q Approximately when did you stop being Nicole Daedone's assistant?
A I don't remember.
MS. BONJEAN: Sorry, I didn't hear that.
Q Approximately when did you stop becoming Nicole Daedone's assistant?
A I don't remember the date.
Q And is there a document that might refresh your recollection?
A Yes.
Q Okay.
MS. BENSING: If we can please pull back up 3500-CB-10.

Q I'll ask that you just take a look at this and let me know if it refreshes your recollection.
A Around June 2008.
MS. BENSING: Okay. We can take that down.
Q Ms. Berkley, who became Nicole Daedone's assistant after you?
A Yia Vang.
Q Yia Vang?
A Uh-huh.
MS. BENSING: I'd like to pull up Government Exhibit 4698, which is in evidence. We can pull it up for the jurors, too.
(Exhibit published.)
MS. BENSING: Thank you.
Q Who is this?
A Reese and Yia.
Q After you stopped working as Nicole Daedone's assistant --
MS. BENSING: We can take that down.
Q After you stopped working as Nicole Daedone's assistant, where did you live?
A The Warehouse.
Q And how did you pay for rent?
A How did I pay for rent? Well, I had to get creative. So I wasn't working at OneTaste anymore, so I had to kind of

figure out what to do, and I was like, well, I have another -- I have skills as a personal assistant now that are really good, and I kind of got curious because I was also doing the sexuality part.

So I went on Craigslist back when they had erotic services on Craigslist, and I looked up to see if this was a thing, and it was. There was an ad for a very personal assistant. So that was just like, oh, okay, that was a sideways step into that. So I was, like, curious to see what that was, so I went for an interview. I had the sort of interview about the administrative part of the job, and then the guy was like, well, you know, if I was going to offer you the job, I have to really review you, so -- wink wink. And so I had sex with him, and it was fun, and he paid me a few hundred dollars.

And then it was like -- I left and I was like, well, I could do that, but then why would I -- I don't really want to spend the rest of the seven hours of the day doing assistant work if that was fun; I can just do that. And so then I started to explore on Craigslist to see what being an escort could be like.

Q And did you begin working as an escort?

A I did.

Q How, if at all, did your time at OneTaste impact your decision to work as an escort?

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q Well, why did you decide to work as an escort? Apart from the financial reasons.

A So there was the -- so there was that, but there was -- it was -- I realized, like, this was a really amazing opportunity for me to continue some research that I had already started around the principle of being able to get turned on by any stroke, which was one of the main principles at OneTaste when I was there. So I had been researching that on my own because I knew it applied in the orgasmic meditation practice, so that's real, and I had done some other research to see if that applied to sexuality; like, regular sex.

And then I wanted, like -- but it was still within my research that I was doing, still within the context of people who were trained and in this practice and still were all my friends. So here it was like, oh, I have this sample of -- opportunity to have this sample of totally random people from all walks of life to see if this principle applied in the world, because if the purpose of the mission is to spread orgasmic meditation and the teachings of it and principles of it, sure, they all work within the context of our bubble, but do they actually help people in the world. And so it was sort of really exciting

to see if that held up in not OneTaste related people.

Q Who taught you that principle of getting turned on by any stroke?

MS. BONJEAN: Objection.

THE COURT: Overruled.

Q You can answer.

A Nicole Daedone.

Q Did there come a time when you moved away from San Francisco?

A Yes.

Q Where did you go?

A New York.

Q What prompted your move to New York?

A So Isaac and I were together, and Isaac was going there to become sort of the male lead at the OneTaste New York Center, and so I wanted to stay with him and went with him to New York.

Q And when you moved to New York, did you continue working initially as an escort?

A Yes.

Q When you were working as an escort, did there come a time when you were sexually assaulted?

A Yes.

Q What, if any, financial goal were you working toward at that point in time?

A So I had, I don't remember if it was -- it was, like, somewhere between $20,000 and $30,000 of debt, and so I wanted to financially pay that off.
Q When did you accrue that debt?
A During my time at OneTaste.
Q Did there come a time when you got involved again with OneTaste?
A Yes.
Q When how did that come about?
A So when I -- when I moved from San Francisco to New York, I let everybody know that I wanted to leave OneTaste, that I wasn't going to be doing anything for OneTaste, and I was just going to be living and paying rent in the OneTaste space in New York, so don't ask me to do any of the things for production or come to any events or anything like that. And they did, they totally -- there was no pressure to do anything like that. All the things that I had experienced where it was this pressure cooker wasn't happening. So I was just really living at the OneTaste Center in New York, and I was working -- I'd see, like, six clients a month or something. Like, not a lot, but just was making my money doing that and having my life and being with Isaac without any pressure.
As I was around without any pressure, I started to stick around in the evenings and go back to the In Groups

that were happening and be around for the courses, and I remembered -- I started having positive experiences again with the material and began to be around more and began to be interested in supporting and participating and being in the back of the room and helping out in a totally voluntary basis. But my interest got piqued again mostly, I think, because a lot of that pressure was off for an extended period of time, and Isaac was there and things were going well. It's like, oh, no, this is really great.

Q Around this time --

And by the way, approximately --

Well, did there come a time when you stopped working as an escort?

A Yes.

Q Why?

A There was a New York Times article that came out about OneTaste that was the first --

MS. BONJEAN: I'm going to object.

THE COURT: Sustained.

MS. BENSING: Your Honor, none of this is -- it's just to explain the witness's --

THE COURT: I'm sustaining that objection. You can ask another question.

MS. BENSING: Okay.

Q Did you have a conversation with Nicole Daedone related

to your work as an escort?
A Yes.
Q And what happened in that conversation?
A She called and let me know that they were instituting a new rule at OneTaste that anybody who -- because they're going to get more attention, mainstream, anybody who was any kind of sex worker that was doing anything either -- like actually working for OneTaste or even volunteering in the courses or in any kind of way, that they'd have to choose. They wouldn't be able to do that anymore. So if I wanted to continue to participate and support and be part of what OneTaste was doing, I'd need to stop being an escort.
Q And you testified that she talked to you about this mainstream attention. What was that coming from?
MS. COHEN: Objection.
THE COURT: Sustained as to form.
Q What did Ms. Daedone say to you about that mainstream attention?
A That it was coming from the article in The New York Times --
MS. BONJEAN: Objection.
THE COURT: Overruled.
A Yeah, so once that was out, it would be important to pull back on anything that was happening in the OneTaste space that wasn't legal.

Q Did you stop working as an escort?
A Yes.
Q And approximately when was that?
A I don't remember the date specifically.
Q Is there something that would refresh your recollection?
A Yes.
MS. BENSING: Could we please pull up 3500-CB-10 for the witness only.
A May of 2009.
MS. BENSING: Okay. We can take that down.
Q When you got back involved with OneTaste, what role did you have?
A When I got back involved, I was support staff. I was helping out in the back of the room and then slowly starting to get opportunities to teach a little bit here and there.
Q Was that significant to you, the opportunity to teach?
A Yes.
Q Why?
A Because it was an opportunity to begin to share and to sort of let the material that I had learned about and experienced and sort of become in the depth and really good at, to share it with others. It was also a totally new skill in and of itself that I was a little bit scared and then found my footing. And so I felt I was more in my

power, really confident to now be able to teach others, and it made me really happy to do so. I also felt like I was supporting the organization by doing that. Like, I was helping it with its purpose, which was my purpose even more than just setting up chairs and stuff like that. So it was great.
Q And what happened next in terms of your job responsibilities?
A After about, like, a year -- I don't know, timing is strange -- but after a while, the leader of the New York Center sort of switched over twice, and it just kept not taking off and making sense, so they had decided to shut it down. I had decided that I didn't want to go back to San Francisco, so I said that I would run it by myself. I wanted to stay and I wanted to run it on my own.
Q Approximately when did you start running the New York Center?
A I don't remember exactly.
Q And is there something that would refresh your recollection?
A Yes.
MS. BENSING: If we can pull up for the witness only 3500-CB-10.
Q Just let me know if this refreshes your recollection.
A Yeah, August of 2009.

MS. BENSING: Okay. We can take that down. Thank you.
Q When you started running the New York Center, how much were you paid?
A $750 a month, and there was some commission for sales.
Q What entity was paying your salary at that point in time?
A Caravan Inc.
Q And you testified about commissions. When you were previously working in San Francisco, did you make commissions?
A No.
Q Okay. So when you were working in New York, you began to have the opportunity to make commissions?
A Yes.
Q You testified earlier that when you were working as an escort, you were working to pay down your debt.
A Uh-huh.
Q When you started working for OneTaste again, what, if anything, happened to your financial situation?
A It -- I started accruing debt again. I was living on my credit card. So the 750 paid for rent, and the rest of my expenses were credit card and it depended on how much commission I was making.
Q When you were in New York working running the OneTaste

Center, what were your hours like?
A All the time. There was no one else doing it, so whatever needed to be done, it was me. It was like a startup.
Q How many days per week did you work?
A Seven.
Q Where were you living during this time period?
A When I was running it? Well, first I was renting a room in a home in Brooklyn with this elderly couple. And then from there, I subletted Maya Gilbert's grandfather's loft in the middle of Manhattan, which was amazing. But we could only be there for eight months at a time because he'd come back for four months of the year. So then when that eight months was up, I moved -- I found a place in Harlem, so I was living in Harlem for the last bit of when I was running OneTaste. So it was Brooklyn, Manhattan, and then Harlem. Park and 22nd.
Q As part of running the New York Center, what were your job responsibilities?
A To -- to hold OM circles. So a time, a practice time for members of the community to come and practice OMing, run classes, teach OMing, run weekly -- started running meet-ups where members of the public could come and play the different communication games, help support the community. What else?

Q Did you take on any --
A Sell everything that was sold. I was the only salesperson. So I'd run events during the week, and then there would be a training course, training weekend, where people could learn how to OM. So then I'd sell from whatever the event was, whoever came, to see who would want to go further and then learn OMing and do that. And then from the OMing classes, then there were other workshops also -- they had started doing coaching programs, so enrolling people into the coaching programs.
Q What, if any, interactions did you have with Rachel Cherwitz during this time period with respect to sales?
A There was this one call I remember. So Ken Blackman came out to teach a course with me, and we did a great job, it was a great course. We needed to enroll from that course into the upcoming coaching program. So afterward, the course happened, and then I set up conversations, sold however many enrollments I managed to enroll. I wasn't very good at sales at that time.
So when I reported to Rachel Cherwitz how much -- how many people signed up for the coaching program, that was definitely a lower number than she wanted. So she called me, we had this phone call, and it was really intense; that's not good enough, we need more, go get more, do whatever you need to do. Like, pressure. I don't remember

exactly the words she used, but it was relentless pressure to do whatever I need to do. And I was describing, well, I did this and this person -- whatever I was describing, it didn't matter anything I said, it was just an onslaught of get more sales, get more sales, get more sales. It just didn't make any sense, almost, the conversation, because my response to whatever I was saying, it was just, like, no, do more.

I had to get off the phone. I felt really embarrassed in front of Ken, but I was so flustered, I had to go walk on the street and walk off the energy that got into my body from the phone call.

Q You mentioned the name Ken Blackman. Who is that?

A He was the main male lead stroker at the time at OneTaste. He was living in San Francisco. He was very well trained, and so in the trainings, he brought a lot of his own wisdom and experience. So he was looked up to and one of the main teachers.

Q When you had this conversation with Rachel Cherwitz, what role did she have at OneTaste at the time?

A She was head of sales.

Q And who did she report to?

A Nicole Daedone.

Q So you mentioned the coaching program.

A Uh-huh.

