UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
May 13, 2025
Defendant. : 9:30 a.m.
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Annette M. Montalvo
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.
ASHLEY COHEN, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

**P R O C E E D I N G S**

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

*United States of America against Rachel Cherwitz and Nicole Daedone.*

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta, and Sean Fern, joined by paralegal specialist Liam McNett and FBI Special Agent Christine Meyer.

Good morning.

THE COURT: Good morning.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, here on behalf of Rachel Cherwitz.

THE COURT: Good morning to all of you.

MS. BONJEAN: Jennifer Bonjean, B-O-N-J-E-A-N, along with attorney Kelsey Killion and Ashley Cohen, who should be here any second; they're just out grabbing something. And then a paralegal, Galila Assefa. I got it wrong yesterday.

THE COURT: Good morning, everyone. Everyone may be seated.

I think we're waiting for one juror, but I wanted

to address a few things with the parties. One I think we could address quickly is just if anyone wanted to be heard on the jury notes. My suggestion is that at the end of the day, so that we don't have to kind of pull a juror away in the middle from the group, is just to ask Juror No. 5, who's the one with the dental issue, just to stay and maybe collect a bit more information about if there's flexibility, if he's in pain, you know, that kind of -- or does this have to happen that particular day.

But I'll hear the parties on that.

MS. BENSING: That makes sense to the Government, Your Honor.

MS. COHEN: Yeah, that makes sentence, Your Honor. In addition, I think as you said yesterday, perhaps we can start an hour later or end an hour --

THE COURT: Or end earlier or something, yeah.

MS. COHEN: Yes.

THE COURT: Or perhaps the doctor could come in --

MS. COHEN: Could accommodate.

THE COURT: -- on a different day. Okay.

So I also want to address the motions that were filed last night. One is regarding text messages, and that's at ECF No. 374, that's the sealed version, and 375 is the publicly-filed version.

Based on what I know at this time, I'm not

inclined to allow the entirety of the text messages at issue to come in, but whether any particular text or portion is admitted is going to depend I think in part on the testimony, at least. But we can sort of address that when it comes up.

The next motion was regarding a video, and that's at ECF No. 376. And more specifically, it's a video clip, which I have watched. Based on the current record, I will not permit the admission of the video clip. Although explicit videos and/or photographs may very well be relevant and admissible, that will depend on specifics. And with respect to the record as it stands and the arguments of the parties and the video clip itself, I am not going to permit the admission of that clip.

That is all that I had to take up before the jury comes. Is there anything else we need to address? And again, at the end of the day, we'll have Juror No. 5 just stay behind -- or we'll let everybody out and then have him come in.

Okay. I'm going to give you all a few minutes to continue to consult with your teams, and hopefully the jury will all be here momentarily.

Okay. We'll recess.

(Court is in recess.)

THE COURT: Okay. We're back on the record, and

we have the jury all here.

Does the Government want to get the witness on the stand? And we'll bring out the jury, as well.

(Witness takes the stand.)

THE COURT: Good morning.

(Jury enters.)

THE COURT: Everyone may be seated.

Good morning to the jury.

And, Government, you may call your next witness.

MS. GUPTA: Thank you, Your Honor.

The Government calls Dana Gill.

(Witness sworn.)

THE COURTROOM DEPUTY: You may be seated.

State your full name for the record, spell your last name slowly, and speak into the microphone.

THE WITNESS: Dana Michelle Gill. And you said spell the last name; is that right?

THE COURTROOM DEPUTY: Yes, please.

THE WITNESS: G-I-L-L.

THE COURT: You may proceed.

(Continued on the next page.)

**DANA MICHELLE GILL**,

called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GUPTA:

Q Good morning, Ms. Gill.

A Good morning.

Q Do you know someone named Nicole Daedone?

A I do.

Q How do you know her?

A She was the founder of OneTaste, or is the founder of OneTaste.

Q Do you know someone named Rachel Cherwitz?

A I do.

Q How do you know her?

A I lived with her at 1080, and she was involved in OneTaste as well.

Q What is OneTaste?

A OneTaste is a company that focuses on something called orgasmic meditation, and they -- they teach about female sexuality and orgasm.

Q You mentioned that Nicole Daedone was the founder of OneTaste.

A Uh-huh.

Q Did she have any other role?
A Not -- not that I'm aware of. Like, she was part -- actively participating in the life of OneTaste, but no other title, as far as I know.
Q And did Rachel Cherwitz have a title at OneTaste?
A She -- her titles varied. The main one that I remember is head of sales.
Q Do you see Nicole Daedone in the courtroom today?
A Yes, I do.
Q Could you identify her by an article of clothing or where she's seated?
A She's standing now; she's in tan.
MS. GUPTA: And, Your Honor, we would let the record reflect that the witness has identified the defendant.
THE COURT: Yes.
Q While you were at OneTaste, did Nicole Daedone cause you any harm?
MS. BONJEAN: Objection.
THE COURT: Sustained.
You can ask your next question.
Q While you were at OneTaste, Ms. Gill, did you suffer any financial harm?
MS. BONJEAN: Objection.
THE COURT: Overruled.

A I -- I -- yes. I -- I ended up having to not take out debt, but go into debt with OneTaste in order to pay for courses and stuff.
Q While you were at OneTaste, did you suffer any psychological harm?
MS. BONJEAN: Objection.
THE COURT: Overruled.
THE WITNESS: That means that I can go, right?
THE COURT: Yes, yes. You may answer if I say overruled.
THE WITNESS: Thank you.
A Can you repeat the question?
Q Yes.
While you were at OneTaste, did you suffer any psychological harm?
A Yes.
Q What was the nature of that psychological harm?
A I was -- I regularly had my intuition challenged and overruled, so I learned to dismiss my inner voice. I was taught to -- or I was trained to become a sacred prostitute, which is a far deviation from my values. And I became only known -- and I internalized that the only value that I have is my sexual abilities.
Q Who, if anyone, at OneTaste called you a sacred prostitute?

A Yia Vang and Nicole Daedone.
Q What role, if any, did Nicole Daedone have in your financial and psychological harm that you just described?
MS. BONJEAN: I'm sorry. Objection.
THE COURT: Basis?
MS. BONJEAN: Foundation, form.
THE COURT: I'm going to sustain the objection.
You can ask a different question.
Q Did Nicole Daedone at all contribute to the harm that you just described?
A Yes, she did.
Q In what way?
A She directly and indirectly trained me to be a sacred prostitute. She convinced me, both directly and indirectly, that I couldn't be in relationships that I wanted to be in or felt like were right and appropriate for me. And she had me service her boyfriend.
Q Who was her boyfriend?
A Reese Jones.
Q And at a high level, when you say "service her boyfriend," what do you mean by that?
A Take care of sexually.
Q Do you see Rachel Cherwitz in the courtroom today?
A Yes, I do.
Q Can you identify her by an article of clothing she's

wearing or where she's seated?
A Also wearing tan and standing now.
MS. GUPTA: And, Your Honor, we would let the record reflect that the witness has identified Rachel Cherwitz.
THE COURT: Yes.
Q So you've described financial and psychological harm that you suffered at OneTaste.
What, if any, role did Rachel Cherwitz play in that harm?
A She -- she would listen to my fear inventories and knew the personal depths of my --
MR. ROBOTTI: Objection.
THE COURT: Basis?
MR. ROBOTTI: Testifying to defendant's knowledge.
THE COURT: Overruled.
Q You may continue.
A So she knew the depths of my fears and insecurities, and she would at times love bomb me, when -- especially when I was wanting -- when I was talking overtly about leaving.
Q You mentioned something called a "fear inventory."
A Uh-huh.
Q What is that?
A It's a -- it was encouraged to be a daily practice, and it was writing out almost like a prayer, but it was listing

all of your deepest fears, and they asked you to go deeper with each unresentful act, blah, blah, blah, so that you were kind of, like, listing and uncovering all of the things that you were afraid of or worried about, concerned about.

Q And did you share those fear inventories with Rachel Cherwitz?

A Yes. She was one of the -- she was the primary person I would read my inventories to.

Q What was the practical effect, if any, of sharing your deepest fears with Rachel Cherwitz?

MS. BONJEAN: Objection to form.

THE COURT: Yes, sustained.

Q What was the practical effect of sharing your fear inventory with Rachel Cherwitz?

MS. BONJEAN: Objection.

THE COURT: I think it's basically the same question. Sustained.

Q You also mentioned love bombing. What do you mean by that?

A Love -- I mean, she would, like, put attention on me in a way that had me feel seen and loved in a new way. For instance, there was this one course where I had been talking about leaving and moving back to Hawaii, because that's where I had recently moved from, and it was my birthday, and we were going around the circle and she pulled me up to the

front of the room, almost like a Hot Seat sort of situation, and had everyone go around the room and say the thing that they loved about me. And then I was gifted a necklace that all of the in people got. And it just made me feel like, oh, yeah, I am loved, they're not trying to manipulate me like I had been worried about and wanting to leave because of.

Q Did you then stay at OneTaste?

A I did.

Q Now, you mentioned earlier that one of the services OneTaste offered while you were there was orgasmic meditation.

A Uh-huh.

Q Was that sometimes referred to as OM?

A It was.

Q Did OneTaste offer any other services aside from OM?

A Yes. They offered a wide variety of courses, coaching programs. The courses outside of OM were, like, men's courses and women's courses and -- I can't even remember. There were a lot of courses.

Q Did OneTaste offer any sexual services?

A I would say so, yes.

Q What kind?

A I would call orgasmic meditation a sexual service.

Q Approximately when were you involved with OneTaste?

A Late 2009, maybe early 2010, until 2013.
Q And what was your role in OneTaste?
A I -- I was a participant. I took some coaching programs, two of them, parts of them. And I worked back-of-house courses, I helped with TurnON events. I kind of did a little bit of everything.
Q Did you have any titles while you were at OneTaste?
A Only informal one.
Q What were the informal titles?
A TurnON bunny, Mother Teresa of orgasm, TurnON fairy, fluffer.
Q What is a TurnON bunny?
A Someone who is bright and shiny and excited and gets other people excited about OneTaste.
Q What, if anyone, gave you that title?
A In my memory, it's Rachel Cherwitz.
Q You mentioned fluffer. What does that mean?
A It means to get someone prepared to be in a leadership role and get them turned on and ready to lead so that they're bright and shiny and full of what they call orgasm.
Q And practically speaking, what did you do in that role?
A I would fondle people -- it was usually only one person, so I would fondle her, flirt with her, kiss her neck, that sort of thing.
Q And for what purpose would you do that?

A To get her turned on enough that she would be ready to lead.
Q Lead what?
A Whatever course she was about to lead, or an OM demo; one or the other.
Q And who, if anyone, gave you the title of fluffer?
A I think it was Rob Kandell, I'm pretty sure.
Q You also mentioned the phrase TurnON fairy. Is that different from TurnON bunny?
A Not really. It's just a synonymous term.
Q Were there any other TurnON bunnies or TurnON fairies at OneTaste while you were there?
A Yes, there were.
Q Who were they?
A Michelle, Maddie, Aubrey, Maya, Liana. Those were the main ones in my mind.
Q Could you provide last names of those individuals, if you know them?
A Yes. Maya Gilbert, Aubrey Fuller, Maddie Carl, and Michelle Wright. And Liana Lifson, sorry, that was the other person.
Q So you mentioned some work that you performed for OneTaste. You mentioned back-of-house, for example. Can you describe what that means?
A Yeah. Back-of-house was making sure that the courses

and the programs ran smoothly. So you would be setting -- you would set up for the course, you would also make sure that there is tea and snacks available. And then during the course itself, you would usually be texting with various people to make sure that the people who are running it were well taken care of and had the support that they needed. So I would, like, run and get lunch for someone, for example, or whatever was needed in the moment.

Q In addition to back-of-house, did you perform any other labor or services for OneTaste?

A Yeah. It varied depending on the season of my time at OneTaste. But I did some PR and marketing stuff, I would do lead generation. I'm pretty sure I got involved -- actually, I know I got involved in sales, though I sucked at it. And then I was also involved in courses, but that wasn't work necessarily.

Q In addition to performing the tasks that you just described, did you perform any sexual services while you were at OneTaste?

A Yes.

Q And at a high level, what kinds of sexual services did you perform?

A I would OM with clients. I had a strap-on on me for a cock sucking demonstration at one point, and then I also serviced Reese Jones.

Q What, if anyone, directed you to perform the sexual services that you just described?
A Any of the core team for the OM partners. It was usually for newer complaints.
MS. BONJEAN: Objection to foundation.
THE COURT: Overruled.
Q Were you paid money to perform any of the forms of labor and services that you just described?
A I -- to my knowledge, I never received a check. It was payment in kind.
Q I want to take a step back and start at the beginning.
First, where did you grow up?
A Southern California.
Q Can you describe the kind of upbringing that you had?
A Yeah.
I was raised in a very loving household that was also very conservative. My parents had very traditional values and patriarchal values, and any deviation from what my father, who was the head of the household, said was okay was -- it wasn't allowed, right? So I had to stay within those patriarchal systems of family values. And that also meant that any authority figure was never challenged. If you -- if they said you jump, then you say how high.
Q And how was sex treated in your upbringing?
A It wasn't -- it wasn't really talked about. Sex was

something that you only did in the context of a marriage, and that part of me was -- had to be very suppressed in my young childhood and adult life.

Q In your view, did your upbringing later affect your experience in OneTaste?

A Absolutely.

Q How?

A I wasn't able to -- I didn't have the capacity within myself to challenge authority. So if someone who was my superior suggested something about my identity, I listened to them because I was a lost young adult. My brain wasn't fully developed. Yeah.

Q Did you attend college?

A I did.

Q What did you study?

A English and French in undergrad.

Q What did you do after completing your undergraduate education?

A I did a little bit of work, and I moved to Hawaii to do a whole lot of nothing, and then I moved back to the mainland because my mom had gotten sick, and that's when I ended up getting -- and then I found some is very rowdy friends, and that's when I ended up finding OneTaste.

Q And when, approximately, did you first learn about OneTaste?

A Late 2009, if I had to make my best guess.
Q How old were you then, approximately?
A 25, if I'm remembering correctly.
Q And how did you first learn about OneTaste?
A My friend, Aubrey Fuller, told me about it. She had been living at 1080.
Q And at that time that you first learned about OneTaste, where were you living?
A I was living with my boyfriend at the time, Malechai.
Q And how were you supporting yourself at that time?
A I had no job. I had just lost my job because it was right after the economic crash of 2008 and I had been teaching.
Q What was your financial situation at the time?
A Dismal.
Q What was the first OneTaste event that you attended?
A It was a TurnON event.
Q What is a TurnON?
A It's a space where they play games, as they call it. You kind of go around and -- I'm forgetting what they called that first game. But you would, like -- you know, if my sex was a kitchen item, what kitchen item would it be, right? And everyone would go around and answer that question.
The main thing that I remember from TurnON is what they call the Hot Seat.

Q What was Hot Seat?
A It was where one person was brought up to the front of the room to sit on a chair, and people could ask, one at a time, any question that they wanted. I mean, you could pass on the Hot Seat, but it was -- it was poo-poo'd to pass.
Q Did you end up in the Hot Seat at any point?
A I did.
Q Did you share anything about yourself?
A I did.
Q What did you share?
A I don't recall everything that I shared. The one main memory that I have from that TurnON is Rachael Hemsi -- we were talking about my family life and my upbringing, and she asked me if I had a good relationship with my mom, and I said, yes, I have a great relationship with my mom. And she looked very confused, and then I was dismissed from the Hot Seat.
Q Did you share your strict upbringing at that time?
A I did.
Q Who else from OneTaste, in addition to Rachael Hemsi, attended the event?
A Rob Kandell and Rachel Cherwitz. Those are the only -- like, of the core team, those are the only ones I remember in my mind.
Q After enrolling in the TurnON event, did you attend any

additional OneTaste courses?
A I did. I signed up for the coaching -- the first coaching program pretty shortly thereafter, to my memory.
Q What was the coaching program?
A It was -- I don't even remember how long it was supposed to be, but it met monthly and it had a three-tier system of relationship coaching, OM coaching, and something else that I don't remember at the moment.
Q Who, if anyone, signed you up for the coaching program?
MS. BONJEAN: Objection to the form of that question.
THE COURT: Overruled.
Q You can answer.
A Thank you. I keep forgetting.
I mean, Rachel Cherwitz was the salesperson in that moment.
Q Approximately how much did the coaching program cost?
A $20,000.
Q And you mentioned earlier that your financial condition at the time was dismal, so what was the plan for how you were going to pay for the coaching program?
A I didn't necessarily have a plan. I knew that I wanted to sign up for it, I was very excited about it, and I'm pretty sure it was a $20 bill. I gave her something in that moment, and it was the only money that I had to my name in

the moment, and she said don't worry about it, we'll figure it out, we can raise money.
Q And did you, in fact, raise money?
A I raised a very small amount, but yes, I did raise some money.
Q How did you raise money?
A I had a bake sale at 1080, and I had a silent auction.
Q Did you raise the full $20,000 that you needed through the bake sale and the silent auction?
A No. I ended up -- my finances were so bad, I ended up signing up for Sugardaddy.com to help pay for it.
Q What is Sugardaddy.com?
A It's a website that connects well-off men with young women who are looking for money, to be cared for.
Q Where did you get the idea to sign up for Sugardaddy.com?
MS. BONJEAN: Objection. Assumes facts not in evidence.
THE COURT: Overruled.
Q You can answer.
A Thank you.
Aubrey Fuller signed me up for it. She had gotten into sex work, and I felt -- I was happy that she was feeling empowered doing it, but it was definitely a far deviation from my values. And then eventually my financial

situation got so dire that it became -- and I then exposed to her experiences and stories around it that I was like, oh, okay, this might not be so bad, Sugardaddy is a good first step.

MS. GUPTA: Could we show the witness Government Exhibit 292, which is in evidence. And I believe this is in evidence, so the jury should be able to see it, as well.

Thank you.

THE COURT: Give me one moment.

MS. GUPTA: Sure.

THE COURT: Yes, go ahead.

MS. GUPTA: Thank you.

(Exhibit published.)

Q Do you recognize this person?
A I do.
Q Who is it?
A Aubrey Fuller.
Q And what was her role in OneTaste at the time?
A She was a participant. She was also a rising star, as some of us talked about. She was well liked among the core staff and got in with pretty closely -- she was closely knit with them.
Q Did you finish the coaching program that you signed up for?
A I did not.

Q Why not?
A Because I had started dating Billie Stubblebine and the relationship got manipulated, and I was very upset that they broke us up.
Q What do you mean by "the relationship got manipulated"?
A Justine Dawson, the president of OneTaste, started seeing Billie and, from my perspective, kind of stole her from me. In my memory, I knew that it was an intentional move. They would mock me for being in a lesbian relationship every so often. Like, I remember Nicole being like, oh, look, the lesbians are here, and it was not a, oh, look, the lesbians are here, it was a little bit mean-spirited from my perspective. And I was just -- I was gutted that Billie left me for Justine. And then as soon as Billie left me, Justine broke up with her.
Q And why did you believe that Justine was acting intentionally?
A I mean, it seemed too convenient that as soon as -- as soon as Billie broke up with me, that Justine was like, and I'm done, bye. That's really the only thing -- actually, no, that's not true. Later on in the coaching program, I briefly chatted with Justine about it and I had already started to shift my perspective and I was starting to consume the jargon, and I was like thank you so much for intervening, I can see how that relationship was bad for me,

and she was like, oh, you're welcome.
Q I'd like to show you some photographs now. Let's start with Government Exhibit 306, which is in evidence.
(Exhibit published.)
Q Do you recognize this person?
A I do.
Q Who is it?
A Nicole Daedone.
Q Now, we've talked about Nicole Daedone a little bit. Did you interact directly with her during your time at OneTaste?
A Very rarely.
Q Under what circumstances did you interact?
A The majority of my interactions with her were either when she was in the front of the classroom during coaching program stuff, teaching, or when it was just, like, one-on-one direct, it was when I was working with Yia as Yia's assistant or towards the end of my tenure when I was servicing Reese. But she kind of coached me -- I had a horrible miscarriage, and I reached out to her and she kind of helped me through it.
Q And where did Nicole Daedone fit into the OneTaste hierarchy during your time at OneTaste?
A She was -- she was god.
MS. GUPTA: Can we pull up Government Exhibit 309.

MS. FARRELL: Your Honor, may I approach the board while she's doing that?

THE COURT: Yes, go ahead.

(Exhibit published.)

Q Do you recognize this photo?
A I do.
Q Who is it?
A Rachel Cherwitz.
Q Where did Rachel Cherwitz fit into the OneTaste hierarchy during your time there?
A She was also one of the primary core staff. She did a lot of sales, and she was very, very close with me. I had bonded with her pretty closely, yeah.

MS. GUPTA: Could we pull up Government Exhibit 201, please, which is also in evidence.

(Exhibit published.)

Q Do you recognize this person?
A I do.
Q Who is it?
A Joanna van Vleck.
Q And what was her role at OneTaste?
A She was president after Justine Dawson.
Q Where did she fit into the OneTaste hierarchy?
A She was part of the core staff.
Q In how much interaction, if at all, did you have with

Joanna van Vleck?
A I interacted with her. I don't recall having a ton of interactions with her outside of, like, outside smoking cigarettes kind of thing.
MS. GUPTA: Could we pull up Government Exhibit 211, which is also in evidence.
(Exhibit published.)
Q Do you recognize this person?
A I do.
Q Who is it?
A Justine Dawson.
Q And is this the individual we were just discussing who began dating your girlfriend?
A Yes.
Q You mentioned earlier that she was president of OneTaste. How did she fit into the OneTaste hierarchy?
A She was part of the core staff, as well.
Q What, if anything, did she do after she was president? If you know.
A No, I have no idea. I mean, she stuck around, but I don't remember what her role was.
MS. GUPTA: Can we go to Government Exhibit 290, which is also in evidence.
(Exhibit published.)
Q Do you recognize this person?

A Yia Vang.
Q What was her role at OneTaste?
A To my recollection -- she was core staff, and to my recollection, she was Nicole's assistant.
Q Did you ever perform any work for Yia Vang?
A I did. I became her apprentice.
Q And what did it mean to be her apprentice?
A I would work with her and she was training me in her -- in her words, she said that Nicole wanted me to --
MS. BONJEAN: Objection. Hearsay. Double hearsay.
THE COURT: Response?
MS. GUPTA: Your Honor, it's the defendant's statement. Statement of a party opponent.
THE COURT: Overruled.
You're asking about Ms. Vang, correct?
MS. GUPTA: Correct.
THE COURT: Overruled.
MS. GUPTA: Oh --
THE COURT: I'm sorry, I'm sorry. Sustaining the objection. Ask the next question.
MS. GUPTA: Understood.
THE COURT: Apologies.
Q I think my question was: So what did you do in your role at Yia Vang's apprentice?

A I was training to be a sacred prostitute. I was essentially the assistant to Nicole's assistant. So I would go and plant -- I planted something in Reese's garden that was Nicole's garden. I relandscaped it. I would run and get food for Nicole, make her tea. There was a lot of plating issues that had to be concerned over.

MS. GUPTA: Could we go to Government Exhibit 242, which is also in evidence.

(Exhibit published.)

Q Do you recognize this person?
A I do.
Q Who is it?
A Eli block.
Q And what was his role at OneTaste?
A When I was there, he was an enrollee in the same way that I was, and he very quickly, later on in my time at OneTaste, climbed the ranks and became core staff.
Q You used the term "core staff" a couple of times. What does that mean?
A It was all of the leaders of OneTaste, the people who were often teaching courses and teaching the students, which is what I would consider myself to be.

MS. GUPTA: Could we pull up Government Exhibit 302, which is also in evidence.

(Exhibit published.)

Q Do you recognize this person?
A I do.
Q Who is it?
A Maya Gilbert or Block.
Q What was her role at OneTaste during your time there?
A Same as Eli. She was a student that was climbing the ranks pretty quickly and eventually became core staff.

MS. GUPTA: Could we pull up Government Exhibit 281.

(Exhibit published.)

Q Do you recognize this person?
A I do.
Q Who is it?
A Rachael Hemsi.
Q And what was her role at OneTaste?
A She was kind of the house mom and would run 1080.

MS. GUPTA: Could we pull up Government Exhibit 221.

(Exhibit published.)

Q Do you recognize this person?
A I do.
Q Who is it?
A Rob Kandell.
Q What was his role at OneTaste?
A He was cofounder with Nicole, and he was the tech guy.

Q You mentioned 1080 a few times. What is 1080?
A 1080 was the primary residence for OM in San Francisco at 1080 Folsom Street.
Q Did there come a time when you moved into the residence?
A Yes.
Q Where was it located?
A 1080 Folsom Street in San Francisco.
Q Can you describe how you came to live at 1080?
A Yeah.
I was living with my boyfriend at the time, Malechai, and I had just signed up for the coaching program, and I did not realize it at the time, but Malechai was heavily addicted to narcotics and came home loaded one night and started a fight with me and started throwing things at my head. So when I -- when he passed out, I packed up my stuff and moved out.
That next day I called Rachel Cherwitz, because she was my main point of contact, and I was like I don't know what to do, I don't know where I'm going to go, and she was like come here, you can come live at 1080, which was a huge relief because I had no idea where I was going to be going.
Q And when, approximately, did you move into 1080?
A If I am remembering correctly, early 2010, probably,

very late 2009.
Q Approximately how many people lived there at that time?
A When I first moved in, there were very few people there. I'm very bad at counting beans in a jar, but if I had to guess, it would be around 15 to 20.
Q And did that change over time?
A Yes, it got more populated as I lived there.
Q Did OneTaste charge you rent?
A Yes.
Q How much was it, approximately?
A If my memory serves me, it was 900 a month to share a room.
Q How did you pay for the rent?
A I had my sugar daddy. That was not being as lucrative as I needed it to be, so I ended up signing up for Redbook, and I also got a legitimate -- what people would consider a legitimate job working at a company in the Mission District called Lilah Belle's.

(Continued on the following page.)

BY MS. GUPTA: (Continuing.)
Q What is Redbook?
A Redbook is a website for sex workers.
Q And how did you come to sign up for that website?
A Aubrey was on it and she signed me up for it.
Q Did she create your profile?
A She did.
Q And you had mentioned earlier that Aubrey Fuller also signed you up for sugardaddy.com?
A Yes.
Q And likewise, did she create the profile for that account?
A She did.
Q And then, you also said you worked somewhere called Lilia Bell's, what was that job?
A It was a to-go food restaurant; organic to-go food restaurant.
Q Where did you direct your rent payments?
A To Caravan Retreats, Rachael Hemsi.
Q What was your understanding, if any, of how Caravan Retreats was related to OneTaste?
A It was a doing business as; a d/b/a.

MS. GUPTA: I would like to show the witness only what's marked as Government Exhibit 34.

(Exhibit published to witness only.)

BY MS. GUPTA:
Q Do you recognize this?
A Yes.
Q What is it?
A 1080.
Q How do you recognize it?
A It looks exactly like the building that I lived in for a number of years.
Q Is Government Exhibit 34 a fair and accurate depiction of 1080, where you lived while you were affiliated with OneTaste?
A It is. It looks a little different, but it is.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 34.
THE COURT: Any objection?
MS. BONJEAN: No objection.
MR. ROBOTTI: No objection.
THE COURT: Government Exhibit 34 is admitted.
MS. GUPTA: Thank you.
Can we publish to the jury? Thank you.
(Government Exhibit 34 received in evidence.)
(Exhibit published.)
BY MS. GUPTA:
Q Can you point out here for the jury which of these buildings is 1080?
A It's the brown building with the dark brown shutters.

Q Could you describe the space at 1080?
A Sure. You would walk in the -- the rightmost door. It's not on the right, but it's the rightmost door. And you would walk into the living room and behind the living room was dining room and kitchen. And just to the right was the office space that was also used for morning practice.
And then the leftmost door, they went into the same area, but it -- that one went directly into the stairs to go up to the second and third stories.
The second story was where newbies were put because there were a lot more restrictions. And the third story was where the core staff slept and there were far less restrictions.
Q What were the restrictions in place on the second floor?
A You couldn't walk around naked when going to the showers or just, in general. And the showers were separated stalls whereas on the third floor there were no stalls in the showers, it was just a giant wet room.
Q Did you have your own room?
A No.
Q How many people did you share your room with?
A One.
Q Did you have your own bed?
A No.
Q How was your bed assigned to be shared?

A I -- to my recollection, I got to choose to a certain degree. I ended up rooming with Henry who, I felt very fortunate, because he was an engineer for Doctors Without Borders, and the earthquake in Haiti had just happened so he was gone a lot, so I ended up getting a private room essentially.
Q To your knowledge, did most people on the second floor share a bed?
A Yes, to my knowledge.
Q While you were living at 1080, did you have any privacy?
A I don't feel like I did.
Q Why not?
A Everything was communal. People would walk in. Doors were rarely closed unless there was an OM happening or -- or a make out.
And, like, for example, I had my grandmother's wedding ring and I had put it -- I had taken it off for whatever reason and put it in my jewelry container and then it went missing, and I was going bananas looking for my grandmother's wedding ring.
And I was driving somewhere like a week later with Mia and I saw the ring on her finger. And I was like: Where did you get that?
And she's like: Oh, I needed it for a video where we were pretending to be married, and I just really liked it

so I decided to keep it.

MR. ROBOTTI: Objection, relevance.

THE COURT: Overruled.

A Everything was communal.

Q And when you refer to "Maya," are you referring to Maya Gilbert?

A Yes.

Q Were you ever alone while you were living at 1080?

A I was alone when I would take the subway to work. And then there was this one time that I had a true back injury, but I definitely exaggerated it because I -- I needed some alone time.

Q While living at 1080, what time did you typically wake up?

A Probably around 5 o'clock.

Q 5:00 a.m.?

A Yes.

Q And what was your schedule like for the day?

A It depended on the season. And the general routine would be wake up, do fear inventory, journal and then go to morning practice which was at 7:00. Maybe do some yoga.

And then if I was going to my formal clock in/clock out job, I would go there and come back. Or if I wasn't working that day for my formal job, I would go do lead generation or, you know, hang out with my friends.

