UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
May 15, 2025
Defendant. : 9:30 a.m.
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Annette M. Montalvo
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Kamille Simons, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(In open court.)

(The Hon. Diane Gujarati, presiding.)

(The following occurs outside the presence of the jury.)

THE COURTROOM DEPUTY: *United States of America against Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta, and Sean Fern, joined by paralegal specialist Liam McNett and FBI Special Agent Christine Meyer.

Good morning.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor. Celia Cohen, Michael Robotti, Kelly Lin, here on behalf of Rachel Cherwitz. And we also have associate Kelly Lenahan-Pfahlert. And we're also joined by paralegal Kamille Simons.

THE COURT: Good morning to all of you.

MS. COHEN: And with us is our client, Rachel Cherwitz.

MS. BONJEAN: Good morning, Your Honor. For Nicole Daedone, Jennifer Bonjean, B-O-N-J-E-A-N, along with attorney Kelsey Killion. I am joined today by paralegals Sophia Moazed and Galila Assefa.

THE COURT: Good morning, everyone. And everyone may be seated. I know the parties handed up a limiting

instruction. I wanted to spend a couple of minutes with that. If the parties have no objection, something can be given after the next break. I wanted to have more than a minute to think about that.

I also understand the Government wanted to raise an issue and asked me to instruct the jury about the fact that you'll all be ignoring them if you see them something along those lines.

MS. GUPTA: Your Honor, this morning one of the jurors stepped in with the team and we all stepped out to avoid being in the elevator with the juror and they looked very perplexed and hurt that we stepped out. If you don't mind just reminding them that we are instructed not to engage with them, meaning everyone here, all the counsel and the defendants.

THE COURT: I think that's fine. I can hear the defendants on that. I can go back to what I told them in the beginning. I can keep it as simple as I told you when the trial started: If the attorneys pass you in the halls without even acknowledging their presence, they're not meaning to be rude. They're doing what they're meant to be doing.

Is the Government fine with that?

MS. GUPTA: Yes, Your Honor.

THE COURT: Does the defense have any issue with that?

MS. COHEN: No, Your Honor.

MS. BONJEAN: That's fine, Your Honor.

THE COURT: As for the electronic devices, I had originally said that any attorney who wanted to bring in devices would have to sit at counsel table and file a notice of appearance, but it sounds like there's a reason why you don't think that makes sense; is that right?

MR. ROBOTTI: Your Honor, in terms of counsel table, we have everyone sitting in the back here. The notice of appearance many get on the docket today.

THE COURT: That will be helpful. And people are only allowed to have their electronic devices while they're in the court at counsel table and I know that wasn't in your proposed order. I'm not sure if --

MR. ROBOTTI: We're happy to revise it.

THE COURT: Maybe have the notice of appearance files and then you can revise your letter.

MR. ROBOTTI: No problem.

THE COURT: There's a couple of smaller issues that I want to take up with the parties, but I want to take it up later in the day, sort of just next steps on a few things including things like request to charge, but I don't want to waste the jury's time now. Let's not put the witness on yet.

MS. COHEN: I wanted to tell Your Honor, to make things a little smoother I know there's going to be several

documents that you have and the Government has to refresh. I put them upside up down so that I don't have to --

THE COURT: Perfect.

MS. GUPTA: Your Honor, may I hand your correct a binder for a witness later today?

THE COURT: Sure, because we can use more binders. Thank you.

(Jury enters.)

THE COURT: Good morning, everyone. You may be seated. I apologize. I kept you waiting slightly this morning. I appreciate that the jurors are doing their best to get here on time.

There is one reminder I want to give to you. It's something I said to you when this trial started which was a quite a few days ago, but I want to remind you if the attorneys see you in the hallways and don't acknowledge your presence, they are not meaning to be rude. They're simply doing what they're supposed to be doing. I just wanted to remind you of that.

With that, I think we can bring in the witness, please.

(Witness takes the stand.)

(Continued on the next page.)

**MARGARET PIXLEY**,
called as a witness, having been previously duly sworn, was examined and testified as follows:
CONTINUED CROSS-EXAMINATION
BY MS. COHEN:
Q Good morning, Max. There's some papers up there. We'll refer to them as we go, if you need to refresh your recollection, as well as a computer in case you wanted to look at something. I just wanted to let you know that.
Yesterday when we left off, just to reorient ourselves, we were talking about the Morellino where you moved in June of 2013. I want to go back to the period of time when you started CP6 and when you moved into the Morellino.
A Right.
Q And just so we remember to orient ourselves, so September of 2012 you testified that's when you first heard about OneTaste and then in December of 2012 you went on the winter retreat; right?
A Yes.
Q I'm doing this so we're all on the same page.
And then February 2013 is when you started CP6?
A Yes.
Q So I wanted to focus on February 2013 until June of 2013.
So, when you started in CP6, you were very excited for that class; right?

A Yes.
Q And you posted often to the CP6 group; right?
A I did.
Q And part of the posing you were really getting your feelings out in those posts; right?
A I believe so, yes.
Q I mean the -- your -- we can refresh on some of them, but you took a long -- you posted lengthy posts. Do you remember that?
A I remember I did make posts to that page. I don't remember the specific contents of any of them.
Q Okay. Well, do you remember -- you know, as soon as you started, you -- you posted, so this would be February 24, 2013 -- so, that's at the beginning of CP6; right?
A Yes.
Q And you posted about wanting to go -- how the class was already getting you to go involuntary. Do you remember talking about that?
A Not specifically, but I assume there's some document I will see at some point that will refresh my memory.
Q Sure. Let me see if I can ask some more before you see a document.
You had before in your life felt inside a pressure to be good all the time?
A That's correct.

Q And in the CP6 program right from the beginning you felt that it was allowing you now realizing that you don't have to try to be good all the time. Do you remember that?
A That sounds right.
Q And you, in fact, recognized some desires that were hidden in you. Do you remember that?
A None specifically, but that was a period of my life where that was happening for me. That's true.
Q And you had -- your main kinky desire that had come up from the beginning of the program was to have a daddy, you said, and --
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Relevance.
THE COURT: Sustained.
BY MS. COHEN:
Q You wanted. You felt that you shouldn't be keeping yourself down anymore. Do you remember that?
A Keeping myself down, I'm not sure how to interpret that.
Q Well, why don't you take a look, just to refresh, DX-13-O which is the first document.
A I did post this.
Q Was it your recollection that you weren't able to keep yourself down, you said. Do you remember that?
A Yes.

Q And that, as a result of the class that you popped through, you called it, the sound barrier, right, and that you didn't have to try to be good anymore?
A Yes.
Q And that was, as we said, February -- the beginning of your CP6 class and you also posted at that time a couple of days later, if you remember this, about how you wanted to be an art historian. Do you remember that?
A Not specifically, but I remember a time in my life when I wanted to be that, yes.
Q And do you remember equating that to being a coach?
A I don't remember that specifically. I'm sorry.
Q Okay. So take a look at the next document, DX-13-P, as in Peter.
A (Reviewing.)
This does refresh my memory and this is a post from me.
Q And is it fair to say that you describing an art historian as -- as something that, you appreciate beautiful things?
MS. BENSING: Objection, relevance.
THE COURT: Sustained.
BY MS. COHEN:
Q Do you recall or does this refresh your recollection that being a coach gave you the ability to put your attention on

people and see the best in them. Do you remember that?
A I do remember that.
Q And you felt at the time that the best part of coaching was that you believed radiating your attention in this way was incredibly valuable; right?
A I believe -- I believe that and I believed that at the time.
Q And it was something that you could do to make a living; correct?
A Yes.
Q And that was your goal at the time; right?
A And that's why I was in the coaching program, with the goal to become a coach.
Q You described on direct examination a breakup with a boyfriend at the beginning of your time at OneTaste.

That was while you were still living in San Francisco; right?
A Correct.
Q And that was when you first started CP6 or -- do you remember?
A I don't remember at what time.
Q And -- but no one specifically -- no one forced you to break up with your boyfriend; right?
A That's correct.
Q And unless you're talking about something else, you may

have posted about this breakup. Do you remember that?
A I don't remember, but I would not be surprised if I posted about it.
Q Okay. Well take a look at DX-13-Q. Let me know when you've had a chance to look at that.
A (Reviewing.)
This is not the break up I was referring to on my direct examination.
Q Okay. So after you broke up with that person, this is another individual?
A This was somebody else I dated briefly around that same time. This is not the person I was referring to.
Q Does this refresh your recollection that that individual proposed to you?
MS. BENSING: Objection, relevance.
THE COURT: Sustained.
BY MS. COHEN:
Q And does it refresh your recollection that, in fact, you -- you didn't want -- you, yourself, didn't want to be in a relationship with someone; right?
A Definitely not with this person. We weren't really even together and he was really obsessive and I don't remember posing this he and I were not together for a long period of time and I think he was moving way too fast for me and it wasn't like a true -- like, I wouldn't even have said that I

was truly in a relationship with the person I'm talking about in this post.
Q But fair to say you didn't want to deal with all of that relationship stuff, you discussed this in this post; correct?
A In this post I talk about not wanting to be in a relationship with that person, that's correct.
Q And you actually said you just want to just cut loose and fuck somebody else, right?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MS. COHEN:
Q Fair to say, you were in the post explaining and exploring your feelings; correct?
A Yes, I'm posting about my feelings.
Q Okay. Now, you also as you went on here -- that was March 1st.
On March 3rd, do you remember you posted about how you told everyone in your life about OM? Do you remember that?
A Not specifically, but, again, I would not be surprised if I posted about that.
Q Okay. So take a look at DX-13-R.
A (Reviewing.)
This is just about everyone in my life; not everyone. I remember this now.

Q And at the time you were still working at your old job at the chiropractic clinic; right?
A I believe so. This is from March of 2013. I believe I was still working there at the time.
Q And it refreshes your recollection that you told your coworkers about OMing; right?
A Yes.
Q You told your boss about OMing?
A I do say that in this post. I don't recall actually talking to her about clitoral stroking and that I wanted to become a coach and go to New York for that.
Q And you indicated that just about everyone in your life knew about OM, right?
A Yes.
Q And that included your family figures; right?
A Yes.
Q Your friends; right?
A Yes.
Q And you, in fact, posted about this not only on CP6 but on Facebook; right?
A Yes.
Q And, in fact -- so that was March 3rd and then two days later, you also posted about how the fact -- posted about the fact that you weren't at OneTaste for the sex, right? Do you remember that?

A I don't, but that rings true to me that I was not at OneTaste for the sex.
Q Right. In fact, we talked about how OMing was more meditative than sex; right?
A Yes.
Q And, in fact, sex really had nothing to do with it?
A Sex had nothing to do with -- well, OMing I view as a sexual practice, but it's also an attention and spirituality generating practice and I did at that time hold it as separate from sex, which would not be in such a strict container.
Like, the 15 minutes of kind of this ritual of OMing or what the practice was defined to be was something that was a little more contained than, like, just a sexual act.
Q And do you remember in the posts at this time talking about how important it was to realize that although sex may sell, that's not what we're offering. Do you remember that?
A Again, I don't remember the specific posts but that sounds -- that sounds like my beliefs at the time and sounds like something that I would have said at the time.
Q Okay. All right, so, turning -- and turning to -- we were just talking about how it wasn't sex to you. In fact, in the end of March you also talked in a post about how everybody except you were sleeping with everybody. Do you remember that?
A I don't remember posting about it, but I remember feeling

that sentiment at the time.
Q And that's -- I mean, a lot of these -- you weren't living with people at that time, but other people in CP6 were living together; right?
A Right. I was not living in an OM community at that time and other people were more enmeshed or further in in the organization than I was.
Q And in the end of March, you posted about on how that made you feel like in a way an outsider, right?
A Yes -- or, I don't remember the post, but I felt like that at the time.
Q And you had -- you had, I don't know if it was a friend or somebody in the program, Margaret Rushing. Do you remember her?
A Yes. Margaret was somebody I knew from the Sister Goddess community who later became involved in OneTaste.
Q And Margaret at the time was having a relationship with someone named Ryan; is that --
A I don't remember that.
Q Do you remember talking about how normally you would feel jealousy, but you were also trying to be mutually loved -- loved Margaret and wanted to support her. Do you remember that?

MS. BENSING: Objection, relevance.

THE COURT: Overruled.

A I don't remember that, but I do really love Margaret Rushing and I want her to be happy and I believe I wanted that at the time.
Q And that's what you felt at the time, right?
A Yes.
Q And then in April, so now we're -- you've been in a month and a half at this point, right, April 6th, you also posted about sneaking over for impromptu OMs at 1080.
Do you remember that?
A Not specifically, but that -- I would go to OM at 1080 and at that time the person that I actually had been dating was living in South of Market in San Francisco which was a walking distance from 1080. So sometimes I would go over to 1080 to do OM practice.
Q And did you -- do you remember though at that time talking about how much you needed to OM and how much you wanted to OM?
A I'm sure that I talked about that at that time. That was true for me that I was getting into my practice. I really loved the practice. I liked what I was experiencing through my practice at that time and I was committed to try to get more practice and I would seek out OMs at that time.
THE COURT: Ms. Cohen, just give Ms. Bonjean a minute to take care of something. Just give another second.
You may continue.

BY MS. COHEN:
Q In mid-April, do you remember applying for a gallery internship at the Center For Sex and Culture?
A I do remember that.
Q In fact, you updated your resume' to include references to OM, do you remember that?
A I had forgotten about that, but that sounds correct.
Q And, in fact, you felt that at the time that was living in the light, right; that talking about OM and telling other people and putting it on your resume', you described that as living in the light, right?
A I don't remember the specific words I used, but I felt that I was coming out with my OM practice at that time and not being in the closet with it. So that sounds like an accurate reflection of how I felt at the time.
Q Because that was a big part of OneTaste at the time; everything was out and open in the light, it wasn't hidden anywhere. There was no hiding OM, right?
MS. BENSING: Objection to the form.
THE COURT: Sustained.
BY MS. COHEN:
Q No one was telling you to hide your feelings about OM; right?
A That's right. No one told me to hide that I was an OM practitioner.

Q In fact, you were encouraged to spread word about OM; right?
A Especially for someone who wanted to become a coach and do this professionally, I think you needed to have a level of openness about it and I was in the coaching program at this point with the goal of becoming a coach and being more public about my experience at OneTaste and talking to people about it was part of, like, how I was putting myself out there to hopefully have clients and be someone who worked professionally for OneTaste.
Q And a little later in that month you actually wanted to find someone to cohost a casual event for OMers. Do you remember that?
A Not specifically.
Q You wanted to do it for OMers who were into kink and BDSM; do you remember THAT?
A That would have been something I would have been interested in and if you can refresh my memory.
Q Sure. DX-13-AD, as in dog.
(Exhibit published to the witness, counsel and the Court.)
A (Reviewing.)
I remember this.
Q Okay. And, in fact, you wanted to -- to open this kink BDSM event, to open it up to the community, right?

A It reads to me, and I believe my intention at the time, was to make an OM event for people who also had interest in the kink community.
Q So, that's April. Now, in June, as we said, you then moved into the Morellino and you continued to post; correct?
A Yes.
Q And in June 20th, you actually -- you posted about all of people that are struggling in their lives in all different ways and how for them, for the struggles in life, you choose this path. Do you remember posting about that?
A I don't specifically remember. I'm sorry, I'm not trying to be difficult, but I don't specifically remember any of these.
Q Okay. Can you take a look at DX-13-AF, as in Frank?
A (Reviewing.)
I remember this.
Q As soon as you're done.
A Go ahead.
Q So in that post -- actually, in your words what were you trying to convey in that post?
A I think it's a little bit of a -- it's a little bit of a poetic post for me. It's kind of -- it's a little bit of a word dump, but I felt inspired at the time about my involvement in OneTaste and I'm not really sure what I was trying to convey here, but it's kind of like there's room for

a lot of people. A lot of different kinds of people could find a benefit through the OM practice.
Q And even those that you felt who, were, like what you called the lost cause, right, you included people like that; right?
A I did.
Q And that's for you, for them, and you also said for us, meaning I guess the community; is that fair?
A Yes.
Q And that you choose this path. Do you remember saying that?
A I do.
Q And in July, again we're now still at the Morellino. In July 13th, do you remember you were now halfway through CP6 at this point; right?
A Yes.
Q And you remember posting that you were living the life of your dreams. Do you remember that?
A No, but it probably happened.
Q So, take a look at DX-13-AH.
A (Reviewing.)
I remember this post.
Q Okay. And so, in fact, you did say you were living the life of your dreams at the time; right?
A I say that in this post.

Q And you were also at the time full of awe and gratitude so much that your heart was bursting; right?
A Yes.
Q And you felt at the time that you were surrounded by friends who were way seekers and world changers; right?
A Yes.
Q And that they loved you unapologetically despite their ability to see straight through your core; right?
A Yes.
Q And that's how you felt at the time; right?
A Yes.
Q And, in fact, you felt so much this way that you actually put this same post on the regular Facebook -- your regular Facebook as well. Do you remember that?
A I don't, but --
Q Well, take a look at DX-13-AN. Let me know if you recognize this as the same --
A Yes. This is the same post on my main page.
Q On your main Facebook page?
A Yes.
Q Once again telling everyone that you were living the life of your dreams; right?
A Yes.
Q And in August 8th you reiterated this fact when you were going to the OMX event. Do you remember that?

A I do.
Q And you brought a friend with you to the OMX event; right?
A Yes. My best friend from San Francisco who I had been living with before I moved to New York.
Q And your best friend that wasn't involved in OneTaste; right?
A Correct.
Q And in this post you -- you talked about how you were packing your bags for OMX; right?
A Yes. Am I allowed to look at it?
Q Yes.
A Yes, I say this in this post.
Q And, in fact, once again you reiterated that you have the greatest life; right?
A Yes.
Q And you didn't just say that; in fact, you emphasized each word with a period, right: The. Greatest. Life. Do you remember posing that?
A This is a post from me that says that. I would like to include that at that time working for OneTaste --
Q I just asked you if you had written that at that time.
A Yes, I did.
Q And those were your feelings that you posted on your regular Facebook page at that time; correct?

A Correct.
Q Okay. Now let's go back now a little bit and talk about when you started working for OneTaste and that was -- well, when you first moved to New York City you were -- you were volunteering at the beginning; right?
A My understanding was that I was working for OneTaste.
Q Well, in fact, when you first met with the Government, you told them that you first were a volunteer. Do you remember that?
A Yes, please.
MS. COHEN: So I'm going to walk up, Your Honor, to the witness.
THE COURT: Yes.
(Counsel approaches.)
Q MPI-1 --
THE COURT: Excuse me?
MS. COHEN: 3500-MPI-1 and I'm just going to focus on the second page, third paragraph, second sentence.
A In the sense that I wasn't getting paid when I first moved to New York I was volunteering at these events.
Q Okay. So you -- you packed up all of your stuff and moved across the country at this point, right?
A Yes.
Q And you didn't have any employment agreement in hand; right?

A That's right. It was a verbal agreement.
Q And you had -- this was not your first job; right?
A No.
Q In fact, we already talked that you worked at the chiropractic clinic?
A That's right.
Q And even though you were only a recent graduate, you actually had jobs since you were fourteen; right?
A That's right.
Q And despite not, I guess you would say, ironing things out, you moved across the country to move into the Morellino, right?
A Yes.
Q And you told the Government at the time that -- you are saying now, but you did tell the Government at the time that you were volunteering at the beginning?
A That's what's written here, yeah.
Q And after a brief period of time Rachel, offered you a job and you began working; right?
A Yes.
Q And you also said that you weren't getting paid at first when you started working, right?
A That's right.
Q And you know that Rachel is not the one at the company that determines who gets paid, you know that; right?

A I knew she wasn't the one that could put me on payroll.
Q Right. And that was Rob Kandell; correct?
A I didn't know that -- well, I had worked with Yia to get put on staff officially sign the documents when Yia came to New York and I had understood that Henry Debusmann in San Francisco was involved in getting me on-boarded as well. I didn't know if Rob Kandell was ultimately responsible for that.
Q But it was someone other than Rachel that actually had to get the employment agreement for you; right?
A Right. Rachel was in sales. It wasn't her job to do the hiring job for new employees.
Q But Rachel really liked you; right?
A I don't know if that's true or not.
Q And Rachel, in fact, was helpful in making sure that you got paid, right?
A I don't recall Rachel helping me in that regard.
Q You were -- okay.
So, eventually you received a W-2 and you got paid for work; correct?
A Yes.
Q And your work day, you talked about yesterday, started with your OMs; right?
A Those were morning practices. I mean --
Q Right. So those weren't part of the work. That was part

of you're in the Morellino, you want to get into your practice and so OMs were what you did on a daily basis in the morning; right?
A Yes. And all of the employees would always do all of the morning practices together, but I think it's fair to say that our morning practices were not the labor we were doing for the company. It was the work we were putting into ourselves so that we can show up in the way we wanted to show up at work.
Q Right. And that was the whole purpose of living in the Morellino; right?
A Yes.
Q And, again, in a similar way you would then do your fear inventory; right?
A Yes.
Q Again, that's part of the practice for you to achieve your goals; right?
A Yes. It was one of the -- one of the practices we used.
Q And meditation also in the mornings sometimes?
A Yes.
Q And then of course you would have breakfast at some point?
A Yes.
Q And then you would go to Bikram, right?
A Yes.
Q And then after that you would start your work day; right?

A I think that -- yeah, that's fair.
Q Around 11-ish; is that fair?
A It varied day-by-day, but the morning practices did take up quite a bit of -- quite a few hours every morning.
Q And you -- you had -- you described long hours. You know, I assume you had long hours as a -- as a doctor as well; right?
A I do work long hours.
Q And those hours as a doctor don't -- withdrawn.
In the Morellino, as we said, people were -- in addition to OMing in the morning there was a lot of OMing going on; right?
A Yes.
Q It would be -- you could walk in and there would be OMing at any time of the day; correct?
A Yes.
Q And it was regular that people would ask others to OM; correct?
A Yes.
Q And, in fact, it happened every day; right?
A That's correct.
Q And you testified that there was no privacy at the Morellino; right?
A Yes, that's correct.
Q But once again you knew that moving in; correct?

A I knew that.
Q And you could have stayed in San Francisco in your own apartment; right?
A I could have chosen not to move -- well, I could have stayed in San Francisco. I could have made different choices, but I did of my own free will move into the Morellino knowing that there was going to be very little, if no privacy.
Q And your -- your family friends paid for your rent; right?
A In the beginning before I started earning money, but that was uncomfortable because I had told them that I was moving to New York to take this job and then they were like, why do you need us to pay for your rent, aren't you working there and I was like, I am, but I haven't gotten paid yet.
Q But then you got paid and you paid your own rent; right?
A Yes.
Q And, of course, as you said Rachel Cherwitz was your boss; right?
A Yes.
Q And she was a boss of others who lived at the Morellino; right?
A Yes.
Q And you talked about those others yesterday, right?
A Yes.
Q And you also said that Rachel was grooming you, right?

A That's what she told me.
Q And she recognized that you are smart; right?
A I don't know how to answer that question. I don't know that she had that viewpoint with me.
Q She recognized that you were a hard worker?
A I think that's fair to say.
Q You put yourself through college; right?
A I think she knew that about me.
Q And she trusted you right away; right?
A I don't know.
Q Well, yesterday you talked about these e-mails that you would send to her reporting on people in the house. Do you remember that?
A I do.
Q And those e-mails were from -- I think the ones we looked at from early July of 2013; right?
A Yes.
Q And that's just maybe a month after you moved in, around there, into the Morellino?
A Correct.
Q And, in fact, when you sent those e-mails that's when she was away from the Morellino; correct?
A I believe those ones in July. It sounds right to me. There was a period of time right after I moved in that Rachel was not present. I don't remember where she was, but she

might have not been in New York and I was sending her sent her house updates.
Q Yesterday you said she was always traveling around and she wasn't always living in the Morellino?
A That's right.
Q And you testified that you didn't like it because you felt like a snitch; do you remember that?
A I did.
Q But that's not what Rachel was asking you to do, right?
A She was asking me to keep tabs on people in the house and report to her about it.
Q And as the boss, right, it was her job to have a pulse on the house when she was away; right?
A She definitely saw that as -- yeah, it was -- she saw that as her role to always be connected to the house in New York and to know what was going on there.
Q And, as we said yesterday, or sorry as you said yesterday, connection was one of the key tenets of being in the Morellino; right?
A That's correct.
Q Because, again, you were all trying to achieve your goals; right?
A Yes.
Q Or I -- you can't speak for other people. You were trying to achieve your goals; right?

A I was trying to achieve my goals.
Q And Rachel didn't tell you to report any violation of rules, right? That's not what she asked you to do; correct?
A Rules were not really a fixed concept for us.
Q Well, she never said tell me bad things people are doing, right? She never said that?
A She wanted to know -- I was asked to specifically report on times when -- if people were what we were -- the term they used to use was colluding. If people were colluding against OneTaste, that was something she wanted to know.
Q We'll take a look at these.
She was asking you how people were doing; correct?
A I don't know how to answer that question.
Q Sure. Let's take a look. It might be easier. Let's look at another one of these that is not yet in evidence. It's marked at Government Exhibit 2673.
MS. COHEN: Just for the witness and I can bring up a copy. I don't have that one up.
MS. BENSING: I think you may have it, Your Honor.
THE COURT: Thank you.
(Exhibit published to witness only.)

(Continuing...)
BY MS. COHEN:
Q This is Government Exhibit 2673.
Do you recognize this?
A I will do.
Q And what is it?
A I had sent Rachel an e-mail. The first line says "here's the pulse on people in the house."
Q Oh, sorry. Without reading. Just asking if you --
A Sorry. It's an e-mail exchange. It's an e-mail I sent to Rachel, and a reply that I got from her.
Q And was this sent in June of 2013?
A It was.
Q And do you recognize the e-mail address?
A I do.
Q And was that your e-mail address at the time?
A Yes.
Q And do you recognize Rachel's e-mail address?
A I do.
Q And is this e-mail a fair and accurate depiction of the e-mail that was sent on June 28, 2013?
A Yes.
MS. COHEN: Your Honor, at this time, defense offers this exhibit not for the truth of the matter asserted, for the same reasons as the government's similar e-mails from

yesterday, Government Exhibit 2673.

THE COURT: Just give me your basis.

MS. COHEN: Oh. It is not being offered for the truth, but the fact that it was sent, and the effect on the listener.

MS. BENSING: No objection.

THE COURT: Okay. Government Exhibit -- still marked as a government exhibit, correct?

MS. COHEN: Yes. 2673.

THE COURT: Government Exhibit 2673 is admitted.

(Government Exhibit 2673 received in evidence.)

MS. COHEN: If we can post that for the jury as well.

Okay. So, again, yesterday we looked at two from July. So this one is earlier in time, right?

A Correct.

Q And in this post you actually -- you know, you told her this is the pulse on the house, right?

A Yes.

Q And you reported about a party that you guys had thrown, right?

A Yes.

Q You said you came together beautifully today to prepare Joanna's party, and you were right, we expensed a lot more than we generated and that people had fun, right?

