UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                 :

UNITED STATES OF AMERICA,      :
                                 :
                                 :
-vs-                             :
                               :        23-CR-146 (DG)
                               :
RACHEL CHERWITZ, NICOLE   :
DAEDONE,                    :
                               :
                               :
               Defendants.   :
------------------------------------------------------X

**<u>DEFENDANTS' OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT</u>**

       Now Comes, Defendants Cherwitz and Daedone and lodges the following objections to the U.S. Probation Department's presentence investigation report ("PSR") disclosed to the Defendants on August 21, 2025.

**General Objections**

(1)    The Defendants generally object to the use of Jane Doe and co-conspirator throughout the report.  There is no basis to conceal any names of witnesses who testified in open-court about the subject matter referenced below. Indeed, it would be improper to redact or file under seal evidence that has already been made part of the public record as there exists a presumption in favor of disclosure where the names and substance of the information was already made a matter of public record. On the other hand, there is no potential harm to any witnesses who testified using their real names and whose testimony was received at trial and is already the subject of post-trial litigation. To the extent the PSR references individuals who did not testify or any information that comes exclusively from § 3500 material, Defendants have redacted those portions of their objections.

(2)    The Defendants generally object to the use of quotation marks around OneTaste terms, such as  "Orgasmic Meditation." The use of quotations inappropriately suggests that the practice of Orgasmic Medication is not a legitimate meditative practice. The government repeatedly stated that it did not take the position that OM was not a legitimate meditative practice. That position has clearly changed, as many of the government's positions have. Orgasmic meditation or clitoral stroking is a practice that long precedes the existence of OneTaste. Defendants were denied an opportunity to present evidence about the history of the practice and its benefits rooted

in scientific studies. Probation's clear contempt for the entire practice of OM is wildly inappropriate.

(3)     The Probation officer failed to conduct an independent and impartial review of the facts as required. *See The Presentence Investigation Report, Publication 107*, Off. of Prob. & Pretrial Servs. I-1, III-10 (2006), https://cdn.ca9.uscourts.gov/datastore/library/2013/02/26/Horvath_presentence.pdf (noting that the probation officer's role as the court's independent investigator is critical, and that "a simple recitation of the government's version of events is inconsistent with the independent nature of the [Offense Conduct] section."). The factual background appears to be entirely written by the government and contains cherry-picked quotations from certain witnesses that are at times also incomplete.

(4)     The PSR improperly conflates the OneTaste practices with the forced labor conspiracy.

(5)     Defendants reserve the right to amend these objections since Defendants' counsel have had insufficient time to review the PSR with them to confirm all objections.

## Objections by Paragraph

(4)     Objection. OneTaste Inc did not "operate through" Texas Limbic Network LLC, OTBA Inc, or The Next Right Thing, LLC. These were independently owned and operated entities that, with their legal counsel, negotiated arms length agreements with OneTaste Inc for licenses to use OneTaste Inc intellectual property or acquired assets from OneTaste Inc. Prior to September 2016, OneTaste NYC LLC was also independently owned and operated. The Institute of OM Foundation is an independently operated 501c3 with its own board distinct from OneTaste Inc. Institute of OM LLC, formed after the charged period, while owned by the same owners as OneTaste Inc, is an independently operating entity. The Land LLC, which owned The Land retreat center, operated independently with its own staff and management and entered into licence agreements with OneTaste for space usage. Neither OneTaste Inc nor any of its subsidiaries or indeed its licensees ever leased any residence in Brooklyn. Defining all of these separately owned managed and operated entities as "the Company" is inaccurate and misleading and unsupported by any evidence in the trial record.

(5)     Objection. OneTaste ceased offering "hands-on" classes on orgasmic meditation in 2016. OneTaste did not operate "warehouses." One of the OneTaste monastic, practice-based residences, known as an "Urban Retreat Center" for study and practice of OneTaste philosophy, was named the "Warehouse."

(6)     Objection. Although Caravan Retreats did collect program fees from residents of OneTaste's monastic residences, Caravan Retreats lost money in maintaining residences for those who wished to engage in the study and practice of Orgasmic Meditation and other practices, such as yoga and sitting meditation.

The Forced Labor Scheme

(9)     Objection. The jury returned a verdict against the Defendants for forced labor conspiracy. No jury found that the Defendants committed acts of forced labor nor were any special interrogatories propounded to the jury to determine any specific factual findings. Defendants object to the unproved claims that Defendants, along with others, subjected individuals to "economic, sexual, emotional and psychological abuse, surveillance, indoctrination and intimidation." Indeed, as the government argued to this jury "[this case] is not about whether these victims actually suffered serious harm and whether they actually caused them to work. That is absolutely not the question of this trial." *See* Tr R. 5222-11-20. Where the prosecution told this jury that the only question for them to answer is whether the Defendants agreed to unlawfully "extract even one form of labor or service from even one victim, any single one, then they are guilty" it is wildly inappropriate to point to a jury verdict to conclude that Defendants actually committed the offense that the government told them it need not find.

(10)     Objection. Defendant objects to the use of the word "inner circle." Furthermore, not every alleged co-conspirator maintained a "senior position" at OneTaste. For example, Aubrey Fuller never held a senior leadership position at OneTaste during the relevant time period.

(12)     Objection.  The jury returned a verdict against the Defendants for forced labor conspiracy. No jury found that the Defendants committed acts of forced labor nor were any special interrogatories propounded to the jury to determine that Defendants used "deceptive and abusive tactics" to obtain labor or services. As identified below, each of the alleged Jane Does testified that they could leave OneTaste at any time, and did so.

> Jane Doe 1 – Ayries Blanck – Blanck did not testify, and therefore there is no evidence to support the claim that the Defendants used "abusive tactics" or "deceptions" to obtain her labor or services.  In fact, . Blanck lacks all credibility as it relates to her claims against Defendants as she fabricated evidence to corroborate these claims and was unable to testify as a result. (Dtk. Nos. 292, 297, 327-6)

> Jane Doe 2 – Rebecca Halpern – Halpern testified that she was not forced to move into community housing *see* Tr. 505:5-8 and that she was a person who had options (Tr. 538:14-15).  She admitted that part of living in the OneTaste community was to be pushed to do the things she signed up to do. *See* Tr. 680:25-681:1-4.

> Jane Doe 3 – Michal Neria – Neria testified that she always had a choice, "Each and every one of those things was offered to me and yes, I made the choice to." (Tr. 2821:16-17), that no one was threatening her *See* Tr. 2821:22-23, and that "nothing obstructed" her from leaving *See* Tr. 2919:14-16.

Jane Doe 4 – Anthia Gillick – Gillick was never an employee of OneTaste, but only a part owner of OneTaste NY for 6 months.  The government admitted that she was situated differently than the other victims due to her financial situation.  *See* Tr. 4786:22-4787:2

Jane Doe 5 – Dana Gill – Gill Port testified that when she lived in a communal residence she was free to come and go as she pleased, as were others (Tr. 1377:1-8), that every time she left, she made the choice to come back and keep associating with OneTaste (Tr. 1392:1-3) and that no one forced her to stay *See* Tr. 1455:20-21.

Jane Doe 6 – Christina Berkley – Berkeley testified repeatedly that not only did she not regret any of her choices at OneTaste *See* Tr. 1136:3-6, 1136:7-9, 1136:10-12, 1135:19-1136:2, 1159:5-14, but that she would have preferred to continue being Nicole Daedone's assistant *See* Tr. 1163:10-18 and she could have left and led an alternate life if she so chosen *See* Tr. 1165:21-25.

