# EXHIBIT 1

Alana Dugandzic
9108 Bell Mountain Dr.
Austin, TX 78730
alanapberg@gmail.com
(512) 797-0882

June 18, 2025

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE: United States v. Rachel Cherwitz and Nicole Daedone
Case No. 23-CR-146(DG)

**Dear Judge Gujarati,**

I am writing to you as a lifelong friend of Rachel Cherwitz, with deep respect for the Court and the seriousness of this case. My hope is to provide meaningful context about Rachel's character, the consistency of our 30+ year relationship, and the deep, unwavering support she has in her life as you consider sentencing.

My name is Alana Dugandzic, and I live in Austin, Texas with my husband, Ivan, and our two children, Ethan (9) and Lyla (7). I own a small but growing vintage retail company called Opa's Vintage Gal, which I started last year after spending 25 years selling enterprise software for companies like Microsoft and Salesforce. Rachel has been one of my dearest friends since we met at age 15 in our regional Jewish youth group in 1993. We bonded immediately, and the foundation of our friendship was built on weekends spent studying Judaism, singing Hebrew songs, celebrating Shabbat, and growing into young women together. We wrote letters back and forth constantly, as teenagers did back then, and I've saved many of them to this day.

That kind of consistent, intimate connection has defined my relationship with Rachel for over three decades. After high school, I moved to Austin to attend the University of Texas at Austin, and Rachel moved to Israel to expand her horizons. She spent the next year backpacking the world, often with mutual friends who I remain close with today. A few years later, I was lucky enough to catch up with her in Dallas. She was visiting her parents, and I happened to be in town for a wedding. She came and sat with me, and we talked for hours as she shared stories about her travels and her hopes for the future. After years apart, it was like no time had passed. Her heart hadn't changed. She was still the same magnetic, warm, deeply feeling Rachel I had always loved and admired. She was looking for direction and still on a path to find herself.

Over the next few years, we stayed in touch and met for meals when our lives overlapped. She told me about her growing involvement with OneTaste. At first, she didn't get into specifics, just that she was excited about its mission and what she was learning.

In 2012, while I was living in Chicago, I visited Austin to see a man I had just started dating. Rachel was also in town with OneTaste and invited us out to dinner. I remember asking, somewhat nervously, what orgasmic meditation actually was. She explained it clearly and thoughtfully. But what stood out to me most was that, even though she spoke with great passion about her work, she never once pressured me to learn, nor did she even subtly encourage me to try it. She was simply sharing her journey. She still felt like the Rachel I had always known, only this time, she seemed happy and grounded. I was proud of her.

In 2018, when I was attending Dreamforce as an employee of Salesforce in San Francisco, Rachel and I met for lunch. She was living at a property near Mendocino at that time, and I hadn't seen her in a while. I will never forget that lunch. Rachel showed up with the grace and composure of a woman who had grown through deep personal work. We sat together for two and a half hours, and I was struck by how beautifully and intelligently she carried herself. She had evolved professionally and spiritually, but at her core, she was still the same person. She had the same intense love for people, a laid-back, cool personality, and a fierce loyalty that never wavered.

Through all of it….teenage letters, life changes, dinner reunions, new cities, and career paths, Rachel has remained a consistent, loving force in my life. My children call her "Teta Rachel" ("Aunt" in Croatian), and she has truly become part of the fabric of our family. Their connection with her is real and deeply personal. Ethan is currently designing a Spanish language game so he and Rachel can continue practicing together, even while she is incarcerated, because their shared curiosity and learning has not skipped a beat. And Lyla sees Rachel as a trusted adult she can talk to about anything without fear or judgment. From a young age, Lyla has been curious about complex and mature topics, and Rachel has helped both of us navigate those moments with honesty, compassion, and safety. She has taught us how to ask the right questions, how to respond with openness rather than fear, and how to hold space for growth. Rachel's presence in my children's lives is not casual. It is foundational.

Her support extends to me in deeply personal ways. I have been navigating my own challenges with depression, anxiety, and ADHD.  These challenges can feel isolating and overwhelming. Even from within prison, Rachel has been a lifeline. Through letters and phone calls, she offers thoughtful guidance and deep emotional insight. She reminds me that my uniqueness is a strength, just as she did when we were teenagers. Her encouragement and grounded presence helped give me the confidence to leave a 25-year corporate career and start my own business at 45. That kind of impact stays with a person for life. No matter the topic, mistake, or moment of confusion, Rachel shows up with honesty and without judgment. I trust her completely.

Judge Gujarati, I want to emphasize something very clearly. Rachel is needed. I need her. Her friends, her family, her community, we all need her. She is not just loved, but depended on. She gives to the people around her in a way that is real and restorative. Her guidance, support, and wisdom lift people up. Whether it is through her professional work outside of OneTaste, or the quiet, compassionate ways she shows up in the world, Rachel makes a difference. She feeds and clothes the homeless, talks with them like human beings, and helps them see their worth and dignity beyond their current circumstances. Her impact is not performative. It is deeply personal. Her presence enriches lives. Mine included.

I am not writing to excuse or minimize anything the Court has heard. I write to share another side of Rachel, the woman who nurtures, who grows, who gives, and who reflects deeply on her past. I respectfully ask that you consider all of this when determining her sentence. I hope it can reflect not only the gravity of the situation, but also the very real possibility of redemption.

Rachel still has so much good to give this world. I have witnessed it for more than 30 years.

Thank you for taking the time to read this letter and for the thoughtful care I know you bring to this responsibility.

With deep respect,

**Alana Dugandzic**

# EXHIBIT 2

Nov 9, 2025

Dear Judge Gujarati,

I would like to share my experience of Rachel Cherwitz, who is currently facing legal challenges in your court.

My hope is that, while making your decision, you will take into account some of the many testimonies of people whose lives have benefited by knowing or simply interacting with Rachel Cherwitz.

Rachel has dedicated many years to alcohol and addiction recovery, with her stated purpose as "removing the shame" from addiction, which is truly one of the most beautiful statements I've heard in years. When I met Rachel, she worked as a counselor at Duffy's drug and alcohol rehab in Calistoga and, at that time, I owned a sober living home in Sonoma County that would receive many Duffy's residents after their time in residential treatment ended.

Through the sober living home, I have heard hundreds of personal stories from people struggling with addiction, many of whom have had their lives deeply and positively impacted by Rachel's spirit, her ability to be present with them, hear them without judgment, and offer hope in the form of reminding them of their own power to find or create a solution to any situation they might find themselves in.

As I have had the pleasure to get to know Rachel over the last 4 years, she has become someone I personally turn to for guidance. I am constantly inspired by her dedication to her own authenticity, as well as her dedication to help others to live authentically while discovering their own truths as a way to heal.

Rachel has never pushed her opinion of what she might think "the answer" to the issue I'm sharing is, or what the "correct" course may be in those moments. She has a beautiful way of always bringing me (and others) back to self by, instead of giving me answers, leaving me with questions to ask myself: What do I want? What are my beliefs and values within this situation? Are my behaviors and choices getting me the desired result? Where is the spot where I have the freedom to stay the course or choose something different? She always encourages me to get more connected with myself so I can then be more connected and engaged in the world around me.

Rachel is a woman who has freely given, and will no doubt continue to offer immense value to any community she plugs into. She has a brilliant way of reigniting the light in people who have lost hope and/or become disconnected with themselves, simply by giving them permission to be who they always were.

Simply put, my world is a better place because Rachel is in it.

Sincerely,

Kerri Russi

# EXHIBIT 3

# Matt P - Sentencing Letter for Rachel

Dear Judge Gujarati,

I write to you on behalf of Rachel Cherwitz, my wife and best friend. I have known Rachel since 2016. We began dating later in 2017 and have been together since. We married in a wonderful ceremony at city hall in San Francisco in 2021.

In my professional career I have been a software engineer for 25 years, serving as Chief Technology Officer for various companies in that time. I have also been a public speaker, author, conference organizer and community leader. I received my Bachelor of Arts from Boston College, majoring in Computer Science and Philosophy with a minor in Cognitive Science.

Rachel is a rare and exceptionally lovely human being. A person of tremendous integrity, someone you could rely on for anything, who has turned every circumstance of her life into something that can benefit others. She bears an uncommonly generous heart, which she shares freely with friends and strangers alike. She sees the humanity and dignity in all people, in a way that is humbling to witness. She is someone who overcame tremendous odds to be the remarkable, inspiring woman that she is. I feel lucky to know her, and even more fortunate to be her partner and friend.

A few examples. One morning, in 2017, we ordered lattes at a little cafe in Los Angeles. Before she even had a sip, a homeless woman walked up to her and asked if she could have her coffee. Without blinking Rachel looked up, smiled, and handed it to her. I was stunned. That she would treat a total stranger, someone that most people would dismiss or avoid, as if they were her closest friend asking. But that is Rachel.

She is this way with everyone, all the time. In 2018 she was getting her master's degree while also working at a rehab facility in Arizona. I drove her to and from work every day. She worked late many nights, well past her shift, staying with residents who were going through the formidable difficulties of early recovery. These were unpredictable and often quite challenging episodes to work through. Rachel drew from a well of infinite patience, ensuring the resident was in good shape before she headed home. She did this not out of duty, but because she understood what was needed and called for.

Later, at another rehab facility in California, now as a licensed clinician, she brought her considerable background in recovery to bear daily. She taught group courses and worked one on one with residents, offering her experience, strength and hope for whatever stage of recovery they were in, navigating their many wily ways and offering them a meaningful path to sobriety. She was employee of the year there in 2020.

In 2022, we lived on Market Street in San Francisco, where there is a lot of drug use and homelessness nearby. Rachel would often bring any extra food or clothes we had to the people outside. Their welfare was always on her mind. She would remember specific people and check in on them when we took walks. If we passed by someone who was not moving, who might be overdosing, she would stop to check whether they were breathing, or call 911 to get them help. She saw these people without judgment and as worthy of the same care as anyone else.

When she wasn't with residents at her job she was in school or volunteering. She began a clinical doctoral program in 2021, and after finishing her own schoolwork, spent many long hours helping her friends with theirs. She also worked with many sponsees in 12 step programs, at food programs for those in need, and volunteered at UCSF's Neuroscape lab in San Francisco.

For someone who turned adverse conditions into strengths, she did everything she could to help more people. Even when she was arrested in June 2023, when she was able to call me from jail, the first thing she asked is, is everyone ok, do they need anything? I have never seen someone with such a courageous, selfless heart as hers.

I ask you to take these words into consideration as you decide her sentence.

Kindly,
Matt Pelletier

# EXHIBIT 4

# MARY VALDOVINOS

## REENTRY PROFESSIONAL

October 29, 2025

Dear Honorable Judge Diane Gujarati and the U.S. District Court,

My name is Mary Valdovinos, and I am writing this letter in full support of Rachel Cherwitz. I first met Rachel in May 2024 through Women Over Dinner, a space dedicated to authentic conversations and connection among women. Since that time, I have attended around ten dinners and volunteered with their nonprofit, Free Food Harlem.

From the very first moment I met Rachel, I felt her warmth and sincerity. She greeted me with a hug, as if she had known me forever, and made me feel like I was part of their sisterhood from day one. That moment stayed with me, Rachel's kindness and empathy are unmatched. She listens deeply, encourages others, and leads with compassion. Rachel and I have shared conversations about overcoming addiction and trauma. She was open about her own path and was incredibly supportive of mine. She has continuously shown a commitment to helping helping others own their truth and rebuild their lives.

As a formerly incarcerated woman who has rebuilt her life and now works professionally in the reentry and social justice field, I see Rachel through a very particular lens: one that understands both redemption and resilience. I spent over a decade navigating the justice system and years overcoming addiction before dedicating my life to helping others find their way forward. Today, I serve as a human services professional and manager of a women's social justice group, where we empower women to use their voices and experiences to create change in their communities.

Because of that background, I can recognize who Rachel is. Her character, her consistency, and her heart for service all speak to the kind of growth and awareness that cannot be faked. She has shared pieces of her own story with vulnerability and courage, and I've seen how that honesty helps others open up, heal, and begin to believe in their own capacity to change.

Rachel is a beacon of hope to many women, myself included. She models what it means to turn pain into purpose. I have no doubt that she will continue to make an even greater impact if allowed to remain in the community. Removing her would not serve justice—it would remove a source of stability, leadership, and hope for so many who are trying to do better for themselves.

I strongly support Rachel Cherwitz and respectfully ask that she be given the opportunity to continue her work and her service in the community. Her example matters. Her presence changes lives.

Respectfully,

Mary Valdovinos

*Mary Valdovinos*

# EXHIBIT 5



2014-02-03 15:12:25 UTC

Here's an upstroke for the day. I just want to say, yet again, that I love this life. This weekend at the Mastery program I was listening to one of the lectures it really hit me that we are pioneers. Being someone out in the world who talks openly about sexuality is...rare. The other day I was sitting at TurnON and heard the leader say the word "clit." It's a word that I hear multiple times a day every day. Maybe I was feeling the other people in the room, but for some reason it struck me. Wow, that's a charged word. Clit. Yikes! She just said clit in a crowded room! Everyone thinks about it; we talk about it. Simply by being who you are you are giving other people permission to be who they are. Simply by stroking or being stroked you show other human beings that intimacy is something that we all want.

# EXHIBIT 6
# (Media Exhibit)

# EXHIBIT 7

February 23, 2013 – Rebecca Weiner CP Graduation Speech

Rebecca Weiner:

Hi, CP 6. I'm Becky. And something sort of extraordinary happened to me recently. I was thinking about this person that I love very deeply, and something hit me really hard, and this is what I got out of the program. And from this practice, I all of a sudden realized that I was withholding my love from him so hard because I was told that that was what you're supposed to do to be cool, to be a woman. And I called him up and I said, I just figured this thing out. I love you, and I'm not going to withhold it from you anymore, and I'm just going to love you and pour it on you, and you're going to be okay with it. And I was fucking scared shitless that he wouldn't be okay with it, but oh, he was. And I never would've gotten to that place if it hadn't been for Om, for this program, for everything I've been through with this practice. And what I want to do in the world is tell other people that they can have that, and to never hijack their connection with other people to actually have that connection. Thanks.

# EXHIBIT 8

PA3MCOM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

             v.                        24 Cr. 542 (AS)

SEAN COMBS,
   a/k/a "Puff Daddy,"
   a/k/a "P. Diddy,"
   a/k/a "Diddy,"
   a/k/a "PD,"
   a/k/a "Love,"

              Defendant.         Sentence
------------------------------x

                             New York, N.Y.
                             October 3, 2025
                             10:15 a.m.
Before:

                HON. ARUN SUBRAMANIAN,

                             District Judge
                             -and a Jury-

                     APPEARANCES

JAY CLAYTON
   Interim United States Attorney for the
   Southern District of New York
BY:  MADISON R. SMYSER
     EMILY A. JOHNSON
     MEREDITH FOSTER
     MITZI STEINER
     MARY C. SLAVIK
     Assistant United States Attorneys

PA3MCOM1

APPEARANCES CONTINUED


AGNIFILO INTRATER LLP
    Attorneys for Defendant
BY:  MARC A. AGNIFILO
    TENY R. GERAGOS
    -and-
HARRIS TRZASKOMA LLP
BY:  ANNA M. ESTEVAO
    -and-
SHAPIRO ARATO BACH LLP
BY:  ALEXANDRA A.E. SHAPIRO
    JASON A. DRISCOLL
    CHRISTOPHER JOHNSON
    -and-
XAVIER R. DONALDSON
BRIAN STEEL
NICOLE WESTMORELAND


Also Present:  Sean Quinn - HSI Special Agent
               Phil Adaszewski - HSI Detective/Task Force Officer

               Chanel-Ashley Foster
               Shannon Becker
               Paralegal Specialists

               Angelica Deniz, U.S. Probation

PA3MCOM1

(Case called)

MS. SLAVIK:  Good morning, your Honor, Christy Slavik, Madison Smyser, Emily Johnson, Mitzi Steiner, and Meredith Foster for the United States.  We are joined at counsel table by paralegal specialist Shannon Becker and Chanel Foster, as well as Special Agent Sean Quinn of HSI and Task Force Officer Phil Adaszewski, also of HSI.

THE COURT:  Good morning.

MR. AGNIFILO:  Good morning, your Honor.  We have Marc Agnifilo, Teny Geragos, Xavier Donaldson, Nicole Westmoreland, Brian Steel.  We have Chris Johnson, we have Jason Driscoll, we have Alexandra Shapiro, we have Anna Estevao, and we all represent Mr. Sean Combs.

THE COURT:  Good morning.

Good morning to you, Mr. Combs.

THE DEFENDANT:  Good morning.

THE COURT:  First thing, do we have the signed consent preliminary order of forfeiture?

MS. SLAVIK:  Yes, your Honor.  I have three copies for each of the parties and one for the Court for your signature.

THE COURT:  Why don't you go ahead and hand it up.

THE DEPUTY CLERK:  Your Honor, I note for the record that we also have the probation officer, if she may give her appearance.

MS. DENIZ:  Angelica Deniz from United States

PA3MCOM1

Probation.

THE COURT:  Good morning.

Let me give you an overview of how we are going to proceed.

First, I'll go over the materials that I have received and deal with the presentence report.  Then I will review the sentencing guidelines calculations.  I will then hear from the government and from the defense and from Mr. Combs.  Next I will review the sentencing factors that I must consider in imposing a sentence that is sufficient but no greater than necessary to achieve the goals of sentencing.  Finally, I will impose the sentence.

In terms of the materials that I have received, there are a lot of them.  I have received from Ms. Geragos the defense's September 22 sentencing memorandum, as well as the exhibits, including letters from family, friends, colleagues, fellow inmates at the MDC, and reports from that facility, as well as the examination reports from Mr. Combs' doctors.  I've also received the September 24 letter from Mr. Steel and the exhibits and the second supplement from October 1.  I have also received the defense's reply memorandum from October 2, and I received the letters from Mr. Combs, Ian Melnick, and Brian Steel last night, on October 2 as well, as well as the video that the defense plans to play here in court.  I have read all of the materials, and especially the letters, I greatly

PA3MCOM1

appreciated those.  I read them very closely.  So thank you for submitting those.

I have also received the government's September 30 memorandum and the exhibits, including letters from Ms. Ventura and others.  Again, the Court greatly appreciates receiving those letters, all of which the Court has closely reviewed.  I have also reviewed the presentence report prepared on August 28, 2025 and revised on September 18.

Does anyone have any further documents for the Court or did I miss anything?

Ms. Slavik.

MS. SLAVIK:  Your Honor, just the consent forfeiture order which you have.

THE COURT:  Which I have now received.  Thank you.

Mr. Agnifilo.

MR. AGNIFILO:  I believe that's everything, Judge.  Thank you.

MS. WESTMORELAND:  Actually, Marc.  Sorry.

Yes, your Honor.  We are going to submit Exhibit 85.  We just received it this morning.  It's a course evaluation from MDC that you have not seen yet.

THE COURT:  Can you hand it up.

MS. SLAVIK:  The government has not received this exhibit.

THE COURT:  You have a copy for Ms. Slavik?

PA3MCOM1

MS. WESTMORELAND:  It's on the way.

THE COURT:  Thank you very much.  This will be made part of the record as well.

MS. WESTMORELAND:  Thank you, your Honor.

THE COURT:  Ms. Slavik, other than Mia, does the government have any plan for any victim to provide an oral statement during these proceedings?

MS. SLAVIK:  Your Honor, no.  And in fact this morning the government learned that Mia no longer wishes to address the Court here today.

I'm comfortable representing to the Court that that is at least in part due to the letter submitted by defense on Wednesday, which can only be described as bullying and I think in contravention to your Honor's individual rules about civility in proceedings, so Mia will not be making a statement here today.  She has submitted a victim-impact statement, a written statement, and we urge the Court to consider Mia's experience in fashioning a sentence today.

THE COURT:  That's the letter that was attached to the government sentencing memorandum?

MS. SLAVIK:  That's right, your Honor.

THE COURT:  Which I have reviewed.  Thank you very much.

Mr. Agnifilo.

MR. AGNIFILO:  I am going to turn it over to Mr. Steel

PA3MCOM1

on this question, Judge.

THE COURT:  I will say that the tone of the defense's letter was inappropriate, so I agree with Ms. Slavik on that point.

MR. AGNIFILO:  I understand.

THE COURT:  And that should not be done again.

MR. AGNIFILO:  Very good.

THE COURT:  Mr. Steel, does the defense plan for any individual other than Mr. Combs to make a statement during today's proceedings?

MR. STEEL:  Yes, sir.

THE COURT:  Who?

MR. STEEL:  Two or three of Mr. Combs' children.  They are in your courtroom, your Honor.  They will all come up, with the Court's permission, to stand next to each other, but there will be two or three of them speaking.  In addition to that, Dr. Reverend Gary Johnson, you have a letter from him, your Honor, as well, your Honor, if you want to hear from Dr. Kruger, Dr. Kaplan.  They are not in your courtroom, but they are in your courthouse in the overflow room.  And IF you have any questions about their analysis, they are here to talk about Mr. Combs and their evaluation of him.

THE COURT:  Just so I understand, in addition to Mr. Combs' children and the second individual, Mr. Johnson, is that right?

PA3MCOM1

MR. STEEL:  Correct.

THE COURT:  They will be speaking and then the doctors, if we need to hear from them, they are in the courthouse.  That's what you're telling me?

MR. STEEL:  There is one other person, your Honor.  He wrote you a letter about the reentry program, Giovanni.  He will be speaking as well, with the Court's permission.

THE COURT:  Ms. Slavik.

MS. SLAVIK:  Your Honor, I believe that all of these individuals that Mr. Steel just mentioned have submitted written letters, and I believe that several are featured on the video that the defense intends to play as well.

As your Honor knows, rule 32 provides for a limited subset of individuals to address the Court at sentencing, and the Second Circuit has interpreted this narrowly.  It's interpreted Rule 32 to apply to the parties, the defense, the defendant, and the government, as well as victims, and the Court is well within its rights to circumscribe other individuals, including character witnesses, from speaking at sentencing.  That is from the Second Circuit case, the *Degroate* case at 940 F.3d 167 from 2019.  Judge Furman has recently invoked this law and this precedent to limit defense witnesses speaking at sentencing.

And I will just note for your Honor that there is some level of irony in the defense objecting to Mia speaking, one

PA3MCOM1

witness speaking for five minutes.  It appears that the defense is trying to drown out the voices of victims in favor of character witnesses, and the Court is well within the law to circumscribe that.

THE COURT:  But you would agree, in the same way that I overruled the defense's objection to Mia speaking here, I would be within my discretion to permit the individuals identified by Mr. Steel to speak, right?

MS. SLAVIK:  Yes, your Honor.  The Court has every right to impose its discretion.  It can permit these folks to speak.  It doesn't have to.  And I will note, again, that these individuals have all provide letters and some are featured on the video.

THE COURT:  Understood.

Mr. Steel, obviously, Mr. Combs' children will be permitted to speak.  Is it Pastor Johnson?  I don't want to be disrespectful.

MR. STEEL:  You are never disrespectful.  Dr. Reverend Johnson.

THE COURT:  Dr. Reverend Johnson.  It's going to be a brief statement.

MR. STEEL:  Correct.

THE COURT:  That's fine.  I am going to think about the other individuals that you referenced to determine whether there is any need for the Court to hear from those people.  OK.

PA3MCOM1

MR. STEEL:  Of course.

THE COURT:  Mr. Agnifilo, have you read the presentence report and discussed it with Mr. Combs?

MR. AGNIFILO:  I have, your Honor.

THE COURT:  Mr. Combs, have you read and discussed with Mr. Agnifilo the presentence report?

THE DEFENDANT:  Yes, I have, your Honor.

THE COURT:  Mr. Agnifilo, is that correct?

MR. AGNIFILO:  It is correct.

THE COURT:  There are a number of objections to the presentence report, so we will go through them first.

A foundational objection raised by the defense is the extent to which the Court may consider so-called acquitted conduct in determining the correct range under the sentencing guidelines.

In 2024, the guidelines were amended to provide that for purposes of determining the correct guidelines range, relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court unless such conduct also establishes, in whole or in part, the instant offense of conviction, from the guidelines Section 1B1.3(c).

There is no guidance from any court on the proper application of the acquitted conduct provision, and the guideline is ambiguous, given that, in most cases, including

PA3MCOM1

this one, juries don't acquit defendants of conduct.  They acquit them of charges.  And we don't have a crystal ball to tell us what the jury in this case was thinking when they acquitted Mr. Combs of the RICO and sex trafficking charges.

However, the application note to the guideline refers to overlapping conduct, suggesting that the real test is simple, to determine whether conduct that underlies an acquitted charge also establishes, in whole or in part, the instant offense of conviction.  That's what we are meant to determine.

As to what establishes in whole or in part means, it's best understood as a relevancy test.  Evidence is not relevant if it does not tend to prove or disprove an element of the offense.  Nothing in the guidelines suggests that the commission intended for courts to ignore conduct relevant to establishing the offense in question, so a more restrictive reading of this language is untenable.  Of course this will lead to some line drawing questions, which the commission recognized, stating that the Court will be in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and, therefore, qualifies as relevant conduct.  The Court has done its best to do that.

The Court observes that even though the defense originally proposed a different definition, at page 11 of their

PA3MCOM1

reply brief filed yesterday they end up proposing pretty much exactly the approach that the Court has adopted.

Having said all this, it is important to understand how narrow and, in this case, inconsequential all of this is. The limitation on considering acquitted conduct only applies to determining the guidelines range, not for any other purpose under the guidelines, and the guidelines themselves are only advisory. For every other purpose the guidelines in 18 U.S.C. Section 3661 make clear that no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

For those purposes, the Supreme Court and the Second Circuit have made clear that acquitted conduct may be considered. For this I cite *United States v. Muir*, 710 F.App'x, 510 (2d Cir. Circuit 2018); *United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005); and *United States v. Watts*, 519 U.S. 148 (1997).

So even if the Court is foreclosed from considering certain conduct in determining the correct guidelines range, it considers all of the facts applying a preponderance of the evidence standard to impose a sentence sufficient but not greater than necessary to comply with the purposes set out in 18 U.S.C. 3553(a).

PA3MCOM1

With that, we move to the parties' specific objections to the presentence report which will also address the parties' objections to various guidelines calculations.  We will start first with the government's objections.

The government first argues that the cross-reference in guidelines Section 2G1.1(c)(1) should apply and that the correct guidelines range should be the criminal sexual abuse guideline, which is in Section 2A3.1.  The application of that guideline dramatically increases Mr. Combs' guidelines range, imposing a six-fold increase in the minimum guidelines sentence alone.  The cross-reference applies if the offense involved conduct described in 18 U.S.C. Section 2242.  The conduct described in Section 2242 is engaging in or causing another person to engage in a sexual act with another person by threatening or placing the victim in fear other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping.  That tracks the language of the statute at Section 2242.

Looking to cases interpreting that statute, there is little precedent on what kind of threat or fear of harm is required, binding, or otherwise.  The government cites to *United States v. Dnjen*, 101 F.App'x 362 (2d Cir. 2004), a summary order in which the Court did not directly address the issue because the defendant's sole argument was based on the wrong statute.  It was also a Rule 11 case and didn't really

PA3MCOM1

get into what the standard is or should be.

The *Sand* treatise recommends a requirement that the defendant's actions implicitly placed the victim in fear of some bodily harm.  The treatise adopted this view because although the statute has been upheld against a vagueness challenge, allowing threat and harm to have unlimited reach would certainly raise constitutional questions.

The text of Section 2242 suggests that a narrow reading, one that requires an imminent concrete threat of harm, such as bodily harm, makes more sense.  By its terms, the statute applies to harms other than those for death, serious bodily injury, or kidnapping.  That borrows language from 18 U.S.C. Section 2241, which requires the threat of those things. Those are all imminent concrete harms relating to physical violence or restraint, and Congress' use of parallel language in Section 2242 suggests that it should apply to harms of the same kind, even if they are not as severe.  Contrast that with the language in 18 U.S.C. Section 1591, which defines serious harm to include any harm, whether physical or nonphysical, including things like psychological, financial, or reputational harm, language absent from Section 2242.

The Court's adoption of a narrower reading is reinforced by the rule of lenity, which applies to the guidelines under binding Second Circuit case law, *United States v. Parkins*, 935 F.3d 63 (2d Cir. 2019).

PA3MCOM1

That brings the Court to the evidence that Mr. Combs caused Ms. Ventura and Jane to engage in sex acts by threatening or placing them in fear of an imminent concrete harm, such as bodily harm.

In this case the government points to evidence of force, fraud, and coercion as supporting application of the cross-reference. This conduct was the conduct underlying the acquitted sex trafficking charge and it counts as acquitted conduct based on the Court's analysis.

As to whether that conduct also establishes, in whole or in part, the offenses of conviction, the government argues that evidence of coercion and the victim's resulting fear is relevant to establishing the defendant's intent that Ventura and Jane were being transported for the purpose of engaging in acts of prostitution with escorts. That's from the government's brief at page 63.

On pages 63 and 64 of its brief, the government cites to two things fitting that category: The defendant's threats to release sex tapes of Ms. Ventura, including during a flight back from Cannes, France, and his demand that she engage in a freak-off, which, in the case of the Cannes trip, happened right after the flight. For Jane they point to evidence of the defendant coercing Jane into engaging into a hotel night while he was arranging it by employing threats concerning her home. That's all from the government's brief, again, at page 63 to

PA3MCOM1

64.

There is no doubt that this evidence counts as coercion.  What is not clear is whether it meets the technical definition under Section 2242.  To be very clear, and as the Court will later address, there was fear of bodily harm and other kinds of threats in this case.

The Court listened carefully to the witnesses during the eight weeks of trial.  Ms. Ventura and Jane testified credibly that there was psychological, emotional, and physical violence in connection with the freak-offs and hotel nights. But for the technical question the Court is dealing with, the intersection between the acquitted conduct provision and the 2A3.1 cross-reference complicates things.

