

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF/NCG/SMF  *271 Cadman Plaza East*
F. #2018R01401  *Brooklyn, New York 11201*

January 7, 2026

<u>By ECF</u>

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Nicole Daedone
     <u>Criminal Docket No. 23-146 (DG)</u>

Dear Judge Gujarati:

  The government, pursuant to the Court's January 2, 2026 Order, respectfully submits this letter in response to the defendant Nicole Daedone's opposition, <u>see</u> ECF No. 488 ("Opp."), to the government's motion for a forfeiture money judgment in the above-captioned case. <u>See</u> ECF No 481. Daedone's opposition rests on a fundamental mischaracterization of criminal forfeiture. She treats forfeiture as a narrow, discretionary remedy and she repeatedly urges the Court to segregate OneTaste's operations into legitimate and illegitimate components, as if forfeiture requires a victim-by-victim forensic accounting. <u>See</u> Opp. at 2. That approach is incompatible with the statutory scheme Congress enacted for forced labor offenses and settled forfeiture principles in the Second Circuit.

  Following Daedone's conviction for forced labor conspiracy, forfeiture under 18 U.S.C. § 1594(d) is mandatory upon a showing by a preponderance of the evidence that the property sought: (i) constitutes or is derived from "proceeds" obtained directly or indirectly from the offense; or (ii) was used or intended to be used to "commit or facilitate" the offense. Fed. R. Crim. P. 32.2(b)(1). The record satisfies that standard. The $12 million Daedone received from the sale of OneTaste represents: (i) property "constituting or derived from" proceeds Daedone obtained "directly or indirectly" as a result of the forced labor conspiracy; and (ii) property traceable to property used to "commit or to facilitate" the forced labor conspiracy. <u>See</u> 18 U.S.C. § 1594(d); Fed. R. Crim. P. 32.2(b)(1)(A).

  Ultimately, Daedone's effort to cabin forfeiture to the facts necessary to sustain her conviction is legally wrong. <u>See</u> Opp. at 5. Because forfeiture is part of sentencing, the Court may consider the full trial record and make forfeiture findings by a preponderance of the evidence. Fed. R. Crim. P. 32.2(b)(1). Nothing in Rule 32.2 limits forfeiture to the narrowest

construction of the verdict; rather, the question is whether the government has shown the requisite nexus and amount by a preponderance of the evidence.

I.  Forfeiture Money Judgments are Authorized and Mandatory

Daedone first asserts that forfeiture money judgments are not authorized by 18 U.S.C. § 1594(d). See Opp. at 2-3. She expressly acknowledges, however, that binding Second Circuit precedent forecloses this argument and raises it solely to preserve the issue for appeal. Id. at 3 n.1. Indeed, the Second Circuit expressly overruled the one within-district case to which Daedone cites, and Daedone's out-of-circuit authority is beside the point in light of binding Second Circuit law. See United States v. Awad, 598 F.3d 76, 79 & n.5 (2d Cir. 2010) (overturning United States v. Surgent, No. 04-CR-364 (JG), 2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009), and holding that forfeiture money judgments are mandatory and need not be traced to identifiable assets in a defendant's possession at the time the forfeiture order is issued). Nothing in Section 1594(d) limits forfeiture to specific property or excludes money judgments. Rather, the statute mandates forfeiture of tainted property without regard to its current form. Once the requisite nexus is established, the Court has no discretion to decline forfeiture. See United States v. Hwa, No. 18-CR-538 (MKB), 2023 WL 4194002, at *1 (E.D.N.Y. Mar. 24, 2023), aff'd 161 F.4th 127 (2d Cir. 2025).

II.  The $12 Million Sale Proceeds Constitute Forfeitable Proceeds of the Forced Labor Conspiracy

Daedone's repeated invocation of "legitimate revenue" misapprehends what the government seeks. The government is not asking the Court to forfeit a generalized stream of operating revenue divorced from the offense. The government seeks forfeiture of the discrete $12 million value Daedone realized in selling OneTaste—a value the evidence shows was obtained, directly or indirectly, as a result of the forced labor conspiracy and by liquidation of property used to commit and facilitate that conspiracy. Section 1594 targets proceeds and facilitating property precisely to prevent offenders, like Daedone, from monetizing assets built, maintained, or made saleable through exploitation.

A.  OneTaste Was Property Used to Facilitate the Conspiracy, and the Sale Proceeds are Traceable to Facilitating Property

As described in the government's forfeiture submission, a forfeiture money judgment in the amount of $12 million is warranted because the OneTaste corporate entity was the vehicle that Daedone used to commit and facilitate the forced labor conspiracy. See ECF No. 481 at 8-9.