Q During this period of time when you were living in New York, did you also work, do chrome work with respect to the coaching programs?
A Yes.
Q Which ones?
A The second one, CP2, the second coaching program, I believe.
Q And where was that coaching program held?
A In San Francisco.
Q And so living in New York, what role did you have with that San Francisco course?
A I was expected to fly out and help with production for the course.
Q How often did you fly out?
A Once a month.
Q Who paid for your flights?
A I did.
Q Did you want to fly out to San Francisco to assist with the coaching program?
A I wanted to be there, but I didn't want to pay for it. I thought that that was -- there's something about it. I'd had enough space away from being in the main place, so it was more relaxed because it was just me, and then it was, like, wait, I'm supposed to fly out and pay for it and work and not get paid extra for all that work and fly back on --

like, I'm supposed to pay for the privilege of working, like, really hard for these productions, for these coaching programs and then making so little, that that just struck me as there's something about this that feels off. But I want to be there, and that's what's expected, so I'll do it.

Q Which airports did you fly out of New York?

A JFK, LaGuardia maybe.

Q Did there --

What happened with your relationship with Isaac when you were living in New York?

A It eventually petered out. It had its -- it ended naturally.

Q And did there come a time when you began dating somebody else?

A Yes.

Q Who was that?

A His name was Vladimir.

Q When you were living in New York but flying back and forth for the coaching program, what, if any, conversations did you have with Nicole Daedone during this time period?

A When I was flying -- like on the phone or in person or --

Q Let me clarify.

Did there come a time where something happened with respect to your relationship with Vladimir?

A There was one coaching program weekend where he was -- he flew out -- we flew out together. He and I had started really seeing each other, we were really connected, and he was helping me with teaching and he was very well trained in the stroking practice. I was very, very into him, very infatuated, totally in love. We flew out, he was in the program, and that weekend it was made clear to me that this was not approved of and I needed to -- basically, I need to choose between this relationship or being at OneTaste.

MS. BONJEAN: Objection to the foundation.

THE COURT: Sustained.

Q So you testified that you came out for --

MS. BENSING: Just to clarify, Your Honor, it was to the last part --

THE COURT: No, it was to the answer.

MS. BENSING: Okay.

THE COURT: I'm sustaining the objection to the question. You can ask a different question.

MS. BENSING: Thank you, Your Honor.

Q So you testified that you were flying back and forth between New York and San Francisco. Did Vladimir come with you on one of those occasions?

A Yes.

Q And did you have a conversation with anybody from OneTaste with respect to your relationship with Vladimir?

Without getting into the contents of the conversation yet.
A Yes, with Yia Vang.
Q Who was Yia Vang? What was Yia Vang's role at that time?
A She was one of the core members. I don't remember if she was still Nicole's assistant or not.
Q And as one of the core members, who did Yia Vang report to?
A Nicole Daedone.
Q What, if anything, did Yia Vang relate to you with respect to your relationship with Vladimir?
MS. BONJEAN: Objection under Rule 801(d)(2)(E).
THE COURT: Response?
MS. BENSING: Your Honor, I think we've established the agency prong.
MS. BONJEAN: Objection on that ground, as well as hearsay.
THE COURT: Sorry. You reference, Ms. Bonjean, (d)(2)(E), correct?
MS. BONJEAN: Yes. I wasn't sure what the proposed exception was, but I'm just objecting on hearsay grounds.
THE COURT: Okay.
Government?
MS. BENSING: Your Honor, we submit that we've

established the agency prong, and if not, we would request it under the prong after that subject to connection.

THE COURT: Admitted subject to connection. Objection is overruled.

Q You could answer.

A She relayed to me that I'm going to need to choose -- there's going to come a time soon where I'm going to need to choose between this relationship and OneTaste.

Q And what, if any, impact did that have on you at that point in time?

A It was awful. It was shocking and awful and horrible and stressful and, like -- it was, like, something like existential fear. Also, what? After all -- like, I've been running this by myself out here, holding this entire New York office alone, and really? Like, the threat to have to choose, again, about a relationship or being kicked out of this place that I've done so much -- like, put my heart and soul and absolutely everything into and believed so completely in and have given so much for, and somehow my commitment was being, I don't know -- it was existentially -- not traumatic, but existentially stressful, like, ah, what's going to happen to my life. And also the stress at, oh, no, do I have to not be with this partner that was really lighting me up and I really was falling in love with. Yeah, it was very stressful.

Q Did there come a time, when you were flying back and forth between New York and San Francisco for this coaching program, where you attended a lunch with Nicole Daedone and others?
A Yeah, that weekend.
Q The same weekend?
A That same weekend, yeah.
Q And what happened?
A There was a lunch that we all went to, all the people that were working production, the core members. I live away, I live far away, and so every time I'd come for a weekend, it was also an opportunity to, like, see my best friends in the whole wide world who were like my family now. It was bizarre. As we got into the cars, no one would talk to me. No one was talking to me or looking at me, like making eye contact.
When we got to the place where we were eating, I was just sort of standing by myself, and everyone was sort of talking with each other and completely ignoring me like I was being shunned.
And then the lunch happened and we were eating our food, I'm sitting at the table eating, everyone is talking and having fun, et cetera. At one point, Nicole told a story or used a metaphor about something to do with something related to me and how I was being in this

relationship sort of as a teaching tale and that it was wrong how I was being with it, in front of everybody. It was all about me. And it was me alone, no one would talk -- it was, again, one of these experiences of, like, just humiliation and shame and being shunned and oh, no.

Q Did there come a time, around this same time period when you were flying back and forth, that you had a conversation with Nicole Daedone about Rachel Cherwitz?

A Yes.

Q What was that conversation?

A Rachel had come out to -- every now and then somebody would be sent out to New York to spend a little bit of time with me just to sort of resource me a little bit so I wouldn't be alone the whole time. So Rachel Cherwitz had come out for a little while. In that time, because of the space, there was something about New York because it wasn't in the pressure-cooker mothership, it was just me, I had had some conversations with Rachel that were really touching, and I felt her sharing with me about her past life and about things that were true for her that were outside, like they weren't kind of the OneTaste persona version of her, it was more her her, and I really felt for her.

And the next time I saw Nicole after that in person, we were in a parking lot, and because I believed that we're in a place where we're here to help each other

and we're also here teaching others through this coaching program how to help each other, help others and also ourselves, I asked Nicole, you know, there's this thing with Rachel that I sense inside that's -- however I described it, and how -- how can I help her? And Nicole kind of did a stunned kind of look and then took a pause for a moment, and then she said: You know the thing about Rachel, and I'm like, what? She's going to teach me what I can do to help her and I'll learn something. And she goes: She's loyal. And that was a serious crack for me.

Q When you say that was a serious crack for you, what do you mean?

A In my mind at that moment, the only two reasons she would make that -- she would say that --

MS. BONJEAN: I'm going to object to the speculation of the defendant's intent in saying something.

THE COURT: Sustained.

Q Did that comment contribute to your eventual decision to leave OneTaste?

A Yes.

Q Approximately how long after that conversation with Nicole did you end up leaving OneTaste?

A Six months maybe.

Q I'm sorry, how many?

A Six months, something like that.

Q Why did it take so long to leave?

A After spending years in that environment, everything I had was there, and the idea of leaving everyone that understood anything about me, Nicole, who was still -- I held in such extremely high esteem and I just loved, loved, all of -- this is where my job was. This is where I lived. This was my purpose. What gave my life meaning and purpose was all here. And so -- and then all of my thinking was very much about everything here is good and everyone here is good and we know what we're doing, and we're on the right track to enlightenment and everyone outside of here isn't.

And so outside of the bubble, there was this very heavy in/out dynamic, and so the people were kind of -- we would call them muggles. I think that term maybe came after me. But we would have judgmentalness about people outside of this bubble, and so what was out there was, like, maybe well-meaning people, but that didn't understand or get it. So there was not going to be anywhere to go to where anyone would understand anything about me. All of my previous relationships were gone. What would I do for a living because this was -- I wasn't going to be an escort again because I was complete with that experience.

So it was just, like, an impossible thought to start off with, and then slowly beginning to, like, really? Like, it felt -- it was, like, psychologically impossible.

Like, it was unheard of to even think about that. Also, the way that I'd experienced how people who had left --

MS. BONJEAN: I'm going to object at this point to the nonresponsiveness.

THE COURT: Overruled.

Q You can finish.

A People who had left had been just shunned. Like, we would stop talking to them and we would talk about them, like they're off their path and we'd judge them. So I knew that if I did that, I'd lose all my friends. It's not like I'd leave and we'd stay connected. You know, I'd leave and it would be done, and I'd also be looked down upon. So there was -- yeah.

And then the thinking -- anyway, it's hard to describe -- was formatted in such a way by that point that living -- I wasn't socialized, in a sense, to feel at ease in the regular world anymore.

(Continued on the following page.

DIRECT EXAMINATION BY
MS. BENSING: (Continued.)
Q Did you continue to work over that approximately six-month period for OneTaste?
A Yes.
Q When you left OneTaste what was your financial state?
A It was terrible. I had a lot of debt.
Q What about your physical state?
A I was so stressed by the change and the lack of money or financial resources, and just was like so survival level stress that my hair started falling out.
Q How about your psychological state?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A I was scared. I was lonely and confused. I was determined to figure something out. I was really sad. I still had feelings of devotion and wanted it to be what I thought it was the whole time. So there's this mix up within me where like I know this isn't right and I don't want to be there, but it's so wonderful and I love these people and I love Nicole.
So I don't understand. It's good that I'm not there but I'm so scared and stressed I don't know what I'm going to do with my life. I'll figure something out.
THE COURT: Ms. Bensing, in the next ten minutes I'm

going to take a break. So you tell me when it's convenient between now and ten minutes from now.

MS. BENSING: I do have a little more than ten minutes left.

THE COURT: How much more?

MS. BENSING: Maybe just 15.

THE COURT: Let's do it. If it becomes too long we'll stop and take a break.

BY MS. BENSING:

Q Before you left OneTaste did there come a time where you visited that Tahoe house that you testified about earlier?

A Yes.

Q What happened?

A There was a gathering of core members. I don't remember why or for what. But I do know during that time Nicole was working on her book, and I had continued to see Vladimir after that weekend. And he and I -- he introduced me to a different modality of OMing that was equally, and in some ways more incredible. And so I had become fascinated because I was so interested in like what can humans do. That's was my thing that drove me the whole time through this whole experience was learning.

So he -- it was so interesting what he brought, and then I had the OMing piece and so we wanted to teach together. So I told her that he and I are going to teach together, and

she -- I think she knew what that meant. I didn't know what that meant, but she knew what that meant and told me about her concern that that would have me leave. And then the following day, she didn't come downstairs.

So yeah, she didn't come downstairs the whole next day, which had never happened before. And then everybody came from the core and there was a big meal that we all had at a big long table and she's writing I think the Desire Sutras. At one point she looked at me and said, Christina, I try to give you all the freedom that you need.

Q When you left OneTaste where did you go?

A Where did I go? I think I somehow ended up back at that loft. I think I was either in Brooklyn or Harlem right before that, but spent a good first chunk of that year after I left in the loft at 22nd and Park.

Q What did you do for work?

A For a while I was an assistant. So Cal, who we showed a picture of earlier, he had a non-profit. So I helped him part-time at his non-profit.

Q What was it like psychologically for you leaving OneTaste?

MS. BONJEAN: Objection, Your Honor, to this line of inquiry.

THE COURT: Overruled.

A That period of time for me, the word that I used at the

time and think of is Dickensian. Like it was just I couldn't feed -- I wasn't making enough money to feed myself. My roommates were letting me eat their food.

I had -- it was like the end of a New York winter and I had holes in my boots and I couldn't get new boots, so I just went around with socks in the winter. And there's just no clarity on how I could get out of the situation, partly because it's like yeah, go get a job kind of thing. But the world was still very strange. It took about six months or so to acclimate to feeling at ease being of the world again.

Q During the time period -- by the way, what year, approximately, did you leave OneTaste?

A 2010.

Q So during this four-year period that you've testified regarding your involvement in OneTaste, did you become familiar with an individual named Beverly Daedone?

A No.

Q Did you ever become aware whether Nicole Daedone's mother worked for OneTaste?

MS. BONJEAN: Objection. Asked and answered.

THE COURT: Overruled.

A No.