And then come back for dinner because there was usually a communal dinner and then hang out with Aubrey in the evening usually.
Q You mentioned morning practice. What is that?
A Where we would get together. People would come down from their rooms at 1080. Some people would come in from their private homes if they were living off site and practicing and we would have group OM.
Q How frequently did you OM while living at 1080?
A Again, it depends on the season. And if I had to average it I would say about five times a day.
Q Did anyone direct you to OM that frequently?
A Yeah, I remember Justine Dawson telling me that she --
MR. ROBOTTI: Objection, hearsay.
MS. BONJEAN: Join.
BY MS. GUPTA:
Q Without getting into the content of any of your discussions, who directed you to OM --
THE COURT: I'm going to sustain -- I'm going to sustain the objection.
Ask the next question.
BY MS. GUPTA:
Q Without getting into the content of your discussions, who if anyone, directed you to OM that frequently?
MR. ROBOTTI: Objection.

MS. COHEN: Objection, still hearsay.
BY MS. GUPTA:
Q You mentioned that someone directed you to OM five times a day?
A Uh-huh.
THE COURT REPORTER: Is that a yes?
MR. ROBOTTI: Objection, hearsay.
THE COURT: Sustained.
Move on to the next question.
BY MS. GUPTA:
Q So you mentioned that at times you had jobs outside of OneTaste and you also performed work for OneTaste.
Approximately how many days a week did you perform work for OneTaste?
A In my mind it felt like every day because my life was OneTaste.
Q Approximately how many hours per day did you work for OneTaste?
A Again, it depends on the season, but anywhere from two to eight.
Q You said you felt like your life was OneTaste. Why?
A I was slowly getting more and more involved. I had had so much around my sexual identity that wasn't accepted in my young life, so once I got to OneTaste and my sexuality was celebrated, it was like a breath of fresh air and I was like

I'm seen as a sexual person and not just seen but celebrated for it. So I really got engaged as deeply as I could.

Q Did you remain in contact with people at OneTaste throughout the day?

A Yes.

Q How?

A We -- by text mostly. There was an understanding that you had about 20 minutes to respond to a text because 15 minutes was an OM.

MS. BONJEAN: Objection to the foundation, basis.

THE COURT: One moment, please.

MR. ROBOTTI: Join.

THE COURT: Sustained.

MS. GUPTA: Sorry, Your Honor --

THE COURT: Objection's sustained.

MS. GUPTA: -- was it just that last part?

THE COURT: I'm sustaining the objection I believe to the question and to the answer.

MS. GUPTA: Understood.

THE COURT: I understood that to be the objection; correct?

MS. BONJEAN: Yes, Your Honor.

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Go ahead.

BY MS. GUPTA:

Q Did your relationship with people outside of OneTaste change once you were involved with OneTaste?
A Very much so.
Q How?
A It started off, like, people who, in my life, like my parents and close friends would voice concern for my involvement in OneTaste and eventually because spending any time outside of OneTaste would negate or deplete the orgasm that I had cultivated.
I ended up cutting ties with most family and friends because they were not supportive of it and it really created a silo for me.
Q Did you socialize at all while at OneTaste?
A Of course.
Q With who?
A People from OneTaste. Occasionally, I would go on, like, a trip to go see my family because they desperately wanted to stay connected with me.
But for the most part, it was socializing with OneTaste people, Aubrey, Maddie and Michelle were probably my best friends.
Q And what types of outings would you go on?
A We'd go to tea at Samovar Tea House. We'd go to dinner. We'd go to Dolores Park and do lead generation.
Q Did you post on social media while you were at OneTaste

of some of your social outings?
A Of course.
Q What social media?
A Facebook and eventually Twitter.
Q And why did you post on Facebook and Twitter?
A Because everybody does. And with Twitter, Rachel Cherwitz told me to create an account because I was doing sales and I hated posing on Twitter, but I had to force myself to.
Q While you were living at 1080, did you sign up for any additional OneTaste courses?
A Yes.
Q What courses?
A I cannot recall all of them. I know I went through their various OM -- leveled OM courses. I signed up for a third -- the third coaching program, as well. And -- and then, I was also in the Valentine's Day course towards the end of my time with OneTaste.
Q Approximately how much did each of these courses cost, to the best of your recollection?
A The OM courses, to my recollection, were around 150 each and I -- if I am remembering correctly, there were four of them.
The third coaching program was cheaper than the first one. It was 10,000 and I cannot remember how much the

Valentine's Day course is. I didn't pay for it.
Q Who paid for it?
A My boyfriend at the time, Amjad.
Q Approximately how much, in total, did you spend on OneTaste courses?
A Maybe 30,000.
Q Why did you sign up for more and more OneTaste courses?
A In part because I was excited about the stuff that I was learning and it was also expected to keep growing and learning because that's how you cultivated more orgasm and stepped into your power.
Q Who, if anyone, taught you that?
A Aubrey, Rachel, Mia, Rachael.
Q You mentioned two Rachels (sic), are you referring to Rachel Cherwitz and Rachael Hemsi?
A I am.
Q Did signing up for these courses affect your financial state?
A It did.
Q How?
A I -- I didn't have the job at Lilia Bell's for all that long in my memory. I -- I didn't work there the whole time I was OneTaste. And so I ended up doing a lot more sex work because it was more flexible and I could make a lot more money in a shorter period to be able to pay for my course work.

Q Were you in debt to OneTaste?
A I was.
Q In addition to the sex work that you mentioned, what are some of the ways that you ended up raising money to pay your debt to OneTaste?
A I married an undocumented immigrant for their Green Card and he paid me $10,000. I -- and then, I did some work trade, as well.
Q You mentioned marrying someone. Can you describe how that happened?
A Yeah. I was working at SoMa Inn Cafe which is right underneath 10 -- it's in the same building as 1080 and it's a restaurant and most of the employees there -- I'm pretty sure I was the only documented citizen working there. The other employees were under-the-table, undocumented employees.
And one of my coworkers said that her boyfriend was needing his Green Card and would I be willing to consider marrying him because he had money to pay. And initially, I was like, no, I'm good. And then after thinking about it and talking to some folks, I ended up deciding to do it.
Q And did you, in fact, get married?
A I did.
Q Did people at OneTaste know about this?
A They did.
Q Who knew?

A Well, I feel like everyone knew.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

BY MS. GUPTA:

Q How much were you paid for the marriage?

A $10,000.

Q Where did that money go?

A Directly to OneTaste.

Q Did anyone at OneTaste know that you used those funds to pay for OneTaste courses?

A Yes.

MS. BONJEAN: Objection to foundation and state of mind.

THE COURT: Sustained.

Ask your next question.

BY MS. GUPTA:

Q Did you tell anyone at OneTaste that you were using this money to pay for OneTaste courses?

A Yes.

Q Who did you tell?

MS. BONJEAN: Objection, hearsay.

THE COURT: Overruled.

Q You can answer.

A Aubrey Fuller, Rob Kandell, Justine Dawson, Rachael Hemsi, Maddie Carl, Michelle Wright, Rachel Cherwitz.

Q And you also mentioned that you had engaged in sex work to pay for OneTaste courses.

Did you tell anyone other than Aubrey Fuller that you were using sex work to pay for OneTaste courses?
A Yes, I was not shy about it.
Q Who did you tell?
A I told Rachael Hemsi because we had a conversation about it in the kitchen. I told Justine Dawson. I told Rachel Cherwitz. I told Rob Kandell. I told Ken Blackman.
Q I want to turn now to discuss some of the OneTaste courses that you took.

Were Nicole Daedone and Rachel Cherwitz involved in teaching OneTaste courses?
A Yes.
Q Can you generally describe OneTaste teachings regarding the classes of OM in the four courses that you mentioned?
A Like, describe OM?
Q Describe what the courses taught about OM.

MS. BONJEAN: Objection, vague.

THE COURT: Sustained.

BY MS. GUPTA:
Q In OneTaste courses and lectures that you attended, did Nicole Daedone ever discuss enlightenment?
A Yes.
Q What, if anything, did she teach about enlightenment?

A Enlightenment was brought about by pushing past any barriers that you have around sex and sexuality, you know, "turn a no into a yes," or, you know, if there's someone that you're repulsed by push through it because that repulsion is keeping you from being free.
Q What did you understand "turn a no into a yes" to mean?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A In hindsight it was like --
MS. BONJEAN: Objection to the "hindsight."
THE COURT: Sustained.
BY MS. GUPTA:
Q At the time, what did you understand "turn a no into a yes" to mean?
A To push through your repulsion. To push -- and say yes to things that you may not want to do so that you can be freed.
Q Did Nicole Daedone ever describe any myths to you?
A Yes. There was a myth of some sacred prostitutes that lived off of the isle -- off of an island in Greece, if I'm remembering the location correctly, who would -- apologize for my language -- "fuck the war out of men."
Q What did that mean to you?
A It was an analogy for the ways in which we could -- we, as women, could alchemize and change the anger of men in sex

into something positive. Like the women were the catalyst for that change.

Q Did Nicole Daedone ever say how that myth connected to OneTaste?

A It was -- it was one of the roles that -- and tasks that was given to me. Certainly, I don't recall how -- outside of that, how it was connected to OneTaste.

Q What do you mean it was the task that was given to you?

A I was given the task to fuck the war out of men.

Q Who gave you that task?

A Nicole.

Q Did Nicole Daedone ever use the term sexual alchemy?

A Yes.

Q What did she say?

A Similar concept. It was taking all of -- like, if you -- there's a -- like you couldn't get raped because you would take that anger from whoever the rapist was and get so turned on that you could turn it into something loving and positive, which I thought was bananas that women can't get raped.

Q Did you agree with that concept?

A Absolutely not.

Q Had you ever been a victim of sexual assault?

A I have.

Q Did you share that with anyone at OneTaste?

A Yes.

Q Who?
A The -- the core staff at 1080. I wanted to -- initially, in my coaching program, I wanted to use everything that I was learning to help counsel survivors of rape victims and rapists themselves because I had previous experience in my undergrad doing that sort of thing and I remember being laughed at.
Q Did these teachings affect your sexual boundaries?
A They did, yes.
Q In what way?
A It taught me that all of the things that I was feeling, all of the red flags and the warnings that my internal dialogue was giving me were not valid and that I needed to dismiss them so that I could become an empowered woman.
Q Was there a particular language that people used at OneTaste that was specific to OneTaste?
MS. BONJEAN: Objection, vague.
THE COURT: Sustained.
BY MS. GUPTA:
Q Are you familiar with the term "the fourth dimension"?
A Yes.
Q How, if at all, was that phrase used at OneTaste?
A It was used to talk about the abstract nature and language that made it really confusing to follow for me. I am not an abstract thinker or an abstract talker. I'm very concrete.

Q Are you familiar with the term "Muggle" as used at OneTaste?
A Yes.
Q What did it mean?
A It was someone who was an everyday person who didn't understand the magic of alchemy, in quotes.
Q Are you familiar with the phrase "aversion practice" as it was used at OneTaste?
A Yes.
Q What did you understand aversion practice to mean?
A Anyone that you had an aversion to, usually a man, that you had to push through your aversion to it so that you could once again step into your power.
Q Did you ever hear the phrase "golden pussy" used?
A Yes.
Q And how was that phrase used at OneTaste?
A It was for women who had boundaries and didn't want to put out.
Q Who, if anyone, used that phrase?
A Nicole.
Q Are you familiar with the terms "the masculine" and "the feminine" as they were used at OneTaste?
A Yes.
Q What, if anything, did Nicole Daedone teach about the masculine and the feminine?

A The masculine was the structures that you could -- and -- and the boundaries that would hold the feminine; and the feminine was the chaos, the sex, the deviance that you can play around in the container of the masculine.
Q Are you familiar with the terms upstroke and downstroke?
A Yes.
Q What did those terms mean at OneTaste?
A They had two different connotations. In terms of OM, the physical upstroke was when you were stroking the clitoris in an upward manner and it would get you turned on and excited and kind of brighten your body or the room.
Downstroke were physical downward direction strokes that were, pardon me, very firm in pressure and it would ground your body, kind of like a tight hug.
In terms of more abstract jargon, it was -- an upstroke was a comment that you could give someone where -- where it would make them happy. It would make them bright and shiny, kind of like a compliment.
And a downstroke would kind of bring them down to earth. It -- it could be done kindly or unkindly.
Q Are you familiar with the term tumesce?
A Yes.
Q What did it mean to be tumesce at OneTaste?
A It usually meant that you were full of orgasm or full of energy and you had too much energy in your body so you were

getting kind of cranky, so you would need to -- what they called -- go over, or have an orgasm.
Q Did OneTaste leaders, including Nicole Daedone and Rachel Cherwitz, ever discuss the concept of consent with you?
A Not overtly in my memory.
Q Did OneTaste leaders, including Nicole Daedone and Rachel Cherwitz, use the phrasing "VIPs"?
A Yes.
Q Who were VIPs?
A Usually high-paying clients.
Q Did OneTaste leaders, again, including Nicole Daedone and Rachel Cherwitz, use the term "marks"?
A Yes.
Q What were marks?
A Similar to high-paying clients, they were people that we were trying to get in courses.
Q Now, you mentioned earlier that you performed work at OneTaste to pay off your debt to OneTaste.
What kinds of tasks did you perform at a high level?
A Back-of-house courses. I did some outreach and lead generation and then I was Reese's handler.
Q What is "lead generation"?
A It's where you would go and get people who would want to sign up or courses or come to TurnON events.
MS. GUPTA: Can we show the witness only what's been

marked as Government Exhibit 4520.

(Exhibit published to witness only.)

BY MS. GUPTA:

Q Do you recognize this?

A I do.

Q What is it?

A It's a text message between myself and Rachael Hemsi.

Q How do you recognize it?

A Because I took that screenshot.

MS. GUPTA: Mr. McNett, could we just flip through?

BY MS. GUPTA:

Q Did you provide more than one screenshot?

A Oh, yes.

Q Is this a fair and accurate depiction of text messages that you exchanged with Rachael Hemsi?

A It is.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4520.

MR. ROBOTTI: Objection, hearsay.

MS. BONJEAN: Objection, hearsay and relevance to --

THE COURT: Sustained.

MS. GUPTA: Your Honor, we would admit these subject to connection or as an agency statement given the prior testimony regarding Rachael Hemsi's role at OneTaste under 801(d)(2).

MS. BONJEAN: Objection to the agency foundation, as well.

THE COURT: One moment, please.

(Pause in proceedings.)

THE COURT: Give me the rule provisions exactly that you are offering this under.

MS. GUPTA: 801(d)(2)(E), I believe.

(Pause in proceedings.)

THE COURT: And you're offering that subject to connection?

MS. GUPTA: Correct, Your Honor. Alternatively, I do believe it would be admissible under 802.

THE COURT: Let me look at what you're seeking at this time to put in. How long is it exactly? Where does it start and where does it end?

MS. GUPTA: If I could have a moment, Your Honor.

THE COURT: Yes. You could hand me up the exhibit that you're trying to admit.

MS. GUPTA: Yes, Your Honor. May I approach?

THE COURT: Yes.

(Counsel approaches.)

THE COURT: And you're seeking to offer this entire document?

MS. GUPTA: Yes, Your Honor.

THE COURT: How much more do you have with this

witness?

MS. GUPTA: Quite a bit more.

THE COURT: This is not what was provided yesterday, is that correct in terms of a motion?

MS. GUPTA: No, Your Honor, this was not the subject of the motion.

THE COURT: So why don't you come back to this. I'm going to sustain the objection for now. You can return to this later and I will hear you on a break, but I don't want to keep the jury waiting. Move on to your next topic.

MS. GUPTA: Understood, Your Honor.

BY MS. GUPTA:

Q Now, Ms. Gill, earlier you mentioned some of the titles that you had when you were at OneTaste including Mother's Teresa of Orgasm and TurnON Fairy, TurnON Bunny, Fluffer and Sacrad Prostitute.

Who, if anyone, gave you these names?

A The TurnON Bunny, TurnON Fairy to my recollection was -- it was used by a lot of the core staff but mostly Rachel Cherwitz.

The Mother Teresa of Orgasm, it was a -- it was a -- what's the word I'm looking for? An activity in the coaching program where we had to -- I don't remember why I was giving myself that name, but I -- I didn't give it to myself, it was in a group discussion and that came up. I think Keith

Paolino, you know, kind of suggested it. And I was like, oh, that seems really applicable, you know, because it's nurturing and loving and generous and giving and that's kind of what we're doing here is being generous with our sex.

And Nicole Daedone came up to me and said I wouldn't normally say yes to something like that, but for you I think it's applicable.

And then what was the other one?

Q I believe you also mentioned Fluffer, TurnON Fairy and Sacred Prostitute?

A Thank you.

Sacred Prostitute was Nicole and Fluffer was Rob Kandell, and TurnON Fairy was also Cherwitz.

Q While at OneTaste did anyone expect you to OM with prospective clients?

A Yes.

Q Who told you to do that?

A Mostly it was people who were head of sales so it varied at the time.

MS. BONJEAN: Objection to foundation.

THE COURT: Overruled.

BY MS. GUPTA:

Q And you testified earlier that Rachel Cherwitz was head of sales; correct?

MR. ROBOTTI: Objection, leading.

THE COURT: Sustained.

BY MS. GUPTA:

Q Who was head of sales during your time at OneTaste?

A I think Alisha was -- Alisha Price was head of sales, but I could be wrong about that, and Rachel Cherwitz took over head of sales eventually.

(Continued on the following page.)

(Continuing...)
BY MS. GUPTA:
Q And did you, in fact, OM with the prospective clients?
A Yes.
Q Did Nicole Daedone or Rachel Cherwitz ever direct you to stroke men associated with OneTaste?
A Yes.
Q What did it mean to stroke a man?
A Give a handjob.
Q Was there another term for that at OneTaste?
A A male OM.
MS. GUPTA: I'd like to now show the witness only what's been marked as Government Exhibit 4518.
Q Do you recognize this?
A I do.
Q What is it?
A Text messages between myself and Rachel Cherwitz.
Q How do you recognize them?
A They're my text messages.
MS. GUPTA: Your Honor, we would move to admit Government 4518.
THE COURT: Okay. Now I'm going to need the full copy of what it is you are seeking to admit.
MS. GUPTA: Yes, Your Honor. I believe it is in your binder, and I can also pass up a copy.

THE COURT: Give me a minute. You don't need to give me another copy if you have already given it to me. It's 4518?

MS. GUPTA: Yes.

THE COURT: Okay. I have it. I don't need another copy then.

Go ahead.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 4518.

MR. ROBOTTI: Objection for the reasons previously stated.

THE COURT: Ms. Bonjean, any objection?

MS. BONJEAN: I join in the objection of Mr. Robotti.

THE COURT: Without any further foundation, I sustain the objection.

BY MS. GUPTA:

Q You mentioned that Rachel Cherwitz directed you to stroke men associated with OneTaste?

A Yes.

Q Did she ever direct you to stroke men associated with OneTaste via text message?

A Yes.

MS. GUPTA: Your Honor, we again move to admit Government Exhibit 4518.

MR. ROBOTTI: Same objections.
MS. BONJEAN: Same.
THE COURT: On that foundation, sustained.
Ask your next question.
MS. GUPTA: Your Honor, may I have a moment, please.
THE COURT: You may.
(Short pause.)
BY MS. GUPTA:
Q Ms. Gill, looking at Government Exhibit 4518, does this reflect a conversation that you and Rachel Cherwitz had?
A Yes.
Q And is this a fair and accurate depiction of a conversation that you had with Rachel Cherwitz?
A Yes.
Q And as part of these conversations -- or does this include directions that Rachel Cherwitz gave you as to stroking men associated with OneTaste?
MR. ROBOTTI: Objection.
THE COURT: What's the basis?
MR. ROBOTTI: Not in evidence.
MS. BONJEAN: And leading.
MR. ROBOTTI: And leading.
THE COURT: Sustained as to leading.
BY MS. GUPTA:
Q Does this text message exchange include directions from

Rachel Cherwitz?
A Yes.
MS. GUPTA: Your Honor, we would move to admit Government Exhibit 4518.
MR. ROBOTTI: Same objections.
MS. BONJEAN: Same objections.
THE COURT: To the extent that you are offering the entire exhibit, the objection is sustained.
BY MS. GUPTA:
Q Ms. Gill, does this exhibit also include references to work you performed at OneTaste? And feel free to take a look.
A Yes.
MS. GUPTA: Your Honor, we would move to admit Government Exhibit 4518.
MR. ROBOTTI: Objection.
MS. BONJEAN: Join.
THE COURT: To the extent that you are seeking to offer the entire exhibit, the objection is sustained.
We are probably going to take a break in ten minutes or so, if you want to move on to something else.
MS. GUPTA: Yes, Your Honor. I'll do that.
THE COURT: Okay.
MS. GUPTA: I'd like to show the witness what's been marked as Government Exhibit 339.
BY MS. GUPTA:

Q Do you recognize this individual?
A Yes. That's Antonios.
Q Is this a fair and accurate depiction of Antonios?
A Yes.
Q What, if any, role did Antonios have with respect to OneTaste?
A He was in the coaching -- the third coaching program with me.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 339.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 339 is admitted.
(Government Exhibit 339 received in evidence.)
BY MS. GUPTA:
Q While you were at OneTaste, did you ever receive any instructions with respect to Antonios?
A Yes.
Q What was the instruction?
A He was getting ready to withdraw from the coaching program, and I was told to go make sure that he stayed in the coaching program.
Q What did you understand that instruction to mean?
A To make out with him, which was all inclusive of a wide

variety of sexual acts.
Q Who gave you that instruction?
A The head of sales.
Q What was your understanding of why you received that instruction?
A Because he was getting ready to leave, and he was a high paying client.
Q Was he considered a VIP?
A I don't recall.
Q What, if anything, did you do with Antonios?
A I performed fellatio and gave him a handjob.
Q Did you later report what had happened to anyone at OneTaste?
A I did.
Q Did you report this to?
A The head of sales.
Q Why did you engage in these sex acts with Antonios?
A Because I was told to.
Q And you said you were told to by the head of sales. Who was that?
A I believe it was Rachel Cherwitz.
Q Were there any other instances where you were directed to OM or engage in sexual activity with VIPs or other high paying clients?
A Yes.

Q What are some examples?
A During the Valentine's Day course there was this young couple. I think they were from Australia. And Kate, the young woman, was very nervous. Her husband was very into everything that was happening, and she seemed to take a liking to me. So I was told to OM with her. So I ended up stroking her so that she would be a little bit more at ease and have a friendly face in the room.
Q You said someone told you to OM with her. Who was that person?
A Rachel Cherwitz.

MS. GUPTA: If we can show the witness only what's been marked as Government Exhibit 267.

Q Do you recognize this?
A I do.
Q Who is it?
A Mark Gottlieb.
Q And what role, if any, did he have with respect to OneTaste?
A He lived on the second floor.
Q At 1080?
A Yes. Sorry. At 1080.
Q Is this a fair and accurate depiction of him?
A Yes.

MS. GUPTA: Your Honor, we move to admit Government

Exhibit 267.

THE COURT: Any objection?

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 267 is admitted.

(Government Exhibit 267 received in evidence.)

BY MS. GUPTA:

Q Did anyone while you were at OneTaste direct you to engage in any sexual activity with Mark?

A I was told to OM with him.

Q Who told you to OM with him?

A I don't recall.

Q Why did you? Or, I'm sorry.

Did you, in fact, OM with him?

A Yes.

Q Why did you?

A Because it was asked of me, and it was considered to be liberative and freeing because I wouldn't have OM'd with him otherwise.

Q Why would you not have OM'd with him otherwise?

A Because he's old.

MS. BONJEAN: Objection. Relevance.

THE COURT: Overruled.

Q You can respond.

A Because he's old and I was not attracted to him. I

wouldn't have OM'd with someone like that normally.
Q What is your understanding of why you were directed to OM with him?
MS. BONJEAN: Objection. Foundation.
THE COURT: Sustained.
Q Do you know why you were asked to OM with him?
A I believe it was because he was a high paying client.
MS. GUPTA: Could we go to Government Exhibit 204, which I believe is -- or, I'm sorry, 205, which I believe is in evidence.
THE COURT: Yes, it is.
Q Ms. Gill, who's pictured here?
A That's Alisha Price.
Q Did anyone at any time while you were at OneTaste direct you to engage in any sexual activity that involved Alisha Price?
A I OM'd with her at least once that I remember, and then I was working back of house for a course, and I was asked to get up on a massage table and hold a dildo to my pelvis while she performed fellatio on it.
Q And what was this in the context of?
A In a course.
Q What course, if you recall?
A I couldn't tell you.
Q Do you recall who asked you to do this?

A I don't.
Q Were there students in attendance at that particular course?
A Yes, there were.
Q Approximately how many students were in attendance?
A It was a small room, so a small handful. I have no memory of how many were in there.
MS. GUPTA: Can we put up Government Exhibit 221.
Q I believe you identified this photo earlier. Can you just remind the jury who is pictured here?
A Rob Kandell.
Q Did anyone at any time while you were at OneTaste direct you to engage in any sexual activity with Rob Kandell?
A Yes.
Q Who directed you to engage in sexual activity with him?
A Yia Vang.
Q What did she direct you to do?
A As my first task of being trained to be a sacred prostitute, she told me to put on a T-shirt that she had borrowed for him, and go to his room wearing just the T-shirt, to return it to him.
Q And did you do that?
A I did.
Q Afterwards, did you report back to anyone?
A I reported back to Yia. He wasn't in the room.

Q Are you familiar with any sexually explicit films commissioned by OneTaste?
A I am -- I have -- I heard about them. I -- oh, and I was in one. Yes. Yes.
Q How are you familiar with them?
A I was asked to be the person for an OM video. I have no idea what happened to it, but I do know that my labia were recorded for a very long time.
Q Who asked you to participate in this film?
A I don't fully recall. I know Rob Kandell stroked me. So in my memory, it was him.
Q Did you want to participate in this video?
A I was willing to because someone asked me to.
Q Were you paid to appear in the video?
A Not to my memory.
Q And do you know what became of the video?
A No idea.
Q At the time you performed all of the sexual services that we just discussed, did you have any savings?
A No.
Q Did you have a place where you could live outside of 1080?
A No.
Q Did you have any support network outside of OneTaste?
A No. I had alienated myself from my family and my friends

at that point.

Q And at a high level, how, if at all, did your performance of these sexual acts affect your emotional state?

A It reinforced the idea that I had no value outside of my sex.

Q And how, if at all, did your performance of these sexual acts affect your psychological state?

MS. BONJEAN: Objection to that.

THE COURT: Overruled.

A It undermined my ability to trust myself, and it made me wholly dependent on the OneTaste community. I felt like I would lose everything, my life, my -- the only relationships that I had left, and my connection to God, even.

THE COURT: Is now a convenient time, Ms. Gupta, to take a break, or do you have another question or two that would be useful to do now and then take a break?

MS. GUPTA: Your Honor, I have maybe three more questions.

THE COURT: Okay. Then why don't you do that.

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q You mentioned your connection to God. Why do you say that?

A Well, I got very involved in church at the end of my tenure. I am currently clergy, an ordained elder, and I

remember journaling about wondering if I would have access to God without OneTaste because OneTaste had reconnected me to my faith.

Q Despite all of the impact that you just described on your emotional and psychological state, did you stay at OneTaste and continue to perform labor and services for the company?

A I did.

Q Why?

A Because that was my entire support network at that point, and I had desperately wanted to feel seen for those parts of me that had been neglected as a young person. I just didn't feel like I had any other options available to me.

MS. GUPTA: Your Honor, now would be a good time for a break.

THE COURT: Okay. The witness may step down.

(Short pause; witness exits courtroom.)

THE COURT: We will take a break until 11:20. Enjoy your break, and don't talk about the case.

I will see you at 11:20.

(Jury exits the courtroom.)

THE COURT: Everyone may be seated.

I want to raise one issue with the parties, and it relates to text messages.

Proper foundation has to be laid before any text message is going to be admitted into evidence. You have given

me a lot of text messages. You have given me lengthy messages. In some cases it's not clear whether they're consecutive. It is not clear what the dates are on some of them. So I leave you with that.

MS. BENSING: Your Honor, may I ask one follow-up question?

THE COURT: Yes.

MS. BENSING: If the government is able to establish the entirety of the date range that this represents the text message between her and the defendant between X date range, I just want to understand if that is sufficient for the Court in terms of that objection. Because I think that there may have also been like a relevance objection or something like that. But --

THE COURT: Even just the foundation and authenticity has to be established before anything is coming into evidence.

MS. BENSING: Understood. Okay. I just wanted to make sure --

THE COURT: What you have given me, some things are cut off. So, I mean, you all know how to get evidence in. You have to lay the right foundation for it. But I think perhaps it's better to lay the foundation before you seek to offer it rather than after the fact.

MS. BENSING: Yes, Your Honor.

THE COURT: And if there's any other exhibits that are lengthy text chains that you want me to look at specifically, I know you filed a motion last night, which, you know, obviously, I looked at all of that. This is different. I mean, you have given me binders and binders of exhibits. So if there's something you think is going to be coming up, let me know because I am not going to waste the jury's time while I flip through dozens and dozens of pages of text messages.

MS. BENSING: So, Your Honor, if we can give the Court a heads up, I think we'll be presenting Government Exhibits 4518, 4519, and 4520.

THE COURT: Okay. 4518?

MS. BENSING: Yes.

THE COURT: 45 -- sorry, what's the next one?

MS. BENSING: 4519.

THE COURT: And 4520 is the one that was attempted to be offered --

MS. BENSING: Correct.

THE COURT: -- already.

Okay. I mean, I will take a look at those, you take a look at those, and if there's no proper foundation and it's not relevant, et cetera, of course it is not coming in. But I didn't want to have an extended conversation about this in front of the jury. But I will tell you, based on what you are giving me here, there needs to be more foundation. And that's

for anybody and everybody who is going to try to admit text messages. Okay.

MS. GUPTA: Your Honor, if I could just clarify one thing.

THE COURT: Yes.

MS. GUPTA: You mentioned some of them look cut off. And that's because the witness took screenshots.

THE COURT: Okay. But you're going to have to lay whatever foundation you have to lay, but I'm not filling in the blanks.

MS. GUPTA: I just wanted to let you that in those instances where it appears to be cut off, generally the next page covers the part that was cut off. I just wanted to make that clear.

THE COURT: You know, I've seen that. But you're going to have to lay the right foundation if you want to try to offer those.

MS. GUPTA: Understood.

THE COURT: See everyone at 20 after.