A Yes.
Q And that, you know, you wouldn't have as much attention and energy again, if possible. I guess you felt like they would have had fun with all of that -- without that; is that fair?
A We were always being told and asked to cultivate our energy, and it was very important if we were building energy or wasting or spending energy. So something like a birthday party could be a waste of the energy we were generating with our practices, if it was just to be happy birthday to someone and not to, you know, be using our energy for our sales for OneTaste.
Q Okay. But the part of the energy was also a core practice of being at the Morellino, all of that was the practice of OM that you were there for, correct?
A OM was an energy generating practice.
Q Yes.
And you reported in this e-mail as well that people were -- some people were tired, right?
A Yes.
Q You reported on who was feeling good, right?
A Yes.
Q You told her how you missed Becky, right?
A Yes.
Q And that you missed Chris? At the bottom.

A I think I called him Chirp.
Q Chirp. I'm sorry.
A Yeah. I don't remember his real name.
Q I misread that. It may not -- I just misread it.
Chirp, that you missed him, right?
A Yes.
Q And you also FaceTime'd with someone named Joseph, right?
A Yes.
Q And --
A Or he FaceTime'd into the house that morning to talk to Ruben and the other housemates. I don't know that I was talking to him.
Q Okay. But you told her how you missed him, too, right?
A Yes.
Q And, in fact, Rachel responded to you that this information was awesome, right?
A Yes.
Q But that she wanted you -- she wanted you to include -- she wanted to know how you were doing, right?
A She does, yes.
Q Your internal landscape, right?
A Yes.
Q And that was while she was away, correct?
A Yes.
Q And she was trying to increase human connection, right --

A Yes.
Q -- through this?
And because she wanted you to achieve your goals, right?
A As long as my goals were OneTaste's goals, she wanted me to achieve them.
Q Well, human connection, and we can pull back up the Morellino, that's one of the key tenets of the practice, correct?
A Yes.
Q And being away from the house, as someone who's in charge of the people living there, in a way, right, she was asking you to tell her about how everyone was doing, correct?
A Yes. The reporting on people in the house, I believe, did start when Rachel was away, but even at times when she was staying in the house, I was still expected to send reports on members of the team.
Q Okay. Let's take a look at what we saw yesterday. It is already in evidence. 26 -- sorry, Government Exhibit 2676.
So this was from July 11. And, again, these -- you wrote to her about things you were noticing about the team, right?
A Yes.
Q And, again, you were putting your attention on the other people, correct?

A Yes.
Q And, again, that is something that is important for any boss to know how the people who are working for her are doing, correct?
A I can understand the bosses would want to know how their employees were doing, but this level of monitoring and reporting is not something I had experienced in any other workplace in my life.
Q Right. But this is not your average workplace, right? You were also living there as a part of to develop yourselves with the OM practice, correct?
A Yes.
Q And I'm going to just show you one more of these.
MS. COHEN: This is not yet in evidence. Just for the witness, Government Exhibit 2675.
Q And do you recognize -- I can walk up again, if you need a paper copy.
A It just came up.
Q Yes. This one -- oh. You can't see the top though.
MS. COHEN: Can you just first show her the top?
Q This is short.
A Yes.
Q Okay. Do you recognize your e-mail address?
A I do.
Q And you also recognize Rachel Cherwitz' address, who you

sent this to?
A I do.
Q And July 12, 2013?
A Yes. At 12:28 in the morning.
MS. COHEN: Okay. And can you show her the rest of it.
Q Okay. And is this a fair and accurate depiction of the e-mail that you sent to Rachel on July 12, 2013?
A Yes.
MS. COHEN: Your Honor, at this time I move Government Exhibit 2675 into evidence, again, not offered for the truth of the matter asserted, but the fact that this was sent.
MS. BENSING: No objection.
THE COURT: Government Exhibit 2675 is admitted.
(Government Exhibit 2675 received in evidence.)
MS. COHEN: Okay. So we can publish this for the jury.
Q And in this e-mail, Max, you told Rachel that it was a brilliant move with Ruben, right, and that he was noticeably more turned on today, right?
A Yes. That's the opening line.
Q And "turned on" at OneTaste was not used in a sexual way, right?
A It was -- it could be, but it was more often -- it's a

way of saying full of life or full of energy.
Q Right.
A Yeah.
Q And you talked about how whatever apparently was suggested, that it was a good move and that he was more energized and feeling better, correct?
A Yeah. I don't remember what I was referring to, but I say that in this e-mail.
Q Okay. And you also talked about how Joanna was jealous, right?
A Yes.
Q And how you didn't see some people, so you really didn't have information, right?
A Uh-huh. Yes.
Q And you talked about yourself as well, correct? I should say, you talked about Becky and I have been more affectionate, taking good care of one another, right?
A Yes.
Q And that's how you were feeling, right?
A Yes.
Q And you also indicated that Chelsea had been a little foggy for the past few days, but you couldn't put your finger on it, right?
A Yes.
Q And if you were -- at this time, you were halfway through

the coaching program, right? Is that right?
A I believe so.
Q Sorry. In the summer of 2013, right?
A Yes.
Q Yes. July.
And as you said, you were really training to be a coach, right?
A Yes.
Q And that's a leader, right? I mean, really, you're coaching someone and helping them work through whatever your coaching them, correct? I mean, that's what a coach does? Or let me -- what were you training to do as a coach?
A Hold space. Hold space for people in their personal evolution and to support them in their growth.
Q And part of that goal of becoming a coach was really you, yourself, had to learn, right?
A Yes. I think that's a fair assertion. You had to have -- be like living the life, walking the path, having your own experiences in order to guide other people into something similar.
Q Right.
And so part of this, you were learning to be tuned into people's feelings so that you could then help them, correct?
A I think that's the most generous interpretation of what

was happening at the time, and one of the reasons I did report on people in the house was because I believed it was cultivating those skills. I now believe that there was also --

Q I am just asking you at the time.

MS. BENSING: Your Honor, I'd ask that the witness be allowed to finish her answer -- their answer. Excuse me.

THE COURT: Yes, she's allowed to finish, and then you can ask the next question.

A I believe there were other motives in Rachel getting these reports that had to do with power dynamics and keeping -- like keeping tabs on us.

Q And that's your interpretation now, correct?

A Yes.

Q At the time, you were training to become a coach, right?

A Yes.

Q And part of being a coach is to be in tune with other people's feelings, right?

A Yes.

Q Okay. And then yesterday, I am not going to bring it up, but we also looked at one of these from July 13. And that was Defense Exhibit 13-B1. Sorry, 13-BI, which is already in evidence. Do you remember that? And that was the next day? You want to see it quickly?

A Sure.

MS. COHEN: I'm sorry. That's already in evidence. You can show, just for the timing.

And can you blow that up, please.

Q And you testified yesterday about this e-mail with Rachel, which was similar, right?

A Yes.

Q And that was July 13, at 12:50 a.m., right?

A Yes.

Q Okay. And you remember --

MS. COHEN: Let's just pull up what's already in evidence -- sorry. It is not. You have it. Not in evidence.

Q To refresh your recollection, if you need it, but DX 13-AH, where you posted on July 13 that you were living the life of your dreams. You testified about that earlier, right?

A Oh, yes.

Q You can look at the screen.

A Yes.

Q And that post was from that same day, July 13, right?

A Yes. There came a time in the coaching program when we were -- when I was working for OneTaste, we were encouraged to post not only just to the OM hub and generate energy with our posts. And so there was a transition point between when I was kind of posting -- I mean, it was always of my own volition, however, there was a time when part of my duties were like generating energy on these pages with posts.

Q Okay. But we went through many posts earlier today, right? And that was before you were working at OneTaste, correct?
A I believe there were definitely some of them. There were some of them that were before I started working.
Q Well, we looked at ones in February today, right?
A Yes.
Q We looked at ones in March, right?
A Yes.
Q We looked at ones in April, right?
A Yes.
Q And I could pull up more, but it's fair to say you posted a lot before you got to the Morellino and started working, correct?
A That's true.
Q And you looked at those posts today, and I am not going to ask you to recall details, but they were lengthy posts, correct?
A Sure. Yeah. I mean, I don't know what's lengthy. It's not a novel, but --
Q It is --
A It was just -- they were posts. I don't know if you can say they're lengthy.
Q They were more than two sentences, right?
A Sure. Yes.

Q Some of them, in fact, were, I'd say -- fair to say half a page?
A Yes.
Q And you talked about one of them today being kind of poetic; do you remember that?
A Yes.
Q And, in fact, a lot of these were poetic, right?
A Yes, that's my writing style.
Q In fact, you're a very good writer, right?
A I don't know that I would say that about myself.
Q I would.
There's no question.
Just in reading these, you -- and you wrote about your feelings in detail, right?
A I did.
Q And these were personal feelings that nobody else knew except for you, right?
A Yes.
Q And you posted those, right?
A Yes.
Q And you continued to post after you got in the Morellino, right?
A I did.
Q And no one told you to post that you were living the life of your dreams, right?

A No one specifically said post that you're living the life of your dreams. No one told me to write that post.
Q In fact, you wanted everyone to know that not only in CP6, but you posted it on your regular Facebook page that day, correct?
A Yes. It was -- there was also part of trying to show your TurnON and show your -- show that you were having a good time to try to bring more people in as leads.
Q You wrote those words, right?
A I did.
Q On July 13, right?
A Yes. Which is, I guess, the point you are making is that's the same day that this other e-mail happened.
Q Yes.
A Yes.
Q And posted not only on CP6, right?
MS. BENSING: Objection. Asked and answered.
THE COURT: Overruled.
Q You posted on CP6 --
A I did.
Q -- we saw that?
A Yes.
Q And you also posted it on your Facebook page, right?
A Yes. On my main Facebook page, people would see it that perhaps would -- everyone on the CP6 page is already in

OneTaste, and people on my main page might be potential leads that we could sell events to. So I posted it there as well.
Q In fact, lots of people saw your Facebook page, your regular Facebook page, right? I mean, it wasn't just for OneTaste?
A Yeah. Correct.
Q In fact, there was a time that you were at a museum in New York where an individual recognized you, saw you, knew you, and had seen your Facebook post; do you remember that?
A Yes. I think I looked at that. It was a museum in San Francisco, actually, but I think the location is irrelevant in this case.
Q Yes. I'm sorry. Yes. You are right. In San Francisco.
And had seen your post about OMing, correct?
A Yes.
Q And that was back again when you were in San Francisco before you were working for OneTaste, correct?
A Yes.
Q And it's fair to say that throughout this period of time, you loved the OM practice, correct?
A That's correct.
Q And, in fact, you said at one point -- you have said in the past that Rachel had told you to do an OM demo with Hamza at one point; do you remember saying that?
A I do not remember that at all.

Q Okay. So let me come back to that. For some reason I don't have the cite to that.

But let me ask another question about that.

You felt it was prestigious to do an OM demonstration, correct?

A That's correct.

Q And that's -- and then you actually posted on the OM hub, in November of 2013, about the OM demonstration; do you remember that?

A Not specifically, but I'm -- again, I --

Q Let me see if I can refresh you.

A -- have no reason to believe it's not true.

Q Sure.

MS. COHEN: So can we bring up what's been marked just for the witness as Defense Exhibit 13-BP. And go to page 3.

This is very small, so I think it might be more helpful for them to blow up. Go down where it says 7454.

Q Can you just take a look at -- do you recognize your e-mail there?

A I do.

Q And this was an OM post you made?

A Yes.

Q Does this refresh your recollection about telling people that you had a desire to do a demo?

A Yes. Thank you.
Q And that your desire included getting on a massage table, butterflying your legs open, and projecting orgasm into a room of many, many people? Do you remember that?
A Yes.
Q And that's how you felt at the time, right?
A Yes.
Q And OMing, as we said, you didn't get to do a demonstration all the time, but every day, day in, day out, you were OMing on multiples time, right?
A That's right. It was a daily practice for me.
Q And, in fact, at one point when you were in -- I believe it was in Philadelphia, you posted on the OM board asking if anyone wanted to be your OM partner, right?
A Yes. We were -- one of the things we were trying to do is what we call light up Philadelphia as a city. They were struggling to get turn out at their events. So one of the times the people from the New York community went out to Philly to be present at one of their TurnON events. And because I didn't live there and I didn't know anyone there, I was looking for a partner for an OM circle.
Q And that would have been someone you didn't know, correct?
A Correct.
Q Okay. You also testified yesterday when we started, when

I started questioning you, that you weren't sure if -- you said you didn't have any friends at OneTaste; do you remember that?

A I believe I said like precious few, or there were only a few people I truly considered to be my friends there.

Q But you did have friends there, right?

A I had some friends at OneTaste, yes.

Q And you had fun with these friends, correct?

A Yes.

Q And you had fun with Becky?

A Becky and I had a bit of a tenuous relationship, a little bit of a rivalry. I think most of our relationship was -- I don't know that I would really characterize it as fun. But I made an effort to try to get to know her and to bond with her.

Q Okay. Well, let me --

MS. COHEN: Your Honor, at this time, this is the only video I am going ask, and you both have a computer there. If someone can just --

THE COURT: I don't. Okay.

MS. COHEN: Your Honor --

THE COURT: I do now.

MS. COHEN: -- you've seen this.

THE COURT: I have seen it? I don't need to see it again. Now I know what you are talking about.

MS. COHEN: Yes. And it's about 30 seconds.

THE COURT: Perfect. Go ahead.

THE WITNESS: Can I watch it?

MS. COHEN: Yes.

THE COURT: Someone can just set it up for the witness.

MS. COHEN: This is Defense Exhibit 21-CX.

(Witness reviews video.)

A I remember this.

Q Do you recognize yourself in the video?

A Yes. That's me.

Q And you recognize anyone else in it?

A Becky. It's a video of Becky and I singing a song together.

Q And is it a fair and accurate depiction of the video that you took?

A Yes.

MS. COHEN: Your Honor, at this time I offer Defense Exhibit 21-CX. I offer this to show the witness' state of mind at the time. There is no -- there are no words other than the singing of a song of lyrics. So there are no additional words.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 21-CX, which is a video, is admitted.

(Defense Exhibit 21-CX received in evidence.)

MS. COHEN: At this time we ask that you play the video. We just need one moment.

THE COURT: Sure.

MS. COHEN: We can publish it to the jury at a later --

THE COURT: You can take a minute, if you want to do it now.

MS. COHEN: Okay. I was going to say maybe turn the screen off until she gets it up.

THE COURT: Okay.

MS. COHEN: Just in case there's information there.

(Video played.)

BY MS. COHEN:

Q At least in that instance you were having fun with Becky, right?

A Yes.

Q And that was something that was posted in early August 2013, right?

A That sounds correct.

Q And this was at the time you were going to OMX, right? Around there?

A That's likely the case.

Q I can refresh you.

13-AQ, we looked at before. And you testified that that's where you posted the greatest life when you were

packing your bags up? We will bring it up.
A You said the video was posted in August?
Q Yes. I can bring it back up.
A It is okay.
Q I think the date was August 3. And then this DX 13-AQ. And this was posted August 8?
A Okay, yes.
Q So that was around that time, correct?
A Yes.
Q And showing you what has been marked for identification as DX 13-BA. This will appear on your screen. It is a photo.
THE COURT: BA, you said?
MS. COHEN: "B" as in "boy," "A" as in "apple."
Q Do you recognize this photo?
A I do.
Q Do you recognize yourself in it?
A Yes. I'm hard to see in it, but I'm in the very back.
Q You are in the back. Yes.
And do you recognize others in it?
A I recognize Becky and Peter and Michelle Wright, and I think that's the guy we used to call Chirp, and someone whose name I don't know.
Q And this is from September 2, 2013; is that right?
A Yes.
Q Is it a fair and accurate depiction of the photograph you

have seen before?
A Yes.
MS. COHEN: Your Honor, we are going to offer this when we redact the information that is on the -- the words on the side.
THE COURT: So you are just offering the picture?
MS. COHEN: We're just offering the picture at DX 13-AQ, and we will redact that now for the jury --
THE COURT: Wait. I'm sorry.
MS. COHEN: I'm sorry. I misread it.
THE COURT: BA, right?
MS. COHEN: BA, yes.
THE COURT: But it looks like there's still some text there that's not redacted.
MS. COHEN: Yes. If you can redact all that.
And we will supply the Court with a redacted --
THE COURT: Okay. So you are offering Defense Exhibit 13-BA, only the photograph.
MS. COHEN: Correct, Your Honor.
THE COURT: Any objection?
MS. BENSING: No.
THE COURT: Defense Exhibit 13-BA, only the photograph, is admitted.
(Defense Exhibit 13-BA, only the photograph, received in evidence.)

MS. COHEN: We can publish that. If you can just blow it up so the jury can see.

Maybe -- well, I guess, turn down the lights a little just for the moment. Sorry. We can see better.

Q Okay. And certainly the picture up there, it's better on the screens, right, but you're the one in the back, right?

A Yes. I am the one in the back on the left.

Q And any recollection of where you were going at this point?

A I don't recall. We're in the car doing some sort of OneTaste something.

Q Okay. And that was September 2, and then after in September -- around September 2013, you also testified how you went and helped out at CP7, right?

A Yes.

MS. COHEN: And you can keep the lights down for this because I'll need it.

We can take this one down, and can we show just to the witness, DX 13-K, as in "kite."

A This is a post I did to my main Facebook page.

THE COURT: Sorry. 13-K?

MS. COHEN: I can hand one up.

THE COURT: The description is different. That's fine. Go ahead.

MS. COHEN: Okay.

THE COURT: The description on your list was different.

MS. COHEN: Oh.

THE COURT: This is just a photograph with some text at the top, correct?

MS. COHEN: Yes, Your Honor.

THE COURT: Okay. Go ahead.

Q This was a post that you made, correct?

A Correct.

Q And is this a fair and accurate depiction of both the photo and the post from September 11, 2013?

A It is.

Q And you recognize yourself as having made that post?

A Yes.

MS. COHEN: Your Honor, at this time we offer Defense Exhibit 13-K into evidence, both the photograph and the text, not -- to show this witness' state of mind at the time.

MS. BENSING: No objection. If the Court was ready for me.

THE COURT: Yes. Defense Exhibit 13-K is admitted.

(Defense Exhibit 13-K received in evidence.)

MS. COHEN: If you can just publish that for the jury. Thank you.

Q And in this post -- you posted this on your regular

Facebook page, correct?
A Correct.
Q And this was when it looks like --
A Yeah.
Q And you say, and it looks like you are on your way to San Francisco at that time, right?
A Yes. This is a photo from my -- I took it in the airplane.
Q Okay. And you described it as when work is play, right?
A Yes.
MS. COHEN: Okay. You can take that down.
Q And you talked yesterday -- you testified yesterday about there were certain times that you didn't want to OM, right?
A Yes.
Q And sometimes that could just be you're not in the mood, right?
A Yes.
Q No different than if whatever passions you have, sometimes you're not in the mood for those, correct?
A Correct.
Q And you already testified you OM'd with people you didn't know a lot, that was typical, right?
A That was typical.
Q And you testified about a man named Jim Kwik, who Rachel brought over to the Morellino, right?

A Yes.
Q And you testified that Rachel asked you to OM, correct?
A Rachel told me that I would be the strokee in his first OM.
Q And you didn't tell her no, that you wouldn't do it, right?
A I did not tell her no.
Q So you didn't -- and you're telling us now you didn't want to, but you didn't express that, correct?
A I did not express that at time.
Q And you testified that you did this because it was what everyone was doing, right?
A Yes.
Q And you also testified that OneTaste pushed your boundaries to help your practice, correct?
A Correct.
Q And after all, you were living in the Morellino to get those boundaries pushed, right?
A Yeah. To grow, and at the time pushing my boundaries was part of how I thought my growth was happening.
Q And at one point you had previously -- in fact, you told the government this before, I believe you testified to it as well, that what would happen if you didn't do this. You said you weren't sure what would happen, right? Do you remember that?

A Yeah. I do remember -- I still feel that way. Like I don't know what would have happened, if I said no.
Q And you suggested that you would at least get extra hard feedback if you didn't want to do it, right?
A Yes.
Q You also said that Eli came -- Eli Block came in at one point to do a male OM with you. You said that yesterday, right?
A Yes. Rachel Cherwitz directed Eli and myself to have a male OM.
Q But, actually, Rachel never told you to OM with him, you just assumed that, right?
A I believe she told me that I was going to stroke Eli.
Q Okay. Well, you told the government about this incident on two different times when you met with them; do you remember that?
A Yes. It has been years, so, yeah.
Q And I can refresh your recollection, if you need it. You told them about it in August of 2018, right?
A Yes.
Q And in that time, you did not say that Rachel told you to do this; do you remember that?
A No. I don't remember that, to be honest.
Q Well, I will show you in a second, but you also talked about this with the government at another time, and you did

not tell them that Rachel told you that you had to OM with him. Do you want me to show you those two times?
A That would be helpful. Thank you.
MS. COHEN: So MPI-1 --
THE COURT: 3500, you mean?
MS. COHEN: Sorry. 3500-MPI-1 and 3500-MPI-22.
Q Max, you already have the first one. So for the first one, it would be page 6, and for the second one, which I will bring up -- sorry. Just lost my place. It is at page 6.
A Okay. I read the first one, let me take a look at the second one.
Okay. Go ahead.
Q Okay. And you never told the government before that Rachel told you to OM with Eli, correct?
A It doesn't say that in this document. And I will just -- I am happy to admit that a lot of this happened a long time ago and my memory of the time is not perfect.
Q And, in fact, that's true, because when you first met with the government, you said that Eli told you you were going to do this, but then the second time you said that you couldn't recall if it was a male or female OM, right?
A Yes. I had forgotten that I had -- I had like blocked it out of my memory that I stroked Eli. And then when they were like, wait, they like prompted me -- or I don't want to say prompted. But they were like, I had essentially forgotten by

the next time I talked to them that that experience had even happened. And then when I noticed that they were surprised by what I was saying, it triggered a memory for me that I had kind of pushed down and then I did recall after that point that it had been a male OM. I had completely forgotten for a period of time that like I had even stroked Eli.

Q Okay. So you're saying the government prompted you, is that what you're saying?

A No. I did say that word, but I think that's an unfair representation. It was more that they were asking about that experience, and because they were asking me about it, it made me reflect more on it and reflect more on this period of time that I had kind of like forgotten or not like -- a lot of this stuff is stuff I put very -- like I was trying to put it behind me. I don't have a -- like remembering details from this long ago is, I think, difficult for like imperfect human memory.

Q But in 2018 it prompted you, you talked about male OM in 2018, that it was a male OM, right?

A Yes. And I recall now that that experience did happen, and it was a male OM.

Q Even though you also told them that you weren't sure if it was a male OM or female OM, right?

A I think I had just forgotten that it happened, and so I was like -- there weren't a lot of male OMs that I did, so I

had just forgotten that it happened, and I assumed we were talking about a time when Eli was stroking me. Because that was much more common that I would be the strokee, and I had just forgotten about the instance in which I stroked him.

Q Okay. And you and Eli were also in the Mastery class together, right?

A I was in the Mastery class. I don't recall if he was a student in that class.

Q Okay. And that's where male OM was introduced in the Mastery class, right?

A It was something I knew about before then, but that was one of the things that did get covered in the Mastery class.

Q And that was a more intense class, Mastery class, right?

A All of the classes in were intense.

Q Yeah. I should have clarified. More intense in terms of sexual -- learning about different sexual acts. Male OM, it's more about sex, you would say, than the coaching program?

MS. BENSING: Objection to the form of the question.

THE COURT: Sustained.

Q Well, you testified yesterday that the mastery class had more sex focus?

A That's true. It was applying the principles of OM to different sexual acts.

Q And that was the last class that you signed up for, right?

A Correct. OMX happened in the middle of it, but that was the last like multiple months-long -- OMX was a weekend. So that was like the last months-long course that I took at OneTaste.

Q And getting back to the Eli point, is that you also told the government you didn't -- you did it, you participated in the OM with Eli because you didn't want to cause trouble, right?

A That's fair. Yeah. That's correct.

Q Because OMing was what you did day in and day out, right?

A Usually with me, as the strokee. But, yeah, it was part -- it was a practice of mine.

Q And, in fact, the Mastery class, you continued to take that class after you left OneTaste, right?

A Yes.

Q And, in fact, the Mastery class also had a strict policy around STI testing, right?

A Yes.

Q And that's sexually transmitted --

A Infection.

Q Infection. Thank you.

And during your Mastery class, because people didn't bring their tests with them, they weren't allowed to engage in that in person, correct?

A Myself and many of the other members who lived at the

Morellino went and got tested and came with our documents, but there were multiple people who -- they never actually asked us to provide those documents. And so at some point we were told because people didn't have them with them, that we wouldn't be doing any of those things in class.

Q All right. They made sure of that at that point, right?

A Yes.

Q You also -- well, it's fair to say there were a lot of hookups at OneTaste, at the Morellino, right?

MS. BENSING: Objection.

THE COURT: Sustained. You can ask another question on this topic.

MS. COHEN: Sure.

Q You were living in the Morellino when most people were in their 20s, right?

A I don't know. I was in my 20s. I don't know.

Q Most people were young?

A Most people were young.

Q Right.

Everyone was single, right?

A I don't think that's true.

Q No one was married? Sorry.

A I don't know everyone's -- a lot of people came and went. Some people had been -- some people who came and went had been divorced, or I don't know the relationship status of everyone

who came through.
Q Well, you posted about how everyone was sleeping with everyone else, right?
A Yes.
Q And OM, as you describe, is a meditative practice, correct?
A Yes.
Q But it was a meditative practice that would help with sexuality, right?
A Yes.
Q And so in some ways sex was a part of everyday life because part of the practice was to help individuals with their sexuality, correct?
A Can you restate the question?
Q Yes.
Part of OM, the meditative practice, was to help, you testified before -- you can take this down -- as to people's sexuality?
A I think what people were having was widely seen as like -- people were exploring their sexuality at OneTaste.
Q Yes.
And you testified that sort of the breaking point for you was this incident where you said Rachel told Ruwan and Becky to go have sex; that was your testimony, right?
A That's correct.

Q And you testified that Rachel had, in fact, been -- was upset at the time, that that incident, upset with behavior; is that right?
A She was upset that we weren't earning enough money.
Q Well, you testified that there was a lot of tumescence on the team?
A She attributed the tumescence on the team as the reason that we were not making enough money at the time.
Q And you testified that people weren't being effective, right?
A That was what she communicated, was that we were to blame for the lack of sales.
Q And, in fact, the reason this upset you is because Chelsea was in a relationship with Ruwan, right?
A That was one of the upsetting aspects of it.
Q And Chelsea and Becky, they were actually pretty close friends, right?
A Correct.
Q And, in fact, that Becky had been with Ruwan before this, correct?
A I don't know. I don't believe they had ever had -- like my understanding at the time was that they had not had penetrative penis and vagina sex.
Q And you actually don't know what they did at this time, right? You testified that Rachel said go have sex, and they

went away, right?
A That's right. I didn't like -- they -- yes.
Q You didn't observe anything, correct?
A I didn't observe them having sex.
Q Right.
You're making that assumption, correct?
A They told us when they came back to the circle we were sitting in.
Q You didn't observe them?
A I did not observe them having sex.
Q And, once again, you told the government before that if you didn't do something that Rachel wanted, you might get hard feedback, right?
A Yes.
Q And that's because she was a tough boss, right?
A Yeah.
Q And you said that she was hard on people, right?
A She was.
Q And she was trying to get sales, correct?
A Correct.
Q Okay. Now, you also, when we were talking about going into the Morellino and trying to push your boundaries, right, it sounds like there came a time that you realized that really wasn't good for you at the time, to push those boundaries, right?