Jane Doe 7 – Michelle Wright – Wright testified that no one told her she couldn't leave *See* Tr. 2568:16-17, that she could have "done anything I wanted" instead of working for OneTaste *See* Tr. 2560:7-9 and that she did not tell Nicole Daedone or Rachel Cherwitz that she did not want to have a sexual relationship with Reese Jones T*See* Tr. 2632:11-15.

Jane Doe 8 – Lianna Lifson – Lifson testified that she could come and go as she pleased *See* Tr. 2293:25-2294:1 and that she chose to spend her time at OneTaste, including in the third floor of the 1080 practice-based residence reserved for advanced practitioners *See* Tr. 2230:21-23

Jane Doe 10 – Max Pixley – Pixley testified that they were not forced to become more involved in OneTaste *See* Tr. 1892:19-25, that they became more involved out of their own volition *See* Tr. 1893:1-3, they could have left OneTaste at any point during their involvement *See* Tr. 1902:14-17 because "I'm a person with free will." *See* 1902:17-20.

Jane Doe 13 – Lyndsi Keves  – Keves testified she was free to leave at any time *See* Tr. 3108:22-25, 3147:1-3 and that "made the choice to leave" after 90 days of working for OneTaste because she didn't like her job *See* Tr. 3065:5-9, 3102:14-15.

Jane Doe 20  – This individual did not testify. Interviews with Jane Doe 20 as memorialized in FBI investigative reports (302s) are devoid of any allegation that she was forced to provide labor or services through "abusive tactics" or "deception."

Jane Doe 21 –  This individual did not testify. Interviews with Jane Doe 21 as memorialized in 302s  are devoid of any allegation that she was forced to provide labor or services through "abusive tactics" or "deception."

(13)    Objection. The jury returned a verdict against the Defendants for forced labor conspiracy. No jury found that the Defendants committed acts of forced labor nor were any special interrogatories propounded to the jury to determine any specific factual findings. Defendants object to the unproved claims that Defendants "manipulated and exploited" OT participants by causing them "serious harm, including psychological, financial, sexual and reputational harm, to perform or continue performing such labor and services."

<u>The Early Years</u>

(14)    Objection. Daedone did not "select" residents of the warehouse. No evidence supports this claim.

(15)    Objection. Daedone did not target Reese Jones for money and business acumen. Daedone began a romantic relationship with Jones. Jones eventually loaned money to the nascent venture which included offering workshops courses and classes and operating and financially supporting community residences that OneTaste called "monastic" residences dedicated to the practice and study of OM, other modalities like yoga and meditation and OneTaste's philosophy, grounded in Buddhism (the name OneTaste is derived from a Vajrayana Buddhist precept) and other spiritual traditions. Jones was not an "investor" in OneTaste. He loaned money to assist in the development of OM, and was repaid those loans.

Daedone never coerced Christina Berkeley, Dana Gill, or Michelle Wright to serve as "handlers" to Jones. None of these women testified that Daedone coerced them to be "handlers." Indeed, Ms. Berkely admitted that she not only consented to being a "handler." *See* Tr. 1157:23-1158:25 she enjoyed it. *See* Tr. 1159:5-14, 1160:1-22. Gill testified that she enjoyed spending time with Reese, which she wrote about in her private journal, and that she continued to visit with him after she moved out.  *See* Tr. 1457:10-23.  Michelle Wright testified that "I could have done anything I wanted" *See* Tr. 2560:7-9 and that no one told her she couldn't leave *See* Tr. 2568:16-17.

(16)    Objection. Reese Jones was not an investor in OneTaste, he loaned money to the company. He did not provide $800,000 in cash to OneTaste.

(17)    Objection. No evidence that Jones made payments personally to Daedone in her capacity as the CEO of OneTaste. Jones and Daedone were in a romantic relationship and lived together. As such, they shared expenses.

(18)    Objection. Christina Berkley testified in no uncertain terms that she consented to each and every activity and never  communicated that she did not want to work for OneTaste. Objection to any characterization of "shunning" as coercion where shunning or being "kicked out of a community" is a constitutionally protected right and hallmark of the right to freedom of association.

(19)    Objection. Wright was not "moved to Las Vegas". She was offered a position as co-lead of a Las Vegas branch of OneTaste. *See* Tr. 2568:18-2569:3

(20)    Objection. Wright did not testify that she "continued" to provide Jones with sexual services. Wright testified that she saw him a few times when he visited Las Vegas and spent a couple of nights with him. There is no competent testimony that M.C. was harmed or alleges that she was harmed by Daedone or by being "forced" to sexually service Jones. M.C. did not testify and stated to media sources after Defendants' convictions, "I do not see myself as a victim of OneTaste, or Nicole Daedone, or Rachel Cherwitz… No one forced me to do anything there. I chose to do what I did."[1]  The record does not reflect that Daedone's alleged statement to Wright about M.C. had correlation to M.C. providing sexual services to Jones.

(22)    Objection. The cherry–picked messages do not demonstrate that Wright did not consent to being Jones' handler or that Daedone and Cherwitz *knew* that Wright did not want to engage in sexual activities with him. There is no other record evidence that probation has pointed to that reflects that "several" of Jones' alleged handlers did not want to engage in sexual activities with Jones or that Daedone knew that they did not want to engage in sexual activities with Jones.

(23)    Objection. It is highly speculative that Daedone meant "sexual" favors in the isolated messages. Moreover, Jones continued to be part of the OneTaste community, including sexual activity with Daedone and others long after August 2014. This is simply a misstatement of the facts and contrary to Jones' own grand jury testimony.

OneTaste's Shift to Sales and Expansion

(24)    Objection. It is a misstatement of the evidence that Cherwitz's role in sales had any correlation to the statement that Jones "could no longer fund OneTaste." OneTaste began selling courses in 2006, and the sales team was established long before Jones was reimbursed for his investment in OneTaste.  Defendants object to the phrasing of the last sentence of this paragraph. The trial evidence reveals unequivocally that OneTaste participants not only "could expect" to participate in OM, they *chose* to participate in OM which was the fundamental tenet of OneTaste. No one would participate in OneTaste if they were not interested in the practice of OM. This was particularly so for each of the twelve witnesses connected to OneTaste who testified.

(26)    Objection. As stated above, OneTaste participants including those identified in ¶12 routinely testified that they consented to the activity described in this paragraph, consented to the activity *at the time as is relevant,* and never communicated to Defendants or the upper management they did not want to participate in such activity. There was testimony from the OneTaste participants identified in  ¶12 that they sought out OM partners by posting and would regularly OM with individuals they did not know.  *See* Tr. 1755:16-1756:12, 2823:19-2826:10, . There was no testimony that anyone was punished for not OMing with someone, nor that anyone was punished by sexual abuse or threats of physical violence. Rather, witnesses were "afraid"

---

[1] A OneTaste 'Victim' Speaks Out…, *Revolver News* (June 9, 2025), https://revolver.news/2025/06/a-onetaste-victim-speaks-out/

they would no longer get to be part of the "inner circle" *See* Tr. 1186:15-22, or that they would have to have "long conversations" *See* Tr. 265:2-11 or would receive "extra hard feedback" *See* Tr. 1856:1-5.