The question is whether there is evidence that would establish, in whole or in part, the prostitution charges that also proves by a preponderance of the evidence that the defendant caused Ventura and Jane to engage in sex acts by threatening or placing them in immediate fear in the kind addressed in 2242.  The government hasn't made that case here.

For that reason, and in light of the dramatic impact of an application of the cross-reference, the constitutional questions raised by *Sand*, the acquitted conduct guideline, and general principles of lenity, the Court declines to apply the cross-reference.

However, as I previously noted, the Court considers

PA3MCOM1

all relevant conduct, including what might otherwise count as acquitted conduct under the guidelines, in determining the appropriate sentence under the 3553(a) factors.  So the Court's resolution of this guideline issue would not affect the sentence ultimately imposed.

Because the Court does not apply the cross-reference to Section 2A3.1, it also does not apply the enhancement for serious bodily injury in that guideline provision, although, again, it considers that evidence in fashioning the appropriate sentence here under 18 U.S.C. Section 3553(a).

Next, the government objects to the lack of an adjustment for obstruction to justice.  The Court overrules the objections for the reasons set forth by the probation department in paragraph 79 through 80 of the PSR and on page 58 of the PSR.

As to the incident relating to the bail application concerning Mr. Combs' marking of pads as legal, this was troubling conduct.  For purposes of the obstruction of justice enhancement, however, a full record was never made as to what happened exactly or who was responsible for it, Mr. Combs, his counsel, present or former, or both.

If the government wanted to press for the record to be completed as to this issue it could have, including after trial, but it did not.  The first time the issue resurfaced was in the PSR.  The Court declines to apply the enhancement on the

PA3MCOM1

basis of the record it has.  The government's objection is overruled.

The government objects to the probation department not applying the vulnerable victim enhancement under guidelines provision 3A1.1 as to Ms. Ventura and Jane.  The Court overrules the objection.  The application note to this provision has an express carve-out that applies if the factor that makes the person a vulnerable victim is incorporated into the offense guideline.  It further points to an example where there is an age enhancement in the relevant guideline and says that the victim enhancement could only be applied for reasons unrelated to age, indicating a broad conception of this language.

The Court agrees with probation in the PSR that the offense guideline here incorporates the factors that made Ventura and Jane vulnerable, as it includes an enhancement for fraud and coercion, with coercion focusing on the voluntariness of the victim, which is tied to the factors that the government points to as rendering Jane and Ventura unusually vulnerable. What made Combs' coercion effective was that the victim were vulnerable and that was for lots of reasons, including prior sexual and violent experiences and age.

The Court also observes that there are some questions as to whether Ms. Ventura and Jane would count as unusually vulnerable or particularly susceptible under the case law cited

PA3MCOM1

by the defense.  However, the Court need not reach that question.  Once again, the Court observes thought would reach the same ultimate sentence whether or not this enhancement as a technical matters applies or not.

Next, we move to Mr. Combs' objections to the PSR. Mr. Combs objects to a number of paragraphs in the PSR, not based on their factual content but on the Court's consideration of information that he deems related to the RICO and sex trafficking counts of which he was acquitted.  Those objections are overruled for the reasons I laid out earlier.

The Court may consider acquitted conduct for any purpose other than determining the guidelines range.  There is a small objection to the nomenclature in paragraph 70 that was resolved by the probation department changing the language of that paragraph, but, in any event, the nomenclature of commercial sex act is irrelevant for any purpose of sentencing. Nevertheless, prostitution is a commercial sex act.

Next, Mr. Combs objects to the characterization of Ms. Ventura and Jane as victims.  That objection is overruled.  The evidence at trial and the material in the presentence report establishes by a preponderance of the evidence that Ms. Ventura and Jane were victims.  That is especially true given the definition of victim in the guidelines, which is a person transported for the purpose of engaging in a commercial sex act whether or not the person consented to the commercial sex act

PA3MCOM1

or prohibited conduct.  Even after the Supreme Court's decision in *Kisor v. Wilkie*, the Second Circuit has held that the application note is entitled to *Stinson* deference.  That's *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024).

Mr. Combs also objects to the escorts being classified as victims.  The objection here is overruled for the same reasons.  The application notes' definition of victim is expansive, and the escorts were plainly transported for the purpose of engaging in a commercial sex act.  That's established by, among other things, Government Exhibit 1402. There is no contradiction between the text and the application notes so *Stinson* again applies.  Evidence at trial supported at least seven escort victims:  Clayton Howard, Jules Theodore, Paul Arthur, Kabrale Williams, Julian Sapp, Reggie, and Rico. I point to the PSR at paragraph 84, Government Exhibit 1402 and Government Exhibit 1406.

Next, Mr. Combs objects to the coercion enhancement based on the jury's acquittal on the sex trafficking counts. That objection is overruled.  The Court agrees with the probation department and government that this enhancement applies.  The enhancement applies where the offense involved fraud or coercion, with coercion being defined as any form of conduct that negates the voluntariness of the victim.

In *United States v. Sweargin*, 935 F.3d 1116 (10th Cir. 2019), the Court noted that coercion often involves an

PA3MCOM1

impending threat of some negative consequence that will affirmatively befall a person if he or she does not succumb to the pressure that is being exerted, and it found coercion where the defendant substantially impaired the victim's ability to choose her own course of conduct.

When something is voluntary in this context, that means that it is unconstrained by interference, not impelled by outside influence.  That's from Black's Law dictionary. According to Merriam-Webster, it also means something that is proceeding from the will or from one's own choice or consent. That's a very broad concept.

The two instances cited by the government concerning Combs' threats to release videos of freak-offs to Ventura and threats concerning Jane's home in connection with the hotel nights alone prove by a preponderance of the evidence that coercion was used under the definition provided in the guidelines, and these are squarely permissible to consider even if counted as acquitted conduct.

The evidence cited here to support this, the trial transcript at pages 701-703, at 3278-79; Government Exhibit B-315; Government Exhibit B-619; Government Exhibit A-104-68 at 1353; Government Exhibit A104-70, at 1380-83; and Government Exhibit A-10473 and 74.

And, obviously, if the acquitted conduct exception had any narrower sweep than what the Court has concluded today, the

PA3MCOM1

credible evidence at trial and the facts detailed throughout the PSR unquestionably support application of this enhancement.

Again, though, the Court would impose the same sentence applying the 3553(a) factors even if this enhancement did not, as a technical matter, apply.

Mr. Combs objects to the application of the enhancement in guidelines Section 3B1.1 for an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. The guideline provision defines participant as a person who is criminally responsible for the commission of the offense but need not have been convicted. It does not define otherwise extensive except to say that in assessing whether an organization is otherwise extensive, all persons involved during its course of the entire offense are to be considered. Thus, a fraud that involved only three participants, but used the unknowing services of many outsiders, could be considered extensive.

In determining whether a scheme is otherwise extensive, the Second Circuit focuses on primarily on the number of people involved. That's from *United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997).

Here, Ventura and Jane qualify as participants. They were victims, and the application notes to Section 3B1.1 provide that victims can be participants only if they promote the sexual conduct with respect to another victim.

PA3MCOM1

The Court overruled Mr. Combs' objections to counting the escorts as victims, so Ventura and Jane count as participants because by a preponderance of the evidence they promoted the sexual conduct with respect to them by finding the escorts, texting them to set up appointments, and handing them money.  That's, among other things, from trial transcript at pages 516-17, 540-41, 531, 4727, 4738-39, and 4744.

The Court finds by a preponderance of the evidence that the offense also involved Combs and at least three criminally other responsible participants -- Kristina Khorram Garren James, and Bridget Collins -- and that it used the services of numerous outsiders that were peculiar and necessary to this offense, including Faheem Mohammed and Combs' various assistants.

Combs was plainly the organizer of the freak-offs and hotel nights.  All of that staff and all of the staff that he was using were acting for his benefit and his direction and it was his money that was used to pay the escorts.

Even if some of this evidence overlaps with the acquitted RICO conspiracy count, it plainly establishes, in whole or in part, the offenses of conviction, as it goes to the defendant's intent, the transport of escorts, Jane and Ventura, for sex, and proof that the acts were in fact acts of prostitution.  The enhancement applies and the objection is overruled.  But the Court again notes that the guidelines are

PA3MCOM1

only advisory and that it would impose the same sentence, regardless of whether the enhancement applies.

Mr. Combs objects to the characterization of Ms. Ventura as a victim and will object to any restitution for her. Mr. Combs even objects to Ms. Ventura's filing of any victim impact statement pursuant to the Crime Victims Rights Act.

As to restitution, the objection is moot because Ms. Ventura is not seeking restitution. Mr. Combs' objection is otherwise overruled. Ms. Ventura was plainly a victim of Mr. Combs' conduct and plainly fits under the CVRA's definition of victim.

Mr. Combs also appears to object to Ms. Ventura's statement not being included in the PSR pursuant to Rule 32. That provision states that the PSR must contain information that assesses any financial, social, psychological, and medical impact on any victim. The PSR does that throughout, and the final PSR summarizes in quotes from her statement. Of course the PSR need not contain all information on impact to a victim. If it were otherwise, no victim could ever make a statement on impact during sentencing because that oral statement would of course not be contained in the PSR. For the same reasons, the Court overrules Mr. Combs' similar objection as to Jane.

Mr. Combs next objects to the presentence report not giving him acceptance of responsibility credit under guidelines Section 3E1.1. That provision is clearly inapplicable. The

PA3MCOM1

application notes make clear that this reduction is inapplicable to defendants who deny the essential facts of guilt at trial and only later admit guilt and express remorse.

Mr. Combs denied the essential facts of guilt, disclaiming his intent to hire escorts for prostitution, saying he was paying for time, not sex.  He has not admitted his guilt.  And while he has expressed remorse for some things, he has not expressed remorse for the actual offense of transporting people for prostitution, and in general the narrative that he and his counsel have put forward, that this case involves nothing more than adults paying for time, not sex, is flatly inconsistent with both reality and any acceptance of responsibility.

The defense points to the application note to the guidelines stating that there are rare situations in which a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct, even though he exercises his constitutional right to a trial, such as where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt.

Here, however, Combs has challenged his factual guilt full throatedly and even does so after trial.  Cite here to *United States v. Kamara*, 85 F.App'x 231 (2d Cir. 2003).  We have held that a defendant who goes to trial to deny his factual guilt may not receive the adjustment for acceptance of

PA3MCOM1

responsibility.

Mr. Combs next wants the Court to apply the zero-point offender provision from the 2023 guidelines, but the rest of the 2024 guidelines.  The Second Circuit has prohibited precisely that approach under its one-book rule.  *See United States v. Ramirez*, 846 F.3d 615 (2d Cir. 2017).  Mr. Combs would have to show that, as a whole, the 2023 guidelines would produce a lower sentence, but he doesn't even make that argument in this case.

Further, even under the 2023 guidelines, the zero-point offender reduction would not be applicable because Mr. Combs received an enhancement under 3B1.1.  For these reasons, the objection is overruled.  Again, the Court notes that the application of this reduction would not affect the final sentence imposed.

Next, Mr. Combs objects to imposition of the $5,000 assessment under the Justice for Victims of Trafficking Act because there are no victims.  Here the PSR and the offense of conviction establishes that the JVTA's mandatory assessment unquestionably applies, so the objection is overruled.

In the PSR, Mr. Combs had objected to forfeiture, but the parties have agreed to a consent order of forfeiture, and so this objection is now moot.  At this time I have a consent preliminary order of forfeiture as to specific property.

Mr. Combs, is this your signature on the last page of

PA3MCOM1

the order, dated October 3?

THE DEFENDANT:  Yes, sir.

THE COURT:  Did you review this order before you signed it?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Did you discuss the order with your lawyers before you signed it?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Mr. Steel, did you review and discuss this order with Mr. Combs before he signed it?

MR. STEEL:  I personally did not, your Honor.

MS. GERAGOS:  Your Honor, I went over this with Mr. Combs.

THE COURT:  Ms. Geragos, did you review and discuss this order with Mr. Combs before he signed it?

MS. GERAGOS:  Yes, I did.

THE COURT:  The Court will sign this order and it will be incorporated into the judgment in this case.

Next, the defense makes a request for a downward departure on the basis that Section 2G1.1 overstates the seriousness of the offense.  That request is denied.  The language is not in the 2G1.1 guideline and the standard would not have been met in this case, in any event.

To the extent not specifically addressed here, all remaining objections by the government and the defense are

PA3MCOM1

overruled.

Are there any objections that I have not addressed? Let's start with Ms. Slavik.

MS. SLAVIK:  No, your Honor.

THE COURT:  Mr. Agnifilo.

MS. GERAGOS:  I just want to make one point for the record, your Honor.  I am not going to go objection by objection.  Our live feed isn't working.

You had mentioned that it's inconsequential, I think was the word, to whether or not you view acquitted conduct in the PSR, and I just want to put on the record for your Honor how consequential it is to have acquitted conduct in these certain factual allegations in the PSR for Mr. Combs in the event that he gets an incarceratory sentence that's higher than what we have requested, because the way that it is worded and the acquitted conduct for which we have objected to over and over again would land him likely in a low, and I may get to this later in the proceeding, but it is not inconsequential at all for Mr. Combs in terms of what his incarceration at the BOP would be like, given the factual recitation, the offense conduct in the PSR.  I really wanted to just make that point.

THE COURT:  I understand the point, and I thank you for raising it.  And it was perhaps not the right word to use. So I'll make that clear in case it causes any issue down the line.

PA3MCOM1

The point was that for purposes of the sentencing analysis, and I went through this, the acquitted conduct provision solely applies to the determination of the correct guidelines range and not those other purposes, such as figuring out where within a guideline you might put a sentence, the purposes of departures, or the purpose of applying the 3553(a) factors.  That's what I meant to say.  But if there is some other consequence and we can address that, I'm happy to --

MS. GERAGOS:  We will address that, if necessary, later in the proceeding, but I just wanted to make that point clear now and make sure your Honor understood it at this juncture.

THE COURT:  Understood.

Hearing nothing else --

MS. SHAPIRO:  I understand that your Honor has ruled. I know the briefing was extensive, that we are preserving all the objections that we made.  I don't know if this is the right point, but I wanted to make a few additional points to supplement the record with respect to your Honor's record on acquitted conduct and a few of these guidelines.

THE COURT:  OK.

MS. SHAPIRO:  Should I do that now?

THE COURT:  You may proceed.

MS. SHAPIRO:  Thank you, your Honor.

I just want to be clear, and I think this is clear

PA3MCOM1

from the papers because the briefs -- both the opening and reply brief were quite extensive.

THE COURT:  I believe it was 380 pages in total.  No. It's more than that.

MS. SHAPIRO:  I was talking about the briefs.

Your Honor, I'll be very brief.  I just want to be clear that the constitutional issues we raised, the Fifth and Sixth Amendment issues, the right to jury trial, the double jeopardy, the due process, the right to findings beyond a reasonable doubt, the fairness concerns, which I think are most -- are set forth quite eloquently by, in particular, Justice Sotomayor in her *McClinton* opinion, but all of those constitutional and fairness concerns, we believe, militate not only in favor of our interpretation of the acquitted conduct guideline, but that they also preclude the Court in balancing the 3553(a) factors or choosing a point within the range, should it choose to apply the guidelines and adopt a guidelines sentence, that all of those militate heavily against any use of acquitted conduct.

The jury had to find the element of force, fraud, and coercion as defined in the jury instructions.  It's clear they rejected that, and that verdict and that finding should be honored, so that's our position.  And I think, to be clear, for that same reason, the coercion enhancements, the victim enhancement, and the organizer/leader enhancement should not be

PA3MCOM1

applied.  And I won't repeat the other points we made in our brief, but I just wanted to be clear on that, your Honor.

(Continued on next page)

PA3AСom2

THE COURT:  All right.  Understood.

And as I noted, the Second Circuit, for example, in the *Muir* case indicated that the Constitutional arguments against acquitted conduct and its use at sentencing were squarely foreclosed by other precedence.  I think that's almost a verbatim quote from *Muir*.  And but I understand the issue you raised, and it was extensively addressed in the papers so you've made those arguments.

MS. SHAPIRO:  Thank you, your Honor.

I don't want the government saying we waived them on appeal, should there be an appeal on the sentence.

THE COURT:  For these reasons and subject to the rulings made and the modifications that are addressed in what I've said, the Court will adopt the presentence report and the factual findings therein.  It will be made part of the record in this matter and placed under seal.  If an appeal is taken, counsel on appeal may have access to the sealed report without further application to this Court.

Now we go to the calculation of the guidelines range.

Mr. Combs was convicted of two counts of transportation to engage in prostitution under 18, U.S.C., Section 2421A, each of which is punishable by not more than ten years of imprisonment, five years to a lifetime of supervised release, and other monetary penalties.

The presentence report reflects an offense level of 27

PA3ACom2

and a criminal history category of I. I have reviewed the PSR. I now calculate and find that the defendant's offense level is 27 based on the analysis above that I've given and the findings that I've made, including the factual findings in the presentence report. The Court agrees with the probation department's calculation of the offense level for each group as well as the number of groups.

So the offense level is 27. The defendant's criminal history category is I, as the defendant has zero criminal history points. An offense level of 27 and criminal history score of I yields an advisory guidelines range of between 70 to 87 months of incarceration.

Additionally, after determining the defendant's ability to pay, the Court may impose a fine under the guidelines, Section 5E1.2(c)(3). At offense level 27, the applicable fine range is between 25,000 and $250,000.

Ms. Slavik, are there any guidelines arguments that I have not addressed or any further objections?

MS. SLAVIK: No, your Honor.

THE COURT: Mr. Agnifilo?

MR. AGNIFILO: Nothing from us. Thank you.

THE COURT: All right. I do not see a basis for a departure here. After calculating the guidelines and potential departures, I must now consider the relevant factors set out in 18, U.S.C., Section 3553(a) to ensure that I impose a sentence

PA3ACom2

sufficient but not greater than necessary to comply with the purposes set forth in subparagraph (a)(2).

At this point, does the government wish to make any final statement?

MS. SLAVIK:  Yes, your Honor.

And before I begin my statement, I just would note that given what I expect to be the length and the breadth of counsel's remarks, I ask that the Court permit me to respond, if appropriate, after those remarks.

THE COURT:  All right.

MS. SLAVIK:  Your Honor, today is about accountability and justice.  Accountability for the defendant who committed serious federal crimes repeatedly over the course of 15 years, and justice for the public, including for the victims whose lives have been shattered by the defendant's acts of abuse and exploitation.

As the Court noted in its remarks just now, the law requires the Court to consider all information about the defendant, and all information about the conduct to impose an appropriate sentence.  And when you step back to consider all the information available to the Court, including all the evidence presented over seven weeks this past spring, it's clear.  This isn't just a case about freak-offs or hotel nights.  It's not just a case about sex.  It's a case with real victims who have suffered real harm at the hands of the

PA3ACom2

defendant, who because of the defendant have questioned their own self-worth and desire to live.  It's about a man who did horrible things to other people to satisfy his own sexual gratification.  He didn't need the money.  His currency was control.  And he weaponized that currency to devastating effects on the victims.

All of the 3553(a) factors that the Court is required to consider support a significant sentence of at least 135 months' incarceration.  And let me just say a word on the recommended sentence.

The government very carefully considered what sentence to recommend here today.  As this Court knows, it's incredibly hard to take into account all of the specific features of a case and of a defendant.  Among other things the government considered, the guidelines range that we believe applies, and compared defendants whose conduct most resembled the defendant's conduct in this case.  And based on those considerations, we believe that a sentence of at least 135 months reflects the conduct appropriately, is consistent with other similarly situated defendants, and fully respects the jury verdict.

And, your Honor, just to directly respond to an accusation that was made in the defendant's reply brief yesterday, the government is not seeking 135 months simply hoping that the Court will split the baby to get the 60 months

PA3ACom2

recommended by probation.  That's not the case at all.  Respectfully, we believe that probation's recommendation of 60 months does not adequately account for the separate harms to Cassie and to Jane.

We are seeking this sentence because we think it's the right sentence for the Court to impose given all the factors that I just mentioned.

So I want to just lay out how I intend to structure my remarks this morning.  First, I want to speak about the offense of conviction.  The defense has tried to turn this into a technical violation, just a minor consequence of a sex, drugs, and rock and roll lifestyle.  This is a gross mischaracterization of the conduct.  The offenses of conviction are serious federal crimes.  Other defendants convicted of Mann Act defenses involving abuse and violence receive significant sentences.  Sentences similar to what the government is recommending today.  And that's because this is not just a case about transportation for prostitution.  It's a case about transportation for prostitution and violence.  The defendant admitted to the violence at trial.  And to not account for it now would be to let the defendant get away with years of domestic violence and abuse.

The second thing I want to focus on, is to zoom out and speak about the people that were harmed by the defendant's offenses, Cassie and Jane specifically, but multiple others

PA3ACom2

were subject to the defendant's abuse and violence.

And, finally, I want to speak about the other 3553(a) factors, including deterrence and the history and characteristics of the defendant.

Throughout these proceedings, I think it's clear that the defendant doesn't understand or appreciate the gravity of his criminal conduct.  Even now at sentencing for his convictions on two federal crimes for which he sought acceptance points, he doesn't fully grapple with how his actions got him here.  His respect for the law is just lip service.

The defendant himself made this point clear.  He's facing a maximum sentence of 20 years.  The probation office recommends 60 months, and the government is asking for over 11 years.  And yet, as his supplemental submission on Wednesday indicated, he has booked speaking engagements in Miami for next week.  That is the height of hubris, your Honor.  Assuming this Court is going to ignore the guidelines, ignore the law, ignore the recommendation of the probation office, and the government and just let him be in Miami on Monday, that is the opposite of demonstrating respect for the law.

Focusing first on the nature and circumstances of the offense, and particularly the scope of the conduct, which is staggering.  The defendant's criminal conduct was not incidental or casual or a momentary lapse in judgment.  The

PA3ACom2

defendant engaged in freak-offs and hotel nights from 2009 until 2024.  That's 15 years.  And freak-offs and hotel nights happened all the time, often on a weekly basis.

The defendant was responsible for transporting many individuals across state lines to participate in the freak-offs and hotel nights.  And as the trial record made clear, sometimes several escorts were transported for the same event. That's a lot of freak-offs and a lot of hotel nights, and it's a lot of travel for freak-offs and hotel nights.  And the defendant knew that this was illegal.  His lawyers may have tried to argue that this wasn't prostitution, but just as this Court knew it was, the defendant knew that it was, too.  He knew that he was engaging in illegal conduct over and over again, but he did it anyway.  Our criminal justice system does not let people do that without consequences.

So, your Honor, the scope of the conduct is significant and it separates the defendant from many other defendants who are sentenced for Mann Act convictions, which I'll talk about more in a moment.  But the most remarkable thing about the manner in which the defendant committed the offenses is the abuse, the violence.  The freak-offs and hotel nights took place in the context of long-term relationships. The defendant tries to paint these relationships as mutual, but the record speaks for itself.

The Court heard Cassie testify about having a

PA3AСom2

freak-off as she was overdosing on drugs.  What's mutual about that?  Or Jane begging to use a condom to have sex with a stranger, and the defendant refusing her.  Cassie being beaten in the bedroom while an escort sits in the living room waiting for another session.  There's nothing mutual about that.

These relationships were abusive.  Time and again the defendant exploited power dynamics, physical violence, and financial control over Cassie and Jane to get what he wanted.

Now, the Court was very understandably interested in other defendants convicted of Mann Act defenses, and I just want to spend a moment speaking about similarly situated defendants.  This is all laid out in the papers, as you noted, several hundred pages.  But looking at these cases, there are a couple of high-level takeaways that I think are worth noting.

First, mathematical equations matching up the count of conviction and criminal history is certainly an interesting exercise, but I think it ultimately provides limited value, and that's because sentencing is an inherently fact-specific exercise.  That's what the statute contemplates and that's what the Supreme Court instructs.  3553(a) directs the Court to consider the need to avoid unwarranted sentence disparities among similarly situated defendants, but even that provision relates to defendants who have committed "similar conduct."  So we have to focus on the conduct.

And this brings me to my second point.  When you look

PA3ACom2

at the conduct here and compare it to the facts of other Mann Act cases, the defendant is most similarly situated to other defendants who have used violence and other abuse, even when that abuse isn't directly tethered to the prostitution.

Several of those cases are highlighted in the government's submission.  They are the cases in which the defendants have physically and emotionally abused victims of Mann Act offenses.  As your Honor undoubtedly sees, many of these cases apply the same cross reference that the government believes applies here.  We understand the Court's ruling on that issue, but this brings me to my third point, which is that even in cases that decline to apply that cross reference, significant sentences are handed down when there's evidence of abuse and manipulation, or otherwise extensive conduct, including in this district.

And I just want to draw your attention, your Honor, to the *Dillon Jordan* case, which is a case from this district.  It's at 21 Crim 423, and it was in front of Judge Cronan recently.  That case involved a defendant who was convicted of a Mann Act conspiracy for his role in running an international prostitution business for approximately seven years.  It was charged as a 371 conspiracy, so that had a statutory maximum sentence of 60 months.  And the conduct at issue in *Jordan* is similar to the conduct here.  In *Jordan*, the defendant love bombed victims and gave them drugs to decrease their inhibition

PA3ACom2

and get them to engage in unwanted sexual encounters with other men.  Jordan was also in a romantic relationship with one of the victims who explained her fear of Jordan's sexual abuse in a way that's very reminiscent of Cassie and Jane's testimony. Specifically, this victim testified that Jordan physically abused her and emotionally manipulated her.  Jordan told the victim to keep going despite the victim not wanting to engage in sex.  And Jordan's promise of exciting events would end in abuse and drug use and unwanted sex.

And just to be clear, I think I misspoke, your Honor, the victim I don't believe testified.  I believe that that came from a victim impact statement.  There was no trial in this case.

The relevant guideline in the *Jordan* case was 2G1.1, which is the same guideline here, and the guidelines range was 21 to 27 months' imprisonment.  In fashioning the sentence, Judge Cronan considered the duration of the conduct, which was almost seven years of transporting women for prostitution, and he also considered the exploitative nature of the conduct and the devastating permanent harm suffered by the victims, as well as the need to prevent harm for future victims.  And in considering all of those things, Judge Cronan imposed an above guidelines sentence of 60 months.  In other words, the statutory maximum sentence.  And said that, based on the offense here and the charge -- this is a quote -- "he very well

PA3ACom2

may have gone higher than five years if he had the authority to do so."

We submit, your Honor, that the *Dillon Jordan* case is the most comparable case in this district. And that case, the conduct only lasted for seven years, which is of course half the duration of the defendant's conduct here. But this is one of the very few Mann Act cases in this district that has anywhere near the level of abuse that's at the heart of the defendant's conduct here.

THE COURT: In *Jordan*, am I correct that the defendant had been convicted and imprisoned in Cuba in the years immediately preceding the offense conduct on charges arising from a similar prostitution business, and that foreign conviction was not included in the criminal history calculation, and so that was one of the grounds under which Judge Cronan had varied upward?

MS. SLAVIK: Yes, your Honor. That is correct.

The defendant in that case had served a term of imprisonment in a foreign country, and that did not count towards his criminal history. And so your Honor is correct that the judge did consider that as well as the other factors that I just mentioned, the duration of the conduct, the serious and permanent harm to the victims, and the threat of future harm and general deterrence concerns in fashioning -- in imposing the 60-month stat max sentence.

PA3ACom2

THE COURT:  So, to be fair, in that case, there was the prior conduct and conviction in a foreign jurisdiction, that's a distinguishing feature, but you say on balance, the circumstances of that case most closely resemble this one?

MS. SLAVIK:  Exactly.  Considering the extensive abuse and other conduct in that case, yes.

THE COURT:  All right.  And so the sentence imposed there was 60 months.

MS. SLAVIK:  Which was the stat max.  And as I noted, Judge Cronan noted if he had the authority, he may well have gone higher.

THE COURT:  All right.

MS. SLAVIK:  So that case is similar to this case in the involvement of violence and abuse.  But even cases that don't involve violence are met with significant sentences in this district.

And I want to point your Honor to the *Mi Sun Cho* case, which I think supports our recommendation for a substantial sentence.  In that case, there was no allegation of violence, but the defendant still got an above guidelines sentence of 70 months.  The guidelines range in that case was 51 to 63 months, and Judge Wood imposed a sentence of 70 months.  Judge Wood there noted the seriousness of the offense and the societal harm caused by facilitating prostitution.

So the defendant there, I believe, also had some

PA3ACom2

limited criminal history in connection with previous prostitution offenses, but I think the point is, even prostitution cases that don't involve violence get significant sentences in this district.

And, finally, on the similarly situated defendant point, the cases in the defense chart and in their submission I think are just unlike the facts and circumstances of the case here.  Many of the cases that appear on the chart don't involve violence.  Many just don't involve the same duration of conduct or the same level of culpability.  So I think relying on the means and medians generated from those cases without significantly deeper analysis would generate disparities because the defendant is so much more culpable than those defendants.

Comparable cases, as I'm sure your Honor has found, certainly probation noted this, comparable cases on all fours are difficult to find here.  But Mann Act cases involving fear, violence and threats routinely get significant sentences.  There is a lot of information to weigh in looking at all of these cases, but I think the point is simple.  Even though the defense wants to frame this as a simple transportation case, that's not what it is.  It's a transportation case with major aggravators, including uncontested violence.  The Court should account for that with a serious sentence that's comparable to sentences given in cases with violence in this district and in

PA3ACom2

other districts.

I want to move on to the harm to the victims. As I mentioned, the violence in this case was uncontested. The conduct here very clearly involved violence. This evidence is largely undisputed and that's because the evidence of what the defendant did is overwhelming. The defendant's abuse of Cassie was pervasive. He hit her. He kicked her. He threw her into walls and on the ground. He stomped on her face. He dragged her by the hair. The video of the defendant's assaults of Cassie at the InterContinental Hotel was played multiple times during the trial, and it never got easier to see. The defendant threw Cassie to the ground and kicked her as she lay motionless, just waiting for it to end. That was just one of many violent outbursts, but one that took place in a public hallway in a Los Angeles hotel in the middle of the day. Imagine how much worse it was behind closed doors.