Daedone's opposition attempts to treat "property" as limited to tangible items and to suggest that a business cannot be a forfeitable instrumentality. See Opp. at 6. But Section 1594 reaches "any property, real or personal . . . ." That phrase is intentionally broad and encompasses intangible property interests. See, e.g., United States v. Torres, 703 F.3d 194, 200-01 (2d Cir. 2012); see also 21 U.S.C. § 853(b)(2). A closely held company is property, and a defendant's ownership interest in it, just like an ownership interest in real property, is an intangible property right that can be forfeited. Where a corporate entity itself is used as the

2

vehicle for the offense, forfeiture reaches the defendant's interest in that corporate asset and the value realized upon its sale.  See United States v. Seher, 562 F.3d 1344, 1369 (11th Cir. 2009) (affirming forfeiture of business inventory that made it easier to commit the offense conduct); United States v. Rivera, 884 F.2d 544, 546-47 (11th Cir. 1989) (affirming forfeiture of entire horse breeding business that facilitated the offense conduct); In re 650 Fifth Ave. & Related Props., 777 F. Supp. 2d 529, 567 (S.D.N.Y. 2011) (forfeiting partnership); United States v. Gjeli, No. 13-421 (GJP), 2019 WL 8373425, at *7 (E.D. Pa. Nov. 25, 2019) (ordering forfeiture of liquor license).  The statute's breadth is designed to prevent sophisticated offenders from immunizing facilitating assets by packaging them in corporate form.

Thus, where the facilitating property is an asset sold, the sale proceeds traceable to that facilitating property are forfeitable.  And facilitation does not require that every aspect of the asset be illegitimate; it requires that the property made the crime easier to commit, served as the vehicle of the offense, or enabled its execution.  See, e.g., United States v. Sabhnani, 566 F. Supp. 2d 148, 152-53 (E.D.N.Y. 2008) (defining facilitating property in the context of Section 1594 as "any property that makes the crime easier to commit or harder to detect"), aff'd, 599 F.3d 215 (2d Cir. 2010); United States v. Pilitz, No. 17-CR-53 (JS), 2023 WL 3602877, at *14 (E.D.N.Y. May 23, 2023) (defining facilitating property); United States v. Schlesinger, 396 F. Supp. 2d 267, 272 (E.D.N.Y. 2005) (noting that "[f]acilitation, as basis for forfeiture, occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance") (quoting United States v. Wyly, 193 F.3d 289, 302 (5th Cir. 1999)).

The government's initial motion already explains why OneTaste fits squarely within that category: it provided the corporate structure, identity, premises and financial infrastructure through which Daedone recruited victims, compelled and coerced labor, and monetized her victims' work.  Put simply, it was the instrumentality of the offense.  See ECF No. 481 at 8-9; cf. Seher, 562 F.3d at 1369.

That distinction is also why Daedone's reliance on United States v. James, 151 F.4th 28 (2d Cir. 2025) is misguided.  Daedone relies heavily on James to argue that the Court must "tailor" forfeiture to "ill-gotten gains" and cannot order forfeiture of an entire business' revenues when some revenue was legitimate.  See Opp. at 4.  That reliance is misplaced for four reasons.

First, James addressed a different statutory forfeiture scheme and a different factual problem.  In James, forfeiture was imposed under the federal health care fraud forfeiture provision where forfeiture is limited to proceeds traceable to the commission of a federal healthcare offense.  151 F.4th at 47.  Thus, James did not account for forfeiture of facilitating property.  Likewise, in James, the appellate record included affirmative evidence, which the government did not dispute, that substantial revenue was derived from legitimate claims, with a defense expert quantifying the tainted portion at roughly 20 percent.  Id. at 47-48.  As Daedone recognizes, the Second Circuit faulted the district court for failing to calculate the percentage of claims tainted by fraud and for including "revenue derived from completely legitimate sources."  See Opp. at 4.

That is not the case here.  The government is not seeking forfeiture of a mix of legitimate and illegitimate discrete billings where the record affirmatively established a

3

substantial legitimate subset that the government conceded. Rather, the government seeks forfeiture based on the liquidation of a single asset—the $12 million sale of OneTaste—where the record supports that OneTaste's survival was materially driven by coerced labor and exploitation.