Q I'd like to show you a series of photographs, which are in evidence. I'm going to start with Government Exhibit 297. Do you recognize this? I'll wait for it to be published to

the jurors. I think the jurors may be able to see it.
Do you recognize Government Exhibit 297?
A No.
Q Can we please pull up Government Exhibit 408, which is in evidence. Do you know this person, Ms. Berkley?
A No.
Q I'd like to pull up Government Exhibit 260. Do you know this person, Ms. Berkley?
A Her face looks familiar, but I don't know who she is.
Q Government Exhibit 382, do you know this person?
A No.
Q Government Exhibit 265, do you know this person?
A I think her name is Margaret.
Q How do you know Margaret?
A She came to some classes. I didn't really interact with her when she came for a little while during the time that I was at the Warehouse in San Francisco. So I think I was in the same room with her once or twice, but I don't really know her.
Q And at any point since you left OneTaste have you spoken with Margaret?
A No.
Q I'd like to show you Government Exhibit 269. Do you recognize this person?
A I think I've seen the picture. I don't know her.

Q Government Exhibit 399?
A No.
Q Government Exhibit 228?
A No.
Q Government Exhibit 327?
A I know who she is. I don't know her personally. She's Ken Blackman's current wife.
Q Have you spoken to her?
A No.
Q And Government Exhibit 404, do you know this person?
A No.

MS. BENSING: Could I have one second, Your Honor?

THE COURT: Yes.

MS. BENSING: No further questions.

THE COURT: I think now is a good time to take a break before we turn to cross-examination. We will come back at 20 minutes to 4:00. The witness may step down. Enjoy your break and don't talk about the case. We'll come back at 20 to 4:00.

(Jury not present; Recess taken.)

THE COURT: Do you want to go and get the jury?

THE COURTROOM DEPUTY: Yes, Judge.

(Jury present.)

THE COURT: Everyone may be seated. Ms. Cohen or Ms. Bonjean, is there any cross-examination?

MS. BONJEAN: Yes, Your Honor. I will begin.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Berkley.

A Good afternoon.

Q My name is Jennifer Bonjean and I represent Nicole Daedone. You were actually associated with OneTaste for about seven years; isn't that right?

A I don't believe it is.

Q Well, you need to look back at your timeline. We can do that. But you remember, I think you testified you started taking classes and went to your first event in about August of 2006, right?

A Right.

Q And you left OneTaste in December of 2010, right?

A Yes.

Q But then you continued to contract with them; isn't that right?

A I don't know what that means.

Q Well, do you remember having an arrangement with them where you would get paid after 2010 for bringing in business?

A I don't remember that, but that could be true.

Q Okay. Well, why don't we -- I'm going to have you take a look at Defense Exhibit -- one second. Let's look at -- let

me ask you this. Do you remember continuing to have OM circles up until 2013?
A Yes.
Q And --
A Although I changed the name of them eventually.
Q You started a competing business, right?
A No.
Q You started practicing and teaching OM, correct? Do you remember that?
A Yes, that is what that was. The competing with them description of it was not accurate.
Q Well, it involved stimulating a woman's clitoris, the practice?
A Yes, yes.
Q We're going to come back to that and go through the timeline a little bit. Let me ask you this. You certainly were there at OneTaste either working or participating in a direct way since August of 2006 to the end of 2010; is that right?
A Yes.
Q December of 2010, right?
A Yes.
Q That's over four years at a minimum, correct?
A Yes.
Q Then you did maintain your relationship with people at

OneTaste past that, correct?
A Very lightly. I don't really remember that, but I think that's probably true but very lightly.
Q Would you consider living in Maya Gilbert's grandfather's loft maintaining a connection with someone from OneTaste?
A Yes. She's the only person that I remember staying in contact with.
Q So you were concerned about losing your friends, but you actually lived in a beautiful Manhattan loft of one of your friend's family members after OneTaste, correct?
A Yes, and that was through him because I knew that it would be available the following year.
Q Right. But again, my point is this was a relationship that you made through Maya Gilbert, who was someone associated with OneTaste, right?
A Yes.
Q A friend, right?
A She had been a friend, yes.
Q And she stayed a friend of yours for years, correct?
A I really loved Maya.
Q Is that a yes?
A Not for years, for a little bit of time.
Q Do you remember communicating with her as far as 2017?
A I know she reached out at some point to see me, and then I didn't see her, but she did reach out. I don't know when

that was.
Q And you communicated with her in 2017, right?
A I don't know.
Q I'm going to back up a second. We'll get to that. I want to ask you some other questions. We're going to shift gears for a second. Over the past three years you have been interviewed by the FBI and a cadre of Assistant United States Attorneys in connection with this case, correct?
A Yes.
Q In fact, let me ask it this way. Do you know how many times you've been interviewed by a member of the U.S. government?
A No.
Q Does it sound correct that you have been interviewed by them on almost a dozen times?
A Yeah.
Q And some of those interviews lasted hours, correct?
A Yes.
Q And isn't it true, Ms. Berkley, that the alleged trauma that you felt from being a part of OneTaste was not as a result of any sexuality practices?
A That's true.
Q And isn't it true that you explored a lot and never felt any shame or that bad things happened to you with OneTaste sexually, right?

A There were some OMs I would rather not have had when I was helping out in courses, but other than that, no.
Q You told the U.S. government, U.S. attorneys, as well as the FBI that you never felt any shame or that bad things had happened to you with OneTaste sexually, correct?
A Yes.
Q And in connection with Reese Jones, isn't it true that you had no issues using all of your skills to please Jones?
A That's true.
Q Isn't it true, Ms. Berkley, that you had no regrets about OneTaste and would do it again; OneTaste felt like a choice?
A True.
Q You never felt pressured to pay for courses; isn't that correct?
A I don't remember.
Q Well, do you recall giving an interview, one of the interviews, with members of the federal government, including Special Agent McGinnis, Special Agent Daniel Schmidt, and Assistant United States Attorney Gillian Kassner, and Assistant United States Attorney Lauren Elbert on February 8, 2023?
A Do I recall that meeting?
Q Yes.
A I don't know what that specific one was.
Q Okay.

A But I did meet with individuals.
Q And would anything refresh your recollection about the meeting and the contents of that meeting?
A Yeah, if you have something.
MS. BONJEAN: May I approach, Your Honor?
THE COURT: Yes. Let me know what you're giving her.
MS. BONJEAN: 3500 CB-3.
THE COURT: Okay.
Q Ms. Berkley, I'm going to ask that you turn to the third page, there's three of six, and to the second full paragraph, if you would, and just read that paragraph to yourself when you get there.
THE COURT: I'm going to need this, as well.
MS. BONJEAN: I'm sorry, Your Honor?
THE COURT: I need it as well. You can put it on the screen for me.
MS. BENSING: Your Honor, I believe the government provided your deputy with a copy of all the 3500 for this witness.
MS. BONJEAN: I have paper copies.
THE COURT: I'll go with this. Thank you.
MS. BONJEAN: May I proceed, Your Honor?
THE COURT: Yes.
BY MS. BONJEAN:

Q You recall telling the FBI agents and U.S. attorneys that you never felt pressured to pay for courses?
A Which paragraph did you want me to read?
Q It's the second full paragraph, on page three of six.
A Okay. I don't recall saying that, and that's what it says here.
Q Okay. Would you agree that you never felt pressured to pay for courses?
A I don't remember feeling pressured.
Q You can put that aside. Thank you. Isn't it true that you learned self empowerment from OneTaste?
A Yes.
Q Now, you became acquainted with OneTaste I think you said in 2006 when you were living with your husband in San Francisco. Do I have that correct?
A Yes.
Q And you were about 27 or 28 years old, right?
A That's right.
Q And you already had a bachelor's degree from the University of Montreal, right?
A McGill University.
Q McGill University. My apologies. It's a very prestigious school in Canada. Would you agree?
A Yes.
Q You studied finance and pre-med?

A Microbiology and immunology.
Q Microbiology and immunology; is that right?
A Yes.
Q And after you moved to San Francisco, you were studying to get your doctorate in psychology; is that right?
A I was going to apply to get into a program, to get a doctorate in psychology.
Q And your husband at the time was a scholar, correct?
A Yes.
Q What was his area of expertise?
A Economics.
Q And you described how you became acquainted with OneTaste by a co-worker bringing a flyer for an event that was called Gypsy Nights, right?
A That's right.
Q And it advertised or indicated that there was going to be a demonstration of an OM, right?
A Yes.
Q And at this time you were looking to find intimacy with your husband?
A Yes.
Q You wanted to be more sexually adventurous with him, correct?
A Yes.
Q And this event piqued your interest because you thought

perhaps this might be a vehicle to obtain that, correct?
A Yes.
Q And so you went to the event, right?
A That's right.
Q Fair to say nobody at that event pushed you to buy future courses or come to sign up for any expensive courses, right?
A That's right.
Q But you learned at this event that OneTaste taught meditation and communication between couples, right?
A Yep.
Q And it was kind of all about intimacy building, right?
A Yes.
Q It had a mindfulness, an eastern philosophy type of influence, right?
A I didn't know that at that event, but it does have that.
Q Now, after going to this class or this event, you became extremely interested in OneTaste, right?
A Yes.
Q It resonated in you in some way, fair?
A Yes.
Q That was about you, something in you, correct?
A Yes.
Q Wasn't anybody else that was saying you should go to these things; there was something about that event that was interesting to you, correct?

A Yes.
Q And you were a highly educated woman, right?
A Yes.
Q You had good logic skills, right?
A Yes.
Q You were in a marriage that was stable, correct?
A Yes.
Q Financially stable, let's say, correct?
A Yes, yes.
Q You, I assume, lived in a normative type of community, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q And that wasn't enough for you, correct, emotionally?
A I wouldn't characterize my state of being psychologically to be that. I never thought that, I don't think.
Q Do you remember you testified I didn't want to just be some professor's wife. Do you remember that?
A Yes.
Q You didn't want to be just some professor's wife, right?
A At the time that I went to that party I was not having that thought.
Q But you had that thought later on, right?
A Yes.
Q You mean when you left your husband you had that thought,

I don't just want to be a professor's wife?
A Before I decided to leave.
Q Okay. So you became familiar with what we now know is the Warehouse, correct?
A Yes.
Q And this was something that really interested you, this communal style living at the Warehouse, right?
A Yes.
Q It was an intense experience, fair?
A Yes.
Q You understood it to be an intense experience, correct?
A Yes.
Q And it was not just about sex, correct?
A Correct.
Q I mean, there were couples that stayed there, right?
A Yes.
Q In fact, you and your husband together had plans to stay there, right?
A With other people, with different research partners, not with each other.
Q I understand. That's point of it.
A In a temporary kind of way.
Q You both, though, were going to participate in living at the Warehouse and have sex or have sexual intimacies or just intimacies with other people, right?

A Yes.
Q You wanted to have an open relationship while at the Warehouse, right?
A Yes.
Q And that was what the Warehouse was about, correct?
A That was some of what happened there. I don't know if that was what it was about.
Q Well, let me ask this. There were some couples that went there who were monogamous and some who were not, right?
A Yes.
Q And you and David is his name, right?
A Yes.
Q You moved into the Warehouse on a part-time trial basis, right?
A Yes.
Q OneTaste had no problems with you doing that, correct?
A Correct.
Q You loved your trial week, right?
A Yes.
Q David not so much, fair?
A Yes.
Q And he said, I don't want to move into this place with all these other people and have research partners, basically, correct? And you said I do. You had a disagreement on this, right?

A I don't know if we had a disagreement, but he didn't want to and I did. And so we did different things.
Q Is that because you met Isaac?
A Partly.
Q Now, in the end you decided to stay at the Warehouse and David decided to leave or he did leave, correct?
A Yes.
Q And eventually you parted ways as a couple as well, fair?
A Yes.
Q And you understood that when you left your husband and his salary that you would be losing a second income, correct?
A Yes.
Q No one forced you to leave your husband and that second income, correct?
A It felt like my choice.
Q You had been there all of one week. Wasn't it your choice?
A I had been coming to events and been around the community for longer than that for about three months or something.
Q So in the course of three months where you were attending events, you made the choice to leave your husband and a second salary, right?
A I did.
Q You also eventually left your vet job, correct?
A Yes.