(Recess taken.)

(Proceedings continue in open court; no jury present.)

THE COURTROOM DEPUTY: Remain seated.

THE COURT: Thank you.

MS. BENSING: Your Honor?

THE COURT: Yes.

MS. BENSING: Can we raise one issue with the Court briefly regarding those exhibits?

THE COURT: Yes. I have an issue to raise with the parties on those exhibits first, though.

Some of those exhibits are not sequentially Bates numbered. And to the extent that you're telling me that this is sort of one document, it doesn't appear to be complete. And there are a couple of instances where the numbers just skip.

So I am not going to take more time now on that. You are going to have to get that in order, but there are gaps in the Bates numbering.

Anyway, what did you want to raise?

MS. BENSING: Your Honor, just that we are shortening the time period, but let us take a look at the originals of these. We may need to seek one that's not Bates stamped so that we are making sure we are getting the entirety. We will work on that right now.

THE COURT: Okay. So it is not just a one-off mistake here. There are several instances where the Bates numbers jump.

MS. BENSING: Understood, Your Honor.

THE COURT: And that's based on the binder that was given to me. So if there's some other version floating

around, that's not what I am going off of.

MS. BENSING: Understood, Your Honor.

THE COURT: Okay. Shall we bring the witness in and bring in the jury.

(Witness retakes the stand.)

(Jury re-entered the courtroom.)

THE COURT: Okay. Everyone may be seated.

Ms. Gupta, you can continue.

MS. GUPTA: Can we pull up Government Exhibit 284, please. I believe this is in evidence.

THE COURT: Yes.

MS. GUPTA: Thank you.

(Direct examination, cont'd)

BY MS. GUPTA:

Q Ms. Gill, do you recognize the person pictured here?

A I do.

Q Who is it?

A That's Reese Jones.

Q And could you remind the jury who is Reese Jones?

A He was Nicole Daedone's boyfriend. I don't know if he still is.

Q During your time at OneTaste, what, if any, affiliation did Reese Jones have with OneTaste?

A He was the financial backer for OneTaste. And then he was Nicole's boyfriend.

Q You mentioned earlier that there was a time where you became Reese Jones' handler. What is "handler"?
A I took care of him, I would -- I was expected to bring him breakfast and hang out with him, take him for walks, and then sexually service him.
Q Who, if anyone, asked you to perform sexual acts for Reese Jones?
A Yia Vang.
Q Before that happened, had anything of significance happened to you on a personal level?
A Yes.
MS. BONJEAN: Objection.
THE COURT: Yes. Sustained.
Q When were you asked to perform sexual acts for Reese Jones? When, approximately?
A Late 2012, maybe early 2013.
Q To your knowledge, were other women at OneTaste also recruited to sexually service Reese Jones?
A Yes.
Q Who?
A Michelle Wright and Maddie Carl.
MS. GUPTA: We can pull up Government Exhibit 408, which I believe is in evidence.
Q Who's pictured here?
A Michelle Wright.

MS. GUPTA: And can we pull up Government Exhibit 261.

Oh, I apologize. For the witness only.

THE COURT: It is in evidence.

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q And who is pictured here?

A Maddie Carl.

Q What relationship, if any, did she have with Reese Jones?

A She was Reese's handler right --

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sorry. I believe there was an objection.

MR. ROBOTTI: Foundation.

MS. BONJEAN: Join.

THE COURT: Okay. Sustained.

BY MS. GUPTA:

Q You mentioned earlier that other women were recruited to sexually service Reese Jones, including Michelle and Maddie, correct?

A Yes.

Q Do you have an understanding of who directed them to do that?

A No.

Q You mentioned that Yia Vang directed you to sexually service Reese Jones?
A Yes.
Q What did she ask you to do?
MS. BONJEAN: Objection. Hearsay.
MR. ROBOTTI: Join.
MS. GUPTA: Your Honor, we believe this is an exception under 801(d)(2).
THE COURT: Are you offering it subject to connection?
MS. GUPTA: Yes. Or, alternatively, as an agency statement.
THE COURT: It is admitted -- the objection is overruled. She may testify, subject to connection.
A Can you repeat the question, please.
Q Yes.
What did Yia Vang direct you to do?
A I was in Reese's bedroom, and she opened the boudoir next to his bed, and it was full of sex toys, and she told me to practice my topping skills by using those toys.
Q What are topping skills?
A It's a BDSM term where you -- the top is the one who is in control who's, for example, leading him around on a dog leash or whipping him with cat tails.
Q To your knowledge, did Maddie Carl and Michelle Wright

continue to sexually service Reese Jones while you were also servicing him?
A I couldn't tell you.
MR. ROBOTTI: Objection. Foundation.
THE COURT: Overruled.
Q You can respond.
A Thank you.
I have some vague memories of them coming in while I was his handler, specifically of Maddie coming in, but I don't have any distinct memory of them coming in.
Q How did you end up becoming Reese Jones' handler?
A Maddie approached me one day and told me that she and Michelle could no longer --
MR. ROBOTTI: Objection. Hearsay.
THE COURT: Response?
MS. GUPTA: Effect on the listener, Your Honor.
THE COURT: Overruled.
Q You can respond.
THE COURT: You may answer.
THE WITNESS: Thank you.
A She told me that she and Michelle could no longer continue doing the work that they were being asked to do, and asked if I would please take over.
Q And what did you say?
A I said yes. They were some of my best friends, and they

looked like they were in pain.
Q How did you first meet Reese Jones?
A My first experience with him was in the back of a classroom when he would come and support Nicole, and then when it comes to my job as his handler, I met him through an audition at a concert.
Q Can you describe the audition?
A I was texted by Yia to meet them, to go to this concert, her and Nicole, and I met them downstairs. I was picked up in a car. Rob Kandell was driving, and he turned around and said, oh, you are sneaking in the back door again, huh.

And then they dropped me off at the venue for this concert. And we listened to music, and I danced with Reese, to see if he liked me. And I remember looking over at Nicole and Yia, and they nodded in approval.
Q You mentioned Yia asked you to go to this concert?
A Uh-huh.
Q Did you view Yia Vang as an authority figure at OneTaste?
A Absolutely.

MS. BONJEAN: Objection to vagueness.

THE COURT: Overruled.
Q You can answer.
A Absolutely.
Q And who did Yia Vang report to, if anyone?
A Nicole.

Q What happened after the audition?
A To my memory, I was then moved in to Reese's house, even though I had to maintain residency at 1080 so that when Nicole came to visit I could move out. And I -- that's when Yia showed me the boudoir of sex toys and showed me what to do.
Q And why do you refer to this meeting with Reese as an audition?
A Because that's what it felt like. It felt like it was meant to see if he liked me.
Q And what did you understand to be the role that you were auditioning for?
A To be his handler, to have sex with him.
Q You mentioned that Yia and Nicole were watching you when you were dancing with Reese. How did you feel while that was happening?
A Nervous. I knew that I wanted to be doing a good job so that I could prove that I was worthy of re-entry into OneTaste because I had just suffered a miscarriage.
Q When did you suffer that miscarriage?
A Earlier that year. In my memory, it was in August.
Q And when approximately was this audition with Reese Jones?
A I think it was in December of 2012.
Q Was Nicole Daedone aware of your miscarriage --
MS. BONJEAN: Objection.

Q -- to your knowledge?

MS. BONJEAN: Same objection.

THE COURT: Sustained.

Q Did you tell people at OneTaste about your miscarriage?

A Yes.

Q Who did you tell?

A I told anyone that would listen. And then I was directed by Hemsi to text Nicole about it because I was having nightmares about like blood running down my arms and my legs, because it was a very traumatic miscarriage. I had to have an emergency room abortion.

And she recommended that I go to Grace Cathedral to try to recover.

Q What was your emotional state in the months after your miscarriage?

A Devastated. I was a shell. I wanted nothing more than to be a parent.

Q At the time Yia directed you to perform sexual acts for Reese Jones, were you still dealing with the emotional effects of your miscarriage?

A Yes.

Q Had you informed Yia of your miscarriage?

A Yes.

Q Now, you mentioned after the audition that you toured Reese Jones's house with Yia. Was Reese Jones there when you

were shown around?
A Not to my recollection.
Q And at that time, what, if anything, did Yia tell you to do as Reese Jones' handler?
MS. BONJEAN: Objection. Hearsay.
THE COURT: Overruled.
A She told me to practice my top, and she specifically pointed to the dog collar and the leash, especially, and then it was some sort of whip, also.
Q What, if anything, did she tell you to do with the dog collar and leash?
A To walk him around the room like he was a puppy.
Q Walk Reese Jones?
A Yes.
Q And what, if anything, did she tell you to do with the whip?
A To whip him and practice being the one in control.
Q At that time, were you interested in that kind of sexual activity?
A No. It made me very uncomfortable.
Q How did you feel when you saw this sex toys?
A It was a lot of sex toys. It was a kind of mind blowing amount.
I felt embarrassed. I felt nervous. I am not a BDSM person. I am definitely not a top. And so it was very

difficult to try to imagine performing those acts.
Q After the tour of Reese Jones's house, what happened next?
A I believe I moved in.
Q Where was Reese Jones' house located, if you remember?
A At the top of the hill above Chinatown.
Q Earlier you talked about some of the sexual activity Yia directed you to do, including topping. What do you mean by that?
A It's being the dominant position in sex, often being very forceful and aggressive, especially in the BDSM world.
MS. GUPTA: I'd like to show you now Government Exhibits 56 and 57, which are in evidence. And we can just put those side by side.
Q Do you recognize these photos?
A I do.
Q What are they?
A That's Reese's house.
MS. GUPTA: I'd like to now show the witness only, Government Exhibits 58 and 59.
Q Do you recognize these photos?
A Yes.
Q What do they depict?
A The deck at Reese's house on the upper level.
Q Are these a fair and accurate depiction of Reese Jones'

decks in his house?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibits 58 and 59.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibits 58 and 59 are admitted.
(Government Exhibits 58 and 59 received in evidence.)
BY MS. GUPTA:
Q And can you describe for the jury what these exhibits show?
A His house was multi stories. I don't remember how many stories exactly. And there were decks I think on every floor, but definitely on the top floor, at least.
Q Did you perform any labor or services related to either of these decks?
A Not that I can recall.
MS. GUPTA: I'd like to now show the witness what's been admitted as Government Exhibit 60.
Q Do you recognize this?
A Yes.
Q What is it?

A That's the top floor of Reese's house.
Q Did you live on the top floor with Reese?
A No. My bedroom was, I think, in the floor below, if I am remembering the levels correctly.
His son did walk in on me while I was performing fellatio on the couch.
MS. BONJEAN: Objection.
THE COURT: Yeah. I am going to sustain, and I am going to strike that answer.
MS. GUPTA: We can take that down. Thank you.
BY MS. GUPTA:
Q What were you expected to do when you were living with Reese Jones?
MS. BONJEAN: Objection. Foundation.
THE COURT: Sustained.
Q You mentioned there came a time when you moved into Reese Jones' house. For approximately how long did you live there?
A Maybe two or three months.
Q And what was your schedule like while you were there?
A It was very busy. I was working -- so I would wake up, make him breakfast. He was usually still asleep, so I would leave breakfast on the nightstand, and then I would leave to go to morning practice that started at 7:00. And then I would go to the church where I worked as the office person, and then eventually I would go and take care of a friend's kid that I

started nannying for a little bit later in my time at Reese's house. And then I would go home and take him for walks, Reese or the dog.

We -- I would invite him to meetings that I had at the church. He only came to one of them. We went on a lot of walks with Baxter. We would go out to dinner, and then -- or we would like stay in bed and watch a movie. And we would also have a lot of sex.

Q How did you know what you were supposed to do with him?

A Maddie and Yia had told me what to do. Everything else was assumed.

Q Did you report back to people at OneTaste regarding what you were doing with Reese?

A Yes.

Q Did you report back to Nicole?

A Very rarely. Every once in a while she would text and check in, be like, oh, I heard someone came to your church talk or something like that.

Q Did you report book to Yia regarding what you were doing with Reese?

A She would check in every once in a while, and I would report. Yeah.

Q Did you view your living with Reese as part of your job at OneTaste?

A Very much so.

Q Were you paid to do it?
A No.
Q Why did you decide to do it?
A I had moved out of 1080 to live with my then boyfriend, and I got pregnant. And then when I had the miscarriage in the second trimester, it was so traumatic that it broke us up. And I didn't have anywhere else to live, so I asked if I could move back into 1080.

And I knew that I wanted to -- like that was my support system, and so I felt like I had to prove myself and that I was worthy of being there again.
Q Did you enjoy the sexual activity with Reese Jones?

MS. BONJEAN: Objection to the relevance.

THE COURT: Overruled.
A No. It wasn't devoid of pleasure, but, no, I did not enjoy it.
Q Are you familiar with the concept of getting off on any stroke?
A Yes.
Q What does it mean?
A It means that you -- you're turned on or you allow yourself to be turned on or get yourself turned on by anything that can happen. So it doesn't matter what the situation is, you find the turn on in it.
Q How, if at all, did that relate to your sexual

relationship with Reese Jones?
A It was a practice of it, right. Like I had to practice finding that pleasure in my sexual encounters with him, even when it was begrudgingly.
Q Now, you mentioned sometimes reporting back to people about your care of Reese. Who did you understand to be the primary person who was in charge of his care?
A Outside of myself?
Q Yes.
A Probably Yia or Maddie.
Q Did others at 1080 know that you were sexually servicing Reese, to your knowledge?
A Yes. People would ask me how it was going there. They knew that I was living there.
Q Now, you said that you continued having a room at 1080 while you were living with Reese. Why is that?
A Because I was told that I had to, if I wanted to be able to keep the room that -- like, I couldn't just move out and then move back in once I was done. I had to maintain my residence at 1080 or -- yeah. I just remember being told that I had to maintain my residence at 1080. And I remember being very upset, and Rachael Hemsi and I got into an argument about it.
Q Do you remember who told you you had to maintain residence at 1080?

A Rachael Hemsi.
Q Did you have an understanding of why you had to maintain a residence there, if you weren't living there?
A No. Because I remember being very confused. And I think, if I am remembering correctly, the argument was that when Nicole came to visit, I had to leave. And so if I wanted somewhere to stay, I had to be paying rent.
Q Were you required to continue to pay rent at 1080 while leaving at Reese Jones' house?
A Yes.
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Did you pay rent at 1080 while living at Reese Jones' house?
A Yes.
Q Do you have an understanding of why?
MS. BONJEAN: Same objection.
THE COURT: I think this has been asked and answered at this point. Move on to the next question, please.
BY MS. GUPTA:
Q How did that affect your financial status?
A It just put me in an even tighter financial bind where I didn't have access to accrue any wealth.
Q How did your time at Reese Jones' house come to an end?
A He was getting very depressed and very sad. I am not

entirely sure of the circumstances why. And I came home one night, and he had drank an entire bottle of, I'm assuming, vodka. I don't know exactly what type of alcohol it was. It was a hard alcohol. And he was obliterated. And I am such a small person, there was no way I could have helped him into his room at all so I had to call Maddie and Yia for reinforcements.

Q Did there come a time when you were dismissed from your position as Reese Jones' handler?

A Yes. I believe he went into rehab, but it was at that point that I was dismissed. I was no longer needed.

Q Who dismissed you?

A I believe it was Yia.

Q During the time that you were assigned to sexually service Reese Jones, were you in a relationship with anyone else?

A Yes.

MS. GUPTA: Showing you, for the witness only, Government Exhibit 415.

Q Do you recognize this?

A Yes.

Q Who is it?

A Rob Bakhshai.

Q Is this a fair and accurate depiction of Rob Bakhshai?

A Yes.

MS. GUPTA: Your Honor, we move to admit Government Exhibit 415.

THE COURT: Any objection?

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 415 is admitted.

(Government Exhibit 415 received in evidence.)

BY MS. GUPTA:

Q Who's pictured here, Ms. Gill?

A Rob Bakhshai.

Q How did you meet Mr. Bakhshai?

A He was in one of the coaching programs.

Q When, approximately, did you meet?

A I think in September-ish of -- so fall of 2012.

Q What was the nature of your relationship with him?

MS. BONJEAN: Objection to the vagueness of that question.

THE COURT: Overruled.

Q You can respond.

A I mean, we -- it didn't start off super hot. We started talking after hanging out on the front bench smoking cigarettes at night, and then we made out and slowly started talking. He lived in Texas at the time. And it just kind of took off from there, and we decided to try dating.

Q Were your feelings for him genuine?

A Very.
Q Were OneTaste leaders aware of your relationship with Robert Bakhshai?
A They were.
MR. ROBOTTI: Objection.
THE COURT: Basis?
MR. ROBOTTI: Calls for speculation about their state of mind.
THE COURT: Sustained.
BY MS. GUPTA:
Q Did you inform others at OneTaste about your relationship with Robert Bakhshai?
A I did.
Q Did you inform the core staff?
A Yes.
Q Did you inform Rachel Cherwitz?
A Yes.
Q Did you inform Nicole Daedone?
A Yes.
Q How, if at all, did OneTaste leaders respond to your relationship with Robert Bakhshai?
A Very negatively.
MS. BONJEAN: Objection.
THE COURT: Yes. Sustained at to form.
BY MS. GUPTA:

Q How, if at all, did Nicole Daedone respond to your relationship with Robert Bakhshai?
A She ended up texting me at one point after Yia and I got into a very strong disagreement. And she told me that Yia was not wrong and that I was not standing in my full power as a woman, that I was taking him away from his ability to be a turned on man, and that I should not be in a relationship with him.
Q What was your understanding of why Nicole Daedone and Yia Vang did not want you to be in a relationship with Robert Bakhshai?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Did you have any understanding of why Yia Vang said these things to you about your relationship with Robert Bakhshai?
A It was couched in that I was putting myself to sleep and that I was undoing all of the work that I had done throughout my time at OneTaste. And I also believed and still believe that --
MS. BONJEAN: Objection to the extent it calls for speculation.
THE COURT: Overruled.
Q You can continue.
A Thank you.
That it was -- they had plans for Rob and for me,

and I would no longer be able to perform any of the services if I was in a monogamous relationship.

Q What was your understanding of OneTaste leaders' plan for Robert Bakhshai?

MS. BONJEAN: Objection. Foundation.

THE COURT: Yes. Sustained.

Q You mentioned that you believed there to be a plan for Robert Bakhshai. Did you have any understanding as to what that plan was?

A He was going to be learning how to be a master stroker from Ken Blackman. And he's a good-looking guy. Who wouldn't want a good-looking guy on your team.

Q What is a master stroker?

A It's usually a man who is stroking the woman's clitoris during an OM, and has accrued so many hours, it is like having a masters degree in it.

Q And you testified that you believed there to be a plan for you as well. What was your understanding of that plan?

MS. BONJEAN: Objection. Foundation.

THE COURT: Sustained.

Q Did you understand there to be a plan for you by Nicole Daedone?

A Yes.

Q What was that plan?

A To continue to take care of Reese. I kept being pushed

into a relationship with Reese.
Q Did there come a time when Robert and you discussed living in the same city?
A Yes.
Q Did you discuss those plans with Yia Vang?
A Yes.
Q And what, if anything, happened next?
A The next day Rob called me and told me that Yia had called him and offered him a job at OneTaste Las Vegas where he could learn from Ken.
Q How did you respond to that news?
A I was very angry and very hurt.
Q Was Robert aware at the time that you were assigned to sexually service Reese Jones?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
BY MS. GUPTA:
Q Was Robert aware that you were sexually servicing Reese Jones?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
Q Did you tell Robert that you were sexually servicing Reese Jones?

A Yes.
Q What was his reaction?
A He was also very upset about it because we were wanting to try monogamy, which was not a popular plan of action for relationships at OneTaste.
Q What is your understanding of why that wasn't a popular plan of action?
A Because then I wouldn't be available to have sex with anyone else.
Q Are you familiar with the phrase "pollinate more flowers," as it was used at OneTaste?
A Yes.
Q What does it mean?
A To have sex with as many people as you can.
Q How did you view your sexual activity with Reese as compared to your relationship with Robert?
MS. BONJEAN: Objection to when.
THE COURT: Sustained.
Q During the time that you were sexually servicing Reese and in a relationship with Robert, how did you compare the two?
A I was head over heels in love with Robert. Reese was a job.
Q Did you ever discuss your relationship with Robert with Rachael Hemsi?

A Yes.
Q Did Rachael Hemsi ever discourage or encourage you from pursuing a relationship with Robert?
A Yes.
Q What did she do?
A She discouraged me. She -- I told her that I wanted to do 30 days of monogamy with Rob, and it was something that I had been working on in therapy and talking to my therapist about. And she said that she couldn't see me doing it with Rob because he was selling goo, and that I should try it with Reese. And even though I continued to say I didn't feel that with Reese, I feel it with Rob, I am not interested in Reese, it kept being pushed on me.
Q Pushed on you by who?
A Rachael Hemsi. In that particular conversation.
Q Did you ultimately try the 30 days of monogamy?
A No.
Q Why not?
A I wasn't allowed.
Q Who didn't allow it?
A You know, Nicole had texted me about how unhealthy that was for me and how bad it would be for me. Yia told me how bad it would be for me, that it would kill me, that I just don't do well in relationship. Rachael Hemsi told me the same thing.

Q And how did hearing these statements make you feel?
A Horrible. It was devastating because I was starting to wake up again to my own internal conscience, and I knew that I wanted to be with him, and I just didn't understand how they could be so against me just trying 30 days of monogamy.
Q Was Yia Vang's view of your relationship important to you?
A Very. She was my mentor.
Q Was Rachael Hemsi's view of your relationship important to you?
A Very.
Q Why?
A She -- I mean, she was the house mom, and she was the one who sat there with me during the emergency room abortion.
Q Was Nicole Daedone view of your relationship important to you?
A Yes.
Q Why?
A Because she -- I mean, she was the head teacher. She had all of the knowledge that she bequeathed to us, and I idolized her.
Q What, ultimately, happened between you and Robert?
A I mean, we -- I ended up leaving OneTaste because of all of that, and we continued to try to date, and then he moved to the East Coast with me when I started grad school. But there

was too much trauma and our relationship didn't make it.
Q I'd like to now show you a series of photographs.
MS. GUPTA: Can we show Government Exhibit 239, which I believe is in evidence.
THE COURT: It is not in evidence.
MS. GUPTA: Oh. Apologies. Just for the witness.
THE COURT: I don't believe it is.
BY MS. GUPTA:
Q Do you recognize this, Ms. Gill?
A The face looks familiar, but I couldn't tell you a name.
MS. GUPTA: Can we show the witness only Government Exhibit 260. Apologies. This one is in evidence. We can show it to the jury as well.
BY MS. GUPTA:
Q Do you recognize this person?
A Lianna Lifson.
Q How do you know her?
A She and I were friends before we got into OneTaste.
MS. GUPTA: Could we go to Government Exhibit 228. And this has already been admitted.
Q Do you recognize this person?
A No.
MS. GUPTA: Can we go to Government Exhibit 382, which has already been admitted.
Q Do you recognize this person?

A Becca.
Q How do you know her?
A She was dating someone that I was dating in the middle of my time at OneTaste.

MS. GUPTA: Government Exhibit 265, please, which is in evidence.

Q Do you recognize this person?
A Her face is familiar, but I couldn't tell you a name.
Q Government Exhibit 269. Do you recognize this person?
A No.
Q Government Exhibit 404?
A No.
Q Do you recognize -- sorry. Just to complete the question.

Do you recognize this person?

A No.
Q And Government Exhibit 327. Do you recognize this person?
A No.

MS. GUPTA: Your Honor, can I ask when you're planning to take a lunch break? I just want to plan, since we have some exhibits we are working on, as previously discussed.

THE COURT: Not before 12:45.

MS. GUPTA: Can I have a moment, please.

THE COURT: Yes.

(Short pause.)

MS. GUPTA: Your Honor, I'd like to go back to Government Exhibit 4518, for the witness only.

THE COURT: Go ahead.

Q Ms. Gill, do you see this on your screen?

A I still see a picture on my screen.

Q Sorry. One second.

Who are these messages with?

A Rachel Cherwitz.

Q And what date do the messages start on?

A September 5, 2012.

Q And can you see what date the messages end on?

MS. GUPTA: And, Mr. McNett, can you just flip through them.

A Is that it?

Q (Indicating).

A September 18, 2012.

Q Could you look at the page numbers on the bottom. Do you see those, where it says Government Exhibit 4518?

A Uh-huh.

Q What page numbers do you see?

A 20 -- 23. 24. 25. 26. 27. 28.

MS. GUPTA: And, Your Honor, this is a slightly modified version that we have created.

THE COURT: Do I have it?

MS. GUPTA: I can pass you up a copy.

THE COURT: You are going to need to remark this because you already talked about an exhibit, and now you're telling me it has changed, right?

MS. GUPTA: Understood.

THE COURT: So why don't you call it something else at this time.

MS. GUPTA: It's 4518-1.

THE COURT: Okay. Do you have it, Ms. Cohen? Mr. Robotti? Ms. Bonjean?

MR. ROBOTTI: I don't believe we have the revised version.

MS. BONJEAN: We don't have it marked as such.

THE COURT: I want to make sure you know exactly what is being given to the witness and that was handed up to me. So we need to take a moment to consult with the government on that.

MS. GUPTA: One moment, Your Honor.

(Short pause.)

BY MS. GUPTA:

Q Ms. Gill, if you can remind us, what pages do you have? 23 through?

A I think 28, if I recall correctly.

Q And what is the time period of these text messages?

A Maybe two weeks.

Q And are all of these communications with Rachel Cherwitz?
A Yes.
Q How do you recognize this exhibit, 4518-1?
A They're screenshots from my phone that I took.
Q And do these reflect the entirety of the messages that you exchanged with Rachel Cherwitz in this time period?
A As far as I can remember, yes.
Q Just from this limited date range in September?
A Right.
Q Is this a fair and accurate depiction of the text messages that you exchanged with Rachel Cherwitz during this time?
A Yes.

MS. GUPTA: Your Honor, we would move to admit Government Exhibit 4518-1.

MS. BONJEAN: Judge, we would object. We would object. But, also, if the Court is inclined, we need to voir dire on this.

THE COURT: I am going to sustain the objection on the foundation that's been laid with respect to the offer of the entirety of the document.

(Continued on the next page.)

(Continuing.)
BY MS. GUPTA:
Q Looking at this exhibit, Ms. Gill, you took these screenshots, correct?
A Yes.
Q Now, during this time in or about September 2012, what was Rachel Cherwitz's role at OneTaste?
A I think head of sales, but I -- I couldn't -- I couldn't tell you exactly.
Q Would she provide you with instructions for your job?
A Yes.
Q And what are some of the ways in which you and Rachel Cherwitz would communicate?
A By text.
Q Would she communicate instructions to you regarding your job via text, as well?
A Yes.
Q In around this time period, would you sometimes send Rachel Cherwitz photos?
A Yes.
Q What was the purpose of that?
A She asked me to send those to her because she had used my phone to take them and she wanted them.
Q And do you recognize the people in the photos?
A Yes.

Q Are some of the screenshots cut off?
A Yes.
Q Why is that?
A Because when I was trying to take those screenshots, I was trying to get the fullness of the text thread, so I would overlap them.
Q And by overlapping them, do you mean that you would include the next message?
MS. BONJEAN: Objection.
THE COURT: Sustained as to the leading.
Q Sorry. Can you explain what you mean by overlapping?
A Yeah. The -- you can't screenshot an entire conversation, so I would screenshot what was available on the screen, and then I'd scroll up and keep a portion of the part that had been cut off so that it was apparent that that's where the conversation had started in the pictures.
Q And is this a fair and accurate depiction of text messages that you exchanged with Rachel Cherwitz in September 2012, between September 5th and September 18th?
A Yes.
MS. GUPTA: Your Honor, we would move to admit Government Exhibit 4518-1 into evidence.
MS. BONJEAN: We have the same objection.
MR. ROBOTTI: Same objection.
THE COURT: Sustained. To the extent you're

offering the entire document, sustained.

MS. GUPTA: Your Honor, could we have a moment?

THE COURT: I'd like you to move on to something else because I don't want to keep the jury waiting. You can return to this.

MS. GUPTA: Understood.

Your Honor, if we could go back to, for the witness only, Government Exhibit 4520. We've marked a new one, 4520-1.

THE COURT: Has this been given to the defendants and the Court?

MS. GUPTA: We have a copy right here, Your Honor. And I can tell you, since it's in your binder, Your Honor, 4520-1 is simply the Exhibit 4520, pages 37 through 48. For defense counsel, as well.

THE COURT: So it's ages 37 to 38?

MS. GUPTA: 48.

THE COURT: 48 of what was 4520?

MS. GUPTA: Correct, Your Honor.

And could we pull this up for the witness, please? Thank you.

THE COURT: So I am missing some pages. I'm missing pages 46 and 47.

MS. GUPTA: Your Honor, we can pass you up a copy.

MS. BONJEAN: We have two.

THE COURT: Move on to something else. You can come back to it.

MS. GUPTA: Understood.

THE COURT: Please move on to something else.

MS. GUPTA: Understood.

BY MS. GUPTA:

Q Ms. Gill, you mentioned there was a time that you left OneTaste.

A Yes.

Q When, approximately, was that?

A The spring or summer of 2013, since I started grad school in the fall of 2013.

Q What caused you to leave at that point?

A The interference and manipulation of my relationship with Rob Bakhshai.

Q Why did you decide to leave at that point?

A I -- I had been having a lot of conversations with my therapist, who I started seeing after the miscarriage, around the nature of my relationship with Rob, especially compared -- compared to my relationship with Reese, as well as conversations with my pastor. And I remember my pastor telling me, like --

MS. BONJEAN: Objection.

THE COURT: Yes, you objected?

MS. BONJEAN: Objection.

THE COURT: Sustained.
Q Where were you living at that point?
A Which point?
Q At the point that you decided to leave OneTaste.
A I was a live-in nanny for my friends who had been involved in OneTaste. They had just had a baby.
Q When you left OneTaste, where did you go?
A I went -- I went to -- well, I went to their house first, because I was -- I was done. And then I eventually left to go to the East Coast for grad school.
Q Following your departure, did anyone who was part of the core staff at OneTaste reach out to you?
A Yes.
Q Who?
A I -- well, I had two different amends made to me; one by Rachael Hemsi around a ding, a very large ding on the side of my car and wanted to give me money even though I had already sold the car. And then the other amends was from Yia Vang.
Q What does it mean to make amends?
A To apologize and try to repair the relationship.
Q When, approximately, did this happen?
A I was living in Texas at the time, so I -- I think it was around 2016, but it may have been late 2015.
Q You said that Rachael Hemsi is related to a ding on

your car.