A That's true.
Q And OneTaste was also a source of reflection, as we've seen in these posts, right, for you to reflect on things that you wanted to work on, correct?
A There was a lot of self-reflection that happened during that time.
Q And you testified yesterday that in October of 2013, you were really -- that's when you really started to have a tough time at OneTaste, right?
A I think there were tough times throughout. It just became more and more of my experience, the deeper I got in.
Q Okay. Well, you testified -- the reason I am saying October, we saw a picture from Halloween, and you talked about how you cut your hair, right?
A Yes. I was definitely struggling in October of 2013.
Q And, actually, in October of 2013, you also posted about you reflected on old behavior of your own prior to coming to OneTaste; do you remember that post?
A I don't.
Q And, once again, in these posts you were opening yourself up to tell people what was going on with you, right?
A Yes.
Q And on October 7, 2013, do you remember talking about how you used to, before OneTaste, you used to cut yourself? Do you remember that?

MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Relevance.
THE COURT: Sustained.
Q Without getting into details, though, you posted about things that were -- you had -- you testified already about circumstances in your life before OneTaste, right?
A That's right. I had a very hard childhood.
Q Right.
And do you remember at least posting reflecting about things in your life before and how OneTaste helped you to move on from -- or to see things in a different light? Do you remember that?
A Not specifically. But, again, I'm certain that I made posts of that nature during my time at OneTaste. I was often having reflections of that nature.
Q All right. Now, you also testified about getting -- about Rachel failing you guys in CP6?
A Yes.
Q Do you remember that? Right?
And, in fact, Rachel was mad at the class, right?
A Yes.
Q And that was because the class had been pushing back a lot on the sales part that she was in charge of, right?
A I don't have a perfect memory of the circumstances around

that, but I -- yeah. Go ahead.
Q Yeah.
And, in fact, she failed the class for not doing what was supposed to be having done in the sales class, right?
A Yes.
Q And she was the instructor of that class, correct?
A Yeah. As the head of sales for the company, she was the one responsible for the sales teaching throughout the coaching program, and the one who ultimately was going to determine if we were competent or not in sales to pass.
Q Correct.
And then after she failed, she ended up passing everybody on the sales part, subsequently, correct?
A That's not my understanding.
Q You finished the CP6 program, correct?
A But we were not certified coaches. We could not be certified coaches until we had passed the sales portion of the exam, so.
Q And you have no recollection that she ended up passing everybody in the class?
A No. That's not my understanding at all.
Q Okay. Well, we'll see if I can refresh. Let me move along.
Okay. And, finally, you became Rachel's assistant in maybe September of 2013, around there? Does that sound

familiar?
A Yes.
Q And, again, Rachel wanted you to become her assistant, right?
A She directed that. Yes.
Q And, in fact, as part of her assistant, she gave you full access to her calendar, right?
A Yes. I had access to her calendar.
Q You had all of her e-mails, right?
A I don't recall.
Q You helped her with her comings and goings, right? You planned it?
A Yes.
Q And Rachel wasn't -- as her assistant, she wasn't hiding anything from you, right?
A I assumed there were always parts of Rachel that were private and not known to me.
Q Well, yes. I should say, in terms of her electronic communications, she wasn't hiding anything from you, right?
A I did have full access to her calendar, I remember that. I could -- because I needed to be able to book sales calls for her. And so I would be able to create events, like create a reminder or event where she would have a sales call. That's how I would schedule her for these sales conversations.
Q So you don't remember on September 18 -- do you remember

a conversation with Marcus Ratnathicam?
A I think Marcus was helping me get access to her Google calendar so that I could make those -- create those events.
Q Yes.
A So that she could, you know, just have the Zoom link, have what she needed to log on, and talk to the client at the time she needed to meet with them.
Q You also requested access to her e-mail; do you remember that? I can refresh, if you don't.
A I don't. I certainly never like read through all of her e-mails.
Q Okay. But let me just show you what has been marked for identification as DX 13-J.
MS. COHEN: Just for the witness. If you can go to page Bates marked 3644 at the bottom.
Q Read that, and we will go to the next page.
A Sorry. Can you make it larger?
Q Yes. Mark it larger. Thank you.
A Okay. Yes.
Q And then go to the next page.
MS. COHEN: Can you -- just the top part. The top two. Zoom.
A Yes.
Q And does this refresh your recollection that, in fact, Rachel gave you her full log-in details for her e-mail?

A This does refresh my recollection.
Q Okay. And in November of 2013, you resigned from OneTaste, right?
A I believe I got in the train in early -- I know that I was traveling -- I think I was on my first day of train travel on the 10th of December 2013. I don't remember exactly when the resignation happened. It was not long before that. So November is about the right time.
Q Okay. You testified yesterday that you didn't give notice; do you remember that?
A I did. That's correct. It was not really common practice at OneTaste to give two weeks notice because they felt that if someone wanted to be out, like if they were no longer invested in it, if they energetically and spiritually didn't want to be involved in OneTaste, there was no like keeping them around for two weeks to do the job. It was very common when people quit, they just kind of quit abruptly.
Q Well, in fact, you gave two weeks notice?
A I did. Okay. Sorry. I don't mean to be misleading.
Q That's okay. Let me just refresh your recollection, if that's helpful.
MS. COHEN: 13 -- DX 13-L.
THE COURT: She's answered the question. What are you refreshing her on?
MS. COHEN: I didn't know --

THE COURT: She gave an answer.
Q You recall now that you gave two weeks' notice?
A I -- it's -- sure. I gave two weeks' notice. If there's evidence that I did, I'm sure that I did.
Q I just wasn't sure --
THE COURT: Go ahead.
MS. COHEN: Just the top, to confirm.
A Okay.
MS. COHEN: Not that part. Sorry. The top part.
A It says -- I say: If it seems appropriate, I will stay on for another two weeks and make sure the structure's in place for someone to come in and succeed as head --
Q I'm sorry.
THE COURT: Just read to yourself, and then she'll ask the next question.
Go ahead.
Q So you said you agreed to stay on another two weeks, if it was appropriate, right?
A Yes.
Q Okay.
MS. COHEN: And can we just show the date of that bottom of that top piece. There you go.
Q You see that date at the bottom, November 4, 2013?
A Yes.
Q Does that sound -- refresh your recollection --

A It does.
Q -- okay, of when you resigned?
A Yes.
Q And showing you what is not yet in evidence as Defense Exhibit 13-AR.

THE COURT: I'm going to want to take a break. Is now a good time or --

MS. COHEN: I'm just about done --

THE COURT: Go ahead.

MS. COHEN: -- if you want to wait a few more minutes, and we'll be done.

THE COURT: Yes. Go ahead.

Q And do you recognize Defense Exhibit 13-AR?
A I don't know that I've ever seen this photo before, but it's a photo of me and people in the OM in New York.
Q And that was the Morellino?
A Yes.
Q And do you recognize yourself in the photo?
A I do.
Q And do you recognize anyone else there?
A Becky Uma is in this photo, Eli Block, Rachel Cherwitz, I believe it is Hamza and Sasha.
Q And do you see there's a date this photo was posted?
A It looks like it says November 5, 2013.
Q Okay. We can -- okay.

And that was the day after you gave notice, right?
A Yes.
Q Okay.

MS. COHEN: Can we redact that part on the side, the whole sub part.

And I offer Defense Exhibit 13-AR.

THE COURT: Just the photograph, right?

MS. COHEN: Just the photograph.

THE COURT: Any objection?

MS. BENSING: No.

THE COURT: Okay. Defense Exhibit 13-AR photograph only is admitted.

(Defense Exhibit 13-AR, photograph only, received in evidence.)

MS. COHEN: Okay. You can publish that.

(Continued on the next page.)

BY MS. COHEN: (Continuing)

Q You said this is at the Morellino, right?

A Yes.

Q And you also testified yesterday that you lived -- after you resigned, you lived at the Brooklyn OM house for a little bit?

A I don't think I lived there. I came and stayed between one and two weeks.

Q Okay. And showing you, again --

MS. COHEN: Is five minutes okay, Your Honor?

THE COURT: You know what, I do want to give the jury a break because, otherwise, we're going to be off on their lunch break.

MS. COHEN: But when we come back, it really will be --

THE COURT: That's fine. We'll take a break, The witness can step down, and we'll reconvene at a quarter to 12.

Just wait until the witness leaves, and then I'll excuse the jury.

(Witness steps down.)

THE COURT: Okay. We're going to meet up again at 11:45. Don't talk about the case. Don't let anyone talk to you about it. Enjoy the next 15 minutes. I'll see everyone at a quarter of.

(Recess taken.)

(In open court; outside the presence of the jury.)

THE COURT: I see someone set up a computer for me. Does that mean we're going to be listening to videos.

MS. BONJEAN: Perhaps.

THE COURT: Okay. That's fine. I don't want to keep the jury waiting.

On the limiting instruction issue, I'm going to propose some different language to you. I just think for lay people, some of the language can actually be kind of confusing. So I think, let me just make sure.

I understand the parties just want the jury to know that if something comes in for a specific purpose, not for the truth, they can only consider it for that specific purpose, right?

MS. BONJEAN: Right.

THE COURT: And the example being perhaps e-mails or testimony about statements?

MS. BONJEAN: That's fine. Your Honor, we, I took my best stab at the government.

THE COURT: I don't think it's necessarily inaccurate. I just think to start talking about hearsay and non-hearsay, I just think we need to boil it down for lay people.

MS. BONJEAN: I defer to you.

THE COURT: So maybe before we take the lunch break,

I'll read what I drafted out, and you all can think about it over the lunch break, but it's really just designed to get to the heart of what we're trying to tell them instead of trying to educate them on legal principles at this stage.

MS. BONJEAN: Sure. No problem.

MS. BENSING: Your Honor, may I raise one very quick note for the record --

THE COURT: Yes.

MS. BENSING: -- that may relate to the next witness before the lunch break?

THE COURT: You think you are going to get through another witness before the lunch break?

MS. BENSING: He may start testifying.

THE COURT: Okay.

MS. BENSING: One can hope, Your Honor.

THE COURT: Sounds good.

MS. BENSING: So Government Exhibit 3823-2, which we anticipate as one of the audio clips that we anticipate seeking to admit --

THE COURT: Is your microphone on? It's sounding very soft.

MS. BENSING: It's just my voice, Your Honor.

THE COURT: Go ahead.

MS. BENSING: Ms. Bonjean and I did discuss one rule of completeness issue. So we're going to amend the timestamp

of the clip that will be introduced into evidence.

THE COURT: To make it longer?

MS. BENSING: Slightly longer. The government is not going to publish that part of it, so we don't have it here today, but that's what we'll be admitting and we'll reclip it.

THE COURT: As long as the parties agree on this. If there's anything you want to raise with me on this, I'll hear it, but if you've agreed, we can do that.

MS. BENSING: Great. Thank you, Your Honor.

MS. BONJEAN: We're still objecting on relevance for a lot of these things.

THE COURT: Yes, but you're not --

MS. BONJEAN: But if the Court overrules that objection, then this would be a complete misstatement. I think it's about a minute longer.

THE COURT: Okay. That works. And, okay.

I think we can bring in the witness and the jury.

You can just come back up here.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Okay. Everyone, may be seated.

And, Ms. Cohen, you may resume your examination.

MS. COHEN: Thank you, Your Honor.

Could you show for the witness Defense Exhibit BD.

Q Just to remind us of what we were talking about --

THE COURT: What's the number?

MS. COHEN: The number --

THE COURT: You said BD.

MS. COHEN: Oh, sorry. DX 13-BD.

Q And just to remind us, we were talking on November 4th, you resigned, just so we're --

A Thank you.

Q -- picking up on that same point.

A Yes.

Q Okay. And if you can see this photo on the screen, do you recognize yourself in this photo?

A I do.

Q And you recognize the other people?

A I do.

Q And who are the other people?

A Henry and Sasha.

Q And does this photo refresh your recollection as to when it was taken or around the time?

A Yes. November 13th.

Q Is this a fair and accurate depiction of the photo that you're in?

A Yes.

MS. COHEN: Okay. And we actually have to take out the name there too and the writing.

Your Honor, at this time, we offer Defense

Exhibit 13-B, as in "boy," D, as in "dog," and we've redacted all the writing on the side.

THE COURT: Okay. So you're offering the photo.

Any objection?

MS. BENSING: No objection to the photo.

THE COURT: Okay. Defense Exhibit 13-BD, photo only, is admitted.

(Defense Exhibit 13-BD so marked.)

Q Max, this photo was taken after you resigned from OneTaste, right?

A Yes.

Q And it was posted on Facebook, right?

A Yes.

Q And then you said there was Henry and Sasha.

Those are two friends from OneTaste, right?

A Two people that I came to know through OneTaste.

MS. COHEN: Okay. You can take that down. And can we also show just for the witness DX 13-B, as in "boy" again, E, as in "Edward."

Q Do you recognize this photo?

A I do.

Q And do you recognize yourself in it?

A I do.

Q And do you recognize the other person?

A I do.

Q Can you look at that for a second.

THE COURT: Can you read that? First of all, it's very tiny.

MS. COHEN: Yes. Can we blow up the side, just the date.

Q It's just to see if this refreshes your recollection around when this was taken.

A This was posted later than it was taken.

Q So you think -- was this, do you remember when it was taken?

A This would have been taken in 2013, I remember that, yes, I remember this photo being taken and I can tell that I have long hair in this photo, and it was from when I was living at the Morellino. So the date that's posted is many months --

Q Much later?

A -- than it was taken, yes.

MS. COHEN: So can we redact now, sorry, on the right.

Q Besides yourself -- I'm sorry if I asked you this.

Did you identify the other person?

A Ruwan Meepagala.

Q Is this an accurate depiction of the photo that you recall?

A Yes.

MS. COHEN: And if you -- at this time, the

government -- the defense, sorry. The defense offers Defense Exhibit 13-BE.

THE COURT: Photo only, right?

MS. COHEN: Photo yes, photo only.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 13-BE, photo only, is admitted.

(Defense Exhibit 13-BE so marked.)

MS. COHEN: Okay. Can we just publish that. Can you zoom in there, just to the photo.

Q And you said this was at the Morellino, right?

A Yes.

Q Okay. Now, you said, we already established you started working for OneTaste in June of 2013 and resigned in November, on November 4, 2013, right?

A Yes.

Q And so you worked for OneTaste for a total of about five months, right?

A Yes.

Q And you testified that you, you decided you didn't want to work there and you had to make a quick escape plan.

Do you remember testifying about that?

A Yes.

Q But, in fact, you stayed working for another two weeks,

right?
A Yes.
Q And you didn't stop being involved with OneTaste, right?
A No.
Q In fact, you continued to live for maybe a short stay at the Brooklyn OM house, right?
A If you can call a week, a week and a half visit living.
Q Yes.
A I was still interested in being -- it was my whole community. Like everyone I knew, everyone that I was connected to when I left, it was, like, I left everyone who had been my family for that time, and so leaving was a big adjustment.
So there were, there were times after I had quit working for OneTaste that I did volunteer to do back of house and I did go to events and I did, you know, continue having some friendships with people for a period of time.
Q Because they were people you felt genuine love for, right?
A Yes.
Q And when you say "back of house," that's working to help in the sort of back while events are going on, right?
A Yes.
Q And that allows you to hear everything that's going on even though you're not partaking in the course?

A If you're in the room, actually in the back. You might be off doing errands or in another part of the building when the course is happening.
Q And, as we said, as I said earlier, you finished the coaching program, right?
A It concluded. I never, like, I never passed the sales portion of my exam and never became, like, a certified coach.
Q Okay. You were there on graduation?
A I was there on graduation.
Q And that was at the end of November 2013?
A Yes.
Q Okay. And you also finished the Mastery which ended in February of 2014, right?
A That's right.
Q And, in fact, you stayed at one point at 1080, right, after that?
A I, I don't recall. I mean maybe a night here and there. I don't --
Q Oh.
A I never, like, lived at 1080.
Q Let me show you what has been marked for identification as Defense Exhibit B, as in "boy," F as in "Frank."
Do you recognize this photo?
A Yes, I do.
Q And who is it a photo of?

A It's a picture of me.
Q And does it refresh your recollection where you were there?
A I think this photo was taken in an airport. I don't remember which airport.
Q And can we see the writing on the right or do you want me to --
A I can see it.
Q Does that refresh your recollection that you were going to be staying with Jeff Ridenour?
A Yes, I believe this does refresh my memory. I think there was a night that I stayed over in San Francisco because I had been living in the South Bay at that time, like an hour away. So there was maybe a night that I stayed at 1080.
Q So you stayed at 1080, and that was in February of 2014, right?
A Yes.
Q Okay. And, again, you know, at this time you stayed there you were still taking classes and you weren't working for OneTaste, correct?
A That's correct.
Q And after, ultimately, you went back and you lived with your family friend, your friend's family, right?
A Correct.
Q And those were the same friends that paid for a lot of

your courses at OneTaste, right?
A Yes.
MS. COHEN: I think I'm -- just hold on one second.
(Pause.)
MS. COHEN: Nothing further. Thank you.
THE COURT: Ms. Bonjean, any cross-examination?
MS. BONJEAN: Yes, Your Honor. Thank you.
CROSS-EXAMINATION
BY MS. BONJEAN:
Q Excuse me in advance.
Good afternoon, Max.
A Good afternoon.
Q My name is Jennifer Bonjean and I represent Nicole Daedone.
A Nice to meet you.
Q Likewise.
You were already involved in self-help communities when you were introduced to OneTaste, right?
A Yes.
Q And you're flying at least once a month to attend Mama Gena's School for the Womanly Arts prior to getting involved in OneTaste, right?
A Correct.
Q And I think you described Mama Gena's School for the Womanly Arts as sort of a female-centric type of program or --

I guess "program" is the right word, right?
A That's correct.
Q And it was at Mama Gena's where you heard Ms. Daedone give some type of speech or presentation that ignited your interest in OneTaste, fair?
A Correct.
Q Do you recall what the speech was about?
A I think it was meant to be, like, an introduction to OneTaste and OMing, and Nicole told a little bit of her story and just, like, gave us an introduction to the practice.
Q Okay. And you understood after that presentation and certainly later that Ms. Daedone's philosophy was, you know, being a champion of female orgasm, right?
A Correct.
Q I think you testified that OneTaste was interested in cultivating and spreading women's orgasm as well as women getting more in touch with their power through orgasm, right?
A Correct.
Q And that's something that resonated with you at the time?
A It did.
Q And as I recall, you attended a TurnON event subsequent to hearing Ms. Daedone speak at Mama Gena's?
A Yes.
Q But that was in San Francisco, fair?
A Yes.

Q And you understood, or maybe you understand now, this was not just an introduction to OneTaste but it was a sales event, right?
A I don't think I realized that at the time but I later came to understand that.
Q And companies sometimes hold events to develop leads for prospective clients, right?
A Yes.
Q And after that course -- strike that.
After that event you attended, your interest was piqued, right?
A Yes.
Q And is it fair to say that you started taking courses or, in San Francisco?
A Yes.
Q And you also got involved in the practice in San Francisco?
A Yes.
Q When you were in San Francisco, you still maintained your own apartment, right?
A Yes.
Q You had a community of friends there, right?
A Yes.
Q And these were not OneTaste people, fair?
A Yes.

Q You had a job that was outside of OneTaste?
A Yes.
Q And you were availing yourself of OneTaste events and courses, to the extent it worked for you, right?
A Yes.
Q Now, one of the messages that Nicole Daedone gave that resonated with you was, I think you said yesterday, sort of a radical feminism, right?
A Yes.
Q And you were looking for a radical feminist message, fair?
A It resonated with me and it was true to my own, yes, I think that's fair.
Q Okay. You were a self-identified feminist at the time, right?
A Yes.
Q And you found this sort of radical message inspiring, right?
A I did.
Q And it is radical, can we agree?
A I agree.
Q Okay. And it was new, right, to you?
A OMing was new to me, yes.
Q And her teachings were kind of new ideas, fair?
A Yeah. There were some Buddhist threads of thought and

different -- I was being exposed to new teachings that I had not come across anywhere else.

Q And this was, this was far beyond the Gloria Steinem philosophy, right?

A What do you mean by that?

Q Do you know who Gloria Steinem is?

A I do.

Q So this was a more radical view -- she was proposing a more radical view of feminism than, say, Gloria Steinem's teaching?

MS. BENSING: Objection.

THE COURT: Sustained as to foundation.

Q Had you read a fair amount of feminist literature before you were introduced to Ms. Daedone's teachings?

A Yes. I went to a women's college, and my best friend was a women's studies major.

Q So you had a fair amount of familiarity with the body of literature and, that existed prior to Ms. Daedone, for instance, publishing her book in 2011, right?

A I had a, yes, I was familiar with feminist works before I became familiar with OneTaste.

Q Okay. Did you read Ms. Daedone's book "Slow Sex"?

A I did.

Q When did you read it in the course of your experience with OneTaste?

A After I saw Nicole speak in New York City, I think I started reading it. I don't know that I ever read it cover to cover, but there would be different times where I would read sections of it.
Q And you testified actually yesterday that when you were looking at an excerpt from, I think, a reading, you said you were very familiar with her writing style, right?
A Yes. Although, you know, maybe she has a ghost writer. I don't know.
Q Well, I mean it's possible that it was a collaborative process and she was the credited author but you testified yesterday that you felt that you, you knew her writing, right?
A I did feel, I do feel that I know Nicole Daedone's voice and her writing.
Q And you know her messages, right?
A Yes.
Q And you had already read her book "Slow Sex" before you even signed up to go to the Morellino, right?
A Parts of it, yes.
Q And despite your childhood challenges that are very real, you had reached adulthood with a great deal of educational success, right?
A I think just the standard amount of educational success.
Q You think it's just standard to go get a college degree, for people?

MS. BENSING: Objection. Relevance.
THE COURT: Sustained.
Q What was, what's standard about your educational success?
MS. BENSING: Objection. Relevance.
THE COURT: Sustained.
Q You have a medical degree now, right?
A I do.
Q Okay. And certainly by the time you reached, I guess, young adulthood, you also had a Bachelor's degree, right?
A I got my bachelor's not long before I like discovered OneTaste.
Q Right. In your 20s?
A Yes.
Q And you testified that, like many young people, you, you didn't know which way you were headed professionally, correct?
A That's correct.
Q And you wanted to have a purpose, right?
A I did.
Q And you wanted to be mission driven, fair?
A Yes.
Q And so you were seeking that type of experience in your life, right?
A That's right.
Q Now, do you remember the TurnON event you went to in San Francisco?

A Not in great detail.
Q Do you know how many people were there?
A I could ballpark 20. I don't know.
Q And of -- I think you said Ms. -- Maya was there, your friend from college?
A Maya, who attended Mills at the same time that I did, we were acquaintances. I knew who she was and that I had gone to college with her.
I would not call us friends, but someone that I recognized from being also an alum of my college was there.
Q And of those 20 people, apart from Maya, let's put her aside for a second, of those 20 people, how many of those people ended up working for OneTaste, as far as you know?
A I don't even remember who was there that night.
Q Do you remember how many of those people, if any, actually signed up to be part of one of the OM communes or communities, residential communities?
A I have no recollection of who was actually there at that first TurnON night so it's hard for me to answer that.
Q And you would agree that you could have stayed engaged with OneTaste at the level you were engaged at in San Francisco, right?
A Yes.
Q No one, no one forced you to get more immersed into OneTaste, right?

A That's correct.
Q That was, that was of your own volition, fair?
A That's fair.
Q And it was you who really pursued Ms. Howerton about getting into the Morellino in New York, right?
A I did, I did send e-mails to Kim Howerton expressing my desire to move into the Morellino.
Q And those e-mails, you provided e-mails to the government in the last few years, right?
A Yes.
Q Okay. These are e-mails that they asked you to go look for, and you did searches and you produced what you could find, right?
A Yes.
Q Okay. And there were no e-mails you came up with where anyone from OneTaste was begging you to come to New York, right?
A No.
Q No --
A That's right.
Q That's correct, correct?
A That's correct.
Q Okay. In fact, you sent multiple messages saying, hey, you know, can I, you know, can I give up my apartment, I'm ready to come, that type of message, right?

A Yes, we saw yesterday two e-mails that I had sent.
Q Right. Now, you testified also yesterday that you went there with an understanding that you had an actual job lined up, right?
A That was my understanding.
Q Okay. Did you, were you able to find any e-mails where you actually got a job offer from OneTaste prior to moving?
A No, and I don't believe that -- first of all, I had not kept a lot of the documents from that time so, but, no, I don't have like an offer of employment in an e-mail from that time.
Q Right. You don't even have like a message in an e-mail saying, hey, you have a job waiting for you, right?
A That's right.
Q But your recollection is somebody at some point said there's a job for you, is that, as I understand it?
A Yes.
Q So without any employment contract, you nonetheless moved to New York, right?
A Yes.
Q And you did so to fully immerse yourself into the OneTaste community?
A Yes.
Q You could have moved into an apartment, right, with like anybody?

A I think if I was -- my understanding at the time was if I was serious about working for OneTaste, living at the Morellino was the way to be part of the community and all, as I mentioned, felt like it was true to me that all of the people in the in group were living there. Nobody was working for OneTaste in the capacity I wanted to work for them and living in their own independent apartment somewhere else.
Q That's your recollection?
A Yes.
Q Okay. There were people who lived in apartments that were not in the Morellino that were engaged and immersed into the OneTaste community pretty significantly, right?
A Yes. I don't know that they were on payroll, but there were people living in other places throughout New York who still participated in OneTaste.
Q And you agree that you could have been involved in OneTaste in New York without living at the Morellino, right?
A In some capacity.
Q You actually couldn't work for OneTaste without living in the Morellino?
A I don't -- that's not really my understanding, but that's not like that was something that was said pointblank or that I have, you know.
Q You testified that you didn't recall anyone -- well, strike that. Let me ask you this.

Do you remember a woman named, I might get this wrong but "E-men-o"?
A Emunah? Yes.
Q Emunah. She worked for OneTaste, right?
A I don't know that she was ever on payroll, but she did a lot of labor for OneTaste.
Q When you say you don't know whether she was on payroll, are you saying you just don't know one way or the other?
A I, my understanding was the time that I was there, she was not an official employee and was not getting paid by OneTaste.
Q And what, where did you derive that understanding from?
A Just, I mean I worked for the company and I feel like I had a pretty good understanding of who was an employee and who was not. Maybe I'm wrong, but, and there were times that she was there that I wasn't there. So it could have happened at a time that I'm just unaware of.
Q What about Eduardo Smith, do you know who that is?
A I, no, I don't know who that is.
Q And let me ask you this. What about Tammy Delever?
MS. BENSING: I'm going to object to relevance.
MS. BONJEAN: I can make a better question.
THE COURT: Okay. So I'll sustain that, and you can ask your next question.
MS. BONJEAN: Yes.

Q Tammy Delever lived at the Morellino home, Morellino residence, right?
A She was there for a period of time when I was there, yes.
Q She lived there, correct?
A I don't recall, to be honest.
Q Okay. What about Joseph Teskey or Teskey, he also lived in the Morellino home, right?
A I know he stayed there for a period of time. I have, I'm not sure if he was ever an official resident or not.
Q Do you remember having an interview with U.S. Attorney's Office and members of the FBI on August 8, August 6th of 2018?
A Yes.
Q Okay. And do you recall telling the members of the government that these individuals, Teskey and Emunah, lived in the communal home?
A Yes. They were, they were definitely, Emunah definitely did, and Joseph was staying there for a while. So I guess you could say he was living there.
Q And was it your understanding that Joseph worked for OneTaste?
A That was not my understanding.
Q Okay. So he lived in the Morellino and didn't work for OneTaste?
A There were, yes, there were people who lived at the Morellino who did not work for OneTaste.