(27)    Objection. Probation routinely conflates activities of employees of OneTaste and activities of those employees who lived in community with other residents who might be employees or not. The probation report completely ignores undisputed evidence that payment was sometimes made by way of trading services for rent, food, and other living expenses.

Defendants' Tactics of Coercion

(28)    Objection. The jury returned a verdict against the Defendants for forced labor conspiracy. No jury found that the Defendants committed acts of forced labor nor were any special interrogatories propounded to the jury to determine any specific factual findings. Defendants object to the unproved claims that Defendants, and their co-conspirators, "engaged in a campaign of indoctrination, grooming, isolation, manipulation, use of past trauma, monitoring, public shaming, relationship disruption, sexual abuse, physical exhaustion,  and financial harm." As a matter of law, labor cannot be forced by serious harm if the harm was not the motivating force behind the labor. Where the alleged victim only characterizes these activities as "serious harm" a decade later, there is an insufficient between the alleged harm and the labor.

(29)    Objection. This characterization of the text exchange,which was inadmissible in any event, lacked foundation and was reflective rather than being in furtherance of any conspiracy, is also highly speculative and fails to demonstrate that Defendants *admitted* that they caused serious harm to a "victim." Notably, Probation has pointed to a single, ambiguous text exchange to which the Defendants were not a party to make its case of knowledge.

*Psychological Harm*

(30)    Objection. There is no authority that supports the proposition that "name-calling" like that described by the witnesses constitutes serious harm.

(31)    Objection.  The description of this event is misleading and does not include the fact that Rebecca Halpern testified that she faked her desire to do the demonstration, and that she did not vocalize the fact that she did not want to participate. Accordingly, Cherwitz could not have known that she did want to do the demonstration. ███████████████████████████████████████████████████████████████████████ *ee* 3500-HT-6.  Halpern and all other witnesses testified that being selected for an OM demonstration was prestigious.  *See* Tr. 203:21-303:3, 1728:1-5, 1845:4-6, 4146:23-4147:4. ███████████████████████████████████████████████████

(33)   Objection. There is no authority that supports the proposition that every uncomfortable experience in the context of an organization that endorsed a disciplined practice, that people voluntarily joined with an understanding of that disciplined environment, constitutes serious harm. Indeed all twelve government witnesses not only participated in OneTaste events and activities, but elected to move into monastic residences to engage in deeper participation *See* Tr. 1142:3-1144:2, 1146:23-1147:23 2080:9-2081:16, 2218:11-2219:18, 2221:7-2222:7. Likewise, there is no authority that supports the proposition that manipulation of adults constitutes serious harm.

(34)   Objection. As the trial testimony reflects, no one was required to take classes that involved so-called "formal ceremonies" named "priests and priestesses of orgasm." Moreover, every single class taught by Daedone had a curriculum that anyone participating *knew* before signing up for the course. Additionally, ideas that involve concepts of "witchery" and "magic" are protected by the First Amendment. None of the examples offered in this paragraph suggests "indoctrination."  There was also no testimony about body piercings or being carved with a scalpel and/or medical instruments.

(35)   Objection. Probation has clearly ignored the trial record. Time and time again the witnesses admitted that they were not isolated or encouraged to limit contact with people outside of the OneTaste community. *See* Tr. 511:25-512:10, 1144:3-10, 1145:22-25, 1386:2-18, 1532:16-25, 2301:2-16, 2492:4-11, 3145:6-19, 4074:14-20, 4098:6-16.

(36)   Objection. Daedone's opinions about monogamy and relationships were well-known and discussed openly. Daedone's opinions are protected by the First Amendment. At no point was Christina Berkely forced to end her relationships *as she admitted* under oath. Berkley testified that she continued to see Isaac even though she was allegedly told not to (Tr. 1152:19-21), "eventually the relationship ran its course naturally and we ended up breaking up of our own desire to." *See* Tr. 1049:23-24, 117:10-15.

Daedone and OneTaste were absolutely entitled to regulate who was permitted into their community and their communal residences. As such, OneTaste's determination that Michelle Wright should not be immediately invited to live in a communal residence is not coercion or psychological abuse, it is protected activity. Wright was free to walk away from OneTaste before she was even accepted into the community.

(37)   Objection. Jane Doe 21 did not testify at trial, and had she testified, there would have been testimony that she was not forced to do anything, and that she was not locked in the room. It is also unclear who "CC-4" is as there is no other mention of CC-4 in the PSR.

(38)   Objection. There is no evidence whatsoever that Defendants targeted individuals with past trauma to take OneTaste courses or join the OneTaste community. To the extent that probation contends that OM did not have the capacity to heal past trauma, science-based evidence proves otherwise. This Court barred expert testimony (Dr. Ley) on this precise issue.

To the extent class participants signed-up for OneTaste courses, they did so, sometimes and in part, to address and heal from past trauma - not because they were targeted but because they were searching for alternative ways to address past trauma. Defendants cannot be held to account for the mindset of individuals even before those individuals joined the OneTaste community or took their first class. As Probation understands this case, the witnesses were "brainwashed" day one of their involvement in OneTaste. Further objecting that there is any evidence that the sales tactic that encourages sales people to focus on potential clients' source of pain is a nefarious psychological tactic. All sales tactics are psychological tactics and have an element of manipulation. The "going to the source of pain" approach is a tactic that was developed by companies unrelated to OneTaste and is  widely used in companies that sell products. It has no direct correlation to "past trauma." Defendants were denied the opportunity to present evidence to rebut this proposition that probation now relies on in support of a lengthy sentence for the Defendants.

(39)    Objection. Defendants' beliefs and thoughts are protected under the First Amendment. Witnesses were not forced to attend 12-step programs. Notably, OneTaste did not operate its own 12-step programs. As such, all individuals who were "encouraged" to attend 12-step programs had routine and frequent contact with people unassociated with OneTaste further demonstrating that they were not forced to remain in a condition of involuntary servitude. Moreover, no one is required to admit addiction to participate in 12-step programs.

(40)    Objection.  The defendants object to the characterization of "letting your beast out" as involving "violent behavior" and the relevance to the forced labor conspiracy conviction.  The jury heard testimony that this was an exercise within a coaching class, in which participants were not necessarily working for OneTaste.  In addition, the testimony was that participants voluntarily chose to participate, and that  they signed a waiver prior to the class assuming all risk and acknowledging, and that "the course is not, and is not promoted as, a substitute for psychotherapy and is not therapeutic in nature." *See* DX21J.  There was also testimony that before each exercise, the participants were told about consent and the use of "green, yellow, and red", with red being a full stop of activity for the participant. *See* TR 454:22-455:10, 1777:6-13, 2557:8-15, 2760:11-15].  There was also no testimony that OneTaste sanctioned violent behavior, and Becky Halpern's testimony  regarding the video of the beast revealed her and others' positive comments at the time regarding their feelings after the exercise.  *See* Tr. 458:12-459:16.

(41)    Objection. The defendants object to the description of Fear Inventories as being recorded electronically.  Testimony at trial established that Fear Inventories were recorded on paper and then ripped up after they were shared with a partner.  *See* Tr. 518:19-521:7. The communal housing requirements specifically outlined the practice of fear inventories.  *See* 3500-RW-12. The fear inventory practice was copied from Alcoholics Anonymous as a self-examination process designed to foster personal growth and spiritual freedom.  There was no testimony that

fear inventories were read aloud in sales meetings.  Defendants also object to the characterization of using withholds to receive sensitive information about OneTaste participants as there was no such testimony and no sales team at the time of withholds for which the government could allege that the information was used.