The defendant's physical abuse of Jane was limited to a single incident, but it was a brutal incident. He kicked down doors. He choked her. He punched her. He kicked her. He slapped her. He did all of this just over a year ago when he knew that he was under federal investigation. And, critically, the defendant did not deny abuse. In fact, a central theme at trial for the defense was owning the abuse, owning the violence. But the superficiality of that claim couldn't be more clear. He owned that violence only insofar as

PA3AComm2

it benefited him.

Throughout the defendant's multiple sentencing submissions, the defendant grossly downplays the violence, but it happened and it was real.  And the Court's sentence has to reflect that brutal violence that the defendant perpetrated against Cassie and Jane.  Admitting to violence in front of a jury as part of a trial strategy, that's not accountability.  A substantial sentence is.  And now is the time that the Court can and must account for that violence.

But the physical violence isn't the only abuse that the defendant was responsible for.  Freak-offs and hotel nights were extended performances of sexual degradation and humiliation.  Neither Cassie nor Jane wanted to have sex with strangers.  They testified to that repeatedly.  The only person that they wanted to have sex with was the defendant.  But that wasn't enough for the defendant.  He insisted on subjecting them to significant risk to their health, safety and dignity by making them engage in freak-offs and hotel nights for hours and hours.  The defendant had an escort urinate in Cassie's mouth while she choked and put her hands up to make it stop.  He wouldn't let Jane stop after she had already had sex with two men and vomited because she wasn't using drugs to help her get through the experience.

This type of harm is real.  It's a deeply intimate and personal harm that affects victims significantly.  We don't

PA3ACom2

need to speculate about the impact to Cassie or Jane.  Cassie's victim impact statement makes very clear that despite ending her relationship with the defendant seven years ago, she is still dealing with the consequences of his abuse.  She still has nightmares and flashbacks of the abuse she endured for ten years, in addition to the permanent scars on her body.  The horrors of what she endured drove her to have suicidal thoughts, which she almost acted on.

Jane's text messages and notes to herself make clear the anguish and trauma she experienced in her relationship with the defendant.  She, too, had thoughts of wanting everything to go black as she testified at trial.  But Cassie and Jane weren't the only ones to suffer long-lasting harms from the defendant's abuse.  Multiple witnesses testified about the physical, sexual, and psychological abuse that they endured.

Mia writes that the defendant stripped her of her freedom, safety, identity, instincts, and autonomy, which led to lasting psychological scars, PTSD, depression, and crippling anxiety.

Deonte Nash was also a victim of the defendant's abuse, and writes that the defendant's brutality caused lasting damage to him and other members of his inner circle.

Capricorn Clark writes that when she spoke up about the defendant's abuse, he blacklisted her from the industry, stopping her promising career in its tracks.

PA3ACom2

Jourdan Atkinson wrote about the abusive working environment and how the defendant's verbal, psychological, and physical abuse affected her.

The defendant's abuse was consistent. Casual even. But life altering for those on the bruised end of it. It affected these people in very real and very serious ways.

The defendant has claimed that he's moved on, that he now has full control over his emotions and anger. There are reasons to view that representation skeptically, but it's important for the Court to recognize that his victims don't have that luxury of moving on so easily. They're still picking up the pieces.

I want to move on to the history and characteristics of the defendant as well as the need for deterrence here. For the conduct that I've just described, the defendant has not adequately acknowledged responsibility. Despite all the evidence of domestic violence that was presented at trial, that the defendant freely characterized as domestic violence, he now tries to walk away from it. He downplays the abuse, calling it rare, and blaming just about anyone besides himself for beating his girlfriends.

But the defendant's physical abuse was not rare. Cassie's testimony made that very clear. From early in their relationship, the defendant was frequently physically violent with her at any perceived slight. Footnote 52 of the

PA3AComp2

government's submission lists over a dozen times in which the defendant was violent with Cassie — in hotel rooms, at freak-offs, at parties, on vacation, in private, in public.  It didn't matter.  And these aren't the only incidents in the trial record.  And no doubt there are countless others.  To say this violence is rare evidences a fundamental misunderstanding of how serious and how dangerous the conduct is.  Once is bad enough.  Dozens and dozens of time is something the public must be protected from.

The defendant suggests that the violence was the result of mutually toxic relationships, but there was nothing mutual about the dynamics of these relationships.  The defendant held all the power.  You saw the photos of Cassie and Jane with injuries, bruises, black eyes, gashes.  You saw zero photos of the defendant with injuries.

And the mutually toxic relationship excuse does nothing to explain the instances of violence that he committed against other people, people other than his romantic partners.  So blaming mutually toxic relationships is nothing more than victim blaming.  Plain and simple.  But the defendant doesn't stop at victim blaming.  He also blames physicians were overprescribing medications.  He blames the drugs and alcohol that he freely consumed and gave to others, and he blames psychological challenges for his violence.

Even in his submission last night, his remorse was

PA3ACom2

qualified.  He talks about my domestic violence will always be a heavy burden that I will forever have to carry, like he's the victim in this scenario.

And with Jane, the defendant claims that he only just realized that he hurt her after hearing her testimony.  But what about the dozens of text messages when she told him that she didn't want to do hotel nights?  That her spirit and soul were tired.  That he treated her like an animal.  That hotel nights were hurting her entire being.  What about when he kicked her legs out from under her and held her in a chokehold?  He didn't realize he was hurting her then?  Your Honor, this is not a person who has accepted responsibility.  He hasn't accepted responsibility for his criminal conduct.  And as your Honor noted earlier, he has not accepted responsibility for the offenses of conviction either.

To be clear, the government is not faulting him for exercising his Constitutional right to go to trial.  But it is relevant to deterrence in particular, whether the defendant shows any recognition that he's done anything wrong.  The obvious answer to this is no given that at every point in time in this case, he has denied guilt under the Mann Act.  And despite that, he has even sought acceptance points, which the Court correctly rejected.

The defendant has continued to insist that he paid escorts for their time, not for prostitution.  This is a

PA3AICom2

ridiculous argument that the jury clearly rejected by returning verdicts on the Mann Act counts.  He knew at the time that his conduct was wrong and illegal.  That's why he asked escorts if they were cops, and that's why he told Cassie to do the same thing.

It's as though he does not think that the law should apply to him.  The Court should have no comfort that the defendant is in the right mindset or committed to changing his ways.

The defense argues that he is unlikely to recidivate, but the conclusions drawn by the psychiatrists that were hired by the defendant should be given little credence.  The government's view is that the information provided to those experts was incomplete, and that's in part because the defendant dramatically minimized his conduct in the interviews with those psychiatrists.  The Court has that information.  The Court can make that assessment for itself.  But the undisputed record shows that this is a defendant who will pose a danger at any age.  Case in point, when the defendant hit, kicked, punched and choked Jane in June 2024, he was 54 years old and he knew that he was under federal investigation.  The evidence shows that when his control is challenged, he reacts unpredictably and abusively.

The last 3553(a) factor that I want to talk about is general deterrence, which is particularly important here

PA3ACom2

because this is a difficult crime to detect.  The actual act of prostitution as well as the abuse and exploitation happens behind closed doors.  As the Court noted in its Rule 29 ruling, prostitution carries a host of ills, including drugs, pimping, physical abuse and rape, all of which were at issue here.  But these problems are difficult to detect because it happens out of public view and depends largely on the courage of victims coming forward.

The only way to reduce demand for prostitution and prevent harmful secondary effects associated with prostitution is to make sure that when sentences are imposed, they appropriately reflect the seriousness of the offense.  And the only way to encourage victims of this sort of abuse to come forward, particularly when their abuser is wealthy and powerful, is to impose a significant sentence reflecting the harm caused to those victims.

Your Honor, today, the Court has the opportunity to send a message to the victims in this case, to all victims of abuse and exploitation, and to the public, that the defendant's crimes are serious, that victims matter, and that people who abuse, exploit, and manipulate will be punished.

The Court's sentence has the power to encourage or deter abusers from committing devastating harm, to encourage victims of abuse to come forward, and to encourage victims to trust the criminal justice system and the Courts.

PA3ACom2

For all these reasons, your Honor, and for the reasons set forth in our submission, the government submits that a sentence of at least 135 months of imprisonment is necessary and warranted.

THE COURT:  Thank you, Ms. Slavik.

Mr. Agnifilo, do you need a moment before you go, or are you ready?

MR. AGNIFILO:  Yeah.  We will take a moment, Judge.  Thank you.

THE COURT:  Let's take five minutes and come back.

(Recess)

THE COURT:  Please be seated.

MR. DRISCOLL:  Good morning, your Honor.

THE COURT:  Mr. Driscoll you may proceed.

MR. DRISCOLL:  Thank you.  And before I begin, it's nice to be back in your courtroom and I appreciate you being so permissive with the microphone today.

I'm going to talk about sentencing disparities, which is Section 3553(a)(6).  And just taking a step back for a moment, your Honor ruled on the guidelines range.  And what 3553(a) teaches us is that the guidelines range is just one factor.  There's a separate section, (a)(6), that counsels that the Court must also fashion a sentence recognizing the need to avoid unwarranted sentence disparities.  Why?

The guidelines were designed to create uniform federal

PA3ACom2

sentencing practices.  So why do we need (a)(6)?  And the recognition there is that a technical, mechanical, blind reliance on the guidelines can actually create disparity.  And respectfully, your Honor, if you applied the guidelines range that you find today in this case, that would exacerbate serious disparities in federal Mann Act sentencing.

This is a case in point.  For 75 years, long before Sean Combs was even born, the Department of Justice has said, "as a general rule, prosecution should not be instituted in the so-called noncommercial cases." The Department of Justice recognized commercial gain as a serious aggravating factor, and the government does not dispute today that Sean Combs did not make a single cent off of his Mann Act offense conduct.  That aggravating factor, it's completely off the table in this case.

Now, that brings me to the *Jordan* case the government just cited.  Respectfully, it is not comparable to this case at all in any way.  In *Jordan*, the defendant received a 60-month sentence.  As your Honor just noted, he served eight years in a Cuban prison for sex crimes prior to committing that offense. In other words, that was his second chance.  He got out of jail.  He did it again.  But his offense conduct looks nothing like Sean Combs.  That defendant ran an international prostitution ring over a span of seven years.  He recruited dozens of young, vulnerable women to be prostitutes.  He had over 100 clients.  He made $1.4 million.  Do you know how many

PA3ACom2

commercial sex acts you need to sell, how much abuse, how much suffering women have to go through for you to make $1.4 million off of Mann Act conspiracy violations?

Mr. Combs' offense is nothing like that.

Jordan's case was worse in other ways. Three of the victims reported unwanted sexual advances and other forms of traumatization. One of the victims there was actually raped by the defendant after being drugged.

Notably, your Honor, back to my initial point about overly technical application of the guidelines, the government didn't even seek the fraud or coercion enhancement in that case. This office, the Southern District of New York, didn't even seek the fraud or coercion enhancement based on my reading of that case. And it was not applied.

The government also mentions the *Mi Sun Cho* case. And respectfully, again, that case is nothing like this case. *Mi Sun Cho* was an international prostitute broker of sorts. She had connections to brothels and other sex trafficking rings, and she, too, profited from the offense.

Worse, this was her fourth time dealing with the criminal justice system. I believe she had three prior instances of arrests for prostitution, one of which resulted in a suspended one-year sentence. Again, a court gave her, in that case, a fourth chance and she blew it. So she got a 60-month sentence.

PA3AcCom2

The offense conduct in these cases is no doubt more heinous. They are recidivists, in some instances serious recidivists, who were given second, third, or fourth chances. And, respectfully, they're simply not comparable. The 60-month sentence in *Jordan* and the 70-month sentence in *Mi Sun Cho*, they grossly overstate what would be appropriate in this case.

The government mentions violence, and this is a theme that they harp on over and over and over again as one of the most aggravating factors here. In our reply brief, your Honor, we mentioned multiple cases in which there were serious allegations of violence, and defendants received sentences akin to what the defense is asking for here, and we think those cases are representative of what is appropriate in such a case. But there are many others.

I would cite the *Saulsberry* case, that's 19-cr-691 from the Western District of Texas. There, the defendant received a 27-month sentence. He met a woman on Facebook who he drugged and transported. He coerced her into at least three instances of prostitution with other men through threats of violence, and one of the victims eventually fled to seek help from law enforcement.

I would point to the *Clemons* case, 14-cr-134 out of the Middle District of Florida. That defendant also received a 27-month sentence. He solicited two victims under the guise of working for him as dancers, enlisted them as prostitutes. He

PA3ACom2

took their IDs.  He used force and threats to cause them to engage in prostitution.  He hit one victim, slammed another, took her phone, and used gesturing acts of violence to coerce women, even when they did not want to work because they were menstruating.

I cite the *Pierson* case, 22-cr-136 out of the Central District of California.  Another 27-month sentence for a defendant in criminal history category III.  There, one of the victims complained about severe eye pain from an eye injury and the defendant said, no, you need to thug for one more night.  The government there argued that there was evidence that the defendant assaulted another victim and even threatened to fire her and kick her out of her home that he was paying for to render her homeless.

These are just examples of cases of heinous acts of violence or coercion in which defendants are given sentences far below what the government is asking for here and far below the guidelines range that the Court has calculated.

Judge, I reviewed every single Mann Act case that's available on PACER.  There were over 900, and we submitted to your Honor's court a list of 378 where the defendants were actually convicted and sentenced of Mann Act conduct.

What does the Department of Justice actually do with the Mann Act?  Your Honor, you said in your post-trial motions and ruling that this is a heartland case.  And, respectfully, I

PA3Acom2

don't know if that's exactly what you meant in the ruling, but this is not a heartland case.  And on that point, actually, the PSR agrees with the defense.

The Mann Act is used in certain categories of cases where there are minors being abused, where there are sex and human trafficking rings, where there are brothels or sole actor pimps who coerce women into a life of prostitution.

The victims in these cases also share common themes.  Most of them are immigrants with unlawful status here in the United States.  They have no families.  They have no friends.  They have no homes here or any reliable source of income, and they find their way into a life of prostitution, normally because the defendants trick them into that working arrangement.

Many of the victims are drug addicts who are plied with drugs to not only fuel their addictions but also to continue coercing them into a life of prostitution.  Many victims are homeless or mentally ill.  I saw many cases in which defendants had bonded women out of prison and then forced them into prostitution.  Otherwise, they would be forced to return.

THE COURT:  What do you say to the government's argument, you mentioned pimps, that Mr. Combs acted in this case like a pimp who coerced two women into over a decade collectively of prostitution?  Why doesn't that fit into the

PA3ACom2

kinds of cases that you're talking about that would be within the heartland of the statute?

MR. DRISCOLL:  Because all pimps, your Honor, share one of the most culpable aggravating factors in Mann Act cases. They make money prostituting women.  The defendant, it's undisputed, again, he did not make money off of his Mann Act offense conduct.  The government says he somehow benefited from power and control.  And that's just a spin on the argument that they tried to convince the jury of.

They said that he used his power and control to somehow coerce these women.  Now they're saying -- the jury rejected that argument flatout.  Now they're saying, well, he actually did the offense for power and for control because those are somehow things he liked.  That's not why pimps engage in prostitution.  And I think we'll talk about this later when we get to deterrence, and specific deterrence.  Profit motive is essential in Mann Act cases, because a lot of these defendants, they make their living off of a life prostituting women.  It's a reliable source of income for them.  It increases their chances of recidivism.  And it provides a motive for other pimps to join in on the conduct.  That's not this case.

So that's my response to the government when they try to equate Sean Combs to a pimp.  He's not, and he did not commit this Mann Act offense conduct in any way for any type of

PA3ACom2

personal gain.

(Continued on next page)

PA3MCOM3

MR. DRISCOLL: Judge, Exhibit 68 is a list of cases where defendants share Mr. Combs' criminal history category and 2G1.1(a)(2) applies, which is the guideline that you were applying in this case.

The median sentence in those cases, I know you know this, it's 12 months and a day. In other words, it's shorter than the time that Mr. Combs has already served. The average of those cases is 14.9 months. And if you just limit it to cases in which the fraud coercion enhancement is applied, which again, your Honor, we respectfully object, but if you just limit the list to those cases, the average sentence is 28 months. That's substantially lower than the guideline range the Court has calculated in this case.

There are certain other enhancements that is motivating the range here, and I'd like to talk about them. Because if they in any way factor into the ultimate sentence, that too would create an unwarranted sentence disparity.

I'll start with the grouping enhancement, the victim grouping. That adds five levels to Mr. Combs' offense level, according to the Court. I have seen dozens, maybe hundreds of cases in which there are multiple victims, sometimes dozens, sometimes hundreds. The government does not seek a grouping enhancement. The Court does not impose one and the sentence does not end up reflecting one.

One comparable case is the *Nabit* case. There, it was

PA3MCOM3

undisputed there were seven victims.  There was no grouping enhancement applied.  The defendant was sentenced initially to 18 months and released after just nine months.

With respect to the organizing role enhancement, I'd cite the *Revoredo* case, your Honor, that's 18 CR 20376 out of the Southern District of Florida.  There the defendants operated a widespread prostitution network.  They recruited dozens of women from Central and South America, they employed many others who organized the travel and the prostitution, and their operation generated at least $1.8 million.  Both defendants were sentenced to 15 months.

In the *Compos Mario* case, that's 11 CR 578, Eastern District of Virginia, there the defendant admitted to trafficking between 50 and a hundred women as the leader of an international prostitution ring.  His conduct spanned at least five years.  He fled the country after he was arrested and was only arrested a decade later.  In that case the women that he employed would service about 30 clients a day, and they would charge about $30 for 15 minutes of commercial sex.  He was sentenced to 18 months after serving, I think, six or seven months in extradition proceedings.

So, again, back to my initial point, your Honor, a blind reliance on the guidelines, it can exacerbate sentence disparities, and that's why 3553(a)(6) instructs the Court to equally consider sentence disparities, regardless of the

PA3MCOM3

guidelines.

Judge, there is a whole other category of cases that the defense submits is more akin to Sean Combs' offense conduct, and those are the four John cases that we cited for the Court in our papers. The average sentence among those individuals is 6.7 months.

I just want to highlight one case, the *Nabit* case, which we briefed, and then another case that we haven't briefed. In the *Nabit* case, the government says that there were no significant aggravators in any of the cases in Exhibit 68, and, respectfully, that is a gross misreading not only of the offense conduct in all of those cases but particularly the *Nabit* case. In their opposition they concede that the *Nabit* case actually shares many of the features of the instant case.

I just want to read some of the portions of the government's sentencing memorandum in *Nabit*: "The defendant berated, degraded, and manipulated the victims. Victim 1 expressed that the defendant was verbally and sexually aggressive towards her. And despite her being in tears on at least one occasion, the defendant did not stop." That's from docket number 34 of the *Nabit* case.

Another quote: "The defendant knew the victims were desperate for money, for drugs, food, and/or shelter. The defendant's manipulative and malevolent conduct is further demonstrated by his repeated payments of just a single dollar

PA3MCOM3

at a time to several of the victims until they met his demands."

Here is a text that *Nabit*, the defendant in that case, sent to victim 7. You're a lowlife lying sack of shit. I meant what I said about making a mold of your pussy. The rest of you isn't worth a shit. That victim later died of a drug overdose.

THE COURT: Am I correct that in *Nabit* there was no threat of physical force, that that was one of the things that the Court had acknowledged?

MR. DRISCOLL: That's a conclusion the Court made. I think the government contested that in the case.

Your Honor, I challenge the government here now to point to a single text message in the decades of communications that we saw from the trial in which Sean Combs said anything remotely as heinous and reprehensible as the message I just read. It doesn't exist.

Ms. Slavik just basically blamed Sean Combs for having a drug addiction over the past 25 years. We find that to be completely inappropriate. But one of the key themes that you see in Mann Act offense conduct is that the pimps, they don't usually abuse drugs. They use drugs to abuse others, but they themselves are not users. I think my colleagues will speak to this, but that in this case is a serious mitigating factor, one that didn't take place in *Nabit*.

PA3MCOM3

I want to talk about one more case.  This is the Lamden case, 13 CR 294, out of the District of Oregon.  And specifically I want to talk about defendant Riggs.  Defendant Riggs was a 64-year-old man who was a repeat customer of a so-called madam who requested one day the services of a prostitute.  She supplied him with a 14-year-old girl.  Instead of turning the girl away or telling her to go home to her parents, he paid for a session of oral sex.  He photographed the oral sex and later that madam supplied the 14-year-old girl to another John who was a pedophile.

This is what the government admitted in that case in its sentencing memorandum.  This is a difficult case and the government understands that all John or buyer cases will present difficult questions for courts at sentencing.  That's from docket 85 in that case.  This court must answer the important question of what penalty is appropriate to punish an adult who buys oral sex from a 14-year-old girl and who memorializes his exploitation of the young girl with photographs.  That's what the government said there.

What sentence did Riggs get?  Twenty-four months, half of his guidelines range, and that is significant, your Honor, because when the sentencing commission first drafted the guidelines, they recognized that in a John case, where the defendant is not making money, that equated to a 57 percent reduction on the sentence and that's precisely what the Court

PA3MCOM3

did there and what, I respectfully submit, everyone in this courtroom would agree is more heinous conduct than the offense conduct we are dealing with in this case.

Your Honor, 3553(a)(6) instructs the Court to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  I have read all of 900 Mann Act cases available on Pacer.  Sean Combs' case is categorically different.  Of course there are some aggravating circumstances here.  There are many more mitigating circumstances which you will hear about in a moment.

But the Court should not dispense with what courts around the country do in these cases all the time.  The government says in Exhibit 68 there is no discernible pattern or logic.  That is not true.  In fact, the sentencing band of those cases, it's rather tight, and, respectfully, for that reason, I submit that a 14-month sentence is the only sentence that would be consistent with the need to avoid unwarranted sentence disparities.

That's all I have to say, your Honor, unless you have particular questions.

THE COURT:  Thank you.

Who is next?

Ms. Westmoreland.

MS. WESTMORELAND:  Thank you, your Honor.

PA3MCOM3

Your Honor, I want to focus on two very important aspects of Mr. Combs' life.  One, I want to focus on the help and inspiration that Mr. Combs has given throughout his life, and I would like to focus on the commitment that he made while at the MDC.

Your Honor, you're aware of some of Mr. Combs' business endeavors, and the Court is aware that Mr. Combs was successful.  But I want to speak with the Court about how he used his success to help others.

Mr. Combs, in a very positive way, touched many more lives than the Court has been able to hear about over this past year and, frankly, many more lives than I'll probably be able to cover in the next few minutes.

When Mr. Combs started his own record label, Judge, there were not a lot of black-owned record labels at the time.  Mr. Combs starting his own label as a young black male back then was almost kind of jokeable, but he had the audacity to do it anyway.

Mr. Combs poured hisself into that label.  He was a writer, a producer, an artist, and a record label owner.  And by Mr. Combs wearing all of those hats and pouring hisself into that label the way he did, it sent a message.  It sent a message that you can do it.  You do not have to just be signed to a label.  You can be the label.  You do not have just have to choose between being an artist or producer, you could be

PA3MCOM3

both, and that you could start a label and make the label successful, no matter what race that you are.

Mr. Combs actually owning this label and being able to create a real distribution deal in the music industry, this changed the industry and it changed the culture. But, more importantly, it changed countless of individuals' lives because what people recognized was that if Mr. Combs could do it, then they could do it too, and Mr. Combs would tell everyone who would listen that they could do it. He spent so many years of his career in the music industry helping and teaching others, to be the best artist that they could be, writers, producers, try all three, do not be scared, and, very importantly, you can be an owner.

The way Mr. Combs inspired the community during that time was like nothing we had ever experienced. When Mr. Combs entered into the fashion industry, there definitely was not many black-owned clothing lines. Mr. Combs starting this line showed the black community that you could more than just have an appearance in someone else's line. You can actually have your own clothing line, and you could actually market it. You were smart enough to market the line and to make it successful.

Your Honor, when Mr. Combs -- I think you heard a little bit about this. When Mr. Combs was awarded Menswear Designer of the Year, it wasn't just about an award. It was about breaking barriers. Mr. Combs was the first black male

PA3MCOM3

awarded the award in the award's 23-year history.  And once Mr. Combs received the award, what he spent his time doing was teaching others and helping others create their own clothing line, and it sent a message.  You can do it.

I do want to say, your Honor, I want to explain something about Mr. Combs' clothing line.  It was not just the traditional urban streetwear.  It was upscale and it was purposely designed to overcome the preconceived notions that only certain races would wear what.

Mr. Combs' clothing line was for all people, and the reason why that's important is because it brought unity.  It inspired change.  The fashion industry no longer just stuck to trends and keeping -- well, if you're from this neighborhood you dress like this, but if you're from this neighborhood, you dress like that.  And implementing this change affected the way that that business is treated to this day.

But, your Honor, what's also very important is that after Mr. Combs figured out how to break barriers with his own line, he then helped others open up theirs, young individuals, individuals within his own community that most people would not have given a shot.  But he wanted to show others and help others by sending a message that they could do it too.

When Mr. Combs entered into the spirits industry, you have heard about that, Judge, I want to explain to the Court that this was so important because he created a model for black

PA3MCOM3

brand collaboration.  And so the message is that we went from association or the appearance of inclusion to actual leadership, and the inspiration that Mr. Combs gave with this endeavor to this day is immeasurable.  Our community finally had a seat at the table, a voice, a real voice.  And after Mr. Combs figured out how to move within that industry, he then moved on to help others.

Your Honor, when Mr. Combs started Revolt, it was one of the few black-owned multi-platinum platform network.  It focused on black culture, it focused on social justice, and it gave black journalists the opportunities to have a voice on multiple networks.  This was one of Mr. Combs' missions, to show his community that they are important and that the issues affecting the black community that they are important.

Mr. Combs told the world social justice is important. Mr. Combs did not just sit around and enjoy his success, because he could have, your Honor, plenty of people do.  They go out, they start businesses, they make a lot of money, and they enjoy their success, and it is not high on their priority list to help others around them or to help their community.

Mr. Combs has spent a lot of time and effort and focus on helping his community, people who are struggling to find their way or constantly hit with barriers, individuals that are trying to achieve their goals and follow their dreams.  He has dedicated so much of his life to breaking the chains of

PA3MCOM3

systemic racism.

Your Honor, in the media world Mr. Combs inspires so many to follow their dreams in media.  He sent a message that you can do it, and Mr. Combs, although he spends a lot of effort building up his community, he often all the time says it doesn't matter your race or your nationality, we can all do it the same.  He is just trying to help his community also achieve the same heights.

When Mr. Combs opened up three charter schools, your Honor, they were in poverty-stricken neighborhoods where the public school systems were inadequate.  They were neighborhoods where these kids were left behind.  The charter schools, they were of high quality.  They were college preparatory focused.  And one of the main models of the school was excellence, black excellence.  Mr. Combs focused and dedicated hisself with those schools to give inspiration to the youth because they are our future leaders, and Mr. Combs really felt like this was one way to implement true change.  And he went and he told these students, and by investing in these students' future that these kids, even though you live in a certain neighborhood, that you can be anything that your heart desires and do not let anybody tell you any differently.

Your Honor, Mr. Combs has touched the lives of so many through these businesses endeavors and other endeavors.  He has employed thousands, thousands of people.  He has employed

PA3MCOM3

individuals of all races, nationalities, gender.  He has given opportunity to inner city individuals who never had real corporate opportunities.

Your Honor, Mr. Combs' companies, they were very diverse.  Your Honor, it goes so much deeper for Mr. Combs because he has really inspired the community.  Mr. Combs has inspired generations and generations to follow.

For example, Judge, vote or die.  Your Honor, vote or die was focused on convincing young individuals and minorities to vote.  And often the minority individuals and the youth, they were just kind of, they weren't considered the important vote that many of the politicians were going after, but Mr. Combs said no.  He went around to educate minorities and the youth about how important voting actually was and that they had a voice, and they needed to be heard, and this is how you help implement change.  Vote or die changed the way voting campaigns happen to this day.

Your Honor, Mr. Combs personally inspired me.  About eight years ago, during the month of September, I was already a lawyer, and I was trying to figure out and find my way.  And one of my main goals is doing something about mass incarceration of the black community.  And so I went to this event in Washington, D.C., and Mr. Combs was there and he was a guest speaker.  I did not know he was going to be there before I arrived, but he was.  And so it is several individuals there,

PA3MCOM3

Mr. Combs, and he is speaking and he is giving us advice.

And I'm never going to forget.  He said:  Listen, everyone.  Sorry.  He said:  Don't be afraid to dream.  Just remember to wake up and to put actions behind your dreams.  And then he said:  And if you do not remember anything that I'm saying today, remember as you accomplish your dreams, don't forget to help others.  And that changed my life.

Mr. Combs is not larger than life.  He is just a human being.  He is just a man.  And he has made some mistakes.  He has flaws, like we all do.  But, Judge, how many of us can say that we have helped so many lives, countless lives, past our family or past our friends, or the people just in our close circle, how many of us has spent decades helping other individuals' lives.

This is an important aspect of Mr. Combs' life and it wouldn't be right to take that from him, because he has made mistakes, and it wouldn't be right for the Court not to consider the years of his life that he has given, that he has inspired, and the countless individuals that he has helped.

Now, Mr. Combs will be the first to tell you that somewhere along his way that he lost his journey, he lost his way.  But, your Honor, I will tell you that Mr. Combs has been sitting in a jail cell for 13 months.  He is clearheaded, he is drug free, he is determined, he is focused, and he is remorseful.  I can look the Court in the eye and tell you that

PA3MCOM3

he's remorseful because I spend almost every single day speaking to Mr. Combs.  Your Honor, he gets it, simply put.