Second, James turned on the absence of a "permeated with fraud" finding by the district court and the presence of record evidence of legitimate revenue. Here, by contrast, the trial record ties OneTaste's valuation and marketability to coerced labor, uncompensated and/or grossly underpaid work, and investor-related exploitation that sustained its operations. See, e.g., Tr. 3303-04; 3310; 3314; 3321-26; 3336-37; 3347-48; 3379-80; 3413; GX 856; GX 1283-D-R; GX 1331-A-R; GX 1332-A-R; GX 2200. Nothing in James or in Section 1594 suggests that a defendant may deduct expenses incurred to operate a corporate entity used to commit or facilitate a forced labor conspiracy. Cf. United States v. Gladden, 78 F.4th 1232, 1251 (11th Cir. 2023) (nothing that while some forfeiture statutes allow credit for lawful services, others do not).

Third, even accepting James's insistence on excluding demonstrably legitimate revenue, forfeiture is still appropriate because the government's facilitation theory independently supports forfeiture of the OneTaste sale proceeds as traceable to property "used to commit or facilitate" the forced labor conspiracy. In other words, James does not foreclose forfeiture of an asset that was itself the vehicle of the crime; James addressed a revenue-calculation defect in a purely proceeds-based forfeiture context. Accepting Daedone's theory in this context would lead to absurd results: courts routinely order forfeiture of, inter alia, mobile phones, vehicles and real property used to facilitate criminal schemes—even though such property invariably has lawful uses and may be acquired or maintained in part with legitimate funds—because facilitation turns on whether the property made the crime easier to commit, not whether the property was capable of lawful use.

Finally, to the extent James stands for anything relevant here, it is that courts must ground forfeiture in record evidence and articulate a legally permissible methodology. The government has done exactly that here: it has identified the statutory bases for forfeiture, anchored its "but-for" nexus and enterprise-value theory in extensive trial citations, and explained why strict tracing and net-profit accounting are not required. Unlike James, where the district court offered little explanation despite acknowledged legitimate revenue, this case presents a supported forfeiture rationale rooted in the trial record and the nature of the asset sold.

Daedone asserts that the government has impermissibly changed its theory by arguing at forfeiture that the entire sale price is tainted after focusing at trial on particular victims. Opp. at 2-3. That claim conflates distinct legal inquiries. The government's burden at trial was to prove the elements of forced labor conspiracy beyond a reasonable doubt. Its burden at the forfeiture phase is to show, by a preponderance, that the proceeds Daedone obtained are traceable to or derived from that conspiracy. There is no inconsistency between those positions. Nothing in Rule 32.2 or Section 1594(d) requires the government to prove that every employee was coerced or that each dollar of value was directly generated by forced labor. It is sufficient to show that the conspiracy materially contributed to the corporate asset's operations and valuation. See United States v. Guess, No. 10-CR-145, 2015 WL 1208882, at *2 (W.D.N.C. Mar. 17, 2015) (citing cases); United States v. Milton, No. 21-CR-478 (ER), 2024 WL 779210, at *5-6 (S.D.N.Y. Feb. 26, 2024); United States v. Park, 825 F. Supp. 2d 644, 648 (D. Md. 2011) (if a

4

business would not have been solvent "but for the infusion of illegally-obtained funds, the entire business may be subject to forfeiture as the proceeds of the offense" and all of the assets of the business may be subject to forfeiture); United States v. Warshak, 631 F.3d 266, 329-30 (6th Cir. 2010) (all proceeds of defendant's business are forfeitable because the business was "permeated with fraud;" but even if a part of the business was legitimate, the proceeds of that part are nevertheless forfeitable if the legitimate side of the business would not exist but for the "fraudulent beginnings" of the entire operation); United States v. Jankowski, No. 23-1404, 2024 WL 4554690, at *8 (6th Cir. Oct. 23, 2024) (affirming forfeiture of corporate entities' total revenue because those corporate entities were "a vehicle to commit fraud"). The record meets that standard.

Daedone attempts to narrow this showing by emphasizing that only a subset of witnesses testified to coercion and by asserting that the jury found only a "single instance" of unlawful labor. Opp. at 4-5. This argument misconstrues both the verdict and the forfeiture inquiry. The jury convicted Daedone of forced labor conspiracy—an offense encompassing a pattern of conduct. For forfeiture purposes, the Court—not the jury—determines the scope of forfeitable property by a preponderance of the evidence and may rely on the entire trial record, not limited by the minimum facts necessary to sustain the conviction. Fed. R. Crim. P. 32.2(b)(1)(B).