Q And isn't it true that you weren't worried about this little excursion because you could always get another job, right?
A I don't remember that. I'm not sure what you're asking.
Q Do you remember telling the federal agents and federal government that you weren't worried about this excursion because you always could get -- could leave and get another job?
A I don't remember telling them that.
Q Is that accurate?
A I don't remember thinking that. So it's possible that I thought that.
Q Let me ask you this. You were consciously aware that leaving your husband would put you into poverty; isn't that right?
A Yes.
Q So you knew when you left your life with David and you quit your vet job and you moved into this Warehouse that it would put you into poverty?
A Yes.
Q And you did it nonetheless, correct?
A Yes.
Q Now, you testified that you stopped speaking to your parents but no one told you to do that, right?
A No.

Q And in fairness, I think you would agree that your parents were Romanian immigrants, right?
A Yes.
Q Probably would not be cool with the fact that they immigrated here so you could join the Warehouse, right?
A Yes.
Q Probably made a lot of sacrifices so you could get that very fancy education you got at McGill, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Well, there were sacrifices made so you could attend college and get this college degree, right?
MS. BENSING: Objection.
THE COURT: Overruled.
A They worked hard. I don't know if they made sacrifices. They worked hard.
Q You didn't talk to them because that would have been a disappointment to them that you joined this Warehouse to explore your sexuality, right?
A Yes.
Q Fair to say they were conservative types?
A Yes.
Q Now, OneTaste offered a number of -- strike that. Let me ask you this. Do you remember having to fill out an application to join the Warehouse?

A I don't remember that.
Q You testified, I think, that not anybody could just walk into the Warehouse and say I want to live here. Right? There was a vetting process?
A Yes.
Q And part of the vetting process was to make sure that whoever was joining the Warehouse shared the same vision and mission or values as the people living in the Warehouse. Right?
A Yes.
Q I mean it's a community of people, right?
A It is.
Q And it's with an intense -- it was an intense process, right?
A It was.
Q And one of the purposes of joining the Warehouse was to, as you said, sort of research sexuality, correct?
A Yes.
Q And for you that also meant researching people?
A Yes.
Q You had a specific interest in this already before you even got there, right?
A That's true, yes.
Q Now, you worked at the massage parlor there?
A Yes.

Q Did OneTaste offer like massage treatments to just OneTaste people or really anyone that wanted to come in for a massage?
A Anyone.
Q You testified about this situation where Nicole Halpern suggested to you a research partner named Bert. Remember that?
A Yes.
Q And that was communicated to you by Ms. Halpern, not Ms. Daedone?
A That's right.
Q And you didn't want to be Bert's research partner, correct?
A Correct.
Q You actually said no, right?
A Yes.
Q And to be clear, at this time you are infatuated with Isaac, right?
A Yes.
Q That's one of the reasons you didn't want to -- well, maybe one. There may have been more. But one of the reasons you weren't interested in Bert, correct?
A No, I just wasn't interested in him.
Q But either way you said no?
A Yes.

Q You recounted this story where Ms. Daedone sort of scolded you in front of other people for not taking Bert as a research partner?
A Yes.
Q And that made you feel bad?
A Yes.
Q And you understood that Ms. Daedone, I think you testified to this, basically told you like this isn't a place where you're just going to shack up with somebody. That's not what we're about here. We're about exploring sexuality, right?
A She didn't say that then. I don't know what she said. She may have said that at some point. Is it that it might be a belief that she communicated at some point? I don't really remember that --
Q You testified -- I'm sorry. I didn't mean to cut you off. Did you want to finish?
A I don't remember her saying that.
Q You testified on direct, though, at some point she communicated to you that you were sort of not contributing to the community, you were taking away from the community. Do I have that right?
A Yes.
Q And that's because the community was all about exploring other people, not just having a boyfriend and hanging out in a

Warehouse, right?
MS. BENSING: Objection.
THE COURT: Overruled.
A That's not across the board true. So I did not see it that way. Some people -- it was for people to experience how they wanted, following their desire of what they wanted. So some people, like you mentioned, were monogamous.
I saw that as an example of a possibility. So, therefore, being in a relationship with somebody and being with that person mainly to me matched what was possible in this community.
Q And some research partners there didn't have to be any sex at all, right?
A That's right.
Q Now even after you had this -- again, I'm using the word scolding, but sort of this statement from Ms. Daedone about taking a research partner, you still didn't take Bert as your research partner, did you?
A That's right.
Q You went to dinner with him, right?
A Yes.
Q And halfway through your meal you said I cannot do this, right?
A That's right.
Q You said I'm not going to do this, correct?

A Yes.
Q And then instead you said listen, can I tell you something about your dating skills and kind of gave him some advice, right?
A Right.
Q And he accepted that advice and it sounds like it ended being a learning experience for both of you, right?
A I don't known what it was for him. For me it was my self preservation kicked in and it was what it was.
Q Right. And nobody forced you to be with Bert, did they?
A There was a lot of psychological pressure put on me to be with him.
Q Apart from Ms. Daedone saying if you want to really be, go to the next level, you should take our advice about research partners. I think that's what you testified to, right?
A I should, something like that.
Q Apart from that one statement, what was the big psychological pressure to be research partners with Bert?
A It was that one statement but it was the entire sort of psychological feel there that over time had an affect on me. That up down vote, for example.
Q Let's stick on Bert for a second.
THE COURT: Let her finish the answer and then you can ask the next question. I don't think she was done.

A That had a cumulative affect that doing what Nicole wanted was, and everyone around was watching, was like it wasn't just that one statement. It was a cumulative experience over time.
Q I'm asking specifically about Bert. Apart from her passing comment about you wanted to take this intense experience at OneTaste to the next level, you know maybe you would have taken our suggestion about this one research partner.
Apart from that statement, was there anything else that anybody said to you that put pressure on you to be with Bert?
A During that specific time that day or --
Q Anytime.
A Not that I remember.
Q And despite that experience, you stayed on at OneTaste, right?
A Yes.
Q You also stayed on seeing Isaac, even though allegedly you were told not to, right?
A Yes.
Q At one point you were asked, I think you -- do you remember being at Stinson Beach, I think at one point, and being suggested or asked to give a professor of some type a massage and you declined. Do you remember that?

A Yes.
Q You said no and Daedone said okay. Do you remember that?
A Yes.
Q And do you recall writing journal entries about your time at OneTaste back in 2007?
A I remember not in particular, but I may have. I know there was a chat board. I don't know if that's what you're referring to.
Q Tell us what that is.
A Online on their web site there was like a chat forum where people would write their thoughts and feelings about things in a public forum. It was sort of like Facebook before Facebook.
Q That was something you did?
A Yes.
Q And do you remember writing on that chat board extremely positive things about being in the community?
A Yes.
Q And you were very excited in March of 2007 to be part of the community, right?
A Yes.
Q You were embracing all the intensity of it, fair?
A Yes.
Q You understood what the intensity of it was, right?
A No.

Q Well, you understood you were going to sleep in beds with other people, correct?
A Yes.
Q You understood that its purpose was to explore sexuality in a way that you had not previously, right?
A That's right.
Q You understood after being there for sometime some of the exercises that were part of living in the Warehouse, right?
A I don't know what you mean by exercises. Do you mean morning practice?
Q Well, morning practice was OMing, right?
A OMing and withholds.
Q I would call that a practice. What would you call it?
A A practice.
Q I think I said exercise, but fair enough. So morning practice involved OMing and withholds, right?
A Yes, that's right.
Q These are all things you got acquainted with very quickly, correct?
A Yes.
Q You enjoyed those things, right?
A Sometimes. Often.
Q Well, like anything, I guess sometimes you didn't enjoy it but you voluntarily did it every morning, right?
A Yes.

Q You didn't walk out the door, correct?
A Yes.
Q The door wasn't locked, fair?
A Yes.
Q You had your phone, correct?
A Yes.
Q You had a computer, right?
A Yes.
Q Did you do yoga?
A No.
Q Did you meditate apart from OMing?
A Not really. Not at the time.
Q Isn't it true that you were clearly and fiercely committed to OneTaste in 2007, and you announced I'm ready, I'd like the red pill, please. Do you remember saying that?
A I don't remember saying that.
Q Do you know what the red pill means? What's meant by that?
A It's from the Matrix. So sort of to keep life as being what it normally is, or take the red pill in the sense of waking up.
Q Would anything refresh your recollection about whether you posted that publicly?
A Something could.
Q I would ask just for the witness, please, 23-AF.

MS. BENSING: Your Honor the government would request a copy of this.

MS. BONJEAN: We're handing it. If you could pull out the bottom.

A I can't tell what the top right corner says. Okay.

Q Does this refresh your recollection about whether you publically announced that you wanted to be red pilled?

A I don't remember, but I believe that this is accurate. If you found it on the chat board, then it is accurate.

Q Do you remember feeling that way?

A I remember feeling extremely excited to be there.

Q And this was after about four months of being there?

A Yes.

Q Now, at some point you realized you didn't really want to work in the massage studio, right?

A I don't remember that.

Q You said your fingers hurt, on direct examination. Do you remember that?

A I didn't do massage, massage but I still -- I couldn't do actual massage, but I could run the massage studio. It was very different. So I took my name off the list of directory of people if they wanted massages. So I was no longer one of the massage therapists available, but I was still running the massage studio.

Q You didn't want to do massage, right?

A Right.
Q And you eventually were asked to be Ms. Daedone's personal assistant, right?
A I don't remember asking.
Q You were asked.
A Oh, I was asked.
Q Right.
A Yes.
Q And that was a top tier job within the community, correct?
A Yes.
Q And that was something that you were excited about, right?
A Yes.
Q That was something you wanted to do, correct?
A Yes.
Q And you were actually asked whether you wanted to be an assistant to Ms. Daedone in the presence of Rob Kandell; is that right?
A I believe so.
Q And Reese Jones was there as well, right?
A Yes.
Q And you testified that Ms. Daedone asked you something along the lines of how well do you suck cock, or something like that?

A That's right.
Q What did you say?
A That I was good at it.
Q So you understood at that point that part of the job of being an assistant was to service or pleasure Reese Jones, right?
A Yes.
Q And as you said earlier, you were absolutely okay with using your skills in that way, right?
A In that context, yes.
Q Yes. I think you would agree that if you weren't okay with that she would have found somebody else, if they wanted to, to take up that role, right?
A Yes. Do you mean the training position or do you mean just the stroking part?
Q That was part and parcel, right?
A Yes.
Q The two went hand in hand, correct?
A Yes.
Q There were no bait and switch. You knew what you were signing up for, correct?
A Yes.
Q And understanding what you were signing up for, you took that opportunity, correct?
A Yes.

Q Now, you testified that you worked like 24/7, right?
A I was on call 24/7.
Q You were on call, but you didn't work 24/7, correct?
A Correct.
Q And you actually enjoyed that position as the assistant, fair?
A Yes.
Q In fact, you were excited about it, correct?
A Yes.
Q And it's one of those experiences that you tell people was some of the cool, crazy shit you've done, right?
A Yes.
Q It was not a bad experience, correct?
A Correct.
Q And at one point you -- strike that. On direct examination you recounted for the jury a situation where Ms. Daedone went away for a weekend with a different love interest of some type, right?
A Yes.
Q And she said something along the lines of, go all in, have at it, right, while I'm away?
A Yeah. It was more than once than that but yes, she said go all the way in.
Q She said go all the way in?
A Yes.

Q You interpreted that to mean like this is going to be something more than just my task of stroking Reese Jones in the morning, right?
A Yes, it was a different exploration.
Q You were excited about that?
A Yes.
Q And during that week end you said you felt like you were queen of the manor, lady of the manor?
A Lady of the house.
Q Lady of the house?
A I was sleeping in her bed and using her shower. It was just him and me and it was really fun.
Q And you liked him too, correct, meaning --
A Yeah. As a person, yes.
Q You liked him as a person, right?
A Uh-huh.
Q He was extremely interesting, correct?
A Yes.
Q Very smart?
A Yes.
Q Charming?
A He was someone I enjoyed spending time with.
Q During that weekend he took you shopping, right?
A Yes.
Q He spent a few thousand dollars on you, correct?