Was there anything else as part of the amends?

A No. She made the amends to say sorry for -- I told you that I would pay for it, and I never did, I'd love to give you money now. And she gave me $500.

Q And you testified that Yia reached out to you, as well?

A Yes.

Q What were her amends?

MR. ROBOTTI: Objection. It's hearsay.

MS. GUPTA: 801(d)(2), Your Honor, subject to connection, or as an agency statement.

MR. ROBOTTI: Judge, specifically the in furtherance prong.

THE COURT: Subject to connection, the objection is overruled.

A So she called and apologized for not training me as a sacred prostitute well enough and being jealous of me.

Q How did these amends affect you?

A That was the worst amends that I have ever received in my entire life, and I told her so.

Q After you left OneTaste, did you ever hear from Nicole Daedone or Rachel Cherwitz again?

A There was one point after I started grad school that Nicole tagged me in something on Facebook about a celebrity pastor, saying, she reminds me of you, and it felt like an

attempt to do what she would call an upstroke.

And then there was another time where I came into Manhattan and attended an event. And if I'm remembering correctly, I was in conversation with Rachel Cherwitz about that process, but it may have been a different person that I had initially talked to.

Q So you mentioned Nicole Daedone tagging you in this post.

Why did you view that as an upstroke?

A I had already left, and it just felt like an attempt to hook me.

Q What do you mean by "hook" you?

A Make me feel positive emotions towards her, like she cared about me.

Q When was the last time you spoke to Nicole Daedone?

A That would be the last time.

Q And when was the last time you spoke to Rachel Cherwitz?

A When I went up to the OM demo in Manhattan.

Q When, approximately, was that?

A I think it was in 20- -- late 2013, maybe early 2014.

Q Was that after you left OneTaste?

A Yes.

Q Why did you attend a OneTaste event after leaving?

A I don't recall the exact reason why I chose to go. I

remember meeting up with someone and walking through Chelsea and talking, and then I was invited up. I don't remember if I had already planned to go to the event or if it was a last-minute decision.

I -- I had hoped that there were still relationships that were genuinely loving and caring from my time spent at OneTaste, and so I went because it felt familiar, and I was -- I was hoping that some of those relationships were genuine.

Q Did you go back to any OneTaste events after that?

A Never.

Q Why not?

A It repulsed me. It felt so grandiose. And I had very -- I -- at that moment, I had very clearly seen how far my values had been skewed through the coercion and the conditioning.

Q In what way had your values been skewed?

MS. BONJEAN: Objection. Vague.

THE COURT: Overruled.

A I -- you know, I had really bought into the idea, into what OM and OneTaste was selling. And when I was told over and over again that, you know, oh, you're seen for this sexual person and it's wonderful and it's beautiful, you know, I embraced it. And then over time, I just -- I -- I kept shifting my values to make accommodations for what was

being asked of me.
Q At the time you left OneTaste, how would you describe your financial state?
A Awful. I -- I had a job, at least, working at the church, but I had -- I still had no savings or income outside of my 30 hours a week at minimum wage.
Q You had described various labor and services that you provided to OneTaste.
Were you ever paid money for any of that labor?
A Not that I can recall.
Q What was your physical condition like when you left OneTaste?
A I -- I mean, I was still -- I was still recovering from the miscarriage. I was -- I was -- and I was, like, in -- in and out of the hospital due to some serious tonsil issues. I was a mess.
Q What was your psychological state like when you left OneTaste?
A Even more of a mess. I felt so manipulated and betrayed, and I felt -- I felt abandoned, and I felt like there were -- there was such a huge abuse of power difference from my teachers and who were supposed to be protecting me in that really tender space around sexuality.
Q What do you mean by that?
A In all of my education and career-building as a clergy

person, I have come to find that there are -- there's a certain level of responsibility that needs to be taken when you're dealing with those really tender spaces --

MS. BONJEAN: I'm going to object to this.

THE COURT: Sustained.

Q Earlier you testified about tender spaces around sexuality.

What do you mean by that?

A Sex is such a vulnerable thing, right? Like, we -- we engage in sexual practices, and it makes us very vulnerable to the other person. And I was being asked to make myself vulnerable in spaces that didn't entirely feel comfortable, and I trusted those people who were in positions of power over me.

Q Which people?

A Rachel, Nicole, Yia, Rachael; both Rachels.

Q What was your emotional state like when you left OneTaste?

A I'm traumatized. I'm -- I'm still sorting through the trauma in my therapy 13 years later.

Q What did you do after you left OneTaste?

A I went to grad school to get my Master of Arts.

Q And today, what do you do for a living?

A I'm a United Methodist pastor.

MS. GUPTA: Your Honor, could I have a moment?

THE COURT: Yes.

(Pause in proceedings.)

MS. GUPTA: If we could go back to Government Exhibit 4519 for the witness only.

Q Ms. Gill, what is this?

A Text messages between myself and Yia Vang.

Q And approximately, what date does this text exchange start?

A December 9th, 2012.

THE COURT: Did you create a different version of this? Because what I'm looking at is different than this.

MS. GUPTA: Yes, Your Honor, we did -- oh, apologies. No, it's the same one.

THE COURT: Okay. Go ahead.

MS. BONJEAN: Judge, it does jump around.

THE COURT: Yes, it does. It does, indeed. I don't know where this is going, but maybe ask your next question.

MS. GUPTA: Your Honor, we're actually towards the end, but there are just a few things we want to try to do with the text messages. Would now be a good time for a lunch break?

THE COURT: No, it would not actually be a good time for a lunch break. We just came back an hour ago.

Do you have more that you can do?

MS. GUPTA: I don't, Your Honor. I'm at the end.

THE COURT: Okay. We will take the lunch break, then, now.

MS. GUPTA: Thank you, Your Honor.

THE COURT: The witness may step down.

(Witness leaves the stand.)

THE COURT: And the jury may come back at 1:30. Enjoy your lunch.

Don't talk about the case. Don't let anyone talk to you about it. And really just enjoy your lunch. 1:30.

(Jury exits.)

THE COURT: Everyone may be seated.

I am not sure why, with four attorneys and two paralegals, the Government is having these issues. But I can tell you when you seat a jury and tell them that the trial can take approximately six weeks, the expectation is not that there's going to be inefficiency; inability to know what you're handing up, what you've given to the Court, what you've given to your adversaries. This has got to change. I am going to stop you next time and not permit you to go back to issues and continue. This really has to change.

I came down after the break and I let the Government know that your exhibits were missing pages. And yet the jury comes out, the examination continues, and we're still with exhibits that have not been provided to the Court

and with pages missing. The defense needs to know what you're showing to the witness, the Court needs to have that, and you need to get your documents in order. I will not allow you to waste this jury's time; anybody.

But Government, I'm, frankly, shocked that this is happening. Take the next hour to get your exhibits in order, and I don't expect to see this again.

MS. FARRELL: Understood, Your Honor. It won't happen again.

May I have your binder? Because I think part of the issue is that what we have is clearly not what you have and I need to --

THE COURT: No. You know what? I've have marked up some things in my binder. You cannot have my binder.

MS. FARRELL: Understood.

THE COURT: You can hand up to me whatever it is you're going to be handing to the witness. If it's something that you want me to look at ahead of time, you can give it to me then or tell me what it is, but no, you may not have my binder.

MS. FARRELL: Understood, Your Honor. Thank you.

THE COURT: We will be back at 1:30, and I expect this to go differently. I had made very clear we were not going to have a lunch break one hour after we had just come back. I gave you the courtesy of doing that today. It

won't happen again. You will be done with your examination if this happens again.

MS. FARRELL: Understood, Your Honor.

May we ask a question before you leave the bench?

THE COURT: Yes.

MS. FARRELL: With respect to -- I genuinely do not understand the sustained objection with respect to the limited Rachel Cherwitz texts. So if Your Honor could just --

THE COURT: You haven't laid a proper foundation for the admission of all of it.

MS. FARRELL: Okay.

THE COURT: Okay.

MS. FARRELL: Thank you.

THE COURT: See you at 1:30.

(Lunch recess taken.)

AFTERNOON SESSION

(Time noted 1:30 p.m.)

(Judge enters.)

THE COURT: We can bring the witness in and --

MS. GUPTA: Your Honor, may I approach with an exhibit?

THE COURT: Yes.

(Counsel approaches.)

(Jury enters.)

THE COURT: Everyone may be seated. I hope everyone had a good lunch.

Ms. Gupta, you may continue your examination.

MS. GUPTA: Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MS. GUPTA:

Q Ms. Gill, I would like to circle back to some of your earlier testimony regarding some communications you had while you were at OneTaste.

Drawing your attention to approximately September 2012, were you in communication with Rachel Cherwitz at that time?

A Yes.

Q How would you communicate with her?

A By phone, by text message.

Q At any point did you provide screenshots of your text

messages between you and Rachel Cherwitz to the Government?

A I did.

Q And how did you provide those screenshots?

A I believe I sent them by text message to an agent.

Q I would like to show you now what's been marked as Government Exhibit 4518-A.

(Exhibit published.)

Q Do you recognize this document?

A Yes.

Q What is it?

A It's a text between myself and Rachel Cherwitz.

Q And what date does this text message exchange start?

A September 9, 2012.

MS. GUPTA: I'll just ask Mr. McNett to flip through to see what date it ends.

Q What's the last date of the text messages?

A September 19, 2012.

Q And is this a subset of the texts you provided to the Government?

A Yes -- I'm sorry, I don't know what a subset is.

Q Is this an excerpt of the texts that you provided to the Government?

A Yes.

Q And does this contain any discussions of your work at OneTaste?

A Yes.
Q Is this a true and accurate copy of screenshots of texts between you and the defendant Rachel Cherwitz between September 9, 2012 and September 19, 2012?
A Yes.
Q And the person listed here at the top of the texts it says Raheli. Who is Raheli?
A Rachel Cherwitz.
Q Was that one of her names?
A Yes.
Q And what is RC?
A It's her initials, Rachel Cherwitz.
MS. GUPTA: Your Honor, we would move to admit Government Exhibit 4518-A.
MR. ROBOTTI: We maintain our objection.
MS. BONJEAN: Same.
THE COURT: The objection is overruled.
(Government Exhibit 4518-A received in evidence.)
MS. GUPTA: Thank you, Your Honor.
Could we please publish to the jury?
(Exhibit published.)
BY MS. GUPTA:
Q Looking at this text message exchange who is the person in the blue?
A Those are my text messages.

Q And who is the person in the black and white?
A Rachel's.
Q And looking at this conversation between you and Rachel Cherwitz on September 9th --
MS. GUPTA: And I'll ask Mr. McNett to scroll down a little bit.
Q What are you all discussing here?
A A garage clicker that she was wanting.
Q For what purpose?
A I have -- I have no recollection.
Q And why did you have the garage clicker?
A I was probably running errands.
MS. BENSING: Continuing on the second page, Mr. McNett.
Q Rachel Cherwitz appears to send you a series of messages. Do you see that?
A I do.
Q And what is your understanding of why there's a number of messages here?
A I wasn't quick enough to respond and she needed the garage clicker more urgently.
Q How quickly did you feel you needed to respond to Rachel Cherwitz typically?
A As soon as I got a text message in.
MS. GUPTA: Could we go to the next page,

Mr. McNett? Could you scroll down a little bit? Thank you.
BY MS. BENSING:
Q So, here looking towards the middle of the page, Rachel Cherwitz says, "Where is Ken? Where is he right now, I mean."
Who is Ken?
A Ken Blackman.
Q And then you responded, "Ken? Do you want me to do something?"
Why did you respond in that way?
A She wouldn't have been asking if she didn't need me to do something with Ken.
MS. GUPTA: Mr. McNett, could we scroll down, please?
Q You're referencing someone named Blake here. Who is Blake?
A He was a student. I can't recall his last name.
Q Rachel Cherwitz writes here, "Who? I need him to be handled, Lord help me, where is Blake? He was supposed to be his handler. Blake is supposed to be handling Ken."
What do you understand her to mean by that?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A Blake was making sure that Ken was prepared for a course that he was getting ready for and making sure that he had everything that he needed, that he was grounded and turned on.

Q And what did you understand "handler" to mean in this context?
A Taking care of his needs, whatever those needs might be.
MS. GUPTA: Mr. McNett, could we go down -- thank you.
BY MS. BENSING:
Q So you respond, "I don't know where he's at." And Rachel Cherwitz goes on to say, "So Ken isn't being handled, yes, will you stroke him? Ken, I mean."
What did you understand her to mean by that?
A That was a male OM, so a handjob.
Q And you responded, "Want me to do something?"
Why did you say that?
A I was responding to "So Ken isn't being handled," I was responding to that question with that.
Q And then you said "Yes."
What were you saying "yes" to?
A "Will you stroke him, Ken, I mean."
Q And did you, in fact, stroke Ken?
A I did.
MS. GUPTA: Mr. McNett, could we go down?
Q Here Rachel Cherwitz writes, "Text me after you stroke him. Excellent. Did you take him over?"
What did you understand her to mean by that?
A She was asking if he had an orgasm.

Q And can you read your response here?
A "All stroked and happy. I did."
MS. GUPTA: Mr. McNett, we can remove that.
Q So, scrolling down on September 18, 2012, can you read your message there?
A "Can I read my inventory to you?"
Q What are you referring to there?
A I wanted to call her and read her my fear inventory.
Q Is that the fear inventory that you testified to earlier?
A Yes.
MS. GUPTA: Your Honor, may I have a moment?
THE COURT: Yes.
(Pause in proceedings.)
MS. GUPTA: No further questions.
THE COURT: Any cross-examination?
MR. ROBOTTI: Yes, Your Honor.
THE COURT: Go ahead, Mr. Robotti.
CROSS-EXAMINATION
BY MR. ROBOTTI:
Q Good afternoon, Ms. Gill.
A Good afternoon.
MR. ROBOTTI: May I have a moment, Your Honor.
THE COURT: Yes.
(Pause in proceedings.)
BY MR. ROBOTTI:

Q Ms. Gill, you started participating in OneTaste courses in 2009?
A Thereabouts, either late 2009 or early 2010.
Q You left OneTaste in February 2013; is that right?
A Thereabouts, yes.
Q So about four years overall?
A Yup.
Q And at the time you started participating in OneTaste, you were living in San Francisco?
A Yup.
Q And you knew OneTaste practiced orgasmic meditation at the time you signed up; right?
A Yes.
Q And you also knew it was a group informed to improve women's sexuality and women's sex life; right?
A Yes.
Q And at the time you started OneTaste you were in your mid-20s?
A Yes.
Q And so you were an adult; correct?
A Can you define "adult"?
Q Over 18 years old.
A Yes, I was over the age of 18.
Q And you had a college degree at that time?
A I did.

Q A Bachelor's degree in English and French?
A Yes.
Q And that was from UC Santa Barbara, right?
A Yes.
Q It's fair to say you're well-educated?
A I did have a lot of opportunities for higher education.
Q And you came from a family that lived in California; right?
A Yes.
Q And your parents were both employed when you were growing up; correct?
A No.
Q Your father was a police officer?
A Yes.
Q And did your mother work?
A Not until I was older.
Q Okay. At the time you started participating in OneTaste, you wanted to do that; right?
A I -- I found a lot of relief and joy in being celebrated for being a sexual human, yes.
Q So when you decided to move into 1080 and you starting doing the courses, you wanted that; right?
A Yes. I was very, like I said, excited about having that aspect celebrated when it had not been previously.
Q And the first event you went to was called a TurnON

event; is that correct?
A Yes.
Q And then you went to a coaching program; is that right?
A Yes.
Q And you learned more about the practice of orgasmic meditation at those programs; correct?
A Yes.
Q And, so, it's fair to say that you signed up for OneTaste knowing about the practice of orgasmic meditation; right?
A Yes.
Q Now I want to talk about a few things you said on your direct testimony today.
So, you testified today you were trained in sacred prostitution at OneTaste; is that right?
A I was trained to be a sacred prostitute.
Q And you said that that deviated from your principles; is that correct?
A It was a very slow process of deviation and I ended up finding that I had deviated very, very far from my principles and values, yes.
Q So, in 2011, though, you said something different than that; right?
A I have no idea what you're referencing.
Q Did you participate in a podcast with Mygu (ph) in December of 2011?

A Yes, I -- I did participate in a podcast with Mygu (ph).
Q And in that podcast you discussed prostitution; correct?
A Yes, that was the topic of conversation.
Q And in discussing your work as a prostitute you said, "It was one of my favorite jobs ever. I loved having sex and I got paid to have sex with -- this might sound a little weird, with random men and it's very exciting."
Did you say that?
A I -- I don't have a memory of the specifics of what I said in that interview and I do remember saying something along those lines that really just, I think, shows how far I had deviated.
Q The question is whether you said it, yes or no?
A I don't have memory of the specifics of that conversation.
Q Can I show you a document to see if it refreshes your recollection?
A Sure.
MR. ROBOTTI: Your Honor, may I approach?
THE COURT: Yes.
(Counsel approaches.)
MR. ROBOTTI: I'm showing what's Defense Exhibit 2-BI.
BY MR. ROBOTTI:
Q I direct your attention, Ms. Gill to page three and at

the time stamp 7:28. If you can take a moment to review that paragraph.
A (Reviewing.)
Do you want me to read it out loud or just in my head?
Q No, just in your head.
A Okay. (Reviewing.)
Q So does that refresh your recollection about whether you said that at this time?
A I have no memory of saying these specific words.
Q Okay. Does it refresh your recollection as to whether you said: There's an edge to there, to that, that's really thrilling and to be honest the majority of my clients if they paid for an hour, we were talking for 45 minutes and having sex for fifteen. They just had no clue how to interact with women and they were so desperate to actually have intimacy. And that's what ended up happening. They just wanted to talk and connect and feel seen and touched and loved.
Did you say that?
MS. GUPTA: Objection.
THE COURT: Basis?
MS. GUPTA: Hearsay.
THE COURT: Overruled. He's asking if she remembers saying that.
A I do not remember saying these specific words.

Q All right. Let's direct your attention to page eight.

Before I get to that, you said on your direct testimony that you were open at OneTaste about being a sex worker; is that correct?

A Yes.

Q And that's not what you said during this podcast; is that correct?

A I have no recollection of the specific words I said during this podcast.

Q All right. Can you take a look at timestamp 23:49 and just read that paragraph to yourself?

A (Reviewing.)

Q And does that refresh your recollection when referring to your time at OneTaste, you said: Part of the controversy was I had to keep it hush-hush to most people until I finally quit?

A Again, I don't have the memory of these specific words. Only the general context.

Q Okay. And you also said earlier in your direct testimony that you were a prostitute to help pay for courses at OneTaste; is that right?

A Yes.

Q And you also said something different about that in this podcast; is that right?

A I don't know.

Q Okay. Taking a look at that paragraph there, does it refresh your recollection that you said: I quit because I got so advanced in the meditation practice it's basically what got me to end up quitting because I didn't feel like I needed it anymore, either monetarily or for the sexual wakening that I was using it for, so to speak, the sexual growing up. Orgasmic meditation was filling that for me.
Do you remember saying that?
A I do not.
Q You also said that you signed up for a sugar daddy website because your finances were so bad; is that right?
A I did agree to sign up for Sugardaddy, yes.
Q But in 2011 you said something different about why you signed up; is that right?
A I don't recall.
Q Can we turn to page nine and have you read the timestamp for 25:35, the paragraph under that?
A (Reviewing.)
Q And does that refresh your recollection that at the time you made a deliberate decision to become a prostitute; is that correct?
A Can you repeat that question? I'm sorry.
Q At the time you said: I don't know what happened but there was a six-month period. It was in the back of my brain, like, hey you should try it. You might actually get something

out of it. So I went on a sugar daddy website and I got myself a sugar daddy.

Did you say that?

A I don't recall.

MR. ROBOTTI: Your Honor, I believe we would like to play just for the witness a couple of clips at this point and seek to introduce those.

THE COURT: Is it what the paper copy corresponds to?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Which ones are you seeking to play?

MR. ROBOTTI: It will DX 2-BC-7 from 7:41 to 8:21.

THE COURT: Sorry, where is that?

MR. ROBOTTI: That should be on the drive that we handed up to you, Your Honor.

THE COURT: Okay. But where does it correspond on 2-D-1.

MR. ROBOTTI: That would be on page three and the timestamp there is 7:28.

THE COURT: And what's the next one?

MR. ROBOTTI: The next one would be page eight and the timestamp is 23:49. And page nine, 25:35.

THE COURT: And you're asking just to have the witness listen to it?

MS. GUPTA: Your Honor, I would note for the record

I didn't receive these or have the opportunity to listen to them.

MR. ROBOTTI: We did provide them to the Government earlier today.

MS. GUPTA: They were provided at 1:30, so it was when we reconvened and I was questioning the witness and I didn't have an opportunity to listen to it.

THE COURT: You're going to have to move along to something else.

MR. ROBOTTI: I'll move along and come back to it. Thank you, Judge.

BY MR. ROBOTTI:

Q Let's go over the reasons you stayed involved over a five-year period. Is it fair to say that there were many reasons you stayed involved?

A There were a few reasons I stayed involved, yes.

Q And one of the reasons you stayed involved was because you loved the OM practice at the time; is that correct?

A I stayed involved because I found the exception -- acceptance, sorry, of my sexuality very liberating.

Q So you found the practice beneficial?

A At the time I found the practice beneficial, yes.

Q And you thought it helped other people; correct?

A I think that I believed that it helped other people at that time, yes.

Q And you believed that yourself, as you said earlier on direct examination, you called yourself the Mother Teresa of Orgasm; is that right?
A Yes.
Q And you believed that you could help free people from their bondage mostly around sex; is that correct?
A Freeing people from their bondage around sexuality in the way that I had been bound definitely appealed to me and was one of the things that I really began to believe, yes.
Q And that was your view as of January 2013; right?
A I don't recall.
Q Did you write that you believed that you were helping to free people from their bondage mostly around sex in January of 2013?
A I don't know what you're referencing.

MR. ROBOTTI: Could we pull up just for the witness Defense Exhibit 2-W?

(Exhibit published to witness only.)

MR. ROBOTTI: Your Honor, if I may approach I can give the witness a copy.

THE COURT: Sure.

And the Government has it?

MS. GUPTA: Yes, Your Honor.

(Counsel approaches.)

BY MR. ROBOTTI:

Q So directing your attention to page 24 and if you read the first five or six lines there.
A (Reviewing.)
Q Does that refresh your recollection that at the time in January 2013 your view was you could help free people from their bondage mostly around sex?
A I'm trying to think of my words. Give me a moment.
Q Of course.
A You know, I -- I think -- I feel like this is written in my journal and it points to the -- it points more to the manipulation than to what my true beliefs were. I was parroting.
Q So, you kept a private journal in January 2013?
A I did.
Q And did you or did you not write this in January of 2013?
A I haven't looked through the whole thing so I don't know which date this particular bit is.
Q Well, if you flip back to page 22, you can see it's written on January 24, 2013.
A Thank you.
I don't recall the exact dates that I wrote, but I -- again, I think that it speaks to my ability to parrot and -- the ways in which I was manipulated more than anything.
Q Ma'am, I understand that's your view today.
My question is whether you wrote that in January of

2013, yes or no?
A It is in my journal for January 24, 2013.
Q And that's right before you left OneTaste; correct?
A Yes.
Q And during your time at OneTaste, you also posted to the OM Hub; is that right?
A I don't even remember what the OM Hub is, sorry.
Q Do you recall the OM Hub being an internal OneTaste social media site?
A I do not have any recollection of the OM Hub.
Q So you don't recall posing on that site about your beneficial views on the OM practice?
A No.
Q Is it fair to say that you OM'd regularly when you were at OneTaste?
A Yes.
Q Sometimes multiple times per day?
A Yes.
Q With several OMing partners?
A Yes.
Q And as of January of 2013, again the very end of your time there, you believe you had moved and grown a lot over your time at OneTaste; is that fair?
A I had grown a lot the entire time I was at OneTaste.
Q Throughout your time at OneTaste, you told Rachel how

Case 1:23-cr-00146-DG-RML Document 446 Filed 08/22/25 Page 138 of 288 PageID #: 12826



helpful the practice had been for you; right?
A There were a lot of wonderful and helpful things about the practice, yes.
Q And specifically you told Rachel about that, right?
A I would imagine so.
Q Right.
MR. ROBOTTI: And can we show just for the witness Defense Exhibit 2-AC?
(Exhibit published to witness only.)
MR. ROBOTTI: Can we zoom into the header at the top paragraph there?
BY MR. ROBOTTI:
Q Looking at what's on your screen, do you recognize this to be an e-mail from you to Robert Kandell and at that time Rachel Cherwitz?
A That is my e-mail address. I don't remember sending this e-mail specifically.
Q But do you recognize that as your e-mail address?
A I do.
Q And the date there is March 12, 2012?
A Yes.
MR. ROBOTTI: Your Honor, the defense seeks to admit Defense Exhibit 2-AC.
THE COURT: Any objection?
MS. GUPTA: Can I have a moment, Your Honor?

THE COURT: Yes.

MS. GUPTA: I'm just looking it over.

(Pause in proceedings.)

MS. GUPTA: Your Honor, I would object on relevance grounds.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Let me direct your attention to the second page.

MR. ROBOTTI: Can we pull up the second page of Defense Exhibit 2-AC?

Q And just looking at that last paragraph there --

THE COURT: Do you have a hard copy?

THE WITNESS: I do not. Not that I know of.

THE COURT: Do you have a hard copy? It's easier than looking at blurbs at a time.

(Counsel approaches.)

THE COURT: And it's a bit lengthy so let's take a moment to look at it.

A (Reviewing.)

Q Now, is that something you wrote attached to the e-mail?

A I don't have any recollection of writing this.

Q The document is attached to the e-mail you sent though?

A I don't know.

Q And do you recognize this as telling Ms. Cherwitz about the benefits of the orgasmic meditation practice?

A It does appear to be that way.
MR. ROBOTTI: Your Honor, the defense seeks to admit Defense Exhibit 2-AC.
MS. GUPTA: Objection, relevance.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q All right. You were friendly with Ms. Cherwitz; correct?
A Yes.
Q And you shared experiences that you normally practiced?
A Yes.
Q And you shared fear inventories with Rachel; correct?
A Yes.
Q And that's a practice borrowed from the twelve-step programs; correct?
A I -- I was not aware of that.
Q The idea is to name and confront your fears; right?
A It's to -- from my understanding it was to uncover the fears, yes.
Q So to name them and uncover them and help conquer them; right?
A I don't know that I would ever say to help conquer them, but to name them and discover them.
Q Now, at the time you believe those fear inventories helped you; right?
A At the time, yes, I did believe those fear inventories

helped.
Q And you asked to share those inventories with Rachel; correct?
A Yes.
Q So that's something that you asked her to do with you; correct?
A I don't actually recall if I ever asked to do it. I do know that I did feel more comfortable with her because I did feel close with her.
Q Let me direct your attention to Defense Exhibit 2-BF.

MR. ROBOTTI: If we can show this to just the witness.

(Exhibit published to witness only.)

THE COURT: So, my collection of documents only goes up to 2-BE. Is there something else?

MR. ROBOTTI: Your Honor, we think this is in evidence already in the Government's exhibits. So let us just have a moment here.

THE COURT: But if you're referring to something as 2-BF I need to have that. If you want to use a different version, you need to tell me what that is.

MR. ROBOTTI: We can hand up 2-BF because I think we'll use it during the examination today.

THE COURT: Okay. Just make sure the Government has it as well.

(Counsel approaches.)

MR. ROBOTTI: Let's show the witness --

THE COURT: Get back to the microphone first.

MR. ROBOTTI: Let's show the witness what's been marked or is in evidence as Government Exhibit 4518-A.

(Exhibit published.)

MR. ROBOTTI: Can I switch to the ELMO, Your Honor?

THE COURT: Yes.

BY MR. ROBOTTI:

Q Looking at page 27 of this document, do you see down here at the bottom where you said, "Can I read my fear inventory to you?"

A Yeah, that was the practice when -- to make sure she was available because I had already been in the practice of reading her my inventory regularly.

Q And turning to the next page, you see again at the top where you ask, can I read my fear inventory to you?

A Yes.

Q These are two instances in which you asked Rachel to read your fear inventory to her; correct?

A Yes. I apologize. I thought you were referring to the first time ever that I asked.

Q Of course. Rachel also tried to mentor you in sales; is that fair?

A I would have never called her in my mentor in the same

capacity as some of the other staff were, but I did try to do sales for a little bit.
Q And you said on direct examination you weren't that good at sales; right?
A Yeah, I don't like selling things.
Q But she did give you tips and try to help you out?
A I don't recall.
Q And you and Rachel you bonded over the fact that you had moved into 1080 under tough circumstances; is that fair?
A She was there for me in a very vulnerable moment.
Q And fair to say you sometimes told each other that you loved each other; right?
A Yeah, that was a pretty common practice.
Q And you also loved your life when you were at OneTaste; is that right?
A There were parts of it that I loved, yes.
Q And that's something you said in January 2012; right?
A I don't recall.
Q And up until January 2013, you also felt you loved your life, right?
A There were parts of my life that I loved. There were parts that were very liberating, yes.
Q And just to turn your attention to what's in front of you as Defense Exhibit 2-W at page 18, do you recall that in January 2013 you said, "Damn, aside from the Robert thing,

life is fucking good"?
A I don't recall saying that, but --
Q And looking at that document does that refresh your recollection that that's something that you wrote?
A It doesn't.
Q All right. So sitting here today do you recall that at that time, about a month before you left, you felt that your life was good?
A I do not remember that, no.
Q All right. Let's talk about the Robert thing. I would like to show you Defense Exhibit 2-AJ. This is for identification.
(Exhibit published to witness only.)
BY MR. ROBOTTI:
Q Do you recognize this photograph?
A I recognize the person in the photograph.
Q And who is it?
A Rob Bakhshai.
MR. ROBOTTI: Defense seeks to admit Defense Exhibit 2-AJ.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 2-AJ is admitted.
(Defense Exhibit 2-AJ received in evidence.)
THE COURT: Do you want to publish it?