Q Okay. That's --
A There you go.
Q Thanks. Now, when you lived in the Morellino, regardless of whether you worked there, there were expectations about how you would live your life, right?
A Yes.
Q That's sort of kind of the nature of communal living, right?
A Yes.
Q Communal living involves making sure everyone sort of understands that we live, we're living with the same sort of beliefs and mission, correct?
A I mean, I think in the case of OneTaste and these houses, there was an understanding that we had shared beliefs and a shared mission.
Q I mean, this, OneTaste wasn't unusual in that way, correct, as far as communal living goes?
A It's the only community I have experience with communal living. There are a lot of other ones out there. I don't want to make a blanket statement.
Q Okay. But you wouldn't join a vegan community and expect to eat meat, right?
MS. BENSING: Objection.
THE COURT: Overruled.
A That's correct.

Q And that's because there's a shared value that you're coming together on, right?
A Yes.
Q Now, you testified that you, when you first got to the Morellino, you weren't initially getting paid but, you know, there was a lag in some type of getting paid, payment, but you did start eventually getting paid, right?
A Yes.
Q You started actually getting paid when you were actually hired, right?
A This one's tricky because I feel like there was some manipulation that took place but, yes, I got hired. I got, like -- I officially started the, like -- there was some point where it was more official, the hiring, was not just the gentlemen's agreement or the verbal agreement that I had gone to New York for. It was -- I mean I had -- yes, let me just pause there.
Q Okay. Yes, that's how it works, right? When you get hired, you start getting paid, right?
A Yes.
Q Now, you testified that your job was like a 24/7 job, right?
A Yes.
Q But you were living in a commune or a community of people, correct?

A Yes.
Q And there were expectations of living in the Morellino that were separate and apart from your job, right?
A Could you give me an example?
Q Well, let's look at, who was it, Joseph Teskey.
As far as you know, he didn't work for OneTaste, right?
A That's correct.
Q And by living at the Morellino, he still agreed that he would participate in OMing, right?
A Yes.
Q I mean that was, that was an expectation of living in the Morellino; it wasn't just a room for rent, correct?
A Yes. If you were going to live in a OM community house, you had to be an OM practitioner.
Q Right. And there were other things expected of you, including participating in keeping the community clean, right?
A Yes.
Q And you were expected to do other sorts of movements, I think, like different yoga or something along those lines?
A Yes.
Q There was an expectation to do these FEAR inventories, right?
A Yes.
Q And FEAR stands for false evidence appearing real, right?

A That's one definition.
Q Okay. I mean, do you have a different definition?
A I think there are other accepted definitions of the word "fear."
Q Well, I'm talking about in the context of FEAR inventory.
A I, I don't recall that that acronym was -- I mean maybe that's how it was presented was that "fear" extended for that acronym. I just don't remember that.
Q Again, that was a practice that people that lived in the Morellino were doing irrespective of their job with OneTaste, right?
A Yes.
Q And you would agree that when you're living amongst your co-workers and your bosses, those lines could get blurred pretty quick, right?
A That's true.
Q And OneTaste was all about pushing boundaries, right?
A It was, yes. There was, there was an aspect of OneTaste that was about boundary pushing.
Q And you didn't have an expectation of privacy, right?
A That's true.
Q Now, the government asked you if anyone enforced your participation in the New York community.
Do you remember them asking you that question?
A Yes.

Q Okay. And assuming, and I think your answer was, well, we all mutually enforced each other's participation.
Do you remember that?
A Yes.
Q Your participation in the New York community was a decision you made all on your very own, right?
A Yes.
Q All right. And I know you can't speak for anybody else, but there was no one, including Ms. Daedone, Ms. Cherwitz or anyone on the upper executive staff, that indicated to you that you were mandated to participate in the New York community, correct?
A That's correct.
Q And at any day, through whatever period of time that you lived there, you could have walked out the door and not come back, correct?
A Yes, and eventually that's essentially what I did.
Q Right, but you could have done it at any point leading up to the time when you actually did it, right?
A Yes. I'm a person with free will.
Q Okay. In fact, you testified that the first time that you did an OM that you didn't want to do was actually in San Francisco, right?
A Yes.
Q That was with this Mark Gottlieb guy?

A Yes.
Q And I think you testified that you didn't want to do that OM but you did it anyway, right?
A Yes.
Q You didn't tell Ms. Daedone or Ms. Cherwitz or anyone on the upper executive staff, I'm not doing this, I don't want to do this, right?
A That's true.
Q So as far as they knew, you were okay doing it, correct?
A Correct.
Q And after that experience, you didn't say, this really isn't for me, I don't want to be OMing with old guys, right? You didn't say that to yourself, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q After that experience of OMing with Mark Gottlieb, you nonetheless plowed forward and plowed ahead to go to New York and have a more intense experience, right?
A Yes.
Q Now, you testified about some of the terms that, the language that OneTaste community members participated in, right?
A Yes.
Q And you sort of had your own vernacular, correct?
A Yes.

Q And some of the words that were, some of the expressions or words that were used sounded sexual in nature but actually also had wider meanings, right?
A Yes.
Q Like turn on was an example that came up, correct?
A Yes.
Q And also you would agree that Ms. Daedone, when she speaks and/or writes does so, speaks in very metaphorical ways, right?
A Yes.
Q Sometimes it's kind of hard to follow, at least it is for me. Would you agree?
A I think -- I don't know. I'm not sure without an example.
Q Well, I mean, you studied her teachings, right?
A Yes. Did I think they were hard to follow? Not particularly.
Q But you would agree that there could be multiple interpretations about it.
A There could certainly be multiple interpretations, yes.
Q This wasn't -- I'm sorry to interrupt you.
A Go ahead.
Q And that's partly by design, so you take what you want from her teachings in some ways, right?
A Yes. I believe multiple, different people could read the

same thing and take away different things from the reading.
Q Now, you -- once you got to the Morellino, you also signed up for the Coaching Program 6, right?
A I was already signed up for it and part of the coaching program before I moved.
Q Okay. So that means that you took at least, what, how many classes did you take in San Francisco before moving to New York?
A So there was How to OM 1 and 2, I believe, and then the winter retreat, and those were the ones that I remember. Then I signed up for CP-6 and I had started when I moved to New York.
Q Okay. So you had taken at least three courses by the time that you started attending CP-6, correct?
A Yes.
Q And that was the course that you took if you wanted to become a coach yourself, right?
A Yes.
Q If you wanted to work with clients yourself, correct?
A Yes.
Q And during that CP-6 course, which lasts about ten months, right?
A Yes.
Q It's like a long, intensive weekend once a month, is that right?

A That's, that's true.
Q And Ms. Daedone would come give lectures or presentations during the course of the coaching program, right?
A Yes.
Q And during one of Ms. Daedone's lectures, during the coaching program, she asks students -- tell me if you remember this -- to guarantee that they would use the green-yellow-red during the program?
A I do remember that.
Q Okay. She also told the students, yourself included, I can't be responsible for your internal experience because I don't know it. Right?
A Yes.
Q Only you know it, correct, that's what she said?
A I believe that to be true.
Q And she also told the group, yourself included, I'll never have you in a place where you don't have the capacity to say green-yellow-red, right?
A Yes.
Q She even asked, is there anyone here who does not agree to use green-yellow-red, do you remember that?
A Not specifically, but I take no issue with that.
Q Would --
A I think that is a fair and accurate representation.
Q Okay. I don't want to pull out videos unnecessarily, but

would, does that ring a bell?
A Yes.
Q At least the substance of it?
A Yes.
Q Okay. And she also, during that discussion, gave everyone a little reminder of what green-yellow-red meant, correct?
A Yes.
Q Now, you testified about a couple other, you testified about the Mark Gottlieb incident. You also testified about, I'm forgetting his name right now, give me a second, the fellow that Rachel Cherwitz, according to you, directed you to go home with?
A Jim Kwik.
Q When you use the word "direct," you really mean like suggested act, right?
A That's not what I mean.
Q What you do mean by direct?
A I remember Rachel telling me he is going to come here, we're going to teach him how to OM, and you will be the strokee for his first OM.
Q And that's what you were there for, at least that's what you had told Rachel you were there for, right?
A Can you be more specific?
Q You didn't tell Rachel at that time, No, I'm not doing

this?
A I did not tell her that.
Q You didn't even object to doing it, right?
A I did not object to doing it.
Q And, what, she was supposed to read your mind?
A Of course not.
Q Okay. So you didn't communicate that you didn't want to OM with Kwik? You're just, you know -- you just remember feeling like you didn't want to at the time, right?
A That's correct. I did not tell her that I didn't want to and I did not, like, say yellow or red, and I did not, yes.
Q Okay. And those words were available to you, correct?
A Yes.
Q You also testified about this Ruwan and Chelsea thing that, you know, was very hurtful and was a breaking point for you, right?
A Yes.
Q It really wasn't a breaking point for you because you stuck around for quite some time, right, after that?
A For me it still is a breaking point because it was my -- I guess I'm referencing my internal feelings when I say that, like I -- that was a breaking point for me. Did I leave the next day? No.
Q It was a breaking point for you internally, but it's not something you shared with anybody, right, I mean shared in the

moment, correct?
Let me withdraw that and give you a more precise question?
It's not anything you shared with Rachel, right, in the moment?
A I think I was just a little bit frozen.
Q Right. You didn't say, you didn't say this is unacceptable, I'm not going to be part of this, or anything of that nature, right?
A No. I wish I had.
Q You have regrets, right?
A Part of the human experience.
Q You also testified about a coaching experience you had with Nicole where you were telling, and this wasn't a word I would use, but you said my sob story, right?
A Yes.
Q But that sob story was really your traumatic childhood, correct?
A My memory of what I was talking about before the coaching is not perfect. That's what I recall. It's possible that -- I don't have a perfect memory around what I was sharing beforehand, but I do remember the coaching that she gave me.
Q And in hindsight, you look back and you feel this is pretty mean spirited or cruel or something of that nature?
A I don't actually think it was mean spirited or cruel. I

just think she was trying to ask me to, like, transmute something into, transmute something heavy and intense into humor, and it was not something I was capable of doing. I don't -- yes.
Q Understood. But you knew that that was, that was a philosophy of Nicole's, correct?
A Yes. It was an application of her teachings.
Q Better way to put it. That's why you have a doctorate.
It was, it was no secret that Ms. Daedone preached this idea of turning these negative, dark, traumatic experiences into something more positive, right?
A That's true. I think the whole reason I really was involved at OneTaste was for this, the training and what we would call like the alchemy of it, sort of take this traumatic past that I had and to somehow transmute it and to find power and find myself from that.
Q Right. And she taught that because she did it for herself, right?
A Yes.
Q She shared her very dark childhood experiences with people, correct?
A Yes.
Q And so she would teach, hey, this worked for me, you should try this out, right?
A Yes.

Q And some of these, these applications, which is what you said, they didn't feel great in the moment; it didn't actually work for you, right?
A That's an example of a time that I just -- it didn't, it kind of fell flat with me. I wasn't able to apply it in that moment in a room full of people.
Q And you didn't. That was okay, correct?
A We just moved on to the next thing.
Q And it sounded like you were disappointed that she didn't come over and, like, hug you and stroke you and, like, you know, give you some reassurance. Maybe I'm misinterpreting that.
A No, I never expected that kind of treatment from Nicole.
Q That's not, that's not what she would have done, right? You knew that about her?
A No. That's not what our relation, our coaching relationship was about. It's not about her caretaking me.
Q Right. I mean she was -- in layperson's terms, she was very much a tough love kind of person, correct?
A Yes.
Q And after the coaching program, you, I think you did go through the graduation piece of it, right?
A I was there for graduation weekend, yes.
Q And that was the demonstration, right?
A Do you mean the --

Q The demo?
A I guess I'm getting the courses confused. Do you mean the demos at the end of the Mastery program, or was there also a demo at graduation?
Q I may be conflating it. Let me ask another question.
Was part of the graduation from the coaching program a demo or was that for the Mastery?
A That was the Mastery program.
Q And you did the Mastery program after the coaching program, right?
A Yes.
Q And then even after that, you did the, you did another program as well?
A OMX was happening in the middle of that, but it was like a weekend event we were putting on in San Francisco, and I was still working for OneTaste at that time.
Q Okay. And at no point while you were working for OneTaste did you lodge objections to Ms. Daedone or Ms. Cherwitz or really anyone about the scope of your work, right?
A I did not.
Q You didn't lodge an objection to Ms. Daedone or Ms. Cherwitz or anyone on the upper executive staff about the pay, right?
A I did not.

Q You didn't lodge any objections to Ms. Daedone or Ms. Cherwitz or anyone in the executive staff about the benefits, right?
A I did not.
Well, and if I could go back to the previous question. Before I started getting paid, I did lodge a complaint about not getting paid, but it wasn't about the -- I think when I responded to your question, I assumed you meant that how little we were getting paid and I was not complaining about how little we were getting paid.
Q You're saying that at some point after you moved from San Francisco and you felt that you were working and you wanted to formalize that position, that's when you brought it up, right?
A Yes.
Q And they gave you a formal position to smooth that out, right?
A Yes.
MS. BONJEAN: Give me one second. All right?
(Pause.)
MS. BONJEAN: Max, I have no further questions.
THE WITNESS: Thank you.
THE COURT: Any redirect, Ms. Bensing?
MS. BENSING: Very briefly, Your Honor.
THE COURT: Go ahead.

MS. BENSING: I'd like to show the witness only Defense Exhibit 13-L.

REDIRECT EXAMINATION

BY MS. BENSING:

Q Do you still have a copy of the exhibits that Ms. Cohen provided to you?

A Yes.

MS. BENSING: And I can also put it up on the ELMO, if that's easier. Just for the witness, please.

MS. FARRELL: Your Honor, may I approach to help the witness find the document?

THE COURT: Yes.

(Pause.)

THE WITNESS: There's a bunch of 13's here, but I don't see L. Here we go. I don't think I have a copy of this one in front of me, as far as I know.

Okay. I'm looking at it.

Q Is this the document that Ms. Cohen used to refresh your recollection about when you resigned from OneTaste?

A Yes.

Q And I want you to just take a minute and look carefully at the document.

THE COURT: Does she have a paper copy?

MS. BENSING: This is a defense exhibit that we were given a hard copy of.

THE COURT: I'm just asking if the witness has a paper copy. So if you want her to read the whole document, someone will have to keep scrolling for her. You might as well give her a paper copy.

MS. BENSING: Yes. And, Your Honor, this is a document that we received from the defense. I don't have an extra.

THE COURT: I'm holding 13-L and I will give this copy to the witness.

MS. BENSING: Thank you, Your Honor.

THE COURT: And for the record, it is four pages.

Is that correct.

MS. COHEN: That's correct, Your Honor.

THE COURT: And it has no markings on it of mine. So I'm giving it to the witness.

MS. BENSING: Thank you very much, Judge.

Q Please take a minute to review that carefully.

(Pause.)

A Okay. I've read it.

Q Are you a participant on this document?

A I'm not.

Q Do you know how this document was generated?

A It appears that it's a text message conversation, and it appears that the person who is the sender is Joanna Van Vleck.

Q Do you know how this was generated?

A I do not.
Q Do you know where this came from?
A No.
Q I'd like you to look at the second, the second text bubble on the first page.
A Yes.
Q Does what's listed here as Rachel Cherwitz --
MS. COHEN: Objection.
Q -- appear to be responding to somebody else?
THE COURT: I'm going to sustain it. You shouldn't be reading from anything.
Q Do there appear to be messages missing from your reading of this conversation?
MS. COHEN: Objection.
THE COURT: Overruled.
A Not that I can tell.
Q Okay. And based on -- and just read it one more time.
Based on the context, I'll ask you whether or not there appear to be messages missing.
MS. BONJEAN: Objection. Asked and answered.
A There appear to be messages missing.
THE COURT: Overruled.
Q Had you ever seen this document before Ms. Cohen put it in front of you?
A No.

Q Had you previously had an opportunity to review your own materials and determine the date that you left OneTaste? And if there's something that might refresh your recollection, I can show it to you.
A Yes, please.
MS. BENSING: Can we please show the witness 3500-MPI-3. Oh, and if we can just show this to the witness. Thank you.
Q Okay. And I'll just direct your attention to the bottom of the first paragraph.
Can you read that?
A It's not on my screen.
THE CLERK: Is it there now?
THE WITNESS: Yes. Thank you.
THE CLERK: Okay.
(Pause.)
A Yes.
Q And does that refresh your recollection about when you left OneTaste?
A The date that's showing here is the date that I got on the train and left New York.
Q And that was when?
A December 10, 2013.
Q And you testified, I think you used the word "escape" with respect to leaving OneTaste.

Why did you use that word?
A That's how I felt at the time. I mean, there's an example of -- "escape" was a word that had been coming up for me regarding leaving OneTaste as far back as September of 2013.
Q And why the word "escape"?
A Because leaving felt like escaping.
Q And why is that?
A I needed to get myself out of a situation that was not good for me anymore.
Q You testified about a breaking point that you had internally as being prior to when you actually left OneTaste.
Why didn't you leave after this breaking point that you described?
A There are a few different reasons, I think, one of which is just that I -- where was I going to go? Where was I going to run to? What was I going to do with my life?
I had given up everything to be part of OneTaste and so in that sense, I felt pretty trapped. Of course, no one was telling me I couldn't leave the building, but I didn't have a plan for myself for what would come after.
And I think there are instances in which leaving OneTaste felt like cutting my losses and moving on, and I had invested a lot into this training and this community and my life in New York and it just took time for me to be willing to

walk away from everything I had invested in.

Q And what was your psychological state at that time?

MS. COHEN: Objection.

THE COURT: Overruled.

A I was in fight or flight every day.

Q And what do you mean by that?

A I didn't feel safe inside. I think my nervous system was really activated. I do have a trauma history, and so sometimes when things are intense, I can experience, like, that kind of fight-or-flight moment where you're maybe having an adrenaline rush or you freeze or you're just a little bit -- you, like, run for the door or you get stuck there. I think I was just trying to survive at that point.

Q And what led you to be in this survival mode?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A It wasn't any one thing in particular. It was all the things together and the way that my life had become a prison for me at OneTaste.

Q With respect to your hiring, you testified that, on cross-examination, that there was some manipulation that took place.

What was that manipulation?

A Because I was told that I would start, like, I was going to go to New York and work production for New York, for the

New York office. Did I sign all of the paperwork to get officially hired before I left for New York? No, I didn't, but I felt like we had, I'm going to use the term a gentleman's agreement.

I believe -- I'm from a small rural community where sometimes you take jobs based on, you know, you trust someone in good faith that they say they're hiring you and they're going to pay you later. I -- of course, like, I was naive at the time, that I perhaps should have insisted on getting officially hired sooner, but I just trusted them at the time and I thought that when I moved there and actually started working for them, that I was going to start getting paid and that was not the case.

Q And did you trust them because these people were your coaches?

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q You testified that you continued to have some involvement in OneTaste after you left. Why?

A Sorry. I don't -- I mean on one level, there were a lot of people that I knew and that had been a big part of my life. It had been my whole community for over a year, and I think there was still, there was part of me that felt sad about losing connection with absolutely everyone that I knew through OneTaste.

There were some relationships where I, you know, I, like -- for example, Jeff Ridenhour is probably the one friend that I still have from OneTaste, but there were a select number of people that mattered to me. And walking away from everything pointblank was -- I mean I think, for the most part, I got myself out of the community really swiftly, but there were still connections I had there.

And I was, I felt pretty alone when I went back to San Francisco and I was trying to find, once again, trying to find my purpose, trying to find what I was going to do with myself and my life and my career. And I think, you know, volunteering to do back of house was a way to at least feel like I was useful or being part of something.

(Continued on next page.)

(Redirect examination, cont'd)

BY MS. BENSING:

Q And, again, what was your psychological state at that point in time?

A I was just mentally scrambled. I was -- like my whole sense of reality was upside down, and my sense of myself was drastically distorted, and I was just trying to put the pieces of my life back together again.

MS. BENSING: No further questions, Your Honor.

THE COURT: Any recross-examination?

MS. COHEN: Just briefly, Your Honor.

THE COURT: Okay. Go ahead, Ms. Cohen.

RECROSS-EXAMINATION

BY MS. COHEN:

Q So, Max, the government showed you what I had also showed you to refresh your recollection, Defense Exhibit 13-L?

A Yes.

Q Now, as you testified, you'd never seen this before, right?

A That's true.

Q And, in fact, you're not -- these are not your messages, correct?

A These are not my messages.

Q However, the top message is a message that you had sent that was repasted here, correct?

A Yes. Rachel's sending my resignation, like a copy of my resignation to the other executive members on the team.
Q Right.
And in that resignation, as we already established, if it seemed appropriate, you were willing to stay another two weeks, right?
A Yes. And then it also -- well.
Q Again, the only part you have seen before are your words at the top, right?
A That's true.
Q And, in fact, in addition to offering to stay two weeks, you also indicated that you loved them all deeply, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q In addition to talking about your willingness to stay, you described your feelings about everyone, right?
A I expressed gratitude for having been part of whatever I was part of.
Q Yes.
You also expressed your love for everyone, right?
A Yes.
Q And a desire to keep your OM practice, right?
A Yes.
Q And you also testified just now on redirect that it was every day fight or flight, you testified --

A Yes.
Q -- to that, right?
And you never told Rachel or Nicole or anyone from upper management that you felt that way every day, right?
A I don't recall a particular time. I think they knew that I was dealing with my trauma responses.
Q Yes. In fact, as you testified just now, you have trauma history, right? You had trauma history before OneTaste, correct?
A True.
Q And that was a lot to deal with, right?
A It just was -- I don't know if it was a lot. It just is something that is true.
Q And the government also showed you a document that you said refreshed your recollection as to when you left OneTaste, right?
A Yes.
Q And that was an e-mail that you had written back in 2022, correct?
A Yes.
Q And that was nine, I think, if I have done my math right, nine years later, correct?
A Yes. I had just tried to figure out the dates and the timeline at that point, and I had looked at my Instagram and seen when I had been posting photos, and I could tell from the

date the photos were posted the date that I left New York City.
Q But fair to say, you left New York City, but you resigned earlier in November, correct?
A Correct.
Q And so -- and you talked about escape, but you didn't -- there was no escape at that time, right? You agreed to stay on for two weeks?
A I did not leave immediately after I resigned.
Q And no one stopped you, no one tried to stop you from leaving, right?
A No one tried to stop me from leaving.
Q And, in fact, you testified just now that you didn't have anywhere to go, right?
A That's right.
Q But, in fact, you went and lived with your friends, family, after this, right?
A Yes.
Q You could have gone and lived -- your friend, I think you talked about Chirp, he was your friend, right?
A No, not really. I think -- that's someone who was in CP6 with me, but that's not someone I was close to at all.
Q And you still had -- you had friends in the sister goddess community, right?
A I did.

Q And you still kept in touch with them, right?
A Some of them. Yes.
Q And you still at times stayed with your friend Jeff in San Francisco after you left, right?
MS. BENSING: Objection. Outside the scope.
THE COURT: Overruled.
A At least on one night I stayed with a friend in San Francisco.
Q And he was your friend, right?
A Yes.
Q And, finally, you talked about when -- you were asked just now about being -- how you felt manipulated, do you remember that?
A Yes.
Q And you said, you know, you were told to go to New York just now on redirect?
A I remember Rachel Cherwitz saying to me, you will go to New York and run production for the New York office.
Q But on cross yesterday, also, I had indicated -- or I had asked you that -- in fact, you agreed with me that you wanted to go to New York, right?
A I did also want to go to New York.
Q In fact -- sorry. Yes.
In fact, we looked at e-mails in which you were asking to move into the Morellino, correct?

A Yes.
Q And, in fact, you testified, I believe, on cross this morning in relation to this same line of questioning that the family, your family's friend, who gave you the rent, questioned you about the fact that you weren't making money when you fist got there, right?
A Yes. Because my understanding was that I would start getting paid when I moved to New York and started working for OneTaste.
Q But you told the government, as we already looked at when you first met with them, that you volunteered when you first got there, correct?
A That's what the write-up from that document said, but it was not like a quote from me. There was a period of time where I was not getting paid and I was doing work. Some people would call that volunteering.
Q And, in fact, you eventually -- you asked for an employment agreement, right?
MS. BENSING: Objection. Outside the scope.
THE COURT: Sustained.
Q You testified on redirect that you weren't getting paid when you first got there?
A Yes.
Q But you got paid when you got an employment agreement, correct?

A Correct.
Q And you were paid for your work at OneTaste, correct?
A After --
Q I didn't ask when, but you were paid for your work at OneTaste?
THE COURT: She was answering the question.
MS. COHEN: Okay. That's fine.
THE COURT: Let her answer the question, please.
A After asking to -- to have my work compensated.
Q You were paid.
And after you left OneTaste, you volunteered as a back of house, right?
A That was truly in my -- that was true volunteering. I did not expect payment for that. That was just me being -- that, for me, was like I -- what I understood to be volunteering was.
Q And you, in addition to volunteering, as you said, you kept in touch with people at OneTaste at first, right?
A Some people at first, a little bit for a little while.
Q And it was hard to leave those people, right?
A Yes.
Q Because you had genuine feelings for a lot of those people, correct?
A Yes.
MS. COHEN: One moment, Your Honor.

THE COURT: Sure.

MS. COHEN: Nothing further. Thank you.

THE COURT: Ms. Bonjean, any recross?

MS. BONJEAN: Just a couple questions, Your Honor.

THE COURT: Okay. And then I'm going to let the jury go to lunch. I'm not rushing you, but if you think it's going to be more than a couple minutes, I will let them go to lunch now.

MS. BONJEAN: It will not be.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q Max, you testified on redirect about what was going on internally with you, at least how you remember it now, right?

A Yes.

Q You said things like, I was in fight or flight mode every day, right?

A Yes.

Q You said it felt like a prison, correct?

A Yes.

Q You said you were mentally scrambled. Those are words you used on redirect, right?

A Yes.

Q And those are your descriptions looking back at your mental state at the time, right?

A Yes.
Q And at no point did you tell Ms. Daedone or Ms. Cherwitz or really any one of the upper management that that's what was going on with you internally at the time, right?
A I don't have a particular memory I can offer of sharing that with anyone.
Q Okay. And you don't know how they would have responded if you did share those sentiments as you did here today, right?
A That's right.

MS. BONJEAN: I have nothing further.

THE COURT: Okay. The witness may step down.

(Witness excused; witness exits courtroom.)

THE COURT: Time for lunch.

I am going to ask the jury to come back at 5 minutes after 2:00. And please enjoy your lunch.

I have no idea what the weather is doing outside, but I hope it is enjoyable.

And don't talk about the case, don't let anyone talk to you about the case. Keep an open mind, and really just enjoy your lunch.

And I will see you at 2:05.

(Jury exits the courtroom.)

THE COURT: I am only going to keep you for another minute or so before I let you all go to lunch. But I did want

to just read to you what I drafted on the proposed limiting instruction. I know that it was a joint -- I think it was a joint draft that you had all given to me. I tried to keep this draft to what I think the parties are attempting to achieve here, and do it in a way that I think is simple for the jury to understand, given that they are not lawyers.