(42)    Objection.  The defendants object to the inclusion of the "re-rape" scene by Anthia Gillick (AKA Brooke Schefield and Jane Doe 4") given that Ms. Gillick was not employed by OneTaste at any point, and she wrote positively about the experience in her journal, saying the joy she felt on the backside was unbelievable *See* Tr. 4118:11-13. There was no testimony that she was forced to participate in the experience. She testified that it was only later while doing therapy that she came to believe that this was not "the softest way" to heal from trauma *See* Tr. 3951:3-7.

(43)    Objection.  The defendants object to the characterization that the defendants surveilled participants by overseeing their routines and activities.  The entire purpose of the communal homes was to share beds and explore human connection. Anyone who chose to live in a residence did so with a full understanding that there would be little to no privacy.

(44)    Objection.  There was no testimony that the defendants oversaw sleeping arrangements for any nefarious purpose.   OneTaste participants including those identified in ¶12 testified that they voluntarily moved into the communal houses knowing that they would have to share beds, and that they were required to keep in communication.  There was no testimony that anyone was forced to live in the communal houses or to share beds, and communal living required residents to stay connected "no matter what" pursuant to the OM Residential Handbook.  *See* 3500-RW-12; *See* Tr. 512:11-13.

(45)    Objection.  The claim that defendant Cherwitz spied on other residents through Jane Doe 10, Max Pixley, is not supported by the evidence.  The emails revealed that Cherwitz generally inquired about how people in the house were doing, and inquired as to how Max Pixley themselves was doing.  *See* Tr. 1828:9-1830:25.

(46)    Objection.  There was no testimony that Daedone set sales quotas for Cherwitz to fill.

(47)    Objection.  There was no testimony that anyone was forced or directed to open a credit card to pay for courses.  There was testimony that Cherwitz told individuals that they could open up a credit card, but, at best, this is a sales tactic.  The suggestion that Michal Neria (Jane Doe 3) was manipulated into opening a credit card is not supported by the evidence because at the time she had only just met defendant Cherwitz and had only been introduced to OneTaste two few weeks prior *See* Tr. 2693:14-15.

(48)    Objection.  As set forth above in paragraph 38, there is no evidence that Defendants targeted individuals with past trauma to take OneTaste courses or join the OneTaste community.

To the extent class participants signed-up for OneTaste courses, they did so, sometimes and in part, to address and heal from past trauma - not because they were targeted but because they were searching for alternative ways to address past trauma. Defendants cannot be held to account for the mindset of individuals even before those individuals joined the OneTaste community or took their first class. Furthermore, Jane Doe 20, did not testify at trial, and there was no testimony that any promises were made to her concerning her past trauma or that OneTaste sought her out because of her past trauma.

(49)    Objection.  There was no evidence at trial that Defendant Cherwitz pressured Michal Neria (Jane Doe 3) to purchase the  OneTaste membership program, and no evidence that John Doe 2 did so as a result of pressure from Cherwitz.

(50)    Objection.  There is no evidence that Defendants Daedone and Cherwitz or their co-conspirators prevented the OneTast participants who worked for commission on the sales team from closing large sales.  With respect to the testimony of Jane Doe 1 (Ayries Blank) there was no testimony as to why she was placed on probation, or that sexual assignments were a part of probation.  Once again, Ayris Blanck should not be considered a victim given that she fabricated journals about her time at OneTaste and was unable to testify.  Finally, with respect to Lianna Lifson, Jane Doe 8, there is no connection between OneTaste and her student loans.  Lifson testified that she paid for OneTaste classes instead of her loans, and there was no testimony that she, a college graduate of Smith College and a graduate of a Masters from NYU, was forced to do so.

(51)    Objection.  As set forth above in the objection to paragraph 12, Dana Gill (Jane Doe 5) performed work for OneTaste to pay for classes, but she also testified that every time she left, she made the choice to come back and keep associating with OneTaste *See* Tr. 1392:1-3 and that no one forced her to stay *See* Tr. 1455:20-21.  She further testified that she enjoyed spending time with Jones (the Investor), and that she wrote about that in her personal journal at the time. There was no testimony that Gill sexually serviced Jones for the purpose of paying off her debt.

(52)    Objection.  The amount of payments do not reflect the work trade and other expenses that came out of wages, nor does it reflect the hours worked or the time period worked.  For example, Michal Neria (Jane Doe 3) only made $1,175, but she barely worked for OneTaste.  While she did sales from March 2015 through August 2015, for most of that time Neria was in courses, including the Nicole Daedone Intensive, Magic School, Coaching Program 9, Mastery and Membership, and she performed very little work. *See* Tr. 2797:20-2798:19.

(53)    Objection. As set forth in paragraph 12, all of the witnesses testified that they were free to leave at any time, and that they were college educated and could have worked elsewhere.

(55)    Objection.  Probation conflates expectations of living in the OneTaste community with employment, labor and services. It is not clear what text message threads were actual labor, and

what was part of communal living, particularly at the Morellino where Max Pixley (Jane Doe 10) specifically sought to live.

(56)    Objection.  This paragraph is factually inaccurate.  The Defendants were never involved in encouraging fake marriages.  Dana Gill entered into a fake marriage on her own and testified that it had nothing to do with OneTaste.  *See* Tr. at 1417:13-1418:15.  The Defendants did not encourage illegal activities or specifically encourage prostitution. Dana Gill and Berkely testified about their prostitution activities and admitted they were outside the context of OneTaste. Although Gill attempted to blame Aubrey Fuller for introducing her to prostitution apps, she conceded that she approved her profiles, went on the dates, accepted the money she received from those dates, and used the money she earned from those activities *See* Tr. 1541:21-1543:18. Dana Gill admitted that in 2011 she said on a podcast that she might get something out of it so she got a Sugardaddy *See* Tr. 1404:16-22.


*Sexual Harm*

(57)    Objection. As a preliminary matter, Defendant Daedone's views on victimhood cannot be fairly described as a demand that "victims of sexual assault or violence should not consider themselves, or be considered by others, to be victims and should not shame or blame those who commit sexual assault for their actions." Probation's view (which is simply a regurgitation of the government's theory) that Daedone's teachings meant literally "surrendering" to violence is not only sophomoric but untrue. Regardless, even if Probation (and the government who seemingly wrote this PSR) *was* a fair characterization, Daedone is entitled to her views no matter how controversial under the First Amendment. She is entitled to share her ideas publicly and to write her ideas in books. Daedone has shared her teachings far and wide in many contexts for well over a decade. There is no authority for the proposition that an expression of ideas and teachings constitutes sexual harm or any harm.

(58)    Objection. The idea around "aversion practice" was not developed by Daedone but rather is a spiritual technique or a concept synthesized from different disciplines like mindfulness, Buddhism, and modern exposure therapy. As articulated above, the concept of aversion practice was endorsed by Daedone publicly. Clearly, of the thousands of people who heard Daedone speak, very few, if any, point to her teachings, including the teaching of aversion practice, as a means by which Defendants caused "sexual harm." In fact, even the government witnesses agreed that Daedone's teachings were not inherently coercive and could be accepted or rejected. *See* Tr. 1904:15-1905:1, 3127:7-21, 4246:3-13).