Your Honor, I want to move to the work that Mr. Combs has been doing at the MDC.  While at the MDC, after getting hisself together, Mr. Combs came to recognize that many of the individuals around him were actually talented, that many of them were smart and had potential.  A lot of them had just given up on life.

Although Mr. Combs was initially and primarily focused on hisself, his personality, he can't help it, he starts wanting to help others, so Mr. Combs started speaking to the individuals that he is housed with and asking them their dreams, asking them their backgrounds.

He noticed, number one, that most of them just lacked education, and he couldn't help but notice that at the MDC there weren't many educational tools or programs that the individuals housed with him could take, but so many around him seem hungry for knowledge, daily people there would come up to Mr. Combs and ask him, how did you become successful?  What did you do?  And he would give them advice one by one.  And that's really how Free Game with Diddy was born.

Now, coming up with Free Game for Diddy, it was not easy because of the individuals incarcerated with him were very divided, divided by race, by gangs, by association.  And so Mr. Combs went to his unit and he said to them, I tell you

PA3MCOM3

what, I'll do this class, and I'll teach you all everything -- I'll teach you all what I know, but we have to make an agreement, we have to make a deal.  If I teach you and we do a class, everybody has to be in the class together.  I won't teach one group and not teach the other group.  Everyone has to be in the class together, and you have to agree that you will be peaceful.  And the unit agreed, so he started teaching the six-week course on business skills.  Your Honor, this is change.  This is inspiration.  This had not happened at MDC ever.

You know, your Honor, I want to tell you one of the very special aspects of it to me is that, yes, he is teaching business skills.  But what he's also doing is telling individuals incarcerated, inmates, that they are worth teaching.

Your Honor, you're in receipt of MDC's evaluation.  You had one before.  We submitted another one to you today.  And, you know, that evaluation, the staff at MDC, they sat through a class because they really wanted to see, was this real, are individuals learning, what is this about?  And they sat through the class, and they have been monitoring the class.

And, your Honor, you saw the work performance.  They said it's excellent, excellent, that so many people -- they are learning, they are learning new skills.

And I believe one of the markers on the evaluation is

PA3MCOM3

how dedicated has Mr. Combs been to teach in the class, and they gave him the highest mark that's possible because he spent countless hours on that curriculum, and he takes the class very seriously, and he's teaching it.

Your Honor, you have read the letters from several individuals that took the class, but I just want to briefly mention two that stuck out to me that I want to tell the Court about. One is that one of the individuals said, I have someone else writing this for me because I can't read and I can't write, but he just wanted to let the Court know how much the class meant to him and how much it means to him that Mr. Combs basically thought he was worthy of teaching.

Your Honor, you received another letter from someone's mother, and they told the Court, it's like I'm looking at my kid again. I have not seen him this hopeful in years.

Your Honor, in closing I am going to say this to the Court. Mr. Combs can reach so many more on the outside that he can on the inside. It is of no benefit to anyone to warehouse him in a prison.

Unless you have any questions, your Honor, that's all for me.

THE COURT:  Thank you.

MS. WESTMORELAND:  Thank you.

THE COURT:  Mr. Steel, can you give me a general estimate on what's coming next.  At some point we will need to

PA3MCOM3

take a break for lunch, so I am just trying to figure out when the best time for that would be.  We also need to fix the Live Note, if we can.

MR. STEEL:  Your Honor, we were going to ask the Court to permit Mr. Combs' children to speak to this Honorable Court.  It will not be long, though.  Then I was going to ask this Honorable Court if we can play sentencing Exhibit number 84, which is the video, which is approximately 11 minutes, 10 minutes, and then I was going to address this Honorable Court on 3553 factors as well.

THE COURT:  Would it make sense for us to do those two things and then for us to take a break and then, Mr. Steel, you could speak after lunch?

MR. STEEL:  Of course.

THE COURT:  Please proceed.

MR. STEEL:  Your Honor, with the Court's permission can Mr. Combs, one at a time, or collectively, whatever the marshals say and the Court says, come up to this podium.

THE COURT:  Of course.  Please come forward.

MR. QUINCY BROWN:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. QUINCY BROWN:  First off I want to say thank you for reading my letter.

THE COURT:  Thank you for sending it.

MR. QUINCY BROWN:  My name is Quincy Brown.  I'm the

PA3MCOM3

eldest son.

No matter what, Sean Combs is my father.  This is our father.  We are going to love him unconditionally through his struggles.

But in front of you, in front of us is a changed man.  Our father has learned a major lesson.  Week after week we have seen him evolve.  It's something we haven't seen in 15 years.  He is completely transformed.

Our father will never, ever do anything to jeopardize his freedom.  As his children, we want to thank you, and we only wish to heal together.

MR. JUSTIN COMBS:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. JUSTIN COMBS:  My name is Justin Combs.  I'm the firstborn son of Sean Combs.  Thank you for giving me the opportunity to speak.

Your Honor, I ask you to give my father a second chance, a second chance at life, a second chance to right his wrongs, a second chance to be the man that he truly is.

This has been the toughest time I have ever been through in my life.  My father is my superhero.  Seeing him broken down and stripped of everything is something I will never forget.

My father always told me to believe in God and never question him and God makes no mistakes.  Going through this

PA3MCOM3

tough time, this time probably saved my father's life, as crazy as it sounds. He is drug free, he is clear, and he refound his purpose.

I talk to my father every day and every other hour and I can truly sincerely say, he is changed for the better. Your Honor, I believe my dad still has so much more to give the world, but even more importantly, so much more to give his children. I humbly ask you to see my father the way I do, the way his family does, and the way he truly is. Thank you.

THE COURT: Thank you.

MR. CHRISTIAN COMBS: Good morning, your Honor. My name is Christian Combs. I'm my father's third son, and I'm the one that people say most likely resembles my pops, not just from obviously how I look, but from my mannerisms and how I interact with people. And I'm this way because my whole life, my entire life, I studied my dad up and down. And to me my dad is the greatest man in the world. He is my hero, always been my hero, and still is my superhero.

And my whole life, he has always taught me to treat women with respect. I've seen him treat my mom with respect and treat her like a queen and that has made me want to treat women like a queen and inspired me to treat women with respect. Throughout my life all I've seen him do is help people, put people in better positions, and take care of people's families and just spread positive energy and be a good person, and I

PA3MCOM3

know that because I've studied him and I know my dad.

Over the past year I had to travel across the country every week just to see him for two hours.  And in these conversations is where I really realized that he has changed. I can tell by his conversations, by the way he carries himself. He is more patient, more relaxed, more trusting, more understanding, and he just a better man.  And I know by the way he carries himself and just by the conversations that he has changed.

Your Honor, I'm asking you not only as his son, but as somebody who has watched him closely throughout every season of his life, and I'm telling you that I see in his eyes, as his twin who has been watching him his whole life, that he has changed.

I'm asking you, please, with the utmost respect, please give my family grace, please let my father out to take care and lead this family, please give him mercy and get out and become the man that we all know that he is.  Thank you so much.

THE COURT:  Thank you.

MS. JESSIE COMBS:  Good afternoon, your Honor.  My name is Jessie Combs, and I'm 18 years old.  I am here speaking with my sisters D'Lila and Janice.

I want to start by saying throughout the trial everyone has had their own views on our dad.  We know he isn't

PA3MCOM3

perfect, and he has made many mistakes, and we aren't here to excuse any of those mistakes.  But, your Honor, he is still our dad and we still need him present in our lives.

When my mother died, I was just a little girl trying to understand along the way too big for words.  I remember my dad sitting us down that day, holding us close, even though his own heart was breaking, and promising that he would always be there to keep us safe, that he would always walk beside us through life.  It was the thing that helped me survive the hardest nights, the birthdays, and the very important milestones we had to experience without her, the moments when I just wanted my mom.

MS. CHANCE COMBS:  Good afternoon, your Honor, my name is Chance Combs.  I am Sean Combs' oldest daughter.

Your Honor, with our dad incarcerated we have all felt a huge emptiness in our lives.  People often tell my sisters and I how strong and how resilient we have been, and maybe we have had to be.  But, your Honor, we are still just daughters who need our father.

Over the past year I have seen my dad change in ways that feel real and lasting.  When we talk he speaks with a clear mind and a sense of purpose that I didn't always hear before.  He is more patient, more thoughtful, and more open about his mistakes.  Instead of making excuses, he talks about how he wants to do better for himself and for us.  He shares

PA3MCOM3

the ways he is working on becoming a better man and a more present father.  I could feel the difference in the way that he listens in response.

I see this most in the way he parents our two-year-old sister, Love.  This past year I have watched him parent our two-year-old sister from behind bars through calls and brief visits here and there.  Watching him nurture her, even from a distance, has been unexpectedly healing.  I get to see glimpses of the father he was to us as babies, but also breaks my heart because my baby sister deserves so much more than this.  She deserves a father who tucks her in at night, who is there when she wakes up scared, who teaches her to ride a bike, who exists in her daily life, not just a voice on a phone or a visit behind bars.

MS. D'LILA COMBS:  Good afternoon, your Honor, I'm D'Lila Combs.  We are scared.  We are scared of the thought of not having our dad nor mom present in our lives.  We are scared for our two-year-old little sister that runs to us every night asking where daddy is and how much she misses him.  We cannot watch our baby sister grow up fatherless the same way we had to grow up motherless.  These are the years she will never get back.  These are the memories she will never have.

I know how much those -- sorry.  I know how much those missing years hurt because I lived that with my mother.  I know how they leave a hole that never quite heals.  It's a struggle

PA3MCOM3

that many cannot imagine.  We are tired of being strong.  We have already lost so much.  We lost our mother, we lost time with our father, and every day he remains incarcerated we lose more and more.

Please, your Honor, please give our family the chance to heal together, to rebuild, to change, to move forward, not as a headline but as human beings who are trying to do better.

Thank you for your time and for considering what we have shared today.  It means more than we can express.  Thank you.

THE COURT:  Thank you.  Thank you all for those words.  I know how hard it was to stand up here and to tell me those things, but it's very important for me to hear.  I really appreciate you all coming up and speaking.  So thank you.

MR. STEEL:  Your Honor, with the Court's permission, we would like to display a sentencing exhibit of Mr. Combs, number 84.

THE COURT:  Please proceed.

(Video played)

(Continued on next page)

PA3ACom4

THE COURT:  All right.  Mr. Steel, we're going to take our break now.  Who is going to be speaking after the lunch break?

MR. STEEL:  We would like the Court to -- Reverend Dr. Gary Johnson, your Honor.

THE COURT:  All right.

MR. STEEL:  As well as a gentleman from the reentry program, if the Court permitted.  You said you would consider that.

THE COURT:  And are there any other attorneys who are speaking?

MR. STEEL:  I apologize, yes.  After I speak, with the Court's permission, Mr. Donaldson, Mr. Agnifilo will be speaking, with the Court's permission.

THE COURT:  Very good.  And understood.

Ms. Slavik, anything else before we take our break?

MS. SLAVIK:  No, your Honor.

THE COURT:  All right.  Let's take a break.  We'll be back at 2:00 p.m.

(Luncheon recess)

THE COURT:  Mr. Steel, you may proceed when ready.

MR. STEEL:  Your Honor, I want to especially thank you for allowing me to practice in your courthouse, in this majestic building.

As Ms. Westmoreland just discussed with you Mr. Sean

Case 1:23-cr-00146-DG-RML   Document 473-1   Filed 11/20/25   Page 102 of 231
PageID #: 16220

PA3ACom4

Combs' life, and Mr. Driscoll talked about the cases.  And I watched the video, which I've watched lots of times.  I sit here with tears in my eyes because I can't believe we're here.

Sean has impacted so many, from his family, his local community, America, and the world in such a positive manner. So I ask myself -- and I've done this, your Honor.  I did it during trial.  How did we get here?  How does this happen to a life?  And now we all come to you for your guidance and your wisdom and we trust you to fashion a sentence, because the jury has spoken and we've been convicted of two counts of the Mann Act.  And we come to you, and I tell you that this moral man, the hardest working person that I have ever known, strong man, he's religious, he's a family man.  The way we came here, your Honor, I believe when you fashion your sentence, please consider the following two reasons.

I believe we're here because, first of all, there was untreated trauma, great trauma in Sean's life, and a ferocious drug addiction that got out of hand and saw Sean at time flatline.

I've represented some people who grew up in total poverty.  They had no food in their cupboards.  They had no clean clothing to wear.  They had no education.  No hope.  And that is not Sean's life.  That is not his life.  But at age three, his father was murdered, not far from your courthouse, and Sean has no memory of his father.  I can't imagine.

PA3ACom4

A few years later, his uncle, his mother's brother, overdosed on drugs, a drug addiction that later in life would haunt also Sean. He was raised in Harlem. And Sean is now 55 years of age, your Honor. And Harlem in the 1970s was not Harlem today. Police were afraid to go there. It was filled with prostitution, drug abuse, shootings, stabbings, killings, gangs.

At age 12, his mother, who besides Sean, is the hardest working person I know. As the Court knows, you've been educated on it, his mother, who is in your courtroom, your Honor, she worked three jobs. She drove a school bus. She worked at a clothing store. And at night, she went to a local facility where people who couldn't use their muscles, stricken with disease, she would care for them, take them to the bathroom, shower them, stroke and brush their hair, play music, touch their skin to try to bring some happiness to people who are otherwise forgotten except by their families. And she saved up all this money and she moved the family to Mount Vernon. That's beautiful. It was beautiful. It was prosperous. But there were problems there. Sean's family was one of the only African American families in the area. So for the first time, Sean encountered racism. He was not played with. He was called the N word. Doors were shut to him. Teams wouldn't have him. So he went back to Harlem to stay there during the day with his friends while his mother worked.

PA3ACom4

But he got a great education.  And Sean is one of the most intelligent people I have ever met, on every level.  He goes to Howard University, and in his second year, he withdraws because he says I have a vision of something that I can do outside of this educational facility.  Although, he loved Howard University.  But he interns with a record label for free.  He cleans the bathrooms and the toilets.  He gets other people food.  He runs errands.  But he's given an opportunity, your Honor, which is all he wanted.  And he's in the studio with artists.  And his ear is better than everyone's.  And he can tell what is a good album, what is going to be a number one hit.  And how people should change the way that they're singing or the way that the beat is constructed.  And music videos were coming alive at that time.  And Sean would change the fashion and the appearance of the people in the music industries.  And soon, it became obvious that he is a true talent.  He became the head of A&R.  Hit after hit was coming, and Sean's name was known throughout the music industry as a genius.

He then started, as Ms. Westmoreland knows and you know, Bad Boy Records.  That becomes arguably the best record label in the world.  And he's finding all the talent, because he has the eye for that and the ear for that.  And he is doing great.  But, your Honor, just like his mother, he will not stop working.  He is working endlessly.  No matter what's going on in his life, he's working endlessly.  But he has rules, and one

PA3ACom4

of the rules include no drugs.  There are no drugs in the studio.  Mr. Combs has not had any drugs.  He's anti-drugs.  He would tell people, it's in your work that you're aware of, if you do drugs, you're going to be behind.  Drugs make you stupid.  You can't function on drugs.

And then, more trauma.  Not only his father, not only what he sees in Harlem, not only racism, but his best friend is shot in a drive-by shooting in Los Angeles.  His blood is gushing from his body and Sean is holding his best friend.  Sean's clothing is soaked with his blood, and his best friend dies in his arms.  A year later, Sean's two roommates in Atlanta are murdered in gun violence.

But Sean just keeps working.  He won't stop.  He's not getting treated.  He is angry.  He is upset.  He's hurt.  But he just keeps on working, trying to help others, trying to break racism, trying to breakdown the barriers to business and education and make it fair, but he neglects himself.

By year 2000, he has an operation, your Honor, and he gets addicted to the painkillers that he's given to recover from the operation.  Until September 16th, 2024, Sean has been high every single day since those painkillers were prescribed to him.  And the drugs were anything, as you know, we tried the case, you heard all the drugs.

He lost his way.  He was medicating because his body was hurt, his emotions were hurt.  But he never stopped

PA3ACom4

working.  And all of that, that combined drug addiction and trauma, untreated, your Honor, caused him to hit, on occasion, it was not every day as the prosecutors said throughout the trial, it was not every time.  This is on occasion.  He would hit the woman he loved.  He loved Ms. Ventura.

The prosecutors state that he has not taken responsibility.  I have been with Sean more than I have been with my family in the past since I met him.  He has only taken responsibility.  He would not have tried the case if there was a plea offer to the Mann Act.  The prosecutors would not offer that.

Every day, your Honor, whether it's the InterContinental video or not, Sean remembers every strike in his mind, and he bangs his head against the wall begging for apology.  He is so remorseful.  He is going to go through the rest of his life carrying that burden, as he wrote to you in his own words.  I have been with Sean when he has prayed, not only for forgiveness for himself, but prayed for healing of anyone that he has harmed or injured.  Sean wants nothing for himself.  This sentence today is not about him.  He wants to get back to his family, to them.

The prosecution said you have to send a message to the community.  Sean has been punished severely already.  It is now 12 months and 17 days at the MDC in Brooklyn.  Sean is not a typical person in custody.  Everyone knows him.  There are

190

PA3AСom4

certain people who it's a trophy for them, they get recognition if they harm him.  As the Court may not know, or may know, and it's on file, the guards stopped a person who was armed with a shank who was right on top of Sean and was about to cut him. Every day he lives in fear.

He has not slept more than two hours consecutively in the year that he's been in custody as required by the rules. He has not seen daylight, except when transported to the courtroom.  There are no windows in his area.  He eats out of bags.  He eats chips all day long.  He lives with approximately 25 other people who are incarcerated.  They live in a small area.  It's one room.  In that room, your Honor, if you have gone there and seen it, there's a bathroom, next to the kitchen, and a shower, and the supposed bed that he lays on, the steal area that he lays on, and the TV area.  And they're all there.  And there's drugs there, your Honor.  Sean has not taken any drugs.  He swears he cannot do that.  He needs help. But he cannot go backwards.

And there's violence there.  The water is polluted. Sean has to, and the other people have to, boil the water before it's usable.  And there's screams from other people all day and night.

But for Sean, as horrible as that is, it's a separation from his family.  He can't believe the position he put himself in.  He grew up without a father, his mother

PA3ACom4

working all the time.  He swore that he would be there for his children, especially November 2018, when Ms. Porter suddenly and unexpectedly passed away.  She is the mother of four of his children.

That's what Sean is fighting for.  He sometimes would tell me it's not worth going on.  There's nothing here.  There's no more hope.  But his family, he could not again bring suffering on them.  That would just be more trauma to them.

Sean has been punished in the sense of his businesses.  His businesses meant everything to him.  He made a great deal of money.  It was not the money.  He had a lot of prestige.  It was not the prestige for him.  His pride was in the fact that, your Honor, he gave opportunities to people who went to Harvard and homeless people, and he put them on the same track and said whoever can out work the other person, you will be elevated.  He does not care the color of skin, the nationality of the person, the sexual preference of the person, the religion of the person.  Sean sees life the way it should be.  We are all humans.  We are all together in this, and we stand here for the next generation to have a better life.  That's what he was trying to do with his life.  That's what he did with his life.  The prosecution wants this Honorable Court to agree with them and have tunnel vision and say Sean Combs should be defined by what you heard in this courtroom.  That's not sentencing.  This Court takes the totality of the person.

PA3ACom4

The businesses are gone.  They're gone, your Honor. The great name recognition of the Combs Enterprise, Sean Combs himself, it has prestige at one time, respect, your Honor, power.  He stands for a change for the better.  He is a fighter for civil liberties and equality.

Mr. Combs has walked with Presidents and homeless.  He can connect to the young and the old.  We need him.  That prestige, that name is gone.  And what Sean cares about is not for himself, but he has said over and over again how he has cursed his children with that name now.

Sean has dedicated himself to this hard work, to this euphoria that he can help people who otherwise did not have opportunities.  It was like a utopia that he wanted to build, build these schools for children who were neglected, run the New York Marathon when he was not in shape to do it.  He's had several operations on his knee at that time, part of the prescription pills.  But he did it because he raised millions of dollars and gave it all to the New York City public school inner cities.

What hurts him about his business gone is the thousands of people that now potentially removed from their résumé that they ever worked with him or his businesses.  They can't be an equalizer, where they'll give equal opportunity to anyone no matter where they come from.  His money is gone, your Honor.  He currently has hundreds of lawsuits, most of them

193

PA3ACom4

frivolous, but he's paying attorneys.  Sean doesn't care about the money.  He wants to go home to his family.

The prosecutor told you, in essence, this Court's sentence must send a message to this community to respect the law and a message to the victims.  I don't know who among us would trade places with Sean Combs.

Some of the media, I am not saying all of the media, some of the media has written up and called Sean a disgrace, an outcast.  Like a leper.  Those people are wrong.  I know Sean, personally.  He's a great man who is being sentenced.  But he still has done things that I would dream of doing.

Your Honor, you will hear from Sean, but he is completely broken.  No one needs to give Sean any speeches.  Nobody needs to tell him that he needs to take responsibility, like the prosecutor said.

Your Honor, he has punished himself more than anyone will ever be able to punish him, and it will stay with him for the rest of his days.  Mr. Combs does not need any additional time in custody.  That is not how we treat drug addiction and trauma and violence today.  That is the way we treated it when I started practicing law.  A person puts their hands on somebody else, nobody thought about psychiatrists and psychologists and therapy.  No one did that.  It was incarceration.  But in 2025, we have to come further.  We ask this Court to see whether that's just.

PA3ACom4

Sean's family loves him.  You've heard from his children.  He still has some true friends.  He knows who his friends are.  Some of them are here, your Honor, because they know his heart.  They know that he lost his way and they know he is so remorseful.  But there is a clear change in Sean.  From the time that he was met by Marc and Teny to the time he stands before you, everyone has said the same thing.  Everyone has said the same thing.  Off the drugs, he is a different person.  The drugs affected his thinking.

Even in this broken state though, all Sean thinks about is others.  As I told you, his family.  And as Ms. Westmoreland told you, your Honor, that jail is built for hopelessness, pain.  People go there to die.  And I don't mean just physically die, although that does happen.  I'm talking about emotionally and mentally and spiritually.  So Sean noticed that, and he pulled together -- as you heard Ms. Westmoreland and you read the notes -- these people who hated each other.  There were constant fights.  The BOP will tell you.  There were constant fights.  There were Crips and there were Bloods and other gang members and they hated each other.  Racism was ramped.  And Sean went individually to each one of these people and explained, we're living together, we all have common interests, I'm in here with you, we all come from different backgrounds, let's learn from each other.  And next thing you know, these people are eating together, shaking

PA3ACom4

hands, laughing.  There has not been a fight in that unit since Sean pulled everyone together with Free Game.

There's a gentleman who was released, but he's on total house arrest.  I spoke with his lawyer.  I'm permitted to say this.  His name is Charles Scruggs, S-C-R-U-G-G-S.  And he's home now.  And if this Honorable Court thought it appropriate, he is sitting by his charged up cellular telephone to give this Court the number.  He was incarcerated with Sean and he will tell you firsthand what it's like to be incarcerated before Sean Combs was at MDC and what Sean Combs has brought to not only him, but all the other people at MDC.

Sean has this ability that I don't have, that probably very few have.  And incarcerating him is warehousing him.  But this Court can use him.  If you think it's appropriate to allow him to get the therapy and counseling that he needs, be with his family, to help heal his family, to help heal himself.  And October 6th is not a speaking engagement.  It'll be discussed by the honorable attorney Donaldson.  October 6th is because other people realize, your Honor, that Sean Combs is different.  He has more experiences now.  He has credibility.  He can go to people who are incarcerated or about to be incarcerated or at risk to be incarcerated.  He can go to any community and he can tell about, you want to hear how you waste your life, let me tell you about drugs, let me tell you about putting your hands on a woman, let me tell you about thinking that you are above

PA3ACom4

the law.

He can change people's lives.  That's what October 6th is.  It's not a speaking engagement.  It is a healing for Sean as well as the community.  He has that opportunity to do that all over the United States of America.  He can save people from being before your Court criminally accused.

The science speaks to us, your Honor.  As I told this Honorable Court, if you want to hear from them, they're in this courthouse.  Dr. Krueger and Dr. Kaplan.  They have evaluated Sean.  There is no malingering like the prosecutor said.  These are the best at what they do.  They test Sean and they will tell you, your Honor, if you want to hear from them directly, they are here.  But we have to get to the root of the problem.  You have to get to the trauma, the violence, why it's there, the drug adduction, why it's there.  And it must be treated.  The Department of Justice will not be able to treat Sean.  They may tell you they will.  We've spoken with everybody.  But it'll be told to you by Dr. Kaplan and Dr. Krueger, an environment where people are afraid for their life, an environment like a prison where there's orders to sleep, when to stand, when to use the bathroom, that is not proper fertile ground for counseling.  It does not work.  It works in a home setting where people can be themselves and have support of their friends, family and community.  That does not mean that Sean is running around.  It's just the environment.

PA3ACom4

The community can use Sean.  You can use him, your Honor, if you think it's appropriate as a tool so other people do not sit in this seat.  He can be a spokesperson.  And if Sean steps a centimeter out of place and does something outside of the bounds of this Court's sentencing disposition, supervised release or probation, your Honor will drag him right before your Court, and he will be revoked.  You have the hammer over him.

Prosecutors tell the Court, and the Court seemed to -- potentially, I'm not saying you have, but made a finding that this was coerced sex, that this was forced, threatened with violence and the release of the sex videos.  I would just like to read a few lines from the transcript, if I may.  And just ask the Court to also consider the following.  This is from Ms. Ventura when questioned on both direct examination and cross-examination.

Ms. Ventura agreed to engage in her first freak-off because, and I'm quoting, she loved him very much and wanted to make him happy.  Transcript 409, 477, 917, 916, 1340.

Ms. Ventura doesn't remember when she told Sean afterwards and going forward that she did not want to say no, she didn't want to say no to freak-offs because she did not want to regret -- want Mr. Combs to regret that he shared this vulnerable side of himself with her.

Ms. Ventura said, and I quote, your Honor:  His trust

PA3ACom4

meant a lot to me.  Transcript 483, 918 and 919.  Ms. Ventura did not want to affect, and I'm quoting, how he felt about me and our relationship.  And really didn't want to make him think that I didn't want to do it anymore.  This is transcript 404, 917.

Ms. Ventura testified that she enjoyed, I'm quoting, time spent with Mr. Combs during the freak-offs.  And that during these times together, she did feel very close to Mr. Combs.  It's 486.  It became an integral part of their relationship early on.  940.  And she wanted to be around Sean because she loved him, she wanted to make him happy, and it was exciting.  That's at 422.

It was important to Ms. Ventura to get more time with Sean, and the time during the freak-offs was special time that she cherished.  914, 1064.

Ms. Ventura did not want to engage in freak-offs, but this was not a sentiment she ever shared with Sean.  She did not want Sean to, and I'm quoting, find somebody else to do it with, so she treaded lightly.  487, 410, 438 -- that's wrong, 938 through 939.  Quote, I didn't know if he would be upset enough to be violent or if he would write me off or just not want to be with me at all.  Ms. Ventura went on to say, your Honor, I'm quoting, when you really care about somebody and you're in love with them, you don't want to disappoint them.  That's transcript 1331.

PA3ACom4

Over and over again, your Honor, during this trial, Ms. Ventura testified, and I'm quoting, she was just in love and wanted to make Sean happy.  That's at 409.

Your Honor, I am not here to retry the case.  I believe, and I still believe, that this Court understands the verdict.  And the verdict on the RICO count and the two sex trafficking counts mandate a finding that the jury -- I heard what you said, your Honor, we don't know why the jury acquitted, I understand that.  But the only issue really litigated was that this was a voluntary sexual encounter, consented to by adults.  That's what we argue.  I understand what you said.  I respect what you said.  But in this particular case, I agree with Ms. Shapiro.  This is issue preclusion or double jeopardy.  It's a due process violation. And the prosecutors never recognize that.  And they should. And society is better off if the verdict is recognized.

You are not sentencing Sean for RICO or sex trafficking.  You are sentencing him for the Mann Act.  And Mr. Driscoll gave you those 900 cases dissected.

Your Honor, seeing Sean take full responsibility for his conduct, he makes no excuses.  He does not call them mistakes.  He calls them his conduct that is unconscionable. He will never lay a hand on anyone, but he needs treatment.  He can touch the lives like no one else or maybe just a few.

If released, he would like to go back to Miami,

PA3ACom4

Florida where he's in walking distance of his mother, to care for his mother.  He will also, if you allow it, Dr. Melnick and Dr. Bryant, they have already stated that they have the resources in that Miami area to get Sean every bit of counseling, therapy that he would ever need.

Sean wants to care for his children, and his children want to care for him.  He needs to repair, not be warehoused.  And then Sean is going to be used by the community in a positive way, which is what he's done his whole life.  He is in the unique position that if this Honorable Court believes that it is something that goes into his special conditions of his release, he will be speaking openly about what it's like to be incarcerated, what it's like to be on drugs, what it is like to lose a global business, what it is like to harm people you love, what it is like to take the happiness from your family.  Sean looks in the mirror and all he sees is the pain that he's given others.

John Lennon once explained that he's a violent man whose done violent things.  John Lennon attacked his mother, his significant others.  He said I don't know why I do it.  John Lennon lived in a different time than us.  They didn't have all these studies and data and science.  He could have been helped.

Sean does not want to be looked at as a celebrity.  He doesn't care if he's never spoken about again.  He does not

PA3ACom4

want to be looked at as somebody who is special or above.  He doesn't want any names.  He wants to be a dad, a son, and a person who is crying out for help from experts.  He will do everything asked for by this Court.  He will never disappoint you.  He will not be before you again.

We ask you to allow Sean to have a 14-month sentence under the cases and the particular individual that you are now pronouncing sentence.  He has taken full accountability, your Honor.  For the prosecutors to read his letter and say that even now he has not taken accountability, that is just not true.  He's not using drug addiction as a crutch.  He's not using the trauma that he has seen and suffered in his life as a crutch.  He's saying that he is too weak, that he has failed the community, his family and himself.  He wants to repair.  He will never be a danger to anyone.