  B. <u>The Sale Proceeds Represent Proceeds Constituting or Derived from the Forced Labor Conspiracy</u>

Daedone insists that the government has offered only "sweeping and conclusory statements," <u>see</u> Opp. at 2, and has failed to "connect the dots" between the forced labor conspiracy and the $12 million sale proceeds. <u>See id.</u> at 3. That is incorrect. The government's filing ties OneTaste's valuation and ability to command a $12 million sale price to specific evidence adduced at trial showing that coerced and underpaid labor reduced operating costs and inflated apparent profitability, while investor-focused exploitation generated capital that sustained operations.

Most notably, as the government explained in its opening motion, the evidence established that absent the conspiracy OneTaste would have been in dire financial straits, and that the $12 million sale price reflected the market valuation of an enterprise whose apparent profitability and brand strength were the product of coerced labor and exploitation. Contrary to Daedone's assertions, this is not "rank speculation," <u>see</u> Opp. at 3, nor does forfeiture require a dollar-for-dollar tracing of each coerced act to each sale dollar. <u>See</u> <u>Guess</u>, 2015 WL 1208882, at *2; <u>Milton</u>, 2024 WL 779210, at *5-6.

Forfeiture reaches any property a defendant would not have obtained "but for" the offense conduct. <u>United States v. Grant</u>, No. 05-CR-1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008); <u>United States v. Kenner</u>, 443 F. Supp. 3d 354, 363 (E.D.N.Y. 2020). Where the offense conduct is integral to a corporate entity's ability to generate the value ultimately realized in a sale, forfeiture does not require artificial parsing of "clean" versus "tainted" revenue streams. The question is whether the property would not have been obtained, directly or indirectly, but for the offense and whether the nexus is established by a

5

preponderance. See United States v. Peters, 732 F.3d 93, 101-02 (2d Cir. 2013) (proceeds include receipts).

   Daedone's effort to minimize evidence in the record—by pointing out that "only three" witnesses testified about being handlers for Reese Jones and that they consented to do so, Opp. at 2-3—does not address the forfeiture question. The relevant inquiry is not whether any particular witness used the word "compelled" in describing an investor relationship; it is whether the conspiracy's coerced or underpaid labor and exploitation materially sustained OneTaste's operations and valuation such that Daedone would not have obtained the $12 million "but for" the offense. The record supports that conclusion. Importantly, Robert Kandell, OneTaste's co-founder and chief operating officer, testified at length about how Reese Jones's investments in OneTaste kept it solvent, and that the provision of coerced sexual services to him were instrumental to facilitating his investments in OneTaste. See, e.g., Tr. 3314-15; 3321-23; 3326-27; 3328-29; 3332; GX 1004; GX 1010; GX 1013. Indeed, at a time when OneTaste's financial condition was "challenged," Tr. 3332, Reese Jones's cash infusions were crucial. Id. And, at the times that Jones was making these investments, he was being handled by various women working for OneTaste. Tr. 3333. These women testified at length to being coerced and compelled to provide that sexual labor to Jones. See Tr. 846; 1014; 1077; 1095-97; 1270; 1294; 1297; 1299; 1300-01; 2318; 2402; 2404; 2407; 3271-72; 3313; GX 2148-D. OneTaste only became profitable following Jones's investments. Tr. 3347. Indeed, Kandell described Jones as "key to [OneTaste's] expansion and [its] growth." Tr. 3380. Other witnesses, including Christopher Hubbard, testified that Daedone explicitly told them that Jones would "bank roll OneTaste." Tr. 846. Thus, the evidence supports the inference that Jones's capital—secured and maintained through coercive conduct tied to the conspiracy—materially enabled OneTaste's continued operations and growth, and thereby contributed to value realized in its $12 million sale.

   The government's submission grounds its claim in evidence adduced at trial, including testimony that: (i) victims were compelled to act as "handlers" for an investor whose capital sustained early expansion and (ii) those coerced practices generated investment capital that sustained operations and enabled the company to eventually command a multi-million-dollar sale price. This is not "rank speculation." It is a permissible inference from trial evidence, corroborated by OneTaste's co-founder and chief operating officer, about how the business stayed afloat and built value, which was ultimately liquidated for Daedone's sole benefit.