A I think like two, maybe. I don't remember how much but it was more than one.
Q Did you tell the federal government it was about three?
A Maybe.
Q That was nice too, right?
A Yes.
Q And then at some point Ms. Daedone returned from wherever she was at, correct?
A Yes.
Q And you felt like you wanted to maintain your lady of the house role, right?
A I didn't know what I was supposed to be doing or what had shifted. So it wasn't clear. I wasn't -- I didn't want to take over her role. I was -- like I didn't know what my role would be or if it would be different than the service sort of position just that. If she wanted to pull me back from that or not, I didn't know.
Q You worked as her assistant, right?
A Yes.
Q This one weekend you kind of weren't working as her assistant, so when she returned you weren't sure am I still the assistant, right?
A Something like that.
Q And --
A I knew I was her assistant. I just didn't know if and

how the role had changed based on what it is that she wanted to do with wherever positioning me however within that.
Q You didn't ask for clarity from her, right?
A I didn't.
Q And then I think you testified that there was some conflict over this because -- I don't want to put words in your mouth, but it resulted in some conflict between you and her, right?
A Awkwardness, yes.
Q Awkwardness?
A Yes.
Q Did you speak with her about the awkwardness?
A I don't remember.
Q You also testified that you paid for things out of your pocket during your time working as an assistant for Ms. Daedone, right?
A Yes.
Q You did get reimbursed, correct?
A Eventually.
Q And your complaint is that sometimes they were not timely reimbursements, right?
A Yes.
Q But you did ultimately get reimbursed, fair?
A Yes.
Q Didn't Rob Kandell at some point give you a credit card?

A He didn't.
Q Did not?
A He did not.
Q Did you understand -- who did you understand to be in charge of the financials of OneTaste?
A Financials, Ken Vanosky and then Rob was more connected to the financials.
Q It wasn't Nicole, correct?
A Correct.
Q Now, at some point you stopped being an assistant for Ms. Daedone, right?
A Yes.
Q And it's not because you quit, correct?
A Correct.
Q You would have stayed an assistant, fair?
A Yes.
Q She didn't want you as an assistant anymore, correct?
A That's right.
Q And then that was around the time that you ended up leaving to go to New York, right?
A Yes.
Q Did you leave OneTaste all together for a while there?
A I still lived there, but I was told everyone that I wasn't part of it anymore.
Q And by living there, you mean in the Warehouse?

A When I moved to New York at the New York -- this location on Grand Street where we were living.
Q When did you move to New York precisely, if you remember?
A I don't remember.
Q How much time elapsed from the time that Ms. Daedone fired you as an assistant to when you moved to New York?
A A few months.
Q And is that why you moved to New York?
A No.
Q Did you just want to get out?
A No. I moved to be with Isaac. He was moving to New York.
Q By the way, for all, you know, being told you can't be with Isaac, you stayed with Isaac, right?
A We keep getting back together.
Q And no one kicked you out of OneTaste for continuing to get back together with Isaac, right?
A Right.
Q Now, you moved to New York initially in what was it, June of 2008?
A I don't remember off the top of my head.
Q Okay. When you first moved to New York did you take a break from OneTaste?
A Yes.
Q So you basically kind of parted ways when you first moved

to New York, right?
A While still living there.
Q While still living there?
A Yes.
Q Where were you living precisely?
A At the OneTaste Grand Street location. So I never moved out. I lived there.
Q You went from San Francisco to New York and you moved into another OneTaste?
A Building in New York, the residence.
Q And you didn't have to do that, correct?
A Correct.
Q And if you and Isaac wanted to run off and live an alternative life, you could have done that, correct?
A We could have, yeah.
Q Could have, right?
A If we wanted to.
Q If you wanted to you could have done that, correct?
A Yeah.
Q And what were you doing for work while you were living at the OneTaste property but not working for OneTaste?
A For part of the time I was an escort.
Q Were you doing anything else?
A Not that I remember, no.
Q You didn't go back to get your advanced degree or

anything, right?
A No.
Q Now, at some point you were actually given a pretty big opportunity in connection with OneTaste, right?
A I'm not sure what you're referring to.
Q You got the opportunity to basically coordinate the New York Center, right?
A Yes. It was getting shut down and I said I wanted to stay.
Q Well, in August of 2009 isn't it true that you were vying to be the director of the New York branch?
A I don't know the timing. I remember the experience of -- I remember when it happened that I asked for that and it was on a phone call. I was just verklempt, like I don't want to leave. I don't want to leave New York but I don't want to leave OneTaste, but I don't want to leave New York and I don't want to leave OneTaste.
I don't know what to do because both of these things are really -- and then it was a phone call with Rachael Hemsi and she was like ask for what you want. I was like I don't know. I don't want to leave New York and I don't want to leave OneTaste. Eventually the idea came, I can run it. I didn't believe I could. I didn't actually believe I had what it took to do it, but it was a Hail Mary I'll run it so I wouldn't leave New York.

Q Yes. So you put yourself out there and said I will run OneTaste's New York branch, right? I'd like to do that. You offered that, correct?
A Yes.
Q And there was some conflict with Alisha Price, right?
A I don't known about specific. She was running the branch at that time. I don't remember specifically the conflict.
Q You wanted to be the leader, though, you said that, I want to be the leader?
A It wasn't to replace her. There was going to be nobody. I just didn't want to leave and I didn't want -- I still wanted to be at OneTaste. It wasn't like I want to kick Alisha out. It was already closing before I even had the idea to want to.
Q Right. You wanted to be the leader of the New York branch even as of August of 2009, right?
A I don't know the date.
Q Well, let's look at Defense Exhibit 23-A. Perhaps this will refresh your recollection. It's just for the witness.
MS. BENSING: Your Honor, the government would request a copy.
THE COURT: You have to blow it up or give her a hard copy. It's too hard to read on the screen.
MS. BONJEAN: I have a hard copy I can give her.
Q Does that refresh your recollection about the timing of

when you were vying for the position of the leader of the New York branch?
A Yeah. Yes, around August 2009 when I was interested in being the leader, yes.
Q You got that opportunity, correct?
A Yes.
Q And you were supported through that experience, correct?
A Yes.
Q You provided a proposal to Rob and Nicole and other people associated with OneTaste, right?
A I don't know.
Q I'm going to have you look at 23-Y. Does this refresh your recollection about whether or not you prepared a proposal?
THE COURT: Can you blow it up. It's really too hard to read on the screen.
MS. BONJEAN: Still can't see it.
THE COURT: I have a hard copy. I want to make sure the witness can see it.
MS. BONJEAN: I can give her a hard copy.
THE COURT: Give her a hard copy. It would be easier.
MS. BONJEAN: No problem.
BY MS. BONJEAN:
Q Does that refresh your recollection about your preparing

a proposal for running the New York branch?
A I don't remember preparing this but I believe you that this comes from somewhere that for me somehow.
Q Do you remember in November 20th of 2009 you posted publically that, Christina loves her job?
MS. BENSING: Objection. Hearsay.
MS. BONJEAN: State of mind.
THE COURT: Sustained.
A I do not remember posing that.
MS. BENSING: I'm sorry, Your Honor. Did you sustain the objection?
THE COURT: Yes.
THE WITNESS: Sorry.
Q Did you love your job in 2009?
A I specifically -- I mean that I don't know exactly how I was feeling exactly in that month, but I did enjoy running OneTaste New York.
Q Let's keep it there then. This time period, you enjoyed your job running New York, OneTaste New York, right?
A Yes.
Q In fact, when you moved to New York and you stopped working there you actually could have gone and worked somewhere else, right?
A Yes.
Q You could have pursued your psychology degree or whatever

education you wanted to pursue, correct?
A At that point I don't know if I was interested in doing that. Yes.
Q You could have done any number of jobs, frankly, right with your education from McGill, correct?
A No. I mean not really.
Q A bachelor's degree from McGill, there isn't a host of other jobs you could have done?
A Not that I had experience in. I had a huge gap. It was -- I probably could have been an assistant somewhere starting at a low level administrative assistant position somewhere.
Q You could have done that, right?
A Theoretically.
Q Not just theoretically, but actually?
A Yes.
Q And instead, you actually went back to OneTaste, you left and you went back, right?
A Yes.
Q Now you started -- you and Nicole actually had a nice communicative relationship during this time period, right?
A When I was running New York?
Q Yes.
A Yes.
Q You e-mailed each other, correct?

A Yes.
Q You gave feedback on some of her writing, right?
A I don't remember.
Q Remember the manifesto that you gave feedback on?
A I don't.
Q You also had a good relationship with Rob Kandell, correct?
A Yes.
Q You weren't seeing Nicole Daedone every day or anything like that, fair?
A I was not.
Q And then eventually you ultimately decided to leave OneTaste, I think maybe it was around December of 2009 when you decided to leave?
A 2010.
Q 2010?
A December 2010.
Q Do you remember getting a recommendation from Rob Kandell?
A No.

(Continued on next page.)

(Continuing.)

BY MS. BONJEAN:

Q I'm going to have you look at Defense Exhibit 23-U. I'm just going to give you the paper.

Do you remember Rob Kandell giving you recommendations more exploring new employment?

A I don't remember this. I don't know what this is for.

Q Okay. So this doesn't refresh your recollection about having been begin a recommendation?

A No.

Q And do you recall that you became a paid contractor in January of 2010 for OneTaste?

A I don't know what paid -- I don't know what that means. Does that mean I was getting commissions for sales?

Q Yeah, even after you left.

A I believe I left in 2010. I don't remember that, but it's possible.

Q Look at 23-V, as in Victor. Does that refresh your recollection about whether or not you were being paid as a contractor for OneTaste even after you allegedly left?

MS. BENSING: Objection.

THE COURT: Sustained to the form.

Q Does that refresh your recollection about whether you were being paid as a 1099 contractor after you ceased your employment with OneTaste?

MS. BENSING: Objection.

THE COURT: Sustained as to form.

Q Did you leave OneTaste and become a contractor for them?

A Possibly. If I -- like, sending somebody to them and then I would get a commission on that.

Q In fact, Ms. Berkley, you actually had a whole -- you continued up until September of 2013 to receive commissions for generating leads for OneTaste; isn't that right?

A I don't know. If there's something documenting that, then --

Q We'll look at 23-AC.

A Okay.

Q Does this refresh your recollection about whether or not even as late as September 2013, you were receiving referral commissions from OneTaste?

A I -- I don't remember this. I see that here, so I think this is real, then I was and -- okay.

Q Okay.

A I believe that this is true, this paper. I don't recall this.

Q So you think your recollection is just foggy about how long you stayed associated with OneTaste as you sit here today?

MS. BENSING: Objection.

THE COURT: Sustained.
Q You testified earlier that you didn't think you had as much time associated with OneTaste as I had suggested in the first part of this cross-examination.
Do you remember that?
A Yes.
Q Okay. And if you accept as true that you were still getting commissions in 2013, that would say you were associated with OneTaste for about seven years, right?
MS. BENSING: Objection.
THE COURT: Overruled.
A That -- if -- like sending somebody there because they were interested in the material, I wasn't working there. It was, like, a slow process of figuring out my relationship to OneTaste, and there were -- if there were people that were interested from this, I can guess at what I was doing by sending them there because that's where they could get the learning they were looking for, and I don't remember doing that a lot. Like, if it -- I just don't remember.
Q Do you remember getting a W-9 as late as September of 2013?
A No.
Q Now, it is true that you also did create something called the Orgasmic Collection, correct?
A The Orgasm Collective.