MR. ROBOTTI: Yes, Your Honor.

(Exhibit published.)

BY MR. ROBOTTI:

Q All right. So, this is Robert Bakhshai, who was your boyfriend for a time; correct?

A Yes.

Q In 2012 you met him; correct?

A I don't remember when I met him but that seems about right.

Q And not long after you met him you fell in love with him, right?

A Yes.

Q You wanted to be together with him?

A I did.

Q And he was another reason you stayed at OneTaste; right?

A I don't think so.

Q Robert was at OneTaste while you were there; correct?

A Yes.

Q And you wanted to continue to interact with him?

A Yes.

Q And you met Robert in San Francisco; is that right?

A Yes.

Q And then OneTaste transferred him to a job in Las Vegas?

A Yes.

Q And that was a good job opportunity for him; right?

A I couldn't say.
Q Do you recall that he was asked to do the CP5 Mastery program?
A I don't know, no.
Q Was it your understanding that he was moving to Las Vegas to help set up OneTaste in that city?
A It's my understanding that he was going to OneTaste Las Vegas to learn from Ken.
Q And that was an opportunity to learn from a master stroker; right?
A Yes.
Q And you and Robert stayed connected during that long-distance period you were in San Francisco and he was in Las Vegas?
A Yes.
Q And at that time Aubrey Fuller told you not to be in a relationship with Robert; right?
A I don't recall.
Q Do you recall being advised not to fall into your same old patterns with men?
A In general; not from a specific person you mean?
Q From Ms. Fuller.
A I don't have a specific recollection of that conversation.
Q Do you recall trying to take a year off from the

relationship with anyone?
A I don't.
Q Do you recall trying to break this pattern, this cycle, that you were having?
A I recall people telling me that I should break the pattern and the cycle.
Q And even though you had decided to try to break a pattern or you were trying to break a pattern, you continued to see Robert; is that right?
A Yes.
Q And that's a decision you thought through with your therapist; correct?
A It was something that I was wrestling with in therapy.
Q And at the time -- towards the end of your time at OneTaste, you were seeing a therapist; right?
A I was.
Q That was a resource that you had?
A Yes.
Q And is it fair to say that your relationship with Robert was strained because you didn't want to be monogamous at the time?
A I was really fighting against the conditioning of non-monogamy and everything that I had learned at OneTaste with what I was feeling on the inside.
Q And at a certain point, Robert had asked you to be

monogamous; is that correct?
A Yes.
Q And that was something you were struggling with?
A I knew that I wanted to be monogamous, that I was struggling with all of the outside voices telling me that I could not do monogamy.
Q And at some point you and Robert discussed getting married; is that right?
A No, not to my recollection.
Q Can you look at Defense Exhibit 2-W right in front of you at page 41?
A (Reviewing.)
Q If you can take a moment to review that page.
Does that refresh your recollection that you and Robert spoke about getting married?
A That was not what this conversation is referring to.
Q So you and Robert did not speak about getting married?
A It was -- we got into a fight about something and I can't remember what he said and I ended up making an offhanded comment of, like, then if you think that way then that means that you would never want to get married in the future and that's what this conversation is referencing.
Q Okay. So it's a discussion with Robert about getting married; correct?
A I wouldn't -- I wouldn't call it a conversation about

getting married.
Q Okay. At a certain point Robert broke up with you; is that right?
A I don't recall that.
Q On February 13, 2023, he broke up with you?
A I don't recall that.
Q Do you recall he broke up with you because you made out with Paul without telling him?
A I don't recall breaking up with him because of that.
Q Or he broke up with you?
A I don't recall breaking up period because of that. We still continued seeing each other afterwards.
Q Can you look at page 53 of Defense Exhibit 2-W?
THE COURT: What is the question, Mr. Robotti?
BY MR. ROBOTTI:
Q So Mr. Bakhshai broke up with you; is that right?
A No.
Q At some point did you two break up, or no?
A We broke up after we had left OneTaste.
Q At this point in time in February of 2013, you and Mr. Bakhshai were fighting about the fact that you wanted to be nonmonogamous?
A No, we were in a fight because I had made out with Paul.
Q And ultimately you ended up in a fight and taking some time apart; is that correct?

A Not to my recollection, no.
Q At this time you were blaming OneTaste for the strain on your relationship with Robert; is that right?
A I was starting to pick up on a lot of the manipulation, what I interpreted to be manipulation.
Q And Robert made the decision to move to Las Vegas; right?
A He did.
Q That was a job that he was offered; correct?
A Yes.
Q That was an adult decision for him to move to Las Vegas?
A I think that he was a part of that decisionmaking process and he had incomplete information.
Q And he prioritized the relationship with OneTaste over the relationship with you at the time; is that fair?
A I think it was a both and not an either/or.
Q All right. So is it fair to say that people at OneTaste worked long hours sometimes?
A Yes.
Q And there was a time period as you said that you worked in sales with Rachel; is that correct?
A A very short time, yes.
Q And then you later worked at Yia Vang's apprentice?
A I don't remember if it was before or after, but I did both of those things, yes.
Q And you also did chores around 1080; is that fair?

A I cooked in the kitchen. Is that what -- is that what you mean by chores?
Q The people around 1080 did chores; right?
A We had a housekeeper, to my memory, at least. I helped cook dinner as, like, payment in kind for rent, I think.
Q And you also took classes at OneTaste; is that correct?
A Yes.
Q And you also had other jobs outside of OneTaste; right?
A At various times, yes.
Q You worked at a restaurant; correct?
A For a brief period, yes.
Q You worked at a cafe; right?
A I worked -- are you talking about SoMa Inn Cafe? Is that the one --
Q That's correct.
A Yes.
Q You were interested in seminary school at the time; right?
A I became interested in seminary probably around 2013 when I was leaving.
Q And so before you left OneTaste; correct?
A I don't believe so.
Q And you went to church on a regular basis while at OneTaste?
A Only in the last year of my time there.

Q So, fair to say, you were balancing multiple different responsibilities; is that right?
A Yeah.
Q Now, Rachel can be a tough boss when you worked for her?
A Yes.
Q Fair to say she can be direct?
A Yes.
Q She can be a little harsh sometimes?
A Uh-huh.
Q It can be a good relationship or a bad relationship sometimes?
A Yes.
Q And she can be direct with you on text message; right?
A Yes.
Q And we looked a couple of minutes ago at Government Exhibit 4518-A; is that correct?
A I'm sorry, I'm going to need a refresher.
MR. ROBOTTI: All right. Let me show this on the ELMO here.
Q This is a series of text messages that Rachel sent you via text; correct?
A Yes.
Q And this is in September of 2012; right?
A If I'm remembering correctly, those were the dates but I don't --

THE COURT: Can you give her the full hard copy, please?

MR. ROBOTTI: Of course.

(Counsel approaches.)

THE COURT: Thank you.

BY MR. ROBOTTI:

Q Now, do you recall that at this time in September of 2012, Rachel was locked out; is that right?

A Again, I don't recall why she was needing the garage clicker.

Q She was needing the garage clicker to gain access to the building; correct?

A Russ Street, yes.

Q And later in this exhibit you reviewed some text messages related to Ken Blackman; is that right?

A Yes.

Q And at this point in this text conversation, you said not once but twice, Do you want me to do something; correct?

A Yes.

Q So that was you asking Ms. Cherwitz if you could do something; correct?

A I was trying to clarify why she was asking about Ken.

Q And in response to her question about Ken, you offered to do something; correct?

A It was more of a reading into the text than an offer, I

would say.
Q So at two different points you did say, do you want me to do something; correct?
A Yes. I was trying to respond to her text message and figure out what she wanted.
Q And is it accurate to say that you never worked for OneTaste?
A I wouldn't say that. I never got paid from OneTaste.
Q You were never on the OneTaste payroll; is that correct?
A Correct.
Q And when people at OneTaste did ask you to do things though, you were comfortable saying no; is that correct?
A No.
Q But you did, in fact, say no to people quite a bit; right?
A I don't recall. It always depended on the circumstance.
Q There were times that you had to work at one of your other jobs; correct?
A Yes.
Q And that happened pretty regularly, right?
A It depends on the time of year this is in of my life at OneTaste.
Q And at a certain point when you were trying out the sales team, you decided you didn't want to do that anymore; right?
A I realized that I was not very good at it.

Q And so you decided I don't want to do this anymore and you asked to not do it; correct?
A I don't recall. I don't recall how I got out of sales.
Q You ultimately did leave the sales role; correct?
A Yes.
Q And the other role that you had was Yia Vang's apprentice; right?
A That was one of the roles, right.
Q And Yia Vang worked with Nicole; right?
A Yes.
Q So that was a pretty high-level job; correct?
A Yes.
Q And there were also times when you signed up for coaching programs; correct?
A Yes.
Q And there were times when you couldn't attend the coaching classes because you had to work; correct?
A If memory serves me, there was one of the coaching programs that I had to miss for work. I remember missing one portion of it. I don't know if it was the whole day or not.
Q So there were times that you signed up for coaching programs and you didn't go; correct?
A I only have memory of missing one.
Q And there were times where there were events where you could not go because of work; right?

A I don't recall.
Q And do you recall that there were mandatory meetings at 1080 sometimes?
A I don't recall there being mandatory meetings.
MR. ROBOTTI: Can we show for the witness Defense Exhibit 2-AP.
(Exhibit published to witness only.)
MR. ROBOTTI: If we can zoom in there.
BY MR. ROBOTTI:
Q Does that refresh your recollection that there were mandatory meetings at 1080?
A I can see that the subject says "Mandatory Meeting," but it does not refresh my memory of it.
Q Does that refresh your recollection about an e-mail between you and Rob Kandell on that date, July 8, 2012?
A No.
Q So you don't recall despite it being your e-mail that there was a mandatory meeting that day?
A Uh-uh.
Q You don't recall telling Robert Kandell, who was high level in the company that you could not attend a mandatory meeting; right?
A No. I don't have memory of this specific e-mail, no.
Q And Mr. Kandell was a pretty important person at OneTaste; correct?

A Yes.
Q And nonetheless, you felt that you were able to reject mandatory meetings with him; is that correct?
A I don't -- I think that I didn't think twice about whether or not a job that was bringing in income would be an issue for meetings, but, again, I don't have -- that's just an assumption of what might have -- I might have been thinking.
Q So at this time in July of 2012, you got a new job; is that right?
A I don't -- I think -- I think that's when it was. That would make sense in my mind's timeline.
Q And you were working Monday through Friday; right?
A Thirty hours a week, yes.
Q And so you had this other job that was taking time away from OneTaste; is that right?
A Yes.
Q And you indicated to Mr. Kandell that because you had this other job that you were not going to be able to spend as much time at OneTaste; is that right?
A I don't recall that, no.
Q At least over the next month or two until your time got more flexible; is that correct?
A That's what the e-mail says.
Q And you said that you would be there in thought, but you wouldn't actually be there; correct?

A That's what the e-mail says. Again, I don't have any recollection of this e-mail.
Q Okay. So at this time you were able to tell the co-founder of the company that you were not coming to certain meetings?
A Yeah.
Q And at this time you were living at 1080; right?
A I don't believe so.
Q In July of 2012?
A I was not living at 1080, no.
Q Where were you living?
A I was living with my boyfriend Mick because I was pregnant.
Q So there was a time period where you were able to leave 1080 and move in with your boyfriend; right?
A Uh-huh.
Q So you had somewhere else to stay besides 1080, right?
A For that brief period, yes.
Q During that brief period of time he was not involved in OneTaste; is that correct?
A He had a meeting with Rachel and -- I think he learned how to OM, but I don't remember. He knew about OneTaste -- sorry, he knew about OneTaste.
Q But he was not a regular participant?
A I don't believe so, no.

Q And during the time that you lived at 1080 you were free to come and go as you pleased; right?
A Yeah.
Q You had your own key; right?
A Yes.
Q The other residents were free to come and go as they pleased; correct?
A Yes.
Q And people not associated with OneTaste are free to come and visit?
A Some of them. There were restrictions.
Q So, in fact, at 1080 you could have guests stay up to eight days at the residence?
A I don't recall the lengths of time that you could have guests.
Q And your parents came to visit you at 1080; correct?
A They came once for a meeting with Rob and Rachel.
Q And you also had friends stay with you at 1080; right?
A I remember one friend staying with me there, yes.
Q So in May 2010 you had a friend named Hector come and visit you?
A I don't remember when it was, but Hector did come and stay with me, yes.
Q In April 2010, you had a friend named Javi come, right, and visit you, right?

A I do have a friend named Javi. I don't remember him staying with us.
Q And you had a personal phone when you were at 1080; correct?
A I did.
Q And you used that phone to call or text anyone?
A Yes.
Q You had a personal computer?
A Yes.
Q You had access to the internet e-mail; correct?
A Yes.
Q 1080 had a free WiFi?
A I paid for it with my rent.
Q And as part of your rent you did work trade; correct?
A For parts of it, yes.
Q So that's a process where you worked were OneTaste and that money goes towards your rent; correct?
A Yes.
Q And that's what you meant on direct examination of payment in kind; right?
A So some of the -- some of the payment in kind was for caravan retreats and rent and some of the payment in kind was for coursework.
Q And from 1080 you could go to your job, you could go to church, right?

A Yes.
Q In fact, you invited the residents of 1080 to come to one of your talks that you gave at the church; right?
A For one talk.
Q On sexuality; right?
A Yes.
Q And many of them went; right?
A Yeah.
Q Now, residents were not told that they had to stay at 1080 to stay turned on; is that correct?
A It was never phrased that way. At least for -- and I can't speak for other people. I can only speak for myself and what was told to me. It was -- the way that it was languaged (sic) was if you're anywhere else you will lose all of the orgasm that you've cultivated and all of the power that you've been working so hard to achieve.
Q And, in fact, there was a time when Rachel thought that you were telling people that they would not stay turned on if they left, do you recall that?
A There was -- I remember getting in trouble, getting yelled at by Rachel for talking to someone who was there visiting from the Austin community and what I said was misinterpreted and we ended up clearing things up.
Q And at that time Rachel said to you people can always come and go. Do you remember that?

A I don't recall that specific comment.
Q Would it refresh your recollection if we looked at Defense Exhibit 2-BF, which is in front of you, page 28?
A Is 2-BF on the transcript because that's 2-B1. Where is 2-BF?
Q It's the messages in front of you.
A On the screen, not the hard copy.
THE COURT: Please hand her a hard copy. It's a lengthy document.
(Counsel approaches.)
BY MR. ROBOTTI:
Q And does that refresh your recollection that Rachel told you people can always come and go from 1080?
A Yes.
Q Now you posted quite a bit on social media while you were at OneTaste; is that right?
A I certainly posted more than I do now.
Q So that was the years of about 2009 to 2013; is that correct?
A Yes.
Q And that included posts about your work; right?
A I have not perused my Facebook in a while. I don't recall what I posted.
Q Do you recall posing about your travels?
A I'm sure I did. I would always post, hey, going and

doing this.
Q And you would post about OneTaste; correct?
A I believe so.
Q And activities outside of OneTaste; right?
A Yeah.
Q And on direct you said that Rachel encouraged you to post on social media; is that right?
A Yeah.
Q And you've been meeting with the Government since May of 2021 in this case; right?
A I don't remember the specific dates but that sounds about right.
Q That's about four years; correct?
A Four years ago?
Q Between May of 2021 and now it's been about four years?
A Yeah.
Q So you've had more than a dozen meetings with the Government in that time period; right?
A I have not counted how many times I've met.
Q How many times would you say you've met?
A I said it earlier I'm horrible with counting beans in a jar. I don't know, ten, twelve?
Q So during those ten or twelve meetings you met with the Government, it wasn't until last week that you mentioned that Rachel asked you to post on social media?

A Yeah. It wasn't a subject that had come up in our conversations.
Q So, that was the first time you ever said that; right?
A Yes.
Q And that was because the Government confronted you with your posts produced by the defense; correct?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Did the Government show you posts that you made of different activities outside of OneTaste?
A Yes.
Q And you needed to explain why it was that you had all of those posts; correct?
MS. GUPTA: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Is it fair to say that at that time the Government asked you whether Rachel encouraged you to post on social media?
MS. GUPTA: Objection.
THE COURT: Overruled.
A No. I believe I brought it up, if I'm remembering correctly. I don't remember what triggered me to say it, what reminded me.
Q And that was in response to a bunch of documents that you

were shown by the Government; right?
A Yes.
Q Your posts; correct?
A Yes.
Q And you're not denying that you did the activities you posted about; right?
A No.
Q Now, on direct you testified that leaving 1080 was not really an option for you; right?
A It didn't feel like an option.
Q You said that you had nowhere else to go?
A At the time it felt like I had nowhere else to go.
Q But you actually went to all sorts of different places while you were living at 1080; right?
A Can you ask that a different way?
Q Sure. So, for example, you went to visit your cousin in Chico; right?
A I -- my cousin did live in Chico. I don't -- and I remember visiting her at various points in my life. I don't have a specific memory of visiting her in Chico during that period of time.
Q You went to baseball games. You went to the beach?
A I went to baseball games with OneTaste people.
Q And also to the beach?
A With OneTaste people, yes.

Q You went to cafes and restaurants?
A Absolutely.
Q You went to remote islands with no internet access; is that correct?
A I went out to Santa Cruz Island National Park, yes.
Q And you went to Disneyland; right?
A I do not remember that one.
Q Let's talk about a couple of specific trips here. So August 11, 2010 you went to Chico; is that fair?
A I don't recall.
MR. ROBOTTI: Could we pull up Defense Exhibit 2-B just for the witness?
THE COURT: B as in boy?
MR. ROBOTTI: B as in boy.
(Exhibit published to witness only.)
BY MR. ROBOTTI:
Q Does that refresh your recollection that on August 11, 2011 you went to Chico?
A I don't recall going to Chico. I don't have a memory of it. I know that I had gone to go see my cousin, but I have no recollection of when it was in my timeline.
Q And do you recall posting on Facebook about going to Chico?
A No.
Q Do you have any reason to doubt the accuracy of your

post?
A No.
Q It's fair to say that you went to Chico on August 11, 2010?
A It would appear so, yes.
Q May 11, 2011 you went to a baseball game; is that right?
A Would you refresh my memory.
MR. ROBOTTI: Would you pull up Defense Exhibit 2-C.
A I do remember going to that game.
Q So that was May 11, 2011?
A I don't -- that's what the date says, yes.
Q On October 6, 2011 you told people at 1080 you were going on vacation; right?
A Can you refresh my memory, please?
Q Sure.
MR. ROBOTTI: Defense Exhibit 2 H.
(Exhibit published.)

(Continued on the following page.)

(Continuing.)
BY MR. ROBOTTI:
Q On that date, you told people at 1080 that you would be going on vacation, correct?
A I didn't read that. Again, I don't have a recollection of this email, and I do remember going on this vacation.
Q So this was a camping trip to a remote island, correct?
A Yes.
Q And you'd be going with little internet access, right?
A Yes.
Q And that was with non-OneTaste people, correct?
A It was with my family.
Q So you went away with your family in October 2011, correct?
A Yes.
Q And at that point you could have left and never come back to OneTaste if you wanted, right?
A I could have.
Q December -- sorry, January 14, 2012, you went to the beach, right?
A Can you refresh my memory, please?
Q Sure.
MR. ROBOTTI: Defendant's Exhibit 2-I.
A That's the island. This is the remote island with little internet access.

Q And so you went to the beach on that day?
A I -- I don't know if the dates are accurate on this one because there was so little internet out there. It may have been posted after I got back.
Q But around that time period, right?
A I would imagine so, but I don't --
Q And February 29, 2012, you went to meet your cousin's baby in Chico; is that correct?
A I don't remember that.
MR. ROBOTTI: Let me show Defense Exhibit 2-K.
A Oh, that was not Chico. That's West Sacramento.
Q So you went to West Sacramento to meet your cousin's baby, correct?
A Uh-huh.
Q And in March 22, 2012, you went back to your alma mater, right?
A Can you refresh my memory, please?
Q Sure.
MR. ROBOTTI: Defense Exhibit 2-L.
Q So this is you on a beach again, correct?
A Yes. I was going down to see my sister, I think. I don't remember why I was -- it's Santa Barbara.
Q So this is your old college, UC Santa Barbara?
A Yes. I was going down to visit my sister who lived there and was also going to school there.

Q All right. So that Disney trip, May 2012 --
A You're really going to have to refresh my memory for that one.
MR. ROBOTTI: Defense Exhibit 2-N.
THE COURT: Just say the letter again.
MR. ROBOTTI: 2-N.
THE COURT: N.
Q Do you recognize this photograph?
A I do.
Q Do you see yourself in there?
A I do.
Q And do you recognize the other people in the photograph?
A I do.
Q And this is May 2012?
A Uh-huh.
MR. ROBOTTI: Your Honor, the defense offers Defendant's Exhibit 2-N into evidence.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 2-N is admitted.
(Defense Exhibit 2-N received in evidence.)
(Exhibit published.)
Q So here you are visiting Disneyland, right?
A Yes.

Q And your boyfriend at the time is in this photograph, correct?
A Yes.
Q And is he the one in the dark shirt behind you to the right?
A My left looking at the picture, but when I'm in the picture, on my right.
Q You can actually mark on the screen, so --
A Oh, can I touch it?
Q You can. So if you would like to mark and identify him.
A Oh, look at that, there he is. That's him.
MR. ROBOTTI: The witness has identified the man in sunglasses in the middle of the photograph.
Q As we talked about before, you lived with him for a little while, correct?
A Yeah. I don't remember exactly how long.
Q In fact, you had almost left 1080 in 2011 and moved in with him, right?
A I -- I have no idea what you're referencing because I definitely did move in with him and out of 1080. I don't remember exactly when. It was before I got pregnant.
Q Do you recall discussing on that podcast moving in with him in the near future?
A I -- no.

Q But ultimately you did move in with him, correct?
A Yes.
Q And Disneyland is in Anaheim, right?
A Yes.
Q And that's about seven hours from San Francisco where you were living, right?
A Yes.
Q And you were able to do that? You were able to leave 1080 with non-OneTaste people and go to Disneyland, right?
A I was not living at 1080. I was living with my boyfriend at the time.
Q You were still participating in OneTaste at the time, right?
A I was.
Q So you were both living with your boyfriend and travel tog Disneyland at that time, right?
A Yes.
Q Now, on other occasions, such as the 4th of July, you went and visited your parents, right?
A Would you please refresh my memory?
Q Sure.

MR. ROBOTTI: Can we show Defense Exhibit 2-AQ.

THE COURT: Maybe a hard copy is better. It's very small print.

THE WITNESS: How do I get rid of the arrow on the

screen?

THE COURT: Mr. D'Agostino, can you clear the arrow off the display?

Thank you.

Q Does that refresh your recollection that you visited your family for 4th of July?

A No.

Q So looking at your email saying that you're going to visit your family doesn't refresh your recollection?

A It does not refresh my recollection.

Q Do you recall ever visiting your family's house on the 4th of July?

A Ever?

Q During your time at OneTaste.

A I -- I have no memory of it, no.

Q Now, when you went on all these trips, you were able to come back to 1080, right?

A Uh-huh.

Q No one kicked you out?

A Right.

Q Nobody said you're outside of OneTaste forever, you can't come back?

A No, I never heard those words.

Q And you made the choice to come back, right?

A Yes.

Q Each time you left, you made a choice to come back and keep associating with OneTaste, right?
A Yes.
Q All right. So let's talk about some of the things you told the Government.

THE COURT: Let me just stop you for one minute, Mr. Robotti, to let you know that in the next ten to 15 minutes I'd like to take a break. But you tell me when that's convenient.

MR. ROBOTTI: This is the perfect time, Your Honor.

THE COURT: Okay. We will take a break until a quarter after 3:00.

The witness can step down.

(Witness leaves the stand.)

THE COURT: If the jury could just come back to the jury room at 10 after 3:00 so we can really start at a quarter after 3:00, I would appreciate it.

Thank you.

(Jury exits.)

THE COURT: I'll see you at 3:15.

(Court is in recess.)

(In open court; jury not present.)

THE COURT: Okay. We can bring back the witness and the jury.

MR. ROBOTTI: Judge, just one tech issue. Give a second.

THE COURT: Tech issue, did you say?

MR. ROBOTTI: Technology.

THE COURT: Oh, I might be the wrong person to ask about that. But okay, go ahead.

MR. ROBOTTI: So we handed up some clips we prepared on the fly in response to the testimony today. They were a little off. I believe the Court has the full --

THE COURT: The 2-V-1?

MR. ROBOTTI: So this would be --

THE COURT: One that corresponds to that, I mean?

MR. ROBOTTI: Defendant's Exhibit 2-BC is the full video from the podcast. What we'd like to do is just play the relevant timestamps for the witness, and then we can clip them after the fact. I just wanted to make sure the Court has that available to --

THE COURT: I asked whatever you gave me during the lunch break, so those were the clips. You're telling me those are not accurate exactly now, or they just don't align to the paper?

MR. ROBOTTI: They don't align perfectly. It's a little bit cut off in one of the clips at the front, so we just wanted to make sure -- I believe the Court should have this exhibit already, the full Defense Exhibit 2-VC.

THE COURT: The full video.

MR. ROBOTTI: The full video, yes. So you should be able to just click the timestamps that we're going to be playing, but I just wanted to make sure the Court had that ready, so we flagged it for you.

THE COURT: And you want me to do this while the witness is on the stand?

MR. ROBOTTI: If Your Honor has already listened to them, you may not need to.

THE COURT: Okay. But what are you going to be doing with the witness? You're going to be asking the witness to listen to it?

MR. ROBOTTI: To listen to it, Your Honor.

THE COURT: Okay.

MR. ROBOTTI: We can also just direct you to the portions of the transcript.

THE COURT: Yes, the transcript is very helpful. Thank you for that.

MR. ROBOTTI: We'll do that.

THE COURT: Okay.

MS. COHEN: Your Honor, I'm sorry, one other question.

Mr. Robotti offered 2-AC, which was objected to on relevancy grounds. It was an email with an attachment of a story. I just want to make sure the record is clear that it

was effect on the listener because --

THE COURT: There was not a sufficient foundation. This is the one where there was one line and on the back there was something else?

MS. COHEN: Yes.

THE COURT: Yes. There was not a sufficient foundation laid for that document.

MS. COHEN: Okay.

MS. BONJEAN: It wasn't on relevance grounds?

THE COURT: There was not a sufficient foundation laid. There may be other grounds to exclude it, but there may also be grounds to admit it. But the witness's answer was essentially that she didn't know about that second page and -- well, you can go back and look at the transcript.

MS. COHEN: You got it. I just wanted to make sure it was clear with our --

THE COURT: Yes.

MS. COHEN: Yes, okay. Thank you.

THE COURT: How much of those clips are you going to play for her? Because one was seven minutes, I think, one was five, one was a couple seconds. I mean, the jury is just sitting there watching someone --

MR. ROBOTTI: We've narrowed them down, Your Honor.

THE COURT: Okay.

MR. ROBOTTI: It's going to be about three minutes total. Three clips, about a minute each.

THE COURT: Fine.

Okay. Let's bring back the witness and the jury.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Mr. Robotti, you may continue your examination.

MR. ROBOTTI: Thank you, Judge.

BY MR. ROBOTTI:

Q So, Ms. Gill, before the break we looked at some documents about a podcast.

Do you recall that?

A You mean at the beginning of my cross?

Q Exactly. So that would be Defense Exhibit 2-BI was the one you had in front of you.

A (Witness indicating.)

Q Correct.

What I'd like to do now is play for you some portions of Defense Exhibit 2-BC.

MR. ROBOTTI: Your Honor, if I may approach the witness with a laptop?

THE COURT: Yes.

MR. ROBOTTI: Your Honor, for the first clip, I'm going to ask the witness to listen to 7:08 to 8:20.

THE COURT: Thank you.

THE WITNESS: Do I hit "play"?

MR. ROBOTTI: Yes.

And this corresponds to page 3, Your Honor.

THE COURT: Yes. Thank you.

(Audio is played for witness only.)

MR. ROBOTTI: When you hit 8:20, you can hit stop.

THE WITNESS: You said 8:20?

MR. ROBOTTI: 8:20.

THE WITNESS: Thank you.

Q Now, ma'am, did you recognize your voice in that clip?

A I did recognize my voice.

Q And you recognize that as the podcast interview that you did in 2011?

A Yes.

Q And did that refresh your recollection about the statements you made then?

A It -- it --

That was way louder than I thought it was going to be.

It did not. Again, I do remember the general aspect of this conversation, but it didn't trigger any overt and specific conversations.

Q Ma'am, that's a recording of your voice, correct?

A It is.

Q And you're not disputing that you made those statements?
A I am not disputing that that's my voice, and I have no memory of this particular -- those particular words coming out of my mouth.
Q You agree, though, that you did, in fact, make those statements in 2011, right?
A Yeah, I -- yeah, I would imagine so, yeah.
Q The recording of your voice, you agree that you made those statements, correct?
A I -- I -- I agree that that is my voice on that.
MR. ROBOTTI: Your Honor, at this point the defense moves to admit this portion of Defense Exhibit 2-BC.
THE COURT: Any objection?
MS. GUPTA: Your Honor, objection. Improper impeachment.
THE COURT: Sustained.
Q Did that refresh your recollection that you stated during that podcast that:
Prostitution was one of my favorite jobs ever. I loved having sex and I got paid to have sex.
A No, I don't -- I don't have a recollection of saying those specific words.
MR. ROBOTTI: Your Honor, at this point we'd like to play 23:49 to 24:43.

THE COURT: 23:49 to what?

MR. ROBOTTI: 24:43, Your Honor.

THE COURT: Okay.

(Audio is played for witness only.)

Q Now, Ms. Gill, do you recall saying on your direct examination that you could be open about the fact that you were a prostitute at OneTaste?

A Yes.

Q Okay. And did you just listen to that clip there?

A I did.

Q Did you recognize that as your voice?

A I did.

Q Did you recognize it as the podcast you gave in 2011?

A Yes.

Q And in that podcast, you stated:

Part of the controversy, I had to keep it hush-hush to most people until I finally quit.

Do you recall saying that?

A I don't.

MS. GUPTA: Objection.

THE COURT: Overruled.

Q And do you recall during your direct examination that you stated that you needed money from prostitution to pay for the coaching program?