I will read it to you. I will read it slowly. You can think about it over the lunch, and if you want to suggest a change, that's fine. But I really just wanted to boil it down to what I think the parties were getting at.

Okay. So here's what I suggest:

Members of the jury, during the course of this trial you have heard and may continue to hear witnesses testify to statements of others, including statements contained in communications such as e-mails. And you have seen and may continue to see such communications themselves.

There are certain circumstances where testimony or other evidence may be admitted for a purpose other than for the truth of what is said or written. For example, sometimes testimony or written communications may be admitted to show that a witness did something because of statements they heard or read. When I allow witness testimony or admit other evidence not for the truth of the words spoken or written but for a different purpose, you may consider the words only for that different purpose.

Is that satisfactory to the parties?

MS. BENSING: That sounds great, Your Honor.

MS. BONJEAN: Yes. That sounds perfect, Your Honor.

MS. COHEN: Agreed, Your Honor.

THE COURT: Okay. And would you like me to read this to the jury when they -- when we initially come back before another witness starts? I think that might make some sense.

MS. BONJEAN: Yes.

MS. COHEN: That makes sense. Yes.

MS. BENSING: That's great, Your Honor.

THE COURT: And that is it, and I think just for record purposes, I addressed the request this morning, Mr. Robotti, for the electronic devices. So I am just going to -- that was filed at ECF No. 379. I am denying it again without prejudice, and you are going to put in a revised request.

MR. ROBOTTI: Thank you, Judge.

THE COURT: Okay, everybody. I will see you back at 2:05.

Oh, wait. One more thing. If there's something you want me to queue up on this laptop, I am happy to do that, so we don't waste time, but I'm not sure -- it's a different laptop, I think, than yesterday, right?

MR. ROBOTTI: Oh, you might have gotten the witness

one.

THE COURT: Okay.

MR. ROBOTTI: Let me talk to the government and see who the next witness is, and we can go from there.

THE COURT: Okay. That's fine.

See everybody at 2:05.

(Luncheon recess taken.)

A F T E R N O O N S E S S I O N

(Proceedings continue in open court; no jury present.)

THE COURTROOM DEPUTY: Remain seated.

THE COURT: Okay. We are back on the record.

Let me just ask, the videos that have been given to me, are they all -- have both audio and video? Because at least one or two don't seem to have any video.

MS. BENSING: One has no video, which is 3823-2.

THE COURT: Okay. I wasn't looking at the numbers when I was pulling them up. That's fine.

MR. ROBOTTI: If Your Honor is referring to the ones I handed up, there's also one without any video.

THE COURT: Yes.

MR. ROBOTTI: Or actually, two.

THE COURT: Yes. And I think that accounts for everything, and you just gave me transcripts as well, which is very helpful. I appreciate that.

Okay. So I am going to bring out the jury, and I am going to read them that instruction that I read to all of you. And then we will have the next witness who is?

MS. BENSING: Chris Kosley.

THE COURT: Right. So let's do the instruction first, and then you can call him.

(Short pause; jury re-enters courtroom.)

THE COURT: Everyone may be seated.

And before the government calls its next witness, I am going to address the jury on something.

Members of the jury, during the course of this trial you have heard and may continue to hear witnesses testify to statements of others, including statements contained in communications such as e-mails. And you have seen and may continue to see such communications themselves.

There are certain circumstances where testimony or other evidence may be admitted for a purpose other than for the truth of what is said or written. For example, sometimes testimony or written communications may be admitted to show that a witness did something because of statements they heard or read.

When I allow witness testimony or admit other evidence not for the truth of the words spoken or written but for a different purpose, you may consider the words only for that different purpose.

Ms. Bensing, you can call your next witness.

MS. BENSING: Thanks very much.

The government calls Chris Kosley.

(Short pause; witness enters courtroom.)

THE COURTROOM DEPUTY: Please step up, remain standing, and raise your right hand.

(Witness duly sworn.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record and spell your last name slowly. Please use the microphone.

THE WITNESS: My full name is Christopher St. John Kosley. Last name is spelled K-o-s-l-e-y.

THE COURT: Good afternoon.

THE WITNESS: Thank you.

THE COURT: You may proceed, Ms. Bensing.

MS. BENSING: Thanks very much.

CHRISTOPHER ST. JOHN KOSLEY,

called as a witness herein by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BENSING:

Q Mr. Kosley, are you familiar with an organization called OneTaste?

A I am.

Q When did you first become involved in OneTaste?

A It would have been late 2006, December -- November, December 2006.

Q And how long were you involved with OneTaste?

A Roughly ten years.

Q Did you have a job with OneTaste at points when you were involved with OneTaste?

A I did. I had several jobs.
Q And at the beginning, what was your job?
A At the beginning I was the sort of media person. I edited and created video, videos for OneTaste.
Q And did you continue to act as a videographer throughout the course of your time at OneTaste?
A Through most of my time, yes.
Q What did your job as a -- I think you said media person. What did your job as a media person entail?
A I created video productions, either promotional videos, or I shot and edited videos of courses and events that we ran, either just for posterity or with the idea of monetizing them, turning them into courses that could be sold online or some fashion.
Q What kinds of courses and events were video or audio recorded?
A Almost all of them. Yeah. Pretty much all the courses we did were shot on video or saved for posterity.
Q And were any courses not recorded?
A Some were not recorded, yes. There were some that either we didn't have the staff or it was deemed at the time it wasn't a course that was worth shooting on video, although most were audio recorded.
Q And the courses and events that you video recorded, what, if any, participation did Nicole Daedone have in those

recordings?
A Most of the time she was the teacher that we were recording or shooting.
Q And would you sometimes record or shoot Rachel Cherwitz?
A Yes. She was often also one of the teachers that we recorded.
THE COURT: Sir, if I can just ask you to either keep your voice up, or you're welcome to move the microphone closer to you.
THE WITNESS: Okay.
THE COURT: Thank you.
Q As part of your work as videographer for OneTaste, did you maintain any files from your time at OneTaste?
A Yes. As a videographer, I would keep backups of all of the files that I worked with because having only a single copy of video files that I was working on would create a single point of failure if a hard drive that I was working on died, and then I would lose the entire project that I had so I maintained backups on separate drives.
Q And how did you maintain those backups?
A I usually found a hard drive that I had laying around that was my personal hard drive, and I would usually -- small portable hard drives that I would connect to whatever main desktop computer I was using and create backup copies of the files I was working with.

MS. BENSING: Can I please pull up for the witness only, on the Elmo, what's been marked as 3500-CK-16.

Q Do you know what this is?

A Yes.

Q What is it?

A This is the copy of the drive that I understand you made with the files that were from the drive I made available to the government, per the subpoena I received.

Q Okay. So let's take a step back.

Did there come a time where you provided a hard drive to the government?

A Yes.

Q And specifically to the FBI?

A Yes.

Q Why did you do that?

A I was subpoenaed to produce that material.

Q And are you testifying here today pursuant to a subpoena?

A Yes, I am.

Q Approximately when did you provide a hard drive to the FBI?

A It was in, I think, early to mid 2020 when -- it was around the time that the documentary was being made.

Q Okay. And is there something that might refresh your recollection on that time frame that you provided it to the FBI?

A I guess if I saw a copy of the subpoena. I don't remember exactly when.

MS. BENSING: I'd like to pull up, just for the witness, if we can switch over, 3500-CK-9.

Q And I'll ask that you just read through this, please, to yourself.

THE COURT: Is there a hard copy?

MS. BENSING: Yes, Your Honor.

THE COURT: I think if you want the witness just to reed the whole copy, it's easier than having someone scroll through, just give him a hard copy.

MS. BENSING: Oh, sure. Well, it is really just the first -- that first little bit right there.

THE COURT: Go ahead.

BY MS. BENSING:

Q I'm just going to ask you to read that first little bit.

A Okay. Yes. I remember it.

Q Does that refresh your recollection as to approximately --

A It does. Yes.

Q -- when you provided this hard drive to the FBI?

A Yes. Around September 2022.

MS. BENSING: Switching back over to the Elmo, if possible.

Q Did you have an opportunity to review the materials on

3500-CK-16 prior to coming to court today?
A Yes.
Q And are these the same materials that you provided to the FBI in or around the fall of 2022?
A Yes, they are.
Q And how do you know that?
A Just from reviewing the files and the file structure and the files themselves that all are identical.
Q And how did you initially create this hard drive that you provided to the FBI?
A It was created as a copy of material that I had made available for the producers of the NetFlix documentary.

MS. BENSING: May I lead a little bit Your Honor?

THE COURT: Yes, go ahead.

MS. BENSING: And I have no objection to if you want to sustain, if there was an objection.

THE COURT: I heard a noise, but I didn't hear an objection.

Is there an objection and then request to strike an answer?

MS. BONJEAN: I have no objection to leading moving forward. I don't have an objection thus far.

THE COURT: Okay. You may go ahead, Ms. Bensing.

MS. BENSING: Thank you. I appreciate it.

Q Did you at some point take various videos that you had

stored from your time at OneTaste and put them on a single drive?
A Yes. That's correct.
Q And how did you do that? How did you come to have that collection of materials on this hard drive?
A Well, so all of the various little portable drives that I had made backups of different projects I had worked on over the years, basically just kind of accrued in bins and storage containers that I had kept and had over the years, and just I had had in my possession, so I reviewed -- I went through that material and collected it into one compendium that became the material that was made available to the documentary filmmakers.
Q So throughout your time at OneTaste, you testified that you maintained files on a series of hard drives, correct?
A Correct.
Q And then subsequent to that, you put those materials into a single hard drive; is that correct?
A That's right.
Q And these are video and audio files from when you were working as the videographer at OneTaste?
A Yes, in various roles.
Q And that is the hard drive that you -- that I'll call it the master hard drive, the one that you loaded everything on to, is that the one that you subsequently provided to the

government in or around September of 2022?
A Yes. That's correct.
Q And with respect to the video and audio files that you provided to the government that are here in 3500-CK-16, what, if any, involvement did you have with respect to the creation or editing of these materials?
A You mean the original materials?
Q Yes. The video and audio files on the hard drive.
A Yes. I was generally the editor or videographer who either shot or edited the files for some subsequent use, depending on what was called for at the time.
Q And when you say that you edited them, did you edit or manipulate their content in any way?
A No, not the content itself, I just cut together -- you know, I took a class that had maybe two hours worth of material and cut it down to either a short three minute clip to use in some kind of promotional capacity, or down to just a watchable, you know, say, 60 minutes, cutting out all the, you know, dross in between that wasn't watchable.
Q Okay. And you've already testified about this a little bit, but are you familiar with an individual named Nicole Daedone?
A I am.
Q And do you see her in the courtroom today?
A I do.

Q And I'd ask that you identify her by an article of clothing.
A That's Nicole in the white jacket.
MS. BENSING: Your Honor, I'd ask that the record reflect that the witness has identified the defendant Nicole Daedone.
THE COURT: Yes.
Q And are you familiar with an individual named Rachel Cherwitz?
A I am.
Q Do you see her in the courtroom today?
A I do.
Q And I'd ask that you identify her by an article of clothing?
A She's wearing what looks like a tan jacket.
MS. BENSING: Your Honor, I'd ask that the record reflect that the witness has identified the defendant Rachel Cherwitz.
THE COURT: Yes.
Q Mr. Kosley, who was your boss at OneTaste?
A Nicole Daedone.
Q And what role did she have?
A Nicole was the head of the company and the organization.
Q And what role did Rachel Cherwitz have at OneTaste?
A Nicole -- I'm sorry.

Rachel was the head of sales, but also held a leadership, a general leadership position.
Q And what was the relationship between Rachel Cherwitz and Nicole Daedone?
MR. ROBOTTI: Objection. Foundation.
THE COURT: Sustained.
Q Well, you worked with the -- I think you testified that you worked with the organization for approximately a decade; is that correct?
A That's correct.
Q And Nicole Daedone was your boss, correct?
A That's correct.
Q And you worked alongside Rachel Cherwitz; is that right?
A That's correct. Yes.
Q What was the relationship between Rachel Cherwitz and Nicole Daedone to your own observations?
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection to the vagueness of that.
THE COURT: Sustained.
Q With respect to Nicole, what, if any, employment relationship did Rachel Cherwitz have?
A Rachel appeared to be Nicole's second or right hand person.
Q I want to -- when you initially started working for OneTaste, who paid you?

A When I initially started working for OneTaste, I was paid by a company owned and run by Reese Jones.
Q And I want to show you Government Exhibit 786.
MS. BENSING: And this is just for the witness, please.
Q And can you see the top of this?
A Yes.
Q And did you review this exhibit before coming to court today?
A I did.
Q And what is this?
A This is an invoice from B&H Audio and Video for some video -- actually lighting equipment that we purchased.
Q And how do you recognize this?
A Just from the logo and the items that were listed for purchase. I remember purchasing this equipment.
Q Is it a fair and accurate copy of this bill or invoice?
A Yes.
MS. BENSING: Your Honor, the government moves to admit Government Exhibit 786.
THE COURT: Any objection?
MS. BONJEAN: Relevance.
MR. ROBOTTI: Yes. Objection on relevance.
THE COURT: Overruled.
Q So just --

THE COURT: Government Exhibit 786 is admitted.

MS. BENSING: Thank you very much.

(Government Exhibit 786 received in evidence.)

MS. BENSING: If we can please publish this to the jury.

Q Okay. And just looking at "ship to," what does that say?

A "Ship to" is my name and the address of the center where we conducted business.

Q And what does under "bill to" say?

A That's to Reese Jones, his address, and -- I'm not sure which address that is. But Reese Jones.

MS. BENSING: Okay. And if we can click back out and scroll down, please. If you can just enlarge in the type of purchase.

A Yes. That's for the lighting equipment that we purchased.

Q And that was for your work as a videographer at OneTaste?

A Correct.

Q And what was the total amount of the bill that Reese Jones paid?

A $3,627.10.

Q Okay. We can take that -- sorry, what is the date?

MS. BENSING: If you can scroll back up.

A May 14, 2007.

Q Okay. I would like to show you what's been marked as

Government Exhibit 790.

Do you recognize this?

A I do.

Q What is this?

A This is an invoice that I sent to Reese to be paid.

Q In approximately what year?

A This is from late 2007, early 2008.

Q And why were you sending Reese Jones an invoice, for what?

A That was to be paid for the video work I was doing for OneTaste.

Q And is this a fair and accurate copy of that invoice that you sent to him?

A It is, yes.

MS. BENSING: I'd like to pull up Government Exhibit 3758.

Q What is this?

A This is another invoice I sent for the same type of work.

Q And what is the date that you sent this?

A This one is from May 6, 2007.

Q And is it a fair and accurate copy of an invoice that you sent to Reese Jones in May of 2007?

A Yes.

MS. BENSING: Your Honor, the government moves to admit Government Exhibits 790 and 3758?

MR. ROBOTTI: Objection on hearsay grounds.

MS. BONJEAN: Join.

THE COURT: Overruled.

MS. BENSING: And if we can go ahead and publish Government Exhibit 790 to the jury.

THE COURT: Yes. Government Exhibit 790 is admitted.

MS. BENSING: Thank you.

(Government Exhibit 790 received in evidence.)

MS. BENSING: And the government was also offering Government Exhibit 3758.

THE COURT: Okay. And that is --

MR. ROBOTTI: Same objection. Hearsay.

MS. BONJEAN: Join. Relevance and hearsay.

THE COURT: Okay. Government Exhibit -- overruled.

Government Exhibit 3758 is admitted.

(Government Exhibit 3758 received in evidence.)

Q Okay. So looking here at Government Exhibit 790, I think you testified already that the invoice period is 12-31-07 to 1-13-08; is that right?

A That's right.

Q And who did you bill this to?

A To Reese Jones.

MS. BENSING: And if we can scroll down.

Q And approximately how much did you bill to Reese Jones

for this time period?
A For this invoice, it was $1,100.
Q And just to be clear, what is the work that you're billing Reese Jones for?
A This is for, again, editing and videography work on a number of different projects.
Q And for which organization were you doing?
A For OneTaste.
MS. BENSING: If we can briefly pull up Government Exhibit 3758. And if we can zoom in.
Q What is this?
A Another invoice from earlier. Same type of work, same general format. Just I had not yet converted it to FileMaker Pro.
Q And what is this invoice for?
A This invoice was for video editing and videography work for projects related to OneTaste.
MS. BENSING: Okay. We can take that down.
Q When you were -- the videography work that you just testified to doing in 2007 and early 2008 for which you were billing Reese Jones, what was that videography work for?
A It was same type of thing that I described. Shooting classes that we were conducting or creating promotional videos.
Q And that was for what purpose?

A Oh, for the purpose of promoting OneTaste or advancing the work of OneTaste.
Q Did there come a time where you lived at a location called the Warehouse?
A Yes.
MS. BENSING: I'd like to show the witness only what's been marked as Government Exhibit 3820. And if we can just pull up the very beginning.
Okay. And we can just pause.
Q Do you recognize this?
A I do.
Q And did you review this exhibit before coming to court today?
A I did.
Q And what is this?
A This was a video that I shot of another OneTaste person, Shara Ogin, giving a tour of some of the space that we used for OneTaste.
Q At the Warehouse?
A We did walk into the Warehouse, yes.
Q And was this one of the files that you maintained on your hard drive that is contained within 3500-CK-16 that you testified about?
A It is. Yes.
Q From what -- approximately what year did you -- were you

involved in shooting this video?

A I believe this was early 2008.

Q And is there something that might refresh your recollection as to the date?

A Yes. If I saw the file path of the -- where the file comes from on my drive, it is all dated.

(Continued on the next page.)

BY MS. BENSING: (Continuing.)

Q And I'd like to just pull up 3500-CK-16. And if we can go to -- you identified where the original of this video was stored on your drive prior to coming to court today?

A Yes, we looked at that.

MS. BENSING: I'd like to pull up a sub-portion of 3500-CK-16.

(Exhibit published to witness only.)

Q Does this refresh your recollection?

A Yeah.

Q As to which year this video was recorded?

A Yes, this was from early 2007 -- not 2008, so April of 2007.

Q And after you recorded this video, did you maintain it using the system that you described earlier?

A Yeah, a copy just sat on a hard drive that I had for all of those years since then.

Q And is the video contained within Government Exhibit 3820 a fair and accurate copy of what you originally shot?

A Yes, it is.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3828 into evidence.

MR. ROBOTTI: Objection. Objection relevance.

MS. BONJEAN: Join.

THE COURT: Overruled. Government Exhibit 3820 is

admitted.

(Government Exhibit 3820 received in evidence.)

MS. BENSING: And if we could please publish this for the jury.

(Video played; video paused.)

MS. BENSING: Just for the record, we've paused the video at ten seconds.

BY MS. BENSING:

Q Mr. Kosley, where is this location right now?

A This location is what we call The Red Bricks building.

Q Where is that in relation to the Warehouse?

A It was located between the Warehouse and the center at 1080 Folsom.

Q What happens in this video?

A We walk over towards the building from the Warehouse.

MR. ROBOTTI: Objection, I think it has audio.

MS. BENSING: I think it's in evidence, but we have no objection to playing it without the audio.

THE COURT: Do I have the transcript of the audio?

Why don't you just play it without the audio for now.

MS. BENSING: Okay. So we can just play it without the sound.

(Video played; video paused.)

BY MS. BENSING:

Q And what street is this that we're looking at in first start of this video?
A That's Folsom Street.
Q And what building is the woman in the video now entering?
A That's what we call the Warehouse.
Q And what are we looking at here in the video as she just enters the building?
A That's the foyer of the business, sort of the common room that everybody used.
MS. BENSING: And if we can just pause, please.
(Video paused.)
MS. BENSING: We're pausing the one minute ten seconds.
BY MS. BENSING:
Q What is visible now on the right-hand side of the screen?
A On the right-hand side of the screen is the sort of closet area, if you will. It's where people kept their personal belongings. It was just a big shared space for where we kept our stuff.
Q Inside the Warehouse?
A Inside the Warehouse, yes.
MS. BENSING: Okay, we can hit play.
(Video played; video paused.)
MS. BENSING: And what is the timestamp?
Q At one minute 14 seconds I've paused the video. What is

this?
A This is the bathroom of the Warehouse.
Q And this was a shared bathroom?
A That's correct.
MS. BENSING: Okay, we can hit play.
(Video played.)
MS. BENSING: We can pause here at the end.
(Video paused.)
Q Do you see the curtains in the video right now?
A Yes.
Q Where does that lead into?
A That leads into the main room of the Warehouse.
MS. BENSING: We can take that down. Thank you.
Q Mr. Kosley did you video record any events at a property on Stinson Beach?
A I did.
Q Whose property was that?
A I don't know who is the owner, but it was -- Reese Jones -- it was Reese's place.
Q And what event or events did you take video for there?
A It was a demo of orgasmic meditation.
Q Approximately what year did this demo occur at Stinson Beach?
A I believe that was 2008.
Q What was the demo at Stinson Beach?

A It was meant to -- it was a demonstration of orgasmic meditation where Nicole was the person being stroked in the demo. It was just meant to sort of -- there were some investors and --

MR. ROBOTTI: Objection to what it meant.

THE COURT: Sustained.

BY MS. BENSING:

Q Well, you were asked to work at that event; correct?

A Yes, I was.

Q And you were asked to video record the event?

A Yes, I was.

Q What was your understanding of the event that was being video recorded?

A That it was --

MS. BONJEAN: Foundation.

THE COURT: Overruled.

Q You can answer.

A It was meant to sort of as a coming out of orgasmic meditation.

Q And for what purpose?

A For the purpose of interesting investors and/or media that were present.

Q And you testified that Nicole Daedone participated in that demo?

A Yes.

Q What was her role in the demo?
A She was the main demo model, if you will.
Q What does that mean?
A She was the person laying on the table being stroked, demonstrating orgasmic meditation.
Q Did Rachel Cherwitz participate in that demo?
A She did, yes.
Q What was her role?
A She introduced it and was sort of an attendant during that, during the demonstration.
Q And you mentioned that Rachel Cherwitz introduced the demo. What do you mean by that?
A She read from a -- some writing that Nicole had done to just introduce the -- what was about to take place.
Q So she read a writing of Nicole's?
A Yes.
Q And how do you know that?
A Just from reviewing the clip and seeing -- remembering --
MR. ROBOTTI: Objection to the foundation.
THE COURT: Sustained.
BY MS. BENSING:
Q Okay. You said that the introduction was Rachel reading an introduction of Nicole. How do you know that?
A I know remember that from being present at the time.
MR. ROBOTTI: Same objection.

MS. BONJEAN: Same objection.

THE COURT: Overruled.

MS. BENSING: I would like to show the witness only what's been marked as Government Exhibit 3802-A-1.

(Exhibit published to witness only.)

Q Do you see this on your screen?

A I do.

Q Do you recognize this?

A I do.

Q What is this?

A This is the beginning of the demo when Rachel was reading the introduction.

Q And did you review this before coming to court today?

A I did.

Q And I think you already testified to this, but what year was -- did you record --

Did you record Government Exhibit 3802-A-1?

A Yes.

Q In what year?

A I believe it was 2008.

Q What was the purpose of recording this? Why were you asked to record this?

A We were often -- I was often tasked with recording what were considered momentous events at OneTaste, so this was one of them.

Q And how did you maintain the recording after you recorded it?
A This was -- I had the project files on a hard drive that I was working on and then I made a backup copy of them on one of my hard drives which then remained in my possession.
Q And is this one of the files that you provided to the Government in 3500-CK-16 that you've already testified about?
A Yes.
Q And is it a fair and accurate copy of what you originally recorded?
A It is, yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3802-A-1 into evidence.

MR. ROBOTTI: Objection, Your Honor, relevance and 403.

MS. BONJEAN: Join.

THE COURT: The objection is overruled. However, I think there's some words on that --

MS. BENSING: We worked it out.

MR. ROBOTTI: I'm withdrawing my objection to the subtitles.

THE COURT: Mr. Robotti?

MR. ROBOTTI: We take the same position as Ms. Bonjean.

THE COURT: The objection is overruled and there's

no issue with the subtitles.

MS. BONJEAN: Correct, Your Honor.

MR. ROBOTTI: Correct.

THE COURT: And Government Exhibit 3802-A-1 is admitted.

(Government Exhibit 3802-A-1 received in evidence.)

MS. BENSING: Thank you, and if we can publish this to the jury.

(Video played; video paused.)

BY MS. BENSING:

Q So, I think you already testified that this was the intro portion of the demo?

A Correct.

MS. BENSING: I'd like to pull up for the witness only what's been marked as Government Exhibit 3802-C-1.

(Exhibit published to witness only.)

BY MS. BENSING:

Q Mr. Kosley, what happens next in the demo?

A Nicole gets up and takes off her robe. Or her robe is taken off for her and she is naked and lays on the table and then another part of the demo Josh Boshnack strokes her genitals for the roughly the next hour.

Q And just directing your attention to 3802-C-1, do you recognize what's before you on the screen here?

A Yes, that's Rob Kandell.

MS. BONJEAN: I can't hear the witness.
THE COURT: If you could just speak into the microphone. Repeat that last answer.
A Yes, that's Robert on the screen, Rob Kandell.
Q Is this a video clip?
A Yes.
Q Is this a video clip you reviewed prior to coming to court today?
A Yes.
Q And what happens in this video clip in Government Exhibit 3802-C-1?
A Robert calls up the -- he says the host, which is Reese Jones.
Q And do individuals walk up on to the screen?
A Yeah, and then Reese walks up.
Q Is this also a video that you shot?
A Yes.
Q And is this a video that you maintained after you shot it?
A Yes.
Q And did you provide it to the Government within 3500-CK-16?
A Yes.
Q Did you review it prior to coming to court today to ensure its accuracy?

A Yes.
Q And is it fair and accurate?
A It is.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3802-C-1 into evidence.

MR. ROBOTTI: Objection, relevance and several 403 grounds.

MS. BONJEAN: Yes, Your Honor. We object to this on relevance grounds and 403.

THE COURT: Government Exhibit -- it's overruled Government Exhibit 3802-C-1 is admitted.

(Government Exhibit 3802-C-1 received in evidence.)

MS. BENSING: And if we could please publish this for the jury.

(Video played; video paused.)

Q I'm pausing at 54 seconds.
Mr. Kosley, I would like to draw your attention to the very bottom left-hand side of the screen. Do you see an individual depicted there?
A I do.
Q And who is that?
A That's Christina Berkley.
Q And who is the individual to Christina Berkley's immediate left; or right when you're looking at the video?
A I think that's Becca Osborne -- or do you mean the

gentleman?

Q The person standing.

A The person standing is Rob Kandell.

Q And the person next to Rob Kandell?

A Standing is Nicole Daedone.

Q Who is standing next to Nicole Daedone?

A That's Joshua Boshnack.

MS. BENSING: Okay. You can keep playing this, please.

(Video played; video paused.)

MS. BENSING: Okay, we can take that down.

BY MS. BENSING:

Q And I think you testified that what happened next during the demo is that Nicole laid down on a table and was stroked; is that correct?

A That's correct.

Q And for approximately how long?

A About an hour.

MR. ROBOTTI: Objection, asked and answered.

THE COURT: Overruled.

BY MS. BENSING:

Q At some point during that hour, what happens?

A People are invited up from the audience to put their hand on Nicole's body.

Q Why?