(59)    Objection. Probation continues to make conclusions that the jury was neither asked to make nor found. There is no evidence that Defendants or any co-conspirators told lesbian women that they needed to be "hungry for dick."  Even if this was said at some point during the alleged

12-year conspiracy, there is zero evidence that the purpose in stating this was to ensure that OneTaste participants "would continue to have sex with strangers" for Daedone's financial benefit.

(60)    Objection. Max Pixley admitted on cross examination that they did not remember the incident with Eli Block perfectly, and that they had previously told the government that they participated in an OM with Eli because they didn't want to cause trouble - not because Cherwitz told them to do so. *See* Tr. at 1856; 6-25; 1857; 13-25.  Pixley also testified that they initially told the government that they could not remember if it had been a male OM.  *See* Tr. 1858: 1-17.

(61)    Objection. As the government and the Court conceded at trial, the act of OM is not inherently nefarious and even the witnesses testified that they considered OM a meditative practice. Some witnesses continued to OM even at the time of trial. Probation concludes otherwise without any basis. Indeed, the Court's basis for precluding the defense from presenting expert testimony concerning the validity of OM as a meditative practice would have debunked the assumptions now made by Probation. The record shows that the witnesses voluntarily and knowingly participated in OM because they chose to. It is the fundamental tenet of OneTaste that any participant would have known before joining a residence dedicated to the practice. The residence handbooks expressly indicated that OM was a practice around which the community united.

(62)    Objection. This is simply a false statement. While there was testimony that Daedone assigned research partners and that people shared beds at the Warehouse. No one testified that they did so under coercion or duress. There would simply be no reason to move into the Warehouse if one did not wish to explore sexually which was known as the purpose of moving into the Warehouse.. If someone did not wish to participate in this community (such as Christina Berkeley's then husband) they could leave and many did. Moreover, Christina Berkely expressly testified that she rejected Daedone's suggestion of a research partner. Although she felt singled out by Daedone and "shamed" for rejecting Daedone's suggestion, there were no other consequences for rejecting the suggestion. This is not sexual harm.

(63)    Objection. There is no evidence that sex was used as a means of encouraging productivity.  Specifically, there was no evidence at trial that Cherwitz encouraged Michal Neria or Max Pixley to have sex if they were not doing well in sales.  In addition, Becky Halpern testified that Rachel told her and the OneTaste staff member to go have sex, but that they did not have sex. *See* Tr. 489:18-19, 572:1-4.

64.    Objection.  This paragraph does not include the testimony by Lyndsi Keves, Jane Doe 13, where she admitted that the statement by Cherwitz was made in a communication exercise during a course for which she assumed the risk that participants may make statements or take actions that she disagreed with, and that the courses may be provoking.  Keeves also admitted

that she could have chosen not to participate in the exercise, but she continued on.  *See* Tr. 3116:20-3119:17.

(65)    Objection.  There is no connection between the encouragement of marriage and the forced labor conspiracy.

(66)    Objection.  There was  no testimony at trial that a means of working through trauma was by having sex.  In addition, there was no testimony about these alleged statements made to Ayries Blanck, and once again, there should not be any reference to Ms. Blanck who fabricated evidence to be used in this trial and did not testify.

*Other Physical Harm*

(67)    Objection. Again, Probation conflates expectations of living in the OneTaste community with employment, labor and services. No authority stands for the proposition that expected "time commitments" as a community member constitutes "deprivation." No authority stands for the proposition that being expected to attend meetings, group activities, and OM (stated requirements of being part of the OM community) constitutes "physical harm." It borders on the absurd to equate expectations of texting in a group chat as "physical harm." No authority supports this position.

(68)    Objection.  There was no evidence that the Defendants or anyone at OneTasted restricted participants access to mainstream activities and materials.  There was abundant testimony that everyone had access to computers and cell phones, that employees saw their families, and that they could leave at any time.

Impact on the Victims

Defendants object to paragraphs 69 through 80 to the extent the statements included are partial statements that do not include the full context. Defendants also note that the many of the impact statements speak of the harm in terms of the impact on their sense of self and their identity e.g. ("changed her identity and sense of self" ¶70; "had become her "whole identity"" ¶71; ("my whole life was OneTaste" ¶72; "someone telling me that my inner voice is wrong ¶74. Each of the nine witnesses the government described as victim witnesses elected to move into a monastic residence that they knew was based on Buddhist principles which, like almost all spiritual and religious traditions, involves giving over a certain amount of autonomy in order to pursue a spiritual path. This is important context to their description of their experiences. They were not required to live in these residences and many employees only a tiny portion of OneTaste's 35,000 in person  participants elected to live in such a residence. In addition to these general objections, the Defendants also object to specific factual inaccuracies in the following paragraphs:

(76)    Objection.  Defendants object to the characterization that Cherwitz instructed Rebecca Halpern to strip naked from the waist down.  This was an OM, which was a practice that Halpern and every OneTaste participant went to OneTaste for, and which required the strokee to be naked from the waist down every single time.  This was not specific to this OM demonstration.  In addition, this paragraph mischaracterizes Rebecca Halpern's testimony.  Halpern did not tell Cherwitz no; rather, that is what she was thinking but ultimately faked her enjoyment. *See* Tr. 305:22-25.  In addition, Halpern testified that Max Pixley was present during this demonstration and afterwards when she was sobbing.  The government failed to disclose a government investigation report prior to Pixley's testimony that indicated that Pixley had no memory of this OM demonstration.

(77)    Objection.  This misstates the trial testimony.  On cross-examination of Anthia Gillick regarding the injury she sustained while performing in silk acrobatics, she admitted that she went out with friends the night she hurt herself, and that she was with her mother when she was hurt.  These facts contradict Gillick's claim that Cherwitz told her not to seek medical treatment given that Gillick's mother was there to seek treatment with Gillick if she was seriously injured, and that she was well enough to go out with friends outside of OneTaste.  *See* Tr. 4075-76.  In addition, despite testifying that Chertiz told Gillick not to see a doctor, Gillick admitted that she actually went to the doctor and she could not recall if there were any consequences for doing so.  Tr. 4082:2-4084:3.

(78)    Objection.  The Defendants dispute that Cherwitz assigned Ayries Blanck to a monthly sex assignment.  During the cross-examination of Anthia Gillick, Gillick was shown a text message between Ayries Blank, Anthia Gillick, and AW and MG in which Ayries Blanck indicated that it was her idea to have sex with thirty men in thirty days. Gillick testified that there was no indication from the text that Rachel Cherwitz suggested this idea *See* Tr. 4123:2-12.

(79)    Objection.  Because Ayries Blanck could not testify at trial, the PSR should not rely on information about her.  The Defendants could not inquire as to the cause of this alleged weight loss and sickness.  In addition, there is no authority that supports the proposition that "name-calling" or derogatory statements described here constitute serious harm.

(80)    Objection. Lyndsi Keves testified that it was her choice to open a credit card.  *See* Tr. 3071:4-7.  Her testimony concerning the options she had to pay for the course also contradict the statements in this paragraph that she was pressured to go into credit card debt.  For example, she testified that she spoke with another OneTaste participant about applying for a business credit card, and that she also thought about paying for courses through her own coaching business.  *See* Tr. 3072:2-25, 3078:1-8. She also admitted that she thought through her finances and carefully thought about opening a credit card, and that she was in charge of her own personal finances.  *Id.*

Labor and Services Performed

(81)    Objection.  This paragraph fails to note that Defendant Cherwitz only made approximately $35,000 a year, and a total of approximately $400,000 in 10 years.  There was also testimony that she was the hardest working employee. Daedone earned a modest income, and for some years lost money, while developing OneTaste.