Sean Combs is a leader.  He is a civil rights leader. His good outweighs his bad by far.

I will answer any of your questions.  And the Court may have this experience, but in order to represent people, I've been given permission by wardens as well as sheriffs to spend time in the jails or prisons as an inmate, so I can understand what my client is going through.  And before the prosecutors ask for 11 years in prison, they should -- be safe, I'm not saying general population, but spend two days in custody.  Two days in custody, your Honor, is like walking

PA3ACom4

dead.

There is no such thing as only a five-year sentence, only a 60-month sentence, only a 135-month sentence, only a 24-month sentence.  Every day, your Honor, it rips the fabric of the heart, the mind, and the soul apart.

Dr. Gary Johnson has come to your courtroom, if you don't mind hearing from him.  He is a community leader in Miami, and he has ideas that Sean can help the community as well as he can help Sean.  If he can come forward if that's okay with the Court.

THE COURT:  All right.

REVEREND JOHNSON:  I guess it's afternoon by now, to the Honorable Judge.

THE COURT:  Good afternoon.

REVEREND JOHNSON:  Thank you, sir, for allowing me to speak.  Excuse my voice.  I've been speaking.

My name is Reverend Gary Johnson.  I'm the former President of Florida SCLC, Southern Christian Leadership Conference, which was founded by Dr. Martin Luther King.  And now I am the national president of King Clergy.

I'm, too, like attorney Brian Steel.  My heart is at turmoil to see our brother in these conditions.  But I was asked by a friend of his, Joy Buttafuoco who called me and asked me have you heard and seen about Sean.  And I got a call from Stan Cobar.  He said, bump, I pay for your hotel if you

PA3ACom4

go.  And then I got a call from junior, who is over Miami Dade Corrections, over the prison system, he said, man, I will pay for your flight.

And then it dawned on me, your Honor, is that it takes a community.  It takes the people, the community, to get behind Sean, to helping with his condition, to helping with his mistakes and the things he's done, to reconcile.  Being a man of God, I also believe that it's redemption.  Who without sin casts the first stone.  We all have sinned.  We all have fallen short.  But no matter how much we assign the blame on this one or that one, it's not making this problem go away.  It's when Sean decided he wanted to make a change to himself and be a part of change.

And so I was with his mother a month ago and she said something to me that touched my heart.  And she said I prayed that God gives me Sean.  When she was pregnant, she said he's a special kid.  She says I love my son.  My son has been good to me.  Every day she gets up, she's hoping she can wake up to her son being here.

So we decided that we won't sit back and watch anything happen.  We want to be a part of change.  And so we know if you gave us an opportunity from this bench, we are asking you to allow us to be an extension from the bench to the community.

If you free him, free his body from this incarceration

PA3ACom4

and allow him to have probation, we'll help free his mind.

As most of the attorneys articulated earlier, we concur with them on the fact that Sean is not a man that takes sides.  When he makes his mind up, you see, he'll take over.

So I believe that if you give him the opportunity under us to work with us, he won't be back in here because he made a mistake.  He'll be back in here to tell you thank you.  And the community will be thanking you for a decision that can only help our community.  Any abuse is any type of abuse is the worst type of abuse, whether it's verbal abuse.

So I ask of you, if you would consider giving him to us, I will be personally responsible for seeing him rehabilitate.  Because no matter how much you give him time in incarceration, that's not going to change his condition.  That's not going to change anything.

And I close with this, as Michael Jordan, Mother Jordan said this:  These sneakers are just sneakers, but when my son puts them on.  Sean needs an opportunity.  If he gets an opportunity, he'll turn it into an empire, and the empire to help people, help women, help children become young millionaires, become young business people.  I'm asking you to give him to us and we won't let you down.  And I thank you so much for this time.  And you've been very honorable in this Court, like the Courts in Miami.  Judge de la O operates the same way.

105

PA3ACom4

If a man can be redeemed, then why not give him that opportunity as well.

Thank you, your Honor.

THE COURT:  Thank you very much.

Mr. Agnifilo.

MR. AGNIFILO:  I think we have Mr. Donaldson and then I'm going to speak briefly.

THE COURT:  All right.  Mr. Donaldson.

MR. DONALDSON:  Your Honor, good afternoon.

THE COURT:  Good afternoon.

MR. DONALDSON:  It's been a long day, but I think it's worth it.  I was told a long time ago that brevity is the soul of wit, so I'll try to be brief but I want to get to it.

I don't want to repeat a lot of what my colleagues said because I think they pretty much summarized, if you could, what we think is the appropriate sentence for Mr. Combs, what we know.  I do want to hit a few things, and I think Mr. Steel called me the honorable, not yet, but the honorable.  I want to hit a few things Mr. Steel talked about just briefly about this comment that the government made earlier.

Before I get to that, I want to emphasize that we do believe that the up to 14 months is the appropriate sentence. And for a lot of reasons, many of which we've already talked about.  But we didn't -- or we did talk a little bit about these collateral consequences.  And I think we should really

PA3ACom4

consider those in conjunction with what Mr. Driscoll talked about earlier, the data that is important as well.  Because then you start getting into objective information about why a sentence is appropriate, and Mr. Driscoll gave you -- and he did read 900 cases -- a lot of information.  And what was also important with what Mr. Steel said regarding the collateral consequences that Mr. Combs is suffering, those are immense, immeasurable, and something that quite frankly I've never seen in 30 years.  And I do appreciate that collateral consequences are normally associated with when we talk about impoverished persons.

I'm here in this courthouse, I don't know, almost every week talking about how difficult it is for young folk of color to come back after being sentenced or convicted of federal felonies.  I don't say that Sean Combs suffers similar collateral consequences, because of course he's wealthy.  Or was wealthy.  But we can't treat him any differently because of that, of course.

And I took the pain to go back and check some things out.  And Judge Koeltl in this district in *U.S. v Stewart* indicated that deterrence and protection of the public is lessened because a conviction itself already visits substantial punishment on the defendant.  That's important here because the conviction in this case and the sentence will itself visit substantial punishment on Mr. Combs.

107

PA3ACom4

But the Second Circuit then went a step further in *U.S. v Stewart* and said, it is difficult to see how a court can properly calibrate a just punishment if it does not consider the collateral effects of a particular sentence.  Why is that important?  Because as we indicated in our letters, the collateral consequences suffered by Mr. Combs are enormous. And I say that not to give him some middle class or wealth discount, because he doesn't get that.  He shouldn't get that. But he should be considered to receive a just punishment.  And the collateral consequences associated with his family, the loss of business -- and when I say loss of business, it's not one of those businesses that you wake up and you're born with. It's one of those businesses that you earn, that you literally earned.  He earned it.

(Continued on next page)

PA3MCOM5

MR. DONALDSON:  And then he lost it all because these mistakes, crimes, and the crime of conviction.

When we talk about avoiding disparities, I'm asking the Court, I'm strongly suggesting to the Court to consider that a just punishment requires this Court to look at the significant and substantial collateral consequences that Mr. Combs has endured.

You also, before I get to another section, asked Mr. Driscoll earlier this morning the government associating or equating Mr. Combs as a pimp.  And I don't want this record to be -- let me say it a different way.  I want the record to be clear that Mr. Combs is not a pimp.  The record should be clear of that.

Why is Mr. Combs not a pimp?  Pimps seek out and recruit women with one sole intent, to prostitute them out to other people.  Intent is what I'm talking about.  Their intent, their sole intent is to seek out women, prostitute them to other persons for money.  That's their sole intent.

Like when we talk about in this district, oftentimes when we distinguish between drug dealers who are in the business of selling drugs, we distinguish between people who commit fraud from people who are in the business of committing fraud.  We have to distinguish pimps from people in the business of pimping and the business of prostituting women and the business of subjugating women.  Mr. Combs is not in the

PA3MCOM5

business of doing that.  Therefore, Mr. Combs, is not, should not be considered a pimp like those nefarious individuals are. He is not that man.

What I also found myself thinking about over the last two weeks, after reading all the letters, listening to Mr. Combs' family members, and watching the video and going through the discovery again and reading the transcript, I tried to put myself in the Court's position, if I could briefly.  And I said to myself, honestly, we have done this enough, I think. The Court is in a difficult position, I think, if I may say that respectfully.

You have these witness-impact statements from Cassie and Jane and Mia and Diontae and other people, and the government saying that Mr. Combs should get 11 years, and I read the Court's decision from the hearing that we had last week, and I appreciate all of it.  I do.  So you have that part.  The Court is looking at and weighing and saying, OK, this is who these people are saying Sean Combs is.  But then you heard that family, then you have read those letters, and then you have seen that video.  And then you've also heard from the government's witnesses, of people who spoke about Sean Combs about who he is, what he did, and what he did for them.

So you find yourself, I think, saying you have -- I have two people here.  What's the real Sean Combs?  I would like to believe that the real Sean Combs is in the grain of all

110

PA3MCOM5

those letters that you have read and what you heard from that family. That's the real Sean Combs. There is no way we can get around that consistent strain inside all those letters and inside those people's voices, inside that video of who the real Sean Combs is. And that is that person, as Mr. Steel said, before he started using drugs, that person who -- one of those characters letters wrote before he started using drugs, drugs that's not allowed around me.

When he was that person, he was focused. When he was that person, he was determined. When he was that person, he had this idealistic view of the world. That person still exists. The letters clearly say that. And the jail course, the MDC course, supports that.

I'm a big fan of consistency. At one point Sean Combs was sober, focused, determined, and doing everything to help out everybody he could. That's consistent. At some point he started using drugs. He became addicted. He started suffering trauma. He started doing bad things. We know that's what happens in this courthouse when drugs get involved, when you start using drugs. We know that's what happens. That's what happened here.

In any sentence I think the Court always asks themselves, why are we here? It's not an excuse to say that we are here partly because the man was addicted to drugs. That's not an excuse. It's not a voluntary thing. That's not an

PA3MCOM5

excuse.  There are persons we know, high end in the entertainment industry, who literary die from these drugs, and we call it a tragedy.  When Prince died of these drugs, we called it a tragedy.  When Whitney Houston died of these drugs, we called it a tragedy.  When Michael Jackson died of these drugs, we called it a tragedy.  We know that Mr. Combs flatlined off these drugs.  It was a tragedy.

Am I making an excuse?  Absolutely not.  Should he have done anything he did?  Absolutely not.  Is that part of the Court's calculation?  Absolutely it is, because it goes to the why we are here, which gets me to my next point.

It's not lip service to say that Mr. Combs has engagements after he gets out of jail.  That's not lip service, respectfully, to the government.  And to be clear, they aren't speaking engagements.  When I heard about these classes in the jail, I literally was shocked because, like Ms. Westmoreland said, it has never been done at MDC.  And I'm saying, in my 30 years of being here, and having hundreds of clients in MDC and MCC, I concur.  It has not been done and it's not like he is special.  He doesn't like me saying that.  I am saying it now.  It's not like he's special when it comes to SDNY.

We have United States senators prosecuted here.  We have had billionaire people prosecuted here.  We have had assemblymen inside MDC and MCC.  We have had legislators inside MDC and MCC.  We have had lawyers, judges, doctors.  We have

PA3MCOM5

had them all inside MDC.

But I dare anyone to tell me in the last 30 years that anyone took the time to do what that man did in that jail, and it's not because he wanted to get out and make it look like he is faking it.  Persons incarcerated see through fakeness, so that couldn't be it.  What it was was the true Sean Combs came back.  That's what happened.

The question is, my question was, what do I do about that?  So I confirmed it.  I spoke to the people at MDC.  I got on a phone call and called down to the Bureau of Prisons in Miami, and I spoke to someone in the Bureau of Prisons because these aren't speaking engagements.  I spoke to the people at the BOP in Miami.  I spoke to chiefs of police in Miami.  I spoke to Department of Corrections in Miami.  I spoke to the board of education in Miami.  I spoke to superintendents in Miami.  And I gave them all the curriculum, and I gave them all the letters.  I spoke to the lawyers of the young men inside of MDC.  And without question or hesitation, everyone said, this is something different.

The people down in Miami immediately contacted me with someone else who they use because they want to see how that can help their facility.  And then national facilities.  Why?  Because it's not just about helping himself, but it's about helping others, and that is important.  That's probably more important than helping yourself.

PA3MCOM5

Why do we do that?  Because contrary to what the government said, and I am going to say this blatantly, we do need something for him to do if he gets out today.  That's one of the questions the Court has asked.  That's one of the questions the government normally talks about in these sentencing proceedings, how does the Court know that Mr. Combs is not going to be a danger to society.  How does the Court know that Mr. Combs, if he gets out, what he is going to be doing.

So what do we do?  We answered those questions.  Not with speaking engagements, but with teaching engagements.  To continue to help those people who have been convicted of crimes who society has cast aside to get them back ready to be productive in society.  That is not speaking.  That is not some engagement that Mr. Combs is saying, hey, I want to go and make some money off these.

These are teaching engagements that we contacted folk about to see, if the Court let Mr. Combs out, we could answer that question, how does the Court know he will not be a danger to society if released.  Because he will be at Bureau of Prisons Department of Corrections sanctioned events helping out or continuing to teach those individuals to make sure that they don't recidivate, which has been of issue to the courts and to society.  That's why he is doing that, and that's the questions that must be answered.

PA3MCOM5

I say all that to say that when I think about the two people, I know who the person is. It's not I. I don't want to speak from a personal opinion. Objectively we know who it is. It's back to where he was. And when we talk about the why again, which the Court must always consider, why he came to this courthouse has something to do with drug dealing, drug use, and drug addictions. Why he came to the courthouse has something to do with his anger issues. How do we know he won't be back? It's because he no longer has those issues. What brought him to the courthouse does not exist anymore. Those are the answers to the Court's questions.

I want to close by saying this, and it's important. I grew up in Liberty City in Miami in the 1980s. Liberty City in Miami was a tough place to be. It's clear to me that when I'm standing in these courthouses often, my purpose is to inform the courts that people like myself, from places where I came up in, have a voice and supposed to be here to let the Court know that we can do it. Mr. Combs going back to Liberty City in Miami and speaking to those folk who have been incarcerated to teach them, to help them, to get them to make the right choices is nothing short of invaluable.

I know we have heard this a lot in this courthouse today about what he can do, but it's important. And to that point we, with the Court's permission, Mr. Steel said earlier, the person who will be in charge of that to make sure that he's

115

PA3MCOM5

doing that, the person who has the contracts with the Bureau of Prisons, the person who has the contract with the GO facilities, the person who has the contract with the Department of State corrections, the person who has assisted folk in their reentry to make sure that they remain compliant on supervised release, he is present.  I think Mr. Steel spoke about him earlier and would like to speak, if possible, to let the Court know that these aren't speaking engagements, these aren't entertainment.  These are purposeful.  These are intentional. They say are designed to ensure that Mr. Combs remains compliant and is doing something productive for society and for the community.

So I would ask the Court, if the Court thinks it's appropriate, to allow the executive director of Re Entry One to speak for a minute or two so the Court understands what we are talking about when we say we have a release plan for Mr. Combs, if he is released, to make sure he's in a structured environment so he is not a recidivist.  I think that's important, with the Court's permission.

THE COURT:  Thank you.

What is the gentleman's name?

MR. DONALDSON:  His first name is Giovanni.  His last name is Sairras.

THE COURT:  Let's hear from Mr. Agnifilo.

MR. AGNIFILO:  I'm ready.

116

PA3MCOM5

THE COURT:  We will hear from you.

As for the additional individuals related to reentry and to Dr. Kruger and Dr. Kaplan, as to all three, I have fairly comprehensive reports from the doctors and the letter from the reentry representative here.  If the concern on your part is that I did not regard the engagements as being purposeful, I did not have that reaction in reading the letter. So if that's the concern, then I do not need to hear --

MR. DONALDSON:  My concern, Judge --

THE COURT:  If it's going to be a minute or two, let's bring him in and hear from him.  Let's do that first.

Mr. Agnifilo, you can go next.

MR. SAIRRAS:  Good afternoon, Judge.

I'm the executive director of Re Entry One.  Re Entry One is a nonprofit organization that provides support services to those who have spent a stint of time in jail or prison.  Our organization serves about a couple of hundred people per year. And by serving these individuals we are able to promote public safety and reduce recidivism within those areas where they live.

From doing our assessments, when we come in contact with our program participants, we notice that there is a constant factor in those that have participated in constructive programming.  We noticed that once they are released, they are less likely to recidivate or reoffend.

117

PA3MCOM5

I have read some of the letters written by those that were impacted by the teachings and mentorship of Mr. Sean Combs.  And as a formerly incarcerated individual myself, I have noticed that his impact is so great that it changed the lives of those within the housing unit where Mr. Combs is housed.

Well, I know something about that because I've done the same thing.  When I was incarcerated, I created life skills and mentorship programs that impacted the lives of those within my housing unit and within the institutions where I was housed.  I can say that since my release many years ago, I have impacted the lives of thousands of individuals who are formerly incarcerated and their families.  And, your Honor, because of this, we have been able to change the narrative.

Now, I know this is a very sensitive topic and subject to talk about for myself because I've been where Mr. Combs is, and what I can say is that when an individual has the willingness to create his own life skills and entrepreneurship programs, in spite of the fact that he is going through these legal challenges, demonstrates reform and rehabilitation.  I know because that was me many years ago.  And since my release, as I stated earlier, not even a parking ticket, your Honor, not even a parking ticket.

And the many families and formerly incarcerated individuals that depend on our programs and services, I speak

PA3MCOM5

within various correctional facilities, state and federal.  I work with the federal care court program, and we work with probation.  Your Honor, I also speak at many different functions hosted by the private prison operators that we work with.

And, Judge, I would just like to say that when I see the smiles on these people's faces, when I hear -- when I see the just thank you for changing my life, I saw the same sentiments within those letters that was written about the work that Mr. Combs is doing at MDC.

And I like to also highlight this, your Honor.  When I read those letters, it brought me back.  What Mr. Combs is doing has reignited a spark within me to start doing more, because if an individual like him, undergoing his own personal legal battles, if he can put the -- his personal needs to the side and just think about others speaks volumes.  I believe that Mr. Combs has shown that he's an asset to those individuals within his housing unit, and he has also become an asset to the government because the programs that he's teaching promote rehabilitation and reform.

Similarly, it's something that we do inside of correctional facilities when I speak about my personal experience to the youth and young adults and other individuals who feel that there is no hope for them, those that are in despair.  And your Honor, as I've been told by wardens and

119

PA3MCOM5

other staff members at these correctional facilities, that, Mr. Sairras, you are a great asset, not only to the organizations that you work with, not only to the community members, but also to the state and Federal Government.

Judge, I'm speaking to you today as someone that is a formerly incarcerated individual who has created similar programs like that of Mr. Combs' program, and that these programs helped me with my own rehabilitation and reentry back into society, and our organization is also eager to work with Mr. Combs in the same way. We have already established several teaching engagements within various correctional facilities and also within marginalized communities, those communities that we serve that are in need of Mr. Combs' teachings and his wisdom.

Lastly, your Honor, our organization's mission is centered within the principle that those who are closest to the problem are normally closest to the solution. And by employing individuals with the lived experience of incarceration, we have not only personally and professionally -- I have not only personally and professionally experienced levels of success that other organization have not seen, because they don't employ returning citizens, they do not utilize their lived experience to connect and communicate with others who are undergoing their own legal challenges.

Your Honor, Mr. Combs, working with our organization, speaking in the community, and connecting with folks within the

PA3MCOM5

corrections system will prove invaluable to correctional employees.

Mr. Combs, from what I've read in those letters, he has been able to bring together individuals who were warring inside of that jail.  This is what we have been able to do in our local area within the jails and the other facilities that we dispense our programs.

Your Honor, to close with this.  When you have someone who has gone through all of this stuff, all of these legal challenges, your Honor, when you have someone that was on high and has fallen from grace and realized the mistakes that they have made, and has gone beyond just their personal calling, but to incorporate other individuals within their thoughts and within their prayers, your Honor, that shows rehabilitation and reform.  And from my personal and professional experience, when individuals are involved in that way, they are not only less likely to reoffend and recidivate, but, most of all, they have become an invaluable asset to not just state and Federal Governments, but to their families and the communities that they serve.

THE COURT:  Thank you very much.

MR. SAIRRAS:  Thank you.

MR. AGNIFILO:  Your Honor, it's getting late in the day.  I am going to be very brief.

I am going to try and give the Court a perspective.

PA3MCOM5

We are asking for a lot.  We are asking for a 14-month sentence.  And in a very short amount of time I want to try and give the Court some reasons to believe that that is the right sentence.

About 30 years ago, Kings County did something that had never been done before.  It created a domestic violence court.  It had never been done.  It's the first one in the country.  And what we started to see -- and I think the reason for this, just taking a quick step back is, I started in the Manhattan DA's office in 1990.  In 1990, the only option we had was to put people in jail.  There really was no other option.  There were over 2,000 murders a year.  There were over 44,000 assaults in 1990.

Somehow we got our arms around the problem and, by 1996, things were starting to get better, and something called the Center For Court Innovation started.  And studies were done.  John Jay did a lot of studies.  We have some of the studies referenced in our principal memorandum, I think, at around pages 50 and 51.  But there are dozens and dozens of studies.

And what the studies indicate is that domestic violence tends to come from childhood trauma, from psychiatric issues, and there has been so much -- your Honor has been exposed to all of this.  Your Honor has seen it in the PSR.

Let me just say, I am always amazed at the quality of

PA3MCOM5

the presentence investigation reports being done in this district and other districts. Mr. DiMaria, our probation officer, who wrote this PSR, at paragraphs 195 to about 198, goes through all of the psychiatric records and it's masterful. What he basically does in three lengthy detailed paragraphs probably saves me quite a bit of time, which is why I can be brief about this. But it's very clear that Sean Combs has genuine psychological challenges.

Just very quickly, in 2014, 2017, and 2020, he reported to three different doctors that -- and those doctors found that he had posttraumatic stress disorder. What was the stressor? We don't really know. We know he grew up without a father. We know, as has been said, I am not going to belabor the point, his father was murdered when he was a baby, practically.

We know that, in the interest of kind of keeping him safe from this information, and I think this is common, the family didn't tell him how his father died. But because he was a young man in Harlem, he kind of picked up that information sort of from the street. And I think it is an interesting sort of peek into his psyche.

And he gave a commencement address at Howard University. I think it was 2014. And what he said was, as soon as he got away from his family, he was at Howard, he went to the microfilm and he put in his father's name. And he says

PA3MCOM5

this in the commencement speech.  Because he wondered and he wondered.  And he saw that Melvin Combs was murdered as part of a drug deal gone bad, essentially.

And so where does the trauma come from?  We don't really know, and I don't know that we need to know, but not having a father, having the, I suppose, anxiety, the unsettled questions, the burning questions of, why don't I have a dad?  Where is he?  I don't know that I trust the information that I'm getting about it.  Obviously, it stayed with him.  And the first thing he did when he went to Howard is to check the microfilm to see what happened to his father.  Maybe that's the trauma.

But what's clear is he had posttraumatic stress disorder.  He also had major depressive disorder.  He was diagnosed with that.  He had major anxiety disorder.  He was diagnosed with that.  So that's the first component.  We will say mental health challenges.

What goes along with that?  Your Honor sat through the eight-week trial.  Has drug use was overwhelming.  I think at one point Cassie said that he was addicted to painkillers.  She too was addicted to painkillers.  There are benzodiazepines that he is being prescribed.  The medical records in the PSR, again, is very fulsome with all of that.  I don't need to go through all that.  We have mental health challenges and we have drug addiction and abuse, and we have domestic violence.

PA3MCOM5

What started to happen in the New York courts in 1996, and it was a gradual thing, is that they started to develop something called problem solving courts.  And problem solving courts had a different mission than the typical New York Supreme Court, New York Criminal Court.  It was basically to try and take a situation and make it better.  That's really what it was, solving a problem.  There is a problem and let's try and solve it.  And the solution to the problem, not that it didn't involve incarceration, but we already have that.  So they were trying to find other ways of solving the problem, and resources were devoted to this and we learned more.  And I think we became more enlightened about what works and what doesn't work.

And one of the things I think worth noting is, there was a tremendous reduction in crime in the City of New York between the early '90s and the mid 2000s.  And that's for a lot of reasons, but part of it is that we started addressing the core problems of why are people violent and how do we solve that problem.

And we have a problem we need to solve here, and that's really what I'm going to talk about.  In less than five minutes I am going to sit down, give it back over to Ms. Slavik, and then I think it would be fair if Mr. Combs has the final word.  But I am not going to belabor all these points.

PA3MCOM5

My wife, who is in court, started the Manhattan mental health court in 2011.  And by then it was sort of picking up speed.  And what we saw was that these were situations that could be treated; not so much through punishment, not by punishing force with force, but by punishing drug addiction, mental health, domestic violence with treatment, with understanding.  And something started to develop, and it was called the integrated domestic violence courts.  And I think there are at least 60 of them in the different counties and there is -- there is one in New York, New York County.  It's an IDVC.

And the idea was, we need to basically have a situation where one court can understand the totality of the situation, which is, so much of what we are throwing at your Honor today -- your Honor has heard it from every angle.  And the idea is, one judge hears from the prosecutor, hears from the purported victims, hears from the family, as your Honor has today, so one court has all of this data because it affects everybody, because your Honor's decision today and the path forward affects Mr. Combs' children directly.  It affects the people who wrote victim-impact letters to your Honor.  It affects everyone.  And so the motto was, one family, one case, one judge, and you are our judge.  And so here is one view of a solution forward.

I know it's a lot to ask that your Honor release him,

PA3MCOM5

but he has been punished.  He has been punished in maybe one of the most public ways I can think of anyone being punished in 35 years of doing this.  The raid at his homes, his children, some of you who you met today, were held at gunpoint.  That's punishment.  And it's punishment that this all happened on such a grand public stage.

We are all social beings.  And I think probably what so many of criminal defendants yearn for is, I just don't want too many people to know.  I told my wife, I told my kids.  I don't want anyone else -- well, everybody knows.  Everybody knows every twist and turn in this case, and that is a form of deterrence.  It's a form of specific deterrence.  It's a form of general deterrence.

At the end of the day, Mr. Combs couldn't get out of jail.  We made a bail application.  He stayed in.  That's a form of general deterrence.  The publicity that he got is a form of general deterrence.  This is all probably one of the greatest general deterrence cases I can ever imagine because everybody knows what happened to Sean Combs.  And what happened to Sean Combs is just immensely destructive in every way.  I think Ms. Ventura said on the witness stand that her lawsuit alone destroyed his businesses.  She said -- I think her answer was:  That's fair to say.

Everything is just ruined.  His family is together and they love each other and they care for each other, but as he

PA3MCOM5

said, they need their father.  This has been just a devastating destructive case for this man on the largest of stages.

So I don't know that we need any more of a sentence to achieve the very important and statutorily mandated factor of general deterrence.  General deterrence is important.  It's something I know the Court is going to think about, because it's in the statutes, in 3553(a).  But I think that this case has shown there is tremendous general deterrence because of the publicity.  Mr. Combs was treated, I am going to use neutral words, in a very stern, punishing fashion, and the world knows all of that.

How do we go forward from here?  How we go forward from here is, I think your Honor has all the tools that the Court needs.

If your Honor looks at the PSR on page 76, there are a number of conditions that I think are all very important for what we need to try and accomplish here today.

There is mental health treatment.  I think that's a very important condition.  It's in the PSR for good reason.  I think anything that your Honor does going forward, Mr. Combs needs meaningful mental health treatment.

A domestic violence program.  What the two doctors that we have attached sealed reports to the Court say is that when it comes to domestic violence treatment, sometimes group programs are the best, having, for the most part, men, but I

PA3MCOM5

suppose it could be women too, having people in a group talking about sort of their shared experiences, and that's in the medical report and that's also in the PSR at page 76.

Drug program. I think drugs are very much at the heart of this. I think it is essential that Mr. Combs not return to illegal drug use. And so I think a fair condition, as we move forward, is that we have him only take things that are prescribed by a medical doctor or any medical health professional, but that's it. He has to be tested in that regard. And that is serious. This is getting to the heart of the problem.

I note that October is domestic violence awareness month. So here we are in a case that probably has put domestic violence in the forefront of people's minds, maybe more than any other case.

And I'm asking your Honor to do something serious. I'm not asking for a light sentence. I'm asking to get to the root problem. And the root problem is his mental health, and there is just a demonstrated history of that. This is not just his lawyers talking. This has been going on for years and years.

Obviously, there is domestic violence and there is tremendous drug use. These things can all be addressed in the same way. We don't have to resort to early 1990s methods. We have learned a lot since then. We have learned a lot about how

PA3MCOM5

these things work.  We have learned a lot about how to treat these things.  And it works.

Crime has gone down because I think that we have gotten enlightened.  We have gotten smarter.  We have used research, and we have relied on places like the John Jay Institute of Criminal Justice to do studies for us.

I know we have thrown so much your Honor's way.  I am going to sit down in two minutes, so this is probably the last thing I say to you.  I'm really so grateful for the time that your Honor has devoted to the case, your Honor's -- 300 something pages and all the other studies and whatnot we gave you.  Thank you so much.

If your Honor has any questions, I'm free to answer them, obviously, but at this point I want to turn it over to my colleagues with the government, and I think it's only fair that Mr. Combs has the last word.  Thank you, Judge.

THE COURT:  Thank you.

Ms. Slavik.

MS. SLAVIK:  Yes, your Honor.  I'll be brief.  There are just a couple of things that I wanted to respond to in the defense presentation.

Taking us back a couple of hours to Mr. Driscoll's presentation, I think that presentation really makes clear how much of an individualized exercise sentencing is, and specifically how differently situated the defendant is from

PA3MCOM5

many other Mann Act cases.

Just as an example, in Defense Exhibit 68, the highest total offense level in that chart is 20.  The defendant here is at 27.  Also in that chart only two of the cases went to trial, as far as we can tell, and here we have an eight-week trial record.