   In addition, continuing into the post-Reese Jones era of OneTaste, victims were compelled to work long hours without pay, pressured to perform services under threat of psychological, economic and reputational harm, and forced into a system that substituted spiritual rhetoric for fair compensation. Tr. 1691-92; 2350; 2425-26; 2107; 2137; 2164; 2419; 3289; 3964; GX 2030-D; GX 856. This coerced labor reduced OneTaste's operating costs, allowed the company to expand rapidly and gave the false appearance of financial success that directly enhanced its market value at the time of the sale. See Tr. 3417; GX 1544; 4501-D-D. Daedone's and her co-conspirators' exploitation of their victims contributed to OneTaste eventually securing additional investment funding and allowed OneTaste to expand and project the financial viability that made it attractive to potential buyers. As a result, the proceeds of the sale of OneTaste that Daedone received are directly traceable to the offense conduct.

Daedone's effort to cabin forfeiture to the employment dates of particular testifying witnesses misapprehends both the nature of conspiracy and the way a corporate asset's value is created. The forced labor conspiracy spanned over a decade and shaped OneTaste's operating model, cost structure, brand identity and investor relationships—features that persisted well beyond the tenure of any individual victim and directly informed the company's ultimate valuation. A corporation's value is not reset each time a particular worker leaves; it reflects the accumulated goodwill, infrastructure and apparent profitability of the business as a going concern. Thus, the fact that certain victims ceased working for OneTaste before 2014, or that some witnesses did not personally work at the company in the years immediately preceding the 2017 sale, does not sever the nexus between the conspiracy and the $12 million value Daedone ultimately realized. Section 1594 does not require the government to match forfeiture dollars to specific victims, employment periods, or discrete labor hours. It requires a showing—by a preponderance—that the property forfeited was obtained, directly or indirectly, as a result of the offense. The record supports that showing here.

Daedone further argues that the government's reliance on United States v. Peters, 732 F.3d 93 (2d Cir. 2013) is "inapt," contending that the Second Circuit's interpretation of "proceeds" as "receipts" was limited to the statute at issue there and that 18 U.S.C. § 1594(d) should be read to mean "profits." See Opp. at 3. But that argument would convert Section 1594(d)'s broad and mandatory forfeiture regime into a profits-accounting exercise that the statute does not prescribe.

The statutory text here is broad. Section 1594 mandates forfeiture of "any proceeds" obtained "directly or indirectly" from the offense, as well as property "constituting or derived from" those proceeds. Those terms are naturally read to reach gross value obtained from the offense, including sale proceeds of a business whose value was generated through the offense conduct. United States v. Afriyie, 929 F.3d 63, 73 (2d Cir. 2019) (forfeiture extends to the appreciation of tainted property). Consistent with that text, the government cited Peters for the straightforward point that forfeiture extends to "receipts" rather than simply "profits." 732 F.3d at 99.

Finally, even if Daedone were correct that "proceeds" could sometimes mean "profits" in some other statute, that would not change the outcome here because the government's forfeiture rests not only on proceeds but also on the independent facilitation theory set forth above.

III.    Daedone Is Not Entitled to an Evidentiary Hearing or Expert Discovery on Forfeiture Nexus

Daedone argues that the Court cannot "simply credit" the government's collapse/valuation showing without giving her an opportunity to present evidence, including "expert testimony." A hearing is not warranted where, as here, the alleged "disputes" are simply arguments about how the Court should weigh trial evidence or characterize the offense conduct. Rule 32.2(b)(1)(B) permits a hearing only when necessary to resolve a genuine, material factual dispute; it does not entitle a defendant to a second trial or expert-driven re-litigation of record facts. Absent such a showing, the Court may decide forfeiture on the trial record and any reliable additional evidence submitted. Here, the government has grounded its nexus showing in

7

trial testimony and exhibits. Nothing in Daedone's opposition identifies a genuine need for a separate evidentiary proceeding; instead, she seeks to relitigate and reweigh trial evidence in a manner inconsistent with Rule 32.2.

Daedone argues that she lacks notice of the government's forfeiture "methodology" and therefore seeks an evidentiary hearing and expert discovery. Opp. at 4-5. That claim is also unfounded: the government's methodology has been clear and consistent throughout this case: forfeiture of the gross proceeds Daedone obtained from selling a business whose value depended on a forced labor conspiracy, along with forfeiture of specific assets traceable to those proceeds. That theory was noticed in the indictment, see ECF No. 1, the bill of particulars, see ECF No. 40, and the government's forfeiture submission. See ECF No. 481. Rule 32.2 permits forfeiture determinations based on the trial record, and Daedone—who elected to have the Court decide forfeiture and stipulated to forfeiture of the seized assets if the Court were to impose a forfeiture money judgment—cannot now claim surprise or demand a second round of fact-finding.