Q Orgasm Collective, my apologies. Right?
A Yes.
Q Tell the ladies and gentlemen what the Orgasm Collective was.
A It was a community -- I guess a community -- it was people who were trained in stroking from wherever they may have been trained in stroking, whether that was at OneTaste or other places where people learn how to do this practice or something similar to it, stroking practice, as it's been taught for much longer than OneTaste has existed. So anyone who was trained in any stroking, there would be biweekly -- every other Monday I would have -- we'd gather and do the practice together, and every now and then I'd also do a how-to -- I changed the name from OMing to GOing, I changed the practice a little bit to explore a little more connection with it. So I trained others in the stroking practice and that they could come to the biweekly sessions.
Q And you changed the name from OMing to GOing, correct?
A That's right.
Q What does go stand for?
A Gateway orgasm.
Q Gateway orgasm. But this wasn't any type of competing business, correct?
A Like, what she was doing was so big and she was, like, who she was. I wasn't trying to be that and compete with

her, and also there was a way that I thought -- called the whole space in a different way. But it also pretty quickly -- it was something that I was doing because I felt this needs to be done, and my business -- the way that I was making money was through coaching, not through -- I was making money, a little bit of money through running a workshop, but over a period of time it pretty quickly was sort of -- I was just holding this because people wanted it to exist, and also I was building my own coaching practice that was very different from anything to do with --

Q You were marketing to OneTaste customers, right?

A The people in New York who -- so OneTaste closed. So after I left, there was a period that it continued to run, and then it totally closed; OneTaste New York stopped existing. So then there were just people who were not OneTaste customers who were in New York, who were trained and wanted space and somewhere to go to have the practice, and I knew how to hold that space.

So there was no OneTaste, and I called Justine and asked if it would be okay if I kept running OM circles because all of these people want, and she said it would be fine. So then I was running OM circles, and there was no OneTaste that I was competing with because there was no OneTaste in New York. And eventually -- so this -- I was now holding the space in this community. Now it was on my

own email list.

And so OneTaste came back six months later, eight months later, I can't remember exactly, and started teaching again and running OM circles again and wanted me to stop. But at this point the relationships were built with the people already, and they wanted the different flavor that I had, so I continued -- I changed the name and continued to hold the space.

Q Okay. So you continued doing what you were doing, right?

A Yes.

Q Okay. And Justine Dawson said, go ahead, right? Good luck, correct?

A Yeah. I mean, I checked in with OneTaste if it was okay if I kept running the circles.

Q And --

A And it was okay.

Q And isn't it fair that in October of 2014, you had a little reunion with people from OneTaste? Do you remember posting a photo of yourself?

A I don't remember.

Q Okay. Let's look at Defense Exhibit 23-AU.

MS. BONJEAN: I think we can pull that one up just for the witness.

A Okay.

Q You posted that, right?
A Yeah.
Q You remember posting that?
A Yes.
Q And are you able to identify the individuals in that photograph?
A Me, Kim Howerton, Rob Kandell, and Ken Blackman.
Q Those were all OneTaste folks, correct?
A Yes. They had left at that point, I believe.
Q Do you know where you were when you took that photograph with them?
A I think it was at a coaching intensive that was done by another coach.
Q Fair to say, though, that those friendships that you were so fearful of losing, you still had some of those friendships, right?
A This -- I was only connected to them after they also left OneTaste. So there was no way that I'd know who would be leaving and who wouldn't be leaving.
Q Okay. But still, you maintained those relationships, is what I'm asking you, right?
A I mean, we met at a conference, they were also at the same event I was at, and also they had left and we, I guess, re-became friends later.
Q Okay.

A And then there are people that I know; they're not friends. But we reconnected much later in a way that I would not have known that I would be doing that, or able to.
Q Do you recall in January of 2017 being invited to a reunion for OneTaste folks by Maya Gilbert?
A No.
Q I'm going to show you what's been marked as Defense Exhibit 23-H. It may be hard to see. We can pull it out.
Let me know when you've had a chance to look at it.
A This isn't my phone number.
Q That's not your phone number?
A No. 990-5 --
Q You don't have to tell us your phone number.
This particular exchange doesn't look familiar to you?
A It doesn't, no.
Q Okay. If it's not, it's not.
MS. BONJEAN: We can take it down.
Q You have no recollection, though, of being invited to the OneTaste reunion, right?
A No.
Q Okay.
As you sit here today, you are a life coach, right?

A Yes.
Q Do you still do OM?
A No.
Q When did you stop doing OM or GO?
A So many years ago. Like 11, 12 years ago. I don't know. Long ago.
Q You currently charge from about $6,000 to $50,000 for people to work with you, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Isn't it true that you work -- you don't work with some types of people and you work with other people, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q You have a website that advertises your services, right?
A Yes.
Q Okay. And you have indicated that you don't work with people who complain and blame others, do you?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Do you work with people who complain and blame others?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Are you blaming others for your choices here today,

Ms. Berkley?
A No.
Q That's because you agree that OneTaste was a choice and you took it, right?
A That's -- it's a complicated question.
Q You told the FBI OneTaste was a choice, right?
A I don't remember telling them that. I did go there and I did decide to go there.
Q So that's a choice, right?
A Yes.
Q Yes?
A Yes.

MS. BONJEAN: Give me a second, please, Your Honor.

THE COURT: Yes.

(Pause in proceedings.)

MS. BONJEAN: I have nothing further.

THE COURT: Ms. Cohen, any cross-examination?

MS. COHEN: Just a short one, Your Honor.

THE COURT: Sure.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good evening, Ms. Berkley. My name is Celia Cohen, and I represent Rachel Cherwitz.

So you were just asked about some choices and I

just wanted to follow up on that. You testified on both direct and cross-examination about learning about OneTaste, about going to see a demonstration about someone giving an orgasm, right?
A Yes.
Q And at that time, you were actually having -- your intimacy, you said, was off with your husband at the time, right?
A That's right.
Q And so that was appealing to you, right?
A Yes.
Q And you made that choice to go and watch that and see if you were interested in something more, right?
A Yes.
Q And, in fact, you were, correct? You became interested after that first demonstration?
A Yes.
Q And then you went to further OneTaste events, right?
A Yes.
Q And you took an introduction to OMing, correct?
A Yes. Well, it was called something else, but yeah.
Q But that was the idea, right?
A Yes.
Q Because really the whole point, one of the main things, besides getting close to people and connection, was the

OMing practice. I mean, if you didn't like OMing, you weren't going to go there, right?
A That's true. Are you asking -- can you ask that question again?
Q Yes. Sorry, that was confusing.
You wouldn't go to OneTaste if you didn't like the OM practice, correct?
A Correct.
Q Right. And it was very open. You knew what it was right at the beginning, correct?
A Yes.
Q And you made that choice to continue with OneTaste, right?
A I did choose to continue with OneTaste.
Q And then you liked it so much, that you decided to move into the Warehouse, right?
A Yes.
Q And you were aware before you moved in that you would be sharing a bed, right?
A Yes.
Q And you were aware that people swapped beds often, right?
A Yes.
Q And you were aware that there were communal showers, right?

A Yes.
Q And you made that choice to move in there, right?
A I did.
Q And, in fact, you didn't even move in there fully at the beginning. You did sort of a trial basis to see if you liked it, right?
A Yes.
Q And because of that trial basis, you decided to move in full time, right?
A Yes.
Q And that was a choice that you made?
A Yes.
Q And that choice was based on your experience in the Warehouse, right?
A It's more complicated than that. There -- there was a covert influence campaign going on that I was unaware of. And so there was influence along with what I felt I wanted -- that contributed to what I felt I wanted.
Q Whether or not you're looking back now saying -- whatever it was, I'm just simply asking you, you did have the choice whether to move in or not, correct?
A Yes.
Q And this was at the beginning, right?
A Yes.
Q And you knew about the research partners, right, right

away?
A Yes.
Q At some point you also said that your husband got a job as a professor in San Diego, right?
A In Michigan.
Q Oh, in Michigan, I'm sorry. I don't know where I got that --
A It was between the two.
Q Oh, okay. So he ended up taking the one in Michigan, right?
And you thought a lot about the decision, about what to do at that point, right?
A Yes.
Q And you said you didn't want to be a professor's wife, right?
A That's right.
Q But you could have moved with him and had been a professor's wife, right?
A Yes.
Q And you would have been part of his salary, right?
A We would be in the same household, so --
Q Yes. And you could have gotten a job there, right?
A Yes.
Q But you chose to stay instead, correct?
A Yes.

Q And then at some point you said you quit your job at the veterinary clinic, correct?
A Yes.
Q And that was another choice that you made, right?
A It was.
Q And another choice that you said you made was at some point you wanted to be all in at OneTaste, right?
A Yes.
Q And, in fact, there were some people who weren't all in, right?
A Yes.
Q And those people could come and go and take courses, right?
A Yes.
Q And they might not have been on what you called sort of the inner circle, right? They might not have been close to Nicole. But you could have done that, right?
A Been more on the outside?
Q Yes.
A Yes.
Q But you wanted to be on the inner circle, right?
A Yes.
Q And, you know, sort of you mentioned about being in high school and high school bullies. Sometimes being with the popular people might not be a good choice, but you want

it anyway, right?
A I'm not sure.
Q Well, being with the popular kids in school, for example, sometimes you want to be with those kids, right?
MS. BENSING: Objection.
MS. COHEN: All right. We'll move on.
THE COURT: Yes, sustained.
Q And when you've also lived in the Warehouse, you had to be -- you were, effectively, part of this community, right?
A When I was in the -- yes.
Q And part of that community meant that as a communal home, you had to help out, right?
A I don't remember specific -- I mean, you had to -- I -- it was a good thing to do, right thing to do.
Q Yea. I mean, you're living with other people, so you're not going to make a mess, right? I mean, you're going to clean up your stuff, right?
A Right.
Q Help out with food, right?
A I know I did help out with cleaning and such, yes.
Q And that was a choice you made to live within the community, right?
A Yes.
Q And then you also learned right away about withholds, right?

A Yes.
Q And that was a part of everyday life at the Warehouse, right?
A That's right.
Q And actually, there was some sense of therapeutic benefit to telling somebody how you really felt, right?
A Sometimes.
Q You knew that from the beginning about the withholds, right?
A Yes -- I don't remember exactly how soon at the beginning, but in the beginning-ish, yeah.
Q And you engaged in it on a daily basis, right?
A Yes.
Q And so you made a choice to stay, and if you stayed, you had to do the withholds, right?
A Yes.
Q And that was part of it, correct?
A That was part of it.
Q And you also said that OM demonstrations are done for educational purposes, right?
A Yes.
Q And OM demonstrations were important for the practice, right?
A OM demonstrations were important for the practice, for helping people know that the practice exists and what's

possible.
Q Yes.
A Yeah.
Q Yes. And, in fact, OM demonstrations were somewhat of an honor within that community, correct?
A That's right.
Q And when you were there, you talked about the inner circle, and you also talked about being a part of something, right? You felt you were a part of something.
A Yes.
Q And you felt accepted, right?
A Yes.
Q And that was important to you, correct?
A Yes.
Q And then later on, you also testified both on direct and cross about at some point you were doing work as an escort --
A That's right.
Q -- to make extra money. And Nicole Daedone contacted you and said it's either OneTaste or the escort, you can't do both, right?
A That's right.
Q And you made the choice then to stay at OneTaste, right?
A That's right.

Q And then when you went to -- you went to New York, right, and you basically -- I think you testified on direct it was really, like, a startup at that point, right? The New York --

A It had that feeling, yeah.

Q It had that feeling, right, right. Just like any business that's a startup, you have to kind of dig in and do everything, right? It's a lot of work.

A Yes.

Q Right? Because the nature of a startup is you don't have the structure. Like if we put it in OneTaste, you don't have everything set up in the way that you do after it gets going, right?

A Right.

Q It's fair to say that's kind of the same with all businesses, right?

MS. BENSING: Objection.

A I don't know.

THE COURT: Sustained.

Q So when you were there, you were doing the startup and you had to do -- in addition to doing the OM circles, I think you said teaching and meet-ups, supporting the community, those were some of the things you were doing, right?

A Yes.