A Yes.

Q Okay. And in this audio that you just listened to, do you recall saying:

I quit because I got so advanced in the meditation practice. That's basically what got me to end up quitting, because I didn't feel like I needed any more either monetarily or for that sexual awakening that I was using it for, so to speak.

A I -- I -- again, I recognize my voice, and I do not recall saying those specific words.

Q Again, you don't dispute it's your voice, right?

A Correct.

MR. ROBOTTI: At this point, the defense moves to admit Defense Exhibit DX 2-BC from 23:49 to 24:43.

MS. GUPTA: Objection. Improper impeachment.

THE COURT: Sustained.

You can ask other questions on this passage, however.

Q Do you recall saying that you --

At the time that you were at OneTaste, it is true that you quit prostitution because you got so advanced in the meditation practice; is that correct?

A I do not recall saying that.

Q And this does not refresh your recollection that that happened?

A It does not.

Q And does this refresh your recollection that you, in fact, kept it hush-hush from people while you were at OneTaste that you were a prostitute?
A It does not. I -- can I expand a little bit more?
Q Sure.
A I -- I do remember being open about me -- about prostitution and sex work. I also remember core staff saying that we had to be quiet about it because they didn't want it getting out. So there were some people that it had to be hush-hush with and others that I was in close relationship with that I did not have to be hush-hush about it with.
Q Okay. So that's different than what you said on direct examination, right?
A It -- not in my mind.
Q Well, on direct examination, you said that you could be open about it, right?
A I do feel like I could be open -- or I still feel like I was able to be open, as open as I wanted to be.
Q But you also had to be hush-hush at least for certain people, correct?
A Yes.
Q That's not something you said on direct, right?
A No.
Q That's not something you said until I played your own

voice for you, right?
A It -- it didn't come up.
Q And it's true that orgasmic meditation was fulfilling for you, what you had been seeking with prostitution, right, in terms of the sexual awakening?
A Can you say that again, please?
Q So orgasmic meditation was fulfilling for you in a way that you no longer needed prostitution; is that right?
A I -- I -- I don't believe so.
Q So do you recall explaining that at the time of 2011, you found orgasmic meditation beneficial such that you no longer needed to engage in prostitution?
A That's -- that's not my memory of it, because I was seeing someone up until -- I remember having a going away party, and I was seeing one of the johns, and he actually came to OneTaste and he was still paying me. So that is not my memory.
Q Okay. Even though that's what you said at the time?
A I don't recall saying that at the time.
Q Again, ma'am, there's no dispute that that's your voice on that audiotape, right?
A Yes.
Q So you did, in fact, say that at the time, right? Whether you recall it or not.
A Sure.

Q I'd like to play one final clip for you and then we can move on.

MR. ROBOTTI: Your Honor, this is going to be 25:35 to 26:31, for the record.

THE COURT: Thank you.

(Audio is played for the witness only.)

MR. ROBOTTI: Your Honor, this is page 9 of the transcript.

THE COURT: Yes, I have it. Thank you.

A You said 26:31?

Q That's correct.

So again, ma'am, do you recognize your voice?

A I do recognize my voice.

Q Is that the podcast from 2011?

A Yes.

Q And again, no dispute that that's your voice and you said these words?

A Correct.

Q Okay. And did that refresh your recollection that you took a six-month period to think about whether or not you were going to sign up to the Sugardaddy website?

A It does not.

Q Sitting here today, do you recall that you spent six months thinking about whether or not to do this?

A No.

Q And that's different from your direct testimony that you had to do this because you needed the money, right?
A My recollection of it was that I -- I did with -- what are the words that I'm trying to say? I did resist when it was first brought up to me, and I did say no, no, that's far outside of my values. I don't remember the length of time that that was. And then it got to the point, and I believe I said this in my direct, it got to the point where it felt like that was no longer an option and I needed money.
Q That latter part's not what you said during your direct examination, right?
A No, that was what I was intending to say.
Q And, in fact, at the time in 2011 you didn't say that either, right?
A I did not hear it on that recording.
Q And 2011, you said that you took a six-month period:

It was at the back of my brain like, hey, you should try it, you might actually get something out of it. And so I went on to a Sugardaddy website and I got myself a Sugardaddy.

That's what you said in 2011, right?
A That is what I heard, yes.

MR. ROBOTTI: Your Honor, at this time the defense moves to admit Defense Exhibit 2-BC, 25:35 to 26:31.

MS. GUPTA: Objection. Improper impeachment.

THE COURT: Sustained.

Q Let's go back to some other words you said in 2013.

So I'd like to look at -- again, this is Defense Exhibit 2-W, the journal in front of you, and if you could look at page 62. When we spoke before the break, you said that you and Robert did not break up, right?

A I -- I don't recall breaking up. We -- we would occasionally, like, get into these fights where he would say we're done, and it was never a true breakup.

Q Okay. Well, that's not what you said a few minutes ago before the break, right?

A We -- we never -- until I left for the East Coast, we never broke up for good.

Q And so why don't we look at page 62. Just take a moment and read the bottom portion of this.

(Pause in proceedings.)

Q And can you also turn to page 53, a few pages back, and if you can read the middle portion of that page.

(Pause in proceedings.)

Q Now, do these passages refresh your recollection that in February of 2013, Robert said to you he wants to break up?

A No. I -- well, he -- so he may have said he wanted to break up, but he didn't trust me, and then we didn't.

Q So does this refresh your recollection that in

February 13, 2013, you said:

So we made out and Robert is pissed, wants to break up, feels like he can't trust me.

A Yes, I did say that.
Q You did write that, right?
A Yes.
Q In your private journal?
A Yes. Wanting to break up is very different from actually breaking up.
Q Okay. Well, you did not mention that on your testimony earlier today, did you?
A No.
Q All right. So I'd like to talk about some things.

And you can set that aside for a moment, ma'am.

I'd like to talk about some things you told the Government.

So do you recall telling the Government on February 9, 2023 that leaving OneTaste was extremely difficult. It felt like it was an impossible place to go back to your parents.

Do you recall saying that?
A Not those specific words, but the sentiment, yes.
Q And you said something similar during your testimony today, right?
A Uh-huh.

Q You said you had nowhere else to live?
A There were times where it felt like there was nowhere else for me to go.
Q But this isn't a true statement, right?
A Can you say that a different way?
Q Well, you had other options, correct?
A There were times when other options presented themselves to me and I took them.
Q So the answer is yes, you had other options, correct?
A At times, yes.
Q So it was not impossible to go back to your parents' house, for instance, right?
A It felt impossible to go back to live with my parents.
Q But you did go back to your parents' house quite a bit, right?
A I visited --
Q You visited --
A -- on occasion.
Q You visited --
A It was still a very strained relationship.
Q So you visited your family while you were living at OneTaste, right?
A On occasion, yes.
Q You went and stayed with them, correct?
A I don't remember if I ever stayed the night or not.

That I can't -- aside from going to the island and staying the night.
Q Right. Because you don't remember going to see them on the 4th of July in 2012, right?
A Not a specific memory of it, no.
Q Despite the document that was shown to you today, right?
A I'm sorry, I don't have memory of it.
Q Okay. And so this was always an option for you, right, to leave 1080 and go to your parents?
A It didn't feel that way.
Q You always had the option, when you went to see your parents, not to come back to 1080, right?
A I'm sorry, can you say that again?
Q You always had the option, when you went to visit your family, not to come back to 1080, right?
A It didn't feel that way.
Q But in reality, that was true, right?
A There were no chains on me.
Q There were no chains on you, correct?
A Correct.
Q And you went freely back and forth.
Where do your parents live again?
A Sacramento.
Q And how far away is that from San Francisco?

A About two hours.
Q So two hours away was your family, right? Yes?
A Yes, sorry, yes.
Q Who you saw regularly?
A I would not say regularly, no. It was a very strained relationship.
Q But on multiple occasions, right?
A Yes.
Q It's fair to say that most people in their mid 20s don't want to move back in with their parents, right?
A I think it depends on the person.
Q What about you?
A I certainly did not want to move back in with my parents. I didn't feel accepted by them.
Q But there's a difference between want and could not, correct?
A I think that's a complicated answer. It's not a very clear-cut answer. It's nuanced.
Q Fair to say you did not want to move back in with your parents?
A No, I did not.
Q You also told the Government on February 9, 2023 that you did not have anything and you feared homelessness and joblessness if you left OneTaste.
Do you recall saying that?

A Not those specific words, but the general sentiment, yes.

Q Homelessness and joblessness, right?

A Again, not the specific words, and I do remember the sentiment.

Q But you did say those words to the Government or no?

A I don't recall.

Q Would it help if I showed you a document to refresh your recollection?

A Maybe.

MR. ROBOTTI: Could we look at 3500-DG-5, at page 2. And this is just for the witness.

And if we could blow up the third paragraph. I'm sorry, also the fourth paragraph.

A I don't recall saying those words.

Q Is the document in front of you wrong?

A I -- my understanding is the notes that were taken were a summary of what I said and not necessarily a dictation.

Q Is that what the Government told you to say?

A No.

Q So you don't remember making those statements?

A Again, I remember expressing those sentiments of fear and isolation that I was limited in my options.

Q And you said something similar today, that you would lose everything and that you had no support network, right?

A Yes.
Q And you're hesitant to admit the words "homelessness" and "joblessness" because that's kind of a ludicrous claim, right?
A No. I just want to be accurate with the words, and I don't recall saying those specific words.
Q Right. And you had multiple other jobs while living at 1080; is that correct?
A At various times, yes.
Q How many jobs? Three? Four?
A It depends on the time period. But you want the total number of jobs throughout my entire time there?
Q Sure.
A Maybe three.
Q And --
A Except -- with the exception of what I consider jobs for OneTaste. But, like, paying jobs.
Q So these were paying jobs that you had outside OneTaste, at restaurants and at the church, correct?
A Uh-huh.
Q And you say people outside of OneTaste all the time, correct, at work?
A I -- yeah, when I -- I was working at the church for about a year.
Q And in the church, you had a broad community outside of

OneTaste, right?
A Uh-huh.
Q And you ultimately ended up devoting your life to the church, correct?
A I did.
Q So when you said a couple hours ago that you had no support network, that's what you said on direct, right? That wasn't true.
A There were time yes it felt like I had no support network, and getting involved in church provided me with the outlet to allow me to leave because I had enough support finally in my life.
Q So you had a broad support network at church, correct?
A I had a support network. I started to accrue one.
Q And you had friends outside of OneTaste, correct?
A I lost a lot of friends during my tenure at OneTaste.
Q Well, 2012 we just saw you go to Disneyland with your friends, right?
A Those were -- those were my boyfriend at the time's friends, not -- so I was there with him.
Q Okay. And at that time you also lived with your boyfriend, right?
A Uh-huh.
Q So there were other options for you, right?
A Staying at his house was not an option.

Q Not the whole time you were there, but certainly for a time it was, right?
A Sure.
Q And you had other friends and you had the church, right?
A Most of my friends that were not involved in OneTaste stopped talking to me. The few that did not, we had limited contact.
Q And you had your sister who lived nearby, too?
A She was not nearby. I wouldn't consider it nearby.
Q Where did she live?
A Santa Barbara.
Q And how far away is that?
A I want to say it's, like, a seven-hour drive.
Q It's the same distance as Disneyland, right?
A No, it's closer than Disneyland.
Q Okay. So it's a trip you could make, right, by car?
A Yeah. I don't remember how I got there.
Q And you also went to visit your cousin, correct?
A Yes.
Q So there were other options. There were a lot of other options, right?
A Those did not feel like options. My sister and I didn't talk for over a year because she was so upset about my involvement in OneTaste, and she's one of my best

friends.
Q And if you had called her up and said, I'm leaving OneTaste, can you take me in, she would have said no?
A I don't know. It didn't feel like an option.
Q So it didn't feel like an option, but in reality, you had these options?
A I -- I didn't -- I don't think so.
Q You also had resources, right?
A Can you say that a different way? What kind of resources?
Q Well, when you originally signed up for OneTaste, isn't it true that your parents gave you money to put towards the course?
A No.
Q No, that's not what you told the Government?
A I don't believe so.
Q Originally you got $10,000 to put towards the course?
A From my parents? No.
Q That's another inaccuracy?
A I have no idea what you're referencing --
MS. GUPTA: Objection.
THE COURT: Sustained.
MR. ROBOTTI: Can we pull up 3500-DG-4, at page 2. When we get there, can we blow up the top paragraph.
Q Ma'am, can you take a moment to review that, please?

A So I did ask my parents for money, and they declined. So if it were me writing this, I would have put a comma after the course because I did pay approximately $10,000. It was not from my parents.

Q So your parents did have money, though, correct?

A They were not generous with their money with me.

Q But you felt that you could ask them for money, correct?

A I thought it was worth a shot.

Q And if you were in a pinch or in trouble, you could go back and ask them again, right?

A I could certainly ask them again, yes.

Q So it's not to say that you had no resources, right?

A I had no resources.

Q You had the option to go back and ask your parents. True?

A Asking is very different from getting.

Q Now, ma'am, you've lied to the United States Government before?

A I have.

Q You entered into a sham marriage; is that correct?

A I married an undocumented citizen -- or an immigrant for his green card.

Q So that was to help an individual get a green card to stay in the United States; is that correct?

A Yes.
Q And this is someone you met working at the SoMa Inn Cafe, right?
A Yes.
Q And you were friendly with a coworker and her boyfriend, correct?
A I mean, we only talked at work.
Q So not even someone you knew that well?
A Correct.
Q And nonetheless, you lied to the United States Government for that?
A In -- you're talking about in my testimony when we were being interviewed?
Q I mean, you tell me. When did you lie?
A I was very worried that we didn't have wedding ringing, and I thought that it would look weird, and I absolutely lied about wedding rings in our interview.
Q So this coworker's boyfriend was from Turkmenistan; is that right?
A Uh-huh.
Q And the coworker asked you to marry her boyfriend, his name was Seid Seidov; is that correct?
A Yes.
Q This was in 2010, right?
A I believe so.

Q And this was your coworker's and Seid's idea, right?
A I -- I don't know who the idea generated with. I have no idea. We didn't talk about that.
Q Well, did you go to them and say, hey, I'm willing to enter a sham marriage for you?
A No, they approached me.
Q They approached you. And they offered you $10,000, right?
A Seid did.
Q And you made the choice to enter into this sham marriage, correct?
A I did.
Q And this was not OneTaste who made you do this, right?
A No, I -- no, it was not OneTaste.
Q This was a choice you made that you're personally responsible for, correct?
A May I elaborate a little bit?
Q Go ahead.
A You know, that's one of those hard things where, you know, yes, I did make that choice, and I also was in debt to OneTaste for coursework and I didn't know how else to pay for it. And I -- I had heard so many stories -- three stories of people who had married other people -- within OneTaste -- for green cards, and it normalized it for me.
Q Well, ma'am, people go into debt all the time, right?

A Yeah.
Q And people who go into debt don't have to break the law to get out of it, right?
A No.
Q And you had another job, right?
A Yes.
Q You had another job -- you had multiple other jobs?
A I think I only held one outside job at a time, with perhaps a little bit of overlap between SoMa Inn Cafe and the church.
Q So this was a choice you made to pay off your debt by committing a crime, right?
A Yes.
Q And you take personal responsibility for that, right?
A Yeah.
Q And it wasn't just showing up to the interview, right? This was a whole elaborate scheme, correct?
A Uh-huh.
Q So you met with him a couple of times a month to get to know him, right?
A I don't -- I don't remember how many times we got together on a regular basis. I don't recall.
Q More than once?
A Yeah, yeah, absolutely.
Q And this was --

The idea behind this was so you could prepare for the meeting with immigration officials, right?
A Uh-huh. Get to know each other, have a legitimate friendship relationship.
Q And the reason you needed to do that, right, was so you could answer the immigration official's questions, correct?
A Uh-huh.
Q That's yes?
A Yes, sorry, yeah.
Q And you needed to know the details about Seid so you could make it seem like you were in a legitimate marriage, right?
A Yes.
Q And did you go to meetings with his lawyer, too?
A Yeah. We all met up, the three of us.
Q During those conversations, you lied there as well, right?
A Yes.
Q Now, you also posted photos of you and Seid on Facebook, correct?
A Uh-huh.
Q Yes?
A Yes. Sorry, I'm so sorry. Yes.
Q You just need to verbalize "yes" for the court reporter.

A I know, I know, I'm so sorry.
Q And in 2011, that's when you posted a number of these photos, right?
A I -- I believe so.
Q You called him family in the photos, right?
A Yeah.
Q Posted about dates you were going on?
A Uh-huh, family dates, family fun dates with him and his niece.
Q And this was to create a whole false record, right?
A Yes.
Q In case the immigration officials started looking into the background, right?
A Uh-huh -- yes.
Q You wanted there to be false documents on the internet to back you up, correct?
A Yes.
Q You even asked your friend, Aubrey Fuller, to write an email vouching for your relationship, right?
A Yes.
Q And she did write that email, right?
A I believe so. I don't -- I don't recall fully, but I believe so.
MR. ROBOTTI: Can we pull up Defense Exhibit 2-AT. And if we could blow that up for the witness.

Q Now, ma'am, does that refresh your recollection that on January 26, 2012, Aubrey Fuller wrote a false email for you, right?
A I mean, I can see it right here. I still have no memory of the specifics of the email, and I do recall that she wrote a letter for me.
Q So you agree she did write a false letter for you?
A Yes.
Q This was somebody in OneTaste you asked to lie to back you up, right?
A I -- I did ask her for a letter, yes.
Q And then you submitted this to the Government on behalf of your application, right?
A Yes.
Q And so that's another lie to the Government, right?
A Yes.
Q And Aubrey went so far as to claim that she had attended your wedding?
A She did.
Q And that you had met and really liked Seid and decided to marry him, right?
A I did like him. He was a nice guy.
Q But you hadn't decided to marry him, right?
A I -- I -- yeah, I was still in the discernment process.
Q And Aubrey claimed that you two had moved in together,

which wasn't true?
A She didn't claim that we moved in together. She claimed that I moved out, which is true.
Q She claimed that you moved out of our place not long after you met him, right?
A Correct.
Q Implying that you had moved in together, right?
A Correct.
Q All right. So maybe that's not technically a lie, right? But it's misleading.
A It is misleading.
Q And you and Seid then went to the interview with immigration officials on November 2, 2011, correct?
A I don't recall the specific dates. That sounds about right.
Q And you posted to Facebook before and after that interview, correct?
A I did.
Q And again, during this interview you both lied to the immigration officials, right?
A Yes.
Q Told the story of how you met, right?
A Uh-huh.
Q Correct?
A Yes. Sorry.

Q How you fell in love?
A Yes.
Q How you spent time together as a married couple?
A Yes.
Q And this was all false?
A Yes -- well, we tried to keep as much true as possible because we did hang out, we did do stuff with his family, we did go places. So that part was true. And the part about it being a romantic relationship was absolutely false.
Q Okay. But even those true parts were told to the U.S. Government officials in an effort to cover up a lie?
A To cover up the fact that it was not a romantic relationship.
Q Correct. And you know it's a crime to lie to government officials, correct?
A I do.
Q And just like you know it's a crime to lie under oath today, correct?
A Correct.
Q It's a crime to enter into a sham marriage to get someone a green card?
A Correct.
Q But you put together this elaborate plan to fool immigration officials; is that right?
A I don't know that I would say I put together a very

elaborate plan. It was --
Q Well, posting to Facebook, creating a false record, meeting with lawyers, going to an immigration official meeting to tell a story, it seems pretty elaborate, right?
A Yeah. I mean, there were a lot of holes in it, but yeah.
Q You did all of this to get $10,000?
A Yes.
Q I'd like to turn back to your time at OneTaste. Okay?
A Yeah.
Q Now, we talked about earlier the fact that you did say no to people at OneTaste sometimes, right?
A Uh-huh.
Q That's correct?
A Yes. Sorry.
Q And on the flip side of that, you also repeatedly told OneTaste people that you wanted to be there, right?
A Can you say that a different way?
Q Did you repeatedly tell people at OneTaste that you wanted to be there?
A I'm just trying to be very careful with my words. I don't -- I mean, it wouldn't -- I -- I did enjoy being at OneTaste.
Q So my question, ma'am, is: Did you tell people at OneTaste that you wanted to be there?

A At times, yes.
Q Including Rachel Cherwitz?
A Yeah.
Q And Nicole Daedone?
A Yeah.
Q And while you were there, you volunteered to participate in additional activities without being asked. Fair to say?
A Uh-huh.
Q Yes?
A Yes. Sorry. I'm learning.
Q No, I just want to remind you to say yes so I don't have to keep reminding you.
Particularly in your last seven or eight months with the company, you volunteered a lot, right?
A I would say I volunteered the entire time; a lot.
Q But volunteered for specific tasks a lot in your last seven, eight months?
A Again, I -- I don't think that there -- in my mind, there's no difference between the last seven to eight months and the entire time I was there for what I volunteered for.
Q Did you volunteer for specific tasks? Yes or no?
A Yes, I would imagine so. I don't have a recollection of any specific tasks necessarily.
Q All right. Well, how about on April 22, 2012, you

reached out to Aubrey Fuller to ask for more responsibility at OneTaste?
A Can you state the date again, please?
Q April 22, 2012.
A I mean, I don't -- I don't recall that conversation.
Q All right.
A Can you refresh my memory?
Q Sure.
MR. ROBOTTI: Let me pull up Defense Exhibit 2-BG.
THE WITNESS: Sorry, say that again.
MR. ROBOTTI: 2-B as in boy, G as in gopher.
Q Ma'am, does that refresh your recollection that on April 22, 2012, you reached out to Ms. Fuller to ask for more responsibility at OneTaste?
A I have a very vague recollection of this. But again, no specific.
Q Does it refresh your recollection that you said:
I want to plug in and help out at OneTaste?
A That sounds like the language that I would use.
Q And did you -- on that date -- sorry. Withdrawn.
Does it refresh your recollection that you stated:
I've been missing being involved and the ops team keeps popping up for me. I have my job, so I might not be able to help out with every event, but I would love to be on the team and help out as often as possible.

Did you say that?
A I -- I don't have a recollection of it.
Q So would you agree at this time, you were telling people at OneTaste that you want to help out as often as possible?
A That's what I -- yeah, that's what it sounds like from the email.
Q Do you have any reason to believe that you did not write those words at that time?
A No.
Q You recognize your email address, right?
A I do.
Q How about on April 28, 2012, do you recall telling senior people at OneTaste that you wanted to join the PR team?
A No. Could you refresh my memory?
Q Sure.
MR. ROBOTTI: I'll pull up Defense Exhibit 2-AX.
THE COURT: I think it's very hard to see on the screen.
MR. ROBOTTI: I'm grabbing hard copies.
Q Now, ma'am, this is an email sent on April 28, 2012, correct?
A That's what the date says, yes.
Q And this is from you to Justine Dawson, Rob Kandell,

Joanna van Vleck, and Raheli Cherwitz, also known as Rachel, right?
A Yes, that's what it says.
Q And this is an email from you saying: I want to join the PR team. Correct?
A That's what that says, yes.
MR. ROBOTTI: Your Honor, with redacting the two bottom emails, the defense moves to admit this, Exhibit 2-AX, for its effect on the listener.
THE COURT: Any objection?
MS. GUPTA: Objection. Hearsay.
THE COURT: Response?
MR. ROBOTTI: Sorry, Your Honor?
THE COURT: I wanted to know if you had a brief response.
MR. ROBOTTI: Yes, Your Honor.
Not offered for the truth. Offered for the effect on the listener. Goes to intent.
THE COURT: And you're just offering the top portion, right?
MR. ROBOTTI: Just the top portion, Your Honor. Intent and knowledge, Your Honor.
THE COURT: Sustained. But you can ask more questions on this.
Q Now, ma'am, does this email refresh your recollection

that in April of 2012, you said:
I want to join the PR team, exclamation point.
Do you remember that?
A I do not.
Q I recently went to Holistic Health Salon, got some leads, and after having a few conversations and joining the ops team, thought it would be a great way for me to plug in more and further my coaching practice. What are your thoughts and what do you need from me?
Do you remember saying that?
A I don't.
Q No reason to dispute that it's your words or your email?
A No.
Q Is it, in fact, true that in April of 2012 you did want to join the PR team?
A It's -- I don't remember that, and that's what it says on here.
Q Sitting here today, do you have any reason to doubt that that was your intent in April 2012?
A I mean, I have no reason to believe that my intent was to try to reinvest into a community that I felt like I belonged to.
Q These are your words, right? You wrote them?
A It appears that way. Again, I don't recall writing

them.
Q But no reason to doubt it, right?
A Correct.
Q Okay. So at this time period, you're telling the senior leadership of OneTaste that you want to get more involved, right?
A Uh-huh.
Q Correct?
A Sorry, yes.
Q And that's because --
THE COURT: Are you offering this at this time?
MR. ROBOTTI: Yes, Your Honor.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: So Defense Exhibit 2-AX, just the top email, is admitted.
Is there going to be a redacted version?
MR. ROBOTTI: Yes, Your Honor. Could we just publish briefly to the jury?
THE COURT: Yes. The top email only.
MR. ROBOTTI: Yes.
(Defense Exhibit 2-AX received in evidence.)
(Exhibit published.)
Q Ma'am, I know you just went through this, but just for the jury, can you please read this email?

A Out loud?
Q Yes, please.
A Okay.
Hi guys. I want to join the PR team. I recently went to Holistic Health Saloon, got some leads, and after having a few conversations and joining the ops team, thought it would be a great way for me to plug in more and further my coaching practice. What are your thoughts and what do you need from me? Cheers, Dana.
Q Thank you.
(Continued on the following page.)

(Cross-examination, cont'd)
BY MR. ROBOTTI:
Q Do you see the "on" underneath your name there?
A I do.
Q And what's on either side of that?
A I should know this, but I do not remember what they're called.
Q I don't either.
A They are fancy parentheses.
Q Okay. So the fancy parentheses on other side. What did you understand those to mean?
A That was a signature that was used among OneTaste, specifically Rachel Cherwitz, from my recollection.
Q And is the meaning of that that you are turned on?
A Yes.
Q And so at this point, in April of 2012, you're telling the senior leadership of OneTaste you are turned on, right?
A Well, so that --
Q Yes or no?
A That's a complicated answer. It is not a yes or no answer.
Q Okay. Let me rephrase.
You included this signal in your e-mail that indicates to the senior leadership of OneTaste that you are turned on?

A It was a -- I had made it a part of my signature. So it was an automatic part of whenever I replied to people.
Q So you are telling everyone that you are turned on at this time?
A Yeah.
Q It's fair to say you were seeking to move up in the company at this point?
A I never saw it as moving up. I was seeking belonging.
Q Getting more involved?
A Uh-huh.
Q Yes?
A Yes. I'm sorry.
Q All right. So on May 2, 2012, do you remember taking on a new research project?
A I do not. No.
Q Okay.
MR. ROBOTTI: Can we pull up Defense Exhibit 2-AG.
Q And this one is very small.
All right. I drew a blue arrow next to ID number 10268.
Can you just review that post, and let me know when you're done.
A I'm done.
Q All right. Now, does that refresh your recollection that in May of 2012 you decided to take on a new research project,

to OM four to five times a day, for at least the next 30 days?
A It does not.
Q Does it refresh your recollection that at that time you believed OM helps fill me up on my orgasm and move through what I'm dealing with hotter and quicker. So you'll be seeing more posts from me about my research on the OM hub?
A Can you, without restating the words that I apparently wrote, can you phrase -- say the question again, please.
Q Sure. Let me break it up.
Does this refresh your recollection that at the time in May of 2012 you believed that OM helps fill me up on my orgasm and move through what I'm dealing with hotter, quicker?
A I believe at that time I had been taught that that's the way that we should be thinking about it. I was very good at parroting.
Q Okay. Did you, in fact, undertake this research project?
A I don't even recall this research project, so I couldn't say.
Q Okay. And did you, in fact, write this post on the OM hub, which was visible to everyone at OneTaste?
A I don't recall. Again, I don't even recall the OM hub.
Q You don't recall posting multiple times to the OM hub during your time there?
A I have no recollection of the OM hub.
Q Now, you had a bunkmate at 1080; is that right?

A I had two different bunkmates at 1080.
Q And one of them was Henry Debusmann, do you remember him?
A I do.
Q I think you spoke about him on direct a little bit?
A Maybe.
Q Was he in Doctors Without Borders?
A That's right. Yes. Thank you.
Q And he was your bunkmate, right?
A Yes.
Q And do you recall reaching out to him on June 10, 2012, asking him to OM with you?
A No.

MR. ROBOTTI: All right. Could we pull up Defense Exhibit 2-AY.

Q Does that refresh your recollection that on June 10, 2012 you reached to Henry Debusmann and asked him to OM with you?
A No. It does not refresh my recollection, and that is a pretty standard request, as far as my practice was concerned.
Q So at this time in mid 2012, seven months or so before you leave OneTaste, you are actively reaching out to people and seeking to do additional OMs?
A Yes. I was still OMing up until I left.
Q And towards the end of that year, you continued to volunteer for things. So do you remember volunteering to play a desire game with your roommates on December 12, 2024?

A I do not. No.

MR. ROBOTTI: Can we pull up Defense Exhibit 2-BA. Top two e-mails, please, to blow up.

A I have zero recollection of what the desire game was.

Q All right. Does this refresh your recollection that on Christmas Eve 2012, Emily Peters-Limbeck asked you: Dear Elves, is it possible to play the desire game remotely.

Do you remember that?

A No.

Q And do you recall responding: Yeah, I want to play remotely, too?

A No.

Q And you're not a 1080, right, at this point?

A I don't remember.

Q Christmas Eve, you are home with your parents, right?

A I don't remember. That would make sense, but I don't -- I truly don't remember. The one thing that is coming to my mind is they came into town one Christmas when I was dating Mick.

Q So your parents --

A For Christmas.

Q So your parents visited you in December 2012?

A I don't remember if that's when they did it or not. I do remember that they visited for Christmas Day because we went to Luca Di Beppo.