A To sort of have the experience of feeling the energy that's being generated from the practice.
Q And who was the person inviting people up to touch Nicole Daedone's body?
A Rachel Cherwitz.
MS. BENSING: I would like to show the witness only what's been marked as Government Exhibit 4793.
(Exhibit published to witness only.)
BY MS. BENSING:
Q Do you recognize this? It should be up on your screen.
A Yes.
Q And what is this?
A It's a picture of Bryan Franklin touching Nicole's thigh.
Q Is this the same shot of the same video we were just looking at, a different portion?
A Yes, it's a still the video, a continuation of the video we just watched.
Q Who is visible in the picture?
A Rachel Cherwitz and Bryan Franklin.
Q And is this a fair and accurate depiction of Rachel Cherwitz and Bryan Franklin at that demo?
A Yes.
MS. BENSING: The Government moves to admit Government Exhibit 4793 into evidence.
THE COURT: Any objection?

MR. ROBOTTI: Relevance.

MS. BONJEAN: Join.

THE COURT: Government Exhibit 4793 is admitted. The objection is overruled.

(Government Exhibit 4793 received in evidence.)

MS. BENSING: And if we can publish this to the jury.

(Exhibit published.)

Q Who is Bryan Franklin?

A Bryan Franklin was a potential investor and business partner.

Q And what is he doing in this picture?

A He's putting his hand on Nicole's thigh while she is being stroked.

Q During that same demo?

A During the demo, yes.

MS. BENSING: If we can pull up for the witness only Government Exhibits 4795 and 4796, if we can put them side-by-side.

(Exhibit published to witness only.)

BY MS. BENSING:

Q Do you recognize Government Exhibits 4795 and 4796?

A I do.

Q And starting with 4795, what is this?

A It's a still shot from that same video, a little later

with Reese Jones putting his hand on Nicole's thigh.
Q And what about 4796?
A The same thing. That's Marta -- I forget Marta's last name.
Q Who is Marta?
A It's Reese's business partner, but also a business collaborator with OneTaste at the time.
Q And these are still shots from the same video recording that you did at Stinson Beach?
A Correct.
Q During that same demo?
A The same demo, yes, same.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibits 4795 and 4796 into evidence.
MR. ROBOTTI: Objection on relevance.
MS. BONJEAN: Join.
THE COURT: Objection overruled. Government Exhibits 4795 and 4796 are admitted.
(Government Exhibits 4795 and 4796 received in evidence.)
MS. BENSING: And if we can publish both of them to the jury, if possible.
(Exhibit published.)
Q And starting with the left hand 4795, who is that?
A That's Reese Jones.

Q And what is he doing?
A He's got his hand on Nicole's thigh while she's being stroked.
Q And in 4796; who is that?
A That's Marta.
Q What is she doing?
A She also had her hand on Nicole's thigh during the demo.
MS. BENSING: We can take that down.
Q What happened after the demo completed, Mr. Kosley?
A When the demo was finished, Nicole got back up, put her robe back on and was just kind of in the room. I think Reese came up and they kissed.
MS. BENSING: I would like to show the witness only what's been marked as Government Exhibit 3802-E-1.
(Exhibit published to witness only.)
Q Do you recognize this?
A Yes.
Q Is this a video clip that you reviewed prior to coming to court today?
A Yes.
Q And does this depict that period of time right after the demo is over?
A Yes.
Q Is this a video you shot?
A Yes.

Q And did you maintain this in your files after you shot it?
A Yes.
Q And did you subsequently provide it to the Government and it's contained within 3500-CK-16?
A Yes, I did.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3802-E-1 into evidence.
MR. ROBOTTI: Objection. Irrelevant and 403.
MS. BONJEAN: Yes, on the same grounds, 401 and 403.
THE COURT: Overruled. Government Exhibit 3802-E-1 is admitted.
(Government Exhibit 3802-E-1 received in evidence.)
MS. BENSING: And if we can please publish this to the jury.
(Video played; video paused.)
Q I'm pausing at 29 seconds.
Mr. Kosley, who is visible walking out right after Nicole Daedone and Reese Jones?
A That's Christina Berkley.
MS. BENSING: Okay. If we can hit play, please.
(Video played; video paused.)
MS. BENSING: I would like to show --
Q Well, you testified earlier that a one of your roles was shooting courses in which Nicole Daedone was teaching; is that

correct?
A That's correct.
MS. BENSING: I would like to show the witness only what's been marked as Government Exhibit 3815-1.
(Video played.)
MS. BENSING: And just pause.
(Video paused.)
Q Do you recognize this?
A I do.
Q And what is this?
A This is Nicole teaching a course.
Q And is this a video clip that you reviewed prior to coming to court today?
A It is.
Q How do you recognize this video clip?
A This was a pretty standard setup for courses we were doing at the time. So same couch, same backdrop, same coffee table we had for a couple of years.
Q Were you involved in recording this video?
A Yes, I recorded most of the videos, pretty much all of them at this time.
Q And where is this location?
A This is at the upstairs -- we call it the yoga studio at 1074 Folsom.
Q 1074 Folsom is what?

A It's we call the center or sort of the main hub of activity and business for OneTaste.
Q What year did you record this video?
A I think this is from 2007.
Q Okay. And did you maintain this video after you recorded it in the same manner that you testified to?
A I did.
Q And did you subsequently provide it to the Government in 3500-CK-16?
A I did.
Q Is it a fair and accurate copy of what you recorded?
A It is.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3815-1.
MR. ROBOTTI: Objection, relevance, 403.
MS. BONJEAN: And join in that objection but doctrine of completeness.
THE COURT: I am going to sustain the objection on relevance on this foundation.
BY MS. BENSING:
Q Mr. Kosley, a couple more questions for you. When you were involved in recording Nicole Daedone, what, if anything, did Nicole Daedone teach about victims or victim's stories?
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection to the vagueness of that

question.

THE COURT: Sustained.

BY MS. BENSING:

Q In or around 2007 what, if anything, did Nicole Daedone teach about victims or victim stories?

MS. BONJEAN: Still, vagueness of the question.

MR. ROBOTTI: Relevance.

MS. BONJEAN: And relevance.

THE COURT: It was sustained to the first objection.

BY MS. BENSING:

Q Mr. Kosley, as part of your work in acting as the videographer for Nicole Daedone, did you ever hear her talk about victim stories?

A Yes.

Q And what, if anything, would she teach about victim stories?

MR. ROBOTTI: Objection relevance.

MS. BONJEAN: Your Honor, it's the same objection.

THE COURT: Overruled.

A She would teach that they would often garner a lot of attention and sympathy.

Q And in Government Exhibit 3815-1 that you reviewed prior to coming to court today what, if anything, is Nicole Daedone teaching about?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection. It's an interpretation, but I object to the foundation and if --

THE COURT: Sustained as to foundation.

MS. BONJEAN: Okay.

BY MS. BENSING:

Q And in this clip of Government Exhibit 3815-1 that you reviewed prior to coming to court today, did Nicole Daedone talk about victim stories?

A She did.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3815-1 into evidence.

MR. ROBOTTI: Objection; 403, relevance.

MS. BONJEAN: Still an objection on relevance grounds.

THE COURT: The objection is overruled. 3815-1 is admitted.

If you're planning to show it, there is some words that --

MS. BENSING: With respect to all of the videos, Your Honor, I believe we've reached an agreement.

MS. BONJEAN: Yes, we're fine.

THE COURT: So 3815-1 is admitted.

(Government Exhibit 3815-1 received in evidence.)

MS. BENSING: Thank you very much.

And if we could publish 3815-1 to the jury.

(Video played; video paused.)

MS. BENSING: I would like to show the witness only what's been marked as Government Exhibit 3823-2.

(Exhibit published to witness only.)

Q Mr. Kosley, do you recognize this?
A I do.
Q And what is this?
A This is a clip from a course that Nicole taught.
Q And does this consist of audio only?
A It's an audio-only clip, yes.
Q How do you recognize this?
A From having reviewed it previously.
Q And did you also review the minute prior to what's depicted here on the screen?
A I haven't reviewed the minute prior, no.
Q Did you review the entirety of the recording before coming to court?
A Yes. I reviewed the entirety of the clip.
Q As well as the entirety of the recording?
A Correct.
Q What year was this audio recording from?
A I'm sorry, I don't know quite what year. I want to say 2008, but if I looked at the file name or --
Q Sure, did you review the file path for this recording prior to coming to court today?

A Yes.
Q And is that contained within 3500-CK-16?
A It is.
Q And would reviewing that file path refresh your recollection as to what year this was recorded?
A Yes.
MS. BENSING: And if we can please pull up 3500-CK-16.
(Exhibit published to witness only.)
Q Does this refresh your recollection as to when this was recorded?
A It does, yes. The date on the file name, 2009, July 2009 is accurate.
Q And were you personally there when this recording was taken?
A I was.
Q How do you know?
A Because I'm on the recording actually and I remember being present for this.
Q Did you maintain this recording after it was shot?
A I did.
Q And did you maintain it in the same way that you've previously testified with respect to the rest of the video and audio files on 3500-CK-16?
A I did.

Q And is the portion in Government Exhibit 3823-2 a fair and accurate copy of that recording?
A It is.
MS. BENSING: Your Honor, the Government --
Q And who is teaching in this recording?
A This is an audio recording of Nicole teaching.
Q And as part of your observing and recording, did Nicole Daedone discuss exploitation?
MS. BONJEAN: Objection to the characterization and leading.
MR. ROBOTTI: Join.
THE COURT: I'll sustain.
Ask your next question.
BY MS. BENSING:
Q In the recording itself that you reviewed prior to coming to court today what, if anything, did Nicole Daedone say with respect to exploitation?
MS. BONJEAN: Objection, Your Honor. It's foundation.
THE COURT: Overruled.
Q You can answer.
MS. BONJEAN: In this clip or --
MS. BENSING: Yes.
Q In Government Exhibit 3823-2 what, if anything, did Nicole Daedone say about exploitation?

A Nicole talked about how being exploited can actually be a good thing.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3823-2 into evidence.

MR. ROBOTTI: Your Honor, Objection, irrelevant, 403.

MS. BONJEAN: Your Honor, I would like to voir dire on this particular one.

THE COURT: Yes, go ahead.

VOIR DIRE EXAMINATION

BY MS. BONJEAN:

Q Mr. Kosley, you've testified that you did the audio recording of this particular, I guess, teaching?

A Correct, yes.

Q Where was it?

A I don't remember exactly where it was. I think it was in San Francisco.

Q Where specifically in San Francisco?

A I believe it was in the center, but I don't remember exactly. It was a recording made on my iPhone at the time. It wasn't made with the regular recording equipment we used.

Q So you recorded it on your own iPhone?

A Correct.

Q And putting aside the physical location, what type of -- was it a course, was it a casual lecture? What was it?

A I believe it was a course, but Nicole often held, like you said, casual lectures, but I don't remember specifically what it was in this case.
Q Do you know who was listening to these remarks that Ms. Daedone made?
A It would have been --
Q Not a would have, who was it?
A Myself and a group of other OneTaste members and course participants.
Q So, course participants. So was this an OM course?
A Again, I don't recall the specific event this came from. I just remember being present and listening to Nicole speak which was a common occurrence.
Q Okay. But you have no idea whether it was a course or a casual conversation? I'm guessing you don't know how many people were present; right?
A I don't remember specifically, no.
Q And you don't remember whether she was actually teaching to anybody; right?
A Any time Nicole was speaking to a group of people, she was teaching.
Q That's your opinion, but you don't know whether she was teaching to people who were new to the program, how about that?
A I can't say specifically, no.

Q And you don't know whether it was associated with any specific course; correct?
A I don't recall.
Q And this clip that you looked at, that came from four and a half hours of video -- audio; right?
A Yes, it's plausible.
Q It's not just plausible. You said you reviewed it all, right?
A Yes.
MS. BENSING: Your Honor, it's beyond the scope of voir dire.
THE COURT: I am going to allow her to continue go ahead.
Q Did you or did you not review four and a half hours of audio from this particular occasion?
A I did not review all four and a half hours, no.
Q You just testified in response to the Government's questioning that you had reviewed the entire recording, yes?
A Yes.
Q So that wasn't true?
A Yes, I did not listen to all four and a half hours, no.
Q So why did you say you did?
A I guess I misunderstood the question.
Q You listened to this -- how long is this clip?
A I don't remember actually. I'd have to look at the run

time. I think it's six or seven minutes.
Q Okay. So you listened to six or seven minutes of a four and a half hour recording; right?
A I listened to more of that recording, but I did not listen to all four and a half hours, no.
Q How much of it did you listen to?
A I don't remember; 15 or 20 minutes of it.
Q Okay. And as you sit here today you don't know what the purpose of this particular speech was; right?
A Nicole's lectures didn't necessarily have a specific purpose. Sometimes she just spoke to a group of people.
Q Sometimes she just did that and sometimes she was speaking in a more formal fashion, right?
A Right.
Q And you don't know which one it is as you sit here today?
A No, I don't.

MS. BONJEAN: Judge, I have no further questions at the moment. I maintain my objection.

MR. ROBOTTI: We join.

THE COURT: Do you wish to offer it or do you wish to ask a couple of additional questions?

MS. BENSING: I'll ask a couple of questions.

BY MS. BENSING:
Q When you reviewed the entirety of where this audio clip came from, how did you review that longer, whatever, four and

a half hour clip?
A We scrubbed through the audio to verify that there was -- the length that I would expect it to have been and nothing edited out and nothing had changed, so -- which is how I often would review long clips. I wouldn't always watch every minute of every clip that I work with.
Q Okay. And were you able to verify that this is a subset of that longer recording by Nicole?
A Yes, yes.
Q And I think you already testified to this, but what year was this?
A I believe it was 2009.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3823-2.
THE COURT: Do you maintain your objection?
MR. ROBOTTI: Yes.
MS. BONJEAN: Yes.
THE COURT: Objection is overruled. Government Exhibit 3823-2 is admitted.
(Government Exhibit 3823-2 received in evidence.)
MS. BENSING: Thank you.
And if we could please play this for the jury.
(Audio played.)
(Continued on the following page.)

(Audio played.) (Audio stopped.)
MS. BENSING: We can take that down.
BY MS. BENSING: (Continuing)
Q Mr. Kosley, did you ever hear Nicole Daedone discuss the infinite game?
A Yes.
Q And what did she say about the infinite game?
MS. BONJEAN: Objection to vagueness and foundation.
THE COURT: Overruled.
A She would often reference a book called "Finite and Infinite Games" which talks about the idea of an infinite game.
MS. BENSING: I'd like to pull up for the witness what's been marked for identification as Government Exhibit 3877-1.
Q Do you recognize this?
A I do.
Q And what is this?
A This is a video from a lecture Nicole gave in New York.
Q And did you -- how do you recognize it?
A I edited the video myself.
Q Did you record the video?
A I did not record the video. The video was recorded by Reese Jones.
Q And how did you get the video?

A Reese handed me the video files and I edited them subsequently.
Q And why did Reese hand you the video files?
A They wanted to turn this --
MR. ROBOTTI: Objection.
THE COURT: Sustained.
Q What was your understanding of why you got the video files?
MR. ROBOTTI: Same objection.
MS. BONJEAN: Same objection.
THE COURT: Overruled.
A They wanted me to edit the -- there were two cameras. They wanted me to edit the video to turn it into a product for sale.
Q So as part of your role as videographer, you received this so you could edit it at OneTaste?
A That's correct.
Q You said that this lecture was in New York. What year was the lecture?
A I believe it was in 2007.
Q After you received this video footage, did you maintain it in the same way that you testified about?
A I did, yes.
Q And did you subsequently provide it to the government and it's contained in 3500CK-16?

A Yes.
Q And did you review this before coming to court today?
A I did.
Q Is it a fair and accurate copy of a portion of the lecture that Nicole Daedone gave?
A It is.
MS. BENSING: Your Honor, the government moves --
Q Or at least the video footage that you received of it?
A Correct.
MS. BENSING: Your Honor, the government moves Government Exhibit 3877-1 into evidence.
I'm sorry. Can I ask one more question, Your Honor?
THE COURT: Yes. Go ahead.
Q What, if anything, did you hear Nicole Daedone discussing on this video?
MS. BONJEAN: I'm going to object, Your Honor.
THE COURT: And I'm going to sustain the objection at this time based on the foundation.
MS. BONJEAN: I'd rather stipulate than hear --
THE COURT: I'm sustaining the objection to -- your last objection.
Q Okay. And you received this as part of your work as videographer, correct?
A Correct.
Q And did you review it when you received it?

A Yes.
Q And did you hear Nicole Daedone discussing topics in this, in this lecture?
A I did.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 3877-1.

MR. ROBOTTI: Objection, irrelevant, cumulative, 403.

MS. BONJEAN: Join in that.

THE COURT: Sustained on this foundation.

Q Well, in the portion that you received as part of your role as videographer, did Nicole Daedone discuss the infinite game?
A She did.

MS. BENSING: Your Honor, the government moves to admit Government 3877-1.

THE COURT: I'm still going to sustain it on foundation. You can move on to another topic.

MS. BENSING: Okay. I'd like to pull up Government Exhibit 1065 for the witness only, please, and if we can please zoom in on the content.

Q Do you recognize Government Exhibit 1065?
A I do.
Q What is it?
A This was an e-mail that was sent out to the residents of

1080 regarding their expected behavior at --
Q And without getting into the content, was this an e-mail sent on December 22, 2011?
A Yes.
Q And at that time, were you a resident of 1080?
A I was.
Q And did you receive this e-mail?
A I did.
Q Is it a fair and accurate -- and who sent this e-mail?
A This was sent by Rachel Cherwitz.
Q Is it a fair and accurate copy of an e-mail sent by Rachel Cherwitz on December 22, 2011?
A Yes.
MS. BENSING: Your Honor, the government moves to admit Exhibit 1065 in evidence.
THE COURT: Give me a moment to finish reading it.
Any objection? I can give you a minute to finish reading it as well.
MR. ROBOTTI: Yes, Your Honor.
(Pause.)
MR. ROBOTTI: We object on relevance and cumulative.
THE COURT: Ms. Bonjean?
MS. BONJEAN: Join.
THE COURT: The objections are overruled. Government Exhibit 1065 is admitted.

(Government Exhibit 1065 so marked.)

MS. BENSING: If we can please publish Government Exhibit 1065 to the jury.

THE COURT: If you could just make, whatever you're publishing, make it big enough so people can see it.

MS. BENSING: Yes. So if we can zoom in at the very top.

Q Again, who is this from?

A Rachel Cherwitz.

Q And what is the subject?

A It says: In Group tonight.

Q What is "In Group"?

A In Groups were events we held weekly as recruiting and, as recruiting events basically.

Q And what was the date that this was sent?

A This was sent on December 22, 2011.

MS. BENSING: Okay. And if we can now please go down and publish the first paragraph.

Q And if you can please read this out Mr. Kosley?

A As many of you heard, Nicole and Rob will be leading In Group tonight. It's very exciting, feels like it's going to be a big night of turn on.

MS. BENSING: Okay. If we can please go down to the second sentence and all of the numbered paragraphs.

Q Okay. I'd like you to read this out, please.

A Sure.

You are all more than welcome to attend and here are a few guidelines and things to remember.

Number one.

THE COURT: Just read slowly, please, for me and for the benefit of the court reporter.

A Number one: In group is a OneTaste sales event. If you are a coach/OM trainer or in training, you cannot obtain leads or clients from the events. The sales team is working hard to be of service to the people coming. Please respect the process in place.

Number two: Please do not talk about leaving -- please do not talk about living in 1080.

It says "living" but --

MR. ROBOTTI: Objection to the interpretation.

THE COURT: Yes, sustained.

A Okay.

Number two: Please do not talk about leaving in 1080. Again, In Group can be the first contact someone has with OneTaste. Be mindful of where they are at. Do not talk about group shower experiences, group OMing, the last hot threesome you had, et cetera.

Number three: Do not under any circumstances, even if you are joking, say that you live in a cult. We have worked for many years to dissolve this idea from our

reputation. Please please please. I cannot stress this enough. Be vigilant here.

Number four: Do not give intimacies to each other. Remember that you are at OneTaste to share your turn on. Just like with Fill Up America, where we empty what's full, In Group is a place where we get to demonstrate to people through example what it means to live an orgasmic life.

Number five: In line with number four, please do not say anything in the rounds that have the potential to whack the leaders. It is our job to strongly and silently support from the audience.

Number six: If you are going on the seat, please be generous. Turn the room on, be bright, and most importantly, have fun.

Number seven: With that, allow new people to go on the hot seat. Remember, this event is for them. Put your attention out and ask questions. I know that you all have the ability and capacity to deliver a dynamite experience for our guests.

Number eight: Lastly and probably most important have fun, be turned on and get ready to play. The greatest skill we have is the ability to feel and give quality attention to the people coming in.

MS. BENSING: Okay. We can take that down, please.

I'd like to show the witness only what's been marked

as Government Exhibit 3086.
Q Mr. Kosley, do you recognize this?
A I do.
Q And is this multiple pages?
A Yes, there's several pages to this.
Q Did you review it prior to coming to court today?
A I did.
Q And what is this?
A This is the course outline or syllabus for a taboo course that we taught in New York.
Q And how do you know what this is?
A I was in attendance and I was one of the teachers and I ran production.
Q And is this a fair and accurate copy of the course outline for the taboo course?
A Yes.
Q And what year is this from?
A 2015.
Q And you said that you were one of the teachers of this course. What was your role in 2015?
A I was running production for OneTaste so I was managing all the, the details of when we put on a course making sure that all the necessary elements were in place, chairs, venue, tea for the teachers, whatever. Whatever needed to be provided to run the course, it was my responsibility.

Q And did you still have videographer roles at this time?
A Occasionally, but mostly I was running production by this point.
Q And were you one of the people who were running this taboo NYC course?
A Yes, I was presenting and teaching in this course.
MS. BENSING: Your Honor --
Q Oh, and I think you testified this is a fair and accurate copy of that course syllabus?
A Yes.
MS. BENSING: The government moves to admit Government Exhibit 3086 into evidence.
MR. ROBOTTI: Judge, objection. Irrelevant on this foundation and cumulative and 403.
MS. BONJEAN: Objection. Relevance. Foundation.
THE COURT: I'm going to sustain the objection on this foundation.
Q Well, Mr. Kosley, let me ask you this.
Are you familiar with the story of Ephesus?
MR. ROBOTTI: Objection. Relevance.
THE COURT: Overruled.
Q You can answer.
A I am familiar with the story that Nicole told about Ephesus or Ephesus, I don't quite remember.
Q What is the story that Nicole told about Ephesus?

A She would tell a story about how there was a temple in a place called Ephesus and the men would come back from war and go to the temple and the priestesses of that temple would, quote, unquote, "fuck the war out of them."
Q Are you familiar with priests or priestesses of orgasm?
A Yes, that was something we had for a while while I was at OneTaste.
Q When approximately?
A Around 2014, 2015, I believe.
Q And what are priests or priestesses of orgasm?
A They were participants or members of OneTaste who had shown sufficient devotion or commitment to the path of orgasm that they were sort of inducted as priests or priestesses of orgasm.
Q And who held the induction ceremony -- did you attend the induction ceremonies?
A I attended and I was inducted as one of the priests of orgasm.
MR. ROBOTTI: Objection to relevance.
THE COURT: Overruled.
Q Who conducted the priest or priestesses of orgasm ceremonies?
A Nicole and Rachel and the leaders of OneTaste.
MS. BENSING: We can take that down.
Q Did there come a time when Reese Jones stopped investing

in OneTaste?
A Yes.
Q And did OneTaste develop a coaching program?
A Yes.
MS. BENSING: I'd like to show the witness what's been marked as Government Exhibit 3808-A-1.
We can just pause it.
Q Do you recognize what's depicted in this exhibit?
A I do.
Q And what is this?
A This is from the coaching program, one of the coaching program weekends.
Q Which coaching program?
A From CP-9, I believe.
Q And what year was CP-9?
A I would have to look at that file name to remember exactly when.
Q Sure.
Did you review the file path for the original of this government exhibit prior to coming to court today?
A Yes. Yes, we looked at that.
Q And was this video contained within what you provided to the government and what's contained within 3500CK-16?
A Yes.
Q I'm going to show you something and let me know if it

refreshes your recollection.

THE COURT: Sorry. You haven't asked him a question yet.

MS. BENSING: Oh, I believe the witness testified that he cannot recall what year.

THE COURT: Okay.

(Pause.)

A Okay. Yes, I see that was from 2015.

MS. BENSING: If we can return back to the exhibit.

Q Just looking at Government Exhibit 3808-A-1, how do you know what this is?

A I recognize the location and I was present for, for the event.

Q And were you involved in recording this event?

A I was not the person running the camera. I was running production for the event but I was present.

Q And did you review the entirety of Government Exhibit 3808-A-1 prior to coming into court?

A I did.

Q And what is it?

A It's a clip of the, you know, the beginning of the weekend when Eli and Yia were introducing Rachel onto the stage.

Q And is it a fair and accurate copy of that portion of CP-9?

A Yes.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 3808-A-1 into evidence.

THE COURT: I want to just clarify. I'm not sure I heard properly.

Did the witness say that he was present at the event or was not? I didn't hear properly.

Q You can answer, Mr. Kosley. Were you present at this event?

A I was present.

THE COURT: Any objection?

MR. ROBOTTI: Yes, Your Honor. We object to the relevance as cumulative and on completeness grounds which we previously discussed with the government. Just preserving the record.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Join.

THE COURT: Objection overruled.

Government Exhibit 3808-A-1 is admitted.

(Government Exhibit 3808-A-1 so marked.)

MS. BENSING: And if we can please publish this to the jury.

(Video played.)

MS. BENSING: And let's pause.

(Video stopped.)
Q Who are the individuals depicted here?
A That's Yia Vang on the left and Eli Block on the right.
MS. BENSING: Okay. We can hit play.
(Video played.)
MS. BENSING: Okay. We can pause.
(Video stopped.)
MS. BENSING: We can take that down.
I'd like to show the witness what's been marked as Government Exhibit 3808-C-1.
Q Mr. Kosley, do you recognize what's in Government Exhibit 3808-C-1?
A Yes.
Q What is this?
A This is Rachel speaking at the same CP event.
Q The CP-9 event?
A Yes.
Q And, again, were you present for this CP-9 event?
A I was.
Q And did you maintain video of this CP-9 event?
A Yes, this was on my hard drives that I have.
Q That you subsequently provided to the government?
A Correct.
Q Did you review it prior to coming to court today?
A I did.

Q And is it a fair and accurate copy of a portion of that video?
A Yes, it is.
MS. BENSING: Your Honor, the government moves to admit Government Exhibit 3808-C-1 into evidence.
MR. ROBOTTI: Objection. Irrelevant. Cumulative. Completeness.
MS. BONJEAN: Join.
THE COURT: The objection is overruled.
Government Exhibit 3808-C-1 is admitted.
(Government Exhibit 3808-C-1 so marked.)
MS. BENSING: And if we can please play this for the jury.
(Video played.) (Video stopped.)
THE COURT: Ms. Bensing, within the next 5, 10 minutes, I'd like to take a break but you tell me when it's convenient.
MS. BENSING: Okay. There's one more exhibit I would like to pull up.
THE COURT: Go ahead.
MS. BENSING: So if we can please pull up Government Exhibit 3808-D-1 for the witness only.
Q What is this, Mr. Kosley?
A This is another clip of Rachel teaching at that CP-9.
Q And, again, is this an event that you were at?