(82)    Objection.  There was no testimony that OneTaste participants operated massage parlors or cafes on behalf of OneTaste, or that anyone had to perform physical labor to maintain OneTaste properties.  While Michelle Wright engaged in massages as a business run out of a OneTaste property, that was her own business that she started and was able to do without paying to rent a space.

(83)    Objection.  The OM practice was not a sexual service given that every single witness in paragraph 12 testified that she went to OneTaste for the OM practice, that she learned what OneTaste offered immediately, and that she chose to participate in OneTaste and organismic meditation and could leave at any time.  The scenes were also not considered labor and services and there was no such testimony to support that. ████████████
████████████████████████

(85)    Objection.  There was no trial testimony in which anyone was forced to do scenes for VIPs or high paying clients.

(86)    Objection.  This paragraph mischaracterizes the relationship of Defendant Daedone and Reese Jones.  Jones was Daedone's boyfriend, and there was no testimony that she asked a OneTaste employee to collect background information on Reese. Daedone invited Jones to participate in a game after she met him. This was all done consensually and with the knowledge of all parties.

(87)    Objection.  There is no connection between these scenes and any labor, and there is nothing illegal about these scenes.

Obstruction of Justice

(88)    Objection. Under USSG §3C1.1, obstruction of justice is established when a defendant willfully obstructs, impedes or attempts to obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing and obstructive conduct related to the defendant's offense and any relevant conduct.

The record is devoid of evidence that Daedone deleted text messages or directed others to do so in an effort to obstruct an investigation into forced labor or related offenses. The record is silent as to what Defendant knew about any investigation at the time or even whether a federal investigation was even underway. There is no reason to believe that any investigation into forced

labor charges was underway when Daedone made ambiguous remarks about deleting her text messages.

(89)    Objection. There has been no finding whatsoever that Defendants attempted to influence witnesses and directed others to influence witnesses. At best, the government complains that public reporting on the case had the effect of making some witnesses uncomfortable. If this Court or the Magistrate wished to conduct a hearing into this allegation, it could and should have done so.

(90)    Objection. Again, a letter written by Ezra Landes to the US Attorney's office was not an attempt to obstruct the prosecution. The record does not demonstrate who provided protected material to Mr. Landes and more importantly whether Defendants were aware that such information was shared. This Court had and still has the opportunity to conduct a *Fatico* hearing into the issue to determine who was responsible for the protective order violation and what if anything Defendants knew about it.

(91)    Objection. An investigator attempting to interview a witness, sharing information with that witness, and immediately discontinuing the conversation upon learning that the witness was represented is not obstruction of justice. The allegations lodged against the investigator are disputed and must be the subject of a hearing as was requested prior to trial. But even if these allegations were true, an investigator giving his opinion of the merits of the case does not constitute obstruction of justice.

(92)    Objection. It is unclear who observed Defendant Daedone making "repeated facial expressions in response to witness testimony, including smirking, eye-rolling, and other visibly derisive gestures." The witness who allegedly observed this should be identified and should make the accusations a matter of record. Presumably the probation officer who allegedly wrote this PSR was not in court to render this opinion of Daedone's facial expressions. The information clearly came from the government. The government should identify the source of this information. To the extent the Court seeks to hold Defendant Daedone responsible for the conduct of individuals "aligned" with OneTaste, a hearing must be held. As probation notes, there is no evidence that Daedone or Cherwitz advised OneTaste to engage in this conduct. In fact, there is no evidence that Deadone or Cherwitz even knew the conduct was occurring. It is unclear what the purpose was in incorporating this information into the PSR if none of this conduct can be connected to the Defendants. Clearly, probation/government seeks to unfairly prejudice Defendants yet again.

## **Defendants Participation**

(95)    Objection. Defendants incorporate their objection as articulated at ¶9. Probation fails to identify a single fact to support the claim that Daedone "coerced the victims to use their assets to incur debt to buy OneTaste classes that they could not afford." Sales tactics are not coercion as

contemplated by a criminal statute and apart from Anthia Gillick who was never employed by OneTaste, there was no evidence that Daedone had any knowledge about the financial status of those taking OneTaste classes. Additionally, the vast majority of alleged victims were financially well off or came to OneTaste with no financial resources and left with no financial resources.

(96)    Objection to Probation's calculation of the offense level and application of enhancement. Defendant will address those objections more specifically at ¶¶105-114.

(97)    Objection to Probation's calculation of the offense level and application of enhancement. Defendant will address those objections more specifically at ¶¶105-114.

(98)    Objection. Defendant has no idea what Probation is attempting to state in this paragraph. The probation officer's hunch, conjecture, feeling, or pontification about whether Daedone engaged in "obstructive conduct" which is undefined is irrelevant. Again, it has been included solely to prejudice the Defendant. This paragraph should never have been included in this PSR.

### Offense Level Computation - Daedone

### Count 1:  Forced Labor Computation

(106)   Objection. A jury returned a verdict for forced labor conspiracy. No jury found that Defendants committed the substantive offense of forced labor. As such, before this enhancement can be applied, this Court must first find that the substantive offense of forced labor occurred. A court determination of whether the offense of forced labor occurred violates various Constitutional protections including the Defendants' right to trial by jury, and their Due Process right to be proved guilty by proof beyond a reasonable doubt.

It should be noted that if Defendants were actually convicted of forced labor, this Court would have the authority to decide the narrow question of whether victims were held in the condition of involuntary servitude for more than one year. But in this case,  the jury was not asked to find that Defendants committed forced labor. Thus, before this Court can determine whether victims were kept in a condition of involuntary servitude for over a year, it must first conclude that the Defendants committed the offense of forced labor.  This Court cannot rely on the jury's verdict to conclude that Defendants committed the offense of forced labor where the jury was explicitly told by the government that the case was not about whether the witnesses suffered serious harm that caused their labor. (Tr. R. 5222:11-20), and that  to find Defendants guilty, they need only find that "Defendants agreed to unlawfully extract even one form of labor or service from even one victim, any single victim, then they are guilty." *See* Tr. 5224:12-18. A judicial determination that Defendants committed the offense of false labor, a finding necessary to apply this enhancement, is a violation of Defendants trial by jury and Due Process rights.

(107)   Objection. The record does not establish by any burden of proof that Defendant Daedone committed the federal offense of criminal sexual abuse against Christina Berkely and Michelle Wright. An application of the enhanced offense level for commission of the §2242(a)(1) would be contrary to the plain language of the statute, authority from across the country, and the United States Constitution.