The other thing is, for every case that Mr. Driscoll cited that involved violence in some way, there are more cases, many of which are included in the government's submission, with very significant sentences, 120 months, 135 months, 180 months.

And, yes, many of those cases do apply the cross-reference, but the point of the cross-reference, the reason that the cross reference is even applicable is because it accounts for the abuse and the violence present in those cases.  And we have the exact same facts here.  We have the abuse, we have the violence that, respectfully, warrants a high sentence.

The other thing I'll say just generally is that 3553(a)(6) is, of course, one sentencing factor that the Court has to consider.  But the Second Circuit has specified that the district court has discretion to weigh those factors differently.  So in a case like this, where there aren't many comparators, the Court need not afford significant weight to that factor.

I want to just focus a little bit on the Jordan case

PA3MCOM5

again.  Mr. Driscoll emphasized that that case was different because there was criminal history in that case for similar conduct.  And, yes, that is correct.

But I just want to zoom out and bring the Court's attention to why that criminal history is relevant.  Why is that important?  In other words, why did Judge Cronan consider that criminal history that was unaccounted for in the guidelines range?  I think the answer to that is that because the defendant was punished for similar conduct previously, it means that what he knew -- what he was doing, he knew it was wrong.  And we have that here.  The defendant very clearly knew that what he was doing was wrong and illegal, and he did it anyway for 15 years.

Another important factor in that case to Judge Cronan was that the defendant there, Jordan, quit the business before he was prosecuted, and that is obviously not the case here. Even here, even when the defendant was under federal investigation, he continued to commit crimes.

And, yes, Jordan was a pimp in the classic sense, but really what are pimps?  Pimps exploit and control their victims.  That's what the defendant did here.  There was significant money involved in this case too, albeit in a different way.  Mr. Driscoll asked how many commercial sex acts would $1.4 million cover?  That was the amount that the Jordan defendant profited from the prostitution business.  And in this

PA3MCOM5

case, where escorts were paid, conservatively, around $5,000, and there were usually three escorts per freak-off, $1.4 million would cover 94 freak-offs.  The similar charts that the government entered into evidence here, that included 117 freak-offs, so the amount of money -- and that, of course, was underinclusive.  The amount of freak-offs in those charts was underinclusive.  So the amount of money here is very significant as well.

Mr. Driscoll challenged the government to find text messages showing verbal abuse, like the text message that he cited from the *Nabit* case.  There were dozens of text messages showing verbal abuse.  I think many of them were entered into evidence at trial.  But this case involves more than just verbal abuse.  It involves physical abuse.  And that physical abuse is on video.  I'm speaking of the Intercontinental video, of course.  The production quality of the Intercontinental video is obviously much different from the video that the defense played before lunch.  It's pixilated.  The picture sometimes jumps.  There is no musical overlay.  But it shows the defendant for who he is when he doesn't realize that the cameras are rolling.

The defendant is a master puppeteer of his own image. He uses his wealth and power to convey a very specific image to the world, but that image is incomplete and it's misleading.

We saw this same dynamic at play at trial in an

PA3MCOM5

Instagram video that the defendant released after the Intercontinental video was leaked publicly, and in that video he claimed that he had hit rock bottom and that he was a changed man.  But for months after that, for months after he claimed to be a changed man, he continued committing crimes.  He continued violating the Mann Act.  He viciously assaulted Jane.  He had drugs in his hotel room when he was arrested.  He was not a changed man then, and, despite what he says now, he's not a changed man now.  You can't trust his words.

Unfortunately, what this case shows is that despite what the defendant was projecting publicly, behind closed doors, when cameras were off, he wasn't helping others.  He was exploiting and violently abusing them.  The defendant's comments about being a model for others is also worth commenting on.  Consider how the defendant could model now what true remorse looks like.  Consider how he could credit and apologize to his victims.

Five attorneys just spoke for the defendant now and really the only time that they mentioned any of the defendant's victims in any sort of meaningful way was when Mr. Steel just spoke at length about how Cassie wanted it.  That's untrue and it's offensive.

The defendant has modeled disdain for his victims, disrespect for this problem of justice, and a complete lack of accountability.

134

PA3MCOM5

Ms. Westmoreland emphasized the defendant using his success to help others, that he had the ability to change countless people's lives.  I want to read the words of one person whose life the defendant changed.  Sean Combs used violence, threats, substances, and control over my career to trap me in over a decade of abuse.  I spent the last seven years of my life slowly rebuilding myself, physically getting clean from the drug abuse Sean Combs forced and encouraged, and mentally understanding how to live with a seemingly insurmountable level of trauma.  The horrors I endured drove me to have thoughts of suicide, ones that I almost followed through on, if not for my family's intervention and urging that I seek professional care.  I still have nightmares and flashbacks on a regular everyday basis and continue to require psychological care to cope with my past.  For over a decade Sean Combs made me feel powerless and unimportant, but my experience was real, horrific, and deserves to be considered.

Your Honor, it's unfortunate that the defense's tactics resulted in a victim no longer feeling comfortable to address the Court in person today, but the Court has several letters from several victims.  And the Court has heard firsthand from some of these victims at trial, sometimes in moments of excruciating testimony.

We ask that the Court take into account these experiences in addition to all of the other 3553(a) factors in

PA3MCOM5

imposing a significant sentence here.

THE COURT:  Thank you, Ms. Slavik.

If there is no one else, Mr. Combs, you do not need to say anything, but if you'd like to be heard, I am here to listen.

MR. STEEL:  Your Honor, can I ask the Court a question.

THE COURT:  Yes.

MR. STEEL:  Mr. Combs and others, can we take a brief comfort break before Mr. Combs speaks?

THE COURT:  Absolutely.  We will take a 10-minute break.  We will come back at 4 p.m.

(Recess)

(Continued on the next page)

PA3ACom6

THE COURT:  Please be seated.

And, Mr. Combs, take your time but whenever you are ready, if you would like to speak, I'm happy to listen to you.

THE DEFENDANT:  Okay.  Thank you.  Give me one minute.

I want to thank you for giving me the chance to finally speak up for myself.  One of the hardest things that I've had to handle is having to be quiet, not being able to express how sorry I am for my actions.  I want to personally apologize again to Cassie Ventura for any harm or hurt that I've caused to her emotionally or physically.  I don't take that lightly.  I would like to apologize to her family.  I'm so sorry.

I would like to apologize to Jane.  I didn't mean to hurt you.  I'm sorry that I brought you into my mess.

I also want to personally apologize to all the victims of domestic violence, because I know that that video, that disgusting, despicable video, triggered a lot of people all around the world.

Domestic violence will always be a heavy burden that I will have to forever carry.  My actions were disgusting, shameful, and sick.  I was sick.  Sick from the drugs.  I was out of control.  I needed help, but I didn't get the help.  Because of that, I can make no excuse.  I could really make no excuse because, because I knew better.  My mother raised me better.  I was taught better.  My faith taught me better.

PA3ACom6

I got lost in my journey of life.  I'm not this larger than life person.  I'm just a human being.  And I be trying my best.  I got lost in the excess.  I got lost in my ego.

And because of my decisions, I lost my freedom.  I lost the opportunity to effectively raise my children and be there for my mother.  I lost all my businesses.  I lost my career.  I totally destroyed my reputation.  But most of all, I lost my self-respect.

I been humbled and broken to my core.  I hate myself right now.  I been stripped down to nothing.  I really am truly sorry for it all, no matter what they say.

I want to apologize to my seven children, Quincy, Justin, Christian, Jessie, D'Lila, Chance, Love, I failed as a father.  I'm so sorry.  Y'all deserve better.

To my mother, mommy, I failed you as a son.  I'm sorry.  You taught me better.  You raised me better.

I know to whom much is given, so much is expected.  I know I failed my community.  Growing up as a kid, I just wanted to be a shining example of what we could do.  When I say we, we as people of color, that we could own our own businesses, take care of our own communities, raise our own children, solve our own problems, create our own wealth, take care of our own problems.  And that was my mission.  And I got lost.  I'm not this bad person.  I'm sorry to my community for letting y'all down.

PA3ACom6

I want your Honor to know that if given a chance, people can change. I know I've changed. I know this because there's events -- there's sometimes something can happen in your life that no matter who you were before, what you were going through, you get so shaken that it just changes your trajectory. It just changes you. And it changes you for the better. Sometimes you have to go through life experiences.

These are not excuses. I know that I've been changed for the better. I can't change the past, but I can change the future. I ask your Honor for mercy. I beg your Honor for mercy.

I ask your Honor for a chance to be a father again. I ask your Honor a chance to be a son again. I ask your Honor for a chance to be a leader in my community again. I ask your Honor for a chance to get the help that I desperately need to become a better person. Because I don't want to let God down. I don't want to let my family down. They need me. I let them down. They don't have no other parent. They're scared. I'm scared. And I have nobody to blame but myself.

I know I'll never put my hands on another person again. I know that I've learned my lesson. I'm willing to comply with any conditions the Court puts upon me. Given a chance, when we talk about the possibility of me sharing my story, it's not for a scheme to try to get less time. It's that this story is real. This story is tragic. And if there's

PA3ACom6

any way, I don't have nothing else.  I have my family, and that's all I need.  I don't care about the fame or the money or making records or performing.  If there's a chance for me to go into, and touch some kids and touch some inmates that have lost hope.  I feel like if your Honor gives me a chance by sharing that story, that this will have a positive outcome.  This will have a healing effect.  So that at least I could help one person for not ending up like this.

I want to say thank you to the jury.  And, your Honor, your Honor gave me the confidence to believe in the jury and to believe that I didn't have to testify.  And the jury came and they sacrificed their time, eight weeks in the summer.  Sacrificed time with their children.  And they weighed the evidence.  And I thank them for the not guilty verdicts.

And I don't take lightly my Mann Act conviction.  I understand the severity of it, and I'm having to deal with the consequences.  And I take full accountability and responsibility.

Your Honor, I know that the prosecution wants you to make an example of me.  I just want you to think about making an example of what a person can do if they get another chance.  If you give me another chance, I won't let you down.  And the evidence of that are those beautiful children that got up there and spoke for me.

Thank y'all.  I love y'all so much.  Proud of y'all.

PA3ACom6

I would never, ever, ever jeopardize being in this situation again, being away from my family that needs me. That's my deterrence.  I don't think nobody wants to come and be in this position.

No matter what anybody says, I know that I'm truly sorry for it all.  Thank you.

THE COURT:  Thank you, Mr. Combs.

Let's take five minutes, and we'll come back.

(Recess)

THE COURT:  Please be seated.

So at the outset, I just want to make clear that, Mr. Combs, you're being sentenced for the offenses of conviction, the Mann Act charges here and not the 1591 sex trafficking charge and not the RICO charge that you were acquitted of.

However, the statute that the Court is required to follow when sentencing any defendant, 18, U.S.C., Section 3553(a), requires the Court, it says:  The Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.  And that's what the Court is required to do.

And as the Court previously noted, in Section 18, U.S.C., Section 3661, Congress further made clear that no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an

PA3ACom6

offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence, and the Court has followed those dictates from Congress.

As mentioned, under 18, U.S.C., Section 3553(a), the Court is required to consider the nature and circumstances of the offense and the history and characteristics of the defendant.

Mr. Combs, I've considered the fact that you are a self-made artist and businessman who has innovated, inspired and lifted up communities, including communities of color worldwide.  The Court agrees with the defense and Ms. Westmoreland that your work history, impact on the black community, and entrepreneurship are celebrated and iconic. That's especially impressive given the early violent death of your father and the trauma that that must have left.  You have donated your time and millions of dollars to benefit worthy causes, including providing schooling for underprivileged children in New York City.  And we saw that in the video.  And that is commendable.

Your development of the Free Game course for inmates while at the MDC is impressive, and the Court hopes that you will continue to work with those who are incarcerated and expand on that curriculum.

There is no doubt that you are devoted to your family, including your mother, your children, your sister, your nephew.

PA3ACom6

And the Court of course considers all the collateral consequences of your incarceration and your conviction, including all of the things that Mr. Donaldson mentioned, including the impact of any sentence on your family, including your mother and your children.

The Court also notes that you have had problems with addiction, and the Court is glad to hear that due to your incarceration, you are on the path to beating those demons.

The Court also understands that these drugs may have exacerbated your erratic and violent behavior over the years.

However, the Court has to consider all of your history here.  And with respect to the freak-offs and hotel nights and your relationships with Ms. Ventura and Jane, the Court rejects the defense's attempt to characterize what happened here as merely intimate, consensual experiences, or just a sex, drugs, and rock and roll story.  A history of good works can't wash away the record in this case, which showed that you abused the power and control that you had over the lives of women you professed to love dearly.  You abused them physically, emotionally, and psychologically.  And you used that abuse to get your way, especially when it came to freak-offs and hotel nights.  The defense's argument that all of this was unrelated to the offense conduct in this case doesn't hold up.

The evidence of the abuse in connection with freak-offs and hotel nights is massive.  I was sitting right

143

PA3ACom6

here for the testimony from Ms. Ventura and from Jane.  We read about it in text messages and e-mails.  We saw it in the images of gashes, bruises, broken doors, and we saw the video of your savage beating of Ms. Ventura.

This was subjugation, and it drove both Ms. Ventura and Jane to thoughts of ending their lives.  That is the reality of what happened.

With that, we move to the Court's obligation to impose a sentence that is sufficient but no greater than necessary to accomplish the goals of sentencing set forth in subsection (a)(2).  First, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

These were serious offenses that irreparably harmed two women.  Physical harm, emotional harm, and again, psychological harm, the effects of which continue to this day.  You plied Ms. Ventura and Jane to drugs, forcing Ms. Ventura to opioid addiction, which she struggles with even today.  The conduct occurred for over a decade and with tremendous frequently over that time period.  Why did it happen so long?  Because you had the power and the resources to keep it going, and because you weren't caught.  And you paid for and organized these acts.  You were no John.  You were more than that.  Even if your currency was satisfying your sexual desires, instead of money.  But the coercion was the same, if not worse.

PA3ACom6

The Court next considers the requirement to afford adequate deterrence to criminal conduct.  Both specific and general deterrence here require a significant sentence.

As for specific deterrence, while you have said here in court, and I've read it in your letter, that you're sorry, you won't do this again, one thing strikes me in particular.  After Ms. Ventura's civil lawsuit had been filed, detailing many of the things she testified about here in court, after the government had executed search warrants on your residences, after the brutal video of the 2016 beating had been made public, and just one month after you issued your Instagram apology where you said many of the things you said here today, you had another hotel night where you brutally assaulted Jane.

As the government describes it, you kicked down five doors in Jane's home, lifted her off the floor by her neck in a chokehold, punched Jane in her head, kicked Jane's body, dragged Jane by her hair, and slapped Jane so hard that she fell down.  Jane creditably testified to those things.

According to her, you said the following:  Take this fucking pill.  You're not going to ruin my fucking night.  You better go out there.  You're not going to ruin my fucking night.  Get out there.  Suck his dick.  Fuck him.  I don't care.  Just you're not going to ruin my fucking night.  You asked Jane, mockingly, is this coercion?

Clearly deterrence is a key consideration.  And the

PA3ACom6

Court is not assured that if released these crimes will not be committed again.

The Court has considered everything that it has heard here in the courtroom and the materials submitted about programs that Mr. Combs would engage in and has considered the analysis of Dr. Krueger and Dr. Kaplan.  But those are outweighed by the entirety of the trial record in this case, which the Court was here for, for eight weeks.  And the Court saw the testimony and saw the messages and saw the evidence.

The need for general deterrence also warrants a significant sentence.  These acts of sexual violence are unfortunately commonplace.  A substantial sentence must be given to send a message to abusers and victims alike that exploitation and violence against women is met with real accountability.  Victims who have the courage to report their abusers and relive the excruciating trauma of that abuse by testifying in court should see that their efforts can result in meaningful accountability.  That promotes respect for the law, furthers just punishment, all the values that we're supposed to serve today.

In terms of the interest to protect the public from further crimes of the defendant, for the same reason, a meaningful sentence is necessary to protect the public from further crimes.

In terms of providing the defendant with needed

PA3ACom6

educational or vocational training, medical care, or other correctional treatment in the most effective manner, the Court, again notes that there are the reports from the doctors, and the Court has considered those in determining what the appropriate sentence would be.  But again, there are other factors that militate in the opposite direction.

The Court has also considered the factors in Section 3553(a)(3) through (7), including in particular the guidelines range and the need to avoid unwarranted sentencing disparities.

Weighing these factors, the Court reaches a few conclusions.  First, the sentence that the government proposes, 135 months, would be more than necessary to comply with the purposes in Section 3553(a)(2).

The statute requires parsimony when sentencing defendants, and the Court is not allowed to impose a sentence that is more than necessary to achieve the purposes of sentencing.  The Court agrees that a serious sentence is warranted that reflects the aggravating factors that I have addressed.  The profound impact on Ms. Ventura and Jane, the time span, over a decade, during which these acts of prostitution occurred, the fact that these offenses occurred with intimate partners, the evidence of physical violence, and the coercion.  But a sentence of over 11 years, over the statutory maximum of the sentences on these offenses ran concurrently is not reasonable.

PA3ACom6

The Court observes that in the exhaustive data provided by the parties, while there are some cases with sentences in the range urged by the government, most of these cases involved defendants with more extensive criminal history scores, and they also involved things like murder, minor victims, an expansive prostitution enterprise with numerous victims and the like.

Even the probation department, which took special care to evaluate the aggravating factors here, including noting that the impact that this case has had on Ms. Ventura and Jane are paramount concerns, recommends a sentence less than half of what the government proposes. The government's recommendation also takes no account of Mr. Combs' mitigating circumstances, such as his lack of recent criminal history, his family ties and ties to the community, his substance abuse, and mental health history, which the Court has considered.

On the other hand, the defense's proposal of a 14-month sentence, effectively a sentence of time served, would not be sufficient to comply with the purposes set forth in the statute, which is the other part of the parsimony requirement. Just as the government's proposal does not account for the mitigating factors identified by the Court and the probation department, the defense's proposal does not adequately account for the aggravating factors: The severity of the conduct at issue, the violence, the drugs, the coercion, and the

PA3ACom6

devastation that it caused to Mr. Combs' victims.  The defense's proposal is insufficient to satisfy the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence among others.

Here, the data shows a wide variance of sentences below the outlier cases in the range of the government's proposal.  And as the government observes, every case has to be evaluated on its own facts and circumstances, and the facts and circumstances of this case are unique.

Weighing all the relevant factors and considering the evidence that the Court heard at trial, and the information provided by the parties and the probation department, the Court determines that the sentence sufficient but not greater than necessary to comply with the purposes set forth in 18, U.S.C., Section 3553(a)(2) is a sentence of 50 months of incarceration.

This is a serious sentence that reflects the gravity of your crimes and conduct.  This is hard time in prison away from your family, friends, children, and your community.  But you will have a life afterward and it provides you with a path toward rehabilitation.  The Court notes that this sentence matches the sentence recommended by the probation department, which also comprehensively evaluated the facts here.

I will now state the sentence I intend to impose, but the attorneys will have a final opportunity to make legal

149

PA3ACom6

objections before the sentence is finally imposed.

The defendant will be sentenced to a term of 50 months of incarceration.

Mr. Agnifilo, is there a recommendation as to facility?

MR. AGNIFILO:  Your Honor, if it's okay with the Court, can we get that to the Court by Monday so we can sort of discuss now in light of the fact that there's a specific sentence that we know about?

THE COURT:  Yes.  There will be a recommendation included that will reflect what you provide to the Court.

MR. AGNIFILO:  That's right.

THE COURT:  The Court imposes the minimum term of supervised release of five years.  No objections have been raised as to the conditions of supervised release.

Are there any objections to the conditions?

MR. AGNIFILO:  No, your Honor.

THE COURT:  The Court will impose the mandatory standard and special conditions of supervised release as stated on pages 73 through 76 of the presentence report.

Does the defense waive the public reading of those conditions?

MR. AGNIFILO:  We do.

THE COURT:  As indicated in the presentence report. As to the search condition, this is justified by the nature and

PA3ACom6

circumstances of the offense, as well as the history and characteristics of the defendant, and the protection of the public, deterrence, and to prevent recidivism as stated in the PSR.

As to the no contact provision, again, this is supported by the nature and circumstances of the offense and protection of the public, deterrence, and to prevent recidivism.

As to access to financial information, given that there is a forfeiture obligation and a fine, and given the circumstances of the offense, this condition is warranted.

The outpatient treatment and outpatient mental health treatment programs are warranted based on the nature of the offense and the nature and characteristics of Mr. Combs concerning his mental health and substance abuse issues.

And I think I might have misspoke earlier.  I think I said that -- the Court's sentence is 50 months.  I think I might have said that this was the same as the PSR, the probation's sentence.  It's ten months less than the probation sentence.

MR. AGNIFILO:  Yes, Judge.

THE COURT:  Just to make that clear.

The Court imposes a fine of $500,000, the maximum provided for each count of conviction.  The Court has considered the factors under Sections 3553(a), 3571, and 3572,

PA3ACom6

as well as the guidelines factors and range.

The maximum fine is warranted based on the need to reflect the seriousness of the offense and provide just punishment, provide for deterrence, and is justified in light of the defendant's immense financial resources, the lack of any financial burden, no other restitution obligation, and the cost to the government of Mr. Combs' imprisonment and supervised release.

This is an upward variance from the guidelines, but is warranted given the guideline does not adequately reflect the severity of the defendant's conduct nor the defendant's immense resources, which enabled his crimes.

There is no restitution.  The Court orders forfeiture of property used or intended to be used to commit or facilitate the commission of the offenses charged in Counts Three and Five of the indictment as reflected in the consent preliminary order of forfeiture, which is incorporated into this sentence.

There is a special assessment of $100.  There is also a special assessment of $5,000 under the JVT Act of 2015.

Do counsel know of any legal reason other than those already argued why the sentence should not be imposed as stated?  Ms. Slavik?

MS. SLAVIK:  Your Honor, I believe the special assessment should be $200 given that there are two counts of conviction.

PA3ACom6

THE COURT:  Very well.

Any objection, Mr. Agnifilo?

MR. AGNIFILO:  No, your Honor.

THE COURT:  All right.  The special assessment is $200.  Thank you.

Ms. Slavik, anything further?

MS. SLAVIK:  No, your Honor.

THE COURT:  Mr. Agnifilo?

MR. AGNIFILO:  Nothing.

THE COURT:  And there are no open counts.

Mr. Combs, you have the right to appeal your sentence. If you are unable to pay the cost of an appeal, you may apply for leave to appeal *in forma pauperis*.  You may also apply for court-appointed counsel.  The notice of appeal must be filed within 14 days of the judgment of conviction.

To both sides, is there any other objection that you have that I have not addressed?  Ms. Slavik?

MS. SLAVIK:  No, your Honor.

THE COURT:  Mr. Agnifilo?

MR. AGNIFILO:  No, your Honor.

THE COURT:  Is there anything else that either side would like to raise before the Court offers some final words to the parties?

MS. SLAVIK:  Not from the government.  Thank you.

MR. AGNIFILO:  Nothing, your Honor.  Thank you.

153

PA3ACom6

THE COURT:  All right.  Thank you.

I want to speak first to the strong women who came forward to tell the world their stories.  Horrific stories, but stories of courage.

Ms. Ventura and Jane, you've been through abuse and trauma that most of us can't imagine.  As Ms. Ventura says, the defense's narrative that her relationship with Mr. Combs was a "great modern love story" is false.  These are her words:  Nothing about this story is great, modern or loving.  This was a horrific decade of my life, sustained by abuse, violence, forced sex, and degradation.

To Ms. Ventura and the other brave survivors who came forward, I want to say first, we heard you.

As Ms. Ventura points out, because of the testimony of the women in this courtroom, these horrible acts were made public.  And it's not something, Mr. Combs, that you will ever be able to wash away.  You will forever be associated with them.

So to Ms. Ventura, Jane, and the other victims who testified here, for coming forward, I can only say that I know your families are proud of you, and your children, when they are old enough, will be proud of you.  And I am proud of you for coming to the Court to tell the world what really happened.

You weren't just speaking to the 12 folks in the jury box.  You were speaking to the millions of women out there who

PA3ACom6

have been victims but who feel invisible and powerless and have had to suffer in silence. You gave them a voice. You stood up to power. It's not easy. You told those women and the world that violence behind closed doors doesn't have to stay hidden forever. The number of people who you reached is incalculable. There are millions of survivors out there. Most of those people will never speak up about their abuse. The consequences are often tragic, as they were in this case.

I know you still bear the trauma of what happened to you. You likely always will. But what you've taught us here by coming forward is that even if you were a victim, you don't always have to be. Your strength in coming forward are an example for us all.

Nothing about this case was good. Nothing. Except for the victims who came forward. As Dr. King taught us, "out of the mountain of despair, a stone of hope." Thank you for your courage.

Turning to Mr. Combs, I know you feel like you're in a dark place right now, but these crimes were serious ones, and your violence, coercion, and abuse have had devastating consequences for the women involved, women who loved and depend on you. From Ms. Ventura: "The horrors I endured drove me to have thoughts of suicide — ones I almost followed through on." "What he did to me is always present, but I am slowly learning how to live my life free of the fears and horrors I endured."

PA3ACom6

But, Mr. Combs, you and your family, you are going to get through this.  There is a light at the end of the tunnel. These letters, all those letters that I saw, show that you have a universe of people who love you.  Let them lift you up now, just like you've lifted them up for so many years.

Your mom writes that you have "always been a loving and caring son."  Your sister Keisha calls you the emotional anchor of your family.  To your son Justin, you have always been there for him every day of his life.  Not just physically, but emotionally, spiritually and in the deepest sense of what it means to be a father.  Chance writes that you have always been our foundation.  And D'Lila and Jessie make clear that you taught us how to become great young women as we grow into adults.  And to your son Christian, you are the best father you could ever imagine.  Quincy writes, pops has always empowered us to be who we want to be.  Even your two year-old daughter, Love, when she hears your voice, she lights up.  It is clear how important you are to her sense of safety, happiness, and belonging.

Your sister Keisha, citing the wisdom of *Corinthians* and *Jeremiah*, notes this is a chance for renewal and redemption for you.  And we've heard a lot about that today.  She's right. The things that the women in this case talked about, it's happening all over this country.  Every day, every minute.  You have the power to help it stop.  The same power that enabled

PA3ACom6

you to hurt these women, you can use it to help others like them.  We all have voices, but you have a megaphone.

Keisha marks out the path that you can forge today even during the time you're in prison.  "Being a champion and uplifting our black and brown children and communities, reaffirming to them that they can be educated and through hard work be successful, and to help provide the tools and opportunities needed to build stronger communities."  That's what you set out to do from the beginning of your career, over three decades ago.  We saw a snapshot of that in the video.  But as you yourself said in your letter to me, you've lost your way.

But as your friend Karen Lindsey said, there is "a true path to redemption here."  You have the chance to not only recognize "what went wrong, but what can be made right."  You will have a chance to show your children and the world what real accountability, change, and healing can look like.  And I'm counting on you to make the most of your second chance.

With that, court is adjourned.

(Adjourned)

# EXHIBIT 9

July 14, 2025

Your Honor Judge Gujarati,

My name is Andrea Marz, and I am a longtime friend, former student, and professional colleague of Rachel Cherwitz. I currently work in the healing arts as a licensed massage therapist (LMT) and craniosacral therapist (CST), and have maintained a private practice for over a decade.

I have known Rachel for most of my life. We first met at a Texas summer camp 30 years ago when we were children, and later participated in youth group together as teenagers. We reconnected in 2009 while I was living in San Francisco attending massage school at the National Holistic Institute. Rachel introduced me to OneTaste, where I began attending events and workshops with her as my teacher. Eventually, I moved into residency in San Francisco and joined the first coaching program. Throughout my time at OneTaste, Rachel was both a trusted friend and mentor. She frequently traveled to Austin to support the OneTaste community I was leading, and later, I moved to New York to co-lead with Rachel there. During that time, we lived, worked, taught, and coached together. After I left the organization, our supportive and caring friendship has continued to this day.

I am aware that Rachel has been convicted of conspiracy to force labor.

Rachel is an exceptionally sensitive and empathetic person. She brings genuine presence and curiosity to her interactions, always seeking to meet people where they are. I witnessed her in countless exploratory sessions and follow-up conversations with students and clients, where she offered kindness, respect, and open-ended opportunities for growth, never pressure. In many staff calls and in-person team meetings that Rachel led, she made it a priority for everyone to check in with how they were feeling, and would not move forward until everyone felt present and included. She worked diligently to ensure that all team members felt supported, cared for, and empowered to ask for what they needed.

I was going through a very challenging time in my life—struggling with anxiety, feelings of inadequacy, and a deep sense of low self-worth. Each day felt like a battle, filled with intense panic and overwhelming dread. I didn't believe I was good at anything, and I questioned whether I'd ever be able to contribute to my community in a meaningful way when I could barely make it through the day.

I remember one evening, sitting at the kitchen table before dinner at the residency.  I was especially low that day. Rachel walked over to me and asked me to stand up on a chair. At that moment, the idea of standing—of being seen—felt daunting. But the way Rachel made the invitation, with such warmth and presence, made me feel safe, held, and gently encouraged. Her energy offered me a glimpse of levity, so I rose to the occasion.

Once I was standing on the chair, and the attention of the room turned toward me, Rachel acknowledged me for my brilliance. She gifted me a "remember to remember" necklace and

offered me a new role—as house manager of the residency. In that moment, she lifted my spirits and gave me a sense of purpose. She spoke with such confidence, as if to say, *of course* you are powerful and capable.

This is just one of many times Rachel gave me a chance to shine when I couldn't see my own light.

Rachel consistently encouraged self-care for both herself and those around her. We meditated together, practiced yoga, prepared meals, and cared for one another as true allies and confidantes. Rachel taught me about healthy boundaries and the importance of being clear and honest in saying no—reminding me that I could only be a true yes if I could be a no. This lesson has been invaluable to my personal and professional growth.