IV.     The Forfeiture Sought is Not Unconstitutionally Excessive

Finally, Daedone contends that a $12 million forfeiture would be unconstitutionally excessive because it would impair her future livelihood. Opp. at 6–7. That argument misapplies United States v. Bajakajian, 524 U.S. 321 (1998), and United States v. Viloski, 814 F.3d 104 (2d Cir. 2016).

The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense," but it does not bar forfeiture that is proportionate to the gravity of the offense. Bajakajian, 524 U.S. at 328–34. The "touchstone" of the constitutional inquiry is proportionality: the amount forfeited must bear a relationship to the seriousness of the offense it is designed to punish. Id. at 334. In assessing proportionality, courts in this Circuit consider the non-exhaustive factors set forth in Viloski, including "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by defendant's conduct." 814 F.3d at 110. Application of those factors confirms that the $12 million forfeiture sought here passes constitutional muster.

First, the essence of Daedone's offense—a forced labor conspiracy—places it among the most serious non-violent federal crimes, implicating fundamental liberty interests and human dignity. Congress classified forced labor offenses in Chapter 77 and mandated forfeiture precisely because such crimes often generate significant financial benefit through exploitation. Daedone's conduct was not incidental or peripheral to the offense; she was convicted as a central participant in a conspiracy that used coercion, economic pressure, and psychological manipulation to extract labor for the benefit of the company she controlled. This is not a mere regulatory or technical violation but a crime whose gravity squarely supports forfeiture of the proceeds and facilitating property derived from it.

Second, Daedone falls squarely within the class of persons at whom Section 1594 was principally aimed. The forfeiture provisions of Chapter 77 are designed to strip traffickers

8

and exploiters of the economic gains and instrumentalities of forced labor. Daedone was not a minor or unwitting participant; she was OneTaste's co-founder and its CEO, and she personally realized $12 million from the sale of the business whose operations and valuation were sustained by the forced labor conspiracy. Forfeiture of that amount therefore directly advances Congress's purpose in enacting mandatory forfeiture for forced labor offenses.

Third, the forfeiture amount is proportionate when viewed against the harm caused by the offense. Forced labor conspiracy carries substantial maximum penalties, including lengthy terms of imprisonment and significant criminal fines, reflecting Congress's judgment about the seriousness of the offense. For an individual, the statutory maximum fine includes an alternative cap of twice the gross gain or twice the gross loss resulting from the offense, see 18 U.S.C. § 3571(d). The $12 million forfeiture thus falls well within the range of punishment Congress deemed appropriate for crimes of this nature. Moreover, the harm caused by Daedone's conduct extended well beyond economic loss, encompassing physical, psychological, reputational, and dignitary harms to victims whose labor was extracted through coercive means. Forfeiture of the value Daedone obtained from monetizing OneTaste is proportionate to both the scale of the harm and the benefit she derived.

Moreover, the forfeiture sought is directly pegged to the value Daedone obtained from the offense—$12 million in sale proceeds—and to the property she used to facilitate that offense. When forfeiture tracks the proceeds or value obtained from the criminal conduct or is directly linked to the instrumentality of that offense, it ordinarily bears the "relationship to the gravity of the offense" that Bajakajian requires, because it does no more than strip the economic benefit the offender extracted from the crime. See Hwa, 161 F.4th at 147-48.

Finally, although courts may consider the effect of forfeiture on a defendant's livelihood, Viloski, 814 F.3d at 113, that factor is not a veto, and it cannot justify allowing a defendant to retain property representing the value obtained from the offense. Forfeiture here is limited to property representing the value Daedone extracted from selling the company that facilitated and benefited from the forced labor conspiracy. The Constitution does not entitle a defendant to retain the proceeds or value of a corporate asset built and sustained through criminal conduct, nor does the potential impact on future earning capacity outweigh the government's strong interest in disgorging criminally derived gains. Under Bajakajian and Viloski, the $12 million forfeiture bears a direct and proportionate relationship to the gravity of the offense and therefore does not violate the Excessive Fines Clause.

V.      <u>Conclusion</u>

      For the foregoing reasons, the Court should enter the proposed Preliminary Order of Forfeiture, including a $12 million forfeiture money judgment and forfeiture of the seized assets, to be credited towards that judgment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
      Kaitlin T. Farrell
      Nina C. Gupta
      Sean M. Fern
      Assistant U.S. Attorneys
      (718) 254-7000