Q And in addition to that, started to do sales, right?
A Yes.
Q And you had both a base salary and commission, correct?
A Yes.
Q And, of course, the more sales you make, the more money you make through commission, right?
A Right.
Q And you also said you agree that you were -- you said you were a terrible salesperson.
A I wasn't terrible. I just wasn't the greatest.
Q You weren't the greatest. Okay, fair.
And you testified -- actually, let me go back for a minute before I continue.
You testified about when you first met Rachel Cherwitz, right? That was sometime in 2007, I think you said?
A I think so. Something like that.
Q Well, let me say, you had been there for a little while before Rachel got there, right?
A Yes.
Q And Rachel came in just sort of in the same way you did, right? She didn't have a position.
A That's right.
Q And she even volunteered at the beginning?
A I don't remember.

Q She was also working her way into OneTaste --
A Yes.
Q -- similar to the way you did, right?
A Yes.
Q And when you were selling in New York, by that point I think you had said Rachel was head of sales. But are you familiar with Kim Howard?
A I know who she is, yeah.
Q And was she the head of sales at some point?
A I don't remember.
Q You don't remember that Rachel wasn't actually head of sales at that time?
A I don't.
Q Okay. But one thing we could probably agree on is that Rachel, she was a good salesperson, right?
A She made a lot of sales.
Q She was -- she was --
I mean, look, sales, it's not for everyone, right?
A It depends on how it's done, yeah.
Q I mean, sales, you know, you have to be kind of relentless, right?
A Not necessarily. You have to -- you have to do it, but there's ways that you can do it that don't involve pressure and the kind of, like, driving intensity. There's a spectrum of what sales can look like.

Q Yeah, all different kinds of people. But fair to say that a lot of times in sales, you have to keep after people, right, if you want to -- I mean, maybe not if you're selling in a store, but something like a car, for example?

MS. BENSING: Objection.

THE COURT: Yes, sustained.

MS. COHEN: Okay.

Q In any event, Rachel, you said, was tough, right?

A Say that again.

Q You said Rachel was tough, right?

A Yes.

Q You said pressure, she would do a lot of pressure for sales, right?

A That's right.

Q And she wanted to make money for the company, right?

A I don't know what she wanted. I assume that's part of what she wanted, but I couldn't tell you what her motivations are or were.

Q You also testified about the man you were --

Sorry. Going back to Isaac for a moment, you testified that you broke up with Isaac, and he actually left OneTaste for six months, right?

A He -- he moved out of the Warehouse to a different location. I don't remember -- he sort of left OneTaste, yeah.

Q Okay. But then he came back, right?
A Yeah, yeah.
Q Okay. And at the end, towards the end of your time at OneTaste, at the time that you were still there, you talked about a person you were dating, Vladimir?
A Yes.
Q And Vladimir also had a sexual relationship with Justine, right?
A Yes.
Q And that made you upset, correct?
A He and I found a fun way to work that out.

(Continued on the following page.)

(Cross-examination, cont'd)

BY MS. COHEN:

Q And when you talked it about being told not to be with Vladimir, you could have left with Vladimir at that point, right?

A Psychologically that wasn't an option --

Q Well, maybe he wasn't --

A -- for me at that point.

Q You don't know if he was going to leave with you, right?

A He left -- after that weekend he was done. Like, he just was gone. And then he and I kept seeing each other, but I was still at OneTaste, but he didn't want to have anything to do with it anymore.

Q So you continued to see him when he wasn't inside, in OneTaste, right?

A Yes.

Q Okay. And you talked about -- you talked about outside people before, and you mentioned the word "muggles," right?

A Yes.

Q You said -- you testified, though, that that term came after you, right?

A Yes.

Q And that's something you heard from the government; is that right?

A No. I knew that term very quickly, within a year of me

leaving, from people in the community that were also coming to my events and the conversations, like that was part of the language.

Q Because you continued to talk to people that were in OneTaste, right?

A The people that were coming to the circles that I was leading.

Q And you taught OM circles on Long Island at a yoga studio as well, right?

A I didn't run OM circles. I taught how to OM in Long Island at a yoga studio, yes.

Q And, actually, the OM circles, we were -- you were talking about before that you ran sort of after you were outside of OneTaste, at the same time, but not with OneTaste; do you remember that?

A Yes.

Q And, actually, OneTaste told you it was okay to run them at first, right, but they wanted you to run them with Rafael Martinez; do you remember that?

A I don't remember that.

Q You don't remember that Rafael Martinez was running those in the community?

A I don't remember that.

Q And you don't remember doing OM circles with him at first?

A He was around. I wouldn't be surprised, but I don't remember it.
Q But then, ultimately, you did do OM circles on your own in the same community, right?
A Yes.
Q And you talked a moment ago about Rob Kandell.
After you left OneTaste, you actually taught with Rob, right?
A I did, yeah, after he left.
Q And you stayed in touch with him, correct?
A Once he left.
MS. COHEN: One moment, Your Honor.
(Short pause.)
THE COURT: Sure.
MS. COHEN: Nothing further, Your Honor.
THE COURT: Is there any redirect examination, Ms. Bensing?
MS. BENSING: Very brief, Your Honor.
THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. BENSING:

Q Ms. Berkley, you were asked some questions on cross-examination about the Orgasm Collective. How, if at all, did that differ from OneTaste?
A I added three minutes, I think, to the beginning of an OM

so that the partners would have time to connect more, where the strokee, the person being stroked, could ask for something that they wanted to help them connect or ground, and then the stroker could say yes or no, and then strokee would find something else, so it was more connected.

And then there wasn't the pressure vibe that was associated with the way it felt at OneTaste. It was just a relaxed, we are coming together to Om. There were no sales there, it is an open, relaxed space, instead of the kind of pressure cooker feeling that could happen in the OneTaste space.

Q When did you stop running the Orgasm Collective, approximately?

A 2013, 2014. I don't remember exactly.

Q So more than a decade ago?

A Yes.

Q You were asked on cross-examination whether you were a paid 1099 contractor after you left OneTaste; do you remember that?

A Yes.

MS. BENSING: I don't have any electronic copy of this, Your Honor, but if I could show the witness only Defense Exhibit 23-V, if I can put it on the Elmo.

THE COURT: That's fine. "B" as in "boy"?

MS. BENSING: "V" as in "Victor."

Q Do you see this in front of you, Ms. Berkley?
A Yes.
Q And I think your testimony was that you left OneTaste in December of 2010, right?
A Yes.
Q I'm going to direct your attention to the date of this?
A Yes.
Q Is January of 2010 before December of 2010?
A Yes.
Q And so that's before you left OneTaste?
A Yes.
Q Were you a paid contractor after you left OneTaste for OneTaste?
A I don't know.
Q Well, you testified a little bit on cross-examination that you may have referred people to OneTaste after you left; do you recall that?
A Yes.
Q How do you square that with your testimony today regarding the trauma that you experienced at OneTaste?
MS. BONJEAN: Objection. Vague.
THE COURT: Sustained.
Q Given your testimony today, why did you refer people to OneTaste after you left?
A It's been a long process. Like, I knew that there's

something messed up here, and there was also a large part of my mind or being that didn't want to see that, and still was so -- but this is so -- it was so good. And so it was very confusing. And so the process of slowly coming to terms with what was true and how actually -- I still loved the people. It wasn't like it turned off immediately. I still loved the people there, I believed in the practice there. I wanted to believe that it was like a good place. The pressure and humiliation was like not okay.

But like, slowly, I -- as I was separating from it and started to get my legs under me and the world, realized, oh, no, really, this is actually a cult.

And the people -- there were a couple people even who were going in to the coaching program, for example, who asked me to like key keep an eye on them.

MS. BONJEAN: Objection to the hearsay.

THE COURT: I think she's finished answering the question you asked. So I am going to strike that last comment. And if you have another question for this witness, you can ask it.

MS. BENSING: Thank you, Your Honor.

Q You were asked a lot of questions on cross-examination about choices, and I think you testified that OneTaste felt like a choice. What do you mean by that?

A There was -- it's like consent and informed consent.

MS. BONJEAN: I am going to object to the analogy of the legal -- partially a legal term.

THE COURT: Overruled.

A So it is like saying yes, but you don't know all of the facts of what you are saying yes to, and some of what was happening or what was going on was this covert influenced setup of this -- the way the whole system was setup, that was pulled where you didn't know, like, yes, you were waking up, but then there is this like secret little hook that all that power that you were awakening was for the system. Nobody said that. And so it was like you weren't consenting or saying yes or choosing, fully knowing all of the things that were going on that were happening at the same time to influence what your choice would be.

All the psychological tools that were being used so that, you know, not everybody, but some people were more vulnerable to, that would kind of become more and more brainwashed in this way, where they became these carbon copies of whatever the core way of being was supposed to be.

So the yeses were -- felt like yeses, felt like choices, but there's gas lighting and suggestion and humiliation, and this idea of don't be a victim, this idea of get turned on by any stroke, and this is the way to enlightenment.

MS. BONJEAN: Object to this long narrative at this

point.

THE COURT: It is responsive. Overruled.

Q You can finish your answer.

A You know, in here is like we know what's good, and if it doesn't feel that way to you, it is just because you're not awake enough yet, but this is the way. And so with the, you know, games, the don't be a victim, get turned on by any stroke, you start finding ways on the inside to be a yes and to make the choices in order to be able to wake up because you believe -- I believed completely, that they -- that what Nicole was teaching and saying was true, and that she really cared, and that she really was tapped in. And everyone else also was being in that way where we ended up policing each other --

MS. BONJEAN: Objection to her speaking about other people's --

THE COURT: Overruled.

A Like I policed people. Like you -- for their benefit. For their benefit.

And within that environment, your own thinking and your idea of like your own desire, like go for a vacation with your friends, or wanting to be a research partner with someone, there were some things that were like, yeah, go for your desire. And then there were some things that were like, nope, there's something wrong with your desire, and if you do

do that, then you are going to get somehow punished, shunned, threatened to be shunned, however, humiliated, scolded.

So then it's like, oh, my actual desire that came from me was off, but this desire that is in alignment with what OneTaste wants is good and right and rewarded. And because it felt so good with all that love and attention and approval and belonging and the love bombing, it like -- and the outside world became smaller and smaller with connections becoming less and less, that it became an imperative on the inside to find the yes and keep going. Because -- and there was benefit to a lot of it, too. So there's also that kind of like confliction in the mind because these things actually did bring benefit. So if some of them did, even this other stuff that doesn't actually feel so good, there must be a way that it does. Yeah.

Q You were asked on cross-examination whether the alleged trauma was as a result of any sexuality practice, and you testified it was not?

A That's right.

Q I want to be very clear. What was the trauma?

A The brainwashing.

MS. BENSING: I have no further questions.

THE COURT: Any recross-examination.

MS. BONJEAN: Yes.

THE COURT: Go ahead, Ms. Bonjean.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q You were a 28-year-old woman with a bachelors degree when you got involved with OneTaste, right?

A Yes.

Q And according to you, you were brainwashed by Ms. Daedone's ideas, right?

A No, that's not accurate. By the actions and system she set up.

Q So some love bombing, right?

A That's part of it.

Q Love bombing, like middle schoolers get love bombed? Kind of like that kind of love bombing?

MS. BENSING: Objection.

A I don't know what that is.

THE COURT: Yes. Sustained.

Q Love bombing, when people give you lots of love, right?

A It's an extreme version of people putting a lot of attention and affection and positive regard on you outside of what would be ordinarily called for within that context.

Q Right. And you ate it up, right?

A Totally.

Q Okay. You got scolded? That's another form of this big pressure that was put on you, right?

A I was shamed and humiliated publicly.

Q Shamed and humiliated how?

THE COURT: I think she said shunned?

Did you say shamed or shunned?

THE WITNESS: Shamed.

THE COURT: Shamed. Okay.

Q How were you shamed and humiliated publicly by Ms. Daedone?

A During that up-down vote event.

Q Okay. Let's stop there.

The up-down vote. Everybody went through the up-down vote, right?

A That's right.

Q That was something that Mrs. Daedone did, and everyone in the community agreed to do to see, hey, are you right for our community, correct?