Q Okay. But, either way, you're not at 1080 for the holidays, right?
A Correct. I would imagine -- I don't know. I don't remember.
Q All right. And a few days later, December 9, 2012, do you recall organizing the women at 1080 to talk to the men at 1080 about their relationships?
A No.
Q All right.
MR. ROBOTTI: Can we pull up Defense Exhibit 2-AW. Can we just blow that up for the witness.
Q Did you have a chance to review?
A Uh-huh.
Q All right. So does this refresh your recollection on December 29, 2012, that you sent an e-mail to all of the residents at 1080, women and men?
A January 29?
Q January 29. Apologies.
A I do not have a specific recollection of this. There's a really vague memory of being involved in a men's course that the women after the fact, when we were debriefing, realized something. I can't remember what. I am assuming it was whatever is listed in here. But I do not have a recollection of it. But -- a very specific one. It is super fuzzy.
Q Do you recall that you sent this e-mail to relay some

thoughts the woman had after group discussion?
A I do not.
Q I think that's what you just said?
A I don't recall the e-mail. I recall the men's group and feeling unsatisfied with how it went.
Q And in response to that, does this refresh your recollection that you wanted a deeper, more connected sex with the men?
A Who doesn't want deeper, more connected sex?
Q Is that a yes?
A I don't recall any of this --
Q Okay.
A -- specifically.
Q But is that how you felt at that time?
A I would not be surprised if that's how I felt at that time. It sounds about right.
Q And, more particularly, you wanted more exquisite, refined, and focused attention on the women and sex, correct?
A Yeah. I mean, that's sounds about right.
Q And you wanted to connect with the men on a deeper emotional level, right?
A Yeah.
Q So this is January 29, 2012. This is two weeks before you move out, right?
A It sounds about right.

Q And you're e-mailing everyone at 1080, telling them you want to be more connected, right?
A Uh-huh.
Q Correct?
A Yes. Sorry. Yes.
Q All right. So it's fair to say that throughout 2012, you were volunteering to take on more work at OneTaste, right?
A Yeah.
Q We just went through seven, eight e-mails. You agree with me on that one?
A Yeah. That sounds about right.
Q Okay. And you're reaching out to OneTaste leadership to ask for more jobs?
A More ways to plug in.
Q Okay. You're refocusing on your OM practice with a new research project, right?
A Yeah. If I remember correctly, my OM practice had fallen off a little bit, as it did. It ebbed and flowed throughout my time there.
Q Okay. And you were choosing to volunteer to take on these additional responsibilities?
A That's a complicated answer.
Q Well, ma'am, you wrote a lot of e-mails to a lot of people saying you wanted more responsibility, right?
A Yes.

Q Those were choices you made, right?
A Yes. And the complication lies underneath why I was choosing those.
Q Well, I am not asking you about your regrets now, I am asking you about what you thought then.
A Thought then about what? Can you restate the question?
Q So I understand, ma'am, that you might regret certain things now, right?
A I never said I -- that's also a complicated answer.
Q Okay. So maybe you don't regret anything at OneTaste.
My question is, what did you think at the time when you were asking for more work? You wanted to do that, right?
A Yeah. I wanted to plug in.
Q So it's around this time, at the end of 2012, that you volunteered to start spending more time with Reese Jones, right?
A What was the date you said again?
Q At the end of 2012.
A I would not say that I volunteered, I would say that I asked, that I was asked.
Q Well, before you were asked, you told Rachael Hemsi you had a crush on Reese Jones; do you remember that?
A I do not.
Q You had met Reese Jones a couple of times by then?
A Yeah. He's a -- I had seen him in the back of courses

with Nicole. He's this bright, shiny, happy guy.
Q Charismatic guy, right? Super interesting?
A Absolutely. Yeah.
Q Very good conversationalist?
A Yeah.
Q Fun to talk to?
A Uh-huh.
Q So it's accurate that you had a crush on him at the time, right?
A No. I was -- if I'm remembering correctly this conversation -- it's slowly coming back. I think that it was used more like not like an actual crush, it's like, oh, he's so sweet. I've got like a total crush on him or like -- I don't know.
Q You said that?
A I have a very vague recollection of it.
Q Sitting here today, ma'am, yes or no, you said you had a crush on Reese Jones?
A I have a very vague recollection of it.
Q So the answer is yes?
A Yes.
Q So that's what you told Rachael Hemsi at the time?
A Yes.
Q And you were so existed that you were jumping up and down because you wanted to work with Reese; do you remember that?

A I do not remember that.
Q And it's true that Reese came to one of your talks at your church, right?
A It is.
Q You had a good time with him?
A He contributed to a lot of fruitful conversation.
Q So, yes, you had a good time with him?
A Yes.
Q And it was after that that you started spending time with him at his house, right?
A No. I was already spending time with him at his house when he came to the talk.
Q Okay. And in total, you spent about three months going back and forth to Reese's house; is that fair?
A That sounds about right.
Q And that was until you decided to leave 1080 in February 2013?
A Yeah. The dates are blurry for me when I removed myself, but that sounds about right.
Q All right. And I am not asking about today. I am asking about at that time.

You were happy you had been given the opportunity to work with him, right?
A I was happy to find a way in to a community that I felt like I belonged to and I had removed myself, and I felt very

unstable.
Q You had just spent the last six months telling people at OneTaste that you wanted more responsibility?
A Uh-huh.
Q Right?
A Uh-huh.
Q Volunteering for tasks, right?
A Uh-huh.
Q And when they approached you with this task to work with Reese Jones, you were excited, right?
A I was excited to have an "in" to the community and to being accepted again.
Q This was an important job, right?
A Uh-huh.
Q Reese was an important guy to the company, right?
A Uh-huh.
Q This was someone --
A Yes.
Q -- close to Nicole Daedone, correct?
A Yes.
Q This was a good opportunity for you?
A What do you mean by "opportunity"?
Q The common term of "opportunity." This was something you could take on to move up in the company?
A I didn't see it as moving up in the company. I saw it as

finding a place where I belonged after being celebrated for being a sexual person.
Q So with whatever definition of "opportunity" you would like to use, this was a good opportunity?
A Yes.
Q And when you ultimately lived on and off with Reese, it was a very nice place, right?
A It was.
Q I think we saw some photographs the government showed earlier. We have a couple, I am not going to reintroduce all of them, but let me show you two.
MR. ROBOTTI: Can we pull up Defense Exhibit 16-K.
Q Do you recognize this as Reese Jones' house?
A Yes.
Q And 16-K1?
And are both 16-K and 16-K1 accurate representations of Mr. Jones' house?
A To my memory, yes.
MR. ROBOTTI: Your Honor, the defense moves to admit 16-K and 16K1.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 16-K and 16-K1 are admitted.
(Defense Exhibit 16-K and 16-K1 received in

evidence.)

MR. ROBOTTI: All right. Can we publish -- well, we can publish 16-K1.

Q All right, ma'am. So this is a mansion, right?
A It's a pretty big house.
Q Pretty big house, right?
A Yeah.
Q In San Francisco?
A Yes.
Q And they don't make a lot of big houses in San Francisco, right?
A No, they do not.
Q Right.

So this was pretty cool to go live in a mansion in the middle of San Francisco, right?
A Yeah, it was nice to experience the luxuries of that place every once in a while. Yeah.
Q You were coming from 1080, right?
A Uh-huh.
Q 1080 wasn't bad, it had a lot of amenities, right?
A Uh-huh.
Q But 1080 is no mansion, right?
A No, it is not.
Q So getting to spend a couple months at a mansion, not so bad?

A No, it was very nice.
Q Okay. And that was something you wanted to do, right?
A That's also a complicated answer.
Q Okay. I'm not asking for the lens of hindsight here, right? For the --
A I am not talking about the lens of hindsight.
Q For the person in her mid 20s, being asked if she wants to go live in a mansion, that was an exciting thing?
A That is exciting, yes.
Q Mr. Jones also took you to parties, correct?
A He took me to one.
Q Okay. Nice party?
A It was. I didn't particularly enjoy it. It wasn't for me.
Q Okay. And he paid for things for you, right?
A He paid for very few things, in my memory.
Q Dinner?
A The occasional -- I think -- I remember going to dinner with him once after that party. The most regular thing that he would pay for, I would drive down the hill to a bagel shop and bring back bagels and lox.
Q Okay. And you were paying rent at 1080 at the time, right?
A I was.
Q Which you were unhappy about, right?

A Yes.
Q But you were not paying rent at Mr. Jones' house, right?
A No.
Q So you were living free in the mansion, correct?
A I didn't stay there every single night, but, yes, I was not paying rent there.
Q So you still had a room at 1080, right?
A Correct.
Q Which is one of the reasons you were paying rent there?
A Correct.
Q And we talked earlier about sugar daddies, right?
A Uh-huh.
Q Okay. And you acknowledge that you had a financial relationship with an older man before, right?
A Uh-huh. Yes.
Q And this is before you met Reese, right?
A Yes.
Q You had a sugar daddy?
A Yes.
Q And, basically, a "sugar daddy" is an older rich man?
A Yes. That's a fair summary.
Q Okay. He takes care of a younger woman, known as a "sugar baby" sometimes?
A Yes.
Q Okay. And you sought out the man who was your sugar

daddy before Reese Jones, right?
A You mean, like me going to the site?
Q You went to the site, right?
A Yes. I was on the site.
Q You went to the site looking for a sugar daddy, right?
A I believe he sought me out, but I don't remember who messaged who first.
Q And this is a website call "Seeking Arrangements"?
A I thought it was sugardaddies.com. But it might have been Seeking Arrangements. I don't recall.
Q If you listened to the podcast, which we are not going to do, would that refresh your recollection?
A Probably not.
Q And that sugar daddy, what was his name?
A I couldn't tell you.
Q You had a longstanding relationship with him, right?
A The sugar daddy from that particular website was very -- was a different person -- it was, in my mind, a relatively short relationship. There was someone else from Redbook who was a longer-standing, basically, sugar daddy, even though it was from a different site.
Q So you had two sugar daddies before Mr. Jones, correct?
A Yes.
Q Okay. And you entered both of those relationships on your own choice, right?

A That's also a complicated answer.
Q You sought out those sugar daddies, right?
A Yes. I needed money.
Q And, again, there's lots of ways to make money, right?
A Uh-huh.
Q Lots of people make money through jobs, right?
A Uh-huh.
Q You had a job?
A Uh-huh.
Q So this is something you chose to do to make money?
A Again, that's a complicated answer.
Q And do you remember the name of the second sugar daddy?
A Stan.
Q Stan.
Okay. You had the longer relationship with him, right?
A Uh-huh.
Q Okay. He took you on trips, right, to Las Vegas?
A No. No. That was just my friend Javi.
Q Okay. You didn't tell Mygu (ph) on the podcast in 2011 that your sugar daddy took you to Vegas?
A Oh, he did. The other guy. Not Stan.
Q Okay.
A He took myself and someone else from OneTaste.
Q Okay. So you went on the trip to Las Vegas with this

man, right?
A Uh-huh. Yes.
Q And he took you to dinner, right?
THE COURT: Excuse me.
Ms. Bonjean, do you need a minute with your team?
MS. BONJEAN: Yes, I do, actually.
THE COURT: Okay. Go ahead. We'll wait.
MS. BONJEAN: I need one second.
THE COURT: Yes, go ahead. You can always ask for a moment if you need it --
MS. BONJEAN: Thank you.
THE COURT: -- to speak with your paralegal or whoever's behind you.
(Short pause.)
MS. BONJEAN: Thank you, Your Honor.
THE COURT: Go ahead, Mr. Robotti. You may continue.
BY MR. ROBOTTI:
Q Okay. So Stan took you and your friend out on the town in Vegas; fair to say?
A Different -- the other guy that I don't remember the name of.
Q Sorry. The other guy took you out on the town with your friend in Vegas, right?
A Yes.

Q And you also recall that -- and I think this is with Stan, you learned the skills you used at OneTaste coaching program to help him in his relationship; do you remember that?

MS. GUPTA: Objection.

THE COURT: One moment, please.

(Short pause.)

THE COURT: Sustained.

MR. ROBOTTI: To form or to substance, Your Honor?

THE COURT: Substance. It is sustained.

Q All right. So let's go back to Reese.

So you really liked Reese when you started working with him, correct?

A I liked him as a person. I wouldn't say that I was attracted to him.

Q You thought of him as an experienced player; do you remember that?

A I do not. No.

Q Okay. Do you remember saying that you loved him, in January 2013?

A I do not recall that. I am not surprised by it because I definitely overused the term "love."

Q Do you remember saying that in your private journal?

A No, I don't.

MR. ROBOTTI: Okay. Can we pull up Defense Exhibit 2-W, at page 10.

A Sorry, what page did you say?
Q Page 10. Apologies.
A Thank you.
MR. ROBOTTI: Sorry. This is just for the witness.
Q It actually starts at the bottom of page 9.
All right. Do you recall saying in January 2013 that: I love the more experienced players like Marcus, Keith, Eric, and Reese. I don't fall in love with them like Robert.
Do you remember saying that?
A I do not recall saying it, and I recognize my writing in the journal.
Q Okay. Is that how you felt at the time?
A Yes, with the caveat that love was not what I considered true love, just it was the colloquial term of, oh, I love my shoes, I love my haircut.
Q Sure. There's romantic and nonromantic love, of course, right?
A Yeah.
Q But you're expressing nonromantic love towards Mr. Jones?
A Of course.
Q So fair to say you were friends?
A We were friendly. We didn't become friends until after I started living with him, I would say.
Q So you did become friends when you lived there?
A I think so.

Q And you grew concerned for him when he was sad; is that fair?
A I grew concerned for his state of being, and I felt sad knowing that he was suffering.
THE COURT: Mr. Robotti, we are not so close to the end of the day. I just want to know if you have an estimate of how much longer you have?
MR. ROBOTTI: I think I am going to be done today, Your Honor. Getting there.
THE COURT: Just give me a time frame. Roughly.
MR. ROBOTTI: I think close to 5:30, Judge. Maybe a little earlier.
THE COURT: Okay. Go ahead.
BY MR. ROBOTTI:
Q Okay. Now, do you remember in January 2013 you also believed that it was good that Robert was living in Las Vegas because it allowed you to spend time with your other partners, including Reese?
A I do not recall saying that. Can you refresh my memory?
Q Sure. Pages 17 and 18 of Defense Exhibit 2-W.
Towards the end of the page, does this refresh your recollection that: In some ways it would all be a lot easier if he were here, and in others it is so good that he's not. How would I spend all the time I want to with him, Reese, Ryan, and Paul?

A You're probably sick of it, but, again, no specific memory of this. I do recognize that these are the words on the page.
Q Now, as we talked about a lot today, you had a lot of competing responsibilities, right?
A With --
Q During this time in your life?
A You mean with jobs and stuff?
Q Yes.
A Yes.
Q Okay. And so it was hard to find the time to spend time with Reese and Robert, do your jobs and all your other responsibilities, correct?
A Yes.
Q Now, a couple of weeks after this, as we talked about, you and Robert either break up or talk about breaking up, correct?
A I'm sorry, say that again.
Q February 20, 2013, you and Robert talk about breaking up.
A Is that in my journal that we already went over?
Q We already -- this is what you testified to earlier about.
A Okay. Then, yeah. I am just trying to make sure I am being clear on which one I am testifying to.
Q Sure.

Okay. And it was after that discussion with Robert that you decided to leave 1080; do you remember?
A Can you refresh my memory, please.
Q Sure.
You can look at page 57.
A Turned right to it.
Q Okay. So does this refresh your recollection that it was on or about February 22, 2013 when you decided to leave 1080?
A Yes.
Q Okay. And you found another job and another place to live, right?
A Yes.
Q You found another job with friends as their live-in nanny, correct?
A Yes.
Q All right. That was Sean and Colleen, right?
A Yes.
Q And you told people at OneTaste you were leaving, right?
A I would imagine so.
Q Okay. In response, no one forced you to stay, right?
A No.
Q As you said earlier, no one chained the door shut, right?
A No.
Q When you told people at OneTaste that you were moving out, they just let you go, right?

A Yeah. No one chained me up anywhere.
Q So you told them you wanted to move out, and you left?
A Are you waiting for a response? That was a question?
Q Yes.
A Okay. Sorry.
I would imagine that there was a little bit more conversation and protest, and that's probably a fair statement that I -- after all of that protest, I still left.
Q Do you remember that or you're imagining that to be?
A That's a good question. Probably imagining.
Q You took a job that, actually, you were expected to work more time at, right?
A Yes.
Q You said an extra two nights a month, right?
A Yes. That's what it says.
Q Okay. And when you told Reese that you were moving out, he wished you well, invited you to stay anytime you wanted? Do you remember that?
A He asked me to stay. He didn't wish me well. He asked me to stay and offered money for me to stay there.
Q Did he tell you you were always welcome to stay there for free?
A Yes.
Q Looking at that same page, can you read the bottom, onto the following page to yourself.

A 57 to 58?
Q Yes.
Okay. Does that refresh your recollection that in response to Reese saying that you were welcome to stay there for free, you said: I think I would do it if I didn't feel the need for space from OneTaste?
A I don't recall saying that, and it doesn't surprise me. I would have loved to not have to work extra hours while also not paying rent at 1080.
Q Do you recall saying in your private journal: I really enjoy spending time with him and being around him and talking to him?
A I did enjoy spending time with him. That's true.
Q And after you moved out, you saw Reese again a few times, right?
A I think after I moved out, if I am remembering correctly, I would still go over there every once in a while because he had not yet intoxicated himself.
Q And when you did return and see he was intoxicated, that troubled you, right?
A Of course.
Q Because he -- you cared about him?
A Yeah.
Q And at that point, he begged you to stay, right?
A I wouldn't say he begged me, but he asked me to.

Q He offered you money?
A Uh-huh.
Q And you turned that down, right?
A Uh-huh.
Q You said no?
A Uh-huh.
Q And as for Robert, when you left, you wanted him to stay at OneTaste, right?
A I wanted him to make his own choices.
Q Well, isn't it true at that time you hated the idea of him quitting?
A If I'm remembering correctly, I hated the -- I didn't want him to hate me for telling him that I didn't want him involved. And I needed him to come to his own decisions.
Q Well, is it true at that time you believed he was confronting his shit, but that you believed he should push through to the other side? Do you remember that?
A Can you refresh my memory, please.
Q Sure. It is 58.
All right. Does that refresh your recollection that at that time you believed he was confronting his shit, but that you thought he should push through to the other side?
A I mean, I don't remember this, and I am not surprised by it.
Q Okay. And is it true that at the time you left OneTaste,

you genuinely thought there was a lot left for him in Las Vegas?
A I am surprised by that. I don't recall that at all.
Q And looking at page 59, does it refresh your recollection that in February 2013 you wrote in your journal: I genuinely think there's a lot left at OneTaste in Vegas for him?
A I do see that in my journal. I don't recall it.
Q Okay. And you don't disagree you wrote it, right?
A Correct.
Q Now, even though when you left you really missed Robert, right?
A When who left?
Q When you left OneTaste, you really missed Robert, correct?
A I was still seeing him so I'm not entirely sure what you mean.
Q Do you recall avoiding seeing him when he came to San Francisco?
A I don't. Will you refresh my memory?
Q Sure. Pages 63 to 64.
Do you recall that when Robert came after you left OneTaste, you said: I'll probably avoid just going to 1080 the entire time?
A I do remember avoiding 1080. I don't remember avoiding him. In my memory, he stayed with me a couple of nights at

Sean and Colleen's. So I don't recall this at all.
Q Okay. Do you recall that at this point in time your situation with Robert was really difficult on you? Do you remember that?
A Yes. It was a very stressful relationship.
Q Okay. And do you remember as a result of what's going on with Robert, you were not excited by anything, work, seminary, OneTaste, OMing; do you remember that?
A I do not. Will you refresh my memory?
Q Sure.
Can we look at pages 69 to 70. Actually, it is at the bottom of 70.
A I'm done.
Q All right. Does that refresh your recollection that at this time, after you left OneTaste, you were upset about Robert?
A I was very upset about Robert and the manipulation going on in our relationship behind the scenes.
Q Okay. But it's fair to say that when you chose to leave OneTaste, one of the big reasons you were upset was Robert, right?
A The manipulation of my relationship with Robert. Not Robert personally.
Q With what had been going on in your relationship with Robert, correct?

A Because of the manipulation, yes.
Q So it's fair to say that one of the reasons you were so upset was Robert?
A I was upset because of the manipulation in my relationship with Robert. Not Robert personally.
Q Now, you continued to OM after you left 1080, right?
A I believe so. For a short period. If I am remembering correctly, it was only with Robert, but I don't have a whole lot of memory of my OMs after moving out.
Q Well, if we look at Defense Exhibit 73.
A You said page 73?
Q 73, yes. Of 2-X -- Defense Exhibit 2-W. Apologies.
A Okay. I am done reading.
Q So after you left -- does that refresh your recollection that after you left OneTaste, you continued to OM with multiple other partners?
A I don't remember OMing with multiple partners, but it says so in my journal.
Q All right. So after you left 1080, you made plans to move out of the state, right?
A Yes.
Q You moved to New Jersey to go to seminary school?
A Yes.
Q And you ultimately became a pastor, right?
A Yes.

Q Okay. And you were making the plans to go to seminary school while you were at OneTaste, right?
A I don't believe so.
Q Can we look at --
A There may have been an inkling of wanting to go into ministry, but in my memory, it was not until I was living at Sean and Colleen's that I was -- that I decided to go to seminary.
Q Well, can we agree that based on our conversations today, memories are sometimes wrong?
MS. GUPTA: Objection.
THE COURT: Overruled.
A Memory is very unreliable, yes.
Q Okay. Sometimes it's hard to remember things that happened a long time ago?
A Especially the timeline of it, yes.
Q Yeah. And what you were feeling 15, 20 years ago?
A I don't forget the feelings of it.
Q Sometimes it's helpful to have a document that was written at that time, right?
A It is.
Q All right. Can we look at page 34 to 35.
Does that refresh your recollection that in January 2013, you wrote in your private journal: I started the process towards seminary today?

A Yeah. I believe that where the lack of clarity in my mind is the process -- I'd kind of forgotten about this part, the process of going to seminary is a very long onboarding process. You have to have a conversation with your pastor, read a book, talk about that book with them. And in my mind, when you were initially asking, I was thinking of like applying to grad school process. So I apologize.
Q So we can agree by January 2013, you were already thinking about your exit toward seminary school, right?
A Yeah.
Q Okay. And you were able to meet with the church official?
A You mean my pastor?
Q Was it your pastor? Sorry.
A Yes.
Q And your understanding was that to go to seminary school, you'd have to give up being polyamorous; is that right?
A Yeah. Yeah. That's fair.
Q And at the time, that was something you didn't want to do, right?
A I really wrestled with it in therapy. There's a lot of conditioning that I was overcoming.
Q And it scared you, right, to move forward?
A With monogamy?
Q With monogamy?

A Yes.
Q But you did move forward, right?
A I did.
Q So you were willing to change your sex practices because you wanted to go to seminary school, right?
A Yeah. I was starting to actually stand in my own self.
Q And it's fair to say that you let the church tell you who you could and couldn't be in a relationship with?
A They never told me who I could and couldn't be in relationship with. They told me I could be in relationship with one person at a time, which is very different, in my mind.
Q But not more than one person at a time, right?
A Right.
Q That was a rule?
A Not a rule. Just unadvised.
Q If you wanted to go to seminary school, that was a rule you had to follow?
A Again, not a rule. Just advised.
Q Advised. Strongly advised?
A Uh-huh.
Q Advised.
Okay. And you chose to do that because you believed in the church's teachings, right?
A I mean, that's a complicated answer. There are a lot of

the church's teachings that I disagree with. There are a lot of the church's teachings that I am obviously onboard with. I wouldn't have been ordained otherwise.

Q Okay. But you agreed to no longer be polyamorous because you wanted to be a part of the church?

MS. GUPTA: Objection. Asked and answered.

THE COURT: Sustained.

How much more do you have now?

MR. ROBOTTI: Just five minutes, Judge.

THE COURT: Great. We can keep going then.

BY MR. ROBOTTI:

Q Now, in July 2014, after -- a long time after you left OneTaste, you reached out to Rachel Cherwitz, right?

A That sounds about right. I don't remember exact -- the exact dates, but I do recall reaching out to her, and I believe that's when I ended up going up to New York for that demo.

Q And she was very excited to see you?

A She was.

Q All right. And you thought it was awesome to see her, right?

A It's always -- it's a mixed bag.

Q At that time, you told Rachel it was awesome to see her, right?

A I did tell her that. I believe I told her that.

Q Okay. And you had just spoken to an interfaith minister about OM and God?
A I don't recall that.
Q All right. This will be the last document we look at here.
MR. ROBOTTI: Can we pull up Defense Exhibit 2-BF.
Q I believe you have that in front of you.
THE COURT: Just for the witness, right?
MR. ROBOTTI: Just for the witness, Your Honor.
Q And we will look at page 34. And, also, just take a look at page 35, as well.
A Can you scroll back to the -- I wasn't done reading. Sorry.
THE COURT: Does she have a hard copy? It might be easier. You are welcome to come up and look for it, if you need to.
MR. ROBOTTI: It should be up there.
A Yes. What page?
Q 34, 35.
A Thank you.
THE COURT: What's the question?
MR. ROBOTTI: I was giving her a moment to finish, Your Honor.
Q All right. At that point you intended to put Rachel in touch with a minister and her partner about OM?

A I don't know if I was intending to put her in touch. I was just telling her -- I don't have any recollection of this person, who this person is.
Q Okay. And Rachel responded, I love you so much?
A Yes, she did.
Q It felt so warm and wonderful to see you. Correct?
A Yes.
MR. ROBOTTI: No further questions, Judge.
THE COURT: Any cross-examination, Ms. Bonjean?
MS. BONJEAN: Yes, I do.
THE COURT: Go ahead. You may proceed.
MS. BONJEAN: Thank you.
CROSS-EXAMINATION
BY MS. BONJEAN:
Q Good afternoon. Ms. Gill, correct? Is that the last name?
A Gill, yes.
Q I have seen Gill and Gillport. Gill is right?
A Yes, it is.
Q All right. My name is Jennifer Bonjean, and I represent Ms. Daedone.
You testified today about your upbringing on direct examination; do you remember that?
A Yes.
Q And I think you testified on direct examination, pursuant

to questioning of the US Attorney's Office, that you believed that your upbringing played a role in sort of your attraction to OneTaste?

A Yes.

Q All right. And that upbringing was a fundamentalist Christian upbringing, right?

A It is a very traditional Evangelical upbringing, yes.

Q Okay. And that Evangelical Christian upbringing meant that you had to respect authority, right? You said that?

A Yes.

Q And in your household that authoritarian figure was your father, correct?

A Yes. And then secondarily my mother.

Q Okay. You also -- you had a purity ring, right?

A I did.

Q Can you tell the ladies and gentlemen of the jury what a purity ring is?

A A purity ring is given to a young woman, usually on her 16th birthday, as a sign of commitment to God and her father that she won't have sex before marriage.

Q And who gave you that purity ring?

A My parents.

MS. GUPTA: Objection.

THE COURT: Basis?

Stop please.

Basis?

MS. GUPTA: Relevance.

THE COURT: Sustained. And I will strike the answer and the question.

MS. BONJEAN: They introduced this, Your Honor. This was --

THE COURT: Excuse me. You can go onto the next question.

BY MS. BONJEAN:

Q And as you testified on direct examination, there were certain attitudes about sex that you grew up with, right?

A Yes.

Q Okay. Can you explain to the ladies and gentlemen of the jury what those attitudes about sex were that you grew up with?

A That sex happens within the confines of marriage.

Q Okay. Anything else?

A Not that I can think of at the moment.

Q I take it that polyamorous relationships were not consistent with your upbringing?

A No, they were not.

Q Okay. Same sex relationships were not consistent with your upbringing?

A Correct.

Q I am guessing OMing probably was not consistent with your

upbringing, right?
A Correct.
Q And during your upbringing, you struggled with accepting those values, right?
A Well, I identify as queer, and so I always felt like that part of me was rejected by my family and our family values.
Q And what is -- not to be ignorant, can you describe what you mean by "queer"?
A Yeah. I am attracted to people and not their genitalia. So I find connection with the person rather than with their gender identity.
Q Okay. So it could be someone who identifies as man, or someone who identifies as a woman, right?
A Correct. Or a trans man, or a trans woman, or nonbinary.
Q Okay. And you also testified, though, that you had a very loving family?
A I did.
Q And you do, correct?
A Yeah.
Q And they were always loving, right?
A There were moments of missed messaging, mismanaged messaging, but I think that love has always been there.
Q And they were always there for you in times of crisis, right?
A I wouldn't say always.

Q Were there occasions where you reached out to them in crisis and they rejected you?
A Yes.
Q You had siblings?
A One.
Q A sister, right?
A Uh-huh.
Q And your father was a police officer, correct?
A Yep.
Q A narcotics police officer?
A For the earlier part of his career, yes.
Q Okay. Now, you had a good relationship with your mother?
A I mean, yeah. I think that I -- yes. It became strained.
Q Right. But you testified, I think you told us a story about how you were on the hot seat and that you were kind of pushed off the hot seat because you told people at OneTaste that you had a good relationship with your mother. Do you remember that?
A I remember being dismissed after saying that, yes.
Q Right.
My question, though, is, at that time, when you said that, you had a good relationship with your mother?
A It had already started to become strained, but, yes.
Q Okay. So when you told everyone in the room that it was

good, you meant it was good and strained or --
A I meant that the history of my relationship with my mother was overall good.
Q Okay. Now, you testified that you went to college.
What college was that?
A UC Santa Barbara.
Q And you studied English and French, correct?
A I did.
Q And you moved to Hawaii after that?
A Yeah. Like not immediately after, but yeah.
Q Did you get a job after college?
A I did.
Q What type of job?
A I worked first at a discount clothing store and then at a credit union.
Q All right. And you lived in Hawaii, I think, for two years, right?
A Yeah. About that.
Q And you were working as a waitress, right?
A Uh-huh.
Q You said you were doing a whole lot of nothing, correct?
A Uh-huh.
Q Is that a yes?
A Yes. Sorry.
Q And you weren't saving any money, right?