A Yes.
Q And is this the video that you received as part of that event?
A Yes.
Q And did you provide this video as well to the government as part of 3500CK-16?
A Yes.
Q Is it a fair and -- did you review the clip prior to coming to court today?
A I did.
Q Is it a fair and accurate copy of a portion of that event?
A Yes.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 3008.

MR. ROBOTTI: Same objection. Relevance. Cumulative. Completeness.

THE COURT: Ms. Bonjean?

MS. BONJEAN: I join in the objection. My apologies.

THE COURT: Objection overruled.

Government Exhibit 3808-D-1 is admitted.

(Government Exhibit 3808-D-1 so marked.)

MS. BENSING: Thank you.

And if we can please play this for the jury.

(Video played.) (Video stopped.)

MS. BENSING: Okay. We can take that down.

And now would be a great time for a break, Your Honor.

THE COURT: Okay. I'm going to ask the jury to come back at 5 minutes after 4.

The witness can step down for now and then the jury will head out.

(Witness steps down.)

THE COURT: Okay. Enjoy the next 15 minutes. Don't talk about the case. Don't let anyone talk to you about the case. See you at 5 after 4.

(Jury exits.)

THE COURT: Before I let you all go, Ms. Bonjean, what time do you need to get out of here?

MS. BONJEAN: I mean I, you know, ideally, it would be not too far past 5 o'clock, but I mean I can make it, I can do 5:30.

THE COURT: Okay. I just want to then mention a couple of things to you now instead of at the end.

MS. BONJEAN: Yes. I can make it to the end.

THE COURT: No, that's fine.

I just wanted to -- instead of doing the things outside the presence of the jury at the end of the day, I'll just do it now just because we are not here tomorrow so we're

heading into a couple of days.

I don't expect that there is going to be any filings other than the one filing I know I'm getting from Mr. Robotti, but if there are issues you want to raise, I would appreciate it if you raise them today or things you want me to look at. I'm going to look at all the videos that I know are coming up, obviously, but if there's something else that would save us time on Monday, that's fine.

I have been spending time looking at the request to charge, I have been working on that, and the parties were very candid about sort of putting certain things in that they thought might really depend on what happens at trial. So, you know, obviously, we're still, you know, not at the end of trial yet, but to the extent that the parties are starting to think about some of the joint requests that they put in differently than they originally had thought about them, talk to each other and you're always welcome to propose something, but I myself also am going to be focusing on these.

So we're not going to have a charge conference particularly soon, but to the extent your views have changed on what you think the jury should be charged on, I guess I'd rather know that sooner rather than later if it's a dramatic change. I think the parties did build in, well, let's wait until trial, or if this comes out, this should be said, but to the extent you're either walking away from something or really

know that you think something should be instructed to the jury, you can let me know sooner rather than later.

That's not a weekend project for you, but I just wanted to let you know that I am focusing on that and I know there were still some open questions still and, of course, there will be a full formal charge conference at an appropriate time.

Also, along those lines sort of thinking towards later in the trial, I will want the parties to make sure they are on the same page before the government rests and if there's any defense case, before the defense rests, as to what came into evidence.

Me and my team are keeping track. I know you are all keeping track too, but I do require that the parties go over with each other everything they think came in and in this case, certain things have been coming in in redacted form and I've been allowing that even without having the hard copy redactions and letting you redact sort of on the fly, but we're going to all have to be careful, making sure that what ultimately would be available to a jury is really what went into evidence. So, you know, whatever, do your recordkeeping in a way that will be easy to do and won't take so long because there are a lot of exhibits in this case.

So I just wanted to mention that now again. It's not something to do for the weekend.

Okay. That is what I had to raise right now. Is there something you want to raise?

MS. BENSING: Yes. Just because Your Honor asked, I do want to flag that the government may brief two issues over the weekend. First, with respect to the financial evidence that we briefed prior to trial. We may file something on that just to tee it up again for the Court.

THE COURT: Can you do it tomorrow?

MS. BENSING: I think so, Your Honor. So we can do our best to get that in by 5 p.m. tomorrow.

THE COURT: Okay. To the extent anything is going to be joined, I know Ms. Bonjean has another thing that's important, so I don't want her to be imposed upon. Frankly, she raised this quite a while ago.

MS. BENSING: Yes. Yes, of course. And we can do our best to --

THE COURT: I mean others may have lives as well. I don't mean to suggest only Ms. Bonjean has something to do, but she did raise this as a personal commitment and I'm going to honor that for her and hope not to put her in a position where she is distracted from her personal commitments over the weekend.

MS. BENSING: Yes, of course. I understand. Let me talk to Ms. Bonjean and we'll figure it out.

THE COURT: Okay. You said two issues.

MS. BENSING: Yes. And we may also renew our request in light of the cross topics to have an expert witness testify but, again, let me speak to the defense.

THE COURT: And this would be the same expert, Ms. Raghavan, is that the name?

MS. BENSING: Yes.

THE COURT: Or is it Dr. Raghavan?

MS. BENSING: Doctor, yes.

MS. BONJEAN: Obviously, we'll be objecting to that particularly given the expansive testimony that people have testified about their own psychological states.

THE COURT: I'll listen to the government, but I remember what your proffer was as to Dr. Raghavan and I also remember what my ruling was at the time.

MS. BENSING: We understand, Your Honor.

THE COURT: Anything else? Actually, time frame on this witness, what do you think, how much longer?

MS. BENSING: Your Honor, I'm done with the videos. I anticipate introducing a few of the text message sub-exhibits next to introduce them and I think we're done with this witness.

THE COURT: Okay. All right. Given Ms. Bonjean's constraints, is the preference to -- I think we probably have to start cross.

Who would be doing the first cross, you,

Ms. Bonjean?

MS. BONJEAN: Yes.

THE COURT: Okay. Let's just see where we are and what time it is.

MS. BONJEAN: Sure.

THE COURT: But you can stay until maybe 5:15?

MS. BONJEAN: Sure.

MS. FARRELL: We have another witness waiting to be on call. Should I just dismiss that witness? It sounds like --

THE COURT: Yes. Also, is there an issue with Monday morning schedule?

MS. FARRELL: Yes, I have a doctor's appointment that I have to go to at 8 a.m. I think I will here by 9:30, but I'm not positive.

THE COURT: I want the name of that doctor. If you are going to get here after a visit with a New York City doctor at 9:30.

MS. FARRELL: I --

THE COURT: I don't need the name of the doctor.

MS. FARRELL: I think I'll be here on time, but I may be a few minutes late. The issue was if my witness was on over the weekend. Anyway, it's not going to be a problem. So I may be a few minutes late, but we can start at 9:30 without me.

THE COURT: Okay. Sounds good.

I'll give you guys the next 5, 7 minutes, whatever it is, and then we'll come back.

(Recess taken.)

(Continued on next page.)

(Proceedings continue in open court; no jury present.)

THE COURT: We can go get the jury.

There's one other thing I wanted to mention just about all of your things. I think somebody made an inquiry as to whether I'd be using my courtroom tomorrow for other proceedings. I do have one proceeding tomorrow in person, in the courtroom. It is a civil case, and it's, I don't know, maybe four or five people on each side maybe.

So I am happy to have you leave, if you need to leave things, and we can just clear -- I'm sure they'll be fine with part of the table or two.

So whatever you can do, just I don't want anyone to disturb your things either, but I don't want you also to feel you have to move everything because we will be in here for a brief period of time only.

MS. FARRELL: Maybe we can stick everything under the benches on our sides. That'll clear the --

THE COURT: That's fine.

MS. FARRELL: -- space.

THE COURT: That's fine.

MS. COHEN: We can clear the tables.

THE COURT: As long as there's nothing super private that, you know, you would be worried about a civil attorney taking a look at.

MS. BONJEAN: This case, maybe.

THE COURT: All right. Whatever -- I am not taking responsibility for your documents on your tables, is what I'm saying, but I'm happy to have you leave them there, and we will work around them.

(Jury re-entered the courtroom.)

THE COURT: Everyone may be seated.

And, Ms. Bensing, you may resume your examination.

MS. BENSING: Thank you very much.

DIRECT EXAMINATION (cont'd)

BY MS. BENSING:

Q And, Mr. Kosley, just a reminder that you're still under oath, okay?

A Thank you.

MS. BENSING: I would like to show the witness -- and I have put up a binder in front of the witness that contains Government Exhibit 4506.

Q So can you open up that binder? Do you see Government Exhibit 4506 in front of you?

A I do.

Q Do you recognize this?

A I do, yes.

Q And what is this?

A This is a compendium of all the text messages I exchanged with Rachel Cherwitz or that I had in my phone at the time I produced this.

Q Okay. And I want to ask you about that.
How did you generate the text messages here in Government Exhibit 4506?
A I used a software application called iMazing that's designed to export text message records from an iPhone.
Q And where were your text message records originally stored?
A On my phone.
Q And was that an iPhone?
A Yes, I had an iPhone.
Q And approximately when did you do this extraction of the text messages on your iPhone?
A This was from October of 2022.
Q And how do you know that?
A The date of production is stamped at the bottom of the page.
Q The date of the extraction you mean?
A The extraction, yes.
Q And did you review what's in Government Exhibit 4506 after you did the extraction?
A Yes. I mean, I didn't read it from front to back, but I have reviewed it, and I believe it is accurate.
Q And is what's contained in here what was in your iPhone, and now it is in the format that the application produced?
A Yes. It was all extracted and now it appears to be

printed out on these page, yes.
Q Okay. And so what was extracted was the same as what was in your phone; is that correct?
A Correct.
Q When did you -- how did you provide this to the government, these text messages with Rachel Cherwitz with Government Exhibit 4506?
A These were produced as part of litigation I was involved with with OneTaste.
Q Let me ask you, was this also contained within 3500-CK-16 that you provided to the government?
A Yes. It was on that drive. Yes.
Q Okay. And have you also reviewed this exhibit contained in 4506 since the time that you produced it to the government?
A Yes. I reviewed it recently when we were reviewing exhibits.
Q Okay. And, in particular, I want to show you Government Exhibit 4506-C. And you can look on the screen or there's a copy of 4506-C in front of you.
Do you recognize this?
A I do.
Q And what is this?
A This is an excerpt of a text exchange I had with Rachel.
Q What is the date range of these text messages?
A Well, are we looking at what's on the screen or what's on

the --
Q Just start with what's in front of you.
A What's in front of me starts at March 11, 2015 and goes through March 15 of 2015.
Q Okay. And how do you recognize that these are your text messages with Rachel Cherwitz?
A I remember the conversation, and because they are from what I produced from the application.
Q Are they a part of that larger collection that you just testified about --
A Yes.
Q -- in Government Exhibit 4506?
A Yes.
Q And I'm going to ask that you look at the version on the screen.
MS. BENSING: And I am going to ask, Mr. McNett, if you can redact up until March 15, 2015.
Q Okay. So looking at now the bottom of page 1 of Government Exhibit 4506-C and into the next page, what date are these text messages exchanged on?
A This was am exchange from March 15, 2015.
Q And how did you and Rachel Cherwitz communicate?
A Well, either verbally in person or by text.
Q And would you and Rachel Cherwitz communicate about sales?

A Sometimes about sales, or sales as it related to production, because I ran production.
Q And is what's contained in Government Exhibit 4506-C a fair and accurate copy of an exchange between you and Rachel Cherwitz on March 15, 2015, as partially redacted on page 1?
A Yes.
MS. BENSING: Your Honor, the government moves to admit the partially redacted version of Government Exhibit 4506-C.
MR. ROBOTTI: Your Honor, I don't think the government has established relevance for the messages between these two people. And we also object on completeness grounds.
THE COURT: Ms. Bonjean?
MS. BONJEAN: I join those objections.
THE COURT: Overruled.
Government Exhibit 4506-C, starting at -- is it the 2:36 a.m. entry; is that correct?
MS. BENSING: Yes, March 15. The March 15, 2015. Exactly, Your Honor.
THE COURT: Well, there's different March. So the -- I'm sorry.
March 15, 2015 entry, and on, is admitted.
(Government Exhibit 4506-C, from March 15, 2015 on, received in evidence.)
MS. BENSING: Thank you very much.

If we could please publish this to the jury.

BY MS. BENSING:

Q Okay. Who is in the gray bubbles, Mr. Kosley? Who is speaking in the gray bubbles?

A That's Rachel Cherwitz.

Q And if we can turn to the second page. Who is texting in the blue bubbles?

A That's me.

Q Okay. If we can go back up.

I am just going to read out Rachel Cherwitz', and I will ask that you read out yourself, okay?

A Okay.

Q I need you to meet with the team so they understand no movement before, during, and after the pitch. I need them super dialed in.

A You bet. I am planning on having a powwow this morning already so I'll make sure that gets conveyed. It is a pretty grounded bunch so I'm not too worried about the demos.

Q Also demo day so they gotta be mega grounded.

A Okay. I will run it out in the meeting and see what's there.

Q Okay. Great.

If they have any sales charge whatsoever, they must exit the room before I go. Anyone shaky, whacked, or charged up gotta go.

And I'll pause here.

What is "sales charge," Mr. Kosley?

A Sales charge would be anybody that had -- believed we were being too sort of overaggressive with our sales pitches.

Q And that reference to "anyone shaky, whacked, or charged up gotta go," what does that -- what did you understand that to mean?

A That if there was anyone on my back of house team that had that kind of sales charge or believed that we were being too aggressive with our sales pitches could not be in the room.

MS. BENSING: Okay. We can take that down, please.

MR. ROBOTTI: Excuse me. Judge, could they read the next seven messages or so for completeness?

MS. BENSING: Your Honor, it is in evidence, but I certainly don't mind reading it.

THE COURT: Go ahead.

BY MS. BENSING:

Q Okay. We gonna kill it today. You doing amazing, Koz.

A Okay. And thanks. Heart.

Q I go back to sleep for a little bit.

A Okay, good. Can you grab on your way in?

Q Yes.

A Can you do me a favor, and there's a PBO shirt on my bed that I meant to bring in that's Ivan's.

Just did a good little pep talk with the back of house team, and they're all solid with sales and solid with the protocol during the pitch.

Q Great. Thank you. I want sheets on chairs today.

And, by the way, after Rachel Cherwitz directed you to have a conversation with respect to your back of house team, did you, in fact, do that?

A I did.

Q I'd now like to show you what's been marked as Government Exhibit 4504, which is in the binder in front of you. Do you recognize what's in Government Exhibit 4504?

A I do.

Q And what is it?

A This is a record of text messages I exchanged with Nicole Daedone.

Q And, again, how did you generate this record of text messages?

A I used that same application to export the record of the messages from my iPhone at the time.

Q And approximately when did you do that?

A This was also in October of 2022.

Q And then did you provide those text exchanges to the government?

A I did.

Q And were these text messages between you and Nicole

Daedone that were originally on your iPhone?
A Yes.
Q And did you review what you exported to ensure the accuracy of the text messages that you exported?
A I did.
Q And have you also flipped through Government Exhibit 4504 to confirm that this is, in fact, what you provided to the government?
A I have, yes.
Q I'd like to show you what's been marked as Government Exhibit 4504-B.
THE COURT: Sorry, say the letter again, please.
MS. BENSING: 4504-B.
Q Do you recognize this?
A I do.
Q What is this?
A It is a text exchange I had with Nicole.
Q And how do you know that?
A Just from recollection, remembering the conversation and also from the metadata on the page.
Q And is this part of the collection of what was within Government Exhibit 4504 that you just testified about?
A Yes.
Q Is it a fair -- and what is the date?
A The date from the exchange with Nicole is from January of

2015. January 18.
Q 2015. And then on page 2 does it continue to January 19, 2015?
A Yes.
Q And is this a fair and accurate copy of text messages that you exchanged with Nicole Daedone --
A Yes.
Q -- on January 18, 2015 into January 19, 2015?
A Yes.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 4504-B into evidence.

MR. ROBOTTI: Your Honor, we object on relevance grounds and the fact that these -- the messages between these two persons are not relevant. In particular --

THE COURT: Let me just take a look at it for a second, and then I'll hear you out.

MS. BONJEAN: Sorry, Your Honor. I don't know that I have 4504 -- I have a different 4504-E, I think.

THE COURT: "B" as in "boy," right?

MS. BENSING: Oh. B?

THE COURT: "B" as in "boy," right?

MS. BENSING: I apologize.

THE COURT: Let's all take a moment to look at it.

I'm sorry, say again what you are offering, which portions exactly? Or just B, the entirety of B?

MS. BENSING: Yes. Just the two pages.

THE COURT: When you get a chance, you can let me know if you have any objection.

(Short pause.)

MS. BONJEAN: I am familiar with this. Judge, we do have an objection to this.

THE COURT: Give me the basis.

MS. BONJEAN: The basis is, it is relevance as well as foundation and completeness.

MR. ROBOTTI: We join.

THE COURT: I am going to sustain it as to foundation. The objection is sustained.

MS. BENSING: Okay.

BY MS. BENSING:

Q Mr. Kosley, are you familiar with the phrase "marriage stroke"?

A Yes.

Q What is that?

A There's a period of time at OneTaste when a lot of people were getting married for some reason.

Q And who, if anyone, said "the marriage stroke"?

A I believe Nicole did.

Q Did you text with Nicole Daedone about the marriage stroke?

A I did.

MS. BENSING: Your Honor, the government moves to admit --

Q And did you talk with her in Government Exhibit 4504-B about it?

A I did.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 4504-B into evidence.

MS. BONJEAN: Maintain these objections.

MR. ROBOTTI: Same.

THE COURT: I am going to sustain on this foundation.

MS. BENSING: Your Honor, we would request to admit it subject to connection from testimony that may come from other witnesses.

THE COURT: I will overrule the objection and allow the evidence to come in. Subject to connection, 4504-B is admitted.

(Government Exhibit 4504-B received in evidence.)

MS. BENSING: Thank you, Your Honor.

If we can please publish 4504-B to the jury.

BY MS. BENSING:

Q And, Mr. Kosley, can you please read out your initial text message to Nicole Daedone on January 18, 2015?

A Yes.

Sometime when you get a sec, will you explain this

marriage stroke to me? I don't quite get it. With Hemsi, it feels amazing and right. The others feel less natural to me and like they're connected to something I'm just missing.

And I'd like to still close the loop with Eli if we can. And lastly talk again about the writing. I'm happy to dig into it, but I admit I get somewhat frozen when I'm facing an empty page and writing from scratch. Call it "blank canvas syndrome" or something. Anyway, amazing amazing two weeks. Damned if I'm not happy.

I mean, so happy I almost started crying today. Just from being so goddamn happy. Thank you.

Q And I'll just read out what Nicole Daedone responded.

It feels like we hit the world card in tarot where masc and fem come together powerfully. That's the marriage piece. The Eli piece we will finish.

A And thanks re Eli.

Q It's a beautiful container.

A I can see the masc-fem coming together aspect. But why opt for the third dimensional form? That's the part that confuses me.

Q Let me pause there.

What is third dimensional?

A Third dimensional just referred to things in the, quote-unquote, real material world. So, yeah.

Q Okay. And I will keep reading.

I like reclamation, using 3D things for our purposes. We can do with marriage what we did with orgasm.
A Yes. I'm down with that, too, for sure.
Q Both are climax based. But we change that. I like a little subversion.
If we can go to the next page.
A Well, I'm sure that's possible. And goodness know I like a little subversion, too. But marriage, actual legal marriage, has some pretty solid, third dimensional implications that are pretty hard to subvert. Death and taxes stuff. I'm not opposed to any of this, mind you, I'm just curious about it.
Q Okay. And we can pause there.
And you testified that there was a marriage stroke at some point during your time at OneTaste. Approximately what time? What time frame?
A Well, around this time frame in early 2015, late 2014. Yeah.
Q Okay.
MS. BENSING: We can take that down.
Q I'd like to show you what's been marked as Government Exhibit 4504-C. I think you have it in front of you as well, Mr. Kosley. So you can flip through this.
Do you recognize it?
A I do.

Q And what is it?
A This is a copy of the message thread I had with Nicole around this time.
Q And is that from January 28, 2015, at 4:53 p.m., through messages on January 29, 2015?
A Yes.
Q And how do you recognize that these are messages between you and Nicole Daedone on those dates?
A This was produced in the same fashion as the others from my iPhone that I had at the time, using the application I used to export it.
Q And is this a portion of what you testified about from Government Exhibit 4504?
A Yes.
Q Is it a fair and accurate copy of text messages that you exchanged with Nicole Daedone on those two days?
A Yes.
Q Did there come a time where you raised with Nicole Daedone concerns that you had at OneTaste?
A Yes.
Q And is this one of those times?
A Yes.
Q And did Nicole then respond to you about those concerns?
A She did, yes.
Q And what did those concerns pertain to at a high level?

A I was concerned about the way in which people who had left OneTaste were -- had left under bad circumstances and wanted to know why -- well, really just wanted to know why.
Q And is your raising these concerns and Nicole Daedone's response reflected here in Government Exhibit 4504-C?
A Yes. In this instance.
MS. BENSING: Your Honor, the government moves to admit Government Exhibit 4504-C into evidence.
MR. ROBOTTI: Objection to relevance.
MS. BONJEAN: And foundation, relevance, and double -- hearsay contained within.
MR. ROBOTTI: Also, there's seven pages here, Your Honor. It's not clear they're all --
THE COURT: Okay. I'm going to sustain on foundation, to the extent you are offering this entire document at this time.
BY MS. BENSING:
Q Mr. Kosley, if you can actually just look at page 1.
Is this the initial part of your raising these concerns with Nicole Daedone?
A Yes.
Q And turning to page 2, is this a continuation of your raising these concerns with Nicole Daedone?
A Yes.
Q And does she respond to those concerns here on page 2?

A Yes.
Q And then does that continue into page 3?
A Yes, it does.
Q And then do you raise additional concerns at the bottom of page 3, or the same concerns?
A It is a continuation of the concerns I had raised, yes.
Q And then turning to page 4, is this a continuation of your raising the same concerns?
A Yes.
Q And does Nicole Daedone respond?
A She does.
Q And then on page 5, does Nicole Daedone continue to respond?
A Yes.
Q And on page 6, does she continue to respond all part of that same conversation?
A Correct. Yes.
Q And does that continue on to page 7?
A Yes.
Q Through to the bottom of page 7?
A Yes.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 4504-C, and part of the foundation, again, I think, is subject to connection to later testifying witnesses.

THE COURT: You maintain your objections?

MR. ROBOTTI: Yes. And, Judge, the double hearsay on 2, 3, 4 -- and I haven't finished the rest. But 2, 3, and 4, there's certainly a fair amount of double hearsay.

MS. BENSING: Your Honor, may I respond to that?

THE COURT: Let me just hear from Ms. Bonjean.

Do you join in that?

MS. BONJEAN: I join in all the objections.

THE COURT: Okay. I will hear from you, Ms. Bensing.

MS. BENSING: Thank you, Your Honor.

The only portions that the government is seeking to admit for their truth are Ms. Daedone's statements. The witness' statements are just for completeness, and the hearsay within hearsay is not being offered for its truth, but simply effect on the listener.

MR. ROBOTTI: Objection. Hearsay.

MS. BONJEAN: We have the same objection.

THE COURT: Okay.

MS. BONJEAN: I don't want to go into a speaking, but same objections.

THE COURT: Okay. The objections are overruled.

Government Exhibit 4504-C is admitted.

(Government Exhibit 4504-C received in evidence.)

MS. BENSING: If we can publish this to the jury.

BY MS. BENSING:

Q And, again, Mr. Kosley, I'll ask that you read out your own text messages. And are those in green and blue in this exhibit?

A Yes.

Q And are Ms. Daedone's messages in gray?

A Yes.

Q And I'll read out Nicole Daedone's. So if you can just start with the messages on January 28, 2015, please.

A Sure.

Do you remember when it happened for you, when you realized that your get off, or your ability to stay in the game, and stay on, wasn't dependent on the circumstances or people around you?

Q I think it's progressive. I'm pretty rebellious. I don't like to depend on anything for my happiness, and I know I want to make an impact so, basically, I think I made a decision deep down that nothing, even me, was going to stop me.

A I might have crossed that line.

I saw Lianna yesterday.

And she is so hurt and mad.

Q Let me pause you there.

Who is Lianna?

A Lianna Lifson was my, I believe, ex-girlfriend at this

time, but someone I had dated.

Q Go ahead.

A And she is so hurt and mad.

And I've been talking to Hemsi.

Q Let me pause you there. Who is Hemsi?

A That's Rachael Hemsi.

Q Please go ahead.

A And she pointed out how for that month when I was like, you know, happy? That for that month, it was a place where I had decided that I was going to enjoy myself no matter what. That it was completely volitional.

And Lianna's anger and hurt, I could see, was all stemming from this place where she felt victimized by things. Another conversation we should have, by the way, as a ties into what we were talking about with Laurel, et al.

But I think I can't see any other way than to figure out how to be happy and get off no matter what.

Because there's always going to be assholes and idiots above and below me.

And I can't depend on them to cooperate.

Q Amen, amen.

In the big book it says something funny. Like we tried to be the director, the actor, the producer, but no one would stay where we put them. So we had to find another way to be happy.

A Setting up sales training. Back in a bit.

And so I am wondering how to make that shift. How to actually thoroughly, consistently get to and be able to hang out in that location. To be honest, you and Hemsi, well, and like my spiritual teacher Adyashanti, maybe, are the only people I know who seem to be able to do that.

Q It's a practice.

A Oh, and I know it is not about, quote, being happy. That's a bill of goods, but in the sense of "being free and all conditions" kind of happiness.

Q Jo and Yia are pretty good too.

Let me pause you there.

Who is Jo?

A That would be Joanna Van Vleck.

Q Who is Yia?

A Yia Vang.

Q Yeah I feel you touched it.

Really touched it.

Now it tells you what to do and you do that.

It's really quite simple.

A And there's this part that is so terrified and fighting it.

Q That's called the ego.

A Okay. I guess it is pretty simple.

There's so much self will in there.

Also the fear of, quote, losing myself.
Q It's so funny though.
All your self will wants for you is misery.
Because misery is predictable.
A So delightfully, predictably miserable.
Do you want to hear about the Lianna get together?
Q Basic gist.
A For the way she felt like she got treated.
The basic gist is something got hurt back in there.
On the surface, she's still really mad. Mostly she blames Hemsi.
Q Hemsi?
A I'm just going to relay what I picked up. By the way, not try and filter and take you up on the offer to help alchemize this stuff.
Yeah, Hemsi.
She really felt that Rachael just wasn't nice to her.
Like she felt really beset upon by her in New York.
And then when she got fired from the yoga studio and was kinda shellshocked, she felt like Hemsi and RC didn't seem to exercise the level of kindness and compassion that she was expecting.
I had just been fired from my life and I've got RC texting me and telling me to get my head out of my ass.

Q Let me pause you.
Who is RC?
A Rachel Cherwitz.
Q Please go ahead.
A She also extrapolates the way she felt mishandled to the quick succession of the departures of her, James, and Ryan, but they were all tied to the way Hemsi treated them.
Q Wow. Okay.
I couldn't figure it out.
A Yeah, I was wondering what to say there.
Q It's still odd. At least we can begin. I know she would want to make it right.
A Yeah. Okay.
Q Can you let Hemsi know?
A It's pretty entrenched.
So can I ask a question around a piece that I feel like I picked up some of the charge?
Q Yep.
A So part of where she's so angry is with what she calls "a culture of manipulation." Places where she saw RC or Hemsi or whoever, essentially directing people on what to do. And she points to the people who left over the course of time. Maddie, Drea, Becky, Pixley, et cetera. That it exemplifies this pattern, of which she feels a part of, naturally.
Q Let me pause you there.