As a preliminary matter, Probation has failed to identify the details of the specific act(s) of criminal sexual abuse that Daedone allegedly committed. Defendant Daedone was  entitled to know with specificity what act of criminal sexual abuse she was accused of committing so she could defend it. Daedone enjoyed the constitutional right to defend against any accusations that would be used to increase her sentence. This notice is constitutionally mandated to enable the Defendants to understand the charges against them as guaranteed by the Sixth Amendment to the Constitution. Neither the indictment nor any 302 report put Defendant Daedone on notice that she was *accused* of committing an offense of §2242(a)(1) against Berkely and Wright.  To put a finer point on it, neither the indictment, §3500 material, or the PSR itself identifies precisely where, when, and how Defendant Daedone caused Berkely and Wright "to engage in a sexual act by threatening or placing that other person in fear." Generalized allegations that Daedone asked Berkely and Wright to be Reece Jones' "handlers" and that the women engaged in sexual activity with Jones, is not a specific accusation that allowed Defendant a fair opportunity to defend against. There was no allegation that Defendant Daedone threatened harm to Berkely or Wright to engage in this conduct. There was not even an accusation that the women did not consent to the activity. If the government intended to ask this Court to punish Defendants for the crime of criminal sexual abuse rather than forced labor conspiracy, it had an obligation to put Defendants on notice of this intent so they could defend it. Moreover, this Court denied Defendants' motion for a Bill of Particulars that would have presumably put Defendants on notice of the who, what, when, and where of this alleged crime of criminal sexual abuse. *See* May 3, 2024 Hr'g Tr. at 14.

Probation is not only asking this Court to find *by a lower standard of proof* that Defendants committed the substantive offense of forced labor, they are asking this Court to also find *by a lower standard of proof* that Defendants committed the offense criminal sexual abuse. This goes far beyond an enhancement appropriate for judicial determination. Indeed, the government has carried out a bait and switch in which the government has simply charged an offense (forced labor conspiracy) that the government has turned into a catch-all sex crimes offense co-extensive with state law but without pesky statutes of limitation and without actually having to prove the elements of a sex crime, like intent, knowledge, and lack of consent. As the government argued to the jury, the case was not about whether the victims suffered serious harm or whether the harm caused them to work  *See* Tr. 5222:11-20. As far as anyone knows, the jury found nothing more than an agreement to commit forced labor and single act in furtherance of the objective. Now that a jury is gone and without affording Defendants an opportunity to understand what specific crimes the government alleges they committed, Probation contends that this Court can serve as the trier of fact on what was actually unindicted top count and make a determination of guilt on

the uncharged offense by a mere preponderance of the evidence. At the very minimum, Defendants are entitled to a *Fatico* hearing where they afforded the opportunity to actually defend the allegation that was never charged or even implied in the § 3500 material.

Constitutional violations aside, the evidence by any standard of proof does not demonstrate that Defendant Daedone caused Berkely or Wright to engage in sexual acts by threatening or placing either one of them in fear. Preliminarily, there is nothing in this record that supports a claim that the women did not *consent* to the sexual acts at the time. While the government told the jury that consent was a non-issue at trial, it is most certainly an issue now that Defendants face sentencing for the offense of criminal sexual abuse. There is no evidence that Defendant Daedone intended to cause Wright and Berkely to engage in sexual acts absent their consent. Moreover, there is nothing in the record that reflects that Dadeone threatened or placed either one of them in fear to overcome their consent.

Berkeley testified that she agreed to be Jones' handler, that she enjoyed the position, and that she was excited about it. She admitted that she enjoyed her experience *See* Tr. R. 1159:5-14. At no point during her interviews with the FBI or from the witness stand did Ms. Berkely claim that she only engaged in sexual activity with Jones out of fear caused by Daedone. Probation/government brazenly seek to re-define the experiences of their own witnesses who may have felt mistreated by Defendants but who don't themselves claim to be victims of sexual abuse.

Similarly, Michelle Wright agreed to accept the position of Jones' handler which she knew involved sexual activity and she never told anyone about her true feelings about engaging in such activity. Wright admitted that she was not forced to live with Jones but she felt emotionally manipulated throughout her entire experience at OneTaste. This testimony is simply insufficient to prove that Defendant caused her through a threat of harm to engage in sexual activity. Criminal sexual abuse has very specific elements that must be satisfied before this Court can punish Defendant for the uncharged offense of criminal sexual abuse.

Threatening or placing one in fear involves some threat of bodily harm. *See United States v. Flaming,* 133 F. 4th 1011, 1024 (10th Cir. 2025) (placing someone in fear under § 2242(1) requires the "defendant's actions to [at least] implicitly place the victim in fear of some bodily harm.") *See also, United States v. Cherry,* 938 F. d 748, 754 (7th Cir. 1991) (acknowledging that "placed in fear" does not require force but the Defendants action must at the very least have implicitly placed the victim in fear of "at least some bodily harm.") Even under the most liberal interpretation, there is simply no authority that placing someone in fear includes a fear of being shunned from a community or a fear of being pushed out of the inner circle.

(109)   Objection. While Daedone was the co-founder, owner of OneTaste, and the alleged philosophical leader sometimes referred to by the government and some witnesses as a "guru" or

"sex cult leader," titles are not dispositive of whether the Defendant was a leader as set forth in the application notes to §3B1.1.

**Offense Level Computation - Cherwitz**

**Count 1:  Forced Labor Computation**

(106) Objection.  This enhancement is not warranted.  Serious bodily injury is deemed to have occured if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law.  The conduct involving Rebecca Halpern does not constitute criminal sexual abuse under federal law as discussed in paragraph 108 below. In addition, the facts established at trial cannot meet the elements of sexual assault under New York state law.  See New York Penal Law section 130.65, sexual abuse in the first degree.

> A person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact  (1) by forcible compulsion (to compel by either: (a) use of physical force; or (b) a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped. (§130.00(8)) or (2) when the other person is incapable of consent by reason of being physically helpless.  "Physically helpless" means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act, and "Sexual contact" means any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed.

The facts established at trial do not amount to forcible compulsion.  There was no physical force used in connection with the OM demonstration.  While a threat can be forcible compulsion, the threat must place the person in fear of immediate death or physical injury to herself or someone else or put the person in fear of being kidnapped.  There was no testimony whatsoever that Rebecca Halpern was put in fear of immediate death, physical injury, or of being kidnapped. Furthermore, the facts did not establish the definition of "sexual contact".  To meet that element, the person doing the touching has to do so for the purpose of gratifying the sexual desire of either party, and there was overwhelming testimony that these demonstrations were not for sexual desire.  Accordingly, the two-point enhancement for serious bodily injury cannot be applied based on a state felony.

The enhancement is also not warranted on the facts presented at trial even without analyzing the statutes.  Halpern testified that she faked her enjoyment of the OM demonstration, and OMing was something Halpern did daily and openly professed her appreciation of the practice. Therefore, Cherwitz could have known that Halpern did not want to participate in the OM.  If

there was truly a sexual assault, Max Pixley would have recalled the incident, but they did not.

████████████████████████████████████████████████ Accordingly this enhancement should not apply.

(107)   Objection. A jury returned a verdict for forced labor conspiracy. No jury found that Defendants committed the substantive offenses of forced labor. As such, before this enhancement can be applied, this Court must first find that the substantive offense of forced labor occurred. A court determination of whether the offense of forced labor occurred violates various Constitutional protections including the Defendants' right to trial by jury, and his Due Process rights to be proved guilty by proof beyond a reasonable doubt.

It should be noted that if Defendants were actually convicted of forced labor, this Court would have the authority to decide the narrow question of whether victims were held in the condition of involuntary servitude for more than one year, but applying this enhancement first requires the Court to determine that Defendants *committed* an offense for which they were not charged, tried or convicted.

(108)   Objection. The record does not establish by any burden of proof that Defendant Cherwitz committed the federal offense of criminal sexual abuse against Rebecca Halpern. An application of the enhanced offense level for commission of the § 2242(a)(1) would be contrary to the plain language of the statute, authority from across the country, and the United States Constitution.