Rachel's presence and unwavering advocacy for my freedom, combined with OneTaste's practices—particularly Orgasmic Meditation (OM) and its underlying principles—supported a profound transformation in me. With their help, I was able to shift out of an old paradigm rooted in fear and gradually begin to recognize and unravel the limiting patterns and tendencies that had held me back. As I brought these unconscious habits into awareness, their grip on me began to loosen.

Over time, I discovered who I was beneath the masks I had worn—the identities I had constructed based on who I thought I should be. This peeling away of layers was not only liberating but also deeply spiritual. It brought me closer to God, and to the realization that at my core—beneath all the conditioning and internalized beliefs—I am free in love.

This taste of freedom has given me a profound sense of purpose. It inspired me to live from that place and to share that love with others.  Rachel is a steady example of someone who has experientially come to know this truth of beingness, in love and is living her life in service to it.

Rachel's belief in me and her unwavering support have had a lasting, positive impact on my life. Her kindness and genuine care continue to ripple outward, and I am deeply grateful to call her my friend.

Thank you for your time and consideration.

Respectfully,

Drea Marz

# EXHIBIT 10

Adam Secore
13746 Red Cedar Trail
Dallas, Texas 75248
November 3, 2025
Judge Gujarati
Re: Rachel Cherwitz Pelletier

Dear Honorable Gujarati,

I am reaching out to you as a close friend of Rachel Cherwitz Pelletier, who is currently appearing before your court. Having known Rachel for over 35 years, I can confidently speak to her character and integrity.

Rachel has always been someone who looks out for others with genuine care and kindness. From childhood to the present, she has remained steadfast in her compassion and loyalty, maintaining meaningful relationships and showing deep concern for the well-being of those around her. While her career path may be unconventional, I can assure Your Honor that Rachel's values and intentions have always reflected honesty, integrity, and a sincere desire to help others.

Throughout the years, Rachel has consistently demonstrated a willingness to help others and an unwavering commitment to doing what is right. Her kindness is not performative, it's simply who she is. Whether through her personal relationships or her involvement in her community, she has been a steady and supportive presence for many.

In addition to being a business owner and having served on multiple boards of directors, I am currently completing my Master's degree in Marriage and Family Therapy with advanced clinical training in psychology. This work has given me an extensive understanding of human behavior and character, and from both personal experience and professional perspective, I can confidently say that Rachel embodies empathy, integrity, and emotional strength.

I understand that the circumstances bringing Rachel before the court may be complex. However, I respectfully ask that you take into consideration the full scope of her character and the many years she has spent as a compassionate, responsible, and ethical member of her community. While at times our actions can be perceived differently than we intend, I believe Rachel's consistent motivation has always been rooted in kindness and a sincere desire to support others. She is not only a dear friend but also someone who continually strives to grow, learn, and care for others in meaningful ways.

Thank you for taking the time to read this letter and consider my perspective. Please do not hesitate to contact me if I can provide any additional insight.

With respect and gratitude,

Adam Secore

# EXHIBIT 11

Nov 9, 2025

To The Honorable Judge,

My name is Lissa A. Boileau, MSN, PMHNP-BC, and I am a board-certified psychiatric nurse practitioner. I work in the field of mental health, supporting individuals with complex trauma, substance use disorders, and psychiatric illness. My professional background also includes working as a registered nurse in level-one trauma centers, addiction recovery programs, and outpatient psychiatric settings. I am a mother of three, a survivor of childhood sexual trauma, the daughter of a mother who struggled with alcoholism and died in a tragic accident in 2015, and a father who suffered from heroin addiction and died from ALS in 2011. I also survived domestic abuse, religious trauma, and multiple episodes of suicidality. I write to you today concerning my dear friend, Rachel Cherwitz, who I am aware has been convicted of forced labor conspiracy.

When I encountered the work of OneTaste and Orgasmic Meditation in early 2016, I was not just seeking something new,  I was fighting for my life. It was in this context that I met Rachel Cherwitz, and over the course of the next two years, she became one of the most pivotal mentors in my recovery and growth.

Initially, given my history, Rachel suggested that I approach the coursework at OneTaste very slowly and deliberately. She held a firm, caring boundary (as I did not have many) and asked that I complete preliminary coursework on consent, boundaries, and personal agency before entering any of OneTaste's more advanced offerings. That guidance changed my life and eventually led to my creating a flourishing self-sustaining business, one rooted in integrity and purpose. Throughout that time, Rachel remained a steady anchor of truth, care, and accountability. While my early access to her was limited, I remember those first impressions very clearly. Rachel said more with her pauses than her words. In my eyes, her presence alone invited a level of honesty that very few people could hold. She saw through the noise and lovingly held the mirror up for myself and others.

Later on, I wanted to be more involved in the community and so I volunteered for courses and later joined the sales team for OneTaste. Rachel oversaw our team, and I learned more about integrity, communication, and purpose from her than I had from any manager or mentor in my nursing career. She modeled how to identify desire in another, how to coax it out and to make somebody the right offer for them, not for me. She trained me to speak with care, and offer our services only when it truly aligned with someone's deeper "yes." I always felt welcome to speak my mind around Rachel both personally and on the team.

While working for OneTaste, Rachel and I met weekly for mentoring conversations which were all about what I needed in order to succeed in my role and to make sure I cared for myself personally. From 2018 until now, we have kept in close contact. Our relationship has grown deeply since that first year and I count her amongst my best friends. Before she was incarcerated, we regularly shared personal phone calls, texts, and in-person contact for support during challenging times. In the past three years, and consistently throughout my graduate studies, Rachel and I remained in close communication. She walked with me through the complexities of being a single mother of three, working full-time as a director of nursing, while also pursuing a demanding master's degree. Her presence was a guiding force — helping me merge the clinical world of psychiatry with the spiritual principles that had helped save my life. Our friendship eventually evolved and now she is like family to me.

One memory that stands out was near the end of my graduate studies. I was grieving the sudden loss of both of my last living elders, overwhelmed by financial strain, and crushed by the weight of my responsibilities. I was ready to quit. Rachel sat with me in one of the darkest seasons of my life and helped me hold the pieces long enough to see the light return. Her words reminded me to trust that pain had meaning, and that I was worthy of support. I did not quit. I graduated because she believed in me when I could not believe in myself. Whenever I think of who I would want at my side in the hardest moments, Rachel is at the top of my list.

Rachel's integrity is not something I read about in theory. It is something I witnessed, consistently, in moments both small and large. She is the first person I ever heard speak plainly about power, pain, and accountability in the same sentence. She did not lead from superiority; she led from experience. Her belief in transformation, in turning suffering into service, continues to shape how I show up as a provider and healer today.

Another example of Rachel's integrity that lives vividly in my memory is the way she quietly supported our mutual friend Prayasi over the years. Prayasi endured profound grief following the loss of her father, alongside periods of housing instability and emotional hardship. Rachel, without ever seeking credit, continually checked in on her well-being, often reaching out to me privately to ensure someone had eyes on her mental and physical health.

It wasn't performative or driven by obligation. Rachel had exquisite attention to the people in her life. She noticed who was struggling, even when they didn't say it aloud. And she acted. With Rachel's encouragement, I was able to help Prayasi secure a stable job and find affordable housing. But the truth is, Rachel was the quiet force in the background, making sure no one fell through the cracks, reminding us of our interconnectedness.

Whether it was feeding someone who was hungry or sitting with someone in grief, Rachel showed up. Not because it was convenient. Not for applause. But because it was who she was.

Rachel's guidance was deeply spiritual for me. Through her, I found a renewed sense of meaning and connection, not just in my recovery but in my spiritual life as well. Her faith in transformation and healing helped restore my own faith in something greater than myself.

The Rachel I know sought liberation — for herself and others. And through her leadership, I and countless others began to remember that liberation is not a philosophy. It is a practice. It is work. And it is possible.

With deepest respect,

Lissa A. Boileau, MSN, PMHNP-BC

Psychiatric Nurse Practitioner

Mother, Trauma Survivor, Spiritual Practitioner

Ronkonkoma, NY

# EXHIBIT 12

Dear Judge Gujarati,

Ms. Rachel Cherwitz  served as a clinical liaison and behavioral tech for the Alternative Med Center. I was her direct supervisor. I was sincerely impressed with her hard work, sense of propriety, compassion and empathy for those suffering addiction as well as her outstanding productivity.  She was hard working and always available to move the team forward.

I also consider Ms. Cherwitz to be an honest and trustworthy person and she and I spend many hours together working with the mentally ill and those in the acute phase of addictive withdrawal. You get to know a person well under those conditions.  I have had the opportunity to observe her daily habits and routines and found her to be extremely organized as well as being an outstandingly considerate and jovial person to be around- even amidst some significantly stressful circumstances. Rachel has a kind heart and a keen mind and it is this combination of empathy and intuition that contributed to her consistently excelling at her position at ATMC.

In her capacity as Clinical Laison/Behavioral Tech she was often the diplomatic representation of the Alternative to Meds Center.  More often than not she was the first person that a perspective client in the throws of addiction encountered. Her job was quite diverse in that she needed to assume multiple roles and travel seamlessly between them for the survival and success of a patient.  Rachel was able to articulate the complex and complicated therapeutic techniques we employ, many of which involve exotic neuro-chemical detoxification treatments as well as cutting edge heavy metal chelation all of which are on the forefront of nutrition, addictionology and alternative medicine and at the same time be able to turn all that off and serve as an empathetic and unconditionally loving case worker to a person in profound distress.   In addition Ms Cherwitz provided needed succor and support to the often emotional parents and relatives of ATMC residents as well as assuaging the concerns of the various department heads on the clinical staff.   On one occasion we had a very difficult cluster b personality disorder in-house and Rachel sat with this person for 9 hours.

Rachel truly embodied what I feel it meant to be a behavioral health worker.  The most important ingredient is compassion, and that may just seem like a very surface statement, however observing her actions in a variety of situations she would endure an enormous amount of short-term pain to reap a positive result with our clients.  For example, sitting with someone who is suffering from bipolar disorder with delusional features is an exercise in patience if you are doing it for 15 minutes. Rachel would do it for hours and hours at a time.  In this way she inspired not just myself but all the members of the team who consistently acknowledged that she was uniquely suited to helping others. She spoke the language of the soft heart but did so with great ingenuity and discernment which helped even the most entrenched addicts show willingness to confront long sequestered emotions.

Serving on a clinical team of a licensed Drug, Alcohol and Prescription Medication Rehab with a mental health unit is not an easy task.  Rachel made it look easy.   Rachel has invariably touched the lives of hundreds of people who are struggling with the modern scourge of chemical dependency.  It is my sincere hope that this letter may aid in providing a positive testimony to her good character, her charitable motives and tendencies and consistent hard work in a job that most would have found unpalatable and even fewer able to do.

Please do not hesitate to contact me if I may be of further assistance if I can provide a more direct endorsement of Rachel.


Sincerely,


John D. Camillieri
(928) 399-0188
Program Director ATMC
3130 West St. Route 89A
Sedona, Arizona, 86336-4942

# EXHIBIT 13

July 21, 2025

Dear Judge Gujarati,

My name is Alison Stevens and I am a Project Management Professional living in San Diego. I have known Rachel Cherwitz for 17 years, since I was 23 years old. We met at the party of a mutual friend and got together for tea shortly after. I lived with her and worked with her on the OneTaste sales team from 2013 to 2018. We have remained friends ever since.

I am aware that Rachel has been convicted of conspiracy to force labor. I wish to share about the positive influence she has had on my life and what a good friend she has been to me.

Rachel saw my potential and mentored me into the woman I am today. As soon as I joined the company, I had lots of ideas about how to better structure and organize our sales processes. She backed me from the beginning, adopting and championing my ideas even when others were hesitant. I was so new and thought I knew everything, but she never embarrassed me when in my eagerness I made lots of mistakes. For example, early in my career I attempted to redesign the curriculum for our Men's Course. Its content ended up unfocused, trying to do too much at once, and resulted in dissatisfied customers. But she picked me up and dusted me off, and we learned and improved the class from there. She fostered an environment where anything was worth a try and gave me opportunities to express my uniqueness.

Once when we were living in New York, I woke up very sick but still wanted to show up to work at the Coaching Program we were facilitating that weekend. Rachel was my boss at the time and she insisted I stay home to take care of myself. My identity at the time was tied up in proving myself and earning my place, but she showed me I was valued for who I was not for what I produced.

I started working a 12-step program in 2013. I had a number of sponsors over the years and knowing that Rachel had extensive experience and training in the 12 steps, we did a round together with her as my sponsor in 2016. At the time, I was going through a break up and had discovered I was four months pregnant only after I miscarried. I wanted to look at my relationship patterns more deeply to understand how I had ended up there. It was one of the hardest seasons of my life and she showed up for me. She sat with me and listened. She treated the information she learned about me from that experience with the utmost care and confidence. Through her gentle curiosity and encouragement, I was able to look at the dysfunctional patterns in my life that weren't serving me. Rather than blaming my partner, and becoming embittered towards men in general, her love and

courage inspired me to keep my heart open. She taught me how to take responsibility for my mistakes and have compassion for others for theirs.

In the spirit of that day in New York when Rachel gave me the permission to rest that I wasn't giving myself, after my miscarriage she facilitated changes that supported my recovery. She saw to it that I was transferred to the New York office so I could live and work with my best friend Margot, which was exactly the support and nourishment I needed. She transferred me off of the fast-paced sales team and gave me a position as student coordinator for a year. She showed me there was always a place for me. She saw how it healed me to work closely with our students as they were in the midst of their journey. I thrived in that role and then all of a sudden, my appetite for sales returned and she made space for me on that team again with open arms.

Rachel's aim is and has always been love, and by human error has missed the mark at times. I have only seen her become more skillful and kind over time. Through her continuing education in mental health, I saw her commitment to helping others and getting the best training possible to do her job well. She improves the lives of those around her wherever she is, and I know society and my life is better with her in it.

I respectfully ask that you consider Rachel's true character and the impact she's had on my life as you determine her sentence.

Yours truly,

Alison Stevens

# EXHIBIT 14

**July 16, 2025**

To the Honorable Judge Gujarati,

My name is Cailin McDuff, and I was first introduced to Orgasmic Meditation in 2017. That same year, I met Rachel Cherwitz when I joined the OneTaste Coaching Program in New York City. I'm a transformational coach for women, and I have worked in the coaching and spirituality industry for 10 years.

I hold a master's degree in Education from Lehman College in the Bronx, NY, and I earned the Professional Certified Coach (PCC) credential through the International Coaching Federation. I served on the leadership team at Accomplishment Coaching—a coach training program—from 2016 to 2020, supporting the development of new coaches.

I am aware that Rachel has been convicted of conspiracy to force labor.

I began participating in OneTaste in June 2017. I started with several weekend courses, weekly practice meetings, and eventually began the Coaching Program in the fall of 2017. I was going to the OneTaste center for events, courses, or women's group meetings once or twice a week. I was part of the OneTaste Membership program from January 2018 through early 2019.  Membership was OneTaste's top level offering with limitless access to its events, programming, and coaching.

Throughout the entire time I was with OneTaste (and especially when the Coaching Program started), I had a close relationship with Rachel as a student. I saw her on average once a week and was receiving feedback from her in a smaller group (maybe 15 students for a weekly event) or a larger group (100 students for the coaching program, once a month on weekends). We also occasionally texted during that time. I knew that she was in touch with what I desired for my life and also saw what was in the way. I felt very supported by her.

When I came into One Taste and met Rachel, I had just received a multiple sclerosis diagnosis that felt crippling to me. I knew my body needed attention, having received this very loud health alarm bell. I was in a big transition moment in my life and had just left my full time job to run my coaching business. And while there was a lot of possibility, I was also in a period of needing to face the darkest parts within myself that I had been resisting my entire life. I had a tender desire to start feeling my body on a deeper level sexually. I also wanted more feeling and connection within myself, and I had no idea where to start.

Up until this point, I had a very fast paced life in New York City. I was proud of my career accomplishments, and I had overridden my body so many times in pursuit of career achievements or connection with men. In a job a few years prior, I remember staying up until all hours of the evening working on powerpoint decks just to get things "right" for my boss. I couldn't see how all of this stress across my life was impacting my body on a very real level, more and more each year. I thought I was "healthy," going to spinning classes, eating frozen Trader Joe's meals, and living a fast, young life.

Rachel was one of the first people in my life to be able to tell me the painful truths that I needed to hear. Nobody had ever been that brave. She told me that if I didn't learn to slow down, I was essentially going to face major consequences with my body. It was completely true. And she delivered that feedback with so much love and grace. That moment of truth with her has echoed through my life in every moment since then. I am now celebrating almost three years off of pharmaceutical drugs (which is rare!), have had no flare ups in five years, and I feel stronger and better than ever. I have been able to create the kind of sustainable life that truly supports and nourishes my body. I am so grateful Rachel could help me wake up to what I couldn't see in the beginning stages of my body healing journey.

In 2022, we transitioned to having a personal friendship. I was living in Southern California at the time, and so I was able to see her from time to time when she would come down to the area - for meals and connection. We kept in touch via text and talked on the phone every now and then.

In early 2023, I remember calling her when I was in a very difficult place in life - feeling like I had wedged myself into a hole in my relationship that I didn't know how to navigate. As she always did, she zoomed out very wide with me to look at my life and choices. And with so much love, curiosity, and generosity, she brought me back to seeing how I was the creator of my entire experience. Nothing was ever being done to me - I always had the power.

This conversation was years after I had been her student, and she generously gave her time and attention. And that's the kind of person Rachel is - showing up when it really matters to bring love and truth. I saw her be generous with women like this on many occasions, and she led the charge in elevating how women treat each other in the community.

I had taken other personal development courses prior to OneTaste, and Rachel was really the one that showed me a whole other level of responsibility and personal power.

She helped me connect responsibility not just to everyday worldly life, but on a much deeper spiritual level that was not previously a part of my awareness or spiritual practice. I started to see how my entire world and experience of life is created through the beliefs that I hold about myself and the world.

Personal responsibility is the main thread that has always run through my relationship with Rachel, and it is foundational to the work that I do with my clients to this day.

I always felt like I was in my own agency as a woman to make choices with Rachel and at OneTaste. Rachel taught me and the other women how to embody a clear "yes" or a clear "no." We went through many training exercises to learn how to hold our power and choice. It was central work to the work we did. I was able to go at my own pace and do what felt good for my body and my spiritual development.

I was approached for sales conversations on a number of occasions at OneTaste, and I always felt at liberty to say no. I said "no" most of the time to those conversations, and my "no" was respected. I also said yes to a few sales conversations where I chose to purchase nothing, and that was honored. When I felt ready to sign up for the membership program (a $60k investment), I told Rachel, and she was happy to have that conversation with me.

And I will never forget that sales conversation - it was one of the most expansive, liberating, and tender moments of my life.  Rachel was so happy to welcome me into the OneTaste Membership program, and she gave me something that is not usually included: ten days of an experience called "Restoration House" at a retreat center in Northern California. It was so incredibly generous of her. I was already a yes - and she wanted to bring in this extra offering, which is what my body really needed at the time.

And that opportunity of being completely held in Restoration House (by Rachel and the team) as I began to unravel the patterns inside of me was so incredibly nourishing. I was a woman who needed nourishment and slowness, and I had absolutely no idea how to give it to myself.

I would not be the woman I am today without everything I received from my relationship with Rachel and my experiences at OneTaste. I know who I am. I know what I want. Most importantly, I know how to nourish myself from a full cup. And now I teach women to have this kind of freedom in their bodies. It is the greatest gift of my life to carry this on.

My deepest hope is that Rachel is allowed to continue her work in the world. It is so needed.

Thank you.


Sincerely,

Cailin McDuff

# EXHIBIT 15

June 18, 2025

Dear Honorable Judge Gujarati,

My name is Marissa Ward, and I reside in Boca Raton, Florida. Currently, I am a Marriage and Family Therapist Intern at a faith-based organization that serves the homeless population here in Florida. Once I complete my graduate degree and supervised hours, I will take the exam to become a Licensed Marriage and Family Therapist (LMFT).

I understand that Rachel has been convicted of conspiracy to force labor. I've known Rachel Cherwitz since April 2014, when I first became an Orgasmic Meditation (OM) practitioner. I worked at a boutique investment bank at the time, and I was trying to figure out who I was and what I wanted for my life as I entered my mid-20s. I attended a lecture that Rachel gave in New York, and then I signed up for a one-day course that she was teaching. After that course, I became a student in Coaching Program 8 (CP8).

The lecture and one-day course Rachel led were about the concept of using "play" as a path to personal growth. My takeaway was that when we relate to life with curiosity and wonder, we can uncover new parts of ourselves and feel more fulfillment in our everyday world. These teachings resonated with me because, at the time, I did not like the life I had created for myself. Working at an investment bank and obsessing over my high school sweetheart did not make me feel fulfilled. I felt far from understanding myself, and I had no safe spaces to explore who I was or what my desires were. Rachel's teachings helped me discover that there was another way to create my life, one that I designed around my essence rather than material things or external validation. This realization was incredibly empowering, and it inspired me to take ownership of my autonomy and power as a woman. Since CP8's theme was also related to play, I signed up with no hesitation.

I always felt at choice and empowered as a woman at OneTaste. I moved at my own pace, which sometimes was fast (signing up for CP) and other times was slow (deciding to leave my job at the investment bank). Rachel was a huge proponent of that. I would watch her work with people and attune to their needs. Often this meant slowing people down to ensure they attune to their own needs, wants, and boundaries first. One example of when she did this with me was when I felt called to leadership within the community. One of the desires I wrote on my CP intake form was "to become Rachel Cherwitz's protégé." There was something about her presence that had me feel both safe and enlivened. I believe it was her willingness to be 100% herself, even though many saw her as "too intense" or "intimidating." I was also categorized in similar ways for most of my life, so I found it easy to relate to her. Rachel did not take my declaration lightly. Her response was, "Let's take it slow and get to know one another before we jump into a mentorship container." I was met with a similar response when I wanted to leave my job at the investment bank. I was encouraged to go slow so I felt ready for that sort of transition.

This is why I am reaching out on Rachel's behalf and sharing my personal experience of working with her for over four years (2015-2018). Once Rachel agreed to mentor me in sales

and teaching, I worked extremely closely with her. OneTaste New York hired me in January 2015, and I worked alongside Rachel almost every day until she departed from the company in June 2018. For much of that time, we worked together at various OneTaste Centers, and we lived together in communal staff housing in New York and San Francisco. I have had the opportunity to observe Rachel in various settings, including formal workspaces, informal living spaces, classroom settings, and casual women's groups. She brought the same level of heart to each environment, and she practiced what she preached in terms of her teachings. Any room Rachel was in was overflowing with play, generosity, integrity, compassion, and accountability. I was often in awe while watching her work with students. I remember one specific women's course where she created an experience for an exhausted single mother of two, putting her in a big comfy chair with cozy blankets and having the back-of-house volunteers bring her favorite type of tea and snacks. She wanted this woman to have the experience of care that she always gives to others, one weekend where she could be taken care of rather than being a caretaker. When we lived in the same city, we would spend entire days together working and practicing activities such as OM, yoga, reflective writing, and sitting meditation. Rachel taught me the power of these practices and the profound impact they could have on my life. I found that taking care of my body with OM and exercise helped relieve many of my depression symptoms, and that journaling and meditation helped me become more intimate with and accepting of my vast interior world. Rachel's approach to spirituality through practices helped me develop my foundation as a person, and it transformed my relationship with God, strengthening my faith.

Rachel was a brilliant salesperson and supervisor. When she trained me in sales, everything she taught was built on a foundation of resonance. She encouraged me to listen to what the customer was saying so I could meet them where they're at. Sometimes this meant offering an Intro to OM course, other times it meant offering a Coaching Program or Intensive, and sometimes it meant offering nothing at all, but encouraging them to attend our free community events, such as OM Circles or lectures. We had this one male student in an Intro to OM class who was very wealthy. He wanted to do an Intensive so he could work with Nicole Daedone, and Rachel strongly suggested he start with some intermediate level courses first. Rachel prioritized resonance over the dollar amount, and working with her taught me the art of focusing my attention on another human being to be of maximum service to their needs or wants.

With Rachel's training, I became a lead salesperson within one year and a lead teacher for advanced courses within two. When I was struggling with sales, I wasn't met with punishment but with genuine curiosity. She would take the time to understand why I wasn't meeting my deliverables and then work with me to get back on track. I recall an instance when I missed my sales goal for three consecutive weeks and felt very discouraged. It was like I hit a wall, and nothing I tried would work. After a lengthy discussion, Rachel suggested I could use more fun. Knowing my love of musical theater, she arranged for me and my fiancé at the time to see Kinky Boots on Broadway. The tickets were paid for, and the impromptu time off from work was not an issue.

Over the years, our relationship evolved from mentor and mentee to peers to friends. Rachel is genuinely one of the most caring and generous people I know. I grew up with severe and

chronic asthma, and one weekend, I got sick before I was supposed to teach a OneTaste Desire course in New York. I was prepared to teach, even though I wasn't feeling well, not because anyone told me to, but because it was important to me. Rachel, who was my supervisor at the time, told me, "Absolutely not." She encouraged me to call my mother and ask her to bring me a nebulizer machine from my childhood home in Queens to help with my respiratory issues. Rachel then proceeded to make me my favorite homemade soup before heading out to cover my Desire course. While she was teaching, she texted me throughout the day to check on how I was feeling and ask if I needed anything. This is the kind of human being Rachel Cherwitz is: generous and compassionate.

On another occasion, my insecurities stopped me from being supportive toward a member of my sales team. They closed someone for an Intro to OM on a day that I made no sales, and I tried to take the credit for it. I am not proud of this moment, especially since I was the team lead. When Rachel noticed that I claimed a sale I didn't make, she sat with me to talk about what happened. She encouraged me to take responsibility for my actions and apologize to my colleague. She also reminded me of the immense support I received when I was first learning sales, and the importance of paying that forward. After I sat with our conversation, I came to my own conclusion that the way I acted that evening was not the woman I want to be. I apologized to my colleague, who was gracious and receptive. I also became a more supportive colleague and friend toward her and other members of my team as a result. This is the kind of human being Rachel Cherwitz is: committed to integrity and accountability.

Rachel's guidance has also helped me evolve spiritually. When I would stay up late to work, Rachel called me out on that. She helped me identify that I work late not just to prove my worth, but to distract myself from my emotions. Rachel taught me how to turn towards and feel my emotions instead of running away from them. She taught me how to stay present with myself through contemplative practices like reflective writing and meditation. When I would try to change myself in relationships with men to feel more worthy of their love, Rachel helped me identify where that habit first started. She taught me how to recognize and celebrate my value so I didn't turn to men for comfort or external validation. These insights helped me shift unhealthy patterns in my work and relating, which have truly changed my life for the better.

Rachel is a huge part of the reason I am the loving, attentive, compassionate, bold, and authentic woman I am today. Over the last 11 years of knowing Rachel, she's helped me grow into myself and taught me refinement along the way, something she was only able to do because of what she experienced and learned throughout her own path. She taught me how to love all parts of myself, including my emotions, which I had previously suppressed and ignored. She helped me realize my gifts for working with people and guiding them through life's challenging times, which eventually inspired me to return to school for a degree in Marriage and Family Therapy. Rachel's teachings didn't just foster professional or emotional growth; they helped me deepen my spiritual life and reconnect with a sense of meaning and faith. She has been a force of good in my life throughout the 11 years I've known her. She is committed to taking personal responsibility and using her challenges as an opportunity for growth. I hope my

letter helps provide a more complete picture of her character and that you will consider this before sentencing in September.

Sincerely,

Marissa Ward

# EXHIBIT 16

Dear Judge Gujarati,

When I come to Free Food, I'm in a good mood because I feel like I'm doing something honorable. And Rachel is like that. She's a nice, kind person. She always says hello. When people need help, she gives her undivided attention, and listens to what people have to say. People come in with different burdens and different issues and we all need somebody with a smiling face, or even to give them a bottle of water.

Rachel has that spirit, that kind spirit that I admire. I feel that when you do something like this, in the end, we will be rewarded. Not in the physical, but in the spiritual, we will be rewarded for the kindness we do for others, for not thinking of ourselves all the time, because we all have to go through ups and downs in life.

The program is excellent. This is a good program. One day I came, and I continued coming. I was over 2 years ago. I didn't know anybody there. Now people ask me to save me a seat at my table for them.

I love Free Food, if I have an appointment that I would make me miss coming, I try to move my appointment around so it doesn't interrupt me coming. I met Rachel probably 2 years ago when she volunteered and I started coming here. She was very kind. She told me to come back and I didn't have to do anything, just sit and have dinner. We will serve you she said.

There should be more people like Rachel. We would have a better world to live in if you have more people like her. She has a good spirit. And I gravitated to that good spirit. You have to be born with that good strength, nobody can train you for that.

Sincerely,

Novelette Gordon

# EXHIBIT 17

Case 1:23-cr-00146-DG-RML    Document 473-1    Filed 11/20/25    Page 202 of 231
PageID #: 16320

## M Gmail

## Ops Team

**Dana Gill** <dgvegan@gmail.com>                                      Sun, Apr 22, 2012 at 11:42 PM
To: Aubrey Fuller <aubsauce@gmail.com>

Hi Guys,

I've been thinking for the last few weeks about where I'm going and what I'm doing, and how I want to plug in and help out at OneTaste. I've been missing being involved, and the Ops Team keeps popping up for me. I have my job, so I might not be able to help out with every event, but I would love to be on the team and help out as often as possible. What do you think?