A That was the spoken about intention of it. I believe there was another -- I mean, the effect of it was like a total psychological breakdown and then put back together, and if you're going to be here, you are going to be all about this purpose.

Q Right. If you're going to be in the cult, as you called it, you're going to be about the purpose, right?

A But your brain is in a survival kind of like reaction, where whatever it is that needs to happen for you to feel okay, because you have been so destabilized, you are going to

choose that.
Q Ma'am, that happened like in the first two months you were there. Was your brain already destabilized, is that what you are telling this jury?
A To some extent.
Q So within two months of living in a Warehouse, your brain was so destabilized that you considered the up-down vote to be so traumatizing that you stayed for the next seven years; is that right?
A So I think it was more than two months. I think that I was already separating from my life in a great degree. There was a lot of love bombing already. There's a lot of like --
Q We got the love bombing.

THE COURT: She's not done with the answer. Let the -- excuse me? No commentary.

She's going to finish her answer.

Go ahead. Take your time.

A The "don't be a victim" piece, the watching pressures being put on people around things that were acceptable or unacceptable. The collective pull-in was very, very strong, where clear thinking was already being substituted for whatever is the thinking of the collective is what I need to be doing here in order to wake up and have the benefits of this experience.

So in order to have the benefits of this experience,

I have to find a way within myself that I suppress my own natural ideas and instincts and intuitions and figure out how I do want whatever it is that all of the things being presented are what I want.

Q Okay. So we got love bombing, we got scolding. Can you give me another example of humiliation other than the thumbs up, thumbs down?

A The Brian Bert example.

Q The Brian Bert example where she said maybe next time you'll take our suggestion for a research partner? Is that the one?

Is that a yes? Is that the one you are --

THE COURT: She needs to be able to answer, Ms. Bonjean. Give the witness the chance to answer before you ask the next question.

A Yes. The context of that experience was --

MS. BONJEAN: Judge, I would ask for an answer to my question. I didn't ask for a narrative.

THE COURT: Excuse me. She was answering your question.

Why don't you just pose a question now.

Q Okay. Were you referencing the scenario where Ms. Daedone said publicly, maybe -- if you really want to be so with our organization, maybe next time you will accept our research partner or the suggestion of a research partner? Is

that the incident you are talking about?
A Those are not the words she used, but that's the instance that I was talking about.
Q Okay. You testified about it already.
A Yes.
Q That's the -- that's what I'm trying to get at, right?
A Yes.
Q Okay. So we have the Mr. Bert example. We have the thumbs up, thumb down. We have general love bombing.
What else was a humiliating experience over the course of your seven years there that made you feel brainwashed?
A Oh, gosh. There were -- I don't remember specific ones. I remember that existing and pressure and gas lighting that were occurring to some regular degree, and the closer in the concentric circles, the more of that was happening.
Q Can you give me one factual example that you haven't already provided?
A There was, at the beginning, certain -- close to the beginning of when I was there, there was this -- in group night, where there was a communication game that we played regularly. And at the time I think I was living there part-time. And everyone was there, and there's a game that we play called hot seats. And do you guys -- I don't know if everyone knows what hot seats are or if I need to explain it.

Q There was some testimony about it. You can go on.
A Okay. So there's hot seats. So I was on the hot seat, and the question came why -- something like why haven't you moved in full-time yet. And I hadn't -- I was just like part-time. And so I started saying, well, something -- well, so the question came, why haven't you moved in full-time yet. And then I started to speak saying, oh, well, because David -- and then I wasn't able to finish my sentence, and I was taken off the hot seat immediately.
And the whole room sort of was in this uproar of like, whoa. And that moment was really exciting and thrilling, but it was at my expense because of the insinuation that -- I'm still not aware that I want to move in fully and leave my husband.
And I was remember thinking, like, do I want to leave my husband? These people are so nice to me. Everything that I am being taught is so valuable. Maybe they're seeing something I don't see. Okay, maybe I want to leave my husband. No, I don't. And then I would -- but the suggestion was dropped in, in this extremely intense psychological moment, in front of everybody.
Q That was part of the brainwashing, right?
A Yes.
Q And you did, indeed, leave your husband and stayed for the next six years, right?

A Three years? I don't know. Until 2010.
Q You stayed for a few years, correct?
A Yes.
Q And that was in your first week at OneTaste, right?
A In the first -- it was part -- I was part-time. So it was after the first three months, four months.
Q All right. So your first three months there. The hot seat experience.
Anything else that comes to mind? I will withdraw it.
MS. BONJEAN: No further questions.
THE COURT: Ms. Cohen?
MS. COHEN: Nothing further, Your Honor.
THE COURT: Okay.
MS. BENSING: Nothing further, Your Honor.
THE COURT: The witness is excused and may step down.
(Witness excused; witness leaves courtroom.)
THE COURT: Okay. We are at the end of the day, a little bit over. I appreciate everybody's paying close attention.
As I told you yesterday, I am going to repeat the same things every evening to you because they are important.
But have a great night. Don't discuss the case with anyone, including with your fellow jurors. If anyone

approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino.

Don't read, listen to, or watch any news or other media reports of the trial. And don't conduct any independent research about the case, the matters in the case, or the individuals involved in the case.

Don't talk to the parties, the witnesses, the attorneys, about anything.

And, finally, keep an open mind.

And, again, appreciate everybody being here on time this morning, and please be here by 9:15 tomorrow morning as well.

And we will -- Mr. D'Agostino will take you back to the jury room.

(Short pause; jury exits the courtroom.)

THE COURT: Everyone may be seated.

We have two jury notes that really just relate to scheduling today, so I will have Mr. D'Agostino show them to the parties, and we can discuss them for a minute.

(Documents tendered to counsel.)

THE COURT: The first one is not actually a jury note, it was handed by the juror, but it is a doctor's note. And that's been marked as Court Exhibit 6, and that relates to juror number 5.

(Court Exhibit 6, so marked.)

THE COURT: And then the other one is Court Exhibit 7. That relates to juror number 18.

And the parties might recall that earlier in the trial, juror number 18 had indicated certain dates of unavailability. The list seems to have shrunk to two dates now.

But in any event, these dates are within the period of time that the jury was told this case would be going on. I will let you look at those for a few minutes.

(Court Exhibit 7, so marked.)

(Short pause; attorneys confer.)

THE COURT: I don't require anything from you tonight on this. I wanted to show it to you, but I can give you my thoughts on it at this time, but we can also just finish this issue in the morning.

The first one, as I said, Court Exhibit 6, relates to a dental procedure on May 22. And it sounds like this doctor only is there once a month, which appears to be the urgency.

You know, we can -- I will hear from the parties. We can find out whether this is something that can be done at the end of the day or the very beginning, or just another day, frankly. Although it says it's urgent, it sounds like -- you know, they're talking about ten days out, and this was written on May 6, although not given to us until today. So query how

really urgent it is or really it's just the doctor's schedule. But we can -- you guys can think about that.

The other one, Court Exhibit 7, is there's one day is a wedding, and one day is a religious observance. Again, these are dates that fell within the period of time the jury was told to expect to sit.

I think Friday, May 23, for the wedding, is Memorial Day weekend, the Friday of Memorial Day weekend, so I don't know whether this is evening wedding or what, but I am not inclined to really do much with that second letter, I'm sorry, the note from juror number 18, at this point, given that we're still a little bit far out from the 23rd and certainly from June 5.

But you can let me know if you want to be heard on this now, or else you can address it in the morning, both of these.

MS. BENSING: I think we can just address it in the morning.

But I do have one scheduling issue that I want to put on the Court's radar.

We have a witness who is a medical resident. They are expected to testify this week. And I just want to flag that depending on how the trial scheduling goes, we may have to take that witness out of order because they have like a range with their medical residency program to specifically

take these days off, and I understand it is quite complicated for the medical facility to --

THE COURT: How long do you think the testimony would be on direct?

MS. BENSING: A few hours, Your Honor.

THE COURT: What type of witness is it?

MS. BENSING: It's a victim witness.

THE COURT: And is this something you have discussed with the defense?

MS. BENSING: No. I wanted to see how we went today. But I am happy to discuss it with the defense, I just wanted to put it on everybody's radar so we can figure it out.

THE COURT: Okay. I don't typically have -- I'm sorry. You're saying you want to take him out of order from the order you have told the defense, or somehow you want to break up the testimony?

MS. BENSING: Well, I think it just depends on how long the next witness goes. But I guess what I am saying is, depending on the pace we are at, this witness can be in New York for these two days, and so we are just mindful that their testimony would need to be completed in order to facilitate the medical --

THE COURT: I guess I am not sure what you are asking. Are you asking to take a break from one witness to put on a second witness potentially?

MS. BENSING: Potentially. Again, this is not an issue yet, but I want to flag it for everybody so that folks knew what was happening, including the Court.

THE COURT: Okay. Let's see what happens, I think.

MS. COHEN: Yeah.

THE COURT: I 'don't think there's anything to decide right now.

Can I have that exhibit list, Mr. Robotti, and the exhibits? Or is that something that you are going to --

MR. ROBOTTI: Your Honor, I think we will have it for you tomorrow morning.

THE COURT: Okay. The list and the exhibits?

MR. ROBOTTI: For the next witness? Or --

THE COURT: I mean, I need the exhibit list for the entire trial for the defense, understanding that you may add things here and there. But that's what I thought I was getting today.

MR. ROBOTTI: Yes, Your Honor. We will aim to have that to you tomorrow morning, the full exhibit list.

You have the exhibits for the next witness.

THE COURT: No, I understand that. Okay. So the full exhibit list you will bring in the morning.

MR. ROBOTTI: Yes.

THE COURT: Sounds good.

Okay. Who is up next?

MS. BENSING: It is another witness who falls in this same victim witness category. We have informed the defense.

THE COURT: Okay. And approximately how long do you think the direct examination will go?

MS. BENSING: Maybe four to five hours, Your Honor.

THE COURT: Okay. And you have told defense who's coming after that? This is this other witness you just mentioned.

MS. BENSING: Yes. So let me talk to them about that scheduling.

THE COURT: And do they know who is after that?

MS. BENSING: I think I spoke with Mr. Robotti about it, but I want to make sure Ms. Bonjean knows.

MS. BONJEAN: I guess I was confused. Is it --

MS. BENSING: We'll provide it to them.

MS. BONJEAN: We will talk.

THE COURT: Okay. So what I am basically asking is, I'd like them to know the next three --

MS. BENSING: Yes.

THE COURT: -- at the very least --

MS. BENSING: Yes. Absolutely.

THE COURT: -- given the time frame that you have told me.

MS. BENSING: Yes.

THE COURT: Okay. Have a good night, everyone. I will see you at 9:30 tomorrow.

MS. COHEN: You, too, Judge.

(At 5:45 p.m., the proceedings were adjourned until 9:30 a.m., Tuesday, May 13, 2025.)

INDEX


| WITNESS | PAGE |
|---|---|
| CHRISTOPHER HUBBARD (resumed) | 957 |
| CROSS-EXAMINATION BY MR. ROBOTTI (resumed) | 957 |
| CROSS-EXAMINATION BY MS. BONJEAN | 967 |
| REDIRECT EXAMINATION BY MR. FERN | 1003 |
| RECROSS EXAMINATION BY MR. ROBOTTI | 1007 |
| RECROSS EXAMINATION BY MS. BONJEAN | 1009 |
| CHRISTINA BERKLEY | 1012 |
| DIRECT EXAMINATION BY MS. BENSING | 1012 |
| CROSS-EXAMINATION BY MS. BONJEAN | 1132 |
| CROSS-EXAMINATION BY MS. COHEN | 1181 |
| REDIRECT EXAMINATION BY MS. BENSING | 1197 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 1204 |

| EXHIBIT | RECEIVED |
|---|---|
| Government Exhibits 56, 57, 60, 203, 205, 213, 247, 272, 273, 275, 297, 327, 3127, 4617, 4624, 4627, 4666, 4671, 4678, 4691, 4698, 4707, 4715, 4716, and 4719 | 1011 |
| Government Exhibit 4636 | 1057 |
| Government Exhibit 4641 | 1083 |