A No.
Q Living paycheck to paycheck on tips, right?
A Right. It's very expensive to live in Hawaii.
Q Right.
And after two years of doing a whole lot of nothing, you moved back to San Francisco, right?
A No. I moved to Sacramento. I moved in with my parents.
Q Okay. So you moved back home?
A I did.
Q And is that when you met Aubrey Fuller and Andreas -- how do you say it?
A Panosyan.
Q Panosyan?
A I met Andreas first. I was living with my parents, and I was going into Nugget Markets, which is a family-owned grocery store, and he was doing an olive oil demo. I was on my way into an interview. And he saw me, and we started chatting, and then we ended up going on a date later that week.
Q I see.
So you met him, and you kicked it off, sort of, there was some connection there, and you went on a date?
A Yes.
Q And it was during that date that he told you that he was dating a woman named Aubrey Fuller, but it was an open relationship, right?

MS. GUPTA: Objection.

THE COURT: Basis?

MS. GUPTA: Hearsay.

THE COURT: Yes. Sustained.

Q Okay. Did you testify on direct that Aubrey and Andreas were in a relationship?

A They were.

Q Okay. Were they in a monogamous relationship?

A No. To my memory, he did not tell me about Aubrey until at least a few dates in.

Q All right. And you testified on direct that you met some rowdy friends, I think; is that right?

A Those would be the rowdy friends.

Q Those are the rowdy friends, right?

And they were rowdy because they were in a social circle that did acid and MDMA and different drugs, right?

MS. GUPTA: Objection.

THE COURT: Basis?

MS. GUPTA: Relevance.

THE COURT: Overruled.

A Yes. They introduced me to those two drugs.

Q Okay. Because that's a social circle that you became a part of?

A Yes.

Q And that was Aubrey and Andreas's fault, right?

A No.
Q Okay. So it wasn't their fault?
A I mean, no, I was in a sad and lost place. I have never thought of placing blame on them for my drug use.
Q Okay. So even though you were exposed to it, you don't blame them for you having chosen to do drugs, right?
A No.
Q Now, these were two people that were also associated with or had become involved at OneTaste -- with OneTaste at some point, right?
A Yeah. In my memory, Aubrey was involved far earlier than Andreas because she was seeing someone else who I think -- I don't know if he lived -- he lived at some center. I don't know if it was OneTaste or somewhere else.
Q And this is how you found your way at a TurnON event associated with OneTaste, right?
A Yes. Aubrey invited me.
Q And this event was exciting to you, correct?
A It was.
Q And it was something new, right?
A It was.
Q And it was very different than sort of the thinking that you had been raised with, right?
A It was.
Q It fed something in you that had not been previously fed,

right?
A It celebrated the part of me that my parents -- that I felt like my parents had rejected.
Q And that was your sexuality?
A Yes.
Q I mean, are parents supposed to embrace their children's sexuality?
A I would embrace my son's.
Q All right. And you were looking for an environment where you could be open sexually, right?
A Yeah. I had never had an environment that was permissive of figuring out who I was in the sexual realm.

(Continued on the next page.)

BY MS. BONJEAN: (Continuing.)
Q And during this period of time, you were still obviously in contact with your family, but am I to assume you didn't tell them about your connection to OneTaste?
A I'm pretty sure I did.
Q So you had a good enough relationship where you could tell your Evangelical Christian parents that you had just become associated with a group that had a primary tenet of orgasmic meditation?
A At this point they hadn't been involved in the church for a long time. They had started to shift a little bit.
Q Not as conservative?
A A little bit more -- they valued -- they valued the relationship with me more than the other.
Q Right. Age will do that; right?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q At which point did you start living with Malachi?
A I was staying at his house allot when he lived in the Sacramento area. I don't think I formally moved in with him until we moved down to Oakland.
Q And just so I understand, you're living with your parents but you're dating this guy Malachi, is that a yes?
A Yes.
Q And Malachi is not a OneTaste fellow?

A Not yet.
Q You introduced him to OneTaste?
A I don't know -- well, we had broken up after all of that. He was already familiar with it because he came to that first TurnON that I went to.
Q Got it. So at some point you and Malachi I guess start spending time together. You are still formally living at your parents'; right?
A You mean before I moved in with him?
Q Yes.
A Yes.
Q And you moved in with him and was that in Sacramento or did you move in with him and went to Oakland?
A That's where my memory is a little bit fuzzy.
Q How long did you live with Malachi?
A I couldn't tell you. I don't think it was more than a year. I'm pretty sure it was less than a year.
Q Can you give me a date range here? Is it 2009 basically or '10?
A No, because -- I'm pretty sure by 2010 I was moving -- I had moved into 1080. So, yeah, it was probably the 2009 range if I had to throw a dart in the dark.
Q And in 2009 you're living with Malachi and he has a drug problem you said; right?
A Yes, he did.

Q And, in fact, he had a serious drug problem that resulted in him assaulting you or something of that nature?
A Yes, he did.
Q And you called Ms. Cherwitz in sort of this state of crisis, right?
A Yes, the following day, yes.
Q And you wanted somewhere safe to go; correct?
A Yeah.
Q And she provided that?
A Yeah.
Q Is there a reason you didn't call your family or --
A That relationship had already started to become so strained because they hated Malachi and knew that I was using drugs and they hated that. So it didn't feel like it was an option for me.
Q Okay. You didn't ask them to get you help to go to rehab, right?
MS. GUPTA: Objection.
THE COURT: Basis?
MS. GUPTA: Relevance.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Instead you went to OneTaste where Rachel Cherwitz got you some housing; correct?
A Yes.

Q I think you testified on direct, but perhaps I'm wrong -- strike that.

At some point I think you said you were living out of a car. Was that around this time, too?

A It's -- that was -- I don't believe I ever testified that I was living out of a car.

Q My apologies. Were you living out of a car to some point?

A Only to the extent that my stuff stayed in my vehicle until I could move into 1080.

Q Got it. So it was short-lived?

A It was very short-lived.

Q But you went then to 1080; right?

A Yes.

Q And you testified on direct examination that you ended up going into debt while at OneTaste; right?

A I ended up owing for the courses if I'm remembering what I said correctly. That's what I intended to say.

Q You were in debt to OneTaste for your courses, right?

A Yes.

Q But it's also true that you showed up at OneTaste's doorstep broke; right?

A Yes.

Q And for a while you were not required to pay any rent there, right?

A Yeah, they gave me a grace period until I could find a job.
Q And you really couldn't find a job so they gave you the opportunity to work off the rent; right?
A I believe that's when I went to Lilia Bell's and started working at Lilia Bell's.
Q Was that OneTaste associated or no?
A No.
MS. BONJEAN: One second. Your Honor, if you could give me one second.
THE COURT: I was going to actually wrap up in a minute or two because we do have an issue to take up. But if you have one or two more questions that make sense to ask now, I will let you do that.
MS. BONJEAN: Sure.
Q I know Mr. Robotti asked this to you, but I'll ask it to you; do you remember giving a number of interviews to the FBI and members of the U.S. Attorney's Office over the last few years, right?
A Yes.
Q And I know you looked at some of those reports; correct?
A Yes.
Q And specifically do you remember giving an interview with a Special Agent McGinnis and a couple of U.S. attorneys on September 21st of 2022?

A No. Would you refresh my memory?

MS. BONJEAN: Yeah, sure. I would be happy to.

THE COURT: Do you want to maybe break here?

MS. BONJEAN: Sure, yeah. We can do that.

THE COURT: Okay. Just it strikes me it would take maybe more than a minute or two.

MS. BONJEAN: It would probably take a minute and I'm sure everyone is exhausted.

THE COURT: Okay. Why don't we -- we're going to break right now. So the witness can step down.

(Witness steps down.)

(Jury exits.)

(Continued on the following page.)

THE COURT: Please be seated.

MS. FARRELL: Your Honor, may we speak to the witness about her hotel?

THE COURT: Yes. I wanted to remind the parties that I wanted to bring Juror No. 5 in just to maybe get a bit more information about this medical dental procedure and I'll hear from the parties on what your proposal is, but my current thought is to indicate to him that if a juror is not here trial can't proceed and, therefore, you know, I wanted to just explore with him whether he could make arrangements to do this at a different time or perhaps end of the day. You know, just kind of get a sense of that.

Does anyone have any specific requests in that regard?

MS. FARRELL: That sounds appropriate.

MS. BONJEAN: Yes, Your Honor.

THE COURT: Can we bring in Juror No. 5 right now?

(Juror No. 5 enters.)

THE COURT: Sir, if you could take your regular SEAT, if you don't mind. And really any seat is fine. I won't keep you long.

Yesterday you had given to Mr. D'Agostino a letter from, I believe, it's a dentist.

JUROR NO. 5: Yes.

THE COURT: And it talks about your need for a procedure and it references a date of Thursday the 22nd of May.

JUROR NO. 5: Yes.

THE COURT: So I wanted to mention to you that if a juror is not here, we can't have trial that day so I wanted to get more information from you to see whether there is a way perhaps this could be taken care of and not have to miss a day of trial. I wonder if there's any flexibility. If you can maybe go to the dentist and get more information or maybe it's something that can be done at the end of the day and we can break a little bit earlier.

JUROR NO. 5: Yes, I can talk to him. I think it

might be possible to do it at the end of the day. I understand the procedure, in order to do it that particular day is when the specialist comes in. I know the original schedule I had was for the morning. I will speak to him. Hopefully he can do it at the end of the day.

THE COURT: I would ask if you can explore whether there's also maybe a different day that you can do it. I don't know how urgent it is, and I certainly don't want to put your health at any risk, but I just, you know, again, we can't have trial if you're not here.

So, I don't know if you can get in touch with your doctor tonight or maybe first thing in the morning, but if you can maybe just try to have it scheduled in a way that allows you to be here for a trial day.

JUROR NO. 5: Okay.

THE COURT: If this is the only day the specialist is there that's one issue, but we're not sitting this Friday the 16th so maybe that's a possibility and you can explain that you're on this jury, which they seem to know from this letter and I appreciate your efforts and anything you can do that doesn't jeopardize your health.

JUROR NO. 5: I will speak to him today if I can. And I will let the deputy know as soon as I know.

THE COURT: I think you can just write a short note with any updated information and hand it to Mr. D'Agostino

when you have it.

JUROR NO. 5: Okay.

THE COURT: Thank you and have a good evening.

(Juror No. 5 exits.)

THE COURT: Okay. So, we'll get more information tomorrow.

Let me just ask if there's anything else in advance of tomorrow that we need to take up and maybe, Ms. Bonjean, really rough estimate?

MS. BONJEAN: I won't be long.

THE COURT: That is fine.

MS. BONJEAN: In fact, it will allow me to go back and make sure I'm not duplicating anything.

THE COURT: I am not trying to curtail your substance. I just really wanted an estimate.

MS. BONJEAN: I can't imagine it would be more than an hour probably less than.

THE COURT: And then any redirect you would anticipate based on what you know now?

MS. GUPTA: Yes, Your Honor. I think it will be brief.

THE COURT: Anything else? Is there any other documents that I don't have that I should have?

MS. BENSING: Yes, Your Honor. There's a couple of things. First I wanted to give the Court the witness lineup

for the following day.

THE COURT: I was going to ask.

MS. BENSING: We will have victim witness up next.

THE COURT: This is the person who's the resident?

MS. BENSING: Exactly, Your Honor. And after that will be an individual named Chris Kosley. There are a couple of issues with respect to Mr. Kosley that I wanted to flag for the Court.

We anticipated introducing a number of videos through Mr. Kosley. We've given that list previously to the defense. I've asked them to let me know by 5 p.m. of any issues with rule of completeness with respect to any of the videos. They do come with much longer videos. The Court has the relevant video clips and I believe we've previously provided --

THE COURT: What are they? I've got a lot of material from you.

MS. BENSING: Yes. And I sent via e-mail to Mr. D'Agostino the list of videos specifically that I intend to introduce.

THE COURT: And I assume you are CCing your adversaries?

MS. BENSING: Yes. I wanted to raise it now because we will not be able to edit these on the fly.

THE COURT: What are they? I mean, just general

category?

MS. BENSING: It's mainly defendant's statements, Your Honor.

THE COURT: In terms of what? Is it a presentation, an interview?

MS. BENSING: Some of them are videos of Ms. Daedone speaking to an audience. Some of them are videos of Ms. Daedone speaking in courses or Ms. Cherwitz speaking at courses. There's one depicts the interior of the warehouse.

THE COURT: And Mr. Kosley's relationship to these is what?

MS. BENSING: He was the video editor at OneTaste during the entirety of the relevant time period and has these stored on drives that he had. So that's the universe but we're not introducing the full videos. Some of them are very, very long so I had flagged yesterday morning for the defense the specific clips, but I just wanted to raise that we won't really be able to take these necessarily at a break because this is a large majority of what I intend to admit through this witness.

THE COURT: I am not sure I'm understanding whether you're saying that there may be an objection to the admission at all or just to wanting to add for completeness sake additional information?

MS. BENSING: Well, I don't think I have that yet

from the defense which is why I'm raising it. It does need to be addressed in advance because that's what I'm introducing through this witness.

MS. BONJEAN: I understand that they're lengthy videos and I have to look at them and unfortunately I know we got them recently, but there's a lot of hours to look at and I may be asking the Court to do what the Court did -- or what the Government did with the other speech that Ms. Daedone gave at CP6, put the whole thing in, use whatever clips you want and then I can use whatever I want for context.

THE COURT: How long are these in total in terms of --

MS. BENSING: Hours, Your Honor.

THE COURT: It sounds like you do not want to offer the whole thing.

MS. BENSING: No. We do not and we produced these as part of our initial exhibits in November.

MS. BONJEAN: With about 5,000 hours of video, with all due respect. It was hard to narrow that count, but in any event I'm going to look at it. I will propose what I believe is an appropriate context and the Court will rule and we'll go from there, but I understand it can't be done on the fly.

MS. BENSING: I just need to know in advance.

THE COURT: But in advance of tomorrow morning.

MS. BENSING: Correct.

THE COURT: So you need to talk to each other in advance. I can't make a ruling until I have the materials and know the position of the defense or whether there's additional information. I'm not going to look at hours and hours of video during every evening and during every break because it's not an efficient way for the parties to handle this. I'm happy to look at things that make sense to look at, but if you can anticipate this, there's a better way to handle this.

MS. BENSING: Yes, and that's why we gave the Court the shorter clips.

THE COURT: That only gets you partway there. What I'm hearing from the defense is that shorter clips may not be sufficient. And if I'm to determine whether the shorter clips are appropriate if there's objection to them I really need to have more context. So, your method of doing this may be fine but your timing is not fine.

MS. BENSING: We did raise it -- I raised it previously with the defense, Your Honor, but I haven't heard back.

THE COURT: I am talking about the timing vis-à-vis the Court.

MS. BENSING: I understand, Your Honor. One more thing on that I want to hand up to the Court a series of subtext exhibits that we tend to introduce.

THE COURT: What is subtext?

MS. BENSING: Full text chains that are marked as Government exhibits and we have subexhibits that we provided to the defense that we intend to admit.

THE COURT: I am not understanding what you're saying when you say subexhibits.

MS. BENSING: Portions of the larger text message chain, Your Honor. So I want to hand up copies of those for the Court as we anticipate those will be introduced through that same witness.

THE COURT: The same issue is there going to be an issue of completeness or something you haven't had a chance to look at.

MS. BONJEAN: I haven't had a chance and, Your Honor, in all fairness we got the videos for Kosley at 6:43 on Monday. That was yesterday. We then came to court. We litigated all day. We came back. We spent two hours writing an opposition to their attempt to put in the video from --

THE COURT: Lit me stop you there. You could have raised it at the end of the day. That one wasn't an obvious one. When I gave you a deadline for joint filings that wasn't an invitation to make filings every evening. We're here. Is there something to raise?

If somebody had said to me we want you to look at this three-minute video where genitalia is pixilated, but here is what it's about, that would have been a quick thing to

handle instead of you spending your time.

MS. BONJEAN: We didn't know.

THE COURT: Okay, but talk to each other. This trial is going more slowly than it should be going based on the content that is coming out as trial.

MS. BONJEAN: I understand. I'm just letting the Court know that it's not for lack of diligence that I haven't been able to look at --

THE COURT: I am not suggesting that at all. You're in a similar situation as the Court is in on some of these issues, right? And the Government is in a similar issue as the Court is in based on some of the issues as I can tell you're seeing some of these documents as Court is unfolding, right, in terms of materials.

MS. BENSING: Yes, Your Honor. And I want to raise one thing with respect to efficiency sake with respect to this witness which is that this witness with respect to a separate employer in approximately 2013/2014 had an incident where he took laptops without permission of the employer, sold them -- took those laptops without the permission of his employer sold them on, I believe, Craigslist, Your Honor, and then disclosed this to his employer and had a repayment plan for which he repaid these.

I understand that the defense does intend to cross-examine on this. I don't think it's appropriate grounds

for cross-examination. I don't think it pertains to credibility and it's more than a decade ago at this point and the Government is moving to preclude cross-examination on this point, but I want to flag it for the Court.

THE COURT: Do you want to comment?

MS. BONJEAN: Yeah, it's the same guy that stole all the video from OneTaste.

THE COURT: This is Kosley?

MS. BONJEAN: Yes. And there's a pattern.

THE COURT: I thought the next --

MS. BENSING: I expect to get to Mr. Kosley tomorrow.

THE COURT: Can you give me now the dates? You said it's over a decade ago.

MS. BENSING: It was in approximately 2013 or 2014, Your Honor.

THE COURT: Is there a 302 or something that's in the materials that I can look at to get more of this information? If I want to know more about this incident, what do I have in front of me?

MS. BENSING: We can file a brief letter for the Court that outlines this in more detail. There is a 302 but I want to be sure that the Court has sufficient information that the Court needs.

THE COURT: And your argument is that it's out of

the time frame and you also think it doesn't go to truthfulness; is that what it is?

MS. BENSING: Correct.

THE COURT: So, you'll put in whatever you put in on this.

MS. BONJEAN: I'm not writing a written response to that. We can deal with it in the morning obviously.

THE COURT: I think that's fine. I'm not sure I really need one, but the Government is offering to give more information and it's in everybody's interest.

Just one more issue that I want to raise about courtroom decorum and I'm not going to call anyone out specifically, but it is my expectation that when a witness is testifying, unless the witness or the lawyer or the Judge cracks a joke, I don't expect anybody to be laughing, particularly not at a witness.

I just want to remind everyone that I can see what's going on and if an attorney or a paralegal or anyone else feels that they can't keep it together, you are more than welcome to step out, get a glass of water, get your giggles out, whatever it is, but I don't want any witness on the stand being laughed at.

It is just inappropriate and I didn't feel it was necessary to call anyone out specifically at the time, but just be aware that I can see everything and there's really no

need for lack of professionalism like that. Okay.

MS. BENSING: Your Honor, there is one other thing.

THE COURT: Yes.

MS. BENSING: We are at a place where we need to start calling custodians.

THE COURT: I am understanding that Mr. Williams is a custodian that's going to be called, right?

MS. BENSING: Possibly, Your Honor. It depends on which of those three methods the Court is amenable to --

THE COURT: Typically you would have a custodian testify about documents that had been produced; correct?

MS. BENSING: Right, Your Honor. And so I think that there was an issue raised with respect to work product privilege, and, so we want to understand the scope of the Court's ruling.

THE COURT: Well, my understanding from the other day, I think Ms. Farrell was giving me an update, but I understood that OneTaste is going to have somebody who is able to testify.

Are they still asserting some sort of privilege? That wasn't my understanding from what Ms. Farrell said but perhaps I misunderstood you.

MS. FARRELL: I may have confused Your Honor. They are providing Mr. Williams as a testifying witness. He -- my understanding is he is going to refuse to answer certain

questions on the basis of privilege.

THE COURT: And the question specifically that he's going to refuse to answer in terms of the category?

MS. FARRELL: From whom text messages were collected principally. That's --

THE COURT: Okay, we'll take this up tomorrow.

MS. FARRELL: And I can update the Court on our efforts to procure. So, essentially we have -- as Your Honor remembers, we have three options we outlined.

THE COURT: I remember.

MS. FARRELL: We can call someone from the U.S. Attorney's Office about the receipt of the materials. We received authorization from DOJ and we have subpoenaed three lawyers for Mr. Williams and also the attorney who directed the collection of the materials.

THE COURT: And who is that?

MS. FARRELL: A woman named Nancy Clarence, I believe, an attorney. And then the attorney who actually, like, handled the physical production, who is Paul Pelletier and Mr. Williams who is the in-house attorney. So we've served all three of them via e-mail after receiving DOJ permission because, as you know, we have to get them to our subpoena attorneys.

Mr. Pelletier has acknowledged receipt for both him and Mr. Williams although Mr. Williams doesn't want to be

sequestered from the courtroom. So they then retracted the acceptance of the subpoena and I explained he had to be sequestered regardless. So I need to call Mr. Pelletier tonight and us straighten that out.

We've separately received authorization and have attempted to serve subpoenas or served subpoenas on a variety of witnesses from whom the texts were collected; based, again, on our review of the text, not because anyone told us but it's easy to triangulate who it came from just by looking at the messages themselves. So we sort of have all of these various people teed up and ready to go potentially.

THE COURT: But your expectation as to any invocation is exactly what with respect to the three people; put aside the people whose texts they are?

MS. FARRELL: That they would invoke the work product privilege over answering specific questions around where these materials came from -- from whom they came from.

THE COURT: But none of these individuals you expect to invoke a privilege against self-incrimination; correct?

MS. FARRELL: I have asked that question and have not been informed that any of them will do so.

THE COURT: Because they are simply being offered up by the company as essentially a custodian.

MS. FARRELL: That's correct. I would want -- it would not shock me if someone changed their mind about that.

And, so -- and obviously it's their Constitutional right to do so.

So, my current understanding is nobody -- none of these three lawyers will be invoking their Fifth Amendment right, but that doesn't mean it will not happen.

MS. BONJEAN: I think we're all on the same page. We would all want to know that before there's a jury in the room.

THE COURT: I would certainly not have anybody invoking in front of a jury, but they would have to invoke in advance.

MS. BONJEAN: We will know in advance.

MS. FARRELL: I will attempt to get full clarity on that from Mr. Pelletier. The other person that OneTaste had offered up as somebody who could authenticate the text messages is Mr. Block.

THE COURT: Right, and you said the other day --

MS. FARRELL: He will invoke. We are prepared to deal with that if we call him instead.

THE COURT: Or immunize him.

MS. FARRELL: Or immunize him for this particular testimony.

THE COURT: But is it your understanding that separate from any Fifth Amendment privilege, he would also assert work product?

MS. FARRELL: That's correct, Your Honor.

So I think from our perspective the work product assertion -- if the option is not to call a member of the U.S. Attorney's Office to authenticate materials under the active production document having received the material, then we have to address -- the work product assertion has to be resolved.

THE COURT: Yes, so, let me understand the scope of what you intend to do if you do it through a U.S. Attorney's Office employee.

MS. FARRELL: We would call someone to testify to the fact that a subpoena was served and that these two or three productions were received by the U.S. Attorney's Office. They were saved here. These specific documents that are now marked as Government -- I'm making up the numbers, but are marked as Government 1 through 200 are text message chains that were received from OneTaste and stored in the U.S. Attorney's offices.

THE COURT: So they were received pursuant to a subpoena; correct?

MS. FARRELL: That's correct.

THE COURT: By grand jury subpoena or --

MS. FARRELL: Grand jury.

THE COURT: And you would be seeking to offer what the subpoena called for, I take it?

MS. FARRELL: Yes, with respect to the text

messages.

THE COURT: Okay. I would like to see the --

MS. FARRELL: It's like a proffer of --

THE COURT: A proffer of --

MS. FARRELL: -- what that person would testify to.

THE COURT: Yes, yes.

MS. FARRELL: Understood. We can provide that. Thank you.

THE COURT: And let me just, on that same issue, as for the people whose texts these are, I've looked at some of this but it's a big binder you gave me.

Approximately how many people are there?

MS. FARRELL: Nine.

THE COURT: Okay. And are there any that you think could be available sooner rather than later?

MS. FARRELL: There are some that have been served. There are some that we may need to seek material witness warrants for, given our attempts. We feel at this point we've exhausted our attempts to serve them subpoenas. Some of them obtained counsel who have not yet accepted. Some of them literally contacted us today saying we represent so-and-so, so they may. There's nine people in varying states of service or non-service. So we may have to seek material witness warrants if it doesn't get frankly resolved tonight. Nine people -- our preference would be not to call nine witnesses, but we'll

do it if we have to get them in.

MS. BONJEAN: And just to flag for the court, these are -- our position is these text messages are very piecemeal. We're going to be obviously likely objecting at least to a bunch of them on sort of completeness. I'm sure there's hearsay in --

THE COURT: Is there anything you're not going to be objecting to?

MS. BONJEAN: There might be. I can't rattle them off from the top of my head, but if you've seen them --

THE COURT: I have.

MS. BONJEAN: -- they're very -- I wasn't around when they got produced and I don't know how they got produced, but they are -- from a very objective standpoint, they are -- they're disjointed, they're not complete and --

THE COURT: As I understood from the Government last week or before that, the Government is only seeking to, through either a U.S. Attorney's Office employee or someone from OneTaste, essentially authenticate that they were what was produced to the Government from OneTaste pursuant to a subpoena. There's still issues of relevance, et cetera; right?

MS. FARRELL: Correct.

(Continued on the next page.)

(Continuing...)

THE COURT: Okay.

MS. FARRELL: We want to establish their authenticity.

And then with respect to relevance, hearsay --

THE COURT: Well, when you say authenticity, you mean -- I mean, I think what you established is that this is what was produced to you from OneTaste, correct?

MS. FARRELL: Correct. In that they are what they appear to be, which is text message chains, including the participants whose names appear on the messages.

THE COURT: And you're purporting to do that or proposing to do that based on what was called for by the subpoena and what the response was, correct?

MS. FARRELL: Correct, Your Honor.

THE COURT: Okay. That's what I understood.

And this issue of disjointedness that Ms. Bonjean is raising, how are you intending to address that sort of more substantive content-based argument?

MS. FARRELL: Our view is that -- and I think the law's view is that that goes to the weight, not the admissibility. That's obviously information that they can cross-examine the custodian on, or argue in front of the jury on --

THE COURT: Okay. But you're saying that there

is -- potentially, your number one option is that -- there's no custodian then, right? It is a US Attorney's Office employee?

MS. FARRELL: Yes.

THE COURT: So what do you mean they can cross-examine on that? I am talking about the content now.

MS. FARRELL: Right. They won't be able to cross-examine -- I mean, let me give you an example.

THE COURT: Yes.

MS. FARRELL: There are some that are between the two defendants, which are clearly nonhearsay because it's the two defendants' statements. And, obviously, neither of the defendants is going to take the stand in the government's case and authenticate these, but that does not mean that the government or anyone else can never get documents in that involve communications solely between two defendants or a defendant and coconspirators.

The authenticity is established by the fact that they were produced by the company in response to a subpoena because the company is not going to produce fake documents in response to --

THE COURT: But that's what I am asking for what the subpoena called for.

MS. FARRELL: Understood, Your Honor.

And so, look. The defense can argue, when I say it

goes to the weight, not the admissibility, that's something the defense can argue in summation. They can cross-examine any sort of -- if not the US Attorney's Office witness or even the document custodian about those documents, they can -- you know, cross-examine percipient witnesses about observations around how texts were used, how they were stored, et cetera, et cetera.

THE COURT: So at the time that OneTaste produced these documents pursuant to the subpoena, they didn't assert any work product protection or any other privilege, I take it; is that correct?

MS. FARRELL: Not over these materials, because they were produced -- I would have to go back and double-check the cover letters, but I --

THE COURT: I think you should do that.

MS. FARRELL: I will. But there, you know, there's obviously no work product protection over materials that were produced.

THE COURT: Yeah. What I am getting at is was this argument made to the government about any protection for these materials before the subpoena was complied with?

MS. FARRELL: I do not believe so, Your Honor.

THE COURT: Okay.

MS. BONJEAN: I think -- am I wrong, though, that the text messages failed to identify those -- who -- so they

may not have voiced objection, but they didn't actually produce the identities of people --

THE COURT: Correct.

MS. BONJEAN: Right. Okay.

THE COURT: You're correct. Yes.

MS. BONJEAN: I mean, I don't --

THE COURT: Right. I am asking a different question.

MS. BONJEAN: There was no motion to compel on that, as far as I know. I'm just saying, I don't --

THE COURT: That's why I want to see what the subpoena called for.

Okay. I think we can continue this. You can be here at 9:15 tomorrow, if there's anything to take up. But on the video issue, because Ms. Bonjean makes the very valid point that she's not going to be able to on the fly kind of -- well, you're not going to be able to on the fly, Ms. Bensing, edit things, and she may not have the time to be able to get you an answer quickly enough. Do I have that right?

MS. BONJEAN: Yes. But I'm going to try to go -- to deal with it.

THE COURT: Okay. And she's not going to be writing in response to your motion to preclude that impeachment. But -- so she'll have an extra half an hour or so.

Okay. Thanks, all.

I will see everyone at 9:15.

And thank you for, Mr. Robotti, I think it was, for the transcripts. I think that is a much quicker way to get through some of these videos, if you are using them to refresh.

MR. ROBOTTI: The only issue sometimes, Judge, we are pulling out excerpts that are in response to the direct. So we'll get them to you as quickly as we can.

THE COURT: That's okay. I think as long as we are not talking about very lengthy videos that you are expecting me to look at on a ten-minute break.

MR. ROBOTTI: Thank you.

THE COURT: Okay. Have a good night, everyone.

MS. FARRELL: Thank you.

(At 5:52 p.m., proceedings were adjourned until Wednesday, May 14, 2025, at 9:15 a.m.)

INDEX


| WITNESS | PAGE |
| --- | --- |
| DANA MICHELLE GILL | 1225 |
| DIRECT EXAMINATION BY MS. GUPTA | 1225 |
| CROSS-EXAMINATION BY MR. ROBOTTI | 1343 |
| CROSS-EXAMINATION BY MS. BONJEAN | 1467 |

| EXHIBIT | RECEIVED |
| --- | --- |
| Government Exhibit 34 | 1252 |
| Government Exhibit 339 | 1280 |
| Government Exhibit 267 | 1283 |
| Government Exhibits 58 and 59 | 1303 |
| Government Exhibit 415 | 1310 |
| Government Exhibit 4518-A | 1339 |
| Defense Exhibit 2-AJ | 1362 |
| Defense Exhibit 2-N | 1388 |
| Defense Exhibit 2-AX | 1430 |
| Defense Exhibit 16-K and 16-K1 | 1444 |