Who is Maddie?
A I'm sorry, I'm forgetting Maddie's last name. She was part of OneTaste for a while.
Q And who is Drea?
A Drea, Andrea Marz.
Q And who is Becky?
A Becky -- I knew her as Becky Uma. I think Rebecca Halpern.

(Continued on the next page.)

DIRECT EXAMINATION (Continuing)
BY MS. BENSING:
Q And who is Pixley?
A Margo Pixley.
Q Okay. Keep reading:
It's funny. I was talking to Jason about this and I think I can say what I see to you. And you see your friend. So you see Lianna, here, right. And you see where she is stuck unnecessarily, suffering unnecessarily.
A Yeah, totally. Whether she's in or out or whatever, it's just painful to watch.
Q And you can see how a shift in consciousness, not circumstances, would alleviate so much pain. But you can't just say Lianna that simply isn't true, you are amazing and brilliant and loved. So you take circuitous routes to waking your friend up.
A Yeah.
Q And if they don't, well, there's double hell to pay because they are still stuck and now you have "tried to trick them." That they are willing to give it all they got. My experience of both RC and RH is that they are so dedicated. Possibly made mistakes. And pay the karma. A shit load of karma. You can see further back now.
A What do you mean, see further back?
Q What we are doing here.

A Oh, yeah.
Q And we are karmic ally bound to all these people.
A That I understand.
Q Nine years later I still worry about Nicole Halpern.
A Yeah.
Q The challenge is seeing a 4th dimensional activity from a three dimensional lens.
Let me pause it here.
You talked about the third dimension. What is the fourth dimension?
A The fourth dimension was understood to be what was happening on sort of a spiritual level or some higher plane that couldn't be seen or felt directly.
Q Okay. I'll keep reading.
But you know how from the 4th, you just see. It's just obvious. Shocks their systems sometimes. So we are trying to become a bit more civilized and you move accordingly. Well, that scares people.
A Yeah. I understand. I think the sense of the way we are making that change isn't quite out there yet.
Q At the same time, it's like we are learning to pretend better becoming more stealth to accommodate the rules of the sleeping.
And let me pause there.
Who are "the sleeping"?

A The sleeping would be anybody outside of OneTaste, more or less.

Q I'll keep reading.

People's egos are like, oh, good you're changing. In a sense, no. I think what happens, say, with RH is the opposite of manipulating. She tells too much truth without filter. We are putting more filters in them.

A Well, yes, that's true.

Q Either they wake up and help. Or they get traumatized.

Let me pause there.

What does "wake up" mean?

MS. BONJEAN: I'm going to object to the extent this is not his words.

THE COURT: I'm going to sustain as to the last question.

Q And let me ask you, was "wake up" a phrase used at OneTaste?

A Yes.

Q And what did it mean?

A It meant to, to be in a sleepless, sort of the way people lived in, like, their default life or their normal everyday life and being in OneTaste, how to practice orgasm meditation, understanding the concepts we taught was being awake.

Q Okay. I'm going to keep reading.

People get upset when we say, hey, we are going to

stop carrying you.
A Yeah, ironic.
Q I think you are making this transition now.
Then there's a series of emojis.
A Yeah, I am seeing that. Is that you or me crying?
Q Tears of joy. And then there's another emoji.
We are like burglars who got recruited for the FBI.
A It's tricky to remember this kind of thing at times. Especially when it's like you're kind of vilified by both sides. Like even the people in the FBI look at you asconce and they hired you.
Q RH and me know who you are.
A I remember Hemsi conveying that to me once a long time ago when we sitting at Extreme Pizza. I forget the exact words but I remember she said something that had me realize she really did see way in here and the way it implied we were bound together as a result.
MS. BENSING: May I have one second, Your Honor?
THE COURT: Yes.
(Pause.)
Q I think you testified earlier that you left OneTaste in 2016.
Did there come a time in 2016 when you were fired by OneTaste?
A Yes.

Q Why?
A I had -- I went out to do some production errands in a OneTaste rental van and picked up some cocaine and basically went out on an all-night bender.
Q Did there come a time when OneTaste sued you after you were fired?
A Yes.
Q And was that a breach of contract lawsuit?
A It was, yes, over a breach of an employment contract.
Q And did that pertain to your possession of video and audio files after you had left OneTaste?
A Yes.
Q Did that lawsuit settle?
A Yes.
Q Approximately when did it settle?
A In the summer of --
Q And if you need something to refresh your recollection, let me know.
A Yes, I'm trying to -- guess it was the summer of 2023.
MS. BENSING: If we can show the witness only, please, 3500CK-12. And if you can please go down to the end. Sorry. Back up.
A Okay.
Q Do you recall approximately when?
A Yes, this is dated April 25, 2023.

MS. BENSING: No further questions, Your Honor.

THE COURT: Okay. Is it Mr. Robotti -- Ms. Bonjean is going to start? Okay. Cross-examination.

MS. BONJEAN: Can we put the lights back up?

THE COURT: Yes.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Mr. Kosley. My name is Jennifer Bonjean and I represent Nicole Daedone.

I want to go back to your early days at OneTaste if I might.

You were working for Apple when you started associating with OneTaste, correct?

A That's correct.

Q And you ultimately decided to give up your job at Apple to work with OneTaste, right?

A That's correct.

Q You were also a member of the community there, right?

A Yes.

Q And we're talking about in the Warehouse days, fair?

A Correct.

Q And loved it, didn't you?

A I enjoyed my time there, yes.

Q In fact you were there, geez, a decade, right?

A Yes.

Q And the job that you picked up when you started working there was as a videographer, is that right?
A Yes.
Q You said that Ms. Daedone was the, sort of the head of the organization, the founder, but isn't it true that Rob Kandell is a co-founder of OneTaste?
A He was, yes.
Q You didn't mention that he was a co-founder. So you understand that he was also a co-founder, correct?
A Yes, that's my understanding.
Q And you moved into the Warehouse in November, December, of 2006, right?
A Yes.
Q And did you start providing your videography services when you moved into the Warehouse or before?
A I believe it was right after.
Q Okay. And how long in total did you live in an OM or OneTaste residential, I guess residential building?
There's a warehouse but there might have been others as well, right?
A Yes. I mean there were -- after the official residential communities, I lived in staff housing because I was working for OneTaste.
Q Okay. Apart from the Warehouse, where did you live that was OneTaste residential housing?

A I also lived at 1080 Folsom.
Q 1080 Folsom?
A Yes.
Q And during your entire decade there at OneTaste, you worked as a videographer, right?
A No, that wasn't the only job I held.
Q But it was one of the jobs you had, correct?
A It was one of the jobs, yes.
Q And you also ran the production side of things?
A Yes, later.
Q And you also were a coach, right?
A Yes.
Q And you also were a Master Stroker, isn't that right?
A I don't know if I was ever officially given that title.
Q Didn't you give yourself that title though?
A No, not necessarily.
Q Okay. Do you consider yourself a Master Stroker?
A No, I would not.
Q Okay. You taught a lot of classes though, right?
A I did.
Q Tell the ladies and gentlemen of the jury what classes you taught.
A I don't remember all of them but I taught the Introduction to OM class and I taught in the Mastery class and I taught in the Taboo class. I don't remember even all the

names of the classes we held but I taught a number of them.
Q In fact, you testified on direct examination about the Taboo class that you participated in, right?
A Yes.
Q And you -- when you testified about it, it sounded like you were mostly on the production side but that's not quite accurate, isn't it?
A I also taught which I believe I said.
Q You also were an instructor within the class, right?
A Correct.
Q Do you remember what units or what subject matter you taught as part of the Taboo course?
A I mainly taught about BDSM.
Q You had a Ropes with Chris Kosley, right?
A That's right.
Q Was that with Ms. Lifson as well?
A Yes, she was a demo or my partner for the course.
Q Was she your partner in real life as well or just the course?
A I believe at the time she was also my partner.
Q And what is Ropes with Chris Kosley?
A I taught about bondage, using ropes as a means of --
Q Okay. And that was part of the Taboo course?
A Correct.
Q Who filmed you when you were doing that course?

A I had a production team so I wasn't the only person filming.
Q What else did you teach about in the Taboo course that you testified about on direct examination?
A To be honest, I don't remember all the modules. It might be --
Q I'm sorry?
A I don't remember.
Q You were asked questions about the priestess and the priest, right? Remember that? Reese was a priest or something?
A Right.
Q There's certain theatrics to this, correct?
A Yes.
Q And is this something that is a prevalent theme in BDSM activities?
A Not necessarily.
Q No, but it can be, correct?
A I wouldn't call it theatrics.
Q Okay. Well, there's rituals, right?
A Sometimes.
Q Yes. And in this case, there were rituals that were played out in this course, right?
A I'm not sure which course you're referring about.
Q The Taboo one. The one you just mentioned.

A Yes, there were rituals that were presented.
Q And in fact, you testified about the Ephesus ritual, a story that Ms. Daedone had told about Ephesus, right?
A Yes.
Q And there's this whole Ephesus ritual in the Taboo course, right?
A Yes.
Q And you participated in it, right?
A Yes.
Q What was your job in that ritual?
A I don't remember.
Q Did it involve flogging?
A Yes.
Q What's flogging?
A Flogging is when you take, there's an implement or toy called a flogger which is sort of a handle with leather tines coming down that you can use to hit another person to create an intense sensation.
Q Okay. And this is also -- I'm not the expert, but is this like a BDSM thing?
A That would be considered a BDSM activity.
Q All right. The Mastery class, we've heard a little bit about that.
Can you tell the ladies and gentlemen about the Mastery class that you participated in teaching?

A I, I did some similar stuff in it. I don't remember exactly what was, what we did in that class to be honest.
Q Did it involve BDSM activities?
A We might have done some BDSM demos, yes.
Q You testified or read from some text exchanges with Ms. Daedone about Lianna Lifson. Do you remember being asked those questions on direct examination?
A I do.
Q And Ms. Lifson was one of your partners, romantic, right?
A She had been, I think. I don't think we were together at that time.
Q Not at the time of these text messages, but prior to that, right?
A Correct.
Q Okay. And she was also your partner in your BDSM activities as well, correct?
A Sometimes, yes.
Q Okay. Did she -- did you always make sure she consented to those BDSM activities?
A Yes.
Q Sure about that?
A 100 percent.
Q That's important, right?
A Yes.
Q All right. You testified that you did production work

and videography work for OneTaste for an extended period of time, really about a decade, right? Not only that, but that was a big piece of it, correct?
A Correct.
Q You would agree that Ms. Daedone wanted almost everything video recorded or audio recorded, right?
A She wanted the teaching material and especially her speaking recorded.
Q Right. She wanted the courses recorded, right?
A Yes, most of them.
Q Right. I think at some point, you moved to audio because some of it was pretty sensitive, right?
A Sometimes. Sometimes we didn't record because of the sensitivity of it.
Q Right. And then, but she also wanted her teachings recorded, right?
A Generally speaking, yes.
Q Her speaking engagements, correct?
A Correct.
Q Her lectures?
A Yes.
Q And that went on for, like, the entire period of time you were there, right?
A Yes.
Q She wasn't -- how many -- let me ask you this.

How many hours do you think you have recorded of Ms. Daedone giving some type of presentation?
A I guess in the hundreds of hours. I'm not sure to be honest.
Q Hundreds, right?
A Likely.
Q I mean that one audio clip we heard from was itself 4.5 hours, right?
A Yes.
Q And I know you didn't listen to it but you remember seeing it was four and a half hours, right?
A Yes.
MS. BENSING: Objection. Objection to the form of the question.
THE COURT: Overruled.
Q And chances are, over the course of this decade, there actually probably could be thousands of hours, right?
A I don't know.
Q Well, you recorded about, what? You recorded most of it according to you, correct?
A Yes. I just -- I never tallied the numbers so I can't say.
Q You can't estimate it?
A No, I wouldn't venture to estimate.
Q Okay. And today in this courtroom, we heard a couple

little clips but, at a minimum, this is coming from a body of hundreds and hundreds of hours of her speaking, correct?
A Yes.
Q She also has written many books, right?
A I'm aware of one that's been published.
Q You're aware of one that's been published?
A Yes.
Q Which one is that?
A "Slow Sex."
Q Okay. Are you aware of "The Eros"?
A I am not, no, I haven't read that.
Q So you worked there for a decade and you're only aware of the book she published in 2011, is that correct?
A Yeah, pretty much.
Q Did you read any of them?
A I read "Slow Sex."
Q Now, let's talk about this material that you assembled over the last decade.
When you were, videoed for OneTaste, you were working for OneTaste, right?
A Not always.
Q Well, generally, you were working for OneTaste pursuant to your job as a videographer, correct?
A If it was an event or an assignment I had been given to video, yes, I was working for OneTaste.

Q So, like, the courses, for example, right?
A Yes.
Q OM demonstrations, right?
A Correct.
Q That Stinson Beach stuff that you, that we looked at earlier, that was recorded by you, right?
A Yes.
Q You were, you were on the payroll of OneTaste when you were recording that, correct?
A Yes.
Q And any sort of events that might have been recorded, you were doing that as an employee of OneTaste, right?
A Yes.
Q And you assembled -- well, strike that.
We looked at that hard drive that you provided to the government. Do you remember that?
A Yes.
Q Okay. And do you remember when you provided that to the government?
A Yes.
Q What year was that?
A That was 2022.
Q All right. Do you recall how many terabytes of information was on that hard drive?
A I believe it was around 3 or 4 terabytes.

Q Okay.
A I don't remember exactly.
Q I can't explain it. Maybe you can explain to the jury what a terabyte of information or data is.
A I mean a terabyte is 1000 gigabytes. I think it was 2 to 3 gigabytes, not terabytes. Obviously, I don't remember at this point.
Q Does 1.3 terabytes sound right?
A That sounds plausible, yes.
Q And that's an extraordinary amount of material, right?
A Yes, electronic data.
Q And you put that -- and this is material you had in your possession after you had been fired from OneTaste, right?
A Yes.
Q Material you took with you from OneTaste, right?
A It was in my possession, yes.
Q Material of a highly sensitive nature, right?
A Yes.
Q Material that wasn't just about Nicole or Rachel, but also for young women that came through that program, right?

MS. BENSING: Objection. Relevance.

THE COURT: Overruled.

A Yes.

(Continued on next page.)

BY MS. BONJEAN: (Continuing.)
Q And when you got fired from OneTaste --
By the way, that wasn't the first time you got fired from OneTaste, was it?
A No.
Q How many times did you get fired from OneTaste over the years?
A In all honesty, I don't remember. Two or three.
Q And mostly drug-related stuff; right?
A No.
Q At least one other time was drug related?
A One other time might have been drug related, yes.
Q And you knew, of course, that OneTaste had a very strict policy about drug use in the context of this organization right?
A Yes.
Q Good reason for that; correct?
A I wouldn't know.
Q Sir, you were there for ten years. You don't have --
And you followed the rules of living in the residential homes, right, or tried to?
A Yeah.
Q And is it your testimony that you don't really know why there might be a good reason for having a known no drugs and alcohol policy when you're engaging in the activities that

OneTaste was engaging in?
A I didn't necessarily agree that OneTaste should be controlling the lives of what people were doing in the privacy of their own time.
Q Okay. But in the context of OneTaste activities, like, for instance, I don't know, driving a OneTaste related -- OneTaste rental car or a car that was rented by OneTaste, that's a OneTaste employment activity; right?
A Agreed.
Q Okay. So you would agree that being high was not something that is just up to your privacy interests; right?
A No.
Q You agree with me?
A I agree with you.
Q But you thought that you should be able to utilize drugs on your own time; right?
A Yes.
Q Okay. But getting back to my prior inquiry, the material that you accumulated over the course of the decade that we discussed, you had it on your own sort of hard drives; is that right?
A Yes.
Q Multiple different hard drives?
A Correct.
Q You kept them in your own private possession?

A Correct.
Q You didn't tell OneTaste that you were maintaining them, right?
A I barely remembered that I had them.
Q And before you gave them over to the federal government, you gave them to filmmakers to make a movie about, right?
A Correct.
Q You didn't ask for permission from OneTaste to do that; correct?
A No.
Q You didn't go ask permission of any of the students who participated in OneTaste courses to give over their -- you know, their image or videos of them to a film make are; right?
A No.
Q You didn't -- for instance, that --
We talked at length or you saw video at length about the Stinson Beach video; right?
A Yes.
Q And there was the video of Ms. Cherwitz reading aloud from an intro to a, I don't know, memoir or writing of Ms. Daedone right?
A Yes.
Q And we saw clips of Ms. Daedone coming out in a robe, yes?
A Yes.

Q And we saw a clip of when she left?
A Yes.
Q And you saw that in between she participated in an OM demonstration that lasted about an hour, right?
A Correct.
Q And that wasn't a normal OM demonstration, can we agree on that?
A Yes.
Q It was much longer; correct?
A Yes.
Q There's no reason to believe that Ms. Daedone didn't consent to that; right?
A Correct.
Q She was sort of in charge of doing that; right?
A Yes.
Q And no reason to believe that everybody there --
Everybody there wanted to be there; right?
A Yes.
Q Okay. There were no children there or anything; correct?
A No.
Q So these were all grown adults doing grown things in this Stinson House -- Stinson Beach property; right?
A Yes.
Q But nonetheless this OM demonstration was -- you know, had Ms. Daedone unclothed; right?

A Yes.
Q Her genitalia was exposed; right?
A Yes.
Q There was video taken of it for the purpose of her company, OneTaste; right?
A Yes.
Q And you decided to give that video to filmmakers without her permission; isn't that right?
A Yes.
Q And, in fact, did you give all 1.3 terabytes of material to the filmmaker?
A Yes.
Q Did you even bother to look at it to see what was there before you handed it over to filmmakers?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Outside the scope.
THE COURT: I am going to sustain.
BY MS. BONJEAN:
Q And you were paid for that footage, weren't you?
A I was paid for footage that I provided that I owned the rights to.
Q Do you think you owned the rights to the Stinson Beach OM demonstration?
A No, but that was not the sum and substance of what I gave

them.
Q But you gave it to them?
A That was not the sum an substance of what I gave to them.
Q But you gave it to them, right?
A Yes.
Q And it actually appeared in a film, right?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You were interviewed by the federal government, FBI agents, U.S. Attorney's Office about how you got this footage, right?
A Yes.
Q And --
MS. BONJEAN: One second, Your Honor. I'm sorry.
THE COURT: Sure.
BY MS. BONJEAN:
Q And after you handed over the 1.3 or 1.6 terabyte of data to the federal government, they had some questions for you about it, didn't they?
A Yes.
Q Okay. And you described it as OneTaste media archives; right?
A Yes.
Q And you said it kind of fell into three buckets. There

was your own stuff; right?
A Correct.
Q And according to you, your own stuff consisted of material that was personally shot and owned; is that right?
A Yes.
Q How did you distinguish what was personally shot and owned when you were on OneTaste's time filming OneTaste content?
A Because I was not working for OneTaste every hour of every day.
Q Did you get permission from every person that you videotaped on your own devices or your own electronics?
A I got permission at the time to shoot them, but not with the documentary.
Q You mean not handing it over to the documentary makers?
A Well, not at the time I handed it over. There was an assumption that when -- if something got used in the film that we would seek releases or seek permission to use them.
Q Sir, did you ever seek a release when you video recorded people on your own devices?
A No. I shot people in a setting where everybody was comfortable with being videotaped.
Q I guess I'm confused. You are differentiating between you videotaping as a OneTaste employee; right?
A Yes.

Q So obviously if people are participating in courses they see the big video equipment and, so, if they get up and they say something, they can see that they're being video recorded; right?
A Yes.
Q Okay. And that happened in the various OneTaste courses right.
A Yes.
Q And obviously when you're video recording Ms. Daedone at her request she knows she's being video recorded, right?
A Yes.
Q Can you explain to me what stuff you were recording on your own that was your personal material?
MS. BENSING: Objection.
THE COURT: What is the basis, asked and answered?
MS. BENSING: Asked and answered, relevance, 403.
THE COURT: Ms. Bonjean, I am going to rule that you are repeating, I think. If you can go on. I've ruled on that objection.
BY MS. BONJEAN:
Q Can you give me an example of something you filmed that didn't belong to OneTaste but you say belonged to you?
A Sure. There was an evening where there was a party and I was in the center of people dancing so I shot some video for that. It was considered mine.

Q Okay. The material that you provided, though, to the filmmakers wasn't just your material; isn't that correct?
A That's correct.
Q So, when you told the FBI that, you weren't being honest; right?
A I'm not sure what you mean.
Q You told the FBI that all you handed over to the filmmakers was material that was your own, but that wasn't true.
A That's not what I told the FBI.
Q Okay.
MS. BONJEAN: Correct. Your Honor, I have an extra copy for you. I apologize it's a little faint.
THE COURT: That is okay.
(Counsel approaches.)
BY MS. BONJEAN:
Q Mr. Kosley, I'm handing you what is marked as Government Exhibit 3500-CK-4 just for you and I'm going to ask if you -- and we have it on the screen too.
(Exhibit published to witness only.)
Q I'm going to ask you to look at the bottom of the first page, the very last sentence and going over to the second page. If you can't see it, I can pull it up for you on the screen. In fact, it is pulled up on the screen, if it's easier.

A (Reviewing.)
Q Did you have a chance to look at it?
A Yes.
Q Do you remember telling the FBI that what you provided to filmmakers was stuff that you personally shot and owned?
A No. That's not what I said.
Q Are you -- well, let me just ask you this: Is that what you -- did you tell -- you don't have to use the exact word, but did you communicate to the FBI that what was provided to the filmmakers was material that was personally shot and owned by you?
A What I told the FBI was that part of the material I gave to the FBI was material of that nature as well as other materials.
Q I'm not talking about what you gave to the FBI.
A Or to the filmmakers.
Q I'm saying did -- go ahead. Why don't you finish your answer.
A I represented the same thing about filmmakers as I did to the FBI. I gave them the same material.
Q Right. And you told the FBI that OneTaste material -- media that you felt was OneTaste material, you were not granting or assuming the rights to this material, right?
A That's correct.
Q Okay. And is it your testimony that you told filmmakers

that you were handing them this material, but you weren't granting or assuming the rights to that material?

A That's correct.

Q And they just went ahead and used it?

A Yes. I mean, they used what they used.

Q And they paid you for it right?

A They paid me for the material that I provided them that I felt I had the rights to.

Q So they distinguished between what you said you owned versus what you stole from OneTaste?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q Isn't it true that the filmmaker told you you would be indemnified, your legal bills would be paid, if you were sued?

MS. BENSING: Objection.

THE COURT: Sustained, sustained.

BY MS. BONJEAN:

Q You weren't about that material being used by the filmmakers when you handed it over; right?

A I was neither worried or unworried. That wasn't the agreement -- I mean, I wasn't worried about it. I wasn't not worried about it.

Q You got sued for doing that; correct?

A I got sued over my employment agreement.

Q You got sued a couple of times, three times actually.

MS. BENSING: Objection.

THE COURT: Sustained.

BY MS. BONJEAN:

Q In fact, some girls wanted to commit suicide because their face was --

MS. BENSING: Objection.

THE COURT: Sustained.

Ms. Bonjean, it's 5:15. I sustained that objection but you can resume your cross-examination another time.

MS. BONJEAN: Thank you, Your Honor.

THE COURT: I am going to ask the witness to step down.

(Witness steps down.)

THE COURT: We're wrapping up slightly earlier today. In the end run it evens out because I know I kept you extra on some other days. I remind you we're not here tomorrow. We're back together on Monday morning and everybody has been doing a wonderful job of making best efforts to get here on time and I appreciate that. So, hopefully that will continue and I hope everybody has a good few days and we'll see everyone in the jury room. At 9:15 you'll assemble and we'll be back here 9:30 on Monday and because we're taking a long break.

I will again remind you of what I have said before

and you know, I repeat myself because I think these are important things for you to keep in mind. So over this somewhat lengthy recess, you are not to discuss the case with anyone, including with your fellow jurors. If anyone approaches you and tries to discuss the trial with you, please let me know about it immediately through Mr. D'Agostino.

Don't read, listen to or watch any news or media reports of the trial and don't conduct any independent research about the case, about the matters in the case or the individuals involved in the case. Don't talk to the parties, the attorneys, the witnesses in the case about anything and, again, what I said earlier is people won't talk to you either and they're not suppose to do that.

Keep an open mind and, again, we won't see you tomorrow, but we will see you on Monday and I wish you all a very good, peaceful next couple of days. And, with that, we can recess.

(Jury exits.)

MS. BENSING: Your Honor, with the Court's permission may we speak with the witness just regarding travel arrangements?

THE COURT: Yes. So we will be back on Monday.

MR. ROBOTTI: Your Honor, one quick issue.

THE COURT: Yes.

MR. ROBOTTI: We had turned over the cross exhibits

for the next witness this afternoon to the Government.

THE COURT: Who is it?

MR. ROBOTTI: I believe it's a victim witness, but it sounds like they're okay with handing them back.

THE COURT: Okay. Have a wonderful weekend everybody else. I will see you Monday.

(Matter adjourned until Monday, May 19, 2025 at 9:30 a.m.)

-ooOoo-

INDEX


| WITNESS | PAGE |
|---|---|
| MARGARET PIXLEY | 1804 |
| CONTINUED CROSS-EXAMINATION BY MS. COHEN | 1804 |
| CROSS-EXAMINATION BY MS. BONJEAN | 1885 |
| REDIRECT EXAMINATION BY MS. BENSING | 1914 |
| RECROSS-EXAMINATION BY MS. COHEN | 1922 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 1929 |
| CHRISTOPHER ST. JOHN KOSLEY | 1936 |
| DIRECT EXAMINATION BY MS. BENSING | 1936 |
| CROSS-EXAMINATION BY MS. BONJEAN | 2036 |

| EXHIBIT | RECEIVED |
|---|---|
| Government Exhibit 2673 | 1831 |
| Government Exhibit 2675 | 1836 |
| Defense Exhibit 21-CX | 1848 |
| Defense Exhibit 13-BA, only the photograph | 1851 |
| Defense Exhibit 13-K | 1853 |
| Defense Exhibit 13-AR, photograph only | 1873 |
| Defense Exhibit 13-BD | 1879 |
| Defense Exhibit 13-BE | 1881 |

| | |
|---|---|
| Government Exhibit 786 | 1947 |
| Government Exhibit 790 | 1949 |
| Government Exhibit 3758 | 1949 |
| Government Exhibit 3820 | 1954 |
| Government Exhibit 3802-A-1 | 1961 |
| Government Exhibit 3802-C-1 | 1963 |
| Government Exhibit 4793 | 1966 |
| Government Exhibits 4795 and 4796 | 1967 |
| Government Exhibit 3802-E-1 | 1969 |
| Government Exhibit 3815-1 | 1973 |
| Government Exhibit 3823-2 | 1981 |
| Government Exhibit 1065 | 1987 |
| Government Exhibit 3808-A-1 | 1995 |
| Government Exhibit 3808-C-1 | 1997 |
| Government Exhibit 3808-D-1 | 1998 |
| Government Exhibit 4506-C, from March 15, 2015 on, | 2011 |
| Government Exhibit 4504-B | 2018 |
| Government Exhibit 4504-C | 2024 |