As a preliminary matter, the govenment never identified the details of the specific act(s) of criminal sexual abuse that Cherwitz allegedly committed prior to trial.  Although there were 302 reports that conveyed the circumstances of the OM demonstration through Halpern and Tayab, there was no indication that it was sexual abuse or that Halpern vocalized her desire not to do the OM. Defendant Cherwitz was/is entitled to know with specificity what act of criminal sexual abuse she was accused of committing so she could defend it. Cherwitz enjoyed the constitutional right to defend against any accusations that would be used to increase her sentence. This notice is constitutionally mandated to enable the Defendants to understand the charges against them as guaranteed by the Sixth Amendment to the Constitution. Neither the indictment nor any 302 reports put Defendant Cherwitz on notice that she was *accused* of committing an offense of §2242(3) against Halpern.

Probation is not only asking this Court to find *by a lower standard of proof* that Defendants committed the substantive offense of forced labor, it is asking this Court to also find *by a lower standard of proof* that Defendants committed the offense criminal sexual abuse. The jury found nothing more than an agreement to commit forced labor and single act in furtherance of the objective. At the very minimum, Defendants are entitled to a *Fatico* hearing where they afforded the opportunity to actually defend the allegation.

Furthermore, an analys of the federal sexual abuse statute demonsrates that the reason that coercion is sufficient to meet sexual abuse is because it has to take place in a prison, a ship, or a place where people are held in custody or pursuant to a contract or agreement with a federal department or agency is because it is not as easy for the victim to consent in such a situation. While USSG 1B1.5, application note 3 indicates that relevant conduct includes conduct that occurred under circumstances that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States, that is purely a jurisdictional issue. In contrast, 18 USC §2242 is not simply a jurisdictional issue - the fact that the act must take place in a facility with some kind of federal custody, contract, or agreement is what makes it coercive, thus necessary to establish the essence of the crime.

In addition, in other cases citing U.S.S.G. § 2H4.1(b)(4)(B), they typically involve either a conviction of the "other felony offense" or a specific finding by the jury that the "other felony offense" occurred. *See e.g.*, *United States v. Callahan*, 801 F.3d 606, 628 (6th Cir. 2015) (jury unanimously found that the defendant's conduct involved kidnapping). There is one reported case, *United States v. Maksimenko*, No. 05-80187, 2007 WL 1834708, at *3 (E.D. Mich. June 25, 2007), in which the enhancement was applied without a jury finding. In that case, there was no trial and the defendant pled guilty to involuntary servitude (18 U.S.C. § 241), alien smuggling conspiracy (8 U.S.C. § 1324(a)(1)(A)(v)(I) and (B)(I)), and money laundering conspiracy (18 U.S.C. § 1956(h)). The defendant then waived his right to a hearing on the enhancement for criminal sexual abuse, and provided written arguments in response to the goverment. *See id.* at *3. The court held that the government met its burden to prove by a preponderance of the evidence that the sentencing enhancement applied. *Id.* at *9. But the evidence there demonstrated that the defendant raped multiple victims while they fought back. *Id*. at *6-8. Those facts are therefore distinguishable from the instant case.

(110)   Objection. Cherwitz was not the founder or a leader of OneTaste. She was head of sales at one point because she worked her way up to the position through hard work. It did not make her a leader or organizer. Furthermore, the application notes indicate that a participant is a person who is criminally responsible for the commission of the offense, and that to qualify as a leader or organizer, the defendant must have been the manager or supervisor of one or more of those participants. Cherwitz did not manage or supervise any of the co-conspirators. Therefore, at most, a 2 level enhancement should apply under §3B1.1 (c).

**NICOLE DAEDONE OFFENDER CHARACTERISTICS**

(135)   Objection. Defendant is currently participating in Spanish language educational class. In addition, together with Ms. Cherwitz, Ms. Daedone has started two educational programs in MDC, a twice weekly meditation class and a twice daily exercise class, regularly attended by 10-20 women, for which participants are now eligible for First Step Act credits. In addition,

defendants have been granted permission to start teaching a third educational class on Buddhist philosophy.

(137-140) 

(148)   Objection. Defendant participated in AA meetings as a way of practising renunciation, not 'annunication'.

(155)    Objection. Defendant's assets were seized, not forfeited. After this occurred various friends paid for her housing and expenses. While she continued to give talks on the Eros Platform operated by Institute of OM LLC, expenses paid on her behalf were not as compensation for any creative or teaching work she was doing.

(156)   Objection. OneTaste did not 'evolve into a sexual wellness practice.' OneTaste was an educational company that taught a spiritual philosophy including a meditation technique called Orgasmic Meditation. The scientific company being referred to is "Institute of OM Foundation," an independent non-profit which is a registered 501(c)(3) organization EIN: 83-2804046. This foundation has sponsored independent research into Orgasmic Meditation resulting in eleven published papers, including nine published peer-reviewed papers.

(158)   Objection.

- Art of Soulmaking: **17,622 incarcerated students have completed** a correspondence course and workbook created by the defendant, which guides incarcerated individuals through meditation, contemplative writing, and creative expression. The participants are paired with a volunteer pen pal. **This program is available in 1,404 facilities across 48 states.**
- Art of Addiction: this program takes place both within and outside of prison **and has been completed by 810 incarcerated students in 1,404 facilities across 48 states**. This is an eight week digital and paperback curriculum which reframes addiction as a drive for realization, using contemplative practices and self-reflection
- Guards to Guardians: re-envisions correctional officers as guardians fostering inmate transformation, using a workbook and training to address occupational trauma. This program is free to corrections staff and was launched in Mendocino County Jail in 2022 and has been introduced **in four additional facilities**.
- Free Food (Love to Table): provides gourmet restaurant-style three-course meals to the homeless and those with food insecurity, while training justice-impacted individuals. This program started in San Francisco and is currently — operating in the Harlem section of

New York, in partnership with Massimo Bottura's Food for Soul. **Free Food has served over 116,000 free meals since 2019.**

(171)   Objection. Ms. Daedone sold the Fort Bragg property on September 30, 2020.


## RACHEL CHERWITZ OFFENDER CHARACTERISTICS

(128)   Objection.  The characterization of the charge in this case as a conspiracy to create a business where the Defendants pretended to be spiritual people in order to make money by taking advantage of vulnerable people is inaccurate.  The Defendants were convicted of a forced labor conspiracy, and there was no other finding by the jury.

## PART D. SENTENCING OPTIONS

### Custody

(175)   Objection. For the reasons stated, *supra,* Defendants object to probation's offense level calculation.

(178-179) Objection to the assertion that forced labor conspiracy is a Class A felony.

(184)   The amount of forfeiture, if any, is hotly disputed. The government must show that the monies already seized from the Defendant were derived from the forced labor conspiracy. Any judgments sought against Defendant must likewise be traced to the commission of the offense.

(186)   Objection. Defendants were convicted of forced labor conspiracy. The government did not prove, or even charge, a crime of forced labor. Thus, the government did not prove that any victims existed. Even the government conceded as much during their closing arguments. Accordingly, Defendants object to any restitution for any intended victim.

### Sex Offender Notification and Registry Requirements

188.    Objection. Defendants were not convicted of sex offenses and are not subject to sex offender notification or registry requirements.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE/VARIANCE

194.    Objection. For the reasons articulated in ¶106, Defendants were not charged or convicted of holding *any* person in a condition of involuntary servitude.