Cheers,
Dana



**Margaret Pixley**
July 13, 2013



DEFENSE EXHIBIT

**13AN**

23-CR-146 (DG)

I'm so full of awe and gratitude that my heart is bursting. Halfway through CP6, and I'm living the life of my dreams. I am surrounded by friends who are way-seekers and world-changers. They love me unapologetically despite their ability to see straight through to my core. I am deeply rooted in purpose. In getting to know myself more deeply than years of self-searching had opened for me. I made the move from San Francisco that my heart had been longing for for years. I'm learning the greatness that I am capable of. I have been given the skills to self-monitor such that I see when my energy is misdirected. The new goal is to be turned on and hit flow. I can see clearly the things in myself that would have to shift so I can have my life and relationships however I want. I'm responsible for everything in my world to the degree that even when I feel victimized I can see myself as the author of that. I'm learning to be the woman I am destined to be - or rather: I am her already. She's getting polished and brought to the surface with this work. I can think of no better gift than that.

👍 Maya Block, Aubrey Anne Fuller and 10 others          2 Comments   Seen by 63

👍 Like                                  💬 Comment



**Alia Al-Yafi** Gorgeous.

5y · Like



⊘ **Amy Jones** Not despite seeing straight through to your core, BECAUSE they see straight through to your core. It's not rotten in there, lady. You are good as gold.

 3

5y · Like

 Write a comment...

DefenseProd00015303

DEFENSE EXHIBIT
13K
23-CR-146 (DG)



**Max Pixley**
September 11, 2013 · New York, NY · 👥

· · ·

When work is play: Jet setting to San Francisco to support over one hundred people go deeper into their orgasm!



👍❤️ Joanna Van Vleck, Robert Kandell and 52 others                    11 Comments

 Like                              💬 Comment

DefenseProd00003930

11/21/2018    Case 1:23-cr-00146-DG-RML    Document 473-1    Filed 11/20/25    Page 205 of 231
OneTaste Mail - I love yous
PageID #: 16323

ONETASTE

Rachel Cherwitz <rachel.cherwitz-disabled@onetaste.us>

## I love yous

**Becky Uma** <becky.uma@onetaste.us>                                                                Fri, Dec 13, 2013 at 9:22 AM
To: Rachel Cherwitz <rachel.cherwitz@onetaste.us>, Eli Block <eli.block@onetaste.us>, Kim Howerton
<kim.howerton@onetaste.us>, Hamza Tayeb <hamza.tayeb@onetaste.us>, Ruwan Meepagala <rmeepagala@gmail.com>,
Chelsea Hunter <chelseahuntress@gmail.com>, Ayries Blanck <Ayries.Blanck@gmail.com>, Johanna wechsler
<josiewechsler@mac.com>, Rafael Martinez <rafael.martinez@onetaste.us>, margaritapixley@gmail.com, Emunah
Malinovitz <livinaslove@gmail.com>, Pooja Lakshmin <plakshmin@gmail.com>, ravi408@gmail.com

Ayries,

What you said when we were saying goodbye touched something in me. You're right. We were just starting to become
closer. I'm so grateful to you for remaining an open channel when we were wading in difficult waters like jealousy or fear
of not being accepted. Your magic and your love flow out of you so freely it's gorgeous to be around. You're friendship
teaches me every day to let go and be vulnerable and connectable. I have a strong desire to stay connected to you and
not let the distance change what we've built. Because it's beautiful. I love you.

Chelsea,

Our connection continues to show me the best of what female friendship can be. We can be loving and soft, fierce and
biting, silly and serious, jealous and vulnerable, wild and dependable. You've truly touched my life forever because you
showed me that I can believe in magic, mine and other people's. Especially yours. It's a bigger gift than I think you even
know. Thank you for using your sword with me that day on the roof. Thank you for dancing the Harlem shake and
stripteasing on the subway. There's no end to the gratitude and love I have for you and I have no fear of losing an ounce
of what we have. You're my family and family is forever. I love you so thoroughly, so damn much.

Eli,

The minute you came in you took on the role of a protector, a guide, a path clearer. You made it your business to make
sure everyone's talents were being brought out fully, to improve anything in place that needed a revamp, to coach out
everyone's master. You tried so hard to figure out our part-time schedules… You even approved and laughed with us
when we tried to run away on our mushroom trip. It's evident how much you care about the success of everyone around
you. I want to say that I'm especially grateful for your strokes in the conversation about addiction and recovery. Aaaand I'll
never listen to Kelly Clarkson or Lorde or Miguel without thinking of you. I'm glad we get to see each other once a month. I
love you.

Emunah,

Your love is like a warm, fuzzy, soft, plush, thick, luxurious blanket. I just want to be wrapped in it all the time. I remember
the time I came down to your room and cuddled up with you and we just talked about anything and everything. You're
approval incarnate. The amount of pure, unfiltered, straight-from-the-source love you have in your body is extraordinary. It
beams out of you. It comes out in the prayers you say, the ceremonies you hold, the food you cook, the hard truths you
tell. I feel privileged to be in your life. I love you very much.

DEFENSE EXHIBIT
21AZ
23-CR-146 (DG)

DefenseProd00014268

Hamza,

Let's be honest. I fell in love with you right away. You showed me what being real and revealing can actually look like. Your beasty check-ins where you just laid everything out on the table and said exactly what was going on with you gave me permission to show myself fully. I somehow didn't try to hide how much pleasure and pain there was in your strokes. You touched that spot that was so far back and so sensitive it was like a game of operation to find it. That's your brilliance. I don't care how good you are at programming. You were put here to see people and electrocute them until they learn to alchemize. I'm going to miss you a lot. I love you.

Johanna,

I don't know how you did it but you have become one of the people in my life who I would protect and defend against all odds. With your sweetness and honesty and vulnerability and willingness to be exactly who you are you wiggled right into my heart. You have taught me how to love and revere the feminine, in other people and in myself. And that is such a gift to me and to everyone around you. I care so much about you and I will not abandon you girl! I'm right here, not going anywhere! So let's stay connected, ok? Deal. I love you.

Kim,

I remember when you first called me Beckers. I felt like I had won the lottery. Your love feels that good. Getting the chance to live with you, to snuggle up next to you at night, to go on crazy adventures and try to accomplish nearly nonsensical tasks with you being funny and sharp the whole way through – it is a privilege that I am grateful for. You're so quiet about all the work you do behind the scenes, but you don't fool me. You're among the hardest working and most devoted of anyone. Thank you for taking me in. Thank you for all the strokes you've given me. I love you so much.

Pixley,

God, I love you. You really feel like a sister. One that I also like to grope. We fight, we cry, we love, we hate, we yell, we kick, we go up, we go down, we laugh, we cuddle, we sing. I feel so grateful that you came into my life. At every turn you've challenged me to be bigger, to be stronger, more powerful. You have the power to do that with everyone who crosses your path. It's your gift. The way we said goodbye in New York was so perfect. A backwards, legs splayed, awkward, sexy, sweet, tender hug. It's us all over. I would defend our friendship to the death. I love you.

Pooja,

I remember one women's group when you came in just as you were. Soft and raw and unfiltered. Seeing you be open gave me and everyone who was there permission to do the same. I remember it actually being a huge shift in how I interacted with the world. You gave me permission to be free. I feel honored to have gotten the chance to see you in all your brilliance. Living with you I got to see the work you do, the deep excavation. And then you go out into the world and you're this bright beacon of sweetness and knowledge and love. It's inspiring to everyone around you, and no question it's inspiring to me. I'll miss you and I love you.

Rachel,

I remember the first time we officially met. You walked into Reflections Yoga with your narrow, dark red glasses on and your straight dark hair. You introduced yourself and I felt the power wafting off of you. There were so many moments between then and now. Of all the people in my life you often shine the brightest in my memories. All the hugs, all the cries, all the spats, all the ridiculous jokes. It's been a welcome challenge and a deep privilege. Thank you for believing in me

DefenseProd00014269

and caring for me like your own cub. The amount I've changed over the time I've known you is huge and it's thanks in large part to your willingness to keep me in your brood, grabbing me by the scruff of the neck, grooming me. You're my family. I love you.

Rafael,

You are literally capable of the impossible. You can pack two cars' worth of stuff into one trunk. You can be on the bomb squad and remain calm. You can set up a room of chairs with machine-like precision. You can receive strokes and keep moving. You can drive in Manhattan traffic. You can take a fledgling city and nurture it until it flourishes. You can love and be loved with passion and tenderness and truth. You're not of this earth, Raf. You're special. Thank you for being such a powerful friend to me for so long now. You know how I feel about you. It's all been said and I'll keep saying it. I love you.

Ravi,

You're one of the people in my life I'd do just about anything for. The kind of trust I have with you is one that can only be built on a history of turmoil and passion, fear and forgiveness, and an immense amount of love and tenderness. Yours is one of the closest male friendships I've had. You came out of nowhere and you approved of me and fuck it Ravi you touched something deep in there. You're a master at seeing people and a master at telling the truth. I'm lucky to have been on the receiving end. I'm always here. Never far. I love you.

Ruwan,

I liked you the moment I met you at that weird CRS studio with its florescent lighting and cold chairs. You were simultaneously so reserved and eager. I never expected to become so close and I'm very grateful we did. I can think of so many times you've absolutely saved my ass with a well timed joke or an offering of your arm to gnaw on. You sometimes pretend your love is light and fluffy but I'm lucky to say I know you and I know how deep and powerful it is. You're one of those people who will succeed in whatever he tries and I look to you for inspiration. I love you.

Summer,

Girl, I am going to miss you. In the short time we have lived together you managed to strike a cord in me that had wanted to be played. In a world where we would probably be competitors we became friends and loving allies to each other. You and I know what it's like to live out in a world where intimacy is not the primary goal. The way you've made yourself open and available makes me like you so much. You're like a book that when you open it you can't stop reading. I'll miss you, and you know I'm not really going anywhere. I love you.

DefenseProd00014270

 **Gmail**

Aubrey Fuller <aubsauce@gmail.com>

# Rachel's birthday

**Aubrey Fuller** <aubsauce@gmail.com>                                      Fri, Apr 4, 2014 at 8:23 AM

Rachel's birthday

Natalie
I met Rachel as Racheli, at my first Ynow ingroup, where I arrived as Hamza's girlfriend who everyone had heard about, since he had come in before me. And we were doing a round about desire and I said something dissipated and witty hoping to look like I was cool and Racheli stopped me and gave me that pierce-into-your-soul look and told me I'm so glad you're here, you can bring it out here, and I melted and knew I would stay. Later she and rob offered us 6 sessions of free coaching and they would just sit there and laugh at me and hamza cuz we were so serious and tortured. she took me through my first thick layer in an extended resentment inventory. She said you just keep writing till you're done. So I wrote for two months and came with 81 pages all on hamza. And she had me read it and we laughed and she loved me in the worst places, the places where others had left and so I tried to cover them up, but with her the more shadow I showed the more connected we got.  And I've seen her teach through so many different phases with grace, and I've seen her cry and crack open with grace and I've seen her love me and fight for me with so much fierceness it makes me want to cry how deep in here you are Rachel. Happy birthday ❤❤❤

Marcus
I remember I sat down for my first coaching session with Rachel. It was in the blue room, her and rob across from me on those weird tall-backed yellow chairs.  I'm not sure if I started talking or if Rachel just started talking but she took me, literally took my entire system in to hers.
And when she did it something deep in my soul rested. I remember this way that wherever I went - to other countries or yoga classes or a church or whatever - in the back of my mind mostly unconscious I'd be carrying on a search, for what I'd now describe as power and a deep meaning that I could give myself to. And in that moment with her I felt it and I said to her, "thank you. I am so glad I found you."
Rachel was my white rabbit, she introduced me to Orgasm and took me deep in to this world. I would not be here without her.

Casey
A few months ago when I was right on the edge of taking a new level of responsibility with Orgasm, Rachel was teasing me in the kitchen at 1080 saying "don't get too close I might ignite your purpose." And, like, it's totally true. When I met Rachel in Austin like a year and a half ago she had the guts and the love to speak directly to my master. I would be very unhappy and isolated if I didn't meet Rach and recieve the magic that is her attention and her fierce fierce love. Thank you Rachel I love you and the pole you hold very very much. 💗💗💗💗💗💗💗💗💗💗💗

Sasha
Rach-
I am grateful for the way that you have loved me over the last give years deeply and concretely and simply and with deep approval for me and my gifts to the world. Even the deepest parts that I think no one saw, you reach underneath and see me. And in this magical way you let me see and feel you, sometimes without meaning to but it feels like a magical gift to love you and see the tenderness and depth of you. I am grateful for how you fiercely continue to remember who I am and remind me countless times what came here for. I am a better teacher, coach, and woman because of the ways we touch each other. Thank you.

Amy
I remember I had been around for a few times before I met Rachel. She came up to me after a lecture that was part of the intimate life series.  Her intensity and directness slowed me, slowed the whole interaction. I remember sitting on

the bench in the back of the room at 1074 and Rachel touching her forearm in this slow deliberate way that made time stop. I was immediately entranced and curious as I got this visceral transmission of who she was as she asked me "what do you want?"

**Eli**
Rachel. I am going to keep this simple. There are very very few people I have met in my life who have shown so much dedication, conviction and surrender to waking up the way you do. I am in constant awe of the way you are able to alchemize and transmute in your life and you've walked the talk since the first day I met you. I love you and you are one of my dearest friends. E

**Aubrey**
I was going to wait for the call but I'll say mine now.

When I came to OneTaste and met you, you were one of the coolest people I had ever seen and I fell in love with you. Your orgasm and your wild untamed fierceness were the thing that brought me back again and again because they called forth my own orgasm and my own beast. Over the years my love has grown and shifted for you. It's big and varied and it especially finds and envelopes the parts of you that you think are unlovable. I have deep gratitude for who you are and all that you have done for me in my life. You are among the six people who have most deeply influenced the course of my life and who I am and I'm glad for that.

**Justine**
Good morning Team!!! Happy Birthday RC!!!! ❤️😍❤️. Though there were many times before, I think my first solid memory of you is in the warehouse and you practicing flogging for the first time on Jim 🐵 (GoldFinger!). Oh my god so many crazy memories from that warehouse. Who could have imagined we would make it to where we are today. You teach me a lot and have helped me grow so much. Feels like you are a true sis. Love you RC. 😘

**Rachael**
It's true. We had reports of you from the road before you arrived. I remember you walked in with your shaved head. And your what ever I don't care attitude. You stayed downstairs durning in group. I remember when you arrived Nicole said - I've been waiting for you. Welcome.

**Hamza**
I remember the first time I tried to escape, I said in a group I was "completing a phase." And Rach turned to me and said, "when you said that I felt this deep heartbreak. You have crawled into my heart in a way that is rare." Then I remember in the coaching she and Rob did with Natalie and I, I finally felt there was someone who could handle us. Then in one of the sessions, after hearing enough about my behaviors, in the most delicate, precise, loving way possible, she said, "I think you might be a drug addict." It slipped deep into me, past all my immune responses like a key into a lock. She held me with love so many times before and after getting sober. More recently, she has taught me how to stroke, how to penetrate, how to hold. And I have seen her grow in new ways and continue to do a tremendous amount of work for her freedom and the freedom of others. Rach, you saved my life. I trust you down to my core with every cell, and I love you so much. I'm so grateful you are in my life, deep mentor and friend. Happy birthday 💖

**Henry**
Back in the day I put her in my phone as Rawchili (-i've always been a bad speller).  And been loving her from afar as she circumnavigates my predator.  I look forward to getting inside her one day (metaphorically 😉) and have infinite warm patience garnered from microseconds of unshielded witnessing. I only hope she enjoys when I ask her to OM as much as I enjoy it.

**Lianna**
Rach 💖 you have been with me since the beginning of my journey. You have been unwavering approval for me, throughout my journey. And even when I was stuck in a whole and I didn't think I could do it, you knew I could. Thank

you. And happy birthday my love.

Billy
To Rachel,
   I don't know how I could've gotten as far in this thing if wasn't for your willingness to truly give me the truth every step of the way. I have transformed every step of the way on all levels with your guidance. To that horrible first om where I was seething anger towards Vinay to just last week landing a stroke about my volcanic orgasm during demo training. I love trusting how much I trust you. And just how much your willing to say the thing for another's freedom  and I wouldn't not be the person I am today if it wasn't for those places of freedom that you gave me and continue to do so.

Dana Levine
Rachel - I remember a moment during my first exploratory after the winter retreat. You were offering me a coaching package, and I was going back and forth on whether I wanted it. You said something along the lines of, "now I think you're a lovely person, but maybe this isn't right for you." At the moment, I assumed that you were just trying to sell me some shit, and would say what it took. But I later realized that you were coming from a place of deep approval for where I was, and only wanted for me what I could have for myself...

Marc Quinn
Rachel I wanna say about MY exploratory. I remember when you were like "no you can just give a deposit now" and I was having some feelings about it and I stopped and said "I guess if I do this the game starts now" and you shouted down the phone "Oh my God I love you" and I remember thinking "oh wow...this woman knows how to play, I need to do this, all I wanna do is learn how to play" and I felt myself totally trust you in that moment. The trust has remained strong and steady ever since and I would follow you into whatever world you were to enter. Happy birthday xx

Leah M
Rachel, happy birthday!! I remember I decided to get coaching from you when somebody in OTP called you "the queen of darkness."  Your clean, clear attention that cut through all my fog had it so that you could reach me in places nobody had before.  The place that Knows.  You woke up my woman that knows.  You are generous and work very hard to give other women what we have.  Thank you thank you thank you.

Jessica
RachO you went to sleep. But I got one more for you, for your big birthday day. It's not over. So lady. Like most of the rest of 'em, you are the reason I signed up for CP. From that moment in  the Austin com course when you told me I fogged Keith. And I was like, someone cut through my fog! I feel so seen! No one had ever done that before. And my yes was just so clear after that. And then w shared our attraction to stupid Lev (we not done with him of course!) who became this funny bridge between us. And now I work under your wing. And what you are ultimately teaching me about is intimacy. I've never been loved with such ferocity Rachel. This week leading up to Casey and me teaching HTO, I felt like I died under your stroking. And it was what needed to die so that my first chair could truly emerge. You teach me that leadership is a service, a deep deep act of loving. And that was the place that your knife revealed so I could love people in that class on Saturday. You are deep in my heart. And I love you a lot. Happy Birthday.

# EXHIBIT 18

Images haven't loaded yet. Please exit printing, wait for images to load, and try to print again.



**Hamza Tayeb**  Follow

Jul 9, 2018 · 5 min read

When the Bloomberg article about OneTaste came out, immediately I became involved in many conversations, mostly with other former members. The reactions have been extremely mixed, as is to be expected when it comes to a polarizing subject like this, and one that is in my opinion very difficult to talk about.

Some people have made a case to me that Nicole is unfairly maligned by the construal of my story in particular. I don't agree with that, but nonetheless, I wanted to take this opportunity to add some additional context that pertains to my own section —

> *For some committed OMers, the experience became even more complicated and bizarre. Hamza Tayeb, 33, was part of OneTaste for about a decade. He started working for it to leave behind an uninspiring Bay Area software job, he says. He also felt tied down by his young son, born while he was still in college. Daedone heard Tayeb's story and said the mother's choice to have the child shouldn't dictate his choices. She absolved him of responsibility toward his son, he says: "I thought, I'm not going to hear that from anywhere else." He started teaching courses and eventually married Cherwitz. One-Taste says Daedone never told members to separate from their families.*

The first obvious thing to clear up is that I wasn't persuaded by Nicole to shirk my family reponsibilities. I was in that orientation already. The biggest mistake I've ever made in my life was when I made a decision that I wasn't going to be active as a father in my son's life. I regret it all the time, and I work now to repair the damage done by that mistake, to the extent I can.

My story involves a young pregnancy. At the time, I was not supportive of the decision my son's mother made to go through with it. I fought, argued, resisted, ran, hid—tried everything to get away from the profound life transformation of becoming a parent. I felt that I wasn't ready, that I was "trapped". All of this predates my involvement with OneTaste, *and* provided motivational grounds for my involvement in the first place.

But you can't stop life from changing, and mine did anyway, many times over during the time period of my early 20s. One of those changes was when my son was born, and another was joining OneTaste and letting go of so much of what had characterized my prior life, including real involvement in my son's life.

Nicole certainly has some views that are controversial and counter-intuitive. I don't agree with all her views, but most of us don't agree with most people's views. The fact is, she said what she said to me, and I think she believed it, and believed her reasons for it were sound, and I don't attribute malice to her. At the time, I couldn't have agreed with her more. Though she gave me what I now regard as bad parenting advice, **she is absolutely not responsible for my failures as a parent. I am.**

Further, what she said to me about my particular case doesn't translate into some blanket callousness about children in general, or a denial of the need to take care of those for whom one has responsibility. I heard her affirm these values over and over in other contexts, and encourage other parents to attend to their children even more than they already were.



This is only speculation, but I believe that part of her calculus was knowing that my son had an attentive step-father, and that he would be well cared for despite my absence. Had that part of the situation been different, there's no telling if she would have made a different determination. My gut tells me she would have, for whatever that is worth.

I do think there are serious questions about influence, authority, and persuasion that problematize this picture. I had many other reasons I was impressed by Nicole, and I certainly weighted her opinion higher than the average person's. There was also at least a potential conflict of interest: Nicole had more to gain by me being a devotee than by encouraging me to be a regular dad in society.

But in the final analysis, it was just her opinion, and it was presented by her as such—not as an order, a mandate, or even a request. I took it to heart because I was already motivated to. I wanted to hear it. That isn't her fault.

I mention this aspect in my story because it was such a powerful motivator for me to hear someone I respected so much give me what felt like her blessing not to focus on fatherhood in my life—a decision I already wanted to make anyway. Frankly, it is an aspect of my story that shows the egg on my own face more than hers, and rightly so in my opinion. Crappy beliefs and a lack of good priorities *should* bring embarrassment, especially when they help an innocent to lose out in a significant way. In OneTaste, I found a place where my bad ideas and irresponsibility about fatherhood were being enabled by people, all the way to the top, even at the same time as many positive values were being instilled in me in other contexts.

To leave that out in the process of bringing so many other things to light is disingenous. So, I consider this aspect of my story more *mea culpa* than *caveat emptor.*

.   .   .

Questions like these are complex and multi-faceted. There is no easy way out of the many philosophical and moral problems raised by the events described in the Bloomberg piece.

If there is anything I hold against the article, it is that it seemed to attribute more coercive power to Nicole and her institution than is really there in my opinion. When I reflect on the pain I feel in connection with my OneTaste experiences, it is as soft, mirror-like and subtle as heartbreak. The shape of the wound constantly points the onus back to my own failed utopian dreams—the ways I made Nicole my personal savior. The disappointment of a promised land lost.

Did her words and actions feed that? Yes.
Did I participate and wish for it? Yes.

Whether or not we might conclude that people like me were in some way *unfairly* led to make these choices—an idea that resonates with me in many cases—we still made them. In my opinion, the exchanges of power

and consent within OneTaste were more akin to something like BDSM than a totalitarian system. Failing to grapple with that is unproductive and misleading. People can still get hurt in a consensual relationship, and acknowledging that doesn't excuse or condone anything.

Just because there are no easy answers in this doesn't mean there aren't more and less satisfactory ones. Coming up with those answers—while continuing to ask deeper and better questions—is long, difficult work. It is also healing work. The press isn't going to do that for us, nor is any leader, though they both might help point the way. It is up to us.

*Photo by Iswanto Arif on Unsplash.*

# EXHIBIT 21

Michael Pelletier

1619 Sedgefield Dr

Murrells Inlet, SC 29576

mpelletier99@gmail.com

508-813-5195

Re: Character Reference for Mrs. Rachel Cherwitz Pelletier

Dear Judge Gujarati,

My name is Michael Pelletier and I am the father of Matthew Pelletier, Rachel's husband. I'm writing simply to share my own experience of Rachel as a person and as part of our family.

Although I didn't know her when the events in question took place, I've come to know her over the past few years through family visits and time together. Rachel has always been kind, polite, and respectful with me and with others. She carries herself with calmness and thoughtfulness, and she treats people with genuine care.

She is a motivated teacher and a licensed therapist who has dedicated herself to helping others. I've heard her speak about the work she does and the many people she has supported in making positive changes in their lives. From what I've seen, she approaches that work — and life in general — with compassion and integrity.

I understand the seriousness of this situation and don't intend to minimize it in any way. My purpose is only to share my own perspective. In the time I've known her, Rachel has shown herself to be a decent, considerate person and a caring daughter-in-law.

Thank you for taking the time to consider my observations as part of your deliberations.

Respectfully,

*Michael Pelletier*

Michael Pelletier

# EXHIBIT 22

Dear Judge Gujarati,

With over twenty years in addiction services, I urge leniency in sentencing Rachel Cherwitz. Incarcerating her would devastate New York's most vulnerable communities.

I first witnessed Rachel's dedication at an On Point outreach event for active drug users on 126th Street. Her organization provided free food and holistic healthcare to marginalized individuals — and Rachel was there, personally ensuring those society overlooks received critical support. Her commitment to people battling addiction and homelessness was unmistakable.

Rachel's groundbreaking work, including her writings "The Art of Addiction," centers on recognizing the inherent strengths of people navigating addiction. She uniquely blends this philosophy with hands-on compassion, serving individuals often deemed "untouchables" and breaking stigma through relentless care. In my career, I've rarely seen someone with her expertise and willingness to lead at the grassroots level.

Removing Rachel punishes our community:

• It deprives vulnerable individuals of essential support and advocacy

• It silences a leader who delivers tangible hope to those in crisis

Her work is a lifeline. We need her strength-based approach in our neighborhoods. I implore you to allow her to continue this irreplaceable service.

Respectfully,

Dimitri Mugianis

Founder of CARDEA

212 920 9702

Dimitri@cardea.net

# EXHIBIT 23

Chat Window opened on 2015-09-17 12:47:21
12:47:21 Rachel Cherwitz: Reese's birthday today
12:48:23 Eli Block: REESE
13:03:16 Kenan: Happy birthday Reese!
13:16:54 Marcus ⬛⬛: A graphic of where attendants came from for the original OMX! (the larger the bubble, the higher the # of attendees)  (Attachment: (Messages Image(1341737578).png))
13:16:59 Joanna Van vleck: That's amazing!!!!!!
13:17:03 Joanna Van vleck: I ❤ data
13:18:49 Marcus ⬛⬛: Yea! Except the bubbles for India, Saudi Arabia and S. Africa are disproportionately big!! i think i was just excited people were coming from there
13:20:42 Rafael: Lol
13:20:48 Rafael: I was gonna say!
13:30:08 Hamza Tayeb: Haha
13:30:44 Hamza Tayeb: Witchcraft and Sorcery is a capital offense in Saudi Arabia
13:30:51 Hamza Tayeb: No joke
13:33:46 Rafael: Woah
13:34:54 Hamza Tayeb: No Saudi Arabia magic school! ⬛⬛⬛⬛⬛⬛
13:40:34 Rafael: Which is funny that one of the oldest traditions is numbers and probability based.
14:21:50 Rachel Cherwitz: In other news. Hamza's debt is totally paid off
14:22:02 Rafael: Fuck yea!!
14:22:26 Marc ⬛⬛: Woo!! Tell me your secret!!
14:22:27 Maya Gilbert: YAH!!!
14:23:42 +447854560066: So good!
14:24:14 Marcus ⬛⬛: Alright!!!
14:27:40 Yia⬛⬛: Landed in NYC!
14:27:46 Yia⬛⬛: Yea Hamza!!!!
14:28:05 Rafael: Yea!
10:36:24 Marcus ⬛⬛: Hi friends!! I am en route now to a weekend camping with my brother in Yosemite. I feel excited to be in nature and spend some time with my brother, a little scared as I let go enough to go camping, and grateful I get to know myself so deeply!! Jesus from running turn on and payment collections to camping!! I love you all very much! Have an amazing weekend making the monies and rocking CP10
10:36:58 Rachel Cherwitz: Enjoy Marcus! that's wonderful
10:37:20 Maya Gilbert: Brotha❤⬛⬛
10:41:29 Yia⬛⬛: Have fun!!!
11:14:50 +447854560066: Camping!! Have a wonderful time Marcus
12:40:15 Ravi Agrawal: ⬛⬛
13:59:16 Rachel Cherwitz:  (Attachment: (IMG_5029.JPG))
13:59:18 Rachel Cherwitz: Did you guys see this?
14:00:38 Maya Gilbert: Oh geez
14:00:39 Joanna Van vleck: They don't have enough votes to get it through congress!!
14:00:40 Joanna Van vleck: It won't happen!!
14:00:50 Aubrey Fuller: It's in Utah only so far I think but there's a lot of political weight pushing to kill it right now all over the country
14:01:01 Rachel Cherwitz: We need to do a big 4th dimension push to shift that
14:01:19 Aubrey Fuller: Yes I'm in
14:01:45 Rachel Cherwitz: Let's all do a set 15min meditation for the rest of the weekend to shift it
14:02:25 Maya Gilbert: Yes
14:07:45 Ravi Agrawal: Yes
14:09:47 Chris Kosley: A very hard right faction of the GOP has been maneuvering toward this for a couple months. There is a possibility that this small faction, combined with a few hard-right Senators with force a government shutdown in an attempt to "force" Obama to approve a budget that defunds PP (something Obama has clearly said will never happen). Most Republican legislators know that forcing a gov't shutdown over this would be a political disaster for the GOP so many are actually working to avoid that as well. The best way to help will be to make sure that in November 2016 we elect whatever DEMOCRAT is running for office, whether it's Hilary Clinton or Bernie Sanders. Until then, the Obama administration has promised not to let this political theatre on the part of the GOP have any affect

of PP's funding so it's not likely to happen on his President Obama's watch.
14:11:36 Yia███: Ok Chris!
14:12:34 Rachel Cherwitz: Ok!!
14:12:38 Rachel Cherwitz: We do both
14:12:50 Chris Kosley: By all means!
14:19:14 Aubrey Fuller: Thanks for covering the explanation of the masculine side that feels good. That's what I thought was happening
14:19:50 Ravi Agrawal: Both
14:20:32 Kenan: Perfect

# EXHIBIT 24

# EXHIBIT 25

# EXHIBIT 26
# (Media Exhibit)

# EXHIBIT 27
# (Media Exhibit)